# Exhibit A

FILED
12-17-2018
Clerk of Circuit Court
Manitowoc County, WI
For Cf04GCV800561

| | | |
|---|---|---|
| **STATE OF WISCONSIN** | **CIRCUIT COURT** | **MANITOWOC COUNTY** |

ANDREW L COLBORN,

          Plaintiff,

   v.

                    Case No.

                    **SUMMONS**

NETFLIX, INC.

CHROME MEDIA, LLC

SYNTHESIS FILMS, LLC

LAURA RICCIARDI

MOIRA DEMOS

LISA NISHIMURA

ADAM DEL DEO

MARY MANHARDT

          Defendants.

THE STATE OF WISCONSIN, to each person named above as a Defendant:

You are hereby notified that the Plaintiff named above has filed a lawsuit or other legal action against you. The complaint, which is attached, states the nature and basis of the legal action.

Within 45 days of receiving this summons, you must respond with a written answer, as that term is used in chapter 802 of the Wisconsin Statutes, to the complaint. The court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to the Court, whose address is 1010 S. 8th Street, Manitowoc, WI 54220, and to Plaintiff's attorney, Griesbach Law Offices, LLC, whose address is PO Box 2047, Manitowoc, WI 54221-2047. For e-filing procedure, see https://www.wicourts.gov/ecourts/efilecircuit/rules.htm. You may have an attorney represent you.

If you do not provide a proper answer within 45 days, the Court may grant judgment against you for the award of money or other legal action requested in the complaint, and you may lose your right to object to anything that is or may be incorrect in the complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Electronically signed by:

Griesbach Law Offices, LLC
By: Attorney Michael C Griesbach
State Bar #01012799

Griesbach Law Offices, LLC
PO Box 2047
Manitowoc, WI 54221-2047
(920) 320-1358

FILED
12-17-2018
Clerk of Circuit Court
Manitowoc County, WI
For 2018CV000561

| | | |
|---|---|---|
| STATE OF WISCONSIN | CIRCUIT COURT | MANITOWOC COUNTY |

ANDREW L COLBORN,

                Plaintiff,

     v.

                          Case No.

NETFLIX, INC.

CHROME MEDIA, LLC

SYNTHESIS FILMS, LLC

LAURA RICCIARDI

MOIRA DEMOS

LISA NISHIMURA

ADAM DEL DEO

MARY MANHARDT

                Defendants.

**COMPLAINT**
(Civil Action)

---

Plaintiff, Andrew L Colborn, by and through his attorneys, Griesbach Law Offices, LLC, by Attorney Michael C Griesbach, alleges and states as follows:

### Statement of Facts

1.  Plaintiff, Andrew L Colborn, is a former Manitowoc County Sheriff's Office police officer. Plaintiff retired in March of 2018 after serving twenty-six years in public service. At no time during his employment at the Manitowoc County Sheriff's Office (hereinafter, MTSO) did plaintiff serve as a public official, as that term is defined in defamation law.

1

2.  Defendant Chrome Media, LLC is an independent film production company founded by defendants Laura Ricciardi and Moira Demos in 2006.

3.  Defendant Netflix, Inc. is an online distributor of original and syndicated television and movie content with an estimated 117 million subscribers worldwide.

4.  On October 31, 2005 twenty-five year old freelance photographer Teresa Halbach was brutally murdered at the Avery Salvage Yard in rural Manitowoc County, Wisconsin. Overwhelming physical and circumstantial evidence proves that Steven Avery and his sixteen year old nephew, Brendan Dassey, were the perpetrators of the crime. Neither plaintiff nor any other law enforcement officer planted evidence or in any other way attempted to frame Avery or Dassey for Halbach's murder. Separate juries returned guilty verdicts against each of them in 2007, and their convictions remain unreversed after numerous appeals.

5..  In 1985, two decades before murdering Halbach, Avery was wrongly convicted of physically and sexually assaulting a woman on a remote stretch of Lake Michigan shoreline in Manitowoc County. Avery served eighteen years of a thirty-two year prison sentence before DNA testing revealed that another man was the assailant. Under new leadership, the Manitowoc County District Attorney's office promptly stipulated to Avery's release.

6.  On December 18, 2015, defendant Netflix released for worldwide distribution a ten part documentary series entitled, "Making a Murderer" (hereinafter, MAM). The series purports to objectively and accurately recount Avery and Dassey's arrest and conviction for Halbach's murder. Within 35 days of its release, 19.3 million viewers had watched MAM worldwide. In a January 16, 2016 article, *Forbes* magazine columnist Paul Tassi described the program as "Netflix's most significant show ever." MAM has remained in the national and international spotlight since its debut with renewed interest upon the recent release of "Making a Murderer Part 2." The original series and its sequel continue to be marketed worldwide and remain available on Netflix for subscribers today.

7.  Defendants Ricciardi, Demos, Nishimura, and Del Deo are the executive producers of MAM. Defendants Manhardt and Demos are its editors. Defendant Netflix, Inc. is the film's distributor.

2

Defendant Chrome Media, LLC and Synthesis Films, LLC are independent film production companies owned by Ricciardi and Demos.

8.   Upon information and belief, each of the defendants, separately and severally, assisted in the creation, editing, production, distribution and marketing of the final version of the series, which was primarily filmed in the state of Wisconsin, and most extensively in Manitowoc County.

9.   MAM was and continues to be marketed as a non-fiction documentary. No disclaimer appears in any of the ten episodes notifying viewers that the series is anything but an actual and accurate portrayal of events. In news and entertainment media interviews since the program's release, defendants Ricciardi and Demos have repeatedly avowed that they were unbiased and objective in their re-telling of events, holding the film out as a non-fiction piece. MAM won 4 Emmy Awards, including "outstanding directing for nonfiction programming" and "outstanding writing for nonfiction programming." It also won the 2017 Cinema Eye Honors Award for "outstanding achievement in nonfiction films made for television."

10. At no time during plaintiff's employment at MTSO did he serve as a spokesperson for the department. Declining dozens of media requests for interviews, plaintiff has refrained from public comment and has in no other way injected himself into the controversy surrounding the Avery case and the release of MAM. As such, he is neither a "public figure" nor a "limited purpose public figure," as those terms are defined in defamation law.

11. Pertinent and significant aspects of MAM are not true as represented and are, instead, false and defamatory toward plaintiff and others. Material and significant facts known to the defendants were omitted and distorted. Despite overwhelming evidence proving Avery and Dassey's guilt and the utter absence of evidence supporting defendant's accusations of police misconduct, defendants falsely led viewers to the inescapable conclusion that plaintiff and others planted evidence to frame Avery for Halbach's murder. Defendants omitted, distorted, and falsified material and significant facts in an effort to portray plaintiff as a corrupt police officer who planted evidence to frame an innocent man. Defendants did so with actual malice and in order to make the film more profitable and more successful in the eyes of their peers, sacrificing and defaming the plaintiff's character and reputation in the process.

3

**Plaintiff's call to dispatch**

12. On November 3, 2005, Teresa Halbach's mother reported to the Calumet County Sheriff's Department that her daughter was missing. Police in Calumet County believed that Teresa's last known whereabouts were either at the George Zipperer residence or the Avery Salvage Yard, both located in Manitowoc County. Halbach had been assigned by her employer, Auto Trader Magazine, to take photos of vehicles that were for sale at each location on October 31, 2005, the last day she had been seen. Calumet County Officers requested assistance from MTSO since Halbach's last known whereabouts were in Manitowoc County.

13. On November 3, 2005, in response to Calumet County's request for assistance, plaintiff drove to the Avery Salvage Yard and the Zipperer residence to investigate Halbach's disappearance. Plaintiff called dispatch to confirm the make, model, and license plate number of the missing person's vehicle as he had done in hundreds of other cases during his career. Neither plaintiff nor any other police officer had contact with Halbach's vehicle on November 3rd or at any other time prior to November 5th, when it was discovered at the Avery Salvage Yard by a volunteer search party.

14. A central part of Avery's defense at trial was that plaintiff and other Manitowoc officers planted Halbach's SUV at the Avery Salvage Yard where Avery resided in a house trailer. With plaintiff on the stand, Avery's attorneys played portions of his call to dispatch in an effort to convince jurors that he came upon the SUV at an undisclosed location on November 3rd, two days before it was found at the salvage yard. Cross examining plaintiff about the contents of the call, Avery's attorneys suggested that plaintiff was looking directly at Halbach's vehicle when he called dispatch. The claim is entirely baseless and false, and defendants knew of its falsity.

15. A side by side comparison of the trial transcript with the scene as depicted in episode 5 of MAM reveals that defendants Ricciardi and Demo, in concert with other named defendants, heavily edited portions of plaintiff's testimony in order to manipulate viewers to falsely conclude that he and other officers planted Halbach's SUV at the salvage yard. Among other distortions, defendants removed plaintiff's affirmative answer to one question and inserted it as his answer to a separate question. At the

4

actual trial, the second question remained unanswered after the Court sustained an objection by the state.

MAM's rendition of the testimony is as follows:

Avery's Attorney: "Well, you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota?"

Plaintiff: "Yes."

In the actual trial, the Court sustained the state's objection, and defense counsel rephrased it as follows:

Avery's Attorney: "This call sounded like hundreds of other license plate or registration checks you have done through dispatch before?"

Plaintiff answered in the affirmative, "Yes."
Trial Transcript, Day 7, p 213

Defendants omitted the plaintiff's affirmative answer to the second question and inserted it into his non-answer to the first. Their manipulation of this crucial line of testimony falsely conveyed to viewers that plaintiff located Halbach's SUV somewhere other than at the salvage yard days earlier and likely assisted other law enforcement officers plant it there at a later time. The impression is false and gave to viewers the exact opposite impression of what plaintiff was asked and how he responded at trial.

16. Defendants Ricciardi and Demos in concert with other named defendants omitted additional trial testimony from plaintiff about the routine nature of his call to dispatch. When asked by the prosecutor on redirect examination: "Mr. Strang (defense counsel) asked whether or not it was common for you to check up on other agencies, or perhaps I'm–I'm mis-phrasing that, but when you are assisting another agency, do you commonly verify information that's provided by another agency?" Plaintiff answered: "All the time. I'm just trying to get -- you know, a lot of times when you are driving a car, you can't stop and take notes, so I'm trying to get things in my head. And by calling the dispatch center and running that plate again, it got it in my head who that vehicle belonged to and what type of vehicle that plate is associated with."

Trial Transcript, Day 7, p 213

MAM failed to include this exchange.

5

17. Defendants Ricciardi and Demos omitted from plaintiff's call to dispatch his words, "see if it comes back to [inaudible]." The phrase was included in the actual recording of the call as well as the recording played at trial. (Trial Trans, Day 7, p 181). Upon information and belief, defendants omitted the phrase because it supports a non-nefarious interpretation of the reason for plaintiff's call.

18. Defendants Ricciardi and Demos strategically spliced "reaction" shots of plaintiff appearing nervous and apprehensive at trial into other portions of his testimony where he did not appear nervous or apprehensive in fact. The edits were part of defendants' overall attempt to manipulate viewers to falsely conclude that plaintiff and other Manitowoc County officers planted Halbach's SUV at the salvage yard. MAM, Episode 5.

19. Upon information and belief, defendants Ricciardi and Demos filmed the entire trial and were aware of the full line of questioning concerning plaintiff's call to dispatch, as well as its significance. With malicious intent, defendants chose to fabricate plaintiff's testimony by splicing and omitting those portions that were not consistent with their misleading and false account of the facts. In truth, plaintiff did not discover Halbach's SUV at another location and help others plant it on Avery's property. MAM's aspersions that he did are false and have caused irreparable harm to his reputation worldwide.

20. In order to enhance the significance of plaintiff's alleged off-sight discovery and subsequent planting of Halbach's vehicle, defendants manipulated facts to convince viewers that MTSO officers, possibly including the plaintiff, secreted Avery's blood from a vial still kept in evidence from his wrongful conviction case, and planted it in Halbach's car. Defendants dramatically re-enacted the vial's "discovery" in the Clerk's office by accompanying one of Avery's lawyers to film the retrieval of the vial. MAM Episode 4 contains a close-up shot of the blood vial with a small hole on top of its rubber stopper while Avery's attorneys rejoice in a "gotcha" moment. In truth, a hole in a blood vial's rubber stopper is not indicative of evidence tampering; it is made in the ordinary course of drawing a blood specimen from a person and storing it in a vial. The hypodermic needle hole in this case was made when a specimen of Avery's blood was drawn by a phlebotomist and stored in the vial in connection with a 1996 post-conviction motion in his wrongful conviction case. The procedure necessarily resulted in the creation of a

6

hole in the rubber stopper. The phlebotomist who drew the specimen from Avery in 1996 was prepared to testify that's what happened in this instance. Having attended the trial in its entirety, defendants Ricciardi and Demos were aware of the routine nature of the hole on the vial's rubber stopper and that the phlebotomist who drew the specimen from Avery was prepared to testify. Defendants manipulated the facts and the significance of the blood vial's discovery as part of their overall effort to convince viewers that plaintiff and other county law enforcement officers framed Avery for the murder.

### The Key

21. Defendants, separately and severally, with actual malice, led viewers to the inescapable but false conclusion that plaintiff and MTSO Lt. James Lenk planted the ignition key for Halbach's SUV in Avery's bedroom. They did so by splicing trial testimony, omitting other testimony, and failing to include essential photographic evidence that would have given viewers a complete view of what occurred.

22. On November 8, 2005, three days after Halbach's vehicle was discovered at the salvage yard, plaintiff and MTSO Investigator James Lenk, both evidence technicians, were assigned to search Avery's bedroom for evidence more remotely connected to the crime, including pornographic material. Plaintiff and Lenk were accompanied by Calumet County Deputy Daniel Kucharski. A previous search of the room on November 5, 2005 yielded hand cuffs and leg irons, apparent sex toys, and pornographic materials in a bookcase that were not collected at that time. After plaintiff roughly returned a large binder, Lenk and plaintiff discovered the ignition key for Halbach's SUV on the carpeted floor next to the bookcase. At trial plaintiff, Lenk, and Kucharski each offered a reasonable explanation as to how the key was missed on the earlier search and miscellaneous entries. All three testified they believed the key had fallen from a crack in the particle board backing of the bookcase when plaintiff roughly returned the binder into the bookcase. They believed Avery hid the key there with plans to retrieve it later and dispose of the SUV.

Plaintiff: Trial Trans Day 7, p 132; Lenk: Trial Trans Day 8, p 14; Kucharski: Trial Trans Day 9, p 55

7

23. On information and belief, defendants Ricciardi and Demos were present during this testimony and viewed certain photographs clearly showing the crack in the back of the bookcase. The photographs were not shown to viewers of MAM. In addition, testimony from officer Tyson, the accompanying officer from the initial search on 11/05/2005, was spliced in order to maximize suspicion that the key was planted and minimize a plausible explanation for how it came to be found. Jerome Buting, one of Avery's attorneys, asked officer Tyson the following question:

"Had you ever, in any other search in your entire career, had to act like a babysitter, or a watchdog, for the officers who were conducting a search?"

Officer Tyson replied, "I did not treat this as if I was babysitting."

Trial Trans Day 7, p 25, lines 7-11

Defendants Ricciardi and Demos replaced Tyson's answer with his negative response, "No," to a separate question in order to give viewers the exact opposite impression of what Tyson in fact conveyed.

(MAM, Episode 7)

24. Upon information and belief, defendants Ricciardi and Demos filmed the entire trial and were aware of the full line of questioning concerning the circumstances of plaintiff and Lenk finding Halbach's ignition key in Avery's bedroom, as well as its significance. They chose to fabricate testimony by splicing or omitting those portions not consistent with their false and defamatory account of the facts. In truth, plaintiff and Lenk did not plant the key, and MAM's aspersions that they did are false and have caused irreparable harm to plaintiff's reputation.

### 1994 or 1995 telephone call and subsequent cover-up

25. Defendants Ricciardi and Demos, acting separately and in concert with the other defendants, led viewers to falsely conclude that plaintiff learned of Avery's 1985 wrongful conviction approximately eight years before he was released, but covered it up. By doing so, defendants created a false motive for plaintiff to plant evidence, making their central but false claim that plaintiff and other police officers framed Avery more believable.

8

26. In 1994 or 1995, while working as a corrections officer at the Manitowoc County Jail during normal business hours, plaintiff answered a telephone call from a detective in another jurisdiction. The detective asked to speak with a Manitowoc County detective about a sexual assault that occurred many years earlier in Manitowoc County. A jail inmate told a fellow inmate that he was responsible for a sexual assault for which another man was convicted. Plaintiff does not believe the caller mentioned the name of the man convicted or the name of the victim in the Manitowoc County assault. If he did, plaintiff was wholly unfamiliar with the names.

27. Plaintiff had no reason to and did not know about Avery's 1985 sexual assault conviction when he received the phone call from the detective. He was not employed by MTSO until 1992, when he was hired as a corrections officer at the Manitowoc County Jail, which was and remains a separate division within MTSO. As a corrections officer, plaintiff was not a sworn law enforcement officer and had no authority to conduct investigations, much less dated criminal activity for which a conviction had already been obtained. Doing so would have been a violation of department policy. Accordingly, plaintiff transferred the call to the detective division after giving the caller the number in case the call went unanswered or was lost in the transfer. Plaintiff subsequently heard that higher-ups at MTSO had given assurances that the right man had been convicted. Plaintiff had no reason to think otherwise until Avery was exonerated by DNA testing in 2003. Given all of the above circumstances, there was no reason for plaintiff to prepare a written report about the call at the time.

28. Plaintiff first learned of Avery's wrongful conviction in September of 2003 when Avery was exonerated by DNA testing. At that time plaintiff recalled the 1994 or 1995 telephone call and surmised it may have been related to the Avery case. At the direction of Sheriff Ken Petersen, plaintiff prepared a written statement memorializing the call as part of Petersen's effort to provide a complete, accurate, and transparent account of the circumstances surrounding Avery's wrongful conviction for consideration by the Wisconsin Attorney General in her independent review. Plaintiff's written statement was promptly delivered to the Attorney General along with all other documents pertaining to her review.

9

29. Defendants Ricciardi and Demos strategically spliced and omitted portions of plaintiff's trial testimony as set forth in Exhibit A, incorporated by reference herein, to distort the facts and nature of the 1994 or 1995 telephone call. These omissions and distortions led viewers to falsely conclude that plaintiff bears responsibility for seven or eight of Avery's 18 years of wrongful imprisonment, providing him with a motive to frame Avery for Halbach's murder.

30. For the same purposes, defendants Ricciardi and Demos included in the second episode of MAM an interview of Steven Glynn, one of Avery's attorneys in his wrongful conviction lawsuit,. Glynn expresses dismay that plaintiff did not prepare a report concerning the call he received in 1994 or 1995 until Avery was exonerated in 2003. Glynn then mistakenly tells viewers that plaintiff's written statement was kept hidden in a sheriff's department safe in 2003 as part of plaintiff and MTSO's effort to cover up their knowledge of Avery's wrongful conviction.

31. Upon information and belief, defendants knew plaintiff's written report concerning the phone call was not left in the sheriff's safe but chose to include Glynn's mistaken belief in order to further their false narrative. Defendants included extensive excerpts of videotaped depositions in Avery's wrongful conviction lawsuit in MAM and, upon information and belief, reviewed the depositions from the lawsuit in their entirety to determine which portions to include. The depositions included extensive questioning of plaintiff, Sheriff Petersen, and others concerning the 1994 or 1995 telephone call and plaintiff's documentation of same in 2003. No reasonable person could have concluded from a review of the depositions and the trial testimony that there was anything nefarious about plaintiff's response to the call or his documentation of same after Avery was exonerated. Nor could any reasonable person have concluded that plaintiff's report was left hidden in a safe as part of a cover-up for MTSO wrongdoing. Yet defendants distorted the facts to provide viewers a false motive for plaintiff to plant evidence and frame Avery for Halbach's murder.

**MAM's omission and distortion of material, significant evidence and facts**

10

32. Defendants, separately and severally, and with actual malice, omitted the following evidence and facts as part of their effort to lead viewers to falsely conclude that plaintiff and others framed Avery for Halbach's murder. Upon information and belief, defendants Ricciardi and Demos were present for all court proceedings, including pretrial motions and the entire trial, where all of this information was revealed. Had these material, significant and known facts been included in MAM, a reasonable viewer would have found Avery's guilt obvious and would not have concluded that plaintiff and other law enforcement officers planted evidence to frame him:

- Avery's DNA was located on the hood latch of Halbach's vehicle.

- Halbach's cell phone, camera, and PDA computer devices were found in a burn barrel on Avery's property. Several hours after Halbach's arrival at the salvage yard, Avery's nephew, witnessed Avery carrying a plastic bag and placing it in the burn barrel where Halbach's electronics were later found. In addition, a family friend, observed smoke and smell of plastic coming from the same burn barrel. The witness along with Avery's brother, stated that Avery had changed clothes and showered and was acting strange.

- The bullet containing Halbach's DNA was linked to the specific firearm hung on a wall over Avery's bed.

- Avery called Halbach's employer, Auto Trader magazine, on the day she was murdered and asked them to send a photographer to take a photo of a car he said he was listing for sale in their magazine. Avery asked the receptionist to send "the same photographer" they sent last time. Halbach's co-workers stated that she had been somewhat concerned by Avery's approaching her wearing nothing but a towel on at least two of her appointments with him. Avery placed direct calls to Halbach's cell phone before she arrived using *67 to hide his identity.

- In the early evening, after Halbach's appointment, Avery's brother, Earl, observed Avery near his truck and trailer with Avery's snowmobile on top. Earl found it strange that Avery would remove the snowmobile from the trailer and put it in his garage since Earl's understanding was that Avery was going to take the snowmobile to a dealer and sell it. When asked by police about the Suzuki, Earl Avery stated it had been outside the garage a few days earlier. Avery's accomplice told police that Avery shot Halbach in his garage.

- Avery gave several different statements about his interaction with Halbach on the day she was murdered. First, that she never arrived for her appointment with him; second, that she did, but he only saw her through a window in his trailer home and did not speak with her; third, that she came inside where he paid her, and, finally, that he went outside to her car and paid her for the photo shoot.

11

- Avery has a history of extreme violence and sexual aggression against women, including beating, strangulation, death threats, attempted abduction at gunpoint, and rape.

33. Defendants Ricciardi and Demos, separately and in concert with the remaining defendants and with reckless disregard for the truth, blatantly and absurdly distorted the nature of three of Avery's prior crimes. Had the true nature of his past crimes been accurately portrayed, a reasonable viewer would have been less likely to accept defendants' wholly false narrative that plaintiff and other local police officers framed Avery for Halbach's murder. Upon information and belief, defendants Ricciardi and Demos had access to the police reports and criminal complaints associated with each of these crimes and knew of their contents.

- Avery was convicted of animal abuse when he was 20 years old. Police reports indicate that he and another party poured gas and oil on the family's pet cat, intentionally threw it in a bonfire, and watched it burn to death. In Episode 1 of MAM, defendants portrayed the incident as an accident and at worse, a childhood prank.

- In 1986, Avery received a six-year prison sentence on convictions for endangering safety by conduct regardless of life and felon in possession of a firearm in connection with his running a woman's car off the road, holding her at gun point and ordering her into his car with the apparent intent to rape her. MAM omitted significant details and used edited portions of depositions to cast Avery as a victim and the victim as a villain for spreading rumors about him.

- On September 4, 2004, approximately a year before murdering Halbach, Avery was arrested for assaulting his fiancé, Jodi Stachowski. On information and belief, Defendants Ricciardi and Demos had access to the police reports concerning the incident and knew of their contents. The reports indicate that Avery shoved Stachowski causing her to fall into a chair and hit her head. Avery then struck her numerous times and threatened to kill her. When Stachowski tried calling 911, Avery ripped the phone out of the wall before she could report the assault. Avery began strangling her and as she lost consciousness he dragged her outside to his vehicle. When Stachowski regained consciousness, Avery said: "I should get the gun and kill you."

- Upon information and belief, Ricciardi and Demos had access to and reviewed the police reports concerning Avery's arrest for assaulting Stachowski. They knew what Stachowski had reported to police, but they chose to omit it because it did not fit with their false characterization of Avery as a harmless individual unlikely to commit a murder. To

12

further their storyline, they portrayed Stachowski as unafraid and supportive of Avery while knowing she was anything but.

## Claims for Relief

### Count 1 – Defamation

34.     Defendants, separately and severally, acting with actual malice committed the tortious acts of defamation, libel, and slander against plaintiff by their creation, production, distribution, publication, and broadcast of the documentary, "Making a Murderer." Defendants manipulated and falsified specific facts as described in paragraphs 1 – 33 above and incorporated by reference herein in order to falsely accuse plaintiff and other MTSO officers of planting evidence to frame an innocent man, or to make the case stronger against a guilty one. Defendants knew or had reason to know of the falsity of the statements, yet knowingly and intentionally, or with reckless disregard for the truth, made them anyhow. Defendants' rendition of the facts and circumstances surrounding the Avery case is false in nature and false in how it was presented.

35.     Defendants, separately and severally, offered more than mere opinions, but definitive declarations of fact provable as either true or false, and thus claimable under defamation law. Defendant's tortious conduct cannot be shielded by the methodology they employed in the telling of their fabricated story. Presenting selectively edited and spliced trial and deposition testimony, excluding facts and evidence that contradict their false narrative, and including only one-sided biased interviews that cast police and prosecutors as villains and Avery and his attorneys as heroes, amount to a statement of fact no less and more insidious than if the defendants had told the falsehoods themselves.

36.     As a direct consequence of the defendants' defamatory conduct, individually and in concert with each other, plaintiff's reputation has been irreparably harmed. Devoted husband, parent, decorated United States Air Force veteran, and dedicated public servant, plaintiff enjoyed

13

an impeccable professional reputation prior to December 18, 2015 when MAM first aired. During the intervening three years, plaintiff has been subject to worldwide ridicule, contempt and disdain as a result of the baseless and false assertions in MAM that he planted evidence to frame an innocent man or strengthen the case against a guilty one.

37.    A Google search of plaintiff's name prior to MAM's debut would have revealed two nondescript news articles about routine local crime. The same search now yields more than 1.8 million hits, nearly all of them painting plaintiff in a negative light. 732 YouTube videos about plaintiff's perceived nefarious role in the Avery case have been produced.

38.    National and international news and entertainment media have published hundreds of articles, television and radio segments adopting the defendants' foregone but false conclusion that plaintiff and other Manitowoc County police officers planted evidence. Social media, including Facebook, Twitter, YouTube, and Reddit is replete with threats and insults directed at plaintiff because of the baseless accusations against plaintiff forced upon viewers of MAM. Countless tweets, memes, and insulting and threatening social media posts portraying plaintiff as a corrupt police officer and prime mover in framing Avery have been posted online.

39.    Defendants, separately and severally, failed to mitigate damages by refusing to take notice of critical analysis in the aftermath of MAM's release. Thorough, careful, and objective analysis by some members of the public and a few journalists revealed that the series had badly distorted the facts. Upon information and belief, defendants were aware of the critical analysis and could have mitigated the harm to plaintiff's reputation by admitting their distortions and omissions of fact when the above mentioned articles were published and in the sequel to the original series, "Making a Murderer Part 2." Instead, with actual malice, defendants doubled

14

down by distorting and omitting additional facts to bolster their pre-ordained conclusion that plaintiff participated in the framing of Avery.

## Count 2: Intentional infliction of emotional distress

40.     Defendants, separately and severally, by extreme and outrageous conduct as set forth in paragraphs 1 to 33 above and incorporated by reference herein, intentionally caused severe emotional distress to plaintiff. Defendants could and should have reasonably foreseen that their false rendering of plaintiff as a corrupt police officer who helped frame an innocent man would lead to popular outrage and threats, resulting in extreme emotional distress.

41.     As a direct consequence of defendants' tortious conduct, plaintiff has received serious and ongoing threats to his and his family's safety, resulting in extreme anxiety on a daily basis with long-term, if not permanent harm to nearly every aspect of his life. Recorded telephone threats alone fill the capacity of 28 compact discs. Avery sympathizers have threatened to kill plaintiff and members of his family, kidnap and sodomize him and gang rape his wife. Photographs of plaintiff's children have been posted online by hateful viewers under the spell of MAM. Repeat late night telephone calls to plaintiff's residence were commonplace in the aftermath of MAM's release, with callers screaming profanities and threatening to do physical harm. Defendants' tortious conduct has changed nearly every aspect of plaintiff's life, from travel plans to whether and where he and his wife go out to eat. Constantly on alert for danger to his family's safety whenever they leave their home, plaintiff suffers from extreme exhaustion and anxiety.

## Count 3: Negligence

15

42.    As producers, editors, and distributers of a non-fiction documentary, defendants breached their duty to confirm factual assertions and not wholly misrepresent the truth. Defendants, separately and severally, have breached that duty as stated in paragraphs 1-33 above and incorporated by reference herein.

43.    As a proximate result of defendants' negligence, plaintiff has suffered humiliation, mental anguish, and extreme emotional and physical distress and has been injured in mind and body. Among special damages suffered by the plaintiff are loss of wages and other expenses incurred to protect his family's safety.


**Wherefore,** plaintiff demands retraction and honest clarification of the erroneous and false statements and depictions described above to clear his good name and restore peace of mind; plaintiff further demands judgment against defendants, separately and severally, for their tortious acts of defamation, intentional infliction of emotional distress, and negligence as stated above. Plaintiff demands a jury trial.


Electronically signed by:
Griesbach Law Offices, LLC
By: Attorney Michael C Griesbach
State Bar #01012799

Griesbach Law Offices, LLC
PO Box 2047
Manitowoc, WI 54221-2047
(920) 320-1358

16

**EXHIBIT A**
**"Making a Murderer's" Distortion of Plaintiff's Testimony Concerning the 1994/1995**
**Telephone Call**

**Key:**
**Black/Bold: trial testimony accurately portrayed in sequence in "Making a Murder"**
~~Black strikethrough:~~ spliced testimony in "Making a Murder"
Red—testimony omitted in "Making a Murder"

<u>Direct examination by District Attorney Kenneth KRATZ:</u>
**KRATZ: Sergeant Colborn, you were asked, as I understand, as part of a civil lawsuit, to provide what's called a deposition. Can you tell the jury what you were asked about?**

**COLBORN: In 1994 or '95, I had received a telephone call when I was working in my capacity as a corrections officer in the Manitowoc County jail. The telephone call was from somebody who identified himself as a detective and began telling me that somebody who had committed an assault in Manitowoc County was in their custody and we may have somebody in our jail on that assault charge that... may not have done it. Uh, I told this individual you're probably gonna want to speak to a detective and I transferred the call to a detective.**

**KRATZ: That's it? That's your connection to Mr. Avery?**

**COLBORN: Yes, sir.**

**KRATZ: Well, let me ask you this, Sergeant Colborn, do you even know whether that call was about Mr. Steven Avery?**

**COLBORN: No, sir.**

**KRATZ: Well, did that cause you enough embarrassment and enough angst that you obtained and planted blood so that it would be found and Mr. Avery would be wrongfully accused of a homicide case?**

**COLBORN: No, sir.**
**KRATZ: Have you ever planted any evidence against Mr. Avery?**
I have to say that this is the first time my integrity has ever been questioned and, no, I have not.

**KRATZ: That's all I have for Sergeant Colborn, Judge. Thank you**

<u>Cross Examination by Attorney Strang:</u>
**STRANG: Did you ever write a report about that?**
**COLBORN: No,** ~~I did not~~ **sir.**

**STRANG: Well, actually you did, didn't you? It was about eight years later, wasn't it?**

1

COLBORN: I wrote a statement on it. Yes, sir.

STRANG: You wrote that statement in 2003, ~~the day after Steven Avery finally walked out of prison, didn't you?~~ after Sheriff Peterson suggested that maybe you should? ~~I don't know what day Steve was released from prison, but I wrote the statement in 2003~~

COLBORN: Yes, sir.

~~STRANG: That's all I have.~~

STRANG: You wrote that statement in 2003, about the 1994 or 1995 telephone call?

COLBORN: Yes.

STRANG: You wrote that statement in 2003, the day after Steven Avery finally walked out of prison, didn't you?

COLBORN: I don't know what day Steve was released from prison, but I wrote the statement in 2003.

STRANG: September 12, 2003 sound right?

COLBORN: I said, I don't know the date that I wrote the statement, but I know it was in 2003.

STRANG: Well, I think I do know the date you wrote it and I'm a happy to show it to you. What do you know as Exhibit 213?

COLBORN: That's the statement I wrote after speaking with Detect -- or Sheriff Peterson.

Redirect:
KRATZ: Sergeant COLBORN, back in 1994 or '95, if you would've written a report... what would it have been about?

COLBORN: That is why I didn't do one, I don't know what it would have been about, that I received a call and transferred it to the Detective Division. If I wrote a report about every call that came in, I would spend my whole day writing reports.

KRATZ: Did this person ever identify the individual that they were talking about?

COLBORN: No, sir. There were no names given.

2

FILED
12-17-2018
Clerk of Circuit Court
Manitowoc County, WI
2018CV000561

**STATE OF WISCONSIN**     **CIRCUIT COURT**     **MANITOWOC COUNTY**

Andrew L Colborn vs. Netflix, Inc. et al

**Electronic Filing Notice**

Case No. 2018CV000561
Class Code: Intentional Tort

NETFLIX, INC.

Case number 2018CV000561 was electronically filed with/converted by the Manitowoc County Clerk of Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $ 20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register as an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: ba47e6**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 920-683-4030.

Manitowoc County Circuit Court
Date: December 17, 2018

FILED
12-17-2018
Clerk of Circuit Court
Manitowoc County, WI
2018CV000561

**STATE OF WISCONSIN**　　　**CIRCUIT COURT**　　　**MANITOWOC COUNTY**

Andrew L. Colborn vs. Netflix, Inc. et al　　　**Electronic Filing Notice**

Case No. 2018CV000561
Class Code: Intentional Tort

CHROME MEDIA, LLC

Case number 2018CV000561 was electronically filed with/converted by the Manitowoc County Clerk of Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $ 20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register as an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: ba47e6**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 920-683-4030.

Manitowoc County Circuit Court
Date: December 17, 2018

GF-180(CCAP), 08/2017 Electronic Filing Notice　　　　　　　　　　　　　　　　　　　§801.18(5)(d), Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.

FILED
12-17-2018
Clerk of Circuit Court
Manitowoc County, WI
2018CV000561

| STATE OF WISCONSIN | CIRCUIT COURT | MANITOWOC COUNTY |
|---|---|---|

Andrew L Colborn vs. Netflix, Inc. et al

**Electronic Filing
Notice**

Case No. 2018CV000561
Class Code: Intentional Tort

LAURA RICCIARDI

Case number 2018CV000561 was electronically filed with/converted by the Manitowoc County Clerk of Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $ 20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register as an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: ba47e6**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 920-683-4030.

Manitowoc County Circuit Court
Date: December 17, 2018

GF-180(CCAP), 06/2017 Electronic Filing Notice

This form shall not be modified. It may be supplemented with additional material.

§801.18(5)(d), Wisconsin Statutes

FILED
12-17-2018
Clerk of Circuit Court
Manitowoc County, WI
2018CV000561

**STATE OF WISCONSIN**    **CIRCUIT COURT**    **MANITOWOC COUNTY**

Andrew L. Colborn vs. Netflix, Inc. et al    **Electronic Filing Notice**

Case No. 2018CV000561
Class Code: Intentional Tort

MOIRA DEMOS

Case number 2018CV000561 was electronically filed with/converted by the Manitowoc County Clerk of Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $ 20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register as an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: ba47e6**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 920-683-4030.

Manitowoc County Circuit Court
Date: December 17, 2018