## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

|  |  |
|---|---|
| **ANDREW L. COLBORN,**<br><br>               **Plaintiff,**<br><br>     **vs.**<br><br>**NETFLIX, INC.; CHROME MEDIA LLC, F/K/A SYNTHESIS FILMS, LLC; LAURA RICCIARDI; AND MOIRA DEMOS,**<br><br>               **Defendants.** | **Civil No.: 19-CV-484** |

## MEMORANDUM IN SUPPORT
## OF MOTION TO DISMISS BY NETFLIX, INC.

Andrew L. Colborn, a sworn law enforcement officer, brings this lawsuit over a documentary television series that uses the unique experiences of Steven Avery, a DNA exoneree charged with murder, to provide a window into the American criminal justice system. Taking viewers from Avery's 1985 wrongful conviction for rape through his 2005 arrest and prosecution for murder, the series explores whether twenty years of scientific advances and legislative reforms have resulted in a more reliable system. As is obvious from even this brief summary, as well as the nationwide, contemporaneous media coverage of Avery's prosecution and trial, the series—titled *Making a Murderer*—

explores issues of the utmost public interest and concern.[1]

Given the subject matter of *Making a Murderer* and Colborn's status as a public official, to prevail in this defamation case, he must plead and prove that Defendants published the documentary series with "actual malice"—i.e., either knowing it was false or despite a "high degree of awareness" of its "probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). Even if Colborn were not a public official, he would still be obliged to plead and prove that Defendants negligently disseminated a material falsehood about him. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974).

With regard to defendant Netflix, Inc., however, Colborn's Amended Complaint comes nowhere close to satisfying federal pleading standards. Instead, he simply lumps Netflix together with co-defendants Chrome Media, LLC—the concededly *independent* production company that created *Making a Murderer*—and its filmmakers, Laura Ricciardi and Moira Demos, and makes vague, conclusory allegations (on "information and belief," no less) about "defendants" collectively.

Setting aside all the other problems with Colborn's lawsuit—most fundamentally, that *Making a Murderer* contains no false statements of fact about him—he has not plausibly alleged that Netflix distributed the documentary series negligently, much less with the requisite actual malice. All of his claims against Netflix should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

---

[1] *See, e.g.*, Monica Davey, *Freed by DNA, Now Charged in New Crime*, NYTimes.com (Nov. 23, 2005), https://www.nytimes.com/2005/11/23/us/freed-by-dna-now-charged-in-new-crime.html?searchResultPosition=1.

## PROCEDURAL HISTORY

Colborn commenced this lawsuit on December 17, 2018—the day before the statute of limitations expired[2]—by filing a Complaint against eight defendants, including Netflix, Chrome, Ricciardi, and Demos, in the Circuit Court for Manitowoc County. *See* Dkt. 1-1. The Complaint alleged defamation, intentional infliction of emotional distress, and negligence claims arising from *Making a Murderer* ("*MaM*").

Colborn filed an Amended Complaint on March 4, 2019. *See* Dkt. 1-2. The Amended Complaint reframed its three causes of action as "Defamation—Actual Malice," "Negligence (In the Alternative)," and "Intentional Infliction of Emotional Distress." *Id.* It also dropped a number of defendants, leaving only Netflix, Chrome, Ricciardi, and Demos (collectively, "Defendants"). *Id.*

The Amended Complaint acknowledges that Chrome is an "*independent* film production company," and it describes Ricciardi and Demos as both Chrome's founders and the filmmakers who actually created *MaM*. *See id.* ¶¶ 4, 8 (emphasis added). It accurately characterizes Netflix's role as having served as the entity that "released" *MaM* for "worldwide distribution." *Id.* ¶ 15. This Memorandum refers specifically to Chrome, Ricciardi, and Demos (but not Netflix) as the "Producer Defendants."

Colborn served an Amended Summons and the Amended Complaint on Netflix on March 5, 2019. *See* Dkt. 20. On April 3, 2019, Defendants removed the case to this Court. *See* Dkt. 1. Shortly thereafter, the parties agreed to an extension of time—until

---

[2] The statute of limitations for defamation and other tort claims in Wisconsin is three years. Wis. Stat. § 893.57. As the Amended Complaint concedes, Netflix first disseminated the documentary series from which Colborn's claims arise on December 18, 2015. *See* Dkt. 1-2 ¶ 15.

May 10, 2019—for Defendants to answer or otherwise respond to the Amended Complaint and the Court granted that stipulated extension on April 10. *See* Dkt. 26.

Netflix now brings this motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). It seeks dismissal with prejudice because Colborn has not plausibly alleged that Netflix acted with the requisite degree of fault in distributing *MaM* and because a Second Amended Complaint would be futile.

## COLBORN'S ALLEGATIONS AGAINST NETFLIX

The gist of Colborn's Amended Complaint is that *MaM*—which chronicles Avery's wrongful conviction in the 1980s for a crime he did not commit, his exoneration and release after eighteen years in prison, his filing of a $36 million civil rights lawsuit against Manitowoc County, its former sheriff and district attorney, and his subsequent conviction (along with his nephew Brendan Dassey) for the 2005 murder of Teresa Halbach—defames Colborn in retelling that story. *See generally* Dkt. 1-2.

As Colborn concedes, Avery's defense at his murder trial was essentially that Colborn and another sheriff's deputy—embarrassed by their role in the botched investigation that led to Avery's wrongful conviction and facing his civil rights action—planted evidence to ensure he was convicted a second time. *See, e.g.*, *id.* ¶ 31. Colborn objects, however, to the series' recounting of that theory. He alleges that, by selectively editing trial testimony and by purportedly taking his statements and actions out of context (including by allegedly omitting from the series information that he believes points toward Avery's guilt), "Defendants" (he typically does not distinguish among them) misled viewers into concluding Avery is innocent and Colborn is crooked. *See generally*

4

Dkt. 1-2.

More specifically, Colborn, a "sworn law enforcement officer," *id.* ¶ 11, who both participated in the investigation of Halbach's death and testified against Avery at trial, complains about *MaM*'s portrayal of three issues he concedes were addressed at Avery's trial: (1) a telephone call Colborn received while serving as a corrections officer at the Manitowoc County Jail, *id.* ¶¶ 21-27; (2) a communication he made to dispatch regarding the license plate number on Halbach's car after she disappeared, *id.* ¶¶ 28-38; and (3) the discovery of the key to Halbach's car in Avery's home, *id.* ¶¶ 39-43.[3]

Although Colborn sprinkles the phrase "actual malice" throughout his Amended Complaint, neither that pleading nor its predecessor contains a *single* allegation describing Netflix's role (if any) in the series' production—Colborn merely alleges that Netflix "released" *MaM* for "worldwide distribution," while simultaneously acknowledging that Chrome is the "*independent* film production company" that created it. *See id.* ¶¶ 4, 15 (emphasis added). The Amended Complaint does not contain *any* statement of alleged fact regarding Netflix's state of mind with respect to the truth or falsity of *MaM* that could plausibly support Colborn's conclusory claim that Netflix acted with the requisite degree of fault.

Instead, wherever the phrase "actual malice" or some other allegation of knowledge of falsity or negligence does appear in the Amended Complaint, Colborn

---

[3] In so doing, however, the Amended Complaint conspicuously fails to acknowledge how the series, which it otherwise incorporates by reference, also devoted significant attention to the State's evidence and arguments. And, of course, it reveals that the jury ultimately *rejected* the defense theory and convicted Avery.

either:

> (1) *Exclusively* discusses the actions taken and knowledge possessed by the Producer Defendants (not Netflix), *see, e.g.*, *id.* ¶¶ 25, 42, 43, or

> (2) Simply refers to "defendants" vaguely and generically and then alleges in conclusory fashion—and sometimes even "on information and belief"—that they acted "jointly," "severally," and/or "in concert," *see id.* ¶¶ 18, 21, 27, 31-36, 38-39, 44-45, 48, 50, 55-56, 60, 64-65.

The Amended Complaint further emphasizes that it requires a comprehensive, "*side by side comparison* of the trial transcript" with scenes from *MaM*'s multiple episodes to appreciate how, in Colborn's view, Ricciardi and Demos "heavily edited" his trial testimony to "manipulate viewers." *See id.* ¶ 32 (emphasis added). To explain this subtle "manipulat[ion]," he is compelled to provide to the Court what purports to be a heavily annotated series of excerpts from the trial transcript. *See* Exhibit B to Dkt. 1-2. Yet nowhere does Colborn plead that Netflix "knew" or even "should have known" the series contained false and defamatory statements because, for example, its representatives attended Avery's murder trial, reviewed trial or deposition transcripts (or even had such transcripts in their possession), watched the many days' worth of raw video footage that the Producer Defendants recorded at trial (to say nothing of footage of the multiple out-of-court depositions and interviews also included in *MaM*), or were otherwise in any way familiar with the minutiae of what transpired at trial or in the lead-up to it such that they would have had any reason to question *MaM*'s accuracy.

By the same token, Colborn implicitly concedes that it was only Ricciardi and Demos—and *not* Netflix—who attended Avery's trial and edited hundreds of hours of raw footage into what became the final series. See, for example, Dkt. 1-2 at:

6

¶ 25—"Ricciardi and Demos strategically spliced and omitted portions of Plaintiff's trial testimony . . . ."

¶ 26—"For the same purposes, Defendants Ricciardi and Demos included in the second episode of MAM an interview of Steven Glynn . . . ."

¶ 34—Ricciardi and Demos omitted from Plaintiff's call to dispatch his words . . . ."

¶ 35—"Ricciardi and Demos strategically spliced 'reaction' shots of plaintiff appearing nervous . . . ."

¶ 36—"Upon information and belief, Defendants Ricciardi and Demos filmed the entire trial . . . ."

¶ 38—"Having attended the trial in its entirety, defendants Ricciardi and Demos were aware of the routine nature of the hole on the vial's rubber stopper . . . ."

¶ 42—"On information and belief, Defendants Ricciardi and Demos were present during this testimony and viewed certain photographs . . . ."

¶ 43—"Upon information and belief, Defendants Ricciardi and Demos filmed the entire trial and were aware of the full line of questioning . . . ."

¶ 44—"Upon information and belief, defendants Ricciardi and Demos were present for all court proceedings . . . ."

¶ 45—"Upon information and belief, defendants Ricciardi and Demos had access to the police reports and criminal complaints associated with each of these crimes and knew of their contents."

Colborn makes no such allegations against Netflix or any of its employees or representatives. To the contrary, he expressly acknowledges that "the series purports to objectively and accurately recount Avery and Dassey's arrest and conviction for Halbach's murder" and that, in "interviews since the program's release, Defendants Ricciardi and Demos have repeatedly avowed that they were unbiased and objective in their re-telling of events, holding the film out as a non-fiction piece." *Id.* ¶¶ 15-16.[4]

---

[4] Although not the focus of this motion to dismiss brought by Netflix, it bears emphasis that Colborn's overarching

Finally, in addition to the allegations of the Amended Complaint, the following evidence relevant to this Motion is properly before the Court, either because it is itself contained in *MaM* (and is therefore incorporated in the Amended Complaint) or because the Court may take judicial notice of it:

- The Amended Complaint's assertion that Colborn "has refrained from public comment and has in no other way injected himself into the controversy surrounding the Avery case," *see id.* ¶ 17, is demonstrably false. Approximately thirty-four minutes into Episode 8 of *MaM*, video from Action 2 News shows a statement released by Colborn after the verdict. The statement reads, "I hope and pray that this verdict helps put to rest any suspicions or loss of confidence that this community may have felt towards our department, because I assure everyone that this agency has some of the finest law enforcement officers in the country in its employ."

- Less than a year after Halbach's death, and in the months leading up to Avery's March 2007 trial, Colborn was the Republican candidate in the 2006 election for Manitowoc County Sheriff. Attached as Exhibits 1 and 2 to the declaration of James A. Friedman are copies of a sample ballot showing that Colborn was the Republican nominee for that office, as well as the election tally sheet showing he received more than 12,000 votes. Colborn testified at Avery's trial about his unsuccessful bid for Manitowoc County Sheriff. *See* Jury Trial Tr.-Day 7, attached as Exhibit 4 to the Friedman Declaration, at 149:4-151:23, 156:6-158:4.

- Colborn had previously run for town constable in Kossuth, Wisconsin. Attached as Exhibit 3 to the Friedman Declaration is a copy of his 2003 nomination papers.

- Colborn testified at Avery's murder trial that he was a sergeant in the

---

allegation against the Producer Defendants—*i.e.,* that the "purported conspiracy and scheme" to frame Avery described in *MaM* was "the product of [their] imagination" and manipulative editing, Dkt. 1-2 ¶ 50—cannot survive reasonable scrutiny. As the Amended Complaint elsewhere concedes, from his lawyers' opening statement through submission of the case to the jury, the transcript of Avery's criminal trial confirms that the very same theories that Colborn labels false and defamatory constituted "[a] central part of Avery's defense." *Id.* ¶ 31. *See, e.g.,* Jury Trial Tr.-Day 1, attached as Exhibit 5 to the declaration of James Friedman, at 117:11-120:11, 131:9-142:2, 147:20-148:10 (opening statement); Decision and Order on State's Motion to Exclude Blood Vial Evidence (Jan. 30, 2007), attached as Exhibit 6 to the Friedman Declaration (finding theory that Colborn helped frame Avery sufficiently credible to warrant admission of evidence supporting it).

Manitowoc County Sheriff's Department and that he served as both a shift commander and patrol supervisor. In these roles, he had both administrative and "supervisory responsibilities." *See* Jury Trial Tr.-Day 7, attached as Exhibit 4 to the Friedman Declaration, at 65:19-23, 66:4-17, 141:16-142:-12, 143:11-14. Colborn further testified that his responsibilities as a sergeant were wide-ranging, including such things as supervising patrol officers, executing search warrants, responding to domestic violence calls, and collecting evidence in criminal cases. *Id.* at 85:23-25, 142:13-143:2, 15-21.

## LEGAL STANDARD

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012); *accord Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555); *accord Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017).

The *Iqbal-Twombly* standard governs a defamation action about a matter of public concern as it does all civil litigation in the federal courts. *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013). However, in cases such as this one, the federal courts have also recognized that protracted litigation will inevitably inhibit the exercise of First Amendment rights and that such cases should therefore be closely scrutinized and,

where appropriate, dismissed at the earliest possible stage. *See, e.g.*, *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) (recognizing that defamation suits can impose "grave risk of serious impairment of the indispensable service of a free press in a free society"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964) (holding that a rule "compelling the critic of official conduct to guarantee the truth of all his factual assertions . . . dampens the vigor and limits the variety of public debate" and "is inconsistent with the First and Fourteenth Amendments").

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court may take judicial notice of public records, *see Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008), including other judicial proceedings, *see Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994). The Court may also consider "documents referenced in the pleading if they are central to the claim," such as the entire contents of *MaM*, which is the subject of this lawsuit, and the transcripts of the judicial proceedings referenced in the Amended Complaint. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (citation omitted); *see also Citadel Grp. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 591 (7th Cir. 2012) ("In deciding a motion to dismiss for failure to state a claim we may consider documents attached to or referenced in the pleading if they are central to the claim."); *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 858 (7th Cir. 2002) (materials attached to the complaint become a part of it for all purposes).

## ARGUMENT

The United States has a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270. As a result—and as the Seventh Circuit has put it—service as a public official is "not for the thin-skinned, even, or perhaps especially, at the local level." *Manley v. Law*, 889 F.3d 885, 889 (7th Cir. 2018).

To ensure that lawsuits by public officials against their critics do not stifle the public debate essential to democracy, the Supreme Court in *Sullivan* held that public officials suing for libel must prove not only that the statements they challenge are false but also that the defendant made them with "actual malice"—i.e., either with knowledge of their falsity or despite a "high degree of awareness" of their "probable falsity." 376 U.S. at 279-80; *see also Garrison*, 379 U.S. at 74; *Grzelak v. Calumet Publ'g Co.*, 543 F.2d 579, 582 (7th Cir. 1975) (stating that the actual malice standard is designed "to prevent persons from being discouraged in the full and free exercise of their First Amendment rights" (citation omitted)).

The actual malice standard is *subjective*—"reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). It requires a public official plaintiff to "focus on the defendant's conduct and state of mind," *Babb v. Minder*, 806 F.2d 749, 755 (7th Cir. 1986), and to prove, by clear and convincing evidence, that the defendant made false statements with a "high degree of awareness of their probable

11

falsity," *Garrison*, 379 U.S. at 74. Moreover, it is the defendant's state of mind *at the time of publication* that matters—"actual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false." *Pippen*, 734 F.3d at 614.

Colborn, a self-described "sworn law enforcement officer" who investigated Halbach's murder and testified against Avery at trial, is a public official. Because his Amended Complaint does not adequately plead actual malice (or even negligence) and because any attempt to amend it would be futile, all of his claims against Netflix should be dismissed with prejudice.

## I. Colborn is a public official.

Whether a defamation plaintiff is a public official is a threshold question of law for the court, *Rosenblatt v. Baer*, 383 U.S. 75, 88 & n.15 (1966), and presents an issue of federal constitutional law, not state law, *Meiners v. Moriarity*, 563 F.2d 343, 352 (7th Cir. 1977).

The Supreme Court has recognized, on multiple occasions, that police and other law enforcement officers are quintessentially "public officials" for these purposes. In *Sullivan* itself, the plaintiff was the official in charge of law enforcement in Montgomery, Alabama. *Sullivan*, 376 U.S. at 256. Four years after *Sullivan*, in *St. Amant v. Thompson,* 390 U.S. at 730 & n.2, the Court held that a deputy sheriff had failed to prove the actual malice necessary for him to prevail in a defamation action. And, three years after that, the Court similarly concluded that a Chicago police detective had failed to demonstrate the requisite actual malice. *See Time, Inc. v. Pape*, 401 U.S. 279, 284, 292 (1971). In so holding, the Court embraced the Seventh Circuit's prior decision that such a plaintiff is a

public official as a matter of law. *See Pape v. Time, Inc.*, 354 F.2d 558, 560 (7th Cir. 1965); *see also Pape v. Time, Inc.*, 419 F.2d 980, 981 (7th Cir. 1969).

Not surprisingly, courts throughout the country have since followed the Supreme Court's lead and overwhelmingly held that law enforcement officers, from patrol officers to police chiefs, are public officials within the meaning of *Sullivan* and its progeny. The Wisconsin Court of Appeals, for example, has recognized that a police chief is a public official because he is, by definition, "a local government employee charged with protecting the public interest in law enforcement." *Pronger v. O'Dell*, 127 Wis. 2d 292, 295, 379 N.W.2d 330, 331-32 (Ct. App. 1985); *see also Miller v. Minority Bhd. of Fire Prot.*, 158 Wis. 2d 589, 599-601, 463 N.W.2d 690, 694-95 (Ct. App. 1990) (concluding that fire department captain is a public official and favorably citing other courts' holdings that sheriff's deputies, police officers and state troopers also qualify as public officials).

Similarly, federal appellate courts throughout the country have not hesitated to apply the public official designation to those working in law enforcement. *See, e.g.*, *McGunigle v. City of Quincy*, 835 F.3d 192, 206 (1st Cir. 2016) (police officer); *Revell v. Hoffman*, 309 F.3d 1228, 1232-33 (10th Cir. 2002) (former Associate Deputy Director of FBI); *Rattray v. City of Nat'l City*, 36 F.3d 1480, 1486 (9th Cir. 1994) (police officer), *modified and superseded on denial of rehearing on other grounds*, 51 F.3d 793 (9th Cir. 1994); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1069-70 (5th Cir. 1987) (chief deputy sheriff and chief of detectives in sheriff's office); *Coughlin v. Westinghouse Broad. & Cable, Inc.*, 780 F.2d 340, 342 (3d Cir. 1985) (per curiam) (police officer); *Meiners*, 563 F.2d at 352 (federal narcotics agent).

More specifically, courts have regularly held that sheriff's deputies—even those with fewer responsibilities than Colborn had as a sergeant, shift commander, and patrol supervisor—are public officials within the meaning of *Sullivan*. *See, e.g.*, *Zerangue*, 814 F.2d at 1069-70; *Karr v. Townsend*, 606 F. Supp. 1121, 1131 (W.D. Ark. 1985) (sheriff's deputy is public official); *Hirman v. Rogers*, 257 N.W.2d 563, 566 (Minn. 1977) (same); *Pardo v. Simons*, 148 S.W.3d 181, 189 (Tex. App. 2004) (same); *Murray v. Lineberry*, 69 S.W.3d 560, 563 (Tenn. Ct. App. 2001) (same).[5]

These holdings make perfect sense given the First Amendment's overarching commitment to promoting "uninhibited, robust, and wide-open" debate about those responsible for performing important governmental functions:

> [T]he 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs. . . . Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, . . . the *New York Times* [actual] malice standards apply.

*Rosenblatt*, 383 U.S. at 85-86. Law enforcement officers such as Colborn comfortably meet this standard. They are, as multiple decisions note, members of "quasi-military"

---

[5] For additional state court precedent, see *Turner v. Devlin*, 848 P.2d 286, 290 & n.8 (Ariz. 1993) (police officer); *Gomes v. Fried*, 136 Cal. App. 3d 924, 933-34 (1982) (police officer); *Moriarty v. Lippe*, 294 A.2d 330-32 (Conn. 1972) (patrol officer); *Jackson v. Filliben*, 281 A.2d 604, 605 (Del. 1971) (police sergeant); *Smith v. Russell*, 456 So. 2d 462, 463-64 (Fla. 1984) (police officer); *Rawlins v. Hutchinson Publ'g Co.*, 543 P.2d 988, 992 (Kan. 1975) (police officer); *Roche v. Egan*, 433 A.2d 757, 762 (Me. 1981) (all law enforcement personnel, including police detective); *Rotkiewicz v. Sadowsky*, 730 N.E.2d 282, 288 (Mass. 2000) (police officer); *Malerba v. Newsday, Inc.*, 406 N.Y.S.2d 552, 554 (App. Div. 1978) (patrolman); *Colombo v. Times-Argus Ass'n*, 380 A.2d 80, 83 (Vt. 1977) (police officer); *Starr v. Beckley Newspapers Corp.*, 201 S.E.2d 911, 913 (W. Va. 1974) (police sergeant).

organizations who carry guns and who possess the authority not only to arrest but also, in some circumstances, to take human life. *See, e.g.*, *Pool v. VanRheen*, 297 F.3d 899, 909 (9th Cir. 2002) (referring to sheriff's department as "quasi-military entity"); *Kokkinis v. Ivkovich*, 185 F.3d 840, 846 (7th Cir. 1999) (same, as to police department); *Eiland v. City of Montgomery*, 797 F.2d 953, 960 (11th Cir. 1986) (same); *Easley v. Kirmsee*, 235 F. Supp. 2d 945, 957 (E.D. Wis. 2002) (finding that sheriff's deputies receive training "on all aspects of a law enforcement officer's duties and responsibilities, including the use of force, both deadly and non-deadly [and] the use of firearms"), *aff'd on other grounds*, 382 F.3d 693 (7th Cir. 2004); *Caraballo v. Cty. of Sawyer*, 2013 WI App 1, ¶ 4, 345 Wis. 2d 398, 824 N.W.2d 929 (table) (Wis. Ct. App. 2012) (per curiam) (unpublished) (sheriff's deputies' discretionary duties include shackling prisoners, as well as enforcing compliance with commands by use of physical force and chemical agents); *see also* Wis. Stat. § 59.27 (enumerating duties of Sheriffs and their deputies).

Given Colborn's responsibilities and privileges as a sheriff's deputy, sergeant and shift commander—which were apparently significant enough to qualify him to be the Republican nominee in the 2006 election for Manitowoc County Sheriff[6]—there can be no doubt either that he had "substantial responsibility for or control over the conduct of governmental affairs," or that the public has a compelling interest in scrutinizing his

---

[6] Although it is not necessary for the Court to reach the issue given Colborn's status as a public *official*, he is also obliged to plead and prove actual malice because he is a "public figure." *See Gertz*, 418 U.S. at 335. Should this case proceed to discovery, all Defendants reserve their right to argue via a motion for summary judgment that Colborn's 2006 campaign for Sheriff, his statements to the press about the Avery verdict, and his role in the investigation and prosecution of Halbach's murder render him a limited purpose public figure.

performance of his official duties. As the Wisconsin Court of Appeals has explained: "[T]here is no more awesome power exercised by government than that of the police. The police have literally the power of life and death over citizens they are to protect . . . ." *State ex rel. Journal/Sentinel, Inc. v. Arreola*, 207 Wis. 2d 496, 516, 558 N.W.2d 670, 677 (Ct. App. 1996). As a result, "the public has a particularly strong interest in being informed about its . . . law enforcement officers." *Hutchins v. Clarke*, 661 F.3d 947, 955 (7th Cir. 2011); *see also Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) (police officer is public official for defamation purposes because "[m]isuse of his authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss").[7]

## II. The Amended Complaint does not plausibly allege that Netflix acted with the requisite fault.

Because Colborn is a public official and because he does not and cannot plead any facts that could plausibly establish that Netflix distributed *MaM* with actual malice, his defamation claim against Netflix must be dismissed. In fact, even if he were a private figure required to plead and prove only negligence, the Amended Complaint would still fall short.

---

[7] For these same reasons, in the context of disputes over open records requests, Wisconsin courts have repeatedly emphasized the need for the public to monitor the conduct of law enforcement officers. *See, e.g.*, *Kroeplin v. Wis. Dep't of Nat. Res.*, 297 Wis. 2d 254, 287, 725 N.W.2d 286, 302 (Wis. Ct. App. 2006) ("The public interest in being informed both of the potential misconduct by law enforcement officers and of the extent to which such misconduct was properly investigated is particularly compelling . . . ."); *Hempel v. City of Baraboo*, 2003 WI App 254, ¶ 18, 268 Wis. 2d 534, 548, 674 N.W.2d 38, 45 ("Police officers must necessarily expect close public scrutiny."), *aff'd on other grounds*, 284 Wis. 2d 162, 699 N.W.2d 551 (2005).

**A.     The Amended Complaint does not plausibly plead actual malice.**

In the wake of *Iqbal* and *Twombly*, the Seventh Circuit has expressly held libel

plaintiffs to the intentionally heavy burden of pleading facts that *plausibly* establish the

defendant knew the allegedly defamatory statements were false or probably false. *Pippen*,

734 F.3d at 614 ("States of mind may be pleaded generally, but a plaintiff still must point

to details sufficient to render a claim plausible."); *see also Michel v. NYP Holdings, Inc.*,

816 F.3d 686, 702 (11th Cir. 2016) ("*Iqbal* itself directly held that malice and other

degrees of intent are subject to the plausibility pleading standard." (citing *Iqbal*, 556 U.S.

at 686-87)).

Like the Seventh Circuit, every other federal appellate court presented with the

issue has held that, where actual malice is an element of a defamation claim, a complaint

lacking plausible factual allegations supporting such a finding must be dismissed. *See*

*Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018); *Michel*, 816 F.3d at 704;

*Biro v. Condé Nast*, 807 F.3d 541, 544-45 (2d Cir. 2015); *McDonald v. Wise*, 769 F.3d

1202, 1219-20 (10th Cir. 2014); *Mayfield v. NASCAR*, 674 F.3d 369, 377 (4th Cir. 2012).

To plausibly plead actual malice, as with any other element of a claim, conclusory

allegations or legal conclusions masquerading as factual assertions will not do; "[b]are

assertions of the state of mind required for the claim . . . must be supported with

subsidiary facts." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013). Thus, if

Colborn's lawsuit against Netflix is to move forward, he must plead facts sufficient to

give rise to a reasonable inference that *Netflix*, as opposed to Ricciardi, Demos, or any

other participant in *MaM*'s creation, was aware of the series' probable falsity vis-à-vis

Colborn when it premiered in December 2015. *See Mimms v. CVS Pharmacy, Inc.*, 889 F.3d 865, 868 (7th Cir. 2018) (under actual malice standard, "knowledge of falsity held by a principal cannot be imputed to its agent. It is the state of mind of the speaker that is relevant").

The Amended Complaint contains no such allegations regarding Netflix, nor could it. At most, Colborn makes broad, undifferentiated accusations against all Defendants, alleging in conclusory fashion that they acted "jointly and severally," Dkt. 1-2 ¶¶ 39, 44, 48, 55, or that Ricciardi and Demos acted "in concert with" the other named Defendants, *id.* ¶¶ 21, 32, 33, 45. Similarly, without offering any averments specific to Netflix, the Amended Complaint flatly declares that all Defendants acted "with actual malice," *id.* ¶¶ 18, 39, 44, 48, 55; "with reckless disregard for the truth," *id.* ¶ 45; or that Defendants "knew or had reason to know that the statements were false," *id.* ¶¶ 50, 60, 64.

These are the very kind of "vague and conclusory" statements reciting the elements of a cause of action that are facially insufficient to advance a claim beyond the pleading stage. *Anderson v. Malone*, No. 17-CV-493-PP, 2018 WL 1462232, at *2 (E.D. Wis. Mar. 23, 2018) (Pepper, J.). Colborn's *only* allegations specific to Netflix are that it "released" the series "for worldwide distribution" and that it continues to make *MaM* available to its subscribers. Dkt. 1-2 ¶ 15. Nothing regarding the required state of mind can plausibly be inferred from these allegations.

Colborn also pleads—again, in conclusory fashion—that, together, all of the Defendants defamed him "to make the film more profitable and more successful in the eyes of their peers." Dkt. 1-2 ¶ 18. But it is black-letter law that an alleged profit motive

18

is insufficient to show actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491

U.S. 657, 667 (1989). Similarly insufficient is the Amended Complaint's accusation that

"Defendants included in their broadcasts [sic] only one-sided[,] biased interviews that

cast police and prosecutors as villains determined to prosecute and convict Avery for a

crime that he did not commit . . . ." Dkt. 1-2 ¶ 49(c). Even if that were accurate (and even

a cursory viewing of *MaM* shows that it is not), "actual malice does not mean bad intent,

ill-will, or animus." *In re Storms v. Action Wis. Inc.*, 2008 WI 56, ¶ 66, 309 Wis. 2d 704,

733, 750 N.W.2d 739, 753. Further, a speaker "is under 'no legal obligation to present a

balanced view' and cannot lose its constitutional protection because the plaintiff believed

it failed to do so." *Torgerson v. Journal Sentinel, Inc.*, 200 Wis. 2d 492, 546 N.W.2d 886

(table), 1996 WL 56655, at *8 (Ct. App. Feb. 13, 1996) (unpublished) (quoting *Perk v.

Reader's Digest Ass'n*, 931 F.2d 408, 412 (6th Cir. 1991)), *aff'd*, 210 Wis. 2d 524, 563

N.W.2d 472 (1997).[8]

What is missing from the Amended Complaint is any allegation that anyone at

Netflix knew or had reason to know that the series conveyed defamatory falsehoods

about Colborn. To be sure, Colborn alleges that Ricciardi and Demos attended and filmed

the entire Avery murder trial. Nowhere, however, does he allege that anyone at *Netflix*

attended even one minute of the Avery or Dassey trials, reviewed one word of the

---

[8] The Amended Complaint also alleges that all Defendants acted with actual malice because they have refused to "admit[] their distortions and omissions of fact" in the wake of "[t]horough, careful, and objective analysis by some members of the public and a few journalists [that] revealed that the series had badly distorted the facts." Dkt. 1-2 ¶ 55. Here, the Amended Complaint makes a not-so-veiled reference to a book criticizing *MaM* published by Colborn's counsel that mirrors many of the allegations in the Amended Complaint. *See generally* Michael Griesbach, INDEFENSIBLE: THE MISSING TRUTH ABOUT STEVEN AVERY, TERESA HALBACH, AND *MAKING A MURDERER* (Kensington Publ'g Corp. 2016). This detour is, however, irrelevant to the issue of actual malice, which is measured at the time of publication, not afterwards. *Pippen*, 734 F.3d at 614.

transcripts of either or those trials, or examined a single trial exhibit. *See, e.g.*, Dkt. 1-2 ¶ 36 ("Upon information and belief, Defendants Ricciardi and Demos filmed the entire [Avery] trial"); *id.* ¶ 43 (same); *id.* ¶ 45 ("Upon information and belief, defendants Ricciardi and Demos had access to the police reports and criminal complaints associated with each of these crimes and knew of their contents."). Absent plausible allegations about scienter specific to Netflix, the Amended Complaint against it must be dismissed.[9]

### B. The Amended Complaint does not plausibly allege negligence.

Even if Colborn were deemed, at this juncture, to be a private figure, his Amended Complaint would still fail to state a claim because he has not plausibly pleaded that Netflix was negligent in its distribution of *MaM*.

"[N]egligence is the failure to use the degree of care that would be exercised by a reasonable person under similar circumstances." *Estate of Schilling by Schilling v. Blount, Inc.*, 152 Wis. 2d 608, 618, 449 N.W.2d 56, 60 (Ct. App. 1989). "The whole theory of negligence presupposes some uniform standard of behavior for the protection of others from harm.'" *Denny v. Mertz*, 106 Wis. 2d 636, 654, 318 N.W.2d 141, 149 (1982) (quoting *Troman v. Wood*, 340 N.E.2d 292, 296-99 (1975)).

---

[9] With regard to Colborn's repeated refrain of "on information and belief": While "information and belief" pleading is not automatically deficient, "alleging something 'on information and belief' is not a license to engage in rank speculation." *Brazil v. Fashion Angels Enters.*, No. 17-CV-824, 2018 WL 3520841, at *2 (E.D. Wis. June 29, 2018), *report and recommendation adopted,* 2018 WL 3518524 (E.D. Wis. July 20, 2018). The Court may not rely merely on a plaintiff's say-so; there must be some factual support to render the allegation plausible. In other words, "there must be a belief that the claim is likely to have evidentiary support after further investigation," and a complaint must plead sufficient facts to create a plausible inference that will be the case. *Verfuerth v. Orion Energy Sys., Inc.*, 65 F. Supp. 3d 640, 647 (E.D. Wis. 2014) (internal marks and citation omitted). Here, even if Colborn's allegations "on information and belief" were interpreted as somehow directed at Netflix, they would be insufficient because he "has not taken the opportunity to explain why such a claim might be likely to have evidentiary support at some time." *Id.*

The Amended Complaint's bare allegations with respect to Netflix fail to satisfy even this lower bar. As discussed above, wherever Colborn attempts to allege that Netflix distributed *MaM* with fault—whether actual malice or negligence—he does so in conclusory fashion and only by indiscriminately lumping it together with the Producer Defendants. He does not do what the law requires, which is to allege a "lack of ordinary care either in the doing of an act or in the failure to do something." *Denny*, 318 N.W.2d at 149-50 (quoting *Troman*, 340 N.E.2d at 296-99). In fact, he does not specifically allege that Netflix did *anything*, other than distribute *MaM*. Nothing in the Amended Complaint connects the alleged omissions, distortions, and falsifications in the series to any action or inaction by Netflix, as opposed to the Producer Defendants. Nor does Colborn attempt to allege a "uniform standard of behavior" for distributors of nonfiction documentary series or even begin to explain how Netflix violated such a standard. (Nor could he because, as discussed below, distributors such as Netflix are not expected or required to investigate the accuracy of programs they distribute, absent some "blatant" clue that the content is false in some material respect.)

Courts throughout the country have dismissed libel claims based on similarly thin and unsupported allegations of negligence. For example, in *Jang v. Trustees of St. Johnsbury Academy*, one federal court concluded that, although the plaintiff's libel complaint alleged the defendants acted "maliciously" as well as "willfully, wantonly, and recklessly," she failed to "connect these conclusory allegations with any recitation of facts from which the Court can infer that [defendants] negligently failed to check the accuracy of the Letter's contents." 331 F. Supp. 3d 312, 351 (D. Vt. 2018), *appeal filed*,

No. 18-3342 (2d Cir. Nov. 5, 2018).

Likewise, in *E-Ventures Worldwide, LLC v. Google, Inc.*, another federal court dismissed a defamation claim against Google over its classification of plaintiff's websites as "pure spam." 188 F. Supp. 3d 1265, 1269, 1277-78 (M.D. Fla. 2016). The court rejected the plaintiff's argument that negligence was "implied" because Google had failed to review all of its websites, finding this allegation "insufficient to plead fault for a claim of defamation." *Id.* at 1278; *see also Glocoms Grp., Inc. v. Ctr. for Pub. Integrity*, No. 17-cv-6854, 2018 WL 2689434, at *6 (N.D. Ill. June 5, 2018) (granting motion to dismiss because, "[b]eyond conclusory allegations that CPI published the allegedly defamatory statements 'in full knowledge that they were untrue' and failed 'to fully investigate,' Glocoms fails to plead any supporting facts that raise a reasonable inference of negligence" (citations omitted)); *Hakky v. Wash. Post Co.*, No. 8:09-cv-2406-T-30MAP, 2010 WL 2573902, at  *6 (M.D. Fla. June 24, 2010) (granting motion to dismiss and stating that, "[a]lthough Plaintiff does point to specific statements in the Article that are false or misleading, Plaintiff does not state how Defendants made these statements negligently, or facts supporting that they were made with malice").

Nothing in the Amended Complaint permits the Court to infer that Netflix failed to exercise the degree of care expected of a company in the business of distributing nonfiction documentary series. The Amended Complaint's "vague and conclusory" statements reciting the elements of a cause of action are facially insufficient to proceed, *see Malone*, 2018 WL 1462232, at *2, and the claims against Netflix should be dismissed even if Colborn were not a public official.

22

**III.** **Because amendment would be futile, the Court should dismiss Colborn's claims against Netflix with prejudice.**

Although, under Federal Rule of Civil Procedure 15, a plaintiff is often granted leave to amend following an initial dismissal for failure to state a claim, "[l]eave to amend need not be granted . . . if it is clear that any amendment would be futile." *Bogie*, 705 F.3d at 608. A complaint should be dismissed with prejudice where its allegations or the contents of exhibits or other material referenced in and central to it show that the plaintiff cannot state a claim as a matter of law. *Id.* at 608-09; *see also Doermer v. Callen*, 847 F.3d 522, 528 (7th Cir. 2017) (affirming dismissal with prejudice where "the law is clearly on the defendants' side"). Both the law and the well-pleaded allegations of the Amended Complaint demonstrate that the flaws in Colborn's pleading cannot be cured by further amendment.

As noted, the Amended Complaint correctly characterizes the respective roles of the Defendants in this case: Chrome was the "*independent* film production company" that, along with its founders, filmmakers Ricciardi and Demos, created *MaM*, while Netflix thereafter "released [the series] for worldwide distribution." Dkt. 1-2 ¶¶ 4, 15. Colborn does not (and cannot) allege either that Netflix, as opposed to Ricciardi and Demos, created the series or that the filmmakers were Netflix employees.

Faced with analogous scenarios, courts across the country have recognized that those who distribute allegedly defamatory material produced by others are not liable for defamation or other content-related torts unless, prior to publication, they know or have reason to know of the allegedly unlawful content. *See, e.g.*, *Lerman v. Flynt Distrib. Co.*,

745 F.2d 123, 140-41 (2d Cir. 1984) (magazine distributor); *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 319-20 (D.D.C. 2011) (online and brick-and-mortar booksellers); *Velle Transcendental Research Ass'n v. Sanders*, 518 F. Supp. 512, 519 (C.D. Cal. 1981) (book publishers).

This standard requires more than just a general awareness of *MaM*'s content, as the Wisconsin Supreme Court recognized in *Maynard v. Port Publications, Inc.*, 98 Wis. 2d 500, 297 N.W.2d 500 (1980). There, the court affirmed dismissal of a defamation claim against a contract printer, holding that it had no duty to review the publications it printed and therefore could not be liable for the contents of an allegedly defamatory newspaper produced by a third party. *Id.* at 567, 297 N.W.2d at 506-07. The court reached this conclusion *even though* the printer had previously refused to print copies of the newspaper because of inappropriate content and was thus generally aware of its contents. *Id.* at 566, 297 N.W.2d at 506; *see also Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992) ("[A] publisher who does not already have 'obvious reasons to doubt' the accuracy of a story is not required to initiate an investigation that might plant such doubt."); *Nader v. de Toledano*, 408 A.2d 31, 57 (D.C. 1979) ("In the absence of an evidentiary showing that a publisher had good reason to suspect its falsity, a statement does not create a duty of inquiry.").

Colborn does not even allege that Netflix reviewed the series or was otherwise familiar with its contents before distributing *MaM*. But even if he did, that would not be enough. Instead, he must plausibly allege, at a minimum, that Netflix *knew that the contents were probably false*. *Maynard*, 98 Wis. 2d at 566, 297 N.W.2d at 506. In the

Seventh Circuit, this means he must allege that "something *blatant* put [Netflix] on notice that [the Producer Defendants were] reckless about the truth." *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1319 (7th Cir. 1988) (concluding that publishers generally have no obligation to fact-check the work of journalists who are freelance contributors or independent contractors (citations omitted) (emphasis added)). Colborn does not make any such allegations, nor could he. As the court explained in *Saenz*, "blatant" notice means "[s]erious factual improbabilities or inconsistencies in the article itself, or resting it solely on an inherently unreliable source such as an anonymous telephone call." *Id.* (citations omitted).

In this case, the well-pleaded allegations of the Amended Complaint *themselves* demonstrate that Netflix had no reason to question *MaM*'s references to Colborn and thus assumed no duty to verify the accuracy of those statements prior to distribution. Absent such a duty, Netflix could not have distributed *MaM* negligently, much less with actual malice. *See Parisi*, 774 F. Supp. 2d at 320-21 (to show that a corporate defendant disseminated allegedly defamatory material with actual malice, "plaintiffs must demonstrate actual malice in a high-level employee in order to attribute actual malice to the corporation"); *accord Lerman*, 745 F.2d at 140; *cf. Sullivan*, 376 U.S. at 286-92 (reversing a libel verdict even though the newspaper defendant did nothing to investigate the accuracy of an advertisement it published that libeled the plaintiff).

Both the Amended Complaint and *MaM* itself demonstrate that Netflix had no reason to suspect that the series conveyed anything false about Colborn. First, far from a "product of Defendants' imagination," *see* Dkt. 1-2 ¶¶ 50, 64, the allegation that Colborn

and another Manitowoc County law enforcement official planted evidence to ensure

Avery's conviction for the Halbach slaying was at the heart of Avery's murder trial,

which Ricciardi and Demos attended and recorded. Colborn concedes this. *See* Dkt. 1-2

¶¶ 31, 36. Further, as the Amended Complaint repeatedly acknowledges and as *MaM*

recounts in detail, Avery was "wrongfully convicted" in Manitowoc County in 1985

before being exonerated by DNA evidence eighteen years later. *Id.* ¶¶ 14, 23, 24. Thus,

any suggestion in *MaM* that Colborn planted evidence or that Avery was wrongly

convicted was not inherently improbable such that Netflix was confronted with "blatant"

evidence that the series contained false statements of fact. Whether or not Manitowoc

County officials framed Avery a second time, it is not inherently improbable to assert that

they might have done so (as Avery's counsel concededly did on his behalf). This is

especially true given that *MaM* is comprised largely of footage of trial testimony, other

evidence including interrogations and depositions, and interviews with participants in the

case.

In addition, Colborn has not pleaded that there was anything in Ricciardi's and

Demos's background that should have put Netflix on notice that they were unreliable. It

is not "actual malice" to publish material from a source whose credibility is not suspect.

*See Chang v. Michiana Telecasting Corp.*, 900 F.2d 1085, 1090-91 (7th Cir. 1990)

(newspaper reporter did not summarize television news report with actual malice where

there was no indication television journalist "was a notoriously unreliable reporter");

*Saenz*, 841 F.2d at 1319-20 (magazine had no duty to fact-check freelancer's article

"absent strong indicators of falsity or unreliability" (citations omitted)); *Simonson v.*

*United Press Int'l, Inc.*, 500 F. Supp. 1261, 1268-69 (E.D. Wis. 1980) (no actual malice

where wire service reporters relied on newspaper report), *aff'd*, 654 F.2d 478 (7th Cir.

1981); *Biskupic v. Cicero*, 2008 WI App 117, ¶¶ 33, 313 Wis. 2d 225, 247, 756 N.W.2d

649, 659 (no actual malice in reporter's reliance on a single source where reporter "did

not have any reason to question [the source's] motives or the veracity of her

information"). The principle that publishers are entitled to rely on authors and other

content creators they have no reason to doubt is merely an application of the black-letter

law that "failure to verify information, without more, is not evidence of actual malice."

*Id.*, 313 Wis. 2d at 247, 756 N.W.2d at 659; *see also Pippen*, 734 F.3d at 614 ("[F]ailure

to investigate is precisely what the Supreme Court has said is insufficient to establish

reckless disregard for the truth.").

The allegations of the Amended Complaint and the content of *MaM* establish that

Netflix had no reason to double-check the accuracy of Ricciardi's and Demos's work,

and consequently could not have disseminated the series with fault—much less actual

malice—as a matter of law. Because another attempt to amend Colborn's claim against

Netflix would be futile, it should be dismissed with prejudice.

## IV. Colborn's intentional infliction of emotional distress claim should also be dismissed.

Colborn's remaining claim for intentional infliction of emotional distress ("IIED")

is based entirely on the premise that Netflix published false and defamatory statements

about him. As a result, that claim must be dismissed along with his defamation claim.

Defamation plaintiffs cannot end-run the requirements of libel law by calling their

claims something else. As the Supreme Court held in *Hustler Magazine v. Falwell*, "public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice.'" 485 U.S. 46, 56 (1988).

In fact, if the Court dismisses Colborn's libel claims, his IIED claim fails whether or not he is deemed a public official for purposes of this motion. As the Fourth Circuit explained in a decision affirmed by the Supreme Court: "[R]egardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional injury allegedly resulting from the defendant's speech." *Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011); *see also Snyder*, 562 U.S. 443, 451 ("The Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress."); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 513 (1984) (when the First Amendment protects speech for libel purposes it similarly protects against a product disparagement claim); *Hill*, 385 U.S. at 387-88 (same, for invasion of privacy); *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192-93 & nn.2-3 (9th Cir. 1989) (same, for intentional infliction of emotional distress and false light).

Colborn's IIED claim also fails because he does not plead any facts that would plausibly establish the elements of the tort. A claim for intentional infliction of emotional distress in Wisconsin requires the plaintiff to plead and prove "(1) that the defendant's conduct was intentioned to cause emotional distress; (2) that the defendant's conduct was

28

extreme and outrageous; (3) that the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling emotional response to the defendant's conduct." *Rabideau v. City of Racine*, 2001 WI 57, ¶ 33, 243 Wis. 2d 486, 501, 627 N.W.2d 795, 802-03. Colborn does not plead any fact plausibly suggesting that Netflix distributed *MaM* with the express intent of causing Colborn emotional distress. Nor does he plead any fact that would plausibly support a contention either that Netflix's conduct in distributing *MaM* was "extreme and outrageous" or that it proximately caused emotional distress so disabling that, as Wisconsin's pattern jury instructions put it, he "was unable to function in other relationships because of the emotional distress caused by the conduct." *Pierce v. Physicians Ins. Co. of Wis.*, 2005 WI 14, ¶ 43, 278 Wis. 2d 82, 104, 692 N.W.2d 558, 568-69 (Prosser, J., concurring) (citing Wis JI-Civil 2725).

## CONCLUSION

The First Amendment requires Colborn, a sworn law enforcement officer, to plead and prove that Netflix distributed *Making a Murderer* with actual malice. His Amended Complaint comes nowhere close to satisfying federal pleading standards—indeed, it does not even plausibly plead negligence. Because amendment would be futile and because Colborn's intentional infliction of emotional distress claim is based entirely on the premise that Netflix defamed him, his lawsuit against Netflix should be dismissed with prejudice.

Dated: May 9, 2019                    Respectfully submitted,


                                      *s/ James A. Friedman*
                                      James A. Friedman, SBN 1020756
                                      Godfrey & Kahn, S.C.
                                      One East Main Street
                                      Suite 500
                                      Madison, WI 53703-3300
                                      T: (608) 284-2617
                                      F. (608) 257-0609
                                      jfriedman@gklaw.com

                                      Lee Levine
                                      Matthew E. Kelley
                                      Ballard Spahr LLP
                                      1909 K Street, NW, Suite 1200
                                      Washington, D.C. 20006-1157
                                      T: (202) 508-1110
                                      F: (202) 661-2299
                                      levinel@ballardspahr.com
                                      kelleym@ballardspahr.com

                                      Leita Walker
                                      Ballard Spahr LLP
                                      2000 IDS Center, 80 South 8th Street
                                      Minneapolis, MN 55402-2119
                                      T: (612) 371-6222
                                      F: (612) 371-3207
                                      walkerl@ballardspahr.com

                                      *Counsel for Netflix, Inc.; Chrome Media*
                                      *LLC; Laura Ricciardi; and Moira Demos*

20601876.1