200 Wis.2d 492
Unpublished Disposition
See Rules of Appellate Procedure, Rule 809.23(3), regarding citation of unpublished opinions. Unpublished opinions issued before July 1, 2009, are of no precedential value and may not be cited except in limited instances. Unpublished opinions issued on or after July 1, 2009 may be cited for persuasive value.
NOTE: THIS OPINION WILL NOT APPEAR IN A PRINTED VOLUME. THE DISPOSITION WILL APPEAR IN A REPORTER TABLE.
Court of Appeals of Wisconsin.

John W. TORGERSON, Plaintiff-Respondent,
v.
JOURNAL SENTINEL, INC., Defendant-Appellant.
John W. TORGERSON, Plaintiff-Appellant,
v.
JOURNAL SENTINEL, INC., Defendant-Respondent.

Nos. 95-1098 & 95-1857.
|
Feb. 13, 1996.

APPEAL from a judgment and an order of the circuit court for Eau Claire County: PAUL J. LENZ, Judge.

Before CANE, P.J., and LaROCQUE and MYSE, JJ.

**Opinion**

LaROCQUE, J.

*1 The Journal Sentinel, Inc., publisher of THE MILWAUKEE JOURNAL (THE JOURNAL) appeals the denial of its summary judgment motion in the libel action initiated by John W. Torgerson, formerly Wisconsin's deputy commissioner of insurance.[1] Torgerson, who concurrently held his public office while he was half owner and an officer of a title insurance company, contends that THE JOURNAL defamatorily and falsely reported that he had violated conflict of interest restraints set forth in two letters from the state Ethics Board, and similarly implied that his initiation of a change in title insurance regulation was for the purpose of advancing his private business at the expense of the public interest and was therefore unethical. We have consolidated Torgerson's separate appeal of a summary judgment dismissing his second libel action based upon the republication of similar articles in other newspapers, including THE EAU CLAIRE LEADER-TELEGRAM.

1     We granted leave to appeal pursuant to § 808.03(2), STATS., by order dated May 11, 1995.

We conclude that Torgerson failed to provide sufficient evidence of actual malice to go to trial. Actual malice is a constitutional requirement for a successful libel action involving a public official. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[2] Actual malice must be shown with "convincing clarity" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 244, 106 S.Ct. 2505, ---, 91 L.Ed.2d 202, 91 L.Ed.2d 202 (1986). "The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact." *Bose Corp. v. Consumers Union,* 466 U.S. 485, 511, 104 S.Ct. 1949, ---, 80 L.Ed.2d 502, 80 L.Ed.2d 502 (1984). We reverse the denial of the newspaper's summary judgment motion. Because the same defect bars the republication lawsuit, the circuit court's judgment of dismissal of that action based on other grounds is affirmed.[3]

2     The First Amendment to the United States Constitution provides: "Congress shall make no law ... abridging the freedom of speech, or of the press...."
      The First Amendment is made applicable to the states by virtue of the Fourteenth Amendment. *New York Times Co. v. Sullivan,* 376 U.S. 254, 263 n. 4, 84 S.Ct. 710, ---, 11 L.Ed.2d 686, 11 L.Ed.2d 686 (1964). There is "state action" even though the matter involves a civil lawsuit between private parties; state courts apply a state rule of common law to impose the invalid restrictions on the constitutional freedoms of speech and press, and therefore the state is exercising its power to deny a federal constitutional right. *Id.* at 265, 84 S.Ct. 710.

3     The circuit court dismissed the second action for failure to comply with the provisions of § 895.05(2), STATS., which compels a demand for retraction before suing for a published libel. Although Torgerson served separate demands for retraction as to both the original and the republication, the court ruled that Torgerson was required to notify

the defendant in his initial demand that he might sue on the republication *before* he brought suit on the initial publication. Because we resolve both lawsuits on other grounds, we do not address the question of notice.

The alleged libel as initially published on October 14 and 15, 1993, read:

Torgerson cut rule despite ethics warning

*Agency no longer keeps track of lowest rates for title insurance*

....

During his recent tenure as a top state insurance regulator, John W. Torgerson was co-owner of a title insurance company, leading to two warnings by the state Ethics Board to avoid a conflict of interest by staying out of title insurance regulation.

But a Milwaukee Journal investigation of state insurance records shows that Torgerson, while deputy commissioner of insurance, helped wipe out a rule that required title insurance companies to disclose publicly in commission files their lowest, discounted rates.

....

Torgerson told The Journal earlier this year, after it disclosed his dual role as insurance regulator and insurance company co-owner, that he had stayed out of title insurance matters.

A substantially identical story was later republished in other newspapers in Wisconsin and Minnesota. After THE JOURNAL refused to comply with Torgerson's demand for retraction made under § 895.05, STATS., he brought suit.

**\*2** Torgerson claims the article is defamatory and false.[4] He relies in part upon the undisputed fact that he initiated the inquiries that caused the Ethics Board to write the advisory letters, a fact not reported in the article, which characterized the letters as "warnings."[5] Torgerson further contends that the article falsely reports that the Ethics Board letters stated that he was told he should be "staying out of title insurance regulation." Rather, he says, the letters merely set forth limited specific circumstances in which he could not be involved in title insurance regulation without an impermissible conflict of interest. Torgerson also contends that the story falsely implies that he participated in getting the rule change for the purpose of advancing his private business, acted contrary to the public interest, and thereby behaved unethically. Torgerson suggests that the defamatory and false inference of his improper motivation is strengthened by the false statement that he had earlier told THE JOURNAL that he had "stayed out of title insurance matters." He points to the actual words of his earlier statement to the paper when he said that "the ethics guidelines were easy to follow ... There is an appearance of conflict which must be avoided ... That appearance is extremely easy to avoid." He asserts proof of actual malice from facts and circumstances detailed later in this opinion.

4   Defamation has been defined as " 'that which tends to injure "reputation" in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.' PROSSER [Law of Torts (hornbook series, 3d ed.), ] p. 756." *Polzin v. Helmbrecht,* 54 Wis.2d 578, 583, 196 N.W.2d 685, 688 (1972). For a newspaper article to be libelous, it need only tend to degrade or disgrace the plaintiff generally, or to subject him to public distrust, ridicule or contempt in the community. *Id.*

   Torgerson must prove that the statements in the article were false because truth is a complete defense in a defamation action. *See Lathan v. Journal Co.,* 30 Wis.2d 146, 158, 153, 140 N.W.2d 417, 423 (1966). The elements of a common law defamation claim are set forth in *Van Straten v. Milwaukee Journal Newspaper-Publisher,* 151 Wis.2d 905, 912, 447 N.W.2d 105, 108 (Ct.App.1989), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2626, 110 L.Ed.2d 646 (1990).

5   To allow the letters to be read in context, we have included them in their entirety in the appendix.

THE JOURNAL contends that the trial court construed the statements at issue out of context and that the story as a whole is neither capable of a defamatory meaning nor false. It points to the conflicting interpretations different parties placed upon the meaning of the Ethics Board letters, including comments from Torgerson himself. THE JOURNAL also argues that the alleged implication of Torgerson's subjective motivation and ethics is protected by the fair comment privilege because it is merely a matter of opinion, neither capable of being proven expressly false nor including a provable false factual connotation.[6]

6  Under the common law principal of "fair comment," legal immunity is afforded for the honest expression of opinion on matters of public interest when based upon a true or privileged statement of fact not made solely for the purpose of causing harm. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 13-14, 110 S.Ct. 2695, ---, 111 L.Ed.2d 1, 111 L.Ed.2d 1 (1990). Moreover, insofar as such statements involve a public official, as long as the "opinion" does not contain a provable false factual connotation, it is given constitutional protection. *Id.* at 14-21, 110 S.Ct. 2695.

THE JOURNAL also maintains that Torgerson failed to meet his burden to establish a prima facie case of actual malice under the rational interpretation analysis of the evidence employed by the United States Supreme Court in *Time, Inc. v. Pape,* 401 U.S. 279, 290, 91 S.Ct. 633, ---, 28 L.Ed.2d 45, 28 L.Ed.2d 45 (1971). This is so, it argues, because Rowan's article provided a reasonable translation of the meaning of highly ambiguous government documents and statements. Because we embrace this application of *Pape* to this case, and because we conclude that the evidence of actual malice is insufficient as a matter of law, we need not address the other issues.

Our review of a decision to grant or deny summary judgment applies the same methodology as the circuit court and we decide the matter de novo. *Crowbridge v. Village of Egg Harbor,* 179 Wis.2d 565, 568, 508 N.W.2d 15, 21 (Ct.App.1993). When the materials introduced for and against summary judgment present only a question of law, that question should be decided by summary judgment. *Southard v. Occidental Life Ins. Co.,* 31 Wis.2d 351, 354-55, 142 N.W.2d 844, 845 (1966). Summary judgment may be particularly appropriate in defamation actions to mitigate the potential chilling effect on free speech and the press that might result from lengthy and expensive litigation. *Bayview Packing Co. v. Taff,* No. 95-0901 slip op. at 12 (Wis. Ct.App. Dec. 12, 1995, ordered published Jan. 30, 1996).

**\*3** The underlying basis of Torgerson's claim is not unlike the circumstances in *Pape. Pape* holds that where the alleged libel of a public official is founded upon a claimed misinterpretation of authoritative government sources that are highly ambiguous, and where the reviewing court concludes from all of the evidence that the newspaper's account of the information is one reasonable translation of the source material, even though it may not be the "true" meaning intended by the source, the claim fails for lack of actual malice. *See id.* at 284-92.

The requirement of actual malice as an element in libel actions by a public official was imposed in *New York Times.* The parties agree that Torgerson was a public official so as to invoke the actual malice rule. *New York Times* held that the First Amendment requires the plaintiff to show that in publishing the defamatory statement the defendant acted with " 'actual malice'-that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-80. The reviewing court must independently "examine ... the statements in issue *and the circumstances under which they were made* to see ... whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." *Id.* at 285 (quoting *Pennekamp v. Florida,* 328 U.S. 331, 335, 66 S.Ct. 1029, ---, 90 L.Ed. 1295, 90 L.Ed. 1295 (1946)) (emphasis added). The evidence of actual malice is subject to the clear and convincing evidentiary standard. *See Pape,* 401 U.S. at 285-86, 91 S.Ct. 633. This heightened evidentiary requirement must be considered by the court in ruling on a motion for summary judgment. *Anderson,* 477 U.S. at 244, 106 S.Ct. 2505.

The rational interpretation approach used in *Pape* arose from a libel action based upon a story published in TIME magazine. The story described a publication released by the United States Commission on Civil Rights in 1961, entitled *Justice,* devoted in part to the problem of police brutality and related private violence in the United States. *Id.* at 280, 106 S.Ct. 2505. *Justice* contained references to accusations that had been made in a civil rights complaint of a shocking incident of police violence against a black family in Chicago. *Id.* at 281, 106 S.Ct. 2505. Pape, a police detective named in the civil rights suit, brought his libel action against TIME because its article quoted at length from the civil rights complaint without ever indicating that the charges were those of the complainant rather than the independent findings of the commission, and without using the word "alleged" in relation to the accusations. *Id.* at 281-82 [7], 106 S.Ct. 2505. The TIME researcher conceded at trial that she was aware of her omission of the word "alleged" in the story, but said she believed the article to have been true as written in light of the full context of the *Justice* report. *Id.* at 283, 106 S.Ct. 2505.

Case 1:19-cv-00484-BHL  Filed 05/09/19  Page 3 of 8  Document 31-6

7   The TIME article began:
> The new paperback book has 307 pages and the simple title *Justice.* It is the last of five volumes in the second report of the U.S. Commission on Civil Rights, first created by Congress in 1957. *Justice* carries a chilling text about police brutality in both the South and the North-and it stands as a grave indictment since its facts were carefully investigated by field agents and it was signed by all six of the noted educators who comprise the commission.
>
> ....
>
> Shifting to the North, the report cites Chicago police treatment of Negro James Monroe and his family, who were awakened in their West Side apartment at 5:45 a. m. by 13 police officers, ostensibly investigating a murder. The police, says *Justice,* "broke through two doors, woke the Monroe couple with flashlights...."

*Time, Inc. v. Pape,* 401 U.S. 279, 281-82, 91 S.Ct. 633, ---, 28 L.Ed.2d 45, 28 L.Ed.2d 45 (1971).

*Pape* reinstated the trial court's directed verdict in favor of the magazine. *Id.* at 283, 106 S.Ct. 2505. It did so on the basis of its legal conclusion that there was an insufficient showing of actual malice.

**\*4** *Pape* ratified earlier standards:

> In *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ... the opinion emphasized the necessity for a showing that a false publication was made with a "high degree of awareness of * * * probable falsity." ... *These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.* There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*Id.* at 291-92, 106 S.Ct. 2505 (emphasis added).

Thus, *Pape* concluded that there was absence of malice while acknowledging that the TIME magazine article reported "as a charge by the Commission what was, in its literal terms, a description by the Commission of the allegations in a complaint filed by a plaintiff in a civil rights action." *Id.* at 284-85, 106 S.Ct. 2505.

*Pape* emphasizes the fact that a libel lawsuit over a publication that purports to report what others say about public affairs differs in a number of respects from the conventional libel case. *Id.* at 284-85, 106 S.Ct. 2505. First, the publication underlying the plaintiff's claim was not the defendant's independent report of the police brutality episode, but TIME's report of what the government agency had said about it. *Id.* at 285, 106 S.Ct. 2505. Further, the alleged damage to reputation was not that arising from mere publication, but that resulting from attribution of the accusations to an authoritative official source. *Id.* Finally, the defendant admitted an awareness at the time of publication that the wording of the government report had been significantly altered, but insisted that its real meaning had not been changed. *Id.*

*Pape* grants the press considerable leeway in making conscious and deliberate choices of "truthful" interpretation, noting:

> Indeed, perhaps the largest share of news concerning the doings of government appears in the form of accounts of reports, speeches, press conferences, and the like. The question of the "truth" of such an indirect newspaper report presents rather complicated problems.
>
> A press report of what someone has said about an underlying event of news value can contain an almost infinite variety of shadings. Where the source of the news makes bald assertions of fact-such as that a policeman has arrested a certain man on a criminal charge-there may be no difficulty. But where the source itself has engaged in qualifying the information released, complexities ramify. Any departure from full direct quotation of the words of the source, with all its qualifying language, inevitably confronts the publisher with a set of choices.

*Id.* at 285-86, 106 S.Ct. 2505.

Similarly, Torgerson's comment that "There is an appearance of conflict which must be avoided ... That appearance is extremely easy to avoid," is reasonably capable of meaning that "he stayed out of title insurance matters." The test is not whether the article is an erroneous interpretation of the documents and the statements made. The question is whether all of the circumstances of the case sufficiently demonstrate a belief by the publisher that it was not true. *Pape* reaffirmed its concern expressed earlier in *New York Times:*

**\*5** A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions-and to do so on pain of libel judgments virtually unlimited in amount-leads to ... "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred.... Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so.

*Id.* at 290, 106 S.Ct. 2505.

Like the reporter for TIME in *Pape,* the reporter for THE JOURNAL, James Rowan, stated in his affidavit that he had no personal animus toward Torgerson and, based upon his review of public records and interviews with the individuals involved, believed when he wrote the story and still believed the facts and statements were true. Torgerson has not provided sufficient facts and inferences to overcome this assertion.

The rationale underlying *Pape* resonates in the present lawsuit. *Pape* characterized the government document, *Justice,* that the TIMES interpreted as "extravagantly ambiguous." *Id.* at 287, 106 S.Ct. 2505. It was impossible to know whether the Civil Rights Commission was seeking to encourage belief or skepticism regarding the incidents described in its report. *Id.* at 286-89, 106 S.Ct. 2505.

The Ethics Board letters and other comments about them in this case are also abundantly ambiguous on the key question. It can be conceded that the letters do not state in so many words that Torgerson must "stay[ ] out of title insurance regulation," and Torgerson did not expressly advise THE JOURNAL that he had "stayed out." However, the letters, read in their entirety and considered along with the comments about them from the writer of the initial letter, may reasonably be interpreted to suggest that is what was meant. The initial letter immediately advises Torgerson that his half ownership and active service as an officer of a title insurance company "raises issues under the Ethics Code." The letter quotes the state Code of Ethics for Public Officials and Employees that limits private employment and business pursuits that "*in no way interfere[ ]* with the full and faithful discharge of his or her duties to the state." (Emphasis added.) An Ethics Board opinion is cited for the proposition that "[a] public officer owes *an undivided duty* to the public whom he serves and should avoid placing himself in a position in which *a conflict of interest might arise.*" (Emphasis added.) Language from another opinion ambiguously advises: "the official's personal interest in the performance of that business may conflict impermissibly with the official's regulatory responsibilities." Perhaps the ambiguity was unavoidable because, at the time the letters were written, they were meant only as a general statement of ethical rules and not directed at a specific activity that Torgerson contemplated. [8]

[8] "It appears to me that in Ethics, as in all other philosophical studies, the difficulties and disagreements, of which history is full, are mainly due to a very simple cause: namely to the attempt to answer questions, without first discovering precisely *what* question it is which you desire to answer." JOHN B. BARTLETT, BARTLETT'S FAMILIAR QUOTATIONS 915 (14th ed.1968) (quoting GEORGE EDWARD MOORE, PRINCIPIA ETHICA, preface (1903)).

**\*6** Other language in the letters is similarly capable of supporting THE JOURNAL's interpretation. The second letter notes a public officer "owes an *undivided loyalty to the public* ...." (Emphasis added.) The writer advises Torgerson that the legislature has clearly expressed its sensitivity to this issue with respect to the Office of Commissioner of Insurance. "It has indicated an intent that the head of the agency avoid *even the possibility of a conflict of interest* by prohibiting the Insurance Commissioner from engaging in any occupation, business or activity that is in any way inconsistent with the performance of the Commissioner's duties. § 15.06(3)(b), *Wisconsin Statutes.*" The writer concludes: "Thus, in determining when and how to avoid situations of potential conflict I advise erring on the side of caution."

Significantly, THE JOURNAL also had the statement from the first letter's author, Jonathan Becker, the board's legal counsel. Becker was "disappointed to learn that Torgerson had been involved in changing the rules governing title insurance regulation." Becker added: "Quite honestly, I'm just very surprised, given what he said publicly and privately to us that he was uninvolved." These comments strongly support THE JOURNAL's interpretation of the letters.

As proof of absence of malice, THE JOURNAL also points to the fact that the article read in its entirety contains both sides of the debate. It pointed out that Torgerson saw nothing wrong with his conduct, said that it hurt no one, said that the rule change was pro-consumer and that he read the letters to mean that he should stay out of regulatory matters "from which he could personally benefit." The story then attributed to Torgerson the observation: "That meant that he did not totally disassociate himself from some general title insurance issues."

Apart from the question of the ambiguity of the letters and the comments about them, Torgerson points to other evidence in this record to support his contention that the question of actual malice bars summary judgment. He suggests summary judgment is inappropriate because the issue of actual malice goes to the publisher's state of mind, *New York Times,* 376 U.S. at 279-80, 84 S.Ct. 710, because all justifiable factual inferences are to be drawn in his favor, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and because a publisher's testimony that he or she acted in good faith in publishing defamatory statements does not "automatically insure a favorable verdict...." *St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, ---, 20 L.Ed.2d 262, 20 L.Ed.2d 262 (1968).

Specifically, Torgerson points to the fact that THE JOURNAL reporter, Rowan, destroyed his interview notes after he was aware that Torgerson had demanded a retraction. He points to the fact that Rowan characterized the letters as "warnings" when he knew they were only written in response to a request from Torgerson for advice. He points to facts that were not included in the article, including a note in the file from Norman Writz, the examiner in the Office of Insurance Commissioner quoted in the article in a light unfavorable to Torgerson. The note stated that the rule change was "okay" and that [n]obody [would] be harmed." Torgerson relies upon the statement that the rule change was accomplished two months before Torgerson resigned to return to Eau Claire where he was an officer and part owner of the private title insurance company. The article fails to mention that a review of the rule-making file demonstrated that the timing of the rule change was simply a result of the natural course of the rule-making process.

**\*7** We first address the issue of the destruction of the reporter's notes. Torgerson relies upon *Chang v. Michiana Telecasting Corp.,* 900 F.2d 1085, 1090 (7th Cir.1990), which noted that the seventh circuit had previously held that a reporter's destruction of his notes permits an inference of malice, citing *Brown & Williamson Tobacco Corp. v. Jacobson,* 827 F.2d 1119, 1134-36 (7th Cir.1987). Torgerson suggests that *Chang* essentially applied the "well-established principle that evidence is presumed to be harmful to the position of the party who destroys it."

We think that neither *Chang* nor *Jacobson* support a determination of actual malice based upon Rowan's destruction of his interview notes. *Chang* refused to draw an inference of malice from circumstances more suspicious than those presented here. The television reporter's notes in that case had "vanished," although the pages in the note pad before and after the relevant story were found; the reporter denied knowing how that happened. *Id.* at 1090. The *Chang* court refused to infer that the notes had been purposely destroyed, noting that the previously anonymous source of the allegedly libelous story had surfaced and confirmed the information that the reporter had noted and then published. *Id.* Thus, the court, observing that the missing notes were only significant as contemporaneous records of the anonymous telephone conversation, concluded that any inference that the missing notes could supply clear and convincing evidence of malice was absent. *Id. Chang* concluded that the mere possibility that the reporter had made notes of her thoughts of disbelief in the truth of her story was "so remote that it does not defeat a motion for summary judgment." *Id.*

In our case, the reporter acknowledged that he had destroyed the interview notes intentionally. He explained, however, that he had destroyed his interview notes because THE JOURNAL required him to move his work space in January 1994, whereby he lost more than half his work space, leaving him one file cabinet and a desk. He indicated that he discarded many files and parts of

© 2019 Thomson Reuters. No claim to original U.S. Government Works.   6

files, including his interview notebooks and legal pads with interview notes to thin out his files. He indicated that although he was aware of the retraction demand, he had heard nothing further for months and believed Torgerson did not intend to follow through on his threat to sue.

There is no claim that the quotes from the interviews were inaccurately reported in the article. To the contrary, Torgerson's contention is that the Ethics Board letters were misinterpreted, that Torgerson's earlier quote in THE JOURNAL was later misquoted and that the article draws improper inferences from the records and statements made by the parties involved. The remote possibility that the reporter would have written in his interview notes that he entertained serious doubts about the truth of his article is far too speculative.

**\*8** *Jacobson* is also easily distinguished. In that case, the court of appeals essentially determined that the "innocent" explanation of a researcher for a libelous television broadcast who intentionally destroyed critical research documents was not believable as a matter of law. First, the researcher who had worked "constantly" on stories involving legal matters claimed that he was unaware the plaintiff had a right to appeal the initial dismissal, a claim the court found "implausible." *Id.* at 1135. Second, the selective "housecleaning" of only part of the documents was unexplained. *Id.* Third, the researcher had no explanation why he had cleaned off his former boss's desk without permission at a location in a different part of the newsroom where the researcher no longer worked. *Id.* Finally, the researcher violated a CBS retention policy requiring that the law department be contacted prior to destruction. *Id.* The interview notes here were not critical to the libel issue, the reporter did not limit destruction to the story in question and he gave a rational explanation for his actions.

We have similar misgivings concerning the other grounds recited to show clear and convincing evidence of actual malice. The use of the word "warning" to describe the Ethics Board letters is not significant:

> [T]he First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words. Editors' grilling of reporters on word choice is a necessary aggravation. But when courts do it, there is a chilling effect on the exercise of First Amendment rights.

*Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1304 (8th Cir.1986) (citation omitted). Accepting the semantical argument "would place the First Amendment at the mercy of linguistic subtleties and fourth-ranked dictionary definitions." *Id.* at 1302. [9]

[9] The JOURNAL points to dictionary definitions of "warn" as "to give notice [or] advice ... of danger, impending evil, possible harm, or anything else unfavorable...." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (Unabr.1966).

Similarly, the plaintiff's contentions regarding the absence of certain favorable facts in the story are insufficient to establish actual malice. The newspaper is under "no legal obligation to present a balanced view" and cannot lose its constitutional protection because the plaintiff believes it failed to do so. *Perk v. Reader's Digest Ass'n,* 931 F.2d 408, 412 (6th Cir.1991).

Said another way:

> [The reporter's] journalism skills are not on trial in this case. The central issue is not whether the [article] measured up to the highest standards of reporting or even to a reasonable reporting standard, but whether the defendant[ ] published the column with actual malice-actually knowing it to be false or having serious doubts as to its truth.

*Woods v. Evansville Press Co.,* 791 F.2d 480, 489 (7th Cir.1986).

In conclusion, Torgerson failed to offer clear and convincing evidence in opposition to summary judgment sufficient to meet the plaintiff's burden of showing by clear and convincing evidence that the JOURNAL knew the

challenged statements were false or had serious doubts about their truth. Because the circuit court dismissed the republication lawsuit on other grounds, we affirm the judgment of dismissal.

*9 *By the Court.*-Judgment affirmed in part and reversed in part. Costs to Journal Sentinel, Inc.

AN EXHIBIT HAS BEEN ATTACHED TO THIS OPINION. THE EXHIBIT CAN BE OBTAINED UNDER SEPARATE COVER BY CONTACTING THE WISCONSIN COURT OF APPEALS.

COURT OF APPEALS

OF WISCONSIN

ROOM 231, STATE CAPITOL EAST

POST OFFICE BOX 1688

MADISON, WISCONSIN 53701-1688

TELEPHONE: (608) 266-1880

FAX: (608) 267-0640

Marilyn L. Graves, Clerk

Court of Appeals

**All Citations**

200 Wis.2d 492, 546 N.W.2d 886 (Table), 1996 WL 56655

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.