# EXHIBIT 5

1    STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                                 BRANCH 1
2

3    STATE OF WISCONSIN,

4                        PLAINTIFF,        JURY TRIAL
                                           TRIAL - DAY 1
5    vs.                                   Case No. 05 CF 381

6    STEVEN A. AVERY,

7                        DEFENDANT.

8
     **DATE:**    FEBRUARY 12, 2007
9
     **BEFORE:**  Hon. Patrick L. Willis
10                Circuit Court Judge

11   **APPEARANCES:**  KENNETH R. KRATZ
                      Special Prosecutor
12                    On behalf of the State of Wisconsin.

13                    THOMAS J. FALLON
                      Special Prosecutor
14                    On behalf of the State of Wisconsin.

15                    NORMAN A. GAHN
                      Special Prosecutor
16                    On behalf of the State of Wisconsin.

17                    DEAN A. STRANG
                      Attorney at Law
18                    On behalf of the Defendant.

19                    JEROME F. BUTING
                      Attorney at Law
20                    On behalf of the Defendant.

21                    STEVEN A. AVERY
                      Defendant
22                    Appeared in person.

23                    **TRANSCRIPT OF PROCEEDINGS**

24                Reported by Diane Tesheneck, RPR

25                    Official Court Reporter

                                 1

1    **I N D E X**

2                                                      PAGE

3    OPENING INSTRUCTIONS BY THE COURT          19

4    **OPENING STATEMENTS**

5    ATTORNEY KRATZ                             37

6    ATTORNEY STRANG                            110

7    **WITNESSES**

8

     **MICHAEL D. HALBACH**
9
     Direct Examination by ATTORNEY KRATZ       156
10
     Cross-Examination by ATTORNEY STRANG       178
11

12   **THOMAS PEARCE**

13   Direct Examination by ATTORNEY KRATZ       190

14   Cross-Examination by ATTORNEY STRANG       202

15   Redirect Examination by ATTORNEY KRATZ     209

16
     **DAVID BEACH**
17
     Direct Examination by ATTORNEY KRATZ       211
18
     Cross-Examination by ATTORNEY STRANG       215
19

20   **EXHIBITS**        MARKED      OFFERED     ADMITTED

21   1 &2                            178         178
     3 & 4          162              178         178
22   5,6,7                           178         178
     8              168              178         178
23   9              169              178         178
     10                              178         178
24

25

                              2

1    THE COURT: At this time the Court calls
2    State of Wisconsin vs. Steven Avery, Case No. 05 CF
3    381. Will the parties state their appearances for
4    the record, please.

5    ATTORNEY KRATZ: Good morning, Judge. The
6    State of Wisconsin appears by Calumet County
7    District Attorney Ken Kratz, lead counsel and
8    appearing as special prosecutor in this case.
9    Appearing with me include Tom Fallon, an Assistant
10   Attorney General from the Department of Justice and
11   Norm Gahn, an Assistant District Attorney, from
12   Milwaukee County, Wisconsin, also appearing as
13   special prosecutor.

14   ATTORNEY STRANG: And good morning. Steven
15   Avery appears in person. He's represented by Jerome
16   Buting, immediately to my left, and I am Dean
17   Strang.

18   THE COURT: All right. We're here this
19   morning, before we bring the jurors out, first of
20   all, to discuss any comments the parties have on the
21   opening instructions that have been provided by the
22   Court. Before we get to that, are there any other
23   issues that either party feels should be addressed
24   before the jurors are brought in?

25   ATTORNEY KRATZ: The one logistical issue I

3

1    had was during the opening statements and the
2    closing arguments the Clerk, Ms Bonin, has a switch
3    near her which is called public seating or something
4    of that nature. I'm going to ask that that switch,
5    and I got the approval of the sheriff for that --

6           Quite frankly, Judge, with PowerPoint or
7    other presentations in this area, the gallery and
8    other spectators find it much easier to see those
9    without that one bank of lights, the public
10   seating lights. If Ms Bonin would like to try
11   that at this point so the Court can see, I would
12   appreciate that.

13          THE COURT: Go ahead.

14          ATTORNEY KRATZ: I think Mr. Buting
15   indicated he had no objection. It just provides
16   less glare and an opportunity for those in the
17   public to observe what it is that we're talking
18   about. Again, I suggest that just for openings and
19   closings.

20          THE COURT: All right. Any objection?

21          ATTORNEY STRANG: There is not.

22          THE COURT: Anything else to take up before
23   we address the opening instructions?

24          ATTORNEY STRANG: My thought is that we
25   might take Mr. Avery's personal statement on

4

1    waiving -- or not waiving, but stipulating to the
2    second element of Count 3 of the second Amended
3    Information.

4              THE COURT: Very well. For the record, I
5    will note the Court has previously been informed
6    that the defendant intended to stipulate to the
7    second element of the possession of a firearm
8    charge; that is, the defendant's status as having
9    been convicted of a felony before November 5 of
10   2005.

11             Before I notify the jury that the
12   defendant is making that stipulation, the Court
13   has to make sure that the defendant is doing so
14   knowingly and voluntarily. So, Mr. Avery, I'm
15   going to be addressing these questions to you.

16             Before the Court accepts your
17   stipulation to one of the elements of the felon
18   in possession of a firearm charge, I'm going to
19   be asking you a few questions. If you have any
20   trouble understanding any question that I ask,
21   let me know and I will let you speak with your
22   attorneys.

23             Mr. Avery, do you understand that you
24   have the right to a jury trial in this case and
25   that includes the right to require the State to

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 6 of 222   Document 32-5

1    prove every element of each offense charged,

2    beyond a reasonable doubt, to all members of the

3    jury? Do you understand that?

4        THE DEFENDANT: Yes, I do.

5        THE COURT: You understand that in the case

6    of the felon in possession of a firearm charge, this

7    means that you can, if you wish, require the State

8    to prove, beyond a reasonable doubt, that you were

9    convicted of a felony before November 5 of 2005? Do

10   you understand that?

11       THE DEFENDANT: Yes, I do.

12       THE COURT: Do you further understand that,

13   if you wish, you can stipulate; that is, you can

14   agree that you were convicted of a felony before

15   November 5 of 2005 and make further evidence on that

16   issue irrelevant; do you understand that?

17       THE DEFENDANT: Yes, I do.

18       THE COURT: Do you wish to waive your right

19   to a jury trial on that element; that is, agree that

20   you were convicted of a felony before November 5 of

21   2005?

22       THE DEFENDANT: Yes, I do.

23       THE COURT: Have you had adequate

24   opportunity to discuss your decision with your

25   attorneys?

6

1          THE DEFENDANT:  Yes.

2          THE COURT:  And have your attorneys

3     explained to you your right to a jury trial on this

4     element?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Has anyone made any promises or

7     threats to you to give up your right to a jury trial

8     on this element of the firearms charge?

9          THE DEFENDANT:  No.

10         THE COURT:  Do you understand each of the

11    questions that I have asked you and what your

12    attorneys have told you about this matter?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Mr. Strang, have you had

15    adequate opportunity to discuss this matter with

16    your client?

17         ATTORNEY STRANG:  Yes.

18         THE COURT:  And do you believe that

19    Mr. Avery is knowingly and voluntarily giving up his

20    right to a jury trial on this particular element of

21    the possession of a firearm charge?

22         ATTORNEY STRANG:  On that element, yes, I

23    do.

24         THE COURT:  Very well, the Court does find

25    that the defendant has knowingly and voluntarily

7

1    waived his right to a jury trial on the second
2    element of the felon in possession of a firearm
3    charge and the Court will accept the defendant's
4    stipulation on that element.

5         ATTORNEY KRATZ:  For the record, Judge, the
6    State also acquiesces and accepts the stipulation.

7         THE COURT:  Thank you.  As I indicated
8    previously, I have provided the parties with a copy
9    of the Court's proposed opening instructions.  And
10   it's the Court's understanding that those proposed
11   instructions are acceptable to each of the parties
12   with the exception of some language involving the
13   elements of the crime on the two counts that are
14   charged as a party to the crime.  First, counsel, am
15   I correct in that understanding?

16        ATTORNEY KRATZ:  Yes, Judge.  Although the
17   State, as Mr. Gahn and Mr. Fallon and I have spoken,
18   and after our brief conversation in chambers, we are
19   asking the Court adopt a very similar series of
20   language that the Court has proposed in its last
21   submission.  I will be happy to put our ideas on the
22   record, but you are correct, Judge, there is one
23   change that we're requesting.

24        THE COURT:  All right.  And Mr. Strang.
25        ATTORNEY STRANG:  We were satisfied with

8

1    the whole of the Court's final proposed instructions
2    to be given preliminarily and we object to the
3    modification that the State has offered.

4         THE COURT: All right. I will hear from
5    the State first, then, on the proposed modification.

6         ATTORNEY KRATZ: Thank you, Judge. The
7    substantive change that we are asking is that
8    towards the bottom of page six of the preliminary
9    instructions, when the Court reads the element of
10   the offense for first degree intentional homicide,
11   as a party to the crime, the Court submit the
12   following language:

13        That Steven Avery caused the death of
14   Teresa Halbach or aided and abetted Brendan
15   Dassey in causing the death of Teresa Halbach.

16        As we have indicated throughout the jury
17   selection process and, in fact, in motions before
18   trial, whether Mr. Dassey testifies in this case
19   at all or whether Brendan Dassey is to be
20   referred to at all in this trial is still very
21   much at issue.

22        To highlight or alert the jury that
23   Brendan Dassey is the individual from which
24   Mr. Avery acted in concert, we believe to be
25   inappropriate and would, as some of the jurors

9

1  quite candidly indicated in jury selection,
2  suggest that the State should, for whatever
3  reason, be calling Mr. Dassey as a witness, not
4  withstanding his Fifth Amendment rights not to do
5  so, or against self-incrimination.

6      We're, therefore, Judge, asking that the
7  elements read that Steven Avery caused the death
8  of Teresa Halbach or aided and abetted another in
9  causing the death of Teresa Halbach.  Similar
10 language would be inserted into the second
11 element, again, removing the words Brendan Dassey
12 and inserting the words another.

13     That provides no prejudice to the
14 defense.  It is an accurate statement of the law
15 and, again, removes the suggestion that the State
16 in some way has a burden, or obligation, or even
17 practically speaking should call Mr. Dassey or
18 insert Mr. Dassey into this case.

19     Lastly, Judge, if the Court adopts that
20 change, then the statement or comment as to
21 unanimous agreement not being required, further
22 up on the page, on page No. 6, is in fact
23 appropriate, is required, and we would ask -- I
24 think that's joined by Mr. Strang -- that that
25 instruction be reinserted and added in the

10

1      preliminary instructions.

2              THE COURT: Mr. Strang? Well, just --

3      before I get to Mr. Strang, Mr. Kratz, what is the

4      language, I'm looking at page 6, element one, what

5      language exactly is the State proposing?

6              ATTORNEY KRATZ: Just instead of the name

7      Brendan Dassey, you are just exchanging that with

8      the word another.

9              THE COURT: Just a second.

10             ATTORNEY KRATZ: Aided and abetted another

11     in the commission of the crime. I think that's a

12     correct statement of the law and as I mentioned,

13     Judge, removes the suggestion that the State have an

14     obligation to set forth its theory of the

15     prosecution when it may very well be that Mr. Dassey

16     not testify in this case.

17             THE COURT: So, you are proposing to read

18     Steven Avery caused the death of Teresa Halbach or

19     aided and abetted another in causing the death?

20             ATTORNEY KRATZ: That's right.

21             THE COURT: And with respect to the other

22     references to Mr. Dassey in this count and the other

23     count, you are proposing that in each case it be

24     replaced with another.

25             ATTORNEY KRATZ: Yes, Judge.

                          11

```
 1            THE COURT:  Mr. Strang.

 2            ATTORNEY STRANG:  How I wish that on

 3       March 2, 2006, the State had thought it as

 4       inappropriate to pair Brendan Dassey and Steven

 5       Avery in the commission of these crimes as it thinks

 6       it today.  And the 11 months of prejudicial

 7       publicity that we have had, perhaps we would have

 8       been spared, if the State thought then that it was

 9       inappropriate to link these two together as

10       co-actors, accomplices in the death of Teresa

11       Halbach.

12            Today is too late to do that.  To now

13       insert the ambiguous term "another", which

14       potentially includes the whole world, is to

15       invite the very speculation about who an

16       accomplice may have been or who a third party

17       culprit may have been, that the State

18       successfully opposed when we made a fairly

19       elaborate proffer on possible third party actors.

20            Up through that motion, it was the

21       State's position that Brendan Dassey, and Brendan

22       Dassey only, was the possible third party or

23       accomplice in this crime.  And now, on no showing

24       at all of the potential culpability of another,

25       the State proposes to throw open the field of
```

12

possible accomplice liability to the entire
world.

That's not fair. It's not consistent
with the positions the State has taken to date
and it leaves Mr. Avery, on the one hand, unable
to suggest directly the liability of a third
person; and yet, on the other hand, defending a
potentially shifting or unstated theory on who
his accomplice or accessory may have been.

The State's choices on this case and on
the history of it before seem to me pretty clear.
Either stick with Brendan Dassey as the man you
think is the accomplice and prove it, or drop the
party to a crime allegation in Count 1 and Count
2 altogether and prove that Steven Avery
committed this crime without allowing him to run
the risk of accessory as a liability to a
phantom.

Those seem to me the two legitimate
choices. That's why we accepted and agreed with
and thought accurate the Court's final draft of
the preliminary jury instructions. We equally
would accept a redraft that struck the party to a
crime theory altogether, but that's the State's
choice to make.

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 14 of 222   Document 32-5

It's allowed to decide on what theory of
liability it will proceed. It is not allowed on
the morning of opening statements to back away
from the man it has roped to Steven Avery for 11
months and say, could have been anybody. Just
another. Just not fair.

And I would ask the Court to leave the
instructions as they are, unless the State wishes
to drop the party to the crime theory of
liability in which case the instructions would be
confined to Steven Avery alone.

As to unanimous agreement, I don't know
that I have talked with the State about this at
all and, in fact, I don't think that unanimous
agreement requirement should be added back. The
Court had struck it; it should remain stricken.
And the reason is really very straight forward.

Understanding that there is Wisconsin
law to the contrary, my view of the due process
requirement in the 14th Amendment and the right
to a unanimous verdict that it embraces is that
the jury, all 12, must be unanimous on whether
the defendant is the principal, the defendant
directly committed the crime, or whether he was
an accessory, that is, an aider and abettor.

14

Now, I agree, for purposes of discussion
in the abstract, that which of two means of
aiding and abetting that Wisconsin law
recognizes, those, let's assume for the sake of
argument, jurors need not agree on unanimously.
Once they have decided unanimously, that it is as
a party to the crime rather than as the principal
that the defendant has been proven guilty.

But this instruction allows jurors to
differ and to return a verdict that is not
unanimous on the fundamental question of whether
one is a principal, or liable as an accessory, an
aider abettor, or a party to the crime.

Unanimity instruction, therefore, ought
not be given at all at this point. By final
instructions, I'm confident that the parties and
the Court, in the end, can draft an instruction
that treats unanimity properly.

THE COURT: All right. There appear to be
two points that separate the parties. And I'm going
to rule as follows: First of all, before I indicate
the Court's decision, I think it's important to note
that what we're talking about here are not the
closing instructions that the jury is going to get
when it's time to deliberate on the verdict, but

15

rather opening instructions, the purpose of which is

simply to make it easier for the jurors to follow

the evidence and understand what it is the State has

to prove in order to justify a guilty verdict.

With that thought in mind, I think it's

best to steer clear of controverted issues that

may be clarified as the evidence comes in.  The

instructions the Court gives in the opening are

not necessarily the instructions that will be

given in the closing.  It's easier to be more

specific at that time once the Court knows what

the evidence is.

For those reasons, I'm going to --

Actually, I previously changed the elements of

the crime language on the two party to the crime

charges based on a format submitted by the

defense.  I'm going to continue to use the

defense format, but I will substitute another for

Brendan Dassey.

I agree that it's not a good idea at the

start of the trial to focus attention on

Mr. Dassey; although, I understand that's the

basis of the State's party to the crime theory.

When the closing instructions are given,

depending on how the evidence comes in, the

1    request being made by the defense may well be

2    appropriate. But for purposes of the opening

3    instructions, which are simply to outline the

4    elements that the State must prove, I don't think

5    that level of specificity is required.

6              With respect to the unanimity language,

7    as I indicated to the parties in prior

8    correspondence, while the comment to the party to

9    the crime instruction would suggest that the

10   unanimity requirement is appropriate, the Court

11   has not had a chance to fully address the defense

12   arguments and there are arguments to the contrary

13   that I believe must be addressed before the Court

14   is in a position to make a final decision.

15             It's not necessary during the opening

16   instructions to tell the jury whether or not they

17   have to be unanimous. The instructions are

18   intended to help them follow the evidence.

19   Therefore, I am not going to include the

20   unanimity language in the opening instructions.

21             I did previously reword the opening

22   language to the substantive instructions to

23   notify the jurors that the Court is going to be

24   reading portions of the specific jury

25   instructions. So certainly the possibility is

17

1    left open that the unanimity language can be
2    inserted in the closing instructions.

3         I believe that addresses the parties
4    comments with respect to the opening
5    instructions. Is there anything else either
6    party feels should be addressed before we bring
7    in the jurors and swear the jury?

8         ATTORNEY KRATZ: Judge, one housekeeping
9    matter, I don't know if you have reminded the jurors
10   or perhaps -- excuse me -- the public as they were
11   brought in, but without an interest in having a Mike
12   Sherman moment, perhaps all cell phones should be
13   turned off. I don't know if that was something --

14        THE COURT: Actually, the Court has ordered
15   that no cell phones be permitted in the courtroom
16   and I trust that the folks guarding the entrance to
17   the door have enforced that requirement.

18        ATTORNEY KRATZ: And the attorneys as well,
19   Judge, at least the State has taken care of that and
20   that's the only other comment we have. Thank you.

21        THE COURT: Anything else from the defense?
22        ATTORNEY STRANG: Nothing here, your Honor.
23        THE COURT: If not, we can have the jury
24   brought in.

25        (Jury panel present.)

18

1      THE COURT:  Good morning, jurors, you can
2   be seated for a brief period of time.  The Court has
3   already called this morning the case of State of
4   Wisconsin vs. Steven Avery, Case No. 05 CF 381.  In
5   a minute I'm going to read to you some opening
6   instructions in this case, but before we do that,
7   the Clerk will swear you in.  So at this time I will
8   ask you to all please rise.
9      THE CLERK:  If you all would raise your
10  right hand.
11      (Jury panel sworn.)
12      THE CLERK:  Please be seated.
13      THE COURT:  Members of the jury, before the
14  trial begins, there are certain instructions you
15  should have to better understand your functions as a
16  juror and how you should conduct yourself during the
17  trial.  Your duty is to decide the case based only
18  on the evidence presented and the law given to you
19  by the Court.
20      Do not let any personal feelings of bias
21  or prejudice about such things as race, religion,
22  national origin, sex, or age affect your
23  deliberations.
24      Do not begin your deliberations and
25  discussion of the case until all the evidence is

19

1    presented and I have instructed you on the law.

2          Do not discuss this case among

3    yourselves or with anyone else until your final

4    deliberations in the jury room.

5          We'll stop or recess from time to time

6    during the trial.  You may be excused from the

7    courtroom when it is necessary for me to hear

8    legal arguments from the lawyers.

9          If you come into contact with any of the

10   parties, lawyers or witnesses, do not speak with

11   them.  For their part, the parties, lawyers and

12   witnesses will not contact or speak with the

13   jurors.

14         As the Court has previously informed

15   you, the jury will not be sequestered during this

16   trial.  That decision is dependent on the jurors

17   not listening to, watching, or reading any news

18   accounts of the case during the trial, nor

19   discussing it with anyone, including members of

20   your family, or other jurors.

21         For these reasons it is vital that you

22   do not listen to any conversation about the case.

23   Do not read any newspaper or internet reports or

24   listen to any news reports on radio or television

25   about this trial.

20

1    To assure that you are not exposed to
2    improper media coverage, the Court is ordering
3    that, for the duration of the trial, you do not
4    watch the local news on television; do not listen
5    to the local news on the radio; and do not read
6    the newspaper, unless you first have someone
7    remove any articles about this case.

8    In addition, do not visit any internet
9    websites or web logs which may include any
10   information about the case. Should you be
11   exposed to any reports or communications from any
12   source concerning the case during the trial, you
13   should report that information to the jury
14   bailiff.

15   Do not investigate this case on your own
16   or visit the scene. Do not engage in any
17   experimentation or research relating to any
18   issues, facts, or persons involved in the case.

19   Do not consult dictionaries, computers,
20   websites, or other reference materials for any
21   additional information.

22   The Court is aware that many of you have
23   been exposed to publicity concerning this case
24   before you were selected to serve as a juror.
25   Each of you has committed to base your verdict

21

1   only on the evidence introduced during the trial.
2   It is of vital importance to the parties and to
3   the sanctity of the court process that you remain
4   true to this commitment.

5           Anything you may see or hear outside the
6   courtroom is not evidence.  You are to decide the
7   case solely on the evidence that is offered and
8   received at trial.

9           Evidence is defined as, first, the sworn
10  testimony of witnesses both on direct and
11  cross-examination, regardless of who called the
12  witness.

13          Second, the exhibits the Court has
14  received.

15          And, third, any facts to which the
16  lawyers have agreed or stipulated or which the
17  Court has directed you to find.

18          Attorneys for each side have the right
19  and the duty to object to what they consider are
20  improper questions asked of witnesses and to the
21  admission of other evidence which they believe is
22  not properly admissible.  You should not draw any
23  conclusions from the fact an objection was made.
24  By allowing testimony or other evidence to be
25  received over the objection of counsel, the Court

22

is not indicating any opinion about the evidence. You jurors are the judges of the credibility of the witnesses and the weight of the evidence.

You are not required to, but you may take notes during this trial except during the opening statements and the closing arguments. The Court will provide you with materials for this purpose. In taking notes, you must be careful that it does not distract you from carefully listening to and observing the witnesses.

You may rely on your notes to refresh your memory during your deliberations, otherwise keep them confidential. Your notes will be collected by the jury bailiff after each day's session and kept in a secure place until the next day of trial. After the trial, the notes will be collected and destroyed.

You will not have a copy of the written transcript of the trial testimony available for use during your deliberations. You may ask to have specific portions of the testimony read to you. You should pay careful attention to all the testimony because you must rely primarily on your memory of the evidence and the testimony

23

1    introduced during the trial.

2            It is the duty of the jury to scrutinize

3    and to weigh the testimony of witnesses and

4    determine the effect of the evidence as a whole.

5    You are the sole judges of the credibility; that

6    is, the believability of the witnesses and of the

7    weight to be given to their testimony.

8            In determining the credibility of each

9    witness and the weight you give to the testimony

10   of each witness, consider these factors:

11           Whether the witness has an interest or

12   lack of interest in the result of the trial.

13           The witness' conduct, appearance and

14   demeanor on the witness stand.

15           The clearness or lack of clearness of

16   the witness' recollections.

17           The opportunity the witness had for

18   observing and knowing the matters the witness

19   testified about.

20           The reasonableness of the witness'

21   testimony.

22           The apparent intelligence of the

23   witness.

24           Bias or prejudice, if any has been

25   shown.

24

1    Possible motives for falsifying

2    testimony.

3    And all other factors -- excuse me --

4    all other facts and circumstances during the

5    trial which tend either to support or to

6    discredit the testimony.

7    Then give to the testimony of each

8    witness the weight you believe it should receive.

9    There is no magic way for you to evaluate the

10   testimony.  Instead, you should use your common

11   sense and experience.  In everyday life you

12   determine for yourselves the reliability of

13   things people say to you; you should do the same

14   thing here.

15   To assist you in evaluating the

16   evidence, I will now read to you portions of the

17   specific jury instructions for the offenses with

18   which the defendant is charged.  I will read them

19   to you in their entirety at the close of the

20   evidence.

21   Count 1 of the Information charges the

22   defendant with first degree intentional homicide

23   as a party to the crime.  Section 939 of the

24   Criminal Code of Wisconsin provides that whoever

25   is concerned in the commission of a crime as a

25

party to that crime and may be convicted of that
crime although that person did not directly
commit it.

     The State contends that the defendant
was concerned in the commission of the crime of
first degree intentional homicide by either
directly committing it or by intentionally aiding
and abetting the person who directly committed
it.

     If a person intentionally aids and abets
the commission of a crime, then that person is
guilty of the crime as well as the person who
directly committed it.  A person intentionally
aids and abets the commission of a crime when,
acting with acknowledge or belief that another
person is committing or intends to commit a
crime, he knowingly either assists the person who
commits the crime or is ready and willing to
assist and the person who commits the crime knows
of the willingness to assist.

     To intentionally aid and abet the crime
of first degree intentional homicide, the
defendant must know that another person is
committing or intends to commit the crime of
first degree intentional homicide and have the

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 27 of 222   Document 32-5

1    purpose to assist in the commission of that
2    crime.

3          Before you may find the defendant guilty
4    of first degree intentional homicide as a party
5    to the crime, the State must prove, by evidence
6    which satisfies you, beyond a reasonable doubt,
7    that the defendant directly committed the crime
8    or intentionally aided and abetted the commission
9    of the crime.

10          First degree intentional homicide as
11   defined in Section 940.01 of the Criminal Code of
12   Wisconsin is committed by one who causes the
13   death of another human being with intent to kill
14   that person or another.  Before you may find the
15   defendant guilty of first degree intentional
16   homicide, the State must prove, by evidence which
17   satisfies you, beyond a reasonable doubt, that
18   the following two elements were present:

19          One, Steven Avery caused the death of
20   Teresa Halbach or aided and abetted another in
21   causing the death of Teresa Halbach.  Cause means
22   that the defendant's act was a substantial factor
23   in producing the death.

24          Two, Steven Avery acted with the intent
25   to kill Teresa Halbach whether he did so directly

27

1        or aided and abetted another.

2                Intent to kill means that the defendant

3        had the mental purpose to take the life of

4        another human being or was aware that his conduct

5        was practically certain to cause the death of

6        another human being.  While the law requires that

7        the defendant acted with intent to kill, it does

8        not require that the intent exists for any

9        particular length of time before the act is

10       committed.

11               The act need not be brooded over,

12       considered, or reflected upon for a week, a day,

13       an hour, or even for a minute.  There need not be

14       any appreciable time between the formation of the

15       intent and the act.  The intent to kill may be

16       formed at any time before the act, including the

17       instant before the act and must continue to exist

18       at the time of the act.

19               You cannot look into a person's mind to

20       find intent.  Intent to kill must be found, if

21       found at all, from the defendant's acts, words,

22       and statements, if any, and from all the facts

23       and circumstances in this case bearing upon

24       intent.

25               Intent should not be confused with

                            28

1      motive.  While proof of intent is necessary to a
2      conviction, proof of motive is not.  Motive
3      refers to a person's reason for doing something.

4              While motive may be shown as a
5      circumstance to aid in establishing the guilt of
6      the defendant, the State is not required to prove
7      motive on the part of a defendant in order to
8      convict.  Evidence of motive does not, by itself,
9      establish guilt.  You should give it the weight
10     you believe it deserves, under all the
11     circumstances.

12             If you are satisfied, beyond a
13     reasonable doubt, at the conclusion of the trial,
14     that the defendant directly committed both
15     elements of first degree intentional homicide,
16     you should find the defendant guilty.  If you are
17     not so satisfied, you must find the defendant not
18     guilty.

19             Count 2 charges the defendant with
20     mutilating a corpse, also as a party to the
21     crime.  The State contends that the defendant was
22     concerned in the commission of the crime of
23     mutilating a corpse by either directly committing
24     it or by intentionally aiding and abetting the
25     person who committed it.

29

1     Before you may find the defendant guilty
2   of mutilating a corpse as a party to the crime,
3   the State must prove, by evidence which satisfies
4   you, beyond a reasonable doubt, that the
5   defendant committed the -- directly committed the
6   crime of mutilating a corpse or intentionally
7   aided and abetted the commission of that crime.
8     Mutilating a corpse as defined in
9   Section 940.11 (1) of the Criminal Code of
10  Wisconsin is violated by one who mutilates a
11  corpse with intent to conceal a crime or avoid
12  apprehension, prosecution, or conviction for a
13  crime.  Before you may find the defendant guilty
14  of this offense, the State must prove, by
15  evidence which satisfies you, beyond a reasonable
16  doubt, that the following two elements were
17  present:
18    One, Steven Avery mutilated the corpse
19  of Teresa Halbach or aided and betted another in
20  mutilating the corpse of Teresa Halbach.
21    Two, in mutilating the corpse of Teresa
22  Halbach or in aiding and abetting another in
23  mutilating her corpse, Steven Avery acted with
24  the intent to conceal a crime.  This requires
25  that the defendant acted with the purpose to

30

1    conceal a crime.

2         If you are satisfied, beyond a
3    reasonable doubt, at the conclusion of the trial,
4    that Steven Avery directly committed both
5    elements of this offense, you should find the
6    defendant guilty. If you are not so satisfied,
7    you must find the defendant not guilty.

8         Count 3 charges the defendant with felon
9    in possession of a firearm. Section 941.29 of
10   the Criminal Code of Wisconsin is violated by a
11   person who possesses a firearm, if that person
12   has been convicted of a felony.

13        Before you may find the defendant guilty
14   of this offense, the State must prove, by
15   evidence which satisfies you, beyond a reasonable
16   doubt, that the following two elements were
17   present:

18        One, the defendant possessed a firearm.
19   Firearm means a weapon which acts by the force of
20   gunpowder. It is not necessary that the firearm
21   was loaded or capable of being fired.

22        Possess means that the defendant
23   knowingly had actual physical control of a
24   firearm. An item is in a person's possession if
25   it is in an area over which the person has

31

1    control and the person intends to exercise

2    control over the item.

3         Two, the second element, is that the

4    defendant had been convicted of a felony before

5    November 5, 2005.  The parties in this case have

6    agreed that Steven Avery was convicted of a

7    felony before November 5, 2005 and you must

8    accept this as conclusively proved.

9         If you are satisfied, beyond a

10   reasonable doubt, at the conclusion of the trial,

11   that both elements of this offense have been

12   proved, you should find the defendant guilty.  If

13   you are not so satisfied, you must find the

14   defendant not guilty.

15        The final count charges the defendant

16   with false imprisonment.  False imprisonment as

17   defined in Section 940.30 of the Criminal Code of

18   Wisconsin is committed by one who intentionally

19   confines or restrains another without the

20   person's consent and with knowledge that he has

21   no lawful authority to do so.

22        Before you may find the defendant guilty

23   of this offense the State must prove, by evidence

24   which satisfies you, beyond a reasonable doubt,

25   that the following five elements were present:

32

One, the defendant confined or
restrained Teresa Halbach during her lifetime.

Two, the defendant confined or
restrained Teresa Halbach intentionally.  This
requires that the defendant have the mental
purpose to confine or restrain Teresa Halbach.

Three, Teresa Halbach was confined or
restrained without her consent.

Four, the defendant had no lawful
authority to confine or restrain Teresa Halbach.

Five, the defendant knew that Teresa
Halbach did not consent and knew that he did not
have lawful authority to confine or restrain
Teresa Halbach.

Although this requires genuine restraint
or confinement, it does not require that it be in
a jail or prison.  If the defendant deprived
Teresa Halbach of freedom of movement or
compelled her to remain where she did not wish to
remain, then Teresa Halbach was confined or
restrained.

The use of physical force is not
required.  One may be confined or restrained by
acts, or words, or both.

You cannot look into a person's mind to

33

find out intent or knowledge. Intent and
knowledge must be found, if at all, from the
defendant's acts, words, and statements, if any,
and from all the facts and circumstances in this
case bearing upon intent and knowledge.

If you are satisfied, beyond a
reasonable doubt, at the conclusion of the trial,
that all five elements of this offense have been
proproved -- excuse me -- have been proved, you
should find the defendant guilty. If you are not
so satisfied, you must find the defendant not
guilty.

In reaching your verdict examine the
evidence with care and caution. Act with
judgment, reason and prudence. Defendants are
not required to prove their innocence, the law
presumes that every person charged with the
commission of an offense is innocent. This
presumption requires a finding of not guilty,
unless in your deliberations you find it is
overcome by evidence which satisfies you, beyond
a reasonable doubt, that the defendant is guilty.

The burden of establishing every fact
necessary to constitute guilt is upon the State.
Before you can return a verdict of guilty, the

34

1    evidence must satisfy you, beyond a reasonable
2    doubt, that the defendant is guilty. If you can
3    reconcile the evidence, upon any reasonable
4    hypothesis consistent with the defendant's
5    innocence, you should do so and return a verdict
6    of not guilty.
7                The term reasonable doubt means a doubt
8    based upon reason and common sense. It is a
9    doubt for which a reason can be given, arising
10   from a fair and rational consideration of the
11   evidence or lack of evidence. It means such a
12   doubt as would cause a person of ordinary
13   prudence to pause or hesitate when called upon to
14   act in the most important affairs of life.
15               A reasonable doubt is not a doubt which
16   is based on mere guesswork or speculation. A
17   doubt which arises merely from sympathy or from
18   fear to return a verdict of guilt is not a
19   reasonable doubt.
20               A reasonable doubt is not a doubt such
21   as may be used to escape the responsibility of a
22   decision. While it is your duty to give the
23   defendant the benefit of every reasonable doubt,
24   you are not to search for doubt, you are to
25   search for the truth.

35

1          As you know, although this is a
2     Manitowoc County case with a Manitowoc County
3     jury, the case is being tried at the Calumet
4     County Courthouse. You will learn that when
5     Steven Avery became a suspect in this case, the
6     Manitowoc County District Attorney turned control
7     of the case over to the Calumet County District
8     Attorney because Mr. Avery had a lawsuit pending
9     against Manitowoc County at the time.

10          For logistical reasons, the parties
11     jointly requested that the trial be held in
12     Calumet County and the Court granted that
13     request. You should draw no inference for or
14     against either party to this case because of the
15     location of the trial, or the fact that it is not
16     being prosecuted by the Manitowoc County District
17     Attorney.

18          In a few minutes the lawyers will make
19     opening statements. The purpose of an opening
20     statement is to give the lawyers an opportunity
21     to tell you what they expect the evidence will
22     show, so that you will better understand the
23     evidence as it is introduced during the trial. I
24     must caution you, however, that the opening
25     statements are not evidence.

36

1           At this time we're going to take a very

2     short break so that the State may get its

3     equipment ready to present the opening statement.

4     We'll be back in just a few minutes.

5               (Jury not present.)

6           THE COURT:  Five minutes, counsel.

7           ATTORNEY KRATZ:  That's fine.

8               (Recess taken.)

9               (Jury present.)

10          THE COURT:  You may be seated.  Members of

11    the jury, at this time we're going to hear the

12    opening statement from the State.  Mr. Kratz, you

13    may begin.

14          ATTORNEY KRATZ:  Thank you, Judge.  May it

15    please the Court, ladies and gentlemen of the jury,

16    Mr. Strang, Mr. Buting, Mr. Avery, good morning.

17          MR. AVERY:  Good morning.

18          ATTORNEY KRATZ:  We're all a little nervous

19    this morning.  And I think that if we admit that,

20    we, being the lawyers, and the jurors asked to

21    decide this important matter, I think we're all

22    going to be better off.

23          And on behalf of the State, let me first

24    start by thanking you, thanking you for your jury

25    service, thanking you for your attention that you

37

1    are about to give in this case, and thanking you

2    in detail for what in jury selection we talked

3    about may perhaps be the most important decision

4    that you will ever make, at least for the rest of

5    your lives.

6            You will note, and we have already

7    introduced, that there are three attorneys on

8    this case, myself, Ken Kratz, the Calumet County

9    District Attorney.  This is my courthouse.  And

10   I'm joined by Mr. Fallon who is seated directly

11   to my right.  Mr. Fallon is an Assistant Attorney

12   General with the Department of Justice.  And

13   joining us also is Mr. Norm Gahn.

14           ATTORNEY GAHN:  Good morning.

15           ATTORNEY KRATZ:  Mr. Gahn is an Assistant

16   District Attorney in Milwaukee County, Wisconsin.

17   You will learn that each of us are special

18   prosecutors in this case.  But what's so special

19   about a special prosecutor?  Why would some small

20   town lawyer from Chilton be in charge of this entire

21   prosecution, this big of a case?  Why would Ken

22   Kratz be asked to lead up this prosecution?

23           We'll talk about how this case was

24   assigned over, but just understand, at least for

25   this person, that although we are all experienced

38

| | |
|---|---|
| 1 | prosecutors, we're doing a favor for Manitowoc |
| 2 | County. It's a rather big favor for Manitowoc |
| 3 | County, but it's a favor nonetheless. It is |
| 4 | helping the Manitowoc County District Attorney's |
| 5 | Office in presenting this case. |
| 6 | Mr. Rohrer, your District Attorney, |
| 7 | asked me to take over the case early on. You |
| 8 | will learn about when that happened. But it is |
| 9 | still something that we were simply asked to and |
| 10 | we did, in fact, perform. |
| 11 | There's two investigators in this case. |
| 12 | Now, you are going to hear that there were |
| 13 | hundreds of law enforcement officers involved in |
| 14 | this investigation, but these kinds of cases |
| 15 | require direction. They require leadership by |
| 16 | law enforcement officials that have experience. |
| 17 | The first lead investigator in the case |
| 18 | who is seated in the courtroom is Mark Wiegert. |
| 19 | MR. WIEGERT: Good morning. |
| 20 | ATTORNEY KRATZ: Mr Wiegert is an |
| 21 | investigator with the Calumet County Sheriff's |
| 22 | Department. |
| 23 | The other lead investigator in this case |
| 24 | is Tom Fassbender. Mr. Fassbender works for the |
| 25 | Department of Justice. He works for a law |

39

1    enforcement branch of the Department of Justice
2    which is called the Division of Criminal
3    Investigation.
4         And, again, knowing who we are, knowing
5    who the five of us are, the prosecution team, we
6    hope may help in determining what's important in
7    these cases.
8         The Judge has told you, at least in
9    brief terms, what an opening statement is. But
10   often times evidence comes in in bits and pieces,
11   especially in a six week trial. That isn't
12   something that you will expect all of the
13   evidence to come at you at once. And so if we
14   can provide a road map or an overview of what the
15   evidence is going to show, that should be helpful
16   for you.
17        Some juries that I have spoken to, it's
18   been helpful to describe this process as the
19   provision of the cover of a jigsaw puzzle box.
20   All right. You think of evidence as pieces in a
21   jigsaw puzzle. You wouldn't tell, if you were
22   handed one piece of a jigsaw puzzle, where that's
23   going to go. But if you got the box and if you
24   have the box, some of the pieces are obvious
25   where they go; some are not so obvious, but at

40

1   least it's a guide.  It's a help for you as to
2   where these pieces all fit.

3           Now, before I go any further, I want to
4   talk to you about something that I know some of
5   you, in your specific questions, expressed as
6   some concern and that's the nature of the
7   evidence that's going to be presented.  This is a
8   very, very serious crime and potentially has
9   very, very graphic kinds of details that may be
10  involved or may be presented.

11          But there is some uncertainty about how
12  much evidence is going to be presented.  And I
13  wanted to assure you, as the lead prosecutor, as
14  the person responsible for the presentation of
15  the case a couple of things.

16          Number one, and perhaps most importantly
17  for you, as the jury, I'm only going to present
18  those pieces of evidence that are necessary;
19  those pieces that are necessary to tell you the
20  entire story.  My job is not to present gruesome,
21  or overly graphic information for you.

22          And I think as we go through this
23  process, you are going to find that the evidence
24  is pretty straight forward.  It is not
25  necessarily gruesome or graphic, isn't something

41

```
 1    that you should fear at this early stage.  All
 2    right.
 3              I understand the sensitivities not only
 4    of you, but of most of the people seated on the
 5    left hand side of the courtroom.  And I --
 6    actually, I want you to look over to the left
 7    side of the courtroom.  That's the Halbach
 8    family.
 9              You are going to see them throughout the
10    case, friends and family.  And I want to assure
11    you that before the first piece of evidence is
12    ever introduced in this case, everyone of those
13    people:  The mother, the father, the brothers,
14    the sisters, the friends, and any other family
15    members that wanted to, have already seen all of
16    this evidence.  All right.
17              I sat down with them and as sensitively
18    as I possibly could, allowed them an opportunity
19    to review the evidence.  That's just something
20    that a prosecutor should do and that's all been
21    done.  So as you see photographs being presented,
22    as you see physical evidence being brought into
23    the courtroom; I want to assure you that the
24    Halbach family already has seen it.
25              They have already known the kinds of
```

42

1    evidence that are going to be presented.  And I

2    think that that was necessary for you to hear and

3    necessary for you to understand that this family

4    does have that information.

5         The Judge has told you that there's four

6    charges.  I'm very, very briefly going to talk

7    about those four, because I don't want to

8    reiterate what the Judge did.  But there are four

9    separate charges that the defendant is charged

10   with:  First degree intentional homicide,

11   mutilation of a corpse, felon in possession of a

12   firearm and false imprisonment.

13        Now, the Judge instructed you and my job

14   today in opening statement, again, this isn't

15   evidence, but it is a help for you; it's the

16   cover if you will; it's the road map; it's the

17   overview, to talk about the first legal concept

18   that you as a jury has to understand.  And that's

19   the concept called being a party to the crime.

20        The Judge has told you that that can be

21   satisfied either if the defendant committed an

22   offense himself or if the defendant aided and

23   abetted another in the commission of the offense.

24   Now, the first two counts, the homicide and the

25   mutilation of a corpse are charged as a party to

43

1    the crime.

2            And so you will learn, at the conclusion
3    of the case, six weeks from now, if you fast
4    forward six weeks from now, that the jury
5    instructions will tell you that if the defendant
6    committed any of those elements himself, or if
7    the defendant aided in another -- another --
8    excuse me -- aided and abetted another in the
9    commission of those offenses, that you can and
10   should find him guilty.

11           Now, I can't stand up here and predict
12   what the defense is going to bring into this
13   case, what cross-examination they may encounter,
14   or if they even choose to present any kind of
15   defense, nor should I. That isn't my job.

16           My job, as the prosecutor, is to present
17   our case, to present the physical evidence that
18   we have developed, to present the witnesses that
19   we have developed to prove our case. But just
20   understand, and just remember this concept when
21   it comes time to deciding whether or not the
22   defendant is guilty.

23           The Judge also told you about something
24   called elements of the offense. The State has
25   the burden of proof here. The defense has

44

1    absolutely no burden.  And our burden is to prove
2    the case, beyond a reasonable doubt.

3         The Judge explained to you already that
4    beyond a reasonable doubt means a doubt for which
5    a reason can be given when considering all the
6    evidence.  Let me tell you what it is not,
7    though.  Beyond a reasonable doubt is not beyond
8    all doubt.  It's not 100 percent.  And when we
9    are dealing with a human justice system, you
10   can't expect beyond all doubt, or beyond a shadow
11   of a doubt, or comments sometimes that we have
12   heard about that.

13        It's beyond a reasonable doubt.  A doubt
14   for which a reason can be given.  And I'm
15   standing before you, members of the jury, telling
16   you that I accept that burden.  I will prove this
17   case, beyond a reasonable doubt.  But we didn't
18   want you going into this case expecting one
19   hundred percent, or beyond all doubt, because
20   there are human factors or dynamics that go into
21   these cases.

22        Each charge, the Judge told you, has
23   elements of those offense, we're going to go
24   through those in just a minute.  But, also, each
25   of the four charges should be considered

45

separately. You shouldn't group them together
and decide if he is guilty of all four or none.
Each of the four counts are to be considered
separately. And, in fact, there is separate
evidence for all four of those counts.

And, finally, the defendant is presumed
innocent. As Mr. Avery sits here today, because
you have heard no evidence in this case, he is
presumed by you, or should be presumed by you, to
be innocent. However, and this is a big however,
that presumption disappears at that very moment
when the evidence in this case satisfies you,
beyond a reasonable doubt, that he is guilty of
that offense. That presumption disappears at the
moment that the evidence proves that he is
guilty.

Count 1, the Judge instructed you, has
two elements. And why I'm telling you this and
why I'm showing them on the screen or on a
PowerPoint presentation is because these are
serious, serious crimes; in fact, the most
serious crimes that we have in the State of
Wisconsin.

The legal concepts aren't all that
complex. We are talking about two things that we

46

1      have to prove, caused the death of somebody and
2      did it intentionally. Nothing magic about that,
3      nothing complex about that and all of you should
4      be able to understand that.

5              The same thing with mutilation of a
6      corpse, just the two elements; that he mutilated
7      a corpse and that he did so to conceal a crime
8      that had been committed. You will hear evidence
9      in this case about what that crime was that he
10     was trying to conceal. The crime, as you may
11     have already guessed, is the first degree
12     intentional homicide.

13             Mr. Avery is also charged with felon in
14     possession of a firearm; again, two elements, the
15     felon in possession. First, that he possessed
16     the firearm, that seems obvious. And, number 2,
17     that some time before November of 2005, he had
18     been convicted of a felony.

19             Now, the Judge has told you that that
20     second element is stipulated. Stipulation means
21     that the facts are agreed to by the parties; that
22     you can take that as already having been proved,
23     beyond a reasonable doubt, that Mr. Avery has
24     that felony conviction. And so it's just the
25     first element of that offense that the State has

47

1    to prove. Do you all understand that? All
2    right.

3            Now, false imprisonment has five
4    separate elements to the offense. Those five
5    elements are that he confined or restrained, note
6    that that's in the disjunctive; he either
7    confined or restrained Teresa Halbach,
8    intentionally, without her consent. He didn't
9    have authority and he knew that he didn't have
10   authority to confine or restrain Ms Halbach.

11           All right. Enough of the civics lesson.
12   Let's talk about what the evidence is going to
13   show. On Monday, October 31st, 2005, beginning
14   at approximately 2:45 p.m., the State intends to
15   prove to you that the defendant restrained,
16   murdered, and mutilated a 25 year old
17   photographer named Teresa Halbach.

18           We're going to prove to you what
19   happened. We're going to prove to you who
20   committed this crime. We're going to prove to
21   you where it happened. We're going to prove to
22   you when, specifically, it happened. And those
23   will prove all of the elements of the offense.

24           What we're not going to prove to you,
25   what the Judge has already told you we don't have

48

| | |
|---|---|
| 1 | to and, in fact, can't prove to you, is why. We |
| 2 | can't prove the why in a case like this. That's |
| 3 | called motive, the reason behind the killing; |
| 4 | what was in Mr. Avery's mind when he decided to |
| 5 | kill this lovely young woman. |
| 6 | I'm going to introduce you to somebody. |
| 7 | This remarkable young woman was 25 years of age; |
| 8 | she was single; she was a freelance photographer. |
| 9 | She had her own photography business that was, |
| 10 | although in its infancy, was doing quite well. |
| 11 | This woman, and I will remind you |
| 12 | several times in this opening and throughout the |
| 13 | trial, I will remind you that we're talking about |
| 14 | a real person. We're talking about somebody's |
| 15 | daughter, somebody's sister, a lot of people's |
| 16 | friend. Teresa Halbach had her whole life in |
| 17 | front of her and the evidence is going to show |
| 18 | that on Halloween of 2005, that all ended, that |
| 19 | ended in the hands of the defendant, Steven |
| 20 | Avery. |
| 21 | It's such a big case, with such a big |
| 22 | job that we have to try to present all of this |
| 23 | investigation. I'm going to start from the |
| 24 | beginning and I'm going to start talking about |
| 25 | the investigation itself. |

49

1    Ms Halbach was reported missing on the
2    third of November, 2005. Ms Halbach worked for
3    a -- at least part of her photography business
4    was that she worked for a publication called *Auto*
5    *Trader Magazine*. You are going to learn through
6    the case and you are going to hear from several
7    witnesses from *Auto Trader* that it is a magazine
8    that, basically, is responsible for selling
9    automobiles, some other things, trailers and the
10   like, but mostly automobiles. And it's a
11   publication that Teresa supplemented her income
12   with.

13        Teresa was mostly responsible or mostly
14   enjoyed taking photographs of weddings and was
15   already developing quite a niche and quite a
16   specialty taking pictures of little kids, of
17   babies and young children. But to supplement her
18   young business, she worked for *Auto Trader*
19   *Magazine*. So to understand how this case
20   transforms from a missing person investigation
21   into what became one of the largest criminal
22   investigations in Wisconsin history, starting
23   from the beginning, we're starting from the
24   investigation, is important for you to
25   understand.

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 51 of 222   Document 32-5

1    The investigation determined that Teresa
2    Halbach took three pictures or at least had three
3    business stops on the 31st of October. Now, one
4    of those were a person by the name of
5    Mr. Schmitz; one of those was a person by the
6    name of Mr. Zipperer. And the third and the last
7    stop that she made late in the afternoon on the
8    31st was at the Steven Avery Salvage Property.

9    The investigation early on determined
10   that this man, Steven Avery, called *Auto Trader*
11   *Magazine* at 8:12 that morning, on that very day,
12   on the 31st of October. And Mr. Avery asked,
13   specifically, that the same woman who has been
14   out here before, the same woman who on at least
15   six and perhaps more occasions had come out to
16   take pictures. Mr. Avery wanted her out there
17   the afternoon of the 31st.

18   Now, two very critical findings very
19   early on in this investigation came to light:
20   Number 1, that Steven Avery was the one who lured
21   Ms Halbach out to the property on the 31st. But
22   number 2, and perhaps as importantly, Steven
23   Avery was the last person to see Teresa Halbach
24   alive.

25   Who is this man? The Judge told you

51

1    that there was a lawsuit which was filed against
2    Manitowoc County and many of you, in fact,
3    virtually all of you, knew something about Steven
4    Avery before serving on this particular jury.
5    Mr. Avery achieved some degree of notoriety back
6    in 2003 when he was exonerated for a 1985 sexual
7    assault conviction.

8            You should know that that exoneration
9    was based upon DNA evidence. You should know
10   that that DNA evidence was performed by the
11   Wisconsin State Crime Laboratory and it was
12   performed by an analyst, the head of the DNA unit
13   in Madison, a woman by the name of Sherry
14   Culhane. I want you to remember that name
15   because you are going to hear that name later on
16   in this case.

17           Mr. Avery, as you already heard, later
18   filed a civil lawsuit against Manitowoc County
19   seeking compensation, seeking money for the --
20   excuse me -- for the time that -- that he was
21   wrongfully convicted. And it's that degree of
22   notoriety, that's how Mr. Avery comes to you in
23   this case. That may or may not have some things
24   to do with this case.

25           Now, we understand and the evidence is

52

1    going to be clear, that Mr. Avery never should
2    have been convicted in 1985 based upon
3    eyewitness -- or mistaken eyewitness testimony;
4    .that there wasn't any DNA evidence, at least the
5    DNA analysis wasn't to the level or to the point
6    that it is now and certainly isn't anything like
7    you are going to hear about in this case; and, in
8    fact, should have been exonerated and was in
9    2003.

10       We'll also tell you and at the close of
11   this case I'm going to point to everyone of you
12   presenting jurors and say that that has
13   absolutely nothing to do with this case.  When
14   deciding who is accountable for the death of 25
15   year old Teresa Halbach, Mr. Avery's past and his
16   past exoneration have nothing to do with this
17   case.

18       Ms Halbach, as you have heard, or she
19   comes in this case as the -- part of a missing
20   persons investigation.  Now, Calumet County, and
21   Mr. Wiegert, as a matter of fact, was in charge
22   of that missing persons investigation early on.
23   That's through the 3rd and the 5th.  Those parts
24   of the missing persons investigation that
25   happened in Calumet County are Calumet County law

53

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 54 of 222   Document 32-5

enforcement's responsibility.  Those parts of the
missing persons investigation that happened in
Manitowoc County necessarily and appropriately
are Manitowoc County's responsibility.

When looking for a 25 year old freelance
photographer, there is nothing improper about
Manitowoc County being involved in that case.
You are going to learn, however, that on the 5th,
on the 5th of November, at about 2:00 in the
afternoon, Judge Jerome Fox, another judge from
Manitowoc County, one of the three sitting judges
in Manitowoc County, assigned me to be
responsible for the prosecution and to assist in
the investigation of this particular case.

You have already heard that the reason
for that was something called a perceived
conflict, an apparent conflict; that is, it may
look bad if Manitowoc County remained involved.
You are going to hear evidence from many law
enforcement officers; in fact, the lead
investigators in this case, that there was no
actual conflict.

There was nothing that prohibited, or
precluded, or legally made it impossible for
Manitowoc County to keep performing or keep

54

1     assisting in this case. But we all felt it
2     better; myself, Mr. Rohrer, the two district
3     attorneys, Sheriff Pagel and the law enforcement
4     officials for Manitowoc, that the case be
5     transferred over to Calumet County and to DCI,
6     the Division of Criminal Investigation, with the
7     State to lead up the investigation.

8         Now, you are going to hear that
9     Manitowoc County officials remained involved in
10    the case. They remained involved in the
11    investigation that when manpower, and we are
12    going to be talking about how many police
13    officers were necessary, that they remain in a
14    helping or a support role, but the case is, in
15    fact, turned over to Calumet County.

16         This particular photograph, I want you
17    to look at for quite a bit of time as I'm
18    talking. This is the Avery Salvage Yard, located
19    in the Town of Gibson. This is a photo that you
20    are going to see a lot during the course of this
21    case. And this is, for the next six weeks, a
22    property that you are going to come to know very,
23    very well.

24         And so as Mr. Fallon and Mr. Gahn and I
25    were talking about this opening statement, we

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 56 of 222   Document 32-5

1    thought it appropriate that we introduce you to
2    the Avery salvage property.  First of all, it's a
3    40 acre property.  The entire square here is 40
4    acres.

5            What you also need to understand is that
6    all of these, appear to be little dots, are cars.
7    These are all junked vehicles in the Avery
8    salvage property.  And a number that you are
9    going to hear is that there are about 4,000
10   junked vehicles on the Avery Salvage property.

11           There's four residences, four places
12   where people live on the Avery salvage property.
13   The first, in the lower left hand corner, which
14   is the northwest corner of the property, is
15   Steven Avery's trailer.  That's where Steven
16   Avery lived on the 31st of October.

17           Living next to Steven was his sister,
18   Barb Janda.  Barb had four sons that were living
19   with her at the time.  But when you kind of look
20   at this property it's important to know where
21   Barb Janda's trailer is.

22           Steven's parents, Allen and Delores
23   Avery, also had a trailer, had a residence on the
24   property.  And that was up closer to what you
25   will find out are some business buildings, the

                        56

1    salvage business itself was kind of up in this
2    quadrant, or this corner of the yard.

3            And, finally, Steven's brother, Charles
4    Avery, Chuck, also had a trailer on the property.
5    All right.

6            Now, you are going to hear that
7    surrounding this property on three sides was an
8    active, working gravel quarry. And so we're
9    going to have some larger aerial photos that
10   we're going to show you in just a minute, but
11   just to give you an idea of what's around this
12   property, not just the 40 acres of search area,
13   but hundreds of acres that surrounded that that
14   were also included in the search.

15           Members of the jury, the evidence is
16   going to show and you are going to hear from
17   officers, when they talk about the search efforts
18   in this case, that a search area this size is
19   nothing short of overwhelming. All right. All
20   of the places that the officers can look is
21   absolutely overwhelming.

22           If you know anything about the case you
23   will understand this event. But on Saturday, the
24   5th of November, Pam and Nikole Sturm, two
25   citizens, two citizen searchers, were given

57

permission and did search the Avery salvage
property.

Pam and Nikole found the needle in the
haystack. Pam and Nikole Sturm found the one
vehicle on the property that all of the citizen
searchers that you are going to hear about were
looking for.

Now, there are several things that the
evidence is going to show. And as you look at
this photograph, several things about the
attempts at whoever placed this vehicle here, to
disguise it, to hide it, attempts to obscure its
detection, you are going to learn, members of the
jury, through this evidence in the case, that the
vehicle was locked, that the four doors on this
vehicle were locked when Pam and Nikole came upon
it.

You are going to learn that the license
plates were both removed, both the front and back
license plates were removed from the vehicle.
You are going to learn the battery was
disconnected and you are also going to learn that
the vehicle identification number was necessary
to, in fact, identify this as Teresa Halbach's
vehicle.

58

1    Now, the evidence is also going to show
2    you where on the property Teresa Halbach's
3    vehicle was found.  It was found in -- not
4    accidentally -- the furthest point from the
5    defendant's trailer.  Again, you are going to
6    find that it was intentionally obscured, that it
7    had immediate access to something called a car
8    crusher on the property.
9        And, again, just to orient you, Steven
10   Avery's trailer is in the lower left hand portion
11   of this particular photograph.  Where it was
12   found was not an accident.  We'll also tell you,
13   during the course of the introduction of the
14   testimony, that it's important where it wasn't
15   found.  It wasn't found on a roadway.  Wasn't
16   found in some mall parking lot.  It was found on
17   the Avery salvage property, the family business
18   property.
19       I talked about the car crusher; you will
20   hear a little bit about that piece of equipment
21   that was near or right next to Teresa Halbach's
22   vehicle.  You are going to learn and you are
23   going to hear evidence sometime through this six
24   weeks how this piece of equipment works, how a
25   regular looking vehicle, car, SUV, truck, starts

59

1    out looking like a regular vehicle and ends up
2    flattened or smashed.

3                You are going to learn why it's
4    important that Teresa's vehicle was next to the
5    car crusher and you are going to learn the
6    numbers of crushed vehicles and how easily Teresa
7    Halbach's vehicle could never have been found in
8    this case.  Could have been slipped in between,
9    if you will, one of those other cars.

10               You will hear about a lot of
11   professionals that were asked to perform
12   assistance in this case.  You are going to hear
13   about law enforcement professionals; you are
14   going to hear about Crime Lab analysts; you are
15   going to hear about some very, very, well
16   qualified expert witnesses.

17               And all of those professionals have two
18   legs.  One of them, though, has four.  It's a
19   Belgian Shepherd named Brutus.  Brutus is a
20   search and rescue -- or search and recovery dog
21   that is insensitively called a "cadaver dog".

22               What Brutus does is one thing.  Brutus
23   is highly trained.  And you are going to hear
24   testimony from Brutus' handler, Julie Cramer.
25   Brutus does one thing and that's find where a

60

deceased person has been.

The first official, first professional, to approach this vehicle after it's found, after law enforcement secures that area so nobody else can get around there, the first professional was a four legged variety. It was Brutus. It was a canine.

And Brutus, you are going to hear, was asked -- not directed towards this vehicle, but asked to just search around this particular location. You are going to hear evidence that late in the afternoon on the 5th, after the vehicle was found, after a search warrant was already obtained in this case, that Brutus, when approaching Teresa Halbach's vehicle, alerted.

It's called hitting on the vehicle. It was quite a dramatic alert. And you are going to hear from Ms Cramer about that. Sadly and unfortunately, that meant one thing to the handler and that meant one thing to the lead investigators in the case. Early on, they suspected, because of Brutus, because of this search and rescue dog, because of this cadaver dog, that a deceased individual either was in the back of this SUV, or at some point had been in

61

1    the back of that SUV.

2              Now, importantly, you are also going to

3    hear that the police decided not to touch the

4    vehicle at that time.  The police decided not to

5    process it even when the Crime Lab was on the

6    scene.

7              You are going to hear that the Crime Lab

8    loaded this vehicle onto an enclosed trailer,

9    trucked the enclosed and intact SUV all the way

10   to Madison, where on a Sunday, for a very brief

11   amount of time, but mostly on Monday, that

12   vehicle was processed by the experts.  Processed

13   by those state agents, by those State Crime Lab

14   expert employees, analysts, when they made some

15   very dramatic and very important findings in the

16   case.

17             I don't want to get ahead of myself.

18   Because on November 5th, on that first night, on

19   that first afternoon, there were places to look,

20   as you can imagine.  After Teresa Halbach's

21   vehicle was found on the Avery salvage property,

22   Mr. Wiegert, Mr. Fassbender, directing many law

23   enforcement officials, had a job to do.

24             Now, you saw the size of the Avery

25   salvage property.  You are going to hear

                          62

testimony from Mr. Fassbender. He's going to
provide you with an idea about the methodology,
about the plan, the search plan in this case.

You are going to hear Agent Fassbender
talk about missing persons investigations and
when they go from missing persons to criminal
investigations, how their thought process
changes. But at that early stage, when they find
the vehicle, when they don't know that there is
any blood in the back of the vehicle, when they
don't know if a body is involved in this case,
that Agent Fassbender and every other law
enforcement officer, you will hear, at that
scene, had one thing in mind and that was to find
Teresa. The job of the police at the time was to
find Karen Halbach's daughter.

And you are going to hear the evidence
that the officers made very, very quick work of
searching all of the residences on the Avery
salvage property, all of the four residences, all
of the outbuildings. They are searching for
Teresa Halbach and the search plan, again, is to
find the victim, find the victim's body.

But a secondary obligation of theirs is
also to look for obvious signs of evidence,

63

1    right? You don't have to watch CSI to know that.
2    At least a first kind of sweep, or a first kind
3    of look through, or a first kind of search of all
4    of these residences are to try to find obvious
5    signs of a crime if, in fact, a crime did occur,
6    or something that is going to help law
7    enforcement find Teresa Halbach. Why I say all
8    that is because Steven Avery -- With search
9    warrant in hand, Steven Avery's residence was
10   searched on the 5th.

11           Now, again, we're looking for Teresa's
12   body, hopefully alive, but if not, it is
13   important to find if she's on that property.
14   Steven Avery's garage is searched, other
15   residences, all of the other buildings on the
16   residence are searched, the salvage business
17   itself. But the 4,000 vehicles, in what you will
18   hear was a torrential downpour, were also
19   examined for the first time on the evening of the
20   5th.

21           Now, law enforcement officers were
22   involved in that, but Brutus' friends were also
23   involved in that, other canines, the rest of the
24   team, the other search and rescue animals, the
25   canines, were taken in a downpour, in the pitch

64

1    dark, out on a 40 acre property. And everyone of
2    these cars was encircled by one of those dogs
3    trying to find Teresa Halbach.

4    Please recall, at this early stage, the
5    police don't know what they are looking for yet.
6    They don't really have an idea yet of the kinds
7    of things that they are looking for. So when you
8    remember this search plan, you will hear evidence
9    and some officers may even call it the funnel
10   approach, nothing fancy about calling it the
11   funnel approach, it makes sense.

12   It's a way to describe search efforts.
13   It is actually an interviewing technique as well.
14   But it's a way to find evidence in a funnel type
15   of approach. We're looking for the body first.
16   Then we're looking for obvious signs of evidence.
17   Then as you get closer and closer into more
18   detail, more thorough, more directed searches,
19   because you are able to go back into all of those
20   places and all of those properties, that's the
21   methodology.

22   And as you hear officers testify
23   throughout this case, when they testify on the
24   witness stand, remember that funnel approach.
25   Remember that kind of methodology as they talk

65

1    about these kinds of things.  But make no
2    mistake, that on the first night, they are
3    looking for Teresa and they are hoping to find
4    Teresa alive.

5              When that was unsuccessful, the next
6    morning, on the 6th, Mr. Fassbender, Mr. Wiegert,
7    were able to secure some help.  They needed
8    bodies.  They needed some cops.  They needed some
9    volunteers.  And so they got volunteer
10   firefighters from all over the Manitowoc and
11   Calumet County areas.

12             And they all showed up in force, en
13   masse, on the morning of Sunday, November 6th.
14   And for the first time, everyone of those 4,000
15   vehicles was opened up.  Everyone of those 4,000
16   trunks was opened by a firefighter with a police
17   officer with them, looking for the body of Teresa
18   Halbach.

19             Also on Sunday, November 6th, a firearm
20   was found, or recovered; it was actually found
21   the evening before.  But it was seized; it was
22   recovered.  It was hanging over the bed of the
23   defendant, Steven Avery.  He thought it was
24   appropriate to recover that as a piece of
25   evidence and, in fact, it was.

66

1          You are going to hear that the brand
2     name of this semi-automatic .22 caliber rifle is
3     Marlin.  You are going to hear that it is
4     something called tube loaded.  Not that any of
5     these things are going to mean much to you at
6     this point, but there are a number of bullets
7     that are able to be loaded into this
8     semi-automatic rifle.

9          You are going to hear, by the way,
10    although hanging over Mr. Avery's bed and his
11    exercising control over that, should be obvious
12    that on the 31st of October, Mr. Avery exercised
13    a great deal more control.

14         A deserving piece of evidence was seized
15    on the -- Sunday, the 6th of November.  And it
16    is, what we believe, the last recorded voice of
17    25 year old Teresa Halbach.  When Mr. Avery, the
18    evidence will show, made arrangements to have
19    this young woman come out to his property that
20    afternoon, he didn't use his own name.

21         He didn't use the name Steven Avery.
22    Even though Ms Halbach had been out to the
23    property, as I told you, on a number of occasions
24    before; Mr. Avery used a different person's name.
25    He used the name B. Janda, the initial B. Janda,

67

J-a-n-d-a.  That's Barb Janda, can be Barb Janda,
but when we called the *Auto Trader Magazine*
people in Milwaukee, and you are going to hear
from Ms Schuster and Ms Pliszka, two employees of
*Auto Trader*, Mr. Avery used the name and used the
number for B. Janda.

Teresa Halbach doesn't know who B. Janda
is.  You are going to hear evidence that Ms
Halbach called back the telephone number for Barb
Janda and she left this voice mail.  This voice
mail was recovered, was retrieved.  You are going
to hear this voice mail.

And you are going to hear from Teresa in
her own words, in this courtroom, that she got
the message, that she knows that you want me to
come out to the property.  Teresa Halbach tells
B. Janda that she's going to be out there
sometime after 2:00 p.m., that very day, on the
31st of October.

This will be important for you in
determining a timeline.  Where was Teresa all
that day; was this before or after she went to
the Schmitz photo shoot and the Zipperer photo
shoot.  That's going to be uncontroverted.
Absolutely, this is the last stop that she made

68

1       on the 31st of October.

2               Two days into this, folks, we're now on
3       Monday, the 7th of November, and the first
4       results come from the Wisconsin State Crime
5       Laboratory. The first results find several
6       things.

7               First of all, in the back cargo area of
8       Teresa's SUV, they find that there's female
9       blood. They find there is a lot of female blood
10      in the back of Teresa's SUV. But they also
11      found, interestingly, male blood, at least at
12      that early stage with their early typing, they
13      could find that it was male blood.

14              And interestingly and importantly that
15      already on Monday, the 7th of November, there is
16      male blood found in the victim's vehicle in at
17      least six different locations. Six different
18      places they find male blood. Mr. Wiegert,
19      Mr. Fassbender, all of the investigators don't
20      understand the significance of the male blood
21      being in six different places. They do, however,
22      understand the significance of a lot of female
23      blood. And they suspect early on that something
24      horrible has come to Teresa Halbach.

25              Also on Monday, a burn barrel was

69

1    discovered, not just any burn barrel.  Again,
2    here's a picture, an overview, a part of the
3    aerial photograph of the Avery property itself.
4    There is Steven Avery's trailer and located
5    outside of Steven Avery's trailer was a burn
6    barrel that was recovered.

7         Now, again, not just any burn barrel,
8    but Steven Avery's burn barrel.  And you will
9    hear later in my opening and you will hear a lot
10   of evidence about the trial, about what critical
11   pieces of information were found from that burn
12   barrel.  But put it in perspective, on Monday,
13   that was found.

14        I provide this slide just as another
15   example for you of where that burn barrel was in
16   relationship, not only to the proximity of Steven
17   Avery's trailer, but the proximity to this red
18   Dodge Caravan.  You may also have guessed, this
19   is the car that Steven Avery asked Teresa Halbach
20   to come take a picture of.  All right.  So the
21   proximity of the burn barrel to his front door
22   and also to the Dodge Caravan will be important
23   in the determination at the close of this case
24   when you decide who was responsible for these
25   crimes.

70

1          The next day, three critical pieces of

2     evidence are found on Tuesday, the 8th.  Now, we

3     talked about these more detailed searches.  On

4     Tuesday, one of these more detailed searches

5     occurred in Mr. Avery's trailer.

6          You are going to hear evidence that this

7     bookcase was pulled out, was jostled about.  You

8     are going to hear evidence about this particular

9     binder having been pulled out of the bookcase.

10    And after the officers looked through it, how it

11    was slammed back in as the book case was actually

12    pulled out from the wall.

13         And after jostling and after searching

14    it, after slamming things around and after

15    putting the bookcase back in its location, you

16    are going to hear this is what the officers saw.

17    They saw a Toyota vehicle key in the bedroom of

18    Mr. Avery.  You are going to hear evidence that

19    it had obvious evidentiary value, that the

20    officers at that time stopped what they were

21    doing and Investigator Dan Kucharski of the

22    Calumet County Sheriff's Department seized or

23    took control of that key during that more

24    detailed search.

25         More detailed searches were also

71

occurring at the same time of the entire Avery
Salvage Yard, which included now officers,
volunteer firefighters, going through all of the
cars again; 4,000 searches occurred again, on
Tuesday. But you are going to hear this time
they weren't looking for a body, at this time
they were looking for stuff. They were looking
for evidence.

After the body wasn't found in their
first search, they are going back and they are
looking for items of obvious evidentiary value.
You are going to hear testimony they found
something of obvious evidentiary value; they
found the victim, Teresa Halbach's, license
plates crumpled up in a station wagon.

I just show you this slide to show you
what the vehicle looked like, the station wagon
that the license plates were found in. And also
provide this aerial photograph to give you an
idea of the vehicle that the license plates were
found in.

Very quickly, I want to remind you of
Steven Avery's trailer is down in the lower left
hand corner; that the access road leading to
Mr. Avery's trailer comes from the top of this

72

1    figure down towards the right. Teresa Halbach's
2    vehicle is found in the first vehicle (sic) next
3    to the access road on its way to Steven Avery's
4    trailer. Again, the evidence is going to show,
5    not by accident, the proximity to the defendant's
6    roadway, the proximity to the defendant's
7    trailer, all becoming important.

8         Now, I told you that there were three
9    important discoveries on the 8th. And the third
10   and perhaps the most important discovery that day
11   is something that's being referred to as a burn
12   area. Again, just to orient you, it's the same
13   kind of picture that we have been looking at:
14   Steven Avery's trailer; Steven Avery's garage.
15   The Dodge Caravan, the van that Ms Halbach was
16   taking pictures of, was located right there; and
17   there's the burn area.

18        The proximity of this burn area to the
19   garage is obvious; the proximity of this burn
20   area to Mr. Avery's trailer itself is obvious.
21   To provide you with another view of this burn
22   area, again located -- you can see his trailer,
23   you can see the garage on the right.

24        But, importantly, that burn area
25   contained human remains. It contained obvious

73

1    bone fragments. Even to the untrained officers
2    that stumbled upon this particular burn area,
3    even when they called over the Crime Lab to
4    process this particular location, it was obvious
5    that there were human remains in this particular
6    burn area.

7        Now, this next picture is particularly
8    important because it was taken before any
9    processing begins. There's the burn area that
10   we're talking about. That's the burn area that
11   contained the obvious human remains. You will
12   see and you will hear from the officers who were
13   at the scene, that this burn area, from the first
14   night, was guarded, was guarded by Mr. Avery's
15   German Shepherd. I believe his name was Bear.

16       But this particular German Shepherd, not
17   of the friendly sort, did not allow law
18   enforcement officers to get close to this burn
19   area. Did not allow any of the canine help that
20   was out there to get close to that area. And any
21   time -- excuse me -- law enforcement even got
22   close to the burn area, Bear made sure that they
23   were shooed away.

24       But I think it's also important about
25   this case, when we talk about proximity, there

74

1    isn't any question who exercises control over

2    this burn area. And in the background, just --

3    just see how close it is to that van that Teresa

4    Halbach was asked to take a picture of.

5         The next day, Wednesday, November 9th,

6    was the first time that recovered bone fragments

7    from that burn area are identified by an

8    anthropologist. An anthropologist is a

9    professional who looks at bones and can identify

10    whether they are human, or that they are

11    non-human, where they go. We'll talk about that

12    a little bit later.

13         But even though these fragments are

14    small, even though they are burned almost beyond

15    recognition, on Wednesday, the 9th, they

16    determined that those were, in fact, adult female

17    remains found right behind the defendant's

18    garage.

19         All right. This is the first image that

20    is not a photograph that I'm showing you. This

21    is computer generated. And we're going to hear

22    from a man who created these images. His name is

23    Tim Austin. He works for the State patrol, the

24    State of Wisconsin, in scene reconstruction.

25         And what Tim Austin will tell you is

75

1    that he was out at the scene -- and we'll talk

2    about this a little bit later -- but he was out

3    at the scene and took over 4100 measurements out

4    at the scene.  And after taking his own

5    photographs and after taking over 4100 images --

6    excuse me -- measurements, he was able to

7    recreate some of these scenes for you, for the

8    jury.

9            And these are created for the jury so

10   that you can see things that the naked eye can't

11   see; so that you can see things that photographs

12   can't show; so that you can see relationships

13   between some evidence and fixed objects or other

14   evidence that's found.  And so as you see this

15   perspective you will see that you are up, you

16   know, dozens of feet above the ground.  And it's

17   something, again, unless you are that tall, you

18   are not going to be able to see this kind of

19   location.

20           But this particular computer generated

21   animation is important to embrace or to -- for a

22   jury to look at in the case because the burn area

23   is clearly visible.  How close it is to

24   Mr. Avery's garage; how close it is to the

25   trailer; how close it is to the other area,

what's called the curtilage, that is the area
that surrounds Mr. Avery's property, all becomes
important.

All right. So these are -- And when
something is not a picture, when it, in fact, was
created through computer animation or computer
generation, I will let you know that.

One of the bones that was recovered was
a long bone. And I'm showing you this for a
reason, in my opening statement, so that you
understand what we're looking at here. That we
aren't just looking at some bone in abstract.
We're not just looking at some DNA profile.

It's Teresa Halbach's shinbone. All
right. It's Karen Halbach's daughter's tibia.
And attached to Teresa Halbach's tibia was some
tissue. Now, despite Mr. Avery -- The evidence
will show, that despite Mr. Avery's effort to
completely obliterate all these bones, by
burning, to incinerate these bones completely,
this bone survived.

This tissue that was on the bone
survived, which allowed a DNA match, which
allowed the State of Wisconsin analyst, guess
who, Sherry Culhane, when she performed an

77

analysis on that tissue, to match it with the
blood found in the back of the SUV; with a soda
can that is found in the front of the SUV; and
with a standard.

Now, the standard is also called an
exemplar. You are going to hear those two
statements, but Teresa Halbach, before the 31st
of October, had a Pap smear performed, a cervical
swab that was performed. And thankfully for us,
that was kept at Bellin, up in Green Bay. Well,
Sherry, also -- Ms Culhane, also, was able to
develop a DNA profile from the Pap smear.

We know that's Teresa. And from that
exemplar, from that example, matches the tissue
on the leg bone; matches the blood; matches the
soda can. We can say with 100 percent certainty
that those human remains are those of Teresa
Halbach.

The first 11 days of this case become
extremely important. And for just about five
minutes here, I want to give you those 11 days
in. And what you have just heard, that part of
the investigation, you have only heard 11 days
worth of investigation, which has gone on 15
months now. But the first 11 days are important

78

1    and I want to just run through those for you.

2           Ms Halbach is killed on the 31st of

3    October, at the Steven Avery salvage property,

4    sometime after 2:45 p.m. You are going to hear

5    from a gentleman by the name of Tom Pearce, who

6    is Teresa Halbach's business partner, that she

7    doesn't show up for work on the 1st or 2nd.

8           And on the 3rd, Teresa Halbach is

9    reported missing to law enforcement authorities.

10   That's when the missing persons investigation,

11   from a law enforcement standpoint, begins. I

12   think, if you will, as to the feelings of the

13   Halbach family and friends and how worried they

14   are even on the 3rd.

15          But on the 4th, you are going to hear

16   from a witness named Ryan Hillegas who helped

17   coordinate the citizen search efforts.

18          You are going to hear that there was

19   something called cell tracking. We're going to

20   hear a little bit about that. A cell phone

21   actually is almost a transmitting device and it

22   pings or beeps, if you will, off of cell towers

23   all over the state, whenever you carry it in your

24   pocket, whether it's on or not. You are going to

25   hear evidence about attempts to find Teresa's

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 80 of 222   Document 32-5

1    cell phone; if we find her cell phone, we can
2    find Teresa.

3         We also looked at those early stages for
4    whether or not she used any of her credit cards.
5    Where is Teresa Halbach? We try to find that
6    out.

7         You are going to hear that a gentleman
8    by the name of Curt Drumm, a pilot in the
9    Manitowoc area, volunteered his airplane and
10   helped law enforcement fly over Mr. Zipperer's
11   residence and Mr. Schmitz's residence and the
12   Avery compound and any of the roads that may have
13   led to and from there to try and find Teresa
14   Halbach.

15        On the 5th, we know that Teresa's
16   vehicle was found at the Avery salvage property.
17   You will hear that search warrants were obtained.
18   You will hear during the course of this case that
19   a search warrant is nothing more than a piece of
20   paper. It's a judicial authorization; a judge
21   authorizes law enforcement officers to search the
22   property, in private areas. And we got many,
23   many search warrants in this case and searched
24   for her body.

25        You have heard already, that on the 6th,

80

firearms are obtained or taken from Mr. Avery's
bedroom; his garage is searched, at least the
first search of the garage for those items of
obvious evidentiary value. But remember, on that
Sunday we don't have any results yet, from the
Crime Lab. Those don't come until sometime on
Monday, when the Crime Lab determines that both
male and female blood is located in the SUV.

We search, for the first time, all of
the junked vehicles, at least all of the trunks
are searched.

And Mr. Avery's burn barrel is
discovered and searched.

And other things will happen and you are
going to hear from other officers that the
surrounding areas, not just the 40 acres, but
hundreds of acres of gravel pits and the like are
being searched in these early days.

On Tuesday, perhaps the most important
of all the days as far as discoveries go, those
three critical discoveries are made: The Toyota
key, the license plates, and the burn area behind
the defendant's property.

On Wednesday, the 9th, there is an
identification made of male blood in the victim's

81

vehicle. That blood matches the DNA profile of
the defendant, Steven Avery. And bones are
recovered and determined to be that of an adult
female.

You will hear on the 10th, on Thursday,
the burn area is further excavated by arson
investigators and other Crime Lab and other types
of officials but, interestingly, the defendant's
DNA is now found on the key.

And, finally, on Friday, the 11th, the
female blood that was found, the great pool, if
you will, of female blood, in the cargo area, is
now matched. It is determined to match the soda
can -- the saliva from the diet Wild Cherry
Pepsi, I believe, soda can in the front of
Teresa's car. The blood is now presumed to be
that of the victim, Teresa Halbach.

You have heard the term that they told
me there would be no math, well, there is going
to be some science. And here's where I have to
at least give you an overview of what the science
of this case is going to be.

The science, the blood part of the
science, the DNA analysis and explanation of this
case is going to come from this gentleman right

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 83 of 222   Document 32-5

here, Norm Gahn.  Mr. Gahn, you will learn by his
examination, is quite knowledgable in DNA and DNA
from a prosecution standpoint.  And in all
honesty and in all candor, that's why he was
added to the prosecution team, because this is
such an important part of the case.  The science
becomes very, very important.

You are going to hear about a DNA
analyst from the Wisconsin Crime Lab named Sherry
Culhane.  Again, Ms Culhane, almost unbelievably,
is the very analyst that exonerates Mr. Steven
Avery several years earlier.  She's the same
analyst that does the detailed DNA work on
Mr. Avery's work with the Innocence Project and
frees Mr. Avery from his incarceration.

Well, that same woman, Sherry Culhane,
processes this vehicle.  Because she's the unit
head, because this is such an important case, she
does the work herself.  She does all of the
analysis of all of the blood that's found in
these cases.

You are going to hear from Ms Culhane,
through the assistance of Mr. Gahn, what DNA is,
that it is a genetic fingerprint, if you will.
Provides an opportunity, as most of you may

83

1    already know, to take a sample and to take a
 2    unknown sample, something like blood that's found
 3    in the back of an SUV and to take a known DNA
 4    sample, since our DNA is all the same in all of
 5    our bodily fluids.

 6            Our blood has the same DNA as our
 7    saliva, as our semen, as the skin cells, as our
 8    tissue; it's all the same DNA. So once you
 9    develop a profile, each of us all has different
10    DNA; it's unique to each of us. And Mr. Gahn
11    will explain all of that for you.

12            But with that as the background, Ms
13    Culhane was able to establish all of the places
14    in that SUV that had Teresa Halbach's DNA. You
15    are going to learn that they found a large
16    quantity of the blood and DNA in the cargo floor
17    and the side panel. The back cargo door, you are
18    going to hear that there were splatters, spatters
19    of Teresa's blood in the back cargo door.

20            You are going to hear that on the rear
21    tailgate there were droplets of Teresa's blood;
22    her DNA is found on the door handle; and, also,
23    as I have already alluded and you might expect,
24    the saliva from the soda can, Ms Culhane will
25    find DNA evidence.

84

I told you about male blood that was in the SUV. On Wednesday, the 9th of November, Steven Avery subjected to a very thorough medical examination, again, as result of a warrant, as a result of a judicial authorization to do that particular kind of examination. And what they found was a very, very deep cut to Mr. Avery's right middle finger but, importantly, on the outside of his right middle finger. And that's where the cut was.

This cut was actively bleeding on the 31st of October. And I guess, thankfully, for the State. And as a jury, I hope at the conclusion of this case you will say thankfully for you. Because DNA analysis was then possible because of his actively bleeding, of his leaving his DNA behind, inside of Teresa's vehicle.

Ms Culhane will tell you that the defendant's blood was found in at least six places in Teresa Halbach's SUV including the rear passenger door, smeared or wiped on the rear passenger door. Okay. There's a front door; there's a back door; kind of like a four door car. It was in the backdoor and it's along the edge or along the metal of the rear passenger

85

door. That's Steven Avery's blood. That's how
much blood he left on the side of the door.

We have heard about the defendant's
blood on the ignition. That positively matched
that of Steven Avery. As you think about this
case and I will argue at the end of the case, but
there isn't any secret and the defense
understands this is as well, an actively bleeding
middle right finger. And when you look at the --
excuse me -- When you look at the smear, kind of
visualize turning the ignition and how that can
smear from the outside of the middle finger and
leave that particular kind of DNA evidence.

Other places that the defendant bled
inside of the victim's car included blood on her
CD case in her front seat. Both front seats had
droplets of Mr. Avery's blood on it. The rear
tailgate, remember I told you there was a droplet
of Teresa's blood; because Mr. Avery is actively
bleeding, there is a droplet of his blood as
well. And also on the front console floor, is
kind of up in that particular area.

Sherry Culhane and Mr. Gahn are better
able to explain all those for you, but it's
important for you to know. Now, again, the

86

1    jigsaw puzzle, when you hear the evidence and
2    when you have to decide who killed Teresa
3    Halbach, this evidence points to one person.

4    Now, Mr. Gahn and his questioning, and
5    Ms Culhane is going to tell you, that DNA
6    evidence, again, is not just from blood. It can
7    be from skin cells which are left through
8    perspiration, sweat, okay, saliva and sweat and
9    all those other kinds of bodily fluids that we
10   talked about. So when somebody's hands are
11   sweating and you handle something, it's possible
12   that you can leave your DNA on that thing that
13   you handled.

14   You heard a suggestion already in which
15   there will be evidence in this case that the
16   battery was disconnected on Ms Halbach's vehicle.
17   We'll tell you, or at least we'll argue as to why
18   that happened. But importantly, in reaching up
19   underneath the hood, to open up Teresa Halbach's
20   vehicle, Mr. Avery was kind enough to leave his
21   DNA on the hood latch. Okay. That will come
22   from Sherry Culhane as well.

23   In handling Ms Halbach's key that starts
24   the ignition and putting it into his bedroom,
25   Mr. Avery was kind enough to leave his DNA on

87

```
 1    that portion of the Toyota key that was found.
 2    So that's part of the science.
 3            Other science is going to include things
 4    like teeth, teeth that were recovered from the
 5    burn area.  This part of the science, by the way,
 6    will be handled by Mr. Fallon, and other expert
 7    witnesses, but most importantly, through somebody
 8    called a forensic odontologist.
 9            That's a big word, kind of scared me
10    when I first heard it.  Gentleman's name is
11    Dr. Donald Simley.  Mr. Simley is a odontologist.
12    From a forensic standpoint, it's kind of a
13    dentist who matches stuff up.
14            So Mr -- or Dr. Simley, the dentist, the
15    odontologist, will show you a -- what's called a
16    panorex x-ray.  We went to Teresa's dentist.  We
17    got her x-rays from when she had work being done
18    and Dr. Simley will show you tooth number 31,
19    which is the second last tooth in the bottom left
20    jaw.
21            Dr. Simley will also tell you that
22    x-rays were taken of teeth that were found from
23    the burn area.  He will show you tooth number 31
24    that was actually recovered from the burn area
25    and will allow the jury to make their own
```

88

1     comparisons.

2              We talked about an anthropologist. Our

3     anthropologist is Dr. Leslie Eisenberg.

4     Dr. Eisenberg will tell you about her

5     credentials, about how she does this -- this

6     whole kind of work. And although, unfortunately,

7     the bones that she had to deal with and, again,

8     we aren't talking about a full skeleton that was

9     found in that -- that bone (sic) pit.

10             If we did, by the way, we may not be

11     including a charge against Mr. Avery for

12     mutilation of a corpse. But mutilation of this

13     little girl -- excuse me -- not this little girl,

14     but this young woman, absolutely occurred.

15     Because this is what's left, small tiny pieces of

16     bone fragment.

17             And when you talk about a jigsaw puzzle,

18     when you talk about trying to put all of this

19     together; it's a very, very difficult process.

20     And when I asked -- And the testimony, actually,

21     of Dr. Eisenberg is going to allude to this

22     jigsaw puzzle kind of analogy and we don't even

23     have a box or a cover to go on. Luckily for us

24     and luckily for you, Leslie Eisenberg is your

25     jigsaw puzzle covered box.

                           89

In other words, Dr. Eisenberg knows
where everyone of these bones goes.
Dr. Eisenberg will identify all of these bone
fragments. She'll identify, from a female
skeleton and from examples that are used, all of
the different parts of Teresa that were found.
Okay. And it will help you as far as
identification processes go, as to what parts of
Teresa's bones and what parts of the body were
actually recovered in this case.

Now, not all evidence is of equal
weight. And two really important pieces of bone
were found. And those were two pieces of what
are called the cranium, the skull, that were
burned very, very badly but were identified as
such by Dr. Eisenberg.

The parts of the skull, this picture
that you are looking at is actually a part of the
skull now. This brilliant woman is going to tell
you that this isn't just part of the skull, but
this is a little piece of the skull that's just
on top of or over somebody's left ear.

How do you tell that kind of thing
looking at a bone like that, but that's what an
anthropologist apparently -- apparently does.

90

1    And that's why she's an expert, and we're not, in
2    this area.  But, importantly, the damage, the
3    defect that's caused, the evidence is going to
4    show that you are looking at the inside, from the
5    inside out, the inside of Teresa's skull out;
6    that the circular or half circle -- because this
7    isn't the full piece, this is half of the
8    important piece here -- is extremely important.

9         The defect, the damage here, the
10   testimony will be, is caused by a high velocity
11   projectile.  We take this same bone fragment and
12   you are going to hear evidence about other
13   experts and it allows some other analysis of this
14   particular piece of bone, this particular piece
15   of cranium.

16        You are going to hear from a gentleman
17   by the name of Ken Olsen from the Crime Lab; he
18   is an expert in trace evidence, the CSI kind of
19   stuff, but the trace from an elemental
20   standpoint.  When you x-ray something, the
21   evidence is going to show bone and other kinds of
22   vascular or veins and things show up after you
23   x-ray even a burned piece of bone.

24        But what also shows up are things that
25   don't burn up.  All right.  When Mr. Olsen

91

testifies, he's going to point to these little
bright dots.  See those okay from there?  These
little bright dots that are right on the lip of
the cranial defect.

Those little bright dots he's going to
say he examined.  He recovered those and he did
his analysis on them, elemental analysis, and
found that they are lead.  These little dots are
lead, what's called lead spray.  You are going to
hear testimony that there's only one thing, only
one item that can travel fast enough, as a
projectile, to cause this kind of a defect and
also leave lead.  And as you might predict,
that's a bullet.  All right.  Lead spray is left
by bullets.

Dr. Eisenberg, then, with the assistance
of a gentleman by the name of Jeffrey Jentzen, is
the Milwaukee County Medical Examiner.
Dr. Jentzen, has -- and you will hear he has a
great deal of experience nationally, a national
expert in things like gunshot wounds.

Dr. Jentzen and Dr. Eisenberg will
render two expert opinions:  First of all, that
the left parietal region, the region just above
the left ear, the thing that you just saw, the

92

1    combination of the projectile and the lead spray,
2    leads these two experts -- and especially the
3    pathologist -- especially Dr. Jentzen, who will
4    tell you that that's an entrance wound, just
5    above the left ear of Teresa Halbach.

6         They will also find a second and we will
7    show you a second entrance wound, similar kind of
8    defect that's found in a recovered bone that is
9    on what's called the occipital region of the
10   skull.  That's to the back and just to the left
11   side of the back of the skull and that was a
12   second entrance wound.

13        Finally, their opinion, when they put
14   together -- when you ask of the State, what was
15   the cause of death, what was the mechanism of
16   death, at the conclusion of this case I will be
17   able to tell you, this was a homicide and it
18   included at least two gunshot wounds to the head
19   of 25 year old Teresa Halbach.

20        I'm almost done so hang on.  Remember
21   this burn barrel, remember found outside of
22   Mr. Avery's trailer, well, this burn barrel, as I
23   told you, was examined.  And although Mr. Avery,
24   the evidence will show you, attempted to burn up
25   all of the stuff that was in the burn barrel, it

93

1    didn't burn.  It didn't burn up.

2            And the things that didn't burn up were

3    electronic components.  All of these electronic

4    components were found in Mr. Avery's burn barrel.

5    This is other evidence.  This is more evidence,

6    not just the science, not just the DNA, not just

7    the blood, but at the conclusion of the case will

8    be other evidence that will be able to assist you

9    in pointing to who killed Teresa Halbach.

10           Of those electronic components, included

11   Teresa's cell phone.  You will hear evidence that

12   Teresa had a Motorola V3 RAZR cell phone.  And

13   when we look at and when the experts show you

14   those electronic components that are found within

15   the burn barrel, you will recognize or some of

16   you might, the Motorola sign.

17           But for those of you that don't, we're

18   going to have a gentleman by the name of

19   Mr. Thomas from the FBI come here from Virginia

20   and he's going to show you all those components

21   and he's going to show you what they looked like

22   when they were recovered from Mr. Avery's burn

23   barrel and what they used to look like on a

24   Motorola V3 RAZR cell phone.  All right.  So you

25   are going to be able to match up the components

94

1    itself and what it used to look like before Mr.
2    Avery's attempts to destroy that evidence as
3    well.

4         You are going to hear about a digital
5    camera that Teresa Halbach had; digital camera
6    that she used to take pictures was a Canon A310,
7    PowerShot A310.  You are going to hear all kinds
8    of interesting evidence about how a digital
9    camera -- and some of you may know this and
10   certainly our media friends know this.  But when
11   you take a picture with a digital camera, that
12   photo, that image that you take with a digital
13   camera leaves a signature.  It leaves an
14   electronic imprint on the image itself.

15        And so, if you put that picture on a
16   laptop computer or your home computer and you
17   take your little mouse and put what's called the
18   cursor, the little arrow thing, over the picture
19   itself, it gives you an incredible amount of
20   information.  Gives you the date that that
21   picture was taken.  It tells you things about the
22   picture itself, including what kind of camera was
23   used.

24        And you are going to learn and you are
25   going to see at least six different pictures that

95

1    were taken at Steven Avery's property by Teresa
2    Halbach. And all six of those include that
3    little imprint, include that signature, will tell
4    you conclusively that Teresa uses the Canon
5    PowerShot A310. All right.

6         We'll have these even more blown up for
7    you, but that says PowerShot A310. There isn't
8    going to be any question at all about whose
9    camera it was that Mr. Avery burned in his burn
10   barrel on the 31st of October.

11        You are going to hear about those other
12   electronic components, by the way. I don't know
13   if you use a palm pilot or a PDA, a personal data
14   assistant. Teresa had one of those. That was
15   also burned up and found in that burn barrel with
16   some other information.

17        But when on the topic of what other
18   evidence, what additional evidence, we're not
19   done there folks. All right. We have other
20   evidence that we have developed in the last 15
21   months. You are going to learn that in
22   Mr. Avery's garage, after shooting the bullets
23   into 25 year old Teresa Halbach, they ejected
24   what are called shell casings.

25        Those are the little brass casings that

96

come out of a gun after you shoot the gun. Well, it's possible for experts, for toolmark experts from the Crime Lab to match up those shell casings with a specific gun. And they will, in fact, match that .22 caliber rifle that's hanging over Mr. Avery's bed.

Now, March 1st and 2nd, 2 bullets were found, also, in Mr. Avery's garage. Through a more detailed search, you will find out why that happened. Through a more detailed search of the garage, two bullet fragments were found in Avery's garage. One of those bullet fragments, after going through Teresa Halbach, included Teresa's DNA.

And so as a matter, through Mr. Gahn and through his experts, you will learn that Teresa helped you too, that she left behind some evidence for you to consider in this case. Teresa left behind her DNA for you to consider on one of the bullets that's found in the defendant, Mr. Avery's, garage.

You will hear about things like phone calls. You'll hear about how phone calls can't be changed in the records and we can provide a timeline as to when certain things happened; when

97

Mr. Avery called for Teresa; when he called her
two times before she ever got there; and when he
places a -- what we're going to be called an
alibi call, two hours after she's already at the
property. You are going to hear about all those
kinds of phone calls.

And as I mentioned, at least briefly,
before other analysis of bone and tissue, other
things to point to, if in fact the State even
question whose bones and whose tissue it is
behind Mr. Avery's property.

Lastly, I just want to remind you of the
kinds of exhibits that you are going to hear in
this case. You are going to see items that were
seized, stuff that was seized from the scene,
from Mr. Avery's property. You are going to get
photographs from out at the scene, but you are
also going to see photographs after the evidence
was already obtained so that you have a more
pristine or a better view of some of this
evidence.

You are going to look at documents and
records. You are going to hear from experts.
And they will provide some written expert reports
and also summary and demonstrative exhibits.

98

```
 1              Just a little bit on summary exhibits.
 2    When there's lots of evidence like documents;
 3    lots of things in documents, phone records, you
 4    know, things like this; when it's hard for you to
 5    digest, we'll try to create a one or a two page
 6    summary of all that information to help the jury
 7    and find out exactly what all of it means.
 8              And, finally, audio and videotaped kinds
 9    of evidence, you would expect to find those kinds
10    of things.
11              Remember I told you before, just talking
12    about different kinds of photos, about those
13    pictures that Teresa took, those six different
14    pictures; this is one of them.  It was taken on
15    June 20th, by Teresa Halbach.
16              I use this as the example because --
17    because I wanted to.  But it shows very clearly
18    Mr. Avery's trailer, his garage.  It's clear
19    through *Auto Trader Magazine*, when Mr. Avery, in
20    June of this year tried to sell this particular
21    trailer, Teresa Halbach took this picture, again,
22    with a Canon PowerShot A310.  You will hear all
23    those kind of things.
24              But the reason, at least for this part
25    of the presentation, I'm showing you this, is it
```

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 100 of 222   Document 32-5

1    tells you a difference between a scene photo and

2    things that I mentioned at least briefly before;

3    computer generated scene models.  Again, this

4    isn't a picture.  This is a -- provided by

5    Mr. Austin, but you will note that it's something

6    that you couldn't see with your eye.

7            Again, usually there's elevations that

8    are involved.  These kinds of models are, by the

9    way, within an inch, you will hear, accurate.

10   Every measurement is within an inch.  So this

11   isn't some blackboard that was taken down and you

12   just do the best you can.

13           And these are 4100 measurements that

14   make everything geometrically perfect,

15   geometrically accurate to within an inch.  But

16   these kinds of models should assist you.  Since

17   it's the middle of February, we're not going to

18   be traipsing off to the Avery property.

19           These kinds of things may help you in

20   understanding better and getting a better tour of

21   the Avery property.  But just this model, as an

22   example, shows you how close Mr. Avery's burn

23   barrel is to his front door; how close it is to

24   the vehicle that Ms Halbach took pictures of.

25   And even things like after taking the pictures,

100

1    the path that Teresa Halbach took as she walked

2    towards Mr. Avery's property.

3            For those of you big picture people, not

4    detail oriented people, you all were asked that

5    question, we'll have aerial photographs for you.

6    Again, when we look at all of the surrounding

7    gravel pits on at least three sides of the Avery

8    property and how that may fit into some of those

9    kind of things.

10           We have interior photos as well.  Photos

11   of the inside of Mr. Avery's garage.  Now, you

12   will note a couple things about this photo.

13   First of all, you will note how cluttered, to say

14   the least, that it is.  And this might help you

15   understand how difficult it was for officers, not

16   knowing what they are looking for, in November,

17   to kind of go through this garage, not knowing

18   that the shooting -- not knowing that the

19   shooting happened in this garage.  The officers

20   didn't really know what they were looking for.

21           But in March, when this picture was

22   taken, and they know what they are looking for

23   and they know where to look in the garage, these

24   kind of pictures should be able to help you.  But

25   Mr. Austin also will help you in giving you a

101

1      geometric perspective, ripping the roof off, if
2      you will, of the garage and show you models of
3      the insides of the garage.

4           By the way, just so there isn't any
5      question why I'm showing you this exhibit, one of
6      the bullets, number 9, which was found in the
7      crack of a -- the cement, that was not cleaned up
8      in this case. And tent number 23A, underneath
9      what was a air compressor, the evidence is going
10     to show, is the bullet that Teresa left her DNA
11     for you. Underneath that air compressor is where
12     they recovered that second bullet.

13          Other interior photos, you are going to
14     see photos of the interior of Mr. Avery's
15     bedroom, the gun rack that hangs over Mr. Avery's
16     bed with two firearms, one was a .50 caliber
17     muzzleloader and on top of that was a .22 caliber
18     automatic -- semi-automatic rifle.

19          But Mr. Austin, again, provides you
20     with, ripping off the roof, if you will, interior
21     scene models, where you are going to be able to
22     look at the living room of Mr. Avery and his
23     spare bedroom and his bathroom and Mr. Avery's
24     master bedroom, be able to kind of walk around
25     within that space. So it will help you

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 103 of 222   Document 32-5

1 | understand where some of these evidence -- or
2 | some of this evidence was found.

3 | Finally, the kinds of witnesses that you
4 | are going to hear from, include citizens and law
5 | enforcement officers and records kinds of people;
6 | although, most of those will be agreed to between
7 | Mr. Strang and us, as well as expert witnesses.

8 | You will hear from various kinds of
9 | citizens like Bobby Dassey, who is one of the
10 | sons of Barb Janda, who you will hear testimony
11 | about, that at about 2:45 on the 31st of October,
12 | Bobby saw a young girl drive up to the Avery
13 | property.

14 | Bobby Dassey saw this young girl, later
15 | identified as Teresa Halbach, get out of her
16 | teal, or blue, or green colored SUV and actually
17 | take pictures of the van that her mom had for
18 | sale. Bobby Dassey is going to tell you, that
19 | after looking out the window and after seeing
20 | Teresa Halbach take these photographs of this
21 | vehicle and finish her job, that Teresa walked
22 | towards Steven Avery's trailer.

23 | You will hear evidence that she was
24 | walking towards the main entrance of Steven
25 | Avery's trailer and that Bobby thereafter took a

103

1    shower and left to go deer hunting, bow hunting,
2    about 15 minutes later. You are going to hear
3    from Bobby that when he left 15 minutes later,
4    Teresa's SUV was there, but Teresa was nowhere to
5    be found.

6            You are going to hear that Bobby Dassey
7    was the last person, the last citizen that will
8    have seen Teresa Halbach alive. You are going to
9    hear from other citizens like that, other people
10   that will help place this case into context for
11   us.

12           Juries are triers of fact. You don't
13   decide what the law is, the judge does that. But
14   you decide what the facts of the case are. And
15   the facts in this case aren't just going to point
16   to who did it; it's not just a who done it case.
17   It's a what happened and where it happened and
18   when it happened.

19           But we're also going to provide you
20   evidence, not just that Steven Avery did it, but
21   to the exclusion of other people as well. In
22   other words, positive evidence about who done
23   know it, but also negative evidence of why that
24   necessarily excludes others. And so you get to
25   find those facts and at the end of this case, you

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 105 of 222   Document 32-5

1    will search for the truth.  You are not to search
2    for doubt, you are to search for the truth.
3            I told you when you started this case
4    and when this opening statement started, that
5    this may, in fact, be the most important decision
6    that you will ever -- going to make.
7            That leaves us, then, with the end.  I'm
8    going to remind you through this case, I'm not
9    going to apologize about it, but this is Teresa
10   Halbach.  I'm not going to apologize about the
11   fact that this is not a DNA profile number.  This
12   isn't a box of recovered bones, but as I have
13   mentioned before, remembering the humanity of
14   Teresa Halbach.  Remembering who she is, what she
15   meant to these people, is an important part of
16   this process.
17           Ultimately, this process includes
18   assigning accountability.  It will require you to
19   assign responsibility for the murder and
20   mutilation of an innocent 25 year old young lady.
21   I'm confident, members of the jury, that after
22   the conclusion of this, what could in fact be a
23   six week trial, that you are going to agree with
24   me.  You are going to agree with the State that
25   we have met our burden, that is, beyond a

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 106 of 222   Document 32-5

```
 1        reasonable doubt.  I will ask at the conclusion

 2        of this case, that you return verdicts of guilty.

 3        Thank you.  Thank you, Judge.

 4              THE COURT:  Thank you, Mr. Kratz.  Members

 5        of the jury, it's quarter to 12.  It's a little

 6        earlier than we normally take our lunch break, but I

 7        don't believe there is time enough to get started

 8        with anything else before lunch.

 9              During the course of the trial the Court

10        will attempt to give you a break every hour and a

11        half or so, because I realize that your attention

12        is required and sitting for much longer than that

13        can impair your attention.

14              I do want to remind you at this time, as

15        I will periodically throughout the trial, that

16        you are not to begin your deliberations and

17        discussion of the case until all of the evidence

18        is presented and I instruct you on law at the

19        conclusion of the case.

20              Do not discuss the case among

21        yourselves, including the opening statement given

22        today, or with anyone one else, until you begin

23        your final deliberations in the jury room.  We'll

24        take our lunch break now and resume at 1:00.

25              (Jury not present.)
```

106

| 1 | THE COURT: You may be seated. Counsel, in |
| 2 | terms of the schedule for this afternoon, is the |
| 3 | State going to have some evidence to present after |
| 4 | the opening statement? |
| 5 | ATTORNEY KRATZ: We will, Judge, we'll have |
| 6 | as many witnesses as the Court wants to proceed with |
| 7 | this afternoon. |
| 8 | THE COURT: All right. We'll see you back |
| 9 | at 1:00. |
| 10 | ATTORNEY STRANG: I have just one quick -- |
| 11 | THE COURT: Go ahead. |
| 12 | ATTORNEY STRANG: -- matter if I might. |
| 13 | I decided against interrupting |
| 14 | Mr. Kratz's opening statement because I thought |
| 15 | this could wait, honestly, and I don't like to |
| 16 | interrupt someone's opening. But probably in the |
| 17 | first 20 minutes of his opening, Mr. Kratz |
| 18 | explained to the jurors that the presumption of |
| 19 | innocence persists only until that moment when |
| 20 | the evidence overcomes it and proves guilt, |
| 21 | beyond a reasonable doubt. |
| 22 | I understand -- I understand the |
| 23 | argument. I understand what was meant, no ill |
| 24 | intent was meant, but that's enough of a |
| 25 | variation from the actual instruction that the |

107

1    presumption of innocence attends the defendant
2    until after closing arguments and deliberations
3    begin, that I simply would ask the Court to
4    repeat part of that presumption of innocence
5    instruction this afternoon, before I start.

6          We don't have to make a big deal out of
7    it; I just thought an abbreviated reminder might
8    help. I also noted in the State's Power Point
9    slide that explained the element of false
10   imprisonment that the language, during her
11   lifetime, was omitted.

12         That's, I think, the kind of thing that
13   the Court already has covered and can cover
14   again, but it might be a good idea, and this
15   covers me too, for the Court simply to remind the
16   jury that all legal instructions come from the
17   Court in the end.

18         THE COURT:  All right.  I did -- I do
19   recall the statement regarding the presumption of
20   innocence that you referred to.  And I do agree that
21   the precise extemporaneous statement for Mr. Kratz
22   is not technically correct.  I'm going to grant your
23   request and repeat the presumption of innocence
24   instruction before you give your opening.

25         The other item about during the victim's

108

| 1 | lifetime, I think I covered in the initial |
| 2 | instructions, again, and I'm confident that six |
| 3 | weeks from now the jury will have forgotten any |
| 4 | subtle distinction that may have taken place in |
| 5 | the opening. But I will repeat the presumption |
| 6 | of innocence instruction without giving any |
| 7 | specific reason why -- |
| 8 | ATTORNEY STRANG: No. |
| 9 | THE COURT: -- because I doubt that the |
| 10 | jury caught the significance of it, but it was |
| 11 | technically incorrect. |
| 12 | ATTORNEY STRANG: Right. And it was |
| 13 | unintended and there doesn't have to be a big deal |
| 14 | made about this. |
| 15 | THE COURT: All right. Anything else |
| 16 | before we break? |
| 17 | ATTORNEY KRATZ: No, that's fine, Judge, |
| 18 | thank you. |
| 19 | (Noon recess taken.) |
| 20 | THE COURT: Members of the jury, a question |
| 21 | came up during break concerning the definition of |
| 22 | presumption of innocence, so I'm going to read that |
| 23 | excerpt to you again at this time, from the opening |
| 24 | instructions I gave you earlier. Then we'll hear |
| 25 | the opening statement from the defense. |

109

1          Defendants are not required to prove

2     their innocence.  The law presumes every person

3     charged with the commission of an offense to be

4     innocent.  This presumption requires a finding of

5     not guilty unless in your deliberations you find

6     it is overcome by evidence which satisfies you,

7     beyond a reasonable doubt, that the defendant is

8     guilty.  Mr. Strang, at this time you may begin.

9          ATTORNEY STRANG:  Thank you, your Honor.

10    Good afternoon.  This summer it will be 22 years, 22

11    years since a woman running on the beach in

12    Manitowoc was raped and beaten nearly to death.  The

13    Manitowoc County Sheriff's Department investigated

14    those awful crimes and they charged Steven Avery

15    with rape and attempted murder on that Manitowoc

16    beach, 22 summers ago.

17          He said consistently that he was

18    innocent, that he had not done it.  No one

19    believed him, no one but his own family believed

20    him.

21          And as that case was making its way

22    through the Manitowoc County Circuit Court, just

23    one county over, Teresa Marie Halbach was five

24    and was starting kindergarten.  Somewhere else,

25    somewhere we don't know, a man named Gregory

110

1   Allen, presumably, was laughing and planning his
2   next violent rape.

3       Eleven years later, in 1996, Steven
4   Avery was trying, still, to make people
5   understand that he was innocent.  DNA testing was
6   in its infancy.  It was beginning to move into
7   courtrooms, out of scientific laboratories.  But
8   we have come a long way, just a few years since
9   1996, and it was not as advanced as it is today.

10      But in 1996, Steven Avery took a chance
11  and had blood drawn, a little vial of blood.  It
12  was sent off, through the help of his lawyers,
13  for early DNA testing.  It couldn't clear him
14  entirely.  It helped, but it did not conclusively
15  prove Steven Avery's innocence of the attempted
16  murder and rape on the Manitowoc beach.

17      And when the tests failed to prove him
18  entirely innocent, that blood was sent back, in a
19  box sealed with evidence tape, to the Manitowoc
20  County Clerk of Court.  And there, in 1996, that
21  blood vial, sealed in the box with evidence tape,
22  took up residence in the now 11 year old file of
23  the 1985 case; in a box, in the open, in the
24  Manitowoc County Clerk of Court's Office.  And
25  there it sat.

111

And in 1996, here, just a few miles

north of here, Teresa Marie Halbach was learning

to drive at age 16, I assume.  And the irony --

Could you hear me before?  Can you hear

me now?

THE COURT:  We can hear you better now.

ATTORNEY STRANG:  All right.  Is it the

Verizon guy who says that?

Teresa was learning to drive, I assume,

at age 16.  And the irony -- the irony is that

the blood vial in the Clerk's Office probably is

what ends up in her car, eventually.

And time moves forward, though, to 2002.

Science also has moved forward.  DNA testing has

improved, and a new effort is made to exonerate

Steven Avery.

Now, the blood in the vial, in the box,

under the evidence tape, in the Clerk's Office,

is not, you will learn, what is used for the 2002

and 2003 DNA testing.  But, some materials from

that box, that file, the overall file from the

1985 case, some are sent to the Wisconsin State

Crime Laboratory in Madison, to Sherry Culhane,

to whom Mr. Kratz introduced you.

And the person from the Manitowoc County

1     Sheriff's Department involved, low these many
2     years later, the department was, but a person
3     from the Manitowoc County Sheriff's Department
4     who documented the things that were sent from
5     that old court file to the Crime Laboratory and,
6     therefore, presumably looked at the box and
7     assisted in deciding what to send.  That person
8     was, by that time, a lieutenant -- or a
9     detective, now a lieutenant, named James Lenk.

10          Now, Detective Lenk was with the
11    Manitowoc County Sheriff's Department, had his
12    office in the Sheriff's Department that adjoins,
13    or is connected by a small courtyard, to the
14    Manitowoc County Circuit Court and the Clerk's
15    Office, by a small courtyard to the south of the
16    courthouse.  He was, as I say, a detective with
17    the Sheriff's Department.  Today he is the
18    lieutenant of the detectives and leads the
19    Detective Unit.

20          He documented, in 2002, what was sent to
21    the State Crime Laboratory from that file.  2002
22    is the year that Teresa Halbach graduated from
23    the University of Wisconsin at Green Bay and came
24    home a short distance back, here to Calumet
25    County, to start off a promising career.

113

1       In 2003, nearly a year after the
2    necessary DNA samples were sent, the Wisconsin
3    State Crime Laboratory was able to establish that
4    Steven Avery did not rape and beat the woman on
5    the Manitowoc beach, as he had been saying all
6    along.  And because of the advance of science,
7    the Crime Lab was better -- was able to do better
8    than that.  It was able to establish that Gregory
9    Allen did.

10       Now, unfortunately, in the time that
11   passed, Mr. Allen had raped violently, again,
12   because he had his liberty while that man did his
13   time.  But in the fall of 2003, as the weather
14   was cooling, the State of Wisconsin at long last
15   joined Steven Avery in a motion to set aside his
16   conviction, and an innocent man also went home.

17       Home for Steven Avery, home is the
18   salvage yard of which you have seen, now, many
19   glorious pictures, from up high, from down low,
20   from angles all over.  The pictures are a good
21   deal more glorious looking than the salvage yard
22   itself, but this was home.  It's the only home
23   that would take him back after this time.

24       Allen Avery, Steven's father, back there
25   in the working shirt, just as you might expect;

114

Allen Avery started that business nearly 40 years
ago on the 40 acres that he scrimped to buy.  He
raised sons and a daughter.  And they didn't
wander far from the business.

Chuck and Earl joined it, Barb works
elsewhere, works a factory job, but lives on the
property.  And this is the sort of business where
the family, as you saw, shares the perimeter of
this property with the 4,000 rusting, decaying
cars that are the refuse, the wreckage of other
people's lives.

This is not a glamorous business, but it
is a necessary business.  It is a good business.
And, yes, as you will learn, you have got to get
your hands dirty if you're going to be in the
salvage business.  Not just dirty, you get your
hands bloody, because you are working with
rusted, jagged metal disassembling cars.  And the
dirt that grinds into your palms and that you
find under your fingernails doesn't wash off at
night.

But this was his family's business and
this was home.  And he rejoined his brother's,
Chuck and Earl; and his father, Allen; his
mother, Delores, on the family's property and at

115

1    the business.  He became, again, one in the Avery
 2    clan, one man in the Avery clan.  And tried to
 3    resume some normalcy of life, sharing the
 4    perimeter of that salvage yard, not in a pretty
 5    house in town, on a nice stone foundation, but in
 6    a trailer home, down from his sister's trailer
 7    home.  Both of them down from the doublewide that
 8    mom and dad have, and Chuck's trailer toward the
 9    back, on the path toward the crusher.
10         And it is, although not glamorous, a
11    worthwhile business and it's work with its own
12    dignity.  What would we do, if we didn't have the
13    salvage yards in which to find spare parts.  I
14    guess we would be reliant entirely on the big
15    corporations that make the cars, to continue to
16    make spare parts for them and sell them at such
17    prices they might see fit.
18         So it would be pretty tough without the
19    Allen Averys and the Steven Averys of the world.
20    It would be pretty tough for the guy who is
21    restoring the 1968 Pontiac GTO hard top, in his
22    garage, to do that economically.  It would be
23    pretty tough for the guy working on a 1965
24    Mustang convertible, in his spare time, to do
25    that.

116

Maybe more importantly, it would be

2      pretty tough for the woman who's got young kids

3      to feed, and a job to hold down, and medical

4      bills, and she just has to get another

5      50,000 miles out of that 1988 Oldsmobile.  And

6      for these people, maybe for you, for many of us,

7      it's a good thing that that young woman's father,

8      or brother, or maybe she, can go to the salvage

9      yard and keep the 1988 Oldsmobile running a

10     little while longer.

11             Now, in 2003, when Steven went home,

12     Teresa Halbach also was home.  Her photography

13     business was flourishing and things were going

14     reasonably well.  In 2004, Steven Avery filed a

15     lawsuit seeking some recompense for the hole in

16     his life, the time he had spent as an innocent

17     man, for the crimes that Gregory Allen committed.

18             This was a serious lawsuit.  It was in

19     federal court, down in Milwaukee, and there was

20     no question but that a Manitowoc County Sheriff's

21     Department and, in the end, the court system, had

22     gotten the wrong guy.

23             And as that lawsuit crept forward, as

24     lawsuits do, we came to October 2005.  In October

25     2005, about the middle part of the month, James

117

1    Lenk and another ranking officer of the Manitowoc

2    County Sheriff's Department, Sergeant Andrew

3    Colborn, Mr. Lenk and Mr. Colborn both were

4    pulled into the lawsuit, not as defendants or

5    parties to the lawsuit, but as witnesses,

6    witnesses who had their depositions taken in the

7    middle of October, 2005.

8         Now, a deposition, typically in a civil

9    lawsuit, is an event where you get a subpoena as

10   a witness; you come normally to a lawyer's

11   office, the conference room, the library, the

12   lawyer's office; lawyers from both or all sides

13   are there.

14        A court reporter is there; these days

15   often a videographer as well.  And the court

16   reporter swears the witness under oath, the

17   lawyers ask questions of the witness under oath

18   and they are recorded, much as Mrs. Tesheneck is

19   recording what we're saying here.  There's no

20   judge; it happens, as I say, typically in a

21   lawyer's office.

22        And these two men, Lenk and Colborn,

23   were witnesses.  They were witnesses about their

24   own conduct.  Neither had been with the Manitowoc

25   County Sheriff's Department in 1985, but an event

118

1    in 1995 or 1996 came up in that lawsuit. And as
2    to that event, both of them were witnesses being
3    questioned about their own activity and conduct
4    with respect to Mr. Avery's imprisonment.

5         By the end of that month, unfortunately,
6    those depositions would begin to matter. And
7    indeed, from the time it was filed in 2004, you
8    will learn, the lawsuit itself mattered. This
9    sort of lawsuit, or the public cry of the
10   innocent man wrongly convicted and imprisoned has
11   to be, as you will see here I think, it has to
12   be, as you get into the heads of law enforcement
13   and begin to understand the process of law
14   enforcement, this kind of thing has to be a
15   nightmare for every good law enforcement officer.

16        These folks do not want to put innocent
17   people in prison. They want to put guilty people
18   in prison. And when they get it wrong, when the
19   whole system gets it wrong, there understandably
20   are feelings of shame, of embarrassment, anger,
21   humiliation, conflicting feelings about this.

22        This is a good cops worst nightmare,
23   made all the more worse by the fact that Gregory
24   Allen, free, thanks to Steven Avery being
25   convicted instead, Gregory Allen went on to rape

119

1    and beat again.

2            This lawsuit kindled real difficult
3    emotions. And the focal point of those emotions,
4    naturally, was the Manitowoc County Sheriff's
5    Department which had investigated the rape many
6    years ago on the Manitowoc beach.

7            And so when October 31, 2005, Halloween,
8    rolls along, Lieutenant Lenk and Sergeant Colborn
9    not only have the lawsuit to contemplate, but
10   now, within the last three weeks, have been made
11   witnesses in it and had their depositions taken.

12           October 31, 2005, began at the Avery
13   Auto Salvage Yard, much as any workday would.
14   This was a Monday, the yard was open. Not long
15   after 8:00 in the morning, about 8:12 in the
16   morning, Steven Avery called *Auto Trader* down
17   in -- actually I think in Hales Corners, Highway
18   100 down on the southwest side of Milwaukee,
19   called *Auto Trader*, as he had done a number of
20   times before, and said, we need a photographer,
21   we have a car for sale.

22           Now, the car belonged to Barb Janda, the
23   van, the mini van you saw computer images of and
24   actual photographs of. It was there. It was
25   hers. It was for sale. I don't expect there

120

will be any dispute about that. And it was
Barb's to sell. The calls about it were Barb's
to take, the price was Barb's to dicker or
negotiate with people interested in making an
offer, on the used van.

Steve left B. Janda as the name because
that was the name of the seller. But Barb works
during the day at a factory in town. She does
not work at the salvage yard as Steven did. He
leaves her telephone number because that's where
the phone calls have to go if there's an
interested buyer.

And this, you will find out, is not at
all unusual or sinister. It doesn't involve
luring anyone anywhere. There was a car for
sale. There were photographs to be taken. And,
indeed, on that day alone, for Teresa Halbach,
with the three appointments we know about; this
was not the only appointment where the seller of
the car was not the person whose name was given
to *Auto Trader*.

The Schmitz car was called in by and
listed as an appointment for a Craig Sippel
(phonetic). And that little bit of confusion was
quickly cleared up by the police. Wasn't really

121

Sippel's car; it was Schmitz's car, no big deal.
But she thought she was going to see a Craig
Sippel, not a Steven Schmitz.

She thought that she was going to see a
B. Janda, I suppose, not a Steven Avery. But
here's what she knew, she knew the address.
Steven gave the address. This is an address, as
Mr. Kratz explained to you and I agree, to which
Teresa Halbach had been a number of times,
probably about a half dozen, five, six, maybe
more times, to take photographs of cars or the
trailer for sale, for example, the photograph you
saw.

She knows the address. She knows where
she's going. As you will see, this is not a
surprise, or a secret to her or to anyone else.
And at 11:45 that morning, she called Barb
Janda's number and evidently left a voice mail
message saying that she would be able to get
there that day, sometime after 2:00.

Now, this Manitowoc County area was
Teresa's territory so to speak, for *Auto Trader*.
This was her freelance work as I understand, not
her main source of income. Her photography
studio work I think probably was her passion and

122

1    this was a side job for a young photographer to
2    generate some more money.
3              She has a territory for Auto Trader.
4    Steven Avery wouldn't necessarily know what her
5    territory is or whether she's the only
6    photographer working it. And sometime close to
7    2:30, he's obviously getting fidgety. He makes
8    two phone calls to her cell phone from his cell
9    phone and he uses the *67 feature, you will find
10   out, which as I understand it on the -- on
11   Teresa's telephone, then, no telephone number
12   would come up; come up is unavailable, or
13   something like that, or blocked.
14             But he is on his own cell phone and he
15   may not want, not being entirely sure whose
16   number he is calling, he may not want to be
17   giving out his cell phone number. At least the
18   second of those calls goes unanswered.
19             And the time frame gets fuzzy here.
20   Mr. Kratz said that it was late afternoon that
21   Teresa arrived and I'm inclined to agree with
22   that; although it is difficult to nail down. But
23   I think the best evidence you will hear is that
24   although Teresa Halbach is in the neighborhood of
25   the Zipperers, who are really just -- I don't

123

know how far, but not too far down Highway 147
and then south toward Manitowoc a little bit. So
they are in the general vicinity.

And I think at about 2:15 she's near the
Zipperers, trying to figure out exactly where
she's going to get to the Zipperers to take that
photograph of their car. But I think the best --
the best estimate we'll get out of the evidence
of when she actually arrives at Avery Road, which
is that gravel road that leads down towards,
first, Barb Janda's trailer and then Steven
Avery's trailer, which you saw on the north edge
of the 40 acre parcel; the best estimate of when
she swings her Toyota down that gravel road is
probably shortly before 3:30, probably not 2:45,
as one of Barb Janda's sons, Bobby Dassey,
recalls it.

Why do I say the best estimate, because
there is a school bus driver. Two of Barb
Janda's boys, Brendan and Blaine, are still in
Mishicot High School and it's Monday, as I said.
And they ride the school bus. And school
schedules being what they are, of course, unless
there is really terrible weather or something,
school lets out at the exact same time every day,

124

1    the bell rings and kids run out the door.

2            The bus is going to be leaving about the

3    same time and the bus driver will be driving the

4    same route every day. So this bus driver, who's

5    no relation to the Avery family, or the Halbachs,

6    or anybody else for that matter, just happens to

7    be the school bus driver; her name is Lisa

8    Buchner.

9            Lisa Buchner, when interviewed by the

10    police says, you know, about 3:30 when I dropped

11    the Dassey boys off at the head of Avery Road, I

12    looked down the road and I saw a young woman

13    taking a photograph, or photographs, of a van.

14    Now, Buchner actually isn't sure when she's

15    questioned about this whether it's Monday,

16    Tuesday, or Wednesday of that week.

17            But Monday is the day that a young woman

18    would have been taking a photograph of the van,

19    down near the end of Avery Road. So she's got a

20    pretty good reason to have a good bead on the

21    time. She's going to know her route, this is

22    something she's doing five days a week. And it's

23    about 3:30 that she sees this young woman down

24    the road, taking a photograph of the van.

25            Teresa Halbach does her business. And

125

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 126 of 222   Document 32-5

1    the way this works is the person selling the car

2    then gives the photographer $40. The

3    photographer makes out a receipt for the

4    transaction, typically also offers the customer

5    the current copy, current edition of the *Auto*

6    *Trader Magazine* and leaves.

7         And that's what Teresa Halbach did.

8    Steven Avery last sees her going back out Avery

9    Road and about to turn left to go back out to

10   Highway 147.

11        Now, somebody clearly sees her later.

12   We don't know who, I don't know where, I don't

13   know when. And I, like Mr. Kratz, don't know

14   why.

15        I do know this and can tell you that you

16   will hear this about the evidence. One of the

17   things that the photographers who freelance or

18   work for *Auto Trader* do, is to go take

19   photographs on appointments that have been set

20   for them through the *Auto Trader* office.

21        But there is another thing they can do,

22   they get some money for that, obviously. Some of

23   the $40 goes to the photograph. But there's

24   another thing they can do and that's called a

25   hustle shot. The hustle shot is exactly that,

1    it's business that the photographer hustles up
2    for herself, or for himself.
3             And as an incentive for the
4    photographer, to hustle a little bit and, you
5    know, thicken the *Auto Trader Magazine* with new
6    customers selling cars, or boats, or trailers, or
7    whatever, as an incentive for their photographers
8    to do that, *Auto Trader* gives the photographer a
9    little bigger cut on a hustle shot.
10            You are going to learn that Teresa
11   Halbach was good at hustle shots.  She drummed up
12   a lot of these.  She was likeable.  She was hard
13   working.  She was good at getting hustle shots.
14            I have no idea -- I have no idea at all
15   and I don't think you will either, unfortunately,
16   whether she had a hustle shot, or two, or three,
17   that day or not.  It would not have been
18   uncommon.  But if, in fact, she's near the
19   Zipperers at 2:15 and as I think is probable from
20   the evidence, she doesn't show up to the Averys
21   until about 3:30, it's possible there's a hustle
22   shot in there or I suppose stopping for lunch or
23   something, we don't know.
24            It's possible there are hustle shots
25   that are not scheduled through *Auto Trader* after

127

the Avery shot. Because after all, I mean, if
we're at 3:30, there's a good bit of daylight
left in the working day, I suppose. But we don't
know.

What we do know is that someone sees her
later. And Steven Avery calls her later, as a
matter of fact, from his cell phone. Again, he
calls her cell phone at about 4:35 that
afternoon. Why, because he thought, I have got
another car I would like to sell. I might as
well, if she's still around, or if she can swing
back, I might as well have her shoot that one
too.

But he doesn't get an answer from her,
doesn't answer the phone, when he calls at 4:35.
He sticks around. And at that point his
girlfriend, Jodi Stachowski, is in jail serving
some time for a drunk driving conviction. She's
in the Manitowoc County Jail.

Jodi, you will learn, calls Steven
regularly. Because she's in jail, she has to
call collect. And you can't call collect from a
jail to a cell phone. I don't know if you can
call collect to any cell phone from anywhere.
But in any event, you can't call a cell phone

128

1    from the jail, calling collect. So you have got
2    to call a land line.

3            So that's exactly what Jodi Stachowski
4    does, first a little bit after 5:30 in the
5    evening she calls. And jail systems, I don't
6    know if you know this, but jail systems,
7    typically, and the Manitowoc County Jail clearly
8    does this, cut off phone calls after 15 minutes.
9    Inmates have a lot of time on their hands,
10   sometimes people they are calling don't. So the
11   call just ends at 15 minutes.

12           So Jodi calls about a little bit after
13   5:30 on the land line. And then she calls again
14   just shortly before 9:00 p.m. And Steven is
15   home. Steven answers the phone in his little red
16   trailer there, both times. And both of those
17   conversations go 15 minutes, almost to the
18   second.

19           He tells her that he's been doing a
20   little cleaning. He tells her that Brendan, his
21   nephew, Brendan Dassey, is over. They hassle.
22   These are inane conversations, honestly, but they
23   are tape recorded, because every phone call out
24   of the jail is tape recorded, so we know they
25   happen.

129

Does it sound like he's just killed
someone, no. Does he hide the fact that his
nephew, Brendan, from 50 yards away, or whatever
it is, Barb's trailer, has come over, no.
Doesn't have to tell Jodi that, if they were up
to something no good, but he does. Brendan is
around.

And for all the world, as I say, these
conversations simply are inane, they don't ring
of someone who has committed a murder or in the
midst of committing a murder, or in the midst of
mutilating a corpse or falsely imprisoning
anyone, no screaming in the background. They are
just inane telephone conversations between a
squabbling boyfriend and a squabbling girlfriend.

And October 31 comes to a close. It's
about three days later, Thursday evening about
5:00, November 3, when Mrs. Halbach reports
Teresa missing. Teresa lives almost next door to
the elder Halbachs; I mean, the two houses, you
can see the one from the other, on the dairy
farm, up north of here, in Calumet County.

So the report goes to the Calumet County
Sheriff's Department. It's a missing person
report. No one has seen Teresa since Sunday,

130

1       actually.  And the Calumet County Sheriff's
2       office responds, interviews the family, a couple
3       of close friends, and learns very quickly about
4       these three appointments that Teresa had on
5       Monday.  Now, at least two of those -- at least
6       two, maybe the third even, but at least two, are
7       in Manitowoc County; Zipperers and Avery, or B.
8       Janda.

9               So the Calumet County Sheriff's
10      Department calls for help from the Manitowoc
11      County Sheriff's Department on this missing
12      person report; that very night, 5:00, the report
13      is made.  By the end the of the dinner hour,
14      Calumet County is calling the Manitowoc County
15      Sheriff's Department for a little bit of help.

16              And who do we get?  We get Sergeant
17      Andrew Colborn.  And he's told, look, two places
18      we would like to sort of check out and see if
19      Teresa Halbach showed up on Monday, the Zipperer
20      residence and Steven Avery.  Well, that's a name
21      that rings a bell, you better believe; less than
22      three weeks, or about three weeks, after his
23      deposition.

24              And it is interesting that of those two
25      places that Sergeant Colborn is asked to check

                        131

1    out and inquire after Teresa Halbach, he only

2    goes to one.  He goes to Steven Avery's home and

3    Steven cooperates with him.  Tells him

4    essentially what I have told you about Teresa

5    Halbach coming to take the picture of Barb

6    Janda's van.  Doesn't clam up, doesn't seem

7    nervous, isn't uncooperative; that very night,

8    November 3, around 7:00, when Sergeant Colborn

9    knocks on his door.

10    Out of the blue, the same night,

11    Lieutenant James Lenk, now the head of the

12    Detective Unit in Manitowoc County Sheriff's

13    Department, calls Calumet about this missing

14    person report.  Now, at this time, on Thursday

15    night, November 3, this is -- let's be clear,

16    this is just a missing person report, a young

17    woman who hasn't been seen for three days.

18    It's in another county.  It's not even

19    Manitowoc County at all.  And nobody has called

20    for Lieutenant Lenk.  And nobody's called looking

21    for him.  But the chief detective of Manitowoc

22    County takes it upon himself, that night, to call

23    Calumet and offer to get involved in the missing

24    person investigation where one of the

25    appointments that was to be kept was Steven

132

1    Avery.

2         And the next morning, Lieutenant Lenk
3    does one better than that, he goes out himself to
4    Steven Avery's trailer with another officer from
5    Manitowoc. And he knocks on the door again, just
6    as Sergeant Colborn had done the night before,
7    inquiring after Teresa Halbach. Again, Steven
8    Avery is cooperative.

9         Lieutenant Lenk asks, could I take a
10   walk through your trailer, can I look around, do
11   you mind? No, I don't mind. Come on in.
12   Lieutenant Lenk walks through Steven's trailer,
13   sees nothing amiss, thanks him for his
14   cooperation and leaves.

15        November 5, Saturday, Steven has left to
16   go to the family cabin up in Crivitz, early that
17   morning, where Allen goes every weekend and most
18   of the family goes up too. Steven has gone up on
19   Saturday morning. But about 10:30 on Saturday
20   morning, Pam and Nikole Sturm find the Toyota
21   they suspect, correctly, as it turns out, is
22   Teresa's. As it turns out, is Teresa's, in the
23   far diagonal corner of the salvage yard from
24   Steven Avery's trailer.

25        As you might expect, law enforcement

133

1      officers descend on the property and the first to
2      arrive are Manitowoc County Sheriff's Department
3      officers at just about 11:00, in the morning, on
4      the nose.  And, folks, from that point forward,
5      from 11:00 a.m. on Saturday, November 5, 2005,
6      this is not so much a funnel approach, as you
7      will see.  It is a tunnel approach.  It is a
8      tunnel vision approach to this case.

9              All of the feelings about Steven Avery,
10     all of those churning emotions, all of that,
11     within the Manitowoc County Sheriff's Department,
12     floods out.  You can call it tunnel vision, you
13     can call it investigative bias, but from that
14     point on, this investigation is about Steven
15     Avery and not much else.

16             From 11:00 in the morning on Saturday,
17     November 5, 2005, before the police say they have
18     even opened the car; before they say they know of
19     any blood of any sort in or on the car; before
20     anybody even knows whether this young woman has
21     been hurt or killed, the focus is on Steven
22     Avery.

23             Other people are asked, her male
24     roommate; former boyfriend and current friend,
25     Ryan Hillegas; others are asked:  Do you know

                          134

anything about her disappearance? Did you have
anything to do with it? All of them say no. And
those denials, those statements are accepted.

Not Steven Averys, not Steven Avery's
denials or expressions of innocence. Time and
again the police go back to Steven Avery and ask
the same questions. And he talks to them every
time.

Even by the time his lawyers in the
civil lawsuit down in federal court in Milwaukee
find out about it and are trying to encourage him
not to the talk to the police, he talks. On the
3rd to Colborn, on the 4th to Lenk, on the 5th to
officers up in Crivitz, on the 6th, on the 9th,
he talks. And he is not believed. Do they want
to go through his house, sure, come on in my
house, on November 4, Lieutenant Lenk.

After the Toyota is found and the police
arrive at about 11:00, that Saturday morning,
Lieutenant Lenk and Sergeant Colborn come in to
work and they too arrive at the Avery property.
You will hear that Lieutenant Lenk now has
changed his sworn version of when he arrived that
afternoon.

And he has the ability to change his

135

1    sworn story about when he arrived that afternoon
2    at the Avery property, because somehow he avoided
3    signing in on the log, the log sheets that the
4    Calumet County Sheriff's Department was keeping
5    of that potential crime scene. He signed out,
6    but somehow he managed not to sign in.

7         And on that 40 acre parcel, after the
8    Toyota has been turned over to the Division of
9    Criminal Investigation in Madison, now, as search
10   efforts are to be begin on that parcel, now the
11   Manitowoc County Sheriff's Department nominally
12   turns over control of the investigation to
13   Sheriff Jerry Pagel of the Calumet County
14   Sheriff's Department, this county's sheriff's
15   department. Nominally, that afternoon, control
16   of this investigation was turned over to Calumet
17   from Manitowoc because of the apparent conflict
18   of interest that Mr. Avery's lawsuit represents
19   for the Manitowoc County Sheriff's Department.

20        Now, if you are thinking, though, that
21   the evidence will show you that Manitowoc County
22   bowed out because of the conflict of interest
23   after it turned the investigation over to Calumet
24   County; if you are thinking that, it's
25   reasonable, but you are wrong. Manitowoc County

136

1     Sheriff's Department stays very much involved in
2     this investigation.

3              And what does Lieutenant Lenk and what
4     does Sergeant Colborn do by way of volunteering
5     to help, that very afternoon, Saturday
6     November 5. Do they volunteer to help look in
7     the 4,000 cars? No. Do they volunteer to search
8     Allen and Delores Avery's home? No. How about
9     the pole barns or the outbuildings of the salvage
10    property's business itself? No. They volunteer
11    to search Steven Avery's trailer. And they do,
12    on November 5.

13             And once they get into that trailer with
14    the search warrant, well, then, what these two
15    do -- and there are two other officers with them,
16    one from Manitowoc and one from Calumet -- what
17    Lenk and Colborn do is, they say, don't worry,
18    we'll take Steven's bedroom. And they search
19    this bedroom.

20             Now, this is a mobile home. If the
21    bedroom itself is 10 by 12, or 12 by 12, or 10 by
22    10, I would be surprised if it was much bigger
23    than that. From me to the wall in front of you
24    is about the depth and roughly the width of that
25    bedroom in the small trailer in which Steven

137

Avery lives.

They search, that is, Lenk and Colborn search his bedroom on the night of November 5. And they find nothing of interest. They see the guns; they stay on the wall. But don't bother seizing guns on the 5th, come back to those the next day. And it is Lenk and Colborn who come back the next day, not somewhere on the property, but to Steven Avery's trailer.

On November 6, they search his garage, garage is actually between him and his sister Barb's trailer, but for our purpose here, let's call it his garage. You will find out that the Dassey boys have access to the garage, Barb has access, the family has access to this garage.

But it's Lenk and Colborn and another detective from Manitowoc County named Dave Remiker who searched the garage on Sunday, the 6th. They find 10, maybe it's 11, something, 10 or 11 spent .22 casings. And they pick all of those up.

But remember -- remember the bullet that's found under little tent number 9 on the picture that Mr. Kratz showed you? The bullet that's apparently in a crack in the floor, right

138

smack in the middle of the garage near the front
where the door is?  That, no one sees or picks up
on November 6th, November 7th, November 8th and
so forth through November 12th.

Neither does anyone see a bullet back
under the air compressor.  But you will see
photographs of that garage as it was in
November 2005, not as it was in March, 2006,
when, finally, low and behold, why there's
bullets, why don't we pick up these bullets.

You will see the garage in photographs,
not computer simulations, photographs, as it was
in November, 2005.  You will be able to see, that
although the garage is very cluttered, there's no
clutter under the air compressor.  There's no
clutter there, where four months later someone
finds a magic bullet, there, as you walk into the
garage, looking at the floor.

November 7, Steven Avery's trailer is
searched again, guess who; Lenk and Colborn.  Now
there probably -- There certainly are over 50 law
enforcement officers on this property, 24 hours a
day, well before November 7th, probably by
sometime late the night of the 5th, certainly by
the 6th.  There may be over 100 law enforcement

139

officers working this property.

They have got the family excluded.  They
have got a perimeter around the entire 40 acres
and more.  They are controlling traffic and
entry.  They are logging in who comes and goes.
They control this place.

And as you heard Mr. Kratz say, they
have got any number of people searching, but it's
Lenk and Colborn, again, who are searching
Mr. Avery's trailer, there in the northwest
corner of that salvage yard.  And on November
7th, they find nothing of interest in his home.

Tuesday, November 8, they are back.
They are back in Mr. Avery's home, back in that
small bedroom.  And now, Lieutenant Lenk, on what
you will hear is probably the seventh search of
that small bedroom, Lieutenant Lenk, now, when
he's the only one in that room, says, why, my
gosh, there's a key sitting in plain view, next
to the night stand.

There is, you saw a picture of it as he
says he found it, one solitary key on a ring,
connected to a fob.  That key fob is just like,
and probably is, the one that Teresa Halbach's
younger sister bought her as a little present.

140

One key, and one key only, on the ring connected
to that fob, it's a Toyota key.

And the man whom the State would have
you believe bled all over Teresa's car, manages
not to bleed on her key. His blood isn't found
there, although, apparently, somehow his DNA is,
but not his fingerprints. And more
interestingly, although this is a 1999 Toyota and
I gather she's been using this key, the State
believes, every day to start her car and turn it
off, Teresa Halbach's DNA and fingerprints are
not found on her key.

For good measure, on November 8,
Lieutenant Lenk and Sergeant Colborn searched
Steven Avery's garage yet again. No bullets, no
nothing. And the case against Steven Avery,
largely, is made at that point. And a whole lot
of it, as you will see, depends on lieutenant
James Lenk, Sergeant Andy Colborn.

And they, both of them, have elected
never to tell Sheriff Jerry Pagel, the man in
charge of the investigation for Calumet County;
they have elected not to tell him that they had
their depositions taken in Steven Avery's case
probably three weeks earlier. They didn't tell

141

1   anybody in the Calumet County Sheriff's
2   Department that.

3           November 8 is also the day that the bone
4   fragments are found in a burn area hardly 20
5   yards outside Steven Avery's master bedroom
6   window. Hardly 20 yards. Small burnt bone
7   fragments, human burnt bone fragments. But what
8   you will learn and you do not hear this morning,
9   what you will learn is that burnt human bone
10  fragments also apparently are found in one of the
11  burn barrels behind Barb Janda's house.

12          Burnt the same way, fragmented about the
13  same way, and apparently human in origin. Not
14  Steven Avery's burn barrel, not the one you heard
15  about, but there are four burn barrels to the
16  southeast, that is the most distant corner of
17  Barb Janda's trailer, from Steven Avery's
18  trailer. Four burn barrels back there for Barb
19  Janda and the Dassey boys. Burnt bone fragments.

20          And there are what seem to be probable
21  human burnt fragmented bones found in the Radandt
22  Gravel Quarry, probably a quarter mile south of
23  Steven Avery's property.

24          Now, I don't think that the State has
25  been able to link, through DNA analysis, those

                        142

```
 1      burnt bone fragments conclusively to Teresa
 2      Halbach.
 3              But how many burnt human bone fragments
 4      are there supposed to be, and when you only have
 5      one person missing.  And the burnt human bone
 6      fragments in the Janda burn barrel, about which
 7      you did not hear this morning, those are
 8      fragments from bones that are not connected, not
 9      part of one limb, not connected to one another
10      within the human body.  Sort of a random mix of
11      bone fragments, as apparently are those that are
12      found a quarter mile to the south in the Radandt
13      gravel pit.
14              And as you piece this evidence together,
15      here's what you are going to have to conclude,
16      bone fragments, parts of this body were found
17      where they were not burned.  They were burned and
18      moved because, again, the fragments aren't
19      connected to one another.
20              It's not that, you know, it's not that
21      an arm could have been removed and burned one
22      place and the rest of the body another place.  We
23      have got the fragments themselves mixed up and
24      found in three different places.  The body
25      couldn't have been burned in that way, in three
```

143

different places or even two, if you set aside
the Radandt gravel pit. These bone fragments
were moved.

The question then becomes, the question
you will have to decide eventually is, were they
moved from Steven Avery's burn area to the Janda
burn barrel or the gravel quarry, or were they
moved from somewhere else to Steven Avery's burn
area and maybe to one of the other places where
bone fragments, burnt, are found.

At least, did they start in the burn
area and get moved somewhere else, or did they
start somewhere else, burned somewhere else and
get moved to the burn area. Now, an expert --
experts here, in what scientists will call
thermal injuries to bodies, cremation, an expert
or two, to the extent you hear that, may be able
to give you some help on that question, some
help, but I'm not sure that an expert can answer
this conclusively.

In the end, you folks are going to have
to do the hard work and the hard thinking on
that. But I think when you have heard it all,
you will conclude that it's at least most likely,
more probable, that the bones were moved to

144

1   Steven Avery's burn area, not burned there and
2   moved from that area to another place or two.

3           Why?  You are going to find out that
4   there are better places, even on the Avery
5   salvage yard property, in which to incinerate a
6   body.  The burn area is relatively flat and
7   scooped out a little bit, but it's relatively
8   flat and open.  It's a burn area, like many farms
9   or rural homes have, just folks have burn
10  barrels.

11          It doesn't have well developed sides to
12  focus heat back inward on the fuel or things
13  being burned.  Neither does it have a ready
14  external source of fuel.  But the aluminum
15  smelter, the aluminum smelter at the Avery Auto
16  Salvage property does.  Big propane jets, an
17  enclosed area, it will take an aluminum
18  transmission down to liquid in a few minutes.

19          The wood furnace that heats the
20  outbuildings of the Avery Auto Salvage business;
21  Chuck's home; Allen and Delores' home, that's an
22  enclosed area that will incinerate fuel in it
23  very quickly.

24          And because we have got probable human
25  burnt bone fragments found on the adjoining

                        145

property, the gravel quarry to the south, we
can't rule out other possible burn sites. And an
expert won't be able to tell you what other
possible burn sites there are. Expert or not,
that's not something he or she will be able to
tell you.

But once it's more likely, as I think
you will find it to be more likely, that the body
is burned somewhere else and bone fragments then
are brought to Steven Avery's burn area, then
he's not guilty. Because if he's the one who
burned the body somewhere else, he's not going to
bring the bones back to dump them 20 yards
outside his bedroom window.

Neither is he going to dump a cell phone
and a digital camera and a palm pilot in his own
burn barrel. Too many other places where these
things could be disposed of out in the salvage
yard, whether the retention pond, whether the
gravel quarry, or some other burn barrel in the
woods. So once you understand that those bones
probably were not burned in that burn area, the
fact that they are found there, you will see
tends to suggest he's not guilty, not that he is.

It is perfectly clear to anyone around

146

this investigation on whom the focus of the
Manitowoc County Sheriff's Department and the
other investigators, to the extent that tunnel
vision, that investigative bias bled over, it's
perfectly clear on whom the focus of this
investigation is.

The police didn't kill Teresa Halbach,
obviously, they have that in common with Steven
Avery, but they wanted to believe he did.  They
very much wanted to believe that he did.  And
whoever did kill her, or burned that body,
exploited that tunnel vision pretty skillful.

Suggesting this sort of tunnel vision,
suggesting this kind of investigative bias,
planting blood in her car, fairly serious
allegations to make.  In fact, I will take away
the fairly, they are serious allegations.
Understand them, that bias and tunnel vision are
human anomalies.

And if you conclude, reluctantly, that
Mr. Lenk or Mr. Colborn, in addition to all the
other interests they took in searching and
focusing on Steven Avery, planted blood in her
car, you will also conclude that they put it
there because they figured it had to be there.

147

It should be there. It must be him.

This wasn't so much, I think the evidence will show you, an effort to frame an innocent man, it was an intense, intense desire to conclude that he, in fact, was the guilty man; all other possible leads for information not withstanding. It was an immediate focus on this man, starting shortly after 11:00, Saturday, November 5, 2005. But you do not have to take my word for that.

I can make this work; I'm not as adept at it as I should be. I'm going to play for you, two tapes, a part of it, just excerpts, short excerpts of two tapes.

The first one is Saturday, November 5, 2005, at 11:35 in the morning, 35 minutes give or take a minute or two, after the Manitowoc County Sheriff's Department first has arrived at the Avery property, because that Toyota has been found; well before the police say they opened the Toyota; well before they say they knew of any blood; well before Brutus, the friendly cadaver dog comes along and hits; 35 minutes after the first officers arrived when the Sturm's called and said, hey, we think we found something.

148

1               What I'm going to do is scroll through a

2      transcript that we prepared and then I will play

3      the excerpt of the tape for you. It is not a

4      great recording. The transcript is not evidence,

5      the tape will be, I expect. So if you think my

6      transcript is wrong, listen to the tape; it's the

7      evidence, or it will be. That's the tape that

8      matters. The transcript may help you in

9      understanding it or hearing it.

10             Detective Remiker is calling in, he's

11      asking for dispatch. Dispatch responds, I put

12      unintelligible, I think it's go ahead, but I'm

13      not sure, you can decide. Maybe you won't

14      understand it for sure either.

15             Detective Remiker says to the

16      dispatcher, you will need to get ahold of the

17      Crime Lab for their evidence response team to

18      start responding to this location. Now, he's out

19      at the Avery Salvage Yard. As you will hear.

20      Dispatch says, 10-4, Crime Lab out of Madison,

21      Milwaukee, where?

22             Our Crime Lab has branches in Wausau,

23      Madison and Milwaukee. The main one is in

24      Madison. Detective Remiker says, it's going to

25      be the Madison response team and he was right.

1      Now, Detective Jacobs joins in, this
2      radio traffic, radio conversation.  Calls in with
3      his badge number, his squad number, I'm in code,
4      you will find out what that means, anything you
5      need other than a portable for Schetter.  And
6      what you'll find out is he's talking about a
7      portable radio for Deputy Inspector Greg Schetter
8      of the Manitowoc County Sheriff's Department who
9      is, I think, the number two or three ranking
10     officer in the Department and who's probably also
11     going out to the Avery property.  Detective
12     Remiker, not that I can think of right now,
13     Dennis.  Dennis Jacobs.  Let's see if this work.
14          (Tape recording played.)
15          DETECTIVE REMIKER:  Yeah, need to get a
16     hold of the Crime Lab for their evidence response
17     to start responding at this location.
18          DISPATCH:  10-4.  Crime Lab out of
19     Madison, Milwaukee, where?
20          DETECTIVE REMIKER:  Madison response
21     team.
22          DETECTIVE JACOBS:  278, I'm in code,
23     anything you need other than a portable for
24     Schetter.
25          ATTORNEY STRANG:  It cut off.  Sorry about

150

1       that, you will hear -- You will get a chance to hear
2       the whole conversation. And it continues, Dennis
3       Jacobs says, okay, other than the car, do we have
4       anything else. He's talking to Remiker here. Dave
5       Remiker says, not yet. Detective Jacobs, Okay. Is
6       he in custody? Detective Remiker, Negative, nothing
7       yet.

8               Not who, not is who in custody, but
9       negative. He is not in custody, nothing yet.
10      Detective Jacobs, Okay. I'll gather my stuff and
11      head out.

12                      (Tape recording played.)

13              DETECTIVE JACOBS: Okay. Other than the
14      car do we have anything else?

15              DETECTIVE REMIKER: Not yet.

16              DETECTIVE JACOBS: Is he in custody?

17              DETECTIVE REMIKER: Not yet, nothing
18      happening.

19              DETECTIVE JACOBS: Okay. I will gather
20      my stuff and head out.

21              ATTORNEY STRANG: Now, that's 11:35, is he
22      in custody yet. Detective Remiker, clearly, I
23      gather, as I hear it, knows who Detective Jacobs is
24      talking about, but we don't, 35 minutes after the
25      police have arrived.

                            151

1          And to get a better feel for that

 2      conversation at 11:35, we have to go back five

 3      minutes earlier when Detective Jacobs is calling

 4      in on the land line, 5 minutes earlier, 30

 5      minutes, 30 minutes after the police have arrived

 6      at the Avery property after Teresa's car has been

 7      found there.

 8          Dispatcher answers the phone.  Detective

 9      Jacobs, Katie -- the name of the dispatcher --

10      just rolled into the parking lot.  Can you tell

11      me, do we have a body or anything yet?  Do we

12      have a body or anything yet?  This is 30 minutes

13      after they found the car.

14          I don't believe so.  I believe they

15      wouldn't find the first bone fragment for three

16      days.  Do we have Steven Avery in custody,

17      though?  I have no idea.  You can hear it

18      yourself.

19          (Tape recording played.)

20          DISPATCH:  Good morning.  Manitowoc

21      County Sheriff's Department, Katie speaking.

22          DETECTIVE JACOBS:  Katie, I just rolled

23      into the parking lot.  Can you tell me, do we

24      have a body or anything yet?

25          DISPATCH:  I don't believe so.

                        152

```
 1              DETECTIVE JACOBS:  Do we have Steven

 2    Avery in custody?

 3         (Tape recording starts playing again.)

 4              DISPATCH:  Good morning.  Manitowoc

 5    County Sheriff's Department, Katie speaking.

 6              DETECTIVE JACOBS:  Katie, I just rolled

 7    into the parking lot, can you tell me do we have

 8    a body or anything yet?

 9              DISPATCH:  I don't believe so.

10              DETECTIVE JACOBS:  Do we have Steven

11    Avery in custody at all?

12              DISPATCH:  I have no idea.

13              ATTORNEY STRANG:  Now, I will finish it out

14    so you can link it up to the call -- the discussion

15    with Detective Remiker 5 minutes later.  Oh, I heard

16    him say pick up that party.  Oh no, the dispatcher

17    says, Pete, who is just another Manitowoc County

18    Sheriff's officer, is sitting up there waiting and

19    stopping people from going in and that.  He found

20    someone with a body only warrant for our department.

21         A body only warrant is an arrest warrant

22    or a bench warrant where they are going to take

23    the person into custody, rather than immediately

24    grant him bail.  Okay.  Do we have -- All right.

25    I will talk to Remiker.  Yeah, your best bet is
```

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 154 of 222   Document 32-5

1    to talk -- because nothing has come through.  We
2    have the vehicle, that I know.  But more than
3    that, I don't know.  All right.  Bye.  Bye.
4                (Tape recording played.)
5                DETECTIVE JACOBS:  Oh, I heard him say
6    pick up that party.
7                DISPATCH:  Oh, no.  We have -- Well,
8    Pete is sitting up there waiting and stopping
9    people from going in and that.  He found somebody
10   with a body only warrant for our department.
11               DETECTIVE JACOBS:  Okay.  Do we have --
12   All right.  I will talk to Remiker.
13               DISPATCH:  Yeah, your best bet is to
14   talk to -- Nothing has come through.  We have the
15   vehicle, that I know.
16               DETECTIVE JACOBS:  All right.  Thank
17   you.
18               DISPATCH:  But what more, I don't know.
19   All right.  Bye.
20               DETECTIVE JACOBS:  Bye.
21               ATTORNEY STRANG:  So you can take the
22   tunnel vision and investigative bias from them, not
23   from me.  Now, in the end here, in the end, when you
24   have heard it all, there's not a speck of Teresa
25   Halbach's blood anywhere in Steven Avery's trailer.

154

There's not a piece of hair, nothing, nothing to
suggest she's ever been in the trailer.  And only
the magic bullet found 4 months later to suggest
she's ever been anywhere near the garage.

And when you consider the forces, the
emotions, the very human failings at work here,
it's no surprise that the blood from that
unsecured vial, in the box, in the Clerk's
Office, that Lieutenant Lenk examined back in
2002, ends up in that Toyota.  Because that's
where it ought to be.  Is he in custody yet?

Jerome Buting and I will not ask you to
make that kind of snap judgment here.  The
Halbachs deserve better than that.  The police
deserve better than that.  You owe it to
yourselves, in making this decision, to do better
than a snap judgment, a snap judgment 30 minutes
after that Toyota is found.

Jerome Buting and I are going to ask you
to do your job right.  Think long and hard about
all of the evidence.  But in the end, after the
full and fair consideration of everything and
everyone, the full and fair consideration that
Steven Avery did not get in 2005, from the
Manitowoc County Sheriff's Department; we're

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 156 of 222   Document 32-5

1    going to ask you to send him home. We're going
2    to ask you to send him home, again. We're going
3    to ask you to get it right this time. We're
4    going to ask you to set it right when this case
5    is over.
6            THE COURT: Thank you, Mr. Strang. Members
7    of the jury, we're going to take an afternoon break
8    now. We'll resume in 15 minutes and the State will
9    begin the presentation of evidence. I will remind
10   you again, as I will a number of times throughout
11   the trial, do not discuss the case during the break
12   or at any other time until all the evidence has been
13   received.
14           (Jury not present.)
15           THE COURT: All right. Counsel, we should
16   be ready to go promptly at 2:45.
17           (Recess taken.)
18           THE COURT: At this time the State may call
19   its first witness.
20           ATTORNEY KRATZ: State will call Mike
21   Halbach, your Honor.
22           THE CLERK: Please raise your right hand.
23           **MICHAEL D. HALBACH,** called as a witness
24   herein, having been first duly sworn, was
25   examined and testified as follows:

156

```
 1              THE CLERK:  Please be seated.  Please state
 2         your name and spell your last name for the record.
 3              THE WITNESS:  Michael Daniel Halbach,
 4         H-a-l-b-a-c-h.
 5                      DIRECT EXAMINATION
 6    BY ATTORNEY KRATZ:
 7    Q.   Mr. Halbach, did you know a young woman by the
 8         name of Teresa Halbach?
 9    A.   I did.
10    Q.   Describe, who was Teresa, please.
11    A.   Teresa was -- or is my sister.  She was born on
12         March 22nd, 1980.  Grew up with my family on a
13         dairy farm near Hilbert.
14              She loved travel; she had been to Spain,
15         Mexico, New Zealand, Australia.
16              She had many friends.  She loved doing
17         things with her friends.  She was a good friend
18         of mine, as well.
19              She was my big sister, someone I could
20         go to talk to about any problems I would have.
21         We would go to lunch, talk about her business
22         which she ran, called Photography by Teresa.
23              And in August of 2005, she coached her
24         sister's 7th grade volleyball team to second
25         place in their league.  So I know that that's
```

157

```
 1              something she really loved doing, was working
 2              with those kids.  That was the main focus of her
 3              photography business as well.
 4                      And she graduated from the University of
 5              Wisconsin, Green Bay, in 2002, major in
 6              photography and she graduated summa cum laude.
 7      Q.      I'm going to hand you a couple of exhibits.
 8              First exhibit is that which is marked as Exhibit
 9              No. 1.  Could you tell us what that is, please.
10      A.      It's a photo of Teresa.
11      Q.      Do you know when that photo was taken?
12      A.      Not exactly, but by the looks of it, it was
13              fairly recent.  I would say 2005.
14      Q.      Does that particular photo accurately depict your
15              sister, Teresa, and as it did the last time that
16              you saw her?
17      A.      Yes.
18      Q.      By the way, when was the last time that you saw
19              her; do you recall?
20      A.      The last time I saw my sister was October 30th,
21              2005, the day before she went missing.  We were
22              at my grandparents house.  It was my grandpa's --
23              Halloween was my grandpa's birthday.  And the day
24              before we went to their house, the entire family
25              was there, aunts, uncles.
```

158

| | | |
|---|---|---|
| 1 | Q. | Mr. Halbach, I'm sure we'll get better at this |
| 2 | | with the jury, but I'm going to direct your |
| 3 | | attention to the large screen in the courtroom, |
| 4 | | is that another version or a larger version of |
| 5 | | what's been marked as Exhibit No. 1? |
| 6 | A. | Yes, it is. |
| 7 | Q. | You mentioned that Teresa was part of your |
| 8 | | family, can you tell us who else was involved in |
| 9 | | your immediate family, please? |
| 10 | A. | I have an older brother, Tim; and then Teresa |
| 11 | | would be the second oldest; myself; and two |
| 12 | | younger sisters, Katie and Kelly; parents, Tom |
| 13 | | and Karen. |
| 14 | Q. | Directing your attention to Exhibit No. 2, I'm |
| 15 | | also putting that on the screen for the jury; can |
| 16 | | you tell us what that is, please. |
| 17 | A. | It's a photo we took outside my parents farm. I |
| 18 | | believe it was in 2004, that summer, early fall. |
| 19 | | It's a photo we used for our Christmas cards that |
| 20 | | year. And it's a photo of my family. |
| 21 | Q. | And as you are pointing to Exhibit No. 2, please, |
| 22 | | could you tell us, or tell the jury, who all is |
| 23 | | in that photo? |
| 24 | A. | Tom, Teresa's, I guess legally would be her step |
| 25 | | dad, standing in the back with the jean shirt; to |

159

| | | |
|---|---|---|
| 1 | | his left is, Katie, younger sister; and to her |
| 2 | | left is Kelly, the youngest of the family. In |
| 3 | | front from left to right is the oldest brother, |
| 4 | | Tim; and then my mom, Karen; then myself holding |
| 5 | | our dog, Eddy; and Teresa is on the end. |
| 6 | Q. | All right. How often would you get to see |
| 7 | | Teresa; how often would you interact with her? |
| 8 | A. | Every few days I would probably talk to her |
| 9 | | either on the phone, or if it was a weekend, we |
| 10 | | would probably see each other, if I was at my |
| 11 | | parent's house if she would stop over during the |
| 12 | | week, or over the weekend. So I would see her -- |
| 13 | | see her or at least talk to her every three days |
| 14 | | or so. |
| 15 | Q. | Are you familiar with Teresa's electronic devices |
| 16 | | that she owned? |
| 17 | A. | Yes, I am. |
| 18 | Q. | Could you tell us about those, please. |
| 19 | A. | She owned a cell phone, a Motorola RAZR, and I |
| 20 | | know this because she talked on it a lot. She |
| 21 | | also had a palm pilot. I believe it was -- the |
| 22 | | brand was Palm 1, I believe. |
| 23 | | She had tons of photography equipment, |
| 24 | | obviously. Hasselblad is one camera; Canon is |
| 25 | | another; and through one of her jobs she had a |

160

| | | |
|---|---|---|
| 1 | | little snapshot camera for the job.  She worked |
| 2 | | through *Auto Trader Magazine*.  She had this |
| 3 | | little snapshot camera to do that job. |
| 4 | Q. | Do you know what kind of vehicle Teresa drove? |
| 5 | A. | It was a Toyota RAV4.  It was bluish-green in |
| 6 | | color. |
| 7 | Q. | We're going to have the actual photo marked as an |
| 8 | | exhibit, but I'm going to direct your attention |
| 9 | | up to the large screen.  Could you tell us what |
| 10 | | it is we're looking at there. |
| 11 | A. | Could you repeat that. |
| 12 | Q. | Sure, I'm about to have this photo made part of |
| 13 | | the -- or to complete the record, but could you |
| 14 | | tell us and can you look at the large screen and |
| 15 | | tell us what it is that we're looking at. |
| 16 | A. | That's Teresa holding one of her cameras she had |
| 17 | | with her professional photography business, |
| 18 | | standing outside the driver's side door of her |
| 19 | | Toyota RAV4. |
| 20 | Q. | Mr. Halbach, could you -- regarding Teresa's |
| 21 | | RAV4, could you tell us how often you had contact |
| 22 | | with that vehicle? |
| 23 | A. | I would say I have ridden in it a few times, but |
| 24 | | I would see it whenever I saw her.  It was her |
| 25 | | only vehicle, so when she would drive it or when |

161

```
 1              she would drive around, she would be in that
 2              vehicle.  So I was very familiar with it and had
 3              ridden in it a few times.
 4    Q.   Teresa's license plate said -- as you sit here
 5              today, did you know or were you familiar with
 6              what Teresa's license plates were?
 7    A.   Yes, I was.
 8    Q.   And how are you familiar with that?
 9    A.   One of Teresa's jokes and how she remembered her
10              license plate, her license plate numbers -- or
11              letters and numbers were SWH-582.  She remembered
12              those letters because she would joke that it
13              stood for single white Halbach.
14         (Exhibits No. 3 & 4 marked for identification.)
15    Q.   Mr. Halbach, I provided you with two exhibits
16              Exhibit No. 3 and Exhibit No. 4, can you tell us,
17              though, what those are, please?
18    A.   Pictures of Teresa's license plate.
19    Q.   And which one of them has the sticker on it.
20    A.   Exhibit No. 3.
21    Q.   All right.  Just so the jury is shown Exhibit
22              No. 3, I'm going to direct your attention to the
23              large screen, again; what is it that we're
24              looking at?
25    A.   Teresa's license plate?
```

162

1  Q.  SWH-582, is that right?

2  A.  That's correct.

3        THE COURT:  Excuse me, Mr. Kratz, just for

4     the record, I think the photo of Teresa Halbach with

5     the RAV4 was referred to as an exhibit, but we

6     haven't marked it yet; are you still looking for the

7     original?

8        ATTORNEY KRATZ:  We are, Judge.  Although

9     we have the original, Judge, we'll be referring to

10    it either with this witness or the next witness who

11    also has familiarity with that.

12       THE COURT:  Just, I think, to keep the

13    record straight, it should be reflected that while

14    it may have been referred to as an expected exhibit

15    number, it has yet to be numbered.

16       ATTORNEY KRATZ:  All right, judge.

17       THE COURT:  You may proceed.

18 Q.  (By Attorney Kratz)- And the other vehicle, or

19    what I guess would be considered the front

20    license plate, you said that was Exhibit No. 4;

21    is that right?

22 A.  Yes, that's correct.

23 Q.  And I have now directed your attention to that on

24    a large skween -- screen, excuse me, once again,

25    Exhibit No. 4, the large screen photo here,

163

| 1 | | accurately reflects Exhibit No. 4; is that |
| 2 | | correct? |
| 3 | A. | Yes, it does. |
| 4 | Q. | All right. I have now handed you what's been |
| 5 | | marked for identification as Exhibit No. 5, tell |
| 6 | | us what that is, please. |
| 7 | A. | It is the picture we looked at not too long ago |
| 8 | | with Teresa standing outside the driver side of |
| 9 | | her Toyota RAV4. |
| 10 | Q. | Just for the record, Exhibit No. 5, then, would |
| 11 | | be the image that we're looking at on the screen |
| 12 | | now; is that correct? |
| 13 | A. | Yes. |
| 14 | Q. | All right. By the way, Mr. Halbach, did you have |
| 15 | | an idea as to when this photo was taken? Did I |
| 16 | | ask you this? |
| 17 | A. | You didn't ask me that. I mean, I would guess |
| 18 | | sometime maybe 2004, maybe early 2005. |
| 19 | Q. | I guess the question that the jury needs to know |
| 20 | | is, was this Toyota RAV4, the vehicle in which |
| 21 | | your sister is standing in front of, the same |
| 22 | | vehicle that she was driving at the end of |
| 23 | | October of 2005? |
| 24 | A. | Yes, it is. |
| 25 | Q. | You mentioned that Teresa was involved in the |

164

1      photography business; can you tell us about that
2      a little bit?

3   A.  Yeah, through college she developed a passion for
4      photography and, hence, why she declared that as
5      her major.  I would say her sophomore and junior
6      year she worked at Bay Park Square Mall in Green
7      Bay at Picture People taking photos of children,
8      mainly families.

9          After she got done doing that, during
10     her last semester at Wisconsin, Green Bay, she
11     started this internship with Tom Pearce of Pearce
12     Photography in Green Bay, doing many of the same
13     things, taking pictures of children, families,
14     some, and also doing weddings on the weekends.
15     So she continued working with him and then later
16     on in 2002, she started her business, which she
17     named Photography by Teresa, which continued up
18     until Halloween of 2005.

19  Q.  Now, you indicated that you are familiar that at
20     least one of her clients was *Auto Trader*
21     *Magazine*; is that what you told us?

22  A.  Yes, that's correct.  She in, I think it was
23     October of 2004, she started working for *Auto*
24     *Trader Magazine* as a way to supplement her income
25     for her professional business.  Since she was

165

| 1 | | just starting out with her own business, she |
| 2 | | wouldn't always have clients.  So.  Yeah, just as |
| 3 | | a way to have some steady income, she got this |
| 4 | | job with the *Auto Trader Magazine* to take |
| 5 | | pictures of vehicles in people's yards, that they |
| 6 | | were selling themselves. |
| 7 | Q. | First photo I'm showing you has been marked as |
| 8 | | Exhibit No. 7, can you tell us what that is, |
| 9 | | please? |
| 10 | A. | Exhibit No. 7 is Canon PowerShot A310; it's the |
| 11 | | box for the Canon camera.  It's not the camera |
| 12 | | itself. |
| 13 | Q. | And, once again, were you familiar that that was |
| 14 | | one of the cameras that Teresa had used in her |
| 15 | | employment? |
| 16 | A. | Yes, I am, in her employment with *Auto Trader*, |
| 17 | | yes. |
| 18 | Q. | The other exhibit, I think it was Exhibit No. 6; |
| 19 | | is that correct? |
| 20 | A. | That's correct. |
| 21 | Q. | Can you tell me what that is, please? |
| 22 | A. | It's a box for a Palm 1 Zire 31 palm pilot. |
| 23 | Q. | And, once again, the large screen, does that |
| 24 | | accurately depict the box, again, recovered from |
| 25 | | your sister's home, the box that she saved for |

166

|     |     |                                                      |
| --- | --- | ---------------------------------------------------- |
| 1   |     | her palm pilot?                                      |
| 2   | A.  | Yes, it does.                                        |
| 3   | Q.  | Was your sister kind of a pack rat; did she save     |
| 4   |     | this kind of stuff?                                  |
| 5   | A.  | Having gone through her stuff, yeah, she saved a     |
| 6   |     | lot of stuff, yes.                                   |
| 7   | Q.  | Was your sister married?                             |
| 8   | A.  | No, she's not.                                       |
| 9   | Q.  | Who did she live with?                               |
| 10  | A.  | She lived with a friend of hers from high school,    |
| 11  |     | named Scott Bloedorn. He lived in the upstairs       |
| 12  |     | of the apartment -- or of the house she was          |
| 13  |     | renting from my parents.                             |
| 14  | Q.  | How close was this to your parents' house?           |
| 15  | A.  | Down the road a short ways, eighth mile, roughly     |
| 16  |     | quarter mile. Not too far.                           |
| 17  | Q.  | Okay. Mike, did you ever have an opportunity to      |
| 18  |     | see or talk with your sister as she either went      |
| 19  |     | to work for the *Auto Trader Magazine* or as she     |
| 20  |     | went to work at her own studio?                      |
| 21  | A.  | As she went there?                                   |
| 22  | Q.  | Yes. In other words, were you familiar with how      |
| 23  |     | she dressed to go to work?                           |
| 24  | A.  | Yes.                                                 |
| 25  | Q.  | Can you tell us about that.                          |

167

1   A.   She would always dress professionally, especially
2        when she was going to her professional
3        photography business, you know, black pants, a
4        nice shirt.  And if she happened to be doing *Auto*
5        *Trader* that same day, she would go in those same
6        clothes.
7             But if it was -- if she wasn't going to
8        her job that day, she would dress comfortably,
9        not necessarily in professional clothes, but nice
10       clothes nonetheless.  Might be a nice pair of
11       jeans and a nice shirt or, you know, maybe khakis
12       and a shirt, sweatshirt.
13  Q.   Mike, as long as we have the photos, again, what
14       we're looking at here, that's a picture -- which
15       picture is that, No. 6?
16  A.   That is Exhibit No. 6.
17  Q.   We're going to have the actual exhibit marked so
18       that we don't just have a photo of it?
19            ATTORNEY KRATZ:  Janet, is that going to be
20       No. 8?
21            THE CLERK:  Yes.
22       (Exhibit No. 8 marked for identification.)
23            ATTORNEY KRATZ:  Mr. Wiegert, could you
24       provide that to the witness.
25  Q.   (By Attorney Kratz)- Mr. Halbach, we're showing

                          168

| 1 | | you what's marked for identification as Exhibit |
| 2 | | No. 8; can you show the jury and tell them what |
| 3 | | that is, please? |
| 4 | A. | This is the same box as in the Exhibit No. 6, |
| 5 | | it's the box for Teresa's Palm 1 Zire 31 palm |
| 6 | | pilot. |
| 7 | Q. | And if I'm not mistaken, Exhibit No. 7, I think, |
| 8 | | was the box for the Canon PowerShot A310; is that |
| 9 | | right? |
| 10 | A. | That's correct. |
| 11 | Q. | We're going to have that box, actually, marked |
| 12 | | for identification as Exhibit No. 9. |
| 13 | | (Exhibit No. 9 marked for identification.) |
| 14 | Q. | Once, again, Mr. Wiegert will be providing that |
| 15 | | to you. If you could show it to the jury and |
| 16 | | tell them what Exhibit No. 9 is, please? |
| 17 | A. | Exhibit No. 9 is the box for the Canon PowerShot, |
| 18 | | the A310, that Teresa used for her *Auto Trader* |
| 19 | | job. |
| 20 | Q. | Once again, after your sister's disappearance and |
| 21 | | after investigators began contacting you, |
| 22 | | specifically, and your family, these items were |
| 23 | | found in her personal effects and turned over; is |
| 24 | | that right? |
| 25 | A. | That's correct. |

169

| 1 | Q. | Can you tell me who Pam Sturm is? |
| 2 | A. | Pam Sturm, to me, would be my first cousin once |
| 3 | | removed. She would be my grandma's sister's |
| 4 | | daughter. |
| 5 | Q. | Okay. The involvement of Pam and her daughter, |
| 6 | | Nikole, after your sister was missing, could you |
| 7 | | describe that for the jury? |
| 8 | A. | You said her involvement? |
| 9 | Q. | Yes. |
| 10 | A. | Pam Sturm was the person who ended up finding |
| 11 | | Teresa's vehicle on the Avery salvage yard. I |
| 12 | | recall coming home that day, after I had been |
| 13 | | with my brother driving, in her -- being inside |
| 14 | | my parents' house crying and my mom telling me |
| 15 | | that we found the vehicle -- or Pam found the |
| 16 | | vehicle, Pam and her daughter, Nikole. So, I |
| 17 | | guess that would be her involvement. |
| 18 | Q. | All right. Let's go back just a little bit, |
| 19 | | Mike, if we can. After your mom reported your |
| 20 | | sister missing on the 3rd of November, how was it |
| 21 | | that you were informed of that? |
| 22 | A. | On Thursday, November 3rd, I was working. I got |
| 23 | | a call from my mom that afternoon at about 2:00 |
| 24 | | or 2:30 wondering if I knew where -- or if I had |
| 25 | | talked to my sister in the previous, you know, |

170

1     since Sunday.  And I said that I hadn't.

2              And so I went on to call one of Teresa's

3     good friends at her work and asked her if she had

4     known where Teresa could be.  Because it was

5     completely unlike her to go somewhere without

6     telling anyone, especially a family member, a

7     good friend, her roommate, or her boss.

8              So, I guess after we made those calls it

9     became very evident to me that something was

10    seriously wrong and I expressed that to my mom.

11    Then shortly after -- and she was, you know, she

12    was in agreement, obviously; she knew something

13    was wrong, just like everyone else did.

14  Q.  Did the family ask for some assistance and did

15    you receive it from some of Teresa's friends

16    regarding searching for her?

17  A.  In searching for her we, you know, all we had to

18    do was make a couple phone calls to some of

19    Teresa's friends and they would call numerous

20    other people.  We needed help passing -- passing

21    out posters on Friday, November 4th and also

22    doing searches by car on Saturday, the 5th and

23    doing searches by foot a few days following that.

24    So, whenever we needed help, we had help from

25    Teresa's friends, family members, community

171

|    |    |                                                           |
|----|----|-----------------------------------------------------------|
| 1  |    | members. Anyone who wanted to help, who had               |
| 2  |    | time, would help us out in searching for Teresa.          |
| 3  | Q. | Who is Ryan Hillegas?                                      |
| 4  | A. | Ryan Hillegas is -- he was Teresa's ex-boyfriend.         |
| 5  |    | They were together a few years and then were off          |
| 6  |    | a few years once they went to college. And he,            |
| 7  |    | basically, organized most or probably all the             |
| 8  |    | search efforts that we did for Teresa. Him,               |
| 9  |    | along with Scott Bloedorn, did the majority of            |
| 10 |    | getting people together and telling people where          |
| 11 |    | to go to search for Teresa.                               |
| 12 | Q. | I ask you to refer back to this photo, can you            |
| 13 |    | tell me what exhibit that is, again?                      |
| 14 | A. | Exhibit No. 5.                                            |
| 15 | Q. | Okay. I can see by your sister's physical                 |
| 16 |    | stature, but if you can just verify for us, was           |
| 17 |    | Teresa in good physical condition?                        |
| 18 | A. | Yes, she was. She had a -- she went to a gym. I           |
| 19 |    | don't know how regularly, but she had a                   |
| 20 |    | membership at a gym and was -- seemed physically          |
| 21 |    | fit, yes.                                                 |
| 22 | Q. | Mike, I think you talked about, on the 3rd,               |
| 23 |    | meeting with your family, and on the 4th, really,         |
| 24 |    | the citizen efforts for Teresa's search kind of           |
| 25 |    | ramped up; but can give you us any more details           |

172

| 1 | | about that? |
|---|---|---|
| 2 | A. | Yeah, on the -- Well, the day we reported Teresa |
| 3 | | missing, that Thursday, we had got a call from a |
| 4 | | man named Jay Breyer who offered his services at |
| 5 | | Youth Educated in Safety, which is a missing |
| 6 | | persons organization. He offered to make copies |
| 7 | | and make up a missing persons poster. |
| 8 | | So we took him up on that offer that |
| 9 | | night, finalized the poster and then the |
| 10 | | following afternoon we had got copies made. He |
| 11 | | had made the copies and around 2:00 or 2:30 in |
| 12 | | the afternoon was when we were meeting with |
| 13 | | whoever had the time and the vehicle to drive |
| 14 | | across all of northeast Wisconsin to put up these |
| 15 | | posters, which basically said, you know, missing |
| 16 | | person, Teresa Halbach, height, weight, what she |
| 17 | | was wearing that day. So that's what happened on |
| 18 | | Friday afternoon. |
| 19 | Q. | Mike, Mr. Fallon is going to hand you what's been |
| 20 | | marked for identification as Exhibit No. 10. I'm |
| 21 | | going to put it up on the screen for the jurors. |
| 22 | | Can you tell us what we're looking at, please? |
| 23 | A. | That's the missing persons poster that Jay Breyer |
| 24 | | helped us make that we put up on the 3rd -- or |
| 25 | | the Friday, the 5th -- or, yeah -- the 4th, |

173

```
 1          Friday, the 4th.  That's right.
 2   Q.    Indicates that your sister was 5 feet 6 inches
 3          tall, 135 pounds; is that approximately accurate?
 4   A.    Yes.
 5   Q.    Now, after -- First of all, let me ask you
 6          where -- where these posters distributed, if you
 7          recall?
 8   A.    It would have been a very large area of northeast
 9          Wisconsin including Appleton, Green Bay,
10          Manitowoc, Chilton, south towards Milwaukee, east
11          to the Lakeshore.  And I recall semi-drivers
12          wanting to, you know, stop at the house, pick up
13          some fliers because they were concerned as well.
14          And they were going to Madison, Milwaukee and
15          further.  So they had volunteered to put up
16          posters for us on their routes.
17   Q.    Mr. Halbach, let me ask you this, did you try to
18          recreate, from the 31st of October, routes that
19          Teresa may have taken?
20   A.    Yes.  Yeah, so those were our main areas we
21          wanted to put up these posters, as well as to
22          search by vehicle and by foot, because we could
23          trace her whereabouts to, you know, a certain
24          location.  That's where you want to focus most of
25          your efforts.  So that's what we did.
```

174

```
 1  Q.  All right.  Perhaps you answered this and I
 2      apologize if you did, but do you recall how many
 3      thousands of these posters you distributed?
 4  A.  I guess I can't recall specifically, but it would
 5      be, you know, probably a couple thousand.
 6  Q.  All right.  Now, we're going to hear from Mr.
 7      Hillegas a little bit later in the trial
 8      regarding the specifics of the missing persons
 9      investigations, but did those search efforts
10      include actually walking around or looking in
11      roadways or ditches?
12  A.  Yeah, that Saturday morning, the 5th, that
13      morning, it was about 7:00 a.m., a group of
14      volunteers met at my sister's house and we set
15      out by vehicle to -- to basically trace the
16      routes that she may have taken that Monday.
17          And certain people were given different
18      areas, not necessarily the places she definitely
19      traveled, but perhaps she drove down to Milwaukee
20      to meet with someone, or drove up to Door County,
21      so we had people driving in those areas as well.
22      But myself, specifically, I went with my brother
23      to the places where we -- and the routes that we
24      thought for sure she could have taken, you know.
25      Since we were her brothers, we can get it in her
```

175

mind better than anyone.  So we drove over there.

I can recall specifically driving down

Highway 147, getting out, looking down

embankments where, if you would drive by

casually, you wouldn't be able to see down there.

So, we thought maybe she had gotten in an

automobile accident, was trapped, you know,

unconscious, whatever it may be.  So we wanted to

do what we could to eliminate that possibility.

So, you know, we looked wherever we

could, drove around as many roads as we could,

side roads, back roads, whatever, just looking

for signs of her vehicle or Teresa herself.

Q.  And until that call came, or until the news came

on the 5th, that Teresa's vehicle had been found,

was that your hope that there had been some

accident or something?

A.  Yeah, I mean, from the start I think it's just

the way my family is, is we're strong,

optimistic, also, you know, realistic too.  But,

yeah, we hoped to find some sign and we hoped we

would find Teresa alive.

So when we found her vehicle, it was

good because we were getting closer to finding

Teresa.  So we were happy to find the vehicle,

                                    176

```
 1          but we didn't find Teresa, so that half the goal

 2          was missing.  We didn't accomplish half the goal

 3          when we found the vehicle.

 4   Q.     All right.  Mike, I had mentioned at the early

 5          stages of the presentation of this case, in fact,

 6          to the jury, about meetings that you had with law

 7          enforcement, meetings you had with me,

 8          individually, throughout this case.  Have you

 9          been kept informed as to the developments and the

10          evidence, not just that was found, but the

11          evidence that was going to be presented at this

12          case?

13   A.     Yes, we had always -- were informed in advance of

14          anything, whether it be a news conference,

15          whether it be information that would be submitted

16          to the courthouse and available to the media,

17          shortly thereafter.  We would always be aware of

18          what was going to be said in the media or what

19          not.  And in advance of every court hearing, we

20          have been kept informed of what we would hear

21          that day, just so there were no surprises; so we

22          could prepare ourselves emotionally for those

23          events.

24   Q.     That includes the physical evidence that is going

25          to be presented at this trial?
```

177

1  A.  Yes, that's correct.

2  Q.  The last question I have, Mike, and I'm going to

3      apologize in advance as to the insensitivity of

4      it, but at any time after the 31st of October,

5      had you ever seen, spoken from, or heard from

6      your sister, Teresa Halbach?

7  A.  No, I have not.

8          ATTORNEY KRATZ:  I would move the admission

9      of Exhibit 1 through 10.

10         THE COURT:  Any objection?

11         ATTORNEY STRANG:  No objection at all.

12         THE COURT:  Those exhibits are admitted.

13         ATTORNEY KRATZ:  No further questions.

14         THE COURT:  Mr. Strang.

15         ATTORNEY STRANG:  Is this working now?

16         THE COURT:  Yes, it is.

17         ATTORNEY STRANG:  All right.

18                **CROSS-EXAMINATION**

19  BY ATTORNEY STRANG:

20  Q.  Thanks for coming.  And I don't have a lot of

21      questions.  I don't want to make this any harder

22      a day for you than it's already been.  But, we

23      have established that Teresa was 5 foot 6, about

24      135 pounds, back in October of 2005?

25  A.  Yes.

178

```
 1   Q.   Give or take.  You said she was fit.  She was an
 2        athlete to some extent?
 3   A.   To some extent, she played a little in high
 4        school, but I know she would exercise at our home
 5        as well.
 6   Q.   Sure.  Little volleyball, was that her sport, or
 7        basketball, or both?
 8   A.   Well, she coached her sister's 7th grade
 9        volleyball team, so there was definitely an
10        interest there.
11   Q.   Was that her sport in high school?
12   A.   She played some.  I don't think she played past
13        her sophomore year, but ...
14   Q.   Okay.  But, you know, I mean, somebody who was at
15        least reasonably athletic and fit?
16   A.   Right.
17   Q.   In addition to working out at home, she belonged
18        to some private gym somewhere?
19   A.   Correct.
20   Q.   Okay.  You guys were all raised on a dairy farm;
21        did you grow up there?
22   A.   Yeah, for the most part, yeah.
23   Q.   Working a dairy farm?
24   A.   Yes.
25   Q.   And when you say for the most part, is that not
```

179

```
 1           when you were a little bitty boy, or ...

 2    A.     Up until I was eight years old on, I was on the

 3           dairy farm, yes.

 4    Q.     Okay.  Sure.  And you, the kids, helped out with

 5           chores, I assume?

 6    A.     Correct.

 7    Q.     Like all farm kids have to?

 8    A.     Yes.

 9    Q.     That included Teresa?

10    A.     She didn't help out in the barn as much as she

11           helped out in the house, babysitting for our

12           sisters and taking care of chores in the house.

13    Q.     She did get acquainted with milking, though, at

14           some point, I assume?

15    A.     Very seldomly.

16    Q.     Was that mostly the boys?

17    A.     Yeah.  Yes.

18    Q.     She was someone who had a good sense of humor?

19    A.     Yes.

20    Q.     Also could stand up for herself, though?

21    A.     Absolutely.

22    Q.     Little bit feisty in a good way?

23    A.     Yes.

24    Q.     Yeah, and I don't mean in a bad way, but I mean

25           she was personable?
```

180

| 1 | A. | Yes, independent. |
| 2 | Q. | And your family, I take -- I take it is |
| 3 | | tightknit, your immediate family? |
| 4 | A. | Yes. |
| 5 | Q. | By that, I mean Tom and Karen, your folks, or you |
| 6 | | and Tim, Katie and Kelly and Teresa? |
| 7 | A. | Yes. |
| 8 | Q. | But you guys also have a pretty good extended |
| 9 | | family in this area, as I understand it? |
| 10 | A. | Yes, we do. |
| 11 | Q. | Has the family been in Calumet County or this |
| 12 | | area for generations? |
| 13 | A. | Yes. Yeah. |
| 14 | Q. | Okay. I mean, in other words, you know Pam |
| 15 | | Sturm, you were saying is a first cousin once |
| 16 | | removed? |
| 17 | A. | Correct. |
| 18 | Q. | I couldn't possibly tell you how you got there |
| 19 | | but, I mean, you have got all kinds of cousins, |
| 20 | | aunts, uncles? |
| 21 | A. | Yes. |
| 22 | Q. | That kind of thing, in the area? |
| 23 | A. | Yes. |
| 24 | Q. | So, in addition to Teresa's friends, you had a |
| 25 | | lot of family to pull on when looking for her? |

181

1   A.   Correct.

2   Q.   This -- this effort to retrace her steps on

3        October 31, did that -- did that get going,

4        Mr. Halbach, pretty much right away, the evening

5        that you all reported her missing.

6   A.   Yeah.  Yeah, we had talked about where we knew

7        Teresa was on the 31st; what appointments she

8        had, where she was supposed to be before then,

9        you know, where she was supposed to be after then

10       and the days following, as well.

11  Q.   Okay.  On the 31st, were you able to nail down

12       appointments?

13  A.   Yes.

14  Q.   So, I mean, do you think it was that Thursday

15       night that you figured out that Avery Auto

16       Salvage was one of the appointments; if you

17       remember?

18  A.   I don't remember exactly if it was that night, or

19       if it was the next day, or -- it was one of those

20       two.

21  Q.   Either Thursday night or Friday morning, the 4th?

22  A.   Yes.

23  Q.   Okay.  And at some point pretty quickly, the

24       media all got interested in this; am I recalling

25       that correctly?

182

| 1  | A. | Yes. |
| 2  | Q. | Was it Friday, already on the TV they were |
| 3  |    | talking about the Avery Auto Salvage or flying |
| 4  |    | over it, that kind of thing? |
| 5  | A. | I don't recall, specifically, myself, you know, |
| 6  |    | seeing the media involvements saying Steven |
| 7  |    | Avery, but I know that they reported on the |
| 8  |    | missing persons case involving my sister, that |
| 9  |    | Thursday night. |
| 10 | Q. | Oh, right away Thursday night? |
| 11 | A. | Correct. |
| 12 | Q. | And then Friday and I know by Saturday, there was |
| 13 |    | a lot of media coverage? |
| 14 | A. | Yes. |
| 15 | Q. | Not that you were watching but, I mean, you were |
| 16 |    | out -- that you were just sort of aware of it? |
| 17 | A. | Yes. |
| 18 | Q. | Did you -- Did you have access to her computer |
| 19 |    | passwords or account information for, like, her |
| 20 |    | cell phone, for example, or bills, that kind of |
| 21 |    | thing? |
| 22 | A. | Cell phone, yes; computer password, yes. |
| 23 | Q. | She had shared that with you at some time |
| 24 |    | earlier? |
| 25 | A. | I did business work for her, website graphics, |

183

```
 1        so --
 2   Q.   Oh.
 3   A.   I, yeah, I just knew it through that.
 4   Q.   So, you knew it through that --
 5   A.   Correct.
 6   Q.   -- because you would have a reason to get on to
 7        her computer to help her with her website?
 8   A.   Well, I didn't have to go on her computer, but I
 9        had to connect to a web host --
10   Q.   Sure.
11   A.   -- just to put stuff for her website, so.
12   Q.   Okay.  I'm nodding like I know what you are
13        talking about and I really don't.  But the point
14        is you had -- you had access to her password
15        information so you could check her cell phone
16        bill?
17   A.   I never did.  I don't know -- So since I never
18        did, I wouldn't know if I had the right password
19        for her cell phone bill.  I knew --
20   Q.   Okay.
21   A.   -- her password for her voice mail.
22   Q.   And that's where I was going.  I think -- I think
23        on Thursday evening, November 3, somebody was
24        able to get at her cell phone records on the
25        computer, but that was not you?
```

184

```
 1   A.   I don't think on her computer, no.

 2   Q.   Okay.  And you didn't have her voice mail?

 3   A.   I said I did -- did have her voice mail password.

 4   Q.   You did have her voice mail password.  Okay.  Did

 5        you check voice mails?

 6   A.   I did.

 7   Q.   Do you remember when you did that?

 8   A.   It was probably Thursday evening, early evening.

 9   Q.   After your mom --

10   A.   Yes.

11   Q.   -- had --

12   A.   Yes.

13   Q.   -- filed a missing persons report?

14   A.   Yes.

15   Q.   Okay.  So I take it you were at work earlier that

16        day?

17   A.   Correct.

18   Q.   And the missing person report was sort of at the

19        end of the day, 5:00 or something?

20   A.   Correct.

21   Q.   Were you familiar enough with Teresa Halbach's

22        everyday stuff to know what -- what she carried

23        keys to?

24   A.   I mean, yes, I think I would have an idea of what

25        keys she would have, yes.
```

185

```
 1   Q.   Okay.  Let's just -- Let's start with the house
 2        that she and Scott Bloedorn were sharing, this
 3        was the older farmhouse?
 4   A.   At one point it was a farmhouse.
 5   Q.   Okay.  Is it actually on the Halbach farm or just
 6        next door or ...
 7   A.   It's next door, my parent's home, the house and
 8        the land.
 9   Q.   Okay.  But it --
10   A.   It's not -- It doesn't share a driveway at all.
11   Q.   Yeah.
12   A.   It has its own driveway.
13   Q.   Separate parcel, but next door.
14   A.   Correct.
15   Q.   Can you see the two houses from one another?
16   A.   You have to look through a line of evergreens and
17        there's a big shed a little further back, but you
18        can see it through the trees, yes.
19   Q.   But they are next door neighbors, essentially;
20        although it's a rural area?
21   A.   Correct.
22   Q.   Okay.  And I take it there was -- there was a
23        house key to the house?  Go ahead.
24   A.   Yes, there was.
25   Q.   Do you know whether there was a separate garage
```

186

```
 1        key?
 2   A.   I believe that's correct.
 3   Q.   Okay.
 4   A.   I would imagine there was.
 5   Q.   And do you have -- do you have any way of knowing
 6        whether Teresa would also have had keys to your
 7        folk's house?
 8   A.   I don't think she did.
 9   Q.   You told us the Toyota was the only car she was
10        driving, so she didn't have keys to other cars,
11        as far as you know?
12   A.   Correct, she didn't, no other keys.
13   Q.   Swipe card for the gym?
14   A.   I can't recall if she specifically had a swipe
15        card.  She must have had something to get into
16        the gym.  I forget what it would have been.
17   Q.   Okay.  And if you know, was she someone with,
18        like, a lot of people, I guess, who would have
19        had some doodads, or charms, or that kind of
20        thing on the key chain?
21   A.   I don't ever recall her having any of that, a lot
22        of fancy stuff on her key chain, no.
23   Q.   Okay.  The gathering at -- was at grandpa's house
24        on Sunday, October 30?
25   A.   That's correct.
```

187

```
 1   Q.   For his -- for his birthday?

 2   A.   Correct.

 3   Q.   And then, I think -- Were there, if you know, did

 4        she -- had she had plans to go to a Halloween

 5        party the Saturday night right before that?

 6   A.   I believe so.  Earlier in the evening she was

 7        helping me with a wedding, shooting a wedding

 8        video.  After that I think she would have went to

 9        a Halloween party.  I believe that's correct.

10   Q.   Okay.  Saturday night, October 29?

11   A.   Right.  Yeah, it would have been later on in the

12        night.

13   Q.   Let's just sort of help the jury with that.

14        You're -- You're a videographer.  You're in the

15        video business?

16   A.   Correct.

17   Q.   So not only would she be a photographer for

18        weddings, but you also videotape weddings as a

19        business, or a side business at times.

20   A.   Well, that was the only one that I had.  That was

21        my first time and I haven't done one since then.

22   Q.   Okay.  But the two of you were helping each other

23        out with that one?

24   A.   Right.

25   Q.   I didn't notice one in the picture, whichever
```

188

```
 1           number it is, where Teresa is standing next to
 2           her Toyota when she has got her camera; I didn't
 3           notice there, but did she ordinarily carry a
 4           purse?
 5    A.     I don't recall her having a purse -- well -- I
 6           can't say for sure.
 7    Q.     That's okay.  That's all right.  How about, I
 8           mean, did you -- did you notice, was she a
 9           jewelry person, bracelets, necklaces?
10    A.     Not a whole lot of jewelry, really, at all.  I
11           don't -- maybe a couple of rings.
12    Q.     Not bracelets, though, or necklaces.
13    A.     Probably not too often.
14    Q.     How about earrings?
15    A.     I don't recall her wearing earrings very often
16           either.
17                 ATTORNEY STRANG:  That's all I have.  Thank
18           you.
19                 THE COURT:  Mr. Kratz, any redirect?
20                 ATTORNEY KRATZ:  Not for this witness,
21           Judge.  Thank you.
22                 THE COURT:  Very well, you are excused.
23                 ATTORNEY KRATZ:  Next witness, Judge?
24                 THE COURT:  You may call your next witness.
25                 ATTORNEY KRATZ:  Tom Pearce.
```

189

| | |
|---|---|
| 1 | THE CLERK: Raise your right hand, please. |
| 2 | **THOMAS PEARCE,** called as a witness |
| 3 | herein, having been first duly sworn, was |
| 4 | examined and testified as follows: |
| 5 | THE CLERK: Please be seated. |
| 6 | THE COURT: You may proceed, Mr. Kratz. |
| 7 | THE CLERK: Please state your name and |
| 8 | spell your last name for the record. |
| 9 | THE WITNESS: Thomas Pearce, P-e-a-r-c-e. |
| 10 | **DIRECT EXAMINATION** |
| 11 | BY ATTORNEY KRATZ: |
| 12 | Q. Mr. Pearce, how are you employed? |
| 13 | A. I'm sorry? |
| 14 | Q. How are you employed? |
| 15 | A. I'm self-employed. |
| 16 | Q. Can you tell the jury in what capacity? |
| 17 | A. I'm a professional photographer. I have my own |
| 18 | studio. |
| 19 | Q. Did you know a young woman by the name of Teresa |
| 20 | Halbach? |
| 21 | A. Oh, yes, I did. |
| 22 | Q. Can you tell the jury how you first became |
| 23 | knowledgable about Ms Halbach? |
| 24 | A. It was in January of 202 (sic), through an |
| 25 | internship program through the university. She |

190

1    approached me to do an internship through the
2    university and I took her on as an intern.  And
3    from there on, through the internship program
4    which ends when she graduates, I saw that she was
5    an exceptional person in photography and for her
6    age, that I asked her to stay on and work through
7    my studio or with me doing weddings and
8    portraits.
9  Q.  What university was this?
10 A.  University of Green Bay.
11 Q.  I think you mentioned that you had seen something
12     in her that actually made you offer her a job;
13     can you tell us what that was?
14 A.  Well, you know, in this field, you see -- and I
15     have worked with other interns and some of them
16     do have the drive, the passion, the want and
17     knowing that -- Being a photographer, a lot of
18     people think it's very easy.  It's a lot of
19     hours.  It's a lot of dedicated work.
20            And she had that and I haven't seen that
21     in many people in a lot of years.  And I was
22     impressed with that.  She knew the
23     responsibility, the sacrifices it took.  And she
24     was eager to learn.  She was consistently asking
25     questions and from -- doing different projects

191

```
 1              and so on.  So I was very impressed with her and
 2              that's why I asked her to stay on.
 3   Q.  Was she technically good at what she did?
 4   A.  Yes.  The university -- I also went to school,
 5              but not here in Green Bay.  They teach you the
 6              book.  And how should I say, you should know the
 7              rules before you know how to break them.  And
 8              that's part of out in the field.
 9                   And that's why I think the internship
10              program is a good program.  Because it has -- In
11              many different fields, people come out and see
12              what it's really like in everyday life and not so
13              much how the book says it.  But you have got to
14              know the book, but you have to break the rules
15              when you are out there.
16   Q.  After offering Teresa a job, or employment
17              through your studio; how long did that last and
18              did that evolve into some other business
19              relationship.
20   A.  As far as working for me, or I should say really
21              with me, she was a go-getter, like I said, she
22              had that passion.  And I looked and as a -- when
23              you are a staff photographer for someone, you
24              have got to abide by their ways of doing things,
25              their policies, because you are working for them,
```

192

1    so you have to do stuff their way.

2          Well, I didn't want to hold her back

3    because she was incredibly involved and had that

4    passion for this. So, on the other hand, I

5    didn't want to not lose her, but have her go out

6    and go, hit and miss, hit and miss, which a lot

7    of young photographers do.

8          I had a full studio, plenty of room for

9    both of us. So we sat down and we talked and we

10   did something that no one has done before. She

11   started her own business, not be in competition,

12   but complimenting each other.

13         So she worked out of my studio; she used

14   all the facilities of the studio, but she ran her

15   own business through that -- through my studio.

16   Meanwhile, we cooperated in doing advertising

17   together, promotions, learning, helping one

18   another. I would book weddings for her, she

19   would book for me. There was never any

20   competition between us. And it was something

21   unusual, but it worked out very well for both of

22   us.

23   Q.  Did she call upon you for advice?

24   A.  Many times, yes. And it was, basically, not only

25       the technical end of it, the photography end of

193

```
 1        it, but on how to run a business, what is needed
 2        behind the scenes.  And that's where in this
 3        business a lot of the people that get into the
 4        photography business, they know photography but
 5        they don't know the business end of it.

 6              So, yes, I did mentor her in a lot of
 7        different areas.  Thirty-eight years of
 8        experience, and I wanted to share that with her,
 9        because I could see that she was, basically, like
10        me when I came out of college -- school.  I was
11        eager.  I had the passion.  We had a lot of
12        similarities.  I graduated from -- with a degree
13        in photography.

14              I was the -- also worked the photo
15        school newspaper and she did.  And I worked at
16        many different studios before I moved up here in
17        the Green Bay market.  So we had that same
18        background.  And I think it's a duty for any of
19        us to share what we have learned, our experiences
20        with someone up and coming.
21   Q.   I think, Mr. Pearce, you talked about weddings
22        and portraits and the like, that was -- or at
23        the -- by the fall of 2005, had Teresa been
24        developing a particular niche within the
25        photography business?
```

194

```
 1                    ATTORNEY STRANG:  Your Honor, I wonder if
 2         we could approach the side bar for just a moment.
 3                    THE COURT:  Sure.
 4                         (Side bar taken.)
 5    Q.   (By Attorney Kratz)~ Mr. Pearce, could you
 6         discuss whether or not Teresa had developed a
 7         particular niche within the photography business?
 8    A.   I think if there was any one area, it was
 9         children.  She loved to photograph children of
10         all ages.  She had a knack for that.  But as far
11         as a niche, I mean, we all -- that would be her
12         certain niche, but she was well versed at doing
13         weddings, and good at doing weddings and
14         portraits and family.  But her love was doing
15         children, from all ages of children.
16    Q.   Now, as part of that business, as part of
17         Teresa's photography business, were you aware of
18         a particular client that she serviced, which was
19         Auto Trader Magazine?
20    A.   There was a time when she had told me about, that
21         she had picked up a client, which was Auto
22         Trader, and she would be running around taking
23         pictures of cars, yes, I was aware of that.
24    Q.   All right.  And had she ever asked your opinion
25         or advice about working for Auto Trader or that
```

195

1    kind of photography?

2  A.   I don't think she asked my advice, but I think I

3       may have suggested something to her.  Her

4       photography business was picking up for studio

5       wise a lot.  And it seemed like when she -- It

6       seemed when she first started with *Auto Trader*

7       was just on Mondays.  Mondays we're typically

8       closed in the industry, because we worked a lot

9       of Saturdays.

10          So, it seemed all of a sudden that she

11      not only had to do *Auto Trader* on Monday, but

12      possibly Wednesdays and some Saturdays.  She was

13      constantly telling me that she was running doing

14      *Auto Trader*.  And I could see that she was

15      starting to burn the candle at both ends.

16          And at one time, I sat her down and I

17      said, gee, you know, you are running here, you

18      are running here, you're running and I didn't

19      want her to get to a burn out point.  So I just

20      asked her, how is *Auto Trader*, is it a good

21      client, blah, blah, blah.

22          We never talked on how much she was

23      making, or whatever.  That -- that was never

24      discussed.  I mean, that was where we drew the

25      line in our business end of it, but I was more

196

1  concerned about her well being of running, of the
2  constant running. She was constantly running and
3  that's what she enjoyed. So that was the only
4  time I really had any discussion with her about
5  *Auto Trader.*

6  Q.  Let me ask you this, Mr. Pearce, are you familiar
7      with the defendant, Steven Avery?

8  A.  As far as familiar with him, as far as what?

9  Q.  Have you heard the name before the 31st of
10     October?

11 A.  Just one time and I think it was the spring, late
12     spring or early summer, Teresa had mentioned to
13     me, she said kind of matter-of-factly, you will
14     never guess whose cars I was taking pictures of.
15     And she told me the name and it didn't ring a
16     bell.

17         She actually had to remind me or say,
18     oh, that was the guy that was wrongfully
19     convicted and so on and so forth. And we had a
20     little discussion and then I remembered the case
21     and so on and so. We talked about -- a little
22     bit about her being out and about, running around
23     all over the county, by herself, and her safety
24     and so on and so forth. And that was basically
25     it. That was the only time she ever mentioned it

197

| | | |
|---|---|---|
| 1 | | to me. |
| 2 | Q. | All right. We have learned that Teresa Halbach |
| 3 | | drove a 1999 Toyota RAV4 SUV, picture's in front |
| 4 | | of you. Would you look on the back; what exhibit |
| 5 | | number is that? |
| 6 | A. | 05 CF 381, Exhibit 5. |
| 7 | Q. | All right. Have you ever seen that vehicle |
| 8 | | before? |
| 9 | A. | Oh, sure. She was working with me when she |
| 10 | | purchased it. Actually, I took that picture. |
| 11 | | And she was happy as a lark to have her first |
| 12 | | car. She used to have a beater that was an older |
| 13 | | car, not a beater. And now this allowed her |
| 14 | | freedom to go. Yeah, she was very happy with |
| 15 | | that car. |
| 16 | Q. | Turning now to a more serious series of topics, |
| 17 | | Mr. Pearce, sometime after the 31st of October, |
| 18 | | after that Monday, after the Halloween; did you |
| 19 | | see Teresa the next day at work, Tuesday, the 1st |
| 20 | | of November? |
| 21 | A. | No, like I said earlier, Mondays we were closed. |
| 22 | | Actually, the last time I saw Teresa was |
| 23 | | Saturday, before the 31st. When Tuesday came, |
| 24 | | she had her own hours because she had her own |
| 25 | | business. Since I'm there like 60 hours a week; |

198

1    she may have been there one week 20 hours.  All
2    depended on her schedule and so on.  But she
3    always kept me informed of was she going to be
4    gone for a day; did she have appointments; was
5    she going to take off for a weekend; etc.  She
6    was very responsible in that sense, extremely
7    responsible for a young person.

8         Well, Tuesday came and by noon she
9    wasn't there.  I didn't think too much, oh, okay,
10   I know she was there Saturday working, did *Auto*
11   *Trader.*  So I'm going through my mind, well,
12   what -- I knew Wednesday, because every Wednesday
13   morning, she actually was one of the founders of
14   a BMG Group, BMG marketing group, Business
15   Marketing Group that meets once a week.  Business
16   leaders, they go over leads and what's going on
17   in Green Bay and so on.

18        She was one of the founders and very
19   active in it.  She usually would come in, oh,
20   about, sometimes 11:00, 11:30 on that Wednesday,
21   religiously.  Because she would be in town for
22   that meeting.  So Wednesday around noon, she
23   didn't show up.  I thought, okay, this is a
24   little strange.  I tried calling her and I got
25   her cell phone, but her phone book and it was

                        199

| | | |
|---|---|---|
| 1 | | full, where I couldn't even leave a message. |
| 2 | Q. | Her voice mail? |
| 3 | A. | Her voice mail box, that's it, yes, it was full. |
| 4 | | I couldn't even leave a message. I thought this |
| 5 | | was a little strange, because typically you get |
| 6 | | right through to her. She was very good at |
| 7 | | returning calls; very good at leaving messages |
| 8 | | and letting me know. So kind of, well, maybe |
| 9 | | she's sick, you know, with the flu, flu season, |
| 10 | | covered up under the covers, turn the cell phone |
| 11 | | off, just go and doing that. |
| 12 | Q. | Sure. |
| 13 | A. | So I thought, well, for sure she'll be in |
| 14 | | Thursday. And I had called, a couple times, her |
| 15 | | cell phone. So by Thursday, now, I haven't heard |
| 16 | | from her. |
| 17 | Q. | This is Thursday the 3rd of November. |
| 18 | A. | Right. Yes. |
| 19 | Q. | Okay. What did you do then? |
| 20 | A. | I tried to call her again, same thing, with the |
| 21 | | phone. Now, some of her work was coming in, |
| 22 | | being shipped in to be processed. And I knew |
| 23 | | that she knew, she kept track of that. So, if |
| 24 | | she was out of town or sick, I think she would |
| 25 | | have called me by this time. And I started |

200

1    getting really, really worried.

2              I didn't know who to call, her friends,

3    etcetera, so I think was around 1:00, somewhere

4    in that time period.  I called Karen, Teresa's

5    mother, seeing if she knew.  That was the only

6    phone number I had, other than Teresa's.  I

7    didn't have any of her friend's.  And talked to

8    Karen about it.  And she was going to call some

9    of her friends, or she already had.  And the next

10   thing I know it was 10:00, on the news, I heard

11   it was, officially, that Teresa was missing.

12   Q.   Perhaps you can help us, Mr. Pearce.  Are you

13        familiar with use of digital cameras, digital

14        film and how a digital camera can imprint or

15        create an electronic signature on photos that are

16        taken there from?

17   A.   I'm not a real good expert on digital, but I know

18        some of what the digital cameras do, if that's

19        what you're --

20   Q.   I'm going to direct you to some images and when

21        you take the cursor for a computer over a digital

22        image, as an example, this image gives the

23        dimensions, gives the date the picture taken is

24        10/10/05 at 3:18 p.m.  Camera model, it indicates

25        Canon PowerShot A310 to JPEG image and the size

                              201

```
 1          of that.  Are you familiar with the taking, or
 2          production of digital photography, that those
 3          kinds of details are provided right in the image
 4          itself?  Do you understand the question?
 5    A.    Yes.  Yes, sir.  Absolutely true, they are.
 6          Unless you get a 10 or $15 or $20 digital camera,
 7          the nicer cameras, even the smaller ones, will do
 8          that automatically in their programing for that.
 9    Q.    All right.  Same question I have asked another
10          witness and I will ask you Mr. Pearce, after
11          the -- well, really after the 29th of October,
12          2005, had you ever heard or spoken to Teresa
13          Halbach?
14    A.    No.
15                ATTORNEY KRATZ:  That's all I have for this
16          witness, Judge.  Thank you.
17                THE COURT:  Mr. Strang.
18                        CROSS-EXAMINATION
19    BY ATTORNEY STRANG:
20    Q.    Mr. Pearce, the Teresa Halbach you knew was
21          someone you described once as feisty?
22    A.    Well, depends on how you mean feisty.
23    Q.    How did you mean it?
24    A.    Full of energy.
25    Q.    Someone who was in good shape and could fight
```

202

```
 1        back?

 2   A.   I would think so.

 3   Q.   She carried a cell phone regularly?

 4   A.   I'm sorry, I can't hear you.

 5   Q.   She carried a cell phone regularly?

 6   A.   As far as I know, yes, that was her life line.

 7   Q.   But that wasn't something she would hook on a

 8        belt or do one of these things, she would keep it

 9        in her purse?

10   A.   Well, most of the time when I would see her, she

11        would have it out of her purse and on the

12        counter.

13   Q.   If she were out somewhere, though, the cell phone

14        was always in her purse, I think you have said

15        before?

16   A.   I couldn't answer that 100 percent.  I would

17        think so.  She was in her car, maybe it would be

18        on the driver's seat.  I know it went with her

19        wherever she went.

20   Q.   And when she was at Pearce Photography, she

21        frequently would leave the cell phone out on the

22        counter.  If she was out somewhere else, it was

23        in her purse, typically, that was your experience

24        with her?

25   A.   Well, I know when she was at work it was always
```

203

```
 1          out in the open on the counter, just like this
 2          picture sitting here, because that was her
 3          business line.  When she was out -- out of the
 4          studio, I really don't know what she did with her
 5          cell phone.
 6    Q.    I'm going to show you a report of an interview
 7          that you had with an agent named Alan Hunsader;
 8          do you remember talking with him?
 9    A.    Sure.
10    Q.    I'm going to offer it as an exhibit, I'm just
11          hoping it might refresh your recollection about
12          the cell phone.  I invite you to look at the last
13          paragraph on that page.  Just to yourself.
14    A.    Yeah, I guess.
15    Q.    Does that help --
16    A.    Yeah.
17    Q.    -- refresh your recollection about your
18          experience with Teresa Halbach and her cell
19          phone?
20    A.    When we would shoot a wedding together she would
21          have her cell phone in her purse.  Through her --
22          When -- When we would go to -- give an example,
23          we did a lot of work in a park which was 5
24          minutes away from us, doing weddings, even in her
25          training time she would keep her cell phone in
```

204

| | | |
|---|---|---|
| 1 | | her purse. That was my oversight. |
| 2 | Q. | You described it as her lifeline just a few |
| 3 | | minutes ago. |
| 4 | A. | Right. |
| 5 | Q. | Was that the only number you had for her? |
| 6 | A. | Yes. |
| 7 | Q. | You don't know whether she had a land line phone |
| 8 | | in her home? |
| 9 | A. | I don't think so. |
| 10 | Q. | You were aware that she evidently shared her cell |
| 11 | | phone number with *Auto Trader* customers. |
| 12 | A. | I knew at one time she said to me that she was |
| 13 | | able to give out her business cards to the *Auto* |
| 14 | | *Trader.* So in that respect I guess, yeah, |
| 15 | | because her cell phone number would be on that. |
| 16 | Q. | And indeed there was -- there were at least a few |
| 17 | | occasions on which you were aware that she was |
| 18 | | getting calls on her cell phone from customers or |
| 19 | | dissatisfied customers of *Auto Trader* and she |
| 20 | | would refer those to the *Auto Trader* office? |
| 21 | A. | She mentioned to me a couple times that people |
| 22 | | were calling her direct. They had a problem with |
| 23 | | *Auto Trader,* or whatever the case may be. |
| 24 | Q. | She said, don't bother me, call the *Auto Trader* |
| 25 | | office? |

205

```
 1   A.   Yes, sir.

 2   Q.   What -- What day was it, as best as you can

 3        recall, and I'm going to chase the time to, if

 4        you can, that you first called Teresa's cell

 5        phone the week of October 31 and found the voice

 6        mailbox full?

 7   A.   I think it would have been Tuesday afternoon and

 8        that -- somewhere in that time period.

 9   Q.   And the voice mail box was full?

10   A.   Yes.

11   Q.   Okay.  And then Wednesday, before this marketing

12        group luncheon, after she didn't show up; did you

13        try that again?

14   A.   Yes, sir.

15   Q.   Still full voice mailbox?

16   A.   Still full.

17   Q.   And if I understood you correctly, you said you

18        tried again Thursday?

19   A.   Mm-hmm, yes, sir.

20   Q.   So full voice mailbox Tuesday, Wednesday and

21        Thursday?

22   A.   I believe, I'm almost positive all three times,

23        because I thought that was very unusual.

24   Q.   Starting Tuesday, mid-afternoon.

25   A.   Yes, sir.
```

206

```
 1    Q.   This studio, it was your studio, but she was
 2         sharing space, if I understood you --
 3    A.   Yes.
 4    Q.   -- correctly?
 5    A.   Yes.
 6    Q.   Keys, keys to the studio, one, more than one?
 7    A.   She had a set of keys, yes, sir.
 8    Q.   What is a set of keys, meaning to the studio?
 9    A.   Well, as myself, we always carry two, so that --
10         I mean, it's the same key, but in case we drop
11         it.  And Teresa had a funny thing about not
12         losing her keys, but misplacing her keys all the
13         time.  So I gave her two, one to put on her key
14         chain and one to put in her purse somewhere, so
15         she always has it.  So, two keys.
16    Q.   If she mislaid the key chain?
17    A.   Yes.
18    Q.   Okay.  So the office key was one of the keys on
19         that key chain?
20    A.   I would think so.
21    Q.   Is it a key chain you saw?
22    A.   I'm sorry?
23    Q.   Is it a key chain that you ever saw?
24    A.   Laying on the counter or something, yes.
25    Q.   Okay.  It had a number of keys on it?
```

207

| 1 | A. | I would think maybe three or four. |
| 2 | Q. | Okay. About three weeks before she disappeared, |
| 3 | | Teresa Halbach, you were aware, had been getting |
| 4 | | a lot of telephone calls that she was not |
| 5 | | answering on the cell phone? |
| 6 | A. | Yes, sir. |
| 7 | Q. | They would leave no message? |
| 8 | A. | If you are referring to the same thing, I think, |
| 9 | | she was standing almost right next to me, in a |
| 10 | | day, and she got this phone call. And she looked |
| 11 | | at it and went, said, oh, not them again, or not |
| 12 | | him again, and just kind of forgot about it. |
| 13 | | She looked a little upset, so I |
| 14 | | questioned her a little bit about this and she |
| 15 | | told me, just forget about it. Somebody keeps |
| 16 | | calling her all different hours, a nuisance call. |
| 17 | | And that was about two or three weeks and she had |
| 18 | | mentioned that she had been getting them for |
| 19 | | awhile and I had said, well, why don't you give |
| 20 | | me the number and I will call and find out |
| 21 | | instead of her dealing with it and she said, no, |
| 22 | | don't worry about it. But that's, I think, what |
| 23 | | you're talking about. |
| 24 | Q. | Right. And whatever the number was that came up |
| 25 | | on the phone, she recognized it? |

208

| 1 | A. | Yeah, she knew what it was, but she wouldn't let |
| 2 | | me know. |

3           ATTORNEY STRANG:  Thank you.

4           THE COURT:  Any other questions, Mr. Kratz?

5           ATTORNEY KRATZ:  Just one area of inquiry

6     of Mr. Pearce.

7                  **REDIRECT EXAMINATION**

8 BY ATTORNEY KRATZ:

9 Q.   Mr. Pearce, would you have considered yourself as

10     long -- or together with a mentor, being a friend

11     of Teresa's?

12 A.   A good friend and a good colleague, yes.

13 Q.   In that regard, had you ever admonished or warned

14     Teresa about her behavior, if she was alone with

15     somebody in a home?

16           ATTORNEY STRANG:  Relevance.

17           THE COURT:  Mr. Kratz.

18           ATTORNEY KRATZ:  Judge, it actually will be

19     relevant to the false imprisonment charge.  The

20     issue of being restrained or confined.  If

21     admonished by an individual that that shouldn't

22     occur, it goes to that particular element of that

23     offense.

24           THE COURT:  Mr. Strang.

25           ATTORNEY STRANG:  I don't know that we

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 210 of 222   Document 32-5

```
 1    ought to be arguing the point here.  I'm not at all
 2    convinced of the relevance.
 3              THE COURT:  I don't know about the
 4    relevance, but I think its beyond the scope of
 5    redirect.  I'm going to sustain the objection.
 6              ATTORNEY STRANG:  We can't hear the Court.
 7              THE COURT:  It's beyond the scope of
 8    redirect.  I'm sustaining the objection.
 9              ATTORNEY KRATZ:  That's all I have of
10    Mr. Pearce then, Judge.  Thank you.
11              THE COURT:  You're excused.
12              ATTORNEY KRATZ:  Could we approach just
13    briefly, Judge.
14              THE COURT:  Sure.
15                   (Side bar taken.)
16              THE COURT:  For the benefit of the jurors,
17    I informed counsel that I really didn't want to go
18    beyond 4:30 today.  I'm aware of the fact that you
19    have not only been sitting in the jury box most of
20    the day, but also the fact that there's travel to
21    and from Manitowoc each day.  So unless it is really
22    important, I'm going to do my best to get you out of
23    here at 4:30 all the time.  But I have been told
24    that there is a witness who isn't going to take very
25    long.  So, Mr. Kratz, you may call your witness.
```

210

```
1              ATTORNEY KRATZ:  Thank you, Judge.  We call
2         David Beach to the stand.
3              THE CLERK:  Please raise your right hand.
4              DAVID BEACH, called as a witness herein,
5         having been first duly sworn, was examined and
6         testified as follows:
7              THE CLERK:  Please be seated.  Please state
8         your name and spell your last name for the record.
9              THE WITNESS:  My name is David Beach.  My
10        last name is spelled B-e-a-c-h.
11             THE COURT:  Mr. Beach, I'm going to ask you
12        to get a little closer to the microphone.
13                     DIRECT EXAMINATION
14   BY ATTORNEY KRATZ:
15   Q.   Mr. Beach, do you know a woman by the name of
16        Teresa Halbach?
17   A.   Yes, I did.
18   Q.   How did you know her?
19   A.   She was my cousin.
20   Q.   Sometime on Friday, the 4th of November, did you
21        volunteer to assist in a search for Teresa?
22   A.   Yes.
23   Q.   And in that regard, were you with somebody else,
24        or paired up with somebody in that search?
25   A.   I was paired with my older sister, Sarah Beach.
```

Case 1:19-cv-00484-BHL   Filed 05/09/19   Page 212 of 222   Document 32-5

| 1 | Q. | On Friday, the 4th of November, did you make any |
| 2 | | stops, or what was your -- or what did your |
| 3 | | search efforts entail? |
| 4 | A. | I met up with my sister and our search effort was |
| 5 | | to look for her vehicle. So we got some |
| 6 | | information from the Halbachs about what her |
| 7 | | schedule was, where she had -- the area that she |
| 8 | | was going to and we just tried to track down the |
| 9 | | Toyota. |
| 10 | Q. | All right. In that effort, Mr. Beach, did you |
| 11 | | find your way to the Avery Salvage Yard property? |
| 12 | A. | Yes. |
| 13 | Q. | And could you tell the jury, please, what |
| 14 | | occurred once you got to that property. |
| 15 | A. | We came to the property. I was the passenger in |
| 16 | | the vehicle. I stepped out, I went into the |
| 17 | | garage. There was a lone desk. There was a |
| 18 | | person sitting at the desk talking on the phone. |
| 19 | | Another person came to the desk to greet |
| 20 | | me and then at that time point I asked the person |
| 21 | | if -- if they ever had any photographers come to |
| 22 | | the salvage yard to take pictures of vehicles. |
| 23 | | And he said he didn't know. And then I came back |
| 24 | | and I mentioned that my cousin was missing. She |
| 25 | | was a photographer. And that was the reason for |

212

```
 1        my visit.
 2   Q.   All right.  Let me ask you, Mr. Beach, do you
 3        know the defendant, Steven Avery, the gentleman
 4        seated in the courtroom today?
 5   A.   At the time I did not; today I do.
 6   Q.   When you got to the salvage yard on the 5th of --
 7        excuse me -- on the 4th of November, that Friday;
 8        was Steven Avery one of the people that you
 9        talked to at the office or in what you call the
10        garage?
11   A.   Yes, he was the second person.
12   Q.   Did you specifically ask Mr. Avery whether or not
13        your cousin, Teresa, had been to the salvage
14        yard?
15   A.   Yes.
16   Q.   What did Mr. Avery tell you?
17   A.   He said that she was there; roughly about 2:00 in
18        the afternoon.
19   Q.   All right.  Just, back up just a second.
20        Mr. Avery himself told you that Teresa was there
21        that day or the day that she had come to take
22        pictures?
23   A.   Yes.
24   Q.   At 2:00 in the afternoon, right?
25   A.   Yes.
```

213

| | | |
|---|---|---|
| 1 | Q. | This would have been three days after her |
| 2 | | appearance there; is that right? |
| 3 | A. | Yes, this was a Friday. |
| 4 | Q. | Okay. Mr. Avery give you any more details about |
| 5 | | what Teresa had done while at the property? |
| 6 | A. | He told me that she was there, there was a |
| 7 | | vehicle behind the office garage and she was |
| 8 | | taken to the vehicle to be photographed. That |
| 9 | | was about -- That was her purpose for being |
| 10 | | there. |
| 11 | Q. | Let me ask you, Mr. Beach, upon your stopping at |
| 12 | | this *Auto Trader* or -- excuse me -- at the Avery |
| 13 | | salvage lot, did you provide any information or |
| 14 | | any literature to the -- either Mr. Avery himself |
| 15 | | or to the Avery salvage business? |
| 16 | A. | No, I did not. |
| 17 | Q. | How long was it that you discussed your cousin |
| 18 | | with Mr. Avery? |
| 19 | A. | Five minutes. |
| 20 | Q. | Finally, Mr. Beach, did Mr. Avery know who you |
| 21 | | were talking about; in other words, did he |
| 22 | | indicate whether or not this woman had been there |
| 23 | | before? |
| 24 | A. | Yes, I described her build, her -- what she |
| 25 | | looked like, what she drove. And he confirmed |

214

```
 1          all that.  And he confirmed that she was there to
 2          take photographs.
 3    Q.    Had she been there before?
 4    A.    Had she been there before?
 5    Q.    Did he tell you?
 6    A.    Yes.
 7    Q.    What did he say, if you can remember?
 8    A.    In my line of questioning about my cousin, she
 9          was missing, he said that, yes, Teresa Halbach
10          came there on a regular basis.
11    Q.    So that the jury is clear, Mr. Beach, after that
12          five minute -- that brief contact with Mr. Avery;
13          did you return to the Avery salvage property or
14          did you have any other conversation with
15          Mr. Avery?
16    A.    No.
17                ATTORNEY KRATZ:  That's all I have of this
18          witness, then, Judge.
19                THE COURT:  Mr. Buting.
20                ATTORNEY BUTING:  Thank you, Judge.
21                        CROSS-EXAMINATION
22    BY ATTORNEY BUTING:
23    Q.    Now, Mr. Beach, do you know what time it was that
24          you came to see Mr. Avery at the Avery Salvage
25          Yard?
```

215

| | | |
|---|---|---|
| 1 | A. | About 4:00. |
| 2 | Q. | On Friday afternoon? |
| 3 | A. | Yes. |
| 4 | Q. | And by that time, of course, there had been |
| 5 | | reports about your sister in the media, right -- |
| 6 | | I'm sorry, your cousin, with the media about her |
| 7 | | being missing and all of that? |
| 8 | A. | I do not know; I did not hear that. |
| 9 | Q. | So you didn't see any of the news report about |
| 10 | | your cousin? |
| 11 | A. | Correct. |
| 12 | Q. | Okay.  So how was it that you ended up at the |
| 13 | | Avery salvage lot? |
| 14 | A. | Friday morning, I received a phone call from my |
| 15 | | parents.  They told me about my cousin, Teresa, |
| 16 | | was missing.  I -- Later that afternoon, I came |
| 17 | | up, I met up with my sister.  We then got |
| 18 | | information from the Halbachs.  After that we |
| 19 | | just drove around and we started from Mishicot |
| 20 | | and we worked our way north. |
| 21 | Q. | Okay.  My question, I guess is, did somebody give |
| 22 | | you information about what her appointments were |
| 23 | | that day? |
| 24 | A. | The Halbachs told me the general area she had |
| 25 | | work in, but they did not give me any idea of |

216

```
 1          where her stops were.

 2    Q.    So no one told you that she had an appointment on

 3          Monday, the 31st, at the Avery salvage lot --

 4          yard?

 5    A.    Correct.

 6    Q.    You just stumbled on that?

 7    A.    Yeah, by incident.  It was incidental.

 8    Q.    Okay.  And when you got there, Steven Avery, the

 9          person sitting to my left, who you now know, came

10          up and seemed concerned about what you were

11          asking about, right?

12    A.    Yes.

13    Q.    Seemed calm?

14    A.    Correct.

15    Q.    Did not appear to be holding anything back?

16    A.    No.

17    Q.    Correct?

18    A.    Correct.

19    Q.    In fact, I think you described him as being very

20          forthright, didn't you?

21    A.    Correct.

22    Q.    Expressing genuine concern about, you know, what

23          happened to your cousin?

24              ATTORNEY KRATZ:  Objection, Judge, calls

25          for speculation, how genuine it may be.
```

217

```
 1                    THE COURT:  Well, he can testify as to his
 2           impression.
 3                    THE WITNESS:  He said that he was
 4           concerned.
 5     Q.    (By Attorney Buting) - Okay.  And you accepted
 6           that?
 7     A.    Yes.
 8     Q.    And he told you -- You described his vehicle --
 9           I'm sorry, you described her vehicle, the RAV4?
10     A.    Yes.
11     Q.    And he said, yes, I do recall, she was driving
12           that.  And she came -- he actually said she came
13           some time mid-afternoon, didn't he?
14     A.    Yes, he said that she was at his garage, salvage
15           yard, around 2:00.
16     Q.    But he actually -- he qualified that by saying
17           approximately mid-afternoon?
18     A.    Correct.
19     Q.    Okay.  Wasn't exact on the time?
20     A.    Correct.
21     Q.    And he said that she did take photo of the
22           vehicle, right?
23     A.    Correct.
24     Q.    And that he did not know her next stop, right?
25     A.    Yes.
```

218

```
 1   Q.   And he told you that when the RAV4 pulled out of
 2        the driveway, that it went to the left from the
 3        Avery property?
 4   A.   Correct.
 5               ATTORNEY BUTING:  All right.  I have no
 6        further questions.
 7               THE WITNESS:  Thank you.
 8               THE COURT:  Anything else?  Very well, you
 9        are excused.
10               Members of the jury, that's going to
11        conclude the court proceedings for today. I will
12        remind you again not to discuss this case with
13        anyone, before we resume tomorrow.  And we'll see
14        you tomorrow morning.
15                    (Jury not present.)
16               THE COURT:  Counsel, I would just ask that
17        tomorrow morning the attorneys meet in chambers at
18        8:20 before the day begins, just to let me know
19        what's coming.
20               ATTORNEY BUTING:  What time did you say the
21        jury is coming, 8:45?
22               THE COURT:  Okay.  Meet at 8:30.  We'll
23        find out from experience what time they normally get
24        here.  I believe you are right, meet at 8:30.
25               ATTORNEY FALLON:  Excuse me, Judge, did you
```

219

1    want to take up that other matter today or tomorrow

2    morning?

3              THE COURT:  I have a number of other

4    matters listed, I'm not sure which one you want, but

5    we'll discuss that tomorrow morning.

6              ATTORNEY FALLON:  All right.

7                  (Proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

220

```
1   STATE OF WISCONSIN  )
                        )ss
2   COUNTY OF MANITOWOC )

3

4              I, Diane Tesheneck, Official Court

5      Reporter for Circuit Court Branch 1 and the State

6      of Wisconsin, do hereby certify that I reported

7      the foregoing matter and that the foregoing

8      transcript has been carefully prepared by me with

9      my computerized stenographic notes as taken by me

10     in machine shorthand, and by computer-assisted

11     transcription thereafter transcribed, and that it

12     is a true and correct transcript of the

13     proceedings had in said matter to the best of my

14     knowledge and ability.

15             Dated this 5th day of October, 2007.

16

17

18

19                          Diane Tesheneck, RPR
                            Official Court Reporter
20

21

22

23

24

25
```

221