2007 WL 1810147
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia,
Atlanta Division.

Byron Jamal RHODAN, Plaintiff,
v.
Warden Derrick SCHOFIELD, et al., Defendants.

Civil Action No. 1:04-CV-2158-TWT.
|
June 19, 2007.

**Attorneys and Law Firms**

Eldridge Suggs, IV, The Suggs Law Firm, P.C., Atlanta, GA, for Plaintiff.

George M. Weaver, Jaret Lyn Teague, Hollberg & Weaver, Atlanta, GA, Kevin Thomas McMurry, District Attorney's Office, Coweta Judicial Circuit, Newnan, GA, for Defendants.

*ORDER*

THOMAS W. THRASH, JR., United States District Judge.

\*1 This is a prisoner civil rights action. It is before the Court on the Defendants' Motions for Summary Judgment [Docs. 79, 81]. For the reasons stated below, the Defendants' motions are GRANTED in part and DENIED in part.

### I. *BACKGROUND*

The facts in this case are hotly disputed. At this stage of the litigation, the Court is required to view the facts and draw all reasonable inferences "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). When conflicts arise between the facts presented by the parties, courts must credit the nonmoving party's version. *Davis v. Williams,* 451 F.3d 759, 763 (11th Cir.2006). Although the facts as accepted at the summary judgment stage of the proceedings, may not be the "actual" facts of the case, the Court "must begin with a description of the facts in the light most favorable to the plaintiff." *Id. (citing Skrtich v. Thornton,* 280 F.3d 1295, 1299 (11th Cir.2002)).

The Plaintiff, Byron J. Rhodes, is a 23-year-old, 4 foot, one inch, achondroplastic dwarf. On April 14, 2004, he was sent to the Georgia Diagnostic and Classification Prison in Jackson, Georgia, after pleading guilty to charges of drug possession and violation of probation. The prison enforces a mandatory shaving policy. Inmates are prohibited from having beards and other forms of facial hair. The reason for the policy is to ensure that guards are able to efficiently and quickly identify each prisoner for security reasons. A failure to comply with the prison shaving policy could subject a prisoner to discipline. (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 5.)

Perhaps because this particular prison was so inundated with other dwarves that Rhodan's facial hair made him difficult to identify, or perhaps simply because rules are rules, the Plaintiff was immediately taken to the prison barber where he was shaved with clippers. (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 5.) Shortly thereafter, the prison warden, Derrick Schofield, placed Rhodan in "administrative segregation." (Pl.'s Opp. to Def.'s Mot. for Summ. J., at 5.) He was assigned to share a cell with Eric B. Haynes. Prisoners are generally assigned to administrative segregation as a penalty for an infraction of prison rules. For example, Haynes was placed in administrative segregation for a previous escape attempt. Rhodan, on the other hand, was placed there for his own protection. (Rhodan Dep. at 67-68.) Rhodan was locked in his cell for 23 hours a day, and handcuffed whenever he was moved from the cell.

Sergeant Kevin Ward was in charge of Rhodan's unit, and it was his duty to direct an inmate to shave when necessary. Prison guard Paul Collins's job duties entailed escorting prisoners from administrative segregation to other areas of the prison such as the prison barbershop. Collins also had the authority to direct Rhodan to shave if needed. Once he entered administrative segregation, Rhodan did not shave for approximately two weeks. (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 7.)

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 1

***2** There are conflicting stories with respect to exactly who told Rhodan to shave at which times. The Plaintiff's version of the story is this. After noticing Rhodan's facial hair, Officer Ward told Rhodan that he needed to shave. Rhodan said that he was unable to see the mirror. He was too short. Haynes told Ward that Rhodan needed to go to the barber for a shave. (Haynes Dep. at 25). Ward then told Rhodan, "Get your roommate to stand you up on the sink so you can look in the mirror to shave." (Haynes Dep. at 25). Instead of offering to bring Rhodan a mirror, or a stool, or to take him to the prison barber, or to even suggest that Rhodan attempt to shave without a mirror, Officer Ward dispatched Officer Collins to confront Rhodan about shaving. (Haynes Dep. at 29) ("Officer Ward had got Officer Collins to come up there and confront you and make sure ... Rhodes shaved."). Collins then told Rhodan to climb up on the bowl-shaped sink bolted to the wall. The sides of the sink were approximately one half of an inch wide. (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 9.) Then Officer Collins allegedly told Haynes to hold Rhodan while he shaved. When Rhodan refused, Officer Collins said that the "sink ain't going to break." To which Rhodan replied, "Yeah, but I might." (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 9.) Rhodan says that Collins simply stated "Oh Baloney." (Rhodan Dep. at 83-84.) Haynes claims that later that day, Collins and Ward came by to make sure that Rhodan had shaved. (Haynes Dep. at 32). They both watched Haynes pick Rhodan up and place him on to the sink. Haynes claims that he only complied with the order, because Collins threatened to place Rhodan in another level of administrative segregation. (Haynes Dep. at 29). Collins denies ever instructing Rhodan to stand on the sink. (Defs.' Mot. for Summ. J., at 6.) In addition, Haynes testified that he told Officer Collins that he would not pick Rhodan up again, and that he was only doing it to prevent Rhodan from being punished. (Haynes Dep. at 44.) Officer Collins denies all of this. He does, however, say that Officer Ward "jokingly" told Rhodan to climb on top of the sink. (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 9-10.)

Two weeks after Officer Collins allegedly ordered Haynes to pick up Rhodan and place him on the sink, Officer Ward ordered him to shave again. Rhodan requested a mirror of some kind, because, again, he was too short to see the mirror. (Rhodan Dep. at 82.) He was denied a mirror, however, on the grounds that it was considered contraband in administrative segregation. (Defs.' Mot. for Summ. J., at 7-8.) This time, Rhodan claims, Ward told him to get up on the sink, but did not order Haynes to hold him. (Rhodes Dep. at 95-96). Officer Ward claims to have no recollection of ever telling the Plaintiff to climb up on the sink. (Def.'s Mot. for Summ. J., at 7-8.) Rhodan claims that either Officer Collins or Officer Johns later provided Haynes and Rhodan with a razor in order to shave. (Rhodan Dep. at 98-99.) When Haynes left to shower, Rhodan remained in the cell alone. (Rhodan Dep. at 99.) With Haynes refusing to help him shave again, (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 11), and fearing the penalties of an infraction of the shaving policy, (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 3), Rhodan climbed up on the sink by himself. He alleges that once he climbed up on to the sink, he balanced himself by placing his feet on the one half-inch, metal edges of the sink, placed one hand on the flat wall, and attempted to shave with the other hand. (Rhodan Dep. at 102). While shaving, the Plaintiff cut himself, which "startled him ..." (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 13). He lost his balance and fell backwards off the sink. He fell on his back and slammed his head down on the concrete floor. Haynes testified that he heard an officer screaming at him while he was in the shower, and telling him that he needed to "pick Mr. Rhodes up off of the floor." (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 13). Haynes claims that he then saw Rhodan laying on the floor crying. (Haynes Dep. at 48.) No one else saw the fall. (Rhodan Dep. at 100-101.) Two inmates, however, heard it. (Rhodan Dep. at 100-101.) Medical officials then carried Rhodan out on a stretcher.

***3** Prior to his incarceration, the Plaintiff had undergone multiple surgeries on his spinal column for conditions associated with his dwarfism. These surgeries, performed by Dr. David Wayne Gray, included placing steel rods with screws in Rhodan's back. Rhodan claims that his screws became dislodged after the fall. (Rhodan Dep. at 159). The ensuing nerve damage triggered a host of other problems. For example, both Rhodan and Haynes testified that after the fall, Rhodan had bladder and bowel control problems. (Haynes Dep. at 13-14; Rhodan Dep. at 192). According to expert testimony, the spinal damage and back injury are consistent with a fall of the type Rhodan describes. (Pl.'s Opp. to Defs.' Mot. for Summ. J., Ex. 5) ("Based upon the review of the medical records, radiographs, my training, my experience, and my knowledge of Byron Rhodan's spinal anatomy, it is my opinion with a reasonable degree of medical probability that Byron Rhodan sustained an injury to his lower back during a fall on April 26, 2004 creating an acute onset of leg pain, numbness, and muscle weakness.") The Defendants contest the magnitude of Rhodan's injuries as well as the cause. They assert that his spinal injuries were preexisting. Rhodan contends, however, that the screws implanted in his back were not broken until after the fall. (Rhodan Dep. at 159.)

The Defendants have produced the testimony of Ronnie

Louis Fritts who claims that he helped Rhodan make up the entire story. Fritts does corroborate the fact that Ward and Collins told Rhodan to shave even "if he had to get on top of that sink to reach the mirror." (Defs.' Mot. for Summ. J., at 9). Fritts claims, however, that Rhodan faked the fall, banged his head on the concrete in order to create an appearance of an injury, and that he helped Rhodan execute the phony fall by looking out for guards with a makeshift mirror. He claims that once Rhodan yelled "ready," Fritts was supposed to yell for assistance. (Defs.' Mot. for Summ. J., at 9-10.) Following his deposition testimony, Fritts sent the Plaintiff's attorney a letter stating that he would not sign the deposition transcript, that he was confused about times and dates, and that he would not testify, but might reconsider were the state to provide him with an attorney. (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 27 n. 4).

After his fall from the sink, Rhodan filed an administrative grievance complaining about the fact that he could not shave because the mirror was not designed for an individual of his height. (Pl.'s Resp. to Defs.' Mot. for Summ. J., at 17.) The grievance claimed that Officer Collins told him to shave the first time by standing on the sink, and that the second time, Officer Ward gave him the instruction to stand on the sink. (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 1.) The grievance was denied at the institutional level, and cited the fact that no evidence could substantiate that Ward or Collins ordered Rhodan to stand on the sink as the basis for the denial. The grievance was also denied because of Ward's statement to prison authorities that Haynes was always in the cell to stabilize Rhodan while he shaved. Lastly, Rhodan's denial of his grievance indicated that the issue was moot because Mr. Youngbird, the Unit Manager, had since installed a new mirror at a lower level. (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 1.)

*4 Rhodan claims that because of his fall, he was unable to walk from April 2004 until about August 2005, and suffered from bowel and bladder control problems. His First Amended Complaint alleges that he was unable to walk without assistance, and that he needed help in order to "make it to the toilet in order to urinate and or defecate." (Pl.'s First Am. Compl., at 4). The prison's failure to provide him with such assistance forced him to urinate and defecate on himself while he was in bed in his prison cell. (Pl.'s First Am. Compl., at 5). Haynes testified that Rhodan suffered from bowel control problems (Haynes Dep. at 136.) The Plaintiff alleges that the prison's policies prevented him from taking a wheelchair into his cell or into the shower. As a result, he was unable to take showers, and for the times that he was able to move, he had to crawl over to the toilet and pull himself up in order to use it. (Pl.'s Original Compl., at ¶¶ 34-41.)

Rhodan contends that he attempted to file an administrative grievance with regards to the prison's failure to accommodate him while he was unable to walk, but that when he attempted to do so, he was told by the Unit Manager, Mr. Youngbird, that he could not have two grievances pending at the same time. Though the prison's official policy allows for the filing of an emergency grievance at any time, Rhodan has filed a sworn affidavit stating that Youngbird prevented him from filing an additional grievance about his medical and bathroom needs. (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 19.) Haynes, however, Rhodan's cellmate, did file a grievance complaining that Rhodan was unable to leave his bed and was constantly relieving himself on the floor and on his bed sheets. (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 19.) Haynes testified that Rhodan's bowel control problems were causing problems for Haynes who was forced to sleep on the floor because the cells were only designed for one person (Haynes Dep. at 60), and to clean up Rhodan after he soiled himself. (Haynes Dep. at 60.)

The Plaintiff filed this action against a slew of individuals associated with Georgia's Department of Corrections. First, he alleged that his Eighth Amendment right to be free from cruel and unusual punishment has been violated in that: (1) Collins and Ward were deliberately indifferent to the substantial risk of harm that would result from making Rhodan shave while balancing atop a narrow sink; (2) Warden Schofield, Collins, and Ward, failed to accommodate Rhodan's dwarfism by making him shave; (3) the Board of Corrections as well as its employees were indifferent to his medical needs by failing to provide him with assistance after he was unable to walk; and (4) Warden Schofield is liable as a supervisor for failing to change prison policies in a way that would have prevented Collins and Ward from ordering Rhodan to shave atop the sink. Second, he alleged that the Defendants have all violated his rights under the Americans with Disabilities Act by failing to accommodate his need for a wheelchair. Third, he alleges that the Defendants are liable under various state laws for, among other things, intentional infliction of emotional distress. He has sued the following people and entities: Warden Derrick Schofield, individually and in his official capacity; Officer Paul Collins, individually and in his official capacity as a Corrections Officer; Officer Kevin Ward, individually and in his official capacity as a Corrections Officer; the Georgia Department of Corrections; the Georgia Board of Corrections; and Board Members James E. Donald, Tommy Rouse, Carlton Powell, Robert Brown, Jr., John Irby, Patricia Miller, Roger Garrison, Bruce Hudson, Robert Jones, Robert

Bass, John Mayes, Ellison Woods, Charles Hudson, J. Tyson Stephens, Wayne Dasher, James Cecil Nobles, William Massee, Jr., and Kenneth Kennedy in their official capacities.

II. *MOTION FOR SUMMARY JUDGMENT STANDARD*

*5 Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

III. *DISCUSSION*

Before delving into the thornier issues, the Court will quickly address the arguments that the Plaintiff has abandoned by failing to address them in his Response [Doc. 101]. First, the section 1983 claims brought against the Department of Corrections and the rest of the Defendants in their official capacities should be dismissed. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."). Second, all of the Plaintiff's state law claims should be dismissed. The Plaintiff has conceded that his state law claims are barred by sovereign immunity and the Georgia Tort Claims Act. Third, the Plaintiff's Americans with Disabilities Act claims against the individual Defendants should be dismissed. The only parties left in the case then are Ward, Collins, and Schofield, in their individual capacities with respect to the Eighth Amendment claims, and the Georgia Department of Corrections, with respect to the ADA claim.

A. *Service of Process As To Ward*

It appears that Ward was personally served on July 8, 2005. Ward argues that Rhodan failed to properly serve him with Summons and the Complaint within the 120 days authorized by Rule 4(m) of the Federal Rules of Civil Procedure. Ward urges the Court to dismiss Rhodan's claim. Such a ruling, however, would functionally bar Rhodan's claim since the statute of limitations has now run. This harsh result is "good cause" to enlarge the 120-day period. Furthermore, this Court has the discretion to enlarge the window for service of process even in the absence of a showing of good cause. *Lepone-Dempsey v. Carroll County Com'rs,* 476 F.3d 1277, 1281 (11th Cir.2007) (citing *Horenkamp v. Van Winkle & Co.,* 402 F.3d 1129, 1133 (11th Cir.2005)). The motion should be denied on this ground.

B. *Exhaustion Under the Prison Litigation Reform Act*

The exhaustion provision of the PLRA states: "No action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). As the Supreme Court has recently stated: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock,* ---U.S. ----, ---- - ----, 127 S.Ct. 910, 918-19, 166 L.Ed.2d 798 (2007); *see also Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ("[W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). The parties agree that Rhodan exhausted his administrative remedies with regard to the claims associated with his fall from the sink. The parties do dispute, however, whether Rhodan may proceed with his claims arising from the prison's failure to accommodate Rhodan's medical needs following the fall. As noted above, Rhodan alleges that after his fall, he experienced muscle weakness and a loss of bladder and bowel control. As a result, he was unable to get to the toilet. He blames the prison's failure to provide him with a wheelchair in administrative

segregation, and the fact that a wheelchair was unable to fit into his tiny cell.

**\*6** There is no question that Rhodan failed to submit a grievance form with regard to his medical needs claim. The question is whether there is an exception to the rule that the failure to exhaust administrative grievances requires a dismissal of the Plaintiff's claim. Rhodan alleges that prison officials prevented him from filing an administrative grievance. In his sworn affidavit, he claims that Officer Youngbird told him that an inmate could not have two administrative grievances pending at the same time. The Defendants do not dispute the fact that Youngbird may have either misinformed Rhodan, or deliberately prevented him from filing a grievance. They respond by stating that prison policies allow a filing of an "emergency grievance" at any time. They do not, however, respond to the factual allegation that Mr. Youngbird either because of a mistake, malice, or some other unknown reason, prevented Rhodan from filing the grievance. Thus, there is an issue of fact as to whether Rhodan was prevented from filing a grievance.

Though exhaustion is mandatory, the text of the PLRA only requires inmates to exhaust "available" remedies. *See Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("Although the PLRA does not provide a definition, the plain meaning of the term "available" is "capable of use for the accomplishment of a purpose: immediately utilizable ... accessible.") (quoting *Webster's Third New Internat'l Dictionary* 150 (1986)). Neither the Supreme Court nor the Eleventh Circuit has ever addressed the issue of whether a remedy is "unavailable" under the PLRA because an inmate is either misinformed or prevented from filing by a prison official. *See Woodford v. Ngo,* --- U.S. ----, ----, 126 S.Ct. 2378, 2403, 165 L.Ed.2d 368 (2006) (noting that the "majority leaves open the question whether a prisoner's failure to comply properly with procedural requirements that do not provide a meaningful opportunity for prisoners to raise meritorious grievances would bar the later filing in federal court") (Stevens, J., dissenting).

The Court holds that an inmate has complied with the PLRA's exhaustion requirement where prison officials have prevented an inmate from filing an administrative grievance. If a prison official prevents an inmate from filing a grievance, the remedy is "unavailable." *Id.* ("We believe that a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an "available remedy ..."); *Priester v. Rich,* 457 F.Supp.2d 1369, 1377 (S.D.Ga.2006) (holding that district judges "can and should make credibility determinations on exhaustion-excusal issues" in order to determine whether inmates were given an adequate opportunity to file); *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (finding that equitable estoppel applies to allegations that prison officials actively prevented inmate from filing a grievance); *Johnson v. Garraghty,* 57 F.Supp.2d 321, 329 (E.D.Va.1999) (holding that evidentiary hearing was necessary to determine whether exhaustion under the PLRA should be excused if "defendants prevented him from utilizing the prison grievance system"); *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004) ("[T]here are certain 'special circumstances' in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified.").

**\*7** The Court's decision is also supported by the fact that exhaustion is not a jurisdictional requirement. *See Jones v. Bock,* 127 S.Ct. at 921 (holding that failure to exhaust is an "affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints"); *Chandler v. Crosby,* 379 F.3d 1278, 1286 (11th Cir .2004) (recognizing that most courts have decided that § 1997e(a) is not a "jurisdictional mandate"). The Supreme Court's recent description of exhaustion as an affirmative defense that need not be plead in the complaint strongly suggests that the requirement is not jurisdictional. Thus, the decision to allow exhaustion in such a case does nothing to enlarge the Court's jurisdiction. It merely prevents defendants from utilizing an affirmative defense in certain situations. Furthermore, this interpretation of the statute avoids the need to address thorny constitutional questions. *See Woodford,* 126 S.Ct. at 2404 ("[T]he Constitution guarantees that prisoners, like all citizens, have a reasonably adequate opportunity to raise constitutional claims before impartial judges.") (Stevens, J., dissenting). Therefore, at trial, Rhodan will have an opportunity to prove that his medical claims are not barred because he was prevented from filing a grievance by prison officials.

C. *Rhodan's Eighth Amendment Claim Against Officer Ward*

The Defendants seek summary judgment on the Eighth Amendment claims that Rhodan has asserted against them under 42 U.S.C. § 1983. Section 1983 provides a cause of action for persons whose rights under the federal constitution have been violated under color of state law. 42 U.S.C. § 1983. The statute confers no substantive

rights itself. Rather, it provides "a method of vindicating federal rights elsewhere conferred." *Graham v. Connor,* 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To establish a section 1983 violation, the Plaintiff must show (1) conduct committed by a person acting under color of state law (2) that deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

There is a genuine issue of fact as to whether Officer Ward violated Rhodan's Eighth Amendment right to be free from cruel and unusual punishment. By its terms, the Eighth Amendment prevents punishments that are "cruel" and "unusual." It suffices to say that Officer Ward's decision to order a dwarf to balance himself atop a bowl-shaped sink, with edges no wider than a half-inch in diameter, and to then demand that he shave himself while performing this stunt, is extraordinarily unusual. The question of whether this particular punishment was "cruel," is based upon an application of the relevant precedents, and whether such conduct is prohibited by cases interpreting and applying the Eighth Amendment. A prison official may be liable under the Eighth Amendment when "the official knows of and disregards an excessive risk to inmate safety." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Indeed, the Eighth Amendment "requires that inmates be furnished with the basic human needs, one of which is reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 34, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

*8 There are two parts of the Eleventh Circuit's interpretation of *Farmer.* First, there is an objective component. The plaintiff must demonstrate that he suffered an "objectively, sufficiently serious" injury. *Boxer X v. Harris,* 437 F.3d 1107, 1111 (11th Cir.2006). "[T]he condition must have inflicted unnecessary pain or suffering upon the prisoner." *LaMarca v. Turner,* 995 F.2d 1526, 1535 (11th Cir.1993). "This objective standard embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency ... but must also be balanced against competing penological goals." *Id.*

The second component is subjective. It requires the plaintiff to show facts which allow a reasonable trier of fact to infer that the prison official had a "sufficiently culpable state of mind." *Id* . "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. On a motion for summary judgment on an Eighth Amendment claim, the Eleventh Circuit interprets *Farmer* to require the production of "sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Purcell v. Toombs Cnty.,* 400 F.3d 1313, 1319 (11th Cir.2005).

Rhodan's version of the story gives him an objectively serious injury. Indeed, no reasonable person could describe his alleged injuries as "de minimis." See *Boxer X,* 437 F.3d at 1111 (finding no serious injury where female prison guard solicits male prisoner's "manual masturbation"). The force of his fall damaged a spine that had already undergone multiple surgeries, a screw was dislodged in his back, and the force of the fall triggered muscle weakness resulting in a loss of bowel and bladder control. If this type of injury is not "objectively" serious then nothing is.

Whether or not Officer Ward's actions subjected Rhodan to a substantial risk of injury, however, is a more complicated question. In hindsight, it is easy to say that Rhodan's injuries were serious. The relevant question is whether there was a substantial risk of injury *at the time* that Officer Ward compelled Rhodan to climb on the sink in order to shave. The Eleventh Circuit has described the question as an objective one. *Purcell,* 400 F.3d at 1320 ("Whether a substantial risk of serious harm exists so that the Eighth Amendment might be violated involves a legal rule that takes form through its application to facts.").

Though the inquiry has been labeled as "objective," there is no formula for determining how substantial the risk of serious injury must be before triggering Eighth Amendment liability. The reason for the absence of a precise formula stems in part from the fact that "no static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (citation omitted). Though "Eighth Amendment judgments should neither be nor appear to be merely the subjective views of judges," *id.* (quoting *Rummel v. Estelle,* 445 U.S. 263, 275, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), most cases in the Eleventh Circuit regarding the "substantial risk of serious injury" appear to be highly fact driven, and based upon an undefined threshold of "seriousness." *See, e.g., Purcell,* 400 F.3d at 1323 (holding that "conditions evidenced by the record here were not sufficiently grave to violate the Constitution"); *Chandler v. Crosby,* 379 F.3d 1278, 1298 (11th Cir.2004) (holding that allegation of extreme summer heat in prison fail to meet the "high bar" of demonstrating a substantial risk of serious injury); *Marsh v. Butler Cnty.,* 268 F.3d 1014, 1028 (11th

Cir.2001) ("We accept that conditions in a jail facility that allow prisoners ready access to weapons, fail to provide an ability to lock down inmates, and fail to allow for surveillance of inmates pose a substantial risk of serious harm to inmates."); *Cottone v. Jenne,* 326 F.3d 1352, 1358 (11th Cir.2003) (finding that inmate with history of violent outbursts and mental instability represented an objectively substantial risk of serious harm to inmates). This is to be expected. "[T[he Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability of a given punishment." *Rhodes,* 452 U.S. at 346 (citations omitted). "But such judgments should be informed by objective factors to the maximum possible extent." *Id.* (citation and punctuation omitted). In none of these cases did the Eleventh Circuit identify a formula that district courts should resort to for the purposes of determining how "substantial" the risk of "serious harm" is.

**\*9** As a general matter, there is a difficulty in weighing any risk. Risks do not come with labels on them, and there is some subjectivity in assessing how likely a particular risk is. There is always a general risk of harm in any prison, as there is a risk of harm in life. The issue here is whether ordering Rhodan to climb on to a small prison sink in order to shave carried a "substantial" risk, or probability, of injury. *See, e.g.,* James E. Krier and Clayton P. Gillette, Risk, Courts, and Agencies, 138 U. Penn. L.Rev. 1027, 1108 (1990) (defining risk as the probability of an event occurring); *see also* Frank H. Knight, Risk, Uncertainty, and Profit 19-20, 197-232 (1921) (distinguishing between "risk"-a mathematically measurable concept-and other circumstances of "uncertainty").

Though mindful of Justice Powell's admonition that judges ought not to let their subjective views dictate Eighth Amendment judgments, neither party has presented the Court with a basis for measuring the probability of whether a dwarf will be injured if he attempts to shave while balancing atop of a tiny, prison sink. *See, e.g.,* Charles Yablon, "The Meaning of Probability Judgments: An Essay on the Use of Misuse of Behavioral Economics," 2004 U. Ill. L.Rev. 899 (2004) (identifying various approaches to probability judgments). Thus, the Court makes its assessment by drawing upon commonsense, empiricism, and an appraisal of the probability of injury based upon the evidence presented.

Fortunately, despite the subjectivity involved in weighing risks, the question here is not a close one. In my judgment, there was an unreasonably high likelihood of injury. Ordering Rhodan to climb atop of a bowl-shaped protrusion, with sides no wider than a half-inch in diameter, requesting that he balance himself upon it, and then requiring him to shave without the benefit of soap or water, exposed him to a substantial risk of falling. Indeed, the risk was born out in this case. Rhodan slipped off of the sink, banged his head, and damaged his back.

This Court's judgment is bolstered by looking to more objective criteria. The Eighth Amendment "prohibits punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain." *Rhodes,* 452 U.S. at 356. "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.' " *Id.* (quoting *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Although the Defendants have put forth a reason for the shaving policy, they have no defense or explanation, let alone a penological justification, for why a prisoner should be forced to climb on top of a sink to shave. *See Smith v. Ozmint,* 444 F.Supp.2d 502, 510 n. 8 (D.S.C.2006) ("Certainly, allowing fellow inmates, rather than corrections officers, to forcibly shave him can serve no legitimate penological interest and may very well constitute 'cruel and unusual punishment.' "). The reason for ordering Rhodan on the sink becomes even weaker when one considers the alternatives available to the prison. The prison could have given Rhodan access to the barber, which they initially did, or provided him with a lower mirror, which they eventually did, or they could have excused him from the shaving requirement. Indeed, the Defendants themselves make no defense of this type of action. They do not argue that it was necessary for the security of the prison or claim that it would have been too burdensome to provide Rhodan with any other accommodation. Recognizing the deficiency in such a line of argument, the Defendants have instead focused their attack upon whether there is a genuine issue of material fact (i.e., they never told him to stand on the sink), and by arguing that they did not know that he could fall. The Supreme Court has held that a harm is cognizable under the Eighth Amendment when it "pose[s] an unreasonable risk" with respect to an inmate's safety. *Helling v. McKinney,* 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (noting that the Eighth Amendment requires that inmates "be furnished with the basic human needs, one of which is reasonable safety"). The risk to Rhodan's safety was unnecessary and unreasonable.

**\*10** The Supreme Court held in *Farmer* that "an official's failure to alleviate a significant risk that he should have perceived but did not" is not a basis for Eighth Amendment liability. *Farmer,* 511 U.S. at 838. But, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from

circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (citations omitted); *see also Hope v. Pelzer,* 536 U.S. 730, 738, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting approvingly of Justice Souter's language in *Farmer* noting that "[w]e may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."). Just because a trier of fact may infer knowledge of the risk of harm, however, does not mean it must do so. At trial, it remains open for Ward to "prove that [he] was unaware even of an obvious risk to inmate safety." *Id.* at 843.

There is evidence in the record that would allow a reasonable factfinder to infer that Officer Ward was subjectively aware of the risk of harm. First, drawing all inferences in favor of Rhodan, a reasonable jury could conclude that Ward was aware of the risks because of the obvious dangers associated with forcing a man to shave while balancing on top of a small prison sink. This is not to say that the objective conditions show that Officer Ward should have known. Rather, a reasonable factfinder could look at the positioning of the sink and Officer Ward's knowledge of those conditions to conclude that he was aware of the harm. Just as if an officer ordered an inmate to walk on broken glass, a reasonable trier of fact could infer, based on the objective criteria, that the officer was subjectively aware of the risk of harm.[1]

Furthermore, according to Haynes's deposition testimony, Collins and Ward acted jointly to enforce the shaving policy. He testified that Ward confronted Rhodan and then dispatched Collins to make him shave. He also testified that both prison guards watched while Rhodan climbed on the sink with Haynes's assistance. This level of cooperation might raise an inference that if Collins was informed of the dangers then Ward was as well. Indeed, Rhodan specifically informed Collins of the risk that he might "break" were he to climb on top of the sink. Though there is no evidence that Rhodan used such specific language with Ward, Rhodan did inform a fellow staff member of the risk of harm. Their cooperation is evidence that could allow a reasonable trier of fact to conclude that both were subjectively aware of the risk of harm, including Rhodan's fear of injury.

Ward also challenges Rhodan's Eighth Amendment claim on causation grounds. He argues that Rhodan fell while Ward was not on duty. Thus, Ward's order was not the "proximate cause" of the fall. He further contends that Rhodan may have been acting under Officer Johns's order to shave. Therefore, he argues there is no evidence that Officer Ward's statements caused the fall.

**\*11** Section 1983 requires proof of an affirmative causal connection between a state official's action and the constitutional violation. *LaMarca,* 995 F.2d at 1538. "A causal connection may be established by proving that the official was personally involved in the acts that resulted in the deprivation." *Id.* Just because there was a time lag in between Ward's order and the time that Rhodan fell does nothing to snap the chain of causation. Ward was "personally involved" in the fall, because of instructions that he personally gave Rhodan. Indeed, Rhodan only climbed on top of the sink, because of the Defendants' orders.

Ward cites *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), as support for the claim that he did not proximately cause Rhodan's injuries. *Martinez* is inapplicable. There, the Supreme Court held that the California Parole Board could not be held liable for their decision to release an inmate that ended up killing a 15-year old girl. *Martinez,* however, is inapplicable. The Court held that the Parole Board did not "deprive" the young woman of life within the meaning of the Fourteenth Amendment. The reason was because the killing, which took place five months after the Board released him, was "too remote a consequence." *Id.* at 280. Thus, the Parole Board did not take the woman's life. Rather, the parolee did. Importantly, the Court refused to find that a constitutional violation had taken place at all; that is, the "remoteness" of the consequence was related to the question of whether there was state action, not whether there was sufficient causation for the purpose of bringing a claim under section 1983.

Even if the case was applicable, Rhodan's injuries are not "too remote." They are the direct byproduct of complying with the instruction to shave by standing on the sink. Justice Stevens, speaking for the Court in *Martinez,* emphasized that the parole board was not aware that the victim would be injured, as opposed to the "public at large." *Id.* at 285. Thus, the board had no knowledge that a specific victim faced a "special danger." *Id.* In this case, there is enough evidence for a reasonable factfinder to infer that Ward was aware of a specific risk of harm to Rhodan.

To return to the analogy above, if Ward had ordered Rhodan to walk across broken glass, it would be ridiculous for him to later argue that Rhodan's injuries were not caused by the instruction, but rather they were caused by the glass. The only question is whether Ward personally participated in Rhodan's injury. His instruction to Rhodan satisfies this concern.

Ward also disputes the causation as it relates to Rhodan's

back injuries. That is, he argues that many of the injuries were preexisting. Rhodan has submitted evidence by Dr. Gray stating that his injuries are consistent with a fall that occurred on the date of the alleged injury. The scope of Rhodan's injuries are questions of fact that are best addressed at trial. Even if some of Rhodan's injuries are preexisting, there is still a question of fact as to how the fall may have exacerbated those injuries.

**\*12** In short, subjecting Rhodan to the humiliation of having a fellow inmate hoist him atop the sink, or forcing him to climb upon a tiny, prison sink and shave under the threat of additional punishment undermines the "basic concept underlying the Eighth Amendment, is nothing less than the dignity of man." *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). It is both cruel and unusual to subject a dwarf to such sadistic, humiliating, and dangerous conduct. Ward's Motion for Summary Judgment as to the Plaintiff's Eighth Amendment claim should be denied.

### D. *Rhodan's Eighth Amendment Claim Against Officer Collins*

Collins is not entitled to summary judgment on the Eighth Amendment claim. He makes two arguments. The first deals with causation. Collins reminds the Court that Rhodan was asked to climb on top of the sink on two occasions. Collins asked him the first time, and Ward asked him the second. There was a two week gap between the first incident and the second. Thus, Collins argues, it cannot be said that he "proximately caused" Rhodan's injuries.

As noted above, Rhodan must prove that Collins personally participated in the constitutional violation. Collins attempts to define the constitutional violation as two discrete events. That is, each individual order constituted an Eighth Amendment violation. This is overly restrictive. Rhodan fell because he attempted to shave in accordance with the directions from Collins and Ward. Collins personally denied Rhodan any accommodation, and made clear that the only alternative was for Rhodan to climb upon the sink and shave. Even though Collins ordered Haynes to stabilize him, Haynes testified that he was only willing to hold Rhodan up on one occasion. The fact that Rhodan fell two weeks later while performing his duties in the manner authorized by Collins does not snap the chain of causation. Just because Ward echoed Collins's order does not absolve Collins of the consequences of the failure to accommodate Rhodan in any other way.

Second, Collins argues that he was not subjectively aware of a substantial risk of harm, and that he did not draw the inference of such a risk. To bolster the argument, Collins cites a portion of the Plaintiff's deposition where Rhodan says that he does not believe that Collins intended or expected him to fall. First, deliberate indifference is not the same as "intent." Even if Collins did not intend for Rhodan to fall, there are facts which would allow a jury to conclude that he was aware of a substantial risk of harm and recklessly disregarded it. This argument was addressed in more detail in above, but in short, there are two main pieces of evidence, which would permit a reasonable finder of fact to infer that Collins was subjectively aware of the risk. First, there are the objective conditions. As noted above, a reasonable jury could conclude that Collins was subjectively aware of the dangerousness of having a man shave on top of a small prison sink, even though Collins is well within his rights to argue that he was oblivious to the danger. Second, Rhodan testified that he specifically told Collins that he might "break" if he climbed up on the sink. Thus, there is a question of fact about whether Collins was subjectively aware of and disregarded the risk of harm. Collins does contest the fact that he actually "ordered" Rhodan on to the sink. Rhodan and another witness disagree. This type of "swearing contest" is not best addressed in a motion for summary judgment.

### E. *Rhodan's Eighth Amendment Claim Against Warden Schofield*

**\*13** All of the claims against Warden Schofield should be dismissed. In short, Rhodan has not set forth a genuine issue of fact with regards to Schofield's deliberate indifference to Rhodan's safety. The relevant question is not whether Schofield was deliberately indifferent to Rhodan's status as a dwarf, but whether he was deliberately indifferent to a substantial risk of harm. There is no suggestion that Schofield had knowledge of the fact that Ward and Collins had been ordering Rhodan to shave on the sink. Indeed, the circumstances of the alleged accident are so bizarre that there is no reason to believe that Schofield should have had any idea it would happen. There is no reason to believe that his failure to devise a specific policy with regards to dwarves and shaving was a proximate cause of the Plaintiff's injury. The claims against Warden Schofield should be dismissed.

F. *Qualified Immunity*

Collins and Ward may nevertheless be shielded from liability for civil damages if they did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope,* 536 U.S. at 739 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities. *McClish v. Nugent,* 483 F.3d 1231, 1237 (11th Cir.2007). Both parties agree that the officers were performing discretionary functions as part of their job duties.

The Court has already determined that the officers' actions were unconstitutional. Officers Ward and Collins impermissibly violated Rhodan's Eighth Amendment right to be free from cruel and unusual punishment when they ordered him to climb on top of a small prison sink, with sides no greater than a half-inch wide, and demanded that he shave while performing this stunt. They consciously disregarded a substantial risk to Rhodan's safety, and their disregard inflicted various injuries upon Rhodan. The only question left to address is whether their conduct violates rights that were "clearly established."

The Supreme Court has explained that the salient question for the purposes of determining whether a right was "clearly established" is whether the state of the law at the time of the violation gave the officials fair warning that their alleged treatment of the Plaintiff was unconstitutional. *Hope,* 536 U.S. at 741. "While officials must have fair warning that their acts are unconstitutional, there need not be a case 'on all fours,' with materially identical facts, before we will allow suits against them." *Holloman v. Harland,* 370 F.3d 1252 (2004) ("This circuit was recently chastised by the Supreme Court for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations.").

The Eleventh Circuit has described the principle set forth by *Farmer,* that a prison official violates the Eighth Amendment where he is deliberately indifferent to a substantial risk of harm, as "well settled." See *Hinson v. Edmond,* 192 F.3d 1342, 1348 (11th Cir.1999); *see also Hale v. Tallapoosa County,* 50 F.3d 1579, 1582 (11th Cir.1995) ("It is well settled that a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment.") The existence of such "well settled law" is enough to put the Defendants on notice that their conduct is impermissible. *See, e.g., Bennett v. Hendrix,* 423 F.3d 1247, 1256 (11th Cir.2005) (denying qualified immunity and finding clearly established law "[b]ecause this Court has held since at least 1988 that it is 'settled law' that the government may not retaliate against its citizens ... we hold that the defendants were on notice and had 'fair warning' ").

**\*14** Ward and Collins make essentially one argument as to why they are entitled to qualified immunity. They argue that it was not clearly established that their conduct violated Rhodan's Eighth Amendment rights. In other words, their claim is that a reasonable prison guard would have had no idea that it was unconstitutional to force a human being to shave while balancing on a small prison sink. The fall, they claim, was "too freakish."

A reasonable prison official would or should have known that intentionally forcing a human being, in this instance a dwarf placed in administrative segregation only because of his height, to climb on top of a small prison sink, ordering him to balance himself on the narrow edges, and then making him shave under the threat of punishment posed a substantial risk of serious harm. Not only does such behavior lack any semblance of respect for a fellow human being, but it was objectively dangerous conduct.

The Plaintiff's argument is not diminished by the fact that the Eleventh Circuit has not previously decided a case dealing with the rare instance of prison guards sadistically making a dwarf shave on top of a sink. Indeed, the Supreme Court has made clear that "[g]eneral statements of the law are not inherently incapable of giving fair and clear warning." *Hope,* 536 U.S. at 741 (citations omitted). *Farmer's* broad statement of principle is not tied to a particularized set of facts.

There are thousands of factual permutations of cruel and unusual conduct that any reasonable prison guard should be aware of. The fact that the risk of serious harm came from something mundane, like balancing on a narrow-edged sink, as opposed to something sensational like a crazed inmate, *Cottone v. Jenne,* 326 F.3d at 1358, is irrelevant. Whether a prison official orders an inmate to continue working on a defective ladder, *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (finding colorable Eighth Amendment claim where guard ordered inmate to continue working on a ladder that he knew was unsafe), orders him to use defective prison work equipment, *Morgan v. Morgensen,* 465 F.3d 1041, 1047 (9th Cir.2006) ("[t]he contours of the right were sufficiently clear that a reasonable prison official would or should have understood that compelling an inmate to continue operating defective and dangerous prison work equipment would violate the Eighth Amendment."), or makes any other demand exposing the inmate to a known risk of substantial harm, the Eighth Amendment forbids it.

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 10

There are a few cases, admittedly decades old and decided well before *Farmer,* in which other circuits have held that minor safety hazards do not violate the Eighth Amendment. *See Tunstall v. Rowe,* 478 F.Supp. 87 (N.D.Ill.1979) (holding that existence of a greasy staircase causing slip and fall does not violate the Eighth Amendment); *Snyder v. Blankenship,* 473 F.Supp. 1208, 1212 (W.D.Va.1979) (finding that failure to repair leaking dishwater did not violate the Eighth Amendment); *Robinson v. Cuyler,* 511 F.Supp. 161, 163 (E.D.Pa.1981) (noting that a slippery kitchen floor does not inflict cruel and unusual punishment).

**\*15** Rhodan, however, is not arguing that the prison failed to protect him from some random, improbable hazard. In this case, the guards themselves created the hazard, and recklessly exposed him to a substantial risk of injury. The principle asserted here is one that recognizes that prison officials may not order inmates into objectively dangerous situations. Another notable difference between these "slip and fall" cases listed above, *see Reynolds v. Powell,* 370 F.3d 1028, 1031 (10th Cir.2004) (describing the above cases as "slip and fall" cases), and the one before the Court, is that Rhodan's injuries were not inflicted by something such as slippery floors, which "constitute a daily risk faced by members of the public at large." *Id.* Rather, the prison deprived him of the means of shaving, threatened him with punishment unless he did so in a dangerous fashion, and he suffered as a result. *See Helling,* 509 U.S. 25 at 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 *(citing DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199-200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989),* to argue that when the State takes an individual into custody, and deprives him of the means to care for himself, "the Constitution imposes a corresponding duty to assume some responsibility for his safety and well being"). This was no slip and fall case. The prisoner here was ordered into a dangerous situation created by the prison guards themselves. Both Ward and Collins violated clearly established law, and neither is entitled to a defense of qualified immunity.

G. *ADA Claim Against the Georgia Department of Corrections*

Rhodan raises two claims associated with the prison's failure to deal with his injuries after the fall. First, he raises an Eighth Amendment claim that the prison was deliberately indifferent to his medical needs by denying him access to a wheelchair. He claims that the absence of a wheelchair rendered him unable to access a toilet, use the shower, and prevented him from taking care of his basic bodily needs. Second, he claims that the prison's failure to accommodate his need for a wheelchair violated the Americans with Disabilities Act.

In his Response, the Plaintiff concedes that his Eighth Amendment claim is identical to the ADA claim (Pl.'s Opp. to Defs.' Mot. for Summ. J., at 33). He did so in response to the Defendants' argument that Title II of the ADA only abrogates the sovereign immunity of a state where a plaintiff also establishes that the conduct in question independently violates the Fourteenth Amendment. *See United States v. Georgia,* 546 U.S. 151, 126 S.Ct. 877, 882, 163 L.Ed.2d 650 (2006) (remanding for more complete factual determination in order to assess the outer scope of the ADA's abrogation of state sovereign immunity); *see also Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 463, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (holding that the Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment).

The Defendants' motion as to the Eighth Amendment claim should be granted. As noted above, states are not "persons" under section 1983. Furthermore, the Supreme Court has held that section 1983 does not pierce a state's sovereign immunity with regards to suits for retrospective monetary damages. *See Fitzpatrick v. Bitzer,* 427 U.S. 445, 451-52, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (explaining that the Congress did not speak with sufficient clarity to abrogate sovereign immunity).

**\*16** In order to prevail on the ADA claim, the Plaintiff must establish an underlying Eighth Amendment violation. *Georgia,* 546 U.S. at 882. This does not mean that the Plaintiff must be able to establish a section 1983 claim. Rather, there must be a violation of the Eighth Amendment in order to abrogate the state's sovereign immunity. Based upon the Plaintiff's supported allegations, and the Defendants' failure to engage this argument, the Defendants' motion for summary judgment as to the Title II ADA claim against the Georgia Department of Corrections should be denied. There is a genuine issue of fact as to whether the prison was deliberately indifferent to Rhodan's medical needs. Haynes filed a grievance notifying the prison that Rhodan was defecating upon himself, and the prison did nothing to address the problem. The Plaintiff alleges that a wheelchair would have alleviated this problem. Thus, sovereign immunity does not bar the Plaintiff's Title II claim. The claim should not be dismissed at this time.

## IV. CONCLUSION

The Defendants' Motions for Summary Judgment [Doc. 79 & 81] should be GRANTED in part and DENIED in part. All of the claims against the Georgia Department of Corrections are DISMISSED except for the Title II, ADA claim. All claims against the Defendants in their official capacities are DISMISSED. All claims against the Defendants in their individual capacities are dismissed with the exception of the Eighth Amendment claims against Ward and Collins.

SO ORDERED, this 18 day of June, 2007.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1810147

Footnotes

1   Furthermore, adequate jury instructions at trial can ensure that the jury knows that "[i]t is not enough merely to find that a reasonable person would have known, or that the defendant should have known ..." *Farmer,* 511 U.S. at 843 n. 8.

End of Document    © 2019 Thomson Reuters. No claim to original U.S. Government Works.