IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

ANDREW L. COLBORN,

                    Plaintiff

NETFLIX, INC., et al.,                                 Case No. 19-CV-484

                    Defendants.

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO NETFLIX, INC.'S MOTION TO DISMISS

---

## INTRODUCTION

Plaintiff, Andrew Colborn, respectfully submits this brief in opposition to Netflix, Inc's motion to dismiss.   Contrary to Netflix's arguments, Plaintiff has sufficiently alleged malice by Netflix.   Malice, knowledge, and intent may be alleged generally.   Therefore, these are not issues that should generally be resolved on pleadings.  Moreover, binding precedent holds that a defamation plaintiff is entitled to discovery regarding actual malice.

Further, Plaintiff has unquestionably pleaded facts that support inferences and findings of actual malice by Netflix.   At this stage, and prior to discovery, Plaintiff does not have access to additional facts that only Netflix could have that further demonstrate its actual malice, such as information regarding its internal editing and production process. But the content of the broadcast itself demonstrates that Netflix acted at least recklessly in publishing the MAM material that is defamatory to Mr. Colborn, and that objective evidence does not depend on which of Netflix's employees shaped that content to convey its defamatory message.

Further, it is ironic for Netflix, an industry giant that touts its content production skills and has bragged about its role in the Making a Murderer broadcasts that defamed Mr. Colborn, whose employees have dished publicly about working on MAM and which has accepted awards

for writing and directing it, to now claim it had no such role. Plaintiff did not expect Netflix to attempt to duck responsibility for the broadcasts. Therefore, to the extent that the Court may find any merit in Netflix's motion, Plaintiff respectfully requests leave to expressly plead additional facts that are well known to Netflix, including, among other things, public statements by its representatives regarding its role in producing the series.

For purposes of preserving the argument, Plaintiff also respectfully submits that this is an appropriate case in which the United States Supreme Court should, if necessary, entertain Justice Clarence Thomas' recent invitation to review and abolish the actual malice standard.

## **FACTS ALLEGED**

Plaintiff, Andrew Colborn, is a former Manitowoc County Sheriff's Officer. Dkt #1-2 (Amended Complaint), p. 6 (of 61), ¶¶11-12, p. 23, ¶23(a). In December 2015, Mr. Colborn's life changed radically when Defendant Netflix published its Making of a Murderer series ("MAM"). The 10-part series of hour-long broadcasts purports to be a documentary chronicling the investigation of the murder of a 25-year-old photographer named Teresa Halbach and the trial and conviction of Steven Avery, a Manitowoc County resident, for the crime. *Id*., p. 7, ¶15.

The Avery trial was publicized in local media at the time, but it did not gain widespread notoriety until after the fact, when Netflix broadcast MAM to viewers worldwide. MAM's central premise asserts, directly and indirectly throughout the successive episodes, that Mr. Colborn participated in a police conspiracy to frame Mr. Avery by planting evidence on the property where Mr. Avery lived and on an adjacent family-owned salvage yard.

Since the MAM broadcast aired, what may amount to tens or hundreds of thousands of MAM fans have discussed Mr. Colborn's alleged culpability in the supposed scheme and have castigated him online. Among other things, Mr. Colborn has received serious and ongoing

threats to his and his family's safety; has been subject to recorded telephone threats, the sheer volume of which fill the capacity of 28 compact discs; and has received numerous late-night telephone calls in which callers have screamed profanities and threatened to do him physical harm. Dkt #1-2, p. 27, ¶70. Avery sympathizers have threatened to kill Mr. Colborn and members of his family, kidnap and sodomize him and gang rape his wife. *Id.* Photographs of Mr. Colborn's children have been posted online by hateful viewers influenced by MAM. *Id.*

Due to the threats of violence and the hostility against him, Plaintiff is required to maintain a state of hypervigilance at all times and to constantly be alert to potential danger. *Id.* Plaintiff has had to be more cautious and guarded in nearly every aspect of his life, including making travel plans and deciding where he and his wife can eat in public. *Id.* As a result, Mr. Colborn suffers from severe emotional distress, anxiety, and exhaustion. *Id.*

**Selective and Biased Editing**

To vilify Mr. Colborn to the extent necessary to create such animosity toward him, MAM relied, among other things, on selective, even fraudulent, edits to Mr. Colborn's trial testimony that were presented in the broadcasts as direct, unedited excerpts of trial footage. *See* Dkt #1-2, Exs. A, B. Nothing in the broadcasts indicates to viewers that there have been edits to his testimony. *See id.* But through heavy and unscrupulous editing, MAM presented what appeared to be actual trial footage as if it consisted of direct quotations from Mr. Colborn's own mouth, when they were not.. In this manner, MAM presents what appear to be admissions of acts in furtherance of MAM's hypothetical conspiracy. An accurate recitation of Mr. Colborn's testimony contradicts MAM's conspiracy theory.

A. **Call to Dispatch: Mismatched Question and Answer**

Among MAM's many revisions to trial testimony, Mr. Colborn's answer to one question

is frequently portrayed as the answer to another. One particularly egregious example palpably contributes to the mania with which MAM's fans have asserted throughout the worldwide web that Mr. Colborn was secretly looking at Teresa Halbach's vehicle when he made the now-infamous, but in fact routine, call to dispatch. Dkt #1-2, pp. 11-16, ¶¶28-38. This, in turn, has been accepted by many as proof that Mr. Colborn participated in a police conspiracy to frame Avery by, among other things, allegedly planting Ms. Halbach's vehicle at the Avery salvage yard prior to its official discovery there. *Id.,* pp. 14-15, ¶36.

At Steve Avery's trial for the murder of Ms. Halbach, in examination by defense counsel after a recording of the call was played in court, counsel posed the following question to Mr. Colborn: "Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back of a 1999 Toyota, from listening to that tape, you can understand why someone might think that, can't you?" Dkt #1-2, p. 13, ¶32.

First, MAM edited the question so that it concluded with the phrase, "1999 Toyota." *Id.* MAM then omitted from the broadcast an objection to the question as posed, which was sustained. *Id.* After the sustained objection, counsel asked the following very different question, "This call sounded like hundreds of other license plate or registration checks you have done through dispatch before?" *Id.* In response to that question, Mr. Colborn responded, "Yes." *Id.*

Next, MAM took Mr. Colborn's answer – "Yes" – to the question regarding the routine nature of the call and inserted it so that it appeared to be an affirmative response to the preceding, no-longer viable question regarding whether the call was readily capable of being interpreted as evidence that Mr. Colborn was looking at Ms. Halbach's car at the time of the call. *Id.* In other words, MAM's editing made it appear to viewers that Mr. Colborn

damagingly admitted that his recorded call to dispatch was a call made while viewing the Halbach vehicle.   Mr. Colborn's actual testimony carries no such insinuation; but MAM made it sound as though he admitted that fact.

MAM's distortion of Mr. Colborn's testimony was needed to make it appear that Mr. Colborn himself admitted that the call suggested that he was looking at the car, and that he was likely looking at the car at the time that he made the call – directly reinforcing MAM's not-very-subtly imparted theory that Mr. Colborn participated in a conspiracy to frame Mr. Avery.[1]

## B.        Call to Dispatch:  Omission of Acknowledgement of Error

In another example of omitted testimony that related to the same line of questioning, MAM omitted Mr. Colborn's acknowledgement that he had been mistaken as to whether the dispatcher first told him that the car was a 1999 Toyota or whether he used those words in his question to her.  Dkt 1-2, pp. 55-56.   This change left viewers with the impression that defense counsel "caught" Mr. Colborn in a false assertion about who referenced the make and model of the vehicle, without the benefit of Mr. Colborn's acknowledgment, on rehearing the recording, that he had first asked about it.   As a result, MAM portrayed Mr. Colborn as an evasive and untruthful witness.   The resulting false impression (buoyed by numerous additional examples of distorted testimony and spliced reaction shots of plaintiff appearing nervous and apprehensive at trial (Dkt #1-2, p. 14, ¶35)) reinforced viewers' conspiracy theories.  *Id.,* p. 23, ¶54.

## C.        1994-95 Call

In another supposed case-clincher touted by MAM-inspired amateur sleuths worldwide, MAM repeatedly insinuates that Mr. Colborn was motivated to participate in the alleged conspiracy against Mr. Avery because Mr. Colborn either felt guilty for having failed to realize

---

[1] The conspiracy is articulated and reiterated throughout MAM.  *See infra*, pp. 10-13.

Mr. Avery's innocence years earlier or took part in covering it up, after initially fielding a cryptic telephone inquiry from a caller who identified himself as a police detective from another jurisdiction and who stated that there was someone in a jail in an adjoining County who may have actually committed an assault for which another individual was in Manitowoc County's custody. In fact, Mr. Colborn maintained then and maintains today that he properly handled the prior call and had no knowledge that Mr. Avery was innocent of the earlier crime until DNA proved his innocence in 2003. Dkt #1-2, pp. 9-11, ¶¶21-27.

MAM again edited testimony to appear to confirm its theory, especially by omitting the underlined portions of testimony elicited at trial by District Attorney Ken Kratz:

> Kratz: You were asked, as I understand, as part of a civil lawsuit, to provide what's called a deposition, [to be questioned by some lawyers; is that right?
>
> Plaintiff: Yes, sir.
>
> Kratz: Do you recall when that occurred?]
>
> [omits 15 additional lines of testimony]
>
> Kratz: Can you tell the jury what you were asked about?
>
> Plaintiff: In 1994 or '95 I had received a telephone call when I was working as my capacity as a corrections officer in the Manitowoc County Jail. Telephone call was from somebody who identified himself as a detective. [And I answered the phone, Manitowoc County Jail, Officer Colborn.
>
> Apparently, this person's assumption was that I was a police officer, not a corrections officer], and began telling me that he had [received information that] somebody who had committed an assault, in Manitowoc County, was in their custody, and we may have somebody in our jail, on that assault charge, that may not have done it.
>
> I told this individual, you are probably going to want to speak to a detective, and I transferred the call to a detective [, to the Detective Division, at the Manitowoc County Sheriff's Department. That's the extent of my testimony.]

| Kratz: | That's it? That's your connection to Mr. Avery? |
|---|---|
| Plaintiff: | Yes, sir. |

Dkt #1-2, pp. 48-49. The above testimony stops at page 140, line 13; the next section below is from the Redirect examination at page 213 of the transcript.

| Kratz: | Let me ask you this, [as you sit here today,] Sergeant Colborn, do you even know whether that call was about Mr. Steven Avery? |
|---|---|
| Plaintiff: | No, <u>sir.</u> [I don't] |

*Id.*, p. 49. The testimony immediately preceding the above question on page 213, in re-direct, is as follows:

| <u>Kratz:</u> | <u>Did this person ever identify the individual that they were talking about?</u> |
|---|---|
| <u>Plaintiff:</u> | <u>No sir. There were no names given.]</u> |

*Id.*

When Attorney Kratz revisited the subject on re-direct examination, MAM again edited the testimony by omitting the underlined portions of the following testimony:

| Kratz: | Sergeant Colborn, [just a very few follow-up questions. Mr. Strang asked you if you had written a report about that telephone call that you had sometime in 1994 or '95; do you remember that question? |
|---|---|
| <u>Plaintiff:</u> | <u>Yes, sir.</u> |
| <u>Kratz:</u> | <u>Do you remember your response?</u> |
| <u>Plaintiff:</u> | <u>My response was, no, that I did not write a report about it.</u> |
| <u>Kratz:</u> | <u>As you look back,]</u> back in 1994 or '95, if you would have written a report, what would it have been about? |
| Plaintiff: | [That is why I didn't do one,] I don't know what it would have been about, [that I received a call and transferred it to the Detective Division.] If I wrote a report about every call that came in, I would spend my whole day writing reports. |
| | [Kratz: Did this person ever identify the individual that they |

> Plaintiff:        No, sir.   There were no names given.]

Kratz:        Let me ask you this, [as you sit here today], Sergeant Colborn, do you even know whether that call was about Mr. Steven Avery?

> Plaintiff:        No, sir [I don't]**.**

*Id.,* p. 53.  More than two pages of additional re-direct is omitted.

As is evident, MAM's alterations:

● Removed Mr. Colborn's explanation that the caller had mistakenly assumed that Mr. Colborn would be the proper person to address the subject of the call (omitting "Apparently, this person's assumption was that I as a police officer, not a corrections officer. . . . ");

● Left out altogether Mr. Colborn's testimony that he transferred the call to the Detective Division at the Manitowoc County Sheriff's Department rather than the County Jail, where Mr. Colborn was working; MAM instead misleadingly left in testimony that Mr. Colborn immediately corrected in which he started to say that he transferred it to "a detective."  MAM then omits Mr. Colborn's identification of the actual department to which the call was transferred (*i.e.,* somewhere other than the jail he worked at);

● Removed references that highlighted the length of time between the call and the Halbach investigation; and

● Removed instances in which the testimony reiterated the point that the caller did not provide any names prior to Mr. Colborn's transfer of the call.

The omissions and edits made by MAM remove testimony that describe handling of the call as routine and therefore, less supportive of  MAM's insinuation that Mr. Colborn knew that Mr. Avery had been wrongly convicted and covered up his department's knowledge of that fact.

**D.        Altered Direct Response to Accusation**

MAM also omitted testimony in which Mr. Colborn directly responded at trial to the question whether he planted evidence to frame Avery.   In MAM, Mr. Colborn testified as follows in response to a "soft cross" by Attorney Kratz:

> Kratz:          Have you ever planted any evidence against Mr. Avery?
>
> [Plaintiff:      That's ridiculous, no I have not.
>
> Kratz:          Have you ever planted any evidence against anybody in the course of your law enforcement career?]
>
> Plaintiff:      I have to say that this is the first time my integrity has ever been questioned and, no, I have not.

Dkt 1-2, p. 49.

In addition to resorting to its tactic of switching answers to questions, MAM removed the underlined words, including, most notably, Mr. Colborn's response, "That's ridiculous" in response to the notion that he would have planted evidence to frame Mr. Avery.   *Id.*  By muting the fervor with which Mr. Colborn denied the accusation, MAM deliberately made Mr. Colborn's denial seem equivocal  – again, fanning the flames of its conspiracy theory  by understating the vehemence of Mr. Colborn's denial of the accusation.

**Republication of Direct Accusations By Avery, His Family, Defense Counsel, and Others**

Perhaps most damagingly, MAM also built  case against Plaintiff by using the out-of-court statements of third parties, all of whom are either affiliated with Avery or heavily biased in his favor, and presenting their theories, musings and speculation as fact and "evidence" of the supposed conspiracy.   Among other things, MAM includes the following defamatory audio and visual content:

● Avery stating as a fact that police – meaning Plaintiff – had "the evidence" that he was not responsible for the prior rape charge prior to his release, but that "nobody said anything."  Dkt 1-2, p. 30.  In fact, as noted *supra,* Plaintiff  reported the  information he received by properly directing the  caller – who never identified Steven Avery – to the Manitowoc County Sheriff's Office Detective Division.  Dkt 1-2, pp. 9-10, ¶23.

- Kim Ducat, a relative of Avery, stating that the Manitowoc County Sheriff's Office was not "done with him" after he was exonerated of the prior rape and that "something was gonna happen" to him, while juxtaposing an image of Plaintiff and other supposed police conspirators in the background. *Id.,* p. 30.

- Former Avery civil attorney Stephen Glynn asserting (inaccurately) that only after Avery was released from his sentence for prior rape charges did Plaintiff contact a superior officer [or, by implication, any other appropriate person] to report the 1995 call, and that the reason that Plaintiff raised the issue of the call again after Avery's release was because he and others in the department realized that Plaintiff "had screwed up, big time." *Id.,* pp. 31-32.

- A copy of the report prepared by Plaintiff – which had been marked as an exhibit in depositions in Avery's civil case – with a voiceover by Avery accusing the officers of "covering something up" and asserting that they were "still covering something up." *Id.,* p. 33.

- Immediately after showing testimony that ended with a reference to Plaintiff's name, a statement by Attorney Glynn further stating that the supposed conspiracy about the 1995 call was "an unconscionable withholding of information" that "cost Steven Avery eight years of his life" and was "as close to a conspiracy of silence as you could find in a case." *Id.,* p. 35.

- While showing a rotating cadre of photographs of Manitowoc County Sheriff's Office employees, including Plaintiff, a statement by another of Avery's civil lawyers stating, "October of 2005 [the month Teresa Halbach disappeared], from the perspective of the Manitowoc County government and their defense lawyers, I think they all knew they were in the most serious kind of trouble." *Id.*

- Attorney Glynn further outlining the alleged motive for Manitowoc County Sheriff's Office employees, including, allegedly, Plaintiff, indicating that "[o]f course, it has an effect on law enforcement" when officers are called liars and accused of hiding evidence and prosecuting someone they knew was not guilty. He then suggests that there is a link between the allegedly strong position that Avery had in his civil case against Manitowoc County in connection with the rape conviction and the investigation of Avery for the disappearance of Teresa Halbach. A timeline is shown with the dates of depositions of Plaintiff and others in the civil case and the Halbach disappearance. Statements by Avery then assert that "they're trying to railroad" him again and that he would not "put it past the County" to plant evidence. *Id.,* p. 36.

- Unidentified bar patrons asserting, respectively, that a female patron "really does believe" that Avery was framed, that the Manitowoc County Sheriff's Office had something to do with it. Her male companion then adds the comment that Avery was the victim of "corruption," "big time." Amended Complaint, Ex. A, pp. 8-9. A voiceover by Avery afterward says, "they figure they just got away with it, they can do it again . . . ." *Id.*, pp. 37-38.

- Avery defense lawyer Dean Strang musing how the Manitowoc County Sheriff's Department representatives would have been tempted to plant evidence, even though he personally didn't see them do it "with [his] own two eyes." *Id.*, p. 38.

- Avery defense lawyer Jerry Buting asserting as a fact that "you've got the motivation of the officers to want to get [Avery]," followed by his statements that officers were

"going to make sure he's convicted" and "they helped it along by planting his blood in the RAV4 and planting that key in his bedroom." *Id.* (Lenk and Colborn are the only two officers expressly identified by MAM as suspects in the "conspiracy.") *Id.*

● An Avery defense investigator's out-of-court assertion that the key to Ms. Halbach's car was scrubbed and Avery's DNA was planted on it. *Id.,* p. 38.

● Attorney Buting's out-of-court assertion that the Manitowoc County Sheriff's allegedly obvious dislike for Avery had permeated all of the lieutenants and sergeants below him, with background graphics showing a hierarchy of the Sheriff's Office and emphasizing Plaintiff's and James Lenk's photographs in color so they stood out from the others. *Id.*, p. 39.

● Buting's out-of-court statement that "someone" knew that Teresa Halbach's vehicle was on Avery's property before the search party found it there, followed immediately by audio of Avery telling an interrogating officer that he had been told that a "cop put it out there and planted evidence." From this conversation, MAM cuts directly to Plaintiff about to testify. The next segment includes the courtroom examination of Plaintiff by Strang that was altered as to Plaintiff's answer concerning the 1999 Toyota, as described *supra* pp. 4-5. *Id.* at pp. 39-40.

● Buting's out-of-court statement that two people with the motive to frame Avery could easily have pulled off the conspiracy, and that they would have no fear of getting caught, because "who better than a police officer would know how to frame somebody?" The camera then cuts to footage of Lenk waiting to testify. Again, Lenk and Plaintiff are the only two officers consistently implicated by MAM as participants in the alleged conspiracy. *Id.,* p. 40.

● Avery's father asserting that the police "set [Avery] up. Right from the beginning." *Id.*

● Footage of Buting and Strang agreeing in an apparent brainstorming session that Plaintiff's and Lenk's description of how the key was found did not actually happen and asserting that if an unspecified one of them was capable of planting the key, then it would be "easy" for him to plant blood. *Id.*, p. 41.

● A dramatic re-enactment of Buting supposedly confirming that a police officer must have allegedly sampled blood from Avery's test vial to plant in the car due to a hole in the stopper that Buting discovers in the vial as stored. MAM does not disclose that even the defense abandoned that theory that evidence was planted when they learned the state would be calling the phlebotomist who put the hole there when drawing a sample of Avery's blood in an appeal of his 1985 wrongful conviction. *Id.*, p. 15-16.

● Avery asserting that he is in "the same situation" as before – "Just a couple of 'em wanting to nail me. And the other ones didn't. But nobody speaks up." Again, Lenk and Colborn are the only officers consistently implicated by MAM as the alleged Sheriff's Deputies who supposedly planted evidence. After Avery finishes speaking, the camera immediately cuts to footage of Plaintiff waiting to testify. *Id.,* p. 41.

● Footage from a press conference in which Buting says that there is evidence of a conspiracy in which Plaintiff was allegedly involved that would meet a federal prosecutor's

burden of proof. *Id.*, p. 42. This is followed by audio of a telephone conversation between Avery and his mother in which she refers to "suspicious" activity and says "Them people ain't gonna get away with everything." *Id.*

● Buting's out-of-court assertion that the case against Avery shows that the government is trying to bring its "full force" on Avery, and the reason is that the defense has accused, "and the evidence suspiciously points to – framing by one of them." He adds, "it's not like they think they're framing an innocent man. But they are." *Id.*

## Defendants' Participation, Knowledge, Information, and State of Mind

The Amended Complaint expressly alleges as a factual matter that all of the Defendants, including Netflix, "jointly and severally created, produced, distributed, published and broadcast MAM with actual malice." Dkt 1-2, p. 20, ¶48. In addition, the Amended Complaint specifically alleges that, among other things:

● Netflix released MAM for worldwide distribution, marketed it for worldwide distribution, and continues to make it available today. Dkt 1-2, p. 7, ¶15.

● Netflix markets MAM as a nonfiction documentary without any disclaimer, and it has won prestigious industry awards based on the premise that it is a documentary. *Id.*, pp. 7-8, ¶16.

● Material and significant facts known to the Defendants were omitted and distorted;, Defendants led viewers to the conclusion that Plaintiff planted evidence to frame Avery with actual malice. *Id.*, p. 8, ¶18.

● The other Defendants (Netflix and Chrome Media) acted jointly with Defendants Ricciardi and Demos to give the impression that Plaintiff covered up a phone call years before Avery's exoneration for a rape, providing a false motive for Plaintiff's alleged framing of Avery for murder. *Id.*, p. 9, ¶21.

● No reasonable person could have concluded that Plaintiff's taking a phone call years earlier was nefarious or that his statement was hidden in a safe as part of a cover-up, but nonetheless, Defendants included those assertions in MAM. *Id.*, p. 11, ¶27.

● The other Defendants (Netflix and Chrome Media) worked in concert with Ricciardi and Demos to heavily edit the trial testimony to manipulate viewers to make it appear that Plaintiff planted Halbach's car at the Avery salvage yard, based on speculation from a call placed by Plaintiff to dispatch to confirm information about the vehicle and falsely make it appear that he must have been looking at the vehicle at the time. *Id.*, pp. 12-13, ¶32.

● Ricciardi and Demos filmed the whole trial, but the Defendants maliciously edited and spliced the testimony to omit portions that were inconsistent with their theories. *Id.*, p. 14,

¶36.

- Defendants jointly spliced and edited testimony to lead viewers to the conclusion that Plaintiff and James Lenk conspired to plant the key to Teresa Halbach's vehicle in Avery's bedroom. *Id.,* p. 16, ¶39.

- Defendants changed another officer's testimony to enhance their assertion that Plaintiff and Lenk planted the key. *Id.,* p. 20, ¶48.

- Defendants jointly and severally omitted numerous specifically-described facts in an attempt to support their conspiracy theory. *Id.,* pp. 18-20, ¶¶44-45.

- Defendants presented defense counsel's statements, often out of court, as the last, unrefuted word, when they were far-fetched hypotheses and theories that lacked factual basis. *Id.,* p. 20, ¶46.

- Defendants made specifically-described alterations to the facts in creating MAM. *Id.,* pp. 20-21, ¶49.

- Defendants selectively edited and spliced testimony and excluded facts that did not support their theories. *Id.,* p. 21, ¶49(d).

- Defendants knew or had reason to know that the statements were false. *Id.,* p. 22, ¶50.

- Netflix distributed these falsehoods worldwide. *Id.,* ¶52.

**Motion to Dismiss**

Netflix has moved to dismiss the claims against it, arguing that the Amended Complaint fails to allege facts from which it can be inferred that Netflix acted with actual malice, though Netflix cannot deny that it published the statements. Plaintiff respectfully submits this brief in opposition to Netflix's motion to dismiss.

**STANDARD ON MOTION TO DISMISS**

Under federal pleading standards, a complaint need only contain factual allegations sufficient to raise a right to relief above the speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 556-570 (2007). The complaint "need only `give the defendant fair notice of what the claim is and the grounds upon which it rests." *Mark Line Indus., Inc. v. Murillo Modular Group, Ltd.*, 2011 WL 1458496 (N.D. Ind.), *3 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93

(2007) and *Twombly*).

A Court should not dismiss a complaint for failure to state a claim under Rule 12(b)(6) unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Townsel v. Jamerson,* 240 894, 898 (N.D. Ill. 2017). The Court must accept as true and liberally construe all of the factual allegations contained in the complaint, *Twombly, supra*, and draw all reasonable inferences in the Plaintiff's favor. *Carlson v. CSX Transportation, Inc.,* 758 F.3d 819, 826 (7th Cir. 2014).

## ARGUMENT

Netflix argues that it must be dismissed because the Amended Complaint fails to sufficiently allege actual malice against it. Netflix contends that it is entitled to a constitutional privilege under the First Amendment to the United States Constitution, and therefore, Plaintiff must show "actual malice" to prevail on defamation claims against it. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80 (1964). "Actual malice" means publication with either 1) actual knowledge of falsity; or 2) reckless disregard for whether a statement was true or false. *Id.*

### I.     The "Actual Malice" Requirement Should Be Reconsidered.

In a recent concurrence to a denial of a petition for *certiorari*, United States Supreme Court Justice Clarence Thomas opined that it is time for the Court to reconsider its jurisprudence under *New York Times v. Sullivan* in an appropriate case. As explained below, this is an appropriate case. Therefore, while this argument is directed to the United States Supreme Court, it is stated briefly here in order to preserve the opportunity to seek review.

The central point of Justice Thomas' argument is that there was no First or Fourteenth Amendment basis for the "actual malice" rule adopted in *New York Times v. Sullivan, supra*, and that it was instead merely a *policy* that the Court instituted in response to the facts presented in the case. *McKee v. Cosby,* --- U.S. ---, 139 S.Ct. 675, 676 (2019) (Thomas, J., concurring).

The *New York Times* case came before the Court by way of a defamation complaint filed by a southern police official who claimed that his reputation had been injured by a political advertisement that decried alleged violations of civil rights. Some of the facts stated in the advertisement were conceded to have been false, and the New York Times admitted that it had not investigated any of the facts nor even consulted its own articles about the events described, but instead relied on the reputations of individuals whose names were listed in the advertisement as supporting its content. 376 U.S. 257-61.

After surveying writings by James Madison that attacked the Sedition Act of 1798, which criminalized criticism of government, the Supreme Court declared in *New York Times* that Madison's writings supported the proposition that state libel laws prohibiting false defamation of government officials violate the First Amendment. 376 U.S. 273-77. But as Justice Thomas pointed out in *McKee,* that conclusion represented a leap of logic:

> . . . constitutional opposition to the Sedition Act—a federal law directly criminalizing criticism of the Government—does not necessarily support a constitutional actual-malice rule in all civil libel actions brought by public figures.

139 S.Ct. at 682. Moreover, as Justice Thomas further explained, Madison's writings both supported the view that public officials wronged by false statements should have redress under the law and opposed the concept of federally-dictated libel laws. *Id.* Yet, the Supreme Court has recognized that *New York Times v. Sullivan* has resulted in the federalization of libel law. *Id.* at 676 (citing and quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 370 (1974)).

In adopting the policy that it embraced in *New York Times v. Sullivan*, the Supreme Court purported to seek a balance between the "breathing space" that the Court contended must be afforded statements critical of public officials and the notion that the press should not be afforded wholesale license to inflict reputational harm at whim. 376 U.S. at 271-72 (internal

quotation and citation omitted). This case illustrates precisely the abuses that have proliferated as a result of the balance that the Court attempted to strike. Netflix asserts in this case that it may freely distribute defamatory statements that accuse a small-town police officer of participating in a criminal conspiracy in the course of his work, exposing him to worldwide opprobrium, without the slightest responsibility or accountability for the truth of those statements, hiding under the shield of the First Amendment, but all the while reaping riches that it derived from destroying Plaintiff's reputation.

Netflix argues that it has the judicially-sanctioned right to deprive Plaintiff of his good reputation and to transform it into a commodity that it can distort for its own profit. It is unlikely that the Supreme Court imagined that its ruling in *New York Times v. Sullivan* would be used in such a way. Plaintiff respectfully requests that the United States Supreme Court reconsider the actual malice standard to the extent that it is asserted to protect this conduct.

## II. Malice, Including Actual Malice, May Be Alleged Generally and Is Not Appropriately Determined at the Pleadings Stage or Before Discovery.

Even under current federal defamation jurisprudence, Netflix's motion should be denied as procedurally inappropriate in at least two respects. First, the rules of civil procedure specifically provide that knowledge, intent, malice, and state of mind may be alleged generally. Fed. R. Civ. Pro. 9(b). Accordingly, so long as actual malice is expressly alleged, it is not typically appropriate to decide the issue against the plaintiff at the pleadings stage, and therefore, courts have permitted defamation claims to proceed based on actual malice alleged generally. *See e.g., World Wrestling Federation Entertainment, Inc. v. Bozell,* 142 F.Supp.2d 514, 527-28 (S.D.N.Y. 2001) (refusing to grant motion to dismiss where plaintiff alleged that defendants knew or should have known that their statements were false and uttered with malice); *see also Hoyne v. The Innocence Project,* 2011 WL 198128 (S.D. Miss.), *5.

Second, to dismiss Plaintiff's action as insufficiently alleging actual malice before he has access to discovery regarding the state of mind of media defendants would directly contradict United States Supreme Court precedent that governs defamation cases. In *Herbert v. Lando*, 441 U.S. 153 (1979), the United States Supreme Court rejected a media defendant's argument that the editorial process should be privileged and therefore beyond the scope of discovery. The Supreme Court stated that, "Inevitably, unless liability is to be completely foreclosed, the thoughts and editorial processes of the alleged defamer would be open to examination." *Id.* at 160. The Court added that it would be "untenable to conclude from our cases that, although proof of the necessary state of mind could be in the form of objective circumstances from which the ultimate fact could be inferred, plaintiffs may not inquire directly from the defendants whether they knew or had reason to suspect that their damaging publication was in error." *Id.*

To so foreclose access to information about the state of mind of defendants in a defamation action would, the Supreme Court explained, improperly contract the rights of defamation plaintiffs as outlined in the Court's prior decisions and "substantially enhance the burden of proving actual malice, contrary to the expectations of *New York Times, Butts*, and similar cases." *Id.* at 169.

> We are thus being asked to modify firmly established constitutional doctrine by placing beyond the plaintiff's reach a range of direct evidence relevant to proving knowing or reckless falsehood by the publisher of an alleged libel, elements that are critical to plaintiffs such as Herbert. The case for making this modification is by no means clear and convincing, and we decline to accept it.

*Id.* at 169-70. The Supreme Court further rejected the notion that media defendants can be immunized from inquiry into the internal communications occurring during the editorial process and thus place beyond reach what the defendant participants learned or knew as the result of conversations or exchanges. *Id.* at pp. 171-74.

Federal courts applying *Herbert v. Lando* have construed it as holding that a plaintiff in a

17

defamation suit is entitled to discovery on the issue of actual malice. *See, e.g., Price v. Viking Press, Inc.,* 625 F. Supp. 641, 649 (D. Minn. 1985) (citing *Herbert v. Lando* and denying motion to dismiss defamation action prior to discovery); *see also Hutchinson v. Proxmire*, 443 U.S. 111, 120, n. 9 (1979) (proof of actual malice "does not readily lend itself to summary disposition.")

In subsequent decisions, the United States Supreme Court and other federal courts have again held that actual malice is a factual analysis that cannot be determined on summary disposition without affording the plaintiff an opportunity or discovery, particularly where many of the details concerning what the defendant knew at the time of publication are likely to be in the possession of the defendant. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986) (plaintiff should be afforded "a full opportunity to conduct discovery" regarding actual malice); *Parsi v. Daioleslam,* 595 F.Supp.2d 99, 108 (D.D.C.2009) ("Discovery is needed, then, to determine what defendant knew at the time he made the contested statements."); *Susan B. Anthony List v. Driehaus*, 805 F.Supp.2d 423, 436 (S.D. Ohio 2011) ("Actual malice is a factual analysis that cannot be determined without discovery.")

Nothing in *Twombly* purported to overrule this line of authority, nor is any of this authority inconsistent with those cases. A Plaintiff must generally allege enough facts to raise "a reasonable expectation that discovery will reveal evidence of" actionable conduct. *Twombly,* 550 U.S. at 556. As is evident from the Supreme Court's analysis in *Herbert v. Lando*, participation in the editorial process of a defamatory publication is sufficient to raise an inference that discovery is appropriate, and it would severely limit the ability of plaintiffs to pursue defamation actions to deny access to that information. 441 U.S. at pp. 169-70.

Here, Plaintiff has alleged that Netflix, together with the other Defendants, created, produced, distributed, published and broadcast MAM with actual malice and that all of the

Defendants participated in the dubious edits that left supposed courtroom testimony a Frankenstein version of spliced, edited, and omitted material.  Dkt 1-2, Ex. B *see also* pp. 4-8, *supra*.  Further, as explained below, the language of the broadcasts alone demonstrates that statements from biased sources including Avery, his defense counsel and their investigator were included and published as truthful assertions that defamed Plaintiff by implicating him in a conspiracy.  The content itself therefore objectively demonstrates that Netflix published the statements with actual malice.

Netflix cannot close its eyes to the content of its own broadcast, titled as a documentary, publish false materials and  accusations without qualification of any kind, and then deny responsibility for its reckless publications.   The allegations in the Amended Complaint are therefore more than sufficient to meet basic pleadings standards and to entitle Plaintiffs to discovery to obtain additional information about the editorial process known only to Netflix.

### III.     Mr. Colborn Has Sufficiently Alleged Actual Malice By Netflix.

The Amended Complaint more than satisfies the "actual malice" standard.

#### A. The Amended Complaint Expressly Alleges That Netflix Participated in Creating, Producing, Distributing, Publishing and Broadcasting MAM with Knowledge of Its Falsity.

As explained above, the Amended Complaint expressly alleges as a factual matter that all of the Defendants, including Netflix, "jointly and severally created, produced, distributed, published and broadcast MAM with actual malice."   Dkt #1-2, ¶48.   Even apart from the evidence of actual malice that is apparent from the broadcast itself, this allegation standing alone plausibly describes Netflix's role.  Contrary to Netflix's assertions, there is nothing implausible or conclusory about the allegations that Netflix in fact participated in creating, producing, distributing, and publishing a series that it broadcasted on its network, nor is it implausible that those who created and produced the series with so many manipulative and damaging edits were

aware that they were doing so.  Allegations are not "conclusory" where they allege basic facts.

*See, e.g., Bosch v. LaMattina,* 901 F.Supp.2d 394, 404-05 (E.D.N.Y. 2012).

Netflix appears to confuse the *Twombly* pleadings standard with a requirement that all

facts be pleaded with the same degree of particularity as fraud complaints.   But as Judge

Easterbrook explained in *Doe v. Smith,* 429 F.3d 706, 708 (7ᵗʰ Cir. 2005):

> . . . .Plaintiffs need not plead facts; they need not plead law; they plead claims for relief. Usually they need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of. . . . Any district judge (for that matter, any defendant) tempted to write "this complaint is deficient because it does not contain..." should stop and think: What rule of law *requires* a complaint to contain that allegation? Rule 9(b) has a short list of things that plaintiffs must plead with particularity, but "interception" is not on that list.

*Id.*  Likewise, actual malice is not on the Rule 9(b) particularity list.

In addition, as explained above, the Amended Complaint alleges in numerous paragraphs

that Netflix participated in the manipulative editing process that defamed Plaintiff – all of which

would be expected given that this is a series that Netflix created, produced, distributed, and

published through its network.  Dkt #1-2, ¶48.

### B. The Amended Complaint Contains Facts That Plausibly Support The Allegations That All of the Defendants Acted With Actual Malice.

A plaintiff may prove actual malice using circumstantial evidence, and motive often

bears on the inquiry. *See, e.g., Harte–Hanks Comm'ns v. Connaughton,* 491 U.S. 657, 667

(1989). Circumstantial evidence can suffice to demonstrate actual malice and may "override

defendants' protestations of good faith and honest belief that the report was true." *Moore v.

Vislosky,* 240 Fed.Appx. 457, 468 (3rd Cir.2007) (quotation and citation omitted).

Most pertinent to the allegations in the Amended Complaint in this case, courts have held

that malice may be shown by the following:

- Purposeful avoidance of truth, *Harte-Hanks Comm'ns, Inc.,* 491 U.S. at 692;

● Deliberate omission of contrary facts, *see, e.g., Hoyne v. The Innocence Project,* 2011 WL 198128 at *5; and

● Fabrication and changes of meaning through alteration of quoted materials. *See, e.g., Hildebrant v. Meredith Corp*, 63 F.Supp.3d 732, 746 (E.D. Mich. 2014).

The Amended Complaint alleges that MAM was made with actual malice in each of the foregoing respects. First, the Amended Complaint expressly alleges that through the process of editing, manipulating, and splicing footage and testimony, MAM fabricated and altered testimony in a manner that can only be described as brazen for a work that described itself as a non-fiction documentary, purporting to show actual events. *See* discussion *supra* at pp. 4-9; *see also* Dkt #1-2, p. 19, ¶45, and Ex. B. As explained above, numerous paragraphs in the Amended Complaint and the Exhibits incorporated therein expressly allege that the defendants presented trial testimony as though it happened in the order as presented in MAM when, in fact, the testimony and footage shown was a collage that consisted of spliced sentences and words and reaction shots inserted and rearranged to make it more consistent with the editors' theories. *Id.*

In a series of opinions issued in a defamation case against Time Magazine, the Seventh Circuit Court of Appeals described its conclusion that heavy-handed editing and rewording of official reports may demonstrate reckless disregard as to truth or falsity:

> . . . . Time took the risk, when it reworded parts of the Commission Report, that it might go too far * * *.' We noted that Time had departed from fidelity to the Commission's Report in order to make the article more interesting and readable for Smithfield, its audience. Time's writers who prepared the article must have known the statements as to Pape's conduct were only allegations in a complaint in a civil suit. As we put it (318 F.2d at page 655)- 'It is our opinion that a jury could read the Time article as stating that the Report said Pape and his follow (sic) officers did what the Commission Report merely said the Monroe complaint alleged they did.'
>     We hold that a sufficient showing has been made so that a jury could find Time, Incorporated acted with reckless disregard as to whether or not the reworded statements, hereinbefore described, were true or false.

*Pape v. Time, Inc.,* 354 F.2d 559, 560-61 (7th Cir. 1965).

21

Other courts have likewise held that overly aggressive "editing" of broadcasts demonstrated evidence of actual malice. Where there were changed facts and false statements in a broadcast,[2] a significant failure to investigate or verify credibility, and a general makeup and presentation of a story, that, considered as a whole, exhibited hostility to the plaintiff, the Court held there was ample evidence of actual malice in *Kentucky Kingdom Amusement Park Co. v. Belo Kentucky Inc.,* 179 S.W.3d 785, 791 (Ky. 2005). *See also Mitchell v. Griffin Television LLC,* 60 P.3d 1058, 1063 (Okl. Ct. App. 2002) (difference between quoted material and what was broadcasted was sufficient evidence of actual malice); *Perez v. WEWS,* 1986 WL 12966, *7 (Ohio Ct. App.) (omissions that made a stronger case for criminal conduct demonstrated actual malice. A fabricated quotation may "carry more force than criticism by another," because it is "against self-interest to admit one's own criminal liability, arrogance, or lack of integrity, and so all the more easy to credit" when allegedly conceded in what appear to be the speaker's own words. *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 512 (1991). For those reasons, "quotations may be a devastating instrument for conveying false meaning." *Id.* at 517.

In *Perez,* similarly to this case, the Court considered a motion alleging an absence of actual malice as to a broadcast that was manipulated to enhance the appearance of a defamation plaintiff's alleged guilt. The Court observed that "the rehearsal and strengthened re-creation" of a

---

[2] When words in a purported direct quotation are fabricated or altered, a plaintiff's reputation may be injured *either* through the fact of the false statement *or* through the manner of the false expression. *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 516 (1991). Wisconsin law, which governs this diversity action to the extent it is not displaced by federal law, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938), holds that when a television broadcast is at issue, the Court considers the audio and video portions in relation to each other. *Mach v. Allison,* 2003 WI App 11, *¶31 (*citing Rodney Smolla, Law of Defamation § 4:32, pp. 4–50 to 4–51 (2d ed.)). The Court considers the "natural and reasonable import" of the words and images on the viewer and must consider the broadcast as a whole, "not in detached fragments." *Id.* (citations and quotations omitted). Moreover, communications are not made nondefamatory merely because they are phrased as opinions, suspicions or beliefs. *Converters Equip. Corp. v. Condes Corp.,* 80 Wis.2d 257, 263-64 (2012).

conversation that was isolated and taken out of context appeared, "with convincing clarity, to have been maliciously planned to cast large upon the television screen a shadow of the appearance of guilt caused solely by hiding from view the actual figure of innocence, and reasonable jurors could so conclude." *Id.* at *7. The Court refused to decide the matter on summary judgment, noting that the judicial task is not to decide what the actual truth is, but merely whether reasonable jurors, exercising their exclusive power to judge credibility, reasonably could find the evidence showed malice with convincing clarity. *Id.* at *8.

Actual malice may also be supported where, as here, innuendoes are added to quoted statements and quoted statements are presented out of context. *Goldwater v. Ginzburg*, 414 F.2d 324, 336-37 (2d Cir. 1969). In addition, "melding" and "distillation" of the contents of statements may result in "misplaced emphasis, or exaggeration, or distortion." *Id.* In *Ginzburg*, the author of an article incorporated materials written by others in an article while omitting portions that "might tend to qualify or contradict the part quoted." *Id*. The author also included "distillations" of source material without any indication; blended multiple sources' statements as if they were one statement; and changed and rewrote others' words. *Id.* The Court held that these facts supported the conclusion that the statements were made with actual malice – *i.e.*, with knowledge of falsity or with reckless disregard as to truth or falsity. *Id.*

These kinds of modifications are particularly indicative of actual malice when calculated to achieve a "predetermined result" in the message conveyed. *Goldwater,* 414 F.2d at 337. Likewise, a "pattern of biased and inaccurate reporting" and a failure "to adequately investigate" also support the conclusion that statements were made with actual malice. *DeRobutt v. Gannett Co., Inc.,* 83 F.R.D. 574, 583-84 (D. Hawaii 1979); *see* discussion *supra* pp. 22-23 (discussing factual distortions in MAM).

Second, as part of its extensive editing, MAM was carefully scripted to exclude evidence, information, testimony, and words that were inconsistent with its central premise, reinforced in each episode, that Plaintiff participated in a conspiracy to frame Steven Avery. *See* discussion *supra* at pp. 10-12; Dkt # 1-2, p. 18, ¶44. A showing of an intent to avoid the truth also meets the actual malice standard. *Stokes v. CBS, Inc.,* 25 F.Supp.2d 992, 1004 (D. Minn. 1998).

Third, the Amended Complaint and the attached and incorporated exhibits explain in detail how MAM repeated defense counsel's, Steven Avery's, his family's, and others' improbable conspiracy theories as truth. Steven Avery and his defense attorneys are the epitome of biased and therefore, unreliable sources. MAM elevated the attorneys' theories, presenting the defense attorneys as unbiased authorities. *See, e.g.,* Dkt #1-2, p. 16, ¶38. They also presented Avery's assertions as the truthful statements of a man who found himself the unwitting victim of a vast conspiracy.

In so doing, MAM presented numerous out-of-court statements by Avery and his defense attorneys that, without any basis other than Avery's and defense counsel's musing, accused Plaintiff and his colleagues of participating in a conspiracy to convict Avery. While this kind of strategy may be expected of the author of a novel, when Netflix took out-of-court accusations against Plaintiff and broadcast them to its entire viewing universe as a supposed non-fiction work and without any caution or disclaimer, Netflix adopted those statements as its own, with reckless disregard as to whether they were false.

Specifically, MAM includes, among other defamatory statements and images, the numerous accusations by third parties described *supra* at pp. 10-12. All of the statements described above were made by sources who were obviously heavily biased in favor of Avery. Repeating their allegations without any balance therefore severely slanted the broadcasts as a

whole and repeatedly reinforced the not-at-all subtle accusation, made more pointedly and emphatically by MAM through its presentation than by any individual whose statements it republished, that Plaintiff participated in a police conspiracy to frame Steven Avery.

It is a familiar tenet of the law of defamation that secondary publication of a defamatory statement may be expose a defendant to liability for defamation. *See, e.g., Hucko v. Joseph Schlitz Brewing Co.,* 100 Wis. 2d 372, 377 (Ct. App. 1981). Here, in addition to secondary publication, actual malice is established through the MAM's extreme use of others' accusations to promote its pre-conceived notion that Plaintiff participated in a conspiracy to frame Avery. By stringing together the statements, insinuations and innuendoes of heavily biased individuals, together with strategically-placed graphics, images and video of Plaintiff at times that identify him as the culprit for the misdeeds described by the speakers, and heavy-handed editing of testimony, the MAM narrative accused Plaintiff of participating in a conspiracy to frame Avery and planting evidence. As the threats and invective directed at Plaintiff demonstrate, viewers understood the Netflix broadcast as plainly making those accusations. Dkt #1-2, , p. 27, ¶70.

A federal court held that similar tactics met the standards for actual malice in *Stokes v. CBS, supra*, where the broadcaster defendants "largely adopt[ed]" a sheriff's deputy's "view of the case as their own" and took each source's emotional assertions at face value. 25 F.Supp.2d at 1003-04. The Court also noted compelling reasons to doubt the deputy's credibility, explaining that "When a media defendant repeats the allegations of a third party, `recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of the report.'" *Id.* (quoting *St. Amant v. Thompson,* 390 U.S. 727 (1968)).

The Court in *Stokes* further opined that the broadcasters "knew or should have known that the extremity of [the deputy's] assertions far outpaced his evidentiary foundation," adding:

[the] highly slanted perspective of each report would further support a finding of actual malice. *See Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 539 (7th Cir.1982) (a preconceived story line may evidence reckless disregard of truth); *Westmoreland v. CBS, Inc.,* 596 F.Supp. 1170 (S.D.N.Y.1984) (bias in the editing of a story); *Jenoff v. Hearst Corp.,* 453 F.Supp. 541, 549 (D.Md.1978), *aff'd,* 644 F.2d 1004 (4th Cir.1981) (hostile reporting). In fact, as the court has already discussed, the broadcasts' one-sidedness goes beyond merely favoring one party's version of events over another. Through the use of ambush tactics ***and distorting visual and editorial techniques, both reports actively contributed to the impression that [the Plaintiff] committed the crime.***

. . . .

Chief Justice Warren's admonition in *Curtis Publishing Co. v. Butts* seems especially apt in this case: "**Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers.**"

*Id.* at 1004-05 (emphasis added).   Certainly, in this case, a sophisticated broadcaster like Netflix should know better than to quote, without any contradiction, heavily biased sources and the accusations of unidentified bar patrons as implicating police officers in a conspiracy to frame a defendant.   If publishing this kind of content is not reckless, then it is difficult to know what is.

Moreover, this conduct by Netflix – even assuming, *arguendo,* that it did nothing more than distribute the MAM series – sets it apart from the facts of *New York Times v. Sullivan.*   In that case, the New York Times representatives who accepted the advertisement for publishing did so based on the strength of the good reputations of those who were cited in the advertisement as vouching for the truth of its statement.   376 U.S. at 287-88.   Therefore, the United States Supreme Court held that their decision to publish the advertisement was objectively reasonable, particularly as it did not appear to include any personal attacks.   *Id.*   Contrary to Netflix's argument, *New York Times* did not authorize even mere distributors (which Netflix is not) to publish obviously biased material as fact.

 In publishing MAM, Netflix relied on the assertions of a convicted murderer who claims to have been wrongly convicted, his family members, his defense attorneys, and random bar patrons.   MAM consists of an extended personal attack on Plaintiff and his colleague, James Lenk

that was not objectively reasonable.

IV.    **Additional Facts Support the Allegation of Actual Malice.**

Plaintiff's allegations are also supported by facts of which Netflix is well aware, and which are publicly known and available.   Prior to receiving Netflix's motion, Plaintiff did not anticipate that Netflix would deny its prominent role in MAM, but since it has, the proposed additional facts are now pertinent to this dispute.   These facts can be considered in response to a motion to dismiss.   A plaintiff opposing a motion to dismiss may submit additional facts consistent with the complaint.  *Geinosky v. City of Chicago,* 675 F.3d 743, 746 n.1 (7th Cir. 2012).  Further, Plaintiff moves to amend to add these facts as well as additional facts concerning defamatory statements in the Defendants' sequel to MAM, MAM2, which was published just a few months ago.  *See* Motion to Amend, Ex. 1 (proposed Second Amended Complaint, identifying proposed additions).   A complaint should not be dismissed when facts can be added by amendment to support the claims asserted.  *Bausch v. Stryker Corp.,* 630 F.3d 546, 562 (7th Cir.2010) (reversing dismissal with prejudice); *Foster v. DeLuca,* 545 F.3d 582, 584–85 (7th Cir.2008) (same); Fed.R.Civ.Pro.15.

Among other facts that Plaintiff proposes to add to the pleadings, Netflix's employees were producers of several episodes of MAM.   *See* Declaration of George Burnett, Ex. 1.  Two of these employees were named in Plaintiff's original complaint.  Dkt #1-1, ¶7.

Moreover, Netflix employees who were involved in MAM have made numerous statements to the press regarding their involvement, and Defendants Demos and Ricciardi have publicly discussed Netflix representatives' collaboration with them.    Burnett Decl, Ex. 2.  One of the producers of several MAM episodes, who is also the Netflix representative to whom Demos and Ricciardi apparently pitched the series, described her collaboration with Demos and

Ricciardi in aligning their vision for the broadcasts as a "mind meld." *Id.* at Ex. 3.

Netflix also received awards for writing and editing MAM, Burnett Decl., Ex. 4, further demonstrating that it is more than plausible that Netflix played a significant role in the editing processes that resulted in the highly defamatory broadcasts. Netflix did not decline the awards, to Plaintiff's knowledge. In addition, Netflix's participation in creating and producing the series is buttressed by the fact that Demos and Ricciardi have said they only had three episodes in "rough cut" when they pitched it to Netflix. Burnett Decl., Ex. 5. The series as produced and distributed contains 10 episodes, and they are not in "rough cut" status.

More generally, Netflix maintains an entire job site on which it advertises for employees whose tasks are to assist in content development for shows that debut on its service. Burnett Decl., Ex. 6. Among other positions, Netflix maintains a position that includes legal review of content to be broadcast on its service. *Id.* at 7. There is no reason to assume that a potentially controversial show like MAM escaped this review.

Ultimately, it is common sense that two admittedly novice filmmakers would not be able to produce such a slick, scripted work without the aid of Netflix's sophisticated writers, editors and producers. *See* Burnett Decl., Exs. 8 (Netflix blog post with flow chart describing processes for production and post-production of Netflix series, including documentaries). Applying the plausibility standard under *Twombly*, it is not plausible that Netflix was *not* involved in the writing and editing that made a case against Plaintiff that, although built on pure conjecture, was so persuasive to some viewers that it incited outrage against Plaintiff.

A publication is responsible under traditional principles of vicarious liability for the actual malice of its editorial employees. *Cantrell v. Forest City Pub. Co.,* 419 U.S. 245, 253-54, (1974). Therefore, Netflix's on-staff representatives' described involvement in MAM provide

plausible grounds for asserting that Netflix bears joint responsibility for the actual malice toward

Plaintiff that pervades MAM. It was the storyline that Plaintiff and James Lenk participated in

an alleged conspiracy to frame Avery that attracted Netflix to the fledgling "documentary."

Netflix should not now be heard to feign ignorance of the premise that piqued its interest.

## V. Plaintiff States A Claim for Intentional Infliction of Emotional Distress.

For the same reasons explained at length above, Plaintiff's claim for intentional infliction

of emotional distress is supported by the facts alleged in the Amended Complaint. Netflix

published content that is so heavily biased and slanted against Plaintiff that it is difficult to

imagine a more obvious case in which a media defendant either deliberately or recklessly

defamed an individual without regard for the truth. Plaintiff's claim for intentional infliction of

emotional distress incorporates all of the prior factual allegations in the Amended Complaint and

also expressly alleges Defendants' knowledge and state of mind. Dkt #1-2, p. 27, ¶69

(Defendants should have known that statements were extreme and outrageous).

## VI. The Amended Complaint Sufficiently Alleges Negligence by Netflix.

Finally, in the event that the United States Supreme Court agrees that the actual malice

standard should be reconsidered and abolished or that it should not apply in this case, Plaintiff's

alternative claim sounding in negligence must be permitted to proceed. Contrary to Netflix's

argument, the claim is sufficiently alleged. As explained at length above, the Amended

Complaint alleges facts that support the assertion in the negligence count that Netflix failed to

exercise reasonable care in making and publishing the statements that implicated Plaintiff in the

alleged conspiracy to frame Avery. Dkt #1-2, pp. 25-26, ¶¶59-66. Among other facts, the

publication of the statements by unidentified bar patrons allegedly supporting the conspiracy

more than suffices to demonstrate the absence of reasonable care.

## CONCLUSION

For the reasons set forth above, Plaintiff Andrew Colborn respectfully requests that the

Court deny the motion to dismiss submitted by Netflix, Inc.

Dated this 13th day of June, 2019.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff, Andrew L. Colborn


By: /s/ George Burnett
George Burnett

**POST OFFICE ADDRESS:**
231 S. Adams Street
Green Bay, WI 54301
P.O. Box 23200
Green Bay, WI 54305-3200
Phone: (920) 437-0476
Fax: (920) 437-2868
State Br No. 1005964

**Co-Counsel:**

Attorney Michael C. Griesbach              Attorney April Rockstead Barker
Griesbach Law Offices                      Schott, Bublitz & Engel, s.c.
State Bar No. 01012799                     640 W. Moreland Blvd.
Griesbach Law Offices, LLC                 Waukesha, WI 53188
PO Box 2047                                (262) 827-1700
Manitowoc, WI 54221-2047                   (262)827-1701 (fax)
(920) 320-1358

#3131702