IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

ANDREW L. COLBORN,

NETFLIX, INC.,                                              Case No. 19-CV-484
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

                    Defendants.

## SECOND AMENDED COMPLAINT

Plaintiff, Andrew L Colborn, by and through his attorneys, the Law Firm of Conway, Olejniczak & Jerry, S.C., Griesbach Law Offices, LLC, and Schott, Bublitz and Engel, S.C., as and for his Amended Complaint against the above-named Defendants, alleges and shows the Court as follows:

### Parties

1.    Plaintiff, Andrew L. Colborn, is an adult residing in Manitowoc County, Wisconsin.

2.    Netflix, Inc. is a foreign corporation authorized to do business in the state of Wisconsin with a principal place of business located at 100 Winchester Circle, Los Gatos, California 95032.

3.    Chrome Media, LLC is a foreign corporation domiciled in New York with a principal place of business located at 15821 Ventura Boulevard, Suite 500, Encino, California 91436.

4.    Chrome Media, LLC is an independent film production company founded by Defendants Laura Ricciardi and Moira Demos in 2006.

5.    Chrome Media, LLC was formerly known as Synthesis Films, LLC.

EXHIBIT
2
tabbies

6. Laura Ricciardi is an adult residing in California.

7. Moira Demos is an adult residing in California.

8. Defendants Laura Ricciardi and Moira Demos have ownership interest in Chrome Media, LLC, formerly known as Synthesis Films, LLC. They also are executive producers of "Making a Murderer 1" and "Making a Murderer 2" and filmed said production while attending the trial of Steven Avery in Manitowoc County.

### Statement of the Facts

9. Plaintiff Andrew L. Colborn was employed as a corrections officer with the Manitowoc County Sheriff's Department from 1992 through 1996.

10. In his capacity as a corrections officer, he was a non-sworn, non-law enforcement officer and had responsibility for security of the jail.

11. Beginning in 1996, Plaintiff Andrew L. Colborn became a sworn law enforcement officer employed with the Manitowoc County Sheriff's Department.

12. For the years 2005 through 2007 and at all times material hereto between 2005 and 2007, Plaintiff Andrew L. Colborn was a patrol Sergeant with the Manitowoc County Sheriff's Department (hereinafter "MTSO"). Plaintiff Andrew L. Colborn was also a trained evidence technician.

13. On October 31, 2005, 25-year-old freelance photographer, Teresa Halbach, was brutally murdered at the Avery Salvage Yard in rural Manitowoc County, Wisconsin. Overwhelming physical and circumstantial evidence proves that Steven Avery and his 16-year-old nephew, Brendan Dassey, were the perpetrators of the crime. Neither Plaintiff nor any other law enforcement officer planted evidence or in any other way attempted to frame Avery or Dassey

- 2 -

for Halbach's murder. Separate juries returned guilty verdicts against each of them in 2007 and their convictions remain unreversed after numerous appeals.

14. In 1985, two decades before murdering Halbach, Avery was wrongfully convicted of physically and sexually assaulting a woman on a remote stretch of Lake Michigan's shoreline in Manitowoc County. Avery served 18 years of a 32-year prison sentence before DNA testing revealed that another man was the assailant. Under new leadership, the Manitowoc County District Attorney's office promptly stipulated to Avery's release.

15. On December 18, 2015, Defendant Netflix released for worldwide distribution a ten-part documentary series entitled, "Making a Murderer" (hereinafter, MAM). The series purports to objectively and accurately recount Avery and Dassey's arrest and conviction for Halbach's murder. Within 35 days of its release, 19.3 million viewers had watched MAM worldwide. In a January 16, 2016 article, *Forbes* magazine columnist Paul Tassi described the program as "Netflix's most significant show ever." MAM has remained in the national and international spotlight since its debut with renewed interest upon the recent release of "Making a Murderer Part 2." The original series and its sequel continue to be marketed worldwide and remain available on Netflix for subscribers today.

16. MAM was and continues to be marketed as a non-fiction documentary. No disclaimer appears in any of the ten episodes notifying viewers that the series is anything but an actual and accurate portrayal of events. In news and entertainment media interviews since the program's release, Defendants Ricciardi and Demos have repeatedly avowed that they were unbiased and objective in their re-telling of events, holding the film out as a non-fiction piece. MAM won four Emmy Awards, including "outstanding directing for nonfiction programming" and "outstanding writing for nonfiction programming." It also won the 2017 Cinema Eye Honors

- 3 -

Award for "outstanding achievement in nonfiction films made for television." Netflix also accepted other awards for writing and editing MAM.

https://www.imdb.com/title/tt5189670/awards And its employees were congratulated by members of the media for their role in defining a new television genre.

https://www.huffpost.com/entry/netflix-is-making-a-murde_b_9074076?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuaHVmZnBvc3QuY29tL3RvcGljL3RlZC1zYXJhbmRvcw&guce_referrer_sig=AQAAAD5CTXLbOxR8N20qHHxSMWzJbNr75b6l5rqx7WKo36ogoezTCQNf9C0_HYHOsgHtrMcVotNgLsJfha8H4YctyCnbpzi4mOEPzw_cJ5d7JVubua8vimd5p3uZ4DMhQ_i6gj2pj9kHRHh3cMm8t_MXR5vPbue4G9r3NF-cNqUvjTH

17. Netflix employees were producers of several episodes of MAM. Netflix employees who were involved in MAM have made numerous statements to the press regarding their involvement. Further, Defendants Demos and Ricciardi have publicly discussed Netflix representatives' collaboration with them. *See, e.g,* https://www.nytimes.com/2018/10/17/arts/television/making-a-murderer-behind-the-scenes.html One of the producers of several MAM episodes, who is also the Netflix representative to whom Demos and Ricciardi apparently pitched the series, described her collaboration with Demos and Ricciardi in aligning their vision for the broadcasts as a "mind meld." https://www.vanityfair.com/hollywood/2018/06/lisa-nishamura-netflix-documentary-wild-wild-country

18. Upon information and belief, Demos and Ricciardi only had three episodes in "rough cut" when they pitched MAM to Netflix. https://www.businessinsider.com/making-a-murderer-filming-process-netflix-2016-1. The series as produced and distributed contains 10 episodes that

- 4 -

were far from rough in their production. Netflix's processes in developing and vetting shows, including documentaries, from production through post-production involves a high degree of involvement from numerous sections of the Netflix workforce. https://medium.com/netflix-techblog/studio-production-data-science-646ee2cc21a1 (flow chart diagramming processes). Netflix maintains an entire job site on which it advertises for employees whose tasks are to assist in content development for shows that debut on its service. https://jobs.netflix.com/ Among other positions, Netflix maintains a position that includes legal review of content to be broadcast on its service. https://jobs.netflix.com/jobs/868145 Upon information and belief, the final MAM product was shaped with the involvement of Netflix content and creative personnel, including, but not limited to, its Chief Content Officer and its head of documentary programming, and it was subject to legal review by Netflix employees prior to its release.

19. At no time during plaintiff's employment at MTSO did he serve as a spokesperson for the department. ~~Declining dozens of media requests for interviews, plaintiff has refrained from public comment and has in no other way injected himself into the controversy surrounding the Avery case and the release of MAM.~~ As such, he is neither a "public figure" nor a "limited purpose public figure," as those terms are defined in defamation law.

20. Pertinent and significant aspects of MAM are not true as represented and are, instead, false and defamatory toward Plaintiff and others. Material and significant facts known to the Defendants were omitted and distorted. Despite overwhelming evidence proving Avery and Dassey's guilt and the utter absence of evidence supporting Defendant's accusations of police misconduct, Defendants falsely led viewers to the inescapable conclusion that Plaintiff and others planted evidence to frame Avery for Halbach's murder. Defendants omitted, distorted, and falsified material and significant facts in an effort to portray Plaintiff as a corrupt police

- 5 -

officer who planted evidence to frame an innocent man. Defendants did so with actual malice and in order to make the film more profitable and more successful in the eyes of their peers, sacrificing and defaming the Plaintiff's character and reputation in the process.

21. Attached as Exhibit A, incorporated herein by reference, are excerpts from Making a Murderer Episodes 1 – 10 which depict numerous inaccuracies in facts and therefore defame plaintiff. These are in addition to defamatory statements that are further described below.

22. Attached as Exhibit B, and incorporated herein by reference, is a transcription of excerpts of Plaintiff's trial testimony that were included in MAM Episodes 5 and 7 but that were significantly altered, as indicated on the exhibit, so as to present a false impression of Plaintiff's testimony and to falsely put words in his mouth and omit others.

### 1994 or 1995 Telephone Call and Subsequent Alleged Cover-Up

23. Defendants Ricciardi and Demos, acting jointly and in concert with the other Defendants, led viewers to falsely conclude that Plaintiff learned of Avery's 1985 wrongful conviction approximately eight years before he was released, but covered it up. By doing so, Defendants created a false motive for Plaintiff to plant evidence, making their central but false claim that Plaintiff and other police officers framed Avery more believable.

24. In 1994 or 1995, while working as a corrections officer at the Manitowoc County Jail during normal business hours, Plaintiff answered a telephone call from a detective in another jurisdiction. The detective asked to speak with a Manitowoc County detective about an assault that occurred many years earlier in Manitowoc County. A jail inmate supposedly had told a fellow inmate that he was responsible for an assault for which another man was convicted. Plaintiff does not believe the caller mentioned the name of the man convicted or the name of the

- 6 -

victim in the Manitowoc County assault. If he did, Plaintiff was wholly unfamiliar with the names.

25. Plaintiff had no reason to and did not know about Avery's 1985 sexual assault conviction when he received the phone call from the detective. He was not employed by MTSO until 1992, when he was hired as a corrections officer at the Manitowoc County Jail, which was and remains a separate division within MTSO. As a corrections officer, Plaintiff was not a sworn law enforcement officer and had no authority to conduct investigations, much less dated criminal activity for which a conviction had already been obtained. Doing so would have been a violation of department policy. Accordingly, Plaintiff transferred the call to the Investigations Unit after giving the caller the number in case the call went unanswered or was lost in the transfer. Plaintiff subsequently heard that higher-ups at MTSO had given assurances that the right man had been convicted. Plaintiff had no reason to think otherwise until Avery was exonerated by DNA testing in 2003. Given all of the above circumstances, there was no reason for Plaintiff to prepare a written report about the call at the time.

26. Plaintiff first learned of Avery's wrongful conviction in September of 2003 when Avery was exonerated by DNA testing. At that time Plaintiff recalled the 1994 or 1995 telephone call and surmised it may have been related to the Avery case. At the direction of Sheriff Ken Petersen, Plaintiff prepared a written statement memorializing the call as part of Petersen's effort to provide a complete, accurate, and transparent account of the circumstances surrounding Avery's wrongful conviction for consideration by the Wisconsin Attorney General in her independent review. Plaintiff's written statement was promptly delivered to the Attorney General along with all other documents pertaining to her review.

27. Defendants Ricciardi and Demos strategically spliced and omitted portions of Plaintiff's trial testimony as set forth in Exhibit A and B, incorporated by reference herein, to distort the facts and nature of the 1994 or 1995 telephone call. These omissions and distortions led viewers to falsely conclude that Plaintiff bears responsibility for seven or eight of Avery's 18 years of wrongful imprisonment, providing him with a motive to frame Avery for Halbach's murder.

28. For the same purposes, Defendants Ricciardi and Demos included in the second episode of MAM an interview of Steven Glynn, one of Avery's attorneys in his wrongful conviction lawsuit. Glynn expresses dismay that Plaintiff did not prepare a report concerning the call he received in 1994 or 1995 until Avery was exonerated in 2003. Glynn then mistakenly tells viewers that Plaintiff's written statement was kept hidden in a Sheriff's department safe in 2003 as part of Plaintiff and MTSO's effort to cover up their knowledge of Avery's wrongful conviction, when in fact the statement had been delivered to the attorney general promptly after it was prepared.

29. Upon information and belief, Defendants knew Plaintiff's written report concerning the phone call was not left in the Sheriff's safe but chose to include Glynn's mistaken belief in order to further their false narrative. Defendants included extensive excerpts of videotaped depositions in Avery's wrongful conviction lawsuit in MAM and, upon information and belief, reviewed the depositions from the lawsuit in their entirety to determine which portions to include. The depositions included extensive questioning of Plaintiff, Sheriff Petersen, and others concerning the 1994 or 1995 telephone call and Plaintiff's documentation of same in 2003. No reasonable person could have concluded from a review of the depositions and the trial testimony that there was anything nefarious about Plaintiff's response to the call or his documentation of same after Avery was exonerated. Nor could any reasonable person have concluded that Plaintiff's report

- 8 -

was left hidden in a safe as part of a cover-up for MTSO wrongdoing. Yet Defendants distorted the facts to provide viewers a false motive for Plaintiff to plant evidence and frame Avery for Halbach's murder.

### Plaintiff's Call to Dispatch

30. On November 3, 2005, Teresa Halbach's mother reported to the Calumet County Sheriff's Department that her daughter was missing. Police in Calumet County believed that Teresa's last known whereabouts were either at the George Zipperer residence or the Avery Salvage Yard, both located in Manitowoc County. Halbach had been assigned by her employer, Auto Trader Magazine, to take photos of vehicles that were for sale at each location on October 31, 2005, the last day she had been seen. Calumet County officers requested assistance from MTSO since Halbach's last known whereabouts were in Manitowoc County.

31. On November 3, 2005, Plaintiff Andrew Colborn was working a regular shift as a patrol sergeant with the Manitowoc County Sheriff's Department when he received a call from Calumet County requesting assistance with a missing person. That evening, Plaintiff was asked to check out two potential residences where Halbach reportedly had been, "the Avery Salvage Yard and the Zipperer residence."

32. On November 3, 2005, Plaintiff called dispatch to confirm the make and model and license plate number of the missing person's vehicle as he had done in hundreds of other cases during his career. Neither Plaintiff nor any other police officer had contact with Halbach's vehicle on November 3rd, or any other time prior to November 5th when it was discovered at the Avery Salvage Yard by a volunteer search party.

33. A central part of Avery's defense at trial was that Plaintiff and other Manitowoc officers planted Halbach's SUV at the Avery Salvage Yard where Avery resided in a house trailer. With

Plaintiff on the stand, Avery's attorneys played portions of his call to dispatch in an effort to convince jurors that he came upon the SUV at an undisclosed location on November 3rd, two days before it was found at the salvage yard. Cross examining Plaintiff about the contents of the call, Avery's attorneys suggested that Plaintiff was looking directly at Halbach's vehicle when he called dispatch. The claim is entirely baseless and false, and Defendants knew of its falsity.

34. A side by side comparison of the trial transcript with the scene as depicted in episode 5 of MAM reveals that Defendants Ricciardi and Demo, in concert with other named Defendants, heavily edited portions of Plaintiff's testimony in order to manipulate viewers to falsely conclude that he and other officers planted Halbach's SUV at the salvage yard. Among other distortions, Defendants removed Plaintiff's affirmative answer to one question and inserted it as his answer to a separate question. At the actual trial, the second question remained unanswered after the Court sustained an objection by the state. MAM's rendition of the testimony is as follows:

Avery's Attorney: "Well, you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota?"

Plaintiff: "Yes."

In the actual trial, the Court sustained the state's objection, and defense counsel rephrased it as follows:

Avery's Attorney: "This call sounded like hundreds of other license plate or registration checks you have done through dispatch before?"

Plaintiff answered in the affirmative, "Yes."
Trial Transcript, Day 7, p 186-187

Defendants omitted the Plaintiff's affirmative answer to the second question and inserted it into his non-answer to the first. Their manipulation of this crucial line of testimony falsely conveyed to viewers that Plaintiff located Halbach's SUV somewhere other than at the salvage yard days earlier and likely assisted other law enforcement officers plant it there at a later time. The

- 10 -

impression is false and gave to viewers the exact opposite impression of what Plaintiff was asked and how he responded at trial.

35. Defendants Ricciardi and Demos in concert with other named Defendants omitted additional trial testimony from Plaintiff about the routine nature of his call to dispatch. When asked by the prosecutor on redirect examination: "Mr. Strang (defense counsel) asked whether or not it was common for you to check up on other agencies, or perhaps I'm—I'm mis-phrasing that, but when you are assisting another agency, do you commonly verify information that's provided by another agency?" Plaintiff answered: "All the time. I'm just trying to get – you know, a lot of times when you are driving a car, you can't stop and take notes, so I'm trying to get things in my head. And by calling the dispatch center and running that plate again, it got it in my head who that vehicle belonged to and what type of vehicle that plate is associated with." (Trial Transcript, Day 7, p 213). MAM failed to include this exchange.

36. Defendants Ricciardi and Demos omitted from Plaintiff's call to dispatch his words, "see if it comes back to [inaudible]." The phrase was included in the actual recording of the call as well as the recording played at trial. (Trial Trans, Day 7, p 181). Upon information and belief, Defendants omitted the phrase because it supports a reasonable interpretation of the reason for Plaintiff's call that contradicts the impressions the defendants intended to make.

37. Defendants Ricciardi and Demos strategically spliced "reaction" shots of plaintiff appearing nervous and apprehensive at trial into other portions of his testimony where he did not appear nervous or apprehensive in fact. The edits were part of defendants' overall attempt to manipulate viewers to falsely conclude that plaintiff and other Manitowoc County officers planted Halbach's SUV at the salvage yard. MAM, Episode 5. In addition, Defendants also included in MAM Episode 5 an out-of-court interview with Avery defense attorney Jerome

Buting in which he states, "If they would be willing to go to that length of planting the key, which I think the jury's going to get . . . ." By including this in the broadcast, Defendants presented it as a foregone conclusion that the police, allegedly including Plaintiff, planted the key at Avery's residence.

38. Upon information and belief, Defendants Ricciardi and Demos filmed the entire trial and were aware of the full line of questioning concerning Plaintiff's call to dispatch, as well as its significance. With malicious intent, Defendants chose to fabricate Plaintiff's testimony by splicing and omitting those portions that were not consistent with their misleading and false account of the facts. In truth, Plaintiff did not discover Halbach's SUV at another location and help others plant it on Avery's property. MAM's aspersions that he did are false and have caused irreparable harm to Plaintiff's reputation worldwide.

39. Defendants also included a portion of an interrogation of Steven Avery in which the interrogating officer says to Avery, "So Tammy told you that somebody told her that a cop put that vehicle -- Theresa's vehicle -- out on your property? Avery responds, "Yeah." The scene then cuts immediately to a visual of Plaintiff about to testify in Court, implying that he is the "cop" who allegedly planted Halbach's vehicle on Avery's property. MAM, Episode 5.

40. In order to enhance the significance of plaintiff's alleged off-sight discovery and subsequent planting of Halbach's vehicle, defendants manipulated facts to convince viewers that MTSO officers, possibly including the plaintiff, secreted Avery's blood from a vial still kept in evidence from his wrongful conviction case, and planted it in Halbach's car. Defendants dramatically re-enacted the vial's "discovery" in the Clerk's office by accompanying one of Avery's lawyers to film the retrieval of the vial. MAM Episode 4 contains a close-up shot of the blood vial with a small hole on top of its rubber stopper while Avery's attorneys rejoice in a

- 12 -

"gotcha" moment. In truth, a hole in a blood vial's rubber stopper is not indicative of evidence tampering; it is made in the ordinary course of drawing a blood specimen from a person and storing it in a vial. The hypodermic needle hole in this case was made when a specimen of Avery's blood was drawn by a phlebotomist and stored in the vial in connection with a 1996 post-conviction motion in his wrongful conviction case. The procedure necessarily resulted in the creation of a hole in the rubber stopper. The phlebotomist who drew the specimen from Avery in 1996 was prepared to testify that's what happened in this instance. Having attended the trial in its entirety, defendants Ricciardi and Demos were aware of the routine nature of the hole on the vial's rubber stopper and that the phlebotomist who drew the specimen from Avery was prepared to testify. Defendants manipulated the facts and the significance of the blood vial's discovery as part of their overall effort to convince viewers that plaintiff and other county law enforcement officers framed Avery for the murder.

### The Key

41. Defendants, jointly and severally, with actual malice, led viewers to the inescapable but false conclusion that Plaintiff and MTSO Lt. James Lenk planted the ignition key for Halbach's SUV in Avery's bedroom. They did so by splicing trial testimony, omitting other testimony, and failing to include essential photographic evidence that would have given viewers a complete view of what occurred.

42. On November 8, 2005, three days after Halbach's vehicle was discovered at the salvage yard, Plaintiff and MTSO Investigator James Lenk, both evidence technicians, were assigned to search Avery's bedroom for evidence more remotely connected to the crime, including pornographic material. Plaintiff and Lenk were accompanied by Calumet County Deputy Daniel Kucharski. A previous search of the room on November 5, 2005 yielded handcuffs and leg

- 13 -

irons, apparent sex toys, and pornographic materials in a bookcase, but not all items were collected at that time.

43. On November 8, 2005 after materials were returned to the bookcase, the ignition key for Halbach's SUV was found on the carpeted floor next to the bookcase. At trial, Plaintiff, Lenk, and Kucharski each offered a reasonable explanation as to how the key was missed on the earlier search and miscellaneous entries. All three testified they believed the key had fallen from a crack in the particle board backing of the bookcase when materials were returned into the bookcase. They believed Avery hid the key there with plans to retrieve it later and dispose of the SUV. (Plaintiff: Trial Trans Day 7, p 132; Lenk: Trial Trans Day 8, p 14; Kucharski: Trial Trans Day 9, p 55).

44. On information and belief, Defendants Ricciardi and Demos were present during this testimony and viewed certain photographs clearly showing the crack in the back of the bookcase. The photographs were not shown to viewers of MAM. In addition, testimony from officer Tyson, the accompanying officer from the initial search on 11/05/2005, was spliced in order to maximize suspicion that the key was planted and minimize a plausible explanation for how it came to be found. Jerome Buting, one of Avery's attorneys, asked officer Tyson the following question:

"Had you ever, in any other search in your entire career, had to act like a babysitter, or a watchdog, for the officers who were conducting a search?"

Officer Tyson replied, "I did not treat this as if I was babysitting." (Trial Trans Day 7, p 25, lines 7-11).

Defendants Ricciardi and Demos replaced Tyson's answer with his negative response, "No," to a separate question in order to give viewers the exact opposite impression of what Tyson in fact conveyed. (MAM, Episode 7).

45. Upon information and belief, Defendants Ricciardi and Demos filmed the entire trial and were aware of the full line of questioning concerning the circumstances of Plaintiff and Lenk finding Halbach's ignition key in Avery's bedroom, as well as its significance. They chose to fabricate testimony by splicing or omitting those portions not consistent with their false and defamatory account of the facts. In truth, Plaintiff and Lenk did not plant the key, and MAM's aspersions that they did are false and have caused irreparable harm to Plaintiff's reputation.

## MAM's Omission and Distortion of Material, Significant Evidence and Facts

46. Defendants, jointly and severally, and with actual malice, omitted the following evidence and facts as part of their effort to lead viewers to falsely conclude that plaintiff and others framed Avery for Halbach's murder. Upon information and belief, defendants Ricciardi and Demos were present for all court proceedings, including pretrial motions and the entire trial, where all of this information was revealed. Had these material, significant and known facts been included in MAM, a reasonable viewer would have found Avery's guilt obvious and would not have concluded that plaintiff and other law enforcement officers planted evidence to frame him:

- Avery's DNA was located on the hood latch of Halbach's vehicle.

- Halbach's cell phone, camera, and PDA computer devices were found in a burn barrel on Avery's property. Several hours after Halbach's arrival at the salvage yard, Avery's nephew witnessed Avery carrying a plastic bag and placing it in the burn barrel where Halbach's electronics were later found. In addition, a family friend observed smoke and smell of plastic coming from the same burn barrel. The witness, along with Avery's brother, stated that Avery had changed clothes and showered and was acting strange.

- The bullet containing Halbach's DNA was linked to the specific firearm hung on a wall over Avery's bed.

- Avery called Halbach's employer, Auto Trader magazine, on the day she was murdered and asked them to send a photographer to take a photo of a car he said he was listing for sale in their magazine. Avery asked the receptionist to send "the same photographer" they sent last time. Halbach's co-workers stated that she had been somewhat concerned by Avery's approaching her wearing nothing but a towel on at least two of her appointments with him. Avery placed direct calls to Halbach's cell phone before she arrived using *67 to hide his identity.

- In the early evening, after Halbach's appointment, Avery's brother, Earl, observed Avery near his truck and trailer with Avery's snowmobile on top. Earl found it strange that Avery would remove the snowmobile from the trailer and put it in his garage since Earl's understanding was that Avery was going to take the snowmobile to a dealer and sell it. When asked by police about the Suzuki, Earl Avery stated it had been outside the garage a few days earlier. Avery's accomplice told police that Avery shot Halbach in his garage.

- Avery gave several different statements about his interaction with Halbach on the day she was murdered. First, that she never arrived for her appointment with him; second, that she did, but he only saw her through a window in his trailer home and did not speak with her; third, that she came inside where he paid her; and, finally, that he went outside to her car and paid her for the photo shoot.

- Avery has a history of extreme violence and sexual aggression against women, including beating, strangulation, death threats, attempted abduction at gunpoint, and allegations of rape.

47. Defendants Ricciardi and Demos, jointly and in concert with the remaining defendants and with reckless disregard for the truth, blatantly and absurdly distorted the nature of three of Avery's prior crimes. Had the true nature of his past crimes been accurately portrayed, a reasonable viewer would have been less likely to accept defendants' wholly false narrative that plaintiff and other local police officers framed Avery for Halbach's murder. Upon information and belief, defendants Ricciardi and Demos had access to the police reports and criminal complaints associated with each of these crimes and knew of their contents.

- Avery was convicted of animal abuse when he was 20 years old. Police reports indicate that he and another party poured gas and oil on the family's pet cat, intentionally threw it in a bonfire, and watched it burn to death. In Episode 1 of MAM, defendants portrayed the incident as an accident and at worst, a childhood prank.

- In 1986, Avery received a six-year prison sentence on convictions for endangering safety by conduct regardless of life and felon in possession of a firearm in connection with his running a woman's car off the road, holding her at gun point and ordering her into his car

- 16 -

with the apparent intent to rape her. MAM omitted significant details and used edited portions of depositions to cast Avery as a victim and the victim as a villain for spreading rumors about him.

- On September 4, 2004, approximately a year before murdering Halbach, Avery was arrested for assaulting his fiancé, Jodi Stachowski. On information and belief, Defendants Ricciardi and Demos had access to the police reports concerning the incident and knew of their contents. The reports indicate that Avery shoved Stachowski causing her to fall into a chair and hit her head. Avery then struck her numerous times and threatened to kill her. When Stachowski tried calling 911, Avery ripped the phone out of the wall before she could report the assault. Avery began strangling her and as she lost consciousness he dragged her outside to his vehicle. When Stachowski regained consciousness, Avery said: "I should get the gun and kill you."

- Upon information and belief, Ricciardi and Demos had access to and reviewed the police reports concerning Avery's arrest for assaulting Stachowski. They knew what Stachowski had reported to police, but they chose to omit it because it did not fit with their false characterization of Avery as a harmless individual unlikely to commit a murder. To further their storyline, they portrayed Stachowski as unafraid and supportive of Avery while knowing she was anything but.

48. Defendants also presented material in such a way that the defense conspiracy theories received the last, apparently unrefuted word, mixing in-court excerpts with out-of-court statements by defense attorneys in an attempt to portray defense theories and speculation as actual and unanswered facts. This includes but is not limited to the following:

- Jerome Buting (end of MAM 6): One of the things that the state argued is that it would have taken a wide-ranging conspiracy of so many people to pull this off and that there's just no way this could be possible. But in fact, that's not true. Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument, well why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?

[cuts to video of James Lenk being sworn to testify] [theme music plays]

- 17 -

## MAM 2

49. On October 19, 2018, Defendant Netflix released for purchase to its subscribers worldwide a sequel to MAM, titled, "Making a Murderer Part 2" (hereinafter MAM2). The ten-part documentary series was written and directed by Defendants Ricciardi and Demos with heavy production, post-production and editing involvement by Netflix, which also marketed and distributed the series.

50. In an article in a film industry publication known as IndieWire, Defendants Ricciardi and Demos state publicly that Netflix was "a partner from the outset," in the production of MAM2, and that "the project was fully financed from the start." In the same interview, Ricciardi and Demos described the story of Steven Avery and Brendan Dassey as "the gift that keeps on giving." https://www.indiewire.com/2018/10/making-a-murderer-part-2-interview-steven-avery-laura-ricciardi-moira-demos-1202013273/

51. Despite widespread criticism in the public domain concerning the falsity of MAM, See, e.g., https://thedailybanter.com/2016/08/the-steven-avery-deception/ and a petition with 2,967 signatures asking Netflix to remove the original series and cancel its sequel because of its false portrayal of Avery as a victim of police malfeasance, https://www.change.org/p/netflix-remove-making-a-murderer-and-cancel-season-2-on-netflix, Defendants doubled down on their baseless claims of evidence planting in MAM2.

52. In MAM2 episodes 1 and 2, Defendants present Avery's post-conviction counsel's wholly speculative conspiracy theories and unreliable "experiments" as convincing proof that Plaintiff and his colleagues planted evidence to frame Avery. Episode 1 includes footage of presumed associates of Zellner tossing a mannequin smeared with a red substance into the back of an SUV of the same make and model as Ms. Halbach's Rav4. Zellner confidently proclaims to

- 18 -

viewers that based upon the blood spatter pattern that resulted, Avery could not have placed Halbach's body into the trunk of her SUV as the prosecution and its experts argued at trial. MAM2, episode 2 adopts as reliable and convincing evidence a similarly unsound scientific test known as "brain fingerprinting" as proof that Avery could not have committed the murder.

53. In MAM2, episode 9, Defendants continued the original series' false claim that plaintiff planted evidence by embracing as fact the unverified and unreliable account of Kevin Rahmlow. Rahmlow claimed he had a conversation with Plaintiff at the Cenex gas station in Mishicot on November 4, 2005, a few days after Ms. Halbach was reported missing and the day before her vehicle was found at the Avery Salvage Yard.

54. MAM2 repeats claims by Rahmlow that he told Plaintiff he observed a vehicle matching the description of Halbach's SUV a day earlier "by the East Twin River dam in Mishicot at the turnaround the bridge [sic]." Rahmlow states that Plaintiff had pulled into the Cenex parking lot in a marked police squad and was in uniform.

55. Plaintiff was off work, not in uniform, and not in a police squad on November 4, 2005. Nor did he speak with Rahmlow on that date or at any other time concerning Ms. Halbach's disappearance. Plaintiff believes his only contact with Rahmlow occurred in September of 2006, when he arrested Rahmlow for drunken driving.

56. Upon information and belief, Defendants Ricciardi and Demos filmed the entire trial and were aware that Plaintiff testified he was not working on November 4, 2005 (Trial Trans, Day 7, p 176-177). They chose to ignore Plaintiff's testimony and adopt as true Rahmlow's unverified, unreliable, and false statement to Avery's attorney instead. By adopting Rahmlow's story, Defendants doubled down on the original series' distortion of Plaintiff's routine call to dispatch,

- 19 -

and its assertion that Plaintiff participated in a conspiracy to plant Halbach's vehicle on the Avery property.

<strong>Claims for Relief</strong>

**Count I – Defamation – Actual Malice**

57. Plaintiff repeats and realleges the allegations of Paragraphs 1 - 56, above, as though fully set forth herein.

58. Defendants, jointly and severally, acting with actual malice, defamed, libeled and slandered Plaintiff by their creation, production, distribution, publication, and broadcast of the documentary, "Making a Murderer."

59. Defendants' false statements and communications about Plaintiff include, but are not limited to, the following statements and communications in the "Making a Murderer" broadcasts:

    a) The statements described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above.

    b) The statements and communications made in the "Making a Murderer" broadcasts, the transcripts of which are attached hereto as Exhibit A. These statements collectively communicated to the viewing public the false assertion that Plaintiff was a participant in a law enforcement conspiracy and scheme to frame Steven Avery for the murder of Teresa Halbach. Defendants falsely stated and communicated through their broadcast that Plaintiff planted evidence, including but not limited to, Teresa Halbach's valet key, her vehicle, and her bone fragments, her blood, and Avery's blood and/or DNA, in order to frame allegedly innocent Defendants or to strengthen their case against them.

    c) The words expressly used in the broadcasts are made more defamatory to Plaintiff because of the Defendants' omission of information that was essential to a truthful depiction

- 20 -

of the facts, including, but not limited to, the facts that were omitted as described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above. Among other things, Defendants included in their broadcasts only one-sided biased interviews that cast police and prosecutors as villains determined to prosecute and convict Avery for a crime that he did not commit and cast Avery and his attorneys as heroes.

d) The statements described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above, which were false because the statements do not accurately reflect the testimony or events purported to be recounted by Defendants, as a result of the manipulation of the content as described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B. Among other things, Defendants selectively edited and spliced trial and deposition testimony and excluded facts that contradicted their false statements and communications.

60. Defendants knew or had reason to know that the statements were false, but made the false statements and communications described above with actual malice, intentionally and knowing that they were false or with reckless disregard for the statements and communications' truth or falsity. The purported conspiracy and scheme described through Defendants' false statements and communications was the product of Defendants' imagination and Defendants knew that the statements and communications about the purported conspiracy and scheme were false.

61. Defendants' false statements and communications as described above are not mere statements of opinion, but are definitive declarations of fact provable as either true or false.

62. Defendants' false statements and communications as described above were communicated and published to the viewing public in the United States of America and in additional countries that subscribe to Netflix and/or to which Netflix publications are distributed.

- 21 -

According to published estimates, more than 19.3 million viewers watched the "Making a Murderer" series within the first 35 days of its broadcast.

63. Defendants' false statements and communications as described above were not privileged or exceed the scope of any alleged privilege because the Defendants, and each of them, intentionally and knowingly or with reckless disregard for the truth, communicated as facts statements that were not truthful and accurate regarding the matters asserted and that went beyond the statements contained in the record of any official proceedings. In addition, Defendants added their own factual assertions and intermixed them with the records of official proceedings in a manner that falsely portrayed the record of the proceedings, including, but not limited to, in the manner described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above.

64. Defendants' false statements and communications tended to harm Plaintiff and actually and irreparably harmed and damaged Plaintiff's reputation, lowering him in the estimation of the community and subjecting him to hostility, hatred and ridicule, and deterring third persons from associated or dealing with him in, among others, the following respects:

a) Plaintiff is a devoted husband, parent, decorated United States Air Force veteran, and dedicated public servant, and enjoyed an impeccable professional reputation prior to December 18, 2015, when Defendants published their false statements and communications about him. Since that time, Plaintiff has been subject to worldwide ridicule, contempt and disdain as a result of the baseless and false assertions in Making of a Murderer.

b) A Google search of Plaintiff's name prior to Defendants' false statements and communications about Plaintiff would have revealed two nondescript news articles about routine local crime that plaintiff had a role in investigating. The same search now yields more than 1.8 million hits, nearly all of them painting Plaintiff in a negative light. 732

- 22 -

YouTube videos about Plaintiff's perceived nefarious role in the Avery case have been produced as a result of Defendants' false statements and communications.

c) National and international news and entertainment media have published hundreds of articles, television and radio segments adopting and republishing the Defendants' false and defamatory statements and communications about Plaintiff. Social media, including Facebook, Twitter, YouTube, and Reddit are replete with threats and insults directed at Plaintiff because of the baseless accusations against Plaintiff made by Defendants. Countless tweets, memes, and insulting and threatening social media posts portraying Plaintiff as a corrupt police officer and cooperative in framing Avery have been posted online.

65. Defendants, jointly and severally, have compounded and aggravated the harm to Plaintiff's reputation by deliberately ignoring critical analysis in the aftermath of the release of the Making of a Murderer broadcasts. Thorough, careful, and objective analysis by some members of the public and a few journalists revealed that the series had badly distorted the facts. Upon information and belief, Defendants were aware of the critical analysis and could have taken action to prevent further harm to Plaintiff's reputation by admitting their distortions and omissions of fact when the above-mentioned articles were published and in the sequel to the original series, "Making of a Murderer Part 2." Instead, with actual malice, Defendants doubled down by distorting and omitting additional facts to bolster their pre-ordained conclusion that Plaintiff participated in the alleged framing of Avery.

66. Defendants' false statements and communications were made in an intentional disregard for the Plaintiff's rights and with ill will toward Plaintiff and as a result of other bad motives, including, but not limited to, Defendants' determination to slant and distort the truth to

- 23 -

sensationalize the facts and circumstances surrounding the investigation of Teresa Halbach's murder and the trial of Steven Avery for her murder in order to exploit those events and circumstances for Defendants' own economic benefit at the expense of the individuals who were involved in the investigation and trial.

67. As a result of the damage to Plaintiff's reputation that was caused by Defendants' false statements and communications about Plaintiff, Plaintiff is entitled to damages in a total amount to be determined at trial, including, but not limited to, general damages; compensatory damages; special damages, including, but not limited to, lost wages; and punitive damages.

**Count II – Negligence (In the Alternative)**

68. Plaintiff repeats and realleges the allegations of Paragraphs 1 - 67, above, as though fully set forth herein.

69. Defendants owed the Plaintiff a duty to exercise reasonable care when making and communicating statements and communications about Plaintiff.

70. Defendants knew or had reason to know that the statements described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above were false, but, alternatively to the allegations set forth in Paragraph 60, above, in making and communicating the statements and communications about Plaintiff, Defendants breached their duty of care to Plaintiff by failing to exercise reasonable care in ascertaining the truth or falsity of the statements and communications described above.

71. Defendants' false statements and communications as described above were communicated and published to the viewing public in the United States of America and in additional countries that subscribe to Netflix and/or to which Netflix publications are distributed, as further described above.

- 24 -

72. Defendants' failure to exercise reasonable care in making and communicating the statements described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B caused damage and harm to Plaintiff's reputation as set forth in Paragraph 54 above. Additionally plaintiff has suffered physical effects such as high blood pressure and anxiety.

73. Defendants' false statements and communications as described above were not privileged or exceed the scope of any alleged privilege because the Defendants communicated as facts statements that were not truthful and accurate regarding the matters asserted and that went beyond the statements contained in the record of any official proceedings. In addition, Defendants added their own factual assertions and intermixed them with the records of official proceedings in a manner that falsely portrayed the record of the proceedings, including, but not limited to, in the manner described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above.

74. Defendants knew or had reason to know that the statements were false, but made the false statements and communications described above with actual malice, intentionally and knowing that they were false or with reckless disregard for the statements and communications' truth or falsity. The purported conspiracy and scheme described through Defendants' false statements and communications was the product of Defendants' imagination and Defendants knew that the statements and communications about the purported conspiracy and scheme were false.

75. Defendants' false statements and communications as described above were made in an intentional disregard of Plaintiff's rights.

76. As a result of the damage to Plaintiff's reputation that was caused by Defendants' false statements and communications about Plaintiff, Plaintiff is entitled to damages in a total amount to be determined at trial, including, but not limited to, general damages; compensatory damages;

- 25 -

and special damages, including, but not limited to, lost wages; personal / physical injury, and punitive damages.

**Count III – Intentional Infliction of Emotional Distress**

77. Plaintiff repeats and realleges the allegations of Paragraphs 1-76, above, as though fully set forth herein.

78. Defendants acted intentionally or recklessly in making the statements and communications as described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above.

79. Defendants' actions and conduct as described above were extreme and outrageous. Defendants could and should have reasonably foreseen that their false rendering of Plaintiff as a corrupt police officer who allegedly helped frame an allegedly innocent man would lead to popular outrage and threats, resulting in extreme emotional distress.

80. As a direct result of Defendants' actions, conduct, communications and statements as described above,

    a)  Plaintiff has received serious and ongoing threats to his and his family's safety;

    b)  Plaintiff has been subject to recorded telephone threats, the sheer volume of which fill the capacity of 28 compact discs;

    c)  Plaintiff has received numerous late-night telephone calls in which callers have screamed profanities and threatened to do him physical harm;

    d)  Avery sympathizers have threatened to kill Plaintiff and members of his family, kidnap and sodomize him and gang rape Plaintiff's wife;

    e)  Photographs of Plaintiff's children have been posted online by hateful viewers influenced by Defendants' communications and statements;

- 26 -

f) Plaintiff has had to be more cautious and guarded in nearly every aspect of his life, including in making travel plans and where he and his wife can eat in public; and

g) Due to the threats of violence and the hostility against him that have been caused by Defendants' statements and communications, Plaintiff is required to maintain a state of hypervigilance at all times and to constantly be alert to potential danger to his family's safety.

81. As a direct result of Defendants' actions, conduct, communications, and statements and the foreseeable consequences thereof, Plaintiff suffers and has suffered from severe emotional distress and anxiety, and exhaustion.

82. As a result of the foregoing, Plaintiff is entitled to damages in a total amount to be determined at trial, including, but not limited to, general damages; compensatory damages; special damages, including but not limited to, lost wages; and punitive damages.

WHEREFORE, PLAINTIFF RESPECTFULLY REQUESTS THE FOLLOWING RELIEF:

A. Damage in a an amount to be determined at trial;

B. Attorneys' fees and costs incurred in prosecuting this action; and

C. Such other and further relief as may be allowed by law.

Dated this 13th day of June, 2019.

> LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
> Attorneys for Plaintiff, Andrew L. Colborn
>
>
> By: *Electronically signed by George Burnett*
> George Burnett

**POST OFFICE ADDRESS:**
231 S. Adams Street
Green Bay, WI 54301
P.O. Box 23200
Green Bay, WI 54305-3200
Phone: (920) 437-0476
Fax: (920) 437-2868
State Bar No. 1005964
#3131743


GRIESBACH LAW OFFICES, LLC


By: *Electronically signed by Michael C. Griesbach*
    Attorney Michael C. Griesbach
    State Bar No. 01012799
    Griesbach Law Offices, LLC
    PO Box 2047
    Manitowoc, WI 54221-2047
    (920) 320-1358


SCHOTT, BUBLITZ & ENGEL, S.C.


By: *Electronically signed by April Rockstead Barker*
    April Rockstead Barker
    State Bar No. 1026163
    Schott, Bublitz & Engel, S.C.
    640 W. Moreland Blvd.
    Waukesha, WI 53188-2433
    (262)-827-1700