# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

ANDREW L. COLBORN,

        Plaintiff,

    vs.                              Civil No.: 19-CV-484

NETFLIX, INC.; CHROME MEDIA LLC,
F/K/A SYNTHESIS FILMS, LLC;
LAURA RICCIARDI; AND MOIRA
DEMOS,

        Defendants.

## REPLY MEMORANDUM
## IN SUPPORT OF MOTION TO DISMISS BY NETFLIX, INC.
## AND RESPONSE
## <u>TO MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT</u>

In the wake of Plaintiff Andrew Colborn's submission in opposition to Netflix's motion to dismiss the Amended Complaint (and his motion for leave to file another one), only one issue remains for resolution by this Court: Has he (or can he) plausibly allege that Netflix, as opposed to the Producer Defendants, disseminated *Making a Murderer* with "actual malice," *i.e.,* despite a "high degree of awareness" that it probably contained defamatory falsehoods about him? *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). This is because Colborn now concedes both that he is a public official required to plead and prove actual malice by the Supreme Court's landmark decision in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and that only that Court has authority to overrule such binding precedent. *See* Dkt. 79 at 29.[1]

On the single issue that remains, Colborn devotes his brief largely to (1) a detailed recitation of the pleaded facts he asserts reveal "Selective and Biased Editing," *see id.* at 3-9, and (2) a discussion of what he represents to be controlling Supreme Court and Seventh Circuit precedent demonstrating that such "editing" plausibly establishes the requisite actual malice in a manner consistent with the pleading standard articulated by the Supreme Court in *Iqbal* and *Twombly, see id.* at 20-27. As Netflix explains further below, however, neither of these contentions survives reasonable scrutiny.

*First,* Colborn's detailed factual recitation, even if it established the presence of "selective and biased editing" (it does not), fails to allege any facts that plausibly suggest *Netflix* was aware of it, much less "highly aware" that it rendered MaM's depiction of him "probably

---

[1] At the very least, therefore, Colborn concedes that his separate cause of action for "negligence" fails to state a valid claim until and unless *Sullivan* is overruled. In addition, he concedes, as he must, that this Court is in no position either to do so or to assess the merits of Justice Clarence Thomas's concurring opinion from the Supreme Court's denial of *certiorari* in *McKee v. Cosby*, 139 S. Ct. 675 (2019) (Thomas, J. concurring). *See* Dkt. 79 at 14-16. Nevertheless, it bears emphasis both that no other member of the Court joined in that opinion and, with all due respect, the historical analysis that undergirds it is, at best, suspect. *See, e.g.,* Lee Levine & Stephen Wermiel, *What Would Justice Brennan Say to Justice Thomas?*, Comm. Law., Spring 2019, at 1.

false."  Rather, his brief, as well as the various iterations of his complaint, refer generically (and repeatedly) to the actions of "MaM," as if the documentary is not only an entity capable of decision-making and action but also a defendant.  Nothing in Colborn's submission negates the fact that neither such conclusory allegations, *see id.* at 12-13, nor his pleadings' only specific allegations about *Netflix's* conduct—*i.e.,* that it released, marketed, and distributed the documentary—say anything about *that* defendant's knowledge of probable falsity.

*Second*, Colborn's discussions of both the "actual malice" and "plausibility" standards suffer from the same fundamental flaws—they rely on a combination of cases that are either no longer good law (because, for example, they were decided before *Iqbal* and *Twombly*) or do not stand for the propositions for which they are cited. By the same token, he simply ignores both Supreme Court and Seventh Circuit precedent that contradicts his positions, including the Court of Appeals' express holding that the plausibility standard governs actual malice pleading.  *See Pippen v. NBCUniversal Media, Inc.*, 734 F.3d 610, 614 (7th Cir. 2013).

Ultimately, Colborn has failed plausibly to explain (including in his proposed Second Amended Complaint) the basis for his contention that Netflix published *Making a Murderer* with actual malice.  This Court should dismiss the Amended Complaint with prejudice as against Netflix and deny Colborn's motion to amend the complaint yet again.

## I.        Colborn Misstates Controlling Precedent.

Colborn's brief relies, in significant part, on three cases: The Supreme Court's decisions in *Herbert v. Lando*, 441 U.S. 153 (1979), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and the Seventh Circuit's decision in *Pape v. Time, Inc.*, 354 F.2d 558 (7th Cir. 1965). His descriptions of the first two cannot be squared with the decisions themselves, and the latter

was ultimately rejected by the Supreme Court. *See Time, Inc. v. Pape*, 401 U.S. 279, 291-92 (1971).

According to Colborn, *Herbert* constitutes "binding precedent hold[ing] that a defamation plaintiff is entitled to discovery regarding actual malice," Dkt. 79 at 1, and that "participation in the editorial process," standing alone, is therefore "sufficient to raise an inference that discovery is appropriate," *id.* at 18. The Supreme Court in *Herbert* held no such thing. The case has absolutely nothing to do with whether a defamation plaintiff is entitled to discovery in the face of a motion to dismiss. Rather, it stands only for the very different proposition that the First Amendment does not bar defamation plaintiffs from obtaining evidence regarding defendants' state of mind *after* such a motion has been adjudicated and *discovery has commenced*. 441 U.S. at 175-76. It in no way suggests that a libel plaintiff can overcome a Rule 12(b)(6) motion on grounds that he needs to conduct discovery.[2]

Similarly, Colborn claims that, in *Anderson*, the Court held that a "plaintiff should be afforded 'a full opportunity to conduct discovery' regarding actual malice" before its complaint may properly be dismissed. Dkt. 79 at 18 (quoting *Anderson*). Again, the Court held no such thing. In *Anderson*, the Supreme Court decided that, on summary judgment in a public-figure defamation case, the plaintiff must provide sufficient proof "to allow a rational finder of fact to find actual malice by clear and convincing evidence." 477 U.S. at 254. The Court *rejected* the plaintiff's assertion that "the defendant should seldom if ever be granted summary judgment

---

[2] Colborn similarly mischaracterizes the holding in *Sullivan* itself, suggesting that it permits a finding of actual malice against "mere distributors" when they "publish obviously biased materials as fact." Dkt. 79 at 26. To the contrary, that is *precisely* what the Court forbade in *Sullivan*, holding that a newspaper could not be said to have published with actual malice an advertisement placed by a coalition of civil rights activists who obviously had a point of view or "bias" (as Colborn would characterize it). *See* 376 U.S. at 266.

where his state of mind is at issue." *Id.* at 256. The full context of the language Colborn quotes makes his mischaracterization of it obvious:

> We do not understand [prior precedent] to hold that a plaintiff may defeat a defendant's properly supported motion for summary judgment in a conspiracy or libel case, for example, without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of a conspiracy or of legal malice. The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict…. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery.

*Id.* at 256-57. In short, *Anderson* is about what a plaintiff must show *after* discovery, not his entitlement to discovery before he has even stated a claim on which relief can be granted.[3]

Finally, Colborn represents as binding precedent a decision by the Seventh Circuit that the Supreme Court rejected nearly five decades ago. Quoting *Pape*, 354 F.2d 559, Colborn argues that "heavy-handed editing and rewording of official reports may demonstrate reckless disregard as to truth or falsity." Dkt. 79 at 21. When *Pape* eventually made its way to the Supreme Court, however, the Court soundly rejected the Seventh Circuit's conclusion that a finding of actual malice could be based on such a "depart[ure] from fidelity" to source material. 354 F.2d at 560-61. As the Supreme Court held, the "most" that can be inferred from such

---

[3] *Anderson* also disposes of Colborn's reliance on the Supreme Court's prior *dicta* in *Hutchinson v. Proxmire* that proof of actual malice "does not readily lend itself to summary disposition." 443 U.S. 111, 120 n.9 (1979) (expressly noting that "the propriety of dealing with [actual malice] by summary judgment is not before us"). As the Wisconsin Supreme Court (among many others) has noted, the Supreme Court's subsequent decision in *Anderson* expressly rejected Colborn's interpretation of that very passage:

> The Court has clarified that the *Hutchinson* statement "was simply an acknowledgment of our general reluctance 'to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws.'"

*Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 539 n.15, 563 N.W.2d 472 (1997) (quoting *Anderson,* 477 U.S. at 256 n.7).

conduct is that it constituted "an error of judgment," which falls well short of the showing

necessary to ground a finding of actual malice. *Time, Inc. v. Pape*, 401 U.S. 279, 291-92 (1971).

In other words, the Supreme Court *rejected* the Seventh Circuit's reasoning that Colborn presents

as controlling authority.

## II. Colborn Ignores His Burden To Plead Facts Plausibly Establishing Actual Malice.

In its opening Memorandum, Dkt. 31 at 16-20, Netflix demonstrated that, following the

Supreme Court's decisions in *Iqbal* and *Twombly*, Colborn is required to plead *facts* that would

plausibly establish that it distributed *MaM* with actual malice. His response is to pretend that the

controlling precedent, in this Circuit and elsewhere, regarding pleading actual malice simply

does not exist.

Most significantly, his brief hinges on the contention that because, under Fed. R. Civ.

P. 9(b), states of mind may be alleged generally, he need not plead facts plausibly establishing

actual malice. *See* Dkt. 79 at 16. But as Netflix has explained, *see* Dkt. 31 at 17, the Seventh

Circuit has expressly *rejected* this very argument in the actual malice context, holding that

"[s]tates of mind may be pleaded generally, but a plaintiff still must point to details sufficient to

render a claim plausible." *Pippen*, 734 F.3d at 614. Every federal appellate court to consider the

issue has agreed that failure plausibly to plead actual malice dooms a public plaintiff's

defamation claim. Dkt. 31 at 17 (collecting cases).

This is not some arcane quirk limited to defamation law: The Supreme Court explained a

decade ago that "Rule 8 does not empower respondent to plead the bare elements of his cause of

action, affix the label 'general allegation,' and expect his complaint to survive a motion to

dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009). The Seventh Circuit has since

emphasized, over and over again, that "[b]are assertions of the state of mind required for the

claim … must be supported with subsidiary *facts*." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013) (emphasis added); *see also, e.g.*, *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018) (same).[4]

In the absence of such pleaded facts, a plaintiff such as Colborn is not entitled to discovery regarding defendant's state of mind, his contention to the contrary notwithstanding. *See* Dkt. 79 at 17-19.  The argument has been foreclosed by the Supreme Court, which expressly held in *Iqbal* that an insufficient pleading such as Colborn's "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  556 U.S. at 678-79; *see also Peace v. Kemper*, No. 14-CV-1416-PP, 2016 WL 552356, at *2 (E.D. Wis. Feb. 10, 2016) (Pepper, J.) (same).  For the reasons discussed above, *Herbert* and *Anderson* are of no help to Colborn, and neither are any of the other cases he cites for the fallacy that a defamation plaintiff is automatically "entitled to discovery on the issue of actual malice."  Dkt. 79 at 18.

Thus, for example, Colborn's reliance on *Doe v. Smith,* 429 F.3d 706 (7th Cir. 2005), *World Wrestling Federation Entertainment, Inc. v. Bozell*, 142 F. Supp. 2d 514 (S.D.N.Y. 2001), and *Price v. Viking Press, Inc.*, 625 F. Supp. 641 (D. Minn. 1985), is demonstrably misplaced. *See* Dkt. 79 at 16, 18, 20.  All three cases were decided *before* the Supreme Court set out the plausibility requirement in *Iqbal* and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and expressly rejected the "no set of facts" formulation on which Colborn continues to rely, *see* Dkt. 79 at 14.  He similarly mischaracterizes *Parsi v. Daioleslam*, 595 F. Supp. 2d 99 (D.D.C. 2009), and *Susan B. Anthony List v. Driehaus*, 805 F. Supp. 2d 423 (S.D. Ohio 2011).  In *Parsi*, which involved a motion to dismiss converted to one for summary judgment, the court held that

---

[4] Despite Colborn's abbreviated defense of it, Dkt. 79 at 29, this authority also dooms his claim for intentional infliction of emotional distress because, among other things, the Amended Complaint does not plausibly allege that anyone at Netflix intended *MaM* to cause Colborn emotional distress, *see* Dkt. 31 at 28-29.

discovery was needed regarding actual malice largely because several publications relevant to that issue had not been translated into English. 595 F. Supp. 2d at 107-08. In *Driehaus*, the defamation counterclaim plaintiff *had* alleged facts that could plausibly suggest actual malice, including that the defamation defendant made the challenged statements knowing the Ohio Elections Commission had found them to be false. 805 F. Supp. 2d at 436-37. Ultimately, the court reversed itself and granted the motion to dismiss the defamation claim because the statements at issue were not defamatory as a matter of law. *Susan B. Anthony List v. Driehaus*, No. 1:10-CV-720, 2013 WL 308748, at *1 (S.D. Ohio Jan. 25, 2013), *aff'd*, 779 F.3d 628 (6th Cir. 2015).

### III. Colborn Fails To Plead Facts Plausibly Suggesting Netflix Had Actual Malice.

In the last analysis, Colborn's claims against Netflix should be dismissed with prejudice because neither the Amended Complaint, nor the proposed Second Amended Complaint, contains facts that plausibly suggest anyone at Netflix knew or had the requisite "high degree of awareness" that *MaM*'s portrayal of Colborn was probably false. *Garrison*, 379 U.S. at 74. Even in his proposed amended pleading, Colborn's factual allegations regarding Netflix are too vague, conclusory, internally contradictory, and ultimately implausible for his claim to proceed to discovery.

As the Seventh Circuit has explained, a primary reason for the *Iqbal-Twombly* standard is "to protect defendants from having to undergo costly discovery unless a substantial case is brought against them." *United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013). *See also Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014). In practice, the plausibility standard means that the plaintiff must provide "enough details about the subject-matter of the case to present a story that holds together." *Bryant v. Ramos*, No. 15-1568-PP, 2017 WL

568314, at *2 (E.D. Wis. Feb. 13, 2017) (Pepper, J.) (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826-27 (7th Cir. 2014)). Because the rule is meant to prevent costly and burdensome discovery for meritless claims, "[t]he required level of factual specificity rises with the complexity of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616-17 (7th Cir. 2011).

Netflix has demonstrated that the Amended Complaint contains nothing more than conclusory allegations regarding its conduct, rather than the specific facts that are required. Dkt. 31 at 18 20. The only allegations specific to Netflix included in that pleading are that it distributed *MaM* worldwide and markets it as a non-fiction documentary. *Id.* at 18; *see also* Dkt. 79 at 12-13 (citing Amended Complaint). The Amended Complaint's remaining allegations are all either specific to Producer Defendants Ricciardi and Demos or vague, undifferentiated allegations that "defendants" acted "jointly and severally" or "in concert with" each other. Dkt. 31 at 18. Colborn does not dispute this description of his pleading—indeed, his brief *repeats* the very same allegations in a bulleted list, *see* Dkt. 79 at 12-13—but nevertheless contends that they are sufficient to save his claim, *id.* at 19-20.

This is another instance in which the law is the opposite of what Colborn says it is. The Seventh Circuit has directly held that undifferentiated allegations against "the defendants" that do not specify each defendant's allegedly unlawful conduct fail the *Iqbal-Twombly* test:

> Liability is personal. An allegation that *someone* looted a corporation does not propound a plausible contention that *a particular person* did anything wrong. The Rules of Civil Procedure set up a system of notice pleading. Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed.

*Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (Easterbrook, J.).[5]

---

[5] Colborn cites two cases for the contrary proposition, one of which (*Doe v. Smith*) was decided before and superseded by *Iqbal* and *Twombly*. *See* p. 6 *supra*. The other, *Bosch v. LaMattina*, 901 F. Supp. 2d 394 (E.D.N.Y. 2012), simply does not stand for the proposition for which it is cited. Specifically, the portion of that decision that

Colborn's extended discussion of factors he asserts constitute circumstantial proof of actual malice, *see* Dkt. 79 at 20-27, is almost entirely beside the point because he has alleged no facts that plausibly tie such factors to Netflix. For example, Colborn's argument is premised on the contention that the editing of *MaM* allegedly created false impressions and omitted material information about him. *See, e.g.*, Dkt. 79 at 21, 24. But he does not plausibly plead facts that, if proven, would establish that any Netflix employee was responsible for—or, for that matter, aware of—any of these editing choices, nor that anyone at Netflix had reason to suspect (much less manifested the required "high degree of awareness" of) misleading editing. To the contrary, the Amended Complaint specifically asserts that Ricciardi and Demos, not anyone at Netflix, attended Steven Avery's trial and related legal proceedings and that they, not anyone at Netflix, edited *MaM*. Dkt. 31 at 6-7 (citing, *inter alia*, Amd. Compl. ¶¶ 25, 26, 34-36 and 42-45).

Colborn also appears to contend that, because *MaM* (1) allegedly contains false statements about him and (2) quoted Avery and his defense counsel, his family, and others critical of Manitowoc County law enforcement in doing so, Netflix must have distributed it with actual malice. *See* Dkt. 79 at 22, 24-25. Both of these contentions have been squarely rejected by the Supreme Court and the Seventh Circuit. For one thing, it is well-settled that a publication's falsity does *not* constitute proof of actual malice. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984) ("there is a significant difference between proof of actual malice and mere proof of falsity"). For another, including statements by biased sources—even reliance on a single source with an ax to grind—does not establish actual malice as a matter of law. *See, e.g.*,

---

Colborn quotes not only involved the heightened pleading standard for a fraud claim but also held that the plaintiff had *met* that standard by making "specific allegations of material misstatements and omissions" by each defendant. *Id.* at 405.

*Woods v. Evansville Press Co.*, 791 F.2d 480, 488 (7th Cir. 1986); *Sullivan*, 376 U.S. at 266 (described in note 3 *supra*).

Although Colborn's brief reads as if the notion that he was involved in an effort to frame Avery is a fantastic conspiracy theory created by Ricciardi and Demos, it was in fact the lynchpin of Avery's defense at trial. Colborn has not and cannot plead facts that would explain how Netflix could know that *MaM*'s references to him were probably false when it further alleges that it was Ricciardi and Demos who attended the trial, gathered the footage, reviewed the evidence, and edited the documentary. Nor does the Amended Complaint allege any fact suggesting that "something blatant" put Netflix on notice that Ricciardi and Demos had probably falsified *MaM*'s references to Colborn. Dkt. 31 at 24-25 (quoting *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1319 (7th Cir. 1988)). To the contrary, Colborn *admits* that "[n]othing in the broadcasts indicates to viewers that there have been edits to [Colborn's] testimony," Dkt. 79 at 3, a concession that *precludes* any plausible contention that Netflix employees "in fact entertained serious doubts" about the film's veracity, *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). In this regard, Colborn's litany of statements by what he deems "biased" sources, *see* Dkt. 79 at 9-12, actually undermines his position—that *MaM* features not one, not two, but *many* people who believed Avery was treated unfairly by law enforcement serves only to make that belief more credible.[6]

---

[6] In fact, *MaM* tells both sides of the story, including not only the prosecution's theory and evidence that Avery was guilty but, most importantly, that the jury rejected the defense's theory and convicted him. Colborn's claim that *MaM* somehow "mut[es] the fervor" of his denials, *see* Dkt. 79 at 9, is both inaccurate and immaterial, because a publisher is not required to include a plaintiff's denial of allegations levied against him, and certainly is not required to give such denials equal prominence. *See, e.g.*, *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 (10th Cir. 2017) ("[T]he First Amendment prohibits a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast plaintiff in a more favorable or balanced light." (citation omitted)).

**IV.    Colborn's Proposed Second Amended Complaint Fails Plausibly To Plead Actual Malice By Netflix.**

The additional facts Colborn cites in his brief and proposes to allege in a Second Amended Complaint are insufficient plausibly to establish that Netflix distributed *MaM* with actual malice.  To the contrary, if anything, they demonstrate that Colborn's conclusory allegations concerning Netflix's alleged actual malice are inherently *implausible*.[7]

*First*, the proposed amended complaint recites several "facts" about the role that Netflix employees played in the production of *MaM*, but none of them even purports to support a contention that any of those employees attended legal proceedings in the Avery case, were involved in the editing decisions that Colborn challenges, or that any Netflix employee had reason to question *MaM*'s accuracy.  For example, Colborn notes that two Netflix employees received formal "credits" as executive producers of the series.  Dkt. 79 at 27.  But Colborn does not allege that everyone credited as an "executive producer" participates in the editing of a documentary series like *MaM*—indeed, he makes no allegation whatsoever about what, if anything, these producers did that would support an inference that they harbored actual malice. That is because there is no connection between a person's mere status as an "executive producer" and involvement in the editing of a film.  The Internet Movie Database (IMDb) listing for Lisa Nishimura (Burnett Decl., Ex. 1), for example, lists some two dozen other projects for which she was credited as executive producer between 2013, when she first heard the pitch for *MaM*, through the documentary's release in 2015.  Dkt. 85-1 at 5-6.  This fact alone renders

---

[7] Although the Declaration of George Burnett (Dkt. 85) states that all of its exhibits represent complete copies of the online postings attached, two of them obviously omit much of that content.  *See* Dkt. 85-3 (*Vanity Fair* profile of Lisa Nishimura with large portions obscured by notifications regarding the site's paywall); Dkt. 85-5 (including approximately one page of multi-page *Business Insider* article).  Netflix has appended unabridged copies of the *Vanity Fair* and *Business Insider* articles as Exhibits A and B, respectively, to the accompanying Declaration of Matthew E. Kelley.

implausible any suggestion that she was so deeply involved in the editing and creation of *MaM* that she knew the portions involving Colborn were probably false. *See generally* Ian Crouch, *What Does a Hollywood Producer Do, Exactly?*, SLATE (Feb. 20, 2009) ("[e]xecutive producers rarely have creative or technical involvement and are often caught up with several projects at once").

*Second*, the "fact" that *MaM* has received more than a dozen prestigious awards (Burnett Decl., Ex. 4), supports, if anything, the implausibility of the notion that Netflix in fact entertained serious doubts about the accuracy of its contents. *See* Dkt. 85-4. And, contrary to Colborn's suggestion that Netflix itself received awards for writing, directing and editing *MaM*, *see* Dkt. 79 at 28, which is apparently designed to create in the Court's mind the impression that Netflix must have been actively involved in such pursuits, the exhibit on which he relies identifies Ricciardi and/or Demos as the writers, editors and directors who won those awards, *not* Netflix (which is plainly identified in its role as *MaM*'s distributor). Dkt. 85-4.

*Third*, none of the statements referenced in the exhibits to the Burnett Declaration (and the corresponding links contained in the proposed amended complaint), which were made to journalists by Ricciardi and Demos, Nishimura and/or other Netflix employees, even purport to speak to Netflix's involvement in the filming or editing of *MaM*, much less its knowledge of the alleged falsity of *MaM*'s references to Colborn. The profile of Nishimura, for example, describes her role as *licensing* documentaries from independent filmmakers including Ricciardi and Demos, not editing any such documentary's content. Dkt. 85-3 at 8. And, contrary to Colborn's representation, it is the profile's author, not Nishimura, who describes Nishimura's initial 2013 meeting with Ricciardi and Demos as a "mind meld," Dkt. 85-3 at 5, a passage that in any event says nothing about her role in creating the series. Those exhibits to the Burnett

Declaration that *do* address that subject underscore the implausibility of the inferences Colborn seeks to draw from them—for example, the *Business Insider* article (Burnett Decl., Ex. 5) quotes Netflix Chief Content Officer Ted Sarandos describing how *MaM* "came to us" when it had been "already seven years in the making." Dkt. 85-5 at 3. The fact that Ricciardi and Demos had three episodes of *MaM* in "rough cut" (plus "sketches of episodes four and five" and a "20-page outline of the series") when Netflix purchased the rights to distribute it provides no support for an inference that Netflix employees thereafter participated in reviewing and editing filmed footage that appeared in the finished product. *Id.*

Similarly, relying on an interview they gave to *The New York Times* (Burnett Decl., Ex. 2), Colborn represents that Ricciardi and Demos have publicly admitted what he characterizes as "Netflix representatives' collaboration with them." Dkt. 79 at 27. In fact, in that article, neither filmmaker references Netflix's role in *MaM* at all. *See generally* Dkt. 85-2. Demos does mention that, having Netflix as a "partner" from the outset while making the *second* season of *MaM* opened "incredible opportunities and creative choices" to the filmmakers, *id.* at 3, but—if anything—that statement speaks to the *absence* of such opportunities during the seven years they worked on the first season before Netflix purchased the rights to distribute it.

*Finally*, the fact that Netflix has recently advertised a job opening for a Script Clearance Analyst (Burnett Decl., Ex. 7) is plainly not relevant to the plausibility analysis, even if it had been posted prior to 2015 when *MaM* was distributed (it was not), because the job posting involved reviewing content for "intellectual property, personal rights, and fair use issues," not defamation. Dkt. 85-7. Similarly, the blog post (Burnett Decl., Ex. 8) describing the company's use in 2018 of data analysis to aid in the production process for scripted (*i.e.*, fictional) programming not only does not indicate whether Netflix used the processes described in 2015, it

obviously describes processes for administration and logistics and does not either state or imply that Netflix employees are involved in creative tasks such as editing.  Dkt. 85-8.

In short, none of the additional facts Colborn cites in his brief and sets forth in his proposed Second Amended Complaint plausibly indicate that Netflix employees (1) participated in the editing Colborn claims rendered *MaM*'s depiction of him false and defamatory or (2) had any reason to question the accuracy of *MaM*'s portrayal of him, much less harbored a high degree of awareness that it was probably false.  Indeed, the proposed amended pleading continues to studiously avoid alleging that Netflix, as a company, or any individual Netflix employee, had the requisite state of mind, referring instead only to "defendants" collectively or working "in concert with" each other.  *See generally* Dkt. 84-1.  As with the Amended Complaint, the only relevant *facts* it alleges are specific to Ricciardi and Demos:  for example, that they "strategically spliced and omitted portions of Plaintiff's trial testimony," *id.* ¶ 27; "heavily edited portions of Plaintiff's testimony," *id.* ¶ 34; and "attended the [Avery] trial in its entirety," *id.* ¶ 40.  As Judge Clevert wrote in dismissing a similarly deficient complaint:

> If [plaintiff's] counsel has a good faith belief that there is evidence supporting her claims she should have plead[ed] them.  Instead, the Second Amended Complaint relies predominantly on the wrongdoing of Nelsen and conclusory statements about the other defendants, with no particulars offered to support them.  As indicated by *Bell Atlantic* and *Iqbal*, factual allegations must be specific enough to justify dragging a defendant into court.  As the First Circuit wrote even before *Bell Atlantic* and *Iqbal*, "the price of entry, even to discovery, is for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings, which may be costly and burdensome.  Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition."  *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir.1999).

*Nealy v. Nelsen*, No. 11-C-0541, 2013 WL 3924358, at *12 (E.D. Wis. July 29, 2013).

The preceding discussion establishes that the additional facts Colborn purports to plead in his proposed Second Amended Complaint do not plausibly allege Netflix disseminated *MaM*

with actual malice.  Although Rule 15(a)(2) provides that courts should freely grant leave to amend "when justice so requires," that leave may and should properly be denied where the proposed amendment fails to cure identified deficiencies or would be futile.  *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017).  Where, as here, the new material in the proposed amendment does not render its claims against Netflix plausible, denial of leave to amend is appropriate.  *Id.* at 355.  Accordingly, this Court should deny Colborn's motion for leave to file the Second Amended Complaint (Dkt. 84) because it would not cure the deficiencies in the Amended Complaint and would be futile.

## CONCLUSION

Netflix is not, as Colborn asserts, "duck[ing] responsibility" for *Making a Murderer*.  Dkt. 79 at 2.  To the contrary, Netflix stands by it.  That fact, however, does not relieve Colborn of his obligation to state a plausible claim for relief from each defendant he has sued.  He has not done so with respect to Netflix, which respectfully requests that this Court grant this Motion, dismiss all of Colborn's claims against it with prejudice, and deny his Motion for Leave to File Second Amended Complaint Pursuant to Fed. R. Civ. P. 15(a).

Dated: June 27, 2019                    Respectfully submitted,


                                        _s/ James A. Friedman_____
                                        James A. Friedman
                                        Godfrey & Kahn, S.C.
                                        One East Main Street
                                        Suite 500
                                        Madison, WI 53703-3300
                                        T: (608) 284-2617
                                        F. (608) 257-0609
                                        jfriedman@gklaw.com

                                        Lee Levine
                                        Matthew E. Kelley
                                        Ballard Spahr LLP
                                        1909 K Street, NW, Suite 1200
                                        Washington, D.C. 20006-1157
                                        T: (202) 508-1110
                                        F: (202) 661-2299
                                        levinel@ballardspahr.com
                                        kelleym@ballardspahr.com

                                        Leita Walker
                                        Ballard Spahr LLP
                                        2000 IDS Center, 80 South 8th Street
                                        Minneapolis, MN 55402-2119
                                        T: (612) 371-6222
                                        F: (612) 371-3207
                                        walkerl@ballardspahr.com

                                        *Counsel for Netflix, Inc.; Chrome Media LLC;*
                                        *Laura Ricciardi; and Moira Demos*

20823237.1

Peace v. Kemper, Not Reported in Fed. Supp. (2016)

2016 WL 552356

2016 WL 552356
Only the Westlaw citation is currently available.
United States District Court, E.D. Wisconsin.

Daniel Anthony PEACE, Plaintiff,

v.

Warden Paul KEMPER, Lisa Avila, Robin
Diebold, Kimberly Engel, CO Jones,
CO II Lamke, Terry Ziem, CO John
Doe 1, and CO John Doe 2, Defendants.

Case No. 14-cv-1416-pp
|
Signed February 10, 2016

**Attorneys and Law Firms**

Daniel Anthony Peace, Waupun, WI, pro se.

Robert B. Bresette, Wisconsin Department of Justice, Madison, WI, for Defendants.

**DECISION AND ORDER DENYING PLAINTIFF'S MOTION TO AMEND COURT FILING FEES (DKT. NO. 30) AND GRANTING DEFENDANTS' MOTION TO STAY DISCOVERY ON THE MERITS (DKT. NO. 38)**

HON. PAMELA PEPPER, United States District Judge

**\*1** On September 15, 2015, the court screening the plaintiff's amended complaint and allowed him to proceed on Eighth and Fourteenth Amendment claims regarding the dissemination of information about the plaintiff's sexual assault, as well as First Amendment retaliation claims. Dkt, No. 25. The defendants have filed a motion to dismiss the plaintiff's retaliation claim and a motion for partial summary judgment on exhaustion grounds. Dkt. Nos. 31, 34. Both of these motions are fully briefed, but the court will address them in a separate order. There are two other motions pending in this case, the plaintiff's motion to amend court filing fees and the defendants' motion to stay discovery on the merits, which the court will address here.

**I. Motion to Amend Court Filing Fees**

On November 6, 2015, the plaintiff filed a motion to amend court filing fees in three of his pending cases. Dkt. No. 30. He notes that he is charged twenty percent of his income for each of the three cases, and asks for a court order either combining the filing fees or allowing the filing fees to be paid one after another rather than concurrently. The plaintiff argues that he needs access to legal research tools and supplies, both for his own cases (which include a mandamus action in Milwaukee County Circuit Court), and his assistance to other individuals with civil and criminal litigation. He indicates that he also must purchase health care products with the funds in his trust account.

The court does not have the discretion to do what the plaintiff asks. Under 28 U.S.C. § 1915(b)(2), "[a]fter payment of the initial partial filing fee, the prisoner **shall be required** to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account." (Emphasis added.) This provision applies to each complaint or appeal the plaintiff files. The statute does not allow the court the discretion to modify the collection requirement. The court also notes that the fact that the plaintiff chooses to use some of his prison income to pay for cases he has filed in state court is not relevant to whether he has to pay the federal filing fees.

Additionally, the court notes that the plaintiff seems to be using his own funds to pay for case law, papers, pens and correction tape to help other inmates with their criminal and civil cases. If the plaintiff does not have enough money to fund his own litigation, he should not be spending his money assisting other inmates with theirs.

The court will deny the plaintiff's motion to amend the court filing fees.

**II. Motion to Stay Discovery on the Merits**

After filing their motion to dismiss and their motion for partial summary judgment, the defendants filed a motion asking the court to stay all discovery on the merits of the plaintiff's claims pending a decision on those motions. Dkt. No. 38. The defendants seek relief from extensive discovery requests the plaintiff served them with just days after they filed their motions.

In Pavey v. Conley, 544 F.3d 739, 742 (7th Cir. 2008), the United States Court of Appeals for the Seventh Circuit "emphasize[s] that in the ordinary case discovery with

Peace v. Kemper, Not Reported in Fed. Supp. (2016)

2016 WL 552356

respect to the merits should be deferred until the issue of exhaustion is resolved." This is not the kind of exceptional case "in which expeditious resolution of the litigation requires that some discovery be permitted before the issue of exhaustion is resolved." Id.

 **\*2** Additionally, a pleading that fails to state a claim under Fed. R. Civ. P. 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). If, based on the defendants' motion, the plaintiff is not allowed to proceed on a retaliation claim, he should not be able to conduct discovery.

At this stage, with the motion to dismiss and the motion for partial summary judgment fully briefed, the court agrees that there is no need for the parties to engage in discovery on the merits of the plaintiff's claim. The court will allow discovery to begin again if and when the court denies the motion to dismiss.

### III. Conclusion

The court **DENIES** the plaintiff's motion to amend court filing fees. Dkt. No. 30. The court **GRANTS** the defendants' motion to stay discovery on the merits. Dkt. No. 38. The court will issue a separate order regarding the defendants' motion to dismiss plaintiff's retaliation claim and their motion for partial summary judgment on exhaustion grounds.

### All Citations

Not Reported in Fed. Supp., 2016 WL 552356

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 308748
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Western Division.

SUSAN B. ANTHONY LIST, et al., Plaintiffs,

v.

Rep. Steve DRIEHAUS, et al., Defendants.

No. 1:10–cv–720.
|
Jan. 25, 2013.

ORDER GRANTING SUSAN B. ANTHONY
LIST'S RENEWED MOTION FOR
SUMMARY JUDGMENT (Doc. 89)

TIMOTHY S. BLACK, District Judge.

**\*1** Sometimes even a person with excellent vision does
not see the forest for the trees.

On August 1, 2011, this Court entered its interlocutory
Order Denying Plaintiff Susan B. Anthony List's Motion
for Summary Judgment on Defamation. (Doc. 34). The
Court held that former Congressman Steve Driehaus
had stated a plausible claim for defamation, sufficient to
proceed to discovery.

About a year later, on June 28, 2012, the United States
Supreme Court ruled in *United States v. Alvarez,* 132 S.Ct.
2537 (2012), that a liar who falsely claimed having won the
Medal of Honor could not be punished criminally for his
false statements given the protection of free speech under
the First Amendment. This decision of the Supreme Court
followed on the heels of *Snyder v. Phelps,* 131 S.Ct. 1207
(2011), where the Court held that a father failed to state
a claim for tort against picketers who hatefully protested
at the funeral of his son, a fallen veteran, because of the
protestors' right to free speech.

Three months later, this Court stopped all further
proceedings in this case until the Court could rule upon
SBA List's Renewed Motion for Summary Judgment
on defamation. Earlier in the summer, SBA List had
retained new trial counsel who had promptly filed the
renewed motion, alleging "new and refined arguments,"

including a claim that associating a political candidate
with a mainstream political position, even if false, cannot
constitute defamation, as a matter of law. Upon review,
and in light of established and recent decisions of the
United States Supreme Court, this Court agrees.

As the United States Supreme Court stated in *Snyder v.
Phelps:*

"Speech on matters of public concern ... is at the heart of
the First Amendment's protection. The First Amendment
reflects a profound national commitment to the principle
that debate on public issues should be uninhibited, robust
and wide-open. That is because speech concerning public
affairs is more than self-expression; it is the essence of
self-government. Accordingly, speech on public issues
occupies the highest rung of the hierarchy of First
Amendment values, and is entitled to special protection."
131 S.Ct. at 1215 (citations omitted).

And as the United States Supreme Court stated recently
in *United States v. Alvarez:*

*"The remedy for speech that is false is speech that is true.*
This is the ordinary course in a free society. *The response*
to the unreasoned is the rational; to the uninformed, the
enlightened; *to the straightout lie, the simple truth.* The
theory of our Constitution is that the best test of truth
is the power of the thought to get itself accepted in the
competition of the market." 132 S.Ct. at 2550 (citations
omitted) (emphasis supplied).

The concomitant principles of free speech and truth
collide most violently in the arena of political speech.
During the recently passed national elections, citizens
were bombarded with political advertisements that the
targets of which daily denounced as lies. Who then shall be
the arbiter of political truth? Ultimately, in a free society,
the truth of political back and forth must be adjudicated
in the "marketplace of ideas," *McIntyre v. Ohio Elections
Comm'n,* 514 U.S. 334, 341 (1995), in the context of the
"uninhibited, robust, and wide-open" debate on "public
issues" that the First Amendment protects. *New York
Times v. Sullivan,* 376 U.S. 254, 2702 (1964)). It is this
fundamental principle of a free society that led the United
States Supreme Court to state:

**\*2** Cases which impose liability for erroneous reports of the political conduct of officials reflect the obsolete doctrine that the governed must not criticize their governors.... The interest of the public here outweighs the interest of appellant or any other individual. The protection of the public requires not merely discussion, but information. Political conduct and views which some respectable people approve, and others condemn, are constantly imputed to Congressmen. Errors of fact, particularly in regard to a man's mental states and processes, are inevitable.... Whatever is added to the field of libel is taken from the field of free debate.

*Sweeney v. Patterson,* 128 F.2d 457, 458 (1942) (quoted favorably by the Supreme Court in *New York Times v. Sullivan,* 376 U.S. at 272 (1964)).

List now argues that associating a political candidate with a mainstream political position, even if false, cannot constitute defamation, as a matter of law. List supports its assertion with citation to more than a dozen cases and asserts that "Driehaus cannot find a single case, in all of American history, that has awarded defamation damages based on a false statement about a public official's position on public policy."

In *Shields v. Booles,* 38 S.W.2d 677, 682 (Ky.1931), the Court of Appeals of Kentucky (its supreme court) rejected a defamation lawsuit based on the *false claim* that a candidate voted for "race-track gambling" because this "was a question upon which men of character held opposite opinion, and to say that representative voted either way was not libel of him, even though the statement was not true."

In *Manasco v. Walley,* 63 So.2d 91, 95 (Miss.1953), the Supreme Court of Mississippi held non-defamatory a *false claim* that legislator had taken certain official legislative action, because it "was a matter about which there might be reasonable differences of opinion" and so neither choice would "reflec[t] upon [the plaintiff's] honesty, integrity, or moral character."

In *Hein v. Lacy,* 228 Kan. 249, 259–60 (1980), the Supreme Court of Kansas held that a brochure attacking a legislator's "voting record and views" was not actionable because it was not "an attack on [his] personal integrity or character," but only on "his views and voting record in areas where there is wide public controversy and difference of opinion," including as to bills with respect to which "knowledgeable and respectable persons appeared on both sides."

In *Cox v. Hatch,* 761 P.2d 556, 562 (Utah 1988), the Supreme Court of Utah held that the *false* attribution of support for the Republican Party and for Senator Hatch's reelection was not defamatory, because support for a "mainstream party" is "not at odds with the fundamental social order."

In *Frinzi v. Hanson,* 140 N.W.2d 259, 262 (Wis.1966), the Supreme Court of Wisconsin held that a statement charging a Democratic candidate in a Democratic Primary with being "not a good Democrat" and having of having "thrown away all pretense at being a Democrat" was not defamatory.

**\*3** In *Pritchard v. Herald Co.,* 120 A.D.2d 956, 956 (N.Y.App.Div.1986), a New York appellate court held that it was not defamatory to describe someone as a "controversial" "black activist," because "the current of contemporary public opinion" does not expose the person to public hatred or contempt.

Moreover, as to Ohio law, in *Sweeney v. Beacon Journal Publishing Co.,* 66 Ohio App. 475, 479 (1941), an Ohio appellate court held that a publication dealing "entirely with the activities of a public officer in his connection with a matter entirely political in character" cannot be libelous.

Each of these cases reflects the truth that courts have "consistently refused to recognize ... any test of truth ... by judges [or] juries" as to public debate. *State v. 119 Vote No! Comm.,* 957 P.2d 691, 695 (Wash.1998) (quoting *New York Times,* 376 U.S. at 271).

The law steers far clear of requiring judicial determination of political "truth," and does so because of the serious

dangers to democracy and the political process that would result from turning the courts into "truth squads" with respect to core political speech on matters of public concern. *See Alvarez,* 132 S.Ct. at 2457–48 (plurality); *id.* at 2552, 2556 (Breyer, J., concurring); *id.* at 2564 (Alito, J., dissenting).

Notwithstanding all of this, the Court's prior analysis is sound to a degree; when one walks through the elements of a claim for defamation, the required allegations are present here. However, that precise and robotic analysis of each of the factors required for defamation caused the Court to focus only on the trees and ultimately not to see the forest. Here, the forest is the right to free speech under the First Amendment, even false speech, when it applies to politics.

Given that, as a matter of law, associating a political candidate with a mainstream political position, even if false, cannot constitute defamation, the Court hereby grants summary judgment to Susan B. Anthony List and dismisses Driehaus's counterclaim for defamation as to the taxpayer funded statements.[1]

1  As to the ordered statement, the Court also grants summary judgment to Susan B. Anthony List and dismisses Driehaus's counterclaim for defamation because the statement is capable of an innocent construction and/or substantially true.

   A statement is not "false" so long as it is true under *any* reasonable construction. In Ohio, this is known as the innocent construction doctrine. *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.,* 6 Ohio St.3d 369, 372 (1983); *see also England v. Auto. Canteen Co.,* 349 F.2d. 989,

991 (6th Cir.1965). An action for defamation does not lie against a statement that is, in fact, false unless plaintiff proves that the statement is not even "substantially true." *Nat'l Medic Servs. Corp. v. E.W. Scripps Co.,* 61 Ohio App.3d 752, 755 (1989). Here, Driehaus's counsel told Lamar that if Lamar put up the billboards, Driehaus would sue. Therefore, whatever reputational harm Driehaus might have suffered from the claim that he "ordered" Lamar not to erect the billboards was no greater than the harm he would have suffered from publication of the truth that he threatened to sue Lamar if it erected the billboard. Here, the falsity burden is not satisfied because "the gist" of the statement is justified. *Masson,* 501 U.S. at 516–18; *see also Bustos v. A & E Television Networks,* 646 F 3d. 762, 764 (10th Cir.2011) (a statement is not actionable unless it is "material," in terms of "the damage it has done to the plaintiff's reputation" relative to "the damage the truth could have caused."); *Texas Monthly, Inc. v. Transamerican Natural Gas Corp.,* 7 S.W.3d 801, 812–13 (Tex.Ct.App.1999) (statement was thus not "more damaging" than the truth, and "the gist" of the statement—"although not 100% accurate in every detail"—was "substantially true and not actionable.").

The Clerk shall enter judgment accordingly, causing this decision to become a final, appealable order. And this case shall be closed in this Court.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 308748

  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Bryant v. Ramos, Not Reported in Fed. Supp. (2017)

2017 WL 568314

2017 WL 568314
Only the Westlaw citation is currently available.
United States District Court, E.D. Wisconsin.

Deborah BRYANT, Plaintiff,

v.

Jennifer M. RAMOS, Defendant.

Case No. 15–1568–pp [1]

[1]  The court has consolidated this case with Bryant v.
Wuerl, 16–cv–213–pp. Dkt. No. 25. The court uses
the original case number for the Ramos complaint,
because this motion to dismiss does not appear in the
docket entries for 16–cv–213. **The court asks the clerk
of court to docket this order under both case numbers**.

|

Signed 02/13/2017

**Attorneys and Law Firms**

Deborah Bryant, Atlanta, GA, pro se.

Jessica M. Butler, William F. Sulton, Peterson Johnson &
Murray SC, Milwaukee, WI, for Plaintiff.

Patrick J. McClain, City Attorney's Office, Milwaukee,
WI, for Defendant.

**ORDER GRANTING MOTION TO DISMISS
CASE AS TO DEFENDANT JENNIFER RAMOS
(DKT. NO. 5), EFFECTIVE MARCH 17, 2017**

HON. PAMELA PEPPER, United States District Judge

## I. **Facts**

 **\*1** According to the plaintiff's complaint, the plaintiff
is an "actress, model and a reality-television star" living
in Atlanta, Georgia. Dkt. No. 1 at 2. In September 2015,
a friend of the plaintiff's invited her to a restaurant in
downtown Milwaukee called Elsa's on the Park. Id. The
plaintiff and her friend arrived at the restaurant together,
but she asserts that "because [she] is famous," other
restaurant customers "began sitting next to and around
[her] to converse with her." Id.

At some point, a person named "Nate" called 911, and
told the dispatcher that he was a bartender at Elsa's,
and that there was a "rowdy crowd" that was "causing
a disturbance," and that "almost a fight broke out." Id.
at 3. Then Brittany Wuerl, the manager of Elsa's, called
911 a second time, indicating that she was "still waiting
for police assistance," and that she was "trying to contain
the people." Id. Wuerl told the dispatcher that "there is
only one person left from that group," and that Wuerl
wanted the police to come before that person left. Id.
Wuerl indicated to the dispatcher that the plaintiff was
"on the reality television show *Love and Hip Hop* and that
'people know' who she is." Id.

Defendant Officer Jennifer Ramos went to Elsa's, and
spoke with Wuerl. Id. Wuerl told the defendant that
the plaintiff "refused to pay 'the group's' bill." Id. The
defendant also spoke with Nina Dismukes, a server at
Elsa's. Id. at 4. It is not clear what, if anything, Dismukes
told the defendant, but the plaintiff asserts that she "did
not tell [the defendant] that [the plaintiff] refused to pay
for the food and beverages that she ordered." Id. Finally,
the defendant spoke with the plaintiff herself. The plaintiff
"told [the defendant] that [the plaintiff] did not agree to
pay for food and beverages ordered by other patrons." She
also told the defendant that "Elsa's was trying to make [the
plaintiff] pay for 'the group's' bill because she is famous."
Id.

The defendant arrested the plaintiff, and "sought the
prosecution" of the plaintiff "for absconding without
paying." Id. The complaint alleges that at the time the
defendant arrested the plaintiff, the defendant "knew
that [the plaintiff] was a famous person." Id. at 6. It
alleges that the plaintiff did not abscond from Elsa's
without paying; rather, she "offered to pay for the food
and beverages that she actually ordered." Id. at 4. The
plaintiff maintains that Wuerl was not happy with this
offer, and "tried to intimidate [the plaintiff] into paying
for 'the group's' bill by telling [the plaintiff] the police
were coming." She argues that "[w]hen that did not
work, Wuerl convinced [the defendant] [sic] join in the
intimidation of [the plaintiff]." Finally, she argues that
when the plaintiff refused to be intimidated, the defendant
arrested her, "jailed her, and made a criminal referral
for absconding without paying." Id. at 5. The prosecutor
declined to issue charges. Id.

## II. **Allegations**
The plaintiff alleged that the defendant violated her
Fourth Amendment rights under 42 U.S.C. § 1983 by

Bryant v. Ramos, Not Reported in Fed. Supp. (2017)

2017 WL 568314

detaining her without reasonable suspicion. Id. She also alleged that the defendant violated her Fourth Amendment rights by unlawfully arresting her. Id. at 6. Finally, she alleges that the defendant violated her Fourteenth Amendment equal protection rights by treating her differently from others on the basis that she is famous. Id. at 7–8.

### III. **Motion to Dismiss**

 **\*2** The defendant has asked the court to dismiss the case against the defendant under Fed. R. Civ. P. 12(b)(6), for failure to state a claim. Dkt. No. 5. The plaintiff—at the time, represented by counsel—opposed the motion. Dkt. No. 11.

### IV. **Analysis**

  A. Governing Law

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990) (citation omitted). In considering a motion to dismiss brought under Rule 12(b)(6), the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. AnchorBank, FSB v. Hofer, 649 F.3d 610, 614 (7th Cir. 2011) (citation omitted). To survive a Rule 12(b) (6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id., citing Twombley, 550 U.S. at 566. In this context, "plausible," as opposed to "merely conceivable or speculative," means that the plaintiff must include "enough details about the subject-matter of the case to present a story that holds together." Carlson v. CSX Transp., Inc., 758 F.3d 819, 826–27 (7th Cir. 2014) (quoting Swanson v. Citibank, N.A., 614 F.3d 400, 404–05 (7th Cir. 2010)).

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that the defendants: 1) deprived her of a right secured by the Constitution or laws of the United States; and 2) acted under color of state law. Buchanan–

Moore v. Cnty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citing Kramer v. Vill. of N. Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004)); see also Gomez v. Toledo, 446 U.S. 635, 640 (1980).

  B. Unlawful Detention Claim

The plaintiff's complaint framed her first cause of action as "unlawful detention." The facts alleged in the complaint are thin, but it appears that the defendant arrived at Elsa's and spoke with two people—the manager and a server—before speaking with the plaintiff. The complaint describes the exchange between the two as being brief: the plaintiff told the defendant that she did not agree to pay for food other people had ordered, and accused the restaurant of trying to make her pay because of her status as a celebrity. It appears that the defendant arrested the plaintiff immediately after this conversation occurred.

Based on these sparse facts, it does not appear that there was any pre-arrest "detention" of the plaintiff. The defendant walked up to the plaintiff, talked to her for a few minutes, then arrested her. In order to survive a motion to dismiss, the plaintiff must provide more facts than these.

The court then turns to the question of whether the defendant unlawfully detained the plaintiff after arresting her. Again, the complaint provides few facts. The complaint states more than once that the defendant "arrested, jailed and sought the prosecution" of the plaintiff for "absconding without paying." See Dkt. No. 1 at 4. It states that the defendant "knowingly extended the detention" of the plaintiff without reasonable suspicion. Yet nowhere in the complaint, nor in the pleadings, does the plaintiff shed light on how long she was detained. This is relevant information.

 **\*3** The Fourth Amendment protects against unreasonable seizures; an arrest is a seizure, and the Fourth Amendment affords persons who are arrested the further, distinct right to a judicial determination of probable cause 'as a prerequisite to extended restraint of liberty following arrest.' " *Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)). In *Gerstein*, the Supreme Court held the judicial determination of probable cause must be "prompt," a holding that "acknowledges that prolonged pretrial detention occasions serious interference with liberty

Bryant v. Ramos, Not Reported in Fed. Supp. (2017)

2017 WL 568314

rights." *Willis v. City of Chicago,* 999 F.2d 284, 287 (7th Cir.1993). And, in *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) the Court refined "prompt" with the "general rule that persons arrested without a warrant must receive a judicial determination of probable cause within 48 hours." *Lopez,* 464 F.3d at 719 (citing *McLaughlin,* 500 U.S. at 56–57, 111 S.Ct. 1661).

Riverside's rule established a "48–hour burden-shifting approach," meaning, as applicable here, that detentions less than 48 hours are presumptively reasonable and "the arrested person bears the burden of establishing that the length of his custody is nonetheless unreasonable." *Portis v. City of Chicago,* 613 F.3d 702, 704 (7th Cir.2010). In *Riverside,* the Supreme Court gave examples of unreasonable delays: "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." 500 U.S. at 56, 111 S.Ct. 1661. The Seventh Circuit has also held that "prolonging the detention of an arrestee to investigate crimes other than the one for which he had been arrested" runs afoul of Riverside. *Wells v. City of Chicago,* 2012 WL 116040, at *6 (N.D.Ill. Jan. 16, 2012) (citing *Willis v. City of Chicago,* 999 F.2d 284, 288–89 (7th Cir.1993)).

Flint v. City of Milwaukee, 91 F. Supp. 3d 1032, 1054–55 (E.D. Wis. 2015).

Here, the plaintiff does not indicate what time the defendant arrested her. She does not indicate how long she was in custody before she was taken to a judicial officer. She does not even indicate *whether* she was taken to a judicial officer. She states only that she was arrested and jailed, and that the defendant sought prosecution, but that the prosecutor disagreed. There is nothing in the complaint, or in the pleadings, to allow the court to determine whether the plaintiff's post-arrest detention was reasonable or unreasonable.

The court will give the plaintiff a short period of time to amend her complaint to add relevant facts. If the plaintiff does not file an amended complaint by the deadline the court sets, the unlawful detention claim will be dismissed.

B. Underline False Arrest Claim

The plaintiff alleges that the defendant had no basis for arresting her. She indicates that she did not agree to pay for anyone's food other than her own, did not tell anyone at Elsa's that she would pay for anyone's food other than her own, and did not refuse to pay for her own food. She asserts (without any factual support) that the defendant knew that she was famous, and arrested her for that, not because the defendant had probable cause to believe that she'd committed a crime.

Probable cause is an absolute defense to a false arrest claim. *Abbott v. Sangamon Cty., Ill.,* 705 F.3d 706, 713–14 (7th Cir.2013). Probable cause exists where "the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id.* at 714 (citing *Thayer v. Chiczewski,* 705 F.3d 237, 246 (7th Cir.2012); *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). While this requires "more than a hunch," it does not require that officers find "that it was more likely than not that the arrestee was engaged in criminal activity." *Abbott,* 705 F.3d at 714 (citing *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *Fox v. Hayes,* 600 F.3d 819, 833 (7th Cir.2010)). The inquiry is purely objective, requiring an examination of how a reasonable officer would act, knowing what the arresting officer knew at the time of the arrest. *Abbott,* 705 F.3d at 714 (citing *Devenpeck v. Alford,* 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004); *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003); *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Tebbens v. Mushol,* 692 F.3d 807, 817 (7th Cir.2012)).

**\*4** Hardy v. City of Milwaukee, 88 F. Supp. 3d 852, 869–80 (E.D. Wis. 2015).

The plaintiff alleges that the defendant arrested her for "absconding without paying." Wis. Stat. § 943.21(1m)(a) states that anyone who, "[h]aving obtained any beverage [or] food ... at any ... restaurant ..., intentionally absconds without paying for it" is guilty of a crime—either a misdemeanor or a felony, depending on the value of the food and beverage. "Section 943.21(1)(a), Stats., is aimed at those who avoid paying for [food or beverages] through

Bryant v. Ramos, Not Reported in Fed. Supp. (2017)

2017 WL 568314

an act of fraud." State v. Steckel, 125 Wis. 3d 577 (Ct. App. 1985). One can "abscond" by making misrepresentations intended to mislead the restaurant regarding the bill. Id.

To determine whether the defendant had probable cause to arrest the plaintiff at Elsa's, the court must look at what the defendant knew at the time of the arrest, and determine whether that knowledge would warrant a reasonable officer in believing that the plaintiff intended to escape paying a bill that she owed. The defendant was aware that there had been a 911 call from Elsa's; if she hadn't known that, she would not have gone there, and would not have talked to the manager, the server and the defendant. It is not clear how much the defendant knew of the content of the two 911 calls—she may have known that a group of people had been "rowdy," or that there almost had been a fight, or that only one person was left from the group. But she knew that Elsa's staff had reported something amiss. She also may have known that the staff at Elsa's was trying to "contain" the group, but that only one person remained.

Once the officer arrived at Elsa's, the manager—Brittany Wuerl—told her that the plaintiff had refused to pay the group's bill. The plaintiff argues that this, in itself, was not sufficient to provide probable cause for arrest; she argues that "[the defendant] was required to do more than arresting and jailing [the plaintiff]." Dkt. No. 11 at 7. But the defendant *did* do more. She spoke with a server; the complaint is evasive regarding what that server said to the defendant. She also spoke with the plaintiff; the plaintiff claims that she denied agreeing to pay for any food other than what she ordered, and claims that she offered to pay for what she ordered.

The court does not know what, exactly, the various players said to the defendant. The court does not know how fraught the atmosphere was into which the defendant walked. The court does not know the plaintiff's demeanor toward the defendant (nor the defendant's toward the plaintiff). Likely all of these factors would have been relevant to the defendant's decision to arrest the plaintiff, but the court does not have that information. All the court knows is that the defendant was aware that there was some sort of disturbance at Elsa's, that Elsa's staff believed that the plaintiff was responsible for a bill for food ordered by a group of people, that the plaintiff refused to pay that bill, and that the plaintiff argued that she did not owe the

bill. The defendant also may have known that people were leaving in the wake of the disturbance.

**\*5** Again, because the facts stated in the complaint are so thin, it is difficult for the court to determine whether the false arrest charge should survive a motion to dismiss. The court again will give the plaintiff time to file an amended complaint to provide additional facts. The court notes a few other points, however.

The plaintiff argues that the incident at Elsa's—a dispute over a restaurant bill—was a "civil" dispute, and thus that it could not give rise to probable cause for a criminal arrest. Dkt. No. 11 at 4. This is a strange argument. A custody dispute between estranged parents is a civil dispute, until one parent kidnaps the child. A disagreement over a debt is a civil dispute, until the creditor decides to collect by slugging the debtor. The question of whether a situation is civil or criminal depends on context and intent, and intent is a very fact-bound inquiry. Once cannot simply cite a few cases—as the plaintiff has done—in which courts found that an individual did not have criminal intent under particular circumstances, and conclude that there could never be criminal intent under similar circumstances.

The plaintiff also argues biased witnesses can negate probable cause. Id. at 9. The plaintiff provides no explanation of why she believes that the Elsa's staff—the manager or the server—were "biased" against her. She asserts several times in the complaint that she is "famous" and that people know who she is. It is not clear why, even if this was true, it would cause the staff at Elsa's to be biased against her.

If the plaintiff has any facts to shed light on these questions, she may include them in her amended complaint.

### C. Equal Protection Claim

Finally, the plaintiff argues that the defendant violated her Fourteenth Amendment equal protection rights. She claims that "[the defendant] singled out [the plaintiff] because she is famous." Dkt. No. 1 at 8. She further argues that the defendant "intentionally treated [the plaintiff] differently from others similarly situated and there is no rational basis for the difference in treatment." Id.

Bryant v. Ramos, Not Reported in Fed. Supp. (2017)

2017 WL 568314

The plaintiff's claim is not the run-of-the-mine equal protection claim. As the Seventh Circuit has noted, a "garden-variety equal protection challenge" is "typically ... concerned with governmental classifications that affect some *groups* of citizens differently from others." United States v. Moore, 543 F.3d 891, 896 (7th Cir. 2008) (quoting Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601 (2008)) (emphasis added by appellate court). The plaintiff alleges that she has been " 'irrationally singled out,' without regard for any group affiliation, for discriminatory treatment." Id. (quoting Engquist at 601). This is called a "class-of-one" equal protection challenge; courts recognize such a challenge "where an individual alleges that [she] has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " Id. (quoting Vill. Of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).

To prevail on her class-of-one claim, the plaintiff first must prove that she was intentionally treated differently from others who were situated similarly. Id. at 897. That means she has to identify some similarly-situated people; those similarly-situated people are called "comparators," and they must be "*prima facie* identical in all relevant respects or directly comparable ... in all material respects" to her. Id. (quoting Racine Charter One, Inc. v. Racine Unified Sch. Dist, 424 F.3d 677, 680 (7th Cir. 2005)).

**\*6** The plaintiff did not identify any comparators in her complaint. She asserts that she is not required to do so, citing Geinosky v. City of Chicago, 675 F.3d 743, 748 n.3 (7th Cir. 2012). Dkt. No. 11 at 10. She is correct that the Seventh Circuit stated in Geinosky that "[e]ven the more demanding pleading requirements under *Iqbal* and *Twombly* do not require a plaintiff to identify specific comparators in a complaint." Geinosky, 657 F.3d at 748 n.3. But the plaintiff still must articulate sufficient facts to "help distinguish between ordinary wrongful acts" that the defendant might have committed and "deliberately discriminatory denials of equal protection." Id. at 748. While there may be some cases in which it is enough to state that a defendant intentionally treated a plaintiff differently than others similarly situated, this is not one of those cases.

The facts in this case demonstrate that at some point, the plaintiff was with a group of people. The Elsa's staff delivered food and beverages to that group of people. The behavior of that group, or members of that group,

was such that it caused Elsa's staff to call 911 twice. By the time the officer arrived, all of the members of the group had left, except the plaintiff, and no one had paid the bill for the food. While the plaintiff need not name comparators by name, her complaint needed to describe the comparators as a group. The complaint did not do so.

For the sake of argument, the court could consider the comparators to be other Elsa's customers. Under that scenario, the plaintiff herself has articulated, in the complaint, a non-discriminatory, rational basis for the defendant to treat her differently than other Elsa's customers. She was among a group of people who ordered and obtained food and beverage, and did not pay the bill, and she refused to pay the bill. Even assuming that the defendant knew that the plaintiff was famous, her refusal to pay a bill for which the defendant had reason to believe she could be responsible (with no other responsible person present to pay it) provided the defendant with a rational, non-discriminatory reason to treat her differently than other Elsa's customers.

Again, the court will give the plaintiff the opportunity to file an amended complaint, and to include any facts that might shed light on her allegation that she was treated differently because she was a celebrity.

D. Prosecution of the Case

The court notes that at the time the plaintiff filed this complaint, she had an attorney in Milwaukee representing her. That counsel prepared the complaint in this case, as well as the complaint against the restaurant manager, Brittany Wuerl, filed two months after the plaintiff filed this case. After the parties had fully briefed this motion to dismiss, the plaintiff's lawyer filed a motion to withdraw from representing her, because his law firm represented defendant Wuerl's insurance company, and the insurance company would not waive that conflict. Once this court consolidated the Ramos and Wuerl cases, counsel was conflicted out of this case, as well.

The court had scheduled oral argument on this motion to dismiss. After the plaintiff's counsel withdrew, the court held a telephonic hearing (with the plaintiff on the line), and agreed to adjourn the oral argument to allow the plaintiff to try to find new counsel. Dkt. No. 30. The court also advised the plaintiff about resources for finding counsel in Milwaukee. Id. The court advised the plaintiff that if she was not able to find counsel by the adjourned

**Bryant v. Ramos, Not Reported in Fed. Supp. (2017)**

2017 WL 568314

date, she would have to represent herself at the oral argument. Id.

The plaintiff did not appear on the conference line on the date scheduled for oral argument—October 13, 2016. Dkt. No. 31. The court noted that no attorney had filed a notice of appearance on the plaintiff's behalf. It heard argument from counsel for the defendant, and took the motion under advisement. Id.

 **\*7** The plaintiff has not filed any documents, or contacted the court, since the telephone hearing on September 6, 2015. Defendant Wuerl has filed a motion for summary judgment, dkt. no. 35, to which the plaintiff has not responded; the court will issue a separate ruling on that motion.

V. **Conclusion**

The court **ORDERS** that the defendant's motion to dismiss is **GRANTED,** effective March 20, 2017, **unless, by the end of the day on Friday, March 17, 2017, the plaintiff files an amended complaint.** If the plaintiff does not file an amended complaint in time for the court to receive it by the end of the day on March 17, 2017, the complaint against defendant Ramos will be dismissed on March 20, 2017 without further notice or hearing.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 568314

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3924358
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

Theola NEALY, Plaintiff,

v.

Peter NELSEN, Nicola Brodlo, Angela
D'fantis, Matthew Gebhardt, Mary Pat
Skelly Bohn, each in his or her individual
and official capacities, Defendants,
and
State of Wisconsin, Intervening Defendant.

No. 11–C–0541.
|
July 29, 2013.

**Attorneys and Law Firms**

Shannon Leigh Peters, Joy M. Bertrand, Joy Bertrand Esq, Scottsdale, AZ, for Plaintiff.

Charles L. Glynn, Charles L. Glynn Law Office, Wauwatosa, WI, Donald H. Carlson, Rebecca C. Levin, Crivello Carlson SC, Milwaukee, WI, Chad R. Gendreau, Monica A. Burkert Brist, Wisconsin Department of Justice Madison, WI, for Defendants.

DECISION AND ORDER GRANTING MOTION
FOR DEFAULT JUDGMENT (DOC. 55);
GRANTING MOTIONS TO DISMISS BY MARY
PAT SKELLY BOHN (DOC. 40), NICOLA BRODLO
(DOC. 57), AND MATTHEW GEBHARDT (DOC.
65); GRANTING MOTION FOR SUMMARY
JUDGMENT BY ANGELA D'FANTIS (DOC.
67); AND SETTING A STATUS CONFERENCE

C.N. CLEVERT, JR., District Judge.

**\*1** Theola Nealy sues Peter Nelsen and four other individuals for civil rights violations related to Nelsen's sexual relationship with Nealy and court proceedings concerning custody of Nealy's and Nelsen's resulting child. Before the court are motions for default judgment against defendant Nelsen, to dismiss claims against defendants Bohn, Brodlo and Gebhardt, and for summary judgment against defendant D'Fantis. Each is discussed below.

## GENERAL ALLEGATIONS OF THE
## SECOND AMENDED COMPLAINT

In her Second Amended Complaint Nealy asserts that between 1997 and April 2009, Peter Nelsen was a social worker employed by the Bureau of Milwaukee Child Welfare (BMCW). Until September 30, 2009, he was certified as a clinical social worker through a state examining board. (Doc. 37 at 2.)

On or about July 2007, Nelsen was assigned by the BMCW to investigate an allegation of child abuse regarding Nealy's two children; he concluded that the allegation was unsubstantiated. After a second allegation regarding abuse was made against Nealy in late August 2007, another BMCW social worker was assigned to an investigation, but Nelsen told Nealy that he had taken over the case. (Doc. 37 at 4.)

After finding the allegations unsubstantiated, Nelsen continued to appear at Nealy's home, weekly then daily through early November 2007. Often the visits lasted an hour and the conversations became increasingly intimate. Nealy was not comfortable with the visits but felt obligated to allow Nelsen into her home and to answer his questions because she knew he could remove her children from her care. (Doc. 37 at 5.) When Nelsen visited he displayed his BMCW credentials on a lanyard around his neck. He told her he had arrest powers over parents suspected of child abuse or neglect and that he could learn anything about her through a database managed by the State of Wisconsin. Between September and early November 2007, Nelsen had sexual intercourse with Nealy six or seven times. (Doc. 37 at 6.) Nealy says she was coerced into having sex with Nelsen because of his control over her children's custody and placement. (Doc. 37 at 7.)

Through Nelsen's sexual contact with Nealy she became pregnant. Nelsen told Nealy to get an abortion but she refused. Within weeks of her refusal to abort the baby, on December 21, 2007, Milwaukee police officers and BMCW social workers seized Nealy's two children. (Doc. 37 at 7.)

Nealy gave birth to a daughter on August 19, 2008. Nelsen appeared at the hospital and gained access to Nealy by displaying his social worker credentials. (Doc. 37 at 8.)

Within a month, Nelsen pressured Nealy to allow him to have visits with the baby. He began keeping the baby for weeks at a time and refused to return the child to Nealy. (Doc. 37 at 11.) Nelsen kept the baby from Nealy entirely, and stated to her that she must do as he said. Although no custody order was in effect, Nelsen also said he would allow Nealy to have only supervised visits with the baby. (Doc. 37 at 12.)

 **\*2** The Second Amended Complaint describes Mary Pat Skelly Bohn as a deputy director with the BMCW, Nicola Brodlo as a "first-line supervisor" of Nelsen at the BMCW, Matt Gebhardt as a "second-line supervisor" of Nelsen at the BMCW, and D'Fantis as a "supervisor of ongoing case managers" with the BMCW. (Doc. 37 at 3.) It further asserts that by February 2009, Nelsen openly posted photos of himself with the baby on Facebook; his Facebook friends included several BMCW coworkers. On at least one occasion in early 2009 he brought the baby to work and Brodlo played with her. (Doc. 37 at 8.) Nelsen dropped off and picked up the baby during work hours. When BMCW colleagues inquired about the infant at Nelsen's house, he told them varying stories, such as that he was providing care for one of his assigned families or that he had found the baby in a van. (Doc. 37 at 12.) Nelsen has said he dropped off and picked up the baby from Nealy's house and at a dental appointment in full view of Nealy's visitation worker or case manager. (Doc. 37 at 9.)

In late winter or early spring 2009, Nealy disclosed the identity of her baby's father to D'Fantis and BMCW ongoing case manager Enrique Lockhart. (Doc. 37 at 8.) In April 2009, Nealy told a social worker assigned to oversee the administration of Nealy's Wisconsin Works (W–2) benefits that Nelsen was the baby's father.[1] (Doc. 37 at 9.)

1    The Second Amended Complaint alleges this happened in April 2008, but the baby was not yet born at that time.

On April 7, 2009, after BMCW was notified by Nealy's W–2 worker of the inappropriate sexual relationship, BMCW placed Nelsen on administrative leave. (Doc. 37 at 17.) On April 8, 2009, the BMCW directed Nelsen to appear at its administrative office to answer questions about his relationship with a female client of the BMCW. (Doc. 37 at 9.) The BMCW issued a letter, signed by Bohn on April 14, 2009, stating its intent to terminate Nelsen

because of his "professional and personal relationship with a female client and her children during 2007 through the present. In addition, this relationship resulted in the birth of a child." (Doc. 37 at 10.) Nelsen then resigned from his position at the BMCW. (Doc. 37 at 10.) The Wisconsin Department of Workforce Development found that although Nelsen resigned, the separation was deemed a discharge because Nelsen would have been terminated for violation of policy relating to the relationship with a client. (Doc. 37 at 17.)

After Nealy disclosed Nelsen's identity as the father, BMCW social workers remained assigned to her family's case in Milwaukee County Children's Court. (Doc. 37 at 10.) In July 2009, Nelsen called Nealy's ongoing case manager and questioned whether the visitation worker knew "exactly what [w]as happening" between Nealy and the baby; he said he would never allow Nealy to have access to the baby again. (Doc. 37 at 13.) In an August 2009 email to the case manager, Nelsen stated he had obtained information on Nealy's March 2009 psychological evaluation. (Doc. 37 at 13.)

On August 17, 2009, Nelsen called BMCW's Bridgette Linderman saying he was anxious and worried about the location of the baby. That same day, a BMCW social worker was assigned to a "same day response" referral regarding the baby and was directed, if he found the baby, to detain the child and place her in the care of her father, Peter Nelsen. The BMCW worker seized the baby that day and placed her with Nelsen, prompting an emergency detention action in Milwaukee County Children's Court. (Doc. 37 at 14.)

 **\*3** Not until after a story about Nelsen's conduct was reported in the Milwaukee press, on August 27, 2009, did Bohn report Nelsen's termination to the Wisconsin Department of Regulation & Licensing. (Doc. 37 at 11.) Within days of a media report, three BMCW social workers arrived at Nealy's home and demanded to know why she was causing trouble. (Doc. 37 at 15.)

Until September 9, 2009, BMCW social workers continued to be assigned to Nealy's cases. On or about September 9, 2009, upon motion filed by Nealy's children's court attorney, a Milwaukee County Circuit Court judge ordered BMCW to assign a different social worker to Nealy's children's court case. (Doc. 37 at 16.)

The state licensing department revoked Nelsen's social worker license on September 23, 2009, based on his sexual conduct with Nealy. (Doc. 37 at 15–16.) After Nelsen resigned from BMCW but before his license was revoked, Brodlo continued to advise Nelsen about his child custody issues. (Doc. 37 at 15.)

The Second Amended Complaint asserts a 42 U.S.C. § 1983 claim against Nelsen for violation of due process; two claims against Gebhardt, D'Fantis, Brodlo, and Bohn under 42 U.S.C. § 1985(2) for conspiracy with Nelsen and others to impede, hinder, obstruct, or defeat the due course of justice; and a claim under 42 U.S.C. § 1986 against Gebhardt, D'Fantis, Brodlo and Bohn for failure to act to prevent civil rights conspiracy violations.

MOTION FOR DEFAULT JUDGMENT

For a second time, Nealy seeks default judgment against Nelsen for his failure to serve disclosures under Fed.R.Civ.P. 26 and answers to interrogatories and document requests, after being ordered to do so. Nelsen has failed to respond to the motion for default judgment as well.

Nelsen's Rule 26 disclosures and other discovery responses were due on or about June 2, 2012. His attorney told Nealy's attorney that because of a death in Nelsen's family, discovery would be delayed until June 13, 2012. However, as of June 25, 2012, when Nealy filed her first motion for default judgment, the discovery remained outstanding. Nealy's first motion for default judgment indicated that her attorney attempted to confer with Nelsen's attorney by telephone before filing the motion, but as of the date the motion was filed Nelsen's attorney had not responded to the voice mail message. As an alternative to default judgment, Nealy sought an order compelling Nelsen to provide the discovery.

In an order on November 8, 2012, this court denied the first motion for default judgment without prejudice but granted the motion to compel. The court wrote that default judgment, as an initial sanction before an order to compel, would be too severe. (Doc. 54 at 2.) Instead, the court ordered Nelsen to serve Nealy with his Rule 26 disclosures and answers to interrogatories and document production requests no later than November 15, 2012. (*Id.* at 3.) The court warned that it would "not look favorably

on any additional delay following the court's order to compel." (*Id.*)

**\*4** The court held a status conference the following day, November 9, 2012. During that conference, counsel for Nelsen said he had emphasized to Nelsen the importance of full compliance with discovery requests. The court stated that "it should be made clear to Nelsen that if there is an ongoing failure to comply with discovery then the motion for default judgment can be renewed." (Doc. 63 at 2.)

Nelsen failed to comply with this court's order to compel. Nealy then filed her second motion for default judgment on November 19, 2012. As of that date, Nealy's attorney had not received any documents from Nelsen. She left a voicemail with Nelsen's attorney on November 16, 2012, to discuss the matter, but as of November 19 he had not responded. Nealy's motion has not been withdrawn, hence it appears that Nelsen still has not supplied plaintiff with the discovery.

Federal Rule of Civil Procedure 37(a)(3)(A) provides for orders to compel and "appropriate sanctions" for a party's failure to comply with discovery requirements. When a defendant fails to obey a court's discovery order, the court may enter "further just orders," including one granting default judgment. Fed.R.Civ.P. 37(b)(2)(A). Unless the failure to comply with the court order was substantially justified or circumstances exist making an award of expenses unjust, the disobedient party must pay the opponent's reasonable expenses, including attorney's fees, caused by the failure. Fed.R.Civ.P. 37(b)(2)(C).

The sanction of default judgment is serious. Hence, in appropriate cases the court grants a motion to compel then graduates to a sanction of dismissal following violation of the order compelling discovery. The court has done so here. Nelsen was ordered to provide discovery no later than November 15, 2012, and he has failed to comply. By failing to respond to the motion for default judgment, he concedes that the motion has merit. Thus, default judgment is a warranted sanction.[2] Moreover, Nealy is entitled to reimbursement of her expenses, including costs and attorney's fees, for her motion to compel. *See* Fed.R.Civ.P. 37(b)(2)(C). She should calculate those sums and submit them to the court and Nelsen's counsel.

2    Further, Nelsen failed to file any answer to Nealy's
     Second Amended Complaint. However, default
     judgment is being granted for the violations of the
     court's order and discovery requirements, not the
     failure to answer the amended pleading.


MOTIONS TO DISMISS

Defendants Bohn, Brodlo, and Gebhardt move to dismiss
the Second Amended Complaint. These defendants are
named in counts two, three, and four, alleging violations
of 42 U.S.C. §§ 1985 and 1986. However, they are not
mentioned anywhere under the section of Nealy's pleading
in which she alleges a § 1983 violation.

A Rule 12(b)(6) motion to dismiss challenges the
sufficiency of the complaint to state a claim upon which
relief may be granted. *See* Fed.R.Civ.P. 12(b)(6). Rule
12(b)(6) requires a plaintiff to clear two hurdles. *EEOC
v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th
Cir.2007). First, the complaint must describe the claim in
sufficient detail to give a defendant fair notice of the claim
and the grounds on which it rests. *Id.* Although specific
facts are not necessary, "at some point the factual detail
in a complaint may be so sketchy that the complaint does
not provide the type of notice of the claim to which the
defendant is entitled." *Airborne Beepers & Video, Inc. v.
AT & T Mobility LLC,* 499 F.3d 663, 667 (7th Cir.2007).
Second, the complaint must set forth a claim that is
plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S.
544, 570, 127 S.Ct. 1955, 1974 (2007); *St. John's United
Church of Christ v. City of Chicago,* 502 F.3d 616, 625 (7th
Cir.2007). The "allegations must plausibly suggest that the
plaintiff has a right to relief, raising that possibility above
a 'speculative level'; if they do not, the plaintiff pleads
itself out of court." *EEOC,* 496 F.3d at 776 (citing *Bell Atl.
Corp.,* 550 U.S. at 555–56, 569 n. 14 (2007)). "A claim has
facial plausibility when the plaintiff pleads factual content
that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged."
*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949
(2009).

**\*5** When considering a Rule 12(b)(6) motion, the court
must construe the complaint in the light most favorable
to the plaintiff, accepting as true all well-pleaded facts
and drawing all possible inferences in the plaintiff's
favor. *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th
Cir.2008). However, legal conclusions are not accepted

as true. A pleading containing only '[t]hreadbare recitals
of the elements of a cause of action, supported by mere
conclusory statements," will not do. *Iqbal,* 556 U.S. at 678.

A. § 1985(2) Claims
Bohn proffers two arguments for dismissal of the 42
U.S.C. § 1985(2) claim: (1) Nealy's action is barred by
the intracorporate conspiracy doctrine; and (2) Nealy fails
to assert several specific facts required for a conspiracy
claim under § 1985(2). Brodlo and Gebhardt do not pursue
the intracorporate conspiracy doctrine but challenge the
Second Amended Complaint on the lack of facts meeting
specific elements of the § 1985(2) claim, similar to Bohn.In
addition, all three defendants argue that the 42 U.S.C.
§ 1986 claim must be dismissed because Nealy cannot
establish an underlying § 1985 claim.


1. Intracorporate conspiracy doctrine
Bohn asserts that because all of the defendants charged
with conspiracy were employees of the same governmental
entity, i.e., BMCW, the intracorporate conspiracy
doctrine bars Nealy's § 1985(2) claims. A conspiracy
cannot exist solely between members of the same
entity. "[M]anagers of a corporation jointly pursuing
its lawful business do not become 'conspirators' when
acts within the scope of their employment are said to
be discriminatory or retaliatory." *Travis v. Gary Cmty.
Mental Health Ctr.,* 921 F.2d 108, 109 (7th Cir.1990). This
intracorporate conspiracy doctrine bars claims against
individual employees and officials of a single government
entity. *Wright v. Ill. Dep't of Children & Family Servs.,* 40
F.3d 1492, 1508–09 (7th Cir.1994). In *Wright,* the doctrine
barred a § 1985(2) claim against thirteen employees of the
Illinois Department of Children and Family Services. *Id.*

Bohn's argument must be rejected for a simple reason: not
all the alleged conspirators were employees of BMCW. In
counts two and three Nealy asserts that Bohn, Gebhardt,
D'Fantis, Brodlo conspired with Nelsen and possibly
others. (Doc. 37 at 19–20.) After Nelsen resigned his
position in or around April 2009 he was no longer part of
the governmental agency. Thus, any conspiracy with him
following his termination as an employee of BMCW does
not fall under the doctrine.

The Second Amended Complaint charges that the
conspiracies constituted failure to report Nelsen to the
state licensing authority, assisting Nelsen in his child

custody dispute with Nealy (count two) and failure to seek the assignment of a separate agency to handle Nealy's state children's court case (count three). The failure to report Nelsen to the licensing authority was said to have occurred solely after Nelsen left employment at BMCW. Further, any conspiratorial assistance for Nelsen in his child custody dispute and failure to reassign the case that occurred after Nelsen's resignation involved conspiracy with a nonemployee. To the extent that Bohn's (or other BCMW employees') actions before Nelsen's resignation may be at issue, it is possible that Nelsen was not acting on behalf of the entity but on his own, which could cause the intracorporate doctrine to be inapplicable. *See Hartman v. Bd. of Trs.,* 4 F.3d 465, 470 (7th Cir.1993) ("[W]e should point out that *Travis* probably would not apply where corporate employees are shown to have been motivated solely by personal bias. In that case, the interests of the corporation would have played no part in the employees' collective action....").

**\*6** Further, the Second Amended Complaint asserts that the state employees conspired with "others," too, and those persons could be nonemployees. The existence of others who were possibly nonemployees again means that the motion to dismiss the allegations on this basis must be denied.

### 2. § 1985(2) Elements

Bohn, Brodlo, and Gebhardt all contend that Nealy's conspiracy claims under § 1985(2) fail because the facts in her complaint do not establish any class-based animus, agreement between conspirators, or injury.

Section 1985(2) permits recovery of damages for injury when "two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." 42 U.S.C. § 1985(2), (3). This provision, applying to conspiracies to obstruct the course of justice in state courts, requires that the conspirators' actions be motivated by an intent to deprive their victims of equal protection. § 1985(2); *Kush v. Rutledge,* 460 U.S. 719, 725, 103 S.Ct. 1483, 1487 (1983). [3] Accordingly, a plaintiff must allege class-based animus. *Nowicki v.*

*Ullsvik,* 69 F.3d 1320, 1325 (7th Cir.1995); *Wright,* 40 F.3d at 1507; *Hernandez v. Dart,* 635 F.Supp.2d 798, 810 (N.D.Ill.2009); *see Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798 (1971) ("The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps other-wise class-based, invidiously discriminatory animus behind the conspirators' action.").

[3]   The first clause of § 1985(2), not at issue here, provides a cause of action for conspiracy to interfere with the administration of justice in federal courts. *See* § 1985(2); *Kush,* 460 U.S. at 724.

In addition, a plaintiff must allege that defendants entered a conspiracy to interfere with justice in a state court. § 1985(2); *Hernandez,* 635 F.Supp.2d at 810. And "[i]t is not enough for a section 1985 plaintiff to plead mere conclusory allegations of a conspiracy. Rather, the plaintiff must plead specific material facts that show the existence of a conspiracy." *Copeland v. Nw. Mem'l Hosp.,* 964 F.Supp. 1225, 1235 (N.D.Ill.1997); *see Webb v. Goord,* 340 F.3d 105, 111 (2d Cir.2003) ("The plaintiffs have not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants. Their conspiracy allegation [under § 1985] must therefore fail."). A plaintiff must show that the conspirators agreed to inflict injury upon her, acting with a single plan the general nature and scope of which each conspirator knew. *Green v. Benden,* 281 F.3d 661, 665 (7th Cir.2002). "Agreement may be inferred from circumstantial evidence, but only if it is sufficient to permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Id.* at 665–66.

**\*7** Moreover, a § 1985(2) claim requires that the plaintiff be personally injured. *Reichenberger v. Pritchard,* 660 F.2d 280, 287 (7th Cir.1981) ("[I]t is undisputed that injury to persons or property, or deprivation of a constitutional right is an indispensable element of a claim under § 1985."); *see* § 1985(2) (stating (emphasis added) that "the party *so injured or deprived* may have an action for the recovery of damages occasioned by such injury or deprivation"); *Griffin,* 403 U.S. at 102–03 (indicating that a § 1985(3) claim, which contains the same language regarding injury as for a § 1985(2) claim, requires an injury or deprivation of a right or privilege as a United States citizen).

Nealy asserts that Bohn, Brodlo, Gebhardt, and D'Fantis "conspired with Nelsen and possibly others to impede, hinder, obstruct, or defeat the due course of justice" in three ways: (1) by failing to report Nelsen to the Wisconsin Department of Regulation and Licensing; (2) by assisting Nelsen in his child custody dispute with Nealy; and (3) "by failing to seek the assignment of a separate agency to handle ongoing case management of Ms. Nealy's children's CHIPS case, despite the obvious conflict [of] interest the Agency had." (Doc. 37 at 19–20.) For the following reasons, all three conspiracy claims must be dismissed.

a. Class-based animus

Regarding the three alleged conspiracies, Nealy's proffered facts fail to set forth any basis for finding class-based animus, as required for a § 1985(2) claim. Indeed, she does not tender any facts supporting even "class of one" animus.

Devoid from the Second Amended Complaint is any indication of Nealy's race. In her briefs opposing the motions to dismiss Nealy says she is African–American, but she never asserted that claim in the Second Amended Complaint. Even taking the representation in Nealy's briefs as true, nothing else in the Second Amended Complaint suggests that the defendants' conduct was based on animus toward African–Americans. At most, the facts plead imply that Bohn, Brodlo, and Gebhardt favored Nelsen over Nealy because he was a coworker.

The Second Amended Complaint does assert that Nealy suffers from anxiety disorder and obsessive-compulsive personality disorder, with schizoid, paranoid, and narcissistic features; she has been receiving psychiatric care since at least 2004; and she has been diagnosed with bipolar depression. (Doc. 37 at 4.) Though Nealy does not expressly claim that she belongs to a class of persons with mental illness, that allegation can be inferred from her pleading.[4] But nowhere does Nealy assert, or even imply, that Bohn, Brodlo, or Gebhardt took any action involving her or her children because of animus toward the mentally ill. Moreover, nothing in the Second Amended Complaint suggests a dislike of the mentally ill by any of these defendants or actions by these defendants consistent with personal animus. Again, at most, the facts set forth in the pleading imply that Bohn, Brodlo, and Gebhardt favored Nelsen over Nealy because he was a coworker.

4      Animus against the mentally ill or deficient may be considered class-based animus under § 1985(2) or (3). *See Lake v. Arnold,* 112 F.3d 682, 688 (3d Cir.1997).

**\*8** It is unclear whether a § 1985(2) claim may be brought under a "class of one" theory. *See, e.g., Unger v. Blevins–Foster,* No. 1:12–cv–00948–LJM–TAB, 2013 WL 2456073, at \*11 (S.D. Ind. June 6, 2013); *Scarlato v. Vill. of Bellwood, Ill.,* No. 08 C 546, 2008 WL 244318, at \*1 (N.D.Ill.Jan.28, 2008). But the Second Amended Complaint lacks even a hint of class-of-one animus by the defendants toward Nealy, and Nealy does not argue class-of-one animus in her briefs.

The typical equal protection case involves discrimination by race, national origin or sex. However, the [Equal Protection] Clause also prohibits the singling out of a person for different treatment for no rational reason. To state a class-of-one equal protection claim, an individual must allege that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."

The classic class-of-one claim is illustrated when a public official, "with no conceivable basis for his action other than spite or some other improper motive ... comes down hard on a hapless private citizen."

*Swanson v. City of Chetek,* No. 10–1658, ––– F.3d ––––, 2013 WL 3018926, at \*3 (7th Cir. June 19, 2013) (citations omitted). The Second Amended Complaint is devoid of any allegation that Nealy was intentionally treated differently from others similarly situated. Indeed, Nealy underscores this shortcoming by asserting that she was treated the same as others. She adds that the BMCW had a history of not reporting discipline of its employees to the state licensing authority. Thus, as to the failure to report Nelsen's discipline Nealy was treated *similarly* to other persons.

b. Agreements

Nowhere in the Second Amended Complaint has Nealy pled facts suggesting an agreement between defendants Bohn or Gebhardt and Nelsen (or others) to injure Nealy. Brodlo is a closer call, yet still Nealy's pleading falls short.

I. Gebhardt

Factual allegations regarding Gebhardt are noticeably absent. Except for the conclusory paragraphs charging conspiracy in violation of § 1985(2) and failure to act in violation of § 1986, Nealy mentions Gebhardt by name in only two paragraphs:

> 10. At all times relevant to the allegations set forth in this Complaint, Matt Gebhardt was a second-line supervisor of Nelsen with the Bureau of Milwaukee Child Welfare. On information and belief, Mr. Gebhardt is a resident of Wisconsin.
>
> ....
>
> 56. On April 9, 2009, Nelsen stated in writing to BMCW Supervisor Matt Gebhardt:
>
> Since her (the baby's) placement with me, I have dropped off and picked up [the baby] from the house of Ms. Nealy in full view of her visitation worker. During a recent visit to her children's dental appointment, I brought [the baby] into the clinic and was greeted by Ms. Nealy's ongoing case manager. My point is in these statements is; (sic) I made little effort to hide that I was the father of [the baby]."

**\*9** (Doc. 37 at 3, 9 (alterations in original).) Also, Gebhardt is referenced generally as one of the "defendants" who acted as employees of the BMCW and as licensed social workers. Moreover, he is among the "persons" described as acting under color of law for purposes of § 1983, and acting within the scope of their employment with respect to the matters at issue. (Doc. 37 at 17–18.)

These meager allegations set forth no plausible claim of conspiracy by Gebhardt. Simply describing Gebhardt as occupying the position of a second-line supervisor and as the recipient of a letter from Nelsen concerning Nealy and the baby, fails to articulate a plausible § 1985(2) conspiracy claim. Such statements do not establish that Gebhardt took any action or made any agreement with any person and thereby engaged in a conspiracy.

Nevertheless, Nealy contends that her allegations indicated Nelsen told a reporter that he left BMCW on good terms and unidentified persons at BMCW told him "they" would help him find another position with the state (Doc. 82 at 3 & n. 1); that Nelsen told Leah Chase, the case worker assigned to Nealy after his resignation, that Gebhardt and Bohn had been very gracious and looked up

Nealy's history (Doc. 82 at 4); and that Gebhardt failed to report Nelsen to the state licensing department or police. Thus, she maintains that a conspiracy has been properly alleged.

Even if these assertions were set forth in the complaint, still missing is any glimmer of an agreement between Gebhardt and anyone else. Furthermore, the Second Amended Complaint lacks any assertion that it was within Gebhardt's duties as an employee of BMCW to report Nelsen to a licensing authority. The only specific references in the complaint relating to a failure to report suggest that it was Bohn's responsibility.

In sum, even construed in light of the arguments in Nealy's brief, the complaint fails to assert any agreement between Gebhardt and Nelsen or Gebhardt and others.

### ii. Bohn

Nealy offers a bit more regarding Bohn, but nothing suggesting an agreement supporting a § 1985(2) claim. She contends that (1) Bohn "never notified the Children's Court about the clear conflict of interest that existed between [BMCW] and Ms. Nealy"; (2) as deputy director of BMCW, Bohn "allowed BMCW to investigate Nelsen's claim that Ms. Nealy had wrongfully taken custody of her own child" while Nelsen had no custody or placement order; (3) Bohn did not report Nelsen to the state licensing department; (4) as deputy director of BMCW and a supervisor, Bohn "allowed BMCW to continue to monitor Ms. Nealy's CHIPS case involving the December 21, 2007 seizure of her older children"; and (5) as deputy director of BMCW and a supervisor, Bohn "allowed BMCW to investigate Nelsen's CHIPS claim about the baby, which resulted in Nelsen having the baby returned to him before he had any legal right to the child." (Doc. 46 at 4–5; *see also id.* at 9.) Like Gebhardt, Bohn is referenced generally as one of the defendants who acted as employees of the BMCW, as a licensed social worker, and as one of the "persons" who acted under color of law for purposes of § 1983, and within the scope of employment. (Doc. 37 at 17–18.)

**\*10** Conspicuously absent from these allegations is any link between Bohn and Nelsen or other possible conspirators. At most, these contentions suggest that Bohn was negligent in doing her job. But they do not mention an agreement between Bohn and anyone else concerning Bohn's conduct toward Nealy.

Regardless, Nealy argues that a cover-up among several public officials constitutes a conspiracy to obstruct legitimate efforts to seek relief from the courts. (Doc. 46 at 12.) But the Second Amended Complaint does not refer to any cover-up jointly made by several public officials. Instead, it asserts separate actions by separate officials.

iii. Brodlo

Nealy asserts that (1) Brodlo was a "first-line supervisor of Nelsen" with BMCW and a resident of Wisconsin; (2) on at least one occasion in early 2009 Nelsen brought the baby to work and Brodlo played with her; (3) after Nelsen resigned from BMCW, Brodlo advised Nelsen about his child custody issues regarding Nealy's child; and (4) in October 2009 when Nealy attempted to regain custody of the baby Nelsen said he had spoken to his supervisor, meaning Brodlo, and BMCW decided he could keep the baby. (Doc. 37 at 3, 8, 15.) Like Gebhardt and Bohn, Brodlo is referenced generally as one of the defendants who acted as employees of the BMCW as a licensed social worker, and as one of the "persons" who acted under color of law for purposes of § 1983, and within the scope of employment. (Doc. 37 at 17–18.)

As to any failure to report Nelsen to the licensing authority, the Second Amended Complaint does not state any plausible claim against Brodlo. Nothing in the pleading or Nealy's briefs suggests Brodlo had any hand in disciplining employees or reporting discipline to state authorities. However, it does include just enough to suggest, inferring *very* broadly from thin allegations, that Brodlo and Nelsen had an understanding that Brodlo would assist or advise Nelsen regarding his child custody issue involving the BMCW, for whom Brodlo worked. Regardless, because Nealy fails to set forth any class-based or class-of-one animus the claims will not proceed.

c. Injury

Additionally, even if all allegations are true and in Nealy's favor, the Second Amended Complaint fails to assert any injury to Nealy resulting from Bohn's (or anyone else's) failure to report Nelsen's termination to the licensing board or the BMCW's failure to assign another agency to her case. Nealy argues that the BMCW's failure to disclose Nelsen's conduct to an outside agency "hampered" her, as a potential litigant, in pursuing claims against the agency. (Doc. 46 at 5.) But the court finds it implausible that

Nelsen's licensure had anything to do with a claim by Nealy against BMCW or its employees, and claims must be plausible to pass the test of a Rule 12(b)(6) motion. Nor does the mere fact that the BMCW was involved in her case mean that she was hindered or impeded in state-court proceedings.

B. § 1986 Claims

Section 1986 provides that

**\*11** [e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured.

A claim under § 1986 is derivative of § 1985 liability. Thus, the absence of a § 1985 claim would require dismissal of a § 1986 claim. *Keri v. Bd. of Trs. of Purdue Univ.,* 458 F.3d 620, 643 (7th Cir.2006); *Rodgers v. Lincoln Towing Serv., Inc.,* 771 F.2d 194, 203 (7th Cir.1985). Here, the Second Amended Complaint does not support Nealy's conspiracy claims as discussed above. Consequently, Nealy cannot establish a claim under § 1985. It follows that her § 1986 claims against defendants Bohn, Brodlo, and Gebhardt fail as well.

C. § 1983 Claim(s)

In the portion of her Second Amended Complaint under the heading of count one, based on § 1983, Nealy mentions only Nelsen by name. She asserts that Nelsen's conduct was unlawful, caused her harm and violated her due process rights as a result of his sexual conduct with her. Regarding the other defendants Nealy asserts only that they are "persons" under § 1983, that they acted within the scope of their employment, and that the State of Wisconsin is liable for any judgment against them because they acted within the scope of their employment. (Doc. 37 at 18–19.[5]) Alone, these contentions do not set forth any basis for concluding the defendants violated any of Nealy's constitutional rights. Thus, these defendants understandably presumed that they were not named in this count and did not challenge this count in their initial briefs. But in response to Brodlo's and Gebhardt's motions to dismiss Nealy wrote that their conduct also violated § 1983, pointing to page 18 of the Second Amended Complaint (which, as discussed above, does not set forth

any claim against Bohn, Brodlo or Gebhardt). (Doc. 71 at 13, Doc. 82 at 11.) Brodlo and Gebhardt replied, contending that the Second Amended Complaint fails to identify the conduct underlying the claim and that the complaint as a whole failed to state a claim for any constitutional violation. (Doc. 84 at 3; Doc. 83 at 3–4.)

5    Also, Nealy asserts that the BMCW continues to retaliate against her and manipulates her access to her child. (Doc. 37 at 19 .) But the BMCW is no longer a party to this lawsuit.

To state a claim for relief under § 1983 Nealy must allege that (1) she was deprived of a right secured by the Constitution or laws of the United States, and (2) that the defendants acted under color of state law. *Gomez v. Toledo,* 446 U.S. 635, 640 (1980); *Waubanascum v. Shawano Cnty.,* 416 F.3d 658, 665 (7th Cir.2005). Here, the second element is met; defendants Gebhardt, Bohn, and Brodlo are (or were at the time of the actions at issue) BMCW employees. Moreover, they do not dispute for purposes of this motion that they acted under color of state law. However, the Second Amended Complaint fails to put Bohn, Brodlo, and Gebhardt on notice regarding what conduct violated § 1983 or plausibly assert any constitutional violations by these defendants. For instance, as was true with the § 1985(2) claim asserted against Gebhardt, occupying a position as a supervisor and receiving a letter from an employee while acting within the scope of public employment does not amount to any constitutional violation. Also, the doctrine of respondeat superior does not apply to § 1983 actions. *Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir.2001).

**\*12** Nealy maintains that Gebhardt's actionable conduct includes his failure to report anything about Nelsen bringing a baby to the office and failure to report Nelsen to the licensing authority or law enforcement. However, the Second Amended Complaint does not allege that Gebhardt saw the baby at the office or had any responsibility regarding state license reporting. Further, it does not place Bohn and Brodlo on notice as to what actions or inaction on their part violated § 1983.

D. A Note on Nealy's Alternative Argument
Nealy contends that the pending motions to dismiss would best be treated as premature motions for summary judgment and that a stay for discovery is required. She contends that with further discovery she will be able to

unearth facts necessary to refine her conspiracy claims. (*See, e.g.,* Doc. 71 at 20–26.) She argues that the court "will benefit from information outside of the Second Amended Complaint" (Doc. 71 at 21) and that she intends to discover evidence that the named defendants other than Nelsen knew about Nelsen's sexual misconduct before the W–2 social worker learned of it, acted with a discriminatory animus, and had a meeting of the minds (Doc. 71 at 24).

But Nealy's attorney appears to misunderstand the role of pleadings and discovery. Discovery follows the pleading of a complaint that sets forth a claim for relief. First, a plaintiff must pass the hurdles set by Rule 8 and 12(b)(6), *Bell Atlantic,* and *Iqbal.* If Nealy's counsel has a good faith belief that there is evidence supporting her claims she should have plead them. Instead, the Second Amended Complaint relies predominantly on the wrongdoing of Nelsen and conclusory statements about the other defendants, with no particulars offered to support them. As indicated by *Bell Atlantic* and *Iqbal,* factual allegations must be specific enough to justify dragging a defendant into court. As the First Circuit wrote even before *Bell Atlantic* and *Iqbal,* "the price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome. Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition." *DM Research, Inc. v. College of Am. Pathologists,* 170 F.3d 53, 55 (1st Cir.1999).

MOTION FOR SUMMARY JUDGMENT

The Second Amended Complaint submits that D'Fantis "was a supervisor of ongoing case managers" with the BMCW and a resident of Wisconsin. (Doc. 37 at 3.) It contends that Nealy disclosed the identity of the baby's father to D'Fantis in late February 2009, and D'Fantis's visit notes from March 27, 2009, discuss Peter Nelsen as the baby's father. On April 3, 2009, Nealy again told D'Fantis that Nelsen was the baby's father and gave D'Fantis his phone number. (Doc. 37 at 8.) At that point, according to the Second Amended Complaint, Bohn, Brodlo, Gebhardt, and D'Fantis conspired with Nelsen and others to "impede, hinder, obstruct, or defeat the due course of justice" in the three § 1985(2) conspiracies discussed above and violated § 1986. (Doc. 37 at 19, 20.)

**\*13** As to the § 1985(2) and § 1986 claims, the foregoing discussion applies. The pleading fails to plausibly assert any class-based or class-of-one animus agreement by D'Fantis, and injury required to prove claims under § 1985(2), and § 1986. In addition, summary judgment is warranted for the reasons discussed below.

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a),(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing a genuine issue for trial. *Id.* at 322–34. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247–48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir.1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex,* 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in his favor. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249.

A. Nealy's Lack of Information and Desire for More Discovery

Local rules for this district require parties filing and responding to a summary judgment motion to submit, respectively, statements of proposed material fact and responses to the opposing party's statements. Civil L.R. 56(b). Civil L.R. 56(b)(2)(B)(I) dictates that a response to a proposed finding of fact, other than an admission, must include "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon." Uncontroverted statements of material fact are

deemed admitted for the summary judgment motion. Civil L.R. 56(b)(4).

Nealy responded to many of defendant's proposed facts with statements such as "Plaintiff does not have sufficient information to confirm or deny this proffered fact due to lack of discovery" (Doc. 79 at 3, ¶ 6) and "Plaintiff has received no discovery to be able to dispute or agree" (Doc. 79 at 4, ¶ 10). Instead of providing a citation to evidence supporting a denial she rests her denial on a lack of discovery and inability to conduct discovery.

**\*14** Federal Rule of Civil Procedure 56(d) states:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Nealy did not file a motion under Fed.R.Civ.P. 56(d) for more discovery. However, in response to the motion for summary judgment she contended that a stay for discovery under Fed.R.Civ.P. 56 is proper.[6] (Doc. 78 at 19–24.)

---

6    Nealy refers to Fed.R.Civ.P. 56(f), presumably to the form of that subdivision that existed in 2010 and before, when the provision was renumbered as Rule 56(d) and reworded. *See* Fed.R.Civ.P. 56 advisory committee's notes 2010 amendments.

---

Nealy's contention that she has not obtained adequate discovery is insufficient for the denial of D'Fantis's proposed facts. Nealy filed her complaint on June 6, 2011, naming Nelsen and state agencies as defendants. (*See* Doc. 1 at 1, 3.) She dropped the state agency defendants in her Amended Complaint, but added John and Jane Doe employees of the BMCW, "whose identities will be determined via discovery in this matter." (Doc. 20 at 2.) Counsel for Nealy and Nelsen conducted a Fed.R.Civ.P. 26(f) conference on March 27, 2012 (Doc. 26 at 4), and the court held a scheduling conference on April, 3, 2012, at which it was decided that the parties would complete fact discovery by October 1, 2012 (Doc. 29 at 1).

Defendants Bohn, Brodlo, Gebhardt, and D'Fantis were added to the case in the Second Amended Complaint filed July 18, 2012, after the discovery schedule was set. At a status conference on November 9, 2012, the court granted Nealy an additional thirty days from that date to conduct discovery with Nelsen. (Doc. 63 at 1.) At that conference, counsel for Nelsen indicated that Nelsen had been deposed. (Doc. 63 at 2.) Other documents in the file, confirmed by Nealy's attorney's statements at the conference (Doc. 63 at 4), suggest that Nelsen's deposition lasted four hours, with another four hours to be scheduled subsequently because of counsels' calendars. It appears that the deposition never resumed, and as mentioned above, Nelsen never required required written discovery. At the November 9 conference Nealy's counsel indicated she would like to complete discovery with Nelsen then proceed to alternative dispute resolution. (Doc. 63 at 4.)

Nealy says that through further discovery from the other defendants she will be able to prove that defendants participated in a cover-up of Nelsen's conduct. (*See, e.g.,* Doc. 78 at 23.) However, she was given time to conduct discovery, even considering Nelsen's noncompliance with discovery requirements. Under Fed.R.Civ.P. 26(a)(1)(D), a party that is served or joined to the action after the Rule 26(f) conference must provide initial disclosures within thirty days after being served or joined, unless a different time is set. Nealy admits that D'Fantis complied in early January 2013, and Nealy's response to the summary judgment motion was filed on February 5, 2013. [7] Further, Rule 26(d) indicates that a party may seek discovery from any source once the Rule 26(f) conference has occurred. Thus, when the four additional defendants were named Nealy could have proceeded with discovery, especially as to D'Fantis, who answered the complaint. The court perceives no barrier to Nealy's propounding of discovery on D'Fantis, Bohn, Brodlo or Gebhardt or third parties such as other employees of the BMCW or La Causa. That Nealy did not serve discovery on them is not a basis for now delaying consideration of D'Fantis's summary judgment motion. That Nealy may have first wanted discovery from Nelsen does not excuse her lack of action as to discovery from the other defendants; she could not assume that the discovery would continue indefinitely simply because Nelsen did not cooperate first.

[7]  Bohn, Brodlo, and Gebhardt did not comply, but Nealy could have moved to compel their initial disclosures. However, she did not.

**\*15** With regard to defendant D'Fantis, Nealy had several months to conduct discovery before the deadline ran. If she needed more time counsel should have spoken up at the November 9 conference. Moreover, Donald Carlson, one of D'Fantis's attorneys, swears that he told Nealy's attorney in mid-December 2012 that he would answer questions about D'Fantis's role in the alleged events if counsel submitted the questions to him by the end of the year. (Doc. 80, ¶ 2.) However, plaintiff's attorney never submitted any written questions for D'Fantis to answer. (*Id.,* ¶ 3.)

Because Nealy had ample time and opportunity to conduct discovery with D'Fantis, Nealy's reliance on a lack of discovery is an insufficient response to the proposed facts. Accordingly, any statements of fact to which Nealy objected due to a lack of discovery will be deemed admitted for purposes of the summary judgment motion.

B. Problems with Nealy's Additional Proffered Facts
In response to the summary judgment motion, Nealy proposed additional facts under Civil L.R. 56b)(2)(B)(ii). However, several of the facts are unsupported by evidence. For many facts, counsel cites to newspaper articles. However, newspaper articles offered for the truth of what they report are inadmissible hearsay. *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997). "And hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial," with the exception that affidavits and depositions, i.e., recorded sworn statements, are allowed. *Id.* Thus, the court has disregarded proposed findings that cite only newspaper articles for the truth of their contents.

Other proposed findings point to four exhibits that are unauthenticated; the documents were attached to Nealy's proffered facts without affidavit (*see* Doc. 79). D'Fantis disputes all facts set forth by plaintiff that cite to Exhibits 1 through 4. However, notwithstanding Nealy's technical failure to authenticate Exhibits 1, 2, and 4, the court will accept them as evidence for now, as the documents appear to come from Nealy's records or case files at the BMCW or Wisconsin Department of Children and Families. The court assumes that these documents could be authenticated at trial. Rather than stay the motion until the documents are authenticated the court will consider them. However, the court will not accept Exhibit 3, as it was acquired from a website, which is not considered

proper evidence. Like a newspaper article, contents of a website are out-of-court statements that are considered hearsay if offered to prove the truth of their contents. *See* Fed.R.Evid. 801(c). Thus, the court will disregard any proposed facts relying solely on the contents of the website print-off.

A couple proposed facts from Nealy cite to a Decision and Order of Magistrate Judge Aaron E. Goodstein in *Estate of Will R. Johnson v. La Causa, Inc.,* No. 10–C–953, slip op. (E.D. Wis. filed June 24, 2011). Although the court may take judicial notice of the existence of that document, and although this court assumes the accuracy of Magistrate Judge Goodstein's statements, the proposed facts are immaterial to the present matter. Therefore, they are disregarded. (*See* Doc. 79 at 10, ¶¶ 4, 5.) The court has also disregarded other proposed facts that are irrelevant. (*E.g.,* Doc. 79 at 12, ¶ 19; *id.* at 13, ¶¶ 27, 28.)

**\*16** Finally, some proposed findings from Nealy are not supported by the evidence cited. For instance, proposed fact ¶ 15 cites to Exhibit 1 "at 607" to establish that after receiving the name of the baby's father "D'Fantis conducted no follow-up regarding this information." (Doc. 79 at 11, ¶ 15.) The court sees no such page number. Instead, it sees Bates numbers between 000337 and 000363. If Nealy meant to type "6–7" of Document 79–1 that entry relates to home visit notes (not even entered into the records by D'Fantis) and does not cover what D'Fantis may have been working on outside of that visit. Such unsupported proposed facts have been disregarded, as have those that are not complete sentences and make no sense (*e .g.,* Doc. 79 at 11, ¶ 16).

C. Statement of Undisputed Facts
D'Fantis is a social worker who was employed by La Causa at the time of the alleged misconduct. (Doc. 70, ¶ 4.[8]) La Causa contracted with the BMCW to provide child protective case management services. (Doc. 70, ¶ 5.) BMCW employees provided the initial assessment and up-front investigation into child welfare matters; La Causa took over once a child was removed from a home until the child was brought to permanency. (Doc. 70 ¶ 6.) Although La Causa worked with the BMCW, the two organizations were completely separate and the BMCW had no direct supervision over La Causa. (Doc. 70, ¶ 7; Doc. 79 at 3, ¶ 7.[9]) La Causa employees and BMCW employees had little to no interaction with each other on any given case

and D'Fantis had no contact with any of the other named defendants during the time of the alleged events. (Doc. 70, ¶ 8; Doc. 79 at 4, ¶ 8.)

[8]   If only Document 70 is cited, Nealy either agreed to the proposed statement or her objection for lack of discovery has been overruled as discussed above.

[9]   Nealy objects to this proposed finding but her response cites to no evidence controverting the proposed statement. Nealy says that D'Fantis entered case notes in the same case management system as BMCW, showing that "La Causa was inextricably intertwined with the BMCW," but even if accepted (no citation supports it), that fact does not establish such intertwining.

In early fall 2008, D'Fantis was employed by La Causa as a training team supervisor; she oversaw approximately five new trainees and their individual caseloads. (Doc. 70, ¶¶ 9, 10.) In November 2008, Enrique Lockhart, one of D'Fantis's trainees, was assigned as Nealy's case worker. (Doc. 70, ¶ 11.) Nealy's case was already open and had been transferred to Lockhart from another case worker who was no longer at La Causa. (Doc. 70, ¶ 12.) At that time, Nealy had two children in out-of-home care and an infant that remained in her care. (Doc. 70, ¶ 13.) At that time, D'Fantis did not know who the father of the infant was; she sought his identity so the social worker could perform background checks on him. (Doc. 70, ¶ 14; Doc. 79 at 5, ¶ 14.)

D'Fantis entered her case notes in the same system as that used by BMCW. (Doc. 79 at 11, ¶ 12.) D'Fantis had access to Nealy's case history, which included information regarding the intake workers previously assigned to Nealy's case. (Doc. 79 at 11, ¶ 13 .)

On February 16, 2009, D'Fantis and Lockhart visited Nealy. (Doc. 70, ¶ 15.) While at Nealy's home D'Fantis learned there was no crib for the infant. (Doc. 79 at 11, ¶ 17; Doc. 79–1 at 6.) In due course, D'Fantis asked Nealy about the infant's whereabouts. (Doc. 79 at 11, ¶ 14; Doc. 79–1 at 6.) D'Fantis again asked Nealy to reveal the identity of the baby's father because she knew he would be around plaintiff's other children. (Doc. 70, ¶ 16; Doc. 79 at 12, ¶ 18.) Nealy wrote down the name of Peter Nelsen on a piece of paper. (Doc. 70 ¶¶ 17, 18.) D'Fantis did not recognize the name and remained concerned because of the hesitation Nealy showed when disclosing the name. (Doc. 70, ¶ 18, 19.) D'Fantis tried to get Nealy to reveal

more information about the father. (Doc. 70, ¶ 20; Doc. 79 at 7, ¶ 20. [10])

[10]   Plaintiff disputes this fact by stating that D'Fantis's efforts to try to persuade plaintiff to reveal more information about the father are not reflected in BMCW case notes. However, a lack of information in BMCW case notes does not overcome D'Fantis's sworn statement that she tried to get more information about Nelson.

**\*17** Prior to this time, in January of 2009, the infant's last name had been changed to Nelsen. (*See* Doc. 79 at 13, ¶ 27; Doc. 88 at 19, ¶ 27; Ex. 2 at 3; Ex. 4 at 3.)

On February 24, 2009, Lockhart, who was being trained by D'Fantis, observed defendant Nelsen drop off and pick up Nealy from an appointment with her children. (Doc. 79 at 12, ¶ 20; Doc. 79–1 at 8–9.)

Nealy's children visited Nealy at BMCW's Region 3 office on March 3, 2009; D'Fantis and Lockhart attended the meeting. (Doc. 79 at 12, ¶ 25; Doc. 79–1 at 9.) Apparently, Nelsen was present at Region 3 on April 8, 2009. (Doc. 79–1 at 3; *see* Doc. 79 at 12, ¶ 26.)

On March 27, 2009, D'Fantis contacted a W–2 liaison and accessed a W–2 database; she discovered that Nealy was receiving W–2 benefits only for the infant fathered by Nelsen, not for her other children. (Doc. 79 at 12, ¶¶ 22, 23; Doc. 79–1 at 12.) That day, Nealy admitted that the infant lived with Nelsen full time. (Doc. 79 at 12, ¶ 21; Doc. 79–1 at 12.)

On April 3, 2009, Nealy gave D'Fantis Nelsen's phone number. (Doc. 70 ¶ 21.) Later that day, D'Fantis left Nelsen a message advising him to call Tracey Clark to discuss placement and custody of the infant. (Doc. 70 ¶ 22.) Nealy's case had been transferred to Clark, as Lockhart had graduated off D'Fantis's team. (Doc. 70, ¶ 23.) Also on April 3, 2009, D'Fantis examined the list of case workers assigned to Nealy's child custody case and discovered that a Peter Nelsen had been assigned as an initial assessment worker. (Doc. 70 ¶ 24.) D'Fantis then contacted her supervisor, Darleen Pawluk, to inform her of the situation. (Doc. 70 ¶ 25.) After she contacted her supervisor, D'Fantis was removed from the case. (Doc. 70, ¶ 26; Doc. 79 at 8–9, ¶ 26.)

C. Discussion

1. § 1985(2) and § 1986 Claims

The undisputed facts show that D'Fantis did not know who Nelsen was at the time Nealy disclosed that he was the baby's father. Moreover, once D'Fantis discovered that Nelsen was Nealy's initial assessment worker, she contacted her supervisor and her involvement in the case ended. Nothing in the record establishes that D'Fantis knew who Nelsen was or had any communication with him before she left a message asking him to call Clark. Moreover, the undisputed facts show that D'Fantis had no contact with any of the other named defendants during the time of the alleged misconduct. No evidence indicates that D'Fantis even knew any of the other named defendants. Nor does any evidence suggest that D'Fantis conspired with *anyone* regarding Nealy's case. Nealy has failed to proffer any evidence showing the existence of a conspiracy to hinder, obstruct, or defeat the due course of justice.

In addition to Nealy's failure to allege class-based animus or injury based on D'Fantis's actions, no reasonable juror could find in her favor as to conspiracy. Thus, summary judgment must be granted on the § 1985(2) claim. Inasmuch as the § 1986 claim depends on the existence of a § 1985 conspiracy, summary judgment must be granted on the § 1986 claim as well.

2. § 1983 Claim

**\*18** As the foregoing discussion indicates, Nealy's § 1983 claim requires her to show that (1) she was deprived of a right secured by the Constitution or laws of the United States, and (2) that D'Fantis acted under color of state law. *Gomez,* 446 U.S. at 640; *Waubanascum,* 416 F.3d at 665.

The undisputed facts show that D'Fantis was an employee of La Causa, not BMCW and there is no indication that La Causa is the state's alter ego. Private persons act "under color of law" for purposes of § 1983 when they conspire or act jointly with state officials. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 152 (1970), *overruled on other grounds by Celotex,* 477 U.S. 317; *Tarpley v. Keistler,* 188 F.3d 788, 791–93 (7th Cir.1999). As discussed above, the undisputed evidence shows no conspiracy between D'Fantis and state officials. Nor does the evidence support any reasonable jury verdict of joint action. D'Fantis did not know Nelsen and the other defendants.

Finally, mere negligence does not provide a basis for § 1983 liability. *Waubanascum,* 416 F.3d at 670. Nealy contends that D'Fantis should have cross-checked Nealy's files more quickly to discover Nelsen's relationship to her case and should have done more when she realized that Nelsen had been assigned to Nealy as a social worker. At most, a reasonable jury could find these inactions amounted to negligence. However, no intentional coverup by D'Fantis can be gleaned from the record before this court. Thus, the court will grant summary judgment in D'Fantis's favor.

## CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Nealy's motion for default judgment against Nelsen (Doc. 55) is granted. The order for default judgment extends to liability only, as damages have not yet been determined.

IT IS FURTHER ORDERED that the motions to dismiss filed by Bohn (Doc. 40), Brodlo (Doc. 57), and Gebhardt (Doc. 65) are granted.

IT IS FURTHER ORDERED that D'Fantis's motion for summary judgment (Doc. 67) is granted.

IT IS FURTHER ORDERED that a telephonic status conference is set for August 27, 2013, at 3:00 PM, at which time the court will discuss further proceedings with counsel for Nealy and the Intervening Defendant.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3924358

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.