UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

------------------------------------------------------------

ANDREW L. COLBORN,                    )
                                      )
                    Plaintiff,        )  Case No. 19-CV-484
                                      )  Milwaukee, Wisconsin
        vs.                           )
                                      )  December 19, 2019
NETFLIX INC., ET AL,                  )  9:35 a.m.
                                      )
                    Defendants.       )
                                      )
------------------------------------------------------------

**TRANSCRIPT OF MOTION HEARING**
BEFORE THE HONORABLE PAMELA PEPPER
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
ANDREW L. COLBORN:              Law Firm of Conway Olejniczak &
                               Jerry SC
                               By: George Burnett
                               231 S Adams St
                               PO Box 23200
                               Green Bay, WI 54305
                               Ph: 920-437-0476
                               Fax: 920-437-2868
                               rgb@lcojlaw.com

                               Schott Bublitz & Engel SC
                               By: April Barker
                               640 W Moreland Blvd
                               Waukesha, WI 53188
                               Ph: 262-827-1700
                               Fax: 262-827-1071
                               Abarker@sbe-law.com

                               Griesbach Law Offices LLC
                               By: Michael C Griesbach
                               PO Box 2047
                               Manitowoc, WI  54221-2047
                               Ph: 920-320-1358

CONTINUED APPEARANCES:


For the Defendant
NETFLIX INC., ET AL:          Godfrey & Kahn SC
                             By: James A Friedman
                             1 E Main St - Ste 500
                             PO Box 2719
                             Madison, WI  53701-2719
                             Ph: 608-284-2617
                             Fax: 608-257-0609
                             Jfriedman@gklaw.com

                             Ballard Spahr LLP
                             By: Leita Walker, Lee Levine &
                             Matthew Kelley
                             1909 K St NW - Ste 1200
                             Washington, DC 20006-1157
                             Ph: 202-508-1110
                             Fax: 202-661-2299
                             Walker@ballardspahr.com
                             levinel@ballardspahr.com

 U.S. Official Transcriber:   SUSAN M. ARMBRUSTER, RMR
 Transcript Orders:           Susan_armbruster@wied.uscourt.com

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

1    TRANSCRIPT OF PROCEEDINGS

2    Transcribed From Audio Recording

3    *    *    *

4    THE CLERK:  Court calls a civil case, 19-CV-484,

5    Andrew Colborn versus Netflix, Inc, et al.  Please state your

6    appearances starting with the attorneys for the plaintiff.

7    MR. BURNETT:  George Burnett, April Barker and Michael

8    Griesbach on behalf of the plaintiff.

9    THE CLERK:  Thank you.  For the defendant.

10   MR. FRIEDMAN:  James Friedman of Godfrey & Kahn and

11   Leita Walker and Lee Levine of Ballard Spahr for the defendants.

12   THE COURT:  The attorneys by phone.

13   MR. KELLEY:  Good morning, Your Honor.  This is

14   Matthew Kelley for the defendants.

15   THE COURT:  Anybody else on the phone, Ms. Wrobel?

16   Okay.  All right.  Thank you, all.  Good morning, everyone.

17   We're here this morning, as you know, because we have several

18   motions on file, most particularly Motions to Dismiss from the

19   defendants.

20   I've reviewed all the pleadings and the small rain

21   forest of trees worth of paper that you all have murdered in --

22   in briefing them and in filing attachments.  I think I have a

23   little bit of a grip on what you're arguing and what you're

24   concerned about.  I am more than happy to give you all

25   additional opportunity to make argument, but I should note and I

1    think, perhaps, Ms. Wroble has already told you, I have a 9:30

2    criminal matter -- I mean a 10:30, sorry, criminal matter that I

3    have to take up, so that's the amount of time that we've got

4    this morning.

5          So with that, let me just walk through what I

6    understand that we've got in front of us.  We have Netflix's

7    Motion to Dismiss.  That's at Docket No. 30.

8          We have the plaintiff's Motion to file -- Relief to

9    File a Second Amended Complaint.  That's at Docket No. 84.

10         We have a Motion, from Chrome, Ricciardi and Demos, to

11   Dismiss for Improper Service.  That's Docket No. 35.

12         And then we have two requests from the plaintiff to

13   file sur-replies or request to file two different sur-replies.

14         And then finally, we have a Motion by the plaintiff to

15   Extend the Time to Serve in the event that I conclude that

16   service was improper.  Any other pending matters that anybody

17   can think of that I didn't list off?  No.

18         Okay.  So I think we should probably start assuming

19   that you all want to make argument, and I'll ask you on each of

20   these, but we should probably start with Netflix's Motion to

21   Dismiss.  Does the defendant wish to make any further argument

22   in that regard?

23         MR. LEVINE:  Yes, Your Honor.

24         THE COURT:  Okay.

25         MR. LEVINE:  Do you prefer that I stand?

1          THE COURT:  You know, normally I prefer that you sit

2     because that puts you closer to the microphone, but it looks

3     like somebody scooched the ElMO in just such a position that

4     I'll be listening to the ElMO talk to me if you sit.

5          MR. LEVINE:  I'm happy to stand.

6          THE COURT:  Just make sure that the mic is canted up.

7          MR. LEVINE:  Gotcha.  I won't be long, Your Honor.

8     Although, I'm happy to answer any questions that you have.

9          I'm pleased to report that unlike the motion that

10    you're going to hear next, this one boils down to a single,

11    relatively straightforward issue, and that's whether the

12    plaintiff, who is a conceded public official, has plausibly

13    alleged either in his initial or his proposed Second Amended

14    Complaint sufficient facts to plausibly allege that Netflix, as

15    opposed to the individual defendants, disseminated Making a

16    Murderer with a required actual malice, which means that they

17    did so despite a high degree of awareness that it references to

18    Officer Colborn were probably false.

19         I'm not going to belabor the concourse of the

20    plausibility standard set out in *Iqbal* & *Twombly* because I know

21    the Court's familiar with them.  But I pause to emphasize that

22    in this circuit, as in every other that considered the question,

23    there is no doubt that the plausibility requirement applies to

24    the actual malice issue.

25         Seventh Circuit case on point is *Pippen v. NBC*

1    *Universal*, which we cite in our brief.

2          With that backdrop, I'll focus on why neither the

3    initial complaints swore their proposed successor plausibly

4    pleads actual malice with respect to Netflix, and that's largely

5    because the affirmative allegations contained in those pleadings

6    foreclose any plausible claim to that effect against Netflix.

7    There are at least six reasons for this.

8          First, the Second Amended Complaint affirmatively

9    pleads that it was the individual defendants, not anyone

10   employed by Netflix, who attended every day of Steven Avery's

11   trial and reviewed all of the voluminous court filings in that

12   and other litigation involving him.  And that it was therefore

13   only plausibly could have been those defendants who allegedly

14   made editing decisions that they knew falsified the trial

15   testimony and other proceedings they describe precisely because

16   they, and not anyone employed by Netflix, had either attended or

17   reviewed the record of all of those proceedings.

18         Second, the Second Amended Complaint affirmatively

19   pleads that the individual defendants who allegedly did all of

20   these things were employed by an independent production company,

21   defendant Chrome Media, not by Netflix.

22         Third, the only specific action taken by Netflix that

23   is pled on the basis of something other than information and

24   belief is that Netflix distributed Making a Murderer to a

25   worldwide audience.

6

1          Fourth, the Second Amended Complaint itself

2    affirmatively pleads that the program communicates to a

3    reasonable viewer, which presumably includes Netflix, that it is

4    an objective and accurate account of the proceedings they've

5    described, and that to quote the opposition brief to this motion

6    at Page 3, "Nothing in the broadcast indicate to viewers that

7    there have been edits".

8          Fifth, there's no allegation in the Second Amended

9    Complaint that Netflix considered or even had any reason to

10   consider that the individual defendants were either unreliable

11   or untrustworthy.  Indeed, the Complaint affirmatively pleads

12   precisely the opposite pleading that at all relevant times, the

13   individual defendants, and I quote from Paragraph 16, "Have

14   avowed that they were unbiased and objective in their recalling

15   of events".

16         And finally, the Second Amended Complaint implicitly

17   acknowledges that Netflix was aware of the following undisputed

18   facts from the face of the program itself, that Steven Avery had

19   been wrongfully convicted and imprisoned for almost 20 years for

20   a crime that he did not commit; that while Avery was

21   incarcerated, plaintiff, who was then a corrections official in

22   Manitowoc County, received a call from another law enforcement

23   agency informing him that someone else had confessed to the

24   crime of which a Manitowoc County inmate, who turned out to be

25   Steven Avery, had been convicted.  And that despite that

1  information, the plaintiff did not prepare a contemporaneous

2  written report at all.  No apparent effort was made to

3  investigate the matter further and as a result, Avery remained

4  in prison for several more years.

5       And Netflix was also aware again from the face of the

6  program itself of the undisputed facts that following Avery's

7  ultimate release, he filed a civil lawsuit against Manitowoc

8  County that shortly thereafter he was arrested for a murder that

9  he says he didn't commit.  And that despite publicly announced

10 efforts to transfer responsibility for that matter elsewhere,

11 given the obvious conflict of interest, the plaintiff

12 nevertheless participated in the search for the decedent's car

13 and a second search of Avery's home during which magically he

14 discovered the key to the decedent's vehicle, which became

15 crucial evidence against Avery.

16      Your Honor, given all of these undisputed pleaded

17 allegations, it is manifestly implausible to make the conclusory

18 assertion, as the Amended Complaint does, that Netflix

19 disseminated Making a Murderer, despite a high degree of

20 awareness, that it references this plaintiff were probably

21 false.

22      Your Honor, the law on this is straightforward.  A

23 distributor, such as Netflix, cannot be said to have

24 disseminated a work of non-fiction created by someone else with

25 actual malice, be it a book, a magazine article, a film or a

8

1   television series with actual malice unless the work itself

2   relates information that is on its face inherently improbable,

3   or there were obvious or, as the Seventh Circuit has put it,

4   blatant reasons to doubt the reliability of the creator or

5   author.

6           We've cited a host of cases arising in the context of

7   a variety of media that articulate and apply this well-accepted

8   rule, including especially the *Saenz v. Playboy Enterprises* case

9   from the Seventh Circuit and the *Biskupic v. Cicero* case from

10  the Wisconsin Court of Appeals.

11          Your Honor, these cases and the liability standard

12  they apply demonstrate that this plaintiff cannot state a

13  plausible claim against Netflix as a matter of law.

14          I might also suggest that although they will

15  undoubtedly deny it, the plaintiff's counsel in their heart of

16  hearts know this is true, which explains why in their opposition

17  brief they rely primarily on the contention that *New York Times*

18  *v. Sullivan* should be overruled, and the actual malice standard

19  it established abandoned, a contention they concede this Court

20  is powerless to accept.

21          For these reasons, Your Honor, I respectfully submit

22  that Netflix's Motion to Dismiss should be granted, that the

23  plaintiff's Motion for Leave to File a Second Amended Complaint

24  should be denied as futile, and that the case against Netflix

25  should be dismissed with prejudice.  Thank you, Your Honor.  I'm

9

1  happy to answer any questions you might have.

2       THE COURT:  Thank you.  I do have a couple of

3  questions.  And my first one is, I'm at a bit of a loss with

4  regard to Netflix's argument, that it was the individual

5  defendants who actually sat through and listened to the trial.

6  And that somehow or another, because they're the ones who were

7  physically present in the courtroom, that they're the only ones

8  who could have kind of gotten the general flavor of what was

9  going on in that courtroom.  There was, obviously, a set of

10  transcripts, a full set of transcripts the plaintiff argues, a

11  full unedited set of transcripts.  And while that might not

12  necessarily show one's facial features or expressions or tone of

13  voice, one doesn't have to sit in a courtroom to read a set of

14  transcripts and understand all the words that were said.  And

15  some of the allegations here are that Netflix, in the Second

16  Amended Complaint, that Netflix was involved in editing those

17  transcripts.  And some of the allegations are that it's those

18  edits that produced a misleading result.

19       So I'm curious about the significance of whose butt

20  was in a chair, forgive my saying, in the courtroom.

21       MR. LEVINE:  Your Honor, that -- the physical presence

22  in the courtroom is -- is for the reasons you've stated not

23  dispositive or even particularly relevant, except in the sense

24  that the Second Amended Complaint includes as exhibits documents

25  that demonstrate, and it is otherwise undisputed, that these

10

1  film makers, the individual defendants, worked on this project

2  for seven years before they took it to Netflix; that they

3  literally camped out in Manitowoc County.  They're the ones who

4  plowed through all the trial transcripts.  They're the ones who

5  attended trial proceedings.  They're the ones who read all the

6  record materials.  And by the time that they came to Netflix,

7  they had multiple episodes already in rough cut.  They had

8  others already scripted.  They had a full story board.

9          And that in the context of a claim that a distributor,

10  like Netflix, whose job it is to distribute works to the public,

11  would have rolled up its sleeves and reviewed transcripts and

12  checked to see if the editing that the plaintiff -- that the

13  other defendants did accurately reflected what took place at the

14  trial is itself implausible, and it's all obviously pled on

15  information and belief.

16          And the Court is entitled to look with some jaundiced

17  eye at an accusation like that or an allegation like that as to

18  whether that is a reasonable inference to draw from the mere

19  fact, the only fact that's alleged in the Complaint, not on

20  information and belief, that Netflix distributed the work.  It's

21  like saying the owner of a book store can be plausibly be said

22  to act with actual malice if a plaintiff puts in a Complaint on

23  information and belief the book store owner reviewed the book

24  and reviewed all of the allegations in the book against the

25  source material before they put the book on the shelves.  We

11

1    know that that's manifestly implausible, as is this.

2          THE COURT:  Another question that I have is I think I

3    heard your argument correctly, but I may not have.  You said

4    that one of the arguments, in support of dismissal, is that the

5    film was distributed or was released with claims that it was

6    factually accurate, and that there was nothing to indicate that

7    there were any edits.  How does that support dismissal against

8    allegations that there were, in fact, edits, and that Netflix

9    had some part in making those edits?

10         MR. LEVINE:  Because the allegation that Netflix had a

11   part in making those edits, as I just stated, is itself

12   implausible.  And that leaves you with the position that when

13   this stuff -- when the episodes that were already in the can

14   when the scripts for the other episodes when they were presented

15   to Netflix, that Netflix somehow developed obvious reasons to

16   doubt the accuracy of the material it was presented with on the

17   grounds that it was inherently improbable, which is the legal

18   standard under the actual malice test, for distribution of

19   material created by somebody else.

20         And that Amended Complaint itself affirmatively says

21   anybody looking at this program would think it was an objective

22   and her account of what happened, excuse me, in the underlying

23   legal proceeding.  So nothing would have jumped out to Netflix

24   that said, this is inherently improbable or we have reason --

25   obvious reason to doubt that this is accurate, and that's the

1    reason why that's important.

2              THE COURT:  Okay.  Thank you.

3              MR. LEVINE:  Thank you.

4              THE COURT:  For the plaintiff, Mr. Conway.

5              MR. BURNETT:  George Burnett for the plaintiff.  The

6    -- I think if we get to the nub of this, the defendants'

7    position is that it would be implausible to believe that they

8    did anything more than take a final product from two novice film

9    producers, who they never worked with before, looked at it, said

10   this looks good to us, especially because these novice film

11   producers told them we're unbiased, and then disseminated it

12   worldwide.

13             The defendants' position is, is that if you believe

14   anything except for that, it's silly.  If I had to summarize

15   what I hear the defendant saying, it is two things.  Number one,

16   you really didn't tell us in anything, except for legalese, what

17   we did wrong.  And number two, you didn't distinguish between

18   what we did wrong and what our co-defendants did wrong.  And

19   therefore, the courthouse door is closed to you.  That's not the

20   law.

21             I found it interesting that there's a debate going on

22   in the briefs about a case out of the Seventh Circuit, *Doe v.*

23   *Smith*.  *Doe v. Smith* is a Judge Easterbrook decision that came

24   before *Iqbal* and *Twombly*, and it really in a very articulate

25   fashion describes what a pleading responsibility is.  You need

13

1    not plead facts.  You need not plead law.  You need not plead

2    legal theories.  You just need to give the defendant a narrative

3    informing them what they did wrong.

4         Now, the defense says that that's obsolete, that that

5    is no longer the law.  We say it remains the law.  After reading

6    the reply brief, I looked up, I Shepardized *Doe v. Smith*, and I

7    found that Judge Adelman has cited and quoted that decision a

8    half a dozen times.  Judge Griesbach has cited and quoted that

9    decision two or three times.  That decision is a clear

10   articulation of what the plaintiff must prove here.

11        This particular Complaint alleges that the defendants

12   collaborated.  They put together a -- what they called a

13   documentary that was misleading and deceptive and destroyed or

14   came close to destroying Mr. Colborn's life.  The Court's read

15   the allegations of damages, and I need not repeat them here.  It

16   is true that anything the defendants did individually doesn't

17   carry the day.

18        For example, Netflix -- Editing a transcript alone

19   doesn't carry the day, but the combination of factors that went

20   on here does carry the day.  They utilized only biased

21   witnesses, Mr. Avery, his relatives, his lawyers.  They edited

22   transcripts in a misleading and deceptive fashion to communicate

23   information that was never imparted by Mr. Colborn and other

24   witnesses.  They were not under any hot deadline.  This was not

25   hot news as the cases call it.  They had the luxury of time, the

1   opportunity to investigate and inspect.

2         Indeed, the facts seem to be that when this particular

3   publication came to Netflix, they had three rough cuts, and it

4   ended up being ten episodes or so.  There are a half a dozen

5   other things that make this suspect, make actual malice

6   plausible.

7         The defendants main contention is that we didn't

8   distinguish between what they did and what their co-defendants

9   did.  Well, allegations that they collaborated, that they

10   created, that they edited, that they worked together are

11   adequate.  We don't have to distinguish at this stage of the

12   litigation what Netflix did right and what Netflix did wrong,

13   and it is no defense to say that you've relied on the work or

14   the reports of others to an action for defamation against a

15   public official.  There is a greater obligation, especially when

16   you're faced with circumstances that should tell you, perhaps,

17   this information isn't true.  After all, both of the defendants

18   were convicted, Mr. Dassey, Mr. Avery in separate trials, and

19   those convictions were affirmed on appeal.  There was plenty of

20   warning signs for Netflix to take heed of.  And discovery will

21   tell us just how much heed they took.

22         So unless the Court has any questions, I think that

23   just about summarizes the plaintiff's position.

24         THE COURT:  Thank you, Mr. Burnett.  As an aside, I

25   called you Mr. Conway.  I was going to apologize to you for

1    that, but given the great respect I have for your former partner

2    and the fact that I miss him, maybe let's just chalk that up to

3    wishful thinking that I could see Mr. Conway here.  I know who

4    you are.

5              MR. BURNETT:  We all miss him, Your Honor.

6              THE COURT:  Yeah, I know.  Any rebuttal comments?

7              MR. LEVINE:  Yes, Your Honor.  I want to make just a

8    few brief comments.  First, the *Doe v. Smith* case to which

9    Mr. Burnett refers, is clearly no longer good law.  It relies on

10   the no set of facts standard set out by the Supreme Court in

11   *Conley v. Gibson*, which was expressly repudiated in *Iqbal* and

12   *Twombly*.

13             If the Court would like a current version of Judge

14   Easterbrook's views with respect to what he found *Twombly* means,

15   I commend to you the *Bank of America* case, which is cited in our

16   brief, which is remarkably similar to this one.  Because in

17   response to something else that Mr. Burnett said, that is

18   another case where the plaintiff in its pleading referred

19   generically to defendants did this, defendants did that,

20   defendants did the other thing.  And Judge Easterbrook expressly

21   held that in the *Iqbal* and *Twombly* world, that just doesn't cut

22   it.  You have to say what each defendant did and plausibly

23   allege what that defendant did that would lead to liability.

24             And, Your Honor, in one of your own decisions, I think

25   you put it quite well in the *Anderson* case, which we also cite

1    in our Complaint, you say that *Iqbal* and *Twombly* requires the

2    plaintiff to set out who, what, where, when and why.  And the

3    who is who did what is important.  A general allegation that

4    defendants did this and defendants did that just doesn't cut it.

5         And in this case, it's even clearer because the

6    Complaint alleges on many, many specific occasions, and we cite

7    specific paragraphs in our papers, that the individual

8    defendants did this.  The individual defendants did that.  The

9    individual defendants did that.  And then there's just a

10   conclusory assertion that defendants collaborated, that all

11   defendants collaborated in doing these things.  That is simply

12   not sufficient under *Iqbal* and *Twombly*.

13        Two more quick points.  One, is it is demonstrably

14   incorrect from the face of the program which Your Honor is

15   entitled to look at on a Motion to Dismiss because it is

16   incorporated in the pleading by reference; that it does not rely

17   only on biased witnesses favoring Mr. Avery.  It has detailed

18   interviews and statements and press conferences held by the

19   prosecutors and trial proceedings involving the prosecutors in

20   telling the State's side of the story.  And it reports, quite

21   explicitly, that Mr. Dassey and Mr. Avery were found guilty.

22   That wasn't kept secret from the audience.  That is a center

23   piece of the thing.

24        And finally in response to Your Honor's previous

25   questions -- further response to Your Honor's previous questions

1    to me about the plausibility of the contention, the generalized

2    on information and belief contention that Netflix somehow

3    participated in the editing, the law is clear both in the *Iqbal*

4    case itself and in a host of Seventh Circuit cases, including

5    the *McCauley* case, which we cite in our brief, that where as in

6    this case, there is an obvious alternative explanation for the

7    conduct that's alleged in the complaint, you haven't pushed the

8    claim across the line from possibility to plausibility.

9         And here where it is clear and specifically pled in

10   the Complaint that Netflix was a distributor, and its common

11   knowledge and common sense that that's what Netflix does is a

12   distributor or a programming, that obvious alternative

13   explanation to the implausible notion that they sat there and

14   reviewed trial transcripts and checked it against the possible

15   film that the producers -- sections that the defendants gave

16   them somehow is a plausible contention.  In the face of the

17   obvious alternative explanation, it just can't carry the day.

18   Thank you, Your Honor.

19        THE COURT:  Thank you, Mr. Levine.  You all are fully

20   aware of the 12(b)(6) standard, and Mr. Levine and Mr. Burnett

21   have both discussed it, and I think everyone is in agreement

22   that the plausibility standard that Judge Easterbrook has talked

23   about and has been discussed over and over and over again in

24   Seventh Circuit cases is the appropriate one.  And just as an

25   aside and just for the purposes of the record, again we're

1    talking right now in particular about the defamation claim in

2    which the plaintiff has to show a false statement communicated

3    by speech, conduct or writing.  It's not privileged, and it

4    tends to harm one's reputation so as to lower him in the

5    estimation of the community or deter third persons from

6    associating or dealing with him, and that's in re *Storms v.*

7    *Action Wisconsin, Inc.*, 309 Wis.2d 704 at 722, a Wisconsin case

8    from 2008.  And then we know, of course, that if the person who

9    is allegedly defamed is a public official, then we have the next

10   step, which is the actual malice step, and the one I think that

11   for the great part Netflix has focussed on.

12          It seems to me that the plaintiff has conceded that

13   the plaintiff meets the definition of a public official.  But

14   what the plaintiff has argued is that particularly the Second

15   Amended Complaint alleges sufficient facts to demonstrate that

16   Netflix acted with actual malice.  And, of course, actual

17   malice, under Wisconsin law, occurs when the actor either knows

18   that a statement is false or makes the statement with reckless

19   disregard for its truth or falsity.  That's *Erdmann v. SF*

20   *Broadcasting*, 229 Wis.2d 156 at 169, the Court of Appeals case

21   from 1999.

22          And particularly in that reckless disregard

23   neighborhood, the plaintiff has to show that the defendant in

24   fact entertained serious doubts as to the publication or in this

25   case the productions truth.  That's again from *Erdmann* at Pages

1   169 through 70.

2          And of particular note, a defendant cannot necessarily

3   escape liability simply by claiming that the defendant believed

4   that the production was truthful.  That's a *St. Amant* case, 390

5   US at 732.  Recklessness can be found when there are obvious

6   reasons to doubt the veracity of the information or the accuracy

7   of it.  Again, from *St. Amant*.

8          Mr. Levine pointed out that the plaintiffs have made

9   an argument that that actual malice standard in *New York Times*

10  *v. Sullivan*, the Supreme Court should rethink.  I'm not going to

11  spend any time on that.  I'm not the boss of them obviously, and

12  that's going to have to be an argument that, perhaps, the

13  plaintiff will have an opportunity to raise in front of that

14  august body at some point in time, but I'm not the -- I'm not

15  the person to do that.

16          So when I turn to the Amended Complaint, I think that

17  the -- that Netflix's argument about lumping if you will, which

18  is lots of people did this, lots of people did that, lots of

19  people did the other things accurately characterizes the Amended

20  Complaint.  However, the plaintiffs have -- The plaintiff has

21  filed a Second Amended Complaint or a proposed Amended Complaint

22  as part of the proceedings asking for leave to file that

23  proposed Amended Complaint.

24          And again, if we're simply talking the threshold issue

25  that we talk about at a 12(b)(6) stage, which is looking within

1    the four corners of that Second Amended Complaint determining

2    whether or not there have been enough facts alleged, whether on

3    information and belief or otherwise, to put the defendant on

4    notice as to what the defendant is alleged to have done.  I

5    think the Second Amended Complaint is substantively different

6    than the first in a number of ways.

7            There are specific allegations as to Netflix, not just

8    everybody held hands and worked together.  But as to Netflix,

9    there are specific allegations in the Second Amended Complaint.

10   For example, the fact that Netflix accepted awards for Making a

11   Murderer for writing and editing.  Netflix accepted those

12   awards, that its employees were recognized in the media for

13   their role in sort of defining this -- this new genre, I'm not

14   sure that it's hugely new, but genre of television.  There were

15   Netflix employers, according to the Second Amended Complaint,

16   who produced several of the individual episodes of the program.

17           There were Netflix employees who have made statements

18   to the press regarding their roles in producing the programs.

19   There is, of course, reference to collaboration with Demos and

20   Ricciardi, and those were allegations that existed in the

21   Amended Complaint, but there were employees who discussed their

22   own roles, and those were employees of Netflix.

23           The plaintiff has alleged in the Second Amended

24   Complaint that in point of fact, there were only I think three

25   episodes, rough-cut episodes that were, as Mr. Levine put it, in

1  industry speak in the can at the time that they came in and

2  pitched to Netflix.  And as it turns out, there were a total of

3  ten episodes that were produced, and they weren't rough, they

4  were final episodes.  And the allegation is that Netflix had a

5  role in developing the programs, in vetting them all the way

6  from pre-production through the post-production, and that

7  Netflix had a role in the final content decisions.

8          They also -- The Second Amended Complaint also alleges

9  that in October of last year, the second part, Making a Murderer

10 Part 2, was admitted -- sorry was released.  And by that time,

11 Netflix had reason to be aware of criticism that had arisen over

12 Part 1 and the accuracy or lack of accuracy, depending on who's

13 doing the talking, of Part 1, and yet continued to proceed with

14 Part 2.

15         And again, the allegations in the Second Amended

16 Complaint are that Netflix specifically was heavily involved in

17 the production, the post-production and the editing of that

18 second series as well as, of course, marketing and distributing,

19 which Netflix has conceded that it was the distributor.  They

20 quote -- The Amended Complaint quotes Ricciardi and Demos as

21 indicating that Netflix was a partner in the making of the

22 second series from the very beginning all the way to the end.

23         And so there are in the Second Amended Complaint,

24 specific factual allegations made as to Netflix rather than

25 simply group allegations of the defendants doing this.  There

1   are still in the Second Amended Complaint some allegations that
2   are collaborative, if you will.  But there are a number of
3   allegations in the Second Amended Complaint that are specific to
4   Netflix.  And Netflix has also argued that, okay, so, you know
5   even if Netflix was a producer, had a role or some of its
6   employees had a role as producers or executive produces, so
7   what.  You don't necessarily control a production simply because
8   you're acting as the producer or the executive producer.

9           I think exactly quoting from Netflix's brief, that is
10  because there's no connection between a person's mere status as
11  an executive producer and involvement in the editing of a film.
12  I have no earthly idea whether that was true.  I was a theater
13  major in college, but I never made it to film.  I just stood out
14  there on the stage and flubbed my lines, so I don't know whether
15  that's true or not.  It may very well be, and that may very well
16  be an issue for summary judgment in terms of what role anyone
17  who carried a producer or an executive producer title may have
18  played and what they may have done as part of that role.

19          But we're at the 12(b)(6) stage, and the 12(b)(6)
20  stage says that the plaintiff needs to plausibly state a claim,
21  and I think the Second Amended Complaint does plausibly state a
22  claim, and it plausibly states a claim against Netflix.  Again,
23  there are allegations that were transcripts that were sliced and
24  diced, and that Netflix played a role in that.

25          With regard to Netflix's argument and Mr. Levine

1    referred to it today, that even if I allow the plaintiff to

2    amend and to file the Second Amended Complaint, it would be

3    futile under Rule 15 for me to allow that because it points to a

4    whole series of cases where courts have declined to hold

5    distributors liable for defamatory content.  And there are

6    numerous cases that it has pointed to both at the circuit court

7    level and at the district court level.  And I agree that those

8    cases refuse to hold distributors liable.  However, all of those

9    cases were very fact bound and fact intensive.  It depended on

10   what the distributors knew.  It depended on what other role the

11   distributor may have played, whether there was another role

12   other than distribution.  And many of those cases, by the way,

13   refused to hold the distributor liable at the summary judgment

14   stage, not at the Motion to Dismiss stage after they had heard

15   evidence about what role the distributor plays.

16          I think many of the arguments that Netflix makes with

17   regard to the Second Amended Complaint sound in summary

18   judgment.  They sound in, you know, wait, wait, Judge, you're

19   going to see evidence, and you're going to hear that this

20   couldn't have happened or that couldn't have happened or this is

21   not the way it went down.  Maybe that will end up being true, I

22   don't know, but that's not where we are right now.  Right now,

23   we're at the Motion to Dismiss stage.

24          So I am going to grant the plaintiff's Motion to File

25   a Second Amended Complaint and deny the Motion to Dismiss --

1   Netflix's Motion to Dismiss the defamation claim.  I note that

2   Netflix also spends a little bit of time talking about the other

3   claims in the Second Amended Complaint, the negligence claim and

4   the intentional infliction of emotional distress claim.

5        The defendant argues that the plaintiff hasn't argued

6   what the ordinary care was that Netflix didn't show, again

7   hammering on the fact that it argues it didn't do anything other

8   than distribute, and so what standard of care could it have

9   violated?

10       I note that the plaintiff has alleged a negligence

11  claim in the alternative to the defamation claim.  But be that

12  as it may, it did allege, the Second Amended Complaint, that the

13  defendant had a duty to exercise reasonable care when

14  communicating information about him, and that some of the

15  statements or information that was communicated about him either

16  was false or had been manipulated to such an extent that it

17  mislead viewers into getting a false impression, and that that

18  was a breach of that duty of care.  And again, it's 12(b)(6)

19  stage, I think that is sufficient to state a claim and to state

20  the elements of a negligence claim under Wisconsin law.

21       And then the last claim of course, intentional

22  infliction of emotional distress.  Netflix argues that this is

23  just another way of stating a defamation claim, and they also

24  state that the plaintiff can't prove the claim because they

25  can't -- The plaintiff can't prove that Netflix intended to

1     cause emotional distress.  The plaintiff has alleged otherwise.

2     Again at the pleading stage, the plaintiff has stated a claim.

3     And so for all of these reasons, I'm going to deny Netflix's

4     Motion to Dismiss and allow the plaintiff to file a Second

5     Amended Complaint.

6           Where that takes us to next is the motions by Chrome

7     and Demos and Ricciardi and their Motion to Dismiss with regard

8     to service, and there are some related motions to that, two

9     motions to file a sur-reply, and then the Motion for An

10    Extension of Time.  I just want to address those really quickly,

11    because I don't think there's a particular need to spend a whole

12    lot of time on them.

13          As you all are aware, our local rules anticipate a

14    motion to -- a response and a reply.  They do not anticipate

15    sur-reply, which is why the plaintiff has sought leave to file

16    sur-replies.  And generally, I would hazard to guess that my

17    colleagues and I are all on the same boat, which is that we're

18    not huge fans of sur-replies.  There's a reason that we get a

19    three part -- the movant gets two kicks at the cat, and the

20    respondent gets one.  However, if there are circumstances in

21    which a party is attempting to respond to a motion or an issue

22    that was really raised for the first time in a reply, we have

23    allowed sur-replies under those circumstances.

24          The plaintiff has filed two requests to file a

25    sur-reply.  The first one is at Docket No. 90.  And as far as I

1    can tell, unless I'm missing something, it's just addressing a

2    case, which I was aware of before the motion for sur-reply was

3    filed, that federal law applies to service after removal.  State

4    law applies to service before removal.  I don't see any need for

5    that sur-reply.  As I indicated, I already knew about the case,

6    so I'm going to deny the motion to file -- for leave to file the

7    sur-reply to Docket No. 90.  I don't think it advances the ball.

8          However, the second motion that the plaintiff filed,

9    it falls under that category that I described of seeking to

10   address an issue that came up only on reply.

11         The plaintiff has asked to file a sur-reply addressing

12   the second declaration of Defendant Demos, which was filed with

13   the defendant's reply brief.  And the plaintiff says that it has

14   located or he has located records from California Secretary of

15   State that are inconsistent with Demos' second declaration.  I

16   don't hear Netflix or the defendants sorry, plural, objecting to

17   my considering the records.  They just say they are not

18   inconsistent.  They don't change anything.  They don't make a

19   difference, but I think that that is an appropriate use of a

20   sur-reply, and so I am going to grant the second motion for

21   leave to file a sur-reply, and I'll consider both the

22   information in that second motion and the defendant's arguments

23   in opposition to that information as part of determining the

24   Motion to Dismiss.

25         That then brings me to the Motion to Dismiss itself

27

1    and to service.  And let me just, say and I'll give each of you
2    an opportunity to address what I'm about to say, but I
3    regretfully believe, for all of our sakes, that I'm not in a
4    position to resolve the Motion to Dismiss with regard to
5    effective service without an evidentiary hearing.  There's a lot
6    of disagreement between the parties over who got what, who knew
7    what, who did what when.  We've got flat statements in some
8    cases by people that they never received service in contrast to
9    other people who said yes, they did.

10          I've gone through all of this, and I'm happy to hear
11   from you all, but I think there are a number of factual
12   disagreements here that require flushing out at an evidentiary
13   hearing.  The reason I say regretfully is because I understand
14   that that is time, effort and expense on all of your part to
15   bring witnesses in on this issue.  But I think there are too
16   many inconsistencies between different versions of the events
17   for me to make that determination without hearing from some
18   folks.

19          The other thing I will note is that the other motion
20   I've not addressed is the Motion for an Extension of Time to
21   file the summons and complaint assuming that I conclude that
22   it's not -- it wasn't properly filed.  I think that's obviously
23   something that address once I've made a decision about whether
24   or not service was effectuated.  However, there's also the
25   statute of limitations problem there.  If there wasn't proper

28

1    service, I don't think I can extend the time.  The statute of

2    limitations has run.  And if there was proper service, then I

3    can.  So I think those two things are inextricably intertwined

4    to some extent.  Whether or not I can give an extension of time

5    to serve is going to necessarily depend on whether or not there

6    was proper service.  So I'm happy to hear from anybody who wants

7    to put an oar in the water on that.  But after going over and

8    over and over the facts, I have questions that I'm not sure --

9    Everybody can argue until they're blue in the face, but I'm not

10   sure they argue -- they respond to the factual question.  From

11   the defendants, given that it's you all's motion.

12            MS. WALKER:  Thank you, Your Honor.  To start, we

13   agree with you that the statute of limitations causes -- you

14   know, is fatal to any motion to extend the time.  And it sounds

15   like you've made up your mind on the need for an evidentiary

16   hearing.  I did want to just clarify, because I know the record

17   is voluminous and there's a lot of dates flying back and forth,

18   that our view is there's really only four affidavits of service

19   or affidavits of what they call due diligence that you need to

20   be looking at.

21            It's Docket Nos. 44, 49 and 50, and that's all that

22   the plaintiffs have put in the record that is not hearsay or is

23   not perjured and withdrawn that really sets forth their position

24   on when attempts to service were made and when they believe

25   service was effected.  We believe it was not, but I don't know

1   that there's really a factual dispute over those affidavits.

2   Our position would be that even if you take them at face value,

3   that still doesn't constitute service.  But if you feel more

4   comfortable with an evidentiary hearing, we're obviously happy

5   to comply.

6           THE COURT:  Thank you.  Ms. Barker.

7           MS. BARKER:  Thank you, Your Honor.  I'll be very

8   brief.  First of all, in an effort -- First of all, if Wisconsin

9   law has to be considered, then we certainly agree with the Court

10  that an evidentiary hearing is appropriate, and I would note

11  that service -- the affidavits that were submitted by the

12  defendants are, in fact, pertinent and therefore those con

13  traditions I think do have to be resolved for even one -- for at

14  least two reasons.

15          One, is that service under Wisconsin law can be proven

16  through the written admission of the defendant such as through

17  affidavits that were submitted in this case under

18  Section 801.10(4)(c).

19          Second, I would note with respect to the argument that

20  there's hearsay in the affidavits of counsel, those statements

21  regarding what counsel was told were obviously submitted for

22  purpose of notice or knowledge of what counsel understood for

23  purposes of the reasonable diligence analysis.  They were not

24  asserted for purposes of truth of the declarant statements.  In

25  fact, we are submitting to the Court that the we later found out

1     that some of those declarations were false, so we do think that

2     those are material.

3              And then I think just in a very brief, perhaps, last

4     salvo to attempt to spir everyone by seeing whether federal law

5     is something the Court would be amenable to applying and then

6     the hearing wouldn't be necessary.  I would just note briefly

7     that the issue, as we saw it, is that the argument was something

8     of a moving target.  28 U.S.C. § 1448, which governs service

9     after removal where there's a defect in service or in service

10    prior to removal, was never mentioned in the initial Motion to

11    Dismiss but was -- and we mentioned it in our response, which

12    lead to the reply brief and the mention of the *Walker* case.

13             As I'm sure the Court is aware, the *Walker* case

14    specifically distinguished *Hanna v. Plumer*, holding that in

15    *Walker*, there was no conflict between Federal Rule of Civil

16    Procedure 3 and the state statute of limitations, that they

17    serve different purposes in that case because *Walker* was not a

18    removal case, and 28 U.S.C. § 1448 was not implicated.

19             Because 28 U.S.C. § 1448 is implicated, this is a

20    removal case.  We think this is a *Hanna* case, *Hanna v. Plumer*,

21    which provides that where there is a direct conflict between a

22    variably promulgated federal rule and even state substantive

23    law, even the statute of limitations, which essentially was what

24    was at issue in *Plumer*.  It was a limitation on when enhanced

25    service had to be accomplished on an executer in order for a

Case 1:19-cv-00484-BHL   Filed 12/27/19   Page 31 of 36   Document 103

1    claim to proceed against an estate.  The federal rule prevails.

2    Even if that means that somebody whose case would be dead in

3    state court gets to proceed in federal court.  That's number one

4    why we think this is not a *Walker* case or this is not governed

5    by *Walker*.

6          Secondly, the state statute of limitations that the

7    defendants rely on in Section 893 is also subject to the

8    provision in Section 893 of the Wisconsin Statutes that holds

9    where 893.15 in the same chapter that holds that where or

10   provides that where a case on a Wisconsin claim is pending in a

11   foreign forum, defined to include federal courts sitting in --

12   located in Wisconsin, federal law looks to -- I'm sorry -- the

13   foreign court looks to local foreign law with respect to the

14   question of commencement of action.  That's 893.15, and it

15   specifically states, in a non-Wisconsin forum, again defined to

16   include a federal court sitting in a state, the time of

17   commencement or final disposition of an action is determined by

18   the local law of the forum.

19         Therefore unlike *Walker*, this is not a case where

20   there is, in fact, a conflict.  In the sense there is a conflict

21   if Wisconsin law says what the defendant say it does.  But if

22   under 893.15, the federal law simply trumps the state statute of

23   limitations because Wisconsin defers to the federal rule as to

24   commencement of action, unlike the Oklahoma statute that was at

25   issue in the *Walker* case.  And then I think I've used up our

1    time.  Thank you, Your Honor.

2         THE COURT:  Any brief response from the defendant?

3         MS. WALKER:  Very briefly on *Walker*.  I don't believe

4    they raised the 893.15 argument before.  I may have missed it,

5    but I believe that's a new argument and, of course, it's not

6    proper at this juncture.

7         The *Walker* case is about when a suit was commenced.

8    It looked at a statute nearly identical to the Wisconsin

9    statute.  And with Oklahoma, that said it's commenced upon

10   filing provided that service happens within X number of days.

11   In Oklahoma, it was 60.  In Wisconsin, it's 90, and that didn't

12   happen.  And everyone here agrees, and you can look at docket

13   91, one of their briefs.  Everyone here agrees that this would

14   have been dead in state court.  And that's the *Bartels* case,

15   Your Honor.  And that's -- If it had stayed in state court and

16   if we after an evidentiary hearing showed that service didn't

17   occur in that 90-day period, we all agree here that it would

18   have been dead in state court.  That's *Bartels*.  And *Walker* says

19   it's dead in federal court, too.  And yet they claim that

20   removal somehow resurrects it, and Your Honor that's not logical

21   and that's just not the law.

22        The cases they cite, not a single one of them, with

23   the exception of one from New York, which involved a state

24   statute very similar to the federal law.  But aside from that,

25   not one of the cases they cite involves this scenario where the

1 statute of limitations ran, the service period ran, and then

2 there was removal. And we cite a lot of cases involving that

3 very situation. And uniformly, they hold removal doesn't

4 resurrect the case.

5 I just want to quote you two passages from the one

6 case they cite from the Eastern District of Michigan and then

7 from *Walker* itself. In the Eastern District of Michigan case is

8 *Mills v. Curioni*, 238 F.Supp.2d 876. And the pertinent language

9 there is, "It is only when an issue arises with respect to the

10 tolling of a statute of limitations by the commencement of an

11 action that a state law which requires something more than the

12 mere filing of a complaint to commence an action will control".

13 So what *Mills* is saying, the case they cite is somehow

14 overruling *Walker*, says is that when you have a state statute

15 where a suit is not commenced merely upon filing, but it's

16 commenced upon filing provided that service happens within a

17 certain number of days, then we're back in *Walker* territory, and

18 that's when the state law applies, and that's exactly what we

19 have here provided that is straight from the Wisconsin statute.

20 And then you can look at the *Walker* case itself, which

21 again is on all four squares with our case. And the quote there

22 is we cannot give the cause of action longer life in the federal

23 court than it would have had in the state court without adding

24 something new to the cause of action, and we may not do that

25 consistently with *Erie Railroad Co. v. Tompkins*.

34

1        And so, Your Honor, we understand that you think we

2   need an evidentiary hearing, but our position, supported by

3   every case cited in all the papers, is that if you find that

4   evidentiary hearing that service did not occur pre-removal or

5   pre-March 18, 2019, the case is over.  Federal rules can't save

6   this.  Thank you, Your Honor.

7        THE COURT:  Thank you, all.  All right.  So you have

8   my ruling on everything except the Motion to Dismiss from Chrome

9   and Demos and Ricciardi as well as the Motion for an Extension

10  of Time.  We need to terminate for today, because we have

11  another hearing that is about to begin.  I will reach out to you

12  all in terms of setting up time, date so forth, get the

13  logistics for a hearing.  Before I do that though I'll look at

14  the arguments that both of you have made with regard to *Walker*

15  and *Hanna* to make sure that's where we need to be.  And if I

16  think that's -- it turns out that we don't need an evidentiary

17  hearing, I'll let you all know that as well.  Anything else on

18  behalf of the plaintiffs this morning?  How about the

19  defendants?  Thank you all very much.

20        BAILIFF:  All rise.

21    (Whereupon proceeding was concluded.)

22

23

24

25

C E R T I F I C A T E

I, SUSAN ARMBRUSTER, RMR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified December 26, 2019.

/s/Susan Armbruster

Susan Armbruster

                    Susan Armbruster, RPR, RMR
                    United States Official Reporter
                    517 E Wisconsin Ave., Rm 200A,
                         Milwaukee, WI 53202
                    Susan_Armbruster@wied.uscourts.gov