IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

ANDREW L. COLBORN,

NETFLIX, INC.,                                    Case No. 19-CV-484
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

Defendants.

## SECOND AMENDED COMPLAINT

Plaintiff, Andrew L Colborn, by and through his attorneys, the Law Firm of Conway,

Olejniczak & Jerry, S.C., Griesbach Law Offices, LLC, and Schott, Bublitz and Engel, S.C., as

and for his Amended Complaint against the above-named Defendants, alleges and shows the

Court as follows:

### Parties

1.   Plaintiff, Andrew L. Colborn, is an adult residing in Manitowoc County, Wisconsin.

2.   Netflix, Inc. is a foreign corporation authorized to do business in the state of Wisconsin

with a principal place of business located at 100 Winchester Circle, Los Gatos, California 95032.

3.   Chrome Media, LLC is a foreign corporation domiciled in New York with a principal

place of business located at 15821 Ventura Boulevard, Suite 500, Encino, California 91436.

4.   Chrome Media, LLC is an independent film production company founded by Defendants

Laura Ricciardi and Moira Demos in 2006.

5.   Chrome Media, LLC was formerly known as Synthesis Films, LLC.

6. Laura Ricciardi is an adult residing in California.

7. Moira Demos is an adult residing in California.

8. Defendants Laura Ricciardi and Moira Demos have ownership interest in Chrome Media, LLC, formerly known as Synthesis Films, LLC. They also are executive producers of "Making a Murderer 1" and "Making a Murderer 2" and filmed said production while attending the trial of Steven Avery in Manitowoc County.

## Statement of the Facts

9. Plaintiff Andrew L. Colborn was employed as a corrections officer with the Manitowoc County Sheriff's Department from 1992 through 1996.

10. In his capacity as a corrections officer, he was a non-sworn, non-law enforcement officer and had responsibility for security of the jail.

11. Beginning in 1996, Plaintiff Andrew L. Colborn became a sworn law enforcement officer employed with the Manitowoc County Sheriff's Department.

12. For the years 2005 through 2007 and at all times material hereto between 2005 and 2007, Plaintiff Andrew L. Colborn was a patrol Sergeant with the Manitowoc County Sheriff's Department (hereinafter "MTSO"). Plaintiff Andrew L. Colborn was also a trained evidence technician.

13. On October 31, 2005, 25-year-old freelance photographer, Teresa Halbach, was brutally murdered at the Avery Salvage Yard in rural Manitowoc County, Wisconsin. Overwhelming physical and circumstantial evidence proves that Steven Avery and his 16-year-old nephew, Brendan Dassey, were the perpetrators of the crime. Neither Plaintiff nor any other law enforcement officer planted evidence or in any other way attempted to frame Avery or Dassey

- 2 -

for Halbach's murder. Separate juries returned guilty verdicts against each of them in 2007 and their convictions remain unreversed after numerous appeals.

14. In 1985, two decades before murdering Halbach, Avery was wrongfully convicted of physically and sexually assaulting a woman on a remote stretch of Lake Michigan's shoreline in Manitowoc County. Avery served 18 years of a 32-year prison sentence before DNA testing revealed that another man was the assailant. Under new leadership, the Manitowoc County District Attorney's office promptly stipulated to Avery's release.

15. On December 18, 2015, Defendant Netflix released for worldwide distribution a ten-part documentary series entitled, "Making a Murderer" (hereinafter, MAM). The series purports to objectively and accurately recount Avery and Dassey's arrest and conviction for Halbach's murder. Within 35 days of its release, 19.3 million viewers had watched MAM worldwide. In a January 16, 2016 article, *Forbes* magazine columnist Paul Tassi described the program as "Netflix's most significant show ever." MAM has remained in the national and international spotlight since its debut with renewed interest upon the recent release of "Making a Murderer Part 2." The original series and its sequel continue to be marketed worldwide and remain available on Netflix for subscribers today.

16. MAM was and continues to be marketed as a non-fiction documentary. No disclaimer appears in any of the ten episodes notifying viewers that the series is anything but an actual and accurate portrayal of events. In news and entertainment media interviews since the program's release, Defendants Ricciardi and Demos have repeatedly avowed that they were unbiased and objective in their re-telling of events, holding the film out as a non-fiction piece. MAM won four Emmy Awards, including "outstanding directing for nonfiction programming" and "outstanding writing for nonfiction programming." It also won the 2017 Cinema Eye Honors

Award for "outstanding achievement in nonfiction films made for television." Netflix also accepted other awards for writing and editing MAM.

https://www.imdb.com/title/tt5189670/awards  And its employees were congratulated by members of the media for their role in defining a new television genre.

https://www.huffpost.com/entry/netflix-is-making-a-murde_b_9074076?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuaHVmZnBvc3QuY29tL3RvcGljL3RlZC1zYXJhbmRvcw&guce_referrer_sig=AQAAAD5CTXLbOxR8N20qHHxSMWzJbNr75b6l5rqx7WKo36ogoezTCQNf9C0_HYHOsgHtrMcVotNgLsJfha8H4YctyCnbpzi4mOEPzw_cJ5d7JVubua8vimd5p3uZ4DMhQ_i6gj2pj9kHRHh3cMm8t_MXR5vPbue4G9r3NF-cNqUvjTH

17.  Netflix employees were producers of several episodes of MAM.  Netflix employees who were involved in MAM have made numerous statements to the press regarding their involvement.  Further, Defendants Demos and Ricciardi have publicly discussed Netflix representatives' collaboration with them.  *See, e.g,*

https://www.nytimes.com/2018/10/17/arts/television/making-a-murderer-behind-the-scenes.html One of the producers of several MAM episodes, who is also the Netflix representative to whom Demos and Ricciardi apparently pitched the series, described her collaboration with Demos and Ricciardi in aligning their vision for the broadcasts as a "mind meld."

https://www.vanityfair.com/hollywood/2018/06/lisa-nishamura-netflix-documentary-wild-wild-country

18.  Upon information and belief, Demos and Ricciardi only had three episodes in "rough cut" when they pitched MAM to Netflix. https://www.businessinsider.com/making-a-murderer-filming-process-netflix-2016-1. The series as produced and distributed contains 10 episodes that

- 4 -

were far from rough in their production. Netflix's processes in developing and vetting shows, including documentaries, from production through post-production involves a high degree of involvement from numerous sections of the Netflix workforce. https://medium.com/netflix-techblog/studio-production-data-science-646ee2cc21a1 (flow chart diagramming processes). Netflix maintains an entire job site on which it advertises for employees whose tasks are to assist in content development for shows that debut on its service. https://jobs.netflix.com/ Among other positions, Netflix maintains a position that includes legal review of content to be broadcast on its service. https://jobs.netflix.com/jobs/868145 Upon information and belief, the final MAM product was shaped with the involvement of Netflix content and creative personnel, including, but not limited to, its Chief Content Officer and its head of documentary programming, and it was subject to legal review by Netflix employees prior to its release.

19. At no time during plaintiff's employment at MTSO did he serve as a spokesperson for the department. As such, he is neither a "public figure" nor a "limited purpose public figure," as those terms are defined in defamation law.

20. Pertinent and significant aspects of MAM are not true as represented and are, instead, false and defamatory toward Plaintiff and others. Material and significant facts known to the Defendants were omitted and distorted. Despite overwhelming evidence proving Avery and Dassey's guilt and the utter absence of evidence supporting Defendant's accusations of police misconduct, Defendants falsely led viewers to the inescapable conclusion that Plaintiff and others planted evidence to frame Avery for Halbach's murder. Defendants omitted, distorted, and falsified material and significant facts in an effort to portray Plaintiff as a corrupt police officer who planted evidence to frame an innocent man. Defendants did so with actual malice

and in order to make the film more profitable and more successful in the eyes of their peers, sacrificing and defaming the Plaintiff's character and reputation in the process.

21. Attached as Exhibit A, incorporated herein by reference, are excerpts from Making a Murderer Episodes 1 – 10 which depict numerous inaccuracies in facts and therefore defame plaintiff. These are in addition to defamatory statements that are further described below.

22. Attached as Exhibit B, and incorporated herein by reference, is a transcription of excerpts of Plaintiff's trial testimony that were included in MAM Episodes 5 and 7 but that were significantly altered, as indicated on the exhibit, so as to present a false impression of Plaintiff's testimony and to falsely put words in his mouth and omit others.

### 1994 or 1995 Telephone Call and Subsequent Alleged Cover-Up

23. Defendants Ricciardi and Demos, acting jointly and in concert with the other Defendants, led viewers to falsely conclude that Plaintiff learned of Avery's 1985 wrongful conviction approximately eight years before he was released, but covered it up. By doing so, Defendants created a false motive for Plaintiff to plant evidence, making their central but false claim that Plaintiff and other police officers framed Avery more believable.

24. In 1994 or 1995, while working as a corrections officer at the Manitowoc County Jail during normal business hours, Plaintiff answered a telephone call from a detective in another jurisdiction. The detective asked to speak with a Manitowoc County detective about an assault that occurred many years earlier in Manitowoc County. A jail inmate supposedly had told a fellow inmate that he was responsible for an assault for which another man was convicted. Plaintiff does not believe the caller mentioned the name of the man convicted or the name of the victim in the Manitowoc County assault. If he did, Plaintiff was wholly unfamiliar with the names.

- 6 -

25. Plaintiff had no reason to and did not know about Avery's 1985 sexual assault conviction when he received the phone call from the detective. He was not employed by MTSO until 1992, when he was hired as a corrections officer at the Manitowoc County Jail, which was and remains a separate division within MTSO. As a corrections officer, Plaintiff was not a sworn law enforcement officer and had no authority to conduct investigations, much less dated criminal activity for which a conviction had already been obtained. Doing so would have been a violation of department policy. Accordingly, Plaintiff transferred the call to the Investigations Unit after giving the caller the number in case the call went unanswered or was lost in the transfer. Plaintiff subsequently heard that higher-ups at MTSO had given assurances that the right man had been convicted. Plaintiff had no reason to think otherwise until Avery was exonerated by DNA testing in 2003. Given all of the above circumstances, there was no reason for Plaintiff to prepare a written report about the call at the time.

26. Plaintiff first learned of Avery's wrongful conviction in September of 2003 when Avery was exonerated by DNA testing. At that time Plaintiff recalled the 1994 or 1995 telephone call and surmised it may have been related to the Avery case. At the direction of Sheriff Ken Petersen, Plaintiff prepared a written statement memorializing the call as part of Petersen's effort to provide a complete, accurate, and transparent account of the circumstances surrounding Avery's wrongful conviction for consideration by the Wisconsin Attorney General in her independent review. Plaintiff's written statement was promptly delivered to the Attorney General along with all other documents pertaining to her review.

27. Defendants Ricciardi and Demos strategically spliced and omitted portions of Plaintiff's trial testimony as set forth in Exhibit A and B, incorporated by reference herein, to distort the facts and nature of the 1994 or 1995 telephone call. These omissions and distortions led viewers

- 7 -

to falsely conclude that Plaintiff bears responsibility for seven or eight of Avery's 18 years of wrongful imprisonment, providing him with a motive to frame Avery for Halbach's murder.

28. For the same purposes, Defendants Ricciardi and Demos included in the second episode of MAM an interview of Steven Glynn, one of Avery's attorneys in his wrongful conviction lawsuit. Glynn expresses dismay that Plaintiff did not prepare a report concerning the call he received in 1994 or 1995 until Avery was exonerated in 2003. Glynn then mistakenly tells viewers that Plaintiff's written statement was kept hidden in a Sheriff's department safe in 2003 as part of Plaintiff and MTSO's effort to cover up their knowledge of Avery's wrongful conviction, when in fact the statement had been delivered to the attorney general promptly after it was prepared.

29. Upon information and belief, Defendants knew Plaintiff's written report concerning the phone call was not left in the Sheriff's safe but chose to include Glynn's mistaken belief in order to further their false narrative. Defendants included extensive excerpts of videotaped depositions in Avery's wrongful conviction lawsuit in MAM and, upon information and belief, reviewed the depositions from the lawsuit in their entirety to determine which portions to include. The depositions included extensive questioning of Plaintiff, Sheriff Petersen, and others concerning the 1994 or 1995 telephone call and Plaintiff's documentation of same in 2003. No reasonable person could have concluded from a review of the depositions and the trial testimony that there was anything nefarious about Plaintiff's response to the call or his documentation of same after Avery was exonerated. Nor could any reasonable person have concluded that Plaintiff's report was left hidden in a safe as part of a cover-up for MTSO wrongdoing. Yet Defendants distorted the facts to provide viewers a false motive for Plaintiff to plant evidence and frame Avery for Halbach's murder.

## Plaintiff's Call to Dispatch

30. On November 3, 2005, Teresa Halbach's mother reported to the Calumet County Sheriff's Department that her daughter was missing. Police in Calumet County believed that Teresa's last known whereabouts were either at the George Zipperer residence or the Avery Salvage Yard, both located in Manitowoc County. Halbach had been assigned by her employer, Auto Trader Magazine, to take photos of vehicles that were for sale at each location on October 31, 2005, the last day she had been seen. Calumet County officers requested assistance from MTSO since Halbach's last known whereabouts were in Manitowoc County.

31. On November 3, 2005, Plaintiff Andrew Colborn was working a regular shift as a patrol sergeant with the Manitowoc County Sheriff's Department when he received a call from Calumet County requesting assistance with a missing person. That evening, Plaintiff was asked to check out two potential residences where Halbach reportedly had been, "the Avery Salvage Yard and the Zipperer residence."

32. On November 3, 2005, Plaintiff called dispatch to confirm the make and model and license plate number of the missing person's vehicle as he had done in hundreds of other cases during his career. Neither Plaintiff nor any other police officer had contact with Halbach's vehicle on November 3rd, or any other time prior to November 5th when it was discovered at the Avery Salvage Yard by a volunteer search party.

33. A central part of Avery's defense at trial was that Plaintiff and other Manitowoc officers planted Halbach's SUV at the Avery Salvage Yard where Avery resided in a house trailer. With Plaintiff on the stand, Avery's attorneys played portions of his call to dispatch in an effort to convince jurors that he came upon the SUV at an undisclosed location on November 3rd, two days before it was found at the salvage yard. Cross examining Plaintiff about the contents of the

- 9 -

call, Avery's attorneys suggested that Plaintiff was looking directly at Halbach's vehicle when he called dispatch. The claim is entirely baseless and false, and Defendants knew of its falsity.

34. A side by side comparison of the trial transcript with the scene as depicted in episode 5 of MAM reveals that Defendants Ricciardi and Demo, in concert with other named Defendants, heavily edited portions of Plaintiff's testimony in order to manipulate viewers to falsely conclude that he and other officers planted Halbach's SUV at the salvage yard. Among other distortions, Defendants removed Plaintiff's affirmative answer to one question and inserted it as his answer to a separate question. At the actual trial, the second question remained unanswered after the Court sustained an objection by the state. MAM's rendition of the testimony is as follows:

Avery's Attorney: "Well, you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota?"

Plaintiff: "Yes."

In the actual trial, the Court sustained the state's objection, and defense counsel rephrased it as follows:

Avery's Attorney: "This call sounded like hundreds of other license plate or registration checks you have done through dispatch before?"

Plaintiff answered in the affirmative, "Yes."
Trial Transcript, Day 7, p 186-187

Defendants omitted the Plaintiff's affirmative answer to the second question and inserted it into his non-answer to the first. Their manipulation of this crucial line of testimony falsely conveyed to viewers that Plaintiff located Halbach's SUV somewhere other than at the salvage yard days earlier and likely assisted other law enforcement officers plant it there at a later time. The impression is false and gave to viewers the exact opposite impression of what Plaintiff was asked and how he responded at trial.

- 10 -

35. Defendants Ricciardi and Demos in concert with other named Defendants omitted additional trial testimony from Plaintiff about the routine nature of his call to dispatch. When asked by the prosecutor on redirect examination: "Mr. Strang (defense counsel) asked whether or not it was common for you to check up on other agencies, or perhaps I'm—I'm mis-phrasing that, but when you are assisting another agency, do you commonly verify information that's provided by another agency?" Plaintiff answered: "All the time. I'm just trying to get – you know, a lot of times when you are driving a car, you can't stop and take notes, so I'm trying to get things in my head. And by calling the dispatch center and running that plate again, it got it in my head who that vehicle belonged to and what type of vehicle that plate is associated with." (Trial Transcript, Day 7, p 213). MAM failed to include this exchange.

36. Defendants Ricciardi and Demos omitted from Plaintiff's call to dispatch his words, "see if it comes back to [inaudible]." The phrase was included in the actual recording of the call as well as the recording played at trial. (Trial Trans, Day 7, p 181). Upon information and belief, Defendants omitted the phrase because it supports a reasonable interpretation of the reason for Plaintiff's call that contradicts the impressions the defendants intended to make.

37. Defendants Ricciardi and Demos strategically spliced "reaction" shots of plaintiff appearing nervous and apprehensive at trial into other portions of his testimony where he did not appear nervous or apprehensive in fact. The edits were part of defendants' overall attempt to manipulate viewers to falsely conclude that plaintiff and other Manitowoc County officers planted Halbach's SUV at the salvage yard. MAM, Episode 5. In addition, Defendants also included in MAM Episode 5 an out-of-court interview with Avery defense attorney Jerome Buting in which he states, "If they would be willing to go to that length of planting the key, which I think the jury's going to get . . . ." By including this in the broadcast, Defendants

presented it as a foregone conclusion that the police, allegedly including Plaintiff, planted the key at Avery's residence.

38. Upon information and belief, Defendants Ricciardi and Demos filmed the entire trial and were aware of the full line of questioning concerning Plaintiff's call to dispatch, as well as its significance. With malicious intent, Defendants chose to fabricate Plaintiff's testimony by splicing and omitting those portions that were not consistent with their misleading and false account of the facts. In truth, Plaintiff did not discover Halbach's SUV at another location and help others plant it on Avery's property. MAM's aspersions that he did are false and have caused irreparable harm to Plaintiff's reputation worldwide.

39. Defendants also included a portion of an interrogation of Steven Avery in which the interrogating officer says to Avery, "So Tammy told you that somebody told her that a cop put that vehicle -- Theresa's vehicle -- out on your property? Avery responds, "Yeah." The scene then cuts immediately to a visual of Plaintiff about to testify in Court, implying that he is the "cop" who allegedly planted Halbach's vehicle on Avery's property. MAM, Episode 5.

40. In order to enhance the significance of plaintiff's alleged off-sight discovery and subsequent planting of Halbach's vehicle, defendants manipulated facts to convince viewers that MTSO officers, possibly including the plaintiff, secreted Avery's blood from a vial still kept in evidence from his wrongful conviction case, and planted it in Halbach's car. Defendants dramatically re-enacted the vial's "discovery" in the Clerk's office by accompanying one of Avery's lawyers to film the retrieval of the vial. MAM Episode 4 contains a close-up shot of the blood vial with a small hole on top of its rubber stopper while Avery's attorneys rejoice in a "gotcha" moment. In truth, a hole in a blood vial's rubber stopper is not indicative of evidence tampering; it is made in the ordinary course of drawing a blood specimen from a person and

- 12 -

storing it in a vial. The hypodermic needle hole in this case was made when a specimen of Avery's blood was drawn by a phlebotomist and stored in the vial in connection with a 1996 post-conviction motion in his wrongful conviction case. The procedure necessarily resulted in the creation of a hole in the rubber stopper. The phlebotomist who drew the specimen from Avery in 1996 was prepared to testify that's what happened in this instance. Having attended the trial in its entirety, defendants Ricciardi and Demos were aware of the routine nature of the hole on the vial's rubber stopper and that the phlebotomist who drew the specimen from Avery was prepared to testify. Defendants manipulated the facts and the significance of the blood vial's discovery as part of their overall effort to convince viewers that plaintiff and other county law enforcement officers framed Avery for the murder.

### The Key

41. Defendants, jointly and severally, with actual malice, led viewers to the inescapable but false conclusion that Plaintiff and MTSO Lt. James Lenk planted the ignition key for Halbach's SUV in Avery's bedroom. They did so by splicing trial testimony, omitting other testimony, and failing to include essential photographic evidence that would have given viewers a complete view of what occurred.

42. On November 8, 2005, three days after Halbach's vehicle was discovered at the salvage yard, Plaintiff and MTSO Investigator James Lenk, both evidence technicians, were assigned to search Avery's bedroom for evidence more remotely connected to the crime, including pornographic material. Plaintiff and Lenk were accompanied by Calumet County Deputy Daniel Kucharski. A previous search of the room on November 5, 2005 yielded handcuffs and leg irons, apparent sex toys, and pornographic materials in a bookcase, but not all items were collected at that time.

- 13 -

43. On November 8, 2005 after materials were returned to the bookcase, the ignition key for Halbach's SUV was found on the carpeted floor next to the bookcase. At trial, Plaintiff, Lenk, and Kucharski each offered a reasonable explanation as to how the key was missed on the earlier search and miscellaneous entries. All three testified they believed the key had fallen from a crack in the particle board backing of the bookcase when materials were returned into the bookcase. They believed Avery hid the key there with plans to retrieve it later and dispose of the SUV. (Plaintiff: Trial Trans Day 7, p 132; Lenk: Trial Trans Day 8, p 14; Kucharski: Trial Trans Day 9, p 55).

44. On information and belief, Defendants Ricciardi and Demos were present during this testimony and viewed certain photographs clearly showing the crack in the back of the bookcase. The photographs were not shown to viewers of MAM. In addition, testimony from officer Tyson, the accompanying officer from the initial search on 11/05/2005, was spliced in order to maximize suspicion that the key was planted and minimize a plausible explanation for how it came to be found. Jerome Buting, one of Avery's attorneys, asked officer Tyson the following question:

"Had you ever, in any other search in your entire career, had to act like a babysitter, or a watchdog, for the officers who were conducting a search?"

Officer Tyson replied, "I did not treat this as if I was babysitting." (Trial Trans Day 7, p 25, lines 7-11).

Defendants Ricciardi and Demos replaced Tyson's answer with his negative response, "No," to a separate question in order to give viewers the exact opposite impression of what Tyson in fact conveyed. (MAM, Episode 7).

- 14 -

45. Upon information and belief, Defendants Ricciardi and Demos filmed the entire trial and were aware of the full line of questioning concerning the circumstances of Plaintiff and Lenk finding Halbach's ignition key in Avery's bedroom, as well as its significance. They chose to fabricate testimony by splicing or omitting those portions not consistent with their false and defamatory account of the facts. In truth, Plaintiff and Lenk did not plant the key, and MAM's aspersions that they did are false and have caused irreparable harm to Plaintiff's reputation.

## MAM's Omission and Distortion of Material, Significant Evidence and Facts

46. Defendants, jointly and severally, and with actual malice, omitted the following evidence and facts as part of their effort to lead viewers to falsely conclude that plaintiff and others framed Avery for Halbach's murder. Upon information and belief, defendants Ricciardi and Demos were present for all court proceedings, including pretrial motions and the entire trial, where all of this information was revealed. Had these material, significant and known facts been included in MAM, a reasonable viewer would have found Avery's guilt obvious and would not have concluded that plaintiff and other law enforcement officers planted evidence to frame him:

- Avery's DNA was located on the hood latch of Halbach's vehicle.

- Halbach's cell phone, camera, and PDA computer devices were found in a burn barrel on Avery's property. Several hours after Halbach's arrival at the salvage yard, Avery's nephew witnessed Avery carrying a plastic bag and placing it in the burn barrel where Halbach's electronics were later found. In addition, a family friend observed smoke and smell of plastic coming from the same burn barrel. The witness, along with Avery's brother, stated that Avery had changed clothes and showered and was acting strange.

- The bullet containing Halbach's DNA was linked to the specific firearm hung on a wall over Avery's bed.

- Avery called Halbach's employer, Auto Trader magazine, on the day she was murdered and asked them to send a photographer to take a photo of a car he said he was listing for sale in their magazine. Avery asked the receptionist to send "the same photographer" they sent last time. Halbach's co-workers stated that she had been somewhat concerned by Avery's approaching her wearing nothing but a towel on at least two of her appointments

with him. Avery placed direct calls to Halbach's cell phone before she arrived using *67 to hide his identity.

- In the early evening, after Halbach's appointment, Avery's brother, Earl, observed Avery near his truck and trailer with Avery's snowmobile on top. Earl found it strange that Avery would remove the snowmobile from the trailer and put it in his garage since Earl's understanding was that Avery was going to take the snowmobile to a dealer and sell it. When asked by police about the Suzuki, Earl Avery stated it had been outside the garage a few days earlier. Avery's accomplice told police that Avery shot Halbach in his garage.

- Avery gave several different statements about his interaction with Halbach on the day she was murdered. First, that she never arrived for her appointment with him; second, that she did, but he only saw her through a window in his trailer home and did not speak with her; third, that she came inside where he paid her; and, finally, that he went outside to her car and paid her for the photo shoot.

- Avery has a history of extreme violence and sexual aggression against women, including beating, strangulation, death threats, attempted abduction at gunpoint, and allegations of rape.

47. Defendants Ricciardi and Demos, jointly and in concert with the remaining defendants and with reckless disregard for the truth, blatantly and absurdly distorted the nature of three of Avery's prior crimes. Had the true nature of his past crimes been accurately portrayed, a reasonable viewer would have been less likely to accept defendants' wholly false narrative that plaintiff and other local police officers framed Avery for Halbach's murder. Upon information and belief, defendants Ricciardi and Demos had access to the police reports and criminal complaints associated with each of these crimes and knew of their contents.

- Avery was convicted of animal abuse when he was 20 years old. Police reports indicate that he and another party poured gas and oil on the family's pet cat, intentionally threw it in a bonfire, and watched it burn to death. In Episode 1 of MAM, defendants portrayed the incident as an accident and at worst, a childhood prank.

- In 1986, Avery received a six-year prison sentence on convictions for endangering safety by conduct regardless of life and felon in possession of a firearm in connection with his running a woman's car off the road, holding her at gun point and ordering her into his car with the apparent intent to rape her. MAM omitted significant details and used edited portions of depositions to cast Avery as a victim and the victim as a villain for spreading rumors about him.

- 16 -

- On September 4, 2004, approximately a year before murdering Halbach, Avery was arrested for assaulting his fiancé, Jodi Stachowski. On information and belief, Defendants Ricciardi and Demos had access to the police reports concerning the incident and knew of their contents. The reports indicate that Avery shoved Stachowski causing her to fall into a chair and hit her head. Avery then struck her numerous times and threatened to kill her. When Stachowski tried calling 911, Avery ripped the phone out of the wall before she could report the assault. Avery began strangling her and as she lost consciousness he dragged her outside to his vehicle. When Stachowski regained consciousness, Avery said: "I should get the gun and kill you."

- Upon information and belief, Ricciardi and Demos had access to and reviewed the police reports concerning Avery's arrest for assaulting Stachowski. They knew what Stachowski had reported to police, but they chose to omit it because it did not fit with their false characterization of Avery as a harmless individual unlikely to commit a murder. To further their storyline, they portrayed Stachowski as unafraid and supportive of Avery while knowing she was anything but.

48. Defendants also presented material in such a way that the defense conspiracy theories received the last, apparently unrefuted word, mixing in-court excerpts with out-of-court statements by defense attorneys in an attempt to portray defense theories and speculation as actual and unanswered facts. This includes but is not limited to the following:

- Jerome Buting (end of MAM 6): One of the things that the state argued is that it would have taken a wide-ranging conspiracy of so many people to pull this off and that there's just no way this could be possible. But in fact, that's not true. Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument, well why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?

[cuts to video of James Lenk being sworn to testify] [theme music plays]

**MAM 2**

- 17 -

49. On October 19, 2018, Defendant Netflix released for purchase to its subscribers worldwide a sequel to MAM, titled, "Making a Murderer Part 2" (hereinafter MAM2). The ten-part documentary series was written and directed by Defendants Ricciardi and Demos with heavy production, post-production and editing involvement by Netflix, which also marketed and distributed the series.

50. In an article in a film industry publication known as IndieWire, Defendants Ricciardi and Demos state publicly that Netflix was "a partner from the outset," in the production of MAM2, and that "the project was fully financed from the start." In the same interview, Ricciardi and Demos described the story of Steven Avery and Brendan Dassey as "the gift that keeps on giving." https://www.indiewire.com/2018/10/making-a-murderer-part-2-interview-steven-avery-laura-ricciardi-moira-demos-1202013273/

51. Despite widespread criticism in the public domain concerning the falsity of MAM, See, e.g., https://thedailybanter.com/2016/08/the-steven-avery-deception/ and a petition with 2,967 signatures asking Netflix to remove the original series and cancel its sequel because of its false portrayal of Avery as a victim of police malfeasance, https://www.change.org/p/netflix-remove-making-a-murderer-and-cancel-season-2-on-netflix, Defendants doubled down on their baseless claims of evidence planting in MAM2.

52. In MAM2 episodes 1 and 2, Defendants present Avery's post-conviction counsel's wholly speculative conspiracy theories and unreliable "experiments" as convincing proof that Plaintiff and his colleagues planted evidence to frame Avery. Episode 1 includes footage of presumed associates of Zellner tossing a mannequin smeared with a red substance into the back of an SUV of the same make and model as Ms. Halbach's Rav4. Zellner confidently proclaims to viewers that based upon the blood spatter pattern that resulted, Avery could not have placed

- 18 -

Halbach's body into the trunk of her SUV as the prosecution and its experts argued at trial. MAM2, episode 2 adopts as reliable and convincing evidence a similarly unsound scientific test known as "brain fingerprinting" as proof that Avery could not have committed the murder.

53. In MAM2, episode 9, Defendants continued the original series' false claim that plaintiff planted evidence by embracing as fact the unverified and unreliable account of Kevin Rahmlow. Rahmlow claimed he had a conversation with Plaintiff at the Cenex gas station in Mishicot on November 4, 2005, a few days after Ms. Halbach was reported missing and the day before her vehicle was found at the Avery Salvage Yard.

54. MAM2 repeats claims by Rahmlow that he told Plaintiff he observed a vehicle matching the description of Halbach's SUV a day earlier "by the East Twin River dam in Mishicot at the turnaround the bridge [sic]." Rahmlow states that Plaintiff had pulled into the Cenex parking lot in a marked police squad and was in uniform.

55. Plaintiff was off work, not in uniform, and not in a police squad on November 4, 2005. Nor did he speak with Rahmlow on that date or at any other time concerning Ms. Halbach's disappearance. Plaintiff believes his only contact with Rahmlow occurred in September of 2006, when he arrested Rahmlow for drunken driving.

56. Upon information and belief, Defendants Ricciardi and Demos filmed the entire trial and were aware that Plaintiff testified he was not working on November 4, 2005 (Trial Trans, Day 7, p 176-177). They chose to ignore Plaintiff's testimony and adopt as true Rahmlow's unverified, unreliable, and false statement to Avery's attorney instead. By adopting Rahmlow's story, Defendants doubled down on the original series' distortion of Plaintiff's routine call to dispatch, and its assertion that Plaintiff participated in a conspiracy to plant Halbach's vehicle on the Avery property.

- 19 -

## Claims for Relief

**Count I – Defamation – Actual Malice**

57. Plaintiff repeats and realleges the allegations of Paragraphs 1 - 56, above, as though fully set forth herein.

58. Defendants, jointly and severally, acting with actual malice, defamed, libeled and slandered Plaintiff by their creation, production, distribution, publication, and broadcast of the documentary, "Making a Murderer."

59. Defendants' false statements and communications about Plaintiff include, but are not limited to, the following statements and communications in the "Making a Murderer" broadcasts:

    a)  The statements described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above.

    b)  The statements and communications made in the "Making a Murderer" broadcasts, the transcripts of which are attached hereto as Exhibit A. These statements collectively communicated to the viewing public the false assertion that Plaintiff was a participant in a law enforcement conspiracy and scheme to frame Steven Avery for the murder of Teresa Halbach. Defendants falsely stated and communicated through their broadcast that Plaintiff planted evidence, including but not limited to, Teresa Halbach's valet key, her vehicle, and her bone fragments, her blood, and Avery's blood and/or DNA, in order to frame allegedly innocent Defendants or to strengthen their case against them.

    c)  The words expressly used in the broadcasts are made more defamatory to Plaintiff because of the Defendants' omission of information that was essential to a truthful depiction of the facts, including, but not limited to, the facts that were omitted as described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above. Among other things, Defendants

- 20 -

included in their broadcasts only one-sided biased interviews that cast police and prosecutors as villains determined to prosecute and convict Avery for a crime that he did not commit and cast Avery and his attorneys as heroes.

d) The statements described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above, which were false because the statements do not accurately reflect the testimony or events purported to be recounted by Defendants, as a result of the manipulation of the content as described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B. Among other things, Defendants selectively edited and spliced trial and deposition testimony and excluded facts that contradicted their false statements and communications.

60. Defendants knew or had reason to know that the statements were false, but made the false statements and communications described above with actual malice, intentionally and knowing that they were false or with reckless disregard for the statements and communications' truth or falsity. The purported conspiracy and scheme described through Defendants' false statements and communications was the product of Defendants' imagination and Defendants knew that the statements and communications about the purported conspiracy and scheme were false.

61. Defendants' false statements and communications as described above are not mere statements of opinion, but are definitive declarations of fact provable as either true or false.

62. Defendants' false statements and communications as described above were communicated and published to the viewing public in the United States of America and in additional countries that subscribe to Netflix and/or to which Netflix publications are distributed. According to published estimates, more than 19.3 million viewers watched the "Making a Murderer" series within the first 35 days of its broadcast.

- 21 -

63. Defendants' false statements and communications as described above were not privileged or exceed the scope of any alleged privilege because the Defendants, and each of them, intentionally and knowingly or with reckless disregard for the truth, communicated as facts statements that were not truthful and accurate regarding the matters asserted and that went beyond the statements contained in the record of any official proceedings. In addition, Defendants added their own factual assertions and intermixed them with the records of official proceedings in a manner that falsely portrayed the record of the proceedings, including, but not limited to, in the manner described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above.

64. Defendants' false statements and communications tended to harm Plaintiff and actually and irreparably harmed and damaged Plaintiff's reputation, lowering him in the estimation of the community and subjecting him to hostility, hatred and ridicule, and deterring third persons from associated or dealing with him in, among others, the following respects:

   a) Plaintiff is a devoted husband, parent, decorated United States Air Force veteran, and dedicated public servant, and enjoyed an impeccable professional reputation prior to December 18, 2015, when Defendants published their false statements and communications about him. Since that time, Plaintiff has been subject to worldwide ridicule, contempt and disdain as a result of the baseless and false assertions in Making of a Murderer.

   b) A Google search of Plaintiff's name prior to Defendants' false statements and communications about Plaintiff would have revealed two nondescript news articles about routine local crime that plaintiff had a role in investigating. The same search now yields more than 1.8 million hits, nearly all of them painting Plaintiff in a negative light. 732 YouTube videos about Plaintiff's perceived nefarious role in the Avery case have been produced as a result of Defendants' false statements and communications.

- 22 -

c) National and international news and entertainment media have published hundreds of articles, television and radio segments adopting and republishing the Defendants' false and defamatory statements and communications about Plaintiff. Social media, including Facebook, Twitter, YouTube, and Reddit are replete with threats and insults directed at Plaintiff because of the baseless accusations against Plaintiff made by Defendants. Countless tweets, memes, and insulting and threatening social media posts portraying Plaintiff as a corrupt police officer and cooperative in framing Avery have been posted online.

65. Defendants, jointly and severally, have compounded and aggravated the harm to Plaintiff's reputation by deliberately ignoring critical analysis in the aftermath of the release of the Making of a Murderer broadcasts. Thorough, careful, and objective analysis by some members of the public and a few journalists revealed that the series had badly distorted the facts. Upon information and belief, Defendants were aware of the critical analysis and could have taken action to prevent further harm to Plaintiff's reputation by admitting their distortions and omissions of fact when the above-mentioned articles were published and in the sequel to the original series, "Making of a Murderer Part 2." Instead, with actual malice, Defendants doubled down by distorting and omitting additional facts to bolster their pre-ordained conclusion that Plaintiff participated in the alleged framing of Avery.

66. Defendants' false statements and communications were made in an intentional disregard for the Plaintiff's rights and with ill will toward Plaintiff and as a result of other bad motives, including, but not limited to, Defendants' determination to slant and distort the truth to sensationalize the facts and circumstances surrounding the investigation of Teresa Halbach's murder and the trial of Steven Avery for her murder in order to exploit those events and

- 23 -

circumstances for Defendants' own economic benefit at the expense of the individuals who were involved in the investigation and trial.

67. As a result of the damage to Plaintiff's reputation that was caused by Defendants' false statements and communications about Plaintiff, Plaintiff is entitled to damages in a total amount to be determined at trial, including, but not limited to, general damages; compensatory damages; special damages, including, but not limited to, lost wages; and punitive damages.

**Count II – Negligence (In the Alternative)**

68. Plaintiff repeats and realleges the allegations of Paragraphs 1 - 67, above, as though fully set forth herein.

69. Defendants owed the Plaintiff a duty to exercise reasonable care when making and communicating statements and communications about Plaintiff.

70. Defendants knew or had reason to know that the statements described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above were false, but, alternatively to the allegations set forth in Paragraph 60, above, in making and communicating the statements and communications about Plaintiff, Defendants breached their duty of care to Plaintiff by failing to exercise reasonable care in ascertaining the truth or falsity of the statements and communications described above.

71. Defendants' false statements and communications as described above were communicated and published to the viewing public in the United States of America and in additional countries that subscribe to Netflix and/or to which Netflix publications are distributed, as further described above.

72. Defendants' failure to exercise reasonable care in making and communicating the statements described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B caused damage and

- 24 -

harm to Plaintiff's reputation as set forth in Paragraph 54 above. Additionally plaintiff has suffered physical effects such as high blood pressure and anxiety.

73. Defendants' false statements and communications as described above were not privileged or exceed the scope of any alleged privilege because the Defendants communicated as facts statements that were not truthful and accurate regarding the matters asserted and that went beyond the statements contained in the record of any official proceedings. In addition, Defendants added their own factual assertions and intermixed them with the records of official proceedings in a manner that falsely portrayed the record of the proceedings, including, but not limited to, in the manner described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above.

74. Defendants knew or had reason to know that the statements were false, but made the false statements and communications described above with actual malice, intentionally and knowing that they were false or with reckless disregard for the statements and communications' truth or falsity. The purported conspiracy and scheme described through Defendants' false statements and communications was the product of Defendants' imagination and Defendants knew that the statements and communications about the purported conspiracy and scheme were false.

75. Defendants' false statements and communications as described above were made in an intentional disregard of Plaintiff's rights.

76. As a result of the damage to Plaintiff's reputation that was caused by Defendants' false statements and communications about Plaintiff, Plaintiff is entitled to damages in a total amount to be determined at trial, including, but not limited to, general damages; compensatory damages; and special damages, including, but not limited to, lost wages; personal / physical injury, and punitive damages.

- 25 -

**Count III – Intentional Infliction of Emotional Distress**

77. Plaintiff repeats and realleges the allegations of Paragraphs 1-76, above, as though fully set forth herein.

78. Defendants acted intentionally or recklessly in making the statements and communications as described in Paragraphs 27-29, 33-40, 44-48, and Exs. A and B, above.

79. Defendants' actions and conduct as described above were extreme and outrageous. Defendants could and should have reasonably foreseen that their false rendering of Plaintiff as a corrupt police officer who allegedly helped frame an allegedly innocent man would lead to popular outrage and threats, resulting in extreme emotional distress.

80. As a direct result of Defendants' actions, conduct, communications and statements as described above,

    a) Plaintiff has received serious and ongoing threats to his and his family's safety;

    b) Plaintiff has been subject to recorded telephone threats, the sheer volume of which fill the capacity of 28 compact discs;

    c) Plaintiff has received numerous late-night telephone calls in which callers have screamed profanities and threatened to do him physical harm;

    d) Avery sympathizers have threatened to kill Plaintiff and members of his family, kidnap and sodomize him and gang rape Plaintiff's wife;

    e) Photographs of Plaintiff's children have been posted online by hateful viewers influenced by Defendants' communications and statements;

    f) Plaintiff has had to be more cautious and guarded in nearly every aspect of his life, including in making travel plans and where he and his wife can eat in public; and

- 26 -

g) Due to the threats of violence and the hostility against him that have been caused by Defendants' statements and communications, Plaintiff is required to maintain a state of hypervigilance at all times and to constantly be alert to potential danger to his family's safety.

81. As a direct result of Defendants' actions, conduct, communications, and statements and the foreseeable consequences thereof, Plaintiff suffers and has suffered from severe emotional distress and anxiety, and exhaustion.

82. As a result of the foregoing, Plaintiff is entitled to damages in a total amount to be determined at trial, including, but not limited to, general damages; compensatory damages; special damages, including but not limited to, lost wages; and punitive damages.

WHEREFORE, PLAINTIFF RESPECTFULLY REQUESTS THE FOLLOWING RELIEF:

A. Damage in a an amount to be determined at trial;

B. Attorneys' fees and costs incurred in prosecuting this action; and

C. Such other and further relief as may be allowed by law.

Dated this 13th day of June, 2019.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff, Andrew L. Colborn

By: *Electronically signed by George Burnett*
George Burnett

**POST OFFICE ADDRESS:**
231 S. Adams Street
Green Bay, WI 54301
P.O. Box 23200
Green Bay, WI 54305-3200
Phone: (920) 437-0476
Fax: (920) 437-2868

State Bar No. 1005964
#3131835

GRIESBACH LAW OFFICES, LLC

By: *Electronically signed by Michael C. Griesbach*
    Attorney Michael C. Griesbach
    State Bar No. 01012799
    Griesbach Law Offices, LLC
    PO Box 2047
    Manitowoc, WI 54221-2047
    (920) 320-1358

SCHOTT, BUBLITZ & ENGEL, S.C.

By: *Electronically signed by April Rockstead Barker*
    April Rockstead Barker
    State Bar No. 1026163
    Schott, Bublitz & Engel, S.C.
    640 W. Moreland Blvd.
    Waukesha, WI 53188-2433
    (262)-827-1700

- 28 -



## SEASON 1 – EPISODE 1

Avery:  They had the evidence back then that I didn't do it. But nobody said anything....

....

Kim Ducat:  They weren't just gonna let Stevie out.  They weren't gonna hand that man $36 million.  They weren't gonna be made a laughing stock, that's for sure.

They just weren't gonna do all that.  And something in my gut said they're not done with him. Something's gonna happen,.  They're not handing that kind of money over to Steve Avery.

(MAM shows photos including that of Plaintiff Andy Colborn testifying in the background during the above excerpt, along with others alleged to be part of the Manitowoc County Sheriff's Department "conspiracy").

## SEASON 1  - EPISODE 2

Steve Glynn: The day of or the day after Steven's release, law enforcement officers in Manitowoc are writing memos to describe activity that had occurred almost ten years earlier. They don't do that unless they feel threatened.

....

Steve Glynn:   We learned during litigation something that we had absolutely no knowledge of before the lawsuit got started.   That 1995 was a very, very significant point in this thing.

[video deposition of plaintiff shown in background]

And that there is not only something to this idea that law enforcement had information about somebody else, but there is serious meat on those bones, I mean serious meat.   What we learn is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department [image of report prepared by plaintiff is shown in background] from another law enforcement agency which at least one of the other officers involved in that process believed to be the Brown County Sheriff's Department saying that they had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison.

[resumes footage from video deposition of plaintiff]

Glynn:          You've gone over exhibit 138.

Plaintiff:      Yes, sir.

Glynn:          It describes you receiving a telephone call 1994 or 1995 from someone who
                identified himself as a detective, correct?

Plaintiff:      Yes.

Glynn:          The detective indicated that there was a person in custody who had made a
                statement about a Manitowoc county offense, correct?

Plaintiff:      Yes.

Glynn:          And what that person in custody had said was that he had committed an assault in
                Manitowoc County and someone else was in jail for it, correct?

Plaintiff:      Yes, sir.

[footage of Glynn speaking in an interview]

Glynn: Manitowoc doesn't have huge numbers of major assaults where people go to prison and
certainly where people would still be in prison. There is a very distinct possibility, I would say
likelihood, that it's Gregory Allen, [graphic shows in background depicting bullet point and a
developing timeline that states:   1995 ● Gregory Allen is arrested for sexual assault in Brown
County/Andrew Colborn receives call about inmate confession] it's the Brown County Sheriff's
Department that is in 1995 on the Gregory Allen case, that Gregory Allen has said something
about Steven Avery, and at a minimum, somebody ought to check this out.

[back to footage of plaintiff's video deposition]

Glynn:          I mean that's a significant event.

Plaintiff:      Right, that's what stood out in my mind.

[back to interview with Glynn]

Glynn:          The fellow who got that call was a guy named Colbert. And you might say that
there should be a record of him immediately making a report on this, there might be a record of
his immediately contacting a supervising officer, there might be a record of him contacting a
detective who handles sexual assault cases, ahh, there might be some record of it. But if you
thought any of those things, you'd be wrong, because there isn't any record in 1995, 1996, 1997,
1998, 2000, 2001, 2002, 2003 [returns to image of graphic with years running from prior
timeline image and with Plaintiff's image above it, and a statement after the year "2003" that
states "DNA evidence exonerates Steven Avery."]  Now 2003 is a year that has meaning
because that's when Steven Avery got out.  And the day he got out, or the day after, that's when
Colburn decides to contact his superior officer, named Lenk.  And Lenk tells him to write a
report.  And they then go have contact with the Sheriff.  Now, let's just stop and think about that
for a minute.  Why does that happen, why does it happen then, when it didn't happen eight years
earlier?  Um, ahh, I mean, I think I know the answer.   I think the answer is pretty clearly these
people realized that they had screwed up big time.  Colburn realized it, Lenk as his superior
realized it, and the Sheriff realized it. [images of plaintiff, Lenk, and the Sheriff are shown] So

Lenk tells Colburn to write a report, the Sheriff tells Lenk, "Get me the report," the Sheriff puts the report in a safe. That's how much he cares about documenting this thing. Well, obviously it doesn't do anybody, it certainly doesn't do Steve Avery any good to document that eight years after the fact, because Steve Avery has been sitting in a cage for those eight years.

[This falsely implies that plaintiff did not advise any appropriate person within the MTSO of the call when it came in 1995 and that Colburn believed that he had "screwed up" and raised the issue later in an attempt to cover up an earlier failure to do anything about the call, when in fact, plaintiff did transfer the call to an appropriate individual within the MTSO.]

[footage of Lt. James Lenk testifying]

Glynn:      This document didn't begin to get prepared until after you had talked to Sheriff Peterson. Is that a fair statement?

Lt. Lenk:   Correct.

Glynn:      This indicates that Colburn said he was informed by someone in 95 or 96 that the case was already solved and the right person was arrested, true? [images of report]

Lt. Lenk:   True.

Glynn:      Sergeant Colburn couldn't recall who it was who told him that the case had already been solved, true?

Lt. Lenk:   True. That's what he told me.

Glynn:      Did he have – did he make any guesses about that or say, gee, it could have been this person, it could have been that person, I'm not sure?

Lt. Lenk:   He wasn't sure.

[ switches to video deposition testimony of Sheriff Peterson; identified as "Steven's 1985 arresting officer"]

Glynn:      You recognize exhibit 125.

Sheriff:    That's one of the Sheriff's Department statement forms. And it looks like James Lenk's signature on it.

Glynn:      Okay, and have you seen this document before?

Sheriff:    No.

Glynn:      Okay. And how about 138, which is the, well, you tell me what it is.

Sheriff:       Yeah. That's another one of our statement forms uh, looks like it was filled out by Andrew Colburn.

[close up of Plaintiff's signature on the form]

Glynn:        And again, have you seen that document before today?

Sheriff:       No.

Avery:        A lot of people told me to watch my back. Most of the time, I didn't even believe them. But then, sitting and doing depositions, I don't know. It kind of changed my mind. They were covering something up. [showing close ups of the report prepared by plaintiff] And they were still covering something up. Even with the sheriff who's on there now – he's covering something up.

[switches to footage of plaintiff's video deposition]

Glynn:        Have you ever had any conversations with anybody else other than Sheriff Peterson and Lietenant Lenk about the subject matter of exhibit 138? Ever discuss it with anyone else, any other officers, any friends, any family?

Plaintiff:     Not that I can specifically recall. I may have mentioned it to other people but I don't recall doing it.

[Switches to video deposition of Mark Rohrer, Manitowoc County District Attorney]

Counsel:    At the time that you received information from the crime lab telling you that Gregory Allen was inculpated in the sexual assault of Mrs. Beernsten, did you have conversation with any people in the Sheriff's office?

Rohrer:      Yes.

Counsel:    Who were they?

Rohrer:      Andy Colburn, and Jim Lenk had information that he had received.

Counsel:    Let me show what's been marked as exhibit 124.

Rohrer:      I'm familiar with the document.

Counsel:    Who's Douglass Jones?

Rohrer:      Assistant District Attorney for Manitowoc County.

Counsel:    All right. What is this memo, to your understanding?

Rohrer:  It speaks for itself.  He had a telephone conversation with Gene Kusche about the case.

[switches to video deposition testimony of Chief Deputy Eugene Kusche]

Counsel:  This document reflects a conversation between you and Douglass Jones shortly after it became public knowledge that Steven Avery had been exculpated and that Gregory Allen had been inculpated right?

Kusche:  That's correct.

Counsel:  All right.  He says as he, Doug Jones, was trying to close the conversation, you told him that in 95 or 96 [cuts to graphic of chart showing Plaintiff's photo under photo of Sheriff Tom Kocourek] Andy Colburn had told Manitowoc County Sheriff Tom Kocourek that an officer from Brown County had told Colburn [close up on reports and Colburn's name] that Allen and not Avery might've actually committed the Bernsteen assault.  Okay?  Did you in fact tell that to Douglass Jones?

Kusche:  I don't recall.

Counsel:  All right.  Does seeing this document, 124, refresh your recollection?

Kusche:  My recollection of this conversation, which is not very strong, was that Colburn made a comment to me about re-- getting some information. . . . .

Counsel:  Yeah . . . .  Okay the statement goes on and says, the next sentence says, Gene stated, that's you, that Colburn was told by Kocourek, something to the effect that we already have the right guy, and he should not concern himself.  Now, did Colburn tell that to you?

Kusche:  I don't recall. . . .

Counsel:  Do you have any reason to believe that Doug Jones would misrecord what you told him?

Kusche:  No.

Counsel:  Then it goes on to say that Doug Jones asked you if this information was known.  Do you remember him asking that?

Kusche:  No.

Counsel:  Then it goes on to say that you said James Lenk . . . .was aware.  Did you tell that to Doug Jones?

Kusche:        If he put it there, I probably did.

Counsel:       And what was the basis for your knowledge about that?

Kusche:        It would have had to have been Andy Colburn.

[shows image of plaintiff from plaintiff's video deposition]

Glynn: This was an unconscionable withholding of information that would have been of use to Steven Avery's lawyers, who were right at that time in the middle of litigation asserting based on the fingernail scrapings that there may have been somebody else involved in this. If that information had come to light in 1995, Steven Avery would have gotten out in 1995. So they cost Steven Avery eight years of his life. This is as close to a conspiracy of silence as I think you could find in a case.

. . . .

Kelly:         Did you provide this information to the attorney general's office?

Rohrer:        Yes. My recollection says I believe we did.

Kelly:         And who's "we"?

Rohrer:        Mike Griesbach and I when we went to Madison.

Kelly:         But this memo is, was drafted after you had been to Madison.

Rohrer:        I'm not sure the date we were in Madison.

Kelly:         You're saying you told that information to the attorney general's office?

Rohrer:        We passed everything we had obtained to the attorney general's office.

Kelly:         Ok, well, neither this memo nor anything about Colborn and Lenk is in any of the records that were provided to the attorney general's office. I can tell you that.

…

[rotating footage of Manitowoc County officials and others, including plaintiff, appears in background]

Walt Kelly:    October of 2005, from the perspective of the Manitowoc County government and their defense lawyers, I believe they all knew that they were in the most serious kind of trouble. That there was a very grave prospect of a very, very substantial verdict.

Manitowoc County, and the Sheriff and the District attorney are arguably covered by insurance policies and there's a good half dozen insurance policies. However, the insurers have taken the

position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the sheriff and the DA, would be on the hook for those damages in that civil suit.

Glynn: We don't need to have somebody tell us that this is going to have an effect on law enforcement. Of course it has an effect on law enforcement. Are you kidding me? I mean law enforcement officers get uptight when there's even a suggestion that they have said something wrong in a courtroom. Imagine what it's like when you're going to say that you're a liar, and that you hid evidence, and that you deliberately prosecuted a person that you knew, or at least had reason to know, wasn't guilty of the crime? And putting all that aside, by the way, in terms of your own professionalism, there's a guy out there raping and beating women while they guy that you put in prison is sitting in a cell. How's that make you feel?

We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt who tells me that he has gotten a call from a journalist asking if either of us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach.

[timeline is again displayed indicating dates of plaintiff's and other's depositions in proximity to Halbach disappearance]

[news footage regarding Halbach's disappearance and information about her 1999 dark green RAV Toyota]

. . . .

[news footage of Avery interview]

. . . .

Avery: . . . . . Anybody can go down the road at nighttime when everybody's sleeping and just drive in – my brother ain't going to hear nothing.

Reporter: So who do you think did something with her?

Avery: I got no idea. If the County did something, or whatever and try to plant evidence on me or something, I don't know. I wouldn't put nothing past the county.

[cutting to footage of Ken Kratz press conference, then to footage of police on scene]

. . .

Spoken by Avery: All I can think is they're trying to railroad me again.

. . . .

Avery: I ain't been home. They's been searching. You know, how hard is it to put evidence in the house or on the property? . . . . The . . . . sheriff . . . was out to get me last time. How do I know he ain't got nothing to do with it this time? . . . .

[more news reports]

Avery: It all comes back – all these memories and everything else, and they're just sketching me out again. And deep down, it hurts.

[more news footage]

Avery: You know we're all victims, and they just won't leave us alone. They just keep it up and keep it up. You know, a person can only take so much, you know. Right now, I got enough of 'em. You know, they can go somewhere else and just leave us alone. Let us do our life and live normal.

[footage of Avery being interrogated]

Avery: See, if somebody else plants that shit there, you ain't going to see . . . .

. . . .

Officer:     How does your DNA get inside of her truck?

Avery: My DNA ain't. That's because they got blood out of me. How much blood they got out of me? A lot of blood. . . . .

## SEASON 1 – EPISODE 3

[Courtroom testimony – testimony by officers in Court regarding key, pictures of Colburn and Lenk standing next to each other]

Unidentified woman/bar patron:     I really do think he was framed. You know? There's a lot that points to where the Sheriff's Department could've had something to do with it. And then I don't know if it's true or not, but I also heard that Manitowoc County was not supposed to be allowed in to search, and they were in there and they searched. And that's who found the key apparently after the third day was the Manitowoc County Sheriff's Deparment. So I mean, like I said, none of it really adds up.

Unidentified man/bar patron: I only have one word, from the cops on up: corruption. I mean, big time. I mean, if people dig far enough, they'll see that.

Unidentified woman/bar patron: I don't care what anybody says, that's a lot of money to pay out from here in Manitowoc County. It's a small area and I really, truly believe the county didn't have the funds to pay it out, so somehow, some way, I don't care if they hate me, that somehow some way something got set up I don't care who it was And they can say, "Oh, you really

believe the Manitowoc County police department and the FBI and everybody came in and they
set this all up just to have Steven Avery guilty of this thing? Yes I do. I'm sorry, yes I do.

. . . .

[footage of interview with Sheriff Tom Kocourek regarding settlement with County; switches to
footage of phone call between Avery and his sister]

Avery: This way, they figure they just got away with it, they can do it again. . . . . You know it
ain't gonna stop 'em.

. . . .

[interview of Dean Strang after he is retained for Avery]

Strang: I didn't see them plant evidence with my own two eyes. I didn't see it. But do I
understand how human beings might be tempted to plant evidence under the circumstances in
which the Manitowoc County Sheriff's Department found itself after Steven's exoneration, of
the lawsuit, of the Avery commission, of the governor hugging Steven, and holding him up as an
example of the criminal justice system gone wrong? Do I have any difficulty understanding
what human emotions might have driven police officers to want to augment or confirm their
beliefs that he must have killed Teresa Halbach? I don't have any difficulty understanding those
human emotions at all.

[interview of Jerry Buting]

Buting: So, you've got motivation of the officers to want to get him. And then when lo and
behold there's this woman who disappears and one of the last people she saw was Steven Avery.
. . now we've got him. A-ha. We knew it. They conclude that he's guilty, right off the bat.
And they thought, "We're going to make sure he's convicted." And they helped it along by
planting his blood in the RAV4 and by planting that key in his bedroom."

. . . .

## SEASON 1 – EPISODE 4

Pete Baetz: . . . .But they came up and represented that they only DNA found on that key was
Steven Avery's. That is patently ridiculous. Any crevices, anything else in that key would have
retained her DNA. And for them to be able to say only Steven's DNA is on this indicates to me
that that key was scrubbed clean and his DNA was place on it.

. . . .

Buting: Some would – might think, "Well, you know, we -- our hands were tied. You know?
That you got a client who's saying that he's being framed. Publicly, that's kind of the defense

you'd better go with or you're contradicting your own client.   But it really wasn't that way here.
The defense was raised because we think the evidence pointed that way.   Here's what we saw.
The Rav 4, the victim's RAV 4 is found on the AverySalvage Yard property – a ridiculous place
to leave it if he was the killer.   There was a crusher on the property . . . Second, his blood was
found inside the vehicle, but only in a few areas.   Spots, so to speak.   There was evidence that he
had a cut on his finger, but what didn't make sense was that there was no fingerprints of avery's
at all in or on the vehicle.   That would mean, if Avery was the killer he had to have had gloves.
But if he's got gloves on, how could he be actively bleeding and leaving his blood behind?. . . . .
So it looked to us like maybe his argument that "If my blood is in that vehicle somebody planted
it there," maybe the evidence was pointing that way.

[Fox 11 report on Avery's "Framing defense"]

. . . .

[Brendan Dassey segments]

Buting interview:   Sheriff Peterson was the arresting officer of Avery in 1985.  He's now the
head of that office and clearly, clearly has a strong dislike for Avery.  If the very top guy has this
kind of attitude about Avery and that kind of personal involvement in the case of Avery, that's
gonna to permeate the department, the whole department.  If not, at least it's going to permeate
the upper echelon that's close to him, and that would include the lieutenants and the sergeants.

[showing photos in a hierarchy, including Sheriff Peterson and others, and plaintiff's photo, the
lower levels of which are shown in brighter color to stand out]

[discussion of involvement of Lenk in Avery's 1985 case; then shows examination of 1985 case
file, leading up to blood vial examination]

Buting (on the phone to Strang): Let me tell you.  This is a red-letter day for the defense.  It
could not have been better.  The seal was clearly broken on the outside of the box and inside the
box is a Styofoam kit.  The seal is broken in that.  We pulled the Styrofoam halves apart and
there in all of its glory was a test tube that said Steven Avery, inmate number, everything on it.
The blood is liquid.  And get this, right in the center of the top of the tube is a little tiny hole.
Just about the size of a hypodermic needle. . . . .And I spoke with a LabCorp person already who
told me they don't do that.  . . . . . Think about it, Dean.  If LabCorp didn't stick the needle
through the top, then who did?  Some officer went into that file, opened it up, took a sample of
Steve Avery's blood and planted it in the RAV4.

## SEASON 1 – EPISODE 5

Buting;        Somebody knew that [the RAV 4] was there before they ever went in there.  I'm
               convinced of it.

[Cuts to footage of interrogation of Avery]

| | |
|---|---|
| Avery: | What about this cop? |
| | .... |
| | Tammy told me that .... |
| | .... |
| | She told me that she'd heard that a cop put it out there and planted evidence. |
| Officer: | Put what out there? |
| Avery: | That vehicle. |
| Officer: | And that's Theresa's vehicle? |
| Avery: | Yeah. |
| Officer: | So Tammy told you that somebody told her that a cop put that vehicle -- Theresa's vehicle -- out on your property? |

Avery: Yeah.

[Cuts to footage of plaintiff about to testify, including their splicing in testimony that replaced a lack of an answer to a question by Strang regarding the call to dispatch about the license plate, as described in Paragraph 32 of the Amended Complaint]

## SEASON 1 – EPISODE 6

Jerry Buting: One of the things that the state argued is that it would have taken a wide-ranging conspiracy of so many people to pull this off and that there's just no way this could be possible. But in fact, that's not true. Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument, well why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?

[cuts to video of James Lenk being sworn to testify]

## SEASON 1 - EPISODE 7

Allen Avery: They had Steve picked as far as I'm concerned right away. They set him up. Right from the beginning. . . . . .

They didn't find nothing down by his trailer for 3-4 days. Then all the sudden stuff starts. "Oh, we found this and we found that." And then the Manitowoc cops found the key. They weren't supposed to be investigating this at all, right?

[switches to trial testimony regarding the discovery of the key and defense's attempt to show that it was planted]

Buting, talking with Strang out of Court: It's not enough to just get the key. He wants Avery's DNA on that. And so he is gonna wait until it is the right time. And there is a Calumet County deputy with him on all of their searches.

Strang: Yep. There is, somewhere near.

Buting: Somewhere nearby, and he was just waiting for the right time . . . when he could do it.

Strang: That key does not fall from you, know, in between the backboard and the frame of that little bookcase.

Buting: No. And find its way underneath a pair of slippers.

. . . .

Buting: And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?

Strang: Blood's easy.

Buting: Yeah.

Strang: Blood's easy.

Buting: Blood's easy.

Buting: The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation to the neighboring department because of that lawsuit. They were deposed in the lawsuit. They didn't tell, you know . . . .

[cut to footage of Lenk being examined in Court by Strang about his alleged conflict of interest; then cut to footage of Avery's mother cooking with subtitled audio of Steven Avery talking]

Avery: I'm in the same situation that I was before. Just of couple of them wanting to nail me. And the other ones didn't. But nobody speaks up. I gotta go through this over and over.

[shows image of Plaintiff waiting to testify]

Avery (continuing)  Sometimes I just wonder, I don't know.  It's just hard to take all in, you know?

[Switching to shot of Plaintiff standing in Court waiting to testify, then Avery appearing to look at Plaintiff and looking sad, then segment with Kratz examining Plaintiff in Court, then Strang examining Plaintiff]

Pete Baetz (Strang and Buting's investigator):

The Manitowoc County Sheriff's Department had, by their own admission, in fact, they're the first ones that brought it up, that there was a conflict of interest there.  And a conflict of interest in the investigation of a crime is probably the most serious violation any investigating agency can make, because it brings into question their credibility in actions throughout the case.  If I had to guess, I would say that they declared it a conflict of interest to dot the I's and cross the t's.  They didn't implement the procedure that would follow a conflict of interest and that is quite simply to totally back off.  They continued their active role in the investigation.  They developed most of the evidence and when they took on that role that they shouldn't have, they also committed themselves to proving Steven Avery had committed the crime.

[Switching to news conference footage:]

Reporter: Sgt. Colburn was up there for quite some time today.  This is a gentleman who I think has been a law enforcement officer for 13 years.  He puts on a uniform and badge and gun every day and goes to work and tries to do his best.  We're all here, we're putting this on tv, this guy's gonna go home and listen to his son maybe cry about how everybody in school made fun of him because his dad's a bad cop.

Strang: This was a hard day, and there've been some hard days for Sgt. Colburn.  But any pain, any burden that he's bearing pales in comparison to what the State of Wisconsin and the people working for it have inflicted on Steven Avery and his family.  And right now, Steven Avery needs Jerry Buting and Dean Strang and anybody out there who believes in him, badly.  We do believe in him.  And we are willing to do hard things to advance his cause.  And he's been saying since November 2005 that someone must have planted his blood if it's in that car.

Reporter: But my question is though, if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place.

Strang: You're hearing the evidence of the conspiracy.  And I've sat in many a federal courtroom and heard federal prosecutors prove a conspiracy on less than we've heard already here and that you will hear by the end of this trial.

. . . . .

[trial examination of Fassbender regarding sign-in sheet at the scene and examination of Lenk; switches to footage of Avery phone call with his mother]

| | |
|---|---|
| Avery's mother: | It seems suspicious. |
| Avery: | Yeah. |
| Avery's mother: | Them people ain't gonna get away with everything. |
| Avery: | No. No. That's why Kratz is worried about it. |
| Avery's mother: | Yeah. |
| Avery: | Yeah, he's scared now. |
| Avery's mother: | Oh yeah? |
| Avery: | Well, why wouldn't he be? |

[shows other segments regarding EDTA testing by FBI]

Buting (speaking in his car): Look how quickly they got the FBI to retool their instruments, recalibrate everything, do these internal validation studies they're going to claim, um, and get results within a matter of weeks. A few weeks. On a test that they haven't done for 10 years. And yet, the crime lab has, in 2002, evidence in its lab that Steven Avery is innocent, and it sits for a year before it gets tested. It shows the imbalance between the individual and the power of the government. The full force of which they're trying to bring to bear on this man. Why? Why in this case? Because we have accused – and the evidence suspiciously points to – framing by one of them. And when you do that, "you do so at your peril," as the state would say, you know?
. . . .
Again, it's not like they think they're framing an innocent man. But they are.

## SEASON 1 - EPISODE 8

Buting: ...... This could be done by two officers. Really one officer. The one officer who keeps coming up, Lieutenant Lenk, whose name's on the evidence transmittal from the 1985 case just a couple years earlier. Lieutenant Lenk, who shows up on November 5th without logging in. Lieutenant Lenk, who finds the magic key. Lieuteannt Lenk who, four months later, four months after Manitowoc no longer is needed, with no legitimate reason, is back at that scene on March 1st, and what's found the nest day? The magic bullet. (photos of Lenk and Colborn)

Kratz: This isn't just two guys. It's Jim Lenk and it's Andy Colborn. Their livelihood, their reputations, their families, everything in their 20 plus years of law enforcement are on the line when some lawyer accuses them of misconduct. Not just any misconduct, but planting evidence in a murder case. And this vial planting defense is absolutely ludicrous. We only had to call one

witness who scientifically could tell you that there is absolutely no way that vial of blood was used to plant.

Strang: Would Lieutenant Lenk lie? Would he lie as a sworn law enforcement officer? Well all I can tell you is he did twice and you heard it. Here he says he arrives at 2:00. When he's asked under oath before, it's 6:30 or 7:00. This isn't 15 minutes off folks. It's under oath and it's a difference of four and a half or five hours. At that time of the year, November 2005, it's the difference between broad daylight and pitch black. He was under oath. If and when police officers plant evidence, they are not doing it to frame an innocent man. They're doing it because they believe the man is guilty. They're not doing it to frame an innocent man. They're doing it to ensure the conviction of someone they've decided is guilty.

Kratz: If you buy Mr. Strang's argument that they were trying to make sure that a guilty person was found guilty, then assigning accountability to the murder of Teresa Halbach shouldn't matter whether or not that key was planted.

In other words, can you set that aside and decide, is there enough other evidence or is the key the only thing that points to Mr. Avery? That key, in the big picture, in the big scheme of things here, means very little.

Buting: We do not and never have claimed that the police killed Teresa Halbach. However, the person or persons who did knew exactly who the police would really want to blame.

Kratz: Despite Mr. Buting standing up here and saying "Look, folks, we're not saying that the cops killed Teresa Halbach. Now what we're saying is that somebody else skillfully exploited law enforcement bias," as if there's somebody smart enough out there that could do that. But when you scrape one layer of this manure off the topsoil, you'll realize that the cops had to kill her. Now, are you, as the jury, in order to find Mr. Avery not guilty, willing to say that your cops, that your Manitowoc County sheriff's deputies, Lieutenant Lenk, Sergeant Colborn, came across a 25 year old photographer, killer her, mutilated her, burned her bones, all to set up and frame Mr. Avery? You've gotta be willing to say that. You've gotta make that leap.

## SEASON 1 - EPISODE 9

Buting: Well if they framed Steven Avery, the question is – is Brendan's case a whole charade too? I mean that's ultimately gonna be the question.

#3053787



**EXHIBIT**

**B**

MAM takes testimony out of context, omits inconvenient portions of responses, splices testimony within questions and answers in order to make for better drama, to make the defense cross-examination of plaintiff look more devastating, to make the direct examination of plaintiff look more scant and absent of detail, and to make plaintiff look less credible. This is in what is billed as a "documentary."

The following is presented as <u>seamless uninterrupted questioning and testimony</u> at trial; the bracketed/highlighted information has been omitted as compared with the trial transcript (Day 7). Boldface text shows or describes text that appears to have been added.

**[Initial question – not found in the transcript as it appears]**[1]

Kratz:        Did Mr. Avery have a response for you?

Plaintiff:     [Yes, he said that she had been there.

Kratz:        Did he tell you what day she had been there?

Plaintiff:     I think I might have told him that, what day that she should have been out there. I don't recall if we mentioned a date, but I do remember asking him what time she had been out there.

Kratz:        Did Mr. Avery recall this young woman?

Plaintiff:     Yes.

Kratz:        Did he name her for you?

Plaintiff:     No.

Kratz:        Did he tell you what she had done at his property that day?]

Plaintiff:     He said that she was taking some pictures of a van that his sister was selling.

[Kratz:        Mr. Avery tell you how long the van had been on his property?

Plaintiff:     He said 5 or 10 minutes.

Kratz:        Did you inquire of Mr. Avery whether or not he had personal contact with this woman on the date she was out there?]

Plaintiff:     I asked Mr. Avery if she had said where she was going. And he said, I never talked to her. She was only here 5 or 10 minutes and she left.

Kratz:        But he never talked to her?

Plaintiff:     That's what he told me, he never talked to her.

---

[1] From unknown source

Plaintiff:        That's what he told me, he never talked to her.

[Omits nearly 50 pages of testimony, cutting from the above response at p. 76 to p. 122 of the trial transcript.]

Kratz:        Let's move on then to [the 8th, which would be Tuesday] the 8th of November [were you asked to return to the property?]

[omits 20 lines of testimony on that page (page 122) and three lines of testimony on page 123 regarding the context of Plaintiff's assignment to go back to the property on the 8th]

Kratz:        Did you have occasion to enter Steven Avery's bedroom on the 8th of November?

Plaintiff:        Yes, sir.

Kratz:        Who did you enter that bedroom with.

Plaintiff:        Deputy Kucharski and Lieutenant Lenk.

[omits 21 lines of testimony on page 123, all of page 124, and 16 lines of testimony on 125 describing in detail the search in the bedroom on November 8]

Kratz:        In performing that search, Sergeant Colburn, did you move or manipulate this piece of furniture [at all]?

[Omits Plaintiff's direct response ("Yes, sir.") and four remaining lines of testimony on that page (page 125) and six lines of testimony at the top of page 126 with additional information about the movement of the piece of furniture]

[Kratz:        If you can describe that further, I don't know if you can do it with your words, or show us with your hands, how you did it?]

Plaintiff:        I will be the first to admit, [I wasn't any too gentle, as we were, you know, getting exasperated.] I handled it rather roughly, twisting it, shaking it, pulling it.

[Omits the remaining lines of testimony on Lines 11-25 on page 126, except for the word "Sergeant," from page 126, line 15; omits all of pages 127-28; omits lines 1-19 and part of line 20 on page 129]

Kratz:        Sergeant,[2] [. . . . .Do you recognize this image, that is][3] did[4] you see this image on the 8th of November?

Plaintiff:        Yes.

---

[2] From page 126, line 15
[3] Omits pages of testimony as indicated above, then omits these first words from p. 129, line 20
[4] Remainder of sentence is from p. 129, lines 20-21

2

[Kratz:          Can you describe that moment, or that event, for the jury, please.

Plaintiff:       As I had mentioned earlier, Lieutenant Lenk had exited – That is the door coming into the bedroom; he had gone through the door to get a bigger container.] I was searching the desk here, Deputy Kucharski was sitting on the bed, [which also isn't in the photograph, but it is in very close proximity to this piece of furniture, the bookcase,] filling out paperwork.

                 Lieutenant Lenk [got about right here, his feet would have been right here, so he was in the room, and] said something to the effect of, [there's a key on the floor here, or,] look, there's a key. [I don't know what his exact verbiage was but he identified that there was a key on the floor.

                 I turned around, as I wasn't very far away, I turned around and looked and I observed this key, lying right where it is. And I observed this key had this black rubberized or plastic end on it, which they didn't – you know, that's a newer model car key, due to that plastic or rubberized end. And I also observed that embossed on there was a Toyota emblem.

                 And we told Deputy Kucharski, get a photograph of this, right away, which he did, which is this photograph. I did not take this photograph.

Kratz:           By the way, as you and Deputy Kucharski and Lieutenant Lenk observed this, did any of the three of you approach or touch this piece of evidence at that time?

Plaintiff:       I may have been standing in this area here, you know. This piece of furniture is only 2 and a half, 3 feet tall, maybe. So I could easily see over it to see the key.

                 I did not approach the key. Lieutenant Lenk did not come into the room. Deputy Kucharski photographed the key from, you know, from whatever angle this picture was taken at. That's as close as we got.

Kratz:           My question, again, was] did either yourself, Lieutenant Lenk, or Deputy Kucharski [prior to this photo was taken] touch that key?

Plaintiff:       No, sir.

Kratz:           Why not?

Plaintiff:       I think all three of us knew at the same time that [there was a very good chance, seeing a Toyota emblem embossed on that key, knowing that Teresa Halbach's vehicle was a Toyota, that] this was a very important piece of evidence. And, you know, none of us were going to taint that.

3

Kratz:          Let me ask you, Sergeant Colburn, you guys, you specifically, Lieutenant Lenk, and now
                Deputy Kucharski, had been in this room for quite some time before this key appears in
                this position, isn't that right?

Plaintiff:      Yes, sir.

Kratz:          Did this surprise you, that you saw this key there?

Plaintiff:      Yes, I was very surprised.

Kratz:          Did the three of you talk about that, we hadn't seen it before, anything like that?

Plaintiff:      I – I believe I said to myself, damn, how did I miss that.

Kratz:          Now, other than the bedroom slippers being pushed to the side, had anything else
                changed, other than the pulling out and twisting and the jostling of the cabinet?

Plaintiff:      As we looked at the cabinet, it appeared that in the process of stuffing everything back
                into the cabinet, we had separated the back of the cabinet, the small piece of paneling
                that would be the back of the cabinet, from the frame of the cabinet itself.

[omits another two lines of testimony on this page (page 132), all of pages 133-34, and the first four
lines of page 135]

Kratz:          Sergeant Colburn –

[omits approximately 3 ¾ pages of testimony, resuming on page 138, at line 20]

Kratz:          You were asked, as I understand, as part of a civil lawsuit, to provide what's called a
                deposition, [to be questioned by some lawyers; is that right]?

Plaintiff:      Yes, sir.

Kratz:          Do you recall when that occurred?

[omits 15 additional lines of testimony]

Kratz:          Can you tell the jury what you were asked about?

Plaintiff:      In 1994 or '95 I had received a telephone call when I was working as my capacity as a
                corrections officer in the Manitowoc County Jail.  Telephone call was from somebody
                who identified himself as a detective.   [And I answered the phone, Manitowoc County
                Jail, Officer Colburn.

                Apparently, this person's assumption was that I was a police officer, not a corrections
                officer], and began telling me that he had [received information that] somebody who
                had committed an assault, in Manitowoc County, was in their custody, and we may have
                somebody in our jail, on that assault charge, that may not have done it.

4

I told this individual, you are probably going to want to speak to a detective, and I transferred the call to a detective [, to the Detective Division, at the Manitowoc County Sheriff's Department. That's the extent of my testimony.]

Kratz:    That's it? That's your connection to Mr. Avery?

Plaintiff:    Yes, sir.

[The above testimony stops at page 140, line 13; the next section below is from the Redirect examination at page 213 of the transcript]

Kratz:    Let me ask you this, [as you sit here today,] Sergeant Colburn, do you even know whether that call was about Mr. Steven Avery?

Plaintiff:    No, [I don't] **The word "sir" does not appear here in the transcript but appears in the broadcast, indicating a different answer was spliced in here, likely for the visual effect of the spliced-in segment.**

[The testimony immediately preceding the above question on page 213, in re-direct, is as follows:

Kratz:    Did this person ever identify the individual that they were talking about?

Plaintiff:    No sir. There were no names given.]

[After the spliced-in section from re-direct, the next portion – again, while appearing to have seamlessly followed the prior testimony – is again taken from the direct examination at page 140]

Kratz:    Well, did that cause you enough embarrassment and enough angst [in which to set up Mr. Avery for a charge of murder?

Plaintiff:    No.

Kratz:    Did that deposition cause you such problems from within your department] that you obtained and planted blood, so that it would be found and Mr. Avery would be wrongfully accused of a homicide case?

Plaintiff:    No, sir.

Kratz:    Have you ever planted any evidence against Mr. Avery?

[Plaintiff:    That's ridiculous, no I have not.

Kratz:    Have you ever planted any evidence against anybody in the course of your law enforcement career?]

Plaintiff:    I have to say that this is the first time my integrity has ever been questioned and, no, I have not.

5

Kratz:          That's all I have for Sergeant Colburn, Judge.

Court:          Mr. Strang.

**Cross-Examination**

Strang:         This is the first time your integrity has been questioned?

Plaintiff:      As it applies to being a police officer, yes.

Strang:         Okay. And it's not the first time Mr. Avery's has been, so I have some questions for you.

[omits 30 pages of testimony, including discussion of Plaintiff's background and his training as an evidence technician]

Strang:         November 3, 2005, when you learned [from Mr. Wiegert that] Teresa Halbach was missing, was just [about exactly, to the day] three weeks after your deposition in Steven Avery's lawsuit?

Plaintiff:      Yes, sir.

[omits 10 lines of testimony]

Strang:         As shift commander, you could have assigned anyone in road patrol to go out to the address on Avery Road?

Plaintiff:      Yes.

Strang:         You chose to do it yourself?

Plaintiff:      Yes.

Strang:         Did you go alone?

Plaintiff:      Yes, I did.

[omits 23 lines of testimony on pages 172-73]

Strang:         When, sir, did you first make a written report of anything having to do with the November 3, 2005, meeting with Mr. Avery?

Plaintiff:      June of '06 I believe.

Strang:         Does June 29, 2006 sound correct?

Plaintiff:      Yes.

[omits more than 23 pages of testimony, from page 174, line 4 to page 198, line 11]

6

Strang:       That is, it was almost 8 months after that first conversation with Steven Avery, the first conversation with him in the investigation, that you wrote down what you say he said to you, back on November 3?

Plaintiff:    Yes, sir.

[Here, the broadcast cuts to an interview with Pete Baetz, the defense investigator, who asserts that the Manitowoc County Sheriff's Office failed to properly handle a conflict of interest, calling their credibility into question]

[Supposedly seamless trial testimony continues thereafter, starting at page 194 (four pages prior to the page containing the testimony that immediately preceded the Baetz interview)]

Strang:       So you're in the house on November 5, November 6, November 7, November 8, true?

Plaintiff:    Yes, sir.

[skips forward more than another page, to p. 196, again, without any indication that it is anything other than seamless]

Strang:       [From Calumet County?]  There was no time that you went in Mr. Avery's home [during November of 2005] when you were not also with Lieutenant Lenk?

Plaintiff:    [Not that I recall.]  A response of "No, sir" is replaced here – the second time that answer has replaced a differently worded response.  It appears that perhaps the use of the same or similar "No, sir" responses in response to multiple questions, with the same or similar inflection, would make Plaintiff look less credible.

[Three additional lines of testimony omitted.]

Strang:       This case, would you describe as the largest investigation in which you personally had participated as a law enforcement officer?

Plaintiff:    Yes, sir.

[Six additional lines of testimony omitted]

Strang:       [You now know that the] law enforcement agencies involved [principally Calumet County Sheriff's Department and the Division of Criminal Investigation] have generated [hundreds or] thousands of pages of police reports?

Plaintiff:    Yes, sir.

Strang:       Your total contribution [to those reports] is what, a little bit under a half page [as of November 8, 2005]?

Plaintiff:    [That's] correct [sir].

7

[Strang:        And then about another page as of June 29, 2006?

Plaintiff:      Correct.]

Strang:         The report that you filed [on, or shortly after, November 8, 2005,] makes no mention of the Toyota key?

Plaintiff:      That's correct, sir.

[The above exchange leaves viewers with the impression that Plaintiff prepared only one-half page of total report content and omits another half a page that he also contributed on a different date; the preceding edits omit statements about Calumet County's involvement, apparent to downplay that fact]

[omits another nine lines of testimony]

Strang:         Were there things that you did not want to commit to paper, in a report?

Plaintiff:      No, sir.

[omits another 19 lines of testimony, including the lines that were spliced in prior to the Pete Baetz interview referenced above]

Strang:         [Well, about 8 months, but then, again,] while we're on Steven Avery and your reports about him, that phone call, [the phone call you took way back in 1994 or 1995, when you were working in the jail,] the phone call where a detective from another law enforcement agency told you may have the wrong guy in jail, that one?

Plaintiff:      Yes, sir.

Strang:         Did you ever write a report about that?

Plaintiff:      No, **I did not**, sir.  [**Boldface words are not in the transcript.**]

Strang:         Well, actually you did, didn't you?  It was about 8 years later, wasn't it?

Plaintiff:      I wrote a statement on it, yes, sir.

Strang:         You wrote a statement [after Sheriff Peterson suggested that maybe you should?

Plaintiff:      Yes, sir.

Strang:         You wrote that statement] in 2003, about the 1994 or 1995 telephone call?

Plaintiff:      Yes.

Strang:         [You wrote that statement in 2003,] the day after Steven Avery finally walked out of prison, didn't you?

8

Plaintiff:      I don't know what day Steve was released from prison, but I wrote the statement in 2003.

[15 lines of testimony omitted]

Strang:         That's all I have.

[Discussion between the Court and counsel is omitted prior to the start of redirect]

**Redirect Examination**

Kratz:          Sergeant Colburn, [just a very few follow-up questions.  Mr. Strang asked you if you had written a report about that telephone call that you had sometime in 1994 or '95; do you remember that question?

Plaintiff:      Yes, sir.

Kratz:          Do you remember your response?

Plaintiff:      My response was, no, that I did not write a report about it.

Kratz:          As you look back,] back in 1994 or '95, if you would have written a report, what would it have been about?

Plaintiff:      [That is why I didn't do one,] I don't know what it would have been about, [that I received a call and transferred it to the Detective Division.]  If I wrote a report about every call that came in, I would spend my whole day writing reports.

[Kratz:         Did this person ever identify the individual that they were talking about?

Plaintiff:      No, sir.   There were no names given.]

Kratz:          Let me ask you this, [as you sit here today], Sergeant Colburn, do you even know whether that call was about Mr. Steven Avery?

Plaintiff:      No, [I don't] The word "sir" is inserted here.

[More than two pages of additional re-direct is omitted]

**Recross Examination**

Strang:         How many calls have you ever gotten in your law enforcement career, from another police officer, suggesting you had the wrong guy in jail?

Plaintiff:      I don't know.  I can't recall any others.

Strang:         That's all I have.

9

The following exchange of Attorney Strang's cross-examination of Plaintiff is also altered as follows, although it is presented, again, as seamless testimony, in Episode 5 of MAM:

Strang:      One of the things the road patrol officers [under your supervision] frequently do, is [look for cars that appear out of place?

Plaintiff:      Yes, sir.

Strang:      Or if they made a traffic stop, they will inquire about the license plate or the registration plates on an automobile?

Plaintiff:      Yes, sir.

Strang:      And they will] call into dispatch and give the dispatcher the license plate number of a car they have stopped, or a car that looks out of place for some reason, correct?

Plaintiff:      Yes, sir.

Strang:      And the dispatcher [, very quickly these days, with his or her computer screen,] can get information about who – to whom a license plate is registered?

Plaintiff:      Yes, sir.

[12 lines of testimony omitted]

Strang:      If the car is abandoned or there's nobody in the car, the registration tells you who the owner presumably is?

Plaintiff:      Yes, sir.

[5 lines of testimony omitted]

Strang:      All right.   I'm going to ask you to listen, if you would, to a short phone call.

[Approximately a page of transcript is omitted here, including an exchange between counsel and the judge.]

[playing from phone call]

Manitowoc County Sheriff's Department.  This is Lynn.

Lynn.

Hi, Andy.

Can you run Sam William Henry 582

10

[Approximately 27 lines of transcript omitted here, including some of the call to dispatch]

Okay.  Shows that she's a missing person.  And it lists to Teresa Halbach.

Okay.

Okay.  Is that what you're looking for, Andy?

'99 Toyota.

Yup.

Okay.  Thank you.

You're so welcome.  Bye, bye.

[Approximately 13 lines omitted]

Strang:     What you're asking the dispatcher [, whose name is Lynn,] is to run a plate that's Sam William Henry 582, did I hear that correctly?

Plaintiff:     Yes, sir.

[Four lines omitted]

Strang:     Sam William Henry would be SWH-582.

Plaintiff:     Yes.

Strang:     This license plate?

Plaintiff:     Yes, sir.

[Five lines of transcript omitted]

Strang:     And the dispatcher tells you that the plate comes back to a missing person or woman?

Plaintiff:     Yes, sir.

Strang:     Teresa Halbach [rest of question omitted]

Plaintiff:     Yes, sir.

Strang:     And then you tell the dispatcher, Oh, '99 Toyota?

Plaintiff:     No, I thought she told me that.

[call replayed, except that MAM omits the first 15 lines of call, which were replayed at trial]

[Strang:          Actually you who suggests this is a '99 Toyota?

11

Plaintiff:    I asked if it was a '99 Toyota, yes.

Strang:    And the dispatcher confirmed that?

Plaintiff:    Yes.]

Strang:    Were you looking at these plates when you called them in?

Plaintiff:    No, sir.

[Strang:    And your best guess is that you called them in on November 3, 2005?

Plaintiff:    Yes]

[Instead of the above exchange, the broadcast splices in the following exchange from two pages earlier in the transcript, at page 182]

Strang:    Do you have any recollection of making that phone call?

Plaintiff:    [It would have had to have been 11/03/05 or – I'm guessing 11/03/05.

[splices back to Plaintiff's answer to a different question on page 184]

Plaintiff:    [Yes], probably after I received a phone call from investigator Wiegert letting me know that there was a missing person.

Strang:    Investigator Wiegert, did he give you the license plate number for Teresa Halbach when he called you?

Plaintiff:    [I don't remember the entire content of our conversation but, obviously, he must have been because I was asking the dispatcher to run the plate for me.]

[omits approximately 35 lines of testimony and cuts to answer to a different question that appears on page 186]

Plaintiff:    No, I just don't remember the exact content of our conversation then.

Strang:    But –

Plaintiff:    He had to have given it to me, because I wouldn't have had the number any other way.

Strang:    Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back of a 1999 Toyota [; from listening to that tape, you can understand why someone might think that, can't you]?

[sustained objection omitted]

[Strang:    This call sounded like hundreds of other license plate or registration checks you have done through dispatch before?]

12

Plaintiff:      Yes.

Strang:         But there's no way you should have been looking at Teresa Halbach's license plate on
                November 3, on the back end of a 1999 Toyota?

[sustained objection omitted]

[Strang:        There's no way you should have been, is there?]

Plaintiff:      I shouldn't have been and I was not looking at the license plate.

Strang:         Because you are aware now that the first time that Toyota was reported found was two
                days later on November 8?

Plaintiff:      Yes, sir.

13