**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

| | |
|---|---|
| **ANDREW L. COLBORN,**<br><br>        **Plaintiff,**<br><br>    **vs.**<br><br>**NETFLIX, INC.; CHROME MEDIA LLC,<br>F/K/A SYNTHESIS FILMS, LLC;<br>LAURA RICCIARDI; AND MOIRA<br>DEMOS,**<br><br>        **Defendants.** | **Civil No.: 19-CV-484-PP** |

**MEMORANDUM IN SUPPORT OF NETFLIX, INC.'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

PROCEDURAL POSTURE .................................................................................... 2

FACTUAL AND PROCEDURAL BACKGROUND............................................. 4

    A.    The 1985 Sexual Assault, Avery's Conviction, and His 2003
        Exoneration ................................................................................................ 4

    B.    Avery's Lawsuit Against Manitowoc County ........................................... 6

    C.    Teresa Halbach's Disappearance ............................................................... 9

    D.    The Murder Investigation ........................................................................ 10

    E.    Avery's Murder Trial ............................................................................... 12

    F.    The Documentary Series *Making a Murderer* ....................................... 16

    G.    This Lawsuit .............................................................................................. 21

ARGUMENT ......................................................................................................... 24

I.    Colborn's Defamation Claim Fails As A Matter Of Law ................................ 31

    A.    Reasonable Viewers Would Not Understand *MaM* To Convey An
        Assertion *By Defendants* That Colborn Framed Avery ......................... 32

    B.    Any Overall Implication Conveyed By *MaM* That Colborn Framed
        Avery Would Be A Non-Actionable Conclusion Based On Fully
        Disclosed Facts ......................................................................................... 34

    C.    The Specific Challenged Passages Of *MaM* Are Not Actionable
        Under The Subsidiary Meaning Doctrine ................................................. 35

    D.    Colborn's Specific Challenges To *MaM* Fail To State A Claim For
        Libel ......................................................................................................... 36

        i.     Colborn fails to state a claim as to passages about the Jail Call .............. 37

        ii.    Colborn fails to state a claim as to passages about the Dispatch
            Call ........................................................................................................... 38

        iii.   Colborn fails to state a claim as to passages about the key ...................... 41

i

      iv.     Colborn fails to state a claim based on "omitted" details ...........................42

II.    The SAC's Tag-Along Claims Also Cannot Survive This Motion To Dismiss ...............47

CONCLUSION ...........................................................................................................................48

Case 1:19-cv-00484-PP   Filed 03/03/20   Page 3 of 56   Document 119

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Repair, Inc. v. ABC, Inc.*,
776 F.2d 143 (7th Cir. 1985) .................................................................34

*Air Wisconsin Airlines Corp. v. Hoeper*,
134 S. Ct. 852 (2014).............................................................................29

*Avery v. Manitowoc County*,
428 F. Supp. 2d 891 (E.D. Wis. 2006)...............................................6, 11

*Barlass v. City of Janesville*,
No. 10-cv-454-slc, 2011 U.S. Dist. LEXIS 165826 (W.D. Wis. Nov. 28, 2011)...................43

*Bogie v. Rosenberg*,
705 F.3d 603 (7th Cir. 2013) ............................................................3, 38

*CBS v. DNC*,
412 U.S. 94 (1973).................................................................................37

*Charlie Auto Sales, Inc./Hyundai de Bayamon v. Mitsubishi Motor Sales of Caribbean, Inc.*,
84 F. Supp. 2d 249 (D.P.R. 1999)............................................................3

*Church of Scientology Int'l v. Time Warner, Inc.*,
932 F. Supp. 589 (S.D.N.Y. 1996)....................................................30, 36

*Citadel Group v. Washington Regional Medical Center*,
692 F.3d 580 (7th Cir. 2012) ...................................................................3

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975)............................................................................2, 30

*Croce v. New York Times Co.*,
930 F.3d 787 (6th Cir. 2019) .................................................................33

*Crosby v. Time, Inc.*,
254 F.2d 927 (7th Cir. 1958) .................................................................38

*Desnick v. ABC, Inc.*,
No. 93 C 6534, 1999 U.S. Dist. LEXIS 994 (N.D. Ill. Jan. 29, 1999)....................30

*Dumas v. Koebel*,
841 N.W.2d 319 (Wisc. Ct. App. 2013) ..................................................48

*Fairfax v. CBS Broadcasting Inc.*,
    No. 1:19-cv-11176 (E.D. Va. Feb. 11, 2020) ........................................................33

*Florida Star v. B.J.F.*,
    491 U.S. 524 (1989)........................................................................................48

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)........................................................................................47

*Global Relief Foundation, Inc. v. New York Times Co.*,
    390 F.3d 973 (7th Cir. 2004) ....................................................................32, 33

*Henson v. CSC Credit Services*,
    29 F.3d 280 (7th Cir. 1994) ...............................................................................3

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988)..........................................................................................47

*Ilsley v. Sentinel Co.*,
    113 N.W. 425 (Wis. 1907)..........................................................................30, 38

*Janklow v. Newsweek, Inc.*,
    759 F.2d 644 (8th Cir. 1985) ...........................................................................33

*Janklow v. Newsweek, Inc.*,
    788 F.2d 1300 (8th Cir. 1986) .........................................................................46

*Kaminske v. Wisconsin Central Ltd.*,
    102 F. Supp. 2d 1066 (E.D. Wis. 2000)..............................................................4

*Kennedy v. Children's Service Society*,
    17 F.3d 980 (7th Cir. 1994) .............................................................................48

*Marjala v. Fox News Network LLC*,
    2017 WI App 7, 895 N.W.2d 103 (Wis. Ct. App. 2017) ..............................28, 34

*Martin-Trigona v. Chicago Tribune*,
    No. 87 C 6605, 1991 U.S. Dist. LEXIS 8860 (N.D. Ill. June 28, 1991)................48

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991).......................................................................28, 29, 37, 40

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th 2016)..................................................................................4

*National Association of Letter Carriers v. Austin*,
    418 U.S. 264 (1974)........................................................................................28

*National Review, Inc. v. Mann,*
140 S. Ct. 344 (2019) ........................................................................................4

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964) .........................................................................................30

*Partington v. Bugliosi,*
56 F.3d 1147 (9th Cir. 1995) ....................................................... *passim*

*Peter Scalamandre & Sons, Inc. v. Kaufman,*
113 F.3d 556 (5th Cir. 1997) .........................................................................37

*Peterson v. Grisham,*
594 F.3d 723 (10th Cir. 2010) .......................................................................27

*Pugh v. Tribune Co.,*
521 F.3d 686 (7th Cir. 2008) ...........................................................................3

*Pusey v. Bank of Am., N.A.,*
No. 14-cv-04979(FB)(LB), 2015 U.S. Dist. LEXIS 91083 (E.D.N.Y. July 13,
2015) ....................................................................................................................47

*Rabideau v. City of Racine,*
627 N.W.2d 795 (Wisc. 2001) ......................................................................48

*Radivojevic v. Daley,*
12 F. App'x 391 (7th Cir. 2001) ...................................................................38

*Riley v. Harr,*
292 F.3d 282 (1st Cir. 2002) ........................................................ *passim*

*Rosenblatt v. Baer,*
383 U.S. 75 (1966) ............................................................................................30

*Simonson v. United Press International, Inc.,*
500 F. Supp. 1261 (E.D. Wis. 1980) ............................................................42

*Starobin v. Northridge Lakes Development Co.,*
287 N.W.2d 747 (Wis. 1980) .........................................................................29

*State v. Avery,*
2011 WI App 124, 804 N.W.2d 216 .......................................................10, 12

*State v. Avery,*
570 N.W.2d 573 (Wis. Ct. App. 1997) .......................................................4, 5

*Stevens v. Tillman,*
855 F.2d 394 (7th Cir. 1988) .........................................................................34

v

*In re Storms v. Action Wisconsin Inc.*,
    309 Wis. 2d 704 (2008) ....................................................................................46

*Terry v. Journal Broadcast Corp.*,
    840 N.W.2d 255 (Wis. Ct. App. 2013) ........................................................ *passim*

*Time, Inc. v. Hill*,
    385 U.S. 374 (1967) ........................................................................................3

*Time, Inc. v. Pape*,
    401 U.S. 279 (1971) ......................................................................................46

## Other Authorities

"People v. Weeks," Historical Soc'y of the N.Y. Courts,
    https://history.nycourts.gov/case/people-v-weeks/ ......................................24

RESTATEMENT (SECOND) OF TORTS § 611 cmt. b ............................................30

2 Robert D. Sack, *Sack on Defamation* § 16.2.1 (5th ed. 2018) ....................................2

WILLIAM COLEMAN, REPORT OF THE TRIAL OF LEVI WEEKS (1800) ...........................................24

# <u>INTRODUCTION</u>

Steven Avery's story is well known and for good reason: Convicted for a rape he did not commit, he spent 18 years in prison. Then, exonerated by DNA evidence, he returned home an exemplar of those wronged by our criminal justice system, only to be re-arrested, tried, and convicted again in the same county for the heinous murder of Teresa Halbach.

Avery's story deserves not only to be told, but also to be examined, discussed, and debated. In the telling, attention is necessarily focused on Avery's defense at trial, which was that he was framed. Avery's attorneys advanced the following theory: in the days before Halbach disappeared, public officials in Manitowoc County were deep in discovery in Avery's multi-million dollar civil suit against the County for his wrongful conviction. One such official was Plaintiff Andrew Colborn, whom Avery's attorneys deposed just weeks before Halbach disappeared and who believed he might be added as a defendant. At Avery's murder trial, his lawyers pointed to that civil suit and the botched rape investigation that gave rise to it to argue that the County (including Colborn) had a motive to plant evidence to ensure Avery's conviction.

*Making a Murderer* ("*MaM*") tells this story through the words of participants with first-hand knowledge, culled from sworn testimony, publicly filed pleadings, news conferences and interviews. The events it depicts are rife with contradictions, ambiguities, and strong opinions on all sides, as its title conveys in capturing the messy and unsatisfying reality of Avery's journey through the criminal justice system: Did 18 years of wrongful imprisonment "make" Avery a coldblooded killer? Or did law enforcement "make" him one, by framing an innocent man?

At the core of the First Amendment are its protections for speech about our criminal justice system, including its flaws, failings and triumphs. Those protections empower defendants such as Netflix to distribute documentaries that ask questions and pose alternative theories and

explanations. They allow for those documentaries to tell stories such as Avery's from differing perspectives and to venture beyond dry recitations of fact. And those protections permit documentarians to edit—to distill 30 years, including weeks of testimony from a murder trial, into a 10-hour series.

Colborn became a part of Avery's story by virtue of his service as a public official, first as a corrections officer and eventually as a sergeant and shift commander for the Manitowoc County Sheriff's Office. He brings this suit because, he alleges, *MaM* portrays him as a "corrupt police officer." But that is exactly how Avery's defense team portrayed Colborn at Avery's trial, and the law does not permit Colborn to recover for what amounts to a retelling of that story to those unable to observe it first-hand. As the Supreme Court has emphasized, because few citizens have the time to attend criminal trials, the First Amendment empowers the media to act as their surrogates and "bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975).

## **PROCEDURAL POSTURE**

As Judge Sack has explained in his authoritative treatise on the law of defamation, "in a libel suit the central event—the communication about which suit has been brought—is ordinarily before the judge at the pleading stage" and "she may assess it upon a motion to dismiss, first hand and in context." 2 Robert D. Sack, *Sack on Defamation* § 16.2.1 (5th ed. 2018). Such motions are especially appropriate where, as in this case, the Court has before it, and may properly consider, both **(1)** the challenged documentary, which is necessarily incorporated in the Second Amended Complaint ("SAC") and must be viewed as a whole in assessing the statements in it that the SAC places at issue, *see Terry v. Journal Broadcast Corp.*, 840 N.W.2d 255, 265 (Wis. Ct. App. 2013) ("The context and circumstances in which the statements were made are

2

also to be considered."), and **(2)** the source material upon which those statements were made, all of which is properly subject to judicial notice. *See Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) ("We may take judicial notice of documents in the public record . . . without converting a motion to dismiss into a motion for summary judgment."); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (same).[1] In short, as is ordinarily the case when a motion such as this one is brought in a defamation action, there is nothing to be learned in discovery that is in any sense either necessary or material to its resolution.

Unfortunately, this memorandum and its supporting documentation are necessarily "responsible for the demise of a good number of trees." *Charlie Auto Sales, Inc./Hyundai de Bayamon v. Mitsubishi Motor Sales of Caribbean, Inc.*, 84 F. Supp. 2d 249, 250 (D.P.R. 1999). That is because *MaM* runs for more than 10 hours and is based not only on Avery's five-week murder trial, but also on the judicial and other public records that undergird his conviction for sexual assault in 1985, his exoneration and release in 2003, and his civil suit against Manitowoc County arising from that wrongful conviction. But it is *imperative* that the Court take the time to "wade[] through the forest that once was," *id.*, because this is the sort of case—arising from statements about a public official and his involvement in a matter of profound public concern— where protracted litigation itself poses a "grave risk of serious impairment of the indispensable service of a free press in a free society." *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967). As a result, the First Amendment reflects "a powerful interest in ensuring that free speech is not unduly

---

[1] Likewise, courts may consider "documents referenced in the pleading if they are central to the claim," such as *MaM*'s entire first season on which this suit is based. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013); *see also Citadel Grp. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 591 (7th Cir. 2012). For ease of reference, this memorandum cites to portions of *MaM* by episode number and time code. Episodes are attached as exhibits to the accompanying Second Declaration of Matthew E. Kelley ("Kelley Decl."), and will be lodged with the Clerk on USB drives. Copies also will be provided to all counsel of record.

burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th 2016).[2]

Defamation cases such as this are not decided simply by reviewing the few challenged statements (here, fewer than 13 minutes of a more than 10-hour documentary). Courts can only decide if a challenged statement is actionable in defamation by viewing that statement in its larger context. *Kaminske v. Wisconsin Cent. Ltd.*, 102 F. Supp. 2d 1066, 1079-80 (E.D. Wis. 2000). Here, that means the challenged statements must be reviewed in the context of Avery's wrongful conviction in 1985, his exoneration and subsequent trial for murdering Halbach in 2005, and, finally, how *MaM* distilled this story into a 10-hour documentary. Thus, although the parties' factual representations may be helpful, the Court can and should both review *MaM* in its entirety and then carefully compare its depiction of what happened in Manitowoc County with the trial transcripts and other public records on which it is based.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The 1985 Sexual Assault, Avery's Conviction, and His 2003 Exoneration

On July 29, 1985, a Manitowoc woman was sexually assaulted as she jogged along Lake Michigan. Ep. 1 at 17:30-18:49; *see also State v. Avery* ("*Avery II*"), 570 N.W.2d 573, 575 (Wis. Ct. App. 1997). One of the first Manitowoc County Sheriff's Deputies to visit the victim in the hospital was Judy Dvorak, who lived near Avery. Ep. 1 at 19:08-20:04. Dvorak said she believed the victim's description of her assailant matched Avery, and the Sheriff's Office quickly focused its investigation on him. *Id.* A Sheriff's Office investigator, Eugene Kusche, drew a sketch of the

---

[2] *See also Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 348 (2019) (Alito, J., dissenting from denial of certiorari) (noting that denial of motion to dismiss in defamation case necessarily requires the defendant "to shoulder all the burdens of difficult litigation" as well as "hefty attorneys' fees," burdens that threaten "the uninhibited expression of views that would contribute to healthy public debate").

4

suspect based on the victim's description that resembled an earlier booking photo of Avery, and the victim picked his picture out from a group of photos and later identified him in a lineup. *Id.* 20:35-23:02; *see Avery II*, 570 N.W.2d at 580.

The victim also identified Avery as her assailant at his trial. *Avery II*, 570 N.W.2d at 580; *see also* Ep. 1 at 33:03-36. In his defense, Avery presented more than a dozen alibi witnesses who testified he was with them the day of the assault and pointed to multiple other discrepancies in the State's evidence. *Avery II*, 570 N.W.2d at 580-81; *see also* Ep. 1 at 30:14-51, 39:42-40:16. The jury convicted Avery of first-degree sexual assault, attempted murder and false imprisonment, for which he was sentenced to 32 years in prison. *Id.* 1 34:23-41; *Avery II*, 570 N.W.2d at 575. The Wisconsin Court of Appeals denied Avery's appeals in 1987 and 1997. *Id.*

Attorneys for the Wisconsin Innocence Project agreed to take Avery's case in 2002. Ep. 1 at 45:46-46:04. They arranged for DNA testing that conclusively ruled him out as the assailant and instead matched Gregory Allen, who was then serving a 60-year sentence for a 1995 sexual assault in Brown County. *Id.*; *see also* Ex. 11 at 1-2.[3] Avery was released on Sept. 11, 2003, after spending 18 years behind bars for a crime he did not commit. Ex. 11 at 1-2; Ep. 1 at 47:27-48:08.

Not surprisingly, news of the test results exonerating Avery and inculpating Allen roiled Manitowoc County law enforcement. The first officials the state crime lab notified about the DNA match to Allen were then-District Attorney Mark Rohrer and his deputy, then-Assistant District Attorney Michael Griesbach. Ex. 12 at 73:16-74:11; Ex. 13 at 7:3-12. Griesbach promptly pulled the Avery case file, and "within a couple minutes" found in it a criminal complaint from 1983 alleging that Allen had exposed himself and attempted to attack a woman

---

[3] For ease of reference, exhibits to the Kelley Declaration are cited by their number, *e.g.*, Ex. 1. The exhibits themselves are identified in the declaration.

on the same stretch of beach as the 1985 assault for which Avery was convicted. Ex. 13 at 9:18-10:3; *see also* Ep. 1 at 49:48-51:50. As Griesbach explained in his interview included in *MaM*, this evidence "at least made it possible that the DA and the sheriff either knew or should have known that Steven Avery was not the assailant—and not only that, we believe there was the potential that they knew, in fact, who the assailant was, but continued with the prosecution." *Id.*

Under the pall of that disturbing possibility, on September 18, 2003—one week after Avery's release—Rohrer asked the Wisconsin Department of Justice "to conduct an independent review." Ex. 11 at 2. That probe revealed that then-Sheriff Tom Kocourek and then-District Attorney Denis Vogel, as well as their subordinates, had strong reasons to believe that Allen was the perpetrator and Avery was innocent, but went ahead with the case against Avery anyway. *See id.* at 6-12; Ep. 1 at 53:18-54:52, 56:31-58:10.

**B. Avery's Lawsuit Against Manitowoc County**

Avery filed suit in this Court in 2004, asserting claims under 42 U.S.C. §§ 1983 and 1985(2) against Manitowoc County, Kocourek, and Vogel for violating his due process rights by targeting Avery and failing to investigate Allen; focusing the investigation on Avery because of personal hostility against him; failing to provide exculpatory information to his defense counsel; and continuing to withhold exculpatory evidence during his incarceration. *See Avery v. Manitowoc Cty.*, 428 F. Supp. 2d 891, 893 (E.D. Wis. 2006). He sought damages of $36 million. Ep. 2 at 9:43-10:24.

During discovery in the civil case, Avery's counsel deposed several Manitowoc County officials, including Colborn. During Colborn's deposition, he testified that, immediately after Avery's 2003 release from prison, Colborn claimed to recall an unusual phone call he received in or around 1995 when he was a corrections officer at the Manitowoc County Jail (the "Jail Call").

Ex. 14 at 16:4-13; Ep. 7 at 18:20-19:04. According to Colborn's testimony, in the 1995 call, the caller identified himself as a detective from another jurisdiction, and said an inmate there had claimed he was responsible for an assault in Manitowoc County for which another man was imprisoned. Ex. 14 at 10:22-11:8; SAC ¶ 24; *see also* Ep. 7 at 24:07-21. Colborn later testified that, at the time he received it in 1995, he transferred the call to Manitowoc County detectives. Ex. 15; Ex. 14 at 14:13-15:15; Tr. 7 at 140:6-10, 160:23-161:13;[4] *see also* Ep. 7 at 17:47-18:30; SAC ¶ 25.

During civil discovery, Colborn's law enforcement colleagues testified that Colborn told them the caller was (or probably was) from Brown County, where Allen was apprehended and convicted for a 1995 sexual assault. Ex. 16 at 32:23-33:9; Ex. 17 at 21:19-22:11; Ex. 18. One of those colleagues, Kusche, told a prosecutor that Colborn provided considerably more detail: *i.e.*, the Brown County detective had identified Allen specifically as the inmate boasting about the Manitowoc County assault and Avery as the innocent prisoner. *See* Ex. 18 (describing conversation between Kusche and Assistant District Attorney Douglass Jones); Ex. 19 at 72:16-78:6 (Kusche stating he did not recall all details of what Colborn told him but that he had no reason to doubt the accuracy of Jones's account); Ex. 12 at 109:18-110:20 (Rohrer confirming same).

Griesbach testified in 2005 that the District Attorney's office also specifically confirmed with Colborn that, upon learning of the Jail Call, then-Sheriff Kocourek's response was "that we've got the right guy and that he [Colborn] should not concern himself." Ex. 13 at 26:20-27:7; *see also* Ex. 12 at 110:2-20; Ex. 18. Griesbach further testified that the victim told him

---

[4] For ease of reference, this brief cites to the transcript of Avery's 2007 murder trial by day, page and line; thus Tr. 7 at 140:6-10 refers to the transcript of Day 7, page 140, lines 6-10. Relevant portions of the transcripts are attached to the Kelley Declaration as Exhibits 28-36.

Kocourek's reaction to Colborn was very similar to his reaction when *she* raised the issue about

Allen with him in 1985. Ex. 13 at 37:1-8. In a 2014 book about Avery's exoneration and

subsequent conviction, Griesbach described Colborn's revelation as a "bombshell":

> A detective from Green Bay called the Manitowoc County jail to report that an
> inmate in their jail was claiming that he had raped a woman jogging on a beach in
> Manitowoc County ten years earlier. The inmate claimed that someone else had
> been convicted of the assault and was presently serving time in prison for a crime
> he didn't commit. Kusche told the ADA that Andy Colborn was the corrections
> officer who spoke with the Green Bay detective and that Colborn got word of it to
> Sheriff Kocourek. But according to Kusche, the sheriff told Colborn and a
> detective to stay out of it—they already had the right guy. Andy Colborn doesn't
> recall if the Green Bay detective mentioned the confessing inmate's name, but
> Gregory Allen was in the Brown County jail at the time . . . ."

Ex. 20. Kusche testified that he did not know about the Jail Call when it occurred, and if he had,

he would have written a report about it and followed up. Ex. 19 at 74:10-12, 79:22-80:12.

Colborn's own account has varied over time and differs from those of his colleagues and

his counsel. Both in 2005 and at Avery's 2007 murder trial, Colborn testified that he did not

remember the caller's jurisdiction, although in 2005 he said he guessed it may have been either

Brown or Sheboygan County. Ex. 14 at 20:25-21:16; *see also* Tr. 7 at 159:23-160:6. In a

September 12, 2003 report, Colborn wrote that he did not recall the detective mentioning any

names. Ex. 15. Thereafter, he testified at Avery's 2007 trial without equivocation that "there

were no names given." Tr. 7 at 213:6-8. By contrast, in the SAC, Colborn avoids saying whether

the detective mentioned Allen's name, asserting only that he "does not believe the caller

mentioned the name of the man convicted or the name of the victim in the Manitowoc County

assault. If he did, Plaintiff was wholly unfamiliar with the names." SAC ¶ 24. Colborn testified

in 2005 that he did not follow up to determine if the call had gone through to a detective and

never heard any feedback from the sheriff's office about the call at the time. Ex. 14 at 15:7-16:3.

But in the SAC, Colborn asserts that he "subsequently heard that higher-ups at MTSO had given assurances that the right man had been convicted." SAC ¶ 25.

On September 12, 2003, the day after Avery's release, Lt. James Lenk told then-Sheriff Petersen about the Jail Call, and Petersen directed Lenk and Colborn to write reports about it. Ex. 17 at 29:17-32:22; Ex. 16 at 31:20-34:5; Ex. 14 at 16:20-18:5. Colborn and Lenk testified that they provided their reports to the sheriff. Ex. 17 at 33:4-8; Ex. 14 at 17:20-18:5. The Wisconsin DCI agent who interviewed Petersen as part of the Attorney General's review wrote in a report that Colborn's and Lenk's statements were among documents Petersen took out of a safe in his office for her to review on September 22, 10 days after Colborn wrote his report. Ex. 21. Petersen testified that Colborn's and Lenk's reports were kept, not in his safe, but rather in a vault. Ex. 16 at 34:15- 36:24.

The foregoing discovery in Avery's civil rights lawsuit was well underway in the fall of 2005. Lenk was deposed on October 11, 2005; Colborn, Petersen and Dvorak were deposed two days later, and Kusche was deposed on the 26th. *See* Ep. 2 at 31:05-16. Kocourek was scheduled to be deposed on November 10, with Vogel's deposition scheduled for five days later. *Id.* at 30:33-41. Then, on October 31, 2005, a young woman from Calumet County went missing.

### C. Teresa Halbach's Disappearance

Teresa Halbach grew up in Calumet County and returned after graduating from the University of Wisconsin-Green Bay in 2002 with a degree in photography. Tr. 1 at 158:4-159:13. By the fall of 2005, she was a 25-year-old with her own photography business. Halbach's clients included *Auto Trader*, a magazine consisting of advertisements for used vehicles. *Id.* 165:19-166:6; Ep. 2 at 32:05-33:29. On October 31, 2005, she accepted three assignments in the

Manitowoc area to photograph used vehicles, including one for Avery. *Id.*; *State v. Avery* ("*Avery III*"), 2011 WI App 124, ¶4, 804 N.W.2d 216, 220.

On November 3, 2005, Halbach's family realized that no one had seen or heard from her since Halloween, and reported her missing to Calumet County authorities. Tr. 1 at 170:18-171:13, 185:8-20. Two days later, Pam Sturm, a distant relative, volunteered to search the Avery salvage yard as part of a larger search of the surrounding area. *Id.* at 170:1-17. Shortly after they arrived, Sturm and her daughter came across a green RAV4 in a remote corner of the property, partially covered by branches and junk. Ep. 2 at 37:13-38:01. It was Halbach's. What was a missing person case was about to become a murder investigation.

### D. The Murder Investigation

Once Halbach's vehicle was discovered at the salvage yard, authorities promptly sought a search warrant for the RAV4, Avery's home, as well as the entire salvage yard property, and the investigation became singularly focused on Avery. *See* Ex. 22. The search pursuant to that warrant continued for several days, during which officers searched Avery's home seven times and his garage four times. Ex. 23 at 2. Authorities obtained yet another warrant on November 9. *Id.* at 15.

Meanwhile, Halbach's SUV arrived at the state crime lab in Madison, where technicians found spots of blood, including a smear near the ignition that DNA testing matched to Avery. Ep. 2 at 52:58-54:04; Ep. 3 at 7:07-22. Investigators also found bloodstains matching Halbach's DNA in the SUV's cargo area. Ep. 6 at 44:44-45:42.

Because of the obvious conflict of interest presented by Avery's pending lawsuit, authorities decided that Calumet County would take the lead in the investigation. Tr. 8 at 143:2-25. Calumet County DA Ken Kratz was appointed special prosecutor. Ep. 2 at 40:09-41:13.

Calumet County Sheriff's Inspector Mark Weigert and DCI Special Agent Tom Fassbender supervised execution of the Avery search warrants, reviewed catalogues of items seized and then, as the trial judge put it, "determined future search activities." Ex. 23 at 9. However, the teams that searched Avery's home and garage continued to include Colborn and Lenk, supervised by one or more Calumet County officers. *Id.* at 8-16.

On November 8, the fourth day of the search, Colborn and Lenk searched Avery's trailer for the sixth time, supervised by Calumet County Deputy Dan Kucharski. *Id.* at 14. Fassbender later testified that he intended it to be "a final, thorough search of the trailer." *Id.* at 15. During this search, Lenk found a key to Halbach's SUV on Avery's bedroom floor after Colborn had wrestled a small bookshelf back into place after removing and replacing several items. Ep. 3 at 6:15-7:04. The key later tested positive for Avery's DNA, but not Halbach's. Ep. 2 at 52:58-54:03; Ep. 3 at 7:07-22; SAC ¶ 43. That same day, investigators found charred human remains in a burn pit behind Avery's garage. Ep. 2 at 47:12-48:31. DNA testing later determined the remains were Halbach's. Tr. 10 at 157:10-162:21. Avery was arrested hours later, on November 9, 2005. Ep. 2 at 54:04-22.

In jail and facing a costly criminal trial, Avery settled his lawsuit against Manitowoc County in February 2006 for $400,000, from which his attorneys were paid $160,000. Ep. 3 at 15:41-52. As presiding Judge Adleman observed, the murder charge "undoubtedly dramatically reduced the value of the case." *Avery v. Manitowoc Cty.*, 428 F. Supp. 2d at 896.

A couple of weeks later, Avery's sixteen-year-old nephew, Brendan Dassey, made incriminating statements during a series of police interrogations. Ep. 3 23:30-28:17. Based on those statements, authorities obtained new warrants and searched the Avery compound again on March 1 and 2, 2006. Ep. 6 9:04-10:51. During those searches, investigators found fragments of

11

two .22-caliber bullets embedded in the floor of Avery's garage, one of which the state crime lab determined contained Halbach's DNA. *Id.* at 4:45-9:17, 15:44-17:53. Although the search included using a jackhammer to break up and remove chunks of the garage floor for testing, Halbach's DNA was not found anywhere else in the garage (although Avery's was). *Id.* at 29:27-30:18.

Avery's trial on charges of first-degree intentional homicide, mutilation of a corpse, false imprisonment, and possession of a firearm by a felon began on February 12, 2007. *Avery III*, 804 N.W.2d at 233. It would last for nearly five weeks. *Id.*

### E. Avery's Murder Trial

The SAC falsely alleges that a law enforcement conspiracy to frame Avery "was the product of Defendants' imagination." SAC ¶¶ 60, 74. Accusations that Colborn and others planted evidence were the centerpiece of Avery's defense at his trial, as Colborn elsewhere acknowledges, *id.* ¶ 33; *see also, e.g.*, Tr. 1 at 117:23-120:11 (defense opening argument). As presiding Judge Patrick Willis explained in denying a prosecution motion to exclude such "frame-up" evidence, "[t]he defendant submits that both Lenk and Colborn would have had a motive to plant evidence against him because of their role in his lawsuit against Manitowoc County relating to his wrongful 1985 criminal conviction." Ex. 24 at 3.[5]

In his opening statement, defense counsel Dean Strang told the jury that Avery's civil rights lawsuit was "a good cop's worst nightmare" that stirred "feelings of shame, embarrassment, anger, [and] humiliation" among Manitowoc County officers. Tr. 1 at 119:5-23. Strang explained to the jurors that, during the trial, he and his co-counsel would try to persuade

---

[5] Judge Willis specifically identified Lenk and Colborn as the only two officers the defense could attempt to implicate as participants in this alleged conspiracy. Ex. 24 at 3.

them that Colborn and Lenk, having been drawn into the wrongful conviction lawsuit just weeks earlier, were focused on making sure Halbach's murder was pinned on Avery because they "very much wanted to believe" in Avery's guilt. *Id.* at 146:25-148:10.

In response, prosecutors called Avery's evidence-planting claims ridiculous and presented evidence to persuade jurors that Avery "restrained, murdered and mutilated" Halbach, as Kratz asserted in his opening statement. *Id.* at 48:15-17. During the trial, prosecution witnesses testified that bloodstains from Avery and Halbach were found in Halbach's RAV4; that charred human remains that were Halbach's were found in a burn pit behind Avery's garage and a burn barrel nearby; and that two .22-caliber bullet fragments were found in Avery's garage during searches in March 2006, one of which tested positive for Halbach's DNA. Tr. 9 at 135:1-137:22; Tr. 10 at 151:8-165:21, 185:2-196:16; Tr. 13 at 12:5-16:21, 127:16-139:6.

Because Avery's defense centered on the contention that law enforcement officials, including Colborn and Lenk, had framed him, both prosecutors and Avery's counsel questioned the officers about the underlying events, including their depositions in the civil case and the Jail Call. Tr. 7 at 138:20-140:13, 158:5-163:22, 231:16-233:17; Tr. 8 at 54:24-58:3, 103:16-107:11. With respect to the Jail Call, Colborn testified that the detective who placed it was from a nearby county and told Colborn he had "received information that somebody who had committed an assault, in Manitowoc County, was in their custody, and we may have somebody in our jail, on that assault charge, that may not have done it." Tr. 7 at 140:1-5, 160:1-4. Colborn said he transferred the caller to the detective division of the Manitowoc County Sheriff's Office. *Id.* at 140:6-11. He further testified that he didn't write a report at the time because "I don't know what it would have been about . . . If I wrote a report about every call that came in, I would spend my whole day writing reports." *Id.* at 213:1-5.

Lenk testified that he recalled Colborn saying that the detective who called was from Brown County. *Id.* at 232:10-18. In addition, Lenk testified that it did not occur to him to tell Fassbender and Wiegert, the officials in charge of the crime scene, about his and Colborn's depositions when they were assigned to search Avery's home. Tr. 8 at 105:8-106:23. On cross-examination, Colborn testified that "the thought crossed my mind that I might be added as a defendant" in the civil rights case. Tr. 7 at 163:11-25. Nevertheless, both Colborn and Lenk testified that the Avery civil lawsuit did not cause them to plant evidence or otherwise try to frame Avery. *Id.* at 140:14-141:7, 233:3-17.

At trial, Avery's lawyers played for the jury a recording of a phone call Colborn made to a Manitowoc County dispatcher before Halbach's RAV4 was found at the salvage yard. In that call, Colborn asks the dispatcher to check the records for license plate SWH-582, which the dispatcher tells him is registered to Teresa Halbach, a missing person. Tr. 7 at 181:4-182:2. Colborn then asks, "'99 Toyota?" and the dispatcher replies, "Yup." *Id.* at 181:24-25.

Colborn testified that he did not remember placing the call and that his "best guess" was that it occurred on November 3 rather than November 4. *Id.* at 182:9-12, 184:22-24. He testified that he and other road patrol officers frequently contact a dispatcher when they make a traffic stop or come across a vehicle that looks out of place so they can learn to whom the vehicle is registered. *Id.* at 177:23-179:6. Colborn acknowledged that this call sounded like hundreds of others he had made to run the plates of vehicles he had encountered while patrolling. *Id.* at 186:20-187:10. Nevertheless, he insisted he was not looking at the car when he made the call; rather, he testified, he assumed he was confirming a license plate number Wiegert had provided when he first contacted Colborn about Halbach. *Id.* at 184:22-185:13, 187:11-21, 213:22-214:9. Avery's counsel argued to the jury that the call indicated Colborn had located the RAV4 before it

was discovered in the salvage yard; in his rebuttal closing, Strang recounted the call and said "[t]his sounds a lot like what road patrol officers do when they come across a stalled car, an abandoned car, a car where it shouldn't be." Tr. 24 at 32:21-34:3.

To account for Avery's blood found in Halbach's SUV, his defense team theorized that it had been planted there by Manitowoc County law enforcement. *See* Ex. 24 at 1-2. The source, Strang suggested to jurors in his opening statement, was a vial of Avery's blood drawn in 1996 during the appeal of his 1985 rape conviction that remained in the public case file at the court clerk's office. Tr. 1 at 111:10-113:9, 155:5-11. More specifically, Strang noted that Lenk had signed the form in 2002 transmitting some evidence from that case file (though not the vial or the blood inside) to the state crime lab for the testing that eventually exonerated Avery. *Id.* Lenk testified that he did not see the blood vial in the Avery file when he transmitted other evidence to the crime lab in 2002 and that he did not know of the vial's existence at the time Halbach's SUV was found. Tr. 8 at 18:2-13. He further asserted that he did not plant Avery's blood in the RAV4 and did not assist anyone else in doing so. *Id.*

During the trial, the defense also argued that law enforcement had planted the key to Halbach's RAV4 in Avery's bedroom while Lenk and Colborn were conducting the sixth search of his trailer. In his closing argument, defense attorney Jerome Buting called it "[t]he magic key, Exhibit A, in this theory that the police planted evidence in this case." Tr. 23 at 162:1-2. Colborn, Lenk and Calumet County Sheriff's Deputy Daniel Kucharski, who supervised the search, testified that they believed the key fell out of a gap in the back of a bookcase Colborn had searched and then wrestled back into place. Tr. 7 at 125:10-126:10, 127:9-12, 130:8-14; Tr. 8 at 12:9-17; Tr. 9 at 35:12-37:22.

Calumet County Sheriff's Sergeant William Tyson, who supervised Colborn and Lenk during a search of Avery's trailer three days earlier, testified that he had been told they should not be left alone during such a search and therefore he carefully watched them throughout. Tr. 7 at 21:25-24:7. Under cross-examination, Tyson acknowledged that he had never had to monitor other officers in this fashion, a task defense attorney Buting likened to being a "watchdog" or "babysitter." *Id.* at 25:5-24. Tyson testified that, because he kept close watch on Colborn and Lenk, it would have been difficult for them to plant evidence. *Id.* at 26:10-19.

In his closing, Kratz called the evidence-planting defense "[a]bsolutely ridiculous" and told jurors that the only way for officers to have planted so much evidence was if they had actually killed Halbach. Tr. 24 at 63:7-15, 110:4-16. Avery's attorneys countered that the defense was not accusing officers of killing Halbach, but rather positing that whoever did skillfully exploited law enforcement's suspicion of Avery, and that officers independently planted evidence because they believed Avery to be guilty. Tr. 23 at 132:15-133:19 ; Tr. 24 at 46:2-49:23. On March 18, 2007, after deliberating for some 20 hours, the jury found Avery guilty of first-degree intentional homicide and being a felon in possession of a firearm, but not guilty of mutilating a corpse. Tr. 27 at 3:3-20.

### F.  The Documentary Series *Making a Murderer*

*Making a Murderer* premiered on Netflix on December 18, 2015. SAC ¶ 15.[6] It chronicles the story of Steven Avery's experiences in the criminal justice system through the words and actions of its participants, as reflected in footage of actual events including his criminal trial, interviews of those with first-hand knowledge, documents and photos, other

---

[6] On October 19, 2018, Netflix premiered a second 10-episode season of *Making a Murderer*, which follows the post-conviction appeals of Avery and Dassey. None of the statements challenged in the SAC are from the second season of *MaM*.

judicial proceedings, news conferences and local news coverage. Because *MaM* depicts events spread over nearly three decades, including a 15-month murder investigation and a five-week jury trial, *MaM* necessarily summarizes and condenses information to present a coherent narrative to the viewer.

The documentary's first two episodes trace the story of Steven Avery from the crimes he committed as a troubled young man to his wrongful rape conviction in 1985 through his 2003 exoneration and subsequent lawsuit against Manitowoc County. Reesa Evans, then a public defender who represented Avery, recalled that records showed he had an IQ of 70 and "had barely functioned in school." Ep. 1 at 14:22-39. His criminal record, *MaM* told viewers, included felony convictions of burglary and animal cruelty, the latter for burning the family cat to death. *Id.* at 9:30-10:36.

The documentary recounts how Avery's life took a further turn for the worse in January 1985, when he had a violent confrontation with Sandra Morris, a cousin whose husband was a Manitowoc County sheriff's deputy. *Id.* at 12:00-14:17. Avery told a sheriff's investigator that he was upset because Morris was spreading false rumors that Avery had a habit of being "on the front lawn and on the road bare ass," even in winter. *Id.* at 13:26-56. Morris later testified that she truthfully told authorities that, when she drove by Avery's house, she had seen him in the yard, naked and masturbating. *Id.* at 4:36-7:36. Early one January morning, when Avery saw Morris driving by, he pursued her in his car and ran her car off the road. *Id.* at 12:46-13:04. "I got out and I grabbed a gun and she asked me what I was doing," Avery said in a recorded confession. *Id.* at 13:09-13:15. As *MaM* recounts, he was charged with endangering safety regardless of life and being a felon in possession of a firearm. *Id.* at 16:02-13.

While he was out on bail pending trial on those charges, Avery's wife gave birth to twin sons on July 23, 1985. *Id.* at 16:23-17:20. As *MaM* explains, within a week, Avery was arrested for the sexual assault for which he would wrongfully spend 18 years in prison. Mike Kinzel, a reporter for a Manitowoc radio station, says in an interview included in the documentary that Avery was one of the "regular names" on the police beat and his reaction to Avery's arrest was, "that's in character." Ep. 1 at 27:08-25. Judge Fred Hazlewood, who presided over the 1985 rape trial, summed up his view at the time: that "violence was a real reoccurring regular part of his life, [and] that women seemed to be the victims." *Id.* at 27:53- 28:13.

*MaM* shows footage of Avery's return home after his release in 2003 and then shifts to his civil lawsuit against Manitowoc County, as told through interviews with the participants and excerpts from video depositions in that case. *MaM* shows that Avery's lawyers viewed the Jail Call as vital to their case. As one of them, Steven Glynn, explained in an interview:

> And the day [Avery] got out, or the day after, that's when Colborn decides to contact his superior officer named Lenk. And Lenk tells him to write a report and they then go have contact with the sheriff. Now let's just stop and think about that for a minute. Why does that happen? Why does it happen then when it didn't happen eight years earlier? I mean, I think I know the answer. I mean, I think the answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk, as his superior realized it, and the sheriff realized it. So Lenk tells Colborn to write a report, the sheriff tells Lenk, "Get me the report." The sheriff puts the report in a safe. That's how much he cares about documenting this thing.

Ep. 2 at 20:33-21:22.

The second through fourth episodes of *MaM* describe Halbach's disappearance, Avery's arrest for and the law enforcement investigation of her killing, the interrogations and arrest of his nephew Brendan Dassey, and other pretrial developments. Here, the narrative shifts from a historical recounting to a present-tense depiction of events as they unfolded.

18

The documentary illustrates the differences of opinion in the community about Avery before his trial, from unidentified bar patrons agreeing with his framing theory, Ep. 3 at 14:09-15:30, to others expressing belief in his guilt—including his own brother, Chuck Avery, who says in a telephone interview, "I'm pretty positive in my head right now, in my mind, that he *did* do it." *Id.* at 41:49-53. *MaM* also includes excerpts from interviews with and news conferences held by law enforcement officials who proclaim Avery's guilt and denigrate the idea that he could have been framed. For example, Manitowoc County Undersheriff Robert Hermann says in an interview that "some of the evidence—the DNA evidence at the scene—it's impossible for us to have that type of evidence, you know, to plant. It's just—it's not realistic." *Id.* at 22:44-23:24.

Episodes 5-8 focus largely on the arguments and testimony at Avery's murder trial. *MaM* chronicles the defense theory that Colborn, Lenk and others in law enforcement planted evidence to frame Avery, as well as the prosecution's rebuttal of those claims and the testimonial, physical and forensic evidence presented to prove Avery's guilt. Condensing and summarizing 24 days of trial testimony in approximately three hours of screen time necessarily required omission of most of that testimony.

For example, Colborn's testimony regarding his call to the dispatcher about Halbach's license plate number—which takes up 11 pages of the trial transcript—was condensed to approximately three and one-half minutes in *MaM*. Ep. 5 at 53:17-56:45. *MaM* shows Colborn testifying that such calls are a routine part of policing; that he didn't remember making the call, but he believed it was to confirm information Weigert had provided about Halbach; and that he was not looking at Halbach's RAV4 when he made the call. *Id.*; *see also* Appendix at 8.[7]

---

[7] To facilitate the required comparison between the testimony and its portrayal in *MaM*, Netflix has attached an Appendix to this motion that provides the text from the official trial transcript side-by-side with a transcript of the testimony as it is shown in *MaM*.

Similarly, *MaM* includes more than 11 minutes of testimony regarding the RAV4 key found in Avery's bedroom—testimony that takes up more than 54 pages of trial transcripts over three days. Ep. 3 at 6:24-7:04; Ep. 7 at 3:38-9:29, 9:42-10:42, 12:03-13:52, 16:18-17:35. It includes Colborn's testimony that the key appeared after he twisted and pulled the bookcase and roughly jammed items back into it, Ep. 7 at 16:18-17:35, as well as Deputy Kucharski's testimony that the bookshelf "was pulled away, turned, searched, and it was reasonable that, while it was turned away, [the key] fell into that area" where it was found, *id.* at 9:00-09.

The documentary also includes a slightly condensed version of Sgt. Tyson's testimony about carefully watching Colborn and Lenk during an earlier search of Avery's trailer, including the fact that Tyson had never before been asked to supervise other officers during a search. *Id.* at 5:12-6:17. And *MaM* includes footage of Kratz telling reporters, "in this case, to suggest that these police officers planted evidence with nothing, that is, with not one shred, at least anything that I've seen that approaches evidence, I think is absolutely deplorable." *Id.* at 13:58-14:52.

*MaM* also includes footage of Buting and prosecutor Norm Gahn during a court-ordered inspection of the Avery rape case file, during which they examine the vial of Avery's blood, along with Buting's call immediately afterwards to Strang. Ep. 4 at 1:01:39-1:04:09. Buting tells his co-counsel that the review "could not have been better" because the seal of the box in which the vial was kept had been cut and there was a needle hole in the stopper of the vial. *Id.* It also includes later footage of a pretrial hearing in which an assistant Attorney General warned that, if Avery's defense team planned to argue the blood was planted, "they do so at their peril." Ep. 5 at 1:03-3:31. The documentary then recounts how the defense advanced its blood planting theory, *e.g.*, Ep. 4 at 32:35-33:05; Colborn's and Lenk's testimony denying it, Ep. 7 at 18:44-19:10,

32:52-33:06; prosecutors criticizing the defense theory, *e.g.*, *id.* at 44:38-45:34; and an FBI

chemist's testimony that the blood in the RAV4 did not come from the vial, *id.* at 42:11-44:36.

Episode 8 includes more than eight minutes of excerpts from both sides' closing

arguments, which consumed most of two days, shifting back and forth to show viewers key

assertions from each side. *MaM* depicts Buting, for example, arguing that planting evidence

> could be done by two officers. Really one officer, the one officer who keeps
> coming up. Lieutenant Lenk, whose name's on the evidence transmittal from the
> 1985 case just a couple years earlier. Lieutenant Lenk, who shows up on
> November fifth without logging in. Lieutenant Lenk, who finds the magic key.
> Lieutenant Lenk, who four months later—four months after Manitowoc no longer
> is needed—with no legitimate reason is back at that scene on March first. And
> what's found the next day? The magic bullet.

Ep. 8 at 6:09-52. The documentary immediately shows Kratz's response:

> This isn't just two guys. It's Jim Lenk and it's Andy Colborn. Their livelihood,
> their reputations, their families, everything in their 20 plus years of law
> enforcement are on the line when some lawyer accuses them of misconduct. Not
> just any misconduct, but planting evidence in a murder case. And this vial
> planting defense is absolutely ludicrous. We only had to call one witness who
> scientifically could tell you that there is absolutely no way that vial of blood was
> used to plant.

*Id.* at 6:53-7:26. The episode reaches its climax with footage of Judge Willis reading the jury's

verdict convicting Avery of murder. *Id.* at 26:02-27:46.

Episode 9 depicts Brendan Dassey's trial and conviction, as well as Avery's sentencing.

The final episode describes post-verdict developments, including the fact that Avery and Dassey

both lost their first rounds of appeals.

### G. This Lawsuit

Colborn filed this suit in the Circuit Court for Manitowoc County against Netflix and

seven other defendants on December 17, 2018. *See* Dkt. 1-1. He filed an Amended Complaint on

March 4, 2019, dropping all defendants except for Netflix, filmmakers Ricciardi and Demos, and their independent production company, Chrome Media LLC. Dkt. 1-2.

Defendants removed the action to this Court on April 3, 2019. Dkt. 1. Netflix then moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) for failure to plausibly plead the required element of actual malice. *See* Dkt. 30. Plaintiff opposed the motion to dismiss and moved for leave to file a Second Amended Complaint. *See* Dkts. 79, 84. This Court found that the Amended Complaint did not plausibly plead actual malice by Netflix, but denied its motion to dismiss, holding the SAC did adequately plead actual malice. *See* Dkt. 104.[8]

This motion is directed at the SAC, in which Colborn asserts that the documentary's presentation of three primary issues are actionable: Colborn's circa 1995 receipt of the Jail Call and his written report about it eight years later; the November 3 call Colborn made to a dispatcher checking the license plate number of Halbach's SUV; and the discovery of the key to the RAV4 in Avery's bedroom. SAC ¶¶ 23-45. In addition to these three claims, the SAC also alleges that MaM's selection and presentation of evidence and testimony created the false impression that Colborn was part of an effort to frame Avery.

***The Jail Call.*** The SAC alleges that the presentation of Colborn's testimony about the Jail Call "led viewers to falsely conclude that Plaintiff bears responsibility for seven or eight of Avery's 18 years of wrongful imprisonment, providing him with a motive to frame Avery for Halbach's murder." *Id.* ¶ 27. He further alleges that Glynn's reference to Sheriff Petersen's keeping Colborn's report in a safe was included to further this "false narrative." *Id.* ¶¶ 28-29.

---

[8] The remaining defendants moved to dismiss pursuant to Rule 12(b)(5) for insufficient service. *See* Dkt. 35. That motion remains pending. *See* Dkt. 115.

***The Call to Dispatch.*** The SAC alleges that *MaM* creates the wrong impression regarding Colborn's call to dispatch about Halbach's plate number by showing him affirmatively answering that he could understand how someone listening to the call might think he was looking at the SUV, when that question was objected to and his affirmative answer was to the follow-up question, "[t]his call sounded like hundreds of other license plate or registration checks you have done through dispatch before?" *Id.* ¶ 34. The SAC alleges that *MaM* "falsely conveyed to viewers that Plaintiff located Halbach's SUV somewhere other than at the salvage yard days earlier and likely assisted other law enforcement officers [sic] plant it there at a later time." *Id.* It additionally alleges that *MaM* "dramatically re-enacted the [blood] vial's 'discovery' in the Clerk's office" to "enhance the significance" of Colborn's alleged discovery of Halbach's car. *Id.* ¶ 40.

***The Key.*** The SAC further alleges that, "in order to maximize suspicion that the key was planted and minimize a plausible explanation for how it came to be found," Tyson's testimony was "spliced" by omitting his assertion that he "did not treat" his supervision of Lenk and Colborn "as if I was babysitting." *Id.* ¶ 44. Colborn also alleges that he was defamed by *MaM*'s failure to show a photograph of the bookcase with its particle board backing detached from the frame. *Id.*

***The Selection and Presentation of Materials.*** Finally, the SAC complains about the documentary's omission of certain derogatory information about Avery, as well as the documentary's presentation of testimony and interviews. SAC ¶¶ 46-48. It asserts that, had this negative information been included, "a reasonable viewer would have found Avery's guilt obvious and would not have concluded plaintiff and other law enforcement officers planted evidence to frame him." *Id.* ¶ 46.

## ARGUMENT

The first murder trial in the United States for which there is a formal record took place nearly 220 years ago. Elma Sands disappeared in Manhattan in December 1799 and her body was recovered in January 1800. *See* "People v. Weeks," Historical Soc'y of the N.Y. Courts, https://history.nycourts.gov/case/people-v-weeks/. The man who had been courting Sands, Levi Weeks, was charged with her murder but was acquitted after a jury trial. *Id.* The court reporter later published an account of the proceedings, which included a preface that explained his motivations for doing so:

> The public are at length presented with the Report of a Trial, which has awakened unusual solicitude among all classes of people. . . . The testimony of the principal witnesses is given in their own words, that the reader may better weigh their respective claims to belief. . . . In the perusal of the following sheets, it is hoped, something more may be found than the gratification of a temporary curiosity. The critical observer of manners, and the philosopher who makes the human heart his study, will, it is believed, be enabled from the picture here presented, to catch a glimpse of some features of real life.

WILLIAM COLEMAN, REPORT OF THE TRIAL OF LEVI WEEKS (1800).[9]

These goals are precisely the same as those that have inspired widespread reporting throughout American history on other trials that likewise have "awakened unusual solicitude." The defendants in many of these cases remain well known to the public: Sacco and Vanzetti, Leopold and Loeb, Manson, von Bulow, Peltier, and Simpson, to name a few. The resulting publications about these trials are equally familiar and, not surprisingly, several of them gave rise to libel claims by trial participants.

*Making a Murderer*'s detailed, unflinching examination of Avery's life, culminating in his conviction for Halbach's murder, is part of this venerable American tradition. The case gained national attention in large part because Avery had previously been exonerated after

---

[9] *See* http://memory.loc.gov/service/gdc/scd0001/2005/20051214001re/20051214001re.pdf.

serving 18 years in prison for a crime he did not commit. Like other well-chronicled judicial proceedings, it has inspired published works by both participants and outside observers, including three books by Colborn's own counsel.[10] Like those other cases, *MaM*'s examination of Avery's case has now given rise to a defamation lawsuit by one of the key witnesses. And, most significantly, like those other cases, *MaM* has contributed to precisely the kind of informed public discourse that sits at the heart of the First Amendment's protections: conversations, discussions, and debates over questions the documentary raised but ultimately did not—and could not—answer, including whether the jury's verdict was correct.[11]

As courts universally recognize, First Amendment protections are especially important in this type of "true crime" defamation case:

> [T]he Constitution requires that we permit the people to be fully informed about the operations of government, including the operation of the judicial branch. It also requires that we tolerate individual expressions of opinion, hostile or otherwise, regarding the performance of those who carry out all aspects of our governmental functions.

*Partington v. Bugliosi*, 56 F.3d 1147, 1159-60 (9th Cir. 1995) (citations omitted).

The First Circuit reiterated these constitutional principles in *Riley v. Harr*, arguably still the leading "true crime" defamation case. That suit concerned the best-selling book *A Civil Action*, which provided "an account of toxic tort litigation over contaminated well water in Woburn, Massachusetts, that allegedly caused the death of several children." 292 F.3d 282, 286 (1st Cir. 2002). John Riley Jr., the owner of a tannery that was the alleged source of some of the pollution, sued the book's author and publisher for, *inter alia*, defamation and intentional

---

[10] The books are UNREASONABLE INFERENCES (2010), THE INNOCENT KILLER (2014), and INDEFENSIBLE (2016).

[11] *See, e.g.*, Dkt. 85-2 (*New York Times* article stating that, after *MaM*, Avery's "case was debated and discussed in various media outlets, turning many viewers into amateur sleuths"); *see also* SAC ¶¶ 15, 51 (referring to online petition with 2,967 "signatures" asking Netflix to remove *MaM*).

infliction of emotional distress. *Id.* at 287-88. Defendants moved to dismiss or, in the alternative, for summary judgment, and the district court granted that motion, rejecting Riley's claims as to all of the challenged statements. *Id.* at 288.

On appeal, the First Circuit recognized that *A Civil Action* "is by no means uncritical" of the toxic tort plaintiffs' theory of the case, noting in particular that the book highlights those plaintiffs' "failure to find direct proof of dumping by the tannery, Riley's steadfast denials of [their] allegations, the conflicting views of experts on each side of the case, and the 1986 jury verdict in federal district court which *rejected* the plaintiffs' claims against the tannery." *Id.* at 287 (emphasis added). The court further explained that "the subject of *A Civil Action*—a controversial lawsuit and the disputed events underlying it—is one about which there could easily be a number of varying rational interpretations, and that in writing about such inherently ambiguous subjects, an author who fairly describes the general events involved and offers his personal perspective about some of the ambiguities and disputed facts should not be subject to a defamation action." *Id.* at 290 (citation, internal marks and alterations omitted). "Otherwise," the court emphasized, "authors would hesitate to venture beyond dry, colorless descriptions of facts, bereft of analysis or insight, and the threat of defamation lawsuits would discourage expressions of opinion by commentators, experts in a field, figures closely involved in a public controversy, or others whose perspectives might be of interest to the public." *Id.* at 290-91 (internal marks omitted).

The court then turned to the specific portions of the book that Riley challenged, including portions allegedly suggesting he was a liar. As the court explained, the statement that "Riley had lied" and variations thereof were protected by the First Amendment because they either were "a subjective view, an interpretation, a theory, conjecture, or surmise," or were conclusions based

on truthful information disclosed to readers such that they "might draw contrary conclusions" on their own. *Id.* at 292 (quoting, *inter alia, Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).

Most recently, in *Peterson v. Grisham*, the Tenth Circuit applied the principles articulated in *Partington* and *Riley* through the lens of modern federal pleading standards. The case arose after two individuals, Ronald Williamson and Dennis Fritz, were exonerated by DNA evidence after spending more than a decade in prison for a rape and murder they did not commit. 594 F.3d 723, 725 (10th Cir. 2010). Fritz and author John Grisham each wrote books about the case. *Id.* at 726. Three law enforcement officials who worked on the wrongful prosecutions—a district attorney, a police officer, and a criminologist—responded by bringing claims for defamation and related torts against Grisham and Fritz, among others. *Id.*

The district court granted defendants' motion to dismiss these claims under Rule 12(b)(6), and the Tenth Circuit affirmed. Following *Partington* and *Riley*, the court held that the book did not reasonably imply anything libelous about the plaintiffs, as their claim alleged. *Id.* at 729. The court explained that, while it reached this conclusion based on state libel law, "allowing the plaintiffs to recover would offend the spirit of the First Amendment" as well, because "[t]o the extent [defendants'] perceptions of the affair were erroneous, we depend on the marketplace of ideas—not the whim of the bench—to correct insidious opinions." *Id.* at 729 n.7.

These and other "true crime" libel cases have established several overarching principles of First Amendment doctrine and modern defamation law:

**First**, the only statements that can give rise to defamation claims are assertions of fact, not subjective expressions of opinion or conclusions based on disclosed facts. *See Terry*, 840 N.W.2d at 263 ("[A] statement in the form of an opinion . . . is actionable only if it implies the

allegation of undisclosed defamatory facts as the basis for the opinion." (citing RESTATEMENT (SECOND) OF TORTS § 566)); *Marjala v. Fox News Network LLC*, 2017 WI App 7, 895 N.W.2d 103 (Wis. Ct. App. 2017) (same).

**Second**, for a statement of fact to be actionable, it must be false. *See Nat'l Assoc. of Letter Carriers v. Austin*, 418 U.S. 264, 283 (1974) ("The *sine qua non* of recovery for defamation . . . is the existence of a falsehood."); *Terry*, 840 N.W.2d at 264-65 (same). Further, because the "law of libel . . . overlooks minor inaccuracies," technical falsity alone will not suffice. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991). Rather, an actionable statement must be *materially* false—that is, it must "have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* Put differently, "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting" of the challenged statement is accurate. *Id.* (internal marks and citation omitted).

This requirement of defamation law, referred to as "substantial truth" or, on the flip side, "material falsity," gives rise to an important principle when addressing a libel claim where, as here, the plaintiff alleges that he has been defamed by alterations to or editing of his own statements. As the Supreme Court held in *Masson*, such editing is *not* actionable unless the process causes a *material* change in the meaning of the plaintiff's statements. 501 U.S. at 515-17. In *Masson,* the defendant allegedly engaged in the practice of "quoting" things the plaintiff *did not even say*, as opposed to what Defendants did here: exercise editorial discretion in condensing a 30-year saga into a 10-hour documentary.

The Supreme Court imposed the "material change in meaning" requirement because it recognized that, as a practical matter, reporters and editors *must* excerpt the words spoken or written by the persons and other source material they quote for reasons of space, clarity, and

context. *See id.* at 515 ("Even if a journalist has tape-recorded the spoken statement of a public figure, the full and exact statement will be reported in only rare circumstances" because of the "practical necessity to edit"). Thus, the Court concluded, "if every [such] alteration constituted [material falsity], the practice of journalism, which the First Amendment standard is designed to protect, would require a radical change, one inconsistent with our precedents and First Amendment principles." *Id.* at 514-15. The practical importance of this editorial function is particularly acute where, as here, documentarians chronicling a trial are attempting to summarize a voluminous legal record for the general public. Thus, a libel claim arising out of a defendant's distillation of a plaintiff's own statements can survive a motion to dismiss only where the edited quotes "would have a different effect on the mind" of the viewer than what the plaintiff actually said. *Id.* at 517; *Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852 (2014) (reaffirming *Masson*).

**Third**, a materially false statement of fact is not actionable unless it is reasonably capable of conveying a meaning that is defamatory. *Terry*, 840 N.W.2d at 264-65. Courts are obliged to make this determination as a threshold matter and, in so doing, must construe the challenged statements "in the plain and popular sense in which they would naturally be understood," and in "[t]he context and circumstances in which the statements were made." *Id.* at 265 (citations omitted). A statement is defamatory only if it "tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." *Starobin v. Northridge Lakes Dev. Co.*, 287 N.W.2d 747, 751 (Wis. 1980).

**Fourth**, even a materially false and defamatory statement of fact about a plaintiff is not actionable if that statement is a fair and accurate report of a court record or proceeding. As Wisconsin courts have recognized for more than a century, this common-law "fair report"

privilege protects from liability the "publication of a fair, correct, and good-faith report of a judicial . . . proceeding," even where that report contains an otherwise-actionable false statement. *Ilsley v. Sentinel Co.*, 113 N.W. 425, 426 (Wis. 1907). Wisconsin's "fair report" privilege is buttressed by the First Amendment itself. *See Cohn*, 420 U.S. at 496-97; RESTATEMENT (SECOND) OF TORTS § 611 cmt. b ("If the report of a public official proceeding is accurate or a fair abridgment, an action cannot constitutionally be maintained . . . .").

**Fifth**, a materially false, unprivileged, and defamatory statement of fact cannot give rise to a viable claim if it is not "of and concerning," or about, the plaintiff himself. This requirement arises from both the common law and the Constitution: in *New York Times Co. v. Sullivan*, for instance, the Supreme Court found the judgment on appeal to be "constitutionally defective" because plaintiff—an Alabama police supervisor—could not show that the challenged statements were about him as opposed to the police department itself. 376 U.S. 254, 288-90 (1964); *see also Rosenblatt v. Baer*, 383 U.S. 75, 80-83 (1966) (same).

**Sixth**, even if a challenged statement is otherwise actionable, it is nevertheless protected by the First Amendment if it merely "implies the same view" as an alleged *overarching* meaning of the challenged work as a whole that is itself non-actionable. *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F. Supp. 589, 595 (S.D.N.Y. 1996), *aff'd*, 238 F.3d 168 (2d Cir. 2001). Under this "subsidiary meaning" doctrine, "where a maliciously false statement implies the same ultimate conclusion as that of the remainder of the publication [which is non-actionable], a plaintiff cannot 'base his defamation action solely on inaccuracies contained within statements subsidiary to these larger views.'" *Id.* at 594 (quoting *Herbert v. Lando*, 781 F.2d 298, 311 (2d Cir. 1986)); *see Desnick v. ABC, Inc.*, No. 93 C 6534, 1999 U.S. Dist. LEXIS 994, at *19 (N.D.

30

Ill. Jan. 29, 1999) (applying subsidiary meaning doctrine), *aff'd on other grounds,* 223 F.3d 514

(7th Cir. 2000).

These principles operate together such that a viable defamation claim can arise **only** from

an (1) unprivileged (2) statement of fact that is (3) materially false and (4) defamatory (5) of the

plaintiff that (6) is not merely subsidiary to the non-actionable alleged meaning of the challenged

work as a whole. None of the aspects of *MaM* that the SAC places at issue satisfies all those

conditions. As explained below, the application of these requirements to this case shows that

Colborn has failed to state a claim for defamation or any other tort as a matter of law.

## I.      Colborn's Defamation Claim Fails As A Matter Of Law

The overarching theory of defamation pleaded in the SAC is that *MaM* falsely implies

that Colborn framed or assisted in framing Avery for murder. The SAC breaks this overarching

theory down into four specific sub-parts: (1) the Jail Call, SAC ¶ 27; (2) the discovery of

Halbach's RAV4 at the Avery salvage yard, *id.* ¶ 37; (3) the RAV4 ignition key found in

Avery's bedroom, *id.* ¶ 41; and (4) the selection and presentation of materials, *id.* ¶ 46.

As in *Partington*, *Riley*, and *Grisham*, however, none of these challenged statements and

alleged omissions satisfy the requirements for a defamation claim—or any other tort claim—

because they are either substantially true statements of fact, non-actionable conclusions based on

disclosed facts, not defamatory of Colborn, and/or privileged under the common law and the

First Amendment as fair reports of judicial proceedings and records.  And, in any event, the

Court need not even examine the four subparts because these alleged inaccuracies (which

collectively comprise fewer than 13 minutes of a 10-hour series) do not change the gist or sting

of the documentary construed as a whole: Avery's attorneys were *unsuccessful* in presenting a

defense at trial and on appeal that Colborn and others in law enforcement framed him. Because

the four subparts advance that same nonactionable gist or sting, they cannot, as a matter of law, give rise to a viable claim, whether viewed individually or as part of the whole.

A. **Reasonable Viewers Would Not Understand *MaM* To Convey An Assertion *By Defendants* That Colborn Framed Avery.**

Where, as here, challenged statements consist of substantially accurate reporting about allegations made by litigants during trials, defamation claims cannot arise as a matter of law. The following is not and cannot be disputed:

- Avery's principal defense in his murder trial was that the Manitowoc County Sheriff's Office framed him for Halbach's murder. *See, e.g.*, SAC ¶ 33.

- Any accurate account of Avery's trial necessarily must include the fact that this "framing" theory was a central pillar of the defense's case.

- In finding beyond a reasonable doubt that Avery was guilty of Halbach's murder, the Manitowoc County jury *rejected* this "framing" theory.

- By reporting on this guilty verdict and the subsequent denial of Avery's appeals, *MaM* made clear to viewers that jurors squarely rejected Avery's "framing" theory and that he remains convicted and in prison.

- Far from resolving for viewers whether the jury got it right, MaM served only to open up a debate with strong views on all sides. *See* note 16 *supra*.

Despite all this, the SAC claims that *MaM* amounts to an affirmative (albeit implicit) declaration *by Defendants themselves* that Colborn framed or helped frame Avery for Halbach's murder. That claim cannot survive a motion to dismiss because, as a threshold matter of law, reasonable viewers would not understand *MaM* to represent an assertion *by Defendants* that Colborn framed or assisted in framing Avery. As defendant Demos explained in an article cited in the SAC itself, "[t]here's a lot of ambiguity, and we were trying to get people to embrace that." Dkt. 85-2 at 2.

The law in this Circuit, as in others, supports the conclusion that *MaM*'s reporting about the Avery defense team's "framing" theory is not reasonably susceptible of the false, defamatory meaning that Avery was in fact framed. In *Global Relief Foundation, Inc. v. New York Times*

32

*Co.*, for example, the Seventh Circuit affirmed dismissal of defamation claims over news reports that the plaintiff was being investigated for links to terrorism, rejecting plaintiff's "argument that these media defendants must be able to prove the truth of the government's charges before reporting on the investigation." 390 F.3d 973, 987 (7th Cir. 2004). Similarly, in *Janklow v. Newsweek, Inc.*, the Eighth Circuit affirmed dismissal of a libel claim by the then-governor of South Dakota, holding that the challenged report of the "historical fact" of a past rape allegation did not mean the magazine "espoused the validity" of that accusation. 759 F.2d 644, 649 (8th Cir. 1985), *on reh'g en banc*, 788 F.2d 1300, 1301 n.2 (1986) (noting panel's holding in this regard was undisturbed). In *Croce v. New York Times Co.*, the Sixth Circuit affirmed dismissal of defamation claims arising out of a newspaper article, holding that the report did not communicate that plaintiff had *in fact* behaved improperly, but rather that it was "a standard piece of investigative journalism that presents newsworthy allegations made by others, with appropriate qualifying language." 930 F.3d 787, 793 (6th Cir. 2019). And, most recently, in *Fairfax v. CBS Broadcasting Inc.*, No. 1:19-cv-11176 (E.D. Va. Feb. 11, 2020) (Ex. 25), another federal court dismissed a libel claim brought by Virginia Lt. Gov. Justin Fairfax arising out of CBS's interviews with two women who accused him of sexually assaulting them. The court granted the network's motion to dismiss because the broadcast interviews did "not sufficiently imply that the accusations are true or accurate or that CBS endorsed the veracity of Fairfax's accusers." *Id.* at 18. In reaching this conclusion, the court noted that CBS's journalists did not report either that Fairfax in fact committed assault or that they believed he did so, and that the broadcasts included "Fairfax's assertions of innocence." *Id.* at 16.

The decisions in *Partington*, *Riley*, and *Grisham* discussed above apply this principle as well. In each of those cases, the federal appeals courts recognized that defamation claims cannot

arise as a matter of law from substantially accurate reporting about the allegations made by litigants during trials. The decision in *Riley* is particularly instructive: as the First Circuit explained, Riley could not establish that *A Civil Action* defamed him in its reporting on plaintiffs' theory that he had dumped toxic chemicals, in part because the book *expressly noted* that a jury rejected that theory with its verdict. *See* 292 F.3d at 286.

Here, *MaM* informed viewers that the defense's "framing" theory has been repeatedly and consistently rejected (as well as including detailed refutations of the theory by prosecutors and witnesses), such that reasonable viewers could not reasonably understand *MaM* to endorse the conclusion that the "framing" theory is in fact true. Colborn's defamation claim thus fails as a matter of law.

### B. Any Overall Implication Conveyed By *MaM* That Colborn Framed Avery Would Be A Non-Actionable Conclusion Based On Fully Disclosed Facts.

Even if *MaM* did imply that Colborn framed or helped to frame Avery—and it did not— any such implication cannot give rise to a libel claim because it would constitute a nonactionable opinion based on fully disclosed true or privileged facts. Under the First Amendment, "opinions on a matter of public interest based on true, disclosed facts" cannot give rise to a defamation claim. *Marjala*, 2017 WI App 7, ¶ 23. Courts have consistently applied that rule to protect publications that offer conclusions based on the speaker's interpretation of disclosed true or privileged facts. *See, e.g.*, *Stevens v. Tillman*, 855 F.2d 394, 400 (7th Cir. 1988) ("When . . . an opinion discloses the defamatory facts (or refers to facts in the public record), it is not actionable apart from those facts.").[12]

---

[12] *See also Action Repair, Inc. v. ABC, Inc.*, 776 F.2d 143, 146 (7th Cir. 1985) ("[A] defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact."); *Partington*, 56 F.3d at 1156 ("even if [defendant] had explicitly written what [plaintiff] contends his statements imply, the statements would be protected since,

Here, the indisputable facts *MaM* discloses to viewers, discussed *supra* at pp. 18-23, — alongside others that lend support to Colborn's claims of clean hands—allow viewers to draw their own conclusions, as evidenced by what Demos referred to as the "cacophony of responses to the series, all these different voices." Dkt. 85-2 at 4. To the extent that viewers understand *MaM* to convey the implication that Colborn framed or helped frame Avery, therefore, that implication is protected by the First Amendment and is nonactionable as a matter of law because it is "a subjective view, an interpretation, a theory, conjecture, or surmise," a conclusion based on these and other fully disclosed facts from which viewers "might draw contrary conclusions." *Riley*, 292 F.3d at 292; *accord Partington*, 56 F.3d at 1156. *MaM* discloses to viewers indisputable facts demonstrating that the Manitowoc County Sheriff's Office had means, motive, and opportunity to frame Avery for the Halbach murder. Even if reasonable viewers would infer from *MaM* the implication that the Sheriff's Office *did in fact* frame Avery, therefore, that implication would constitute a constitutionally protected opinion based on those disclosed facts.

### C. The Specific Challenged Passages Of *MaM* Are Not Actionable Under The Subsidiary Meaning Doctrine.

As explained above, this defamation claim fails because (1) *MaM* does not reasonably imply that Colborn in fact famed Avery; and (2) even if *MaM* did reasonably convey that implication, the First Amendment fully protects it as an opinion based on disclosed facts. Either of those two conclusions forecloses Colborn's claim not only as to *MaM* as a whole, but also as to the particular passages that Colborn challenges in the SAC. That is because, under the First Amendment's "subsidiary meaning" doctrine, if a court determines that the alleged overarching

---

read in context, they are not statements implying the assertion of objective facts but are instead interpretations of the facts available to both the writer and the reader.").

defamatory meaning of a challenged work is not actionable, subsidiary challenged statements that "merely impl[y] the same view" also must be dismissed, even if they are both provably false and otherwise defamatory. *Church of Scientology*, 932 F. Supp. at 595.

In *Church of Scientology*, for example, the court dismissed such subsidiary claims after determining that a publication's primary contention—*i.e.*, that the challenged article had falsely alleged "that Scientology's purpose is making money by means legitimate and illegitimate"— was itself non-actionable. *Id*. The court so held even though it concluded that one of the challenged statements otherwise presented a fact issue as to both defamation and actual malice. *Id*. Because that specific statement "merely implie[d] the same view which [the court had] held to be nonactionable," claims based on it were properly subject to dismissal. *Id*.

The SAC's allegations lead to this same conclusion. Colborn's overall contention—that *MaM* falsely accused him of framing Avery—is nonactionable for all of the reasons discussed *supra*. Whether or not *MaM* inaccurately portrayed some details regarding the Jail Call, the "call in" of Halbach's license plate, or the discovery of the RAV4 key, as Colborn alleges, is immaterial under the subsidiary meaning doctrine because, even according to the SAC, those passages imply the same non-actionable meaning that *MaM* allegedly conveys as a whole.

While the Court thus need not evaluate each of the specific passages of *MaM* that the SAC challenges to conclude that it should be dismissed with prejudice, the following section nevertheless explains why, as a matter of law, those challenged passages are not actionable.

### D. Colborn's Specific Challenges To *MaM* Fail To State A Claim For Libel.

Libel law requires this Court to view challenged statements in context and as part of the challenged publication as a whole. When viewed in this manner, none of the discrete passages of *MaM* that Colborn specifically challenges in the SAC can give rise to a viable defamation claim.

**i.   Colborn fails to state a claim as to passages about the Jail Call.**

First, Colborn claims that Defendants "strategically spliced and omitted portions of [his] trial testimony . . . to distort the facts and nature of the [Jail Call]." SAC ¶ 27. But as the Court can see for itself from the transcript provided in the Appendix, the minor edits to Colborn's trial testimony regarding the Jail Call did not create *any* change in the meaning of that testimony, let alone a *material* change as required to establish falsity as a matter of law under *Masson*. *See also* SAC Ex. B at 4-6, 8-9. All that is removed is the kind of irrelevancy, circumlocution and repetition that is common both in trial testimony and in ordinary conversation. *E.g.*, *id.* at 5 (showing after Colborn testified he transferred the call to a detective, *MaM* omitted that he added, "to the Detective Division at the Manitowoc County Sheriff's Department. That's the extent of my testimony."); *see also Masson*, 501 U.S. at 515 (noting "the practical necessity to edit and make intelligible a speaker's perhaps rambling comments").

The raw testimony and the edited version that appears in *MaM* convey exactly the same information: while Avery was incarcerated, Colborn received a call from someone identifying himself as a detective; the detective indicated that someone in custody in his jurisdiction may have committed an assault in Manitowoc County for which another man was wrongly imprisoned; Colborn transferred the call to a Manitowoc County detective; Colborn testified he was unsure that the call related to Avery; and Colborn did not memorialize the call until *after* Avery was exonerated. *Id.*; *see also supra* pp. 8-11. The mere fact that *MaM* provides viewers with a condensed version of this testimony cannot itself give rise to a libel claim. *See CBS v. DNC*, 412 U.S. 94, 124 (1973) ("editing is what editors are for; and editing is selection and choice of material"); *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 563 (5th Cir. 1997) ("It is common knowledge that television programs . . . edit the tape they collect down to a

brief piece."). Indeed, because *MaM*'s reporting of Colborn's testimony about the Jail Call accurately summarized that testimony, those challenged sections of *MaM* are both true and privileged from liability as a fair report of judicial proceedings. *Ilsley*, 113 N.W. at 426.

Second, the SAC complains that *MaM* quoted one of Avery's attorneys as stating that Colborn's report about the Jail Call "was kept hidden in a Sheriff's department safe in 2003 . . . when in fact the statement had been delivered to the attorney general promptly after it was prepared." SAC ¶ 28. However, that statement is true, as reflected in a Wisconsin Department of Justice Case Activity Report of which this Court can take judicial notice. *See* Ex. 21 at 1-2 (identifying Colborn's report about the Jail Call among "the documents which were being maintained in a safe in the office of Sheriff Petersen").[13] And, *MaM* does not reasonably convey the meaning Colborn ascribes to it; as noted *supra*, in *MaM*, Glynn merely says that the sheriff kept Colborn's report in a safe, not that the report was withheld or hidden.[14] And even if it were *not* true, Colborn cannot show that this statement was defamatory of *him*. It says nothing derogatory *about Colborn* to report that his superior officer chose to keep his report under lock and key. *See Crosby v. Time, Inc.*, 254 F.2d 927, 929 (7th Cir. 1958).

### ii. Colborn fails to state a claim as to passages about the Dispatch Call

*MaM* showed viewers testimony establishing that Colborn "called in" the license plate number of Halbach's RAV4 to dispatch before it was found at the Avery salvage yard; that Colborn denied he was looking at the vehicle when he made the call; that Avery stated during an

---

[13] It is well settled that a court need not accept as true allegations in a complaint that are contradicted either by documents incorporated in the pleading itself or by records subject to judicial notice. *See, e.g.*, *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013); *Radivojevic v. Daley*, 12 F. App'x 391, 392 (7th Cir. 2001).

[14] *See also* Ex. 20 at 232 (Colborn's counsel discussing the "affidavit hidden in the sheriff's safe").

interrogation that he heard the SUV had been placed on his property by an unnamed police officer; and that the Manitowoc County Sheriff's Office had access to a vial of Avery's blood at the time the SUV was found, stained with blood matching Avery's DNA. Colborn claims these passages are actionable because (1) viewers saw an edited version of his trial testimony about the license plate; (2) Colborn's picture was shown after *MaM* recounted Avery's statement to the police; and (3) Colborn has an alternative explanation for why the stopper on the vial of Avery's blood appeared to have been punctured by a needle. SAC ¶¶ 34, 39-40. These allegations do not suffice to state a claim for defamation as a matter of law.

First, the SAC complains that *MaM* edited his trial testimony regarding the call to dispatch such that it "gave to viewers the exact opposite impression of what [he] was asked and how he responded at trial." SAC ¶ 34. In particular, the SAC challenges an edit that Colborn asserts made it appear he had answered in the affirmative when asked whether he "can understand how someone listening to [his call to dispatch] might think that [he] was calling in a license plate that [he] was looking at on the back end of a 1999 Toyota." *Id.* It alleges that he did not actually answer that question because it drew a successful objection from the prosecution. *Id.*

Simply put, the edit does not, by any stretch of the imagination, create a "material change in [the] meaning" of Colborn's testimony—indeed, it does not change the meaning at all. At trial, Colborn was asked whether "road patrol officers" would "call into dispatch and give the dispatcher the license plate number of a car they have stopped, or a car that looks out of place for some reason," to which he replied, "Yes, sir." *See supra* at 16; *see also* SAC Ex. B at 10. Colborn likewise answered in the affirmative when asked whether the dispatcher "can get information about . . . to whom a license plate is registered," and whether, "[i]f the car is abandoned or there's nobody in the car, the registration tells you who the owner presumably is."

*Id.* Colborn then confirmed that he had called in license plate number SWH-582 to his dispatcher, and that upon hearing the car was registered to Halbach, he asked the dispatcher to verify that the vehicle in question was a "[19]99 Toyota," which the dispatcher confirmed. *Id.* at 10-11. Colborn also answered in the affirmative when asked whether his call "sounded like hundreds of other license plate or registration checks that [he] had done through dispatch before." SAC ¶ 34. The "gist" or "sting" of this line of testimony is that Colborn conceded on cross-examination that the audio recording of his calling in of Halbach's license plate number would have appeared essentially identical to an outside observer if he had been looking at her SUV at the time he placed that call. The edit merely distilled that concession down from a line of questioning into a single question-and-answer. Accordingly, it cannot give rise to a defamation claim as a matter of law. *Masson*, 501 U.S. at 515-17.

Second, Colborn cannot base a claim on *MaM*'s reporting of Avery's statement to a police interrogator that Avery had heard a law enforcement officer left Halbach's SUV on his property even though, after reporting this statement, "[t]he scene then cuts immediately to a visual of [Colborn] about to testify in Court." SAC ¶ 39. As Colborn concedes, "[a] central part of Avery's defense at trial was that [Colborn] and other Manitowoc officers planted Halbach's SUV at the Avery Salvage Yard." *Id.* ¶ 33. Reporting Avery's allegation *in an interrogation by police* that the SUV was planted and showing Colborn's image afterwards did not reasonably convey to viewers that the allegation is in fact true—it was merely a restatement and illustration of one of the defense's theories of the case, which cannot give rise to a libel claim as a matter of law under *Partington*, *Harr*, and *Grisham*.

Third, Colborn does not allege that *MaM* included *any* false statements of fact regarding the vial of Avery's blood in the Manitowoc County court clerk's office, including that the

stopper of the vial appeared to have been punctured by a needle. Colborn merely offers his own conclusory assertion that "a hole in a blood vial's rubber stopper is not indicative of evidence tampering" because such a hole could have been made during the process of taking and storing the specimen in the first place, rather than during a subsequent extraction. SAC ¶ 40. Moreover, Colborn cannot dispute that *MaM* reported that an FBI-administered test on the blood found in Halbach's SUV could not detect the presence of EDTA, a chemical additive present in the stored vial of Avery's blood, which, if detected, would have advanced the "framing" theory. *See* Ep. 7 at 39:52-44:36. In this way, *MaM* accurately reported about the bloodstains, such that viewers were free to (and did) draw their own conclusions about the probative value of such evidence.

### iii. Colborn fails to state a claim as to passages about the key.

*MaM*'s reporting about the key to Halbach's SUV cannot give rise to a defamation claim as a matter of law. The SAC focuses on two aspects of this reporting: (1) *MaM* edited the trial testimony of the Calumet County officer who supervised Lenk and Colborn in an earlier search; and (2) Colborn and others "offered a reasonable explanation" at trial "as to how the key was missed on the earlier search and miscellaneous entries." SAC ¶¶ 43-44.

First, the alleged edit to the officer's testimony did not result in the kind of "material change in meaning" necessary to create actionable falsity under *Masson*. At trial, the Calumet County officer testified that he had been told "that no Manitowoc County deputy should be alone on the property." He was first asked whether he ever "had to act like a babysitter, or a watchdog, for the other officers who were conducting a search," to which he responded that he "did not treat this as if [he] was babysitting." SAC ¶ 44. He was immediately thereafter asked whether, "in any of [his] years as an officer, [he] had to watch the officers who were searching where you were, to make sure that they weren't alone," to which the officer answered "no." Tr. 7 at 23:6-

26:19; Ep. 7 at 4:19-6:00. *MaM* condensed that two-question series to a single question and answer, such that the officer answered "no" to the first question. Whether Tyson was watching or babysitting the Manitowoc deputies is a question of semantics, not defamation. *See Simonson v. United Press Int'l, Inc.*, 500 F. Supp. 1261, 1266 (E.D. Wis. 1980) (declining to engage in an "endless game of semantics" over reports that were substantially true). Because the meaning of the officer's testimony was not materially changed, *Masson* requires the conclusion that this condensation cannot give rise to a defamation claim as a matter of law.

Second, Colborn's assertion that he and others "offered a reasonable explanation" at trial for how the key was found actually illustrates why this aspect of *MaM* is *not* actionable. *MaM included* Colborn's testimony that the key appeared after he had been rough with a bookcase in Avery's bedroom, "twisting it, shaking it, pulling it." Ep. 7 at 16:33-48. *MaM* also disclosed to viewers Deputy Kucharski's testimony that it was reasonable to believe the key fell out of the bookcase as Colborn maneuvered it. *Id.* at 9:00-09. And *MaM* also conveyed the uncontested fact that Lenk found the key only after multiple searches failed to do so. Viewers were thus empowered to (and, again, did) draw their own conclusions about the probative value of the key—precisely as the First Amendment intends.[15]

### iv. Colborn fails to state a claim based on "omitted" details

The SAC also alleges that *MaM* omitted certain facts in an effort to "lead viewers to falsely conclude that plaintiff and others framed Avery for Halbach's murder." SAC ¶ 46; *see also id.* ¶¶ 20, 27, 36. It further asserts that this omission of information made "[t]he words

---

[15] *See also* Ex. 26 (Griesbach explaining "it's impossible to know with 100 percent certainty" if the key was planted).

expressly used in the broadcasts . . . more defamatory to Plaintiff." *Id.* ¶ 59(c). This argument fails for multiple reasons.

**First,** much of the SAC's allegations concerning "omitted" information centers on evidence it says *MaM* omitted about Avery's past and his actions surrounding Halbach's death. SAC ¶¶ 46-47. Had *MaM* included particular details about Avery, the SAC alleges, "a reasonable viewer would have found Avery's guilt obvious," and, as a result, this reasonable viewer "would not have concluded that plaintiff and other law enforcement officers planted evidence to frame him." *Id.* The fundamental fallacy of this argument is obvious: To the extent they are actionable at all, omissions of facts *about Avery* cannot defame Colborn. Defamation is personal; a plaintiff cannot recover for a statement made about someone else, even if that statement indirectly harms the plaintiff. *Barlass v. City of Janesville*, No. 10-cv-454-slc, 2011 U.S. Dist. LEXIS 165826, at *36 (W.D. Wis. Nov. 28, 2011), *aff'd*, 483 F. App'x 281 (7th Cir. 2012).

More significantly, the SAC relies on a false dichotomy. Whether or not Avery is guilty says nothing about whether Colborn and his colleagues planted evidence. As Avery's defense attorney expressly argued, "[i]f and when police officers plant evidence, they are not doing it to frame an innocent man. They're doing it because they believe the man guilty." Ep. 8 at 8:35-8:56. And as the prosecution responded, "[i]f you buy [the defense's] argument that they were trying to make sure that a guilty person was found guilty, then assigning accountability to the murder for Teresa Halbach shouldn't matter whether or not the key was planted." *Id.* 8:56-9:39. In short, it can be true *both* that Avery murdered Halbach *and* that Colborn planted evidence.[16]

---

[16] The SAC further alleges that *MaM* "distorted the nature" of Avery's past crimes and arrests. *See* SAC at ¶ 47. Not only does *MaM*, as discussed *supra* at pp. 18-23, include much of this information, but the SAC also neglects to mention that the judge at Avery's murder trial *excluded* all of the prior bad acts evidence the SAC references. *See* Ex. 27, at 4-11, 12-15.

**Second**, *MaM* likewise (and of necessity) omitted significant information and evidence favorable to Avery, including the facts that eight unidentified fingerprints were found on Halbach's RAV4, Tr. 23 at 151:3-152:11; that one of Avery's nephews testified his family had three burn barrels, but authorities found four, including the one that contained Halbach's remains, *id.* at 147:21-148:13; and that although authorities found in the burn pit several rivets believed to be from the jeans Halbach was wearing when she disappeared, they did not find the metal button closing the waist of the jeans, *id.* at 137:6-20.

**Third,** the SAC falsely alleges that *MaM* excluded information that it actually includes:

Trial Testimony: The SAC alleges that the filmmakers "spliced and omitted portions of Plaintiff's trial testimony . . . to distort the facts and nature of the 1994 or 1995 telephone call." SAC ¶ 27; SAC Ex. B, at 47-48. Yet Episodes 2 and 7 include several minutes of Colborn's own deposition and trial testimony that make the very assertions about this call that the SAC alleges were omitted. *Compare* SAC ¶¶ 24-26 with Ep. 2 at 18:30:15-19:43, Ep. 7 at 22:55-24:15.

Call to Dispatch: The SAC alleges *MaM* edited his response to the question of whether someone could have believed he was looking at Halbach's car during the call. SAC ¶ 34. But, although the SAC claims this edit conveyed the "exact opposite impression" of his unedited testimony, *MaM* includes, immediately after the challenged passage, Colborn's denial that he had located the vehicle when he placed the call. Ep. 5 at 56:21-56:45.

Phlebotomist Testimony: The SAC alleges the filmmakers knew that a phlebotomist "was prepared to testify" that the hole in the stopper of the blood vial in Avery's case file was caused by the needle used to take the sample. SAC ¶ 40. Setting aside the fact that the phlebotomist did

---

Excluding such details about Avery, which were themselves excluded from Avery's trial, cannot and does not defame Colborn as a matter of law.

not actually testify, *MaM* includes extensive trial testimony from the FBI's Chemistry Unit Chief, who asserted that Avery's blood found in Halbach's car could not have come from the evidence vial. *See* Ep. 7 at 42:12-44:23, 47:26-50:33.

Burn Barrel: The SAC alleges *MaM* excluded the fact that investigators found parts of Halbach's electronic devices in a burn barrel on Avery's property. SAC ¶ 46. However, *MaM* includes footage of an interrogation of Avery's nephew, Brendan Dassey, in which an investigator confronts him with the fact that the electronics were found in the barrel and, what's more, Dassey equivocates on whether Avery put them there. Ep. 10 at 27:30-28:03.

Avery's Past Bad Acts: Although Colborn asserts that *MaM* failed to include details about his past bad acts, which as discussed at note 16, the trial court excluded from evidence, *MaM* in fact discusses both his animal cruelty conviction and his roadside confrontation with his cousin. *See supra* at 19-20. *MaM* also displays Avery's threatening letters to his then-wife during his first prison term. Ep. 1 at 37:00-10.

**Fourth**, it bears emphasis (1) that the Avery criminal investigation and trial lasted more than 17 months, (2) that *MaM* includes only about 10 hours of content, and (3) that in that 10 hours *MaM* attempts to chronicle not only Avery's conviction for murder, but also his earlier, wrongful conviction for rape, his exoneration for that crime , an investigation by the Attorney General into his wrongful conviction, the efforts of a legislative task force named after him to reform the State's criminal justice system, his civil suit against Manitowoc County, the trial and conviction of his nephew Brendan Dassey, and the first eight years of their post-conviction efforts to secure their freedom. Given that reality, what the SAC classifies as omissions are no more than constitutionally protected editing decisions the filmmakers had to make in order to condense the material into a manageable time frame. As the Eighth Circuit has observed,

"[e]very news story (like every judicial opinion) reflects choices of what to leave out, as well as what to include." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1306 (8th Cir. 1986). Thus, the court cautioned against judicial intrusion into editorial decisions, noting that "[a]ccounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors." *Id.*; *c.f. Time, Inc. v. Pape*, 401 U.S. 279, 290-91 (1971) ("Any departure from full direct quotation of the words of a source, with all its qualifying language, inevitably confronts the publisher with a set of choices.").

The SAC does not allege that any *material* facts about Colborn included in *MaM* are untrue. He admits he received a call around 1995 from a detective who told him that Manitowoc County may have an innocent person in jail; he wrote a report about that call in 2003; he called dispatch to ask about the license plate number and make of Halbach's car before it was discovered at the salvage yard; he was present when Lenk found the key to Halbach's RAV4 in Avery's bedroom three days after their first search of the room; and there was a hole in the stopper of the test tube containing Avery's blood. And, ironically, in attempting to argue that *MaM* improperly omitted information, the SAC presents a misleading sampling of passages without acknowledging the broader context in which they appear. Colborn's "choice of passages from the [interviews and testimony] is no less selective than [the filmmakers']"—in fact, it is much more so. *In re Storms v. Action Wis. Inc.*, 309 Wis. 2d 704, 726, 727 (2008). As discussed *supra*, *MaM* extensively recounts the prosecution's arguments, law enforcement's statements, and statements by many others who believe in Avery's guilt.

\*\*\*

Clearly, Colborn does not believe *MaM* treated him or Manitowoc County fairly: simmering beneath the surface of the SAC is a sense of outrage over the spotlight *MaM* placed

on a small community that thought it had moved past a difficult moment in its history. As Colborn's attorney wrote in his book about the documentary, it "invited the world to take part in a brain teasing adventure." Ex. 26 at 43. But despite the inevitable opening of old wounds, searching inquiry into whether our criminal courts deliver justice should be celebrated, not denigrated. And although victors often get to write history, the law thankfully does not mandate it. *MaM* included voices from all sides to tell the Steven Avery story, and the filmmakers were not required to exclude Avery's side of it to placate Colborn's outrage at being accused *by Avery* of misconduct.

## II. The SAC's Tag-Along Claims Also Cannot Survive This Motion To Dismiss

The SAC's tag-along claims for negligence (Count II) and intentional infliction of emotional distress (Count III) likewise cannot survive this motion to dismiss. The negligence claim cannot succeed as a matter of law because Colborn has already conceded his status as a public official for purposes of this case, Dkt. 79 at 29, and the First Amendment *requires* a public official plaintiff to prove fault *in excess of* negligence—namely, constitutional actual malice—to recover for any alleged injury arising out of challenged speech or expression. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (plaintiff cannot avoid constitutional limitations on defamation claims by pleading alternative tort claims). Moreover, the negligence claim duplicates the gravamen of the defamation claim: The SAC asserts that Defendants injured Colborn through the publication of "false statements" that "were not privileged" and that were communicated "to the viewing public" that "caused damage and harm to [his] reputation." SAC ¶¶ 71-73. Such inherently duplicative negligence claims fail as a threshold matter of law. *See, e.g.*, *Pusey v. Bank of Am., N.A.*, No. 14-cv-04979(FB)(LB), 2015 U.S. Dist. LEXIS 91083, at *10 (E.D.N.Y. July 13, 2015) (collecting cases and dismissing as duplicative negligence claim that "unequivocally sound[s] in

defamation"); *Martin-Trigona v. Chi. Tribune*, No. 87 C 6605, 1991 U.S. Dist. LEXIS 8860, at *1 (N.D. Ill. June 28, 1991).

The SAC's IIED claim similarly fails as a matter of law for at least two reasons. First, the First Amendment "preclude[s]" any IIED claim arising out of a broadcast that conveys information on "a matter of public concern." *Dumas v. Koebel*, 841 N.W.2d 319, 329 (Wisc. Ct. App. 2013) (citing *Snyder v. Phelps*, 562 U.S. 443 (2011)). Because *MaM* addresses a matter of public concern, *see Fla. Star v. B.J.F.*, 491 U.S. 524, 536-37 (1989) (challenged speech "involved a matter of paramount public import: the commission, and investigation, of a violent crime which had been reported to authorities"), Colborn cannot state a claim for IIED here.

Second, a required element of any IIED claim in Wisconsin is "that the defendant's conduct was extreme and outrageous." *Rabideau v. City of Racine*, 627 N.W.2d 795, 802-03 (Wisc. 2001). As the Seventh Circuit has observed, "[e]xtreme or outrageous behavior means that the average member of the community must regard the defendant's conduct in relation to the plaintiff as being a complete denial of the plaintiff's dignity as a person," which "is a high standard, and Wisconsin courts have been reluctant to find conduct sufficiently extreme to meet this test." *Kennedy v. Children's Serv. Soc'y*, 17 F.3d 980, 986-87 (7th Cir. 1994) (citation and internal marks omitted). Where an IIED claim arises out of speech that also is challenged in a defamation claim, the act of communicating that speech by definition does not meet the "high standard" of constituting "extreme and outrageous" conduct. *Terry*, 840 N.W.2d at 271.

## CONCLUSION

For all of the foregoing reasons, Netflix respectfully requests that the Court grant its motion pursuant to Rule 12(b)(6) and dismiss the SAC with prejudice.

Dated: March 3, 2020          Respectfully submitted,

_s/ James A. Friedman_____
James A. Friedman
Godfrey & Kahn, S.C.
One East Main Street
Suite 500
Madison, WI 53703-3300
T: (608) 284-2617
F. (608) 257-0609
jfriedman@gklaw.com

Lee Levine
Matthew E. Kelley
Ballard Spahr LLP
1909 K Street, NW, Suite 1200
Washington, DC 20006-1157
T: (202) 508-1110
F: (202) 661-2299
levinel@ballardspahr.com
kelleym@ballardspahr.com

Leita Walker
Ballard Spahr LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
T: (612) 371-6222
F: (612) 371-3207
walkerl@ballardspahr.com

_Counsel for Defendants_