# **Exhibit 12**

United States District Court

Eastern District of Wisconsin

---

## Avery v. Manitowoc County

04 C 986



Video Deposition of

**Mark Rohrer - part 2**

Recorded 09/22/2005 in Manitowoc, WI

9:38 am - 11:11 am, 89 mins. elapsed

---

## Magne-Script

(414) 352-5450

*15746 Condensed transcript with index*

| Page 63 | Page 65 |
|---|---|

**Page 63**

Witness
Mark Rohrer - part 2

Thursday 09/22/2005 at 08:30 by: Barbara Cohen Joseph

Nash, Spindler, Grimstad & McCracken
201 East Waldo Boulevard
Manitowoc, WI

Caption:  Avery v. Manitowoc County
Case No.:  04 C 986
Venue:    United States District Court
          Eastern District of Wisconsin

**Page 65**

1  John F. Mayer
2  Nash, Spindler, Grimstad & McCracken
3  201 East Waldo Boulevard
4  Manitowoc, WI 54220
5  On behalf of Tom Kocourek
6
7  James E. McCambridge
8  Wisconsin Department of Justice
9  17 W. Main St., PO Box 7857
10  Madison, WI 53707-7857
11  On behalf of Mark Rohrer
12
13  Also Present:  Steven Avery
14
15
16
17
18
19
20
21
22
23
24
25

**Page 64**

1           A P P E A R A N C E S
2  Walter F. Kelly
3  Walter F. Kelly, S.C.
4  700 W. Michigan St. #400
5  Milwaukee, WI  53202
6  On behalf of the Plaintiff
7
8  Claude J. Covelli
9  Boardman, Suhr, Curry & Field
10  1 S. Pinckney St. #410, PO Box 927
11  Madison, WI  53701-0927
12  On behalf of Denis Vogel and Manitowoc County
13
14  Timothy A. Bascom
15  Bascom, Budish & Ceman, S.C.
16  2600 N. Mayfair Rd. #1140
17  Wauwatosa, WI  53226-1308
18  On behalf of Manitowoc County
19
20  Raymond J. Pollen
21  Crivello, Carlson & Mentkowski, S.C.
22  710 N. Plankinton Ave. #500
23  Milwaukee, WI  53203
24  On behalf of Tom Kocourek and Manitowoc County
25

**Page 66**

1              I N D E X
2  EXAMINATION BY                    PAGE NO.
3    Mr. Kelly . . . . . . . . . . . . . . . . . .  66
4  EXHIBIT NO.                       PAGE NO.
5  123 - 9/4/03 memo Griesbach To File: State v. Avery  77
6  124 - 9/18/03 memo from Jones to Rohrer . . . . .  108
7       (The exhibits were retained by Mr. Kelly)
8    (The sealed original transcript was sent to Mr. Kelly)
9              ===========
10            E X A M I N A T I O N
11    BY MR. KELLY:
12  Q   Good morning, Mr. Rohrer.
13  A   Good morning.
14  Q   Would you tell me your age, please?
15  A   I'm 40 years old.
16  Q   And when did you finish law school?
17  A   I apologize to being -- for being accurate [sic], but
18      I believe it was in 2002 I graduated, in January.
19  Q   All right.
20  A   I mean, not -- I'm sorry.  1992.
21  Q   What law school did you attend?
22  A   Thomas Cooley Law School in Lansing, Michigan.
23  Q   And you took office in March of 2003 as the district
24      attorney of Manitowoc County; is that right?
25  A   Yes, I did.

| Page 67 | Page 69 |
|---|---|

**Page 67**

1  Q   And you were appointed by Governor Doyle to that
2      position?
3  A   Yes, I was.
4  Q   Would you tell me the positions that you held between
5      the time you graduated from law school and March of
6      2003, as a lawyer.  And if you can do it, just put
7      them in order from '92 up through March of '03.
8  A   I was an associate attorney for the law firm of
9      Winter, Fox & Stangel.  The name of the law firm prior
10     to that was Olson, Winter & Fox.  And that's in Two
11     Rivers, Wisconsin.
12 Q   And that was throughout the period, is that the only
13     employment?
14 A   Yes.
15 Q   Okay.  And during that period of employment as an
16     associate attorney, did you specialize in any
17     particular areas of the law?
18 A   No.
19 Q   Did you practice criminal law at all?
20 A   Yes.
21 Q   What kind of work did you do in criminal law?
22 A   Any type of criminal law that came into the office
23     generally was assigned to me.  I took public defender
24     appointments.  I did felonies and misdemeanors and
25     traffic.

**Page 68**

1  Q   Do you know who your immediate predecessor in office
2      was as the district attorney in Manitowoc County?
3  A   Yes.
4  Q   Who was that?
5  A   Jim Fitzgerald.
6  Q   And do you know about how long he had served in that
7      position?
8  A   Not the precise time, no.
9  Q   Approximately?
10 A   Rough estimate, at least 15 years.
11 Q   And do you know who his predecessor was?
12 A   I believe it was Elma Anderson.
13 Q   And do you know how long Elma Anderson served as the
14     district attorney?
15 A   No.
16 Q   And Elma Anderson's predecessor was who?
17 A   I'm not certain, but I believe it was Denis Vogel.
18 Q   Okay.  In the course of your practice as an associate
19     attorney at your law firm, did you have occasion to be
20     on the other side from the district attorney's office
21     in Manitowoc County on various cases?
22 A   Can you please -- what do you mean by other side?
23 Q   You were defending somebody that they were
24     prosecuting.
25 A   Yes.

**Page 69**

1  Q   Okay.  Can you approximate the number of times that
2      that occurred?
3  A   I cannot.
4  Q   Okay.  Can you fix a range?
5  A   I cannot.
6  Q   Would you say it was more than a hundred cases?
7  A   Yes.
8  Q   Were you ever involved in cases in which Jim
9      Fitzgerald himself personally was on the other side
10     from you?
11 A   Yes.
12 Q   Prior to taking office as the district attorney of
13     Manitowoc County, did you ever have any discussions
14     with Jim Fitzgerald about the Steven Avery case?
15 A   No.
16 Q   Ever have any discussions of any kind with Jim
17     Fitzgerald prior to your taking office in March of '03
18     about Gregory Allen?
19 A   No.
20 Q   How did you first become aware of the DNA results that
21     exonerated Steven Avery with respect to the sexual
22     assault of Penny Beerntsen and inculpated Gregory
23     Allen?
24 A   I found out about the results from a phone call.
25 Q   From whom?

**Page 70**

1  A   The crime lab in Madison.
2  Q   Do you remember who the person was who called you?
3  A   No, I do not.
4  Q   What were you told, as best you recall it?
5  A   The conversation basically -- I don't recall all the
6      details, but she informed me that the DNA results came
7      back to Gregory Allen on the samples that they had
8      tested.
9  Q   And not to Steven Avery?
10 A   That was not discussed at that time, from my
11     recollection.
12 Q   At the time that you were contacted by the crime lab,
13     did you have an awareness that this testing was
14     pending, or was that a new subject to you?
15 A   I was aware of it.
16 Q   How were you aware of it?
17 A   Jim Fitzgerald told me about that before he left the
18     office.
19 Q   On one occasion or more than one occasion?
20 A   I believe it was one occasion, from my recollection.
21 Q   And was it a discussion that took place between the
22     two of you?
23 A   Yes.
24 Q   Was it part of a briefing where he was bringing you up
25     to speed on various cases, or was it just relating to

## Page 71

1    this particular case?
2  A  I don't recall.  It was just one of the things he
3    mentioned during a conversation we had.
4  Q  Okay.  Was anyone else present for the conversation?
5  A  No.
6  Q  Prior to that conversation, had you ever discussed the
7    Steven Avery case with Jim Fitzgerald?
8  A  No.
9  Q  Tell me everything you can remember about what
10    Fitzgerald told you.
11  A  He just told me that there -- from my recollection,
12    that there was testing being done.  He pointed where
13    the file was in the office and that was it.
14  Q  What was the file to which he pointed?
15  A  The Steven Avery file.
16  Q  In prior testimony you marked and identified in dialog
17    with my colleague, Steve Glynn, five boxes of
18    materials, Exhibits 95 through 99.  Do you recall
19    that?
20  A  Yes, I do.
21  Q  The file that you just referred to, the Steven Avery
22    file, is that part of those exhibits as far as you
23    know?
24  A  Yes, to the best of my knowledge.
25  Q  Okay.  At the time that you had the discussion with

## Page 72

1    Jim Fitzgerald, it was known to you as the Steven
2    Avery file and it was segregated as such; is that
3    right?
4  A  In my office, yes, which was his former office.
5  Q  So the file itself was in Fitzgerald's former office,
6    your office after you took office?
7  A  Correct.
8  Q  Where did Fitzgerald go?  Did he leave the office at
9    the time?
10  A  He lost the election.
11  Q  And where did he go from there, do you know?
12  A  I do not know precisely where he went after that.
13  Q  Do you know generally?
14  A  Not precisely, no.  I know he went to various other
15    ADA -- D.A.'s offices, but I don't know where he went.
16  Q  What D.A.'s offices did he go to, as best you can
17    recall?
18  A  The only one I know if is the most recent one was
19    Vilas.  I don't recall the county before that.
20  Q  As far as you know, he's practicing in Vilas County
21    now?
22  A  I don't know what he's doing right now.
23  Q  When did you know that he was practicing in Vilas
24    County?
25  A  I don't recall.  I just heard about it.

## Page 73

1  Q  When did you hear about it?
2  A  I don't recall.
3  Q  Since the time of your last deposition, have you made
4    any further search for any documents concerning
5    Gregory Allen or Steven Avery?
6  A  I have not.
7  Q  To your knowledge, has anybody at your behest done so?
8  A  At my request?
9  A  At your behest.
10  A  I'm sorry, I don't know what you mean by behest.
11    Forgive me.
12  A  At your request, at your inquiry.
13  A  All right.
14  Q  At your direction.
15  A  No.
16  Q  After you received the phone call from the crime lab
17    telling you that the results had come back that
18    Gregory Allen was inculpated in the sexual assault of
19    Mrs. Beerntsen, who was the first person that you then
20    spoke with?
21  A  Well, to be precise, what the phone call was was that
22    the hair samples were Gregory Allen's.  That's what I
23    was told on the phone.
24  Q  Okay.  What did you do?  Who's the first person you
25    talked to?

## Page 74

1  A  Mike Griesbach.
2  Q  Where?
3  A  In my office.
4  Q  Anybody else there?
5  A  At that time, no.
6  Q  How long did the conversation last?
7  A  I don't recall.
8  Q  What did you tell Mike Griesbach?
9  A  I told him about the phone call and we had to decide,
10    you know, what we were going to do on the basis of the
11    phone call.
12  Q  Let me just back up a little bit.  As I understand it,
13    the conversation that you had with Fitzgerald about
14    the pendency of the crime lab's examination of the
15    samples in the Steven Avery case took place shortly
16    after you won the election and he lost the election.  Is that
17    right?
18  A  I didn't win the election.
19  Q  Who won the election?
20  A  Mike Griesbach.
21  Q  How did it come to pass that you became the district
22    attorney?
23  A  Mike Griesbach did not take office, he declined it.
24    And then an appointment process took place.  I applied
25    for it and I was appointed by Governor Doyle, March

Page 75

1     17, 2003.
2  Q   The conversation that you testified to earlier with
3     Jim Fitzgerald took place shortly after you took
4     office?
5  A   It took place after I was in office and before he left
6     the office.
7  Q   And about how soon after you took office did he leave
8     the office, approximately?
9  A   At most a couple months.
10  Q   Okay.
11  A   Maybe less.
12  Q   So let me ask you this.  From the time of that
13     conversation with Jim Fitzgerald until you received
14     the information that you've told us about that you
15     received from the crime lab, did you have any
16     discussions about the Steven Avery case with anyone in
17     your office?
18  A   No, I did not.  From my recollection, no.
19  Q   Did you take responsibility for the then-pending case
20     file and crime lab inquiry during the period of time
21     between when you took office and when the information
22     that you've told us about came back from the crime
23     lab, or was that file assigned primarily to someone
24     else?
25  A   The file was left in the office.  Nothing was done

Page 76

1     with it.
2  Q   Did you consider that it was assigned to anybody?
3  A   At that time, no.
4  Q   Okay.  Again, for the same period of time, the period
5     of time between when you were informed by Fitzgerald
6     up to when you received the phone call from the crime
7     lab personnel, did you have conversation with any
8     other person outside the district attorney's office
9     about the Steven Avery case?
10  A   No, I did not, from my recollection.
11  Q   When you took office, were you in any fashion of your
12     own knowledge aware of the Steven Avery case?
13  A   No, I was not.
14  Q   So the first you knew of it was when Fitzgerald
15     briefed you to the extent that he did on the case.
16  A   That's correct.
17  Q   At the time that you received the phone call from the
18     crime lab, was Gregory Allen known to you at all?
19  A   No, he was not.
20  Q   So it was a completely new name to you when you got
21     the call from the crime lab?
22  A   Yes.
23  Q   I'm going to show you what's been marked as Exhibit
24     123 and ask you to take a moment and examine that, if
25     you would.

Page 77

1     MR. COVELLI:  Is this the September 18th?
2     MR. KELLY:  No, this is September 4th.
3     MR. MCCAMBRIDGE:  Off the record, why don't
4     you give me --
5     REPORTER:  Off the record.
6     (Off the record 9:52 - 9:53)
7     REPORTER:  We're back on the record.
8  BY MR. KELLY:
9  Q   Mr. Rohrer, have you finished examining the document?
10  A   Exhibit 123?
11  Q   Yes.
12  A   Yes, I have.
13  Q   All right.  Have you seen it before today?
14  A   Yes, I have.
15  Q   What do you understand it to be?
16     (Exhibit 123 identified)
17  A   It is a memo from Mike to me -- or, not to me.  It's a
18     memo that Mike prepared in regard to this case from
19     the conversation that took place on September 3rd.
20  Q   All right.  And is this the convers-- this is Mike
21     Griesbach's recording in writing of the conversation
22     he had with you after you received the call from the
23     crime lab.
24  A   Yes.
25  Q   Is there anything in there that you think is

Page 78

1     inaccurate?
2  A   The only thing is I'm not for sure if it's in Box 1 of
3     2.  But the rest of the document is accurate.
4  Q   Is there anything that you recall of the conversation
5     between you and Mike Griesbach on that occasion that
6     you want to add to what is recorded in Exhibit 123?
7  A   We may have discussed, like I said, other things, but
8     I don't recall exactly verbatim what was said.
9  Q   Okay.  He refers to the fact that you were on
10     CCAP.  Do you see that?
11  A   Yes.
12  Q   For the record, what's CCAP?
13  A   It's basically a circuit court access program that we
14     can do for criminal background checks for people who
15     have been charged with and convicted with crimes
16     throughout the state.
17  Q   When on the occasion referred to in Exhibit 123 you
18     were on CCAP, were you looking for information about
19     Gregory Allen?
20  A   Yes.
21  Q   Do you recall what you found?
22  A   His date of birth.  May have found other things I
23     can't recall about his record.  But that's all I can
24     recall at this time.
25  Q   All right.  At the time on this occasion September 3rd

| Page 79 | Page 81 |
|---|---|

**Page 79**

1    when you and Mike talked, did you talk at all about
2    wanting to find any further information that might be
3    in the district attorney's files about Gregory Allen?
4  A  No, we did not.
5  Q  At any occasion after that, did you have any such
6    conversation with Mike?
7  A  No.  You're saying to look for other information
8    regarding Gregory Allen in the file?
9  Q  In any file anywhere in the D.A.'s office.
10  A  No.
11  Q  To your knowledge, did Mike Griesbach make any effort
12    to find any further information concerning Gregory
13    Allen in the files of the district attorney's office
14    than the document that's identified in Exhibit 123?
15  A  I can't say what he did on his own.
16  Q  You don't know.
17  A  None at my direction.
18  Q  Do you know whether or not it was at your direction if
19    he made any such effort?
20  A  He did not make such an effort at my direction.
21  Q  Okay.  But what I'm asking you is, whether or not he
22    made it at your direction do you have any knowledge
23    that he made it?
24  A  No.
25  Q  Okay.  After this conversation with you and Mike

**Page 80**

1    Griesbach, to whom did you next speak about what you
2    had found out from the crime lab?
3  A  My recollection is Gail Prost was then brought to the
4    office.
5  Q  And who is Gail Prost?
6  A  The assistant district attorney in the office as well.
7  Q  And was she brought to the office at your direction?
8  A  Yes.
9  Q  And why did you ask to see her?
10  A  I wanted to discuss with her about doing some legal
11    research in regard to Mr. Allen.
12  Q  Tell me what you recall of those conver-- Was Mr.
13    Griesbach present when you spoke to Gail Prost?
14  A  I believe so.  From my recollection, yes.
15  Q  Tell me what you recall of the discussion on that
16    occasion that you had with Gail.
17  A  I was going to have her check out the statute of
18    limitations issue of whether or not Mr. Allen could be
19    prosecuted potentially if the case would arise after
20    doing research through the file.
21  Q  When you say "after doing research through the file,"
22    tell me what you meant by that at the time.
23  A  It was after Mr. Griesbach and I were going to review
24    the file to determine whether or not we should have
25    the case dismissed against Mr. Avery.

**Page 81**

1  Q  So what did you direct Gail to do?
2  A  To start doing some potential legal research if we
3    could charge Mr. Allen.
4  Q  Did you ask her to seek out any further
5    information that might be available concerning
6    Mr. Allen?
7  A  I did not.
8  Q  Did you have any knowledge at the time whether Mr.
9    Allen was incarcerated?
10  A  I looked at CCAP.  That was my only basis that made my
11    determination that he was incarcerated at that time.
12  Q  So based on what you saw in CCAP, you thought he was
13    in jail at the time?
14  A  At the time of our conversation?
15  Q  At the time of your conversation with Gail.
16  A  Yes.
17  Q  Where was he incarcerated as you reviewed CCAP?
18  A  I didn't know where he was incarcerated, I just knew
19    from the CCAP he had a sentence he was serving.
20  Q  Did you know what the sentence was?
21  A  I don't recall the precise sentence, no.
22  Q  Well, what's you best recollection of what you
23    discovered about Mr. Allen when you looked at CCAP and
24    talked to Gail Prost about it?
25  A  There was a prison -- well, I didn't talk to her about

**Page 82**

1    the prison sentence.  There was a prison sentence on
2    CCAP that Mr. Allen was serving.
3  Q  Do you recall what the length was?
4  A  Not off the top of my head, no.
5  Q  Do you recall what the crimes were?
6  A  Not precisely, no.  I'd have to look at it.
7  Q  Well, generally what's your best recollection?
8  A  I don't want to guess.  I'd have to look at the CCAP
9    record to be sure.
10  Q  I know you don't want to guess.  I'm just asking you
11    what your best recollection is.
12  A  It may have been sexually related.
13  Q  Okay.  Did Mr. Griesbach have any conversation with
14    Ms. Prost at that time?
15  A  I don't recall.
16  Q  After you and Mr. Griesbach spoke with Ms. Prost --
17    well, strike that.  Let me ask you, what did you tell
18    Ms. Prost when she came in to see you about what you
19    had heard?
20  A  Heard from what?
21  Q  From the crime lab.
22  A  I don't recall precisely what I said to her.  My only
23    recollection is about the researching the statute of
24    limitations issue on Mr. Allen.
25  Q  Did you tell her what you had been told by the person

| Page 83 | Page 85 |
|---|---|

**Page 83**

1     from the crime lab?
2  A  Again, as I said, I don't recall precisely what I said
3     to her.
4  Q  I'm not asking for precise recollection.  All I'm
5     asking for is your best recollection.
6  A  And I don't know for sure what I said.
7  Q  You don't have to know it for sure.  Just tell me what
8     your best recollection is.
9  A  The only thing I recall what I talked to her about is
10    the statute of limitations issue.  I don't know what
11    else I talked to her about.
12  Q  Okay.
13  A  It may have come up, but I don't know.
14  Q  All right.  After that conversation with her and Mr.
15    Griesbach, with whom did you next speak about what you
16    had been informed of by the woman from the crime lab?
17  A  I don't recall.
18  Q  Did you at some point decide to call Mr. Tinker at the
19    Attorney General's office?
20  A  I did.
21  Q  At the time you decided to call Mr. Tinker, had you
22    made any further announcement in your office
23    concerning what you had been told by the person at the
24    crime lab than what you've already told us about your
25    conversation with Mr. Griesbach and Ms. Prost?

**Page 84**

1  A  Could you repeat the question?  I apologize.
2  Q  Let's read it back.
3     (Question played back 10:00 - 10:01)
4  A  I don't recall.
5  Q  Do you have any recollection of announcing to other
6    members of your staff and office that the crime lab
7    had made a determination that Steven Avery was
8    exculpated and Gregory Allen was inculpated in the
9    matter of the sexual assault on Penny Beerntsen?
10  A  Yes, I do.
11  Q  What's your recollection of that?
12  A  I probably told the office about the situation and
13    that we were not to discuss it outside the office and
14    to keep it within the office.
15  Q  Tell me your best recollection, precise or not, about
16    the words that you used when you told the office, as
17    you put it, about the situation.  How did you describe
18    the situation?
19  A  I don't recall.
20  Q  You have no recollection of that?
21  A  I don't recall what I said.
22  Q  Do you recall generally what you said about it?
23  A  I just, like I said, I made the announcement and I
24    don't recall the words I used other than what I've
25    already told you.

**Page 85**

1  Q  Meaning that you said something about the situation?
2  A  Yes.
3  Q  Do you recall whether you told the office the
4    substance of what you had been told by the woman from
5    the crime lab?
6  A  I don't recall if I mentioned specifically about the
7    crime lab.
8  Q  Do you recall what you told them about Steven Avery?
9  A  No, I don't recall precise-- I don't recall.
10  Q  Did you use Steven Avery's name?
11  A  Yes.
12  Q  Do you recall what you told them about Gregory Allen?
13  A  No.
14  Q  Did you use Gregory Allen's name?
15  A  Yes.
16  Q  Do you remember who was present?
17  A  No.
18  Q  Do you recall whether Brenda Petersen was present?
19  A  I don't recall.  But she would have been notified.
20  Q  Would have been?
21  A  Yes.
22  Q  By you?
23  A  Yes.
24  Q  Notified on the occasion of you making an announcement
25    to a group of people or notified separately?

**Page 86**

1  A  I don't recall if I did it individually or as a group.
2  Q  All right.  Do you recall whether Beverly Badker was
3    present?
4  A  She was made aware of it.
5  Q  Do you recall whether she was made -- was she made
6    aware of it by you?
7  A  Yes.
8  Q  Do you recall whether it was in a group of people or
9    separately?
10  A  I don't recall.
11  Q  Do you recall whether a Ms. Mertens was made aware of
12    it?
13  A  No, not from me.
14  Q  Do you recall whether independently of you Mr.
15    Griesbach made anybody in the office aware of it?
16  A  Not that I am aware of, no.
17  Q  Okay.
18  A  Other than he was present for the conversation with
19    Mr. Prost.
20  Q  All right.  At the time that you made Ms. Petersen and
21    Ms. Badker aware of it, had you already spoken with
22    Mr. Tinker?
23  A  I don't recall.
24  Q  How many conversations did you have with Mr. Tinker
25    about the Steven Avery matter?

Page 87

1   A   I don't recall.
2   Q   Can you estimate them?
3   A   I talked to him about on a couple of occasions.  I
4       do not know the number.
5   Q   You talked to him on the phone or in person?
6   A   Both.
7   Q   In person you talked to him in Madison; is that right?
8   A   Yes.
9   Q   But not in Manitowoc.
10  A   Correct.
11  Q   When you were in Manitowoc, you talked to him by
12      phone.
13  A   Correct.
14  Q   Meaning he didn't come to Manitowoc.
15  A   Correct.
16  Q   When you went to Madison, you were accompanied by Mr.
17      Griesbach?
18  A   Yes, I was.
19  Q   And you brought with you the Steven Avery file from
20      the district attorney's office.
21  A   We did.
22  Q   Did you bring anything further?
23  A   We just brought the file.
24  Q   All right.  Can you tell me how many times you spoke
25      with Mr. Tinker before you went to Madison and brought

Page 88

1       the file?
2   A   I do not know.
3   Q   When you got to Madison, did you speak to Mr. Tinker?
4   A   Yes.
5   Q   Did you speak to anybody else?
6   A   Yes.
7   Q   Who?
8   A   We were -- met with during the meeting the Attorney
9       General Peg Lautenschlager.  Various other assistant
10      attorney generals were present, don't know all their
11      names.  DCI investigators were present.
12  Q   Let's start with the assistant attorneys' general.
13      Did you talk to Mike Bauer?
14  A   I don't recall the names, as I said, of all the
15      assistants that were there.  But he may have been
16      present.
17  Q   How about Tom Falon?  Do you recall whether he was
18      there?
19  A   Tom Falon?
20  Q   Falon.
21  A   Yeah, he was present.
22  Q   All right.  Jennifer Nashold, was she present?
23  A   I don't recall that name, but she may have been
24      present also.
25  Q   Monica Burkert-Brist, was she present?

Page 89

1   A   Again, she may have been present, but I don't recall
2       the name.
3   Q   All right.  Robbie Lowery?
4   A   She may have been present, but I don't recall the
5       name.
6   Q   Do you remember the identity of any of the DCI
7       investigators?
8   A   No.  Not...
9   Q   Does Deb Strauss ring a bell at all?  Do you remember
10      whether she was present on that occasion?
11  A   She may have been present, but I don't recall the
12      name.
13  Q   All right.  By that time, that is, to say by the time
14      you met in Madison at the attorney general's office,
15      you had received information from people in the
16      district attorney's office about Gregory Allen; is
17      that right?
18  A   Yes.
19  Q   Who were the people from whom you had received that
20      information?
21  A   I don't recall precisely.
22  Q   Give me your best recollection.
23  A   It may have been Bev Badker and Brenda Petersen.
24  Q   Anybody else that you recall?
25  A   No.

Page 90

1   Q   By the time that you went to Madison to meet in the
2       attorney general's office, had you had further
3       discussions with Mike Griesbach about Gregory Allen?
4   A   Yes.
5   Q   How many?
6   A   I don't know.
7   Q   Tell me what you recall of the contents of those
8       discussions.
9   A   I don't recall those contents of the discussions.
10  Q   At all?
11  A   No.
12  Q   To your knowledge, at that time had Mr. Griesbach been
13      conducting any further inquiries about who Gregory
14      Allen was, what his record was and so forth?
15  A   He or I may have done that.
16  Q   Well, let's start with you.  What did you do?
17  A   I'm not sure who did what, but we did do a criminal
18      history check on Mr. Allen at the sheriff's
19      department.
20  Q   Anything further that you recall?
21  A   We had done the CCAP check before that.
22  Q   Right.
23  A   He or I may have gotten ahold of the prior complaint
24      out of the clerk's office.  I forget who got it, it
25      was either he or I.

## Page 91

1  Q   Had the two of you, in respect to this search, made a
2      decision to try and find out within the confines of
3      the County of Manitowoc government whatever you could
4      about Gregory Allen?
5  A   That was not what we were doing, no.
6  Q   What did you consider that you were doing?
7  A   Just as I told you.  We got a criminal history check
8      on Mr. Allen from the sheriff's department, and I
9      believe Mike or I obtained that complaint.
10 Q   All right.  With whom did you do the criminal history
11     check in the sheriff's department?
12 A   I don't recall.
13 Q   Was it sheriff's department personnel?
14 A   Yes.
15 Q   Was it Mr. Beck?
16 A   I don't recall.
17 Q   To your knowledge, what did they examine to respond to
18     your inquiry?
19 A   They printed out a criminal history for us and that
20     was it.
21 Q   Was it an extensive history, in your opinion?
22 A   I don't recall the history.
23 Q   Tell me everything you recall that Brenda
24     Petersen told you after she heard this
25     information about Gregory Allen from you.

## Page 92

1  A   She may have, at a time, mentioned Mr. Allen.  I don't
2      recall what she said precisely.
3  Q   Tell me your best recollection.  I don't care whether
4      it's precise or not.  I want to know your best
5      recollection of what she told you.
6  A   I don't recall exactly what she said.
7  Q   I'm not asking you exactly.  I'm asking you your
8      best general recollection of what Brenda Petersen
9      told you about Gregory Allen after you told her
10     what you had been informed by the crime lab.
11         MR. COVELLI:  Objection.  Asked and
12     answered.
13         MR. MCCAMBRIDGE:  And I'll object to
14     foundation beyond does he have a recollection,
15     you know, and what he's already testified.
16 BY MR. KELLY:
17 Q   You can answer.
18 A   And I don't recall what she said precisely.
19 Q   Do you understand that I'm asking you not what you
20     recall precisely, but what your best recollection is,
21     whatever it may be?
22 A   I understand your question.
23 Q   Okay.  What is your best recollection of what Brenda
24     Petersen told you?
25 A   I don't recall what she said verbatim.

## Page 93

1  Q   I'm not asking you verbatim.  I'm asking you your best
2      recollection of what she said.  Come on, you're a
3      lawyer, you know the difference that I'm talking
4      about.  Just give me your best recollection.
5          MR. BASCOM:  Objection.  Argumentative.
6          MR. MCCAMBRIDGE:  Object --
7          MR. COVELLI:  If he has one.
8          MR. MCCAMBRIDGE:  Yeah, I think -- well, why
9      don't we establish that, Walt.
10 BY MR. KELLY:
11 Q   You can answer.
12         MR. MCCAMBRIDGE:  As a foundation.
13 BY MR. KELLY:
14 Q   You can answer.
15 A   If I may, which one am I answering?
16 BY MR. KELLY:
17 Q   Your best recollection, whatever it may be,
18     general, precise, exact, specific, whatever --
19     your best recollection of what Brenda Petersen
20     told you after you told her about Gregory Allen.
21         MR. COVELLI:  Objection to the form of the
22     question.
23 A   Again, she knew about Gregory Allen.  And that's --
24     again, I don't recall what she said.
25 BY MR. KELLY:

## Page 94

1  Q   Okay.  Well, let's try it this way, then.  Did she
2      tell you that she had always believed from the
3      beginning that Gregory Allen had been the person who
4      assaulted Penny Beerntsen?
5          MR. COVELLI:  Objection to form.
6  BY MR. KELLY:
7  Q   You can answer.
8  A   I don't recall those exact words being used.
9  Q   Okay.  What do you recall were the words that she used
10     in telling you what she believe about that?
11 A   There may have been mention that they believed that
12     Allen was the perpetrator.
13 Q   And who was the "they" that she was referring to?
14 A   She mentioned just in conversation about herself.
15 Q   Well, you just said "they," right?  Was she
16     referring to herself and Beverly Badker?
17 A   I am not sure.  I am not sure.  Like I said, she -- as
18     I said, I don't recall the conversation.
19 Q   You were so disturbed about what you were told
20     concerning the knowledge of Brenda Petersen and
21     Beverly Badker that you contacted the attorney
22     general's office to ask them about that, right?
23 A   No.  The purpose of contacting the attorney general
24     was to do an investigation about the file.  That's why
25     I contacted them, to do an independent investigation,

## Page 95

1  from my recollection.
2  Q   But what caused you to want the independent
3      investigation was what you had been told by Brenda
4      Petersen, Beverly Badker, and perhaps others; is that
5      right?
6  A   No.
7  Q   I'm going to ask you to take a moment and examine what
8      is Exhibit 5 in this proceeding.  And I'm going to
9      direct your attention to the third full paragraph from
10     the bottom of the page, on Bates page 005614.  Have
11     you had a chance to examine that?
12 A   Yes.
13 Q   May I have it, please?  The paragraph that I directed
14     your attention to, I'm going to read it into the
15     record.  "Soon after the mistake became public
16     knowledge within the Manitowoc County Courthouse, the
17     current district attorney, Mark Rohrer, started
18     receiving information that people within the
19     courthouse never believed these crimes were committed
20     by Avery.  These people all believed Allen committed
21     the crime.  Some of these individuals even stated to
22     D.A. Rohrer they made these concerns known to either
23     the district attorney at the time, Denis Vogel, or the
24     Manitowoc County Sheriff, Tom Kocourek."  First of
25     all, did you tell that information to the attorney

## Page 96

1      general's office?
2  A   If Mr. Tinker said I did, I did.
3  Q   Well, what's your recollection of whether or not this
4      is accurately reciting what you told the attorney
5      general's office?
6  A   I did receive that information, yes.
7  Q   And you did tell it to them?
8  A   Yes.
9  Q   And the information that you received was from what
10     sources?
11 A   As the document points, employees in the office and
12     others.
13 Q   Who were they?
14 A   There were some people in the sheriff's department.
15     There was people in the office, in the D.A.'s office.
16 Q   Okay.  Let's start with the D.A.'s office.  Who were
17     the people in the D.A.'s office?
18 A   Bev Badker and Brenda Petersen.
19         REPORTER:  The first name again, please?
20 A   Bev Badker, Brenda Petersen.
21     BY MR. KELLY:
22 Q   And any others in the D.A.'s office?
23 A   No.
24 Q   Who were the people in the sheriff's office?
25 A   The names that were mentioned were Andy Colburn and

## Page 97

1      Jim Lenk had information that he had received.
2  Q   When you say the names that were mentioned,
3      mentioned to whom?
4  A   I don't recall if they talked to me specifically or
5      someone else, and the information then came to me.
6  Q   And who would that someone else be?
7  A   Again, I don't recall how the information got to me.
8      It's either through another source or from them
9      directly.
10 Q   So we know, if it was from them directly to you, then
11     that's to you.  But if it was through another source,
12     who would that other source be?
13 A   It may have been Ken Peterson, the sheriff.
14 Q   When did Ken Peterson speak with you, if he did, about
15     the Steven Avery case?
16 A   In September of 2003.
17 Q   On one occasion or more than one occasion?
18 A   I don't recall the amount of occasions.  At least one.
19 Q   At least one.  Did he initiate that contact with you
20     or did you initiate it with him?
21 A   I'm not sure.
22 Q   Okay.  Where did it take place?
23 A   The sheriff's department.
24 Q   Anyone else present?
25 A   I don't recall the individuals that were there.

## Page 98

1  Q   But there was more than just you and Sheriff Peterson?
2  A   Yes.
3  Q   How many people more?
4  A   I don't recall the individuals who were there.  It was
5      just myself, Ken and others.
6  Q   And were the others from the sheriff's department?
7  A   Yes.
8  Q   Were they from anywhere else, to your knowledge?
9  A   Mike Griesbach may have been there.
10 Q   What were you guys told?
11 A   I don't recall what was told at that time, in that
12     meeting.
13 Q   Tell me your best recollection of what was said
14     to you at the meeting.
15 A   I don't recall.
16 Q   What was the discussion about Andy Colburn?
17 A   Nope, was not -- my recollection, we weren't
18     discussing Andy.  May have.  I don't know.
19 Q   Well, I thought your -- correct me if I'm wrong, but I
20     thought your prior testimony that led to this entire
21     dialog is that you received from some other source
22     information about Andy Colburn and Jim Lenk in respect
23     to Gregory Allen.
24 A   In regard to this case.  That's what I said.  In
25     regard to the Avery case.

| Page 99 | Page 101 |
|---|---|

**Page 99**

1  Q  Okay.  So what were you told at that meeting about
2     Andy Colburn and Jim Lenk?
3  A  I don't recall.
4  Q  You have no recollection at all?
5  A  I don't recall.
6  Q  What were you told at that meeting about what some --
7     one or more members of the sheriff's department
8     believed about Gregory Allen?
9  A  I don't recall.
10 Q  Was Gregory Allen brought up at the meeting?
11 A  Yes.
12 Q  By whom?
13 A  I don't recall.
14 Q  Did Ken Peterson talk about Gregory Allen?
15 A  He may have.
16 Q  Did Ken Peterson produce any documents?
17 A  From my recollection, yes.
18 Q  Did he go to the safe to get them?
19 A  Not that I am aware of.  I didn't --
20 Q  Did he go into his own desk to get them?
21 A  I don't know.
22 Q  Did he discuss with you at that meeting Tom Kocourek?
23 A  Yes.
24 Q  Did he tell you anything about Tom Kocourek having
25     been informed about Gregory Allen at the time of the

**Page 100**

1     Steven Avery prosecution?
2  A  I don't recall what he said about Tom Kocourek during
3     that meeting.
4  Q  You have no recollection?
5  A  I do not recall what he said.
6  Q  Did he talk at all about Tom Kocourek having been
7     provided information by a man named Bergren who worked
8     for the City of Manitowoc Police Department at the
9     time of the Steven Avery case?
10 A  I don't recall that.
11 Q  About how long did that meeting last?
12 A  Less than an hour, I would say.
13 Q  Was Mr. Beck present?
14 A  I don't recall.
15 Q  Was Mr. Colburn present?
16 A  I don't recall.
17 Q  Was Mr. Lenk present?
18 A  I don't recall.
19 Q  Other than the people that you've identified, do you
20     know anybody else who was present?
21 A  As I said earlier, Mr. Griesbach may have been
22     present.
23 Q  Other than him, anybody else that you recall?
24 A  I don't recall.
25 Q  Did you keep any notes of the meeting?

**Page 101**

1  A  No, I did not.
2  Q  To your knowledge, did Mr. Griesbach?
3  A  I don't know if he did or not.  You'd have to ask him.
4  Q  Was there a reason that you didn't keep any notes of
5     the meeting?
6  A  I just didn't.
7  Q  In the conversations that you had with Ms. Petersen
8     and Ms. Badker, did you keep any notes of that?
9  A  No, I did not.
10 Q  Do you recall whether before you went to Madison to
11     meet at the attorney general's office, Mr. Findley had
12     made a public demand that there be an investigation of
13     what had happened in the Steven Avery prosecution?
14 A  He may have done that.  I don't recall when he made
15     that request.
16 Q  Do you have any recollection of whether, before you
17     went to Madison, the attorney general had made a
18     statement that she could not conduct such an
19     investigation because she didn't have any statutory
20     authority to do so?
21 A  I don't recall that.
22 Q  Do you recall anything like that having occurred?
23 A  There was a thought initially that there may be a
24     potential conflict of interest that they couldn't do
25     the investigation.

**Page 102**

1  Q  What was the conflict of interest that was perceived
2     at the time?
3  A  The attorney general's office had done the appellate
4     work on the original case.
5  Q  At a point in time, you made a formal request of the
6     attorney general's office to review the circumstances
7     of the arrest and prosecution of Steven Avery; is that
8     right?
9  A  I did.
10 Q  I'll show you what's been marked as Exhibit 1.  Is
11     that the request?
12 A  Yes.
13 Q  That request was made after the meeting in Madison; is
14     that right?
15 A  I don't recall.  I believe we had discussed them doing
16     a review at the time of the meeting, and that it was
17     decided that they would be doing a review before we
18     went down there.  The reason why is we had to give a
19     special prosecution basis for it, and I think that's
20     what that is in there, 978.06.
21 Q  So when you were in Madison, you talked about 978.06
22     as a basis for the request.
23 A  We had talked about them doing a review, and they
24     needed to have a written request as you have in front
25     of you.

Page 103

1   Q   They needed more than that, though.  They needed
2       a statutory basis, didn't they?
3   A   Yep.
4   Q   And that was something that you discussed when
5       you were in Madison.
6   A   I don't recall if that precise discussion took place.
7       We had to do a request in writing, as I did.
8   Q   Well, in fact there had been a discussion about
9       whether they could give you what you wanted,
10      which is did they have the authority.  There was
11      an issue about whether or not they had the
12      authority to conduct the kind of investigation
13      that you wanted.
14  A   Correct.  They had to be made, in essence, a special
15      prosecution of the case.
16  Q   Right.  So that was the strategy that you and they
17      agreed upon that led to the creation of Exhibit No. 1?
18  A   I wouldn't call it strategy.  It's something that had
19      to be done.
20  Q   Well, in order to get the investigation done, the two
21      of you had to agree that there was a statutory basis
22      for it, right?
23  A   I had to make the request, yes.
24  Q   Well, but the suggestion that you make the request was
25      made by the attorney general's office to you, not vice

Page 104

1       versa.  They said to you, "Okay.  We need a basis.
2       Here's the basis."  You then wrote the letter.
3   A   That may have taken place, yes.
4   Q   Okay.  And then they responded to the letter in
5       Exhibit 2; is that right?
6   A   May I review it, please?
7   Q   Sure.
8   A   Okay.  I have reviewed Exhibit 2.
9   Q   Okay.  So that was their response to your request; is
10      that right?
11  A   Yep.
12  Q   All right.
13  A   Yes.
14  Q   Now, you are represented here today by Mr. McCambridge
15      from the attorney general's office; is that right?
16  A   Yes, I am.
17  Q   And is the reason for that representation that you are
18      a state employee?
19  A   Yes.
20  Q   All right.  And you are not represented by any of the
21      other lawyers who are here who represent parties in
22      the litigation; is that right?
23  A   That is correct.
24  Q   Okay.  And you're not represented by the corporation
25      counsel for Manitowoc County; is that correct?

Page 105

1   A   That is correct.
2   Q   Okay.  At any time before you authored this
3       September 18th, 2003 correspondence, did you talk
4       with any representative of the attorney general's
5       office about potential civil liability for
6       Manitowoc County in connection with the
7       prosecution and conviction of Steven Avery?
8   A   I may have.
9   Q   Did you discuss that with Mr. Tinker?
10  A   I may have.  I don't recall.
11  Q   Did you discuss that with Mr. Bauer at all?
12  A   Not that I recall, no.
13  Q   Did you discuss that with Peg Lautenschlager?
14  A   I may have.  I don't recall.
15  Q   All right.  Before you went up to Madison with Mr.
16      Griesbach, did you have any discussions with Mr.
17      Rollins about potential civil liability for Manitowoc
18      County in connection with the prosecution and
19      conviction of Steven Avery?
20  A   I may have, yes.
21  Q   Okay.  Tell me what you recall of that discussion.
22  A   I don't recall the discussion other than that was a
23      potential thing that we saw that could potentially
24      happen here.
25  Q   And was it a part of your discussion that in

Page 106

1       order to deal with the issue of potential civil
2       liability you would ask to have an investigation
3       done by the attorney general?
4   A   I don't recall if I told that to Mr. Rollins.  I may
5       have.
6   Q   Okay.  In fact he may have suggested it to you.
7   A   No, that was my decision.  I made that on my own.
8   Q   Okay.
9   A   No one made that suggestion but me.
10  Q   Okay.
11  A   You were fearful of the potential liability of
12      Manitowoc County in respect to what had happened to
13      Mr. Avery?
14  A   I was not fearful of it.
15  Q   No, you were concerned about it.
16  A   I wasn't concerned about it.
17  Q   You didn't care about it.
18  A   Not that I didn't care about it, but it wasn't my
19      situation to worry about.  My job was to preserve the
20      integrity of the file and my office.
21  Q   Well, your job went beyond that in your own mind
22      because you asked for this investigation to be done,
23      right?
24  A   That's part of the integrity of my office, so I don't
25      think it is going beyond that.

## Page 107

1  Q  So you were concerned about the integrity of your
2     office.
3  A  To have an independent investigation done.
4  Q  What was it about your office's integrity that you
5     were concerned about?
6  A  I just wanted an independent review.
7  Q  Okay.
8  A  That's all.
9  Q  Had Mr. Griesbach expressed any opinion to you about
10    the behavior of Mr. Vogel at the time you made the
11    request of the attorney general?
12 A  He had prepared a memo about a conversation he had
13    with Mr. Vogel. I don't recall its contents.
14 Q  I know he did that. But I'm asking you whether or not
15    he talked with you at all about any concerns that he
16    personally had about how Vogel had handled the case.
17 A  I don't recall those conversations.
18 Q  Did they take place at all?
19        MR. COVELLI:  Asked and answered.
20 A  I don't recall what was said.
21     BY MR. KELLY:
22 Q  Was there such a conversation?
23 A  There may have been, yes.
24 Q  Okay. Tell me your best recollection, it doesn't have
25    to be precise or exact, of what Mike Griesbach said to

## Page 108

1     you about that.
2        MR. COVELLI:  Objection. No foundation.
3     Form of question.
4  A  I don't recall what Mike said during that conversation
5     other than he had a telephone conversation with Vogel.
6     That's all I remember at this time.
7     BY MR. KELLY:
8  Q  He was upset about the conversation with Vogel, wasn't
9     he?
10 A  I don't recall if he was upset or not.
11 Q  He didn't like what Vogel was doing and he told you
12    that; is that right?
13 A  I don't recall him saying that, no.
14 Q  Okay. Did you ever talk to Janine Geske before you
15    went to see the attorney general's office?
16 A  I believe Mike may have done that.
17 Q  Did he report to you on the conversation he had had
18    with Ms. Geske?
19 A  He may have.
20 Q  What did he tell you?
21 A  I don't recall.
22 Q  Do you recall anything about what he told you
23    concerning that?
24 A  No, not at this time.
25        (Exhibit 124 identified)

## Page 109

1  Q  Okay. Let me show you what's been marked as
2     Exhibit 124. Take a moment, if you would, and
3     examine that.
4  A  I'm familiar with the document.
5  Q  Okay. Who's Douglass Jones?
6  A  Assistant district attorney for Manitowoc County.
7  Q  All right. What is this memo, to your understanding?
8  A  It speaks for itself. He had a telephone conversation
9     with Gene Kusche about the case.
10 Q  All right. This memo is dated the same day that your
11    letter to the attorney general is dated, September
12    18th. Do you see that?
13 A  Yes, I do.
14 Q  Do you recall whether or not Mr. Jones provided this
15    memo to you before or after you wrote the letter to
16    the attorney general?
17 A  I don't recall.
18 Q  Okay. In this memo, Mr. Jones says that in talking
19    with Gene Kusche, Kusche told Jones that in '95 or '96
20    Colburn had told Kocourek that an officer from Brown
21    County had told Colburn that Greg Allen and not Steven
22    Avery may have actually committed the Beerntsen
23    assault. Do you see that?
24 A  The language that you're reading from is about "might
25    have actually committed the Beerntsen assault." Is

## Page 110

1     that the reference you're making?
2  Q  I'm starting on the sentence -- Let's read it
3     into the record. "He then told me" -- and the
4     "he" refers to Gene Kusche. "He then told me
5     that in '95 or '96, Andy Colburn had told Tom
6     Kocourek, former Manitowoc County sheriff, that
7     an officer from Brown County had told Colburn
8     that Allen and not Avery might have actually
9     committed the Beerntsen assault. Gene stated
10    that Colburn was told by Kocourek something to
11    the effect that we already have the right guy and
12    he should not concern himself." So this is
13    information that's being provided to you on
14    September 18th by Doug Jones, right?
15 A  That's correct.
16 Q  Did you provide this information to the attorney
17    general's office?
18 A  Yes. My recollection is I believe we did.
19 Q  And who's we?
20 A  Mike Griesbach and I when we went to Madison.
21 Q  But this memo was drafted after you had been to
22    Madison.
23 A  I'm not sure of the date we were in Madison.
24 Q  Well --
25 A  I'd have to look at the record to see when we went.

## Page 111

1  Q   Exhibit No. 1, September 18th is when you write the
2      letter following the decision that's made about the
3      statutory basis that you're going to seek for the
4      investigation.
5  A   Again, I apologize.  I do not know whether or not this
6      was done at the same time that we met with the
7      attorney general or before.  I don't have the precise
8      date in mind when we met with the attorney general.
9      It was around this time.
10 Q   Okay.  So you're telling me you don't remember whether
11     or not you had the information in Exhibit 124 when you
12     went to Madison?
13 A   My recollection is that I believe I did, but I'm not
14     certain.
15 Q   And you're saying you told that information to the
16     attorney general's office?
17 A   We passed everything we had obtained to the attorney
18     general's office.
19 Q   Okay.  Well, neither this memo nor anything about
20     Colburn and Lenk is in any of the records that were
21     provided to the attorney general's office.  I can tell
22     you that.  Does that give you any concern about
23     whether or not you provided this information, that is
24     to say the information in Exhibit 124, to the attorney
25     general's office?

## Page 112

1  A   And, again, it's my recollection that we did do that,
2      and I don't know for sure, but my recollection at this
3      time.
4  Q   Well, there's only two people in the "we," it's you
5      and Mike Griesbach, right?
6  A   In the what?
7  Q   In the "we" that you're talking about when you say
8      "we."
9  A   Right.
10 Q   Nobody else went to Madison, right?
11 A   That's correct.
12 Q   Okay.  And when you and Mike were there you met with
13     certain people in the attorney general's office,
14     you've told us about that, right?
15 A   Correct.
16 Q   So if this information was provided to the attorney
17     general's office, either you did it or Mike Griesbach
18     did it, in your best recollection.
19 A   From my recollection, I believe that's what was done.
20     I'm not certain.  But, again, I just have a vague
21     recollection that that was done.
22 Q   Did you personally give that information to Peg
23     Lautenschlager?
24 A   We turned over the entire Avery file to --
25 Q   I know that.  I'm asking you about your

## Page 113

1      conversation --
2          MR. MCCAMBRIDGE:  Let's -- we can be
3      courteous.
4          MR. KELLY:  Okay.  All right.  You're right.
5  A   We turned over --
6          MR. KELLY:  I apologize.  I withdraw that
7      question.  Let me ask it another way.
8  Q   You've told us on that day, that you met with the
9      attorney general.
10 A   And I don't recall the date that I met with the
11     attorney general.
12         MR. MCCAMBRIDGE:  The question is -- if you
13     would really listen to the question.
14         WITNESS:  I'm sorry.
15         MR. MCCAMBRIDGE:  You've told us you met
16     with the attorney general, yes or no.
17 A   Yes.
18 BY MR. KELLY:
19 Q   Okay.  Did you personally provide the information in
20     Exhibit 124 that we're talking about here, that I've
21     read into the record, to the attorney general?
22 A   To my recollection, I could be wrong, I believe we
23     turned over -- this was contained within the materials
24     we turned over to the attorney general.  We turned
25     over the entire file, as I stated earlier.

## Page 114

1  Q   Okay.
2          MR. MCCAMBRIDGE:  Let me try to help.  The
3      question was did you give this information, not
4      this document, did you give this -- if I
5      understand your question, did you give this
6      information to the attorney general.  Yes or no
7      or you don't know.  I mean, whatever.
8  A   I don't know.  I'm saying from my recollection, I
9      believe I did.
10 BY MR. KELLY:
11 Q   Okay.  And did you give it to her in oral form or did
12     you turn this document, Exhibit 124, over to her?
13 A   I don't --
14         MR. COVELLI:  Object to form.
15 A   I don't recall if it was oral or as the whole file,
16     sir.
17 BY MR. KELLY:
18 Q   Do you have any belief, as you sit here today, as to
19     whether or not you or Mike Griesbach at any point in
20     time turned over Exhibit 124 to any representative of
21     the attorney general's office?
22 A   I believe we had done so, but I'm not certain.
23 Q   Okay.  Apart from the document, do you have any
24     recollection of whether you or Mike Griesbach provided
25     to representatives of the attorney general's office

| Page 115 | Page 117 |
|---|---|

**Page 115**

1     the information that's contained in Exhibit 124 that
2     we've read into the record about what Kusche found out
3     about Colburn and Lenk?
4 A   Again, we may have.
5 Q   But you don't recall.
6 A   I don't recall. I don't recall but we may have.
7 Q   When you received this information from Douglass Jones
8     on September 18th that's set forth in Exhibit 124...
9 A   Yes?
10 Q   ...was it disturbing to you that the information
11     reported that Kocourek said something to the effect
12     that we already have the right guy and he should not
13     concern himself?
14 A   I didn't have an opinion about whether or not it was
15     disturbing or not to me.
16 Q   Had you received at that time, from any other source,
17     information that Kocourek was taking that position
18     generally with regard to any other suspect in the
19     Steven Avery case: that he had the right guy, don't
20     concern yourself about anybody else? Had you received
21     that information from any other source than this
22     Exhibit 124 at the time that you received this Exhibit
23     124?
24 A   I don't recall.
25 Q   In the meeting that took place in Ken Peterson's

**Page 116**

1     office at the sheriff's department, had anybody
2     provided any information of that kind to you?
3 A   Of what kind, please?
4 Q   Of the kind that when Sheriff Kocourek was provided
5     information about Gregory Allen or some other suspect
6     in the Penny Beerntsen sexual assault, he was taking
7     the position don't worry about it, we've got the right
8     guy.
9 A   Did anyone say that during the meeting? Is that your
10     question?
11 Q   Or words to that effect.
12 A   They may have. I don't recall.
13 Q   Let's go off the record for a minute.
14       REPORTER: Off the record.
15       (Off the record 10:42 - 10:46)
16       REPORTER: We're back on the record.
17 BY MR. KELLY:
18 Q   Mr. Rohrer, in response to the formal request that you
19     made, which you've identified to us in Exhibit No. 1,
20     was ultimately a report issued in December by the
21     attorney general's office?
22 A   If I could see it, it may refresh my recollection when
23     it was issued.
24 Q   I'll show you Exhibit 6.
25 A   Okay. I do recognize Exhibit 6, sir.

**Page 117**

1 Q   Okay. And what's it do to your recollection about it
2     being in December?
3 A   It's dated December of 2003.
4 Q   Okay.
5 A   I recognize the report.
6 Q   All right. At any time between when you first heard
7     from the woman at the crime lab and when you received
8     Exhibit No. 6, the report, did you have any discussion
9     with Jim Fitzgerald about the Steven Avery matter?
10 A   No.
11 Q   Again during that same period of time now, we're
12     talking between September 3 and December 17th, did you
13     talk with Denis Vogel?
14 A   No.
15 Q   At any time during that period of time, did you talk
16     with Tom Kocourek?
17 A   Yes.
18 Q   On how many occasions?
19 A   I do not know.
20 Q   More than one?
21 A   I do not know.
22 Q   At least one?
23 A   Yes.
24 Q   Where was the one that you recall?
25 A   I don't recall.

**Page 118**

1 Q   How long did it last?
2 A   Less than an hour.
3 Q   Who was present?
4 A   I don't recall.
5 Q   Well, it was at least you and Kocourek, right?
6 A   Yes.
7 Q   Okay. Was there anyone else present?
8 A   I don't recall.
9 Q   Was Mike Griesbach present?
10 A   I don't recall.
11 Q   What was the occasion for that conversation with
12     Kocourek? How did it come about, how did the meeting
13     come about?
14 A   I don't recall.
15 Q   Was it initiated by you?
16 A   I don't recall.
17 Q   Was it initiated by Mr. Kocourek?
18 A   I don't recall.
19 Q   Did you talk about the Steven Avery case?
20 A   Yes.
21 Q   Tell me everything you recall that you talked about
22     with him.
23 A   I don't recall what was said.
24 Q   You recall nothing of the meeting?
25 A   I recall that a meeting took place, we discussed

| Page 119 | Page 121 |
|---|---|

Page 119

1      Steven Avery.  I don't recall.
2  Q   Did you discuss Gregory Allen?
3  A   May have.
4  Q   Did you discuss Tom Bergner?
5  A   I don't recall.
6  Q   Did you discuss what you had been told at the meeting
7      with Ken Peterson?
8  A   I don't recall.
9  Q   Did you discuss what Brenda Petersen and Beverly
10     Badker had told you?
11 A   I don't recall.
12 Q   Did you make any notes of your meeting with Kocourek?
13 A   I did not.
14 Q   Is there a reason why you didn't?
15 A   I just didn't.
16 Q   All right.  You knew that there was an investigation
17     going on at the time by the Department of Justice
18     concerning Mr. Kocourek's behavior, right?
19 A   I don't recall when I had the meeting with Mr.
20     Kocourek as it related to the investigation.
21 Q   Well, we've already discussed the fact that it
22     took place sometime between when you received the
23     information from the crime lab and when the
24     report was issued, right?
25 A   Correct.

Page 120

1  Q   So are you saying that your conversation with Kocourek
2      took place sometime between September 3 and September
3      18th?
4  A   That's possible, yes.
5  Q   Okay.  So that would be a period of time in which you
6      were talking with Mr. Tinker about your concerns
7      respecting the Steven Avery prosecution, right?
8  A   Concerns with information I received in regard to the
9      Steven Avery prosecution.
10 Q   Well --
11 A   Based on the exhibit you showed me earlier.
12 Q   Exhibit No. 5 that we've already discussed, I'm going
13     to read this paragraph to you.  It follows the
14     paragraph we read earlier.  It says, "D.A. Rohrer
15     expressed his concerns about these allegations to the
16     attorney general's office and requested an independent
17     review.  The focus of this review would be to
18     determine if Allen was ever a suspect in this
19     investigation and, if so, was this information turned
20     over to the defense attorneys as part of the discovery
21     procedure."  Okay?  So that is something that you told
22     the attorney general's office that you wanted.
23         MR. COVELLI:  Objection to form.
24     BY MR. KELLY:
25 Q   Is that right?

Page 121

1  A   I don't recall precisely what I said, but if Mr.
2      Tinker stated I said it, I'd have no reason to doubt
3      him.
4  Q   And part of the concern about whether or not the
5      information concerning Gregory Allen was handled
6      properly in the prosecution to your knowledge at that
7      time, that is to say at the time of your meeting at
8      the attorney general's office, concerned the behavior
9      of former Sheriff Kocourek; is that right?
10         MR. MURRAY:  Form.  Form of the question.
11 A   If you could repeat the question, please.
12     BY MR. KELLY:
13 Q   Sure.  Part of your concern when you went and talked
14     to the attorney general was whether or not Kocourek
15     had behaved properly with respect to the investigation
16     insofar as information concerning Gregory Allen was
17     involved.
18         MR. MURRAY:  Same objection.
19 A   Again, I just wanted to make sure that an independent
20     review was done on the file to make sure everything
21     was handled properly was my concern.
22     BY MR. KELLY:
23 Q   By the sheriff as well as by the district attorney's
24     office, right?
25 A   In the entire case as a whole, yes.

Page 122

1  Q   Okay.  And what I'm trying to get here is, you've told
2      us you have an hour-long conversation with Sheriff
3      Kocourek.
4  A   I believe I said less than an hour, if I recall my
5      answer to your question, sir.
6  Q   Okay.  Can you fix the approximate period of time?
7  A   I cannot.
8  Q   And at the time that you talked to Kocourek, you were
9      an experienced criminal lawyer, right?
10 A   Yes.
11 Q   Okay.  Yet you made no notes of your conversation with
12     Kocourek.
13         MR. MURRAY:  Object as argumentative.
14     BY MR. KELLY:
15 Q   Is that right?
16 A   I stated earlier I did not make notes, no.
17 Q   Okay.  Can you tell me why?
18 A   I just didn't make notes.
19         MR. COVELLI:  Asked and answered.
20     BY MR. KELLY:
21 Q   Well, I know you just didn't make notes, but I'm
22     asking you what your state of mind was at the time as
23     to why you did not make notes.
24 A   I just didn't make the notes.
25 Q   When you went to the attorney general's office and

Page 123

1    talked to them about the case, did you tell the
2    representatives of the attorney general's office about
3    the conversation that you had had with Kocourek?
4  A  I don't recall.
5  Q  Did you tell the representatives of the attorney
6    general's office about the conversations that you had
7    had with Sheriff Peterson?
8  A  I don't recall.
9  Q  At any time between when you first received the phone
10    call from the representative of the crime laboratory
11    and December 17th when the report was published by the
12    attorney general, did you talk to Mrs. Beerntsen?
13  A  Yes.
14  Q  On how many occasions?
15  A  I don't recall.
16  Q  More than one?
17  A  At least once.
18  Q  Okay.  And was the once in-person or by phone?
19  A  What were the dates again, please?
20  Q  Between September 3rd and December 17th of 2003.
21  A  I don't recall if it was on the phone or in person.
22  Q  Who initiated the contact?
23  A  I don't recall.
24  Q  What was the reason for the contact?
25  A  I don't recall.

Page 124

1  Q  What did Mrs. Beerntsen say to you?
2  A  I don't recall.  She was pleased with how I was
3    handling the case.  That I do recall.
4  Q  What did you say to her?
5  A  I don't recall.
6  Q  Did she tell you anything about how disturbed she
7    was that it turned out that it was Gregory Allen
8    who had attacked her?
9        MR. BASCOM:  I'm going to object to the form
10        of that question.
11  A  I don't recall that being said.
12      BY MR. KELLY:
13  Q  Did she tell you anything about the contact that she
14    had received from Thomas Bergner at the time of the
15    events in question after she had been attacked and
16    before the actual trial?
17        MR. BASCOM:  Objection to the form.
18        MR. POLLEN:  I object also.  It assumes
19        facts not in evidence.
20      BY MR. KELLY:
21  Q  You can answer.
22  A  I apologize.  Because of the objections, may I have
23    the question repeated back?
24  Q  Sure.  Did Penny Beerntsen, in her conversation with
25    you, tell you anything about any information she had

Page 125

1    received from Thomas Bergner concerning another
2    possible assailant than Steven Avery at a period of
3    time between when she was attacked and when the trial
4    began?
5  A  I don't recall.
6  Q  Did she tell you anything about a phone call that she
7    had received at home from a City of Manitowoc police
8    officer raising the question of whether or not Steven
9    Avery was the proper defendant in the case?
10  A  I don't recall that.
11  Q  Do you have any recollection of anything she told you?
12  A  As I stated earlier, she was pleased with how I was
13    handling the case and complimented me on that.
14  Q  Anything else you remember that she told you?
15  A  Well, she was upset with the fact that Steven Avery
16    was convicted.
17  Q  Did she tell you why she was upset?
18  A  I don't recall.
19  Q  Did she tell you anything about her concerns as to how
20    the sheriff conducted himself?
21  A  I don't recall.
22  Q  Is there anything further you recall of the
23    conversation with Mrs. Beerntsen?
24  A  No.
25  Q  What was it that you did that she was so pleased with?

Page 126

1        MR. MURRAY:  Foundation.  If you know.
2      BY MR. KELLY:
3  Q  As she expressed it to you.
4  A  Well, how professionally we handled the situation, how
5    quickly we moved on the situation, how thorough we
6    were with the situation.  She was very pleased with
7    that.
8  Q  Well, you didn't do anything, did you?  You just
9    asked the attorney general to conduct an
10    investigation.
11        MR. MCCAMBRIDGE:  Objection.
12        MR. MURRAY:  Argumentative.
13        MR. MCCAMBRIDGE:  That's a little snotty.
14        MR. KELLY:  Moi?
15  Q  What was it about your behavior that she liked?
16        MR. COVELLI:  Asked and answered.
17        MR. MURRAY:  Foundation.  Go ahead and
18        answer.
19  A  I already answered that question.  I said that she was
20    pleased with how we handled ourselves with the
21    situation, how professional --
22      BY MR. KELLY:
23  Q  Who's we?
24  A  Mike and I.
25  Q  Did you tell her anything about what you had found out

## Page 127

1      in the course of your discussions with Kocourek,
2      Peterson or any other representatives of the sheriff's
3      department?
4    A   I don't recall.
5    Q   At any time between September 3rd when you received
6      the information that you did from the crime lab and
7      December 17th, did you have any discussions with any
8      representatives of the City of Manitowoc?
9    A   Yes.
10   Q   With whom?
11   A   Perry Kingsbury, Tom Bergner.
12   Q   Did you meet them together or separately?
13   A   My recollection is they were together.
14   Q   Where did the meeting take place?
15   A   City of Manitowoc Police Department.
16   Q   Did it take place before you went to the attorney
17      general's office or after?
18   A   I don't recall.
19   Q   Do you know whether the information that you
20      received in the meeting that you had with those people
21      was information that you provided to the attorney
22      general's office?
23   A   Myself or Mr. Griesbach?
24   Q   Mr. Griesbach was at the meeting as well?
25   A   Yes.

## Page 128

1    Q   Was there anyone else at the meeting?
2    A   From my recollection, I don't recall other than those
3      four people.
4    Q   Was Jim Wyss at the meeting?
5    A   No.
6    Q   What was the occasion for the meeting?  How did it
7      come about?
8    A   I don't recall.
9    Q   Did you ask for the meeting or did they volunteer to
10      meet with you?
11   A   I asked for the meeting.
12   Q   And why did you ask for the meeting?
13   A   To discuss the case.
14   Q   Well, why discuss the case as to them?  What knowledge
15      did you have that caused you to want to meet with
16      Perry Kingsbury and Tom Bergner?
17   A   I don't recall.
18   Q   You did have information about Tom Bergner at the
19      time that you called for that meeting?
20   A   I don't recall.
21   Q   Well, how did you select him to be involved in the
22      meeting?
23   A   He was just there.
24   Q   Whom had you contacted to have the meeting?
25   A   I believe myself or Mike Griesbach contacted Perry

## Page 129

1      Kingsbury.
2    Q   And did this take place after the meeting that you had
3      at Ken Peterson's office?
4    A   I don't recall.
5    Q   What prompted you or Mike Griesbach to call for this
6      meeting?
7    A   To discuss the case.
8    Q   What did Tom Bergner tell you at the meeting?
9    A   He mentioned Gregory Allen's name, that they were
10      doing surveillance on him at the time that this
11      incident took place.
12   Q   Anything further?
13   A   That's all I recall at this time.
14   Q   Did he tell you that he had talked to Tom Kocourek
15      about the surveillance that they had been doing of
16      Greg Allen?
17   A   I don't recall.
18   Q   Did he provide to you any of the documents from the
19      investigation of Gregory Allen that they had been
20      conducting at the time?
21   A   I don't recall.
22   Q   Did he tell you he had provided extensive documentary
23      information to Perry Kingsbury about the investigation
24      that was being conducted of Gregory Allen at the time
25      that Penny Beerntsen was assaulted?

## Page 130

1    A   I recall a file being present during the meeting.
2      That was discussed.
3    Q   Did Kingsbury say anything to you at the meeting about
4      what his reaction had been when Bergner produced that
5      file and gave it to him?
6    A   I don't recall.
7    Q   Do you remember anything being said where Kingsbury
8      said, "Hey, I don't want it," anything like that?
9    A   I don't recall.
10   Q   Did you ask to see the file?
11   A   I don't recall.
12   Q   Did you in fact see the file?
13   A   I don't recall.
14   Q   Did you see any of the investigatory reports that
15      were made concerning Gregory Allen for the period
16      of time between January of 1985 and August 2nd of
17      1985 by members of the City of Manitowoc Police
18      Department?
19   A   I don't recall.
20   Q   Do you recall whether you looked at any documents at
21      that meeting?
22   A   May have looked at some of the reports in there.
23   Q   Did Bergner tell you that they had put Allen
24      specifically under surveillance for the period of time
25      between the 14th of July and the 2nd of August 1985

## Page 131

1    because they perceived him to be extremely dangerous
2    with respect to sexual violence?
3             MR. COVELLI:  Objection.  Form.
4    A   I don't recall.
5    BY MR. KELLY:
6    Q   Anything further that you recall of the conversation
7        between you, Griesbach, Kingsbury and Bergner at that
8        meeting?
9    A   I think they may have had a code name for Allen at
10       that time that was brought up, but I don't recall the
11       code name.
12   Q   The Sandman?
13   A   I don't recall.
14   Q   Does that ring a bell at all?
15   A   All I know is there was a code name they had for him.
16   Q   Okay.  Did you make any memorandum concerning that
17       meeting?
18   A   No, I did not.
19   Q   To your knowledge, did Mr. Griesbach make any
20       memorandum?
21   A   I don't know.
22   Q   Did you discuss with Mr. Griesbach about whether or
23       not you should be making a memorandum?
24   A   No.
25   Q   Did you provide the information from the meeting,

## Page 132

1    whatever it was, to the attorney general's office?
2    A   I don't recall.
3    Q   After that meeting, did you have any discussions with
4        Jim Wyss about the Steven Avery prosecution?
5    A   No.
6    Q   Have you to this day had any such discussions?
7    A   No.
8    Q   To your knowledge, has Mr. Rollins?
9    A   I don't know.
10   Q   Mr. Rollins talk to you at all about any potential
11       liability of the City of Manitowoc in this case?
12   A   No.
13   Q   After you received the information from the crime lab
14       on September 3rd, did you talk with Judge Hazelwood
15       about this case at all?
16   A   Yes.
17   Q   On how many occasions?
18   A   I don't know.
19   Q   Did you talk to him about Gregory Allen at all?
20   A   Yes.
21   Q   Was Mr. Griesbach with you on any of the occasions in
22       which you talked to Judge Hazelwood about this case?
23   A   Yes.
24   Q   Was it an in-person meeting or was it a meeting that
25       took place over the phone?

## Page 133

1    A   In person.
2    Q   One or more than one?  One or more than one?
3    A   More than one.
4    Q   It took place in the judge's chambers or elsewhere?
5    A   Judge's chambers and his office.
6    Q   Okay.  More than two meetings?
7    A   I don't recall.
8    Q   All right.  Was the information that you had received
9        from Bergner and Kingsbury discussed with Judge
10       Hazelwood?
11   A   That I received?
12   Q   Well, that you and Griesbach received when you met
13       with him.
14   A   I don't recall.
15   Q   Was the fact that Bergner and the Manitowoc City
16       Department had been surveilling Gregory Allen
17       information that you discussed with Judge Hazelwood?
18   A   I don't recall.
19   Q   What do you recall of the discussion between you,
20       Griesbach and Judge Hazelwood about the Steven Avery
21       case?
22   A   We let him know about the results of the DNA.  We let
23       him know that we reviewed the file and it was our
24       intention to dismiss the case.  That's what I recall.
25   Q   So this would be the first meeting with Judge

## Page 134

1    Hazelwood that took place before you actually filed
2    the formal papers concerning the dismissal?
3    A   Yes.
4    Q   And that dismissal, I can tell you, took place on the
5        10th of September of 2003, okay?  Is that all right?
6    A   If that's the date if I saw the document, I would have
7        no reason to doubt you --
8    Q   Okay.
9    A   -- if that's what you say it is.
10   Q   Did you have a second meeting with Judge Hazelwood
11       after the case was dismissed?
12   A   We may have had a meeting before the -- another
13       meeting before the case was dismissed or after.  I
14       don't recall.
15   Q   Did you have any meetings with Judge Hazelwood
16       concerning the case after you went to the
17       attorney general's office with Mr. Griesbach?
18   A   I don't recall.  We may have.
19   Q   Do you recall at any time talking with Judge Hazelwood
20       about the information that you had found out from Mr.
21       Bergner about Gregory Allen?
22   A   I don't recall.
23   Q   At any time after you received the call from the crime
24       lab, did you have any discussions with Jim Bolgert
25       about this case?

## Page 135

1   A   Yes.
2   Q   On how many occasions?
3   A   At least once.
4   Q   In person or by phone?
5   A   By phone.
6   Q   Who initiated the call?
7   A   I did.
8   Q   Was it --
9   A   Judge Hazelwood suggested that I do that.
10  Q   Was it before or after you got the dismissal -- or
11      filed the papers for the dismissal in the case?
12  A   I believe it was before.
13  Q   Any further conversations after the case was
14      dismissed with Jim Bolgert?
15  A   Not that I recall.
16  Q   What do you recall of the conversation you had with
17      him?
18  A   I called him up to let him know what was going on,
19      what we were intending to do.  I recall him being
20      emotional.  I don't recall what he said.
21  Q   Emotional in what sense?
22  A   He was emotional.
23  Q   I know.  Was he happy?  Was he sad?  Was he angry?
24      What were the emotions that you experienced when
25      you...

## Page 136

1   A   I can't get into his head other than he was very
2       emotional during the phone call.  I didn't sense
3       anger.
4   Q   Was he happy?
5   A   He seemed to he happy from what I could tell from his
6       emotion, yes.
7   Q   Did he say anything about Steven Avery?
8   A   Not that I recall.
9   Q   Did he ask you any questions about Gregory Allen?
10  A   Not that I recall.
11  Q   Did he make any statements to you about whether or not
12      information concerning Gregory Allen had been provided
13      to him when he was representing Steven Avery?
14  A   He did not say anything like that.
15  Q   Do you recall any further discussions you had with Jim
16      Bolgert after that one, concerning the Steven Avery
17      matter?
18  A   I don't recall.
19  Q   Did you know Bolgert previously as a result of
20      having done criminal defense work?
21  A   Yes.  And he married my wife and I.
22  Q   Okay.  So he's a friend of yours?
23  A   He's not a friend.  He's -- he married us.  He's a
24      friend of my in-laws, actually.
25  Q   Okay.  At any time after you received the information

## Page 137

1       that you received from the crime lab, did you have any
2       conversation with a Richard Brey, B-r-e-y, about the
3       --
4   A   Are you referring to BRIGH [Brey]?
5   Q   Is that how it's pronounced, BRIGH?
6   A   Yes.
7   Q   ...about the Steven Avery case?
8   A   Not that I recall.
9   Q   After September 3 when you got the information you did
10      from the crime lab, did you ever talk to Tom
11      Beerntsen?
12  A   No.  Excuse me.  No.
13      WITNESS:  May I have some water?
14      MR. MCCAMBRIDGE:  Sure.
15      MR. KELLY:  That's all I have.
16      WITNESS:  Oh.
17      MR. MCCAMBRIDGE:  Okay.
18      REPORTER:  Anything further for the record,
19  gentlemen?
20      MR. COVELLI:  Nothing further.
21      MR. BASCOM:  Nothing.
22      REPORTER:  There being nothing further, the
23      deposition is concluded at 11:11 a.m.  Off the
24      record.

**A**

**access** 78:13
**accompanied** 87:16
**accurate** 66:17 78:3
**accurately** 96:4
**actual** 124:16
**ADA** 72:15
**add** 78:6
**age** 66:14
**agree** 103:21
**agreed** 103:17
**ahead** 126:17
**ahold** 90:23
**allegations** 120:15
**Allen** 69:18,23 70:7 73:5,18 76:18 78:19 79:3,8,13 80:11 80:18 81:3,6,9 81:23 82:2,24 84:8 85:12 89:16 90:3,14 90:18 91:4,8,25 92:1,9 93:20,23 94:3,12 95:20 98:23 99:8,10 99:14,25 109:21 110:8 116:5 119:2 120:18 121:5,16 124:7 129:16,19,24 130:15,23 131:9 132:19 133:16 134:21 136:9,12
**Allen's** 73:22 85:14 129:9
**amount** 97:18
**Anderson** 68:12 68:13
**Anderson's** 68:16
**Andy** 96:25 98:16 98:18,22 99:2 110:5
**anger** 136:3

**angry** 135:23
**announcement** 83:22 84:23 85:24
**announcing** 84:5
**answer** 92:17 93:11,14 94:7 122:5 124:21 126:18
**answered** 92:12 107:19 122:19 126:16,19
**answering** 93:15
**anybody** 73:7 74:4 76:2 86:15 88:5 89:24 100:20,23 115:20 116:1
**Apart** 114:23
**apologize** 66:17 84:1 111:5 113:6 124:22
**appellate** 102:3
**applied** 74:24
**appointed** 67:1 74:25
**appointment** 74:24
**appointments** 67:24
**approximate** 69:1 122:6
**approximately** 68:9 75:8
**areas** 67:17
**argumentative** 93:5 122:13 126:12
**arrest** 102:7
**asked** 92:11 106:22 107:19 122:19 126:9,16 128:11
**asking** 79:21 82:10 83:4,5 92:7,7,19 93:1,1

107:14 112:25 122:22
**assailant** 125:2
**assault** 69:22 73:18 84:9 109:23,25 110:9 116:6
**assaulted** 94:4 129:25
**assigned** 67:23 75:23 76:2
**assistant** 80:6 88:9,12 109:6
**assistants** 88:15
**associate** 67:8,16 68:18
**assumes** 124:18
**attacked** 124:8,15 125:3
**attend** 66:21
**attention** 95:9,14
**attorney** 66:24 67:8,16 68:2,14 68:19 69:12 74:22 80:6 83:19 88:8,10 89:14 90:2 94:21,23 95:17 95:23,25 96:4 101:11,17 102:3 102:6 103:25 104:15 105:4 106:3 107:11 108:15 109:6,11 109:16 110:16 111:7,8,16,17,21 111:24 112:13 112:16 113:9,11 113:16,21,24 114:6,21,25 116:21 120:16 120:22 121:8,14 122:25 123:2,5 123:12 126:9 127:16,21 132:1 134:17

**attorneys** 88:12 120:20
**attorney's** 68:20 76:8 79:3,13 87:20 89:16 121:23
**August** 130:16,25
**authored** 105:2
**authority** 101:20 103:10,12
**available** 81:5
**Ave** 64:22
**Avery** 63:10 65:13 66:5 69:14,21 70:9 71:7,15,21 72:2 73:5 74:15 75:16 76:9,12 80:25 84:7 85:8 86:25 87:19 95:20 97:15 98:25 100:1,9 101:13 102:7 105:7,19 106:13 109:22 110:8 112:24 115:19 117:9 118:19 119:1 120:7,9 125:2,9,15 132:4 133:20 136:7,13,16 137:7
**Avery's** 85:10
**aware** 69:20 70:15,16 76:12 86:4,6,11,15,16 86:21 99:19
**awareness** 70:13
**a.m** 137:23

**B**

**back** 70:7 73:17 74:12 75:22 77:7 84:2,3 116:16 124:23
**background**

78:14
**Badker** 86:2,21 89:23 94:16,21 95:4 96:18,20 101:8 119:10
**Barbara** 63:4
**Bascom** 64:14,15 93:5 124:9,17 137:21
**based** 81:12 120:11
**basically** 70:5 78:13
**basis** 74:10 81:10 102:19,22 103:2 103:21 104:1,2 111:3
**Bates** 95:10
**Bauer** 88:13 105:11
**Beck** 91:15 100:13
**Beerntsen** 69:22 73:19 84:9 94:4 109:22,25 110:9 116:6 123:12 124:1,24 125:23 129:25 137:11
**began** 125:4
**beginning** 94:3
**behalf** 64:6,12,18 64:24 65:5,11
**behaved** 121:15
**behavior** 107:10 119:18 121:8 126:15
**behest** 73:7,9,10
**belief** 114:18
**believe** 66:18 68:12,17 70:20 80:14 91:9 94:10 102:15 108:16 110:18 111:13 112:19 113:22 114:9,22 122:4 128:25

135:12
believed 94:2,11
  95:19,20 99:8
bell 89:9 131:14
Bergner 119:4
  124:14 125:1
  127:11 128:16
  128:18 129:8
  130:4,23 131:7
  133:9,15 134:21
Bergren 100:7
best 70:4 71:24
  72:16 81:22
  82:7,11 83:5,8
  84:15 89:22
  92:3,4,8,20,23
  93:1,4,17,19
  98:13 107:24
  112:18
Bev 89:23 96:18
  96:20
Beverly 86:2
  94:16,21 95:4
  119:9
beyond 92:14
  106:21,25
birth 78:22
bit 74:12
Boardman 64:9
Bolgert 134:24
  135:14 136:16
  136:19
bottom 95:10
Boulevard 63:7
  65:3
Box 64:10 65:9
  78:2
boxes 71:17
Brenda 85:18
  89:23 91:23
  92:8,23 93:19
  94:20 95:3
  96:18,20 119:9
Brey 137:2,4
briefed 76:15
briefing 70:24

BRIGH 137:4,5
bring 87:22
bringing 70:24
brought 80:3,7
  87:19,23,25
  99:10 131:10
Brown 109:20
  110:7
Budish 64:15
Burkert-Brist
  88:25
B-r-e-y 137:2

--- C ---

C 63:11 64:1
call 69:24 73:16
  73:21 74:9,11
  76:6,17,21
  77:22 83:18,21
  103:18 123:10
  125:6 129:5
  134:23 135:6
  136:2
called 70:2 128:19
  135:18
Caption 63:10
care 92:3 106:17
  106:18
Carlson 64:21
case 63:11 69:14
  71:1,7 74:15
  75:16,19 76:9
  76:12,15 77:18
  80:19,25 97:15
  98:24,25 100:9
  102:4 103:15
  107:16 109:9
  115:19 118:19
  121:25 123:1
  124:3 125:9,13
  128:13,14 129:7
  132:11,15,22
  133:21,24
  134:11,13,16,25
  135:11,13 137:7
cases 68:21 69:6,8

70:25
caused 95:2
  128:15
CCAP 78:10,12
  78:18 81:10,12
  81:17,19,23
  82:2,8 90:21
Ceman 64:15
certain 68:17
  111:14 112:13
  112:20 114:22
chambers 133:4,5
chance 95:11
charge 81:3
charged 78:15
check 80:17 90:18
  90:21 91:7,11
checks 78:14
circuit 78:13
circumstances
  102:6
City 100:8 125:7
  127:8,15 130:17
  132:11 133:15
civil 105:5,17
  106:1
Claude 64:8
clerk's 90:24
code 131:9,11,15
Cohen 63:4
Colburn 96:25
  98:16,22 99:2
  100:15 109:20
  109:21 110:5,7
  110:10 111:20
  115:3
colleague 71:17
come 73:17 74:21
  83:13 87:14
  93:2 118:12,13
  128:7
committed 95:19
  95:20 109:22,25
  110:9
complaint 90:23
  91:9

completely 76:20
complimented
  125:13
concern 110:12
  111:22 115:13
  115:20 121:4,13
  121:21
concerned 106:15
  106:16 107:1,5
  121:8
concerning 73:4
  79:12 81:5
  83:23 94:20
  108:23 119:18
  121:5,16 125:1
  130:15 131:16
  134:2,16 136:12
  136:16
concerns 95:22
  107:15 120:6,8
  120:15 125:19
concluded 137:23
conduct 101:18
  103:12 126:9
conducted 125:20
  129:24
conducting 90:13
  129:20
confines 91:2
conflict 101:24
  102:1
connection 105:6
  105:18
consider 76:2
  91:6
contact 97:19
  123:22,24
  124:13
contacted 70:12
  94:21,25 128:24
  128:25
contacting 94:23
contained 113:23
  115:1
contents 90:7,9
  107:13

conver 80:12
convers 77:20
conversation 70:5
  71:3,4,6 74:6,13
  75:2,13 76:7
  77:19,21 78:4
  79:6,25 81:14
  81:15 82:13
  83:14,25 86:18
  94:14,18 107:12
  107:22 108:4,5
  108:8,17 109:8
  113:1 118:11
  120:1 122:2,11
  123:3 124:24
  125:23 131:6
  135:16 137:2
conversations
  86:24 101:7
  107:17 123:6
  135:13
convicted 78:15
  125:16
conviction 105:7
  105:19
Cooley 66:22
corporation
  104:24
correct 72:7
  76:16 87:10,13
  87:15 98:19
  103:14 104:23
  104:25 105:1
  110:15 112:11
  112:15 119:25
correspondence
  105:3
counsel 104:25
county 63:10
  64:12,18,24
  66:24 68:2,21
  69:13 72:19,20
  72:24 91:3
  95:16,24 104:25
  105:6,18 106:12
  109:6,21 110:6

110:7
**couple** 75:9 87:3
**course** 68:18
  127:1
**court** 63:12 78:13
**courteous** 113:3
**courthouse** 95:16
  95:19
**Covelli** 64:8 77:1
  92:11 93:7,21
  94:5 107:19
  108:2 114:14
  120:23 122:19
  126:16 131:3
  137:20
**creation** 103:17
**crime** 70:1,12
  73:16 74:14
  75:15,20,22
  76:6,18,21
  77:23 80:2
  82:21 83:1,16
  83:24 84:6 85:5
  85:7 92:10
  95:21 117:7
  119:23 123:10
  127:6 132:13
  134:23 137:1,10
**crimes** 78:15 82:5
  95:19
**criminal** 67:19,21
  67:22 78:14
  90:17 91:7,10
  91:19 122:9
  136:20
**Crivello** 64:21
**current** 95:17
**Curry** 64:9

**D**

**D** 66:1
**dangerous** 131:1
**date** 78:22 110:23
  111:8 113:10
  134:6
**dated** 109:10,11

117:3
**dates** 123:19
**day** 109:10 113:8
  132:6
**DCI** 88:11 89:6
**deal** 106:1
**Deb** 89:9
**December** 116:20
  117:2,3,12
  123:11,20 127:7
**decide** 74:9 83:18
**decided** 83:21
  102:17
**decision** 91:2
  106:7 111:2
**declined** 74:23
**defendant** 125:9
**defender** 67:23
**defending** 68:23
**defense** 120:20
  136:20
**demand** 101:12
**Denis** 64:12 68:17
  95:23 117:13
**department** 65:8
  90:19 91:8,11
  91:13 96:14
  97:23 98:6 99:7
  100:8 116:1
  119:17 127:3,15
  130:18 133:16
**deposition** 73:3
  137:23
**describe** 84:17
**desk** 99:20
**details** 70:6
**determination**
  81:11 84:7
**determine** 80:24
  120:18
**dialog** 71:16
  98:21
**difference** 93:3
**direct** 81:1 95:9
**directed** 95:13
**direction** 73:14

79:17,18,20,22
  80:7
**directly** 97:9,10
**discovered** 81:23
**discovery** 120:20
**discuss** 80:10
  84:13 99:22
  105:9,11,13
  119:2,4,6,9
  128:13,14 129:7
  131:22
**discussed** 70:10
  71:6 78:7
  102:15 103:4
  118:25 119:21
  120:12 130:2
  133:9,17
**discussing** 98:18
**discussion** 70:21
  71:25 80:15
  98:16 103:6,8
  105:21,22,25
  117:8 133:19
**discussions** 69:13
  69:16 75:16
  90:3,8,9 105:16
  127:1,7 132:3,6
  134:24 136:15
**dismiss** 133:24
**dismissal** 134:2,4
  135:10,11
**dismissed** 80:25
  134:11,13
  135:14
**district** 63:12,13
  66:23 68:2,14
  68:20 69:12
  74:21 76:8 79:3
  79:13 80:6
  87:20 89:16
  95:17,23 109:6
  121:23
**disturbed** 94:19
  124:6
**disturbing** 115:10
  115:15

**DNA** 69:20 70:6
  133:22
**document** 77:9
  78:3 79:14
  96:11 109:4
  114:4,12,23
  134:6
**documentary**
  129:22
**documents** 73:4
  99:16 129:18
  130:20
**doing** 72:22 80:10
  80:20,21 81:2
  91:5,6 102:15
  102:17,23
  108:11 129:10
  129:15
**doubt** 121:2 134:7
**Doug** 110:14
**Douglass** 109:5
  115:7
**Doyle** 67:1 74:25
**drafted** 110:21
**D.A** 72:15,16 79:9
  95:22 96:15,16
  96:17,22 120:14

**E**

**E** 64:1,1 65:7 66:1
  66:10
**earlier** 75:2
  100:21 113:25
  120:11,14
  122:16 125:12
**East** 63:7 65:3
**Eastern** 63:13
**effect** 110:11
  115:11 116:11
**effort** 79:11,19,20
**either** 90:25 95:22
  97:8 112:17
**election** 72:10
  74:16,18,19
**Elma** 68:12,13,16
**emotion** 136:6

**emotional** 135:20
  135:21,22 136:2
**emotions** 135:24
**employee** 104:18
**employees** 96:11
**employment**
  67:13,15
**entire** 98:20
  112:24 113:25
  121:25
**essence** 103:14
**establish** 93:9
**estimate** 68:10
  87:2
**events** 124:15
**evidence** 124:19
**exact** 93:18 94:8
  107:25
**exactly** 78:8 92:6
  92:7
**examination** 66:2
  74:14
**examine** 76:24
  91:17 95:7,11
  109:3
**examining** 77:9
**exculpated** 84:8
**Excuse** 137:12
**exhibit** 66:4 76:23
  77:10,16 78:6
  78:17 79:14
  95:8 102:10
  103:17 104:5,8
  108:25 109:2
  111:1,11,24
  113:20 114:12
  114:20 115:1,8
  115:22,22
  116:19,24,25
  117:8 120:11,12
**exhibits** 66:7
  71:18,22
**exonerated** 69:21
**experienced**
  122:9 135:24
**expressed** 107:9

Case 1:19-cv-00484-BHL   Filed 03/03/20  Page 24 of 32  Document 120-12

120:15 126:3
**extensive** 91:21
129:22
**extent** 76:15
**extremely** 131:1

**F**

**F** 64:2,3 65:1
**fact** 78:9 103:8
106:6 119:21
125:15 130:12
133:15
**facts** 124:19
**Falon** 88:17,19,20
**familiar** 109:4
**far** 71:22 72:20
**fashion** 76:11
**fearful** 106:11,14
**felonies** 67:24
**Field** 64:9
**file** 66:5 71:13,14
71:15,21,22
72:2,5 75:20,23
75:25 79:8,9
80:20,21,24
87:19,23 88:1
94:24 106:20
112:24 113:25
114:15 121:20
130:1,5,10,12
133:23
**filed** 134:1 135:11
**files** 79:3,13
**find** 79:2,12 91:2
**Findley** 101:11
**finish** 66:16
**finished** 77:9
**firm** 67:8,9 68:19
**first** 69:20 73:19
73:24 76:14
95:24 96:19
117:6 123:9
133:25
**Fitzgerald** 68:5
69:9,14,17
70:17 71:7,10

72:1,8 74:13
75:3,13 76:5,14
117:9
**Fitzgerald's** 72:5
**five** 71:17
**fix** 69:4 122:6
**focus** 120:17
**following** 111:2
**follows** 120:13
**forget** 90:24
**Forgive** 73:11
**form** 93:21 94:5
108:3 114:11,14
120:23 121:10
121:10 124:9,17
131:3
**formal** 102:5
116:18 134:2
**former** 72:4,5
110:6 121:9
**forth** 90:14 115:8
**found** 69:24 78:21
78:22 80:2
115:2 126:25
134:20
**foundation** 92:14
93:12 108:2
126:1,17
**four** 128:3
**Fox** 67:9,10
**friend** 136:22,23
136:24
**front** 102:24
**full** 95:9
**further** 73:4 79:2
79:12 81:4
83:22 87:22
90:2,13,20
125:22 129:12
131:6 135:13
136:15 137:18
137:20,22

**G**

**Gail** 80:3,5,13,16
81:1,15,24

**Gene** 109:9,19
110:4,9
**general** 88:9,12
92:8 93:18
94:23 101:17
106:3 107:11
109:11,16 111:7
111:8 113:9,11
113:16,21,24
114:6 121:14
123:12 126:9
**generally** 67:23
72:13 82:7
84:22 115:18
**generals** 88:10
**general's** 83:19
89:14 90:2
94:22 96:1,5
101:11 102:3,6
103:25 104:15
105:4 108:15
110:17 111:16
111:18,21,25
112:13,17
114:21,25
116:21 120:16
120:22 121:8
122:25 123:2,6
127:17,22 132:1
134:17
**gentlemen** 137:19
**Geske** 108:14,18
**give** 77:4 89:22
93:4 102:18
103:9 111:22
112:22 114:3,4
114:5,11
**Glynn** 71:17
**go** 72:8,11,16
99:18,20 116:13
126:17
**going** 74:10 76:23
80:17,23 95:7,8
95:14 106:25
111:3 119:17
120:12 124:9

135:18
**Good** 66:12,13
**gotten** 90:23
**government** 91:3
**Governor** 67:1
74:25
**graduated** 66:18
67:5
**Greg** 109:21
129:16
**Gregory** 69:18,22
70:7 73:5,18,22
76:18 78:19
79:3,8,12 84:8
85:12,14 89:16
90:3,13 91:4,25
92:9 93:20,23
94:3 98:23 99:8
99:10,14,25
116:5 119:2
121:5,16 124:7
129:9,19,24
130:15 132:19
133:16 134:21
136:9,12
**Griesbach** 66:5
74:1,8,20,23
78:5 79:11 80:1
80:13,23 82:13
82:16 83:15,25
86:15 87:17
90:3,12 98:9
100:21 101:2
105:16 107:9,25
110:20 112:5,17
114:19,24 118:9
127:23,24
128:25 129:5
131:7,19,22
132:21 133:12
133:20 134:17
**Griesbach's** 77:21
**Grimstad** 63:6
65:2
**group** 85:25 86:1
86:8

**guess** 82:8,10
**guy** 110:11 115:12
115:19 116:8
**guys** 98:10

**H**

**hair** 73:22
**handled** 107:16
121:5,21 126:4
126:20
**handling** 124:3
125:13
**happen** 105:24
**happened** 101:13
106:12
**happy** 135:23
136:4,5
**Hazelwood**
132:14,22
133:10,17,20
134:1,10,15,19
135:9
**head** 82:4 136:1
**hear** 73:1
**heard** 72:25 82:19
82:20 91:24
117:6
**held** 67:4
**help** 114:2
**Hey** 130:8
**history** 90:18 91:7
91:10,19,21,22
**home** 125:7
**hour** 100:12 118:2
122:4
**hour-long** 122:2
**hundred** 69:6

**I**

**identified** 71:16
77:16 79:14
100:19 108:25
116:19
**identity** 89:6
**immediate** 68:1
**inaccurate** 78:1
**incarcerated** 81:9

81:11,17,18
**incident** 129:11
**inculpated** 69:22
73:18 84:8
**independent**
94:25 95:2
107:3,6 120:16
121:19
**independently**
86:14
**individually** 86:1
**individuals** 95:21
97:25 98:4
**information**
75:14,21 78:18
79:2,7,12 81:5
89:15,20 91:25
95:18,25 96:6,9
97:1,5,7 98:22
100:7 110:13,16
111:11,15,23,24
112:16,22
113:19 114:3,6
115:1,7,10,17,21
116:2,5 119:23
120:8,19 121:5
121:16 124:25
127:6,19,21
128:18 129:23
131:25 132:13
133:8,17 134:20
136:12,25 137:9
**informed** 70:6
76:5 83:16
92:10 99:25
**initially** 101:23
**initiate** 97:19,20
**initiated** 118:15
118:17 123:22
135:6
**inquiries** 90:13
**inquiry** 73:12
75:20 91:18
**insofar** 121:16
**integrity** 106:20
106:24 107:1,4

**intending** 135:19
**intention** 133:24
**interest** 101:24
102:1
**investigation**
94:24,25 95:3
101:12,19,25
103:12,20 106:2
106:22 107:3
111:4 119:16,20
120:19 121:15
126:10 129:19
129:23
**investigators**
88:11 89:7
**investigatory**
130:14
**involved** 69:8
121:17 128:21
**in-laws** 136:24
**in-person** 123:18
132:24
**issue** 80:18 82:24
83:10 103:11
106:1
**issued** 116:20,23
119:24

_____
**J**
**J** 64:8,20
**jail** 81:13
**James** 65:7
**Janine** 108:14
**January** 66:18
130:16
**Jennifer** 88:22
**Jim** 68:5 69:8,14
69:16 70:17
71:7 72:1 75:3
75:13 97:1
98:22 99:2
117:9 128:4
132:4 134:24
135:14 136:15
**job** 106:19,21
**John** 65:1

**Jones** 66:6 109:5
109:14,18,19
110:14 115:7
**Joseph** 63:4
**Judge** 132:14,22
133:9,17,20,25
134:10,15,19
135:9
**judge's** 133:4,5
**July** 130:25
**Justice** 65:8
119:17

_____
**K**
**keep** 84:14 100:25
101:4,8
**Kelly** 64:2,3 66:3
66:7,8,11 77:2,8
92:16 93:10,13
93:16,25 94:6
96:21 107:21
108:7 113:4,6
113:18 114:10
114:17 116:17
120:24 121:12
121:22 122:14
122:20 124:12
124:20 126:2,14
126:22 131:5
137:15
**Ken** 97:13,14 98:5
99:14,16 115:25
119:7 129:3
**kind** 67:21 69:16
103:12 116:2,3
116:4
**Kingsbury** 127:11
128:16 129:1,23
130:3,7 131:7
133:9
**knew** 76:14 81:18
93:23 119:16
**know** 68:1,6,11,13
71:23 72:11,12
72:13,14,15,18
72:20,22,23

73:10 74:10
79:16,18 81:18
81:20 82:10
83:6,7,10,13
87:4 88:2,10
90:6 92:4,15
93:3 97:10
98:18 99:21
100:20 101:3
107:14 111:5
112:2,25 114:7
114:8 117:19,21
122:21 126:1
131:15,21 132:9
132:18 133:22
133:23 135:18
135:23 136:19
**knowledge** 71:24
73:7 76:12
79:11,22 81:8
90:12 91:17
94:20 95:16
98:8 101:2
121:6 128:14
131:19 132:8
**known** 72:1 76:18
95:22
**Kocourek** 64:24
65:5 95:24
99:22,24 100:2
100:6 109:20
110:6,10 115:11
115:17 116:4
117:16 118:5,12
118:17 119:12
119:20 120:1
121:9,14 122:3
122:8,12 123:3
127:1 129:14
**Kocourek's**
119:18
**Kusche** 109:9,19
109:19 110:4
115:2

_____
**L**

**lab** 70:1,12 73:16
75:15,20,23
76:7,18,21
77:23 80:2
82:21 83:1,16
83:24 84:6 85:5
85:7 92:10
117:7 119:23
127:6 132:13
134:24 137:1,10
**laboratory** 123:10
**lab's** 74:14
**language** 109:24
**Lansing** 66:22
**Lautenschlager**
88:9 105:13
112:23
**law** 66:16,21,22
67:5,8,9,17,19
67:21,22 68:19
**lawyer** 67:6 93:3
122:9
**lawyers** 104:21
**leave** 72:8 75:7
**led** 98:20 103:17
**left** 70:17 75:5,25
**legal** 80:10 81:2
**length** 82:3
**Lenk** 97:1 98:22
99:2 100:17
111:20 115:3
**letter** 104:2,4
109:11,15 111:2
**let's** 84:2 88:12
90:16 94:1
96:16 110:2
113:2 116:13
**liability** 105:5,17
106:2,11 132:11
**liked** 126:15
**limitations** 80:18
82:24 83:10
**listen** 113:13
**litigation** 104:22
**little** 74:12 126:13
**long** 68:6,13 74:6

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 26 of 32   Document 120-12

100:11 118:1
**look** 79:7 82:6,8
110:25
**looked** 81:10,23
130:20,22
**looking** 78:18
**lost** 72:10 74:16
**Lowery** 89:3

**M**

**M** 66:10
**Madison** 64:11
65:10 70:1 87:7
87:16,25 88:3
89:14 90:1
101:10,17
102:13,21 103:5
105:15 110:20
110:22,23
111:12 112:10
**Main** 65:9
**making** 85:24
110:1 131:23
**man** 100:7
**Manitowoc** 63:8
63:10 64:12,18
64:24 65:4
66:24 68:2,21
69:13 87:9,11
87:14 91:3
95:16,24 100:8
104:25 105:6,17
106:12 109:6
110:6 125:7
127:8,15 130:17
132:11 133:15
**March** 66:23 67:5
67:7 69:17
74:25
**Mark** 63:2 65:11
95:17
**marked** 71:16
76:23 102:10
109:1
**married** 136:21
136:23

**materials** 71:18
113:23
**matter** 84:9 86:25
117:9 136:17
**Mayer** 65:1
**Mayfair** 64:16
**McCambridge**
65:7 77:3 92:13
93:6,8,12
104:14 113:2,12
113:15 114:2
126:11,13
137:14,17
**McCracken** 63:6
65:2
**mean** 66:20 68:22
73:10 114:7
**Meaning** 85:1
87:14
**meant** 80:22
**meet** 90:1 101:11
127:12 128:10
128:15
**meeting** 88:8
98:12,14 99:1,6
99:10,22 100:3
100:11,25 101:5
102:13,16
115:25 116:9
118:12,24,25
119:6,12,19
121:7 127:14,20
127:24 128:1,4
128:6,9,11,12,19
128:22,24 129:2
129:6,8 130:1,3
130:21 131:8,17
131:25 132:3,24
132:24 133:25
134:10,12,13
**meetings** 133:6
134:15
**members** 84:6
99:7 130:17
**memo** 66:5,6
77:17,18 107:12

109:7,10,15,18
110:21 111:19
**memorandum**
131:16,20,23
**mention** 94:11
**mentioned** 71:3
85:6 92:1 94:14
96:25 97:2,3
129:9
**Mentkowski**
64:21
**Mertens** 86:11
**met** 88:8 89:14
111:6,8 112:12
113:8,10,15
133:12
**Michigan** 64:4
66:22
**Mike** 74:1,8,20,23
77:17,18,20
78:5 79:1,6,11
79:25 88:13
90:3 91:9 98:9
107:25 108:4,16
110:20 112:5,12
112:17 114:19
114:24 118:9
126:24 128:25
129:5
**Milwaukee** 64:5
64:23
**mind** 106:21
111:8 122:22
**minute** 116:13
**misdemeanors**
67:24
**mistake** 95:15
**Moi** 126:14
**moment** 76:24
95:7 109:2
**Monica** 88:25
**months** 75:9
**morning** 66:12,13
**moved** 126:5
**MURRAY** 121:10
121:18 122:13

126:1,12,17

**N**

**N** 64:1,16,22 66:1
66:10,10
**name** 67:9 76:20
85:10,14 88:23
89:2,5,12 96:19
129:9 131:9,11
131:15
**named** 100:7
**names** 88:11,14
96:25 97:2
**Nash** 63:6 65:2
**Nashold** 88:22
**need** 104:1
**needed** 102:24
103:1,1
**neither** 111:19
**never** 95:19
**new** 70:14 76:20
**Nope** 98:17
**notes** 100:25
101:4,8 119:12
122:11,16,18,21
122:23,24
**notified** 85:19,24
85:25
**number** 69:1 87:4

**O**

**O** 66:10
**object** 92:13 93:6
114:14 122:13
124:9,18
**objection** 92:11
93:5,21 94:5
108:2 120:23
121:18 124:17
126:11 131:3
**objections** 124:22
**obtained** 91:9
111:17
**occasion** 68:19
70:19,19,20
78:5,17,25 79:5
80:16 85:24

89:10 97:17,17
118:11 128:6
**occasions** 87:3
97:18 117:18
123:14 132:17
132:21 135:2
**occurred** 69:2
101:22
**office** 66:23 67:22
68:1,20 69:12
69:17 70:18
71:13 72:4,4,5,6
72:6,8 74:3,23
75:4,5,6,7,8,17
75:21,25 76:8
76:11 79:9,13
80:4,6,7 83:19
83:22 84:6,12
84:13,14,16
85:3 86:15
87:20 89:14,16
90:2,24 94:22
96:1,5,11,15,15
96:16,17,22,24
101:11 102:3,6
103:25 104:15
105:5 106:20,24
107:2 108:15
110:17 111:16
111:18,21,25
112:13,17
114:21,25 116:1
116:21 120:16
120:22 121:8,24
122:25 123:2,6
127:17,22 129:3
132:1 133:5
134:17
**officer** 109:20
110:7 125:8
**offices** 72:15,16
**office's** 107:4
**Oh** 137:16
**okay** 67:15 68:18
69:1,4 71:4,25
73:24 75:10

Case 1:19-cv-00484-BHL    Filed 03/03/20    Page 27 of 32    Document 120-12

76:4 78:9 79:21
79:25 82:13
83:12 86:17
92:23 94:1,9
96:16 97:22
99:1 104:1,4,8,9
104:24 105:2,21
106:6,8,10
107:7,24 108:14
109:1,5,18
111:10,19
112:12 113:4,19
114:1,11,23
116:25 117:1,4
118:7 120:5,21
122:1,6,11,17
123:18 131:16
133:6 134:5,8
136:22,25
137:17
**old** 66:15
**Olson** 67:10
**once** 123:17,18
135:3
**opinion** 91:21
107:9 115:14
**oral** 114:11,15
**order** 67:7 103:20
106:1
**original** 66:8
102:4
**outside** 76:8
84:13

___
**P**

**P** 64:1,1
**page** 66:2,4 95:10
95:10
**papers** 134:2
135:11
**paragraph** 95:9
95:13 120:13,14
**part** 63:2 70:24
71:22 105:25
106:24 120:20
121:4,13

**particular** 67:17
71:1
**parties** 104:21
**pass** 74:21
**passed** 111:17
**Peg** 88:9 105:13
112:22
**pendency** 74:14
**pending** 70:14
**Penny** 69:22 84:9
94:4 116:6
124:24 129:25
**people** 78:14
85:25 86:8
89:15,19 95:18
95:20 96:14,15
96:17,24 98:3
100:19 112:4,13
127:20 128:3
**perceived** 102:1
131:1
**period** 67:12,15
75:20 76:4,4
117:11,15 120:5
122:6 125:2
130:15,24
**perpetrator** 94:12
**Perry** 127:11
128:16,25
129:23
**person** 70:2 73:19
73:24 76:8
82:25 83:23
87:5,7 94:3
123:21 133:1
135:4
**personally** 69:9
107:16 112:22
113:19
**personnel** 76:7
91:13
**Petersen** 85:18
86:20 89:23
91:24 92:8,24
93:19 94:20
95:4 96:18,20

101:7 119:9
**Peterson** 97:13,14
98:1 99:14,16
119:7 123:7
127:2
**Peterson's** 115:25
129:3
**phone** 69:24
73:16,21,23
74:9,11 76:6,17
87:5,12 123:9
123:18,21 125:6
132:25 135:4,5
136:2
**Pinckney** 64:10
**place** 70:21 74:15
74:24 75:3,5
77:19 97:22
103:6 104:3
107:18 115:25
118:25 119:22
120:2 127:14,16
129:2,11 132:25
133:4 134:1,4
**Plaintiff** 64:6
**Plankinton** 64:22
**played** 84:3
**please** 66:14
68:22 95:13
96:19 104:6
116:3 121:11
123:19
**pleased** 124:2
125:12,25 126:6
126:20
**PO** 64:10 65:9
**point** 83:18 102:5
114:19
**pointed** 71:12,14
**points** 96:11
**police** 100:8 125:7
127:15 130:17
**Pollen** 64:20
124:18
**position** 67:2 68:7
115:17 116:7

**positions** 67:4
**possible** 120:4
125:2
**potential** 81:2
101:24 105:5,17
105:23 106:1,11
132:10
**potentially** 80:19
105:23
**practice** 67:19
68:18
**practicing** 72:20
72:23
**precise** 68:8 73:21
81:21 83:4
84:15 85:9 92:4
93:18 103:6
107:25 111:7
**precisely** 72:12,14
82:6,22 83:2
89:21 92:2,18
92:20 121:1
**predecessor** 68:1
68:11,16
**prepared** 77:18
107:12
**present** 65:13
71:4 80:13
85:16,18 86:3
86:18 88:10,11
88:16,21,22,24
88:25 89:1,4,10
89:11 97:24
100:13,15,17,20
100:22 118:3,7
118:9 130:1
**preserve** 106:19
**previously** 136:19
**primarily** 75:23
**printed** 91:19
**prior** 67:9 69:12
69:17 71:6,16
90:23 98:20
**prison** 81:25 82:1
82:1
**probably** 84:12

**procedure** 120:21
**proceeding** 95:8
**process** 74:24
**produce** 99:16
**produced** 130:4
**professional**
126:21
**professionally**
126:4
**program** 78:13
**prompted** 129:5
**pronounced**
137:5
**proper** 125:9
**properly** 121:6,15
121:21
**prosecuted** 80:19
**prosecuting** 68:24
**prosecution** 100:1
101:13 102:7,19
103:15 105:7,18
120:7,9 121:6
132:4
**Prost** 80:3,5,13
81:24 82:14,16
82:18 83:25
86:19
**provide** 110:16
113:19 129:18
131:25
**provided** 100:7
109:14 110:13
111:21,23
112:16 114:24
116:2,4 127:21
129:22 136:12
**public** 67:23
95:15 101:12
**published** 123:11
**purpose** 94:23
**put** 67:6 84:17
130:23

___
**Q**

**question** 84:1,3
92:22 93:22

108:3 113:7,12
113:13 114:3,5
116:10 121:10
121:11 122:5
124:10,15,23
125:8 126:19
**questions** 136:9
**quickly** 126:5

---

**R**

**R** 64:1
**raising** 125:8
**range** 69:4
**Raymond** 64:20
**Rd** 64:16
**reaction** 130:4
**read** 84:2 95:14
110:2 113:21
115:2 120:13,14
**reading** 109:24
**really** 113:13
**reason** 101:4
102:18 104:17
119:14 121:2
123:24 134:7
**recall** 70:4,5 71:2
71:18 72:17,19
72:25 73:2 74:7
78:4,8,21,23,24
80:12,15 81:21
82:3,5,15,22
83:2,9,17 84:4
84:19,21,22,24
85:3,6,8,9,9,12
85:18,19 86:1,2
86:5,8,10,11,14
86:23 87:1
88:14,17,23
89:1,4,11,21,24
90:7,9,20 91:12
91:16,22,23
92:2,6,18,20,25
93:24 94:8,9,18
97:4,7,18,25
98:4,11,15 99:3
99:5,9,13 100:2

100:5,10,14,16
100:18,23,24
101:10,14,21,22
102:15 103:6
105:10,12,14,21
105:22 106:4
107:13,17,20
108:4,10,13,21
108:22 109:14
109:17 113:10
114:15 115:5,6
115:6,24 116:12
117:24,25 118:4
118:8,10,14,16
118:18,21,23,24
118:25 119:1,5
119:8,11,19
121:1 122:4
123:4,8,15,21,23
123:25 124:2,3
124:5,11 125:5
125:10,18,21,22
127:4,18,19
128:2,8,17,20
129:4,13,17,21
130:1,6,9,11,13
130:19,20 131:4
131:6,10,13
132:2 133:7,14
133:18,19,24
134:14,18,19,22
135:15,16,19,20
136:8,10,15,18
137:8
**receive** 96:6
**received** 73:16
75:13,15 76:6
76:17 77:22
89:15,19 96:9
97:1 98:21
115:7,16,20,22
117:7 119:22
120:8 123:9
124:14 125:1,7
127:5,20 132:13
133:8,11,12

134:23 136:25
137:1
**receiving** 95:18
**reciting** 96:4
**recognize** 116:25
117:5
**recollection** 70:11
70:20 71:11
75:18 76:10
80:3,14 81:22
82:7,11,23 83:4
83:5,8 84:5,11
84:15,20 89:22
92:3,5,8,14,20
92:23 93:2,4,17
93:19 95:1 96:3
98:13,17 99:4
99:17 100:4
101:16 107:24
110:18 111:13
112:1,2,18,19,21
113:22 114:8,24
116:22 117:1
125:11 127:13
128:2
**record** 77:3,5,6,7
78:12,23 82:9
90:14 95:15
110:3,25 113:21
115:2 116:13,14
116:15,16
137:18,24
**recorded** 78:6
**recording** 77:21
**records** 111:20
**reference** 110:1
**referred** 71:21
78:17
**referring** 94:13
94:16 137:4
**refers** 78:9 110:4
**refresh** 116:22
**regard** 77:18
80:11 98:24,25
115:18 120:8
**regarding** 79:8

**related** 82:12
119:20
**relating** 70:25
**remember** 70:2
71:9 85:16 89:6
89:9 108:6
111:10 125:14
130:7
**repeat** 84:1
121:11
**repeated** 124:23
**report** 108:17
116:20 117:5,8
119:24 123:11
**reported** 115:11
**REPORTER** 77:5
77:7 96:19
116:14,16
137:18,22
**reports** 130:14,22
**represent** 104:21
**representation**
104:17
**representative**
105:4 114:20
123:10
**representatives**
114:25 123:2,5
127:2,8
**represented**
104:14,20,24
**representing**
136:13
**request** 73:8,12
101:15 102:5,11
102:13,22,24
103:7,23,24
104:9 107:11
116:18
**requested** 120:16
**research** 80:11,20
80:21 81:2
**researching** 82:23
**respect** 69:21
91:1 98:22
106:12 121:15

131:2
**respecting** 120:7
**respond** 91:17
**responded** 104:4
**response** 104:9
116:18
**responsibility**
75:19
**rest** 78:3
**result** 136:19
**results** 69:20,24
70:6 73:17
133:22
**retained** 66:7
**review** 80:23
102:6,16,17,23
104:6 107:6
120:17,17
121:20
**reviewed** 81:17
104:8 133:23
**Richard** 137:2
**right** 66:19,24
72:3,22 73:13
74:17 77:13,20
78:25 83:14
86:2,20 87:7,24
88:22 89:3,13
89:17 90:22
91:10 94:15,22
95:5 102:8,14
103:16,22 104:5
104:10,12,15,20
104:22 105:15
106:23 108:12
109:7,10 110:11
110:14 112:5,9
112:10,14 113:4
113:4 115:12,19
116:7 117:6
118:5 119:16,18
119:24 120:7,25
121:9,24 122:9
122:15 133:8
134:5
**ring** 89:9 131:14

Rivers 67:11
Robbie 89:3
Rohrer 63:2
  65:11 66:6,12
  77:9 95:17,22
  116:18 120:14
Rollins 105:17
  106:4 132:8,10
Rough 68:10

_____ S _____

s 64:1,10 72:15,16
  79:9 96:15,16
  96:17,22
sad 135:23
safe 99:18
samples 70:7
  73:22 74:15
Sandman 131:12
saw 81:12 105:23
  134:6
saying 79:7
  108:13 111:15
  114:8 120:1
says 109:18
  120:14
school 66:16,21
  66:22 67:5
sealed 66:8
search 73:4 91:1
second 134:10
see 78:10 80:9
  82:18 108:15
  109:12,23
  110:25 116:22
  130:10,12,14
seek 81:4 111:3
seen 77:13
segregated 72:2
select 128:21
sense 135:21
  136:2
sent 66:8
sentence 81:19,20
  81:21 82:1,1
  110:2

separately 85:25
  86:9 127:12
September 77:1,2
  77:19 78:25
  97:16 105:3
  109:11 110:14
  111:1 115:8
  117:12 120:2,2
  123:20 127:5
  132:14 134:5
  137:9
served 68:6,13
serving 81:19
  82:2
set 115:8
sexual 69:21
  73:18 84:9
  116:6 131:2
sexually 82:12
sheriff 95:24
  97:13 98:1
  110:6 116:4
  121:9,23 122:2
  123:7 125:20
sheriff's 90:18
  91:8,11,13
  96:14,24 97:23
  98:6 99:7 116:1
  127:2
shortly 74:15 75:3
show 76:23
  102:10 109:1
  116:24
showed 120:11
sic 66:17
side 68:20,22 69:9
sir 114:16 116:25
  122:5
sit 114:18
situation 84:12,17
  84:18 85:1
  106:19 126:4,5
  126:6,21
snotty 126:13
somebody 68:23
soon 75:7 95:15

sorry 66:20 73:10
  113:14
source 97:8,11,12
  98:21 115:16,21
sources 96:10
speak 80:1 83:15
  88:3,5 97:14
speaks 109:8
special 102:19
  103:14
specialize 67:16
specific 93:18
specifically 85:6
  97:4 130:24
speed 70:25
Spindler 63:6
  65:2
spoke 73:20 80:13
  82:16 87:24
spoken 86:21
St 64:4,10 65:9
staff 84:6
Stangel 67:9
start 81:2 88:12
  90:16 96:16
started 95:17
starting 110:2
state 66:5 78:16
  104:18 122:22
stated 95:21
  110:9 113:25
  121:2 122:16
  125:12
statement 101:18
statements 136:11
States 63:12
statute 80:17
  82:23 83:10
statutory 101:19
  103:2,21 111:3
Steve 71:17
Steven 65:13
  69:14,21 70:9
  71:7,15,21 72:1
  73:5 74:15
  75:16 76:9,12

84:7 85:8,10
  86:25 87:19
  97:15 100:1,9
  101:13 102:7
  105:7,19 109:21
  115:19 117:9
  118:19 119:1
  120:7,9 125:2,8
  125:15 132:4
  133:20 136:7,13
  136:16 137:7
strategy 103:16
  103:18
Strauss 89:9
strike 82:17
subject 70:14
substance 85:4
suggested 106:6
  135:9
suggestion 103:24
  106:9
Suhr 64:9
sure 78:2 82:9
  83:6,7 90:17
  94:17,17 97:21
  104:7 110:23
  112:2 121:13,19
  121:20 124:24
  137:14
surveillance
  129:10,15
  130:24
surveilling 133:16
suspect 115:18
  116:5 120:18
S.C 64:3,15,21

_____ T _____

T 66:10
take 74:23 75:19
  76:24 95:7
  97:22 107:18
  109:2 127:14,16
  129:2
taken 104:3
talk 79:1 81:25

88:13 99:14
  100:6 105:3
  108:14 117:13
  117:15 118:19
  123:12 132:10
  132:14,19
  137:10
talked 73:25 79:1
  81:24 83:9,11
  87:3,5,7,11 97:4
  102:21,23
  107:15 118:21
  121:13 122:8
  123:1 129:14
  132:22
talking 93:3
  109:18 112:7
  113:20 117:12
  120:6 134:19
telephone 108:5
  109:8
tell 66:14 67:4
  71:9 74:8 80:12
  80:15,22 82:17
  82:25 83:7
  84:15 87:24
  90:7 91:23 92:3
  94:2 95:25 96:7
  98:13 99:24
  105:21 107:24
  108:20 111:21
  118:21 122:17
  123:1,5 124:6
  124:13,25 125:6
  125:17,19
  126:25 129:8,14
  129:22 130:23
  134:4 136:5
telling 73:17
  94:10 111:10
tested 70:8
testified 75:2
  92:15
testimony 71:16
  98:20
testing 70:13

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 30 of 32   Document 120-12

71:12
**then-pending**
75:19
**thing** 78:2 83:9
105:23
**things** 71:2 78:7
78:22
**think** 77:25 93:8
102:19 106:25
131:9
**third** 95:9
**Thomas** 66:22
124:14 125:1
**thorough** 126:5
**thought** 81:12
98:19,20 101:23
**Thursday** 63:4
**time** 67:5 68:8
70:10,12 71:25
72:9 73:3 74:5
75:12,20 76:3,4
76:5,17 78:24
78:25 80:22
81:8,11,13,14,15
82:14 83:21
86:20 89:13,13
90:1,12 92:1
95:23 98:11
99:25 100:9
102:2,5,16
105:2 107:10
108:6,24 111:6
111:9 112:3
114:20 115:16
115:22 117:6,11
117:15,15
119:17 120:5
121:7,7 122:6,8
122:22 123:9
124:14 125:3
127:5 128:19
129:10,13,20,24
130:16,24
131:10 134:19
134:23 136:25
**times** 69:1 87:24

**Timothy** 64:14
**Tinker** 83:18,21
86:22,24 87:25
88:3 96:2 105:9
120:6 121:2
**today** 77:13
104:14 114:18
**told** 70:4,17 71:10
71:11 73:23
74:9 75:14,22
82:25 83:23,24
84:12,16,25
85:3,4,8,12 91:7
91:24 92:5,9,9
92:24 93:20,20
94:19 95:3 96:4
98:10,11 99:1,6
106:4 108:11,22
109:19,20,21
110:3,4,5,7,10
111:15 112:14
113:8,15 119:6
119:10 120:21
122:1 125:11,14
**Tom** 64:24 65:5
88:17,19 95:24
99:22,24 100:2
100:6 110:5
117:16 119:4
127:11 128:16
128:18 129:8,14
137:10
**top** 82:4
**traffic** 67:25
**transcript** 66:8
**trial** 124:16 125:3
**try** 91:2 94:1
114:2
**trying** 122:1
**turn** 114:12
**turned** 112:24
113:5,23,24,24
114:20 120:19
124:7
**two** 67:10 70:22
91:1 103:20

112:4 133:6
**type** 67:22

_____

**U**
**ultimately** 116:20
**understand** 74:12
77:15 92:19,22
114:5
**understanding**
109:7
**United** 63:12
**upset** 108:8,10
125:15,17
**use** 85:10,14

_____

**V**
**v** 63:10 66:5
**vague** 112:20
**various** 68:21
70:25 72:14
88:9
**Venue** 63:12
**verbatim** 78:8
92:25 93:1
**versa** 104:1
**vice** 103:25
**Vilas** 72:19,20,23
**violence** 131:2
**Vogel** 64:12 68:17
95:23 107:10,13
107:16 108:5,8
108:11 117:13
**volunteer** 128:9

_____

**W**
**W** 64:4 65:9
**Waldo** 63:7 65:3
**Walt** 93:9
**Walter** 64:2,3
**want** 78:6 82:8,10
92:4 95:2
128:15 130:8
**wanted** 80:10
103:9,13 107:6
120:22 121:19
**wanting** 79:2
**wasn't** 106:16,18

108:8
**water** 137:13
**Wauwatosa** 64:17
**way** 94:1 113:7
**went** 72:12,14,15
87:16,25 90:1
101:10,17
102:18 105:15
106:21 108:15
110:20,25
111:12 112:10
121:13 122:25
127:16 134:16
**weren't** 98:17
**we're** 77:7 113:20
116:16 117:11
**we've** 115:2 116:7
119:21 120:12
**WI** 63:8 64:5,11
64:17,23 65:4
65:10
**wife** 136:21
**win** 74:18
**Winter** 67:9,10
**Wisconsin** 63:13
65:8 67:11
**withdraw** 113:6
**Witness** 63:1
113:14 137:13
137:16
**woman** 83:16
85:4 117:7
**won** 74:16,19
**words** 84:16,24
94:8,9 116:11
**work** 67:21 102:4
136:20
**worked** 100:7
**worry** 106:19
116:7
**wouldn't** 103:18
**write** 111:1
**writing** 77:21
103:7
**written** 102:24
**wrong** 98:19

113:22
**wrote** 104:2
109:15
**Wyss** 128:4 132:4

_____

**X**
**X** 66:1,10

_____

**Y**
**Yeah** 88:21 93:8
**years** 66:15 68:10
**Yep** 103:3 104:11

_____

**#**
**#1140** 64:16
**#400** 64:4
**#410** 64:10
**#500** 64:22

_____

**0**
**005614** 95:10
**03** 67:7 69:17
**04** 63:11
**08:30** 63:4
**09/22/2005** 63:4

_____

**1**
**1** 64:10 78:2
102:10 103:17
111:1 116:19
**10th** 134:5
**10:00** 84:3
**10:01** 84:3
**10:42** 116:15
**10:46** 116:15
**108** 66:6
**11:11** 137:23
**123** 66:5 76:24
77:10,16 78:6
78:17 79:14
**124** 66:6 108:25
109:2 111:11,24
113:20 114:12
114:20 115:1,8
115:22,23
**14th** 130:25
**15** 68:10

**17** 65:9 75:1
**17th** 117:12
  123:11,20 127:7
**18th** 77:1 105:3
  109:12 110:14
  111:1 115:8
  120:3
**1985** 130:16,17,25
**1992** 66:20

---
**2**
**2** 63:2 78:3 104:5
  104:8
**2nd** 130:16,25
**2002** 66:18
**2003** 66:23 67:6
  75:1 97:16
  105:3 117:3
  123:20 134:5
**201** 63:7 65:3
**2600** 64:16

---
**3**
**3** 117:12 120:2
  137:9
**3rd** 77:19 78:25
  123:20 127:5
  132:14

---
**4**
**4th** 77:2
**40** 66:15

---
**5**
**5** 95:8 120:12
**53202** 64:5
**53203** 64:23
**53226-1308** 64:17
**53701-0927** 64:11
**53707-7857** 65:10
**54220** 65:4

---
**6**
**6** 116:24,25 117:8
**66** 66:3

---
**7**

**700** 64:4
**710** 64:22
**77** 66:5
**7857** 65:9

---
**9**
**9/18/03** 66:6
**9/4/03** 66:5
**9:52** 77:6
**9:53** 77:6
**92** 67:7
**927** 64:10
**95** 71:18 109:19
  110:5
**96** 109:19 110:5
**978.06** 102:20,21
**986** 63:11
**99** 71:18

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 32 of 32   Document 120-12