# Exhibit 13

United States District Court
Eastern District of Wisconsin

**Avery v. Manitowoc County**

04 C 986



Videotape Deposition of

**Michael Griesbach**

Recorded 09/22/2005 in Manitowoc, WI

11:43 a.m. - 1:06 p.m., 84 mins. elapsed

**Magne-Script**
(414) 352-5450

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 2 of 17   Document 120-13

## Page 1

(1) Witness
(2) Michael Griesbach
(3)
(4) Thursday 09/22/2005 at 08:30 by: Barbara Cohen Joseph
(5)
(6) Nash, Spindler, Grimstad & McCracken
(7) 201 East Waldo Boulevard
(8) Manitowoc, WI
(9)
(10) Caption: Avery v. Manitowoc County
(11) Case No.: 04 C 986
(12) Venue:    United States District Court
(13)        Eastern District of Wisconsin

## Page 2

(1)            APPEARANCES
(2) Walter F. Kelly
(3) Walter F. Kelly, S.C.
(4) 700 W. Michigan St. #400
(5) Milwaukee, WI 53233
(6) On behalf of the Plaintiff
(7)
(8) Claude J. Covelli
(9) Boardman, Suhr, Curry & Field
(10) 1 S. Pinckney St. #410, PO Box 927
(11) Madison, WI 53701-0927
(12) On behalf of Denis Vogel and Manitowoc County
(13)
(14) Timothy A. Bascom
(15) Bascom, Budish & Ceman, S.C.
(16) 2600 N. Mayfair Rd. #1140
(17) Wauwatosa, WI 53226-1308
(18) On behalf of Manitowoc County
(19)
(20) Raymond J. Pollen
(21) Crivello, Carlson & Mentkowski, S.C.
(22) 710 N. Plankinton Ave. #500
(23) Milwaukee, WI 53203
(24) On behalf of Tom Kocourek and Manitowoc County
(25)

## Page 3

(1) John F. Mayer
(2) Nash, Spindler, Grimstad & McCracken
(3) 201 East Waldo Boulevard
(4) Manitowoc, WI 54220
(5) On behalf of Tom Kocourek
(6)
(7) James E. McCambridge
(8) Wisconsin Department of Justice
(9) 17 W. Main St., PO Box 7857
(10) Madison, WI 53707-7857
(11) On behalf of Michael Griesbach
(12)
(13) Also Present: Steven Avery

## Page 4

(1) I N D E X
(2) EXAMINATION BY PAGE NO.
(3) Mr. Kelly . . . . . . . . . . . . . . . . . . . . 4, 54
(4) Mr. Covelli . . . . . . . . . . . . . . . . . . 53
(5) (The sealed original transcript was sent to Mr. Kelly)
(6) ============
(7) E X A M I N A T I O N
(8) BY MR. KELLY:
(9) Q  Mr. Griesbach, would you tell me your date of birth
(10) and your age, please?
(11) A  Sure. February 13th, 1961, and I'm 44 years old.
(12) Q  Okay. And you're currently an assistant district
(13) attorney in the Manitowoc County D.A.'s office?
(14) A  That is correct.
(15) Q  Okay. How long have you been in the Manitowoc County
(16) D.A.'s office?
(17) A  I believe it would be 14 years. 1991 to now, so 14
(18) years.
(19) Q  Okay. And I understand — we had some testimony by
(20) Mark Rohrer just a little while ago that there was a
(21) brief period of time during which you were the
(22) district attorney of Manitowoc County?
(23) A  It's kind of a complicated matter. I had been elected
(24) as the district attorney in 2002 after running for
(25) election. I chose, for basically personal reasons,

### Page 5

(1) not to take office. But in the intervening time
(2) between actually the primary election which was in
(3) September of 2002 until January of 2003 which was when
(4) the new term was going to begin, I was still present
(5) as was the former D.A., Jim Fitzgerald.
(6) Q Okay.
(7) A But the answer is basically no, I have not served as
(8) the district attorney in Manitowoc County.
(9) Q Did you remain in office between January of '03 and
(10) March of '03 when Mark Rohrer came on board?
(11) A Yes, I did.
(12) Q Okay. I don't want to go into the personal reasons,
(13) but I do need to ask this. Did the personal reasons
(14) have anything to do with this case, with the Steven
(15) Avery case?
(16) A Not at all.
(17) Q Oh, okay. Fine. All right. So the period of time
(18) that you've served as an assistant district attorney
(19) in the Manitowoc County district attorney's office up
(20) until January 1 of 2003, your boss was Jim Fitzgerald?
(21) A That's right.
(22) Q Okay. And then starting in March of 2003, your boss
(23) became Mark Rohrer?
(24) A Yes.
(25) Q And he's still your boss.

### Page 6

(1) A Yes.
(2) Q Okay. So, then, you were in the office during some of
(3) the postconviction proceedings in the Steven Avery
(4) case.
(5) A That would be right.
(6) Q In particular, you were in office when Steve Glynn
(7) represented Steven Avery in 1996 in an effort to
(8) secure his release on the basis of DNA evidence at
(9) that time.
(10) A In office in the sense that I worked there as an
(11) assistant D.A.
(12) Q Okay.
(13) A Right.
(14) Q Let me ask you this. Did you have – in any of those
(15) proceedings, did you have any responsibilities
(16) yourself?
(17) A No.
(18) Q Okay. In respect to the Steven Avery conviction,
(19) during the period of time that you worked for Mr.
(20) Fitzgerald, did you ever discuss the case with him?
(21) A I may have once. I recall being present more or less
(22) as an observer during one of the postconviction
(23) motions when Mr. Fitzgerald was appearing for the
(24) state. And I thought Mr. Glynn but perhaps someone
(25) from the Wisconsin Innocence Project was appearing for

### Page 7

(1) Mr. Avery. Nothing in depth in terms of a
(2) conversation at all.
(3) Q We've had some testimony about the fact that in early
(4) September of '03, around September 3rd, Mark Rohrer
(5) received a telephone call from the crime lab
(6) concerning the analysis the crime lab had done and the
(7) fact that the crime lab had by its analysis determined
(8) that the person who had assaulted Penny Beerntsen was
(9) Gregory Allen and not Steven Avery.
(10) A Yes, I re– yes.
(11) Q And you were informed of that by Mark Rohrer?
(12) A Yes.
(13) Q Okay. Up until that moment, had you from any source
(14) any knowledge concerning Gregory Allen?
(15) A None.
(16) Q Was it a new name to you when Rohrer told you about
(17) what he had been told by the crime lab?
(18) A Yes, it was.
(19) Q Okay. Again, up until that time, you were serving in
(20) an office that included Brenda Petersen as the
(21) victim/witness coordinator and Beverly Badker as a
(22) paralegal, right?
(23) A Yes.
(24) Q Up until you heard from Rohrer about what he had heard
(25) from the crime lab, had you discussed Gregory Allen or

### Page 8

(1) Steve Avery with either Brenda Petersen or Bev Badker?
(2) A No.
(3) Q Okay. Where did you go to law school?
(4) A I went to Marquette U.
(5) Q Okay. And when did you complete your studies at
(6) Marquette?
(7) A It would have been 1983 undergrad, and then 1986 law
(8) school.
(9) Q Okay. Between '86 and '91 when you entered the D.A.'s
(10) office, what did you do?
(11) A Working backwards I guess from Manitowoc, I was an
(12) assistant D.A. in Ozaukee County from – I still
(13) remember the date – May 2nd of 1988 until I believe
(14) it was September of 1991. Prior to working as an
(15) assistant D.A. in Ozaukee, I was in private practice
(16) for a couple years, I guess that would be two years
(17) between law school and Ozaukee County, as an attorney
(18) for a law firm by the name of Gonyo Law Office, which
(19) was located in Berlin, Wisconsin, west of Oshkosh.
(20) Q Okay. When you were in private practice, did you do
(21) any criminal work?
(22) A A small amount.
(23) Q Okay. So you were – is it fair to say that you were
(24) a relative rookie in criminal law when you started at
(25) the Ozaukee office?

## Page 9

(1) **A** That's very fair to say, yes.
(2) **Q** Okay. All right. We've had an exhibit marked here
(3) today and discussed with Mr. Rohrer to an extent, and
(4) it's Exhibit 123. I'd ask you to take a moment and
(5) examine that.
(6) **A** Sure.
(7) **Q** You're the author of that document?
(8) **A** Yes, I am.
(9) **Q** Okay. And that recites – or let me ask you. What
(10) does that recite?
(11) **A** Well, it summarizes the afternoon when we received the
(12) information from the crime lab that they had a DNA
(13) specimen re-tested with the new technology and that
(14) the specimen on the Avery file pointed to and came to
(15) be identified as Gregory Allen instead of Mr. Avery.
(16) This was relevant evidence on this assault.
(17) **Q** Okay. Go ahead.
(18) **A** The memo further is my note of what I observed in the
(19) Avery file. When we got the call from the crime lab,
(20) I and Mark retrieved the Avery file and looked through
(21) the file. And the memo recounts that within a couple
(22) minutes I did locate a criminal complaint alleging
(23) that Mr. Allen had committed a crime about a year
(24) prior to the assault in this case, and the police
(25) reports as well caught my attention because we had

## Page 10

(1) been told by the crime lab that the DNA specimen came
(2) back to a Mr. Allen, Gregory Allen. So I retrieved
(3) that and found it of interest.
(4) **Q** When you say you retrieved the file, was it you or
(5) Rohrer or both of you who actually retrieved,
(6) physically retrieved the file?
(7) **A** When I say "retrieved," I should clarify. I actually
(8) meant the Allen complaint and the police reports from
(9) within the file. As far as retrieving the entire
(10) file, my recollection is that the file was in several
(11) boxes. I think the boxes were kept in the office of
(12) Mark, in the district attorney's office himself, if I
(13) recall correctly. I'm not absolutely sure about that.
(14) **Q** Okay. Do you know why – well, strike that. Were you
(15) aware that there was this analysis going on at some
(16) time prior to September 3 or was it new news to you?
(17) **A** I was vaguely aware that that was being done, yes.
(18) **Q** Was anybody in the office assigned to that case at
(19) that time?
(20) **A** No.
(21) **Q** Do you know how it came to be that the Avery file in
(22) September of 2003 was in Rohrer's office, how it had
(23) gotten there, where it had been obtained from?
(24) MR. MAYER: Object as multiple. Form.
(25) MR. KELLY: You're right. I'll withdraw

## Page 11

(1) the...
(2) **Q** I'll just ask you, do you know where it came from and
(3) how it got there?
(4) **A** I believe that it was there from when Mr. Fitzgerald
(5) was there and that it was just still there. It was
(6) not an active file in the sense that Mr. Rohrer had
(7) been looking at it or I or anyone else in our office.
(8) **Q** Okay. After Mr. Rohrer got the information that he
(9) did from the crime lab and spoke with you about it,
(10) did you make any effort to track down any further
(11) information concerning Gregory Allen?
(12) **A** I think we did. I think we looked into whether he had
(13) previously been charged in Manitowoc County or any
(14) other county. I think we looked at CCAP and – in an
(15) effort to see whether he had been charged or convicted
(16) of previous crimes.
(17) **Q** And what did you find?
(18) **A** Well, I do recall finding that he had been convicted
(19) of the crime alleged in the criminal complaint that
(20) was in the Avery file, approximately a year earlier.
(21) I did note that the district attorney at that time,
(22) Denis Vogel, was also the prosecutor in that case and
(23) was present at the sentencing hearing on that case. I
(24) think I noted the disposition. I don't remember if I
(25) – I don't recall exactly what it is at this time. My

## Page 12

(1) recollection, though, is that it was a fine. It was
(2) not a – it was not – it was a lewd and lascivious
(3) charge I believe and the result was a fine, if I'm
(4) recalling correctly.
(5) **Q** What were the underlying factual circumstances of that
(6) case, if you recall?
(7) **A** That Mr. Allen had been on a beach fairly close to
(8) where the Beerntsen assault – the victim's assault in
(9) this case – took place, and that it involved a
(10) different woman approximately a year prior to the
(11) assault in question here; that the victim alleged that
(12) somebody was – a man was chasing her. I believe that
(13) he had dropped his shorts or something to that effect
(14) and had grabbed – attempted to grab her while she was
(15) on the beach, I believe, walking.
(16) **Q** Okay. Do you have any recollection of whether or not
(17) the document that you – or the documents, police
(18) reports and/or charging documents, whatever documents
(19) you found when you first went into the Avery file and
(20) found these documents about Gregory Allen, do you
(21) recall whether any of those documents had any stamp,
(22) identifying stamp on them indicating that they had
(23) been provided by anybody to the state public
(24) defender's office?
(25) **A** I recall specifically that they did not have such a

### Page 13

(1) stamp.
(2) Q Okay. I understand this from Mark Rohrer's testimony
(3) this morning, but I'll ask you about it. At some
(4) point, as I understand it, you and he obtained from
(5) the sheriff's department a record of Gregory Allen's
(6) criminal records?
(7) A Yes.
(8) Q Can you tell me how that came about?
(9) A I believe we went to the dispatch center at the
(10) sheriff's department, asked them to run a record check
(11) on Mr. Allen. The concern was where was Mr. Allen
(12) now.
(13) Q And what did you find out from that record check?
(14) A That he had been convicted in a Brown County case I
(15) believe in 1995 and was serving a prison term as a
(16) result of that conviction, that that conviction was
(17) also a type of a sexual assault charge, I believe an
(18) entry into a home in Brown County.
(19) Q Do you have any recollection about how proximate in
(20) time it was that you went to the dispatch center and
(21) got that information as compared with when you
(22) received the information from the crime lab?
(23) A Couple days.
(24) Q Okay. So would it be fair to say that you and Mark
(25) Rohrer were looking at the time for whatever

### Page 14

(1) information you could find out about Gregory Allen's
(2) criminal record?
(3) A Among other things.
(4) Q You want to enlarge on that, what the other things
(5) were?
(6) A Well, we were looking primarily into any information
(7) that would confirm that indeed Mr. Allen committed
(8) this crime back in 1985 and not Mr. Avery. We wanted
(9) to be certain before we stipulated and agreed with the
(10) Innocence Project that Mr. Avery did not commit this
(11) crime and that Mr. Allen did.
(12) Q And at some point your search satisfied you in that
(13) respect?
(14) A Yes.
(15) Q Okay. I want to back up a little bit to what happened
(16) immediately after you received the information from
(17) Mr. Rohrer that's indicated in Exhibit 123 and that
(18) you've told us about. And I'm going to ask you this
(19) question with reference to you yourself, and not you
(20) and Mr. Rohrer. To whom did you next speak about what
(21) had been the information that you had received from
(22) Mr. Rohrer that he in turn had received from the crime
(23) lab? To whom did you next speak about that?
(24) A I don't recall.
(25) Q Okay. At some point you spoke with Brenda Petersen

### Page 15

(1) and Beverly Badker about this?
(2) MR. COVELLI: Objection to form.
(3) BY MR. KELLY:
(4) Q Did you?
(5) A I'm not so sure about that. I don't believe I did.
(6) If I did, it was during a conversation with other
(7) people present, a general conversation. I am
(8) relatively certain that I did not individually speak
(9) with either of them at any time since this.
(10) Q All right. Do you have a recollection of this sort of
(11) general gathering that you're talking about, what
(12) occasioned that?
(13) A Vague as far as the recollection. What occasioned it,
(14) nothing specific. And in terms of the timing,
(15) probably as, you know, weeks or at most a month went
(16) on. It wasn't a particularly meaningful discussion, I
(17) guess, from my standpoint anyhow.
(18) Q At some point did Mr. Rohrer make an announcement to
(19) people in the office about what he had found out from
(20) the crime lab?
(21) A He probably did.
(22) Q All right. And you and he made a trip to the attorney
(23) general's office in Madison at sometime relatively
(24) soon after you got the information from the crime lab.
(25) A Yes.

### Page 16

(1) Q Okay. What was the reason for going to Madison?
(2) A Mr. Rohrer had decided that it would be appropriate to
(3) request the attorney general to look at this in an
(4) independent sense. And we were taking the boxes, the
(5) three or four boxes that are part of this file,
(6) physically taking them to the attorney general and
(7) also present ourselves for any questions that they
(8) had.
(9) Q Why were you taking the boxes to the attorney general?
(10) A I think at some point we felt that it would be – it
(11) would be the best way to handle this in terms of our
(12) office if there was to be any claim of improper
(13) conduct from the office, the district attorney's
(14) office back in 1985, that we not be the ones taking in
(15) information or making any type of conclusion since it
(16) is the same office though a different district
(17) attorney years later. I guess the legal thing is to
(18) avoid the appearance of impropriety.
(19) Q And by that time, by the time you went to Madison, you
(20) had received information from people within the
(21) Manitowoc district attorney's office about the Steven
(22) Avery matter and Gregory Allen; is that correct?
(23) MR. MAYER: Form of the question.
(24) BY MR. KELLY:
(25) Q You can answer.

## Page 17

(1) A  I believe Mr. Rohrer had received some information
(2) from people within the office, and I secondarily
(3) perhaps through him would have received that
(4) information.
(5) Q  And what was your understanding of what that
(6) information was?
(7) MR. COVELLI: Objection. Form.
(8) MR. MAYER: Yeah. I think you're asking him
(9) to speculate. Go ahead.
(10) A  Okay. Only that Ms. Badker and Ms. Petersen had
(11) apparently expressed some concern to Mr. Vogel at the
(12) time that it wasn't Mr. Avery who was the assailant
(13) but that it indeed was a Mr. Allen.
(14) BY MR. KELLY:
(15) Q  And this information that was provided by Ms. Badker
(16) and Ms. Petersen was information, as far as you know,
(17) that they provided to Mark Rohrer and he then told you
(18) about?
(19) A  I really don't have a clear recollection of exactly
(20) how I came to that, to understand that or to know
(21) that.
(22) Q  All right. But do you have a clear recollection that
(23) you knew it by the time that you were on your way to
(24) Madison?
(25) A  I have a clear recollection that I knew it within a

## Page 18

(1) month of the DNA information coming back from the
(2) crime lab. Whether it was before going to Madison or
(3) not, I don't know.
(4) Q  Okay. Well, let me show you something here. I'll ask
(5) you to take a moment with this. This is Exhibit 5 in
(6) these depositions, and it's a Department of Justice
(7) investigatory report. And I'll direct your attention
(8) -- I mean, take your time with the whole thing if
(9) you'd like, but I direct your attention in particular
(10) to the second to last and the third to last paragraphs
(11) on page 005614, which is the Bates stamp number.
(12) A  I have reviewed that.
(13) Q  Okay. May I see it for a moment? I'm going to read
(14) it into the record, paragraph by paragraph. "Soon
(15) after the mistake became public knowledge within the
(16) Manitowoc County courthouse, the current district
(17) attorney, Mark Rohrer, started receiving information
(18) that people within the courthouse never believed these
(19) crimes were committed by Avery. These people all
(20) believed Allen committed the crime. Some of these
(21) individuals even stated to D.A. Rohrer that they made
(22) these concerns known to either the district attorney
(23) at the time, Dennis Vogel, or the Manitowoc County
(24) sheriff, Tom Kocourek." Was that information that you
(25) and Mr. Rohrer provided to the attorney general's

## Page 19

(1) office when you went to Madison?
(2) MR. COVELLI: Objection. Form.
(3) A  It sounds like Mr. Rohrer provided that information,
(4) according to that person's account of what he provided
(5) to them. I have no reason to doubt that that's not
(6) the case.
(7) MR. COVELLI: Move to strike. Lack of
(8) foundation.
(9) BY MR. KELLY:
(10) Q  Were you present at the meeting when Mr. Rohrer
(11) provided this information to representatives of the
(12) attorney general's office?
(13) A  I was certainly present during the meeting that Mr.
(14) Rohrer provided the information he did to the A.G.'s
(15) office. Now, whether I have a specific recollection
(16) of that piece, namely that those people in the office
(17) had expressed concerns to him, that they had told
(18) officials at the time that it wasn't Mr. Avery, I
(19) don't know that for sure, I guess, is all I'm saying.
(20) I believe that's probably the case.
(21) Q  Tell me your best recollection of what either you or
(22) Mr. Rohrer said to the people at the attorney
(23) general's office about that subject.
(24) MR. MAYER: Object. Compound.
(25) A  My best recollection is that Mr. Rohrer probably did

## Page 20

(1) tell them that. He was, I would say, the primary --
(2) being the district attorney, the person who led off in
(3) the information that was given to the attorney
(4) general's office. And I suppose my best recollection
(5) is that that was stated, especially given the fact
(6) that I've reviewed what you have there.
(7) BY MR. KELLY:
(8) Q  Especially given the fact what?
(9) A  That I've reviewed what you've shown to me in terms of
(10) the A.G.'s recollection.
(11) Q  All right. Do you remember whether Mr. Rohrer or you
(12) identified the people in the D.A.'s office who had
(13) provided this information?
(14) A  That was probably done.
(15) Q  And was it --
(16) A  By Mr. Rohrer, I would think.
(17) Q  Was it Ms. Petersen and Ms. Badker who were
(18) identified?
(19) A  Again, my best recollection is that that's correct.
(20) Q  All right. Were there other people included within
(21) this phrase "people within the courthouse who never
(22) believed these crimes were committed by Avery" who
(23) were identified by you or Mr. Rohrer to the
(24) representatives of the attorney general's office?
(25) A  Whether it was at that time or later, I believe that a

## Page 21

(1) Jill Mertens, former secretary in the district
(2) attorney's office during Mr. Vogel's administration,
(3) was probably mentioned, her name.
(4) Q All right. Anybody else who was mentioned, to your
(5) knowledge?
(6) A Not that I recall.
(7) Q How about the identification by Mr. Rohrer to
(8) representatives of the attorney general of any persons
(9) within the sheriff's department?
(10) A I really don't recall.
(11) Q Do you have any recollection of attending a meeting
(12) with Sheriff Peterson in his office in which the
(13) matter of the Avery prosecution and Gregory Allen was
(14) discussed?
(15) A Yes, I do.
(16) Q Can you tell me your best recollection of who was at
(17) that meeting?
(18) A I believe that Deputy Inspector Beck was present, Mr.
(19) Rohrer, myself, Sheriff Peterson, and perhaps Deputy
(20) Inspector Mike Bushman. Not certain of the last one.
(21) Q All right. Do you recall whether or not Steve
(22) Rollins, the county's corporation counsel, was there?
(23) A I don't believe he was at that particular meeting.
(24) Q Okay. Do you remember how it came to be that that
(25) meeting was set up?

## Page 22

(1) MR. COVELLI: Form.
(2) A I don't remember.
(3) BY MR. KELLY:
(4) Q All right. Was it called for by you and Mr. Rohrer?
(5) A I really don't know.
(6) Q All right. Do you have any recollection about whether
(7) Sheriff Peterson produced any files and records
(8) concerning Steven Avery and/or Gregory Allen at that
(9) meeting?
(10) A He may have had the Allen information regarding the
(11) record checks that we had requested of the dispatch
(12) earlier. Perhaps the photo array in the assault case
(13) in 1985.
(14) Q What was the subject matter of the meeting?
(15) A I think the subject matter was basically a recognition
(16) that, you know, that Mr. Allen was very likely the
(17) assailant here, that Mr. Avery was not, that there
(18) will be press inquiries regarding that, that it is
(19) what it is, that we are confident, the D.A.'s office,
(20) that Mr. Avery should be released from prison as soon
(21) as possible. There may have been, you know, some
(22) discussion about the photo array, that we would like
(23) to see it, that Mr. Rohrer and I would like to see it
(24) and that Sheriff Peterson thought we should look at,
(25) too, just to see how it was conducted. And I believe

## Page 23

(1) part of the focus was on Mr. Allen in how similar or
(2) not similar to the description by the victim, and Mr.
(3) Avery, was Mr. Allen and whether he was in the photo
(4) array or not.
(5) Q What did you find out about that?
(6) A Mr. Allen was not in the photo array. His physical
(7) appearance and height and weight and such were pretty
(8) consistent with the victim's description of the
(9) assailant at the time.
(10) Q Did you ever find out whether or not there was a
(11) booking photograph of Gregory Allen that was available
(12) on the evening of July 29th, 1985, when Mrs. Beerntsen
(13) had been attacked and the sheriff called for some
(14) photos to be brought over, whether there was an actual
(15) photo, booking photo of Gregory Allen from the 1983
(16) offense that you've already told us about that was
(17) available?
(18) A My best recollection is that there was not a photo, a
(19) booking photo of Mr. Allen. I could be mistaken. But
(20) that's my best recollection.
(21) Q When you say that, do you mean not available when you
(22) went to the meeting or not available on the evening of
(23) July 29th?
(24) A I guess I mean when we were at the dispatch center. I
(25) don't know about what was or was not available on the

## Page 24

(1) date of the original assault in 1985.
(2) Q Do you have any recollection, throughout the course of
(3) these events since you found out about them on
(4) September 3rd, as to whether or not there was at one
(5) time a booking photograph of Gregory Allen that was
(6) made in connection with the 1983 offense that
(7) subsequently was either lost or destroyed or for some
(8) reason disposed of?
(9) A I have no information about that.
(10) Q All right. Do you recall whether at the meeting with
(11) Sheriff Peterson there was any discussion about the
(12) matter of Gregory Allen as being identified in 1995 as
(13) having been Penny Beerntsen's assailant and then there
(14) was some discussion with Sheriff Kocourek about that?
(15) A If you could re– I think I lost you. Probably my
(16) losing more than your saying. But I lost it.
(17) Q At the meeting that took place in Sheriff Peterson's
(18) office with the people that you've described to us,
(19) was there any discussion about the fact that it had
(20) come to light in 1995 from some source or sources that
(21) it was actually Gregory Allen who had attacked Mrs.
(22) Beerntsen and not Steven Avery?
(23) MR. BASCOM: Object to the form of that
(24) question.
(25) A I don't recall that information discussed at that time

## Page 25

(1) during that meeting. Might have been, might not have
(2) been.
(3) BY MR. KELLY:
(4) Q Okay. I'm going to show you what's been marked as
(5) Exhibit 124 and ask you if you'd take a moment and
(6) examine that.
(7) A Yeah, I've taken a look at it.
(8) Q Okay. And, first of all, is this a document that
(9) you've seen before today?
(10) A I think I have.
(11) Q It's dated September 18th of '03. Doug Jones was an
(12) attorney in the D.A.'s office at that time, right?
(13) A Still is, yes.
(14) Q Okay. A colleague of yours?
(15) A Yes.
(16) Q And was this information that's in 124 made available
(17) to you at the time that this memo was prepared?
(18) A Yeah. I think by the time that memo was prepared, I
(19) was aware of the contents of that memo. My earlier, I
(20) guess, hesitation was I don't recall that the contents
(21) of that memo was discussed at the meeting with Sheriff
(22) Peterson sometime earlier.
(23) Q All right.
(24) A It may have been, may not have been.
(25) Q Okay. Was any further investigation, to your

## Page 26

(1) knowledge, of the statements that are made in this
(2) memorandum about the information that was provided to
(3) Sheriff Kocourek and how he responded, was there any
(4) further investigation of that by you or Mr. Rohrer as
(5) far as you know?
(6) A No, I don't know.
(7) Q Okay. So was there any further discussion, to your
(8) knowledge, of the information that's stated in here
(9) about Mr. Allen by you or Mr. Rohrer with either
(10) Colburn or Lenk?
(11) A There very well may have been. It was likely from Mr.
(12) Rohrer. I, you know, vaguely remember this topic, the
(13) contents of that memo being discussed here and there
(14) over the -- you know, the following weeks. I was more
(15) of a receiver of information. I was not directing
(16) anybody to look into anything. But I do recall this
(17) same topic coming up once or twice more.
(18) Q And what further information, if any, that you recall,
(19) did you receive about that?
(20) A My recollection is just that it was confirmed that
(21) indeed that Sheriff Kocourek had said, upon hearing
(22) that somebody else did this, that we've got the right
(23) guy and that he should not concern himself. My
(24) impression is that that was what people were saying
(25) was the case. I don't have personal knowledge that he

## Page 27

(1) said that, but...
(2) Q Okay. And when you say "what people were saying was
(3) the case," can you identify the people that you're
(4) talking about?
(5) A I believe it would be Officer Colburn, and he's the
(6) only one I can say with any level of certainty that
(7) confirmed that. Now, you know, what one reads into "I
(8) think we have the right guy" is another story. I'm
(9) not speaking to that issue. But as far as that having
(10) been said by -- allegedly said by Sheriff Kocourek,
(11) that is my understanding of Deputy Colburn's
(12) recollection of what was said.
(13) Q All right. And do you have any understanding of what
(14) Mr. Lenk says about that?
(15) A I don't.
(16) Q Okay. And who was your source of information as to
(17) what Colburn was saying?
(18) A Probably Mark, Mr. Rohrer.
(19) Q All right. To your knowledge, was the information
(20) concerning what Colburn said and how Kocourek
(21) responded provided by Rohrer to the attorney general's
(22) office?
(23) A I believe it probably was.
(24) Q And what's the basis for that belief?
(25) A Just from the general way in which Mark, the district

## Page 28

(1) attorney, and I, for whatever it's worth, were
(2) handling this case. All information we had was
(3) provided to the attorney general.
(4) Q To your knowledge, did Mark Rohrer make any notes of
(5) any of the interviews he had with Brenda Petersen or
(6) Beverly Badker or Colburn or Sheriff Peterson?
(7) A I don't know whether he did or not.
(8) Q Did you?
(9) A No.
(10) Q Is there some reason you didn't?
(11) MR. COVELLI: Well, objection. He didn't --
(12) lack of foundation. He never said he interviewed
(13) these people.
(14) BY MR. KELLY:
(15) Q You can answer.
(16) A I don't -- I didn't make any notes of whatever
(17) conversations I heard. My main focus was on whether
(18) or not Mr. Avery should be released, and quickly. And
(19) after that, I think I memoed up a few things: a call
(20) from Mr. Vogel that I'm sure you're aware of.
(21) Q I am.
(22) A And some conversations that I think I had with Penny
(23) Beerntsen, the alleged victim, and I think with Janine
(24) Geske as well. But I did not memo up much in the
(25) office. Frankly, there wasn't a lot discussed in the

### Page 29

(1) office about this case early on, and Mr. Rohrer and I
(2) were very busy dealing with this case as well as the
(3) usual case load in the D.A.'s office.
(4) Q Do you believe that you turned over to the district
(5) attor- I'm sorry, to the attorney general's office
(6) the information that you received from the
(7) dispatcher's office at the sheriff's department about
(8) Gregory Allen's record?
(9) A I don't know. If we didn't, it was because we didn't
(10) feel that it was the focus. The focus of that portion
(11) of us in checking Mr. Allen's records were to ensure
(12) that Mr. Avery was not the guilty party here. And the
(13) - sending the file to the attorney general's office
(14) and asking for their assistance did not deal with that
(15) issue. We had already convinced ourselves that Mr.
(16) Avery was not guilty of this crime.
(17) Q Well, but you had broader concerns than that as well,
(18) right? You had questions respecting the fact that
(19) Steven Avery having been exonerated and Gregory Allen
(20) having been inculpated, as to what Gregory Allen may
(21) have done to other persons subsequent to July 30th of
(22) 1985.
(23) MR. COVELLI: Objection to form.
(24) BY MR. KELLY:
(25) Q And whether or not you would be prosecuting with

### Page 30

(1) respect to anything further and Gregory Allen.
(2) A Certainly with respect to whether we'd be prosecuting
(3) Mr. Allen for this assault in 1985. I remember
(4) feeling when we found out that he was in prison in
(5) Brown County for a very lengthy period of time, 30
(6) years or something, that I remember feeling relieved
(7) and glad that he was in prison and had no other
(8) information that he was responsible for other crimes
(9) other than this 1985 assault.
(10) Q 1985 or 1995?
(11) A 1985 assault.
(12) Q Well, certainly he was guilty of the 1995 assault,
(13) right?
(14) A In Brown County?
(15) Q Yeah.
(16) A Yes, and I was relieved that that was the case. But
(17) we didn't have to do anything about that case, it had
(18) already been prosecuted and he was sentenced.
(19) Q But you had to make a decision about whether or not to
(20) prosecute him for the Penny Beerntsen assault.
(21) A That's right.
(22) Q And you had to look into the question of whether or
(23) not he might have assaulted other women than the 1995
(24) victim and what, if anything, to do about that.
(25) A I had no information that he had assaulted anybody

### Page 31

(1) other than the 1995 victim and Penny Beerntsen, and
(2) that he was on the beach a year prior to the Penny
(3) Beerntsen assault and arguably attempted to assault a
(4) woman there and, at the least, was involved in lewd
(5) and lascivious behavior with her.
(6) Q And you and Mr. Rohrer went to a meeting with Perry
(7) Kingsbury and Tom Bergner as part of your follow-up to
(8) the information that you had received from the crime
(9) lab.
(10) A Yes.
(11) Q All right. And do you remember when that took place
(12) relative to when you had received the information from
(13) the crime lab?
(14) A Within a week, I would think.
(15) Q Okay. And do you remember what occasioned that
(16) meeting, how it came about that you went to talk with
(17) those two gentlemen?
(18) A No.
(19) Q Okay. Was that meeting initiated by you folks or
(20) initiated by them?
(21) A I really don't remember.
(22) Q At the time you went to the meeting, did you have any
(23) knowledge whatsoever of who Thomas Bergner was with
(24) respect to the Steven Avery/Gregory Allen matter?
(25) A I knew Tom Bergner well, worked with him, and I think

### Page 32

(1) I understand your question. I believe that I knew
(2) that he had expressed doubt to Sheriff Kocourek about
(3) the assailant, as to whether Mr. Avery was the
(4) assailant and in fact that it could have been Mr.
(5) Allen.
(6) Q And you knew that before you got to the meeting with
(7) Kingsbury and Bergner.
(8) A Probably in a real general way.
(9) Q Okay. What was the source of your knowledge? I mean,
(10) I'm not talking now about what you find out in the
(11) meeting.
(12) A Right.
(13) Q I'm talking about what you're carrying in your head
(14) into the meeting and what its source or sources were
(15) at the time, as best you recall.
(16) A I really don't recall. It's just a general – Whether
(17) we heard from Chief Kingsbury or Detective Bergner,
(18) through a phone conversation that I heard third or
(19) fourth-hand, it was not a direct conversation that
(20) sticks out in my mind. What does stick out is what we
(21) were told at that meeting.
(22) Q Okay. Well, we'll get there.
(23) A Okay.
(24) Q But what I'm – whatever may be the chain of the three
(25) or four people, I guess all I can ask of you is

Page 33

(1) whatever the source of your knowledge was, that
(2) general knowledge that you've described as you went
(3) into the meeting, from whom did it come to you?
(4) Specifically, was it Mark Rohrer?
(5) A I really don't know. If I knew about it, it was
(6) likely Mark.
(7) Q Could it have been anybody else?
(8) A I don't know.
(9) Q Well, let me suggest this to you. Had you spoken to
(10) Penny Beerntsen by then?
(11) A I'm sure I had.
(12) Q Had Penny Beerntsen discussed with you information
(13) provided to her by Tom Bergner?
(14) A Yes, she did.
(15) Q Okay. Tell me what you recall of that.
(16) A Again, the timing of all this as to whether Penny and
(17) I spoke about this particular matter, that Tom Bergner
(18) matter, prior to my meeting with Chief Kingsbury and
(19) Detective Bergner, I don't know about the timing of
(20) that. But I do recall eventually speaking with Penny
(21) about the fact that Tom had expressed some concern to
(22) Sheriff Peterson – excuse me, Sheriff Kocourek that
(23) in fact this sounded like Allen and not Avery.
(24) Q Okay. Do you recall whether before you went to the
(25) meeting with Bergner and Kingsbury you had had any

Page 34

(1) conversations with Janine Geske about the Avery/Allen
(2) matter?
(3) A I recall having a lot of conversations with both Mrs.
(4) Beerntsen and Janine Geske, but the timing of it,
(5) again, I don't recall. I'm not very good with timing,
(6) frankly. But I believe I probably did speak with
(7) Janine early on, before that meeting with Bergner and
(8) Kingsbury.
(9) Q And whatever information that you've described as
(10) general that you may have had going into the meeting
(11) with Kingsbury and Bergner, had you discussed that
(12) with Mark Rohrer before you got into the meeting with
(13) Kingsbury and Bergner? Meaning was he, as far as you
(14) know from you, carrying the same kind of general
(15) information?
(16) MR. COVELLI: Objection to form.
(17) A I don't know.
(18) BY MR. KELLY:
(19) Q Okay. You don't remember whether you had talked it
(20) over with him.
(21) A Right. I don't remember.
(22) Q Do you remember whether you were informed, before you
(23) went to the Kingsbury/Bergner meeting, by Janine Geske
(24) about a phone call that Penny Beerntsen had received
(25) from somebody within the Manitowoc City Police

Page 35

(1) Department suggesting to Ms. Beerntsen that Steven
(2) Avery may not have been the person who attacked her
(3) and it may have been some other person?
(4) A I lost you.
(5) Q Okay. I'm focusing on the period of time before you
(6) step inside the room with Kingsbury and Bergner. And
(7) I'm asking whether you remember Janine Geske having
(8) spoken to you before that time and told you about
(9) Penny Beerntsen having received a phone call from
(10) somebody from the Manitowoc City Police Department
(11) saying that that person – and this is back in 1985 –
(12) had been suggesting to Penny Beerntsen that Steven
(13) Avery wasn't her assailant, it was somebody else?
(14) A I don't remember talking with Janine exactly about
(15) that or – it's the "somebody from the police
(16) department calling Penny and telling her that" that I
(17) don't recall hearing from Janine.
(18) Q Okay. Do you recall at any time having heard that
(19) from Janine?
(20) A I recall speaking with Janine about the fact that
(21) Detective Bergner talked to Kocourek back in '85 about
(22) his belief that it prob– it may not have been Avery
(23) and it might have been Allen. Beyond that, in terms
(24) of detail about who told who what and when, I can't
(25) help you.

Page 36

(1) Q Do you have any recollection, at any time now, of
(2) having spoken to Penny Beerntsen in which she told you
(3) that somebody from the Manitowoc City P.D. had called
(4) her and said to her you may not have the right guy
(5) here, are you confident about this, and she in turn
(6) called Kocourek?
(7) A That sounds familiar.
(8) Q Okay. Tell me what your best recollection is.
(9) A That Detective Bergner, I guess I was under the
(10) impression it was him, had informed Penny that it
(11) could have been this other person, and that Penny,
(12) being concerned to make sure she had the right person,
(13) talked to Kocourek about that.
(14) Q And what – did she say how Kocourek responded?
(15) A I have a hard time recalling exactly what he said, but
(16) my impression was that – I really can't answer that
(17) without speculating or trying to remember something
(18) that I don't recall right now.
(19) Q Can you give me your best recollection?
(20) MR. COVELLI: Objection. No foundation.
(21) A She didn't – I was – I had the impression that her
(22) information, the information she gave to Sheriff
(23) Kocourek, was not acted upon or considered too
(24) seriously.
(25) BY MR. KELLY:

Page 37

(1) Q Do you have any recollection of Penny telling you that
(2) the way Kocourek responded to what she was telling him
(3) was actually quite similar to the way Kocourek is said
(4) by Colburn in Exhibit 124 to have responded,
(5) specifically, "We've got the right guy. Don't concern
(6) yourself"?
(7) MR. MAYER: Form of the question.
(8) A Something to that effect.
(9) BY MR. KELLY:
(10) Q Okay. Now I'd like to ask you what you indicated that
(11) you do recall, and that is what you found out at the
(12) meeting with Kingsbury and Kocourek concerning the
(13) Steven Avery/Gregory Allen –
(14) MR. COVELLI: I think you misspoke.
(15) A Kingsbury and Bergner?
(16) Q I'm sorry. I misspoke.
(17) A That's all right.
(18) Q Let me rephrase it. Focusing on the meeting where you
(19) and Mr. Rohrer went to talk with Kingsbury and
(20) Bergner, tell me your best recollection of what was
(21) said by them at the meeting.
(22) A Tom Bergner told us that he recalls going to Sheriff
(23) Kocourek at the time of this assault, shortly after
(24) it, and telling the sheriff that he had this other
(25) fellow, Gregory Allen, under surveillance for a week

Page 38

(1) or two prior to this assault and that it seemed to fit
(2) his M.O., that he expressed real reservation about
(3) whether it was Mr. Avery that did this and that they
(4) really need to look at Mr. Allen.
(5) Q And did Bergner go on and tell you how the sheriff
(6) responded to him?
(7) A I believe he did.
(8) Q And what did he say?
(9) A I don't remember what he said. But Detective Bergner
(10) – and, again, I wasn't there obviously during the
(11) conversation between Detective Bergner and Sheriff
(12) Kocourek. But Detective Bergner – the impression I
(13) had was that the sheriff didn't really want to go too
(14) into that information and believed that he had the
(15) right person, that Mr. Avery was the assailant.
(16) Q You said earlier in your testimony today that you know
(17) Tom Bergner.
(18) A Yes.
(19) Q And I had the sense that you know him professionally.
(20) A Yes.
(21) Q And would it be fair to say that you know him well?
(22) A Yeah.
(23) Q And that you've worked with him over the years?
(24) A Yes.
(25) Q And what do you think of him professionally? Do you

Page 39

(1) have an opinion concerning his reputation and
(2) concerning your own thoughts about him?
(3) A Yes. His re–
(4) MR. MAYER: Form and relevance.
(5) BY MR. KELLY:
(6) Q You can answer.
(7) A His reputation, I believe, is that he's a good cop, an
(8) honest cop. And my working with him and my own
(9) working relationship with him was always – I have a
(10) lot of respect for Detective Bergner.
(11) Q Okay. At the meeting that took place with Kingsbury
(12) and Bergner, were there any documents that they
(13) produced for you?
(14) A Not that I recall.
(15) Q Okay. Were there any documents present?
(16) A Not that I recall.
(17) Q Do you recall whether Bergner elaborated on who was
(18) involved in the surveillance of Gregory Allen? And
(19) when I say "who was involved," I mean within the City
(20) of –
(21) A Right.
(22) Q – Manitowoc Police Department.
(23) A I don't. It may have been detectives, it may have
(24) been Bergner. He was a detective at that time, and
(25) then he was captain when we met with him in eighty–

Page 40

(1) in 2003. It might have been one of the other
(2) detectives. I don't know.
(3) Q Okay. Did he by chance – I shouldn't put it that
(4) way. Did he by any means describe to you whether the
(5) decision on his part to go and talk to Kocourek was a
(6) decision he made completely on his own, or was it
(7) something that had been discussed amongst the officers
(8) in the – and perhaps even his superiors in the city
(9) department before he went to see Kocourek?
(10) A I had the impression it was Tom Bergner himself.
(11) Q Okay. All right. Did Kingsbury offer any thoughts of
(12) his own – strike that. Was Perry Kingsbury the chief
(13) of the city department at the time that you
(14) interviewed him and Bergner?
(15) A Yeah, that we were present together. We didn't really
(16) interview them, but yes, he was police chief at that
(17) time.
(18) Q Okay. Did he have any thoughts of his own to offer
(19) about what Bergner was telling you?
(20) A Not really.
(21) Q Okay. Can you fix this in time, the meeting that you
(22) have with Bergner and Kingsbury, relative to the
(23) information that you received on or about September
(24) 3rd from Mark Rohrer after he had spoken with the
(25) people at the crime lab?

Page 41

(1) A I believe it would have been anywhere from a day after
(2) to two or three days after. So September 4th, 5th, or
(3) 6th, somewhere around there. Certainly before we went
(4) to the A.G.'s office.
(5) Q Okay. And when you went to the A.G.'s office, to your
(6) recollection did you or Rohrer inform the A.G.'s
(7) office about what Bergner had told you?
(8) A I don't recall. Probably, but I don't recall for
(9) certain.
(10) Q Okay. By the time that you met with Kingsbury and
(11) Bergner, had you already met with Ken Peterson?
(12) A I believe so.
(13) Q Okay. Was Bergner discussed at all in the meeting
(14) that you had with Peterson?
(15) A I don't believe so.
(16) Q So you don't have any impression that what you heard
(17) from Bergner at the meeting that you had with him was
(18) something that he – that Ken Peterson was aware of?
(19) A I don't have an impression one way or the other.
(20) Q All right. After you had the meeting with Bergner and
(21) Kingsbury, did you provide the information that you
(22) heard there in any conversation – did you provide the
(23) information to Janine Geske in any conversation you
(24) had with her?
(25) A Probably. Specific recollection, no, but probably.

Page 42

(1) Q Okay. Did you provide the information that was given
(2) to you by Bergner in any conversation you had with
(3) Penny Beerntsen?
(4) A Again, probably.
(5) Q Okay. Did you yourself have any conversations with
(6) Tom Beerntsen after the September 3rd information that
(7) Rohrer told you that he had received from the crime
(8) lab?
(9) A I did.
(10) Q One or more?
(11) A One or two at most.
(12) Q Can you fix them approximately in time?
(13) A The first one may have – is likely soon after we
(14) found out. One of my roles was to let Penny know what
(15) happened, to let Penny know of the new evidence that
(16) it appeared that Mr. Avery was not the assailant. And
(17) Tom either – I think initially Tom answered the
(18) phone, and I let him know before letting Penny know is
(19) my recollection of how this worked out.
(20) Q So this is very early on after you get the information
(21) from the crime lab.
(22) A Yes.
(23) Q Okay. Any further discussion with Tom on that
(24) occasion that you recall?
(25) A No. I don't recall.

Page 43

(1) Q All right. And was there then a later conversation
(2) you had with Tom Beerntsen?
(3) A I believe there was one other conversation.
(4) Q Let me just go back to the first one for a moment. Do
(5) you recall anything further that Tom Beerntsen said to
(6) you when you provided this information to him?
(7) A Not offhand, no.
(8) Q All right. And what was the content of the second
(9) conversation?
(10) A It was –
(11) Q With Tom Beerntsen.
(12) A Right. Either Tom called me or I called Tom, and I
(13) don't recall exactly the purpose of the conversation.
(14) Perhaps it was when was Mr. Avery going to be
(15) released. It seems to me it was something along those
(16) lines. I'm sure there was some discussion at some
(17) point about how did this happen, meaning how did Mr.
(18) Avery get charged. And convicted.
(19) Q Did you respond to that at all, tell him what your
(20) thoughts were about that?
(21) A I probably – I probably did in some way. I don't
(22) recall any, any...
(23) Q Do you remember in substance what you said to him?
(24) A No.
(25) Q Okay. How about to Penny, did you have such a

Page 44

(1) conversation with her at any time?
(2) A Yes.
(3) Q Tell me what you remember of that.
(4) A Well, initially my conversations with Penny was just
(5) about what – that Mr. Avery was found not to be her
(6) assailant and that Mr. Allen was. She was concerned
(7) that Mr. Allen was, you know, in custody and that he's
(8) not – he was not out to commit other crimes and for
(9) her own safety, I suppose. Was concerned whether or
(10) not we were going to be filing charges against Mr.
(11) Allen. And there was discussion regarding how this
(12) case occurred in 1985 during some of those
(13) conversations.
(14) Q Tell me what you remember of those discussions.
(15) A I know that Penny spoke about the identification
(16) procedure when she was up at the hospital, her best
(17) recollection regarding the composite drawing and the
(18) photo array, her best recollection regarding – well,
(19) that was primarily it.
(20) Q Okay. Did you tell her at some point about what
(21) Bergner had told you?
(22) A Probably.
(23) Q What did she say?
(24) A Penny was upset that that information did not appear
(25) to have been taken too seriously at the sheriff's

Page 45

(1) department.
(2) Q By Sheriff Kocourek?
(3) A Right.
(4) Q Okay. At some point, Mr. Rohrer has told us, you and
(5) he met with Sheriff Kocourek.
(6) A I don't think that's correct. I don't recall meeting
(7) – in fact I'm quite certain I did not meet with
(8) Sheriff Kocourek. I think Mark did.
(9) Q And do you have any recollection of what Mark Rohrer
(10) told you had been his conversation with Sheriff
(11) Kocourek about what he, Mark Rohrer, had found out?
(12) A Nothing that's even close to a definite recollection.
(13) I'd be speculating.
(14) Q Okay.
(15) A Or I'd be drawing upon a faulty memory.
(16) Q Vogel called you at some point?
(17) A Yes.
(18) Q When was it, relative to when you were informed on or
(19) about September 3rd by Rohrer of what the crime lab
(20) had said to you? About how proximate in time was it
(21) to that?
(22) A At most a week, I believe.
(23) Q Okay. And tell me everything you remember of what
(24) transpired in that conversation.
(25) A He called me on a Friday, left a message on my

Page 46

(1) voicemail. I was in court, didn't get back to him
(2) until – actually I did not get back to him. He
(3) called on Monday, the next Monday, before I had a
(4) chance to get back to him. And I don't recall if he
(5) already knew. He must have known – I had no other
(6) reason to speak with him – that Mr. Avery was found
(7) not to have been the assailant here.
(8) Q Okay. What did he want?
(9) A At some point he asked me whether there was anything
(10) in the Avery file with regard to Mr. Allen.
(11) Q And what did you tell him?
(12) A I told him that I did find in the Avery file a copy of
(13) the criminal complaint filed against Mr. Allen
(14) regarding the incident a year prior to this assault,
(15) and a copy of the police reports involved in that
(16) incident as well.
(17) Q And what did he say?
(18) A I believe he asked me whether there was anything else
(19) in that file with regard to Mr. Allen.
(20) Q And what did you tell him?
(21) A I don't – I don't – I didn't tell Mr. Vogel much.
(22) In fact, as I'm thinking of this, I'm not even sure
(23) that I told him that I located the Allen complaint in
(24) the file. I more or less listened to what Mr. Vogel
(25) said and did not say a lot in return.

Page 47

(1) Q Were you bothered by the Vogel call?
(2) A Not necessarily. No. I don't recall – I also recall
(3) that Judge Hazlewood in this case, who signed the
(4) order releasing Mr. Avery, suggested, I think, to me
(5) that maybe it would be a good idea to let Mr. Vogel
(6) know before the media hears about this just as a
(7) courtesy, a professional courtesy. And I'm not sure,
(8) as we sit here, that I didn't place the first call to
(9) Mr. Vogel and that he was calling me back, and on his
(10) second call back, I spoke with him.
(11) Q But whatever the sequence was, as far as you recall
(12) there was only one actual conversation between the two
(13) of you?
(14) A Yes.
(15) Q And that's a conversation about which you made a
(16) memorandum.
(17) A Yes.
(18) Q And do you recall whether that's a conversation that
(19) you discussed at any time with Janine Geske?
(20) A I'm sure I did.
(21) Q Do you remember what you told her?
(22) A I don't think I was bothered, to go back to your
(23) earlier question, by the fact that he called me. I
(24) was, and I told Janine that I was, bothered by sort of
(25) the tone and the – the tone of the conversation.

Page 48

(1) Q Did – Were you finished?
(2) A Yeah.
(3) Q Did you explain to Janine what you meant by that?
(4) What was it about the tone that was bothersome to you?
(5) A I thought it was a bit nonchalant for just then, I
(6) believe from me – in fact I know from me – first
(7) learning, Mr. Vogel's first learning, that the person
(8) he prosecuted and convicted of this sexual assault who
(9) had spent years in prison was not in fact the
(10) assaulter, the assailant. I don't know Mr. Vogel,
(11) but, again, if that were me, I would have – I would
(12) have reacted differently.
(13) Q Do you recall at any time telling Janine Geske that
(14) you thought that Vogel's behavior in the case should
(15) be looked into, especially with respect to what you
(16) had found out from Bergner?
(17) A I probably did.
(18) Q Okay.
(19) A If I can add? I'm sorry, but...
(20) Q Go ahead.
(21) A The primary concern – or one of the other concerns I
(22) had in this file was whether or not the criminal
(23) complaint against Mr. Allen and the police reports
(24) with regard to Mr. Allen from the incident a year
(25) earlier, both of which were in the Avery file, whether

## Page 49

(1) those things were turned over to the defense as part
(2) of discovery. That was one of my primary concerns
(3) throughout.
(4) Q And did you find out whether or not they were?
(5) MR. COVELLI: Objection. No foundation.
(6) A I did not personally. My understanding is the
(7) attorney general concluded that they were, that that's
(8) their belief.
(9) BY MR. KELLY:
(10) Q Other than what the attorney general's belief was, did
(11) you find out from any other source whether or not the
(12) information that you found in the file had been turned
(13) over to the defense?
(14) A None.
(15) Q Did you believe it should have been?
(16) A Absolutely.
(17) Q Why?
(18) A We have a duty as prosecutors to turn over any
(19) information that may be exculpatory to the other side,
(20) and I viewed that as potentially exculpatory as there
(21) may be another suspect involved here.
(22) Q Did you –
(23) MR. COVELLI: I'll object to no foundation.
(24) This person has not been identified as an expert
(25) witness.

## Page 50

(1) BY MR. KELLY:
(2) Q Did you ever make a determination or – well, strike
(3) that. Did you look at all into the question of
(4) whether or not the information that Bergner provided
(5) to Kocourek concerning Gregory Allen was in turn
(6) provided by Kocourek to Vogel?
(7) A I did not.
(8) Q Do you know whether or not Rohrer looked into that at
(9) all?
(10) A I don't.
(11) Q Do you know whether or not Rohrer discussed that with
(12) Kocourek when he met with him?
(13) A I don't.
(14) Q Do you recall whether you discussed with Janine Geske
(15) whether the information that Bergner provided to
(16) Kocourek was something that was discussed by Kocourek
(17) with Vogel?
(18) MR. MAYER: Object to the form.
(19) MR. COVELLI: Could I hear the question
(20) again? I'm sorry.
(21) MR. KELLY: Sure. I'll ask it again.
(22) Q Do you recall whether you discussed with Janine Geske
(23) the question of whether what Bergner had told Kocourek
(24) was something that Kocourek in turn discussed with
(25) Vogel?

## Page 51

(1) A I don't recall.
(2) Q Okay. In the period of time between when you received
(3) the information from Mark Rohrer about what he had
(4) heard from the crime lab, which is on September 3 of
(5) 2003, and when you went to see the people in Madison
(6) in the justice department, do you have any
(7) recollection of talking with Rohrer about the exposure
(8) of Manitowoc County, the sheriff, the D.A. in a civil
(9) lawsuit by Steven Avery for damages?
(10) A I do not recall any such conversation.
(11) Q Okay. At any time after you received the information
(12) from Rohrer that he in turn had received from the
(13) crime lab, have you ever discussed this case, Steven
(14) Avery/Greg Allen, with Jim Wyss of the City of
(15) Manitowoc?
(16) A I don't believe I have.
(17) Q With any other City of Manitowoc representatives?
(18) A Other than Berg–
(19) Q Other than Kingsbury and Bergner?
(20) A Okay. No, I don't believe I have.
(21) Q Since the time that you received the information from
(22) Rohrer that he in turn received from the crime lab,
(23) have you discussed this case with Jim Bolgert at all?
(24) A No. I wanted to.
(25) Q I was going to say it looks like you have some regret

## Page 52

(1) about that. At any time, have you discussed the case
(2) with Reesa Evans?
(3) A No.
(4) Q Oh, yeah. Since the time that you received the
(5) information that you did from Mark Rohrer about the
(6) crime lab's findings, have you had any discussions
(7) with Jim Fitzgerald about the case?
(8) A I don't think so. No.
(9) Q Okay. With Elma Anderson about the case?
(10) A I don't believe so.
(11) Q Do you remember whether Elma Anderson was in the
(12) office at the time of the Steven Avery prosecution?
(13) A I believe she was in –
(14) MR. COVELLI: Well, I'm going to object. No
(15) foundation. Excuse me.
(16) A I thought – I believe she was not.
(17) BY MR. KELLY:
(18) Q She left sometime before that?
(19) A Right.
(20) Q Do you know where she went?
(21) A She eventually went to the Kewaunee County D.A.'s
(22) office as an assistant D.A., and I believe there was a
(23) short period when she was in private practice with –
(24) I think with the Dewane law firm here in Manitowoc.
(25) D-e-w-a-n-e.

### Page 53

(1) Q And that was after she left the D.A.'s office and
(2) before she went to Kewaunee County.
(3) A I believe that's correct.
(4) Q Do you know why she left the D.A.'s office?
(5) A I don't. Well, she ran against Mr. Vogel in a
(6) contested election. I don't know the exact timing
(7) with regard to when she left and that election.
(8) MR. KELLY: That's it.
(9) REPORTER: Gentlemen?
(10) (Chorus of noes)
(11) REPORTER: There being nothing further for
(12) the record —
(13) MR. COVELLI: No, no, no. No, no.
(14) REPORTER: I beg your pardon. Off the
(15) record for a moment, please.
(16) (Off the record 1:01 - 1:02)
(17) REPORTER: Back on the record. Mr. Covelli.
(18) EXAMINATION
(19) BY MR. COVELLI:
(20) Q Just a couple follow-up questions. You had indicated
(21) at a time that you had a meeting with Sheriff Peterson
(22) that the descriptions of Allen and Avery were similar.
(23) Do you remember testifying about that subject?
(24) A Somewhat similar.
(25) Q Okay. If I understood it, you had seen — you may

### Page 54

(1) have seen a photograph from the photo array of Mr.
(2) Avery dating back to roughly 1985. Is that correct?
(3) A Yes.
(4) Q But you did not see any photograph of Mr. Allen dating
(5) back to that point in time; is that correct?
(6) A I think I eventually did.
(7) Q Okay. But not at the time of that meeting.
(8) A Right.
(9) Q Okay. Were Mr. Avery and Mr. Allen the same height?
(10) A No.
(11) Q Were they close to the same height?
(12) A Not really. I think there was five or six inches
(13) different.
(14) Q Were they the same weight?
(15) A No.
(16) Q Okay. Did they have the — were their hairlines the
(17) same? Did one have a receding hairline, one have a
(18) full head of hair, do you remember?
(19) A I really don't remember.
(20) MR. COVELLI: All right. That's all I have.
(21) MR. KELLY: Anybody else? I have a follow-
(22) up here.
(23) EXAMINATION
(24) BY MR. KELLY:
(25) Q Mr. Griesbach, you said in response to one of Mr.

### Page 55

(1) Covelli's questions that eventually you did see a
(2) photo of Allen dating back to the time.
(3) A Yes.
(4) Q When did that happen and how did — what did you see?
(5) A I believe that, you know, whether it was dispatch or
(6) someone eventually — and I don't remember how long
(7) after this — obtained a photo of Mr. Allen. And what
(8) I saw was a person who looked like Mr. Avery but that
(9) was either taller or shorter. I don't remember right
(10) now the physical characteristics, but there was a —
(11) that's what stuck out in my mind, the height
(12) difference.
(13) Q When you say someone got a photo of Allen, who was
(14) that?
(15) A I don't know.
(16) Q How was it brought to your attention?
(17) A I don't know.
(18) Q And you recall checking out the photo?
(19) A I recall seeing the photo at some point, but I recall
(20) more specifically checking out the relative heights of
(21) Mr. Allen and Mr. Avery early on in the case here.
(22) Q Was it a lineup photo?
(23) A I think it was a mug shot.
(24) Q Booking photo?
(25) A Yeah.

### Page 56

(1) Q So how can you tell from a booking photo, which is
(2) basically a head shot, what the relative heights of —
(3) A That information, the relative height and weight, I'm
(4) drawing from some other information about Mr. Allen.
(5) I recall specifically, and I don't know the source,
(6) but I recall specifically knowing the height and
(7) weight or learning the height and weight of Mr. Allen
(8) versus the height and weight of Mr. Avery.
(9) Q In the mug shot that you saw of Allen that dates back
(10) to the time in question, did he have a beard?
(11) A I don't recall.
(12) Q As far as you know, the original composite drawing was
(13) withdrawn from evidence and is in the possession of
(14) Kusche; is that right?
(15) A As far as I know, the — I have heard that, that
(16) Detective Kusche at some point had the original
(17) composite drawing in his residence.
(18) Q And did he have a booking photograph along with it?
(19) A I don't know that.
(20) Q Did you hear anything about that?
(21) A No.
(22) MR. KELLY: That's all I have.
(23) MR. BASCOM: I have nothing.
(24) REPORTER: There being nothing further —
(25) MR. KELLY: Thank you.

(1) WITNESS: Thank you.
(2) REPORTER: – the deposition is concluded at
(3) 1:07 p.m. Off the record.
(4) End of record
(5)
(6)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)