# **Exhibit 16**

United States District Court

Eastern District of Wisconsin

---

## Avery v. Manitowoc County

04 C 986



Video Deposition of

## Kenneth Petersen

Recorded 10/13/2005 in Manitowoc, WI

12:04 pm - 1:29 pm, 84 mins. elapsed

---

## Magne-Script

(414) 352-5450

*15843 Standard transcript*

Witness

Kenneth Petersen


Thursday 10/13/2005 at 09:00 by: Jeff Joseph


Nash, Spinlder, Grimstad & McCracken

201 East Waldo Boulevard

Manitowoc, WI


Caption:  Avery v. Manitowoc County

Case No.: 04 C 986

Venue:    United States District Court

          Eastern District of Wisconsin

1                    A P P E A R A N C E S

2      Walter F. Kelly

3      Walter F. Kelly, S.C.

4      700 W. Michigan St. #500

5      Milwaukee, WI  53233

6      On behalf of the Plaintiff

7

8      Stephen M. Glynn

9      Glynn, Fitzgerald & Albee, S.C.

10     526 E. Wisconsin Ave.

11     Milwaukee, WI  53202

12     On behalf of the Plaintiff

13

14     Claude J. Covelli

15     Boardman, Suhr, Curry & Field

16     1 S. Pinckney St. #410, PO Box 927

17     Madison, WI  53701-0927

18     On behalf of Denis Vogel and Manitowoc County

19

20     Timothy A. Bascom

21     Bascom, Budish & Ceman, S.C.

22     2600 N. Mayfair Rd. #1140

23     Wauwatosa, WI  53226-1308

24     On behalf of Manitowoc County

25

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 4 of 76   Document 120-16

1    Raymond J. Pollen

2    Crivello, Carlson & Mentkowski, S.C.

3    710 N. Plankinton Ave. #500

4    Milwaukee, WI  53203

5    On behalf of Tom Kocourek and Manitowoc County

6

7    John F. Mayer

8    Nash, Spindler, Grimstad & McCracken

9    201 East Waldo Boulevard

10   Manitowoc, WI  54220

11   On behalf of Tom Kocourek

12

13   Also Present:  Steven Avery

14

15

16

17

18

19

20

21

22

23

24

25

1                      I N D E X

2    EXAMINATION BY                              PAGE NO.

3    Mr. Glynn . . . . . . . . . . . . . . . . . . .    4

4    EXHIBIT NO.                                 PAGE NO.

5    138 - Statement of Andrew Colborn . . . . . . . .   29

6    139 - Debra Strauss DOJ report re Mr. Petersen. .   37

7    140 - Memo  . . . . . . . . . . . . . . . . . .    45

8         (The exhibits were retained by Mr. Kelly)

9     (The sealed original transcript was sent to Mr. Kelly)

10                    ===========

11              E X A M I N A T I O N

12         BY MR. GLYNN:

13   Q    Sheriff Petersen, we've met before, but just to remind

14        you, my name is Steve Glynn.  I'll be asking you some

15        questions.  I'll first take you through some

16        background, then we'll cover a few specific times in

17        history.  Okay?  One back in the 1985 time range, one

18        in the 1995 time range, and then we'll be moving to

19        more current things.  If you don't understand any of

20        the questions that I'm asking, I'm sure you'll let me

21        know.  Fair enough?

22   A    Yes.

23   Q    Okay.  Let's start out with the easiest question.  How

24        do you spell your last name?  Does it end up with an

25        e-n or an o-n?

1    A    It's P-e-t-e-r-s-e-n.

2    Q    Okay.  It shows up different ways in different

3         documents.  That's why --

4    A    That's correct.

5    Q    -- I was asking.  Can you tell me a little bit about

6         your educational background?

7    A    Well, I was born and raised in Manitowoc, educated

8         local parochial school.  Graduated Lincoln High School

9         in '67, Lake Shore Technical College in '69 with an

10        associate degree in marketing, and 1988, I graduated

11        from Mount Senario College with a Bachelor of Science

12        in criminal justice.

13   Q    Okay.  So when did you get interested in law

14        enforcement work?

15   A    The early seventies.

16   Q    And did you become employed in law enforcement around

17        then?

18   A    Yes.  1975, May 15th.

19   Q    And what did you do then?

20   A    I was hired by the Manitowoc County as a traffic

21        officer.

22   Q    Okay.  So that was at a time, if I recall correctly,

23        when the traffic section was separate from the

24        sheriff's department; is that right?

25   A    That's correct.

1   Q   Okay.  And refresh me, please.  When did they merge?

2   A   January of 1979.

3   Q   Okay.  And in January of '79, did you go along with

4       the merger?  I mean, did you stay a member of that law

5       enforcement unit?

6   A   Yes.

7   Q   And were you still involved with traffic, or did your

8       duties change at some point?

9   A   No, basically we did the same thing.  Our titles just

10      changed.

11  Q   Okay.  Is there a point when your job description and

12      duties changed from traffic?

13  A   I would say in 1979, primarily a traffic officer

14      handled on-road complaints.  We responded to criminal;

15      however, once the situation was stabilized, then a

16      sheriff's department detective would take over.

17  Q   Okay.  And you're obviously now the sheriff.

18  A   Correct.

19  Q   When did you become sheriff?

20  A   In 2001, I was sworn in.

21  Q   Up to 2001, was your background staying in the -- what

22      I guess I would call the traffic portion of the

23      sheriff's department?

24  A   No.

25  Q   When did you change from that?

1    A    In 1982, I was promoted to sergeant on patrol.  I

2         stayed in that capacity through '87.  In '88, I became

3         deputy inspector of operations and I oversaw the

4         patrol division and the detective division, and then

5         in '89, I was promoted to inspector and under-sheriff,

6         and that position I held until I was elected sheriff.

7    Q    Okay.  And are you married, sir?

8    A    Yes.

9    Q    To whom?

10   A    Pardon?

11   Q    To whom?

12   A    My wife Mary.

13   Q    Okay.  Is she involved in law enforcement at all?

14   A    No.

15   Q    Do you have siblings?

16   A    Yes, three.

17   Q    Any of them involved in law enforcement?

18   A    My daughter is a security sergeant for the University

19        of Washington Medical College.

20   Q    Okay.  Brothers or sisters involved in law

21        enforcement?

22   A    Oh, yes.  I have one that's a reserve deputy.

23   Q    And who's that?  Is it Keith?

24   A    Keith.

25   Q    Okay.  And Keith is married to whom?

1   A   Brenda Petersen.

2   Q   And that's the same Brenda Petersen who worked in the

3       victim/witness unit in the district attorney's office,

4       correct?

5   A   That's correct.

6   Q   Okay.  As a general matter, do you socialize much with

7       Keith?

8   A   No.

9   Q   Are you guys over at each other's houses very often?

10  A   No.

11  Q   Okay.  How about discussions with Brenda?  Are those

12      common, or were those common back in, say, the period

13      from 1985 to, I don't know, to 2003?

14  A   No.

15  Q   Why not?  I mean, I don't want to get into personal

16      stuff.

17  A   Oh.

18  Q   But, I mean, is it just -- is it just a matter that it

19      just simply doesn't happen?

20  A   No.  You know, since they've been married, I think

21      I've been to their house three times, and I think

22      they've been married about four or five years, so we

23      just don't socialize that much.

24  Q   Yeah.  Okay.

25  A   And I don't have much...

1   Q   Yeah.  Fair enough.

2   A   I don't dislike them or anything.  I just don't have

3       any --

4   Q   It just doesn't happen.

5   A   Right.

6   Q   Yeah.  With respect to on-the-job time, would you run

7       into Brenda Petersen in connection with your job?

8   A   Very rare.

9   Q   And can you give me a time and frequency rate on that?

10      I mean, are we talking about once every couple years

11      or once every couple of weeks?

12  A   Probably about once every two years.

13  Q   Okay.  All right.  Well, let me take you back to, say,

14      let's start in July of 1985.  As I understand, what

15      you've told me up to this point, you would have been

16      involved as a sergeant.  You would have been involved

17      still with patrol.  Is that true?

18  A   That's correct.

19  Q   Okay.  And as a sergeant with patrol responsibilities,

20      would you have had anything to do with the operation

21      of the jail?

22  A   No.

23  Q   Did you have familiarity with how the jail was

24      operated, whether it was within your duties or not?

25  A   Basically, yes.

1    Q    Okay.  How about transportation of people arrested and

2         taking people who have been arrested into the jail

3         setting?  Would you do that occasionally?

4    A    Yes.

5    Q    Would you have an opportunity to observe how it is

6         that a person is booked in and a record made of that

7         person's booking at the jail?

8    A    Yes.

9    Q    Can you describe that for us, please?

10   A    This is in the old setting back in '85.

11   Q    Yes, please.

12   A    They would be brought up to second floor on the

13        elevator that would have come right -- directly down

14        from the sally port, the north garage.  Once at the

15        booking counter, they would have done everything, you

16        know, paper manual, asked questions and write

17        everything down.  There was no computer entry or

18        anything on that order.  And of course they asked the

19        usual questions, like name, date of birth --

20   Q    Sure.

21   A    -- religion, next of kin, where you work, insurance,

22        that type of thing.  And from there, they would go to

23        photo and prints and then holding for the first 12

24        hours and then into the cell block after.

25   Q    Part of the process that you've just described you

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 12 of 76   Document 120-16

1    refer to as photo and prints.  I take it that means

2    what might commonly be called a mug shot, a front and

3    a profile view of the offender?

4  A    Correct.

5  Q    And do you know what happened in terms of the storage

6    of those photographs?

7  A    There was a file system up in the photo room.  That's

8    all I know.  And they sat in folders -- or not

9    folders, but...

10  Q    Holders of some sort?

11  A    Like envelopes.  Envelopes of some sort.

12  Q    Okay.  It sounds as though that was not anything that

13    was ever within your responsibility; is that correct?

14  A    No.  No.

15  Q    That is, you didn't take the photographs, you didn't

16    store the photographs, you didn't organize the

17    photographs.

18  A    No.

19  Q    All true?

20  A    Correct.

21  Q    Okay.  Do you recall whether or not you had any

22    involvement at all in the arrest of Steven Avery or

23    the gathering of evidence in his case or the

24    processing of evidence in his case; in short, any

25    involvement at all in the case of Steven Avery in

1    which he was charged with a sexual assault of Penny

2    Beerntsen back in July of 1985?

3    A    I believe yes.

4    Q    Okay.  And obviously I was asking multiple questions

5         there and trying to be broad because I just wanted to

6         cover the area first.  Can you break out for me your

7         involvement and start, if you can, with the earliest

8         involvement and take me right on through all of it?

9    A    You mean leading up to the arrest or the arrest?

10   Q    All of it.

11   A    Okay.  That evening, I would have received a phone

12        call from Sheriff Kocourek informing me to arrest

13        Steve Avery, to see if he was at home and arrest him

14        for attempted first-degree homicide.

15   Q    Okay.

16   A    As the shift commander, I would have enlisted the help

17        of other patrol officers.  I contacted James Froelich

18        and Mike Bushman, and then I did make a call to Arland

19        Avery to make sure Steve still lived where I thought

20        he lived.  And Arland had some concerns, so he asked

21        us if we'd meet at his house and talk to him.  So we

22        did, and Arland expressed concern that if Steve

23        resisted, there would -- you know, somebody would get

24        hurt, and he asked if I would let him come along so

25        that he could try and talk to Steve so that, you know,

1       everything would go smoothly.

2   Q   Let me interrupt you there.

3   A   Right.

4   Q   Okay?  And I think it'll probably be easier if we take

5       this sort of chunk by chunk --

6   A   Sure.

7   Q   -- as we're going along.  Let's start out with the

8       telephone call from Sheriff Kocourek.  Can you tell me

9       what you recall of him -- what he said to you?

10  A   Just that I was to go and check Steve Avery's

11      residence, and if he was there to arrest him for

12      attempted first-degree homicide.  That's all I recall.

13  Q   Did he tell you of whom or what the case involved?

14      Did he tell you it involved, for example, a sexual

15      assault?  Did he mention --

16  A   No.  No.

17  Q   -- the Beerntsen name, do you recall?

18  A   I don't know.  I should have -- I don't know for sure,

19      but I should have known that from the afternoon shift.

20  Q   Okay.  And tell me why you say that, that is why you

21      should have known that.

22  A   Because the prior shift commander would tell me what

23      took place on the afternoon shift.

24  Q   And that would be because of your position as sergeant

25      on patrol?

1    A    Right.  Right.

2    Q    So do you have any recollection as to the time of day,

3         roughly, when you got the call from Sheriff Kocourek?

4    A    Oh, somewhere between 8:30 and 9:30, somewhere in

5         there.

6    Q    In the evening?

7    A    Yes.

8    Q    And were you still on duty then or were you at home?

9    A    Yes.  I start at 8:00 p.m.

10   Q    Started at 8:00 p.m.  Okay.  So do you know where you

11        were physically?

12   A    No.  Don't recall.

13   Q    Don't know if you were out in a car somewhere else as

14        opposed to at the sheriff's department, for example?

15   A    Correct.

16   Q    But at some point, you do get this call.  Does he tell

17        you anything about any other officers that are

18        involved or anything that he particularly wants done

19        except the arrest of Mr. Avery?  I mean, is he asking

20        you to gather evidence?  Is he asking you to look for

21        any particular evidence?

22             MR. POLLEN:  In that call.

23             MR. GLYNN:  In that call.

24   A    No, not that I'm aware of.

25   Q    All right.  And again, I mean, the -- he's not asking

1      you, for example, to gather photographs, I take it?

2  A   No.

3  Q   Did you ever have anything to do with gathering

4      photographs from the jail for a photo showup in this

5      case?

6  A   No.

7  Q   Did you ever hear anything about anybody who did have

8      that obligation?

9  A   No.

10 Q   So as you sit here today, you have no knowledge as to

11     who it is who gathered photographs, if that's what

12     happened, from the jail to prepare a photo showup for

13     the victim in that case.

14 A   I would have no idea.

15 Q   Okay.  When you decide that you need to get some other

16     officers to help, you mentioned James freh-lik, frey-

17     lik [Froelich]?

18 A   Froelich [frey-lik].

19 Q   Could you spell that, please?

20 A   F-r-o-e-l-i-c-h.

21 Q   Okay.  And you named one other officer, and my writing

22     is so bad I can't even read what I wrote down.

23 A   Michael Bushman.

24 Q   Bushman.  I guess that looks like Bushman on my page.

25     Are these other people in the patrol division?

1    A    They were, yes.

2    Q    And any special reason you'd choose them?

3    A    No.

4    Q    Just people that were available?

5    A    Yes.

6    Q    And again, you say you decided to get in touch with

7         Arland Avery.  And for the record, Arland Avery was

8         also associated with the Manitowoc County Sheriff's

9         Department, correct?

10   A    Yes.  He was also a patrolman on the night shift.

11   Q    And you knew him, obviously?

12   A    Oh, yes.

13   Q    And you also knew him to be a relative of Steve Avery.

14   A    Yes.

15   Q    And that's the reason that you called him.

16   A    Right.

17   Q    So you had taken us through going over and talking to

18        him and concerns expressed about not wanting anybody

19        to get hurt in this process, and so you made a

20        decision that it would make sense to have Arland Avery

21        come along; is that correct?

22   A    Yes.

23   Q    All right.  Can you pick it up from there?

24   A    Okay.  We did proceed to Steve's house, which would

25        have been north of where Arland had been living.  Mike

1      Bushman was a canine officer, so he went to the west

2      side of the residence.  Jim Froelich would have

3      accompanied Arland to the door, which I believe was on

4      the east side of the house.  And I stood off to the --

5      well, what would I call it -- the northeast.  And then

6      we would have a view of all four sides between us.  I

7      know Arland knocked on the door and somebody asked who

8      it was.

9   Q  Let me interrupt you, because I'm not going to -- I'm

10     not going to take you through all the details --

11  A  Okay.

12  Q  -- of that arrest.  I mean, was there -- were there

13     any other law enforcement folks there that --

14  A  No.

15  Q  -- besides the folks you've identified?

16  A  No.

17  Q  In particular, was Judy Dvorak at the house at any

18     time when you were there?

19  A  No.

20  Q  And the arrest of Mr. Avery occurred?

21  A  Yes.

22  Q  He was taken into custody and -- excuse me, and taken

23     to the jail; is that correct?

24  A  That's correct.

25  Q  Were you with him when he was taken to the jail?

1    A    I took him to the jail.

2    Q    You did personally.

3    A    Yes.

4    Q    And so the process that you described earlier about

5         what happens when somebody is taken to the jail under

6         arrest, is that the process that was followed then?

7    A    Yes.

8    Q    Photograph taken of Mr. Avery at the time?

9    A    Not while I was there.

10   Q    Okay.  At what point did you turn him over to the jail

11        people and go somewhere else?

12   A    We had to collect hair -- pubic hair samples and

13        combings, and I did that and processed that.  And

14        after that, I left and they finished the booking

15        process.

16   Q    Okay.  When you say you had to collect these...

17   A    Yeah.

18   Q    ...who told you to do that?

19   A    That would have come from the sheriff at some point

20        also.

21   Q    Were you in -- That sort of gives rise to the next

22        group of questions.  Were you in contact with the

23        sheriff from the time of the original call to go make

24        the arrest until the time that you brought Mr. Avery

25        to the jail?

1   A   No.

2   Q   No communication in either direction?

3   A   Not that I recall.

4   Q   Okay.  How about communication by him with anyone else

5       that was part of your team and --

6   A   No.

7   Q   -- the sheriff's directions being conveyed to you?

8   A   No.

9   Q   So when's the next time you talked to the sheriff or

10      someone else talked to the sheriff and conveyed his

11      comments to you?

12  A   I don't recall specifically.

13  Q   But it obviously was sometime in connection with the

14      jail for the obtaining of the --

15  A   Yes.

16  Q   -- of the hair samples, right?

17  A   Yes.

18  Q   Do you recall that conversation, or do you just simply

19      know it must have happened because you know you

20      gathered samples?

21  A   It would have happened -- it had happened; otherwise,

22      I wouldn't have gathered samples.

23  Q   Okay.  Are you -- Again, I don't want to be too picky

24      about this, but I'm trying to nail down the sheriff

25      versus someone else.  Do you know that that direction

1       would have come from Sheriff Kocourek as opposed to,

2       for example, I don't know, Kusche or anybody else that

3       was involved?

4    A  That night, the only person I had any contact with was

5       the sheriff.  There was no one else that I was aware

6       of.

7    Q  Okay.  Did you ever go to the hospital where Ms.

8       Beerntsen was?

9    A  No.

10   Q  While she was there?

11   A  No.

12   Q  Were you ever there while the sheriff was there?

13   A  No.

14   Q  That night, that is the night of July 29th or the

15      morning of the 30th, were you ever at the hospital?

16   A  No.

17   Q  Okay.  After you've turned Mr. Avery over to the

18      jailers, what's the next thing you had to do in

19      connection with this case?

20   A  I would go downstairs and dictate my report as to what

21      took place.

22   Q  And you did that?

23   A  Yes.

24   Q  And that's done on what kind of system back in '85, do

25      you know?

1   A   Those hand-held recorders.

2   Q   And then you just turn a tape over to somebody for

3       transcription?

4   A   To the secretary that does the transcribing, yes.

5   Q   Okay.  After that, what did you do?

6   A   I would have gone back on patrol.

7   Q   Anything else to do with the Avery case?

8   A   I testified at his trial.  That was all.

9   Q   About the arrest.

10  A   Yeah.

11  Q   I'm sorry?

12  A   I test-- yeah, I testified about the arrest --

13  Q   Right.

14  A   -- at the trial and that was all.  Yes.

15  Q   Yes.  Having looked at your trial testimony

16      transcript, I didn't see much beyond the arrest.  Is

17      that a fair statement in terms of your involvement in

18      this case?

19  A   That's correct.

20  Q   Did you have anything to do with execution of the

21      search warrant?

22  A   No.

23  Q   And you weren't involved in a lineup?

24  A   No.

25  Q   The -- let's see.  Okay.  Now, let's talk about

1    instead of your own involvement in the case your

2    conversation with others concerning the case back in

3    the time frame of -- well, let's say late July of 1985

4    through the trial and sentencing into early '86.

5    Obviously, you would have had some conversation with

6    people in the district attorney's office in

7    preparation for testimony on the case, true?

8  A  I don't recall talking to them at all.

9  Q  Really?

10 A  Yeah.

11 Q  I mean, you think you just got put on the stand cold?

12 A  I don't know.  I just don't remember talking to them

13    at all.

14 Q  All right.  I take it you have testified and had

15    testified in a courtroom prior to 1985 in your --

16 A  Yes.  Yes.

17 Q  -- position as a law enforcement officer, correct?

18 A  Yes.

19 Q  And was it typically the practice of Mr. Vogel at that

20    time to have a preparation session with a witness?

21       MR. MAYER:  Form of the question and

22       foundation.

23    BY MR. GLYNN:

24 Q  You can answer.

25 A  Okay.  Sometimes yes, sometimes no.

1    Q    So --

2    A    It would depend on the case.

3    Q    But as you're sitting here today, you just don't have

4         any recollection of conversations with Mr. Vogel about

5         this case?

6    A    Yeah, I don't have any recollection of meeting with

7         him.

8    Q    On any subject that is associated with the case?

9    A    Right.  Right.

10   Q    That was not a good question.  Let me try to narrow it

11        down a little bit.  You didn't talk to him in any

12        effort to prepare you as a witness for your testimony

13        in the trial, correct?

14   A    No, I don't know.

15   Q    At least you don't recall.

16   A    I don't recall it.

17   Q    And you also don't recall -- and this is the part I

18        want to make sure I'm understanding.  You also don't

19        recall any other conversations with District Attorney

20        Vogel on any other aspect of the Avery/Beerntsen case;

21        is that true?

22   A    That's correct.

23   Q    Okay.  Now, how about Sheriff Kocourek?  Did you have

24        conversations with him concerning the -- well, I'm

25        going to refer to it as the Avery case, but it's the

1    one that we've been discussing.

2    A    In what time frame?

3    Q    Well, right now I'm limiting it to the -- up to the

4         time of sentencing, so 1985 into early 1986.

5    A    Other than, you know, the report that I dictated and

6         came -- you know, was presented to him, no, nothing

7         more than that.

8    Q    When you say it was presented to him, was that because

9         he was essentially acting as the lead officer on the

10        case, or was it presented to him simply because he was

11        sheriff and all reports went by the sheriff?

12   A    No, it was because he was the investigator.

13   Q    And based on your own experience in that department,

14        was that a common occurrence for the sheriff to be the

15        lead investigator?

16             MR. MAYER:  Form of the question.

17   A    Occasionally.

18   BY MR. GLYNN:

19   Q    Can you give me an estimate as to how many times prior

20        to the Avery case you had seen Mr. Kocourek act as a

21        chief investigator?

22   A    There were just a few times, no more than three.

23   Q    But you think there were some times prior to that case

24        when that occurred?

25   A    Yeah.  I was only there, you know, eight hours a day.

1  Q    Right.

2  A    You know, so what he did in those other hours, I don't

3        know.

4  Q    But again, are you able to identify those cases for me

5        in any way?

6  A    No.  Not off the top of my head I can't.

7  Q    Is there something that you have access to that would

8        refresh your recollection as to what those cases were

9        and in particular when they were?

10 A    Not that I'm aware of.

11 Q    Did it strike you as unusual for the chief

12       investigator on the case to be Mr. Kocourek?

13 A    I think due to his detective background with the city,

14       he involved himself more.  Normally, in my -- if I was

15       to compare himself to myself, I wouldn't be involved.

16 Q    The -- Make sure I understand this.  It was not

17       common, it was instead rare for him to be involved as

18       chief investigator of a crime investigation prior to

19       July 1985; is that correct?

20 A    That I don't know.  You mean rare?

21 Q    Yeah.  I think that's a term you used.

22 A    Yeah, I would say rare.

23 Q    Okay.  But you do have a recollection that it

24       happened, and it could have happened two or three

25       times?

1    A    That's poss-- yes.

2    Q    Prior to July of 1985?

3    A    Yes.

4    Q    But you can't remember the names of the cases or the

5         particulars of any cases.

6    A    That's correct.

7    Q    Can you tell me anything about the types of cases?  I

8         mean, were they crimes of violence as opposed to white

9         collar fraud types of crimes or forgery kinds of

10        crimes?

11   A    No --

12   Q    Any distinguishing factors about him?

13   A    No.  He would -- I think depending on what he was

14        doing at the time, you know, he'd pick and choose.

15   Q    And that's just based on your own observations.

16   A    Right.

17   Q    That's not based on a conversation with him?

18   A    I know -- you know, I know sheriffs today that will --

19        that'll do the same thing.

20   Q    Sure.

21   A    But I know others that, you know, have a total hands

22        off but, you know, that's a personal prerogative.

23   Q    And in 1985, did you have any conversation with

24        Sheriff Kocourek as to why it is that he was involved

25        in the Avery/Beerntsen case?

1   A   No.

2   Q   So he never expressed to you a reason for being

3       involved in it.

4   A   No.

5   Q   Let me move the time frame up a little bit, and let's

6       go into the 1995-1996 range.  You are aware, are you

7       not, that there were postconviction efforts brought by

8       Mr. Avery?

9   A   Yes.

10  Q   And that among the issues raised in the postconviction

11      motions was the possibility that some other person

12      than he had been involved in the offense and in

13      particular a person identified, at that stage anyway,

14      only as someone coming from Sheboygan?  You know about

15      that?

16  A   No.

17  Q   Are you aware of officers in the sheriff's department

18      -- You were sheriff by then, right?

19  A   No.

20  Q   When -- I'm sorry.

21  A   2000.

22  Q   In nine--

23  A   2000 I was elected, took office 2001.

24  Q   Yeah.  In '95, '96, what was your role?

25  A   I was the ins--

1   Q    Were you under-sheriff then?

2   A    The inspector and under-sheriff.

3   Q    Okay.  And in that role, you were essentially second

4        in command of the department; is that true?

5   A    Correct.

6   Q    You know a detective named Kusche?

7   A    Yes.

8   Q    Were you aware that Detective Kusche was gathering

9        statements from a number of other detectives

10       concerning their knowledge of a Sheboygan County

11       suspect in the Avery matter?

12  A    No.

13  Q    Did you have any involvement in the postconviction

14       investigations that were going on in '95 or '96 about

15       the Avery case?

16  A    No.

17  Q    In particular -- I'm going to jump ahead, but I'll

18       come back to '95.  You recall in 2003 when you are

19       sheriff learning that there had been contact with your

20       sheriff's department by another law enforcement

21       agency, probably the Brown County Sheriff's

22       Department, concerning a person who had been arrested

23       by that other law enforcement agency and contacting

24       your agency?  You know what I'm talking about?

25  A    Yes, I believe so.

1  Q   Okay.  And this at some stage gets to involve a couple

2      of other -- couple of other deputies -- I'm sorry.

3      Yeah.  A couple of other deputies who made written

4      statements about their contact --

5  A   Correct.

6  Q   -- back in 1995, and they made those statements in

7      2003, correct?

8  A   I believe so.

9  Q   And I just want you, with that in mind, to let me know

10     whether you had any knowledge of that going on in

11     1995.

12 A   No.

13 Q   Are you aware of ever hearing anybody discuss that in

14     1995?

15 A   No.

16 Q   Now, you've seen, I take it -- Well, let me just show

17     you what's been marked in this case as Exhibit 124 and

18     just ask you to take a minute and read that over.

19 A   Okay.

20 Q   And may I also show you what were marked earlier in

21     this as Exhibit 125 and another document that has not

22     yet been marked as an exhibit, which I'll give to the

23     reporter.

24          MR. BASCOM:  And what is that, Steve?

25              (Exhibit 138 identified)

1          MR. GLYNN:  It'll be 138 and it'll be Bates

2          5250, and it's the statement of Andrew Colborn.

3     A    Okay.

4     Q    And, Sheriff, I'm going to also give you what we've

5          just had marked as Exhibit 138, ask you to take a

6          quick look at that.

7     A    Okay.

8     Q    You recognize Exhibit 124 as a memo prepared by Doug

9          Jones, an assistant D.A.?

10         MR. POLLEN:  I'm going to object.

11         Foundation.  I mean, it is what it is.  That's

12         what it says.

13    BY MR. GLYNN:

14    Q    Is that what you recognize that as?

15    A    It would appear so.

16    Q    Okay.  When's the first time you saw this memo?

17    A    Right now.

18    Q    Okay.  So let's turn to 125.  What do you recognize

19         that as being?

20    A    That's one of the sheriff's department statement

21         forms, and it looks like James Lenk's signature on it.

22    Q    Okay.  And have you seen this document before?

23    A    No.

24    Q    Okay.  And how about 138, which is the -- well, you

25         tell me what it is.

1   A   Yeah.  That's another one of our statement forms.

        Looks like it was filled out by Andrew Colborn.

3   Q   And again, have you seen that document before today?

4   A   No.

5   Q   Okay.  The documents that you've looked at here, 138,

6       125, 124, all relate to the same matter, do they not?

7   A   I believe so.

8   Q   I mean, you've seen them now?

9   A   Yes.

10  Q   And that matter has to do with the subject that we

11      were discussing very briefly a few minutes ago; that

12      is, a telephone call coming into the sheriff's

13      department from a detective employed by a law

14      enforcement agency outside Manitowoc, correct?

15  A   Correct.

16  Q   And that was in the '95 general time range?

17  A   I believe so.

18  Q   As reflected in these documents?

19  A   Yes.

20  Q   Now, you had conversations in 2003 about that subject,

21      did you not?

22  A   Right.

23  Q   And you talked at the time with Sergeant Colborn?

24  A   Yes.

25  Q   And you talked at the time with -- is it just Deputy

1            Lenk?

2      A    It's Lieutenant Lenk.

3      Q    Lieutenant Lenk.  I'm sorry.

4      A    Yes.

5      Q    And they told you about these events that had occurred

6            in 1995 as they recalled them, correct?

7      A    Yes.

8      Q    Do you remember who else was involved in those

9            conversations between you and -- well, let's start

10           with Mr. Colborn?

11     A    No, I believe both Andy Colborn and James Lenk came to

12           my office at the same time.

13     Q    And with no one else?

14     A    Correct.

15     Q    And you were with no one else?

16     A    Correct.

17     Q    So it was just the three of you?

18     A    Yes.

19     Q    Okay.  And you had talked about this matter of the

20           1995 telephone contact from an outside agency to the

21           Manitowoc County Sheriff, correct?

22     A    Yes.

23     Q    And what did they tell you?  Let's start with Sergeant

24           Colborn.  What did he tell you had occurred?

25     A    He said when he was working in the jail, he had

1    received a phone call I believe from a detective in

2    Brown County, that he had a suspect who said that he

3    had assaulted a person in Manitowoc County and

4    somebody else was in prison.  And that's about it.  He

5    said he referred it to a detective and heard nothing

6    of it after that.

7  Q    And I take it that that was something that you

8    considered to be significant material, correct?

9  A    Yes.

10             MR. MAYER:  Form of the question.

11    BY MR. GLYNN:

12  Q    You recognize that if in fact the statement that was

13    being reported by the detective in Brown County was

14    accurate that someone may have been wrongfully

15    convicted of something in Manitowoc County, correct?

16  A    Correct.

17             MR. COVELLI:  Objection.  Calls -- no

18        foundation.

19    BY MR. GLYNN:

20  Q    You also recognize that since neither -- well, since

21    -- let's just deal with Sergeant Colborn.  Since

22    Sergeant Colborn had not memorialized that telephone

23    call in any way, that is he had not prepared a report

24    concerning it, that he should now attempt to do that,

25    correct?

1   A   I did tell him to fill out a statement and we'd put it

2       with the case file.

3   Q   And you directed him to prepare a written report,

4       right?

5   A   Yes.

6   Q   And do you believe that Exhibit 138 is that report?

7   A   Yes.

8   Q   Have you seen any other report from Sergeant Colborn

9       relating to the matter that we've been discussing,

10      that is the 1995 telephone call?

11  A   No, I haven't.

12  Q   So, again, that's, I take it, a reason that you

13      believe that Exhibit 138 is that report?

14  A   Correct.

15  Q   And it was more than just prepare the report.  You

16      wanted the report to be given back to you, correct?

17  A   Not to me personally.  It would be -- At that point in

18      time, it would be stored in a vault, and it would have

19      to go back into that vault.

20  Q   Okay.  Where is the vault?

21  A   First floor, right off the secretarial offices.

22  Q   And is that a vault to which you have access?

23  A   Oh, yes.

24  Q   And is it a vault to which others have access?

25  A   Yes.

1   Q   Who are the others that have access to that vault?

2   A   Bill Beck, the records custodian; and Cathy Leist, the

3       business operations manager.

4   Q   Okay.  For purposes of sort of punctuation here, is

5       that Bill Beck, comma, who is the records custodian?

6   A   Yes.

7   Q   Okay.  And this woman whose name you gave us, who is

8       -- what's her position again?

9   A   She's the business operations manager.

10  Q   And what does she have to do with the vault?

11  A   Well, the vault holds a number of things, you know,

12      some personnel files from separated employees, that

13      type of thing, and...

14  Q   Financial records of the department, that kind of

15      thing?

16  A   Sure.  And tapes from different county departments

17      that are stored in two locations, that type of stuff.

18  Q   Okay.  So other than the three of you, that is this

19      person dealing with operations, this person dealing

20      with -- is it Beck?

21  A   Yes.

22  Q   And yourself.  Is there anybody else that has access

23      to the safe?

24  A   The under-sheriff.

25  Q   Okay.  Anybody else?

1   A   No, not that I believe.

2   Q   So it would have had to have been one of those four

3       persons that would have received Sergeant Colborn's

4       report to put it into the vault?

5   A   Correct.

6   Q   Do you recall whether that was you?

7   A   No.

8   Q   That is, you don't recall --

9   A   I don't --

10  Q   -- or you know it was not you?

11  A   No, I don't recall.

12  Q   So it may have been you is I guess what you're saying.

13  A   It could have been.

14  Q   And if I were to ask you the same series of questions

15      about Lieutenant Lenk's report, would your answers be

16      the same?

17  A   Correct.

18  Q   That is, Exhibit 125 appears to be his report of that

19      event that we've been discussing?

20  A   Yes.

21  Q   You asked him to make a report?

22  A   Yes.

23  Q   And that report ended up in the vault.

24  A   Yes.

25  Q   And you know it ended up in the vault because at some

1      later point, on or about September 22, 2003, you were

2      interviewed by Special Agent Debra Strauss of the

3      Wisconsin Division of Criminal Investigation, correct?

4   A    I wasn't interviewed by her.

5   Q    Well, let me -- Let me get this marked.

6   A    I've seen that.  They haven't -- they never

7      interviewed me.

8   Q    They didn't.

9   A    No.

10   Q    Okay.

11   A    They did talk to me.

12   Q    Okay.

13   A    And they informed me what they were doing and asked

14      for a report.

15   Q    Fair enough.

16   A    But no -- but no interview.

17   Q    Let me get this marked.  Okay.  Let me show you what's

18      been marked --

19   A    Sure.

20   Q    -- as Exhibit 139.  And can you tell us what that is?

21            (Exhibit 139 identified)

22   A    It looks like notes from Debra Strauss and -- yeah,

23      Debra Strauss.

24   Q    And have you seen that before?

25   A    Yes.

1    Q    And when were you shown that and by whom?

2    A    Yesterday.  Amy Doyle.

3    Q    Okay.  So -- let me grab it back.  When you're meeting

4         with Amy Doyle, is she showing you this document, or

5         did you have this document?

6    A    No, she showed me.

7    Q    This document purports to be a memorialization of a

8         meeting that took place between yourself and Debra

9         Strauss, correct?

10   A    Correct.

11   Q    And during that meeting, she told you certain things,

12        correct?

13   A    Yes.

14   Q    She asked you certain things?

15   A    No, she didn't ask me anything.

16   Q    Well...

17   A    She mostly told -- she told me.

18   Q    She asked you for copies of documents?

19   A    Yes.

20   Q    Okay.  You said you'd be willing to produce documents?

21   A    Yes.

22   Q    And eventually did so?

23   A    Yes.

24   Q    And this report includes a list of the documents that

25        you provided to her on that date, correct?

1    A    I don't think it came to her on that date, no.

2    Q    Whenever it is that you gave them to her.

3    A    Correct.

4    Q    You went over the documents that were in the vault

5         with her on the date reflected in the report, correct?

6    A    I didn't go over them.

7    Q    You didn't.

8    A    No.

9    Q    Did you take them out and show them to her then?

10   A    No, the reports could have been pulled out at that

11        point and she would have had access to look at them;

12        however, before she -- we would have had to copy them

13        if she was going to take a copy.

14   Q    Right.

15   A    Yeah.

16   Q    But my point is --

17   A    Yeah.

18   Q    -- that she was allowed access to the documents in

19        terms of being able to review them on the day that she

20        met with you, correct?

21   A    I'm not sure.

22              REPORTER:  [Changing audiotape] Excuse me.

23           Briefly pause.  Please continue.

24   BY MR. GLYNN:

25   Q    If she didn't get access to them on that day, when

1        would she have gotten access?

2    A    Whenever they were copied.

3    Q    And what was done with the copies?

4    A    They were given to her, whatever, sent to her.  That

5        you'd have to ask Bill Beck.  That would have been

6        something he did.

7    Q    Okay.  So you went to the location in the sheriff's

8        office where the vault is and removed the case file

9        from it; is that true?

10   A    That's possible, yes.

11   Q    And indicated at the time that you would be willing to

12       give her a copy of the documents but you'd have to get

13       the copies made?

14   A    Correct.

15   Q    When you gave her copies of documents, among the

16       documents that were provided were the statements of

17       Mr. Lenk and Mr. Colborn, correct?

18   A    That I wouldn't know.  You'd have to ask Bill Beck.

19   Q    Are you able to tell me what documents from the case

20       file were kept in the vault?

21   A    Specifically, no.

22   Q    Why was a decision made to keep any part of that case

23       file in a vault?

24   A    Because we figured we'd be retrieving it more

25       frequently.  Otherwise, they're kept in the basement,

1      down in the records room.

2  Q   And --

3  A   That's farther away.

4  Q   When was it placed in the vault?

5  A   Don't know.  We'd have to ask Bill Beck.

6  Q   So you yourself have no knowledge at all as to when

7      that file went into the vault.

8  A   No.

9  Q   And you yourself have no recollection of putting

10     anything into that case file?

11 A   No.

12 Q   Is that true?

13 A   That's correct.

14 Q   What all do you remember as being in the case file

15     relating to the Avery matter that was in that vault?

16          MR. POLLEN:  At what time?

17          MR. GLYNN:  Today.

18          MR. POLLEN:  Okay.

19 A   Just the investigative reports, the envelopes of hair

20     samples that were left, statements, lab reports.

21     That's about all.

22     BY MR. GLYNN:

23 Q   Is it your understanding that the entire case file was

24     in the vault?

25 A   I believe so, yes.

1   Q   That is, you had never been led to believe that there

2       was another part of the file that was not in the

3       vault.  Is that a fair statement?

4   A   Correct.

5   Q   Did you ever direct anybody to put anything into the

6       vault?

7   A   In the vault?

8   Q   Mm-hmm.

9   A   The statements, for one thing, yeah.  There was a

10      letter from some inmate from Brown County Correctional

11      I believe that went in there.

12  Q   Right.

13  A   I don't know who.  But he said that Steve admitted to

14      -- admitted to the crime, and I know the sheriff had

15      left that when he left office.

16  Q   That is, Sheriff Kocourek had left that?

17  A   Yes.

18  Q   And left it where?

19  A   There's a small safe in his former office that would

20      have had that.

21  Q   Well, when you became sheriff, did you find items in

22      the small safe in what was now your office that

23      related to the Avery matter?

24  A   Just that letter.

25  Q   And that's the only thing that was there?

1   A   Yes.

2   Q   And did you then cause that letter to go from that

3       safe to the larger safe where the whole file was kept?

4   A   Yes.

5   Q   When's the first time you recall seeing any of that

6       file being in the vault?

7   A   After Steve was released.

8   Q   Had you been in the vault yourself prior to that time?

9   A   Occasionally, yes.

10  Q   And I take it that at that time, you did not see the

11      file in the vault?

12  A   No, I wasn't -- but I wasn't looking for it either.

13  Q   I understand.  But, I mean, it's a fairly sizeable

14      file, right?

15  A   Yeah, and it's a fairly sizeable vault.

16  Q   Yeah, that's what I'm going to get to.  I mean, is the

17      vault, you know, capable of holding multiple bankers

18      boxes, for example?

19  A   Oh, yes.

20  Q   Can you give me the dimensions, roughly?

21  A   Probably twelve feet by about four feet.

22  Q   And 12 is, what, depth?

23  A   Length.  Or width.

24  Q   Okay.

25  A   And depth is about four feet.

1   Q   And height?

2   A   About eight feet.

3   Q   So this is a big operation.

4   A   Yes.

5   Q   And do you know in what format the Avery file was kept

6       at that stage?  Was it in boxes or plastic bags, or

7       what?

8   A   It would have been in boxes.  Probably banker boxes.

9   Q   Okay.  So you don't yourself have any knowledge as to

10      whether that file was there before Mr. Avery's

11      exoneration in 2003 or not.

12  A   No.

13  Q   Is that a fair statement?

14  A   Correct.

15  Q   All right.  Then since 2003, the file was maintained

16      in the vault?

17  A   Yes.

18  Q   At anybody's direction, or just because that's where

19      it was and it was just kept there?

20  A   I think it's because of where it was and the

21      likelihood of, you know, multiple requests on it.

22  Q   Now, the same day that Lieutenant Lenk's report is

23      prepared, which appears to be September 12th, 2003...

24  A   Mm-hmm.

25  Q   ...and the same day that Sergeant Colborn's report is

1    prepared, which again appears to be September 12th,

2    2003, is the date that you issued a memo, which I'll

3    have marked in a moment, but that indicated that

4    employees were to make no comments concerning the

5    Steven Avery case.

6  A    That's correct.

7  Q    Correct?

8           MR. GLYNN:  Can you mark this, Jeff?

9           REPORTER:  Sure.

10          MR. GLYNN:  Thanks.

11             (Exhibit 140 identified)

12 Q    Okay.  Let me show you what's marked as Exhibit 140.

13     It's a two-sentence statement.  You've seen that

14     before, correct?

15 A    Correct.

16 Q    Is that something you went over yesterday with Ms.

17     Doyle?

18 A    No.

19 Q    By the way, what documents did you go over with Ms.

20     Doyle yesterday?

21 A    My testimony at his trial.

22 Q    Anything else?

23 A    Not that I'm aware of, no.

24 Q    Yeah.  How about -- how about --

25 A    That other thing you showed me from --

1    Q    How about this DCI report?

2    A    That.  Yeah, that would be it.

3    Q    Okay.  So the only two things that you went over with

4         her were a transcript of your trial testimony and a

5         copy of the Exhibit 139, which is the DCI report,

6         correct?

7    A    Correct.

8    Q    So can you tell me the circumstances that led up to

9         the making of 140?

10   A    Corp counsel advised us not to talk about any of those

11        things.

12   Q    When did that happen?

13   A    That would have been about the time Steve was

14        released.  So if this was September 12th, it would

15        have been that day or so.

16   Q    The document was not prepared, then, in any connection

17        at all with Exhibits 125 and 138?

18   A    No.

19   Q    Just coincidence in terms of timing?

20   A    Correct.

21   Q    And did you get a written direction from the corp

22        counsel on that?

23   A    No.

24   Q    Just an oral comment?

25   A    Right.

1   Q   And was this his decision, that is that news releases

2       are going to be issued either by you or by Inspector

3       Hermann, or was that your decision?

4   A   No, that would be my decision, if there were any.

5   Q   Okay.  That is, you're not suggesting that you were

6       directed by corp counsel to make that statement.

7   A   No.

8   Q   Let's talk about other conversations concerning the

9       Avery/Beerntsen matter with Tom Kocourek.  When I

10      asked you earlier about such conversations, you asked

11      me what time frame, and I said, well, we were talking

12      about then back in 1985.  Now I want to expand that

13      time frame to include any time.  Have you had

14      conversations about the Avery/Beerntsen matter with

15      Tom Kocourek?

16  A   Yes.

17  Q   Can you tell me when and what the subject matters

18      were?

19  A   Well, the other time would have been when he was

20      leaving office and he told me that statement was in

21      the one safe.  And then after the lawsuit started.

22  Q   This lawsuit?

23  A   Yes.

24  Q   Mm-hmm.

25  A   We had brief conversation on if Bergner had told him

1  anything, and he told me he didn't remember talking to

2  Bergner and that Bergner -- he didn't recall Bergner

3  talking to him, and that's about -- that was about it.

4  There wasn't a whole lot more.

5  Q  So it sounds like there are two conversations after

6  1985 between yourself and Mr. Kocourek concerning the

7  Avery matter.  Am I right about that?

8  A  Right.  I think he -- he mentioned also about the

9  appeals that had failed, and I think that's about all.

10  Q  Do you know when that statement was made about the

11  appeals that had failed?

12  A  About the same time that he had talked about the

13  Bergner statements.

14  Q  And that's when he's leaving office?

15  A  No, that was --

16  Q  Oh, I'm sorry.  That's when the civil case was filed.

17  A  That was after -- That was after the civil case was

18  filed.

19  Q  Okay.  Well, so at the time the civil case is filed,

20  that's -- Well, actually, let me back up.  Let's go to

21  the first comments when he's leaving office.  He tells

22  you about what's in the sheriff's safe in his office,

23  now your office.

24  A  Correct.

25  Q  Is that right?

1   A   Right.

2   Q   Anything else about that that you recall?

3   A   No.

4   Q   Any other conversation about the Avery matter?

5   A   No.

6   Q   Did he tell you why he had it in the vault?

7   A   No, he said somebody from -- some inmate from Brown

8       County sent it to him.  That's all I know.

9   Q   So he said it came to him directly from an inmate?

10  A   No, he didn't.  I don't know where it -- if it came

11      direct or where it came from.  All I know is it was

12      there.

13  Q   Okay.  So he didn't tell you how he got it.

14  A   No.

15  Q   Or why it was there as opposed to being in the vault.

16  A   Correct.

17  Q   That is, the bigger vault.

18  A   Correct.

19  Q   Did he tell you that it had been shared with anybody?

20  A   I think Beerntsens.

21  Q   And this is -- this is certainly before Mr. Avery had

22      been exonerated in this case.

23  A   Correct.

24  Q   Do you know if it was before the motions to get a new

25      DNA test had been filed?

1    A    I believe.

2    Q    That is, you think it was before that?

3    A    Yes.

4    Q    So to your knowledge, was there any legal action

5         pending relating to the Avery case at the time that

6         Sheriff Kocourek and you -- or ex-Sheriff Kocourek and

7         you had the conversation about the inmate document

8         that was in that little vault?

9    A    Not that I'm aware of.

10   Q    Did you take a look at the document, the document from

11        the inmate?

12   A    I believe I did.

13   Q    And if it'll refresh your recollection, let me give

14        you back Exhibit 139 and invite your attention to the

15        second paragraph from the bottom that begins by saying

16        "The first document."

17   A    Okay.  That would be...

18   Q    You think that's it?

19   A    It could be.  It's in the right time frame.

20   Q    Okay.  You're not aware of anything more than one

21        affidavit from some -- well, you know the term

22        "jailhouse snitch"?

23   A    Mm-hmm.

24   Q    You ever heard that term?  That's a fair term for Mr.

25        Lucero?

1           MR. MAYER:  Form of the question.

2           MR. COVELLI:  Objection.  No foundation.

3       BY MR. GLYNN:

4    Q   Correct?

5    A   I suppose.

6    Q   Okay.  And this is not the first docu-- the first

7        accusation you've ever heard made by a jailhouse

8        snitch?

9    A   Correct.

10          MR. BASCOM:  Object to the form.

11          MR. MAYER:  Object to relevance.

12      BY MR. GLYNN:

13   Q   And is this the first -- is this the only affidavit

14       that you're aware of that comes from a person in the

15       category of being a jailhouse snitch about Mr. Avery?

16          MR. MAYER:  Form of the question.

17          MR. COVELLI:  Objection to form.

18   A   Yes.

19      BY MR. GLYNN:

20   Q   Okay.  So there is no other similar affidavit that you

21       ever saw that relates to Mr. Avery, correct?

22   A   Correct.

23   Q   And obviously, you now know from the DNA analysis and

24       the order of the court that the particular allegations

25       made by this person are just plain false, correct?

1        MR. POLLEN:  Object to the form.

2        Foundation.  From this witness, speculation.  Go

3        ahead, sir, if you know.

4    A    I don't know.

5    BY MR. GLYNN:

6    Q    You don't know.  That is, you think it's possible that

7         Mr. Avery committed -- I'm sorry, said he committed

8         the offense when he didn't.

9        MR. COVELLI:  Objection to form.

10   A    I'd have no idea.

11   Q    That is because you weren't there when it happened.

12   A    Right.

13   Q    So you don't have firsthand knowledge.  But as

14        somebody with the law enforcement experience that you

15        have, do you have any reason at all to believe that

16        there is any truth whatsoever in the statement made by

17        Mr. Lucero?

18        MR. COVELLI:  Objection.  Foundation.

19        MR. MAYER:  Yeah.

20        MR. COVELLI:  And form of the question.

21        MR. MAYER:  Asking him to speculate.

22   BY MR. GLYNN:

23   Q    You're allowed to answer the question.

24   A    No.

25   Q    Okay.  Now, with respect to the second conversations

1    with Sheriff Kocourek, again at that stage ex-Sheriff

2    Kocourek, these happened in conjunction with, well,

3    the early stages of the civil case in which you're a

4    witness here today; is that right?

5  A    Correct.

6  Q    And are you able to pin it down any more than that?

7  A    No.

8  Q    Did you make any memos about it or take any notes or

9    have a calendar that says "meeting with Tom Kocourek"

10    or anything like that?

11  A    No.

12  Q    What causes you to relate it to the civil case filing?

13  A    Well, he would have stopped in the office and the

14    subject would have come up.

15  Q    Was that the first time he had stopped in the office

16    since he left?

17  A    Oh, no.  No, he's been in numerous times.

18  Q    And had he ever discussed the Avery case on those

19    stoppings-in at the office?

20  A    No.  No.  Not with me.

21  Q    So this is the first time that he's back in the

22    sheriff's department discussing the Avery case with

23    you, true?

24  A    I don't believe he came to discuss the Avery case.  He

25    was there for some reason, but the subject came up but

1    that wasn't the main purpose of his visit.

2  Q   No, but he was in your office discussing the Avery

3      case.

4  A   Yes.

5  Q   And that was the first time that it happened, correct?

6      Since he left office.

7  A   I believe so, yes.

8  Q   And when he had this discussion with you, what can you

9      recall him saying?

10  A   I believe it was mostly referring to Bergner and his

11     statement that he had called him and told him about

12     Allen, and Sheriff said he had no recollection of a

13     call from Bergner and he didn't know of Allen.

14  Q   Did he say that this was something that was being

15     discussed in the media?  I mean, did you know who Greg

16     Allen was then?

17  A   No.

18  Q   Did you know what he was talking about, what Kocourek

19     was talking about?

20  A   I knew who Allen was at the time of the conversation.

21     The first --

22  Q   That is, whene-- in -- whenever the conversation was

23     that you're now describing.

24  A   Did I know who Allen was.

25  Q   By that point, you knew who Greg Allen was.

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 56 of 76   Document 120-16

1    A    Yes.

2    Q    I take it you knew who Greg Allen was at least as far

3         back as September of 2003, correct, which is when the

4         exoneration took place?

5    A    That's when I knew about Greg Allen, yes.

6    Q    And prior to that time, had you known anything about

7         Gregory Allen?

8    A    Never heard of him.

9    Q    Ever heard the name, ever had any interaction with him

10        that you know of?

11   A    No.

12   Q    So in 2003, you learned that one of the things that's

13        happened is that not only did Mr. Avery not commit the

14        crime that he had been convicted of and incarcerated

15        for but there was pretty solid evidence that somebody

16        else had done it, correct, and in particular Gregory

17        Allen had done it, true?

18   A    Correct.

19   Q    And did you at that stage do anything in your

20        department to try to figure out how that had happened?

21   A    No.

22   Q    Did you conduct any internal investigation of your own

23        department to see how this had taken place?

24   A    No.  None of the people that were involved in the case

25        in the investigative part were there.

1  Q   So does that mean that you had considered conducting

2      an investigation, but then decided after you had

3      identified the people that were involved and learned

4      that they were no longer there that there would be no

5      point in the investigation?

6  A   Correct.

7  Q   But that is a mental process you went through; that

8      is, you considered conducting an investigation, you

9      determined the identities of the people who were

10     involved, you determined their present connections

11     with the sheriff's department, you learned that they

12     were no longer with the sheriff's department, and then

13     decided there would be no investigation.

14          MR. MAYER:  Form of the question.

15     BY MR. GLYNN:

16  Q   Is that true?

17  A   Correct.

18  Q   When did you go through that process?

19  A   It would have been about the same time the district

20     attorney told me that Steve was being released.

21  Q   And did you discuss that with District Attorney

22     Rohrer?

23  A   No.

24  Q   He's the district attorney who told you that, I take

25     it, correct?

1   A   Correct.

2   Q   Did you discuss it with anybody in the district

3       attorney's office?

4   A   No.

5   Q   Did you discuss it with anybody on the Manitowoc

6       County Board?

7   A   No.

8   Q   Discuss it with anybody in the world?

9   A   No.

10  Q   Make any memos about it?

11  A   No.

12  Q   Okay.  So now we're a little later in time, a civil

13      case has been filed, and we're back on the scene of

14      Tom Kocourek being in your office discussing with you

15      the Avery case for the first time since he left

16      office.  Right?

17  A   Correct.

18  Q   And at that time, he brings up the name of Tom Bergner

19      and the name of Gregory Allen; is that right?

20  A   I believe so.

21  Q   I mean, or did you ask him about it?  Did you bring up

22      the Bergner thing?

23  A   No.  Don't recall how it came up.

24  Q   You were aware by that point in time that a person

25      from the Manitowoc Police Department named Bergner had

1    stated that he had gone to the sheriff's office and

2    talked with Mr. Kocourek about Gregory Allen, correct?

3         MR. COVELLI:  Objection to the form.

4    A    I learned that through the grapevine.  I didn't hear

5         that directly from Bergner.

6    BY MR. GLYNN:

7    Q    Okay.  I mean, but I take it the grapevine would

8         include, for example, the attorney general's report of

9         its investigation concerning this case, true?

10   A    Yes.

11   Q    Because certainly you read that report, right?

12   A    Yes.

13   Q    And you're aware that that report reflects the fact

14        that Mr. Bergner stated that he had gone to Mr.

15        Kocourek and talked to him.

16   A    Right.

17   Q    About Mr. Allen, and in particular Mr. Allen being a

18        live and likely suspect in the Beerntsen assault,

19        correct?

20   A    Correct.

21   Q    Okay.  So when Mr. Kocourek had this conversation with

22        you about Mr. Allen in your office, this wasn't news

23        to you; that is, this wasn't the first time you had

24        ever heard Mr. Allen being identified as a suspect or

25        the assertion that Mr. Bergner said he had talked to

1                Mr. Kocourek, right?

2     A          Correct.

3     Q          Did you ask Mr. Kocourek whether Mr. Bergner had ever

4                come to talk to him?

5     A          No, he...

6     Q          Or did he just --

7     A          That's what he told me.

8     Q          -- say that to you?

9     A          Correct.

10    Q          Okay.  He brought up the subject, and he said it

11               didn't happen.

12    A          I don't know --

13    Q          At least that he didn't recall it happening.

14    A          I don't know who brought up the subject, but he

15               doesn't remember talking to Bergner, or he didn't.

16    Q          Well, when you say you don't know who brought up the

17               subject, did you ask him whether he had had the

18               conversation with Bergner?

19    A          I don't know.  I don't recall.

20    Q          So you may have.

21    A          It's possible.

22    Q          And when he said that, what was his demeanor?

23               MR. BASCOM:  Object to the form.

24    A          He was fine, normal.

25               BY MR. GLYNN:

1   Q   Just matter of fact?

2   A   Yes.

3   Q   This has been said, but it didn't happen?

4           MR. POLLEN:  Object to form.

5   BY MR. GLYNN:

6   Q   That's all?

7   A   Correct.

8   Q   And did you tell him he should do anything about that?

9   A   No.

10   Q   Did you suggest that he might want to take some action

11      based on that?

12   A   No.

13   Q   Did you ask him if he had told anybody else that he

14      had not had any recollection of Mr. Bergner talking to

15      him?

16   A   No.

17   Q   Had you seen any public statements attributed to Tom

18      Kocourek in which he said -- he had said that he had

19      no recollection of Mr. Bergner speaking with him prior

20      to your conversation with him?

21   A   Not that I recall.

22   Q   Did you at any time after your conversation with Mr.

23      Kocourek see anything in the media in which Mr.

24      Kocourek asserted that he had not spoken with Mr.

25      Bergner about Mr. Allen?

1    A    Not that I recall.

2    Q    So did you do anything in response to that statement

3         by Mr. Kocourek?

4    A    No.

5    Q    Again, did you memorialize it in any way?

6    A    No.

7    Q    Did you report it to anyone?

8    A    No.

9    Q    Did you, for example, tell District Attorney Rohrer

10        that that's what had been told to you by Mr. Kocourek?

11   A    No.

12   Q    Anyone else in his office?

13   A    No.

14   Q    Did you tell anybody at all in the world, that --

15   A    No.

16   Q    -- you recall?  I'm sorry?

17   A    No.

18   Q    Okay.  So in -- Again, did you have any conversation

19        yourself with Mr. Bergner on this subject?

20   A    He did call me on the phone one day.

21   Q    Okay.  And can you tell me when that was?

22   A    No, it would have been sometime after the fact.

23   Q    After which fact?

24   A    After all this.

25   Q    After the conversation with Mr. Kocourek...

1    A    Right.

2    Q    ...for example?

3    A    Right.

4    Q    That we've just been discussing?

5    A    Yeah.

6    Q    Okay.  Can you tell me what he said when he called?

7    A    He said that there were some statements being

8         attributed to himself that he didn't make.

9    Q    Okay.

10   A    But he didn't elaborate on what they were.

11   Q    Did you ask him to elaborate?

12   A    No.

13   Q    Did he say anything more about it?

14   A    No.

15   Q    Did you ask him anything more about it?

16   A    No.

17   Q    Did he say that these were statements relating even to

18        the Avery case?

19   A    They related to Allen, Gregory Allen.

20   Q    Okay.  So he calls you and says that there are some

21        statements being attributed to him that relate to

22        Gregory Allen, and he didn't make...

23   A    He said --

24   Q    ...any of those statements?

25   A    He said he -- no, he just said he didn't make them.

1           So...

2     Q     He didn't make them.

3     A     But when you deal with the news media, that's not

4           unusual.

5     Q     And did he identify the statements for you in any

6           regard at all?

7     A     No.

8     Q     And you didn't ask him...

9     A     No.

10    Q     ...what statements.

11    A     No.

12    Q     Did you ask him why he was calling you?

13    A     No.

14    Q     Did he say why he was calling you?

15    A     I think he was questioning the statements.  I think

16          there was a news report out sometime prior that he was

17          upset about.

18    Q     And did he identify that news report?

19    A     No.

20    Q     So you believe that he was upset about the news

21          report, even though he didn't say that.

22    A     Yes.

23    Q     What caused you to have that belief?

24    A     Because he denied saying whatever the news report was

25          attributing to him.

1    Q    And you never asked him why it is that he felt a need

2         to talk to you about that.

3    A    No.

4    Q    As opposed to someone else.

5    A    No.

6    Q    Did you ever talk to him in person...

7    A    No.

8    Q    ...about that subject?

9    A    No.

10   Q    When you spoke with him by phone, do you know where he

11        was calling you from?  Did he say anything?

12   A    No.

13   Q    Did he indicate that he'd like to get together and

14        talk about this?

15   A    No.

16   Q    Did you indicate that?

17   A    No.  No.

18   Q    So the -- Did he say anything, by the way, at that

19        time about whether or not he had yet been interviewed

20        by agents from the Wisconsin Department of Justice?

21   A    No, he didn't.

22   Q    Did he say that he had been interviewed by a newspaper

23        reporter from the Milwaukee Journal Sentinel?

24   A    No.

25   Q    Did he by any chance mention a reporter whose first

1       name is Tom?  Well, did he name any reporter at all?

2    A    No.  No.

3    Q    Okay.  Name Kircher ring any bells with you --

4    A    No.

5    Q    -- as being something that he had discussed?

6    A    No.

7    Q    Did he say anything about having had conversations

8       with other people including people in the district

9       attorney's office?

10   A    No.

11   Q    Have you now exhausted your recollection of everything

12       he said to you and you said to him during this

13       conversation concerning Gregory Allen?

14   A    Yes.

15      (Counsel conferring off the record 1:15:58 - 1:16:08)

16   Q    You've had conversations, I take it, with Mike

17       Griesbach about the Avery case, correct?

18   A    Not that I recall.

19   Q    How about with Mark Rohrer?

20   A    Yes.

21   Q    Do you recall Mike Griesbach being present when you

22       had conversations with Mark Rohrer?

23   A    No, he may have been with him, but I'm not sure.

24   Q    Tell me what you can recall about your first

25       conversation with Mark Rohrer relating to the Avery

1          case.

2     A    Well, Mark came to my office and told me that DNA

3          evidence had come back and showed that the DNA

4          belonged to a Gregory Allen, and that he was going to

5          contact the courts and see about getting Steve

6          released.

7     Q    And that was before, obviously, Steve was released,

8          true?

9     A    That's correct.

10    Q    And it was before the court order for his release?

11    A    Mm-hmm.

12    Q    What he was expressing to you was I guess what could

13         be called inside information; that is, it had not yet

14         been placed on the public record?

15    A    Correct.

16    Q    Letting you know that something was coming and you

17         should be aware of it.

18    A    Right.

19    Q    What was your reaction to that?

20    A    Well, if he's innocent, let him out.

21    Q    Okay.  And did you and Mr. Rohrer have any discussions

22         about what would happen within your department

23         relating to the case?

24    A    No.

25    Q    Did you have any discussion with Mr. Rohrer about the

Video Deposition of Kenneth Petersen  10/13/05

```
 1          timing of what was to follow?
 2   A      No.
 3   Q      And how long it would take for the court process to go
 4          on or when he'd be out or anything like that?
 5   A      No.
 6   Q      Any discussion at that point about comments with the
 7          media?
 8   A      No.
 9   Q      Was this a face-to-face conversation?
10   A      Yes.
11   Q      And what did you understand from the comments made to
12          you by Mr. Rohrer to be the purpose of that...
13   A      To let me know --
14   Q      ...face-to-face meeting?
15   A      To let me know it was coming, that this was coming
16          down the pike and that there would probably be news
17          media knocking at the door.
18   Q      About how long was the whole conversation?  Couple
19          minutes, or was it longer?
20   A      Not much more.  Five, ten minutes.
21   Q      How about after that?  Did you have other
22          conversations with Mr. Rohrer concerning the Avery
23          case?
24   A      Not that I can recall.
25   Q      So except for this one conversation that was, you
```

Magne-Script Video Court Reporters                     414-352-5450

1    know, five to ten minutes long, you don't recall any

2    conversations with him concerning the Avery case.

3  A    No.

4  Q    Is that so?

5  A    Correct.

6  Q    And do you not recall, then, any conversations with

7    him concerning, for example, this business with

8    Sergeant Colborn and Lieutenant Lenk?

9  A    I don't recall that.

10  Q    Do you recall any conversations with Mr. Rohrer or Mr.

11    Griesbach about Mr. Allen?

12  A    Other than the D.A. telling me that the DNA was

13    attributed to Gregory Allen, that would be it.

14  Q    In that very first conversation.

15  A    Right.

16  Q    The only one that you can recall now.

17  A    Right.

18  Q    Okay.  So as you're sitting here and as we've gone

19    through this discussion, you have no recollection of

20    any meetings or conversations, either face to face or

21    telephone or through any other format, between

22    yourself and Mr. Rohrer except the one that you've

23    described that occurred before Mr. Avery was released.

24    Is that true?

25  A    Correct.

1   Q   And the same is true with respect to Mr. Griesbach?

2   A   Correct.

3   Q   Let's turn to Denis Vogel for a moment.  Do you recall

4       having any conversations with him from -- well, for

5       the moment, let's say from September of 2003 to the

6       present?

7   A   I haven't --

8   Q   Concerning the Avery case.

9   A   I haven't talked to Denis Vogel since he left office.

10  Q   Okay.  How about before he left office?  You indicated

11      you do not recall being prepped before your testimony

12      with him.  Do you recall any conversation with him at

13      all...

14  A   None.

15  Q   ...about this case?

16  A   None whatsoever.

17  Q   Did you ever have any conversation with anybody in his

18      office concerning a belief about Gregory Allen being

19      the suspect, being the person who actually assaulted

20      Ms. Beerntsen?

21  A   No.

22      (Counsel conferring off the record 1:21:17 - 1:21:48)

23               REPORTER:  Go off the record briefly?

24               MR. GLYNN:  Yeah.  Please.

25               REPORTER:  Off the record.

1    (Off the record 1:21 - 1:23)

2    REPORTER:  Back on the record.

3    BY MR. GLYNN:

4    Q    Okay.  Let me follow up on a few things.  Steve Avery

5         is taken to the jail, turned over for prints and

6         pictures.  Do you know to whom?

7    A    I believe Vic Buretta.

8    Q    And can you spell that name?

9    A    B-u-r-e-t-t-a.

10   Q    Okay.  And he was a jailer at that time?

11   A    Correct.

12   Q    Second, you also indicated that you had to collect

13        pubic hair and other evidentiary samples.  I take it

14        that was just from Mr. Avery?

15   A    Yes.

16   Q    Again, that was nothing -- that was not anything that

17        had you involved with Ms. Beerntsen.

18   A    Correct.

19   Q    Next, there was a prior shift commander who had given

20        you some information, you believe, on July 29th, 2005.

21        Would that have been Mr. Beilke?

22   A    No, Mr. Beck.

23   Q    Mr. Beck.  Okay.

24        MR. POLLEN:  You can even read his writing.

25        I'm impressed [re Mr. Glynn reading Mr. Kelly's

1        notes].

2        BY MR. GLYNN:

3    Q   There was a point at which in your conversations with

4        Mr. Lenk and Sergeant Colborn they indicated that --

5        well, actually, I guess to be more precise, it's

6        Sergeant Colborn who indicated that he had directed

7        the Brown County caller to a detective.  Do you recall

8        who that detective was?

9    A   No idea.

10   Q   And the -- You made a comment during the examination

11       about learning about the Bergner statement to Kocourek

12       through what you described as the grapevine.  Can you

13       be any more specific than that?  I mean, do you know

14       who it is that made a comment, or is it from the news

15       media or just what your source of information was?

16   A   Believe the news media.

17   Q   And are you somebody who is a news hound and covers

18       print media and electronic media and radio and all

19       that stuff, or do you get all your news information

20       from one source generally?

21   A   Oh, no.

22   Q   Okay.  What would be your media sources back in 2003?

23   A   Newspaper, radio, and TV.

24   Q   So I take it you're not able to tell me which of those

25       it would have been?

1    A    No.

2    Q    It could have been any or all.

3    A    Yes.

4    Q    Let me take a look at my note here.  In your very

5         first conversation with Tom Kocourek about this matter

6         back in July of 1985, you indicated that you were told

7         to arrest Steve Avery for attempted first-degree

8         homicide; is that right?

9    A    Correct.

10   Q    There's no reference of sexual assault?

11   A    Not at that point.

12   Q    None.  I mean, you had no idea what the circumstances

13        were of the attempted first-degree homicide, whether

14        there was a weapon, whether this guy should be

15        considered armed, I mean, anything like that?

16             MR. MAYER:  Form of the question.

17   A    No.

18        BY MR. GLYNN:

19   Q    And you had no idea who the victim was?

20   A    Oh, I knew the victim.

21   Q    At that time?

22   A    I knew the victim.

23   Q    You did.

24   A    I knew who she was.

25   Q    Okay.  So you knew he was -- The information you had

1   gotten from the prior shift commander, would that have

2   involved sexual assault?

3 A  It could have.

4 Q  But again, your directions from Kocourek have nothing

5   to do with sexual assault in the first conversation,

6   it's all about homicide.

7 A  Correct.

8 Q  And later, when you're at the jail, or at least after

9   you've been -- after you've arrived at the jail, you

10   have a conversation again with Kocourek in which he is

11   talking about getting these samples, correct?

12 A  Correct.

13 Q  And the samples include pubic hair, right?

14 A  Correct.

15 Q  And based on your experience, you realize that you

16   don't ordinarily obtain pubic hair samples unless

17   there's an allegation of some form of sexual contact

18   or sexual assault, true?

19 A  Correct.

20 Q  Do you recall whether or not Tom Kocourek said

21   anything in that second conversation about sexual

22   assault?

23 A  I don't recall anything specific, no.

24       MR. GLYNN:  Okay.  That's all I have.

25       MR. KELLY:  One more.

1              MR. GLYNN:  Oh.  You got some?  Okay.

2    Q    You turned Mr. Avery over to Mr. Buretta at the jail?

3    A    Correct.

4    Q    Do you recall seeing anybody else on duty at the jail?

5    A    No, the only one I dealt with was Vic.

6    Q    Okay.  Did you specifically -- do you remember seeing

7         Dave Dvorak there at the jail?

8    A    No.

9              MR. GLYNN:  Okay.  Thanks.  That's all.

10             REPORTER:  Okay.  There being no further

11        questions, this deposition is concluded at 1:29

12        p.m.  Off the record.