# Exhibit 17

# United States District Court
# Eastern District of Wisconsin

## Avery v. Manitowoc County

04 C 986



Video Deposition of

## James Lenk

Recorded 10/11/2005 in Manitowoc, WI

11:08 am - 11:57 am, 48 mins. elapsed

### Magne-Script

(414) 352-5450

*15823 Condensed transcript with index*

## Page 1

Witness
James Lenk

Tuesday 10/11/2005 at 11:00 by: Barbara Cohen Joseph

Nash, Spindler, Grimstad & McCracken
201 East Waldo Boulevard
Manitowoc, WI

Caption: Avery v. Manitowoc County
Case No.: 04 C 986
Venue:   United States District Court
         Eastern District of Wisconsin

## Page 2

```
 1              A P P E A R A N C E S
 2   Walter F. Kelly
 3   Walter F. Kelly, S.C.
 4   700 W. Michigan St. #400
 5   Milwaukee, WI  53233
 6   On behalf of the Plaintiff
 7
 8   Stephen M. Glynn
 9   Glynn, Fitzgerald & Albee, S.C.
10   526 E. Wisconsin Ave.
11   Milwaukee, WI  53202
12   On behalf of the Plaintiff
13
14   Amanda J. Kaiser
15   Boardman, Suhr, Curry & Field
16   1 S. Pinckney St. #410, PO Box 927
17   Madison, WI  53701-0927
18   On behalf of Denis Vogel and Manitowoc County
19
20   Timothy A. Bascom
21   Bascom, Budish & Ceman, S.C.
22   2600 N. Mayfair Rd. #1140
23   Wauwatosa, WI  53226-1308
24   On behalf of Manitowoc County
25
```

## Page 3

```
 1   Amy J. Doyle
 2   Crivello, Carlson & Mentkowski, S.C.
 3   710 N. Plankinton Ave. #500
 4   Milwaukee, WI  53203
 5   On behalf of Tom Kocourek and Manitowoc County
 6
 7   John F. Mayer
 8   Nash, Spindler, Grimstad & McCracken
 9   201 East Waldo Boulevard
10   Manitowoc, WI  54220
11   On behalf of Tom Kocourek
12
13   Also Present:  Steven Avery
14
15
...
25
```

## Page 4

```
 1              I N D E X
 2   EXAMINATION BY                    PAGE NO.
 3   Mr. Glynn . . . . . . . . . . . . . . . .    4
 4   Ms. Doyle . . . . . . . . . . . . . . . .   41
 5   EXHIBIT NO.                       PAGE NO.
 6   125 - 9/12/03 report statement. . . . . .   15
 7       (The exhibits were retained by Mr. Kelly)
 8     (The sealed original transcript was sent to Mr. Kelly)
 9                ==========
10              E X A M I N A T I O N
11     BY MR. GLYNN:
12   Q  Morning, Mr. Lenk.
13   A  Morning.
14   Q  I'm going to have a few questions for you about your
15      own background and then a few questions that will
16      relate to your involvement with the Steven Avery case
17      and some related matters.  Okay?
18   A  Okay.
19   Q  Let's start out with some obvious things.  How old are
20      you, please?
21   A  56.
22   Q  And can you give me your employment, say, starting,
23      oh, 1980?
24   A  1980, I believe I was working at that time for
25      Michigan Bell Corporate Security in Michigan.
```

Page 5

1  Q  Okay.
2  A  Prior to that I had worked for the Detroit Police
3     Department. And then I moved over here in '88, and I
4     worked at Fleet Farm for a year and then I got on the
5     sheriff's department in December of '88.
6  Q  In what capacity were you with the sheriff's
7     department?
8  A  I started out as a jailer and then I worked up to the
9     road, became a road officer.
10 Q  Okay. And when did you become a road officer?
11 A  I think it was about a year later, so it must have
12    been around December, maybe, of '89.
13 Q  Okay.
14        MR. GLYNN: The record should also reflect
15    that Mr. Avery is here now.
16        REPORTER: Thank you.
17 BY MR. GLYNN:
18 Q  How long did you stay as road officer?
19 A  Oh, a couple years, then I became part of the Metro
20    Drug Unit.
21 Q  And when was that, roughly?
22 A  '92, maybe.
23 Q  Okay.
24 A  After that I became -- I got promoted to sergeant,
25    went back into the jail for a couple months and then

Page 6

1     became a road sergeant after that.
2  Q  And where does that take us in calendar years?
3  A  I was a road sergeant from '92, I believe, until I
4     became a sergeant up in the Detective Unit in I
5     believe it was '98. I became a lieutenant of the
6     Detective Unit in May of '93 -- or 2003.
7  Q  So lieutenant of the Detective Unit in May of '03?
8  A  Yes.
9  Q  Okay. And you stayed in that capacity until when?
10 A  Currently.
11 Q  Okay. So that's where you are, on the same title and
12    same position?
13 A  Right.
14 Q  All right. Have you, while you were with the
15    sheriff's department, had any involvement with the
16    Steven Avery case that involves allegations of sexual
17    assault of Penny Beerntsen?
18 A  Other than -- I wasn't aware of it until I got the
19    copy the other day. I did send out evidence in 2002,
20    or something like that.
21 Q  Okay.
22 A  And then the statement that you have in front of you.
23 Q  Okay.
24 A  That's the only involvement.
25 Q  So back in 1988 when you were around, you didn't have

Page 7

1     anything to do with any of the ongoing Avery materials
2     if there was anything going on at that time?
3  A  No, sir.
4  Q  And similarly in '95-96 when there were postconviction
5     efforts, you were not involved in any of the
6     investigative aspects of that?
7  A  No.
8  Q  So you are aware, I take it, that in 2002, 2003 there
9     were -- actually 2001, there were postconviction
10    efforts again submitted on behalf of Mr. Avery that
11    related to DNA analysis of certain evidence; is that
12    correct?
13 A  I knew that because I had to send stuff to the crime
14    lab.
15 Q  Right. And in that capacity, as somebody associated
16    with the Detective Unit, you at one point were
17    involved at least to the extent of submitting evidence
18    to the crime lab, true?
19 A  True.
20 Q  Okay. Can you tell me who directed you to do that?
21 A  I believe it was a court order that came over stating
22    that it should be sent to the crime lab.
23 Q  And is that an order that would apply directly to you,
24    or would it go to the sheriff and then the sheriff
25    would give it to you, or how did that work?

Page 8

1  A  I'm not exactly sure how that came through. Normally
2     it doesn't come to me directly. They just usually
3     send it to the evidence technician.
4  Q  Sure.
5  A  At that time I was in charge of the evidence room,
6     so...
7  Q  Actually you anticipated my question. So it's because
8     of your role in relation to the evidence room, you
9     believe, that that would have come to you.
10 A  True.
11 Q  And it was a simple matter, I take it, of removing
12    items from the evidence room, bagging them in some
13    fashion and transferring them to the crime lab?
14 A  Yes, sir.
15 Q  And was that the Madison or the Milwaukee crime lab?
16    Do you remember?
17 A  Other than -- I don't remember. I would assume it
18    would be Madison, but I wouldn't know unless I looked
19    at the transmit.
20 Q  Did you physically involve yourself in the
21    transportation?
22 A  No, sir.
23 Q  Okay. That got delegated to somebody else, I take it.
24 A  Yeah, it was either delegated or it was sent through
25    the certified mail.

Page 9

1  Q  Okay.  Now, let me come back to the document you've
2     already referenced, and let me ask the reporter to
3     mark this, please.
4         MR. GLYNN:  Are we at 125 now?
5         MR. KELLY:  Yes, we are.
6         REPORTER:  Yes.
7         MR. GLYNN:  Thanks.
8  BY MR. GLYNN:
9  Q  Let me show you this document that now has the exhibit
10    sticker on it as 125.  I take it that's something
11    you've seen before.
12 A  Yes.
13 Q  Okay.  Before I get into questions about the specific
14    document, let me ask whether prior to September of
15    2003 you had any active awareness that this DNA
16    challenge to Mr. Avery's conviction was going on.  I
17    mean, do you follow my question?  I mean, I know that
18    you had something to do with locating evidence --
19 A  Mm-hmm.
20 Q  -- and making arrangements to have it taken to a crime
21    lab.  But is that something that registered in your
22    mind as an active investigation and wondering what was
23    going on with it, keeping tabs on it, that kind of
24    thing?
25 A  No, sir.

Page 10

1  Q  Okay.  I mean, it sounds to me as though this was
2     simply one of the many tasks that may have come your
3     way in your position; is that right?
4  A  Yes, sir.
5  Q  Didn't have any special significance to you.
6  A  No, sir.
7  Q  Okay.  Were there discussions that you engaged in with
8     anybody about the Avery case at the time that this
9     material was being gathered for shipment to the crime
10    lab?
11 A  Not that I recall.  I don't recall any specific
12    conversations about sending the evidence in other than
13    send it in.
14 Q  Okay.  No discussions about the history of the case?
15 A  [Shaking head]
16 Q  Or, you know, that this is now a second or third
17    challenge to his conviction, anything like that?
18 A  No, sir.
19 Q  Okay.  Let me come back now to September of '03.  You
20    see the Exhibit 125 has a date on it of 9/12/03,
21    correct?
22 A  Yes.
23 Q  By that time, Mr. Avery had gone through the court
24    process that led to his exoneration, okay?
25 A  Mm-hmm.

Page 11

1  Q  And I take it as someone with the Manitowoc County
2     Sheriff's Department at that stage, you would have
3     been aware of that.  True?
4  A  Yes.
5  Q  It was fairly big news at the time, presumably?
6  A  Yes.
7  Q  And, again, let me ask whether, before September 12
8     and the preparation of Exhibit 125, you had
9     conversations with anyone about the Avery case; for
10    example, conversations that may have involved
11    discussions of Gregory Allen.  Do you recall any such
12    conversations?
13 A  No, sir.
14 Q  Did you know the name "Gregory Allen" prior to
15    September 12th, 2003?
16 A  No, sir.
17 Q  I take it that you had not, then, had any involvement
18    in any cases involving him, or if you did, you didn't
19    recall it at the time?
20 A  I've never had -- To my knowledge, I've never had a
21    case with Gregory Allen.
22 Q  Okay.  And how about Steven Avery?  Had you had any
23    knowledge of Mr. Avery or any cases of his, let's go
24    back to the time that you were involved in sending
25    evidence to the crime lab, as of that date?

Page 12

1  A  No, sir.
2  Q  So I take it that in September of 2003, you were sort
3     of getting your education, such as it was, in the
4     Avery matter.  True?
5  A  That's true.
6  Q  And is it fair to say that that came exclusively from
7     the media, as opposed to partly from the media, partly
8     from fellow officers or others involved in law
9     enforcement?
10 A  I would say the majority, if not all, came from the
11    media about the case.
12 Q  Are you able to identify anybody in the sheriff's
13    department with whom you had any conversations about
14    the case?
15 A  The only one --
16 Q  Other than what's reflected in this memo.
17 A  Okay.  The only one that I had mentioned, or actually
18    had it mentioned to me, was when I saw the picture
19    that was drawn by then-time chief investigator Kusche.
20 Q  Mm-hmm.
21 A  And he told me that it was involving a case, sexual
22    assault case in Two Rivers.
23 Q  And how did you happen to see that?
24 A  It was hanging on his wall in his office.
25 Q  And can you describe what it was?  Was it only the

### Page 13

1 composite or was there also a photograph with it?
2 A  You know, to my knowledge it's a composite. I don't
3    know if there was a photograph there or not.
4 Q  Okay. Could have been. I mean, it's not that you
5    have a recollection that there was not a photograph
6    there; is that true?
7 A  Right. It could have been or could not have been.
8 Q  Okay. But what you recall now is the composite.
9 A  Sure.
10 Q  And, I'm sorry, maybe you said this and I just lost
11    it. Can you tell me about when it was that that
12    happened, even if it's just when in relationship to
13    something else as opposed to when on a calendar?
14 A  I'm sure it was sometime when I first came up to the
15    Detective Unit, '98 or so.
16 Q  Okay.
17 A  I'm not positive.
18 Q  Do you recall conversation with Mr. Kusche at that
19    time about the composite, circumstances under which it
20    was prepared or the case?
21 A  No. He just said, "Doesn't that look like the
22    information that was given about the suspect?" I
23    said, "Yeah."
24 Q  What information about the suspect --
25 A  Just the description that was given.

### Page 14

1 Q  And how did you know what description --
2 A  He told me the description, and he said, "This is what
3    they described and this is the picture I" --  And
4    there may have been a picture next to it so I could
5    compare it.
6 Q  Yeah. That's --
7 A  That's probably --
8 Q  That's what I was wondering.
9 A  Yeah.
10 Q  Because it would be easier, obviously --
11 A  Sure.
12 Q  -- if it's comparing the photo to a composite.
13 A  Yes.
14 Q  So that would have been roughly five years earlier
15    than the memo that we've got in front of us as 125.
16 A  Roughly, yeah.
17 Q  And did Mr. Kusche say anything else about the
18    composite, about the preparation of the document or
19    that it was his first time or his best one or anything
20    at all that stands out in your mind?
21 A  No, he was just happy that it turned out well.
22 Q  Sure.
23 A  Other than that, he really didn't elaborate.
24 Q  And, so now, you know, that the exoneration of Mr.
25    Avery has occurred and the fact that Mr. Allen has

### Page 15

1    been identified as the perpetrator of that offense,
2    have you had any conversations with Mr. Kusche about
3    the accuracy of the drawing in retrospect?
4 A  No, not really.
5 Q  I mean, obviously it's 20/20 hindsight at that stage.
6 A  True.
7 Q  But just wondering whether you've had any conversation
8    at all with him about it.
9 A  Uh-uh [shaking head].
10 Q  You're shak--
11 A  No, other than looked like the picture.
12 Q  Right.
13 A  You know, looked like the drawing or whatever.
14      MR. GLYNN:  Okay. Could we go off the
15    record for a second. I just want to close the
16    door behind us.
17      REPORTER:  Off the record.
18    (Off the record 11:23 - 11:23)
19      REPORTER:  Back on the record.
20      MR. GLYNN:  Thank you.
21      (Exhibit 125 identified)
22 Q  Okay. Now, let me ask you to take a look at 125,
23    please. You've already indicated that you'd seen that
24    before. And let me back this up a little bit. I see
25    the date on here of September 12th, '03. And I see

### Page 16

1    that the content of the document indicates that you
2    were talking to Sergeant Andy Colborn and had certain
3    conversation with Sergeant Colborn, and at the very
4    bottom it indicates that you later went to Sheriff
5    Petersen. And obviously I'll come back and go through
6    all of this. I'm trying to find out first of all
7    whether this narrative describes events that all took
8    place on September 12th, or did any of this take place
9    on September 12th, or is September 12th simply the
10    date on which you wrote the report?
11 A  It is my recollection that everything took place on
12    this date.
13 Q  Okay.
14 A  September 12th.
15 Q  And can you tell me why it is that Exhibit 125 would
16    have been prepared?
17 A  At the time that Officer Colborn gave me the
18    information, although it was vague, because of the
19    circumstances it had come out already about this Avery
20    case, I thought it may or may not be relevant. So I
21    said maybe you should pass that on to the sheriff.
22    That's how we ended up going up to Sheriff Petersen.
23 Q  Okay. And when you say, "I thought that maybe you
24    should pass it on," is that you talking to yourself?
25 A  No, no. I had --

Page 17

1  Q  Or you talking to Colborn?
2  A  I had mentioned that to Sergeant Colborn, that he
3     should probably go up and talk to the sheriff and at
4     least tell him what you have.
5  Q  Okay.
6  A  Whether it's relevant or not, that's not his decision.
7  Q  Sure. Well, let's go through this then, please.
8     We've got a conversation on September 12th between you
9     and Sergeant Colborn, and it's apparently taking place
10    in your office; is that right?
11 A  Yes.
12 Q  And the conversation had something to do with one of
13    the detectives that I don't even need to get into with
14    you, I don't think, unless you're going to tell me
15    that that conversation was in some way related to the
16    Avery case.
17 A  No.
18 Q  Sounds like it wasn't.
19 A  No.
20 Q  Okay. So after this, or maybe it's part of this
21    unrelated conversation, something was said about the
22    Steven Avery exoneration, I take it.
23 A  Mm-hmm.
24 Q  Is it --
25 A  Yes.

Page 18

1  Q  Okay. Can you tell me, flesh this out a little bit
2     and tell me your recollection as to how that went?
3  A  You know, I don't have any recollection. In fact I
4     had forgotten about this statement until it was
5     brought to my attention.
6  Q  Okay.
7  A  I didn't think anything of it too much at the time,
8     and I just forgot about it.
9  Q  So having read this, your recollection is not
10    refreshed about that?
11 A  No, I don't know what else was talked about.
12 Q  Okay. But you do know that whatever the conversation
13    was about one of the detectives, it was not a
14    conversation related to the Avery matter.
15 A  Right.
16 Q  And I take it when you prepared Exhibit 125, you did
17    so in an effort to be accurate, correct?
18 A  Yes.
19 Q  And as complete as you thought was appropriate to the
20    circumstances?
21 A  Yes.
22 Q  You had by that time been involved in law enforcement
23    either in Detroit or in private law enforcement, if
24    you will, or in the sheriff's department for many
25    years.

Page 19

1  A  Yes.
2  Q  And had written many reports by that time in your
3     life?
4  A  Yes.
5  Q  And knew the importance of accuracy and completeness
6     in a report, correct?
7  A  Yes.
8  Q  So you also recognized that a person had been
9     incarcerated for some 18 years for an offense on which
10    he had now been exonerated, correct?
11 A  Yes.
12 Q  And knew that that was a very significant event in the
13    criminal justice system, correct?
14 A  Yes.
15 Q  So when the subject was brought up, it was a subject
16    to which you paid close attention. I mean, this was a
17    big deal in the media at the time, and you've already
18    indicated that it was a significant matter in the
19    criminal justice system, true?
20       MR. BASCOM:  Objection. Multiple.
21       MR. MAYER:  And form also.
22 BY MR. GLYNN:
23 Q  You can answer.
24 A  Oh, okay. Yeah, it was a big deal.
25 Q  Sure. And because of that, I mean, this report came

Page 20

1     into existence, true?
2  A  True.
3  Q  I mean, you have lots of conversations about lots of
4     cases in your daily activities that don't lead to the
5     generation of a report statement like this, correct?
6  A  That is correct.
7  Q  So now let's go through the report. And, again, can
8     you tell me what your own report writing style was?
9     If you were trying to take down something verbatim or
10    a quote, would it be your practice to put quote marks
11    in, or did you not generally use quote marks in the
12    reports that you wrote?
13 A  If it's an accurate quotable statement, I usually use
14    quote marks.
15 Q  Okay. So this you would consider not to be a quotable
16    statement, but rather more in the nature of a summary
17    of a statement; is that fair?
18 A  Right.
19 Q  And Sergeant Colborn is telling you that he was
20    working in the jail division around 1995; is that --
21 A  Yes.
22 Q  -- safe to say? When it says "probably 1995," is that
23    Sergeant Colborn's term, "probably 1995," or is that
24    your term?
25 A  That's my term.

## Page 21

1  Q  Okay. And would that have been based exclusively on
2     what he said, or would you have attempted to relate
3     what he said to something you knew about for 1995?
4  A  I didn't have any recollection of '95. It had to be
5     something that he was relating.
6  Q  Okay. So would it be a fair inference for a reader of
7     this report to conclude that Sergeant Colborn
8     indicated that it was probably 1995 that the events he
9     was about to describe had occurred?
10 A  Yes.
11 Q  Okay. And he said he received a telephone call as
12    opposed to a personal visit, correct?
13 A  Correct.
14 Q  And, again, there isn't an issue about whether it's a
15    telephone call as opposed to a fax transmission or a
16    personal visit. I mean, it was a phone call because
17    that's what your report says.
18 A  That's what he told me.
19 Q  And he said that the person calling said he was a
20    detective, and the best that Sergeant Colborn could
21    recall is that he thought the caller might have been
22    from Brown County; is that correct?
23 A  That's correct.
24 Q  And where this abbreviation of BRO County occurs,
25    that's obviously supposed to be Brown County, true?

## Page 22

1  A  Yes.
2  Q  And he said he isn't sure -- I'm sorry, I'm quoting
3     from the report. At the end of that sentence, the
4     four words are, quote, "but he isn't sure," close
5     quote. I take it that means that Sergeant Colborn
6     wasn't certain that the caller was a detective from
7     Brown County as opposed to some other area; is that
8     right?
9  A  That's what he told me, right.
10 Q  Okay. That's his best recollection?
11 A  Correct.
12 Q  Of something that had happened roughly eight years
13    earlier.
14 A  Correct.
15 Q  And wherever that detective was from, the detective
16    told him that he has a person in custody, and I note
17    that at first it said "have" and then it got changed
18    to "has" for being the present tense.
19 A  Mm-hmm.
20 Q  Is that what you were trying to convey, that --
21 A  Yes.
22 Q  -- that Sergeant Colborn was saying that the detective
23    was saying to Sergeant Colborn that the detective, at
24    the time of the call to Colborn, had this person in
25    custody?

## Page 23

1  A  That's what he told me, yes.
2  Q  Okay. And that person, according to the detective,
3     had said that a few years earlier that person, the
4     suspect who is in jail, had committed an assault in
5     Manitowoc County. Am I reading that correctly?
6  A  Yes.
7  Q  And am I interpreting that correctly?
8  A  [Nodding]
9        MS. DOYLE: You have to answer.
10 A  To the best of my -- Yeah. To the best of my
11    knowledge, yes.
12    BY MR. GLYNN:
13 Q  Okay. And you use the phrase, quote, "an assault,"
14    close quote. And, again, the report doesn't use it in
15    quotes. I'm just trying to let --
16 A  Mm-hmm.
17 Q  -- you know what words I'm quoting here. Does "an
18    assault," as the term would have been used by you in
19    September 2003, mean a sexual assault or could it be
20    any kind of assault?
21 A  It could be any kind of assault.
22 Q  Okay. If it had been referring to a sexual assault,
23    would you have put down "sexual assault" as opposed to
24    an assault, or don't you know?
25 A  Yes.

## Page 24

1  Q  You think you would have?
2  A  I would have wrote that down. Yes.
3  Q  Okay. So you think that what Colborn was telling you
4     at the time was just the phrase "an assault"?
5  A  Yes.
6  Q  Okay. That is, that was what the detective told
7     Colborn, was "an assault"?
8  A  That's what he told me, yes.
9  Q  Yeah. Okay. Detective -- I'm reading the last
10    sentence of the second paragraph. "This detective
11    also told Sergeant Colborn that he believes someone
12    was arrested for this crime already." Did I read that
13    accurately?
14 A  Yes.
15 Q  And, again, what that sentence is telling us is that
16    the detective believed that someone had already been
17    arrested for that crime that the person in custody was
18    saying he had committed; is that correct?
19 A  That's what it --
20       MS. DOYLE: I'm going to object. Lack of
21    foundation.
22    BY MR. GLYNN:
23 Q  Well, I mean, it's your report. That's what you
24    understood?
25 A  That's what I understood from Sergeant Colborn.

## Page 25

1  Q  Sure. And continuing on to the next paragraph,
2     "Sergeant Colborn said the detective wanted to speak
3     to someone in the Detective Unit - but Sergeant
4     Colborn can't remember who he advised or passed this
5     information on to." Did I read that correctly?
6  A  Yes.
7  Q  Okay. And, again, that pretty much speaks for itself,
8     right? I mean, the detective that he thought was from
9     Brown County told the sergeant that he, the detective,
10    wanted to speak to somebody in the Manitowoc Detective
11    Unit, true?
12 A  True.
13         MS. DOYLE: I'm just going to object. Lack
14    of foundation, unless you're saying what Colborn
15    told him.
16         MR. GLYNN: Sure.
17 Q  I mean, that's all based on what Colborn told you,
18    correct?
19 A  Exactly.
20 Q  Yeah. And when we say "in the Detective Unit," are
21    you meaning that Sergeant Colborn was referring to the
22    Manitowoc County Sheriff's Department Detective Unit?
23 A  Yes.
24 Q  Because that's what you guys were in, correct?
25 A  Yes.

## Page 26

1  Q  And Colborn can't remember who he advised or passed
2     this information on to. Did Colborn tell you that he
3     did in fact advise someone or pass the information on
4     to someone, but he just couldn't remember who it was?
5  A  That's the way I took it, yes.
6  Q  As opposed to saying, "I don't know if I told
7     somebody," or "I don't know if I advised anybody."
8  A  No, I didn't take it that way.
9  Q  You took it that he did in fact pass the information
10    on to someone, but today, eight years later, wasn't
11    sure of who that person was.
12 A  Correct.
13 Q  And, again, that's based on what Sergeant Colborn said
14    to you.
15 A  Exactly.
16 Q  And this indicates that Colborn said he was later
17    informed by someone that the case was already solved
18    and the right person was arrested. Now, the "he"
19    that's in that sentence that I just read in the second
20    to last paragraph here, that's Sergeant Colborn,
21    correct?
22 A  Correct.
23 Q  I mean, he's not saying that he's still quoting this
24    person from Brown County. I mean, that's Sergeant
25    Colborn saying that Sergeant Colborn was later

## Page 27

1     informed by somebody that the case was already solved
2     and the right person arrested.
3  A  Yes.
4  Q  Okay. Excuse me. And, again, Sergeant Colborn
5     couldn't recall who it was that told him that the case
6     had already been solved, true?
7  A  True. That's what he told me.
8  Q  Did he make any guesses about that or say, "Gee, it
9     could have been this person, it could have been that
10    person, I'm not sure."
11 A  He wasn't sure. He said it probably -- The only thing
12    he said is, "It probably wouldn't be Gene Kusche
13    because I didn't know Gene at the time."
14 Q  Okay.
15 A  So...
16 Q  So he could sort of exclude Gene Kusche, but that was
17    about as much as he could do in terms of identifying
18    that source.
19 A  Correct.
20 Q  And you indicate that you later went to Sheriff
21    Petersen to pass on the information, correct?
22 A  Correct.
23 Q  Okay. Well, I'll come back and talk about that for a
24    minute. But let me just talk about your state of mind
25    on September 12th, 2003, after receiving this

## Page 28

1     information. You recognized that what Sergeant
2     Colborn was saying could be important information,
3     correct?
4  A  Yes.
5  Q  And, again, I mean, that's why the report is prepared?
6  A  Correct.
7  Q  And that's why the decision is made to go to Sheriff
8     Petersen to pass on the information?
9  A  Correct.
10 Q  And, again, I have to state some obvious things, but
11    certainly it wasn't your job to pass on every single
12    bit of information that came to you on every single
13    case that crossed your desk to Sheriff Petersen,
14    correct?
15 A  Correct.
16 Q  Part of your job as a supervising law enforcement
17    person was to use your own discretion and your own
18    judgment in determining what's important and what's
19    not and what needs to go to the sheriff and what
20    doesn't, correct?
21 A  Yeah, most of the time.
22 Q  Sure. And, I mean, and sometimes you might be ordered
23    by somebody to give me all information that comes in
24    on something.
25 A  Correct.

## Page 29

1  Q  And you would do that then, true?
2  A  Correct.
3  Q  But I take it nothing like that had been given to you
4     as a directive with respect to the Avery case.
5  A  No.
6  Q  In point of fact, do you have a recollection of there
7     being a directive from Sheriff Petersen that the Avery
8     case was not to be discussed outside the department
9     with anybody, and that directive coming out around
10     September 12th, '03?
11  A  I don't know when it came out.  I remember at some
12     point there was a directive that it shouldn't be
13     discussed.
14  Q  Okay.  And as specific dates, that's just not
15     something that you have recall of.
16  A  I don't recall.
17  Q  Okay.  So the state of mind that you had on September
18     12th was that this information should go to the
19     sheriff, right?
20  A  Yes.
21  Q  And can you tell me why that would be?
22  A  Although it had really no specifics into it, I thought
23     maybe under the circumstances with the Avery case that
24     it may or may not have some relevance, and I thought
25     it should be brought to the sheriff's attention.

## Page 30

1  Q  Okay.  And how do you do that physically?  I mean, do
2     you call to make an appointment or do you go knock on
3     a door, or what was your access like in September of
4     2003 to Sheriff Petersen?
5  A  I think I just went up and knocked on his door.
6  Q  And did you go with Sergeant Colborn?
7  A  I believe we went together.
8  Q  Okay.  And was Sheriff Petersen available?
9  A  I believe he was.
10  Q  Did you talk to him right then?
11  A  To my recollection, I would assume it was right then,
12     but I can't say absolutely it was right then.
13  Q  Yeah, okay.  Do you have a recollection of whether --
14     well, whether any part of the report that's Exhibit
15     125 had been prepared by that time?
16  A  No.
17  Q  That is, by the time you went to see Sheriff Petersen.
18  A  No.
19  Q  So this document, 125, didn't begin to get prepared
20     until after you had talked to Sheriff Petersen.  Is
21     that a fair statement?
22  A  Correct.
23  Q  So do you recall at any time during the meeting with
24     Sheriff Petersen there being anyone else present
25     besides yourself, Sergeant Colborn and Sheriff

## Page 31

1     Petersen?
2  A  I don't recall.
3  Q  Do you recall whether the meeting stayed in Sheriff
4     Petersen's office as opposed to moving anywhere else?
5  A  I don't think I've ever had a conversation with the
6     sheriff that didn't stay in his office.  I mean, we
7     never left the office and went somewhere else.
8  Q  Okay.  Do you recall whether Sheriff Petersen took any
9     notes of what you were saying?
10  A  I don't recall.
11  Q  Do you recall whether what you were saying was
12     recorded in any fashion?
13  A  No.
14  Q  No, it wasn't, or no, you don't recall?
15  A  I don't believe it was, but I don't recall
16     specifically.
17  Q  When you and Sergeant Colborn were there, did you
18     report what Sergeant Colborn had said to you, or did
19     you simply ask Sergeant Colborn to tell the sheriff
20     what Sergeant Colborn had told you?
21  A  I don't know exactly how it went down.  Usually if I
22     take someone to talk to a supervisor, I usually lead
23     into it with a quick summary of what it was and then
24     let someone else explain it.
25  Q  Sure.  And that's, I mean, again, that's probably what

## Page 32

1     would have happened based on your own experience and
2     practice.
3  A  It's probably what happened.
4  Q  Okay.  It certainly would not be the case that
5     Sergeant Colborn would not be allowed to speak to the
6     sheriff.
7  A  No.
8  Q  I mean, that's the point of his being there, correct?
9  A  Correct.
10  Q  So that if the sheriff has questions, he can follow
11     them up with Mr. Colborn?
12  A  Correct.
13  Q  And do you have any recollection as to how long the
14     meeting lasted?
15  A  You know, I don't, other than it was probably very
16     short.
17  Q  Mm-hmm.  Do you have a recollection of anybody saying
18     anything in particular?
19  A  Other than the sheriff said, "Give me a statement as
20     to what you just told me."
21  Q  Okay.
22  A  That's how this came about.
23  Q  And -- Well, and when you say that's how this came
24     about, it is that direction from the sheriff, together
25     with your own feeling of the significance of the

### Page 33

1   event, that caused you to prepare the statement that's
2   here as Exhibit 125.
3 A Correct.
4 Q And after you prepare that statement, what's your
5   practice in terms of what you do with it?  Does it go
6   to a case file, does it go to the sheriff, does it go
7   any particular place?
8 A This particular statement went to the sheriff.
9 Q All right.  Did you see it after it went to the
10   sheriff?
11 A No, sir.
12 Q When's the next time you did see it?
13 A When Amy came to talk to me last Friday.
14 Q Okay.  And Amy, for our record, is Ms. Doyle, the
15   lawyer --
16 A Correct.
17 Q -- seated to your left.  And I take it at that time
18   you read the statement?
19 A Yes.
20 Q Were you able to recall anything beyond what you've
21   told us so far about the obtaining of the statement?
22 A No.
23 Q Besides Sheriff Petersen, do you recall having any
24   discussion with anyone else concerning what it is that
25   Sergeant Colborn had said?

### Page 34

1 A I don't believe so.
2 Q Do you recall having any conversation with Sergeant
3   Colborn after September 12th, 2003, about this
4   subject?
5 A Other than a couple days ago when he mentioned he got
6   a phone call and he had to do a deposition.
7 Q Okay.  And actually I was going to be coming to asking
8   you that.  But I'm talking about in, roughly,
9   September of 2003, for example, any follow-up in which
10   you bump into Colborn and say, "Remember yet who it is
11   that you got the call from or" --
12 A No.
13 Q -- "who it is that you talked to," or him coming to
14   see you and saying, "You know that conversation we had
15   earlier, I think the guy that I talked to was so-and-
16   so"?
17 A No.
18 Q So as of today, Mr. Lenk, is it -- I'm sorry.  What's
19   your title?  You're lieutenant?
20 A Lieutenant of Detectives.
21 Q Okay.  I don't mean to diminish your title by not
22   using it all the time.  Lieutenant, when you came in
23   today, did you have any more information about the
24   subject matter of Exhibit 125 than you can recall
25   having back in 2003?

### Page 35

1 A [Shaking head]
2 Q That is, had you picked up any new information of any
3   kind since you prepared the report that you don't
4   remember?
5 A Other than -- No, other than actually getting the
6   report and remembering I actually did it.  I had
7   totally forgotten about it.
8 Q Okay.  So no conversa-- Well, setting the report aside
9   and talking only about the incident described in the
10   report, that is a contact from some other law
11   enforcement agency about a person in custody for an
12   assault and wondering if that person was involved in
13   an assault that was prosecuted earlier or that was
14   going on earlier in Manitowoc County, was there any
15   conversation about that general subject matter that
16   you can recall having with anybody else?
17 A No.
18 Q Did you ever talk to any other people from Brown
19   County about it or any other Brown County law
20   enforcement agency including, for example, the City of
21   Green Bay Police Department?
22 A No.
23 Q Or Ashwaubenon or anybody else?
24 A No, sir.
25 Q Okay.  So, again, I think I'm approaching beating the

### Page 36

1   dead horse, but I just need to make sure that the
2   horse is in fact dead.  There is not any more
3   information that you have right now, today, about the
4   subject matter of the statement contained in 125 than
5   you had at the time you prepared 125; is that true?
6 A That's all I have.
7 Q Okay.  Now let me shift to conversations with anybody
8   in connection with this litigation that's going on
9   now.  Okay?
10 A [Nodding]
11 Q You had some conversation with Sergeant Colborn in
12   which, presumably, you told each other about this
13   process that you're involved in here today.
14 A Yes, sir.
15 Q Is that right?  Do you recall whether you contacted
16   him or he contacted you?
17 A I believe he contacted me.
18 Q Is he still with the sheriff's department?
19 A Yes.
20 Q Okay.  So you're both active members --
21 A Right.
22 Q -- of the sheriff's department today.  And when he
23   approached you, however the contact occurred, whether
24   it was he to you or you to him, was it limited to the
25   question of the existence of a subpoena or did you

Page 37

1     discuss this document? Did you discuss the fact that
2     the events described in 125 had occurred? Did you
3     have any other conversation?
4 A  No, not really. He had mentioned to me that he had
5     gotten some kind of contact that he had to make a
6     deposition, and he asked me if I had any contact and I
7     said yes. I said, "I have no idea what it's about. I
8     wasn't even hired at the time." And he had mentioned
9     something about a phone call. And it still didn't
10    register to me until he came out and he said, "No,
11    it's about that information I gave you about a phone
12    call I got." I said, "Oh, okay." That's how I
13    remembered it. So...
14 Q  And did he say anything about having an improved
15    recollection or increased amounts of information --
16 A  No.
17 Q  -- today as opposed to what he had back then?
18 A  Not to my knowledge.
19 Q  How about conversations with Sheriff Petersen? Was
20    this matter taken up between you and him at any time
21    after September 12th, '03, to your recollection?
22 A  No.
23 Q  So, again, I mean, it's as though as of September 12,
24    '03, sort of a door gets closed on the issue, at least
25    in your mind, and that door isn't opened again until

Page 38

1     the subpoena comes around.
2 A  Correct.
3 Q  And, well, you're not aware of any other person
4     besides Sheriff Petersen, Sergeant Colborn and
5     yourself that has ever had conversation about this or
6     discussion about this; is that right?
7 A  Not to my knowledge.
8 Q  "This" meaning --
9 A  This document.
10 Q  This subject, yeah.
11 A  No.
12 Q  Okay.
13    (Counsel consulting off the record 11:51:10 - 11:52:35)
14 Q  In Exhibit 125, in the third paragraph, quote,
15    "Sergeant Colborn said the detective wanted to speak
16    to someone in the Detective Unit, but Sergeant Colborn
17    can't remember who he advised or passed the
18    information on to." Do you remember that?
19 A  Yes.
20 Q  Okay. Again, that's Sergeant Colborn indicating that
21    the person he recalled as a Brown County detective
22    wanted to speak to someone in the Manitowoc Detective
23    Unit, correct?
24 A  He said whoever he had talked to wanted to speak to
25    someone in the Detective Unit.

Page 39

1 Q  Right. And, again, I think we've already agreed that
2     that's the Manitowoc County Detective Unit that he's
3     referring to?
4 A  That the person he wanted to speak to?
5 Q  Yes.
6 A  Yes, sir.
7 Q  And, in short, he wanted to speak to a Manitowoc
8     County detective who might know something about this
9     other case. I mean, that's what you understood --
10 A  Correct.
11 Q  -- Sergeant Colborn to be saying that the other person
12    had said to Sergeant Colborn.
13 A  Correct.
14 Q  And the testimony that you gave earlier about the
15    composite drawing that -- What's Mr. Kusche's title at
16    the present?
17 A  At that time he was chief investigator.
18 Q  Okay. That Chief Investigator Kusche had in his
19    office, as I understood your testimony toward the end
20    of that discussion, you were thinking that there
21    probably was a photograph there as a comparison point?
22 A  I think there probably was now that I'm thinking about
23    it. There probably was a picture there so you could
24    compare the two.
25 Q  Let me try one other thing, then see if that refreshes

Page 40

1     your recollection at all. Obviously Inspector Kusche
2     would have had to have gotten a description verbalized
3     to him by the victim in the assault, true? In order
4     to prepare the --
5 A  That would be normal procedure.
6 Q  That's the ordinary way of --
7     MS. DOYLE: I'm just going to object. Lack
8     of foundation.
9     BY MR. GLYNN:
10 Q  Sure. And that's the ordinary way that that kind of
11    composite would be prepared?
12 A  Usually from the victim or from a witness or --
13 Q  Sure. Sure. But, I mean, from somebody who says they
14    saw the person.
15 A  Correct.
16 Q  And could it have been that what Inspector Kusche was
17    saying to you was the description he had received from
18    the victim and asking you to compare that to the
19    composite, as opposed to comparing the photograph to
20    the composite?
21 A  No, I think actually it was comparing the photograph
22    to the composite.
23 Q  Okay.
24 A  To see how close they were.
25 Q  Okay. And so what he had was then a photograph of --

Page 41

1 And I take it the photograph was of Mr. Avery?
2 A I believe so. I --
3 Q Yeah. And, again, this was obviously before Mr. Avery
4 had been exonerated of the crime.
5 A Mm-hmm.
6 Q This was, I think you said, in what, like, '98 or '9,
7 something like that?
8 A Somewhere in my first part of coming up in the
9 Detective Unit.
10 Q Yeah. Okay. And at that time, again, I think you've
11 indicated that the Avery case was not something
12 significant to you.
13 A No, sir, not at all.
14 MR. GLYNN: Okay. I think I'm finished.
15 Anybody else have any...
16 MR. BASCOM: I don't have any questions for
17 this witness.
18 MS. DOYLE: I just have one question.
19 E X A M I N A T I O N
20 BY MS. DOYLE:
21 Q I believe you stated that Exhibit 125 was prepared
22 because of a request made by Sheriff Petersen that you
23 prepare a report; is that correct?
24 A Correct.
25 Q Would you have prepared Exhibit 125 if the sheriff

Page 42

1 didn't direct you to prepare a written report

2 regarding your conversation with Colborn?

3 A Probably not.

4 MS. DOYLE: That's all I have.

5 REPORTER: There being nothing further for

6 the record, the deposition is concluded at 11:57

7 a.m. Off the record.

**A**
abbreviation 21:24
able 12:12 33:20
absolutely 30:12
access 30:3
accuracy 15:3 19:5
accurate 18:17 20:13
accurately 24:13
active 9:15,22 36:20
activities 20:4
advise 26:3
advised 25:4 26:1 26:7 38:17
agency 35:11,20
ago 34:5
agreed 39:1
Albee 2:9
allegations 6:16
Allen 11:11,14,21 14:25
allowed 32:5
Amanda 2:14
amounts 37:15
Amy 3:1 33:13,14
analysis 7:11
Andy 16:2
answer 19:23 23:9
anticipated 8:7
anybody 10:8 12:12 26:7 29:9 32:17 35:16,23 36:7 41:15
apparently 17:9
apply 7:23
appointment 30:2
approached 36:23
approaching 35:25
appropriate 18:19
area 22:7
arrangements 9:20
arrested 24:12,17 26:18 27:2
Ashwaubenon 35:23
aside 35:8
asked 37:6
asking 34:7 40:18
aspects 7:6
assault 6:17 12:22 23:4,13,18,19,20 23:21,22,23,24 24:4,7 35:12,13 40:3
associated 7:15
assume 8:17 30:11
attempted 21:2
attention 18:5 19:16 29:25
available 30:8
Ave 2:10 3:3
Avery 1:10 3:13 4:16 5:15 6:16 7:1,10 10:8,23 11:9,22,23 12:4 14:25 16:19 17:16,22 18:14 29:4,7,23 41:1,3 41:11
Avery's 9:16
aware 6:18 7:8 11:3 38:3
awareness 9:15
a.m 42:7

**B**
back 5:25 6:25 9:1 10:19 11:24 15:19,24 16:5 27:23 34:25 37:17
background 4:15
bagging 8:12
Barbara 1:4
Bascom 2:20,21
based 21:1 25:17 26:13 32:1
Bay 35:21
beating 35:25
Beerntsen 6:17
behalf 2:6,12,18 2:24 3:5,11 7:10
believe 4:24 6:3,5 7:21 8:9 30:7,9 31:15 34:1 36:17 41:2,21
believed 24:16
believes 24:11
Bell 4:25
best 14:19 21:20 22:10 23:10,10
beyond 33:20
big 11:5 19:17,24
bit 15:24 18:1 28:12
Boardman 2:15
bottom 16:4
Boulevard 1:7 3:9
Box 2:16
BRO 21:24
brought 18:5 19:15 29:25
Brown 21:22,25 22:7 25:9 26:24 35:18,19 38:21
Budish 2:21
bump 34:10

**C**
C 1:11 2:1
calendar 6:2 13:13
call 21:11,15,16 22:24 30:2 34:6 34:11 37:9,12
caller 21:21 22:6
calling 21:19
capacity 5:6 6:9 7:15
Caption 1:10
Carlson 3:2
case 1:11 4:16 6:16 10:8,14 11:9,21 12:11 12:14,21,22 13:20 16:20 17:16 26:17 27:1,5 28:13 29:4,8,23 32:4 33:6 39:9 41:11
cases 11:18,23 20:4
caused 33:1
Ceman 2:21
certain 7:11 16:2 22:6
certainly 28:11 32:4
certified 8:25
challenge 9:16 10:17
changed 22:17
charge 8:5
chief 12:19 39:17 39:18
circumstances 13:19 16:19 18:20 29:23
City 35:20
close 15:15 19:16 22:4 23:14 40:24
closed 37:24
Cohen 1:4
Colborn 16:2,3,17 17:1,2,9 20:19 21:7,20 22:5,22 22:23,24 24:3,7 24:11,25 25:2,4 25:14,17,21 26:1,2,13,16,20 26:25,25 27:4 28:2 30:6,25 31:17,18,19,20 32:5,11 33:25 34:3,10 36:11 38:4,15,16,20 39:11,12 42:2
Colborn's 20:23
come 8:2,9 9:1 10:2,19 16:5,19 27:23
comes 28:23 38:1
coming 29:9 34:7 34:13 41:8
committed 23:4 24:18
compare 14:5 39:24 40:18
comparing 14:12 40:19,21
comparison 39:21
complete 18:19
completeness 19:5
composite 13:1,2 13:8,19 14:12 14:18 39:15 40:11,19,20,22
concerning 33:24
conclude 21:7
concluded 42:6
connection 36:8
consider 20:15
consulting 38:13
contact 35:10 36:23 37:5,6
contacted 36:15 36:16,17
contained 36:4
content 16:1
continuing 25:1
conversa 35:8
conversation 13:18 15:7 16:3 17:8,12,15,21 18:12,14 31:5 34:2,14 35:15 36:11 37:3 38:5 42:2
conversations 10:12 11:9,10

11:12 12:13
15:2 20:3 36:7
37:19
**convey** 22:20
**conviction** 9:16
10:17
**copy** 6:19
**Corporate** 4:25
**correct** 7:12
10:21 18:17
19:6,10,13 20:5
20:6 21:12,13
21:22,23 22:11
22:14 24:18
25:18,24 26:12
26:21,22 27:19
27:21,22 28:3,6
28:9,14,15,20,25
29:2 30:22 32:8
32:9,12 33:3,16
38:2,23 39:10
39:13 40:15
41:23,24
**correctly** 23:5,7
25:5
**Counsel** 38:13
**County** 1:10 2:18
2:24 3:5 11:1
21:22,24,25
22:7 23:5 25:9
25:22 26:24
35:14,19,19
38:21 39:2,8
**couple** 5:19,25
34:5
**court** 1:12 7:21
10:23
**crime** 7:13,18,22
8:13,15 9:20
10:9 11:25
24:12,17 41:4
**criminal** 19:13,19
**Crivello** 3:2
**crossed** 28:13
**Currently** 6:10
**Curry** 2:15

**custody** 22:16,25
24:17 35:11

---
**D**

**D** 4:1
**daily** 20:4
**date** 10:20 11:25
15:25 16:10,12
**dates** 29:14
**day** 6:19
**days** 34:5
**dead** 36:1,2
**deal** 19:17,24
**December** 5:5,12
**decision** 17:6 28:7
**delegated** 8:23,24
**Denis** 2:18
**department** 5:3,5
5:7 6:15 11:2
12:13 18:24
25:22 29:8
35:21 36:18,22
**deposition** 34:6
37:6 42:6
**describe** 12:25
21:9
**described** 14:3
35:9 37:2
**describes** 16:7
**description** 13:25
14:1,2 40:2,17
**desk** 28:13
**detective** 6:4,6,7
7:16 13:15
21:20 22:6,15
22:15,22,23
23:2 24:6,9,10
24:16 25:2,3,8,9
25:10,20,22
38:15,16,21,22
38:25 39:2,8
41:9
**detectives** 17:13
18:13 34:20
**determining**
28:18

**Detroit** 5:2 18:23
**diminish** 34:21
**direct** 42:1
**directed** 7:20
**direction** 32:24
**directive** 29:4,7,9
29:12
**directly** 7:23 8:2
**discretion** 28:17
**discuss** 37:1,1
**discussed** 29:8,13
**discussion** 33:24
38:6 39:20
**discussions** 10:7
10:14 11:11
**District** 1:12,13
**division** 20:20
**DNA** 7:11 9:15
**document** 9:1,9
9:14 14:18 16:1
30:19 37:1 38:9
**door** 15:16 30:3,5
37:24,25
**Doyle** 3:1 4:4 23:9
24:20 25:13
33:14 40:7
41:18,20 42:4
**drawing** 15:3,13
39:15
**drawn** 12:19
**Drug** 5:20

---
**E**

**E** 2:1,1,10 4:1,10
41:19
**earlier** 14:14
22:13 23:3
**easier** 14:10
**East** 1:7 3:9
**Eastern** 1:13
**education** 12:3
**effort** 18:17
**efforts** 7:5,10
**eight** 22:12 26:10

**either** 8:24 18:23
**elaborate** 14:23
**employment** 4:22
**ended** 16:22
**enforcement** 12:9
18:22,23 28:16
35:11,20
**engaged** 10:7
**event** 19:12 33:1
**events** 16:7 21:8
37:2
**evidence** 6:19
7:11,17 8:3,5,8
8:12 9:18 10:12
11:25
**exactly** 8:1 25:19
26:15 31:21
**EXAMINATION**
4:2
**example** 11:10
34:9 35:20
**exclude** 27:16
**exclusively** 12:6
21:1
**Excuse** 27:4
**exhibit** 4:5 9:9
10:20 11:8
15:21 16:15
18:16 30:14
33:2 34:24
38:14 41:21,25
**exhibits** 4:7
**existence** 20:1
36:25
**exonerated** 19:10
41:4
**exoneration** 10:24
14:24 17:22
**experience** 32:1
**explain** 31:24
**extent** 7:17

---
**F**

**F** 2:2,3 3:7
**fact** 14:25 18:3
26:3,9 29:6 36:2

37:1
**fair** 12:6 20:17
21:6 30:21
**fairly** 11:5
**far** 33:21
**Farm** 5:4
**fashion** 8:13
31:12
**fax** 21:15
**feeling** 32:25
**fellow** 12:8
**Field** 2:15
**file** 33:6
**find** 16:6
**finished** 41:14
**first** 13:14 14:19
16:6 22:17 41:8
**Fitzgerald** 2:9
**five** 14:14
**Fleet** 5:4
**flesh** 18:1
**follow** 9:17 32:10
**follow-up** 34:9
**forgot** 18:8
**forgotten** 18:4
35:7
**form** 19:21
**foundation** 24:21
25:14 40:8
**four** 22:4
**Friday** 33:13
**front** 6:22 14:15
**further** 42:5

---
**G**

**gathered** 10:9
**Gee** 27:8
**Gene** 27:12,13,16
**general** 35:15
**generally** 20:11
**generation** 20:5
**getting** 12:3 35:5
**give** 4:22 7:25
28:23 32:19
**given** 13:22,25
29:3

**Glynn** 2:8,9 4:3
   4:11 5:14,17 9:4
   9:7,8 15:14,20
   19:22 23:12
   24:22 25:16
   40:9 41:14
**go** 7:24 11:23
   15:14 16:5 17:3
   17:7 20:7 28:7
   28:19 29:18
   30:2,6 33:5,6,6
**going** 4:14 7:2
   9:16,23 16:22
   17:14 24:20
   25:13 34:7
   35:14 36:8 40:7
**gotten** 37:5 40:2
**Green** 35:21
**Gregory** 11:11,14
   11:21
**Grimstad** 1:6 3:8
**guesses** 27:8
**guy** 34:15
**guys** 25:24

---

**H**
**hanging** 12:24
**happen** 12:23
**happened** 13:12
   22:12 32:1,3
**happy** 14:21
**head** 10:15 15:9
   35:1
**hindsight** 15:5
**hired** 37:8
**history** 10:14
**horse** 36:1,2

---

**I**
**idea** 37:7
**identified** 15:1,21
**identify** 12:12
**identifying** 27:17
**importance** 19:5
**important** 28:2
   28:18
**improved** 37:14

**incarcerated** 19:9
**incident** 35:9
**including** 35:20
**increased** 37:15
**indicate** 27:20
**indicated** 15:23
   19:18 21:8
   41:11
**indicates** 16:1,4
   26:16
**indicating** 38:20
**inference** 21:6
**information**
   13:22,24 16:18
   25:5 26:2,3,9
   27:21 28:1,2,8
   28:12,23 29:18
   34:23 35:2 36:3
   37:11,15 38:18
**informed** 26:17
   27:1
**Inspector** 40:1,16
**interpreting** 23:7
**investigation** 9:22
**investigative** 7:6
**investigator** 12:19
   39:17,18
**involve** 8:20
**involved** 7:5,17
   11:10,24 12:8
   18:22 35:12
   36:13
**involvement** 4:16
   6:15,24 11:17
**involves** 6:16
**involving** 11:18
   12:21
**issue** 21:14 37:24
**items** 8:12

---

**J**
**J** 2:14 3:1
**jail** 5:25 20:20
   23:4
**jailer** 5:8
**James** 1:2

**job** 28:11,16
**John** 3:7
**Joseph** 1:4
**judgment** 28:18
**justice** 19:13,19

---

**K**
**Kaiser** 2:14
**keeping** 9:23
**Kelly** 2:2,3 4:7,8
   9:5
**kind** 9:23 23:20
   23:21 35:3 37:5
   40:10
**knew** 7:13 19:5,12
   21:3
**knock** 30:2
**knocked** 30:5
**know** 8:18 9:17
   10:16 11:14
   13:2,3 14:1,24
   15:13 18:3,11
   18:12 23:17,24
   26:6,7 27:13
   29:11 31:21
   32:15 34:14
   39:8
**knowledge** 11:20
   11:23 13:2
   23:11 37:18
   38:7
**Kocourek** 3:5,11
**Kusche** 12:19
   13:18 14:17
   15:2 27:12,16
   39:18 40:1,16
**Kusche's** 39:15

---

**L**
**lab** 7:14,18,22
   8:13,15 9:21
   10:10 11:25
**Lack** 24:20 25:13
   40:7
**lasted** 32:14
**law** 12:8 18:22,23
   28:16 35:10,19

**lawyer** 33:15
**lead** 20:4 31:22
**led** 10:24
**left** 31:7 33:17
**Lenk** 1:2 4:12
   34:18
**let's** 4:19 11:23
   17:7 20:7
**lieutenant** 6:5,7
   34:19,20,22
**life** 19:3
**limited** 36:24
**litigation** 36:8
**little** 15:24 18:1
**locating** 9:18
**long** 5:18 32:13
**look** 13:21 15:22
**looked** 8:18 15:11
   15:13
**lost** 13:10
**lots** 20:3,3

---

**M**
**M** 2:8 4:10 41:19
**Madison** 2:17
   8:15,18
**mail** 8:25
**majority** 12:10
**making** 9:20
**Manitowoc** 1:8,10
   2:18,24 3:5,10
   11:1 23:5 25:10
   25:22 35:14
   38:22 39:2,7
**mark** 9:3
**marks** 20:10,11
   20:14
**material** 10:9
**materials** 7:1
**matter** 8:11 12:4
   18:14 19:18
   34:24 35:15
   36:4 37:20
**matters** 4:17
**Mayer** 3:7 19:21
**Mayfair** 2:22

**McCracken** 1:6
   3:8
**mean** 9:17,17
   10:1 13:4 15:5
   19:16,25 20:3
   21:16 23:19
   24:23 25:8,17
   26:23,24 28:5
   28:22 30:1 31:6
   31:25 32:8
   34:21 37:23
   39:9 40:13
**meaning** 25:21
   38:8
**means** 22:5
**media** 12:7,7,11
   19:17
**meeting** 30:23
   31:3 32:14
**members** 36:20
**memo** 12:16
   14:15
**mentioned** 12:17
   12:18 17:2 34:5
   37:4,8
**Mentkowski** 3:2
**Metro** 5:19
**Michigan** 2:4
   4:25,25
**Milwaukee** 2:5,11
   3:4 8:15
**mind** 9:22 14:20
   27:24 29:17
   37:25
**minute** 27:24
**Mm-hmm** 9:19
   10:25 12:20
   17:23 22:19
   23:16 32:17
   41:5
**months** 5:25
**Morning** 4:12,13
**moved** 5:3
**moving** 31:4
**Multiple** 19:20

**N**

N 2:1,22 3:3 4:1
  4:10,10 41:19
  41:19
name 11:14
narrative 16:7
Nash 1:6 3:8
nature 20:16
need 17:13 36:1
needs 28:19
never 11:20,20
  31:7
new 35:2
news 11:5
Nodding 23:8
  36:10
normal 40:5
Normally 8:1
note 22:16
notes 31:9

**O**

O 4:10 41:19
object 24:20
  25:13 40:7
Objection 19:20
obtaining 33:21
obvious 4:19
  28:10
obviously 14:10
  15:5 16:5 21:25
  40:1 41:3
occurred 14:25
  21:9 36:23 37:2
occurs 21:24
offense 15:1 19:9
office 12:24 17:10
  31:4,6,7 39:19
officer 5:9,10,18
  16:17
officers 12:8
oh 4:23 5:19
  19:24 37:12
okay 4:17,18 5:1
  5:10,13,23 6:9
  6:11,21,23 7:20
  8:23 9:1,13 10:1
  10:7,14,19,24
  11:22 12:17
  13:4,8,16 15:14
  15:22 16:13,23
  17:5,20 18:1,6
  18:12 19:24
  20:15 21:1,6,11
  22:10 23:2,13
  23:22 24:3,6,9
  25:7 27:4,14,23
  29:14,17 30:1,8
  30:13 31:8 32:4
  32:21 33:14
  34:7,21 35:8,25
  36:7,9,20 37:12
  38:12,20 39:18
  40:23,25 41:10
  41:14
old 4:19
ongoing 7:1
opened 37:25
opposed 12:7
  13:13 21:12,15
  22:7 23:23 26:6
  31:4 37:17
  40:19
order 7:21,23
  40:3
ordered 28:22
ordinary 40:6,10
original 4:8
outside 29:8

**P**

P 2:1,1
PAGE 4:2,5
paid 19:16
paragraph 24:10
  25:1 26:20
  38:14
part 5:19 17:20
  28:16 30:14
  41:8
particular 32:18
  33:7,8
partly 12:7,7
pass 16:21,24
  26:3,9 27:21
  28:8,11
passed 25:4 26:1
  38:17
Penny 6:17
people 35:18
perpetrator 15:1
person 19:8 21:19
  22:16,24 23:2,3
  24:17 26:11,18
  26:24 27:2,9,10
  28:17 35:11,12
  38:3,21 39:4,11
  40:14
personal 21:12,16
Petersen 16:5,22
  27:21 28:8,13
  29:7 30:4,8,17
  30:20,24 31:1,8
  33:23 37:19
  38:4 41:22
Petersen's 31:4
phone 21:16 34:6
  37:9,11
photo 14:12
photograph 13:1
  13:3,5 39:21
  40:19,21,25
  41:1
phrase 23:13 24:4
physically 8:20
  30:1
picked 35:2
picture 12:18
  14:3,4 15:11
  39:23
Pinckney 2:16
place 16:8,8,11
  17:9 33:7
Plaintiff 2:6,12
Plankinton 3:3
please 4:20 9:3
  15:23 17:7
PO 2:16
point 7:16 29:6,12
  32:8 39:21
Police 5:2 35:21
position 6:12 10:3
positive 13:17
postconviction
  7:4,9
practice 20:10
  32:2 33:5
preparation 11:8
  14:18
prepare 33:1,4
  40:4 41:23 42:1
prepared 13:20
  16:16 18:16
  28:5 30:15,19
  35:3 36:5 40:11
  41:21,25
present 3:13
  22:18 30:24
  39:16
presumably 11:5
  36:12
pretty 25:7
prior 5:2 9:14
  11:14
private 18:23
probably 14:7
  17:3 20:22,23
  21:8 27:11,12
  31:25 32:3,15
  39:21,22,23
  42:3
procedure 40:5
process 10:24
  36:13
promoted 5:24
prosecuted 35:13
put 20:10 23:23

**Q**

question 8:7 9:17
  36:25 41:18
questions 4:14,15
  9:13 32:10
  41:16

**R**

R 2:1
Rd 2:22
read 18:9 24:12
  25:5 26:19
  33:18
reader 21:6
reading 23:5 24:9
really 14:23 15:4
  29:22 37:4
recall 10:11,11
  11:11,19 13:8
  13:18 21:21
  27:5 29:15,16
  30:23 31:2,3,8
  31:10,11,14,15
  33:20,23 34:2
  34:24 35:16
  36:15
recalled 38:21
received 21:11
  40:17
receiving 27:25
recognized 19:8
  28:1
recollection 13:5
  16:11 18:2,3,9
  21:4 22:10 29:6
  30:11,13 32:13
  32:17 37:15,21
  40:1
record 5:14 15:15
  15:17,18,19
  33:14 38:13
  42:6,7
recorded 31:12
referenced 9:2

quick 31:23
quotable 20:13,15
quote 20:10,10,11
  20:14 22:4,5
  23:13,14 38:14
quotes 23:15
quoting 22:2
  23:17 26:23

**referring** 23:22 25:21 39:3
**reflect** 5:14
**reflected** 12:16
**refreshed** 18:10
**refreshes** 39:25
**regarding** 42:2
**register** 37:10
**registered** 9:21
**relate** 4:16 21:2
**related** 4:17 7:11 17:15 18:14
**relating** 21:5
**relation** 8:8
**relationship** 13:12
**relevance** 29:24
**relevant** 16:20 17:6
**remember** 8:16 8:17 25:4 26:1,4 29:11 34:10 35:4 38:17,18
**remembered** 37:13
**remembering** 35:6
**removing** 8:11
**report** 4:6 16:10 19:6,25 20:5,7,8 21:7,17 22:3 23:14 24:23 28:5 30:14 31:18 35:3,6,8 35:10 41:23 42:1
**reporter** 5:16 9:2 9:6 15:17,19 42:5
**reports** 19:2 20:12
**request** 41:22
**respect** 29:4
**retained** 4:7
**retrospect** 15:3
**right** 6:13,14 7:15 10:3 13:7 15:12 17:10 18:15 20:18 22:8,9 25:8 26:18 27:2 29:19 30:10,11 30:12 33:9 36:3 36:15,21 38:6 39:1
**Rivers** 12:22
**road** 5:9,9,10,18 6:1,3
**role** 8:8
**room** 8:5,8,12
**roughly** 5:21 14:14,16 22:12 34:8

---
**S**

**S** 2:1,16
**safe** 20:22
**saw** 12:18 40:14
**saying** 22:22,23 24:18 25:14 26:6,23,25 28:2 31:9,11 32:17 34:14 39:11 40:17
**says** 20:22 21:17 40:13
**sealed** 4:8
**seated** 33:17
**second** 10:16 15:15 24:10 26:19
**Security** 4:25
**see** 10:20 12:23 15:24,25 30:17 33:9,12 34:14 39:25 40:24
**seen** 9:11 15:23
**send** 6:19 7:13 8:3 10:13
**sending** 10:12 11:24
**sent** 4:8 7:22 8:24
**sentence** 22:3
24:10,15 26:19
**September** 9:14 10:19 11:7,15 12:2 15:25 16:8 16:9,9,14 17:8 23:19 27:25 29:10,17 30:3 34:3,9 37:21,23
**sergeant** 5:24 6:1 6:3,4 16:2,3 17:2,9 20:19,23 21:7,20 22:5,22 22:23 24:11,25 25:2,3,9,21 26:13,20,24,25 27:4 28:1 30:6 30:25 31:17,18 31:19,20 32:5 33:25 34:2 36:11 38:4,15 38:16,20 39:11 39:12
**setting** 35:8
**sexual** 6:16 12:21 23:19,22,23
**shak** 15:10
**shaking** 10:15 15:9 35:1
**sheriff** 7:24,24 16:4,21,22 17:3 27:20 28:7,13 28:19 29:7,19 30:4,8,17,20,24 30:25 31:3,6,8 31:19 32:6,10 32:19,24 33:6,8 33:10,23 37:19 38:4 41:22,25
**sheriff's** 5:5,6 6:15 11:2 12:12 18:24 25:22 29:25 36:18,22
**shift** 36:7
**shipment** 10:9
**short** 32:16 39:7
**show** 9:9
**significance** 10:5 32:25
**significant** 19:12 19:18 41:12
**similarly** 7:4
**simple** 8:11
**simply** 10:2 16:9 31:19
**single** 28:11,12
**sir** 7:3 8:14,22 9:25 10:4,6,18 11:13,16 12:1 33:11 35:24 36:14 39:6 41:13
**solved** 26:17 27:1 27:6
**somebody** 7:15 8:23 25:10 26:7 27:1 28:23 40:13
**sorry** 13:10 22:2 34:18
**sort** 12:2 27:16 37:24
**sounds** 10:1 17:18
**source** 27:18
**so-and** 34:15
**speak** 25:2,10 32:5 38:15,22 38:24 39:4,7
**speaks** 25:7
**special** 10:5
**specific** 9:13 10:11 29:14
**specifically** 31:16
**specifics** 29:22
**Spindler** 1:6 3:8
**St** 2:4,16
**stage** 11:2 15:5
**stands** 14:20
**start** 4:19
**started** 5:8
**starting** 4:22
**state** 27:24 28:10 29:17
**stated** 41:21
**statement** 4:6 6:22 18:4 20:5 20:13,16,17 30:21 32:19 33:1,4,8,18,21 36:4
**States** 1:12
**stating** 7:21
**stay** 5:18 31:6
**stayed** 6:9 31:3
**Stephen** 2:8
**Steven** 3:13 4:16 6:16 11:22 17:22
**sticker** 9:10
**stuff** 7:13
**style** 20:8
**subject** 19:15,15 34:4,24 35:15 36:4 38:10
**submitted** 7:10
**submitting** 7:17
**subpoena** 36:25 38:1
**Suhr** 2:15
**summary** 20:16 31:23
**supervising** 28:16
**supervisor** 31:22
**supposed** 21:25
**sure** 8:1,4 13:9,14 14:11,22 17:7 19:25 22:2,4 25:1,16 26:11 27:10,11 28:22 31:25 36:1 40:10,13,13
**suspect** 13:22,24 23:4
**system** 19:13,19
**S.C** 2:3,9,21 3:2

---
**T**

**T** 4:10 41:19
**tabs** 9:23

**take** 6:2 7:8 8:11
   8:23 9:10 11:1
   11:17 12:2
   15:22 16:8
   17:22 18:16
   20:9 22:5 26:8
   29:3 31:22
   33:17 41:1
**taken** 9:20 37:20
**talk** 17:3 27:23,24
   30:10 31:22
   33:13 35:18
**talked** 18:11
   30:20 34:13,15
   38:24
**talking** 16:2,24
   17:1 34:8 35:9
**tasks** 10:2
**technician** 8:3
**telephone** 21:11
   21:15
**tell** 7:20 13:11
   16:15 17:4,14
   18:1,2 20:8 26:2
   29:21 31:19
**telling** 20:19 24:3
   24:15
**tense** 22:18
**term** 20:23,24,25
   23:18
**terms** 27:17 33:5
**testimony** 39:14
   39:19
**Thank** 5:16 15:20
**Thanks** 9:7
**then-time** 12:19
**thing** 9:24 27:11
   39:25
**things** 4:19 28:10
**think** 5:11 17:14
   18:7 24:1,3 30:5
   31:5 34:15
   35:25 39:1,22
   40:21 41:6,10
   41:14
**thinking** 39:20,22

**third** 10:16 38:14
**thought** 16:20,23
   18:19 21:21
   25:8 29:22,24
**time** 4:24 7:2 8:5
   10:8,23 11:5,19
   11:24 13:19
   14:19 16:17
   18:7,22 19:2,17
   22:24 24:4
   27:13 28:21
   30:15,17,23
   33:12,17 34:22
   36:5 37:8,20
   39:17 41:10
**Timothy** 2:20
**title** 6:11 34:19,21
   39:15
**today** 26:10 34:18
   34:23 36:3,13
   36:22 37:17
**told** 12:21 14:2
   21:18 22:9,16
   23:1 24:6,8,11
   25:9,15,17 26:6
   27:5,7 31:20
   32:20 33:21
   36:12
**Tom** 3:5,11
**totally** 35:7
**transcript** 4:8
**transferring** 8:13
**transmission**
   21:15
**transmit** 8:19
**transportation**
   8:21
**true** 7:18,19 8:10
   11:3 12:4,5 13:6
   15:6 19:19 20:1
   20:2 21:25
   25:11,12 27:6,7
   29:1 36:5 40:3
**try** 39:25
**trying** 16:6 20:9
   22:20 23:15

**Tuesday** 1:4
**turned** 14:21
**two** 12:22 39:24

**U**

**Uh-uh** 15:9
**understood** 24:24
   24:25 39:9,19
**Unit** 5:20 6:4,6,7
   7:16 13:15 25:3
   25:11,20,22
   38:16,23,25
   39:2 41:9
**United** 1:12
**unrelated** 17:21
**use** 20:11,13
   23:13,14 28:17
**usually** 8:2 20:13
   31:21,22 40:12

**V**

**v** 1:10
**vague** 16:18
**Venue** 1:12
**verbalized** 40:2
**verbatim** 20:9
**victim** 40:3,12,18
**visit** 21:12,16
**Vogel** 2:18

**W**

**W** 2:4
**Waldo** 1:7 3:9
**wall** 12:24
**Walter** 2:2,3
**want** 15:15
**wanted** 25:2,10
   38:15,22,24
   39:4,7
**wasn't** 6:18 17:18
   22:6 26:10
   27:11 28:11
   31:14 37:8
**Wauwatosa** 2:23
**way** 10:3 17:15
   26:5,8 40:6,10
**went** 5:25 16:4

   18:2 27:20 30:5
   30:7,17 31:7,21
   33:8,9
**we've** 14:15 17:8
   39:1
**When's** 33:12
**WI** 1:8 2:5,11,17
   2:23 3:4,10
**Wisconsin** 1:13
   2:10
**witness** 1:1 40:12
   41:17
**wondering** 9:22
   14:8 15:7 35:12
**words** 22:4 23:17
**work** 7:25
**worked** 5:2,4,8
**working** 4:24
   20:20
**wouldn't** 8:18
   27:12
**writing** 20:8
**written** 19:2 42:1
**wrote** 16:10 20:12
   24:2

**X**

**X** 4:1,10 41:19

**Y**

**yeah** 8:24 13:23
   14:6,9,16 19:24
   23:10 24:9
   25:20 28:21
   30:13 38:10
   41:3,10
**year** 5:4,11
**years** 5:19 6:2
   14:14 18:25
   19:9 22:12 23:3
   26:10

**#**

**#1140** 2:22
**#400** 2:4
**#410** 2:16
**#500** 3:3

**0**

**03** 6:7 10:19 15:25
   29:10 37:21,24
**04** 1:11

**1**

**1** 2:16
**10/11/2005** 1:4
**11:00** 1:4
**11:23** 15:18,18
**11:51:10** 38:13
**11:52:35** 38:13
**11:57** 42:6
**12** 11:7 37:23
**12th** 11:15 15:25
   16:8,9,9,14 17:8
   27:25 29:10,18
   34:3 37:21
**125** 4:6 9:4,10
   10:20 11:8
   14:15 15:21,22
   16:15 18:16
   30:15,19 33:2
   34:24 36:4,5
   37:2 38:14
   41:21,25
**15** 4:6
**18** 19:9
**1980** 4:23,24
**1988** 6:25
**1995** 20:20,22,23
   21:3,8

**2**

**20/20** 15:5
**2001** 7:9
**2002** 6:19 7:8
**2003** 6:6 7:8 9:15
   11:15 12:2
   23:19 27:25
   30:4 34:3,9,25
**201** 1:7 3:9
**2600** 2:22

**4**

**4** 4:3
**41** 4:4

| 5 |
|---|
| **526** 2:10 |
| **53202** 2:11 |
| **53203** 3:4 |
| **53226-1308** 2:23 |
| **53233** 2:5 |
| **53701-0927** 2:17 |
| **54220** 3:10 |
| **56** 4:21 |

| 7 |
|---|
| **700** 2:4 |
| **710** 3:3 |

| 8 |
|---|
| **88** 5:3,5 |
| **89** 5:12 |

| 9 |
|---|
| **9** 41:6 |
| **9/12/03** 4:6 10:20 |
| **92** 5:22 6:3 |
| **927** 2:16 |
| **93** 6:6 |
| **95** 21:4 |
| **95-96** 7:4 |
| **98** 6:5 13:15 41:6 |
| **986** 1:11 |