# **Exhibit 19**

United States District Court

Eastern District of Wisconsin

_____

**Avery v. Manitowoc County**

04 C 986



Videotape Deposition of

**Eugene Kusche**

Recorded 10/26/2005 in Manitowoc, WI

09:35 a.m. - 1:10 p.m., 191 mins. elapsed

_____

**Magne-Script**

(414) 352-5450

Page 1

(1) Witness

(2) Eugene Kusche

(3)

(4) Wednesday 10/26/2005 at by: Barbara Cohen Joseph

(5)

(6) Nash, Spindler, Grimstad & McCracken

(7) 201 East Waldo Boulevard

(8) Manitowoc, WI

(9)

(10) Caption: Avery v. Manitowoc County

(11) Case No.: 04 C 986

(12) Venue:   United States District Court

(13)        Eastern District of Wisconsin

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

Page 2

(1)          A P P E A R A N C E S

(2) Walter F. Kelly

(3) Walter F. Kelly, S.C.

(4) 700 W. Michigan St. #400

(5) Milwaukee, WI 53233

(6) On behalf of the Plaintiff

(7)

(8) Stephen M. Glynn

(9) Glynn, Fitzgerald & Albee, S.C.

(10) 526 E. Wisconsin Ave.

(11) Milwaukee, WI 53202

(12) On behalf of the Plaintiff

(13)

(14) Amanda J. Kaiser

(15) Boardman, Suhr, Curry & Field

(16) 1 S. Pinckney St. #410, PO Box 927

(17) Madison, WI 53701-0927

(18) On behalf of Denis Vogel and Manitowoc County

(19)

(20) Timothy A. Bascom

(21) Bascom, Budish & Ceman, S.C.

(22) 2600 N. Mayfair Rd. #1140

(23) Wauwatosa, WI 53226-1308

(24) On behalf of Manitowoc County

(25)

Page 3

(1) Raymond J. Pollen

(2) Crivello, Carlson & Mentkowski, S.C.

(3) 710 N. Plankinton Ave. #500

(4) Milwaukee, WI 53203

(5) On behalf of Tom Kocourek and Manitowoc County

(6)

(7) Terri L. Weber

(8) Nash, Spindler, Grimstad & McCracken

(9) 201 East Waldo Boulevard

(10) Manitowoc, WI 54220

(11) On behalf of Tom Kocourek

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

Page 4

(1) I N D E X

(2) EXAMINATION BY PAGE NO.

(3) Mr. Kelly . . . . . . . . . . . . . . . . . . . . . 4

(4) EXHIBIT NO. PAGE NO.

(5) 153 - Subpoena. . . . . . . . . . . . . . . . . . 5

(6) 154 - Framed composite and two mug shots. . . . . 7

(7) 155 - Order for releasing composite 11/14/98 and

(8) photographs to Gene Kusche . . . . . . . . . 9

(9) 156 - Mug shot #7652, City of Manitowoc P.D. . . . 12

(10) (Exhibits 153, 155 and 156 retained by Mr. Kelly;

(11) (Exhibit 154 retained by Mr. Pollen)

(12) = = = = = = = = = = =

(13) E X A M I N A T I O N

(14) BY MR. KELLY:

(15) Q  Mr. Kusche, my name is Walter Kelly, as you

(16) heard. I'm one of the two lawyers representing

(17) Steven Avery, and I'm going to have some

(18) questions for you today that encompass the period

(19) of time since his case – the case against him

(20) involving the assault of Penny Beerntsen in the

(21) mid-1980s and right down to today. Have you ever

(22) been deposed before?

(23) A  Yes, I have.

(24) Q  Okay. So you're familiar –

(25) A  Sure.

## Page 5

(1) Q – with the basic principles. Would you tell me your
(2) current address, please?
(3) A My current address is 2001 South 10th Street,
(4) Manitowoc, Wisconsin.
(5) Q And what's your phone number at home?
(6) A (920) 684-7095.
(7) Q And would you tell me your date of birth and age,
(8) please?
(9) A January 26, 1946. I'm 59.
(10) Q And as I understand it, you're retired from the
(11) Manitowoc County Sheriff's Department?
(12) A That's correct.
(13) Q When did you retire?
(14) A May 10th, 2003.
(15) (Exhibit 153 identified)
(16) Q I'm going to show you what's been marked as
(17) Exhibit 153. Ask you to take a moment and
(18) examine that.
(19) A Yes.
(20) Q You recognize that to be a copy of the subpoena
(21) that was served on you for your testimony here
(22) today?
(23) A That is correct.
(24) Q And that was as a result of a conversation
(25) between you and me involving the establishment of

## Page 6

(1) a time and date for your testimony.
(2) A That's correct.
(3) Q Okay. There's a request for the production of
(4) documents and things as part of that subpoena.
(5) Do you see that?
(6) A Yes, sir.
(7) Q Okay. Have you brought anything today in
(8) response to that?
(9) A Yes, sir.
(10) Q What have you brought?
(11) A I brought a composite sketch, framed, with a
(12) photograph from that case and a photocopy of a
(13) mug shot of Gregory Allen.
(14) Q Okay.
(15) *MR. KELLY: Let's take a moment and mark*
(16) *those.*
(17) *MR. POLLEN: There's also a copy of the*
(18) *order releasing a copy of the composite sketch to*
(19) *Mr. Kusche, I assume:*
(20) *MR. KELLY: Okay.*
(21) *MR. POLLEN: Well, you can look at it, but I*
(22) *don't think you need to mark that.*
(23) *MR. KELLY: Let's go off the record for a*
(24) *moment, Barbara.*
(25) *REPORTER: Off the record.*

## Page 7

(1) *(Off the record 9:39 - 9:41)*
(2) *REPORTER: Back on the record.*
(3) (Exhibit 154 identified)
(4) *BY MR. KELLY:*
(5) Q Mr. Kusche, I have one large framed photograph
(6) and composite drawing, and I'm going to ask your
(7) counsel if we could bring that up on the table
(8) and put it in camera range, and then I'm going to
(9) ask you just a few questions about it.
(10) A Yes, sir.
(11) Q We've marked this as Exhibit 154 on the back, and
(12) you've brought that today in response to the
(13) Subpoena, Exhibit 153; is that right?
(14) A That's correct.
(15) Q On the front of this exhibit, there is what
(16) appears to be a composite drawing, and then below
(17) it two photographs of Steven Avery. And it
(18) appears that the composite drawing is marked with
(19) Exhibit 26. Do you see that?
(20) A That's correct.
(21) Q Okay. I notice on another document that you
(22) brought today that there is a reference to the
(23) photographs that appear below the composite
(24) drawing as being Exhibit 22 in the original
(25) criminal proceedings.

## Page 8

(1) A Correct.
(2) Q And yet there's no exhibit sticker on the
(3) photograph comparable to the one that's on the
(4) composite drawing; is there a reason for that?
(5) A It may be on the back. I do not know.
(6) Q All right. The photograph that appears on the
(7) bottom, is that a booking photograph?
(8) A What we call a mug shot, yes.
(9) Q Okay. And is that a blow up of the original mug
(10) shot, or is that the size of the original mug
(11) shot?
(12) A That's an enlargement.
(13) Q All right. Who did that enlargement?
(14) A I do not know.
(15) Q Okay. Was that enlargement, Exhibit 22, at the
(16) original criminal trial?
(17) A I believe so.
(18) Q Okay. So it was not a smaller actual mug shot,
(19) it was the blow up of the mug shot that was used
(20) at the original trial?
(21) A I know it was used in the trial. I do not know
(22) if the smaller one was used also.
(23) Q All right. Who prepared this framing and
(24) composition with the composite drawing at the top
(25) and the two photos at the bottom?

Page 9

(1) A  Manitowoc Art and Supply.

(2) Q  Okay. And did they do that at your request?

(3) A  That's correct.

(4) Q  When was that done relative to the completion of

(5) the trial?

(6) A  Oh, 13 years later.

(7) Q  In the interim period of time, did you have

(8) possession of both the composite drawing and the

(9) photograph?

(10) A  No, sir.

(11) Q  Who did?

(12) A  The court.

(13) (Exhibit 155 identified)

(14) Q  Okay. I want to show you what's been marked as

(15) Exhibit 155 and ask you if you would tell me what

(16) that is.

(17) A  This is an order for releasing the exhibit,

(18) issued by the court, Judge Hazelwood, releasing

(19) the photograph and the composite to me.

(20) Q  All right. And that's dated when?

(21) A  Fourteenth day of October, 1998.

(22) Q  Okay. Are you able to discern, as you look at

(23) Exhibit 154, the date of the photograph that was

(24) taken of Steven Avery that's at the bottom of the

(25) page? Or bottom of the exhibit, rather.

Page 10

(1) A  Let's look at that. Excuse me.

(2) Q  Specifically, does it look like –

(3) A  January 3rd, 1985.

(4) Q  Okay. So that would be a booking photograph that

(5) was taken when Steven Avery was arrested in

(6) January of 1985 with respect to an endangerment

(7) charge involving a woman named Sandra Morris?

(8) MR. POLLEN:  Object on foundation. Go

(9) ahead, sir, if you know.

(10) BY MR. KELLY:

(11) Q  If you know.

(12) A  I wouldn't know.

(13) Q  Okay. I've forgotten the answer, so forgive me.

(14) Did you cause this to be framed?

(15) A  Yes, sir.

(16) Q  Okay. Why did you do that?

(17) A  It was my first drawing, my first composite. It

(18) was the only one I ever did that was used in a

(19) court case, and I thought it would make a

(20) interesting display in my office.

(21) Q  In the course of dis– You did display this in

(22) your office?

(23) A  Yes, sir.

(24) Q  And for what period of time did you display it in

(25) your office?

Page 11

(1) A  I think it went up early part – or early half of

(2) 1999, until I retired in 2003.

(3) Q  And after you retired in 2003, did you display it

(4) in your home?

(5) A  It was not hung on the wall. On a couple of

(6) occasions, it was sitting out and then it was put

(7) away.

(8) Q  In the course of time between when you first

(9) displayed it in your office and down to today,

(10) have there been occasions when you have told

(11) people who were viewing it that you were proud of

(12) the resemblance between the photograph of Steven

(13) Avery and the composite drawing?

(14) A  I don't know if the word "proud" would be

(15) appropriate. I found it interesting that they

(16) were very close, yes.

(17) Q  Okay. You now know, of course, that the person

(18) who was described to you by Penny Beerntsen as

(19) being her assailant is not the man who is in the

(20) photograph on the bottom of Exhibit 154?

(21) A  No, I don't.

(22) Q  You assert that Steven Avery is the person who

(23) attacked her?

(24) A  I do not know.

(25) Q  Well, you –

Page 12

(1) A  So I do not know that he is not the person. You

(2) asked me if I knew. No, I don't. I don't know.

(3) Q  You don't know that DNA has exonerated Mr. Avery

(4) and inculpated Mr. Allen?

(5) A  I have heard that it has. I do not know. I have

(6) not seen any reports. I have not seen where the

(7) evidence came from. I do not know is what I'm

(8) saying.

(9) Q  Okay.

(10) A  As a personal knowledge.

(11) (Exhibit 156 identified)

(12) Q  Okay. This has been marked as Exhibit 156. You

(13) also brought that today in response to the

(14) subpoena?

(15) A  Yes, sir.

(16) Q  What is that?

(17) A  This is a mug shot from the City of Manitowoc

(18) Police Department, No. 7652.

(19) Q  How did you come into possession of that?

(20) A  I requested a copy from the City of Manitowoc.

(21) Q  When did you do that?

(22) A  June of this year.

(23) Q  Why did you do that?

(24) A  I was told that it was there.

(25) Q  By whom were you told that?

## Page 13

(1) A  I believe by Sheriff Petersen.

(2) Q  What did Sheriff Petersen tell you was there?

(3) A  A photograph of Gregory Allen with a beard.

(4) Q  And for what reason was that important enough to

(5) you for you to request it?

(6) A  Because of the release of Avery and the statement

(7) this was the actual individual. And I wanted to

(8) see how he compared with the sketch.

(9) MR. KELLY:  Could we have the sketch and the

(10) photograph of Avery brought back in camera range?

(11) Q  Mr. Kusche, would you hold up the mug shot of

(12) Gregory Allen?

(13) A  [Complies]

(14) A  And I take it that after you obtained Exhibit 156, you

(15) did make the comparison that you were curious about?

(16) A  Yes, sir.

(17) Q  Between Gregory Allen and the composite?

(18) A  Yes, sir.

(19) Q  And what's your judgment about that?

(20) MR. BASCOM:  I'm going to object to the form

(21) of the question.

(22) MS. WEBER:  And I'll object as well.

(23) BY MR. KELLY:

(24) Q  You can answer. How does it compare, especially

(25) as compared with the comparison you've already

## Page 14

(1) made between Steven Avery and the drawing?

(2) MR. BASCOM:  Same objection.

(3) BY MR. KELLY:

(4) Q  In your mind.

(5) MR. BASCOM:  Same objection.

(6) MS. WEBER:  And I join.

(7) BY MR. KELLY:

(8) Q  You can answer.

(9) A  Well, I have been instructed not to answer if

(10) there's an objection all my career, so I have to

(11) –

(12) MR. BASCOM:  No, I'm making an objection for

(13) the record so that –

(14) WITNESS:  Oh.

(15) MR. BASCOM:  – at the time of trial, the

(16) judge can make –

(17) WITNESS:  Okay.

(18) MR. BASCOM:  – a ruling as to whether or

(19) not that's an appropriate question for you to

(20) answer. Unless your lawyer tells you not to, go

(21) ahead, if you can, answer the question.

(22) WITNESS:  Oh, okay. You're talking to an

(23) old cop who is –

(24) MR. BASCOM:  I understand.

(25) WITNESS:  I was trained not to talk – an

## Page 15

(1) objection.

(2) MR. BASCOM:  You're not that old. You're

(3) talking to an old lawyer too.

(4) A  I found significant differences between Gregory

(5) Allen and my sketch.

(6) BY MR. KELLY:

(7) Q  Okay. And how about as between Gregory Allen and

(8) your sketch and Steven Avery and your sketch, how

(9) do they compare relatively, in your mind?

(10) MR. BASCOM:  Same objection.

(11) MR. POLLEN:  I object to form too.

(12) BY MR. KELLY:

(13) Q  You may answer.

(14) MS. WEBER:  And I join.

(15) MR. BASCOM:  Go ahead if you understand.

(16) A  Okay. I found that Steven Avery was closer in

(17) appearance to my sketch from a composite sketch

(18) view. You have to understand, a composite is not

(19) a portrait, and the impact of the total sketch is

(20) closer to Steve Avery than to Gregory Allen.

(21) BY MR. KELLY:

(22) Q  Any other differences that you noted with respect

(23) to Gregory Allen in comparison of Exhibit 156 and

(24) your composite drawing in 154?

(25) A  What do you mean by...

## Page 16

(1) Q  Any other differences? You said you had noticed

(2) differences between Gregory Allen and your

(3) composite sketch.

(4) A  Are you asking specifically what I see here is

(5) different?

(6) Q  What you think is different between the composite

(7) and the Gregory Allen mug shot.

(8) A  The receding hair line, the hair, the beard

(9) [indicating on self and photo]. You have to

(10) understand, this – I was told this photo –

(11) Q  When you say "this," I'm going to ask you if you

(12) would, just for the sake of the record, to put

(13) the mug shot that you're talking about in front

(14) of the camera while you're talking.

(15) A  Okay.

(16) MS. WEBER:  That's fine.

(17) A  I was told that this was the closest one we had

(18) in time to the sketch, but this was a year later,

(19) and there are differences in hair that could

(20) occur within one year. So whether he looked more

(21) like this at the time, I don't know. I'm going

(22) by this picture.

(23) BY MR. KELLY:

(24) Q  Okay. That's fine. Thank you. We can take it

(25) down now. [Exhibit No. 154 removed from table]

Page 17

(1) Mr. Kusche, in addition to Exhibits 154, 155

(2) and 156, have you brought any other documents

(3) with you responsive to the Subpoena, Exhibit 153?

(4) **A** No, sir.

(5) **Q** At any time in the past, between today and

(6) January 1 of 1985, have you had in your

(7) possession, as distinct from the official

(8) possession of the department, any of the

(9) documents called for in Exhibit 153?

(10) **A** Yes.

(11) **Q** Which ones have you at some time had?

(12) **A** I've had reports. I had a photo of Penny

(13) Beerntsen, newspaper clippings, I believe

(14) petitions from the – for evidence. Copies

(15) thereof rather, not the originals. All the

(16) things I would have would be copies.

(17) **Q** Anything else you recall that you had?

(18) **A** I think that would be about it.

(19) **Q** Those things that you just enumerated, did you

(20) have them at your home after you retired?

(21) **A** No.

(22) **Q** Did you have them at your office while you were

(23) working for the department?

(24) **A** Yes.

(25) **Q** And when you retired, did you turn over whatever

Page 18

(1) you had to the department?

(2) **A** Everyth– I left several files full of cases, my

(3) files, my personal files.

(4) **Q** All right. Were there any of your personal files

(5) that you took with you when you went into

(6) retirement?

(7) **A** Cases?

(8) **Q** Anything of any kind.

(9) **A** Oh, I took a lot of papers with me.

(10) **Q** Okay. Anything else?

(11) *MR. BASCOM: Can I just have some*

(12) *clarification, Walter? Are you talking about*

(13) *relative to this case or anything?*

(14) *MR. KELLY: I'll get to that.*

(15) **A** I took equipment that I used, things on my desk,

(16) things on my wall, plants. I pretty much cleared

(17) my office out except – uniforms, I took.

(18) Firearms. Except for old cases, I think I took

(19) pretty much everything out of there.

(20) **Q** Okay. Amongst the things that you took,

(21) including what you characterized as lots of

(22) papers, were there any of the things that are

(23) called for in Exhibit 153?

(24) **A** Not that I'm aware of.

(25) **Q** Okay. So your best recollection is that anything

Page 19

(1) that you had pertaining to Steven Avery, Gregory

(2) Allen, the sexual assault of Penny Beerntsen,

(3) stayed with what you left behind when you left

(4) the department.

(5) **A** Right. They would have been working files. Right.

(6) **Q** Okay. So the only thing that you retained after

(7) that are the exhibits that we've already marked

(8) today.

(9) **A** That's correct.

(10) **Q** When you refer to working files, would you tell

(11) me what you mean by that?

(12) **A** It would be a file in which I kept correspondence

(13) to me, memos, my notes, copies of my report,

(14) things of that nature.

(15) **Q** All right. Do you recall whether, when you left

(16) the department, you had a working file involving

(17) the Penny Beerntsen sexual assault and the Steven

(18) Avery prosecution?

(19) **A** Not of the prosecution itself, no.

(20) **Q** What did you have?

(21) **A** I had a postconviction investigation file

(22) involving some interviews I took – I conducted.

(23) **Q** These were interviews you conducted around 1995

(24) and 1996 when there were postconviction

(25) proceedings going on?

Page 20

(1) **A** That's correct.

(2) **Q** And these were interviews of other officers in

(3) the department?

(4) **A** That's correct.

(5) **Q** And were you directed to do those investigatory

(6) interviews by anybody?

(7) **A** Yes, sir.

(8) **Q** By whom?

(9) **A** By the then district attorney, Jim Fitzgerald.

(10) **Q** Other than that file, did you have any other

(11) working files, or other files for that matter,

(12) concerning the sexual assault of Ms. Beerntsen,

(13) Steven Avery and/or Gregory Allen?

(14) **A** I don't believe so.

(15) **Q** Okay. Do you know what became of your

(16) postconviction investigation file?

(17) **A** No.

(18) **Q** Earlier in your testimony you said that at one

(19) time you had materials, including reports, a

(20) photograph of Penny Beerntsen, news clips,

(21) petitions for evidence. Do you remember that?

(22) **A** Yes.

(23) **Q** Where did you have that?

(24) **A** The news clips and petition for evidence would

(25) have been in my work– postconviction working

(1) file. [Coughing] Excuse me. The photograph was
(2) one that never went to court, but that Penny
(3) Beerntsen wanted. And we just never connected in
(4) getting it to her, so it was in my office. I
(5) think it was in a storage room.
(6) Q  All right. And how about the reports that you
(7) talked about?
(8) A  That would have been the postconviction reports.
(9) Q  Okay. Did you –
(10) A  Unless you mean other than Beerntsen case – or
(11) Avery case? I had other report –
(12) Q  No.
(13) A  Okay. Just – okay.
(14) Q  No. I'm talking – Well, and I'm including
(15) Gregory Allen.
(16) A  I had no knowledge of Gregory Allen.
(17) Q  Okay. Did you turn over the materials that
(18) you've described to us to anybody when you
(19) retired?
(20) A  They were left in my office.
(21) Q  And do you know who was responsible for what was
(22) left in your office?
(23) A  Detective Lieutenant Jim Lenk took over.
(24) Q  Okay. When you and I talked on the phone, you
(25) said that it would be necessary for you to

(1) reschedule a rehabilitation session that you had
(2) –
(3) A  Yes.
(4) Q  – set for this morning. Do you remember that?
(5) A  Yes.
(6) Q  What kind of rehabilitation is that?
(7) A  It's in the pool at the Y. I wear a brace for
(8) leg problems.
(9) Q  Okay. Are you presently medicated at all? I
(10) mean here, today?
(11) A  Yes, I have taken medications.
(12) Q  Okay. Would you tell me what those medications
(13) are? I mean, you don't have to give me the long
(14) name. What are they –
(15) A  I can – I have a lot, so, you know, I have a
(16) list.
(17) Q  Okay. All right.
(18) A  Is this really important? I don't know, because
(19) sometimes personal –
(20) Q  You'll see when I ask you the follow-up question.
(21) A  Okay.
(22) Q  Matter of fact, let's go off the record.
(23) *REPORTER:  Off the record.*
(24) (Off the record 9:59 - 10:00)
(25) *REPORTER:  Back on the record.*

(1) *BY MR. KELLY:*
(2) Q  Mr. Kusche, when we've been off the record, we've
(3) – you've had the opportunity to examine your
(4) medication schedule. I want to ask you just one
(5) question. In your understanding of yourself as
(6) you have been medicated, is there any impairment
(7) of your memory function here today?
(8) A  Not to my knowledge.
(9) Q  Okay. I believe you told me earlier that you
(10) retired in 2003 from the sheriff's department?
(11) A  That is correct.
(12) Q  Do you remember when in 2003?
(13) A  May 10th was my last working day.
(14) Q  Okay. How long had you been in law enforcement
(15) prior to your retirement date, roughly?
(16) A  I started as a young military policeman in Saigon
(17) in 1965.
(18) Q  Okay. And when did you start with Manitowoc
(19) County Sheriff's Department?
(20) A  February 12th, 1979.
(21) Q  Before that, had you been working in law
(22) enforcement elsewhere?
(23) A  Yes.
(24) Q  Where?
(25) A  When I got out of the military, I went to work

(1) for the Kenosha Police Department. Then I went
(2) to the State Attorney General's Office, Division
(3) of Criminal Investigation. I went back to
(4) school, and then I went to the Columbia County
(5) District Attorney's Office as a
(6) paralegal/criminal investigator. Then I went as
(7) an investigation supervisor for the southeastern
(8) district of the state for consumer protection.
(9) And then I went to Manitowoc.
(10) Q  Okay. I'm going to take them one by one. About
(11) how long were you with the Kenosha P.D.?
(12) A  A little over two years.
(13) Q  Okay. And with the State Division of Criminal
(14) Investigation?
(15) A  About the same time.
(16) Q  Did you specialize in any kinds of investigations
(17) when you were with the state?
(18) A  Narcotics.
(19) Q  Okay. You then remarked that you went back to
(20) school.
(21) A  Yes.
(22) Q  What schooling was that?
(23) A  Gateway Technical Institute in Kenosha.
(24) Q  And what did you – Did you obtain a degree
(25) there?

## Page 25

(1) **A** There I obtained the associate degree.

(2) **Q** Okay. And for how long did that last?

(3) **A** I'm trying to think. Maybe a year or so, a year

(4) and a half. Then I went to Columbia County and

(5) that was for three years. I left there in, I

(6) believe, '77.

(7) **Q** Did you specialize in any particular kinds of

(8) investigations when you were with Columbia

(9) County?

(10) **A** Basically postcase investigations, things that

(11) needed additional investigation after the local

(12) police departments presented their cases to the

(13) district attorney.

(14) **Q** Okay.

(15) **A** Or something of very severe nature.

(16) **Q** You say of a very severe nature?

(17) **A** Yeah, if it was something that they needed

(18) assistance on, I would assist them.

(19) **Q** Okay. And then you mentioned working with the

(20) southeastern district of the state. Would you

(21) tell us what that is?

(22) **A** That was with the Department of Agriculture,

(23) Trade and Consumer Protection. I was an

(24) investigation supervisor out of the Milwaukee

(25) office for consumer protection investigations.

## Page 26

(1) **Q** Okay. About how many people did you supervise?

(2) **A** Five.

(3) **Q** And how long were you in that position?

(4) **A** About a year.

(5) **Q** Would you tell me your educational history,

(6) please?

(7) **A** Well, I have the associate degree. Then I

(8) received a bachelor's degree through Mount

(9) Scenario College. And I've had many hours of

(10) specialized training, many hours.

(11) **Q** Any of your specialized training involve training

(12) with respect to exculpatory evidence?

(13) **A** N–

(14) *MR. BASCOM: I'm going to object to the form*

(15) *of the question.*

(16) *BY MR. KELLY:*

(17) **Q** You can answer.

(18) **A** I really don't understand how you mean it. I

(19) mean...

(20) **Q** In the course of your education, were you trained

(21) with respect to what exculpatory evidence is and

(22) what your obligations are as a police officer –

(23) **A** Oh, of course.

(24) **Q** – with respect to it?

(25) **A** Yes.

## Page 27

(1) **Q** Where were you trained in that regard?

(2) **A** Well, I mean, it's generalized training. It's

(3) not – I can't tell you exactly what class it was

(4) in.

(5) **Q** When you say it's generalized training, do you

(6) mean it's well known –

(7) **A** Yes.

(8) **Q** – within professional law enforcement?

(9) **A** Of course.

(10) **Q** Okay.

(11) *MR. POLLEN: I need you to slow down. Let*

(12) *him get his question out first –*

(13) *WITNESS: Yes, sir.*

(14) *MR. POLLEN: – pause for a moment and then*

(15) *answer, so we have a clear record. Okay?*

(16) *WITNESS: Yes, sir.*

(17) *BY MR. KELLY:*

(18) **Q** We've had some testimony in this case about the

(19) positions you held in the Manitowoc County

(20) Sheriff's Department. So I would like it, if you

(21) would, to tell us, over the course of your

(22) history from 1979 to 2003, what positions you

(23) held in the Manitowoc County Sheriff's

(24) Department.

(25) **A** I started as chief deputy.

## Page 28

(1) **Q** Who hired you for that job?

(2) **A** The county.

(3) **Q** Any particular chief involved in that, or

(4) sheriff?

(5) **A** Well, when I started the process, it was Sheriff

(6) George Wanish. When the process was completed,

(7) it was Tom Kocourek.

(8) **Q** Okay. So you were chief deputy for a period of

(9) time?

(10) **A** That's correct.

(11) **Q** From when to when?

(12) **A** In function, from 1979 to 1985.

(13) **Q** And are you distinguishing between in function

(14) and something else?

(15) **A** With title, yes. I held the title for another

(16) year.

(17) **Q** Until 1986?

(18) **A** Correct.

(19) **Q** And after 1986, what position did you hold?

(20) **A** I was lieutenant on the patrol division.

(21) **Q** And between 1986, when you became lieutenant in

(22) the patrol division, and May of 2003, when you

(23) retired, did you hold any other positions?

(24) **A** Yes, sir.

(25) **Q** And what were those?

## Page 29

(1) A  I was chief investigator.

(2) Q  When did that position occur?

(3) A  1989, I believe.

(4) Q  So when you retired, you retired as chief

(5) investigator.

(6) A  That's correct.

(7) Q  First of all, what caused you to retain the title

(8) but not the function of chief deputy between 1985

(9) and 1986?

(10) A  Sheriff's order.

(11) Q  And what was the reason for that order?

(12) A  I do not know.

(13) Q  Okay. At the same time that you retained the

(14) title of chief deputy but not the function, did

(15) someone else assume the function of chief deputy?

(16) A  Yes.

(17) Q  And who was that?

(18) A  Vern Klement.

(19) Q  And what title did he have while you were holding

(20) the title of chief deputy?

(21) A  Undersheriff.

(22) Q  And who caused that to occur?

(23) A  I presume the sheriff.

(24) Q  Are you saying you don't know?

(25) A  I was not party to how it was done, no.

## Page 30

(1) Q  Did you have knowledge of why it was done?

(2) A  Why it was done?

(3) Q  Yeah.

(4) A  Because the sheriff wanted it.

(5) Q  Arising out of what circumstances?

(6) A  I do not know.

(7) Q  Okay. What caused you to lose the title of chief

(8) deputy in 1986 and move into the position of

(9) lieutenant in the patrol division?

(10) A  The –

(11) MR. POLLEN:  Object to the form of the

(12) question, phrase "lose the title." But go ahead,

(13) sir.

(14) BY MR. KELLY:

(15) Q  You can answer.

(16) A  The position was eliminated by action of the

(17) county board.

(18) Q  And do you know what caused that to occur?

(19) A  I was not party to any of that, so I do not know.

(20) Q  Your testimony, regardless of whether or not

(21) you're a party, is you have no knowledge of –

(22) A  I have no knowledge of why.

(23) Q  Okay.

(24) A  I – No knowledge, no.

(25) Q  What, you have some understanding or belief?

## Page 31

(1) A  It's nothing I could testify to. It's just that

(2) – speculation in my own mind.

(3) Q  What's your speculation?

(4) MR. BASCOM:  Object to the form.

(5) MR. GLYNN:  Excuse me. Let's go off the

(6) record for a second.

(7) REPORTER:  Off the record.

(8) (Off the record 10:09 - 10:11)

(9) REPORTER:  Back on the record.

(10) BY MR. KELLY:

(11) Q  Mr. Kusche, earlier today you told us that you had

(12) previously testified in a deposition. I want to

(13) remind you that you can testify to literally anything

(14) in a deposition. There are no rules of hearsay or

(15) limitations. The judge may make rulings on

(16) evidentiary issues if there are objections by other

(17) counsel, but it's not as if you're in a criminal court

(18) –

(19) A  Right.

(20) Q  – being confined by the rules of evidence. Okay? Do

(21) you understand that?

(22) A  Yes, sir.

(23) Q  All right. So tell me what your speculation is.

(24) MR. BASCOM:  Object to the form. Calls for

(25) speculation.

## Page 32

(1) MS. WEBER:  And I'll join.

(2) A  You have to understand, the chief deputy is the

(3) sheriff's number two man. It's the person who

(4) does the day-to-day work for the sheriff. For

(5) some reason the sheriff, I believe, lost

(6) confidence in me and no longer seemed to trust

(7) me. And I believe for this reason, whatever the

(8) cause of that may be, which I do not know to this

(9) day, he decided he wanted somebody else in there.

(10) BY MR. KELLY:

(11) Q  We had Vern Klement testify that he became the

(12) undersheriff in May of 1985. Does that sound

(13) about right to you in terms of when your

(14) functioning as the chief deputy changed?

(15) A  Yes.

(16) Q  Okay. So that's just a couple of months before

(17) this whole Penny Beerntsen sexual assault and the

(18) Steven Avery trial, right?

(19) A  Yes.

(20) Q  Okay. Did you ever have a conversation with Tom

(21) Kocourek about why he lost confidence in you?

(22) A  I asked him why did you do this, and he said

(23) because I lacked tact.

(24) Q  And did you respond to that?

(25) A  Yes. I said, "Tom, tact on your department was

## Page 33

(1) the ability to smile at somebody's face while you

(2) stabbed them in the back," which was a tactless

(3) thing to say.

(4) Q And what did he say to that?

(5) A I don't think he responded.

(6) Q Okay. There's at least two statements that were

(7) taken by agents of the Department of Justice in

(8) this case in which there were references made to

(9) the department being in turmoil as a result of

(10) the change that was made involving you and the

(11) creation of the undersheriff position. Do you

(12) have any recollection of any turmoil occurring in

(13) the department around these changes?

(14) A I don't think those changes caused turmoil.

(15) Q Okay. So your answer is no. You don't re—

(16) A There was turmoil in the department, but

(17) basically it was because in '79 the traffic

(18) department ceased to exist and it became a

(19) sheriff's department, and there were a lot of

(20) adjustments being made. It was a dynamic period.

(21) I don't think my change had a lot of impact on

(22) it.

(23) Q Okay. You have not retained counsel personally

(24) today.

(25) A No, sir.

## Page 34

(1) Q You're not represented by any lawyer here today;

(2) is that right?

(3) A I'm told I'm essentially represented by the

(4) gentleman representing the county.

(5) Q Okay. But you haven't retained any counsel

(6) personally.

(7) A No, sir.

(8) Q All right. And you're no longer employed by the

(9) county.

(10) A That's correct.

(11) Q You're fully retired.

(12) A That's correct.

(13) Q Does your pension come from the state system, or

(14) from the county, or a combination?

(15) A From the state system.

(16) Q Okay. Have you met with any of the lawyers here

(17) today in anticipation of your testimony?

(18) A No.

(19) Q Have you reviewed any documents with any lawyer

(20) in anticipation of your testimony?

(21) A Yes.

(22) Q With what lawyer?

(23) A Amy Doyle.

(24) Q Did you meet personally with Ms. Doyle?

(25) A Yes.

## Page 35

(1) Q When did meet with Ms. Doyle?

(2) A Monday.

(3) Q So that would be two days ago.

(4) A That's correct.

(5) Q And where did you meet with her?

(6) A Sheriff's department.

(7) Q And for how long did you meet with her?

(8) A Two hours maybe.

(9) Q Did you review documents with her?

(10) A Yes.

(11) Q Did you receive or examine any reports of

(12) testimony?

(13) A Yes.

(14) Q What testimony did you review?

(15) A My testimony at the trial.

(16) Q Any other testimony?

(17) A Other testimony? No, I don't believe so.

(18) Q Did you examine anybody else's – the transcript

(19) of anybody else's testimony, either at the trial

(20) or in depositions?

(21) A No.

(22) Q Did you receive any reports about anybody else's

(23) testimony from Ms. Doyle?

(24) MR. POLLEN: I'm going to object at this

(25) time and instruct the witness not to answer about

## Page 36

(1) *conversations that he had with Ms. Doyle because*

(2) *I believe that's protected by the attorney-client*

(3) *privilege, and he need not answer that.*

(4) MR. KELLY: Okay. We're going to go off the

(5) *record. I'm calling the judge.*

(6) MR. BASCOM: Okay.

(7) REPORTER: Off the record.

(8) (Off the record 10:17 - 10:30)

(9) REPORTER: Back on the record.

(10) BY MR. KELLY:

(11) Q Mr. Kusche, you were present while we had the

(12) dialogue with the court; is that correct?

(13) A That's correct.

(14) Q All right. So you understand you have to answer

(15) the questions about what happened when you were

(16) with Ms. Doyle.

(17) A Yes.

(18) Q Okay. First of all, would you tell me your best

(19) recollection of what documents you reviewed with

(20) her?

(21) A I reviewed my testimony in the original trial; I

(22) reviewed transcripts of my interviews with the

(23) detectives in '95-'96, around in that area; a

(24) letter from Doug Jones; a report from the

(25) Department of Justice.

Page 37

(1) Q Of an interview of you?

(2) A That's correct. Document-wise, I think that's

(3) it.

(4) Q All right. Generally speaking, what areas of

(5) events or testimony in the Steven Avery/Penny

(6) Beerntsen/Greg Allen matter did you review with

(7) Ms. Doyle? Just by topic, what did you talk

(8) about with her concerning the various topics

(9) relating to the case?

(10) A My recollection of what I did on the case; my

(11) procedure for doing the composite; what I knew of

(12) statements by Leo Jadowski, Arland Avery about

(13) the presence of a photograph. Let's see, boy. A

(14) lot of material that we've gone over today so

(15) far. You know, basically what I was doing, what

(16) I did, what I remember, what I remember people

(17) saying, when I – what sequence of events, how

(18) they occurred.

(19) Q Particularly at the hospital and that evening?

(20) A That's correct.

(21) Q All right. Anything else you recall of the

(22) topics you discussed with Ms. Doyle?

(23) A Other than going over those reports that I

(24) mentioned, that was pretty about much it [sic].

(25) Q So in view of testimony you've given today about

Page 38

(1) the documents that you retained after you left

(2) the sheriff's department, the documents that

(3) you've described must have been documents that

(4) Ms. Doyle produced for you to review.

(5) A That's correct.

(6) Q They were not things that you brought –

(7) A No.

(8) Q – with you to the conference with her.

(9) A No.

(10) Q Is that correct?

(11) A That's correct.

(12) Q All right. Did you, by any chance, bring

(13) Exhibits 154, 155 and 156 with you to the

(14) conference with Ms. Doyle?

(15) A Yes.

(16) Q Okay. Did you discuss with Ms. Doyle the

(17) conversation that you had had with me to schedule

(18) your testimony?

(19) A Just that you wanted me to bring the picture.

(20) And she says bring it along, that she wanted to

(21) see it.

(22) Q Okay. And did you and she discuss the comparison

(23) of Exhibit 156 with the composite drawing and

(24) Steven Avery as we did earlier here today?

(25) A Yes.

Page 39

(1) Q All right. And did Ms. Doyle show you any other

(2) photographs or mug shots of either Greg Allen or

(3) Steven Avery that she had?

(4) A No.

(5) Q Okay. Did Ms. Doyle talk with you at all about

(6) whether or not you had recollections of these

(7) various events in nine–

(8) A Yes.

(9) Q And did she talk with you about refreshing

(10) recollection?

(11) A Specifically those words?

(12) Q Or words or comparable concepts.

(13) MR. BASCOM: I'm going to object to the

(14) form.

(15) A What we discussed was there were things in my

(16) statement that I do not remember anymore.

(17) BY MR. KELLY:

(18) Q All right. Did she tell you anything about

(19) telling me that you didn't recall things?

(20) A She said if you do not remember, say you don't

(21) remember.

(22) Q Okay. Did she tell you anything about the

(23) techniques that have been used either by me or

(24) Mr. Glynn in conducting depositions in this case

(25) and how to respond to them?

Page 40

(1) A She said you would press on points and ask

(2) questions, perhaps repeatedly.

(3) Q And? Anything further she said?

(4) A Just tell him what you know.

(5) Q Okay. Did she talk with you at all about your

(6) previous experience testifying in depositions or

(7) at trial?

(8) A No.

(9) Q Did she talk with you at all about the political

(10) relationships in the department between you and

(11) Tom Kocourek that caused this realignment of

(12) positions?

(13) A I think I got on it. I don't know if she asked

(14) me about it.

(15) Q You told her about it?

(16) A I believe so, yes.

(17) Q What did you tell her?

(18) A I told her that at that time the sheriff and I

(19) were not on the best of terms.

(20) Q Okay. Did you tell her that that fact had any

(21) bearing upon the way in which the Steven Avery

(22) investigation was conducted?

(23) A No.

(24) Q Did you tell her anything about any opinions you

(25) expressed to the sheriff about how the

## Page 41

(1) investigation was conducted?

(2) A No.

(3) Q Did you tell her anything about things that you

(4) knew about within the department involving the

(5) relationships amongst the detectives and the way

(6) in which the sheriff conducted the investigation?

(7) A Only to the fact that the sheriff, on occasion,

(8) came to major crimes and took charge.

(9) Q And that he did so in this instance.

(10) A I know he was there. I was not really part of

(11) the investigation other than drawing the picture.

(12) I'm assuming he took charge. I know he took

(13) charge in other cases.

(14) Q Are you saying that you did not have any

(15) discussion with Ms. Doyle about whether or not

(16) Sheriff Kocourek was in charge of this

(17) investigation?

(18) A No.

(19) Q Okay. "No," meaning no, you didn't have such a

(20) discussion with –

(21) A No, I didn't have such a discussion.

(22) Q Okay. Did you – In your conversation with Ms.

(23) Doyle about what you call the sequence of events

(24) at the hospital that evening, did she tell you

(25) anything about what other witnesses had said they

## Page 42

(1) remembered about what happened? About what other

(2) witnesses had said they remembered about the

(3) sequence of events at the hospital that evening?

(4) A I believe in a couple of cases it did come up, yes.

(5) Q Okay. Did she tell you, for example, about what

(6) Al Kolanczyk had said that he remembered about

(7) what happened at the hospital?

(8) A I don't believe so.

(9) Q Did she tell you anything about what Judy Dvorak

(10) said about what she remembered was the sequence

(11) at the hospital?

(12) A I don't believe so.

(13) Q With whom did you discuss – strike that. About

(14) what people did you talk with Ms. Doyle

(15) concerning what happened at the hospital?

(16) A Bill Beck.

(17) Q Anyone else?

(18) A That's the only one I can recall.

(19) Q Okay. What did she tell you Bill Beck had said?

(20) A That he had called for me to come there, that I

(21) think he believed that – I think – It was him

(22) or someone else who said that the sheriff arrived

(23) before I did, and I didn't recall that.

(24) Q Okay. Did she make any comparison between what

(25) your statement to the Department of Justice

## Page 43

(1) agents said about the sequence of events at the

(2) hospital as compared to what other people had

(3) said was the sequence at the hospital?

(4) A I think there was an error in one of the

(5) Department of Justice's statements, which I

(6) pointed out, but I don't think we discussed it.

(7) Q When you say one of the Department of Justice's

(8) statements, were there more than one?

(9) A I'm talking in paragraph. In a particular

(10) paragraph, I think there was something that I

(11) considered to be an error.

(12) Q In respect to their interview of you?

(13) A That's correct.

(14) Q All right. What was the error, as you recall it,

(15) that you pointed out to her?

(16) A I'd have to see the report in order to remember.

(17) Q Okay. Did she compare, for example, what Bill

(18) Beck said about contacting you and having you

(19) come to the hospital with what you told the

(20) Department of Justice agents about how you came

(21) to the hospital?

(22) A No.

(23) Q Okay. Did she tell you anything about what Tom

(24) Kocourek either had made statements about or

(25) testified about concerning what happened at the

## Page 44

(1) hospital?

(2) A No.

(3) Q Is there anything else you can remember in the

(4) course of this two hour meeting that you and Ms.

(5) Doyle talked about?

(6) A Whether I saw any photographs – a pile of

(7) photographs, whether I knew who brought

(8) photographs. That was a good portion of the

(9) conversation.

(10) Q Did she talk with you at all about who the

(11) jailers were that night?

(12) A She asked me if I knew who they were.

(13) Q Okay. Did she talk with you at all about how the

(14) photographs got from the jail to the hospital?

(15) A Exactly what I just said, yes.

(16) Q Okay. Did she talk with you at all about any

(17) other members of the department with whom you've

(18) had conversations about this case?

(19) A Yes.

(20) Q And what did you tell her about that?

(21) A Larry Conrad, Sheriff Kocourek, Al Kolanczyk.

(22) Obviously Andy Colborn; I don't really have great

(23) rem– memory of that conversation.

(24) MR. BASCOM: Can I have some clarification,

(25) Walter? When you say conversations about this

Page 45

(1) case, are you talking about the Steven Avery vs.
(2) Manitowoc County case, or the State vs. Steven
(3) Avery case?
(4) MR. KELLY: Both.
(5) MR. BASCOM: At any time?
(6) MR. KELLY: Well, in respect to the pending
(7) question.
(8) MR. BASCOM: Well, I'm asking –
(9) MR. KELLY: I want to go back and I don't
(10) want to be interrupted here. You can make an
(11) objection, whatever you want, but –
(12) MR. BASCOM: Object to the form of the
(13) question as vague as to time.
(14) MR. KELLY: Okay. I'd like to go back and
(15) hear the question and answer.
(16) REPORTER: Certainly.
(17) (Portion of record played back on the record 10:42 - 10:43)
(18) MR. KELLY: Okay.
(19) REPORTER: All right. Okay.
(20) BY MR. KELLY:
(21) Q Tell me what you told Ms. Doyle about
(22) conversations you've had with Larry Conrad about
(23) this case.
(24) A Just that we have discussed it. Specifically,
(25) each detail?

Page 46

(1) Q Everything you remember that you and Ms. Doyle
(2) talked about respecting your conversations with
(3) Larry Conrad concerning this case. And when I
(4) say this case –
(5) A He told me that –
(6) MR. POLLEN: Wait.
(7) BY MR. KELLY:
(8) Q When I say this case, I'm referring to both this
(9) civil suit and the underlying criminal action and
(10) subsequent proceedings in the Steven Avery
(11) matter.
(12) MR. POLLEN: Okay. Now go ahead.
(13) A I was told you were very interested in the fact I
(14) had the sketch hanging on my wall in my office.
(15) That seemed to be a point of interest.
(16) BY MR. KELLY:
(17) Q I'll try it again. All I'm asking you at this
(18) moment is what did you tell Ms. Doyle about
(19) conversations you had had with Larry Conrad about
(20) this case.
(21) A I think that was pretty much it, that the
(22) interest was on the sketch.
(23) Q All right. How many conversations with Larry
(24) Conrad have you had about this case?
(25) A Oh, geez, I see him quite often, e-mail with him,

Page 47

(1) talk with him. Not always – It's not always
(2) about this case, but sometimes it comes up. You
(3) know, have you heard anything, things of this
(4) nature. It seems anytime any officers, old
(5) detectives or what have you get together,
(6) sometimes it comes up, somehow.
(7) Q Okay. Have you talked with Larry Conrad since he
(8) was deposed in this case?
(9) A Yes.
(10) Q How many times?
(11) A Twice.
(12) Q And on those occasions did you talk about what
(13) his – what he had to say about this case and
(14) what his deposition was like?
(15) A On once – one occasion.
(16) Q Okay. And the other one you did not talk about
(17) this case at all with him?
(18) A No.
(19) Q So you've had one conversation after Larry
(20) Conrad's deposition in which you talked about
(21) this case?
(22) A Correct.
(23) Q What did he tell you and what did you say to him?
(24) A What I just said, that you seemed to be
(25) interested in the fact that I had the picture

Page 48

(1) hanging on the wall and what he knew about me
(2) having a photograph to draw the picture from.
(3) Q Okay. Anything else that you talked with him
(4) about?
(5) A Not about this case, no.
(6) Q Did I hear you say just a moment ago that you've
(7) had e-mail exchanges with yourself and other
(8) detectives and former members of the department,
(9) some of which have involved this case?
(10) A No. I said I've had contact with him by e-mail.
(11) I didn't say it had to do with this case.
(12) Q Have you had e-mail exchanges with any other
(13) person in the world about this case?
(14) A No.
(15) Q And then the get-togethers that you're talking
(16) about, what are those?
(17) A Breakfasts.
(18) Q And what other persons who have been involved in
(19) some way in this case have you met with at
(20) breakfast and sometimes talked about this case?
(21) A Don Belz.
(22) Q Anyone else?
(23) A At breakfast, that would – probably him, he and
(24) Larry Conrad and maybe Fred Nicholson. I don't
(25) know if we discussed this case with Fred.

Page 49

(1) Q  Okay.

(2) A  We may have.

(3) Q  Don Belz tell you about his testimony in this

(4) case?

(5) A  I don't believe so.

(6) Q  Tell you anything about information brought to

(7) him by Leroy Beilke about another suspect in this

(8) case?

(9) A  He was upset with that.

(10) Q  Okay.

(11) A  That that was said.

(12) Q  Okay. Larry Con– What did – Any further

(13) conversations you've had with Larry Conrad about

(14) this case, apart from the one you've told us

(15) about after he testified?

(16) A  Oh, before. I mean, again, like what's

(17) happening, you know, what's the story, what's

(18) going on. The question of where the hair came

(19) from, nobody seems to know.

(20) Q  Where what hair came from?

(21) A  The hair the DNA came from. No one seems to know

(22) where that came from.

(23) Q  Who's discussed where the hair came from for the

(24) DNA?

(25) A  I did.

Page 50

(1) Q  Okay. With whom?

(2) A  Sheriff Kocourek, Larry Conrad, Don Belz.

(3) Q  How many times with Kocourek?

(4) A  A couple of times, maybe.

(5) Q  How many times with Conrad?

(6) A  Perhaps a couple.

(7) Q  And with Belz?

(8) A  Maybe once.

(9) Q  Did any one or more of you in the course of those

(10) conversations doubt the validity of the DNA

(11) examination?

(12) A  We don't know where it came from.

(13) Q  So?

(14) A  We're detectives, we want to know where the

(15) evidence came from. Just because something

(16) exists doesn't mean it's probative. I want to

(17) know where it came from.

(18) Q  Okay. Was there any speculation about where it

(19) might have come from?

(20) MR. BASCOM: Object to the form. Calls for

(21) speculation.

(22) BY MR. KELLY:

(23) Q  You can answer.

(24) A  They said that someone put a blanket or a towel

(25) on her at the scene. It could have been a

Page 51

(1) transfer from that. Don't know. I don't know

(2) where it came from.

(3) Q  Did any one or more of you, including Sheriff

(4) Kocourek, make any effort to find out by any

(5) means whatsoever where the hair came from?

(6) MS. WEBER: Object to the form of the

(7) question.

(8) BY MR. KELLY:

(9) Q  You can answer.

(10) A  I asked the county's attorneys when I was

(11) questioned at one time, and they basically

(12) refused to say anything. Says, [gesturing "who

(13) knows"].

(14) Q  Okay. When you tell me that you were – had a

(15) meeting with the county attorneys, who are you

(16) talking about?

(17) A  Amy Doyle, another attorney. This was at the

(18) sheriff's department awhile back. And they

(19) basically just asked me to go over my – what I

(20) was remembering, what I could say. It wasn't as

(21) detailed as what Amy and I did later.

(22) Q  So the other lawyer, in addition to Amy Doyle,

(23) who was with Amy Doyle on that occasion was

(24) somebody from the county?

(25) A  I think it was somebody else with her firm is the

Page 52

(1) impression I got.

(2) Q  Okay. Meaning it was not som– To your knowledge

(3) it was not somebody from the corporation

(4) counsel's office.

(5) A  It was not somebody from the corp counsel.

(6) Q  And can you approximate in time when this

(7) interview occurred?

(8) A  It was earlier this year sometime. [Referring to

(9) date book] I don't know. I would have to go

(10) through this page-by-page and I might come up

(11) with it. I would just say first part of the

(12) year.

(13) Q  First part of 2005?

(14) A  Correct.

(15) Q  How did that meeting come about? Did she ask for

(16) it?

(17) A  Yes.

(18) Q  What did she tell you about that?

(19) A  They wanted to talk to me.

(20) Q  Okay.

(21) A  I had called the corp counsel's office because I

(22) was contacted by Court TV, and that was going to

(23) be in June. I remember that – June or July.

(24) Because they were going to come up here, and they

(25) wanted to interview me and photograph that

## Page 53

(1) sketch.

(2) Q  Okay. So you wanted some advice from the

(3) corporation counsel about that?

(4) A  I said I would – I had no problem with it, but I

(5) would not do it without the county's approval.

(6) Q  Okay. And was that what led to the meeting with

(7) Ms. Doyle?

(8) A  I don't know.

(9) Q  All right.

(10) A  It may have. And I think it happened after that, so

(11) it may be. I don't know.

(12) Q  I take it you're examining your date book.

(13) A  That's what I'm doing.

(14) Q  Okay. Take your time.

(15) A  I hope I put it in here. I may not have put –

(16) June 30th.

(17) Q  This is a meeting on June 30th of 2005 with you,

(18) Amy Doyle and some other lawyer?

(19) A  Yeah. I didn't put his name in here, because I

(20) think she was the one who contacted me.

(21) Q  All right. But you're clear that that other

(22) lawyer was not somebody from the county

(23) corporation counsel's office.

(24) A  Not to my knowledge, no.

(25) Q  All right. Did you bring Exhibit 154 with you to

## Page 54

(1) that meeting?

(2) A  No.

(3) Q  All right. And about how long did that meeting

(4) last?

(5) A  Maybe an hour.

(6) Q  Okay. And did Ms. Doyle bring documents with

(7) her?

(8) A  They had documents, yes.

(9) Q  Okay. She and the other lawyer?

(10) A  That's correct.

(11) Q  And did they review those documents with you?

(12) A  No.

(13) Q  What was the – what would I call it? What was

(14) the main subject matter that was discussed during

(15) that one hour period?

(16) A  The evening – or the 29th of...

(17) Q  July.

(18) A  July. What occurred, what I did, what I saw,

(19) what I heard and what I said.

(20) Q  Okay. And did Ms. Doyle supply you with any

(21) further information –

(22) A  No.

(23) Q  – about what other people were saying about that same

(24) thing?

(25) A  No.

## Page 55

(1) Q  Okay. Were you interviewed by Court TV?

(2) A  No.

(3) Q  Do you have any knowledge about whether anybody

(4) else was interviewed by Court TV in connection

(5) with this case?

(6) A  No.

(7) Q  You know, you gave us some names earlier of

(8) people with whom you've discussed the case, and

(9) you listed Don Belz, Larry Conrad and Fred

(10) Nicholson. Did you talk with Fred Nicholson

(11) after his deposition?

(12) A  No.

(13) Q  All right. Do you remember what you've discussed with

(14) Fred Nicholson about the case?

(15) A  I think all – he said all he did was the time

(16) trip to check on the purchase at Shopko.

(17) Q  Okay. In any of these conversations involving

(18) Don Belz, Larry Conrad and Fred Nicholson, were

(19) there any discussions about how well or not so

(20) well the sheriff conducted this investigation?

(21) A  I don't think that was broached.

(22) Q  Were there any discussions about how the

(23) investigation was conducted?

(24) A  No. I believe the question of had anybody run

(25) into the name Greg Allen, had anybody heard about

## Page 56

(1) that before.

(2) Q  And with whom did you discuss that?

(3) A  Oh, I – with these same people.

(4) Q  Okay. And what was the discussion?

(5) A  I think Larry Conrad said he had some

(6) recollection of him, but not with this case.

(7) Q  Did Larry Conrad say anything about conversations

(8) he had had with Tom Bergner about Greg Allen?

(9) A  No.

(10) Q  Did Larry Conrad say anything about tracking down

(11) information concerning Greg Allen in connection

(12) with a 1983 case against Greg Allen for an

(13) assault on a woman on a beach in Manitowoc?

(14) A  I think he said he had a contact with him, but it

(15) wasn't this case.

(16) Q  Right. It was a prior case.

(17) A  Yes. He didn't go into detail.

(18) Q  Okay. He did not talk with you about providing

(19) the information from that case to Tom Bergner?

(20) A  No.

(21) Q  Did all of you talk about Tom Bergner at all?

(22) A  I think it came up because in the statement in

(23) the paper it said that he had given the sheriff

(24) information on Greg Allen.

(25) Q  Right.

Page 57

(1) **A** And nobody was aware of it.

(2) **Q** And what did you all think of that as you talked

(3) it over?

(4) *MR. BASCOM: Object to the form.*

(5) *MR. KELLY: You're right. I'll withdraw the*

(6) *question.*

(7) **Q** What did you say to each other about this

(8) information that came up concerning Tom Bergner

(9) providing information to Sheriff Kocourek about

(10) Greg Allen?

(11) **A** I don't think anybody had anything to say because

(12) we didn't know did it occur, what was said; we

(13) didn't know. We hadn't heard anything about it

(14) other than what was in the paper.

(15) **Q** Well, you gave some testimony earlier today about

(16) how everybody understands what the exculpatory

(17) evidence rule is, right?

(18) **A** Sure.

(19) **Q** Any discussion amongst you about how serious it

(20) would be if the Greg Allen information had in

(21) fact been provided by Bergner to Kocourek?

(22) **A** No.

(23) **Q** Hold on for a minute.

(24) *MR. POLLEN: How are you doing? Do you need*

(25) *a break or are you doing okay?*

Page 58

(1) *WITNESS: Shortly.*

(2) *MR. POLLEN: Shortly?*

(3) *WITNESS: Shortly.*

(4) *MR. POLLEN: Okay.*

(5) *WITNESS: Detect a fish syndrome.*

(6) *REPORTER: Shall we go off the record?*

(7) *MR. KELLY: Yeah, let's go off the record.*

(8) *REPORTER: Off the record.*

(9) (Off the record 10:57 - 11:04)

(10) *REPORTER: We're back on the record.*

(11) **BY MR. KELLY:**

(12) **Q** Mr. Kusche, I want to just return to a couple of

(13) loose ends here. On either occasion that you met

(14) with Amy Doyle, whether it was in June or the

(15) meeting that took place just a couple of days

(16) ago, did you have any discussion with her about

(17) the photographic array –

(18) **A** Yes.

(19) **Q** – that was done for Mrs. Beerntsen that evening at

(20) the hospital?

(21) **A** Yes.

(22) **Q** Okay. On both occasions, or just one occasion,

(23) did you discuss that with Ms. Doyle?

(24) **A** I know Monday we did. I don't know if we touched

(25) on the subject in June. I think in June it was

Page 59

(1) more me talking.

(2) **Q** All right. In respect to the conversation that

(3) you had with Ms. Doyle about the photographic

(4) array, did you tell her that you were present for

(5) it?

(6) **A** When it was given – shown to Ms. Beerntsen?

(7) **Q** Yes.

(8) **A** Yes.

(9) **Q** Okay. Let's get 154 up here again for a moment.

(10) Was the photograph that appears in 154 at the

(11) bottom of Steven Avery one of the photographs

(12) that was shown to Mrs. Beerntsen?

(13) **A** The smaller version.

(14) **Q** Yes.

(15) **A** Yes.

(16) **Q** Okay. Actually, let me show you what's been

(17) marked as Exhibit 74 in this case. And in the

(18) lower – on the lower left-hand side it appears

(19) to me at least, and I'm asking you if it appears

(20) to you that that's the smaller mug shot of Steven

(21) Avery that is blown up in Exhibit 154?

(22) **A** Yes.

(23) **Q** Okay. So that's Steven Avery as he appeared on

(24) January 3 of 1985, right?

(25) **A** Yes.

Page 60

(1) **Q** What's the picture to the right on Exhibit 74?

(2) **A** It's a picture of Avery dated May 20th, 1986.

(3) **Q** Okay. And what's the picture at the top –

(4) **A** Picture –

(5) **Q** – on Exhibit 74?

(6) **A** Picture of Steve Avery dated July 30th, 1985.

(7) **Q** Okay. Would you hold Exhibit 74 up next to 154?

(8) **A** [Complies]

(9) **Q** So as we look at that, Exhibit 74 in the lower right-

(10) hand corner facing us is Steven Avery in 1986; is that

(11) right?

(12) **A** This one [pointing]?

(13) **Q** Yes.

(14) **A** That's correct.

(15) **Q** And in the lower left – On the photo – the mug

(16) shot on the lower left-side is Steven Avery in

(17) January of '85, right?

(18) **A** Correct [pointing].

(19) **Q** And the picture at the top is Steven Avery on the

(20) night of the day Mrs. Beerntsen was assaulted; is

(21) that right?

(22) **A** No.

(23) **Q** 7/30/85?

(24) **A** It would be the following day.

(25) **Q** So do you know whether that photo was taken when

## Page 61

(1) he was booked in the jail on the evening of the

(2) 29th and 30th of July?

(3) A I'd have no personal knowledge other than reading

(4) the date on the card.

(5) Q Okay. But what's your understanding? Do you

(6) know what I mean when I say that? You don't have

(7) to have firsthand knowledge. As you look at

(8) these, knowing what you know as a police officer,

(9) that photo that you have your finger on right now

(10) in Exhibit 74 was taken the night that Mrs.

(11) Beerntsen was assaulted, whether it was before or

(12) after midnight.

(13) A It's dated the 30th, so it would be

(14) contemporaneous in some manner or form...

(15) Q Okay.

(16) A ...to that date.

(17) Q And in the ordinary course, such a photo would be

(18) taken when Steven Avery was brought into the

(19) jail; is that right?

(20) A That's correct.

(21) Q Okay. Thank you. Actually, let's get 154 up

(22) here again. When the photo array was done, the

(23) only mug shot of Steven Avery that was available

(24) was the one that's in Exhibit 154 and the smaller

(25) mug shot on the left-hand side of Exhibit 74,

## Page 62

(1) right?

(2) A Yes.

(3) Q Okay. And did you participate in setting up that

(4) photo array?

(5) A No.

(6) Q Who set up the photo array?

(7) A I don't know.

(8) Q But you saw it taking place?

(9) A I saw the photographs shown to Penny Beerntsen.

(10) Q How many photos were shown to her?

(11) A I don't really remember.

(12) Q By whom?

(13) A I believe the sheriff had them.

(14) Q Were they displayed in a framing document, or

(15) were they displayed just laid out on a table

(16) somewhere?

(17) A In my recollection they were laid out on the

(18) table.

(19) Q By the sheriff.

(20) A That's correct.

(21) Q Okay. Was anyone else in the room at the time?

(22) A I believe there was.

(23) Q Who was that?

(24) A I don't recall.

(25) Q One more person, two more?

## Page 63

(1) A I don't recall. My attention was not on the

(2) people.

(3) Q What was your attention on?

(4) A The photographs.

(5) Q Okay. Earlier you testified that amongst the

(6) people that you spoke with about the case on more

(7) than one occasion was Al Kolanczyk. Do you

(8) recall that?

(9) A I spoke with him once.

(10) Q Okay. When was that? Well, let me rephrase

(11) that. Was it after the information appeared in

(12) the public media –

(13) A Yes.

(14) Q – that Steven Avery had been exonerated?

(15) A Yes.

(16) Q Okay. Where was the conversation?

(17) A At Wal-Mart.

(18) Q All right. Was anyone else present than the two

(19) of you?

(20) A My wife was somewhere around. I don't know if she was

(21) nearby.

(22) Q Okay. What did the two of you talk about?

(23) A We talked about the case.

(24) Q What's your best recollection of what you said to

(25) each other?

## Page 64

(1) A I know he wasn't happy. Apparently he got

(2) suspended, and I had not been aware of that. And

(3) that he stated that he had no– apparently it was

(4) alleged that he refused to go to the hospital.

(5) He said he did not, but he was delayed in getting

(6) there. That was most of the conversation.

(7) Q Was there any discussion on that occasion of the

(8) sequence of events at the hospital as he

(9) remembered them and you remembered them?

(10) A I just said – I believe I said, "I thought you

(11) were there later." I didn't know what time he

(12) got there.

(13) Q Okay. Later than?

(14) A Later than me.

(15) Q So you thought you got to the hospital before Al

(16) Kolanczyk?

(17) A I thought I did. I didn't see him, so I didn't

(18) know.

(19) Q All right. Was that something that you discussed

(20) with Ms. Doyle when you met with her two days

(21) ago?

(22) A I may have. I don't recall offhand.

(23) Q In the conversations that you've told us about

(24) that have occurred between you and other

(25) personnel of the sheriff's department, the

(1) detectives in the sheriff's department, on any
(2) occasion was there any discussion amongst you
(3) about whether the sheriff proceeded, or may have
(4) proceeded, too rapidly to focus on Steven Avery?
(5) A   I don't know if it was the sheriff focusing too
(6) rapidly. I think he was identified in the
(7) initial stages of the investigation and it
(8) proceeded from there.
(9) Q   Was there any discussion amongst you about
(10) anybody focusing too rapidly on Steven Avery?
(11) I'm talking about conversations on any occasion
(12) between you and any one or more of the
(13) detectives.
(14) A   I can't say specifically. It may have, you know,
(15) as part of the newspaper article saying that the
(16)   – was focused to the exclusion of other people.
(17) And I don't think it was focused to the exclusion
(18) of other people.
(19) Q   What was the conversation that occurred amongst
(20) you and the detectives about that?
(21) A   Again, I can't remember exactly who it was with,
(22) but whether it was – of course, was there any
(23) knowledge about Allen and nobody was familiar
(24) with Allen, that other people were checked out or
(25) looked at, and that the victim identified him.

(1) Q   Well, was there any discussion about Judy Dvorak
(2) having said that the person sounded like Steven
(3) Avery?
(4) A   I recall someone at the hospital saying that. I
(5) don't know if it was her. I don't remember
(6) talking to her.
(7) Q   Okay. I'm asking you about conversations that
(8) you've told us about that occurred –
(9) A   It may have occurred. I just have no specific
(10) recollection of that.
(11) Q   Well, how about any recollection? It doesn't
(12) matter whether your recollection is specific.
(13) I'm just asking –
(14) A   Well, what I'm saying is things were discussed
(15) and sometimes it's just a matter of what's
(16) happening now, what's said, do you remember this
(17) or something of that nature, and I don't always
(18) recall what the topic was specifically.
(19) Q   Sure. Okay. And what I'm saying to you is
(20) that's fine. You're certainly free to give that
(21) testimony. But what I'm asking you is whether
(22) it's specific or not, whether your memory's
(23) perfect or not, do you recall talking with any
(24) one or more of the detectives on any occasion
(25) about whether or not the sheriff focused too

(1) rapidly on Steven Avery and that caused problems
(2) in the case?
(3) MS. WEBER:  I'm going to object to the form.
(4) Also asked and answered.
(5) MR. POLLEN:  I join in that, and I object to
(6) form. But go ahead, sir, if you can.
(7) BY MR. KELLY:
(8) Q   You may answer.
(9) A   Again, I state it may have come up as part of the
(10) article in the newspaper, and, well, the response
(11) we would have is – that I recall would be,
(12) "Well, we had a victim who said it was him."
(13) Q   And who is we?
(14) A   Myself and whoever I was talking with. Again, I
(15) don't recall each incident of conversation.
(16) Q   In any discussion that you had with any one or
(17) more of the detectives, as you've told us you did
(18) about this case, was there any discussion amongst
(19) you about whether or not the sheriff was
(20) pressured by Tom Beerntsen to move on this case?
(21) A   Not in conversation with any detective, no.
(22) Q   In any other way did that subject come up?
(23) A   Pressure from Tom Beerntsen?
(24) Q   Yeah.
(25) A   Yes.

(1) Q   On the sheriff.
(2) A   On the sheriff? I don't if it was on the sheriff.
(3) Q   Pressure from Tom Beerntsen in any way. I
(4) believe you said yes.
(5) A   Yes.
(6) Q   Okay.
(7) A   I've had a conversation with a local attorney who
(8) was part of the initial stages, a Ron Kaminski.
(9) And he was – I don't know, he was a special
(10) prosecutor or something at the time, and of the
(11) initial stages, just for bond. And he said that
(12) Tom Beerntsen was at his office early, you know,
(13) wanting to get things done. That's all I can
(14) recall.
(15) Q   And this is something that you talked about with
(16) one or more of the detectives –
(17) A   No.
(18) Q   – in the department?
(19) A   No.
(20) Q   This is something you knew but did not discuss
(21) with anybody?
(22) A   It was a comment from an attorney. I don't know
(23) if it's – It's nothing a part of our
(24) investigation.
(25) Q   Again, what I'm asking you is whether knowing

### Page 69

(1) what you knew from that conversation, you had any

(2) conversation with any of the detectives in the

(3) department about that?

(4) A No.

(5) Q All right. And you're telling me that your

(6) recollection is that amongst yourselves, you and

(7) the detectives did not ever discuss Tom Beerntsen

(8) pressuring the sheriff in this case.

(9) A No.

(10) Q Okay. You mentioned a bit earlier in your

(11) testimony an Officer Colborn and a document that

(12) you saw about that; is that right?

(13) A That's correct.

(14) Q Okay. I'm going to show you Exhibit 124 in this

(15) case. And you've seen that before, right?

(16) A I saw this Monday.

(17) Q Had you seen it before Monday?

(18) A No.

(19) Q This document reflects a conversation between you

(20) and Douglass Jones on September 18th, right?

(21) A That's correct.

(22) Q That's shortly after it became public knowledge

(23) that Steven Avery had been exculpated by the DNA

(24) evidence and that Gregory Allen had been

(25) inculpated, right?

### Page 70

(1) A That's correct.

(2) Q Was the call that is reflected in this document

(3) initiated by Mr. Jones?

(4) A Yes.

(5) Q Do you remember what he said to you initially

(6) when he first introduced himself?

(7) A I think he wanted me to put up a – this was a

(8) call, if I have the sequencing correct, that a

(9) campaign sign for someone for school board.

(10) Q Anything else that you recall that introduced the

(11) subject matter of the Steven Avery case?

(12) A I really don't recall how it came up.

(13) Q All right. Look at the first sentence, if you

(14) would. He says –

(15) A Okay.

(16) Q – he called you on the afternoon –

(17) A Oh, okay.

(18) Q – of September 11th to tell you that there was an

(19) article in the Herald Times Reporter about the Avery

(20) case and that Avery had been released. Do you see –

(21) A That may have been how it started.

(22) Q Okay.

(23) A I really don't recall that much about the

(24) conversation.

(25) Q Okay. But in any event, you're not disagreeing

### Page 71

(1) with the first sentence.

(2) A I wouldn't disagree with it.

(3) Q All right. And then he says in this memo that

(4) you told him that you were already aware of the

(5) article and about Steven Avery being released.

(6) A Correct.

(7) Q Then he says, "We chatted about unrelated

(8) matters."

(9) A Right.

(10) Q Probably about the political campaign, right?

(11) A Perhaps.

(12) Q Okay. Any other unrelated matters that you

(13) remember?

(14) A I don't recall.

(15) Q All right.

(16) A I don't have much recollection of the call.

(17) Q Then he says that your future plans, your health,

(18) your exercise regimen, he told you things about

(19) his family. Do you remember all of that

(20) occurring?

(21) A No.

(22) Q All right. Then he says as he, Doug Jones, was

(23) trying to close the conversation, you told him

(24) that you would retain the drawing.

(25) A Yes.

### Page 72

(1) Q Do you remember telling him that?

(2) A No.

(3) Q At the time that you spoke to him, you in fact

(4) had the drawing, though.

(5) A Yes.

(6) Q All right. Had he asked you to keep it?

(7) A No.

(8) Q Do you know why you told him that you would

(9) retain the drawing?

(10) A I would imagine we were anticipating this event.

(11) Q Meaning that the question of the drawing would

(12) come up –

(13) A Sure.

(14) Q – in subsequent legal proceedings.

(15) A Of course.

(16) Q All right. He goes on and he says, referring to

(17) you, "He then told me that in '95 or '96, Andy

(18) Colborn had told Tom Kocourek, former Manitowoc

(19) County Sheriff, that an officer from Brown County

(20) had told Colborn that Allen, and not Avery, might

(21) have actually committed the Beerntsen assault."

(22) Okay? That is what Exhibit 124 says, correct?

(23) A That's correct.

(24) Q Okay. Did you in fact tell that to Douglass

(25) Jones?

## Page 73

(1) A  I don't recall.

(2) Q  All right. Does seeing this document, 124,

(3) refresh your recollection?

(4) A  No.

(5) Q  All right. Do you have any reason to disbelieve

(6) what this document says you told Doug Jones?

(7) A  I recall Colborn saying something to me, and I

(8) might have said something to him on the side. I

(9) don't know if Tom Kocourek's name came into it.

(10) I don't recall that.

(11) Q  All right. Anything else with respect to that

(12) sentence that...

(13) A  Again, that's all I can recall.

(14) Q  So you knew about Gregory Allen in 1995 or '96 –

(15) A  No. No. I –

(16) Q  – because Tom Colborn told you.

(17) A  No. He didn't tell me that in 1995, '96.

(18) Q  Okay. Then –

(19) A  He said he had the conversation in '95, '96.

(20) Q  All right.

(21) A  I didn't hear about it till in passing talking to

(22) Andy at one time, something being said within –

(23) probably within a matter of a couple of – a

(24) couple, three months of this conversation

(25) occurring.

## Page 74

(1) Q  What happened within a couple, three months of

(2) this conversation?

(3) A  Andy making a comment to me about this. Because

(4) I said this thing comes up with conversations.

(5) And he may have said something, and it would not

(6) necessarily have been important to me that I

(7) would file it away for future memory. It might

(8) have just made a – been a side comment at the

(9) end of a telephone conversation.

(10) But I did not receive that information in '95,

(11) '96. At that time I was chief investigator and would

(12) have done something. I would have – And then I made

(13) this comment. I probably asked him, was Lenk, who was

(14) my replacement, aware of this. And that's how I would

(15) imagine I said he – that Detective Lenk was aware.

(16) He was not that until – He didn't take command of

(17) that bureau until 2003.

(18) Q  You made a statement in the course of that long

(19) narrative answer that within two or three months

(20) of this time he told me.

(21) A  I would say.

(22) Q  Within two or three months of what time?

(23) A  Of this telephone conversation that I had with

(24) Doug Jones [indicating Exhibit 124].

(25) Q  So your testimony is that within two or three

## Page 75

(1) months prior to September 18th of 2003, Colborn

(2) told you this?

(3) A  Made a comment on something to that effect.

(4) Q  So this is before there's been any public

(5) knowledge or information, two to three months

(6) before there's been any public knowledge or

(7) information that Steven Avery has been

(8) exonerated. And you're telling us that Colborn

(9) told you, "Hey listen, back in '95 or '96, I

(10) found out that" –

(11) A  When it came out – It had happened aft– well,

(12) I'm assuming two to three months, I don't know.

(13) After the information about Avery came out and

(14) before this conversation with Jones, that comment

(15) was made.

(16) Q  Well, it's an absolute fact that the first time

(17) the district attorney found out about the results

(18) of the DNA examination was on September 3 of

(19) 2003.

(20) A  Okay. I have no –

(21) Q  And this document – look at it. This document,

(22) dated September 18th, is referring to a

(23) conversation between you and Doug Jones that took

(24) place on September 11th, 2003. Do you see that?

(25) A  Yes, I see that.

## Page 76

(1) Q  So you're telling us that –

(2) A  I don't –

(3) Q  – Colborn spoke to you before anybody knew

(4) anything about Steven Avery being exonerated?

(5) A  I don't know when it occurred. It happened

(6) before this con– [indicating Exhibit 124]. It

(7) may have happened that day.

(8) Q  So you're changing your prior testimony that it

(9) was two to three months before this conversation?

(10) A  I don't know. It happened before it. It

(11) happened after I left my position and before that

(12) conversation, anytime in there.

(13) Q  Okay.

(14) A  I don't know. I told you, I don't have very

(15) specific recollection of this conversation.

(16) Q  Well, you seem to have recovered some of your

(17) recollection about it. Apparently Colborn

(18) identified Allen to you.

(19) A  He – I don't know that he identified Allen to

(20) me. I'm saying what my recollection was of this

(21) conversation, which is not very strong, was that

(22) Colborn made a comment to me about getting some

(23) information.

(24) Q  Yeah. Okay.

(25) A  And I related it in the phone conversation.

Page 77

(1) Q  Okay. The statement goes on and says, the next
(2) sentence says, "Gene stated," that's you.
(3) A  Mmm-hmm.
(4) Q  – "that Colborn was told by Kocourek something
(5) to the effect that we already have the right guy
(6) and he should not concern himself." Now –
(7) A  That –
(8) Q  Did Colborn tell that to you?
(9) A  I don't recall it.
(10) Q  Did you tell that to Doug Jones?
(11) A  I don't recall it.
(12) Q  Do you have any reason to believe that Doug Jones
(13) would misrecord what you told him?
(14) A  No.
(15) Q  Okay. Then it goes on to say that Doug Jones
(16) asked you if this information was known. Do you
(17) remember him asking you that?
(18) A  No.
(19) Q  Then it goes on to say that you said Lenk, MCSO
(20) Lieutenant James Lenk, detective bureau command
(21) officer, was aware. Did you tell that to Doug
(22) Jones?
(23) A  If he put it there, I probably did.
(24) Q  And what was the basis for your knowledge about
(25) that?

Page 78

(1) A  It would had to have been from Andy Colborn.
(2) Q  Did you talk with Lenk about whether or not Lenk
(3) was aware of this?
(4) A  No.
(5) Q  All right. At any time?
(6) A  Not to my recollection.
(7) Q  Okay. And then the statement goes on and says,
(8) "He did not indicate in any way when Lenk first
(9) learned about Colborn and Kocourek's
(10) conversation." Is that true?
(11) A  I wouldn't know.
(12) Q  All right. "On late Thursday afternoon," he
(13) says, "he found Mark Rohrer and apprised him of
(14) the conversation with Gene," referring to you,
(15) and then he says, "By the time I found Mark, he
(16) indicated that he'd already been made aware of
(17) conversation between Colborn and Kocourek."
(18) A  Okay.
(19) Q  Did he tell you that?
(20) A  No.
(21) Q  That you remember: he did not tell you that.
(22) A  Not to my recollection.
(23) Q  Okay. Now, you just testified a moment ago that
(24) had you been in office at the time and chief
(25) investigator that you would have had to do

Page 79

(1) something about that information, right?
(2) A  If there's information on somebody else having
(3) committed the crime, yes.
(4) Q  Well, and that's what this is saying. This is
(5) what this information –
(6) A  No, that's not what that's saying. I did not
(7) have any information prior to my retirement that
(8) someone else committed the crime.
(9) Q  Oh, I'm mis– that was an ambiguous question on my
(10) part. What I'm saying to you is, the information that
(11) Colborn had about Greg Allen might have been the
(12) actual assailant rather than Steven Avery would be
(13) information about someone having committed a crime.
(14) MR. BASCOM: Object to the form.
(15) BY MR. KELLY:
(16) Q  Specifically Greg Allen.
(17) MR. BASCOM: Same objection.
(18) A  I'm not really following that.
(19) BY MR. KELLY:
(20) Q  Well, let's posit this.
(21) A  All right.
(22) Q  Let's say that it's before May of 2003 and you're
(23) the chief investigator.
(24) A  Yes.
(25) Q  And an officer within the department comes and

Page 80

(1) says to you an officer in Brown County called me
(2) and told me Greg Allen did the Penny Beerntsen
(3) assault, not Steven Avery. Your testimony is you
(4) would have to do something about that then.
(5) A  Yes.
(6) Q  Okay. And you would have to draw up a report of
(7) having received that information from one of your
(8) subordinates.
(9) A  Of course.
(10) Q  And you would have to follow-up on that lead; is
(11) that right?
(12) A  Yes.
(13) Q  Okay. So the fact that you received this
(14) information when you did would not cause you to
(15) have to do that, you're saying, because you were
(16) no longer in office.
(17) A  If the information here is that Lenk was aware of
(18) it, I may have asked if that occurred. I'm
(19) assuming that from this report.
(20) Q  Okay. Did you in fact at any time have any
(21) discussion with the subject matter of Exhibit 124
(22) with Tom Kocourek?
(23) A  No.
(24) Q  Did you at any time have any dealings with Jim
(25) Gospodarek about the Steven Avery case?

(414)352-5450

## Page 81

(1) A  No.

(2) Q  Did you ever have any conversations with him

(3) about the Steven Avery case of any kind?

(4) A  Other than the fact that he had taken a 4-wheeler

(5) down on the beach.

(6) Q  In connection with the investigation?

(7) A  That's correct.

(8) Q  When did you have that conversation with

(9) Gospodarek?

(10) A  I was aware he did it. It would have been after

(11) he did it. Because after I did the sketch, and

(12) maybe a day or two later, I also did some

(13) neighborhood canvassing. And I think that other

(14) than that, I had had no other contact with

(15) reference to the investigation.

(16) Q  Well, you participated in the execution of the

(17) search warrant on the morning of July 30th,

(18) didn't you?

(19) A  I recall being there. What the level of my

(20) participation was, I really don't recall.

(21) Q  And you interviewed all of the witnesses that

(22) were provided on the Steven Avery witness list…

(23) A  No, I didn't.

(24) Q  …prior to the trial.

(25) A  No, I didn't.

## Page 82

(1) Q  Did you serve subpoenas on the Steven Avery

(2) witnesses?

(3) A  Yes.

(4) Q  Did you talk with them when you served the

(5) subpoenas?

(6) A  Don't believe so.

(7) Q  All right. You participated in the canvas?

(8) A  Yes.

(9) Q  Did you perform any other functions in the course

(10) of the investigation than those that I just

(11) enumerated with you?

(12) A  I don't believe so.

(13) Q  There are reports, which I'll show you. More

(14) than one person has said that the sheriff placed

(15) you in charge of the investigation; is that true?

(16) A  No.

(17) Q  One person said you and Larry Conrad were placed

(18) in charge of the investigation; is that true?

(19) A  No.

(20) Q  Who was in charge of the investigation?

(21) A  As far as I know, Sheriff Kocourek and Don Belz

(22) were.

(23) Q  Okay. In relationship to the canvas, would you

(24) tell us what that canvas was?

(25) A  I think it was going to houses on the streets

## Page 83

(1) just off the beach and asking people if they had

(2) seen anything or heard anything on that

(3) particular time that was unusual or out of place,

(4) or if they saw anybody or any vehicles.

(5) Q  Who participated in the canvas in addition to

(6) you?

(7) A  Who. I don't really recall at this time.

(8) Q  Who directed that the canvas be done?

(9) A  Sheriff Kocourek.

(10) Q  When was the canvas done?

(11) A  I think the next day or the day thereafter.

(12) Q  Did you prepare any report in connection with

(13) what you did in the canvas?

(14) A  I think I had my notes from the people I

(15) contacted and turned that in. What happened to

(16) it, I don't know.

(17) Q  Turned it in to whom?

(18) A  I don't recall.

(19) Q  What would you have done in the ordinary course

(20) in relationship to a canvas and notes that you

(21) had?

(22) A  Probably turned it in to a secretary for typing.

(23) If it was done, I don't know – or turned it in

(24) to who's ever in charge.

(25) Q  When you met with Ms. Doyle on both occasions,

## Page 84

(1) there were no notes of those kind that you

(2) reviewed, right?

(3) A  That is correct.

(4) Q  Nor any report about your notes in that respect

(5) that you reviewed with her.

(6) A  That is correct.

(7) Q  Did she say anything to you about whether or not

(8) there were any reports on the canvas?

(9) A  She said there weren't any.

(10) Q  Did she say that that was a question in the case,

(11) about why there weren't any?

(12) A  No. She asked me, just like you, if I knew

(13) anything about them.

(14) Q  Okay. Did you participate at all in any search

(15) of the beach area?

(16) A  No.

(17) Q  What's your recollection of your participation in

(18) the search of the house?

(19) A  I was standing there watching.

(20) Q  Why?

(21) A  I wanted to be there, I guess.

(22) Q  Who sent you there?

(23) A  I think I just went along.

(24) Q  Who else was present?

(25) A  I don't recall without seeing the report.

Page 85

(1) **Q** What Judy Dvorak there?

(2) **A** I don't recall.

(3) **Q** Did you see her at the hospital the night before?

(4) **A** I think I saw her there.

(5) **Q** Did you have any conversations with her?

(6) **A** I don't recall.

(7) **Q** Okay. Did you participate in the reenactment of

(8) the assault on Mrs. Beerntsen as it was conducted

(9) by the sheriff on the beach two or three days

(10) after the actual assault?

(11) **A** No.

(12) **Q** Have you ever had any conversation with Don Belz

(13) about his role in the investigation?

(14) **A** Yes.

(15) **Q** How many times?

(16) **A** Couple times, three times.

(17) **Q** Don Belz say anything to you about the sheriff

(18) taking over the investigation and he not

(19) conducting it in the way he ordinarily would

(20) have?

(21) **A** He didn't say it that way.

(22) **Q** What did he say?

(23) **A** He said the sheriff took over the investigation.

(24) **Q** Okay. Did he say when the sheriff took over the

(25) investigation?

Page 86

(1) **A** No.

(2) **Q** Of course, you were at the hospital that night

(3) when the sheriff was there, right?

(4) **A** That's correct.

(5) **Q** So you knew the sheriff was in charge at the

(6) hospital that night.

(7) **A** I know the sheriff was at the hospital. Whether

(8) he was in command of the entire investigation, I

(9) do not know.

(10) **Q** Well, was anyone else at the hospital that was in

(11) command of the entire investigation on the

(12) evening of July 29th?

(13) **A** Sometimes the sheriff can be there, it doesn't

(14) mean he's in command. Or he may take command

(15) initially and then it gets turned over to someone

(16) else.

(17) **Q** Yeah.

(18) **A** So...

(19) **Q** Well, what's your recollection of what happened that

(20) night?

(21) **A** That night?

(22) **Q** Was he or wasn't he in command of the

(23) investigation as you recall it?

(24) **A** Well, he was the highest ranking man there, yes.

(25) **Q** And was he behaving like he was in charge of the

Page 87

(1) investigation?

(2) MR. POLLEN: Object to form.

(3) MS. WEBER: I'll join.

(4) **A** He was being sheriff; he was asking about things

(5) being done. If that means he was in command...

(6) BY MR. KELLY:

(7) **Q** Were you in charge at the hospital that night?

(8) **A** No.

(9) **Q** Was Kolanczyk in charge?

(10) **A** He would be the investigator on the scene.

(11) **Q** So you think he was in charge?

(12) **A** I don't know. Because again, my scope was very

(13) limited, so I wasn't being – paying a lot of

(14) attention to else [sic] that was going on.

(15) **Q** I'm not asking you for perfect knowledge. I'm

(16) asking you for your impression, whatever may have

(17) been its source, as to who was in charge of the

(18) investigation at the hospital.

(19) **A** The sheriff, as department head, was there;

(20) therefore, he was in charge at that moment in

(21) time.

(22) **Q** And at any time subsequent to that in respect to

(23) the functions that you performed in the

(24) investigation, did it appear to you that anybody

(25) other than the sheriff was in charge of the

Page 88

(1) investigation?

(2) **A** I knew he was taking an active part. Does that

(3) mean he was in charge? He was in charge. I know

(4) other people were more active in the

(5) investigation. What they were doing in it – You

(6) have to understand, the sheriff would be the only

(7) one who could give me orders, so to me he was in

(8) charge. Whether he was in charge to every other

(9) person, you know, I mean, there is a chain of

(10) command. So whether Don Belz was giving the

(11) orders to the rest of the detectives, I don't

(12) know.

(13) **Q** Don Belz ever give you an order in respect to the

(14) investigation of the Steven Avery case?

(15) **A** No.

(16) **Q** Other than you, Kolanczyk and the sheriff and

(17) Beck and Dvorak, was anybody else from the

(18) department present at the hospital that night?

(19) **A** I don't recall.

(20) **Q** Okay. I'm going to ask you a whole sequence of

(21) questions about the events on the evening of July

(22) 29th, and I want to remind you that I don't have

(23) any special legal definition of knowledge here.

(24) What I'm asking you for is your best recollection

(25) from whatever source, whether it's hearsay,

Page 89

(1) whether it's what you directly remember, whether
(2) it's something somebody told you. Okay? You
(3) understand that?
(4) **A** Correct.
(5) **Q** All right. How were you first notified that
(6) something had happened that required you to or
(7) that you were being requested to go the hospital?
(8) **A** I was called by dispatch.
(9) **Q** Do you remember who the dispatcher was?
(10) **A** No.
(11) **Q** What were you told when you were called by
(12) dispatch?
(13) **A** I was told to get my sketch pad and go to the
(14) hospital.
(15) **Q** Where were you at the time?
(16) **A** Home.
(17) **Q** Can you approximate the time?
(18) **A** I'm thinking afternoon or early evening,
(19) somewhere in there.
(20) **Q** Did the dispatcher tell you what it was about?
(21) **A** No.
(22) **Q** Did you have any idea what you were wanted for
(23) with your sketch book?
(24) **A** I think she said there was a victim at the
(25) hospital and they wanted a sketch.

Page 90

(1) **Q** Did she say who "they" was?
(2) **A** I don't recall if she did.
(3) **Q** Did she identify Beck at all?
(4) **A** I may have been told that he was the officer on
(5) the scene, but I'm not absolutely sure.
(6) **Q** Did she identify the sheriff at all?
(7) **A** No.
(8) **Q** All right. I want to – I'm going to stop for a
(9) moment on the events that evening and ask you
(10) when last, prior to that evening, had you been
(11) involved in a course concerning doing composite
(12) sketches?
(13) **A** I had just completed a course, what they call
(14) Rapid Visual Perception. It was a – [coughs]
(15) excuse me – a one-semester, 40-hour course that
(16) dealt primarily with producing composite
(17) drawings.
(18) **Q** Where had you taken that course?
(19) **A** It was a course given by Mount Scenario College
(20) at the Manitowoc County Sheriff's Department.
(21) **Q** Was there any course concerning the doing of
(22) composite drawings that you had taken previously
(23) to the Mount Scenario course?
(24) **A** No.
(25) **Q** Was there any later course that you took with

Page 91

(1) respect to composite drawings?
(2) **A** Yes.
(3) **Q** Was the later course considered a more advanced
(4) course than the Mount Scenario course?
(5) **A** Oh, yes.
(6) **Q** And when was the later course in relationship to
(7) the Steven Avery matter?
(8) **A** I took maybe seven or eight additional courses
(9) over the years.
(10) **Q** And those were after the Steven Avery – after
(11) you did this composite that's involved in Exhibit
(12) 154.
(13) **A** That's correct.
(14) **Q** So as of the time that you were called to the
(15) hospital to bring your sketch pad, you had
(16) completed the one course at Mount Scenario that
(17) you've told us about.
(18) **A** That's correct.
(19) **Q** And as I understand it – you tell me if I'm
(20) right about this – that course was one that was
(21) offered in such a way that it actually took place
(22) at the department.
(23) **A** That is correct.
(24) **Q** And you were not the only person in that course.
(25) **A** That is correct.

Page 92

(1) **Q** Who else was in the course with you?
(2) **A** I don't remember everybody who was there. I know
(3) Bill Beck was there.
(4) **Q** Was the sheriff there?
(5) **A** No.
(6) **Q** If I told you that Beck had given us some
(7) testimony that he thought the sheriff took it,
(8) would that change your testimony at all?
(9) **A** No. I don't remember him being there.
(10) **Q** Okay. All right. Anybody else you can remember
(11) who took the course?
(12) **A** No, because there were a lot of courses I took,
(13) and I don't remember who was in each.
(14) **Q** Can you fix the period of time between when the
(15) course ended and when Mrs. Beerntsen was
(16) assaulted? Was it a matter of days, weeks?
(17) **A** Maybe a couple months. That would be just a
(18) guess. I'd have to see the course material.
(19) **Q** Would it be fair to say that whoever contacted
(20) the dispatcher and told the dispatcher to have
(21) you get your sketch pad and come must have known
(22) that you had taken this course?
(23) **A** Yes.
(24) *MR. BASCOM: Object to the form.*
(25) *BY MR. KELLY:*

Page 93

(1) Q When you completed the course, did you announce,
(2) or was it announced in any way, that you were a
(3) person who, within this department, would
(4) thereafter be doing composite sketches?
(5) A No.
(6) Q Do you know whether or not the course was
(7) something that was offered in order to give the
(8) department a skill that it had not previously
(9) had, that is to say the skill to do composite
(10) sketches?
(11) A No.
(12) Q No, I'm wrong, or no, you don't remember?
(13) A No, it was not offered for that purpose.
(14) Q Okay. What purpose was it offered for?
(15) A At that time a lot of officers were attempting to
(16) complete their bachelor's degree, and one of the
(17) courses needed would be an art credit. And the
(18) county board would only pay for those courses
(19) substantively related to police work; therefore,
(20) for our art credit, they gave us this Rapid
(21) Visual Perception course.
(22) Q And were you such a person, that is to say, were
(23) you then working on your degree at Mount Scenario
(24) and needing those credits?
(25) A That's correct.

Page 94

(1) Q All right. And I'm sorry, you may have already
(2) answered this. Do you remember what the time
(3) span was between when you finished the course and
(4) when the Steven Avery –
(5) A Maybe two to three months. I'd have to look at
(6) the documents to tell you for sure.
(7) Q At that point in time, had you done any composite
(8) drawings in any other case than the Steven Avery
(9) case from the time you completed the course up to
(10) when you were called to the hospital?
(11) A No.
(12) MR. POLLEN: Object to form.
(13) BY MR. KELLY:
(14) Q All right. Where was your sketch pad?
(15) A In my house.
(16) Q In addition to the sketch pad, what other
(17) materials did you need to do the composite?
(18) A Charcoal pencils, eraser. Basically that's it.
(19) Q All right. Were all of those at your house?
(20) A Sure.
(21) Q Did you go straight from your house to the
(22) hospital?
(23) A Yes.
(24) Q Did you stop on the way at the sheriff's
(25) department?

Page 95

(1) A I don't believe so.
(2) Q All right. Did you stop on the way at the jail?
(3) A No.
(4) Q When you got to the hospital, who was the first
(5) person you met who was involved in this?
(6) A I seem to think it was Bill Beck.
(7) Q All right. Do you remember what Bill Beck told
(8) you?
(9) A He told me that there was an assault and that a
(10) woman was – who was on the beach, that she was
(11) in the emergency room with the doctors now and
(12) they'd like to have a composite sketch done when
(13) she comes out.
(14) Q Did he say who was the "they" that wanted to have
(15) the composite sketch done?
(16) A No. I presumed it was he.
(17) Q He, Bill Beck.
(18) A He, Bill Beck.
(19) Q All right. Did he report on the identity of the
(20) woman who had been assaulted to you in that
(21) conversation?
(22) A He may have. I don't recall.
(23) Q All right. Do you remember him reporting to you
(24) on what he had been told by the nurse that Mrs.
(25) Beerntsen had described with respect to the

Page 96

(1) person who assaulted her?
(2) A I don't recall that.
(3) Q Did he, Bill Beck, make any effort to describe to
(4) you what he knew to be the description of the
(5) person who had assaulted Mrs. Beerntsen at that
(6) time, meaning when you arrived at the hospital?
(7) A I don't believe so.
(8) Q Did he brief you about the case?
(9) A Yes.
(10) Q You know, from having seen with Ms. Doyle on both
(11) occasions, that your Department of Justice
(12) investigatory statement reports that Bill Beck
(13) briefed you about the case.
(14) A Yes.
(15) Q What's that phrase mean to you, being briefed
(16) about the case?
(17) A Told me what's happening.
(18) Q All right. Did he tell you that there was any
(19) difficulty with his and Ms. Dvorak's desire to
(20) remain in the emergency room with Mrs. Beerntsen
(21) arising from the reactions of the doctors or
(22) nurses?
(23) A I – He may have. I'm not sure.
(24) Q All right. At the time that you were speaking
(25) with Bill Beck, where were you located

Page 97

(1) physically?

(2) A  It was either the lobby or the hallway.

(3) Q  And where was that in relationship to the

(4) emergency room?

(5) A  If it was in the hallway, it would have been

(6) outside the emergency room.

(7) Q  All right. Was anyone else present?

(8) A  I don't remember.

(9) Q  Do you remember seeing Tom Beerntsen?

(10) A  I may have. I didn't know him.

(11) Q  All right. Do you recall whether you were

(12) introduced to him?

(13) A  No.

(14) Q  Okay. Why do you say you may have seen him?

(15) A  He may have been there, and if I didn't recognize

(16) him, I have no recollection of it.

(17) Q  You don't remember talking with him at all.

(18) A  No.

(19) Q  Do you remember Beck reporting to you that Dvorak

(20) was in the emergency room with Mrs. Beerntsen?

(21) A  I believe he told me that.

(22) Q  Okay. Did he tell – Do you recall about what

(23) time it was when that conversation with Beck

(24) occurred, roughly?

(25) A  No, I don't.

Page 98

(1) Q  Okay. Was there a period of time during which

(2) you remained outside the emergency room...

(3) A  Yes.

(4) Q  ...and Bill Beck continued to be present?

(5) A  Yes and no, coming and going. I wasn't...

(6) Q  Coming – Who was coming and going?

(7) A  Well, he might – may have been there. He may

(8) have been going on the phone, doing other things.

(9) It was a period of time that I was there just

(10) waiting.

(11) Q  All right. During that waiting period of time,

(12) was Sheriff Kocourek there?

(13) A  To my recollection, he came later than I did. He

(14) came in; at what time he did, I don't know.

(15) Q  Can you estimate the period of time that you were

(16) outside the emergency room and before you ever

(17) saw Mrs. Beerntsen?

(18) A  No, I can't.

(19) Q  Are you able to say whether it was more than an

(20) hour?

(21) A  I'm thinking it was, but I'm not sure.

(22) Q  Okay.

(23) A  You know, my recollection of that period is not

(24) ironclad.

(25) Q  All right. During the period of time that you

Page 99

(1) were waiting, do you recall whether or not the

(2) sheriff came?

(3) A  That's the period of time I thought he came.

(4) Q  Sometime in that period of time.

(5) A  Sometime in that period.

(6) Q  How proximate to your arrival was his arrival?

(7) A  That I saw him? A guess would be maybe 15

(8) minutes, but that's a guess.

(9) Q  You seem to be drawing a distinction between when

(10) you saw him and when he may have arrived. Were

(11) you doing that in your testimony just a moment

(12) ago?

(13) A  Yes. He may have been there and I not see him.

(14) Q  Okay. Where did he come from when you saw him?

(15) A  I have no idea.

(16) Q  Did he come out of the emergency room?

(17) A  No.

(18) Q  How do you know that?

(19) A  Because I would have been right outside the

(20) emergency room.

(21) Q  So you weren't waiting in the front hall, you

(22) were waiting right outside the emergency room.

(23) A  Well, I was waiting where I could see the door,

(24) because I wanted to be ready.

(25) Q  All right. And that's where you first saw the

Page 100

(1) sheriff.

(2) A  I believe so.

(3) Q  Do you know where he came from?

(4) A  No.

(5) Q  Other than the sheriff and Mr. Beck and yourself, and

(6) perhaps Mr. Beerntsen, was there anybody else outside

(7) the emergency room at that time that you recall?

(8) A  I think Judy came out once, but I'm not sure.

(9) Q  Okay. Did you know Judy Dvorak?

(10) A  Yes.

(11) Q  Okay. So you would recognize her on sight.

(12) A  Yes.

(13) Q  And Beck had already told you that she was in

(14) there.

(15) A  Yes. I believe so.

(16) Q  When she came out, what did she do?

(17) A  I don't recall.

(18) Q  Do you remember whether she spoke to the sheriff?

(19) A  I don't recall.

(20) Q  Do you remember whether she reported on anything

(21) that Mrs. Beerntsen had said about who her

(22) assailant was or what happened to her?

(23) A  I really can't say for sure. I mean –

(24) Q  Give me your best recollection, however imperfect

(25) it may be.

### Page 101

(1) **A** Things were said. I think more like, you know,

(2) she was hurt and that they were waiting for a –

(3) I think someone said they were waiting for a

(4) specialist. It may have been Judy.

(5) **Q** Not the specialist, but it may have been Judy who

(6) said that.

(7) **A** Yeah, it may have been Judy saying they were

(8) waiting for a specialist.

(9) **Q** Who was she speaking to?

(10) **A** I don't know. I was standing – I believe I was

(11) standing there. It may have been to who all who

(12) was standing there.

(13) **Q** So she's coming out and reporting on what's going

(14) on in the emergency room to whoever of you was

(15) there.

(16) **A** That's my recollection, yes.

(17) **Q** And your recollection, as I understand it at this

(18) point, would be Beck, yourself and the sheriff

(19) for sure are standing there when she comes out.

(20) **A** I can't say. I don't recall. I know these

(21) people were there at some time during the

(22) evening. When she came out and said this, I

(23) don't know who was standing there.

(24) **Q** And do you know, in time, about how long that was

(25) after you had arrived?

### Page 102

(1) **A** It would just be a guess, if I made a guess.

(2) **Q** Okay. What's your guess?

(3) **A** My –

(4) *MR. BASCOM: Object to the form. Calls for*

(5) *speculation.*

(6) **A** My guess would be maybe a half hour, something of

(7) that nature.

(8) *BY MR. KELLY:*

(9) **Q** Okay. Did you have your notebook with you at the

(10) time?

(11) **A** I probably did.

(12) **Q** In addition to your sketch pad and materials.

(13) **A** Yes, probably did.

(14) **Q** Did you make any notes about these events –

(15) **A** No.

(16) **Q** – that occurred at the hospital?

(17) **A** No.

(18) **Q** Did you ever complete a report about it?

(19) **A** No.

(20) **Q** Okay. How come?

(21) **A** Because I just did the sketch.

(22) **Q** About how long did Ms. Dvorak report on the

(23) goings on in the emergency room when she came out

(24) that you –

(25) **A** I think it was just coming out and stating they

### Page 103

(1) were waiting for a specialist and then went back

(2) in, to my recollection.

(3) **Q** Do you recall whether she spoke to Mr. Beck at

(4) all about the identification of Mrs. Beerntsen's

(5) assailant on that occasion?

(6) **A** I don't – can't recall.

(7) **Q** You don't recall whether or not Beck said

(8) anything to you before you went into any room

(9) about the fact that Mrs. Beerntsen had given a

(10) description and the description was said to be

(11) Steven Avery.

(12) **A** I heard from somebody that "That sounds like

(13) Steve Avery."

(14) **Q** Okay.

(15) **A** Who it was, I've racked my mind to think of, and

(16) I can't remember who said it.

(17) **Q** Well, let's talk about who the possibilities are.

(18) **A** Okay.

(19) **Q** As far as I understand it from you, the

(20) possibilities at this point in time are Beck.

(21) **A** Yes.

(22) **Q** Dvorak.

(23) **A** Yes.

(24) **Q** Sheriff Kocourek.

(25) **A** Yes.

### Page 104

(1) **Q** Not yourself, because you're the listener, not

(2) the speaker. And was Kolanczyk there by that

(3) time?

(4) **A** He may have been. I don't recall.

(5) **Q** You're not sure about that.

(6) **A** I'm not sure.

(7) **Q** All right. And was – And you don't remember

(8) whether Tom Beerntsen was there.

(9) **A** I don't remember if Tom Beerntsen was there.

(10) **Q** Are there any other specific people whom you could

(11) consider to be possibilities for who would have said

(12) that?

(13) **A** I can't say, because I don't recall who exactly

(14) was there.

(15) **Q** All right. But there's no one else specifically

(16) that you can think of, other than the people

(17) we've named.

(18) **A** Not that I can specifically name, no.

(19) *WITNESS: [Addressing Mr. Pollen] Can I get*

(20) *some more water?*

(21) **Q** Okay. And let's go through them. Are you clear

(22) that it was not Kocourek who said, "That sounds

(23) like Steven Avery"?

(24) **A** I don't think it was him.

(25) **Q** All right. And are you clear that it was not Tom

## Page 105

(1) Beerntsen who said, "That sounds like Steven

(2) Avery"?

(3) **A** If he had said it – See, I didn't know him.

(4) Therefore, if – I don't remember a civilian

(5) being there…

(6) **Q** Okay.

(7) **A** …talking to us.

(8) **Q** Okay. All right. So – And we know it wasn't

(9) you.

(10) **A** Yes.

(11) **Q** So we're down to Beck, Kolanczyk or Dvorak.

(12) **A** Or if someone else was there that I don't

(13) remember.

(14) **Q** Okay. And the only person who had been in the

(15) emergency room with Mrs. Beerntsen was Dvorak, at

(16) that point in time.

(17) **A** I don't know that. I don't know whether Beck had

(18) been with her earlier and talked to her. I don't

(19) know when, if any description was given, whether

(20) it had been in there or prior to that.

(21) **Q** Okay.

(22) **A** So I don't know.

(23) **Q** So betwee–

(24) *REPORTER: We are about to end the first*

(25) *videotape.*

## Page 106

(1) *MR. KELLY: Let me just ask one more*

(2) *question.*

(3) *REPORTER: Certainly.*

(4) *BY MR. KELLY:*

(5) **Q** As between the three people that we've named,

(6) Beck, Kolanczyk and Dvorak, you don't know who it

(7) was.

(8) **A** I have no idea. I have no recollection.

(9) **Q** And as far as you're concerned, maybe it was even

(10) the sheriff?

(11) **A** It could have been.

(12) **Q** Okay.

(13) *REPORTER: Off the record for a moment.*

(14) (End of first videotape 11:58 - 11:58)

(15) *REPORTER: We've begun the second videotape*

(16) *and we're back on the record.*

(17) *BY MR. KELLY:*

(18) **Q** While you were waiting outside the emergency room and

(19) before you ever entered it or any other room, do you

(20) recall somebody coming from the jail with a stack of

(21) photographs and giving them to the sheriff?

(22) **A** No.

(23) **Q** Do you have any recollection of the sheriff

(24) starting to enter the emergency room with

(25) photographs from the jail and you saying to him,

## Page 107

(1) "Don't do that until I go in and do the

(2) composite"?

(3) **A** I remember saying that, but I don't know if it

(4) was to him.

(5) **Q** All right. Do you remember to whom else, than

(6) him, it might have been?

(7) **A** It could have been to any of the other

(8) individuals. All I remember is that someone

(9) saying "We have a mug shot." And I says, "Don't

(10) show her and don't show me."

(11) **Q** And that person who said "We have a mug shot"

(12) said "We have a mug shot"?

(13) **A** That's my recollection.

(14) **Q** And do you recall whether that mug shot that was

(15) identified as a mug shot was of Steven Avery?

(16) **A** I never saw it. I can't tell you.

(17) **Q** Did anybody say anything about that?

(18) **A** I may have supposed it because they said it

(19) sounds like Steve Avery.

(20) **Q** Okay.

(21) **A** And then someone coming up said we have a mug

(22) shot. Maybe in my mind I supposed it was of

(23) Steve Avery.

(24) **Q** You told us earlier that you were looking at the

(25) photographs when the photo array was done with

## Page 108

(1) Mrs. Beerntsen.

(2) **A** That's correct.

(3) **Q** And you told us that the photograph that appears

(4) at the bottom of Exhibit 154 was the photograph

(5) of Steven Avery that was in the array.

(6) **A** That is correct.

(7) **Q** And you're telling us now that the mug shot

(8) that's being referred to as "a mug shot" may well

(9) have been Steven Avery; is that right?

(10) *MR. POLLEN: I'm going to object. That just*

(11) *calls for speculation on his part.*

(12) **A** I'm guessing that it was, because that evening,

(13) later, they came up and there was – that mug

(14) shot was there, so I'm assuming they had it.

(15) **Q** And it was based on that assumption that you

(16) said, "Don't show that mug shot."

(17) **A** Right.

(18) **Q** Okay.

(19) **A** Or any mug shots. I didn't want any photographs

(20) showed to her.

(21) **Q** And to whom did you say that?

(22) **A** Whoever made the comment about the mug shots.

(23) **Q** Who was the jailer who brought the photos over?

(24) **A** I have no idea.

(25) **Q** Do you know who was on duty at the jail that

Case 1:19-cv-00484-BHL    Filed 03/03/20    Page 29 of 46    Document 120-19

## Page 109

(1) night?

(2) A  No idea.

(3) Q  After you left the hospital that night, where did

(4) you go?

(5) A  Might have gone back to my office.

(6) Q  And where was your office?

(7) A  In the sheriff's department.

(8) Q  Okay. Who was in the building when you went

(9) back?

(10) A  I have no recollection.

(11) Q  What time was it?

(12) A  I – It was later in the evening.

(13) Q  Do you recall whether or not you had any contact

(14) with Ken Petersen at that time?

(15) A  I don't recall it.

(16) Q  Had the decision then been made to arrest Steven

(17) Avery?

(18) A  I don't know.

(19) Q  How long did you stay at your office?

(20) A  I think I sealed the sketch and left.

(21) Q  Did you leave the sketch there?

(22) A  Yes.

(23) Q  Do you have a recollection of whether or not

(24) Kolanczyk arrived by the time you made the

(25) directive that no one should go into the

## Page 110

(1) emergency room with any of the mug shots?

(2) A  I don't recall.

(3) Q  Did you see Sheriff Kocourek move in and out of

(4) the emergency room during the period of time that

(5) Mrs. Beerntsen was being treated?

(6) A  No.

(7) Q  Do you deny that that occurred?

(8) A  No.

(9) Q  You just don't remember?

(10) A  I don't recall.

(11) Q  Do you recall whether or not Beck moved in and

(12) out of the emergency room during the time that

(13) you were waiting?

(14) A  I don't recall that either.

(15) Q  Do you remember Beck leaving the hospital at any

(16) time?

(17) A  No.

(18) Q  Do you remember when Sheriff Kocourek arrived

(19) whether he spoke with Beck?

(20) A  I believe he did, but it was not within my

(21) hearing.

(22) Q  Okay. And do you recall whether after that

(23) conversation Beck left?

(24) A  No.

(25) Q  Did you at any time enter the emergency room

## Page 111

(1) yourself?

(2) A  I think I may have, but I asked for a room where

(3) I could sit with her and have a table.

(4) Q  Well, we'll take them one at a time. In respect

(5) to entering the emergency room, do you recall

(6) what caused you to do that?

(7) A  I think – If I did, it was when they told me she

(8) was ready, that I could talk to her.

(9) Q  Do you recall who it was that told you that she

(10) was ready?

(11) A  No, I don't.

(12) Q  Do you recall whether it was somebody on the

(13) hospital staff, that is to say a physician or a

(14) nurse, or whether it was someone within the

(15) sheriff's department?

(16) A  I really don't recall.

(17) Q  Do you remember whether Judy Dvorak came out and

(18) announced that now others than she could come

(19) into the emergency room?

(20) A  I don't recall that.

(21) Q  All right. Do you remember at any time being in

(22) the emergency room with Judy Dvorak, Sheriff

(23) Kocourek, and Mrs. Beerntsen and you?

(24) A  I really can't say. I think when I went in

(25) there, my attention was focused on her and

## Page 112

(1) talking to her. And, then, if there were others

(2) in the room, I really can't recall.

(3) Q  When you say your attention was focused on her,

(4) what did you first say to her, and what do you

(5) recall her first saying to you?

(6) A  She was very badly beaten, and I asked her if she

(7) felt up to doing – sitting with me and doing a

(8) sketch.

(9) Q  So you told her you were there to do – you

(10) introduced yourself?

(11) A  That is correct.

(12) Q  And you told her you were there to do a sketch.

(13) A  That's correct.

(14) Q  If she was up to it.

(15) A  Yeah.

(16) Q  What did she say?

(17) A  She said yes.

(18) Q  All right. Did you tell her what was involved in

(19) doing a sketch?

(20) A  I did after we got to a room.

(21) Q  That's not what I'm asking. I'm asking while

(22) you're in the emergency room.

(23) A  I don't know if I did or not.

(24) Q  All right. Did you tell her about how long, or

(25) did she ask about how long, it was going to take

Page 113

(1) to do the sketch?

(2) **A** I says maybe a couple of hours.

(3) **Q** Did she say – So she did ask?

(4) **A** I told her. Whether it was in response to a

(5) question or not, I don't recall. I usually tell

(6) people, you know, that it's going to take, you

(7) know, one to three hours, I usually tell. Now,

(8) I think I told her it would take – it would

(9) probably take a couple of hours.

(10) **Q** Okay. Do you have any recollection of whether or

(11) not her readiness to receive you for the purpose

(12) of doing this sketch was purely a medical matter,

(13) meaning the doctors were done with her and now

(14) you can talk to her, or was it also a law

(15) enforcement matter, meaning the doctors are done

(16) with her and we've taken her statement?

(17) **A** I assumed – I have no direct knowledge. I

(18) assumed it was because the medical situation was

(19) resolved to the point that I could talk to her.

(20) **Q** Do you know whether or not a statement had been

(21) taken from her while she was in the emergency

(22) room prior to when you entered?

(23) **A** Do I know that? No.

(24) **Q** Well, when I say – Again, when I say "know" –

(25) **A** Yeah. I believe that a statement was, you know,

Page 114

(1) taken from her or – I think when – geez – that

(2) when Judy Dvorak was in there, I believe she took

(3) down notes to what was – This is just a vague

(4) recollection. This – I really don't know, but

(5) this is my impression.

(6) **Q** Your impression is that Judy Dvorak had taken a

(7) statement from Penny Beerntsen before you entered

(8) the emergency room.

(9) **A** Or got some information in some manner or form,

(10) yeah.

(11) **Q** And that information, did you understand,

(12) included a description of her assailant?

(13) **A** I presume that, because somebody said that sounds

(14) like Steve Avery.

(15) **Q** Okay. So that was something you knew as you were

(16) saying to Mrs. Beerntsen, we're going to do this

(17) – if you – with your permission, we're going to

(18) do this composite sketch and it's going to take a

(19) couple of hours.

(20) **A** Correct.

(21) **Q** Okay. Do you remember at that point in time

(22) whether or not Beck was still present?

(23) **A** No, I don't remember.

(24) **Q** Do you remember whether or not Kolanczyk was

(25) still present?

Page 115

(1) **A** No.

(2) **Q** Do you recall whether the sheriff was in the

(3) emergency room at the time that that conversation

(4) took place?

(5) **A** I don't know.

(6) **Q** Well, what's your best recollection?

(7) **A** I really don't recall whether he was or not.

(8) **Q** All right. And how about Judy Dvorak, was she

(9) still there?

(10) **A** I don't recall anybody else being there. They

(11) may have been there. I just don't recall them.

(12) **Q** Is it your testimony that the matter of moving

(13) Mrs. Beerntsen to a room was a matter introduced

(14) by you at that point, or were there other

(15) arrangements being made for her to go to one?

(16) **A** I don't know whether there was or not, but I

(17) believe I asked is there a place that we can do

(18) this. And whether it was because it was already

(19) arranged or it was a response to my request, I

(20) can't tell you.

(21) **Q** All right. Of whom did you ask that?

(22) **A** I believe the E.R. staff.

(23) **Q** What were you told?

(24) **A** I was told there was a room and we were taken

(25) there, to my recollection, because we ended up in

Page 116

(1) a room.

(2) **Q** Were you told that there was going to be some

(3) delay while she was moved to a room?

(4) **A** No.

(5) **Q** You went directly from the emergency room to

(6) another room in the hospital?

(7) **A** To my recollection, it was just off the emergency

(8) room. It wasn't very far.

(9) **Q** So was it a patient room, or was it some room

(10) that was just contiguous –

(11) **A** There was a bed in it, so it was in some manner

(12) or form, it was a patient room.

(13) **Q** Rather than a holding area with respect to the

(14) emergency room?

(15) **A** I don't know their nomenclature.

(16) **Q** I'm talking about the difference between a room

(17) for a patient to stay overnight on the one hand,

(18) a room in a hospital as we call it in common

(19) language, or whether it was simply a room that

(20) was available contiguous to the emergency room.

(21) **A** I recall a bed being in there, so I'm assuming it

(22) was a patient room.

(23) **Q** Okay.

(24) **A** What it was beyond that, I don't know.

(25) **Q** Do you remember whether or not at that point in

Page 117

(1) time you had been introduced to Tom Beerntsen?

(2) A No, I wasn't.

(3) Q Do you remember Tom Beerntsen being in this room

(4) that we're talking about?

(5) A No, I don't.

(6) Q Do you recall whether or not the sheriff was in

(7) the room?

(8) A While I was doing the sketch?

(9) Q Yes.

(10) A Nobody was in the room.

(11) Q Just you and Mrs. Beerntsen.

(12) A That's correct.

(13) Q Nobody came and went into the room and out of the

(14) room while you were doing it?

(15) A I think it was an opening door, are you done yet

(16) type thing. I mean, people used to seeing on

(17) television that things get done in 15 minutes.

(18) Q Yeah.

(19) A That's not reality.

(20) Q Right. I think you've testified, or you made a

(21) statement to the Department of Justice agents,

(22) that it took you between an hour and an hour and

(23) a half.

(24) A That would be my guess.

(25) Q Okay. So less than two hours, but more than one.

Page 118

(1) A Yes.

(2) Q And I believe you've said that you thought that

(3) Mrs. Beerntsen did a very good job in terms of

(4) working with her on this composite.

(5) A Yes.

(6) Q And this was the first one that you had done in

(7) an actual case since you completed the course.

(8) A That's correct.

(9) Q And the basis for your saying that she did a good

(10) job was that there were adjustments that you had

(11) to make to the composite that's shown in Exhibit

(12) 154 based on things that she said to you.

(13) A Correct.

(14) Q Including her – a statement that she made that

(15) the person appeared to be too old and that you

(16) had to adjust the sketch because of that.

(17) A Right. My drawing made him – Because I put

(18) facial lines in and I had to remove them.

(19) Q So – Let's get 154 again for the moment. So we

(20) now know that the person Mrs. Beerntsen described

(21) to you was Gregory Allen, right?

(22) A No.

(23) Q No?

(24) A No.

(25) Q Well, we know that Gregory Allen was the

Page 119

(1) assailant of Mrs. Beerntsen because the DNA has

(2) shown that.

(3) A Well, you know that. I don't know that, I'm

(4) saying.

(5) Q Well, let's again – Let's talk about knowledge

(6) here.

(7) A Right.

(8) Q I'm not talking about firsthand knowledge. I'm saying

(9) that the DNA has –

(10) A I have not read any reports. I do not know.

(11) People won't give me answers. So I can't say. I

(12) don't know.

(13) Q Okay. So you're –

(14) A I don't take what's in the paper as gospel truth,

(15) believe me.

(16) Q Well, do you take DNA evidence that's been done

(17) by the State Crime Lab and become the basis for

(18) vacating –

(19) A That there w–

(20) Q Let me finish. – vacating a judgment of

(21) conviction of Steven Avery? Is that enough for

(22) you to know that Steven Avery did not commit this

(23) assault?

(24) A No. Where did the evidence come from? That's

(25) all I'm asking.

Page 120

(1) Q You're saying you doubt the DNA examination

(2) because –

(3) A That it was a match? I believe there was a

(4) match.

(5) Q Okay. So you –

(6) A Has DNA evidence been fabricated before? Yes. I

(7) don't know.

(8) Q You think that happened here?

(9) A I don't know. That's why I'm asking.

(10) Q Okay. So let's see if we understand, then.

(11) A Okay.

(12) Q Given this doubt in your mind...

(13) A Sure.

(14) Q ...are you asserting that this sketch, this

(15) composite sketch you did, is a sketch of Steven

(16) Avery?

(17) A The sketch I did was what I was directed to by

(18) the victim of the case.

(19) Q Right. Who was describing her assailant.

(20) A Correct.

(21) Q All right. And that assailant that she described

(22) you depict in 154.

(23) A Correct.

(24) Q And you say that comes very close to Steven

(25) Avery.

Page 121

(1) **A** Yes.

(2) **Q** And not as close to Gregory Allen.

(3) **A** That is correct.

(4) **Q** Even though Gregory Allen has been inculpated by

(5) DNA evidence.

(6) **A** Yes. I can't say what – that it looks like him.

(7) In my mind, it doesn't.

(8) **Q** So you actually think that your sketch is more

(9) valid evidence that Steven Avery committed this

(10) crime than the DNA evidence that's inculpated

(11) Gregory Allen.

(12) **A** My sketch is what the victim had me draw –

(13) **Q** Right.

(14) **A** – as what she saw.

(15) **Q** Right.

(16) **A** My sketch looks more like Steven Avery than it

(17) does Gregory Allen.

(18) **Q** Right. That's right. And –

(19) **A** That causes me a problem.

(20) **Q** And Mrs. Beerntsen thinks that Gregory Allen is

(21) the person who assaulted her.

(22) **A** Okay. She's the victim, I'm not.

(23) **Q** Right.

(24) **A** I'm saying that is what she had me draw.

(25) **Q** Mm-hmm.

Page 122

(1) **A** I think it looks more like him than like him.

(2) **Q** Right.

(3) **A** But this is a picture of him a year later. He may

(4) have looked more like that a year earlier. I don't

(5) know.

(6) **Q** Actually, did you make any effort to find out

(7) whether or not there was a mug shot of Gregory

(8) Allen before the assault of Mrs. Beerntsen that

(9) might be available to you?

(10) *MR. BASCOM: Object to the form of the*

(11) *question. It's vague as to time.*

(12) *BY MR. KELLY:*

(13) **Q** At any point in time.

(14) **A** I asked if there was a mug shot of him with a

(15) beard.

(16) **Q** I'm going all the way back to 1985 and

(17) thereafter.

(18) **A** I had no knowledge of Gregory Allen before that.

(19) **Q** He was not in the array of photographs that was

(20) shown that evening to –

(21) **A** Okay.

(22) **Q** What do you mean, okay? You looked at those

(23) photographs.

(24) **A** I don't – Well, sure. But I don't know who was

(25) in there. I couldn't name to you who was in

Page 123

(1) there and who was not in there. I'm saying, I

(2) have never seen him with a beard on till this

(3) photograph, which was a year later. The hair is

(4) very different, but hair changes. He may have

(5) looked more like that at that time [indicating

(6) Exhibit 154].

(7) **Q** I want to show you what's been marked as Exhibit

(8) 117 in this case. I ask you to take a moment and

(9) look at that.

(10) *MR. POLLEN: Do you still want this up*

(11) *[referring to Exhibit 154]?*

(12) *MR. KELLY: I do.*

(13) *MR. POLLEN: Okay.*

(14) *BY MR. KELLY:*

(15) **Q** Have you seen that?

(16) **A** No.

(17) **Q** I mean right now, have you looked at that?

(18) **A** Oh, yes. Yes.

(19) **Q** Do you know who that is from looking at it and

(20) examining...

(21) **A** It says Gregory Allen.

(22) **Q** Okay. And what's the date on that?

(23) **A** It's October 22nd, 1985.

(24) **Q** Okay. Would you put that up next to the picture

(25) of Steven Avery?

Page 124

(1) **A** [Complies]

(2) **Q** Okay. Now, is it your testimony that the drawing that

(3) you did in Exhibit 154 looks even more like Steven

(4) Avery than Greg Allen in Exhibit 117?

(5) **A** Yes.

(6) **Q** Okay. And that's dated October of 1985, right?

(7) **A** Yes.

(8) **Q** And again, the victim was describing the person

(9) who actually assaulted her, right?

(10) **A** Yes.

(11) **Q** And we – Well, let's put it this way. The DNA

(12) has indicated that that's Gregory Allen, right?

(13) **A** That's correct.

(14) **Q** And not Steven Avery.

(15) **A** That's correct.

(16) **Q** Okay.

(17) *MR. KELLY: We can...*

(18) *MR. POLLEN: Okay [removes Exhibit 154].*

(19) *BY MR. KELLY:*

(20) **Q** So is it fair to say that when you were doing the

(21) composite sketch, you knew there was a suspect

(22) and somebody had mentioned that it was Steven

(23) Avery?

(24) **A** That is correct.

(25) **Q** Did you have any prior knowledge of Steven Avery

(1) as a result of his contacts with the sheriff's

(2) department?

(3) A I had seen his name.

(4) Q In what context had you seen his name?

(5) A In reviewing reports.

(6) Q What reports had you reviewed?

(7) A All the reports in the depart– or mostly all the

(8) reports when I working.

(9) Q So you had reviewed the reports that were

(10) involved when Steven Avery was arrested in

(11) January of 1985.

(12) A I probably did.

(13) Q Did you see the photograph that is represented in

(14) Exhibit 154 when he was booked in January of '85?

(15) A No.

(16) Q In January of 1985, you were still the chief

(17) deputy in both title and function.

(18) A That's correct.

(19) Q So as a matter of course, everybody who was

(20) arrested, particularly on a serious crime, that

(21) would be reported to you.

(22) A I reviewed the reports, yes.

(23) Q And you would deal with the sheriff on that. You

(24) would inform the sheriff of what had happened on

(25) particular arrests and the information and

(1) discuss that with him.

(2) A Only if something were extremely unique or what

(3) have you.

(4) Q Okay. Was that the case with respect to the

(5) Steven Avery endangerment charge in January of

(6) 1985?

(7) A I don't recall it being so.

(8) Q Do you remember who the investigating officer was

(9) on that?

(10) A No.

(11) Q Do you recall discussing with Larry Conrad his

(12) interview of Steven Avery after Avery was

(13) arrested in that case?

(14) A I don't recall that.

(15) Q Do you remember whether or not you visited Steven

(16) Avery at all when he was in jail?

(17) A No.

(18) Q Are you denying that you ever saw Steven Avery in

(19) any way before July 29th of 1985?

(20) A No.

(21) Q You're not.

(22) A No.

(23) Q You just don't remember.

(24) A I don't have any specific recollection of him.

(25) Q Okay. At any time in the course of the evening

(1) between the period of time when you arrived at

(2) the hospital and when you left to go to your

(3) office, did you leave the hospital temporarily?

(4) A Not to my recollection.

(5) Q After you completed the composite, what did you

(6) say to Mrs. Beerntsen most immediately?

(7) A I says, "Is this the man who assaulted you?" She

(8) said yes.

(9) Q All right. What did you then do?

(10) A I think I went to the door and said, "We're

(11) done."

(12) Q You went to what?

(13) A The door of the room and said, "We're done."

(14) Q To whom did you say that?

(15) A I think the sheriff was out there.

(16) Q Anyone else?

(17) A I just said it generally. I don't remember

(18) anybody specifically.

(19) Q Okay. Do you recall ever in the course of the

(20) evening going to the jail yourself to get the

(21) photos?

(22) A Never.

(23) Q You did not do that.

(24) A Did not do that.

(25) Q Do you recall going to the jail to get a framing

(1) – I'm not quite sure what they call it in law

(2) enforcement, but I –

(3) A It's a shof–[phonetic] – it's a folder with the

(4) holes in it. Sure.

(5) Q That allows pictures to be put in for an array.

(6) A Correct.

(7) Q Do you recall going to get that?

(8) A No.

(9) Q Was there anybody else from the department

(10) outside Mrs. Beerntsen's room than the sheriff?

(11) A I don't recall.

(12) Q How much of a time delay was there between when

(13) you reported that you had completed the sketch

(14) and when the photo array was done?

(15) A I think they came in and did it immediately.

(16) Q Okay. Who is they?

(17) A I recall the sheriff. And I seem to think other

(18) people were there, but I'm not really sure.

(19) Q Okay. So what you remember for sure is that it's

(20) you and the sheriff and Mrs. Beerntsen in the

(21) room to do the photo array.

(22) A Correct.

(23) Q And he already had the photos.

(24) A Correct.

(25) Q And your recollection is that he simply laid out

Page 129

(1) the photos.

(2) **A** That's my recollection, yes.

(3) **Q** And you're saying that you were looking at them.

(4) **A** Yes.

(5) **Q** And as you looked at them, you thought the mug

(6) shot, Exhibit 74 in the lower left-hand corner,

(7) looked like the person whose composite drawing

(8) you had done.

(9) **A** Yes.

(10) **Q** And Mrs. Beerntsen was looking at the photos at

(11) the same time.

(12) **A** Correct.

(13) **Q** And what did she say, as you recall?

(14) **A** I think she just pointed, saying "That's him." I

(15) —

(16) **Q** At this mug shot right here.

(17) **A** That's correct.

(18) **Q** The one in the lower left-hand corner of Exhibit No.

(19) 74.

(20) **A** That's correct.

(21) **Q** All right. You knew that to be Steven Avery at

(22) the time that you were looking at it.

(23) **A** No.

(24) **Q** You did not?

(25) **A** No.

Page 130

(1) **Q** And do you know whether or not she knew it to be

(2) Steven Avery?

(3) **A** I wouldn't know.

(4) **Q** Do you have any knowledge about how it came to be

(5) that Steven Avery's mug shot was included amongst

(6) those that were shown to Mrs. Beerntsen by the

(7) sheriff?

(8) **A** Before I had gone in, someone said we had — they

(9) had mentioned it sounds like Steven Avery, and

(10) then they said we have mug shots. I'm assuming

(11) that that's why his mug shot was included.

(12) **Q** So as far as you know, somebody called the jail

(13) to get the mug shots.

(14) **A** I presume so.

(15) **Q** But it's an assumption on your part.

(16) **A** It's an assumption.

(17) **Q** You were not involved in the photographs being

(18) obtained from the jail to do the photo array.

(19) **A** No.

(20) **Q** And you have no recollection of you yourself

(21) asking for the inclusion of Steven Avery's mug

(22) shot.

(23) **A** No.

(24) **Q** Okay. Would you agree with me that how Steven

(25) Avery appeared on the evening of July 29th, 1985,

Page 131

(1) and July 30th, 1985, is represented by the top

(2) mug shot in Exhibit No. 74, not by the mug shot

(3) in the lower left-hand corner?

(4) *MR. POLLEN: Object on foundation from this*

(5) *witness.*

(6) *BY MR. KELLY:*

(7) **Q** You can answer.

(8) *MS. WEBER: I'll join.*

(9) **A** Just by the look of the dates, it's different.

(10) *BY MR. KELLY:*

(11) **Q** Right.

(12) **A** And the hair is different.

(13) **Q** Right. So if we were to make an assumption like

(14) one that you suggested earlier, that Mrs.

(15) Beerntsen was actually describing Steven Avery

(16) rather than Greg Allen, it would have to be the

(17) Steven Avery depicted in the top mug shot,

(18) wouldn't it?

(19) *MR. BASCOM: Object to the form.*

(20) *BY MR. KELLY:*

(21) **Q** You can answer.

(22) *MR. POLLEN: I object to form and foundation*

(23) *again. It's —*

(24) *BY MR. KELLY:*

(25) **Q** How he looked that night —

Page 132

(1) *MS. WEBER: I'll object.*

(2) *BY MR. KELLY:*

(3) **Q** — not how he looked six months before.

(4) *MS. WEBER: I'll join on both of those.*

(5) *MR. BASCOM: Same objection.*

(6) *BY MR. KELLY:*

(7) **Q** Is that right?

(8) **A** I didn't know what he looked like when he

(9) assaulted her.

(10) **Q** Right.

(11) **A** Later, when he was arrested, his hair looked like

(12) that.

(13) **Q** Later, when he was arrested, meaning in July of

(14) 1985, he looked like this.

(15) *MR. BASCOM: Object to the form.*

(16) *BY MR. KELLY:*

(17) **Q** You can answer.

(18) **A** After the event at the beach, after everything

(19) had occurred and he was arrested, then he looked

(20) like that. Hair can be changed and altered.

(21) That's one of the things — You know, I mean —

(22) **Q** Okay.

(23) **A** Whether you comb your hair or you look messy.

(24) Whether his hair looked like that earlier in the

(25) day, I don't know.

## Page 133

(1) Q Okay. But the comparison here is between a

(2) photograph of Steven Avery –

(3) A He looks like the pictures.

(4) Q Hold on, please.

(5) A Okay.

(6) Q – between a booking photograph of Steven Avery

(7) taken on the night that Mrs. Beerntsen was

(8) assaulted, the top picture...

(9) A Yeah.

(10) Q ...and a booking photograph of Steven Avery taken

(11) in January of 1985, the bottom photo.

(12) A Right.

(13) Q Correct?

(14) A Correct.

(15) Q And that – What your testimony is, that which

(16) more closely compares to the composite drawing

(17) you did was not the booking photo done on the

(18) evening of July 30th, it was the one that was

(19) done in January of 1985.

(20) A That is correct.

(21) Q Okay. Do you think it would be fair to say that

(22) Mrs. Beerntsen had the drawn image of whoever it

(23) was that was in the composite photo that you

(24) created firmly in her mind at the time that she

(25) examined the photos in the photo array?

## Page 134

(1) MR. BASCOM: Object to the form of the

(2) question.

(3) MS. WEBER: I'm joining.

(4) MR. POLLEN: Foundation of this witness to

(5) know that. But go ahead, sir.

(6) BY MR. KELLY:

(7) Q You can answer.

(8) A Are you saying, if I can get this clear, that she

(9) had my drawing in her head when she looked at the

(10) photos?

(11) Q As I understand your testimony, you complete the

(12) drawing.

(13) A Yes.

(14) Q You show it to her.

(15) A She was watching the entire time.

(16) Q Okay. And she says, "That's it. That's the

(17) guy."

(18) A Yeah.

(19) Q Immediately thereafter you go to the door, the

(20) sheriff comes in, you do the photo array; is that

(21) correct?

(22) A Yes.

(23) Q The image that's in her mind as she's looking at

(24) the photo array is the image of the composite

(25) that you just completed with her.

## Page 135

(1) MR. BASCOM: Object to the form of –

(2) BY MR. KELLY:

(3) Q Correct?

(4) MR. BASCOM: Object to the form of the

(5) question.

(6) A I can't say what's in her mind. Did she see this

(7) just before? Yes.

(8) BY MR. KELLY:

(9) Q Okay.

(10) A I can't say what's in her mind.

(11) Q So that's the impression that she carries into

(12) her examination of the photo array.

(13) MR. BASCOM: Object to the form of the

(14) question.

(15) MS. WEBER: Object.

(16) BY MR. KELLY:

(17) Q To your observation.

(18) MR. BASCOM: Object to the form of the

(19) question.

(20) MS. WEBER: I join.

(21) A My drawing was the result of what image she had

(22) in her head. That's what that is. I'm just the

(23) pencil.

(24) BY MR. KELLY:

(25) Q Right. That's right. I agree with that.

## Page 136

(1) A I'm just the pencil.

(2) Q Okay.

(3) A And I can't say that – My view is that that's

(4) the image she had in her head.

(5) Q Mm-hmm.

(6) A Whether she transposed that and put what was on

(7) paper and thought that later, I can't say.

(8) Q You've examined with Amy Doyle...

(9) A Yes.

(10) Q ...a statement made by Arland Avery that Leo

(11) Jadowski told him that you drew that composite

(12) based on a photo of Steven Avery.

(13) A Yes.

(14) Q And not on – Well, that's not right. But based

(15) on a photo of Steven Avery, specifically the

(16) January 1985 photo.

(17) A All right.

(18) Q Okay?

(19) A Sure.

(20) Q Did you tell Leo Jadowski that?

(21) A No.

(22) Q Did you tell Arland Avery that?

(23) A No.

(24) Q How are you able to account for what you have

(25) already described to us as being an accurate

Page 137

(1) depiction of Steven Avery's January 1985 photo,

(2) rather than a more accurate depiction of Gregory

(3) Allen? How do you account for that remarkable

(4) resemblance, given the fact that Steven Avery did

(5) not assault Mrs. Beerntsen?

(6) MR. BASCOM: Object to the form of the

(7) question.

(8) A I account for it as I drew what the victim told

(9) me to draw.

(10) BY MR. KELLY:

(11) Q Would you agree with me that it's pretty remarkably

(12) coincidental that that would depict Steven Avery's

(13) January 30, 1985 mug photo which was available to you

(14) that evening?

(15) MR. BASCOM: Object to the form.

(16) MR. POLLEN: Object to the form.

(17) MS. WEBER: I join.

(18) A One, the photo wasn't available to me.

(19) Q No?

(20) A No.

(21) Q It wasn't in the array?

(22) A After I drew the sketch, I saw it.

(23) Q Okay. So it was available to you.

(24) A No.

(25) Q It was around that evening. It had been brought

Page 138

(1) over from the jail to the hospital, right?

(2) A I don't know when it arrived.

(3) Q You're just saying – You're telling us under

(4) oath you didn't look at it.

(5) A I'm telling you I didn't see it and I didn't know

(6) if it was there before I started the sketch

(7) either. I don't know when it arrived.

(8) Q But you knew Steven Avery was the person who had

(9) been identified as the suspect.

(10) A I heard the name.

(11) Q And you knew that the photos had been called for

(12) from the jail.

(13) A No, I don't.

(14) Q Well, didn't you just go to the door and the

(15) sheriff came right in with the photos?

(16) A Yes.

(17) Q Okay.

(18) A How they came there, I do not know. I don't know a

(19) call was made.

(20) Q Okay.

(21) A I'm assuming one was made. I do not know that.

(22) Q Do you have any reason to understand why it would

(23) be that Jadowski would tell Arland Avery that you

(24) drew the photo – you drew the composite based on

(25) the photo?

Page 139

(1) A You'd have –

(2) MR. BASCOM: Object to the form.

(3) MS. WEBER: Join.

(4) A You'd have to ask Leo.

(5) BY MR. KELLY:

(6) Q That's all you'd have to say about that?

(7) A I have no idea where he came up with it.

(8) Q Have you talked to Leo Jadowski about this case

(9) at all?

(10) A No.

(11) Q So unlike the other people that you've told us

(12) about, the other detectives with whom you've had

(13) these conversations, you've not had any

(14) conversation with Leo Jadowski.

(15) A That's correct.

(16) Q At any time, did you have any conversation with

(17) Jim Gospodarek about this case?

(18) A I don't think anything really specific when it

(19) was going on, other than the fact that he had

(20) been on the beach with the 4-wheeler.

(21) Q You don't have any recollection of any further

(22) conversations with him?

(23) A No.

(24) Q Do you remember Gospodarek talking with you at

(25) all about the fact that he thought that the wrong

Page 140

(1) person had been convicted?

(2) A No.

(3) Q About how long did it take for the photo array to

(4) be done?

(5) A I have no idea.

(6) Q Well, you were right there, weren't you?

(7) A Oh, you mean to be laid out and identified?

(8) Q Yeah.

(9) A As soon as it was laid out, it was – she pointed

(10) at it and said, "That's him."

(11) Q And after she made that identification, what did

(12) you do?

(13) A I think I walked out of the hall – into the hall

(14) and others wanted to see the sketch.

(15) Q What others?

(16) A The other officers that were there.

(17) Q Who were they?

(18) A Bill Beck.

(19) Q Beck was still there, huh?

(20) A I presume it was.

(21) Q Well, you presume. I'm asking you, was he there?

(22) A I don't recall who was there. I know other

(23) people wanted to see it.

(24) Q Were you carrying the sketch with you?

(25) A Yes.

Page 141

(1) **Q** Did you show it to them?

(2) **A** Yes.

(3) **Q** How many people did you show it to?

(4) **A** I don't remember. Whoever was there.

(5) **Q** Okay.

(6) **A** They wanted to see it.

(7) **A** And was there a discussion about it being Steven

(8) Avery?

(9) **A** Yeah, it looked just like him.

(10) **Q** Okay. And was Kolanczyk there?

(11) **A** I don't know if he was there or not.

(12) **Q** Was Petersen there?

(13) **A** I don't remember.

(14) **Q** Was Leroy Beilke there?

(15) **A** Don't remember that.

(16) **Q** Is there anybody you remember who was there,

(17) other than Beck and the sheriff?

(18) **A** I'm not even sure Beck was there. I just knew

(19) that there were other officers there. I don't

(20) remember specifically who was there.

(21) **Q** Did any of the other officers say, "Oh, that

(22) looks like Steven Avery"?

(23) **A** Yeah. I'm sure they –

(24) **Q** They did?

(25) **A** They did. I remember the comment being made,

Page 142

(1) "Boy, that looks like him."

(2) **Q** Who made that comment?

(3) **A** I don't recall.

(4) **Q** Did you tell that to the Department of Justice

(5) agents when they questioned you about this case?

(6) **A** I may have.

(7) **Q** Okay. Do you remember how many other officers

(8) were there?

(9) **A** I don't recall.

(10) **Q** Where did you go from there? Anything further

(11) happen at the hospital?

(12) **A** I don't remember anything further happening.

(13) **Q** You went from there to the sheriff's department?

(14) **A** That is correct.

(15) **Q** You sealed the drawing?

(16) **A** Correct.

(17) **Q** Where did you put it?

(18) **A** It was in my office.

(19) **Q** Okay. Did you do a report on anything that

(20) happened that evening?

(21) **A** I did not.

(22) **Q** Why not?

(23) **A** I just did a sketch.

(24) **Q** Well, you did a lot more than a sketch. You

(25) talked to a lot of people, you had conversations

Page 143

(1) about the case, you knew about the identification

(2) of Steven Avery.

(3) **A** We have – When you have conversations about

(4) something, you don't necessarily make a report

(5) about it. I may talk amongst other officers

(6) about things, I don't make a report about it.

(7) **Q** So –

(8) **A** And my function that night was to make a sketch.

(9) The sketch was my report.

(10) **Q** So you didn't do any report about the process of

(11) making the sketch.

(12) **A** No.

(13) **Q** And how that occurred.

(14) **A** No.

(15) **Q** Okay. Did you consider that your composite was

(16) an investigatory tool?

(17) **A** Yes.

(18) **Q** Okay. At any time since you did this composite

(19) sketch in this case, have you done any other

(20) composite sketch that has been used in a trial?

(21) **A** No.

(22) **Q** Have you done any other composite sketch that has

(23) been used in an investigation?

(24) **A** Yes.

(25) **Q** How many such sketches have you done?

Page 144

(1) **A** I don't know. Maybe around 50 over the last 20

(2) years.

(3) **Q** And these were used in investigations in the

(4) Manitowoc County Sheriff's Department?

(5) **A** Manitowoc County, Manitowoc City, Kiel.

(6) **Q** Are you done?

(7) **A** Yeah, I believe so.

(8) **Q** Okay. So when a sketch is done for an

(9) investigatory purpose, is it like the process

(10) that you've described you engaged in that

(11) evening?

(12) **A** No.

(13) **Q** What is the process for this kind of sketch

(14) you're telling us now?

(15) **A** Later? I now use a form that records the

(16) statement that the individual makes as to the

(17) physical attributes. If I use a feature catalog,

(18) an FBI feature catalog, if that's necessary –

(19) *REPORTER: Which catalog?*

(20) *WITNESS: It's an FBI feature catalog.*

(21) *REPORTER: Thank you.*

(22) **A** That's [pointing to composite sketch] – that was made

(23) with charcoal. I use pencil now; it's easier to work

(24) with, easier to erase. I don't give up the original

(25) now. I get a color photo of it which reproduces it

Page 145

(1) well, and I keep the original in my files. And the

(2) form that I use to interview becomes part of the case

(3) file.

(4) BY MR. KELLY:

(5) Q Okay. So those are all practices that have

(6) developed since the trial of the case in the

(7) Penny Beerntsen sexual assault?

(8) A They are practices as a result of further

(9) training.

(10) Q Okay. Okay. We're just going to go through some

(11) reports here. It's not going to take all that

(12) long, and then we'll be done.

(13) I'm going to show you Exhibit 15, pages 5514

(14) through 5516, which is the Department of Justice

(15) interview of Al Kolanczyk, and –

(16) MR. POLLEN: That's a three-page exhibit?

(17) MR. KELLY: Yeah.

(18) MR. POLLEN: Thank you.

(19) MR. KELLY: But I'm going to direct the

(20) witness.

(21) Q At the bottom of the first page, Mr. Kusche,

(22) there is a sentence that begins, "While Kolanczyk

(23) was still standing there, a jailer came to the

(24) hospital and handed the sheriff a stack of

(25) pictures. Kolanczyk stated that Sheriff Kocourek

---

Page 146

(1) put these pictures in his pocket."

(2) A You're saying the first page?

(3) Q Yeah, it runs over. From the bottom of the first

(4) page –

(5) A Oh, okay.

(6) Q I'll start again, because we want the record to

(7) be clear. "While Kolanczyk was still standing

(8) there, a jailer came to the hospital and handed

(9) the sheriff a stack of pictures. Kolanczyk

(10) stated that Sheriff Kocourek put these pictures

(11) in his pocket. Kolanczyk asked the sheriff if

(12) Kolanczyk should set up a photo id for the victim

(13) to review, and the sheriff responded that he

(14) would handle it." Do you see that?

(15) A Yep.

(16) Q Okay. Now, the next paragraph says, "While

(17) Kolanczyk was still at the hospital, Gene Kusche,

(18) from the Manitowoc County Sheriff's Department,

(19) came to the hospital. Kusche was going to work

(20) with the victim to draw a composite picture.

(21) Kolanczyk heard Kusche state that no one should

(22) show the victim any pictures of potential

(23) suspects until the composite picture is

(24) completed. Kolanczyk then observed Kusche and

(25) Sheriff Kocourek go into the victim's hospital

---

Page 147

(1) room to do the drawing." Do you see that?

(2) A Yes.

(3) Q Okay. In your recollection of events, is that

(4) sequence of events accurate?

(5) A It – I don't remember Kolanczyk being there when

(6) I got there. I don't remember seeing any jailer

(7) with a pile of photographs. And if the sheriff

(8) walked in with me to the E.R., he could have; I

(9) just was not paying attention to him.

(10) Q Well, I'm particularly interested, given your

(11) testimony, in the final sentence of that second

(12) paragraph where Kolanczyk says you and Kocourek

(13) went into the victim's hospital room to do the

(14) drawing. Do you believe that to be inaccurate,

(15) in view of your testimony?

(16) A Was he with me when I did the drawing? Is that

(17) what you're saying?

(18) Q The statement says, this is Kolanczyk speaking to

(19) the agents…

(20) A Okay.

(21) Q …telling them that he observed you and the

(22) sheriff go into the victim's hospital room to do

(23) the drawing.

(24) A Why he said that, I don't know. The sheriff was

(25) not in there with me when I did the drawing.

---

Page 148

(1) Q Okay. So you believe that to be an inaccurate

(2) statement?

(3) A Well, he may have gone in with me to the room,

(4) but when I did the drawing, I had nobody in there

(5) but she and I.

(6) Q Well, what's your recollection? I mean, I

(7) thought you testified –

(8) A I don't recall him coming into the room.

(9) Q Are you saying you don't recall it one way or the

(10) other, or are you saying you re–

(11) A I don't recall the sheriff coming into the room

(12) with me.

(13) Q Are you denying it?

(14) A He wasn't in there when I did the drawing.

(15) Q Did he go into the room with you?

(16) A I don't recall that.

(17) Q Well, when you say you don't recall it, it means

(18) either you don't recall one way or the other that

(19) he went in with you, or that you recall it and he

(20) did not. I'm asking you which it is.

(21) A Okay. I do not recall him going into the room

(22) with me. I do remember him not being in the room

(23) when I did the sketch.

(24) Q So if he went into the room with you, he had to

(25) exit the room before you did the sketch.

## Page 149

(1) **A** Yes.

(2) **Q** Okay. Are you saying that, based on what

(3) Kolanczyk observed, which is to say the sheriff

(4) went into the room with you, that Kolanczyk is

(5) mistaken?

(6) **A** No. I'm saying I do not recall him coming into

(7) the room with me.

(8) **Q** Okay.

(9) **A** He may have come in, but he – then he would have

(10) had to leave, because he wasn't in there when I

(11) did the sketch.

(12) **Q** Yeah. And if he went in the room with you, he

(13) was carrying the photographs with him, wasn't he?

(14) *MR. BASCOM: Object to the form of the*

(15) *question.*

(16) *MS. WEBER: I'll join.*

(17) *MR. BASCOM: Calls for speculation.*

(18) **A** I do not know.

(19) *BY MR. KELLY:*

(20) **Q** Well, that's what Kolanczyk says.

(21) **A** That's what Kolanczyk says.

(22) **Q** Do you disagree with Kolanczyk?

(23) **A** I do not know.

(24) **Q** Okay.

(25) **A** [Handing document to Mr. Kelly]

## Page 150

(1) **Q** Hold on to that for one more second. Okay. We're

(2) done with that one.

(3) I'm going to show you Exhibit 15, pages 5559

(4) through 5561, which is the interview of Arland Avery.

(5) On the second page of this Department of Justice

(6) interview, if you go down one, two, three, four, five,

(7) six, to the seventh full paragraph. I'm going to read

(8) this statement into the record. You've already

(9) testified about it to some extent, but I want to just

(10) secure your answer on the record. "Arland Avery

(11) stated that although he was not investigating the

(12) case, he heard information from Leo Jadowski.

(13) Jadowski told Arland Avery that Steve Avery did not

(14) commit the crimes he was charged with and that

(15) Jadowski knew this from Gospodarek. Jadowski stated

(16) that Gospodarek wanted to continue to investigate the

(17) case and that the sheriff, Tom Kocourek, said no, and

(18) that the case was closed."

(19) My question to you is, either from Gospodarek or

(20) from Jadowski, did you ever receive this information?

(21) **A** No.

(22) **Q** If you'd go down two more paragraphs to the final

(23) sentence in the paragraph, says, "Arland Avery

(24) stated that he was told by Jadowski that Gene

(25) Kusche drew the composite drawing by looking at a

## Page 151

(1) photograph of Avery." Do you see that?

(2) **A** Where are we again now?

(3) **Q** Go down two more paragraphs to the – it's about

(4) a six line paragraph –

(5) **A** Okay.

(6) **Q** – that begins "Arland Avery stated"?

(7) **A** All right.

(8) **Q** The final sentence of that paragraph says, quote,

(9) "Arland Avery stated that he was told by Jadowski

(10) that Gene Kusche drew the composite drawing by

(11) looking at a photograph of Avery." Do you see

(12) that?

(13) **A** Yep.

(14) **Q** Did you ever tell Jadowski that you looked at a

(15) photograph of Avery to draw the composite?

(16) **A** Nope.

(17) **Q** Do you deny telling that to Jadowski?

(18) **A** Yes.

(19) **Q** Do you have any reason to believe why Jadowski

(20) would make this statement?

(21) **A** I have no idea.

(22) **Q** Okay. If you'd go to the final sentence in this

(23) statement. "Arland Avery stated that it was the

(24) consensus of the detectives and officers working

(25) for the sheriff's department that Steven Avery

## Page 152

(1) did not commit the crimes for which he was

(2) charged. However, everyone was told not to

(3) investigate further by the sheriff, Tom

(4) Kocourek." Do you see that statement?

(5) **A** Yep.

(6) **Q** In the conversations that you had with the

(7) detectives and officers in the department who

(8) worked on this case, was there such a discussion?

(9) **A** No.

(10) **Q** Okay. Have you seen the statement that was made

(11) by Tom Kocourek to the investigators before

(12) today?

(13) **A** No.

(14) **Q** Amy Doyle show it to you?

(15) **A** No.

(16) **Q** Okay. I'm going to show it to you now. This is

(17) Exhibit 15, pages 5569 to 5573. It's a long

(18) statement, but there are only particular parts of

(19) it that I want to ask you about. If you would go

(20) to the second page, one, two, three, four, five

(21) full paragraphs down. I'm going – It starts

(22) with "Kocourek stated..." I'm going to read it

(23) into the record while you're reading it.

(24) "Kocourek stated that he could not remember if he

(25) was in the room with Kusche when he drew the

Page 153

(1) composite drawing. When the composite drawing
(2) was completed, Kocourek could remember Kusche
(3) asking Beerntsen if the drawing looked like her
(4) assailant."
(5) Now, let's stop there. When you showed her that
(6) drawing and asked her if it looked like her assailant,
(7) was the sheriff in the room?
(8) A I don't re– Not when I first asked, no.
(9) Q You asked more than once?
(10) A I probably did.
(11) Q Okay.
(12) A I probably did it for having witnesses saying...
(13) Q "Beerntsen responded that it did. It was at this
(14) point that Kocourek could remember someone saying
(15) that the drawing looked like Avery." Did the
(16) sheriff say that to you when –
(17) A No.
(18) Q No. "Kocourek believed that this comment was
(19) made away from the victim." I believe your
(20) testimony is that only you and the sheriff and
(21) the victim were in the room.
(22) A Yes.
(23) Q So was this comment made by the sheriff to you
(24) away from the victim, "That looks like Steven
(25) Avery"?

Page 154

(1) A I don't remember him saying that.
(2) Q Okay.
(3) A I remember it being made, but my recollection is
(4) that it was made in the hallway.
(5) Q Earlier?
(6) A After.
(7) Q Well, it – Your earlier testimony is the
(8) statement was made much earlier, because that's
(9) how the photos were obtained.
(10) A No. No. When you're asking about the drawing.
(11) Q Mm-hmm.
(12) A Someone saying the drawing looked like Avery.
(13) The drawing had to be done.
(14) Q So you're saying that took place in the hallway
(15) outside.
(16) A That's my recollection, yes.
(17) Q Rather than the sheriff saying that inside the
(18) room.
(19) A That is correct.
(20) Q Okay. Now, go down to the next paragraph. It
(21) says, "Following the composite drawing, a photo
(22) lineup was created. Kocourek said that several
(23) photographs from the jail were placed in a paper
(24) cutout so that the booking numbers were not
(25) visible." Your recollection is different than

Page 155

(1) that, right?
(2) A That's right.
(3) Q Okay. And in your recollection, the booking
(4) photo numbers would have been visible.
(5) A Yes, they would have been.
(6) Q Okay. And then it – Then he goes on to say he
(7) believed that Beerntsen was shown one or two
(8) sheets of photographs. Your recollection is
(9) different than that.
(10) A Yes.
(11) Q All right. "Kocourek stated that he worked with
(12) Kusche in showing the victim the photo lineup."
(13) Is that true?
(14) A I was in the room.
(15) Q But he's saying he worked with you.
(16) A I don't know what he means by that.
(17) Q Did he review the photographs with you before he
(18) showed them to Ms. Beerntsen?
(19) A No.
(20) Q Did he discuss them with you?
(21) A No.
(22) Q Did he tell you anything about Steven Avery?
(23) A No.
(24) Q He just came in and laid them out, in your
(25) recollection.

Page 156

(1) A My recollection, yes.
(2) Q Okay. Okay. Do you remember the sheriff saying
(3) anything to you about discussing with Judy Dvorak
(4) the description that had been given by Mrs.
(5) Beerntsen of her assailant?
(6) A No, I don't remember that.
(7) Q Okay.
(8) WITNESS: [Addressing Mr. Pollen] Si vous
(9) plez [requesting more water].
(10) (Discussion off the record 12:50:42 - 12:51:58)
(11) Q I'm going to give you the statement of Denis
(12) Vogel. First of all, before today, have you seen
(13) Vogel's statement?
(14) A No.
(15) Q Did you discuss Vogel at all with Amy Doyle two
(16) days ago?
(17) A Yes.
(18) Q What was the discussion between you and Amy Doyle
(19) about Vogel?
(20) A I think sometime during the trial or shortly
(21) thereafter, I had made a comment to Denis that I
(22) didn't think there was enough to convict Steve
(23) Avery, and his response to me was, "Well, you
(24) haven't seen all the evidence or the trial." And
(25) you're right, I haven't.

Page 157

(1) Q What caused you to make that statement to him,
(2) especially in view of what you've told us about
(3) how you feel about the composite?
(4) A Eye witnesses are not always the best evidence.
(5) I'm a physical evidence kind of officer, and I
(6) like to see good, solid physical evidence, and I
(7) didn't see that in this case.
(8) Q Okay. If you'd take the Vogel statement, the
(9) last full paragraph on the first page. This is
(10) Vogel being questioned and giving the answers to
(11) the agents. And he says, "Vogel was contacted
(12) prior to a photo lineup being shown to Beerntsen.
(13) Vogel stated that he could remember discussing
(14) with officers that they needed to make sure the
(15) photographs were a fair representation of who
(16) Beerntsen was describing. Vogel thought maybe he
(17) would have had this conversation with either Tom
(18) Kocourek or Gene Kusche. Vogel said it was
(19) possible that he saw the photographs before they
(20) were shown to Beerntsen, but he was not sure."
(21) Here's the question. Did you talk to Vogel
(22) the night that you were at the hospital?
(23) A No.
(24) Q Did you call him on the phone that night?
(25) A No.

Page 158

(1) Q Do you know whether or not Kocourek did?
(2) A No.
(3) Q Did Kocourek say anything to you about
(4) conversations he had had with Vogel that night
(5) about the photo array?
(6) A No.
(7) Q Would you agree with me that based on this
(8) statement, if this statement is accurate, then it
(9) must have been Kocourek who talked to Vogel?
(10) A I wo–
(11) MR. BASCOM: Object to the form.
(12) MS. WEBER: I join.
(13) BY MR. KELLY:
(14) Q You may answer.
(15) A I assume, since it's not me.
(16) Q The answer is yes.
(17) MS. WEBER: Same objection
(18) BY MR. KELLY:
(19) Q Is that correct?
(20) A Correct.
(21) Q All right. While you were at the hospital, did
(22) any person mention Vogel's name?
(23) A I can't recall.
(24) Q Do you remember whether or not in briefing you
(25) Beck said anything to you about Vogel having been

Page 159

(1) contacted?
(2) A I seem to have a fuzzy memory of someone saying
(3) the D.A. has been called, but who it was and in
(4) what context and when, I can't remember.
(5) Q Did you see the sheriff making a number of calls
(6) that evening while you were at the hospital?
(7) A I saw him on the phone. Who he was calling, I
(8) don't know.
(9) Q We've had some testimony in this case about the
(10) limited availability of mobile communications at
(11) that time as compared to today. Am I – And you
(12) correct me if I'm wrong about this. My
(13) recollection is that only the sheriff, yourself
(14) and one other person had mobile communication
(15) devices available to you at that time. Does that
(16) sound...
(17) A Portable radios?
(18) Q Well, some kind of mobile communication device,
(19) whatever the technology was then.
(20) A We all had portable radios.
(21) Q So you had a portable radio at that time?
(22) A I don't know if I had it with me. I usually left
(23) them at the office.
(24) Q Are the portable radios networks for police-to-
(25) police communication?

Page 160

(1) A Sure.
(2) Q At that time, I –
(3) A Sure.
(4) Q Yeah. But they're not a means by which you can
(5) communicate with, say, a layperson at home?
(6) A No.
(7) Q So your testimony is you saw Kocourek, not on a
(8) portable device, but on the telephone talking
(9) with –
(10) A I believe I recall him on the phone, yes.
(11) Q Okay. Do you remember whether or not it was
(12) Kocourek who mentioned to you that he had been in
(13) touch with the D.A.?
(14) A No, I don't remember that.
(15) Q Okay. Other than Beck or Kocourek, could it have
(16) been anybody else who made the statement about
(17) having been in touch with the D.A.?
(18) A I seem to think it was Beck, but I'm – you know,
(19) that's a long time ago and I'm not really sure.
(20) Q You have knowledge about the fact that there was
(21) a lineup that occurred after this photo array?
(22) A I know there was one done. Other than that, I
(23) don't have any knowledge.
(24) Q Okay. Do you know whether or not Steven Avery
(25) was in the lineup?

Page 161

(1) **A** I was told he was.

(2) **Q** Okay. Do you have any knowledge about the fact

(3) that only Steven Avery was the one person who was

(4) in both the photo array and the lineup?

(5) **A** I've heard that was the case.

(6) **Q** But other than hearing it, you do not have

(7) knowledge of your own?

(8) **A** Other than hear– I read it.

(9) **Q** Okay. All right. At any time did you have any

(10) conversations with Brenda Petersen about this

(11) case?

(12) **A** No.

(13) **Q** With Beverly Badker?

(14) **A** No.

(15) **Q** With Jill Mertens?

(16) **A** No. Do you recall whether there was any

(17) discussion at the hospital involving you and

(18) Kocourek and the matter of Miranda warnings and

(19) how to handle Steven Avery when he was arrested?

(20) **A** No.

(21) **Q** Were you involved at all in the discussions to

(22) execute the arrest of Steven Avery that evening?

(23) **A** No.

(24) **Q** Do you recall about what time you got home?

(25) **A** I'm not – I can't remember for sure. I'm

Page 162

(1) thinking it was later, but I can't tell you for

(2) sure.

(3) **Q** Did you go home directly from your office at the

(4) sheriff's building?

(5) **A** I believe so.

(6) **Q** Do you remember talking with any other person at

(7) the sheriff's building while you were there than

(8) the people you've already told us about?

(9) **A** I may have, but I wasn't there that long.

(10) **Q** Did you have any conversation with Ken Petersen

(11) about what had developed at the hospital when –

(12) and about the potential arrest of Steven Avery?

(13) **A** I have – Again, it may be a conversation in

(14) passing or something of that nature, "What's

(15) going on?" and – but I don't have any

(16) recollection of it.

(17) **Q** Do you recall whether there was any question

(18) about whether or not you might accompany those

(19) who were going to arrest Steven?

(20) **A** I don't remember it coming up.

(21) **Q** Okay. Do you remember any conversation with

(22) anybody at the sheriff's department about Arland

(23) Avery going with whoever was going to make the

(24) arrest of Steven.

(25) **A** Not that night –

Page 163

(1) **Q** That evening.

(2) **A** Not that evening, no.

(3) **Q** Okay. Is there anything else you remember about

(4) any conversations you had with anybody at the

(5) sheriff's building?

(6) **A** That night?

(7) **Q** After you left – Right, after you left the

(8) hospital that night.

(9) **A** I don't have any recollection of anything. I

(10) think I just went there, took care of the picture

(11) and went home.

(12) **Q** I want to – Well, let me give this to you. This

(13) is Judy Dvorak's statement, pages 5602 to 5604.

(14) On the second page, first – second full

(15) paragraph, "Dvorak said…"? "Dvorak said that

(16) when she took the statement from Beerntsen there

(17) was another detective in the room with her.

(18) Dvorak was unable to recall who this other person

(19) was. Dvorak said the interview with Beerntsen

(20) was a joint interview between herself and the

(21) other detective. Dvorak believed the other

(22) detective may have completed the report, but she

(23) was not sure." Was that you?

(24) **A** No.

(25) **Q** All right. Do you have any knowledge about who

Page 164

(1) that other detective was, based on what you saw

(2) at the hospital that night?

(3) **A** I didn't see another detective there. And I

(4) wasn't a detective at the time.

(5) **Q** Right.

(6) **A** The only detective I recall seeing was Kolanczyk.

(7) **Q** Right. And did you ever see Kolanczyk go into

(8) the emergency room where Dvorak was?

(9) **A** No.

(10) **Q** Did you ever see the sheriff go in?

(11) **A** I don't really have a memory of that occurring.

(12) **Q** Okay. If you'd go down to the one, two, three,

(13) four, five, six, seventh paragraph down. "S/A

(14) Strauss asked Dvorak when Avery became a suspect

(15) for this assault. Dvorak responded that after

(16) she and the detectives had gone through the

(17) initial interview with Beerntsen and Beerntsen

(18) provided a physical description of her assailant,

(19) Avery became a suspect. Dvorak thought Avery

(20) became a suspect based on Beerntsen's physical

(21) description." Is that consistent with your

(22) recollection of how Avery became a suspect?

(23) **A** I heard someone say, "That sounds like Steve

(24) Avery."

(25) **Q** Okay.

Page 165

(1) **A** So I'm assuming that it was based upon a

(2) description she gave.

(3) **Q** Okay. If you go down two more paragraphs,

(4) "Dvorak was then asked..." The second sentence

(5) says, "Dvorak said she has seen the drawing

(6) completed by Kusche, but she could not remember

(7) if she saw the drawing the night of the assault

(8) or the following day." Do you see that

(9) statement?

(10) **A** Yes.

(11) **Q** And then the next paragraph says, "Dvorak said

(12) that when she saw the composite drawing prepared

(13) by Kusche, she thought the assailant looked like

(14) Avery." You see that?

(15) **A** Yes.

(16) **Q** Do you remember whether she was one of the people

(17) outside Mrs. Beerntsen's room that evening who

(18) saw the composite and made a comment about it?

(19) **A** I'm not absolutely sure, but I seem to think she

(20) was. But I'm not – I can't say for absolutely

(21) sure.

(22) **Q** Okay. Here's your statement, which is pages 5574

(23) to 5576. If you go down to the third full

(24) paragraph on the first page, there's a paragraph

(25) about you being briefed by Beck. Do you see

Page 166

(1) that?

(2) **A** Third full paragraph?

(3) **Q** Yeah, on the first page.

(4) **A** Okay. "Met with William Beck."

(5) **Q** Okay. And then it goes on and it says, "At the

(6) hospital, Beerntsen provided a verbal description

(7) of her attacker. After giving the verbal

(8) description, Kusche stated that he could remember

(9) someone saying 'Sounds like Steven Avery.'" And

(10) you've already testified to that, right?

(11) **A** Yes.

(12) **Q** And then it says, "Kusche believed that Sheriff

(13) Tom Kocourek was not there at the time." Is that

(14) correct?

(15) **A** That's correct.

(16) **Q** Okay.

(17) **A** I thought he was there later.

(18) **Q** So in your recollection, at that point in time,

(19) the only people who you can recall who were there

(20) were you, Beck and Dvorak?

(21) **A** That's all I can remember specifically.

(22) **Q** Okay. So it was either Beck or Dvorak who made

(23) the statement, "That sounds like Steven Avery."

(24) **A** That's the only people I can specifically

(25) remember. There may have been others there.

Page 167

(1) **Q** Okay.

(2) **A** I cannot attribute the statement to anyone in

(3) particular.

(4) **Q** Then the statement says, "Around that same time,

(5) there was someone on the telephone calling for

(6) photographs to get a photo lineup together." You

(7) see that?

(8) **A** Yep.

(9) **Q** So that would be either, as far as you recall,

(10) Dvorak, Beck or yourself.

(11) **A** I don't remember making that statement in this

(12) report.

(13) **Q** Okay. So let's make sure we get this. Your

(14) testimony is that when you spoke to the agents

(15) for the Department of Justice on the 24th of

(16) September, you do not recall saying to them,

(17) "Around that same time, there was someone on the

(18) telephone calling for photographs to get a photo

(19) lineup together."

(20) **A** I don't recall that statement, because I don't

(21) recall someone being on the phone calling for

(22) photographs.

(23) **Q** So do you think you may have made the statement

(24) and you're not just remembering it?

(25) **A** No, I think I may have made some statement that

Page 168

(1) may have been misplaced in the thing, because I

(2) don't remember anybody getting a – giving a

(3) phone call for the photographs.

(4) **Q** So you think that the –

(5) **A** I think someone may have called for them, but I

(6) don't remember that I was aware of someone making

(7) a phone call.

(8) **Q** Well, did you discuss someone calling for them

(9) with the agents –

(10) **A** No. I don't –

(11) **Q** – when they interviewed you?

(12) **A** I don't recall that.

(13) **Q** Okay.

(14) **A** For some reason it –

(15) **Q** Are you denying it? Are you saying no, I didn't

(16) talk with them about that?

(17) **A** I may have said something about being –

(18) photographs being called for from the sheriff's

(19) department, but I'm not saying that I made the

(20) statement – Maybe there was someone calling for

(21) photographs, but here it sounds so definitively,

(22) like I know someone was calling for photographs.

(23) That I would not have said. I may have said I

(24) know photographs were called for because they

(25) arrived. But I didn't make this statement like

(1) that [indicating to the written statement].

(2) Q  Okay. Let's go over to the second page. I

(3) believe you said earlier that there was a

(4) statement that you recalled when you reviewed –

(5) Let me strike that. You testified earlier today

(6) that when you and Amy reviewed this – Amy Doyle

(7) reviewed this statement, you remembered that

(8) there was one thing in this statement that was

(9) inaccurate. Do you remember that testimony?

(10) A  Yes.

(11) Q  Is that the thing that you recall?

(12) A  At least that.

(13) Q  Well, are you now saying it was – there was more

(14) than one thing?

(15) A  There may have been. I was going through a lot

(16) of reports including the trial testimony; there

(17) was something in there that was inaccurate.

(18) Q  Okay. Let's go to the first – second full

(19) paragraph on the second page. "After the

(20) composite drawing was completed…"? Do you see

(21) that?

(22) A  Yes.

(23) Q  "After the composite drawing was completed, a

(24) photo lineup was brought in for Beerntsen to look

(25) at. Based upon the photos collected, Kusche

(1) stated that he could pick out Avery as the person

(2) who most closely matched the composite drawing."

(3) A  Yes.

(4) Q  Did you tell that to the agents?

(5) A  Yes.

(6) Q  All right. "Kusche relayed that he was not in

(7) the room when Beerntsen picked Avery out of the

(8) photo lineup."

(9) A  That's not correct.

(10) Q  Did you tell that to the agents?

(11) A  No. No.

(12) Q  That's directly contrary to your testimony today.

(13) A  That's directly contrary.

(14) Q  Okay. "When Kusche finished his drawing, he

(15) stated that he left the room. Kusche said that

(16) he currently has the original composite drawing

(17) in his possession."

(18) A  Yes.

(19) Q  Did you leave the room when you finished the

(20) drawing?

(21) A  After everything was done and…

(22) Q  Later on…

(23) A  Yeah.

(24) Q  …after the photo array was done.

(25) A  Sure. After the photo array.

(1) Q  But you were there when the photo array was done

(2) –

(3) A  Yes.

(4) Q  – is what you're saying.

(5) A  Yes. Because otherwise, this doesn't make any

(6) sense. It says, "Kusche could pick out Avery as

(7) the person most clos"– I wouldn't have seen the

(8) photo – I wouldn't know that until the photo

(9) array was done. So I had to be there during the

(10) photo array.

(11) Q  Unless the sheriff showed you the photos.

(12) A  Which he didn't. Well, I mean, he did when he

(13) laid them on the table.

(14) Q  Okay. That's all I've got. Oh, hold on for one

(15) moment.

(16) A  I hate that.

(17) Q  Was there only one composite that was prepared by

(18) you in this case at any time, whether at the

(19) hospital or elsewhere?

(20) A  Yes.

(21) Q  Do you recall someone saying, after Penny

(22) Beerntsen had been interviewed, "That sounds like

(23) Steven Avery"?

(24) A  Yes.

(25) Q  Okay. Do you recall someone saying, after seeing

(1) the composite, "That looks just like Steven

(2) Avery"?

(3) A  Yes.

(4) Q  Do you remember who the person was who, after

(5) seeing the composite, said, "That looks just like

(6) Steven Avery"?

(7) A  Immediately at the hospital?

(8) Q  Yeah.

(9) A  No.

(10) Q  Might have been Judy Dvorak –

(11) A  Might have been.

(12) Q  – might not have been?

(13) A  Yes.

(14) Q  Okay. And the person who said "It sounded like

(15) Steven Avery" might have been Judy Dvorak, might

(16) not have been?

(17) A  Might not have been.

(18) MR. KELLY:  Okay. That's all I've got.

(19) MR. POLLEN:  The original of Exhibit 154 –

(20) MR. KELLY:  Let's go off the record for a

(21) moment.

(22) MR. POLLEN:  Okay.

(23) REPORTER:  Are we going to close the record

(24) or just off the record for a moment?

(25) MR. KELLY:  Let's go off the record for a

Page 173

(1) moment.
(2) REPORTER: Off the record.
(3) (Off the record 1:09 - 1:16)
(4) REPORTER: We're back on the record.
(5) MR. KELLY: I'm going – This is Mr. Kelly
(6) speaking. I'm going to make a record on the fact
(7) that I have requested that Exhibit 154 be
(8) delivered to me and kept with the other original
(9) exhibits in the case. Mr. Pollen and the other
(10) defense counsel and the witness think that that
(11) is, at the moment, an inappropriate placement of
(12) Exhibit 154. The witness' thought is that it has
(13) been released to him by judicial order from the
(14) judge who presided in the criminal case. And Mr.
(15) Pollen is of the view that, for the time being,
(16) the safest thing to do is for him to take
(17) possession of 154 and inquiry to be made of
(18) either Judge Hazelwood or Judge Hazelwood's
(19) successor about the placement of the – of
(20) Exhibit 154 during the pendency of this case. In
(21) addition, Mr. Glynn and I have represented to
(22) counsel for the defense that we will notify them
(23) soon about whether or not we're going to seek
(24) that 154 be placed in the custody of the
(25) presiding federal court judge in this case.

Page 174

(1) MR. POLLEN: Sure. I agree. That's a fair
(2) representation.
(3) MR. BASCOM: Except for the fact that I
(4) don't object to any counsel taking possession or
(5) control of the original exhibit. I don't care
(6) who has it. I just want to make sure that
(7) whoever does take control and possession of it
(8) maintains it in its original form and that before
(9) any deconstruction or destructive testing or
(10) examination of the interior portions of this
(11) exhibit, there would be a protocol established
(12) and everybody would have an opportunity to have
(13) people present and have it videotaped, etcetera,
(14) which is normally done in these cases.
(15) MR. KELLY: If you want to give it to me,
(16) that's – those conditions are all perfectly
(17) agreeable to me.
(18) MR. BASCOM: So we'll find out – After we
(19) get Judge Fox's order, we can work something out
(20) among ourselves and arrive at a conclusion that's
(21) agreeable to everybody.
(22) MR. POLLEN: Sure.
(23) MR. KELLY: Okay.
(24) MR. POLLEN: I'm sure that we'll be able to
(25) work that out.

Page 175

(1) MR. KELLY: All right.
(2) REPORTER: There being nothing further for
(3) the record, the deposition is concluded at 1:19
(4) p.m. Off the record.
(5) End of record
(6)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)