# Exhibit 20

Cover design by Elmarie Jara/ABA Publishing.

The materials contained herein represent the opinions of the authors and/or the editors, and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the ABA Publishing unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

A different version of this book, titled *Unreasonable Inferences*, was previously published by Point Beach Publishing, LLC in 2010.

© 2014 Michael Griesbach. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission contact the ABA Copyrights & Contracts Department, copyright@americanbar.org, or complete the online form at http://www.americanbar.org/utility/reprint.html.

Printed in the United States of America.

18 17 16    5 4 3

Library of Congress Cataloging-in-Publication Data

Griesbach, Michael, author.
  The innocent killer : the true story of a wrongful conviction and its astonishing aftermath / Michael Griesbach.
      pages cm
  Includes bibliographical references and index.
  ISBN 978-1-62722-363-8 (alk. paper)
1. Avery, Steven--Trials, litigation, etc. 2. Trials (Rape)--Wisconsin. 3. Trials (Murder)--Wisconsin. 4. Murder investigation--Wisconsin. 5. Rape investigation--Wisconsin. 6. Judicial error--Wisconsin. I. Title.
   KF225.A84G75 2013
   345.775'028230977567--dc23
                                                              2013044201

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

www.ShopABA.org

# Contents

ACKNOWLEDGMENTS

INTRODUCTION

PROLOGUE

**PART I**

**PART II**

**PART III**

EPILOGUE

AFTERWORD

POST-SCRIPT

AUTHOR'S NOTES

ABOUT THE AUTHOR

Index

Allen—suddenly ran over the sand dunes and began walking right behind her. He pulled his shorts half way down his legs and began masturbating. And then he lunged at her, just like Penny Beerntsen's assailant had two summers later. Fortunately, in this case the victim was able to escape Allen's grasp and run away. This was way too similar to the assailant's MO during the Penny Beerntsen attack to be just a coincidence. And it happened on the same stretch of beach! What are the chances of that? Vogel had to have made the connection. Why else was the complaint in the Avery file?

Then it got even worse. The victim in the first attack had told police she recognized the man—he used to come into the convenience store where she worked, and a co-worker even knew his name. It was Gregory Allen. Later she called the police again to report that Allen had called her a few days after the incident. She was scared. She'd moved to Green Bay, but somehow Allen found her telephone number, which meant he also knew where she lived.

I couldn't believe it. Allen used the exact MO two years later when he assaulted Penny Beerntsen—right down to calling her after the crime. How could Vogel not make the connection? And if he didn't, why were the Allen reports in Avery's file?

Then I looked at the criminal complaint. Maybe Vogel just signed off on the complaint and someone else handled the case from there, as frequently happens amidst the chaos in district attorney's offices. But that's not what I found. Vogel had personally prosecuted the file, from start to finish. He appeared for the state at the bail hearing and successfully argued for $500 cash bail. He met with Allen's attorney at the pretrial conference. He subpoenaed the state's witnesses for trial, he cut a plea agreement with the defense a few days before the trial, and on February 28, 1984, with Gregory Allen in court to enter his plea, he amended the charge to disorderly conduct. The judge accepted the plea agreement and ordered a fine of $100 plus costs—not a bad deal for running over a sand dune to accost a woman walking along a beach.

Given his full knowledge of Allen's crime and Steven Avery's sixteen alibi witnesses, it's especially ironic that two years later Vogel noted in Avery's file that "the defendant may have alibi."

*  *  *

Mark and I devoted much of our time to the Avery case in the week after the crime lab call, but our regular caseload didn't disappear. The other attorneys in the office were swamped, too, but they pitched in and somehow we muddled through. But bombshells were exploding every other day, and now it was time for another.

Mark asked me to join him in his office, and by the look on his face I knew it was serious. One of the other prosecutors in the office had called Gene Kusche the day before Avery was released. Gene was retired by then, but for some reason, our colleague called him about the Avery case. Mark caught wind of it and asked him what they discussed.

He said he called Kusche to see if he knew about Avery's exoneration and that he would soon be released from prison. Apparently, he thought Kusche should know about it before he found out through the media. Nobody's ever accused either Gene or our fellow prosecutor of being men of few words, so the conversation covered other ground, too.

Kusche told him about an incident that occurred ten years after Avery was convicted. A detective from Green Bay called the Manitowoc County jail to report that an inmate in their jail was claiming that he had raped a woman jogging on a beach in Manitowoc County ten years earlier. The inmate claimed that someone else had been convicted of the assault and was presently serving time in prison for a crime he didn't commit. Kusche told the ADA that Andy Colborn was the corrections officer who spoke with the Green Bay detective and that Colborn got word of it to Sheriff Kocourek. But according to Kusche, the sheriff told Colborn and a detective to stay out of it—they already had the right guy. Andy Colborn doesn't recall if the Green Bay detective mentioned the confessing inmate's name, but Gregory Allen was in the Brown County jail at the time awaiting trial for raping the woman in Green Bay ten years after Penny Beerntsen was attacked on the beach.

Kusche told the assistant DA something else that was even more disturbing. He said he withdrew the composite drawing from the court file several years earlier. It was at his home, and he was planning to keep it there.

It went right over my head then, but Penny Beerntsen said something similar during our phone conversation a few days earlier. She told me she ran into Kusche a few years before at the grocery store, and he said something

to harp on the details of the wrongful conviction, the jury might become confused with what they were deciding and acquit for the wrong reasons. I could almost hear Kratz summing up the state's argument. "The objective of a jury trial is to find the truth, Judge, not to muddy the waters."

But where the prosecution would see prejudice and confusion of the issues, the defendant's attorneys would see critical evidence necessary for his defense. I imagined how effectively Dean Strang might argue the point. He'd point out that a police conspiracy was the cornerstone of the defense, and however fantastic it might appear to some, the defendant had marshaled some credible evidence in support of his claim. "Remember, Your Honor," he would implore the court, "our client is charged with a crime that could deprive him of his liberty for the rest of his life. He must be allowed to present his defense!"

But as it turned out, my musings about the rules of evidence were unnecessary and my fear was misplaced because a week before trial, Judge Willis accepted a stipulation that had been hammered out by the parties. The fact that the defendant was wrongfully convicted of first-degree sexual assault and attempted murder in 1985 would get in, as would the fact that he had a $36 million wrongful conviction lawsuit pending against the county. But that's as far as it would go. There'd be no mention of the details of the wrongful conviction—nothing about a suspiciously created composite drawing or about an affidavit hidden in the sheriff's safe. The jury wouldn't know about Gregory Allen's sexually deviant sociopathic behavior leading up to his attack on Penny Beerntsen or about his lunging at the woman who was walking her dog on the same isolated stretch of beach two summers earlier. Nor would they hear about Denis Vogel's inaccurate claim that Allen's probation agent said he had an airtight alibi.

I was hugely relieved. Without its details, the conspiracy theory lost most of its punch. The connection between Steven Avery's wrongful conviction in 1985 and the allegation that he murdered Teresa Halbach twenty years later would strike the jury as speculation, at best, and the spotlight would be squarely where it belonged: on the accused.

\* \* \*

The legal maneuvering of the parties accelerated rapidly in the final month leading up to the trial. Lawyers on both sides were working on nothing but the Avery file. They were living and breathing the case, and like most trial lawyers, occasionally waking up late at night to jot down a note or two for fear of forgetting something important in the morning.

Given the circumstantial nature of the evidence that tied Steven Avery to Teresa's murder, I knew there was a good chance that Buting and Strang would launch a "*Denny*" defense, named after a 1984 Wisconsin Court of Appeals case bearing the same name. Under *Denny* and similar cases in other states, the defense is allowed to present evidence to the jury that a specific person, or persons, other than the accused could have perpetrated the crime. In other words, they get to name names.

But the defense can only do so under very strict criteria. They must be able to show that the other party had motive, opportunity, and at least some evidence connecting the third person to the crime "which is not remote in time, place or circumstances." The rule is called the "legitimate tendency test," and while it sounds like a legal mouthful, it actually makes sense.

Hoping to stop that part of the defense in its tracks, Kratz and his team had filed a "Motion Concerning Third Party Liability" six months earlier. Filing the motion so early was a preemptive strike by the prosecution since the defense had strategically not tipped its hand by naming the person or persons they planned to blame for Teresa's murder. In fact, it wasn't until January 10, 2007, less than a month before trial, that Buting and Strang filed their "Statement on Third-Party Responsibility."

In it they identified "every customer of the salvage yard, every family friend, and every member of the Avery extended family who was present at the salvage yard during the hours in question" as possible third-party perpetrators.

The defendant's pleading was broad, perhaps impermissibly so, but the motion itself carried some weight. Steve wasn't the only member of the Avery clan to have had trouble with the law. His older brother Chuck had a violent past, most notably an incident six years earlier when his former wife accused him of rape and attempting to strangle her with a telephone cord.

Steve's younger brother Earl had potential, too. He pled no contest to battery and sexual assault charges in 1992 stemming from an attack on his wife.