# **Exhibit 28**

```
STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                        BRANCH 1
_____

STATE OF WISCONSIN,

                PLAINTIFF,        JURY TRIAL
                                  TRIAL — DAY 1
vs.                               Case No. 05 CF 381

STEVEN A. AVERY,

                DEFENDANT.
_____
```

**DATE:**    FEBRUARY 12, 2007

**BEFORE:**  Hon. Patrick L. Willis
            Circuit Court Judge

**APPEARANCES:**  KENNETH R. KRATZ
                  Special Prosecutor
                  On behalf of the State of Wisconsin.

                  THOMAS J. FALLON
                  Special Prosecutor
                  On behalf of the State of Wisconsin.

                  NORMAN A. GAHN
                  Special Prosecutor
                  On behalf of the State of Wisconsin.

                  DEAN A. STRANG
                  Attorney at Law
                  On behalf of the Defendant.

                  JEROME F. BUTING
                  Attorney at Law
                  On behalf of the Defendant.

                  STEVEN A. AVERY
                  Defendant
                  Appeared in person.

                  **TRANSCRIPT OF PROCEEDINGS**

            Reported by Diane Tesheneck, RPR

                  Official Court Reporter

1

1          Defendants are not required to prove

2     their innocence.  The law presumes every person

3     charged with the commission of an offense to be

4     innocent.  This presumption requires a finding of

5     not guilty unless in your deliberations you find

6     it is overcome by evidence which satisfies you,

7     beyond a reasonable doubt, that the defendant is

8     guilty.  Mr. Strang, at this time you may begin.

9          ATTORNEY STRANG:  Thank you, your Honor.

10    Good afternoon.  This summer it will be 22 years, 22

11    years since a woman running on the beach in

12    Manitowoc was raped and beaten nearly to death.  The

13    Manitowoc County Sheriff's Department investigated

14    those awful crimes and they charged Steven Avery

15    with rape and attempted murder on that Manitowoc

16    beach, 22 summers ago.

17         He said consistently that he was

18    innocent, that he had not done it.  No one

19    believed him, no one but his own family believed

20    him.

21         And as that case was making its way

22    through the Manitowoc County Circuit Court, just

23    one county over, Teresa Marie Halbach was five

24    and was starting kindergarten.  Somewhere else,

25    somewhere we don't know, a man named Gregory

110

1     Allen, presumably, was laughing and planning his

2     next violent rape.

3             Eleven years later, in 1996, Steven

4     Avery was trying, still, to make people

5     understand that he was innocent.  DNA testing was

6     in its infancy.  It was beginning to move into

7     courtrooms, out of scientific laboratories.  But

8     we have come a long way, just a few years since

9     1996, and it was not as advanced as it is today.

10             But in 1996, Steven Avery took a chance

11    and had blood drawn, a little vial of blood.  It

12    was sent off, through the help of his lawyers,

13    for early DNA testing.  It couldn't clear him

14    entirely.  It helped, but it did not conclusively

15    prove Steven Avery's innocence of the attempted

16    murder and rape on the Manitowoc beach.

17             And when the tests failed to prove him

18    entirely innocent, that blood was sent back, in a

19    box sealed with evidence tape, to the Manitowoc

20    County Clerk of Court.  And there, in 1996, that

21    blood vial, sealed in the box with evidence tape,

22    took up residence in the now 11 year old file of

23    the 1985 case; in a box, in the open, in the

24    Manitowoc County Clerk of Court's Office.  And

25    there it sat.

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 4 of 39   Document 120-28

1          And in 1996, here, just a few miles
2     north of here, Teresa Marie Halbach was learning
3     to drive at age 16, I assume.  And the irony --
4          Could you hear me before?  Can you hear
5     me now?
6          THE COURT:  We can hear you better now.
7          ATTORNEY STRANG:  All right.  Is it the
8     Verizon guy who says that?
9          Teresa was learning to drive, I assume,
10     at age 16.  And the irony -- the irony is that
11     the blood vial in the Clerk's Office probably is
12     what ends up in her car, eventually.
13          And time moves forward, though, to 2002.
14     Science also has moved forward.  DNA testing has
15     improved, and a new effort is made to exonerate
16     Steven Avery.
17          Now, the blood in the vial, in the box,
18     under the evidence tape, in the Clerk's Office,
19     is not, you will learn, what is used for the 2002
20     and 2003 DNA testing.  But, some materials from
21     that box, that file, the overall file from the
22     1985 case, some are sent to the Wisconsin State
23     Crime Laboratory in Madison, to Sherry Culhane,
24     to whom Mr. Kratz introduced you.
25          And the person from the Manitowoc County

112

1    Sheriff's Department involved, low these many
2    years later, the department was, but a person
3    from the Manitowoc County Sheriff's Department
4    who documented the things that were sent from
5    that old court file to the Crime Laboratory and,
6    therefore, presumably looked at the box and
7    assisted in deciding what to send.  That person
8    was, by that time, a lieutenant -- or a
9    detective, now a lieutenant, named James Lenk.
10         Now, Detective Lenk was with the
11   Manitowoc County Sheriff's Department, had his
12   office in the Sheriff's Department that adjoins,
13   or is connected by a small courtyard, to the
14   Manitowoc County Circuit Court and the Clerk's
15   Office, by a small courtyard to the south of the
16   courthouse.  He was, as I say, a detective with
17   the Sheriff's Department.  Today he is the
18   lieutenant of the detectives and leads the
19   Detective Unit.
20         He documented, in 2002, what was sent to
21   the State Crime Laboratory from that file.  2002
22   is the year that Teresa Halbach graduated from
23   the University of Wisconsin at Green Bay and came
24   home a short distance back, here to Calumet
25   County, to start off a promising career.

113

In 2003, nearly a year after the
necessary DNA samples were sent, the Wisconsin
State Crime Laboratory was able to establish that
Steven Avery did not rape and beat the woman on
the Manitowoc beach, as he had been saying all
along.  And because of the advance of science,
the Crime Lab was better -- was able to do better
than that.  It was able to establish that Gregory
Allen did.

        Now, unfortunately, in the time that
passed, Mr. Allen had raped violently, again,
because he had his liberty while that man did his
time.  But in the fall of 2003, as the weather
was cooling, the State of Wisconsin at long last
joined Steven Avery in a motion to set aside his
conviction, and an innocent man also went home.

        Home for Steven Avery, home is the
salvage yard of which you have seen, now, many
glorious pictures, from up high, from down low,
from angles all over.  The pictures are a good
deal more glorious looking than the salvage yard
itself, but this was home.  It's the only home
that would take him back after this time.

        Allen Avery, Steven's father, back there
in the working shirt, just as you might expect;

114

1    Allen Avery started that business nearly 40 years

2    ago on the 40 acres that he scrimped to buy.  He

3    raised sons and a daughter.  And they didn't

4    wander far from the business.

5        Chuck and Earl joined it, Barb works

6    elsewhere, works a factory job, but lives on the

7    property.  And this is the sort of business where

8    the family, as you saw, shares the perimeter of

9    this property with the 4,000 rusting, decaying

10   cars that are the refuse, the wreckage of other

11   people's lives.

12       This is not a glamorous business, but it

13   is a necessary business.  It is a good business.

14   And, yes, as you will learn, you have got to get

15   your hands dirty if you're going to be in the

16   salvage business.  Not just dirty, you get your

17   hands bloody, because you are working with

18   rusted, jagged metal disassembling cars.  And the

19   dirt that grinds into your palms and that you

20   find under your fingernails doesn't wash off at

21   night.

22       But this was his family's business and

23   this was home.  And he rejoined his brother's,

24   Chuck and Earl; and his father, Allen; his

25   mother, Delores, on the family's property and at

115

```
 1    the business.  He became, again, one in the Avery
 2    clan, one man in the Avery clan.  And tried to
 3    resume some normalcy of life, sharing the
 4    perimeter of that salvage yard, not in a pretty
 5    house in town, on a nice stone foundation, but in
 6    a trailer home, down from his sister's trailer
 7    home.  Both of them down from the doublewide that
 8    mom and dad have, and Chuck's trailer toward the
 9    back, on the path toward the crusher.
10            And it is, although not glamorous, a
11    worthwhile business and it's work with its own
12    dignity.  What would we do, if we didn't have the
13    salvage yards in which to find spare parts.  I
14    guess we would be reliant entirely on the big
15    corporations that make the cars, to continue to
16    make spare parts for them and sell them at such
17    prices they might see fit.
18            So it would be pretty tough without the
19    Allen Averys and the Steven Averys of the world.
20    It would be pretty tough for the guy who is
21    restoring the 1968 Pontiac GTO hard top, in his
22    garage, to do that economically.  It would be
23    pretty tough for the guy working on a 1965
24    Mustang convertible, in his spare time, to do
25    that.
```

116

```
 1           Maybe more importantly, it would be
 2      pretty tough for the woman who's got young kids
 3      to feed, and a job to hold down, and medical
 4      bills, and she just has to get another
 5      50,000 miles out of that 1988 Oldsmobile.  And
 6      for these people, maybe for you, for many of us,
 7      it's a good thing that that young woman's father,
 8      or brother, or maybe she, can go to the salvage
 9      yard and keep the 1988 Oldsmobile running a
10      little while longer.
11           Now, in 2003, when Steven went home,
12      Teresa Halbach also was home.  Her photography
13      business was flourishing and things were going
14      reasonably well.  In 2004, Steven Avery filed a
15      lawsuit seeking some recompense for the hole in
16      his life, the time he had spent as an innocent
17      man, for the crimes that Gregory Allen committed.
18           This was a serious lawsuit.  It was in
19      federal court, down in Milwaukee, and there was
20      no question but that a Manitowoc County Sheriff's
21      Department and, in the end, the court system, had
22      gotten the wrong guy.
23           And as that lawsuit crept forward, as
24      lawsuits do, we came to October 2005.  In October
25      2005, about the middle part of the month, James
```

117

1    Lenk and another ranking officer of the Manitowoc
2    County Sheriff's Department, Sergeant Andrew
3    Colborn, Mr. Lenk and Mr. Colborn both were
4    pulled into the lawsuit, not as defendants or
5    parties to the lawsuit, but as witnesses,
6    witnesses who had their depositions taken in the
7    middle of October, 2005.
8           Now, a deposition, typically in a civil
9    lawsuit, is an event where you get a subpoena as
10   a witness; you come normally to a lawyer's
11   office, the conference room, the library, the
12   lawyer's office; lawyers from both or all sides
13   are there.
14          A court reporter is there; these days
15   often a videographer as well.  And the court
16   reporter swears the witness under oath, the
17   lawyers ask questions of the witness under oath
18   and they are recorded, much as Mrs. Tesheneck is
19   recording what we're saying here.  There's no
20   judge; it happens, as I say, typically in a
21   lawyer's office.
22          And these two men, Lenk and Colborn,
23   were witnesses.  They were witnesses about their
24   own conduct.  Neither had been with the Manitowoc
25   County Sheriff's Department in 1985, but an event

118

in 1995 or 1996 came up in that lawsuit. And as
to that event, both of them were witnesses being
questioned about their own activity and conduct
with respect to Mr. Avery's imprisonment.

By the end of that month, unfortunately,
those depositions would begin to matter. And
indeed, from the time it was filed in 2004, you
will learn, the lawsuit itself mattered. This
sort of lawsuit, or the public cry of the
innocent man wrongly convicted and imprisoned has
to be, as you will see here I think, it has to
be, as you get into the heads of law enforcement
and begin to understand the process of law
enforcement, this kind of thing has to be a
nightmare for every good law enforcement officer.

These folks do not want to put innocent
people in prison. They want to put guilty people
in prison. And when they get it wrong, when the
whole system gets it wrong, there understandably
are feelings of shame, of embarrassment, anger,
humiliation, conflicting feelings about this.

This is a good cops worst nightmare,
made all the more worse by the fact that Gregory
Allen, free, thanks to Steven Avery being
convicted instead, Gregory Allen went on to rape

119

and beat again.

This lawsuit kindled real difficult emotions. And the focal point of those emotions, naturally, was the Manitowoc County Sheriff's Department which had investigated the rape many years ago on the Manitowoc beach.

And so when October 31, 2005, Halloween, rolls along, Lieutenant Lenk and Sergeant Colborn not only have the lawsuit to contemplate, but now, within the last three weeks, have been made witnesses in it and had their depositions taken.

October 31, 2005, began at the Avery Auto Salvage Yard, much as any workday would. This was a Monday, the yard was open. Not long after 8:00 in the morning, about 8:12 in the morning, Steven Avery called *Auto Trader* down in -- actually I think in Hales Corners, Highway 100 down on the southwest side of Milwaukee, called *Auto Trader*, as he had done a number of times before, and said, we need a photographer, we have a car for sale.

Now, the car belonged to Barb Janda, the van, the mini van you saw computer images of and actual photographs of. It was there. It was hers. It was for sale. I don't expect there

120

1  property, the gravel quarry to the south, we

2  can't rule out other possible burn sites. And an

3  expert won't be able to tell you what other

4  possible burn sites there are. Expert or not,

5  that's not something he or she will be able to

6  tell you.

7      But once it's more likely, as I think

8  you will find it to be more likely, that the body

9  is burned somewhere else and bone fragments then

10  are brought to Steven Avery's burn area, then

11  he's not guilty. Because if he's the one who

12  burned the body somewhere else, he's not going to

13  bring the bones back to dump them 20 yards

14  outside his bedroom window.

15      Neither is he going to dump a cell phone

16  and a digital camera and a palm pilot in his own

17  burn barrel. Too many other places where these

18  things could be disposed of out in the salvage

19  yard, whether the retention pond, whether the

20  gravel quarry, or some other burn barrel in the

21  woods. So once you understand that those bones

22  probably were not burned in that burn area, the

23  fact that they are found there, you will see

24  tends to suggest he's not guilty, not that he is.

25      It is perfectly clear to anyone around

146

this investigation on whom the focus of the
Manitowoc County Sheriff's Department and the
other investigators, to the extent that tunnel
vision, that investigative bias bled over, it's
perfectly clear on whom the focus of this
investigation is.

The police didn't kill Teresa Halbach,
obviously, they have that in common with Steven
Avery, but they wanted to believe he did.  They
very much wanted to believe that he did.  And
whoever did kill her, or burned that body,
exploited that tunnel vision pretty skillful.

Suggesting this sort of tunnel vision,
suggesting this kind of investigative bias,
planting blood in her car, fairly serious
allegations to make.  In fact, I will take away
the fairly, they are serious allegations.
Understand them, that bias and tunnel vision are
human anomalies.

And if you conclude, reluctantly, that
Mr. Lenk or Mr. Colborn, in addition to all the
other interests they took in searching and
focusing on Steven Avery, planted blood in her
car, you will also conclude that they put it
there because they figured it had to be there.

147

1 It should be there.  It must be him.

2    This wasn't so much, I think the

3 evidence will show you, an effort to frame an

4 innocent man, it was an intense, intense desire

5 to conclude that he, in fact, was the guilty man;

6 all other possible leads for information not

7 withstanding.  It was an immediate focus on this

8 man, starting shortly after 11:00, Saturday,

9 November 5, 2005.  But you do not have to take my

10 word for that.

11    I can make this work; I'm not as adept

12 at it as I should be.  I'm going to play for you,

13 two tapes, a part of it, just excerpts, short

14 excerpts of two tapes.

15    The first one is Saturday, November 5,

16 2005, at 11:35 in the morning, 35 minutes give or

17 take a minute or two, after the Manitowoc County

18 Sheriff's Department first has arrived at the

19 Avery property, because that Toyota has been

20 found; well before the police say they opened the

21 Toyota; well before they say they knew of any

22 blood; well before Brutus, the friendly cadaver

23 dog comes along and hits; 35 minutes after the

24 first officers arrived when the Sturm's called

25 and said, hey, we think we found something.

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 16 of 39   Document 120-28

1               What I'm going to do is scroll through a

2     transcript that we prepared and then I will play

3     the excerpt of the tape for you.  It is not a

4     great recording.  The transcript is not evidence,

5     the tape will be, I expect.  So if you think my

6     transcript is wrong, listen to the tape; it's the

7     evidence, or it will be.  That's the tape that

8     matters.  The transcript may help you in

9     understanding it or hearing it.

10           Detective Remiker is calling in, he's

11    asking for dispatch.  Dispatch responds, I put

12    unintelligible, I think it's go ahead, but I'm

13    not sure, you can decide.  Maybe you won't

14    understand it for sure either.

15           Detective Remiker says to the

16    dispatcher, you will need to get ahold of the

17    Crime Lab for their evidence response team to

18    start responding to this location.  Now, he's out

19    at the Avery Salvage Yard.  As you will hear.

20    Dispatch says, 10-4, Crime Lab out of Madison,

21    Milwaukee, where?

22           Our Crime Lab has branches in Wausau,

23    Madison and Milwaukee.  The main one is in

24    Madison.  Detective Remiker says, it's going to

25    be the Madison response team and he was right.

Now, Detective Jacobs joins in, this radio traffic, radio conversation. Calls in with his badge number, his squad number, I'm in code, you will find out what that means, anything you need other than a portable for Schetter. And what you'll find out is he's talking about a portable radio for Deputy Inspector Greg Schetter of the Manitowoc County Sheriff's Department who is, I think, the number two or three ranking officer in the Department and who's probably also going out to the Avery property. Detective Remiker, not that I can think of right now, Dennis. Dennis Jacobs. Let's see if this work.

(Tape recording played.)

DETECTIVE REMIKER: Yeah, need to get a hold of the Crime Lab for their evidence response to start responding at this location.

DISPATCH: 10-4. Crime Lab out of Madison, Milwaukee, where?

DETECTIVE REMIKER: Madison response team.

DETECTIVE JACOBS: 278, I'm in code, anything you need other than a portable for Schetter.

ATTORNEY STRANG: It cut off. Sorry about

```
 1          that, you will hear -- You will get a chance to hear

 2          the whole conversation.  And it continues, Dennis

 3          Jacobs says, okay, other than the car, do we have

 4          anything else.  He's talking to Remiker here.  Dave

 5          Remiker says, not yet.  Detective Jacobs, Okay.  Is

 6          he in custody?  Detective Remiker, Negative, nothing

 7          yet.

 8                   Not who, not is who in custody, but

 9          negative.  He is not in custody, nothing yet.

10          Detective Jacobs, Okay.  I'll gather my stuff and

11          head out.

12                   (Tape recording played.)

13                   DETECTIVE JACOBS:  Okay.  Other than the

14          car do we have anything else?

15                   DETECTIVE REMIKER:  Not yet.

16                   DETECTIVE JACOBS:  Is he in custody?

17                   DETECTIVE REMIKER:  Not yet, nothing

18          happening.

19                   DETECTIVE JACOBS:  Okay.  I will gather

20          my stuff and head out.

21                   ATTORNEY STRANG:  Now, that's 11:35, is he

22          in custody yet.  Detective Remiker, clearly, I

23          gather, as I hear it, knows who Detective Jacobs is

24          talking about, but we don't, 35 minutes after the

25          police have arrived.
```

151

```
1                    And to get a better feel for that

2          conversation at 11:35, we have to go back five

3          minutes earlier when Detective Jacobs is calling

4          in on the land line, 5 minutes earlier, 30

5          minutes, 30 minutes after the police have arrived

6          at the Avery property after Teresa's car has been

7          found there.

8                    Dispatcher answers the phone.  Detective

9          Jacobs, Katie -- the name of the dispatcher --

10         just rolled into the parking lot.  Can you tell

11         me, do we have a body or anything yet?  Do we

12         have a body or anything yet?  This is 30 minutes

13         after they found the car.

14                   I don't believe so.  I believe they

15         wouldn't find the first bone fragment for three

16         days.  Do we have Steven Avery in custody,

17         though?  I have no idea.  You can hear it

18         yourself.

19                   (Tape recording played.)

20                   DISPATCH:  Good morning.  Manitowoc

21         County Sheriff's Department, Katie speaking.

22                   DETECTIVE JACOBS:  Katie, I just rolled

23         into the parking lot.  Can you tell me, do we

24         have a body or anything yet?

25                   DISPATCH:  I don't believe so.
```

152

1          DETECTIVE JACOBS:  Do we have Steven
2     Avery in custody?
3         (Tape recording starts playing again.)
4          DISPATCH:  Good morning.  Manitowoc
5     County Sheriff's Department, Katie speaking.
6          DETECTIVE JACOBS:  Katie, I just rolled
7     into the parking lot, can you tell me do we have
8     a body or anything yet?
9          DISPATCH:  I don't believe so.
10          DETECTIVE JACOBS:  Do we have Steven
11    Avery in custody at all?
12          DISPATCH:  I have no idea.
13          ATTORNEY STRANG:  Now, I will finish it out
14    so you can link it up to the call -- the discussion
15    with Detective Remiker 5 minutes later.  Oh, I heard
16    him say pick up that party.  Oh no, the dispatcher
17    says, Pete, who is just another Manitowoc County
18    Sheriff's officer, is sitting up there waiting and
19    stopping people from going in and that.  He found
20    someone with a body only warrant for our department.
21          A body only warrant is an arrest warrant
22    or a bench warrant where they are going to take
23    the person into custody, rather than immediately
24    grant him bail.  Okay.  Do we have -- All right.
25    I will talk to Remiker.  Yeah, your best bet is

                              153

to talk -- because nothing has come through.  We
have the vehicle, that I know.  But more than
that, I don't know.  All right. Bye.  Bye.

          (Tape recording played.)

          DETECTIVE JACOBS:  Oh, I heard him say
pick up that party.

          DISPATCH:  Oh, no.  We have -- Well,
Pete is sitting up there waiting and stopping
people from going in and that.  He found somebody
with a body only warrant for our department.

          DETECTIVE JACOBS:  Okay.  Do we have --
All right.  I will talk to Remiker.

          DISPATCH:  Yeah, your best bet is to
talk to -- Nothing has come through.  We have the
vehicle, that I know.

          DETECTIVE JACOBS:  All right.  Thank
you.

          DISPATCH:  But what more, I don't know.
All right. Bye.

          DETECTIVE JACOBS:  Bye.

          ATTORNEY STRANG:  So you can take the
tunnel vision and investigative bias from them, not
from me.  Now, in the end here, in the end, when you
have heard it all, there's not a speck of Teresa
Halbach's blood anywhere in Steven Avery's trailer.

154

1    There's not a piece of hair, nothing, nothing to

2    suggest she's ever been in the trailer.  And only

3    the magic bullet found 4 months later to suggest

4    she's ever been anywhere near the garage.

5         And when you consider the forces, the

6    emotions, the very human failings at work here,

7    it's no surprise that the blood from that

8    unsecured vial, in the box, in the Clerk's

9    Office, that Lieutenant Lenk examined back in

10   2002, ends up in that Toyota.  Because that's

11   where it ought to be.  Is he in custody yet?

12        Jerome Buting and I will not ask you to

13   make that kind of snap judgment here.  The

14   Halbachs deserve better than that.  The police

15   deserve better than that.  You owe it to

16   yourselves, in making this decision, to do better

17   than a snap judgment, a snap judgment 30 minutes

18   after that Toyota is found.

19        Jerome Buting and I are going to ask you

20   to do your job right.  Think long and hard about

21   all of the evidence.  But in the end, after the

22   full and fair consideration of everything and

23   everyone, the full and fair consideration that

24   Steven Avery did not get in 2005, from the

25   Manitowoc County Sheriff's Department; we're

                          155

1    going to ask you to send him home.  We're going

2    to ask you to send him home, again.  We're going

3    to ask you to get it right this time.  We're

4    going to ask you to set it right when this case

5    is over.

6            THE COURT:  Thank you, Mr. Strang.  Members

7    of the jury, we're going to take an afternoon break

8    now.  We'll resume in 15 minutes and the State will

9    begin the presentation of evidence.  I will remind

10   you again, as I will a number of times throughout

11   the trial, do not discuss the case during the break

12   or at any other time until all the evidence has been

13   received.

14            (Jury not present.)

15            THE COURT:  All right.  Counsel, we should

16   be ready to go promptly at 2:45.

17            (Recess taken.)

18            THE COURT:  At this time the State may call

19   its first witness.

20            ATTORNEY KRATZ:  State will call Mike

21   Halbach, your Honor.

22            THE CLERK:  Please raise your right hand.

23            **MICHAEL D. HALBACH**, called as a witness

24   herein, having been first duly sworn, was

25   examined and testified as follows:

156

```
 1            THE CLERK:  Please be seated.  Please state

 2       your name and spell your last name for the record.

 3            THE WITNESS:  Michael Daniel Halbach,

 4       H-a-l-b-a-c-h.

 5                    **DIRECT EXAMINATION**

 6  BY ATTORNEY KRATZ:

 7  Q.   Mr. Halbach, did you know a young woman by the

 8       name of Teresa Halbach?

 9  A.   I did.

10  Q.   Describe, who was Teresa, please.

11  A.   Teresa was -- or is my sister.  She was born on

12       March 22nd, 1980.  Grew up with my family on a

13       dairy farm near Hilbert.

14            She loved travel; she had been to Spain,

15       Mexico, New Zealand, Australia.

16            She had many friends.  She loved doing

17       things with her friends.  She was a good friend

18       of mine, as well.

19            She was my big sister, someone I could

20       go to talk to about any problems I would have.

21       We would go to lunch, talk about her business

22       which she ran, called Photography by Teresa.

23            And in August of 2005, she coached her

24       sister's 7th grade volleyball team to second

25       place in their league.  So I know that that's
```

157

```
 1         something she really loved doing, was working
 2         with those kids.  That was the main focus of her
 3         photography business as well.
 4                   And she graduated from the University of
 5         Wisconsin, Green Bay, in 2002, major in
 6         photography and she graduated summa cum laude.
 7    Q.   I'm going to hand you a couple of exhibits.
 8         First exhibit is that which is marked as Exhibit
 9         No. 1.  Could you tell us what that is, please.
10    A.   It's a photo of Teresa.
11    Q.   Do you know when that photo was taken?
12    A.   Not exactly, but by the looks of it, it was
13         fairly recent.  I would say 2005.
14    Q.   Does that particular photo accurately depict your
15         sister, Teresa, and as it did the last time that
16         you saw her?
17    A.   Yes.
18    Q.   By the way, when was the last time that you saw
19         her; do you recall?
20    A.   The last time I saw my sister was October 30th,
21         2005, the day before she went missing.  We were
22         at my grandparents house.  It was my grandpa's --
23         Halloween was my grandpa's birthday.  And the day
24         before we went to their house, the entire family
25         was there, aunts, uncles.
```

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 26 of 39   Document 120-28

```
 1   Q.   Mr. Halbach, I'm sure we'll get better at this
 2        with the jury, but I'm going to direct your
 3        attention to the large screen in the courtroom,
 4        is that another version or a larger version of
 5        what's been marked as Exhibit No. 1?
 6   A.   Yes, it is.
 7   Q.   You mentioned that Teresa was part of your
 8        family, can you tell us who else was involved in
 9        your immediate family, please?
10   A.   I have an older brother, Tim; and then Teresa
11        would be the second oldest; myself; and two
12        younger sisters, Katie and Kelly; parents, Tom
13        and Karen.
14   Q.   Directing your attention to Exhibit No. 2, I'm
15        also putting that on the screen for the jury; can
16        you tell us what that is, please.
17   A.   It's a photo we took outside my parents farm.  I
18        believe it was in 2004, that summer, early fall.
19        It's a photo we used for our Christmas cards that
20        year.  And it's a photo of my family.
21   Q.   And as you are pointing to Exhibit No. 2, please,
22        could you tell us, or tell the jury, who all is
23        in that photo?
24   A.   Tom, Teresa's, I guess legally would be her step
25        dad, standing in the back with the jean shirt; to
```

159

1          his left is, Katie, younger sister; and to her

2          left is Kelly, the youngest of the family.   In

3          front from left to right is the oldest brother,

4          Tim; and then my mom, Karen; then myself holding

5          our dog, Eddy; and Teresa is on the end.

6   Q.     All right.  How often would you get to see

7          Teresa; how often would you interact with her?

8   A.     Every few days I would probably talk to her

9          either on the phone, or if it was a weekend, we

10         would probably see each other, if I was at my

11         parent's house if she would stop over during the

12         week, or over the weekend.  So I would see her --

13         see her or at least talk to her every three days

14         or so.

15  Q.     Are you familiar with Teresa's electronic devices

16         that she owned?

17  A.     Yes, I am.

18  Q.     Could you tell us about those, please.

19  A.     She owned a cell phone, a Motorola RAZR, and I

20         know this because she talked on it a lot.  She

21         also had a palm pilot.  I believe it was -- the

22         brand was Palm 1, I believe.

23                She had tons of photography equipment,

24         obviously.  Hasselblad is one camera; Canon is

25         another; and through one of her jobs she had a

                                160

| | |
|---|---|
| 1 | little snapshot camera for the job.  She worked |
| 2 | through *Auto Trader Magazine*.  She had this |
| 3 | little snapshot camera to do that job. |
| 4 | Q.   Do you know what kind of vehicle Teresa drove? |
| 5 | A.   It was a Toyota RAV4.  It was bluish-green in |
| 6 | color. |
| 7 | Q.   We're going to have the actual photo marked as an |
| 8 | exhibit, but I'm going to direct your attention |
| 9 | up to the large screen.  Could you tell us what |
| 10 | it is we're looking at there. |
| 11 | A.   Could you repeat that. |
| 12 | Q.   Sure, I'm about to have this photo made part of |
| 13 | the -- or to complete the record, but could you |
| 14 | tell us and can you look at the large screen and |
| 15 | tell us what it is that we're looking at. |
| 16 | A.   That's Teresa holding one of her cameras she had |
| 17 | with her professional photography business, |
| 18 | standing outside the driver's side door of her |
| 19 | Toyota RAV4. |
| 20 | Q.   Mr. Halbach, could you -- regarding Teresa's |
| 21 | RAV4, could you tell us how often you had contact |
| 22 | with that vehicle? |
| 23 | A.   I would say I have ridden in it a few times, but |
| 24 | I would see it whenever I saw her.  It was her |
| 25 | only vehicle, so when she would drive it or when |

161

1      she would drive around, she would be in that
2      vehicle.  So I was very familiar with it and had
3      ridden in it a few times.
4   Q.  Teresa's license plate said -- as you sit here
5      today, did you know or were you familiar with
6      what Teresa's license plates were?
7   A.  Yes, I was.
8   Q.  And how are you familiar with that?
9   A.  One of Teresa's jokes and how she remembered her
10     license plate, her license plate numbers -- or
11     letters and numbers were SWH-582.  She remembered
12     those letters because she would joke that it
13     stood for single white Halbach.
14     (Exhibits No. 3 & 4 marked for identification.)
15  Q.  Mr. Halbach, I provided you with two exhibits
16     Exhibit No. 3 and Exhibit No. 4, can you tell us,
17     though, what those are, please?
18  A.  Pictures of Teresa's license plate.
19  Q.  And which one of them has the sticker on it.
20  A.  Exhibit No. 3.
21  Q.  All right.  Just so the jury is shown Exhibit
22     No. 3, I'm going to direct your attention to the
23     large screen, again; what is it that we're
24     looking at?
25  A.  Teresa's license plate?

162

1    Q.   SWH-582, is that right?

2    A.   That's correct.

3              THE COURT:  Excuse me, Mr. Kratz, just for

4         the record, I think the photo of Teresa Halbach with

5         the RAV4 was referred to as an exhibit, but we

6         haven't marked it yet; are you still looking for the

7         original?

8              ATTORNEY KRATZ:  We are, Judge.  Although

9         we have the original, Judge, we'll be referring to

10        it either with this witness or the next witness who

11        also has familiarity with that.

12             THE COURT:  Just, I think, to keep the

13        record straight, it should be reflected that while

14        it may have been referred to as an expected exhibit

15        number, it has yet to be numbered.

16             ATTORNEY KRATZ:  All right, judge.

17             THE COURT:  You may proceed.

18   Q.   (By Attorney Kratz)~ And the other vehicle, or

19        what I guess would be considered the front

20        license plate, you said that was Exhibit No. 4;

21        is that right?

22   A.   Yes, that's correct.

23   Q.   And I have now directed your attention to that on

24        a large skween -- screen, excuse me, once again,

25        Exhibit No. 4, the large screen photo here,

                          163

1       accurately reflects Exhibit No. 4; is that
2       correct?
3    A.  Yes, it does.
4    Q.  All right.  I have now handed you what's been
5       marked for identification as Exhibit No. 5, tell
6       us what that is, please.
7    A.  It is the picture we looked at not too long ago
8       with Teresa standing outside the driver side of
9       her Toyota RAV4.
10   Q.  Just for the record, Exhibit No. 5, then, would
11       be the image that we're looking at on the screen
12       now; is that correct?
13   A.  Yes.
14   Q.  All right.  By the way, Mr. Halbach, did you have
15       an idea as to when this photo was taken?  Did I
16       ask you this?
17   A.  You didn't ask me that.  I mean, I would guess
18       sometime maybe 2004, maybe early 2005.
19   Q.  I guess the question that the jury needs to know
20       is, was this Toyota RAV4, the vehicle in which
21       your sister is standing in front of, the same
22       vehicle that she was driving at the end of
23       October of 2005?
24   A.  Yes, it is.
25   Q.  You mentioned that Teresa was involved in the

                        164

1         photography business; can you tell us about that

2         a little bit?

3 A.    Yeah, through college she developed a passion for

4         photography and, hence, why she declared that as

5         her major.  I would say her sophomore and junior

6         year she worked at Bay Park Square Mall in Green

7         Bay at Picture People taking photos of children,

8         mainly families.

9              After she got done doing that, during

10        her last semester at Wisconsin, Green Bay, she

11        started this internship with Tom Pearce of Pearce

12        Photography in Green Bay, doing many of the same

13        things, taking pictures of children, families,

14        some, and also doing weddings on the weekends.

15        So she continued working with him and then later

16        on in 2002, she started her business, which she

17        named Photography by Teresa, which continued up

18        until Halloween of 2005.

19 Q.    Now, you indicated that you are familiar that at

20        least one of her clients was *Auto Trader*

21        *Magazine*; is that what you told us?

22 A.    Yes, that's correct.  She in, I think it was

23        October of 2004, she started working for *Auto*

24        *Trader Magazine* as a way to supplement her income

25        for her professional business.  Since she was

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 33 of 39   Document 120-28

1          just starting out with her own business, she

2          wouldn't always have clients.  So.  Yeah, just as

3          a way to have some steady income, she got this

4          job with the *Auto Trader Magazine* to take

5          pictures of vehicles in people's yards, that they

6          were selling themselves.

7     Q.   First photo I'm showing you has been marked as

8          Exhibit No. 7, can you tell us what that is,

9          please?

10    A.   Exhibit No. 7 is Canon PowerShot A310; it's the

11         box for the Canon camera.  It's not the camera

12         itself.

13    Q.   And, once again, were you familiar that that was

14         one of the cameras that Teresa had used in her

15         employment?

16    A.   Yes, I am, in her employment with *Auto Trader*,

17         yes.

18    Q.   The other exhibit, I think it was Exhibit No. 6;

19         is that correct?

20    A.   That's correct.

21    Q.   Can you tell me what that is, please?

22    A.   It's a box for a Palm 1 Zire 31 palm pilot.

23    Q.   And, once again, the large screen, does that

24         accurately depict the box, again, recovered from

25         your sister's home, the box that she saved for

                             166

```
 1          her palm pilot?
 2   A.    Yes, it does.
 3   Q.    Was your sister kind of a pack rat; did she save
 4          this kind of stuff?
 5   A.    Having gone through her stuff, yeah, she saved a
 6          lot of stuff, yes.
 7   Q.    Was your sister married?
 8   A.    No, she's not.
 9   Q.    Who did she live with?
10   A.    She lived with a friend of hers from high school,
11          named Scott Bloedorn.  He lived in the upstairs
12          of the apartment -- or of the house she was
13          renting from my parents.
14   Q.    How close was this to your parents' house?
15   A.    Down the road a short ways, eighth mile, roughly
16          quarter mile.  Not too far.
17   Q.    Okay.  Mike, did you ever have an opportunity to
18          see or talk with your sister as she either went
19          to work for the *Auto Trader Magazine* or as she
20          went to work at her own studio?
21   A.    As she went there?
22   Q.    Yes.  In other words, were you familiar with how
23          she dressed to go to work?
24   A.    Yes.
25   Q.    Can you tell us about that.
```

167

```
 1   A.   She would always dress professionally, especially

 2        when she was going to her professional

 3        photography business, you know, black pants, a

 4        nice shirt.  And if she happened to be doing *Auto*

 5        *Trader* that same day, she would go in those same

 6        clothes.

 7                  But if it was -- if she wasn't going to

 8        her job that day, she would dress comfortably,

 9        not necessarily in professional clothes, but nice

10        clothes nonetheless.  Might be a nice pair of

11        jeans and a nice shirt or, you know, maybe khakis

12        and a shirt, sweatshirt.

13   Q.   Mike, as long as we have the photos, again, what

14        we're looking at here, that's a picture -- which

15        picture is that, No. 6?

16   A.   That is Exhibit No. 6.

17   Q.   We're going to have the actual exhibit marked so

18        that we don't just have a photo of it?

19                  ATTORNEY KRATZ:  Janet, is that going to be

20        No. 8?

21                  THE CLERK:  Yes.

22            (Exhibit No. 8 marked for identification.)

23                  ATTORNEY KRATZ:  Mr. Wiegert, could you

24        provide that to the witness.

25   Q.   (By Attorney Kratz)~ Mr. Halbach, we're showing
```

168

1    you what's marked for identification as Exhibit

2    No. 8; can you show the jury and tell them what

3    that is, please?

4    A.   This is the same box as in the Exhibit No. 6,

5    it's the box for Teresa's Palm 1 Zire 31 palm

6    pilot.

7    Q.   And if I'm not mistaken, Exhibit No. 7, I think,

8    was the box for the Canon PowerShot A310; is that

9    right?

10   A.   That's correct.

11   Q.   We're going to have that box, actually, marked

12   for identification as Exhibit No. 9.

13     (Exhibit No. 9 marked for identification.)

14   Q.   Once, again, Mr. Wiegert will be providing that

15   to you.  If you could show it to the jury and

16   tell them what Exhibit No. 9 is, please?

17   A.   Exhibit No. 9 is the box for the Canon PowerShot,

18   the A310, that Teresa used for her *Auto Trader*

19   job.

20   Q.   Once again, after your sister's disappearance and

21   after investigators began contacting you,

22   specifically, and your family, these items were

23   found in her personal effects and turned over; is

24   that right?

25   A.   That's correct.

169

1   Q.   Can you tell me who Pam Sturm is?

2   A.   Pam Sturm, to me, would be my first cousin once

3        removed.  She would be my grandma's sister's

4        daughter.

5   Q.   Okay.  The involvement of Pam and her daughter,

6        Nikole, after your sister was missing, could you

7        describe that for the jury?

8   A.   You said her involvement?

9   Q.   Yes.

10  A.   Pam Sturm was the person who ended up finding

11       Teresa's vehicle on the Avery salvage yard.  I

12       recall coming home that day, after I had been

13       with my brother driving, in her -- being inside

14       my parents' house crying and my mom telling me

15       that we found the vehicle -- or Pam found the

16       vehicle, Pam and her daughter, Nikole.  So, I

17       guess that would be her involvement.

18  Q.   All right.  Let's go back just a little bit,

19       Mike, if we can.  After your mom reported your

20       sister missing on the 3rd of November, how was it

21       that you were informed of that?

22  A.   On Thursday, November 3rd, I was working.  I got

23       a call from my mom that afternoon at about 2:00

24       or 2:30 wondering if I knew where -- or if I had

25       talked to my sister in the previous, you know,

                            170

1   since Sunday.  And I said that I hadn't.

2           And so I went on to call one of Teresa's

3   good friends at her work and asked her if she had

4   known where Teresa could be.  Because it was

5   completely unlike her to go somewhere without

6   telling anyone, especially a family member, a

7   good friend, her roommate, or her boss.

8           So, I guess after we made those calls it

9   became very evident to me that something was

10  seriously wrong and I expressed that to my mom.

11  Then shortly after -- and she was, you know, she

12  was in agreement, obviously; she knew something

13  was wrong, just like everyone else did.

14  Q.  Did the family ask for some assistance and did

15      you receive it from some of Teresa's friends

16      regarding searching for her?

17  A.  In searching for her we, you know, all we had to

18      do was make a couple phone calls to some of

19      Teresa's friends and they would call numerous

20      other people.  We needed help passing -- passing

21      out posters on Friday, November 4th and also

22      doing searches by car on Saturday, the 5th and

23      doing searches by foot a few days following that.

24      So, whenever we needed help, we had help from

25      Teresa's friends, family members, community

171