# Exhibit 29

```
 1   STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                              BRANCH 1
 2   _____

 3   STATE OF WISCONSIN,

 4                 PLAINTIFF,        JURY TRIAL
                                     TRIAL — DAY 7
 5   vs.                             Case No. 05 CF 381

 6   STEVEN A. AVERY,

 7                 DEFENDANT.

 8   _____

 9   DATE:     FEBRUARY 20, 2007

10   BEFORE:   Hon. Patrick L. Willis
               Circuit Court Judge

11   APPEARANCES:   KENNETH R. KRATZ
                     Special Prosecutor
12                   On behalf of the State of Wisconsin.

13                   THOMAS J. FALLON
                     Special Prosecutor
14                   On behalf of the State of Wisconsin.

15                   NORMAN A. GAHN
                     Special Prosecutor
16                   On behalf of the State of Wisconsin.

17                   DEAN A. STRANG
                     Attorney at Law
18                   On behalf of the defendant.

19                   ATTORNEY JEROME F. BUTING
                     Attorney at Law
20                   On behalf of the defendant.

21                   STEVEN A. AVERY
                     Defendant
22                   Appeared in person.

23               TRANSCRIPT OF PROCEEDINGS

24          Reported by Diane Tesheneck, RPR

25               Official Court Reporter

                          1
```

# I N D E X

WITNESSES                                                    PAGE

**SERGEANT WILLIAM TYSON**

Cross-Examination by ATTORNEY BUTING                          3

Redirect Examination by ATTORNEY KRATZ                       62

**SERGEANT ANDREW L. COLBORN**

Direct Examination by ATTORNEY KRATZ                         64

Cross-Examination by ATTORNEY STRANG                        141

Redirect Examination by ATTORNEY KRATZ                      212

Recross-Examination by ATTORNEY STRANG                      215

**LIEUTENANT JAMES LENK**

Direct Examination by ATTORNEY KRATZ                        216

| **EXHIBITS** | MARKED | OFFERED | ADMITTED |
|---|---|---|---|
| 158 | | 120 | 121 |
| 206-207 | | 63 | 64 |
| 211 | 135 | 136 | 137 |
| 212 | 179 | 243 | 243 |
| 213 | 200 | | |

2

1        assume, right?

2   A.   Correct.

3   Q.   Who was making that assignment, Mr. Fassbender or

4        Mr. Wiegert?

5   A.   To tell you the truth, I don't know which one

6        came up with that assignment.  I don't know.

7   Q.   Okay.  Were they both present?

8   A.   They were both in the command center area, yes.

9   Q.   All right.  And you said on direct that you were

10       advised to watch them, make sure that none of

11       Manitowoc officers were alone in the property?

12  A.   That was the initial instruction from the

13       district attorney of Manitowoc County.  He made

14       an announcement to all Manitowoc officers, that

15       you are not to be alone on the property, period.

16  Q.   Were you there when that was made?

17  A.   Yes.

18  Q.   Okay.  And so was there a discussion of that

19       again with Mr. Wiegert or Mr. Fassbender when you

20       were signed up, paired up with these three

21       Manitowoc officers?

22  A.   I don't think that was reiterated; it was well

23       understood.

24  Q.   Well, your assignment inside that trailer, the

25       residence, was to, as I recall, was to not

19

| | | |
|---|---|---|
| 1 | | actually do the searching yourself, you were just |
| 2 | | watching, making notes, documenting, right? |
| 3 | A. | Yes. |
| 4 | Q. | So of the four officers in that little trailer, |
| 5 | | only the Manitowoc officers were the ones |
| 6 | | actually doing the searching, right? |
| 7 | A. | Right. |
| 8 | Q. | You were doing the watching, right? |
| 9 | A. | I was doing the documentation. |
| 10 | Q. | And the watching, right? |
| 11 | A. | Yes. |
| 12 | Q. | You never let them out of your eye sight, did |
| 13 | | you? |
| 14 | A. | I cannot sit up here and look at you guys and |
| 15 | | tell you that three hours inside that residence |
| 16 | | that I didn't turn my back, walk away, glance |
| 17 | | away; so I can't say that every second of the |
| 18 | | close to three hours I was making direct eye |
| 19 | | contact with them or watching every move they |
| 20 | | made. |
| 21 | Q. | Well, you did, I think at one point, describe an |
| 22 | | incident or moment when -- |
| 23 | | ATTORNEY BUTING: Actually, let's put up -- |
| 24 | | Counsel, I am going to need your indulgence on this, |
| 25 | | please, because I don't have the computer animated |

```
 1        diagram.  Would you be able to put that up?

 2                    ATTORNEY STRANG:  I do.

 3                    ATTORNEY BUTING:  Do we?  Let me figure out

 4        the exhibit number.

 5                    ATTORNEY FALLON:  What exhibit numbers,

 6        counsel?

 7                    ATTORNEY BUTING:  We're going to start with

 8        102.

 9                    ATTORNEY FALLON:  On the ELMO.

10                    ATTORNEY BUTING:  Yes.

11   Q.   (By Attorney Buting)~ Okay.  I'm showing you up

12        on the screen here Exhibit 101, previously

13        marked, does that look familiar to you, sir, at

14        least what it depicts?

15   A.   Appears to be the Steve Avery residence.

16   Q.   And if you could go look at the bedroom area --

17        Actually, I'm going to put up a different one to

18        show you that; 104 is next.  Okay.  Do you see

19        that?

20   A.   Yes.

21   Q.   And is that a representation of the bedroom, back

22        bedroom, Mr. Avery's bedroom, and the hallway

23        bathroom area?

24   A.   Yes.

25   Q.   All right.  I apologize for that delay.  But, I
```

21

```
 1        believe you said that at one point you were

 2        watching them so carefully that Mr. Lenk,

 3        Lieutenant Lenk, excuse me, walked out of the

 4        bedroom into the bathroom area, right?

 5   A.   Correct.

 6   Q.   Through this hallway.  And you were standing

 7        right here at the doorway while they were

 8        searching, right?

 9   A.   Originally, yes.

10   Q.   In other words, this bedroom really wasn't even

11        big enough for four grown men to be walking

12        around and doing things, was it?

13   A.   With the bed, you know, as I previously had

14        testified, Detective Remiker and Lieutenant Lenk

15        were by the closet area.  Sergeant Colborn was up

16        by the desk and bookcase area?

17   Q.   All right.  So you are indicating the lower part

18        of the --

19   A.   Yes.

20   Q.   -- is the closet; lower part of this screen here.

21        And the upper is the desk bookcase area?

22   A.   Correct.

23   Q.   And you were standing in the door?

24   A.   Just inside the doorway.

25   Q.   Just inside the doorway, right.  Okay.  But you
```

22

1    mentioned that when Lieutenant Lenk went out into

2    the bathroom, you repositioned yourself in the

3    doorway so you could see him in the bathroom and

4    those in the bedroom, right?

5  A.  Yes.

6  Q.  You were keeping an eye on what was going on with

7    Mr. Lenk and -- Lieutenant Lenk and the other

8    officers?

9  A.  I would say I was positioning myself to see if

10   they had located any evidence.

11 Q.  Well, and you were also trying to abide by the

12   directive that Manitowoc officers should not be

13   alone in any of this property, right?

14 A.  It was more of a documentation type thing.  I

15   mean, I did not treat these guys like I did not

16   trust them, okay.

17 Q.  Well, let me ask you this, sir.  You knew that

18   the district attorneys told those officers not to

19   be alone on any property, right?

20        ATTORNEY KRATZ:  Mischaracterization,

21   Judge, he said the Manitowoc County district

22   attorney, if he could rephrase the question.

23        ATTORNEY BUTING:  I don't particularly care

24   which district attorney, it's a district attorney.

25   All right.

23

1    Q.   (By Attorney Buting)~ You knew that?

2    A.   Yes.

3    Q.   You knew that it was important to the

4         prosecution, or some attorneys on site, that

5         these officers not be alone anywhere on that

6         Avery property, right?

7    A.   Yes.

8    Q.   And you knew that this was Mr. Avery's trailer?

9    A.   Yes.

10   Q.   And that if anything, of all the places that they

11        should not be alone, it would be in Mr. Avery's

12        trailer, right?

13   A.   We did not know that on that day.

14   Q.   Mr. Avery was the one who was suing them, right?

15        You knew that?

16   A.   I was aware of that fact, yes.

17   Q.   You knew that, that's right.  And you knew that's

18        why Manitowoc recused themselves, or transferred

19        authority over to Calumet, right?

20   A.   Yes.

21   Q.   It was because of this man right here, right?

22   A.   I believe that's correct.

23   Q.   And it was this man right here's trailer that you

24        were in?

25   A.   Yes.

24

```
 1   Q.   And so that, of all places, you knew was
 2        important that you make sure that these Manitowoc
 3        officers not be alone?
 4   A.   Correct.
 5   Q.   And so you kept an eye on them, didn't you?
 6   A.   I was watching what they were doing, yes.
 7   Q.   Had you ever, in any other search in your entire
 8        career, had to act like a babysitter, or a
 9        watchdog, for the officers who were conducting a
10        search?
11   A.   I did not treat this as if I was babysitting.
12   Q.   Had you ever, in any of your years as an officer,
13        had to watch the officers who were searching
14        where you were, to make sure that they weren't
15        alone?
16   A.   No.
17   Q.   This was a first for you, wasn't it?
18   A.   Yes.
19   Q.   And you made sure, because you were the watchdog
20        here, you were the custodian, the representative
21        of Calumet, you made sure that none of those
22        officers could have planted anything, right?
23   A.   I watched them to the best of my ability, within
24        those three hours.
25   Q.   And to the best of your ability meant you did
```

25

```
 1        everything you could to make sure that they knew

 2        they were being watched and that they couldn't

 3        plant any evidence if they wanted to?

 4   A.   They were told the same instructions that I were,

 5        that I was going into that residence to document

 6        and recover all evidence that was seized.

 7   Q.   Well, and you did a good job doing that, didn't

 8        you?

 9   A.   I believe to the best of my ability, yes.

10   Q.   All right.  And would you agree with me that it

11        was -- would have been very difficult for

12        Lieutenant Lenk or Sergeant Colborn to have

13        planted a Toyota key in that residence, under

14        your watch?

15   A.   I believe it would have been difficult.

16   Q.   Extremely difficult, right?

17   A.   It would have been difficult, yes.

18   Q.   Because you were watching them?

19   A.   To the best of my ability, yes.

20   Q.   Did you ever suggest to Mr. Fassbender or

21        Mr. Wiegert that maybe you would like to have

22        some of your own officers in there doing this

23        search that night, to Mr. Avery's residence?

24   A.   We didn't have all those officers that you

25        mentioned at the scene that day.
```

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 11 of 76   Document 120-29

1     picture, the leg irons and handcuffs were located
2     in this area here.
3  Q. Now, this particular photograph, you can see a
4     pair of slippers, bedroom slippers next to it; is
5     that right?
6  A. Yes, sir.
7  Q. You can see a electrical outlet or a socket; is
8     that right?
9  A. Yes, sir.
10 Q. Can you point to that, please.  Were you asked,
11    or at least as part of your responsibilities of
12    searching the bedroom, were you asked to do a
13    thorough search of this piece of furniture?
14 A. Yes.
15 Q. And did you do that?
16 A. Yes.
17 Q. In performing that search, Sergeant Colborn, did
18    you move or manipulate this piece of furniture at
19    all?
20 A. Yes, sir.
21 Q. Can you describe that for the jury, please.
22 A. As I stated before, we were looking for specific
23    printed or photographs.  There is a narrow area
24    between this bookcase and this desk, right there.
25    And in order to make sure that there was no

                              125

```
 1          evidence or anything else that we needed lodged
 2          between there, I actually tipped this to the side
 3          and twisted it away from the wall.
 4     Q.   If you can describe that further, I don't know if
 5          you can do it with your words, or show us with
 6          your hands, how you did it?
 7     A.   I will be the first to admit, I wasn't any too
 8          gentle, as we were, you know, getting
 9          exasperated.  I handled it rather roughly,
10          twisting it, shaking it, pulling it.
11     Q.   And that's the bookcase that you are talking
12          about?
13     A.   Yes, this piece of furniture right here, a
14          bookcase.
15     Q.   I'm sorry.  Sergeant, in shaking and twisting
16          that particular bookcase, did you pull it away
17          from the wall itself, that you can see behind
18          there?
19     A.   Yes, I did.
20     Q.   After that process was complete, were the
21          items -- The binder that we can see in the lower
22          left hand corner of the bookcase; can you point
23          to that, please.  Was that, and the other items
24          within that bookcase, removed and examined by
25          yourself and your -- other members of your team?
```

126

1   A.   Yes, sir.

2   Q.   Did you have occasion to replace those items into

3        that bookcase after having pulled it from the

4        wall?

5   A.   Yes, sir.

6   Q.   What was done with the bookcase after that

7        thorough search of the -- of those materials was

8        completed?

9   A.   The items that we didn't use -- or collect as

10       evidence, that binder and some of the other

11       things there were kind of stuffed, rather

12       forcefully, back in there.  And other items that

13       we were going to collect as evidence were -- we

14       had so many that we didn't have a container in

15       the room large enough to hold them all.  So

16       Lieutenant Lenk exited the bedroom to get a

17       larger container and I began to search this desk

18       here.

19  Q.   By a larger container, what are you talking

20       about?

21  A.   A box.

22  Q.   Now, at this time, that is, as the search was

23       completed, what was done with that piece of

24       furniture; what was done with the bookcase

25       itself?

127

1   A.   It was still kind of away from the wall, but it

2        was more or less stuffed back into its original

3        position.

4   Q.   The next exhibit, Exhibit No. 209, describe what

5        that is, please.

6   A.   That's just a different photograph of the same

7        bookcase.

8   Q.   I'm going to allow the jury to see that as well.

9        Is this the photo that you are talking about

10       of -- of the bookcase?

11  A.   Yes, sir.

12  Q.   The next exhibit, No. 210, can you describe what

13       that is for us, please.

14  A.   210 is a picture, a photograph of the -- Well,

15       you can see that we have some materials there

16       stuffed in a bag.  Then there's the bedroom

17       slippers.  And now there is a key with a fob,

18       lying between the bedroom slippers.

19  Q.   Sergeant Colborn, I'm going to direct your

20       attention, then, to the large screen.  I would

21       like you to carefully take the laser pointer and

22       describe for the jury what it is that we're

23       looking at?

24  A.   These were some items that we had bagged up.  I

25       don't recall what that is.  These were the same

128

bedroom slippers that were in the other

                    photograph, but you can see that they have been

                    jostled.  That's the electrical outlet.  And now

                    there is a key and with this connecting canvas or

                    nylon fob and a black plastic buckle, lying on

                    the floor.

Q.   The piece of furniture, that is, the bookcase

     that we see in Exhibit 210, has that been removed

     or replaced to its original position?

A.   I can't say we have got it exactly 100 percent

     where it was, but it's very close to its original

     position, yes.

Q.   So the jury understands the timing of these,

     Exhibit No. 208 shows the slippers right next to

     the outlet.  And this exhibit, 210, shows the

     slippers pushed to what would be the left and

     actually a little bit closer to the photographer;

     is that fair?

A.   That's correct.

Q.   Do you recognize this image, that is, did you see

     this image on the 8th of November?

A.   Yes.

Q.   Can you describe that moment, or that event, for

     the jury, please.

A.   As I had mentioned earlier, Lieutenant Lenk had

                               129

exited -- That is the door coming into the
bedroom; he had gone through that door to get a
bigger container.  I was searching the desk here.
Deputy Kucharski was sitting on the bed, which
also isn't in the photograph, but is in very
close proximity to this piece of furniture, the
bookcase, filling out paperwork.

Lieutenant Lenk got about right here,
his feet would have been right here, so he was in
the room, and said something to the effect of,
there's a key on the floor here, or, look,
there's a key.  I don't know what his exact
verbiage was but he identified that there was a
key on the floor.

I turned around, as I wasn't very far
away, I turned around and looked and I observed
this key, lying right where it is.  And I
observed this key had this black rubberized or
plastic end on it, which they didn't -- you know,
that's a newer model car key, due to that plastic
or rubberized end.  And I also observed that
embossed on there was a Toyota emblem.

And we told Deputy Kucharski, get a
photograph of this, right away, which he did,
which is this photograph.  I did not take this

130

1    photograph.

2  Q.  By the way, as you and Deputy Kucharski and

3      Lieutenant Lenk observed this, did any of the

4      three of you approach or touch this piece of

5      evidence at that time?

6  A.  I may have been standing in this area here, you

7      know.  This piece of furniture is only 2 and a

8      half, 3 feet tall, maybe.  So I could easily see

9      over it to see the key.

10             I did not approach the key.  Lieutenant

11     Lenk did not come into the room.  Deputy

12     Kucharski photographed the key from, you know,

13     from whatever angle this picture was taken at.

14     That's as close as we got.

15 Q.  My question, again, was, did either yourself,

16     Lieutenant Lenk, or Deputy Kucharski, prior to

17     this photo was taken, touch that key?

18 A.  No, sir.

19 Q.  Why not?

20 A.  I think all three of us knew at the same time

21     that there was a very good chance, seeing a

22     Toyota emblem embossed on that key, knowing that

23     Teresa Halbach's vehicle was a Toyota, that this

24     was a very important piece of evidence.  And, you

25     know, none of us were going to taint that.

131

```
 1   Q.   Let me ask you, Sergeant Colborn, you guys -- you
 2        specifically, Lieutenant Lenk, and now Deputy
 3        Kucharski, had been in this room for quite some
 4        time before this key appears in this position;
 5        isn't that right?
 6   A.   Yes, sir.
 7   Q.   Did this surprise you, that you saw this key
 8        there?
 9   A.   Yes, I was very surprised.
10   Q.   Did the three of you talk about that, we hadn't
11        seen it before, anything like that?
12   A.   I -- I believe I said to myself, damn, how did I
13        miss that.
14   Q.   Now, other than the bedroom slippers being pushed
15        to the side, had anything else changed, other
16        than the pulling out and the twisting and the
17        jostling of the cabinet?
18   A.   As we looked at the cabinet, it appeared that in
19        the process of us stuffing everything back into
20        the cabinet, we had separated the back of the
21        cabinet, the small piece of paneling that would
22        be the back of the cabinet, from the frame of the
23        cabinet itself.
24   Q.   Let me stop you there.  Did you have occasion,
25        then, to go look at the back of this piece of
```

1          furniture, the back of the cabinet, after this

2          key was processed?

3    A.    Yes.

4    Q.    I know I'm jumping ahead just a little bit, but

5          could you describe what you saw; could you

6          describe the back panel of the cabinet?

7    A.    It would be made out of a -- I'm trying to think

8          of the right word, like a piece of wood, the same

9          thickness maybe as a piece of paneling that one

10         would put on a wall.  You know, it's a thin piece

11         of wood, it's not -- it's not like it's a quarter

12         inch piece of plywood nailed to the back of the

13         cabinet.  It's a thin piece of wood.

14              The piece of furniture itself is old and

15         not in the best state of repair.  And I believe

16         it was just very small, short brads or nails that

17         held the piece of paneling or the piece of wood

18         to the back of the cabinet.  And I'm sure that

19         when we were putting things in we exercised more

20         than enough force to push it away.  And there was

21         a gap now between the back of the -- the piece of

22         paneling on the back of the cabinet and the frame

23         of the cabinet itself.

24   Q.    I'm going to show you an exhibit that's been

25         received as Exhibit No. 169; although taken on a

133

1      different day, we're all in agreement about that,
2      does Exhibit 169 look the same as when you
3      witnessed the back of this cabinet on the 8th of
4      November?
5   A.  Yes, sir.
6   Q.  What was done with the key, if you remember?
7   A.  Initially, it was photographed and Lieutenant
8      Lenk and I both -- when I say told, it was not
9      like we were ordering him, but we just
10     communicated to Deputy Kucharski that he needed
11     to make sure he put on a fresh set of gloves;
12     pick up that key, put it in a separate container,
13     totally by itself; and we needed to contact the
14     Command Post right away and let them know that we
15     had located a key that could possibly be a key to
16     Teresa's vehicle.
17  Q.  Did somebody from the Command Post come to your
18     location then?
19  A.  Two people from the Command Post came to our
20     location.  Special Agent Fassbender and
21     Investigator Wiegert.
22  Q.  Were you present when the lead investigators were
23     shown this key that was discovered?
24  A.  Yes.  We packaged the key and we went into the
25     living room and that's where we remained until

                          134

1        the two investigators came and looked at the key.

    2                ATTORNEY KRATZ:  What exhibit number is

    3        next, Madam Clerk?

    4                THE CLERK:  211.

    5    Q.  (By Attorney Kratz)~ Sergeant Colborn --

    6                ATTORNEY KRATZ:  And, Judge, the record

    7        should reflect that the evidence bag is being opened

    8        with the assistance of Investigator Wiegert.

    9    Q.  (By Attorney Kratz)~ But Sergeant Colborn, you

   10        are going to be shown the contents of what is

   11        being marked as Exhibit No. 211.

   12        (Exhibit No. 211 marked for identification.)

   13                ATTORNEY KRATZ:  Deputy Wiegert, if you

   14        would be so kind as to show it to this witness.

   15    Q.  (By Attorney Kratz)~ Sergeant Colborn, please

   16        don't -- don't touch this exhibit.  But an

   17        exhibit that has now been marked for

   18        identification as Exhibit 211 is being shown to

   19        you.

   20                ATTORNEY KRATZ:  If you stand to the side a

   21        little bit, Investigator Wiegert, I would appreciate

   22        it.

   23    Q.  (By Attorney Kratz)~ Tell the jury what that is,

   24        please.

   25    A.  That appears to be the exact same key as pictured

                              135

right there on that photograph.  It's a long key,
with a black plastic end, with a Toyota emblem on
the end of it.  And that same nylon, actually, I
think corresponds to something that someone would
wear around their neck and clip to the other
plastic end.

ATTORNEY KRATZ:  With permission, Judge,
may Investigator Wiegert post it or at least show
the jurors?

THE COURT:  Any objection?

ATTORNEY STRANG:  Nope.

THE COURT:  Yes, you may do so.

ATTORNEY KRATZ:  Hold it up by one end,
Investigator, and show the jurors, please.

THE COURT:  The record should probably also
reflect he's wearing rubber gloves at this time, or
unless you can describe them more accurately.

ATTORNEY KRATZ:  Latex gloves.  And
although Mr. Kucharski will be testifying as well,
Judge, I don't believe there is any contest as to --
as to this exhibit and I will move its admission at
this time.

THE COURT:  Any objection?

ATTORNEY STRANG:  Well, there's plenty of
contest as to that exhibit, but not as to it having

136

1    been authenticated and identified.  And I don't have

2    any objection to it being received.

3              ATTORNEY KRATZ:  Thank you.

4              THE COURT:  All right.  The exhibit will be

5    received.

6              ATTORNEY KRATZ:  Thank you.

7    Q.   (By Attorney Kratz)~ After Special Agent

8         Fassbender and Investigator Wiegert were shown

9         that key, do you know what happened to that key?

10   A.   Just -- excuse me, we decided, between the three

11        of us, just to wait in the living room.  Special

12        Agent Fassbender and Investigator Wiegert said

13        that another law enforcement officer would be

14        coming down to take possession of the key.

15             So we all three just waited until he got

16        there.  We turned the key over and I believe we

17        were told that it would be going to Madison, to

18        the Crime Lab, where Teresa's vehicle already

19        was.

20   Q.   Sergeant Colborn, after this search, after this

21        thorough search of Mr. Avery's residence was

22        completed, were you asked to perform a similar

23        thorough search of somebody else's residence that

24        day?

25   A.   Yes, I believe it was Charles Avery's residence.

                           137

```
 1   Q.   And was that search performed by the same team;
 2        that is, yourself, Lieutenant Lenk and Deputy
 3        Kucharski from Calumet County?
 4   A.   Yes, sir.
 5   Q.   Sergeant Colborn, we have heard some references
 6        this week, and even last, to your involvement in
 7        this case.  And now that you are here, now that
 8        you are in court, I have some questions regarding
 9        your knowledge of Mr. Avery.
10             First of all, prior to November of 2005,
11        had you been involved at all in the
12        investigation, testifying against, or prosecution
13        of Steven Avery in any previous criminal
14        proceedings?
15   A.   No, sir.
16   Q.   Had you ever been personally named in any civil
17        lawsuits, or ever personally been accused of any
18        wrongdoing regarding Mr. Steven Avery?
19   A.   No, sir.
20   Q.   You were asked, as I understand, as part of a
21        civil lawsuit, to provide what's called a
22        deposition, to be questioned by some lawyers; is
23        that right?
24   A.   Yes, sir.
25   Q.   Do you recall when that occurred?
```

138

1    A.   I believe it was in October of 2005.

2    Q.   Do you remember how long that deposition, how

3         long that -- that process took?

4    A.   I thought it was less than an hour, but an hour

5         or less.

6    Q.   All right.  You were asked some questions, is

7         that right, under oath?

8    A.   Yes, sir.

9    Q.   Did you answer those questions to the best of

10        your knowledge and ability?

11   A.   Yes, I did.

12   Q.   Do you recall the context in which you were asked

13        those questions; in other words, do you recall

14        what you were asked about?

15   A.   Yes, sir.

16   Q.   Can you tell the jury what you were asked about?

17   A.   In 1994 or '95 I had received a telephone call

18        when I was working as my capacity as a

19        corrections officer in the Manitowoc County Jail.

20        Telephone call was from somebody who identified

21        himself as a detective.  And I answered the

22        phone, Manitowoc County Jail, Officer Colborn.

23             Apparently this person's assumption was

24        that I was a police officer, not a corrections

25        officer, and began telling me that he had

139

1    received information that somebody who had

2    committed an assault, in Manitowoc County, was in

3    their custody, and we may have somebody in our

4    jail, on that assault charge, that may not have

5    done it.

6              I told this individual, you are probably

7    going to want to speak to a detective, and I

8    transferred the call to a detective, to the

9    Detective Division, at the Manitowoc County

10   Sheriff's Department.  That's the extent of my

11   testimony.

12   Q.   That's it?  That's your connection to Mr. Avery?

13   A.   Yes, sir.

14   Q.   Well, did that cause you enough embarrassment and

15        enough angst in which to set up Mr. Avery for a

16        charge of murder?

17   A.   No.

18   Q.   Did that deposition cause you such problems from

19        within your department that you obtained and

20        planted blood, so that it would be found and

21        Mr. Avery would be wrongfully accused of a

22        homicide case?

23   A.   No, sir.

24   Q.   Have you ever planted any evidence against

25        Mr. Avery?

140

```
 1    A.   That's ridiculous, no, I have not.

 2    Q.   Have you ever planted any evidence against

 3         anybody in the course of your law enforcement

 4         career?

 5    A.   I have to say that this is the first time my

 6         integrity has ever been questioned and, no, I

 7         have not.

 8              ATTORNEY KRATZ:  That's all I have for

 9         Sergeant Colborn, Judge.

10              THE COURT:  Mr. Strang.
```

### CROSS-EXAMINATION

```
12   BY ATTORNEY STRANG:

13   Q.   This is the first time your integrity has been

14        questioned?

15   A.   As it applies to being a police officer, yes.

16   Q.   Okay.  And it's not the first time Mr. Avery's

17        has been, so I have some questions for you.  You

18        were, in November of 2005, in the Road Patrol

19        Division of the Manitowoc County Sheriff's

20        Department?

21   A.   Yes, sir.

22   Q.   You were a sergeant in that division?

23   A.   Yes, sir.

24   Q.   Were there other sergeants in that division?

25   A.   Yes, sir.
```

141

```
 1   Q.   How many?

 2   A.   There's one lieutenant and two sergeants assigned

 3        per shift; there's three shifts.  We're looking

 4        at six sergeants, three lieutenants.

 5   Q.   Your shift particularly was noon to 8:00 p.m.?

 6   A.   Yes, sir.

 7   Q.   That made you the assistant shift commander as

 8        opposed to the other sergeant?

 9   A.   Yes, sir.

10   Q.   And the shift commander, himself, when the

11        lieutenant had a day off?

12   A.   Yes, sir.

13   Q.   The Road Patrol Division does exactly that, it

14        patrols the roads of Manitowoc County?

15   A.   Yes, sir.

16   Q.   Typically in marked squad cars?

17   A.   Yes, sir.

18   Q.   Speeding and other traffic law enforcement?

19   A.   Yes, sir.

20   Q.   Calls for help from citizens, a variety of calls?

21   A.   Yes, sir.

22   Q.   You might be the first to respond to a domestic

23        violence call, let's say?

24   A.   Yes, sir.

25   Q.   You might respond to a flat tire on the side of
```

142

```
 1        the road?

 2   A.   Yes, sir.

 3   Q.   This division, during the noon to 8:00 shift,

 4        back in, let's say, November, 2005, had

 5        approximately how many officers out on the road

 6        during that noon to 8:00 shift?

 7   A.   Well, I believe that par -- four or five officers

 8        counting the shift commander.

 9   Q.   Roughly?

10   A.   Yes, sir.

11   Q.   I understand.  And the shift commander had some

12        administrative duties, but also had some road

13        patrol duties?

14   A.   Yes, sir.

15   Q.   Collection of evidence was not typically a duty

16        of the Road Patrol Division?

17   A.   Yes, it is.

18   Q.   That is, some members of the Road Patrol Division

19        may be trained in the collection of evidence,

20        correct?

21   A.   Correct.

22   Q.   Just as some members of the other divisions of

23        the Manitowoc County Sheriff's Department may

24        have special training as evidence technicians or

25        in evidence collection?
```

143

feel he is an experienced officer and if I have a
        investigative type question, I feel comfortable
        talking with him about it.

Q.      All right.  And the time came in 2005 or 2006
        when you decided that you aspired to some rank
        higher than sergeant within the department, true?

A.      I'm sorry, could you repeat.

Q.      The time came in 2005, or perhaps in 2006, I
        don't know when, but at some point, certainly
        before the elections in 2006, you began to aspire
        to a rank higher than sergeant in your
        department?

A.      Yes.

Q.      You decided to run for sheriff?

A.      That's correct.

Q.      Of Manitowoc County?

A.      That is correct.

Q.      Another officer, within the department, at the
        same time, also was running for sheriff in the
        same 2006 election?

A.      Yes.

Q.      That created a situation in which two officers
        from the same department were running against
        each other?

A.      Yes.

                            149

```
 1    Q.   There was some tension, at least, in that
 2         situation?
 3    A.   Are you talking about in 2006, last summer?
 4    Q.   Well, whenever the campaign began to heat up.
 5    A.   I don't really think the campaign ever got
 6         heated, but I didn't really feel any tension.
 7    Q.   Okay.  But, one of the things you both were
 8         interested in doing, and the other gentleman is a
 9         man named Robert Hermann, correct?
10    A.   Yes.
11    Q.   The brother of Todd Hermann?
12    A.   Yes.
13    Q.   One of the things that you and Robert Hermann
14         both did was sort of see who would support you
15         and who might support the other fellow in the
16         race for sheriff?
17    A.   No.
18    Q.   Weren't interested who was on your side?
19    A.   No, I wasn't.
20    Q.   Do you know whether Lieutenant Lenk was on your
21         side?
22    A.   I have no idea how Lieutenant Lenk voted during
23         the sheriff's campaign.  I would hope that he
24         supported me, but it wouldn't change my feeling
25         one iota if he didn't.
```

150

1   Q.   I understand that.  But how long was it between

2        the time you declared your candidacy publicly and

3        the time of the election?

4   A.   I thought we had to have our nomination papers

5        filed in May of 2006 and the election was in

6        November of 2006.

7   Q.   Okay.  So let's call it five, six months,

8        roughly.  I'm just trying to get a rough time

9        frame here, okay.  Lieutenant Lenk's working

10       hours, you know, to overlap in part with your

11       own, on the days you are both at work?

12  A.   Yes.

13  Q.   That is, he would typically work something like

14       an 8 to 5 kind of shift?

15  A.   I'm not sure what his duty hours are, but

16       somewhere in that time frame.

17  Q.   In other words, in the afternoon, you two would

18       be on duty at the same time?

19  A.   Yes, sir.

20  Q.   And in all that time, he never approached you and

21       gave you an attaboy, or told you he was in his

22       corner -- in your corner, or that he couldn't be,

23       nothing?

24            ATTORNEY KRATZ:  Judge, I'm going to object

25       as irrelevant.  Is this sometime after November of

                        151

1        2005?

2                    ATTORNEY STRANG:  It is.

3                    ATTORNEY KRATZ:  I can't see the relevance,

4        then, to what happened at the Avery salvage

5        property; I will interpose that objection then.

6                    THE COURT:  Mr. Strang.

7                    ATTORNEY STRANG:  Well, I'm happy to be

8        heard out of the presence, if the Court wishes that.

9                    THE COURT:  All right.  I think what I will

10       do at this time is excuse the jury for a few

11       minutes.

12                   ATTORNEY STRANG:  We can excuse the witness

13       as well.

14                   THE COURT:  Mr. Colborn, you are excused as

15       well.

16                        (Jury not present.)

17                        (Witness not present.)

18                   THE COURT:  Mr. Strang.

19                   ATTORNEY STRANG:  This isn't a long line of

20       inquiry, your Honor, but clearly this is relevant to

21       Sergeant Colborn's bias or potential for bias here.

22       Lieutenant Lenk was his partner through several days

23       of searching.  Consistently, as the testimony has

24       shown, they were paired together, usually with

25       Detective Remiker as well.

                              152

Together they were deposed, within 48 hours, in Steven Avery's lawsuit. I expect to elicit testimony that they discussed their depositions. Now, together, it is the two of them who, in Sergeant Colborn's words, had their integrity questioned.

Whether these two stood together and had each other's back during a race for a higher office that well could have been affected by the lawsuit that Steven Avery had filed, by further developments in that lawsuit, I think is directly relevant to this witness' credibility and bias.

THE COURT: Mr. Kratz.

ATTORNEY KRATZ: We're talking about two different things, Judge. Testimonial bias, which would be today, and is this witness prepared to shade his testimony to the benefit that perhaps of Lieutenant Lenk or somebody like that, Mr. Strang's area of inquiry is appropriate, if in fact the Court finds that to be relevant.

However, what Mr. Strang is really talking about is having each other's back, or motive, or being in partnership, for lack of a better term, in planting evidence or being involved in criminal behavior and activity. Then

153

that only becomes relevant if they had this
connection, if they had this friendship or this
bond, before November of 2005.

So, if that is in fact the dual purpose
of this, then I would ask Mr. Strang to confine
his bias inquiry, at least as it regards
Lieutenant Lenk and the election, and to that
which might affect his testimony today; it would
have no relevance as to what occurred in November
of 2005.

THE COURT: How do you propose that that be
conveyed to the jury, what the purpose of his
questioning is?

ATTORNEY KRATZ: Well, as asked, then,
Judge, it is -- it is irrelevant and should be
inadmissible. If we direct it more towards
testimonial, that is, if he wants to get into, would
you do something to help your buddy, Jim Lenk,
today, in testifying, I think that's -- that that's
appropriate, but that should be made clear.

And if we're getting into more than
that, that is, as Mr. Strang, using his words, I
have your back, if we're talking about back in
November of 2005, their previous friendship may,
in fact, be relevant and all those kind of

154

1 things, but not what happened in the 2006

2 election.

3     ATTORNEY STRANG:  Let's bring us back to

4 the actual line of questioning, because I don't know

5 that we need to slice the salami that thin.  What

6 I'm doing now is simply following up on and

7 exploring his claim that he has no idea whether Jim

8 Lenk supported him or not for sheriff.  He hopes he

9 did, but if Mr. Lenk did not vote for him, it

10 wouldn't affect, by one iota, his view of Mr. Lenk.

11     And I'm following that up, since he's

12 already acknowledged that he thinks well of Mr.

13 Lenk and has worked with him and known him since

14 1996.  I'm also going to ask him when it is that

15 becoming sheriff popped into his head, since

16 presumably that was some -- some day before the

17 day in May, 2006, when he had to file his

18 candidacy papers.  And that's really,

19 essentially, all the farther I'm going with this.

20     THE COURT:  All right.  It seems to me of

21 marginal probative value, but if you are telling me

22 you are almost done, I will let you ask a few more

23 questions and then move on.  All right.  We can

24 bring the jurors back.  And then if the

25 Victim/Witness Coordinator is here, she can bring

155

1       Mr. Colborn in.

2                    (Jury present.)

3              THE COURT:  You may be seated.  And

4       Mr. Strang, you may resume your questioning.

5              ATTORNEY STRANG:  Thank you.

6   Q.  (By Attorney Strang)~ So the question was,

7       Sergeant Colborn, in the months leading up to

8       this election, are you telling this jury that

9       there wasn't any time when Lieutenant Lenk

10      approached you and told you either that he was in

11      your corner or couldn't support you, for sure?

12  A.  No, I'm not saying that.

13  Q.  Well, what did he tell you about whether he was

14      supporting you?

15  A.  We did not have -- I tried my hardest not to have

16      any discussions about the election at work

17      because I didn't want it to distract from work.

18      Privately, Lieutenant Lenk gave me every

19      indication that he was supporting me.

20  Q.  Privately, you took him to be in your corner?

21  A.  Yes.

22  Q.  You may want to get just a little bit closer to

23      the mike, the mike is sort of touchy.  When was

24      it that you began to think seriously about

25      running for sheriff, yourself?

                          156

```
1    A.    January or February of 2006.

2    Q.    Had the idea occurred to you back in 2005?

3    A.    I can't recall, specifically.  I may have thought

4          about it, but ...

5    Q.    But at least by January or February, 2006, you

6          had a building sense that, maybe I could do the

7          top job in this department?

8    A.    Yes, sir.

9    Q.    Maybe I could do some things a little bit

10         differently than I see them being done?

11   A.    Yes, sir.

12   Q.    Maybe I could bring something important to the

13         job of sheriff and serve the citizens of

14         Manitowoc County?

15   A.    Yes, sir.

16   Q.    By May that idea had become strong enough to

17         cause you to go through all the steps necessary

18         to declare a candidacy?

19   A.    Yes, sir.

20   Q.    You had not run for an elected office before?

21   A.    Actually, yes, I had.

22   Q.    Okay.  At a countywide level?

23   A.    Yes.

24   Q.    All right.  So at least that process you were

25         familiar with and willing to undergo again?
```

157

1    A.    Yes.

2    Q.    Knocking on doors, speaking at Lion's Club

3          dinners, that kind of thing?

4    A.    Yes, sir.

5    Q.    Now, it was, I think, October 13, 2005, in

6          specific, in which your deposition was taken in

7          Mr. Avery's lawsuit?

8    A.    Yes, sir.

9    Q.    Was this the first time you had ever had your

10         deposition taken?

11   A.    Yes, sir.

12   Q.    New experience for you?

13   A.    Yes.

14   Q.    You were not so much asked to attend a deposition

15         as you were the recipient of a subpoena to do so?

16   A.    I believe so, yes, sir.

17   Q.    That deposition process involved being sworn,

18         same oath you took today, essentially?

19   A.    Yes, sir.

20   Q.    But in a conference room or library of a lawyer's

21         office?

22   A.    Yes, sir.

23   Q.    You were questioned by Mr. Avery's lawyers at

24         that deposition?

25   A.    Yes, sir.

158

```
 1   Q.   You sat across the table from Mr. Avery, himself,
 2        that day, October 13, 2005?
 3   A.   I know Mr. Avery was in the room, I don't -- no,
 4        it wasn't like I was directly across from him.
 5   Q.   No.
 6   A.   He was down at the end of the table.
 7   Q.   Yeah, and I didn't mean directly across, but the
 8        two of you shared this conference room and the
 9        table?
10   A.   Yes, sir.
11   Q.   Along with other people?
12   A.   Yes, sir.
13   Q.   Court reporter?
14   A.   Yes, sir.
15   Q.   Various lawyers?
16   A.   Yes, sir.
17   Q.   Some of the questions concerned a telephone call
18        that you had taken?
19   A.   Yes.
20   Q.   You understood the call, which today you can
21        place only as 1994 or 1995?
22   A.   That's correct, sir.
23   Q.   You understood the call to be coming from someone
24        who was a detective?
25   A.   Yes, sir.
```

159

| | | |
|---|---|---|
| 1 | Q. | Detective with a law enforcement agency? |
| 2 | A. | Yes. |
| 3 | Q. | In an adjoining or nearby county? |
| 4 | A. | I believe so, yes, sir. |
| 5 | Q. | You don't remember the details today? |
| 6 | A. | No, I don't, sir. |
| 7 | Q. | And, indeed, on October 13, 2005, you didn't |
| 8 | | remember many of the details either? |
| 9 | A. | No, sir. |
| 10 | Q. | But the gist of it was, we have got somebody here |
| 11 | | in custody who we think maybe did an assault in |
| 12 | | Manitowoc County, that was part of it? |
| 13 | A. | Yes, sir. |
| 14 | Q. | And we further think that you may have someone in |
| 15 | | jail for the assault? |
| 16 | A. | That was the gist of the phone conversation, yes. |
| 17 | Q. | Right.  And I understand you don't remember the |
| 18 | | exact words, but that was the gist? |
| 19 | A. | Yes, sir. |
| 20 | Q. | Now, as a corrections officer in the jail, this |
| 21 | | was not directly your responsibility? |
| 22 | A. | No, sir. |
| 23 | Q. | You passed, or tried to pass the call, to the |
| 24 | | Detective Unit? |
| 25 | A. | Yes, sir. |

160

1  Q.  But you understood that you were being told, by a

2      law enforcement officer, that Manitowoc County

3      may have someone locked up, who didn't commit the

4      crime for which he was imprisoned; that much you

5      understood?

6  A.  Yes, sir.

7  Q.  Was that a matter to shrug off for you?

8  A.  I didn't shrug it off, sir. I did what the

9      caller asked me to do, connect him to a

10     detective.

11 Q.  I think, actually, you suggested that perhaps the

12     caller should talk to a detective?

13 A.  No, he specifically asked for a detective.

14 Q.  How he happened to call the jail and get to you,

15     you have no idea?

16 A.  No, I don't, sir.

17 Q.  Lieutenant Lenk, you were aware, also was

18     deposed, had his deposition taken, in this same

19     lawsuit?

20 A.  Yes, sir.

21 Q.  This was a federal lawsuit?

22 A.  I don't even know enough about it to know whose

23     jurisdiction it was.

24 Q.  Okay.

25 A.  I know there was a lawsuit.

161

```
1    Q.   All right.  Do you know if it was down in
2         Milwaukee?
3    A.   The deposition?  My deposition?
4    Q.   Or the lawsuit, either one?
5    A.   My deposition was in the City of Manitowoc.  I
6         don't know where the lawsuit -- I don't know.
7    Q.   Fair enough.  But you did -- you did have an
8         opportunity to talk to Lieutenant Lenk about the
9         fact that he, too, was having his deposition
10        taken?
11   A.   I don't recall discussing the deposition portion
12        of it with Lieutenant Lenk.
13   Q.   What did you discuss, about the civil lawsuit,
14        with Lieutenant Lenk?
15             THE COURT:  Excuse me, Counsel, are you
16        referring to some time before the deposition or
17        after?
18   Q.   I'm referring to the time immediately before the
19        deposition, after you would have gotten your
20        subpoena.
21   A.   Okay.  Yes, I knew that Lieutenant Lenk had a
22        subpoena for the same deposition that I did, yes.
23   Q.   Okay.  And I'm not interested in the content of
24        your conversation, which probably would be
25        hearsay, but the two of you established that one
```

162

1       another had subpoenas for depositions in that

2       lawsuit?

3   A.    Yes, sir.

4   Q.    And, again, without going into the content,

5       aft -- shortly after your depositions were taken,

6       the two of you talked about the fact that your

7       depositions had been taken?

8   A.    Not really, not beyond the fact of, you know, did

9       you go on the day that you were supposed to, yes,

10      and that was pretty much it.

11   Q.    Okay. Fair enough. Did you have any concern

12      that you would be added as a defendant in that

13      lawsuit?

14   A.    I don't know if concern is the correct word, I

15      know I expressed that I didn't have any knowledge

16      of that case. I wasn't a Manitowoc County

17      resident at that time.

18   Q.    My question, though, was whether you had concern,

19      the thought crossed your mind, that you might be

20      added as a defendant in that civil lawsuit?

21   A.    Yes, the thought crossed my mind that I might be

22      added as the defendant.

23   Q.    You had never been the defendant in a lawsuit

24      before?

25   A.    Not that I recall, no.

163

```
1    Q.   Do you think you would recall?

2    A.   I would think, but ...

3    Q.   This isn't something you were relishing?

4    A.   No.

5    Q.   How do you think having been a defendant in

6         Mr. Avery's lawsuit, for his wrongful conviction,

7         would have affected your prospects in the race

8         for sheriff?

9                   ATTORNEY KRATZ:  Objection, speculation.

10   Q.   (By Attorney Strang)~ Did you consider that?

11                  THE COURT:  Just a second.  I'm going to

12        sustain the objection.

13   Q.   (By Attorney Strang)~ Did you consider the

14        prospect of an effect on your race for sheriff,

15        if you were added to that lawsuit?

16   A.   No, I didn't, sir.

17   Q.   I would like to shift off the lawsuit and talk to

18        you about reports, police reports, for a little

19        bit.  And I promised you we were going to get

20        back to the recruit academy, and we will.

21                  Reports are something that police

22        officers, and by that I mean broadly; sheriff's

23        deputies, municipal police officers, special

24        agents of the Division of Criminal Investigation,

25        just law enforcement officers generally.  All
```

164

1         right. Reports are something that is common to

2         the work of policemen?

3 A.   Is that a question?

4 Q.   It is.

5 A.   Yes, reports are common to policing.

6 Q.   That is one of the things you learned to do in

7         the recruit academy, was to prepare a report?

8 A.   That's correct, sir.

9 Q.   It is a regular routine, in policing, to prepare

10        reports of your activities, as they bear on a

11        criminal investigation?

12 A.   Yes, sir.

13 Q.   You were taught in the academy the basics of how

14        to prepare such a report?

15 A.   Yes, sir.

16 Q.   Reports have several purposes, I guess, one would

17        be to assure accurate collection of facts; that

18        would be one purpose of a police report?

19 A.   Yes, sir.

20 Q.   Another purpose would be to set down, on paper,

21        your memories before they begin to fade?

22 A.   Yes, sir.

23 Q.   A third purpose would be to allow others in the

24        department to benefit from knowing what facts you

25        had learned or steps you had taken in an

165

```
 1        investigation?
 2   A.   That I don't -- that I don't know.  Sometimes
 3        reports are confidential and no other officers
 4        view them.
 5   Q.   Sometimes, but let expands on that.  In any sort
 6        of a larger jurisdiction, let's use Manitowoc
 7        County, the sheriff's department, policing is a
 8        24 hour a day business?
 9   A.   Yes, sir.
10   Q.   365 days a year?
11   A.   Yes, sir.
12   Q.   That is, there may be very small towns that have
13        only a part-time police officer, constable,
14        police department, correct?
15   A.   Yes, sir.
16   Q.   But with the Manitowoc County Sheriff's
17        Department, it's around the clock, 24/7, 365 days
18        a year?
19   A.   Yes, sir.
20   Q.   Obviously, no single officer can work 24 hours,
21        seven days a week, so you divide the day into
22        shifts.
23   A.   That's correct, sir.
24   Q.   A criminal investigation that happens to begin on
25        one shift, may be carried over on another?
```

166

```
 1   A.   Yes, that's possible.

 2   Q.   Officers who actually don't work the same shift,

 3        may be working on the same investigation?

 4   A.   Yes, sir.

 5   Q.   Witnesses may have to be interviewed and their

 6        working hours may require officers who work on

 7        the late shift, or the overnight shift, to

 8        conduct the interviews?

 9   A.   Correct.

10   Q.   So by preparing reports, officers on one shift

11        can share their information with officers on the

12        other shifts?

13   A.   Absolutely.

14   Q.   And in this sense, there is a collective benefit

15        that allows the department to continue its

16        criminal investigative duties, around the clock?

17   A.   Yes, sir.

18   Q.   Yet another purpose of police reports is to

19        report upward, to supervisors, what it is you are

20        doing?

21   A.   Yes, sir.

22   Q.   Reports typically are reviewed by supervisors?

23   A.   Yes, they are.

24   Q.   For accuracy?

25   A.   Yes.
```

167

```
 1   Q.   For thoroughness?

 2   A.   Yes.

 3   Q.   For completeness?

 4   A.   Yes.

 5   Q.   Preparing reports is something that a thorough

 6        police officer does?

 7   A.   Yes.

 8   Q.   Preparing reports is something that a police

 9        officer should do in a timely fashion, true?

10   A.   Yes.

11   Q.   Because, again, one of the first purposes is to

12        get the facts down on paper accurately while they

13        are fresh in your mind?

14   A.   Yes, sir.

15   Q.   And preparing reports in a timely and thorough

16        way is something that a fair police officer does,

17        isn't it?

18   A.   I would imagine, yes, sir.

19   Q.   That is, you want the report to be objective?

20   A.   Yes.

21   Q.   Accurate in the sense of fair and factually

22        correct?

23   A.   Yes.

24   Q.   Not tilted or biased in any fashion?

25   A.   Correct.
```

168

```
 1    Q.   The idea is to lay out the facts and see where
 2         they lead?
 3    A.   Yes, sir.
 4    Q.   You prepare reports, then, and as they go up the
 5         stream, for a supervisors review, the supervisor
 6         typically will sign off or indicate approval in
 7         some fashion?
 8    A.   Yes, sir.
 9    Q.   Or may send the report back for further work?
10    A.   Yes, sir.
11    Q.   You are a supervisor, yourself, in the Road
12         Patrol Unit?
13    A.   Yes, sir.
14    Q.   You fill this function.  That's one of your
15         administrative duties, is to review reports
16         prepared by deputies under you, in the Road
17         Patrol Unit?
18    A.   Yes, sir.
19    Q.   You encourage them to file timely reports?
20    A.   Yes.
21    Q.   Thorough reports?
22    A.   Yes.
23    Q.   And fair reports?
24    A.   Yes, sir.
25    Q.   The reports, you know, after now 10, going on 11
```

169

| | | |
|---|---|---|
| 1 | | years as a sworn law enforcement officer, then |
| 2 | | sometimes will go further, to a prosecutor? |
| 3 | A. | Yes, sir. |
| 4 | Q. | Prosecutors rely on those police reports in |
| 5 | | making charging decisions? |
| 6 | A. | Yes, sir. |
| 7 | Q. | If they elect to charge a case, you know as well, |
| 8 | | in your criminal justice system, that the |
| 9 | | reports, then, go to the defense, once a case has |
| 10 | | been charged in court? |
| 11 | A. | Yes, sir. |
| 12 | Q. | The defense lawyers then rely on the thoroughness |
| 13 | | of those reports? |
| 14 | A. | Yes, sir. |
| 15 | Q. | The accuracy of those reports? |
| 16 | A. | Yes, sir. |
| 17 | Q. | The timeliness of those reports? |
| 18 | A. | Yes, sir. |
| 19 | Q. | And at a very practical level, if later, you, as |
| 20 | | the officer involved in some activity, have |
| 21 | | forgotten exactly what happened, you can turn |
| 22 | | back to your report? |
| 23 | A. | Yes. |
| 24 | Q. | Use it to refresh your recollection? |
| 25 | A. | Yes, sir. |

170

```
 1    Q.   Sometimes use the report of other officers to
 2         refresh your recollection?
 3    A.   Yes, sir.
 4    Q.   Which, again, is you relying on the accuracy and
 5         the thoroughness and the timeliness of reports by
 6         other officers?
 7    A.   Yes, sir.
 8    Q.   And if you were to change your explanation of
 9         what happened, either the prosecution or the
10         defense might use the report to show that you had
11         said something different in the report?
12    A.   Yes, sir.
13    Q.   If you don't prepare a report, then you haven't
14         committed anything to paper, correct?
15    A.   Correct.
16    Q.   And someone who doesn't commit anything to paper,
17         then, can't be pinned down on the details as
18         would someone who had put the details on paper?
19    A.   Okay.  I mean, that makes sense.
20    Q.   Makes sense to you?
21    A.   Mm-hmm.
22    Q.   Now, let's go to this investigation, the
23         activities concerning this investigation, are you
24         with me?
25    A.   Yes, sir.
```

171

Q. November 3, 2005, when you learned from
   Mr. Wiegert that Teresa Halbach was missing, was
   just about exactly, to the day, three weeks after
   your deposition in Steven Avery's lawsuit?

A. Yes, sir.

Q. You were the shift commander that day, as we have
   established?

A. Yes, sir.

Q. You learned about Ms Halbach being missing at
   about what time?

A. Somewhere between 6:30 and 7:30.

Q. You were scheduled to get off shift at eight?

A. Yes, sir.

Q. Nearing the end of your day?

A. Yes, sir.

Q. As shift commander, you could have assigned
   anyone in road patrol to go out to the address on
   Avery Road?

A. Yes.

Q. You chose to do it yourself?

A. Yes.

Q. Did you go alone?

A. Yes, I did.

Q. At that time, all you knew is that this address
   on Avery Road was one of the appointments that Ms

172

1        Halbach evidently had the day she was last seen
2        by family or friends?
3    A.  Yes, sir.
4    Q.  You happened to meet Steve Avery -- or not meet
5        him for the first time, but run into him, so to
6        speak, when you went out there that evening?
7    A.  Yes, sir.
8    Q.  You talked with him?
9    A.  Yes, I did.
10   Q.  He was very cordial?
11   A.  Yes, he was.
12   Q.  And as you followed through, you saw events
13       unfold, eventually it was Steven Avery who was
14       charged with killing Teresa Halbach?
15   A.  Yes, sir.
16   Q.  That came a week, roughly, after your first
17       conversation with him on Thursday, November 3rd?
18   A.  Yes, sir.
19   Q.  Mr. Avery then was charged with the most serious
20       crime someone can commit in this state?
21   A.  Yes, sir.
22   Q.  When, sir, did you first make a written report of
23       anything having to do with the November 3, 2005,
24       meeting with Mr. Avery?
25   A.  June of '06 I believe.

173

```
1    Q.   Does June 29, 2006 sound correct?

2    A.   Yes.

3    Q.   A few days short of the 4th of July?

4    A.   Yes, sir.

5    Q.   Not quite 8 months after the conversation with

6         Mr. Avery?

7    A.   Yes, sir.

8    Q.   Was that a timely report?

9    A.   I wasn't even aware that Manitowoc County had our

10        own report.  I didn't find out about it till

11        then.

12   Q.   You were aware that Manitowoc County sheriff's

13        deputies had played a substantial role at the

14        Avery property for a week, from November 5 to

15        November 12?

16   A.   Yes.

17   Q.   You saw literally dozens of fellow officers from

18        the Manitowoc County Sheriff's Department during

19        that week?

20   A.   Yes.

21   Q.   And your testimony today is you aren't aware that

22        any of them ever wrote any report?

23   A.   No, I wasn't.  I knew Calumet County Sheriff's

24        Department was handling the report portion of it.

25   Q.   And somebody finally suggested to you, in June,
```

174

1      more than 7 months later, that maybe you ought to
2      write a report about that first interview with
3      Steven Avery?
4  A.  They informed me that there was indeed a report
5      and that I should make an entry on it, yes.
6  Q.  You made an entry on it?
7  A.  Yes, I did.
8  Q.  And that entry was all of about a page?
9  A.  I guess it was a few paragraphs; I don't know how
10     many.
11 Q.  Did you happen to notice when you were with
12     Mr. Avery on November 3, a big, fresh gash or cut
13     on his right middle finger?
14 A.  No, I did not notice that.
15 Q.  Didn't notice him bleeding?
16 A.  No, sir, I didn't.
17 Q.  Or notice anything that looked like it had been
18     recently bleeding or recently a fresh, open cut?
19 A.  No, sir, I didn't notice any injury.
20 Q.  That's why there is no mention of such an injury
21     in your report, true?
22 A.  Correct.
23          ATTORNEY STRANG:  What time does the Court
24     wish to take the afternoon break, for my purposes,
25     your Honor?

175

```
 1                THE COURT:  We'll go another 10 minutes.

 2                ATTORNEY STRANG:  Thank you.

 3     Q.   (By Attorney Strang)~ Now, did I understand you

 4          correctly, in your testimony earlier today,

 5          Sergeant Colborn, that today you remember what it

 6          is you were doing on your day off, Friday,

 7          November 4, 2005, the day after you first talked

 8          to Steven Avery?

 9     A.   Yes.

10     Q.   We were talking about timely and thorough and

11          accurate reports before.  And I wonder if you

12          recall, oh, a little over a month ago, not quite

13          six weeks ago, in fact, January 11, 2007, being

14          interviewed by Investigator Steier of the Calumet

15          County Sheriff's Department; do you remember

16          that?

17     A.   Yes.

18     Q.   And you knew that Investigator Steier was

19          interviewing you in connection with this case?

20     A.   Yes.

21     Q.   You know, as a law enforcement officer, that it's

22          important, if one speaks to another -- to a

23          police officer, to give accurate information to

24          the officer?

25     A.   Yes, sir.
```

176

```
 1    Q.    You know, in fact, that it's a crime in the state
 2          of Wisconsin, intentionally to give false
 3          information to a police officer?
 4    A.    Yes, sir.
 5    Q.    And on January 11, 2007, you recall Investigator
 6          Steier asking you if you could recall what you
 7          had done on Friday, November 4, 2005, your day
 8          off; do you recall him asking you that?
 9    A.    Yes.
10    Q.    And what you told him was, that you could not
11          recall what you had done on your off day; that's
12          what you told Investigator Steier?
13    A.    Yes, at that precise second that he asked me, I
14          could not recall everything that I had done on
15          that day.
16    Q.    You recalled later?
17    A.    Yes.
18    Q.    And when, sir, when did you call up Investigator
19          Steier and say, I'm sorry, I was wrong, I now
20          remember what I did on my day off, Friday,
21          November 4, 2005?
22    A.    I didn't call Investigator Steier.
23    Q.    One of the things the road patrol officers, under
24          your supervision, frequently do, is look for cars
25          that appear out of place?
```

177

```
1    A.   Yes, sir.

2    Q.   Or if they made a traffic stop, they will inquire

3         about the license plate or the registration

4         plates on an automobile?

5    A.   Yes, sir.

6    Q.   And they will call into dispatch and give the

7         dispatcher the license plate number of a car they

8         have stopped, or a car that looks out of place

9         for some reason, correct?

10   A.   Yes, sir.

11   Q.   And the dispatcher, very quickly these days, with

12        his or her computer screen, can get information

13        about who -- to whom a license plate is

14        registered?

15   A.   Yes, sir.

16   Q.   Also, the dispatcher can give you, right over the

17        phone or the radio, the information about what

18        car the license plate is registered to?

19   A.   Yes, sir.

20   Q.   This is useful so that you know who you may be

21        approaching, if there's a driver of the car

22        that's stopped?

23   A.   Yes, sir.

24   Q.   It's also useful to know whether the license

25        plate appears to be on the car for which it is
```

178

1     registered?

2  A.  Yes, sir.

3  Q.  If the car is abandoned or there's nobody in the

4      car, the registration tells you who the owner

5      presumably is?

6  A.  Yes, sir.

7  Q.  Are you the only Andy, to your knowledge, in the

8      Manitowoc County Sheriff's Department?

9  A.  The only officer with the first name Andy?

10 Q.  Yes.

11 A.  No, I'm not.

12 Q.  All right.  I'm going to ask you to listen, if

13     you would, to a short phone call.  And I will ask

14     you, first, if you are the Andy speaking.  All

15     right?

16 A.  Mm-hmm.

17         ATTORNEY KRATZ:  Judge, before counsel does

18     this, could we have it identified as to the date and

19     time.

20         ATTORNEY STRANG:  Absolutely, I will do the

21     best I can.  In fact, I should mark it.

22     (Exhibit No. 212 marked for identification.)

23         ATTORNEY STRANG:  This is a CD Rom that we

24     obtained from the -- or a copy of the CD Rom that we

25     obtained from the Manitowoc County Sheriff's

179

Department, Exhibit 212, counsel. Thank you.

       For counsel's benefit this will be track three. All I'm told by the sheriff's department is that these are calls between November 3 and November 12, 2005.

       ATTORNEY KRATZ: Judge, we don't know when -- what he is about to play them is within a 9 day period?

       ATTORNEY STRANG: If the witness made the call, I'm going to ask him when he made the call.

       THE COURT: All right. Go ahead.

       Manitowoc County Sheriff's Department. This is Lynn.

       Lynn.

       Hi, Andy.

       Can you run Sam William Henry 582. See if it comes back to (Inaudible.)

       Sam William Henry 582.

       ATTORNEY STRANG: Let me just stop it right there. In fact, I'm going to go back, because it was so soft at the beginning.

       Manitowoc County Sheriff's Department. This is Lynn.

       Lynn.

       Hi Andy.

180

```
                    Can you run --
Q.   (By Attorney Strang)~ Is that you?
A.   It sounds like me.  I believe it's me.
Q.   Okay.  I'll --
                    Sam William Henry 582.  See if it comes
     back to (Inaudible.)
                    Lynn.
                    Hi Andy.
                    Can you run Sam William Henry 582.  See
     if it comes back to (Inaudible.)
                    Sam William Henry 582.  I (Inaudible.)
     All righty.  You speak any Spanish there, Andy?
     I just a call at the top of the list, is my on
     call didn't call me back.  If I want to get in
     trouble, Andy, I get in trouble.  You know, what
     am I supposed to do?
                    Well --
                    My favorite one is in the city of
     Manitowoc.  Okay.  Shows that she's a missing
     person.  And it lists to Teresa Halbach.
                    All set.
                    Okay.  Is that what you're looking for,
     Andy?
                    '99 Toyota.
                    Yup.
```

```
 1              Okay.  Thank you.

 2              You're so welcome.  Bye, bye.

 3  Q.   Okay.  That's the entire call.  Hangs up.  That's

 4       your voice?

 5  A.   Yes, I believe that's my voice.  Yes.

 6  Q.   When did you make that phone call inquiring about

 7       a license plate?

 8  A.   I don't know.

 9  Q.   Do you have any recollection of making that phone

10       call?

11  A.   It would have had to have been 11/03/05 or -- I'm

12       guessing 11/03/05.

13  Q.   Okay.  But let's -- let's ask -- establish this

14       first, do you remember making the call?

15  A.   Not really, no.

16  Q.   What you're asking the dispatcher, whose name is

17       Lynn, is to run a plate that's Sam William Henry

18       582; did I hear that correctly?

19  A.   Yes, sir.

20  Q.   Sam William Henry is a phonetic code that law

21       enforcement officers use, because sometimes it's

22       hard to tell just a letter over radio?

23  A.   Yes, sir.

24  Q.   Sam William Henry would be SWH-582.

25  A.   Yes.
```

182

```
 1   Q.   This license plate?

 2   A.   Yes, sir.

 3   Q.   I'm showing, for the benefit of the record, this

 4        is either Exhibit 152 or 153?

 5             THE CLERK:  It's on the plate itself.

 6             ATTORNEY STRANG:  This one happens to be

 7        153.

 8   Q.   (By Attorney Strang)~ And the dispatcher tells

 9        you that the plate comes back to a missing person

10        or woman?

11   A.   Yes, sir.

12   Q.   Teresa Halbach.  Mispronounces the last name, but

13        you recognize the name?

14   A.   Yes, sir.

15   Q.   And then you tell the dispatcher, Oh, '99 Toyota?

16   A.   No, I thought she told me that.

17             Manitowoc County Sheriff's Department.

18        This is Lynn.

19             Lynn.

20             Hi Andy.

21             Can you run Sam William Henry 582, see

22        if it comes back to (Inaudible.)

23             Sam William Henry 582.  I (Inaudible.)

24        All righty.  Do you speak any Spanish there,

25        Andy?  I just got a call that the top of my list,
```

183

```
  1            is my on call didn't call me back.  If I want to
  2            get in trouble, Andy, I get in trouble.  You
  3            know, what am I supposed to do?
  4                      Well --
  5                      My favorite one is in the city of
  6            Manitowoc.  Okay.  Shows that she's a missing
  7            person.  And it lists to Teresa Halbach.
  8                      All set.
  9                      Okay.  That's what you're looking for,
 10            Andy?
 11                      '99 Toyota?
 12                      Yup.
 13                      Okay.  Thank you.
 14                      You are so welcome.  Bye, bye.
 15    Q.    Actually you who suggests this is a '99 Toyota?
 16    A.    I asked if it was a '99 Toyota, yes.
 17    Q.    And the dispatcher confirmed that?
 18    A.    Yes.
 19    Q.    Were you looking at these plates when you called
 20            them in?
 21    A.    No, sir.
 22    Q.    And your best guess is that you called them in on
 23            November 3, 2005?
 24    A.    Yes, probably after I received a phone call from
 25            Investigator Wiegert letting me know that there
```

184

```
1         was a missing person.

2    Q.   Investigator Wiegert, did he give you the license

3         plate number for Teresa Halbach when he called

4         you?

5    A.   I don't remember the entire content of our

6         conversation but, obviously, he must have because

7         I was asking the dispatcher to run the plate for

8         me.

9    Q.   Did you not trust that Investigator Wiegert got

10        the number right?

11   A.   I don't -- That's just the way I would have done

12        it.  I don't -- It's not a trust or distrust

13        issue.

14             ATTORNEY STRANG:  I'm about to move to a

15        different area, your Honor.

16             THE COURT:  All right.  We'll take our

17        afternoon break at this time.  Members of the jury,

18        do not discuss the case during break.  And we'll

19        resume in about 15 minutes.

20                  (Jury not present.)

21             THE COURT:  Counsel, you should report back

22        a little before 3:00.

23             ATTORNEY STRANG:  Thank you.

24                  (Recess taken.)

25             THE COURT:  Mr. Strang, you may resume your
```

185

```
 1        cross-examination.
 2                    CROSS-EXAMINATION CONTD
 3   BY ATTORNEY STRANG:
 4   Q.   So as you sit here today, Sergeant Colborn, you
 5        don't recall whether Investigator Wiegert gave
 6        you Ms Halbach's telephone number when he called
 7        you that Thursday evening?
 8   A.   He never asked me anything about a telephone
 9        number.
10   Q.   But you think he must have given you her license
11        plate number?  Did I say telephone number?
12   A.   Yes, you did.
13   Q.   I'm sorry.  I apologize.  What I meant is, you
14        don't recall, as you sit here today, whether
15        Mr. Weigert gave you Teresa Halbach's license
16        plate number when he called you on November 3?
17   A.   No, I just don't remember the exact content of
18        our conversation then.
19   Q.   But --
20   A.   He had to have given it to me, because I wouldn't
21        have had the number any other way.
22   Q.   Well, and you can understand how someone
23        listening to that might think that you were
24        calling in a license plate that you were looking
25        at on the back end of a 1999 Toyota; from
```

186

1    listening to that tape, you can understand why

2    someone might think that, can't you?

3           ATTORNEY KRATZ:  It's a conclusion, Judge.

4    He's conveying the problems to the jury.

5           THE COURT:  I agree, the objection is

6    sustained.

7  Q.  This call sounded like hundreds of other license

8    plate or registration checks you have done

9    through dispatch before?

10 A.  Yes.

11 Q.  But there's no way you should have been looking

12   at Teresa Halbach's license plate on November 3,

13   on the back end of a 1999 Toyota?

14          ATTORNEY KRATZ:  Asked and answer, your

15   Honor, he already said he didn't and was not looking

16   at the license plate.

17          THE COURT:  Sustained.

18 Q.  (By Attorney Strang)~ There's no way you should

19   have been, is there?

20 A.  I shouldn't have been and I was not looking at

21   the license plate.

22 Q.  Because you are aware now that the first time

23   that Toyota was reported found was two days later

24   on November 5?

25 A.  Yes, sir.

187

```
 1        it's going to be on a weekend or whether the Court

 2        is going to allow a day or the better part of a day,

 3        that the jury gets a probably much needed day off,

 4        we'll need to schedule that within the trial.  But I

 5        am prepared with my redirect at this time, Judge.

 6                THE COURT:  Very well.  We can bring the

 7        witness back in and the jurors.

 8                    (Jury present.)

 9                You may be seated.  Mr. Kratz, at this

10        time you may begin your redirect.

11                ATTORNEY KRATZ:  Thank you, Judge.
```

**REDIRECT EXAMINATION**

BY ATTORNEY KRATZ:

Q.   Sergeant Colborn, just a very few follow-up
     questions.  Mr. Strang asked you if you had
     written a report about that telephone call that
     you had sometime in 1994 or '95; do you remember
     that question?

A.   Yes, sir.

Q.   Do you remember your response?

A.   My response was, no, that I did not write a
     report about it.

Q.   As you look back, back in 1994 or '95, if you
     would have written a report, what would it have
     been about?

```
 1   A.   That is why I didn't do one, I don't know what it
 2        would have been about, that I received a call and
 3        transferred it to the Detective Division.  If I
 4        wrote a report about every call that came in, I
 5        would spend my whole day writing reports.
 6   Q.   Did this person ever identify the individual that
 7        they were talking about?
 8   A.   No, sir.  There were no names given.
 9   Q.   Let me ask you this, as you sit here today,
10        Sergeant Colborn, do you even know whether that
11        call was about Mr. Steven Avery?
12   A.   No, I don't.
13   Q.   Mr. Strang also played a telephone call for you,
14        a call to the dispatch center, wherein you asked
15        to verify a license plate; do you recall that?
16   A.   Yes, sir.
17   Q.   Do you know if you made that inquiry of the
18        dispatch center before or after you went to the
19        Avery property on the 3rd of November?
20   A.   I did not, no, sir.  I would think -- I don't
21        know.
22   Q.   Mr. Strang asked whether or not it was common for
23        you to check up on other agencies, or perhaps
24        I'm -- I'm misphrasing that, but when you are
25        assisting another agency, do you commonly verify
```

213

```
 1          information that's provided by another agency?
 2     A.   All the time.  I'm just trying to get -- you
 3          know, a lot of times when you are driving a car,
 4          you can't stop and take notes, so I'm trying to
 5          get things in my head.  And by calling the
 6          dispatch center and running that plate again, it
 7          got it in my head who that vehicle belonged to
 8          and what type of vehicle that plate is associated
 9          with.
10     Q.   All right.  Mr. Strang also asked you about a
11          interview that you had with a Investigator Steier
12          from the Calumet County Sheriff's Department
13          sometime in January of this year; is that
14          correct?
15     A.   Yes, sir.
16     Q.   Mr. Strang asked you if, when Investigator Steier
17          asked if you were able to, at that time, back in
18          January, to recreate your day, if you will, on
19          your day off on the 4th of November; is that the
20          substance?
21     A.   Yes, sir.
22     Q.   And in January, were you able to do that?
23     A.   No, sir.
24     Q.   Have you since been asked to recreate or to
25          reexamine your comings and goings on the 4th of
```

| | |
|---|---|
| 1 | November? |
| 2 | A. Yes, sir. |
| 3 | Q. And have you now been able to do that? |
| 4 | A. Yes, sir. |
| 5 | Q. At any time during the 4th of November, were you |
| 6 | anywhere near the Avery salvage property? |
| 7 | A. No, I was not. |
| 8 | Q. At any time other than what we have heard about |
| 9 | on the 3rd, were you anywhere near that salvage |
| 10 | property. |
| 11 | A. No, I was not. |
| 12 | Q. Again, before arriving there on the 5th of |
| 13 | November, had you gone near or approached |
| 14 | anywhere around the Avery salvage property |
| 15 | itself? |
| 16 | A. No, sir, I had not. |
| 17 | ATTORNEY KRATZ: That's all the redirect I |
| 18 | have of this witness. Thank you, very much, sir. |
| 19 | THE COURT: Mr. Strang. |
| 20 | **RECROSS-EXAMINATION** |
| 21 | BY ATTORNEY STRANG: |
| 22 | Q. How many calls have you ever gotten in your law |
| 23 | enforcement career, from another police officer, |
| 24 | suggesting you had the wrong guy in jail? |
| 25 | A. I don't know. I can't recall any others. |

215

```
1   Q.   You talked about manpower before, was there an
2        abundance of evidence techs at that scene?
3   A.   No, sir, there was not.
4   Q.   Are you an evidence tech, or were you?
5   A.   Yes, sir.
6   Q.   Do you know, at that scene, what other members of
7        Manitowoc County Sheriff's Department would have
8        similar training or experience as an evidence
9        tech?
10  A.   Yes, sir.  Sergeant Andy Colborn and Detective
11       Dave Remiker.
12  Q.   Now, Lieutenant Lenk, prior to your arrival at
13       the Avery Salvage Yard on the 5th, had you had
14       previous dealings or contact with Steven Avery?
15  A.   Just the contact on the 4th of November.
16  Q.   Do you recall being one of many individuals
17       involved in what's called a deposition, for
18       Mr. Avery?
19  A.   Yes, sir.
20  Q.   And can you tell the jury about that process,
21       please.
22  A.   Well, the process was, I received a subpoena to
23       give a deposition in the Avery lawsuit case
24       against Manitowoc County.
25  Q.   Did you respond to that subpoena, did you provide
```

231

1          testimony?

2     A.   Yes, sir, I did.

3     Q.   And so the jury understands, when Mr. Avery was

4          wrongfully convicted back in 1985, were you a

5          member of the Manitowoc County Sheriff's

6          Department?

7     A.   No, I was not.

8     Q.   Then, what involvement did you have; in other

9          words, what was your part of the deposition?

10    A.   The part of the deposition was that I received a

11         statement from Sergeant Colborn, in 2003, I

12         believe, September, that he had taken a phone

13         call back in 1997, from another department, I

14         believe he said it was Brown County Sheriff's

15         Department, that they had in custody an

16         individual that had committed an assault in

17         Manitowoc County and that Manitowoc County had

18         someone in custody for that assault.

19    Q.   Is that all?

20    A.   That's all.

21    Q.   Did you even receive that call back in the

22         mid-nineties?

23    A.   No, sir, I did not.

24    Q.   So your deposition was that you heard that Andy

25         Colborn got such a call; is that right?

232

```
 1   A.   Yes, sir, I received that information from Andy,
 2        himself.
 3   Q.   Did that lawsuit cause you any personal or
 4        professional embarrassment?
 5   A.   No, sir, it did not.
 6   Q.   Did that lawsuit create any angst or ill feelings
 7        on your part?
 8   A.   No, sir, it did not.
 9   Q.   Did the fact of that lawsuit cause you any upset,
10        or aggravation, or anger?
11   A.   No, sir, it did not.
12   Q.   Did that lawsuit cause you or compel you to -- to
13        plant any evidence in this case?
14   A.   No, sir, definitely not.
15   Q.   What did you feel about that lawsuit; do you
16        remember?
17   A.   I pretty much didn't care, one way or the other.
18   Q.   All right.  How were individuals assigned
19        responsibilities out at the Avery salvage
20        property?
21   A.   I believe the assignments came through the two
22        officers in charge, Agent Fassbender and
23        Investigator Wiegert.
24   Q.   Was this a situation where you volunteered for a
25        particular search or an area that you wanted to
```

                                    233