# **Exhibit 30**

```
 1   STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                            BRANCH 1
 2
 3   _____

 4   STATE OF WISCONSIN,

 5                   PLAINTIFF,        JURY TRIAL
                                       TRIAL DAY 8
     vs.                               Case No. 05 CF 381
 6
     STEVEN A. AVERY,
 7
                     DEFENDANT.
 8
 9   _____

10   DATE:     FEBRUARY 21, 2007

11   BEFORE:   HON. PATRICK L. WILLIS
               Circuit Court Judge
12
     APPEARANCES:
13
               KENNETH R. KRATZ
14             Special Prosecutor
               On behalf of the State of Wisconsin.
15
               THOMAS J. FALLON
16             Assistant Attorney General
               On behalf of the State of Wisconsin.
17
               NORM GAHN
18             Special Prosecutor
               On behalf of the State of Wisconsin.
19
               DEAN A. STRANG
20             Attorney at Law
               On behalf of the Defendant.
21
               JEROME F. BUTING
22             Attorney at Law
               On behalf of the Defendant.
23
               STEVEN A. AVERY
24             Defendant
               Appeared in person.
25
```

1

**I N D E X**

| WITNESSES | | | PAGE |
|---|---|---|---|

**LIEUTENANT JAMES LENK**

| | PAGE |
|---|---|
| Direct Examination by ATTORNEY KRATZ | 5—19 |
| Cross-Examination by ATTORNEY STRANG | 19—108 |
| Redirect Examination by ATTORNEY KRATZ | 108—116 |
| Recross-Examination by ATTORNEY STRANG | 116—120 |

**DETECTIVE DAVE REMIKER**

| | PAGE |
|---|---|
| Direct Examination by ATTORNEY KRATZ | 121—170 |
| Cross-Examination by ATTORNEY STRANG | 178—211 |
| Redirect Examination by ATTORNEY KRATZ | 218—221 |

**LIEUTENANT DAN KUCHARSKI**

| | PAGE |
|---|---|
| Direct Examination by ATTORNEY KRATZ | 222—233 |

| EXHIBITS | MARKED | MOVED | ADMITTED |
|---|---|---|---|
| 7C | | 137 | 137 |
| 214 | 37 | 120 | 120 |
| 215 | 45 | | |
| 216 | 59 | | |
| 217 | 112 | | |
| 218 | 158 | 160 | 160 |
| 221 | 226 | | |
| 222 | 226 | | |
| 223 | 226 | | |

3

```
 1   Q    I'm going to show you what's been, um, received
 2        as Exhibit No. 103.  It's a computer animation.
 3        I'm going to zoom into the bedroom area.  Ask if
 4        that's going to assist you in describing your
 5        search of that bedroom that day?
 6   A    Yes, sir, it will.
 7   Q    Okay.  Was this bedroom thoroughly searched by
 8        yourself, uh, Sergeant Colborn, and Deputy
 9        Kucharski from the Calumet County, uh, Sheriff's
10        Department?
11   A    On 8th?
12   Q    Yes.
13   A    Yes, sir.
14   Q    Sometime towards, uh -- Well, let me back up
15        just -- just a minute.  Were you in close enough
16        proximity that you were able to see Sergeant
17        Colborn in that bedroom?
18   A    Yes, sir.
19   Q    Uh, referring to Exhibit 103, is this a large
20        bedroom?
21   A    No, sir, it is not.
22   Q    Were you able to see Deputy Kucharski?
23   A    Yes, sir.
24   Q    Do you recall, Lieutenant Lenk, a pair of bedroom
25        slippers being in this bedroom?
```

10

```
1   A   Yes, sir, I do.

2   Q   Could you just, using the laser pointer, and just

3       point to the, um -- for the jurors, about where

4       those were located?

5   A   Approximately right in there.

6   Q   Right next to what we now know as a bookcase?

7   A   Yes, sir.

8   Q   Did you have occasion to inspect or look at those

9       bedroom slippers?

10  A   Yes, I did.

11  Q   Describe that for the jury, please.

12  A   When we first came into the bedroom, the slippers

13      were sitting there.  I just picked them up, looked

14      inside, and put them back down.

15  Q   Did you look underneath them?

16  A   Yes, I did.

17  Q   Did you notice anything underneath the slippers

18      when you looked under them?

19  A   No, sir.  There was nothing there.

20  Q   Thereafter, or sometime during the search, uh,

21      were you aware of, and did you, uh, see, Sergeant

22      Colborn manipulating or moving a piece of

23      furniture now known as the bookcase?

24  A   Yes, sir.

25  Q   After replacing or pushing back the bookcase,
```

11

```
 1          what did you do?

 2     A    After the magazines and a binder were pushed back

 3          into the bookcase, I advised Deputy Kucharski that I

 4          would go out into the living room and retrieve bags

 5          or try to get boxes to put the items that we had

 6          recovered.

 7     Q    Did you do that?

 8     A    Yes, I did.

 9     Q    On your return to the bedroom, tell the jury what

10          you saw?

11     A    When I entered the bedroom, I caught my eye, I saw a

12          key laying in front of the slippers by the back

13          corner of that cabinet.

14     Q    Now, before Sergeant Colborn's manipulation or,

15          um, banging around of that piece of furniture,

16          had that key been there?

17     A    No, sir, it was not.

18     Q    If you could use your laser pointer again, tell

19          the jury about where in that bedroom you were

20          standing when you saw the key and where was the

21          key?

22     A    I was coming in that door, and the key was right at

23          the back corner of that cabinet on the floor.

24     Q    There's been another exhibit which has been

25          admitted into evidence.  It's Exhibit No. 210.
```

12

| | |
|---|---|
| 1 | | Actually a photograph.  I'm going to show that to |
| 2 | | you at this time and ask you to tell the jury |
| 3 | | what we're looking at. |
| 4 | A | You're looking at the cabinet with the slippers and |
| 5 | | the key that was laying on the floor. |
| 6 | Q | And that -- that image, that view, uh, is that |
| 7 | | what you saw on the 8th of November? |
| 8 | A | Yes, sir, it is. |
| 9 | Q | After seeing that key, um, did you direct, um, |
| 10 | | any activity or was any activity decided between |
| 11 | | the three of you? |
| 12 | A | I informed the other two officers that there's a key |
| 13 | | laying on the floor and it was not there before. |
| 14 | | They all looked at it.  At that point Deputy |
| 15 | | Kucharski photographed it and subsequently collected |
| 16 | | it. |
| 17 | Q | How did he collect it?  Did you witness that? |
| 18 | A | He had, uh, gloves on.  He collected it.  I believe |
| 19 | | he put it into a evidence bag. |
| 20 | Q | Now, Lieutenant Lenk, let me just ask you, were |
| 21 | | you surprised to see that key? |
| 22 | A | Yes, sir, I was. |
| 23 | Q | Why? |
| 24 | A | It wasn't there before. |
| 25 | Q | At that time, and at that early time in observing |

13

```
1          the key, did you believe that it had obvious
2          evidentiary value?
3     A    When we looked at the key, it appeared to have a
4          Toyota emblem on the key itself.  At that point we
5          thought it may have some significant value.
6     Q    After Deputy Kucharski photographed and collected
7          the key, do you know what was done with it?
8     A    Deputy Kucharski contacted the officers in charge of
9          the case, uh, Agent Fassbender and Investigator
10         Wiegert, told them what he had found, and they
11         subsequently came to the trailer.
12    Q    Was the key provided to them if you know?
13    A    I believe at that time it was shown to them and they
14         said they would send someone back to collect the key.
15    Q    All right.  Now, Lieutenant Lenk, at -- at that
16         moment, that is, after the collection of the key,
17         did you, Deputy Kucharski, and Sergeant Colborn
18         attempt to ascertain where the key had come from
19         or do some further investigation?
20    A    Yes, we did.
21    Q    Tell the jury what kind of investigation you did,
22         please.
23    A    We looked at the cabinet, um, at the back corner of
24         the cabinet.  We saw that there was an opening
25         between the back of the cabinet and the, um, side,
```

14

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | approximately a half to an inch, and we believed that    |
| 2  |   | that's where the key had fallen from the cabinet.        |
| 3  | Q | Can you point on Exhibit No. 210 the back corner         |
| 4  |   | where the cabinet had been pulled away?                  |
| 5  | A | Right back in there.                                     |
| 6  | Q | Let me show you another exhibit.  Exhibit 169.           |
| 7  |   | It's already been admitted into evidence.  Ask if        |
| 8  |   | you recognize that exhibit?                              |
| 9  | A | Yes, sir.  That is the cabinet we're talking about.      |
| 10 | Q | Could you point to the area of, uh, the back             |
| 11 |   | panel being pulled away that you've been                 |
| 12 |   | describing?                                              |
| 13 | A | Right there.                                             |
| 14 | Q | And, again, recognizing that this photo was taken        |
| 15 |   | on a different day, uh, other than the, uh, 8th,         |
| 16 |   | uh, does Exhibit No. 169 look the same as it did,        |
| 17 |   | uh, that, uh -- that morning on the 8th of               |
| 18 |   | November?                                                |
| 19 | A | Yes, sir, it does.                                       |
| 20 | Q | Lieutenant Lenk, after noting the, um -- the             |
| 21 |   | defect or the abnor -- abnormality to the camera,        |
| 22 |   | did you have any further discussion with your,           |
| 23 |   | um, fellow searchers as to finding this key?             |
| 24 | A | Yes.  We discussed the fact that it had to have come     |
| 25 |   | from that cabinet and probably from all the jostling     |

15

```
 1          and tipping of the cabinet.
 2    Q     After completing the search, uh, what you now
 3          described a thorough search of the interior of
 4          the Avery, um, trailer, what was your next
 5          responsibility?
 6    A     I'm not exactly sure what we did after that.
 7    Q     Do you remember searching any other buildings
 8          that day?
 9    A     Yeah.  We had searched other buildings.  I'm not
10          exactly sure which ones they were.
11    Q     Um, let's talk about timing, or at least time
12          frames the, um, rest of your day.  Um, do you
13          know what you did, at least generally, the rest
14          of your day.  In other words, what general
15          responsibilities were you given?
16    A     Whatever responsibilities were given to Deputy
17          Kucharski that day, we assisted him.  Uh, our primary
18          responsibility were searching buildings.
19    Q     I see.  And just so that jury's not left to
20          wonder, was there anything, at least that you
21          believed, that was of substantial evidentiary
22          value found in the rest of your searches, uh,
23          that day or that afternoon?
24    A     No, sir.
25    Q     On the 9th, that is the day -- next day,
```

16

```
 1           Wednesday, were you asked to return to the Avery

 2           salvage property?

 3    A      Yes, sir, we were.

 4    Q      And what were your responsibilities that day?

 5    A      I was assigned with, also, Sergeant Colborn to Deputy

 6           Wendling to assist him in searching.

 7    Q      Who's Deputy Wendling?

 8    A      He's an officer with the Calumet County Sheriff's

 9           Department.

10    Q      As part of Deputy Wendling's team on the 9th of

11           November, were you asked to perform any searches

12           that day?

13    A      Yes, we were.

14    Q      Do you remember where you searched that day?

15    A      We went back to the Steven Avery trailer and we also

16           searched his garage.

17    Q      Were you looking for something specific in the

18           trailer?

19    A      We were looking for a garage door remote and a pair

20           of woman's gloves.

21    Q      Did you find either of those items?

22    A      There was a pair of woman's gloves found in a paper

23           bag underneath the desk.

24    Q      The last area of inquiry, um, I have, uh,

25           Lieutenant Lenk, actually relates to other
```

17

```
 1          connections or other, um, items that may be
 2          located in Manitowoc County.  Let me specifically
 3          ask you, uh, whether you have ever seen, uh, any
 4          vial of Mr. Steven Avery's blood in possession
 5          anywhere in, Cal -- in, uh, Manitowoc County?
 6    A     No, sir, I have not.
 7    Q     Did you ever, before the 5th of November, have
 8          knowledge of a vial of Mr. Avery's blood in the
 9          Manitowoc County Clerk of Court's Office?
10    A     No, sir, I did not.
11    Q     Did you ever see a vial of blood in the clerk's
12          office?
13    A     No, sir.
14    Q     Between the 3rd and 5th of November, were you
15          ever in the Manitowoc County Clerk of Court's
16          Office?
17    A     No, sir, I was not.
18    Q     Lieutenant Lenk, did you ever, um, obtain any
19          blood from the clerk's office or did you obtain
20          any blood from any location and plant it anywhere
21          on the Avery salvage property?
22    A     No, sir, absolutely not.
23    Q     Did you ever plant it anywhere in Teresa
24          Halbach's vehicle or anywhere where it could be
25          found as part of this investigation?
```

18

```
 1  A    No, sir, definitely not.
 2  Q    Did you ever assist any other officer so that
 3       another officer could either plant evidence, uh,
 4       or try to in some way frame Mr. Avery for this
 5       homicide?
 6  A    No, sir.
 7  Q    And, lastly, uh, had you ever heard from any
 8       member of the, uh, Manitowoc County law
 9       enforcement community, uh, that they had
10       participated in some frame-up or planting of
11       evidence?
12  A    No, sir, there was not.
13  Q    And just to make sure, since we've gone through
14       the, uh -- the key evidence, um, did you have any
15       occasion to plant the -- Teresa Halbach's key or
16       place her key in Mr. Avery's residence?
17  A    Absolutely not.
18            ATTORNEY KRATZ:  That's all the
19       questions I have of Lieutenant Lenk, Judge.
20       Thank you.
21            THE COURT:  Mr. Strang?
22            ATTORNEY STRANG:  Thank you, Your Honor.
23                   **CROSS-EXAMINATION**
24  BY ATTORNEY STRANG:
25  Q    Next year it will be quarter century that you've
```

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 13 of 39   Document 120-30

```
1   A   Yeah, I believe it was 2003.

2   Q   Uh, and by "big news" I mean, this was something

3       that was on the televisions?

4   A   Yes, it was.

5   Q   You recall it being in the newspapers?

6   A   Yes, sir.

7   Q   You recall the newspapers, uh, shining a light,

8       so to speak, on your Department?

9   A   Yes, sir.

10  Q   Examining the way that earlier conviction had

11      been handled?

12  A   Correct.

13  Q   You understood that your Department had been the

14      investigating agency in the 1985 case?

15  A   Yes, sir.

16  Q   You understood that that investigative process

17      led to serious charges being brought against

18      Mr. Avery?

19  A   That's correct.

20  Q   Ultimately, led to his conviction?

21  A   Correct.

22  Q   And that it turned out he hadn't committed the

23      crimes?

24  A   According to the release, yes, apparently he had not.

25  Q   Do you have any question about that?
```

50

```
 1   A   No, sir, I don't.

 2   Q   Any doubt in your mind about whether Mr. Avery

 3       was innocent of the crimes for which he was

 4       convicted?

 5   A   No, sir, I have no knowledge of the case.  I would

 6       not hazard a guess one way or the other.

 7   Q   Simply a matter on which you have no opinion?

 8   A   Pretty much.

 9   Q   Is this another one of these things that you

10       didn't care about one way or another?

11   A   I would say other than the fact that it involved my

12       Department, I really didn't care one way or the

13       other.

14   Q   Okay.  And that was a phrase you -- you recall

15       using just yesterday when Mr. Kratz asked you how

16       you felt about or what you cared about

17       Mr. Avery's lawsuit?

18   A   Correct.

19   Q   Now, you remember -- not the exact time, of

20       course -- but you remember the general event of

21       Mr. Avery filing a civil lawsuit?

22   A   Yes, sir.

23   Q   Filed it against Manitowoc County?

24   A   Yes.

25   Q   Relating to the actions of the Manitowoc County
```

51

```
1              Sheriff's Department?
2    A    Yes, sir, I believe that's what it was.
3    Q    That is a sheriff's office in the state of
4         Wisconsin as a county office; correct?
5    A    Yes.
6    Q    Uh, so you understood that the lawsuit put in
7         issue the actions of your Department?
8    A    Yes.
9    Q    Did you care when that lawsuit was filed?
10   A    I'm not exactly sure what you mean by that, sir.
11   Q    Did you care about the lawsuit being filed?
12   A    No, sir, I did not.
13   Q    Didn't care at all that the county was being sued
14        over the actions of your Department?
15   A    I didn't have any involvement in the case and I
16        really didn't have an opinion one way or the other.
17   Q    And you didn't care one way or the other who won
18        the lawsuit, if I understood your testimony?
19   A    I didn't say anything about caring who won or not, I
20        just said I didn't really care about the lawsuit.
21   Q    Didn't care about the lawsuit.  If you didn't
22        care about the lawsuit, then I guess you didn't
23        care one way or the other who won or lost?
24   A    No, sir.
25   Q    You didn't or -- or are you agreeing or --
```

                                  52

```
 1   A   No, sir, I didn't care one way or the other.

 2   Q   All right.  And do I understand you to be saying

 3       that you didn't care one way or the other, then,

 4       whether someone who had been wrongfully convicted

 5       got some compensation for that?

 6   A   I felt if he was wrongly convicted then, yes, he

 7       should have some compensation.

 8   Q   Then how is it that you didn't care one way or

 9       the other?

10   A   I didn't really have a strong opinion one way or the

11       other.

12   Q   All right.  But if he happened to get some

13       compensation, that would be all right for you?

14   A   That would be fine.

15   Q   All right.  Uh, do you think somebody who goes to

16       prison for a long time for a crime he didn't

17       commit ought to get some compensation?

18   A   I believe so.

19   Q   But you didn't have a strong opinion about that

20       one way or the other?

21   A   No, sir.

22   Q   Uh, did you have a strong opinion one way or the

23       other about the fact that the man your Department

24       missed back in 1985 was out free on the streets

25       because Mr. Avery was doing his time?
```

53

```
1              ATTORNEY KRATZ:  Objection, relevance, Your
2       Honor.
3              THE COURT:  Uh, Mr., uh, Strang?
4              ATTORNEY STRANG:  I'm -- I'm exploring
5       his attitudes about the lawsuit and its
6       consequences.
7              ATTORNEY KRATZ:  This isn't a consequence
8       of the lawsuit at all, Judge.
9              THE COURT:  Yeah.  I'm going to sustain the
10      objection.
11   Q  (By Attorney Strang)  Do you care one way or the
12      other, Lieutenant Lenk, about whether your
13      Department gets the right guy in a criminal
14      investigation?
15   A  Definitely.
16   Q  That you do care about?
17   A  Yes, sir.
18   Q  And what's your preference?
19   A  I'm not sure what your question is, sir.
20   Q  Well, since you cared about whether they do or
21      don't get the right guy, what's your preference?
22   A  My preference is you always try to get the right
23      person.
24   Q  Now, this was the lawsuit that eventually led to
25      your deposition?
```

54

```
 1   A   Yes, sir.
 2   Q   Your deposition on, I think, October 11, 2005?
 3   A   I believe that's the date.  I'm not positive.
 4   Q   I won't even bother to mark this, but I don't
 5       want to have you have any questions about it.
 6       I'm showing you the transcript of your
 7       deposition.  What's the date of that deposition?
 8   A   October 11, 2005.
 9   Q   That's you with your picture on the front?
10   A   Yes, sir.
11   Q   Lieutenant Lenk, was October 11, 2005, the first
12       time you had ever had your deposition taken?
13   A   Regarding this lawsuit?
14   Q   Regarding anything.
15   A   No, sir.  I believe I've had done it at least once
16       before.
17   Q   Had -- had a deposition before.  All right.  Uh,
18       this was, though, something unusual for you?
19   A   Yes.
20   Q   You were subpoenaed?
21   A   Is that a question, sir, or --
22   Q   Yes.
23   A   Yes, I was.
24   Q   And, uh, you asked, uh -- or you were asked a
25       number of questions?
```

55

```
 1   A    That's correct.
 2   Q    You under -- you un -- you understand that this
 3        process here that we're doing, I'm the one asking
 4        questions?  So I'm speaking to you.  I'm asking
 5        you a question?
 6   A    Yes, sir.
 7   Q    Okay.  And you're providing answers?
 8   A    Yes, sir, I am.
 9   Q    Uh, you provided answers at the deposition in
10        much the same format, didn't you?
11   A    Yes, sir, I did.
12   Q    And I think you told us that one -- sort of the
13        major topic of this deposition was the telephone
14        call that Sergeant Colborn, in fact, when he was
15        in the jail, had received some years earlier?
16   A    That's correct.
17   Q    Sergeant Colborn told you about that telephone
18        call, didn't he?
19   A    Yes, in 2003.
20   Q    That is, he told you about it on the very day of
21        Steven Avery's release or the very next day,
22        didn't he?
23   A    I don't recall.  It could have been, yes.
24   Q    But you all were having a conversation about
25        Mr. Avery being released from prison; right?
```

56

```
 1    A    I don't know if we were having a conversation about

 2         that specifically, no.

 3    Q    But, in any event, uh, whether there was a

 4         conversation or not, uh, Officer Colborn had

 5         given you this information, uh, and you thought

 6         it may or may not be relevant?

 7    A    That's correct.

 8    Q    And, uh, you should -- you -- you told Officer

 9         Colborn he ought to pass it along to the sheriff?

10    A    Yes, sir.

11    Q    And the two of you went to Sheriff Peterson

12         together about it?

13    A    Yes, sir, I believe we did.

14    Q    And, uh, Sheriff Peterson suggested that maybe

15         the two of you ought to prepare a short report or

16         statement about that?

17    A    That's correct.

18    Q    You prepared that statement on September 12,

19         2003?

20    A    I believe it was that same day, yes.

21    Q    Do you recall that, or do you not, as being the

22         day after Steven Avery was released from prison?

23    A    I don't specifically recall if that was the same day.

24    Q    Did you consider the possibility that you might

25         be added as a defendant to that civil lawsuit?
```

57

```
1   A    No, sir, I did not.

2   Q    Never crossed your mind?

3   A    No, sir.

4   Q    Now, Teresa Halbach.  It's November 3, 2005 when

5        you first learned that she is missing?

6   A    That's correct, sir.

7   Q    She's reported missing by another county?  Not

8        Manitowoc County?

9   A    Yes, it was Calumet County.

10  Q    The adjoining county, but a different county

11       altogether?

12  A    That's correct.

13  Q    Uh, this is, at that point, their missing person

14       investigation?

15  A    Yes, sir.

16  Q    You at -- at the time, November 3, 2005, uh, were

17       then, as you are now, the chief detective, if you

18       will, for Manitowoc County?

19  A    Lieutenant of detectives, yes, sir.

20  Q    That is in charge of all of the other detectives

21       in the Manitowoc County Sheriff's Department?

22  A    Correct.

23  Q    You also have some duties as a detective yourself

24       in the field, so to speak?

25  A    Yes, sir.
```

58

```
 1        Avery's toothbrush?

 2   A    Could be.  Yes, sir.

 3   Q    Or a toothbrush?

 4   A    Could be.  Yes.

 5   Q    Razor?  Those kinds of --

 6   A    Yes.

 7   Q    -- ordinary toiletry items?

 8   A    I'm -- I'm assuming if they were there, yes.  I don't

 9        recall that, but --

10   Q    All right.  Now, we've got Exhibit 169 up on the,

11        uh, screen.  Let's see.  That's not Exhibit 169.

12        That's something else.  Um, but this is -- this

13        is the -- the key as you first observed it?

14   A    Correct, sir.

15   Q    If I may take the laser pointer here.

16              ATTORNEY KRATZ:  It's No. 210, Counsel.

17              ATTORNEY STRANG:  Two-ten.  Thank you,

18        Mr. Kratz.

19   Q    (By Attorney Strang)  So I've got Exhibit 210 up

20        on the screen, and what we've got here is --

21        is -- is this -- what we're calling bookcase --

22        is that in the -- in the position it was when you

23        walk in from the living room and see the key

24        lying there?

25   A    Yes, sir, I believe so.
```

95

| | | |
|---|---|---|
| 1 | Q | Not quite flush against the wall, but close? |
| 2 | A | Yes. |
| 3 | Q | And, um, I don't know that we can get any better |
| 4 | | angle on that, but, um, if -- it looks like the |
| 5 | | cord running off the, uh, power pack for the |
| 6 | | phone or whatever that is? |
| 7 | A | Yes, sir. |
| 8 | Q | Looks like the -- the cord is pressed up against |
| 9 | | the wall? |
| 10 | A | I don't know, sir.  I can't tell. |
| 11 | Q | Okay.  What you do -- what you do see is the -- |
| 12 | | the -- the key there, uh, looks like it's, I |
| 13 | | don't know, a few, two, three-something inches |
| 14 | | away from the wall? |
| 15 | A | Yes, sir. |
| 16 | Q | Something like that; right? |
| 17 | A | Yes, sir.  That's correct. |
| 18 | Q | And then maybe something like a similar distance |
| 19 | | off to the side of the bookcase? |
| 20 | A | Yes. |
| 21 | Q | Now -- now that we have that zoomed in, Exhibit |
| 22 | | 210, tell me, um, there's a key ring; is that -- |
| 23 | | is that right? |
| 24 | A | That looks like the key ring.  Yes. |
| 25 | Q | I mean, there was a key ring in other words? |

96

```
 1   A    Yes, it's that blue whatever it is.
 2   Q    All right.  Um, and then that -- the -- the
 3        blue -- that -- that's blue fabric?  The lanyard
 4        we were talking about?
 5   A    Correct.
 6   Q    And the -- I guess it's the -- the female end of
 7        the clasp?
 8   A    Right.
 9   Q    All right.  Now, uh, you see a house key on
10        there?
11   A    No, sir, I do not.
12   Q    Garage key?
13   A    No, sir.
14   Q    Um, how about even one work key?
15   A    No, sir.
16   Q    Swipe card for a gym?
17   A    No, sir.
18   Q    Or athletic club?
19   A    No, sir.
20   Q    Just the long Toyota key?
21   A    Yes, sir.
22   Q    That's all that was on it when you saw it?
23   A    Yes, sir.
24   Q    Mr. Buting's going to go back to work and see if
25        he can find this Exhibit 169, which was the
```

97

```
 1        picture of the -- the back panel -- the veneer

 2        panel on the bookcase?

 3   A    Yes, sir.

 4             ATTORNEY STRANG:  We don't have that.

 5        Um, Counsel, is -- is there a -- a regular

 6        photograph of Exhibit 169?

 7             ATTORNEY KRATZ:  Sure.  That's where the

 8        exhibits are.

 9             ATTORNEY STRANG:  As opposed to just on the

10        screen?

11             ATTORNEY KRATZ:  Yes.

12   Q    (By Attorney Strang)  One sixty-nine?

13   A    Yes, sir.

14   Q    You were shown that on direct?

15   A    Yes, sir.

16   Q    Okay.  See if we can do it this way.  All right.

17             ATTORNEY STRANG:  Mr. Buting, we need

18        the gizmo.  And then there's a second gizmo.

19        There we go.  Lights, camera, action.  All right.

20   Q    (By Attorney Strang)  How's that?  Pretty good?

21        Can you see that?

22   A    Yes, sir.

23   Q    All right.  Now, this photograph, whenever it's

24        taken, is taken after someone has pulled the

25        bookcase away from the wall a little bit?

                              98
```

```
 1   A     That's correct, sir.

 2   Q     That is, in -- in Exhibit 169, the bookcase, is

 3         farther away from the wall than it was when you

 4         first saw the Toyota key?

 5   A     Correct, sir.

 6   Q     And we can see that back veneer panel, or part of

 7         the board, whatever the panel is on the back?

 8   A     Yes, sir.

 9   Q     All right.  Did you -- did you touch this

10         bookcase at some point?

11   A     I had been searching the front of the bookcase.  Yes,

12         sir.

13   Q     Okay.  And, I mean, was it collected as evidence?

14   A     The bookcase?

15   Q     Yes.

16   A     At this time, no, sir.

17   Q     It wasn't?

18   A     No, sir.

19   Q     Uh, did -- did you, uh -- did you have a chance

20         to sort of touch the back panel there after --

21         after you noticed it sticking out like that?

22   A     I don't believe so.  No, sir.

23   Q     So you -- you don't know whether it, uh -- it's

24         being held out there now and wanted to spring

25         back toward the frame or whether that's its sort
```

```
 1        of resting position at this point?
 2    A   My estimate would be that's its resting position.
 3    Q   So it -- it -- it -- it's tendency there is to
 4        spring open, not to spring shut?
 5    A   I wouldn't know.  I would think so, but I wouldn't --
 6    Q   Well, okay.  That's -- that's at least the way
 7        you saw and perceived the bookcase after you
 8        noticed the back panel loose like that?
 9    A   Yes, sir.
10    Q   Now, you had been the first one to empty out that
11        bookcase?
12    A   No, sir, I was not.  Are we still talking about
13        November 8?
14    Q   Uh, no, I'm just talking the first, uh --
15    A   No, sir, I was not.
16    Q   -- in general.  On the 5th, you were not?
17    A   No, sir.
18    Q   All right.  Did someone empty out that bookcase
19        in your sight?
20    A   I believe -- yes, it was searched.  I don't recall
21        watching them search it.  I was on the other side of
22        the room.
23    Q   Okay.  But -- but you know that somebody searched
24        it on November 5?
25    A   Yes, sir.
```

100

```
 1   Q   Took all the stuff out?

 2   A   I don't know if they took it all out.  No, sir.

 3   Q   Or not.  All right.  Uh, how about on -- on

 4       November 8?  Do you know whether, uh, Mr. Colborn

 5       took all of the stuff out of the bookcase?

 6   A   All the magazines, and the photos, and that type of

 7       thing were taken out of the bookcase.

 8   Q   So that he could look in the bookcase?

 9   A   I suppose.

10   Q   The bookcase doesn't have cabinet doors on it?

11   A   No, sir.

12   Q   It's a relatively small piece of furniture?

13   A   Yes.

14   Q   Maybe yea high?

15   A   Yes, sir.

16   Q   I don't know, 18 inches square on the top?

17       Something like that?  Give or take?

18   A   Approximately.

19   Q   All right.  Um, and, uh, did you get a chance to

20       look into the bookcase when it was empty of its

21       contents?

22   A   I may -- I glanced in there.  I didn't really take a

23       hard look in there.  No, sir.

24   Q   You didn't see a, uh -- a blue lanyard, and a

25       black clasp, and the Toyota key in the back in
```

101

```
1          that bookcase, did you?

2     A    No, sir, I did not.

3     Q    That's something you would have seen if the

4          bookcase was empty and you'd looked in it?

5     A    Had I looked closely, yes, sir.

6     Q    And, um, you're not -- you're not suggesting that

7          the key, and the lanyard, and the ring, and the

8          clasp were, uh -- were somehow wedged up into the

9          space where the back veneer separates from the

10         frame, are you?

11    A    That's a possibility, yes.

12    Q    And nobody saw a blue lanyard hanging down?

13    A    Apparently not, sir.

14    Q    Uh, and if that -- if that board tends to want to

15         rest at that position, how would somebody have

16         wedged something up in there and kept it there?

17    A    I have no idea, sir.

18    Q    Uh, did you look under the bookcase?

19    A    I'm sure it was looked under when it was tilted to

20         the side.  Yes, sir.

21    Q    All right.  You -- you didn't notice any -- any

22         tape or any secret compartment down there to hold

23         something?

24    A    No, sir.

25    Q    What you did notice is that the, um -- back to
```

102

|   |   |
|---|---|
| 1 | the 210. What you did notice is that the, uh -- |
| 2 | the key is found not behind the bookcase, is it? |
| 3 | A | No, sir, it was not. |
| 4 | Q | Uh, not flush with the wall, was it? |
| 5 | A | No, sir. |
| 6 | Q | But to the sides of the bookcase? |
| 7 | A | Back by the corner to the side. Yes, sir. |
| 8 | Q | And with -- with all of this which you've |
| 9 | | described, and I won't even go to later |
| 10 | | November 8 or November 9, but with all of this, |
| 11 | | we've got a page or page-and-a-half of police |
| 12 | | reports from you, didn't we? |
| 13 | A | From myself, sir? |
| 14 | Q | Yes. |
| 15 | A | Yes, sir. |
| 16 | Q | Now, November 5, when you, uh -- you volunteered |
| 17 | | with Mr. Colborn and Mr. Remiker to search Steven |
| 18 | | Avery's trailer, uh, as of that time you |
| 19 | | previously had talked with Sergeant Colborn about |
| 20 | | the depositions the two of you gave? |
| 21 | A | I believe we did at some point. Yes, sir. |
| 22 | Q | Talked before the depositions, didn't you? |
| 23 | A | He asked me if I got a -- a deposition subpoena, and |
| 24 | | I said, yes. |
| 25 | Q | And the two of you had a little conversation |

103

| | | |
|---|---|---|
| 1 | | about that? |
| 2 | A | Yes. I had no idea what I was getting subpoenaed |
| 3 | | for, and he said it was because of a statement he had |
| 4 | | made. |
| 5 | Q | A statement -- you know, a phone call he had |
| 6 | | gotten? |
| 7 | A | Correct, sir. |
| 8 | Q | From a Brown County law enforcement agency? |
| 9 | A | That's what he said, sir. |
| 10 | Q | From a detective? |
| 11 | A | Yes, sir. |
| 12 | Q | They had someone in custody? |
| 13 | A | Yes, sir. I believe so. |
| 14 | Q | Someone who had committed a Manitowoc assault |
| 15 | | some years prior? |
| 16 | A | It was a Manitowoc assault. I don't know if there |
| 17 | | was a time attached to it. I'm not sure. |
| 18 | Q | At least what Sergeant Colborn told you was there |
| 19 | | was a few years prior. The detective from the |
| 20 | | other Brown County agency was telling him. |
| 21 | A | Yes, if that's what's on there. |
| 22 | Q | And, uh, the detective also told Colborn that he |
| 23 | | believed someone already was arrested for the |
| 24 | | crime? |
| 25 | A | That's correct, sir. |

104

```
 1    Q    So Sergeant Colborn fills you in on what he
 2         thinks the depositions are about and, uh, the two
 3         of you don't talk about the depositions after
 4         them?
 5    A    After the depositions?
 6    Q    Right.
 7    A    We may have mentioned it to each other.
 8    Q    Okay.  But it's less than four weeks later,
 9         November 5, and one thing you do know is that you
10         didn't mention that deposition to Special Agent
11         Fassbender?
12    A    That's correct, sir.
13    Q    You didn't mention it to Investigator Mark
14         Wiegert?
15    A    That's correct.
16    Q    Didn't hear Sergeant Colborn mention the
17         depositions to either of those two gentlemen
18         either?
19    A    Not to my recollection.  No, sir.
20    Q    Didn't tell Sheriff Pagel that you'd been deposed
21         three, four weeks earlier?
22    A    No, sir.
23    Q    Had Steven Avery actually been sitting there
24         during you deposition?
25    A    He came in after I had started giving my deposition.
```

105

```
 1        Yes, sir.
 2   Q    And, um, without you telling Mr. Fassbender, and
 3        Mr. Wiegert, Sheriff Pagel about the deposition,
 4        there's really no way they would have known about
 5        it, would they have?
 6   A    No, sir.
 7   Q    So that's not information they could consider in
 8        deciding whether to accept your offer to
 9        volunteer to search Mr. Avery's trailer?
10   A    They didn't have that information, sir.
11   Q    Because you didn't give it to them?
12   A    No, sir, I did not.
13   Q    In effect, you took the decision upon yourself
14        that this was information they didn't need to
15        have?
16   A    At that time I didn't even think about the
17        deposition.
18   Q    Would it have been a little bit fairer to
19        Mr. Fassbender if you had given him this
20        information so that he, as the lead -- one of the
21        two lead investigators, could have considered it?
22   A    It would have been more information for him.  I don't
23        know if it would have changed his decision.
24   Q    I don't know either, but would it have been fair
25        to give him that information?
```

106

```
1    A    Had I thought of it, yes, sir.
2    Q    Would it have been fair to give that to
3         Mr. Wiegert or Sheriff Pagel?
4    A    Same answer.  Yes, sir.
5    Q    And before you went rummaging through Steven
6         Avery's bedroom once, twice, three times,
7         whatever it was, for hours, would it have been
8         fairer to Steven Avery if someone other than a
9         person who had been deposed in his lawsuit had
10        done that search?
11   A    No, sir, I don't think it would have been.
12             ATTORNEY STRANG:  That's all I've got.
13        Oh.  I'm -- I'm sorry.
14   Q    (By Attorney Strang)  You came back to
15        Mr. Avery's four months later?  Not quite four
16        months later?
17   A    Yes.
18   Q    March 1 and March 2 of 2006?
19   A    That's correct, sir.
20   Q    Much smaller search this time, wasn't it?
21   A    Yes, sir.  I believe it was just the garage.
22   Q    The entire rest of the property was not closed
23        off to the public?
24   A    No, sir, it was not.
25   Q    The rest of the property was not closed off to
```

107

| | | |
|---|---|---|
| 1 | Q | About how long was it before Calumet County |
| 2 | | authorities arrived, if you recall? |
| 3 | A | I got there roughly 11 a.m. and I think they arrived |
| 4 | | at 11:06 is what my notes say. |
| 5 | Q | All right. |
| 6 | A | Six minutes.  Five.  Within ten minutes. |
| 7 | Q | Five or six minutes is what Manitowoc was there; |
| 8 | | is that right?  How long? |
| 9 | A | Oh, yes.  Very shortly.  Yes. |
| 10 | Q | Thereafter, it was Calumet County, to your |
| 11 | | knowledge, continuously at that scene from that |
| 12 | | point, actually, through the 12th of November? |
| 13 | A | Yes. |
| 14 | Q | In that five or six minutes that Manitowoc |
| 15 | | County, uh, was there alone, would you have been |
| 16 | | in a position to see if anybody either entered |
| 17 | | that vehicle or tampered with that vehicle? |
| 18 | A | Nobody entered that vehicle or did anything to that |
| 19 | | vehicle other than watch it. |
| 20 | Q | All right.  Let me ask you, Detective, uh, |
| 21 | | Remiker, at some point shortly thereafter, were |
| 22 | | you joined by your district attorney, Mr. Rohrer, |
| 23 | | and Mr. Griesbach, an Assistant D.A., from, uh, |
| 24 | | Manitowoc County? |
| 25 | A | Eventually, those individuals came to that location. |

142

```
1        Yes.
2   Q    After their arrival, do you recall a discussion
3        regarding who should head up both this
4        investigation and, if necessary, uh, any, um,
5        lawyer involvement, any D.A. involvement, in the
6        case?
7   A    There was a lot of discussion about that, yes.
8   Q    Can you recount that for the jury, please?
9   A    Um, obviously, uh, there were Calumet County people
10       there.  There were, um, Manitowoc County, uh,
11       investigators, administrative staff there.  In fact,
12       um, at one point, uh, Deputy Inspector Schetter
13       arrived, and, um, he had, obviously, more knowledge
14       or -- or understanding of what was going -- his
15       perception of maybe a conflict of inter -- interest
16       in some ongoing litigation between, uh, Steven Avery
17       and Manitowoc County.
18            And there was a decision made and a
19       discussion made amongst Manitowoc County
20       individuals, Calumet County individuals, and
21       individuals from each District Attorney's Office
22       that it was probably in the best interest to have
23       Calumet County officers, um, work on the
24       investigation, and, uh, they would even also, uh,
25       ask the State of Wisconsin or DCI to assist also.
```

143

|    |   |                                                            |
|----|---|------------------------------------------------------------|
| 1  |   | your understanding?                                        |
| 2  | A | Yes.  This is recorded on my digital camera, which        |
| 3  |   | also has the ability to record movies and audio.          |
| 4  | Q | Now, let me ask you this, uh, um, Detective,               |
| 5  |   | Remiker, have you been asked to compare this              |
| 6  |   | particular phone call that we're about to hear            |
| 7  |   | with some, um, business records and determine the         |
| 8  |   | date and time of this call?                                |
| 9  | A | Yes.                                                       |
| 10 | Q | And have you been able to do that?                         |
| 11 | A | Yes.                                                       |
| 12 | Q | What is the date and time of the call that we're          |
| 13 |   | about to hear, if you -- if you know?                      |
| 14 | A | That phone call, um, was placed on October 31, 2005       |
| 15 |   | at 11:43 a.m., I believe.                                  |
| 16 | Q | All right.  I'm going to play this, uh, video             |
| 17 |   | clip, and then I'm going to ask if you can                 |
| 18 |   | identify it.                                               |
| 19 | A | Okay.                                                      |
| 20 | Q | "Hello.  This is Teresa with *Auto Trader*                |
| 21 |   | *Magazine*.  I'm the photographer, and just giving        |
| 22 |   | you a call to let you know that I could come out          |
| 23 |   | there today, um, in the afternoon.  It would --           |
| 24 |   | will probably be around two o'clock or even               |
| 25 |   | longer, but, um, if you could please give me a            |

159

```
 1          call back and let me know if that will work for
 2          you, because I don't have your address or
 3          anything, so I can't stop by without getting a
 4          call back from you.  And my cell phone is
 5          737-4731.  Again, it's Teresa, 920-737-4731.
 6          Thank you."
 7                  "Monday, 12:25 a.m."
 8          Detective Remiker, is that the, um, recording,
 9          the answering machine message, that you heard at
10          that time?
11     A    Yes.
12     Q    From an individual identifying herself as Teresa
13          from Auto Trader Magazine.  Uh, did you believe
14          that was important and did you, in fact, retain a
15          copy of that message?
16     A    Yes.
17               ATTORNEY KRATZ:  I will move the
18          admission of Exhibit 218, please.
19               THE COURT:  Any objection?
20               ATTORNEY STRANG:  None at all.  And, um,
21          you know, we -- we consider that the voice of
22          Teresa Halbach to be established.
23               THE COURT:  Very well.  The exhibit is
24          admitted.
25               ATTORNEY KRATZ:  Thank you, Judge.
```

160