# **Exhibit 32**

```
1    STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                         BRANCH 1
2    _____

3    STATE OF WISCONSIN,

4                    PLAINTIFF,        JURY TRIAL
                                       TRIAL — DAY 10
5    vs.                               Case No. 05 CF 381

6    STEVEN A. AVERY,

7                    DEFENDANT.
8    _____

     DATE:    FEBRUARY 23, 2007
9
     BEFORE:  Hon. Patrick L. Willis
10            Circuit Court Judge

11   APPEARANCES:  KENNETH R. KRATZ
                   Special Prosecutor
12                 On behalf of the State of Wisconsin.

13                 THOMAS J. FALLON
                   Special Prosecutor
14                 On behalf of the State of Wisconsin.

15                 NORMAN A. GAHN
                   Special Prosecutor
16                 On behalf of the State of Wisconsin.

17                 DEAN A. STRANG
                   Attorney at Law
18                 On behalf of the Defendant.

19                 JEROME F. BUTING
                   Attorney at Law
20                 On behalf of the Defendant.

21                 STEVEN A. AVERY
                   Defendant
22                 Appeared in person.

23                 TRANSCRIPT OF PROCEEDINGS

24             Reported by Diane Tesheneck, RPR

25                 Official Court Reporter


                           1
```

```
1   A.   Correct.
2              ATTORNEY GAHN:  I would ask if Detective
3        Wiegert would bring you Exhibit 325.  It's the Pap
4        smear of Teresa Halbach.
5   Q.   Now, we have already identified that exhibit as
6        the Pap smear of Teresa Halbach; is that correct?
7   A.   Yes.
8   Q.   What is a Pap smear?
9   A.   As I understand it, it is a sample of cells from
10       a woman's cervix.  It is used for medical testing
11       to check for abnormal cells.
12  Q.   And where would the DNA come from in a Pap smear?
13  A.   As I stated earlier, any cell that -- any
14       nucleated cell is going to have DNA.  So any of
15       the cells from the Pap smear, cervical area,
16       tissue cells, it will come from the nucleus of
17       those epithelial cells that are on that smear.
18  Q.   Now, using the DNA technology that you described
19       before lunch time, did you develop a DNA profile
20       for Teresa Halbach, from that Pap smear?
21  A.   Yes, I did.
22  Q.   And I'm going to ask you, if according to your
23       reports, does the slide we will put up next
24       display your results?
25  A.   Yes, it does.
```

149

Q.    I would like you to take the laser pointer and at
               this point explain to the jurors exactly what
               they are looking at.
         A.    This series of numbers and letters on this side
               are referred to as genetic markers.  And all of
               this information pinpoints where those genetic
               markers are found throughout your DNA.  Earlier I
               talked about the target regions of DNA that are
               amplified, and we make a whole lot of copies of
               them.
                     This is what I was referring to.  We
               looked at 15 different target areas of DNA that
               are amplified.  These numbers on the right side
               are the types at each one of those locations.  So
               for instance, at D3S1358, Teresa Halbach's type
               is a 16 18.
         Q.    Are there other possible types at that genetic
               location of D3S1358?
         A.    Yes.
         Q.    Do you know how many different types there are at
               that location?
         A.    Not exactly, but probably something like 11 to
               20.
         Q.    Can you compare, for the jurors, when you talk
               about types, how these would be like ABO types?

                                   150

```
 1   A.    These types are actually the different fragment

 2         sizes, those different target sizes that we

 3         amplified.  The ABO system is a type of genetic

 4         marker, but the discriminating power of ABO

 5         systems, which is what we used many years ago, is

 6         much less than the discriminating power of the

 7         combined -- all of these combined types.

 8   Q.    Now, you previously testified that you collected

 9         your swab A-1 from the rear cargo area --

10   A.    Yes.

11   Q.    -- of the RAV4; is that correct?

12   A.    Yes.

13   Q.    Can we go to the next one, please.  And, again,

14         please show the jurors where you collected your

15         A-1 from.

16   A.    In this area right here.

17   Q.    And that was a blood stain that tested positive

18         in this presumptive test, correct?

19   A.    Right.

20   Q.    You also testified that you collected swab A-2

21         from across the panel of the rear cargo area.

22         Show the jurors, again, where that was.

23   A.    Yes, that was right in this area here.

24   Q.    And you also testified that you collected your

25         swab A-4 from the metal frame.  Show the jurors
```

151

```
 1         where that was.
 2    A.   Right along here.
 3    Q.   And you also testified that you collected A-3
 4         from the cargo door itself; is that correct?
 5    A.   Yes.
 6    Q.   And can you show the jurors where that is?
 7    A.   Right here.
 8    Q.   And, again, all of these stains, you had a
 9         presumptive positive test for blood?
10    A.   That's correct.
11    Q.   And you also testified that you collected a swab
12         from the Wild Cherry Pepsi can which you labeled
13         at A-14; is that correct?
14    A.   Yes, right here.
15    Q.   And, again, show the jurors.  Thank you.  Now,
16         did you develop DNA profiles from each of these
17         swabs?
18    A.   Yes, I did.
19    Q.   And according to the reports that you have, does
20         the following slide correctly depict your
21         results?
22    A.   Yes, it does.
23    Q.   And, again, would you explain to the jurors what
24         this slide shows.
25    A.   Again, these are the genetic markers, these are
```

152

```
1           the 15 different markers we're looking at.  And
2           these are the types that were developed from each
3           one of these evidence samples.
4    Q.     And each one of those evidence samples came from
5           the RAV4 of Teresa Halbach, correct?
6    A.     Correct.
7    Q.     Now, can you tell whether this particular DNA
8           profile is from a male or a female?
9    A.     Yes.
10   Q.     How can you do that?
11   A.     This marker here, referred to as amylogen, is a
12          gender marker.  If you are female, you are only
13          going to have an X chromosome.  If you are a
14          male, you will have a X and a Y chromosome.
15   Q.     So this profile is from a female?
16   A.     Correct.
17   Q.     I notice that after genetic marker D7SA20 there
18          is an 11?
19   A.     Correct.
20   Q.     Why is there only one number there?
21   A.     As I stated earlier, these genetic markers are
22          independently inherited, just like genes.  So you
23          inherit 50 percent from your mom and 50 percent
24          from your dad.  Now, the fact that this is an 11
25          means that she is a homozygote at this marker.
```

153

1   And that means she got the same type from her mom
2   and the same type from her dad.  At D-3 there are
3   two markers.  This is referred to as a
4   heterozygote.  And she received one from her mom
5   and one from her dad.
6   Q.   And this DNA profile that you developed from the
7   cuttings and the swabs from the RAV4, did you
8   compare that profile to the DNA profile that you
9   developed from Teresa Halbach's Pap smear?
10  A.   Yes, I did.
11  Q.   And according to your reports, does this slide
12  correctly display your findings?
13  A.   Yes, sir, it does.
14  Q.   Would you please point out to the jurors your
15  findings and conclusions?
16  A.   Again, these are all the genetic markers.  And
17  you can see that the types from the evidence
18  samples are consistent with the types from the
19  Pap smear of Teresa Halbach.  So at this genetic
20  marker, the evidence sample is 16 18, Teresa is
21  16 18.  At this marker it's 69.3, Teresa is a
22  69.3.  And all of these markers are consistent
23  with the ones from Teresa Halbach.
24  Q.   And did you calculate a statistic to determine
25  how rare or how common this particular DNA

154

1     profile would be in the population?

2  A.  Yes, I did.

3  Q.  And I'm going to show you a slide and ask you if

4     this correctly depicts the statistical analysis

5     that you performed?

6  A.  Yes, it does.

7  Q.  And would you explain to the jurors what this

8     slide means.

9  A.  Remember earlier I said that we do a statistical

10     analysis when we have a match between an evidence

11     sample and a reference sample.  If we have an

12     exclusion, we're finished, that's the end of it.

13     But if you have a match between an evidence

14     sample and a reference sample, then you have to

15     determine how common or how rare that match -- or

16     I mean that profile from the evidence sample is

17     in the population.

18          This first number here tells me that the

19     probability of finding someone in the Caucasian

20     population, some unrelated, random person that

21     has the same profile as the evidence sample, the

22     probability of that is 1 person in 416

23     quadrillion in the Caucasian population, 1 person

24     in 642 quadrillion in the African-American

25     population, 1 person in 641 quadrillion in the

155

1          southeastern Hispanic population, and 1 person in
2          1 quintillion in the southwestern Hispanic
3          population.
4      Q.  And why do you look at these different
5          populations when you are estimating the frequency
6          of these genetic markers?
7      A.  When we are calculating and estimating these
8          frequencies, we use a data base that's maintained
9          by the FBI.  And that data base has samples from
10         individuals in these four different population
11         groups.  This slide illustrates that even though
12         the rarity of the profile is different, in these
13         four population groups, there's not a lot of
14         difference between population groups.  There are
15         some differences, but this profile is extremely
16         rare across all four populations.
17     Q.  What does this number -- What do these numbers
18         mean, Ms Culhane?
19     A.  This number means that the probability of finding
20         a person, random person, unrelated, in the
21         population, that has the same profile as the
22         evidence sample, is 1 person in 416 quadrillion.
23     Q.  Do you have an opinion, to a reasonable degree of
24         scientific certainty, whether Teresa Halbach is
25         the source of the blood that you found on A-1,

                              156

1     A-2, A-3 and A-4, and the source of the

2     biological fluid on the Wild Cherry Pepsi can?

3  A. Yes, I do.

4  Q. And what is that opinion?

5  A. That Teresa Halbach is the source of the DNA from

6     those items.

7           ATTORNEY GAHN:  I'm going to ask Detective

8     Wiegert to bring you what has been marked as Exhibit

9     337.

10 Q. Again, I have spoken with defense counsel before

11    we began this afternoon and, Ms Culhane, does

12    that container, which is Exhibit 337, contain

13    some charred remains that you examined in this

14    case?

15 A. Yes, it does.

16 Q. And did you assign a Crime Lab designation number

17    to that?

18 A. Yes, I did.

19 Q. What is that?

20 A. Item BZ.

21 Q. And I'm going to ask you to look on the slide on

22    the big screen.  And what is contained in that

23    box there in front of you, which is Exhibit 337,

24    is this the piece of charred remains that you

25    examined?

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 11 of 49   Document 120-32

A.   Yes, it is.

Q.   And when did you receive this; do you know?

A.   I can refer to my notes.

Q.   Please.

          THE COURT:  Do we have a number for the
     photo exhibit?

          ATTORNEY GAHN:  Your Honor, we don't have
     that with us, but you will get one.

A.   Item BZ was taken into the laboratory on November
     11th, 2005.

Q.   And was this -- When you examined this, was this
     a combination of bone and tissue?

A.   It appeared to be, yes.

Q.   And what is shown on the big screen here, which
     we will later get an exhibit for and mark it, is
     that the bone and tissue fragment sample that you
     examined?

A.   Yes, it is.

Q.   How did you go about processing this for DNA?

A.   Because this sample was compromised, it had been
     subjected to -- appeared to be subjected to
     intense heat, I needed to find an area that I
     felt was the least damaged.  So I chose a portion
     of the tissue, which I believe was in this area
     here, close to the bone.  And sampled a portion

                         158

1        of that to continue my extractions and to

2        continue my typing.

3   Q.   Were you able to develop a DNA profile from this

4        piece of charred remains?

5   A.   Yes, I was.

6   Q.   And according to your reports, does the next

7        slide correctly display your findings of your

8        test?

9   A.   Yes, it does.

10  Q.   Would you explain to the jurors what this is.

11  A.   Again, these are the genetic markers that we're

12       looking at.  And these are the types.  You will

13       notice here there are no numbers at these

14       positions, these markers.  And the reason is

15       because this was a fairly degraded sample of DNA.

16       DNA is a very stable molecule; however, it breaks

17       down and is degraded and broken up into pieces by

18       several things, heat being one, sunlight,

19       nucleases in the environment that chew it up.

20            But this was obviously a sample that had

21       been subjected to intense heat.  And so,

22       therefore, on these fragments, these STR markers,

23       which are fairly large, the fragments -- there

24       was not enough DNA at those positions to develop

25       a type.

159

1    Q.   Did you compare this partial profile with the DNA
2         profile that you obtained from the Pap smear of
3         Teresa Halbach?
4    A.   Yes, I did.
5    Q.   And does this slide accurately depict your
6         findings?
7    A.   Yes.
8    Q.   And would you please explain what your findings
9         were, to the jury?
10   A.   In the -- At the marker positions where I did get
11        results, these types are consistent with Teresa.
12        Obviously, I don't know what the types are here
13        because there were no results.  But for
14        everything else, all the types that I actually
15        developed, they were consistent with Teresa
16        Halbach.
17   Q.   Now, you stated previously, when you made your
18        comparisons to Teresa Halbach's DNA profile with
19        the samples of blood that you found in the RAV4,
20        you were able to determine that Teresa Halbach
21        was the source of that blood; is that correct?
22   A.   Yes.
23   Q.   Can you say that in this case?
24   A.   No.
25   Q.   Why not?

160

1   A.   This was a partial profile.  When we have a

2        partial profile, we can only do a statistical

3        interpretation on the markers that we have

4        results for.  In order to get very large numbers

5        and very rare profiles, what gives us those large

6        numbers is results, at all 15 different markers.

7        When we have less than that, then the frequency

8        of that profile becomes a little more common than

9        it would if it was a complete profile.

10   Q.   Were you able to develop a statistic to tell you

11        how rare or how common the DNA profile on Item

12        BZ, the charred remains, would be in the

13        population?

14   A.   Yes, I was.

15   Q.   And does the next slide depict the frequency in

16        the population of the DNA profile on the charred

17        remains?

18   A.   Yes.

19   Q.   And would you explain to the jury these numbers

20        and what they mean.

21   A.   This calculation was done exactly like the

22        calculation from the blood stains.  The

23        difference is, this was not a full profile, it

24        was only a partial profile.  So if you do a

25        statistical analysis of the types that you got,

161

1    and calculated the frequency of those types, the

2    probability of another random, unrelated person,

3    in the population, having the profile, the

4    partial profile of the remains, is 1 person in

5    1 billion in the Caucasian population, 1 person

6    in 2 billion in the African/American population,

7    1 person in 2 billion in the southeastern

8    Hispanic population; and 1 person in 3 billion in

9    the southwestern Hispanic population.

10   Q.   And, again, can you break this down for the

11        jurors, exactly what that number, one billion,

12        would mean, as it relates to this DNA profile

13        from the charred remains?

14   A.   That is the frequency that that partial profile,

15        those results at just the markers that I got

16        results from, the frequency of that partial

17        profile, that is the frequency that it occurs in

18        the population.

19   Q.   Are there a billion people in the State of

20        Wisconsin?

21   A.   I don't believe so.

22            ATTORNEY GAHN:  Your Honor, I have now what

23        has been a photograph that has been marked as

24        Exhibit 338.  I will ask Mr. Fallon if he will give

25        that to Ms Culhane.

162

1    Q.    And Ms Culhane, would you look at that

2          photograph, and is that a photograph of the piece

3          of charred remains that we previously put up on

4          the large screen.

5    A.    Yes, it is.

6                ATTORNEY GAHN:  I would ask if Detective

7          Wiegert would bring you Exhibit 237 -- I'm sorry,

8          277.  This would be the bullet fragment.

9    Q.    And can you identify that exhibit that's in front

10         of you, Ms Culhane?

11   A.    Yes, this is Crime Lab item designation FL.  And

12         it is a lead bullet fragment.  My initials and

13         markings are on the packaging.

14   Q.    And can you tell when you received that exhibit?

15   A.    That came into the laboratory on May 16 -- I'm

16         sorry, March 16th, 2006, and I took custody on

17         March 28th, 2006.

18   Q.    And how did you process that bullet?

19   A.    The first thing I did was, just like every item

20         of evidence, it was a visual examination.  There

21         was nothing visual on the fragment.  There didn't

22         appear to be any stain.  So in order to remove

23         any residual DNA that might have been on the

24         bullet, I washed it.  I put it in a test tube and

25         washed it with some buffer that we use to extract

163

1          the DNA.  And the washing of that bullet, the
2          washing liquid is what I performed the rest of my
3          procedure on.
4     Q.   And were you able to develop a DNA profile from
5          that washing on Item FL, the bullet?
6     A.   Yes.
7     Q.   And according to your reports, does the next
8          slide correctly display your findings?
9     A.   Yes, it does.
10    Q.   And would you please explain your results to the
11         jurors?
12    A.   Again, I was looking at all of these.  These are
13         the different markers.  And these are the types
14         at each one of these markers.  You will notice at
15         D-16 and at TPOX I am -- there's an asterisk
16         there.  That indicates that there was a visible
17         peak there which represents a type.  But it was
18         below our parameters for including that in the
19         final analysis.  So it -- I'm missing a peak here
20         and a peak at TPOX.
21    Q.   And did you compare this profile that you
22         obtained from the bullet fragment with the DNA
23         profile you obtained from the Pap smear of Teresa
24         Halbach?
25    A.   Yes, I did.

164

1  Q.  And according to your reports, does this slide
2      correctly display your findings?
3  A.  Yes, it does.
4  Q.  And would you explain them to the jury.
5  A.  The profile from the bullet is consistent with
6      all of the types from Teresa Halbach.  You will
7      notice at D16 she's missing the 13 type, and at
8      TPOX she is missing the 10 type.  And, again,
9      those peaks were visible, but they were below our
10     threshold for calling those types.
11 Q.  Did that have any impact on your match criteria
12     in this interpretation?
13 A.  The impact is that I cannot use the information,
14     the frequencies at this marker, and at this
15     marker, to figure out my final frequency.  In
16     other words, I had to calculate the frequencies
17     at all of the other markers except D16 and TPOX.
18 Q.  But nothing about those two asterisks that you
19     have on your -- on the chart here excluded Teresa
20     Halbach as being on the bullet?
21 A.  That's correct.
22 Q.  Did this match differ in any way from the
23     previous matches that you called?
24 A.  Yes, it did.
25 Q.  And could you explain to the jury what happened.

165

1   A.    During the extraction of this item of evidence,

2         as I talked about earlier, we set up controls

3         that we run with all of our samples.  When we

4         begin an extraction, whether it is an evidence

5         sample or a reference sample, when we begin the

6         extraction, we begin what's called a manipulation

7         control.  And it's, basically, a negative blank

8         control.  And its helps us monitor if any

9         unintentional DNA is introduced into the sample

10        or into the process.

11               In this particular case, there was a

12        trace amount of -- a trace amount of DNA showed

13        up in the quantitation portion where I had to

14        quantitate and find out how much DNA I had.

15        There was a trace amount of DNA in the negative

16        control.  I took the profile to completion and I

17        developed the profile on it.  And the profile in

18        the negative control turned out to be consistent

19        with my own DNA type.

20   Q.    What did that mean?

21   A.    That means that during the extraction procedure I

22        inadvertently introduced my own DNA into the

23        negative control.

24   Q.    Did that have any impact on your interpretation

25        of your results?

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 20 of 49   Document 120-32

```
 1   A.   It did not have any impact as far as the profile
 2        from the evidence sample.  It's just the fact
 3        that I introduced my own DNA into the
 4        manipulation control.
 5   Q.   Were there any other profiles developed on the
 6        bullet besides Teresa Halbach?
 7   A.   No.
 8   Q.   Was Teresa Halbach's profile the only profile
 9        that you found on that bullet?
10   A.   Yes.
11   Q.   Were there any mixtures?
12   A.   No.
13   Q.   And your profile was found where?
14   A.   In the negative control, which should have had
15        just reagents in it.  It should not have had any
16        DNA at all in it.
17   Q.   And how do you think your DNA profile got into
18        that control?
19   A.   I believe my DNA profile was introduced during
20        the extraction procedure when I was talking.  At
21        the time when I was setting up these samples, I
22        was training two analysts, newer analysts, in the
23        lab.  And they were watching me.  This sample was
24        not an average sample, simply because we handled
25        it a little different.  It wasn't a swabbing and
```

167

```
1        it wasn't a cutting.  The washing part of it was
2        a little bit different than what we usually do.
3             So I was explaining to them what I was
4        doing and as I was setting it up.  And
5        apparently -- I felt as if I was far enough away
6        from my workbench not to introduce my DNA, but
7        apparently I was incorrect.
8   Q.   Now, your DNA did not come up on the bullet, did
9        it?
10  A.   No.
11  Q.   It only was in the control?
12  A.   That's correct.
13  Q.   Do you have an opinion, to a reasonable degree of
14       scientific certainty, whether Teresa Halbach is
15       the source of the DNA on Item FL, the bullet?
16  A.   Yes.
17  Q.   And what is that opinion?
18  A.   I believe she is the source of the DNA on that
19       bullet.
20            ATTORNEY GAHN:  I would ask if Detective
21       Wiegert would, please, bring to Ms Culhane what's
22       been marked as Exhibit 324, and this would be the
23       buccal swab of Steven Avery.
24            Your Honor, before I go any further, I
25       think we have some considerable more testimony
```

168

```
 1          for the rest of these samples.  Would you like to

 2          break now?

 3                   THE COURT:  I think we'll go another 15

 4          minutes to kind of split the afternoon equally in

 5          two.

 6                   ATTORNEY GAHN:  Okay.

 7     Q.   (By Attorney Gahn)~ Detective Wiegert has brought

 8          you what has been marked as Exhibit 324, and that

 9          is what you identified as the buccal swab of

10          Steven Avery?

11     A.   Yes.

12     Q.   And once again, that's what's called a standard,

13          correct?

14     A.   Correct.

15     Q.   And what are standards used for?

16     A.   As reference samples to compare to the evidence

17          samples.

18     Q.   Using the DNA testing procedures that you

19          described this morning, did you develop a DNA

20          profile from the buccal swab of Steven Avery?

21     A.   Yes, I did.

22     Q.   And does the next slide correctly depict the DNA

23          profile that you developed from Steven Avery's

24          buccal swab?

25     A.   Yes, it does.
```

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 23 of 49   Document 120-32

```
 1   Q.   And would you describe for the jurors your
 2        findings?
 3   A.   These are the same genetic markers that I
 4        examined when I looked at the evidence samples
 5        and the standard from Teresa Halbach.  And,
 6        again, at each one of these markers, Steven
 7        Avery's sample had a specific type.  The
 8        amelogenin marker is XY, which is different from
 9        Teresa because this is a male individual.  And he
10        has the X and Y chromosome.
11   Q.   We heard testimony yesterday that a number of
12        swabs were taken from the garage floor of Steven
13        Avery.  And did you receive, at the Crime Lab,
14        swabs that were taken from the garage floor of
15        Steven Avery's garage?
16   A.   Yes, I did.
17   Q.   And did you assign Crime Lab designation numbers
18        G, I1, J, K, O, and P to six of the swabs from
19        the stains on the garage floor of Steven Avery's
20        garage?
21   A.   Yes, I did.
22   Q.   And did you test those swabs from Steven Avery's
23        garage floor --
24   A.   Yes.
25   Q.   -- for a DNA profile?  And did you obtain a DNA
```

170

```
 1        profile?

 2   A.   Yes, I did.

 3   Q.   And does the next slide correctly show the DNA

 4        profile that you obtained from the six swabs of

 5        blood from the garage floor?

 6   A.   Yes, it does.  And, again, you can see that the

 7        types are consistent throughout all of the

 8        markers that we looked at.

 9   Q.   Now, did you receive other items?  We have had

10        testimony in this case that blood stains from the

11        sink or the vanity in the residence of Steven

12        Avery were taken and sent to the Crime Lab; do

13        you recall that?

14   A.   Yes.

15   Q.   And do you recall submitting those to DNA

16        testing?

17   A.   Yes.

18   Q.   And did you develop a profile from those

19        submissions?

20   A.   Yes, I did.

21   Q.   And what was the profile you developed?

22   A.   It was consistent with Steven Avery's profile.

23   Q.   And I'm going to show you the next slide.  And

24        this has been identified as the Grand Am, the

25        1993 Grand Am owned by Steven Avery.  Did you
```

171

1        also examine this at your Crime Lab?

2    A.   Yes, I did.

3    Q.   And on the next slide, can you point out to the

4         jurors, did you locate any bloodstains in that

5         vehicle?

6    A.   Yes, there were bloodstains on the gear shaft

7         here and along the console.

8    Q.   And did you do presumptive tests on those

9         bloodstains?

10   A.   Yes, I did.

11   Q.   And did you eventually do DNA testing on those

12        bloodstains?

13   A.   Yes.

14   Q.   And what were your results?

15   A.   The types were consistent with Steven Avery.

16   Q.   We had testimony a few days ago that there was a

17        swab taken of the release lever of the hood latch

18        of Teresa Halbach's RAV4.  That was identified as

19        Exhibit 205.

20             ATTORNEY GAHN:  Will you find that exhibit,

21        please, Detective Wiegert.

22   Q.   Can you identify that exhibit, Ms Culhane?

23   A.   Yes, this is our item designation ID, and it has

24        our laboratory bar code item designation and my

25        initial and date on it.

172

1    Q.   And that contains a swab from the hood latch of
2         Teresa Halbach's RAV4?
3    A.   Yes.
4    Q.   And did you perform DNA testing on that hood
5         latch --
6    A.   Yes.
7    Q.   -- swab?  Do you recall, when you looked at the
8         swab, did you notice any condition to it, as far
9         as color?
10   A.   It was discolored, but it did not have the
11        appearance -- it was not a reddish-brown
12        discoloration consistent with blood.
13   Q.   So it did not appear to have blood on the swab?
14   A.   Correct.
15   Q.   But you proceeded with DNA testing on the swab,
16        nevertheless?
17   A.   Yes.
18   Q.   And did you develop a profile from the swab of
19        the hood latch of Teresa Halbach's RAV4?
20   A.   Yes, I did.
21   Q.   And I'm going to show you the next slide and ask
22        you, do your notes and your records reflect these
23        as your findings?
24   A.   Yes, they do.
25   Q.   Could you explain what your findings were to the

                              173

1      jury.

2   A.   Looking at the same genetic markers, these are

3        the types that were developed from the swab that

4        was reportedly taken from the hood latch of the

5        RAV4.

6   Q.   And this is what you would call a full profile;

7        is that correct?

8   A.   Yes.

9   Q.   What does that mean when you say it is a full,

10       complete profile?

11  A.   A full profile indicates that you have gotten

12       results at all 15 different markers that we look

13       at.  If this was a partial profile, such as in

14       the charred remains, I would be missing types at

15       some of these markers.

16  Q.   Did you compare this profile that you found on

17       the swab of the hood latch of Teresa Halbach's

18       RAV4 with the DNA profile that you developed from

19       the buccal swab of Steven Avery?

20  A.   Yes, I did.

21  Q.   And does this next slide correctly display your

22       findings?

23  A.   Yes, it does.

24  Q.   And would you please describe your findings to

25       the jurors?

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 28 of 49   Document 120-32

```
 1   A.    At each one of the markers, the types from the
 2         swabbing on the hood latch were consistent with
 3         the types from Steven Avery's buccal swab.  If
 4         you look at all the numbers for all of the
 5         markers, they are consistent with the entire
 6         profile.
 7   Q.    Now, you testified before that you received a
 8         number of standards at the Crime Lab, did you?
 9   A.    Yes.
10   Q.    In other words, you received buccal swabs from
11         Allen Avery, Brian Dassey, Brendan Dassey, Barb
12         Janda, Bobby Dassey, Earl Avery, Chuck Avery and
13         Delores; is that correct?
14   A.    Yes.
15               THE COURT:  Mr. Gahn, excuse me, after you
16         wrap up this portion of the hood latch, I think
17         we'll take our break.
18               ATTORNEY GAHN:  Yes, your Honor.  Fine.
19         Thank you.
20   Q.    (By Attorney Gahn)~ Did you develop DNA profiles
21         from all those standards of reference samples?
22   A.    Yes, I did.
23   Q.    When you would come up with a profile from an
24         evidentiary item like the hood latch, did you
25         compare the profile from the hood latch with all
```

175

```
 1        the other standards?

 2   A.   Yes, I did.

 3   Q.   And what were the results?

 4   A.   They were inconsistent.  The profile from the

 5        hood latch was not consistent with any of the

 6        other standards that I examined.

 7   Q.   But the profile from the hood latch matches

 8        Steven Avery?

 9   A.   That's correct.

10   Q.   And do you have an opinion, to a reasonable

11        degree of scientific certainty, whether the DNA

12        profile that you developed from the swab of the

13        hood latch of Teresa Halbach's RAV4, that Steven

14        Avery is the source of that profile?

15   A.   Yes.

16   Q.   And what is that opinion?

17   A.   That he is the source of that profile.

18             ATTORNEY GAHN:  Thank you.

19             THE COURT:  All right.  Thank you.  Members

20        of the jury, we're going to take our afternoon break

21        at this time.  We'll resume a little before 3:00.  I

22        will remind you, again, not to discuss the case at

23        any time during the break.

24                  (Jury not present.)

25             THE COURT:  Counsel, let's report back a
```

176

1  little before 3:00.

2              (Recess taken.)

3          THE COURT:  Counsel, before we bring the

4  jury back in, I just wanted to get some idea of the

5  agenda for the rest of the day.  Mr. Gahn, how long

6  do you think you will be with direct?

7          ATTORNEY GAHN:  I think at least a half

8  hour, possibly 40, 45 minutes.  But I don't think

9  not before a half hour, I don't believe.

10         THE COURT:  All right.  And, Mr. Buting, I

11 take it you may well not complete your

12 cross-examination, but you wish to get started?

13         ATTORNEY BUTING:  I wouldn't even come

14 close to completing the examination.  Normally, I

15 guess I wouldn't mind starting and finishing it if

16 it was the next day, but I think with a whole break

17 of a weekend, it might be easier, if the Court

18 didn't mind ending a little early today, if we would

19 just start fresh with cross on Monday morning.

20         THE COURT:  Okay.  Before I answer that,

21 does the State have any shorter, quicker witnesses.

22         ATTORNEY KRATZ:  I'm finding out right now,

23 Judge.  We have some examination with Mrs. Halbach,

24 Karen Halbach, that we would be happy to put in

25 today.

                        177

ATTORNEY BUTING:  Could we approach for a
moment, please.

          THE COURT:  Go ahead.

               (Side bar taken.)

          THE COURT:  All right.  Before we go back,
I should announce we just had a side bar conference
and I think the feeling is that if the direct
examination ends a little early today, we'll
probably simply let the jury go home a little early.

          There was a side bar earlier this
morning where counsel asked the Court if the
other jurors knew why one of the jurors was
missing today.  And the answer to that is, yes,
they learned that this morning when they were
leaving on the bus.  And that was the purpose for
that brief side bar we had earlier today.  All
right.  At this point we'll bring in the jury.

               (Jury present.)

          THE COURT:  You may be seated.  And,
Mr. Gahn, you may resume your direct examination of
the witness.

          ATTORNEY GAHN:  Thank you, your Honor.

          **DIRECT EXAMINATION CONTD.**

          ATTORNEY GAHN:  I would ask if Detective
Wiegert could retrieve Exhibit 211, which is the

1          Toyota key.  Please take that to Ms Culhane.

2     BY ATTORNEY GAHN:

3     Q.   We have presented you with an exhibit that has

4          previously been marked as Exhibit 211, and

5          previously identified as a Toyota key that was

6          found in Steven Avery's residence.  And I ask

7          you, do you recognize that key?

8     A.   Yes, I do.

9     Q.   And how do you recognize that key?

10    A.   It's the Toyota key that I examined.  There was a

11         -- This is the same keyring that it was attached

12         to.

13    Q.   We also have, on the next slide, a photograph

14         that -- is that key that you have in front of

15         you, Exhibit 211, the key that is in this

16         photograph?

17    A.   Yes, it is.

18    Q.   There is also another item in that photograph,

19         and does that help you identify the key?

20    A.   Yes, it does.

21    Q.   And, please, explain that to the jury.

22    A.   This is the packaging that the key was brought to

23         the laboratory in.  Again, this is our bar code

24         tracking system in the laboratory.  And this is

25         our item designation C, and my initials, and the

179

1      date.

2  Q.  I'm going to show you what has been marked as

3      Exhibit 316 and ask you if this photograph, which

4      you are being shown, is the photograph that is

5      depicted on the large screen?

6  A.  Yes, it is.

7  Q.  And now, I would like to go to the next slide.

8      And this is a slide of the key that you have in

9      front of you; is that correct?

10 A.  It appears to be, yes.

11 Q.  When you received this key, how did you process

12     it, Ms Culhane?

13 A.  I received the key.  It was in a sealed brown

14     paper bag.  I opened it up.  I had gloves on.

15     And I held the metal part of the key in one hand

16     and I swabbed the black -- I should show you up

17     here -- this black rubberized part of the key,

18     with a sterile cotton swab.  And I did it in very

19     much the same way that I swabbed the Pepsi can

20     that we looked at earlier.

21          At this point, there were no visible

22     indications of any staining, so I was primarily

23     interested to see if I could recover DNA that had

24     been left behind by possibly touching.  So I

25     swabbed all of the surfaces, the front and back,

                           180

1     and the edges of the key, and that's what I did

2     my analysis on.

3  Q.  After you did the swabbing of the key, did you do

4     anything else with the key?

5  A.  Yes, I did.

6  Q.  Please explain to the jurors what you do with the

7     key.

8  A.  I took the key to see if it fit the vehicle.  So

9     I put the key into the ignition.  I still had, of

10    course, gloves on, during this entire process.  I

11    put the key into the ignition and turned the

12    ignition.  It did turn the ignition, but it did

13    not crank the car.  And I later learned that that

14    was because, I believe, the battery had been

15    disconnected.  But it did actually turn

16    completely over.  I also locked, I believe it was

17    the front driver's side door, and used the key to

18    unlock the door.

19 Q.  The buccal swab that you took of this key, did

20    you submit that to DNA testing?

21 A.  Yes, I did.

22 Q.  And were you able to develop a profile from the

23    swabbing of Item C, the key to Teresa Halbach's

24    car?

25 A.  Yes.

181

```
 1   Q.   And does this slide clearly and correctly show
 2        your findings?
 3   A.   Yes, it does.
 4   Q.   Would you explain to the jury your findings.
 5   A.   Again, we looked at the same 15 markers.  And at
 6        each one of these markers I developed a type.
 7        And that is the profile that characterizes the
 8        swabbing that I took from the key.
 9   Q.   And, again, this profile that you developed from
10        the key, is that a profile that came from a male
11        individual?
12   A.   Yes, it is.  And that's -- We have an X and a Y
13        chromosome which indicate the male individual.
14   Q.   And did you compare the profile that you
15        developed from your swabbing of this key with the
16        DNA profile that you developed from the buccal
17        swab of Steven Avery?
18   A.   Yes, I did.
19   Q.   And does this next slide correctly show your
20        findings?
21   A.   Yes, it does.
22   Q.   And, again, would you explain your findings to
23        the jury.
24   A.   The same 15 markers, these are the types at each
25        one of these markers.  And you can see at every
```

182

1    type, the type from the evidence -- or the

2    profile from the evidence sample is consistent

3    with the profile from Steven Avery.

4  Q.  And, again, Ms Culhane, the profile that you

5    developed from Item C, the key, is that what you

6    refer to as a full, complete DNA profile?

7  A.  Yes.

8  Q.  And why is that, again?

9  A.  Because we have types at each one of these

10    markers.  There are types present at each one of

11    the markers.

12  Q.  And, again, did you compare this profile with the

13    DNA profiles that you developed from all the

14    standards that were submitted in this case?

15  A.  Yes, I did.

16  Q.  In other words, did you compare the DNA profile

17    that you found on Item C with the DNA profile

18    from the buccal swab of Allen Avery?

19  A.  Yes.

20  Q.  And Brian Dassey?

21  A.  Yes.

22  Q.  And Brendan Dassey?

23  A.  Yes.

24  Q.  And Barb Janda?

25  A.  Yes.

183

```
1    Q.    And Bobby Dassey?

2    A.    Yes.

3    Q.    And Earl Avery?

4    A.    Yes.

5    Q.    And Chuck Avery?

6    A.    Yes.

7    Q.    And Delores Avery?

8    A.    Yes, I did.

9    Q.    And did the DNA profile that you developed from

10         Item C, the key, match any of those standards?

11   A.    No, it did not.

12               ATTORNEY GAHN:  At this time, I'm going to

13         ask Detective Wiegert if he can, please, retrieve

14         for me the photograph of the RAV4 -- I'm looking for

15         the photograph, I'll give you a exhibit number in

16         just one second -- Exhibit 290, 294, 291, and 292,

17         please.

18   Q.    Ms Culhane, would you find Exhibit 290.

19   A.    290?

20   Q.    290.

21   A.    No, I have 291, 292 and 294.

22   Q.    Do you have that?

23   A.    Yes, I do.

24   Q.    And I apologize for the delay here.  Is that

25         photograph depicted on the large screen here?
```

184

```
1    A.   Yes, it is.

2    Q.   Now, you previously testified that you took

3         cuttings which you identified as Item A-6 from

4         the RAV4?

5    A.   Correct.

6    Q.   Can you show the jurors where it was you took the

7         cuttings?

8    A.   In the front driver's seat, right about here.

9    Q.   And those were the cuttings of a stain that you

10        had tested for blood with the presumptive test?

11   A.   Yes.

12   Q.   And I also believe that you testified earlier

13        that you collected your Item No. A-7 from the

14        center console area of the RAV for, would you

15        point that out to where that was for the jurors.

16   A.   Right along the floor here by the console.

17   Q.   Okay.  And did you perform DNA testing on those

18        two evidentiary samples?

19   A.   Yes, I did.

20   Q.   And did you develop a DNA profile for the blood

21        stain on Item A-6?

22   A.   Yes, I did.

23   Q.   And according to your reports, does the next

24        slide correctly depict the DNA findings?

25   A.   Yes, it does.
```

185

```
 1   Q.   And, again, would you explain those to the
 2        jurors.
 3   A.   Again, these are the same 15 markers and these
 4        are the types at each one of these markers that
 5        were developed from the cutting of the stain in
 6        the driver's seat of the RAV4.
 7   Q.   And, again, is this what you consider to be a
 8        complete full DNA profile?
 9   A.   Yes.
10   Q.   And did you also compare this profile to the DNA
11        profile that you developed from the buccal swab
12        of Steven Avery?
13   A.   Yes, I did.
14   Q.   And does this slide correctly display your
15        findings?
16   A.   Yes, it does.
17   Q.   And would you explain your findings to the jury?
18   A.   Again, this is the profile developed from the
19        evidence sample.  You can tell it's from a male
20        individual.  All of the types are consistent with
21        each one of the types, at each marker, from the
22        reference standard of Steven Avery.
23   Q.   And the DNA profile that you found in Item A-6,
24        the bloodstain, did you compare that to the other
25        standards that you received at the lab?
```

186

1    A.   Yes, I did.

2    Q.   And how did this profile compare to the other

3         standards?

4    A.   It was not consistent with any of the other

5         standards that I examined.

6    Q.   It was only consistent with the DNA profile of

7         Mr. Steven Avery?

8    A.   That's correct.

9    Q.   Did you develop a DNA profile from your Item No.

10        A-7, which were the blood crusts by the center

11        console?

12   A.   Yes.

13   Q.   And does the following slide show your findings?

14   A.   Yes, it does.

15   Q.   And would you explain those to the jurors.

16   A.   Again, at each genetic marker, these are the

17        types.  At D-5, this asterisk here indicates that

18        there was a peak there, a visible peak, but it

19        was below the parameters of our system.  So that

20        would not be included in the statistical

21        interpretation of this sample -- of this profile.

22   Q.   Now, that's only not included in the statistical

23        analysis, correct?

24   A.   Correct.

25   Q.   Now, the fact that that asterisk was there, did

                        187

```
 1        not have any impact in your interpretation of

 2        this profile as it compared to Steven Avery, did

 3        it?

 4   A.   No.

 5   Q.   And did you compare this profile to Steven

 6        Avery's profile?

 7   A.   Yes, I did.

 8   Q.   And does this slide correctly show your findings?

 9   A.   Yes, it does.  And, again, you can see that the

10        profile is consistent with Steven Avery at every

11        genetic marker.

12   Q.   Do you have an opinion, to a reasonable degree of

13        scientific certainty, whether Steven Avery is the

14        source of the blood stain on Item A-6, which was

15        the stain found on the driver's passenger seat?

16   A.   Yes, I do.

17   Q.   And what is that opinion?

18   A.   That Steven Avery is the source of that profile.

19   Q.   And do you have an opinion, to a reasonable

20        degree of scientific certainty, whether Steven

21        Avery is the source of the DNA profile that you

22        found on Item A-7, the blood crusts by the center

23        console?

24   A.   Yes, I do.

25   Q.   And what is that opinion?
```

188

```
 1   A.   That Steven Avery is consistent with that
 2        profile.
 3   Q.   Do you have Exhibit 293 in front of you?
 4   A.   No, I'm sorry, I don't.
 5   Q.   I'm sorry.  Do you have that now?
 6   A.   Yes.
 7   Q.   Is that photograph the same photograph that is up
 8        on the big screen?
 9   A.   Yes, it is.
10   Q.   Now, you previously testified that you collected
11        a cutting which you identified as Item A-9 of a
12        bloodstain from the front passenger seat of
13        Teresa Halbach's RAV4.  Can you show the jurors
14        where that cutting was, once more.
15   A.   Yes, right in this area here.
16   Q.   And did you perform a DNA test on that cutting?
17   A.   Yes, I did.
18   Q.   And according to your reports, does the following
19        slide correctly display your results?
20   A.   Yes, it does.
21   Q.   Could you explain them to the jurors.
22   A.   These are the exact same markers that we looked
23        at in each sample.  And, again, there are types
24        at each one of these markers, and XY depicting a
25        male individual.
```

189

```
 1   Q.   And, again, is this what you call a complete full
 2        profile?
 3   A.   Yes, it is.
 4   Q.   And did you compare the profile that you
 5        developed from the bloodstain from the front
 6        passenger seat of Teresa Halbach's car with the
 7        DNA profile that you obtained from the buccal
 8        swab of Steven Avery?
 9   A.   Yes, I did.
10   Q.   And does this next slide show your findings?
11   A.   Yes, it does.
12   Q.   And would you explain them to the jury, too,
13        please.
14   A.   This is the profile developed from the cutting in
15        the passenger -- the front passenger seat.  And
16        this is the profile from Steven Avery's buccal
17        swab.  And you can see it's consistent at all of
18        the 15 genetic markers.
19   Q.   Do you have an opinion, to a reasonable degree of
20        scientific certainty, whether Steven Avery is the
21        source of the bloodstain that was found on Item 9
22        on the front passenger seat of Teresa Halbach's
23        RAV4?
24   A.   Yes, I do.
25   Q.   And what is that opinion?
```

190

```
 1   A.   That Steven Avery is the source of that stain,
 2        A-9.
 3   Q.   All right.  Now, you also previously testified
 4        that you collected the swab from what was Item
 5        A-10, that is the CD case that was on the front
 6        seat of Teresa Halbach's car, correct?
 7   A.   Yes.
 8   Q.   And did you develop a DNA profile from the blood
 9        stain on the CD case?
10   A.   Yes, I did.
11   Q.   And does the next slide correctly show your
12        findings?
13   A.   Yes, it does.
14   Q.   Did you compare this profile with the profile
15        that you developed from the buccal swab of Steven
16        Avery?
17   A.   Yes, I did.
18   Q.   And does this next slide correctly show your
19        findings according to your reports?
20   A.   Yes, it does.  Again, you can see all of the
21        types are exactly the same through all the
22        genetic markers.
23   Q.   And do you have an opinion, to a reasonable
24        degree of scientific certainty, whether Steven
25        Avery is the source of the blood that you found
```

191

| | | |
|---|---|---|
| 1 | | on the CD case in Teresa Halbach's SUV? |
| 2 | A. | Yes, I believe he is the source of the blood |
| 3 | | stain, Item A-10. |
| 4 | Q. | Ms Culhane, do you have Exhibit 294 in front of |
| 5 | | you? |
| 6 | A. | Yes, I do. |
| 7 | Q. | And does that photograph -- is that depicted on |
| 8 | | the large screen here? |
| 9 | A. | Yes, it is. |
| 10 | Q. | Now, you previously testified that you collected |
| 11 | | a bloodstain from the paneling of the rear |
| 12 | | passenger door.  And would you point out to the |
| 13 | | jurors, one more time, where that bloodstain was? |
| 14 | A. | This area right here. |
| 15 | Q. | Yes.  And you designated that as Crime Lab |
| 16 | | designation Item A-12; is that correct? |
| 17 | A. | Yes. |
| 18 | Q. | And did you perform DNA testing on Item A-12? |
| 19 | A. | Yes, I did. |
| 20 | Q. | And did you develop a DNA profile from the |
| 21 | | testing of that bloodstain? |
| 22 | A. | Yes, I did. |
| 23 | Q. | And does the next slide correctly show your |
| 24 | | findings? |
| 25 | A. | Yes, it does. |

192

```
1   Q.   And, again, did you compare the profile, the DNA

2        profile that you developed from the bloodstain on

3        the rear passenger door of Teresa Halbach's RAV4,

4        with the DNA profile that you obtained from the

5        buccal swab of Steven Avery?

6   A.   Yes, I did.

7   Q.   And does this slide correctly show your findings?

8   A.   Yes, it does.  And, again, you can see, at each

9        one of the markers, the types are consistent.

10  Q.   I would ask you if you have in front of you

11       Exhibit 291.

12  A.   Yes, I do.

13  Q.   And is that photograph shown on the big screen

14       now?

15  A.   Yes, it is.

16  Q.   Now, you previously testified that you collected

17       this bloodstain on the dashboard of Teresa

18       Halbach's RAV4, by the ignition switch; is that

19       correct?

20  A.   Yes.

21  Q.   And this -- you did a presumptive test for blood

22       on that stain?

23  A.   Yes, I did.

24  Q.   And did you perform DNA testing on this

25       bloodstain in Teresa Halbach's vehicle?
```

193

```
 1  A.   Yes.
 2  Q.   And did you develop a DNA profile from that
 3       bloodstain?
 4  A.   Yes, I did.
 5  Q.   And does this next slide correctly show your
 6       findings?
 7  A.   Yes, it does.
 8  Q.   And did you compare the DNA profile from that
 9       bloodstain with the DNA profile of Steven Avery?
10  A.   Yes, I did.
11  Q.   And does this next slide show your results?
12  A.   Yes, it does.
13  Q.   And, again, would you explain what those were to
14       the jury.
15  A.   This is the profile from A-8, which is the stain
16       by the ignition.  And this is the profile from
17       Steven Avery's buccal swab.  And you can see at
18       each one of the markers, the types are
19       consistent.
20  Q.   And, once again, is this what you consider a full
21       complete DNA profile?
22  A.   Yes, it is.
23  Q.   And the DNA profile that you developed from Item
24       A-8, the blood stain found near the ignition of
25       Teresa Halbach's SUV, did you compare that
```

194

```
 1        profile with the profiles that you developed from
 2        all the other standards in this case?
 3   A.   Yes, I did.
 4   Q.   And what were your results?
 5   A.   It was not consistent with any of the other
 6        standards.
 7   Q.   It was only consistent with the DNA profile of
 8        Steven Avery?
 9   A.   Correct.
10   Q.   Did you arrive at a statistical number for this
11        profile that would reflect how often, or how
12        rare, or how common, this profile would be in the
13        population?
14   A.   Yes, I did.
15   Q.   And I would ask if this slide correctly displays
16        that statistic?
17   A.   Yes, it does.
18   Q.   And could you explain to the jurors what that
19        statistic is?
20   A.   This number tells me that the probability of
21        another unrelated, random person in the
22        population, having the same profile as the
23        evidence samples that we just talked about, is 1
24        person in 4 quintillion in the Caucasian
25        population, 1 person in 898 quintillion in the
```

195