# **Exhibit 34**

_____

STATE OF WISCONSIN,

                PLAINTIFF,     JURY TRIAL
                                TRIAL – DAY 23

vs.                             Case No. 05 CF 381

STEVEN A. AVERY,

                DEFENDANT.

_____

**DATE:**   MARCH 14, 2007

**BEFORE:**  Hon. Patrick L. Willis
          Circuit Court Judge

**APPEARANCES:**  KENNETH R. KRATZ
              Special Prosecutor
              On behalf of the State of Wisconsin.

              THOMAS J. FALLON
              Special Prosecutor
              On behalf of the State of Wisconsin.

              NORMAN A. GAHN
              Special Prosecutor
              On behalf of the State of Wisconsin.

              DEAN A. STRANG
              Attorney at Law
              On behalf of the Defendant.

              JEROME F. BUTING
              Attorney at Law
              On behalf of the Defendant.

              STEVEN A. AVERY
              Defendant
              Appeared in person.

                **TRANSCRIPT OF PROCEEDINGS**

            Reported by Diane Tesheneck, RPR

                Official Court Reporter

1

1    2:25 and see how you are doing.

2                    (Recess taken.)

3                    (Jury present.)

4         THE COURT:  Mr. Buting, at this time you

5    may begin the defense closing.

6         ATTORNEY BUTING:  Thank you, Judge.  Good

7    afternoon, ladies and gentlemen.  This is the first

8    time I have actually had a chance to talk to you.  I

9    have sort of been talking at you as we walk by the

10   witnesses for 6, 5 weeks, whatever.  And I'm

11   really -- I feel honored and privileged to do so,

12   just as I am honored and privileged to defend

13   Mr. Steven Avery here, in this very, very serious

14   case.

15         Let me make one thing very clear, right

16   here at the outset.  We do not and have never

17   claimed that the police killed Teresa Halbach.

18   But in that respect they have that in common with

19   Steven Avery.  However, the person or persons who

20   did kill Teresa, knew exactly who the police

21   would really want to blame for this crime.

22         And they were aided in that respect, by

23   widespread media publicity as early as Friday

24   morning, November 4th, the very morning after the

25   day she was first reported.  Widespread publicity

                          132

1    that identified Mr. Steven Avery as one of the
2    last people known to have seen her.  And because
3    of who he is, that drew even more media attention
4    than perhaps it might other wise have.  And the
5    focus was on Mr. Avery, rather than one of the
6    other customers that she saw that day.

7         And this was the very same Steven Avery
8    who was suing the Manitowoc County and the
9    Sheriff's Department, with a lawsuit asking for a
10   whole lot of money, for the wrongful conviction
11   and all the years in prison that he spent, from a
12   1985 wrongful conviction.

13        I believe that when the Manitowoc
14   officers saw this, they very badly wanted to
15   believe that he was guilty and that this was
16   their way out.  And that from that point forward,
17   that they had this investigative bias, focused on
18   Steven Avery, that was, then, skillfully
19   exploited by the real perpetrator of this crime.

20        Now, from the very beginning, Steven
21   Avery has proclaimed his innocence in this case.
22   He told that -- everybody that had a camera,
23   anybody who talked to him, that he was not
24   guilty, and that he was being framed.  That the
25   police planted his blood.

133

1      And I want you to think for just a

2  moment how difficult a situation you would be in

3  if that had occurred to you.  How, after all of

4  this evidence comes out, and police, who better

5  than anyone else would know how to plant

6  evidence, how you would get back the presumption

7  of innocence.  How do you go about trying to get

8  the community, and ultimately a jury such as you,

9  to believe in our system of justice, to believe

10 that in America you are presumed innocent, unless

11 the State, which has the entire burden of proof,

12 can prove you guilty, beyond a reasonable doubt.

13      What would you do?  Remember, this

14 morning and five weeks ago, you promised that you

15 would do that, despite all of the pre-trial

16 publicity you may have been exposed to and may or

17 may not have retained.  You promised each of us

18 and the Court, and the Judge instructed you

19 today, that you must presume Mr. Avery innocent,

20 and that you must hold the State to the burden of

21 proof, beyond a reasonable doubt.  We will talk a

22 little bit more about that later, but I want you

23 to keep that in mind.  Because as you go through

24 this evidence, you have to apply that, because

25 that is your sworn duty.

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 5 of 85   Document 120-34

1          Now, we have offered a theory of

2    defense.  And that's what it is, it's a theory.

3    Because if someone frames you, you are obviously

4    not there to see how, exactly, it happened;

5    where, how, when, the kinds of things that

6    Mr. Kratz is going to argue we haven't presented.

7    There is no videotape showing how this was done.

8    There's no cop who, in a *Perry Mason* moment,

9    breaks down on the witness stand and says, yes, I

10   did it, I did it, you got me.  This is real life,

11   that doesn't happen.

12         You are entitled to reasonable

13   inferences, however, and we're entitled to the

14   inferences that can be drawn from circumstantial

15   evidence, just as much as they are.  And so you

16   ask yourself, what would it look like, what would

17   it look like, what would a case look like if

18   somebody was being framed.

19         And we're going to do that for a little

20   bit now.  And I think when you do, you are going

21   to see that it would look a lot like this case.

22   You would look first and you would see, well,

23   what about the lack of evidence, in areas that

24   you would expect there to be evidence.  And,

25   then, you would look at the areas where there

135

1    appears to be evidence linking the person to the
2    crime and ask yourself why does all of that
3    evidence appear suspicious or unreliable.
4              And we're going to go back and forth on
5    that a little bit, but those are the two main
6    areas I want to talk about first.  Evidence
7    that's not there, that should be.  And evidence
8    that is there that appears suspicious or
9    unexplained.  And let me turn to that first.
10             In fact, let me turn to what probably
11   is, at least on its face, the most damning piece
12   of evidence in this case, and that is, Teresa
13   Halbach's remains, found in the burn pit, outside
14   Mr. Avery's garage, trailer, whatever.
15             We'll look at the -- what the evidence
16   shows first.  We know that not all of her remains
17   have ever been found.  I believe Dr. Eisenberg
18   said only 40 percent of her skeletal remains.
19   We're not talking the rest, obviously, that you
20   would expect might be gone, but skeletal remains,
21   only 40 percent.  Not because the other 60
22   percent gets burned up.  No expert has ever came
23   into this court and said fire would consume bone
24   completely.
25             What fire does, according to these

136

1   experts, is it goes through these phases of
2   charred to ultimately calcined -- calcinated, I
3   believe the word was.  Sixty percent of it is
4   missing.  All right.  That's -- That's peculiar
5   to begin with.  But, then --

6           Well, before I move off that, there's
7   something else that's missing and that is,
8   Mr. Kratz points out, well, the jeans, we found
9   these rivets in this pair of jeans here.  But
10  they only found five of six, assuming that these
11  are the same jeans, and these are just a
12  representative example.  But what did they not
13  find, the biggest item of all, the button that
14  closes the waist.

15          They have got magnets they are using
16  through all this dirt.  They are the sifting
17  through every thing and they don't find this
18  button anywhere.  They don't find her house keys
19  anywhere, her work keys anywhere.  They find one
20  single key, which we'll certainly talk about.

21          But most importantly, all the experts
22  agree, these bones were moved.  And I have got to
23  tell you, we have been here, now, for five weeks
24  and we have still not heard any explanation from
25  this side about how that happens.

137

In fact, we haven't heard any explanation about a lot of things. We have heard manner and cause of death, but that's not really how Teresa Halbach was killed, or even where Teresa Halbach was killed.

Unfortunately, from my standpoint on this point anyway, the State gets to go last. This is called sandbagging. This is where we don't get to respond to the theory or the argument that they have been harboring all this time and haven't told you folks either. So they are going to get up here after Mr. Strang and I are done and they are going to say, hey, this is the explanation, take our word for it. And we don't -- of course, don't have a chance to respond.

Well, I'm going to trust that between the 12 of you, ultimately 12, you will be able to answer those questions that they raise. You will be able to pick apart, as well as I can, whatever theory they come up with, because we have not heard any yet.

The bones were moved. The question is, were they moved to Mr. Avery's burn pit, or were they moved from Mr. Avery's burn pit. The State

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 9 of 85   Document 120-34

1   would have you believe that the original site of

2   burning was the burn pit, behind his garage.  But

3   they have offered no explanation for why bones,

4   human bones, would be found in the Janda burn

5   barrel, some 150 feet, or whatever it is, away,

6   in the other yard.

7          And Dr. Eisenberg told you -- By the

8   way -- I can't believe I forgot this -- there's a

9   third site.  There's actually three different

10  sites where human, or possible suspected human

11  bones were found.  Clearly identified human bones

12  were found in the burn pit.  And clearly

13  undisputed human bones were found in the burn

14  barrel.

15         But there's also this mysterious quarry

16  site, a quarter mile or so away that -- You will

17  have to forgive me, but I'm not as

18  technologically savvy as Mr. Kratz, and so we're

19  going to be using the ELMO instead of a laptop.

20  But this is -- this is the map that was shown to

21  you.  This is the diagram that was created by

22  Mr. Austin, with the assistance of Dr. Eisenberg.

23         This flag down here, is the third site,

24  where pelvic bones were found, according to

25  Dr. Eisenberg.  They were sent to the FBI to do

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 10 of 85   Document 120-34

mito-typing (phonetic).  We did a stipulation
that nothing could be determined from them.  But
what she said was, all three locations where
bones were found, or possible human bones in the
case of the quarry, were all burned to the same
degree, same amount of calcination.

So there is a similarity here that
continues forward through all of them.  And, very
important, no evidence of more than one body.  I
don't even know if there are other bodies missing
in Manitowoc County, or people missing, but in
this instance, Dr. Eisenberg concluded, and
Dr. Fairgrieve agreed, no evidence of more than
one body.  So we have got these bones in three
different locations.

Now, curiously, you have never seen a
photograph of what this site looks like, or what
the bones looked like, and neither have I.  And
neither has, I assume, any of the prosecution
team because, for some curious reason, no
photographs were taken of that site.

The method of recovery in this case was
not skillfully done, as Mr. Kratz tried to argue,
by these experienced arson experts.  This
investigation needed a forensic anthropologist to

140

1    be called to that scene, before anything was

2    touched.  And Dr. Fairgrieve explained why.

3            Dr. Eisenberg admitted that by the time

4    she got the bones, she was unable to determine

5    some important information about its location,

6    how it was sited.  And not only was nobody called

7    to the scene, but no photographs.

8            Have you seen one photograph of any of

9    those bones in the burn pit, in this location,

10   before it's picked up?  One photograph?  No, you

11   see boxes of bones, tables where they are thrown

12   out.  You don't see them in their site.  And

13   Dr. Fairgrieve explained to you why that's

14   important, especially important, if you're going

15   to try and answer the question of, was that the

16   burn site.

17           Dr. Fairgrieve is probably the expert in

18   the world, or at least in this North America, on

19   the forensic identification and interpretation of

20   cremains, much more experienced than

21   Dr. Eisenberg in this area.  I don't have a

22   problem with Dr. Eisenberg; she's a fine person,

23   and a fine anthropologist.

24           But Dr. Fairgrieve has much more

25   experience in the field, dealing with cremains.

141

1    He's written a book that's coming out soon.  He's

2    worked for the Crown all of his life.  This is

3    the first case he's ever testified for the

4    defense.  So this is not some paid defense expert

5    that we have just brought in here to try and --

6    try and do a smoke screen or something.

7        This is a world renown expert.  And what

8    he says is, he's had a lot of cases, or he's been

9    called in and that very question has been

10   presented, the bones were moved, where is the

11   original site.  Was it over here, or was it where

12   the bones were found.

13       Dr. Eisenberg says, you have to listen

14   carefully to her opinion, she concluded -- First

15   of all, she could not rule out other possible

16   burn sites, but her opinion was that it was most

17   likely the original site was behind the garage.

18   And that was based on the fact that most of the

19   bones that were recovered were found in that

20   location, that she would have expected more

21   breakage, and that she found a lot of small

22   delicate type of bones in that area, and so,

23   therefore, she concludes this must be where the

24   burn took place.

25       But Dr. Fairgrieve told you, that from

142

his own case experience, real world case
experiences, he has found the tiniest bones in
the human body, the little bones in your middle
ear.  He has found those moved into the secondary
site, not at the original burn site.

And he told you something else that,
frankly, just makes common sense.  In his
experience, where the majority of the bones are
found, that's the location where the bones were
moved to.  Why?  Why does that make common sense?
Because if you're -- if for whatever reason you
are trying to disguise the original site where
the burn took place, and you are going to plant
them, or put them some place else, of course you
are going to move as many of them as you can to
the second location.  That makes common sense.
It would make perfect sense.  And it fits with
Dr. Fairgrieve's own real case experience.

The other thing Dr. Fairgrieve said is
that, had an expert been called to the scene, a
real forensic anthropologist, you can determine
things about that.  I believe he talked about a
case where he was able to tell that this was the
first, the original spot of burning, because
there was some anatomically connected bones.

143

1    Even though burned, they are close together,

2    anatomically, so you can tell that's where they

3    were burned. If you moved them, they would fall

4    apart and they would be rearranged.

5            Unfortunately, Dr. Fairgrieve, again, he

6    didn't go out on a limb. He said, I cannot tell

7    you for certain, where the original burn site is,

8    nobody can, because of the collection effort.

9            And I'm not faulting these officers,

10   there's nothing deliberate going on here. They

11   probably never encountered a case like this

12   before. And what they should have probably done

13   is just put a tarp over it. Instead, Agent

14   Sturdivant recalls -- I think it took five hours

15   before Mr. Ertl to come to the scene. And it's

16   already starting to get towards dark, 3:00, 3:30

17   or something. So they're hurriedly trying to get

18   as much as they can, working up to dark, until it

19   gets too dark, without light.

20           It's not that they deliberately

21   destroyed the evidence at the scene, but by

22   moving it without the kind of knowledge -- Well,

23   you have seen archaeologists on TV and in movies,

24   you know how they do it, how they move very

25   carefully with brushes. They want to make sure

144

that they can determine exactly where the
location of these bones are. Because, if they
are not in any kind of anatomical connection,
that tells you something.

So, Dr. Fairgrieve -- I'm sorry --
Dr. Eisenberg tells us that these bones were
found in the burn barrel. Zoom in first so you
can read the top. This is Exhibit 401. Evidence
Tag 7964, she told you was bones recovered from
one of the four Janda burn barrels that were
located.

She finds long bone shafts, metacarpal
fragments, vertebral -- vertebral fragments, and
a scapula fragment. And the helpful little
diagram here describes where you would find these
in your body. Now, obviously these are scattered
all over ones skeleton. It's not like somebody
dismembers an arm and burns that in the burn
barrel and you would expect to find only those
items. These were scattered and we'll talk about
why in just one second.

I think this was -- This is Exhibit 402,
the pelvic bones that were found in the quarry.
Now, again, possible, I'm not going to overstate
here. She was not conclusively able to determine

145

1    that they were human, but they were all burned to

2    the same degree.  And she certainly could not

3    rule it out.

4            What explanation is there for finding

5    scattered bones of Teresa Halbach in the burn

6    barrel and in the burn pit.  I'm going to propose

7    one possible theory, there could be others.  You

8    may come up with others on your own.  But I want

9    to show you, first, one of the instructions the

10    judge read you that's in your packet.

11            Focusing here on the reasonable

12    hypothesis.  If you can reconcile the evidence

13    upon any reasonable hypothesis, consistent with

14    the defendant's innocence, you should do so and

15    return a verdict of not guilty.

16            I suggest that a reasonable hypothesis

17    is that somebody else burned Teresa Halbach's

18    body elsewhere, maybe in the quarry, maybe

19    somewhere else.  And then they used that burn

20    barrel that was found on the Janda's property as

21    a container to transport the remains, as many as

22    they could scoop in, to Mr. Avery's backyard.

23            And they dump it in the burn pit, or

24    scatter it about, whichever, think that they've

25    got it all, turn it back over.  And think about

146

how heavy these burn barrels are, you are not
going to be able to lift them up and turn them
upside down as easily as you would be tipping
them over. And they inadvertently leave a few
behind. This is most likely happening in the
dark.

And the barrel gets, then, placed over
on the Janda property, along with the other three
that were there, and so there's four barrels
found. That explains why there's scattered bones
from all over, skeleton, found in the barrel.
Explains why most of them are there in
Mr. Avery's. And explains why any would be found
in the burn barrel at all.

If Mr. Avery wanted to get rid of the
bones, from his burn area, he would not put a
scattered few in someone else's burn barrel and
leave all the rest behind. That's not making
sense. It doesn't make sense. No one would do
that.

One other little interesting bit of
testimony that almost slid by me, actually, was
Mr. Dassey, Bobby Dassey's testimony. Sometimes
the truth comes out in little dribs and drabs
when people aren't expecting it. And on direct

147

examination, as Mr. Kratz, I believe it was, was
trying to lead Mr. Dassey through a number of
photographs.

He asks him about the burn barrels that
your mom has out back. And Bobby says, we have
three. And then they try to correct him, and
he's like, I thought we had three. And yet four
are found on November 5th.

Where did that fourth one come from? I
submit it was the transport item used, perhaps
picked up, used to transport the bones and then
placed over where the others would -- where the
others were.

Let me tell you something about who
another possible suspect is. It may not, but
it's a reasonable hypothesis to explain the bones
the way they are. Now, when you realize -- The
reason I'm spending some time on this, is when
you realize that this is what may have happened
here, then you realize why it's so important.

Because if that body was burned
elsewhere and then moved and dumped on
Mr. Avery's burn pit, then Steven Avery is not
guilty, plain and simple. Because no one would
burn a body somewhere else and then move the

148

1   remains and dump them in your own backyard.  No

2   one would do that.

3         Now, that's why the State has gone to

4   such trouble avoiding the fact that the bones

5   were moved, that's why you heard nothing about it

6   here.  Because it does not fit with their theory

7   that Avery is guilty.  They know that if you come

8   to believe that there is reasonable doubt about

9   whether those bones were moved to Mr. Avery's

10  backyard, then you are going to find him not

11  guilty.

12        You have to find him not guilty.  Even

13  if, in the end, you aren't completely satisfied

14  how it occurred.  Because although we offer you a

15  theory of defense, that does not mean that we

16  take on the burden of proof.  The State has the

17  burden of proof.  They have to answer the

18  questions that come to your mind, beyond a

19  reasonable doubt.

20        If someone is framed, they are not going

21  to be there.  They are not going to see how

22  exactly it is done, but this is consistent with

23  the evidence, I submit.

24        Now, let's turn from the evidence that

25  appears to be incriminating, but is suspicious.

149

Let me turn for a moment to some of the evidence
that is lacking, that you would expect to find,
if Mr. Avery was really guilty.

There was blood identified in the RAV4,
that is, Mr. Avery's. And I don't know why,
frankly, we went through this exercise in
statistics in figuring out what a billion means,
when we're not, we've never challenged that. We
don't challenge that -- whether his profile --
when they come in and they say this is his blood,
this is not his blood, or whatever, there is no
dispute on that.

The question is, how did that blood get
there. And as you think, again, what a case
would look like if someone is framed, this is
very important as well. Because in the RAV4,
they find five, ultimately six stains, I believe,
which they theorize must have come from an
actively bleeding person, which means, the person
was not wearing gloves, and yet, they find no
fingerprints.

Why, because fingerprints are very
difficult to plant. Can't say it's never been
done, but it's extremely difficult to plant
someone's fingerprints. Much easier to plant

150

someone's blood, if you can get ahold of some.
So that right there is peculiar.

Now, is it because he wiped off his
fingerprints, took the time to wipe off all his
fingerprints, but missed the blood.  Come on,
that doesn't make sense at all.  Besides, we know
that there are eight unidentified fingerprints,
at this moment, that were found on that vehicle,
including some very incriminating locations.

I went through it with Mr. Riddle.
Right on the back rear cargo door of the RAV4 --
which of course I don't have -- right where you
would expect, if somebody is opening that door to
put a body in, they are going to find your
fingerprints, if you're not wearing gloves.  And
if you're bleeding you're not wearing gloves.
You can't be.  You can't have it both ways.

I would also point out, Dr. --
Mr. Riddle, I asked him, well, you took the
fingerprint standards of Lieutenant Lenk and
Sergeant Colborn.  You know what the defense here
is.  You know what we have been accusing them of
for the last month or more.  Did they ask you to
compare these unidentified latents that were
found on Teresa Halbach's vehicle with Sergeant

151

Colborn or Lieutenant Lenk's standards, to see if
you could rule them out, or match.  The answer,
no.  Why, because they don't want you to know.

You cannot open this vehicle without
touching that latch.  And this is where he said
he found them, the fingerprints.  There, there,
and there.  Riddle also found them on the hood.
Isn't that interesting.  He says the lifting up
of the hood has been a big part of the State's
case.  No one has compared those to Lenk and
Colborn.

The other thing that's kind of curious
is that no one at the scene sees any blood in the
vehicle.  Granted it's -- part of the windows are
tinted, and it's -- but it's not dark.  This
vehicle was found at 10:30, 11:00 a.m. in the
morning, on a Saturday.

And I believe Mr. -- or Special Agent
Fassbender, I believe he was the one, that says
he came with his flashlight.  Maybe that was
Ertl.  Was looking 5 or 10 minutes inside that
vehicle and didn't see any blood.  Now, maybe you
won't see the blood on the black CD case, but if
indeed the vehicle is locked, you might want to
be looking inside to see if there's a key,

152

1    wouldn't you think.

2         You are going to be shining your

3    flashlight right there to see if maybe the key is

4    in the ignition, no one sees this rather peculiar

5    looking bloodstain that looks sort of like you

6    might get if you take a Q-tip and dab it.

7    Doesn't look consistent with the State's theory,

8    as I understand it.

9         And then you look at maybe the most

10   obvious lack of evidence.  And that is the

11   complete lack of any blood or DNA of Teresa

12   Halbach anywhere inside Mr. Avery's entire

13   trailer and you heard what the police did with

14   that trailer.  They peeled off the paneling, they

15   ripped up the carpeting.

16        You heard Mr. Ertl talk about how in one

17   instance he was familiar with, the suspect had

18   cleaned up the carpet with carpet cleaner and it

19   wasn't noticeable.  When they peeled the carpet

20   back, it had soaked through to the pad.  Well,

21   the police were at least smart enough to look for

22   that.

23        Here no blood on that pad.  No blood on

24   the carpet.  No bloody bedding.  Admittedly, you

25   could burn the bedding, sure.  You could get rid

153

1  of the bedding.  But no blood on the mattress.

2  And there's no evidence that there was any change

3  in the mattress.  And there's no evidence that

4  any mattress or box springs or any of that was

5  burned.

6       No blood spatter on the walls or the

7  ceiling.  No bloody trail of a body being carried

8  out of that bedroom into the garage or into the

9  burn pit.  Nothing on the carpet.  Nothing on the

10 back stoop, the deck, anywhere.  No scratches on

11 the headboard.  No rope fibers on the headboard.

12 Nothing that would indicate somebody restrained,

13 struggling for their life, was murdered in that

14 bedroom.

15      Why am I telling you this?  The State is

16 now saying he was -- I believe they are trying to

17 argue that she was killed in the garage, although

18 that's still not clear either.  Why do I care

19 about the bedroom, because the Judge has told you

20 that you bring your common experiences too, you

21 can rely on those common experiences.  And one of

22 the common experiences that you have all,

23 unfortunately, been exposed to, was the pre-trial

24 publicity in this case.

25      ATTORNEY KRATZ:  Judge, I'm going to

1    interpose an objection.  He is commenting on

2    pre-trial or out of court statements, whether by

3    counsel or by other witnesses.  That is absolutely

4    improper.  That is not a common experience that they

5    bring to the courtroom.

6              THE COURT:  All right.  Just a second, I'm

7    going to excuse the jury for a couple minutes.

8                   (Jury not present.)

9              THE COURT:  You may be seated.

10             ATTORNEY BUTING:  Judge, I'm actually

11   bringing this up only to show them, and my next

12   explanation would be how important it is not to leap

13   to a quick judgment and why it's so important that

14   they disregard all of that kind of information they

15   may have heard before and focus on the evidence in

16   this case.  That's where I'm going with this.

17             THE COURT:  Okay.  I wasn't sure from the

18   introduction comment if you were going to refer to

19   any information that was not introduced as evidence.

20   As I understand it, you are telling me you are not.

21             ATTORNEY BUTING:  That's correct.  That's

22   all I intend to say about it.

23             THE COURT:  Mr. Kratz.

24             ATTORNEY KRATZ:  When he starts with,

25   unfortunately, you were exposed to information, he

                         155

1    is pre-supposing, first of all, that they know that.

2              Secondly, Mr. Strang and Mr. Buting, in

3    jury selection, referred in great detail to out

4    of court statements in this particular case.

5              But, third, and most importantly, the

6    jury has already been instructed not to consider

7    anything that was outside the courtroom.  So to

8    highlight some -- something they may have heard

9    on the news, or something earlier, is absolutely

10   improper and I'm suggesting that Mr. Buting knows

11   that.

12             ATTORNEY BUTING:  I disagree.  This jury

13   was exposed to false, misleading information for

14   months.  And it's not until they came into this

15   courtroom that they heard the other side.  That's

16   the point -- this is the best example I can think of

17   on why a case has to be decided and tried in the

18   courtroom.

19             The Court's instructed them.  We talked

20   about it in voir dire.  We couldn't ignore the

21   fact that at least three of these jurors who are

22   sitting here today came in saying, I think he's

23   guilty.  They promised to put it aside, but

24   that's all I'm doing is reminding them of that.

25             THE COURT:  One of the problems, as I

156

recall, is that the jurors, and I don't have each
individual juror's answer committed to memory, but
it's my understanding that they were exposed to
pre-trial publicity in varying degrees.  For the
most part we wound up with jurors who weren't as
exposed to the publicity as some others.  But I also
agree that we do not have a jury composed completely
of people who were not exposed to any pre-trial
publicity.

I'm a little concerned that, even the
reference to publicity, for the same reasons I
expressed as one of the reasons for dismissing
the false imprisonment charge is, references to
it could possibly lead the jurors to talking
about it in deliberations and that's something
that I don't think we want.

ATTORNEY BUTING:  I agree.  And that's as
far as I was going with it.  I wasn't going to draw
any more references to it, other than to remind them
how I think this is the best example, now that they
have been through the process, to understand why it
is so important for them to only judge the case on
the facts, not speculating.

THE COURT:  All right.  I'm going to ask
you -- you can refer to speculation, but I'm going

157

1    to ask you to phrase it in some other way that
2    doesn't involve referring to pre-trial publicity, in
3    order to avoid the problems with it.
4         ATTORNEY BUTING:  That's fine.  I will just
5    finish by saying, that this case is an example of
6    why you can't leap to quick judgments and why you
7    should base your decision on the evidence in court.
8         THE COURT:  That's fine.  Anything else,
9    Mr. Kratz?
10        ATTORNEY KRATZ:  I'm not sure how to
11   un-ring that bell, Judge.
12        ATTORNEY BUTING:  Well, I wish I could
13   un-ring it too.
14        THE COURT:  Both parties have made
15   arguments about un-ringing bells.  I don't think the
16   comments that have been made thus far get us
17   significantly into that problem to require
18   corrective action.  So as long as there's not going
19   to be a reference -- any further reference to any
20   pre-trial publicity, lets bring the jurors back and
21   allow Mr. Buting to continue.
22        ATTORNEY BUTING:  Thank you.
23             (Jury present.)
24        THE COURT:  You may be seated.  Members of
25   the jury, we're hoping that our sound problems are

                              158

1   related to a bad battery, so the battery is being

2   replaced.  In a minute, we'll resume.

3          ATTORNEY BUTING:  All right.  Where were

4   we.  What I think this case is, is a good example of

5   why it is so important that people not leap to quick

6   judgments about a case, maybe decide something

7   that's based -- that's not based on the evidence you

8   hear in court.  You promised, and I'm confident you

9   all will decide this case based only on the evidence

10  you have heard in court, and this case is a good

11  example why.

12         Let's look at what else evidence -- what

13  other evidence is lacking.  Now, if the State's

14  theory is that she was shot in the garage, where

15  is her blood?  None of her blood is found in that

16  garage.

17         We have heard testimony about high

18  velocity blood spatter that comes when someone is

19  shot from a bullet.  There's none on the floor.

20  Maybe even more important, there's none on any of

21  all that -- any of that clutter that you saw.

22  When it's high velocity spatter, it can go

23  anywhere.

24         How would Mr. Avery be able to clean up

25  everything, not just on a floor, but every little

159

item. Because, remember, at least in March, they
picked up and handled every single, and examined
every piece of evidence. Every cooler, every
box, every can, every piece of junk that we all
have in our garage, they looked at. And that's
where you would expect to find spatter that no
one would be able to clean up, even if they tried
to clean up.

Now, is there evidence that he did clean
up at all? Well, his blood was found in the
garage. Why is that? If he's cleaning up, how
is it that his blood is found there. Is he able
to see a blood spot and say, oh, that's Teresa
Halbach's blood. Oh, that's mine, I can leave
mine, I will just clean up hers. Come on.

They have you believe that -- I'm
assuming he's going to get up here and say, this
is what happened because, of course, we haven't
heard it yet, that the bottle of bleach is so
incriminating. I don't know anybody who doesn't
have a bottle of a bleach somewhere in their
house. And an important part is, it was in his
house. They say it's in his bathroom, what they
didn't tell you until I got up and cross-examined
them, is that the bathroom is the laundry room.

160

1    So even there they try and mislead you into

2    thinking something means more than it does.  A

3    bottle of bleach found in ones laundry room means

4    nothing.  And it means nothing in this case.

5            And, by the way, if the theory is that

6    there's no blood of Teresa Halbach anywhere on

7    the floor of that garage, is that because he is

8    such a good cleaner, then why are there 10, 11

9    .22 shells laying all over the floor right in the

10   open.  Don't you think if they are going to go to

11   the trouble of cleaning up the blood, after you

12   kill somebody, that maybe you might pick up the

13   shells that are right out there in plain view for

14   the police to find.  Don't you think that would

15   be what you would do?

16           So those are some examples of the kind

17   of evidence, that if someone is being framed, you

18   might expect to find -- you might expect to find

19   lacking, because it doesn't fit with the reality

20   of what would have happened if the crime actually

21   occurred as the State apparently alleges.

22           We talked about one piece of

23   incriminating evidence and how that looked

24   suspicious.  Let's look at maybe the biggest,

25   most glaring suspicious piece of evidence in this

case.  The magic key, Exhibit A, in this theory
that the police planted evidence in this case.

Because if you believe that those police
officers put that key in his room, that they are
capable of planting that kind of evidence to try
and link him, then why not plant -- why couldn't
they have also planted blood.  If they go to that
extent that they -- that they plant Teresa
Halbach's key in his bedroom to try and convict
him, then that's it, it's over, case over,
because you can't rely on anything else they have
given you.

Now, let's look at this key.  First of
all, why would he bring the key in his house and
put it in his own bedroom.  Why would you do
that?  If you still got the vehicle, and you
still wanted somehow to use the key, to drive it
some place -- by the way, why would you want to
disconnect the battery, if you're still going to
use the key?  What good does the key do if the
battery is disconnected?  So that's a disconnect,
no pun intended here.

But why wouldn't you just leave the key
in the car?  Why wouldn't you hide the key under
the -- neath the car, or somewhere where you know

162

it is?  Why would you bring an incriminating item
like that into your own bedroom, especially since
you know, as of November 3rd, when Sergeant
Colborn comes to visit him, and November 4th,
when Lieutenant Lenk and Detective Remiker come
to visit him and all the television cameras are
there, that you are a person of interest, right?
You are not going to put the key in your bedroom.
Doesn't make sense.

And, then, the key is not found until
the 7th search of that trailer.  You already had
four grown men in that little trailer.  I'm
sorry, in that little bedroom they had four men,
for three hours, on Saturday night, November 5th.
And they come in here and they try to tell you
that's not really a thorough search.  Three hours
in a little bedroom with four men, is not enough
time to do a thorough search?  Who are they
trying to kid here.

And, then, it's not until November 8th,
when they have been in the bedroom, again, with
three men:  Lenk, and Colborn, and Kucharski,
it's another hour or more before they find it
then.  There's a common theme, by the way, that
we've been hearing in this case, whenever

163

1    something is mysteriously found much, much later

2    when it should have been, but earlier searches

3    didn't count, those were just cursory searches,

4    three hours cursory searches.

5         This computer rendering of the bedroom

6    is helpful just to show you how small this

7    bedroom is.  How long does it take four men to go

8    through a closet, a dresser that's over here, a

9    desk and a bookcase, or World War II record album

10   holder, whatever it is.  Seven entries.

11        Now, I submit that the reason it wasn't

12   found in the first entry is because there was a

13   watchdog along, Sergeant Tyson.  The one thing

14   that they did was, they say it's okay to use

15   these Manitowoc officers for searches because

16   we're going to have a Calumet person there with

17   them to make sure nothing goes wrong.

18        Sergeant Tyson admitted he had never

19   been in a situation before where he had been told

20   to keep an eye on those guys, your fellow cops,

21   keep an eye on them.  What are you doing putting

22   those three men into the person of interest, he's

23   a suspect in their eyes, what are you doing

24   putting three cops who have that kind of

25   potential conflict in that person's bedroom, that

164

1      you need to have another officer from another
2      agency watching over them, babysitting them.
3      That is absurd.

4              Lenk and Colborn volunteered for that
5      duty and they volunteered for a reason.  But in
6      the first search Sergeant Tyson did his job.  I
7      believe it when he says that he watched them.  He
8      looked like a watchdog.  He was watching them
9      like a hawk and he wasn't searching.  That's
10     important too.  They were doing the searching and
11     he was just doing the collecting.  So the
12     opportunity wasn't there for Lenk or Colborn to
13     plant the key.

14             And then they are in there again, very
15     briefly the next day, again, with Tyson.  Note
16     that each entry they are -- they are -- each time
17     they go in there, they were with Tyson, except
18     for November 8th and they go in with Deputy
19     Kucharski, who tried to make light of it by
20     saying that, you know, the possibility of
21     planting is about as likely as aliens coming down
22     and planting it.

23             But he had to admit, he was not told to
24     watch those officers.  He was there with Lenk and
25     Colborn.  He's told to search and that's what

he's doing, he's doing his job. And he's sitting
on the bed, after one hour. In fact, I think he
said he was getting almost done and took off his
gloves. He's sitting here, going through this
drawer.

Lieutenant Lenk is right here with his
back to him, like this, crouched down on the
floor, so he's not going see what's going on.
Lenk gets up, walks out the door, comes back in a
minute later, oh, my gosh, look at that, there's
a key. Low and behold, it's in plain view.

And so they come up with this theory,
this absolutely preposterous theory on how this
magic key, that no one ever finds before,
suddenly appears in plain view, out of this
bookcase. They find it right there, where those
slippers are. Right like that.

And how does it happen, well, they
decide, maybe they help the back of this cabinet
a little bit, but they decide that somehow this
key must be secreted in this cabinet, by Mr.
Avery, in his own bedroom, with everybody looking
at him, and that it somehow magically fell out
this -- this gap, bounces off the wall. And by
the way, we're talking about key, fob, and

166

1      plastic clip. Somehow bounces off the wall,

2      turns around the corner and lands, what is it 90

3      degrees from where it should be, where it would

4      have fallen.

5            Now, here is something else. I want you

6      to contrast what the State -- what kind of

7      evidence the State has given you. In this case,

8      we have been presented with a wooden gun rack, as

9      an Exhibit No. 196. This has really been

10     important in this case, hasn't it, this wooden

11     gun rack. It's meaningless. They have got --

12     And we have a got a photograph of it too. We

13     have the real thing and the photograph. What do

14     you need this for? Why do need this for? Why is

15     this in evidence. This is totally irrelevant.

16     They have pictures to show the guns are on the

17     wall, okay.

18           We have got a photograph of an empty

19     box. And we have got the box right here. We

20     have got a photograph of another empty box, and

21     we have got the empty box here too. What did

22     they give you on this bookcase, that, a

23     photograph. Where is the bookcase? Where is the

24     bookcase? Don't you think that's a little more

25     important in this case than that wooden gun rack.

167

1          They don't want you experimenting with

2     that bookcase and this key, because they know you

3     will see that it is incredibly improbable that

4     this key is going to find it's way out, the key,

5     the ring, the cloth fob, the plastic clip, and

6     not get hung up on anything.  It's going to

7     bounce around like they say it will.  So you ask

8     yourself why you haven't seen that, right there

9     in the property room.  Nice picture of it.

10          ATTORNEY KRATZ:  Judge, I'm going to

11     interpose an objection.  Counsel is suggesting that

12     only the State could have introduced that, instead

13     of the defense.

14          ATTORNEY BUTING:  State's burden.

15          THE COURT:  I'm over --

16          ATTORNEY KRATZ:  He's suggesting only the

17     State.

18          THE COURT:  This is closing argument, the

19     objection is overruled.

20          ATTORNEY BUTING:  While we're at it, while

21     we're talking about candor with the jury, I don't

22     know if you recall, but I do, in the opening

23     statements, these nice PowerPoint presentations that

24     Mr. Kratz has prepared, one of them he puts up there

25     in his opening statement and he shows this tailgate.

168

1       Puts up a nice PowerPoint slide showing the rear of

2       the vehicle like this.

3              And he's going through where Mr. Avery's

4       blood, DNA, was found on Teresa Halbach's

5       vehicle.  And he's got one of his nice slick

6       arrows pointing right here with a circle.  I see

7       that and I think, my gosh, I have been working on

8       this case for months, did I miss that; how could

9       I miss that the client's blood is supposedly on

10      the back tailgate.  Well, when I looked more

11      carefully, and as we heard from Sherry Culhane,

12      he was wrong.  There was no blood of Mr. Avery

13      ever found on the rear of that vehicle on the

14      tailgate.  Now, Mr. Kratz is human, we all make

15      mistakes; I have certainly made plenty here.  But

16      that's a pretty big mistake.

17             The key, also, by the way, has no blood.

18      Remember, she swabbed it and the stains were

19      clean and it only has his DNA.  And, frankly,

20      counsel misspoke when he said, it's always the

21      last person -- when you are talking about trace

22      DNA from the fingers, it's always the last person

23      that touches it that's going to be on there, not

24      what the testimony was as I recall it.  Testimony

25      was, the last person may have more of it, but you

                                169

1    are going to find a multiple, most likely, at

2    least two people.  Particularly when it's an item

3    like a key that someone handles every day and

4    deposits their own DNA on.

5            And, finally, before we take a break

6    here, the source of Mr. Avery's DNA in his house

7    is plentiful.  Toothbrushes, razors, all kind of

8    personal items in ones home, if Mr. Lenk and

9    Mr. Colborn wanted to put Mr. Avery's DNA on that

10   key, that was easily available.  It doesn't have

11   Mr. Avery's fingerprints on the key; doesn't have

12   any of Teresa Halbach's DNA on the key.

13           Keep in mind, also, when you think about

14   the evidence that's lacking and evidence that's

15   suspicious, you came into this case, and as I

16   recall seeing up there on the PowerPoint slides,

17   there were four charges, now there's three.

18   Think about that, while we take our break.  Is

19   this okay, your Honor?

20           THE COURT:  Yes.  All right.  Members of

21   the jury, we'll take a break at this time.  Again,

22   do not begin your discussions of the case until all

23   the arguments have been completed and the Court

24   submits the case to you.  You are excused.

25           (Jury not present.)

170

```
 1              THE COURT:  Counsel, can I see you briefly

 2     in chambers at the start of the break.

 3              ATTORNEY BUTING:  Sure.

 4                   (Recess taken.)

 5                   (Jury present.)

 6              THE COURT:  Members of the jury, before we

 7     resume, I can report to you that I met with counsel

 8     during the break.  I just wanted to give you some

 9     idea about where we were going from here.  But we

10     are probably going to go late today in order to

11     finish the closing arguments of the parties.  There

12     isn't going to be any time to begin deliberations

13     today.

14              After the closings are finished, we will

15     take a brief break to identify the alternate

16     jurors who will not be deliberating and then we

17     will adjourn for the day and begin deliberations

18     tomorrow morning.  We are going to take breaks,

19     probably at faster intervals than normal, to keep

20     you fresh enough to follow the closing arguments,

21     but closing arguments will be what we will

22     complete today.  Mr. Buting, you may resume.

23              ATTORNEY BUTING:  Thank you, Judge.  Before

24     I leave the magic key for a minute, I just want to

25     make sure I was clear enough that, again, this is
```

171

1  her car key, that obviously she used every single

2  day.  It was Teresa Halbach's key.

3        And I believe Ms Culhane said she

4  swabbed all the way around that whole plastic

5  holder, all the way around it.  Not just along

6  one edge of it.  And yet she found none of Teresa

7  Halbach's DNA, not a shred of it.  And found only

8  Mr. Avery's DNA, as if somehow the key had been

9  wiped clean and his DNA was placed on it.  He

10  certainly is not going to do that.  He's not

11  going to wipe off her DNA and leave his behind.

12        And as to the bookcase, why it's not

13  here, think about, again, it's their theory, that

14  this key could have found it's way magically out

15  of that bookcase and into its position.  Their

16  burden of proof in the entire case, and also

17  their theory to explain to you how this very

18  unusual key materializes out of nowhere and yet

19  it is not here.

20        All right.  Now, let's look at another

21  piece of evidence that initially appears,

22  certainly incriminating, but as you look more

23  closely, looks more and more suspicious.  And

24  that is, Mr. Avery's blood in the RAV4.

25        Keep in mind that we're talking about a

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 43 of 85   Document 120-34

1    very little amount of blood here.  Mr. Kratz

2    maybe confused you when he made it seem like

3    there was a lot.  Yeah, there's not one

4    microliter, but we're talking very small amounts

5    of blood.  As a matter of fact, the photographs

6    that were taken by Mr. Groffy, before any swabs

7    were taken, before any of the blood is wiped off.

8    This is the front seat, I can barely see

9    anything, unless that -- if that's the spot of

10   blood, right there, that's awfully small,

11   particularly when you are talking about fabric.

12        The CD case, can't even find any blood,

13   can't see any blood.  I believe Mr. Stahlke must

14   have misspoke when he said it seemed like it was

15   covered, that there was lots of blood on it.

16        The FBI guy who looked at it, the swabs,

17   we'll talk about that, Mr. -- Dr. LeBeau, later.

18   But he showed you pictures of those swabs and

19   there was hardly any blood on it.  If fact, they

20   looked gray, like fingerprint dust, or something.

21        So, really, we have this and this, which

22   Mr. Stahlke says is consistent with active

23   bleeding.  It is also consistent with active

24   planting.  So when I first saw this, I thought,

25   you know, what is the source of Mr. Avery's

173

blood.

Well, we have heard about how his -- he had blood in the bathroom. And so I looked at these pictures, these were pictures that I believe either Detective Remiker or Sergeant Colborn testified that they went around and took on Saturday night, at the apartment, before there was any kind of seizures of swabs.

The first thing you do when you go in is you take pictures and then you start collecting evidence. Well, you look at this particular swab, we'll do a close up on it. It's an awful odd looking blood drop, with a little whole in the middle, as if somebody would dab a Q-tip in it, that was my first thought.

And, then, the blood vial. And I offer that -- and we have offered that as a possible source of the blood that's found, Mr. Avery's blood that's found in the RAV4. It was in a public office, in an unsecured area; not in a vault where they keep locked up exhibits only; not down in the basement where they normally keep old files; but in that battered old cardboard box that we saw sitting in the Clerk's Office, because it was -- there were so many requests to

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 45 of 85   Document 120-34

see it, from the media and the public, that that made it more convenient.

They kept no good log back then, of people who were asking to see files, see any file, that one not withstanding. The clerk, Ms Zigmunt, later tightened that up in, I think it was October of '06, this past year. Now everybody has to sign in before they can look at any file. But back then she admitted that the deputy clerks would be more casual about it. And who would you be more casual about making someone sign in than a police officer, who you would normally trust.

So there would certainly be no reason for these clerks to take note or think that some police officer, Lieutenant Colborn, or Sergeant Colborn, I'm sorry, Lieutenant Lenk or Sergeant Colborn, would have any nefarious intent by looking at Mr. Avery's file. And that area of the file where it's kept is sort of screened off from the rest of the unit.

And probably more likely, though, is the after hours access that the deputies have. The Manitowoc Sheriff's Department is responsible for security in the courthouse so, understandably,

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 46 of 85   Document 120-34

they have master keys that fit all the doors.
And how difficult, really, would it be for
someone like Lieutenant Lenk or Sergeant Colborn,
veteran officers, to come in after hours, or on
Saturday morning, and get what they needed.  I
submit it would be not difficult at all.

Now, Mr. Kratz, I can hear him now, he's
going to get up here and say, where is the
evidence.  This is all speculation.  Where is the
evidence.  As if he would expect anybody who was
being framed to have a videotape of the officer
taking the vial of blood and planting it.

Or as if he expects one of these police
officers, in front of everybody, under oath, on
streaming video on the internet, to admit, oh,
yes, of course, I took the blood and planted it.
Yes, I would admit that if I did it.  Sure, I
would go away to federal prison probably but,
yeah, rather than lie under oath, I would rather
go to prison than admit that.

Come on.  This is real life.  It's not
TV.  You can't expect a *Perry Mason* moment where
you're going to get somebody to admit, to you
guys, and everyone else in the world, that they
did this.

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 47 of 85   Document 120-34

1          So what do we have, though.  We have
2     reasonable inferences that can be drawn and
3     circumstantial evidence, just like they do.
4          The box, you have seen the video, I'm
5     not going to go through all that again, but I
6     want to just remind you, show you the box.
7     Evidence tape is very clearly cut, opened, and
8     the box is resealed with nothing but a piece of
9     scotch tape.
10          This one may show up a little better.
11     Inside the box was the styrofoam container, and
12     it was opened by all of us together, which also
13     had -- which also had evidence tape sealing it,
14     right along here.  And on the video, you could
15     see very clearly that that was slit, as if by a
16     razor or scissors, or something sharp.  So that
17     one would easily open this sort of clam shell
18     styrofoam container, and there is the vial of
19     blood.
20          The vial of blood has a hole, what
21     appeared to be any way, a hole in the middle,
22     right there, which is where professionals would
23     gain access to the blood, if they need it.  But
24     this vial has something more, as even Dr. LeBeau
25     admitted.  This vial has blood in between the

177

rubber stopper and the glass, so that the experts
who use these things all time, could say, even
Dr. LeBeau, I believe is the one, who said this
vial, clearly the top had clearly been taken off.

So, there's evidence that the box was
unsecured and the top had been removed at some
point. And the blood is still liquid. Can't
really show you it in there, the way they have
got it incapsulated in yet another glass tube.
You can't really see it, but you did see, I
think, in the video, as it was rocked back and
forth, the blood was still liquid and, therefore,
easily available to plant. And we're only
talking about a few drops. That's all that's
necessary to leave the amount of blood that they
found in that RAV4, a few drops, that's all.

Now, Lieutenant Lenk, whose name keeps
coming up at every important part of this case,
had reason to know that that blood of Mr. Avery's
was sitting in the courthouse. Because he was
the evidence tech -- the whole head of the
evidence department for Manitowoc. And he signs,
in 2000 -- what's the date here -- 2002,
September, he signed Exhibit 214, as the
transmitting, or submitting officer to submit

1    these items to the Crime Lab.

2          Now, I'm not trying to mislead you here,

3    these items do not include the vial that we're

4    talking about.  But they clearly show that these

5    came from exhibits held by the court since the

6    end of the trial.  And yet Lieutenant Lenk would

7    have you believe, in his testimony, that he had

8    no idea that that 1985 court file had any kind of

9    exhibits like that in there.

10          The one thing they did look for

11   fingerprints on, they looked for Lenk and

12   Colborn's fingerprints on the blood vial.  No

13   surprise there.  Second nature with cops when

14   they handle anything like that, a biological

15   piece of evidence, they are going to put their

16   gloves on.  So, okay, they look there, don't find

17   any.  But, again, they're looking for something

18   that they know isn't going to be there in the

19   first place, and trying to present that as if it

20   means something.

21          So then there's the question of the

22   opportunity to plant blood.  And that's why we

23   heard all this testimony about the scene and

24   whether it was secure or not secure.  Well, keep

25   in mind that that sheriff's department, even

179

though their bosses said, within 45 minutes of
getting there, that we're turning over this
investigation to Calumet, the one item, the one
item on that 40 acre property that they knew was
important, the main piece of evidence, was that
RAV4.

And they kept their officers in control
of it for four hours. Talk about the fox
guarding the hen house here, ladies and
gentlemen. Come on. Is that just a coincidence,
or is that Lenk and Colborn having some influence
here?

How carefully was it being watched?
Mr. Kratz told you that it was being maintained
very securely and carefully. Well, we heard that
until Special Agent Fassbender arrived at 2:25,
there was no log at all of who was coming and
going, looking at this main piece of evidence
that they knew about.

They rely on two civilians, Nikole and
Pamela Sturm, to be their watch dogs, so they can
see from this crusher, distance 369 feet, I think
it was, Mr. Austin measured. And, you know, I
don't fault the Sturms. I mean, its revision is
history, for them to say that they were watching

180

1          that carefully the whole time they were there,

2          that far away, to make sure nobody, even a police

3          officer, approached.

4                    Why would they care.  Once they knew it

5          was Teresa's vehicle, you know, the sad news that

6          it was, that's where their attention would be

7          drawn.  They weren't watching this to see who

8          approached the RAV4.

9                    And there was a tarp over the RAV4, for,

10         now, we find out, for an hour apparently,

11         according to the digital signatures that we can

12         find on digital photographs.  And a tarp that's

13         built up in such a way that it's practically a

14         tent.  That's not the best picture, but from a

15         distance, this large tented over object, being

16         very careful not to have the tarp touch the

17         sides, with a nice little opening here.

18                   Now, maybe that's not when it was

19         planted, but it's certainly an opportunity.

20         Probably more likely is that it's getting dark,

21         and while the officer -- I don't believe, by the

22         way, that there was any testimony that Mr. -- or

23         Sergeant Orth was seated where Mr. Kratz said he

24         was.  But even not withstanding that, what we did

25         hear was that there's other means of ingress and

181

egress to that property.

Sergeant Orth testified that while the officers were somewhere in this area, remember this picture was taken after the vehicle had been removed, but that there's -- there's ways in and out from the west. I will show you in a moment, if I can find the overhead.

A little farther up, one can see the -- how the roads down here, we have lots of ways to get in and put that -- First of all, for someone to plant the vehicle. And, secondly, for anyone to approach it while it's there. And an even more distant shot that shows all the ways in to this plot of land.

So while maybe directly to the south of that berm it is not immediately accessible, there's all these other ways in from here, or from here. When somebody who knows the area, perhaps someone who's been a patrol sergeant for many years, knows the county like the back of his hand, is going to know how to get to that RAV4.

Then we have this whole question of whether the vehicle is locked or not. Well, the Sturms said they thought it was locked, but then when they were questioned more carefully it turns

1     out that Nikole didn't check the rear tailgate.
2     She checked it with her sleeve, the other four
3     doors, but not the rear tailgate.
4              If it was locked, by the way, who do you
5     go to when you lock your keys out.  Most of the
6     time you go to call the cops.  Who better knows
7     how to open up a car, quickly, than police?  So
8     the fact that it was or wasn't locked isn't
9     crucial in this case, in my estimation.
10             But on this evidence, it's not entirely
11    clear, when it gets to the Crime Lab, it really
12    is locked.  You will have to rely on your memory
13    for that, but I think the record is unclear,
14    frankly.
15             There is also, I want to point out, all
16    you would have to open, by the way, are two
17    doors, to put the blood where it was found.  The
18    driver's side, you can reach everything in that
19    front seat and that one rear passenger door.  So
20    you wouldn't have to have them all open and
21    sitting in the car in order to do this.
22             And then we have the interesting
23    circumstance of Lieutenant Lenk and his behavior
24    on November 5th and since then, in which he
25    testified, in a prior hearing in this case.

183

Lieutenant Lenk is the only officer, the only
witness in this case who was -- who has lied
under oath.  He gave sworn testimony one day that
he didn't get to this site until 6:30 or 7:00,
when it is getting dark, but came in front of you
today and says, again, under oath, that it was
2:00.

Well, what happened in the interim?  He
forgot about the logs.  And when you look at the
logs, he signs out, but he never signs in.
Fassbender had those logs starting at 2:25.  So
lo and behold, Lenk now appears on the scene at
2:00, to explain why he never logged in.  Because
otherwise the alternative is, he comes at 6:30 or
7:00 and evades the guard that's doing the log.
That doesn't look good either.

So ask yourself, what evidence there is,
what inferences you can draw from a witness who
gives two different versions, under oath, about a
critical point like this.  His whereabouts, by
the way, that entire day, he never writes a
report.

So, I also expect, again, because they
get to go last, I'm having to anticipate, and you
may have to answer some other questions that they

184

1  raise.  But I expect that they are going to say
2  this would have to be this complicated wide
3  ranging conspiracy in order to frame Mr. Avery.
4  Not true.  Not true at all.  This could be done
5  by two officers, really one officer, the one
6  officer who keeps coming up, Lieutenant Lenk,
7  whose name is on the evidence transmittal from
8  the 1985 case, just a couple years earlier.

9       Lieutenant Lenk, who shows up on
10  November 5th without logging in.  Lieutenant
11  Lenk, who finds the magic key.  Lieutenant Lenk,
12  who four months later, four months after
13  Manitowoc no longer is needed, with no legitimate
14  reason, is back at that scene on March 1st and
15  what's found the next day, the magic bullet,
16  which we'll talk about in a moment.

17       Actually, let's talk about it now.
18  Again, every time they try and -- Every time they
19  find something that they should have found
20  before, it was because, oh, that prior search was
21  just for a missing person.  We signed a search
22  warrant affidavit in which we said we were
23  looking for evidence of a homicide.  But, oh, we
24  were just looking for a missing person, we didn't
25  know what we were looking for.

185

1      They are in that garage on November 6th,

2      for an hour and 47 minutes, three officers.  They

3      find 10 or 11 shell casings, but they found -- if

4      they saw a bullet, don't you think they would

5      pick up that bullet?  Don't you think that might

6      be important?

7           Now, where was it found?  Right smack

8      dab in the middle, one of them.  This is the

9      March 1st photo, but No. 9, right as you walk in

10     the door, the main overhead door, it's sitting

11     right there in a crack.  Now, to you and I, that

12     may not look like much, but to an officer who's

13     looking for -- if they found .22 shell

14     cartridges, is going to be looking for a bullet,

15     that's going to be pretty obvious.  But it's not

16     found until March 1st.  And then the other, most

17     important one, is found back here, up against the

18     wall.

19          Now, one or two things had to happen,

20     either they missed it, during the first search,

21     or the scene had been altered between the first

22     search and March 1st.  And, in fact, we know

23     that's what happened.  We had the officers

24     identify, look at this, there's a different car

25     in there, there's this big engine hoist.

186

1      Mr. Avery wasn't altering it, but other people in

2      his family obviously had access, someone's car

3      was parked in there.  Things probably moved

4      around, who knows.

5           But then we have testimony from Rollie

6      Johnson, about his many gofer hunts.  He says

7      that if you go out there now, when the snow

8      melts, you will find his .22 shells all over the

9      place, including right -- most likely in that

10     garage.  His gun, his .22 and, yeah, those shell

11     casings were fired in that .22, from that .22,

12     you can tell that because of the way the pin

13     hits.

14          But, according to Mr. Johnson, his --

15     the remnants of his firings, even years from now,

16     are probably still there.  Especially if you

17     think about that, the Item FL, No. 23 that's

18     under the air compressor.  That probably hasn't

19     been moved in years.  Who knows how long that

20     bullet had been there.

21          It didn't have Teresa Halbach's DNA on

22     it, which we will talk about it in a moment.  And

23     that bullet is probably totally irrelevant to

24     this case.  Just one of many residues left over

25     from Mr. Johnson's target practices and whatnot.

187

1          I'm not sure it was entirely clear, so I

2     just want to go over with you and make sure it's

3     clear.  The shell casings, we have two bullets

4     and 11 shell casings.  The shell casings,

5     Mr. Newhouse was able to identify, came from that

6     gun, but he can't say that the bullet, the

7     ultimate bullet, FL, came from any of those shell

8     casings.  And he can't say that Mr. Avery, for

9     that matter, ever handled any of them because

10    nobody did any fingerprints of them.

11         And, then, the second bullet, the one

12    they showed you that's down in the crack, that

13    was designated as Item FK, Mr. Newhouse said he

14    could not match to the gun, the .22 caliber

15    Glenfield Marlin that was found in Mr. Avery's

16    bedroom.  He said that all he could say was that

17    it would come from a class -- gun of a similar

18    class, which I think included even a pistol that

19    we talked about, with a different brand name.

20         But we know, that on that very property,

21    the Avery 40 acre salvage yard area, there were

22    other, at least one other, maybe two, .22

23    Glenfield Marlin rifles.  In Bobby Dassey's

24    bedroom, is one of them, exactly the same model,

25    one of the most common models in the world.

188

1      So, even Mr. Newhouse couldn't say

2   whether that bullet had any connection at all to

3   this case, or to Teresa Halbach, or even to the

4   gun that was found in Mr. Avery's bedroom, Rollie

5   Johnson's gun.  He did say, however, that that

6   one item, under the air compressor, came from

7   that gun and no other.

8      And when I questioned that, how reliable

9   is that degree of science anyway.  We're talking

10   about these eyeball comparisons to these --

11   comparison microscopes.  It sounds very much like

12   the hair comparison analysis that had been

13   discredited years ago.  And I predict this

14   so-called science is the next to go.

15      But at any rate, he was very defensive

16   about his field, perhaps understandably, but when

17   he wouldn't even admit that DNA is more objective

18   than this comparison thing he does, you got to

19   wonder.  And, you also got to wonder why he

20   didn't show you the photos of the comparison of

21   the bullets, side by side, and neither did the

22   State.

23      He didn't want you to see those

24   comparison's, Mr. Newhouse, because he was afraid

25   when you looked at them you would see what I saw,

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 60 of 85   Document 120-34

1    which is there's a lot of differences between

2    those two fields of view.  And that his opinion,

3    that it came -- that they are one in the same,

4    they came from the same rifle, is questionable.

5            But, putting all that aside for a

6    second, even if he is correct, that that Item FL

7    that was fired from the .22 rifle that was

8    found -- Rollie Johnson's rifle, found in

9    Mr. Avery's bedroom, that still doesn't mean it's

10   connected to this case with any relevance.

11           Look at first, Mr. Olson, who does the

12   lead analysis from the fragments of the cranium

13   bones that he found.  He said it's 99 percent

14   lead.  Well, Mr. Newhouse, in his notes, and I

15   talked to him about this as well, he made a point

16   that this -- Remember he talked about the two

17   kind of bullets, some which are lead and some

18   which were coated.

19           And this one, I believe he said, was

20   coated with copper coating.  Both of these

21   bullets -- fragments that he found, were coated

22   with copper.  Where's the copper?  I asked

23   Newhouse, did you -- did you try and compare that

24   -- the lead, little pieces of lead that he saw in

25   those x-rays, with the type of lead that's in

190

Item FL. And he said, no, he wasn't asked to.

So without some kind of connection between Teresa Halbach and that bullet, the bullet has no relevance in this case. It's just a random fragment, that's found in an old garage, that means nothing.

And so we come to Sherry Culhane. Now, you know, one of the odd things about trying a case with this kind of publicity, where other people can watch at home, or wherever, is that you get some feedback about how you do. Some of it not so good. And some people told me maybe I was a little hard on Sherry Culhane.

And if you think that, you know, I apologize if I offended anybody with my cross-examination of her, but I ask you not to hold it against Mr. Avery. Because I have a job to do and as an advocate, I need to point out, if someone goes over the line and goes too far, you have to understand it.

Now, I don't have a problem with almost everything that Sherry Culhane did in this case, and I said so. I haven't been up here disputing her statistical calculation. I haven't disputed any of her -- the Power Points where she's lining

191

1     up the profile of one to the next.

2           And it's true that she did help

3     exonerate Mr. Avery in 2003, although she sat on

4     it for a year and he spent an extra year in

5     prison, she did exonerate him by finding an

6     exclusion and then a match to Mr. Gregory Allen.

7     And we appreciate that. And I didn't mean to not

8     appreciate that.

9           But I also pointed out, it's not like

10    she's a defense witness either. She helped

11    convict him in 1985, with this now discredited

12    science of hair comparison analysis, where she

13    rendered opinions to jurors just like yourself.

14    So most of what she did in this case was fine; in

15    fact, it was more than fine. Because it really

16    excluded Mr. Avery from -- either Teresa Halbach

17    from all these items, or Mr. Avery from the other

18    items. Really the other way around, she's

19    looking for Teresa Halbach's DNA in incriminating

20    places. And she doesn't find it.

21          So I can imagine how frustrating it

22    might be when you get a phone message that tells

23    you this, early on, try to put her in his house

24    or garage. Now, this is not blind testing, by

25    any means. These agents are telling Ms Culhane

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 63 of 85   Document 120-34

1     what they want.  And this is November 11th.

2              Well, here it is, she's working on this

3     bullet fragment now, in March.  And she still has

4     not found one item that links Teresa Halbach to

5     Mr. Avery's house or garage.  So she's got to

6     feel some pressure.  This is the biggest case of

7     her career.  The biggest case the Crime Lab has

8     ever had: 380 items, 180, I think, submitted just

9     to her unit.

10             It's almost five months late and nothing

11    has been found.  So when she gets this last

12    bullet fragment, she recognizes, I think she

13    said, it's a probative piece of evidence.  She

14    knew what it was.  And when she gets this

15    contaminated test, the pressure is on for her to

16    go way out on a limb, farther than she's ever

17    gone in her life.  Never before has she ever

18    asked to deviate from a protocol to make an

19    inclusion, until this case.

20             Now, she probably convinced herself that

21    it's okay because it's just in the control, who

22    cares.  There's no evidence that the bullet is

23    contaminated, right?  Well, we talked about that,

24    what controls are, and why they have them, and

25    how you can find contamination in controls very

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 64 of 85   Document 120-34

easily, because if a control has anything but
zero DNA, it's been contaminated.

What you can't tell is when a piece of
evidence shows up with someone's DNA, you can't
tell whether it's there because it has been
contaminated or not. And so what you do is, you
run a control. And the protocol says, if that
control is contaminated, you toss it out, and
that's the end of it. Because they know, from
their own tests, that there's cross contamination
that can occur from one evidence item to the
next. And they can never rule it out if there's
a contaminated control.

So where is Teresa Halbach's DNA coming
from? Ms Culhane says, she's theorizing and she
thinks, well, maybe -- maybe I'm talking too much
or I'm too close to the bench and that that's how
her DNA got on there. But in truth, she doesn't
know how her DNA got on there.

And what we do know is, that Teresa
Halbach's DNA was right there at her bench, right
underneath the same bench that she's working on,
is her storage area. We talked about the central
storage area for evidence. She checked it out in
November. She never put it back until mid April,

194

1          I think it was.

2                    And all that while, she's got Teresa

3          Halbach's DNA, from the RAV4, in the cargo area,

4          sitting right there on her bench.  That's a bad

5          practice right there.  But when you get a

6          contaminated control, you can't tell how and

7          whether Teresa Halbach's DNA ended up there in

8          the same extraction mechanism that she's doing or

9          not.  You just can't tell.

10                   And their own logs, their own

11         contamination logs that I introduced, talk about

12         how difficult it is.  We went through it.  I

13         won't go through it again with you.  But there

14         are instances in here where it specifically says,

15         evidence from one case has been contaminated into

16         another.

17                   And they look and they try and figure

18         out why, corrective measures.  And they can't

19         figure it out.  They can't figure it out.  So how

20         are we supposed to figure it out?  How are you

21         supposed to figure it out?  You can't.  And

22         that's why the protocol says, you toss it out and

23         you do it over.

24                   Only she had a problem, because she had

25         used it all up.  She took a chance, rather than

                              195

1    trying to swab it, to put it in this buffer and

2    dissolve it all.  And she had a one shot, one

3    chance with this DNA test.  And when it came back

4    contaminated, she was kind of stuck, you know,

5    this was probative.

6            And so she went out on that limb and

7    said, I'm asking for a deviation from the

8    protocol.  We're going to call this Teresa

9    Halbach's DNA.  And why is that so important?

10   Why -- Why do we know that it's unreliable?  What

11   else is there to tell us, maybe, that it's an

12   unreliable conclusion?  It's the only place.  All

13   these other items, it's the only thing that's

14   ever come up with Teresa Halbach's DNA.

15           You people look a little bit tired,

16   anybody want to stretch for a moment?  Would you

17   like to get up and stretch?  Is that okay, Judge?

18           THE COURT:  That's a good idea.

19           ATTORNEY BUTING:  All right.  Let me --

20   There's one other area, though, where -- that we

21   have to talk about, that Mr. Avery's DNA is found

22   on.  And that's the hood latch.  But that's the most

23   easy -- easiest to understand, really, because --

24   First of all, note that it's not found until month's

25   later, which means that it wasn't found in the first

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 67 of 85   Document 120-34

1    sweep of the car that Sherry Culhane does.

2              And who followed Sherry Culhane into

3    that vehicle, who's the next person?  The first

4    thing they do is DNA, so that no one is

5    contaminating anything.  Next one to come in is

6    Mr. Stahlke, the blood spatter guy.

7              He admits he is leaning in, he's got his

8    hands in there.  He's touching.  And I think he's

9    even -- I don't remember if he admits actually

10   touching the blood itself, but he's certainly all

11   over the area where it was, with his gloves.

12             And then someone asked him to get the

13   odometer reading.  So he turns the key and

14   there's nothing.  So he realizes maybe the

15   battery is dead.  He comes around to the hood,

16   and he said, he didn't change his gloves.  And he

17   opens the hood and, then, of course, sees the

18   battery is disconnected.  And they have to do

19   something else to get the odometer reading.

20             But that's -- that's the problem with

21   DNA, it's so easily translated -- or transferred

22   in the environment.  That's why you are supposed

23   to peal off your gloves.  And he didn't.

24             Let's move on to some of the other

25   aspects of this case that are really peculiar.

                          197

How about a complete lack of any motive for
Mr. Avery to kill Teresa Halbach.  Why would he
kill Teresa Halbach?  It's a man who's wrongly
incarcerated, spent years in prison.  Gets out,
has a good lawsuit pending; he's going to get a
whole lot of money, in all likelihood.  Why would
he kill somebody?  That makes no sense.

First thing that leaps out at you when
you heard about this charge, maybe more peculiar,
is why Teresa Halbach?  Why kill some woman that
just comes over and takes pictures of your car
four or five times?  Why her?

And just quickly, this theory that
somehow he was luring her over by using the name
B. Janda, is completely bogus, because the very
same day, one of the other customers did the same
thing.  You give the name of the owner.  Mr. -- I
may have it backyards, Mr. Schmitz, I believe,
called for -- Mr. Sippel called and left
Mr. Schmitz's name because he's the owner and he
was the one who was going to be there when the
car was looked at.

If he is really going to plan to kill
Teresa Halbach, specifically, why not just call
her on the cell phone?  Why leave a paper trail?

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 69 of 85   Document 120-34

1      Why call the office, you know, leave your
2      address, Avery Road?  I mean, hello, Avery Road,
3      doesn't take a rocket scientist to trace it back
4      to him.
5             And where was she killed?  In the
6      garage?  We still don't know, from the State's
7      theory.  But think about this, maybe he's got
8      some explanation he's going to come up with here,
9      but if she's killed in the garage and she's
10     burned in the burn pit, what's she doing in the
11     back of the RAV4?
12            He put's her into the cargo area of the
13     RAV4 so he can drive 20 feet around the other
14     side of the building to take her out and put her
15     into the burn pit?  Makes no sense at all.  It's
16     another reason to suspect that that burn pit is
17     not the original site of burning, because her
18     body was very clearly inside that rear of that
19     RAV4.
20            Why burn the phone, and the camcorder,
21     and the -- or I'm sorry, the camera, and the palm
22     pilot?  Why burn those items in your own burn
23     barrel?  You are surrounded by quarries.  You are
24     out in a rural area.  You have got 4,000 junk
25     cars.  You have crushed cars you can put it in.

199

1          Why do you burn it?  What's the point?

2     Get rid of it.  It's easy to get rid of.  Toss it

3     in one of the ponds.  Bury it.  No one is going

4     to find pieces of metal.  Especially, again, if

5     after November 3rd and 4th, it's obvious, the

6     police are looking at you.

7          Mr. Kratz says, the location of that car

8     tells us it was going to be crushed.  And think

9     what would have happened if that car -- if

10    Patricia Sturm had not found that car on Saturday

11    afternoon, that car would have been crushed and

12    we would have lost that evidence forever.

13          Well, ask yourself, why wasn't it

14    crushed, already?  You got a crusher, I mean, you

15    got a crusher on your property.  You got -- 54

16    cars are crushed there.  It's obviously used all

17    the time.  Why isn't it already crushed on

18    November 5th, especially if you know the cops are

19    looking at you?  Common sense.

20          And why try and build this complicated

21    outdoor fire to get rid of a body, when you have

22    got something like this on your property, that

23    can melt aluminum to liquid.  Big enough, easily,

24    to do the job you need, if that's what you are

25    going to do.  You would use that.  But, of

course, that doesn't fit with the State's theory,
because if you did use the smelter, you wouldn't
move the bones back on your property.

All right. Let me talk about the FBI,
Dr. LeBeau. I suggest he is not a credible
witness. And more importantly, the test, for
what it was used, for the opinions that were
given, is not credible for that.

He gets the award for the most absurd
expert opinion of anybody that's come into this
courtroom and this trial. When he says, I can
conclude to a reasonable degree of scientific
evidence, that when I test those three items, and
don't find EDTA, these other three items that I
never bothered to test, they don't have EDTA
either.

How can you ever make that kind of
conclusion? That tells you how sloppy he is with
his opinions, how willing he is to give them what
they want.

Compare his testimony to Dr. Janine
Arvizu, who was forthright, not dogmatic. She
gave Mr. -- Dr. LeBeau his due. She agreed with
him when he was right and pointed out where he
was wrong.

Case 1:19-cv-00484-BHL  Filed 03/03/20  Page 72 of 85  Document 120-34

1          She said that this protocol is fine,

2     perhaps, the test, if EDTA is, in fact, present.

3     But to then use it beyond that and say that the

4     absence of it, the absence of EDTA by doing this

5     test proves it's not there, goes too far.  It

6     even goes beyond the scope of the protocol

7     itself.

8          Because the protocol says that this

9     procedure allows for the screening and

10    confirmation of EDTA in the suspected bloodstain.

11    Doesn't say that you can then conclude, if you

12    don't get it, that's it's not there.  And the

13    reason why is -- it took Dr. Arvizu to figure

14    out, I certainly couldn't -- it's this whole idea

15    of limit of detection.

16         The test that he did, injecting

17    something right into the -- into this instrument,

18    this whatever it was, MS/MS thing, that's easy.

19    I mean, yeah, you are going to get a low -- you

20    know, you are going to be able to get a low limit

21    of detection because it's pure, put right into

22    there.

23         It's the extraction process, where you

24    are taking something out of the fabric or a swab,

25    diluting it, extracting it and going through that

1    whole process of filtering, that it becomes more

2    difficult.  Your level of detection is now much

3    higher.

4           In addition, the protocol was rushed.

5    Think about that.  Think about how this whole

6    thing came about.  The FBI has not tested for

7    EDTA in 10 years, since the O.J. Simpson case.

8    His explanation is, because no one asked.  Think

9    about that.  Why do you think no one asked?

10          First of all, we can't ask for it, as

11   the defense, the defense bar.  Only the

12   prosecution can ask for it.  What did they do in

13   that case?  They screwed it up.  They found EDTA

14   and later argued, whether they were right or

15   wrong, we will never know, later claimed, oh,

16   that was just a carryover from a different

17   sample.  Well, the jury was told that there was

18   EDTA in that case, look what happened.

19          What prosecutor is going to trust them

20   to do this same kind of test and not screw up

21   their case?  This prosecution team.  Because they

22   were desperate to try and do something to

23   discredit the defense of planting, whatever it

24   took.

25          And, so, when it normally takes three to

203

four months to develop one of these protocols,
they suddenly come up with one in two weeks. And
they are testing it and validating it and
actually doing the test samples before, as
Dr. Arvizu said, before they even got their
results of their own competency tests from this
procedure.

So why is the FBI involved in this case
at all? Again, this shows credibility, a lack of
it. They try to say, oh, we're concerned about
police misconduct. We want our public officials
to be truthful. And if there's some officer who
is planting, we want to know about it.

Well, I asked them, what investigation
did you start? Where is the grand jury? What's
the U.S. attorney doing? Is there even any
investigator on the case from the whole FBI,
that's talked to any witness? No.

All they have got is this lab that's
asked to do this new protocol and here's what
they are told. Purpose of this request is to
establish the presence of EDTA in the vial of
blood, thereby eliminating the allegation that
this vial was used to plant evidence. That's it.
It's not to find out whether these cops are

204

1      corrupt.  It's to eliminate the defense.  So are
2      we surprised at the results?  I'm certainly not.
3            The real reason the FBI got involved in
4      this case is because Mr. Avery had the audacity,
5      and, you know, this is what I'm going to hear,
6      probably, how dare he accuse these fine officers
7      and besmirch their reputations.
8            And when that happens, they circle the
9      wagons.  Cops, when they get accused of
10     misconduct, they circle the wagons.  That's the
11     code of silence, or that's the bond they have.
12     And that's why Calumet and DCI were so quick to
13     jump on the bandwagon, when Lenk and Colborn were
14     professing they did nothing wrong.  They had
15     nothing to do with this.  And Lenk and Colborn
16     probably counted on that.
17           Quickly, a couple of other peculiar
18     things about the timeline.  The -- Bobby Dassey
19     says that he sees Teresa Halbach at 2:45, he
20     leaves at three, and the vehicle is still there,
21     something like that.  He has no good way of
22     verifying the time, but he tells the officer,
23     talk to Scott Tadych -- Tadych, he can tell you
24     precisely, is the word he used, precisely what
25     time it was.

205

1          Well, how does he know that Tadych can
2     tell precisely what time it was that he
3     supposedly is being seen, unless the two of them
4     maybe got together, talked about a story they had
5     come up with.
6          Remember, those two people, unlike
7     anybody else that was asked about an alibi and
8     maybe weren't, but those two people alibied
9     themselves.  Without each other, there is no
10    alibi for either one of them.  Nobody sees Dassey
11    go hunting in the woods.  Taking a shower, by the
12    way, before he goes off hunting, like his Irish
13    Spring soap is going to help attract deer.  Come
14    on.
15         And he goes there so that -- he wants to
16    get there before dusk, because that's when the
17    deer feed.  I'm not a hunter, but we know what
18    time he left and came home.  It was well before
19    dusk, he is home at 5.  That doesn't make sense.
20         More importantly, Lisa Buchner, the
21    school bus driver, is a completely disinterested
22    party and she does have a reason to know the
23    time, precisely, because she has got a regular
24    route that she drives, 3:30 to 3:40 every day.
25    School lets out 3:05.  She's drives, drops the

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 77 of 85   Document 120-34

people off.  She's dropping those Dassey boys off
at that time.

What does she say?  She says she saw a
woman taking pictures of a van.  Now, how many
women are out there taking pictures of a van at
that same time period.  She's honest and says I
don't remember if it was Monday, the 31st,
Tuesday, the 1st, or Wednesday, November 2nd.
That's what she tells Investigator Wiegert on
November 7th, just one week afterwards now, when
it's fresh in mind.

And she's so concerned about it, she
went to the barricades on November 5th and said,
hey, I think I saw her.  I think I saw her.  I
don't remember what day but, you know.  That's
what she describes, this woman taking pictures.
The State, 16, 17 months later, is able to
confuse her, and say, well, yeah, maybe it was a
week earlier, maybe it was a couple weeks
earlier, but that's not what she said when it was
fresh in her mind.

The State will argue that the location
wasn't right.  She said she saw someone taking --
she saw her taking the pictures of something down
around the turn around circle.  And it's true,

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 78 of 85   Document 120-34

that's not where Barb Janda's car was, or this
van was.  It was up the road a ways.  Well,
either she's mistaken about that or -- and I
submit this is a very real possibility -- she is
doing a hustle shot, because she's been flagged
down on her way out and asked to take another
picture.  By who?

We know it's happened before.  We have
evidence.  Angela Schuster said, just a few weeks
earlier, Tom Janda had flagged her down and taken
a hustle shot, on the way out.

And John Leurquin, the propane driver,
yeah, he's not as certain, but he does
corroborate Lisa Buchner in that he sees this
green SUV around the same time.  He doesn't know
who's driving, and maybe it wasn't Teresa Halbach
at that point.  This person who was hustling a
shot perhaps, was driving away with.  But he
recalled it because it was different, wasn't the
usual regular vehicles that he always sees.

So when the State tells you that Bobby
Dassey is this credible witness, who's the last
person to see Teresa Halbach alive, maybe he's
right, if he's the killer.  Or Scott Tadych, his
only alibi.  He tells him --

1          ATTORNEY KRATZ:  Judge, I'm sorry, I'm
2    going to interpose an objection on third party
3    liability.  I would like to be heard.
4          ATTORNEY BUTING:  I will rephrase that.  I
5    will withdraw that.
6          ATTORNEY KRATZ:  I don't want it rephrased,
7    I want to be heard.
8          THE COURT:  I'm going to let Mr. Buting
9    finish up, then I will hear your objection.
10          ATTORNEY KRATZ:  Thank you, Judge.
11          ATTORNEY BUTING:  Police, when they
12    interview Mr. Dassey, just accept his story,
13    unquestioning -- unquestioningly.  And they accept
14    Mr. Tadych's story.  They don't go check out his
15    alibi for later, where he says he is visiting his
16    mother at the hospital.  Well, where is the proof of
17    that?
18          Why do you believe him, especially when
19    he tells you that, when he comes back, he sees
20    this fire, and then he knows what time it is
21    because he leaves around 7:45, he wants to get
22    home so he can watch *Prison Break*.  *Prison Break*,
23    at 8:00, in Wisconsin.  Did they check that out
24    to see what time it comes on?
25          Do you still want to be heard or?

209

1          THE COURT:  You can continue.

2          ATTORNEY BUTING:  All right.  I will talk

3     briefly about the other, since Mr. Kratz said that

4     these -- Mr. Fassbender and Wiegert were

5     investigating, parallel, these other suspects,

6     including the boyfriends, ex-boyfriends, whatever,

7     but look at what they did.  They admit that, yeah,

8     sure, Mr. Avery may be a suspect or a person of

9     interest because we know he was one of the people

10    who saw her on the last day.

11         But who else saw her on the last day,

12    George Zipperer, and look how he behaved.  Mr.

13    Avery says, come on in, very cooperative.

14    Zipperer is belligerent.  But we didn't know

15    that.

16         Hillegas, former boyfriend, no alibi,

17    didn't even ask him.

18         Male roommate, Mr. Bloedorn, who doesn't

19    report her missing for four days.  What's up with

20    that?  Don't ask him for an alibi.  Where was he?

21         Bradley Czech, male friend with a little

22    bit more personal relationship with her, perhaps.

23    Again, no alibis checked.

24         Mr. Pearce, an employer who never

25    bothers to report her missing, for four days.

210

All of these roles that these people play, the officers admitted would normally, in a normal missing person or homicide investigation, be considered possible suspects that you would at least look at and check out, but not here.

And what about all the other people on the Avery property on October 31st? What's up with that? Where are their alibis? Customers and other people who work and live there.

And, interestingly, going quickly back to this hustle shot for a minute, I asked, you know, you think maybe -- well, of course, if she was flagged down, there wouldn't be any record in her palm pilot.

But if it was a different kind of hustle shot that she was on her way to go do, the FBI technician, or whatever, that came here and talked about the electronics, said that he might have been able to recover that kind of data from the palm pilot, but wasn't asked to. They were concerned about him trying to prove that it was Teresa Halbach's palm pilot, not what was on it.

And, then, there's what I consider the mysterious part of Teresa Halbach's life. And I mean no disrespect to the Halbach's family,

whatsoever, when I say this.  But Teresa had her
own private life.  We know that.  She had at
least three circles of friends, I think it was
described:  Her family, people that she worked
with in the community, marketing and whatnot, and
the Green Bay friends.

     And apparently they didn't intersect
very much.  Because she's missing for four days
before anyone reports it.  And maybe most
interestingly is, we know that on Saturday night
she was out, with somebody, or she was -- I can't
say she was out with somebody, but we know that
she went out, some Halloween party somewhere,
bar, wherever, in Green Bay area is what
Mr. Hillegas, I think, said he thought, or maybe
Mike Halbach.

     And yet, despite all those fliers that
were sent around, all over the state, thousands
of them, not one person has come forward to say I
was with her Saturday night.  Something is weird
about that.  Especially when you combine it -- I
believe Mr. Pearce, I may be misquoting him, but
I believe he, at one point, had some thought that
maybe she had met somebody on the weekend and
that's where she was and why she wasn't showing

1     up.

2             But then we have the weird thing about

3     the voice mail.  Why did the police not follow up

4     on this.  We were not confused about these

5     records, but I'm glad that Mr. Zimmerman was able

6     to enlighten us, that the messages that are on

7     this exhibit, 372, 18 of them, would not

8     constitute a full mailbox.  He said that very

9     clearly.

10            And what he said was, when I asked him

11     if this -- if this persons account was sending

12     out a message when you called, that said mailbox

13     is full, would something more have to be on it

14     than what's on these records.  And he said, yes.

15     And he said that, yes, that meant something had

16     to have been erased.  Something on her voice mail

17     was erased by somebody.

18            And to do that, you would have to have

19     her password.  And I'm not at all accusing the

20     Halbachs of that.  But somebody else close, that

21     had her password, and for some reason thought it

22     necessary to erase a message.  What was so

23     important on her voice mail, or perhaps so

24     incriminating on her voice mail, that would

25     necessitate somebody, close enough to her that

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 84 of 85   Document 120-34

1    has her password, erasing one or more messages.

2              These are all reasonable doubts, ladies

3    and gentlemen.  These are all questions that

4    police and law enforcement ignored, because it

5    points away from Steven Avery, who wouldn't have

6    had her password and points to someone else.

7              Mr. Strang will finish up and give you a

8    little bigger picture in a moment, but I'm

9    confident that you are going to find more than

10   reasonable doubt and find Mr. Avery not guilty.

11   Thank you.

12             THE COURT:  All right.  Members of the

13   jury, we're going to take a break at this time.  I'm

14   going to talk to the attorneys about scheduling.

15   Again, do not discuss this matter during the break.

16   We'll call you back shortly.

17                  (Jury not present.)

18             THE COURT:  You may be seated.  First of

19   all, Mr. Kratz, I will hear your objection at this

20   time.

21             ATTORNEY KRATZ:  Thank you, Judge.  This

22   Court has entered numerous pre-trial rulings for

23   which Mr. Buting was a party.  One of those

24   pre-trial rulings prohibited any reference to a

25   possible third party, that is, a killer, other than

214