# Exhibit 35

STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                        BRANCH 1
_____

STATE OF WISCONSIN,

          PLAINTIFF,         JURY TRIAL — DAY 24
                            CLOSING ARGUMENTS, CONTD.
vs.                         Case No. 05 CF 381

STEVEN A. AVERY,

          DEFENDANT.
_____

**DATE:**    MARCH 15, 2007

**BEFORE:**   Hon. Patrick L. Willis
            Circuit Court Judge

**APPEARANCES:**   KENNETH R. KRATZ
                  Special Prosecutor
                  On behalf of the State of Wisconsin.

                  THOMAS J. FALLON
                  Special Prosecutor
                  On behalf of the State of Wisconsin.

                  NORMAN A. GAHN
                  Special Prosecutor
                  On behalf of the State of Wisconsin.

                  DEAN A. STRANG
                  Attorney at Law
                  On behalf of the Defendant.

                  JEROME F. BUTING
                  Attorney at Law
                  On behalf of the Defendant.

                  STEVEN A. AVERY
                  Defendant
                  Appeared in person.

                  **TRANSCRIPT OF PROCEEDINGS**

              Reported by Diane Tesheneck, RPR

                  Official Court Reporter

1

a question.  They are not advocating anything, as far as I could pick up.  Or as I say, sort of selling you something, overselling something. They are candid on cross-examination, just as they were on direct examination.  I thought, at least, that's what this group of people shared.

Was I surprised that we had to call the bus driver, rather than the State calling, to help you with the time frame that afternoon, yeah, I was surprised.  But we did it, since they didn't.  And now you have got that information.

But, you know, these -- these people rang true to my ear, at least.  And it's your ears that matter.

So let me move to my second question: Can you believe the police?  Can you believe the law enforcement folks who are so sure that Steven Avery's guilty?  What do you see about their behavior before they are on the stage here? Well, look at what they say and do when they don't know that you are going to be listening and seeing.

Let's start with Andy Colborn, since I sort of started with him on November 3.  He calls in, does a license check on Teresa Halbach's car.

31

He says he thinks it was probably on November 3,
not sure, but probably November 3, that he did
that.  But remember he's working on November 3,
so he would have had his radio.

     And it's Detective Remiker who says
ordinarily you would use your radio when you are
calling in a license check to dispatch.  He uses
his cell phone instead.  The tape you hear is
clearly a phone call, not a radio in.  So I think
it's probably more likely that this license check
is November 4, when Sergeant Colborn acknowledges
he was off.

     Didn't work on November 4.  And you may
remember, Mr. Kratz asked him, do you remember
what you were doing on November 4, 2005.  He
says, yes, I do.  I was off.  I remember what I
was doing.  Doesn't tell you what he was doing,
other than to deny he went to the Avery Salvage
yard, or denied he had anything to do with
planting evidence.  But he is off.

     And I'm not going to play it for you
again, it's in evidence, but -- Let's see if this
comes up.  That's -- That's what you hear on the
tape that we played.

          SERGEANT COLBORN:  Lynn.

Case 1:19-cv-00484-BHL   Filed 03/03/20   Page 4 of 36   Document 120-35

```
 1              DISPATCHER:  Hi Andy.

 2              SERGEANT COLBORN:  Can you run Sam,

 3    William, Henry, 582, see if it comes back to that

 4    da da da da da -- then they start talking over

 5    each other.  I can't make it out.  You can listen

 6    to it if you want.  Then she goes off on talking

 7    about needing a Spanish interpreter, chitty

 8    chatting while she's doing the license check.

 9              She's comes back and she confirms it's

10    Teresa Halbach's license plate, the missing

11    person.

12              Sergeant Colborn says, '99 Toyota, and

13    so on.

14              Why is he doing that?  Why is he doing

15    that?  Why is he calling in a license check on

16    November 3, or November 4, which ever day it is?

17    You can get that information from Investigator

18    Wiegert, or if you want to call your dispatcher,

19    ask your dispatcher.

20              This sounds a lot like what road patrol

21    officers do when they come across a stalled car,

22    an abandoned car, a car where it shouldn't be.

23    That's what this sounds like.  Draw your own

24    conclusions, obviously look at it like from any

25    other piece of evidence.  But what's important is
```

33

he is doing this, not on a witness stand, he is
doing this when he doesn't know anybody is going
to be seeing, or hearing, or evaluating it later.

Stay -- Move off Sergeant Colborn, but
stay in the Manitowoc County Sheriff's Department
for the moment. Mr. Kratz argued to you
yesterday that Special Agent Fassbender, starting
November 5, devoted his resources where this
thing was likely going. Where this thing was
likely going.

True, I guess he did, in the sense that
it was certainly clear pretty quickly where this
thing, this investigation, was going. In my
opening, and with Detective Remiker, we had a
chance to hear, at 11:30 in the morning, on
November 5, half an hour after the first police
officers arrived at the Avery property, there to,
you know, see the concealed Toyota that the
Sturm's had found. Half an hour later, for you
to hear, at a time when he, you know, he wouldn't
have known it, Manitowoc detective, Dennis
Jacobs, talking to his dispatcher:

Can you tell me, do we have a body or
anything yet?

DISPATCHER: I don't believe so.

34

```
 1              Very next thing he says:

 2              Do we have Steven Avery in custody,

 3      though?

 4              Yeah, it's pretty clear where this is

 5      going.  By the time Special Agent Fassbender

 6      arrives, you know, at 2:25, 3 hours later that

 7      afternoon almost, it's pretty clear where it's

 8      going.  And five minutes after this one

 9      conversation --

10              THE COURT:  Mr. Strang, I'm getting a

11      signal for a break, so we're going to take a short

12      break and then we'll resume in 10 minutes.

13                  (Jury not present.)

14              THE COURT:  You may be seated.  Let's

15      report back at 10:15.

16                  (Recess taken.)

17                  (Jury present.)

18              THE COURT:  Mr. Strang, you may resume.

19              ATTORNEY STRANG:  Thank you.

20              So five minutes later, five minutes

21      after Detective Jacobs called with the

22      dispatcher, he is on the phone with Detective

23      Remiker, or the radio, I don't remember now, but

24      you got the tape in evidence.  Of course,

25      Detective Remiker does testify, and you may
```

35

1    remember him, kind of presented himself as

2    someone who thought they were barking up the

3    wrong tree, that Steve didn't do this, when he

4    testifies.  That morning, just about an hour

5    after the Sturms have first found the Toyota.

6           Okay.  Other than the car, do we have

7    anything else?

8           Not yet.

9           Okay.  Is he in custody?

10           ATTORNEY STRANG:  It's not who are you

11    talking about, who do you mean by he.

12           Negative, nothing yet.

13           One pronoun, he, and these guys know who

14    they are talking about at 11:35 in the morning.

15    Are these folks acting in a way that seems good

16    faith and honest to you, back then?  Six days

17    after this, Special Agent Fassbender makes the

18    telephone call to Sherry Culhane at the Crime

19    Lab, try to give her some direction.  And, you

20    know, she's holding herself out as a scientist,

21    that's how she holds herself out.

22           Is Special Agent Fassbender asking for

23    science, on the exhibit that Mr. Buting showed

24    you?  Is he asking for science there, for a good

25    cautious, objective, let's see where the science

36

leads us kind of thing, when he's asking, try to
put her -- put her in his house or garage.
That's not a very good fit, in my view, with the
State's, counsel's argument here, when they
submit evidence, they are not looking for a
specific answer.  Oh, really.

The memo belies that.  The phone memo
does.  And Sherry Culhane, on the stand, herself,
tells you, that by the time these buccal swabs
are taken in November, 2005, from all kinds of
people other than Steven Avery, members of his
family, these are elimination samples.
Elimination samples.  We have already decided
they didn't do it, we're just trying to eliminate
if we find their DA -- their DNA anywhere.

Sherry Culhane, for that matter, had she
followed the protocol on her testing, the bottom
line folks, had she followed her protocol on the
testing of that bullet found in March.  She can't
say it's Teresa Halbach's DNA.  First time in her
career, 23 years, first time, on the last chance
to put Teresa Halbach in his house or garage, she
deviates from the protocol and includes Teresa
Halbach.

Now, it was just the control that was

37

1    contaminated.  It was just Sherry Culhane's DNA.

2    That doesn't turn the evidentiary sample into

3    having Teresa Halbach's DNA.  Okay.  All right.

4    Fine.  But the protocol presumably is there for a

5    reason.  Protocols are the foundation of good

6    science.  And the protocol says, if you have got

7    contamination, you set that experiment aside and

8    you do it again, you don't rely on that one.

9         Science ought to be reliable.  It ought

10   to be consistent.  And it ought to be cautious,

11   otherwise, it's not science.  And the results

12   simply aren't reliable.  That's why you have a

13   control.  And when you get contamination, you now

14   know that something has gone wrong with this.

15        And to say that the contamination is

16   over here, but not over here, is a little like

17   saying, I don't know, maybe no one even eats TV

18   dinners any more, maybe they're microwave dinners

19   now, I guess, from what I see in the grocery

20   store.  But whatever, however you heat this stuff

21   up, when you pull off the plastic, or the tin, or

22   whatever covers the meal, you know, and the

23   little peach cobbler has a fly in it, in that

24   little compartment, you don't eat the Salisbury

25   steak either, okay.  You know, this is -- this is

38

1    not fancy stuff in the end.  It's -- It is and

2    should be common sense, at some level, in the

3    end.  But she deviates, for the first time in 23

4    years.

5           The end -- This continues, the end of

6    January, 2007, bringing us up to six weeks ago.

7    Now, the State goes all the way to Virginia, to

8    Quantico, to get the FBI.  Are they trying -- Is

9    the FBI trying to root out possible police

10   corruption?  Are they concerned about the

11   integrity, of policing in northeastern Wisconsin?

12   Trying to find out if there's a bad cop or not?

13   I think the decision is already made.

14          You have this, too, Special Agent Gerald

15   Mullen of the FBI, memo to the FBI laboratory,

16   this January 30th --

17          ATTORNEY KRATZ:  Judge, I'm sorry, I don't

18   mean to interrupt.  I believe the defense is

19   entitled to one closing.  Mr. Buting covered exactly

20   the same territory yesterday.  I understood they

21   were going to split and talk about different items.

22   I simply wanted to interpose an objection.  My

23   apologies to counsel, but that was my understanding

24   from the Court.

25          ATTORNEY STRANG:  I would be more concerned

39

about boring you. Mr. Buting did cover it. It's there.

But I want to say something about EDTA that Mr. Buting did not. Janine Arvizu, who is not a doctor, Mr. Buting misspoke, she didn't complete her dissertation. She did the other Ph.D. work. I want to make sure you got out of that what she had to tell you. And it's this, the FBI protocol that they put together in a couple of weeks here, is good for identifying and confirming the presence of EDTA. It is not designed for confirming the absence of EDTA. It has to do with the detection limits. The instrument has a detection limit and the method has a detection limit.

So, look, if you were interested in finding out whether your friend is at home, and the instrument you chose was a telephone, call him at his house, ring his telephone number, if he answers the phone, you have confirmed his presence with your instrument. He is there, you have called his home, not his cell phone, he is there. He's got to be, if he's answering his phone. You have confirmed his presence.

However, if your instrument is your

40

```
 1    telephone and you call his home and it just rings
 2    and rings, and it's not answered, you have not
 3    confirmed his absence.  He could be in the
 4    shower.  He could be in the basement folding the
 5    laundry, he could be in bed sleeping.  He could
 6    be pouting and just not answering the phone
 7    because he sees it's you calling on the caller ID
 8    and he doesn't want to talk to you today.
 9    Whatever it is, you haven't confirmed his absence
10    with the telephone.  You haven't designed a
11    protocol to get you to that.
12              Your method, in other words, of
13    detection, isn't suited to confirming absence,
14    only presence.  If you like fresh baked hot apple
15    pie, and I put you in a room and I blindfold you
16    and we walk in, a fresh baked hot apple pie, your
17    nose is the instrument.  It has a detection
18    limit.
19              A dog has a better instrument, lower
20    detection limit, fancier instrument.  He can
21    detect less of the smell of apple pie than you
22    can, but you have got this instrument to use.  If
23    it's within your detection limits, and the pie
24    is, you know, slid on the table under you while
25    you are blindfolded, you will detect it with your
```

41

instrument.

However, if the method is no good, because we have got to consider that, you are not smelling an apple pie. Well, is the room too big, are the windows open, is the pie too far away, does the room smell badly of something else that's interfering with your instrument detecting the fresh baked apple pie? We have method detection problems and limits. Or is the apple pie, not fresh baked, but it's an 11 year old apple pie? You may not detect that either, with your instrument. I don't think Janine Arvizu was really telling you more than that. And, unfortunately, Dr. LeBeau was trying to tell you more than that and overselling his case.

Now, others who matter, in the law enforcement group who think Steve is guilty. Mr. Lenk and Mr. Colborn. They denied here, of course, but what are they doing, in 2002, when the evidence slip has to be signed for transmission of the hair sample and fingernail clippings, or whatever it is, to the Crime Lab, and the evidence custodian at the time, Detective Sergeant James Lenk, signs off.

Is he really, as he claims here, simply

42

signing the form, giving it to Sergeant Shallue
and allowing Sergeant Shallue to fill out the
otherwise blank form?  You are entitled to
disbelieve that.  Or at least to say he's not an
honest evidence custodian if he is doing that at
the time.  He is begging to be fired, because he
is not documenting what's going where.  Or if
he's just telling you here, to distance himself
from that file in the Clerk's Office, you are
entitled to consider that too.

Would Lieutenant Lenk lie, in the end?
Would he lie, as a sworn law enforcement officer?
Well, all I can tell you is, he did, twice, and
you heard it.  I have the transcript from the
earlier hearing.  Here he says he arrives at
2:00.  When he's asked under oath before, it's
6:30 or 7, once when he's asked, and the other
time he's asked, it's late afternoon.  This isn't
15 minutes off, folks.  It's under oath and it's
a difference of four and a half or five hours.

At that time of year, November, 2005,
it's the difference between broad daylight and
pitch black.  He was under oath, and he gave two
very different answers to the same question, at
two different times, under oath.  He was the only

43

witness, in five weeks, shown to have made
inconsistent statements, under oath.

Others made inconsistent statements and
were shown to have. Blaine Dassey comes to mind.
Scott Tadych comes to mind. Both of them are
asked, at first, by the police, was there a
bonfire, on Halloween, no, no bonfire. Later
they get asked again, now there is a bonfire. In
fact, Scott Tadych comes here and says big
bonfire, flames to the top of the roof. Same
guy, again, I showed, when first asked by the
police, no bonfire. Closer in time to October
31, no, didn't see a bonfire that night.

That's inconsistent statements, but they
are not under oath. They still, as the Judge
instructed you yesterday, are something you can
consider, consistency or inconsistency of a
witness' statements, over time. Still you can
consider those when you decide who you believe,
and not under oath.

Blaine explained that a little bit.
Explained his changes of his story. Well, the
police kept asking him. They didn't like the
answer, they asked him again. Got angry with him
and his mother, at the restaurant, when they

44

1  wouldn't reject Uncle Steve.  Is that because
2  Blaine is scared of Uncle Steve?

3          My recollection, yours will govern,
4  there's 12 of you and one of me, but my
5  recollection of that testimony is that the
6  question was whether Blaine Dassey was scared,
7  and the answer was something like, no, not
8  really, but he used to boss us around.  You will
9  decide that.

10         But in any event, Lieutenant Lenk, by
11 the time he gets to you folks, is telling you
12 some really implausible things.  Like, I had
13 never been to Steven Avery's house.  I have never
14 been on the Avery property, but somehow, just out
15 of habit, I turned right at the end of Avery
16 Road, and I -- I -- I just happened to drive
17 straight to Steven Avery's trailer.  Okay.

18         So this -- You know, what they are doing
19 and whether -- whether you think you can trust
20 them back when they are not aware they are going
21 to be observed or revealed later, is important in
22 the same way what he does, back before he knows
23 it's going to be played out to you, is important
24 in assessing who you believe.  Are they acting
25 honestly?  Is he acting like an innocent person

                        45

1   would act, or might act?

2           It is important because it comes down to

3   the bias in the end.  You know, would, in the

4   end, police officers plant evidence?  And that's

5   a hard one, you know.  That's why it's helpful to

6   say, boy, are they behaving honestly and in good

7   faith up to then.  Because in the end, would they

8   plant evidence against someone.  Now, you will

9   have to decide whether you have a reasonable

10  doubt about that, or whether, you know, we have

11  shown that to you at any level, or not.

12          But, look, it is a matter of bias, if it

13  happened.  And what you critically, I think, need

14  to understand, that if and when police officers

15  plant evidence, they are not doing it to frame an

16  innocent man.  They are doing it because they

17  believe the man guilty.  They are not doing it to

18  frame an innocent man.  They are doing it to

19  ensure the conviction of someone they have

20  decided is guilty.

21          That's why you plant evidence.  Other

22  than in the strangest, you know, most abandoned

23  of conscience sort of police officer, they aren't

24  after framing an innocent person, they are after

25  ensuring the conviction of someone they just

                         46

1    believe is guilty.

2         So as you approach the whole concept of
3    planting you have got to understand the bias that
4    would drive it, not, you know, boy, they are out
5    to get an innocent guy. It's just the opposite.
6    It's just the opposite. But it's also just as
7    corrosive to do it. Because juries decide guilt,
8    not police officers who are involved in the hunt.
9    You know, they get invested too, in the outcome,
10   and in whom they suspect, who they think is good
11   for something.

12        And, you know, the State pooh-poohs the
13   idea that a civil lawsuit, for a whole lot of
14   money, against the Manitowoc Sheriff's
15   Department, would have caused anyone to so
16   dislike Steven Avery that they would plant
17   evidence against him. Well, look what the mere
18   suggestion that they did plant evidence has done,
19   in terms of a reaction here.

20        The defensiveness of the case that the
21   State presented to you, the anger about the mere
22   suggestion of planting evidence, the
23   self-righteousness, the hostility, the trying to
24   have it both ways with you. We trusted the
25   Manitowoc people, they were skilled. They were

                          47

honest. They were the best available evidence
technicians.

But we also had somebody watching. We
were short of manpower. We needed them. But, in
the first search of Steven Avery's -- first
lengthy search of Steven Avery's house, on the
evening of November 5, we got enough people that
two of them can be taking photos. Two of them
can be taking photos, in this little trailer, as
you heard. You hear the State trying to have it
both ways, here.

And in sort of getting at the bias that
would drive a police officer, potentially, to
plant evidence, it's this -- it's this need, this
belief that he is not really innocent. He's
guilty, he's got to be guilty. It's what you
hear from Detective Jacobs and Detective Remiker,
it's that quality. It's the sense that this is
where this is going, three hours in, when all we
have got is the car, on a big property with a
whole lot of other people there.

It's the -- After five weeks of evidence
and 501 exhibits, it's the State standing up and
telling you it's clear. What in the world is
clear and simple when it takes five weeks and 501

48

exhibits to try to show.  And whatever this is,
whatever, whichever way you come out, this case
isn't clear and simple.

And that's where the civil lawsuit feeds
in.  It's not that it feeds in with bad cops.  It
feeds in with good cops, in the sense that it
erodes, fundamentally, the sense of identity, we
get the bad guys, we don't get the good guys.

And here it is, they got it wrong, that
department got it wrong.  Not only do they get it
wrong, but the right guy is still out there and
he commits another rape, Gregory Allen.  This
goes to my identity, if I wear that same uniform.
Even if I'm aligned with these people, as you
hear the sort of reaction from the prosecutors to
this.

And now, you know, since -- since he
really couldn't have been that innocent, he's got
to be guilty of this one.  He must be the right
guy this time.  So you -- you know, nobody means
to do this, but you start looking around things
that are inconvenient, that don't quite square up
with the theory that he did it.

One example, and one example only, from
the blood, Teresa Halbach's blood in her own car.

1    If it were true, as the State now says, that
2    Steven Avery shot Teresa Halbach in his own
3    garage, killed her there, and if it were true
4    that he then burned her in the area immediately
5    behind the garage, why, why is her bloody head
6    ever in the Toyota at all.  It's farther to take
7    her back to her car than it is to take her around
8    the corner of your garage, to the burn site, if
9    that's what it is.

10             So the State sort of ignore's the fact
11    that if Steve Avery had done it, and done it in
12    the way they say, her blood wouldn't be in the
13    car.  The bloody hair stain wouldn't be there.
14    It is there, of course, so it suggests that
15    somebody did have to use the car as a transport.
16    She wasn't burned there -- or wasn't killed
17    there, but that's inconvenient.  You guys have to
18    be, in the end, if you're going to do what you
19    can do here, more objective than that.

20             You can't overlook the inconvenient,
21    because it doesn't fit.  You can't overlook, for
22    example, in deciding whether Lieutenant Lenk
23    dropped the key on the floor, rather than finding
24    it honestly.

25             You can't overlook the fact that all her

                              50

physical evidence applies equally to the State as
it does to the defense.

We know that because the defense has
subpoenaed some witnesses. They have brought
some witnesses in here. They have subpoenaed
some documents, and you have seen those
subpoenaed documents in this case.

Well, don't you think, folks, that if
either Sergeant Colborn or Lieutenant Lenk had a
pimple, had a blemish on their record for
truthfulness, or for honesty, or for planting
evidence, or for doing anything that was opposed
to the oath that they took to uphold the law in
Manitowoc County, don't you think you would have
heard about that. Don't you think that those two
good lawyers, excellent, in fact, defense
attorneys, would have presented that to you.

So when Mr. Strang tells you to look at
the big picture, and when he talks about, let's
see how they acted beforehand, beforehand you
didn't hear any evidence at all about Mr. Lenk or
Mr. Colborn. That is significant. But as
significant is the facts and circumstances
surrounding this particular bedroom.

And when Mr. Kucharski, Deputy

Kucharski, talked about sitting on this bed, and
actually facing towards the door, his feet, I
think the testimony was, were facing where the
key ends up when Lieutenant Lenk exits the room
and comes back. Don't you have to kind of ask
yourself the question, how did the key get there?

If it was planted, how did that key get
there? Did Lieutenant Lenk, as he's walking
here, throw it? Did he kind of lob it over
Mr. Kucharski. Well, that's ridiculous.
Absolutely ridiculous. And although all three of
these officers, and in fact the prosecution team,
would have preferred, obviously, that the key
wouldn't have been found in this way, it was.
All right.

Cases come to you how they are. And
again, under the microscope of a case of this
magnitude, there is going to be some human
factors. And there's going to be some things
that you are going to have to wrestle with. And
this is one of those things. I'm not going to
short change you on that particular case.

And you may take a long time in deciding
whether or not that key is significant, or
whether the key is not significant. But let me

ask you, just kind of for the sake of talking, as
Mr. Strang wanted to talk with you rather than at
you, I certainly have a style that I would prefer
that as well. Let's assume they never found the
key. Let's assume this key isn't part of this
case at all.

Let's assume Mr. Strang's theory is
correct, that these cops aren't trying to plant
an innocent person, but trying to make sure that
a guilty person is found guilty. Well, can't you
then, with that argument, set the key aside? Do
you have the ability, as a jury, to set that key
aside, if in fact it doesn't matter whether or
not Mr. Avery is guilty or not guilty in this
analysis? Can you set that aside and decide is
there enough other evidence, or is the key the
only thing that points to Mr. Avery?

Well, if this was a CSI case, one of
those cases on TV where sometimes that key, or
sometimes one little piece of evidence like that
may decide the guilt or innocence, it would make
a difference. But that key, in the big picture,
in the big scheme of things here, means very
little. All right.

Now, I'm telling you that not because I

64

don't want you to consider it, not because I
think that it's not important, or not because the
credibility of these officers is in question to
the State at all.  What I am suggesting, though,
is that if you buy Mr. Strang's argument, if you
buy Mr. Strang's argument that they were trying
to make sure that a guilty person was found
guilty, then assigning accountability to the
murder for Teresa Halbach, shouldn't matter
whether or not that key was planted.

In other words, it shouldn't matter to
the Halbach family.  You shouldn't be punishing
the police officers, in other words, the other
officers that were involved in this
investigation, if you come to that conclusion.
You are not going to.  You are not going to come
to that conclusion because you have heard nothing
about these police officers that they would do
such a thing.  But my suggestion is simply not to
focus all your attention.

In the law, that's called searching for
doubt.  The Judge has told you, and may even tell
you again in your closing instruction, that you
are to search for the truth, you are not to
search for doubt.  In other words, you don't go

65

one is that the defendant killed her and burned
it, and the other one, I guess, the defense wants
you to just come up with on your own.

That brings me to the conclusion, or the
last question, and that's, did the cops kill
Teresa Halbach. Again, the defense says no. But
if the cops had her blood, if the cops had her
bones, and before the 5th, if the cops knew she
was dead, let me say that again, if before the
5th the cops knew that Teresa Halbach was dead,
they were either told that by the real killer, or
they killed Teresa Halbach.

You have got to be willing to accept one
of those scenarios. And I don't think you can.
And I don't think you should. And I don't think
that the evidence points to that at all.

Mr. Strang, in his opening statement,
promised you what the defense was going to be.
Mr. Strang told you that it's no surprise that
the blood from an unsecured vial in the box in
the Clerk's Office, that Lieutenant Lenk examined
in 2002, ends up in the Toyota. At the start of
the case, that was what the defense was. That's
what the defense theory was. That's what the
defense said their theory of defense and what the

110

1    evidence was going to show in this case.

2            Vial planting, though, causes some

3    risks, risks to, what I'm characterizing as risks

4    to the defense.  Because when you announce that

5    defense, the State gets to meet that defense.  We

6    get an opportunity to tell you, the jury, through

7    witnesses, whether or not that's plausible,

8    whether or not that could happen, or whether or

9    not that's implausible.

10           And there's two ways to do that.  First,

11   is the common sense way to do that.  The vial

12   planting defense for Mr. Avery, and for the

13   defense team, is that either Mr. Lenk or

14   Mr. Colborn got through this door.  All right.

15   They got through a door that they didn't have a

16   key to, and they got through a door that they

17   didn't have the code to.  That's the first part

18   of this.

19           The next thing that they are asking you

20   to buy is that they knew that there was a file

21   someplace in the Clerk of Court's Office,

22   sometime between the 3rd and the 5th of November.

23   Now, why do I say the 3rd and the 5th, because

24   the 3rd is when Teresa is reported missing,

25   doesn't pay to plant evidence and to steal a vial

                        111

of blood before we know that it's going to do any
good.  And the 5th is when Pam Sturm finds her.
So between the 3rd and the 5th they have to know
that this box actually exists.

They also need you to buy that they know
that there is a box within the box.  That there
is a vial of blood inside of that particular box
in the Clerk's Office.  They need you to
believe -- They need you to believe that they get
through a door they have no key, that they have
no code, they find a box that they don't know the
existence of, they find the vial that they don't
know the existence of, and then they are able to
get their hands on that vial of blood.

They also need you to believe that
nobody sees them do this, that they are able to
do that undetected, to secret it, again, to
remove it from the Clerk of Court's Office in
Manitowoc, to plant the blood, assuming they know
how to do that, in six different places.

I'm stopping right here, because I need
to.  Because for the defense version to hold any
water at all, the van -- excuse me -- the SUV
can't be found yet.  They have to plant the blood
before it's found.  Again, there's only two ways

112

that they can do that. Either they kill this 25
year old girl, or they found her murdered
somewhere else.

And if they found her murdered somewhere
else, then weren't they taking quite a chance,
weren't Mr. Lenk and Colborn, if you admit or buy
what it is that these two gentlemen are selling,
wouldn't you have to agree that they took a
chance that this very 25 year old photographer
was also last seen alive by that man.

My God, they got lucky, didn't they. To
go and find the vial of blood, even assuming they
knew where it was, that the dead woman that they
had in their possession, theoretically, was also
the last person to have seen Mr. Avery. It
doesn't make sense. All right.

That's the common sense way to deal with
the vial of blood planting. By the way, because
the vial of blood is still in the Clerk's Office,
you have to reverse this process. You have got
to get the blood back after we do the planting.
We have to get through, again, the door that we
have no key to, and we have no code to, and into
the box, and get this thing secreted back in
there, undetected, with nobody seeing.

113

That's not reasonable.  That's not a
reasonable doubt.  Reasonable doubts are for
innocent people.  Reasonable doubts are things
that juries adopt when all the evidence points to
that.  And this planting, this vial planting
defense, even from a common sense standpoint, is
absolutely ludicrous.

But what we were able to do, what you
heard, is scientifically exclude that vial of
blood.  You heard from Dr. LeBeau, who testified
that this blood is loaded with EDTA and this
blood, and this blood, and this blood, have no
detectable levels of EDTA.  And so instead of
calling all of the people with keys and with
codes, and people in the Clerk's Office, and who
might have seen Lieutenant Lenk or Colborn, or
all those kinds of things, instead of doing it
that way, we only had to call one witness, who
scientifically could tell you that there is
absolutely no way that that vial of blood was
used to plant.

In fact, that very question was asked of
Dr. LeBeau, the head of the toxicology section,
or the unit at the FBI.  And he said, by a
reasonable degree of scientific certainty, this

114

vial of blood is excluded, that means it's not
it, it's excluded as the source of those three
bloodstains.

Now, why is that important. Lieutenant
Lenk and Sergeant Colborn, as I mentioned
earlier, are good, decent, honest cops, sworn to
uphold the law. Kinds of officers Manitowoc
citizens should be proud to have on your police
force. They are the kinds of guys that you want
investigating cases for you, for Manitowoc
County. And again, they are not just some cops,
they are your cops, that's why a Manitowoc jury
decides this case.

This isn't just two guys, it's Jim Lenk
and it's Andy Colborn. And when you accuse
police officers of official misconduct, that's
serious business. Mr. Strang correctly predicted
that there would be some anger about this issue,
coming from the prosecution side, and there is.

Let me tell you why. Their livelihood,
their reputations, their families, everything in
their 20 plus years of law enforcement are on the
line, when some lawyer accuses them of
misconduct. Not just any misconduct, but
planting evidence in a murder case. All right.

1     Serious, serious business.

2              And as a representative of the State, as

3     the prosecutor in this case, I'm here to tell you

4     folks, that if you are going to allege that some

5     Manitowoc cop is crooked, that some Manitowoc cop

6     committed a crime, you better have something to

7     back it up.  And when you don't, and when there

8     is a witness from the FBI who says that didn't

9     happen, and when common sense said, that didn't

10    happen, these men are owed an apology.  Their

11    good name, their reputations, need to be restored

12    to them.

13             And Mr. Strang talked about what a

14    guilty verdict, or a not guilty verdict, may do

15    in this case.  A guilty verdict is most

16    importantly attributed to whether or not

17    Mr. Avery committed these horrific acts in these

18    cases.  But also the issue of official or police

19    misconduct should be something that angers you,

20    just as its angers me.

21             Mr. Buting said that he might have been

22    a little rough on Ms Culhane, that he owed her an

23    apology.  I'm hoping that the comments that have

24    been directed towards Jim Lenk and towards Andy

25    Colborn, at the conclusion of this case, are also

116

met with an apology.

　　　　But what I heard yesterday, what I heard
yesterday, from Mr. Buting, when he suggested
that perhaps it was Teresa's lifestyle that
contributed to her homicide, I'm paraphrasing,
but he said, because she was at some party, what
do we know about this party that she was at on
Saturday, or what do we know about some phone
calls that she had gotten, or what do we know
about her living arrangements.

　　　　Do you blame a 25 year old homicide
victim?  And when you suggest that that victim
had some responsibility, or something to do with
her own demise, you need to be held accountable
for that.  You need to be taken to task for that.
And, again, as the prosecutor, I'm expressing my
indignance about that.

　　　　Any suggestion that these good people of
the Halbach family have to endure in listening to
Mr. Buting stand before you and say, what about
this woman's lifestyle, or what about this party,
or what about who she's living with, is
absolutely out of bounds, absolutely improper,
has no place in this case.

　　　　What does have a place in this case is

the facts.  And now I have come full circle.  And

at the conclusion of this, my final argument

before you, the jurors, you have seen, and should

see by now, the stark difference between the

State's facts, between our reliance on the facts,

and the defense necessarily relying upon

speculation.

Physical evidence, the DNA evidence, the

eyewitness testimony, the scientific evidence,

the big fire that Mr. Avery had, common sense all

point to one person and there's a reason for

that.  As the jury in this case, you have a duty.

You have a duty to return what's called a true

verdict.  You have a duty to search for the

truth.

I agree with Mr. Strang that you do have

a duty in this case, but I disagree when Mr.

Strang tells you that your finding of guilt in

this case is not going to solve the crime.  It

is.  It's going to solve the crime.

And I'm here to tell you, also, as the

prosecutor, and collectively, the three of us

prosecutors, with lots and lots of years of

experience, are also going to tell you that it

will provide closure.  It will provide closure

118

1    for the Halbach family, at least in the legal

2    sense.  And it's in the sense for what you are

3    charged to do, and that is to assign

4    responsibility.  It's to assign accountability

5    for the death of Teresa Halbach.

6         I don't believe it is a difficult

7    decision.  It's a complex series of facts.  And

8    it is a very, very serious case.  But it's not a

9    difficult case.  It's not a difficult decision

10   that you have to make, because everything in this

11   case pointed towards one person, towards one

12   defendant.

13        I'm thanking you, at the conclusion of

14   this case, on behalf of the State of Wisconsin.

15   And urging you, urging you, to follow the Court's

16   instructions, to follow the evidence in the case,

17   and return verdicts of guilty.  Thank you.  Thank

18   you, Judge.

19        THE COURT:  Now, members of the jury, the

20   duties of counsel and the Court have been performed.

21   The case has been argued by counsel.  The Court has

22   instructed you regarding the rules of law which

23   should govern you in your deliberations.  The time

24   has now come when the great burden of reaching a

25   just, fair, and conscientious decision of this case

119