IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

ANDREW L. COLBORN,

                Plaintiff

NETFLIX, INC.,                                            Case No. 19-CV-484
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

                Defendants.

## DECLARATION OF TIMOTHY CORRIGAN, Ph. D.

I, Timothy Corrigan, declare under penalty of perjury as follows:

1. I, Timothy Corrigan, am a Professor Emeritus of English and Cinema Studies at the University of Pennsylvania.

2. My curriculum vitae is attached as exhibit 1. As my curriculum vitae indicates, I hold a Ph. D. from Emory University in British Romanticism and Literary Theory and did a post doctorate at University of Paris III/ Paris Center for Critical Studies.

3. I have been teaching Documentary Film at the University level for 40 years. I have written books, book chapters, scholarly articles and presented lectures on documentary film making around the world. My book, *The Essay Film: From Montaigne, After Marker* and *Writing about Film* is exclusively about contemporary documentary film. *Writing about Film*, *The Film Experience*, and *Critical Visions in Film Theory* all include a substantial section on documentary film that I authored.

4. Attached as exhibit 2 is a book chapter I authored titled "Documentary Films, Representing the Real". This Chapter appears in *The Film Experience*. NY: Bedford/St. Martin's and Palgrave Macmillan, 2004. Co-authored with Patricia White. 547 pages. 2nd Ed., 2009. 583 pages. 3rd Ed., 2012. 4th Ed., 2015. 5th Ed., 2018. 6th Ed., 2020.

5. Attached as exhibit 3 is a glossary of film terms I prepared.

6. I was retained by Plaintiff's counsel in this case to examine film techniques used in *Making a Murderer* to analyze the documentary, particularly with respect to audio and visual effects and editing techniques.

7. I reviewed different episodes of the Netflix series *Making a Murderer 1 (MAM)*, most carefully episodes 2 (ECF # 120-2 17:18-24:00) and 5 (ECF # 120-5 53:00-57:00), to examine how the series represents Manitowoc County police sergeant Andrew Colborn, particularly as part of his testimony in the depositions taken in Steven Avery's civil case and his trial testimony in the criminal trial for the murder of Teresa Halbach.

8. The first sequence examines Colborn's phone conversation about a prisoner in another Wisconsin county who confessed to the rape of the woman for which Avery had already been serving ten years of what would become an eighteen-year prison sentence.

9. The second describes Colborn's conversation with a police dispatcher about the license plates on Halbach's missing car. While these key sequences in his testimony appear to present an objective or transparent record of Colborn's testimony, both in fact edit and shape his responses (most especially in episode 5), through certain cinematic techniques and styles, to create the impression of an individual guilty of some wrongdoing and cornered by unrevealed facts or truths.

10. This does not mean Colborn's responses and movements did not occur, but rather that the cinematography (such as the camera distance and angles), the editing (including reduction or alteration of responses), and sound (involving the use of music and silences) prejudice and shape the understanding and interpretation of Colborn's testimony in a way that tends to read his testimony as self-incriminating.

11. The cinematography and editing often employ a fairly standard documentary technique but one that here clearly disadvantages Colborn. In episode 2, a comparison of the video deposition of Andrew Colborn from October 13, 2005, known in the film industry as a rough cut (which refers to the video footage before it has been edited into a final cut for audience viewing), with the final cut in the Netflix series is particularly revealing.

12. On MAM 1, Avery's defense attorney, Stephen Glynn, is depicted in brightly lit and colored close ups before a background of legal books (ECF # 120-2 Episode 2 17:18-17:33, 17:44 -17:58, 20:00 – 20:13, 20:48 – 21:07, 21:13 -21:34), while Colborn appears in darkly shaded images in a courtroom (ECF # 120-2 Episode 2 17:34 – 17:44, 18:28 – 19:06, 19:41 – 20:00). A graphic timeline of 1995 to 2003 adds an almost scientific or mathematical validity to the sequence (ECF # 120-2 Episode 2 19:23 – 19:41, 20:14 - 20:38) and a triptych insert of the three police officers (ECF # 120-2 Episode 2 21:08-20:13), followed by a tracking shot onto anonymous prison doors (ECF # 120-2 Episode 2 21:35 – 21:48), visually aligns the three officers as potentially conspiratorial partners in the imprisonment of the faceless victim Avery.

13. Intercutting Glynn with shots of Colborn's testimony is a conventional documentary technique since the 1930s, known as expositional documentary style (ECF # 120-2 Episode 2 17:37-17:43, 19:48-20:00). In these practices, commentary and explanation counterpoint the presentation of the documentary images. Traditionally that commentary has been referred to as "the voice of God" since it provides an authoritative interpretation to images or actions that might otherwise appear ambiguous.

14. In this key sequence of *Making a Murderer*, the dominant image of Glynn and his commentary on Colborn's testimony clearly puts into play that traditional authority to the extent that the literally interprets what Colborn is saying in a way that far exceeds what Colborn is actually saying. Often it simply ignores the actual testimony (ECF # 120-2 Episode 2 17:18 - 21:40). According to Glynn, who identifies Colborn as the source of the problem, "there should be a record of [the phone call clearing Avery of the crime]. But there isn't any record of it. . . ." He continues that "only in 2003 does Colborn decide to contact his superior officer. . . . . Why does it happen then and not eight years earlier. I think I know pretty clearly. I think I know the answer. They screwed up big time." (ECF # 120-2 Episode 2 20:50 -21:08).

15. Throughout Glynn's claims, it is significant that Glynn underlines his comprehensive authority with the word "they," thus making Colborn, Lenk, and Peterson all equally guilty of a shared conspiracy. In fact, the video deposition from October 13, 2005, Colborn describes in detail his lack of involvement with the Avery case since 1994-95, being out of the country when the crime first occurred (Colborn Video Depo Decl. of GB, Ex. A 4:18:00 – 4:18:30). He also explains in detail how he in fact transferred the original telephone call to his superiors, "as was protocol." (Colborn Video Depo Decl. of GB, Ex. A 4:19:47 – 4:20:50). Directly contradicting Glynn's claims in the Netflix series, Colborn also says explicitly that he later reported his concerns to Lenk and Peterson in 2003, as well as providing a written statement of the call received in 1995. (Colborn Video Depo Decl. of GB, Ex. A 4:21:00 – 4:23:37). That testimony is largely ignored or distorted in Glynn's dramatic description of a "clear" conspiracy.

16. In episode 5 a medium long shot shows Avery's attorney standing at a table with a laptop computer referencing a conversation between a police dispatcher and Colborn, while Colborn appears in close-ups or extreme close-ups (ECF # 120-5 Episode 5 53:22 – 56:55). Here the editing contrasts the visual dominance and authority of the attorney and his assistant in the medium long shot with what seems like, especially as the long take of the interrogation uncomfortably continues through the voice-over of the recording, Colborn's seeming unease and confusion in the tight close ups.

17. The editing in both sequences reinforces this dynamic through shot/counter shot exchanges and eye-line matches. While fiction films commonly use this kind of exchange to describe, for example, the visual dialogue between two people where the back-and forth meeting of their eyes parallels the harmony of their conversation, here Colborn's eyes are regularly turned down or nervously shift from the direct and accusatory eye line of the attorney, notably when in episode 5 Colborn claims to not

clearly remember details from actions and conversations that happened many years ago. More generally, this editing contributes significantly to the body language which is central to any film or video representation: Colborn's is a constricted figure, unmoving and tense, contrasting the attorney's relaxed and open gestures before a gallery of individuals.

18. It is noteworthy that the video deposition of Colborn's testimony paints a very different picture of these visual dynamics. In the video deposition, referenced in episode 2, Colborn appears confident and relaxed: he makes regular eye contact with the examining attorney and seems physically at ease enough to occasionally laugh. (Colborn Video Depo Decl. of GB, Ex. A 4:21:50 – 4:22:45).

19. More obviously and unsettling perhaps, the editing of certain responses occasionally creates answers that distort the actual testimony. Longer more explanatory responses, for instance, are sometimes replaced with shorter and more definitive replies, responses that implicitly indicate problems and omissions in Colborn's actions—as in the above example of Glynn's distorting summary (ECF # 120-2 Episode 2 17:15-21:40) of Colborn's testimony. This is also the case with the more complicated and nuanced exchange about Colborn's ability to connect the license plate of a car with the missing "99 Toyota," where the obvious answer to why he would know the make of the car that went missing is edited out in order to conclude with Colborn's simple "yes".

20. The soundscape of the series is a major part of *Making a Murderer* in three ways. First, although dialogue is of course and necessarily edited, in these episodes it becomes especially influential in the way individuals defending Avery are given the damning punch lines or summaries: while Colborn typically provides very short replies without explanation ("Yes, sir"), the sound bites of the attorney's questioning Colborn frequently feature purportedly summary and conclusive lines ("I think I know the answer. These people screwed up big time!").

21. Second, throughout the series, eerie or suspenseful music underscores the visual information to create a melodramatic and suspenseful layer that suggests a murder mystery rather than a documentary investigation. In the second sequence, for instance, this occurs when the attorney dramatically plays a sound bite from the dispatcher's conversation that indicates that Colborn had himself identified the make of the missing Toyota. Referred to as a type of "stinger" in film form, a melodramatic musical phrase with strings and percussion underscores the last parts of the exchange, extending through a long take on Colborn that implies that Colborn has been caught in some kind of lie (rather than a memory lapse) (ECF # 120-5 Episode 5 55:24 – 56:55).

22. Third and more largely, especially in the two Colborn sequences, lengthy and dramatic silences punctuate the dialogue in certain sequences that tend to equate silence with a cover up or conspiracy.

23. Documentary film and video have used many strategies across numerous platforms for 125 years. Contemporary documentaries are more popular than ever before, and they now thrive on a variety of streaming sites. The traditional or conventional categories of documentary, as fundamentally non-fiction and non-narrative forms, have more and more been abandoned as a self-evident goal. More often than not, current documentaries compromise with the strategies of entertainment fiction and narrative suspense, often undermining their status as objective or unbiased accounts of any topic. That is certainly the case with *Making a Murderer*.

24. I completed a comparative timeline of two sections of *Making a Murderer*:

    a. Colborn Video Depo (Decl. of GB, Ex. A 4:10 PM-4:24 PM) versus edited commentary by Glynn (ECF # 120-2 Episode 2 17:00-21:20): Colborn's testimony about the 1995 call re. Allen and his 2003 statement on the call. Netflix omits large parts of Colborn's explanation and further distorts the testimony through the expository explanation of Glynn whose "voice of God" authority ignores Colborn's explanation and assumes an authoritative interpretation of the events.

    b. Colborn's Day 7 trial testimony about his call to the dispatcher regarding Halbach's missing Toyota. Compare the trial transcript of the very extensive and explanatory testimony (Decl. of ARB, Ex. A pp. 177-190), in which Colborn's explanation is ultimately uncomplicated (a detective probably gave him the license number earlier and he would have known the make of Halbach's car from earlier reports) versus the attorney and Netflix's very short dramatization of it as a disturbing indication that Colborn might have known already where the car was hidden ("you could understand how someone might think you were looking at the missing car) (ECF # 120-7 Episode 7 53:21-57:00). Note the eerie musical score that underpins the sequence that typically in suspense movies suggests a shocking revelation.

    Dated this 29th day of April, 2020.

    By: *s/Timothy Corrigan*
      Timothy Corrigan, Ph. D.

#3369597