IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
_____

ANDREW L. COLBORN,

                Plaintiff

NETFLIX, INC., et al.,                                Case No. 19-CV-484

                Defendants.
_____

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' 12(b)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT
_____

## INTRODUCTION

Defendant Netflix, Inc., filed a Rule 12(b)(6) motion to dismiss Plaintiff's Second Amended Complaint. In support of the motion, Netflix argues that the statements that Defendants made in a documentary series were "substantially true," non-defamatory, are protected as opinion, and are non-actionable under a doctrine of "subsidiary meaning."

As further explained below, the series centered its premise on third-party accusations that are not privileged under Wisconsin law. Defendants then augmented and added to those accusations through the artful use of visuals, through sound effects, and through editing and manipulation of what appeared to be actual testimony by the Plaintiff, Andrew Colborn.

Examined individually and in context, Defendants' statements are patently defamatory toward Mr. Colborn. The statements are not protected as opinion, and the "subsidiary meaning" doctrine could not apply on these facts. Nor should Mr. Colborn's other claims be dismissed.

Mr. Colborn respectfully requests that the Court deny the motion to dismiss.

## PROCEDURAL POSTURE AND PERTINENT FACTS

After removing this case from Manitowoc County, Wisconsin, to federal court, Defendants filed motions to dismiss. Certain of the Defendants moved to dismiss the claims

against them on the grounds that they had not been properly served with process; those motions are still pending. Defendant Netflix, Inc. ("Netflix") did not contest service, but filed a 12(b)(6) motion asserting that Mr. Colborn had not pleaded actual malice by Netflix.

With his response to Netflix's motion, Mr. Colborn moved for leave to file a Second Amended Complaint. The Court held that the Second Amended Complaint survived Netflix's substantive challenges and granted Mr. Colborn leave to file it.

In response to the Second Amended Complaint, Netflix filed another motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), this time asserting that Mr. Colburn's claims should be dismissed because even assuming that the statements were made and that some of the statements are false, the statements are 1) "substantially true" 2) protected as expressions of opinions, 3) non-defamatory, or 4) non-actionable under the "subsidiary meaning" doctrine.

Under Netflix's various theories and for purposes of the current motion, which Plaintiff anticipates the remaining Defendants will join if their service motion fails, the most pertinent allegations in the Second Amended Complaint are those that relate to MAM's false and defamatory statements and the context and background in which those statements were made.

## Pertinent Second Amended Complaint Allegations

From 1992 through 1996, Mr. Colborn was a non-sworn, non-law enforcement corrections officer with the Manitowoc County Sheriff's Department. Second Amended Complaint ("SAC") at ¶10. In his capacity as a corrections officer, Mr. Colborn's responsibilities related to security of the jail. *Id.* He first became a sworn law enforcement officer with the Sheriff's Department in 1996. *Id.* ¶11. Between 2005 and 2007, Mr. Colborn served as a patrol sergeant. *Id.* at ¶12. Mr. Colborn was also a trained evidence technician. *Id.*

2

In 1985, Steven Avery was wrongfully convicted of physically and sexually assaulting a woman in Manitowoc County. SAC at ¶14. Avery served 18 years in prison before DNA testing revealed that another man was the assailant. *Id.* The Manitowoc County District Attorney's office subsequently stipulated to Avery's release. *Id.*

In October 2005, Teresa Halbach was brutally murdered at the Avery Salvage Yard in Manitowoc County. *Id.* at ¶13. Avery and his nephew, Brendan Dassey, were convicted of the crime, and their convictions remain unreversed. *Id.* The SAC expressly alleges that <u>neither Plaintiff nor any other law enforcement officer planted evidence or in any other way attempted to frame Avery or Dassey</u>. *Id.* (emphasis added).

In December 2015, Netflix released for distribution a ten-part documentary series titled "Making a Murderer" ("MAM" or "MAM1"). *Id.* at ¶15. Within 35 days of its release, MAM had been seen by 19.3 million viewers. *Id.* MAM was and continues to be marketed as a non-fiction documentary. *Id.* at ¶16. No disclaimer appears in any of the episodes notifying viewers that the series is anything but an actual and accurate portrayal of events. *Id.*

The SAC alleges that "pertinent and significant aspects" of MAM "are not true as represented and are, instead, false and defamatory toward Plaintiff and others." *Id.* at ¶20. MAM omitted and distorted material and significant facts in order to falsely lead viewers to the inescapable conclusion that Mr. Colborn and others planted evidence to frame Avery for Halbach's murder. *Id.* Defendants distorted and falsified facts to portray Mr. Colborn as a "corrupt police officer who planted evidence to frame an innocent man." *Id.* The SAC and the exhibits that are incorporated therein identify dozens of statements throughout MAM that, individually and collectively, defame Mr. Colborn through inaccurate and defamatory statements and through altered excerpts that appear to represent Mr. Colborn's actual testimony at Avery's

trial. *Id*. at ¶¶21-22, ¶¶23-48. In the interests of avoiding duplication and additional length to this submission, more specific descriptions of the statements are referenced and presented in charts and lists that are incorporated in the argument section of this brief.

The statements described in the SAC include manipulations of the facts and trial testimony relating especially to three events that MAM portrayed as alleged evidence of Mr. Colborn's alleged participation in the conspiracy to frame Mr. Avery, including 1) Mr. Colborn's receiving, while as a corrections officer in 1995, a call from another law enforcement officer who advised Mr. Colborn that an individual in another county may have committed a crime for which a different person was in jail in Manitowoc County; 2) Mr. Colborn's involvement in the search of the Avery premises at which Ms. Halbach's vehicle key was discovered; and 3) a call to a dispatcher placed by Mr. Colborn in which Mr. Colborn sought confirmation of information relating to Ms. Halbach's vehicle. *Id*. at ¶¶23-45. However, those were by no means the only statements identified in the SAC as defamatory toward Mr. Colborn. To the contrary, as noted above, numerous statements and modifications to testimony were expressly described in exhibits to the SAC. *Id*. at Exs. A, B. Moreover, Mr. Colborn alleged that the broadcast distorted and falsified facts to portray Mr. Colborn "as a corrupt police officer who planted evidence to frame an innocent man." *Id*. at ¶20. The SAC alleges that MAM also omitted material in an effort to make viewers believe that Avery was innocent, *id.* at ¶¶46-47, and presented material so that the "conspiracy theories received the last, apparently unrefuted word, mixing in-court excerpts with out-of-court statements" in an effort to portray theories and speculation as actual facts. *Id*. at ¶48.

The SAC also alleges that Defendants further defamed Mr. Colborn in a sequel, MAM2, which was released in 2018. *Id*. at ¶¶49-56. Among other things, MAM2 quoted an individual

that Mr. Colborn had previously arrested for drunken driving as accusing Mr. Colborn of having discovered Ms. Halbach's car prior to the time that it was officially located. *Id.*

<u>**Defendants' Post-Publication Characterizations of MAM**</u>

Defendants have publicly acknowledged that they did not include all of the facts presented in the trial.[1] In a video interview with Chris Matthews on the show "Hardball," Defendants Ricciardi and Demos stated that there was not enough evidence in the show to determine Avery's guilt or innocence and that providing all of the evidence "was not our endeavor, actually." Declaration of April Rockstead Barker, ¶4. In a subsequent podcast interview, Demos and Ricciardi explained that they needed to present the materials in a way that people would care about Avery. Barker Decl., Ex. C. As Ricciardi explained:

> Part of what we learned just from some feedback screenings, which was always a small, select group, was that when people watched the first two episodes, by the end of the second episode,[2] they had empathy for Steven. They knew he'd been wrongly convicted. They knew he was trying to do something constructive and not have his 18 years in prison have been in vain. But then of course he gets rearrested, and there seems to be really compelling evidence against him . . . but you're not sure what to think, but they feel for the guy, which is really important, because he's our main character. We need people to care about him.

*Id.,* p. 12.

---

[1] As a consequence of the United States Supreme Court's rulings in *Ascroft v. Iqbal,* 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), the Seventh Circuit allows and encourages a party opposing a motion to dismiss to submit materials outside the pleadings that illustrate facts that the party expects to be able to prove. *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n. 1 (2012). When additional materials are submitted by the party opposing the motion to dismiss, it is not necessary for the Court to convert the motion to a summary judgment motion under Federal Rule of Civil Procedure 56. *Id.* Here, the cited materials show that Defendants acknowledge, consistent with the allegations in the SAC but contrary to the arguments in Defendants' brief, that they were not attempting to portray through MAM a fair and accurate version of Avery's murder trial, but rather, a story that illustrated Defendants' belief that the process was unfair to Avery and the verdict unsound. The cited materials further show that many overwhelmingly accepted those conclusions after viewing MAM.

[2] Episode 2 focuses on the supposed conspiracy to plant evidence and Mr. Colborn's alleged role in it.

Demos also explained that, in fact, it did not matter how much time they would ultimately be allotted, because their "story" would be the same in any format:

> Along the way, we had a three-part, four-part, five-part, six-part, eight-part, ten-part… but it was always the same story. It was just how much material did we have to be able to tell it the best.

*Id.,* p. 10. Demos and Ricciardi have characterized the "story" as one that explored whether Avery was, in fact, proven "guilty beyond a reasonable doubt, and, you know, is the process fair? Can we trust the verdict?" Barker Decl., Ex. D, p. 3. As Demos explained to Matthews, the "question of the series" is, "Was this a fair process?" Barker Decl., ¶4*; see also* Barker Decl., ¶7 (filmmakers assert that the series challenges whether the public can trust and rely on verdicts in criminal cases). The filmmakers explained after the release of MAM that their conclusions were that the state did not prove its case beyond a reasonable doubt and that the process was not fair. Barker Decl., Ex. E, p. 4.

As the filmmakers further explained on "Hardball," what piqued the filmmakers' interest in Avery's story in particular was that "at the time he was charged in the new crime, he did have a federal lawsuit pending. . . . So the timing of that was of interest to us, as well as everything that had come before." Barker Decl., ¶4. Ricciardi also stated in the podcast interview that the theory that Avery was framed, as espoused by Avery's brother, is what inspired her to begin work on the project. Barker Decl., Ex. C, p. 5.

The host of "Hardball," Chris Matthews, pressed the filmmakers as to whether a petition, signed by 300,000 people, requesting Avery's pardon, demonstrated that viewers interpreted MAM presenting enough evidence from which they could conclude that, in fact, "This guy was railroaded." Barker Decl., ¶4. In response, Demos observed that the American public has a poor understanding of the judicial system, but she referred to statements by Avery's attorneys,

including statements outside of court, that the evidence that had been presented at trial showed that the police had misused evidence against Avery. *Id.*

The filmmakers have also embraced media characterizations of the series as exposing injustice against Avery. *See* Barker Decl., Ex. F. These injustices were exposed through the "amazing window into the system" that the documentary allegedly provided, Barker Decl., ¶7, that allowed the filmmakers to juxtapose information in a way contrasted with the public narrative. Barker Decl., Ex. C, p. 13. As the Defendants explained, the series "teaches [viewers] to read the news differently," such as by incorporating reporters' interviews with Avery in ways that help further the series' "plot points." *Id.* at pp. 13-14.

### MAM's Accusations as Understood By Viewers

The SAC alleges that viewers understood MAM's message loudly and clearly. SAC ¶¶64(b)-(c). And consistent with these allegations, viewers' reactions to MAM, both online and in angry verbal attacks directed at Mr. Colborn, reflect that they understood MAM as irrefutably establishing that Mr. Colborn was a central figure in a law enforcement conspiracy to plant evidence and frame Steven Avery for Ms. Halbach's murder. The following are a small sampling of messages received by Mr. Colborn following the release of MAM:

> . . . I'm just calling in regards to the documentary that I just finished watching it and it appears pretty clearly that you were obviously involved beyond a detective role. . .

Colborn Decl., Ex. 1, 1-7-16 4:04 PM

> Hi Detective Colborn, I'm calling about the Steven Avery case – I wanted to know if you planted evidence with Detective Lenk. It sure seems like that from the documentary. . . . I think you definitely planted evidence . . . .

Colborn Decl., Ex. 1, 1-20-16 1:16 PM

> Hi. This is regarding the Steven Avery case . . . . You know what you have done. This is completely unprofessional. . . . . You framed him and I don't care if the

documentary was one-sided. You know what you did . . . . You are going to
hell. . . .

Colborn Decl., Ex. 1, 1-21-16 10:54 AM

Some callers' messages make it apparent that they formed the belief, based on the edited

versions of testimony presented in MAM, that Mr. Colborn had been "caught" in lies under oath:

. . . . This man was innocent. . . .The Sheriff Sergeant Colborn and Lieutenant Lenk,
they were caught in lies under oath . . . . Shame on those corrupt cops . . . .

Colborn Decl., Ex. 1, 1-21-16 11:26 AM

Detective Colborn should be out of a job. Steven Avery and Brendan Dassey are
both innocent. . . . You lied under oath multiple times along with all of your other
fellow employees. I'm disgusted by the Sheriff's Department completely and
fully. . . . I hope you know that everyone knows that you're a **** liar.

Colborn Decl., Ex. 1, 1-14-16 2:16 PM

. . . I've been calling numerous times and been getting no answer . . . . only awful
disgusting human beings would do such a thing to innocent people, not only once,
but twice, Colborn. The whole world has observed your lies . . . . I hope you're
harassed . . . until the day you die. . . . . I hope that your wife is the next victim. . .

Colborn Decl., Ex. 1, 1-21-16 11:14 AM

. . . You lied . . . You are a horrible disgusting person for . . . planting evidence in
the Steven Avery case . . .

Colborn Decl., Ex. 1, 1-7-16 4:27 PM

Hi Detective Colborn. I just watched Making a Murder and you are soooo guilty. You
were at the . . . you were at the the lot . . . the Avery yard, and you saw the car before, um
and you're in it with Lenk. You guys are so shady and corrupt. . . .

Colborn, Ex 1, 1/26/16 to 1/27/16, 3:42 PM

Yeah, I believe that Lt. Andrew Colborn needs to be investigated for his involvement and
manipulating a crime scene and um ah his involvement and I, I think he should probably
be in prison right now um for his ah for his behavior because he's obviously perverted
justice and manipulated evidence and he has lied under oath, he's perjured himself. And,
um everyone knows that man drove Teresa Halbach's car and placed it on Steven

Avery's property and um, that man deserves justice and Andrew Colborn needs to be held accountable for his criminal behavior.  Thank you.

Colborn, Ex. 1, 2/8/16 to 2/14/15 11:09 PM

My theory is that ah, [*laughter*] in the ah, Colborn was a dimwitted corrections officer who felt like a loser and committed a crime in order to advance his career and he's a corrupt public servant. . . . it is quite obvious that he is not just a crooked cop but he's a liar.  **Um and he's got some some sick perversions and when you watched him in that documentary you could just see his eyes twitching.  Um, and ah, he just looks like he is guilty of something.**  And probably of ah, corroborating ah, him and James Lenk, framing Steve Avery for Theresa Halbach's murder.  It's just a disgusting thing . . . .

Colborn, Ex. 1, 2/8/16 to 2/14/15 12:46 AM (emphasis added)

Hey Andy . . . . You're probably out planting evidence on somebody right now, but um I just want to let you know that **I saw your appearance on the television program and I really couldn't believe how scared you were in that one scene.  I just wanted to talk to you about it, when you were upon the stand. Um, I actually thought you were going to wet your pants you were so scared**. . . . .

Colborn, Ex. 1, 2/15/16 to 2/19/16 2:13 PM (emphasis added)

. . . . I can't even sleep watching this show . . . . you're disgusting.  **I can see it in your eyes on every interview**. . . .

Colborn, Ex. 1, 11/16/16 at 3:31 AM (emphasis added)

Other callers' messages referenced and blended the themes presented in MAM, including

MAM's repeated assertion that Mr. Colborn had a grudge against Avery because Mr. Colborn

allegedly "hid" the 1995 jail call, as well as MAM's conspicuous omission of information that

Mr. Colborn's presence at the scene in which the key was discovered was by request and was

consistent with his background as an evidence technician:

. . . . Hello, so, I'm from Canada, and I've watched the Netflix series, called Making a Murderer. . . . Every viewer knows your mistake. So why did you volunteer exactly to view the case when you had problems with this individual in in the past, with the last case? Is it possible that you were trying to take revenge back on this person? Because the Calumet County Department could have clearly taken over this case. Because it is quite obvious that you guys are quite mad with the fact that you caught the wrong guy ruining your reputation as a police officer. . . .

Colborn Decl., Ex. 1, 1-21-16 11:19 AM

> . . . . My biggest question to you, sir, is why were you on the scene when the key was found? . . . That scene was searched seven times before that key was found by other investigators not yourself. So, do you really believe that these other investigators were that incompetent, to find such an item in plain sight? . . . . .

Colborn Decl., Ex. 1, 1-15-16 to 1-18-16 4:35 PM

Likewise, MAM's truncated and altered presentation of Mr. Colborn's testimony regarding the call to dispatch left viewers questioning Mr. Colborn based on the series' failure to fairly convey to viewers Mr. Colborn's reasonable explanation that he received the license plate number from the officer who asked him to look for the vehicle:

> . . . Also when you called the dispatcher and asked her about that license and where it was registered to, where you were reading that license plate number from . . . I just don't understand how you would have that number and how you would know what the car was registered to . . . . .

Colborn Decl., Ex. 1, 1-15-16 to 1-18-16 4:35 PM

Other callers' messages showed that Avery's alleged innocence was linked in their minds with the conclusion that Mr. Colborn had planted evidence:

> Hi Sir. I was just wondering if you felt bad for sending an innocent man to prison and planting evidence. It's not good police work.

Colborn Decl., Ex. 1, 1-7-16 3:38 PM

> Why the **** did you frame Steven? You **** son of a *****. You're a sick, crooked, disgusting cop. . . . . You should be in prison, you son of a *****

Colborn Decl., Ex. 1, 1-3-16 12:03 PM

Others took to heart out-of-court accusations by Avery's defense attorneys and others that asserted that federal prosecutors had proven conspiracy cases on less evidence than the defense allegedly mounted against Mr. Colborn:

> Mr. Colborn, this is a concerned citizen of the state of California. I've seen the case with Steven Avery. . . everybody knows what is going on here with you guys setting up and framing this poor man Steven Avery . . . be ready to sit in federal prison for a long long time. I hope you rot in hell, you son of a ****

Colborn Decl., Ex. 1, 1-15-16 to 1-18-16 4:34 PM

> . . . Everybody knows you're **** guilty . . .

Colborn Decl., Ex. 1, 1-7-16 11:11 AM

Many other messages left for Mr. Colborn are simply strings of profanity or insults.

Mr. Colborn received hundreds of similar calls. Countless online commenters and bloggers have

likewise explained that, after viewing MAM, they are convinced that Avery was framed by law

enforcement officers, including Mr. Colborn. *See, e.g.,* Barker Decl., Ex. G.

## **STANDARD OF REVIEW**

Under federal pleading standards, a complaint need only contain factual allegations

sufficient to raise a right to relief above the speculative level. *Bell Atlantic Corp. v. Twombly*,

550 U.S. 554, 556-570 (2007). The complaint "need only 'give the defendant fair notice of what

the claim is and the grounds upon which it rests.'" *Mark Line Indus., Inc. v. Murillo Modular*

*Group, Ltd.*, 2011 WL 1458496 (N.D. Ind.), *3 (quoting *Erickson v. Pardus*, 551 U.S. 89,

93 (2007) and *Twombly*) (Barker Decl., Ex. L).

A court should not dismiss a complaint for failure to state a claim under Rule 12(b)(6)

unless it is clear that no relief could be granted under any set of facts that could be proved

consistent with the allegations. *Townsel v. Jamerson,* 240 F.Supp.3d 894, 898 (N.D. Ill. 2017).

The court must accept as true and liberally construe all of the factual allegations contained in the

complaint, *Twombly, supra*, and draw all inferences in the Plaintiff's favor. *Carlson v. CSX*

*Transportation, Inc.,* 758 F.3d 819, 826 (7th Cir. 2014).

In a federal court, a plaintiff in a defamation action need only meet the pleading standards of Rule 8, even if state-law procedural rules would have required more specific pleading in defamation cases. *Rivera v. Allstate Ins. Co.,* 140 F.Supp.3d 722, 727-28 (N.D. Ill. 2015). Under the federal rules, the plaintiff need not plead every defamatory statement. *Id.*

## ARGUMENT

Defendants rely heavily on appeals to freedom of the press as allegedly excusing all manner of defamatory statements and inaccuracies, seeming without any perceptible limitation. But even in a society that has a "free press," those "who misuse that liberty may be held accountable." *See Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 795 (Tex. Sup. Ct. 2019). As the United States Supreme Court has explained, "there is also another side to the equation: we have regularly acknowledged the 'important social values which underlie the law of defamation,' and recognized that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation.'" *Milkovich v. Lorrain Journal Co.,* 497 U.S. 1, 22 (1990) (quoting and citing *Rosenblatt v. Baer,* 383 U.S. 75 (1966)).

> The right of a man to protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent system of ordered liberty.

*Id.* (quoting Stewart, J.).

Defendants also portray this case as about a "true crime" broadcast, but it is not. MAM is more accurately described as hybrid between a documentary and an exposé that is more accurately described as "false crime," both in the sense that MAM challenges the validity of the criminal allegations for which Avery was prosecuted and lobs charges of criminal conduct against law enforcement officers who have never been charged or prosecuted. As explained

below, MAM accuses Mr. Colborn of participating in criminal conduct for which he has not been investigated, arrested, charged, or convicted.

Analyzing the defamatory statements in detail, as the law requires, MAM's broadcast cannot be defended as "substantially true," nor can Defendants' statements be protected as "opinion," under the "subsidiary meaning doctrine" nor reasonably characterized as non-defamatory. Further, the Defendants' motion is also procedurally inappropriate.[3]

## I.      Defendants' Motion is Procedurally Inappropriate.

A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it and information that is subject to proper judicial notice. If a moving party relies on additional materials, then the motion must be converted to one for summary judgment under Rule 56." *Geinosky, supra,* 675 F.3d at 745 n. 1 (citations omitted).  Despite its clarity, Defendants flout that rule, adding information and documents never mentioned in the SAC, all while resisting the Plaintiff's discovery served with the complaint and pending many months. *See infra* Section III.C. The motion cites and depends on six deposition transcripts from Steven Avery's civil case, a 2003 attorney general report, a search warrant, a 2003 sheriff's safe report, multiple judicial decisions from Avery's criminal trial, multiple transcripts from that very long criminal trial, a statement from Mr. Colborn  and excerpts from two books on the subject—Indefensible and The Innocent Killer.  (Dkt ##120-26).[4]  In fact, the Defendants treat their own broadcasts as

<hr>

[3] Defendants also include an *ad hominem* attack through references to statements by Mr. Colborn's counsel that are unconnected with his representation of Mr. Colborn in this case. This tactic is unworthy of comment other than to observe that, to paraphrase Aristotle, invective is a poor substitute for argument.  *See, e.g., Gomez v. St. Vincent Health, Inc.,* 649 F.3d 583, 591 (7th Cir. 2011).

[4] Space limitations and other issues that must be addressed prevent consideration of every inappropriate fact contained in Defendants' brief. For one example, Defendants claim that an unauthenticated, hearsay memo used as a deposition exhibit at Avery's civil case contradicts facts alleged in the SAC. Dkt #119 at p. 7. They cite  others'

objective proof of facts that the Plaintiff challenges or expressly asserts are false.[5] Except for very limited passages from the trial, the SAC cites none of this and, even were it cited, what the Defendants reference is hardly central to the Plaintiff's claims as caselaw requires. *Id.* Defendants also ignore proper procedure to obtain judicial notice of official documents, Fed. R. Evid. 201, so most information the Defendants place before the court is illegitimate under the very motion they bring.

The critical question then is what should the Court do about such a blatant transgression of the rules. There are several choices. One, convert the motion to summary judgment, something Rule 12(d) contemplates, while allowing the Plaintiff opportunity to take the discovery he seeks and the Defendants have long resisted. Second, sift through the parties' voluminous submissions and consider only information appropriate to a Rule 12(b)(6) motion, a disagreeable choice since no court should abandon its traditional role and correct a litigant's obvious procedural errors. Third, summarily dismiss the motion under the Court's broad superintending powers, as the motion is an obvious subterfuge to disguise a summary judgment motion as one under Rule 12(b)(6) in order to bar the Plaintiff from discovery. That is a well-deserved response to a litigant who chose to play fast and loose with well-established rules and burden a busy District Court with tasks it never should need to assume.

If the Court elects to hear the motion, Plaintiff also preserves for review the argument that this successive motion is not permitted under the federal rules. Federal Rule of Civil

---

deposition testimony that they claim contradicts Mr. Colborn's allegations and testimony – though neither the author of the report nor the alleged source of the author's statement is among the depositions submitted.

[5] Defendants boldly state as facts matters far beyond the allegations of the SAC as if they can somehow be taken as established just because they were referenced in the broadcasts. To be clear, the SAC in no way admits or incorporates every fact asserted in the broadcasts; Mr. Colborn alleges that they were false and defamatory.

Procedure 12(g)(2) requires litigants to consolidate dismissal arguments in a single motion. *See, e.g., Ennenga v. Starns,* 677 F.3d 766, 772-73 (7th Cir. 2012). This rule serves the obvious practical purpose of preventing parties from indefinitely extending proceedings through serial motions to dismiss or from using amendment of a pleading to make arguments that could have been made in a prior motion to dismiss. *Id.; see also* Wright & Miller, 5C Fed.Prac. & Proc. Civ. §1388 (3d ed.). However, the Seventh Circuit has interpreted Federal Rule of Civil Procedure 12(h)(2) as permitting a failure-to-state-a-claim arguments in successive motions. *See Ennenga,* 677 F.3d at 772-73. But as the Third Circuit explained in respectful disagreement, the conclusion reached in *Ennenga* "fails to address the language from Rule 12(h)(2) that arguably limits a party to presenting [successive failure-to-state-a-claim] arguments in a pleading, a motion for judgment on the pleadings, or at trial." *Leyse v. Bank of America Nat'l Ass'n*, 804 F.3d 316, 321 (3d Cir. 2015) (internal quotation and citation omitted).

## II. The MAM Broadcasts Were Orchestrated to Convey the Filmmakers' Assertions That Mr. Colborn Participated in a Conspiracy to Frame Avery.

In considering how the legal issues raised by Defendants may apply in the context of MAM and Mr. Colborn's claims, it is first necessary to appreciate the visual and structural techniques that were skillfully crafted to convey the defamatory material in MAM. This requires examining the broadcast in some detail in order to appreciate the cumulative effect of MAM's tactics, which built insinuation on top of innuendo, going far beyond any assertions made by defense attorneys or any other individual speaker.

Though virtually all of us watch television and movies, few are familiar with the cinematic techniques that may be employed to significantly affect our impressions of the material that we see. For example, camera distance and angles; reduction or alteration of content;

and sound, such as the use of music and silence, may all "prejudice and shape the understanding and interpretation" of visual content. *See* Declaration of Timothy Corrigan, Ph.D., at ¶8.[6]

Through a more advanced analysis of content than we, as viewers, typically engage in while we are viewing broadcasts, it is possible to identify techniques such as "expositional documentary style," in which "commentary and explanation counterpoint the presentation of the documentary images." *Id.* at ¶12. The commentary is referenced in the motion picture/documentary industry as the "voice of God" because it provides "an authoritative interpretation to images or actions that might otherwise appear ambiguous." *Id.*

Even the apparent distance between the camera and the subject can influence perception. A subject portrayed in what is described as a "long shot" may appear more visually dominant than a subject portrayed in "close-up." *Id.* at ¶15. Editing of footage may also contrast "shot/countershot" exchanges and "eye-line matches." *Id*. at ¶16. Fiction films often use these techniques so that the back-and-forth meeting of the eyes of two people in conversation "parallels the harmony of their conversation," but a mismatch between them contributes "significantly to the body language which is central to any film or video representation." *Id.*

By comparison to footage that Defendants did not include in MAM, this technique can be identified in MAM. The full video deposition of Mr. Colborn's testimony in Avery's civil case demonstrates that Mr. Colborn appeared "confident and relaxed" and made "regular eye contact with the examining attorney." *Id*. In contrast, in the clips of Mr. Colborn's testimony in the civil trial and at Mr. Colborn's deposition that appear in MAM, Mr. Colborn's gaze is not matched to the examining attorneys. *Id.* Moreover, the deposition footage was not displayed in full screen in

---

[6] Dr. Corrigan's declaration may and should be submitted in opposition to Defendants' motion to dismiss, as the Seventh Circuit has explained, to illustrate expert testimony that will be offered in support of Plaintiff's allegations. *See supra* n.1 (citing *Geinosky,* n. 1).

MAM, so that Mr. Colborn appeared to be looking down in answering questions, but the full-screen video shows that he was looking at an exhibit. Burnett Decl., Ex. 1 at 4:10 PM, 4:13-4:17 PM. The document cannot be seen on MAM. *See* Dkt# 120-2 at 18:30-19:05.

Additional sound and audio editing techniques – collectively, the "soundscape" – further enhance the impressions that the series seeks to create. Corrigan Decl., ¶12-20. For example, the dialogue is edited so as to provide to Mr. Colborn short replies that appear to lack explanation, while giving to attorneys and Avery supporters the "summary and conclusive" lines, such as "I think I know the answer. These people screwed up big time!" *Id.* at ¶18. In contrast, Mr. Colborn's summaries – "that is why I didn't do one [write a report]" are edited out. *See* Dkt #120-2 p. 212; *cf.* Dkt #120-2 20:55 – 21:08; 120-7 23:46 – 24:03.

In addition, eerie and suspenseful music is used in a way that "suggests a murder mystery rather than a documentary investigation." Corrigan Decl. at ¶19. Referenced in the industry as a "stinger," a "melodramatic musical phrase with strings and percussion," together with a visual "long take" on Mr. Colborn, are used in the testimony about the call to dispatch to "imply that Colborn has been caught in some kind of lie (rather than a memory lapse)." Lengthy and dramatic silences are further used to "punctuate" dialogue in sequences designed "to equate silence with a cover up or conspiracy." *Id.* at ¶20.

While the legal significance of MAM techniques is further explained below, the following chart tracks some of the examples through which MAM used a combination of juxtaposed content and visual and audio techniques to cement in viewers' minds as an established fact Mr. Colborn's alleged participation in a conspiracy to frame Avery for murder.

| Ref. No. | Episode / Time into Broadcast | Content of Statement | Type of Statement | Cinematic Techniques/Defamatory Effect |
|---|---|---|---|---|
| 1 | 1<br>ECF # 120-1<br><br>4:35 – 4:45 | Steven Avery voiceover: " They had the evidence back then that I didn't do it. But nobody said anything . . . ". | Repetition of Third-Party (Steven Avery) accusation | Steven Avery, speaking as a voiceover narrator, makes direct accusation of conspiracy to hide evidence exonerating him in prior civil case |
| 2 | 1<br>ECF # 120-1<br><br>1:01:19 – 1:01:42 | Kim Ducat (Avery relative) states on camera: "They weren't just gonna let Stevie out. They weren't gonna hand that man $36 million. They weren't gonna be made a laughing stock, that's for sure. They just weren't gonna do all that. And something in my gut said they're not done with him. Something's gonna happen. They're not handing that kind of money over to Steven Avery." | Repetition of Third-Party (Kim Ducat) accusation | Ducat describes the alleged nefarious intent of County actors as unequivocal, positive statements of fact |
| 3 | 1<br>ECF # 120-1<br>1:01:29-1:01:44;<br>1:01:33 – photograph | Photos of Mr. Colborn and others are shown immediately after and during Kim Ducat's statement. | MAM addition, not attributable to third party | Visually identifies Mr. Colborn as a member of the alleged conspiracy identified by Avery and Ducat |
| 4 | 1<br>ECF # 120-1<br>49:22-49:39 | Steve Glynn, Avery's counsel in the civil case against Manitowoc County, is interviewed and states, "The day of or on the day after Steven's release, law enforcement officers in Manitowoc are writing | Repetition of Third-Party (Steve Glynn) accusation (made outside of any judicial proceedings) | Glynn as a knowledgeable expert/ voice of authority, explains the purported motive of Mr. Colborn and others, and he asserts that Mr. Colborn, who wrote the "memo" in question, "felt threatened" |

| | | memos to describe activity that had occurred almost ten years earlier. They don't feel the need to do that unless they feel threatened." | | |
|---|---|---|---|---|
| 5 | 2<br>ECF # 120-2<br>17:34-17:43 | Video deposition of Mr. Colborn is shown in the background as Glynn speaks (image of Colborn) | MAM addition – augmenting statements by Glynn | Identifies Mr. Colborn as the purported culprit in the alleged wrongdoing being described by Glynn |
| 6 | 2<br>ECF # 120-2<br>17:37-18:24 | Steve Glynn continues, "And that there is not only something to this idea that law enforcement had information about somebody else, but there is serious meat on those bones, I mean serious meat. What we learn is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department [image of Mr. Colborn's report is shown in background] from another law enforcement agency . . . saying that they had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison." | ●Third-Party statements by Glynn, setting the context for accusations to follow;<br><br>●MAM adds visual of report | Glynn continues to set the stage for the alleged conspiracy, providing his version of the 1995 call, with MAM identifying Mr. Colborn and his subsequent report as allegedly central to the alleged conspiracy |
| 7 | 2<br>ECF # 120-2 | Video footage of Mr. Colborn's testimony in civil case in response to questioning by Glynn; Mr. | Excerpts from prior video-recorded testimony of Mr. | Selection of testimony enforces impression of Glynn allegedly forcing Mr. Colborn to submissively admit |

| | | 18:28 - 19:04 | Colborn's testimony is represented as one-word answers responding to each of Glynn's questions | Colborn, selected by MAM | everything that Glynn is saying, suggesting that Glynn has the goods on Mr. Colborn |
|---|---|---|---|---|---|
| 8 | 2 ECF # 120-2 19:05 – 19:41 | | Steve Glynn continues, "Manitowoc doesn't have huge numbers of major assaults where people go to prison and certainly where people would still be in prison. . . . . at a minimum, somebody ought to check this out." | Repetition of Third-Party (Steve Glynn) accusation (made outside of any judicial proceedings) | Glynn implies that the person who took the call (Mr. Colborn) likely knew the identity of the person who committed the rape for which Avery was in jail and that it was Mr. Colborn's responsibility to verify that information |
| 9 | 2 ECF # 120-2 19:24 – 19:41 | | Graphic shown during a cutaway from Glynn's interview, while Glynn is still speaking, shows, "1995 ● Gregory Allen is arrested for sexual assault in Brown County / Andrew Colborn receives call about inmate confession" | MAM addition augmenting Glynn's comments through its own accusatory graphic | Graphic lends purported factual/scientific accuracy to and builds on and expands Glynn's accusation that Mr. Colborn knew about "inmate confession" that he knew that the real perpetrator was Gregory Allen |
| 10 | 2 ECF # 120-2 19:41 – 19:47 | | Cuts to video of Mr. Colborn's deposition testimony in Avery's civil case: Glynn: I mean that's a significant event. Mr. Colborn: Right, that's what stood out in my mind. | MAM addition to Glynn's accusation | In conjunction with the preceding statements by Glynn and the preceding graphic, this exchange falsely makes it appear that Mr. Colborn admitted that he knew that the other inmate was Allen and that the call concerned Avery |
| 11 | 2 ECF # 120-2 | | Returns to interview with Glynn, who says, "The fellow who got that call was named Colborn. And you might say that there should be | Repetition of Third-Party (Steve Glynn) accusation (made outside of | Glynn insinuates that Mr. Colborn did something wrong by failing to "make a record" of the 1995 telephone call. Glynn does not mention that Mr. Colborn worked in the jail at the time, not the Sheriff's Department, and |

| | | a record of him immediately making a report on this, there might be a record of his immediately contacting a supervising officer, there might be a record of him contacting a detective who handles sexual assault cases, ahh, there might be some record of it. But if you thought any of those things, you'd be wrong, because there isn't any record in 1995, 1996, 1997, 1998, 2000, 2001, 2002, 2003 . . . ." | any judicial proceedings) | followed protocol by appropriately transferring the call to a detective – all of which was the gist of the testimony elicited by Glynn during the deposition |
|---|---|---|---|---|
| | 19:47 – 20:26 | | | |
| 12 | 2 ECF # 120-2 20:14 – 20:25 | Visual cuts to graphic with years running from a timeline image with Mr. Colborn's photograph above it, and a statement after the year "2003" that states, 'DNA evidence exonerates Steven Avery." | MAM addition emphasizing Glynn's accusation and including Mr. Colborn's photograph | Emphasizes Mr. Colborn's alleged role in purported conspiracy |
| 13 | 2 ECF # 120-2 20:25 – 21:13 | Glynn continues, "Now 2003 is a year that has meaning because that's when Steven Avery got out. And the day he got out, or the day after, that's when Colborn decides to contact his superior officer, named Lenk. And Lenk tells him to write a report. And then they go have contact with the Sheriff. . . . .why does it happen . . . when it didn't happen eight years earlier? | Repetition of Third-Party (Steve Glynn) accusation (made outside of any judicial proceedings) | Falsely implies that Mr. Colborn did nothing in response to the call about Mr. Avery and or that he should have, but did not, write a report about it at the time the call came in, and that his writing a report later was due to his allegedly realizing that he had "screwed up big time" and that his superiors, including the Sheriff, shared this view. |

| | | Um, ahh, I mean, I think I know the answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk as his superior realized it, and the Sheriff realized it. | | |
|---|---|---|---|---|
| 14 | 2<br>ECF # 120-2<br>21:08-21:12 | Images of Mr. Colborn, James Lenk, and the Sheriff are shown. | MAM addition that augments Glynn's accusations against Mr. Colborn. | The images are portrayed as a visual representation and accusation of an alleged conspiracy between the three individuals pictured |
| 15 | 2<br>ECF # 120-2<br>21:12 –<br>21:39 | Glynn continues, "So Lenk tells Colborn to write a report, the Sheriff tells Lenk, 'Get me the report.' The Sheriff puts the report in a safe. That's how much he cares about documenting this thing. Well obviously it doesn't do anybody, it certainly doesn't do Steven Avery any good to document that eight years after the fact, because Steve Avery has been sitting in a cage . . . ." | Repetition of Third-Party (Steve Glynn) accusations (made outside of any judicial proceedings) | Statements are designed to incite outrage in the mind of viewers and anger them about the conduct of Mr. Colborn and his alleged co-conspirators; the reference to the Sheriff's allegedly putting the report in a "safe" is not only false but hyperbolic and apparently intended to emphasize the "cloak and dagger" nature of the story as told |
| 16 | 2<br>ECF # 120-2<br><br>22:55-23:14 | Avery voiceover after civil trial deposition excerpts, stating, "A lot of people told me to watch my back. Most of the time, I didn't even believe them. But then, sitting and doing depositions, I don't know. It kind of changed my | Repetition of Third-Party (Steven Avery) accusation | ● Through MAM's placement of this audio content, Avery, once again elevated to the status of narrator, implicitly interprets the preceding deposition testimony for the audience, indicating that there was a conspiracy to "cover up" the 1995 call<br>● Avery also insinuates that a "lot of people" had knowledge that he needed to "watch his back," |

| | | | | |
|---|---|---|---|---|
| | | mind. They were covering something up." | | insinuating that it was common knowledge that Mr. Colborn and others were out to get Avery.<br>● Avery's opinions include his alleged assessment of the entirety of the deposition testimony in the civil case, when only excerpts are included in MAM |
| 17 | 2<br>ECF # 120-2<br>22:45-22:50 | Cuts to image with close-up of Mr. Colborn's signature. | MAM addition | MAM's visual identifies Mr. Colborn as the person "covering up" something as asserted by Mr. Avery |
| 18 | 2<br>ECF # 120-2<br><br>23:14-23:26 | Avery states, "And they were still covering something up. Even with the sheriff who's on there now – he's covering something up." | Repetition of Third-Party (Steven Avery) accusation | Continuation of prior express accusation directly following implication identifying Mr. Colborn as the culprit in the "cover up" through visual of Mr. Colborn's signature |
| 19 | 2<br>ECF # 120-2<br>23:28-23:50 | Cuts to footage of Mr. Colborn's videotaped deposition | MAM addition, | Again visually identifies Mr. Colborn as a participant in the "cover up." |
| 20 | 2<br>ECF # 120-2<br>26:52-26:56 | Video image of Mr. Colborn | MAM addition | With the testimony that follows, again implicates Mr. Colborn in alleged cover up |
| 21 | 2<br>ECF # 120-2<br><br>26:56-27:33 | Steven Glynn, as the narrator/Voice of God, asserts, "This was an unconscionable withholding of information that would have been of use to Steven Avery's lawyers . . . If that information had come to light in 1995, Steven Avery would have gotten out in 1995. So they cost Steve Avery Eight years of his life. This is as close to a conspiracy of silence as I think you could find in a case." | Repetition of Third-Party (Steve Glynn) accusation (made outside of any judicial proceedings), juxtaposed after deposition testimony. | Again, Glynn, as the narrator, authoritatively appears to interpret the deposition testimony immediately preceding this comment and explains to lay audiences that it supposedly proves a "conspiracy of silence" and "withholding of information" by Mr. Colborn and his superiors, when the testimony shown cannot be interpreted in that manner, especially with respect to Mr. Colborn |

| 22 | 2<br>ECF # 120-2<br>28:24-29:07 | Rotating images of Mr. Colborn, other alleged conspirators shown. | MAM visual addition | Visual implicates Mr. Colborn as part of the alleged conspiracy to withhold information |
|---|---|---|---|---|
| 23 | 2<br>ECF # 120-2<br>28:35-29:37 | Interview with Walt Kelly, who states, "October of 2005, from the perspective of the Manitowoc County government and their defense lawyers, I believe they all knew they were in the most serious kind of trouble. There was a very grave prospect of a very, very substantial verdict. [Their] insurers have taken the position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the Sheriff and the DA, would be on the hook for those damages in the civil suit. | Repetition of Third-Party (Walt Kelly) accusation (made outside of any judicial proceedings), juxtaposed after deposition testimony. | Narration by Kelly; because this audio follows photographs of Mr. Colborn with other Manitowoc County employees, Mr. Kelly's comments appear to expressly include Mr. Colborn as one of those who "all knew they were in the most serious kind of trouble." Mr. Kelly, who was the attorney in the civil case, is positioned as someone who would know all the facts regarding that case, including many facts not featured in MAM |
| 24 | 2<br>ECF # 120-2<br>29:40-30:22 | Glynn interview continues, "We don't need to have somebody tell us that this is going to have an effect on law enforcement. Of course it has an effect . . . . Imagine what it's like when you're going to say that you're a liar, and that you hid evidence, and that you deliberately prosecuted a person that you | Repetition of Third-Party (Steve Glynn) accusation (made outside of any judicial proceedings) | Glynn, speaking again as an authority with knowledge of all of the facts of the civil case, levels accusations at the group of Manitowoc County alleged law enforcement wrongdoers, whom MAM has consistently depicted together in visual images as including Mr. Colborn, that asserts that he is a liar, hid evidence, and participated in a prosecution of Avery when he knew Avery was not guilty, while the real perpetrator raped and beat others |

| | | knew, or at least had reason to know, wasn't guilty of the crime? And putting all that aside, by the way, in terms of your own professionalism, there's a guy out there raping and beating women while the guy that you put in prison is sitting in a cell." | | |
|---|---|---|---|---|
| 25 | 2 ECF # 120-2 30:29-31:04 | Glynn continues, "We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt [Kelly] who tells me that he has gotten a call from a journalist asking if either of us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach." | Repetition of Third-Party (Steve Glynn) accusation (made outside of any judicial proceedings) | Glynn links the alleged conspirators' supposed vulnerability to the civil legal attack to the investigation of Avery for Teresa Halbach's murder |
| 26 | 2 ECF # 120-2 39:30-40:08 | News footage regarding Teresa Halbach's disappearance is followed by footage of an Avery interview in which he says that anyone could have access to his property to plant evidence and accuses the county of possibly doing "something" with Teresa Halbach and trying "to plant | Repetition of Third-Party (Steven Avery) accusation | ●Avery's statements are used to narrate and drive home the accusation that the Manitowoc County conspirators are at it again, allegedly planting evidence and possibly even murdering Teresa Halbach<br><br>●Avery further implies that the County is dishonest and capable of any nature of wrongdoing |

| | | evidence on me," adding that he "wouldn't put nothing past the county." | | |
|---|---|---|---|---|
| 27 | 2<br>ECF # 120-2<br>41:19-41:24 | Avery voiceover, "All I can think is they're trying to railroad me again." | Repetition of Avery accusation | Avery explains that the same individuals, who have repeatedly been identified as including Mr. Colborn, are trying to frame him "again" |
| 28 | 2<br>ECF # 120-2<br>42:45-43:02 | Avery continues, "I ain't been home. They've been searching. You know, how hard is it to put evidence in the house or on the property? . . . .The . . . . Sheriff . . . was out to get me the first time. How do I know he ain't got nothing to do with it this time?" | Repetition of Third-Party (Steven Avery) accusation, with obvious edits by MAM, as well | Avery, continues to imply, outside of any courtroom, that the Sheriff and law enforcement officers on the property are likely planting evidence because the Sheriff was "out to get" Avery |
| 29 | 2<br>ECF # 120-2<br>44:24-44:35<br>46:37-46:52 | After more news footage, Avery continues, "all these memories and everything else, and they're just sketching me out again. . . . You know we're all victims, and they just won't leave us alone. They just keep it up. . . . ." | Repetition of Third-Party (Steven Avery) accusations | Avery narrates again, indicating that he is being victimized by police whom he insinuates are falsely pursuing him on purpose |
| 30 | 2<br>ECF # 120-2<br>52:24-52:29 | Footage of Avery interrogation: Avery: "See, if somebody else plants that shit there, you ain't going to see . . . ." | Repetition of Avery accusations | Avery's insistence that evidence has been planted is used to conclude the episode on an ominous note |
| 31 | 3<br>ECF # 120-3<br>14:14-14:42 | Unidentified woman in a bar states, "I really do think he was framed. . . .There's a lot that points to where the Sheriff's Department could've had something to do with it. And then | Repetition of third-party accusation by anonymous bar patron with MAM addition of visual | Juxtaposition of bar patron statement regarding alleged "framing" by the Sheriff's Department that follows visuals of Mr. Colborn, thereby enhancing the bar patron's statement to drive home the alleged participation of Mr. Colborn in the alleged conspiracy |

| | | I don't know if it's true or not, but I also heard that Manitowoc County was not supposed to be allowed in to search, and they were in there and they searched. And that's who found the key apparently after the third day was the Manitowoc County Sheriff's Department. . . " | | |
|---|---|---|---|---|
| 32 | 3<br><br>ECF # 120-3<br><br>14:43-15:05 | Male bar patron adds, "I only have one word, from the cops on up: corruption. I mean, big time. I mean, if people dig far enough, they'll see that." | Repetition of third-party accusation by anonymous bar patron | Accusation of corruption in investigating officers; MAM has identified Mr. Colborn as involved in conspiracy and therefore, as one of the "corrupt officers" |
| 33 | 3<br><br>ECF # 120-3<br><br>15:06 - 15:36 | Unidentified female bar patron continues, "I don't care what anybody says, that's a lot of money to pay out from here in Manitowoc County. It's a small area and I really, truly believe the county didn't have the funds to pay it out . . . .And they can say, "'Oh, you really believe the Manitowoc County police department and the FBI and everybody came in and they set all this up just to have Steven Avery guilty of this thing? Yes, I do. . . ." | Repetition of third-party accusation by anonymous bar patron | This statement again asserts that the civil suit led to the supposed conspiracy to frame Mr. Avery, and also asserts that the FBI was involved, thereby insinuating that the FBI testimony that blood in the vial scientifically could not have come from the prior case should not be believed, either |

| 34 | 3<br>ECF # 120-3<br>16:45-16:55 | In a telephone call with his sister, Avery says, "This way, they figure they just got away with it, they can do it again . . . . You know it ain't gonna stop 'em." | Repetition of third-party accusation by Avery | Avery again makes accusations regarding the alleged conspiracy in which the group referenced as "they" has been clearly developed by preceding context of the series as including Mr. Colborn |
| --- | --- | --- | --- | --- |
| 35 | 3<br>ECF # 120-3<br><br>20:21 –<br>21:03 | Dean Strang says in an out-of-court interview that was apparently specifically for MAM, "I didn't see them plant evidence with my own two eyes. I didn't see it. But do I understand how human beings might be tempted to plant evidence under the circumstances in which the Manitowoc County Sheriff's Department found itself. . . . I don't have any difficulty understanding those human emotions at all." | Repetition of out-of-court statements by Avery's attorney | Statements imply that evidence was planted by the police in a classic example of defamation by implication/insinuation/innuendo |
| 36 | 3<br>ECF # 120-3<br><br>21:16-21:49 | Attorney Buting, in an interview that was apparently also for MAM, states, "So, you've got motivation of the officers to want to get him. And then when lo and behold there's this woman who disappears and one of the last people she saw was Steven Avery. . . .`Now, we've got him. A-ha. We knew it.' They conclude that he's guilty, right off the bat. And they thought, `We're going to | Repetition of out-of-court statements by Avery's attorney | ●Falsely imputes to Mr. Colborn a motive to "want to get" Mr. Colborn – which Mr. Colborn denies<br><br>●Directly accuses officers to plant blood in the RAV and to plant the key in Avery's bedroom |

| | | | | |
|---|---|---|---|---|
| | | make sure he's convicted.'' And they helped it along by planting his blood in the RAV4 and by planting that key in his bedroom." | | |
| 37 | 4<br><br>ECF # 120-4<br><br>32:41 – 33:04 | Attorney Buting, in an interview for MAM, states "Some would – might think, `Well, you know we – our hands were tied . . . .That you got a client who's saying that he's being framed. Publicly, that's kind of the defense you'd better go with' . . . . But it really wasn't that way here. The defense was raised because we think the evidence pointed that way. . . ." | Repetition of out-of-court statements by Avery's attorney | Buting, impliedly portrayed as an expert, interprets "the evidence" for the audience as supporting Avery's framing defense |
| 38 | 4<br><br>ECF # 120-4<br><br>1:00:05 – 1:00:43 | Buting says in another MAM interview, "Sheriff Peterson . . . .clearly, clearly has a strong dislike for Avery.   If the very top guy has this kind of attitude . . . that's gonna permeate the department, the whole department. If not, at least it's going to permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants." | Repetition of out-of-court statements by Avery's attorney | Buting states as a matter of fact that Mr. Colborn and others had a "strong dislike" for Avery just because their superior officer allegedly disliked Avery, ascribing a false motive for Mr. Colborn to allegedly participate in the supposed conspiracy |
| 39 | 4<br><br>ECF # 120-4 | Mr. Colborn's photograph is shown immediately after the above comments, underneath a hierarchy of photographs of the | Visual by MAM | Augments Buting's statements by directly implicating Mr. Colborn as an alleged "lieutenant" or "sergeant" with a motive to frame Avery, as described by Buting in his comments |

| | | | | |
|---|---|---|---|---|
| | 1:00:25 – 1:00:47 | Sheriff's Department chain of command, with the lower levels (including the photograph of Mr. Colborn) illuminated | | |
| 40 | 4 ECF # 120-4 1:03:00 1:04:15 | Buting says in telephone call to Strang that the supposed tampering with a blood vial containing Avery's blood shows that "Some officer went into that file, opened it up, took a sample of Steve Avery's blood and planted it in the RAV4." | Repetition of out-of-court accusations by Avery's attorney | Direct accusation that Mr. Colborn and others who participated in the conspiracy planted Avery's blood in Ms. Halbach's vehicle in order to frame Avery |
| 41 | 5 ECF # 120-5 52:03- 52:12 | Buting states, "Somebody knew that [Ms. Halbach's vehicle]" was there before they ever went in there. I'm convinced of it." | Repetition of out-of-court accusations by Avery's attorney | Accusation that vehicle was planted |
| 42 | 5 ECF # 120-5 52:13 – 53:20 | Interrogation of Avery regarding follows Buting's statement; Avery tells an officer that he was told by a woman identified only as "Tammy" that "a cop" put Ms. Halbach's vehicle on Avery's property "and planted evidence." | Repetition of out-of-court accusations by Avery | Accusation that vehicle was planted as part of the law enforcement conspiracy to plant evidence, in which Mr. Colborn has repeatedly been identified in preceding episodes as a key participant |
| 43 | 5 ECF # 120-5 53:20-:24 | Immediately after the above, cuts to footage of Mr. Colborn about to testify | MAM visual addition | Identifies Mr. Colborn as the person who allegedly planted Ms. Halbach's vehicle |
| 44 | 5 ECF # 120-5 53:24 – 56:56 | Manipulated testimony as described *infra* and in the SAC appears to show Mr. Colborn as damagingly admitting to Strang it is reasonable to understand his | MAM edited testimony is presented as the "clincher" | Edited testimony is used to supposedly put an admission in Mr. Colborn's mouth which, especially when juxtaposed with preceding content, appears to result in a direct admission that Mr. Colborn had discovered Ms. Halbach's car prior to the time it was |

| | | | | |
|---|---|---|---|---|
| | | call to believe that Mr. Colborn had to have been looking at the vehicle at the time | | officially discovered and therefore, must have participated in the conspiracy to plant it on Avery's property |
| 45 | 6<br>ECF # 120-6<br><br>56:26 – 57:11 | Buting, in an interview with MAM, states, "One of the things that the state argued was that it would have taken a wide-ranging conspiracy . . . . Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?" | Repetition of out-of-court accusations by Avery's attorney | Accusations that one or two law enforcement participated in the conspiracy; Buting refers to "they," so he implies it likely was at least two; Mr. Colborn and James Lenk are repeatedly identified in the prior episodes as likely the two "henchmen" for the alleged conspiracy |
| 46 | 7<br>ECF # 120-7<br>1:04 – 1:17 | Statement by Avery's father: "They had Steve picked . . . right away. They set him up. Right from the beginning. . . ." | Repetition of accusations by Avery's father | Directly accuses the conspirators of a plotting to "set up" Avery |
| 47 | 7<br>ECF # 120-7<br>16:19 – 17:32 | Edited trial testimony regarding the discovery of the key is shown here as further described in Mr. Colborn's brief | Edited/manipulated testimony made to look as though it is Mr. Colborn's exact testimony | Testimony that has been manipulated to appear less credible, as explained *infra*, is juxtaposed directly after Avery's father's insinuation that the key was planted by Manitowoc County law enforcement |

| 48 | 7<br><br>ECF # 120-7<br><br>10:45 –<br>12:00 | Buting and Strang are shown in an out-of-court conversation filmed by MAM, stating:<br><br>Buting: "It's not enough to just get the key. He wants Avery's DNA on that. And so he is gonna wait until it is the right time.  And there is a Calumet County deputy with him on all of their searches.<br><br>Strang: Yep. There is . . . .<br><br>Buting: Somewhere nearby, and he was just waiting for the right time . . . when he could do it.<br><br>Strang: That key does not fall from, you know, in between the backboard and the frame of that little bookcase.<br>. . . .<br>Buting:  And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?<br><br>Strang: Blood's easy. . . . | Repetition of out-of-court accusations by Avery's attorneys | ●Accusations are that at least one member of the alleged conspiracy – as to which, again, Mr. Colborn and James Lenk have been implicated by preceding statements as alleged henchman – carefully planned the opportunity to plant Ms. Halbach's key in Avery's bedroom during the search in which Mr. Colborn was present<br><br>●Alleges that "they" (*i.e.,* Mr. Colborn and James Lenk) were motivated to frame Avery because they had been deposed in the Avery lawsuit |

| | | Buting: The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation . . . because of that lawsuit. They were deposed in the lawsuit. They didn't tell. . . ." | | |
|---|---|---|---|---|
| 49 | 7<br><br>ECF # 120-7<br><br>14:48 – 15:15 | Avery states, "I'm in the same situation that I was before. Just a couple of them wanting to nail me. And the other ones didn't. But nobody speaks up. I gotta go through this over and over." | Repetition of accusation by Avery | Avery's statements reinforce and state as fact that "a couple" of the law enforcement officers, who are implicated as officers from Manitowoc County ("the same situation I was before. Just a couple of them wanting to nail me") participated in the conspiracy to frame him |
| 50 | 7<br><br>ECF # 120-7<br><br>15:15 – 20:32 | Directly after Avery's comments above, MAM displays image of Mr. Colborn, and audio of Avery continues; video then switches between images of Mr. Colborn waiting to testify, Avery looking sad, and Mr. Colborn in court | MAM visual addition | Identifies Mr. Colborn as one of the officers participating the conspiracy as identified by Avery in his preceding comments |
| 51 | 7<br><br>ECF # 120-7<br><br>20:32 – 21:41 | Avery's defense investigator, Pete Baetz, accuses the Manitowoc County Sheriff's Department, through alleged conflict of interest, of having "committed themselves to proving Steven Avery had committed the crime." | Repetition of third-party accusation by Avery investigator | Provides context for credibility challenges made by the series against Mr. Colborn and others by accusing the department members as being suspect with respect to "their credibility," and as having "committed themselves to proving" that Avery was guilty, regardless of the truth |
| 52 | 7<br><br>ECF # 120-7 | Switches to news conference footage of exchange with reporter in which she questions Strang about whether the defense went | Repetition of out-of-court accusation by Avery's attorney | Strang, speaking out of court, goes farther than necessary in his role as defense counsel and asserts that there is not just reasonable doubt regarding alleged planting evidence sufficient to warrant a not guilty |

| | | | |
|---|---|---|---|
| | 24:28 – 26:01 | too far by accusing Mr. Colborn of being a "bad cop," which includes the following:<br><br>    Strang:  This was a hard day, and there've been some hard days for Sgt. Colborn. . . ."<br><br>    Reporter:  "But my question is though, if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place."<br><br>    Strang:  You're hearing evidence of the conspiracy.  And I've sat in many a federal courtroom and heard federal prosecutors prove a conspiracy on less than we've heard already hear and that you will hear by the end of this trial." | | verdict in the criminal trial, but sufficient evidence to convict Mr. Colborn in a federal court for a conspiracy to plant evidence |
| 53 | 7<br>ECF # 120-7<br><br>37:43 – 37:57 | Telephone conversation between Avery and his mother:<br>Avery's mother:  It seems suspicious.<br>Avery:  Yeah.<br>Avery's mother: Them people ain't gonna get away with everything. | Repetition of accusations by Avery and his mother. | Accusations directed toward Mr. Colborn and other alleged conspirators as "them people" who aren't going to "get away" with the conspiracy as identified in preceding discussion. |

| 54 | 7<br>ECF # 120-7<br><br>45:35 –<br>46:54 | Following segments regarding testing of the blood by the FBI, Buting is shown stating, "Look how quickly they got the FBI to retool their instruments . . . . It shows the imbalance between the individual and the power of the government. The full force of which they're trying to bring to bear on this man. Why? . . . Because we have accused – and the evidence suspiciously points to – framing by one of them. . . . . Again, it's not like they think they're framing an innocent man. But they are." | Repetition of out-of-court accusation by Avery's attorney | ●Buting suggests that the FBI testing is suspicious, implying to viewers that the blood vial testimony may also be part of the conspiracy (an argument not made by defense attorneys in court, only for MAM)<br><br>●Buting directly accuses the alleged conspirators of "framing an innocent man." As explained above, MAM has repeatedly implicated Mr. Colborn as a member of the alleged conspiracy |
|---|---|---|---|---|
| 55 | MAM2 (as alleged in SAC ¶¶53-59. | Repeats accusations by a man Mr. Colborn previously arrested for drunk driving who now says that Mr. Colborn found Ms. Halbach's vehicle prior to its official discovery. | Repetition of Third-Party Accusations | Further unprivileged assertions of criminal or dishonest conduct. Further, this assertion was embraced by MAM viewers on social media. *See* Barker Decl., Ex. J. |

(ECF numbers above correspond to docket numbers that are referenced as "Dkt" in the text of the brief.)

**III.    The Issue of "Substantial Truth" Cannot Be Determined in Defendants' Favor.**

Media defendants do not have a general license to repeat accusations of criminal conduct just because someone has made them before they were published by the media. As explained below, under the doctrine of re-publication, accusations of criminal or dishonest conduct are actionable even if attributed to another party– and even when made by media defendants – unless the accusations can be established to be true (not just to have been uttered by the third party) or the repetition of the statements meets the criteria for protection under a specific defense, such as the privilege that applies to "fair reports" of judicial or other official proceedings.

Though Defendants mention the "fair report privilege," they have not argued in their brief that the entire broadcast was privileged, nor could they, as explained below. Instead, they cite non-Wisconsin authority as allegedly allowing the media to defend, as "accurately" repeated, any accusations made against anyone by anyone else. That is not the law of Wisconsin, as explained below. Moreover, even if third-party accusations could be considered "true" simply because they were made, Defendants' statements would not qualify under the other requirements imposed by the substantial truth doctrine.

**A.  Under Wisconsin Law, Repetition of Third-Party Statements is Not "Truth."**

Defendants argue that all of the statements in MAM are "substantially true" accounts of accusations by third parties that Mr. Colborn and others planted evidence to frame Steven Avery. This doctrine is not a sound basis for dismissal of Mr. Colborn's claims for numerous reasons.

First, Defendants' description of the doctrine of "substantial truth" is not consistent with Wisconsin law. Under Wisconsin law, one who republishes a third party's defamatory statement by a third party is also liable to persons defamed by the statement; it is not a defense to a

defamation claim that the defendant merely accurately repeated a statement that was first uttered by a third party. *Hart v. Bennet*, 672 N.W.2d 306, 318 (Ct. App. 2003).

> The principle of the republisher's liability was recognized in Wisconsin almost a century and a half ago in *Sans v. Joerris*, 14 Wis. 722, 726 (1861).
>
>> The law is well established that it is no justification in an action for libel, that the libelous matter was previously published by a third person, and that the defendant, at the time of his publication, disclosed the name of that person and believed all of the statements in the libel to be true.

*Id. See also Gerol v. Arena*, 377 N.W.2d 618, 621 (Wis. Ct. App. 1985) (explaining that under Wisconsin precedent, defendant could not defend statements as "true because he indeed had heard such rumors" because that is not a defense to a defamation action; rather, the defendant was required to prove the truth of "the defamatory charges repeated by the defendant" (citing Restatement (2d) of Torts §581A cmt. e (1977)); *see also Hucko v. Joseph Schlitz Brewing Co.*, 302 N.W.2d 68, 72 (Wis. Ct. App. 1981) ("Secondary publication by a newspaper, magazine, or periodical may expose such a publisher to liability . . . .").

As further explained below, MAM is replete with express and implied accusations that Mr. Colborn participated in a conspiracy to plant evidence to frame Avery and that Mr. Colborn lied about it in his testimony at Avery's trial. *See infra* at pp. 18-35 (chart). Police officers who plant evidence may be convicted of felony charges of misconduct in office and obstructing an officer. *See, e.g.,* Barker Decl., Ex. H (charges against a former officer under Wis. Stat. §§946.41(1), 946.12(1)). Perjury is likewise a criminal offense. Wis. Stat. §946.31.

A statement by any person that Mr. Colborn committed criminal conduct is defamatory. *See, e.g., Downer v. Tubbs*, 139 N.W. 820, 822 (Wis. Sup. Ct. 1913). Under Wisconsin law, it is "elementary" that a publication that falsely "by printing or writing, or by signs or pictures . . . accuses a person of a crime, blackens his character, or tends to expose him to public ridicule,

contempt, or hatred, is libelous." *Id.* (internal quotation and citation omitted). Also defamatory are false statements that tend to prejudice a person in his business, impute to him want of official integrity, or that cause him, in his official capacity, to be regarded with distrust. *Id.* (internal citations omitted). Moreover, a statement that a person has been charged with a crime imputes the commission of the crime to him, "and is defamatory." *Prahl v. Brosamle*, 295 N.W.2d 768, 775 (Wis. Ct. App. 1980), abrogated on other grounds, *Wilson v Layne,* 526 U.S. 603 (1999).

Although Steven Avery's attorneys could potentially assert that statements that they made in defending Avery at his murder trial were subject to a privilege for communications made by attorneys during the course of court proceedings, even they could not seek refuge in that privilege for comments that they made to the media. *See, e.g., Kennedy v. Zimmermann*, 601 N.W.2d 61, 65-66 (Iowa Sup. Ct. 1999) (interviews with news reporters fall outside scope of privilege for statements by attorneys in judicial proceedings); Prof. Resp. Crim. Def. Prac. 3d §31:25 (updated Nov. 2019) (general law of libel applies to attorneys' out-of-court statements); 50 Am.Jur.2d Libel & Slander §300 (updated 2020) (republication to nonparticipants is generally not privileged). *A fortiori,* Defendants' repetition of those statements, long after the conclusion of Avery's trial and to a worldwide audience, could not fall within any such privilege, even if it extended to Defendants rather than merely to the defense attorneys themselves.

Nonetheless, Defendants argue that accurate recitations of accusations by third parties are protected as "substantial truth," citing examples of non-Wisconsin authority in which courts in other jurisdictions and federal courts interpreting other states' law have, without saying as much, conflated and expanded the affirmative defense of "fair report" or "neutral reportage" and labeled it as an application of the "substantial truth" doctrine instead. Dkt # at 119 at 32-34.

The "fair report" privilege is an affirmative defense that protects a media defendant to the extent that the defendant renders an accurate report of certain official proceedings. *See* David Elder, Defamation: A Lawyer's Guide §3:25. The "fair report" privilege is generally unavailable where reports of what occurs in courts are combined with "defamatory observations of comments thereon." *Id.* Moreover, the privilege may be forfeited where the defendant expressly adopts or concurs in allegations of criminality or other immoral or unprofessional conduct. *Id.* The defendant's imprimatur for the accusations need not be expressly stated; it is enough that the defendant appears to give them an "air of authenticity" or "insinuates or implies" that the "plaintiff was guilty or culpable." *Id*. As a matter of black letter law, the privilege is unavailable where a report is made with actual malice, or where it is "inaccurate, incomplete, or unfair." 50 Am.Jur.2d Libel and Slander §300 (updated Feb. 2020); *see also Buckstaff v. Hicks*, 68 N.W. 403, 404 (Wis. Sup. Ct. 1896) (conditional or qualified communications such as "fair reports of proceedings of courts and legislatures" are subject to the "cardinal principle" that "they must be made in good faith."). Moreover, "excessive publication" that transmits statements "to the world" may result in loss of a conditional privilege. *Id., 68 N.W. at 405.*

In Wisconsin, the "fair report" privilege is codified with respect to publication in newspapers, but the statute does not encompass broadcast publications. Wis. Stat. §895.05(1). For newspapers, the Wisconsin Legislature expressly limited the privilege as codified so that it does not protect libelous matter contained in any "headline or headings to any such report, or to libelous remarks or comments added or interpolated in any such report or made and published concerning the same, which remarks or comments were not uttered by the person libeled or spoken concerning the person libeled in the course of such proceeding . . . ." *Id.* Under a common law or statutory "fair report" privilege, "caution [is] demanded of a reporter of

privileged public proceedings when he enters the field of content and summarization." *Isley v. Sentinel Co.,* 113 N.W. 425, 427 (1907); *see also* Elder, *supra,* a§3:25 (citing *Isley*).  In *Isley*, the Court explained that content in a report transcends the bounds of the "fair report" privilege if "is even capable" of being understood as asserting the veracity of the facts alleged by the participants in the proceeding upon which the report is based. *Id.*

 With the exception of one statement that is referenced in a single sentence in Defendants' brief, and which will be addressed separately below, Defendants did not expressly argue that a "fair report" privilege protected their entire broadcast. *Cf.* Dkt #119 at pp. 32-34 (arguing that broadcast is "substantially true" report of others' allegations). Any such argument would have failed from the gate, as is evident from the criteria for the privilege, because as the summary of its content shows, MAM strays far beyond any official report of any proceeding and links together numerous extrajudicial defamatory accusations by Avery, Avery's family members, Avery's former civil lawyers, Avery's defense lawyers speaking in interviews for MAM, and even unidentified bar patrons, to suggest the truth of Avery's conspiracy accusations. *See* pp. 18-35 *infra*. In addition, the SAC alleges that the statements were unfair, inaccurate and made with actual malice, which was the subject of a prior challenge by Defendants but must be assumed for purposes of this motion. *See* SAC at ¶60; *Buckstaff v. Hicks,* 68 N.W. at 404 (conditional privileges such as "fair report" require a showing of "good faith").   Further, the "fair report" privilege is an affirmative defense which Plaintiff was not required to anticipate, as to which Defendants carry the burden of proof, and which is "rarely a good reason to dismiss under Rule 12(b)(6)." *See, e.g., Reiser v. Residential Funding Corp.,* 380 F.3d 1027, 1030 (7th Cir. 2004).

 A "neutral reportage" privilege would be inconsistent with governing Wisconsin law regarding republisher liability, and Wisconsin has not adopted it. *See Hart v. Bennet, supra*, at

n.14 (noting that "some jurisdictions" have recognized a "neutral reportage" privilege that "applies to charges about a public figure or public official in certain situations," but adhering "to the established common law rule" in applying established Wisconsin precedent).

As noted above, Defendants do not purport to primarily ground their motion in "fair report" or "neutral reportage" privilege, but reach instead for an assortment of non-Wisconsin opinions that have attempted to describe as "substantial truth" what would create, in fact, an expanded version of the "fair report" privilege and which would ignore the republication doctrine that imposes liability for a publisher's non-privileged repetition of defamatory third-party statements. Without addressing the conflict posed by Wisconsin law, Defendants primarily rely on the Seventh Circuit's opinion in *Global Relief Foundation, Inc., v. New York Times Co.,* 390 F.3d 973, 987 (7th Cir. 2004), a case that was decided based on the court's interpretation of Illinois law as permitting republished statements relating to a government investigation of the plaintiff. As one commentator has noted, that case "reflects Illinois law, at best." Truth, Accuracy and Neutral Reportage: Beheading the Media Jabberwock's Attempt to Circumvent New York Times v. Sullivan, 9 Vand. J. Ent. & Tech. L. 551, 743 (Spring 2007). Even if it did not conflict with Wisconsin precedent governing republisher liability, *Global Relief* could not apply because it reported about a government investigation, 390 F.3d at 987, not repetition and augmentation of a criminal defendant's accusations against those involved in his arrest.

The other cases cited by Defendants are similarly inapposite. *Janklow v. Newsweek, Inc.,* 759 F.2d 644, 649 (1985), on reh'g en banc, 788 F.2d 1300 (8th Cir. 1986), applied South Dakota law. Likewise, *Croce v. New York Times Co.,* 930 F.3d 787, 793 (6th Cir. 2019), was decided under Ohio law, is inconsistent with Wisconsin precedent regarding republisher liability, and involved reporting that was characterized as including "appropriate qualifying language." Here,

as explained *infra,* Defendants ramped up Avery's accusations and purported to give them credibility through "expert" interviews, visuals that repeated and enhanced the accusations, and manipulations of Mr. Colborn's own testimony. And *Fairfax v. CBS Broadcasting, Inc.,* (E.D. Va. Feb. 2020), is again inconsistent with Wisconsin's republisher liability doctrine.

*Partington v. Bugliosi*, 56 F.3d 1147, 1159-69 (9th Cir. 1995), which Defendants also cite, held that statements about an attorney's performance in trial constituted a subjective evaluation that could not be proven true or false, and therefore were not defamatory. In holding that the plaintiff also could not recover under a "false light" theory, the court also distinguished a "minor misrepresentation" at issue in that case from more serious accusations, such as lying or perjury. *Id.* However, MAM does not merely "critique" Mr. Colborn's performance but squarely places him in the middle of an alleged conspiracy to frame Avery. *See* pages 18-35 *supra.* And in *Peterson v. Grisham,* 594 F.3d 723, 729 (10th Cir. 2010), which applied Oklahoma law and its statutory privilege, the court explained that it was significant that the plaintiffs were not accused of any criminal conduct. *Id.*

Defendants' reliance on *Riley v. Harr,* 292 F.3d 282 (1st Cir. 2002), is similarly misplaced. The decision purported to apply New Jersey law but cited little precedent in reaching its conclusions. Moreover, Defendants describe *Riley* as similar to the present case because the Court allegedly rejected a defamation claim where a book "expressly noted that a jury rejected [the allegedly defamatory] theory with its verdict." Dkt #119 at p. 41 (citing 292 F.3d at 286). Assuming, *arguendo,* that *Riley* can be fairly interpreted as Defendants suggest, the rationale would not sanitize the MAM broadcast for several reasons. Defendants' assertions that MAM "informed viewers that the defense's 'framing' theory has been repeatedly and consistently rejected," that MAM included "detailed refutations of the theory by prosecutors and witnesses"

and that "reasonable viewers could not reasonably understand MAM to endorse the theory that the 'framing' theory is in fact true," *cf.* Dkt #119 at p. 34, are not followed by any references to the MAM broadcast and are, as noted above, utterly inconsistent with the filmmakers' and viewers' interpretations of MAM. As explained above, the filmmakers have publicly described MAM as challenging the validity of the verdict. *See* discussion *supra* at pp. 5-7. In addition, viewers have overwhelmingly interpreted MAM as making those accusations. *Id.* at pp. 8-11. Examination of the content of the broadcasts themselves demonstrates how MAM, with astounding cinematographic skill, led viewers to those conclusions. *See supra* pp. 18-35. Further, as shown below, the last three episodes of MAM lodge an all-out assault on the verdicts issued against Avery and Dassey, paired with frequent odes to their innocence:

Episode 8 (Dkt. #120-8)

- Eerie, foreboding music plays as the Averys and their lawyers in the courtroom (25:50-26:00).

- Avery is shown shaking head as the verdict is read (26:50-27:30).

- There is a long take on Avery, with sad music playing in the background, and shots of his mother looking upset (27:30-27:50).

- In footage of press conferences, first brief remarks by Kratz are shown, then comments are made by Strang and Buting are shown going to the podium. Strang says that the verdicts are clearly inconsistent. He says, "Our criminal justice system failed [Avery] before and I fear this is another example." He adds that it's "sad" that as a society, "we haven't mastered justice any better than we have." (29:35-31:55).

- A reporter asks, "So do you think there's a killer out there who has not been caught?" (31:56-32:08).

- Buting replies, "Absolutely. That's been our position all along." (31:56-32:08).

- Avery's father is shown saying, "They got their way, period. Manitowoc County won again." (33:24-33:31).

- Shortly thereafter in the episode, MAM features an interview with an excused juror that says that he felt that there were "biased jurors" who had their minds made up. He said that other jurors were "weak and tired" and that, as a result, the

verdict "may have been a compromise." The excused juror states that there are, in fact, "a lot of unanswered questions," adding "I believe we don't know for sure. . . . .who killed Teresa . . . ." (35:40-36:35).

- Following the interview with the excused juror, MAM includes footage from an interview with Avery's investigator in which he accuses the prosecutor of acting "unprofessionally" and states angrily, "This wasn't seeking a truth, this was seeking a conviction." (37:00-37:50).

- Kim Ducat, Avery's cousin, is then shown stating that the conviction proves that "they" were "hellbent" on "nailing" Avery (37:50-38:10).

Episode 9 (Dkt. #120-9)

- Strang directly criticizes the Dassey verdict and says he does not believe that Dassey committed the offenses for which he was convicted (56:45-57:50).

- Avery's mother states, "I love [you] guys and I know you're innocent." (57:50-58:00).

- Clips are shown from the Avery sentencing hearing, at which he denies killing Teresa Halbach and states that he will prove his innocence (1:00:05-1:01:00).

- Strang is shown stating to the camera, "Most of what ails our criminal justice system lie in unwarranted certitude on the part of police officers and prosecutors and defense lawyers and judges and jurors that they're getting it right." (1:03:11-1:03:30).

- Buting is shown stating to the camera, "We can never be guaranteed that no one's ever going to accuse us of committing a crime. And if that happens, then you know, good luck, in this criminal justice system." (1:03:49-1:04:06).

Episode 10 (Dkt. #120-10)

- A reporter for a local radio station is interviewed noting that everyone was convinced that Avery was guilty of rape until evidence proved otherwise and that now, with the Halbach case, investigative techniques are better and that in the community, the feeling is that Avery "got what he deserved." (2:40-3:20)

- Allan Avery is shown stating, "They ruined us. They ruined our business." (3:54-4:00)

- Avery says, "I gotta prove my innocence again. Just like my first case." (5:06-5:30).

- Post-conviction, most hearing footage is shown with a voiceover of Avery stating, "The appellate attorneys – they gotta find a loophole that what they did, it's not legal." (6:23-6:37)

- Allan Avery states that Avery's mother has "a lot of hope for a new trial" as a result of Avery's appeal. (7:13-7:20).

- Avery's girlfriend states in an interview with MAM that she "truly did not believe" that Avery was guilty. (8:25-8:40)

- Dassey's mother (Avery's sister) is shown stating in 2010, "If Steven would have done it, I think he would have confessed by now. And he hasn't confessed. I believe he's innocent." (10:40-10:55).

- Printed words on screen state, "In August 2011, the Wisconsin Court of Appeals upholds Judge Willis' decision denying Steven a new trial." Immediately following that statement, Avery states, "I always feel like they kicked me in the gut again . . . ." (39:36-39:45)

- Printed words state, "Four months later, in December 2011, the Wisconsin Supreme Court refuses to hear Steven's case." Immediately after, Avery states, "They shoulda did something. They shoulda heard it. Because the case doesn't make no sense. You always get let down by the court system." (39:57-40:13)

- Printed words on the screen state, "At the filmmaker's request, Steven's former lawyers meet to discuss Steven's remaining legal options." Those present are shown as including Steve Glynn, now identified as part of the post-conviction team; Strang; and Buting. During the meeting, Buting states, "I've still got my suspicions about whether something improper occurred during the deliberations." (41:14-42:35).

- MAM next cuts to an interview with the excused juror, who states, "I feel terrible that Teresa's gone . . . but I also on the other hand feel bad because Steven and Brendan's life has been taken from them, basically . . . . deep in my heart, with all the evidence and all of the things that I know . . . whoever did this to Teresa is still out there." (43:39-45:01)

- Avery's mother is shown stating, "I'm stickin' by Steven." She is also shown displaying a home listing for a house that she has "picked" for Avery "when he gets out so that he has got a good place to live. After being in prison for something he don't even do." (45:48-46:21)

- Avery is next heard stating, "I'm trying to fight for a new trial." (46:40-46:50)

- The broadcast features Avery's *pro se* post-conviction motion. (46:32-49:08)

- Following sentimental footage of Avery's parents, Kim Ducat, Avery's cousin, is shown stating, "I hope when the day comes when he's freed, his name is finally cleared, that his parents are still there . . ." (58:25-58:45)

- Buting is shown stating, ". . . . This may take a while to right this wrong. It took 18 years last time. I certainly hope that it doesn't take another 18 years." (1:00:00-1:00:14)

- Avery states, "I want my life. But they keep on taking it . . . .When you know you're innocent, you keep on going." (1:00:50-1:01:20)

It is difficult to imagine how the series could have more clearly hammered the filmmakers' position that the verdict got it wrong and was wrongfully obtained. Defendants' argument that they reported the verdict against Avery is also, as they themselves admit, not in and of itself inconsistent with their accusations that law enforcement planted evidence. *See* Dkt #119 at 43.

As explained above, no Wisconsin authority permits republished third-party statements to be characterized as "true" or "substantially true" just because someone else initially uttered them. Rather, the statements must either be shown by the republisher to fall within a recognized privilege or proven to be true. *See, e.g., Gerol v. Arena, supra*, 377 N.W.2d 621; *see also Hucko, supra,* 302 N.W.2d at 72. Therefore, Defendants' expanded version of substantial truth to cover material that could not fairly be interpreted as within the scope of "fair report" or any other recognized privilege is not consistent with Wisconsin law and cannot support their motion to dismiss. Defendants' argument should be seen for what it is, which is an attempt to evade the limits of Wisconsin's "fair report" privilege by expanding the contours of "substantial truth."

**B. MAM Did Much More Than Report on the Defense As Presented At Trial.**

Even if Defendants could somehow contend that every repetition of a third person's statement is substantially true simply because it was made by the third person, the defamatory material in MAM was far outside the scope of what any court would consider "substantial truth."

The defense of "substantial truth" can excuse "[s]light inaccuracies of expression" where a defamatory charge is "true in substance." *Prahl v. Brosamle, supra*, 98 Wis. 2d at 141, 295 N.W.2d at 776 (quoting 581A Restatement (2d) of Torts at 237 (1965)); *Maguire v. Journal Sentinel, Inc.,* 232 Wis. 2d 236, 247, 605 N.W.2d 881, 888 (Wis. Ct. App. 1999) (citing *Latham v. Journal Co.,* 30 Wis. 2d 146, 158, 140 N.W.2d 417, 423 (Wis. 1966)). However, a false

statement that a person has been charged with (or committed) a crime "is not a slight inaccuracy," even if the "balance" of the publication is substantially true. *Prahl*, 98 Wis. 2d at 141, 295 N.W.2d at 776. The defense of substantial truth does not "sanitize" glaring falsehoods, even when they are presented in a "series of true or substantially true statements." *Id.* In addition, "substantial truth" does not protect statements that are alleged to be based on public records but that reflect "speculation about the meaning" of the records. *Laughland v. Beckett,* 870 N.W.2d 644, 474-75 (Wis. Ct. App. 2015).

It is important to note that the "substantial truth" doctrine should not be confused or merged with the defense of "incremental harm." The latter defense does not address whether the statement is true or false, and instead questions whether a false statement damaged the plaintiff's reputation more than admittedly true facts. *Maguire*, 605 N.W.2d at 888. To the extent that Defendants argue that equally damaging statements about Mr. Colborn were made by others, that is not a "substantial truth" defense. It is an "incremental harm" argument, which is not recognized in Wisconsin. *Id.*

Under Wisconsin law, a defense of "substantial truth" fails when some of the publication's accusations "might be true" but others are not. *Gerol v. Arena*, 377 N.W.2d 618, 620 (Wis. Ct. App. 1985). For example, in *Gerol,* the Wisconsin Supreme Court rejected an argument that statements were substantially true when a publication magnified evidence of a doctor's hospitalization for a drug overdose by referencing "hospitalizations in the plural" and described evidence of a possible suicide attempt in terms of "plural attempts." *Id.,* 377 N.W.2d at 620-21. The court held that a jury could find that those alterations were more defamatory to the plaintiff than the truth because they represented him "as chronically drug dependent and as mentally unstable." *Id.* Similarly, the Court held that referring to the plaintiff as a "hired gun" in

medical malpractice actions, when most of his work involved his own patients, could support a conclusion by jurors that a person would interpret the content in a manner that was "substantially untrue." *Id.,* 377 N.W.2d at 621.

Other jurisdictions likewise refuse to protect as "substantial truth" statements that present facts in a way that is false, misleading, or augmented by the publisher. *See, e.g., Scripps NP Operating, supra*, 567 S.W.3d at 792-94 (where gist of story was not only that allegations were made, but that they were in fact true, substantial truth doctrine could not be conclusively established); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 117-18 (Tex. Sup. Ct. 2000) (publisher may be liable for defamation where discrete facts that are literally or substantially true are published in such a way that they create a substantially false and defamatory impression by "omitting key facts" or juxtaposing facts in a misleading way); *Toney v. WCCO Television, Midwest Cable and Satellite, Inc.,* 85 F.3d 383, 387 (8th Cir. 1996) (defendant may be liable for omitting important facts or juxtaposing facts "so as to imply a defamatory connection").

A court cannot rule, as a matter of law, that statements are substantially true where they impute fraudulent or criminal intent to a person who has not been convicted of or even charged with a crime. *See Scripps NP Operating, LLC v. Carter, supra,* 573 S.W.3d at 794. In addition, even where a person has been formally convicted of a crime – which certainly is not the case for Mr. Colborn – a defendant cannot "hide behind the truth defense" to make a statement whose "gist" is that the person actually committed the acts for which he was convicted. *See, e.g., Rivera v. Lake County,* 974 F. Supp.2d 1179, 1192 (N.D. Ill. 2013). Moreover, statements that contradict evidence as it was presented in a trial may "alter the underlying meaning of the reporting" about the trial, as Mr. Colborn alleges in this case. *See, e.g., Skakel v. Grace,* 5 F. Supp.3d 199, 208 (D. Conn. 2014). *A fortiori*, Defendants cannot contend that "substantial truth"

protects them. As demonstrated in Section II, *supra*, Defendants' villainization of Mr. Colborn, through the use of MAM's additions, cumulatively goes beyond that which Avery's attorneys or any other individual attempted to assert against him.

### 1. MAM Used Its Own Additions, Enhancements, Augmentation, and Juxtaposition of Materials to Defame Mr. Colborn.

Under Wisconsin law, audio and visual portions and their relation to each other must be considered when evaluating the defamatory effects of a broadcast. *Mach v. Allison*, 656 N.W.2d 766, 712 (citing *Giwosky v. Journal Co.,* 237 N.W. 2d 36 (1976) and Rodney Smolla, Law of Defamation §4:32, pp. 4-50 to 4-51 (2d ed.)). The "gist" of a publication is the "'natural and reasonable import' of the words and images on the viewer." *Id.* (citing and quoting *Woods v. Sentinel-News Co.,* 216 Wis. 627, 258 N.W. 166 (1935)).

The chart set forth in Section II, above, demonstrates that the cumulative effect of MAM's skillfully crafted presentation is substantial. It is not remotely credible for Defendants to assert that MAM did nothing more than report the same information that anyone would have obtained by watching the trial or listening to any of the statements of any third parties in isolation. Contrary to Defendants' argument, Defendants did much more than explain that there was a trial, that the defense argued that Avery was framed by law enforcement in retaliation for his civil suit, and that the jury rejected that theory and convicted Avery.

It is also important to note that the portions of the Avery civil case deposition testimony that are included in Episode 2 do not fairly reflect the testimony that Glynn actually elicited from Mr. Colborn, all of which the SAC alleges was available to Defendants when they produced MAM. That testimony shows that, contrary to the Glynn accusations repeated in MAM, Glynn elicited testimony from Mr. Colborn that establishes that there would have been no reason, under the jail's record-keeping practices, for Mr. Colborn to make a report of the call that he

transferred from the jail. Burnett Decl., Ex. 1 at 2:46-4:19. Glynn also elicited testimony that,

through a series of leading questions by Glynn, conclusively established that Mr. Colborn had no

authority to investigate the call further, directly contrary to Glynn's accusations in MAM:

Glynn:          At any rate, you recognized that this was significant enough that you should
                forward that call that was coming in from another detective to someone in the
                Manitowoc County Sheriff's Department to take it further, correct?

Mr. Colborn:    Yes.

Glynn:          It wasn't within your jurisdiction to take it any further, correct?

Mr. Colborn:    No, sir.

Glynn:          I mean, even if you had wanted to, you didn't have the legal authority under your
                job duties to do that.

Mr. Colborn:    Correct.

Burnett Decl., Ex. 1 at 12:41-14:30; Dkt.#120-14 p. 14.

        MAM also portrays Mr. Colborn as furthering the cover-up in his deposition testimony

that he did not recall with whom he may have discussed, in 2003, the prior call to the jail.

Through juxtaposition with other witnesses' testimony that is pieced together to suggest that

Mr. Colborn may have discussed the report with an assistant district attorney in 2003, MAM

implies that the other witnesses' testimony catches Mr. Colborn in a lie. Dkt# 120-2  23:50 –

26:52. The testimony by Mr. Colborn that MAM includes stops just short of a clarification that

would have dispelled any nefarious construction of Mr. Colborn's testimony: Glynn asks Mr.

Colborn, "But you're not ruling out the possibility that you may have discussed it," to which Mr.

Colborn replies, "No I'm not ruling out the possibility that I may have discussed it with someone

else." Burnett Decl., Ex. 1, 19:06-19:34. The omission of this clarification is used to attempt to

portray a more stark contrast between Mr. Colborn's testimony and that of others.

        Nor are supposed denials by Mr. Colborn, which are contained in other episodes that

viewers may or may not have watched, sufficient to alter the gist of MAM. First, to the extent

that MAM includes denials, they either pay mere lip service to them or, worse, carefully craft and manipulate them to look less credible. *See* discussion *infra* at pp. 60-65. Second, some viewers may have watched only one or two episodes and not have been aware of the supposed clarifications in Colborn's own testimony, even as it was manipulated and truncated by MAM.

At the very least, the materials referenced in the SAC plausibly may be interpreted as supporting Mr. Colborn's claims. It could be concluded that the statements <u>cannot</u>, as a matter of law, be protected by the "substantial truth" doctrine, because they accuse Mr. Colborn of criminal conduct, rather than merely asserting that a criminal defendant raised that defense at a trial. At a minimum, whether MAM's statements considered in the context of the broadcast of a whole are "substantially true" should be decided by a finder of fact.

### 2. MAM Altered Mr. Colborn's Prior Testimony To Make the Substance and Appearance of His Testimony Appear Less Credible.

Defendants concede, as they must, that Mr. Colborn accurately identifies numerous edits by MAM to his direct testimony, both at the deposition taken in Avery's civil action and at the criminal trial of the charges relating to Ms. Halbach's murder. Defendants contend that none of the copious edits affected the gist of the reporting about Mr. Colborn, and that, in any case, their splicing and reformulations of testimony were merely editorial prerogative. Neither is true.

The seminal case in which the question of falsity was examined in a claim involving alteration of quoted material is *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496 (1991). In *Masson*, a psychologist claimed that a journalist defamed him by fabricating, altering and misquoting statements that were attributed to him. The district court granted summary judgment on the grounds that actual malice could not be established, and the Court of Appeals affirmed.

In reversing, the United States Supreme Court explained that the statements were false if the published statements materially differed in meaning from the statements that the speaker

actually made. 501 U.S. at 517. The court further clarified that a statement is "false" if it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* (quotation and citation omitted). The Court noted that "[i]n general, quotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim. They inform the reader that he or she is reading the statement of the speaker, not a paraphrase or other indirect interpretation by an author." 501 U.S. at 511.

The Supreme Court further explained that when words in a purported direct quotation are fabricated or altered, a plaintiff's reputation may be injured *either* through the fact of the false statement *or* through the manner of the false expression. *Id.*

> A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation. First, the quotation might injure because **it attributes an untrue factual assertion to the speaker.** An example would be a fabricated quotation of a public official admitting that he had been convicted of a serious crime when in fact he had not.

> Second, r*egardless of the truth or falsity of the factual matters asserted within the quoted statement,* the attribution may result in injury to reputation because **the manner of expression** or even the fact that the statement was made indicates **a negative personal trait** or an attitude the speaker does not hold. . . . .

*Id.* (emphasis added). A fabricated quotation may "carry more force than criticism by another," because it is "against self-interest to admit one's own criminal liability, arrogance, or lack of integrity, and so all the more easy to credit" when allegedly conceded in what appear to be the speaker's own words. *Id.* at 512. For those reasons, "quotations may be a devastating instrument for conveying false meaning." *Id.* at 517.

The Supreme Court rejected the defendants' argument that the press should be given a license to "rationally interpret" quoted material, refusing to give journalists the freedom "to place statements in their subjects' mouths without fear of liability." 501 U.S. at 519-20.

The significance of the quotations at issue, absent any qualification, is to inform us that we are reading the statements of the [speaker], not [the reporter's] rational interpretation of what [the speaker] has said or thought. Were we to assess quotations under a rational interpretation standard, we would give journalists the freedom to place statement in their subjects' mouths without fear of liability. By eliminating any method of distinguishing between the statements of the subject and the interpretation of the author, we would diminish to a great degree the trustworthiness of the printed word and eliminate the real meaning of quotations. Not only public figures but the press doubtless would suffer under such a rule. Newsworthy figures might become more wary of journalists, knowing that *any comment could be transmuted and attributed to the subject, so long as some bounds of rational interpretation were not exceeded.* We would ill serve the values of the First Amendment if we were to grant near absolute, constitutional protection for such a practice.

*Id.* (emphasis added).

The Court instead analyzed each of six statements identified by the plaintiff in opposition to the Defendants' summary judgment motion in order to determine "whether the published passages differ materially in meaning from the tape-recorded statements so as to create an issue of fact for a jury as to falsity." 501 U.S. at 521. The Court noted that it could rule in the Defendants' favor as to each statement only if it could conclude "as a matter of law" that the remarks "bear the same substantial meaning" as the actual recorded statements. *Id.* at 524. The court held that five of the six statements presented a jury question as to whether the alterations materially altered the meaning of the statements, including, among others, statements that purported to quote the speaker as indicating that he did not know why he included content in an academic paper when his actual comment was that he included the material because it was true and he believed it. *Id.* The court explained that the revised statement could injure "a scholar's reputation." *Id.* The court additionally held that statements presented questions of fact for the jury where they could be interpreted as making the speaker look more "arrogant" or as using an "unprofessional tone," made the speaker appear to admit that he was dishonorable, and made the speaker appear to admit that he would forsake integrity for pecuniary or other gain. *Id.* at 522-25.

Quoted statements also may be found to materially differ from the speaker's meaning when an author adds "innuendoes to some quoted statements" and "quote[s] other statements out of context." *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969), recognized as abrogated on other grounds by *Gleason v. Smolinki*, 125 A.3d 920 (Conn. Sup. Ct. 2015). In addition, "melding" and "distillation" of the contents of statements may result in "misplaced emphasis, or exaggeration, or distortion." *Id.* In *Ginzburg*, the author of an article incorporated materials written by others in an article while omitting other portions of the sources that "might tend to qualify or contradict the part quoted." *Id.* The author also included "distillations" of source material without any indication and changed and rewrote others' words. *Id.*

Defendants argue that they could not portray Mr. Colborn's testimony in its entirety because they did not have the broadcast time to do so. But it is one thing to edit for space when abridged material is clearly labeled as an excerpt. If editing is necessary for length, there is nothing that prevents a creator of a work from disclosing that fact to viewers. Disclaimers can be used, just as re-recreations are often identified as such. *See Masson, supra*, 501 U.S. at 512-13 (noting that an "acknowledgment that the work is so-called docudrama or historical fiction, or that it recreates conversations . . . might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they attributed.") Here, in contrast, MAM edited what are represented as direct statements that are not in any way identified as having been edited and that instead purportedly present seamless representations of trial testimony. MAM openly invited an examination of Mr. Colborn's credibility based on edited portions and spliced of testimony that were effectively scripted to fit its narrative and thesis.[7] Ultimately, MAM's "editing license" argument asserts that it "rationally interpreted" the testimony when it cobbled

---

[7] This very concern animates the principle protection under the "fair report" privilege is forfeited by those who take too many liberties in "summarizing" testimony and trial proceedings. *See* discussion *supra* Section III.A.

together responses to different questions and reordered them to suit its presentation – an excuse that was rejected in *Masson*, as explained above.

In determining whether the edited testimony could materially alter a reasonable viewer's impression of Mr. Colborn in a way that is defamatory, it must be borne in mind that unidentified edits to testimony are even more potentially damaging than edits to mere news interviews. Testimony is given under oath; therefore, changes can make a witness appear less truthful and, accordingly, imply that the speaker is a potential perjurer. This potential consequence calls for especial care in editing purported direct representations of testimony, because minor changes in the demeanor and manner of presentation of a witness may be crucial to observers who are evaluating the credibility of testimony. MAM invited viewers to make these evaluations by purporting to use the device of a documentary to enable "armchair jurors" around the world.

Altering testimony without any indication that it has been altered creates a substantial risk of changing the perception upon which the viewer is being invited to evaluate the speaker's credibility, which may be especially damaging when the speaker's statements are represented as precise testimony given under oath. Accordingly, the kinds of edits that may be inconsequential in edits of news interviews may significantly affect a viewer's impression of a witness' credibility. The context of the statements cannot be ignored in evaluating their defamatory effect. *See Masson, supra,* at 524 (considering plaintiff's reputation as a scholar in analyzing whether edits to statements could damage his reputation).

Attesting to the critical nature of visual observations of witness' demeanor, reviewing courts have long refused to redetermine trial courts' assessment of the credibility of witnesses, relying on the trial courts' opportunity to observe witnesses in making those determinations. *See, e.g., Gimbel v. Commodity Futures Trading Comm'n*, 872 F.2d 196, 199 (7th Cir. 1989)

(deferring to credibility determinations of administrative law judge who "was the only individual who had the opportunity to observe the demeanor of the witnesses" in resolving conflicts between witnesses' testimony); *U.S. ex rel. Melind v. People of the State of Illinois*, 1994 WL 710663, *4 (N.D. Ill.) (Barker Decl., Ex. M); *U.S. v. Liefer*, 778 F.2d 1236, 1249 (7th Cir. 1985); *United States v. Oregon State Medical Soc.*, 343 U.S. 326, 339 (1952). The opportunity to observe a witness first-hand when assessing credibility is recognized as so valuable that determinations of witness credibility "can virtually never be clear error." *U. S. v. Ortiz*, 431 F.3d 1035, 1039 (7th Cir. 2005) (internal quotation marks and citations omitted).

For similar reasons, when considering the admissibility of videotapes in judicial proceedings, courts consider the fact of its editing, because "[a]lmost always, an edited tape necessarily raises issues as to every sequence portrayed as to whether the event shown is fairly representative of fact, after the editing process, and whether it is unduly inflammatory because of the manner of presentation." 29A Am. Jur.2d Evidence §979 (updated Feb. 2020). In addition, "since motion pictures are susceptible to fabrication, the courts, as a general rule, exercise caution in determining whether they should be allowed as evidence." *Id.* Courts' wariness of edited tapes demonstrates that it cannot be described as a leap of logic – nor as inherently implausible – for a plaintiff to allege in a defamation case that edited tapes have changed the impression or meaning of the testimony. When courts recognize as a basic principle that the editing of videotapes presented at a trial can impact the credibility of witnesses, it can hardly be denied that falsely purporting to provide viewers with an accurate representation of trial testimony when, in fact, the testimony has been edited, can significantly affect viewers' assessments of a witness' credibility under oath.

As was cogently explained by a seasoned federal court judge who has judged credibility and overseen juries as factfinders, credibility determinations require those who listen to testimony to pay attention "to the slightest nuance or dissonance." Hon. John L. Kane, *Judging Credibility, Litigation Magazine*, Vol. 33 No. 3, p. 31, 32 (Spring 2007) (Barker Decl., Ex. K). Assertions that strike the listener as illogical or unintelligent can undermine the witness' credibility. *Id.* at 34-36. Responses that do not match the content called for in a question may make the listener believe that the witness is either being evasive or does not know the answer. *Id.*

As Judge Kane further explained, another central factor in assessing a witness' credibility is "the principle of consonance": "A statement must sound as if it makes sense and is capable of being easily understood." *Id.* at p. 35. The sense that a witness' response is consistent with other facts is "what makes us believe a statement is right." *Id*. It follows that a statement that appears to be inconsistent with other facts, or that appears to strike a dissonant note, may appear false. *See id.* at p. 36 (fact or opinion that does not appear to fit will not "ring true" even if it appears to be "superficially logical"). Credibility also "depends on a sense of completeness." *Id.*

Understood in this context, Defendants' claims to unfettered discretion to edit testimony overstate the law. Defendants were responsible to avoid presenting edited statements in a manner that a reasonable viewer would regard as more damaging to the speaker than an unedited account. *See Masson*, 501 U.S. at 521. In this case, as in *Masson,* the supposed clips of Mr. Colburn's trial testimony "purport[] to be nonfiction." *Id*. at 513. As explained above, nothing in the broadcast indicates to a viewer that the testimony shown is "anything but the reproduction of actual conversations" between examining counsel and the Plaintiff at trial. *Cf. id.* A viewer would understand that footage to be "nearly verbatim" excerpts of trial testimony. *Cf. id*.

As explained below, significant revisions to Mr. Colborn's testimony occurred respect to 1) his testimony regarding the "call to dispatch" made by Mr. Colborn in which he requested information regarding Ms. Halbach's vehicle; 2) his testimony regarding the call that he forwarded while employed by the Manitowoc County jail; and 3) his testimony regarding the discovery of Ms. Halbach's key in Avery's bedroom.[8]

### 3. Call to Dispatch

At Avery's trial, Mr. Colborn is asked, "Investigator Wiegert, did he give you the license plate number for Teresa Halbach when he called you?" Dkt# 120-29, trans. p. 185. MAM removes Mr. Colborn's response that "obviously" the investigator must have given him the license plate number for Ms. Halbach's vehicle. Instead, MAM substitutes a response to a different question, in which Mr. Colborn states "No, I just don't remember the exact content of our conversation then." Dkt# 120-5 55:53 – 56:10. While Mr. Colborn then adds, "He had to have given it to me, because I wouldn't have had it any other way," the alteration of Mr. Colborn's actual response to the question, removing the stronger phrasing by Mr. Colborn that explained that it was obvious to him that Mr. Wiegert had given him the license plate number, and instead making his response appear to start with the word, "No," alters the impression of Mr. Colborn's testimony and makes it appear as though the line "I wouldn't have had it any other way" was an afterthought or something that he was making up as he went along. These edits made Mr. Colborn's testimony appear inconsistent or, at a minimum, more equivocal, when contrasted with the insistence with which Mr. Colborn in fact responded.

Immediately following the above, watered-down version of Mr. Colborn's response to questioning regarding why he had the license plate number, MAM builds on the manufactured

---

[8] Additional discussion regarding the defamatory impact of these alterations is also discussed in the section below that responds to Defendants' argument that MAM is not capable of defamatory interpretation. *See* Section VI, *infra.*

ambiguity by wholesale swapping Mr. Colborn's response to one question for another that was

not answered due to an objection. MAM portrays the following as seamless trial testimony:

> Mr. Colborn: He had to have given it to me, because I wouldn't have had the number any other way ---
>
> Atty. Strang: Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back of a 1999 Toyota?
>
> Mr. Colborn: Yes.

Dkt #120-29, trans. pp. 186-87; Dkt#120-5 55:50-56:28. The above passage makes it appear as

though Mr. Colborn damagingly admitted that others could view his comments consistently with

the notion that he actually had found the Toyota prior to its official discovery on the Avery

property. In fact, the question that counsel is shown as asking was not answered, because the

judge sustained an objection to it. Mr. Colborn's "yes," response was offered in response to the

following, very different question:

> Atty. Strang: This call sounds like hundreds of other license plate or registration checks you have done through dispatch before?
>
> Mr. Colborn: Yes.

Dkt#120-29, trans.p. 187. Mr. Colborn's affirmative response was to a question that simply

asked whether his call was similar to any license or registration check, which is very

different from a question asking him whether his statements during the call made it appear

that he was looking at evidence that officially was not reported as discovered for another

two days. A viewer of MAM could – and many did – interpret this as an "a ha" moment in

which Mr. Colborn allegedly damagingly admitted that his call could be interpreted against

his interest. *See* discussion *supra* at pp. 8-11. As the United States Supreme Court has

noted, an admission that is against one's interest and that appears to come out of one's own mouth can be more damaging than an accusation leveled by another. *Masson* at 512.

### 4. Call to Manitowoc County Jail.

Regarding the call that Mr. Colborn answered at the Manitowoc County Jail in 1995, MAM again damagingly misrepresented the trial testimony as exact footage by:

● Omitting from a response Mr. Colborn's statement that he answered the call identifying himself as "Manitowoc County Jail, Officer Colborn." Dkt# 120-29 trans p. 139; cf. Dkt# 120-5 55:53 – 56:10. While this was previously stated, the fact that testimony is consistent with itself is an important factor in assessing the witness' credibility. *See United States v. Liefer, supra*, 778 F.2d at 1249.

● Omitting from the above response Mr. Colborn's testimony that it was his impression that the person who called him mistook him for a police officer despite his identification of himself as a jail officer. *Id.* The omitted testimony emphasizes that Mr. Colborn had no personal responsibility to investigate the substance of the call.

● Omitting testimony that further underscores the internal consistency of Mr. Colborn's testimony in this exchange. MAM includes testimony in which Mr. Colborn explains that he transferred the call to a detective, but MAM edits from the conclusion of the sentence Mr. Colborn's clarification that he transferred the call to the Detective Division (identifying the proper division to address the call as an entirely separate division). *Id.*

● Depriving the prosecution of the effect of redirect and instead giving defense counsel the last word by incorporating into Mr. Kratz's supposed direct examination what are in fact redirect examination questions as to allegations by the defense that Mr. Colborn had animosity toward Avery because of the prior civil case. The resulting mash-up feels awkward and nonsensical, thereby making it appear that the prosecution and Mr. Colborn, as its witness, are not credible.

The exchange on redirect, in full was:

Mr. Kratz:     "Did this person ever identify the individual that they were talking about?

Mr. Colborn:  "No sir. There were no names given."

Mr. Kratz:     Let me ask you this, as you sit here today, Sergeant Colborn, do you even know whether that call was about Mr. Steven Avery?

Mr. Colborn:  No, I don't.

Dkt# 120-29 trans. p. 213. MAM removes from its amalgamation of direct and re-direct testimony the first two lines of the redirect testimony, which emphasize that "no names were given" in the call. Dkt# 120-7 18:35 – 18:43. Only the portion that focuses on what Mr. Colborn subjectively claims to be the case – that he does not know whether the call about Avery – is included, eliminating the objective basis for that assertion, *i.e.,* the caller's failure to state any names.

Moreover, the response, "No, I don't," which is a more forceful response, was replaced with "No sir." Dkt #105 at p. 48.[9]

● Removing from Mr. Colborn's answer to the testimony immediately preceding the above exchange Mr. Colborn's explanation why he did not prepare a report of the call in 1995. The actual exchange, as represented in the trial transcript, is as follows:

Mr. Kratz: As you look back, back in 1994 or '95, if you would have written a report, what would it have been about?

Mr. Colborn: That is why I didn't do one. I don't know what it would have been about, that I received a call and transferred it to the Detective Division. If I wrote a report about every call that came in, I would spend my whole day writing reports.

Dkt# 120-29 trans. p. 212-213. MAM removed the explanation, "That is why I didn't do one," Dkt# 120-7 23:46-24:03, which would directly respond to the numerous criticisms that the series levels at Mr. Colborn because no report was written in 1995. In addition, starting the response instead with the phase, "I don't know what it would have been about" makes it look as though Mr. Colborn did not answer the question or respond in a normal way of speaking, which is pertinent to an assessment of his credibility by viewers. *See* Kane, *supra*, p. 35.

In addition, MAM again omitted the conclusion of his first sentence, consisting of the words, "that I received a call and transferred it to the Detective Division." *Id.* Mr. Colborn's explanation makes evident in very simple terms the absurdity of any expectation that a report would be prepared based on such limited information. However, in MAM, statements that appear to have potency are reserved for the defense attorneys, further skewing the context in which Mr. Colborn's testimony was presented.

---

[9] In contrast, MAM substitutes a more forceful response to a question – "No, I did not sir," for a response that was "No sir," – when it attempts to portray Mr. Colborn as later inconsistently admitting that he wrote a statement about the jail call. Barker Decl., Ex. A, p. 199; *cf.* Dkt# 120-7 23:10 -23: 43. In fact, Mr. Colborn initially responded in the negative when asked if he wrote a report, but acknowledged that he had written a document that he described as a statement, *see id.,* so counsel's questioning likely evoked a negative response initially due to semantics, not because of any inconsistency in the testimony. Dkt# 120-7 23:10 -23: 43.

● Mis-portraying and splicing together an edited version of a question-and-answer exchange between cross-examining counsel and Mr. Colborn that appeared as follows in the trial transcript:

| | |
|---|---|
| Attorney Strang: | You wrote a statement after Sheriff Peterson suggested that maybe you should? |
| Mr. Colborn: | Yes, sir. |
| Attorney Strang: | You wrote that statement in 2003, about the 1994 or 1995 telephone call? |
| Mr. Colborn: | Yes. |

Barker Decl. Ex. A trans. p. 199. MAM's version of the exchange is as follows:

| | |
|---|---|
| Attorney Strang: | You wrote a statement in 2003, about the 1994 or 1995 telephone call? |
| Mr. Colborn: | Yes. |

Dkt#120-7 23:10 -23: 43.

In the edited statement, it appears that counsel forced Mr. Colborn to sheepishly admit writing a statement for no good reason only years after an event. But he testified that he wrote the statement when he did because a superior officer instructed him to do so.

● Removing language from a question-and-answer exchange that would have included references to the fact that the call to the jail was "way back in 1994 or 1995" and that it occurred "when you [Mr. Colborn] were working in the jail." Dkt #105, p. 51; *cf.* Barker Decl., Ex. B. trans. p. 198-199. The edit as reduce emphasis of the remoteness of the call.

### 5. Discovery of the Toyota Key

With respect to testimony regarding the discovery of Teresa Halbach's vehicle key in Avery's bedroom, MAM again makes numerous edits to testimony without any indication that the testimony has been edited. Examples include, among others, the following:

● MAM eliminates Mr. Colborn's emphatic denial that he ever planted any evidence against Mr. Avery, which was "That's ridiculous, no I have not." *Id.* It instead substitutes his answer to a different question, "Have you ever planted any evidence against anybody in the course of your law enforcement career," to which Mr. Colborn responded, "I have

to say that this is the first time my integrity has ever been questioned and, no, I have not." *Id.* The actual response makes perfect sense in response to the question asked, but the spliced version is substantially less forceful than the actual response and does not appear to respond to the question asked (because it is not the response to the question asked), thereby again making Mr. Colborn appear evasive in his responses.. MAM removed from Mr. Colborn's testimony the suggestion to viewers that the central theory of their series – that Mr. Colborn planted evidence – was "ridiculous." As noted above, MAM nonetheless unfairly incorporated bombastic punch lines to Avery, his family, and his attorneys. *See* Corrigan Decl., ¶20.

● MAM revises Mr. Colborn's answers about reports that he wrote in connection with the search at the Avery property so that it appears that he wrote only one report that was less than half a page, when in fact, he wrote two reports, as the actual answers to the questions would have made clear. Barker Decl., Ex. B, trans. pp. 196-199; Dkt# 120-7 22:22-22:39; 22:54-23:43. The omission augments MAM's accusations that Mr. Colborn hid and failed to provide information throughout the Avery investigation.

● MAM omits an entire "soft cross" that immediately follows the above discussion. Dkt #105, p. 47; Dkt# 120-29 trans. p. 132; Dkt# 120-7 17:06-17:32. A "soft cross" is, as is commonly known to trial attorneys, used to eliminate the potential for a witness to appear to be blind-sided on cross-examination by having the witness explain, during direct testimony, matters that are likely to come up on cross-examination. In his response to questions in the "soft cross," Mr. Colborn testified that he was "very surprised" that the key was there given that he and the other officers had been in the room "for quite some time" before it was discovered. *Id.* Mr. Colborn also emphasized this by stating, "I believe I said to myself, damn, how did I miss that." *Id.*

● Mr. Colborn's repeated denials in direct examination that he planted evidence, in questions that were obviously intended to build emphasis and effect, are also blunted by cutting and splicing them together into one question and eliminating Mr. Colborn's straightforward, "No" response to whether he "set up Mr. Avery for a charge of murder." Dkt #120-29 trans. p. 140; *cf*. Dkt# 120-7 18:43 – 19:15.

● MAM omits from Mr. Colborn's statements his testimony that the Toyota emblem was on the key and his knowledge that Ms. Halbach's vehicle was a Toyota as influencing why he thought this "was a very important piece of evidence." Dkt #120-29 trans. p. 140; Dkt# 120-7 17:06-17:32. The omission removes a credible explanation by Mr. Colborn that contradicts MAM's insinuation that Mr. Colborn already knew the key was Ms. Halbach's because he conspired to plant it in the bedroom.

● MAM omits Plaintiff's direct and forthright response, "yes," to the question whether he manipulated "this piece of furniture" – the furniture is not identified in the lead-up in MAM because it has been edited out, but refers to the small bookcase from which law enforcement officers believe the key fell – and severely truncates Mr. Colborn's

testimony regarding that critical issue. Dkt #105, p. 45; *cf.* Dkt# 120-29 trans. p. 125-129. Instead, MAM substitutes a response that does not appear to directly answer the question, and which therefore appears evasive and as volunteering unrequested information, which is often interpreted as done by those who are not being truthful: "I will be the first to admit, I handled it rather roughly, twisting it, shaking it, pulling it." Dkt# 120-7 16:34-16:50. The question that was in fact asked prior to the shown response was "If you can describe that further, I don't know if you can do it with your words or show us with your hands, how you did it?" *Id.* The response was also edited; it began, "I will be the first to admit, I wasn't any too gentle, as we were, you know, getting exasperated. . . ." *Id.*

● MAM omits critical context from Mr. Colburn's testimony regarding the exact moment of discovery of the key, including omission of testimony that explains that Deputy Kucharski, who is portrayed as likely not in on the alleged conspiracy to plant evidence, was "in very close proximity" to the bookcase near the place where the key was discovered at the time of its discovery, and that Mr. Colborn also "wasn't very far away" and that he had to turn around to see the key at the time that Lieutenant Lenk mentioned it. Dkt# 120-29 trans. p. 140; Dkt# 120-7 16:19 – 17:32. The omitted testimony also reduces Mr. Colborn's testimony about Mr. Lenk's statements upon noticing the key, omits his description of what he could see of the key, omits his direction to Deputy Kurchaski to photograph the key, and omits direct testimony that the spot from which the key was photographed was "as close as [they] got" to the key at the time.

● MAM omits 20 lines of trial testimony elicited by prosecutor Ken Kratz. Dkt #105, p. 45 (referencing pages 122-23 of trial testimony). The testimony provides context for Mr. Colborn's assignment to return to the Avery property on the date in question. *See* Barker Decl., Ex. A, trans. p. 122-23; Dkt# 120-7 16:19 – 17:32. Elsewhere, MAM includes accusations, including direct accusations by Avery's defense team investigator, that it was improper for Mr. Colborn and other Manitowoc County Sheriff's deputies to be on the property. As explained above, accusations that Mr. Colborn received from viewers demonstrate that they found the absence of this explanation as corroborating the accusations that Mr. Colborn was there to plant evidence. *See* discussion s*upra* pp. 8-11.

● MAM also omitted 30 pages of testimony regarding the lead-up to the search of the Avery property, including Mr. Colborn's background and training as an evidence technician. Dkt #105, p. 49; Barker Decl., Ex. A, trans. pp. 141-71.

● MAM omits numerous transcript pages in which Mr. Colborn describes searches on the Avery property before the key was found. Barker Decl., Ex. A., trans. pp. 76-121. This information would have helped viewers understand that Mr. Colborn did not appear out of the blue for the search in which the key was found. *See* Kane, *supra*, at pp. 38-39.

Construing all reasonable inferences in Plaintiff's favor, the revisions to material that was presented as exact testimony by Mr. Colborn can be interpreted as making his testimony appear

less credible and as presenting a distorted impression to viewers, and therefore, as defamatory to Mr. Colborn. Defendants' motion to dismiss should therefore be denied.

### C.  Defendants Should Produce Their Raw Footage Before Any Definitive Ruling.

Defendants' motion to dismiss argues, in a nutshell, that a comparison of the MAM broadcasts and the trial transcripts establishes that Defendants' broadcast was a fair representation of the trial as a whole and that it fairly represented Mr. Colborn's testimony.

In making the determination whether these assertions have any merit, Wisconsin law requires that the visual and audio portions of a broadcast must be considered in relation to each other. *Mach v. Allison*, *supra*. Defendants' argument their report was essentially a substantially true report of the trial and Mr. Colborn's testimony at the trial therefore requires an evaluation of the raw footage taken by Defendants at the trial.

Only by comparing the raw footage to the edited version can it be determined whether additional video editing was used in a way that made Mr. Colborn appear less credible than the actual footage of his testimony. And, as Dr. Corrigan explains, a comparison of the video of Mr. Colborn's deposition in the Avery civil trial suggests that MAM likely also selected video portions of the trial testimony that made Mr. Colborn appear to be comparatively less at ease than he appeared in his actual testimony and that altered the sight line between Mr. Colborn's gaze and examining attorneys. *See* discussion *supra* Section II; Corrigan Decl. ¶17.

There should be no reason why the trial footage cannot be produced, but Defendants have refused to produce the testimony and have refused to participate in a Rule 26(f) conference despite Plaintiffs' requests. As explained in the motion to compel a Rule 26(f) that Plaintiff is also filing, Defendants' refusal is based primarily on their unilateral assertion that their motion should be decided based on the written transcript of the trial rather than video footage. For the

moment, the COVID-19 crisis has made production of discovery generally more difficult, and therefore, a motion to compel discovery may have to await relaxation of government orders intended to stem transmission of the virus. However, a Rule 26(f) conference can be ordered and, when government restrictions are lifted, the footage should be produced. As explained in his motion, Mr. Colborn respectfully requests that he be allowed an opportunity to supplement his response to Defendants' motion to dismiss after he is allowed to review the raw footage that is in Defendants' possession.

It should be noted that Defendants may also have footage, including interviews of Avery, his property, and others close to him, that may include statements or video that may prove that MAM was not a "substantially true" account of the information in Defendants' possession, as the materials in Defendants' possession may include material information that was omitted from MAM and that is inconsistent with the accusations made by MAM regarding Mr. Colborn.

## IV.    MAM IS NOT PROTECTED AS ALLEGED "OPINION."

Defendants also argue that their "documentary" is protected as an expression of opinion. While parties may be entitled to assert alternative arguments in support of their positions, Defendants' argument that their broadcast expresses an opinion is necessarily inconsistent with their prior assertion that they merely accurately reported substantially true facts. Moreover, again, Defendants' arguments fail to support dismissal of Mr. Colborn's claims.

As an initial matter, it is important to note that Defendants do not and cannot cite authority that supports any notion that repeating third-parties' opinions could fall within an exception to the authority that holds publishers liable for republication of defamatory material. Therefore, Defendants must treat the statements by third parties in MAM as Defendants' own statements regardless of their claim that they are "opinion."

There is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990). As the United States Supreme Court has explained, "expressions of 'opinion' may often imply an assertion of objective fact.'" *Id.* For example, a statement expressing an opinion that another person is a liar implies a knowledge of the facts that "lead to the conclusion" that the alleged liar has "told an untruth." *Id.*

> Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words "I think."

*Id.*, 497 U.S. at 19.

Allegedly defamatory statements should be construed as a whole and in context, as Defendants acknowledge. *See* Dkt #119 at p. 36; *see also Winters v. Morgan*, 576 P.2d 1152, 1154 (Okla. Sup. Ct. 1978) ("[l]anguage out of context may have a different meaning than the same language" as it appears in a publication). In the context of documentary filmmaking, there is often an assumption by viewers that while the documentary may advocate a particular point of view, the facts that are recorded in the documentary are themselves true. Corrigan Decl., Ex. 2, pp. 29-30. By watching a documentary, viewers' points of view may be altered through access to a more immediate view of "real" facts than they otherwise would be able to observe. *Id.*

**A. There is No "Opinion" Protections for Accusations of Criminal Conduct.**

As explained above, Defendants' broadcast and statements they republish accuse Mr. Colborn of participating in a conspiracy to "plant" evidence and frame Steven Avery for murder. Defendants cannot claim that there is any protection for "opinion" statements of this nature,

because there is no protection, Constitutional or otherwise, for accusations of criminal conduct couched as "opinions." *See Cianci v. New Times Pub. Co.*, 639 F.2d 54, 63-64 (2d Cir. 1980).

As the Court noted in *Cianci,* "No First Amendment protection enfolds false charges of criminal behavior." *Id.,* 639 F.2d 54, 63 (quoting and citing *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369 (N.Y.), *cert. denied,* 434 U.S. 969 (1977)). The Court explained that an accusation of criminal activity, "unless made by an observer and sometimes even by him . . . . is by necessity a statement of opinion." *Id.* (internal citations omitted). Therefore, the law of defamation does not permit a defendant to "escape liability for accusations of crime simply by using, explicitly or implicitly, the words, 'I think.'" *Id.*

Similarly, statements that "imply an assertion" or that create the "impression" or "connotation" that a person made false statements under oath are not protected as opinion, because they are "factual" in nature. *Milkovich, supra,* 497 U.S at 21*; accord, Pfister v. Sentinel Co.,* 84 N.W. 887, 889 (Wis. Sup. Ct. 1901) (accusations in article that went beyond mere reporting regarding injunction that was issued, and that presented author's "opinion" that plaintiff was engaged in misconduct, were defamatory and actionable). Moreover, statements that lack "prefatory language" that would suggest that they should be construed as opinion, and which make accusations of criminal conduct, are not protected as opinion. *Rivera v. Lake County*, 974 F. Supp.2d 1179, 1192-93 (N.D. Ill. 2013).

MAM includes numerous statements that accuse Mr. Colborn, directly and indirectly, of planting evidence. *See supra* at pp. 18-35. Therefore, as explained above, the statements expressly and impliedly accuse Mr. Colborn of both committing a crime and lying under oath when he denied doing so. *See* discussion *supra* Section III.A. For example, in the first two episodes alone, MAM implicitly and explicitly includes the following:

(1) repetition of accusations made by Steven Avery, bolstered by insinuation and innuendo by his relatives, that there was a conspiracy among Manitowoc County law enforcement officers to frame him by planting evidence, *supra* pp. 18-35;

(2) repetition of accusations that describe an alleged "conspiracy of silence" based on alleged hiding and "covering up" of the 1995 call to the Manitowoc County jail, *id*.;

(3) Repeated, strategically placed visuals that identify Mr. Colborn during or immediately after accusations by Avery, Glynn and others regarding the alleged conspiracy, *id*.;

(4) excerpts of deposition testimony from the civil case, which, as explained above, are not consistent with the actual content of the video of the deposition, *id*.; and

(5) Glynn's accusations that Mr. Colborn had "screwed up big time," *id*.

These statements therefore cannot be protected under the theory that they are "opinion" statements. As explained above, there is no Constitutional protections for these statements at all to the extent that they may construed as "opinion." *Cianci*, 639 F.2d at 63. Accordingly, if MAM asserts an "opinion" that Mr. Colborn committed criminal activity, Mr. Colborn cannot be required to meet a Constitutional "actual malice" requirement.[10]

### B. Numerous MAM Statements Expressly Or Impliedly Suggest a Factual Basis.

Wisconsin generally follows the guidance provided by Restatement (Second) of Torts as to the law of defamation. *See, e.g., Prahl v. Brosamle, supra,* at 776. The Restatement advises that a defamatory communication is actionable "if it implies the allegation of undisclosed defamatory fact as the basis for the opinion." Restatement (Second) of Torts §566 (1977).

---

[10] As Mr. Colborn previously argued, he also reserves the right to challenge the "actual malice" standard to the extent that it may otherwise apply under *New York Times v. Sullivan*, 376 U.S. 254 (1964) on review. Dkt #79, pp. 14-16.

Under the Restatement approach, liability is imposed for "mixed opinions" "where an opinion is "apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication." *Id*. It is important to note that the test is a subjective one from the standpoint of the recipient of the communication, not an objective test from the standpoint of the speaker.

> [T]he meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express.

Restatement at cmt. c. An expression of opinion is therefore not protected as opinion when it "may reasonably be understood to imply the assertion of undisclosed facts which may justify the expressed opinion . . . ." *Id.*

It is significant in evaluating a purported opinion statement that, when evaluated in the context of the entire publication, it "contains no language which would alert the reader that the statement is merely one of opinion." *See Miller v. Jones,* 970 P.2d 571, 575 (Nev. Sup. Ct. 1998); *see also Int'l Galleries, Inc. v. La Raza Chicago, Inc.,* 2007 WL 3334204, **7-8 (N.D. Ill.) (considering how article was "framed" and noting its "context" as a "news piece" in holding that it did not merely express an opinion) (Barker Decl., Ex. N). Further, a statement that is "juxtaposed" with other supposed source materials in a manner that lends the statement "an air of accuracy," so that the entire work appears "designed to indicate . . . that the points made . . . are not merely opinion, [but] are independently reported and verified facts" support a conclusion that the statement is a "factual assertion, which if untrue, is defamatory." *See Miller,* 970 P.2d at 575. It is sufficient if the statement "seems likely to have created in the mind of the [viewer] a factual scenario at odds with the truth." *Id.* at 1298.

In *Int'l Galleries, Inc.,* Judge Kendall of the Northern District of Illinois, applying Illinois law, held that an article that cited "several sources" for allegedly false information that it

presented gave the "impression that he story presents not the writer's or the [newspaper's] opinion about the [plaintiff]," but instead facts "gleaned from persons with relevant knowledge."2007 WL 3334204, *8. Accordingly, the court held that "an ordinary reader could view the Article as stating actual facts" about the plaintiff's business. *Id. See also Scripps NP Operating, LLC, supra*, 573 S.W.3d at 795 (holding that editorial asserted statements of fact despite an attempted disclaimer where it referenced prior news reports).

Applying the Restatement approach, as incorporated in Wisconsin Jury Instructions, the Wisconsin Court of Appeals held that statements that were "all variations of the underlying (and unsubstantiated) factual assertion" that the plaintiff had "engaged in fraudulent activity," the statements could not be protected as opinion. *Laughland, supra,* 370 N.W.2d at 475.

Alleged statements of opinion have been held to imply undisclosed facts where:

● A newspaper quoted a third party as calling the plaintiff a "con artist" in conjunction with the assertion that the speaker "would never lend him money." The two statements together could be interpreted as implying that the speaker had "particular and articulable reasons" for believing that the plaintiff "practiced the art of obtaining money or property from another by fraud, or was otherwise deceitful." *Yancey v. Hamilton,* 786 S.W.2d 854, 858 (Ky. Sup. Ct. 1989).

● A newspaper article asserted that a prosecutor "turns [criminals] right back, and they commit crime after crime, they couldn't have a better friend." The statements were found to be factual when attributed to a police officer who was presented as having knowledge of the way the prosecutor handled his cases. *Ball v. E.W. Scripps Co.,* 801 S.W.2d 684, (Ky. Sup. Ct. 1990).

● An editorial stated that plaintiff was "just as guilty in small towns as he was in Oklahoma City," and added that "[s]eeking out possible weak juries or less fair federal judges is not the American Way of justice," which insinuated that plaintiff was seeking a weak jury or a less fair federal judge "to acquit him even though he was guilty." *Winters, supra*, at 1154.

Again, the summaries of the MAM episodes demonstrate that Defendants included in their broadcasts bald accusations by third-party speakers, many of whom imply that they have personal knowledge of the truth of their statements. *See, e.g.,* pp. 18-35. Viewers interpreted some of these statements as representing the sentiments of the entire Manitowoc County

community. *See, e.g.,* Barker Decl., Ex. I, part 2 (blog comment by MAM viewer stating that, "Even the community is talking and knows that the key was planted. Granted the folks they are talking to are in a bar and look like they may or may not be inebriated…however, the whole town looks like this.") Moreover, many of the speakers are portrayed as legal authorities and speak in voiceovers or narration that represents their "opinions" as the product of their expertise, experience, or detailed involvement in matters that are not fully presented in MAM, such as Avery's civil legal proceedings. *See, e.g.* pp. 18-35, *supra* at reference numbers 2 (referencing speaker's "gut" knowledge; 4 (purporting to explain conduct of law enforcement officers, as an apparent expert); 16 (Avery states that based on his attendance at depositions, which are not disclosed in their entirety in the broadcast, he realized there was a "cover-up"); 23 (Avery's civil lawyer says that the civil suit carried a "grave prospect" of a substantial verdict, based on his apparently intimate knowledge of the case; 32-33 (bar patrons assert knowledge that there is law enforcement corruption and that Avery was framed) 51 (defense investigator purports to identify motives of Sheriff's Office based on his knowledge of law enforcement behavior). In addition, the edits to Mr. Colborn's testimony cannot possibly be described as "opinion" statements that are made on a "fully disclosed" set of facts, because 1) nothing indicates to viewers that the statements are anything but factual representations of trial testimony, and 2) the edits were therefore not evident to viewers at all.

The statements in MAM may be – and were – interpreted as factual assertions that directly and indirectly accuse Mr. Colborn of participating in a crime based on a distorted and altered presentation of Mr. Colborn's testimony and a selective mixture of statements by interested persons. Moreover, nothing in the supposed docu-series warns any readers that it is merely presenting "opinion." MAM cannot be described as a protected form of "opinion."

## V. THE SUBSIDIARY MEANING DOCTRINE DOES NOT PROTECT MAM.

Defendants further assert with little or no analysis of any of the actual content of MAM that the statements in it are protected by the "subsidiary meaning" doctrine. It appears that Defendants argue that if their statements are generally protected as substantially true – which, as explained above, they are not – then any "minor" embellishments are also protected.

The "subsidiary meaning" doctrine, which is infrequently applied, has been described as supporting the conclusion that where some statements are not actionable, others that "merely imply the same view" are likewise inactionable. *See, e.g., Skakel*, *supra,* 5 F. Supp.3d at 210. As explained in detail above, the statements that are in MAM are actionable. Accordingly, this doctrine has no bearing here.

Defendants may be attempting to argue that reporting about the Avery trial and the defenses asserted in it was protected. But Defendants' republication of defamatory accusations out of court, visual and audio additions, and manipulation and edits to Mr. Colborn's direct testimony cannot be described as merely "subsidiary" to any "fair report" of the proceedings. The "subsidiary meaning" doctrine does not apply when a publisher falsely imputes credibility or reliability to even an existing criminal conviction, because purported independent corroboration of alleged guilt cannot be described as merely a "gloss" on a prior conviction. *Skakel,* 5 F.Supp.3d at 212-13. *A fortiori,* where, as here, Defendants' broadcast falsely magnified and represented as well-founded and true accusations of misconduct that had previously been alleged only by a defendant who was convicted in a criminal trial, Defendants cannot contend that their assertions that Avery's accusations were valid added mere "gloss."

As the court explained in *Skakel,* "[i]n a defamation case the forum is the court of public opinion; that is, the focal point is public sentiment. . . ." Mr. Colborn alleges that Defendants'

broadcast misstated information and augmented Avery's allegations in a way that gave them undue credence and that fomented wide-scale hatred against him in the "court of public opinion." Therefore, as in *Skakel*, the "subsidiary meaning" doctrine is "unavailing." *See id*. at 213.

Further, to the extent that Defendants may be attempting to argue that accusations of police misconduct were merely "subsidiary" to an examination of the question of Avery's guilt or innocence, this contention is belied by Defendants' argument that these are independent propositions, because Avery may be innocent or guilty irrespective of whether police allegedly conspired to plant evidence. *See* Dkt #119 at p. 43. In short, there is no support under Wisconsin law for Defendants' arguments that accusations of criminal misconduct may be dismissed as merely "subsidiary." To the contrary, Wisconsin courts have repeatedly held that accusations of criminal or dishonest conduct are defamatory. *See* Section III.A., *supra*.

## VI. DEFENDANTS' STATEMENTS ARE DEFAMATORY.

Defendants also argue that the broadcast does not have a defamatory meaning. The argument fails for numerous reasons, as further explained below. First, Defendants focus on certain portions of the broadcast examined in isolation rather than considering it as a whole. Second, they ignore numerous defamatory statements in the broadcast, including statements that are described in detail in the exhibits to the SAC. Third, as the summaries referenced above demonstrate, MAM is replete with statements and alterations to statements, as well statements by other speakers that give rise to liability to MAM under the doctrine of republication, *see* discussion *supra* Section III.A., all of which either directly or by innuendo accuse, insinuate, and suggest that Mr. Colborn planted and fabricated evidence. MAM accuses Mr. Colborn of participation in a conspiracy to commit criminal and dishonest conduct. The allegations have exposed Mr. Colborn to hatred and ridicule. *See* SAC at ¶¶64(b)-(c); *see also supra* pp. 8-11.

**A. MAM's Statements Must be Analyzed Individually and Considered In Context.**

In Wisconsin, as elsewhere, defamatory words are examined for their full import under in the context of the entire communication, and should not be interpreted in an overly crabbed or restricted manner. *See, e.g., Downer*, 139 N.W. at 823-24. The same is true for broadcast publications that juxtapose audio and visual content, which cannot be considered "in detached fragments." *Mach v. Allison,* 259 N.W.2d at 712 (citing and quoting *Woods v. Sentinel-News Co.,* 258 N.W. 166 (1935)). Therefore, contrary to Defendants' argument, individual statements in MAM cannot be severed from the context of the broadcast, which overwhelmingly presents various audio and visual components in a manner that conveys to viewers MAM's express and implied accusations that Mr. Colborn and others in fact conspired to frame Avery.

**B. Statements May Be Defamatory By Implication, Insinuation, or Innuendo.**

Wisconsin precedent recognizes that "One may be libeled by implication and innuendo quite as easily as by direct affirmation." *Converters Equip. Corp. v. Condes Corp.,* 80 Wis. 2d 257, 264 (1977) (internal quotation and citation omitted). Further, Wisconsin law embraces the principle that statements may be capable of a defamatory meaning when, considered in context, they suggest or imply more than the literal statements when considered in isolation.

For example, In *Mach, supra*, the court analyzed a sequence of video and audio content in a broadcast in detail. The court concluded that a broadcast that showed video images of the plaintiff holding a stick and another man inciting a dog to leap at the man, taken in context with a reporter's simultaneous audio commentary, could be viewed as implying that the plaintiff used violence as a dog training method, even though the sequences themselves stopped short of showing any violence by the plaintiff. 656 N.W.2d at 779-80. The court explained that "a reasonable viewer could understand that [the plaintiff] used [on a dog not shown] the methods

depicted with the two other dogs." *Id*. Therefore, the broadcast was "fairly and reasonably capable of conveying the defamatory implication" that the plaintiff alleged. *Id.*

Similarly, in *Schaefer v. State Bar of Wisconsin*, 252 N.W.2d 343, 346 (1977), the Wisconsin Supreme Court reversed a lower court holding that dismissed allegations of defamation on the basis that the plaintiff purportedly "read into" the document "more than [was] objectively there." The court held that the following statements, if false, as the court was required to assume on review of a demurrer (the predecessor to the modern motion to dismiss), were capable of a defamatory meaning:

> ● That a widow was much younger than her husband and of a different religion. The plaintiff contended that this meant that "she was an opportunist who married only for pecuniary gain." The Court held, "we cannot say as a matter of law that the statement could not reasonably be considered defamatory or to be so understood. . . .A jury question is therefore presented . . . ."

> ● That the widow was "now utilizing her seventh set of attorneys." The Court observed that even if false, the statement "usually would not be" considered defamatory, but that in "construing the complaint liberally, as we must, we cannot hold that in the context and circumstances of the case the statement could not reasonably considered defamatory."

*Id.*

In *Downer, supra,* the Wisconsin Supreme Court held that the following statements were defamatory to the superintendent of a public asylum in Outagamie County:

> ● The phrase "war carried on at the expense of the county," suggested "that plaintiff made war on defendant for personal revenge, corruptly using public funds . . . .";

> ● The words, "money flowed freely into the hands of men selected to use it for our defeat at the polls," suggested that "plaintiff's war was for personal revenge and took the course of his using public funds, corruptly, by placing the same in the hands of his agents to defeat the writer in a political contest . . . .";

> ● The words, "we always believed that this money came from Appleton" suggested that "it came from the depository of public funds, which was, by common knowledge, located in Appleton, and that the corrupt conduct was hidden from the people . . . .";

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 76 of 90   Document 131

- A Biblical reference to "Diana," as a short-hand reference to the plaintiff," was a "concise, caustic and sarcastic method" of telling a story that was "capable, under the circumstances, of being understood as a very ingenious and scathing arraignment for reprehensible official misconduct, cloaked under superficial pretense of purity."

*Id.*, 139 N.W.2d at 823-24; *see also Hatfill v. New York Times Co.,* 416 F.3d 320, 331 (4th Cir. 2005) ("it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory") (citing *Carwile v. Richmond Newspapers, Inc.,* 82 S.E.2d 588 (1954)).

As explained below, applying these standards, MAM's broadcast is replete with statements that may be construed as defamatory, and many of which are so indisputably defamatory that they could be considered defamatory as a matter of law.

### C.  MAM Republishes Directly Defamatory Statements of Others.

As explained above, the charts of MAM's statements and techniques identify numerous instances in which MAM republishes statements that directly and indirectly accuse Mr. Colborn of criminal conduct, dishonesty, incompetence, and participation in a conspiracy to frame an innocent man for murder. *See supra* pp. 18-35. These statements are defamatory under Wisconsin law. *See* discussion *supra* Section III.A.

### D.  MAM's Additions and Editing Created Its Defamatory Communication.

As likewise explained in detail above, MAM's manner of presentation of the statements of third parties, augmented by its own graphics and its distortion of Mr. Colborn's trial and deposition testimony, further insinuated, implied, and used innuendo to convey that he did in fact plant the evidence, as the defense alleged. *See discussion supra* at III.A. MAM combined commentary, sound effects, and visual imagery – including graphics and charts referencing Mr. Colborn and images shown during or following incriminating comments by others – together with editing and splicing Mr. Colborn's testimony at Avery's criminal trial and in deposition for Avery's civil case in a way that made his testimony seem less credible. *See supra* Section III.B.

It is impossible to assert that the overall presentation of MAM can be divorced from the manner in which any portions of it would be understood in the minds of readers. That is why the law requires defamatory statements to be considered in the context of the entire publication. *See Mach,* 656 N.W.2d at 712. Further, in this case, the overall narrative and themes portrayed in MAM likely had a profound effect on viewers' evaluation of Mr. Colborn's edited and spliced testimony and the many other defamatory statements about Mr. Colborn that were made by Steve Glynn, Steven Avery, and others and republished by MAM. When two versions of the same events are irreconcilable, credibility is often resolved through a "gestalt" approach that considers "the entire body of evidence presented." Kane, *supra,* at pp. 35-36.

As Judge Kane explained, a "skillful narrative . . . places critical events in context," where "context" means "more than merely time and place; it is the entire framework." *Id.* Context "gives meaning and thus credibility to actions and events" because it "supplies the critical ingredient of *why*." *Id.* (emphasis in original). A coherent context presents each part of a narrative "so that the connection between each is obvious." *Id.*

So understood, it is apparent why viewers concluded that MAM's assertions regarding allegedly planted evidence are so integrally connected to MAM's assertions regarding the supposed cover-up of the 1995 call to the Manitowoc County jail. *See* discussion *supra* pp. 8-11. MAM's weaving together of the various strands of the story created a sense of coherence that made the resulting overall impression appear greater than the sum of its parts.

**E.  MAM Defames Mr. Colborn in Numerous Respects.**

The last 10 pages of Defendants' brief take in isolation and misrepresent certain passages of the SAC and the transcripts out of context to suggest that Mr. Colborn merely quibbles with minor discrepancies. As explained above, MAM is replete with third-party accusations of

planting evidence, visuals of Mr. Colborn during or after voiceovers making accusations of

planting and hiding evidence, and other graphic and audio enhancements. This defamatory

material has also been extensively identified in the charts and bullet points above. To assert that

these accusations, presented in the manner in which they were, with the devices employed and

the number of times that they were relayed, did not defame Mr. Colborn any more than a straight

description of the facts of the Avery criminal trial, borders on the fantastic. Nonetheless, the

following paragraphs respond, with as little repetition as possible, to Defendants' claims.

### 1. Jail Call

Defendants' treatment of the call to the Manitowoc County jail in 1995 was scrupulously

and masterfully orchestrated to suggest and imply nefarious conduct and intent by Mr. Colborn,

as outlined in detail at pages 18-35, above. In addition, the edits to Mr. Colborn's testimony on

this point, and their damaging effect, are summarized in bullet points above at pages 58-65.

Nonetheless, Defendants narrowly focus on a few of the edits that were made to Mr. Colborn's

testimony and argue that, taken individually and out of context, they were inconsequential.

Based on the full effect of the MAM broadcast content summarized at pages 18-35,

*supra,* and the cumulative effect of the edits to testimony that were described at pages 58-65,

*supra,* a jury could find the statements that were combined and reshaped did not merely

eliminate "rambling" by Mr. Colborn, but instead altered and omitted important aspects of Mr.

Colborn's testimony that explained more fully the context of the call and his role at the time, that

emphasized what he did and that it was appropriate, and that presented his testimony about it in a

manner that was coherent and complete. *Cf.* Kane, *supra*, p. 36. Moreover, the edited testimony

was juxtaposed with accusations by Avery and Glynn and visuals that repeatedly identified Mr.

Colborn as the principal villain of the story. *See* pp. 18-35, *supra*, Ref.## 3, 5, 12, 14, 20, 22, 43.

Contrary to the oft-repeated theme of Defendants' brief, Mr. Colborn is not complaining that MAM did not include video of Avery's entire trial. His complaint is that MAM presented information about the trial and other matters in a manner that was selective and unfair to him. Defendants were on a mission, as later acknowledged by Demos, to tell their story, regardless of how much material they could include. *See* discussion *supra* at pp. 7-11.

In one sentence on page 38 of their 50-page brief, Defendants also throw in an assertion that their presentation of Mr. Colborn's testimony regarding the call to the jail is also privileged as "a fair report of judicial proceedings." Dkt #119 at p. 38. Defendants fail to discuss, describe or develop the scope of the fair report doctrine, including the limitations that preclude it from applying where additional comment and observations are intermingled with reports of judicial proceedings and where the presentation is not fair. *See* discussion *supra* Section III.A. The doctrine could not conceivably apply to any portions of MAM for those reasons, and Defendants cite no authority that suggests that discrete portions of a broadcast can be severed and separately analyzed in order to ignore additional content. Such a rule would undermine the tenets that a "fair report" cannot be mixed with commentary and that publications must be viewed in their entirety in defamation cases, as explained above. *See* discussion *supra* Section III.A.

Further, as explained above, the presentation of the testimony regarding the jail call was far from a "fair report"; to the contrary, undisclosed edits and spliced responses were made without any indication to viewers that Mr. Colborn's testimony was altered. *See* discussion *supra* Section III.B. Further, as explained above, Defendants' altered and truncated version of Mr. Colborn's testimony in court gave an impression that directly contradicted express testimony that was provided by Mr. Colborn in Avery's civil suit. Defendants had the deposition testimony in

their possession and incorporated selective portions of it in MAM in a manner that misrepresented the content of the testimony. *See* discussion *supra* at pp. 49-50.

In no way can MAM's presentation of the call to the jail be defended as a "fair report" of any proceeding, even if that issue could be severed from the remainder of the MAM broadcast.

### 2. Call to Dispatch

As also explained above, MAM edited Mr. Colborn's testimony about his call to dispatch to, among other things, appear to put in his mouth a direct concession that the call could reasonably be interpreted as establishing that he was looking at the back of Ms. Halbach's vehicle when he made the call – a concession that he appeared to be forced to admit by examining counsel. *See* discussion *supra* at pp. 59-60. Moreover, contrary to Defendants' argument, this does not fairly represent a distilled version Mr. Colborn's testimony: Mr. Colborn never said that he understood how other people could interpret his call as if he was looking at the license plate at the time. This apparent admission is more damaging to Mr. Colborn than an accusation lobbed by defense counsel. *See Masson, supra*, at 512.

Defendants claim that the line of questioning preceding the altered exchange, which included Mr. Colborn's affirmative responses to questions regarding whether dispatchers often confirm license plate numbers for officers about vehicles on the road, must be interpreted as establishing that Colborn had already admitted that the critical call could be interpreted as such a call. That is not a fair interpretation of Mr. Colborn's testimony. The question that Mr. Colborn actually answered, which queried whether the call "sounded like hundreds of others," is at best an ambiguous and uncontroversial statement. It can fairly and most naturally be interpreted as inquiring whether the call to dispatch that he made was unexceptional and routine. The question does not go so far as to call for an allegedly bombshell admission that anyone hearing the call

would think that Mr. Colborn was reading the license plate from the back of another car instead of confirming information he had been just provided by another investigator. The reason for Defendants' editing decision to splice together the answers is evident, and it is much more than a "space saver." It delivers a punch that the actual testimony never did.

Further, Defendants' argument is, again, that they "rationally interpreted" Mr. Colborn's testimony, contrary to the extent of editing license afforded them by the United States Supreme Court. *See Masson,* 501 U.S. at 519-20. Even assuming that Defendants' theory that they merely "distilled" prior testimony presents one rational interpretation of the testimony as a whole, a reasonable interpretation of the edited testimony is that Mr. Colborn was forced by defense counsel to admit that someone could reasonably construe his call as a call in which he was reading from Ms. Halbach's license plate and that this was not a concession that he previously made. Therefore, assuming, *arguendo,* that there are multiple potential interpretations, a jury must decide whether the edited statement was defamatory. *Mach, supra,* at 656 N.W.2d at 712.

As also explained above, the altered version of Mr. Colborn's testimony also omits and waters down his preceding explanations for why he would have the license plate, leaving out that it was "obviously" because he had been provided it by the investigator with whom he had previously spoken. This omission, together with other edits that downplayed the significance of Mr. Colborn's testimony that he had received the number from another investigator and was merely confirming it, were effective in leading viewers to conclude that Mr. Colborn did not testify that he received the license number prior to the call. Barker Decl., Ex. G ("Maybe he was given the license plate number before calling dispatch and just wanted to verify it? Still doesn't make sense why he just wouldn't say that in court.") MAM denied Mr. Colborn his own words and his own voice, appropriating for itself what appeared to be his narrative.

Ultimately, Mr. Colborn's testimony was truncated to the point where it was not seen credible, with no indication to viewers that it had been edited at all. *See, e.g.,* Barker Decl. at Ex. G (online comment stating that Mr. Colborn's "reaction in court" with respect to the sequence regarding the call to dispatch was "strange"). In addition, MAM's removal of Mr. Colborn's concession, after the call was re-played in court, that he mis-remembered the content of his discussion of the dispatcher in his prior testimony, gave viewers the impression that he "didn't have much of a response after [Steven Avery's] defense attorney played the recording twice. At least not from what the documentary showed." Barker Decl., Ex. G. Moreover, these edits were made in context of accusation after accusation of misconduct that MAM leveled against Mr. Colborn. The collective impact on viewers was clear, as shown by the content of calls that Mr. Colborn received. *See* discussion *supra* at pp.8-11 .

Defendants further argue that it is nondefamatory to repeat Avery's accusation that an officer planted the car and then cut to a visual of Mr. Colborn. As explained above, this kind of juxtaposition of visual and spoken words to create a clear implication and accusation is recognized as actionable defamation. *See Mach, supra.* It is no defense that they were just repeating what Avery said or that it was consistent with a "defense theory" in Avery's case. *See* discussion *supra* III.A. And it far exceeds the bounds of any fair report privilege to repeat accusations made in jail interrogations. *See id.* To insulate the routine rebroadcast of such statements as fact would allow unlimited dissemination of interrogated suspects' incriminations of anyone and everyone on whom they may attempt to deflect suspicion.

Defendants also take issue with portions of the SAC that allege that a hole in a vial stopper does not demonstrate that someone tampered with it. Dkt #119 at p. 41. These allegations cannot be considered to be legal conclusions – the application of law to facts – but are factual

allegations that must be taken as true on a motion to dismiss. *See* discussion *supra* pp. 11-12. Further, to the extent that the Defendants' objective is to characterize these facts as non-defamatory, they must be considered in context of MAM's repetition of out-of-court statements by Avery's attorney that triumphantly proclaim that the hole in the vial stopper proved that "some officer" planted evidence. *See* Dkt# 120-4  MAM Episode 1:03:00–1:04:15. By proclaiming as fact proof that Manitowoc County law enforcement planted evidence against Avery in one instance, MAM made it appear more plausible to viewers that all of the alleged evidence planting occurred and that the conspiracy in which Mr. Colborn allegedly participated in fact existed.  Comments by Buting further suggest the FBI's refutation is suspect.  See pp. 18-35, supra, at Reference No. 54.

### 3.  Discovery of the Toyota Key

Again, as explained above, MAM's edits to Mr. Colborn's testimony regarding the discovery of Ms. Halbach's key are damaging to him when compared to his actual testimony. *See* discussion *supra* at pp. 62-64. In addition, the edits are presented by MAM in context of other evidence portraying Mr. Colborn as a villain, including direct statements by Buting and Strang, outside of formal judicial proceedings, that accuse him of planting evidence generally and the key specifically. In this context, edits to Mr. Colborn's testimony remove credibility of his explanation for how the key was discovered, as explained above, in several respects. *See* discussion *supra* at pp. 62-64. MAM also eliminates almost entirely explanation for why he was there – as an evidence technician – omitting multiple pages of pertinent trial testimony. *Id.* Further, again, viewers' calls to Mr. Colborn demonstrate how this omission made it more credible to viewers that Mr. Colborn was on the scene only as part of a conspiracy to plant the key. *See* discussion *supra* at pp. 8-11.

**F. Omissions Further Explain the Context of the Defamatory Statements.**

Defendants also contend that the numerous omissions from MAM that are identified in the complaint are of no consequence because other facts that could have supported Avery were omitted as well. Dkt #119 at p. 44. In fact, the omissions, including omissions of information regarding Mr. Avery directly affected his credibility and, therefore, were critical to the context in which Avery's and his counsel's convoluted accusations about instances of planting evidence and framing him appeared to viewers to be more credible and less far-fetched. *See, e.g.,* Barker Decl., Ex. I, p. 1 (post stating, "I admit that it does sound crazy when you say that someone in the county sheriff's department conspired to have her killed. It does. BUT when you look at the timeline and everything else these bastards have done, you cannot put it past them.").[11]

Defendants also argue that MAM included some of the facts that the SAC alleges were downplayed, such as information regarding Avery's prior arrest for running his cousin off the road and brandishing a gun at her and his prior conviction for animal abuse. However, true to form, MAM skillfully presents these incidents as essentially, misunderstandings. It portrays the cousin, Sandra Morris, as an unreliable witness who disliked him for no reason. Dkt# 102-1 5:15 – 7:07. Avery's father is shown stating that Morris and her husband were always "picking on" Steve. *Id*. at 12:00 – 12:10. In addition, ironically, Avery and his prior counsel state in interviews that Morris provoked Avery into the confrontation by "spreading rumors" that he considered defamatory. *Id*. at 13:27 – 13:47; 14:00 – 14:20. According to Avery, he did not know how to handle the fact that Morris' accusations made him seem like a "no good person" other than through intimidating her with a vehicle and a gun. *Id*. at 14:45 – 15:07. Another cousin, Kim Ducat, is also shown suggesting that the incident was no big deal because "The people who were

---

[11] The bloggers comment that "you cannot put it past" law enforcement to engage in such outlandish conduct tracks Avery's comment that he "wouldn't put anything past the County." Dkt# 120-2 39:30-40:08.

close to Steve knew he was harmless. He was always laughing, he was always happy, happy, happy." *Id.* at 7:29-7:50.

Other than that incident, Avery is shown stating that he "ain't got much" on his record, other than youthful indiscretions for which he blames friends who turned out to be the "wrong people." *Id.* at 9:59 – 10:27. Avery describes the Incident with cat as the inadvertent product of his being "egged on" by friends to "toss" the family cat "over the fire" one night so that the cat "lit up." *Id.* at 9:59 – 10:27. He implies that it was essentially an accident, and it is portrayed as sad that he missed his oldest child's birth because he was in jail for the crime. *Id.* at 11:30-11:40.

As Judge Kane explained, the "principle of consonance" requires that the framing theory be supported by apparent evidence of Mr. Avery's innocence – otherwise, it could not resonate as powerfully with viewers. In addition, extremely compelling and powerful facts will cause one to search for a way to support the ultimate premise, even in the face of logical evidence to the contrary. Kane, p. 35. Tellingly, the filmmakers have described it as critical that viewers empathized with Avery in order to entertain the rest of the series' allegations. *See supra* pp. 5-7.

As noted above, Wisconsin defamation precedent that holds that if statements are capable of a nondefamatory as well as a defamatory meaning, then a jury question is presented as to how the statement was understood by its recipients. *Schaefer, supra,* at 346. The omissions are properly described and alleged in the SAC because they provide critical context against which Avery's accusations and those of others were provided with enhanced credibility that was manufactured by MAM as part of its story-telling decisions.

### G. Lip Service to Avery's Conviction Does Not Make MAM Less Defamatory.

Finally, contrary to Defendants' arguments, defamatory statements are not exempt merely because the defendant includes a "caution" that the plaintiff denies them, particularly when the

"unmistakable theme" of the publication(s) is that there is evidence that should be used to investigate him. *See, e.g., Hatfill, supra,* 416 F.3d at 333-34. As explained above, this is particularly the case where, as here, MAM deliberately altered Mr. Colborn's denials so that they look less credible, making his own conduct appear to support their accusations.

## VII.    PLAINTIFF'S EMOTIONAL DISTRESS CLAIM IS NOT BARRED.

Defendants also argue that the First Amendment precludes Mr. Colborn's claim for intentional infliction of emotional distress, citing *Dumas v. Koebel*, 841 N.W.2d 319, 329 (Wisc. Ct. App. 2013) (citing *Snyder v. Phelps*, 562 U.S. 443 (2011)).  This Court's task, however, is to predict how Wisconsin's highest court – the Wisconsin Supreme Court – would decide the issue; this Court is not bound by *Dumas*, particularly when the Court of Appeals in Wisconsin is prohibited from declaring law. *Cook v. Cook,* 560 N.W.2d 246, 255-56 (Wis. Sup. Ct. 1997).

As noted, *Dumas* purported to follow the United States Supreme Court's decision in *Snyder v. Phelps*. In *Snyder*, the Court held that family members of a fallen service member whose funeral was picketed could not sue the picketers for intentional infliction of emotional distress, because the speech was protected by the First Amendment. However, the Court specifically advised that its holding was "narrow" and limited to the facts of the case before it. 562 U.S. at 460. The Court also noted that there was no allegation that the picketers were not representing their "honestly believed" views on public issues. *Id.* at 455.

Subsequently, a federal district court considered *Snyder* and concluded that a state-law claim for intentional infliction of emotional distress is not barred where the statements published purport to convey facts, the speaker had knowledge that the facts conveyed in the statements were false, and whether the publication of the statements was intended to, and did, inflict severe emotional distress on a particular victim. *Holloway v. American Media, Inc.,* 947 F.Supp.2d

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 87 of 90   Document 131

1252, 1264-65 (N.D. Ala. 2013). Accordingly, the Court denied a 12(b)(6) motion by media defendants who falsely reported gruesome details of the plaintiff's daughter's death. *Id.*

Defendants also argue that the conduct alleged by Mr. Colborn is not sufficiently "outrageous" to satisfy a claim for intentional infliction of emotional distress. However, in *Holloway*, the Court rejected a similar challenge, concluding that Alabama law did not categorically preclude emotional distress claims based on false and injurious speech and that the claim therefore could not be dismissed on the pleadings. *Id*. at 1266-67. Other courts have likewise permitted emotional distress claims based on false speech that rises to the level of "outrageous" conduct. For example, a court held that false dissemination of rumors that a plaintiff had AIDS, particularly where the defendant would be seen as a credible source, was sufficient to support a claim for intentional infliction of emotional distress as a matter of law. *Chapman By & Through Chapman v. Byrd*, 475 S.E.2d 734, 739 (N.C.Ct.App.1996).

In this case, Mr. Colborn alleges conduct, which happens to take the form of false speech, that is sufficiently reprehensible and outrageous to support a claim for intentional infliction of emotional distress. Mr. Colborn alleges that Defendants took the speculation of a convicted murderer and his advocates and allies and used a world media platform and smoke and mirrors to infuse those baseless accusations with the false appearance of objective truth, thereby near-instantly transforming him into a worldwide pariah. Few people can say the same. It is difficult to deny that such conduct meets the Defendants' proffered standard of "a complete denial of the plaintiff's dignity as a person." Dkt #119 at p. 48. Mr. Colborn has alleged outrageous conduct.

## VIII.   MR. COLBORN'S NEGLIGENCE CLAIM IS PROPERLY ALLEGED.

Defendants also insist that Mr. Colborn's negligence claim must be dismissed under the Constitutional "actual malice" standard. Dkt #119 at p. 47.[12] However, as noted above, Defendants have asserted for the first time through their motion that MAM should be most properly be considered an expression of opinion. *See* discussion *supra* Section IV. As also explained above, there is <u>no</u> Constitutional privilege that protects false "opinion" statements that make accusations of criminal conduct.  *Id*. Therefore, if MAM is determined at trial to have been a false statement that expressed a bald opinion that Mr. Colborn is a criminal, Defendants may not insist on a higher standard of fault than negligence. Moreover, Mr. Colborn's negligence claim is not "duplicative" of any other claim, because under Wisconsin law, every person owes every other person a duty of reasonable care.  *See Smaxwell v. Bayard,* 682 N.W.2d 923, 933 (Wis. Sup. Ct. 2004); *see also* Fed.R.Civ.P. 8(d)(3) (party may plead inconsistent claims). A claim for breach of this duty has different elements and is distinct from a defamation claim. *Cf. Mach, supra,* at n.6. There is no basis to dismiss Mr. Colborn's claim.

## CONCLUSION

For the reasons set forth above, Plaintiff, Andrew Colborn, respectfully requests that the Court deny the Defendants' motion to dismiss.

Dated this 30th day of April, 2020.


By:  /s/April Rockstead Barker_____
       April Rockstead Barker
       Attorneys for Plaintiff, Andrew L. Colborn

---

[12] As explained above, Mr. Colborn has preserved for review a general challenge to this standard.  *See supra* n, 10.

Schott, Bublitz & Engel, s.c.
640 W. Moreland Blvd.
Waukesha, WI  53188
(262) 827-1700
(262) 827-1701 (fax)
abarker@sbe-law.com

**<u>Co-Counsel:</u>**

Attorney George Burnett
231 S. Adams Street
Green Bay, WI 54301
P.O. Box 23200
Green Bay, WI  54305-3200
Phone:  (920) 437-0476
Fax:  (920) 437-2868
State Br No. 1005964

Attorney Michael C. Griesbach
Griesbach Law Offices
State Bar No. 01012799
Griesbach Law Offices, LLC
PO Box 2047
Manitowoc, WI  54221-2047
(920) 320-1358