```
 1    206 and 207 into evidence?

 2              THE COURT:  Any objection?

 3              ATTORNEY KRATZ:  No.

 4              THE COURT:  They are admitted.

 5                   (Recess taken.)

 6                   (Jury present.)

 7              THE COURT:  Mr. Kratz, at this time you may

 8    call your next witness.

 9              ATTORNEY KRATZ:  State will call Andrew

10    Colborn to the stand.

11              THE CLERK:  Please raise your right hand.

12              SERGEANT ANDREW L. COLBORN, called as a

13    witness herein, having been first duly sworn, was

14    examined and testified as follows:

15              THE CLERK:  Please be seated.  Please state

16    your name and spell your last name for the record.

17              THE WITNESS:  Andrew L. Colborn,

18    C-o-l-b-o-r-n.

19              ATTORNEY KRATZ:  You don't have to be quite

20    so close.

21                   DIRECT EXAMINATION

22    BY ATTORNEY KRATZ:

23    Q.  Mr. Colborn, can you tell us, how are you

24        employed, please.

25    A.  I'm a patrol sergeant with the Manitowoc County
```

64

EXHIBIT
A
Blumberg No. 5118

```
 1        Sheriff's Department.
 2   Q.   How long have you been a law enforcement officer?
 3   A.   Since 1996.
 4   Q.   Prior to 1996, what did you do?
 5   A.   I was a Corrections Officer from 1992 to 1994,
 6        also with the Manitowoc County Sheriff's
 7        Department.
 8   Q.   What does a Corrections Officer do?
 9   A.   A Corrections Officer is a non-sworn, non-law
10        enforcement officer, that is a responsibility for
11        security of the jail.
12   Q.   All right.  How was it that you became a sworn
13        law enforcement officer?
14   A.   When a position opened up at the Manitowoc County
15        Sheriff's Department, I did perform the State
16        written test, performed an agility test, went on
17        an eligibility list, and eventually I was
18        selected.
19   Q.   What are your current duties with the Manitowoc
20        County Sheriff's Department?
21   A.   I'm a assistant shift commander for the noon to 8
22        shift so I have some administrative duties and
23        then I have some patrol duties.
24   Q.   Prior to being selected as a law enforcement
25        officer, did you have any duties in your prior
```

65

```
 1        life that in any way prepared you for being a law
 2        enforcement officer?
 3   A.   No.
 4   Q.   Sergeant, you hold the rank of sergeant?
 5   A.   Yes, sir.
 6   Q.   And in early November of 2005, did you hold that
 7        same rank?
 8   A.   Yes, sir.
 9   Q.   What were your duties back in early November of
10        '05?
11   A.   Essentially the same duties that I hold today.  I
12        was a patrol supervisor on -- I work a six day
13        on, three day off rotation.  So on the days that
14        the lieutenant that's assigned to the shift is
15        off, I would be the shift commander.
16   Q.   So you have supervisory responsibilities as well?
17   A.   Yes, sir.
18   Q.   I'm going to direct your attention to
19        November 3rd of 2005, ask if you were employed on
20        that evening?
21   A.   Yes, sir.
22   Q.   Do you recall what your duties were on
23        November 3rd?
24   A.   I was the shift commander for the noon to 8
25        shift, that's the shift I'm assigned to.
```

66

```
 1   Q.   Sometime during that shift, Sergeant Colborn,

 2        were you informed of a Calumet County missing

 3        persons investigation that was ongoing?

 4   A.   Yes, sir.

 5   Q.   And being involved in that -- or excuse me, being

 6        aware of that investigation, were you asked to

 7        assist in any way?

 8   A.   Yes, sir.

 9   Q.   Tell the jury how you were asked to assist?

10   A.   I was contacted by, I believe it was inspector or

11        Investigator Mark Wiegert from the Calumet County

12        Sheriff's Office, who contacted the dispatch

13        center by telephone, who then transferred the

14        call to my patrol car.

15             He asked if I could respond to, I

16        believe he gave me the address of 12928 Avery

17        Road.  He asked if I knew where that was and I

18        told him, yes, I believe that that was the

19        address of Avery Auto Salvage.  And he asked if I

20        could go there and check for a missing person

21        because they had a missing person report that had

22        generated in Calumet County and it had been

23        determined, through the course of their

24        investigation, that she had been out at the Avery

25        Salvage Yard, taking pictures of a vehicle that
```

67

```
 1         was for sale.
 2    Q.   At the time that Investigator Wiegert asked for
 3         your assistance, did Investigator Wiegert tell
 4         you other places within Manitowoc County that Ms
 5         Halbach had known to have been on the 31st of
 6         October?
 7    A.   I don't believe in the -- in the initial phone
 8         call that he did.
 9    Q.   All right.  Some time later that evening you
10         heard?
11    A.   Yes, sometime later that evening he gave me
12         another address on County Highway B and another
13         name and asked me to check there as well.
14    Q.   What name was that, just so -- we're going to
15         eventually get there?
16    A.   I believe the first name was George; I know the
17         last name was Zipperer.
18    Q.   Sergeant Colborn, are you at all familiar with
19         the Avery salvage business itself?
20    A.   Yes.
21    Q.   Tell the jury how you are familiar with that
22         business.
23    A.   I have been, personally, a customer of the Avery
24         Auto Salvage business; as well as, I have had
25         contacts there through with law enforcement.  And
```

68

```
1        I have children that are the same age as some of

2        the owners of Avery Auto Salvage, so I had

3        contact with them through the course of school

4        events.

5   Q.   All right.  Let's take those -- Well, when we

6        discuss this, I'm going show you what's been

7        received as Exhibit 86, can you tell us what that

8        is, please.

9   A.   That's an overhead, like an airplane view,

10       birds-eye view of the Avery Auto Salvage.

11  Q.   Prior to the 3rd of November, 2005, had you been

12       to that property?

13  A.   Prior to 2005?

14  Q.   Prior to November 3rd of 2005, had you been to

15       that property?

16  A.   Yes.

17  Q.   And under what circumstances, can you tell the

18       jury about that?

19  A.   Again, as a customer.

20  Q.   Let's talk about that, first.  What do you mean

21       as a customer.

22  A.   I have several older vehicles, one, as a matter

23       of fact, is a 1950 Chevrolet pickup truck.  And

24       I -- in the process of tinkering around with it,

25       I have gone to several auto salvage and I have
```

69

| | |
|---|---|
| 1 | always been referred to the Avery Auto Salvage as |
| 2 | the place to go if you are looking for an older |
| 3 | model vehicle parts -- or parts for an older |
| 4 | model vehicle. |
| 5 | Q. Was there one person in particular that you would |
| 6 | normally have contact with at the Avery Auto |
| 7 | Salvage? |
| 8 | A. No, actually, usually there were two; either I |
| 9 | had contact with Charles Avery or Earl Avery. |
| 10 | Q. All right. They are brothers and, in fact, the |
| 11 | owners of the business; is that right? |
| 12 | A. Yes, sir. |
| 13 | Q. Let me ask you this, Sergeant Colborn, if you |
| 14 | know, prior to the 3rd of November, 2005, when |
| 15 | was the last time you were at the Avery Auto |
| 16 | Salvage business? |
| 17 | A. I think the last time I was at the Avery Auto |
| 18 | Salvage business would have been 1999. |
| 19 | Q. All right. So at least six years previously? |
| 20 | A. Yes, sir. |
| 21 | Q. But you knew where it was? |
| 22 | A. Yes, sir. |
| 23 | Q. Then, on November 3rd, after Mr. Wiegert asked |
| 24 | for your help; did you proceed to this scene? |
| 25 | A. Yes, sir. |

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 7 of 63   Document 132-1

```
 1   Q.   And that's 2005; is that right?

 2   A.   Yes, sir.

 3   Q.   Can you tell the jury, please, what happened when

 4        you got there on November 3rd?

 5   A.   Again, I knew that Earl Avery, who was probably

 6        the person that I have had the most contact with

 7        or know the best, doesn't live on the Avery Auto

 8        Salvage property, so my initial -- what I was

 9        initially trying to do was to make contact with

10        Charles Avery, who does reside on there.

11             I knew Charles to -- I didn't know if he

12        owned the business, but I certainly knew that he

13        managed the business.  So I was going to make

14        contact with him and ask him if he had seen

15        someone on the property taking pictures of a

16        vehicle that was for sale.

17   Q.   In looking for Charles Avery, do you remember

18        what building you went to?

19   A.   Well, initially, I was kind of surprised when I

20        drove in, because the shop area, a lot of --

21        there were new buildings and things had changed

22        since the last time I was there.  But I was

23        attempting to make contact at his residence,

24        which I believe is right behind that large,

25        square shaped building.
```

71

```
 1   Q.   We're handing you a laser pointer to assist you
 2        in your --
 3   A.   I believe that --
 4   Q.   -- testimony.
 5   A.   I thought that was his residence right there.
 6   Q.   And you were pointing actually to the residence
 7        which would be just the south of the --
 8   A.   That one right there.
 9   Q.   You have to wait until I finish my question, sir.
10        You are pointing to a trailer or a residence just
11        south of the Avery business itself.  And I think
12        counsel is willing to stipulate that is Charles
13        Avery's residence.
14             ATTORNEY STRANG:  Certainly my
15        understanding.
16             THE COURT:  All right.  The record will
17        reflect the stipulation.
18   Q.   (By Attorney Kratz)~ Did you drive or walk into
19        this property?
20   A.   I drove.
21   Q.   Can you tell the jury where you came in from,
22        please.
23   A.   There is -- To my knowledge there is only one
24        entrance onto the property and that's off Avery
25        Road, which the whole of Avery Road isn't
```

72

```
 1          pictured on that picture.  But I ended up coming

 2          down that dirt road there and parking almost

 3          where there is a vehicle parked right now.

 4    Q.    Why don't you show us where you parked.  If I

 5          zoomed into that location would that help us?

 6          All right.  We have now zoomed in to Exhibit 86,

 7          could you, again, show the jury about where it

 8          was that you parked.

 9                   You are pointing which would be just to

10          the north of the large building, which is

11          something we have been calling the new office or

12          the new shop building; is that correct?

13    A.    Yes, sir.

14    Q.    All right.  After parking at that location, tell

15          the jury what happened.  By the way, about what

16          time was this that you got there?

17    A.    I'm guessing around 7:00, between 6:30 and 7:30.

18    Q.    Was it light out or was it dark?

19    A.    It was dark.

20    Q.    After parking there, Sergeant Colborn, what

21          happened?

22    A.    I got -- I exited my squad car and I was going to

23          walk down the road, that road right there, in

24          order to access Charles' residence.  Almost as

25          soon as I got out of my car I heard something
```

73

| | | |
|---|---|---|
| 1 | | behind me.  I turned and Steve Avery was walking |
| 2 | | towards me and he had come out of that residence |
| 3 | | right there. |
| 4 | Q. | Do you know whose residence that is? |
| 5 | A. | I believe that's Al and Delores Avery's |
| 6 | | residence. |
| 7 | Q. | Did you have any conversation with Steven Avery |
| 8 | | at that time? |
| 9 | A. | Yes, I did. |
| 10 | Q. | And could you describe that conversation for the |
| 11 | | jury, please? |
| 12 | A. | I think Steve initiated the conversation with me |
| 13 | | by asking me what I wanted, what I was doing |
| 14 | | there. |
| 15 | Q. | Were you dressed similar to what you are dressed |
| 16 | | today? |
| 17 | A. | Yes, I was in uniform. |
| 18 | Q. | Did you have a marked squad car? |
| 19 | A. | Yes, I did. |
| 20 | Q. | What did you tell Mr. Avery? |
| 21 | A. | I told Avery -- Mr. Avery, that there was -- I |
| 22 | | had received a call from Calumet County and that |
| 23 | | they had informed me that there was a girl |
| 24 | | missing from Calumet County and asked him if she |
| 25 | | had come out to their property to photograph a |

74

```
 1              vehicle that they were selling.
 2        Q.    Did Mr. Avery have a response for you?
 3        A.    Yes, he said that she had been there.
 4        Q.    Did he tell you what day she had been there?
 5        A.    I think I might have told him that, what day that
 6              she should have been out there.  I don't recall
 7              if we mentioned a date, but I do remember asking
 8              him what time she had been out there.
 9        Q.    Did Mr. Avery recall this young woman?
10        A.    Yes.
11        Q.    Did he name her for you?
12        A.    No.
13        Q.    Did he tell you what she had done at his property
14              that day?
15        A.    He said that she was taking some pictures of a
16              van that his sister was selling.
17        Q.    Mr. Avery tell you how long the woman had been on
18              his property?
19        A.    He said 5 or 10 minutes.
20        Q.    Did you inquire of Mr. Avery whether or not he
21              had personal contact with this woman on the date
22              she was out there?
23        A.    I asked Mr. Avery if she had said where she was
24              going.  And he said, I never talked to her.  She
25              was only here 5 or 10 minutes and she left.
```

75

```
 1   Q.   But he never talked to her?

 2   A.   That's what he told me, he never talked to her.

 3   Q.   Did he describe that further, how he knew she was

 4        there?

 5   A.   He said he saw her out the window taking the

 6        pictures.

 7   Q.   Okay.  Did you complete that conversation with

 8        Steven Avery?  Do you recall that conversation?

 9   A.   I told Mr. Avery that her parents and her family

10        were getting worried and was he sure that she

11        didn't mention where she might have been going

12        after she left.  And he said, no, I didn't talk

13        to her.  She was only here a few minutes and then

14        she left.

15   Q.   What was Mr. Avery's demeanor like as he was

16        talking to you; was he cooperative?

17   A.   Yes, he was very cordial.

18   Q.   Mr. Avery indicate to you the time, that is, when

19        this young woman had been on his property?

20   A.   He said he thought between 2:00 or 2:30.

21   Q.   What did you do then?

22   A.   I believe I thanked him for talking with me and I

23        started to get back in my car.  And I believe

24        Mr. Avery told me that he hoped she turned up

25        soon.
```

76

```
 1    Q.   What did you do then?

 2    A.   I left.  I left the property and I contacted --

 3         he is the under sheriff of our department now,

 4         but at the time he was the deputy inspector of

 5         the operations division.  I called him.

 6    Q.   What's his name?

 7    A.   Greg Schetter.  And I let him know that Calumet

 8         County was investigating a missing persons case

 9         and that one of the places that it had been

10         mentioned that this party was at was on -- at the

11         Avery Salvage Yard and I just left there and made

12         contact and that I was unable to locate that

13         person.  And he suggested that I probably contact

14         Lieutenant Lenk and see if he wanted -- if

15         Lieutenant Lenk wanted any of our detectives to

16         assist Calumet County in searching any place

17         else.

18    Q.   Did you do that?

19    A.   Yes, I did.

20    Q.   And did you speak with Lieutenant Lenk that

21         evening?

22    A.   Yes, by phone.  And then when I got into the

23         department, because prior to going into the

24         department I went past the other residence.  I

25         must have also contacted Investigator Wiegert and
```

77

1    let him know that I hadn't located.

2              And he, I believe, at that time told me

3    of the other address.  So I purposely drove past

4    that residence.  I saw it was dark, but that

5    there were cars in the driveway.  But the

6    residence was dark.  I didn't see any lights on

7    there.  So I ended my tour of duty for patrol.

8  Q.  Let me just stop you.  Whose residence was this

9      that you drove past?

10 A.  George Zipperer's.

11 Q.  Go ahead.  What did you do?

12 A.  I ended my patrol tour of duty, but I remained on

13     duty to assist Calumet County Detective Dedering

14     and Detective Remiker in making contact at George

15     Zipperer's residence.

16 Q.  Was that done at that time?

17 A.  It was done, you know, within probably a half

18     hour or 45 minutes of my getting back to the

19     department.

20 Q.  The question, Sergeant Colborn, did you assist in

21     that process?

22 A.  Yes, sir.

23 Q.  You mentioned that there was a Calumet detective

24     that was involved, as well as Manitowoc; is that

25     right?

                        78

```
1    A.   Yes, sir.

2    Q.   In meeting with the Zipperers?

3    A.   Yes, sir.

4    Q.   And, again, do you remember who they were?

5    A.   I believe his name is John Dedering.

6    Q.   All right.  When you -- I'm just going to go back

7         just briefly to your contact with Mr. Avery.  You

8         mentioned that he was cooperative; is that right?

9    A.   Yes, sir.

10   Q.   I want you to remember back, as best you can,

11        Sergeant Colborn, at that initial meeting with

12        Mr. Avery, you, Sergeant Andy Colborn, did you

13        have any feelings or any inclination that

14        Mr. Avery may have been involved in Ms Halbach's

15        disappearance?

16   A.   Not at that time, no.

17   Q.   Did you do anything on the 3rd of November to

18        further investigate Mr. Avery?

19   A.   On November 3rd?

20   Q.   Yes.

21   A.   No, sir.

22   Q.   Did you ever go back onto his property on the

23        3rd?

24   A.   No, sir.

25   Q.   After going to the Zipperers with Detective -- I
```

79

```
 1        think it was Remiker and Dedering, what did you
 2        do after that?
 3   A.   After we were done, completed at the Zipperers?
 4   Q.   Yes.
 5   A.   I went home.  I was done with -- you know, I was
 6        already on overtime.  I checked out and went
 7        home.
 8   Q.   Do you know about what time that was?
 9   A.   10:30, 11:00 at night, maybe.
10   Q.   All right.  Do you remember what you did the rest
11        of that evening?
12   A.   Just probably fell asleep on the couch.  I went
13        to bed and, you know, fell asleep.
14   Q.   The next day, on the forth of November, were you
15        working that day?
16   A.   No, sir, I was off that day.
17   Q.   It's a Friday; is that right?
18   A.   Yes, sir.
19   Q.   Do you remember what you did on the 4th?  We'll
20        get back to that, but do you recall, generally,
21        your day on the 4th of November?
22   A.   Yes, sir.
23   Q.   Move your attention one day further, on the 5th,
24        Saturday, the 5th of November; do you recall what
25        you were doing that day or that morning?
```

80

```
 1   A.   That was also a regularly scheduled day off for
 2        me.  Yes, I recall what I did on that day.
 3   Q.   We'll get into the morning, but let me just jump
 4        right to this investigation.  Were you contacted
 5        at all by any supervisors or superiors that day
 6        and asked to participate in this case?
 7   A.   I was contacted by the noon to 8 shift commander
 8        for that day, and he did ask me to come into work
 9        and pick up a patrol vehicle and respond out to
10        the Avery Salvage Yard.
11   Q.   Did you do that?
12   A.   Yes.
13   Q.   In a marked vehicle?
14   A.   Yes, I did take a marked vehicle out there.
15   Q.   And about what time was it that you arrived at
16        the Avery scene itself; do you recall?
17   A.   I know I left my house between 4:00 and 4:30.  I
18        probably got out to the Avery Salvage Yard
19        between 5:15, 5:30 maybe.
20   Q.   To your best recollection?
21   A.   Yes.
22   Q.   What happened when you got to the Avery salvage
23        business?
24   A.   I made contact with the same supervisor who had
25        called me and I asked him, what do you want me to
```

81

```
 1          do.  And he informed me that there was a deputy
 2          there that had some personal business or matters
 3          to attend to.  She had been out there since
 4          apparently earlier in the day.  And he asked me
 5          to transport that deputy back to the department
 6          so that she could get her own private vehicle and
 7          go home.  And then come back out to the Avery
 8          Salvage Yard and provide security.
 9     Q.   Did you do that?
10     A.   Yes.
11     Q.   What did you do when you got back to the Avery
12          business?
13     A.   Tried to stay in the car as much as possible
14          because it was pouring rain.  But they directed
15          my attention to a place way off in the salvage
16          yard where I could see some lights.  And
17          somewhere up in this area here they just told me
18          to sit in the car and not let anyone go down any
19          of these roads.
20     Q.   Providing scene security up near what would be
21          the business buildings?
22     A.   Yes.
23     Q.   Did you do that?
24     A.   Yes.
25     Q.   How long did you have that responsibility.
```

82

```
 1   A.   Maybe like an hour, hour and a half.  And I was
 2        then told that, actually, I could go home.  So I
 3        was preparing to do that.  I was checking all my
 4        equipment to make sure I had everything that I
 5        got out there -- came out there with.  And then I
 6        was told that I was going to be needed in a
 7        different capacity and not to go home.
 8   Q.   All right.  Let me ask you this, Sergeant
 9        Colborn, any time that day, any time on the 5th
10        of November, did you ever make your way down
11        towards the pond, or down towards the southeast
12        quadrant of the Avery salvage property?
13   A.   No, sir.
14   Q.   Could you point to that area for us, with the
15        laser pointer.  Point to the northeast corner of
16        the property.  I'll specifically ask you about
17        that area, did you go near that area at all on
18        the 5th of November?
19   A.   No, sir.
20   Q.   How about on the 3rd when you were there 2 days
21        earlier, talking to Steven Avery?
22   A.   No, sir.
23   Q.   And were you down there at all on the 4th of
24        November?
25   A.   No, sir.
```

                              83

```
 1   Q.   When initially being told that you could leave,
 2        or that you were in effect packing up to leave,
 3        who was it that approached you with other duties?
 4   A.   Detective Remiker.
 5   Q.   Do you know what you were being asked to do then?
 6   A.   He just said, you may want to check in with
 7        Inspector Wiegert -- Detective Wiegert, before
 8        you go home, because you can see the huge area
 9        here, it's going to have to be checked, and we
10        don't have a lot of people here to do that.
11   Q.   Do you know how many sworn law enforcement
12        officers were on scene at that time, or is that
13        something that you wouldn't even have a guess on?
14   A.   No, I didn't take a head count.  I don't know.  I
15        would ball park it at 50 or less, but I don't
16        know.
17   Q.   All right.  Now, 50 sounds like a lot of police
18        officers; do you think that's a lot for that size
19        scene?
20             ATTORNEY STRANG:  Irrelevant.
21             THE COURT:  Sustained.
22   Q.   (By Attorney Kratz)~ Did you check in with
23        Investigator Wiegert before you left?
24   A.   Yes.
25   Q.   And can you tell the jury, please, what -- what
```

84

```
 1        that conversation was?
 2   A.   I believe he asked me if I was an evidence
 3        technician and I said, yes, I am.  And --
 4   Q.   Let me stop you there.  What all goes into being
 5        an evidence technician?
 6   A.   It's an investigative portion, it's an
 7        investigative duty some police officers are
 8        trained to do and some who may not be interested
 9        in that are not.  Not every police officer is an
10        evidence technician.  You do get special training
11        on how to do photographing, how to identify
12        evidence, how to collect evidence without
13        destroying it.
14   Q.   All right.  And you had been through that
15        training?
16   A.   Yes, sir.
17   Q.   With Manitowoc County, that is, with the
18        sheriff's department, had you performed evidence
19        collection duties prior to November 5th of 2005?
20   A.   Yes, sir.
21   Q.   How long had you been an evidence tech?
22   A.   Since 1997.
23   Q.   Have you ever executed a search warrant or
24        collected evidence in that capacity before?
25   A.   Yes, sir.
```

85

```
 1    Q.   After Investigator Wiegert asked you if you were
 2         an evidence tech, what were you told to do?
 3    A.   I was just told to stand by, not to go home.  So
 4         I went back out to my patrol car.
 5    Q.   And, again, where was that parked, if you can
 6         show us?
 7    A.   I may, you know, have moved it closer to the
 8         Command Post, but initially I was parked right in
 9         this area here.
10    Q.   Again, near the business buildings?
11    A.   Yes, sir.
12    Q.   How long did you wait for further assignment?
13    A.   Maybe 5, 10 minutes.
14    Q.   Now, Sergeant Colborn, did you know what
15         assignment you were going to be given; in other
16         words, did you know where you were going to be
17         directed that night?
18    A.   No, sir.
19    Q.   What's the next direction that you recall
20         receiving?
21    A.   I believe the next person I made contact with was
22         Sergeant Bill Tyson from the Calumet County
23         Sheriff's Department.  And he was with Lieutenant
24         Lenk and Detective Remiker.  I believe he came
25         out of the Command Post.  They kind of motioned
```

86

| 1 | | to me. So walked up to them and Sergeant Tyson |
|---|---|---|
| 2 | | said, you are going to be working for me and we |
| 3 | | are going to be going to Steve Avery's trailer. |
| 4 | Q. | What did working for me mean, or what do you |
| 5 | | believe it meant? |
| 6 | A. | Well, I had been told by this time that the |
| 7 | | Calumet County Sheriff's Department was leading |
| 8 | | up this investigation. So I interpreted working |
| 9 | | for me as, you are the boss and you are going to |
| 10 | | tell me what to do. |
| 11 | Q. | Okay. Were you okay with that? |
| 12 | A. | Yes. |
| 13 | Q. | Did you then proceed with Deputy Tyson to the |
| 14 | | Steven Avery trailer? |
| 15 | A. | Yes, sir. |
| 16 | Q. | Do you remember how you got there, how you got |
| 17 | | down there? |
| 18 | A. | I believe we took two cars. I believe Sergeant |
| 19 | | Tyson took his Calumet County patrol car and we |
| 20 | | probably -- I don't think we took my marked unit, |
| 21 | | I think I got in Detective Remiker's car, or |
| 22 | | Lieutenant Lenk's car, whichever. It was an |
| 23 | | unmarked Manitowoc County car. |
| 24 | Q. | All right. Tell us again, if you can look at |
| 25 | | Exhibit 86, now where did you drive, where did |

87

```
 1        you guys go then?
 2   A.   I had never been to Steve Avery's trailer before
 3        so I really didn't know where it was.  But we
 4        drove down this road to that trailer right there.
 5   Q.   I will zoom in again on Exhibit 86; do you recall
 6        where the cars were parked?
 7   A.   I believe we parked them in this driveway here
 8        that goes up to that garage.
 9   Q.   Do you recall that particular search that
10        evening?
11   A.   Yes, sir.
12   Q.   How is it that you have a independent memory of
13        that first search of Steven Avery's trailer?
14   A.   Because I was involved in it.
15   Q.   Okay.  Did each of the search team members have a
16        specific responsibility within that trailer, if
17        you know?
18   A.   Not really.  I did have the specific
19        responsibility of photographing.  But as far as
20        collecting, I mean, we all worked as a team.  It
21        wasn't like one person went here and one person
22        went there.  We were always -- worked together as
23        a team, always within arm's length of one
24        another.
25   Q.   Was that by design, do you know?
```

88

```
 1   A.   I don't know if it was by design, per se, but it
 2        just seemed that this would be the best way for
 3        things to work and that we could be the most
 4        careful and concise, working together as a team.
 5   Q.   All right.  Let me ask you, Sergeant Colborn, did
 6        you know the kinds of things that you were
 7        looking for in Steven Avery's trailer?
 8   A.   Not specific -- specifically, no.
 9   Q.   Was there generally a term of things that you
10        were looking for?
11   A.   I was looking for any evidence that would
12        substantiate or eliminate her having been there.
13   Q.   Who's her?
14   A.   Teresa Halbach.
15   Q.   What rooms were it that the four of you searched?
16   A.   I believe that first night we did search the
17        entire trailer.  We started in what I term to be
18        the master bedroom or the largest bedroom.
19   Q.   All right.  We have already heard from Sergeant
20        Tyson so what responsibilities -- I'm just
21        talking about you now, not the others -- but what
22        responsibilities did you have in the search of
23        that bedroom?
24   A.   Again, initially, I did all the photographing
25        that night with a 35mm camera.  And then I was
```

89

| | |
|---|---|
| 1 | looking in -- there was a bookcase type piece of |
| 2 | furniture next to the bed and a desk next to |
| 3 | that. |
| 4 | And while I say it's the larger bedroom, |
| 5 | it's still kind of a small bedroom so those |
| 6 | pieces of furniture were almost tight together. |
| 7 | And there was very little distance between the |
| 8 | bed and those pieces of furniture, I mean, maybe |
| 9 | 2 foot. And that's the area that I was |
| 10 | specifically searching -- |
| 11 | Q. How many -- |
| 12 | A. -- in that bedroom. |
| 13 | Q. I'm sorry. How many men were in that bedroom? |
| 14 | A. There was myself, Detective Remiker, Lieutenant |
| 15 | Lenk and Sergeant Tyson. |
| 16 | Q. I'm going to put on the screen an exhibit which |
| 17 | has already been received; it's Exhibit 103. |
| 18 | It's a computer generated exhibit. Zoom in, |
| 19 | specifically, into the bedroom; does that help |
| 20 | you better orient yourself to Steven Avery's |
| 21 | bedroom? |
| 22 | A. Yes. |
| 23 | Q. Take the laser pointer, please, and tell the |
| 24 | jurors in what area you had initial |
| 25 | responsibility to search on the 5th of November. |

90

1   A.   This cabinet right here, I guess we could call

2         that a bookcase, and this desk right here.

3   Q.   All right.  And did you -- Let's talk about the

4         cabinet first.  Mr. Wiegert is going to hand you

5         what's been marked as Exhibit No. 203 and on 204,

6         ask if you found those items in Mr. Avery's

7         bedroom on the 5th of November?

8   A.   Yes, sir.

9   Q.   Tell the jury where you found them, please.

10   A.   That's a shelf right there, there's a little

11         space between that shelf and the top of the

12         cabinet.  I found them inside there, inside that

13         area.

14   Q.   Now, after finding or locating a piece of

15         physical evidence during this search, that is, on

16         the 5th, what did you do with that evidence?

17   A.   As soon as I located something that, in my

18         opinion, was of evidence, which doesn't

19         necessarily make it evidence, but if it was, in

20         my opinion, to be of evidentiary value, I stopped

21         what I was doing.  I informed Sergeant Tyson,

22         hey, I found some leg irons and handcuffs in

23         here.

24             Then Sergeant Tyson would come over.  I

25         would photograph them, then he collected them and

91

```
1        put them -- you know, went through the
2        administrative duties that the Calumet County
3        Sheriff's Department requires for logging
4        evidence.
5    Q.  The actual seizure, or the collection of them,
6        was whose responsibility?
7    A.  Calumet County's.
8    Q.  Sergeant Tyson?
9    A.  Well, on that evening, yes, Sergeant Tyson,
10       sorry.
11   Q.  When you look at Exhibit 103, this computer
12       generated diagram, other than the roof being
13       ripped off, for obvious reasons, does that look
14       the same or similar as it did on the 5th of
15       November?
16   A.  Yes, sir.
17   Q.  You see on the wall above the bed, the headboard,
18       there is a gun rack; do you see that?
19   A.  Yes.
20   Q.  Is that how it looked on the 5th of November as
21       well?
22   A.  Yes.
23   Q.  Did you see any firearms on that gun rack that
24       aft -- that evening?
25   A.  There were two firearms on that gun rack, just
```

92

```
 1          pretty much like it is in the picture.
 2    Q.    Were you able, Sergeant Colborn, to identify
 3          those guns, or at least what kind of guns they
 4          were?
 5    A.    I know as soon as we walked into the room we
 6          noticed the guns right away.  I probably stood
 7          right about here and I could see that one of the
 8          guns, I believe it's this lower one, was a
 9          muzzleloader, and it had a piece of masking tape
10          on the stock that said Steve.
11    Q.    What about the gun on top; is that a long gun as
12          well?
13    A.    It's a .22 caliber rifle.
14    Q.    Now, let me ask you, to the best of your
15          recollection, Sergeant Colborn, were those guns,
16          were those firearms seized from Mr. Avery's
17          bedroom on the 5th of November?
18    A.    I don't think we did take them on the 5th of
19          November, no.
20    Q.    So the jury understands, at that time, that is,
21          that first day, that first night that you guys --
22          you guys meaning the law enforcement -- got
23          there, had Teresa Halbach's body or any of her
24          remains been located?
25    A.    No, sir.
```

93

| | | |
|---|---|---|
| 1 | Q. | Did you even know that you were dealing with a |
| 2 | | crime at that time? |
| 3 | A. | I -- Initially, we were still treating this more |
| 4 | | or less as a missing person. |
| 5 | Q. | All right. But you were looking for items that |
| 6 | | had obvious evidentiary value; is that right? |
| 7 | A. | Yes, sir. |
| 8 | Q. | What were some of the other rooms that -- or let |
| 9 | | me just -- let me just make this clear, while in |
| 10 | | that room, while in that bedroom searching, did |
| 11 | | you notice any -- anything on the floor; |
| 12 | | specifically, did you notice any car key on the |
| 13 | | floor? |
| 14 | A. | No, sir. |
| 15 | Q. | In looking at, or on top of, either the desk or |
| 16 | | the bookcase, did you notice any car key or |
| 17 | | something that may have had obvious evidentiary |
| 18 | | value in that regard? |
| 19 | A. | Not really, no. |
| 20 | Q. | Okay. What other rooms were searched that night? |
| 21 | A. | I believe we searched every -- every room in the |
| 22 | | trailer that evening. |
| 23 | Q. | Try to get to a overview here. This has been |
| 24 | | received as Exhibit No. 102, does this appear to |
| 25 | | be an overview of the Avery trailer, again, a |

94

```
 1        computer generated diagram?
 2   A.   Yes, sir.
 3   Q.   Lists both bedrooms, the bathroom, living room,
 4        dining room and kitchen area; is that right?
 5   A.   Yes, sir.
 6   Q.   Each of those rooms searched that evening?
 7   A.   Yes, sir.
 8   Q.   You said you were taking 35mm photography in that
 9        trailer; is that correct?
10   A.   Yes, sir.
11   Q.   Were there other photographs also being taken?
12   A.   I believe Detective Remiker had brought a small
13        digital camera in as well and he was taking some
14        digital photos as well.
15   Q.   I show you a photo that's been received as
16        evidence.  This is Exhibit No. 163 and ask if you
17        recognize this particular photo.
18   A.   That's a photograph of the master bedroom area I
19        was just talking about in Steve Avery's trailer.
20   Q.   Is that how it looked on the 5th of November?
21   A.   Yes, sir.
22   Q.   Exhibit No. 175, again, which has been received,
23        could you tell us what this is, if you know.
24   A.   That's in the living room area of that same
25        trailer, the same residence.  And this is like a
```

95

```
 1        corner of the living room that was set up as a
 2        computer work area.
 3   Q.   Was that an area that you and your colleagues
 4        searched that evening?
 5   A.   Detective Remiker was the primary officer that
 6        looked at that area, but he did call me over a
 7        couple times to have me take pictures of items
 8        that he had found.
 9   Q.   You can't fit four grown men into that --
10   A.   No, sir.
11   Q.   -- corner; is that right?  After the search was
12        completed, or when the search was wrapping up,
13        could you tell us how that search ended, how that
14        effort ended?
15   A.   The items that we had decided were of evidentiary
16        value that night were placed in Sergeant Tyson's
17        patrol vehicle and he stayed with the evidence.
18        We all went back to the Command Post.  And not
19        exactly sure which Calumet County officer told us
20        what time to be there the next day, but we were
21        instructed to return the next day; myself,
22        Lieutenant Lenk, and Detective Remiker.  And we
23        all left at the same time.
24   Q.   After leaving the residence on the 5th, can you
25        tell the jury where you went, please.
```

96

1    A.    I would have gone back to the Manitowoc County
2          Sheriff's Department, which is in the city of
3          Manitowoc and to get my personal vehicle, so I
4          could go home.
5    Q.    Do you know about what time you cleared the
6          scene; in other words, about what time you left,
7          if you remember?
8    A.    I'm sorry, I don't.  I know it was late, that's
9          all.
10   Q.    The next day, that is, on the 6th of November,
11         were you asked to come back to the scene?
12   A.    Yes, sir.
13   Q.    And what were you asked to do on the 6th?
14   A.    On the 6th, when I came out there, again, with
15         Detective Remiker and Lieutenant Lenk and I
16         believe just -- this time just Lieutenant Lenk
17         went into the Command Post to make contact with
18         who we would be working with with Cal County that
19         day.
20               And Detective Remiker and I just kind of
21         waited until he came back out.  And we were
22         introduced to Deputy Kucharski.  And then Deputy
23         Kucharski informed us what our assignment would
24         be for that day.
25   Q.    Okay.  Prior to arriving on the scene, once

97

```
 1        again, did you know what your assignment was
 2        going to be?
 3   A.   No, I had no idea.
 4   Q.   Was an evidence collection team formed or
 5        developed that morning, on the 6th?
 6   A.   Yes, sir.
 7   Q.   Do you remember who was involved in that team?
 8   A.   It was myself, Lieutenant Lenk, Detective
 9        Remiker, and Deputy Kucharski, who's a employee
10        of the Calumet County Sheriff's Department.
11   Q.   Once again, was it determined who would be in
12        charge of that group of search individuals?
13   A.   After the first day, we didn't, you know -- I
14        didn't need to be told who was in charge, I knew.
15        But Deputy Kucharski told me that he would be
16        responsible for collecting and maintaining
17        security on any evidence that was located that
18        day.
19   Q.   All right.  What areas, then, of search were you
20        involved with, if any, on the 6th of November?
21   A.   Initially, we started at the garage, at Steve
22        Avery's residence.
23   Q.   Tell me about this garage, please?
24   A.   It's a wooden, frame structure, maybe like a car
25        and a half garage.  Not -- Not attached to the
```

98

```
 1        residence.  It had a vehicle parked out in front

 2        of it, a black Ford pickup truck.

 3   Q.   I show you what's been received in evidence as

 4        Exhibit No. 38, can you tell us what we're

 5        looking at here, please.

 6   A.   That's Steve Avery's residence.  That's his

 7        garage.  That's his pickup truck.

 8   Q.   All right.  And that garage was searched; is that

 9        right?

10   A.   Yes, sir.

11   Q.   Who was that searched by?

12   A.   The aforementioned team; myself, Lieutenant Lenk,

13        Detective Remiker, and Deputy Kucharski.

14   Q.   Do you remember the interior of that garage on

15        the 5th of November?

16   A.   Yes, sir.

17   Q.   Can you briefly describe that for the jury?

18   A.   There was a smaller sport utility vehicle parked

19        in one half of the garage.  It was a Suzuki

20        Samurai.  There was a snowmobile also parked in

21        there, a Skidoo snowmobile.  And there were some

22        other benches and tools that kind of went all the

23        way around the garage.  There wasn't a lot of

24        room in there, with all the other apparatus that

25        was in there.
```

99

```
 1   Q.   In this case, already, and I think the defense
 2        had asked and has been admitted, Exhibit No. 119,
 3        ask you to take a look at Exhibit No. 119.  Tell
 4        us what we're looking at here.
 5   A.   That would be the interior of Steve Avery's
 6        garage.
 7   Q.   Fair to say there's a lot of stuff in there?
 8   A.   Yes, sir.
 9   Q.   What kind of search was performed of that garage?
10   A.   Well, the same type of, you know, search that we
11        had performed the night before in his residence.
12        We were looking for anything that would lead us
13        to believe that there was a missing person in
14        there.
15   Q.   Each of the items that we see, and we can even
16        zoom into some of these things, was each and
17        every one of those items removed from the garage
18        and thoroughly searched, or searched under each
19        and every one of these items?
20   A.   No.  No, sir.
21   Q.   Wasn't that kind of search?
22   A.   No.
23   Q.   In a very broad way, that is, in a overview
24        fashion, because we're going to hear from Deputy
25        Kucharski, but in a very broad sense, can you
```

100

```
 1          tell us the kinds of things that were recovered
 2          or viewed while you were in that garage?
 3   A.     Almost as soon as we stepped in the garage I
 4          noticed, as did everyone else, that there were
 5          several spent shell casings lying on the floor of
 6          the garage.
 7   Q.     What's a shell casing?
 8   A.     It's the brass portion of a bullet.  After the
 9          bullet has been expended or fired, the casing is
10          usually ejected through from the firearm and
11          lands in close proximity to the shooter, usually
12          on the ground.
13   Q.     Let me ask you this, Sergeant Colborn, are you
14          familiar with shell casings for different kinds
15          of, or different calibers of firearms?
16   A.     Yes.
17   Q.     By visual inspection, that is, without picking
18          them up or without even taking a look at those
19          shell casings, were you able to determine what
20          caliber weapon was used to fire those bullets?
21   A.     Yes.
22   Q.     How were you are able to determine that?
23   A.     The shell casings that were laying on the ground
24          were small, for one.  They were brass and they
25          didn't have a center primer.  They had been fired
```

101

```
 1        on the corner of the bottom of the casing; in
 2        other words, the rim of the casing.  And a
 3        .22 caliber weapon is one of the only weapons
 4        that is a rim fire weapon.  Most weapons have a
 5        primer in the center of the bullet.  This does
 6        not; it's fired off the rim.
 7   Q.   How many, what you believed were .22 caliber
 8        shell casings, were readily apparent or viewable
 9        to the naked eye as you entered that garage?
10   A.   There were quite a few, 12 maybe, 12 plus.
11   Q.   Do you know for sure?
12   A.   No, sir, I don't.
13   Q.   During the course of that search, were the shell
14        casings that were at least out in plain view
15        seized by Deputy Kucharski?
16   A.   Yes, we photographed them first, where they were
17        lying.  Initially, Deputy Kucharski and I were
18        both doing photographs, but then we thought
19        perhaps that was a bit redundant.  So I just
20        let -- Deputy Kucharski felt more than
21        comfortable taking the photographs so I just
22        stopped taking pictures and assisted with
23        locating.
24   Q.   About how long did the search of this garage
25        take?
```

102

```
1    A.   One hour, one and a half hours.

2    Q.   Looking at the stuff, I will call it junk; I

3         don't know if I will get an objection about that,

4         but probably not.  Looking at the junk that we

5         see here, in a one hour search, were you able to

6         thoroughly search this garage?

7    A.   No.  I mean, if we were looking for something

8         minute, you could spend easily an hour just in

9         this area right here.

10   Q.   All right.  Were you given other search

11        assignments that day?

12   A.   Yes, sir.

13   Q.   Can you tell us where you were next assigned to

14        search?

15   A.   I believe the next assignment, I believe, was the

16        Ford pickup truck that was parked right in front

17        of the garage.

18   Q.   And that was Steve's black truck that we had seen

19        before?

20   A.   I do have to mention, there were several times,

21        and I believe this was one of them, where we

22        would be searching a specific area, somebody from

23        Cal County would come and say, I need your

24        assistance doing this.  So we would stop what we

25        were doing and assist them with another project
```

103

| | |
|---|---|
| 1 | and then go back.  So I believe before we started |
| 2 | searching that Ford pickup truck, I was asked to |
| 3 | photograph some burning barrels and assist in |
| 4 | loading them up into a covered trailer. |
| 5 | Q.  All right.  Did you do that? |
| 6 | A.  Yes, sir. |
| 7 | Q.  Just as long as we have this picture up, first, |
| 8 | we're going to go back to Exhibit 38; was that |
| 9 | the truck that you assisted in searching? |
| 10 | A.  Yes. |
| 11 | Q.  Now, you talked about some burn barrels, where |
| 12 | were these located? |
| 13 | A.  Behind or to the side of Steve's garage.  There |
| 14 | was three or four of them. |
| 15 | Q.  Did you know whose burn barrels those were? |
| 16 | A.  No, I didn't. |
| 17 | Q.  You said that there were others that were |
| 18 | assisting in the recovery of those; do you know |
| 19 | who those other individuals were? |
| 20 | A.  I didn't know, you know, everyone's name from the |
| 21 | Calumet County Sheriff's Department, or the |
| 22 | Department of Criminal Investigations that was |
| 23 | working there.  I just recognized that some of |
| 24 | the officers were not at all connected with |
| 25 | Manitowoc County, but they were uniformed.  And I |

104

```
 1         saw Calumet County, you know, Sheriff's
 2         Department patches on their uniforms, but I do
 3         not know them by name.
 4    Q.   There were some Manitowoc officers also involved?
 5    A.   Yes.
 6    Q.   Those burn barrels, I think a picture of them has
 7         been received as Exhibit 52, I'm going to show
 8         you that picture; do you recognize that?
 9    A.   Yes, I took that picture.
10    Q.   Who is that we see in the picture?
11    A.   That's Detective Dave Remiker from the Manitowoc
12         Sheriff's Department.
13    Q.   These are the four burn barrels that you assisted
14         in recovering and loading; is that right?
15    A.   Yes, sir.
16    Q.   Looks like it's raining here again; is that
17         right?
18    A.   Yes.  I wanted to get a picture to show that we
19         were trying our best to protect the contents of
20         the barrel; that's the reason that tarp is on
21         there.
22    Q.   After those barrels were loaded, did you proceed
23         to complete the search of Steve's black truck?
24    A.   Yes, sir.
25    Q.   All right.  After that effort, what did you do
```

                                105

```
1       then?
2   A.  Again, this is going to be one of those times
3       that I was pulled away for another project.  We
4       were almost completed with the search of Steve's
5       truck when I was -- again, another Calumet County
6       supervisor told me -- or asked me where the
7       Maribel Caves Park was.  And I said, you know, I
8       described where it was, but not being from
9       Manitowoc County, he didn't really know where it
10      was.  And he said, well, some searchers have
11      found some things at the Maribel Caves Park, can
12      you go out there; see what they have, if you
13      think it's evidence, pick it up.  So myself and
14      Detective Remiker went out to Maribel Caves Park
15      where we made contact with a civilian search
16      party.  And they showed us some things that they
17      had found and we ended up bagging them up and
18      turning them over to the Calumet County Sheriff's
19      Department.
20  Q.  What did do you then?
21  A.  When I got back, then, I believe, the search of
22      Steve's truck, I think, had been completed then.
23      You know, in my absence, Deputy Kucharski had
24      completed the search and then I would have to
25      take a look at his report to see what our next
```

106

```
 1        assignment was.  I believe we were sent to Chuck
 2        Avery's residence -- no, either Chuck's or
 3        Steve's sister.  And I'm not positive which one
 4        was next.
 5    Q.  Who's Steve's sister?
 6    A.  Her first name is Barb.  I believe at that time
 7        her last name was Janda.
 8    Q.  All right.  Did you assist in the search of Barb
 9        Janda's trailer?
10    A.  Yes.
11    Q.  And we're going to hear from Detective Remiker
12        later, but do you recall being present when a
13        telephone answering machine was located.
14    A.  Yes.
15    Q.  This has been received as Exhibit No. 55, can you
16        tell us what we're looking at, please.
17    A.  I believe that's the answering machine that was
18        in Barb Janda's residence.
19    Q.  Who else was present when this answering machine
20        was investigated or searched?
21    A.  It was the same search team that had gone into
22        Steve Avery's garage; Lieutenant Lenk, myself,
23        Detective Remiker, and Deputy Kucharski.
24    Q.  Were the messages on this machine examined?
25    A.  When we -- When we found the answering machine, I
```

107

```
1        saw that there were messages on there.  I said,
2        let's unplug it and take the answering machine.
3        And, of course, the conversation between all of
4        us, we said, well, what if somehow in the
5        unplugging process we lose the messages.  So,
6        yes, we hit the play button and listened to the
7        messages and Detective Remiker recorded the
8        messages as they were being played.
9   Q.   Did you have occasion that day to reenter Steven
10       Avery's trailer?
11  A.   I believe that was the day that I was asked to --
12       our whole team was asked to go back into Steve's
13       trailer and obtain serial number -- I think that
14       was the day -- that we were asked to obtain a
15       serial number off Steve's computer, the tower
16       portion of his computer.
17  Q.   Are you sure about that, or are you guessing?
18  A.   I'm not positive if that was the day or not.  I
19       know that was one of the assignments that I
20       completed.  I thought it was that day, but I'm
21       not positive.  I do know, also, that that day we
22       had to go back into Steve Avery's trailer and
23       collect his weapons.
24  Q.   Can you, again, describe those weapons.
25  A.   He had a, like a two place or gun rack over his
```

108

```
 1        bed.  There were two weapons on the gun rack; one
 2        was a .22 caliber rifle, and the other was a --
 3        if I remember correctly -- was a .50 caliber
 4        muzzleloader.
 5   Q.   We're going to have these marked, actually.
 6             ATTORNEY KRATZ:  Mr. Fallon, if you could
 7        have them marked.
 8             ATTORNEY FALLON:  They're marked.
 9             ATTORNEY KRATZ:  Oh, I'm sorry.
10   Q.   (By Attorney Kratz)~ Do you see a picture of the
11        .22 caliber rifle?
12   A.   Yes, sir.
13   Q.   And what exhibit number is that?
14   A.   It is Exhibit 164.
15   Q.   See if I can find that here.  Do you recognize
16        Exhibit No. 164?
17   A.   Yes, it's a .22 caliber rifle that we located in
18        Steve Avery's bedroom.
19   Q.   I have put up a photograph of Exhibit No. 164;
20        again, does that .22 caliber rifle look the same
21        or similar as it did when it was seized on the
22        6th of November?
23   A.   Yes, sir.
24   Q.   Did you, by the way, that day, on the 6th, have
25        occasion to, at all, inspect or further inspect,
```

109

```
 1        that rifle?
 2   A.   When we collected the rifle, in order to manage
 3        an evidence room, we first needed to make sure
 4        that the weapon wasn't loaded.  So I did pull the
 5        action back to see if it was going to eject a
 6        round.  And I believe I pulled the tube out,
 7        which is under the barrel there.
 8   Q.   Why don't you show you us with the laser pointer.
 9   A.   That portion of the weapon is the magazine.  To
10        load it, you pull a tube out, I believe, an
11        insert rounds through that notch right there.
12             This is the action of the magazine; it's
13        a semi-automatic weapon.  So I pulled this action
14        back to see if there was a round inside the
15        barrel.  And I believe the safety is right there
16        on the weapon and I would have checked to make
17        sure that the safety was on, because if someone
18        handling the weapon, obviously, if it was loaded
19        with the safety off, it could fire.
20   Q.   Sure.  Are you familiar with a semi-automatic
21        rifle such as Exhibit No. 164?
22   A.   Yes, sir.
23   Q.   Now, a tube loaded or a tube fed magazine, for
24        those on the jury that aren't gun enthusiasts,
25        can you tell us just -- just generally how that
```

                              110

```
1          works?
2     A.   This portion of the weapon right here is where
3          it's loaded.  At the very end here, you can twist
4          a knob and you pull out like a plastic plunger
5          and you load -- you would have to turn the weapon
6          almost upside down.  But if you can see that,
7          there's a little notch there, that's where you
8          put the rounds in and then you just slide this
9          tube back in until it locks.
10              And if it doesn't lock, you put too many
11         rounds in.  You have to get it so that that
12         locks.  As you fire the weapon, there's a spring
13         on there and it just keeps pushing the rounds
14         back to the chamber.
15    Q.   After a .22, you mentioned a rim fire bullets,
16         but after the shell casings are ejected, where do
17         they come out of?
18    A.   Out of that area right there, that silver area.
19    Q.   And with a semi-automatic weapon, do you have to
20         reload it, or cock it, or do anything that any --
21         any action like that that we might hear with
22         other weapons?
23    A.   No, sir.  A semi-automatic weapon will continue
24         to fire as fast as you can pull the trigger.  You
25         must release the trigger to its sear each time,
```

111

```
 1        but it will continue to fire as fast as you can

 2        pull the trigger, until all the shells are

 3        expended.

 4   Q.   By the way, Sergeant Colborn, I don't know if you

 5        know this, but do you know what kind of weapon

 6        this is; what brand name weapon?

 7   A.   I know when we catalogued the weapon, when we

 8        took it, and when Deputy Kucharski took it in as

 9        evidence, I read the manufacturer name to him,

10        but I don't recall who manufactured that weapon.

11   Q.   That's fine.  Thank you.  You said there was a

12        second weapon that was seized; is that right?

13   A.   Yes, sir.  You gave me a photograph that's marked

14        Exhibit 165.

15   Q.   Why don't you tell us what that is?

16   A.   That's a muzzleloading weapon, similar to like a

17        musket from the Revolutionary War or frontier

18        period.  It's called muzzleloading because that's

19        where you load it, through the muzzle.

20   Q.   Where were these items seized from?

21   A.   Steve Avery's bedroom, on a gun rack that was

22        hanging above his bed.

23   Q.   Is there anything else that was seized from

24        Mr. Avery's trailer that day, that is, on the 6th

25        of November, that you can recall?
```

112

```
 1   A.   Not that I recall, no, sir.

 2   Q.   Any other buildings that you were asked to search

 3        that day?

 4   A.   Not that I specifically recall, no.

 5   Q.   All right.

 6             ATTORNEY KRATZ:  Judge, before going into

 7        the next day's search for the 7th, this might be a

 8        good time for a lunch break.

 9             THE COURT:  All right.  The Court agrees.

10        Members of the jury, we're going to take our lunch

11        break at this time.  Again, do not discuss the case

12        in any fashion and during the break and we'll resume

13        at 1:00.

14                  (Jury not present.)

15             THE COURT:  You may be seated.  Go off the

16        record at this time.

17                  (Off the record discussion.)

18             THE COURT:  At this time we'll go back on

19        the record.  Mr. Kratz.

20             ATTORNEY KRATZ:  Judge, before we break for

21        lunch, Mr. Strang was kind enough to alert me that

22        this witness may be cross-examined with the

23        assistance of a audio CD.  Mr. Strang gave me a CD

24        that has 24 tracks on it.  I don't know if he

25        intends to play all 24 tracks in the
```

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 50 of 63   Document 132-1

cross-examination, but it would certainly assist us
in orienting as to the time and the context of those
conversations, if those could be identified.  If
they can't, that's fine, but if the tracks
themselves, rather than listen to all 24 during the
lunch hour, could be identified, we would appreciate
that.

       THE COURT:  Mr. Strang.

       ATTORNEY STRANG:  Well, I provided the CD
out of an abundance of caution.  I think these --
these taped calls are all calls that the State, like
the defense, received during the hearing on
August 9, 2006, from the Manitowoc County Sheriff's
Department.  We should probably excuse the witness.

       THE COURT:  I was just thinking about that
myself.  Mr. Colborn, if you can step out of the
courtroom for a minute, we'll continue here.  The
witness has now left the courtroom.

       ATTORNEY STRANG:  Right.  As I say, I'm
quite confident that when we received the CD's from
the Manitowoc County Sheriff's Department on
August 9, 2006, the State also received the very
same recorded calls, both radio transmissions and
some land lines at the sheriff's department that are
answered by dispatchers.  Out of an abundance of

114

```
1      caution, I gave Mr. Kratz another copy of the disc
2      I'm going to mark today.  But I'm not interested in
3      disclosing my cross-examination over the lunch hour
4      while, you know, the State is free to prepare
5      including with the witness.
6                THE COURT:  All right.  If it's information
7      that the parties already have, I don't know what's
8      going to come in but, Mr. Kratz, if you need a break
9      before redirect, I will take up a request at that
10     time.
11               ATTORNEY KRATZ:  That's fine and counsel
12     may hear the very same response later in the trial.
13     That's fine.  Thank you, Judge.
14               THE COURT:  Okay.
15                   (Noon recess taken.)
16               THE COURT:  Mr. Kratz, at this time you may
17     resume your direct examination of Mr. Colborn.
18               ATTORNEY KRATZ:  Thank you, Judge.
19                   **DIRECT EXAMINATION**
20     BY ATTORNEY KRATZ:
21     Q.   Sergeant Colborn, we left off with the next day,
22          I believe, of your involvement with the -- on
23          Monday, the 7th of November; do you remember that
24          day?
25     A.   Yes, sir.
```

115

| | | |
|---|---|---|
| 1 | Q. | Were you asked to return to the Avery property? |
| 2 | A. | Yes, I was. |
| 3 | Q. | And, by the way, who were you asked to return |
| 4 | | there by? |
| 5 | A. | The Calumet County Sheriff's Office, or |
| 6 | | Department of Criminal Investigation, one of |
| 7 | | those officers. |
| 8 | Q. | If you could speak up just a little bit, |
| 9 | | Sergeant, I would appreciate it. |
| 10 | A. | I was either asked to return by the Calumet |
| 11 | | County Sheriff's Department, one of their |
| 12 | | supervisors, or by the Department of |
| 13 | | Corrections -- or Department of Criminal |
| 14 | | Investigations, Agent Tom Fassbender. |
| 15 | Q. | Were you, for lack of a better word, volunteering |
| 16 | | for this service, or these duties? |
| 17 | A. | No. |
| 18 | Q. | On the 7th of November, then, do you recall about |
| 19 | | what time you returned to the salvage yard? |
| 20 | A. | Somewhere between 6:30 in the morning and 7:30 in |
| 21 | | the morning, I believe. |
| 22 | Q. | Sergeant Colborn, what were you asked to do on |
| 23 | | the 7th, if you recall? |
| 24 | A. | On the -- On Monday, I was informed that -- by |
| 25 | | Sergeant Tice that I -- Tyson, that I would be |

116

```
 1    working with him, again.  This would be the same
 2    Sergeant Tyson that I had worked with on
 3    Saturday.
 4              And he informed us that our assignment
 5    that day was to go into the Avery Salvage Yard
 6    and open any trunks of vehicles that had not yet
 7    been searched, because the trunks, apparently,
 8    they couldn't find the keys for these vehicles
 9    and we were to look inside the trunks of these
10    vehicles.
11 Q. Were there any other members of your team, other
12    than you and Sergeant Tyson?
13 A. Also Lieutenant Lenk was with me that day.
14 Q. And did you, in fact, assist in opening up or
15    searching trunks that hadn't yet been opened?
16 A. Yes, I did.
17 Q. What else happened on the 7th?
18 A. That took the better part of the morning.  I
19    believe in the afternoon we were instructed to
20    start collecting -- you know, specifically
21    instructed to collect -- I take that back.  At
22    some point we were also asked to get a -- I
23    believe this was the day that we were asked to
24    get the serial number off Steven Avery's
25    computer.
```

117

```
1    Q.   Did you assist Sergeant Tyson in that regard?

2    A.   Yes, I did.

3    Q.   Can you tell the jury what you did, please.

4    A.   The serial number is on the back of the computer.

5         And the portion of the computer that we needed

6         the serial number was underneath a desk that had

7         been shown earlier, the photograph that was shown

8         earlier.  So I crawled underneath the desk and

9         used a flashlight to obtain the manufacturer and

10        the serial number of the computer, which Sergeant

11        Tyson wrote down.

12   Q.   All right.  How long did that process take?

13   A.   At the most, 10 minutes.

14   Q.   Did you go in any other part of the residence, or

15        did you confine yourself to the living room area?

16   A.   I just confined myself to the area where the

17        computer was that day.

18   Q.   What else did you do then?

19   A.   I believe then we were instructed to -- I believe

20        we were instructed, then, to start collecting

21        some firearms from the other residences that were

22        on the Avery property.  I believe, specifically,

23        Barb Janda's residence.

24   Q.   And did you do that?

25   A.   Yes, sir.
```

118

```
 1    Q.   All right.  What's the next thing you did on the
 2         7th?
 3    A.   I know at one point I was asked to take some
 4         photographs, I believe, of a burning barrel that
 5         was on Steve Avery's property.  I did do that.
 6    Q.   Which -- Which burn barrel did you take
 7         photographs of?
 8    A.   It was a burn barrel that was on, I would -- that
 9         was in close proximity to Steve's trailer.  And I
10         remember it had a car wheel by it.
11    Q.   To orient us to that, there's an exhibit which
12         has been received, it's Exhibit 114.  It's,
13         again, an exterior computer animation.  If you
14         take your laser pointer up there, tell us what
15         we're looking at, and what burn barrel you were
16         asked to examine and photograph?
17    A.   That burn barrel right there.  I remember right
18         on one -- either this side or this side of it
19         there was a car wheel standing on its edge with a
20         tire missing.
21    Q.   Did it appear to you, at least as you went to
22         that scene and as you look at Exhibit 114, who
23         that burn barrel is attached to?
24    A.   Yes, it's the burn barrel for that residence,
25         right there, Steve Avery's residence.
```

                              119

```
1   Q.   Now, Sergeant, you talked about some different
2        kinds of photography.  I think you talked about
3        digital as well as 35mm photography; do you
4        remember that day, the 7th of November, what kind
5        of photography you were performing?
6   A.   35mm, I did not do any digital photography the
7        entire time I was out there, personally.
8   Q.   That way you talked about a wheel next to the
9        burn barrel, I'm going to show you what's been
10       marked as Exhibit No. 158, in fact, Mr. Fallon is
11       going to hand it to you, but I would ask you if
12       you could tell us what this is an image of.
13  A.   That is a car wheel, that's at the very edge of
14       Steve Avery's burn barrel.  And those wires, I
15       believe, that are around the wheel are actually
16       part of the make up of the tire, probably like
17       portions of the steel belt.
18  Q.   As we get closer, do a little bit of a close up,
19       can you see that better now on the screen?
20  A.   Yes, sir.
21  Q.   By the way, Exhibit 158, is that a photo that you
22       took or likely took?
23  A.   Yes, sir.
24            ATTORNEY KRATZ:  In all honesty, Judge, so
25       that I don't forget, I'm going to move the admission
```

120

```
 1         of Exhibit 158 at this time.
 2                    THE COURT:  Any objection?
 3                    ATTORNEY STRANG:  None.
 4                    THE COURT:  158 is received.
 5    Q.    (By Attorney Kratz)~ Were you asked to do
 6          anything else on the 7th, Sergeant?
 7    A.    I believe I was also -- At some point, apparently
 8          the Command Post received word that some
 9          searchers had located an area that -- it looked
10          suspicious, there was plastic poking up from the
11          ground and it looked like the ground had been
12          disturbed.  So I was asked to go to that area
13          along with the Wisconsin State Crime Lab,
14          Sergeant Tyson, and Lieutenant Lenk and help the
15          Crime Lab, if they requested it, to excavate that
16          area.
17    Q.    Do you know on what roadway this was?
18    A.    I believe it was off Kuss, White Cedar Road.
19    Q.    This is something that Mr. Ertl, yesterday,
20          talked about a potential burial site but what
21          wasn't; was that your understanding, that it
22          turned out not to be?
23    A.    Yes, it turned out to be nothing.
24    Q.    Did you do anything else on the 7th.
25    A.    I think by the time we were down with that, that
```

121

```
 1          consumed the rest of the day.
 2   Q.     Let's move on then to the 8th, which would be
 3          Tuesday, the 8th of November, were you asked to
 4          return to the property?
 5   A.     Yes, sir.
 6   Q.     Again, who were you asked to return there by?
 7   A.     By -- No, I didn't get the -- the -- wasn't told
 8          to me directly.  Usually Lieutenant Lenk met with
 9          members of the Calumet County Sheriff's
10          Department and Department of Criminal
11          Investigations at the completion of each day and
12          then I would just check with Lieutenant Lenk, are
13          we needed tomorrow or no.
14   Q.     I see.
15   A.     And then he said, we're needed tomorrow.
16   Q.     Did you show up then on the 8th?
17   A.     Yes, sir.
18   Q.     And who were you attached to, or who were you
19          assigned to that day?
20   A.     I was assigned to Deputy Dan Kucharski from the
21          Calumet County Sheriff's Department.
22   Q.     Do you know what you were asked to do on the 8th?
23   A.     Yes, Deputy Kucharski, Lieutenant Lenk, and
24          myself were instructed, by Special Agent
25          Fassbender, to look for some specific printed
```

122

```
1         material inside Steven Avery's residence.
2    Q.   Okay.
3    A.   And to collect same.
4    Q.   Did you have occasion to enter Steven Avery's
5         bedroom on the 8th of November?
6    A.   Yes, sir.
7    Q.   Who did you enter that bedroom with.
8    A.   Deputy Kucharski and Lieutenant Lenk.
9    Q.   How long did you spend in that bedroom on the
10        8th, if you recall?
11   A.   An hour or so.
12   Q.   Were you directed to perform any search of that
13        trailer, specifically of that bedroom?
14   A.   Before -- Actually, before we started on the
15        bedroom, I was instructed to, with Deputy
16        Kucharski, to remove the computer and to wait
17        until the computer was picked up by another law
18        enforcement officer.
19   Q.   Okay.  Did you do that?
20   A.   Yes, sir.
21   Q.   Then, moving to the bedroom, my question is,
22        whether you were to perform a search that day?
23   A.   Yes, sir.
24   Q.   I'm showing you what's been marked for
25        identification as Exhibit No. 208; can you tell
```

123

```
 1          us what that is, please.
 2    A.    These are photographs of a cabinet that's right
 3          next to the desk in Steve Avery's bedroom, that
 4          would be the same bedroom where the firearms were
 5          that I described before and --
 6    Q.    We're just talking about the first one now,
 7          Exhibit 208.
 8    A.    That's this photograph here.  It's a picture
 9          of -- this is a desk.
10    Q.    I'm actually going to put a view up for the jury
11          so that we can -- Okay.  If you want to use your
12          laser pointer where everybody can see what you
13          are talking about then.
14    A.    This is a desk.  There's an open area, that's the
15          picture.  This is a cabinet, you can see how
16          closely it is positioned to the desk there.
17    Q.    Let me just stop you, is this something that you
18          earlier called a bookcase.
19    A.    This cabinet, I'm sorry, yes, I called it a
20          bookcase and that's actually, I guess, what it
21          is, a bookcase.
22    Q.    Just so that the jury understands, was this the
23          item from which the handcuffs and the leg irons
24          were seized a couple days earlier?
25    A.    Yes, sir.  It's easier to see now, with this
```

124

```
 1   A.   Correct.

 2   Q.   The Sheriff's Department includes as one of its

 3        divisions, or bureaus, units, if you will, an

 4        Investigative Unit?

 5   A.   Yes, sir.  To make it easier, both patrol and

 6        investigations are assigned to the Operations

 7        Division of the Manitowoc County Sheriff's

 8        Department.

 9   Q.   Very well.  Thank you.  But they are separate

10        units within the operations division?

11   A.   Yes, sir.

12   Q.   You had been trained in evidence collection as a

13        technician?

14   A.   Yes, sir.

15   Q.   That went back to, I think, 1997?

16   A.   Yes, sir.

17   Q.   That was something for which you volunteered?

18   A.   Yes.

19   Q.   You were accepted or someone accepted your offer

20        and you got some special training?

21   A.   Yes, sir.

22   Q.   One of the people from whom you got that special

23        training is seated right over there, second to my

24        right in the back, true?

25   A.   Evidence tech training?
```

144

```
1   Q.   Yes.

2   A.   No, sir.

3   Q.   Didn't get that kind of training from Special

4        Agent Fassbender?

5   A.   No, I did not.

6   Q.   What training did you get from Special Agent

7        Fassbender?  I'm talking about well before

8        November, 2005 now.

9   A.   Special Agent Fassbender was my DAT, which is

10       defense and arrest tactics, instructor during the

11       recruit academy at Fox Valley Tech.

12  Q.   All right.  Having nothing directly to do with

13       evidence collection?

14  A.   That's correct, sir.

15  Q.   But you went through a recruit academy?

16  A.   Yes, sir.

17  Q.   As do all police recruits or candidate officers?

18  A.   Yes, sir.

19  Q.   How long did that academy last?

20  A.   It was 400 hours when I went through the academy.

21       Ten weeks, roughly.

22  Q.   Roughly 10 weeks full-time?

23  A.   Yes, sir.

24  Q.   All right.  We'll come back to that a little bit

25       later in a different context.  Did you have any
```

145