```
 1        training as an evidence technician from
 2        Lieutenant James Lenk?
 3   A.   Yes.
 4   Q.   He, you know, to be a lieutenant in charge of the
 5        Detective Unit within the Operations Division?
 6   A.   Yes, sir.
 7   Q.   Are there more than one lieutenant in the
 8        Detective Unit?
 9   A.   No, sir.
10   Q.   So he's the chief detective, in fact, of
11        Manitowoc County?
12   A.   Yes, sir.
13   Q.   Within the Sheriff's Department.  He was involved
14        in training you as an evidence technician?
15   A.   I am not exactly sure how to answer that without
16        elaborating somewhat.
17   Q.   Well, let's start with a yes or a no.
18   A.   Yes, he has given me training material during the
19        course of my career.
20   Q.   Okay.  And has he given you anything more formal
21        than that; in other words, I'm going to let you
22        elaborate here, but we'll do this in a question
23        and answer format.
24   A.   Lieutenant Lenk personally hasn't trained me on
25        any specific issue.  We would have semi-annual,
```

146

EXHIBIT
B

```
 1        or sometimes quarterly meetings, of all the
 2        evidence techs, where Lieutenant Lenk might
 3        present some new information or somebody who had
 4        recently gone to training might present some new
 5        information.  But Lieutenant Lenk never took me
 6        one-on-one and trained me in any sort of specific
 7        application of being an evidence technician.
 8   Q.   But you have sort of in house, in service,
 9        programs --
10   A.   Yes, sir.
11   Q.   -- if you will?  Sharing information on new
12        techniques or new teaching?
13   A.   Yes, sir.
14   Q.   Sometimes that comes from Lieutenant Lenk?
15   A.   Yes, sir.
16   Q.   Other times he may simply be involved in
17        overseeing the meeting?
18   A.   Yes, sir.
19   Q.   You have known Lieutenant Lenk, personally, how
20        long?
21   A.   Since 1996, so 10, 11 years.
22   Q.   Was it '96 that you actually became a sworn
23        officer?
24   A.   Yes, sir.
25   Q.   And if I understood you, the period as a
```

147

```
 1          corrections officer in the Manitowoc County Jail
 2          was '92 to '94?
 3    A.    '92 to '96.
 4    Q.    I'm sorry, then I misunderstood you.  You went
 5          directly from the jail to the recruit academy and
 6          then as a sworn officer?
 7    A.    Yes, sir.
 8    Q.    It was 1996, then, when you joined the department
 9          as a sworn officer, that you met the man who is
10          now Lieutenant Lenk?
11    A.    Yes, sir.
12    Q.    He, at that time, was also in the road unit or
13          the Road Patrol Unit?
14    A.    Yes, sir.
15    Q.    You became friendly with Lieutenant Lenk?
16    A.    Yes.
17    Q.    Let's call him James Lenk and not worry about his
18          rank, at any given time, all right.  Do you call
19          him Jim?
20    A.    Yes, I do.
21    Q.    You worked closely with him for several years?
22    A.    Yes.  I have worked with him several times, yes.
23    Q.    He is one of the people on the department to whom
24          you feel personally close?
25    A.    We don't do anything together socially, but I
```

148

```
 1   Q.   You were aware that it was found, without its
 2        license plates?
 3   A.   Yes, sir.
 4   Q.   You are aware that the license plates weren't
 5        reported found until November 8, 2005?
 6   A.   Yes, sir.
 7   Q.   Now, you spent a good bit of your time, your
 8        working hours at least, between November 5 and
 9        November 9, at the Avery salvage property.
10   A.   Yes, sir.
11   Q.   You were asked on direct examination if you
12        remembered when you first arrived on Saturday,
13        November 5, at that property; do you recall that?
14   A.   Yes, sir.
15   Q.   And if I heard you correctly, which you said is
16        you thought somewhere between 5 and 5:15?
17   A.   That's what I thought, yes.
18   Q.   Is that your recollection as you sit here now?
19   A.   Yes.
20   Q.   Okay.  Now, that's a question that you have been
21        asked at a prior hearing in this case, correct?
22   A.   Yes.
23   Q.   Back on August 9, 2006, you testified at a
24        hearing?
25   A.   Yes.
```

188

```
 1                    ATTORNEY STRANG:  Page 42, counsel.
 2      Q.   (By Attorney Strang)~ And on August 9, 2006, you
 3           were asked the following question and gave this
 4           answer?
 5                    QUESTION:  Okay.  Now, moving onto
 6           Saturday, November 5th, did you -- can you tell
 7           me what time you arrived at the Avery property?
 8                    And your answer was:
 9                    ANSWER:  Sometime between 6 and 6:30, in
10           the evening.
11                    And I will show you the transcript.  Is
12           that the question you were asked and the answer
13           you gave on August 9?
14      A.   Yes, it is.
15      Q.   Now, since then, you have had a chance to get
16           prepared to testify for this trial?
17      A.   Yes, sir.
18      Q.   One of the things you have had the benefit of
19           doing is sitting down with the gentleman to my
20           right, at the prosecution table?
21      A.   Yes, sir.
22      Q.   And they ran through some of the areas they
23           expected to cover with you in your testimony?
24      A.   Yes, sir.
25      Q.   You did not have the benefit of doing that on, or
```

189

```
 1         shortly before, August 9, 2006?

 2    A.   Yes, I did.  Actually, we did it on 6/29/06, the

 3         date you previously mentioned.

 4    Q.   Okay.  Five or six weeks earlier?

 5    A.   Yes, sir.

 6    Q.   Specifically, have you had a chance, though,

 7         since August 9, to look at the log sheet for

 8         November 5, 2005, at the Avery property?

 9    A.   I have not.

10    Q.   How is it that your memory improved or changed

11         and that you now think it was between 5 and 5:15

12         that you arrived, not 6 or 6:30?

13    A.   I -- I don't know.  I did review my time cards

14         for that pay period and I saw what time I went on

15         duty, so I -- when I answered Mr. Kratz's

16         question, I didn't think it would have taken me

17         from 6 or 6:30 to get there.

18    Q.   Okay.  So it's not so much that you actually

19         remember now, it's just that you have spent some

20         time trying to reconstruct time from your house

21         and when you got the call and what your time

22         records show?

23    A.   Yes.

24    Q.   Okay.  And we have got Exhibit 142 in evidence

25         and I would say today you did pretty well.  I
```

190

```
 1        will show you Exhibit 142.  I have got it open to

 2        the page where I think you will find yourself

 3        signing in; is that right?

 4   A.   Yes, sir.

 5   Q.   5:12 p.m.?

 6   A.   Yes, sir.

 7   Q.   That would be the sign in out by the Command

 8        Post, true?

 9   A.   I don't know.  I -- I have never seen this form

10        before today.  That's what it looks like.

11   Q.   Well, the question really is, where do you

12        remember logging in?

13   A.   I thought we logged in out by Avery Road and 147,

14        but if you say it's by the Command Post, that

15        could be.

16   Q.   No, no, no, I wasn't there.  Avery Road and 147,

17        in other words, even farther out from the Command

18        Post?

19   A.   Yes, sir.

20   Q.   To get anywhere near the property you had to log

21        in?

22   A.   Yes, sir.

23   Q.   All right.  5:12 p.m. you log in?

24   A.   Yes, sir.

25   Q.   Do you recall, now, whether Lieutenant James Lenk
```

191

| | | |
|---|---|---|
| 1 | | was there when you arrived, on November 5? |
| 2 | A. | I don't know if he was there or came later. I |
| 3 | | don't know. |
| 4 | Q. | Okay. And you do know that you logged out with |
| 5 | | him and with Detective Remiker that evening; do |
| 6 | | you recall that? |
| 7 | A. | Yes, sir. |
| 8 | Q. | And, indeed, we can see that if you flip forward |
| 9 | | a couple three pages, can you find where you have |
| 10 | | logged out, on Exhibit 142? |
| 11 | A. | Yes, sir. |
| 12 | Q. | The three of you, Lenk, Colborn, Remiker log out |
| 13 | | another 10:41 p.m.? |
| 14 | A. | Yes, sir. |
| 15 | Q. | Now, you were, as I say, spending most of your |
| 16 | | working hours out there, somewhere on the Avery |
| 17 | | property, from November 5 through at least |
| 18 | | November 9? |
| 19 | A. | Yes, sir. |
| 20 | Q. | You -- As you told us already, you went into |
| 21 | | Steven Avery's trailer a number of different |
| 22 | | times during those several days? |
| 23 | A. | Yes, sir. |
| 24 | Q. | You said on direct examination that, you know, at |
| 25 | | least initially, you still viewed this as a |

192

```
 1        missing persons case?
 2   A.   Yes, sir.
 3   Q.   You also knew that by the time you entered
 4        Mr. Avery's trailer at 7:30 on Saturday,
 5        November 5, you were doing so with a search
 6        warrant?
 7   A.   Yes.
 8   Q.   A search warrant in which a fellow law
 9        enforcement officer had sworn that you were
10        looking for evidence of murder, among other
11        things?
12   A.   I didn't know what the content of the search
13        warrant was or how they obtained it.
14   Q.   Search warrants, though, you do know, are used in
15        criminal investigations?
16   A.   Yes, sir.
17   Q.   Not in missing person investigations?
18   A.   I can't really answer that.  I could imagine the
19        Court would give a search warrant for a missing
20        person if we could prove probable cause that that
21        missing person was at a certain spot.
22   Q.   Isn't a search warrant ordinarily used --
23   A.   Yes, it is.
24   Q.   -- when there is probable cause to believe you
25        will find evidence of a crime?
```

193

```
 1   A.   Yes, it is.
 2   Q.   All right.  And you were looking for evidence of
 3        a crime, beginning on the evening of November 5,
 4        true?
 5   A.   Yes, sir.
 6   Q.   One of the things you do, as an evidence
 7        technician, is you wear latex gloves, just like
 8        those that Mr. Wiegert had on earlier, when you
 9        searched someone's home, or garage, or whatever
10        it is?
11   A.   Yes, sir.
12   Q.   You wear those, everybody involved, every law
13        enforcement officer involved in the search wears
14        them?
15   A.   Yes, sir.
16   Q.   That way you can't leave your own fingerprints at
17        the scene or on evidence?
18   A.   Yes, sir.
19   Q.   And in theory, you shouldn't be leaving your own
20        DNA on the scene or on evidence?
21   A.   Correct, sir.
22   Q.   So you're in the house on November 5, November 6,
23        November 7, November 8, true?
24   A.   Yes, sir.
25   Q.   And, finally, on November 8, Mr. Kratz asked you,
```

194

```
 1        were you doing a thorough search of the master

 2        bedroom of Mr. Avery's trailer; do you remember

 3        that?

 4   A.   Yes.

 5   Q.   Now, that thorough search, had you working on the

 6        bookcase and on the desk?

 7   A.   Yes, sir.

 8   Q.   You described yourself as being, I think you said

 9        none too gentle?

10   A.   That's true.

11   Q.   With the bookcase.  And explained, I wasn't any

12        too gentle, as we were getting exasperated?

13   A.   Yes, sir.

14   Q.   What was exasperating you about the bookcase, or

15        that bedroom, on November 8, 2005?

16   A.   The content of the material that we were

17        collecting.

18   Q.   So you felt exasperated and that caused you to

19        take it out on the bookcase?

20   A.   Didn't exactly take it out on the bookcase, it

21        just caused us to not be gentle in the handling

22        of the material.

23   Q.   You were back in again on November 9, I don't

24        know that you covered that on direct, but you

25        actually were back into Mr. Avery's trailer,
```

195

```
 1        briefly, on November 9, to look for a garage door
 2        opener?
 3    A.  Yes, sir.
 4    Q.  That was also with Lieutenant Lenk, correct?
 5    A.  And a Calumet County deputy, yes, sir.
 6    Q.  Named Wendling, Deputy Wendling?
 7    A.  Yes, sir.
 8    Q.  From Calumet County?  There was no time that you
 9        went in Mr. Avery's home during November of 2005
10        when you were not also with Lieutenant Lenk?
11    A.  Not that I recall.
12    Q.  No time you went into Mr. Avery's garage when
13        Lieutenant Lenk was not also with you?
14    A.  Not that I recall, no, sir.
15    Q.  This case, you would describe as the largest
16        investigation in which you personally had
17        participated as a law enforcement officer?
18    A.  Yes, sir.
19    Q.  Some of the lengthiest searches, if we take
20        November 5 through November 9 as a whole, in
21        which you have participated?
22    A.  Yes, sir.
23    Q.  Led to very serious charges against Mr. Avery?
24    A.  Yes, sir.
25    Q.  You now know that the law enforcement agencies
```

196

| | |
|---|---|
| 1 | involved, principally Calumet County Sheriff's |
| 2 | Department and the Division of Criminal |
| 3 | Investigation, have generated hundreds or |
| 4 | thousands of pages of police reports? |
| 5 | A. Yes, sir. |
| 6 | Q. Your total contribution to those reports, is |
| 7 | what, a little bit under half a page, as of |
| 8 | November 8, 2005? |
| 9 | A. That's correct, sir. |
| 10 | Q. And then about another page as of June 29, 2006? |
| 11 | A. Correct. |
| 12 | Q. The report that you filed on, or shortly after, |
| 13 | November 8, 2005, makes no mention of the Toyota |
| 14 | key? |
| 15 | A. That's correct, sir. |
| 16 | Q. Would you like to see it? |
| 17 | A. No, I believe you. |
| 18 | Q. In fact, the only thing you discuss in your |
| 19 | report is that on November 8, 2005, you were |
| 20 | using these cotton swabs, about which we have all |
| 21 | heard a lot, and distilled water, to collect some |
| 22 | blood spots in the bathroom and laundry room of |
| 23 | Mr. Avery's trailer? |
| 24 | A. Yes, sir. |
| 25 | Q. Were there things that you did not want to commit |

197

| 1 | | to paper, in a report? |
|---|---|---|
| 2 | A. | No, sir. |
| 3 | Q. | And it all began, I guess, your involvement in |
| 4 | | this investigation began, that Thursday night, |
| 5 | | November 3, 2005? |
| 6 | A. | Yes, sir. |
| 7 | Q. | And that's the -- that's the report that we |
| 8 | | established you wrote more than 7, nearly 8 |
| 9 | | months later? |
| 10 | A. | Yes, sir. |
| 11 | Q. | That is, it was almost 8 months after that |
| 12 | | conversation with Steven Avery, the first |
| 13 | | conversation with him in this investigation, that |
| 14 | | you wrote down what you say he said to you, back |
| 15 | | on November 3? |
| 16 | A. | Yes, sir. |
| 17 | Q. | Did you have any rough notes, note pad, anything |
| 18 | | to work off when you wrote that report in the |
| 19 | | heat of June, 2006? |
| 20 | A. | No, I did not, sir. |
| 21 | Q. | Well, about 8 months, but then, again, while |
| 22 | | we're on Steven Avery and your reports about him, |
| 23 | | that phone call, the phone call you took way back |
| 24 | | in 1994 or 1995, when you were working in the |
| 25 | | jail, the phone call where a detective from |

198

```
 1         another law enforcement agency told you you may
 2         have the wrong guy in jail, that one?
 3   A.    Yes, sir.
 4   Q.    Did you ever write a report about that?
 5   A.    No, sir.
 6   Q.    Well, actually you did, didn't you?  It was about
 7         8 years later, wasn't it?
 8   A.    I wrote a statement on it, yes, sir.
 9   Q.    You wrote a statement after Sheriff Peterson
10         suggested that maybe you should?
11   A.    Yes, sir.
12   Q.    You wrote that statement in 2003, about the 1994
13         or 1995 telephone call?
14   A.    Yes.
15   Q.    You wrote that statement in 2003, the day after
16         Steven Avery finally walked out of prison, didn't
17         you?
18   A.    I don't know what day Steve was released from
19         prison, but I wrote the statement in 2003.
20   Q.    September 12, 2003 sound right?
21   A.    I said, I don't know the date that I wrote the
22         statement, but I know it was in 2003.
23   Q.    Well, I think I do know the date you wrote it and
24         I'm a happy to show it to you.
25                     ATTORNEY STRANG:  I will mark it for
```

199

```
 1        identification.
 2        (Exhibit No. 213 marked for identification.)
 3   Q.   (By Attorney Strang)~ What do you know as
 4        Exhibit 213?
 5   A.   That's the statement I wrote after speaking with
 6        Detect -- or Sheriff Peterson.
 7   Q.   What's the date of your statement?
 8   A.   September 12, 2003.
 9   Q.   Do you remember that now as the day after Steven
10        Avery finally walked out a free man?
11   A.   Sir, I already said I didn't know what day he got
12        released.
13             ATTORNEY STRANG:  That's all I have.
14             THE COURT:  Mr. Kratz.
15             ATTORNEY KRATZ:  I do have a issue outside
16        the presence of the jury, Judge.  I ask that I be
17        able to be heard.
18             THE COURT:  All right.  At this time we'll
19        excuse the jurors for a few minutes.
20                  (Jury not present.)
21             ATTORNEY KRATZ:  I think the witness should
22        be excused as well.
23             THE COURT:  All right.  Mr. Colborn, you
24        may step outside.  Mr. Kratz.
25                  (Witness not present.)
```

200

ATTORNEY KRATZ: Thank you, Judge. As this
Court may know, this was a cross-examination which
was much anticipated. It was the subject of a great
deal of pre-trial litigation. It was the point in
the trial where the defense had represented to this
Court, in something that's called an offer of proof,
which is a lawyer's obligation, at least as this
Court presented it to the defense, to tell the Court
what the defense intended to show at trial.

When submitting the defense theory of
the case, in response to the State's motion to
exclude evidence of blood vial, of planting
evidence, the defense, in their offer of proof,
told this Court, promised this Court, that the
defense would -- with evidence, would show that
this witness, Mr. Colborn, or the next witness,
Mr. Lenk, somehow obtained a vial of blood from
the Clerk of Court's Office in Manitowoc County
and planted that evidence, or planted that blood
in Teresa Halbach's SUV.

Now, we have had heard Mr. Strang's
opening statement where planted evidence has been
eluded to. We have heard cross-examination of
other law enforcement witnesses, by Mr. Buting,
specifically, where he asked whether those

201

1    officers expected that their superiors would be

2    planting evidence in this case.

3              But now, when it would logically come up

4    in trial, now when evidence would logically be

5    presented, or when the very witness in the

6    defense offer of proof comes before this Court

7    and is able to be asked regarding sneaking into

8    the Clerk's Office, or stealing a vial of blood,

9    or planting evidence, we hear nothing.

10             And despite the contamination by the

11   defense throughout the entire jury selection

12   process, which this Court I think can take

13   judicial notice of, you heard all the questioning

14   about the vial of blood in the Clerk's Office in

15   jury selection, you heard the contamination in

16   press releases, you heard the contamination in

17   opening statements.

18             Now, for the first time, when evidence

19   should be placed into -- into the record, or at

20   least placed into this particular case, we hear

21   nothing.  And so, Judge, I'm asking for

22   alternative direction, or rulings from the Court,

23   first, if the defense is abandoning their

24   planting evidence theory.  The State needs to

25   know that and we need to know that now.

                          202

```
1          Because there shouldn't be any more --
2     any more questions of, are you friends with
3     Mr. Lenk, or any questions of any other witnesses
4     about a planting or about blood vials, if they
5     intend not to honor their offer of proof, if the
6     defense now intends not to, as they told this
7     Court in response to the State's motion to
8     exclude this very evidence, that they would prove
9     that evidence from the Clerk's Office, by way of
10    vial of blood would be brought into this case.
11         If they do, in fact, that is, if the
12    defense does in fact intend to abandon that
13    defense, then I will be asking for curative
14    instructions of this jury, at this time, that up
15    to this point in the trial they should disregard
16    Mr. Strang's opening statement, when he talked
17    about further evidence of planting evidence, of
18    any other witnesses that have been asked about
19    planting evidence, or any reference at all to
20    blood vial type evidence.
21         If, in fact, I'm mistaken, if I am
22    jumping the gun, if you will, if this is all
23    going to be Lieutenant Lenk now, rather than
24    Sergeant Colborn, then I am happy to be the first
25    one to stand corrected.  But, if this defense is
```

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 19 of 53   Document 132-2

```
1    going to be abandoned, before I redirect this
2    particular witness, the State is entitled to that
3    ruling and we're entitled to that information.
4              THE COURT:  Mr. Strang.
5              ATTORNEY STRANG:  I will stand on the
6    written materials we made, we tendered to the Court
7    and filed, with respect to a proffer of evidence and
8    reasonable inferences from evidence as to the blood
9    vial.  I will stand on the transcript that our
10   capable court reporter has made of my opening
11   statement and simply note that, while he means no
12   inaccuracy and he is simply trying to give the Court
13   a summary, Mr. Kratz's description of our written
14   materials and my opening statement are not exactly
15   correct, and I will simply stand on them rather than
16   characterize them.
17             Second, just by the by, we haven't
18   gotten to the defense case-in-chief yet at all.
19   We're in the prosecution case-in-chief.  So all
20   of this, at some level, would be wildly
21   premature.  But, beyond that, to confront it most
22   directly, I'm idealistic.  I'm certainly naive at
23   times.  I am not so naive to think that someone
24   who may have planted blood evidence, who may have
25   been involved in planting a key, would come into
```

204

```
 1    this courtroom, and simply, because asked under

 2    oath, did you do it, say, oh, yes, I did it.  We

 3    are not going to have a *Perry Mason* moment here.

 4            We will at some point have to establish

 5    the existence of the blood vial in the Clerk's

 6    Office and its state of being there so to speak.

 7    And that could be done in the defense

 8    case-in-chief; it could be done on

 9    cross-examination in the State's case-in-chief,

10    if the opportunity should present itself with an

11    appropriate witness.

12            But I do not expect anyone, Lieutenant

13    Lenk, Sergeant Colborn, anyone else, to make an

14    admission, that you would see in the *Perry Mason*

15    show, on the witness stand.  And the suggestion

16    that we should be held to getting one from such a

17    witness is preposterous.  This jury will be

18    asked, in the end, by both sides, to rely on

19    reasonable inferences and common sense and on all

20    of the evidence.

21            So I don't think there's any relief to

22    be granted at the moment and there's no point in

23    discussing now what reasonable inferences may be

24    available at this point, since neither the jury

25    nor the parties know what the whole of the
```

205

1      evidence will be when the evidence is closed.

2              THE COURT:  Mr. Kratz, anything else?

3              ATTORNEY KRATZ:  Just -- I'm sure, Judge,

4      just one moment, if I could.  I appreciate

5      Mr. Strang's response, Judge.  And when Mr. Strang,

6      and I believe I wrote these words down correctly, we

7      will establish the blood vial in the Clerk's Office,

8      perhaps not through these witnesses; but it is, what

9      I have heard, that they are not abandoning that

10     defense.

11             That was my concern, because there's

12     nothing that requires Mr. Strang or Mr. Buting to

13     keep planting these little nuggets, if you will,

14     and then when the defense part comes, from them

15     saying, defense rests, or saying, now we have

16     abandoned it, when there is further contamination

17     of the jury.

18             That's our concern, Judge.  We're able

19     to meet this defense and we intend to meet this

20     defense.  But we have to do that in good faith

21     reliance, upon pre-trial rulings of this Court,

22     by pre-trial representations by the defense as to

23     where this trial is going, so that we don't

24     interrupt the flow of this case.

25             I don't want to object every time I hear

                              206

```
 1      the word planting.  I don't want to object every
 2      time I hear the word, are you friends with
 3      Lieutenant Lenk, or anything that might go down
 4      that road.  In fact, the defense intends to, as
 5      their offer of proof, indicates to prove that up
 6      at some point, or to embrace that as one of their
 7      defenses.
 8              And I know that's a clumsy term, and
 9      with my apology to Mr. Strang, but I still
10      believe that we're entitled to know that.  We're
11      entitled at some point, before there is further
12      contamination, if in fact this defense is going
13      to be abandoned at some point, the State is
14      entitled to know that.  That was my point in
15      putting it on the record at this very moment,
16      before I proceed with my redirect examination.
17              THE COURT:  I don't know that the defense
18      disagrees that if they should abandon that defense
19      that you would be entitled to some notice, but I
20      don't understand the defense to be saying that they
21      are abandoning that defense.
22              ATTORNEY STRANG:  The Court is right on
23      both counts.  And this is, you know, I would like to
24      know too whether the State is abandoning the false
25      imprisonment charge, but until we at least get to
```

207

the point where the State rests its case-in-chief,
that's all premature.

         And I understand Mr. Kratz's concerns.
I don't know that if we were abandoning any
defense that I would have done the same
cross-examination, or for that matter, that
Mr. Colborn would have been called on direct at
all.

         ATTORNEY KRATZ: What I would, just as a
final point, Judge, I would ask then, that before
the State rests, before the State concludes its part
of the case, that we be allowed a hearing, that we
be allowed an opportunity on an admissibility
hearing, or to meet what at least has been presented
to this point.

         We have heard about vials of blood. We
have heard -- the jury has at least heard,
substantially during the voir dire process, about
a vial of blood in the Clerk's Office. We don't
have, obviously, any results from the FBI at this
particular point yet. But if and when we do get
those, I know that there is some disagreement as
to what's rebuttal evidence and can rebuttal, or
reply evidence, be put in even in the State's
case-in-chief.

208

Because if the defense, technically,
wouldn't call one single witness and the State
relied upon the defense representation that they
intended to put this in and the defense changed
their mind, we would be precluded from meeting
the challenges, or at least meeting the
assertions that have been made up to this point.

So, perhaps more by way of prediction
between now and the close of the State's case, we
will be asking for a hearing on this very issue.
I don't intend to have this conversation again.
Mr. Strang is right, we'll wait to see how the
case plays out.

But prior to the State being precluded
from meeting this defense, or at least from
presenting evidence relevant to this particular
topic, and before the State rests, we will be
asking for a more extensive opportunity to be
heard, even if it's just in writing, Judge.  We
will submit something, but we will need some kind
of a ruling before the State does rest its case.

THE COURT:  All right.  If I'm reading your
comments correctly, you are not asking the Court to
do anything at this point in time, but you are
indicating that you may be asking for relief of some

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 25 of 53   Document 132-2

1    kind at the close of the -- or before the close of

2    the State's case, pending whatever action the

3    defense takes between now and then.

4            ATTORNEY KRATZ:  This was the earliest

5    opportunity and, in fact, the first obvious

6    opportunity to have heard that kind of evidence.

7    Since I didn't hear it, I'm putting the Court and

8    defense on notice of our position.

9            THE COURT:  Mr. Strang.

10           ATTORNEY STRANG:  Fair enough.  And I -- I

11   think I should, you know, in the spirit of the

12   disclosure that Mr. Kratz has struck, add joining

13   part of what -- part of what he said.  I mean,

14   clearly, because about half, I think, of the blood

15   vial sample has been sent off to the FBI for

16   testing, and we expect testing is ongoing, clearly

17   there will have to be a hearing.  Mr. Kratz may have

18   one type of hearing in mind; we have another.

19   Certainly a **Walstad** hearing and there are a variety

20   of other issues that may arise with the FBI testing.

21           We are no closer to being able to

22   conduct any independent testing or to have an

23   expert to meet and assess the FBI's testing, than

24   we were when we first addressed this issue.  We

25   have received a protocol from the FBI, thanks to

210

Mr. Gahn for that; we got that, I don't know, at
the end of last week, I think.

And we'll be filing a motion addressing,
in writing, the issues that this testing and the
denial of defense opportunity for independent
testing or even for a reasonable chance to find
an expert to meet and help us assess, possibly
contradict the FBI test results.  It raises a
whole field of fair trial and due process issues
here.  I will address those in writing.

I hope to file that before the end of
this week.  I expect the State would want a
chance to respond in writing and, you know,
whatever I see as heading, is the Court needing
to schedule, conceivably.  I mean, on Wednesday,
gets FBI results and what they are, the Court
needing to set a fair amount of time aside to
address the whole cluster of issues surrounding
that FBI testing.

THE COURT:  All right.  Anything else
before we bring the jury back in and allow the State
to redirect?

ATTORNEY KRATZ:  No.  And Mr. Strang's
comments are certainly well stated and we actually
join that, Judge; we will need a day and whether

211

```
 1            ATTORNEY STRANG:  That's all I have.
 2            THE COURT:  All right.  You are excused.
 3       Mr. Kratz, the State may call its next witness.
 4            ATTORNEY KRATZ:  The State would call
 5       Lieutenant James Lenk, then.
 6            THE CLERK:  Please raise your right hand.
 7            LIEUTENANT JAMES M. LENK, called as a
 8       witness herein, having been first duly sworn, was
 9       examined and testified as follows:
10            THE CLERK:  Please be seated.  Please state
11       your name and spell your last name for the record.
12            THE WITNESS:  James M. Lenk, L-e-n-k.
13                     DIRECT EXAMINATION
14  BY ATTORNEY KRATZ:
15  Q.   Mr. Lenk, how are you employed?
16  A.   I'm employed with the Manitowoc County Sheriff's
17       Department.
18  Q.   In what capacity, sir?
19  A.   I'm a lieutenant of detectives.
20  Q.   What are your duties as lieutenant?
21  A.   To distribute work amongst the other detectives,
22       to supervise other detectives, also to take cases
23       myself.
24  Q.   So, together with the supervisory responsibility,
25       you have an active case load; is that right?
```

216

```
1   A.   That's correct.

2   Q.   How long have you been a law enforcement officer?

3   A.   Total of approximately 24 years.

4   Q.   And where did your law enforcement career begin?

5   A.   At the Detroit Police Department in Detroit,

6        Michigan.

7   Q.   How long were you employed in Detroit?

8   A.   Just over four years.

9   Q.   After your -- By the way, what did you do with

10       the Detroit Police Department?

11  A.   I started out at as a patrol officer.  I worked

12       undercover, vice unit.  And I also worked

13       juvenile investigations.

14  Q.   All right.  What was the next law enforcement

15       position that you held?

16  A.   I worked for Michigan Bell, Corporate Security,

17       Michigan Bell Telephone.

18  Q.   How long was that?

19  A.   Approximately two to three years; I don't recall

20       specifically.

21  Q.   All right.  Thereafter, what did you do?

22  A.   I moved to Wisconsin and applied for the

23       Manitowoc County Sheriff's Department.

24  Q.   And were you successful in obtaining that

25       position?
```

217

```
 1   A.   Yes, I was.

 2   Q.   When did that start?

 3   A.   It started December, 1988.

 4   Q.   Tell the jury, if you would, what your

 5        responsibilities first were with the Manitowoc

 6        Sheriff's Department?

 7   A.   When I first got hired on the Manitowoc County

 8        Sheriff's Department, I worked as a jail officer

 9        for a year.

10   Q.   Did you move from that to something else?

11   A.   Yes, I moved from that to patrol officer.

12   Q.   How long were you a patrol officer?

13   A.   I was a patrol officer for a short period of time

14        and then I went to the Metro Drug Unit.

15   Q.   How long were you with the drug unit?

16   A.   Approximately a year and a half.

17   Q.   Could you describe your progression, then,

18        through the Manitowoc Sheriff's Department?

19   A.   After the Metro Drug Unit, I became a sergeant

20        and I was assigned to the jail division; that

21        lasted a couple months.  Then I was reassigned to

22        the Patrol Division as a sergeant.

23   Q.   At some point, did you move out of the patrol

24        status?

25   A.   Yes, I did.
```

218

```
1    Q.   And did you move into investigations or into the
2         Detective Bureau?
3    A.   Yes, I did.
4    Q.   When did that happen, do you recall?
5    A.   That was in February of '98, I believe.
6    Q.   All right.  At some point, Lieutenant Lenk, did
7         you move into a supervisory capacity within the
8         Detective Bureau?
9    A.   Yes, I did.
10   Q.   When was that; do you recall?
11   A.   That was May of 2003.
12   Q.   Lieutenant Lenk, I'm going to direct your
13        attention to November 3rd of 2005, ask if you
14        were first employed in the same capacity that you
15        hold now, at that time?
16   A.   Yes, sir.
17   Q.   And as the lieutenant in the Detective Bureau,
18        were you made aware of a missing persons
19        investigation that Calumet County had begun?
20   A.   Yes, I was.
21   Q.   How were you made aware of that?
22   A.   I received a phone call from Investigator Wiegert
23        asking for assistance on a missing female.
24   Q.   Is that something you worked on yourself on the
25        3rd, or assigned other officers?
```

| | | |
|---|---|---|
| 1 | A. | I actually assigned the work to the other |
| 2 | | officers. I stayed in the headquarters building |
| 3 | | and did miscellaneous follow-up and paperwork. |
| 4 | Q. | You did what, I'm sorry? |
| 5 | A. | Miscellaneous follow- up and paperwork. |
| 6 | Q. | Regarding this case or just other work? |
| 7 | A. | This case and other work. |
| 8 | Q. | All right. Is there an individual from the |
| 9 | | Detective Bureau that you assigned to lead the |
| 10 | | Manitowoc part of this investigation? |
| 11 | A. | Yes, it would have been Detective Remiker. |
| 12 | Q. | And does he have a first name? |
| 13 | A. | Dave. |
| 14 | Q. | If you can assist the jury, Lieutenant Lenk, that |
| 15 | | first day, that is, the first day of the missing |
| 16 | | persons investigation, the 3rd of November, what |
| 17 | | was it that your agency, that Manitowoc, was |
| 18 | | asked to assist with? |
| 19 | A. | We were asked to assist with the missing female, |
| 20 | | Teresa Halbach, to assist the Calumet County |
| 21 | | officer that was coming to our county, to go to a |
| 22 | | couple locations. I believe at least one |
| 23 | | location, to see if they could gain information |
| 24 | | to her possible whereabouts. |
| 25 | Q. | As supervisor within the Detective Bureau, did |

220

```
 1        you speak directly with Detective Remiker

 2        regarding those assignments?

 3   A.   Yes, I did.

 4   Q.   And were you informed.  Were you briefed, I think

 5        is the term, by Detective Remiker, regarding his

 6        findings that day?

 7   A.   Yes, I believe I was.

 8   Q.   Did you have any conversation, direct

 9        conversation, with Calumet County that first day?

10   A.   Not direct conversation. I talked to Investigator

11        Dedering, who was also the one that came over to

12        our county.

13   Q.   All right.  Anything else happen on the 3rd,

14        other than what you have described regarding

15        the -- Manitowoc's limited role that day?

16   A.   No, sir.

17   Q.   All right.  On the 4th, that would be on Friday,

18        the 4th of November, did you personally become

19        involved in the Manitowoc County portion of this

20        investigation?

21   A.   Yes, sir.

22   Q.   Could you tell the jury how you became involved?

23   A.   Again, I received a telephone call from

24        Investigator Wiegert requesting that we go out

25        and reinterview Steven Avery.
```

221

| | | |
|---|---|---|
| 1 | Q. | And did you proceed to Mr. Avery's property that |
| 2 | | day? |
| 3 | A. | Yes, I did. |
| 4 | Q. | Who did you go with? |
| 5 | A. | Detective Dave Remiker. |
| 6 | Q. | Now, Lieutenant Lenk, had you ever been to the |
| 7 | | Avery Salvage Yard as of the 4th of November? |
| 8 | A. | No, I hadn't. |
| 9 | Q. | Did you know where you were going on the |
| 10 | | property? |
| 11 | A. | No. |
| 12 | Q. | When you got to -- Or did you proceed to that |
| 13 | | scene? |
| 14 | A. | Yes. |
| 15 | Q. | When you got to the scene, where did you and |
| 16 | | Detective Remiker go? |
| 17 | A. | We turned to the right on Avery Lane, I guess it |
| 18 | | is, towards Steven's trailer. |
| 19 | Q. | To assist in your testimony, I'm going to show |
| 20 | | you a much referred to exhibit, it's Exhibit No. |
| 21 | | 86; do you recognize that exhibit? |
| 22 | A. | Yes, I do, sir. |
| 23 | Q. | What is that? |
| 24 | A. | That's the Avery Salvage Yard. |
| 25 | Q. | And when you and Detective Remiker got to this |

222

```
 1         location, tell the jury where you went.  There's
 2         a laser pointer, if you need it, just to your
 3         right, if that would assist you.
 4    A.   We came in -- It's hard to tell the area here.
 5         We came in this road and we turned to the right.
 6    Q.   Why did you turn right?
 7    A.   Habit, I guess, just turned to the right.
 8    Q.   All right.  Tell the jury where you went, please.
 9    A.   We went down to the -- almost to the end of the
10         road and we exited the vehicle.  Detective
11         Remiker went up to the house trailer to knock on
12         the door, with no response; after which he went
13         to, I believe, the Janda trailer, again, knocked
14         on the door, no response.
15              As we were getting ready to leave, there
16         was a golf cart coming down the lane towards us.
17    Q.   And who was on the golf cart?
18    A.   Steven Avery and his mother.
19    Q.   Did you have occasion to make contact with both
20         Steven and his mother at that time?
21    A.   We talked to Steven, yes.
22    Q.   Upon speaking to Mr. Avery, did you and Detective
23         Remiker ask for an opportunity to look in the
24         inside of his trailer?
25    A.   Yes.  Detective Remiker asked permission to look
```

                              223

```
 1         inside his trailer.
 2   Q.    And was that done?
 3   A.    Yes, it was.
 4   Q.    How long did that take?
 5   A.    Approximately five minutes.
 6   Q.    Mr. Avery cooperative during that entire process?
 7   A.    Yes, he was.
 8   Q.    As you think back to that specific time,
 9         Lieutenant Lenk, do you have an independent
10         memory of your sense of whether Mr. Avery may
11         have been involved in Ms Halbach's disappearance?
12   A.    My memory at that point was that I did not think
13         there was any involvement with Mr. Avery.
14   Q.    So you, Lieutenant James Lenk, the head of the
15         Detective Bureau, on the 4th of November, didn't
16         even think Steve was involved; is that what you
17         are telling us?
18   A.    That's correct.
19   Q.    Let me ask you this, Lieutenant Lenk, with that
20         having been said, did you take any steps from
21         that point forward to either plant evidence or to
22         ensure that Mr. Avery would be falsely accused of
23         that homicide?
24   A.    No, sir, I definitely did not.
25   Q.    Is that something that you have ever done in your
```

224

```
 1        law enforcement career?
 2   A.   No, sir, I have never planted any evidence at any
 3        time.
 4   Q.   Would you ever do something like that?
 5   A.   No, sir, I would not.
 6   Q.   The next day, on Saturday, the 5th of November;
 7        do you remember that day?
 8   A.   Yes, sir.
 9   Q.   What were you doing that day, if you recall?
10   A.   I was with my wife over near Menasha, looking for
11        a trailer for camping.
12   Q.   Do you remember getting a call that day?
13   A.   Yes, sir.  I believe it was a page, initially.
14   Q.   Did you speak with somebody?
15   A.   Yes, I did.
16   Q.   Who was that?
17   A.   Detective Remiker.
18   Q.   After getting the call from Detective Remiker,
19        did that affect your activities that morning?
20   A.   Yes, sir.  We stopped looking for the trailer and
21        I advised my wife, I have to get back, I have to
22        go to work.
23   Q.   What did you do then?
24   A.   We left the trailer sales, started to head home.
25        We got to Oneida and 441, my wife insisted that I
```

```
 1          get something to eat because she knew that I
 2          wouldn't eat the rest of the day, so we stopped
 3          at Wendy's.
 4    Q.    Was that your idea?
 5    A.    No, it was not.
 6    Q.    But you stopped any way?
 7    A.    Yes, sir.
 8    Q.    All right.  Where did you go then?
 9    A.    After we had a quick lunch at Wendy's, I went
10          directly home.  And then from home, I went to the
11          department, to pick up my vehicle and my
12          supplies.
13    Q.    And when you talk about picking up a vehicle, can
14          you describe that vehicle for us, please.
15    A.    It's an unmarked police vehicle owned by
16          Manitowoc County Sheriff's Department.
17    Q.    What kind of supplies did you pick up at the
18          Sheriff's Department?
19    A.    Briefcase with various papers in it, radio, that
20          type of thing.
21    Q.    Okay.  Where did you go then?
22    A.    I went from there to the Avery Salvage Yard.
23    Q.    And, again, that's Exhibit No. 86; is that right?
24    A.    That's correct.
25    Q.    As you sit here today, Lieutenant Lenk, do you
```

226

```
1          recall about what time you arrived at that scene?
2    A.    It was just shortly after 2:00, 2:05, somewhere
3          in there.
4    Q.    Now, when you got to the scene, the Avery salvage
5          scene, had there been any kind of log in or check
6          in procedure put in place yet?
7    A.    I don't recall a log in at that point.
8    Q.    All right.
9    A.    I just don't recall.
10   Q.    What did you do when you got to the scene?
11   A.    I met with the officers that were at the scene,
12         some from Manitowoc County, some from Calumet
13         County.
14   Q.    Where did you meet with them?
15   A.    Right at the beginning of the roadway where the
16         command center would have been set up.
17   Q.    Can you show us on the diagram -- or excuse me,
18         the photo?
19   A.    Would have been right in this area.
20   Q.    Be an area just to the south of what we now know
21         are the business buildings; is that right?
22   A.    That's correct, sir.
23   Q.    I'm sorry, the north of. When you got there
24         Lieutenant Lenk, were there other members of your
25         department already on scene?
```

227

1    A.    Yes, there were.

2    Q.    Do you remember who you met with or who you saw

3          at that time?

4    A.    I know I talked to Deputy Inspector Schetter.

5          I'm not real sure who else was there from our

6          department that I talked with, quite a few

7          officers there.

8    Q.    From a hierarchy standpoint, or who's the boss

9          kind of a standpoint, is Deputy Inspector

10         Schetter, or was he at the time, ahead of you or

11         on top of you, regarding authority or rank within

12         the department?

13   A.    Yes, sir, he was.

14   Q.    Do you recall, Lieutenant Lenk, being involved,

15         or overhearing discussions regarding who should

16         lead up this investigation?

17   A.    I believe, by the time I got there, that they had

18         already decided that Calumet County would lead

19         the investigation.

20   Q.    All right.  Were there Calumet County officers on

21         scene?

22   A.    Yes, sir, I believe there were.

23   Q.    At some point later that afternoon, do you recall

24         other officials arriving at the scene, including

25         myself, with the signed search warrant?

                              228

```
1   A.   Yes, sir, I do.

2   Q.   After D.A.'s and lead investigators got to the

3        scene, were you asked to perform any duties at

4        that scene?

5   A.   Yes, sir.  We were asked to assist Calumet

6        County.

7   Q.   From Manitowoc County, other than Deputy

8        Inspector Schetter, was there any individual of

9        higher rank than you at the scene?

10  A.   I'm not sure.  You mean from the sheriff's

11       department?

12  Q.   Yes.

13  A.   No, sir.  I don't think so.

14  Q.   All right.  Now, looking at Exhibit No. 86 and

15       remembering back to that first late afternoon; do

16       you remember whether manpower issues were a

17       factor that afternoon?

18  A.   Yes, sir, they were a factor.

19  Q.   Could you describe that for the jury.  What does

20       that mean?

21  A.   That means that there was a very large area.  The

22       search warrants were already obtained and there

23       was limited manpower to search that area.

24  Q.   I'm sure most, if not all of these potential --

25       or these jurors have not been to a crime scene;
```

229

```
 1        is this a typical crime scene by way of size or
 2        scope?
 3   A.   No, sir, it's not.
 4   Q.   Can you describe better or explain that for the
 5        jury, please.
 6   A.   Most crime scenes are a smaller area, either a
 7        house or a small yard, or a room, this area was
 8        immense.
 9   Q.   When you arrived, did you appreciate the size or
10        the scope of this effort?
11   A.   Yes.  I also got a further appreciation the more
12        I looked around the property.
13   Q.   All right.  What did you believe Manitowoc County
14        Sheriff's Department involvement was going to be
15        at that scene?
16   A.   Our involvement was to be part of the search
17        team, basically extra eyes and hands to do the
18        searching.
19   Q.   Are you familiar with the term evidence tech?
20   A.   Yes, sir.
21   Q.   What is that?
22   A.   It's an individual on the police department, or
23        sheriff's department, that has had some training
24        in how to gather evidence and package evidence,
25        at a crime scene.
```

230

```
 1        become involved?

 2   A.   No, sir.

 3   Q.   Did you even know when you got your assignments

 4        -- and we'll be talking about a couple later that

 5        week -- but did you know where you were going to

 6        be assigned?

 7   A.   No, sir.

 8   Q.   Lieutenant Lenk, were you made aware that search

 9        teams were being assembled?

10   A.   Yes, sir.

11   Q.   And was there anything unique about the law

12        enforcement officers that were being selected for

13        those search teams, if you know?

14   A.   I don't know, specifically, other than that they

15        were to have a Calumet officer in charge of the

16        team.

17   Q.   What I'm asking, though, is the other -- other

18        than a Calumet County lead person involved, the

19        others that were chosen to be on that team, did

20        they have any unique or similar quality about

21        them?

22   A.   Yes, sir.  They were requesting anyone that had

23        evidence technician experience.

24   Q.   As a supervisor and as a long time law

25        enforcement officer, do you have an opinion as to
```

234

```
 1        why that was being done?
 2   A.   My opinion is they wanted the best people that
 3        they could get, at the scene, to do the
 4        searching.
 5   Q.   All right.  That first night, were you made a
 6        part of one of those teams?
 7   A.   Yes, sir.
 8   Q.   Who was in charge or who was the lead officer in
 9        your search team?
10   A.   Sergeant Bill Tyson.
11   Q.   Now, you are a lieutenant and he was a sergeant;
12        is that right?
13   A.   That's correct, sir.
14   Q.   Did you have any concern or problem with taking
15        directional orders from Sergeant Tyson?
16   A.   No, sir.
17   Q.   Did you believe at that time, or actually
18        throughout this entire investigation, that rank
19        had anything to do with who was calling the
20        shots?
21   A.   No, sir, I did not.
22   Q.   Tell the jury, if you recall, when that first
23        team was assembled, if there were particular
24        responsibilities that each officer had?
25   A.   Each officer was assigned a certain area of
```

235

```
 1        searching.  It was done as a team, but each
 2        officer was assigned a certain particular area of
 3        a room, or living room, or kitchen, of an area
 4        that he was responsible for, or a team of
 5        officers would be responsible for.
 6   Q.   All right.  Was there direction that your team
 7        received about items of evidentiary value and who
 8        should take them into custody or who should seize
 9        them?
10   A.   Yes, we were told that all evidence would be
11        collected by Calumet County officers.  All
12        reports would be done by Calumet County officers.
13        And basically we were there just to assist in the
14        searching process.
15   Q.   Let's talk about reports for a minute.  Wouldn't
16        it be typical for each individual officer at a
17        scene like this to do their own reports?
18   A.   Normally, yes.
19   Q.   Are you saying this was different or you were
20        given different direction?
21   A.   We were given different directions, yes.
22   Q.   The first area that you were involved personally,
23        in searching on the 5th, was what?
24   A.   Steven Avery's trailer.
25   Q.   Can you tell us who the other members of your
```

236

| | | |
|---|---|---|
| 1 | | search team were? |
| 2 | A. | Sergeant Tyson, Sergeant Colborn and Detective |
| 3 | | Remiker. |
| 4 | Q. | The jury has already heard this a couple of times |
| 5 | | so we're not going to go piece by piece, I'm sure |
| 6 | | thankfully; but could you just tell us the rooms |
| 7 | | that were searched by the search team, please. |
| 8 | A. | The rooms that were searched would be the |
| 9 | | southernmost bedroom, that would be Steven |
| 10 | | Avery's bedroom; the hallway; the bathroom that |
| 11 | | is next to the bedroom; next to the bathroom area |
| 12 | | is a second bedroom that was searched; next to |
| 13 | | the bath -- or the second bedroom is the living |
| 14 | | room area; followed by the kitchenette area; and |
| 15 | | the kitchen. |
| 16 | Q. | I'm not sure my math is that great, Lieutenant, |
| 17 | | but how long have you been a police officer, just |
| 18 | | total number of years? |
| 19 | A. | Around 24 year. |
| 20 | Q. | In 24 years of law enforcement experience, have |
| 21 | | you been involved in searches of residences and |
| 22 | | property before? |
| 23 | A. | Yes, I have. |
| 24 | Q. | Are there different kinds of searches? |
| 25 | A. | I'm not sure what you mean. |

237

```
1    Q.   Well, if a property, a residence, as an example,
2         is to be searched by you or another law
3         enforcement officer; are you familiar with the
4         detail in which some of those searches are
5         performed in?
6    A.   Yes, sir.
7    Q.   Was this first search of the Avery property
8         intended to be a thorough, tear the place apart,
9         type search?
10   A.   No, sir, it was not.  It was more of a general
11        search.
12   Q.   All right.  I guess that's my question, maybe
13        tell the jury what you believed a general search
14        was?
15   A.   At that time, a general search was looking for
16        any obvious signs for the missing Teresa Halbach,
17        in that trailer.  It's pretty generalized at that
18        point.
19   Q.   Do you know about how long you guys took in that
20        trailer?
21   A.   I believe it was around two and a half hours.
22   Q.   All right.  During that initial search, did you
23        notice any firearms in Mr. Avery's bedroom?
24   A.   Yes, sir.
25   Q.   Can you describe what you saw, please.
```

238

```
 1   A.    There was a gun rack above the head of the bed,

 2         in the bedroom area.  There were two firearms in

 3         there.  I believe one was a .22 and one was a

 4         muzzleloader firearm.

 5   Q.    You said that you searched the entire trailer.

 6         After that first search was complete, of Steven's

 7         trailer, can you tell the jury what you did,

 8         please.

 9   A.    After that search was completed, I think we ended

10         for the day.

11   Q.    Was there some meeting or something that occurred

12         before you left?

13   A.    Yes, there was a meeting at the command center.

14   Q.    What's the purpose of that?

15   A.    To discuss what had been done and what needs to

16         be done the next day.

17   Q.    Lieutenant Lenk, any time on the 5th of November,

18         did you have any contact with Teresa Halbach's

19         SUV?

20   A.    No, sir, I did not.

21   Q.    Did you have any contact with her SUV on the 4th

22         of November, or the 3rd of November, or in fact

23         any time there before?

24   A.    No, sir, I did not.

25   Q.    Were you asked to return to the property the next
```

239

```
 1        day, the 6th?
 2   A.   Yes, sir, I was.
 3   Q.   And can you describe for the jury what your
 4        responsibilities were on the 6th, please.
 5   A.   On the 6th we met at the command center.  We were
 6        assigned to Deputy Kucharski.  And I believe we
 7        were to search the garage on Steven Avery's
 8        portion of the property.
 9   Q.   Describe the kind of search that was, please.
10   A.   Again, that was a general search for any
11        indications of Teresa Halbach.
12   Q.   Where did you go after that?
13   A.   I believe we went -- got -- either went back to
14        the command center or received information from
15        them for the next place to search.
16   Q.   Do you remember how long you were in the garage,
17        roughly?
18   A.   Maybe an hour, hour and a half, I'm not exactly
19        sure.
20   Q.   Now, the question, Lieutenant Lenk, is searching
21        that garage for an hour, or an hour and a half,
22        do you believe that you found, or would have
23        found everything of any evidentiary value in that
24        garage?
25   A.   At that time we thought we found everything that
```

```
 1          was of evidentiary value, yes.
 2     Q.   All right.  Do you remember the interior of that
 3          garage, as you think back?
 4     A.   Yes, I do.
 5     Q.   Was there a lot of things in that garage?
 6     A.   Yes, sir, it was full of things.
 7     Q.   All right.  Were you informed, Lieutenant Lenk,
 8          of how long, that is, the estimated time that law
 9          enforcement was going to keep control of this
10          scene?  Did you know that first day?
11     A.   No, I didn't know that first day.
12     Q.   Did you know whether you were going to do
13          additional searches of either residences, or
14          garages, or outbuildings, or anything like that?
15     A.   Yes, we planned on doing additional searches of
16          the buildings.
17     Q.   Let me ask you, Lieutenant Lenk, on the 6th, that
18          is, on that Sunday, did you have occasion to
19          assist other officers in a search of the
20          defendant's sister's home, that's Barb Janda?
21     A.   Yes, sir.
22     Q.   Could you describe that search, generally, for
23          us, please.
24     A.   That was, again, a general search looking for
25          items that might relate to Teresa Halbach.
```

241

```
1   Q.   Do you remember Detective Remiker noticing and
2        investigating an answering machine at that time?
3   A.   Yes, sir.
4   Q.   Were you asked to return to Steve Avery's trailer
5        at all?
6   A.   Yes, sir, I think we were.
7   Q.   And do you remember the scope of that?
8   A.   I believe we were asked to go back, as a team, to
9        collect the firearms, a vacuum cleaner and the
10       bedding, I believe, off the spare bedroom.
11  Q.   Again, who was in charge of seizing and taking
12       control of the evidence on that day?
13  A.   Calumet County officer Deputy Kucharski.
14            ATTORNEY KRATZ:  I just have two other
15       points, Judge, and then I will recommend that we
16       quit for the day, but let me finish this day, if I
17       may.
18  Q.   On the 6th, Lieutenant Lenk, were there other
19       buildings that you were asked to search?
20  A.   Yes, sir, there were.
21  Q.   What were those buildings?
22  A.   There was a large business office area building,
23       I believe they called it the office.  And we also
24       searched, I believe it was Mr. Chuck Avery's
25       residence.
```

242

```
 1   Q.   All right.  And the same search team that is
 2        headed by Kucharski was involved in those
 3        searches as well?
 4   A.   Yes, sir.
 5   Q.   All right.
 6             ATTORNEY KRATZ:  I do recommend, Judge, and
 7        this may be a good time to break for the day and
 8        call this witness tomorrow morning.
 9             THE COURT:  All right.  Members of the
10        jury, I will remind you, again, that you are not to
11        discuss this case at all and make sure you don't
12        watch any news accounts about the case this evening.
13        We'll see you tomorrow morning.
14             ATTORNEY STRANG:  Your Honor?
15             THE COURT:  Yes.
16             ATTORNEY STRANG:  While we still have the
17        jury, I forgot to move in Exhibit 212, Sergeant
18        Colborn; 213 was only marked and need not be moved
19        in.
20             ATTORNEY KRATZ:  No objection.
21             THE COURT:  212, you are asking for
22        admission?
23             ATTORNEY STRANG:  Yes.
24             THE COURT:  Court will admit 212.  Very
25        well, you are excused for the day.

                          243
```

```
 1                    (Jury not present.)

 2              THE COURT:  All right.  Counsel, we'll see

 3      you tomorrow morning.

 4              ATTORNEY STRANG:  8:30?

 5              THE COURT:  Yes.

 6              ATTORNEY KRATZ:  Thank you, Judge.

 7                (Proceedings concluded.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                            244
```