# Judging Credibility

## by John L. Kane

Whom do I believe—and why?

There is no law on judging credibility. Judges and jurors receive guidelines and elementary observations in the form of stock instructions but are essentially free to decide for themselves. Because the entire trial process rests on persuasion, determining credibility is more than evaluating testimony. Although it is customary to speak of the credibility of witnesses and the persuasiveness of counsel, both deal with the same thing: the degree of belief we attach to what we see and hear.

A few brave souls have attempted to parse the elements of credibility, but this essential function is left largely to the mysteries of intuition. Although demeanor evidence can mislead, it is considered a reliable basis for finding credibility. Does the witness hesitate or stammer or show fear in answering questions? Reliance on demeanor vests wide discretion in the fact-finder. As Judge Jerome Frank, no slouch when it came to pushing the judicial envelope, observed, the methods of evaluating oral testimony "do not lend themselves to formulations in terms of rules and are thus, inescapably, 'un-ruly.'"

In earliest common law, the jurors themselves were the only witnesses, testifying on the basis of their knowledge of the events and what was reported to them. The jury trial in this country was justified by the assertion that jurors were from the same locale and already knew the witnesses and their reputations for character and veracity. By a curious transformation, today's jurors are selected on the basis of their lack of familiarity with the dramatis personae, and a judge's personal knowledge of the litigants can create an appearance of impropriety requiring recusal. In the modern trial, the determination of credibility is supposed to be based solely on what takes place in the courtroom by fact-finders who have little or no knowledge of the parties, the witnesses, or the events. In effect it is a process of studied ignorance.

This stress on courtroom demeanor results in an entirely subjective evaluation. Witnesses are observable only on the stand and for a very short time. For most of them, testifying is an unusual experience, and they can be expected to be on edge. Judges and juries know little about what makes one person stammer or hesitate. There certainly is no time to delve into the subconscious of each witness. Perhaps the examining attorney's bright-red tie reminds the witness of her funny uncle or the bailiff's bald head triggers repressed emotions toward the teacher who failed her in algebra. Will she stammer or hesitate while she gets her thoughts in order?

In a recent jury trial, a lawyer conducting voir dire attempted to establish rapport with a juror. When she related that she had been born and raised in Kansas, he said that he, too, had lived there. After the trial the juror confided to me that her childhood had been miserable and whenever that attorney spoke he reminded her of her unhappy experiences. We are left to wonder just how persuasive his closing argument could have been. If a fleeting observation of a witness's demeanor is equally unrevealing, on what can the fact-finder rely?

The nostrum that a person telling the truth has nothing to fear and therefore no reason to stammer or hesitate is based on the myth that being subjected to charges of perjury for falsely testifying under oath is sufficient to exact truthfulness from anyone. If the oath actually had that effect, why would we need to probe and question? Not only are prosecutions for perjury rare, but the oath's archaic language and the ritualistic tone and breakneck speed with which it is usually administered suggest that its meaning and import are seldom comprehended beyond the level of hearing a cashier say "Have a nice day!"

The Honorable John L. Kane is a Senior Judge for the Federal District of Colorado, in Denver.

EXHIBIT K

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 1 of 7   Document 132-11

Ever since social Darwinism replaced old-time religion, the oath has not meant much. The individual belief that false testimony results in eternal damnation never did affect the honestly—but erroneously—perceived recollection, nor would a rejection of such a belief necessarily give the non-conformist the psychological freedom to lie. This is particularly so when a witness is recounting his intent or explaining the reasonableness of his actions. Time heals all wounds, and many an honest person comes to believe verily in post hoc rationalizations. If the oath is ineffectual, what saving grace can we expect from jury instructions?

The standard credibility instruction tells the fact-finder to consider the witness's strength of memory, ability in the described circumstances to see and hear, and the clarity with which he is able to recall events. Tone of voice, shades of expression, and gestures are also to be considered. Motive and interest are said to create bias. The natural and acquired experience that an observant person uses to form an opinion of whether to trust the veracity of someone in the important transactions of his own life is said to be the most important qualification of all.

Jurors do not need to be reminded to take their role seriously and to apply their own common sense. That is not to say, however, that sitting as a juror does not have a sobering effect. Many jurors have told me in post-verdict conversations that sitting on a jury was indeed one of the most important experiences in their lives. They have described the experience as transforming. One said, "I can never again think about what people say or do without recognizing I have an obligation to pay close attention before forming an opinion." But is paying attention enough?

The formalized rubrics of folk wisdom for judging credibility are of little, if any, value. What natural and acquired shrewdness is involved? There are no criteria for determining such skills in either judicial or jury selection, nor is the judge of credibility possessed of any greater awareness of unconscious influences than the witness who is subject to them. The lack of rules (*un*-ruliness) in determining credibility with the concomitant wide discretion vested in the fact-finder presents inherent difficulties so insurmountable that appellate courts throw up their hands and say that questions about the credibility of witnesses are not reviewable except in extreme circumstances.

Trial seminars are filled with tips on interpreting nonverbal cues. People constantly send all kinds of unarticulated messages, but interpreting them is at best the product of intuition or rank speculation and at worst, unmitigated legerdemainia. We are told, for example, that a witness or potential juror is reacting negatively to the questioner by folding her arms across her chest—and an individual who frowns and squints is assumed to be angry or hostile. But is it not equally plausible that a witness or juror with a dour expression is making an extra effort to focus and concentrate on the questions? "I squint and frown," a juror in a patent case once told me, "for the same reason I chew pencils when I'm doing a crossword puzzle. I'm thinking, tuning everything else out." All those clenched teeth, frowns, and squints may give some people headaches, but it does not necessarily mean they are rejecting a point or are hostile to the examiner. If instructions have little effect and folk wisdom is unreliable, can cross-examination save the day?

We are taught to give great weight to cross-examination, but the commentators of yesterday were unaware of what the excessive reliance upon depositions has done to the lawyer's "greatest weapon." We may still see effective cross-examination in criminal cases where depositions are rarely permitted, but in more than one civil case, lawyers have told me they cannot cross-examine because the witness was never deposed. Today's cross-examination usually consists of a tedious reiteration of the testimony on direct, with evocations of prior inconsistent statements. Most such statements are trivial and seldom lead to an admission that the present testimony is false. The usual exchange goes something like this:

Q: You said the light was red when your deposition was taken two years ago, and now you say it was yellow. Was your memory better then, or is it better now?

A: At the time my deposition was taken I thought it was red, but I've thought more about it since then, and now I'm sure it was yellow.

So much for impeachment by prior inconsistent statements.

Trial and appellate courts are sometimes distinguished on the basis that the primary function of the former is to determine facts and of the latter, to define the law. In a casual sense, this distinction is helpful. Facts, however, are meaningless unless some value is incorporated into them. The inevitable metaphor for deciding such values is weighing. When we weigh facts, we are determining what values they carry with them. What is it about specific contentions that leads us to believe they are true? And if we cannot rely on the

# I chew pencils when I'm doing a crossword puzzle because I'm thinking.

oath, cross-examination, the witness's demeanor, or unruly instructions, how is credibility established and determined?

Here is a thematic process that I find useful, though certainly not definitive. Two underlying principles govern: not prejudging credibility, and ruthlessly examining your own prejudices. From this flows a principle of universal application regarding the nature of deception.

First, leave the conclusion on credibility uncharted and find it later rather than work forward from it. Making conclusions as the events happen is like building a house of cards and watching the entire edifice tumble when a joker is added to the roof. It is not simply a matter of keeping an open mind until all the evidence is in, as we instruct juries to do; it is then and only then that the process should begin. While the testimony takes place, listen carefully, paying attention to the slightest nuance or dissonance.

A former partner of mine defended a man in the trash-hauling business in a tax evasion case. The defendant's CPA had rolled and testified for the government that the defendant was fully advised of all tax consequences but gave the CPA false information. Cross-examination was to begin shortly before noon, and my partner demanded that over the recess the witness produce his college diploma before the cross began. Something in his testimony did not sound right. The judge was irritated because he thought counsel was stalling,

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 2 of 7   Document 132-11



but he took an early adjournment and ordered the witness to produce the requested diploma. It turned out to be a clumsy forgery. The witness never had a degree and was never certified as a public accountant. What was the dissonant note? He had testified on direct that he received a B.A. in accounting from the University of Denver. Having graduated from D.U. himself, my partner remembered that its business school awarded B.S. degrees. The judge was thunderstruck. More importantly, so was the jury.

Second, impartiality is essential to reaching a just conclusion, whether ruling on an objection, deciding on the merits, or determining credibility. Achieving impartiality is, however, easier said than done. It is not a matter of wishing it so or declaring yourself to be impartial. In fact, it is not a process leading to an objective state of mind. Rather, it is intensely subjective. It requires you to dredge the subconscious for your own prejudices and predilections. To deny that you have prejudices is illusory; to recognize them is an act of relentless searching. Only when the prejudice is recognized can it be removed from the decisional process.

Years ago I drew a sex discrimination case that greatly disturbed me. I did not know either of the parties, and there was nothing unusual about the cause of action, yet I was inexplicably hypercritical when reviewing the defendant's pleadings and briefs. In probing my reaction, I remembered that my mother had worked as a bookkeeper for a railroad. Shortly after World War II, her employer told her that she could not receive a raise, though she deserved it, because to do so would mean she would be paid as much as the men in the office doing the same work. The case before me was at a different time with different parties under different law, but if I had not questioned my personal discomfort, my credibility findings would have been skewed.

When I preside over a matter that makes me angry or uneasy, I ask myself, What is it about this matter that is disturbing me? And why am I upset? Similar inquiries enable jurors to put what may be troubling them on the table, in effect defanging the snake. Then and only then can the fact-finder reconstruct the dispute or issue in relation to general principles of universal application.

This internal process is similar to how prejudicial questions or uninvited responses in jury trials are dealt with, such as a witness blurting out that the plaintiff's father was a jailbird and like father, like son. We instruct the jury to disregard the statement rather than declare a mistrial. In my view that admonition is not enough. You cannot unring a bell. But a detailed explanation not only defuses the prejudice, it also furthers the jury's understanding of its proper function. The court should go on to explain: "That statement is clearly out of bounds. I am not saying you must forget it, because that would be impossible. Instead, I am saying you must consciously disregard it and see to it that your fellow jurors likewise disregard it. To illustrate disregarding, if you are to add three plus two plus one, you will arrive at six, but if you have to disregard *one*, you cannot conclude that six is the answer."

### Juror Safety and Comfort

When juries are properly instructed, the fact that they are composed of six or more individuals prevents even the most determined from articulating prejudices in justifying their votes or opinions. Peer pressure may dissuade jurors from expressing the prejudice, but appropriate instruction and that same peer pressure impel jurors to expect and demand that fellow jurors state reasons for their votes during deliberations. Doubtless there was a time when jurors shared the same communal biases, but cultural diversity and civic anonymity suggest that a consensus must be reached through expression.

Skilled trial lawyers do not waste voir dire by slyly attempting to indoctrinate jurors and obtain commitments. That just creates resistance. Rather, they get the jurors com-

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 3 of 7   Document 132-11

fortable enough to think about their prejudices, to articulate them in response to nonthreatening questions, and only then to agree to set them aside so that a decision can be based on agreed values. The instructions of law and the emotional bonding jurors experience through the trial and recesses provide that basis. If you put in the trash heap where they belong the shibboleths that people of Northern European extraction favor the prosecution, Southern Europeans are good for the defense, and poor people hate corporations—plus generalities such as *schoolteachers follow directions* and *salesmen believe anything*—it is still possible to recognize several principles of universal application.

The first is that the witness who speaks truthfully may say what is false in fact and the witness who intends to falsify may inadvertently speak the truth. Eyewitness testimony is notoriously unreliable. The witness may honestly believe the person he identifies is his assailant and yet be mistaken. In a gang-related case, a witness may fear repercussions and deny an identification he honestly believes to be true yet is not.

The second principle is that lying is not necessarily speaking falsely; it is speaking what you do not believe. Deception is withholding what you think or believe in order to create a false impression in or a misunderstanding by the listener. That is the essence of a Ponzi scheme.

The third principle is that it is not possible to believe or disbelieve based entirely on the character of the speaker, who may be mistaken, or on the understanding of his character, which may be wrong. Credibility therefore demands an evaluation of the substance of the communication. That requires a process for discovering what people can be persuaded to believe. The first essential is to cut through the clutter of fallacies.

A good advocate avoids bringing clutter to the fact-finder's task because the rejection of fallacies is cumulative. If the advocate persists, she will eventually be ignored entirely. There is only so much guff even the most tolerant adjudicator can endure, and no one, not even the judge or juror, can determine what that quantum will be on any given subject at any particular time. When is enough, enough?

Whether in argument or testimony, illogical and vacuous assertions undermine credibility. Consider the following examples of fallacious argument techniques:



- Ad hominem remarks. Incivility, gratuitous insults, and sarcasm are distracting and counterproductive, and substituting an attack on the person for one on the substance generates a negative reaction unlikely to achieve persuasion. Many studies show that when a witness is attacked, the fact-finder identifies with the prey and not the predator.
- Rhetorical manipulations. John Locke described referring to famous persons as a kind of authority, and bootstrapping one's own opinion with the conclusion that anyone who disagrees is insolent or immodest. Dr. Johnson defined appeals to loyalty and patriotism as the last refuge of the scoundrel. A related concept is the classic *ignoratio elenchi*, to argue for one thing as if it proved another and confuse apparently similar conclusions. We find this in products liability and pharmaceutical patent cases where one party attempts to conflate the results of tests on lab rats with the cause of disease or infection in humans.
- Irrelevancies. Introducing factors that have nothing to do with the desired result suggests confusion and renders the statements easily dismissable. This is similar to the inconsistent and generally self-defeating argument "It didn't happen, but if it did, it was completely justified." Using unnecessary adverbs is also counterproductive. Many briefs state "Defendants vehemently object. . . ." Is the judge then to vociferously sustain the objection rather than passively overrule it?
- Appeals to force, status, or position. These make the listener resentful and inclined to accept the opposite of what is being said. Counsel should avoid telling a judge that she will be committing reversible error. It is far more persuasive to advise that the appellate court has charted a clear path and let the judge draw her own conclusion.
- Appeals to popularity. "Everybody does it" is usually a good reason not to do it. Judges and jurors are selected for an official task, they are told they are special, and they accept that status—so what everyone else does is hardly persuasive. Adhering to the duties of the office of judge or juror rather than the ululations of the crowd is what being official is about.
- Linguistic vacuity. Fads are superficial practices or inter-

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 4 of 7   Document 132-11

ests that people follow with exaggerated zeal for a limited time. Fads in behavior and values are just as shallow as fads in clothing and hairstyles. In today's linguistic fads, *absolutely* does not mean something is absolute, *totally* does not mean something is total, and *excellent* does not mean something excels. Their use invites the listener to believe that the speaker cannot think clearly. A witness who frequently answers *absolutely* instead of *yes* to questions on direct begs to be creamed on cross.

- Evasion. If the lawyer or witness does not answer the question but volunteers something else, it is easy to believe he does not know the answer. The lawyer asks, "Did your company keep the customer lists in any sort of restricted file?" The witness responds, "He had no business taking that list when he resigned." What inference can be drawn? Either that no security measures were taken or the witness does not know whether any were in place. If a judge asks a lawyer, "What does Delaware law say about the responsibility of directors for conducting a stockholders meeting?" and counsel answers, "In Iowa there is no such duty," the lawyer's ability to persuade has evaporated. On the other hand, a candid reply—"I don't know, but I will find out"—enhances the lawyer's credibility.
- Ambiguity. This is created by using the same word with different meanings in the same context. For example: "The contract specifies evergreen trees, and the trees provided were obtained from Evergreen Nurseries." In one sense or the other, they are evergreen trees, but which one? If the fact-finder has to stop to wonder, not just that point is lost but likely the next three as well, and the trust that is so essential to persuasion may be lost entirely.
- Equivocation. By equivocating, you avoid committing yourself. What does one make of the agnostic who prays to God, if there is one, to save his soul, if he has one, from Hell, if there is such a place? The speaker's failure to commit leaves the listener with no basis for caring about the answer.

Having eliminated the clutter, we next note that credibility determinations are made under conditions of uncertainty. This leads to what I call the principle of consonance: A statement must sound as if it makes sense and be capable of being easily understood. Most often, a lack of credibility is found when a statement is inconsistent with an awareness of the social knowledge of people; the conditions required for living together; or shared values, interests, and aspirations. These commonsense ingredients are shaped into what we accept as true and, therefore, what we regard as credible. This sense of consonance, or harmony with the world as we know it, is what makes us believe a statement is right. Let me give two examples.

In a recent trial, the manager of a construction project was testifying as the principal damage witness. He testified from books, diary entries, and daily logs. In introductory statements, he said that he had a master's degree in economics from a prestigious institution. On cross-examination, he was confronted with a record from that institution showing he had attended but failed to graduate. In sum, he lied on his resume. Nevertheless, the jury returned a verdict precisely according to the facts and figures in his testimony. After the jury was discharged, I asked one of the jurors what weight they gave to his false statement. The reply was, "Lots of people fudge on their resumes. It doesn't mean much, and after all these years from when he went to school, we felt he probably believed his own BS. But the records and journals were consistent with everything else we heard. It made sense his company should get paid."

I have also seen an expert medical witness destroyed when he falsely claimed membership in an honorary organization. Those jurors felt he could not be trusted even though his testimony fell well within the parameters of his specialty. What is the difference between these two cases? Because the first concerned facts that were supported by extrinsic evidence,

# The question is not which position is right and which is wrong, but which is the better reasoned.

trust was not an essential factor. In the second, the jury was asked to believe the witness because of who he was. His opinion depended upon his character, and he revealed a serious flaw.

Bias and prejudice also tend to be ironclad criteria for evaluating credibility. I expect a mother to be highly motivated to protect and support her child. I recognize such an interest can shade her testimony, but that alone will not make it incredible. Likewise, I expect a defendant in a medical malpractice action to testify he did everything called for in the relevant protocol. In such circumstances, I look for corroboration. There may be no requirement for it, but the burden of persuasion will rarely be met without it. And speaking of persuasion, what role does argument play in assessing credibility? Is argumentation the same as argumentativeness?

The legal philosopher John Rawls asserted that we judge specific cases in terms of general principles, but we also judge general principles in terms of specific cases. If a question relates to a fundamental principle or value, there are multiple ways in which it can be answered. Because I must choose between otherwise acceptable alternatives, I therefore can be persuaded to pick one or another. This dilemma is frequently expressed by saying that reasonable minds can differ—which is when the arguments of counsel become crucial. The question is not, as is frequently argued, which position is right and which is wrong, but which is the better reasoned.

### Search for Credibility

Argument is giving reasons, not quarrelling, and judging is the process of selecting the best reason from those that are available. Bickering is a distraction that tends to make me ignore both counsel and search for the best reason on my own. In a sense, the clients are then appearing pro se. The bottom line is that the fact-finder needs a compelling reason to believe which of the available reasons is the best answer, and woe to the lawyer who absents himself from that process. If the compelling reason comes from an advocate or a witness or an expert report, so much the better. If not, the fact-finder still must find it. This search for credibility explains why poorly presented cases take more time to be

Case 1:19-cv-00484-BHL　Filed 04/30/20　Page 5 of 7　Document 132-11

decided. I have taken cases under advisement for otherwise inexcusably long periods just so I could make that search and arrive at a gestalt.

When, for example, two companies are at swords' points over a deal gone bad and each executive testifies about the same crucial phone conversation to his respective advantage, the credibility finding must be made on evidence extraneous to the conversation. If counsel fails to supply sound reasons to be weighed, I will find it necessary to let the matter cool "under advisement"—sleep on it. This allows me to give more careful thought to the entire body of evidence presented. A decision without that surcease is bound to be arbitrary.

Aside from hoping the judge sleeps on it, how do skilled trial lawyers guard against the risk of arbitrariness? They elevate credibility to an art by drawing on narrative and musical theory. What do the arts have to do with credibility? Everything.

If all trial courts did was find facts, the function itself would be senseless. We make sense out of facts by applying values to them. Clearly we cannot determine a fact credible

## Logic is the precursor to believing, not a substitute for it.

if it cannot be related to a value. In this regard laws are formalized values. More fundamentally, human beings continually engage in the search for meaning. That is the fact-finder's implicit charge.

In the search for meaning, we refract what we learn through the lens of our own lives. Take storytelling as an example. Because we instinctively frame our experience of the world by using stories, the search for meaning (i.e., credibility) is greatly facilitated by the use of narrative technique. Both historically and analytically, storytelling has its origins in music, one of the most complex of human activities. Narrative and musical structure form the basis for determining credibility at its deepest level because they are tools for structuring our understanding in terms of our experience and values.

Like music, the act of storytelling involves perception, memory, timing, grouping, and harmony. Logic is the precursor to believing, not a substitute for it. To be believed, a story must resonate in any key. If a fact or opinion jars a sense of harmony, if it distracts, if it simply does not fit, no matter how superficially logical it may seem, it will not ring true. Skillful application of narrative technique thus requires consideration of the role of order, context, and coherence and leads to a concept of expanded relevance.

It is customary to think of relevance as anything tending to support a thesis, antithesis, or synthesis or, as the Federal Rules of Evidence say, anything "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." But relevance is not exclusively a matter of logic. It relates to theme and progression as well, and in this regard musical theory is particularly instructive.

Consider Beethoven's Fifth Symphony, with its recurring theme of three short notes followed by a longer one: da da da daah. More than any other musical composition, the Fifth exemplifies thematic unification. The theme recurs in almost every bar of the first movement and is then developed and modified in the other movements. By the end of the symphony, the phrase *da da da daah* has been explored in all aspects, and the listener is infused with a sense of unity confirmed by the triumphal coda.

Similarly, in any argument or trial, a theme must be presented at the opening and then developed in various perspectives that echo and resound throughout the facts so that the listener perceives it as a unifying principle. All those facts and arguments that produce the unification are, ipso facto, believed. What the fact-finder has come to believe is then confirmed by the closing argument. That is what converts advocacy from a craft to an art. Art is what we most deeply believe. It transcends logic and expression.

If facts are presented in an understandable order and constructed to make application of the legal value readily apparent, the fact-finder will have confidence in the conclusion. The order of presentation makes some facts more acceptable than others. Chronological order is the usual way to convey a narrative to highlight cause and effect, but factors other than beginning, middle, and end must be considered in making the story understandable. As in music, the order can be thematic. In other cases, the gist may be character: Who is the story about? True character, like grace, is revealed by how an individual acts under pressure. In some cases the best organizing principle is to establish those pressures first.

It is surprising how infrequently the fact-finder is told the order or purpose of the evidence. The order the fact-finder imposes on the facts determines the weight and relevance the evidence will receive. That is another reason to wait until all the evidence is in before determining what to believe. It is also why a closing argument that fails to put it all together is a failed argument. Nor should the fact-finder have to ask why certain evidence is being offered. The advocate must fill in the blanks. What is the conflict between the parties? What stood in the way of their best intentions? Was it the failure of one party or was it events outside her control?

A skillful narrative also places critical events in context. Context is more than merely time and place; it is the entire framework, including psychological factors, within which the parties and witnesses acted and crucial decisions were made. Context gives meaning and thus credibility to actions and events. It supplies the critical ingredient of *why*. Context also determines relevance. The lawyer's job is to make what may not appear to be immediately relevant readily comprehensible within the framework of the larger case.

In addition to order and context, credibility depends on a sense of completeness, coherence, and an expanded concept of relevance that appeals to notions of internal consistency, common sense, and experience. Present what a naturally curious mind would want to learn. Completeness produces acceptance of the constituent parts. Coherence largely depends on the logic with which the parts are presented, so that the connection between each is obvious. If indeed there is completeness, the result can be paradoxical or ironic and still be convincing. If, on the other hand, the judge or jury is

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 6 of 7   Document 132-11



left waiting for the other shoe to drop, what is left unsaid will not be appreciated.

I once observed a criminal trial at London's Old Bailey. The defendant, a former employee, was charged with robbing the payroll and killing the paymaster in the process. After presenting evidence of the corpus delicti, the crown introduced a teacup found in the paymaster's office bearing the defendant's fingerprints, and rested without further explanation. The judge peered over the bench and nearly shouted, "What about the bloody teacup?" In England, judges evidently take a more active role in the prosecution than here.

Finally, internal coherence is critical in evaluating credibility. When the actions of the persons involved are shown to be in accordance with their nature or characters, when they do the kinds of things people will do (consistent with probability or necessity), credibility is enhanced. A causally unconnected string of actions and behavior not shown to be motivated by psychological norms convinces no one.

The concept of relevance is thus expanded to more than the legal or factual issues in the case. In a specific context a question may seem irrelevant, but the fact-finder is simultaneously concerned with the order, context, and coherence of the larger narrative. In a tort case a lawyer may be directing examination to the question of proximate cause, to which the objection is made that the solicited answer is irrelevant to that issue. It may well be relevant, however, to the strength of the witness's memory or the characteristic behavior of the plaintiff.

Attention to narrative technique goes far beyond the credibility of constituent elements and may have unexpected rewards. Indeed, a powerful narrative can salvage an otherwise flawed case. In my court a group of franchisees recently moved for a preliminary injunction after the franchisor invoked its contractually unfettered discretion to terminate their franchises in response to the franchisees' public criticism of onerous treatment the franchisor had allegedly inflicted on a fellow franchisee. The facts were skillfully narrated, free of hyperbole and clutter; counsel added to their credibility by allowing the facts to speak for themselves. More to the point, the franchisor's conditions to cure were both degrading and, on their face, impossible to comply with, providing valuable context and a scorched-earth coherence. What was my dilemma? The franchisees' legal theory was dead wrong. But the power of their narrative alone sent me to the books in search of a viable answer.

Bertrand Russell said, "Truth consists in some form of correspondence between belief and fact." The objective of law and the trial process is to reflect as nearly as possible societal and cultural belief as distinguished from subjective, individual belief. The important part is not what I as an individual judge personally believe but what the discipline of law discloses to be the values of the culture in which I live. Juries are composed of six or more people so that a consensus rather than individual beliefs determines outcome. Jury instructions are designed to achieve this result, and the lawyer who ignores their import will not persuade the jurors any more than a lawyer who ignores the law can persuade a judge in a bench trial. No part of this process fails to be governed by the correspondence between societal and cultural belief and fact. The more these beliefs correspond with facts, and the more they hang together, the truer they are.

If the evidence is believed, the claim will be regarded as true. The latter flows from the former. But because we are not dealing with certainty, only with what is more likely than not, we must be persuaded. Persuasion is determined by the strength, not the volume, of the evidence. If what the lawyer seeks to prove is suspect or differs from ordinary experience, it must be broken down into constituent parts that do reflect normality. For a statement to be believed it must fit; the story in which it takes place must be coherent and plausible. What the fact-finder believes is what resonates with his understanding of life.

More than analytical rigor, judging credibility requires imagination and empathy for the human condition. To paraphrase the novelist Frank Delaney, we join our myths with facts according to our feelings, and we choose what we believe from what we are told. We bring to the facts our feelings, our experiences, and our desires. What we believe is what harmonizes the totality of this combination. If the spirit of the law is to be grasped, how facts and belief merge is the central concern. Certainty is never possible, but the development of belief does not require certainty. It requires persuasion. 🗅

Case 1:19-cv-00484-BHL   Filed 04/30/20   Page 7 of 7   Document 132-11