2007 WL 3334204
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

INTERNATIONAL GALLERIES, INC., a Texas corporation, Plaintiff,
v.
LA RAZA CHICAGO, INC., an Illinois corporation, and Miguel Angel Arrieta, Defendants.

No. 05 C 4991.
|
Nov. 2, 2007.

Attorneys and Law Firms

Andrew J. Kochanowski, David John Szymanski, Nabeel N. Hamameh, Sommers Schwartz, P.C., Southfield, MI, for Plaintiff.

Mark Douglas Brookstein, Robert A. Carson, Gould & Ratner, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

VIRGINIA M. KENDALL, United States District Court Judge.

*1 On August 30, 2005, Plaintiff International Galleries, Inc. ("IGI"), a now defunct multilayer marketing company once in the business of selling art reproductions, filed a two-count Complaint against Defendants La Raza Chicago, Inc. ("La Raza"), the publisher of a Spanish language newspaper in the Chicago, Illinois area, and Miguel Angel Arrieta ("Arrieta," and together with La Raza, "Defendants"), a writer for the La Raza newspaper. IGI's Complaint alleges that La Raza published an article, written by Arrieta, entitled "Painted Fraud" (the "Article"), that contains false statements about IGI's business. The Complaint states causes of action for defamation *per se* and *per quod*.

Now before the Court are the parties' fully-briefed cross Motions for Summary Judgment.[1] In their Motion for Summary Judgment, Defendants argue that Plaintiff cannot establish defamation *per se* because the Article contains expressions of non-actionable opinion and because the allegedly defamatory statements in the Article are capable of an innocent construction. Defendants further argue that Plaintiff may not recover-either for defamation *per se* or *per quod*-because the gist or sting of the allegedly defamatory Article is substantially true. Finally, Defendants argue that Plaintiff cannot recover for defamation *per quod* because Plaintiff has not pleaded and cannot prove special damages.

For its part, Plaintiff argues that it is entitled to summary judgment on its claim for defamation *per se* because each of the statements in the Article with which it takes issue is false and defamatory. Further, Plaintiff argues that it is entitled to summary judgment as to Defendants' second, third, fifth, sixth, seventh and eighth affirmative defenses because: (1) the allegedly defamatory statements in the Article are not opinion under Illinois law; (2) none of those statements are "rhetorical hyperbole;" (3) there is no public concern privilege under Illinois law; (4) Illinois does not recognize the incremental harm doctrine as a defense in a defamation case; (5) the allegedly defamatory statements are not capable of an innocent construction; and (6) the Uniform Single Publication Act ("USPA") is not applicable.[2]

The Court finds that the allegedly defamatory statements in the Article do not constitute non-actionable opinion and are not capable of an innocent construction. The Court also finds that, while Plaintiff may have failed properly to plead the special damages element of a cause of action for defamation *per quod*, Defendants have waived any argument related to the insufficiency of the pleadings and have not demonstrated that Plaintiff will not be able to prove special damages. With respect to the remaining affirmative defenses at issue, the Court finds that: (1) the allegedly defamatory statements in the article do not constitute "rhetorical hyperbole;" (2) Illinois courts have declined to adopt the incremental harm doctrine; and (3) the public concern privilege does not exist under Illinois law. Finally, the Court finds that genuine issues of material fact remain for trial with respect to whether the allegedly defamatory statements in the Article are substantially true. Accordingly, for the reasons set forth herein, Plaintiff's Motion for Summary Judgment is Granted in part and Denied in part and Defendants' Motion for Summary Judgment is Denied.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.



## UNDISPUTED FACTS

**La Raza and the Article.**

*2 La Raza is publishes a weekly newspaper serving both Chicago and neighboring suburban areas and its circulation reaches 40% of the Hispanic population of metropolitan Chicago. (Defs.' Response ¶ 2).³ On August 19, 2005, La Raza published the Article, which concerns IGI's business. (IGI Response ¶ 4). The Article, in its entirety, reads as follows:

**Painted Fraud**

> Art critics, financial analysts, collectors and civic group representatives issued an alert for Chicago residents to take precautions against the possibility of falling prey to a fraud of high magnitude, orchestrated through a "pyramid" which offers the purchase of pictorial art works alleged to be of high value.
>
> Erasmo Salgado, owner of a collection comprising over a thousand works of art, including most of the works of the late Carlos Cortés (including the only mosaic mural created by the muralist and poet), regrets however that this alert comes out six months after the appearance in Chicago of International Galleries Inc., an orchestrator of financial engineering by which an increasing number of buyers of reproductions alleged to be of great artistic and monetary value are attracted.
>
> Although there is still time to avoid yet more people being lured into buying these art copies, Salgado affirms that in six months so far, over five thousand people have been trapped by this story.
>
> Regarding this, Victor Pallini, a Financial Advisor with Systems Group Midwest, affirms that the basic problem in this matter is that International Galleries' method of operation is quite similar to that used about 15 years ago by promoters of the famous pyramid schemes which bankrupted thousands of citizens who believed in the automatic multiplication of their money by merely investing it in a kind of mutual fund.
>
> The difference, he points out, is that in order to avoid prosecution for alleged fraud, the promoters are now offering copies of paintings, and in accordance with the free market system of the United States and most of the rest of the world, the prevailing argument runs that if somebody buys an art reproduction for one or two thousand dollars, it's his business. This is to say, there is a product in exchange.
>
> At present, the scheme for luring buyers with this system appears unstoppable. People of all kinds are falling for it like flies.
>
> As a matter of fact, the main ingredient is the "get rich quick" promise, in a matter of six or eight weeks, according to José Luis Piña, Director of Casa de la Cultura Mestizarte in the Pilsen neighborhood.
>
> "What they first offer, for a thousand dollars as a minimum for getting in, is to return this amount immediately in works of art; the cash is to be used to finance other works of art. But what is wrong is that the alleged pieces that they deliver are cheapos that can be picked up for even a dollar in the Chinese market and have nothing like the value ascribed to them," he affirms.
>
> *3 A related problem, Piña adds, is that the segment of the visual arts, instead of fulfilling its educational and formative role within society, becomes a mere item of commerce.
>
> And so they lead buyers to believe that the copies they buy, for prices that vary between $240 and $1,200, are real works.
>
> This leads to the question: who will pay those amounts if one day the company which promotes their sale disappears from the market?
>
> "There won't be anybody who will pay $1,200 for a simple poster," Salgado responds incisively.
>
> The miracle of the loaves
>
> The method of operation used by International Galleries sales people is similar to a sales program developed by many other companies. The difference is that in this case, instead of offering goods and services, they sell people the idea of a benefit which will continue to bring them economic gains for the rest of their lives.
>
> The people who make contact with potential buyers are the same ones who have already become customers of the business. In order to recover their investments and be compensated, they in turn must recruit groups of five people. Every time they meet this quota, according to the Compensation Plan, they get a bonus of from $2,000 to $4,500.

When they first contact potential buyers, company representatives expound on how, as they see things in the real world for thousands of citizens in this country, "what they first tell you is that at present there is nobody in the United States who is not dogged by three monsters: debts, a mortgage and not enough money," as explained by Alfonso Vital, a Mexican resident of this country who related his experience.

"Then they lure you with the idea that to overcome these monsters, you have to be smart. And they conclude the talk with the affirmation that there is now International Galleries, Inc. to help the poor.

"All you have to do is invest a minimum of a thousand dollars, up to a maximum of five thousand, whereupon they will turn over to you pictures (copies of paintings) with a value of around that amount, but they furthermore tell you that with this purchase you have the right to have what they call an 'Express Card' in which earnings in U.S. currency will be available as a benefit from the money invested," Vital said.

As the company explains it, earnings delivered by way of the card are generated every time that new partners or buyers join. They underscore the commitment that the thousand dollars invested multiply automatically, because more and more buyers are joining into the system and, with the money that you put in, they could finance the acquisition of more paintings to sell.

But there is more. If you convince another five people to join the system, you earn a bonus that varies between two thousand and four thousand five hundred dollars.

> "At the end of each talk, they show examples of people who participate actively with the company and today, six months after having joined, have earned up to $70,000 from an initial investment of $1,000. In other words: the panacea in its full splendor."

*4 But the problem arises when one asks: how can it be that a work of art be sold in quantities ranging from $200 to $1,200?

The International Galleries representatives then comment that it has to do with certified copies, like those presently exhibited in numerous museums around the world.

Authenticated fakes

Salgado feels that, in its eagerness to grow, the International Galleries people pay no heed to the damage done to the plastic arts, as besides assuring that works on display in museums throughout the world are copies, they promise people the opportunity to own a Diego Rivera or a Rembrandt for $800.

By merely making people believe they are acquiring highly valuable works, they indulge in suspicious behavior, the collector added. He even feels it is an insult to artists to promote the sale of copies with the issuance of Certificates of Authenticity." In other words, what they certify is false.

International Galleries Inc. does not deceive anybody, according to one of the company's representatives in refutation, under conditions of confidentiality because of not being authorized to speak for the company. However, he presents himself as part of a large company whose intervention has saved hundreds of families in the United States and other countries from financial disaster.

He explains that those who join into the company's method of buying and payouts do so voluntarily, seeking to get out of their financial problems. "Few do it for love of art." Furthermore, most don't even have any idea about art.

(Cplt., Exh. A thereto). Although he was a citizen of Illinois when this action was filed, defendant Arrieta relocated to Puebla, Mexico in December 2006. (IGI Response at ¶ 2).

**IGI and its Business.**
IGI-which is now in bankruptcy proceedings-was a Texas corporation engaged in the business of selling limited edition art reproductions. (IGI 56.1 at ¶ 1; Defs.' Response at ¶ 1). To that end, IGI entered into contracts with a number of artists for the exclusive rights to reproduce original artwork in limited editions in return for royalties based upon the sales of those reproductions. (Defs.' Response at ¶ 6). Each such original work of art that was reproduced by IGI was physically transferred to

and maintained by IGI. *Id.* at ¶ 7, 220 Ill.Dec. 195, 672 N.E.2d 1207. Each work was digitally scanned, color-proofed, and reproduced using the Giclee method on approximately 40 IGI-owned large-format industrial fine art printers which printed each reproduction on canvas. *Id* at ¶¶ 7, 11, 220 Ill.Dec. 195, 672 N.E.2d 1207. Each reproduction sold was accompanied by a certificate of authenticity, which certificate indicated the title, artist, and number in series of the reproduction. *Id.* at ¶ 11, 220 Ill.Dec. 195, 672 N.E.2d 1207. In addition to licensing original artwork from living artists, IGI also purchased original oil paintings produced by non-contemporary painters and offered limited edition reproductions of those paintings to the public via the same method. *Id.* at ¶ 8, 220 Ill.Dec. 195, 672 N.E.2d 1207. IGI's reproductions, which cost about $40 to produce and which ranged in price for IGI members from $200 to $4000-were offered for sale in an on-line catalogue on IGI's distributors' websites. *Id.* at ¶ 13, 220 Ill.Dec. 195, 672 N.E.2d 1207; IGI Response at ¶ 12.

**\*5** In addition to making available reproductions for purchase and subsequent resale to customers having no affiliation with IGI, IGI also offered a member referral rewards program ("the rewards program") which paid commissions to members who referred other members to IGI who also bought IGI reproductions. (Defs.' 56.1 at ¶ 24; IGI Response at ¶ 24.) IGI advised that through the rewards program, members could earn money after a one-time purchase. (Defs.' 56.1 at ¶ 25; IGI Response at ¶ 25.) For every $100 spent on IGI's reproductions, a member would receive one Member Reward Card ("MRC"). (Defs.' 56.1 at ¶ 28; IGI Response at ¶ 28.) MRCs were maintained on the IGI member's website, provided by IGI upon joining the program. (Defs.' 56.1 at ¶ 29.) The MRCs could be redeemed for cash in two ways-first in the XPress program and then in the Bonus program. *Id.*

An MRC first had the potential to be redeemed for cash as an XPress card, which has eight slots that are electronically "punched" for cash rewards. (Defs.' 56.1 at ¶ 32; IGI Response at ¶ 32.) Rewards (punches) in the XPress program were allocated by IGI in two ways: half of the cards received by each member generated rewards based upon the cardholder's individual sales and referral efforts and the other half of the cards received by each member generated rewards based upon "global" sales, regardless of who referred the purchasing members to IGI. (Defs.' 56.1 at ¶¶ 34-36; IGI Response at ¶¶ 34-36.)

After an MRC was fully redeemed in the XPress program, it entered the Bonus reward program, in which rewards depended entirely upon the member's own sales and referral efforts. (Defs.' 56.1 at ¶ 41; IGI Response at ¶ 41.) The only way a member could earn rewards in the Bonus program was to refer other members who purchased reproductions from IGI. (Defs.' 56.1 at ¶¶ 42-43; IGI Response at ¶ 42.)

IGI provided training materials to its members to aid them in their efforts to refer others to join as new members. (Defs.' 56.1 at ¶ 63; IGI Response at ¶ 63.) The training materials instructed members to follow the IGI "30-DAY PLAN OF ACTION ... and teach the new Members that you enroll into IGI to do the same .... They will do the same for the new Members they enroll and when this process duplicates through the various levels of your organization, the number of Members in your Group will quickly multiply." (Defs.' 56.1 at ¶ 66; IGI Response at ¶ 66.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard applies when cross motions for summary judgment are filed, as they have been in this case. *Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir.2005). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir.2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the Court is "not required to draw every conceivable inference from the record and mere speculation or conjecture will not defeat a summary judgment motion." *Cont'l Cas. Co.*, 427 F.3d at 1041 (internal quotations and citations omitted). Moreover, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir.2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the Court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *See Albiero v. City*

of Kankakee, 246 F.3d 927, 933 (7th Cir.2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir.1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party. *Brewer v. Bd. of Trs.*, 479 F.3d 908, 915 (7th Cir.2007).

## DISCUSSION

### I. Illinois Law Regarding Defamation.

*6 Under Illinois law, a defamation action "provides redress for false statements of fact that harm reputation." *Brennan v. Kadner*, 351 Ill.App.3d 963, 968, 286 Ill.Dec. 725, 814 N.E.2d 951 (1st Dist.2004) (citing *Hopewell v. Vitullo*, 299 Ill.App.3d 513, 517, 233 Ill.Dec. 456, 701 N.E.2d 99 (1st Dist.1998)). "To prove defamation, a plaintiff must show: (1) the defendant made a false statement concerning the plaintiff; (2) there was an unprivileged publication of the defamatory statement to a third party by defendant; and (3) publication of the defamatory statement damaged the plaintiff." *Id.* (citing *Parker v. House O'Lite Corp.*, 324 Ill.App.3d 1014, 1020, 258 Ill.Dec. 304, 756 N.E.2d 286 (1st Dist.2001)).

A statement may be defamatory *per se* or defamatory *per quod*. *Bryson v. News Am. Publications, Inc.*, 174 Ill.2d 77, 88, 220 Ill.Dec. 195, 672 N.E.2d 1207 (1996). A statement is defamatory *per se* when "it is so obviously and naturally harmful to the person to whom it refers that injury to his reputation is presumed." *Schivarelli v. CBS, Inc.*, 333 Ill.App.3d 755, 759, 267 Ill.Dec. 321, 776 N.E.2d 693 (1st Dist.2002) (citing *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 10, 180 Ill.Dec. 307, 607 N.E.2d 201 (1992)). In Illinois, there are five categories of statements that are defamatory *per se*: "(1) those imputing the commission of a criminal offense; (2) those imputing infection with a loathsome communicable disease; (3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; (4) those that prejudice a party, or impute lack of ability, in his or her trade, profession or business; and (5) those imputing adultery or fornication." *Brennan*, 351 Ill.App.3d at 968, 286 Ill.Dec. 725, 814 N.E.2d 951 (citing *Bryson*, 174 Ill.2d at 88-89, 220 Ill.Dec. 195, 672 N.E.2d 1207)).

Statements are defamatory *per quod* when: (1) the defamatory character of the statement is not apparent on its face and resort to extrinsic circumstances is necessary to demonstrate its injurious meaning; and (2) the statement is defamatory on its face, but does not fall within one of the limited categories of statements that are actionable *per se*. *Schivarelli*, 333 Ill.App.3d at 759, 267 Ill.Dec. 321, 776 N.E.2d 693 (citing *Bryson*, 174 Ill.2d at 103, 220 Ill.Dec. 195, 672 N.E.2d 1207. To recover for defamation *per quod*-as opposed to defamation *per se*-a plaintiff must plead and prove special damages. *Id.* To prove special damages, a plaintiff must demonstrate "actual damage to ... reputation and pecuniary loss resulting from the defamatory statement." *Bryson*, 174 Ill.2d at 104, 220 Ill.Dec. 195, 672 N.E.2d 1207.

### II. The Allegedly Defamatory Statements in the Article are not Protected Statements of Opinion.

A statement is constitutionally protected under the First Amendment to the United States Constitution "only if it cannot be reasonably interpreted as stating actual fact." *Bryson*, 174 Ill.2d at 100, 220 Ill.Dec. 195, 672 N.E.2d 1207 (quoting *Milkovich v. Lorain Journal Col*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). The determination of whether an alleged defamatory statement is a statement of fact or a non-actionable statement of opinion is a question of law. *Brennan*, 351 Ill.App.3d at 969, 286 Ill.Dec. 725, 814 N.E.2d 951 (citing *Moriarty v. Greene*, 315 Ill.App.3d 225, 234, 247 Ill.Dec. 675, 732 N.E.2d 730 (1st Dist.2000)). Illinois employs a totality of the circumstances analysis based on *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984) to determine whether a statement is opinion or fact. *Moriarty*, 315 Ill.App.3d at 234-35, 247 Ill.Dec. 675, 732 N.E.2d 730. When conducting the totality of the circumstances analysis, the Court considers the alleged defamatory statements from the perspective of an ordinary reader of the statement. *Ollman*, 750 F.2d at 979 n. 16. Whether an ordinary reader would view a statement as one of fact or opinion depends upon: "(1) the precision of the statement; (2) verifiability of the statement; (3) literary context of the statement; and (4) public and social contexts of the statement." *Brennan*, 351 Ill.App.3d at 969, 286 Ill.Dec. 725, 814 N.E.2d 951 (citing *Moriarty*, 315 Ill.App.3d at 235, 247 Ill.Dec. 675, 732 N.E.2d 730. When it is "clear that the writer is exploring a 'subjective view, an interpretation, a theory, conjecture or surmise, rather than claiming to be in possession of objectively verifiable

Case 1:19-cv-00484-BHL Filed 04/30/20 Page 5 of 9 Document 132-14

facts, the statement is not actionable.' " *Moriarty,* 315 Ill.App.3d at 235, 247 Ill.Dec. 675, 732 N.E.2d 730 (quoting *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993)).

**\*7** Defendants argue that IGI's defamation *per se* claim fails because the challenged statements are expressions of opinion. Defendants focus much of their argument on the Article's employment of the word "possibility." Defendants argue that the Article "suggested the 'possibility' of fraud," but "stops far short of actually accusing IGI of being an illegal pyramid scheme." (Def.'s Reply in Support of Mtn. for Summary Judgment at p. 4.) Because the Article suggests only that IGI's business is "quite similar" to certain unspecified "famous pyramid schemes," Defendants argue, it lacks sufficient precision and verifiability to be interpreted as asserting facts. Defendants further argue that the choice to "frame [the Article] as an 'alert' issued by the cited sources" amounts to nothing more than "sensationalistic journalism used to grab the readers' attention." *Id.*

The Court finds that the Article does not meet the "narrow" test utilized in Illinois to determine whether a statement is non-actionable opinion. *Skolnick,* 132 F.Supp.2d at 1125. In this case, an ordinary reader could reasonably interpret the Article as stating facts and not expressing opinion. First, the Article is not "framed" as an alert. Instead, the headline "Painted Fraud" is followed immediately by the following statement:

> Art critics, financial analysts, collectors and civic group representatives issued an alert for Chicago residents to take precautions against the possibility of falling prey to a fraud of high magnitude, orchestrated through a "pyramid" which offers the purchase of pictorial art works alleged to be of high value.

(Cplt., Exh. A thereto at p. 1). This language does not frame the Article as an alert; to the contrary, it frames the Article as a report *on* an alert which, as indicated by the use of the past tense, has already been issued. And whether or not art critics, financial analysts, collectors and civic group representative issued any such alert is certainly verifiable. Moreover, contrary to Defendant's characterization, this language does not warn La Raza's readers about a possible fraud, but rather about the possibility of falling prey to a fraud. That is to say, a reasonable reader could interpret this language to mean that art critics, financial analysts, collectors and civic group members have determined that IGI is a "fraud of high magnitude" related to IGI's similarity to an illegal pyramid scheme and that those persons-persons with specialized knowledge-have issued an alert, warning about the possibility of falling prey to that fraud.

Defendants are correct that the Article stops short of actually accusing IGI of being an illegal pyramid scheme. However, after first describing an alert about the possibility of falling prey to a fraud of high magnitude, the Article then presents precise factual statements, each of which is susceptible to verification, about the nature of IGI's business-the "fraud of high magnitude" at issue in the Article. For example, the Article reports that "[w]hat [IGI] first offer[s], for a thousand dollars as a minimum for getting in, is to return this amount immediately in works of art." (Cplt., Exh. A thereto at p. 2) The Article also states that "[t]he people who make contact with potential buyers are the same ones who have already become customers of the business. In order to recover their investments and be compensated, they in turn must recruit groups of five people." *Id.* at p. 3. The Article further states that "[IGI] underscore[s] the commitment that the thousand dollars invested multiply automatically ..." *Id.* The Article also explains that IGI sells "certified copies" of paintings and that it provides purchasers with "Certificates of Authenticity" but that "what they certify is false." *Id.* at p. 4. The Article also reports that "they promise people the opportunity to own a Diego Rivera or a Rembrandt for $800." *Id.* Each of these statements about the nature of IGI's business is specific and verifiable.

**\*8** Of at least equal significance is the context in which the statements appear. The Article did not appear on La Raza's Opinion page. Instead, the Article is presented as a news piece-reporting on the alert referenced above. The Article cites several sources for the information presented, lending to the impression that the story presents not the writer's or La Raza's opinion about IGI, but instead facts about IGI gleaned from persons with relevant knowledge. In this context, an ordinary reader could view the Article as stating actual facts about IGI. Accordingly, the Article does not qualify as protected opinion under Illinois law.

### III. The Allegedly Defamatory Statements in the Article are Not Capable of Innocent Construction.

Like the question whether a statement qualifies as one of

opinion, the question whether a statement is reasonably capable of an innocent construction is a question of law. *Salamone v. HollingerInt'l, Inc.*, 347 Ill.App.3d 837, 840, 283 Ill.Dec. 245, 807 N.E.2d 1086 (1st Dist.2004). "[A] written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se.*" *Tuite v. Corbitt*, 224 Ill.2d 490, 503, 310 Ill.Dec. 303, 866 N.E.2d 114 (2006) (quoting *Chapski v. Copley Press*, 92 Ill.2d 344, 352, 65 Ill.Dec. 884, 442 N.E.2d 195 (1982)). "[T]he innocent construction rule does not require courts to strain to find an unnatural innocent meaning for a statement when a defamatory meaning is far more reasonable." *Id.* at 504-05, 310 Ill.Dec. 303, 866 N.E.2d 114 (quoting *Bryson*, 174 Ill.2d at 94, 220 Ill.Dec. 195, 672 N.E.2d 1207).

In this case, a defamatory meaning for the statements in the Article is far more reasonable than the innocent construction urged by the Defendants. Defendants offer the tenuous argument that the "true focus" of the Article is "the reported concern that by using copies of art to earn money, that 'segment of the visual arts, instead of fulfilling its educational and formative role within society, becomes a mere item of commerce.'" (Defs.' Mem. in Support of Mtn. for Summary Judgment at p. 7, 220 Ill.Dec. 195, 672 N.E.2d 1207). Defendants then argue that "to merely express the view that art should not be used for commercial purposes hardly impugns professional integrity by imputing criminal conduct." *Id.*

To be sure, the Article does report the concern of Jose Luis Pina, Director of Casa de la Cultura Mestizarte, that "[a] related problem ... is that the segment of the visual arts, instead of fulfilling its educational and formative role within society, becomes a mere item of commerce." (Cplt., Exh. A thereto at p. 2, 220 Ill.Dec. 195, 672 N.E.2d 1207). But that is not the true focus of the Article at all. As described above, the Article opens by describing an alert for Chicago residents to be wary of falling prey to a "fraud of high magnitude." After setting the tone in that fashion, the Article proceeds to characterize IGI's business as "quite similar" to illegal pyramid schemes and accuses IGI-in an effort to avoid prosecution-of offering products for sale that are nothing more than "authenticated fakes," suggesting that to the extent members are making money, it must be due to those aspects of the business that are similar to an illegal pyramid scheme and not because IGI offers a valuable product at a fair price. *Id.* at p. 4, 220 Ill.Dec. 195, 672 N.E.2d 1207. Alerting the community to this "fraud of high magnitude" is the true focus of the Article which, when considered in context and afforded its natural and obvious meaning, is not reasonably susceptible of an innocent construction.

### IV. Summary Judgment on Plaintiff's Defamation Claim or on Defendants' Affirmative Defense of Substantial Truth would be Improper Because the Facts Regarding IGI's Business are in Dispute.

*9 In Illinois, a defendant seeking to establish truth as a defense to a defamation claim "need demonstrate only the 'substantial truth' of the allegedly defamatory material." *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill.App.3d 555, 563, 276 Ill.Dec. 1, 793 N.E.2d 760 (1st Dist.2003). A defendant makes such a showing by demonstrating "that the 'gist' or 'sting' of the allegedly defamatory statement is true." *Id.* "When determining the 'gist' or 'sting' of allegedly defamatory material, a trial court must 'look at the highlight of the article, the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement.'" *Parker v. House O'Lite Corp.*, 324 Ill.App.3d 1014, 1026, 258 Ill.Dec. 304, 756 N.E.2d 286 (1st Dist.2001) (quoting *Gist v. Macon County Sheriff's Dep't*, 284 Ill.App.3d 367, 370, 219 Ill.Dec. 701, 671 N.E.2d 1154 (4th Dist.1996)). "The substantial truth of a statement is normally a jury question, but where no reasonable jury could find that substantial truth had not been established, the question is one of law." *Harrison*, 341 Ill.App.3d at 563, 276 Ill.Dec. 1, 793 N.E.2d 760 (citing *Parker*, 324 Ill.App.3d at 1026, 258 Ill.Dec. 304, 756 N.E.2d 286).

In this case, the parties dispute what constitutes the "gist" or "sting" of the Article. On the one hand, Defendants claim that the sting of the article is that is that IGI's operation was "quite similar" to an illegal pyramid scheme and they argue the substantial truth of that proposition. On the other hand, IGI suggests that the real gist of the Article comprises the following two propositions: (1) a supposedly credible coalition of Chicago artists, financial advisors and civic group leaders, after having examined IGI's business practice, have in fact found it to be fraudulent; and (2) that IGI's members are buying worthless pieces of art and are then made to recruit others to do the same solely to profit financially. The second of IGI's proffered "gists" is really just another way of saying that IGI is "quite similar" to an illegal pyramid scheme (and is therefore a "fraud of high magnitude")-which this Court finds to be the "pertinent angle" of the Article. *See Parker*, 324 Ill.App.3d at 1026,

Case 1:19-cv-00484-BHL Filed 04/30/20 Page 7 of 9 Document 132-14

258 Ill.Dec. 304, 756 N.E.2d 286.

Defendants argue that "[s]tate and federal anti-pyramid law consistently focuses on whether compensation in the program is primarily based upon recruitment of additional members, as opposed to sale of a product to retail customers."[4] (Defs.' Mem. in Support of Mtn. for Summary Judgment at p. 9, 258 Ill.Dec. 304, 756 N.E.2d 286.) Defendants characterize IGI's business as offering compensation that is based primarily upon recruitment of additional members. IGI disagrees and argues that independent distributors of its reproductions are not compensated primarily for recruiting new independent distributors. IGI argues that selling reproductions to customers who did not want to become IGI members provided a greater benefit than recruiting new independent distributors because the IGI member making the sale would receive both the difference between the suggested retail price (the sale from IGI to the member) and the price at which the member resold the reproduction and also the reward cards generated by the purchase from IGI (because reward cards issue to purchasing members and not to customers purchasing from members). (IGI Resp. to Defs.' Mtn. for Summary Judgment at p. 11, 258 Ill.Dec. 304, 756 N.E.2d 286.) IGI also argues that its members were compensated in the rewards program only when they referred new members who purchased reproductions and, as such, referral compensation was tied to the sale of reproductions and was not solely based upon the referral of a new member. *Id.*

*10 Summary judgment is improper for either party in this case because the facts regarding IGI's business and the way in which its members were compensated-which will determine whether the statements in the Article are defamatory or whether IGI was, in fact, similar to an illegal pyramid scheme-are in dispute. Accordingly, it is not possible for the Court to determine whether the Article is false and defamatory or whether the "gist" or "sting" of the Article is substantially true. As such, the parties' Motions for Summary Judgment must be denied.

**V. Plaintiff is Entitled to Summary Judgment on Defendants Third, Fifth and Sixth Affirmative Defenses.**
Plaintiff argues it is entitled to judgment as a matter of law on the affirmative defenses that: (1) the article constitutes "rhetorical hyperbole;" (2) that the article is a fair report on a matter of public concern; and (3) that Plaintiff is barred from recovery under the incremental harm doctrine. Defendants respond only that these three defenses are "simply aspects of the opinion and substantial truth defenses." (Defs.' Mem. in Opposition to Mtn. for Summary Judgment at p. 8, 258 Ill.Dec. 304, 756 N.E.2d 286). Plaintiffs are entitled to judgment as a matter of law on each of these defenses. First, the Court has already found that the Article contains statements of fact. Accordingly, Plaintiff is entitled to judgment in its favor on Defendants' affirmative defense that the Article is merely "rhetorical hyperbole." *See Stanley v. Carrier Mills-Stonefort Sch. Dist. No. 2,* 459 F.Supp.2d 766, 774 (N.D.Ill.2006) (citing *Kolegas v. Heftel Broad. Corp.,* 154 Ill.2d 1, 180 Ill.Dec. 307, 607 N.E.2d 201 (Ill.1992) ("a statement should only be considered rhetorical hyperbole when it is obviously an exaggeration, rather than a statement of literal fact."). Second, Plaintiff is correct that in Illinois, the fair report privilege applies only to reports of official actions or proceedings and the Article does not report on either of those things. *See Solaia Tech., LLC v. Specialty Publ. Co.,* 221 Ill.2d 558, 588, 304 Ill.Dec. 369, 852 N.E.2d 825 (2006). Accordingly, Plaintiff is entitled to judgment in its favor on Defendants' affirmative defense that the Article is privileged as a fair report on a matter of public concern. Finally, "[n]o court in Illinois has explicitly adopted the incremental-harm defense." *Myers v. The Telegraph,* 332 Ill.App.3d 917, 925, 265 Ill.Dec. 830, 773 N.E.2d 192 (5th Dist.2002) (declining to adopt the defense). Accordingly, Plaintiff is entitled to judgment in its favor on Defendants' affirmative defense based upon the incremental-harm doctrine.

**VI. Defendants' Motion for Summary Judgment Addressing the Special Damages Element of the Plaintiff's Claim for Defamation *Per Quod* is Denied.**
Finally, Defendants argue that they are entitled to summary judgment on Plaintiff's claim for defamation *per quod* because Plaintiff has failed to plead and cannot prove special damages. With respect to the failure to plead special damages, the Court finds that the eve of trial is simply too late for Defendants to make what amounts to a motion to dismiss for failure to plead special damages. *See Altoona Clay Prods., Inc. v. Dun & Bradstreet, Inc.,* 37 F.R.D. 460, 465 (W.D.Pa.1965). Nor have Defendants demonstrated that Plaintiff will not be able to prove special damages. In response to Defendants' arguments that IGI has not demonstrated that it was profitable prior to the publication of the Article, IGI points to affidavits demonstrating that its members encountered difficulty in selling IGI reproductions following the publication of the Article. Drawing all reasonable inferences in favor of IGI, these affidavits constitute evidence that customers refused to do business with IGI and its members after reading the

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 8

Article. If not controverted, this evidence may be sufficient to establish special damages. *See Becker v. Zellner,* 292 Ill.App.3d 116, 127, 226 Ill.Dec. 175, 684 N.E.2d 1378 (2nd Dist.1997) ("In other words, plaintiffs alleged that a third party actually stopped doing business with them as a result of Zellner's alleged statements. This allegation is sufficient to support a claim of defamation *per quod*.... If plaintiffs properly establish their damages as alleged ... they could be entitled to relief.") Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's claim for defamation *per quod* is Denied.

## CONCLUSION

**\*11** For the reasons set forth herein, Plaintiff's Motion for Summary Judgment is Granted in part and Denied in part. Defendants' Motion for Summary Judgment is Denied.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3334204

---

Footnotes

1   Also before the Court is Plaintiff's Motion to Strike Various Exhibits (Docket entry 239). As the Court has already advised the parties, that Motion was taken under advisement as the Court considered the parties' Motions for Summary Judgment and is Granted in Part and Denied in Part consistent with this Opinion.

2   None of the parties to this action offers any argument or explanation regarding the USPA. Plaintiff offers only a citation to the Act, which states that "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one edition of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions." 740 ILCS 165/1. The Complaint in this case does not allege multiple publications of the Article at different times to different audiences. *See Blair v. Nevada Landing P'ship, RBG, LP,* 369 Ill.App.3d 318, 324-326, 307 Ill.Dec. 511, 859 N.E.2d 1188 (2nd Dist.2006). As such, the Act does apply in this case inasmuch as it operates to define the time at which actual malice will be relevant as well as to prevent Plaintiff from arguing that there is any continuing or repeated injury in this case. Accordingly, Plaintiff's Motion for Summary Judgment with respect to Defendants' affirmative defense based upon the USPA is Denied.

3   The facts are presented in the parties' statements pursuant to Local Rule 56.1. With respect to Plaintiffs' Motion, Plaintiffs' Statement of Undisputed Material Facts is cited as "IGI 56.1 ¶ ___"; Defendant's Response is cited as "Defs.' Response ¶ ___"; Defendant's Statement of Additional Facts is cited as "Defs.' 56. 1(b)(3)(C) ¶ ___"; and Plaintiffs' Response thereto is cited as "IGI Resp. to Add'l Facts ¶ ___". With respect to Defendant's Motion, Defendant's Statement of Undisputed Material Facts is cited as "Defs.' 56.1¶ ___"; Plaintiffs' Response is cited as "IGI Response ¶ ___"; Plaintiffs' Statement of Additional Facts is cited as "IGI 56.1(b)(3)(C) ¶ ___"; and Defendant's Response is cited as "Defs.' Resp. to Add'l Facts ¶ ___".

4   IGI agrees that what is prohibited by anti-pyramid laws is compensation for recruitment of members. (IGI Mem. in Support of Mtn. for Summary Judgment at p. 9, n. 7, 307 Ill.Dec. 511, 859 N.E.2d 1188. (citing *US v. Gold Unlimited, Inc.,* 177 F.3d 472, 484 (6th Cir.1999) for the proposition that "[m]any stated prohibit only those schemes that compensate participants 'primarily' for the recruitment of new participants ... as opposed to sales of goods or services [while the law in other states only exempts] compensation based 'solely' or 'exclusively' on sales rather than on recruiting.")).

End of Document       © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    9