## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

|  |  |
|---|---|
| **ANDREW L. COLBORN,**<br><br>　　　　　　**Plaintiff,**<br><br>　　**vs.**<br><br>**NETFLIX, INC.; CHROME MEDIA LLC,**<br>**F/K/A SYNTHESIS FILMS, LLC;**<br>**LAURA RICCIARDI; AND MOIRA**<br>**DEMOS,**<br><br>　　　　　　**Defendants.** | **Civil No.: 19-CV-484-PP** |

## REPLY MEMORANDUM IN SUPPORT OF NETFLIX, INC.'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

I.   Simplifying the judicial task ................................................................................ 4

     A.   Certain facts and controlling legal principles are undisputed ................................ 4

     B.   Much of Colborn's Opposition is properly disregarded .......................................... 5

     C.   Discovery is neither necessary nor appropriate ...................................................... 7

II.  Argument ............................................................................................................. 9

     A.   Colborn's contention that Netflix can be liable for "republishing"
          statements made by Avery and his lawyers is incorrect as a matter of
          law ..................................................................................................................... 9

     B.   Colborn's alternative theory that *MaM* defamed him by implication
          fails the First Amendment's rigorous, two-part test for libel-by-
          implication claims .............................................................................................. 14

          1.   *MaM* does not *reasonably* imply that Colborn in fact framed
               Avery ............................................................................................................ 15

          2.   *MaM* does not *endorse* the proposition that Colborn framed
               Avery ............................................................................................................ 18

     C.   Colborn misconstrues Netflix's reliance on the First Amendment
          doctrine that expressions of opinions based on fully disclosed facts
          are protected from liability .................................................................................. 20

     D.   Colborn misconstrues Netflix's reliance on the subsidiary meaning
          doctrine, which renders examination of specific statements contained
          in *MaM* unnecessary .......................................................................................... 23

     E.   Colborn misapprehends Netflix's reliance on *Masson* and the
          Supreme Court's articulation of the "material falsity" requirement ...................... 25

     F.   Colborn has failed to state claims for intentional infliction of
          emotional distress and negligence ...................................................................... 27

          1.   The First Amendment bars Colborn's IIED claim ............................................ 28

          2.   Colborn relies on a false representation of the law regarding
               negligence ...................................................................................................... 29

CONCLUSION .............................................................................................................. 30

Case 1:19-cv-00484-BHL   Filed 06/01/20   Page 2 of 38   Document 140

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Group, LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) ......................................................................25

*Air Wisconsin Airlines Corp. v. Hoeper*,
    134 S. Ct. 852 (2014) .....................................................................................25

*Board of Forensic Document Examiners, Inc. v. ABA*,
    922 F.3d 827 (7th Cir. 2019) ..........................................................................10

*Brokers' Choice of America, Inc. v. NBC Universal, Inc.*,
    861 F.3d 1081 (10th Cir. 2017) .........................................................................7

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) .......................................................................................27

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) .......................................................9, 15, 19, 20

*Christopher v. American News Co.*,
    171 F.2d 275 (7th Cir. 1948) ......................................................................5, 16

*Church of Scientology International v. Time Warner, Inc.*,
    238 F.3d 168 (2d Cir. 2001)......................................................................23, 24

*Cianci v. New Times Publishing Co.*,
    639 F.2d 54 (2d Cir. 1980).................................................................21, 22, 29, 30

*Dallas Morning News, Inc. v. Tatum*,
    554 S.W.3d 614 (Tex. 2018).............................................................................15

*Desnick v. ABC, Inc.*,
    No. 93 C 6534, 1999 U.S. Dist. LEXIS 994 (N.D. Ill. Jan. 26, 1999) ....................23

*Dr. R.C. Samanta Roy Institute of Science & Technology, Inc. v. Lee Enterprises*,
    Nos. 05-C-422, 05-C-0423, 2006 U.S. Dist. LEXIS 53922 (E.D. Wis. Aug. 2, 2006) ................................................................................................................3

*Dumas v. Koebel*,
    2013 WI App 152, 841 N.W.2d 319 ...................................................................28

*Estate of Enoch v. Tienor*,
    No. 07-C-376, 2008 U.S. Dist. LEXIS 13636 (E.D. Wis. Feb. 11, 2008)................7

ii

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ............................................................... 16

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ................................................................................. 18

*Gentile v. State Bar of Nevada*,
    501 U.S. 1030 (1991) ............................................................................. 30

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ............................................................................... 30

*Gist v. Macon County Sheriff's Department*,
    284 Ill. App. 3d 367 (1996) .................................................................... 18

*Global Relief Foundation, Inc. v. New York Times Co.*,
    390 F.3d 973 (7th Cir. 2004) ....................................................... 11, *passim*

*Holloway v. American Media, Inc.*,
    947 F. Supp. 2d 1252 (N.D. Ala. 2013) .................................................. 28

*Howard v. Antilla*,
    191 F.R.D. 39 (D.N.H. 1999) ................................................................ 15

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) ........................................................................... 27, 30

*Janklow v. Newsweek, Inc.*,
    759 F.2d 644 (8th Cir. 1985) ........................................................ 12, 18, 27

*Johnson v. CBS*,
    10 F. Supp. 2d 1071 (D. Minn. 1998) ..................................................... 15

*Lathan v. Journal Co.*,
    140 N.W.2d 417 (Wis. 1966) ................................................................. 12

*In re Lisse*,
    905 F.3d 495 (7th Cir. 2018) ................................................................... 7

*Lott v. Levitt*,
    556 F.3d 564 (7th Cir. 2009) ................................................................. 16

*Mach v. Allison*,
    656 N.W.2d 766 (Wis. Ct. App. 2002) .................................................. 8, 9

*Maguire v. Journal/Sentinel*,
    198 Wis. 2d 389 (Ct. App. 1995) ........................................................... 25

iii

*Marjala v. Fox News Network LLC*,
2017 WI App 7, 895 N.W.2d 103 ........................................................................21

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) ................................................................................6, 26

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) ..............................................................................2

*Milsap v. Journal/Sentinel, Inc.*,
100 F.3d 1265 (7th Cir. 1996) ..............................................................................22

*Moore v. Sun Publishing Corp.*,
881 P.2d 735 (N.M. Ct. App. 1994) ..............................................................................15

*New Times, Inc. v. Isaacks*,
146 S.W.3d 144 (Tex. 2004) ..............................................................................16

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ................................................................................18, 29

*Newton v. National Broadcasting Co.*,
930 F.2d 662 (9th Cir. 1990) ..............................................................................8

*Nix v. ESPN, Inc.*,
772 F. App'x 807 (11th Cir. 2019) ..............................................................................8

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) ..............................................................................22

*Peterson v. Grisham*,
594 F.3d 723 (10th Cir. 2010) ..............................................................................22, 23

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) ..............................................................................14

*Puhr v. Press Publishing Co.*,
25 N.W.2d 62 (Wis. 1946) ..............................................................................16

*Riley v. Harr*,
292 F.3d 282 (1st Cir. 2002) ..............................................................................2, 3, 22

*Sheppard* v. *Maxwell*,
384 U.S. 333 (1966) ................................................................................30

*Skakel v. Grace*,
5 F. Supp. 3d 199 (D. Conn. 2014) ..............................................................................24

iv

*Snyder v. Phelps*,
    562 U.S. 443 (2011)....................................................................................................28

*Snyder v. Phelps*,
    580 F.3d 206 (4th Cir. 2009) ....................................................................................10

*Stepanov v. Dow Jones & Co., Inc.*,
    120 A.D.3d 28 (N.Y. App. Div. 1st Dep't 2014).....................................................15

*Stevens v. Tillman*,
    855 F.2d 394 (7th Cir. 1988) ..............................................................................21, 24

*Tatur v. Solsrud*,
    498 N.W.2d 232 (Wis. 1993)....................................................................................19

*Teamsters Local No. 579 v. B & M Transit, Inc.*,
    882 F.2d 274 (7th Cir. 1989) ....................................................................................30

*Terry v. Journal Broadcast Corp.*,
    2013 WI App 130, 840 N.W.2d 255 ........................................................................22

*Time, Inc. v. Hill*,
    385 U.S. 374 (1967)....................................................................................................2

*Time, Inc. v. Pape*,
    401 U.S. 279 (1971)..................................................................................................27

*Verity v. USA Today*,
    436 P.3d 653 (Idaho 2019)........................................................................................15

*Vinas v. Chubb Corp.*,
    499 F. Supp. 2d 427 (S.D.N.Y. 2006)......................................................................15

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) ............................................................................15, 16

*Wyoming Corp. Services v. CNBC, LLC*,
    32 F. Supp. 3d 1177 (D. Wyo. 2014)........................................................................15

## Other Authorities

deathwishiii, *Monsters*, REDDIT (June 19, 2019, 8:46 AM),
    https://www.reddit.com/r/StevenAveryIsGulity/comments/c2dcnx/monsters/ ......................17

Doug Schneider, *Poll: 22% think police fabricated Avery evidence*, GREEN BAY
    PRESS GAZETTE (May 12, 2017),
    https://www.greenbaypressgazette.com/story/news/local/steven-
    avery/2017/05/12/poll-22-think-police-fabricated-avery-evidence/101564682/....................17

v

Fed. R. Evid. 201(d)-(e) .................................................................................................7

1 Hon. Robert D. Sack, SACK ON DEFAMATION § 2:7.1 (5th ed. 2017).........................................11

klasikvhs, *Karma is a bitch* (review of *Making a Murderer*), IMDB (Jan. 1, 2016),
https://www.imdb.com/review/rw3385712/?ref_=tt_urv ..........................................................17

zellnerissuper, *How is this acceptable?*, REDDIT (Oct. 13, 2019, 11:15 AM),
https://www.reddit.com/r/StevenAveryIsGuilty/comments/dh4cj1/how_is_this
_acceptable/f3lulq6/ ......................................................................................................17

Case 1:19-cv-00484-BHL   Filed 06/01/20   Page 7 of 38   Document 140

<u>**INTRODUCTION**</u>

Plaintiff Andrew Colborn's Opposition ("Opp.," Dkt. 131) to Netflix, Inc.'s motion to dismiss the Second Amended Complaint ("SAC," Dkt. 105) consumes 90 pages, but he recites the central premise of his lawsuit early on, repeating it twice in the first few passages. *Making A Murderer* ("*MaM*"), he claims, "distorted and falsified facts to portray Mr. Colborn as a 'corrupt police officer who planted evidence to frame an innocent man.'" Opp. 3, 4 (citing SAC ¶ 20).

This "crooked cop" theory was, of course, the cornerstone of Steven Avery's defense at his murder trial, not some wild idea dreamed up by *MaM*'s creators. Thus, from the very start of this lawsuit, through not one but two amended complaints, Colborn has tethered his claims to *MaM*'s presentation of his testimony on three topics that took center stage during Avery's trial—the "jail call," the "dispatch call," and the discovery of the key to Teresa Halbach's vehicle—alleging that *MaM*'s editing of that testimony defamed him.

Now, faced with unassailable authority that *MaM*'s abridgment of this testimony and other underlying source material—editing that was obviously necessary to condense Avery's life story, including his five-week murder trial, into a 10-hour documentary—is not actionable, Colborn pivots. In his Opposition, he argues for the first time (1) that Netflix can be held liable for "republishing" statements made by Avery and his lawyers setting out their defense theory and (2) that *MaM* defames Colborn by implication and innuendo.

These new arguments fail as a matter of law. The First Amendment protects the alleged "republications" at issue here—statements that, when construed (as they must be) in the context of the documentary as a whole, accurately describe critical aspects of Avery's wrongful conviction for rape, exoneration, and subsequent conviction for murder and used them as a window through which to examine the workings of our criminal justice system. As for Colborn's

1

newly minted contention that *MaM* defamed him by implication, it too ignores the critical distinction between the questions *MaM* raised and the conclusions some (but certainly not all) viewers may have chosen to reach, but which the documentary itself is careful not to endorse.

By the same token, Colborn's Opposition largely ignores the most relevant authority—most notably, *Riley v. Harr*, 292 F.3d 282 (1st Cir. 2002)—that sets out and applies the First Amendment protections afforded to detailed explorations of the judicial process. Buried deep in his sprawling brief, Colborn argues that *Riley* and analogous cases do not control because they applied the law of states other than Wisconsin. *See* Opp. 41-42. This is a red herring—these cases rely on First Amendment principles applicable nationwide, in state and federal courts alike.

So, rather than grapple with law that is plainly not on his side, Colborn opts for diversion and distraction: parsing various common law and constitutional doctrines on which Netflix does *not* rely; citing cases with facts wholly detached from those at issue here; misinterpreting and mischaracterizing Netflix's actual arguments; and obfuscating the judicial task with an irrelevant expert report, an 18-page chart on "cinematic techniques," a litany of hearsay statements by ostensible *MaM* viewers whose own words reveal they are anything but "reasonable," and an ill-conceived request for discovery to salvage his claims.

Such misdirection will not, however, save Colborn's case. Wisconsin's common law is subject to the First Amendment, which demands that courts critically examine misguided defamation claims such as this one and dismiss them at the outset before imposing the expensive and onerous burdens of discovery. *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) ("[T]here is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation."); *see also Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) (recognizing that defamation suits can impose "grave risk of

serious impairment of the indispensable service of a free press in a free society."); *Dr. R.C. Samanta Roy Inst. of Sci. & Tech., Inc. v. Lee Enters.*, Nos. 05-C-422, 05-C-0423, 2006 U.S. Dist. LEXIS 53922, at \*16 (E.D. Wis. Aug. 2, 2006) (Griesbach, J.) ("[D]efamation lawsuits are almost universally disfavored by the law.").

There is much in Colborn's Opposition that the Court can disregard, and this Reply will help separate wheat from chaff. But first, it bears emphasis: if there is one case the Court should read, it is *Riley*, in which the First Circuit affirmed dismissal of libel claims arising from the book *A Civil Action*. Colborn has little to say about this case, other than that it "purport[s] to apply New Jersey law" and that, in discussing their respective protagonists' legal theories and factual allegations, *MaM* was somehow less transparent than *A Civil Action.* Opp. 42-43.

Upon watching *MaM*'s 10 episodes, the Court will see for itself that the documentary extensively presents the State's refutation of Avery's defense theory, the jury's rejection of that theory, and Avery's ultimate conviction. In short, this lawsuit is all but indistinguishable from *Riley*, which applied the *First Amendment* (not state law) in holding that, where the story of a judicial proceeding is told from a particular "voice"—where it allows readers and viewers access to the "inner musings" of the participants—what might in isolation seem capable of being proved true or false is not reasonably understood as an assertion of fact. *Riley*, 292 F.3d at 291-92. Simply put, where "it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise," the First Circuit explained, the statements are not actionable. *Id.* at 289 (citing *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).

Netflix is confident that the Court will come away from watching *MaM* understanding that, although it allows Avery and his lawyers to tell his side of the story, it is far from one-sided—that it falls far short of "lead[ing] viewers to the inescapable conclusion that Mr. Colborn

and others planted evidence to frame Avery for Halbach's murder." Opp. 3. Instead—as Colborn notes throughout his brief—the series "explore[s]," *id.* at 6, "questions," *id.* at 6, 10, and "invite[s] an examination" of the judicial process that led to his conviction, *id.* at 54, all of which is protected by the First Amendment.

I.    **Simplifying the judicial task**

This Reply will bring to 170 the number of pages of briefing on this motion, and Netflix is keenly aware that the task before the Court may seem daunting. However, on closer look—when extraneous, irrelevant information and arguments are set aside—the task is straightforward and dismissal entirely appropriate. Moreover, Colborn's contention that the Court should postpone decision until he is able to obtain and review video of the entirety of Avery's criminal trial is demonstrably without merit.

A.    **Certain facts and controlling legal principles are undisputed.**

The parties agree on many things, most notably that the Court must consider *MaM* as a whole in determining whether it is actionable. *See, e.g.*, Opp. 67, 75. Because *MaM* is the centerpiece of the SAC and therefore in the record, the Court can and should review the series for itself rather than rely on any party's characterization of it. The parties also agree that what Colborn claims is the overarching "gist" of *MaM*—that Colborn was a "corrupt police officer who planted evidence to frame an innocent man," *id.* at 3, 4—was an accusation first leveled by Avery's defense team at trial, *id.* at 38, 77. They also agree that it is standard fare for documentarians to express a point of view, and that viewers understand this. *Id.* at 67.

Likewise, the following material facts are contained within the four corners of the SAC itself and are undisputable: (1) When Colborn was a Manitowoc County corrections officer in the mid-1990s, he received a phone call from a detective in another jurisdiction who said an inmate

there was claiming to have committed an assault in Manitowoc County for which another man was wrongfully imprisoned (the "Jail Call"); (2) Colborn testified about the Jail Call both in a deposition taken in Avery's wrongful imprisonment lawsuit and at his murder trial; (3) at some point after Teresa Halbach went missing, Colborn called a sheriff's office dispatcher to check the license plate number for Halbach's then-missing SUV, which Colborn also testified about during Avery's murder trial; and (4) Colborn was present during a follow-up search of Avery's bedroom when the key to Halbach's vehicle appeared. There is no dispute that these events were central to Avery's defense that he was framed for Halbach's murder—and that it was Avery's defense team, not *MaM*, that first "weav[ed] together . . . the various strands" of Avery's story. Opp. 78.

**B.     Much of Colborn's Opposition is properly disregarded.**

**First**, many of the factual allegations in Colborn's Opposition must properly be disregarded as irrelevant, including:

- The five pages he devotes to repeating derogatory messages left on his office voicemail by anonymous cranks, Opp. 7-11, and the 18-page chart of purported "cinematic techniques" and associated discussion of a cinema studies professor's opinions about *MaM*, *id.* at 15-35. Beyond the sheer absurdity of this Court taking its cues from the sort of fringe viewers quoted in Colborn's Opposition (discussed *infra* at 17), the law is clear that "the defamatory effect of the [publication] is to be ascertained not from the viewpoint of a critic or language expert, but rather from that of a reader of reasonable intelligence who takes ordinary interest" in the publication at issue. *Christopher v. Am. News Co.*, 171 F.2d 275, 278 (7th Cir. 1948); *see also infra* at 16-17 & n.7.[1]

---

[1] Similarly irrelevant are the 32 bullet points ostensibly supporting Colborn's contention that "the last three episodes of MAM lodge an all-out assault on the verdicts issued against Avery and Dassey, paired with frequent odes to their innocence." Opp. 43. Spanning three pages, none of these examples have *anything* to do with Colborn. *Id.* at 43-46. Colborn complains, for example, that Episode 8 shows Avery shaking his head during the reading of the guilty verdict and his claims of innocence during his sentencing hearing—scenes which accurately depict what happened in the courtroom at those moments. *Id.* at 43-44. He also objects to *MaM*'s inclusion of defense counsels' criticism of the guilty verdict against Brendan Dassey, even though Colborn was not involved in that case. *Id.* at 44. Strangely, Colborn even protests *MaM*'s inclusion of an

- The collection of statements *MaM*'s producers made about the series after its release, Opp. 5-7—though Netflix has no real objection to their consideration. If anything, those statements support Netflix's position that *MaM* raises questions but does not reach conclusions. As Colborn acknowledges, the producers publicly stated that the evidence against Avery was "compelling" but that proving his guilt or innocence was not the point. Rather, *MaM*'s mission was to ask viewers whether they could "trust the verdict" and the "process." In any event, and as discussed further below, *infra* at 19-20, the producers' statements *about MaM* are not relevant to *this* motion because they were not made within the context of the documentary itself.

- The extended discussion of how courts and juries assess witness credibility and the admissibility of video evidence. This Court is required to review *MaM* from the standpoint of a reasonable *viewer* of a documentary television series, not a judge or jury asked to make credibility determinations at a trial. Opp. 55-57, 78. Not surprisingly, therefore, Colborn's reliance on this inapposite body of law proves far too much—if, as he contends, *see id.* at 55-56, such credibility determinations require observation of the demeanor of the entirety of the testimony of every witness called during the course of a trial, it would be impossible (and therefore presumably forbidden) for a documentarian to do anything other than record and then replay an entire trial for a television audience. This is most certainly not the law.

**Second**, the Court need not concern itself with a number of libel law doctrines discussed in Colborn's Opposition for the simple reason that Netflix nowhere relies on them. For example, although Colborn concedes that Netflix does not rely on the so-called "neutral reportage" doctrine, he nevertheless devotes multiple pages to arguing that it should not apply. *Id.* at 40-41. Other legal theories Netflix never advances, but which Colborn nevertheless deems necessary to address in his Opposition, include "rational interpretation," *id.* at 52-53, 82; "incremental harm," *id.* at 47; and Wisconsin's common-law substantial truth doctrine (which has been subsumed by the *constitutional* requirement of "material falsity" set forth in controlling cases such as *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991), and *Global Relief Foundation, Inc. v. New York Times Co.*, 390 F.3d 973, 987 (7th Cir. 2004)), *id.* at 36-38.

---

interview with a local radio reporter who opines that, after the murder conviction, the general feeling in the community was that Avery "got what he deserved." *Id.*

**Third**, Colbon takes a number of shots at the procedural propriety of Netflix's motion, each of which misses its mark. All of the exhibits to Netflix's opening brief either are referenced in and integral to the SAC or are properly subject to judicial notice under well-established Seventh Circuit precedent. *See* Mem. in Supp. of Netlix's Mot. to Dismiss ("Mem.") 2-3 & n.1, 38 & n.13 (Dkt. 119). Colborn wrongly accuses Netflix of "ignor[ing] proper procedure to obtain judicial notice of official documents" under Rule 201, Opp. 14, but the rule does *not* require a separate motion or specific procedure to request judicial notice; it merely requires that all parties be given notice and an opportunity to be heard. Fed. R. Evid. 201(d)-(e); *see also In re Lisse*, 905 F.3d 495, 497 (7th Cir. 2018) (Easterbrook, J.) (recommending that litigants request or oppose judicial notice in their briefs). Netflix's request for judicial notice is, therefore, not a "blatant transgression of the rules," Opp. 14, but rather precisely what Judge Easterbrook has described as the preferred procedure for doing so.[2]

### C.   Discovery is neither necessary nor appropriate.

Finally, notwithstanding Colborn's contention to the contrary, there is no need for discovery prior to the resolution of this motion in Netflix's favor. *See, e.g.*, *Estate of Enoch v. Tienor*, No. 07-C-376, 2008 U.S. Dist. LEXIS 13636, at *3 (E.D. Wis. Feb. 11, 2008) ("[T]he motion to dismiss challenges the legal sufficiency of the complaint, so discovery is not necessary for the Court to make its ruling."). Without citing any relevant authority from anywhere, Colborn insists he is entitled to discovery based not on any facts set out in his pleading, but purely on his

---

[2] Similarly, although Colborn acknowledges that this motion is not a prohibited "successive" motion under controlling Seventh Circuit precedent, Opp. 14-15, he ignores the fact it is the first motion directed at the SAC and thus is proper in any event. *See, e.g.*, *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1102 (10th Cir. 2017).

speculation that otherwise unidentified "raw footage" from Avery's criminal trial might be received differently by viewers than what was presented in *MaM*. Opp. 65-66.

This fishing expedition represents yet another pivot from the SAC, which urges the Court to make a "side by side comparison of the trial transcript" with footage of testimony shown in *MaM*. SAC ¶ 34; *see also id.* Ex. B. Now, faced with the reality that such a comparison confirms *MaM*'s accurate representation of the gist of that testimony, Colborn shifts to a new, two-fold argument: that production of raw trial footage might reveal (1) that *MaM* contains altered images—though there is no ground to believe that, and Colborn has never before alleged it or (2) that *MaM* selected portions of testimony where Colborn purportedly looked nervous or dishonest rather than relaxed and forthcoming. Courts have uniformly rejected such overtures to inject themselves into the editorial process and micromanage what are inherently subjective editing choices. *See Nix v. ESPN, Inc.*, 772 F. App'x 807, 814 (11th Cir. 2019) (emphasizing that courts must "afford news media editorial discretion"); *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 685-86 (9th Cir. 1990) ("the First Amendment cautions courts against intruding too closely into questions of editorial judgment") (citation omitted).[3]

Not surprisingly, therefore, Colborn misrepresents the holding of the one case he does cite, *Mach v. Allison*, 656 N.W.2d 766 (Wis. Ct. App. 2002). *Mach* does not support the proposition that courts must be able to compare a television broadcast against the raw footage

---

[3] Colborn's assertions about how his videotaped deposition testimony is presented in *MaM* illustrate the inherently subjective nature of such editorial choices. For example, Colborn claims that, in the deposition excerpts presented in *MaM*, his "gaze is not matched to the examining attorneys." Opp. 16. But, in the very passage he cites, Colborn makes eye contact with Avery's attorney four times and holds that gaze for several seconds. *See* Ep. 2 at 18:28-19:05. Colborn's further complaint that the document he is reviewing is not visible on screen is, at best, an overstatement: Avery's attorney expressly states that Colborn had reviewed "Exhibit 138" and the document is unmistakably reflected in Colborn's glasses as he testifies. *Id.*; Opp. 16-17.

from which it was compiled. The Wisconsin Court of Appeals properly analyzed the television news report at issue, considering the audio and video together as a whole; it did not hold or even imply that anything more was needed for the court to determine as a matter of law whether the broadcast conveyed the allegedly defamatory meanings claimed by the plaintiff. *Id.* at 778-80.

## II.    Argument

Colborn seeks to use the law to punish Netflix for telling the story of Avery's wrongful conviction, exoneration, and subsequent murder prosecution "long after [its] conclusion . . . to a worldwide audience." Opp. 38. He plainly resents not only *MaM*'s refusal to let Manitowoc County put the Avery saga behind it, but also *MaM*'s insistence that government officials' position is not the only one that matters. In support of his claim that *MaM* should not be permitted to tell Avery's life story by including the perspective of Avery and his family, Colborn relies on a panoply of common law rules, two of which (the "republication" and "implied libel" doctrines) he raises for the first time and all of which must bow to the First Amendment.

As the courts have consistently recognized, the First Amendment "severely limit[s]" the reach of the common law to avoid "sap[ping] the vigor of public debate, and [ ] frighten[ing] the press from even reporting to the public the few debates that might occur." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1097 (4th Cir. 1993). More specifically, under the First Amendment, defendants are not liable for repeating already-public accusations levied by or against public officials on a matter of significant public concern and debate, particularly when they include the contentions of *both* sides, as *MaM* undisputedly did.

### A.    Colborn's contention that Netflix can be liable for "republishing" statements made by Avery and his lawyers is incorrect as a matter of law.

In its opening Memorandum, Netflix demonstrated that *MaM* is not actionable in defamation for accurately describing Avery's frame-up defense because no reasonable viewer

would consider *Netflix itself* to be affirmatively asserting that Colborn was a crooked cop. *See*

Mem. 31-34. Colborn's newly minted response is, essentially, that tale bearers are as bad as tale

makers—that "Repetition of Third-Party Statements is Not 'Truth,'" Opp. 36—and that *MaM*

therefore defamed him by repeating accusations leveled at Colborn by Avery and his relatives,

supporters, and defense attorneys. *Id.* 37-46. This argument misstates and ignores both

controlling First Amendment precedent and the contents of *MaM* itself.

Netflix does not dispute that, at common law, a defendant can be liable for republication

of a third party's defamatory statements. But the republication doctrine does not override the

First Amendment's protections, which include imposing the burden on Colborn to prove material

falsity and the fundamental requirement that the Court assess such falsity by reviewing

challenged statements in full, in context, and from the perspective of a reasonable viewer. *See,*

*e.g.*, *Bd. of Forensic Document Exam'rs, Inc. v. ABA*, 922 F.3d 827, 832 (7th Cir. 2019)

("Context is key, as it matters not only what was said, but who said it, where it was said, and the

broader setting of the challenged statements."); *see also Snyder v. Phelps*, 580 F.3d 206, 219 (4th

Cir. 2009) (courts evaluating whether statement is actionable must "assess how an objective,

reasonable reader would understand a challenged statement by focusing on the plain language of

the statement and the context and general tenor of its message"), *aff'd*, 562 U.S. 443 (2011).

Courts have recognized that journalism, including documentary filmmaking, would be

impossible under the narrow interpretation of the republication rule that Colborn advocates

because documentarians and other journalists would be required to determine the accuracy of

every potentially defamatory charge or counter-charge and would be permitted to repeat only the

ones they determined to be "correct." As Judge Sack explains in his authoritative treatise on the

law of defamation, by requiring, *inter alia*, consideration of an allegedly defamatory statement in

the context of the entire publication in which it is contained, the law of defamation "soften[s]" the deleterious impact that republication liability would otherwise impose. 1 Hon. Robert D. Sack, SACK ON DEFAMATION § 2:7.1 (5th ed. 2017).

Application of this principle in this Circuit is exemplified by *Global Relief. See* 390 F.3d 973. In that case, the plaintiff charity argued that articles reporting the government was investigating whether it had financial links to terrorist groups amounted to a republication of third-party allegations that it was in fact funding terrorism. *Id.* at 980-81. But the Seventh Circuit, reviewing the challenged allegations in the context of the articles in which they were contained, agreed with the district court that the gist of those articles was that, based on those allegations, the plaintiff was being investigated, not that it was in fact involved in financing terrorism—and *that* gist was substantially true. *Id.* at 986-87. The Court of Appeals firmly "reject[ed] GRF's argument that these media defendants must be able to prove the truth of the government's charges before reporting on the investigation itself." *Id.* at 987.

*Global Relief* is dispositive of Colborn's efforts to invoke the republication doctrine in this case. The story of Avery's murder trial cannot be told without explaining his defense theory that Colborn and other law enforcement officials planted evidence. As a result, Netflix is not obliged to suppress that part of the story. As the Seventh Circuit recognized in *Global Relief,* to hold otherwise would eviscerate the ability of journalists and documentarians to discuss a wide range of disagreements on issues of public concern.

Colborn contends that *Global Relief* is somehow not binding on this Court because, he says, it "was decided based on the court's interpretation of Illinois law." Opp. 41. Not so. The Seventh Circuit affirmed dismissal of the defamation claims in *Global Relief* because of the *First Amendment's* requirement that substantially true statements are not actionable as defamation.

*Global Relief*, 390 F.3d at 982 ("the rule making substantial truth a complete defense and the constitutional limits on defamation suits coincide") (citing *Haynes*, 8 F.3d at 1228). The fact that substantial truth also is a complete defense to a defamation claim under Illinois common law (as it is in Wisconsin, *see Lathan v. Journal Co.*, 140 N.W.2d 417, 423 (Wis. 1966)) does not detract from the constitutional mandate that defendants may be held liable for only those statements that are materially false and defamatory *when understood in context*. Thus, even if *Global Relief* were to "conflict with Wisconsin precedent governing republisher liability," Opp. 41, that Wisconsin precedent would have to yield to the federal constitutional principle the Seventh Circuit recognized and applied in *Global Relief*.

Colborn further attempts to distinguish *Global Relief* by pointing out that it involved reports about a government investigation. Opp. 41. But that fact does not help him because *MaM* is also about government investigations and criminal proceedings. Here, as the defendants successfully argued in *Global Relief*, requiring Netflix to prove the precise truth of every allegation made by Avery and his attorneys "would dramatically and improperly chill the ability of the press to report on the actions of government and would deny the public information about matters of vital public concern." *Global Relief*, 390 F.3d at 985. And, in any event, other courts have applied the rule articulated in *Global Relief* to, for example, allegations of sexual assault even when no government investigation is underway. *See, e.g.*, *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 649 (8th Cir. 1985) (report of "historical fact" of years-old rape allegations against public official was substantially true), *on reh'g en banc,* 788 F.2d 1300, 1301 n.2 (1986).

Considering *MaM* as a whole and in context as the law requires leads to the inevitable conclusion that no reasonable viewer would interpret it as an affirmative factual assertion *by Netflix* that Colborn was a "corrupt police officer who planted evidence to frame an innocent

man." Opp. 3, 4 (citing SAC ¶ 20). The reality that the framing theory is presented as Avery's *defense*, not some empirical fact, is unmistakable in the context of *MaM* because viewers hear it in Avery's and his defenders' own voices, not via the detached reporting of a putatively objective journalist or narrator. Reasonable people understand that a man accused of murder has strong incentive to accuse law enforcement of misconduct; the notion that such viewers would consider Avery's commentary to be that of an objective narrator laying out the gospel truth strains credulity. *See* Opp. 18, 22. For the same reason, reasonable viewers understand that Avery's lawyers are not disinterested experts speaking with the "Voice of God," but advocates for their client both in and out of court. *See id.* at 23. Likewise for his friends and family. As such, it insults the intelligence of *MaM's* millions of viewers to suggest that any reasonable subset of them uncritically believed that everything said in *MaM* by a convicted murderer, his family, and his defense lawyers had been confirmed as accurate and was endorsed by the documentary itself.

To the contrary, reasonable viewers understand that law enforcement officers such as Colborn are frequently the target of accusations of misconduct by defendants and their lawyers— some true, many not—and those viewers can be enlightened by the sparring without confusing the views expressed by one of the combatants with those held (but not expressed in the documentary itself) by its creators.[4]  If the law were otherwise, and "republication" of such

---

[4] On that point, Colborn engages in pure sophistry by suggesting that Netflix's opening Memorandum did not cite portions of *MaM* that showed Avery's "framing" theory had been rejected by jurors and judges or include prosecutors' and experts' refutations of that theory. Opp. 42-43. Netflix provided extensive citations to those portions of *MaM* on pages 10-12 and 19-21 of its memorandum, including portions of an interview with an undersheriff who scoffs at the framing defense, Ep. 3 at 22:44-23:24; footage of prosecutor Kenneth Kratz's labeling of the evidence-planting allegation as false and "deplorable," Ep. 7 at 13:58-14:52; and Avery's own brother expressing belief in his guilt, Ep. 3 at 41:49-53. In fact, *MaM* faithfully details both the prosecution's theories and evidence, including extensive portions of the testimony of an FBI expert refuting the claim that Avery's blood in Halbach's SUV came from a vial in the court clerk's office, Mem. 41 (citing Ep. 7 at 39:52-44:56), as well as long excerpts from Kratz's

statements were actionable in defamation regardless of the context in which they are presented, then no one, including those seeking to defend the actions of a law enforcement officer such as Colborn, could repeat such statements, even for the purpose of rebutting them.[5] As the Seventh Circuit explained in *Global Relief*, that is not the law.

### B. Colborn's alternative theory that *MaM* defamed him by implication fails the First Amendment's rigorous, two-part test for libel-by-implication claims.

Beyond his inapposite invocation of the republication doctrine, Colborn now complains for the first time that *MaM*'s retelling of Avery's frame-up defense defamed him "by implication." Opp. 75. This new theory—that *MaM* defamed him through "insinuation on top of innuendo," *id.* at 15—is similarly and definitively precluded by the First Amendment.

As an initial matter, in the SAC, Colborn claimed that *MaM* defamed him through "false statements and communications." *E.g.*, SAC ¶¶ 59-64, 66-67. That operative pleading (his third effort at pleading) makes only a single reference to an allegedly defamatory implication, *id.* ¶ 39, and it contains not one mention of "innuendo." Now, however, Colborn asserts that *all* of the challenged portions of *MaM* "directly *or by innuendo* accuse, insinuate, and suggest" defamatory implications about him. Opp. 74 (emphasis added). Because a complaint may not be amended by the briefs in opposition to a motion to dismiss, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011), this Court can and should reject Colborn's newfound libel-by-implication claim out of hand.

---

closing argument in which he calls the planting defense "ludicrous" and asserts that he only had to call one witness—the FBI expert—to debunk the blood-planting allegation, *id.* at 21 (citing Ep. 8 at 6:23-7:26).

[5] Such a rule would enable Colborn to sue successfully his own counsel for his multiple "republications" of Avery's defense theories in the three books he has written on the subject.

Even if this Court entertains Colborn's libel-by-implication theory, it still would fail on its merits. "[B]ecause the Constitution provides a sanctuary for truth," Colborn must make an "especially rigorous" showing to survive this motion. *Chapin*, 993 F.2d at 1092-93 (citing *White v. Fraternal Order of Police*, 909 F.2d 512, 519-20 (D.C. Cir. 1990)). The First Amendment instructs that a libel-by-implication claim must be dismissed unless both the challenged language can "be *reasonably* read to impart the false innuendo," *and* that the publication on its face affirmatively suggests that "the author *intends or endorses* the inference." *Id.* (emphases added). Courts across the country have recognized and adopted this two-prong test.[6] Colborn fails to demonstrate that *MaM* satisfies either prong, let alone both.

> ### 1.      *MaM* does not *reasonably* imply that Colborn in fact framed Avery.

As Netflix explained in its opening Memorandum, reasonable viewers of *MaM* would not understand the series to convey the defamatory meaning that Colborn in fact framed or assisted in framing Avery. Mem. 31-34. Colborn is unable to demonstrate otherwise.

**First,** his Opposition cites at length from the declaration of a professor of "English and Cinema Studies," who opines on the "visual and structural techniques" that, he believes, created for viewers an "impression" of misconduct by Colborn. Opp. 15-17, 63, 65, 67. The Wisconsin Supreme Court has, however, expressly held that "it is the duty of the court to determine *from the publication itself* whether it bears the interpretation given to it by the plaintiff in his

---

[6] *See, e.g.*, *White*, 909 F.2d at 520; *Wyo. Corp. Servs. v. CNBC, LLC*, 32 F. Supp. 3d 1177, 1189 (D. Wyo. 2014); *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 437 (S.D.N.Y. 2006); *Howard v. Antilla*, 191 F.R.D. 39, 44 (D.N.H. 1999); *Johnson v. CBS*, 10 F. Supp. 2d 1071, 1075 (D. Minn. 1998); *Verity v. USA Today*, 436 P.3d 653, 667 (Idaho 2019); *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 635 (Tex. 2018); *Stepanov v. Dow Jones & Co., Inc.*, 120 A.D.3d 28, 37 (N.Y. App. Div. 1st Dep't 2014); *Moore v. Sun Publ'g Corp.*, 881 P.2d 735, 741 (N.M. Ct. App. 1994).

complaint," and that "[t]he court is *not* aided in this determination by the affidavits of third parties as to how they or other persons interpreted it." *Puhr v. Press Publ'g Co.*, 25 N.W.2d 62, 65 (Wis. 1946) (emphases added).[7] Likewise, the Seventh Circuit has emphasized that, "when reviewing a motion to dismiss" in a defamation case, a court has no obligation to "take *the plaintiff's* interpretation of the allegedly defamatory words at face value." *Lott v. Levitt*, 556 F.3d 564, 569 (7th Cir. 2009) (emphasis added). Ancillary elements of a challenged report, such as the "dramatic intonation" of a news reporter, are not "sufficiently distinctive to convey a clear implication to [] viewers," whether "standing alone or in combination with other factors." *White*, 909 F.2d at 526. The professor's declaration that Colborn attempts to put before the Court therefore has no bearing on this Court's task of evaluating what, if any, implication *MaM* reasonably conveys about Colborn.

**Second**, and relatedly, Colborn argues that "viewers' reactions to *MaM*, both online and in angry verbal attacks directed at Mr. Colborn, reflect that they understood *MaM* as irrefutably establishing" wrongdoing on Colborn's part. Opp. 7-11. This argument fails as a matter of both law and logic. On the law, as just discussed, random third parties' reactions to and interpretations of a challenged publication are irrelevant to the court's determination of whether the challenged speech is reasonably capable of conveying an allegedly false and defamatory implication. *Puhr*, 25 N.W.2d at 65. The logical flaw is even more striking. Colborn alleges that "MAM ha[s] been

---

[7] *See also Christopher*, 171 F.2d at 278 (in deciding "defamatory effect" of publication, what matters is reasonable reader, not "viewpoint of a critic or language expert"); *Farah v. Esquire Magazine*, 736 F.3d 528, 535-37 (D.C. Cir. 2013) (in considering motion to dismiss, the court properly asks not how "some actual readers" viewed the challenged report, but how "the hypothetical reasonable reader" would); *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004) ("The appropriate inquiry is objective, not subjective. Thus, the question is not whether some actual readers were misled, as they inevitably will be, but whether the hypothetical reasonable reader could be.").

seen by 19.3 million viewers," Opp. 3, yet he asks the Court to evaluate what is a "reasonable" interpretation of the series based on snippets of the reactions of a dozen or so unnamed persons—who may not have seen any of *MaM*, let alone all of it—but took the demonstrably *unreasonable* action of tracking down Colborn's contact information and leaving him hate-mail, *id.* at 7-10. Courts do not conduct straw polls to determine whether a publication or broadcast is reasonably capable of conveying an allegedly defamatory meaning—and even if they did, they would hardly rely on such an unrepresentative and unreliable sample.[8]

**Third**, Colborn brushes off analogous cases that Netflix cites from the Seventh and Eighth Circuits—which held that reporting on allegations of misconduct does not imply the *truth* of those allegations—by characterizing them as creatures of Illinois and South Dakota law, respectively. Opp. 41-42. But, as discussed *supra*, the Seventh Circuit in *Global Relief* relied on constitutional principles in holding that "media defendants" need not "be able to prove the truth" of allegations the government was investigating before reporting about them. 390 F.3d at 987. Indeed, the Court of Appeals principally relied on an Illinois appellate court decision that itself

---

[8] Although equally irrelevant to the legal issue before this Court, Netflix notes that a 2017 poll of Wisconsin residents by St. Norbert College found only 22 percent believed law enforcement fabricated evidence against Avery. Doug Schneider, *Poll: 22% think police fabricated Avery evidence*, GREEN BAY PRESS GAZETTE (May 12, 2017), https://www.greenbaypressgazette.com/story/news/local/steven-avery/2017/05/12/poll-22-think-police-fabricated-avery-evidence/101564682/. Moreover, the irrelevance and inadmissibility of the hysterical, and demonstrably unreasonable, online posts and messages directed at Colborn is punctuated by the equally ugly messages directed at *MaM*'s producers. *E.g.*, zellnerissuper, *How is this acceptable?*, REDDIT (Oct. 13, 2019, 11:15 AM), https://www.reddit.com/r/StevenAveryIsGuilty/comments/dh4cj1/how_is_this_acceptable/f3lulq 6/ (commenter referring to producers Laura Ricciardi and Moira Demos by the epithet "the cowardly docut***s"); deathwishiii, *Monsters*, REDDIT (June 19, 2019, 8:46 AM), https://www.reddit.com/r/StevenAveryIsGulity/comments/c2dcnx/monsters/ (commenter stating that vulgar epithet "is too kind..psychopaths fits."); klasikvhs, *Karma is a bitch* (review of *Making a Murderer*), IMDB (Jan. 1, 2016), https://www.imdb.com/review/rw3385712/?ref_=tt_urv (stating that producers "are hacks" who "greedily put their names in the credits").

described the doctrine at issue as "rooted in the United States Constitution." *Gist v. Macon Cty. Sheriff's Dep't*, 284 Ill. App. 3d 367, 371 (1996) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) and *Masson*, 501 U.S. 496). The Eighth Circuit case, in which the court affirmed dismissal of a libel claim because reporting on the "historical fact" of a rape allegation "cannot be read to imply that [the publication] espoused the validity" of that accusation, likewise principally relied on the Supreme Court's decision in *Garrison v. Louisiana*, 379 U.S. 64 (1964). *See Janklow*, 759 F.2d at 649. The First Amendment, not idiosyncrasies of state law, instructs that *MaM* did not reasonably imply that Colborn framed Avery merely because it reported on his and his lawyers' allegations to that effect.

Because Colborn cannot satisfy even the first prong of the two-prong test for libel-by-implication claims, his belated attempt to adopt this theory of the case fails at the outset.

### 2.   *MaM* does not *endorse* the proposition that Colborn framed Avery.

Even if *MaM* could reasonably be understood to convey the implication that Colborn framed Avery, and it cannot, his libel-by-implication theory still would fail because *MaM* does not communicate to viewers that the documentary *endorses* that implication as true. Quite the contrary, *MaM* embraces the ambiguity over the circumstances of Halbach's death and Avery's ensuing conviction, informs viewers that the "framing" theory has been rejected by jurors and judges alike, quotes observers who believe that Avery is guilty, including his own brother, and shows excerpts from interviews with and news conferences held by law enforcement officials who expressly and in no uncertain terms reject the idea that Avery was framed. *See* Mem. 19-21.

Not surprisingly, Colborn's Opposition nowhere even purports to grapple with the endorsement prong because any such attempt would not survive reasonable scrutiny. The closest he comes is his contention that Defendants Demos and Ricciardi made statements outside of

*MaM* that, according to Colborn, suggest they agree with Avery's framing theory. *See, e.g.*, Opp. 5-7. This argument, too, fails for multiple reasons.

**First**, the "endorsement" prong of the implication test turns on "[t]he language" of the challenged report itself, not the subjective beliefs of the defendant. *Chapin*, 993 F.2d at 1093; *Tatur v. Solsrud*, 498 N.W.2d 232, 234 (Wis. 1993) ("[W]ords must be reasonably interpreted and … construed . . . *in the context in which they were used and under the circumstances they were uttered*." (emphasis added) (citation omitted)). Statements made outside the four corners of the documentary by its producers have no bearing on the analysis.

**Second**, even if the Court were to consider the quotes from Demos and Ricciardi that Colborn selectively included in his Opposition, they simply cannot be reasonably read to endorse the claimed implication. The statement that Avery's framing theory may have "inspired" Defendant Ricciardi to "begin work" on *MaM*, for example, says nothing about whether she *endorses* that theory. Opp. 6. Likewise, "referr[ing] to statements by Avery's attorneys . . . that the evidence that had been presented at trial showed that the police had misused evidence against Avery" says nothing about whether Demos agrees with those statements, let alone that those statements endorse the specific proposition that Colborn himself participated in framing Avery. *Id.* at 6-7. In fact, the Opposition itself notes not only that Demos and Ricciardi have affirmatively stated that "there was not enough evidence in the show to determine Avery's guilt *or* innocence," *id.* at 5 (emphasis added), but also that they have characterized the "'story' as one that explored" questions including "[I]s the process fair?" and "Can we trust the verdict?," *id.* at 6. As the Fourth Circuit has explained:

> [T]he mere raising of questions is, without more, insufficient to sustain a
> defamation suit in these circumstances. Questions are not necessarily accusations
> or affronts. Nor do they necessarily insinuate derogatory answers. They may
> simply be, as they are here, expressions of uncertainty. The [challenged] article

advances alternative answers to the questions it raises, presenting both favorable and unfavorable views, but does not ultimately adopt any particular answer as correct. From this, a reasonable reader would not be likely to conclude that one answer is true and the other false.

*Chapin*, 993 F.2d at 1098 (quoting *Chapin v. Greve*, 787 F. Supp. 557, 567 (E.D. Va. 1992)).

*MaM* likewise "advances alternative answers to the questions it raises, presenting both favorable and unfavorable views, but does not ultimately adopt any particular answer as correct" and, in doing so, it does not endorse the "answer" that Colborn in fact framed Avery.

In short, Colborn's attempt to recast his claim into one of libel-by-implication fares no better than his original theory of the case. Even if the Court entertains this argument, it remains the case that *MaM* does not defame Colborn as a matter of law.

**C.**     **Colborn misconstrues Netflix's reliance on the First Amendment doctrine that expressions of opinions based on fully disclosed facts are protected from liability.**

In its opening Memorandum, Netflix further demonstrated that, even if *MaM* conveyed the implication that Colborn framed Avery, that implication cannot give rise to a libel claim in these circumstances because it would amount, at most, to a nonactionable opinion based on fully disclosed true or privileged facts. Mem. 34-35. Colborn responds to this argument by misapprehending the opinion-based-on-disclosed-fact doctrine and misdirecting the Court to inapposite precedent rather than the controlling current case law of Wisconsin and this Circuit.

Colborn initially asserts that Netflix's "argument that [*MaM*] expresses an opinion is necessarily inconsistent with their prior assertion that they merely accurately reported substantially true facts." Opp. 66. This reflects a basic misunderstanding of Netflix's argument: As Netflix's opening Memorandum explains, *MaM* does not stake out a position on whether Avery is guilty or innocent—rather, it explores and raises questions about his arrest and prosecution. If the Court were to find that *MaM* does reasonably convey such a position,

however, that position would necessarily be based on the substantially true or privileged facts disclosed in the documentary itself, and would therefore constitute non-actionable opinion.

In his Opposition, Colborn ignores the basic and widely accepted principle that the First Amendment protects two analytically distinct types of opinions: (1) completely subjective expressions of belief that are not capable of proof or disproof, often called "pure" opinions; and (2) conclusions based on fully disclosed true or privileged facts. Colborn concedes that the First Amendment protects the former, Opp. 67, but ignores that both the Wisconsin Court of Appeals and Seventh Circuit have concluded it also protects the latter, *see, e.g.*, *Marjala v. Fox News Network LLC*, 2017 WI App 7 ¶ 23, 895 N.W.2d 103 ("opinions on a matter of public interest based on true, disclosed facts" not actionable); *Stevens v. Tillman*, 855 F.2d 394, 400 (7th Cir. 1988) ("When . . . an opinion discloses the defamatory facts (or refers to facts in the public record), it is not actionable apart from those facts."). It is therefore entirely *consistent* to argue, as Netflix has, that even if *MaM* implies that Colborn framed Avery, that implication is protected under the First Amendment because it is based on facts that *MaM* disclosed for its viewers' own consideration.

Colborn attacks Netflix's opinion argument largely by citing the Second Circuit's decision in *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2d Cir. 1980), which he claims holds that "accusations of criminal conduct" are exempt from the constitutional protections for opinions. Opp. 67-68. This is, of course, an untenable proposition,[9] even if it were an accurate description of the case, which it is not: the Court in *Cianci* held that the First Amendment restrictions on defamation actions by public officials fully apply to those involving accusations

---

[9]  Under such a theory, for example, anyone who watched the O.J. Simpson trial and subsequently voiced her view that "he did it" would be exposed to defamation liability.

of criminality and that "even when the statement includes a term which could refer to criminal conduct," it is not actionable "if the term could not reasonably be so understood in context." 639 F.2d at 64. Moreover, the Court in *Cianci* declined to recognize the opinion-based-on-disclosed-facts doctrine because it did not find support for the principle in "pre-Restatement Supreme Court decisions," prior Second Circuit precedent, or New York or California case law. *Id.* at 64-65. Wisconsin courts and the Seventh Circuit, by contrast, have repeatedly recognized and applied the opinion-based-on-disclosed-facts doctrine. *See, e.g.*, *Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1268 (7th Cir. 1996); *Terry v. Journal Broad. Corp.*, 2013 WI App 130 ¶ 23, 840 N.W.2d 255.

It is no surprise that Colborn avoids grappling with this aspect of the opinion doctrine, because it is central to the "true crime" cases that he hopes this Court will ignore. Opp. 12-13. In *Partington v. Bugliosi*, for example, the Ninth Circuit held that, where a challenged publication "merely outlines a set of facts, allowing the reader to draw his own conclusion about them," even if that publication conveys an allegedly defamatory implication, it is nonetheless nonactionable because the defendant "can only be said to have expressed his own opinion after having outlined all of the facts that serve as the basis for his conclusion." 56 F.3d 1147, 1156 (9th Cir. 1995). In *Riley*, the First Circuit likewise concluded that the alleged implication from *A Civil Action* that the plaintiff lied was protected by the First Amendment because it either was "a subjective view, an interpretation, a theory, conjecture, or surmise," or a conclusion based on truthful and/or privileged information disclosed to readers such that they "might draw contrary conclusions" on their own. 292 F.3d at 292. And in *Peterson v. Grisham*, the Tenth Circuit recognized that, even if the defendants had expressed "erroneous" views about a case they saw as "a miscarriage of justice," the First Amendment nevertheless commands that "we depend on the marketplace of

ideas—not the whim of the bench—to correct insidious opinions." 594 F.3d 723, 729 n.7 (10th Cir. 2010).

In sum, even if viewers come away from watching *MaM* with the impression that Colborn framed Avery, under the First Amendment any such implication constitutes a constitutionally protected opinion based on the uncontroverted facts set out in *MaM* itself.

### D. Colborn misconstrues Netflix's reliance on the subsidiary meaning doctrine, which renders examination of specific statements contained in *MaM* unnecessary.

As Netflix has explained, the subsidiary meaning doctrine holds that, once the Court determines that the overall gist and sting of *MaM* is not actionable for the reasons set forth *supra*, it need go no further to dismiss this action in its entirety. *See* Mem. 30-31, 35-36 (citing *Church of Scientology Int'l v. Time Warner, Inc.,* 932 F. Supp. 589, 595 (S.D.N.Y. 1996), *aff'd,* 238 F.3d 168 (2d Cir. 2001)). Put simply, under the First Amendment, "when a 'published view' of a plaintiff is not actionable as libel, other statements made in the same publication are not 'actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which it has been held that there can be no recovery.'" *Church of Scientology*, 238 F.3d at 175 (quoting *Herbert v. Lando*, 781 F.2d 298, 312 (2d Cir. 1986)); *see also Desnick v. ABC, Inc.*, No. 93 C 6534, 1999 U.S. Dist. LEXIS 994, at *19-20 (N.D. Ill. Jan. 26, 1999) *aff'd on other grounds,* 233 F.3d 514 (7th Cir. 2000).

In this case, the gist and sting of *MaM* is that Avery's attorneys presented a defense at trial and on appeal that Colborn and others framed him, that the jury rejected the defense, and that the verdict was affirmed on appeal. *See* Mem. 31. As Netflix has explained *supra,* that overarching meaning is not actionable as a matter of law. *See Global Relief*, 390 F.3d at 986-87; *see also supra* at 9-14. And, even if the Court accepts Colborn's self-serving characterization of the gist and sting—that *MaM* itself endorses the notion that he is a "corrupt police officer who

planted evidence to frame an innocent man," *see* Opp. 3, 4—the subsidiary meaning doctrine still applies because, as explained *supra*, any such conclusion constitutes a constitutionally protected expression of opinion based on disclosed facts. *See Stevens*, 855 F.2d at 400; *supra* at 20-23. Either way, under the subsidiary meaning doctrine, specific statements and defense theories included in *MaM*, which "imply the same view," are rendered non-actionable as well because they are "simply an outgrowth of and subsidiary to" the overarching, non-actionable gist or sting of the series construed as a whole. *Church of Scientology*, 238 F.3d at 175.

Colborn's only response to this argument is a *non sequitur*: the assertion that an accusation of criminal conduct cannot be "subsidiary" to a broader defamatory meaning. Opp. 74. He does not cite any authority for the proposition that there is an "accusation of criminal conduct" exception to the doctrine, because there is none. The only case that Colborn cites, *Skakel v. Grace*, is inapposite because its discussion of the subsidiary meaning doctrine is pure *dictum*. 5 F. Supp. 3d 199, 212 (D. Conn. 2014).[10] Further, the court theorized that the doctrine would not apply because the challenged statements relied on DNA evidence not presented at Skakel's murder trial (and which did not actually exist), while Avery's allegations against Colborn and others were, of course, his entire defense at trial. *Id.* at 212-13.

In short, because *MaM*'s overall gist regarding Colborn is not actionable, neither are the specific challenged portions of the series. Even so, as Netflix explained in its opening Memorandum and discusses further below, Colborn's attacks on specific portions of *MaM* fail.

---

[10] The court concluded the doctrine did not apply because Skakel (unlike Colborn) was not a public official or public figure.

### E. Colborn misapprehends Netflix's reliance on *Masson* and the Supreme Court's articulation of the "material falsity" requirement.

Colborn concedes, as he must, that the First Amendment guarantees content creators the editorial discretion to condense, reorder, and otherwise alter an interviewee's quotes and other source material without fear of defamation liability unless "the published statements materially differed in meaning from the statements that the speaker actually made." Opp. 51-52 (citing *Masson*, 501 U.S. at 517); *see also Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852 (2014) (reaffirming *Masson*); *Maguire v. Journal/Sentinel*, 198 Wis. 2d 389 (Ct. App. 1995) ("it is acceptable to condense or paraphrase . . . as long as the summary accurately and fairly reflects what transpired"). Colborn further acknowledges that, to determine whether such a "material change in meaning" has occurred, courts properly ask whether the edited content "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Opp. 51-52 (quoting *Masson*, 501 U.S. at 517). Based on these settled First Amendment principles, Netflix showed in its opening Memorandum that the editorial decisions made in *MaM* that Colborn challenges in the SAC do not give rise to a viable defamation claim.

Colborn persists in arguing, however, that *MaM* "openly invited an examination of [his] credibility based on edited portions and splice[s] of testimony that were effectively scripted to fit its narrative and thesis." Opp. 54. As an initial matter, "inviting an examination" is just another way to say "posing questions," and "it is generally settled as a matter of defamation law . . . that a question, 'however embarrassing or unpleasant to its subject, is not accusation.'" *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015) (Kavanaugh, J.) (quoting *Chapin*, 993 F.2d at 1094). Moreover, as the Court can and should determine for itself, the editorial choices that Colborn challenges yielded *no* changes in meaning, let alone the required *material* changes. Rather than address Colborn's page after page of repetitive assertions on this

point, *see* Opp. 58-65, a few examples are illustrative of how Colborn relies on unremarkable editing that does not serve to effect any change in meaning:

- Colborn complains that in condensing his testimony regarding the Jail Call, *MaM* (1) did not include how he identified himself when he answered the phone; (2) omitted his "clarification" that he transferred the call to the "Detective Division" rather than to "a detective"; and (3) presented the State's questions consecutively rather than broken up into direct and re-direct phases, *Id.* at 60;

- Colborn complains that *MaM* shows him answering "No sir" to a question where, at trial, he answered "No, I don't," which he claims is "more forceful," *Id.* at 61;

- Colborn complains that, in condensing his extensive testimony about the Key, *MaM* shows him answering a question, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not," rather than depicting his actual answer at trial, "That's ridiculous, no I have not," because he again contends the edited version is "less forceful," *Id.* at 62-63; and

- Colborn complains that *MaM* did not show his "repeated denials in direct examination that he planted evidence," because *MaM* chose to consolidate them into a single question-and-answer, *Id.* at 63.

None of these edits (or the others on which Colborn relies) rises to the level of a "material change in meaning" under *Masson*, where the Supreme Court found no such change even when the defendant quoted plaintiff making a statement he concededly never made, because the "words attributed to [plaintiff] did not materially alter the meaning of his [actual] statement." 501 U.S. at 524 (no material difference between "it sounded better" and he "just liked" it).

Ultimately, Colborn's libel-by-editing claim reveals itself to be much ado about nothing. Colborn characterizes Netflix as claiming "unfettered discretion to edit testimony," Opp. 57, but of course Netflix makes no such claim. Rather, Netflix acknowledges that it is limited in its editorial discretion by *Masson* and its progeny, just like any other content creator. The fault in Colborn's argument is that he does not and cannot demonstrate that *MaM* ever strayed *beyond* those bounds, because none of the basic editorial judgments discussed above—or the others that

Colborn identifies in his Opposition—creates a "material change in meaning" that can give rise to a claim for defamation-by-editing.[11]

As the Supreme Court has explained, "[a]ny departure from full direct quotation of the words of a source, with all its qualifying language, inevitably confronts the publisher with a set of choices." *Time, Inc. v. Pape*, 401 U.S. 279, 290-91 (1971); *accord Janklow*, 788 F.2d at 1306 ("Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors."). Colborn disagrees with the choices made in *MaM*, and the First Amendment protects his right to express that disagreement in civil discourse. It does not permit him to punish those choices through this civil suit.

### F.     Colborn has failed to state claims for intentional infliction of emotional distress and negligence.

The Supreme Court has unequivocally held that public figures and public officials such as Colborn cannot evade the First Amendment's restrictions on defamation actions by framing their claims as another tort such as intentional infliction of emotional distress or "negligence." *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (public-figure plaintiff cannot make out a claim for intentional infliction of emotional distress premised on speech absent proof of a false statement made with actual malice); *see also* Mem. 47-48. In attempting to salvage his tag-along claims for IIED and negligence, Colborn not only ignores this precedent

---

[11] Colborn's further insistence that *MaM* should have featured a "disclaimer" notifying viewers that it contained edited content, Opp. 54, is both unsupported and unsupportable. The Supreme Court has instructed that content creators need not "state the obvious" through labels or disclaimers for their work to receive the full protections of the First Amendment and relevant laws. *See, e.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 583 n.17 (1994) (no parody label necessary to receive fair use protection). And, *MaM* explains to viewers that Avery's trial lasted *five weeks*, all of which could not possibly be included, unabridged, in a 10-hour series, and no reasonable viewer would have expected as much or required a disclaimer to say so.

and misrepresents the cases he does cite, he asserts that the law is the opposite of what it is. Opp. 87-89. As a result, these claims must be dismissed with prejudice as well.

### 1.    The First Amendment bars Colborn's IIED claim.

Although *Hustler* is dispositive of his IIED claim, Colborn fails to mention it at all. Even the case on which he relies, *Holloway v. American Media, Inc.*, acknowledges that, in *Hustler,* the Supreme Court prohibited public-figure plaintiffs from prevailing on IIED claims premised on speech unless they can prove the challenged speech was false and made with constitutional actual malice. 947 F. Supp. 2d 1252, 1261 (N.D. Ala. 2013). As shown *supra* and in Netflix's opening Memorandum, *MaM* and the challenged portions within it are not actionable as defamation, which disposes of Colborn's IIED claim.  Indeed, Colborn acknowledges that the Wisconsin Court of Appeals has held that, following the U.S. Supreme Court's decision in *Snyder v. Phelps*, 562 U.S. at 458, the First Amendment precludes *all* IIED claims premised on speech about matters of public concern, *see* Opp. 87 (attempting to distinguish *Dumas v. Koebel*, 2013 WI App 152 ¶ 32, 841 N.W.2d 319, 329).[12]

Colborn also attempts to sidestep Netflix's showing that, even if *MaM* were actionably defamatory, his IIED claim nevertheless fails because simply disseminating defamatory material does not constitute the requisite "extreme and outrageous conduct" as a matter of law. Mem. 48. Here, as well, although he does not deny that Wisconsin courts have squarely rejected IIED

---

[12] Urging the Court to ignore Wisconsin Court of Appeals precedent as nonbinding (a position that would undermine his other arguments), Colborn says that this Court should instead adopt the reasoning of *Holloway*, which also is not binding. Opp. 87-88. Setting aside Colborn's hypocrisy in relying on non-Wisconsin authority when he excoriates Netflix for doing the same, if the Court's duty in this circumstance is to predict how the Wisconsin Supreme Court would interpret *Snyder*, Opp. 87, logic would dictate that the Wisconsin Court of Appeals is a better guide than the U.S. District Court for the Northern District of Alabama. And, in any event, Netflix respectfully suggests that such analysis is unnecessary because *Snyder* itself is unambiguous.

claims premised on defamatory speech, he cites inapposite cases from outside Wisconsin that have held otherwise based on the law of those states. Opp. 88.

### 2. Colborn relies on a false representation of the law regarding negligence.

In defending the viability of his negligence claim, Colborn doubles down on his demonstrably false contention that the First Amendment's protections do not apply whenever a plaintiff challenges a statement accusing him of committing a crime. Opp. 89. There is simply no support for this remarkable proposition and, not surprisingly, Colborn offers none.  His negligence claim must be dismissed because he is concededly a public official and, as such, he is precluded by the First Amendment from pursuing a negligence claim based on speech about his performance of his official duties. *See* Mem. 47-48.

This is the *holding* of the Supreme Court's landmark decision in *New York Times Co. v. Sullivan*, which similarly involved a law enforcement official's defamation claim over the publication of third parties' statements criticizing police. 376 U.S. at 257-58.  Indeed, *Sullivan* involved a publication that allegedly accused a law enforcement official of committing crimes in the course of his official duties. The U.S. Supreme Court held that public officials in such situations *cannot* recover for defamation unless they clearly and convincingly prove the challenged statements were published with constitutional actual malice—knowledge of falsity or reckless disregard of the truth—a far more demanding standard than mere negligence. *Id.* at 287-88. In doing so, the Supreme Court noted that public officials must expect criticism that includes allegations that they violated the law, since in American politics "[c]harges of gross incompetence, disregard of the public interest, communist sympathies, and the like usually have filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent.'" *Id*. at 273 n.14 (citation omitted). Even in *Cianci*, the case on which Colborn

Case 1:19-cv-00484-BHL   Filed 06/01/20   Page 36 of 38   Document 140

principally relies, the court stressed that the public-official plaintiff still bears the "heavy burden" of proving constitutional malice, *not* mere negligence. 639 F.2d at 71; *see also id.* at 59, 63-64.

That a public official such as Colborn must prove constitutional malice, not simple negligence, to recover for allegedly harmful falsehoods has been the law of the land for some 56 years and is not an issue that is open for interpretation or debate. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *Hustler*, 485 U.S. at 56. [13] Colborn's negligence claim is barred by the First Amendment. It must be dismissed with prejudice.

## CONCLUSION

 The Supreme Court has recognized that the media "guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Sheppard* v. *Maxwell*, 384 U.S. 333, 350 (1966). "Public awareness and criticism have even greater importance where, as here, they concern allegations of police corruption." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1035-36 (1991). In the final analysis, Netflix cannot be held liable for a documentary about a criminal prosecution that includes the defense team's discussions of their theory of the case, especially when the failure of that theory is unambiguously reported as well. Crucial public discourse regarding the criminal justice system would be impossible if public officials such as Colborn were allowed to use the threat of defamation litigation to suppress the scrutiny and criticism vital to ensuring the fairness of and justice dispensed by our courts. The Court should dismiss his lawsuit with prejudice.

---

[13] While Colborn certainly is entitled to preserve for U.S. Supreme Court review a challenge to the actual malice standard, Opp. 89 n.12, falsely claiming that the standard does not apply at all to accusations of criminal conduct is entirely improper. *See Teamsters Local No. 579 v. B & M Transit, Inc.*, 882 F.2d 274, 280 (7th Cir. 1989) ("a party is not entitled to deliberately ignore or misstate case law that is unfavorable to its position").

Dated: June 1, 2020               Respectfully submitted,

 *s/ James A. Friedman*_____
James A. Friedman
Godfrey & Kahn, S.C.
One East Main Street
Suite 500
Madison, WI 53703-3300
T: (608) 284-2617
F. (608) 257-0609
jfriedman@gklaw.com

Lee Levine
Matthew E. Kelley
Ballard Spahr LLP
1909 K Street, NW, Suite 1200
Washington, DC 20006-1157
T: (202) 508-1110
F: (202) 661-2299
levinel@ballardspahr.com
kelleym@ballardspahr.com

Leita Walker
Ballard Spahr LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
T: (612) 371-6222
F: (612) 371-3207
walkerl@ballardspahr.com

*Counsel for Defendants*