UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ANDREW L. COLBORN,

        Plaintiff,

                                                                   Case No. 19-cv-0484-bhl

    v.

NETFLIX INC., et al.,

        Defendants.

---

## DECISION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

---

      In this defamation action, Plaintiff Andrew L. Colborn asserts claims against four defendants who were involved in the production and distribution of two documentary miniseries, *Making a Murderer* and *Making a Murderer 2*. The case has been long-stalled at the pleading stage, with a prompt resolution complicated by Colborn's initial delay in filing suit (waiting until just before the statute of limitations expired on most of his claims), his further delay in attempting service, and his filing of amended and second amended complaints. Defendants have not aided matters with their extensive motion practice, which has flooded the Court with lengthy briefs raising disputed factual and legal issues against a still undeveloped record.

      At this point, all defendants have moved to dismiss Colborn's claims, but on two different bases. Defendants Laura Ricciardi, Moira Demos, and Chrome Media LLC (Chrome) seek dismissal based on Colborn's alleged failure to serve them timely with his initial and amended complaints. Defendant Netflix Inc., which was served timely, seeks dismissal of the latest (second amended) complaint as a matter of law, based on various First Amendment defenses. Because the record establishes that Colborn properly and timely served Ricciardi, Demos, and Chrome by publication, the Court will deny their motion to dismiss. The Court also denies Netflix's motion to dismiss as to all but one of Colborn's claims. While Colborn's negligence claim is barred by the First Amendment, his defamation and intentional infliction of emotional distress claims are

properly pleaded. The Court will not accept Netflix's invitation to engage in fact finding at the pleading stage of the case.

## BACKGROUND

On December 18, 2015, Netflix first aired what became an extraordinarily popular documentary series, *Making a Murderer*. The series relates the events surrounding multiple criminal and civil legal proceedings involving Steven Avery. As recounted in the documentary, in 1985, Avery was wrongfully convicted of raping a female jogger in Manitowoc County. After serving just over half of his 32-year prison sentence, Avery was released when DNA evidence showed another man had committed the assault. Avery then pursued civil claims against Manitowoc County and two elected officials (the former County Sheriff and District Attorney) involved with his wrongful conviction. Amidst that litigation, a third legal proceeding erupted when Avery was charged with the murder of Teresa Halbach, a young woman who went missing while on assignment photographing used cars for sale, including a vehicle for sale at Avery's residence. A jury ultimately convicted Avery of Halbach's murder. His appeals from that second conviction have been rejected and he remains in state prison.

*Making a Murderer* and its 2018 sequel, *Making a Murderer 2*, purport to be documentaries depicting the events, including the "flaws, failings and triumphs," surrounding these legal proceedings. Defendants insist that the original series and its sequel present both sides of these events, albeit in a dramatic and entertaining way. Colborn argues, however, that the presentation was biased and falsely depicts him as having framed Avery for the Halbach murder. As a result, he has been subjected to an onslaught of threats and criticism. Through this lawsuit, Colborn seeks redress from Defendants for the harm arising from this allegedly biased and false depiction.

### A. Colborn's Efforts to Serve the Complaint.

Colborn filed his initial complaint in Manitowoc County Circuit Court on December 17, 2018, nearly three years to the day after Netflix first broadcast *Making a Murderer*. The initial complaint names eight defendants, half of whom have since been dropped from the lawsuit. Colborn made no attempt to serve the initial complaint.

On March 4, 2019, Colborn filed an amended complaint asserting claims against only four defendants: Netflix, Laura Ricciardi, Moira Demos, and Chrome. Netflix is a streaming service and co-producer of the *Making a Murderer* series. Ricciardi and Demos are the filmmakers and primary producers of the series. Chrome is a film production company owned by Ricciardi and

Demos. For purposes of this decision and order, Ricciardi, Demos, and Chrome will be referred to as the Filmmaker Defendants.

After filing the amended complaint, Colborn for the first time attempted service on the defendants. He had no trouble serving Netflix, which acknowledges receiving proper service on March 5, 2019. Serving the Filmmaker Defendants proved more complicated.

On March 6, 2019, Colborn attempted personal service on Chrome through its registered agent, Tal Benari. Benari is employed at an accounting firm, R.C. Baral & Co., with offices at 15821 Ventura Boulevard in Encino, California, an address that Chrome also lists as its principal place of business. Benari was not present when the process service attempted service at the Encino, California business address on March 6 and again on March 7. Accordingly, the process server left copies of the original and amended summonses and complaints at the reception desk. Benari acknowledges receiving copies from the receptionist on either March 7 or 8. The process server also made three attempts (on March 8, 9, and 12) to serve Benari at his home address in Tarzana, California. The process server then tried again to serve Benari at his Encino office on March 15. Benari denies being personally served before May 2019.

Colborn's process server also attempted to serve both Ricciardi and Demos at Chrome's Encino business address. Neither Ricciardi nor Demos was present at that address on March 6 and the receptionist told the process server they were not Chrome employees. The next day, the process server attempted unsuccessfully to serve them at their home in Los Angeles. Ricciardi and Demos confirm that serving them during this time period would have been difficult; both were traveling and away from home from March 4, 2019 (when the amended complaint was filed) through March 19, 2019. Ricciardi admits that when she finally returned home on March 19, 2019, she discovered two large envelopes addressed to her and Demos containing copies of the pleadings.

At the time of these efforts, Colborn's counsel was exploring alternative service possibilities.[1] Counsel searched the internet for possible upcoming speaking appearances by Ricciardi and Demos. She also sought out possible filming locations and checked the dockets for

---

[1] Colborn also retained a second, alternate firm, Excel Investigations, to serve the Filmmaker Defendants. Apparently, an Excel process server also attempted service on Benari, Ricciardi, and Demos at the Encino, California business address and at their respective home addresses. Colborn reports receiving inconsistent factual reports from Excel about the process server's efforts and, not wishing to file an untruthful statement with the Court, disclaims reliance on any claims that that process server properly served anyone. (Dkt. 74.) The Court appreciates Colborn's discretion.

appellate proceedings involving the Avery case in hopes of finding a place where service might be accomplished. None of these alternate efforts proved fruitful.

When these efforts failed, Colborn elected to attempt service by publication under Wisconsin law. Colborn filed a Publication Summons and Amended Publication Summons in the circuit court on March 11, 2019. (Dkt. 71 at ¶8.) The Amended Publication Summons was then published in the *Los Angeles Times* on March 13, 20, 27 and April 3, 2019. (Dkt. 25.)

### B. Removal and Federal Court Proceedings.

On April 3, 2019, Netflix removed the case to federal court on diversity jurisdiction grounds. On May 9, 2019, Netflix moved to dismiss the complaint under Rule 12(b)(6), arguing that Colborn had failed to plead a plausible claim of defamation. The next day, Demos, Ricciardi, and Chrome Media filed their own motion to dismiss, asserting that Colborn had failed to serve them properly with the initial or amended complaints. Colborn responded with substantive and procedural arguments to both motions.

On December 19, 2019, the Court held a telephone hearing on the motions to dismiss. After allowing argument, the Court denied Netflix's motion, concluding the amended complaint plausibly alleged a defamation claim. The Court then granted Colborn leave to file a Second Amended Complaint. The Court did not rule on the Filmmaker Defendants' motion to dismiss and in a later order concluded that factual issues related to Colborn's service efforts required an evidentiary hearing. Before the Court could conduct the evidentiary hearing (scheduled for March 6, 2020), the COVID-19 pandemic hit and the hearing was postponed and later cancelled.

On January 3, 2020, Colborn filed his Second Amended Complaint. He served the Filmmaker Defendants with this latest pleading but agreed they did not need to respond until their motion to dismiss on the service issues was resolved. Netflix was also served with the Second Amended Complaint. It responded with a second motion to dismiss, insisting that the defamation claims, even if plausible, failed as a matter of law.

On September 21, 2020, with these motions pending, the case was subject to a judicial reassignment. Shortly thereafter, the Court held a status conference at which it questioned whether an evidentiary hearing was necessary, given that the underlying facts concerning service efforts were likely undisputed. The parties confirmed that their disagreements primarily related to the characterization of Colborn's service efforts rather than the actual facts of what took place.

Accordingly, the Court ordered the parties to file agreed upon statements of facts relating to the efforts at service and continued the status conference for three months.

At the continued status conference, the Court heard reports on the status of the case and took the motions to dismiss under advisement. After ruling on other pending procedural motions, the Court ordered the parties to mediate the dispute. A subsequent March 9, 2021 mediation before Magistrate Judge William E. Duffin proved unsuccessful.

## ANALYSIS

### I. Colborn Successfully Served the Filmmaker Defendants by Publication.

The Filmmaker Defendants seek dismissal of the claims in the Amended Complaint based on insufficiency of service and statute of limitations grounds. They contend that Colborn failed to serve them timely with the initial and amended complaints, with the result that the statute of limitations has since expired, precluding Colborn from pursuing his claims against them. Because the relevant facts concerning service occurred before removal, resolution of the motion requires analysis of the Wisconsin statute of limitations for defamation claims and the Wisconsin procedural rules governing service of process. *See* Charles Alan Wright & Arthur R. Miller, 4A Fed. Prac. & Proc. Civ. §1082 (4th ed. April 2021 update) ("In determining the validity of service in the state court prior to removal, a federal court must apply the law of the state under which the service was made.").

#### A. Wisconsin Law Required Colborn to "Commence" Claims Based on Making A Murderer by March 18, 2019.

Wisconsin has a three-year statute of limitations for intentional torts, including defamation. Wis. Stat. §893.57. To be timely under Wisconsin law, a defamation action must be "*commenced* within 3 years after the cause of action accrues." *Id.* (italics added). A case is "commenced" when the summons and complaint are filed with the court, provided service of an authenticated copy of the summons and of the complaint is made upon the defendant "within 90 days after filing." Wis. Stat. §801.02(1).

Colborn's claims against the Filmmaker Defendants in the original and amended complaints are based entirely on the original *Making a Murderer* miniseries. That series first aired on December 18, 2015, and the parties therefore agree that Colborn's claims accrued on that date. To be timely, Colborn was required to file his summons and complaint within 3 years – by

December 17, 2018, and serve the defendants within 90 days of the filing – by March 18, 2019. The parties dispute whether Colborn satisfied the second of these requirements.

Service of a summons and complaint under Wisconsin law is governed by Wis. Stat. §801.11. Generally, a plaintiff must achieve *personal* service on both individual and corporate (including LLC) defendants. But Wisconsin law allows for service by publication if other methods of service cannot be accomplished with "reasonable diligence." Wis. Stat. §§801.11(1)(c), (5)(b).

### 1. Colborn Exercised Reasonable Diligence in Attempting Personal Service.

The Filmmaker Defendants argue that Colborn was not entitled to serve them by publication because he failed to exercise "reasonable diligence" in attempting personal service. (Dkt. 35 at 9.) They note that Colborn waited until the last day before the statute of limitations expired to file his summons and complaint, which he then never attempted to serve. They further complain that Colborn made insufficient efforts at personal service of the Amended Complaint before proceeding to service by publication. According to the Filmmaker Defendants, by waiting until the last minute to file, and then letting 77 of the 90 days pass before even attempting service, Colborn failed to exercise reasonable diligence, making his resort to service by publication improper. (*Id.* at 11.)

Under Wisconsin law, whether a plaintiff exercised "reasonable diligence" in attempting personal service is a highly factual issue. *See Heaston v. Austin*, 176 N.W.2d 309, 313 (Wis. 1970); *Haselow v. Gauthier*, 569 N.W.2d 97, 99 (Wis. Ct. App. 1997). In *Heaston*, the Wisconsin Supreme Court observed that even just two attempts at personal service "may under certain conditions be sufficient to show reasonable diligence." In that case, the Court affirmed a trial court's determination that the plaintiff's efforts, which included just two visits to the defendant's home on the same day, were insufficient. 176 N.W.2d at 313. The Court noted, however, that the trial court could have ruled "either way" on the reasonable diligence issue. *Id.* Similarly, in *Haselow*, the Wisconsin Court of Appeals affirmed a circuit court finding that a plaintiff had not shown reasonable diligence where the process server made just a single visit to the defendant's address, only to give up on any further personal service efforts after being told the defendant had moved to Hawaii. 569 NW.2d at 101.

Here, unlike the plaintiffs in *Heaston* and *Haselow*, Colborn has shown he exercised reasonable diligence before resorting to service by publication. The record establishes that Colborn's process server made multiple attempts at personal service on the Filmmaker Defendants

at multiple locations. With respect to Chrome, the record shows Colborn's process server made four attempts to serve Benari, Chrome's registered agent, at his business address (once each on March 6, 7 and twice on March 15). He also tried three times to serve Benari at his home address (on March 8, 9, and 12). While merely leaving copies of the pleadings with a receptionist was not effective service under Wisconsin law, the process server's decision to do so does not render his other efforts at personal service unreasonable or non-diligent.[2]

With respect to Ricciardi and Demos, the process server twice attempted service on them at the office address designated for their production company, and he twice attempted service at their home address. The record also includes sworn statements from Colborn's counsel of her reasonable and diligent efforts to identify other locations for possible service of Ricciardi and Demos. Colborn's diligence is also established by counsel's sworn statement that she made the effort to hire a second process serving firm, even if that firm proved untrustworthy.

While neither party has pointed to a directly controlling case, the Court is satisfied that the record of these various efforts demonstrates reasonable diligence under Wisconsin law. As the Wisconsin Supreme Court explained, even just two attempts at service can be reasonable diligence, and Colborn's efforts go well beyond the meager efforts that were found insufficient in *Haselow* or *Heaston*. Colborn's primary process server undertook multiple efforts to serve each of the Filmmaker Defendants at multiple locations and on multiple days. This in itself is sufficient to show reasonable diligence. Indeed, given Ricciardi's admission that she and Demos were traveling during this time period, only an incredible amount of additional diligence would have resulted in successful personal service. Further, counsel's additional efforts – hiring a second process server and searching the internet for other potential service locations – push Colborn's efforts over the "reasonable diligence" line.

While Colborn's delays in filing suit and in pursuing service were not helpful, the Court does not find that this tardiness makes his other efforts unreasonable or non-diligent. In the modern legal world, service is rarely an issue (indeed the Federal Rules encourage cooperation to minimize

---

[2] The Court agrees with the Filmmaker Defendants that leaving the pleadings with the receptionist at Benari's office did not constitute successful service. Service on an LLC can be made on an "officer, director or managing agent" of the LLC or by leaving the pleadings "with the person who is apparently in charge of the office" of such an officer, director or managing agent. Wis. Stat. §801.11(5)(a). But the receptionist with whom process was left was not a person in charge of the office of a *Chrome* officer, director or managing agent. She was a receptionist for the firm that employed Benari, who was merely Chrome's registered agent for service of process. It is also far from clear that she would qualify as a person in charge of the office, even if Benari had been an officer, director or managing agent of Chrome.

the burden of service). It was not unreasonable for Colborn to expect to have time for service after filing the amended complaint. The efforts that he undertook after the amended complaint was filed were sufficient.

### 2. The Record Establishes that Colborn's Service of the Filmmaker Defendants by Publication Was Proper under Wisconsin Law.

The Filmmaker Defendants also argue that Colborn failed to achieve proper service on them by publication. They insist that Colborn's publication summons was insufficient under Wisconsin law because (1) Colborn has not filed sufficient proof of his attempts at personal service or of mailing the pleadings to the Filmmaker Defendants; and (2) his "proof of publication" fails to show proper publication of the summons. (Dkt. 35 at 12.) The Court rejects both arguments.

Under Wisconsin's service rules, service by publication on both natural persons and limited liability companies requires "publication of the summons as a class 3 notice, under ch. 985" and "mailing" the summons and the complaint to the defendant's address. Wis. Stat. §§801.11(1)(c), (5)(b). A class 3 notice requires the insertion of the publication summons in a qualifying newspaper 3 times. Wis. Stat. §985.07(3). A publication summons "is deemed served on the first day of required publication." Wis. Stat. §801.13(2).

Contrary to defendants' suggestion, the factual record of Colborn's service efforts is adequately supported. Colborn has provided declarations from the process server, counsel, and the newspaper that published notice. Collectively, these materials show Colborn satisfied the requirements for service by publication. The "Proof of Publication" declaration provided by the newspaper shows a publication summons was inserted in the *Los Angeles Times* four times (March 13, March 20, March 27, and April 3, 2019). (Dkt. 25.) Colborn has also filed copies of an original and amended publication summons (Dkt. 18 & 19), both of which include the language required by Wisconsin law, Wis. Stat. §801.095(4). Likewise, the newspaper's Proof of Publication includes a copy of the published notice that tracks the language in the publication summons (including the 40-day response deadline, which differs from summonses that are served personally). *See* Dkt. 25; Wis. Stat. §801.095(4).

The Filmmaker Defendants also argue that Colborn's service by publication was ineffective because the publication summons was flawed. (Dkt. 86 at 7-8.) They point out that the publication summons uses the caption from the Amended Complaint (and includes only the four remaining defendants) and insist the summons was therefore insufficient under Wisconsin

law. (*Id.*) This argument confuses the differences between a summons and complaint, especially in the context of service by publication.

Where service is made by publication, Wisconsin law requires the plaintiff to arrange for publication of a publication summons, the contents of which must be substantially in the form detailed in Wis. Stat. §801.095(4). The complaint itself is not published of course; Wisconsin does not absurdly require publication of the entire pleading, which could fill up multiple newspaper pages. Rather, service by publication is intended to provide notice of the existence of the complaint and lawsuit. Wisconsin law thus requires the plaintiff to mail copies of the summons and complaint to the defendant, "at or immediately prior to the first publication." Wis. Stat. §801.11(1)(c).

Here, the record shows that Colborn obtained and published a publication summons in a form consistent with Wis. Stat. §801.095(4). He has also presented proof that he mailed copies of the original and amended complaints, along with the publication summons to Ricciardi, Demos, and Chrome. This complied with the requirements of Wisconsin law.[3]

That Colborn's publication summons used the updated caption from the Amended Complaint is of no legal significance. Wisconsin law requires only that the publication summons be substantially in the form detailed in Section 801.095(4) and there can be no question that the publication summons satisfied that requirement. Moreover, it would make no sense for the publication summons to have used an old, superseded caption, listing defendants who had been dropped from the lawsuit. The updated caption reflected the correct state of the parties at the time of publication and service. And the Filmmaker Defendants do not point to any confusion or prejudice they could possibly have suffered by use of an accurate caption, which included each of them, while omitting other persons no longer being pursued in the litigation. Accordingly, even if the Filmmaker Defendants were right that the publication summons should have used the original caption, such a technical error would not affect the court's jurisdiction or require dismissal under Wisconsin law. *See Burnett v. Hill*, 557 N.W.2d 800, 805-07 (Wis. 1997).

The Filmmaker Defendants' reliance on *Bartels v. Rural Mut. Ins. Co.*, 687 N.W.2d 84 (Wis. Ct. App. 2004), and *Wahal v. Weiss*, 2016 WI App 57, 882 N.W.2d 871 (Wis. Ct. App. 2016), is misplaced. Neither of these cases involved service by publication, let alone the

---

[3] Because notice was first published on March 13, 2019, service was effective on that date. *See* Wis. Stat. §801.13(2). Accordingly, Colborn timely "commenced" his claims within the applicable statute of limitations.

requirements for a publication summons. *Bartels* involved a plaintiff who failed to serve her complaint on the defendants within 90 days of filing, with the result that the statute of limitations expired. 687 N.W.2d at 86. The Wisconsin Court of Appeals affirmed the circuit court's unsurprising ruling that the plaintiff's subsequent filing and service of an amended complaint could not resurrect claims from the original complaint on which the statute of limitations had run. *Id.* at 88-89. *Wahal* is an unpublished, non-precedential, *per curiam* decision from the Court of Appeals applying *Bartels* to a case in which the plaintiff filed and personally served an amended complaint, but without ever having served the original complaint on the defendants. 2016 WI App 57, ¶10. As the Court has already found, Colborn's service by publication was timely, his publication summons complied with the requirements of Wisconsin law, and he properly and timely mailed copies of both the original and amended complaints to the Filmmaker Defendants. *Bartels* and *Wahal* have no application to this case.

## II. Colborn Has Adequately Pleaded Defamation (and Intentional Infliction of Emotional Distress) Claims against Netflix.

Netflix seeks dismissal of Colborn's Second Amended Complaint in its entirety on First Amendment grounds. This is Netflix's second motion to dismiss. At a December 19, 2019 hearing, the Court denied Netflix's first motion to dismiss the Amended Complaint, concluding that Colborn had plausibly alleged defamation claims. (Dkt. 103, 104.) At the same hearing, the Court rejected Netflix's argument that Colborn should not be granted leave to file the Second Amended Complaint, a copy of which was attached to Colborn's motion for leave to amend. (*Id.*) The Court explained that Netflix's arguments were misplaced at the motion to dismiss stage and would be more appropriately raised, after discovery, on summary judgment. (*Id.*)

Despite the Court's earlier rulings, Netflix seeks a second bite at the dismissal apple. Its latest motion is styled as a motion to dismiss under Rule 12(b)(6), but Netflix spends more than 20 pages of its opening brief characterizing (in its favor) the factual background to Colborn's claims. Netflix then invites the Court to rule that Colborn's defamation claim fails as a matter of law, invoking a number of First Amendment defenses.

At this stage, the Court must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiff's favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). "To survive a motion to dismiss, the complaint must 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Roberts*, 817 F.3d at 564-65 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In contrast, a moving party is entitled to summary judgment if it can show the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). These different motions obviously have very different legal standards.

### A. The Second Amended Complaint Alleges Facts Supporting a Defamation Claim under Wisconsin Law.

Under Wisconsin law, to state a defamation claim, a plaintiff must allege: (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person defamed; and, (3) the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her. *In re Storms v. Action Wisconsin Inc.*, 750 N.W.2d 739, 748 (Wis. 2008). If the plaintiff is a public figure, he or she must also allege, and ultimately prove by clear and convincing evidence, actual malice. *Id.* Actual malice means that the allegedly defamatory statement was made with "knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).

As this Court has already ruled in denying Netflix's first motion to dismiss and in rejecting Netflix's opposition to Colborn's motion for leave to file the Second Amended Complaint, his latest pleading adequately and plausibly pleads these elements, including actual malice. (Dkt. 103-105.) The Second Amended Complaint alleges that the defendants "falsely led viewers to the inescapable conclusion that Plaintiff and others planted evidence to frame Avery for Halbach's murder [and] omitted, distorted, and falsified material and significant facts in an effort to portray Plaintiff as a corrupt police officer who planted evidence to frame an innocent man." (Dkt. 105, ¶20.) Colborn further alleges that defendants committed this defamation "with actual malice and in order to make [their series] more profitable and more successful in the eyes of their peers, sacrificing and defaming [Colborn's] character and reputation in the process." (*Id.*) These allegations are supported by extensive detail, set forth in two attachments that list alleged inaccuracies, including altered clips of trial testimony, which Colborn contends present a "false impression" of his testimony and "falsely put words in his mouth." (*Id.*, ¶22.) This suffices to state a claim under Wisconsin law.

Having failed to convince the Court of the inadequacy of Colborn's allegations, Netflix shifts gears and offers a series of arguments for rejecting Colborn's claims as a matter of law. These latest contentions fail foremost because they are rife with factual assertions and would require the Court to make inferences (if not flat-out factual findings) in Netflix's favor, turning the motion to dismiss standard on its head.

### 1. That the Alleged Defamation Occurred in "True Crime" Documentaries Does Not Constitutionally Insulate Netflix from Potential Liability.

Netflix portrays both *Making a Murderer* and *Making a Murderer 2* as part of the "venerable American tradition" of "true crime" reporting and suggests this label alone renders defendants immune from defamation claims. (Dkt. 119 at 31-34.) But this argument obviously paints with far too broad a brush. Neither the Supreme Court nor the Seventh Circuit has ever suggested a speaker enjoys unconditional First Amendment immunity for making defamatory statements simply because the statements concern legal proceedings. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964), the Supreme Court held the First Amendment required public officials pursuing defamation claims against their critics to bear the heavy burden of establishing "actual malice." While Justice Black's concurrence (joined by Justice Douglas) urged the adoption of a broader, unconditional immunity, *id.* at 293-297, along the lines Netflix now proposes, a majority of the Supreme Court has never gone this far.[4]

Moreover, the record remains undeveloped concerning defendants' knowledge and actions. Whether Colborn can muster sufficient evidence for a jury to find that Netflix and the other defendants defamed him with "actual malice" remains to be seen. But until the summary judgment record is complete, it would be improper for the Court to resolve this issue. Indeed, two of the three out-of-circuit cases Netflix cites in support of its "true crime" argument, *Partingon v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995), and *Riley v. Harr*, 292 F.3d 282 (1st Cir. 2002), are affirmances of *summary judgment* decisions. In the remaining case, *Peterson v. Grisham*, 594 F.3d 723 (10th Cir. 2010), the Tenth Circuit affirmed a district court's dismissal of defamation claims at the pleading stage, but the appellate court's decision offers little helpful analysis. The dismissal was based not on the First Amendment, but on the Court's conclusion that the defendants

---

[4] Indeed, some recent decisions have suggested the Court's imposition of the "actual malice" standard in *New York Times v. Sullivan* may itself have gone too far. *See, e.g., McKee v. Cosby*, 586 U.S. ___, 139 S. Ct. 675 (2019) (Thomas, J., concurring in denial of certiorari); *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 251-56 (D.C. Cir. 2021) (Silberman, J., dissenting in part).

were "statutorily protected from suit" under an Oklahoma statute, *see id.* at 728-29, which plainly has no application here. And, even if Wisconsin law tracked the Oklahoma statute, the Tenth Circuit's affirmance is summary and does not help in analyzing the sufficiency of Colborn's extremely detailed allegations under Wisconsin law.

### 2. Netflix's Insistence that Colborn's Defamation Claim Fails as a Matter of Law Is Based on Netflix's Own Unilateral Characterizations of the Facts.

Netflix next argues that dismissal is appropriate because "reasonable viewers" would not understand the documentary series to convey that the defendants (including Netflix) were asserting that Colborn framed Avery for Teresa Halbach's murder. (Dkt. 119 at 39.) Netflix insists the allegedly defamatory statements identified in the complaint "consist of substantially accurate reporting" of the defense's theory at Avery's murder trial. (*Id.*) This argument cannot be resolved at the pleading stage.

Whether defendants' presentation of the facts surrounding the defense's theory was substantially accurate is an inherently factual issue. Colborn plausibly alleges that defendant's portrayal of the underlying facts was not substantially accurate, and that is all he needs to do at this stage. Indeed, his assertion that defendants intentionally altered excerpts from the Avery trial transcripts would appear to undercut Netflix's substantial accuracy claims. Likewise, whether a reasonable viewer might interpret the series as conveying that Colborn actually framed Avery (contrary to the jury's finding) is also an inherently factual issue. Colborn's citation to specific threats he received from viewers strongly suggests that at least some audience members understood the documentary to be accusing Colborn of criminal misconduct leading to Avery's conviction for the Halbach murder.

The resolution of these issues must, at a minimum, await discovery and summary judgment. In fact, Netflix's primary support for this argument, *Global Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973 (7th Cir. 2004), is a summary judgment decision. In *Global Relief*, the Seventh Circuit held that a district court properly granted summary judgment for various reporters and news organizations, but only after a record had been developed showing that defendants' reports about the September 11, 2001 terrorist attacks were substantially true, providing an absolute bar to plaintiff's defamation claims. If the record at summary judgment establishes that defendants' reporting on the Avery case was substantially true, they, like the

defendants in *Global Relief*, will be entitled to summary judgment. But that conclusion cannot be reached at this stage in the proceedings.

Netflix is also not entitled to dismissal based on its argument that the series' implication that Colborn criminally framed Avery for the Halbach murder "constitute[s] a nonactionable opinion based on fully disclosed true or privileged facts." (Dkt. 119 at 41-42.) Whether Netflix fully disclosed the true or privileged facts is the heart of Colborn's claim. He alleges that defendants did not fully disclose the true facts, but instead knowingly and with malice "omitted, distorted, and falsified material and significant facts in an effort to portray [him] as a corrupt police officer who planted evidence to frame an innocent man." (Dkt. 105, ¶20.) Netflix's insistence that "indisputable facts" support its position is misplaced; Netflix has filed a motion to dismiss and it is not the appropriate time to resolve such factual issues. If the facts are indeed undisputed or "indisputable," Netflix can present its arguments after discovery at summary judgment.

Netflix next invokes what it calls "the First Amendment's 'subsidiary meaning' doctrine." (Dkt. 119 at 42-43.) Netflix contends that because Colborn's overall contention that defendants falsely accused him of framing Avery for the Halbach murder is not actionable, Colborn's complaints about defendants' allegedly malicious falsification of the facts supporting that contention are also not actionable. This argument fails because the underlying premise is wrong. As explained above, Colborn's allegations concerning defendants' false portrayal of his suggested framing of Avery are sufficient to state a claim and, at this point in the proceedings, are actionable.

Finally, Netflix's challenges to Colborn's specific defamatory statements are likewise not subject to resolution at the motion to dismiss stage. Its offers of disputed characterizations of Colborn's allegations concerning the series' portrayal of the "Jail Call," the "Dispatch Call," the "Key," and various other omitted facts are issues for summary judgment, or perhaps, for a jury to resolve. This Court cannot appropriately resolve them on a motion under Rule 12(b)(6).

### B. The First Amendment Bars Colborn's Negligence Claim, But Not His Claim for Intentional Infliction of Emotional Distress.

The vast majority of the parties' briefing relates to Colborn's defamation claim, but Netflix also moves for dismissal of the other two claims alleged in the Second Amended Complaint. Colborn's claims for "Negligence (In the Alternative)" and "Intentional Infliction of Emotional Distress" both expressly incorporate the allegations on which he bases his defamation claim. (Dkt. 105, ¶¶68, 77.) From those underlying allegations, Colborn claims the defendants were negligent

by "failing to exercise reasonable care in ascertaining the truth or falsity of the statements and communications" previously identified in the Second Amended Complaint. (Dkt. 105, ¶70.) He similarly uses the underlying allegations to assert a claim for emotional distress under Wisconsin law, insisting that defendants' conduct was "extreme and outrageous" and resulted in "extreme emotional distress." (*Id*., ¶79.)

Netflix argues that the First Amendment bars both of these alternative claims. It contends that a public official plaintiff like Colborn must "prove fault *in excess* of negligence – namely, constitutional actual malice – to recover for any alleged injury arising out of challenged speech or expression." (Dkt. 119 at 54.) As to the emotional distress claim, Netflix contends that the First Amendment precludes all claims for intentional infliction of emotional distress that are premised on speech about a matter of public concern. (*Id.* at 55.) It further argues that its alleged misconduct is insufficiently "extreme and outrageous" to support an emotional distress claim. (*Id.*)

The Court agrees with Netflix that Colborn's negligence claim is barred by the First Amendment. The fundamental point in the Supreme Court's *New York Times v. Sullivan* ruling is that a public official plaintiff bears a high burden in pursuing tort claims related to the publication of matters that are of public concern. To pursue such a claim, the plaintiff must prove actual malice by clear and convincing evidence. 376 U.S. at 283-84. This requirement precludes any state law liability based on mere negligence. Accordingly, Colborn's negligence claim against Netflix is dismissed.[5]

Netflix's challenge to Colborn's intentional infliction of emotional distress claim cannot be granted at this stage, however. Contrary to Netflix's assertions, the Supreme Court has never held that the First Amendment completely bars public officials' claims for the intentional infliction of emotional distress. In *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 57 (1988), the Supreme Court held that the public figure in that case, Jerry Falwell, was precluded from pursuing an emotional distress claim against a magazine for publishing an obviously satirical cartoon that was not "reasonably believable." The Court specifically confirmed that a public official could pursue an intentional infliction of emotional distress claim based on a publication, but only if the "publication contains a false statement of fact which was made with 'actual malice,' *i.e.,* with

---

[5] Colborn also asserts negligence claims against the Filmmaker Defendants, who have not yet answered the Second Amended Complaint. Because Colborn's negligence claim is barred as a matter of First Amendment law, the Court will also dismiss his negligence claims against the Filmmaker Defendants, and they need not respond to the negligence claims in the Second Amended Complaint.

knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Id*. at 56.  Likewise, in *Snyder v. Phelps*, 562 U.S. 443, 451 (2011), the Supreme Court rejected an intentional infliction of emotional distress claim based on picketing at a military funeral, but noted that the complained-of speech consisted of statements that "were not provably false."  Colborn's Second Amended Complaint alleges that defendants published false statements with actual malice.  This is sufficient, at least at the pleadings stage, to overcome Netflix's First Amendment challenges.  Likewise, Colborn has sufficiently alleged that defendants' conduct was "extreme and outrageous" that dismissal at the pleading stage would be inappropriate.

## CONCLUSION

The record establishes that Colborn properly served the Filmmaker Defendants by publication.  In addition, Colborn's Second Amended Complaint adequately pleads claims for defamation and intentional infliction of emotional distress under Wisconsin law.  But Colborn's attempt to pursue negligence claims against Netflix (and the other defendants) is barred by the First Amendment.  Accordingly,

IT IS HEREBY ORDERED that the Filmmaker Defendants' motion to dismiss (Dkt. 34) is DENIED.

IT IS FURTHER ORDERED that Netflix's motion to dismiss (Dkt. 118) is DENIED as to Colborn's defamation and emotional distress claims but GRANTED as to his negligence claims.

Defendants are directed to Answer the Second Amended Complaint within 14 days of this Order.

Dated at Milwaukee, Wisconsin this 26th day of May, 2021.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge