# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF WISCONSIN
# GREEN BAY DIVISION

| | |
|---|---|
| ANDREW L. COLBORN,<br><br>          **Plaintiff,**<br><br>    vs.<br><br>NETFLIX, INC.; CHROME MEDIA LLC, F/K/A SYNTHESIS FILMS, LLC; LAURA RICCIARDI; AND MOIRA DEMOS,<br><br>          **Defendants.** | Civil No.: 19-CV-484-BHL |

### DEFENDANT NETFLIX, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO SUBPOENA TO MICHAEL GRIESBACH

Defendant Netflix, Inc., ("Netflix") respectfully moves this Court, pursuant to Federal Rules of Civil Procedure 26 and 45, for an order directing Mr. Griesbach to produce records responsive to a third-party subpoena (the "Subpoena").

### INTRODUCTION

Today, Mr. Griesbach is one of three attorneys appearing as counsel of record for Plaintiff Andrew Colborn. But long before he joined that legal team, he served as an assistant district attorney in Manitowoc County and authored three books about the underlying events here. Through that work, Mr. Griesbach built a significant collection of documents relevant to issues in this action. The documents include, among other things, evidence related to Steven Avery's exoneration, civil case against the County, and subsequent conviction for murder; documents related to Mr. Griesbach appearance in *Making a Murderer*; and documents revealing the public's views toward the Avery saga and the players involved in it—including Mr.

Colborn—and how those views and the players' reputations were impacted, if at all, by the documentary. Netflix seeks those documents through its Subpoena.

Notably, in his objections to the Subpoena Mr. Griesbach did *not* claim that any of the information requested is privileged—nor could he, as Netflix explicitly tailored the Subpoena to avoid discovery of attorney-client privileged information. Rather, to justify his refusal to produce *any* responsive records, Mr. Griesbach relied on the sort of rote, boilerplate objections that the Seventh Circuit Court of Appeals routinely rejects, including that the information is "otherwise available," not relevant, and "over-broad and unduly burdensome." The Subpoena, however, seeks information well within the scope of discovery contemplated by Federal Rules of Civil Procedure 26 and 45, and Mr. Griesbach bears a burden to justify his refusal to comply with it. For the reasons stated herein, he cannot satisfy that burden. Mr. Griesbach's objections should be rejected, and he should be compelled to comply with the Subpoena.

## BACKGROUND FACTS

Today, Mr. Griesbach is part of a team of three lawyers from three different law firms representing Mr. Colborn in this action, but for more than thirty years, Mr. Griesbach was an assistant district attorney for Manitowoc County, Wisconsin. In his role as a prosecutor for Manitowoc County, Mr. Griesbach played an integral role in the 2003 exoneration of Mr. Avery for the rape of Penny Beerntsen, and later, he was involved in decisions made during the early stages of the investigation into the death of Teresa Halbach, including drafting the initial search warrant(s) for the Avery Salvage Yard.

Beyond that, by his own representation, Mr. Griesbach "became obsessed with the Avery case" in 2003—more than 12 years before *Making a Murderer* premiered and more than 15 years before Mr. Colborn retained Mr. Griesbach as his counsel. He is the author of three books about Mr. Avery and *Making a Murderer*, including *Unreasonable Inferences: The True Story of a*

*Wrongful Conviction and Its Astonishing Aftermath* (2010), *The Innocent Killer: A True Story of a Wrongful Conviction and its Astonishing Aftermath* (2014), and *Indefensible: The Missing Truth about Steven Avery, Teresa Halbach, and Making a Murderer* (2016), the last of which was published more than two years before he began representing Mr. Colborn. He has "spoken out extensively on radio, television, and print interviews about how Steven Avery was, to use a colloquial term, screwed over by the former sheriff and DA," and he had given "numerous media interviews" regarding *Making a Murderer*. In fact, he was even interviewed by Netflix's co-defendants Laura Ricciardi and Moira Demos (the "Producer Defendants") and appeared in Episode 1 of the series. In short, Mr. Griesbach is in possession of documents and communications of great relevance to Netflix's defenses.

Netflix therefore served on Mr. Griesbach a third-party subpoena pursuant to the Federal Rules on February 10, 2022, seeking discovery of documents and communications related, in general, to the research, drafting and fact-checking of his books; to his communications regarding *Making a Murderer*, Netflix and the Producer Defendants; and to his work while assistant district attorney on the Penny Beerntsen and Teresa Halbach cases. *See* Ex. 1. On February 24, 2022, Mr. Griesbach served objections to the Subpoena, and refused to produce even a *single* responsive document. *See* Ex. 2. On March 8, Netflix provided a deficiency letter to Mr. Griesbach, which included a request to meet and confer regarding the Subpoena. *See* Ex. 3. That meeting between counsel occurred on March 11. As confirmed in emails memorializing the discussion, *see* Ex. 4, counsel for Mr. Griesbach made clear during the meet and confer that his client did not plan to produce *any* documents responsive to the Subpoena.

Accordingly, Netflix now respectfully requests that the Court order Mr. Griesbach to produce documents responsive to the Subpoena.

# ARGUMENT

Mr. Griesbach is far from a stranger to this case. Unlike a more typical "third party," he is fully aware of the claims and defenses at issue—indeed, the state-court complaint that commenced this action bears his signature (and his signature alone). S*ee* Dkt. 1-1. Presumably, then, Mr. Griesbach should have no trouble locating documents responsive to the Subpoena or understanding their materiality. His vague claims regarding relevance, burden and overbreadth thus fall flat. Indeed, his status as counsel of record in this case *reduces* the burden he might otherwise face, and—as explained in further detail in Secton III, *infra*—that status in no way excuses him from the obligations he faces as a fact witness.

Meanwhile, Netflix's Subpoena to Mr. Griesbach seeks discovery of nonprivileged information that is not only relevant but central to its defenses in this action and that is unavailable from other sources. Thus, for all the reasons discussed herein, the Court should compel Mr. Griesbach's compliance with the Subpoena.

## I. The Federal Rules of Civil Procedure Favor Broad Discovery.

Mr. Griesbach objected to the Subpoena on the grounds that "[t]he evidence is not relevant pursuant to Fed. R. [Evid.] 401" and that it "seek[s] information and material that could never be admitted into evidence." Ex. 2 ¶¶ 2, 5. However, the Federal Rules of Civil Procedure are very clear that discovery is to be "broad and liberal." *Meta v. Target Corp.*, 2015 U.S. Dist. LEXIS 158720, at *3 (E.D. Wis. Nov. 24, 2015). The text of Rule 26 enshrines this presumption in favor of discovery: "Parties may obtain discovery regarding *any* nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added). And as Rule 26 makes explicit, "[i]nformation within th[e] scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1); *see also Fralish v. Digital Media Sols., Inc.*, 2021 U.S. Dist. LEXIS 225281, at *7 (N.D. Ind. Nov.

17, 2021) ("In discovery, what is relevant includes more than what is admissible at trial."); *Banks v. Baraboo Sch. Dist.*, 2020 U.S. Dist. LEXIS 176620, at * 9 (W.D. Wisc., Sept. 25, 2020) ("Relevance in discovery is broader than relevance at trial; during discovery, a broad range of potentially useful information should be allowed when it pertains to issues raised by the parties claims." (internal marks and citations omitted)).

"The scope of information that can be sought through a [third-party] subpoena is as broad as what is otherwise permitted under Rule 26(b)(1)." *Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, 2021 U.S. Dist. LEXIS 206600, at * 3 (N.D. Ill. June 10, 2021) (internal marks omitted). And "the general criterion for judicial review of subpoenas," including subpoenas directed at third parties, is whether the subpoena "is reasonable in the circumstances." *McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003). "Before restricting discovery, the court should consider the totality of the circumstances, weighing the value of the material sought against the burden of providing it, and taking into account society's interest in furthering the truthseeking function in the particular case before the court." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002) (internal marks omitted). Factors courts must consider when presented with a motion to compel include "timeliness, good cause, utility, and materiality." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 993 (7th Cir. 2002).

## II. The Discovery Sought by Netflix is Neither Overly Broad Nor Unduly Burdensome and Mr. Griesbach has Failed to Demonstrate Otherwise.

Mr. Griesbach argues—in a single, conclusory sentence—that Netflix's discovery "requests are over-broad and unduly burdensome," Ex. 2 ¶ 6, but his objections fail to address a *single one* of Netflix's requests individually or to explain why any particular request is improper. *See generally id.* ¶¶ 1-8. Such rote, facially deficient objections are "tantamount to no objections at all" and "are ineffectual as every court in the country has held." *Ezell v. City of Chicago*, 2021

5

Case 1:19-cv-00484-BHL   Filed 03/22/22   Page 5 of 19   Document 206

U.S. Dist. LEXIS 99624, at *17 (N.D. Ill. May 26, 2021) (collecting cases). Rather, "[t]he burden rests upon the objecting party to show why a particular discovery request is improper." *Gingerich v. City of Elkhart Prob. Dep't*, 273 F.R.D. 532, 536 (N.D. Ind. 2011) (internal marks omitted). This is true even on motions to compel directed at third parties, *see, e.g.*, *Finnegan v. Myers*, 2014 U.S. Dist. LEXIS 204437, at * 8 (N.D. Ind. Feb. 18, 2014), and even if the subpoena is broad, *see Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 560 (7th Cir. 1984).[1]

Thus, Mr. Griesbach must "state with specificity the grounds for objecting to the request, including reasons." *Fralish*, 2021 U.S. Dist. LEXIS 225281, at *11; *Perry v. City of Gary*, 2009 U.S. Dist. LEXIS 65103, at *11 (N.D. Ind. July 27, 2009) (stating that the party resisting discovery "must adequately demonstrate the nature and extent of the claimed burden by making a *specific showing* as to how disclosure of the requested documents and information would be particularly burdensome" (internal marks omitted) (emphasis added)). "This showing typically requires affidavits or other [affirmative] evidence supporting a party's assertions of burden." *Avenatti v. Gree USA, Inc.*, 2021 U.S. Dist. LEXIS 52969, at *7 (S.D. Ind. March 17, 2021) (quoting *Whole Woman's Health All. v. Hill*, 2019 U.S. Dist. LEXIS 234048 (S.D. Ind. Oct. 7, 2019) (collecting cases)). "[G]eneral objections that recite boilerplate language without explanation of how they apply to *specific discovery requests* do not meet this burden" and are

---

[1] As the court explained in *Deitchman*, there is nothing "unusual" about a broad subpoena. "[A subpoena] is normally just a means of opening discussion between discoverer and discoveree. The discoverer asks for too much because he is not, until he is told, aware of the discoveree's problems. When a court is confronted with a motion to quash such a subpoena, its duty is not to deny any discovery, but to reduce the demand to what is reasonable, considering the discoverer's needs and the discoveree's problems." 740 F.2d at 560.

"routinely overrule[d]" by the Seventh Circuit. *Fralish*, 2021 U.S. Dist. LEXIS 225281, at *11 (emphasis added).

Here, Mr. Griesbach made *no* showing—specific or otherwise—as to how the Subpoena would burden him at all, much less burden him *unduly*. *See Nw. Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004) (recognizing the question is not whether a subpoena poses a burden—all subpoenas pose some burden—but whether the burden "exceed[s] the benefit of production of the material sought by it"). As Netflix demonstrates below, its Subpoena is neither overly broad nor unduly burdensome because it targets the discovery of specific, non-public information that is uniquely in Mr. Griesbach's possession and is relevant to Netflix's defense.

### A. Netflix Seeks Non-Public Information Uniquely Possessed by Mr. Griesbach.

Mr. Griesbach claims that "[t]he[] requests seek evidence that is otherwise available," but he fails to identify with any specificity which requests seek only "publicly available records." *See* Ex. 2 ¶¶ 2, 4. Mr. Griesbach's failure is unsurprising given that the Subpoena seeks documents uniquely in Mr. Griesbach's custody and control.

For example, Document Request 2 seeks "[a]ll documents and communications which you consulted, relied upon, sent, received, or used in writing the books." In his book *Indefensible*, Mr. Griesbach references at least two non-public sources who provided information for the book. First, he describes how "a detail-oriented Avery-obsessed Redditor friend of mine" investigated various phone calls Steven Avery placed on the day Teresa Halbach was murdered. *Indefensible* at 178. Second, he explains how "[a] friend of [his] spoke to Colborn about *Making a Murderer* and how he felt about it. [Colborn] responded that he hadn't watched it, but had heard about it." *Id*. at 208-09. Any documents reflecting the information provided by these "friends" are responsive to Request 2 and not otherwise available from public sources.

Document Request 7 seeks "[a]ll documents and communications regarding or related to Making a Murderer." Clearly, to the extent Mr. Griesbach sent or received e-mails using a private email address, such e-mails are not "publicly available records" *and* are not readily available to Netflix through another source. And, documents produced to-date make clear that Mr. Griesbach *did* communicate about the series using a private e-mail account. *See* Ex. 5 (email sent from mjgriesbach@gmail.com with subject line "Sykes interview re Netflix doc, save at home"). Although this particular document was discovered through a subpoena to the Manitowoc County Sheriff's Department, that is *only* because Mr. Griesbach forwarded the email to an employee of the Sheriff's Department. *Id.* Unless Mr. Griesbach forwarded every personal email to an employee of the Sheriff's Department, he is certainly in possession of other responsive, non-public information.

So too with Document Request 11, which seeks "[a]ll correspondence between, among or involving . . . Ken Kratz . . . [regarding] Teresa Halbach [or] Steven Avery." According to a separate document obtained by Netflix, in November 2005, Mr. Griesbach had a private meeting with Ken Kratz, Mark Rohrer, and Detective Wiegert, during which the decision was made to apply for a search warrant for the Avery Salvage Yard. *See* Ex. 6. According to this record, the meeting attendees also decided that the Calumet County Sheriff's Department would "lead the investigation due to maybe a conflict of interest." *Id.* Indeed, Mr. Griesbach recounts some of these details in *Indefensible* when he explains that both he and Rohrer "felt that with [Avery's] wrongful conviction lawsuit still pending, there'd be a conflict of interest if [Manitowoc County] continued to be involved." *Indefensible* at 40. It is thus clear that Mr. Griesbach has non-public information that is relevant to this case.

What's more, Mr. Griesbach's assertion that Netflix seeks documents that are otherwise "publicly available" is directly contradicted by his separate objection that "[t]he requested information is protected because of its *proprietary nature*." *Compare* Ex. 2 ¶¶ 2, 4, 7, *with id*. ¶ 3 (emphasis added). These objections are mutually exclusive and to date Mr. Griesbach has failed to identify what information that Netflix seeks is allegedly available from other public sources.

### B. The Information Netflix Seeks is Relevant to Its Defenses in This Action.

As noted above, the federal rules construe "relevancy" so broadly that *relevant* information need not itself directly bear on an issue in the case but merely "lead to *other* matters that could bear on[] any issue that is or may be in the case." *Varelas v. Crown Equip. Corp.*, 2018 U.S. Dist. LEXIS 40525, at *2-3 (E.D. Wisc. Mar. 13, 2018) (emphasis added) (internal marks omitted). And a "bare representation" that the information subpoenaed is not relevant is "not enough to establish an undue burden under Rule 45 or to show some other exceptional circumstance that would justify prohibiting the [discovery] altogether." *CSC Holdings*, 309 F.3d at 993. Netflix's Subpoena to Mr. Griesbach easily clears this low bar.

One obvious example illustrating the relevance of the requested documents relates to Mr. Colborn's allegation that Defendants "led viewers to falsely conclude that Plaintiff learned of Avery's 1985 wrongful conviction [for the rape of Penny Beerntsen] approximately eight years before he was released, but covered it up." SAC ¶ 23, Dkt. 105. Mr. Colborn alleges various specific facts with respect to a phone call he received regarding the identity of the actual perpetrator, and he contends that "Defendants Ricciardi and Demos strategically spliced and omitted portions of Plaintiff's trial testimony . . . to distort the facts and nature of the 1994 or 1995 telephone call." *Id.* ¶ 27. Specifically, he alleges that he "does not believe the caller mentioned the name of the man" identified by the caller as the perpetrator, and that Mr.

9

Case 1:19-cv-00484-BHL    Filed 03/22/22    Page 9 of 19    Document 206

Colborn's 2003 written statement regarding this call "was promptly delivered to the Attorney General along with all other documents pertaining to her review." *Id.* ¶¶ 24, 26.

In order for a statement to be defamatory, it must be *materially false*; Netflix is therefore entitled to defend itself by arguing that the underlying statements in *Making a Murderer* are substantially true. *See, e.g.*, *Nat'l Assoc. of Letter Carriers v. Austin*, 418 U.S. 264, 283 (1974) ("The sine qua non of recovery for defamation . . . is the existence of a falsehood."); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991) (discussing doctrine of substantial truth).[2] Based on various *public* statements by Mr. Griesbach, Netflix reasonably believes that he possesses information relevant to this defense. For example, during Mr. Griesbach's time as assistant district attorney, he was personally involved in Manitowoc County's investigation of, and response to, Steven Avery's 2003 exoneration in the rape case that wrongfully sent him to prison for 18 years. As a longtime assistant district attorney, Griesbach was with then-District Attorney Mark Rohrer when the state crime lab called to notify him that DNA testing ruled out Avery as the culprit in the 1985 rape. *Innocent Killer* at 127-28; *see also Indefensible* at 127. Soon thereafter, Griesbach discovered that Manitowoc County prosecutors and law enforcement quite likely knew or suspected that Avery was innocent and that the man the DNA tests implicated, Gregory Allen, was the real rapist. *Innocent Killer* at 127-55.

Indeed, before Teresa Halbach's disappearance, Griesbach was deposed in Avery's wrongful conviction case, *id.* at 180-81, and, his testimony suggested that Mr. Colborn himself either downplayed or misrepresented his role in bringing the call to the attention of his superiors

---

[2] To be clear, this case does not necessarily turn on the truth or falsity of Mr. Avery's "frame-up" theory (though a finding that Mr. Colborn framed Mr. Avery would end the case in Defendants' favor). Rather, Defendants can prevail in this case merely by showing that *Making a Murderer*'s portrayal of the trial was substantially accurate, regardless of whether Mr. Avery's defense was meritorious, as well as on various other grounds, including lack of actual malice.

in the Sheriff's office. For example, Mr. Griesbach testified that he was aware in 2003 that other law enforcement officials said that Colborn expressly told them the detective was from Brown County. Specifically, he testified that, in 2003, he had discussed with D.A. Rohrer a fellow prosecutor's memorandum which reported that Colborn told a former sheriff's department colleague not only that the caller was from Brown County, but that he expressly identified both Allen as the perpetrator *and* Avery as the wrongly accused. Ex. 8 at 25:4-28:3 (Griesbach Dep., *Avery v. Manitowoc Cty.*, No. 04 C 986 (Sept. 22, 2005)). In addition, Mr. Griesbach testified unequivocally that Colborn had confirmed to the DA's office that, upon learning of the call, then-Sheriff Kocourek had assured Colborn that "we've got the right guy and that he should not concern himself." *Id*. 26:20-27:12.

Mr. Griesbach's books similarly call into question Mr. Colborn's inconsistent accounts regarding both whether the caller mentioned any names and the response to the call by his superiors in the Sheriff's office. In his 2014 book, Mr. Griesbach described Mr. Colborn's revelations as a "bombshell":

> A detective from Green Bay called the Manitowoc County jail to report that an inmate in their jail was claiming that he had raped a woman jogging on a beach in Manitowoc County ten years earlier. The inmate claimed that someone else had been convicted of the assault and was presently serving time in prison for a crime he didn't commit. [Former Sheriff's Department Chief Investigator Eugene] Kusche told the ADA that Andy Colborn was the corrections officer who spoke with the Green Bay detective and that Colborn got word of it to Sheriff [Tom] Kocourek. But according to Kusche, the sheriff told Colborn and a detective to stay out of it—they already had the right guy. Andy Colborn doesn't recall if the Green Bay detective mentioned the confessing inmate's name, but Gregory Allen was in the Brown County jail at the time . . .

*Innocent Killer* at 147.³ Further, Mr. Griesbach states unequivocally in his book that Colborn's 2003 report regarding the telephone call was "hidden in the sheriff's safe," *not* delivered promptly to the Attorney General, as Mr. Colborn contends in this action. *Id*. at 232.

The evidence related to this phone call is not the only evidence relevant to this case that Mr. Griesbach possesses. As another example, in the Second Amended Complaint, Mr. Colborn alleges that Defendants, "in concert," "heavily edited portions of Plaintiff's [trial] testimony in order to manipulate viewers to falsely conclude that he and other officers planted Halbach's SUV at the salvage yard." SAC ¶ 34. Mr. Colborn then alleges that "Defendants, jointly and severally, with actual malice, led viewers to the inescapable but false conclusion that Plaintiff and MTSO Lt. James Lenk planted the ignition key for Halbach's SUV in Avery's bedroom." *Id*. ¶ 41.

Again, Netflix is entitled to conduct discovery aimed at establishing the truth of what *Making a Murderer* says about how Mr. Avery used the discovery of Ms. Halbach's car key to buttress his frame-up defense. Mr. Griesbach's own books make clear he is in possession of evidence relevant to this endeavor. On page 221 of *The Innocent Killer*, Mr. Griesbach details that "after Teresa[ Halbach]'s RAV4 was discovered at the [Avery] salvage yard," he "helped draft the initial search warrant" for the Avery property.⁴ The searches by Calumet County officers alone "yielded nothing," Mr. Griesbach wrote. *Id*. at 212. "But a few days later, two Manitowoc County Sheriff's Department officers, Detective Jim Lenk and Sergeant Andy Colborn, searched [Mr. Avery's] bedroom again," when the key to the RAV4 was "discovered" on the floor behind a bookcase. *Id*. This was about the same time that Colborn and Lenk were

---

³ A nearly identical passage appears in Griesbach's first book about the case. Michael Griesbach, UNREASONABLE INFERENCES 172-73 (2010).
⁴ This is also why Mr. Griesbach's claim that he "has no special knowledge concerning the evidence in the Halbach investigation" rings hollow. *See* Ex. 2 ¶ 7.

being deposed in Mr. Avery's civil suit against the County. As Mr. Griesbach himself wrote, "[T]he coincidence of the timing of their depositions and their finding Teresa's car keys in Avery's bedroom was awfully strange[.]" *Id*. at 213. The precipitating cause of that search, however, was the search warrant Mr. Griesbach personally helped draft. Thus, the "documents and communications [he] consulted in [his] preparation of the initial search warrant for the Avery property" are clearly relevant and discoverable. *See* Ex. 1 at Ex. A, Document Request 10.

As yet another example, Mr. Colborn alleged that *Making a Murderer* (and not Mr. Avery's trial itself or news reports published at the time of trial) harmed his reputation, even destroying his decades-long marriage. SAC ¶¶ 64, 72, 82. Just as it is entitled to engage in discovery on the element of Mr. Colborn's defamation claim related material falsity, Netflix is entitled to engage in discovery on Mr. Colborn's claims for damages. And Mr. Griesbach has personal knowledge (and, in all likelihood, documentary evidence) on this topic, which he details in his books. As an example, he writes about the "considerable—and irrational—anger [that] was directed at anyone associated with [Avery's] exoneration" once Mr. Avery was subsequently arrested for the murder of Teresa Halbach, as well as the near even divide of public opinion on Avery's guilt for this new crime. *The Innocent Killer* at 206, 214. Mr. Griesbach writes that "[f]or the most part, [people's] opinions didn't evolve. Some thought from the start that Avery was guilty as sin, . . . [a]nd their opinions didn't change when Lenk and Colborn found the keys." *Id*. at 215. Others, however, were as convinced of a conspiracy to convict Mr. Avery. *Id*. at 215-18; *see also Indefensible* at 23, 43, 44-51, 63, 105, 206-09.

Other passages in Mr. Griesbach's books similarly undercut key allegations in Mr. Colborn's Second Amended Complaint and are likely to lead to relevant evidence regarding

community reactions to *Making a Murderer* and the impact the documentary had (if any) on Mr. Colborn's reputation. For example:

- In his 2014 book, Mr. Griesbach described a conversation with James Lenk in which Mr. Lenk expressed anger that Avery's defense lawyers had accused him and Mr. Colborn of planting evidence. *Id.* at 212-13. Mr. Griesbach wrote that he told Mr. Lenk, "it stinks, but there's nothing you can do," because "[a] person charged with a crime has a constitutional right to defend himself" and "the media has a right to cover the story completely." *Id.*

- Mr. Griesbach wrote that "[t]he quirky circumstances of the investigation scared [him]—especially how Colborn and Lenk were the ones to find the keys," *id.* at 236, and that the prosecutor's attempts to "soften the blow" of that evidence "rang hollow to many," *id.* at 242. He also noted that the Calumet County officer supervising their search of Avery's trailer "retreat[ed] from his statement that Lenk and Colborn could not have planted the keys," admitting it was "possible." *Id.* at 242.

- In his third book, which is focused on critiquing *Making a Murderer* and rehabilitating his now-client's reputation, Mr. Griesbach acknowledges that the law enforcement officers whose deposition excerpts were included in *Making a Murderer* "looked more defensive than they should have if they had nothing to hide." *Indefensible* at 31. "When I later watched the complete video of the depositions of the officers who were most directly accused of wrongdoing—either in the first Avery case or in the second—my concern that they had something to hide, though significantly reduced, was not completely alleviated. This was not simply a case of only selective editing to make them look bad." *Id.* at 31-32.

- Also in his third book, he writes about calls from viewers that Mr. Lenk and Mr. Colborn received in the days after *Making a Murderer*'s release, including on Christmas Day, when "[h]e had hoped to spend a peaceful day with his family, who still loved him." *Id.* at 44. The book does not specify whether it was Mr. Lenk or Mr. Colborn who received the call, but if the latter, this statement obviously undermines Mr. Colborn's claim that that *Making a Murderer* destroyed his marriage.

Ultimately, the knowledge and evidence Mr. Griesbach acquired over the course of his decades-long "obsession" led him to email the Producer Defendants, just days after the series premiered on Netflix. "I binged my way through all 10 episodes by Saturday afternoon and enjoyed it immensely," he wrote Ex. 7 (Dec. 23, 2015 email from Griesbach to Ricciardi and

14

Demos).[5] He went on to say that he "share[d] most of the views you expressed" in a recent newspaper interview, including especially Demos' statement that "In the end we are not trying to provide any answers. We don't have a conclusion. We are really raising questions and our goal is to promote a dialogue about these things," and Ricciardi's assertion that "one needs to be careful not to be too certain about any of this . . . there's lots of room for ambiguity." *Id.* As Mr. Griesbach wrote in his 2016 book, "[a]s in any issue as complicated and as controversial as this one, the truth is elusive in the Avery case." *Indefensible* at xii.

The documents Netflix seeks from Mr. Griesbach are clearly discoverable and relevant to Mr. Colborn's claim that Defendants, including Netflix, presented false statements of fact to viewers of the series that defamed Mr. Colborn and that they did so with actual malice—i.e., either knowing the series was false or with reckless disregard for its truth.

### III. Netflix's Subpoena Is Not Intended to—Nor Does It—Interfere with Mr. Griesbach's Representation of Mr. Colborn

As Mr. Griesbach plainly stated in one of his three books on Steven Avery, "[i]f only I had not been involved in the Avery story myself, perhaps then I could have simply enjoyed the craftsmanship" of *Making a Murderer*. *Indefensible* at 9. Protest as he might that he is "not a witness in this matter, nor should he be permitted to become one," Ex. 2 ¶ 1, the fact is that Mr. Griesbach is a percipient witness in the underlying events at issue, and he has been since long before his representation of Mr. Colborn in this litigation. One need only review his books to see that Mr. Griesbach possesses personal, relevant and discoverable material related to the matters at the very heart of this action.

---

[5] Netflix understands from counsel for the Producer Defendants that they intend to produce this document in a future production of records responsive to pending discovery requests served by Mr. Colborn.

The mere fact that Mr. Griesbach is counsel of record in this matter does not preclude him from being ordered to comply with the Subpoena. Indeed, "it is clear that no special privilege or immunity shields a person from [discovery] simply because he or she is an attorney, or even an attorney for a party to the suit." *Kaiser v. Mut. Life Ins. Co.*, 161 F.R.D. 378, 379 (S.D. Ind. 1994) (quotation omitted); *see also Dewey v. Bechthold*, 2019 U.S. Dist. LEXIS 183381, at * 20 (E.D. Wisc. Oct. 23, 2019) (attorneys who are fact witnesses "cannot claim harassment and undue burden when the opposing party seeks discovery from them."); *Tuszkiewicz v. Allen-Bradley Co.*, 172 F.R.D. 398, 400 (E.D. Wisc. 1997) (granting motion to compel discovery directed to counsel for opposing party for information not related to counsel's representation in the matter); *Appvion, Inc. v. P.H. Glatfelter Co.*, 2016 U.S. Dist. LEXIS 42519, at * 11 (E.D. Wisc., Mar. 30, 2016) ("the mere fact that an individual, employed by a party, has a license to practice law does not insulate him from discovery or create a massive hurdle that must be overcome.").; *Johnston Dev. Grp., Inc. v. Carpenters Local Union No. 1578*, 130 F.R.D. 348, 352 (D.N.J. 1990) ("There is no general prohibition against obtaining the deposition of adverse counsel regarding relevant, non-privileged information."). Rather, as the *Kaiser* court made clear, it is far better to "follow the ordinary standards and procedures provided in the rules for resolving . . . objections" than to create a separate standard of attorneys. *Kaiser*, 161 F.R.D. at 379.

Importantly, Mr. Griesbach does not object to the Subpoena on the basis that it seeks information protected by the attorney-client privilege or attorney work product doctrine—or any other privilege, for that matter. *See generally* Ex. 2. And regardless, Netflix's Subpoena is explicitly tailored to avoid the possibility of seeking discovery of privileged information. Mr. Griesbach previously swore in this action that Mr. Colborn "contacted [him] in October of 2018

16
Case 1:19-cv-00484-BHL   Filed 03/22/22   Page 16 of 19   Document 206

to ask if I would represent him concerning the subject matter of this action[.]" Decl. of Michael Griesbach at 1 (May 31, 2019), Dkt. 72. And Netflix's Subpoena specifically calls for the production of documents created "before October 1, 2018," Ex. 1 at 2, that are relevant to Netflix's defenses but *unrelated* to Mr. Griesbach's representation of Mr. Colborn in this matter. *See Cascone v. Niles Home for Children*, 897 F. Supp. 1263, 1267 (W.D. Mo. 1995) (Plaintiff "seeks information concerning [counsel's] *own actions*, all of which were taken *before* this litigation commenced. This is a distinction worth making. . . . Where the attorney's conduct itself is the basis of a claim or defense, or where the attorney's conduct occurred before the litigation started and not in anticipation of the litigation, then the opposing party has a right to the attorney's testimony."); *accord Johnson*, 130 F.R.D. at 352. In other words, to the extent there exist privileged documents regarding the information sought by this Subpoena, Netflix explicitly *excluded* those documents from the scope of its subpoena, and Mr. Griesbach's status as counsel for Mr. Colborn does not excuse him from complying with the Subpoena.

## **CONCLUSION**

For the foregoing reasons, Netflix respectfully requests that this Court issue an order compelling Mr. Griesbach to comply with the Subpoena.

Dated: March 22, 2022                Respectfully submitted,

  *s/ James A. Friedman*
James A. Friedman
Godfrey & Kahn, S.C.
One East Main Street
Suite 500
Madison, WI 53703-3300
T: (608) 284-2617
F. (608) 257-0609
jfriedman@gklaw.com

Leita Walker
Ballard Spahr LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
T: (612) 371-6222
F: (612) 371-3207
walkerl@ballardspahr.com

Matthew E. Kelley
Ballard Spahr LLP
1909 K Street, NW, Suite 1200
Washington, D.C. 20006-1157
T: (202) 508-1112
F: (202) 661-2299
kelleym@ballardspahr.com

*Counsel for Netflix, Inc.*

# CERTIFICATION OF COMPLIANCE WITH CIVIL L. R. 37

I, Leita Walker, under penalty of perjury and subject to 28 U.S.C. § 1746, certify in compliance with Civil L. R. 37 that, I as counsel for Movant Netflix, Inc. ("Netflix"), in good faith conferred with John F. Mayer, counsel for Michael C. Griesbach, regarding the Subpoena served by Netflix on Mr. Griesbach for the production of various records. Counsel met and conferred on Friday, March 11, 2022, and exchanged subsequent email correspondence regarding the Subpoena, as reflected in Exhibit 4, attached to my declaration filed in support of this Motion. After conferring, the parties were unable to reach an accord regarding the Subpoena. The following individuals participated in the March 11 meeting:

- Leita Walker, counsel for Netflix;

- Isabella Salomao Nascimento, counsel for Netflix;

- John F. Mayer, counsel for Mr. Griesbach;

- Kevin Vick, counsel for Defendants Chrome Media LLC, f/k/a Synthesis Films, LLC, Laura Ricciardi and Moira Demos (together "Producer Defendants"); and

- James Friedman, local counsel for all Defendants.

Counsel for Plaintiff Andrew Colborn were invited to attend the meet and confer but chose not to do so. I certify under penalty of perjury that the foregoing is true and correct.

Dated: March 22, 2022

                                                    /s/ *Leita Walker*
                                                  Leita Walker