# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

ANDREW L. COLBORN,

        Plaintiff,

v.

NETFLIX, INC.,
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

        Defendants.

Case No. 19-CV-484

## MICHAEL GRIESBACH'S BRIEF OPPOSING DEFENDANT NETFLIX, INC.'S MOTION TO COMPEL

Michael Griesbach by his attorneys, Mayer, Graff & Wallace, LLP, provides the following in opposition of Defendant Netflix, Inc.'s Motion to Compel.

## BACKGROUND

In February, 2022, defendant Netflix, Inc. ("Netflix") served a subpoena pursuant to Fed. R. Civ. P. 45 on Michael Griesbach ("Griesbach") for information related to a number of books that Mr. Griesbach authored about his impressions of the Netflix Series *Making a Murderer* and the subjects discussed within the series. See generally Dkt. 207-1, Subpoena. As Netflix pointed out in their brief, Mr. Griesbach is counsel of record for plaintiff Andrew L. Colborn; he is not a witness in this matter, nor should he be forced to become one as it simply would not further this matter. As such, Mr. Griesbach objected to the subpoena. Dkt. 207-2, Objection. The parties then conferred and Netflix remained insistent that Mr. Griesbach's materials are somehow relevant to

1

the outcome of this matter despite Mr. Griesbach's explanation that all materials he reviewed are publicly available and his impressions of the same could not possibly qualify as evidence such that a jury could consider them.[1] Netflix then filed the subject Motion to Compel.

ARGUMENT

I.  **The Documents Which Netflix Seeks Do Not Meet The Standard Of Relevant Evidence: They Are Nothing More Than The Thoughts, Opinions, And Conclusions Based On Reviews Of Publicly Available Materials**

Netflix wants this Court to accept this idea that Mr. Griesbach's thoughts about evidence are evidence themselves. It is undisputed that Mr. Griesbach's books are based entirely on his own impressions of publicly available records. See generally Griesbach Aff. Fed. R. Evid. 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact of consequence in determining the action." Under this standard, the evidence which Netflix seeks is irrelevant. Mr. Griesbach's books were written based on his impressions and thoughts regarding publicly available information (this is the same information on which the defendants based their docuseries) and therefore do not have any tendency whatsoever to make any particular fact more or less probable. See generally Griesbach Aff. Fed. R. Evid. 402 provides that irrelevant evidence is not admissible. Further, even if it is found to be relevant evidence, Fed. R. Evid. 403 provides for the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or **needlessly presenting cumulative evidence**." (Emphasis added.) Accordingly, Mr. Griesbach's impressions of

---

[1] Ironically, the conclusions he reached are obviously explained in the books that were published. Accordingly, Netflix would seem to have another agenda. Specifically, one very obvious and unavoidable conclusion is that defense counsel is engaging in gamesmanship aimed at making Attorney Griesbach a witness despite the fact that he is counsel.

2

the evidence could not possibly be relevant to any fact at issue. The jury must and will be free to reach its own conclusions and impressions of the evidence. Thus, there would be nothing more than a needless presentation of cumulative evidence and it would do nothing other than prejudice Mr. Coburn by turning his advocate into a witness.

> Advisory Committee notes for Fed. R. Evid. 403 provide:
>
> The case law recognizes that certain circumstances call for the exclusion of evidence which is of unquestioned relevance. These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme. Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission.

The defendants are both wasting time with this endeavor and attempting to prejudice the plaintiff. There is simply nothing which could possibly make Mr. Griesbach's notes relevant to this matter.

Mr. Griesbach, like many others, became fascinated by the cases against Steven Avery. It was a very significant matter in a small community in which Mr. Griesbach had worked in criminal prosecution his entire career. His interest drove him to want to learn more about the matters, so he began to look through public records of the cases including court filings, the Court's written decisions and orders, transcripts of court proceeding, and the transcripts of Netflix's own *Making a Murderer* docuseries. Griesbach Aff., ¶ 3. Like many that watched the series and/or followed the news (particularly in Manitowoc), Mr. Griesbach formed opinions and was, to say the least, intrigued. Mr. Griesbach then wrote his books based on this publicly available information. Mr. Griesbach's books are, of course, publicly available, and obviously express <u>his</u> thoughts and impressions.[2] While Mr. Griesbach's interest may have given rise to books on the topic, the reality

---

[2] Not only are his impressions of the evidence not evidence that this or any jury could possibly consider, but a properly instructed jury, contrary to Netflix's apparent position, will be instructed to stay away from the books. Mr. Griesbach's notes and the publicly available commentary are material extraneous to this case. Stated

is that he is no different than any other person who watched the Netflix series or followed the cases in the news and then formed opinions other than the fact that he chose to record and publish his thoughts and conclusions. If this is the standard, then anybody who watched the series, read about the case in the news, wrote a tweet relating to the case, wrote a blog post about the cases, or otherwise publicly expressed any opinion on the cases should be a witness in this matter. That cannot be the standard as it simply defies logic and does nothing to further this matter. Indeed, the only logical conclusion from Netflix's position is that anyone familiar with any of the actual evidence which would include jurors, judges, court staff, and on and on, are witnesses simply because they are familiar with the evidence. This cannot possibly be the law; the Court recognizes the very real distinction between the evidence collected by law enforcement and the commentary, opinions, and reactions to this evidence. Defense counsel try to blur this very real distinction which taken to its logical end point undermines and defies the fundamental rules regularly employed by courts and those involved in the administration of justice.

## II. The Immediate And Practical Impact of Netflix's Position Is That It Turns Plaintiff's Counsel Into A Witness Thereby Undermining The Plaintiff's Right To Effective Counsel

Netflix wants to turn Mr. Griesbach into a witness in this matter. In doing so, Netflix is undermining the plaintiff's right to effective counsel. Courts are generally quite concerned when persons attempt to play the dual role of counsel and witness, and for good reason. Wisconsin's advocate-witness rule is set forth in Wisconsin Supreme Court Rule 20:3.7 and provides:

(a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless
(1) the testimony relates to an uncontested issue;

---

otherwise, the jury must confine itself to the evidence admitted by the Court. No court could ever conceive of the possibility that notes, comments, opinions, and impressions created by someone commenting on the evidence could somehow or in some way be evidence itself.

4

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.[3]

"The advocate-witness rule generally bars a lawyer from acting as both an advocate and a witness in the same proceeding except under special circumstances." United States v. Jones, 600 F.3d 847, 861–62 (7th Cir. 2010). Federal courts look to the relevant state court rules of professional conduct to understand the attorney as witness rule in a given state. Crafton v. Law Firm of Jonathan B. Levine, 12-CV-602, 2013 WL 3456982, at *1 (E.D. Wis. Jul. 9, 2013) citing Diettrich v. NW Airlines, Inc., 168 F.3d 961, 964 (7th Cir. 1999). Trial courts have broad discretion as to whether to allow an attorney to testify in a case in which he or she is an advocate. State v. Foy, 557 N.W.2d 494, 499 (Wis. Ct. App. 1996); Harris v. State, 354 N.W.2d 291, 298 (Wis. 1977).

"There is, however, a longstanding ethical prohibition against an attorney testifying for his or her client in most cases." Foy, 557 N.W.2d at 499. "The rule recognizes the danger that an attorney might not be a fully objective witness, as well as the risk that a jury could confuse the two roles when deciding how much weight to accord to a testifying attorney's statements." Jones, 600 F.3d at 862. As such, "courts should not usually permit an attorney who is an advocate in a trial to testify in that trial, especially where the value of the testimony is small or collateral to the ultimate issues." Foy, 557 N.W.2d at 499. Further, "[t]he party seeking disqualification based on [Rule] 20:3.7 has the burden of proving the necessity for disqualification." State v. Gonzalez-Villarreal, 824 N.W.2d 161, 164 (Wis. Ct. App. 2012).

---

[3] While Netflix has not directly indicated that they seek the disqualification of Mr. Griesbach as the plaintiff's counsel, it is certainly within the realm of possibility that Netflix's motives are more nefarious than simply collecting evidence. Even if Netflix is honest in its intentions, the ramifications of turning Mr. Griesbach into a witness cannot be taken lightly as a real risk to the plaintiff's right to effective representation is on the line.

5

Courts have found that, "The roles of attorney and witness 'usually are incompatible.'" In re Gibrick, 562 B.R. 183, 187 (Bankr. N.D. Ill. 2017) citing Gusman v. Unisys Corp., 986 F.2d 1146, 1148 (7th Cir. 1993). The rule "has deep roots in American Law." Id. Court have noted that, "[d]isqualifying an attorney is a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'" Owen v. Wangerin, 985 F.2d 312, 317 (7th Cir. 1993) (internal quotation omitted); Mercury Vapor Processing Techs., Inc. v. Village of Riverdale, 545 F.Supp.2d 783, 787 (N.D. Ill. 2008). **"Because they are potential 'techniques of harassment,' motions for disqualification are 'viewed with extreme caution.'"** In re Gibrick, 562 B.R. 183, 187 citing Freeman v. Chicago Musical Instrument Co., 689 F.2d 715, 722 (7th Cir. 1982); Mercury Vapor, 545 F.Supp.2d at 787 (emphasis added.) While the defendants are not seeking disqualification outright, they are constructively turning Mr. Griesbach, an advocate for the plaintiff, into a witness in this matter.

"The Seventh Circuit has suggested that an attorney's testimony is likely to be necessary when it is 'foreseeable' he will testify." In re Gibrick, 562 B.R. 183, 188, citing Bank of Am. v. Saville, 416 F.2d 265, 272 (7th Cir. 1969). "Still others have said that an attorney ought to testify if he 'has crucial information in his possession which must be divulged,' or if his testimony is 'essential to the case.'" Id. citing Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp., 546 F.2d 530, 538–39 n.21 (3d Cir. 1976), General Mill Supply Co. v. SCA Servs., Inc., 697 F.2d 704, 708 (6th Cir. 1982). There is nothing which makes Mr. Griesbach's testimony crucial, essential, or foreseeable in this matter. Mr. Griesbach considered publicly available evidence from public sources and formulated his own conclusions and opinions

(which happen to be available publicly in his book) just as every person who watched the *Making a Murderer* series did.[4]

### III.  Mr. Griesbach Had No Special Powers Allowing Him Access To Material, His Only Access Came From Reviewing Public Materials

Having scoured the content of Mr. Griesbach's books, Netflix offers two brief excerpts as supposed proof that he relied on non-public sources and then asks the Court to speculate there must be more. The first excerpt is that "a detail-oriented Avery-obsessed Redditor friend of (his) investigated various phone calls Steven Avery placed on the day Teresa Halbach was murdered." Contrary to what defense counsel expresses, this excerpt supports a conclusion entirely at odds with the position of Netflix. Dkt. 206, p. 7. Specifically, Netflix omitted from its brief, perhaps because including it would belie its claim, what Mr. Griesbach <u>actually</u> wrote about Avery's calls. Having correctly cited the only page Mr. Griesbach references the subject, Netflix well knows that the "Avery-obsessed Redditor friend" recounted nothing more about the subject than what was already in the public domain; namely, that of the 14 calls Avery placed on the day he murdered Ms. Halbach, he only used the *67 function on his phone[5] on the two occasions he called Ms. Halbach. *Indefensible*, p. 178. The prosecution had entered this and other evidence to show that Avery lured Ms. Halbach to the salvage yard. Griesbach Aff., Ex. A- Trial Transcript. The irony of Netflix's omission is not lost on anyone familiar with the facts of this case because it omitted the same information in *Making a Murderer*. <u>See generally</u> Dkt. 105, Second Amend. Compl.

---

[4] And much like every judge, juror, members of court staff, and other citizens that chose, or by virtue of employment, were required to read and listen to evidence. This cannot possibly make their impressions and conclusions evidence itself.

[5] Dialing *67 when making an outbound phone call blocks the caller's number from being displayed on a caller I.D. function.

Netflix knows the *67 evidence was in the public domain before Mr. Griesbach recounted it in his book because it originated from one of the main sources of information that Netflix and the producer defendants used themselves in the production of *Making a Murderer*. Not only did the producer-defendants film the trial, but the transcript along with thousands of pages of other court Griesbach Aff., Ex. B- stevenavery.org Web Pages, Ex. C- transcripts.thedealr.net Links to *Making a Murderer* Transcripts. That others helped Mr. Griesbach review this gargantuan body of public documents hardly makes the information "non-public," as Netflix claims. It is absurd for Netflix to assert that Mr. Griesbach's use of public documents to bring attention to essential evidence that Netflix and the producer defendants left out of *Making a Murderer*. Indeed, the assertion by Netflix seems to prove that it omitted evidence to purposely misinform its viewers. The bottom line is that this contorted logic only undermines Netflix's position.

The only other excerpt Netflix cites as proof that Mr. Griesbach relied on non-public information is his passing comment in *Indefensible* that Mr. Colborn told a friend he "hadn't watched [*Making a Murderer*], but had heard about it." Dkt. 206, p. 7 citing *Indefensible*, pp. 208-209. While admittedly non-public information, as Netflix notes, the Court must determine whether the burden imposed on the recipient of the subpoena "exceed[s] the benefit of production of the material sought by it." Dkt. 206, Def. Br., p. 7 citing <u>See Nw. Mem. Hosp. v. Ashcroft</u>, 362 F.3d 923, 927 (7th Cir. 2004).

Given the breadth of the documents sought by Netflix and the limited, if any, relevance of this single statement of Mr. Colborn, the balance should weigh in Mr. Griesbach's favor, especially because neither Mr. Colborn nor his attorneys have (ever) suggested he watch *Making a Murderer* before Mr. Griesbach wrote *Indefensible*. But the Court need not weigh the competing factors

8

because whatever benefit Netflix would have received from exploring the issue no longer exists as Mr. Colborn has conceded in his most recent response to Interrogatory Number 3 of Netflix's Second set of Interrogatories that other than a few excerpts, he still has not watched *Making a Murderer*. Griesbach Aff., Ex. E- Discovery Responses.

Having failed to find anything else in his books suggesting he possesses relevant non-public information, Netflix inexplicably cites the fact that Mr. Griesbach's emailed a link to a **public** radio interview to his home email address. Dkt. 206, Def. Br., p. 8. As it did in its first citation to Mr. Griesbach's book, Netflix omits the content of the interview, undoubtedly because the interview imparted nothing that was not already in the public domain. Instead, Netflix simply surmises that Mr. Griesbach must have other emails containing relevant non-public information, and on that basis demands that he turn over communications from his personal email account. This is nothing but a speculative attempt on the part of Netflix to create an impression that Mr. Griesbach must be hiding something or perhaps had some special access. This is absolutely without any foundation. As Mr. Griesbach's affidavit verifies, he had the same access to public records that anyone else had. Netflix is attempting to create doubt in the absence of a reason to believe doubt exists. The only credible and reliable conclusion that the records supports, based on Mr. Griesbach's affidavit and from the information reported in the books, is that Mr. Griesbach relied on the same evidence available to anyone.

In its final attempt to convince this Court that Mr. Griesbach's notes and impressions are somehow or in some way relevant evidence, Netflix seizes upon an unsourced correspondence sent to a news outlet requesting that it retract misinformation concerning alleged law enforcement misconduct in the Avery case. Dkt. 206, p. 8. The fact, however, is that the correspondence was

9

among the 30,000 documents Netflix received in response to a subpoena it issued to the Manitowoc County Sheriff's Department. Id. The correspondence briefly references Mr. Griesbach's participation in drafting the initial search warrant for the Avery salvage yard. It also references the decision to have the Calumet County Sheriff's Department lead the investigation, although it does not indicate whether Mr. Griesbach participated in the decision. On this basis alone, Netflix demands that Mr. Griesbach turn over any and all correspondence with the fifteen individuals named in its Request Number 11, under circumstances in which there is absolutely no basis to conclude or infer that Mr. Griesbach had correspondence with the fifteen individuals. This is another desperate effort by Netflix to drum up an issue where none exists.

Once again, Netflix omits the public nature of the imparted information and that it was in the public domain well before Mr. Griesbach published *Indefensible*. The Calumet County Sheriff's investigative reports, along with a myriad of other official documents in the Avery case, were released within weeks of *Making a Murderer*'s release and months before Mr. Griesbach published *Indefensible*. The documents, which were promptly posted online, were released in response to FOIA requests from viewers of *Making a Murderer*, many of whom wondered whether the documentary was a true representation of the facts in the Avery case. Griesbach Aff., Ex. F- FOIA Request Documents. Both Mr. Griesbach's assistance in drafting the search warrant and the decision to have the Calumet County Sheriff's Department lead the investigation are recounted in the reports, although there is no indication that Mr. Griesbach participated in the decision.

## IV. Netflix Has Failed To Show Mr. Griesbach Possesses Non-Public Information Relevant To Its Defense

What Netflix has demonstrated is that it will twist words and logic in a desperate attempt to create an aura of doubt or suspicion when the same simply do not exist. Having failed to show

that Mr. Griesbach possesses non-public information relevant to its defense, Netflix turns to his public statements to justify its subpoena. As its first example, Netflix cites Mr. Griesbach's deposition testimony in Mr. Avery's wrongful conviction lawsuit, claiming it calls into question Mr. Colborn's recollection of events surrounding the phone call he received as a corrections officer in 1995 or 1996, including whether the caller identified Mr. Avery as the wrongly accused and Gregory Allen as the perpetrator. Dkt. 206, p. 10.

Predictably and without any basis whatsoever, Netflix overstates the extent of Mr. Griesbach's knowledge concerning the issues it wishes to explore. A review of Mr. Griesbach's testimony reveals he could offer nothing beyond his qualified recollection based on multiple levels of hearsay. One of Mr. Griesbach's colleagues, Assistant District Attorney Douglass Jones, had relayed information he received from former Manitowoc County Chief Investigator Eugene Kusche concerning Mr. Colborn's receipt of the call. Mr. Jones' memorialization of their conversation reveals that Mr. Kusche never told him his source for the information, making even Mr. Kusche's information unsourced. Dkt. 120-18, Jones Memo. Using qualifying statements such as, "my recollection" and "my impression is that that was what people were saying," Mr. Griesbach explicitly stated he did not have "personal knowledge" concerning the information Netflix wishes to pursue. Dkt. 207-8, p. 5.

Given the remoteness of Mr. Griesbach's knowledge, Netflix has failed to show he is likely to have information that meets even the low bar of relevance applicable to discovery. Netflix can and, in fact, has issued document subpoenas to persons who may have more direct knowledge of

the information it seeks, at least when compared to Mr. Griesbach's recitation of unsourced hearsay.[6]

Moreover, and as stated elsewhere in this brief, the marginal, if any relevance of Mr. Griesbach's hearsay information concerning the 1995/1996 call must be weighed against other factors, including the burden placed on Mr. Griesbach's searching through documents dating back nearly twenty years as well as the "exceptional circumstance" that Mr. Griesbach would likely be forced to withdraw as Mr. Colborn's attorney if he were deemed to have information relevant to Netflix's defense on such tenuous grounds.

In yet another attempt, Netflix turns to Mr. Griesbach's books, citing first his reference in *The Innocent Killer* to a document left in the former sheriff's safe. According to Netflix, "Mr. Griesbach states unequivocally in his book that Colborn's 2003 report regarding the telephone call was 'hidden in the sheriff's safe,' *not* delivered promptly to the Attorney General, as Mr. Colborn contends in this action." Dkt. 206, p. 12, citing *The Innocent Killer* at 232.

Netflix has confused (one hopes inadvertently) which document Mr. Griesbach was referring to. Although Netflix omits it, it is clear from the context that Mr. Griesbach is referencing an affidavit from a "jail-house snitch" kept by the former sheriff in his office safe—not Mr. Colborn's 2003 report. *The Innocent Killer* at 149-150, 232. Contrary to what Netflix claims, Mr. Griesbach has never suggested, whether in his books or anywhere else, that Mr. Colborn's 2003 report was not promptly turned over to the Attorney General—a fact that was documented by the agency tasked by the Attorney General to gather information, the Wisconsin Division of Criminal Investigation (DCI). Griesbach Aff., Ex. F- DCI Report.

---

[6] Netflix has issued document subpoenas to Jones, Petersen, and James Lenk (Kusche is deceased).

Netflix argues that additional passages from Mr. Griesbach's books prove he has information relevant to its defense, this rings similarly hollow. There is nothing novel, for instance, in Mr. Griesbach's telling Mr. Colborn's colleague, Jim Lenk, that when defending a client at trial, criminal defense lawyers are permitted to falsely accuse police officers of wrongdoing "because '[a] person charged with a crime has a constitutional right to defend himself' and 'the media has a right to cover the story completely.'" Dkt. 206, p. 14, citing *The Innocent Killer* at 212-213. As conceded by Netflix, Mr. Griesbach was responding to Mr. Lenk's displeasure about his reputation being sullied by Mr. Avery's lawyers at trial, not by a documentary released ten years later that distorted the facts beyond what even Mr. Avery's defense team presented. Moreover, there are a myriad number of methods and ways Netflix can explore whether the trial itself and not *Making a Murderer* ruined Mr. Colborn's reputation without destroying Mr. Colborn's right to retain counsel of his choice.

Netflix references an excerpt which indicates that Mr. Colborn wished to spend Christmas Day with his family "who still loved him" and this was dashed because of viewer reaction to Making a Murderer. Dkt. 206, p. 14, citing *Indefensible* at 44. Netflix' argument that the passage "obviously undermines Mr. Colborn's claim that Making a Murderer destroyed his marriage" irrationally assumes Mr. Colborn's marriage was destroyed all at once just two weeks after *Making a Murderer* aired. Again, the marginal, if any, benefit Netflix might receive by exploring the issue with Mr. Griesbach is vastly outweighed by other factors, including that Netflix can and is exploring the issue by actually examining the records from Mr. Colburn's divorce.

The remaining excerpts cited by Netflix express nothing more than Mr. Griesbach's opinions of certain aspects of the investigation, many of which show his opinion evolved from the

time he watched *Making a Murderer* to a later period following his review of the evidence. At that point he learned how badly the defendants had misled viewers. Dkt. 206, pp. 14-15. Netflix offers no explanation of how Mr. Griesbach's opinions are relevant, especially those formed when he knew little other than what Netflix spoon-fed its viewers. Regardless, Mr. Griesbach's opinions are no more valuable to Netflix than those of hundreds if not thousands of other similarly "obsessed" observers of the Avery case and *Making a Murderer*.

The same can be said with regard Netflix's citation of a congratulatory email Mr. Griesbach sent to the producer defendants on Dec. 23, 2015, approximately one week after *Making a Murderer*'s release. Dkt. 206, pp. 14-15. Having liberally cited *Indefensible*, Netflix understands that Mr. Griesbach's opinion changed drastically upon examining the facts. Indeed, the defendant's manipulation of the truth is *Indefensible's* central theme. In fact, the radio interview Netflix cited in its brief was a conversation about the significant degree to which *Making a Murderer* distorted the truth. Dkt. 206, Def. Br., p. 8. In short, Mr. Griesbach's opinion is not only irrelevant to Netflix's defense, the fact it evolved supports Mr. Colborn's claim.

### V. Mr. Griesbach's Research Is Protected Under Wis. Stat. § 885.14 Which Is An Absolute Privilege Which Netflix Did Not Mention Nor Address

Wis. Stat. § 885.14 provides in relevant part, "no person having the power to issue a subpoena may issue a subpoena compelling a news person to testify about or produce or disclose any of the following that is obtained or prepared by the news person in the news person's capacity in gathering, receiving, or preparing news or information for potential dissemination to the public . . . any news or information obtained or prepared in confidence by the news person [and] any news, information, or identity of any source of any news or information . . ." Wis. Stat. § 885.14(2). A news person is defined as "any person who is or has been engaged in gathering,

14

receiving, preparing, or disseminating news or information to the public for an entity described in par. (a)" with par. (a) including "any business or organization that, by means of print . . . disseminates on a regular and consistent basis news or information to the public, including a . . . book publisher". Wis. Stat. § 885.14(1).

Mr. Griesbach falls neatly under the definition of a news person. Mr. Griesbach gathered information for public dissemination for his book published by Pinnacle Books. Pinnacle Books disseminates information to the public by publishing books on a regular basis. The statute clearly prohibits Netflix from obtaining "any news or information obtained or prepared in confidence by the news person" as well as "any news, information, or identity of any source of any news or information." These are broad categories which cover the information gathered by Mr. Griesbach in the preparation of his books. While Mr. Griesbach has already indicated that he relied exclusively on publicly available information, the reality is Wis. Stat. § 885.14 <u>absolutely protects him from disclosing the specific documents, persons, and other information which he utilized for his books</u>. This statute by itself must dictate the outcome of Netflix's efforts. Despite this, at no point and in no place has Netflix even noted the existence of this fundamental evidentiary prohibition.

The legislature clearly felt the need to provide strong protections for those wishing to disseminate information to educate the public. Even if a party gets a hold of such information, they are prohibited from utilizing it as the statute states, "Any news, information, records, communications, or the identity of a source of any news or information obtained in violation of this section are inadmissible for any purpose in any judicial, legislative, or administrative actions,

Case 1:19-cv-00484-BHL   Filed 04/13/22   Page 15 of 17   Document 214

proceeding, or hearing." Thus, Netflix is neither entitled to the information nor could it use the information in this matter even if it obtained it.

Further, "A disclosure to another person or dissemination to the public of news, information, or the identity of a source . . . by a news person does not constitute a waiver of the protection from compelled disclosure". Wis. Stat. § 885.14(4). As such, even though Mr. Griesbach's book is published and even though he has already indicated that he relied on publicly available documents, he did not waive his protection from compelled disclosure. It is likely that the legislature was attempting to protect authors such as Mr. Griesbach from situations exactly such as this. If any author can suddenly become a witness because of their interest and research into a topic, their incentive to provide information and thoughts to the public is greatly diminished. Such legislation and protections are necessary to prevent harassment of those disseminating information, thereby ensuring that news and information can be disseminated to the public. Some of the most fundamental concepts underlying our society are the rights of free speech and freedom of the press. Without such protections, speech and press are likely to be inhibited by fear of retaliation or concerns of being dragged into litigation for any number of reasons. Mr. Griesbach, clearly fits within the parameters of this legislation and is therefore granted its protections.

## CONCLUSION

Netflix and its counsel have taken a position that has no basis in evidentiary law and the law of discovery. It is a position that is absolutely prohibited by Wisconsin law. This, of course, leads to the question, of course, of why Netflix would do this. Counsel for Mr. Griesbach suggests that Netflix has a motive that exceeds the scope of its effort. It may be to harass, it may be to

disqualify counsel chosen by Mr. Colburn, or it could be to simply acquire information that it would use to stir up controversy or to be used for intimidation. We will never know, but we do know that such information and material sought by Mr. Griesbach is anything but discoverable, relevant evidence. The legislature has unequivocally barred Netflix from obtaining such information. There are many other common-sense reasons based on the fundamental rules of evidence and discovery that not only augment against Netflix's efforts, but strongly condemn the same.

Dated this 13th day of April, 2022.

/s/ John F. Mayer

By: _____
     John F. Mayer, SBN: 1017384
     Attorney for Michael Griesbach
     MAYER, GRAFF & WALLACE, LLP
     1425 Memorial Drive, Suite B
     Manitowoc, WI 54220
     Telephone: (920) 683-5800
     Facsimile: (800) 465-1031
     Email: jmayer@mgwlawwi.com