# Exhibit 5

| | |
|---|---|
| **From:** | Walker, Leita (Minn) |
| **Sent:** | Tuesday, April 12, 2022 6:27 PM |
| **To:** | Kelley, Matthew E. (DC); Salomao Nascimento, Isabella (Minn) |
| **Subject:** | Fwd: Follow-up to Meet-and-Confer |
| **Attachments:** | Colborn - response to Leita Walker.pdf; Colbron -- responses to Kevin Vick.pdf |

Sent from my iPhone

Begin forwarded message:

> **From:** April Barker <abarker@sbe-law.com>
> **Date:** April 12, 2022 at 4:50:12 PM CDT
> **To:** "Walker, Leita (Minn)" <WalkerL@ballardspahr.com>, Kevin Vick <kvick@jassyvick.com>, James Friedman <JFriedman@gklaw.com>, "Parsons, Emmy (DC)" <parsonse@ballardspahr.com>
> **Cc:** George Burnett <GB@lcojlaw.com>, Michael Griesbach <attymgriesbach@gmail.com>, "Debra L. Bursik" <debrab@lcojlaw.com>
> **Subject: Follow-up to Meet-and-Confer**
>
> ⚠ **EXTERNAL**
> Hi all,
>
> I am attaching documents that contain Kevin's and Leita's messages from Friday with our responses in boldface type. (In order to avoid confusion, I removed boldface from some of Leita's headings -- they are still underlined.)
>
> It seemed that it would be too unwieldy to try to send these responses within an email message at this point, and I was concerned that we might lose font coloring and highlighting that distinguish whose comments were made by which speakers at this point.
>
> If I missed an issue, please let me know.
>
> April

1

Case 1:19-cv-00484-BHL   Filed 04/26/22   Page 2 of 14   Document 220-5

Here are the items Netflix would like to discuss; counsel for the Producer Defendants may have additional questions. All of these items should be on your radar already through prior correspondence; we have just compiled them here for convenience. Several produced documents are referenced and we will send those by separate email to facilitate the discussion.

Manitowoc County Documents

1. We are using the Manitowoc County documents produced by your team on February 9, 2022, and we have disregarded the subsequent set of documents produced by your team on February 28, 2022.

1. Do you agree that the parties will use Mr. Colborn's personnel file as bates stamped by Netflix as MCSC_000001-0127?
    a. If so, Netflix shall apply the "Confidential" designation to these documents as you requested and produce the records to all parties in accordance with the ESI protocol.

All parties are in agreement with #1 and #2 above, and will proceed accordingly.

1. Do you agree to produce the "de-duped" Manitowoc County documents, as we requested by email correspondence on February 17, 2022?

The parties agreed that the first set of Manitowoc County documents which your team produced to us were de-duped, and we asked you to confirm whether the second set which your team produced was the complete set or whether it was similarly de-duped. Debra indicated that the second production of these documents is the complete set, with no duplicates removed. We offered to try to compare the two productions to determine what was de-duped from the first set. We told you that if we are unable to complete that comparison, we likely will ask you to provide a declaration regarding how documents were de-duped from the first set and confirming the omitted documents can't be identified and produced to us.

1. With regard to your claim that some of these documents may be privileged: Some of the Manitowoc County documents for which you claim privilege were *also* produced in whole, or in part, by Netflix, as indicated by the "FOIA" bates label. Will you will withdraw your claim of privilege as to those documents? For example:

    a. Mr. Colborn's communications with Patrick O. Dunphy (FOIA_0015512-13; FOIA_0015520; FOIA_0016447; FOIA_0016449-50; FOIA_0016472-73; FOIA_0018423-24);
    b. Mr. Colborn's communications with Matthew V. Fisher (FOIA_0015982-83); and
    c. Mr. Colborn's communications with Jerilyn Dietz (FOIA_0016534-35 (attached)

We provided several reasons why these documents are not privileged. First, we explained that the documents were never privileged because Plaintiff communicated using his Manitowoc County email address, in which he held no reasonable expectation of privacy. Manitowoc County's computer use policy is clear that such communications can be accessed anytime. Plaintiff signed an acknowledgment of this policy, indicating his understanding and acceptance of this policy.

Second, we explained that even if they were privileged at the time of creation, these documents have now been in the public domain for so long that any privilege is long gone. We explained that the documents with prefix "FOIA" were produced by Manitowoc County pursuant to Wisconsin's public records law to members of the public (not anyone from Netflix or Ballard), and many of them were posted online long ago. This cat cannot be put back in the bag: neither Colborn nor the Court has any authority to "claw back" these documents from third parties (whether individuals or social media platforms such as Reddit); likewise, they cannot enjoin their further distribution. These documents are now irrevocably public, and their disclosure results in a subject-matter waiver of any privilege that might otherwise protect other, related communications.

You disagreed. We indicated that we would be moving to compel on this issue, and you indicated that we should do so as the parties would not reach agreement on this point. You further indicated that any motion to compel would need to seek a ruling on both the privilege as to the documents and the scope of questioning of Plaintiff at his deposition about these records and the subjects contained therein.

1. Do you also agree to withdraw any claim of attorney-client privilege with respect to any communications that Mr. Colborn forwarded, in whole or in part, to third-party Brenda Schuler? For example:

    a. Mr. Colborn's communications with Patrick O. Dunphy (Manitowoc-000242-43; Manitowoc-000249; Manitowoc-000270-272; Manitowoc-010315-16);
    b. Mr. Colborn's communications with Matthew V. Fisher (Manitowoc-000264-65);

With respect to communications between Plaintiff and counsel or prospective counsel, we explained that, even assuming for the sake of argument that these were once privileged, that privilege was waived by Plaintiff when he forwarded the communications to non-attorney third parties, such as Brenda Schuler. You generally agreed that communications revealed to others who don't share an agency relationship are not privileged. You indicated that you would assess whether there is any agency relationship with Schuler, and provide us Plaintiff's position next week (you said you were talking to Mr. Colborn Monday and would endeavor to give us a definitive answer no later than Tuesday, April 12). We followed up that there is substantial overlap between the documents produced by Manitowoc County in response to the public records requests—i.e., the FOIA documents—and the communications which Plaintiff forwarded to Brenda Schuler. We additionally indicated that a finding of waiver over these communications would result in a subject-matter waiver. You indicated that you would review the scope of subject-matter waiver and provide us Plaintiff's position on that as well. Please note that if you take the position that Ms. Schuler is or was Ms. Colborn's agent, we will expect to see any documentation of that relationship that exists (in addition to any release or other contract he has related to Ms. Schuler's film project).

**We can agree that documents forwarded by Mr. Colborn to other individuals who are not attorneys and with whom there is no other privilege are not privileged. We will produce such documents without AEO designations. We do not have authority from our client at this time to enter into any stipulation that there has been a "subject matter waiver."**

1. Will you agree to revisit your confidentiality/AEO designations on these documents and remove all AEO designations? Will you also review all confidentiality designations, unless the document could be properly withheld under the open records law?

You indicated that you would review the confidential/AEO designations for the documents produced in response to Netflix's subpoena to Manitowoc County and would provide us Plaintiff's position on the designations next week. We indicated this too would be part of a motion to compel, in which we would seek recovery of fees, if agreement cannot be reached.

**We can provide revised designations by the end of this week. We agreed to participate in a motion to extend the Defendants' deadlines, at Chrome's request, but also benefiting Netflix, specifically to allow time to attempt to compromise with respect to the issues that you raised at a reasonable pace given the amount of material involved and the fact that team members who are primarily handling some of these matters are involved in other active litigation cases as well. Therefore, we do not believe that this timeline is unreasonable.**

Additional Privilege Designations

1. Do you agree to withdraw your assertion of a "3rd party journalist privilege" with respect to any documents and communications withheld or redacted on this basis, and to produce all such records in full to Defendants? For example, in your production of Mr. Colborn's text messages, you withheld in full text message exchanged between Mr. Colborn and Brenda Schuler, Shawn Rech and Emily Matesic. Wisconsin's reporter's privilege does not apply to non-journalists such as Mr. Colborn. Further, he has put these emails in issue in his response to Chrome Interrogatory No. 10 (stating he "disclosed how MAM has caused me damage to the producers of an upcoming documentary").

With respect to Plaintiff's assertion of a "3rd party journalist privilege," we explained that Plaintiff has no standing to assert a reporter's privilege. We further explained that although a journalist can assert the privilege when a subpoena is directed at the *journalist* and seeks documents in the *journalist's* possession, the discovery requests at issue here were directed to Mr. Colborn. No journalist can preclude a source such as Mr. Colborn from complying with discovery obligations. Here, those obligations include producing documents in his possession, custody, or control that are responsive to Defendants' discovery requests—including his correspondence with journalists and filmmakers. One primary purpose of the reporter's privilege is to prevent lawyers and litigants from using journalists as free investigators rather than complying with their responsibility to conduct discovery from the parties to the action. Indeed, the Wisconsin statute on the reporter's privilege includes an exhaustion component, which requires the requestor of the records to have attempted to procure the records from all other sources, which here would be Plaintiff.

You clarified that Plaintiff is not himself asserting the reporter's privilege, and that you agree he does not satisfy the newsperson definition in the statute. You said that the journalists with whom Plaintiff was communicating are now claiming that the responsive information is privileged and that you should not disclose it, and that you are offering these individuals an opportunity to assert their own privilege over this information.

We informed you that this issue is not a close call. We will be moving to compel production of these responsive documents and seeking fees, unless Plaintiff agrees to produce all responsive records that have been withheld and to reproduce redacted records in unredacted form. You indicated you would let us know your final position promptly next week.

**Counsel for WBAY and the Wall Street Journal have indicated subsequent to the conference with you last week that they will not seek protection for these communications in these proceedings; accordingly, those communications will be produced. I note that Craig Linder, counsel for the Wall Street Journal, indicated that he did not necessarily agree with your assertion that a subpoena to a source such as Mr. Colborn would not trigger potential journalist's privilege protection. My understanding is that the Wall Street Journal could have contended a broader privilege applied such as under New York's journalist's privilege. This issue demonstrates why we could not simply assume based on the wording of Wisconsin's statute that your analysis was correct. However, Mr. Linder indicated that they had concluded that the content at issue was not sufficiently sensitive to warrant the effort to become involved in this case.**

**With respect to the communications with Brenda Schuler and Shwan Rech, they have asked that we designate any such communications as "Confidential" pursuant to the protective order because they are in production and the communications relate to an as-yet unreleased work. If you object to such designations, please advise. Please keep in mind that you have to date refused to relinquish your own designations of all Netflix email communications as "Confidential." It may be that we will be able to reach some agreement to seek permission from the Court to file documents designated as "Confidential" under seal without the need to go through local rule procedures as to each document for purposes of later motion practice.**

1. Do you agree to waive any assertion of "priest/parishioner privilege" with respect to Pastor Tom Pankow, whom you have identified as a damages witness for Mr. Colborn?

**Mr. Colborn does not assert priest/parishioner privilege with respect to Pastor Tom Pankow.**

1. Do you agree to waive any assertion of "spousal privilege" with respect to all documents and communications withheld or redacted on this basis between Mr. Colborn and Barb Colborn, as Mr. Colborn has identified the dissolution of his marriage as an alleged damage and has also identified Ms. Colborn as a damages witness?

<span style="color:orange">With respect to the April 18 depositions of Pastor Thomas Pankow and Barbara Colborn, April indicated that she is available on that date and will appear on behalf of Plaintiff, and Kevin indicated he would participate remotely on behalf of Producer Defendants. April, just let us know whether we should expect you in person or remotely, and if remote, we will send both you and Kevin the link as soon as that has been set up.</span>

<span style="color:orange">Regarding the clergy-parishioner and spousal privileges, we stated that we are deposing the pastor and Mr. Colborn's ex-wife primarily because he identified them as damages witnesses, and we don't want to waste time at the depositions by an unexpected assertion of privilege. George indicated that whether the privilege applies is dependent on the questions being asked, but that Plaintiff agrees that any claims for damages based on conversations with either of these witnesses over which he claims a privilege cannot then be introduced at a later time against the defendants. We further explained that the driving forces behind the need to depose these individuals are Plaintiff's intentional infliction of emotional distress claim and his allegation that the documentary was the cause of his divorce. In response to George's question about, if Plaintiff withdrew the allegation about the divorce being caused by the documentary, whether that would eliminate the need to depose Ms. Colborn, we indicated that we would need withdrawal of at least the IIED claim, the divorce allegation, and likely an agreement that she could not be used as a witness at trial. But we indicated that, even then, Ms. Colborn is uniquely</span>

situated to provide relevant testimony on Plaintiff's garden-variety claim for damages in a defamation case. Withdrawal of the IIED claim and the divorce allegations would significantly reduce the scope of these witnesses' depositions, though.

You ultimately informed that you would confer with Plaintiff about whether he will waive any claim of clergy-parishioner and spousal privileges and inform us as soon as possible next week. If Plaintiff agrees to waive the privileges, we will also expect him to produce any documents he withheld on the basis of these privileges. If he does not waive the privileges, we likely will bring a motion on the issue and will seek fees.

**Mr. Colborn will waive spousal privilege and also withdraws, for purposes of these proceedings and to streamline the litigation only, the assertion that MAM caused his divorce.**

February 28 and March 3 Colborn Text Message Production

1. The text messages were not produced in accordance with the parties' ESI protocol, including because they lack bates labeling. Please re-produce the productions with each text entry bates labeled;

1. The text message productions are also deficient in that they were not produced with metadata or as members of "families." In addition, there are at least 32 text messages where the body field is blank, and there is an indication that there was an attachment. We do not want you to re-produce the entire production, but are you willing—upon our identification of specific text messages, including those we intend to use in any briefing to the court and/or in any hearing or trial proceeding—to promptly produce those specific messages in accordance with the ESI protocol?

The difficulties we identified with the production are that we are unable to code, filter, or reconfigure the spreadsheets in any meaningful way without destroying their organizational integrity and losing the ability to go back to "square one," and that we have been unable to ascertain which attachments correspond with the relevant "blank" fields in the spreadsheets. We proposed simply adding a column to the spreadsheets and providing a uniform prefix, such as "ColbornTexts-00001," which would then increase sequentially and be applied across both spreadsheets of text messages. The parties could then refer to individual texts according to each text's unique identifier.

Debra expressed concern that adding such a column would de-couple the computer links to the respective attachments, so Debra will check with your ediscovery provider and quickly let us know about the possibility of providing a uniform label to the text messages across the spreadsheets. We indicated that we would continue trying to figure out which attachments correspond to the respective blank fields in accordance with the provided instructions.

**We are advised by our ESI provider that Defendants should be able to insert a column in the excel spreadsheets if they keep the spreadsheet with the other files so as to not lose the data in attachments.**

**However, the various spreadsheets cannot be combined easily. There were 3 spreadsheets produced as the data came from 3 different phones. Our e-discovery provider has indicated it would take**

**further research to see if the data between phones can be combined. If defendants wish to pursue that, they would need to bear that cost.**

**Right now the data can be identified by the A, B, and C – which was on each spreadsheet and the line number, which appears on the far left side of the spreadsheet.**

March 11 Colborn Email Production

1. On what basis are you asserting that *all* emails in the March 11 production of Mr. Colborn's emails are designated "Attorneys' Eyes Only"?

We asked you to revisit your blanket designation of all of Plaintiff's emails as AEO. You agreed to do so, and the parties agreed that you would provide us an excel spreadsheet with any confidentiality designations for these documents, which our ediscovery team will then apply to the documents.

**As we explained, we were only concerned with private information – such as addresses, phone numbers, or other personal information in the emails. Again we can identify which emails those are by the end of this week.**

Damages Witnesses

1. When will you supplement your January 28, 2021 and February 16, 2021 responses to the Producer Defendants' Interrogatory Number 10, which called on you to provide the "individual's full name and present, or, if that is not known, last known address, telephone number, email address, occupation, and present or last known employer," as well as the "substance of each person's knowledge"? In addition to requiring contact information and substantive knowledge for those individuals identified on February 16, Defendants also require complete identifying information and substantive knowledge for all individuals described in vague detail in your January 28 response.

With respect to outstanding information regarding the witnesses Plaintiff identified in response to Producer Defendants' Interrogatory Number 10, George indicated that he will ask Plaintiff to provide telephone numbers or other forms of contact, such as email addresses, in advance of counsels' meeting with Plaintiff that is scheduled for Monday. George indicated that we can expect a short description of the substance of each person's knowledge relevant to Plaintiff's damages claims after counsels' meeting with Plaintiff on Monday.

**After further consultation with Mr. Colborn, we may be withdrawing some of these witnesses. We will provide the information that you requested for those witnesses whom Mr. Colborn intends to preserve as damages witnesses as soon as possible.**

Additional Questions

**We do not see reason to respond at this time to your additional comments to your "Additional Questions" below, but this should not be taken as agreement with argument that you have included in your questions or comments.**

1. Do you anticipate producing documents in response to Netflix's Second RFPs on Wednesday, April 6? If not, what is your plan for production of responsive records?

We received your latest production, so thank you. Debra indicated that, at this time, Plaintiff does not anticipate any further productions in response to Netflix's Second RFPs.

1. When will the parties receive deposition notices for the depositions planned for the last week of April, including:
    a. April 26: Adam Del Deo;
    b. April 27-28: Laura Ricciardi and Moira Demos; and
    c. April 29: Lisa Nishimura?

With respect to the notices of depositions for those Netflix deponents listed above, Debra emailed them shortly after the meeting. We informed you that 8 a.m. Pacific time did not work for the Netflix witnesses and suggested a 10 a.m. Pacific start time.

We also discussed a few topics not in my April 4 email:

- With respect to Mr. Griesbach's books, we agreed to provide you with copies of the copyright pages from the books which we may use, to ensure that all parties are working from the same editions. You indicated that this would suffice, and that we do not need to produce the books to you at this time. You would procure copies, to the extent those books are not already available to you through Mr. Griesbach.

- Further, on the motion in limine related to Mr. Griesbach, we asked whether Plaintiff would stipulate to a briefing schedule that is scheduled closer to the time of the trial in this case, which has yet to be scheduled. We further informed that we will move for such a briefing schedule, as the Court has no reason to yet resolve this issue and the parties have other pressing discovery matters to resolve. You indicated that you will confer as a team and then promptly inform us of whether you will agree to a stipulated briefing schedule or whether you would oppose our motion. April indicated that Mr. Colborn brought the Motion in Limine in hopes of somehow heading off disclosure of a large number of documents by Mr. Griesbach that would be time consuming to review during an already busy period of discovery. We said we did not know how many responsive documents Mr. Griesbach had and that our meet and confer with his counsel was extremely unproductive and his counsel did not agree to voluntarily disclose any documents. Upon further reflection, I would now note that whatever the outcome of the Motion in Limine, such motions go to admissibility, not discoverability. So regardless when/whether the Motion in Limine is decided, our position is that we're entitled to Mr. Griesbach's documents, for the reasons set forth in our motion to compel. Thus briefing the Motion in Limine over the next few weeks (rather than closer to trial) will in no way alleviate April's concerns about the need to review additional documents and will in fact just add to everyone's already full plates. Further, it will be difficult for us to respond completely to the Motion in Limine until we're able to see the documents that we've requested of Mr. Griesbach.

Finally, I wanted make clear Netflix's position regarding a few items in April's attached email:

April wrote: We also remind you that we consented to an extension of many of your deadlines in the case for the purpose of allowing time for discussion and resolution of alleged issues to the extent possible.

> Netflix has not sought any extensions from the court in this case. Plaintiff and the Producer Defendants have sought extensions, which Netflix did not oppose. The one time Netflix indicated it needed a bit more time to get documents to you (last October), you moved for sanctions (a motion you later withdrew).

April wrote: Finally, with respect to Netflix's designation of all email messages involving MAM's production as confidential, we reiterate our concern that you have failed to supply any rationale for these designations in response to our prior inquiries. The problem that this creates is that according to local rule, the protective order is not a sufficient basis for filing documents under seal; a separate request must be made identifying the basis for the designations. When we file our response to your eventual summary judgment motion(s), we will not have any basis for representing to the Court that they should be filed under seal, because you have not articulated one. In the absence of any plausible rationale for sealing these documents, we will need to seek direction from the Court well in advance of summary judgment briefing regarding the proper treatment of these documents so that we are not caught in a bind during summary judgment briefing.

> I don't believe we have failed to respond to any inquiry about this and if you can point us to a specific inquiry we will try to find our response to that inquiry for you. At present, unless someone moves the court for intervention on designations, it seems we will all be in the same boat come time for summary judgment since you, too, have designated nearly everything confidential. In fact, unlike Netflix (and as discussed above and during our phone calls) you have designated a significant percentage of your production as AEO. We are open to any suggestion you want to make about how to deal with this. We 100% agree that over-designation unnecessarily complicates this case. That said, we do not believe we have over-designated.

April wrote: Please also note that we have not yet completed an exhaustive list of deficiencies with the Defendants' productions, and we reserve the right to request additional meet-and-confer conferences as may be necessary or appropriate as we continue our review and analysis of Netflix's and Chrome's productions.

> We are not sure which of the Defendants you are talking about here and are concerned that you continue to conflate Netflix with the Producer Defendants—e.g., in asserting you have granted us many extensions. That said, we are always willing to meet and confer, though we would be surprised to learn at this late date that you believe our discovery responses are in any way deficient. Although you have certainly had questions about our production (e.g., related to raw footage and Google docs), we have answered those questions and you have never identified any actual deficiencies, despite our serving written responses nine months ago and finishing our document production five months ago, on October 28 (except for a small set of documents we expect to produce in the very near future that are responsive to your recently served 7th set).

April, George and Mike,

In addition to those matters already raised in Leita's email and comments in orange below, here are my additional follow-up items from the parties' meet and confer conference calls this week:

1. You stated that you would be inquiring with Mr. Colborn on Monday regarding any agreements between him and the entities and people behind the *Convicting* documentary project. We believe that we are entitled to any such agreements, and you stated that you would inquire as to the existence of any such agreements and would advise us regarding that and also regarding your position whether you will provide us with such documents. In the absence of such an agreement, we will be moving to compel with respect to such materials.

   **As George indicated, we do not believe there is an "Agreement," rather, an authorization. We will be producing it based on your request, though I am not certain that it is responsive to any of your specific formal requests.**

2. You represented that Plaintiff was not instructed to time-limit searches of documents and communications to after December 2015, in response to my pointing out the paucity of such materials in Plaintiff's production to date. You stated that Plaintiff's position is that he has now (as of April 7, 2022) produced everything responsive in his possession, but that you would confirm this is the case with Mr. Colborn when you speak on Monday. Relatedly, you stated that Plaintiff's position is that he does not possess any responsive emails or text messages that predate December 2015. I believe you said that you would confirm this with Mr. Colborn when you speak on Monday, but if I'm incorrect in my recollection, I would ask now that you do so regardless.

   **Plaintiff's position is that he does not possess any responsive email messages or text messages that predate December 2015.**

3. You stated that Plaintiff's position is that he does not possess any documents contemporaneous to the events he has placed at issue in this case through his Second Amended Complaint, starting in 1994/1995 and including 2003-2007, other than the modest amount of documents he has already produced. Again, you stated that you would confirm this with Mr. Colborn when you speak on Monday.

   **Plaintiff had produced what he believed to be all responsive documents, but he is double-checking this. Any responsive non-privileged documents identified will be produced. Mr. Colborn likely will also produce in the near future some additional documents as to which privilege claims for those documents may be abandoned, but they do not relate to the time frames that you have identified. Mr. Colborn simply had no reason to nor did he retain many documents relating to the events that were the underlying subject of MAM.**

4. You stated that you would check with Mr. Colborn on Monday regarding his [hshs.com](hshs.com) email account and whether there are any responsive documents there, as I pointed out that Mr. Colborn sometimes sent such emails from his Manitowoc County Sheriff's Office (MTSO) account when he worked there.

**Mr. Colborn indicates that he is prevented by a firewall from sending messages from the hshs.com email account. Those responsive messages that Mr. Colborn forwarded from his other account to the hshs.com account have been produced.**

5. You stated that Plaintiff's position is that he searched for all types and formats of documents – not just limited to emails and text messages – and has produced all responsive documents in his possession. Again, I believe you said that you would confirm this with Mr. Colborn when you speak on Monday, but if I'm incorrect in my recollection, I would ask now that you do so regardless.

   **Correct. The search was not limited to email messages and text messages.**

6. You stated that Plaintiff's position is that he has produced all documents providing the factual basis for his damages claims and calculations. We note the lack of information provided regarding Mr. Colborn's pension and hospital wages. Does the April 6 production you made cover that, or should we expect that more such financial documents are forthcoming?

   **Please note that any hospital or pension income should be reflected in Mr. Colborn's tax returns, which we have now produced. Please advise whether this satisfies your request.**

7. Plaintiff has not produced documents regarding mitigation of damages or financial opportunities that he has been offered in relation to his prominence from *Making a Murderer*, such as speaking opportunities or agreements with the producers of *Convicting*. Please produce such documents or confirm in writing that Mr. Colborn's position is that no such documents exist.

   **Correct; to our knowledge, no such documents exist, other than to the extent text messages already produced may have referenced speaking engagements that Mr. Colborn did not attend.**

8. While I don't believe we raised this at the meet and confer calls, I note that Plaintiff has produced in discovery negative messages he received from the public, but he has not provided any more positive messages, including "fan mail" that he has referenced receiving in his writings. Please produce any such positive messages and fan mail related to *Making a Murderer*.

   **It was my impression that the term "fan mail" may have been used sarcastically, to refer to negative messages. However, Mr. Colborn does not have any positive "fan mail" related to Making a Murderer in his possession other than anything that was already produced, unless there may be some documents in materials provided to Jerilyn Dietz. Mr. Colborn may abandon privilege claims as to some materials that he provided to Ms. Dietz, but not as to other confidential communications with Ms. Dietz while she was assisting him in attempting to pursue the claims that ultimately were filed in this case.**

9. Plaintiff will supplement certain discovery responses, including responses to RFA 1 and Interrogatories 1, 2, 5, and 7 from the Producer Defendants. Please let me know if I'm mistaken as to the specific items for which Mr. Colborn has agreed to supplement.

**It is our goal to supplement the indicated responses by the end of this week, barring additional interruptions, particularly those related to this case.**

10. We discussed working together to resolve issues with accessing the media attachments to the text messages that Mr. Colborn produced. It is not clear to me whether that has been completely resolved, or whether we still have to finish addressing the issue.

    **If you need to have your tech staff reach out to Debra Bursik to further address these issues, please feel free to have them contact her at 920-437-0476.**

11. You stated that Plaintiff's position is that he does not possess certain documents or communications that I identified in my March 23, 2022 letter, as missing from production, despite Plaintiff's direct references to them in other documents, but you would confirm this with Mr. Colborn on Monday. The specific documents and communications are:
    - Physical files, including "fan mail" dropped off at Jerilyn Dietz's law offices in February 2016, as referenced in January 2016 emails with Jerilyn Dietz.
    - February 2017 emails to numerous individuals, including the DOJ and DA, circulating an article and jailhouse confession letter, referenced in text messages with Brandy Rima and several other individuals.
    - October 2017 emails with Mark Wiegert regarding Kevin Rahmlow and the November 2005 call to dispatch, referenced in October 2017 text messages with Mark Wiegert.
    - Communications with Joe Kriel and others reflecting opportunities to "make some serious cash on the speaking circuit" and the agreements with the *Convicting* producers that prevented him from taking such opportunities, referenced in October 2017 text messages with Joe Kriel.

    **With respect to "fan mail," please see the discussion of that issue, above. With respect to the other identified bullet points, you are correct that Mr. Colborn does not believe that he has any such documents in his possession and we have not been able to find them in the messages extracted from his phones.**

1. Please clarify one point that seemed to be a source of confusion. In her April 5, 2022 email, April explained Plaintiff's discovery responses referring to MTSO's production by saying "We attempted to inform you that we would not be including in Mr. Colborn's responses copies of the very same documents that were obtained from the Manitowoc County production." Defendants understood this to mean that Colborn has some copies of emails included in the MTSO production that he did not produce himself. But then during the April 7, 2022, I believe Debra represented that there were no duplicates and that ==Plaintiff had produced all emails in his possession.==
    - To the extent Mr. Colborn independently possesses "the very same documents that were obtained from the Manitowoc County production," please produce them. We are glad to address duplicates on our end and are most concerned with a complete search and production. If there are no such duplicate documents, then please confirm here so we're clear.

        **The yellow highlight statement above is correct. This is not correct: ". . . Colborn has some copies of emails included in the MTSO production that he did not produce himself."**

- o One item I would note: It is apparent from the MTSO production that there are MTSO emails exchanged with the "fantomfixer" email account that Plaintiff did not produce in his email production. Please produce those and any other responsive emails that Plaintiff did not previously produce to us.

    **If responsive email messages existed in exchanges with the fantomfixer email account, they do not appear to exist there now, to our knowledge. We have reviewed the specific examples that you identified to confirm this. If there are additional specific examples that you would like to bring to our attention, please identify them.**

1. As I mentioned on the call, the Producer Defendants have another production forthcoming in the coming days. Given the breadth of the requests served by Plaintiff on the Producer Defendants in March, it has taken time to compile the voluminous responsive documents, but we are diligently working to produce this final set of documents.

Thank you,

Kevin