# EXHIBIT 1

**In The Matter Of:**

*Andrew Colborn v*
*Netflix, Inc., et al.*

*Brenda Schuler*
*May 20, 2022*
*Confidential*

*Colleen Reed Reporting LLC*
*P.O. Box 293*
*Milwaukee, Wisconsin 53201*
*www.colleenreed.com*

Original File 052022brendaschulerfwx.txt
Min-U-Script® with Word Index

```
 1              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF WISCONSIN
 2    ------------------------------------------------------

 3    ANDREW COLBORN,

 4           Plaintiff,     CIVIL ACTION NO. 19-CV-0484

 5        -vs-

 6    NETFLIX, INC., ET AL,    ***CONFIDENTIAL***

 7           Defendants.

 8    ------------------------------------------------------

 9    DEPOSITION OF:  BRENDA SCHULER

10    DATE:          May 20, 2022

11    TIME:          8:39 a.m. to 4:57 p.m.

12    LOCATION:      Godfrey & Kahn, S.C.
                     833 East Michigan Street
13                   Suite 1800
                     Milwaukee, Wisconsin  53202
14
      REPORTED BY:   Janet D. Larsen, RPR
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3           SCHOTT BUBLITZ & ENGEL S.C., by
             APRIL ROCKSTEAD BARKER, ATTORNEY AT LAW
 4           640 West Moreland Boulevard
             Waukesha, Wisconsin  53188
 5           abarker@sbe-law.com
             appeared via Zoom videoconference on
 6           behalf of the Plaintiff.

 7           BALLARD SPAHR LLP, BY
             LEITA WALKER, ATTORNEY AT LAW
 8           2000 IDS Center
             80 South 8th Street
 9           Minneapolis, Minnesota  55402
             walkerl@ballardspahr.com
10           appeared on behalf of Netflix, Inc.

11           BALLARD SPAHR LLP, BY
             ISABELLA SALOMAO NASCIMENTO
12           ATTORNEY AT LAW
             2000 IDS Center
13           80 South 8th Street
             Minneapolis, Minnesota  55402
14           salomaonascimentoi@ballardspahr.com
             appeared via Zoom videoconference on
15           behalf of Netflix, Inc.

16           BALLARD SPAHR LLP, by
             EMILY S. PARSONS, ATTORNEY AT LAW
17           1909 K Street NW, Suite 1200
             Washington, DC  20006-1157
18           parsonse@ballardspahr.com
             appeared via Zoom videoconference on
19           behalf of Netflix, Inc.

20           JASSY VICK CAROLAN LLP, by
             MEGHAN E. FENZEL, ATTORNEY AT LAW
21           KEVIN L. VICK, ATTORNEY AT LAW
             355 South Grand Avenue, Suite 2450
22           Los Angeles, California  90071
             mfenzel@jassyvick.com
23           kvick@jassyvick.com
             appeared via Zoom videoconference on
24           behalf of Chrome Media LLC.

25
```

```
1          ANNIGIAN RYAN LLP, by
           NICHOLAS A. KURTZ, ATTORNEY AT LAW
2          114 North Indian Hill Boulevard, Suite E
           Claremont, California  91711
3          nk@arllp.com
           appeared on behalf of the Witness.
4
     ALSO PRESENT VIA ZOOM VIDEOCONFERENCE:
5          Moira Demos
           Laura Ricciardi
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          Do you see all that?

2    A.   I do.

3    Q.   Do you remember getting an email from Mr. Colborn

4         in reference to what he says here, about Judge

5         Pamela Pepper?

6    A.   My recollection isn't great on it, but I believe

7         it was something regarding, like, her history on a

8         website or something.  Did you get the email.  I

9         don't remember exactly what it was.

10   Q.   Are you willing to run a search for the name

11        Pamela Pepper and send us any email you have about

12        her?

13   A.   Possibly.

14   Q.   And Mr. Colborn says, I will forward what Mike

15        sent me about her.

16             Do you see that?

17   A.   Yes, m-hm.

18   Q.   And so he's forwarding you a communication that he

19        had with -- Mike Griesbach -- I'll withdraw that.

20             My first question is Mike is a reference

21        to Mike Griesbach; correct?

22   A.   Yes.

23             MS. BARKER:  Object as to foundation.

24   Q.   So he was forwarding you a privileged

25        communication he had with his attorney,

1           Mr. Griesbach; correct?

2                        MS. BARKER:  Same objection.

3    A.    I don't know, I don't know how privilege works.

4          I'm sorry.  I don't know if he was just sharing

5          something he didn't care if it was privileged or

6          not or if all attorney-client is privileged for

7          anything.  I don't know.  But, yes, he forwarded

8          an email from Mike Griesbach.

9    Q.    Okay.  And he said, just between you and me, tho,

10         and what was your understanding of why he said

11         that?

12                       MS. BARKER:  Object as to foundation.

13   A.    Not to share with anyone.

14   Q.    Did he ever tell you to not tell Mr. Griesbach

15         that he was sharing communications with you?

16   A.    Maybe, maybe.  I don't, I can't think of anything

17         offhand but maybe.  He could have said, don't

18         share this with Mike.  I, I don't know.

19                       (Exhibit 2028 marked for identification)

20   Q.    The court reporter just handed you Exhibit 2028.

21         Again, these are text messages between you and

22         Mr. Colborn; correct?

23   A.    Yes.

24   Q.    And the exhibit begins at Bates No. 8990, but I'll

25         direct you to three pages in, 8992.

1        how much they support our decision to do this, and

2        the pastor told me we will all be in his prayers.

3        Thought you would like to know that, Brenda.

4                Did I read that correctly?

5  A.   Yes.

6  Q.   And you say, Aww.  Thanks so much.  That is

7        wonderful to hear.  And he says, You betcha.  Nice

8        to have the support of a church, and people seem

9        to be happy about what we are doing.

10              Did I read that correctly?

11  A.   Yes.

12  Q.   And so, like, he had the support of his law

13        enforcement community, Mr. Colborn had the support

14        of his church community; correct?

15  A.   Yes, his church, yes.

16  Q.   Oh, you can hang on to that actually --

17  A.   Okay.

18  Q.   -- for just one more minute.

19            I'll take that back.  I'm going to hand

20        you another exhibit.

21           (Exhibit 2051 marked for identification)

22  Q.   So the court reporter has handed you Exhibit 2051.

23        These are texts, and really they're, well, they're

24        texts with some photographs from Mr. Colborn to

25        you; correct?

1   A.   Correct.  Yes.

2   Q.   And at the top on Bates No. 5126 he says, This is

3        what I have for you, and he sends you a picture of

4        a box with some files in it, it looks like; is

5        that correct?

6   A.   Correct, yes.

7   Q.   And this was coming in June of 2018; right?

8   A.   Yes.

9   Q.   And what was in that box?

10   A.   That was the file that he had previously given to

11        a prior attorney that he gave to me.  It was the

12        CDs that we were talking about earlier, the 27,

13        his personnel report.  Oh, his personnel -- It was

14        everything pretty much from Manitowoc County

15        regarding his personnel report, complaints he had

16        received, or I don't want to say complaints,

17        emails he had received that we talked about

18        earlier.  What else was in there.  It was

19        everything related to him personally that he had

20        given to a prior attorney that he had hoped would

21        take his case.

22   Q.   Do you know that attorney's name?

23   A.   No, no.

24   Q.   And he or she decided not to take Mr. Colborn's

25        case?

Case 1:19-cv-00484-BHL   Filed 06/24/22   Page 9 of 31   Document 253-2

1   A.   I don't know if, I don't know the situation,

2        honestly.  I don't know what it was.

3   Q.   He never talked to you about why that attorney

4        said no?

5   A.   Maybe.  I don't remember if he, what he said about

6        it.  I just knew that she wasn't taking it,

7        whoever it was.  Might have been a prior -- I

8        thought she worked for, he knew her through his

9        job somehow, I thought.

10  Q.   Have you given us the documents in that box in the

11       picture?

12  A.   That's the ones we talked about earlier with all

13       of the complaints and the personnel reports.

14  Q.   So all the ten?

15  A.   Yes, yes.

16  Q.   It's a pretty small box.  Does seeing it again

17       make you more willing to give us everything?

18  A.   I think everything in it you're either going to

19       either have or it's the ten complaints because

20       this is what was given to his lawyers.  I don't

21       have this box anymore, so it's, it's -- I did give

22       you the personnel report, I believe.

23  Q.   So you don't have this box anymore?

24  A.   No, no.  Nor, nor this.

25  Q.   Okay.  But you think you gave us everything

1     that -- I mean did you make a copy of everything
2     that was in the box before you gave it to his
3     lawyers?
4  A.  I scanned a lot of it, and I also had the wave
5     files of the CDs with the calls.
6  Q.  Okay.  And so you think you have given all of that
7     to us?
8  A.  Everything that I copied or put on-line, yes.
9  Q.  Okay.  On the next page, there's another photo of
10    a file in, like, a plastic folder.
11           Do you see that?
12 A.  Yes.  Yes.
13 Q.  And what was that?
14 A.  I just want to see what this one is.  Since
15    release of Making a Murderer -- Oh, okay.  This
16    is, these are formal incident reports, the top one
17    anyway, incident reports that came in, whether it
18    be, like, the bomb threats that they received.  He
19    had a couple interactions with people threatening
20    him.  So there were more of the incident reports.
21    I know there was a lot of emails between one or
22    two parties that just went back and forth, back
23    and forth, and I believe there were several copies
24    of the same one that seemed like a big stack
25    because I remember kind of sorting it.  The CD is

1    A.    Right.

2    Q.    Which phone call again?  Say it again for me.

3    A.    Sure.  That '95, '96 phone call that Andy received

4          and transferred --

5    Q.    Got it.

6    A.    -- to a detective.

7    Q.    Yeah.

8    A.    Mike was under the impression, I believe, somehow,

9          some way that Kusche actually received a call, and

10         I caught that in the Complaint, and I said, I

11         don't think that's, I never heard that, where is

12         that from.

13   Q.    Mike was under that impression because Kusche

14         might have told him that?

15   A.    No.  I don't know how Mike was under the

16         impression.  I have no idea.

17   Q.    Just a mistake?

18   A.    Right.

19   Q.    We'll move on.

20               I'm going to hand you two exhibits at

21         once.  This will be 2063, this will be 2064.

22               (Exhibits 2063 and 2064 marked for

23         identification)

24   A.    All right.

25   Q.    If you could look at 2063 first.  This is an email

1        Mr. Colborn sent to you on December 7th, 2018.

2   A.   Yes.

3   Q.   And it forwards an email he got from his attorney,

4        Mr. Griesbach; correct?

5   A.   Correct.

6   Q.   And it's a partial draft of the Complaint about a

7        week before it was filed; correct?

8   A.   Correct.

9   Q.   And this is, we've seen text messages between you

10       and Mr. Colborn about your edits, but this is the

11       email where he actually sent the thing to you;

12       correct?

13  A.   That's what it looks like, yes.

14  Q.   And then Exhibit 2064 is a similar email where

15       Mr. Griesbach had sent a second section of the

16       Complaint, draft Complaint, to Mr. Colborn, and

17       then Mr. Colborn sent it to you; correct?

18  A.   Right.  The second part, correct.

19  Q.   Did you have any concerns as all this was

20       happening about Mr. Colborn preserving

21       attorney-client privilege?

22  A.   No, because I wasn't aware of any of that.  I mean

23       I even was working with Mike researching in the

24       book and I felt like things that a legal assistant

25       would almost do.  So, no, I didn't even know that,

1       to be honest, that that would be an issue, and I

2       didn't even think about it since, because Mike did

3       know I was checking it.  I, I didn't remember that

4       Andy sent it to me first.

5  Q.   So at some point Mr. Griesbach found out.  He

6       maybe didn't know on December 7th; correct?

7  A.   Very soon after.

8  Q.   Okay.  Let's mark this as Exhibit 2065, and I'll

9       give you just a minute or two to, to review 2065.

10      And I'm going to be pointing you to -- Well, I'll

11      give you a chance to review it, but then I just

12      want to confirm that these are text messages

13      between you and Andy Colborn talking about edits

14      to the Complaint.

15            (Exhibit 2065 marked for identification)

16  A.   All right.  Let me take a look here.  How far did

17      you want me to read?  I'm sorry.

18  Q.   Well, let me ask you this.  This was all sent on

19      December 16th, 2018; correct, December 16th, 2018?

20  A.   Correct.

21  Q.   And this is just a couple days before the

22      Complaint was to be filed; correct?

23  A.   I believe one day, actually, one, one or two,

24      yes.

25  Q.   And you're in this text message chain going back

1          between you and Mr. Colborn; correct?

2    A.    Yes.

3    Q.    And I'll direct you to page Bates No. 7072.

4    A.    Okay.

5    Q.    We don't have to read this.  This is a big, long

6          text.

7    A.    I know.  Who is this?  Him to me?  Me to him.

8    Q.    You to Mr. Colborn.  Let me read the first couple

9          lines.

10   A.    Okay.

11   Q.    And just to set the stage, this is January 6,

12         2019, right after the Complaint was filed;

13         correct?

14   A.    Correct.

15   Q.    So you say, Mike is on the other line with him

16         now.  He called while I was chatting with him.

17         I'm glad he did because of the attorney work

18         product, and I'm not, quote, officially working,

19         quote, for Mike.  I'll have to ask him how we get

20         my stuff to be privileged.  Anyway, period.  And

21         then you go on to talk about this character named

22         Rocky Lapomarto.  But my question is, it seems

23         maybe to have occurred to you at this point there

24         are some privilege and attorney work product

25         issues?

1   A.   Yes.

2   Q.   And you were expressing, I don't know if it's

3        concern or maybe curiosity about that?

4   A.   Right after -- Yes, yes, that's what it appears

5        definitely.

6   Q.   And did you ever ask Mike, quote, how we get my

7        stuff to be privileged, as you say there in the

8        text message?

9   A.   My recollection, I don't know if this, when this

10       was, but, yes, I remember sharing information,

11       again, up until April and the group took over,

12       just saying how I don't want my things to be

13       public, okay.  I wasn't, I don't think I

14       necessarily, necessarily was thinking anything

15       about his stuff not being privileged by including

16       me.  I was more worried about my stuff becoming

17       public that I was sharing with him.

18   Q.   Okay.  And did you ever get an answer from

19       Mr. Griesbach about that?

20   A.   If I recall correctly, I believe he said, just put

21       attorney-client privilege on it or something

22       because I was not officially in a paid capacity

23       working for him, more of a -- I don't know what I

24       was.

25   Q.   A volunteer?

```
 1   A.   I wasn't officially working for him, but I was

 2        certainly helping him.

 3   Q.   Got it.

 4             MS. WALKER:  Let's mark this as 2069.

 5             (Exhibit 2069 marked for identification)

 6   Q.   2069 is another text exchange between you and

 7        Mr. Colborn; correct?

 8   A.   Yes, m-hm.

 9   Q.   And this is now a couple months after the lawsuit

10        was filed in February 8th of 2019.

11             Do you see that?

12   A.   February, yes, I do.

13   Q.   And you say to Mr. Colborn, Hey, are you around?

14        He says, Yeah, I'm at home.  What's up?  And you

15        say, Oh, no biggy.  Mike left me a message about

16        the meeting and sounds like I can't help at all.

17             Do you see that?

18   A.   Yes.

19   Q.   And you say, I don't want to be deposed, but I

20        said if they wanted me to sign something that I

21        can help with no pay, I'd be happy to.  But they

22        don't think it's a good idea.  It's all good.  Was

23        just going to fill you in if Mike hadn't yet.

24             Do you see that?

25   A.   Yes.
```

1  Q.  And tell me about the message he left or the

2      conversation you had about why you were no longer

3      able to help with the case.

4  A.  Sure.  As you can probably tell, prior to the

5      Complaint being filed, I was a big part of helping

6      the research aspect of it, so I think that was

7      always kind of the plan.  I wasn't doing much with

8      transition at that point, if, hardly anything.  So

9      when April and the group came on and took it on,

10     they obviously have their own resources.  I wasn't

11     an employee of Mike's.  Officially I couldn't

12     really bring any value to them.  I had hoped I

13     could because I wanted to be part of that.  And

14     it, it just wasn't, I wasn't able to do that.  And

15     for obvious reasons, they have their own staff.

16     I'm not an attorney, so he was just letting me

17     know that I really couldn't know anything, be a

18     part of anything, see anything, so it was kind of

19     I think where the big cutoff was where we, I

20     handed it off and had to step back quite a bit.

21 Q.  Mr. Colborn seems fairly disappointed by that.  He

22     says in the next text message, Mike hadn't

23     mentioned that.  I was really hoping you could be

24     involved, although I certainly see why they

25     wouldn't want to be deposed.  Can you still give

1      info to Debra and will you still be willing to?

2            Do you see that?

3  A.  I do, yes.

4  Q.  And, in fact, what happened is that Mr. Colborn

5      did continue to keep you in the loop on this

6      lawsuit off and on; correct?

7            MS. BARKER:  Object.  Foundation.

8  A.  I think -- Not to the same degree had I stayed on

9      with him, obviously.  But, yeah, I mean he, he

10     told me periodic things so, sure, sure, more as a

11     friend than a resource person.

12  Q.  The info he references giving to Debra --

13  A.  Yes.

14  Q.  -- what was that, and did you give it to her?

15  A.  I did, and I, I did include those in discovery.  I

16     was handing off all of my research documents that

17     I felt would be applicable in the Complaint that I

18     had used to check the Complaint, so I was

19     basically just getting her up to speed on the

20     background of the case, their investigator.

21  Q.  Did you have a conversation with her --

22  A.  I did, yes.

23  Q.  -- to orient --

24  A.  I met with her.

25  Q.  You did.

1  A.  Yes.

2  Q.  Okay.  Did you ever draft any exhibit to any

3      Complaint like a comparison, a list of defamatory

4      statements or a comparison of trial testimony to

5      what was in Making a Murderer?

6  A.  In the first Complaint, yes, I did.  The second

7      Complaint, unless they used something from the

8      first Complaint, I had nothing to do with the

9      second when, again, I don't know what you call it,

10     the Amended Complaint, when April and George came

11     on.  The first one, yes.  The first one, yes, I

12     know I had an exhibit in there.

13          MS. WALKER:  Mark this as Exhibit 2070.

14          (Exhibit 2070 marked for identification)

15 Q.  So this is an email string with a lot of signature

16     block.

17 A.  Right.

18 Q.  Stuff we can ignore at the end, but if you flip

19     backwards from that, the first real email at the

20     bottom of the chain is from Deb Bursik to you

21     asking if there's a piece of paper regarding the

22     dispatch call Mr. Colborn received.

23          Do you see that on January 16th, 2019?

24 A.  What page are you on?

25 Q.  I'm on the 2829.









1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Colleen Reed Reporting LLC
414.322.3621







```
1                    ERRATA SHEET

2

3    Deponent:   Brenda Schuler

4    Date:       5-20-22

5    Case:       Andrew Colborn v Netflix, Inc., et al

6

7    Page 14 Line 11-12 Change part to contractor Reason clarification

8    Page 39 Line 26 Change 2013 to 2014 Reason clarification

9    Page 40 Line 5 Change 2019 to 2020 Reason my error

10   Page 47 Line 22-23 Change Jan to March Reason my error

11   Page 48 Line 15 Change Mike to Lenk Reason Reporter error

12   Page 49 Line 20 Change several months Within a month to Reason my error

13   Page 80 Line 1 Change lamb blasted to lambasted Reason Reporter error

14   Page 43 Line 12 Change 2005 to 2007 Reason Attorney error

15   Page 48 Line 14 Change About him to By Kerak Reason my error

16   Page 87 Line 1 Change Don't to do Reason my error

17   Page 169 Line 17 Change See below Reason context

18   Page___Line___Change_____Reason_____

19   Page___Line___Change_____Reason_____

20   Page___Line___Change_____Reason_____

21   Page___Line___Change_____Reason_____

22   Page___Line___Change_____Reason_____

23   Page___Line___Change_____Reason_____

24   Page___Line___Change_____Reason_____

25   Page___Line___Change_____Reason_____
```

**Colleen Reed Reporting LLC**
**414.322.3621**

In regard to 17 above, the question by Ms Walker was taken out of context. She did not reference that my text; "we should shoot all liberal law professors" was in response to an attached article titled something to the effect of "UC Professor thinks all cops should be killed."

1

2

3

4                        SIGNATURE PAGE

5

6    I, Brenda Schuler, do hereby certify that I have read

7    the foregoing transcript of proceedings, taken the 20th

8    day of May, 2022, and the same is true and correct,

9    except for the list of corrections, if any, noted on

10   the errata sheet.

11

12

13   Dated this _24th_ day of _____, 2022

14   Deponent Signature _____

15

16

17

18   Subscribed and sworn to before me this _24_ day of
     _JUNE_____, 2022 in _OUTAGAMIE_____ County
19   State of _WISCONSIN_____
     My commission expires: _12-4-25_____
20   Notary Public Printed Name: _CKORTH_____
     Notary Public Signature _____CK_____
21

22

23

24

25

1    STATE OF WISCONSIN)

2    MILWAUKEE COUNTY  )

3                    I, JANET D. LARSEN, a Notary Public in

4    and for the State of Wisconsin, do hereby certify that

5    the deposition of BRENDA SCHULER was taken before me

6    under and pursuant to the Federal Rules of Civil

7    Procedure on the 20th day of May, 2022.

8                    That before said witness testified,

9    she was first duly sworn by me to testify the truth.

10                    That I am not a relative or employee or

11   attorney or counsel of any of the parties, or a

12   relative or employee of such attorney or counsel, or

13   financially interested directly or indirectly in this

14   action.

15                    That the foregoing pages are a true and

16   correct transcription of my original shorthand notes

17   taken at said time and place.

18

19                    Dated this 24th day of May, 2022
                     at Milwaukee, Wisconsin.
20

21                    _____
                     JANET DONALDSON LARSEN
22                   REGISTERED PROFESSIONAL REPORTER
                     NOTARY PUBLIC, STATE OF WISCONSIN
23                   MY COMMISSION EXPIRES 1-22-26

24

25