# EXHIBIT 1

# In The Matter Of:

*Andrew Colborn v*
*Netflix, Inc., et al.*

---

*Brenda Schuler*
*May 20, 2022*
*Confidential*

---

*Colleen Reed Reporting LLC*
*P.O. Box 293*
*Milwaukee, Wisconsin 53201*
*www.colleenreed.com*

Original File 052022brendaschulerfwx.txt
Min-U-Script® with Word Index

```
 1              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF WISCONSIN
 2    ------------------------------------------------------

 3    ANDREW COLBORN,

 4             Plaintiff,     CIVIL ACTION NO. 19-CV-0484

 5        -vs-

 6    NETFLIX, INC., ET AL,     ***CONFIDENTIAL***

 7             Defendants.

 8    ------------------------------------------------------

 9    DEPOSITION OF:  BRENDA SCHULER

10    DATE:           May 20, 2022

11    TIME:           8:39 a.m. to 4:57 p.m.

12    LOCATION:       Godfrey & Kahn, S.C.
                      833 East Michigan Street
13                    Suite 1800
                      Milwaukee, Wisconsin  53202
14
      REPORTED BY:    Janet D. Larsen, RPR
15

16

17

18

19

20

21

22

23

24

25
```

1                       A P P E A R A N C E S

2

3           SCHOTT BUBLITZ & ENGEL S.C., by
            APRIL ROCKSTEAD BARKER, ATTORNEY AT LAW
4           640 West Moreland Boulevard
            Waukesha, Wisconsin  53188
5           abarker@sbe-law.com
            appeared via Zoom videoconference on
6           behalf of the Plaintiff.

7           BALLARD SPAHR LLP, BY
            LEITA WALKER, ATTORNEY AT LAW
8           2000 IDS Center
            80 South 8th Street
9           Minneapolis, Minnesota  55402
            walkerl@ballardspahr.com
10          appeared on behalf of Netflix, Inc.

11          BALLARD SPAHR LLP, BY
            ISABELLA SALOMAO NASCIMENTO
12          ATTORNEY AT LAW
            2000 IDS Center
13          80 South 8th Street
            Minneapolis, Minnesota  55402
14          salomaonascimentoi@ballardspahr.com
            appeared via Zoom videoconference on
15          behalf of Netflix, Inc.

16          BALLARD SPAHR LLP, by
            EMILY S. PARSONS, ATTORNEY AT LAW
17          1909 K Street NW, Suite 1200
            Washington, DC  20006-1157
18          parsonse@ballardspahr.com
            appeared via Zoom videoconference on
19          behalf of Netflix, Inc.

20          JASSY VICK CAROLAN LLP, by
            MEGHAN E. FENZEL, ATTORNEY AT LAW
21          KEVIN L. VICK, ATTORNEY AT LAW
            355 South Grand Avenue, Suite 2450
22          Los Angeles, California  90071
            mfenzel@jassyvick.com
23          kvick@jassyvick.com
            appeared via Zoom videoconference on
24          behalf of Chrome Media LLC.

25

```
1        ANNIGIAN RYAN LLP, by
         NICHOLAS A. KURTZ, ATTORNEY AT LAW
2        114 North Indian Hill Boulevard, Suite E
         Claremont, California  91711
3        nk@arllp.com
         appeared on behalf of the Witness.
4
    ALSO PRESENT VIA ZOOM VIDEOCONFERENCE:
5        Moira Demos
         Laura Ricciardi
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Brenda Schuler - May 20, 2022**
**Confidential**

166

```
 1                    Do you see all that?
 2   A.   I do.
 3   Q.   Do you remember getting an email from Mr. Colborn
 4        in reference to what he says here, about Judge
 5        Pamela Pepper?
 6   A.   My recollection isn't great on it, but I believe
 7        it was something regarding, like, her history on a
 8        website or something.  Did you get the email.  I
 9        don't remember exactly what it was.
10   Q.   Are you willing to run a search for the name
11        Pamela Pepper and send us any email you have about
12        her?
13   A.   Possibly.
14   Q.   And Mr. Colborn says, I will forward what Mike
15        sent me about her.
16                    Do you see that?
17   A.   Yes, m-hm.
18   Q.   And so he's forwarding you a communication that he
19        had with -- Mike Griesbach -- I'll withdraw that.
20                    My first question is Mike is a reference
21        to Mike Griesbach; correct?
22   A.   Yes.
23                    MS. BARKER:  Object as to foundation.
24   Q.   So he was forwarding you a privileged
25        communication he had with his attorney,
```

1      Mr. Griesbach; correct?

2               MS. BARKER:  Same objection.

3  A.   I don't know, I don't know how privilege works.

4      I'm sorry.  I don't know if he was just sharing

5      something he didn't care if it was privileged or

6      not or if all attorney-client is privileged for

7      anything.  I don't know.  But, yes, he forwarded

8      an email from Mike Griesbach.

9  Q.   Okay.  And he said, just between you and me, tho,

10     and what was your understanding of why he said

11     that?

12              MS. BARKER:  Object as to foundation.

13 A.   Not to share with anyone.

14 Q.   Did he ever tell you to not tell Mr. Griesbach

15     that he was sharing communications with you?

16 A.   Maybe, maybe.  I don't, I can't think of anything

17     offhand but maybe.  He could have said, don't

18     share this with Mike.  I, I don't know.

19              (Exhibit 2028 marked for identification)

20 Q.   The court reporter just handed you Exhibit 2028.

21     Again, these are text messages between you and

22     Mr. Colborn; correct?

23 A.   Yes.

24 Q.   And the exhibit begins at Bates No. 8990, but I'll

25     direct you to three pages in, 8992.

1    how much they support our decision to do this, and
2    the pastor told me we will all be in his prayers.
3    Thought you would like to know that, Brenda.
4          Did I read that correctly?
5    A.   Yes.
6    Q.   And you say, Aww.  Thanks so much.  That is
7    wonderful to hear.  And he says, You betcha.  Nice
8    to have the support of a church, and people seem
9    to be happy about what we are doing.
10         Did I read that correctly?
11   A.   Yes.
12   Q.   And so, like, he had the support of his law
13   enforcement community, Mr. Colborn had the support
14   of his church community; correct?
15   A.   Yes, his church, yes.
16   Q.   Oh, you can hang on to that actually --
17   A.   Okay.
18   Q.   -- for just one more minute.
19         I'll take that back.  I'm going to hand
20   you another exhibit.
21         (Exhibit 2051 marked for identification)
22   Q.   So the court reporter has handed you Exhibit 2051.
23   These are texts, and really they're, well, they're
24   texts with some photographs from Mr. Colborn to
25   you; correct?

| | | |
|---|---|---|
| 1 | A. | Correct.  Yes. |
| 2 | Q. | And at the top on Bates No. 5126 he says, This is |
| 3 | | what I have for you, and he sends you a picture of |
| 4 | | a box with some files in it, it looks like; is |
| 5 | | that correct? |
| 6 | A. | Correct, yes. |
| 7 | Q. | And this was coming in June of 2018; right? |
| 8 | A. | Yes. |
| 9 | Q. | And what was in that box? |
| 10 | A. | That was the file that he had previously given to |
| 11 | | a prior attorney that he gave to me.  It was the |
| 12 | | CDs that we were talking about earlier, the 27, |
| 13 | | his personnel report.  Oh, his personnel -- It was |
| 14 | | everything pretty much from Manitowoc County |
| 15 | | regarding his personnel report, complaints he had |
| 16 | | received, or I don't want to say complaints, |
| 17 | | emails he had received that we talked about |
| 18 | | earlier.  What else was in there.  It was |
| 19 | | everything related to him personally that he had |
| 20 | | given to a prior attorney that he had hoped would |
| 21 | | take his case. |
| 22 | Q. | Do you know that attorney's name? |
| 23 | A. | No, no. |
| 24 | Q. | And he or she decided not to take Mr. Colborn's |
| 25 | | case? |

1   A.   I don't know if, I don't know the situation,

2        honestly.  I don't know what it was.

3   Q.   He never talked to you about why that attorney

4        said no?

5   A.   Maybe.  I don't remember if he, what he said about

6        it.  I just knew that she wasn't taking it,

7        whoever it was.  Might have been a prior -- I

8        thought she worked for, he knew her through his

9        job somehow, I thought.

10  Q.   Have you given us the documents in that box in the

11       picture?

12  A.   That's the ones we talked about earlier with all

13       of the complaints and the personnel reports.

14  Q.   So all the ten?

15  A.   Yes, yes.

16  Q.   It's a pretty small box.  Does seeing it again

17       make you more willing to give us everything?

18  A.   I think everything in it you're either going to

19       either have or it's the ten complaints because

20       this is what was given to his lawyers.  I don't

21       have this box anymore, so it's, it's -- I did give

22       you the personnel report, I believe.

23  Q.   So you don't have this box anymore?

24  A.   No, no.  Nor, nor this.

25  Q.   Okay.  But you think you gave us everything

1      that -- I mean did you make a copy of everything

2      that was in the box before you gave it to his

3      lawyers?

4   A.  I scanned a lot of it, and I also had the wave

5      files of the CDs with the calls.

6   Q.  Okay.  And so you think you have given all of that

7      to us?

8   A.  Everything that I copied or put on-line, yes.

9   Q.  Okay.  On the next page, there's another photo of

10      a file in, like, a plastic folder.

11          Do you see that?

12  A.  Yes.  Yes.

13  Q.  And what was that?

14  A.  I just want to see what this one is.  Since

15      release of Making a Murderer -- Oh, okay.  This

16      is, these are formal incident reports, the top one

17      anyway, incident reports that came in, whether it

18      be, like, the bomb threats that they received.  He

19      had a couple interactions with people threatening

20      him.  So there were more of the incident reports.

21      I know there was a lot of emails between one or

22      two parties that just went back and forth, back

23      and forth, and I believe there were several copies

24      of the same one that seemed like a big stack

25      because I remember kind of sorting it.  The CD is

1  A.  Right.

2  Q.  Which phone call again?  Say it again for me.

3  A.  Sure.  That '95, '96 phone call that Andy received

4      and transferred --

5  Q.  Got it.

6  A.  -- to a detective.

7  Q.  Yeah.

8  A.  Mike was under the impression, I believe, somehow,

9      some way that Kusche actually received a call, and

10     I caught that in the Complaint, and I said, I

11     don't think that's, I never heard that, where is

12     that from.

13 Q.  Mike was under that impression because Kusche

14     might have told him that?

15 A.  No.  I don't know how Mike was under the

16     impression.  I have no idea.

17 Q.  Just a mistake?

18 A.  Right.

19 Q.  We'll move on.

20         I'm going to hand you two exhibits at

21     once.  This will be 2063, this will be 2064.

22         (Exhibits 2063 and 2064 marked for

23     identification)

24 A.  All right.

25 Q.  If you could look at 2063 first.  This is an email

1          Mr. Colborn sent to you on December 7th, 2018.

2    A.    Yes.

3    Q.    And it forwards an email he got from his attorney,

4          Mr. Griesbach; correct?

5    A.    Correct.

6    Q.    And it's a partial draft of the Complaint about a

7          week before it was filed; correct?

8    A.    Correct.

9    Q.    And this is, we've seen text messages between you

10         and Mr. Colborn about your edits, but this is the

11         email where he actually sent the thing to you;

12         correct?

13   A.    That's what it looks like, yes.

14   Q.    And then Exhibit 2064 is a similar email where

15         Mr. Griesbach had sent a second section of the

16         Complaint, draft Complaint, to Mr. Colborn, and

17         then Mr. Colborn sent it to you; correct?

18   A.    Right.  The second part, correct.

19   Q.    Did you have any concerns as all this was

20         happening about Mr. Colborn preserving

21         attorney-client privilege?

22   A.    No, because I wasn't aware of any of that.  I mean

23         I even was working with Mike researching in the

24         book and I felt like things that a legal assistant

25         would almost do.  So, no, I didn't even know that,

1          to be honest, that that would be an issue, and I

2          didn't even think about it since, because Mike did

3          know I was checking it.  I, I didn't remember that

4          Andy sent it to me first.

5     Q.   So at some point Mr. Griesbach found out.  He

6          maybe didn't know on December 7th; correct?

7     A.   Very soon after.

8     Q.   Okay.  Let's mark this as Exhibit 2065, and I'll

9          give you just a minute or two to, to review 2065.

10         And I'm going to be pointing you to -- Well, I'll

11         give you a chance to review it, but then I just

12         want to confirm that these are text messages

13         between you and Andy Colborn talking about edits

14         to the Complaint.

15              (Exhibit 2065 marked for identification)

16    A.   All right.  Let me take a look here.  How far did

17         you want me to read?  I'm sorry.

18    Q.   Well, let me ask you this.  This was all sent on

19         December 16th, 2018; correct, December 16th, 2018?

20    A.   Correct.

21    Q.   And this is just a couple days before the

22         Complaint was to be filed; correct?

23    A.   I believe one day, actually, one, one or two,

24         yes.

25    Q.   And you're in this text message chain going back

1           between you and Mr. Colborn; correct?

2    A.    Yes.

3    Q.    And I'll direct you to page Bates No. 7072.

4    A.    Okay.

5    Q.    We don't have to read this.  This is a big, long

6          text.

7    A.    I know.  Who is this?  Him to me?  Me to him.

8    Q.    You to Mr. Colborn.  Let me read the first couple

9          lines.

10   A.    Okay.

11   Q.    And just to set the stage, this is January 6,

12         2019, right after the Complaint was filed;

13         correct?

14   A.    Correct.

15   Q.    So you say, Mike is on the other line with him

16         now.  He called while I was chatting with him.

17         I'm glad he did because of the attorney work

18         product, and I'm not, quote, officially working,

19         quote, for Mike.  I'll have to ask him how we get

20         my stuff to be privileged.  Anyway, period.  And

21         then you go on to talk about this character named

22         Rocky Lapomarto.  But my question is, it seems

23         maybe to have occurred to you at this point there

24         are some privilege and attorney work product

25         issues?

1   A.   Yes.

2   Q.   And you were expressing, I don't know if it's

3        concern or maybe curiosity about that?

4   A.   Right after -- Yes, yes, that's what it appears

5        definitely.

6   Q.   And did you ever ask Mike, quote, how we get my

7        stuff to be privileged, as you say there in the

8        text message?

9   A.   My recollection, I don't know if this, when this

10       was, but, yes, I remember sharing information,

11       again, up until April and the group took over,

12       just saying how I don't want my things to be

13       public, okay.  I wasn't, I don't think I

14       necessarily, necessarily was thinking anything

15       about his stuff not being privileged by including

16       me.  I was more worried about my stuff becoming

17       public that I was sharing with him.

18   Q.  Okay.  And did you ever get an answer from

19       Mr. Griesbach about that?

20   A.  If I recall correctly, I believe he said, just put

21       attorney-client privilege on it or something

22       because I was not officially in a paid capacity

23       working for him, more of a -- I don't know what I

24       was.

25   Q.  A volunteer?

```
 1   A.   I wasn't officially working for him, but I was
 2        certainly helping him.
 3   Q.   Got it.
 4             MS. WALKER:  Let's mark this as 2069.
 5             (Exhibit 2069 marked for identification)
 6   Q.   2069 is another text exchange between you and
 7        Mr. Colborn; correct?
 8   A.   Yes, m-hm.
 9   Q.   And this is now a couple months after the lawsuit
10        was filed in February 8th of 2019.
11             Do you see that?
12   A.   February, yes, I do.
13   Q.   And you say to Mr. Colborn, Hey, are you around?
14        He says, Yeah, I'm at home.  What's up?  And you
15        say, Oh, no biggy.  Mike left me a message about
16        the meeting and sounds like I can't help at all.
17             Do you see that?
18   A.   Yes.
19   Q.   And you say, I don't want to be deposed, but I
20        said if they wanted me to sign something that I
21        can help with no pay, I'd be happy to.  But they
22        don't think it's a good idea.  It's all good.  Was
23        just going to fill you in if Mike hadn't yet.
24             Do you see that?
25   A.   Yes.
```

```
 1   Q.   And tell me about the message he left or the
 2        conversation you had about why you were no longer
 3        able to help with the case.
 4   A.   Sure.  As you can probably tell, prior to the
 5        Complaint being filed, I was a big part of helping
 6        the research aspect of it, so I think that was
 7        always kind of the plan.  I wasn't doing much with
 8        transition at that point, if, hardly anything.  So
 9        when April and the group came on and took it on,
10        they obviously have their own resources.  I wasn't
11        an employee of Mike's.  Officially I couldn't
12        really bring any value to them.  I had hoped I
13        could because I wanted to be part of that.  And
14        it, it just wasn't, I wasn't able to do that.  And
15        for obvious reasons, they have their own staff.
16        I'm not an attorney, so he was just letting me
17        know that I really couldn't know anything, be a
18        part of anything, see anything, so it was kind of
19        I think where the big cutoff was where we, I
20        handed it off and had to step back quite a bit.
21   Q.   Mr. Colborn seems fairly disappointed by that.  He
22        says in the next text message, Mike hadn't
23        mentioned that.  I was really hoping you could be
24        involved, although I certainly see why they
25        wouldn't want to be deposed.  Can you still give
```

1     info to Debra and will you still be willing to?

2              Do you see that?

3  A.  I do, yes.

4  Q.  And, in fact, what happened is that Mr. Colborn

5     did continue to keep you in the loop on this

6     lawsuit off and on; correct?

7              MS. BARKER:  Object.  Foundation.

8  A.  I think -- Not to the same degree had I stayed on

9     with him, obviously.  But, yeah, I mean he, he

10    told me periodic things so, sure, sure, more as a

11    friend than a resource person.

12 Q.  The info he references giving to Debra --

13 A.  Yes.

14 Q.  -- what was that, and did you give it to her?

15 A.  I did, and I, I did include those in discovery.  I

16    was handing off all of my research documents that

17    I felt would be applicable in the Complaint that I

18    had used to check the Complaint, so I was

19    basically just getting her up to speed on the

20    background of the case, their investigator.

21 Q.  Did you have a conversation with her --

22 A.  I did, yes.

23 Q.  -- to orient --

24 A.  I met with her.

25 Q.  You did.

1  A.   Yes.

2  Q.   Okay.  Did you ever draft any exhibit to any

3       Complaint like a comparison, a list of defamatory

4       statements or a comparison of trial testimony to

5       what was in Making a Murderer?

6  A.   In the first Complaint, yes, I did.  The second

7       Complaint, unless they used something from the

8       first Complaint, I had nothing to do with the

9       second when, again, I don't know what you call it,

10      the Amended Complaint, when April and George came

11      on.  The first one, yes.  The first one, yes, I

12      know I had an exhibit in there.

13           MS. WALKER:  Mark this as Exhibit 2070.

14           (Exhibit 2070 marked for identification)

15 Q.   So this is an email string with a lot of signature

16      block.

17 A.   Right.

18 Q.   Stuff we can ignore at the end, but if you flip

19      backwards from that, the first real email at the

20      bottom of the chain is from Deb Bursik to you

21      asking if there's a piece of paper regarding the

22      dispatch call Mr. Colborn received.

23           Do you see that on January 16th, 2019?

24 A.   What page are you on?

25 Q.   I'm on the 2829.

```
 1   A.   Right.  Right.

 2   Q.   All right.

 3   A.   And it was on-line, which -- Okay.  I just got it

 4        maybe before it became public, I guess, right.

 5                 (Exhibit 2081 marked for identification)

 6   Q.   So now you're looking at a text exchange marked

 7        2081.  Correct?

 8   A.   Yes.

 9   Q.   And this is about a mediation that occurred in the

10        case.  Do you see that in the top email, top text?

11   A.   Right, m-hm.  Yes.

12   Q.   And Mr. Colborn proceeds to tell you about what

13        happened at the mediation.  He says, Netflix and

14        the twins refuse to settle so now the case is back

15        in front of the judge.

16                 Do you see that?

17   A.   Yes.

18   Q.   And then a sentence or two later he says, The

19        twins, and is this a reference to Ricciardi and

20        Demos?

21   A.   Yes.

22   Q.   The twins feel that they were very fair and honest

23        with their documentary and are appalled at my

24        frivolous suit, which is trying to tarnish their

25        sterling reputation.  Netflix says all they did
```

1          was distribute it, not our fault.

2                    Did I read that correctly?

3     A.   Yes.

4     Q.   And so you understood that Mr. Colborn was telling

5          you what happened at the mediation; correct?

6                    MR. KURTZ:  Objection.  Document speaks

7          for itself.

8                    MS. BAKER:  Foundation.

9     A.   Yes.

10                   MS. WALKER:  Did you get the answer?

11                   (Answer read)

12    Q.   Did you have any idea that Mr. Colborn should not

13         be sharing with you what happened at a

14         confidential mediation?

15                   MR. KURTZ:  Objection.  Calls for a

16         legal, speculation and conclusion.

17                   MS. BARKER:  Join.

18    A.   I, I don't know.  I think I just looked at it like

19         it was a friend sharing information that he

20         trusted.  I don't know, because I still thought

21         this one, I don't know, I don't know, which ones

22         were public or became recorded, and I felt like he

23         did give me information maybe before it became

24         public, but it still became public, but this maybe

25         wasn't.  I don't, I don't remember.

1    Q.    So if you go to the next page --

2    A.    Sure.

3    Q.    -- there's another text from Mr. Colborn.  He

4          says, They, I think he means the filmmakers, were

5          there!  I told you what they said in the text I

6          sent this morning!  And what Netflix said.

7          Absolutely no effort to mediate at all.

8                   Did I read that correctly?

9    A.    Yes.

10   Q.    And you said, I thought maybe it was just their

11         lawyers talking.  Damn, we should have been

12         filming that.  Or at least she'll know I'm walking

13         out.

14                  Did I read that correctly?

15   A.    You did, but I don't think that's what I meant to

16         type.  I don't know what that means.

17   Q.    Yeah.  But it sounds like you wished you could

18         have been at the mediation to film the defendants

19         in this case; is that right?

20   A.    Yes.

21   Q.    And why did you want to film them?

22   A.    I just wanted to be there probably more than

23         anything.  I said that from the beginning, I'd

24         love to be able to be part of that.

25   Q.    And on the next page, 9139 --

1    A.    Okay.

2    Q.    -- a couple texts down, you say, We could have

3          filmed them walking out of the building.

4                    Do you see that?

5    A.    Yes.

6    Q.    Out of the hearing, I mean; correct?

7    A.    Yes.

8    Q.    And then in the next text from Colborn, he

9          clarifies that it was done by Zoom.

10                   Do you see that?

11   A.    Yes.

12   Q.    And that, quote, They are all, they are playing

13         COVID to the hilt.

14                   Do you see that?

15   A.    Yes.

16   Q.    Did you encourage Mr. Colborn to file this

17         lawsuit?

18                   MR. KURTZ:  Objection.  Vague.

19                   MS. BARKER:  I'm sorry, I didn't hear

20         that question.  Could you read it back.

21                   (Question read)

22   A.    I encouraged him, told him I would support him

23         regardless, whether he did or not.  He wasn't sure

24         if he wanted to.  It took him a long time to make

25         that decision until he had to.  I told him I would

1      help him any way possible.  If I, if I could

2      provide information that would help his case,

3      yes.

4  Q.  Did you ever talk to Shawn Rech about

5      Mr. Colborn's decision to file a lawsuit?

6  A.  Yes, I believe I did, yes.

7  Q.  Okay.  Was Shawn Rech supportive?

8  A.  I remember two situations, and they vary.  So I

9      don't know what time frame they were, but one was

10      once he -- I don't think he wanted him to simply

11      because he had experience with that, okay.  So

12      that was one time I remember that he knew how, how

13      lawsuits worked and that he knew what would happen

14      going through everything.  On the other hand, Andy

15      was, really wanted to do that, so I remember a

16      conversation about potentially one of Shawn's

17      partners, not partners, not acquaintances, what is

18      he, I don't know, friends that was an attorney

19      that he worked with on prior projects, that he

20      asked him to, he put him in touch with him, and

21      nothing became of it because he's not that type of

22      lawyer is my understanding.

23  Q.  Did you ever talk to Mr. Rech about how

24      Mr. Colborn's lawsuit might impact Convicting a

25      Murderer?

1  A.  I'm sure it was a discussion that we would have to

2      include it to some degree, but we weren't able to

3      film any of it anyway, so it didn't matter.  Once

4      he got the lawyers, it became kind of a completely

5      moot point.  Would I have loved to follow through

6      this whole process and filmed it, yes, because of

7      how I felt about everything.  I think Shawn was

8      probably smarter knowing that that would never be

9      the case.

10  Q.  Do you know if Mr. Rech felt like the lawsuit in

11      any way has stolen the thunder of Convicting a

12      Murderer and that it'll be old news in some sense

13      by the time it's released?

14  A.  I don't know that the lawsuit would have affected

15      that he felt our film would be any less valuable.

16  Q.  I'm just asking; I don't know.

17  A.  Yeah, okay, okay.  As far as old news, I mean the

18      longer you get from anything, sure, I mean things

19      take time.  Do we wish we could have gotten it out

20      two years ago, absolutely.

21  Q.  Do you think this lawsuit is keeping it relevant

22      so that people will still be paying attention to

23      Convicting a Murderer when it's released?

24  A.  I don't think very many people are paying

25      attention to this lawsuit so, no.

| | | |
|---|---|---|
| 1 | Q. | Are you concerned that because of Convicting a |
| 2 | | Murderer, Mr. Colborn hasn't been able to speak |
| 3 | | out in his defense? |
| 4 | A. | Am I concerned? |
| 5 | Q. | That he's had to keep his lips sealed and wait for |
| 6 | | Convicting a Murderer to be released? |
| 7 | | MR. KURTZ: Objection. Argumentative. |
| 8 | | Ambiguous. |
| 9 | A. | I think he's not speaking -- |
| 10 | | MS. BARKER: Object. |
| 11 | A. | -- because he has a lawsuit pending and he's not |
| 12 | | able to. I don't think it had -- No, I -- No. |
| 13 | Q. | But pre-lawsuit it was the Non-Disclosure |
| 14 | | Agreements that kept him from speaking out; |
| 15 | | correct? |
| 16 | | MS. BARKER: Object as to foundation. |
| 17 | Q. | Pre the lawsuit? |
| 18 | A. | I didn't want him to get attacked publicly. I |
| 19 | | thought it was futile for him to do any speaking |
| 20 | | engagements. He wanted to do people calling in, |
| 21 | | and I just thought that was a really bad idea. I |
| 22 | | had witnessed that before. That was a big part of |
| 23 | | it. I was concerned for him. |
| 24 | Q. | And the agreements he voluntarily signed were also |
| 25 | | a part of it; correct? |

```
1                   MS. BARKER:  Object as to foundation.
2    A.    Right, right.  He wasn't able to.  I mean he spoke
3          that clearly we would want something to be
4          exclusive in a film.  So, yeah, I think that was
5          part of it.
6                   MS. WALKER:  So let's go off the record
7          for five minutes.  I think that's all my
8          questions, but I want to double check.
9                   MS. BARKER:  Well, I'll have some.
10                  (Break taken)
11                  MS. WALKER:  Ms. Schuler, I have no
12         further questions.  Thank you for being a trooper
13         and for hanging with us today.  The other
14         attorneys may have some questions.
15                  THE WITNESS:  Thank you.
16                  E X A M I N A T I O N
17   BY MS. BARKER:
18   Q.    Ms. Schuler, this is April Barker.  I have some
19         questions.
20   A.    Okay.
21   Q.    You said that you watched all of the Making a
22         Murderer episodes several times; correct?
23   A.    Correct.
24   Q.    Making a Murderer included statements by
25         Attorneys Buting and Strang that were not from the
```

1    ERRATA SHEET

2

3    Deponent:  Brenda Schuler

4    Date:      5-20-22

5    Case:      Andrew Colborn v Netflix, Inc., et al

6

7    Page 14 Line 11-12 Change part to contractor Reason clarification

8    Page 39 Line 26 Change 2013 to 2014 Reason clarification

9    Page 40 Line 5 Change 2019 to 2020 Reason my error

10   Page 47 Line 22-23 Change Jan to March Reason my error

11   Page 48 Line 15 Change Mike to Lenk Reason Reporter error

12   Page 49 Line 20 Change several months to within a month Reason my error

13   Page 80 Line 1 Change lamb blasted to lambasted Reason Reporter error

14   Page 43 Line 2 Change 2005 to 2007 Reason Attorney error

15   Page 48 Line 14 Change About him to Reason my error

16   Page 87 Line 1 Change Don't to do By Kerak Reason my error

17   Page 169 Line 17-2 Change See below Reason context

18   Page___ Line___ Change_____ Reason_____

19   Page___ Line___ Change_____ Reason_____

20   Page___ Line___ Change_____ Reason_____

21   Page___ Line___ Change_____ Reason_____

22   Page___ Line___ Change_____ Reason_____

23   Page___ Line___ Change_____ Reason_____

24   Page___ Line___ Change_____ Reason_____

25   Page___ Line___ Change_____ Reason_____

**Colleen Reed Reporting LLC**
**414.322.3621**

In regard to 17 above, the question by Ms Walker was taken out of context. She did not reference that my text; "we should shoot all liberal law professors" was in response to an attached article titled something to the effect of "UC Professor thinks all cops should be killed."

1

2

3

4                          SIGNATURE PAGE

5

6    I, Brenda Schuler, do hereby certify that I have read

7    the foregoing transcript of proceedings, taken the 20th

8    day of May, 2022, and the same is true and correct,

9    except for the list of corrections, if any, noted on

10   the errata sheet.

11

12

13   Dated this 24th day of _____, 2022

14   Deponent Signature _____

15

16

17

18   Subscribed and sworn to before me this 24 day of
     JUNE _____, 2022 in OUTAGAMIE County
19   State of WISCONSIN
     My commission expires: 12-4-25
20   Notary Public Printed Name: CKORTH
     Notary Public Signature _____
21

22

23

24

25

1   STATE OF WISCONSIN)

2   MILWAUKEE COUNTY  )

3                    I, JANET D. LARSEN, a Notary Public in

4   and for the State of Wisconsin, do hereby certify that

5   the deposition of BRENDA SCHULER was taken before me

6   under and pursuant to the Federal Rules of Civil

7   Procedure on the 20th day of May, 2022.

8                    That before said witness testified,

9   she was first duly sworn by me to testify the truth.

10                   That I am not a relative or employee or

11  attorney or counsel of any of the parties, or a

12  relative or employee of such attorney or counsel, or

13  financially interested directly or indirectly in this

14  action.

15                   That the foregoing pages are a true and

16  correct transcription of my original shorthand notes

17  taken at said time and place.

18

19                   Dated this 24th day of May, 2022
                     at Milwaukee, Wisconsin.
20

21                   _____
                     JANET DONALDSON LARSEN
22                   REGISTERED PROFESSIONAL REPORTER
                     NOTARY PUBLIC, STATE OF WISCONSIN
23                   MY COMMISSION EXPIRES 1-22-26

24

25