IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| **ANDREW L. COLBORN,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**NETFLIX, INC.; CHROME MEDIA LLC, F/K/A SYNTHESIS FILMS, LLC; LAURA RICCIARDI; AND MOIRA DEMOS,**<br><br>**Defendants.** | **Civil No.: 19-CV-484-BHL** |

### DECLARATION OF ANDREW COLBORN

I, Andrew Colborn, pursuant to 28 U.S.C. § 1746, hereby declare:

A.   ~~In~~ *I understand that in* a letter to my attorneys dated July 8, 2022, counsel for Netflix, Inc. proposed 63 discrete factual stipulations in an effort to streamline questioning at my deposition, scheduled to begin on July 21. ~~That~~ *and that* letter is attached hereto as Exhibit A.

B.   ~~My~~ *I understand that my* counsel responded to that letter by email on July 20, 2022. ~~That~~ *and that* email and its attachment are attached hereto as Exhibit B.

C.   Now, in reliance on Netflix's counsel's representation that they will use my admission of certain facts to streamline my deposition, I hereby make the following admissions, as well as some additional factual averments. I understand that Defendants in this case do not stipulate to the additional factual averments. To avoid confusion, I have maintained the numbering scheme used in Netflix's July 8 letter. Anything marked as intentionally left blank is so marked because, at this juncture, I do not agree to the stipulation proposed by Netflix.

Colborn
EXHIBIT NO. 1
DATE: 7-21-22
365Reporting, LLC

1.      [Intentionally left blank]

2.      [Intentionally left blank]

3.      [Intentionally left blank]

4.      [Intentionally left blank]

5.      [Intentionally left blank]

6.      [Intentionally left blank]

7.      [Intentionally left blank]

8.      [Intentionally left blank]

9.      [Intentionally left blank]

10.     I wrote a statement in September 2003 regarding a telephone call that I received in or around 1995 [1994 or] while I was a corrections officer at the Manitowoc County Jail. That statement was provided to then-Sheriff Kenneth Peterson, who told me that he would put the statement in a safe. Shortly thereafter, the statement was turned over to investigators for the State of Wisconsin.

11.     [Intentionally left blank]

12.     In response to examination at the criminal trial of Steven Avery, I acknowledged that the trial was the first time that I felt my integrity as a law enforcement officer had been questioned.

13.     [Intentionally left blank]

14.     [Intentionally left blank]

15.     [Intentionally left blank]

16.     [Intentionally left blank]

17.     I believe that Jerome Buting has damaged my reputation in out-of-court statements about me that were made after the release of *Making a Murderer*.

18. At one point, I wanted to sue Mr. Buting for defamation.

19. I believe that Dean Strang has damaged my reputation in out-of-court statements about me that were made after the release of *Making a Murderer*.

20. At one point, I wanted to sue Mr. Strang for defamation.

21. I believe former *Post Crescent* journalist John Ferak has damaged my reputation.

22. At one point, I wanted to sue Mr. Ferak for defamation.

23. [Intentionally left blank]

24. [Intentionally left blank]

25. [Intentionally left blank]

26. [Intentionally left blank]

27. I have not watched *Making a Murderer* in its entirety.

28. [Intentionally left blank]

29. [Intentionally left blank]

30. [Intentionally left blank]

31. [Intentionally left blank]

32. [Intentionally left blank]

33. [Intentionally left blank]

34. [Intentionally left blank]

35. I have watched no portion of Episode 8, to my knowledge and recollection.

36. I have watched no portion of Episode 9, to my knowledge and recollection.

37. I have watched no portion of Episode 10, to my knowledge and recollection.

38. I am voluntarily participating in a documentary tentatively called *Convicting a Murderer*, which has not yet been released to the public.

39. [Intentionally left blank]

40. [Intentionally left blank]

41. [Intentionally left blank]

42. [Intentionally left blank]

43. [Intentionally left blank]

44. No person I have identified in response to Chrome Media LLC's First Set of Interrogatories, Interrogatory No. 10, has ever told me that *Making a Murderer* caused the person to think less of me, but some people identified in the response have treated me differently since the release of the series.

45. Some members of my law enforcement community supported me after the release of *Making a Murderer*, but some did not.

46. Some members of my faith community supported me after the release of *Making a Murderer*, but some did not.

47. [Intentionally left blank]

48. I voluntarily retired from the Manitowoc County Sheriff's Department in 2018.

49. [Intentionally left blank]

50. I had a retirement party when retiring from the Manitowoc County Sheriff's Department in 2018.

51. Upon announcing my retirement, I received supportive calls from some people.

52. Since my retirement, I decided to return to the workforce and was able to find new employment.

53. [Intentionally left blank]

54. I filed for divorce from my now-ex-wife Barb Colborn in March 2021.

55. My divorce from Ms. Colborn was finalized in February 2022.

56. For purposes of this case, I have agreed not to assert that *Making a Murderer* caused my divorce.

57. I had a romantic relationship with Jodi Maurer prior to my divorce from Ms. Colborn.

58. I moved out of the residence that I shared with Ms. Colborn in January 2021. I moved back into the residence in March 2021.

59. I began living with Ms. Maurer at a shared residence in April 2021.

60. *Making a Murderer* did not cause Ms. Maurer to avoid romantic involvement with me.

61. My relationship with Ms. Maurer harmed my relationship with my ex-wife, Ms. Colborn.

62. My relationship with Ms. Maurer also harmed my relationship with my adult children.

63. [Intentionally left blank]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on July 21, 2022

Andrew Colborn

# Ballard Spahr
LLP

2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2119
TEL 612.371.3211
FAX 612.371.3207
www.ballardspahr.com

Leita Walker
Tel: 612.371.6222
Fax: 612.371.3207
walkerl@ballardspahr.com

July 8, 2022

*Via E-mail*

George Burnett
231 S. Adams Street/PO Box 23200
(920) 437-0476
GB@lcojlaw.com

April Rockstead Barker
Rockstead Law, LLC
525 N. Lincoln Ave.
Beaver Dam, WI 53916
(920) 887-0387
aprilbarker@rockstead.com

Michael Griesbach
Griesbach Law Offices, LLC
PO Box 2047
Manitowoc, WI 54221-2047
(920) 320-1358
attymgriesbach@gmail.com

Re:     Proposed stipulations ahead of Plaintiff Andrew Colborn's deposition

Dear Counsel,

In light of Judge Ludwig's strong suggestion at the July 7 hearing for the parties to work together to streamline Plaintiff Andrew Colborn's deposition, we propose the following stipulations. Please let us know by Friday, July 15 whether Mr. Colborn will stipulate to these facts so that we have time to finalize our questions and exhibits for Mr. Colborn's July 21 deposition.

If Mr. Colborn is not willing to stipulate to any fact below, we will require time at his deposition to question him about that fact. If you try to end the deposition before Defendants can complete their examination, and if Defendants are required to renew their motion for

*Exhibit A*

additional deposition time, we will provide a copy of this letter to the Court, along with other relevant materials.

1. Plaintiff Andrew Colborn has no evidence that any Netflix employee attended any portion of any proceeding (civil or criminal) involving Steven Avery.

2. Mr. Colborn has no evidence that any Netflix employee has ever been to Manitowoc County, Wisconsin.

3. Mr. Colborn has no evidence that any Netflix employee ever spoke to anyone who appears in *Making a Murderer*.

4. Mr. Colborn has no evidence that any Netflix employee ever received or read any transcript from any proceeding (civil or criminal) involving Mr. Avery.

5. Mr. Colborn has no evidence that any Netflix employee ever received or watched any raw footage of any proceeding (civil or criminal) involving Mr. Avery.

6. Mr. Colborn has no evidence that any Netflix employee ever received or watched any other raw footage used by the filmmakers in creating *Making a Murderer*.

7. At the trial of Mr. Avery for the murder of Teresa Halbach, a central part of Mr. Avery's defense was that law enforcement, including Mr. Colborn, planted evidence to frame him (hereafter, the "frame-up theory").

8. One part of the frame-up theory put forth by the defense at Mr. Avery's trial was that Mr. Colborn was looking directly at Ms. Halbach's vehicle when he made a November 3, 2005 call to dispatch.

9. A second part of the frame-up theory put forth by the defense at Mr. Avery's trial was that Mr. Colborn was involved in planting the key to Ms. Halbach's vehicle in Mr. Avery's bedroom.

10. Colborn wrote a report in September 2003 regarding a telephone call he received in or around 1995 while he was a corrections officer at the Manitowoc County Jail. That report was provided to then-Sheriff Kenneth Petersen, who kept the report in a safe before it was turned over to investigators for the State of Wisconsin.

11. Mr. Colborn felt wronged by the frame-up theory put forth by the defense at Mr. Avery's trial.

12.　Mr. Colborn felt the frame-up theory put forth by the defense at Mr. Avery's trial questioned his integrity.

13.　Mr. Colborn felt the frame-up theory put forth by the defense at Mr. Avery's trial harmed his reputation.

14.　The defense's use of the frame-up theory at Mr. Avery's trial caused Mr. Colborn distress.

15.　Even prior to its release, Mr. Colborn understood that *Making a Murderer* would not portray him in a favorable light because it would document the frame-up theory put forth by the defense at Mr. Avery's trial.

16.　After *Making a Murderer*'s release, Mr. Colborn recognized that claims it makes (if any) mirror those claimed by the defense during Mr. Avery's trial for the murder of Ms. Halbach.

17.　Mr. Colborn believes Jerome Buting has damaged his reputation.

18.　At one point, Mr. Colborn wanted to sue Mr. Buting for defamation.

19.　Mr. Colborn believes Dean Strang has damaged his reputation.

20.　At one point, Mr. Colborn wanted to sue Mr. Strang for defamation.

21.　Mr. Colborn believes John Ferak has damaged his reputation.

22.　At one point, Mr. Colborn wanted to sue Mr. Ferak for defamation.

23.　Mr. Colborn believes Kathleen Zellner has damaged his reputation.

24.　At one point, Mr. Colborn wanted to sue Ms. Zellner for defamation.

25.　An article by Mr. Ferak prompted a lot of death threats to be directed at Mr. Colborn.

26.　Mr. Colborn's statement during an interview with third-party filmmakers that he did not watch one single second of *Making a Murderer* was untrue.

27.　Mr. Colborn has not watched *Making a Murderer* in its entirety.

28.　Mr. Colborn has watched no portion of Episode 1.

29.　Mr. Colborn has watched no portion of Episode 2.

30.    Mr. Colborn has watched no portion of Episode 3.

31.    Mr. Colborn has watched no portion of Episode 4.

32.    Mr. Colborn has watched no portion of Episode 5.

33.    Mr. Colborn has watched no portion of Episode 6.

34.    Mr. Colborn has watched no portion of Episode 7.

35.    Mr. Colborn has watched no portion of Episode 8.

36.    Mr. Colborn has watched no portion of Episode 9.

37.    Mr. Colborn has watched no portion of Episode 10.

38.    Mr. Colborn is voluntarily participating in a documentary tentatively called *Convicting a Murderer*, which has not yet been released to the public.

39.    *Convicting a Murderer* is meant to serve as a rebuttal to *Making a Murderer*.

40.    Mr. Colborn entered into an exclusivity agreement with the producers for *Convicting a Murderer*.

41.    Mr. Colborn's exclusivity agreement for *Convicting a Murderer*—or at least his understanding of that agreement—has caused him to decline opportunities to publicly defend his reputation.

42.    Brenda Schuler, one of the producers of *Convicting a Murderer*, has told Mr. Colborn that the people making it are pro "LE" (law enforcement), that it will make Mr. Avery look "GAF" (guilty as fuck), and that it will "humanize the hell" out of Mr. Colborn.

43.    Ms. Schuler's disclosure of the information set forth in Stipulation No. 42 has not caused Mr. Colborn to withdraw his cooperation from *Convicting a Murderer*.

44.    No person identified by Mr. Colborn in response to Chrome Media LLC's First Set of Interrogatories, Interrogatory No. 10, has ever told him that *Making a Murderer* caused the person to think less of him.

45.    Mr. Colborn's law enforcement community supported him after the release of *Making a Murderer*.

46.     Mr. Colborn's faith community supported him after the release of *Making a Murderer*.

47.     No one has confronted Mr. Colborn as a result of *Making a Murderer*.

48.     Mr. Colborn voluntarily retired in 2018.

49.     In 2016, Mr. Colborn was already preparing to retire from the Manitowoc County Sheriff's Office in no more than three years.

50.     Mr. Colborn had a retirement party.

51.     Upon announcing his retirement, Mr. Colborn received supportive calls from dozens of people.

52.     Since his retirement, Mr. Colborn decided to return to the workforce and was able to find new employment.

53.     Mr. Colborn has not lost income due to *Making a Murderer*.

54.     Mr. Colborn filed for divorce from his now-ex-wife Barb Colborn in March 2021.

55.     Mr. Colborn's divorce from Ms. Colborn was finalized in February 2022.

56.     *Making a Murderer* did not cause Mr. Colborn's divorce.

57.     Mr. Colborn had an affair with Jodi Maurer while married to Ms. Colborn.

58.     After filing for divorce from Ms. Colborn, Mr. Colborn moved out of the residence he shared with Ms. Colborn.

59.     Mr. Colborn immediately began living together with Ms. Maurer at a shared residence.

60.     *Making a Murderer* did not cause Ms. Maurer to avoid romantic entanglement with Mr. Colborn.

61.     Mr. Colborn's infidelity irreparably harmed his relationship with his ex-wife, Ms. Colborn.

62.     Mr. Colborn's infidelity also harmed his relationship with his adult children.

63. Rifts within his immediate family have caused Mr. Colborn anxiety and distress.

Sincerely,

Leita Walker

Cc: Kevin Vick, Meghan Fenzel, Jean-Paul Jassey, James Friedman, Matthew Kelley, Emmy Parsons, Isabella Nascimento

| | |
|---|---|
| **From:** | April Barker <abarker@sbe-law.com> |
| **Sent:** | Wednesday, July 20, 2022 2:08 PM |
| **To:** | Walker, Leita (Minn); Parsons, Emmy (DC); Salomao Nascimento, Isabella (Minn); Kelley, Matthew E. (DC); Kevin Vick; Jean-Paul Jassy; Meghan Fenzel; James Friedman |
| **Cc:** | George Burnett; Debra L. Bursik |
| **Subject:** | Stipulations |
| **Attachments:** | Proposed stipulations 7.19.22.pdf |

⚠ **EXTERNAL**

Leita,

In reliance on your representation that you will use proposed stipulations to streamline your deposition questioning of Mr. Colborn, I am attaching a document that lists those of your proposed stipulations that Mr. Colborn will agree to enter into (referenced by paragraph number in your initial correspondence proposing them, and also reproduced below the list of numbers), as well as several stipulations that Mr. Colborn would agree to enter into if revised as shown in the attached document (also referenced by paragraph number from your original proposed stipulation list).

April

1

Approved proposed stipulations: 18, 20, 21, 22, 27, 38, 48, 50, 52, 54, 55

18. At one point, Mr. Colborn wanted to sue Mr. Buting for defamation.

20. At one point, Mr. Colborn wanted to sue Mr. Strang for defamation.

21. Mr. Colborn believes John Ferak has damaged his reputation.

22. At one point, Mr. Colborn wanted to sue Mr. Ferak for defamation.

27. Mr. Colborn has not watched *Making a Murderer* in its entirety.

38. Mr. Colborn is voluntarily participating in a documentary tentatively called *Convicting a Murderer*, which has not yet been released to the public.

48. Mr. Colborn voluntarily retired in 2018

50. Mr. Colborn had a retirement party.

52. Since his retirement, Mr. Colborn decided to return to the workforce and was able to find new employment.

54. Mr. Colborn filed for divorce from his now-ex-wife Barb Colborn in March 2021.

55. Mr. Colborn's divorce from Ms. Colborn was finalized in February 2022.


Revised proposed stipulations

10- Mr. Colborn wrote a statement in September 2003 regarding a telephone call he received in or around 1995 while he was a corrections officer at the Manitowoc County Jail. That statement was provided to then-Sheriff Kenneth Petersen, who told Mr. Colborn that he would put the statement in a safe. Shortly thereafter, it was turned over to investigators for the State of Wisconsin.

11- Mr. Colborn felt that defense theories involving the possibility that Steven Avery may have been framed for the murder of Teresa Halbach were ludicrous. He also thought that he was not being fairly portrayed by defense attorneys at Mr. Avery's trial.

12 - Mr. Colborn acknowledged in response to examination at the Avery criminal trial that the trial was the first time that he felt that his integrity as a law enforcement officer had been questioned.

15 - Prior to its release, Mr. Colborn was told that *Making a Murderer* would not portray him in a favorable light because it was going to be a "hatchet job."

17. -- Mr. Colborn believes that Jerome Buting has damaged his reputation in out-of-court statements about Mr. Colborn that were made after the release of *Making a Murderer.*

19. -- Mr. Colborn believes that Dean Strang has damaged his reputation in out-of-court statements about Mr. Colborn that were made after the release of *Making a Murderer.*

35 -- Mr. Colborn has watched no portion of Episode 8, to his knowledge and recollection.
36 -- Mr. Colborn has watched no portion of Episode 9, to his knowledge and recollection.
37 -- Mr. Colborn has watched no portion of Episode 10, to his knowledge and recollection.

44 - No person identified by Mr. Colborn in response to Chrome Media LLC's First Set of Interrogatories, Interrogatory No. 10, has ever told him that *Making a Murderer* caused the person to think less of him, but some of them have treated him differently since the release of the series

45 - Some members of Mr. Colborn's law enforcement community supported him after the release of *Making a Murderer*, but some did not.

46 -- Some members of Mr. Colborn's faith community supported him after the release of *Making a Murderer*, but some did not.

51. Upon announcing his retirement, Mr. Colborn received supportive calls from some people.

56. For purposes of this case, Mr. Colborn has agreed not to assert that *Making a Murderer* caused Mr. Colborn's divorce.

57. Mr. Colborn had a romantic relationship with Jodi Maurer prior to his divorce from Ms. Colborn.

58. Mr. Colborn moved out of the residence he shared with Ms. Colborn in January 2021. He moved back to the residence in March 2021.

59. Mr. Colborn began living with Ms. Maurer at a shared residence in April 2021

60. *Making a Murderer* did not cause Ms. Maurer to avoid romantic involvement with Mr. Colborn.

61. Mr. Colborn's relationship with Ms. Maurer harmed his relationship with his ex-wife, Ms. Colborn.

62. Mr. Colborn's relationship with Ms. Maurer also harmed his relationship with his adult children.