# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

ANDREW L. COLBORN,

                Plaintiff,

      vs.

NETFLIX, INC.; CHROME MEDIA
LLC, F/K/A SYNTHESIS FILMS, LLC;
LAURA RICCIARDI; AND MOIRA
DEMOS,

            Defendants.

Civil No.: 19-CV-484-BHL

## DEFENDANT NETFLIX, INC.'S MEMORANDUM
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

This defamation lawsuit arises from *Making a Murderer* ("MaM"[1]), a ten-hour documentary series Netflix released on December 18, 2015. Created by filmmakers Laura Ricciardi and Moira Demos (the "Producer Defendants"), MaM tells the true story of Manitowoc County resident Steven Avery, who spent 18 years in prison for a rape he did not commit before DNA evidence exonerated him. Avery then returned home, only to be arrested, tried, and convicted again for another crime, the murder of Teresa Halbach.

During his murder trial, Avery claimed he was framed by members of the Manitowoc County Sheriff's Office ("MCSO")—including Plaintiff Andrew Colborn. Specifically, his lawyers contended in open court that law enforcement planted evidence to ensure his conviction because they were embarrassed by the wrongful conviction, and because they feared the enormous monetary damages Avery stood to recover in a pending civil rights action. MaM documents Avery's allegations and his journey through the criminal justice system through the words of those with first-hand knowledge, culled from contemporaneous sources of sworn testimony, publicly filed pleadings, news conferences and interviews.

Colborn claims MaM's portrayal defames him in three ways: (1) by abridging in-court testimony; (2) by "adopting" Avery's frame-up allegations as fact; and (3) by portraying Avery in a more flattering light than he deserved, claiming that if certain facts about Avery had not been omitted, no viewer would have questioned the jury's guilty verdict or Colborn's honesty.

---

[1] Here and elsewhere, "MaM" refers only to season one ("S1") of the two-season series. Although the Second Amended Complaint ("SAC") briefly references season two ("S2"), *see* SAC ¶¶ 49-56, it only challenges S1 as false and defamatory. *See* SAC ¶¶ 57-82 (detailing claims at issue, referencing and challenging only S1 statements). The parties conducted no discovery regarding S2.

1

The Court need not actually dig into any of these theories to grant this motion. Even if they were valid (they're not), there is no evidence that Netflix released MaM with "actual malice." Under that constitutional doctrine, a public official plaintiff such as Colborn must establish by *clear and convincing evidence* that Netflix released MaM with knowledge of its alleged falsity or with a high degree of awareness of probable falsity. He cannot do this, regardless whether MaM manipulated the underlying source material to create materially false statements (it did not). No one at Netflix ever saw or possessed the source material underlying the series. No one at Netflix was responsible for fact-checking or vetting the series, and they did not do so. No one at Netflix ever had any reason to doubt or question the filmmakers or the truth of what MaM documents, much less the knowledge of probable falsity required under the law. Colborn has no evidence to the contrary. For this reason alone, Colborn's claims against Netflix fail as a matter of law.

Regardless, not one of the three theories of Colborn's case holds up under scrutiny, for both factual and legal reasons. *First*, Colborn cannot prove material falsity. This Court need not determine the truth or falsity of claims made by Avery's counsel at his trial. The only question in *this* case is whether MaM accurately documented that trial. The Court can answer that question now, as a matter of law, and in Netflix's favor because publicly available court records establish MaM's substantial truth. MaM's filmmakers edited their source material—all documentary filmmakers do. But none of their edits created a materially false statement—none changed the overall "gist or sting" of Avery's accusations or Colborn's response to those accusations—and Colborn thus cannot satisfy the burden of proof he bears. In the words of Colborn himself: "The claims by the Netflix documentary mirror those claimed by the defense during trial." Statement

of Proposed Material Facts ("SPMF") ¶ 27. Or as his friend, confidante, and advocate Brenda Schuler put it: "There is nothing new in Making a Murderer." *Id.* ¶ 28.

*Second*, MaM, on its face, refutes Colborn's claim that it somehow "adopts" or "endorses" Avery's frame-up defense as *incontrovertible fact*. Undoubtedly, MaM tells Avery's story from his perspective, but that is not defamatory. Meanwhile, despite the filmmakers' decision to build MaM around Avery, it portrays him as deeply flawed and troubled, balancing commentary from Avery and his supporters with commentary by his detractors and Colborn's defenders. MaM documents events rife with contradictions, ambiguities, and strong opinions on all sides. No reasonable viewer could conclude it endorses Avery's perspective or reaches any conclusion about his culpability—or Colborn's. Even its title—*Making a Murderer*—reflects the ambiguity underlying Avery's story: Did 18 years of wrongful imprisonment "make" Avery a coldblooded killer? Or did law enforcement "make" him one, by framing him?

*Third*, allegedly omitted facts about Avery are not "of and concerning" Colborn and so cannot support a defamation claim as a matter of law. Setting that aside, Colborn's claim that Netflix had some duty to make Avery look bad so Colborn would look better does not equate to a false statement. Avery's guilt does not exonerate Colborn. As Colborn's former counsel of record Michael Griesbach has previously acknowledged on multiple occasions, it is possible *both* that Avery killed Teresa Halbach *and* Colborn planted evidence to ensure he was convicted. In any event, because these alleged omissions are not *about* Colborn, they cannot defame him.

Documentarians can tell the story of murder trials, including allegations an accused makes against law enforcement, without running afoul of the law. Were Colborn's theory of this case to prevail, journalists, documentarians, commentators, and ordinary citizens could not fully discuss any criminal trial without the specter of being sued for defamation over their repetition of

the accusations of criminality and other reputation-damaging details that came out in the context of the trial. For this reason, the First Amendment protects substantially true reports and places the burden squarely on the shoulders of public-official defamation plaintiffs such as Colborn to prove that challenged statements about them are materially false and made with actual malice. Colborn cannot meet this burden, and his intentional infliction of emotional distress ("IIED") claim fails along with his defamation claim. Netflix is entitled to judgment on Colborn's two claims as a matter of law, and the Court should grant summary judgment in its favor.

## BACKGROUND ON AVERY'S CONVICTION FOR RAPE, EXONERATION, AND SUBSEQUENT CONVICTION FOR THE MURDER OF TERESA HALBACH[2]

On July 29, 1985, a Manitowoc woman named Penny Beerntsen was sexually assaulted while she was jogging. Steven Avery quickly became a suspect and ultimately was convicted of first-degree sexual assault, attempted murder and false imprisonment, for which he was sentenced to 32 years in prison. After 18 years in prison, DNA testing exonerated Avery. He was released, and returned home in September 2003.

Two years later, on October 31, 2005, a young woman named Teresa Halbach went missing. A photographer who worked for *Auto Trader*, Halbach had accepted an assignment that day at the Avery Salvage Yard. On November 3, Halbach's mother reported her missing, and two days later volunteer searchers came across her Toyota RAV4 on the Avery property. A

---

[2] The facts recounted herein are not "material" and are included merely to orient the Court. Many of them are included in *State v. Avery*, 570 N.W.2d 573 (Wis. Ct. App. 1997), *State v. Avery*, 804 N.W.2d 216 (Wis. Ct. App. 2011), and *Avery v. Manitowoc Cnty.*, 428 F. Supp. 2d 891 (E.D. Wis. 2006), and are thus subject to judicial notice. *See Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016). Others are recounted in news reports, such as those catalogued at https://madison.com/steven-avery-case-read-the-original-stories/collection_0804d526-b4a7-11e5-adf2-931380a48d26.html, and all of them are documented in unchallenged portions of MaM. Despite these background facts being uncontroversial and indisputable, Plaintiff refused to stipulate to them on the eve of filing and refused to specify (or even meet and confer on) what about them was objectionable.

smear of blood in the front of the RAV4 matched to Avery and blood in the cargo area matched to Halbach. On November 8, during a sixth search of Avery's home, the key to Halbach's vehicle was discovered in Avery's bedroom. The key was later determined to have Avery's DNA on it. Investigators also found charred human remains on the Avery property, which DNA testing would later reveal were Halbach's.

Avery was charged with first-degree intentional homicide on November 15. Calumet County District Attorney Ken Kratz was appointed special prosecutor. In a search conducted in March 2006, after Avery had been charged, investigators recovered a bullet and bullet fragments from Avery's garage that came from a rifle found in his trailer and that contained Halbach's DNA. Avery's case went to trial in February 2007 and lasted nearly five weeks. The jury convicted Avery for Halbach's murder.

## MATERIAL FACTS

### I. AVERY'S CIVIL CASE FOR WRONGFUL IMPRISONMENT AND THE MANITOWOC COUNTY SHERIFF'S OFFICE'S CONFLICT OF INTEREST

After Avery's exoneration for rape, the State of Wisconsin investigated and concluded that Manitowoc County Sheriff Tom Kocourek and District Attorney Denis Vogel, and others, had strong reasons to believe that another man was Beerntsen's real assailant and that Avery was innocent, but went ahead with the case against Avery anyway. SPMF ¶ 1. Avery filed a civil rights lawsuit for $36 million in this Court in 2004, asserting claims against Manitowoc County, Kocourek, and Vogel for violating his constitutional rights. *Id.* ¶ 2.

The Plaintiff here, Andrew Colborn, was deposed in Avery's civil case and testified that, immediately after Avery's 2003 release, Colborn recalled receiving a phone call in 1994 or 1995 when he was a corrections officer at the Manitowoc County Jail (hereafter referred to as the "jail call"). *Id.* ¶¶ 3-4. Colborn testified that the caller identified himself as a detective from another

jurisdiction, and said an inmate there had claimed he was responsible for an assault in Manitowoc County for which another man was imprisoned. Colborn testified that he transferred the call to a detective, but did not document the jail call until making a written statement about it in September 2003. Colborn provided the statement to the then-sheriff, who kept it in his safe. *Id.* ¶¶ 5-9; Statement of Stipulated Material Facts ("Stip.") ¶ 2.

Avery was arrested for killing Halbach while in the midst of discovery in his civil case. In jail and facing a costly criminal trial, he settled his lawsuit against Manitowoc County for $400,000, from which his attorneys were paid $160,000. SPMF ¶¶ 3, 10. Meanwhile, authorities decided that Calumet County would take the lead in the Halbach investigation, to avoid any conflict of interest arising from Avery's prior wrongful conviction and resulting civil litigation. *Id.* ¶ 11. Nevertheless, it was Colborn and another MCSO employee, James Lenk, who purported to find a key piece of evidence in the case against Avery: the key to Halbach's SUV. It appeared on the floor of Avery's bedroom, after Colborn had roughly handled a small bookshelf. *Id.* ¶ 12.

## II. AVERY'S TRIAL FOR HALBACH'S MURDER

As Colborn acknowledges, accusations that he and Lenk planted evidence to frame Avery were a *central* part of Avery's defense at his trial. SAC ¶ 33. The presiding judge denied a prosecution motion to exclude this defense because, *inter alia*, "Avery's charges against Lenk and Colborn in the federal lawsuit could have provided . . . motive." Judge Patrick Willis specifically identified Lenk and Colborn as the only two officers the defense could attempt to implicate as participants in this alleged conspiracy. SPMF ¶¶ 13-14.

With regard to Colborn, and as relevant here, three events were the focus of questioning at Avery's trial by both prosecutors and Avery's counsel. The first was the *jail call*, discussed above. Another was the *discovery of the key*, also discussed above. And a third is referred to herein as the *dispatch call*—a call Colborn made to a dispatcher about the license plate number

of Halbach's vehicle. Specifically, Avery's counsel argued to the jury that the dispatch call indicated Colborn had located the SUV before it was "officially" discovered in the salvage yard. Both Colborn and Lenk testified at trial that Avery's civil lawsuit against the County did not cause them to plant evidence or otherwise try to frame Avery. Colborn specifically testified he did not have any reason to suspect the jail call in the mid-90s was about Avery, he was not looking at Halbach's car when he made the dispatch call, and he believed the RAV4 key fell out of a gap in the back of a bookcase due to his rough handling of it. *Id.* ¶¶ 15-20.

After the jury convicted Avery, Colborn issued a statement featured on the local nightly news: "I hope and pray that this verdict helps put to rest any suspicion or loss of confidence that this community may have felt towards our department, because I assure everyone that this agency has some of the finest law enforcement officers in the country in its employ." At his deposition in this case, Colborn admitted that the presiding judge allowed Avery and his counsel to argue at trial that law enforcement planted evidence to frame him, and that this was not something Defendants here made up out of "whole cloth." *Id.* ¶¶ 23-24, 26.

## III.   MAM'S PORTRAYAL OF EVENTS

MaM premiered on Netflix on December 18, 2015. Stip. ¶ 1. The ten-part documentary series chronicles Avery's experiences in the criminal justice system through the words and actions of its participants, including through footage of actual events such as Avery's murder trial and related press conferences, interviews of those with first-hand knowledge, trial and deposition transcripts and exhibits, other documents and photos, and third-party news coverage. SPMF ¶ 25. Colborn himself admits that "[t]he claims by the Netflix documentary mirror those claimed by the defense during trial," and that it upset him, not because it invented some fabulous new story line, but because it served to "maintain and keep alive" what he characterizes as "lies" promulgated by Avery's defense attorneys at his murder trial. SPMF ¶¶ 27, 29. Avery was the

principal subject of MaM, which builds its examination of the criminal justice system around his story, *Id.* ¶ 30. But MaM did not "adopt" Avery's frame-up defense as fact. *Id.* ¶ 31. It merely documented it as part of a 10-hour series. *Id.* ¶¶ 25, 31.

Briefly summarized,[3] MaM begins by showing Avery's criminal history as a troubled young man before moving to his rape conviction and exoneration. SPMF ¶¶ 32-35. Early episodes include statements by third-parties disparaging Avery as a violent individual who victimized women. *Id.* ¶¶ 32, 34. MaM then documents Avery's civil rights lawsuit and the jail call, Halbach's disappearance, and Avery's arrest for her murder. *Id.* ¶¶ 35-37. Episode 3 in particular shows a community divided over the arrest before ending with a confession by Avery's nephew Brendan Dassey that he helped kill Halbach, which Episode 4 addresses at length. *Id.* ¶¶ 38-42.

Episode 5 starts a four-episode arc depicting Avery's murder trial. These episodes include Colborn's testimony on the jail call, dispatch call, and discovery of the key. They also show vehement defense of Colborn and other law enforcement officials by lawyers for the prosecution, a third-party journalist, and others. Episode 8 includes more than eight minutes of excerpts from both sides' closing arguments. It reaches its climax with footage of Judge Willis reading the jury's verdict convicting Avery of murder. It also includes footage of a local news anchor reading Colborn's post-verdict statement. Episode 9 includes footage of Avery's sentencing and Judge Willis' statement that he is "probably the most dangerous individual ever

---

[3] A more expansive description of each episode can be found at SPMF ¶¶ 32-80. Because the law requires the Court to view the challenged statements within the context of the series as a whole, *see Bd. of Forensic Doc. Exam'rs, Inc. v. ABA*, 922 F.3d 827, 832 (7th Cir. 2019), Netflix previously filed all 10 episodes at Dkts. 120-1 to 120-10.

to set foot in this courtroom." Episode 10 describes post-verdict developments, such as the fact that Avery and Dassey both lost their first rounds of appeals. SPMF ¶¶ 43-80.

## IV.    NETFLIX'S INVOLVEMENT IN MAM

Netflix licensed MaM in July 2014 from the Producer Defendants, at which point the series was almost entirely shot and the first three episodes were already assembled. SPMF ¶¶ 84-85. Demos described the project as "exceedingly independent"—"produced, directed, shot and edited by my partner Laura Ricciardi and myself," *Id.* ¶ 85. In fact: No Netflix employee attended any portion of any court proceeding involving Avery, traveled to Manitowoc County, conducted any interview of anyone featured in MaM, otherwise spoke to anyone depicted in it, watched or received raw footage of the underlying events, or reviewed or received any other source material from the events MaM documents, such as deposition or trial transcripts or exhibits. *Id.* ¶¶ 106-111, 113-115. Colborn has no evidence to the contrary. *Id.* ¶ 112.

In the license agreement, the Producer Defendants warranted that they would provide a "truthful and accurate" series to Netflix that did not defame anyone. *Id.* ¶ 86. The Producer Defendants hired their own lawyers for the production. *Id.* ¶ 87. No one at Netflix was responsible for vetting MaM for accuracy or for defamation, and no one at Netflix engaged in such vetting. In fact, no one at Netflix even edited the series, and Netflix executives have stated unequivocally that they relied upon the Producer Defendants to know and check the facts of MaM. Likewise, they have stated unequivocally that they did not doubt (nor did they have any reason to doubt) the filmmakers' commitment to accuracy. They have stated that that they never had concerns about the series' accuracy and would have raised any concerns they had. *Id.* ¶¶ 89, 91-94, 122-124.

Netflix's involvement in MaM once it acquired and financed the series included assisting the Producer Defendants in budgeting and scheduling, facilitating introductions to third parties,

and making other business decisions. *Id.* ¶ 90. Creatively, the Netflix team reviewed "cuts"—assembled footage the Producer Defendants had edited into proposed scenes and episodes. Netflix provided "notes" on the cuts that addressed topics such as pacing, graphics, and music. SPMF ¶¶ 95-103. Importantly, the Netflix team reviewed cuts for their overall look and feel and from the perspective of a Netflix subscriber; they did *not* conduct side-by-side comparisons to previous iterations in an attempt to understand what precisely the filmmakers had added or cut. Further, Netflix never suggested or intended to suggest that the filmmakers sacrifice accuracy to speed up the pace of the series or make an episode more impactful. *Id.* ¶¶ 95-96, 101.

In fact, it was not until April 2022, when preparing for their depositions in this case, that Netflix employees learned of the specific edits at issue. When asked about the edits, the lead Netflix executive on MaM, Lisa Nishimura, testified that they did not materially change the "point" of Colborn's testimony and that the edits would not have caused her concern even if she had been aware of them. Both Nishimura and her colleague Adam Del Deo testified that MaM does not convey that Colborn did, in fact, plant evidence to frame Avery, and they rejected the notion that reasonable viewers could interpret it that way. *Id.* ¶¶ 116-124.

## V.    COLBORN'S ALLEGATIONS IN THE SAC

The SAC, filed at Dkt. 105, puts at issue supposedly false "statements" detailed in Paragraphs 27-39, 33-40, 44-48 and Exhibits A and B. Colborn has the burden to articulate and prove how these portions of MaM are false and defamatory, but his allegations can generally be assigned to one of three categories: (1) abridging testimony; (2) adopting Avery's frame-up defense as fact; and (3) failing to include negative information about Avery.

As for the first theory, Colborn claims MaM edits in-court testimony so as to create materially false statements about the real-life events on which he was questioned at Avery's murder trial: the **jail call**, the **dispatch call**, and the **discovery of the key**. He claims MaM's

portrayal of the jail call implies he "learned of Avery's 1985 wrongful conviction approximately eight years before he was released, but covered it up," thereby creating a motive to frame Avery for Halbach's murder when the cover-up came to light. SAC ¶¶ 24, 28-29. He alleges MaM's portrayal of the dispatch call caused viewers to believe he was aware of the location of Halbach's car—was even looking at its license plate—before its official discovery, lending credence to Avery's claim that Colborn planted evidence to frame him. *Id.* ¶¶ 33-34. And he alleges his testimony about the discovery of the key "was spliced in order to maximize suspicion that the key was planted and minimize a plausible explanation for how it came to be found." *Id.* ¶ 44.

Separate and apart from these edits, Colborn generally complains that MaM is biased and unfair to him in its telling of Avery's story and omission of certain information. *Id.* ¶¶ 59(c), 65-66; *see also* SPMF ¶ 125. But he has not actually watched the series and so he could not answer questions at his deposition about whether certain portions of MaM counterbalance the allegedly unflattering portions he has sued over. *Id.* ¶ 127. In fact, Colborn's *only* basis for claiming that MaM was biased against him or that it somehow conclusively asserted he planted evidence, thereby defaming him, were calls and messages he received from anonymous individuals who he concedes were not reasonable viewers and who may not even have watched MaM. Stip. ¶¶ 3-4; SPMF ¶¶ 126-128. Meanwhile, Colborn agrees that it is perfectly acceptable for documentaries to have a perspective or point of view and for filmmakers to have a bias or agenda. ███████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ In any event, Colborn cannot satisfy his burden to show that MaM's portrayal of Avery's defense—or anything else in the documentary—is defamatory or otherwise actionable as a matter of law.

Finally, in addition to his defamation claim, Colborn sues for IIED. Colborn admits, however, that physical manifestations of his emotional distress (if any) are so subtle that not even is live-in girlfriend is able to observe them. Medical records—which Colborn admits are the only documentary evidence of his emotional distress—back this up ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ Meanwhile, Colborn appears to have lived a full and meaningful life since MaMs' release: he celebrated his voluntary retirement, took a new job, stayed active in his church, and even found romance, though not with his wife. In any event, Colborn cannot meet his burden to show MaM caused the emotional distress he claims to have suffered. His distress (if any) is just as easily traced to other events in his life, including his divorce from his visually-impaired ex-wife, and the 2007 Avery trial itself, which he admits was emotionally difficult. Stip ¶¶ 6-12; SPMF ¶¶ 137-138, 141-147.

## SUMMARY JUDGMENT STANDARD IN PUBLIC OFFICIAL DEFAMATION CASES

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Colborn, a public official, bears the burden in this case to prove not only the publication of provably false, unprivileged statements, but also constitutional actual malice. On the fault element in particular, he cannot simply "discredit" Netflix's evidence; rather, he must "present *affirmative* evidence," even if that evidence is "likely to be within the possession of the defendant." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (emphasis added). Meanwhile, the Court must "view the evidence presented through the prism of the substantive evidentiary burden" and "bear in mind the actual quantum and quality of proof necessary to support liability," and here that burden is heightened: Colborn must prove actual malice by *clear and convincing evidence*. *Liberty Lobby*, 477 U.S. at 254. Finally, because of the chilling effect lengthy and expensive litigation has on

free speech, "summary judgment is an important and favored method for adjudicating public figure defamation actions." *Torgerson v. Journal/Sentinel Inc.*, 210 Wis. 2d 524, 538-40, 563 N.W.2d 472, 479 (1997).

## ARGUMENT

Netflix is entitled to summary judgment for two, independent reasons. First, after more than a year of discovery, Colborn has no evidence that would give rise to a genuine issue of material fact regarding whether Netflix published any of the challenged statements with actual malice. Colborn therefore cannot meet his burden, and his failure is case dispositive, as shown in **Section I**.

If the Court agrees that Netflix is entitled to summary judgment on actual malice, it need not go any further. But even if it does not agree, Colborn cannot survive summary judgment because MaM is not defamatory as a matter of Wisconsin law. "[A] defamation plaintiff must show that the defendant (1) published (2) a false, (3) defamatory, and (4) unprivileged statement." *Fin. Fiduciaries, LLC v. Gannett Co.*, --- F.4th ---, 2022 U.S. App. LEXIS 23418, at *18 (7th Cir. Aug. 22, 2022) (citing *Torgerson*, 210 Wis. 2d at 534-35). **Sections II** and **III** explain why Colborn cannot establish these elements, either.

First, filmmakers are free to document what transpires in open court, and comparing the trial transcript to the relevant portions of MaM demonstrates the series' recounting of the trial is substantially true. Rest assured, *the Court can make this determination as a matter of law*. *Glob. Relief Found. v. N.Y. Times Co.*, 390 F.3d 973, 987 (7th Cir. 2004) ("[C]ourts must ask whether a reasonable jury could find substantial truth has not been established. If the answer is no, the question is one of law."). Indeed, this Court previously recognized as much, noting at the motion to dismiss stage: "If the record at summary judgment establishes that defendants' reporting on the Avery case was substantially true, they, like the defendants in *Global Relief*, will be entitled

13

to summary judgment." Dkt. 176 at 13-14. Second, the frame-up defense was *Avery*'s defense and was presented as such. MaM did not endorse or adopt this defense as "the truth," and even if some unreasonable viewers interpreted MaM that way, Colborn has no evidence that Netflix intended for viewers to make this inference or knew that they would. Finally, any remaining challenged "statements"—omissions, really—are not *about* Colborn and thus do not defame him.

That leaves Colborn's IIED claim, which fails because his defamation claim fails. Regardless, Colborn has no evidence to support any of the tort's elements, as shown in **Section IV**. The Court should grant summary judgment on all claims in favor of Netflix.

## I.     COLBORN HAS NO EVIDENCE THAT NETFLIX DISTRIBUTED THE CHALLENGED STATEMENTS WITH ACTUAL MALICE.

The actual malice standard is designed to afford "breathing space" for investigations and reports on matters of public concern. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964). To establish actual malice, Colborn must first show falsity, which he cannot do, for the reasons discussed in Section II, *infra* at 26-40. *See Torgerson*, 210 Wis. 2d at 543, 563 N.W.2d at 480-81; *see also Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991) ("a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity"). Then, as a conceded public official, Colborn must point to admissible evidence from which a reasonable jury could find—*by clear and convincing evidence*—that Netflix itself (not the Producer Defendants) either knew that the challenged statements were false or had "reckless disregard" for their truth, meaning it released MaM with a "high degree of awareness of [its] probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 67, 74 (1964); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Harris v. Quadracci*, 48 F.3d 247, 252 (7th Cir. 1995); *Torgerson*, 210 Wis. 2d at 534-35; *see also Liberty Lobby*, 477 U.S. at 254.

This is a demanding standard, by design. Actual malice typically is found only where a publication "is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous [tip];" when "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation;" or "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732. None of those circumstances exist here: Even Colborn admits the accusation that he planted evidence to frame Avery was part and parcel of—indeed, "central" to—Avery's defense at his 2007 murder trial. SAC ¶ 33; SPMF ¶¶ 13, 24. "It wasn't something [Defendants] made up out of whole cloth." SPMF ¶ 26.

To date, nearly all of Colborn's allegations regarding actual malice (in the SAC and in his discovery responses) refer to "defendants" collectively. But on summary judgment, Colborn cannot simply lump all Defendants together in an attempt to impute the states of mind of the independent filmmakers to Netflix.[4] *See, e.g.*, *Saenz v. Playboy Enters.*, 841 F.2d 1309, 1319 (7th Cir. 1988). Instead, Colborn must point to evidence of the states of mind of the handful of Netflix employees who interacted with the Producer Defendants and reviewed footage *after* the Producer Defendants edited and assembled it into a cohesive "cut." *See Sullivan*, 376 U.S. at 287; *Mimms v. CVS Pharmacy, Inc*., 889 F.3d 865, 868 (7th Cir. 2018). Netflix's core team for MaM consisted of Nishimura, Del Deo, Ben Cotner, and—to a lesser extent—Marjon Javadi. SPMF ¶ 88. There simply is no evidence that these people knew that the challenged statements were false, or that they entertained serious doubts about their truth. Colborn cannot establish actual malice, so his defamation claim fails.

---

[4] Netflix does not believe there is any evidence that the Producer Defendants published MaM with actual malice, either.

**A.** **Netflix was not responsible for editing or fact-checking MaM, did not do so, and no Netflix employee ever saw any unedited source material.**

Key to understanding all that follows in this subsection are two indisputable points: (1) that Netflix trusted the filmmakers, never had reason to doubt them, and relied upon them to know and check the facts in MaM, SPMF ¶¶ 89, 119, 122-124; and (2) that this reliance was not an abdication of some "duty" to investigate but rather is both industry standard and fully consistent with controlling authority. As the Seventh Circuit explained in *Saenz*, publishers are "under no obligation" to check the facts in content authored by an independent contractor "unless something blatant put them on notice that he was reckless about the truth," such as "[s]erious factual improbabilities or inconsistencies in the publication itself." 841 F.2d at 1319; *accord Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 485 (7th Cir.1986).[5]

Here, there is no evidence of any such notice at all, much less "blatant" notice. In particular, there is nothing "inherently improbable" about the claim that law enforcement officials planted evidence to ensure Avery's conviction: First, as documented in MaM, that claim was presented in open court at Avery's 2007 murder trial, with the express permission of Judge Willis. *See* SPMF ¶¶ 14, 24. Second, Colborn's former counsel—a man who *personally knew* the officers implicated—has acknowledged the plausibility of Avery's theory. *See id.* at ¶¶ 21-22. And third, the MCSO had previously shown itself capable of shockingly bad judgment, if not criminal misconduct, as the probe into Avery's wrongful conviction established. *Id.* ¶ 1.

Thus, Netflix had no obligation to fact-check or conduct a legal "vetting" of MaM for defamation and—contrary to Colborn's allegations, *see* SAC ¶ 18—it did not do so. SPMF ¶ 89.

---

[5] *See also Sullivan*, 376 U.S. at 287; *Chang v. Michiana Telecasting Corp.*, 900 F.2d 1085, 1090-91 (7th Cir. 1990); *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124 (2d Cir. 2013); *Simonson v. United Press Int'l, Inc.*, 500 F. Supp. 1261, 1269 (E.D. Wis. 1980), *aff'd*, 654 F.2d 478 (7th Cir. 1981).

Rather, it licensed MaM from the Producer Defendants, and obtained an industry-standard representation and warranty that the they would deliver to Netflix a "truthful and accurate" series that did not defame anyone. *Id.* ¶ 86. Consistent with this obligation, the Producer Defendants hired their own lawyers for the production. *See id.* ¶ 87. All of the editing was controlled by the filmmakers. *Id.* ¶ 92. Or as Del Deo put it: "Laura and Moira were the filmmakers. They were looking at the footage—the trial footage, you know, all the assets they had. They would be the ones to make the call as to what ends up in the documentary or not." *Id.* ¶¶ 93-94.

The series was also entirely shot by the Producer Defendants. *id.* ¶ 85, as Avery was convicted for Halbach's murder *years* before Netflix even acquired MaM. No Netflix employee attended any portion of any proceeding involving Avery—not his 1985 rape trial, not proceedings in his 2004 civil rights case, and not his 2007 murder trial—or ever even visited Manitowoc County. *Id.* ¶¶ 106-107. No Netflix employee ever received, much less reviewed, raw footage of the underlying events documented in MaM or any other source material such as deposition or trial transcripts or exhibits. *Id.* ¶¶ 110-111, 113-114. Netflix employees did not sit in on any interviews—certainly they did not conduct any themselves. Indeed, no member of the Netflix team has ever even spoken to anyone depicted in MaM. *Id.* ¶¶ 108-109. Colborn has no basis upon which to refute these sworn statements. *See id.* ¶ 112. Meanwhile, the testimony of Netflix executives completely aligns with the documentary evidence and third-party witness testimony. *See, e.g.*, *id.* ¶ 115 (testimony that not even editors review all raw footage).

Because it did not attend the proceedings, edit the series, or even have access to raw footage and other underlying source material, Netflix simply did not—and still does not—know what was left on the cutting room floor. It did not do side-by-side comparisons of raw to edited footage—it didn't even have access to raw footage. *See id.* ¶ 110. And although Netflix

employees received multiple cuts of each episode, they were watching those cuts so they could share their overall comments about things like pacing and feel—not doing side-by-side comparisons to past iterations to spot subtle edits to testimony. *Id.* ¶¶ 96-103. Indeed, Netflix employees were not even aware of the specific edits at the center of this lawsuit until their depositions in April 2022, *id.* ¶ 116, and when questioned about the challenged edits, Nishimura testified that she did not personally have "any knowledge of changes that are made," *id.* ¶¶ 117-118. During similar questioning, Del Deo reiterated that he had not seen any raw footage and that editorial decisions were up to the filmmakers: Netflix "trusted them to edit the show." *Id.* ¶ 119.

Given these undisputed facts, Colborn simply cannot prove that Netflix *knew* any aspect of MaM was false or likely false. He essentially conceded as much at his deposition. Asked repeatedly how Defendants could have known certain statements were false, his only answer was to say they attended Avery's trial and observed what transpired there. *Id.* ¶ 104. But no one from Netflix attended the trial. *Id.* ¶ 106. Colborn went even further, admitting that individuals who did *not* attend trial could not know what transpired there. Asked about his one-time attorney's personal uncertainty about whether the police had planted evidence to ensure a guilty verdict, *see, e.g.*, *id.* ¶ 21, and how, if Griesbach believed the frame-up defense was plausible, others were expected to know it was false, Colborn responded, "I don't have an answer other than Mr. Griesbach didn't attend the trial." *Id.* ¶ 105. Neither did Netflix.

### B. Colborn's "evidence" regarding MaM's content and Netflix's motives in shaping that content do not establish actual malice.

Unable to point to Netflix employees' familiarity with source material or any role in the editing or vetting of MaM, Colborn resorted during discovery to alleging that the series was biased against him, that Netflix licensed it in pursuit of some anti-law enforcement agenda, and that Netflix was driven by greed to sensationalize the Avery story and "hook" viewers.

As an initial matter, Colborn's admission that he has watched little more than an hour of the series and has no intention of watching any more, *see* SPMF ¶ 126, raises serious doubts about his ability to make any allegations about MaM, much less characterize the series' overarching themes and conclusions (if any) or assess whether its portrayal of events is fair and balanced. *See also id.* ¶ 127. Putting this aside, his claims on actual malice are threefold: that it can be shown by pointing to (1) the content of MaM itself, (2) Netflix's purported "motivations" in releasing it, and (3) Netflix's decision to release S2. All these theories lack merit.

### 1.     MaM's content does not establish actual malice.

Colborn believes the series itself "proves" actual malice because it is biased against him and in favor of Avery. SPMF ¶ 125. As a matter of law, this is not actual malice.

First, merely including statements from people who are biased against the plaintiff is not, absent more, evidence of actual malice. *Saenz*, 841 F.2d at 1319. This makes sense: "self-interest and politics 'motivate[] many news sources; if dealing with such persons were to constitute evidence of actual malice . . . , much newsgathering would be severely chilled.'" *Fairfax v. CBS*, 2 F.4th 286, 294 (4th Cir. 2021). Avery's and his supporters' biases are clear for all MaM viewers to see, and it is simply "untenable" for Colborn to suggest that Avery's conviction somehow "precludes commentators outside of the judicial system from expressing a contrary view." *See Riley v. Harr*, 292 F.3d 282, 294 (1st Cir. 2002). If true, no documentary could ever question whether justice was served in a jury trial without running the risk of liability.

Second, Avery accused Colborn of planting evidence within the context of trial. Those accusations are a matter of public record, received significant publicity at the time they were first made, and—Colborn admits—harmed his reputation years before MaM's release. SPMF ¶ 139. Such allegations may be reported on regardless of whether they are true, and even regardless of whether the publisher finds the allegations credible. *See Erdmann v. SF Broad. Of Green Bay,*

*Inc.*, 229 Wis. 2d 156, 170, 599 N.W.2d 1, 8 (1999) ("While the facts the police provided to the media ultimately proved to be untrue, the television report accurately reflected the information law enforcement publicly disseminated."); *see also* Section II.II.A, *infra* at 28-34. Again, to hold otherwise would end the media's coverage of courts was we know it.

Third, it does not constitute actual malice to publish an allegation that has been denied. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003). This is especially true because MaM (viewed in its entirety as the law requires), counter-balanced Avery's accusations and statements by his supporters with an unflinching look at Avery's many flaws and by including footage sympathetic to Colborn—not only his own testimony denying he planted evidence, but also his post-trial statement to the press and full-throated defenses of his integrity by numerous third parties. *See infra* at 37-38 (bullet list). Far from establishing actual malice, including this "other side of the story" "tends to undermine the claims of [actual] malice." *Michel v. NYP Holdings*, 816 F.3d 686, 703 (11th Cir. 2016); *see also McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1304 (D.C. Cir. 1996).

Fourth, as a matter of law—and with full acknowledgement that Avery is MaM's "main character or principal subject," SPMF ¶ 30—the decision to tell a story of immense public interest and concern through his eyes is not actual malice, either. That is, even assuming MaM positions Avery as a "protagonist" and was somehow "unbalanced" as a result (it was not), Netflix was "under 'no legal obligation to present a balanced view' and cannot lose its constitutional protection because the plaintiff believed it failed to do so." *Torgerson v. Journal Sentinel, Inc.*, 200 Wis. 2d 492 (table), 546 N.W.2d 886 (table), 1996 Wisc. App. LEXIS 186, at *25 (Ct. App. 3d Dist. Feb. 13, 1996) (unpublished) (quoting *Perk v. Reader's Digest Ass'n*, 931 F.2d 408, 412 (6th Cir. 1991)), *aff'd*, 210 Wis. 2d 524, 563 N.W.2d 472 (1997); *see also Riley*,

292 F.3d at 287 (affirming dismissal of claims against book even though it "tells the story of the *Anderson* litigation primarily from the perspective of the plaintiffs' attorney," "repeatedly suggests" the denials of the defendant in the underlying litigation "were false," and positions the plaintiffs' attorney as a "protagonist").

### 2. Netflix's alleged motivations for releasing MaM do not establish actual malice.

Colborn also tries to prove *actual* malice by pointing to *common law* malice—*i.e.*, alleged animus Netflix and some of the people quoted in MaM purportedly harbored against him or law enforcement. *See, e.g.*, SAC ¶ 66; *see also* SPMF ¶ 125 (Colborn asserting that Netflix has "an instinctive distrust of law enforcement"). Even if these allegations were accurate, and they are not, "actual malice does not mean bad intent, ill-will, or animus." *Storms v. Action Wis. Inc.*, 2008 WI 56 ¶ 66, 309 Wis. 2d 704, 733, 750 N.W.2d 739, 753.

So Colborn resorts to theorizing that Netflix was motivated by greed: in his telling, Netflix is a giant company intent on making more money, no matter the cost to people like him, and—in pursuit of profits—it did whatever it could to sensationalize an old, forgotten story, hook viewers, and drive up subscriptions. SAC ¶¶ 15, 17, 62. Again, this is not an original argument. Almost every plaintiff suing over speech alleges a profit-motive because—almost always—the speech at issue was sold, as part of a newspaper, magazine, book, or film. And so, nearly as often as the argument is raised, it fails. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989); *see also Woods*, 791 F.2d at 484.

Regardless, the allegation is not true. It goes without saying that all Defendants wanted MaM to be successful—including because they thought it addressed an important topic. But they also wanted MaM to be accurate. Indeed, Nishimura and Del Deo attest that, if they had ever been concerned about the accuracy of a cut or episode, they would have raised the concern with

the Producer Defendants—but they never experienced such concern. SPMF ¶ 124. The Netflix team would not have proposed revisions to the series with the intent of making the final product inaccurate, *id.* ¶ 101, and Colborn has no evidence suggesting otherwise.

Nevertheless, Colborn relies heavily on "notes" from Netflix to the Producer Defendants as supposed support for his argument that it was willing to—and that it knowingly did—sacrifice accuracy for the sake of entertainment, viewer engagement, and commercial success. The notes do not support this argument. As an initial matter, they were suggestions, not directives, and just because a revision was proposed, does not mean it was made. *See* SPMF ¶ 97. But, even hypothesizing that a note somehow led to a misleading edit, there is no evidence Netflix *knew* this had occurred. Without such evidence, Netflix's advice to the Producer Defendants cannot be evidence of actual malice. That analysis alone is enough to dispose of the notes. But for the sake of completeness, Netflix addresses those that Colborn claims demonstrate actual malice, focusing first on notes that relate to the editing of in-court testimony at the center of this lawsuit (there are precious few) and then more generic notes on the series pacing, music, and graphics.

### a. Notes on the jail call, the dispatch call, and discovery of the key

Colborn's discovery responses point to only a few isolated notes by Netflix on those portions of the series depicting the jail call, the dispatch call, and the discovery of the key. None of the notes suggest the supposedly misleading edits at issue were made at Netflix's request or even that it knew such edits had been made. Certainly they do not show Netflix knew that the edits somehow rendered MaM false and defamatory.

**_Jail Call_**: Colborn has not identified *any* evidence that Netflix participated in shaping this scene. Rather, his responses to written discovery point to just two documents in which Del Deo

expressed some skepticism about the weight of this evidence. *See* SPMF ¶ 148.[6] Whether Del Deo thought the jail call was "the key to the case" or a "weak revelation" is merely his opinion, as Colborn himself acknowledged in his interrogatory responses. *See id.* Colborn cannot deny that this evidence figured prominently both in Avery's civil rights lawsuit and the murder trial, and he has no "affirmative" evidence that anyone at Netflix had knowledge that anything in this portion of MaM was probably false. *Liberty Lobby*, Inc., 477 U.S. at 257.

**_Dispatch Call_**: In blaming Netflix for this part of MaM, Colborn points to just a few documents that mention the "cliffhanger" nature of the dispatch call and that question whether "we can hold a bit longer on Colb[o]rn's face here. He looks caught. . . . We know this is court footage that may not exist. Just a suggestion." *See* SPMF ¶¶ 100, 102. None of these documents suggest that Netflix directed *any* edit to Colborn's testimony about the dispatch call, and his reliance on the last note is particularly misguided as it explicitly acknowledges the filmmakers must work with the footage they have. *See id.* ¶ 102; *see also id.* ¶ 100. Meanwhile, confronted with other edits to this portion of the series, Nishimura stated that even if she had known about those edits—she did not—they would not have concerned her. *Id.* ¶ 118. Ultimately, the allegation that Colborn may have been looking at Halbach's car before it was discovered in the Avery salvage yard reflects actual testimony elicited during the cross-examination of Colborn and was a cornerstone of Avery's defense. *See* SPMF ¶¶ 16-17, 46-55.

**_Discovery of the Key_**: Regarding Netflix's familiarity with or shaping of this part of MaM, Colborn's discovery responses point only to *internal* communications among members of the Netflix team. SPMF ¶ 149. Again, whether Netflix employees thought this was a "weak"

---

[6] Because Colborn's interrogatory responses often mischaracterize the notes and quote snippets out of context, Netflix points the Court to the notes themselves, which are cited in the SPMF.

argument speaks only to their opinion about the weight of an argument Avery's defense presented at trial and that was therefore necessarily a part of MaM.

### b. Notes on pacing, music and graphics

Colborn's SAC includes numerous allegations about the "omission" of testimony and evidence, *see, e.g.*, SAC ¶¶ 20, 27, 35-36, 41, 46-47, and wrongly reads something nefarious into Netflix's suggestions to improve pacing. SPMF ¶ 98. But the notes he cites in support of his allegations and assumptions are routine and innocuous. *See id.* They aimed simply to improve viewer engagement and help viewers digest the most salient points of a long and sprawling account. *Id.* ¶ 99; *see also id.* ¶ 98 (explaining that "notes in regards to pacing" are commonplace and have "to do with the way you're moving the viewer through the story"). *None* of these notes (or any other notes) suggest that Netflix was aware of the information Colborn complains was omitted to his detriment. None of them direct the filmmakers to speed up scenes in a way that changed their meaning—Netflix would not have done that. *See id.* ¶ 101. None of them show Netflix had reason to believe its suggestions might have that effect—it did not. *Id.* ¶¶ 96-103. Meanwhile, no legal authority supports the proposition that editing for length is evidence of actual malice. To the contrary, case law is clear that courts should leave to the discretion of the media what details should or should not be included. *See, e.g.*, *Nix v. ESPN*, 772 F. App'x 807, 814 (11th Cir. 2019) (per curiam) (courts must "afford news media editorial discretion"); *Riley*, 292 F.3d at 293 (defendant "was free to make his own editorial choices, so long as he 'fairly described the general events involved'" (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995))); *see also Machleder v. Diaz*, 801 F.2d 46, 54-55 (2d Cir. 1986); *Torgerson*, 210 Wis. 2d at 552; 563 N.W.2d at 484.

The same is true for notes on music[7] and graphics:[8] Netflix hoped the addition of these standard elements would engage viewers and help them follow along, not mislead them. SPMF ¶ 103. Regardless, using music to underscore emotional points or to engage an audience does not transform a true depiction of events into a false one and thus cannot be false or defamatory, *see Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶¶ 25-26, 351 Wis. 2d 479, 505-07, 840 N.W.2d 255, 267-68. It therefore cannot constitute actual malice, either. *See Don King Prods. V. Walt Disney Co.*, 40 So. 3d 40, 44-45 (Fla. 4th DCA 2010) (rejecting noting that use of "ominous music to enhance [a] program's entertainment value" constitutes evidence of actual malice); *see also* SPMF ¶ 131. In any event, none of the notes indicate that Netflix intended for music to change the meaning of the content. None of them even begin to support the notion that Netflix had a high degree of awareness that MaM was probably false. Further, even if Netflix's suggestions regarding music could be interpreted to reflect some favoritism or sympathy for Avery, bias alone is not evidence of actual malice, *see supra* at 11, 19—and if they indicate belief in Avery, that is the *opposite* of actual malice.

As for graphics, Colborn does not even *allege* that any of the graphic or visual elements in MaM are false, nor can he point to any evidence to suggest that Netflix intended to change the meaning of a scene or to convey a false statement of fact or knew its notes on visual elements might have that effect. Rather, as the notes reflect and as Nishimura and Del Deo have averred, the Netflix team suggested the use of graphic elements in order to *enhance* the clarity and factual accuracy of the series. SPMF ¶ 103. Again, that is the *opposite* of actual malice.

---

[7] For Colborn's allegations about music in the series, *see* SPMF ¶ 150.

[8] For his allegations about graphics in the series, *see* SAC Ex. A; SPMF ¶ 103.

### 3. Netflix's decision to release S2 does not establish actual malice.

In a final attempt to show actual malice by Netflix, the SAC points to the release of S2 of MaM, in October 2018, SAC ¶¶ 49-56, and claims "Defendants doubled down on their baseless claims of evidence planting," despite criticism of Season 1, *id.* ¶ 51. Even if this were true (it's not), the content of a documentary released in 2018 says nothing about Netflix's state of mind when it released MaM nearly three years earlier. Post-publication conduct, including declining to correct or retract allegedly defamatory material, simply is not, without significantly more, evidence of actual malice. *See, e.g.*, *Bose Corp. v. Consumers Union*, 466 U.S. 485, 498 (1984); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013).

\*　　　　　\*　　　　　\*

The hurdles that public officials must clear to bring defamation actions reflect our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270. Avery's case deserves to be the subject of debate, and that debate cannot occur if the only permissible viewpoint is Colborn's. There is simply no evidence that Netflix distributed MaM knowing it contained falsehoods or with serious doubts about its truth. Colborn cannot establish actual malice, and Netflix is entitled to summary judgment on his defamation claim.

## II. COLBORN'S DEFAMATION CLAIM FAILS BECAUSE HE CANNOT MEET HIS BURDEN TO ESTABLISH MATERIAL FALSITY.

If the Court rules in Netflix's favor on the issue of actual malice (which assumes falsity) it need go no further. But if it does not, then it must loop back to that fundamental question in any defamation case and consider whether Colborn can bear his "burden of showing falsity, as well as fault." *See Phila. Newspapers v. Hepps*, 475 U.S. 767, 775-76 (1986). Further, the Court

must hold Colborn not only to the burden of showing falsity—but to the burden of showing *material* falsity. Under the "substantial truth doctrine" recognized by both Wisconsin law and the First Amendment, a statement need not be absolutely true in every precise detail to be immune from defamation liability. Rather, what is required is that the report's "gist" or "sting" be accurate. *Masson*, 501 U.S. at 516-17; *Glob. Relief*, 390 F.3d at 982; *Lathan v. Journal Co.*, 30 Wis. 2d 146, 158, 140 N.W.2d 417, 423 (1966). This means a challenged statement must create a different—and more defamatory—effect on the mind of a reasonable reader or viewer than would the precise truth. *Masson*, 501 U.S. at 517. A publication "that contains a false statement is actionable only when *significantly greater opprobrium* results from the report containing the falsehood than would result from the report without the falsehood." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993) (internal marks omitted).

In determining whether a publication is actionable as not substantially true—*i.e.*, materially false—"[c]ontext is key," as "the broader setting of the challenged statements" matters. *Bd. of Forensic Doc. Exam'rs*, 922 F.3d at 832. More specifically, "[w]hen a television broadcast is at issue, [courts] consider both the audio and video portions and their relation to each other, as well as the juxtaposition of the various audio and video segments," and "consider the broadcast as a whole, 'not in detached fragments.'" *Mach v. Allison*, 2003 WI App 11, ¶ 31, 259 Wis. 2d 686, 712, 656 N.W.2d 766, 778 (citation omitted). As a matter of law, MaM's portrayal of Colborn's role in the Avery case was substantially true, and Netflix is therefore entitled to summary judgment.

### A. The substantial truth doctrine protects MaM's reporting on the Avery trial and its abridgement of trial testimony.

Colborn's claims that MaM misleadingly-edited trial testimony fail because the First Amendment and Wisconsin law bar defamation claims based on substantially accurate reports of

court proceedings. *See, e.g.*, *Nieman v. VersusLaw, Inc.*, 512 F. App'x 635, 637-38 (7th Cir. 2013) (First Amendment privileges publication of facts in judicial records); *Ilsley v. Sentinel Co.*, 133 Wis. 20, 23, 113 N.W. 425, 426 (1907) (discussing Wisconsin's common-law fair report privilege); *see also Maguire v. Journal/Sentinel, Inc.*, 198 Wis. 2d 389 (table), 542 N.W.2d 239 (table), 1995 Wisc. App. LEXIS 1415, at *4 (Ct. App. 1st Dist. Nov. 14, 1995) (unpublished).

Just last month, the Seventh Circuit recognized that what it called "Wisconsin's judicial-proceedings privilege" barred defamation claims based on a newspaper's report about allegations made against the plaintiffs in civil litigation. *Fin. Fiduciaries*, 2022 U.S. App. LEXIS 23418, at *18. Meanwhile, Wisconsin courts have long recognized the common-law privileges against defamation set forth in the Restatement (Second) of Torts. *Zinda v. La. Pac. Corp.*, 149 Wis. 2d 913, 922, 440 N.W.2d 548, 552 (1989). As the Restatement explains, the relevant common-law privilege protects a report about a government proceeding that "is accurate and complete or a fair abridgement of the occurrence reported." Restatement (Second) of Torts § 611 (1977). By "accurate," the Restatement means "substantially true." *Id.* cmt. f.

Thus, it does not matter—given the interlocking protections of the fair report privilege and substantial truth doctrine—whether Avery's frame-up defense was true or even credible. Indeed, Defendants could have found the defense completely *in*credible and Avery a complete fabulist, and *still* recounted his claims pursuant to the privilege. *Id.* cmt. a. All that matters is whether MaM's recounting was substantially accurate.

On that question, *Masson* is the foremost authority addressing the line between nonactionable editing and actionable falsification. The Court in *Masson* rejected the plaintiff's argument that *any* alteration of quotations beyond correcting for grammar and syntax represented a falsehood, recognizing that word-for-word quotations are not always feasible or even accurate

representations of the speaker's meaning and noting the "practical necessity to edit and make intelligible a speaker's perhaps rambling comments." 501 U.S. at 514-15. The Court concluded: "If an author alters a speaker's words but effects no material change in meaning, including any meaning conveyed by the manner or fact of expression, the speaker suffers no injury to reputation that is compensable as a defamation." *Id.* at 516.

Following *Masson*, in *Texas Beef Group v. Winfrey*, 201 F.3d 680 (5th Cir. 2000), the Fifth Circuit held that a segment of Oprah Winfrey's talk show about mad cow disease did not materially alter the gist of statements by experts supporting the cattle industry, even though it omitted several points that they had made. "Although the show's producer undeniably spliced questions and answers, the editing did not misrepresent [the expert's] responses," the court said, noting the "common knowledge" that television programs cut down longer footage to fit into a shorter time frame. *Id.* at 689; *see also Palmer v. Alvarado*, 561 S.W.3d 367, 369-70, 373 (Ky. Ct. App. 2018) (holding that a political advertisement was not materially false even though it edited and rearranged footage of a court hearing).

Closer to home, in *Terry*, the Wisconsin Court of Appeals analyzed a television station's reports detailing consumers' complaints about the plaintiff, a wedding photographer. 2013 WI App 130, ¶ 25, 351 Wis. 2d at 506, 840 N.W.2d at 267. The court held that the defendant's editing, including its use of altered images and "scary music," were not materially false statements of fact. *Id.*

> In essence, Terry is challenging the way in which she was portrayed in so far as the music and video edits are concerned, but she does not have a cause of action for the words that were used to portray her. . . . Terry cannot maintain a defamation action for how she *feels* she was portrayed.

*Id.* 2013 WI App 130, ¶ 26, 351 Wis. 2d at 507, 840 N.W.2d at 267-68.

The same is true here: Colborn cannot pursue a defamation claim for how he feels he was portrayed in the few, brief, detached fragments of MaM he has watched. The portions Colborn challenges must be considered in the context of the series as a whole, and as shown in the side-by-side comparison of MaM to trial transcript (previously submitted to the Court at Dkt. 119-1), none of the editing decisions Colborn challenges results in a material falsehood. None would have a different effect on the mind of a reasonable viewer than the complete, unedited testimony, nor would they engender significantly greater opprobrium against Colborn than that caused by the underlying proceedings as a whole, which MaM documented in detail and at length.

To help the Court with its side-by-side comparison of MaM to trial testimony, the following table summarizes what that comparison reveals.

| Colborn's claim of omission | Why the alleged omission does not render MaM materially false. |
| --- | --- |
| MaM omitted testimony that he answered the jail call "Manitowoc County Jail, Officer Colborn." SAC Ex. B[9] at 4; SPMF ¶ 58 | Viewers would not grasp the difference in the responsibilities between a sworn deputy and a jailer. MaM included Colborn's testimony that he received the call "when I was working as my capacity as a corrections officer at the Manitowoc County Jail." SPMF ¶ 59. |
| MaM omitted the portion of his testimony where he "corrected" his reference to transferring the jail call to a detective and said he transferred it to the detective division of the sheriff's office. SPMF ¶ 57. | Under *Masson*, whether Colborn transferred the call to an unnamed detective or the detective division is not the kind of detail that would make a material difference in the mind of a reasonable viewer. |
| MaM omits his testimony on redirect examination that the caller of the jail call did not provide him with any names. SAC Ex. B at 5. | MaM includes Colborn's testimony that he did not know if the call had anything to do with Steven Avery. SAC Ex. B at 5; SPMF ¶ 62. |

---

[9] Exhibit B purports to be a comparison between Colborn's testimony presented in Episode 7 of MaM and the trial transcript. Notably, there are several inconsistencies between Exhibit B and what MaM actually shows, and (except for the testimony regarding the dispatch call) neither the SAC nor Exhibit B identifies with any particularity how edits purportedly shown in Exhibit B render MaM false and defamatory.

| | |
|---|---|
| MaM omits his response, "that's ridiculous, no I have not," to Ken Kratz's question, "Have you ever planted any evidence against Mr. Avery?"<br>SAC Ex. B at 5. | Following Kratz's question "Have you ever planted any evidence against Mr. Avery?" MaM included Colborn's testimony that "I have to say that this is the first time my integrity has ever been questioned, and no, I have not."<br>SAC Ex. B at 5.<br>Colborn admitted at his deposition that MaM did convey that he expressly denied planting evidence against Avery.<br>SPMF ¶¶ 63-64. |
| MaM omits some of his explanation of why he didn't write a contemporaneous report about the jail call: that if he had, the report would only be "that I received a call and transferred it to the detective division."<br>SAC Ex. B at 9. | MaM included Colborn's statement that "if I wrote a report about every call that came in, I would spend my whole day writing reports."<br>SAC Ex. B at 9; *see also* SPMF ¶ 61. |
| MaM omitted his "yes" answer to a question on cross examination that "This call sounded like hundreds of other license plate or registration checks you have done through dispatch before?" and showed him answering "yes" to a different question: "You can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota."<br>SAC ¶ 34; *see also* SPMF ¶ 53. | The edit is sandwiched between footage of Colborn *twice* denying he was looking at Teresa Halbach's SUV, and it includes Colborn's testimony that he must have gotten the plate number from another investigator. MaM shows Strang asking Colborn, "Were you looking at these plates when you called them in?" and Colborn responding, "No, sir." SPMF ¶ 50.<br>It also shows Strang asking Colborn whether Investigator Mark Weigert had provided the license plate number, and Colborn testifying that he does not remember exactly, but "he had to have given it to me, because I wouldn't have had the number any other way."<br>SPMF ¶¶ 51-52.<br>Later, MaM shows Dean Strang asking, "there's no way you should have been looking at Teresa Halbach's license plate on November 3, on the back end of a 1999 Toyota?" followed by Colborn's firm and definitive answer (after another objection eliminated for brevity), "I shouldn't have been and I was not looking at the license plate."<br>SPMF ¶ 54. |
| MaM omitted Calumet County Sgt. William Tyson's answer to Jerry Buting asking if he | Tyson answered "no" to Buting's follow-up question whether "in any of [his] years as an |

| | |
|---|---|
| ever "had to act like a babysitter, or a watchdog, for the other officers who were conducting a search," and showed Tyson simply answering "no" to that question. SAC ¶ 44, *see also* SPMF ¶¶ 67-70. | officer, [he] had to watch the officers who were searching where you were, to make sure that they weren't alone," to which Tyson answered "no." SPMF ¶¶ 68-70. Under *Masson* and *Simonson v. United Press Int'l, Inc.*, 500 F. Supp. 1261, 1266 (E.D. Wis. 1980), whether Tyson was "watching" or "babysitting" the Manitowoc deputies is a question of semantics, not defamation. |
| MaM did not show viewers "certain photographs clearly showing the crack in the back of the bookcase" where Colborn speculated Avery had hidden the key. SAC ¶ 44. | MaM includes Colborn's testimony that he had handled the small bookcase "rather roughly, twisting it, shaking it, pulling it" before the key appeared. SPMF ¶ 66. |
| MaM omitted other testimony about Colborn's discovery of the key to Halbach's other vehicle. SAC Ex. B at 2-4. | The omitted testimony is comprised of no more than the kind of asides and circumlocutions that the *Masson* Court recognizes can be omitted. Colborn himself acknowledged that this part of MaM conveys the important points of his testimony that he handled the bookcase roughly and did not touch the key. SPMF ¶ 66. |
| MaM omitted testimony Colborn gave during questioning by prosecutor Kratz about his asserted conversation with Avery the day Halbach was reported missing. SAC Ex. B at 1-2. | The omitted testimony shown in Exhibit B merely provides a few additional details, but nothing that would give a viewer a different impression of Colborn. |
| MaM omits certain testimony about reports Colborn filed regarding his conversation with Avery on the day Halbach was reported missing. SAC Ex. B at 7-8. | Whether Colborn submitted only one-and-a-half pages of reports in the Halbach case, or only half a page, is not a material distinction that would make any difference to a reasonable viewer. |
| Colborn alleges that "Defendants Ricciardi and Demos strategically spliced 'reaction' shots of plaintiff appearing nervous and apprehensive at trial into other portions of his testimony where he did not appear nervous or apprehensive in fact." SAC ¶ 37. | Neither the SAC nor its exhibits specify which "reaction shots" purportedly create a false impression, nor do they explain how these "reaction shots" create a materially false statement about Colborn. At his deposition, Colborn complained that a brief shot of him leaning back in the witness chair and cracking his knuckles "does make me look nervous and apprehensive and that I've been caught in some sort of lie," and asserted that footage was recorded when the jury was not present. Colborn Tr. 496:18-497:6. The |

| | alleged edits to the blink-and-you'll-miss-it scene would not have any material effect on the mind of a reasonable viewer. |
|---|---|

At bottom, Colborn's complaints about MaM's editing lay bare what led to this suit and why his defamation claim fails as a matter of law: Furious that, eight years after Avery's conviction, Defendants dredged up painful history, Colborn wanted to hold someone accountable. But the First Amendment does not permit Colborn to censor commentary he finds painful. Again, MaM simply "mirror[ed]" what happened at trial, SPMF ¶ 27, leaving Colborn with nothing on which to base a lawsuit but quibbles over semantics and minor details, not demonstrations of material falsity. None of the edits changes the gist or sting of the testimony involved or results in a different effect on the mind of a reasonable viewer that would engender more significant opprobrium against Colborn than an unedited presentation of the testimony. MaM's choices of which footage to show and how to condense decades' worth of material into a ten-hour documentary series are expressive decisions fully protected by the First Amendment.

**B.** **Other challenged statements are not actionable because MaM merely documents a public controversy, and does so accurately; it does not endorse or adopt Avery's frame-up defense.**

In addition to complaints about the editing of in-court testimony, Colborn also makes a vague and amorphous claim that merely documenting Avery's murder trial and the surrounding controversy and including statements by Avery and his supporters constitutes defamation. There is no dispute, however, that MaM accurately portrayed what people actually said and, when examined in the full context of the series, reasonable viewers would not understand them as assertions of fact by Netflix. Even if they did, the law does not require Netflix to "guarantee the truth of all the inferences" viewers might possibly make, *Woods*, 791 F.2d at 487-88, and there is no evidence Netflix intended to endorse or adopt Avery's accusations as its own or even knew

viewers would walk away from MaM with that impression. Netflix cannot be held liable for the innuendo and implications Colborn ascribes to MaM.

> ### 1. Reasonable viewers would not understand the challenged statements by Avery and his supports as assertions of fact by Netflix.

The Seventh Circuit's opinion in *Global Relief* is directly on point. The plaintiff in *Global Relief* sued over six news reports in the months after the September 11, 2001 attacks that said the Islamic charity was a target of federal terrorism funding investigations. 390 F.3d at 974-78. GRF was indeed under investigation: the Treasury Department blocked its assets shortly after it filed suit, and it was later named a Specially Designated Global Terrorist group. *Id.* at 979-80. But the foundation argued that the reports were actionable because they implied that GRF was *in fact* funding terrorism, which GRF denied. *Id.* at 980. The foundation maintained that "the defendants should be required to demonstrate not only that they accurately reported the government's suspicions but that GRF was *actually* guilty of the conduct for which the government was investigating the group." *Id.* (emphasis added).

The Seventh Circuit affirmed the trial court's grant of summary judgment to the news organizations, agreeing the reports were substantially true. *Id.* at 990. The court explained that

> the sting of the articles was not that GRF was actually funneling money to terrorists but that the government was investigating the group for links to terrorism and contemplating freezing GRF's assets. The sting was that such an investigation was being conducted, not that GRF was guilty of the conduct for which it was being investigated. . . . Whether the government was justified in its probe is irrelevant to the defamation claims when these media defendants accurately reported on the investigation itself.

*Id.* The panel noted that "[m]any of the articles included GRF's denials and none of the articles concluded that GRF was actually guilty of the conduct for which it was being investigated." *Id.* at 987. The court firmly "reject[ed] GRF's argument that these media defendants must be able to prove the truth of the government's charges before reporting on the investigation itself." *Id.* The

Seventh Circuit reaffirmed this principle in *Financial Fiduciaries*, holding that the article in question was substantially true because it "was careful to describe the allegations as such, not as facts." 2022 U.S. App. LEXIS 23418, at *19; *see also Croce v. N.Y. Times Co.*, 930 F.3d 787, 793 (6th Cir. 2019); *Clark v. E! Entm't TV, LLC*, 60 F. Supp. 3d 838, 850 (M.D. Tenn. 2014); *Ackley v. Bartlesville Examiner-Enter.*, No. 06-CV-529-TCK-PJC, 2007 U.S. Dist. LEXIS 87897, at *6 (N.D. Okla. Nov. 29, 2007).

The SAC refers to five related statements by Avery and his lawyers that it contends are actionably false and defamatory. The first is a statement by Steven Glynn, one of Avery's attorneys in his civil rights lawsuit. Colborn alleges that Glynn "mistakenly tells viewers that Colborn's written statement was kept hidden in a Sheriff's department safe in 2003 as part of Plaintiff and MTSO's effort to cover up their knowledge of Avery's wrongful conviction, when in fact the statement had been delivered to the attorney general promptly after it was prepared." SAC ¶ 28. This contention misrepresents what Glynn actually said, *see* SPMF ¶ 36, but that doesn't matter, because Colborn signed a sworn declaration on the verge of his deposition averring that the Sheriff at the time "told me that he would put the statement in a safe." Stip. ¶ 2. During his deposition, Colborn admitted that his statement was, in fact, kept in the sheriff's safe, SPMF ¶ 9. The Court need not concern itself further with this statement, which cannot serve as the basis for Colborn's defamation claim.[10]

As for MaM's other four affirmative statements challenged in the SAC, none can be reasonably understood as an assertion of fact by Netflix:

- SAC ¶ 37 challenges the use of Buting's statement in an interview that "[i]f they would be willing to go that length of planting the key . . ." However, Buting's

---

[10] That Colborn based his claims in part on this falsehood and maintained it through three iterations of his Complaint and years of litigation speaks volumes about his suit's lack of merit.

statement here (his opinion, really) is consistent with what he argued at trial and no reasonable viewer would understand it as a statement of fact by Netflix.

- SAC ¶ 39 challenges MaM's inclusion of footage from an interrogation of Avery in which he claims someone named "Tammy" told him that "a cop" put Halbach's vehicle on the Avery property. SPMF ¶ 45. Reasonable viewers do not understand statements accused murderers make to authorities as assertions of fact.

- SAC ¶ 40 challenges the portion of Episode 4 where defense and prosecution attorneys retrieve the vial of Avery's blood from the court clerk's office. *See* SPMF ¶ 42. Contrary to the SAC's false contention, this was not a "dramatic[] reenact[ment]" but rather footage of actual events as they unfolded. *Id.* In that sense, the footage is absolutely true. Buting's speculation that the hole in the rubber stopper was an indication of tampering would not be understood by reasonable viewers as a statement of fact and does not even refer to Colborn.

- SAC ¶ 48 challenges an out-of-court statement by Buting responding to the notion that framing Avery would require a conspiracy among a large group of people to succeed. *See* SPMF ¶ 56. Buting muses that "two people could've done this easily enough if they had the motive to do it. Maybe one, even. . . . [W]ho better than a police officer would know how to frame somebody?" *Id.*; SAC ¶ 48. This statement has the same gist as the portion of Buting's closing argument shown in Episode 8. *See* SAC Ex. A at 14.

In addition to these statements by Avery and his lawyers, Exhibit A to the SAC lists dozens of other statements by Avery and his supporters that Colborn claims would be understood by viewers as authoritative statements of fact. But viewing these statements in the context of the entire documentary (as required) demonstrates that no reasonable viewer would understand them that way. As the documentary shows, and as Colborn acknowledged at his deposition, Avery claimed he was framed by Colborn and other law enforcement officers and there were some in the community who believed that. *See* SPMF ¶¶ 38-39. Avery's backers are not presented as authoritative sources of accurate information, and—contrary to Colborn's baseless contentions— MaM balances its use of pro-Avery statements with plenty of "rebuttal" footage. The examples are too numerous to detail in this memorandum, but some of the most prominent include:

- The Undersheriff's statements criticizing Avery's "framing" theory of defense that "some of the evidence—the DNA evidence at the scene—it's impossible for

us to have that type of evidence, you know, to plant. It's just—it's not realistic." SPMF ¶ 40;

- Gahn's argument to Judge Willis on the blood-vial issue, during which he defends Manitowoc County law enforcement by saying, "when officers are accused of what they're being accused of, they deserve to have their reputations protected. They're good solid decent family men. . . . Again, I just cannot emphasize too much, give us the chance to meet this planting frame-up defense." MaM shows the court granted that request. SPMF ¶ 44;

- Kratz's defense of Manitowoc County law enforcement at a news conference, saying that "around these parts if you're going to suggest that a cop is crooked, you're going to suggest that a cop committed crimes, then you better have something other than your elbow was on the table. And in this case, to suggest that these police officers planted evidence with nothing, that is not with one shred, at least anything that I've seen that approaches evidence, uh, I think is absolutely deplorable." SPMF ¶ 72;

- Local reporter Angenette Levy describing Colborn at a news conference as "a law enforcement officer for thirteen years. He puts on a uniform, a badge and a gun every day and goes to work and tries to do his best," and challenging Strang regarding the defense's "framing" theory in Colborn's defense by asking, "if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place." SPMF ¶ 73;

- Gahn's further defense of Manitowoc County law enforcement: "My blood starts to boil when . . . I hear this, that these police officers, these good solid citizens, good decent men are accused of planting this evidence." SPMF ¶ 74;

- The jury verdict, finding Avery guilty of first degree intentional homicide and possession of a firearm. SPMF ¶ 77;

- Colborn's own post-verdict public statement, in which he states the verdict should "put to rest any suspicions or loss of confidence that this community may have felt towards our department." SPMF ¶¶ 23, 78;

- Judge Willis' statement at Avery's sentencing that "you are probably the most dangerous individual ever to set foot in this courtroom." SPMF ¶ 79.

There are many more examples, and the law is clear that presenting both sides of a

contested issue is not a materially false endorsement of the truth of either side's allegations. *Fin.*

*Fiduciaries*, 2022 U.S. App. LEXIS 23418, at *19; *Glob. Relief*, 390 F.3d at 987; *see also, e.g.*,

*Riley*, 292 F.3d at 291-92 (reasonable readers would consider statements in book written in attorney's "voice" as statements by the attorney, not the author, and not as assertions of fact).

It is Colborn's burden to prove that MaM communicated to reasonable viewers that he *in fact* planted evidence against Avery. He cannot meet that burden. Having not watched MaM, he has no way of knowing whether it concluded he was a "corrupt police officer"—he only assumes it did. He further admits this assumption is based entirely on calls, voicemails and other messages from anonymous people, whom he admits are unreasonable—and who may not have even watched MaM themselves. *See* SPMF ¶ 128. Meanwhile, any reasonable viewing of MaM shows that it does not draw any conclusions. As in *Financial Fiduciaries* and *Global Relief*, the allegations against Colborn are presented to MaM's viewers as just that—allegations by an accused (and later convicted) murderer and his defenders. It is crystal clear to viewers who is making these allegations. MaM also presents its viewers with the vigorous pushback against those allegations by prosecutors and other law enforcement officials, both inside and outside the courtroom. It shows that the jury convicted Avery. Most importantly, MaM includes footage of Colborn's own explicit denials of wrongdoing in testimony under oath. The gist and sting of MaM is that Avery and his defenders *accused* Colborn of planting evidence to frame Avery, and that is absolutely true. Under *Global Relief* Colborn's defamation claim must fall.

> ## 2. There is no evidence Netflix intended or even knew MaM could convey the allegedly defamatory implications Colborn ascribes to it.

Even if the Court finds a jury question on whether MaM presents Avery's allegations as *established fact*, it should still grant Netflix's motion for summary judgment because the law requires Colborn to prove by clear and convincing evidence that Netflix "intended or [at least] knew" that MaM conveyed the "innuendo" he alleges. *Saenz*, 841 F.2d at 1318; *see also Woods*, 791 F.2d at 487. Colborn has no such evidence.

In *Saenz*, the court decided the "construction" of the publication was a jury issue, but then affirmed summary judgment for the defendant anyway, holding that no "reasonable jury could . . . conclude that the defendants either intended or were reckless with regard to the potential falsity of defamatory inferences which might be drawn from the article." *Id.* at 1318. If this sounds familiar, it should: This rule of law gets the Court right back to Netflix's lack of actual malice, discussed in Section I, *supra* at 14-26. As *Saenz* explained:

> If a plaintiff official must establish by clear and convincing evidence that the defendants acted with actual knowledge of or in reckless disregard for the falsity of their accusations, it follows that where the plaintiff is claiming defamation by innuendo, he also must show with clear and convincing evidence that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material.

*Id.*

Just as Colborn has no evidence of actual malice regarding discrete editing decisions, he has no evidence that Netflix employees *intended* viewers to interpret MaM as implying that Colborn *in fact* planted evidence—or even that they were aware viewers might interpret the series this way. Indeed, there is ample evidence to the contrary. Del Deo unequivocally *denied* that MaM somehow asserts that Colborn planted evidence to frame Avery, SPMF ¶ 120, and Nishimura likewise avers that she never intended for MaM to convey that Colborn was, *in fact*, guilty of planting evidence and "do[es] not believe that viewers would understand either the *series or Netflix*" to be making such a statement. *Id.* ¶ 121. Thus, as in *Saenz*, even if Colborn could show MaM "is capable of supporting false and defamatory implications," the "uncontradicted affidavits" of Nishimura and Del Deo show they were "unaware" of these

39

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 40 of 47   Document 269

implications. 841 F.2d at 1319. Colborn's claim that MaM somehow defamed him by endorsing or adopting Avery's defense—a claim of inference and innuendo—thus fails as a matter of law.[11]

## III. ANY REMAINING CHALLENGED STATEMENTS OR OMISSIONS ARE NOT ACTIONABLE BECAUSE THEY ARE NOT ABOUT COLBORN.

Defamation is a personal tort, intended to compensate for harm to the plaintiff's personal reputation. Thus, "'[i]t is well settled that defamatory words must refer to some ascertained or ascertainable person, and that that person must be the particular plaintiff.'" *Barlass v. City of Janesville*, No. 10-cv-454-slc, 2011 U.S. Dist. LEXIS 165826, at *36 (W.D. Wis. Nov. 28, 2011) (quoting *Schoenfeld v. Journal Co.*, 204 Wis. 132, 136, 235 N.W. 442, 444 (1931)), *aff'd*, 483 F. App'x 261 (7th Cir. 2012). It is not "enough for plaintiff to identify general false statements that defendants allegedly made . . . . To plead a claim of defamation, plaintiff must allege false statements the defendants made about *plaintiff*." *Wesbrook v. Ulrich*, No. 13-cv-494-wmc, 2014 U.S. Dist. LEXIS 26592, at *26 (W.D. Wis. Mar. 3, 2014). This is a First Amendment mandate as well, particularly where, as here, the challenged publication is about government activities such as law enforcement. *See, e.g.*, *Sullivan*, 376 U.S. 291-92; *Rosenblatt v. Baer*, 383 U.S. 75, 82-83 (1966).

Many of the challenged portions of and purported omissions from MAM cannot support Colborn's claims because they are not about him. They include (but are not limited to):

- The portion in MAM of the defense and prosecution retrieving the vial of blood from the court clerk's office, *see* SPMF ¶ 42. The SAC alleges this portion "convince[d] viewers that MTSO officers, *possibly* including the plaintiff,

---

[11] In the interest of space and time, and because Netflix is confident that, after extensive discovery, no evidence exists to show the requisite knowledge or intent required by *Saenz* and *Woods*, it does not belabor here the opinion defense raised in its motion to dismiss, Dkt. 119 at 32-35, which was based primarily on *Riley*, 292 F.3d at 282. However, to the extent the Court disagrees, Netflix reserves the right to revisit the opinion defense at trial or on appeal. Moreover, although *Riley* was, at its core, a decision based on the opinion doctrine, it contains many statements of law relevant to this case. Netflix encourages the Court to read the opinion in its entirety.

secreted Avery's blood from a vial still kept in evidence from his wrongful conviction case, and planted it in Halbach's car." SAC ¶ 40 (emphasis added). This admission that the clip does not specifically refer to Colborn means that it is not defamatory of him as a matter of law.

- A number of passages listed Exhibit A to the SAC (which does not explain what, precisely, is defamatory about them) that use vague pronouns and refer to law enforcement generally, not Colborn specifically. *See e.g.*, SAC Ex. A at 7-9, 14. Similarly, Exhibit A cites statements by three unidentified patrons of a Manitowoc tavern expressing their beliefs that the MCSO was corrupt and framed Avery without singling out any particular deputy. *Id.* at 8-9.

- Exhibit A also cites a statement by Avery that does not say anything about anyone: "Sometimes I just wonder, I don't know. It's just hard to take all in, you know?" *Id.* at 13.

All of these allegations fail because, under Wisconsin law, "certainty as to the person who is defamed must appear from the words themselves, for no innuendo can render certain that which is uncertain." *Thompson v. Nat'l Catholic Reporter Publ'g Co.*, 4 F. Supp. 2d 833, 840 (E.D. Wis. 1998) (quoting *Luthey v. Kronschnabl*, 239 Wis. 375, 379, 1 N.W.2d 799, 801 (1942)).

Relatedly, in Paragraphs 46 and 47 of the SAC, Colborn points to a number of supposed "omissions" and "distortions" in MAM, none of which is actionable because all are about *Avery*, not Colborn. The notion that their inclusion would have convinced viewers of Avery's guilt, *see* SAC ¶ 46, is irrelevant. This is so for a host of reasons, including because their respective culpabilities are not mutually exclusive. It is entirely possible that Avery was both guilty *and* law enforcement planted evidence to ensure his conviction. *See supra* at 3, 16. Because the purported omissions and distortions do not convey any false and defamatory fact *about Colborn*, the allegations in Paragraphs 46 and 47 do not support Colborn's defamation claim.

## IV. COLBORN'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM HAS MULTIPLE FATAL FLAWS.

Colborn's IIED claim fails because it is derivative of his defamation claim, which, as shown *supra*, fails as a matter of law. *See, e.g.*, *Terry*, 2013 WI App 130, ¶ 42, 351 Wis. 2d at

515, 840 N.W.2d at 271-72. Colborn cannot recover for IIED based on speech that is not false and not made with constitutional actual malice. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988). Moreover, because *MaM* documents issues of public concern and is not defamatory, the First Amendment bars Colborn's IIED claim. *Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *Dumas v. Koebel*, 2013 WI App 152, ¶¶ 32-33, 352 Wis. 2d 13, 32-33, 841 N.W.2d 319, 328-29. But to the extent some portion of Colborn's defamation claim survives summary judgment, dismissal of his IIED claim is still appropriate. An IIED claim requires proof

> (1) that the defendant's conduct was intentioned to cause emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling emotional response to the defendant's conduct.

*Rabideau v. City of Racine*, 2001 WI 57, ¶ 33, 243 Wis. 2d 486, 501, 627 N.W.2d 795, 802-03. Colborn cannot prove any of these elements.

First, under Wisconsin law, it is not enough to prove the defendant intentionally engaged in conduct that caused the plaintiff emotional distress; "the plaintiff must show that the conduct was engaged in *for the purpose of causing emotional distress*." *Id.* at ¶ 36, 243 Wis. 2d at 503, 627 N.W.2d at 803 (emphasis added). There is not a shred of evidence in the record that would indicate Netflix acquired and distributed MaM "for the purpose of" causing Colborn emotional distress. Rather, Netflix licensed MaM because it is in the business of distributing important, compelling documentaries and it believed MaM to be one. SPMF ¶ 123.

Second, even if Netflix could be liable for defamation in this case, merely making defamatory statements about someone is not extreme and outrageous behavior. *See, e.g.*, *Harp v. Glock*, No. 18-C-1039, 2019 U.S. Dist. LEXIS 71149, at *22-23 (E.D. Wis. Apr. 25, 2019) (dismissing IIED claim for lack of extreme and outrageous behavior while allowing defamation

claim to proceed); *see also Riley*, 292 F.3d at 299 ("Harr's portrayal of Riley cannot be said to have exceeded 'all possible bounds of decency,' or to be 'atrocious, and utterly intolerable'").

Third, Colborn cannot prove cause in fact. Like many a defamation plaintiff before him, he is prone to blame everything that has gone wrong in his life on the content in suit. Indeed, at the outset of this case he even blamed MaM for his divorce, but his ex-wife subsequently explained they divorced because Colborn was unfaithful to her, *see* SPMF ¶ 144, and Colborn has since withdrawn that allegation, Stip. ¶ 13. Meanwhile, he admits there have been many intervening and superseding stressful events in his life over the past two decades, including:

- the trial itself, which he admits was emotionally difficult, SPMF ¶ 142; others have also attested to the trial's emotional impact on Colborn, *see id.* ¶¶ 141;

- defamatory statements by a host of third parties both during and for years after trial, including Avery's attorneys and a journalist named John Ferak whose articles, Colborn claims, led to death threats, *see* Stip. ¶¶ 14-16; SPMF ¶ 140;

- maintenance of an extra-marital, romantic relationship, Stip. ¶ 11; SPMF ¶ 144;

- the end of his 30-year marriage, SPMF ¶ 145; and

- estrangement from his children, and from his ex-wife's relatives whom he had long considered family, because of his affair and divorce, Stip. ¶ 12; SPMF ¶¶ 146-147.

Given the sheer number and severity of the stressors in Colborn's life, he cannot prove cause-in-fact and certainly he cannot do it without expert testimony, which he does not have.[12] *See White v. Leeder*, 149 Wis. 2d 948, 960, 440 N.W.2d 557, 562 (1989) (expert testimony may be necessary where causation is "not within the realm of ordinary experience and lay comprehension" because it involves "unusually complex or esoteric issues," such as dispute

---

[12] Colborn's deadline to disclose any affirmative expert witness was September 2, *see* Dkt. 210, and he did not disclose any expert who can speak to the cause of his alleged emotional distress.

between the parties over which stressor is the cause of plaintiff's alleged distress when many independent stressors exist).

Fourth, and finally, Colborn cannot establish he has suffered an "extreme" and "disabling" response "to the defendant's conduct," *Rabideau*, 2001 WI 57, ¶ 33, 243 Wis. 2d at 501, 627 N.W.2d at 802-03, for two reasons. First, Netflix's conduct here was to release a documentary, one which Colborn admits he has not even watched. *See* Stip. ¶¶ 3-4. So whatever his alleged response, it was not "to" MaM. Second, Colborn does not have evidence of the damages sufficient to take this claim to a jury. Wisconsin requires that to recover for IIED, the plaintiff's emotional distress must be so severe that they are "unable to function in other relationships because of the emotional distress caused by the conduct." *Pierce v. Physicians Ins. Co. of Wis.*, 2005 WI 14, ¶ 43, 278 Wis. 2d 82, 103-04, 692 N.W.2d 558, 568-69 (Prosser, J., concurring) (citing Wis JI-Civil 2725). The record evidence shows that if Colborn suffered any distress at all connected to MaM, it was by no means severe. After MaM premiered, he voluntarily retired from the MCSO, received a going-away party and well wishes from friends and colleagues, and landed another job. Stip. ¶¶ 6-8; SPMF ¶ 137. He took a leadership position in his church, where his fellow parishioners supported him. *Id.* ¶ 138. And he testified that MaM did not prevent him from striking up a romantic relationship with a woman who was not his wife, an affair which was the triggering event for his divorce rather than MaM. *Id.* ¶ 144; Stip. ¶ 11.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████ Meanwhile, even today, he admits that any physical manifestations of his alleged

emotional distress are so mild that not even the woman he lives with can observe them. *Id.* ¶ 132. Because no rational jury could find for Colborn on his IIED claim, it fails as a matter of law.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant Netflix, Inc. respectfully requests that this Court grant its Motion for Summary Judgement and enter an order in its favor on all counts.

Dated: September 16, 2022  Respectfully submitted,

*s/ Leita Walker*
Leita Walker
Isabella Salomão Nascimento
Ballard Spahr LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
T: (612) 371-6222
F: (612) 371-3207
walkerl@ballardspahr.com
salamaonascimentoi@ballardspahr.com

Matthew E. Kelley
Emmy Parsons
Ballard Spahr LLP
1909 K Street, NW, Suite 1200
Washington, D.C. 20006-1157
T: (202) 508-1112
F: (202) 661-2299
kelleym@ballardspahr.com
parsonse@ballardspahr.com

James A. Friedman
Godfrey & Kahn, S.C.
One East Main Street
Suite 500
Madison, WI 53703-3300
T: (608) 284-2617
F. (608) 257-0609
jfriedman@gklaw.com

*Counsel for Netflix, Inc.*