# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

ANDREW L. COLBORN,

               **Plaintiff,**

   **vs.**

NETFLIX, INC.; CHROME MEDIA
LLC, F/K/A SYNTHESIS FILMS, LLC;
LAURA RICCIARDI; AND MOIRA
DEMOS,

            **Defendants.**

**Civil No.: 19-CV-484-BHL**

---

## DEFENDANT NETFLIX, INC.'S STATEMENT OF PROPOSED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Netflix, Inc., by and through its undersigned attorneys, and in support of its Motion

for Summary Judgment, submits the following Statement of Proposed Material Facts ("SPMF"),

pursuant to the Court's Procedures to be Followed on Motions for Summary Judgment and Civil

L.R. 56(b)(1)(C).

In addition to the enumerated facts below, Netflix requests the Court watch *Making a

Murderer* ("MaM"), the subject of this lawsuit, in its entirety. All 10 episodes were previously

filed at Dkt. 120-1 through 120-10, and are cited here by episode number (*e.g.*, "Ep. 1"). Netflix

also directs the Court to *State v. Avery*, 570 N.W.2d 573 (Wis. Ct. App. 1997), *State v. Avery*,

804 N.W.2d 216 (Wis. Ct. App. 2011), and *Avery v. Manitowoc Cnty.*, 428 F. Supp. 2d 891 (E.D.

Wis. 2006), which provide background on the events documented in MaM.

Beyond those published decisions, Netflix includes in this SPMF references to the contents of unpublished slip opinions, pleadings, and testimony in court proceedings involving Steven Avery. Many of these materials are already part of the record as they were filed with Netflix's motion to dismiss the Second Amended Complaint. Those materials speak for themselves and their content is indisputable and subject to judicial notice. *See Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016) ("Courts routinely take judicial notice of the actions of other courts or the contents of filings in other courts."). However, Plaintiff refused to stipulate to the contents of these materials and so Netflix includes them here, in an abundance of caution, as enumerated "proposed" facts.

## I. AVERY'S CIVIL CASE FOR WRONGFUL IMPRISONMENT AND THE MANITOWOC COUNTY SHERIFF'S OFFICE'S CONFLICT OF INTEREST

1. After Avery was exonerated for the rape of Penny Bernsteen in 2003, the Wisconsin Department of Justice conducted an independent review of the case and concluded that then-Manitowoc County Sheriff Tom Kocourek and then-District Attorney Denis Vogel, as well as their subordinates, had strong reasons to believe that another man assaulted Bernsteen and that Avery was innocent, but went ahead with the case against Avery anyway. *See* Dkt. 120-11 at 2, 6-12; Dkt. 120-12 at 73:16-74:11; Dkt. 120-13 at 7:3-12; *see also* Ep. 1 at 53:18-55:09, 56:31-58:10.

2. Also following his exoneration, Avery filed a civil rights lawsuit for $36 million in this Court in 2004, asserting claims against Manitowoc County, Kocourek, and Vogel for violating his constitutional right to due process by targeting him and failing to investigate the actual rapist; focusing the investigation on Avery because of personal hostility against him; failing to provide exculpatory information to his defense counsel; and continuing to withhold exculpatory evidence during his incarceration. *See* Decl. of Leita Walker ("Walker Decl.") Ex. 1

(Compl., *Avery v. Manitowoc Cnty.*, 1:04-cv-00986-LA (E.D. Wis. Oct. 12, 2004), Dkt. 1); *see also* Ep. 2 at 9:43-10:24.

3.      Discovery in Avery's civil suit was underway in the fall of 2005: then-Lt. James Lenk was deposed on October 11, 2005, *see* Dkt. 120-17; then-Sgt. Andrew Colborn and then-Manitowoc County Sheriff Ken Petersen were deposed two days later, *see* Dkts. 120-14, 120-16; and former Manitowoc County Sheriff's Office Chief Investigator Eugene Kusche was deposed on the 26th, *see* Dkt. 120-19; *see also* Ep. 2 at 31:05-16.

4.      During Colborn's deposition in Avery's civil lawsuit, he testified that, immediately after Avery's 2003 release from prison, Colborn recalled an unusual phone call he received in 1994 or 1995 when he was a corrections officer at the Manitowoc County Jail (hereafter referred to as the "jail call"). Dkt. 120-14 at 16:4-13; Ep. 7 at 17:36-19:04.

5.      Colborn further testified that, during the jail call, the caller identified himself as a detective from another jurisdiction, and said an inmate there had claimed he was responsible for an assault in Manitowoc County for which another man was imprisoned. Dkt. 120-14 at 10:22-11:8; SAC ¶ 24; *see also* Ep. 7 at 17:36-18:30.

6.      Colborn also testified that he tried to transfer the call to a Manitowoc County detective and provided that phone number to the caller in case the call did not go through. Dkt. 120-14 at 14:13-15:15.

7.      Colborn did not document his recollection of the jail call in a written statement until September 12, 2003, in which he wrote that he "supplied the [caller] with a telephone number to one of [Manitowoc County]'s detectives" and that he did not recall the detective mentioning any names. Dkt. 120-15.

8.      Both Colborn and Lenk testified in Avery's civil rights case that they provided their written reports on the jail call to the sheriff. Dkt. 120-17 at 33:4-8; Dkt. 120-14 at 17:20-18:5.

9.      Colborn testified in this case that his statement was kept in the sheriff's safe. Walker Decl. Ex. 2 (Colborn Tr.) at 404:4-11.

10.     Avery was arrested for killing Teresa Halbach in the midst of discovery in his civil case. In jail and facing a costly criminal trial, he settled his lawsuit against Manitowoc County for $400,000, from which his attorneys were paid $160,000. *Avery v. Manitowoc Cnty.*, 428 F. Supp. 2d 891, 893 (E.D. Wis. 2006); Ep. 3 at 15:39-15:52.

11.     Meanwhile, because of the conflict of interest presented by Avery's pending lawsuit against Manitowoc County, authorities decided that Calumet County would take the lead in the investigation. Dkt. 120-30 at 143:2-25.

12.     While under the supervision of Calumet County Deputy Dan Kucharski, Colborn and fellow Manitowoc County Sheriff's Office ("MCSO") employee James Lenk purported to find the key to Halbach's SUV, which appeared on the floor of Avery's bedroom after Colborn had roughly handled a small bookshelf in the room. Dkt. 120-29 at 125:10-126:10, 127:9-12, 130:8-14; Dkt. 120-30 at 12:9-17; Dkt. 120-31 at 35:12-37:22; *see also* Ep. 3 at 6:21-7:14.

## II.     AVERY'S TRIAL FOR HALBACH'S MURDER

13.     Accusations that Colborn and others planted evidence were a central part of Avery's defense at his trial. SAC ¶ 33; *see also, e.g.*, Dkt. 120-28 at 117:23-120:11; Dkt. 120-24.

14.     The prosecution moved to exclude such "frame-up" evidence, but Judge Patrick Willis denied that motion. He specifically identified Lenk and Colborn as the only two officers the defense could attempt to implicate as participants in this alleged conspiracy and explained

4

that "[t]he jurors are entitled to some explanation as to why the prosecution of this matter is being handled by Calumet County and why they are being transported to Calumet County to hear the case," and "Avery's charges against Lenk and Colborn in the federal lawsuit could have provided such motive, whether or not Lenk and Colborn were actually parties to the lawsuit." Walker Decl. Ex. 3 (CHRM034924) at 034925, 034927; Dkt. 120-24 at 3.

15.     Because Avery's defense centered on the contention that law enforcement officials, in particular Colborn and Lenk, had framed him, both prosecutors and Avery's counsel questioned the officers about the underlying events, including their depositions in the civil case and the jail call. Dkt. 120-29 at 138:20-140:13, 158:5-163:22, 231:16-233:17; Dkt. 120-30 at 54:24-58:3, 103:16-107:11.

16.     Avery's counsel also argued to the jury that a call Colborn made to dispatch regarding the RAV4's license plate number (hereafter, the "dispatch call") indicated Colborn had located the SUV before it was discovered in the salvage yard. Dkt. 120-35 at 32:21-34:3.

17.     In his rebuttal closing, defense counsel Dean Strang recounted the dispatch call and said "[t]his sounds a lot like what road patrol officers do when they come across a stalled car, an abandoned car, a car where it shouldn't be." Dkt. 120-35 at 32:21-34:3.

18.     To account for Avery's blood found in Halbach's SUV, Avery's counsel also argued that it could have been planted there by law enforcement, along with the RAV4 key in Avery's bedroom. *See* Dkt. 120-24 at 1-2.

19.     Both Colborn and Lenk testified at trial that the Avery civil lawsuit did not cause them to plant evidence or otherwise try to frame Avery. Dkt. 120-29 at 140:14-141:7, 233:3-17.

20.     Colborn, Lenk, and Kucharski testified that they believed the RAV4 key fell out of a gap in the back of the bookcase Colborn had searched and then wrestled back into place.

Dkt. 120-29 at 125:10-126:10, 127:9-12, 130:8-14; Dkt. 120-30 at 12:9-17; Dkt. 120-31 at 35:12-37:22.

21.      Colborn's former counsel of record, Michael Griesbach, would later write in a January 2016 email that while he was "convinced [Avery] is guilty . . . I'm nowhere near as certain that the cops did not plant evidence to bolster their case." Walker Decl. Ex. 4 (Griesbach0026044).

22.      In another email from January 2016, Griesbach wrote, "Dean as much as admitted that he knows his guy did it . . . which is not to say that the cops did not plant evidence to make their case." Walker Decl. Ex. 5 (Griesbach0015978).

23.      After the jury returned its guilty verdict, Colborn issued a statement that was featured on the local nightly news, in which he said, "I hope and pray that this verdict helps put to rest any suspicion or loss of confidence that this community may have felt towards our department, because I assure everyone that this agency has some of the finest law enforcement officers in the country in its employ." Ep. 8 at 33:58-34:19.

24.      At his deposition in this case, Colborn testified that Judge Willis permitted Avery and his defense team to "point [the] finger at deputies" and attempt to prove Avery was "framed." Walker Decl. Ex. 2 (Colborn Tr.) at 31:19-33:15.

## III.    MAM'S PORTRAYAL OF EVENTS

25.      MaM, a ten-part documentary series, chronicles the story of Avery's experiences in the criminal justice system through the words and actions of its participants, including through footage of actual events such as Avery's murder trial and related press conferences, interviews of those with first-hand knowledge, trial and deposition transcripts and exhibits, other documents and photos, and third-party news coverage. *See generally* Eps. 1-10.

26. Colborn testified at his deposition that MaM presented "Avery's evidence," not "something [Defendants] made up out of whole cloth." Walker Decl. Ex. 2 (Colborn Tr.) at 228:18-21.

27. Prior to filing suit, he also acknowledged: "The claims by the Netflix documentary mirror those claimed by the defense during the trial." Walker Decl. Ex. 6 (Manitowoc-000158).

28. Colborn's friend, confidante, and advocate, Brenda Schuler, wrote in an email that "[t]here is nothing new in Making a Murderer," Walker Decl. Ex.7 (Manitowoc-000063), a statement with which Colborn agreed at his deposition, *see id*. Ex. 2 (Colborn Tr.) at 44:10-45:18.

29. In pre-suit correspondence, Colborn also wrote that MaM "maintain[s] and keep[s] alive [Avery's] lies" about him. *See* Walker Decl. Ex. 2 (Colborn Tr.) at 163:11-23 (referencing *id.* Ex. 8 (Manitowoc-000270)).

30. At her deposition in this case, Laura Ricciardi testified that Steven Avery was the "main character or a principal subject" of MaM. Walker Decl. Ex. 9 (Ricciardi Tr.) at 49:9-12.

31. Ricciardi testified that MaM's filmmakers documented Avery's frame-up theory but did not "adopt it," and overall "did not take sides." Walker Decl. Ex. 9 (Ricciardi Tr.) 47:3-10; 48:19-24.

32. Episode 1 shows Avery's criminal history as a troubled young man, including documenting felony convictions for burglary, animal cruelty for burning the family cat to death, and a January 1985 confrontation where Avery ran his cousin, Sandra Morris, off the road and threatened her with a gun. Ep. 1 at 9:30-10:36, 12:00-16:03.

33.     The episode then depicts Avery's arrest and conviction for the 1985 rape he did not commit. *Id.* at 27:53-28:13.

34.     In an interview appearing in MaM Episode 1, Judge Fred Hazlewood, who presided over the 1985 rape trial, said that "violence was a real reoccurring regular part of [Avery's] life, [and] that women seemed to be the victims." *Id.* at 27:53- 28:13.

35.     Episode 2 documents Avery's civil rights lawsuit against Manitowoc County, including portions of Colborn's deposition about the jail call he received while working as a jailer in the 1990s. *See* Ep. 2 at 18:27-19:59.

36.     The episode also shows an interview with one of Avery's lawyers in the civil case, Steven Glynn, who says:

>     "And the day [Avery] got out, or the day after, that's when Colborn decides to contact his superior officer named Lenk. And Lenk tells him to write a report and they then go have contact with the sheriff. Now let's just stop and think about that for a minute. Why does that happen? Why does it happen then when it didn't happen eight years earlier? I mean, I think I know the answer. I mean, I think the answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk, as his superior realized it, and the sheriff realized it. So Lenk tells Colborn to write a report, the sheriff tells Lenk, 'Get me the report.' The sheriff puts the report in a safe. That's how much he cares about documenting this thing."

*Id.* at 20:33-21:24.

37.     The episode ends with Halbach's disappearance, Avery's arrest, and law enforcement searches of the Avery compound. *Id.* at 31:16-56:34.

38.     Episode 3 depicts the split in opinion in Manitowoc, including with interviews of some who believed Avery's claims he was framed, *id.* at 14:16-15:36, and others expressing belief of Avery's guilt—including Avery's own brother, Chuck, *id.* at 41:55-42:03.

39.     At his deposition in this case, Colborn acknowledged that local residents had divergent views at the time of Avery's arrest and trial, stating "I'll agree that there were some in

the community that thought he was innocent; some thought he had done this again" and "Avery had his supporters . . . . Law enforcement probably had a few supporters as well." *See* Walker Decl. Ex. 2 (Colborn Tr.) at 77:8-14, 83:3-7.

40.     The episode also includes the views of law enforcement, such as footage from an interview with Manitowoc County Undersheriff Robert Hermann, who says that "some of the evidence—the DNA evidence at the scene—it's impossible for us to have that type of evidence, you know, to plant. It's just—it's not realistic." Ep. 3 at 22:50-23:19.

41.     The episode ends with footage of authorities' announcement that Brendan Dassey, Avery's nephew, had confessed to helping kill Halbach and footage of the confession itself. *Id*. at 23:39-1:00:52.

42.     While Episode 4 focuses largely on pretrial events in the case against Dassey, the episode closes with footage of Avery's counsel Jerome Buting, prosecutor Norm Gahn, and Investigator Weigert inspecting the vial of Avery's blood in the court clerk's office which Avery's attorneys speculated was the source of Avery's blood in Halbach's SUV, and then footage of a phone call from Buting to Strang in which Buting claims that the hole in the rubber stopper indicated the vial had been tampered with. Ep. 4 at 1:01:45-1:04:20.

43.     Episode 5 starts a four-episode arc depicting Avery's murder trial. *See generally* Eps. 5-8.

44.     Episode 5 includes footage of prosecutor Norm Gahn defending Manitowoc County law enforcement by saying, "when officers are accused of what they're being accused of, they deserve to have their reputations protected. They're good solid decent family men. . . . Again, I just cannot emphasize too much, give us the chance to meet this planting frame-up defense." MaM shows the court granted that request. Ep. 5 at 1:09-2:18.

45.     It also includes footage of law enforcement interrogating Avery, during which Avery claims someone named "Tammy" told him that "a cop" put Halbach's vehicle on the Avery Salvage Yard property. *Id.* at 52:12-53:20.

46.     The final three and one-half minutes of the episode show excerpts of Colborn's testimony regarding the call he made to a county dispatcher before Halbach's SUV was found. *Id.* at 53:20-56:55.

47.     MaM's presentation of Colborn's testimony about the dispatch call begins by showing Avery defense lawyer Dean Strang eliciting testimony from Colborn that patrol officers often call a dispatcher to check the license plate number "of a car they have stopped, or a car that looks out of place for some reason," to get information about the person to whom the vehicle is registered. Ep. 5 at 53:17-53:50.

48.     Also in Episode 5, MaM then shows Strang playing a tape of the call, in which Colborn asks a dispatcher to "run" a license plate SWH-582, which the dispatcher says "shows that she's a missing person, and it lists to Teresa Halbach." *Id.* at 54:03-54:20.

49.     Colborn is heard asking the dispatcher, "'99 Toyota?" and she replies, "Yup." *Id.* at 54:19-54:23.

50.     Amid further cross-examination, MaM shows Strang asking Colborn, "Were you looking at these plates when you called them in?" and Colborn responding, "No, sir." *Id.* at 55:26-55:30; *see also* Dkt. 119-1 at 5.

51.     After that denial, MaM shows Colborn testifying he believed the call happened on November 3, 2005, "[p]robably after I received a phone call from [Calumet County] Investigator [Mark] Weigert letting me know that there was a missing person." Ep. 5 at 55:37-55:52.

52.     Strang asks Colborn whether Weigert had provided the license plate number, and Colborn testifies that he does not remember exactly, but "[h]e had to have given it to me, because I wouldn't have had the number any other way." *Id.* at 55:53-56:09; *see also* Dkt. 119-1 at 6-7.

53.     Then, Strang asks whether someone listening to the call could reasonably conclude that Colborn was looking at the SUV when he made the dispatch call, followed by Colborn's affirmative answer to another question asking whether the call sounded like hundreds of other calls he had made before. Ep. 5 at 56:10-56:26; *see also* Dkt. 119-1 at 7-8.

54.     MaM also shows the very next exchange, in which Strang asks, "But there's no way you should have been looking at Teresa Halbach's license plate on November 3, on the back end of a 1999 Toyota?" followed by Colborn's answer, "I shouldn't have been and I was not looking at the license plate." Ep. 5 at 56:26-56:42; *see also* Dkt. 119-1 at 8.

55.     Colborn acknowledged at his deposition that MaM included not one, but two of his explicit denials, while he was testifying in uniform and under oath, that he was looking at Halbach's vehicle at the time of the call. Walker Decl. Ex. 2 (Colborn Tr.) at 344:23-345:1.

56.     Episode 6 shows more testimony from Avery's trial, as well as an out-of-court statement by Buting responding to the prosecution's assertion that framing Avery would require a conspiracy among a large group of people to succeed, musing rather that "two people could've done this easily enough if they had the motive to do it. Maybe one, even. . . . [W]ho better than a police officer would know how to frame somebody?" Ep. 6 at 56:26-57:08.

57.     Episode 7 includes excerpts of Colborn's testimony regarding the jail call, which Colborn criticized in his opposition to Netflix's Motion to Dismiss the SAC for leaving out the portion of his testimony in which he "corrected" his reference to transferring the call to a

detective and said he transferred the call to the detective division of the sheriff's office. Ep. 7 at 17:46-18:30; SAC Ex. B at 4; Dkt. 79 at 6-8.

58.    At his deposition in this case, Colborn criticized MaM for leaving out testimony that he answered the phone, "Manitowoc County Jail, Officer Colborn." Walker Decl. Ex. 2 (Colborn Tr.) at 355:23-357:8.

59.    However, the episode includes Colborn's testimony that he received that call "when I was working [in] my capacity as a corrections officer at the Manitowoc County Jail." Ep. 7 at 17:46-18:30; SAC Ex. B. at 4.

60.    Colborn also testified that "my reason that I didn't write a report has been eliminated from my testimony. . . . There would have been no need to write a report every time you receive a telephone call and transfer it." Walker Decl. Ex. 2 (Colborn Tr.) at 362:22-363:9.

61.    But the episode includes Colborn's statement that "[i]f I wrote a report about every call that came in, I would spend my whole day writing reports." SAC Ex. B at 9; *see also* Ep. 7 at 23:54-24:02.

62.    Episode 7 also includes Colborn's testimony that he did not know if the call had anything to do with Avery. SAC Ex. B at 5; Ep. 7 at 18:36-18:44.

63.    The episode also includes Colborn's denial that he planted evidence to frame Avery. Specifically, Kratz asked Colborn, "Have you ever planted any evidence against Mr. Avery?" SAC Ex. B at 5. And MaM shows Colborn responding, "I have to say that this is the first time my integrity has ever been questioned, and no, I have not." Ep. 7 at 19:09.

64.    Colborn objects that this scene omits his previous response, "that's ridiculous, no I have not," and at his deposition testified that it was because the answer included in MaM "doesn't come across very forceful or convincing," though he admitted that MaM did convey

that he expressly denied planting evidence against Avery. Walker Decl. Ex. 2 (Colborn Tr.) 359:2-14; 360:14-16.

65.     Colborn also complains of the scene in Episode 7 that appears at 24:19-24:30, in which Colborn says that a brief shot of him leaning back in the witness chair and cracking his knuckles "make[s] me look nervous and apprehensive and that I've been caught in some sort of lie," and asserted that footage was recorded when the jury was not present. Walker Decl. Ex. 2 (Colborn Tr.) at 496:18-497:6.

66.     Episode 7 also shows excerpts of testimony regarding the RAV4 key found in Avery's bedroom, including Colborn testifying that the key appeared after he handled the bookcase "rather roughly, twisting it, shaking it, pulling it," and jammed items back into it. Ep. 7 at 16:42-17:30; *see also* Walker Decl. Ex. 2 (Colborn Tr.) at 351:17-25 (admitting this scene conveys the important parts of his testimony, including that he handled the bookcase roughly and didn't touch the key).

67.     The episode includes excerpts of the testimony of Calumet County Sheriff's Sgt. William Tyson, who testified that he accompanied the Manitowoc County officers on a November 5, 2005 search of the trailer because he had been told that Manitowoc County deputies should not be left alone on the Avery property. Ep. 7 at 4:18-5:58.

68.     At trial, defense attorney Jerome Buting asked Tyson whether he ever "had to act like a babysitter, or a watchdog, for the other officers who were conducting a search," to which Tyson responded that he "did not treat this as if [he] was babysitting." Dkt. 119-1 at 21.

69.     Buting immediately followed up by asking whether, "in any of [his] years as an officer, [he] had to watch the officers who were searching where you were, to make sure that they weren't alone," to which Tyson answered "no." Dkt. 119-1 at 21.

70. Colborn complains that, in MaM, this exchange is condensed to a single question and answer:

> Buting: Had you ever in any other search in your entire career had to act like a babysitter, or a watchdog, for the officers who were conducting a search?

> Tyson: No.

Ep. 7 at 5:18-5:31.

71. Episode 7 also shows Colborn's and Lenk's testimony denying planting blood, *id.* at 18:44-19:10, 32:53-33:09, and prosecutors criticizing the defense's "frame-up" theory, *id.* at 44:38-45:34.

72. It includes Kratz telling reporters, "around these parts if you're going to suggest that a cop is crooked, you're going to suggest that a cop committed crimes, then you better have something other than your elbow was on the table. And in this case, to suggest that these police officers planted evidence with nothing, that is with not with one shred, at least anything that I've seen that approaches evidence, uh, I think is absolutely deplorable." *Id.* at 14:04-14:29.

73. The episode also includes local reporter Angenette Levy describing Colborn at a news conference as "a law enforcement officer for thirteen years. He puts on a uniform, a badge and a gun every day and goes to work and tries to do his best," and challenging Strang by asking, "if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place." *Id.* at 24:30-25:47.

74. It also includes Gahn's saying of Manitowoc County law enforcement: "My blood starts to boil when . . . I hear this, that these police officers, these good solid citizens, good decent men are accused of planting this evidence." *Id.* at 34:45-34:58

75.     Episode 8 includes more than eight minutes of excerpts from both sides' closing arguments, intercutting those arguments (*i.e.*, shifting back and forth between them) to show viewers key assertions from each side. Ep. 8 at 3:40-12:04.

76.     The episode depicts Buting arguing that evidence could have been planted by one officer working alone—naming Lenk, *id.* at 6:08-6:50, and then Kratz's response to this that "th[e] vial planting defense is absolutely ludicrous," *id.* at 7:22-7:27.

77.     And it reaches its climax with footage of Judge Willis reading the jury's verdict convicting Avery of murder. *Id.* at 26:02-27:46.

78.     Episode 8 also includes footage of a local news anchor reading Colborn's post-verdict statement praising the verdict. *Id.* at 33:57-34:16.

79.     Episode 9 shows footage of Dassey's trial and conviction and from Avery's sentencing, where Judge Willis tells Avery, "you are probably the most dangerous individual ever to set foot in this courtroom." Ep. 9 at 53:00-54:00; *id*. 1:01:59-1:02:03.

80.     Episode 10 describes post-verdict developments, such as the fact that Avery and Dassey both lost their first rounds of appeals.  *See generally* Ep. 10.

81.     [This enumerated item intentionally left blank.]

82.     On October 19, 2018, Netflix premiered a second 10-episode season of Making a Murderer, which follows the post-conviction appeals of Avery and Dassey. SAC ¶ 49.

83.     None of the statements challenged in the SAC are from the second season of MaM. *See* SAC ¶¶ 57-82 (detailing claims at issue, referencing and challenging only S1 statements).

## IV.    NETFLIX'S INVOLVEMENT IN MAM

84. Netflix licensed MaM from Laura Ricciardi and Moira Demos in July 2014. (hereinafter, the "Producer Defendants"). Walker Decl. Ex. 10 (excerpts of NFXCOL0000091) at 1.

85. Prior to Netflix's acquisition of the film, Moira Demos wrote in July 2013 that "[t]he series is 90% shot and we currently have rough cuts of the first three episodes. To date this project has been exceedingly independent. The series has been entirely produced, directed, shot and edited by my partner Laura Ricciardi and myself." Walker Decl. Ex. 11 (E. Dailly Subp. Prod. 31-0001) at 0002.

86. The license agreement, signed on or about July 28, 2014, contained a warranty that the Producer Defendants would provide a "truthful and accurate" series to Netflix that did not defame anyone. *See* Walker Decl. Ex.10 (excerpts of NFXCOL0000091) at 107.

87. The Producer Defendants hired their own lawyers for the production. Walker Decl. Ex. 12 (CHRM003641); *see also* Decl. of Lisa Nishimura ("Nishimura Decl.") ¶ 6.

88. Netflix's core team for MaM consisted of Lisa Nishimura, Adam Del Deo, Ben Cotner, and—to a lesser extent—Marjon Javadi. *See* Walker Decl. Ex. 13 (Del Deo Tr.) at 65:9-66:22.

89. No one at Netflix was responsible for vetting MaM for accuracy or for defamation, or engaged in such vetting. Nishimura Decl. ¶ 6; *see also* Decl. of Adam Del Deo ("Del Deo Decl.") ¶ 8.

90. On the business side, in addition to financing the film, Netflix helped the Producer Defendants with budgeting, meeting deadlines, and facilitating introductions to third-party specialists who could help with elements of the filmmaking such as music and graphics. Nishimura Decl. ¶ 5; Del Deo Decl. ¶ 4; Walker Decl. Ex. 13 (Del Deo Tr.) 63:14-24; *id.* Ex. 14

(NFXCOL0000215) at 216; *id*. Ex. 15 (NFXCOL0000242); *id*. Ex. 16 (NFXCOL0000265); *id*.

Ex. 17 (NFXCOL0000282) at 287; *id*. Ex. 18 (NFXCOL0000294) at 296; *id*. Ex. 19

(NFXCOL0000335) at 339; *id*. Ex. 20 (NFXCOL0002099).

91.     No one at Netflix edited the series. Walker Decl. Ex. 21 (Nishimura Tr.) at 16:7;

56:23-57:3; Nishimura Decl. ¶ 7; *see also* Del Deo Decl. ¶ 5.

92.     At her deposition in this case, Nishimura testified that "[a]ll of the editing was

controlled purely by the filmmakers. . . . [T]o be clear, no one on my team is a trained editor.

And the software and the actual mechanism of editing is not one that I myself or anyone on my

creative team is trained in." Walker Decl. Ex. 21 (Nishimura Tr.) at 56:9-14, 56:23-57:1; *see also*

*id.* at 16:6-7.

93.     Likewise, at his deposition in this case, Del Deo testified that "Laura and Moira

were the filmmakers. They were looking at the footage—the trial footage, you know, all the

assets they had. They would be the ones to make the call as to what ends up in the documentary

or not." Walker Decl. Ex. 13 (Del Deo Tr.) at 144:13-17; *see also id*. at 161:13-15; Walker Decl.

Ex. 9 (Ricciardi Tr.) at 178:15-25.

94.     Laura Ricciardi testified at her deposition that "if I think about the workflow,

we—you know, we were working in separate locations. I think we were, you know, mainly

communicating on phone calls. There was an occasional meeting, but, you know, for the most

part, we -- Moira and I were most interested in, you know, being able to do the creative work,

and then, at times we were required to share it with Netflix and that would, you know, lead to

notes and conversations, and then we would go back and we would work creatively[.]" Walker

Decl. Ex. 9 (Ricciardi Tr.) at 178:15-25.

95.     Creatively, the Netflix team did help shape the series by reviewing edited, assembled footage—"cuts"— for their overall look and feel and from the perspective of a Netflix subscriber. Nishimura Decl. ¶¶ 5, 7; Del Deo Decl. ¶¶ 4-5.

96.     However, members of the team did not conduct side-by-side comparisons of cuts to previous iterations in an attempt to understand what precisely the filmmakers added or cut to improve flow. Nishimura Decl. ¶ 7; Del Deo Decl. ¶ 5.

97.     Upon reviewing a cut Netflix would provide to the filmmakers "notes," which served as suggestions and jumping-off points for discussion, not demands; just because a suggestion was made does not mean it was implemented. Walker Decl. Ex. 21 (Nishimura Tr.) at 126:21-25; *id.* Ex. _9 (Ricciardi Tr.) at 94:9-17; *see also* Del Deo Decl. ¶¶ 4-5.

98.     Although Colborn asserts Netflix's suggestions to improve pacing show actual malice, such suggestions are a common form of feedback in documentary filmmaking and have "to do with the way you're moving the viewer through the story." Walker Decl. Ex. 22 (Dennis Tr.) at 40:14-22; *compare id.* Ex. 23 (Pl.'s Responses to Netflix's First Set of Interrogs. (Oct. 6. 2021)), Interrog. 2 at 9; *with id.* Ex. 24 (NFXCOL0000212); *id.* Ex. 25 (NFXCOL0001943) at 1946; *id.* Ex. 26 (NFXCOL0001959); *id.* Ex. 27 (NFXCOL0001976) at 1996; *id.* Ex. 28 (NFXCOL0002075) at 2078; *id.* Ex. 29 (NFXCOL0002131).

99.     Nishimura stated in her declaration that edits regarding pacing were intended to "engage the viewer" and help the viewer digest the most salient points of a long and sprawling account. Nishimura Decl. ¶¶ 8, 13-14.

100.    So too for "cliffhangers": Del Deo attests that Netflix employees suggested that episodes should end on a cliffhanger—a standard documentary series technique—in order to keep viewers engaged so they watch the next episode, including those episodes in which Avery

is ultimately convicted. *See* Del Deo Decl. ¶ 12; *compare* Walker Decl. Ex. 23__ (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 2 (citing *id.* Ex. 24 (NFXCOL0000212) at 213) *with id.* Ex. 30 (NFXCOL0000226) at 229; *id.* Ex. 31 (NFXCOL0000273) at 274; *id.* Ex. 19 (NFXCOL0000335) at 339; *id.* Ex. 32 (NFXCOL0002059) at 2063.

101.    No one at Netflix ever suggested (or would suggest) that filmmakers sacrifice accuracy in order to speed up the pace of a scene or to make a scene more impactful. Del Deo Decl. ¶¶ 11, 13; *see also* Nishimura Decl. ¶ 8.

102.    An example of this is Netflix's note suggesting the Producer Defendants hold on a particular scene a bit longer, while expressly acknowledging that "[w]e know this is court footage that may not exist." *See* Walker Decl. Ex. 24 (NFXCOL0000212) at 213.

103.    Other notes Colborn highlighted in his discovery responses suggested the use of graphical elements to enhance the clarity and factual accuracy of the series, especially because Avery's prosecution for Halbach's murder involved a large number of facts and relevant players, including several law enforcement agencies and legal teams. Nishimura Decl. ¶ 16; Del Deo Decl. ¶¶ 13-14; *compare* Walker Decl. Ex.23 (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 3-4 *with id.* Ex. 33 (NFXCOL0000208) at 210; *id.* Ex. 14 (NFXCOL0000215) at 219; *id.* Ex. 34 (NFXCOL0000288); *id.* Ex. 27 (NFXCOL0001976) at 1982; *id.* Ex. 35 (NFXCOL0000293); *id.* Ex. 36 (NFXCOL0000245); *id.* Ex. 16 (NFXCOL0000265).

104.    At his deposition in this case, Colborn testified that "defendants" knew MaM was false because "[t]hey were sitting in the courtroom and saw my complete unedited testimony." Walker Decl. Ex. 2 (Colborn Tr.) at 435:12-436:9, *see also id.* 441:8-14, 444:13-445:3.

105.     Asked how others could know Avery's frame-up theory was false when even Griesbach—a local resident who personally knew the accused officers—believed the theory was plausible, Colborn further testified: "I don't have an answer other than Mr. Griesbach didn't attend the trial." Walker Decl. Ex. 2 (Colborn Tr.) at 464:11-465:17.

106.     No Netflix employee who worked on MaM attended any portion of any court proceeding involving Steven Avery. Walker Decl. Ex. 21 (Nishimura Tr.) at 173:23; *see also* Nishimura Decl. ¶ 10; Del Deo Decl. ¶ 7.

107.     No Netflix employee who worked on MaM ever visited Manitowoc County. Walker Decl. Ex. 21 (Nishimura Tr.) at 173:23; Nishimura Decl. ¶ 10; Del Deo Decl. ¶ 7.

108.     No Netflix employee who worked on MaM attended or conducted any interview of any person for MaM. Nishimura Decl. ¶ 10; Del Deo Decl. ¶ 7.

109.     No Netflix employee who worked on MaM has ever spoken to anyone depicted in MaM. Nishimura Decl. ¶ 10; Del Deo Decl. ¶ 7.

110.     No Netflix employee who worked on MaM ever received or reviewed raw footage of the underlying events depicted in MaM. Nishimura Decl. ¶ 9; Del Deo Decl. ¶ 6; *see also* Walker Decl. Ex. 37 (NFXCOL0000138) (all raw footage was in the exclusive possession and control of the Producer Defendants).

111.     Beyond raw footage, no Netflix employee who worked on MaM ever received or reviewed any other source material from the events MaM documents such as deposition or trial transcripts or exhibits. Nishimura Decl. ¶¶ 9, 10; Del Deo Decl. ¶ 6.

112.     Colborn admits he has no evidence to contradict the preceding six statements. Walker Decl. Ex. 2 (Colborn Tr.) at 182:2-10, 182:23-183:2, 183:3-18, 184:21-185:1; *id.* Ex. 38 (email from Colborn's counsel confirming Colborn has no such evidence).

113.     At her deposition in this case, Nishimura testified as follows: "I'd like to clarify how you define 'raw footage.' So, you see here when they refer to 'assembled footage,' you know, that is what the filmmakers do, right? So, they had been working on the project for many, many years, and I imagine, at that point, had hundreds, if not thousands of hours of footage. So, we would review material, but material as provided by the filmmakers in an assembled form. So, edited by them." Walker Decl. Ex. 21 (Nishimura Tr.) at 49:10-19; *see also id.* 106:2-22, 107:14-17.

114.     Del Deo similarly testified that the Netflix creative team "looked at the cuts that came in," but did not, for example, review any of the videotaped depositions from Avery's civil lawsuit against Manitowoc County. Walker Decl. Ex. 13 (Del Deo Tr.) at 145:12-17.

115.     Not even the third-party editors the filmmakers hired to work on MaM reviewed all of the raw footage. Walker Decl. Ex. 39 (Manhardt Tr.) at 153:17-22.

116.     Moreover, Netflix employees were not aware of the specific edits at issue in this case until their depositions in April 2022. Nishimura Decl. ¶ 11; Del Deo Decl. ¶ 15.

117.     At her deposition in this case, Nishimura testified that she did not personally have "any knowledge of changes that are made, and, so, it's hard for me to speculate on motive for change." Walker Decl. Ex. 21 (Nishimura Tr.) at 95:7-19; *see also* Nishimura Decl. ¶ 11.

118.     Questioned about editing to the scene where Colborn testifies about the dispatch call, Nishimura testified that "Colborn successfully makes his point saying, 'I should not have been and I was not looking at the license plate.' So I believe he made his point. . . . And speaking to the macro, you know, the jury found Steven Avery guilty. So I think [viewers] must have heard this as well." Walker Decl. Ex. 21 (Nishimura Tr.) at 176:16-25; Nishimura Decl. ¶ 11 ("I

would not have had questions or concerns about the edits had I known about them at the time, which I did not.").

119.    At his deposition in this case, Del Deo similarly testified, "[W]e trusted them to edit the show . . . [s]o I'm not in a position to comment—to make a snap judgment here today as to whether or not a piece of footage that's raw footage should be swapped out or used within the context of the series." Walker Decl. Ex. 13 (Del Deo Tr.) at 161:13-21.

120.    Del Deo unequivocally denied that he believes MaM to be asserting that Colborn planted evidence to frame Avery. Walker Decl. Ex. 13 (Del Deo Tr.) at 173:15-19; *id.* 174:2-7.

121.    Both he and Nishimura likewise have averred that Netflix did not intend for MaM to convey that Colborn *in fact* planted evidence and that it never occurred to them that any reasonable viewer would understand either the *series or Netflix* to be reaching a conclusion about Colborn's culpability. *See* Nishimura Decl. ¶ 18; Del Deo Decl. ¶ 10.

122.    The Netflix employees who worked on MaM did not doubt—or have any reason to doubt—the Producer Defendants' commitment to accuracy. Walker Decl. Ex. 13 (Del Deo Tr.) at 62:21-63:5, 146:23-24; Nishimura Decl. ¶ 4.

123.    At his deposition in this case, Del Deo testified to the following: "I was very impressed at how . . . how they wanted to . . . capture, you know, accurate, factual events, really follow the story from the Steven Avery perspective and also from the perspective of the police officers involved in the case, Manitowoc, and let—let the subjects capture in an objective way what was happening[.]" Walker Decl. Ex. 13 (Del Deo Tr.) at 62:21-63:5.

124.    Nishimura and Del Deo attest that, if they had ever been concerned about the accuracy of a cut or episode, they would have raised the concern with the Producer Defendants—but they never experienced such concern. Nishimura Decl. ¶ 8; Del Deo Decl. ¶ 9.

## V.    COLBORN'S ALLEGATIONS IN THE SAC

125.    Colborn asserts that because Netflix wanted to sensationalize an old, forgotten story and hook viewers to make more money, MaM is biased and unfair, and that Netflix— unlike him—"ha[s] an instinctive distrust of law enforcement." SAC ¶¶ 15, 17, 48, 59(c), 62, 66; Walker Decl. Ex. 2 (Colborn Tr.) at 174:9-12; 463:7-13; *see also id.* Ex. 23 (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 1-3 (Netflix intended to "inflame viewers to dislike him"); *id.* Ex 49 (Pl.'s Suppl. Response to Netflix's Interrog. No. 1 (July 15, 2022)) at 4 (Netflix employees wanted viewers to "see police as adversaries").

126.    But, at the time of his deposition, Colborn had watched only slightly more than an hour of the entire series; he had not watched even a second of Episodes 8, 9, or 10; and he had no intention of watching any more. Walker Decl. Ex. 2 (Colborn Tr.) at 58:7-10; 67:15-17; 411:2-23; 485:24-486:5.

127.    In response to a series of questions at his deposition regarding whether unchallenged portions of MaM might counterbalance the portions Colborn believes portray him negatively, Colborn repeatedly said he did not know because he had not watched the entire series. Walker Decl. Ex. 2 (Colborn Tr.) at 125:4-10, 125:23-126:10; *see also, e.g.*, *id.* 188:23-190:11, 190:12-192:25, 471:13-474:21, 480:7-486:5.

128.    Colborn's only basis for claiming that MaM was biased against him or that it somehow conclusively asserted he planted evidence, thereby defaming him, were calls and messages he received from anonymous individuals who he concedes were not reasonable viewers and who many not even have watched MaM. Walker Decl. Ex. 2 (Colborn Tr.) at 205:2-8, 292:16-294:3, 293:13-19; 296:1-19.

129. ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

130.     Colborn does not believe the CaM filmmakers' perspective prevents them from making a fair and objective documentary. Walker Decl. Ex. 2 (Colborn Tr.) at 236:1-5.

131.     Schuler likewise testified that she also believes CaM will be "a fair and accurate and transparent documentary" despite her bias against Avery, and she does not believe there is anything unethical or irresponsible about making a documentary that has a point of view. Walker Decl. Ex. 40 (Schuler Tr.) at 190:16-191:20; *see also id.* 220:4-221:11.

132.     Colborn admits that any physical manifestations of his alleged emotional distress are so mild that not even the woman he lives with is able to observe them. Walker Decl. Ex. 2 (Colborn Tr.) at 131:16-132:18, 133:22-25, 296:20-297:10.

133.     Colborn testified in his deposition that the only documentary evidence regarding his alleged emotional distress is his medical records and testimony.  Walker Decl. Ex. 2 (Colborn Tr.) at 339:23-340:5.

134. ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

135. ████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████

136. Colborn admitted at his deposition that his medical records are accurate in this regard. Walker Decl. Ex. 2 (Colborn Tr.) at 332:25-341:7.

137. Colborn received supportive calls from dozens of people upon announcing his voluntary retirement from the Manitowoc County Sheriff's Office in 2018. Walker Decl. Ex.2 (Colborn Tr.) at 313:2-25.

138. Colborn held a leadership position in his church for years after MaM premiered, ending in 2020 after approximately six years. Decl. of Rev. Tom Pankow ("Pankow Decl.") ¶¶ 9-10; Walker Decl. Ex. 44 (COLBTXTS_0006758) at 6761.

139. Colborn testified at his deposition that the evidence-planting allegations raised in Avery's murder trial harmed his reputation years before MaM's release. Walker Decl. Ex. 2 (Colborn Tr.) at 136:24-137:5.

140. He likewise admitted that statements by several third parties during and after the Avery trial defamed him and led to death threats. Walker Decl. Ex. 2 (Colborn Tr.) at 120:23-121:17, 141:8-20; *id.* Ex. 45 (COLBORN-004486); *id.* Ex. 46 (COLBORN-004586); *id.* Ex. 47 (COLBORN-004611).

141. His ex-wife, Barbara Colborn, stated that, during the Avery trial, Colborn was stressed, agitated, withdrawn, quiet and not himself; that he would "pace in the house" and "started drinking a little more;" and that he "didn't want to go anywhere in public. Decl. of Barbara Colborn ("B. Colborn Decl.") ¶¶ 8-9; *see also* Decl. of Kathleen Heinzen ¶ 6 ("[Colborn] was not himself during the trial."); Pankow Decl. ¶ 12 ("[Colborn] took Avery's claims at trial that he planted evidence very personally.").

142. At his deposition, Colborn agreed that the Avery murder trial was emotionally difficult for him; specifically, that he "wasn't himself" during the trial, that he was quiet, that he could only focus on the trial, and that he stopped going out in public during the trial. Walker Decl. Ex. 2 (Colborn Tr.) at 113:15-17; 114:9-11.

143. At the outset of this case Colborn blamed MaM for his divorce, *see* Walker Decl. Ex. 48 (Pl.'s Response to Chrome Defs.' First Set of Interrogs. (Jan. 28, 2022)), Interrog. 8.

144. His ex-wife subsequently explained they divorced in large part because Colborn was unfaithful to her. *See* B. Colborn Decl. ¶ 28.

145. Colborn admitted that his divorce caused him anxiety and distress. Walker Decl. Ex. 2 (Colborn Tr.) at 301:17-25.

146. Colborn's affair and divorce also harmed his relationship with his in-laws, as Ms. Betty Heinzen, Colborn's former mother-in-law, stated that she "no longer consider[s] Andrew Colborn a relative because he ran off with another woman and divorced my daughter, Barb, who suffers from problems with her peripheral vision." Decl. of Betty Heinzen ¶ 4.

147. Likewise, Ms. Heinzen's husband and Colborn's former father-in-law, Paul Kopidlansky stated, while MaM had no impact on his opinion of Colborn because he didn't watch it, he is "not proud of [Colborn]" because he "ran off with another woman when his wife Barbara needed him most." Decl. of Paul Kopidlansky ¶¶ 5-6, 9.

148. Colborn contends that two references in Netflix documents to the jail call show actual malice, but in those documents Del Deo simply states his opinion that it "seems very thin that Colburn not having specific knowledge of who called him would be the key to the case," and that the call "is [a] weak revelation to me." *Compare* Walker Decl. Ex. 23 (Pl.'s Response to

Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 2-3 *with id.* Ex. 33 (NFXCOL0000208) at 210; *id.* Ex. 30 (NFXCOL0000226) at 227.

149.    Colborn similarly contends that internal communications among the Netflix team regarding the discovery of the key to Halbach's SUV show actual malice, but in them Cotner only expresses the opinion that the discovery of the key is among "the weaker arguments" at Avery's trial. *Compare* Walker Decl. Ex. 23 (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 3-4; *with id.* Ex. 34 (NFXCOL0000288).

150.    Colborn also points to Netflix employees' notes and communications regarding music in the series, but those documents show that Netflix employees suggested "a thriller atmospheric score," that would "punctuate" "key point[s]" and "really up[] the stakes" for viewers, such as with "danger music" at a climactic point. *Compare* Walker Decl. Ex. 23 (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 3; *with id.* Ex. 14 (NFXCOL0000215) at 216; *id.* Ex. 15 (NFXCOL0000242); *id.* Ex. 16 (NFXCOL0000265); *id.* Ex. 17 (NFXCOL0000282) at 287; *id.* Ex. 18 (NFXCOL0000294) at 296; *id.* Ex. 19 (NFXCOL0000335) at 339; *id.* Ex. 20 (NFXCOL0002099).

Dated:  September 16, 2022                    Respectfully submitted,

                                             *s/ Leita Walker*
                                             Leita Walker
                                             Isabella Salomão Nascimento
                                             Ballard Spahr LLP
                                             2000 IDS Center, 80 South 8th Street
                                             Minneapolis, MN 55402-2119
                                             T: (612) 371-6222
                                             F: (612) 371-3207
                                             walkerl@ballardspahr.com
                                             salamaonascimentoi@ballardspahr.com

Matthew E. Kelley
Emmy Parsons
Ballard Spahr LLP
1909 K Street, NW, Suite 1200
Washington, D.C. 20006-1157
T: (202) 508-1112
F: (202) 661-2299
kelleym@ballardspahr.com
parsonse@ballardspahr.com

James A. Friedman
Godfrey & Kahn, S.C.
One East Main Street
Suite 500
Madison, WI 53703-3300
T: (608) 284-2617
F. (608) 257-0609
jfriedman@gklaw.com

*Counsel for Netflix, Inc.*