IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| ANDREW L. COLBORN,<br><br>                Plaintiff,<br><br>vs.<br><br>NETFLIX, INC.; CHROME MEDIA LLC, F/K/A SYNTHESIS FILMS, LLC; LAURA RICCIARDI; AND MOIRA DEMOS,<br><br>                Defendants. | Civil No.: 19-CV-484-BHL |

## DECLARATION OF ADAM DEL DEO

I, Adam Del Deo, under penalty of perjury and subject to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of 18, and have personal knowledge of the facts set forth herein. If called to testify about these matters, I could and would do so competently.

2. I am currently the Vice President, Original Documentary Series for U.S., Canada, and U.K. at Netflix, Inc.

3. After I joined Netflix as a Director of Content for the Original Documentary team, in the summer of 2013, I began helping my colleague Lisa Nishimura with *Making a Murderer* ("MaM"), a documentary series created by filmmakers Laura Ricciardi and Moira Demos.

4. As an Executive Producer for MaM, I worked with the Netflix team to ensure the filmmakers adhered to budgets and deadlines. On the creative side, we helped the filmmakers by

reviewing their edited, assembled footage—known as "cuts"—and by proposing refinements through "notes." Notes tended to address topics such as pacing of the series, music, and graphics.

5. I am not an editor, and neither I nor anyone else on the Netflix team was involved in the filmmakers' editing of the series. We only saw the cuts the filmmakers assembled and provided to us, which we were reviewing from the perspective of a Netflix subscriber and from a greater distance than the filmmakers. We were not making detailed comparisons to prior cuts to understand the minutiae of how the filmmakers addressed our recommendations.

6. Until Plaintiff's legal counsel played a few seconds of raw footage for me at my deposition, I had never received or reviewed any raw footage or other source material for MaM. Nor did I receive or view trial or deposition transcripts or exhibits from the events underlying MaM.

7. In addition to never possessing or viewing any raw footage or other source material used by the filmmakers in creating MaM:

   a. I never attended a single legal proceeding involving Steven Avery.

   b. I have never been to Manitowoc, Wisconsin.

   c. And I have never spoken to anyone featured in MaM.

8. Beginning the first time I met Laura and Moira, I was struck by their deep knowledge of the case. As I got to know them better, I developed the utmost confidence in the filmmakers to create an accurate and compelling documentary series. They never gave us reason to doubt them or their work. Ultimately, I relied upon the filmmakers to get the facts right. I did not personally check the facts or vet the series for inaccuracies.

2

Case 1:19-cv-00484-BHL    Filed 09/16/22    Page 2 of 4    Document 272

9. If I had been confronted with a cut or other information from the filmmakers or anyone else that caused me to question the accuracy of MaM, I would have raised my questions or concerns with Laura and Moira. I never had any such concerns.

10. I understand that Plaintiff alleges that MaM somehow endorses or adopts Avery's theory that Plaintiff planted evidence to frame him for Teresa Halbach's murder. I disagree with this allegation. In any event, I did not intend for viewers to interpret MaM as somehow asserting that Colborn was *in fact* guilty of planting evidence. While I knew viewers would come to their own conclusions about Avery's and Colborn's respective culpabilities, it didn't occur to me that they would view either *MaM or Netflix* as arriving at a definitive conclusion.

11. I understand that Plaintiff has offered many of the notes my team provided to the filmmakers to support his belief that Netflix was biased against him and treated him unfairly. I have recently reviewed the notes that Plaintiff relies upon, and I disagree with his interpretation of those notes. I can say unequivocally that we at Netflix have never asked a documentary filmmaker to fabricate footage, make an edit, or omit footage in order to mislead or misinform the viewers, or give an inaccurate impression of real events. MaM is no exception. It would be a mistake to interpret any of our notes to suggest to the contrary.

12. I understand that Plaintiff has pointed to comments we made that are not unusual with regard to pacing and episode structure. For example, he has pointed to notes looking to end episodes with a moment of suspense, or "cliffhanger." We often suggest that episodes end on a "cliffhanger" in order to keep viewers engaged so that they watch the next episode. MaM was no exception. We wanted viewers to watch all ten episodes of the series to get the full story MaM was intended to capture, including the fact that Avery was ultimately convicted and his post-trial motions were unsuccessful.

13. I provide notes on pacing, graphics, music choice, and building of climactic moments in all the documentaries I work on. Documentaries—especially multi-hour, multi-episode documentaries such as MaM—ask a lot of viewers in terms of time and attention. We wanted people to watch MaM, and we knew the filmmakers would have to streamline Avery's story, distilling it to its most salient points, if viewers were going to stay engaged. We also wanted viewers to feel emotionally connected to MaM's subjects and see them as multi-dimensional people—not just Avery, but all its subjects. MaM uses standard filmmaking techniques to help viewers arrive at and process its most climactic moments. But no one at Netflix ever suggested here (or would suggest) that filmmakers sacrifice accuracy in order to speed up the pace of a scene or to make a scene more impactful.

14. Finally, we often provide notes that filmmakers should frequently identify subjects in documentaries, where the film or series includes many different players. This is to allow viewers to easily track who all of the subjects are, and it is a standard practice. Again, MaM was no exception.

15. I also understand that Plaintiff has complained that MaM truncated his testimony from Avery's murder trial and even accuses MaM of somehow altering his physical appearance. I had never compared what was included in MaM to what was omitted until my deposition in this case. But even if I had been aware of the edits pointed out to me at my deposition prior to MaM's release (I was not), they would not have caused me any concern.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2022

Adam Del Deo

4

Case 1:19-cv-00484-BHL    Filed 09/16/22    Page 4 of 4    Document 272