IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| ANDREW L. COLBORN,<br><br>Plaintiff,<br><br>vs.<br><br>NETFLIX, INC.; CHROME MEDIA LLC,<br>F/K/A SYNTHESIS FILMS, LLC;<br>LAURA RICCIARDI; AND MOIRA<br>DEMOS,<br><br>Defendants. | Civil No.: 19-CV-484-BHL |

## DECLARATION OF LISA NISHIMURA

I, Lisa Nishimura, under penalty of perjury and subject to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of 18, and have personal knowledge of the facts set forth herein. If called to testify about these matters, I could and would do so competently.

2. I am currently the Vice President, Independent and Documentary Film at Netflix, Inc.

3. I licensed for Netflix the documentary series at issue in this case, *Making a Murderer* ("MaM"), created by filmmakers Laura Ricciardi and Moira Demos.

4. From the moment I met Laura and Moira, they impressed me. They had conducted exhaustive research into Steven Avery's story and had full command of the facts. They struck me as fastidious and meticulous and devoted to telling Avery's compelling story

with accuracy and respect for all involved. As I worked with the filmmakers to bring MaM to fruition, my initial impression of them was confirmed. I trusted Laura and Moira. They never gave those of us at Netflix reason to doubt them or their work, and we relied on them to get the facts right.

5. As an Executive Producer for MaM, it was my responsibility to ensure adherence to budgets and deadlines and otherwise support the filmmakers. On the creative side, my team and I helped the filmmakers refine their edited, assembled footage (known as "cuts"). We reviewed the cuts and provided our "notes" to the filmmakers, offering suggestions on things like pacing, music, and graphics. We assumed that, if the filmmakers made a change proposed in a note, then they believed they could do so without compromising the accuracy of the series.

6. I understand the complaint in this action alleges that "Netflix's processes in developing and vetting shows, including documentaries, from production through post-production involves a high degree of involvement from numerous sections of the Netflix workforce." I'm not aware that anyone at Netflix ever "vetted" MaM for accuracy. Certainly, I never asked any member of my team or anyone in Netflix's legal department to vet the series. Again, we relied on the filmmakers to get the facts right and they hired their own lawyer to vet the series.

7. I am not a film editor and no one at Netflix edited footage for MaM. The filmmakers handled that. We reviewed assembled cuts of scenes and episodes for look and feel and overall effect. We were not doing side-by-side comparisons of first cuts to later cuts to assess exactly what the filmmakers had added or deleted.

8. Our notes on the pacing of the series were intended to help the filmmakers engage the viewer. We never suggested or intended to suggest that the filmmakers should sacrifice

2

Case 1:19-cv-00484-BHL    Filed 09/16/22    Page 2 of 6    Document 275

accuracy in favor of speed. If I had thought an edit for pacing had compromised accuracy in any way, I would have raised that concern with Laura and Moira. I never had such concerns.

9. I never reviewed or possessed any of the raw footage shot or obtained by the filmmakers until Plaintiff's legal counsel played a few seconds of what they said was the filmmakers' raw footage for me at my deposition. I never received or reviewed any of the courtroom footage shot or obtained by the filmmakers, any of the videotaped depositions from Steven Avery's civil litigation, or any trial or deposition transcripts or exhibits.

10. In addition to never possessing or viewing any raw footage or other source material used by the filmmakers in creating MaM:

   a. Neither I nor anyone else on my team ever attended a single legal proceeding involving Steven Avery.

   b. Neither I nor anyone else on my team has ever been to Manitowoc, Wisconsin.

   c. Neither I nor anyone else on my team has ever spoken to anyone featured in MaM.

11. I understand that Plaintiff has complained about how certain edits were made to the content of his testimony, including that various excerpts were omitted. I was not aware of the exact nature of his complaint until my deposition. After reviewing the edits presented to me in my deposition about, for example, a call Plaintiff made to dispatch, I can say that I would not have had questions or concerns about the edits had I known about them at the time, which I did not. I do not believe they materially changed the content of the testimony. If ever I had been confronted with a cut or other information from the filmmakers (or anyone else) that caused me to question the accuracy of their work, I would have raised questions. This never happened.

12. I understand that Plaintiff has offered certain notes to support his belief that Netflix was biased and treated him unfairly. I have recently reviewed the notes, and I disagree with Plaintiff's interpretation and characterization of them. I can say unequivocally that we at Netflix have never asked a documentary filmmaker to fabricate footage, make an edit, or omit footage in order to mislead or misinform viewers, or give an inaccurate impression of real events. It would be a mistake to interpret any of our notes to suggest anything to the contrary.

13. Netflix's notes on MaM offer general feedback to the filmmakers about how a viewer might react to the series. For example, we encouraged the filmmakers to shorten various scenes and eliminate portions that felt duplicative. This is common advice, as often documentary filmmakers are focusing and distilling massive amounts of source material into something viewers will watch and can digest and learn from. The challenge was especially acute for MaM, despite its nearly 10 hours of run time. Avery's story is sprawling and complicated, spanning multiple trials and decades. A lot of information had to be omitted.

14. In the notes we recommended that the filmmakers "foreshadow" future plot points in early episodes in order to keep viewers engaged, so they would watch coming episodes and benefit from receiving a complete account. This is not an unusual suggestion. We wanted viewers to watch all ten episodes of the series to get the full story MaM was intended to capture. MaM included not only the fact that Avery accused law enforcement of planting evidence to frame him for Halbach's murder, but also that the jury did not find this accusation credible, that it convicted him, and that his post-trial motions were unsuccessful.

15. It also is not unusual to ask filmmakers whether additional footage exists that might assist viewers in understanding what is happening in the story. But we would never make suggestions like this in an effort to have a filmmaker fabricate footage. Rather, any such notes

4

asking whether footage of a particular event exists were intended to bring clarity to the story MaM documents, for the viewer's benefit, not to somehow invent a new storyline that was unsupported by the facts.

16. The team also provided notes on music choice and the use of graphics, because both are important tools in documentary filmmaking. Filmmakers sometimes add graphics to documentaries to make it easier for viewers to follow what is happening, especially in multi-hour, multi-episode documentaries like MaM, which ask a lot of viewers in terms of time and attention. MaM documents Avery's life over decades and includes a large number of players, including several law enforcement agencies and numerous legal teams. It was important to provide visual cues so the audience could follow the story—including the allegations Avery's defense team raised at trial against Plaintiff.

17. As for music selection, we were not suggesting the use of music to change the meaning or content of the material depicted, nor do I think that is even possible. Music—or even the absence thereof—is a way to keep the audience's attention, emotionally engaged, and to help move the viewer through the story.

18. Part of Steven Avery's story is that he was prosecuted for murder and (unsuccessfully) defended himself by accusing law enforcement, including the Plaintiff, of planting evidence to frame him. MaM necessarily included this storyline. The documentary is told from Avery's perspective. Obviously the jury disagreed and convicted Avery and MaM showed that. But neither I nor anyone on my team intended for MaM itself to convey that

5

Case 1:19-cv-00484-BHL    Filed 09/16/22    Page 5 of 6    Document 275

Colborn *in fact* planted evidence. I did not and still do not believe that viewers would understand either the *series or Netflix* to be reaching a conclusion about Colborn's culpability. I do not believe that is a reasonable interpretation of the documentary.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 14, 2022

Lisa Nishimura