# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
--------------------------------------------------------

ANDREW COLBORN,

                    COPY

          Plaintiff,

-vs-                         CIVIL ACTION NO. 19-CV-0484-BHL

NETFLIX, INC., ET AL.,              VOLUME I

          Defendants.
--------------------------------------------------------

VIDEOTAPED DEPOSITION OF

ANDREW L. COLBORN

--------------------------------------------------------


DATE:              July 21, 2022

TIME:              9:23 a.m. - 5:22 p.m.

LOCATION:          Godfrey & Kahn, S.C.
                   833 East Michigan Street
                   Suite 1800
                   Milwaukee, Wisconsin  53202











REPORTED BY:
Paula Huettenrauch, RMR, CRR
365Reporting, LLC

VIDEOGRAPHER:
Jon Hansen, CLVS
Video Concepts
608.408.7411

1

1    Times Reporter, which is the newspaper in Manitowoc

2    County, Wisconsin, correct?

3         A    Yes, it is.

4         Q    And the date in the upper left-hand corner

5    there is January 31st, 2007.  Do you see that?

6         A    Sorry.  No, I don't.  Where is that?

7         Q    (Indicating.)

8         A    Oh, yes.

9         Q    Do you read the Herald Times Reporter?

10        A    I don't have a subscription.  I occasionally

11   look at it online.

12        Q    Do you agree what you were reading the

13   Herald Times Reporter back in 2007?

14        A    Yes, I'm sure there were days in 2007 that

15   I -- that I read the paper, yes.

16        Q    Do you have any specific recollection of

17   reading this article?

18        A    I do not.

19        Q    I'll read the headline of the top article to

20   you.  "Defense allowed to point finger at deputies."

21   Do you have any quibble with the accuracy of that

22   headline?

23             MR. BURNETT:  Objection, foundation.

24        A    I have an objection with everything the

25   media --

31

1          Q      Mr. Colborn, you don't get to object today.

2     You only get to answer questions.  Your attorney gets

3     to object.

4              My question is do you dispute the accuracy

5     of that headline?  I know you -- I know you dispute

6     that you planted evidence or the defense's theory, if

7     we can call it that, but do you dispute the accuracy

8     of the headline that the, quote, defense was allowed

9     to point finger at deputies?  Do you dispute that?

10         A      I'm sorry, Mrs. Walker.  I thought your

11    question was do I object to the headline.

12         Q      No.  Do you dispute its accuracy that this

13    is what the defense was allowed to do?

14              MR. BURNETT:  Objection, foundation.

15         A      No, I don't dispute the headline.

16         Q      And then there's a subheadline, "Judge:

17    Attorneys allowed to prove Avery framed."  You don't

18    dispute the accuracy of that headline, do you?

19              MR. BURNETT:  Objection, foundation.

20         A      I'm not sure what you mean by "accuracy of

21    that headline."  That's certainly what's printed here

22    in front of me.  I don't recall the specific arg --

23    article, but I'm not going to dispute that that's

24    what's written and in front of me.

25         Q      I'm asking you a little bit more than that.

                                                                    32

1    I'm asking whether you dispute the accuracy of the

2    contents, the substance of what's being said here.

3              I can ask it differently.  Isn't it true

4    that the judge allowed the attorneys to prove that

5    Avery was framed?

6              MR. BURNETT:  Objection, foundation.

7              MS. WALKER:  Again, he attended portions

8    of the trial and was cross-examined on this very

9    topic.  I think he can answer the question.

10             MR. BURNETT:  I didn't tell him not to

11   answer the question.  I objected to the foundation.

12   I don't think you've established personal knowledge,

13   but go ahead.

14        A    Yes, it's my understanding that the judge

15   allowed that.

16        Q    So, Mr. Colborn, let me ask you just one

17   more time if you'll go back to the proposed

18   stipulations 7, 8, and 9.  Are you still going to

19   refuse to admit those?  And I'll let you read them if

20   you need to.

21        A    Yes, I'm not going to stipulate to those.

22        Q    All right.  Let's take a look at Exhibit 7,

23   which I'll hand you in just a moment.

24        A    Okay.

25             (Exhibit 7 marked for identification.)

                                                        33

1    Schuler, correct?

2        A    Correct.

3        Q    And the email that Brenda sent to you was an

4    email she sent to someone named Mr. Ferak.  Mr. Ferak

5    is referenced in the stipulations you did agree to.

6    He's a former journalist, correct?

7        A    I'm not 100 percent positive, but I believe

8    he still is a journalist.  I believe he's the editor

9    of the Patch newspaper in Joliet, Illinois.

10       Q    And she's writing to Mr. Ferak in your

11   defense, and I will point you down in her email maybe

12   eight lines where she says, "There is nothing new in

13   Making a Murderer, other than an incredibly slanted

14   and selectively edited (read splicing of actual

15   testimony days apart into one) version based of the

16   Defense's view."  Do you see where I'm reading?

17       A    Yes.  Yes.

18       Q    And I read that correctly, correct?

19       A    Yes, you did.

20       Q    And you forwarded this to your wife at the

21   time, correct?

22       A    Yes.

23       Q    And that's because you agreed with

24   Ms. Schuler, correct?

25       A    As it pertained to Mr. Ferak, yes, I did.

Case 1:19-cv-00484-BHL  Filed 08/16/22  Page 6 of 90  Document 279-2
920.365.2341  |  365Reporting, LLC  |  www.365reporting.net

1        Q     Right.  And you agreed there was nothing new

2     in Making a Murderer, and it was a slanted version

3     based on the defense's view, correct?

4        A     I didn't include any comments on that.

5        Q     That wasn't my --

6        A     I forwarded this to my ex-wife.

7        Q     That's not -- that's not my question.  You

8     forwarded it because you agreed with what Ms. Schuler

9     wrote here, correct?

10        A     I forwarded it because my ex-wife was

11     concerned about all the negative press we were

12     receiving from Mr. Ferak, who was a local reporter in

13     Wisconsin at the time.

14        Q     Okay.  You can just say no, and I can ask a

15     new question.  Well, I'll just ask -- I'll ask it

16     this way.  Do you disagree with Ms. Schuler and what

17     she said here?

18        A     I don't disagree with her opinion, no.

19        Q     Let's take a look at that proposed

20     stipulation number 15, if you could go back to

21     Exhibit 1.

22        A     Okay.

23        Q     I'll read it out loud to you.  We asked you

24     to agree that "Even prior to its release, Mr. Colborn

25     understood that Making a Murderer would not portray

45

1          MR. BURNETT:  I'll withdraw the

2     objection.  You can answer.

3          A     I disagree with that statement.

4          Q     On what basis?  Let me -- let me ask you.

5     You've not watched the whole thing?

6          A     Correct.

7          Q     In fact, you haven't even watched the last

8     three episodes at all according to your stipulated

9     facts, correct?

10         A     That is correct, yes.

11         Q     So you have no idea in those last three

12    episodes whether it tells both sides of the stories,

13    raises questions, or encourages viewers to reach

14    their own conclusion?  You just don't know, correct?

15         A     I don't know any of the content of the last

16    three episodes, that's correct.

17         Q     Can you point me to where in Making a

18    Murderer it contends that you planted evidence to

19    frame Avery for Teresa Halbach's murder?

20         A     I believe there's quite a few examples in

21    the Complaint that were -- so I'm not an attorney.

22         Q     I know.

23         A     I hired attorneys to do the research to find

24    that evidence.

25         Q     I'm just asking you -- yeah.  And your

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 8 of 90   Document 279-2
920.565.2341 | 365Reporting, LLC | www.365reporting.net

1      Steven Avery?

2          A    I'm sorry.  Can you repeat that?  I'm sorry.

3          Q    So I'll represent to you in the three

4      episodes you didn't watch --

5          A    Yes.

6          Q    -- the reading of the verdict is shown --

7          A    Okay.

8          Q    -- and Steven Avery is walked out of the

9      courtroom in handcuffs to jail.  That detracts from

10     any strong and definite statement that you planted

11     evidence to frame him, correct?

12         A    I don't know.  Without watching it, I don't

13     know.  I don't know how -- in what context it was

14     shown, so I don't know.

15         Q    Do you have any intention of watching Making

16     a Murderer in its entirety?

17         A    No.

18         Q    Okay.

19         A    I don't.

20         Q    Despite litigating a federal lawsuit that

21     may go to trial, you don't plan to watch the

22     documentary that you've sued over?

23         A    It's ruined my life.  I'm not going to pay

24     to watch it.

25         Q    Well, that's not my question, and I'll move

67

1    such a thing!  But a majority assumed he was

2    guilty--why would the police have arrested him if he

3    wasn't involved?"

4              I think I skipped over a sentence about

5    Nancy Grace, but otherwise, did I read that

6    correctly?

7         A    Yes.

8         Q    And do you agree with this assessment of the

9    local reaction to the murder of Teresa Halbach and

10   the arrest of Steven Avery?

11        A    I'll agree that there were some in the

12   community that thought he was innocent; some thought

13   he had done this again.  I don't know if the majority

14   was one way or the other.  That's Mike's opinion.

15             (Exhibit 15-B marked for identification.)

16        Q    Understood.  So I'll now hand you

17   Exhibit 15-B, which is also from The Innocent Killer.

18   This is from a few pages later in the book, page 215.

19   And in the third paragraph down, Mr. Griesbach wrote,

20   "The Avery case was naturally the chief topic of

21   discussion at Warren's from the date of Teresa

22   Halbach's appearance" [sic] "until the end of the

23   trial.  From Mike the window washer to the county

24   executive, everyone at Warren's had an opinion about

25   the case, and given what I do for a living, they

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 10 of 90   Document 279-2
920.585.2344  |  365Reporting, LLC  |  www.365reporting.net

1    quote.  You would agree with Ms. Heinzen's

2    assessment, correct?

3        A    Mrs., I believe, and, you know, that might

4    be her interpretation of it, but yes, certainly Avery

5    had his supporters and not quite or anywhere near as

6    vocally.  Law enforcement probably had a few

7    supporters as well.

8        Q    So I want to turn again to Exhibit 1 and

9    those stipulations that we proposed.

10       A    Okay.

11       Q    And specifically numbers 11, 13, and 14.

12   I'll read them out loud.  Number 11 says, "Mr.

13   Colborn felt wronged by the frame-up theory put forth

14   by the defense at Mr. Avery's trial."

15           Number 13 says, "Mr. Colborn felt the

16   frame-up theory put forth by the defense at

17   Mr. Avery's trial harmed his reputation."

18           And number --

19       A    Hang on one second, okay?  So you're reading

20   11, 12, and 13, because mine says 13 blank --

21       Q    Yes.

22       A    -- and 11.

23       Q    I know.  If you could flip to the ones we

24   proposed --

25       A    Okay.

                                                              83

1          A     Yes.

2          Q     She told us that you felt like the system

3    turned on you by letting the evidence planting theory

4    be introduced at trial.  Do you agree with that?

5          A     Again, I don't ever recall telling her that

6    the system turned on me.  I probably told her I

7    didn't feel that the officers involved in the

8    investigation were getting the backing that they

9    probably needed from the county.

10         Q     She --

11         A     I'm sorry.  Go ahead.

12         Q     She told us that you were afraid you were

13   going to be sent to prison.  Do you agree with that?

14         A     No.

15         Q     She said that you were not yourself during

16   the trial.  Do you agree with that?

17         A     Yes.

18         Q     She said that you were quiet and could only

19   focus on the trial.  Do you agree with that?

20         A     Yes.

21         Q     She said you would pace in the house.  Do

22   you agree with that?

23         A     Yes.

24         Q     She said you were withdrawn.  Do you agree

25   with that?

113

1      A     Well, I've been withdrawn all my life, so

2      certainly, yes, I agree with that.

3      Q     She said you started drinking more during

4      the trial.  Do you agree with that?

5      A     Well, I'm not going to sit here and say I

6      crawled into the bottle because I didn't, but

7      certainly, yes, I probably used that as some sort of

8      way to de-stress after work, yes.

9      Q     She said you stopped going out in public.

10     Do you agree with that?

11     A     Yes.

12     Q     She said you started avoiding people.  Do

13     you agree with that?

14     A     That would be more after the release of

15     Making a Murderer, not during the trial.

16     Q     She said that you started feeling like you

17     couldn't trust anyone during the trial.  Do you agree

18     with that?

19     A     No.

20     Q     So I'll ask you to look one more time at

21     those proposed stipulations, number 11 --

22     A     Okay.

23     Q     -- 13, and 14.  And my --

24     A     11, 13, and 14?

25     Q     And my question is will you agree to them?

114

1       Q     Is it how you felt at the time of the trial?

2       A     There were times that I was angry, yes.

3       Q     And it was because your integrity was being

4    questioned?

5       A     It was -- among other things, yes, yes.

6       Q     And you felt like no one was coming to your

7    defense?

8       A     Well, I'm speaking specifically about the

9    media, yes.  No, I didn't feel any member or news

10   organization was coming to our defense, no.

11      Q     And you felt like your reputation was taking

12   a hit, correct?

13      A     Certainly.

14      Q     So now go to page 23.

15      A     Of the same document?

16      Q     Of the same exhibit.

17      A     Okay.  All right.  I have it.

18      Q     That second full paragraph, minute marker

19   1:14:15.  Do you see that?

20      A     The one that starts, "So Mr. Ferrick"?

21      Q     Yes.

22      A     Yes.

23      Q     It says, "So Mr. Ferrick on one occasion had

24   written an article and it prompted a lot of death

25   threats."  Did I read that correctly?

1        A    Yes.

2        Q    **Do you remember making this statement to the**

3    **filmmakers of Convicting a Murderer?**

4        A    You know, I don't -- I told you earlier I

5    don't specifically recall, but you told me this is an

6    exact excerpt of Brenda Schuler's -- or whoever

7    interviewed me, that this is the excerpt of what I

8    said.

9        Q    **Right.  No reason to dispute that you said**

10   **it, correct?**

11       A    I'm not disputing I said that.

12       Q    **And that's a true statement in your mind,**

13   **correct --**

14       A    Yes.

15       Q    **-- that he wrote an article and it prompted**

16   **a lot of death threats?**

17       A    Yes.

18       Q    **Okay.  Will you go back to Exhibit 1 and**

19   **look at our proposed stipulation number 25?**

20       A    Yeah.

21       Q    **You have to go back here.**

22       A    No, I have to read, though, this whole thing

23   because that may -- that article may have been about

24   another case that had nothing to do with Steven

25   Avery.  Mr. Ferak was also going after our department

1          Q      Correct.

2          A      Yes.   The sheriff's department instructed me

3     to do it.

4          **Q      And did you know that that statement was**

5     **recorded and included in Episode 8 of Making a**

6     **Murderer?**

7          A      Well, having not watched Episode 8, no, I

8     don't know that statement was made.

9          Q      And I'll --

10         A      So I wouldn't know what context or anything.

11         **Q      I'll read the statement to you.   You told**

12    **the press, I hope and pray that this verdict helps**

13    **put to rest any suspicions or loss of confidence that**

14    **this community may have felt towards our department**

15    **because I assure everyone that this agency has some**

16    **of the finest law enforcement officers in the country**

17    **in its employ.**

18         **I know you don't remember it word for word,**

19    **but does that sound like what you said?**

20         A      I certainly would have stood up for our

21    department, yes, and I certainly -- and still pray

22    for the Halbach family, so that sounds consistent.

23         **Q      Does it make you feel better to know that**

24    **that was included in Episode 8?**

25                    MR. BURNETT:   Objection, form.

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 16 of 90   Document 279-2
920.585.2341   |   365Reporting, LLC   |   www.365reporting.net

1      A    I would have to watch Episode 8 and see in

2   which context -- how it was used.  Like, was it used

3   to ridicule me?  So then no, I wouldn't feel better

4   about how it was used.

5      **Q    But you don't plan to watch Episode 8,**

6   **correct?**

7      A    As I sit here right now today and talk with

8   you, no, I don't plan on watching Episode 8, but

9   certainly there's no reason I can't change my mind at

10  some point.

11     **Q    Okay.**

12          MS. WALKER:  Let's go to Exhibit 37.

13          (Exhibit 37-A marked for identification.)

14     A    Do I have that one or no?

15     **Q    I'm going to give it to you.**

16     A    Oh, okay.

17          MS. WALKER:  Sure.  So Exhibit 37

18  collectively is Mr. Colborn's responses to

19  interrogatories in this case.  I have marked the

20  different responses and supplemental responses and

21  signature pages as Exhibits 37-A, B, C, and D.  It's

22  a little confusing given the way things kind of came

23  in.

24     **Q    But let's start with Exhibit 37-A, which,**

25  **Mr. Colborn, I'll represent to you are the first**

1    Lauren, L-a-u-r-e-n, last name is McCracken,

2    M-c-C-r-a-c-k-e-n.

3         Q     Okay.

4         A     Next oldest child's first name is Brandy,

5    B-r-a-n-d-y, and her last name is Rima, R-i-m-a.

6    Next oldest child's first name is Jeffrey, common

7    spelling, also last name McCracken.

8         Q     Anyone else?

9         A     Yes.  Next child's -- I'm going from oldest

10   to youngest.  Amanda, also common spelling, her last

11   name is Colborn.  And the youngest child's first name

12   is Jeremiah, J-e-r-e-m-i-a-h, also last name Colborn.

13        Q     And they're all adults, correct?

14        A     Yes.  Jeremiah would be the youngest.  He's

15   30.

16        Q     You also did not list a woman named Jodi

17   Maurer.  I understand you're in a relationship with

18   her, correct?

19        A     Yes.

20        Q     And is she a witness to your alleged

21   emotional distress in this case?

22        A     No, not really, because I don't -- we don't

23   discuss it.

24        Q     Okay.  Do you live with her?

25        A     Yes.

131

1          Q    Okay.  And she's not been in a position to

2     observe any physical manifestations of your distress?

3          A    Not really, no.

4          Q    Do you have any physical manifestations of

5     distress?

6          A    Such as?

7          Q    Loss of weight, physical manifestations of

8     anxiety, inability to sleep, depression.

9          A    Not depression.  I do have, you know,

10    inability to sleep.  I am constantly in a state of

11    hypervigilance.  I am very distrustful of people now.

12    I am extremely introverted, much more so than I was

13    before.

14         Q    Do you think Ms. Maurer has been able to

15    observe these --

16         A    No.

17         Q    Not in a position to observe it?

18         A    No.

19         Q    It's just not observable; is that what

20    you're telling me?

21         A    Right.  She's never said, like, "Why do you

22    do this" or "Why do you do that?"  She just assumes

23    that's the way I am.

24         Q    Okay.  And you haven't had any conversations

25    with her about this case?

                                                          132

1          A     I have not.

2          **Q     How long have you lived with her?**

3          A     We started sharing a residence April of

4     2021.

5          **Q     So in more than a year, this case has never**

6     **come up?**

7          A     No.  I mean, I've -- obviously I told her

8     today I'm going to -- you know, I've told her when

9     court dates are, and she's asked me once if the

10    lawsuit was still ongoing because there was such a

11    long gap between anything happening, and I said it

12    was.  She expressed concern about being drug into it,

13    things like that.

14         **Q     So did you not list her and your children**

15    **because you didn't want to drag them into it or is it**

16    **because she really doesn't know anything about the**

17    **lawsuit or the underlying facts?**

18         A     She doesn't -- yeah, she doesn't know

19    anything about it because I won't discuss it, and she

20    doesn't pry about it.  I think she senses it's one of

21    those topics that should be avoided.

22         **Q     And your alleged emotional distress wouldn't**

23    **be observable by the person living in the same house**

24    **as you?**

25         A     I don't believe so, no.

                                                              133

 1         A    Like have I taken anything today?

 2         **Q    Yeah.  Do you have --**

 3         A    I have acid reflux, so I took an antacid.

 4         **Q    Uh-huh.**

 5         A    I have asthma, so I have to take an inhaler

 6    every morning.  I'm on a medication for anxiety.  I

 7    can't give you the name of it.  Not because I'm

 8    trying to withhold it, because I don't know, but you

 9    have my records.  I believe I took one of those this

10    morning.

11         **Q    Okay.**

12              MS. WALKER:  It's nearly 1:00.  I think

13    this is a good place to break and have lunch and come

14    back.

15              MR. BURNETT:  Sure.  What time do you

16    want to resume?

17              MS. WALKER:  Let's go off the record.

18              MR. BURNETT:  Let's go off.

19              THE VIDEOGRAPHER:  Going off the record

20    at 12:54.

21              (Lunch recess held.)

22              THE VIDEOGRAPHER:  We're back on the

23    record at 2:13.

24         **Q    (By Ms. Walker:)  All right, Mr. Colborn.  I**

25    **have some wrap-up questions from items we were**

Case 1:19-cv-00484-BHL  Filed 09/16/22   Page 21 of 90   Document 279-2
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    discussing before the lunch break, and the first one

2    is would you agree with me that your integrity had

3    been questioned and your reputation harmed at the

4    time of trial?

5        A    Yes.

6        Q    And you can't as you sit here today quantify

7    the reputational harm arising from trial and the

8    contemporaneous media coverage that came along with

9    the trial, can you?

10                   MR. BURNETT:  Objection, form.

11       A    I can say after the verdict, my reputation

12   and everything went back to how it was.

13       Q    How do you know that?

14       A    Because after his conviction, the negative

15   press stopped, people began being more favorable

16   about the events of the trial, the unfolding of the

17   trial, the conviction.  It was just a general

18   atmosphere that was more supportive.

19       Q    So the publicity disappeared, but the

20   articles that were written remained out there,

21   correct?

22       A    That were written during the trial?

23       Q    Yes.

24       A    I don't know when they archive those, but I

25   don't recall a blitzkrieg of negative press like

Case 1:19-cv-00484-BHL   Filed 09/16/23   Page 22 of 90   Document 279-2
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    on.

2         Q    Well, that's not my question.  You agreed

3    with Attorney Strang that he ruined your credibility?

4         A    Do you mean I agreed with Brenda?

5         Q    Did you agree with Brenda?

6         A    I don't see where I agreed, but I'm on the

7    same page with her, yes.

8         Q    Yeah.  As you sit here today, do you agree

9    that Attorney Strang ruined your credibility and your

10   integrity?

11        A    I agree that Attorney Strang played a part

12   in it after the release of Making a Murderer, yes.

13        Q    Are you able to distinguish the reputational

14   harm Attorney Strang caused you versus the

15   reputational harm Jerome Buting called you -- caused

16   you versus that that Making a Murderer caused you

17   versus that that John Ferak caused you or that

18   Kathleen Zellner caused you?

19        A    No, I can't because Making a Murderer gave

20   them all their material.

21        Q    Well, Making a Murderer took material from

22   the trial, correct?

23        A    Kathleen Zellner wasn't part of that trial.

24        Q    Making a Murderer took their material from

25   the trial, correct?

141

1    years ago.

2           Q    So you're changing your story?

3                MR. BURNETT:  Objection, form.

4           A    I'm saying I based a lot of this information

5    off social media, threats that were being made to me,

6    and I didn't have the trial transcript in front of

7    me.

8           Q    Any other reason you're departing from that

9    statement?

10          A    No, no other reason.

11          Q    Two lines down from there you say, "The

12   defense continues, in part thru Netflix, to maintain

13   and keep alive these lies to this day.  Just last

14   week Strang was on WTMJ Radio saying these things I

15   just mentioned.  The trial was over 10 years ago, how

16   much longer can the defense attorneys continue this

17   crusade against my agency and me personally??"  Did I

18   read that correctly?

19          A    Yes.

20          Q    And if I'm reading this, you believe the

21   defense team lied about you during the trial,

22   correct?

23          A    Yes.

24          Q    Okay.  That's when their crusade against you

25   began, correct?

163

1      A      Yes, I do.

2      Q      But unless Mr. Griesbach was in the room

3   with you or any of us sitting here today were in the

4   room with you, none of us can know with 100 percent

5   certainty, correct?

6      A      I would think that I drove that point home

7   in the trial, and based on the subsequent conviction,

8   I believe the jury was convinced of it.

9      Q      We would have to trust you, correct,

10  Mr. Colborn?

11     A      Yes, you would have to trust that I was

12  telling the truth under oath.

13     Q      And the jury found for the prosecution and

14  convicted Mr. Avery, correct?

15     A      Yes, they did.

16     Q      And the jury's findings were included in

17  Making a Murderer, correct?

18              MR. BURNETT:  Objection, form.

19     Q      Do you know?

20     A      I have not watched a clip of or any of

21  Making a Murderer when the jury verdict is read or --

22  so I can't answer you positively.  I don't know what

23  was included.  I don't know what episode that was in.

24     Q      You have no reason to dispute that it was

25  included, correct?

174

1     I'm not alleging that.

2          Q    Okay.  And you have no reason to believe

3     that anyone from Netflix attended any portion of any

4     proceeding against Mr. Avery, correct?

5          A    I don't know that.

6          Q    I'm asking you only based on your personal

7     knowledge, you don't have any reason --

8          A    No.

9          Q    -- to believe that?

10         A    No, I do not.

11         Q    So I'll take you back to Exhibit 1 that you

12    signed this morning, and if you could flip to

13    Exhibit A, which is the stipulations we proposed.

14         A    One sec.  I've got to find that.  Okay.

15         Q    And flip to Exhibit A, which is the initial

16    stipulations we proposed.

17         A    Okay.

18         Q    And I want to point you to the first

19    seven -- sorry, the first six.  You declined to admit

20    these, and my question for you is as you sit here

21    today in your personal capacity, knowing that you

22    rely on your lawyers to process all the evidence, but

23    personally, let me ask you about number 1.  Are you

24    personally aware of any evidence that any Netflix

25    employee attended any portion of any proceeding

1    involving Steven Avery?

2         A    I personally do not know, correct.

3         Q    **Number 2, do you have any personal knowledge**

4    **or are you personally aware of any evidence that any**

5    **Netflix employee has ever been to Manitowoc County,**

6    **Wisconsin?**

7         A    During '16, '17 we had an abundance of

8    protests out in front of our courthouse with people

9    screaming how corrupt we were and how they should be

10   freed, and I thought Netflix was involved in that,

11   but I don't have any personal knowledge or evidence.

12   Like, no one ever brought someone to me and said,

13   "This person works for Netflix."

14        Q    **Are you personally aware of any evidence**

15   **that any Netflix employee ever spoke to anyone who**

16   **appears in Making a Murderer?**

17        A    I personally have no knowledge.  I don't

18   know if they did or they didn't.

19        Q    **Are you personally aware of any evidence**

20   **that any Netflix employee ever received or read any**

21   **transcript from any proceeding against Mr. Avery or**

22   **involving Mr. Avery?**

23        A    Number 4, I believe I did see documents that

24   did say that Netflix employees had a few transcripts

25   of the criminal trial of Mr. Avery.

183

1    Q    Do you remember anything about those

2    documents?

3    A    No, I don't.

4         MS. WALKER:  So we would just ask on the

5    record that to the extent those documents exist and

6    can be identified, that plaintiff produce them to us.

7    Q    Number 5 here, do you personally have any --

8    are you personally aware of any evidence that any

9    Netflix employee ever received or watched any raw

10   footage of any proceeding involving Mr. Avery?

11   A    I believe my attorneys do have evidence that

12   Netflix employees did view both civil and criminal --

13   or, yes, civil and criminal video of me testifying

14   both in deposition and in his criminal trial for the

15   murder of Teresa Halbach.

16   Q    Okay.  Do you understand that to be raw

17   footage or footage that was produced by the

18   filmmakers and then provided to Netflix or do you not

19   know?

20   A    I don't know.

21   Q    Number 6, are you personally aware of any

22   evidence that any Netflix employee ever received or

23   watched any other raw footage used by the filmmakers

24   in creating Making a Murderer?

25   A    I personally don't know what they used,

184

920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    so -- or watched, no.

2         Q    So going back to Exhibit 2, the Second

3    Amended Complaint, and referring you to paragraph 46.

4         A    Okay.

5         Q    Actually, it will be on the -- on page 16,

6    the last --

7         A    Okay.

8         Q    -- of the bullet points, and you say that

9    among the things omitted from Making a Murderer, in

10   the last bullet here, was that Avery had a history of

11   extreme violence and sexual aggression against women,

12   including beating, strangulation, death threats,

13   attempted abduction at gunpoint, and allegations of

14   rape.  Did I read that correctly?

15        A    Yes.

16        Q    All right.  So let's take each of those in

17   that bullet one at a time.  Do you know if there was

18   evidence presented at trial that Avery ever beat a

19   woman?

20        A    I don't -- I don't know because I wasn't

21   allowed to attend the trial other than the day I

22   testified, so I don't know.

23        Q    So if I told you that the judge excluded

24   that evidence, you would have no reason to dispute

25   me --

185

1      A    Correct.

2      Q    And so if Making a Murderer didn't include

3  that evidence, that's consistent with what happened

4  at trial as far as you know, correct?

5              MR. BURNETT:  Objection, form.

6      A    Could you repeat?  Sorry.

7      Q    Yeah.  If these things weren't included at

8  trial --

9      A    Uh-huh.

10     Q    -- and if Making a Murderer didn't include

11  them, then Making a Murderer was consistent with what

12  happened at trial, correct?

13             MR. BURNETT:  Objection, form.

14     A    I'm not going to agree that I --

15     Q    Okay.

16     A    -- believe that Making a Murderer was

17  consistent with what happened at trial.

18     Q    Well, you can -- I think we can agree that

19  if we want to know what evidence was excluded, we can

20  look at this Exhibit 57, correct?  That's the judge's

21  order?

22     A    Yes.

23     Q    Okay.  So we talked about the exclusion from

24  the trial of the Sandy Morris incident, and I

25  actually want to play a clip for you now from Making

                                                              188

1    a Murderer.  This will be from Episode 1, which we'll

2    mark in its entirety as Exhibit 58, and then the clip

3    we're about to play we'll mark as Exhibit 58-A.

4                    (Exhibits 58 and 58-A marked for

5    identification.)

6                    (Video playing.)

7         Q    Had you ever seen that clip from Making a

8    Murderer?

9         A    No.

10         Q    Okay.  So if you look back at Exhibit 57, I

11    can point you now directly to page 10, onto page 11,

12    where the Court excluded acts of recklessly

13    endangering the safety of Sandy Morris.  And while

14    you look for that, I'll just ask you, isn't it true,

15    Mr. Colborn, that even though the judge did not

16    permit the jury to hear that evidence, Making a

17    Murderer included it?

18                    MR. BURNETT:  Objection, form.

19         A    Yes.  A portion of his inter -- a portion of

20    his interview with Detective Conrad and a very small

21    portion of her testimony was included in the clip you

22    showed me, yes.

23         Q    And so in that sense at least, Making a

24    Murderer painted a less flattering picture of Steven

25    Avery than the jury was permitted to hear, correct?

Case 1:19-cv-00484-BHL  Filed 09/16/22  Page 31 of 90  Document 279-2
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1              MR. BURNETT:  Objection, form.

2         A    It would appear to me, based on the reaction

3    by people around the globe --

4         Q    Well, I'm going to move to strike, and I'd

5    just ask that you answer my question, that this is a

6    very unflattering thing to publicize about Steven

7    Avery, not even the jury got to hear it because it

8    was so prejudicial according to the judge, but the

9    filmmakers put it in the documentary, correct?

10             MR. BURNETT:  Objection, form.

11        A    Yes, it was in the clip you just showed me.

12        Q    You also complained in the Second Amended

13   Complaint that Making a Murderer portrayed an

14   incident involving animal abuse as an accident and at

15   worst a childhood prank.  Do you remember that

16   allegation?

17        A    Yes.

18        Q    Okay.  But you acknowledge that this story

19   about the animal abuse was omitted from Avery's

20   trial, correct?

21        A    I don't know if it came up in his trial or

22   not.

23        Q    Okay.  Let me point you to Exhibit 57 again

24   and specifically page 7.  There's a subhead, 1982 Act

25   of Criminal Cruelty Involving the Killing of a Cat.

                                                              190

1    Do you see that?

2                    MR. BURNETT:  What page are we on?

3                    THE WITNESS:  7.

4                    MS. WALKER:  Page 7.

5        Q    And if you read to the end of that Section 3

6    in the Court's order, the last sentence is that "The

7    offered evidence fails all three parts of the

8    Sullivan test and is not admissible."  Do you see

9    that?

10       A    What page is it where it mentions the

11   Sullivan test?

12       Q    On page 10 at the top.

13       A    Oh, 10.  Okay.  Are they talking about the

14   animal cruelty there, because it's shifted to

15   something else by then, but --

16       Q    So the animal cruelty section begins on

17   page 7 --

18       A    Uh-huh.

19       Q    -- and it goes through page 8, 9, and

20   concludes at the top of page 10.

21       A    All right.  I see the area you're talking

22   about.

23       Q    So that animal cruelty evidence was excluded

24   from trial, correct?

25       A    It looks like it.

1        Q    Did you know that Making a Murderer included

2    that story and showed it to viewers?

3                    MR. BURNETT:  Objection, form.

4        A    No, I didn't.

5        Q    Okay.  Let's play that clip.

6                    (Exhibit 58-B marked for identification.)

7                    (Video playing.)

8        Q    Had you ever seen that clip there?

9        A    I have not.

10        Q    So based on this clip and the one of Sandy

11    Morris, you would agree with me that viewers of

12    Making a Murderer got a more complete picture of

13    Mr. Avery's criminal history than the jurors did,

14    correct?

15                    MR. BURNETT:  Objection, form.

16        A    I would agree that a watered-down version of

17    his acts were portrayed in Making a Murderer while

18    they weren't allowed in court.

19        Q    So at least the viewers of the documentary

20    heard about him attacking a woman and burning a cat,

21    correct?

22        A    Yes.

23        Q    The jury didn't get to hear about that, did

24    they?

25        A    No.

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 34 of 90   Document 279-2
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1          A      Yes.

2          Q      Okay.  And you're not basing your conclusion

3    or your opinion on what Making a Murderer concludes

4    on anything other than the hateful calls you got from

5    a number of anonymous callers; is that correct?

6          A      Hundreds, if not thousands.

7          Q      Okay.

8          A      Yes, that is correct.

9          Q      Okay.  So you turned over 89 different

10   voicemails to us.  Does that sound about right?

11         A      Yes.

12         Q      Okay.

13         A      I don't know.

14         Q      Okay.  I'll represent to you we listened to

15   each one.  There were 89.

16         A      Okay.

17         Q      Are there thousands more you haven't turned

18   over?

19         A      No.  I've turned over everything that I had.

20         Q      Okay.

21         A      Some didn't go to a recording.

22         Q      Okay.  And I'm sorry, I didn't catch your

23   answer, so I'm going to have to ask it again.  Other

24   than those crank calls and hateful messages from

25   dozens of anonymous people, you're not basing your

1      A     Clearly Avery, his relatives and friends,

2     his attorneys, and then Dean Strang and Jerome

3     Buting, investigator aren't going to give anything

4     but biased answers.

5      Q     Okay.  Well, that sort of brings me to most

6     of what I wanted to talk about here, which is as I

7     look through all of the responses your counsel

8     drafted to our interrogatories, what they seem to be

9     pointing to is bias or maybe evidence that they think

10    demonstrates an agenda by Netflix.  They've pointed

11    to instances where Netflix was perhaps skeptical of

12    evidence that Avery presented at his trial.  You

13    pointed yourself to some of that, where someone at

14    Netflix thought that something Avery presented at

15    trial was sort of weak.  Do you remember pointing

16    that one out to me?

17     A     Yes.

18     Q     And they thought that of Avery's evidence,

19    correct?  In other words, it was Avery's evidence; it

20    wasn't something they made up out of whole cloth?

21     A     Yes.

22     Q     So I want to just talk about this notion of

23    documentary filmmaking and bias, but before we get

24    there, I want to ask, do you have any evidence that

25    Netflix instructed the producer defendants to make

1      Q      Okay.  And you don't think their

2  perspective, their pro law enforcement world view,

3  keeps them from making a fair and objective

4  documentary I take it?

5      A      No, I don't.

6      Q      You're very pro law enforcement?

7      A      Yes.

8      Q      Pro military?

9      A      Yes.

10      Q      Conservative?

11      A      Yes.

12      Q      And you have a bias in that you are

13  100 percent convinced that Avery is guilty, correct?

14              MR. BURNETT:  Objection, form.

15      A      I don't have a bias that way.  He was

16  convicted by a jury of his peers.

17      Q      Well, he was --

18      A      So I believe in that verdict, yes.

19      Q      Okay.  He was also convicted of rape,

20  correct?

21      A      Yes.

22      Q      And that jury verdict was flat-out wrong,

23  correct?

24      A      Correct.

25      Q      So juries can get it wrong, correct?

                                                              236

1                    CERTIFICATION PAGE

2

3      STATE OF WISCONSIN        )

4      MILWAUKEE COUNTY          )

5

6              I, PAULA M. HUETTENRAUCH, RMR, CRR,
       Notary Public in and for the State of Wisconsin, do
       hereby certify:

7

8              That prior to being examined, the
       deponent named in the foregoing deposition,
       ANDREW L. COLBORN, was by me duly sworn to testify

9      the truth, the whole truth, and nothing but the
       truth.

10

11             That said deposition was taken before
       me at the time, date, and place set forth; and I
       hereby certify the foregoing is a full, true, and

12     correct transcript of my shorthand notes so taken and
       thereafter reduced to computerized transcription

13     under my direction and supervision.

14             I further certify that I am neither
       counsel for nor related to any party to said action,

15     nor in any way interested in the outcome thereof; and
       that I have no contract with the parties, attorneys,

16     or persons with an interest in the action that
       affects or has a substantial tendency to affect

17     impartiality, or that requires me to provide any
       service not made available to all parties to the

18     action.

19

20     IN WITNESS WHEREOF, I have hereunto
       subscribed my name this 28th day of July, 2022.

21

22     _Paula Huettenrauch_

23     Paula M. Huettenrauch, RMR, CRR
       Notary Public - State of Wisconsin

24     My Commission Expires 8/18/2023

25

                                                        251

1                UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF WISCONSIN
2   --------------------------------------------------------

ANDREW COLBORN,                          **COPY**
3
            Plaintiff,

4

-vs-                      CIVIL ACTION NO. 19-CV-0484-BHL
5

NETFLIX, INC., ET AL.,              VOLUME II
6

            Defendants.
7   --------------------------------------------------------

8           CONTINUED VIDEOTAPED DEPOSITION OF

9                   ANDREW L. COLBORN

10   --------------------------------------------------------

11   DATE:               July 22, 2022

12   TIME:               9:02 a.m. - 4:40 p.m.

13   LOCATION:           Godfrey & Kahn, S.C.
                         833 East Michigan Street
14                       Suite 1800
                         Milwaukee, Wisconsin  53202
15

16

17

18

19

20

21

     REPORTED BY:
22   Paula Huettenrauch, RMR, CRR
     365Reporting, LLC
23

     VIDEOGRAPHER:
24   Jon Hansen, CLVS
     Video Concepts
25   608.408.7411

                                                        252

1   Buting's book come out, before Ken Kratz's book came

2   out, before Mike Griesbach's Indefensible book came,

3   because Making a Murderer preceded all of those.

4       Q    So I'll move to strike because you're

5   speculating.  And I'm just asking you based on your

6   personal knowledge, do you know if any of those

7   callers had watched Making a Murderer?

8               MR. BURNETT:  Let me object to the form

9   and foundation of the question, but go ahead.

10      A    All I know is I didn't receive any of these

11  type of calls prior to the release of Making a

12  Murderer.

13      Q    Okay.  So the answer to my question is you

14  don't know?

15      A    Right.  Correct.

16      Q    So my colleague who listened to the 89

17  voicemails noted that very few callers mentioned

18  their location but those who did were from out of

19  town.  Does that sound right to you?

20      A    And out of the country, but yes.

21      Q    So locally no one except for John Hartraub?

22  Kevin Hartraub?

23      A    Hartlaub.

24      Q    Hartlaub.  Locally no one was calling or

25  confronting you in person in a critical way, correct?

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 40 of 90   Document 279-2
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1          A    So what do you consider locally?

2          Q    **Within Manitowoc County.**

3          A    Okay.  Well, I gave you the example of the

4     service --

5          Q    **Other than that.**

6          A    In Manitowoc County?  I don't -- no, I don't

7     believe so.  No one in Manitowoc County I believe

8     called.  I don't recall.  I'd have to look at my

9     entire list of phone numbers, but --

10          Q    **As you sit here today, you don't recall**

11     **that?**

12          A    No.

13          Q    **The people who left anonymous voicemails,**

14     **you don't plan to call them to trial to testify on**

15     **your behalf, do you?**

16          A    No.

17          Q    **Okay.  And that's in part because you don't**

18     **know who they are, correct?**

19          A    Yes, that's correct.

20          Q    **And you haven't identified any of them as**

21     **witnesses in your discovery responses, correct?**

22          A    No.

23          Q    **And for all you know, some of these people**

24     **were sitting in prison or a mental institution**

25     **somewhere, correct?**

293

1            MR. BURNETT:  Objection, foundation.

2       Q    You don't know?

3       A    Correct.

4       Q    You do know that some of them were convicted

5  felons, correct?  I'll show you an example to jog

6  your -- a document to jog your memory.

7       A    Thank you.

8       Q    Could you go to Exhibit 8?

9       A    Do I have that?

10      Q    Yeah.

11      A    Got it.

12      Q    And flip about 20 pages in to tracking

13  number 355, if you could.  Sorry, 356.

14      A    Okay.

15      Q    And just to refresh your memory, this is a

16  transcript of the interview you gave for Convicting a

17  Murderer, correct?

18      A    Well, it's my answers.  Again, like I said

19  yesterday, the question doesn't appear.

20      Q    Okay.

21      A    And I can't determine which interview it is,

22  but it's either interview one or two of Convicting a

23  Murderer interviews.

24      Q    Okay.  So I'm going to start reading at the

25  top of that third row.  "Unwisely, I invited him to

                                                          294

1        Q    I don't need it.  Mr. Colborn, would you

2   agree that almost by definition the people who left

3   those voicemails for you were unreasonable?

4        A    Yes.

5        Q    No reasonable person would react this way to

6   a documentary, correct?

7        A    I've had reasonable people question me about

8   it, yes.

9        Q    Well, that's not my question.  No reasonable

10  person would watch a documentary and then call and

11  leave a death threat, correct?

12       A    Well, I would hope not, but maybe your

13  definition of reasonable and mine might be different.

14       Q    What about under your definition?

15       A    I could see how someone could be so moved by

16  such a production that they may contemplate it.

17       Q    Uh-huh.  And follow through, you think

18  that's reasonable?

19       A    No, I don't think it's reasonable.

20       Q    Okay.  So now I want to talk a little more

21  about Ms. Maurer.  You didn't list her in your

22  interrogatory responses, and I think your explanation

23  for that yesterday was you haven't talked to her

24  about the facts -- underlying facts in this case or

25  this lawsuit, correct?

1        A      That is correct.

2        Q      And you testified yesterday she has no

3    knowledge of your damages, that you don't have any

4    physical manifestations of anxiety or distress that

5    she could observe, correct?

6        A      Well, I did correct that by saying she's

7    aware that I have hypertension.

8        Q      Okay.  But otherwise, nothing she can

9    observe?

10       A      Correct.

11       Q      And that's true even though the two of you

12   live together?

13       A      Yes.

14              (Exhibit 81 marked for identification.)

15       Q      I'm going to hand you what we've marked as

16   Exhibit 81.  So this is a text between you and

17   Ms. Maurer, correct?

18       A      Correct.

19       Q      And you texted her, "Jodi, as you may have

20   suspected this whole Avery case was and continues to

21   be a thorn in my side.  Your continued support means

22   more to me than you can possibly imagine.  Thank you

23   so very much from the bottom of my heart."  And then

24   your counsel redacted something.

25              Jodi responded, "Andy I'm sorry you had to

1          Q     And I'm in Exhibit A --

2          A     Okay.

3          Q     -- of Exhibit 1, which is our initial

4     letter.

5          A     Got it.

6          Q     And I'm at number 63.

7          A     Oh, okay.  Okay.

8          Q     So let me rephrase the question.  You agreed

9     to number 61, and you agreed to number 62, that the

10    relationship with Ms. Maurer harmed your marriage and

11    it harmed your relationship with your children.

12         A     Yes.

13         Q     And I'm trying to understand how the -- how

14    you can deny that none of this caused you anxiety and

15    distress.  Can you explain that?

16         A     Well, I guess --

17         Q     I can rephrase.  Did the divorce cause you

18    anxiety?

19         A     Sure.

20         Q     Did the divorce cause you distress?

21         A     I don't know about anxiety.  So --

22         Q     What's the word --

23         A     I'm not exactly sure of the difference in

24    definition between the two, but I would say it

25    certainly caused me some distress, yes.

301

1          A     Yes, I see it.

2          Q     You told the interviewer, "When I announced

3     my retirement, I received calls from tens, if not

4     hundreds, of people who thanked me or told me that I

5     had helped them through a difficult time or they were

6     glad that I did this or glad that I did that, and

7     numerous people have apologized to me for not coming

8     forward."  Did I read that correctly?

9          A     Yes.

10          Q     So we had asked you to stipulate to the

11     following statement:  "Upon announcing his

12     retirement, Mr. Colborn received supportive calls

13     from dozens of people."  Here you said you received

14     calls from tens, if not hundreds, of people.

15               So my question is will you stipulate to that

16     statement?  I'll read it again.  "Upon announcing his

17     retirement" --

18          A     Where is this statement?

19          Q     Yeah, it's in Exhibit 1.

20          A     In your --

21          Q     My letter, number 51.

22          A     Okay.  Thank you.  Okay.

23          Q     Will you agree to that statement, having

24     seen where it came from?

25          A     Yes.

1    dollar figure on it.

2        **Q    Okay.**

3        A    I would need a jury to make that

4    determination.

5        **Q    What about Jerome Buting, can you put a**

6    **dollar figure on how much he's harmed your**

7    **reputation?**

8        A    That would be the same answer.

9        **Q    And Kathleen Zellner?**

10       A    Kathleen Zellner?  She hasn't -- so she's

11   flipped from different theory to different theory.

12   Now law enforcement isn't even a suspect anymore.

13   Plus, this is being used in the course of the defense

14   of her client, so I would have no standing in that.

15       **Q    What about Dean Strang, can you put a dollar**

16   **figure on how much he's harmed your reputation?**

17       A    I would just repeat the same answer that I

18   gave you for Jerome Buting and John Ferak.

19       **Q    Okay.  Mr. Colborn, my last few pages here**

20   **is about your medical records, and I'm going to try**

21   **not to go through them one by one in the interest of**

22   **time.  So I'll just ask you a couple questions, and**

23   **then we'll see how deep we have to go into these.**

24       A    Okay.

25       **Q    Isn't it true that you were not prescribed**

1      anxiety and hypertension medication until two weeks

2      after you filed this lawsuit, December 28th, 2018?

3          A    That's two different prescriptions.

4          Q    Yeah.  I can ask it this way.  Isn't it true

5      you weren't prescribed anxiety medication at any

6      point before you filed this lawsuit?

7          A    I don't recall the date I was prescribed.

8          Q    Well, you didn't go on anxiety medication

9      when Making a Murderer was released, correct?

10         A    No.

11         Q    And you didn't go on anxiety medication that

12     first year when you have told us you were

13     experiencing all this backlash from Making a

14     Murderer, correct?

15         A    Correct.

16         Q    And you didn't go on it 2 -- within the

17     second year after its release in 2017, correct?

18         A    Do you have my medical record there so I can

19     look at the date?

20         Q    Yeah.  Exhibit 120.

21              (Exhibit 120 marked for identification.)

22         A    Thank you.

23         Q    Uh-huh.  So --

24         A    Where is the date?

25         Q    Yeah, I'm trying to find it for you.  So the

                                                               333

1    date is about halfway down the page.  It says Today's

2    Visit.  You saw Theresa Krueger-Junk, Nurse

3    Practitioner, on Friday, December 28th of 2018.  Do

4    you see that?  And then above there it says you

5    started taking buspirone and isinopril.

6         A    Lisinopril.

7         Q    Thank you.

8         A    Yes.

9         Q    Okay.

10         A    Yeah, I see the -- I see the date.

11         Q    Okay.  And does that jog your memory as to

12    whether it was December 28th, 2018 when you first

13    started taking those medications?

14         A    Yes.

15         Q    Okay.  So not one, not two, but three entire

16    years after Making a Murderer was released, correct?

17         A    Correct.

18         Q    And, in fact, it was filing the lawsuit that

19    seemed to raise your anxiety levels; is that correct?

20         A    No.

21         Q    Well, the lawsuit was filed in December

22    2018, and about eleven days later is when you went on

23    these anxiety and blood pressure medications,

24    correct?

25              A    I would have to check on the blood pressure

 1    because I thought it was a preceding visit, but I'm

 2    not 100 percent positive, but certainly I was on them

 3    by this visit.  It was the fact that this just was

 4    never going away probably --

 5         Q    Okay.  When do you think you went on --

 6         A    -- is the greatest --

 7         Q    Oh, I didn't mean to interrupt.

 8         A    That's okay.

 9         Q    When did you think you went on blood

10    pressure medication?

11         A    So because I have asthma, I have to have a

12    visit every six months as opposed to a year.  So I

13    thought it was the six-month visit before that that I

14    would have gone on blood pressure medication.

15         Q    When would that have been approximately, the

16    date?

17         A    Well, I'm assuming June of '18.

18         Q    Okay.  Does asthma tend to cause high blood

19    pressure; do you know?

20         A    My asthma's pretty well controlled, but I

21    don't -- I don't know if hypertension is a by-product

22    of having asthma, for lack of a better word.

23              (Exhibit 117 marked for identification.)

24         Q    Okay.  I'm going to hand you what we've

25    marked as Exhibit 117.  This is another medical

1    record.  You can see about a third of the way down

2    the page the date of this visit was December 14th,

3    2018, which would have been three or four days before

4    you filed the lawsuit in this case.  Do you see that?

5         A    Okay.

6         Q    And if you flip to the second page, at the

7    very bottom there's a note that says, "Informed

8    patient his blood pressure is slightly elevated.

9    Discussed diet/salt restriction/exercise.  He will

10   monitor blood pressure at home and follow up if he

11   notices it stays elevated."  Did I read that

12   correctly?

13        A    Yes, you did.

14        Q    Does this jog your memory that --

15        A    Yes.

16        Q    -- this was maybe the first time you had

17   elevated blood pressure?

18        A    Correct.  So --

19        Q    Three days or four days before you filed the

20   lawsuit?

21        A    Correct.

22             (Exhibit 112 marked for identification.)

23        Q    Okay.  I'm going to hand you Exhibit 112.

24   This is another medical report.

25        A    Okay.

336

1    Q    This is from February 2018.  Do you see that

2    at the top?

3    A    Where it says dictated on 2/9/18 or no?

4    Q    I was looking at filed on 2/12/18, but --

5    A    Okay.

6    Q    -- it says you were seen on 2/9/18.  So

7    anyway, February '18, correct?

8    A    Yes.

9    Q    Okay.  If you could flip to the third page.

10   A    Is it page 155 that you want?

11   Q    Yeah, and also 156.

12   A    Okay.

13   Q    You see it's just --

14   A    Got it.

15   Q    -- off by one.  So this would have been two

16   and a half years or so after Making a Murderer's

17   release, two years?  Do you see that?

18   A    Yes.

19   Q    Okay.  And you filled out two screening

20   questionnaires.  One was the Depression Questionnaire

21   where zero means not at all and 3 is nearly every

22   day, and you scored a 1 out of, I think, 30 points

23   here.  There's ten items.  Does that sound right to

24   you?

25   A    Yes.

337

1          Q     Okay.  So that's a very low score on the

2     Depression Scale, correct?

3          A     Yes.

4          Q     Okay.  And you were being honest when you

5     completed this questionnaire?

6          A     Maybe.  I don't know if I was honest or not.

7     I didn't want to be put on any sort of medication.

8          Q     Okay.  Well, this is --

9          A     So I may have stretched things, but I would

10    think that for the most part I was honest.

11         Q     Okay.  This is the only -- medical records

12    are the only evidence we have of your alleged

13    anxiety, correct?

14         A     Correct.

15         Q     Okay.  The second questionnaire is the GAD,

16    which is the General Anxiety Disorder questionnaire.

17    Again, zero means no anxiety at all, and in every

18    category you put a zero, correct?

19         A     Correct.

20         Q     Okay.  On the next page, toward the bottom,

21    in all caps there's a word that says PSYCH with a

22    colon.  Do you see that?

23         A     Is it on 157?

24         Q     Uh-huh.

25         A     No, I don't see that.

Case 1:19-cv-00484-BHL  Filed 09/16/22  Page 53 of 90  Document 279-2
920.585.2341 | 365Reporting, LLC | www.365reporting.net

```
 1          Q    I think -- so do you see there's -- there's

 2     page 156 of the medical report and then there's

 3     COLBORN 157?

 4          A    Yeah, I have --

 5          Q    So look at --

 6          A    Oh, I see.  Okay.

 7          Q    Look at COLBORN 157.

 8          A    Yeah, that's the page I have, COLBORN 157.

 9          Q    Correct.  And so do you see right here PSYCH

10     at the top?

11          A    Okay.

12          Q    It's actually at the top and the bottom,

13     PSYCH?

14          A    Yes.

15          Q    It says, "Denies anxiety, depression, or

16     mania."

17          A    Yes.

18          Q    Do you see that?

19          A    Yes.

20          Q    And that's accurate, correct?

21          A    It's accurate that I denied telling her I

22     had it, yes.

23          Q    Uh-huh.  Okay.  And, again, all we have to

24     go on in terms of your anxiety and distress and

25     emotional distress is your medical records, correct?
```

339

1              MR. BURNETT:  Let me object to the form

2     of the question.  Go ahead.

3         Q    And your testimony here today, that's all

4     we've got, correct?

5         A    Correct.

6         Q    Okay.  I don't think I've given you

7     Exhibit 123, but I'm about to.

8         A    Okay.

9              (Exhibit 123 marked for identification.)

10        Q    And this is another medical record.  You can

11    see at the top under Encounter Information, it says

12    2/20 of 2019.  Do you see that?

13        A    Yes.

14        Q    Okay.  About a year later; is that right?

15        A    Yes.

16        Q    Okay.  Go to the second page of that

17    document.  At the very top it says Anxiety.  Do you

18    see that word?

19        A    Yes.

20        Q    And you told the doctor your personal

21    situation had improved.  Do you see that?

22        A    Uh-huh.

23        Q    Okay.  And then there's on that same page

24    another Generalized Anxiety Disorder Questionnaire.

25    Do you see that?

340

1          A     Yes.

2          Q     **And you put mostly zeros.  You scored a 2**

3     **out of a possible 21 points.  Do you see that?**

4          A     Uh-huh.  Yes.

5          Q     **Okay.  You were accurate in answering that**

6     **questionnaire?**

7          A     Yes.

8                     MS. WALKER:  All right.  So let's go off

9     the record.  I think I'm done, but I just want to

10    check my notes.

11                    THE VIDEOGRAPHER:  Going off the record

12    at 10:59.

13                    (Brief recess held.)

14                    THE VIDEOGRAPHER:  We're back on the

15    record at 11:18.

16                    MR. BURNETT:  Kevin, can I go ahead and

17    make that statement before you start?

18                    MR. VICK:  Sure.

19                    MR. BURNETT:  We've had a chance to

20    discuss the time arrangement off the record, and I

21    suspect we've exceeded the general rule for seven

22    hours.  I've talked to Mr. Vick, and I'm going to let

23    him continue to question Mr. Colborn with the

24    recognition that most of his questions are going to

25    be in the -- on the subject matters -- on subject

                                                              341

1    plates when you called dispatch, right?

2        A    Yes.

3        Q    And at the end, it also includes testimony

4    that you shouldn't have been and you weren't looking

5    at Ms. Halbach's car when you made that call,

6    correct?

7        A    Well, there was some video footage inserted

8    in there as well that I didn't do, like the knuckle

9    cracking, Dean Strang's staredown.  None of that was

10   during that testimony.

11       Q    Mr. Colborn, my question is different than

12   that.  It was at the very end of the clip.

13       A    Uh-huh.

14       Q    It includes testimony where you say again

15   you weren't looking at Ms. Halbach's car when you

16   made that call, correct?

17       A    Yes.

18       Q    So it clarifies you were not looking at the

19   back end of her 1999 Toyota, right?

20            MR. BURNETT:  Objection, form.

21       A    I don't know if it clarifies it or not.  It

22   doesn't appear to because people seem to think I was.

23       Q    Would you agree with me that it shows you

24   stating explicitly twice that you were not looking at

25   the car when you made the call to dispatch?

344

1          A     Yes.

2          Q     Does that address your concern that this

3     exchange might give the impression that you were

4     looking at the license plate when you made that call

5     to dispatch?

6                    MR. BURNETT:  Objection, form.

7          A     Can you repeat, sir?

8          Q     Sure.  So the fact that there's two explicit

9     denials from you that you were looking at the car

10     when you made the call to dispatch, doesn't that

11     address your concern that this exchange might give

12     the impression that you, in fact, were looking at the

13     car when you made the call?

14                    MR. BURNETT:  Same objection.

15          A     No, it doesn't address my concern.

16          Q     Why not?

17          A     Because that's not how I testified.  I

18     testified under oath, and it wasn't portrayed -- my

19     testimony wasn't portrayed accurately.

20          Q     But that testimony did include two explicit

21     denials that you were looking at the car when you

22     made the call to dispatch, correct?

23          A     Yes, I've agreed to that.

24          Q     Let's look at Exhibit B in the Second

25     Amended Complaint.

345

1     right?

2         A     Yes.

3         Q     And that Mr. Lenk found the key after you

4     handled the bookcase roughly, correct?

5         A     Yes.

6         Q     And it includes that you did not touch the

7     key, correct?

8         A     Yes.

9         Q     Would you admit that that episode gets

10    across each of the key points that Mr. Kratz elicited

11    from you during this line of questioning in your

12    testimony?

13               MR. BURNETT:  Object, form.

14        A     And the actual skill with which this was

15    presented is the problem.  It makes it appear that

16    that is how I answered when it's not.

17        Q     Would you agree that the substance that's

18    presented, though, is the same in terms of the key

19    points that Mr. Kratz was trying to solicit on your

20    testimony on direct?

21               MR. BURNETT:  Objection to the form.

22        A     Yes, I will agree that the portions -- that

23    a portion of my testimony about how I handled the

24    bookcase and that I didn't touch the key are on this

25    clip.

351

1    the last question, the question before it?

2        **Q    Oh, sure.**

3        A    Can I have that read back to me --

4        **Q    Yeah.**

5        A    -- please?

6        **Q    Do you agree that Mr. Kratz was asking**

7    **questions here to make it clear that this call didn't**

8    **motivate you to frame Mr. Avery for the murder of**

9    **Ms. Halbach?**

10       A    Yes.

11       **Q    And to make clear that you didn't plant**

12   **evidence against Mr. Avery?**

13       A    I don't know if this had anything to do with

14   planting evidence.  He was -- well, I guess if we go

15   on to the next page, yes.  I'm only -- I'm only on

16   47.  Are we including 48?

17       **Q    Oh, to be clear, I was asking about 47 and**

18   **48.**

19       A    Okay.

20       **Q    If you'd like a moment to review, that's**

21   **fine.**

22       A    Okay.  I got it.  Yes, that came up as well.

23       **Q    Is there anything I'm missing here that you**

24   **would say is, you know, a crucial point in your**

25   **testimony?**

355

1                    MR. BURNETT:  Objection, form.

2          A    They -- to start off, they eliminated the --

3    my identification of myself when I answered the

4    phone.  I answered the phone.  I said, "Manitowoc

5    County Jail, Officer Colborn."  I didn't identify

6    myself as a deputy.  By eliminating that, people

7    watching this -- and I'm dressed in a law enforcement

8    uniform, when I'm testifying, people automatically

9    assume that when I was working in '94, '95, I'm a

10   sworn law enforcement officer by eliminating that,

11   because if I was a sworn law enforcement officer, my

12   answering the phone would have been Manitowoc County

13   Jail, Deputy Colborn, but I wasn't a deputy at the

14   time.  I'm a non-sworn corrections officer.  So

15   people now are like, Hmm, he's a law enforcement

16   officer but he doesn't do nothing with this

17   information.

18          **Q    And is that why you transferred the call to**

19   **the detectives --**

20          A    Correct.

21          **Q    -- detective and the sheriff?**

22          A    I had no authority to --

23                    MR. BURNETT:  You've got to let him

24   finish.

25                    COURT REPORTER:  Yeah, I missed the end

 1    of your question, Kevin.

 2              THE WITNESS:  I'm sorry.

 3         Q    Is that why you transferred the call to the

 4    sheriff's office?

 5              MR. BURNETT:  Go ahead.

 6         A    Well, the jail is part of the sheriff's

 7    office, but that's why I transferred the call to an

 8    investigator, yes, sir.

 9         Q    Do you know if that fact is reflected in

10    Making a Murderer, that you transferred the call to a

11    detective?  I'm not quizzing you on the contents of

12    that, Mr. Colborn.  I'm just asking if you know.

13         A    I don't know if it's in Making a Murderer or

14    not.

15         Q    Let's --

16         A    And I --

17         Q    Let's look at a different clip.

18         A    Okay.

19         Q    This is Episode 7 still, and I'm looking at

20    minute 17, second 36 to minute 19, second 10.  Am I

21    still sharing?  Yes.

22              (Video playing.)

23         Q    So the clip that we just saw, Mr. Colborn,

24    that makes clear that you received this call in 1994

25    or '95 when you were a corrections officer, right?

                                                              357

1     wishy-washy about that, pretty unsure of himself.

2     For instance, "Have you ever planted any evidence

3     against Mr. Avery?" my response at trial was, "That

4     is ridiculous, no, I have not."  And then the second

5     question Mr. Kratz asked me, "Have you ever planted

6     any evidence against anybody in the course of your

7     law enforcement career?" that whole question is

8     eliminated.  Instead, it looks like I answered, "Have

9     you ever planted evidence against Mr. Avery" by

10    saying, "I have to say this is the first time my

11    integrity has been questioned."  That doesn't come

12    across very forceful or convincing.  It's hardly

13    answering the question.  So I don't believe that's an

14    accurate portrayal.

15         Q    Did you feel that accusations that you

16    planted evidence against Mr. Avery were calling into

17    question your integrity?

18         A    The question was have you ever planted any

19    evidence against anybody in the course of your law

20    enforcement career.  That's my answer to that

21    question.

22         Q    Mr. Colborn, I'm going to move to strike.

23    That wasn't my question.

24              My question is leaving this for a second,

25    did you feel that accusations against you that you

359

1    planted evidence against Mr. Avery, that that called

2    into question your integrity as a law enforcement

3    officer?

4        A    Yes.

5        Q    And do you feel like this scene shows you

6    denying that you planted any evidence against

7    Mr. Avery?

8        A    I'm sorry.  The scene on Making a

9    Murderer --

10       Q    Sure.

11       A    -- that you just showed me?

12       Q    The clip we just -- we just --

13       A    Is that what you are asking about?

14       Q    The clip we just looked at, you deny having

15   planted any evidence against Mr. Avery, right?

16       A    Yes.

17       Q    Okay.  Last one.  If you could move on to

18   page 52 of Exhibit B.

19       A    Okay.

20       Q    And what I'm interested in here is where it

21   starts, oh, maybe a quarter of the page down, it says

22   Redirect Examination.

23       A    Okay.  I see it.

24       Q    So just looking at that section.

25       A    Okay.

360

 1          A     Yes.

 2          Q     -- that Dean Strang asked about this subject

 3     matter during his cross-exam.

 4          A     Yes.

 5          Q     And then Mr. Kratz on redirect wanted to

 6     respond to some of the points that Mr. Strang had

 7     raised, right?

 8          A     Yes.

 9          Q     Mr. Kratz wanted to make clear that you

10     hadn't written a report about the call in 1994 or

11     '95?

12          A     Yes.

13          Q     And that if you had written a report you

14     wouldn't have known what it was about; is that right?

15          A     Correct.

16          Q     That you didn't know the call was even about

17     Mr. Avery, right?

18          A     Correct.

19          Q     Is there anything I'm missing here that's

20     key to understanding your testimony?

21                MR. BURNETT:  Objection, form.

22          A     I explained in the presence of -- all these

23     questions were in the presence of the jury.  I

24     explained in the presence of the jury my reason that

25     I didn't write a report has been eliminated from my

                                                              362

1    testimony.  It just simply says, "I don't know what

2    it would have been about," and that was actually a

3    question, "that I received a call and transferred it

4    to the Detective Division."  There would have been no

5    need to write a report every time you receive a

6    telephone call and transfer it.  Certainly there's no

7    agency on the face of the Earth that does a report

8    about that, and that whole explanation has been

9    eliminated from my testimony there.

10            Q     Let's take a look at the clip.

11            A     Okay.

12            Q     And this is still in Episode 7.  It's at

13    minute 23, second 48 to minute 24, second 5.

14                  (Video playing.)

15            Q     So the clip that we watched, again, it made

16    clear that you didn't write a report in 1994 or '95

17    about the call, correct?

18            A     Yes.

19            Q     That if you had written a report, you

20    wouldn't have known what it was about, right?

21            A     Correct.

22            Q     And we can agree that the line about whether

23    you knew the call was about Mr. Avery, that's not in

24    this clip, right?

25            A     Correct.

                                                              363

1    looked at earlier, which was the statement you

2    prepared on September 12th?

3        A    Yes.

4        Q    Now -- so would you agree that based on this

5    document, at least what this document purports to say

6    is that your statement was, in fact, kept in the

7    sheriff's department safe?

8        A    Yes.

9        Q    And yesterday you stipulated to that fact,

10   right?

11       A    Yes.

12       Q    Okay.  Now, you said that James Lenk had

13   given some incorrect information to Sheriff Petersen?

14       A    Yes.

15       Q    How do you know that?

16       A    The paragraph that reads, "Sergeant Colborn

17   said he was later informed by someone that the case

18   was already solved and the right person was

19   arrested."  I never said that.

20       Q    And how do you know that that's what he

21   passed on to Sheriff Petersen?

22       A    I'm reading it off his statement, so -- I

23   wasn't there when he -- I don't know what he said

24   verbally to the sheriff.

25       Q    That was going to be my question, is whether

404

Case 1:19-cv-00484-BHL  Filed 09/16/22   Page 67 of 90   Document 279-2
920.585.2341   |   365Reporting, LLC   |   www.365reporting.net

1    the lawsuit.  The other two I don't believe so.

2         Q    How much of Making a Murderer would you

3    estimate that you watched before you filed the

4    lawsuit?

5         A    Like in what context?  Minutes?

6         Q    Sure, minutes.

7         A    Less than 30.

8         Q    How about as you sit here today, do you have

9    a sense of total number of minutes?  And if you want

10   to give me a range, that's fine.

11        A    45 to 60.  Probably less than 60.  30 to 45.

12        Q    Is that -- so you've only -- let me make

13   sure I'm understanding this correctly.  Have you

14   watched 30 to 45 more minutes or is it still 30 to

15   45 minutes total, meaning --

16        A    No.

17        Q    -- you've only watched an extra --

18        A    30 to 45 more minutes, additional minutes.

19        Q    Oh, okay.  Gotcha.

20        A    Sorry.

21        Q    So then it's a total of like an hour to hour

22   15?

23        A    Possibly, yes.

24             MR. VICK:  Okay.  This is a good time to

25   take a break.

1    Strang.

2         Q    I think you're right, but you made two of --

3    you made two denials that we saw in that clip

4    earlier, right?

5         A    Yes.

6         Q    I'd like you to look at Exhibit 2, which is

7    the -- your Second Amended Complaint.

8         A    Oh, I actually have that one handy for once.

9         Q    And I'd like for you to look at paragraph

10   33, and I'll read the paragraph.

11        A    Okay.

12        Q    It says, "A central part of Avery's defense

13   at trial was that Plaintiff and other Manitowoc

14   officers planted Halbach's HUV" [sic] "at the Avery

15   Salvage Yard where Avery resided in a house trailer.

16   With Plaintiff on the stand, Avery's attorneys played

17   portions of his call to dispatch in an effort to

18   convince jurors that he came upon the SUV at an

19   undisclosed location on November 3rd, two days before

20   it was found at the salvage yard.  Cross examining

21   Plaintiff about the contents of the call, Avery's

22   attorneys suggested that Plaintiff was looking

23   directly at Halbach's vehicle when he called

24   dispatch.  The claim is entirely baseless and false,

25   and Defendants knew of its falsity."  Did I read that

Case 1:19-cv-00484-BHL-SCD   Filed 09/16/22   Page 69 of 90   Document 279-2
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    right?

2        A    Yes.

3        Q    What is the basis for your allegation that

4    defendants knew of the falsity of this central part

5    of Avery's defense?

6                MR. BURNETT:  Objection, foundation.

7    Go ahead.

8        A    They were sitting in the courtroom and saw

9    my complete unedited testimony.

10       Q    Now, you were alone when you made the call

11   to dispatch you said, right?

12       A    Yes.

13       Q    So you're the only one that would know for

14   certain whether or not you were looking at Teresa

15   Halbach's car when you made that call, correct?

16       A    Yes.

17       Q    And Avery's --

18       A    I don't have an eyewitness with me, no.

19       Q    And Avery's attorneys were suggesting the

20   opposite, right?

21       A    I wasn't really sure what Avery's attorneys

22   were suggesting, and I don't want to speculate or

23   tell you that that's what they were doing because I

24   don't know.

25       Q    But your testimony at trial and your

1      Q     But it's a sentiment that some people were

2    saying at the time, right?

3                  MR. BURNETT:  Objection, foundation.

4      A     Yeah.

5      Q     It's a sentiment that some people expressed

6    to you at the time?

7      A     Uh-huh.  Yes.

8      Q     So then, Mr. Colborn, how can you say that

9    my clients knew that Avery's defense attorneys'

10   theory was false?

11                 MR. BURNETT:  Objection, form.

12     A     For the reason that I said.  They sat in the

13   courtroom the entire time, so they were privy to

14   information that the average citizen wouldn't have.

15     Q     What was that information?

16     A     Again, we had a gag order.  So when people

17   would ask me that question, I always had to say, "We

18   can't discuss the case."  There was a lot of people

19   that didn't know for a long time that Brendan Dassey

20   had confessed to investigators and then investigators

21   were able to locate evidence based on Brendan's

22   confession.  People may not have known that the

23   murder weapon was hanging over his bed.  People may

24   not have known her bones were in his backyard after

25   he mutilated her and burned her up in his pit.  They

                                                          441

1    needle."

2         A    Yes.

3         Q    "The hypodermic needle hole in this case was

4    made when a specimen of Avery's blood was drawn by a

5    phlebotomist and stored in the vial in connection

6    with a 1996 post-conviction motion in his wrongful

7    conviction case.  The procedure necessarily resulted

8    in the creation of a hole in the rubber stopper.  The

9    phlebotomist who drew the specimen from Avery in 1996

10   was prepared to testify that's what happened in this

11   instance."  Did I read that correctly?

12        A    Yes.

13        Q    What is the basis for your allegation in the

14   next sentence which is, "Having attended the trial in

15   its entirety, Defendants Ricciardi and Demos were

16   aware of the routine nature of the hole on the vial's

17   rubber stopper and that the phlebotomist who drew the

18   specimen from Avery was prepared to testify."

19             MR. BURNETT:  Objection, foundation.

20        Q    Or let me rephrase that.  Do you have a

21   personal knowledge basis for making the allegation in

22   that sentence I just read?

23        A    I'm personally aware that your clients were

24   in the court for its entirety, and I've seen the

25   Making a Murderer episode where it's portrayed as a

                                                            444

1    great day for the defense when they discovered this

2    vial that I'm assuming could have only been filmed by

3    your defendants -- your clients I mean.  I'm sorry.

4         **Q    Would it surprise you to learn that they**

5    **didn't film it?**

6         A    Yes, it would.

7         **Q    Do you recall that Norm Gahn is in there, in**

8    **that section, when it's being discovered?**

9         A    I viewed the portion where Jerome Buting is

10   making a call to co-counsel.

11        **Q    Do you recall a little bit later Norm Gahn**

12   **is in it too, who is one of the prosecutors?**

13        A    I know who Norm Gahn is, but I didn't view

14   that portion of it.

15        **Q    So why do you think that my clients were**

16   **aware of the routine nature of the hole on the vial's**

17   **rubber stopper and that the phlebotomist who drew the**

18   **specimen from Avery was prepared to testify?**

19             MR. BURNETT:  Objection, foundation.

20        **Q    Do you have any personal knowledge to**

21   **support that portion of the allegation?**

22        A    I don't recall the motion hearing where that

23   was discussed, if I was present or not, so I can't --

24   again, a lot of these documents are the work product

25   of my counsel.  I didn't compile all this information

                                                              445

1    and Deputy Kucharski, can you understand how they

2    might have some uncertainty about your three's

3    explanation about how the key came to be found that

4    day?

5                    MR. BURNETT:  Objection, form,

6    foundation.

7         A    I don't have an instinctive distrust of law

8    enforcement.  I trust law enforcement because I was

9    in it for 27 years.  So I like to think that my

10   testimony and when I say something, people understand

11   that I'm under oath and I'm saying the truth.  If I

12   don't know the answer to a question, I say I don't

13   know.

14        Q    But can you understand how people who didn't

15   know you personally, I'm not saying that they

16   necessarily think that you're lying, but how they

17   could walk away from hearing the explanation of how

18   the key was found and just say, "I'm not sure what

19   happened"?

20                   MR. BURNETT:  Objection --

21        Q    Can you understand that?

22                   MR. BURNETT:  Objection to form and

23   foundation.

24        A    My explanation at trial was the only

25   possible way I could think that that key got to where

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 74 of 90   Document 279-2
920.585.2341 | 365Reporting, LLC | www.365reporting.net

```
 1    it was.  I don't know any other way because that was

 2    the only piece of furniture that we had searched, and

 3    then the key was discovered laying on the floor in an

 4    area we had previously looked.  So I don't know.

 5         Q    And I think we saw a document that

 6    Mr. Griesbach wrote yesterday where he said that he

 7    believes Steven Avery was guilty but he wasn't

 8    sure -- so sure that the police didn't plant

 9    evidence.  Do you recall that document?

10         A    Yes.

11         Q    So if Mr. Griesbach wasn't sure, how can you

12    expect my clients to have been sure?

13         A    I don't know if Mr. Griesbach had all the

14    information available to him when he made that

15    statement, but the key was found in Steven Avery's

16    bedroom with Steven Avery's DNA on it, not my DNA,

17    not Jim Lenk's DNA, not Deputy Kucharski's DNA,

18    Steven Avery's.

19         Q    But you understand that Mr. Griesbach was

20    very interested in the Avery case and he was a

21    student of the case, right?

22              MR. BURNETT:  Objection, form,

23    foundation.

24         Q    Do you think it would be fair to call

25    Michael Griesbach a student of the Steven Avery --
```

464

920.585.2341 | 365Reporting, LLC | www.365reporting.net

 1    the trial of Steven Avery for the murder of Teresa

 2    Halbach?

 3                    MR. BURNETT:  Same objection.

 4        A    He's certainly been involved in it, although

 5    not in the trial and investigation himself.  He's

 6    written books about it.

 7        Q    So again I would ask, if he wasn't so sure

 8    that planting didn't occur, how can you say that

 9    other people should -- you know, either knew or

10    absolutely should have known that the planting theory

11    was false?

12                    MR. BURNETT:  I object to the form of

13    the question.  I think it's argumentative.  It's been

14    asked multiple times and answered.  Go ahead and

15    answer if you have a further answer.

16        A    I don't have an answer other than

17    Mr. Griesbach didn't attend the trial.

18        Q    Now, finding that key in Steven Avery's

19    trailer turned out to be a big deal into the

20    investigation into the murder of Teresa Halbach,

21    right?

22        A    I don't know if one piece of evidence was

23    more -- I don't know if any one piece of evidence was

24    more important than -- I would say the discovery of

25    her body in his backyard was probably more important

                                                          465

920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1          A     Correct.

2          Q     And Ms. Walker talked yesterday about

3    certain things regarding a number of Mr. Avery's

4    prior crimes that were not presented to the jury

5    also, right?

6          A     Yes.  We talked about that yesterday, yes.

7          Q     So I won't repeat the stuff that you went

8    over yesterday, but I did want to talk about some

9    other things that are included in Making a Murderer

10   that present Steven Avery in a negative light that

11   were not even presented to the jury but are reflected

12   in Making a Murderer.

13             Are you aware that Making a Murderer

14   includes Chuck Avery's statement that after Brendan

15   Dassey's confession, he was, quote, pretty positive,

16   end quote, that Steven probably had murdered Teresa

17   Halbach?

18         A     No, I haven't seen that.

19         Q     And Chuck Avery is Steven Avery's brother,

20   right?

21         A     Yes.

22         Q     Are you aware that Making a Murderer

23   includes a scene where Barb Tadych tells Steven Avery

24   that she hopes he burns in hell for what he did?

25         A     Her name might be pronounced "Todd-ick," but

471

1    no, I'm not aware of that.

2         Q    Are you aware that there is a scene in

3    Making a Murderer where Steven Avery tells his

4    parents that if they didn't figure out how to get him

5    out on bail within two weeks, he was going to give up

6    and kill himself?

7         A    No, I'm not aware of that.

8         Q    Are you aware that there's a scene in Making

9    a Murderer where Steven Avery himself opines that the

10   prosecution was, quote, going to win anyway?

11        A    No, I'm not aware of that.

12        Q    Are you aware that Making a Murderer

13   contains interviews with some people who say violent

14   crime was in Steven Avery's character and others who

15   say it was not?

16        A    Well, I have seen interviews where people

17   say that the police did it on Making a Murderer.  I

18   haven't seen any clips or any video where people are

19   saying that they believe they -- law enforcement got

20   it.  So I'm unaware of that.

21        Q    I'm really trying to limit the number of

22   clips I show you given our time crunch.

23        A    Sure.

24        Q    So I'm going to pose these instead rather as

25   questions.

1          A     Okay.

2          Q     Are you aware that there's a scene where

3     Steven Avery's sister says that a violent assault was

4     not in his nature?

5          A     No.

6          Q     Are you aware that there's a scene where a

7     member of the media says that it was because he was

8     one of the usual suspects around Manitowoc County?

9          A     No.

10         Q     Are you aware that there's a scene where the

11    presiding judge in the Penny Beerntsen case says that

12    he believed Avery's propensity against violence --

13    against -- violence against women in particular, was

14    a fact?

15         A     No, I'm not aware of that.

16         Q     Isn't that a good example of Making a

17    Murderer showing different viewpoints and opinions

18    regarding Steven Avery's character?

19                MR. BURNETT:  Objection, form.

20    Go ahead.

21         A     I would have to watch the entire thing to

22    offer an intelligent answer on that, and I haven't

23    done that.

24         Q     Are you aware that Undersheriff Hermann is

25    interviewed in Making a Murderer?

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 79 of 90   Document 279-2
920.585.2344 | 365Reporting, LLC | www.365reporting.net

1          A     No, I wasn't aware of that.

2          Q     Are you aware that he is extremely critical

3    of Steven Avery's allegations that evidence was

4    planted?

5          A     I'm not aware of that.

6          Q     Are you aware that there is a scene in

7    Making a Murderer where he not only denies the

8    planting allegations but characterizes them as,

9    quote, impossible, end quote, and quote, far-fetched,

10   end quote.

11         A     No, I'm not aware of that.

12         Q     Now, incidentally, you ran against

13   Undersheriff Hermann to replace Ken Petersen as the

14   sheriff of Manitowoc County, right?

15         A     Yes, I did.

16         Q     But Making a Murderer includes a clip of

17   him -- I'll represent that Making a Murderer includes

18   a clip of him very vigorously disputing the planting

19   allegations that were made against law enforcement

20   officers.  Are you aware of that?

21         A     No.

22         Q     Is it your position that Making a Murderer

23   is biased against law enforcement?

24         A     Yes.

25         Q     Are you aware that Laura Ricciardi has

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 80 of 90   Document 279-2
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    while we're human and imperfect, for the most part

2    the criminal justice system does get it right.

3         Q    I already told you about Undersheriff

4    Hermann's calling the planting accusations

5    far-fetched and impossible, right?

6         A    Yes, sir.

7         Q    So I'm going to play you now something from

8    Episode 5, which I believe is one that you have

9    seen -- or parts of the episode.  I take that back.

10   I'm going to show you a clip of Norm Gahn.  Are you

11   familiar with this scene?

12        A    No.

13             (Video playing.)

14        Q    Would you agree that that shows prosecutors

15   pushing back quite vigorously against the planting

16   theory?

17             MR. BURNETT:  Objection, form.

18        A    Yes.

19        Q    And they refer to the officers being accused

20   as being good, solid, decent family men, right?

21        A    I don't think I saw that, but -- I don't

22   recall hearing that, hearing them say that.  I

23   thought it centered more around the testing of the

24   blood or that we have a right to have our reputations

25   protected or something to that extent.

480

1          Q     I'll go to another clip that's maybe more

2     directly about you.  This is in Episode 7.  Oh, the

3     one I just showed was Episode 5, 1:08 to 2:34.

4          A     Okay.

5          Q     The one I'm going to show now is Episode 7,

6     13:55 to 14:28.

7                     (Video playing.)

8                     MS. RICCIARDI:  You're in Episode 5.

9                     MR. VICK:  Oh, is this still in

10    Episode 5?  My apologies.  Now I'm in Episode 7.

11                    (Video playing.)

12         Q     Would you agree that that shows Ken Kratz

13    vigorously disputing the planting allegations?

14                    MR. BURNETT:  Objection, form.

15         A     That appeared to be an out-of-court

16    interview --

17         Q     Yeah.

18         A     -- with reporters, not in front of the judge

19    like the preceding one.

20         Q     Oh, you're absolutely correct.  I'm not

21    limiting this just to the in court.  I'm saying would

22    you agree that this is an instance of Ken Kratz out

23    of court to the media, I think the word he used was

24    deplorable to describe the planting theory; is that

25    accurate?

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 82 of 90   Document 279-2
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1      A    Yes.

2      Q    So this is another instance where Making a

3  Murderer shows people pushing back strongly against

4  the planting theory, right?

5              MR. BURNETT:  Objection, form.

6      A    In that particular clip, yes.

7      Q    Had you ever seen that clip before?

8      A    No.

9      Q    Okay.  Same thing, Episode 27 -- or

10  Episode 7.  Now I'm going to 24:29 to 24:50.  Again,

11  this is going to be another one out of court.

12      A    Okay.

13              (Video playing.)

14      Q    Is that another instance showing someone?

15      A    Yes.  I've seen that one.

16      Q    Yeah.  Did you appreciate that that one was

17  in this episode?

18      A    I have to be honest with you, I don't

19  appreciate anything about Making a Murderer, but I

20  appreciate that the reporter asked that question of

21  Attorney Strang.

22      Q    And do you appreciate that that reporter's

23  question was then included in this episode?

24      A    Without watching it in its entirety, I have

25  to stay by my original answer that I don't appreciate

482

1    anything about Making a Murderer.  I don't appreciate

2    it at all.

3        Q    But you've testified that you haven't seen

4    the whole series, right?

5        A    Correct.

6        Q    And I don't want to use my time showing you

7    all the episodes.

8        A    Okay.

9        Q    I'll represent Episode 7 at 34:45 to 35:08,

10   if you have any interest in seeing these later, I'm

11   sure your counsel could probably get it for you.

12       A    Yes.

13       Q    There's another episode of Norm -- there's

14   another instance of Norm Gahn sticking up for you.

15   Is that something you're aware is in Making a

16   Murderer?

17       A    No.  Well, is that the one you just showed

18   me or --

19       Q    It's a different one.

20       A    Okay.

21       Q    Are you aware that there is also footage, a

22   scene, of yet another instance of Norm Gahn, this

23   time at a press conference, where he's pushing back

24   on the planting theory?

25       A    No.

                                                          483

1          Q     Are you aware that during that press

2    conference he calls it a, quote, despicable

3    allegation?

4          A     No, I'm not aware of it.

5          Q     Would you say that Norm Gahn there in

6    calling it a despicable allegation pretty accurately

7    captures your own views of those allegations made

8    against you and Lieutenant Lenk?

9          A     Certainly.

10         Q     Are you aware that there is a clip in

11   Episode 7 of Making a Murderer that shows Mike

12   Halbach giving his views on Steven Avery?

13         A     No.

14         Q     Are you aware that it -- that there's --

15   that it shows that Mike Halbach believes Steven Avery

16   was guilty and was lying when he claimed to be

17   innocent?

18         A     I'm not aware of that in Making a Murderer,

19   no.

20         Q     So nobody had ever told you that Mike

21   Halbach was in -- there was a scene involving Mike

22   Halbach giving his opinion that Steven Avery was

23   guilty and was lying?

24         A     As it pertains to Making a Murderer?

25         Q     Correct.

1          A     That's correct.

2          Q     **Are you aware that there is a scene in**

3   **Making a Murderer in which Judge Willis provides his**

4   **view that Steven Avery is, quote, probably the most**

5   **dangerous individual to set forth -- set foot in this**

6   **courtroom?**

7          A     In Making a Murderer?

8          Q     **Yes, in Making a Murderer.**

9          A     No, I'm not aware that that's in Making a

10   Murderer.

11         Q     **After this deposition, are you going to**

12   **watch the entire series do you think, Sergeant**

13   **Colborn?**

14               MR. BURNETT:  Objection, form, calls for

15   speculation.

16         A     As we sit here and talk right now, I don't

17   have that intention, but I certainly will seek the

18   advice of my counsel on it.

19         Q     **Prior to bringing this lawsuit, did anybody**

20   **tell you about the clips that you and I have**

21   **discussed in the last hour or so in which various**

22   **individuals defend you?**

23         A     No.

24         Q     **Do you think that could change your overall**

25   **view of the series?**

485

1        A    No.

2        Q    **How could you know without watching them?**

3        A    Well, I can't.  You just said what do I

4   think, so I thought you wanted me to render an

5   opinion.

6        Q    **Did John Ferak's columns typically include**

7   **quotes from people in law enforcement who were**

8   **defending you, who were telling -- who were saying**

9   **that these are despicable allegations that are being**

10  **made?**

11       A    Not that I recall.

12       Q    **I'd like to look at Exhibit -- Exhibit 1146.**

13            (Exhibit 1146 marked for identification.)

14       A    Thank you.

15       Q    **This is another text between you and Brenda**

16  **Schuler, right?**

17       A    Yes.

18       Q    **And she says at the top, "Andy, sorry to bug**

19  **you as I just deleted the emails not that long ago**

20  **from you.  Ken needs them again.  He lost them.  So**

21  **sorry!  Can you check your emails to me please?  Your**

22  **'sent' file please?"  And your response is, "I may**

23  **have hard copy but I think I deleted them from my**

24  **sent file and anywhere else after Ferak demanded all**

25  **our emails.  Would hard copy work???"  And she says,**

486

```
 1        A    Is that the Amended Complaint?

 2        Q    It is, yeah.

 3        A    Okay.

 4             MR. BURNETT:  Are we in a position to

 5   wrap this up?

 6             MR. VICK:  We are.

 7             MR. BURNETT:  Great.

 8        Q    I'd like you to look at paragraph 37

 9   specifically.

10        A    Okay.  Okay.

11        Q    So here you say, "Defendants Ricciardi and

12   Demos strategically spliced 'reaction' shots of

13   plaintiff appearing nervous and apprehensive at trial

14   into other portions of his testimony where he did not

15   appear nervous or apprehensive in fact."  Do you see

16   that?

17        A    Yes.

18        Q    Do you recall what it was about your

19   demeanor in any of the shots that made you look

20   nervous or apprehensive?  Was there anything that you

21   can recall right now that made you feel that way?

22        A    Specifically the clip that you showed me

23   that I commented on earlier where it appears that

24   Dean Strang is giving me some sort of staredown and

25   the -- it pans to the shot of me leaning back and
```

496

1        cracking my knuckles.

2                I did that during a recess out of the view

3        of the jury.  I certainly didn't do it in front of

4        Attorney Strang, but it certainly does make me look

5        nervous and apprehensive and that I've been caught in

6        some sort of lie.

7        **Q      Now, Mr. Colborn, I'm not sure if you're**

8        **aware, but during this deposition the last couple**

9        **days, you've kept your head down a decent amount.**

10       **Does that sound right?**

11       A      I'm frequently reading, but yes.

12       **Q      And you've sometimes had your head in your**

13       **hands or cracked your knuckles in the course of this**

14       **deposition.  Does that sound right?**

15       A      Okay.  I don't recall that, but I don't know

16       what -- what you want me to -- what you're trying

17       to -- can you clarify a little bit for me?

18       **Q      Well, is it possible that maybe things like**

19       **cracking your knuckles or looking down, that that's**

20       **just a natural mannerism of yours?**

21       A      The footage that I've watched of my trial

22       testimony, I frequently make contact with whoever

23       questioning me.  Now, I was not in trial given a

24       stack of documents like this and told frequently to

25       go to this page, go to that page, look at this, look

497

1               CERTIFICATION PAGE

2

3    STATE OF WISCONSIN      )

4    MILWAUKEE COUNTY        )

5

6            I, PAULA M. HUETTENRAUCH, RMR, CRR,
     Notary Public in and for the State of Wisconsin, do
     hereby certify:

7

8            That prior to being examined, the
     deponent named in the foregoing deposition,
     ANDREW L. COLBORN, was by me duly sworn to testify

9    the truth, the whole truth, and nothing but the
     truth.

10

11           That said deposition was taken before
     me at the time, date, and place set forth; and I
     hereby certify the foregoing is a full, true, and

12   correct transcript of my shorthand notes so taken and
     thereafter reduced to computerized transcription

13   under my direction and supervision.

14           I further certify that I am neither
     counsel for nor related to any party to said action,

15   nor in any way interested in the outcome thereof; and
     that I have no contract with the parties, attorneys,

16   or persons with an interest in the action that
     affects or has a substantial tendency to affect

17   impartiality, or that requires me to provide any
     service not made available to all parties to the

18   action.

19

20   IN WITNESS WHEREOF, I have hereunto
     subscribed my name this 28th day of July, 2022.

21

22   *Paula Huettenrauch*

23   Paula M. Huettenrauch, RMR, CRR
     Notary Public - State of Wisconsin

24   My Commission Expires 8/18/2023

25

500