Exhibit 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANDREW L. COLBORN, )
Plaintiff, ) Case No.
vs. ) 19-cv-0484
NETFLIX, INC., et al., )
Defendants. )

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF LAURA RICCIARDI
May 17, 2022

REPORTED REMOTELY BY:
AMBER S. WILLIAMS, C.S.R. No. 1080
Notary public

A. Sorry. I just spoke over you. I apologize.

We were -- we included that in the series, because how could we cover the Halbach trial without including the defense theory of framing? I mean, they were -- they were explicit about that theory, and so we necessarily included it. But by including it, we didn't adopt it. We were not trying to communicate anything to the public about that; we were merely showing what we documented.

Q. So there was no point of view that Steven Avery was innocent?

MR. VICK: Objection.

THE WITNESS: No.

Q. (BY MR. BURNETT): There was no point of view that documentary makers endorsed that Steven Avery had been framed by law enforcement?

A. No. As I said, we didn't take a position on -- on those things.

Q. Did you portray the prosecution and the defense neutrally?

MR. VICK: Objection. Vague. Best evidence rule. Witness is not here as an expert.

With that, you can answer if you understand.

THE WITNESS: I believe we took the same approach, it was a universal approach, to the storytelling at every stage, from inviting people to participate in the documentary to the way things were covered.

Q. (BY MR. BURNETT): My question was: Did you portray the prosecution and the defense neutrally?

A. I don't know what that neutrally --

MR. VICK: Let me -- just give me a moment to interpose.

Same objections as to your previous question.

Q. (BY MR. BURNETT): You don't know what it means to be neutral?

A. I was trying to define for you what our approach was, and --

Q. Right.

A. -- it was the same approach. It was a democratic universal approach. So yes, we -- we approached them in the same way. We -- we covered them in the same way.

Q. You picked neither side?

A. We did not take sides.

Q. Okay. Did -- did you include -- strike

that.

Did your -- do you understand the meaning of the word "protagonist"?

A. Yes, I do.

Q. Could you define that for us?

A. Sure. Would you like me to define it within the context of the series or would you like me to --

Q. We'll get to that. If you could just define the word generally.

A. Sure. I would say a main character or a principal subject.

Q. And you're familiar with the word "antagonist"?

A. Yes, I am.

Q. And what does that word mean?

A. A person or thing who stands in opposition to the protagonist.

Q. And is the protagonist -- strike that.

Did "Making a Murderer" have a protagonist?

A. Yes.

Q. Who was the protagonist?

A. Steven Avery.

Q. Did the -- "Making a Murderer" have an

MR. VICK: Objection. Compound. Vague.
THE WITNESS: We would share cuts with Netflix, and they would provide feedback notes.
Q. (BY MR. BURNETT): And the feedback notes, what would they generally contain?
A. A range of things. But it was their, I think, questions and comments, general feedback about the cuts.
Q. Did -- did Netflix make suggestions and recommendations as to how to improve the documentary in those notes?
MR. VICK: Objection. Best evidence.
THE WITNESS: They made suggestions.
Q. (BY MR. BURNETT): Did you take them seriously?
MR. VICK: Objection. Vague.
THE WITNESS: We took them as suggestions. We -- we took them as suggestions.
Q. (BY MR. BURNETT): Did you ever state that you felt Netflix's suggestions and recommendations were extraordinarily helpful?
A. I'm sorry. Would you repeat that?
Q. Sure. Did you ever state that you thought Netflix's recommendations and suggestions were extraordinarily helpful?

and collaboratively." I mean, I, myself, have talked about -- I believe in life I've talked about it, having been a collaboration.

Q. So you thought it was a -- a collaborative work. And would you agree that you worked closely with the folks at Netflix to produce "Making a Murderer"?

MR. VICK: Objection. Vague.

THE WITNESS: I don't know what Lisa Nishimura means by "closely."

Q. (BY MR. BURNETT): Worked together perhaps, communicating openly and frequently. Would that describe how you and Netflix worked together?

A. I don't know if I would say "frequently." I mean, I -- you know, if I think about the workflow, we -- you know, we were working in separate locations. I think we were, you know, mainly communicating on phone calls. There was an occasional meeting, but, you know, for the most part, we -- Moira and I were most interested in, you know, being able to do the creative work, and then, at times we were required to share it with Netflix and that would, you know, lead to notes and conversations, and then we would go back and we would work creatively, and then -- it was that sort of

**REPORTER'S CERTIFICATE**

I, Amber S. Williams, CSR NO. 1080, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me.

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction.

That the foregoing is a true and correct record of all testimony given, to the best of my ability.

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this ________ day of ____________________ , ___________.

AMBER S. WILLIAMS NOTARY PUBLIC COMM NO. 65680 STATE OF IDAHO

AMBER S. WILLIAMS, CSR NO. 1080
Notary Public
Post Office Box 2636
Boise, Idaho 83701-2636

My commission expires June 1, 2027