Exhibit 23

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

ANDREW L. COLBORN,

                Plaintiff

NETFLIX, INC.,                              Case No. 19-CV-484
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

                Defendants.

---

## PLAINTIFF'S RESPONSES TO NETFLIX, INC.'S
## FIRST SET OF INTERROGATORIES

---

**NOW COMES** the Plaintiff by his attorneys, and responds to the above-referenced Interrogatories as follows:

## GENERAL OBJECTIONS

To the extent that any of the Interrogatories call for information which is protected by the attorney-client privilege, work-product doctrine or otherwise immune from discovery, Plaintiff hereby objects to furnishing any such information and such information is not being provided.

To the extent that any of the Interrogatories go beyond the scope of Fed.R.Civ.P. 26, Plaintiff objects and will comply only to the extent of the obligations set forth therein.

Discovery and investigation are continuing in this matter and Plaintiff reserves the right to amend and/or supplement these responses accordingly.

Subject to the foregoing objections and the specific objections asserted below, Plaintiff respectfully submits, without in any way conceding relevancy, or admissibility, the following responses to the Interrogatories:

**INTERROGATORY 1:** Identify all facts that you believe support your allegation that Netflix published the Challenged Statements with knowledge of their falsity or with reckless disregard of their truth or falsity.

**RESPONSE:** Plaintiff objects to this Interrogatory as calling for information the details of which are in Defendants' exclusive possession pending discovery that has not fully been provided to Plaintiff and pending an opportunity to depose Defendants and their current and former employees and agents. As recognized by the United States Supreme Court in *Herbert v. Lando*, 441 U.S. 153 (1979), the specific details regarding the events leading up to publication of defamatory material are normally within the possession of defamation defendants, and therefore, discovery should be permitted to defamation plaintiffs regarding those issues. Prior rulings in this case have established that Plaintiff articulated a plausible basis for the allegations in the Second Amended Complaint that Netflix, Inc. worked with Laura Ricciardi and Moira Demos to make false and defamatory statements and omissions about him in MAM and MAM2. Accordingly, Plaintiff is entitled to responses to discovery requests seeking further information from Defendants.

Plaintiff further objects that service of contention interrogatories such as this interrogatory is normally recognized as appropriate only near the end of discovery in order to avoid the use of such devices as vehicles for prematurely attempting to invade the mental impressions / work product of opposing counsel.

Subject to and without waiving his objections, Plaintiff responds that the following facts referenced in documents produced by Defendants to date, and/or reasonable inferences therefrom, support the conclusion that Netflix published the "Challenged Statements" with actual malice (knowledge of falsity or reckless disregard for their truth or falsity):

Netflix 210 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employee Adam Del Deo raised questions internally regarding the weight of the call that Plaintiff received in or about 1995, noting that it seemed "very thin that Colborn not having special knowledge of who called him would be the key to the case . . . . if you are Colborn, why even disclose." Nonetheless, Netflix employees acknowledged that the phone call and "the subsequent flow of information to other figures" in the Sheriffs Department is "something we keep going back to throughout the series" and suggested using techniques to buttress the point. Netflix 293 (marked as CONFIDENTIAL pursuant to the Protective Order). Netflix introduced the idea of a chart to emphasize "connections between various law enforcement officers." Netflix 329 (marked as CONFIDENTIAL pursuant to the Protective Order).

Netflix 213, 215 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix directed those working on the project to "hold a bit longer" on Plaintiff's face in an episode, to emphasize his allegedly looking "caught," even though it might involve "Court footage that may not exist."

Netflix 219 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees worked to edit the series through a point of view that sought to establish Sheriff's Department

2

employees as conspirators; for example, they directed that materials be reviewed specifically for what they could use to show that "the Sheriffs' were pissed that Steven got off." Similarly, at Netflix 222 (marked as CONFIDENTIAL pursuant to the Protective Order), they say, "Is there anything we can use/show to . . . allude to the fact that [law enforcement officers] may have planted something when they were [on the Avery property] without permission?" Netflix also looked for ways to telegraph alleged bad intent of law enforcement officers to viewers, indicating that the end to an episode should make it "explicit that in the next episode the cops are going to seek revenge" for Avery's exoneration from the earlier rape conviction. Netflix 329 (marked as CONFIDENTIAL pursuant to the Protective Order).

Netflix 219 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees suggested and approved graphics and inserts that were used to highlight Plaintiff at key moments and to spotlight his alleged connection to accusations made by the series, as outlined in Plaintiff's response to Netflix's second motion to dismiss.

Netflix 227 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees' "plot points" summary extracted from the original outlines provided to them summarizes the points in a way that is far more slanted and unsupported than the original outlines' characterization of events, stating, for example, as one plot point, that "cops covered up evidence about Gregory Allen" – *i.e.*, the telephone call that Plaintiff received but properly reported to his superior. In that same summary, the Netflix employee (Adam Del Deo) concedes that the 1995 phone call was to him, "a weak revelation."

Netflix 212, 237 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees were deeply involved in editing and deciding which materials should be cut or shortened in the editing of MAM episodes, including using techniques to "intercut" dialogue.

Netflix 241-43 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees were deeply involved in determining the music to accompany MAM episodes. Further, as established by Netflix 339 (marked as CONFIDENTIAL pursuant to the Protective Order), they made these decisions specifically to "emphasize further" the accusations in the series and to inflame viewers against Plaintiff. Similarly, they included edits to ensure that the music "really up[ped] the stakes" to further inflame audience members against Plaintiff and others. *See* Netflix 296 (marked as CONFIDENTIAL pursuant to the Protective Order). Netflix wanted a "thriller atmospheric score." Netflix 216 (marked as CONFIDENTIAL pursuant to the Protective Order). *See also* Netflix 273 (directing that music be made more intense in Episode 5 and 6); Netflix 287 (approving as good "danger" music the scoring accompanying images of Plaintiff walking Plaintiff out of court). Under Wisconsin law, the MAM broadcasts are to be considered in their entirety, including audio and visual elements, by the trier of fact.

Netflix 264-65, 284-85 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees specifically sought images of Plaintiff that would further inflame viewers to dislike him, as evidenced by their search for "shots" of Plaintiff "showing satisfaction" with the Avery verdict in order to promote in viewers feelings of "intense anger, bewilderment, and even fury"; to make viewers "VERY upset!" and to see if those feelings could be "ratched up." For similar reasons, Netflix employees crafted the series to include shots of and identify Plaintiff walking Avery out of court after the verdict. Netflix 267 (marked as CONFIDENTIAL pursuant to the

3

Protective Order). Netflix employees characterized Plaintiff in their internal communications as a "suspect" in "tampering with evidence" despite the absence of any charges alleging that and based strictly on the accusations of the defense team for a then-accused murderer who were for obvious reasons desperate to deflect blame from their client. Netflix 268 (marked as CONFIDENTIAL pursuant to the Protective Order).

Netflix 288: Netflix employees acknowledged that the key falling on the floor was "weaker evidence" of the alleged conspiracy to plant evidence and that some of the points in the series appeared initially to be "grasping for" evidence of a conspiracy, acknowledging, for example, that it could "just have been a simple oversight that [James] Lenk didn't sign in" at an Avery property search; proposing adding a graphic / timeline to help buttress the weight of the accusations.

In addition, Netflix employees helped to craft the series to "[set] Colborn up" as the "potential cop to plant the car," indicating that the recrafted draft episode that incorporated their suggestions "works really well now." Netflix 274-78 (marked as CONFIDENTIAL pursuant to the Protective Order).

Netflix employees debated whether comments by Jerry Buting, one of Avery's defense lawyers, went too far in inciting viewers to believe not only that Sheriff's Department officers conspired to plant evidence, but also that they went so far as to kill Teresa Halbach in order to convict Avery – a conclusion that some of the callers who left threatening messages for Plaintiff apparently drew from the series. Netflix 294-95 (marked as CONFIDENTIAL pursuant to the Protective Order). They specifically referenced the phrase Buting used, "we're going to make sure he's convicted," which was incorporated in the series (Netflix 294-95 marked as CONFIDENTIAL pursuant to the Protective Order). In this exchange, Netflix employees stated:

**Adam Del Deo:**

. . . .

In this sequence, it feels like Jerry Buting, on an almost definitive basis, is accusing the officers. Although I think the officers have the strongest motive, I think Jerry's statement come across at [sic] fact. ..they thought, for sure, we're going to make sure he's convicted." It may be worth soften his statement so it doesn't come across so subjective.

Ben, can you add that.

Great work – this is going to be a great series.

**Benjamin Cotner:**

I will do a last pass and draft an email for you, Lisa, to review and send in the morning.

Adam, I am kind of worried that this note goes contrary to the direction we've been pushing them in. I've been under the impression that we are desperate to say that someone else could have done it. I'm afraid that if we tell them to soften something it is going to really confuse the filmmakers. . . . I don't think that subjective is necessarily

4

bad, but if it is completely unfounded then you might be right. Let me know what you think . . .

**Adam Del Deo:**

I hear you. Let me try to clarify.

I think the statement as Jerry currently communicates it comes across, to me, as a matter of fact the officers did it (as oppose to highly likely they did it). In other words, I think if Jerry's statement involving the officers can come across as a highly possible/very likely scenario (since the officers had a very strong motive to kill Steven) it would be convincing that someone else, most likely one of/some of the officers, were involved.

I think we're saying the same thing. However, I just wanted to make sure Jerry isn't saying the officers killed as a matter of pure fact since there's no physical evidence to really prove the officers were there, rather just very strong motive. Take a look at Jerry's statement again and see if you agree. If not, leave the way it is.

**Benjamin Cotner:**

I think its a really valid point but I would rather leave it in for now – it is something we can always pull out later, but I am so happy that they finally have a point of view. I hope people know that it is just a theory …

Netflix 294-95 (marked as CONFIDENTIAL pursuant to the Protective Order).

Netflix employees participated in editing the treatment of Plaintiff's call to dispatch to make it appear that Plaintiff was "caught in a lie" through the omission of testimony as described in Exhibit B to the Second Amended Complaint, even though earlier drafts of the outline for those episodes only described the call as showing that Plaintiff had "called in" the vehicle prior to its discovery. Netflix 339 (marked as CONFIDENTIAL pursuant to the Protective Order).

Plaintiff further notes that the foregoing facts, reflected in just the small set of documents produced to date, are eminently consistent with the allegations in the Second Amended Complaint. Moreover, they are troublingly inconsistent with the arguments and representations that Netflix made in the brief submitted in support of its initial motion to dismiss in these proceedings.

In addition, Netflix republished accusations that are included in the "Challenged Statements" that were obviously made by biased sources, including the following:

Statements by Avery, his relatives, and friends, to the effect that Plaintiff and Sheriff's Department officers conspired to frame Avery, as detailed in Exhibit A to the Second Amended Complaint;

Statements by Avery's attorneys and investigator to the effect that Plaintiff and Sheriff's Department officers conspired to frame Avery, as detailed in Exhibit A to the Second Amended Complaint;

5

Statements by unidentified bar patrons, to the effect that Plaintiff and Sheriff's Department officers conspired to frame Avery, as detailed in Exhibit A to the Second Amended Complaint.

Netflix's production to date establishes that Netflix employees knew that these statements went too far when making unproven accusations, *see, e.g.,* Netflix 294 (marked as CONFIDENTIAL pursuant to the Protective Order), but included them in MAM anyway. In addition, the series outline specifically acknowledged that Avery, "his family" and "a few LOCALS" believed that he was being framed but had "no way of proving it." Netflix 147 (marked as CONFIDENTIAL pursuant to the Protective Order).

In addition, Plaintiff filed and referenced a sampling of publicly available media and internet articles and materials in his brief in response to Netflix's initial motion to dismiss and in the supporting Declaration of George Burnett.

Discovery and investigation are ongoing, and Plaintiff reserves the right to supplement his response as may be appropriate.

**INTERROGATORY NO. 2:** For each material fact that you allege was omitted from Making a Murderer or Making a Murderer 2, (1) state the omitted fact, (2) identify all facts that you believe suggest, indicate or prove that Netflix was aware of the omitted fact and (3) identify all facts that you believe suggest, indicate or prove that Netflix had knowledge that omission of the fact would cause Making a Murderer or Making a Murderer 2 to be false or that Netflix omitted the fact with reckless disregard of the series' falsity.

**RESPONSE:** Plaintiff objects to this Interrogatory as vague as to whether it calls for descriptions of information omitted in MAM1 or 2 that Plaintiff contends was defamatory to him or to omitted information that was included as context for the false and misleading nature of the series as a whole. Plaintiff further objects to this Interrogatory to analyze information the details of which are in Defendants' exclusive possession pending discovery that has not fully been provided to Plaintiff and pending an opportunity to depose Defendants and their current and former employees and agents. As recognized by the United States Supreme Court in *Herbert v. Lando*, 441 U.S. 153 (1979), the specific details regarding the events leading up to publication of defamatory material are normally within the possession of defamation defendants, and therefore, discovery should be permitted to defamation plaintiffs regarding those issues. Prior rulings in this case have established that Plaintiff articulated a plausible basis for the allegations in the Second Amended Complaint that Netflix, Inc. worked with Laura Ricciardi and Moira Demos to make false and defamatory statements and omissions about him in MAM and MAM2. Accordingly, Plaintiff is entitled to responses to discovery requests seeking further information from Defendants. Moreover, this Interrogatory requests that Plaintiff analyze documents partially produced by Defendants only 10 days prior to the date of this response and as to which there has not been adequate time to analyze the documents in the context of the matters described in the Second Amended Complaint.

Plaintiff further objects that service of contention interrogatories such as this Interrogatory is normally recognized as appropriate only near the end of discovery in order to avoid the use of

6

such devices as vehicles for prematurely attempting to invade the mental impressions / work product of opposing counsel.

Subject to and without waiving his objections, Plaintiff responds as follows:

- Netflix omitted from the portion of the MAM series that contains the quoted statements from Avery attorney Steven Glynn, reproduced at Dkt #105, pp. 30-31, the facts that Plaintiff transferred the call to the Detective Division and contacted a supervisor after receiving the call in 1995. Stating these facts in conjunction with Glynn's statements was necessary in order to prevent Glynn's statement, independently and in context with the other statements by Glynn that were contained in MAM, from being interpreted as accusing Mr. Colborn of making no report to a supervisor after receiving the call in 1995. While this fact is later mentioned in deposition testimony excerpts, it is too distant in time and too obscured by the manner of its presentation to reasonably correct the false impression given to viewers by Glynn's statements. The communications and statements by Netflix employees as contained in the second production of documents, including the specific documents identified in response to Interrogatory No. 1, and especially communications between Lisa Nishamura, Ben Cottner, and Adam Del Deo, establish that Netflix employees were deeply involved in editing and reviewing the contents of MAM, including, but not limited to, quotations by "characters," including Avery attorneys. These communications establish that Netflix employees were attempting to "ratchet up" the drama and include a "point of view" that accused law enforcement officers of grave misdeeds, even though they also knew that the revelation of the 1995 phone call was "weak."

These communications include the following:

  o Netflix 219 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees worked to edit the series through a point of view that sought to establish Sheriff's Department employees as conspirators; for example, they directed that materials be reviewed specifically for what they could use to show that "the Sheriffs' were pissed that Steven got off." Similarly, at Netflix 222 (marked as CONFIDENTIAL pursuant to the Protective Order), they say, "Is there anything we can use/show to . . . allude to the fact that [law enforcement officers] may have planted something when they were [on the Avery property] without permission?" Netflix also looked for ways to telegraph alleged bad intent of law enforcement officers to viewers, indicating that the end to an episode should make it "explicit that in the next episode the cops are going to seek revenge" for Avery's exoneration from the earlier rape conviction. Netflix 329 (marked as CONFIDENTIAL pursuant to the Protective Order).

  o Netflix 227 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees' "plot points" summary extracted from the original outlines provided to them summarizes the points in a way that is far more slanted and unsupported than the original outlines' characterization of events, stating, for example, as one plot point, that "cops covered up evidence about Gregory Allen"

7

– *i.e.*, the telephone call that Plaintiff received but properly reported to his superior. In that same summary, the Netflix employee (Adam del Deo) concedes that the 1995 phone call was to him, "a weak revelation."

o Netflix 212, 237 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees were deeply involved in editing and deciding which materials should be cut or shortened in the editing of MAM episodes, including using techniques to "intercut" dialogue.

o Netflix 264-65, 284-85 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees specifically sought images of Plaintiff that would further inflame viewers to dislike him, as evidenced by their search for "shots" of Plaintiff "showing satisfaction" with the Avery verdict in order to promote in viewers feelings of "intense anger, bewilderment, and even fury"; to make viewers "VERY upset!" and to see if those feelings could be "ratched up." For similar reasons, Netflix employees crafted the series to include shots of and identify Plaintiff walking Avery out of court after the verdict. Netflix 267 (marked as CONFIDENTIAL pursuant to the Protective Order). Netflix employees characterized Plaintiff in their internal communications as a "suspect" in "tampering with evidence" despite the absence of any charges alleging that and based strictly on the accusations of the defense team for a then-accused murderer who were for obvious reasons desperate to deflect blame from their client. Netflix 268 (marked as CONFIDENTIAL pursuant to the Protective Order).

o Netflix 288: Netflix employees acknowledged that the key falling on the floor was "weaker evidence" of the alleged conspiracy to plant evidence and that some of the points in the series appeared initially to be "grasping for" evidence of a conspiracy, acknowledging, for example, that it could "just have been a simple oversight that [James] Lenk didn't sign in" at an Avery property search; proposing adding a graphic / timeline to help buttress the weight of the accusations.

o In addition, Netflix employees helped to craft the series to "[set] Colborn up" as the "potential cop to plant the car," indicating that the recrafted draft episode that incorporated their suggestions "works really well now." Netflix 274-78 (marked as CONFIDENTIAL pursuant to the Protective Order).

o Netflix 294-95 (marked as CONFIDENTIAL pursuant to the Protective Order): As quoted in response to Interrogatory No. 1, above, Netflix employees debated whether comments by Jerry Buting, one of Avery's defense lawyers, went too far in inciting viewers to believe not only that Sheriff's Department officers conspired to plant evidence, but also that they went so far as to kill Teresa Halbach in order to convict Avery – a conclusion that some of the callers who left threatening messages for Plaintiff apparently drew from the series. Netflix 294-

8

95 (marked as CONFIDENTIAL pursuant to the Protective Order). They specifically referenced the phrase Buting used, "we're going to make sure he's convicted," which was incorporated in the series (Netflix 294-95 marked as CONFIDENTIAL pursuant to the Protective Order).

- o Netflix 339 (marked as CONFIDENTIAL pursuant to the Protective Order): Netflix employees participated in editing the treatment of Plaintiff's call to dispatch to make it appear that Plaintiff was "caught in a lie" through the omission of testimony as described in Exhibit B to the Second Amended Complaint, even though earlier drafts of the outline for those episodes only described the call as showing that Plaintiff had "called in" the vehicle prior to its discovery. Netflix 339 (marked as CONFIDENTIAL pursuant to the Protective Order).

It is reasonable to infer from these facts that Netflix employees not only had knowledge that the omission would cause the series to be false and omitted the fact with disregard of the series' truth or falsity, but specifically sought to create a better "story" by omitting facts that would cause viewers to doubt that officers conspired to frame Avery.

- Omissions from Court testimony: It is likewise reasonable to infer that the Netflix employees who were deeply involved in editing the dialogue and who repeatedly sought to revise the episodes so that the dialogue moved faster, *see* Neflix #212, 237 (marked "Confidential" pursuant to protective Order), and who viewed the revised versions of the episodes, were and had to be aware that the courtroom testimony presented in MAM omitted most of the statements made in the yellow-highlighted portions of Exhibit B to the Second Amended Complaint. Because the following omissions changed the responses in ways that are readily identifiable as substantive and as affecting viewers' perceptions of Plaintiff's credibility, the only reasonable inference is that Netflix employees who were participating in the edits to the series did so to create in the series an impression contrary to the content and appearance of the omitted testimony, and therefore, with knowledge that the omissions would cause MAM to be false or omitted the facts with reckless disregard of the series' truth or falsity:

  - o Dkt #105, p. 47, omission of testimony by Plaintiff reflecting surprise that he had missed the key in earlier searches.

  - o Dkt #105, pp. 47-49, omission of testimony by Plaintiff that the person who called him appeared to incorrectly assume that the caller had reached a law enforcement officer, rather than a jailer, and that he transferred the call to the Detective Division at the Sheriff's Department.

  - o Dkt #105, p. 48, omission of testimony by Plaintiff, in response to the question ("Have you ever planted any evidence against Mr. Avery,") stating in positive terms, "That's ridiculous. . . ."

9

o Dkt #105, p. 49, omission of testimony describing Plaintiff's background as an evidence technician, as relevant to his participation in searches of the Avery property.

o Dkt #105, p. 51, omission of testimony indicating that Plaintiff wrote a statement about the prior call after directed to do so by a superior, contrary to Glynn's assertion that it was done simply because Plaintiff allegedly recognized a prior mistake.

o Dkt #105, p. 52, omission, again, of testimony by Plaintiff that he transferred the prior call to the Detective Division.

o Dkt #105, p. 52, omission of testimony, "That is why I didn't do one" as to question about a report about the prior call.

o Dkt #105, pp. 54-55, omission of testimony in which Plaintiff acknowledges that he asked in the call whether the vehicle in question was a "'99 Toyota," apparently to enhance the "caught in a lie" impression that Netflix employees wanted here

o Dkt #105, p. 55, omission of testimony in response to question whether Plaintiff had been given the license plate number by an investigator prior to the call to dispatch, in which Plaintiff indicated that while he didn't remember the entire content of the conversation, "he must have," and substituting instead a negative response, to make it appear that only after the negative response did Plaintiff concede the truth of the statement in response to further questioning.

o Dkt #105, p. 55-56, omission of the actual question that Plaintiff was answering in the affirmative with respect to the call to dispatch and substituting instead a different question to which an affirmative answer appeared to be an admission of the defense interpretation of the call to dispatch.

Discovery and investigation are ongoing, and Plaintiff reserves the right to supplement his response as they proceed. In particular, evidence regarding Netflix's specific activities and participation in editing MAM was only provided 10 days prior to this response. Plaintiff anticipates supplementing this response as analysis of that material continues and as additional material is produced.

**AS TO OBJECTIONS:**

     Dated this 6th day of October, 2021.

               April Rockstead Barker
               State Bar #: 1026163
               Attorneys for Plaintiffs

10

SCHOTT, BUBLITZ & ENGEL s.c.
640 W. Moreland Boulevard
Waukesha, WI 53188
(262) 827-1700
(262) 827-1701-Fax
abarker@sbe-law.com

In association with Co-Counsel:

George Burnett
LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
231 S. Adams Street
Green Bay, WI 54301
P.O. Box 23200
Green Bay, WI  54305-3200
Phone:  (920) 437-0476
Fax:  (920) 437-2868
State Bar No. 1005964


Attorney Michael C. Griesbach
GRIESBACH LAW OFFICES, LLC
State Bar No. 01012799
Griesbach Law Offices, LLC
PO Box 2047
Manitowoc, WI  54221-2047
(920) 320-1358

11

**AS TO RESPONSES:**

STATE OF WISCONSIN   )
                            ) ss:
COUNTY OF _____  )


       ANDREW L. COLBORN, being first duly sworn on oath, states that he has read the foregoing responses to the Interrogatories and that the same are true to the best of his knowledge at this time.  Further, he reserves the right to amend the responses should later discovered information suggest that any of the foregoing responses are incorrect or incomplete.


_____
ANDREW L. COLBORN

Subscribed and sworn to before me
this _____ day of _____, 2021.


_____
Notary Public, _____ County, Wis.
My Commission is permanent.

12