Exhibit 48

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

ANDREW L. COLBORN,

                    Plaintiff,

                                                        Case No. 19-CV-484

NETFLIX, INC.,
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and MOIRA DEMOS,

                    Defendants.

## PLAINTIFF'S RESPONSES TO DEFENDANT CHROME MEDIA LLC'S FIRST SET OF INTERROGATORIES

Plaintiff, Andrew L. Colborn, by and through his attorneys, Law Firm of Conway, Olejniczak and Jerry, S.C., responds to Defendant Chrome Media LLC's First Set of Interrogatories as follows:

### GENERAL OBJECTIONS

To the extent that any of the Interrogatories call for information which is protected by the attorney-client privilege, work-product doctrine or otherwise immune from discovery, Plaintiff hereby objects to furnishing any such information and such information is not being provided.

To the extent that any of the Interrogatories go beyond the scope of Fed.R.Civ.P. 26, Plaintiff objects and will comply only to the extent of the obligations set forth therein.

Plaintiff also objects to the wording of Defendants' requests on the basis that Wisconsin law requires that defamatory broadcasts be considered in their entirety, not just as a collection of allegedly separate statement. The entire MAM broadcasts must be considered with respect to

their falsity and Defendants' knowledge of falsity and/or reckless disregard of the truth with respect to the broadcasts. Plaintiff objects to the Interrogatories to the extent they suggest or imply otherwise.

Discovery and investigation are continuing in this matter and Plaintiff reserves the right to amend and/or supplement these responses accordingly. In addition, Plaintiff's counsel has only just been able to format produced raw footage to viewable format and have not had the opportunity to view it yet, and again, Plaintiff reserves the right to supplement his responses accordingly.

Subject to the foregoing objections and the specific objections asserted below, Plaintiff respectfully submits, without in any way conceding relevancy, or admissibility, the following responses to the Interrogatories:

**INTERROGATORY NO. 1:** Identify with specificity all "spliced and omitted portions of Plaintiff's trial testimony as set forth in Exhibit A and B" that you contend "distort the facts and nature of the 1994 or 1995 telephone call…[and] led viewers to falsely conclude that Plaintiff bears responsibility for seven or eight of Avery's 18 years of wrongful imprisonment, providing him [Colborn] with a motive to frame Avery for Halbach's murder," as alleged in Paragraph 27 of the Second Amended Complaint.

      **RESPONSE NO 1:  Subject to Plaintiff's General Objections, Plaintiff refers to the summaries attached in chart form hereto. Discovery and investigation are ongoing, and Plaintiff reserves the right to supplement his responses accordingly.**

**INTERROGATORY NO. 2:** For each "spliced and omitted portion" identified in your response to Interrogatory No. 1, state how that spliced or omitted portion "distort[ed] the facts and nature of the 1994 or 1995 telephone call…[and] let viewers to falsely conclude that Plaintiff bears responsibility for seven or eight of Avery's 18 years of wrongful imprisonment, providing him [Colborn] with a motive to frame Avery for Halbach's murder," as alleged in Paragraph 27 of the Second Amended Complaint.

      **RESPONSE NO 2:  Subject to Plaintiff's General Objections, Plaintiff refers to the summaries attached in chart form hereto. Discovery and investigation are ongoing, and Plaintiff reserves the right to supplement his responses accordingly.**

**INTERROGATORY NO. 3:** Describe in detail all facts that you contend support your allegation in Paragraph 33 of the Second Amended Complaint that "Defendants knew of [the]

falsity" of Steven Avery's criminal attorneys' "suggest[ion] that Plaintiff was looking directly at Halbach's vehicle when he called dispatch."

**RESPONSE NO 3:** **Subject to Plaintiff's General Objections, Plaintiff responds as follows: Plaintiff's testimony at the civil trial regarding the call that he made to dispatch was reasonable and credible and he specifically denied that he was looking at Halbach's vehicle during his testimony.**

**In addition, upon information and belief, the Defendants had reviewed the Avery Trial Court's Decision and Order dated January 30, 2007, which explained that any theory regarding any alleged involvement of Plaintiff in planting Avery's blood in Halbach's vehicle was extremely weak and rested on an unexplained contradiction:**

> **[as] pointed out by the State at oral argument: How could Lenk or Colbom have known that Teresa Halbach was dead at the time they are alleged to have planted the defendant's blood in her vehicle? Under the defendant's theory, either Lenk, Colbom, or both would have had to have formulated a plan involving their own commission of serious felonies and executed that plan within a very short period of time, motivated apparently only by their embarrassment for not allegedly having acted more responsibly on information that could have led to Mr. Avery's exoneration back in 1995 or 1996.**

**Decision and Order at p. 11.**

**It was only due to the extremely low bar afforded criminal defendants by law to attempt to offer theories to attempt to exculpate themselves that this theory was even allowed to be presented by the judge. Under any common-sense or reasonable standard, the assertion that Plaintiff had found Halbach' vehicle prior to the time that she was known to have been deceased was obviously false.**

**Defendants are educated persons; both have advanced degrees. In addition, Ms. Ricciardi has a law degree and practiced law for some time after graduation. Accordingly, it is reasonable to infer that both Ricciardi and Demos knew that there was no reasonable basis to believe that Plaintiff planted blood in Avery's car, that any theories to the contrary border on the fantastic and are patently ludicrous, and therefore, that they knew they were false.**

**INTERROGATORY NO. 4:** Describe in detail all facts that you contend support your allegation in Paragraph 40 of the Second Amended Complaint that "defendants manipulated facts to convince viewers that MTSO officers, possibly including plaintiff, secreted Avery's blood from a vial still kept in evidence from his wrongful conviction case, and planted it in Halbach's car."

**RESPONSE NO 4:** **Subject to Plaintiff's General Objections, Plaintiff responds as follows: The facts that support the allegation that Defendants manipulated the facts**

in question are set forth in the remainder of Paragraph 40 of the Second Amended Complaint. Upon information and belief, Defendants had reviewed the Avery Trial Court's Decision and Order dated January 30, 2007 in which the Court noted the fact that the State intended to present evidence that the hole in the blood vial stopper had been created by the phlebotomist who withdrew Mr. Avery's blood on January 2, 1996.

**INTERROGATORY NO. 5:**  Describe in detail all facts that you contend support your allegation in Paragraph 64 of the Second Amended Complaint that the Challenged Statement "tended to harm [you] and actually and irreparably harmed and damaged [your] reputation, lowering [you] in the estimation of the community and subjecting [you] to hostility, hatred and ridicule, and deterring third persons from associating or dealing with [you]."

**RESPONSE NO 5:**  Subject to Plaintiff's General Objections, Plaintiff responds as follows: Plaintiff's counsel will be producing copies of numerous recorded voicemails that Plaintiff received from threatening and verbally abusive MAM viewers across the world, and Plaintiff designates those documents in response to this Interrogatory; Plaintiff's counsel will also be producing copies of email messages and online posts to the same effect; in addition, Plaintiff will testify regarding the countless telephone calls that he received at his personal residence and at work that were not recorded. Due to the intense verbal abuse that Plaintiff suffered from the public at large following the MAM broadcast, Plaintiff eventually resigned from the Sheriff's Department earlier than intended. In addition, the effect of the abuse on Plaintiff has contributed to the demise of Plaintiff's marriage of multiple decades. Plaintiff also incorporates in this response his response to Interrogatory No. 8, below. Damages are ongoing. Plaintiff reserves the right to supplement this response as discovery and investigation continue.

**INTERROGATORY NO. 6:**  For each of the Challenged Statements, describe in detail all facts that you contend support your allegation that the Producer Defendants published that Challenged Statement with knowledge of their falsity or reckless disregard of their truth or falsity.

**RESPONSE NO 6:**  Subject to Plaintiff's General Objections, Plaintiff refers to the summaries attached in chart form hereto.

**INTERROGATORY NO. 7:**  For each material fact that you allege was omitted from Making a Murderer, state that omitted fact and describe in detail why you believe that the Producer Defendants had knowledge that omission of the fact would cause Making a Murderer to be false or that the Producer Defendants omitted the fact with reckless disregard of the series' truth or falsity.

**RESPONSE NO 7:**  Subject to Plaintiff's General Objections, Plaintiff refers to the summaries attached in chart form hereto, and to the allegations of the specific paragraphs of the Second Amended Complaint that are described as "Challenged Statements," as the factual basis for many of the allegations is set forth therein,

including detailed descriptions of the specific alterations to and omissions of trial testimony by the Defendants. Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) Discovery and investigation are ongoing, and Plaintiff reserves the right to supplement his responses accordingly.

**INTERROGATORY NO. 8:** Describe in detail all items of damage you contend you sustained as a result of the Producer Defendants' acts or omissions alleged in the Second Amended Complaint.

**RESPONSE NO 8:** Subject to his General Objections, Plaintiff responds as follows: Making a Murderer damaged if not destroyed my reputation, my health and my personal life. My reputation as a police officer, so important to maintain as trustworthy and being with integrity as well as honest, was severely damaged as millions viewed and believed the falsehood that was Making a Murderer. In the social media realm my reputation was totally destroyed as I was, and still am portrayed as the poster child for corruption. I began to fear that this annihilation of my reputation would affect the weight of my courtroom testimony on other cases, effectively ruining my career as a police officer. My health was affected as I did and continue to live in a state of constant hypervigilance, as Making a Murder prompted a multitude of death threats to me and towards my family. Never being able to totally relax, as well as constantly anticipating an attack on me and/or a member of my family has caused me to develop both hypertension and anxiety, which has to be treated with prescription medication. Due to the stress caused by MAM, I have trouble sleeping and I find myself often angry and irritable. I no longer feel I can trust anyone totally ever again. My personal life has also been greatly damaged as a result of MAM. My inability to go back to the person I was before MAM has destroyed my 30 year marriage and the marriage ended in divorce. I have lost family members and friends because of MAM's false narrative, reckless agenda and portrayal of me, which is only exacerbated by the social media crazies who continually, 7 years after its release, claim that I am a corrupt evil person and that MAM is truthful. I am often confronted by total strangers who inform me that they despise me for "what I've done" regarding Steven Avery. I'm not allowed to be present at any media event at my current employer as my presence could be disruptive.

**INTERROGATORY NO. 9:** For each item of damages that you identified in Interrogatory No. 8, identify the amount of damages you are claiming and your method for calculating such amount.

**RESPONSE NO 9:** Subject to his General Objections, Plaintiff responds as follows: The damage to my reputation prompted me to retire from law enforcement

4 years earlier than I had wanted too, costing me at least $400,000. The value of the damage to my personal life, the destruction of my marriage and the loss of friends and family, personal health and wellbeing, sense of calm and sense of safety and security, and general damage to my reputation I am requesting be determined at trial by the jury. In my personal opinion, a value of a million dollars per Episode of MAM 1 and 2 would not even cover the loss of personal happiness caused by Defendants, yet Defendants have undoubtedly been enriched by at least that amount through what they took from me.

**INTERROGATORY NO. 10:** Identify all persons with knowledge of facts relating to the damages you describe in Interrogatory No. 8, and the substance of each person's knowledge.

**RESPONSE NO 10:** Subject to his General Objections, Plaintiff responds as follows: I have discussed the facts of the damages detailed in my response to Interrogatory No. 8 with very few people due to my newfound inability to trust anyone. I have disclosed those damages to my healthcare providers, and to the law firms who represent me in this suit. I have also disclosed how MAM damaged me personally to the law firm representing me in my divorce case. I further have disclosed how MAM has caused me damage to the producers of an upcoming documentary entitled Convicting a Murderer during interviews with them. Beyond that, I rarely, if ever discuss how MAM caused me damages, I instead only defend myself, my fellow deputies, my former agency and law enforcement in general when asked or confronted about Netflix or the producers of MAM or MAM itself.

**INTERROGATORY NO. 11:** Identify every health care provider that you have seen for treatment of any condition(s) that you believe was caused or exacerbated by Making a Murderer, and for each, describe that nature of the symptoms for which you sought treatment, the diagnosis you received, all medication(s) you were prescribed, and all treatments and therapy you received and the dates of the treatments and therapy.

**RESPONSE NO 11:** Subject to his General Objections, Plaintiff designates his previously produced health care records in response to this Interrogatory, without waiving the confidentiality designations in said prior production, which are incorporated by reference herein. Plaintiff further responds that he has seen the following providers that he has seen for anxiety relating to the effects of MAM: Theresa J. Kruegerjunk, NP, of Prevea on December 28, 2018, noted as having "presented for" anxiety; follow-up June 28, 2019. Plaintiff has taken Busiprone / Buspar as a result of his anxiety caused by MAM. Plaintiff believes that the stress is also adversely affecting his blood pressure, for which he takes Lisinopril. Damages are ongoing, and Plaintiff reserves the right to supplement this response.

**As to Objections:**

Dated this 28th day of January, 2022.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff, Andrew L. Colborn

By: _____

George Burnett

*Jon C Rockford Banker*
*SBW# 1026163*

**POST OFFICE ADDRESS**
231 S. Adams Street
Green Bay, WI 54301
P.O. Box 23200
Green Bay, WI 54305-3200
Phone: (920) 437-0476
Fax: (920) 437-2868
State Bar No. 1005964

**AS TO RESPONSES:**

STATE OF WISCONSIN    )
                      ) ss:
COUNTY OF _____  )


ANDREW L. COLBORN, being first duly sworn on oath, states that he has read the foregoing responses to the Interrogatories and that the same are true to the best of his knowledge at this time. Further, he reserves the right to amend the responses should later discovered information suggest that any of the foregoing responses are incorrect or incomplete.


_____

ANDREW L. COLBORN

Subscribed and sworn to before me
this _____ day of _____, 2022.


_____
Notary Public, _____ County, Wis.
My Commission is permanent.

| Ex. A subpart number / short description | Basis for inferring knowledge of falsity and/or reckless disregard of the truth (obvious reasons to doubt veracity of informant or information, *see Anderson v. Herbert*, 2011 WI App 56, ¶¶22-23. |
|---|---|
| 1 [Avery quote, "Nobody said anything . . . ."] | Obvious reasons to doubt veracity of informant, Avery, a convicted murderer who claims that he was framed. Further, accusations regarding the civil suit settled for far less than he was claiming, and the suit did not establish liability for the allegations made. |
| 2 [Kim Ducat – dire warnings of alleged intent to retaliate for civil suit] | Obvious reasons to doubt veracity of informant, an Avery relative and sympathizer, who offers no apparent basis for her statements other than her own alleged intuition. |
| 3 [Photo of Plaintiff and other alleged County "conspirators" during/following Ducat statements] | Obvious reasons to doubt veracity of informant, an Avery relative and sympathizer, yet, Defendants augmented and built on the comments by directly accusing Plaintiff of scheming to retaliate against Avery through its visual of Plaintiff timed to coincide with/follow Ducat's statements. |
| 4 [Glynn – lengthy comment accusing Plaintiff of "feeling threatened" by civil suit due to alleged mishandling of 1995 call] | Obvious reasons to doubt veracity of informant, an attorney/advocate for Avery in the civil suit who likely believes that he lost the prospect of a significant amount of additional fees that he could have recovered in the civil suit. |
| 5-19 [Glynn – 1995 call set-up and descriptions, augmented by MAM images of Plaintiff and statements by Glynn allegedly implicating Plaintiff in alleged "cover up" of the call] | Obvious reasons to doubt veracity of informants, Avery and an attorney/advocate for Avery in the civil suit who likely believes that he lost the prospect of a significant amount of additional fees that he could have recovered in the civil suit. Yet, Defendants amplified and exaggerated Glynn's statements through their visuals implicating Plaintiff in the alleged "cover up"; by selecting and cherry-picking excerpts from civil suit depositions that concerned Plaintiff, even when witnesses were obviously speculating; juxtaposing Avery's comments of a claimed "cover-up" with the depositions and culminating in Glynn's accusations that there was an "unconscionable" withholding of information and a "conspiracy of silence." |
| 21-24 [Accusation by Glynn that Plaintiff and | Obvious reasons to doubt veracity of informant, an attorney/advocate for Avery in the civil suit who likely believes that he lost the prospect of a significant amount of additional fees that he could have recovered in the civil suit. |

| | |
|---|---|
| others were in "the most serious kind of trouble" and allegedly "hid evidence" and were "liar[s]," so that the civil suit was allegedly a motive for Plaintiff and others to implicate Avery in the Halbach murder] | |
| 25-27 [RAV identified, followed by Avery telling investigators it was planted; Avery even goes so far as to suggest that County "did something" with Halbach herself to set him up] | Obvious reasons to doubt veracity of informant, Avery, a convicted murderer who claims that he was framed. In addition, Defendants included Avery's suggestion the County actually may have harmed Halbach, an unsubstantiated accusation that even his defense attorneys disclaimed at his trial. |
| 28-29 [video and photos of Plaintiff and James Lenk, followed by bar patrons saying that law enforcement and others framed Avery and that they believed that local law enforcement and the FBI "set this all up just to have Stephen Avery guilty of this thing" – again, implying that law | Obvious reasons to doubt veracity of speakers, local residents spouting off in a tavern, who are not even identified by name. Yet, Defendants used visuals to tie the accusations directly to Plaintiff and James Lenk. |

| | |
|---|---|
| enforcement may have harmed Halbach just to frame Avery for it] | |
| 30-33 [County settlement referenced, then Avery is heard alleging that they framed him, followed by Strang and Buting making out-of-court statements to the effect that officers planted blood in Halbach's RAV and planted the RAV key in Avery's bedroom] | Obvious reasons to doubt veracity of informants, Avery and his attorneys. |
| 34 [Baetz states that the County/law enforcement scrubbed the RAV key and put Avery's DNA on it] | Obvious reasons to doubt veracity of informant, Avery's private investigator for murder trial. |
| 35-39 [Buting makes statements regarding alleged planting of blood in the RAV, coupled with MAM's use of photographs of Plaintiff, implicating him as alleged culprit] | Obvious reasons to doubt veracity of informant, Avery's advocate/attorney. Yet, Defendants used visuals to tie the accusations directly to Plaintiff. |
| 40-42 [statements by Avery and his attorneys | Obvious reasons to doubt veracity of informants, Avery and his attorneys. Yet, Defendants included photographs of Plaintiff to tie the accusations to him and timed the statements to be followed by edited testimony by Plaintiff at trial, which they specifically altered to make it appear that he acknowledged that his |

| | |
|---|---|
| regarding alleged planting of RAV] | call to dispatch could be interpreted as establishing that he was looking at the vehicle when he made it. In fact, Plaintiff did not so testify. Therefore, Defendants knew that statement was false as they had altered it. |
| 43-44 [Buting out-of-court statements that two police officers, maybe one, could have planted evidence and would have no fear of being caught, coupled with image of James Lenk] | Obvious reasons to doubt veracity of informant, Avery's advocate/attorney. Yet, Defendants used visuals to tie the accusations to James Lenk, who is also repeatedly in the series alleged to be a conspirator with Plaintiff. |
| 45 [Allen Avery statements that law enforcement set up Avery by planting the key] | Obvious reasons to doubt veracity of informant, Avery's father. |
| 46 [Avery attorneys' out-of-court statements that the key was planted, blood was planted, and tying it to those who were deposed in the civil suit but who allegedly "didn't tell"] | Obvious reasons to doubt veracity of informants, Avery's attorneys. |
| 47-48 [Avery statement that a "couple of 'em want[] to railroad me," coupled with Plaintiff's photograph inserted by MAM] | Obvious reasons to doubt veracity of informant, Avery. Yet, Defendants added visuals to tie the accusations directly to Plaintiff. |
| 49-50 [Defendants again use imagery to implicate Plaintiff | Obvious reasons to doubt veracity of informant, Avery. Yet, Defendants added visuals to tie the accusations directly to Plaintiff. |

| | |
|---|---|
| in Avery's conspiracy allegations] | |
| 51-54 [Baetz allegations of conflict of interest, coupled with Strang and Buting out-of-court accusations of alleged framing] | Obvious reasons to doubt veracity of informants, Avery's attorneys/investigator. |
| 55 [Buting reference in closing argument to Lenk finding key, but MAM adds photograph of Plaintiff with James Lenk] | Obvious reasons to doubt veracity of informant, Avery's attorney, yet Defendants emphasized and augmented arguments by adding a photograph of Plaintiff, at a point at which the attorney only referenced James Lenk. Defendants knowingly altered viewers' impression/interpretation of the closing argument excerpt through placement of their visual. |
| 56 [Cut to Kratz argument referencing Lenk and Colborn] | Placement of these excerpts and timing of sequence makes it seem that Buting in fact referenced Colborn in his argument excerpt that directly preceded Kratz excerpts, when he did not. Defendants knowingly altered viewers' impression/interpretation of the closing argument excerpts through placement of the excerpts. |
| 57-60 [Excerpts from closing arguments are strung together to misleadingly suggest that even Kratz acknowledges that the police must have killed Halbach] | Defendants knowingly altered viewers' impression/interpretation of the closing argument excerpts through placement of the excerpts, to make it appear that even though Avery's attorneys disclaimed a theory that the police killed Halbach, the prosecution acknowledged it. |
| 61 [Avery's attorneys' out-of-court statements regarding impact of alleged Avery framing on possible Dassey defense] | Obvious reasons to doubt veracity of informants, Avery's attorneys. |



## SEASON 1 – EPISODE 1

1    Avery: They had the evidence back then that I didn't do it. But nobody said anything....

….

2    Kim Ducat: They weren't just gonna let Stevie out. They weren't gonna hand that man $36 million. They weren't gonna be made a laughing stock, that's for sure.

3    They just weren't gonna do all that. And something in my gut said they're not done with him. Something's gonna happen,. They're not handing that kind of money over to Steve Avery.

(MAM shows photos including that of Plaintiff Andy Colborn testifying in the background during the above excerpt, along with others alleged to be part of the Manitowoc County Sheriff's Department "conspiracy").

## SEASON 1 - EPISODE 2

4    Steve Glynn: The day of or the day after Steven's release, law enforcement officers in Manitowoc are writing memos to describe activity that had occurred almost ten years earlier. They don't do that unless they feel threatened.

….

5    Steve Glynn:  We learned during litigation something that we had absolutely no knowledge of before the lawsuit got started.   That 1995 was a very, very significant point in this thing.

6    [video deposition of plaintiff shown in background]

7    And that there is not only something to this idea that law enforcement had information about somebody else, but there is serious meat on those bones, I mean serious meat.   What we learn is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department [image of report prepared by plaintiff is shown in background] from another law enforcement agency which at least one of the other officers involved in that process believed to be the Brown County Sheriff's Department saying that they had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison.

8    [resumes footage from video deposition of plaintiff]

Glynn:       You've gone over exhibit 138.

Plaintiff:     Yes, sir.

Glynn:       It describes you receiving a telephone call 1994 or 1995 from someone who identified himself as a detective, correct?

Plaintiff:     Yes.

Glynn:        The detective indicated that there was a person in custody who had made a
              statement about a Manitowoc county offense, correct?

Plaintiff:     Yes.

Glynn:        And what that person in custody had said was that he had committed an assault in
              Manitowoc County and someone else was in jail for it, correct?

Plaintiff:     Yes, sir.

[footage of Glynn speaking in an interview]

9  Glynn: Manitowoc doesn't have huge numbers of major assaults where people go to prison and
certainly where people would still be in prison. There is a very distinct possibility, I would say
likelihood, that it's Gregory Allen, [graphic shows in background depicting bullet point and a
developing timeline that states:  1995 ● Gregory Allen is arrested for sexual assault in Brown
County/Andrew Colborn receives call about inmate confession] it's the Brown County Sheriff's
Department that is in 1995 on the Gregory Allen case, that Gregory Allen has said something
about Steven Avery, and at a minimum, somebody ought to check this out.

10  [back to footage of plaintiff's video deposition]

Glynn:        I mean that's a significant event.

Plaintiff:     Right, that's what stood out in my mind.

[back to interview with Glynn]

11  Glynn:        The fellow who got that call was a guy named Colbert. And you might say that
there should be a record of him immediately making a report on this, there might be a record of
his immediately contacting a supervising officer, there might be a record of him contacting a
detective who handles sexual assault cases, ahh, there might be some record of it. But if you
thought any of those things, you'd be wrong, because there isn't any record in 1995, 1996, 1997,
1998, 2000, 2001, 2002, 2003 [returns to image of graphic with years running from prior
timeline image and with Plaintiff's image above it, and a statement after the year "2003" that
states "DNA evidence exonerates Steven Avery."]  Now 2003 is a year that has meaning
because that's when Steven Avery got out. And the day he got out, or the day after, that's when
Colburn decides to contact his superior officer, named Lenk. And Lenk tells him to write a
report. And they then go have contact with the Sheriff. Now, let's just stop and think about that
for a minute. Why does that happen, why does it happen then, when it didn't happen eight years
earlier? Um, ahh, I mean, I think I know the answer. I think the answer is pretty clearly these
people realized that they had screwed up big time. Colburn realized it, Lenk as his superior
realized it, and the Sheriff realized it. [images of plaintiff, Lenk, and the Sheriff are shown] So

Lenk tells Colburn to write a report, the Sheriff tells Lenk, "Get me the report," the Sheriff puts the report in a safe. That's how much he cares about documenting this thing. Well, obviously it doesn't do anybody, it certainly doesn't do Steve Avery any good to document that eight years after the fact, because Steve Avery has been sitting in a cage for those eight years.

[This falsely implies that plaintiff did not advise any appropriate person within the MTSO of the call when it came in 1995 and that Colburn believed that he had "screwed up" and raised the issue later in an attempt to cover up an earlier failure to do anything about the call, when in fact, plaintiff did transfer the call to an appropriate individual within the MTSO.]

12    [footage of Lt. James Lenk testifying]

Glynn:    This document didn't begin to get prepared until after you had talked to Sheriff Peterson. Is that a fair statement?

Lt. Lenk:    Correct.

Glynn:    This indicates that Colburn said he was informed by someone in 95 or 96 that the case was already solved and the right person was arrested, true? [images of report]

Lt. Lenk:    True.

Glynn:    Sergeant Colburn couldn't recall who it was who told him that the case had already been solved, true?

Lt. Lenk:    True. That's what he told me.

Glynn:    Did he have – did he make any guesses about that or say, gee, it could have been this person, it could have been that person, I'm not sure?

Lt. Lenk:    He wasn't sure.

13    [ switches to video deposition testimony of Sheriff Peterson; identified as "Steven's 1985 arresting officer"]

Glynn:    You recognize exhibit 125.

Sheriff:    That's one of the Sheriff's Department statement forms. And it looks like James Lenk's signature on it.

Glynn:    Okay, and have you seen this document before?

Sheriff:    No.

Glynn:    Okay. And how about 138, which is the, well, you tell me what it is.

Sheriff:      Yeah. That's another one of our statement forms uh, looks like it was filled out by Andrew Colburn.

[close up of Plaintiff's signature on the form]

Glynn:        And again, have you seen that document before today?

Sheriff:                No.

14    Avery:        A lot of people told me to watch my back.  Most of the time, I didn't even believe them. But then, sitting and doing depositions, I don't know.  It kind of changed my mind.   They were covering something up. [showing close ups of the report prepared by plaintiff] And they were still covering something up. Even with the sheriff who's on there now – he's covering something up.

15    [switches to footage of plaintiff's video deposition]

Glynn:        Have you ever had any conversations with anybody else other than Sheriff Peterson and Lietenant Lenk about the subject matter of exhibit 138? Ever discuss it with anyone else, any other officers, any friends, any family?

Plaintiff:    Not that I can specifically recall. I may have mentioned it to other people but I don't recall doing it.

16    [Switches to video deposition of Mark Rohrer, Manitowoc County District Attorney]

Counsel:      At the time that you received information from the crime lab telling you that Gregory Allen was inculpated in the sexual assault of Mrs. Beernsten, did you have conversation with any people in the Sheriff's office?

Rohrer:       Yes.

Counsel:      Who were they?

Rohrer:       Andy Colburn, and Jim Lenk had information that he had received.

Counsel:      Let me show what's been marked as exhibit 124.

Rohrer:       I'm familiar with the document.

Counsel:      Who's Douglass Jones?

Rohrer:       Assistant District Attorney for Manitowoc County.

Counsel:      All right.  What is this memo, to your understanding?

Rohrer:    It speaks for itself. He had a telephone conversation with Gene Kusche about the case.

17    [switches to video deposition testimony of Chief Deputy Eugene Kusche]

Counsel:    This document reflects a conversation between you and Douglass Jones shortly after it became public knowledge that Steven Avery had been exculpated and that Gregory Allen had been inculpated right?

Kusche:    That's correct.

Counsel:    All right. He says as he, Doug Jones, was trying to close the conversation, you told him that in 95 or 96 [cuts to graphic of chart showing Plaintiff's photo under photo of Sheriff Tom Kocourek] Andy Colburn had told Manitowoc County Sheriff Tom Kocourek that an officer from Brown County had told Colburn [close up on reports and Colburn's name] that Allen and not Avery might've actually committed the Bemsteen assault. Okay? Did you in fact tell that to Douglass Jones?

Kusche:    I don't recall.

Counsel:    All right. Does seeing this document, 124, refresh your recollection?

Kusche:    My recollection of this conversation, which is not very strong, was that Colburn made a comment to me about re-- getting some information. . . . .

Counsel:    Yeah . . . . Okay the statement goes on and says, the next sentence says, Gene stated, that's you, that Colburn was told by Kocourek, something to the effect that we already have the right guy, and he should not concern himself. Now, did Colburn tell that to you?

Kusche:    I don't recall. . . .

Counsel:    Do you have any reason to believe that Doug Jones would misrecord what you told him?

Kusche:    No.

Counsel:    Then it goes on to say that Doug Jones asked you if this information was known. Do you remember him asking that?

Kusche:    No.

Counsel:    Then it goes on to say that you said James Lenk . . . .was aware. Did you tell that to Doug Jones?

Kusche:        If he put it there, I probably did.

Counsel:       And what was the basis for your knowledge about that?

Kusche:        It would have had to have been Andy Colburn.

18   [shows image of plaintiff from plaintiff's video deposition]

19   Glynn: This was an unconscionable withholding of information that would have been of use to Steven Avery's lawyers, who were right at that time in the middle of litigation asserting based on the fingernail scrapings that there may have been somebody else involved in this.   If that information had come to light in 1995, Steven Avery would have gotten out in 1995.   So they cost Steven Avery eight years of his life.   This is as close to a conspiracy of silence as I think you could find in a case.

.  .  .  .

20   Kelly:        Did you provide this information to the attorney general's office?

Rohrer:       Yes.  My recollection says I believe we did.

Kelly:         And who's "we"?

Rohrer:       Mike Griesbach and I when we went to Madison.

Kelly:         But this memo is, was drafted after you had been to Madison.

Rohrer:       I'm not sure the date we were in Madison.

Kelly:         You're saying you told that information to the attorney general's office?

Rohrer:       We passed everything we had obtained to the attorney general's office.

Kelly:         Ok, well, neither this memo nor anything about Colborn and Lenk is in any of the records that were provided to the attorney general's office.   I can tell you that.

...

21   [rotating footage of Manitowoc County officials and others, including plaintiff, appears in background]

22   Walt Kelly:   October of 2005, from the perspective of the Manitowoc County government and their defense lawyers, I believe they all knew that they were in the most serious kind of trouble.   That there was a very grave prospect of a very, very substantial verdict.

Manitowoc County, and the Sheriff and the District attorney are arguably covered by insurance policies and there's a good half dozen insurance policies.   However, the insurers have taken the

position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the sheriff and the DA, would be on the hook for those damages in that civil suit.

23    Glynn: We don't need to have somebody tell us that this is going to have an effect on law enforcement. Of course it has an effect on law enforcement. Are you kidding me? I mean law enforcement officers get uptight when there's even a suggestion that they have said something wrong in a courtroom. Imagine what it's like when you're going to say that you're a liar, and that you hid evidence, and that you deliberately prosecuted a person that you knew, or at least had reason to know, wasn't guilty of the crime? And putting all that aside, by the way, in terms of your own professionalism, there's a guy out there raping and beating women while they guy that you put in prison is sitting in a cell. How's that make you feel?

We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt who tells me that he has gotten a call from a journalist asking if either of us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach.

24    [timeline is again displayed indicating dates of plaintiff's and other's depositions in proximity to Halbach disappearance]

25    [news footage regarding Halbach's disappearance and information about her 1999 dark green RAV Toyota]

. . . .

26    [news footage of Avery interview]

. . . .

27    Avery: . . . . . Anybody can go down the road at nighttime when everybody's sleeping and just drive in – my brother ain't going to hear nothing.

Reporter:   So who do you think did something with her?

Avery: I got no idea. If the County did something, or whatever and try to plant evidence on me or something, I don't know. I wouldn't put nothing past the county.

[cutting to footage of Ken Kratz press conference, then to footage of police on scene]

. . .

Spoken by Avery: All I can think is they're trying to railroad me again.

. . . .

Avery: I ain't been home. They's been searching. You know, how hard is it to put evidence in the house or on the property? . . . . The . . . sheriff . . . was out to get me last time. How do I know he ain't got nothing to do with it this time? . . . .

[more news reports]

Avery: It all comes back – all these memories and everything else, and they're just sketching me out again. And deep down, it hurts.

[more news footage]

Avery: You know we're all victims, and they just won't leave us alone. They just keep it up and keep it up. You know, a person can only take so much, you know. Right now, I got enough of 'em. You know, they can go somewhere else and just leave us alone. Let us do our life and live normal.

[footage of Avery being interrogated]

Avery: See, if somebody else plants that shit there, you ain't going to see . . . .

. . . .

Officer:     How does your DNA get inside of her truck?

Avery: My DNA ain't. That's because they got blood out of me. How much blood they got out of me? A lot of blood. . . . .

### SEASON 1 – EPISODE 3

28   [Courtroom testimony – testimony by officers in Court regarding key, pictures of Colburn and Lenk standing next to each other]

29   Unidentified woman/bar patron:     I really do think he was framed. You know? There's a lot that points to where the Sheriff's Department could've had something to do with it. And then I don't know if it's true or not, but I also heard that Manitowoc County was not supposed to be allowed in to search, and they were in there and they searched. And that's who found the key apparently after the third day was the Manitowoc County Sheriff's Deparment. So I mean, like I said, none of it really adds up.

Unidentified man/bar patron: I only have one word, from the cops on up: corruption. I mean, big time. I mean, if people dig far enough, they'll see that.

Unidentified woman/bar patron: I don't care what anybody says, that's a lot of money to pay out from here in Manitowoc County. It's a small area and I really, truly believe the county didn't have the funds to pay it out, so somehow, some way, I don't care if they hate me, that somehow some way something got set up I don't care who it was And they can say, "Oh, you really

believe the Manitowoc County police department and the FBI and everybody came in and they set this all up just to have Steven Avery guilty of this thing? Yes I do. I'm sorry, yes I do.

. . . .

30  [footage of interview with Sheriff Tom Kocourek regarding settlement with County; switches to footage of phone call between Avery and his sister]

31  Avery: This way, they figure they just got away with it, they can do it again. . . . . You know it ain't gonna stop 'em.

. . . .

[interview of Dean Strang after he is retained for Avery]

32  Strang: I didn't see them plant evidence with my own two eyes. I didn't see it. But do I understand how human beings might be tempted to plant evidence under the circumstances in which the Manitowoc County Sheriff's Department found itself after Steven's exoneration, of the lawsuit, of the Avery commission, of the governor hugging Steven, and holding him up as an example of the criminal justice system gone wrong? Do I have any difficulty understanding what human emotions might have driven police officers to want to augment or confirm their beliefs that he must have killed Teresa Halbach? I don't have any difficulty understanding those human emotions at all.

[interview of Jerry Buting]

33  Buting: So, you've got motivation of the officers to want to get him. And then when lo and behold there's this woman who disappears and one of the last people she saw was Steven Avery. . . now we've got him. A-ha. We knew it. They conclude that he's guilty, right off the bat. And they thought, "We're going to make sure he's convicted." And they helped it along by planting his blood in the RAV4 and by planting that key in his bedroom."

. . . .

**SEASON 1 – EPISODE 4**

34  Pete Baetz: . . . .But they came up and represented that they only DNA found on that key was Steven Avery's. That is patently ridiculous. Any crevices, anything else in that key would have retained her DNA. And for them to be able to say only Steven's DNA is on this indicates to me that that key was scrubbed clean and his DNA was place on it.

. . . .

35  Buting: Some would – might think, "Well, you know, we -- our hands were tied. You know? That you got a client who's saying that he's being framed. Publicly, that's kind of the defense

you'd better go with or you're contradicting your own client. But it really wasn't that way here. The defense was raised because we think the evidence pointed that way. Here's what we saw. The Rav 4, the victim's RAV 4 is found on the AverySalvage Yard property – a ridiculous place to leave it if he was the killer. There was a crusher on the property . . . Second, his blood was found inside the vehicle, but only in a few areas. Spots, so to speak. There was evidence that he had a cut on his finger, but what didn't make sense was that there was no fingerprints of avery's at all in or on the vehicle. That would mean, if Avery was the killer he had to have had gloves. But if he's got gloves on, how could he be actively bleeding and leaving his blood behind?. . . . . So it looked to us like maybe his argument that "If my blood is in that vehicle somebody planted it there," maybe the evidence was pointing that way.

[Fox 11 report on Avery's "Framing defense"]

. . . .

[Brendan Dassey segments]

36    Buting interview:   Sheriff Peterson was the arresting officer of Avery in 1985. He's now the head of that office and clearly, clearly has a strong dislike for Avery. If the very top guy has this kind of attitude about Avery and that kind of personal involvement in the case of Avery, that's gonna to permeate the department, the whole department. If not, at least it's going to permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants.

37    [showing photos in a hierarchy, including Sheriff Peterson and others, and plaintiff's photo, the lower levels of which are shown in brighter color to stand out]

38    [discussion of involvement of Lenk in Avery's 1985 case; then shows examination of 1985 case file, leading up to blood vial examination]

39    Buting (on the phone to Strang): Let me tell you. This is a red-letter day for the defense. It could not have been better. The seal was clearly broken on the outside of the box and inside the box is a Styofoam kit. The seal is broken in that. We pulled the Styrofoam halves apart and there in all of its glory was a test tube that said Steven Avery, inmate number, everything on it. The blood is liquid. And get this, right in the center of the top of the tube is a little tiny hole. Just about the size of a hypodermic needle. . . . .And I spoke with a LabCorp person already who told me they don't do that. . . . . . Think about it, Dean. If LabCorp didn't stick the needle through the top, then who did? Some officer went into that file, opened it up, took a sample of Steve Avery's blood and planted it in the RAV4.

## SEASON 1 – EPISODE 5

40    Buting;          Somebody knew that [the RAV 4] was there before they ever went in there. I'm convinced of it.

41 [Cuts to footage of interrogation of Avery]

| | |
|---|---|
| Avery: | What about this cop? |
| | . . . . |
| | Tammy told me that . . . . |
| | . . . . |
| | She told me that she'd heard that a cop put it out there and planted evidence. |
| Officer: | Put what out there? |
| Avery: | That vehicle. |
| Officer: | And that's Theresa's vehicle? |
| Avery: | Yeah. |
| Officer: | So Tammy told you that somebody told her that a cop put that vehicle -- Theresa's vehicle -- out on your property? |

Avery: Yeah.

42 [Cuts to footage of plaintiff about to testify, including their splicing in testimony that replaced a lack of an answer to a question by Strang regarding the call to dispatch about the license plate, as described in Paragraph 32 of the Amended Complaint]

**SEASON 1 – EPISODE 6**

43 Jerry Buting: One of the things that the state argued is that it would have taken a wide-ranging conspiracy of so many people to pull this off and that there's just no way this could be possible. But in fact, that's not true. Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument, well why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?

44 [cuts to video of James Lenk being sworn to testify]

**SEASON 1 - EPISODE 7**

45 Allen Avery: They had Steve picked as far as I'm concerned right away. They set him up. Right from the beginning. . . . .

They didn't find nothing down by his trailer for 3-4 days. Then all the sudden stuff starts. "Oh, we found this and we found that." And then the Manitowoc cops found the key. They weren't supposed to be investigating this at all, right?

[switches to trial testimony regarding the discovery of the key and defense's attempt to show that it was planted]

46

Buting, talking with Strang out of Court:  It's not enough to just get the key.  He wants Avery's DNA on that.  And so he is gonna wait until it is the right time.  And there is a Calumet County deputy with him on all of their searches.

Strang: Yep.  There is, somewhere near.

Buting: Somewhere nearby, and he was just waiting for the right time . . . when he could do it.

Strang: That key does not fall from you, know, in between the backboard and the frame of that little bookcase.

Buting: No.  And find its way underneath a pair of slippers.

. . . .

Buting: And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?

Strang:  Blood's easy.

Buting: Yeah.

Strang:  Blood's easy.

Buting:  Blood's easy.

Buting: The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation to the neighboring department because of that lawsuit.  They were deposed in the lawsuit.  They didn't tell, you know . . . .

47   [cut to footage of Lenk being examined in Court by Strang about his alleged conflict of interest; then cut to footage of Avery's mother cooking with subtitled audio of Steven Avery talking]

Avery: I'm in the same situation that I was before.  Just of couple of them wanting to nail me.  And the other ones didn't.  But nobody speaks up.  I gotta go through this over and over.

48   [shows image of Plaintiff waiting to testify]

49   Avery (continuing)  Sometimes I just wonder, I don't know.  It's just hard to take all in, you know?

50   [Switching to shot of Plaintiff standing in Court waiting to testify, then Avery appearing to look at Plaintiff and looking sad, then segment with Kratz examining Plaintiff in Court, then Strang examining Plaintiff]

Pete Baetz (Strang and Buting's investigator):

51   The Manitowoc County Sheriff's Department had, by their own admission, in fact, they're the first ones that brought it up, that there was a conflict of interest there.  And a conflict of interest in the investigation of a crime is probably the most serious violation any investigating agency can make, because it brings into question their credibility in actions throughout the case.  If I had to guess, I would say that they declared it a conflict of interest to dot the I's and cross the t's.  They didn't implement the procedure that would follow a conflict of interest and that is quite simply to totally back off.  They continued their active role in the investigation.  They developed most of the evidence and when they took on that role that they shouldn't have, they also committed themselves to proving Steven Avery had committed the crime.

[Switching to news conference footage:]

52   Reporter:  Sgt. Colburn was up there for quite some time today.  This is a gentleman who I think has been a law enforcement officer for 13 years.  He puts on a uniform and badge and gun every day and goes to work and tries to do his best.  We're all here, we're putting this on tv, this guy's gonna go home and listen to his son maybe cry about how everybody in school made fun of him because his dad's a bad cop.

Strang:  This was a hard day, and there've been some hard days for Sgt. Colburn.  But any pain, any burden that he's bearing pales in comparison to what the State of Wisconsin and the people working for it have inflicted on Steven Avery and his family.  And right now, Steven Avery needs Jerry Buting and Dean Strang and anybody out there who believes in him, badly.  We do believe in him.  And we are willing to do hard things to advance his cause.  And he's been saying since November 2005 that someone must have planted his blood if it's in that car.

Reporter:  But my question is though, if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place.

Strang:  You're hearing the evidence of the conspiracy.  And I've sat in many a federal courtroom and heard federal prosecutors prove a conspiracy on less than we've heard already here and that you will hear by the end of this trial.

. . . . .

[trial examination of Fassbender regarding sign-in sheet at the scene and examination of Lenk; switches to footage of Avery phone call with his mother]

53    Avery's mother:    It seems suspicious.
       Avery:              Yeah.
       Avery's mother:    Them people ain't gonna get away with everything.
       Avery:              No.  No.  That's why Kratz is worried about it.
       Avery's mother:    Yeah.
       Avery:              Yeah, he's scared now.
       Avery's mother:    Oh yeah?
       Avery:              Well, why wouldn't he be?

[shows other segments regarding EDTA testing by FBI]

54    Buting (speaking in his car):  Look how quickly they got the FBI to retool their instruments, recalibrate everything, do these internal validation studies they're going to claim, um, and get results within a matter of weeks.  A few weeks.  On a test that they haven't done for 10 years. And yet, the crime lab has, in 2002, evidence in its lab that Steven Avery is innocent, and it sits for a year before it gets tested.  It shows the imbalance between the individual and the power of the government.  The full force of which they're trying to bring to bear on this man.  Why?  Why in this case?  Because we have accused – and the evidence suspiciously points to – framing by one of them.  And when you do that, "you do so at your peril," as the state would say, you know?
. . . .
Again, it's not like they think they're framing an innocent man. But they are.

## SEASON 1 - EPISODE 8

55    Buting:  . . . . . .  This could be done by two officers.  Really one officer.  The one officer who keeps coming up, Lieutenant Lenk, whose name's on the evidence transmittal from the 1985 case just a couple years earlier.  Lieutenant Lenk, who shows up on November 5th without logging in. Lieutenant Lenk, who finds the magic key.  Lieutennt Lenk who, four months later, four months after Manitowoc no longer is needed, with no legitimate reason, is back at that scene on March 1st, and what's found the nest day?  The magic bullet. (photos of Lenk and Colborn)

56    Kratz:  This isn't just two guys.  It's Jim Lenk and it's Andy Colborn.  Their livelihood, their reputations, their families, everything in their 20 plus years of law enforcement are on the line when some lawyer accuses them of misconduct.  Not just any misconduct, but planting evidence in a murder case.  And this vial planting defense is absolutely ludicrous.  We only had to call one

witness who scientifically could tell you that there is absolutely no way that vial of blood was used to plant.

57    Strang:  Would Lieutenant Lenk lie?  Would he lie as a sworn law enforcement officer?  Well all I can tell you is he did twice and you heard it.  Here he says he arrives at 2:00.  When he's asked under oath before, it's 6:30 or 7:00.  This isn't 15 minutes off folks.  It's under oath and it's a difference of four and a half or five hours.  At that time of the year, November 2005, it's the difference between broad daylight and pitch black.  He was under oath.  If and when police officers plant evidence, they are not doing it to frame an innocent man.  They're doing it because they believe the man is guilty.  They're not doing it to frame an innocent man.  They're doing it to ensure the conviction of someone they've decided is guilty.

58    Kratz:  If you buy Mr. Strang's argument that they were trying to make sure that a guilty person was found guilty, then assigning accountability to the murder of Teresa Halbach shouldn't matter whether or not that key was planted.

In other words, can you set that aside and decide, is there enough other evidence or is the key the only thing that points to Mr. Avery?  That key, in the big picture, in the big scheme of things here, means very little.

59    Buting:  We do not and never have claimed that the police killed Teresa Halbach.  However, the person or persons who did knew exactly who the police would really want to blame.

60    Kratz:  Despite Mr. Buting standing up here and saying "Look, folks, we're not saying that the cops killed Teresa Halbach.  Now what we're saying is that somebody else skillfully exploited law enforcement bias," as if there's somebody smart enough out there that could do that.  But when you scrape one layer of this manure off the topsoil, you'll realize that the cops had to kill her.  Now, are you, as the jury, in order to find Mr. Avery not guilty, willing to say that your cops, that your Manitowoc County sheriff's deputies, Lieutenant Lenk, Sergeant Colborn, came across a 25 year old photographer, killer her, mutilated her, burned her bones, all to set up and frame Mr. Avery?  You've gotta be willing to say that.  You've gotta make that leap.

## SEASON 1 - EPISODE 9

61    Buting:  Well if they framed Steven Avery, the question is – is Brendan's case a whole charade too?  I mean that's ultimately gonna be the question.

#3053787

**Exhibit B Summary**

| Ex. B subpart number / short description | How Omission / Change Made MAM False in Substantial Part | Basis for inferring knowledge of falsity and/or reckless disregard of the truth (obvious reasons to doubt veracity of informant or information, *see Anderson v. Herbert,* 2011 WI App 56, ¶¶22-23. |
|---|---|---|
| 1—4, portions of 5, 9, 10-11, 18, 20-22, 23, portions of 24, 25-26, 28-29, 32, 37, 39-47, 52 | Large omissions of text eliminate context, by conflating substantive testimony and omitting explanation and context that would alter viewers' evaluation of Plaintiff's credibility and explanations. This is especially the case regarding such topics as the background of the search in Avery's bedroom, which explains why Plaintiff was involved due to his status as an evidence technician (rather than for a nefarious reason) and that he was there at the request of Calumet County, not because of any agenda of his own | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 5 | Omits Plaintiff's direct response to a question ("Yes, sir,") making Plaintiff appear to be evasive and less forthright in responding to questions regarding the bedroom search | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 6 | Elimination of Plaintiff's descriptions of the search details makes the testimony regarding the bedroom search seem more clipped, truncated, lacking in detail, and less credible | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |

| | | |
|---|---|---|
| 7 | Plaintiff's emphatic testimony that he did not approach the key is eliminated, along with additional details that make the testimony seem more clipped, truncated, lacking in detail, and less credible | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 8 | Omits Plaintiff's testimony that he was very surprised to see the key there given that they had searched the bedroom previously, which leaves that question seemingly unanswered when Buting and Strang muse about it at other points in the series, and omits additional details that make the testimony seem more clipped, truncated, lacking in detail, and less credible | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 12-13 | Omits language emphasizing Plaintiff's role as a corrections officer and not a police officer at the time of the call to the jail | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 14 | Omission / edit that appears designed to convey a different verbal and nonverbal impression of Plaintiff | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to |

| | | emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
|---|---|---|
| 15 | Omits testimony that emphasizes that Plaintiff was not provided any names of person allegedly wrongly incarcerated in call to jail | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 16 | Omits Plaintiff's response that he did not set up Mr. Avery for murder. The softer language that is included later likely would not have as much impact in evaluating Plaintiff's testimony and the fact that he gave the same answer twice would have been important for viewers to know | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 17 | Omits and mutes Plaintiff's assertion that the proposition that he planted evidence is "ridiculous" | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 19 | Elimination of reference to Mr. Wiegert alters and simplifies Defendants' version of the call to dispatch issue by eliminating a reference to another involved individual who would | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated |

| | | |
|---|---|---|
| | presumably have noticed if there was something wrong or odd about Plaintiff's response | in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 24 | Omission / edit that appears designed to convey a different verbal and nonverbal impression of Plaintiff | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 27 | Omits reference to one of the reports that Plaintiff prepared regarding the property search to reinforce accusation that Plaintiff inadequately documented his actions, attempting to reinforce claims regarding prior jail call statement | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 30 | Again omits reference to the fact that Plaintiff was working at the jail at the time of the prior call to the jail | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |

| 31 | Omits references to the fact that he wrote a statement about the prior call at the direction of a supervisor, rather than because he in any way acknowledged that a report should have been prepared earlier | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
|---|---|---|
| 32-35 | Omissions that decrease emphasis on Plaintiff's reasons for not writing a statement at the time that the jail call was received | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 36 | Omission / edit that appears designed to convey a different verbal and nonverbal impression of Plaintiff | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 38 | Eliminates testimony providing explanation of context for call to dispatch and regarding Plaintiff's role as a supervisor | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to |

| | | emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
|---|---|---|
| 48 | Omits Plaintiff's acknowledgment that he misremembered that he suggested that the vehicle was a Toyota in the call to dispatch, making it appear that Strang simply caught Plaintiff in a lie rather than that Plaintiff admitted that he misremembered that fact and owned up to it | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 49 | Omits reference to date of call | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 50 | Omits Plaintiff's affirmative response to the question asked and instead makes it appear that Plaintiff did not have as strong a recollection and that his answer was evasive rather than a direct response | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
| 51 | Omits Plaintiff's response that Investigator Wiegert must have given him the vehicle information and substitutes the response "No" – changing the response | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated |

| | | in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |
|---|---|---|
| 53 | Changes and alters Plaintiff's response to a question so that it appears that Plaintiff damagingly admits that the call to dispatch sounded like he was looking at the back of Halbach's vehicle, when he did not so testify | Defendants knew the alterations changed the impact of the testimony and it is evident that they made them for that reason, in order to continue to tell their story. This is further corroborated in the document productions by Netflix, which demonstrate the involvement of Netflix personnel in attempting to make the story more dramatic and to emphasize Plaintiff as an alleged villain of the story. (See Plaintiff's Responses to First Set of Interrogatories of Netflix, Inc.) |



MAM takes testimony out of context, omits inconvenient portions of responses, splices testimony within questions and answers in order to make for better drama, to make the defense cross-examination of plaintiff look more devastating, to make the direct examination of plaintiff look more scant and absent of detail, and to make plaintiff look less credible.   This is in what is billed as a "documentary."

The following is presented as <u>seamless uninterrupted questioning and testimony</u> at trial; the bracketed/highlighted information has been omitted as compared with the trial transcript (Day 7). Boldface text shows or describes text that appears to have been added.

[Initial question – not found in the transcript as it appears][1]

Kratz:        Did Mr. Avery have a response for you?

Plaintiff:        [Yes, he said that she had been there.]

Kratz:        [Did he tell you what day she had been there?]

Plaintiff:        [I think I might have told him that, what day that she should have been out there.  I don't recall if we mentioned a date, but I do remember asking him what time she had been out there.]

Kratz:        [Did Mr. Avery recall this young woman?]

Plaintiff:        [Yes.]

Kratz:        [Did he name her for you?]

Plaintiff:        [No.]

Kratz:        [Did he tell you what she had done at his property that day?]

Plaintiff:        He said that she was taking some pictures of a van that his sister was selling.

Kratz:        [Mr. Avery tell you how long the van had been on his property?]

Plaintiff:        [He said 5 or 10 minutes.]

Kratz:        [Did you inquire of Mr. Avery whether or not he had personal contact with this woman on the date she was out there?]

Plaintiff:        I asked Mr. Avery if she had said where she was going.   And he said, I never talked to her.  She was only here 5 or 10 minutes and she left.

Kratz:        But he never talked to her?

Plaintiff:        That's what he told me, he never talked to her.

---

[1] From unknown source

Plaintiff:    That's what he told me, he never talked to her.

2   [Omits nearly 50 pages of testimony, cutting from the above response at p. 76 to p. 122 of the trial transcript.]

Kratz:    Let's move on then to [the 8th, which would be Tuesday] the 8th of November [were you asked to return to the property?]

3   [omits 20 lines of testimony on that page (page 122) and three lines of testimony on page 123 regarding the context of Plaintiff's assignment to go back to the property on the 8th]

Kratz:    Did you have occasion to enter Steven Avery's bedroom on the 8th of November?

Plaintiff:    Yes, sir.

Kratz:    Who did you enter that bedroom with.

Plaintiff:    Deputy Kucharski and Lieutenant Lenk.

4   [omits 21 lines of testimony on page 123, all of page 124, and 16 lines of testimony on 125 describing in detail the search in the bedroom on November 8]

Kratz:    In performing that search, Sergeant Colburn, did you move or manipulate this piece of furniture [at all]?

5   [Omits Plaintiff's direct response ("Yes, sir.") and four remaining lines of testimony on that page (page 125) and six lines of testimony at the top of page 126 with additional information about the movement of the piece of furniture]

[Kratz:    If you can describe that further, I don't know if you can do it with your words, or show us with your hands, how you did it?]

Plaintiff:    I will be the first to admit, [I wasn't any too gentle, as we were, you know, getting exasperated.] I handled it rather roughly, twisting it, shaking it, pulling it.

[Omits the remaining lines of testimony on Lines 11-25 on page 126, except for the word "Sergeant," from page 126, line 15; omits all of pages 127-28; omits lines 1-19 and part of line 20 on page 129]

Kratz:    Sergeant,[2] [. . . .Do you recognize this image, that is][3] did[4] you see this image on the 8th of November?

Plaintiff:    Yes.

---

[2] From page 126, line 15
[3] Omits pages of testimony as indicated above, then omits these first words from p. 129, line 20
[4] Remainder of sentence is from p. 129, lines 20-21

2

**[Kratz:** Can you describe that moment, or that event, for the jury, please.

**Plaintiff:** As I had mentioned earlier, Lieutenant Lenk had exited – That is the door coming into the bedroom; he had gone through the door to get a bigger container.] I was searching the desk here, Deputy Kucharski was sitting on the bed, [which also isn't in the photograph, but it is in very close proximity to this piece of furniture, the bookcase,] filling out paperwork.

Lieutenant Lenk [got about right here, his feet would have been right here, so he was in the room, and] said something to the effect of, [there's a key on the floor here, or,] look, there's a key. I don't know what his exact verbiage was but he identified that there was a key on the floor.

I turned around, as I wasn't very far away, I turned around and looked and I observed this key, lying right where it is. And I observed this key had this black rubberized or plastic end on it, which they didn't – you know, that's a newer model car key, due to that plastic or rubberized end. And I also observed that embossed on there was a Toyota emblem.

And we told Deputy Kucharski, get a photograph of this, right away, which he did, which is this photograph. I did not take this photograph.

**Kratz:** By the way, as you and Deputy Kucharski and Lieutenant Lenk observed this, did any of the three of you approach or touch this piece of evidence at that time?

**Plaintiff:** I may have been standing in this area here, you know. This piece of furniture is only 2 and a half, 3 feet tall, maybe. So I could easily see over it to see the key.

I did not approach the key. Lieutenant Lenk did not come into the room. Deputy Kucharski photographed the key from, you know, from whatever angle this picture was taken at. That's as close as we got.

**Kratz:** My question, again, was] did either yourself, Lieutenant Lenk, or Deputy Kucharski [prior to this photo was taken] touch that key?

**Plaintiff:** No, sir.

**Kratz:** Why not?

**Plaintiff:** I think all three of us knew at the same time that [there was a very good chance, seeing a Toyota emblem embossed on that key, knowing that Teresa Halbach's vehicle was a Toyota, that] this was a very important piece of evidence. And, you know, none of us were going to taint that.

3

8

Kratz:     Let me ask you, Sergeant Colburn, you guys, you specifically, Lieutenant Lenk, and now Deputy Kucharski, had been in this room for quite some time before this key appears in this position, isn't that right?

Plaintiff:     Yes, sir.

Kratz:     Did this surprise you, that you saw this key there?

Plaintiff:     Yes, I was very surprised.

Kratz:     Did the three of you talk about that, we hadn't seen it before, anything like that?

Plaintiff:     I – I believe I said to myself, damn, how did I miss that.

Kratz:     Now, other than the bedroom slippers being pushed to the side, had anything else changed, other than the pulling out and twisting and the jostling of the cabinet?

Plaintiff:     As we looked at the cabinet, it appeared that in the process of stuffing everything back into the cabinet, we had separated the back of the cabinet, the small piece of paneling that would be the back of the cabinet, from the frame of the cabinet itself.

9     [omits another two lines of testimony on this page (page 132), all of pages 133-34, and the first four lines of page 135]

Kratz:     Sergeant Colburn –

10     [omits approximately 3 ½ pages of testimony, resuming on page 138, at line 20]

Kratz:     You were asked, as I understand, as part of a civil lawsuit, to provide what's called a deposition, [to be questioned by some lawyers; is that right]?

11     Plaintiff:     Yes, sir.

Kratz:     Do you recall when that occurred?

[omits 15 additional lines of testimony]

12     Kratz:     Can you tell the jury what you were asked about?

Plaintiff:     In 1994 or '95 I had received a telephone call when I was working as my capacity as a corrections officer in the Manitowoc County Jail. Telephone call was from somebody who identified himself as a detective. [And I answered the phone, Manitowoc County Jail, Officer Colburn.

Apparently, this person's assumption was that I was a police officer, not a corrections officer], and began telling me that he had [received information that] somebody who had committed an assault, in Manitowoc County, was in their custody, and we may have somebody in our jail, on that assault charge, that may not have done it.

4

13

I told this individual, you are probably going to want to speak to a detective, and I transferred the call to a detective [, to the Detective Division, at the Manitowoc County Sheriff's Department. That's the extent of my testimony.]

Kratz:      That's it? That's your connection to Mr. Avery?

Plaintiff:   Yes, sir.

[The above testimony stops at page 140, line 13; the next section below is from the Redirect examination at page 213 of the transcript]

Kratz:      Let me ask you this, [as you sit here today,] Sergeant Colburn, do you even know whether that call was about Mr. Steven Avery?

14

Plaintiff:   No, [I don't]  The word "sir" does not appear here in the transcript but appears in the broadcast, indicating a different answer was spliced in here, likely for the visual effect of the spliced-in segment.

15

[The testimony immediately preceding the above question on page 213, in re-direct, is as follows:

Kratz:      Did this person ever identify the individual that they were talking about?

Plaintiff:   No sir. There were no names given.]

[After the spliced-in section from re-direct, the next portion – again, while appearing to have seamlessly followed the prior testimony – is again taken from the direct examination at page 140]

16

Kratz:      Well, did that cause you enough embarrassment and enough angst [in which to set up Mr. Avery for a charge of murder?]

Plaintiff:   No.

Kratz:      Did that deposition cause you such problems from within your department] that you obtained and planted blood, so that it would be found and Mr. Avery would be wrongfully accused of a homicide case?

Plaintiff:   No, sir.

17

Kratz:      Have you ever planted any evidence against Mr. Avery?

Plaintiff:   That's ridiculous, no I have not.

Kratz:      Have you ever planted any evidence against anybody in the course of your law enforcement career?]

Plaintiff:   I have to say that this is the first time my integrity has ever been questioned and, no, I have not.

5

Kratz:          That's all I have for Sergeant Colburn, Judge.

Court:          Mr. Strang.

**Cross-Examination**

Strang:         This is the first time your integrity has been questioned?

Plaintiff:      As it applies to being a police officer, yes.

Strang:         Okay. And it's not the first time Mr. Avery's has been, so I have some questions for you.

18    [omits 30 pages of testimony, including discussion of Plaintiff's background and his training as an evidence technician]

19    Strang:         November 3, 2005, when you learned [from Mr. Wiegert that] Teresa Halbach was missing, was just [about exactly, to the day] three weeks after your deposition in Steven Avery's lawsuit?

Plaintiff:      Yes, sir.

20    [omits 10 lines of testimony]

Strang:         As shift commander, you could have assigned anyone in road patrol to go out to the address on Avery Road?

Plaintiff:      Yes.

Strang:         You chose to do it yourself?

Plaintiff:      Yes.

Strang:         Did you go alone?

Plaintiff:      Yes, I did.

21    [omits 23 lines of testimony on pages 172-73]

Strang:         When, sir, did you first make a written report of anything having to do with the November 3, 2005, meeting with Mr. Avery?

Plaintiff:      June of '06 I believe.

Strang:         Does June 29, 2006 sound correct?

Plaintiff:      Yes.

22    [omits more than 23 pages of testimony, from page 174, line 4 to page 198, line 11]

6

| Strang: | That is, it was almost 8 months after that first conversation with Steven Avery, the first conversation with him in the investigation, that you wrote down what you say he said to you, back on November 3? |

Plaintiff:  Yes, sir.

23  [Here, the broadcast cuts to an interview with Pete Baetz, the defense investigator, who asserts that the Manitowoc County Sheriff's Office failed to properly handle a conflict of interest, calling their credibility into question]

[Supposedly seamless trial testimony continues thereafter, starting at page 194 (four pages prior to the page containing the testimony that immediately preceded the Baetz interview)]

Strang:  So you're in the house on November 5, November 6, November 7, November 8, true?

Plaintiff:  Yes, sir.

24  [skips forward more than another page, to p. 196, again, without any indication that it is anything other than seamless]

Strang:  [From Calumet County?]  There was no time that you went in Mr. Avery's home [during November of 2005] when you were not also with Lieutenant Lenk?

Plaintiff:  [Not that I recall.]  A response of "No, sir" is replaced here – the second time that answer has replaced a differently worded response.  It appears that perhaps the use of the same or similar "No, sir" responses in response to multiple questions, with the same or similar inflection, would make Plaintiff look less credible.

25  [Three additional lines of testimony omitted.]

Strang:  This case, would you describe as the largest investigation in which you personally had participated as a law enforcement officer?

Plaintiff:  Yes, sir.

26  [Six additional lines of testimony omitted]

27  Strang:  [You now know that the] law enforcement agencies involved [principally Calumet County Sheriff's Department and the Division of Criminal Investigation] have generated [hundreds or] thousands of pages of police reports?

Plaintiff:  Yes, sir.

Strang:  Your total contribution [to those reports] is what, a little bit under a half page [as of November 8, 2005]?

Plaintiff:  [That's] correct [sir].

7

[Strang:        And then about another page as of June 29, 2006?

Plaintiff:        Correct.]

Strang:        The report that you filed [on, or shortly after, November 8, 2005,] makes no mention of the Toyota key?

Plaintiff:        That's correct, sir.

[The above exchange leaves viewers with the impression that Plaintiff prepared only one-half page of total report content and omits another half a page that he also contributed on a different date; the preceding edits omit statements about Calumet County's involvement, apparent to downplay that fact]

28    [omits another nine lines of testimony]

Strang:        Were there things that you did not want to commit to paper, in a report?

Plaintiff:        No, sir.

29    [omits another 19 lines of testimony, including the lines that were spliced in prior to the Pete Baetz interview referenced above]

30    Strang:        [Well, about 8 months, but then, again,] while we're on Steven Avery and your reports about him, that phone call, [the phone call you took way back in 1994 or 1995, when you were working in the jail,] the phone call where a detective from another law enforcement agency told you may have the wrong guy in jail, that one?

Plaintiff:        Yes, sir.

Strang:        Did you ever write a report about that?

Plaintiff:        No, I did not, sir.  [Boldface words are not in the transcript.]

Strang:        Well, actually you did, didn't you?  It was about 8 years later, wasn't it?

Plaintiff:        I wrote a statement on it, yes, sir.

31    Strang:        You wrote a statement [after Sheriff Peterson suggested that maybe you should?

Plaintiff:        Yes, sir.

Strang:        You wrote that statement] in 2003, about the 1994 or 1995 telephone call?

Plaintiff:        Yes.

Strang:        [You wrote that statement in 2003,] the day after Steven Avery finally walked out of prison, didn't you?

8

| | |
|---|---|
| Plaintiff: | I don't know what day Steve was released from prison, but I wrote the statement in 2003. |

32    [15 lines of testimony omitted]

Strang:    That's all I have.

[Discussion between the Court and counsel is omitted prior to the start of redirect]

**Redirect Examination**

33    Kratz:    Sergeant Colburn, [just a very few follow-up questions. Mr. Strang asked you if you had written a report about that telephone call that you had sometime in 1994 or '95; do you remember that question?

Plaintiff:    Yes, sir.

Kratz:    Do you remember your response?

Plaintiff:    My response was, no, that I did not write a report about it.

Kratz:    As you look back,] back in 1994 or '95, if you would have written a report, what would it have been about?

34    Plaintiff:    [That is why I didn't do one,] I don't know what it would have been about, [that I received a call and transferred it to the Detective Division.] If I wrote a report about every call that came in, I would spend my whole day writing reports.

35    [Kratz:    Did this person ever identify the individual that they were talking about?

Plaintiff:    No, sir.   There were no names given.]

Kratz:    Let me ask you this, [as you sit here today], Sergeant Colburn, do you even know whether that call was about Mr. Steven Avery?

36    Plaintiff:    No, [I don't] The word "sir" is inserted here.

37    [More than two pages of additional re-direct is omitted]

**Recross Examination**

Strang:    How many calls have you ever gotten in your law enforcement career, from another police officer, suggesting you had the wrong guy in jail?

Plaintiff:    I don't know.  I can't recall any others.

Strang:    That's all I have.

9

The following exchange of Attorney Strang's cross-examination of Plaintiff is also altered as follows, although it is presented, again, as seamless testimony, in Episode 5 of MAM:

38

Strang:     One of the things the road patrol officers [under your supervision] frequently do, is [look for cars that appear out of place?

Plaintiff:     Yes, sir.

Strang:     Or if they made a traffic stop, they will inquire about the license plate or the registration plates on an automobile?

Plaintiff:     Yes, sir.

Strang:     And they will] call into dispatch and give the dispatcher the license plate number of a car they have stopped, or a car that looks out of place for some reason, correct?

Plaintiff:     Yes, sir.

Strang:     And the dispatcher [, very quickly these days, with his or her computer screen,] can get information about who – to whom a license plate is registered?

Plaintiff:     Yes, sir.

39     [12 lines of testimony omitted]

Strang:     If the car is abandoned or there's nobody in the car, the registration tells you who the owner presumably is?

Plaintiff:     Yes, sir.

40     [5 lines of testimony omitted]

Strang:     All right.   I'm going to ask you to listen, if you would, to a short phone call.

41     [Approximately a page of transcript is omitted here, including an exchange between counsel and the judge.]

[playing from phone call]

Manitowoc County Sheriff's Department.  This is Lynn.

Lynn.

Hi, Andy.

Can you run Sam William Henry 582

10

42    [Approximately 27 lines of transcript omitted here, including some of the call to dispatch]

Okay.  Shows that she's a missing person.  And it lists to Teresa Halbach.

Okay.

Okay.  Is that what you're looking for, Andy?

'99 Toyota.

Yup.

Okay.  Thank you.

You're so welcome.  Bye, bye.

43    [Approximately 13 lines omitted]

Strang:    What you're asking the dispatcher [, whose name is Lynn,] is to run a plate that's Sam William Henry 582, did I hear that correctly?

Plaintiff:    Yes, sir.

44    [Four lines omitted]

Strang:    Sam William Henry would be SWH-582.

Plaintiff:    Yes.

Strang:    This license plate?

Plaintiff:    Yes, sir.

45    [Five lines of transcript omitted]

Strang:    And the dispatcher tells you that the plate comes back to a missing person or woman?

Plaintiff:    Yes, sir.

46    Strang:    Teresa Halbach [rest of question omitted]

Plaintiff:    Yes, sir.

Strang:    And then you tell the dispatcher, Oh, '99 Toyota?

Plaintiff:    No, I thought she told me that.

47    [call replayed, except that MAM omits the first 15 lines of call, which were replayed at trial]

48    [Strang:    Actually you who suggests this is a '99 Toyota?

11

Plaintiff:     I asked if it was a '99 Toyota, yes.

Strang:     And the dispatcher confirmed that?

Plaintiff:     Yes.]

Strang:     Were you looking at these plates when you called them in?

Plaintiff:     No, sir.

49    [Strang:     And your best guess is that you called them in on November 3, 2005?

Plaintiff:     Yes]

[Instead of the above exchange, the broadcast splices in the following exchange from two pages earlier in the transcript, at page 182]

Strang:     Do you have any recollection of making that phone call?

Plaintiff:     [It would have had to have been 11/03/05 or – I'm guessing 11/03/05.

[splices back to Plaintiff's answer to a different question on page 184]

50    Plaintiff:     [Yes], probably after I received a phone call from investigator Wiegert letting me know that there was a missing person.

Strang:     Investigator Wiegert, did he give you the license plate number for Teresa Halbach when he called you?

51    Plaintiff:     [I don't remember the entire content of our conversation but, obviously, he must have been because I was asking the dispatcher to run the plate for me.]

52    [omits approximately 35 lines of testimony and cuts to answer to a different question that appears on page 186]

Plaintiff:     No, I just don't remember the exact content of our conversation then.

Strang:     But –

Plaintiff:     He had to have given it to me, because I wouldn't have had the number any other way.

53    Strang:     Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back of a 1999 Toyota [; from listening to that tape, you can understand why someone might think that, can't you]?

[sustained objection omitted]

[Strang:     This call sounded like hundreds of other license plate or registration checks you have done through dispatch before?]

12

Plaintiff:        Yes.

Strang:        But there's no way you should have been looking at Teresa Halbach's license plate on November 3, on the back end of a 1999 Toyota?

[sustained objection omitted]

[Strang:        There's no way you should have been, is there?]

Plaintiff:        I shouldn't have been and I was not looking at the license plate.

Strang:        Because you are aware now that the first time that Toyota was reported found was two days later on November 8?

Plaintiff:        Yes, sir.