# Exhibit 49

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

ANDREW L. COLBORN,

        Plaintiff

NETFLIX, INC.,
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

        Defendants.

Case No. 19-CV-484

**PLAINTIFF, ANDREW L. COLBORN'S SUPPLEMENTAL RESPONSE TO DEFENDANT NETFLIX'S INTERROGATORY NO. 1**

Plaintiff, Andrew L. Colborn, by and through his attorneys, supplements his response to Defendant Netflix's Interrogatory No. 1 as follows.

## INTERROGATORIES

<u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:</u>  In supplement to Plaintiff's prior response to Netflix's Interrogatory No. 1, and subject to all objections asserted in Plaintiff's prior response, Plaintiff supplies the attached chart of additional facts responsive to the Interrogatory.

**As to Objections:**

Dated this 15th day of July, 2022.

        Attorneys for Plaintiff, Andrew L. Colborn

        By: *Electronically signed by April Rockstead Barker*
            State Bar Number: 1026163

Rockstead Law, LLC
525 N. Lincoln Ave.
Beaver Dam, WI 53916
(920) 887-0387
(262) 666-6483 (facsimile)

aprilrbarker@rocksteadlaw.com

Co-Counsel:
LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C
231 S. Adams Street
Green Bay, WI 54301
P.O. Box 23200

Green Bay, WI 54305-3200
Phone: (920) 437-0476 / Fax: (920) 437-2868

GRIESBACH LAW OFFICES, LLC
Attorney Michael C. Griesbach
State Bar No. 01012799
Griesbach Law Offices, LLC
PO Box 2047
Manitowoc, WI 54221-2047
(920) 320-1358

**AS TO RESPONSES:**

STATE OF WISCONSIN )
                                ) ss:
COUNTY OF _____ )


       ANDREW L. COLBORN, being first duly sworn on oath, states that he has read the foregoing responses to the Interrogatories and that the same are true to the best of his knowledge at this time. Further, he reserves the right to amend the responses should later discovered information suggest that any of the foregoing responses are incorrect or incomplete.

                                                               ANDREW L. COLBORN

Subscribed and sworn to before me
this \_\_\_\_\_ day of _____, 2022.


_____
Notary Public, _____ County, Wis.
My Commission:_____


LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff, Andrew L. Colborn
231 S. Adams Street/PO Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
GB@lcojlaw.com

| Bates Range (NFXCOL) | Evidence of or supporting Actual Malice / From Which Actual Malice May Be Inferred |
|---|---|
| 308 | Lisa Nishimura advises an incoming employee, Adam DelDeo, to think about decisions about the structure of the series "from a marketing perspective" and "to some degree awards qualifying perspective," demonstrating that Netflix's goals in participating in the postproduction process were to market the series and qualify for awards rather than to tell the truth. |
| 1906 | Status update from the filmmakers demonstrates that Netflix representatives had seen early assemblies and therefore were able to note changes (especially editing changes) as postproduction occurred and between different versions of episodes. |
| 1907, 1930 | Netflix representatives were aware that Laura Ricciardi and Moira Demos were attempting to participate with Avery's attorneys in obtaining independent testing of the "blood vial" featured in the series in further efforts to aid Avery's defense team |
| 199 | Netflix representatives suggested changes to the series to augment the focus on Steven Avery's voiceovers |
| 202, 1940 | Netflix representatives sought to find ways to have the series "allude to" possible planting of evidence against Avery independently of any theories suggested by Avery's lawyers in interviews or otherwise |
| 1933-34 | Netflix representatives sought to assist in creating the final product for the Making a Murderer series in such as away that it would provide an "immersive and all-encompassing experience for the viewer including deft and unexpected foreshadowing of key elements, pitch perfect call-backs of evidence and breathtaking reveals," along with a "thriller" atmosphere through the score. |
| 193 5 | Netflix representatives sought to ensure through visuals in MAM that the Avery family would be portrayed as "a very happy family" (so that viewers would engage with them and see police as adversaries) |
| 1937-38; 1981-82; see also 227, 231, 2019 | Netflix representatives acknowledged in communications with Chrome representatives that as originally prepared, MAM was "confusing" as to the details surrounding the call to the Manitowoc County jail that Plaintiff received and that it "seemed very thin that Colborn not having specific knowledge of who called him would be the key to the case." Yet, Netflix representatives participated in the post-production process through which MAM was edited to present an allegedly "clear" storyline in early episodes that conveyed to viewers the impression that Plaintiff was a Sheriff's deputy when the call came in and either did absolutely nothing with it or participated in a department-wide conspiracy to suppress it, rather than forwarding it from the jail to the appropriate department. |
| 1940, 1978 | Netflix representatives endorsed and agreed with an approach that used the initial episode of the series to "set up" the notion for viewers that Manitowoc County law enforcement planned to "seek revenge" against Avery because of his civil suit |
| 1946 | Netflix representatives sought to cut and trim material concerning the call to the Manitowoc County jail in order to enhance the "storyline" at the expense of |

| | |
|---|---|
| | detail that could have helped viewers understand that there was not one clear version of the events surrounding the call. |
| 1946 | Netflix representatives sought to enhance the notion that Avery in his civil suit was practically assured a victory prior to the Halbach murder, relying on commentary by Avery's lawyers in that case to convey the claim. |
| 219 | Netflix representatives acknowledged that MAM was relying solely on one of Avery's prior attorneys to contend that police officers were allegedly upset that Avery was cleared of the earlier rape conviction |
| 224-25, 212, 1949, 1959, 1996, 2131, 2062, 2076, 2078, 2083 | Netflix representatives consistently sought to edit, cut and tighten scenes involving courtroom testimony, so that context was lost to the goal of telling a supposedly clear "story" in Avery's favor and against law enforcement, including Mr. Colborn. Netflix representatives also cautioned against too much "talking in a courtroom" as making for "a really dry episode." |
| 1949, 1961, 2131 | Netflix representatives approached MAM from the assumption that Avery is "innocent" and that the judge was "biased" against him. |
| 1952 | Netflix representatives advised Chrome representatives to include in MAM "sweet photos" of Avery and his nephew in order to "reinforce the sense of injustice and calamity" that the series was to impart. |
| 1953, see also 2009-2010, 243, 2174 | Netflix representatives sought to use the pacing of the series to give the audience "incredibly riveting reveals" using music as well to "play a key role in foreshadowing, and helping to drive emphasis on key information and characters as they emerge." This included establishing "a subtle but impactful `theme' music for the baddies, eg., Lenk, Petersen, Kratz . . . ." |
| 1953, 2050, 300 | Netflix representatives knew of and agreed with keeping content in the series that showed random individuals in a pool hall accusing Manitowoc County law enforcement officers of planting evidence against Avery. |
| 1964, 2125 | Netflix representatives advised Chrome that they were "looking for" the series to leave people feeling "terrified and enraged, to feel as though it's their responsibility and need to discuss this case, to raise it in the social consciousness and to drive awareness . . . . Leave the audience feeling angry!" They further advised that "Our audience needs to be left not only feeling extremely upset and saddened for Steven and Brenden, but also incredibly angry." |
| 1977 | Netflix representatives indicated in their notes that Chrome should expand "the emotional range for the viewer throughout the series. We want to feel the swells of hope, the range of injustice, the horror of the defenseless. Viewers across the globe should be in tears and shouting at their screens throughout." |
| 2163-64, 2186-87 | Netflix representatives encouraged Chrome to "ratche[t] up" the episode of MAM in which the verdict against Avery is read, stating that "Currently the beat emits anger and we feel injustice was done, but given the overall investment made in watching 8 hours thus far, the audience should be feeling more intense anger, sadness, bewilderment, and perhaps even fury at this jury decision." They also encouraged Chrome to include either footage of Avery and his family looking disappointed or footage of law enforcement officers, including Plaintiff, "showing satisfaction" for this purpose. |

| 1970 | Netflix representatives endorsed MAM's assertions that Sheriff Peterson allegedly exerted "influence over the sentiment of his department" with respect to Avery, based on Avery's lawyers' claims |
| --- | --- |
| 2132 | Netflix representatives acknowledged it was "unlikely" that FBI representatives would "aid and abet" Manitowoc County as part of a conspiracy unless the department had a "deep history" with the agency. |
| 2133 | A law enforcement official is characterized as a "key villain" in Netflix representatives' notes |
| 2134 | Netflix representatives' notes demonstrate that they were brainstorming with Chrome to determine whom should be portrayed as the "mastermind" of the alleged law enforcement conspiracy, rewriting the facts to fit their story, and that they approved using Avery's lawyer's "analysis" of law enforcement officers' alleged motives and conduct. |
| 1974 | Netflix representatives recommended against using imagery of Avery that made him look unlikeable (e.g., "smug") |
| 229 | Netflix representatives proposed making a segment on Plaintiff's call to dispatch during the Avery investigation a "cliffhanger" and then sought to eliminate additional information that "dulled" and "killed" the effect of the "bomb," including visuals of Delores Avery pointing out places where officers allegedly "could have" entered the property to plant evidence |
| 1979 | Netflix representatives sought to "establish a motive" for the prior Sheriff to "interfere" in the investigation of the prior rape charges against Avery through visuals that sought to portray the Sheriff's wife and Penny Bernsteen as close |
| 1991 | Netflix representatives encouraged Chrome to hint that there was "evidence" that James Lenk or "the cops in general" planted evidence, despite no actual evidence of planting having been presented at any time in the series |
| 1992 | Netflix representatives encouraged Chrome to edit testimony sequences of prosecution witnesses for "comedic effect" |
| 2005 | Netflix representatives encouraged Chrome to ensure that episodes began with big "reveals" |
| 2011 | Netflix knew and acknowledged that the series was "built on [Steven Avery]'s narrative" through his phone calls to and from prison |
| 245, 2039, 2043; 2167; 2174; 2089, | Netflix representatives looked for ways to identify Plaintiff throughout the series in ways designed to enhance anger toward him based on the series' claim that he was "always a suspect" in allegedly "tampering with evidence," despite no actual evidence that Mr. Colborn "tampered with" evidence, as well as to present his appearance as a "shock." They also approved of the use of "danger music" in connection with his appearance in the series. |
| 2020 | Netflix representatives sought to "highlight" that law enforcement was supposedly collectively "letting a known rapist go free" |
| 2150, 278 | Netflix representatives endorsed changes by Chrome to prior versions of MAM in ways that worked "really well" to "[s]et[] Colborn up as the potential cop to plant the car" as a "[s]ensational and strong end" to an episode |
| 2063 | Netflix representatives characterized the changes to MAM that added the "cliffhanger" about the dispatch call to episode 5 as "terrific," stating "He goes from being so sure and then is caught in a clear lie about the origin of the car |

| | |
|---|---|
| | make and model." The alleged "clear lie" impression was obtained by omitting Plaintiff's acknowledgement that he had been mistaken about the "original of the car made and model," as explained in Exhibit B to Plaintiff's Second Amended Complaint. It can be reasonably inferred that Netflix representatives knew this because they had seen prior, less edited versions of the episode. |
| 2071, 2079 | Netflix representatives acknowledged that statements made by Avery's attorney in the series might be construed as "defamatory" if they were not aligned with "court filings" and to the extent that they were "directly claiming [law enforcement[ framed Steven." |
| 2078 | Netflix representatives acknowledged in their notes that argument made by Avery's attorney "actually detracts" from the argument that "Lenk/Colburn" could have "planted" Ms. Halbach's vehicle key. They also proposed eliminating James Lenk's testimony regarding the search and noted that "Buting's claim that [James Lenk] put the DNA on the key is really weak." |
| 273 | Netflix representatives recommended eliminating testimony by James Lenk because it never really delivered "enough of a silver bullet" to support a direct claim that Lenk planted evidence |
| 288 | Netflix representatives acknowledged that it could have simply been a "simple oversight" that James Lenk didn't sign in at one point during the search of the Avery property, and indicated that a "timeline" was needed to ensure that it didn't "feel speculative and grasping for conspiracy" |
| 294-95 | Netflix representatives discussed whether to include commentary by Avery's attorney that suggested that police killed Teresa Halbach despite the fact there is "no physical evidence to really prove the officers were there" but refrained from advising that it be pulled because they did not want to go "contrary to the direction" Netflix had been pushing Chrome in, as Netflix representative were "so happy that [Chrome] finally [had] a point of view" incorporated in the series. |
| Deposition testimony | Netflix representatives knew the content of the final episodes, including the obviously defamatory comments summarized in Exhibit A to the Second Amended Complaint |
| Deposition testimony and numerous email messages produced by Defendants | Netflix representatives were involved in frequent / regular calls to discuss the postproduction of MAM and viewed versions of episodes as they were prepared. |