IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

___

ANDREW L. COLBORN,

                Plaintiff,

vs.

NETFLIX, INC.,                                         Case No. 19-CV-484
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

                Defendants.

___

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTIONS
FOR PARTIAL SUMMARY JUDGMENT**

___

## INTRODUCTION

Plaintiff brought this action against the Defendants, Netflix, Inc.; Chrome Media, LLC; Laura Ricciardi; and Moira Demos; for damages that their "Making a Murderer" series caused him after it was broadcast on Netflix.

In this motion, Plaintiff requests partial summary judgment on a few discrete issues, including (1) Defendants' publication of MAM; (2) the defamatory nature of republished third-party statements that were included in MAM; and (3) Defendants' actual malice as to the published third-party statements.

Plaintiff does not contend that the republished third-party statements are the only components of MAM that defamed him. Plaintiff brings this motion as to those statements because the defamatory nature of those statements and Defendants' actual malice regarding them can be decided as a matter of law, which is not the case for the broadcast as a whole.

## MATERIAL UNDISPUTED FACTS

There is no dispute that Defendants published the "Making a Murderer" series. Proposed Undisputed Fact No. 1; Dkt#181, Netflix Answer, ¶15, Barker Decl., Ex. 1, Demos Tr. at pp. 94-95, 103. The broadcast contains numerous statements from individuals identified in the series as Steven Avery, Steven Avery's family members, and Steven Avery's attorneys, that individually or collectively imply or insinuate that Plaintiff or a group of law enforcement officers that included him planted evidence to frame Steven Avery for murder. Undisputed Fact Nos. 2-54 (for brevity, the statements are not repeated here because they are included in a table herein at pp. 6-12). In addition, bar patrons whose identities are not provided in the series are featured in the series as making express accusations that Manitowoc County law enforcement officers framed Avery. *Id.* At least some of these individuals are shown playing pool with Avery's brother. Proposed Undisputed Fact No. 61; Barker Decl., Ex. 5, Demos Tr. at p. 150.

Steven Avery was convicted of murder in 2007. Proposed Undisputed Fact No. 58; Barker Decl., Ex. 2. Plaintiff has denied in sworn testimony that he planted evidence to frame Steven Avery. Proposed Undisputed Fact No. 70; Barker Decl., Ex. 7.

The Netflix representatives of the creative team that participated in the production of MAM reviewed and approved the final versions of all episodes of MAM prior to its being published. Proposed Undisputed Fact 59; Barker Decl., Ex. 3, Nishamura Tr. at pp. 170-71; Ex. 4, Del Deo Tr. at p. 141

Netflix series notes advised Chrome to use Ms. Ducat's statement that the County was "not done" with Mr. Avery to impart "a more explicit ending [to an early episode] that makes it clear that in the next episode the cops are going to seek revenge." Proposed Undisputed Fact No. 71; Barker Decl., Ex. 8, Nishamura Tr. pp. 131-32; Ex. 9 at exhibit p. 5 (NFXCOL 0001978).

Netflix representatives also endorsed using Avery's father's statement, "They framed an innocent man just like they did 20 years ago" as a "cliffhanger." Proposed Undisputed Fact #72, Ex. 9 at NFXCOL 0001981.

Defendants referred to those associated with Manitowoc County law enforcement as "the baddies" for whom a specific "bad guy theme" music was to play during their appearances as part of an overall "thriller atmospheric score." Proposed Undisputed Fact ##72-73; Barker Decl., Ex. 8, Nishamura Tr., pp. 131-32, 136-37; Ex. 9 at exhibit pp. 36, 64 (NFXCOL 0002009, 2037); Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001934.

The production notes also include a suggestion that source material be reviewed for the purpose of finding material to "allude to the fact that [cops] may have planted something . . . ." during a search at the Avery property. Proposed Undisputed Fact 74; Barker Decl., Ex. 10 (Del Deo Tr., pp. 88-89); Ex. 11 at NFXCOL 0001940. In MAM production notes that were shared with Chrome, Netflix's creative team admitted that it seemed "very thin" that the call by Mr. Colborn "would be the key to the case." Proposed Undisputed Fact 75; Ex. 10 (Del Deo Tr., pp. 88-89); Ex. 11 at NFXCOL 0001938.

In MAM production Netflix sought family pictures of the Averys to include in the series, saying, "Let's make them look like a very happy family." Proposed Undisputed Fact 76; Barker Decl., Ex. 10 (Del Deo Tr., pp. 88-89); Ex. 11 at NFXCOL 0001935. They also identified an image of Avery "looking a little smug" as one that should be replaced with a different shot while discussing a version of an MAM episode. Proposed Undisputed Fact 77; Barker Decl., Ex. 12.)[1] In contrast, Defendants worked to replace another image of Mr. Colborn in an early version of

---

[1] Netflix has stipulated through counsel that documents within this Bates range are authentic.

the MAM trailer with what they called a "squirmy shot" instead. Proposed Undisputed Fact No. 78; Barker Decl., Exs. 13, 14(Demos Tr. pp. 218-19; CHRM 000481-82).

## SUMMARY JUDGMENT STANDARD

A motion for partial summary judgment may be granted if there is no genuine dispute as to any material fact and the Court is satisfied that the movant is entitled to judgment as a matter of law as to the issues identified in the motion. Fed.R.Civ.Pro. 56(a).

## ARGUMENT

Plaintiff seeks partial summary judgment on the issue of publication, which is believed to be undisputed; and as to three discrete issues relating to certain republished statements by third parties that appear in the Making a Murderer series (MAM): (1) the defamatory meaning of the statements as they appear in MAM; (2) actual malice as to those statements; and (3) the statements' falsity.

The issues raised by this partial summary judgment motion do not extend to other issues that Plaintiff believes are appropriate for consideration at trial based on all of the facts. These include, among others, the false and defamatory nature of other statements in MAM and of the statements that are contained in MAM when considered as a whole; the Defendants' actual malice in publishing the other statements and MAM as a whole; and any issues relating to various defenses anticipated to be raised by Defendants with respect to MAM as a whole or as to any part of it, including their assertions of a fair report privilege or their claims of substantial truth.[2]

---

[2] Although Plaintiff contends that comparison of the MAM broadcast to Avery trial transcripts demonstrate, standing alone, that MAM is not a fair report of the Avery trial, it is Plaintiff's position that consideration of the video imagery, graphics, and music should be considered in evaluating any "fair report" defense.

4

## I. DEFENDANTS PUBLISHED MAM.

There is no dispute that Netflix published MAM and that the Chrome Defendants intended that Netflix do so. Proposed Undisputed Fact No. 1; Dkt #181, Netflix Answer, ¶15, Barker Decl., Ex. 1 , Demos Tr. at pp. 94-95, 103. Therefore, Plaintiff is entitled to partial summary judgment on the element of publication of the statements in MAM.

## II. ACTUAL MALICE CAN BE FOUND AS A MATTER OF LAW AS TO REPUBLISHED THIRD-PARTY STATEMENTS.

Republication of third-party statements subjects a publisher to liability as if he had made the statements himself. *Hart v. Bennet*, 672 N.W.2d 306, 318 (Ct. App. 2003); *Gerol v. Arena*, 377 N.W.2d 618, 621 (Wis. Ct. App. 1985) (explaining that under Wisconsin precedent, defendant could not defend statements as "true because he indeed had heard such rumors" because that is not a defense to a defamation action; rather, the defendant was required to prove the truth of "the defamatory charges repeated by the defendant" (citing Restatement (2d) of Torts §581A cmt. e (1977)); *see also Hucko v. Joseph Schlitz Brewing Co.,* 302 N.W.2d 68, 72 (Wis. Ct. App. 1981) ("Secondary publication by a newspaper, magazine, or periodical may expose such a publisher to liability . . . .").

Moreover, in a defamation case in which actual malice must be shown, actual malice can be shown by a Defendant's reliance on (1) sources that are unverified or anonymous; (2) sources that are inherently improbable; or where there are obvious reasons to doubt the veracity of the source. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

As shown in the table, below, MAM contains numerous statements that repeat or embellish third-parties' accusations against Mr. Colborn and the "law enforcement" conspiracy in which they claimed he participated. Apart from the MAM embellishments that are identified, all of these statements are made by (1) Mr. Avery, who has been convicted of murder; (2) Mr.

Avery's family and friends; (3) Mr. Avery's advocates and agents, including out-of-court statements by attorneys and his investigator; and (4) unnamed – and therefore, essentially, anonymous – bar patrons about whom Defendants have acknowledged they knew nothing regarding their possible personal biases. *See* chart below; *see also* Proposed Undisputed Facts ##3-54 and 59-61.

| Episode / Time into Broadcast | Statement and/or MAM Embellishments |
|---|---|
| 1 ECF # 120-1 4:35 – 4:45 | Steven Avery voiceover: " They had the evidence back then that I didn't do it. But nobody said anything . . . ". |
| 1 ECF # 120-1 1:01:19 – 1:01:42 | Kim Ducat (Avery relative) states on camera: "They weren't just gonna let Stevie out. They weren't gonna hand that man 36 million dollars. They weren't gonna be made a laughing stock, that's for sure. They just weren't gonna do all that. And something in my gut said they're not done with him. Something's gonna happen. They're not handing that kind of money over to Steven Avery." |
| 1 ECF # 120-1 1:01:29-1:01:44; 1:01:33 – photograph | Photos of Plaintiff and others are shown during Kim Ducat's statement. |
| 2 ECF # 120-1 49:22-49:39 | Steve Glynn, identified as Avery's counsel in the civil case against Manitowoc County, states, "The day of or on the day after Steven's release, law enforcement officers in Manitowoc are writing memos to describe activity that had occurred almost ten years earlier. They don't do that unless they feel threatened." |
| 2 ECF# 120-2 17:20 – 17:34 | Steve Glynn states, "We learned during litigation something that we had absolutely no knowledge of before the lawsuit got started. That 1995 was a very, very significant point in this thing." |
| 2 ECF # 120-2 17:34-17:43 | Video deposition of Mr. Colborn is shown in the background with Steve Glynn voice over (image of Mr. Colborn) |
| 2 | Steve Glynn continues, "And that there is not only something to this idea that law |

| ECF # 120-2 17:37-18:24 | enforcement had information about somebody else, but there is serious meat on those bones, I mean serious meat. What we learn is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department [image of Mr. Colborn's report is shown in background] from another law enforcement agency . . . saying that they had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison." |
|---|---|
| 2 ECF # 120-2 18:28 - 19:04 | Video footage of Mr. Colborn's testimony in civil case in response to questioning by Glynn |
| 2 ECF # 120-2 19:05 – 19:41 | Steve Glynn continues, "Manitowoc doesn't have huge numbers of major assaults where people go to prison and certainly where people would still be in prison. There is a very distinct possibility, I would say likelihood, that it's Gregory Allen. It's the Brown County Sheriff's Department that is in 1995 on the Gregory Allen case, that Gregory Allen has said something about Steven Avery, and at a minimum, somebody ought to check this out." |
| ECF # 120-2 19:24 – 19:41 | Graphic shown during a cutaway from Glynn's interview, while Glynn is still speaking, shows, "1995 ● Gregory Allen is arrested for sexual assault in Brown County / Andrew Colborn receives call about inmate confession" |
| 2 ECF # 120-2 19:41 – 19:47 | Cuts to video of Mr. Colborn's deposition testimony in Avery's civil case, with the following exchange:<br>Glynn: I mean that's a significant event.<br>Mr. Colborn: Right, that's what stood out in my mind. |
| 2 ECF # 120-2 19:47 – 20:26 | Returns to interview with Glynn, who says, "The fellow who got that call was a guy named Colborn. And you might say that there should be a record of him immediately making a report on this, there might be a record of him immediately contacting a supervising officer, there might be a record of him contacting a detective who handles sexual assault cases, ahh, there might be some record of it. But if you thought any of those things, you'd be wrong, because there isn't any record in 1995, 1996, 1997, 1998, 2000, 2001, 2002, 2003 . . . ." |
| 2 ECF# 120-2 20:14 - 20:25 | Visual cuts to graphic with years running from a timeline image with Mr. Colborn's photograph above it, and a statement after the year "2003" that states, 'DNA evidence exonerates Steven Avery." |
| 2 ECF# 120-2 20:26 - 21:14 | Glynn continues, "Now 2003 is a year that has meaning because that's when Steven Avery got out. And the day he got out, or the day after, that's when Colborn decides to contact his superior officer, named Lenk. And Lenk tells him to write a report. And they then go have contact with the Sheriff. Now, let's just stop and think about that for a minute. Why does that happen, why does it happen the, when it didn't happen eight years earlier? Um, ahh, I mean, I think I know the answer. I think the |

| | |
|---|---|
| | answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk as his superior realized it, and the Sheriff realized it. |
| 2 ECF # 120-2 21:08-21:12 | Images of Mr. Colborn, James Lenk, and the Sheriff are shown. |
| 2 ECF # 120-2 21:12 – 21:39 | Glynn continues, "So Lenk tells Colborn to write a report, the Sheriff tells Lenk, `Get me the report.' The Sheriff puts the report in a safe. That's how much he cares about documenting this thing. Well obviously it doesn't do anybody, it certainly doesn't do Steven Avery any good to document that eight years after the fact, because Steve Avery has been sitting in a cage for those eight years. |
| ECF # 120-2 21:48 – 22:52 | Footage of James Lenk and Sheriff Peterson being questioned by Glynn in depositions at Avery's civil trial that includes Glynn getting Lenk to say that Mr. Colborn "wasn't sure" who told him that the rape in question was already solved and that the right person was arrested, and that includes a close-up of Mr. Colborn's signature identified on an exhibit |
| 2 ECF # 120-2 22:55-23:14 | Avery voiceover stating, "A lot of people told me to watch my back. Most of the time, I didn't even believe the. But then, sitting and doing depositions, I don't know. It kind of changed my mind. They were covering something up." |
| 2 ECF # 120-2 22:45-22:50 | Image with close-up of Mr. Colborn's signature. |
| 2 ECF # 120-2 23:14-23:26 | Avery continues, "And they were still covering something up. Even with the sheriff's who on there now – he's covering something up." |
| 2 ECF # 120-2 23:28-23:50 | Cuts to footage of Mr. Colborn's videotaped deposition. |
| 2 ECF # 120-2 26:52-26:56 | Video image of Mr. Colborn |
| 2 ECF # 120-2 | Steven Glynn is shown, asserting, "This was an unconscionable withholding of information that would have been of use to Steven Avery's lawyers . . . If that information had come to light in 1995, Steven Avery would have gotten out in 1995. |

| | |
|---|---|
| 26:56-27:33 | So they cost Steve Avery eight years of his life. This is as close to a conspiracy of silence as I think you could find in a case." |
| 2 ECF # 120-2 28:24-29:07 | Rotating footage of Mr. Colborn and other alleged conspirators is shown. |
| 2 ECF # 120-2 28:35-29:37 | Walt Kelly, also identified as an Avery attorney, states, "October of 2005, from the perspective of the Manitowoc County government and their defense lawyers, I believe they all knew they were in the most serious kind of trouble. There was a very grave prospect of a very, very substantial verdict……. [Their] insurers have taken the position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the Sheriff and the DA, would be on the hook for those damages in the civil suit." |
| 2 ECF # 120-2 29:40-30:22 | Glynn continues, "We don't need to have somebody tell us that this is going to have an effect on law enforcement. Of course it has an effect on law enforcement. Are you kidding me? I mean law enforcement officers get uptight when there is even a suggestion that they have said something wrong in a courtroom. Imagine what it's like when you're going to say that you're a liar, and that you hid evidence, and that you deliberately prosecuted a person that you knew, or at least had reason to know, wasn't guilty of the crime? And putting all that aside, by the way, in terms of your own professionalism, there's a guy out there raping and beating women while the guy that you put in prison is sitting in a cell." |
| 2 ECF # 120-2 30:29-31:04 | Glynn continues, "We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt [Kelly] who tells me that he has gotten a call from a journalist asking if either of us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach." |
| 2 ECF # 120-2 39:30-40:08 | News report excerpt regarding Halbach's disappearance is followed by footage of Avery interview in which he says that anyone could have access to his property to plant evidence and accuses the county of possibly doing "something" with Teresa Halbach and trying "to plant evidence on me," adding that he "wouldn't put nothing past the county." |
| 2 ECF # 120-2 41:19-41:24 | Avery voiceover, "All I can think is they're trying to railroad me again." |
| 2 ECF # 120-2 42:45-43:02 | Avery continues, "I ain't been home. They's been searching. How hard is it to put evidence in the house or on the property? . . . .The . . . . Sheriff . . . was out to get me the first time. How do I know he ain't got nothing to do with it this time?" |
| 2 | Avery continues, "…all these memories and everything else, and they're just |

9

| | |
|---|---|
| ECF # 120-2 44:24-44:35 46:37-46:52 | sketching me out again. And deep down, it hurts. [more news footage] ……You know we're all victims, and they just won't leave us alone. They just keep it up and keep it up. You know a person can only take so much, you know . . . . ." |
| 2 ECF # 120-2 52:24-52:29 | Avery states during an apparent interrogation: "See, if somebody else plants that shit there, you ain't going to see . . . ." |
| 3 ECF # 120-3 14:14-14:42 | Unidentified woman in a bar states, "I really do think he was framed. . . .There's a lot that points to where the Sheriff's Department could've had something to do with it. And then I don't know if it's true or not, but I also heard that Manitowoc County was not supposed to be allowed in to search, and they were in there and they searched. And that's who found the key apparently after the third day was the Manitowoc County Sheriff's Department. . . " |
| 3 ECF # 120-3 14:43-15:05 | Male bar patron adds, "I only have one word, from the cops on up its: corruption. Big time. I mean, if people dig far enough, they'll see that." |
| 3 ECF # 120-3 15:06 - 15:36 | Unidentified female bar patron continues, "I don't care what anybody says, that's a lot of money to pay out from here in Manitowoc County. It's a small area and I really, truly believe the county didn't have the funds to pay it out . . . .And they can say, `Oh, you really believe the Manitowoc County police department and the FBI and everybody came in and they set all this up just to have Steven Avery guilty of this thing? Yes, I do. . . .'" |
| 3 ECF # 120-3 16:45-16:55 | MAM depicts a telephone call between Avery and his sister in which Avery says, "This way, they figure they just got away with it, they can do it again . . . . You know it ain't gonna stop 'em." |
| 3 ECF # 120-3 20:21 – 21:03 | Dean Strang, speaking out of court, is shown stating, "I didn't see them plant evidence with my own two eyes. I didn't see it. But do I understand how human beings might be tempted to plant evidence under the circumstances in which the Manitowoc County Sheriff's Department found itself. . . . I don't have any difficulty understanding those human emotions at all." |
| 3 ECF # 120-3 21:16-21:49 | Attorney Buting, speaking out of court, states, "So, you've got motivation for the officers to want to get him. And then when lo and behold there's this woman who disappears and one of the last people she saw was Steven Avery. . . .`Now, we've got him. A-ha. We knew it.' They conclude that he's guilty, right off the bat. And they thought, `We're going to make sure he's convicted.'' And they helped it along by planting his blood in the RAV4 and by planting that key in his bedroom." |

10

| | |
|---|---|
| 4<br>ECF #<br>120-4<br>32:41 –<br>33:04 | Attorney Buting, speaking out of court, states "Some would – might think, `Well, you know we – our hands were tied . . . .That you got a client who's saying that he's being framed. Publicly, that's kind of the defense you'd better go with' . . . . But it really wasn't that way here. The defense was raised because we think the evidence pointed that way. . . ." |
| 4<br>ECF #<br>120-4<br>1:00:05 –<br>1:00:43 | Buting says out of court, "Sheriff Peterson . . . .clearly, clearly has a strong dislike for Avery. If the very top guy has this kind of attitude . . . that's gonna permeate the department, the whole department. If not, at least it's going to permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants." |
| 4<br>ECF #<br>120-4<br>1:00:25 –<br>1:00:47 | Mr. Colborn's photograph is shown immediately after the above comments, underneath a hierarchy of photographs of the Sheriff's Department chain of command, with the lower levels (including the photograph of Mr. Colborn) illuminated |
| 4<br>ECF #<br>120-4<br>1:03:00<br>1:04:15 | Buting says in an apparent telephone call to Strang that the supposed tampering with a blood vial containing Avery's blood shows that "Some officer went into that file, opened it up, took a sample of Steve Avery's blood and planted it in the RAV4." |
| 5<br>ECF #<br>120-5<br>52:03-<br>52:12 | Buting states, out of court, "Somebody knew that [Ms. Halbach's] vehicle was there before they ever went there. I'm convinced of it." |
| 5<br>ECF #<br>120-5<br>52:13 –<br>53:20 | Interrogation of Avery follows Buting's statement; Avery tells an officer that he was told by a woman identified only as "Tammy" that "a cop" put Ms. Halbach's vehicle on Avery's property "and planted evidence." |
| 5<br>ECF #<br>120-5<br>53:20-:24 | Immediately after the above, cuts to footage of Mr. Colborn about to testify |
| 6<br>ECF #<br>120-6<br>56:26 –<br>57:11 | Buting, in an interview with MAM, states, "One of the things that the state argued was that it would have taken a wide-ranging conspiracy . . . . Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?" |
| 7<br>ECF #<br>120-7 | Statement by Avery's father: "They had Steve picked . . . right away. They set him up. Right from the beginning. . . ." |

| | | |
|---|---|---|
| | 1:04 – 1:17 | |
| 7<br>ECF #<br>120-7<br>10:45 –<br>12:00 | | Buting and Strang are shown in an out-of-court conversation filmed by MAM, stating:<br>Buting: "It's not enough to just get the key. He wants Avery's DNA on that. And so he is gonna wait until it is the right time. And there is a Calumet County deputy with him on all of their searches.<br>Strang: Yep. There is . . . .<br>Buting: Somewhere nearby, and he was just waiting for the right time . . . when he could do it.<br>Strang: That key does not fall from, you know, in between the backboard and the frame of that little bookcase.<br>. . . .<br>Buting: And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?<br>Strang: Blood's easy. . . .<br>Buting: The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation . . . because of that lawsuit. They were deposed in the lawsuit. They didn't tell. . . ." |
| 7<br>ECF #<br>120-7<br>14:48 –<br>15:15 | | Avery states, "I'm in the same situation that I was before. Just a couple of them wanting to nail me. And the other ones didn't. But nobody speaks up. I gotta go through this over and over." |
| 7<br>ECF #<br>120-7<br>15:15 | | Directly after Avery's comments above, MAM displays image of Mr. Colborn, and audio of Avery continues; video then switches between images of Mr. Colborn waiting to testify, Avery looking sad, and Mr. Colborn in court |
| 7<br>ECF #<br>120-7<br>24:28 –<br>26:01 | | Switches to exchange with reporter in which she questions Strang about whether the defense went too far by accusing Mr. Colborn of being a "bad cop," which includes the following:<br>Strang: This was a hard day, and there've been some hard days for Sgt. Colborn. . . .<br>Reporter: "But my question is though, that if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place."<br>Strang: You're hearing evidence of the conspiracy. And I've sat in many a federal courtroom and heard federal prosecutors prove a conspiracy on less than we've heard already here and that you will hear by the end of this trial." |
| 7<br>ECF #<br>120-7<br>37:43 –<br>37:57 | | Telephone conversation shown between Avery and his mother:<br>Avery's mother: It seems suspicious.<br>Avery: Yeah.<br>Avery's mother: Them people ain't gonna get away with everything. |

12

As to the republished statements, actual malice can be found as a matter of law under the standard articulated in *St. Amant* because of the evident inherent biases of the sources. But in addition, communications between Netflix creative team representatives and the filmmakers establish that they intentionally stacked these third-party statements to tell a specific story emphasizing the law enforcement conspiracy in which Mr. Colborn is identified as participating.

For example, Netflix series notes advised Chrome to use Ms. Ducat's statement that the County was "not done" with Mr. Avery to impart "a more explicit ending [to an early episode] that makes it clear that in the next episode the cops are going to seek revenge." Proposed Undisputed Fact No. 71; Barker Decl., Ex. 8, Nishamura Tr. pp. 131-32; Ex. 9 at NFXCOL 0001978. Netflix representatives also endorsed using Avery's father's statement, "They framed an innocent man just like they did 20 years ago" as a "cliffhanger." Proposed Undisputed Fact No. 72; Ex. 9 at NFXCOL 0001981.

Defendants cannot credibly contend that they did not specifically select the third-party statements to advance a preconceived law enforcement conspiracy narrative in MAM. In their communications, the Defendants referred to those associated with Manitowoc County law enforcement as "the baddies" for whom a specific "bad guy theme" music was to play during their appearances as part of an overall "thriller atmospheric score." Proposed Undisputed Fact #73; Barker Decl., Ex. 8, Nishamura Tr., pp. 131-32, 136-37; Ex. 9 at NFXCOL 0002009, 2037; Ex.10 (Del Deo Tr., pp. 88-89); Ex. 11 at NFXCOL 0001934.

Defendants' own documents also show that they were actively looking for opportunities to use source material in such a way to "allude to the fact that [cops] may have planted something . . . ." Proposed Undisputed Fact No. 74; Barker Decl., Ex. 10 (Del Deo Tr., pp. 88-89); Ex. 11 at NFXCOL 0001940. There is no reasonable inference but that Netflix knew that

13

Defendants were using third parties' words to convey the accusations of a law enforcement conspiracy, and in fact, urged Chrome and its representatives to enhance them. And despite the prominence given to Steve Glynn's tale of the alleged genesis of the conspiracy in the supposed "cover up" of the call that Mr. Colborn received while working at the Manitowoc County jail, in comments shared between Defendants, Netflix admitted that it seemed "very thin" that the call by Mr. Colborn "would be the key to the case." Proposed Undisputed Fact #75; Ex. 10 (Del Deo Tr., pp. 88-89); Ex. 11 at NFXCOL 0001938.

In contrast to the knowingly damning portrayals of law enforcement, Netflix advised Chrome to ensure that Steven Avery and his family were portrayed in a positive light, regardless of whether the portrayals were accurate or not. For example, Netflix sought family pictures of the Averys to include in the series, saying, "Let's make them look like a very happy family." Proposed Undisputed Fact No. 76; Barker Decl., Ex. 10 (Del Deo Tr., pp. 88-89); Ex. 11 at NFXCOL 0001935. They also identified an image of Avery "looking a little smug" as one that should be replaced with a different shot. Proposed Undisputed Fact No. 77; Barker Decl., Ex. 12. In contrast, Defendants worked to replace another image of Mr. Colborn in an early version of the MAM trailer with a "squirmy shot" instead. Proposed Undisputed Fact No. 78; Barker Decl., Exs. 13-14.

It should be noted that the communications described above do not by any means constitute the totality of evidence of actual malice that Plaintiff intends to present at trial with respect to MAM as a whole. At trial – or in response to any motion for summary judgment that Defendants may file – Plaintiff intends to demonstrate that MAM as a whole contains numerous other defamatory statements, graphics, and video, including edited video of the Plaintiff's own testimony that changes his answers to court testimony. The examples cited above are provided

14

in this context to refute any suggestion that there can be any reasonable inference that the third-party statements that are the subject of this motion were not intended to convince viewers of the existence of a law enforcement conspiracy to frame Avery.

### III. THE THIRD-PARTY STATEMENTS ARE DEFAMATORY.

As shown in the table above, the third parties' statements, whether taken individually or in combination with each other, and when paired with MAM's images, video and graphics, accuse Mr. Colborn, and/or a group of Manitowoc County "law enforcement" that includes Mr. Colborn,[3] of planting evidence as part of a conspiracy to frame Steven Avery for Teresa Halbach's murder. There can be no reasonable argument that these are not accusations of criminal conduct. *See, e.g.,* Wis. Stat. §§946.41(1), 946.12(1); 946.31.

Accusations of criminal conduct are defamatory. *See, e.g., Downer v. Tubbs,* 139 N.W. 820, 822 (Wis. Sup. Ct. 1913). Therefore, the statements in MAM that repeat third parties' accusations of criminal conduct by Mr. Colborn are defamatory as a matter of law.

### IV. MAM IS FALSE AS TO ACCUSATIONS THAT MR. COLBORN PARTICIPATED IN A CONSPIRACY TO PLANT EVIDENCE AND/OR PLANTED EVIDENCE.

The statements by third parties that are republished in MAM and that accuse Mr. Colborn of planting evidence are false. Mr. Colborn testified at the Avery trial that he did not plant evidence or attempt to frame Mr. Avery. Proposed Undisputed Fact No. 70; Barker Decl., Ex. 7. Defendants can identify no facts that suggest otherwise nor any reasonable inference that can be drawn to support any such contention.

---

[3] A statement is defamatory as to an individual if his identity is ascertainable. *See, e.g., Wildes v. Prime Mfg. Corp.*, 160 Wis. 2d 443, 448 (Ct. App. 1991). A statement is also defamatory as to an individual if it is made to a recipient who incorrectly, but reasonably, understands it to refer to the individual. *Id.*

15

To overcome a summary judgment motion as to this element, Defendants must come forward with specific facts sufficient to raise a genuine issue of material fact that Plaintiff in fact planted evidence or participated in a conspiracy to do so. *See, e.g., Liu v. T&H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1990). Any inferences that they seek to have drawn in their favor must be reasonable inferences. *See, e.g.. Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

To the extent that Defendants may attempt to rely on suspicions that they contend were outlined in MAM, all of those alleged suspicions were based on nothing more than pure speculation and conjecture. For example, MAM's insinuation that Mr. Colborn could have planted Ms. Halbach's vehicle key in Steven Avery's bedroom is based on nothing more than the fact that Mr. Colborn was in the room when James Lenk discovered it and that he was accused by Avery's defense counsel of having a bias or grudge against Mr. Avery after having been deposed in Avery's civil suit. *See* Dkt #120-7 at 10:45 – 12:00. There are no facts from which reasonable inferences could be drawn to permit a jury to conclude that Mr. Colborn in fact planted any evidence to frame Steven Avery, nor that he conspired to do so. Accordingly, Plaintiff should be granted summary judgment on this issue.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant his motion for summary judgment and rule that it is determined for purposes of these proceedings that (1) Defendants published MAM; and (2) Defendants published the third-party statements described in Proposed Undisputed Fact 2 with actual malice; and (3) the statements are defamatory.

Dated this 16th day of September, 2022.

                /s/ April Rockstead Barker_____
                April Rockstead Barker
                State Bar No. 1026163
                Mailing address: 525 N. Lincoln Ave.
                Beaver Dam, WI 53916
                (920) 887-0387
                (262) 666-6483 (facsimile)
                aprilrbarker@rocksteadlaw.com

**Co-counsel:**
R. George Burnett
State Bar No. 1005964
2331 S. Adams St.
Green Bay, WI 54301
Phone: (920) 437-0476
Fax: (920) 437-2868