IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

ANDREW L. COLBORN,

        Plaintiff,

vs.

NETFLIX, INC.,
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

        Defendants.

Case No. 19-CV-484

**PLAINTIFF'S PROPOSED UNDISPUTED FACTS
SUBMITTED IN SUPPORT OF PLAINTIFF'S MOTIONS
FOR PARTIAL SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that pursuant to Eastern District of Wisconsin Local Rule Civil 56, Plaintiff proposes the following as undisputed facts in support of his motion for partial summary judgment:

1. Defendants published the 10-part series "Making a Murderer.". Netflix, Inc., Answer, Dkt #181, p. 5, ¶15; Barker Decl., Ex. 1, Demos Tr. at pp. 94-95, 103.

2. The following statements, made by the identified individuals, are contained in MAM where or approximately where indicated, together with graphics, images and video as described below. (Declaration of Matthew Kelley, previously filed in this action as Dkt #120 at pp. 1-3, ¶¶2-11; specific references are cited below).

| Fact No. | Episode / Time into Broadcast | Statement and/or MAM Embellishments |
|---|---|---|
| | | |

| 3 | 1<br>ECF # 120-1<br>4:35 – 4:45 | Steven Avery voiceover: " They had the evidence back then that I didn't do it. But nobody said anything . . . ". |
|---|---|---|
| 4 | 1<br>ECF # 120-1<br>1:01:19 –<br>1:01:42 | Kim Ducat (Avery relative) states on camera: "They weren't just gonna let Stevie out. They weren't gonna hand that man 36 million dollars. They weren't gonna be made a laughing stock, that's for sure. They just weren't gonna do all that. And something in my gut said they're not done with him. Something's gonna happen. They're not handing that kind of money over to Steven Avery." |
| 5 | 1<br>ECF # 120-1<br>1:01:29-<br>1:01:44;<br>1:01:33 –<br>photograph | Photos of Plaintiff and others are shown during Kim Ducat's statement. |
| 6 | 2<br>ECF # 120-1<br>49:22-49:39 | Steve Glynn, identified as Avery's counsel in the civil case against Manitowoc County, states, "The day of or on the day after Steven's release, law enforcement officers in Manitowoc are writing memos to describe activity that had occurred almost ten years earlier. They don't do that unless they feel threatened." |
| 7 | 2<br>ECF#<br>120-2<br>17:20 – 17:34 | Steve Glynn states, "We learned during litigation something that we had absolutely no knowledge of before the lawsuit got started. That 1995 was a very, very significant point in this thing." |
| 8 | 2<br>ECF # 120-2<br>17:34-17:43 | Video deposition of Mr. Colborn is shown in the background with Steve Glynn voice over (image of Mr. Colborn) |
| 9 | 2<br>ECF # 120-2<br>17:37-18:24 | Steve Glynn continues, "And that there is not only something to this idea that law enforcement had information about somebody else, but there is serious meat on those bones, I mean serious meat. What we learn is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department [image of Mr. Colborn's report is shown in background] from another law enforcement agency . . . saying that they had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison." |
| 10 | 2<br>ECF # 120-2<br>18:28 -19:04 | Video footage of Mr. Colborn's testimony in civil case in response to questioning by Glynn |
| 11 | 2 | Steve Glynn continues, "Manitowoc doesn't have huge |

|    | ECF # 120-2<br>19:05 – 19:41 | numbers of major assaults where people go to prison and certainly where people would still be in prison. There is a very distinct possibility, I would say likelihood, that it's Gregory Allen. It's the Brown County Sheriff's Department that is in 1995 on the Gregory Allen case, that Gregory Allen has said something about Steven Avery, and at a minimum, somebody ought to check this out." |
|----|---|---|
| 12 | ECF # 120-2<br>19:24 – 19:41 | Graphic shown during a cutaway from Glynn's interview, while Glynn is still speaking, shows, "1995 ● Gregory Allen is arrested for sexual assault in Brown County / Andrew Colborn receives call about inmate confession" |
| 13 | 2<br>ECF # 120-2<br>19:41 – 19:47 | Cuts to video of Mr. Colborn's deposition testimony in Avery's civil case, with the following exchange:<br>Glynn: I mean that's a significant event.<br>Mr. Colborn: Right, that's what stood out in my mind. |
| 14 | 2<br>ECF # 120-2<br>19:47 – 20:26 | Returns to interview with Glynn, who says, "The fellow who got that call was a guy named Colborn. And you might say that there should be a record of him immediately making a report on this, there might be a record of his immediately contacting a supervising officer, there might be a record of him contacting a detective who handles sexual assault cases, ahh, there might be some record of it. But if you thought any of those things, you'd be wrong, because there isn't any record in 1995, 1996, 1997, 1998, 2000, 2001, 2002, 2003 . . . ." |
| 15 | 2<br>ECF#<br>120-2<br>20:14 -20:25 | Visual cuts to graphic with years running from a timeline image with Mr. Colborn's photograph above it, and a statement after the year "2003" that states, 'DNA evidence exonerates Steven Avery." |
| 16 | 2<br>ECF#<br>120-2<br>20:26 -21:14 | Glynn continues, "Now 2003 is a year that has meaning because that's when Steven Avery got out. And the day he got out, or the day after, that's when Colborn decides to contact his superior officer, named Lenk. And Lenk tells him to write a report. And they then go have contact with t the Sheriff. Now, let's just stop and think about that for a minute. Why does that happen, why does it happen the, when it didn't happen eight years earlier? Um, ahh, I mean, I think I know the answer. I think the answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk as his superior realized it, and the Sheriff realized it. |
| 17 | 2<br>ECF # 120-2<br>21:08-21:12 | Images of Mr. Colborn, James Lenk, and the Sheriff are shown. |
| 18 | 2 | Glynn continues, "So Lenk tells Colborn to write a report, |

|    | ECF # 120-2<br>21:12 – 21:39 | the Sheriff tells Lenk, `Get me the report.' The Sheriff puts the report in a safe. That's how much he cares about documenting this thing. Well obviously it doesn't do anybody, it certainly doesn't do Steven Avery any good to document that eight years after the fact, because Steve Avery has been sitting in a cage for those eight years. |
|----|------|------|
| 19 | ECF # 120-2<br>21:48 – 22:52 | Footage of James Lenk and Sheriff Peterson being questioned by Glynn in depositions at Avery's civil trial that includes Glynn getting Lenk to say that Mr. Colborn "wasn't sure" who told him that the rape in question was already solved and that the right person was arrested, and that includes a close-up of Mr. Colborn's signature identified on an exhibit |
| 20 | 2<br>ECF # 120-2<br>22:55-23:14 | Avery voiceover stating, "A lot of people told me to watch my back. Most of the time, I didn't even believe the. But then, sitting and doing depositions, I don't know. It kind of changed my mind. They were covering something up." |
| 21 | 2<br>ECF # 120-2<br>22:45-22:50 | Image with close-up of Mr. Colborn's signature. |
| 22 | 2<br>ECF # 120-2<br>23:14-23:26 | Avery continues, "And they were still covering something up. Even with the sheriff's who on there now – he's covering something up." |
| 23 | 2<br>ECF # 120-2<br>23:28-23:50 | Cuts to footage of Mr. Colborn's videotaped deposition. |
| 24 | 2<br>ECF # 120-2<br>26:52-26:56 | Video image of Mr. Colborn |
| 25 | 2<br>ECF # 120-2<br>26:56-27:33 | Steven Glynn is shown, asserting, "This was an unconscionable withholding of information that would have been of use to Steven Avery's lawyers . . . If that information had come to light in 1995, Steven Avery would have gotten out in 1995. So they cost Steve Avery eight years of his life. This is as close to a conspiracy of silence as I think you could find in a case." |
| 26 | 2<br>ECF # 120-2<br>28:24-29:07 | Rotating footage of Mr. Colborn and other alleged conspirators is shown. |
| 27 | 2<br>ECF # 120-2<br>28:35-29:37 | Walt Kelly, also identified as an Avery attorney, states, "October of 2005, from the perspective of the Manitowoc County government and their defense lawyers, I believe they all knew they were in the most serious kind of trouble. There was a very grave prospect of a very, very substantial verdict. [Their] insurers have taken the position that because of the nature of the allegations against the County, |

4

| | | |
|---|---|---|
| | | the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the Sheriff and the DA, would be on the hook for those damages in the civil suit." |
| 28 | 2<br>ECF # 120-2<br>29:40-30:22 | Glynn continues, "We don't need to have somebody tell us that this is going to have an effect on law enforcement. Of course it has an effect on law enforcement. Are you kidding me? I mean law enforcement officers get uptight there is even a suggestion that they have said something wrong in a courtroom. Imagine what it's like when you're going to say that you're a liar, and that you hid evidence, and that you deliberately prosecuted a person that you knew, or at least had reason to know, wasn't guilty of the crime? And putting all that aside, by the way, in terms of your own professionalism, there's a guy out there raping and beating women while the guy that you put in prison is sitting in a cell." |
| 29 | 2<br>ECF # 120-2<br>30:29-31:04 | Glynn continues, "We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt [Kelly] who tells me that he has gotten a call from a journalist asking if either of us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach." |
| 30 | 2<br>ECF # 120-2<br>39:30-40:08 | News report excerpt regarding Halbach's disappearance is followed by footage of Avery interview in which he says that anyone could have access to his property to plant evidence and accuses the county of possibly doing "something" with Teresa Halbach and trying "to plant evidence on me," adding that he "wouldn't put nothing past the county." |
| 31 | 2<br>ECF # 120-2<br>41:19-41:24 | Avery voiceover, "All I can think is they're trying to railroad me again." |
| 32 | 2<br>ECF # 120-2<br>42:45-43:02 | Avery continues, "I ain't been home. They's been searching. How hard is it to put evidence in the house or on the property? . . . .The . . . . Sheriff . . . was out to get me the first time. How do I know he ain't got nothing to do with it this time?" |
| 33 | 2<br>ECF # 120-2<br>44:24-44:35<br>46:37-46:52 | Avery continues, "all these memories and everything else, and they're just sketching me out again. And deep down, it hurts. [more news footage] You know we're all victims, and they just won't leave us alone. They just keep it up and keep it up. You know a person can only take so much, you know . . . . ." |

5

| | | |
|---|---|---|
| 34 | 2<br>ECF # 120-2<br>52:24-52:29 | Avery states during an apparent interrogation: "See, if somebody else plants that shit there, you ain't going to see . . ." |
| 35 | 3<br>ECF # 120-3<br>14:14-14:42 | Unidentified woman in a bar states, "I really do think he was framed. . . .There's a lot that points to where the Sheriff's Department could've had something to do with it. And then I don't know if it's true or not, but I also heard that Manitowoc County was not supposed to be allowed in to search, and they were in there and they searched. And that's who found the key apparently after the third day was the Manitowoc County Sheriff's Department. . ." |
| 36 | 3<br>ECF # 120-3<br>14:43-15:05 | Male bar patron adds, "I only have one word, from the cops on up: it's corruption. Big time. I mean, if people dig far enough, they'll see that." |
| 37 | 3<br>ECF # 120-3<br>15:06 -15:36 | Unidentified female bar patron continues, "I don't care what anybody says, that's a lot of money to pay out from here in Manitowoc County. It's a small area and I really, truly believe the county didn't have the funds to pay it out . . . .And they can say, `Oh, you really believe the Manitowoc County police department and the FBI and everybody came in and they set all this up just to have Steven Avery guilty of this thing? Yes, I do. . . .'" |
| 38 | 3<br>ECF # 120-3<br>16:45-16:55 | MAM depicts a telephone call between Avery and his sister in which Avery says, "This way, they figure they just got away with it, they can do it again . . . . You know it ain't gonna stop 'em." |
| 39 | 3<br>ECF # 120-3<br>20:21 – 21:03 | Dean Strang, speaking out of court, is shown stating, "I didn't see them plant evidence with my own two eyes. I didn't see it. But do I understand how human beings might be tempted to plant evidence under the circumstances in which the Manitowoc County Sheriff's Department found itself. . . . I don't have any difficulty understanding those human emotions at all." |
| 40 | 3<br>ECF # 120-3<br>21:16-21:49 | Attorney Buting, speaking out of court, states, "So, you've got motivation for the officers to want to get him. And then when lo and behold there's this woman who disappears and one of the last people she saw was Steven Avery. . . .`Now, we've got him. A-ha. We knew it.' They conclude that he's guilty, right off the bat. And they thought, `We're going to make sure he's convicted.'' And they helped it along by planting his blood in the RAV4 and by planting that key in his bedroom." |

6

| | | |
|---|---|---|
| 41 | 4<br>ECF # 120-4<br>32:41 – 33:04 | Attorney Buting, speaking out of court, states "Some would – might think, `Well, you know we – our hands were tied . . . .That you got a client who's saying that he's being framed. Publicly, that's kind of the defense you'd better go with' . . . . But it really wasn't that way here. The defense was raised because we think the evidence pointed that way. . . ." |
| 42 | 4<br>ECF # 120-4<br>1:00:05 –<br>1:00:43 | Buting says out of court, "Sheriff Peterson . . . .clearly, clearly has a strong dislike for Avery. If the very top guy has this kind of attitude . . . that's gonna permeate the department, the whole department. If not, at least it's going to permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants." |
| 43 | 4<br>ECF # 120-4<br>1:00:25 –<br>1:00:47 | Mr. Colborn's photograph is shown immediately after the above comments, underneath a hierarchy of photographs of the Sheriff's Department chain of command, with the lower levels (including the photograph of Mr. Colborn) illuminated |
| 44 | 4<br>ECF # 120-4<br>1:03:00<br>1:04:15 | Buting says in an apparent telephone call to Strang that the supposed tampering with a blood vial containing Avery's blood shows that "Some officer went into that file, opened it up, took a sample of Steve Avery's blood and planted it in the RAV4." |
| 45 | 5<br>ECF # 120-5<br>52:03- 52:12 | Buting states, out of court, Somebody knew that [Ms. Halbach's] vehicle was there before they ever went there. I'm convinced of it." |
| 46 | 5<br>ECF # 120-5<br>52:13 – 53:20 | Interrogation of Avery follows Buting's statement; Avery tells an officer that he was told by a woman identified only as "Tammy" that "a cop" put Ms. Halbach's vehicle on Avery's property "and planted evidence." |
| 47 | 5<br>ECF # 120-5<br>53:20-:24 | Immediately after the above, cuts to footage of Mr. Colborn about to testify |
| 48 | 6<br>ECF # 120-6<br>56:26 – 57:11 | Buting, in an interview with MAM, states, "One of the things that the state argued was that it would have taken a wide-ranging conspiracy . . . . Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?" |

| 49 | 7<br>ECF # 120-7<br>1:04 – 1:17 | Statement by Avery's father: "They had Steve picked . . . right away. They set him up. Right from the beginning. . . ." |
|---|---|---|
| 50 | 7<br>ECF # 120-7<br>10:45 – 12:00 | Buting and Strang are shown in an out-of-court conversation filmed by MAM, stating:<br>Buting: "It's not enough to just get the key. He wants Avery's DNA on that. And so he is gonna wait until it is the right time. And there is a Calumet County deputy with him on all of their searches.<br>Strang: Yep. There is . . . .<br>Buting: Somewhere nearby, and he was just waiting for the right time . . . when he could do it.<br>Strang: That key does not fall from, you know, in between the backboard and the frame of that little bookcase.<br>. . . .<br>Buting: And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?<br>Strang: Blood's easy. . . .<br>Buting: The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation . . . because of that lawsuit. They were deposed in the lawsuit. They didn't tell. . . ." |
| 51 | 7<br>ECF # 120-7<br>14:48 – 15:15 | Avery states, "I'm in the same situation that I was before. Just a couple of them wanting to nail me. And the other ones didn't. But nobody speaks up. I gotta go through this over and over." |
| 52 | 7<br>ECF # 120-7<br>15:15 | Directly after Avery's comments above, MAM displays image of Mr. Colborn, and audio of Avery continues; video then switches between images of Mr. Colborn waiting to testify, Avery looking sad, and Mr. Colborn in court |
| 53 | 7<br>ECF # 120-7<br>24:28 – 26:01 | Switches to exchange with reporter in which she questions Strang about whether the defense went too far by accusing Mr. Colborn of being a "bad cop," which includes the following:<br>Strang: This was a hard day, and there've been some hard days for Sgt. Colborn. . . .<br>Reporter: "But my question is though, that if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place."<br>Strang: You're hearing evidence of the conspiracy. And I've sat in many a federal courtroom and heard federal |

| | | |
|---|---|---|
| | | prosecutors prove a conspiracy on less than we've heard already here and that you will hear by the end of this trial." |
| 54 | 7<br>ECF # 120-7<br>37:43 – 37:57 | Telephone conversation shown between Avery and his mother:<br>Avery's mother: It seems suspicious.<br>Avery: Yeah.<br>Avery's mother: Them people ain't gonna get away with everything. |

55. The statements identified in the table set forth in paragraph 3-54, above, are capable of being understood, individually or collectively, as implying or making innuendos that Steven Avery was wrongly convicted of the murder of Teresa Halbach.

56. The statements identified in paragraph 3-54, above, are capable of being understood, individually or collectively, as implying or making innuendos that Manitowoc County law enforcement officers framed Steven Avery for the murder of Teresa Halbach.

57. The statements identified in paragraph 3-54, above, are capable of being understood, individually or collectively, as implying or making innuendos that Plaintiff was one of the key participants in a law enforcement conspiracy to frame Steven Avery for the murder of Teresa Halbach.

58. Steven Avery was convicted of murder in 2007. Barker Decl., Ex. 2.

59. The Netflix representatives of the creative team that participated in the production of MAM reviewed and approved the final versions of all episodes of MAM prior to its being published. Barker Decl., Ex. 3, Nishamura Tr. at pp. 170-71; Ex. 4, Del Deo Tr. at p. 141.

60. Defendants' representatives admitted that had little to no knowledge about the individuals shown in Episode 3 of MAM in a bar and making statements that Manitowoc County law enforcement framed Avery, including no knowledge regarding their contacts with the

Averys (other than as stated in paragraph 9, below) or law enforcement. Barker Decl., Ex. 5, Demos Tr. pp. 148-54; Ex. 3, Nishamura Tr. pp. 172-73; Ex. 6, Del Deo Tr. p. 156.

61. At least one of the bar patrons who make statements in Episode 3 of MAM is shown playing pool with Chuck Avery, Steven Avery's brother. Barker Decl., Ex. 5, Demos Tr. at p. 150.

62. Mr. Colborn received voicemail messages from callers who were critical of him after the release of MAM, most of whom did not identify themselves, including messages stating the following.

63.

. . . I'm just calling in regards to the documentary that I just finished watching it and it appears pretty clearly that you were obviously involved beyond a detective role. . .

Colborn Decl., Dkt #130, and Ex. 1, 1-7-16 4:04 PM

64.

Hi Detective Colborn, I'm calling about the Steven Avery case – I wanted to know if you planted evidence with Detective Lenk. It sure seems like that from the documentary. . . . I think you definitely planted evidence . . . .

*Id.,* Ex. 1, 1-20-16 1:16 PM

65.

Hi. This is regarding the Steven Avery case . . . . You know what you have done. This is completely unprofessional. . . . . You framed him and I don't care if the documentary was one-sided. You know what you did . . . . You are going to hell. . . .

*Id.,* Ex. 1, 1-21-16 10:54 AM

66.

. . . I've been calling numerous times and been getting no answer . . . . only awful disgusting human beings would do such a thing to innocent people, not only once, but twice, Colborn. The whole world has observed your lies . . . . I hope you're harassed . . . until the day you die. . . . . I hope that your wife is the next victim. . .

*Id.,* 1-21-16 11:14 AM

.

67.

Hi Detective Colborn. I just watched Making a Murder and you are soooo guilty. You were at the . . . you were at the the lot . . . the Avery yard, and you saw the car before, um and you're in it with Lenk. You guys are so shady and corrupt. . . .

*Id.,* 1/26/16 to 1/27/16, 3:42 PM

68.

Hey Andy . . . . You're probably out planting evidence on somebody right now, but um I just want to let you know that I saw your appearance on the television program and I really couldn't believe how scared you were in that one scene. I just wanted to talk to you about it, when you were upon the stand. Um, I actually thought you were going to wet your pants you were so scared. . . . .

*Id.,* Ex. 1, 2/15/16 to 2/19/16 2:13 PM (emphasis added)

69.

Mr. Colborn, this is a concerned citizen of the state of California. I've seen the case with Steven Avery. . . everybody knows what is going on here with you guys setting up and framing this poor man Steven Avery . . . be ready to sit in federal prison for a long long time. I hope you rot in hell, you son of a \*\*\*\*

*Id.,* Ex. 1, 1-15-16 to 1-18-16 4:34 PM

70. Mr. Colborn denied in sworn testimony during the Avery criminal trial that he planted evidence to frame Steven Avery. Barker Decl., Ex. 7 (excerpts from Avery criminal trial transcript at pp. 140-41).

71. Netflix series notes advised Chrome to use Ms. Ducat's statement that the County was "not done" with Mr. Avery to impart "a more explicit ending [to an early episode] that makes it clear that in the next episode the cops are going to seek revenge." Barker Decl., Ex. 8, Nishamura Tr. pp. 131-32; Ex. 9 at exhibit p.5, excerpt from Deposition Ex. 7 (NFXCOL 0001978).

72. Netflix representatives also endorsed using Avery's father's statement, "They framed an innocent man just like they did 20 years ago" as a "cliffhanger." *Id.,* Ex. 9 at exhibit page 8 (NFXCOL 0001981).

73. In series notes, Defendants referred to those associated with Manitowoc County law enforcement as "the baddies" for whom a specific "bad guy theme" music was to play during their appearances as part of an overall "thriller atmospheric score." Barker Decl., Ex. 8, Nishamura Tr., pp. 131-32, 136-37; Ex. 9 at exhibit pp. 36, 64 (Deposition Ex. 7 at NFXCOL 0002009, 2037); Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001934.

74. Netflix production notes, which were forwarded to Chrome, include a suggestion that source material be reviewed for the purpose of finding material to "allude to the fact that [cops] may have planted something . . . ." during a search at the Avery property. Barker Decl., Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001940.

75. In MAM production notes that were shared with Chrome, Netflix's creative team admitted that it seemed "very thin" that the call by Mr. Colborn "would be the key to the case." Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001938.

76. In MAM production Netflix sought family pictures of the Averys to include in the series, saying, "Let's make them look like a very happy family." Barker Decl., Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001935.

77. They also identified an image of Avery "looking a little smug" as one that should be replaced with a different shot while discussing a version of an MAM episode. Barker Decl., Ex. 12 at NFXCOL 0001974.[1]

---

[1] Netflix has stipulated through counsel that documents within this Bates range are authentic.

78. Defendants worked to replace another image of Mr. Colborn in an early version of the MAM trailer with what they called a "squirmy shot" instead. Barker Decl., Ex. 13, Demos Tr. pp. 218-19; Ex. 14 at CHRM 481-82.