# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

|  |  |
|---|---|
| **ANDREW L. COLBORN,** | |
| **Plaintiff,** | |
| **vs.** | **Civil No.: 19-CV-484** |
| **NETFLIX, INC.; CHROME MEDIA LLC, F/K/A SYNTHESIS FILMS, LLC; LAURA RICCIARDI; AND MOIRA DEMOS,** | |
| **Defendants.** | |

## DECLARATION OF MOIRA DEMOS

I, Moira Demos, under penalty of perjury and subject to 28 U.S.C. § 1746, declare as follows:

1.      I am co-creator of the documentary series *Making a Murderer* and co-founder and co-owner of Chrome Media LLC, f/k/a Synthesis Films, LLC with Laura Ricciardi.  I submit this Declaration in support of the Motion for Summary Judgment filed in the above-captioned matter on behalf of myself, Laura Ricciardi, and Chrome (sometimes referred to collectively herein as the "Producer Defendants"). I am over 18 years old and have personal knowledge regarding the facts set forth in this Declaration.

2.      As one of two lead creators of *Making a Murderer*, I played several roles.  My credits on *Making a Murderer* included director, executive producer, writer, editor, director of photography, and sound recordist.  In practical terms, that meant that I was responsible for most of the filming, sound recording and editing of the Series. Laura and I collaborated on storytelling.  Although we worked with and received assistance and input from others in the

course of producing *Making a Murderer*, we retained creative control and are the two people responsible for ultimately deciding what was included in *Making a Murderer*.

3. I began working on the film project that became *Making a Murderer* while I was a graduate film student in the thesis phase of my five-year program at Columbia University. Prior to film school, I worked as a film and television lighting technician in New York City where I was a member of IATSE Local 52, and I worked as a documentary film editor.

4. With the exception of some modest grants that we received and small donations from family and friends, Laura and I self-funded the production (filming) and post-production (editing) of *Making a Murderer* before entering into a licensing agreement with Netflix in 2014. To help fund *Making a Murderer*, I took lighting work on film, television and commercial shoots and I worked as an editor.

5. *Making a Murderer* chronicles the story of Steven Avery, a resident of Manitowoc County, Wisconsin who after serving 18 years for a wrongful conviction was exonerated through DNA evidence only to be arrested and convicted for a second even more serious crime. While there are other individuals featured prominently in *Making a Murderer*, including Steven Avery's nephew and co-defendant, Brendan Dassey, who was also convicted of murdering Teresa Halbach and related crimes, Steven Avery is the principal subject or main character. It was Avery's seemingly unique status as a DNA exoneree charged with a new, serious crime that motivated Laura and me to commit to making this project because an individual's journey from one extreme of the American criminal justice system to the other is of great public concern and documenting the journey would provide a significant window into the legal process at work. Although a significant portion of *Making a Murderer* concerns the investigations and legal proceedings related to the Teresa Halbach murder, the series covers a

2

30-year time period and it is not until more than halfway through the second episode that Teresa Halbach is reported missing. Before that point, the series documents a range of Steven Avery's experiences in the legal and political systems, including his early life and encounters with the criminal justice system and criminal offenses, his 1985 wrongful conviction, his related appellate and postconviction efforts, his 2003 exoneration, the Wisconsin Department of Justice's investigation into the wrongful conviction, the Avery Task Force (renamed the Criminal Justice Study Commission), and Avery's federal civil rights lawsuit against Manitowoc County and two of its former law enforcement officials.

**The Producer Defendants' Initial Interest in Steven Avery's Story**

6. Laura Ricciardi and I read a November 23, 2005 *New York Times* front-page article recounting the story of Steven Avery, who was exonerated through DNA evidence after serving 18 years for a crime he did not commit only to be arrested a little over two years later and charged with murder. We were immediately interested in the article and wanted to learn more. We had never heard of someone exonerated by DNA evidence who was later charged with a serious crime. We believed that Avery's seemingly unique situation might present an interesting vantage point for examining how the American criminal justice system compared from 1985 (the year Avery was wrongly convicted) to 2005 (the year he was arrested and charged for the new crime), a 20-year timespan that had seen the advent of DNA technology and many legislative reforms.

7. In December 2005, Laura and I traveled to Manitowoc, Wisconsin to begin researching and filming a project that, many years later, would eventually grow into and become *Making a Murderer*.

8.      We moved to Manitowoc in January of 2006 expecting Avery to go to trial for the murder of Teresa Halbach later that spring.

9.      In March 2006, our plans changed after Special Prosecutor Ken Kratz's March 1 and 2, 2006 press conferences, at which he revealed that a 16-year old relative of Avery's, Brendan Dassey, had made a confession that Avery had raped and murdered Teresa Halbach and he (Dassey) had been involved too.  Dassey was in custody and ultimately became Avery's co-defendant.  We could tell from these developments and the public and media reaction to them that the story was getting even more complex.

10.     There was extensive news coverage of Steven Avery's exoneration (as well as coverage of the Wisconsin Department of Justice's investigation into the 1985 case, the state legislature's Avery bill [subsequently renamed the Criminal Justice Reform Bill] and Avery's civil rights lawsuit), the disappearance of Teresa Halbach, the Halbach murder investigation, and the Avery and Dassey hearings and trials. Developments from the Halbach case frequently made the nightly news on multiple local television stations.

11.     Laura and I lived in Wisconsin from January 2006 until August 2007 to conduct research and sit-down interviews, request and acquire public records and other primary source materials, and review and license archival footage and other materials for the 30-year story.  We also filmed events as they unfolded and covered the pre-trial, trial and sentencing phases of both the Avery and Dassey cases.  We made a number of trips to Wisconsin from 2009 to 2014 to do additional filming.

**Interviews and Other Investigative Efforts**

12.     Laura and I filmed events as they were unfolding in an observational documentary style where neither we nor the subjects knew what would happen next.  We also conducted sit-

4

down interviews with subjects regarding those events and conducted sit-down interviews with subjects about past events.   We began reaching out and requesting access to numerous people connected to Avery's various legal matters, including Avery, Sandra Morris (his cousin whom he ran off the road and pointed a gun at), his ex-wife, Lori, (whom among other things he threatened to kill), retired Manitowoc County Sheriff's Office ("MTSO") deputies Judy Dvorak and Arland Avery, retired Sheriff Thomas Kocourek, former Manitowoc County District Attorney Denis Vogel, Penny Beerntsen (the survivor of the 1985 sexual assault,  attempted murder and false imprisonment [herein, "1985 sexual assault"]), Avery's family, his then fiancé, his former and present attorneys, Judge Hazlewood (who presided over the Beerntsen matter and was then retired) and later Judge Patrick Willis (who presided over Avery's murder trial) and Judge Jerome Fox (who presided over Dassey's murder trial), Peg Lautenschlager (then Wisconsin Attorney General), reporters and politicians.  Some, but not all, of them agreed to interviews and/or other filming.  With Avery's trial attorneys, the filming we did in the lead up to and during the murder trial was limited and we had to wait to do most of our interviews with them until after the murder trial was completed.

13.     We reached out to the family of Teresa Halbach, but they did not wish to do sit-down interviews or otherwise participate.  Given what they had been through, we understood. We made a good faith effort to film them at public events and film Teresa's brother Mike Halbach's press conferences.   In *Making a Murderer*, we tried to present their perspective by using that more public footage as well as using archival vérité and interview footage of them that we were able to license or otherwise include.

14.     We also reached out to the prosecutors in Avery's and Dassey's murder cases, including Special Prosecutor Ken Kratz, Thomas Fallon and Norm Gahn.  However, the

prosecutors either did not respond to requests or declined to participate. Again, in *Making a Murderer*, we tried to present the State's experiences and perspective by including extensive coverage of the prosecutors in court through all phases of the Halbach murder trials, archival footage of Ken Kratz from the period before we were filming in Wisconsin and footage we could shoot at or obtain of press conferences (both before and during Avery's and Dassey's trials) where the prosecutors answered questions and (primarily Ken Kratz) set forth the State's theories and outlined key evidence that they believed pointed to Avery's and Dassey's guilt. Kratz's March 2, 2006 press conference referenced above is one such event, as that was a particularly significant turning point in the case. *See MaM* Ep. 3 26:00–28:26; *see also MaM* Ep. 7 44:28–45:30.

15.     We also reached out to Undersheriff Robert Hermann at MTSO, as we understood that he was acting as a spokesperson for the Department and we also understood that current MTSO personnel generally were forbidden from talking with the media about the Penny Beerntsen and Teresa Halbach matters. We interviewed Undersheriff Hermann, and portions of that interview are included in episode 3 of *Making a Murderer*. *See MaM* Ep. 3 22:51–23:22.

16.     We also interviewed then Assistant District Attorney Michael Griesbach who spoke about Avery's wrongful conviction and subsequent exoneration for the 1985 sexual assault of Penny Beerntsen. Griesbach also discussed matters concerning the investigation by the Wisconsin Department of Justice that followed Avery's release, along with matters related to Avery's civil rights lawsuit against Manitowoc County, former Manitowoc County Sheriff Thomas Kocourek and former Manitowoc County District Attorney Dennis Vogel (who had been the lead prosecutor). *Making a Murderer* includes portions of Griesbach's interview in episode 1. *See MaM* Ep 1 at 49:51–51:500.

6

17.     As part of our research into and documenting of Avery's 1985 conviction and imprisonment, related appeals and postconviction efforts, subsequent exoneration, the Wisconsin Department of Justice's investigation and Avery's subsequent civil rights lawsuit, the Avery Task Force, and the Halbach case we obtained copies of many primary source materials related to those matters, investigations and proceedings.  For example, we obtained copies of:

- Pleadings, orders and other documents related to Avery's priors;
- Pleadings, orders and other documents related to Avery's 1985 conviction;
- The Wisconsin Department of Corrections file on Avery;
- Pleadings, orders and other documents related to Avery's appeals and postconviction efforts to overturn his 1985 conviction;
- Correspondence and reports relating to Avery's exoneration;
- Copies of the Wisconsin Department of Justice's Division of Criminal Investigation ("DCI") investigative reports regarding Avery's 1985 conviction, subsequent imprisonment and 2003 exoneration, as well as many documents and correspondence related to those reports;
- A copy of the Wisconsin Attorney General's report regarding whether there were any criminal or ethical violations relating to Avery's 1985 conviction, subsequent imprisonment and 2003 exoneration;
- Pleadings and other documents from Avery's civil rights lawsuit, including videos and transcripts of the depositions of numerous witnesses in that case including Sandra Morris and MTSO officials such as Plaintiff Andrew Colborn, Sheriff Kenneth Petersen, Lieutenant James Lenk, former deputy Judy Dvorak, former Chief Deputy Eugene Kusche, and Manitowoc County Assistant District Attorney Michael Griesbach, Manitowoc District Attorney Mark Rohrer, and DCI Special Agents Amy Lehmann and Debra Strauss, and Assistant Attorney General Thomas Fallon;
- Copies of documents referenced at those depositions;
- Copies of documents related to the criminal record of Gregory Allen, the man who DNA evidence showed was the actual person responsible for the 1985 sexual assault of Penny Beerntsen for which Avery had been wrongfully convicted;
- Video and audio copies of interrogations of Steven Avery in the Sandra Morris (audio only) and Halbach cases;
- Video and audio copies of interrogations of Brendan Dassey;
- Audio copies of Avery's and Dassey's jail calls recorded while they were in custody awaiting trial for the murder of Teresa Halbach;
- Video footage, pleadings and orders related to the pre-trial proceedings in Avery's and Dassey's cases; and

7

- Footage from press conferences related to the Avery and Dassey cases.

We also obtained secondary sources like newspaper articles and news footage related to the above items.

18. Laura and I obtained these materials to better understand the subjects that we were covering and to try to make *Making a Murderer* as accurate as we could. We spent considerable sums of money obtaining copies of these materials, including, for example, copying charges and license fees.

19. In connection with making *Making a Murderer*, I estimate that I personally spent at least 1200 hours reviewing the materials described above in Paragraph 17, which includes only researching and reviewing third-party materials. The estimate does not include time spent in production or post-production with original or pool footage from all of our sitdown interviews, vérité shoots, recording of pre-trial and trial footage, etc. Factoring in those efforts would bring the total to well over ten thousand hours over a ten-year period.

20. We carefully researched *Making a Murderer* and relied among other things on public records and other primary sources. To this day, I am confident that we were as accurate as the record allowed for the numerous legal matters that we covered.


**Trial Footage, Unterminated Feed Issues and Steps Taken to Address those Issues**

21. The Judge presiding over Steven Avery's murder trial, Hon. Patrick L. Willis, permitted use of a single camera in the courtroom to film all public pre-trial hearings, and the media worked according to a pool system where members of the media could plug into a mult-box fed from the camera to take that feed. All outlets had the right to use the footage. Synthesis Films participated in this pool system.

8

22.     Before trial Judge Willis had a meeting with all the members of the media including Synthesis Films to discuss camera coverage for the trial.  A true and correct copy of Judge Willis' Order Regarding Trial Administration, dated January 19, 2007, is attached as Exhibit 17 to the concurrently filed Declaration of Laura Ricciardi.  It was ultimately decided that there would be three pool cameras (A, B, C) for the courtroom, as well as one pool camera in the hallway, which would move downstairs in the afternoon to also record daily press conferences.  The A-camera (which Laura and I call the "witness cam") was a manned camera in the back right corner of the gallery that filmed the witnesses and the judge.  The B-camera (which Laura and I call the "lawyer cam") was a remote-control camera mounted to the wall above the jury box that filmed the lawyers, the defendant, the gallery and the projection screen.  The C-camera (which Laura and I call the "C-cam") was a manned camera in the small, windowed media room in the back left corner of the courtroom that rolled on the rare moments when someone in the courtroom was up on their feet moving and could not be filmed well by the A- and B-camera positions.

23.     During the trial in Calumet County, Laura and I were upstairs in the small media room in the back left corner of the courtroom.  I was operating the remote-control/B-camera and performing a live edit between the three cameras (A, B, C) and Laura was controlling the sound mixer.

24.     During trial, there were three feeds that were fed down to the media room in the basement where all of the media outlets as well Synthesis Films were set up to record.  The first feed was of raw (unedited) footage from the witness cam (A-camera).  The second feed was of raw (unedited) footage from the lawyer cam (B-camera).  The third feed was a feed of the live edit of all three cameras (A, B, C) (which Laura and I call the "mixed feed").

9

25.     Whereas all the media outlets were recording from the (edited) mixed feed and using it in their contemporaneous coverage, we at Synthesis Films were the only ones recording from the raw (unedited) footage feeds from the witness and lawyer cams (A- and B-cameras, respectively) as well as copying the tape of the C-camera operator.  We were not recording from the (edited) mixed feed.  We only reviewed and began working with our recordings of the A-camera and B-camera feeds and C-cam tapes after the trial was completed.  When we did so, we realized that the raw feed from the witness cam (A-camera) was "unterminated."  Unbeknownst to us during the trial, on the morning of the second day, someone had removed an adapter that was connecting the witness cam (A-camera) feed to the mult-box, located down in the media room, and instead connected the feed, without an adapter, directly to the mult-box, which created what is called an "unterminated" feed. The result is that the footage from the witness cam (A-camera) was unusable for broadcast and could not be fixed.

26.     The witness cam (A-camera) footage is unusable as it is "blown out," meaning it is very high contrast and the whites are clipping.  The witnesses' facial and other features have no detail and often could not be made out clearly.  As a result, the footage recorded off the unterminated feed was non-repairable and unusable for our documentary project and it did not meet broadcast standards.

27.     We only discovered the unterminated feed issue after Avery's trial was completed.  In response, Laura and I made repeated efforts to reach out to dozens of people working at the local television stations who had covered Avery's trial in an attempt to obtain copies of their stations' mixed feed footage or the opportunity to make copies of such footage.  Attached as Exhibits 29 and 30 to this Declaration and 28, 31, 32, and 35 to the concurrently filed Declaration of Laura Ricciardi are true and correct copies of some of our correspondence

10

related to those efforts to obtain more footage.  Ex. 28, CHRM034819 (initial outreach email from Demos to pool re footage); Ex. 31, CHRM034769 (Ricciardi explaining the unterminated feed to producer); Ex. 29, CHRM034730 (pool member recognizing contributions to the group); Ex. 30, CHRM034747 (Hearst affiliate assisting with footage); Ex. 35, CHRM034867 (CBS affiliate assisting with footage).

28.     In 2007, we were able to duplicate footage from two local television stations, WISN and WBAY.  Their footage consisted of the mixed feed footage described above, which meant there was not complete footage of witnesses (including Plaintiff) during every moment of their time on the witness stand.  The mixed feed footage only sometimes showed the witnesses because the recorded live edit was cutting back and forth between the witness, the attorneys, the judge, the gallery, the projection screen and the C-cam footage.  Moreover, the television stations did not always record the totality of a witness' testimony.  In 2015, we made additional efforts to obtain more usable footage of two trial witnesses: Plaintiff and Leslie Eisenberg.  That was because neither of the stations from which we already had obtained usable footage, i.e., WISN and WBAY, had been rolling during significant portions of those two witnesses' testimony.  We were successful in obtaining such additional footage from WGBA, although we had to pay a $10,000 license fee to the station.  That footage was also mixed feed footage and for the reasons listed above was still not complete coverage of the witnesses.

29.     As a result, there were gaps of the witnesses that Laura and I could not fill.  When working on *Making a Murderer*, there were times when Laura and I did not have usable footage of Plaintiff testifying in response to a particular question, as the only footage of Plaintiff at that moment was the unterminated footage from the witness cam (A-camera).  This was an issue we had with every witness that testified after the morning of the second day of trial that appears in

11

the series and the way we addressed the problem was the same across all the witnesses. To address the problem, we found a response from the usable footage we had that was as close as possible to the moment for which we did not have usable footage. For example, there is a scene in *Making a Murderer* in which prosecutor Kratz asks Plaintiff whether he knows if the Jail Call was even about Steven Avery. Because there was no on-screen usable footage of Plaintiff responding, "No, I don't" to Kratz's question, Laura and I substituted usable footage that we had where Plaintiff answered "No, sir." Our goal in this and all other substitutions was to find substitute footage that stayed true to the substance of witnesses' testimony (including Plaintiff's). *See MaM* Ep. 7 at 18:42.

30.     Lodged previously with my declaration in support of the Motion to Restrict, Dkt. No. 283, as Exhibits 1–4 are copies of portions of the raw footage that we had for this particular moment referenced in the prior paragraph, along with a composite clip showing the footage from the three relevant feeds that we prepared for ease of comparison. Specifically, Exhibit 1 is a copy of the A-camera footage, Exhibit 2 is a copy of the B-camera footage, Exhibit 3 is a copy of the mixed feed footage, and Exhibit 4 is a composite of the footage in Exhibits 1 through 3. These are excerpts of much larger files that we produced in discovery to Plaintiff in this case in connection with our agreement to provide Plaintiff with copies of all of our raw footage of Plaintiff testifying at Avery's trial, as reflected by the CHRM digital bates stamps included in the individual clips themselves. The copies of raw footage are provided in .mov files and may not open automatically on computers with Windows operating systems, but they should be able to opened using the free and open-sourced VLC media player available online.

31.     Contrary to Plaintiff's allegations that *Making a Murderer* "spliced" testimony to try to make Plaintiff look bad or to change the gist of his testimony, we went to considerable

effort utilizing the usable footage we possessed to portray the substance of Plaintiff's testimony accurately and to avoid making material changes to the gist of what Plaintiff's contentions were on the witness stand. In taking these steps, we tried, and I believe we succeeded, in accurately maintaining the material substance of the witnesses' testimony, including that of Plaintiff. I do not believe any of the edits we made responding to the unterminated feed footage issue materially altered Plaintiff's demeanor or the meaning of any of Plaintiff's testimony included in *Making a Murderer* let alone in a defamatory manner as he alleges in the Second Amended Complaint ("SAC").

**Other Matters Related to Editing and Production of *Making a Murderer***

32. *Making a Murderer* documents events beginning in the early-1980s and continuing through 2015. It covers Avery's early life, his early encounters with the criminal justice system/criminal offenses, his 1985 arrest and wrongful conviction, his related appeals and postconviction challenges, his 2003 exoneration and release, the Wisconsin Department of Justice's investigation into his wrongful conviction, Avery's involvement in legislative reforms, his 2004 civil rights lawsuit, the 2005 disappearance of Teresa Halbach, Avery's subsequent arrest for her murder, the investigation into Avery and his nephew Brendan Dassey, the pre-trial period leading up to Avery and Dassey's 2007 trials, Avery's 2007 trial, Dassey's separate 2007 trial, the juries' guilty verdicts and reaction to them, and Avery's and Dassey's appeals and postconviction efforts.

33. *Making a Murderer* also explores its subjects' experiences in the legal system, as well as aspects of the legal system itself.

34. The process of making a documentary necessarily requires significant editing. That involves summarizing, condensing, and compressing a huge volume of information and

13

materials. Avery's 2007 trial alone lasted approximately five weeks, with 60 witnesses and hundreds of exhibits. While Season 1 of *Making a Murderer* spends a considerable amount of time in the courtroom for Avery's murder trial (slightly less than two hours), *Making a Murderer* necessarily could only include a portion of what occurred there. The same is obviously true of Plaintiff's trial testimony. At Avery's trial, Plaintiff testified on the stand for approximately 3 hours and 10 minutes, or approximately 3 hours and 40 minutes if you include oral argument of counsel during the time he was on the stand. And Plaintiff is just one of 25 witnesses at Avery's trial whose testimony is included in *Making a Murderer*. If *Making a Murderer* had included all of the witnesses' entire testimony, the trial scenes alone would have been about 130 hours.

35. Our intent when editing footage was to summarize, condense and compress voluminous material in a comprehensible manner for viewers that accurately captured the gist of subjects' testimony and viewpoints on events. The standard editorial practices we used to summarize, condense and compress subjects' testimony, actions and viewpoints were applied universally to all witnesses who appear in the series. With respect to the Teresa Halbach case, we necessarily had to choose certain pieces of evidence to feature and in making those choices we looked to the prosecution and the defense to see what each side said was their most important evidence.

36. We explicitly sought to include both the view of the State and of Avery's defense attorneys in the Series, even when representatives from the prosecution and law enforcement declined to make themselves available for interviews. We used press conferences and arguments in court to substitute for direct interviews.

37. While in post-production, we ensured we had proper permissions and hired Rights and Clearance Counsel in connection with using footage, images, and other materials in the

Series.  Rights and Clearance counsel also vetted *Making a Murderer* to ensure that it was legally proper and did not, for example, defame any of its subjects.  We did this both as a preventative measure and because we wanted to be accurate.

**The Distribution Agreement with Netflix and Working with Netflix in Post-Production**

38.     After Steven Avery's trial in 2007, Laura and I started the long process of mapping out and editing footage for what eventually became *Making a Murderer.*  We had difficulty pitching what at that time was an unconventional format: a long-form documentary series.  We spent several years working on the first few episodes to demonstrate to potential distributors that it was more than just a documentary feature film and that a long-form series was justified.

39.     Lisa Nishimura of Netflix recognized the complexity and appeal of the story and took a risk.  After discussions and later negotiations by our outside counsel with Netflix, in 2014, we entered into a licensing agreement with Netflix whereby *Making a Murderer* would be distributed on the Netflix platform.

40.     Throughout the remaining post-production, Netflix creative executives provided notes, but we chose how (and whether) to implement them and retained creative control. I was the lead editor and performed most of the editing myself and I oversaw the work of contributing editors.

41.     We had initially planned for eight episodes but expanded to ten episodes to devote more running time to Avery's and Dassey's trials.

42.     Netflix marketed the show, though we had some input on marketing issues.

15

43.     Netflix suggested we hire a graphics company to create graphics for the Series. We provided the information to include in the graphics and gave notes and input to make the graphics accurate and viewer-friendly.  We believed that using graphics was appropriate because, particularly in the early episodes of *Making a Murderer*, viewers are presented with lots of events, dates, locations and individuals, including numerous MTSO officers, to keep track of.

44.     We were invited to and participated in many media interviews and industry, legal, educational and cultural events following *Making a Murderer's* release on Netflix on December 18, 2015.

45.     We received many messages, both positive and negative, after the Series was released. We received an email from then Manitowoc County ADA Michael Griesbach congratulating us on the Series and its overall message about ambiguity and uncertainty in the criminal justice system.  Attached as Exhibit 34 to the concurrently filed Declaration of Laura Ricciardi is a true and correct copy of Michael Griesbach's December 23, 2015 email to Laura and me.  CHRM002666.

**Allegations in the SAC regarding *Making a Murderer***

Plaintiff's Overarching Complaint

46.     Much of the SAC strikes me as being premised on an overarching complaint that *Making a Murderer* includes the viewpoints of Steven Avery's defense and others that Plaintiff and others in law enforcement planted evidence to frame Avery for the murder of Teresa Halbach.  However, that was a core part of Avery's defense at his murder trial.  We could not document Avery's trial without including this key defense.

16

47.     The SAC often seriously mischaracterizes portions of *Making a Murderer* in which Avery and his defenders' voice planting accusations against Plaintiff as statements made by "Defendants" or "*Making a Murderer*."  But *Making a Murderer*'s inclusion of subjects' viewpoints does not mean that we were endorsing or agreeing with what they said.  Indeed, *Making a Murderer* also includes statements made by Plaintiff and others explicitly denying and pushing back against Avery's planting allegations.

48.     Attributing *Making a Murderer*'s subjects' viewpoints to Laura and me shows a fundamental misunderstanding of *Making a Murderer*.  Laura and I purposefully did not include in *Making a Murderer* an omniscient voiceover narrator telling viewers what and whom to believe.  Instead, *Making a Murderer* includes individuals expressing their own views in interviews, in vérité footage, in deposition and trial testimony, and at press conferences and public places where various matters were being discussed.  When editing the part of *Making a Murderer* focused on the investigation into and trial of Steven Avery for the murder of Teresa Halbach, we chose to lay out the story in the present tense, again without voice-over narration by us or anyone else.  The result is that the events play out as people on all sides of the Halbach case take action, voice their points of view and make their respective legal arguments concerning Halbach and her horrific murder, as well as the investigation, prosecution, conviction, and sentencing of Avery and Dassey and the appellate and postconviction phases of those cases. *Making a Murderer* includes a variety of viewpoints, opinions, assertions, and counter-assertions.  *Making a Murderer* also explores ambiguities in the story, and, far from beating viewers over the head with a "correct" conclusion, reflects the many uncertainties in the matter. In creating *Making a Murderer*, Laura and I intended to raise questions but deliberately did not provide answers or tell viewers what to think.

17

49.     I do not know whether Steven Avery killed Teresa Halbach.  I accept that, unless there is some new revelation in the case, I will probably have to live with that uncertainty.  I also do not know whether Plaintiff or others in law enforcement planted evidence against Avery.  Again, unless there is some new revelation on that score, I anticipate that I will have to live with the uncertainty.

The 1994–95 Jail Call

50.     I reviewed Plaintiff's allegations in his pleadings about specific statements related to the 1994–95 Jail Call and related subjects.  None of the Plaintiff's challenged statements relating to them were included in *Making a Murderer* with knowledge of their falsity or with a high degree of awareness of probable falsity.  I did not and do not entertain any doubts that *Making a Murderer* accurately captured the gist of the parties' contentions with regard to those statements and subject matter.

51.     Plaintiff alleges in Paragraph 27 of the SAC that Defendants "spliced and omitted" portions of Plaintiff's testimony about the Jail Call to lead "viewers to falsely conclude that Plaintiff bears responsibility for seven or eight of Avery's 18 years of wrongful imprisonment, providing him with a motive to frame Avery for Halbach's murder."  That is not true.  We did not attempt to lead *Making a Murderer* viewers to conclude that Plaintiff bears responsibility for seven to eight years of Avery's wrongful imprisonment providing him with a motive to frame Avery for Halbach's murder, nor do I believe that *Making a Murderer* does so.  While Avery and his attorneys accused Plaintiff of planting evidence and claimed he was motivated to do so by, among other things, Avery's civil rights lawsuit and Plaintiff's involvement in the Jail Call, that was simply their viewpoint, which was reflected in *Making a Murderer* along with viewpoints of others, including that of Plaintiff, whom *Making a Murderer*

18

shows denying that accusation.  *Making a Murderer* also includes other statements by Plaintiff related to the Jail Call: (1) that he did not know if the caller was talking about Steven Avery; (2) that he forwarded the call to an MTSO detective to address the caller's concerns; (3) Plaintiff did not prepare a report on the Jail Call in 1995 because he did not think one was called for; and (4) Plaintiff did not plant evidence and was not motivated to plant evidence based on the Jail Call. *See MaM* Ep. 7 at 22:57–24:30.

52.     The Avery trial was approximately five weeks long, and Plaintiff alone was on the stand for three-plus hours. Abridgment of Plaintiff's and other witnesses' testimony was a necessity, and thus *Making a Murderer* could not include the entirety of Plaintiff's testimony. That applies generally, and also specifically with respect to the Jail Call.  Laura and I tried to capture the core aspects of Plaintiff's testimony on that subject, and I believe that we accurately did that.  In condensing Plaintiff's testimony, we did not attempt to distort Plaintiff's testimony, nor do I believe that we did so.  I do not believe that the particular items related to the Jail Call that Plaintiff complains about in his SAC constitute material alterations of the gist of Plaintiff's testimony.  Regardless, the editing decisions that Laura Ricciardi and I made were not done with the intent to make any such material changes.  Nor did we know that any such material change was made or entertain any doubts that what *Making a Murderer* included accurately reflected the key substance of Plaintiff's testimony and of Avery's attorneys' suggestions and accusations that Plaintiff had planted evidence.

53.     To the extent there are any material inaccuracies resulting from *Making a Murderer*'s efforts to compress and summarize testimony (although I do not believe there are), such inaccuracies were inadvertent. I did not and do not entertain any doubts that what was presented in *Making a Murderer* accurately captured the gist of the parties' contentions.  That

19

applies generally and also specifically to those portions of *Making a Murderer* related to the Jail Call.

54.     I believed when *Making a Murderer* was released on December 18, 2015, (and still believe now) that *Making a Murderer*'s inclusion of Plaintiff's testimony that he did not know if the Jail Call had anything to do with Steven Avery conveyed the idea that Plaintiff was claiming that Avery's name was not mentioned to him during the Jail Call.

55.     I understand that in discovery Plaintiff complained about a brief sequence at 17:35-46 of Episode 7 of Making a Murderer.  That is an instance where, because of the unterminated feed problem discussed above, we did not have usable footage of Plaintiff on the witness stand listening to prosecutor Ken Kratz when he says to Plaintiff "You were asked, as I understand as part of a civil lawsuit to provide what's called a deposition."  As a result, I included footage from another part of Kratz's examination of Plaintiff when Plaintiff was also listening to Kratz and waiting for him to complete his question.[1]  I do not believe the shot included in *Making a Murder* of Plaintiff materially alters the meaning of his testimony or presents him in a materially different manner than at trial.  I also understand that in discovery Plaintiff complained about the shot at the end of a scene in which Plaintiff is shown testifying at 24:23–30 of Episode 7 of *Making a Murder*.  I understand Plaintiff suggests this shot was chosen

---

[1] Lodged previously with my declaration in support of the Motion to Restrict, Dkt. No. 283, as Exhibits 5–8 are copies of portions of the raw footage that we had for this particular moment along with a composite clip showing the footage from the three relevant feeds that we prepared for ease of comparison.  Specifically, Exhibit 5 is a copy of the A-camera footage, Exhibit 6 is a copy of the B-camera footage, Exhibit 7 is a copy of the mixed feed footage, and Exhibit 8 is a composite of the footage in Exhibits 5 through 7.  These are excerpts of much larger files that we produced in discovery to Plaintiff in this case in connection with our agreement to provide Plaintiff with copies of all of our raw footage of Plaintiff testifying at Avery's trial, as reflected by the CHRM digital bates stamps included in the individual clips themselves.

to make him look "confused or rattled." That is not why I selected that shot, and I do not believe it makes him look confused or rattled. We did not have usable footage of Plaintiff from trial at that exact moment—right when Avery's attorney Dean Strang concluded his questioning of Plaintiff. The usable mixed feed did not cut back to Plaintiff until Dean Strang had already sat down, the judge had already excused Plaintiff and Plaintiff was starting to stand up. I needed to find a usable shot of Plaintiff not talking and not listening but simply waiting for what was to happen next. In order to show Plaintiff in a moment like that, immediately following examination, I substituted a shot of Plaintiff from the moment immediately following direct examination. [2] I do not believe the shot included in *Making a Murder* of Plaintiff materially alters the meaning of his testimony or presents him in a materially different manner than at trial.

56. I believed on December 18, 2015, (and still believe now) that compression of a Q&A that resulted in Plaintiff answering the question—"Have you ever planted any evidence against Mr. Avery?"—with the response "I have to say that this is the first time my integrity has ever been questioned, and no, I have not" instead of "that's ridiculous, no I have not," did not materially alter the meaning of Plaintiff's testimony. To the contrary, it shows that Plaintiff was firmly denying Avery's planting accusations and taking umbrage at their being made against him. *See MaM* Ep. 7 at 18:42–19:15.

---

[2] Lodged previously with my declaration in support of the Motion to Restrict, Dkt. No. 283, as Exhibit 9–12 are copies of portions of the raw footage that we had for this particular moment, along with a composite clip showing the footage from the three relevant feeds that we prepared for ease of comparison. Specifically, Exhibit 9 is a copy of the A-camera footage, Exhibit 10 is a copy of the B-camera footage, Exhibit 11 is a copy of the mixed feed footage, and Exhibit 12 is a composite of the footage in Exhibits 9 through 11. These are excerpts of much larger files that we produced in discovery to Plaintiff in this case in connection with our agreement to provide Plaintiff with copies of all of our raw footage of Plaintiff testifying at Avery's trial, as reflected by the CHRM digital bates stamps included in the individual clips themselves.

57.     I believed on December 18, 2015, (and still believe now) that the substance of Plaintiff's explanation for why he did not prepare a report of the Jail Call in 1995 is captured by *Making a Murderer*'s inclusion of Plaintiff's testimony that he "didn't know what [a 1995] report would have been about" and "if I wrote a report about every call that came in, I would spend my whole day writing reports." *See MaM* Ep. 7 at 22:57–24:30.

58.     I believed on December 18, 2015, (and still believe now) that Stephen Glynn's statement that Plaintiff's Sept. 12, 2003 written statement was left in the Sheriff's safe not only represented Glynn's opinion on the matter, but I also was aware of a September 30, 2003 report from Wisconsin DCI in which Special Agent Debra Strauss had confirmed that Plaintiff's written statement *was*, in fact, kept in Sheriff Petersen's safe.  I understand that while Plaintiff's SAC alleged that Glynn's statement was false, Plaintiff has now admitted that his written statement *was*, in fact, kept in a safe in the Sheriff's office.

59.     While *Making a Murderer* also includes statements by others that Plaintiff was given reassurances by someone at MTSO in the 1990s that he need not worry because they already had the "right guy" in prison, I am aware that Plaintiff himself has testified that he does not recall ever receiving any such reassurances from anyone at MTSO.

60.     To the extent there are any material inaccuracies resulting from *Making a Murderer*'s efforts to compress and summarize testimony with respect to the Jail Call (although I do not believe there are), such inaccuracies were inadvertent and I did not and do not entertain any doubts that what was presented in *Making a Murderer* accurately captured the gist of the parties' contentions and testimony, including Avery's attorneys' express or implied accusations against Plaintiff and also Plaintiff's denial of those accusations.

22

<u>Call to Dispatch</u>

61.     I reviewed Plaintiff's allegations in the pleadings about specific statements related to the Call to Dispatch and related subjects.  None of the Plaintiff's challenged statements relating to them were included in *Making a Murderer* with knowledge of their falsity or with a high degree of awareness of probable falsity.  I did not and do not entertain any doubts that *Making a Murderer* accurately captured the gist of the parties' contentions with regard to those statements and subject matter.

62.     I believed on December 18, 2015, (and still believe now) that the compression of questions and answers addressed in Paragraph 34 of the SAC does not materially change the meaning of Plaintiff's testimony.  Guided by what happened at trial, *Making a Murderer* shows the key points in that question-and-answer exchange: (1) Avery's attorneys suggested Plaintiff was looking at Teresa Halbach's car when he made the Call to Dispatch; and (2) Plaintiff denied that.  *See MaM* Ep. 5 at 53:35–57:00.

63.     Plaintiff's allegations in Paragraph 34 of the SAC ignore prior questioning by Avery's attorney shown in *Making a Murderer* that had established that Plaintiff frequently called dispatch and provided a license plate number for a car that he had stopped or had come across while on patrol.  *Making a Murderer* then shows Avery's attorney playing portions of the audio recording of the Call to Dispatch to Plaintiff and then asking him if he was looking at Teresa Halbach's license plate when he made the call, and Plaintiff denies that he was.  After more questions and answers, *Making a Murderer* proceeds to the scene about which Paragraph 34 complains.  But what the SAC calls a "manipulation" is simply a streamlining of the question-and-answer that saves time and removes an evidentiary objection (for which there was no footage of the objecting prosecutor Kratz, or the Judge), followed by Avery's attorney rephrasing

23

his initial question. While the wording of the two questions may be different, to me, they convey the same meaning, particularly in context. Avery's attorney is suggesting the audio recording of the Call to Dispatch sounds like one of the frequent calls Plaintiff had testified about where he had been looking at a car's license plate when calling dispatch. The attorney was insinuating that Plaintiff was similarly looking at Teresa Halbach's license plate during the Call to Dispatch. And Plaintiff denies that. I do not believe *Making a Murderer* materially changes the gist of that exchange. Episode 5 ends with Plaintiff explicitly denying the accusation a second time. We did not intend to convey any assertion or implication that Plaintiff was admitting that he was looking at Teresa Halbach's car when he made the Call to Dispatch, nor do we believe that *Making a Murderer* does so. Lodged previously with my declaration in support of the Motion to Restrict, Dkt. No. 283, as Exhibits 13–16 are copies of portions of the raw footage that we had for this particular moment, along with a composite clip showing the footage from the three relevant feeds that we prepared for ease of comparison. Specifically, Exhibit 13 is a copy of the A-camera footage, Exhibit 14 is a copy of the B-camera footage, Exhibit 15 is a copy of the mixed feed footage, and Exhibit 16 is a composite of the footage in Exhibits 13 through 15. These are excerpts of much larger files that we produced in discovery to Plaintiff in this case in connection with our agreement to provide Plaintiff with copies of all of our raw footage of Plaintiff testifying at Avery's trial, as reflected by the CHRM digital bates stamps included in the individual clips themselves.

64.     I believed on December 18, 2015, (and still believe now) that *Making a Murderer* conveys Plaintiff's explanation for how he believes he got the license plate and other information for Teresa Halbach's car (from Mark Wiegert), and that the additional testimony Plaintiff cites in Paragraphs 35 and 36 of the SAC would have been cumulative. Editing decisions were not

24

motivated by any desire to present a false impression of Plaintiff's testimony on the subject. Instead, Plaintiff's testimony was edited for compression and summarization reasons. Again, such standard editing techniques were applied universally to witnesses and Plaintiff was treated no differently than any other witness. Also, Paragraph 36 notes that *Making a Murderer* did not include a portion of the Call to Dispatch that Plaintiff acknowledges was "inaudible." We did not include inaudible statements as a general principle because inaudibility would confuse and frustrate viewers.

65. I believed on December 18, 2015, (and still believe now) that *Making a Murderer* does not contain any "reaction" shots of Plaintiff that materially change the gist of his trial testimony in a manner defamatory to him. I am aware of one particular scene in *Making a Murderer* about which Plaintiff complained at his deposition in this case, which I attended in person. That shot is at 55:31 of Episode 5 of *Making a Murderer*. In my opinion, that shot does not make Plaintiff look "nervous or apprehensive," as his SAC alleges in Paragraph 37. To the contrary, Plaintiff is shown holding his head up and his eye level steady. In any event, we did not include that shot in *Making a Murderer* to make Plaintiff look nervous or apprehensive. Rather, because of the unterminated feed footage problem discussed above, we did not have usable footage of Plaintiff at that particular moment from trial. The *un*usable footage we had reflects that, after the question and answer sequence shown in *Making a Murderer* at 55:24–30 of Episode 5 is done, there was a pause in the questioning and answering before Avery attorney Dean Strang asked his next question.[3] I used the shot included at 55:30–37 of Episode 5 because

---

[3] Lodged previously with my declaration in support of the Motion to Restrict, Dkt. No. 283, as Exhibits 17–20 are copies of portions of the raw footage that we had for this particular moment, along with a composite clip showing the footage from the three relevant feeds that we prepared for ease of comparison. Specifically, Exhibit 17 is a copy of the A-camera footage, Exhibit 18 is

it came from the same cross-examination of Plaintiff by Strang and also included a pause where Plaintiff was waiting for Strang to ask his next question. I do not believe the shot included in *Making a Murder* of Plaintiff materially alters the meaning of his testimony or presents him in a materially different manner than at trial.

66. I understand that, in discovery, Plaintiff complained that the same "reaction" shot discussed in the prior paragraph was *not* used in a different sequence that appears at 19:30 of Episode 7 of *Making a Murderer*. I understand that, in that instance, Plaintiff complained that the "reaction" shot in question made him look "confident"—not "nervous"—and he was complaining about its not being included in Episode 7 there. To me, Plaintiff saying a particular shot makes him look "nervous or apprehensive" and then arguing that the very same shot makes him look "confident" is indicative of the lack of merit in Plaintiff's complaints about editing decisions that we made for *Making a Murderer*.

67. I believed on December 18, 2015, (and still believe now) that the scene in *Making a Murderer* showing Plaintiff's testimony regarding the Call to Dispatch about which he complains in Paragraph 38 of his SAC is not a "fabricat[ion]," but includes and accurately captures the gist of both Avery's defense lawyers' accusations and also Plaintiff's repeated express denials of those accusations.

68. I believed on December 18, 2015, (and still believe now) that *Making a Murderer*'s cutting from Steven Avery telling interrogators that he believes law enforcement

_____

a copy of the B-camera footage, Exhibit 19 is a copy of the mixed feed footage, and Exhibit 20 is a composite of the footage in Exhibits 17 through 19. These are excerpts of much larger files that we produced in discovery to Plaintiff in this case in connection with our agreement to provide Plaintiff with copies of all of our raw footage of Plaintiff testifying at Avery's trial, as reflected by the CHRM digital bates stamps included in the individual clips themselves.

officials planted evidence against him to a scene involving Plaintiff accurately reflects the fact that, at trial, Avery's attorneys were accusing Plaintiff of being one of two officers (along with Lenk) who planted evidence. In fact, I recall that Judge Willis issued an order allowing Avery's attorneys to accuse Plaintiff and Lenk—and only Plaintiff and Lenk—of planting evidence.

69. Paragraph 40 erroneously alleges that the scene in *Making a Murderer* involving Avery's criminal defense attorney Jerome Buting's discovery of a blood vial stored in a box with a broken seal kept at the Manitowoc County Clerk of Court's office was a "dramatic re-enactment." It was not. It was shot live by Avery's attorney Jerome Buting, who receives a credit at the end of Episode 4 reflecting that. *See MaM* Ep. 4 at 1:05:11. It should have been obvious that this scene was not a re-enactment because it includes prosecutor Norm Gahn and investigator Mark Wiegert, who obviously would not have been participating in a "re-enactment" of Avery's attorneys coming across the blood vial. I believed on December 18, 2015, (and still believe now) that *Making a Murderer*'s inclusion of this scene captures the fact that Avery's defense team was excited about the blood vial discovery, which was reflected in arguments they made at trial. *See MaM* Ep. 4 1:02:26–1:04:14. I would also note that *Making a Murderer* includes the prosecution's efforts to rebut those arguments, including via an FBI test and an expert witness for the State testifying about that test. *See MaM* Eps. 5–7.

70. I believe that *Making a Murderer* accurately portrays the Call to Dispatch insofar as it presents Plaintiff's testimony that he believed it was November 3, 2005 when he made the Call to Dispatch (such testimony is included in *Making a Murderer*), but there is no presentation of any documentary evidence pointing to a definitive time and date to confirm when the call occurred. To my understanding, the Call to Dispatch had to have occurred sometime between when Teresa Halbach was reported missing on November 3, 2005 and when her vehicle was

27

found on the Avery property on November 5, 2005. In my research for *Making a Murderer*, I never came across any written log that definitively set forth the caller information, date, and time for the Call to Dispatch. In this litigation, I have seen documentation that could be relevant to setting the date and time of that call, but I have not seen any such evidence that definitively confirms the date and time of the Call. I am aware that Plaintiff complained in discovery that we "spliced" the portion of *Making a Murderer* in which he is shown surmising that it was likely November 3, 2005 when he made the Call to Dispatch, i.e., Episode 5 at 55:38–50. We simply compressed Plaintiff's testimony there to include testimony from earlier in the question and answer in which Plaintiff provides the date on which he believes he made the Call to Dispatch. That was done for clarity for *Making a Murderer* viewers, not to make Plaintiff look bad. I do not believe the shot included in *Making a Murder* of Plaintiff materially alters the meaning of his testimony or presents him in a materially different manner than at trial.

71.  I am aware of differing sworn testimony about the timing of the Call to Dispatch. As depicted in Episode 7, Plaintiff has testified that he believed that he placed the Call to Dispatch on November 3, 2005 after speaking with Calumet investigator Wiegert. *See MaM* Ep. 5 at 55:35–56:10. By contrast, in a sworn affidavit accompanying Avery's October 23, 2017 motion for reconsideration, a local resident named Kevin Rahmlow testified that he saw Teresa Halbach's car on the side of the road in Mishicot on November 3 and 4, 2005, saw a missing person poster about Teresa Halbach and her car, and then alerted an MTSO officer whom he ran into at a gas station on November 4, 2005, about his having seen the car on the side of the road. He further attested that, after viewing *Making a Murderer*, he recognized that officer as Plaintiff. *See* CHRM009598 (Rahmlow affidavit).

**72.** To the extent there are any material inaccuracies resulting from *Making a Murderer*'s efforts to compress and summarize testimony with respect to the Call to Dispatch (although I do not believe there are), such inaccuracies were inadvertent and I did not and do not entertain any doubts that what was presented in *Making a Murderer* accurately captured the gist of the parties' contentions and testimony, including Avery's attorneys' express or implied accusations against Plaintiff and also Plaintiff's denial of those accusations.

Discovery of the Key

73.     I reviewed the Plaintiff's allegations in the pleadings about specific statements related to the discovery by James Lenk of the key to Teresa Halbach's car in Steven Avery's bedroom on November 8, 2005 and related subjects. None of the Plaintiff's challenged statements relating to them were included in *Making a Murderer* with knowledge of their falsity or with a high degree of awareness of probable falsity. I did not and do not entertain any doubts that *Making a Murderer* accurately captured the gist of the parties' contentions with regard to those statements and subject matter.

74.     I believed on December 18, 2015, (and still believe now) that the scene in *Making a Murderer* showing Calumet Sgt. Tyson's testifying that he had to watch Manitowoc County officers during searches to make sure they weren't left alone on Avery's property, and that it was the only time in Tyson's career that he had been asked to do that, accurately captures the gist of Tyson's testimony. While Plaintiff challenges the editing in that scene, we simply condensed Tyson's testimony as part of overall efforts to streamline the presentation of events in light of time constraints. Edits were not made to materially alter the substance Tyson's testimony. Rather, I believe both the first question in the challenged question and answer exchanged (shown in *Making a Murderer*) and the second question (not shown) carried the same gist: whether Tyson had ever in his career had to watch over fellow law enforcement officers during a search to make sure they were never left alone without supervision. *See MaM* Ep. 7 at 5:20–6:17; Ricciardi Decl Ex 19, CHRM008000 at 25:5–26:19 and 53:1-10.

75.     I believed on December 18, 2015, (and still believe now) that *Making a Murderer* accurately presents the substance of Plaintiff's explanation for how he believes the key was found on November 8, 2005, after numerous prior searches of Avery's bedroom had failed to

locate it. Specifically, *Making a Murderer* shows witness testimony that the State's theory was that the key probably fell out from the back of a bookcase as a result of Plaintiff's having handled that bookcase "roughly" on November 8th. The SAC complains that *Making a Murderer* does not include photographs of the back of the bookcase, but *Making a Murderer* could not include everything from trial. There were hundreds of exhibits at Avery's trial, and *Making a Murderer* only includes footage of a handful of them. *Making a Murderer*'s non-inclusion of the photograph was not the result of any decision to "le[a]d viewers to the inescapable but false conclusion that Plaintiff and MTSO Lt. James Lenk planted the ignition key," as the SAC falsely claims. Rather, Laura and I believed *Making a Murderer* had already captured the gist of Plaintiff's (Kucharski's and Lenk's) explanation for the circumstances and timing of the discovery of the key. The same goes for Plaintiff's complaint in discovery that *Making a Murderer* did not include more of prosecutor Kratz's questioning of Plaintiff regarding the bookcase. At the point in the Series that Plaintiff is testifying about the bookcase, *Making a Murderer* viewers have already heard testimony about the finding of the key from Deputy Daniel Kucharski in Episode 3 at 6:21 during Avery's preliminary hearing, and from two witnesses at Avery's trial, Deputy Daniel Kucharski and Lieutenant James Lenk *See MaM* Ep. 7 at 6:19–13:58. *Making a Murderer* could not include Plaintiff's entire testimony and we necessarily had to make editing decisions. I do not believe those editing decisions materially alter the meaning of Plaintiff's testimony or present him in a materially different manner than at trial.

76. I believed on December 18, 2015, (and still believe now) that *Making a Murderer* accurately captures the gist of the rest of Plaintiff's testimony regarding the discovery of the key. Plaintiff notes that in response to the question, "There was no time that you went in Mr. Avery's home when you were not also with Lieutenant Lenk," Plaintiff's answer is changed from "Not

that I recall" to "No, sir." But that does not materially alter his testimony. That change was made because of the unterminated feed footage problem discussed above. We only had usable footage of only one instance in which Plaintiff responds "Not that I recall," on cross examination but we had multiple questions and answers included in *Making a Murderer* with that response, and using the exact same shot in response to two consecutive questions would not have worked. So I made the substitution of "No sir" for one of those instances while including "Not that I recall" for the second instance. It was not done to try to change the meaning of Plaintiff's testimony or make him look worse. To the contrary, Plaintiff often responded Yes/No plus "sir" to questions at trial, so I believe the substitution here was generally consistent with Plaintiff's question-answering.

77. I believed on December 18, 2015, (and still believe now) that *Making a Murderer* does not materially alter the gist of Plaintiff's testimony by including a clip in which Avery's attorney Dean Strang questions Plaintiff about a "half page" report he had submitted on November 8, 2005. *See MaM* Ep. 7 at 22:22–23:05. While Plaintiff complains that he also filed another half-page or page report at a later date (in June 2006), Strang's questioning of Plaintiff regarding that other report is included in *Making a Murderer* too. *See MaM* Ep. 7 at 20:02–20:40. In any event, I do not believe that Plaintiff's testimony regarding those reports is materially changed whether the total length of those two reports was half a page, a page, or a page and a half, and we did not edit *Making a Murderer* on that score in order to try to make Plaintiff look bad.

78. I am aware that Plaintiff complained in discovery about a brief sequence at 16:13–20 of Episode 7 of Making a Murderer where we had to use substitute footage of him on the witness stand waiting after a question-and-answer exchange because we did not have usable

footage of that exact moment due to the unterminated feed problem discussed previously.[4] I selected the footage shown in Making a Murderer there because it came from the same direct examination of Plaintiff by prosecutor Kratz and also showed Plaintiff having just answered a question and looking to Kratz while he waited for him to ask his next questions. I do not believe the shot included in *Making a Murder* of Plaintiff materially alters the meaning of his testimony or presents him in a materially different manner than at trial.

79.     I am aware that Plaintiff complained in discovery about another instance at 22:21–27 of Episode 7, where we did not have footage of that precise moment because of the unterminated feed issue. The mixed feed footage cuts from Avery's attorney Dean Strang to Plaintiff a moment too late because Plaintiff is already beginning his answer to Strang's question, which Plaintiff answers "Yes sir." The substituted footage I selected for *Making a Murderer* did not have that problem and it included the exact same answer from Plaintiff: "Yes, sir." I actually took it from the very next question during Plaintiff's testimony[5] I do not believe

_____

[4] Lodged previously with my declaration in support of the Motion to Restrict, Dkt. No. 283, as Exhibits 21–24 are portions of copies of the raw footage that we had for this particular moment, along with a composite clip showing the footage from the three relevant feeds that we prepared for ease of comparison. Specifically, Exhibit 21 is a copy of the A-camera footage, Exhibit 22 is a copy of the B-camera footage, Exhibit 23 is a copy of the mixed feed footage, and Exhibit 24 is a composite of the footage in Exhibits 21 through 23. These are excerpts of much larger files that we produced in discovery to Plaintiff in this case in connection with our agreement to provide Plaintiff with copies of all of our raw footage of Plaintiff testifying at Avery's trial, as reflected by the CHRM digital bates stamps included in the individual clips themselves.

[5] Lodged previously with my declaration in support of the Motion to Restrict, Dkt. No. 283, as Exhibits 25–28 are portions of copies of the raw footage that we had for this particular moment, along with a composite clip showing the footage from the three relevant feeds that we prepared for ease of comparison. Specifically, Exhibit 25 is a copy of the A-camera footage, Exhibit 26 is a copy of the B-camera footage, Exhibit 27 is a copy of the mixed feed footage, and Exhibit 28 is a composite of the footage in Exhibits 25 through 27. These are excerpts of much larger files that we produced in discovery to Plaintiff in this case in connection with our agreement to provide Plaintiff with copies of all of our raw footage of Plaintiff testifying at Avery's trial, as reflected by the CHRM digital bates stamps included in the individual clips themselves.

33

the shot included in *Making a Murder* of Plaintiff materially alters the meaning of his testimony or presents him in a materially different manner than at trial.

80.     I am also aware that Plaintiff has complained in discovery about the very next exchange that appears in *Making a Murderer* at 22:35–39 of Episode 7 because it includes a shot where Plaintiff answers a question with "Correct" instead of "That's correct, sir."   Again, this substitution was made because of the unterminated feed problem, and the mixed feed footage we had for this moment did not work either.   While Avery's attorney is asking the question and before Plaintiff answers, *Making a Murderer* includes a photo of what Avery's attorney Strang is questioning him about:  Plaintiff's report of a little under half a page.   That allows viewers to see the report for themselves.   The mixed feed cuts away from Plaintiff back to attorney Strang very quickly after Plaintiff provides his answer "That's correct, sir."   Cutting from the photo of the report to Plaintiff and then so quickly to Strang would not have worked.   I selected a shot with Plaintiff saying "Correct" used in *Making a Murderer* from another portion of the cross-examination where the camera stays on Plaintiff after he answers and shows him continuing to look at Dean Strang while he listens to the next question.   I do not believe the shot included in *Making a Murder* of Plaintiff materially alters the meaning of his testimony or presents him in a materially different manner than at trial. [6]

_____

[6] Lodged previously with my declaration in support of the Motion to Restrict, Dkt. No. 283, as Exhibits 29–32 are portions of copies of the raw footage that we had for this particular moment, along with a composite clip showing the footage from the three relevant feeds that we prepared for ease of comparison.  Specifically, Exhibit 29 is a copy of the A-camera footage, Exhibit 30 is a copy of the B-camera footage, Exhibit 31 is a copy of the mixed feed footage, and Exhibit 32 is a composite of the footage in Exhibits 29 through 31.  These are excerpts of much larger files that we produced in discovery to Plaintiff in this case in connection with our agreement to provide Plaintiff with copies of all of our raw footage of Plaintiff testifying at Avery's trial, as reflected by the CHRM digital bates stamps included in the individual clips themselves.

34

81.    I should note that there were other details omitted from *Making a Murderer* regarding the discovery of the Key that were unfavorable to law enforcement, including the fact that the initial criminal complaint in the Avery criminal case identified Deputy Kucharski as the officer who found the key, not James Lenk.  *See* CHRM019831.  However, *Making a Murderer* did not include such details.  Again, it came down to a question of having massive amounts of footage and material, and necessarily not being able to include everything.

82.    I believe that *Making a Murderer* accurately portrays the opinions and commentary from various individuals sympathetic to Avery, as well as the opinions and commentary from various individuals who believe that Avery is guilty of murdering Teresa Halbach, as well as the opinions and commentary from various individuals sympathetic to law enforcement and Plaintiff..

83.    Any alleged omissions to *Making a Murderer* were due to the challenge of compressing 30 years of history into 10 hours of television.  I do not believe that they alter the meaning of the Series or present Avery's criminal defense theories and opinions as "actual and unanswered facts."  In light of the mass of material reviewed for this Series, it is a misnomer to refer to "omissions" as that is based on an erroneous assumption that all material is to be included and anything that is not is an omission when in fact the reverse is true – the question was one of what "makes the cut," i.e., what do we have room to include in light of the wide scope of the subject matter and the voluminous amount of potential material?

84.    To the extent there are any material inaccuracies resulting from *Making a Murderer*'s efforts to compress and summarize testimony with respect to the discovery of the key (although I do not believe there are), such inaccuracies were inadvertent and I did not and do not entertain any doubts that what was presented in *Making a Murderer* accurately captured the

35

gist of the parties' contentions and testimony, including Avery's attorneys' express or implied accusations against Plaintiff and also Plaintiff's denial of those accusations.

Alleged "Omissions"

85.     Plaintiff's premise of allegedly defamatory "omissions" ignores the fact that, by definition, *Making a Murderer* could not include everything that anyone would have liked to include—not Plaintiff, not Avery and his attorneys, not the prosecution.  Making a documentary series necessarily requires editing. This involves summarizing, condensing, and compressing a substantial volume of information.  Simply put, it would have been impossible to include everything.  We did not alter the meaning of the events, including the components of the series that relate to Plaintiff Andrew Colborn as well as to Steven Avery's defense theories and strategies.

86.     None of the alleged "omissions" listed in Paragraphs 46 and 47 or anywhere else in the SAC were not included in *Making a Murderer* with knowledge of falsity or with a high degree of awareness of probable falsity with respect to any statement of and concerning Plaintiff. I did not and do not entertain any doubts that *Making a Murderer*'s not including such matters resulted in any material change.

87.     Plaintiff's alleged omissions are also cumulative in kind to many similar facts already in *Making a Murderer*.  For example, Plaintiff points to Avery's DNA being found on the hood latch of Teresa Halbach's vehicle, but *Making a Murderer* already devotes significant attention to Avery's blood being found in Halbach's car and to scientific testing by the FBI and expert testimony by a State's witness rebutting Avery's attorney's arguments that the blood had been planted.  *See generally*, *MaM* Ep. 6 ("Testing the Evidence") and Ep 7 ("Framing Defense").  Similarly, Plaintiff points to Teresa Halbach's cell phone, camera and other

36

possessions being found in a burn barrel on Avery's property, but *Making a Murderer* already addresses the fact that Ms. Halbach's cremains were found in Avery's burn pit and in a burn barrel behind the neighboring Dassey family trailer.

88. I believe the SAC is wrong insofar as it is suggesting that *Making a Murderer* does not include the crimes for which Avery was actually charged and convicted. Those include his burning to death of a family cat, some burglaries when he was younger, running his cousin Sandra Morris off the road and pointing a gun at her, the 1985 sexual assault of Penny Beerntsen (for which he was wrongfully convicted), and, of course, the murder of Teresa Halbach. *See MaM* Ep. 1 at 5:18–7:24 (Morris allegations of indecent exposure); 9:30–9:59 (burglaries); 10:00–10:53 (cat burning and conviction and probation); 12:31– 13:59 (Morris assault); 16:07 (Morris criminal charges). *Making a Murderer* also includes the fact that Avery sent his ex-wife letters from prison threatening to kill her. *See MaM* Ep. 1 at 36:53–37:38; *MaM* Ep. 2 at 11:33– 11:44. In fact, *Making a Murderer* viewers were shown far more evidence of Avery's prior crimes and violent acts than jurors at his murder trial, as Judge Willis excluded those prior crimes and acts from evidence. *See* CHRM034905 (order re prior bad acts).

89. Aside from being cumulative, many of the alleged "omissions" listed in the SAC relate to items that were the subject of disputes between Avery and the prosecution. For Laura and me, that meant including them in *Making a Murderer* would have taken a considerable amount of additional time because we would have had to include both sides and often additional surrounding context. Again, we simply did not have time to include everything in *Making a Murderer*.

90.     Perhaps most notably, the SAC's complaints about alleged omissions also ignore the large number of scenes that are included in *Making a Murderer* and that reflect negatively on Avery.  Those include:

- A scene with a statement by Chuck Avery, Steven Avery's brother, stating that he was "pretty positive" Steven murdered Teresa Halbach. *MaM* Ep. 3 at 42:00–42:08.
- A scene in which Steven Avery's sister, Barbara Janda, tells Steven "I hate you for what you did to my kid.  All right? So you can rot in hell." *See MaM* Ep. 3 25:21–25:29.
- Scenes showing Avery's nephew Bobby Dassey testifying against him at his murder trial, with Dassey shown as being one of the prosecution's most important witnesses. *See MaM* Ep. 5 at 19:28–21:56.
- A scene showing Teresa Halbach's brother Mike Halbach opining that he believed Avery was guilty. *See MaM* Ep. 7, 59:12-1:00:04.
- Scenes discussing Avery's prior bad acts, including numerous crimes that the judge in the Avery murder trial excluded from evidence. *See MaM* Ep. 1 at 5:18–7:24 (Morris allegations of indecent exposure); 9:30–9:59 (burglaries); 10:00–10:53 (cat burning and conviction and probation); 12:31– 13:59 (Morris assault); 16:07 (Morris criminal charges).
- An interview in which Judge Hazlewood, the presiding judge in Avery's 1985 trial, opines that Avery had a propensity for violence against women. *See MaM* Ep. 1, 26:36–28:18
- A scene in which Steven Avery tells his parents that he was going to kill himself if they did not figure out a way to post bail for him.
- A scene with Avery opining that the prosecution was going to win at trial.
- An interview with a member of the local media who said the arrest of Avery for the 1985 sexual assault was not a surprise because Avery was one of the "regular names" on the crime beat in Manitowoc County and the assault was "in character" for him.  See *MaM Ep 1 at 27:09 – 27:52*
- The jury's guilty verdicts in Avery's trial for the murder of Teresa Halbach. *See MaM* Ep. 8 at 26:02–28:01.
- A scene showing Judge Willis, who presided over Avery's trial, opining that Avery was "probably the most dangerous individual to set foot in this courtroom." *MaM* Ep. 9 at 1:01:08–1:02:53.

91.     The SAC also fails to acknowledge many scenes in *Making a Murderer* in which subjects push back against Avery's planting accusations against Plaintiff, including:

- An interview with the MTSO Undersheriff criticizing Avery's planting accusations against officers and characterizing them as "impossible."  *See MaM* Ep. 3 at 22:51–23:22.

- *Multiple* scenes in which the prosecutors from Avery's murder trial push back against Avery's planting accusations by, among other things, calling those accusations "despicable" and "deplorable." *See*, *e.g.*, *MaM* Ep. 7 at 13:55–14:28; 44:00–45:30.
- A scene in which a member of the media calls out Avery's criminal defense attorneys for accusing Plaintiff of planting. *See MaM* Ep. 7 at 24:30–24:50.
- A newscast in which an anchorman reads Plaintiff's prepared public statement following the jury's guilty verdict in Avery's murder trial. *See MaM* Ep. 8 34:02–19.
- Footage from Plaintiff's testimony at Avery's murder trial in which Plaintiff expressly denies the planting and framing accusations.

92.     To the extent there are any material inaccuracies resulting from *Making a Murderer*'s not including any of the alleged omissions in Paragraphs 46 and 47 of the SAC (although I do not believe there are), such inaccuracies were inadvertent and I did not and do not entertain any doubts that what was presented in *Making a Murderer* accurately captured the gist of the parties' contentions and testimony, including Avery's attorneys' express or implied accusations against Plaintiff and also Plaintiff's denial of those accusations.


Plaintiff's Remaining Complaints about Statements by Avery and his Defenders

93.     None of the SAC's challenged statements relating to subjects other than those already addressed above were included in *Making a Murderer* with knowledge of falsity or with a high degree of awareness of probable falsity.  I did not and do not entertain any doubts that *Making a Murderer* accurately captured the gist of the parties' contentions regarding the subject matter embraced therein.

94.     In Paragraph 37 of the SAC, Plaintiff complains about *Making a Murderer*'s inclusion of Avery's criminal defense attorney Buting's musings on arguments that he planned to make that he hoped the jury would accept.   Similarly, in Paragraph 48, Plaintiff complains about another statement from Buting in which he opines that a conspiracy to frame Avery would not have necessarily required a large number of conspirators (as the prosecution argued to dispute

39

the conspiracy charge), but instead could have been achieved by two people or "[m]aybe even one" followed by a cut to James Lenk on the witness stand. In both instances, that simply reflects Buting's opinions and is consistent with the arguments he later presented to the jury at Avery's trial. The SAC's allegation that *Making a Murderer* therefore "presented it as a foregone conclusion that the police, allegedly including Plaintiff, planted the key at Avery's residence," is wrong. Again, these are instances where the SAC incorrectly claims that the views of *Making a Murderer*'s subjects are those of *Making a Murderer* and its creators. As explained above, that is not how *Making a Murderer* worked. Indeed, *Making a Murderer* also includes Plaintiff's explicit denials that he planted evidence.

95.     In Paragraph 39, the SAC challenges the inclusion of a scene in which an interrogator asks Steven Avery whether someone told him that "a cop put that vehicle – Teresa's vehicle – out on your property," to which Avery responds "Yeah," followed by a cut to a visual of Plaintiff. Again, that is Avery's statement, not a statement by "Defendants" as Plaintiff alleges. Its inclusion in *Making a Murderer* is consistent with the fact that Avery's counsel argued at trial that Plaintiff and James Lenk planted evidence against Avery.

96.     Paragraph 40 of the SAC is another instance in which Plaintiff incorrectly conflates statements made by documentary subjects with statements made by "Defendants." Moreover, as explained above, the blood vial scene is not a "re-enactment." Paragraph 40 is also wrong that I was "aware" that a phlebotomist was prepared to refute Avery's defense arguments about the blood vial at trial. I was not aware of that. No phlebotomist ever testified. By contrast, the prosecution did call someone from the FBI as an expert witness to counter Avery's arguments about the blood vial and planting, and *Making a Murderer* includes testimony from that witness.

40

97.     At times, Plaintiff appears to be complaining about *Making a Murderer*'s use of
visuals, graphics and possibly music.  However, we included visuals and graphics in *Making a
Murderer* for clarity and to help viewers follow along, not to try to make Plaintiff look bad.  For
example, the first couple of episodes of *Making a Murderer* introduce a lot of different
characters to viewers, in particular many individuals who worked at MTSO.  Graphics and
visuals were used to help viewers keep track of such individuals and better understand their
relationship within the department.  Graphics were also used in the series to help viewers
understand events, dates and geography.  Plaintiff's complaints about *Making a Murderer*'s use
of music is equally unfounded.  Music is standard to documentary filmmaking, is used
throughout the Series, and we did not include any music in *Making a Murderer* to materially
alter Plaintiff's testimony or his presentation in the series.

98.     I understand that in discovery, Plaintiff pointed to an email that I sent to people at
Netflix working on the trailer for *Making a Murderer* in which I reference a "squirmy shot" of
Plaintiff or, alternatively, a shot of Sheriff Kenneth Petersen that could be used in the trailer.  I
used the word "squirmy" as a shorthand adjective describing the shot of Plaintiff to distinguish
this shot of Plaintiff taken from the middle of his deposition, from the shot of Plaintiff taking the
oath at the beginning of his deposition that the creators of the trailer already had.  The trailer
could not include the shot of Plaintiff taking the oath at his deposition because that shot was not
in *Making a Murderer* so I was providing them with two potential alternate choices of shots that
were included in *Making a Murderer* to replace that shot in the trailer, either someone else
(Sheriff Kenneth Petersen) taking the oath, or Plaintiff from another moment of his deposition.

99.     Exhibit A to the SAC includes portions of some statements by Avery, his
attorneys, his relatives and supporters, and others that were included in *Making a Murderer*.

Avery and his defenders offer their own personal opinions, as is made clear from *Making a Murderer*. *Making a Murderer* presents Avery and his supporters as voicing their opinions, not as authoritative sources of facts. Those opinions are consistent with the arguments that Avery's counsel made in his civil lawsuit and in his murder trial. The SAC fails to acknowledge that *Making a Murderer* also includes contrary opinions from many others that Avery was guilty and that his accusations against Plaintiff were false. It also includes Plaintiff's testimony denying the accusations against him, as well as statements by others to the same effect.

100.    At one or more of the depositions in this case, I recall that Plaintiff's attorneys played a particular portion of Episode 3 of *Making a Murderer* in which certain individuals from the local community in a tavern express their opinions that they believed law enforcement had framed Steven Avery. *See MaM* Ep. 3 at 14:10–15:37. However, *Making a Murderer* also includes statements from members of the community opining that Steven Avery was guilty of murdering Teresa Halbach, including in that same episode. *Making a Murderer* also contains statements with individuals like members of the Halbach family and Avery's own siblings opining that they believed Avery was guilty.

101.    Exhibit A to the SAC also demonstrates that the local news coverage of Avery's murder case included his planting accusations against law enforcement. We included media as a major character in the Series to reflect the public discussion around the Teresa Halbach case and to underscore why *Making a Murderer* necessarily had to include the media's treatment of criminal matters in order to document Avery's trial and the surrounding events. I would also note that, again as shown by Exhibit A, *Making a Murderer* also includes footage from a press conference in which a reporter challenges Avery's attorney for making planting accusations against Plaintiff. We included that scene in *Making a Murderer* to help capture various

42

viewpoints, including those of members of the community who viewed Avery's planting accusations with skepticism if not outright hostility.

102. To the extent there are any material inaccuracies resulting from *Making a Murderer*'s efforts to compress and summarize testimony with respect to subjects other than the Jail Call, the Call to Dispatch and the discovery of the Key (although I do not believe there are), such inaccuracies were inadvertent and I did not and do not entertain any doubts that what was presented in *Making a Murderer* accurately captured the gist of the parties' contentions and testimony, including Avery's attorneys' express or implied accusations against Plaintiff and also Plaintiff's denial of those accusations.

103. Attached as Exhibit 29 is a true and correct copy of an email from journalist Sean Downs responding on April 16, 2007 to Moira Demos's April 15, 2007 email offering to help with footage "as you did a lot of work for all of us switching the feed," produced by the Producer Defendants as CHRM034730.

104. Attached as Exhibit 30 is a true and correct copy of an email from Moira Demos responding to Sean Downs on April 23, 2007 thanking him for the offer to copy footage, produced by the Producer Defendants as CHRM034747.

I declare under penalty of perjury and subject to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated this 16th day of September, 2022     Respectfully submitted,


/s/ Moira Demos
Moira Demos

43