# EXHIBIT 1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF WISCONSIN

-------------------------------------------------

3

ANDREW L. COLBORN,

4

                    Plaintiff,

5

   -vs-                    Case No. 19-CV-0484

6

NETFLIX, INC., et al.,

7

                    Defendants.

8

-------------------------------------------------

9

10          * * * * CONFIDENTIAL * * * *

11

12          Video-Recorded Examination of

13  KENNETH PETERSEN, taken at the instance of the

14  Defendants, under and pursuant to the Federal Rules

15  of Civil Procedure, before Sarah M. Gilkay, a

16  Certified Realtime Reporter, Registered Merit

17  Reporter, and Notary Public in and for the State of

18  Wisconsin, at GODFREY & KAHN, S.C., 833 East Michigan

19  Street, Suite 1800, Milwaukee, Wisconsin, on

20  May 19th, 2022, commencing at 10:14 a.m. and

21  concluding at 2:45 p.m.

22

23

24

25      Job No. CS5223455

```
 1   APPEARANCES IN PERSON:
 2   SCHOTT, BUBLITZ & ENGEL, S.C., by
     Ms. April Rockstead Barker
 3   640 West Moreland Boulevard
     Waukesha, Wisconsin  53188
 4   Appeared on behalf of the Plaintiff.
 5
     GODFREY & KAHN, S.C., by
 6   Mr. James A. Friedman
     One East Main Street, Suite 500
 7   Madison, Wisconsin  53703
     Appeared on behalf of the Defendants.
 8
 9   APPEARANCES VIA ZOOM VIDEOCONFERENCE:
10
     GRIESBACH LAW OFFICES, LLC, by
11   Mr. Michael Griesbach
     830 North 12th Street
12   Manitowoc, Wisconsin  54220
     Appeared via Zoom on behalf of the Plaintiff.
13
14   BALLARD SPAHR, LLP, by
     Mr. Matthew E. Kelley
15   1909 K Street, NW, 12th Floor
     Washington, DC  20006
16   Appeared via Zoom on behalf of the Defendant
     Netflix, Incorporated.
17
18   JASSY VICK CAROLAN, LLP, by
     Mr. Kevin L. Vick
19   Ms. Meghan Fenzel
     355 S. Grand Avenue, Suite 2450
20   Los Angeles, California  90071
     Appeared via Zoom on behalf of the Defendants
21   Chrome Media, Laura Ricciardi, and Moira Demos.
22                        * * * * *
23              A L S O   P R E S E N T
24   Mr. Dalton Clements, videographer, via Zoom
     Ms. Laura Ricciardi, via Zoom
25   Ms. Moira Demos, via Zoom
```

1    BY MR. VICK:

2    Q    So the -- the contemporaneous reporting, was

3         that important for purposes of accuracy?

4    A    Yes.

5              MS. BARKER:  Same objections.

6    BY MR. VICK:

7    Q    Do the prosecutors rely on the officers' reports

8         to then help prove their cases that they might

9         bring?

10             MS. BARKER:  Objection.  Foundation.

11        Incomplete hypothetical.

12             THE WITNESS:  I believe so.

13   BY MR. VICK:

14   Q    Did poor report writing undermine the

15        prosecutor's ability to present their case

16        against a suspect?

17             MS. BARKER:  Objection.  Incomplete

18        hypothetical.  Lack of foundation.  Calls for a

19        legal conclusion.

20             THE WITNESS:  Yes.

21   BY MR. VICK:

22   Q    If an officer had located evidence that he

23        thought was potentially important to an ongoing

24        murder investigation, would you expect that

25        officer to prepare a report about that by the

1        Zoom gallery, and I saw them both drop.

2    BY MR. VICK:

3    Q    So looking down a little bit lower,

4         Sheriff Petersen --

5    A    Yep.

6    Q    -- do you see where there is -- in green there

7         is a response that's on the right and it says

8         "Andrew Colborn@co.manitowoc.wi.us"?

9    A    Yes.

10   Q    And the response there is "I think it's a great

11        idea.  I would need to run this past the

12        sheriff.  That may or may not be a problem.  I

13        will need a day or two to get back to you.

14        Okay?"

15             Did I read that correctly?

16   A    Yes.

17   Q    Was it your experience that employees of the

18        Sheriff's Office would check with the sheriff

19        before they would agree to appear in a

20        television program related to a case that the

21        Sheriff's Office had handled?

22   A    I would think it wouldn't be allowed.

23   Q    Why not?

24   A    It goes against everything we teach them.

25   Q    What specifically does it go against that you

1    teach them?

2  A  We don't try a case in public.

3  Q  What about if it was a case that had already

4     been completed?

5  A  It would depend on whatever the court ordered.

6  Q  What if it was a case in which a criminal

7     defendant had been convicted but there were

8     ongoing post-conviction legal proceedings still

9     continuing?

10 A  The answer would be "no."

11 Q  Why would the answer be "no"?

12 A  Because all it's doing is muddying up the waters

13    for the appeals.

14 Q  Scrolling down to the next page -- I'm sorry.  I

15    jumped too far.  Please -- yeah, stop there,

16    Meghan.  Thank you.

17            After the response from Mr. Colborn --

18    I'm still on the first page, Sheriff Petersen.

19 A  Okay.

20 Q  I misspoke and jumped ahead.  I'm looking at

21    those bottom two statements or little bubbles

22    for the texts on the first page from Ken Kratz.

23    The first one says "Okay, Andy.  We will have a

24    great trip.  They provide a limo and really are

25    nice people.  I'm happy to share with Robbie an

```
 1    Q    And were they subject to the same policies and
 2         practices as the sheriff's department?
 3                    MS. BARKER:  Object to foundation.
 4                    THE WITNESS:  With the exception of
 5         the firearms, because most of them were unarmed.
 6    BY MR. VICK:
 7    Q    Besides that, would the answer be yes?
 8    A    Yes.
 9                    MS. BARKER:  Objection.  Vague.
10    BY MR. VICK:
11    Q    And you would know that based upon the fact that
12         you were the sheriff who was ultimately
13         responsible for the jail; right?
14    A    Right.
15                    MS. BARKER:  Objection.
16                    THE WITNESS:  We had -- there was a --
17    BY MR. VICK:
18    Q    And who --
19    A    There was a policy and procedure manual, and it
20         addressed the entire department.
21    Q    Okay.  Did you personally work with
22         Andrew Colborn?
23    A    No.
24    Q    Did you have contact with Andrew Colborn when
25         you were both working in the sheriff's
```

1        department?

2    A    On a very limited basis.

3    Q    Under what circumstances would you have contact

4        with him?

5    A    Well, at one point he came with Lt. Lenk to my

6        office talking about somebody confessing to

7        Steven -- or to the Beerntsen case, and he

8        wanted to know how to handle it.

9    Q    Let's talk about the Beerntsen case just for a

10        little bit.

11            After Mr. Avery was released, were you

12        involved in any investigations related to his

13        wrongful conviction for Penny Beerntsen's

14        assault and his subsequent exoneration?

15    A    No.

16    Q    Were you involved in any reviews related to

17        those subjects having to do with the sheriff's

18        department?

19    A    No.

20    Q    I apologize.  One sec.

21            We talked earlier about Steven Avery's

22        civil lawsuit that he brought against the

23        County, former Sheriff Kocourek, and I believe

24        also former District Attorney Vogel; right?

25    A    Yes.

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 8 of 17   Document 289-1

1    Q    And when did you know that that conversation had
2         occurred?
3    A    Somewhere in the '90s.
4    Q    What had you heard about that conversation?
5    A    That somebody had indicated he overheard
6         somebody in Brown County saying that they were
7         involved and whatever.  It's one of those
8         jailhouse conversation-type things.
9    Q    Do you know whether anything was done by
10        Sheriff Kocourek in response to his receiving
11        information about that jailhouse conversation?
12   A    No.
13                  MS. BARKER:  Objection.
14                  THE WITNESS:  I have no idea.
15                  MS. BARKER:  Foundation.  Assumes
16        facts.
17   BY MR. VICK:
18   Q    Did you ever speak to Sheriff Kocourek about
19        that subject?
20   A    No.
21   Q    Did you ever speak to other people in Manitowoc
22        County Sheriff's Office regarding the subject?
23   A    No.
24   Q    Do you have any recollection of what you
25        discussed with Mr. Colborn and Mr. Lenk on that

1       occasion that they came to talk to you about a

2       call that Mr. Colborn received in the '90s?

3    A  Basically the same thing as what it says here.

4    Q  So what's reflected in Exhibit 1007 is

5       consistent with your recollection of what

6       Mr. Colborn and Mr. Lenk told you at that

7       meeting that you had with them?

8    A  Yes.

9    Q  What was your reaction at that meeting when

10      Mr. Lenk and Mr. Colborn told you this?

11   A  I told them to document the information received

12      and to put it with the investigative file.

13   Q  Did you ask them why they had not come to you

14      earlier with this information?

15   A  No.  This was about the same time that he was

16      being released.

17   Q  Did you ask Mr. Colborn why -- if he had

18      prepared a report regarding the call

19      contemporaneously with it happening back in the

20      mid-'90s?

21   A  No.  I didn't know it was him.

22   Q  At that point when he and Mr. Lenk came to you

23      and met with you, did you say something along

24      the lines of "Sgt. Colborn, did you prepare a

25      report of this back in the mid-'90s at the

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 10 of 17   Document 289-1

1    Q    During that conversation, did you ask them

2         whether either of them had written a report back

3         in 1994 and '95 regarding the telephone call

4         that Mr. Colborn received?

5    A    I don't recall.

6    Q    Would you have expected Mr. Colborn to have

7         prepared a report regarding his receipt of that

8         phone call?

9    A    Yes.

10   Q    Did you ask Mr. Lenk and Mr. Colborn to prepare

11        any reports --

12   A    Yes.

13   Q    -- at that time in 2003?

14   A    Yes.

15   Q    Did you ask Mr. Colborn whether he had followed

16        up with anyone in the sheriff's department back

17        in 1994 and '95 regarding the call?

18   A    No, because that was the one where I was --

19        where Kocourek was handling it in the '95, '96

20        time frame.

21   Q    And let's -- continuing on in this document,

22        Exhibit 1008, please look on page 33 of the

23        document itself, line 20.

24             MS. BARKER:  I'm just going to object

25        that I think the witness isn't being offered an

1    BY MR. VICK:

2    Q    Yes.  Please stop at line 19 on page 34.

3    A    19.  Okay.  All right.

4    Q    And have you finished, Mr. Petersen?

5    A    Yes.

6    Q    So is your present understanding consistent with

7         your testimony that's reflected in what you just

8         read?

9    A    Yes.

10   Q    And at the end you mentioned that you directed

11        Mr. Colborn to prepare a statement; right?

12   A    Yes.

13   Q    And that it would be stored in a vault; correct?

14   A    Yes.  That's where the file was.

15   Q    Did you ever hear that Sgt. Colborn contacted

16        former Sheriff Kocourek in this same time period

17        of 2003?

18   A    I have no idea.

19   Q    Did you contact Sheriff Kocourek in this time

20        period of 2003 regarding the subject matter?

21   A    No.

22   Q    Why -- or you mentioned that the case file for

23        Steven Avery was in the vault; is that right?

24   A    Yes.

25   Q    Was that typical, for case files for an old

1   Q    Are you ready, Sheriff Petersen?

2   A    Sure.  Yeah.

3   Q    Do you understand this to be the statement that

4        Sgt. Colborn prepared in response to your

5        direction to him that he should prepare a

6        statement regarding that 1994 and '95 phone

7        call?

8   A    It must be.

9   Q    Do you recall if he provided it to you back in

10       2003?

11  A    No.

12  Q    Is it that you don't recall, or you don't

13       believe that he did?

14  A    I don't believe he did.

15  Q    Had you asked him to provide it to you?

16  A    No.  I told him to complete it and put it with

17       the case file, but he did it on a statement.

18  Q    That would be in the -- that would be in the

19       safe?

20  A    Well, he did it on a statement form.  That would

21       be for a witness.  What he should have done was

22       it should have been on a regular incident

23       report, and then that would have gone back

24       through the system a second time before it went

25       to the case file.

1   Q    Could you please explain to me the difference

2        between incident reports and statements.

3   A    Incident reports are numbered.  They all -- of

4        course they all follow a sequence.  One incident

5        can refer to another incident.

6               This statement doesn't even have an

7        incident number on it, so I don't know how

8        anybody that was going to file it would know

9        where to put it.

10  Q    So the absence of the incident number would make

11       it harder for this to be catalogued and located

12       later?

13  A    Yes.  Very much so.

14  Q    And you would have wanted Sgt. Colborn to

15       prepare an incident report that would have made

16       it easier to be catalogued and located later;

17       right?

18  A    Yes.  It would become a part of that file.

19  Q    But instead he prepared this statement, which

20       did not do that; right?

21  A    That's correct.

22  Q    And you said this statement would then go -- it

23       would go into the case file in the safe?

24  A    It would have -- it would, if they could -- if

25       they would be able to identify which case it was

1       going to.  He's got no names in here.

2   Q   Let's look at -- hold on one second.

3                Would someone in the Manitowoc County

4       Sheriff's Office as a matter of course review an

5       incident report, as compared to a statement?

6   A   Yeah.  It would go to admin.  If it's an

7       incident report, it goes through the system and

8       it's given a status of whether it's active,

9       requires more investigation, or is closed or

10      unfounded.

11  Q   And what if it's a statement?

12  A   It's just part of the incident, so it just -- it

13      would -- depending on what else is in that

14      incident report.

15               MR. VICK:  Meghan, let's look at

16      CHRM00478.

17       (Exhibit 1010 marked for identification.)

18               MS. FENZEL:  I'm introducing this as

19      Exhibit 1010.

20  BY MR. VICK:

21  Q   Sheriff Petersen --

22  A   Yep.

23  Q   -- please review this document which has been

24      marked as Exhibit 1010.

25  A   Okay.  You can move up.  Okay.

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 15 of 17   Document 289-1

1          record.  The time is 2:25 p.m.

2                  (Recess taken.)

3                  THE VIDEOGRAPHER:  And we are back on

4          the record.  The time is 2:32 p.m.

5     BY MR. VICK:

6     Q    Sheriff Petersen, you testified previously that

7          you believed that the Teresa Halbach

8          investigation fell -- originally fell into

9          Calumet County maybe based upon where she was

10         based out of; is that right?

11    A    Correct.

12    Q    Once the body was found in Manitowoc County,

13         would that have normally shifted it over to the

14         Manitowoc County Sheriff's Department as being

15         lead investigators?

16    A    It would have under normal conditions, but

17         because of me being recused, it was handed back

18         over to them so that we wouldn't view -- or they

19         wouldn't view it as any improprieties.

20    Q    So they found that you had a conflict of

21         interest potentially, and that's why it got sent

22         back to Calumet County?

23    A    Both -- both myself and the DA's office.

24    Q    I see.  What about the Sheriff's Department

25         beyond you, was there an understanding that

1    STATE OF WISCONSIN    )
                           ) SS:
2    COUNTY OF MILWAUKEE   )

3

4                I, Sarah M. Gilkay, RPR, RMR, CRR, and
5         Notary Public in and for the State of Wisconsin,
6         do hereby certify that the preceding deposition
7         was recorded by me and reduced to writing under
8         my personal direction.
9                I further certify that I am not a
10        relative or employee or attorney or counsel of
11        any of the parties, or a relative or employee of
12        such attorney or counsel, or financially
13        interested directly or indirectly in this
14        action.
15                In witness whereof, I have hereunder
16        set my hand and affixed my seal of office on
17        this 6th day of June, 2022.

18

19

20

21

                                    Sarah Gilkay

22                          Sarah Gilkay
                   RPR, RMR, CRR, and Notary Public
23             My commission expires March 8th, 2026

24

25