# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF WISCONSIN
 2    ----------------------------------------------------

 3    ANDREW COLBORN,

 4          Plaintiff,     CIVIL ACTION NO. 19-CV-0484

 5       -vs-

 6    NETFLIX, INC., ET AL,    ***CONFIDENTIAL***

 7            Defendants.

 8    ----------------------------------------------------

 9    DEPOSITION OF:  BRENDA SCHULER

10    DATE:           May 20, 2022

11    TIME:           8:39 a.m. to 4:57 p.m.

12    LOCATION:       Godfrey & Kahn, S.C.
                      833 East Michigan Street
13                    Suite 1800
                      Milwaukee, Wisconsin  53202
14
      REPORTED BY:    Janet D. Larsen, RPR
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3           SCHOTT BUBLITZ & ENGEL S.C., by
             APRIL ROCKSTEAD BARKER, ATTORNEY AT LAW
 4           640 West Moreland Boulevard
             Waukesha, Wisconsin  53188
 5           abarker@sbe-law.com
             appeared via Zoom videoconference on
 6           behalf of the Plaintiff.

 7           BALLARD SPAHR LLP, BY
             LEITA WALKER, ATTORNEY AT LAW
 8           2000 IDS Center
             80 South 8th Street
 9           Minneapolis, Minnesota  55402
             walkerl@ballardspahr.com
10           appeared on behalf of Netflix, Inc.

11           BALLARD SPAHR LLP, BY
             ISABELLA SALOMAO NASCIMENTO
12           ATTORNEY AT LAW
             2000 IDS Center
13           80 South 8th Street
             Minneapolis, Minnesota  55402
14           salomaonascimentoi@ballardspahr.com
             appeared via Zoom videoconference on
15           behalf of Netflix, Inc.

16           BALLARD SPAHR LLP, by
             EMILY S. PARSONS, ATTORNEY AT LAW
17           1909 K Street NW, Suite 1200
             Washington, DC  20006-1157
18           parsonse@ballardspahr.com
             appeared via Zoom videoconference on
19           behalf of Netflix, Inc.

20           JASSY VICK CAROLAN LLP, by
             MEGHAN E. FENZEL, ATTORNEY AT LAW
21           KEVIN L. VICK, ATTORNEY AT LAW
             355 South Grand Avenue, Suite 2450
22           Los Angeles, California  90071
             mfenzel@jassyvick.com
23           kvick@jassyvick.com
             appeared via Zoom videoconference on
24           behalf of Chrome Media LLC.

25
```

```
1        ANNIGIAN RYAN LLP, by
         NICHOLAS A. KURTZ, ATTORNEY AT LAW
2        114 North Indian Hill Boulevard, Suite E
         Claremont, California  91711
3        nk@arllp.com
         appeared on behalf of the Witness.
4
    ALSO PRESENT VIA ZOOM VIDEOCONFERENCE:
5        Moira Demos
         Laura Ricciardi
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1   A.   Because, I don't know why I said that, I don't

2        know.  And it was because it was my boss from

3        Transition, I recall that.  I, I don't recall, I'm

4        sorry, I don't recall --

5   Q.   Okay.

6   A.   -- whether I told her or not.

7   Q.   That's fine.

8             So I think you and Ms. Nascimento,

9        Isabella, talked about a lot of the documents that

10       Mr. Colborn had already produced to us.  And she

11       may have even mentioned to you that we didn't need

12       you to reproduce the same documents.  Do you

13       remember that?

14  A.   I believe I recall her saying we don't, we're okay

15       with overlap, we don't have to go through and,

16       like, sift through and just get the ones that they

17       have or not have, right.

18  Q.   Okay.

19  A.   She was very helpful with understanding.

20  Q.   Do you, did you review Mr. Colborn's documents

21       before he produced them to us?

22  A.   No, no.  Oh, wait, I apologize.  You mean like the

23       emails and the texts?

24  Q.   M-hm.

25  A.   I did, yes.
```

1   Q.   You did.

2   A.   Yes.

3   Q.   So you knew that he was going to give those to us?

4   A.   I did.

5   Q.   And how did it happen that you reviewed them?  Did

6        he talk to you about it, or did his attorneys

7        reach out to you or tell me about that?

8   A.   If I recall correctly, his attorney, I think it

9        was April, maybe Debra, somehow set it up with my

10       boss about it just as a courtesy, I'm sure.

11  Q.   Your boss being Shawn Rech?

12  A.   Right, Shawn Rech.  So somehow there was a

13       connection between Shawn and April.  We had a

14       short meeting about what this meant exactly.  We,

15       we said, great, we're, you know, we're okay with

16       it, and they produced them.  I reviewed them.  I

17       did go through and review them, all the texts and

18       whatnot, and sent them out.

19  Q.   And there were about 4,000 texts, you remember?

20  A.   Yes, yes.

21  Q.   So I don't mean to be argumentative but --

22  A.   Sure.

23  Q.   -- I'm struggling to understand how you had time

24       to review 4,000 texts for him, but you can't

25       review another, sounds like easily less than a

1      Writer.

2  A.   Wrong_Righter, correct.

3  Q.   And that is your user name on, on Reddit?

4  A.   Yes.  Reddit, yes, yes, Reddit, yes.

5  Q.   And is Wrong_Righter a reference to, to the work

6      you're doing on behalf of Mr. Colborn?

7  A.   No, Wrong_Righter was, when I joined Reddit, I

8      created Wrong_Righter because I, it was nothing to

9      do with Colborn, it was to do with Making a

10     Murderer overall.

11  Q.   Okay.

12  A.   I wanted the other side of the truth to be put out

13     there so --

14  Q.   Okay.  But that first paragraph is essentially

15     accurate that you fact checked Mr. Kratz's book

16     and serve as a consultant for Mr. Griesbach and

17     use the Reddit handle Wrong_Righter; correct?

18  A.   Correct.

19  Q.   Were you paid for the work you did for

20     Mr. Kratz?

21  A.   No.

22  Q.   Okay.  And I assume you sort of took on that role

23     in the same way you did for Mr. Griesbach, it just

24     happened organically over time?

25  A.   Probably a little quicker, just because he already

1    A.    I'm sorry, could you say that again.

2    Q.    Are you anticipating it will cover roughly the

3          same time period as Making a Murderer so 1985 with

4          the rape, the exoneration, the murder trial?

5    A.    Making a Murderer 1 or Making a Murderer --

6    Q.    Your documentary, your documentary.

7    A.    Right, right, but I mean are you asking if it's --

8          Are they gone?

9                    MR. KURTZ:  It's all right.

10   A.    Are you asking, I guess, if ours will cover the

11         Making a Murderer 1 time frame --

12   Q.    Yeah.

13   A.    -- or the Making a Murder 1 and 2 with Zellner

14         time frame?

15                   It's post Making a Murderer and Making a

16         Murderer 2.

17   Q.    Just tell me what time frame.  That's the easiest

18         way to ask the question.

19   A.    It's basically as far back as we can go on Steven

20         Avery.

21   Q.    Okay.

22   A.    Until, gosh.  I mean, it -- with -- Yes, through

23         the same time frame.

24   Q.    Okay.

25   A.    I think that's the easiest way to say it, yes.

1   Q.   And then I assume it explores Making a Murderer as

2        well, the documentary that was released in 2015?

3   A.   Sure, yes.

4   Q.   Okay.  And is it fair to say it aims to correct

5        the record as you see it and be a count -- I think

6        I've heard it described as a counter

7        documentary?

8   A.   I think that's fair.

9   Q.   And so a rebuttal to Making a Murderer; is that

10       another way you would describe it?

11   A.   I think that's the way it's been described.

12   Q.   Would you agree that it tells things more from

13       Mr. Colborn's perspective?

14   A.   Mr. Colborn's?  I think it's the full story.  It's

15       not just his side.  I mean we interviewed 40 plus

16       people, so I don't -- I mean I know three things

17       about his perspective on certain things.  I don't

18       know what you mean, I guess.

19   Q.   Do you know if Mr. Colborn was featured in the

20       trailer?

21   A.   I think maybe.

22   Q.   You didn't feature all 40 people in the trailer?

23   A.   Oh, gosh, no.  No, I think when the trailer came

24       out, we hadn't even interviewed everybody yet.

25   Q.   You would consider him a main subject of the

1       documentary, Mr. Colborn?

2   A.  Yeah, I, I -- One in ten we'll say, so there's

3       probably ten that have more time than other

4       people.

5   Q.  There's been a term batted around a lot in this

6       case so far, protagonist.  Do you know what a

7       protagonist is?

8   A.  Refresh my memory.  I, I think so.

9   Q.  So you've got a protagonist and an antagonist.

10  A.  Sure.

11  Q.  Does Making a Murderer, does Convicting a Murderer

12      have a protagonist?

13  A.  Explain protagonist.

14  Q.  Let me ask you how you would define it.

15  A.  I think what you're, what you asked me --

16  Q.  There's no wrong answer.

17  A.  No, I know, but, yes, I, I think it would be that

18      they're supportive of Steven Avery's side of the

19      story, yes, and, yes.

20  Q.  Okay.  So Steven Avery is the antagonist --

21  A.  Yes.

22  Q.  -- in your documentary?

23              And law enforcement, including

24      Mr. Colborn, is the protagonist; is that right?

25  A.  Yes, yeah.

```
 1   Q.   Okay.  Do you have any reservations about making a

 2        documentary that has a protagonist and an

 3        antagonist?

 4   A.   No.

 5   Q.   Do you think there's anything fundamentally unfair

 6        about that?

 7   A.   Not if you're sharing what's factual in the trial.

 8        If you're sharing factual information, no, I don't

 9        have any issues with it.

10   Q.   And am I correct -- Well, let me just hand you an

11        exhibit.  Some of these I don't necessarily need

12        to put in front of you --

13   A.   Okay.

14   Q.   -- but if I don't, my whole system gets out of

15        order.

16   A.   Oh, no, I understand.

17   Q.   So we're just going to mark them and keep moving.

18   A.   That sounds good.

19   Q.   This will be 2033.

20             (Exhibit 2033 marked for identification)

21   Q.   So this is another printout from Reddit; correct,

22        this Exhibit 2033?

23   A.   Yes.

24   Q.   And I apologize, again, it's so small.

25   A.   I know, that's okay.
```

1    Q.    And I may have asked this, but when -- This was --

2          I don't know, I've lost track of time, blame

3          COVID.  This was last fall; right?

4    A.    Yes.

5    Q.    So we're going on six or eight months here since

6          this was released; does that sound about right?

7    A.    Yes, yes.

8    Q.    And when do you expect to release Convicting a

9          Murderer?

10   A.    Our hopes is before year end actually.

11   Q.    Okay.

12   A.    Yes.

13   Q.    Are you waiting to release it until this lawsuit

14         ends that we're here today to discuss?

15   A.    I don't think it's going to be, no, no, not at

16         all.

17   Q.    Is the lawsuit going to be part of Convicting a

18         Murderer?

19   A.    At this point it's a mention.

20                    (Discussion off the record)

21                    (Exhibit 2037 marked for identification)

22   Q.    So this is Exhibit 2037 you've just been handed.

23   A.    Okay.

24   Q.    It's an email produced by Mr. Colborn Bates

25         stamped 4614.

1           Do you see that?

2    A.    Yes.

3    Q.    Near the bottom of the first page you're writing

4          this email, I believe to Mike Griesbach; is that

5          correct?

6    A.    Yes.

7    Q.    On January 9th, 2019.

8           Do you see that?

9    A.    I do, yes.

10   Q.    And you tell Mr. Griesbach, I'm traveling to

11         Cleveland for a week next Tuesday, and we will be

12         discussing how to proceed with filming since the

13         defamation lawsuit wasn't initially taken into

14         account.  I foresee Shawn -- That's Mr. Rech?

15   A.    Yes.

16   Q.    -- wanting to follow it and perhaps obtain some

17         type of behind the scenes access.  I'd like to get

18         your thoughts on that, too, as you'd be part of

19         it, that's the route, if that's the route Shawn

20         wanted to take.

21          Did I read that correctly?

22   A.    Yes, yes.

23   Q.    And this was about a month after Mr. Colborn had

24         sued Netflix; correct?

25   A.    Correct.

```
 1   Q.   And you're emailing his attorney, Mr. Griesbach,

 2        about the lawsuit here; right?

 3   A.   Yes.  M-hm.

 4   Q.   And did he respond -- I see he did respond right

 5        above on the same day; correct?

 6   A.   It looks like it, yes.

 7   Q.   He says, Yep, I'll generally be keeping mum.

 8   A.   Oh, okay.

 9   Q.   And I don't, in any event, he responded, I don't

10        need to read that out loud --

11   A.   Okay.

12   Q.   -- to you.

13   A.   Okay.

14   Q.   Did he ever respond to the notion of including

15        some behind the scenes access in Convicting?

16   A.   Yes.

17   Q.   And what did he say?

18   A.   No.

19   Q.   Did he say that in an email or over the phone?

20   A.   I don't recall if, I, I don't recall, I do not

21        have record of it in an email, but I mean, let me,

22        let me think.  Just let me see.  Mike was the

23        original attorney before April came on.  I was

24        much more involved at that point.  After they came

25        on, I wasn't involved.
```

1    Q.    Okay.

2    A.    I handed things over that would help their PI, I

3          guess, and at that point, no, it was shut down.

4    Q.    Okay.

5    A.    It was shut down, so we never interviewed Mike or

6          anything like that.

7    Q.    Okay.

8    A.    We would like to, yes, but, no.

9    Q.    The, the notion of including behind the scenes

10         access in Convicting never got off the ground; is

11         that what you're saying?

12   A.    Yes.

13   Q.    And have you been given access to any of the

14         documents produced by the defendants in this

15         case?

16   A.    From -- I'm sorry, I don't understand.

17   Q.    So if Netflix has produced documents to

18         Mr. Colborn, for example, as part of this

19         lawsuit?

20   A.    No.

21   Q.    Have you been given access to those?

22   A.    Sorry.  I have not been given any access to

23         anything from anyone.

24   Q.    Has Mr. Colborn told you about any of the

25         documents that Netflix has produced in this case?

```
 1       feel for them, but I want the truth to be out
 2       there.
 3    Q. Well, you know that this topic, people feel very
 4       passionately about the Avery case; correct?
 5    A. Yes.
 6    Q. There are whole Reddit communities devoted to it;
 7       correct?
 8    A. Oh, absolutely.
 9    Q. And we've talked about some of the unkind emails,
10       some might say violent emails, Mr. Colborn got.
11    A. Right.
12    Q. Are you concerned that that sort of thing, those
13       sorts of threats and harassment might be directed
14       at the filmmakers of Making a Murderer when you
15       release your documentary?
16    A. I wouldn't be surprised if they were.  I've
17       already had threats and I'm nobody.  So I'm not --
18       I want them, I want the truth to be out there.
19       I'm not necessarily saying, gee, I hope that
20       they're inundated.  I don't wish that on
21       anybody.
22    Q. But you'd agree with me that what the crazy people
23       out in the world decide to do shouldn't stop
24       filmmakers from making content?
25                 MR. KURTZ:  Objection.
```

```
1    Q.   Shouldn't stop you from making content; is that
2         right?
3    A.   I'm good with, yes, the clarification with a
4         documentary that's portrayed in an ethical way.
5    Q.   And you have no control over what people who watch
6         the documentary you're producing do after they
7         watch it; correct?
8    A.   No.
9              MS. BARKER:  Objection.  Lacks
10        foundation.
11   Q.   All right.
12             (Exhibit 2039 marked for identification)
13   Q.   So the court reporter just handed you what's been
14        marked as Exhibit 2039.  This was a document
15        produced by Mr. Colborn, Bates No. 4888, and I'll
16        first ask you, because I know that's not your
17        signature, if you've ever seen this sort of
18        document before.
19   A.   Yes, I have.
20   Q.   Okay.
21   A.   Yes.
22   Q.   This is an Appearance Release that Mr. Colborn
23        signed; correct?
24   A.   Yes, yes.
25   Q.   And this is an Appearance Release for Convicting a
```

1        Convicting a Murderer on Netflix?

2   A.   I don't think I can answer for him on that, but he

3        just wants the truth out is how, how I believe he

4        feels about it.  As long as he's not

5        misrepresented, I don't -- he just wants the world

6        to know.  So I don't know, I don't know.

7   Q.   All right.  So back to Exhibit 8.  Did your

8        attorney hand it to you?

9             MR. KURTZ:  I missed that, sorry.

10       2008.

11            MS. WALKER:  Thank you.  2008.  I knew I

12       would struggle with that all day, but maybe it

13       will save us heartache later.

14  Q.   So I'll ask you to flip in, oh, five or six pages

15       to Bates No. 4459.

16  A.   All right.  Okay.

17  Q.   And this is now really early, I guess two years

18       after the release of Making a Murderer but still

19       awhile before the lawsuit.  Do you see the date

20       there of December 7th, 2017?

21  A.   Correct.

22  Q.   And you text Mr. Colborn.  Ugh.  Ken just got on

23       me about my support of the petition.  So fucking

24       frustrating, Andy.

25            Do you see that?

1    A.    I do.

2    Q.    Is this a reference to Ken Kratz?

3    A.    Correct.

4    Q.    And then you put, From Ken, colon, and I think

5          what you're doing here is copying a message that

6          Ken Kratz sent to you; is that right?

7    A.    Correct.

8    Q.    And so the message Ken Kratz sent to you says, I

9          saw your post, Brenda, circulation the petition to

10         have Netflix cancel making MaM and quit production

11         on season 2.  Not that I necessarily disagree with

12         your participation in that public position, but

13         isn't this exactly the kind of decision we all

14         talk about first?  The bottom line is if we ever

15         hope to secure a movie or series deal, we need MaM

16         to continue being relevant.

17               Did I read that correctly?

18   A.    I believe so.

19   Q.    And then you say, and I think you're now talking

20         in your own voice, Odd how he can drop YouTube

21         videos about their deceit and do presentations,

22         but I have to get permission.  Whatever.

23               Did I read that correctly?

24   A.    Yes.

25   Q.    And then you write, Here's my rely, colon.  I

1      think you must have copied to Mr. Colborn what you

2      had previously sent to Mr. Kratz?

3  A.   Correct.

4  Q.   So what you said to Mr. Kratz was, This is making

5      them relevant.  It's putting their deceit in the

6      news just like your YouTube videos.  Isn't that

7      what we are fighting for?  I shared on my personal

8      Facebook page support of a petition to stop MAM2.

9      I think we all know that this isn't stopping

10     Netflix, but it is showing the masses there's an

11     issue.  That can definitely segue into people

12     wanting the other side to be told.

13          Did I read that correctly?

14  A.   Correct.

15  Q.   So you agreed with Mr. Kratz that you won't,

16     quote, need MaM to continue being relevant; was

17     that correct, in December 2017?

18          MS. BARKER:  Objection.  Documents speak

19     for themselves.

20          I don't -- His feeling on it was that if

21     Making a Murderer was cancelled because of this

22     petition, that it would ruin his project, okay.  I

23     didn't feel that way.  That wasn't why I signed a

24     petition.  I signed a petition because it's what I

25     believed in.  So he was upset with me because I

1      signed that petition publicly knowing that he

2      could get a film deal, again, not with Convicting,

3      this was the other one, so he was upset with me

4      for trying to get Making a Murderer, that I signed

5      a petition to try and get it cancelled.

6  Q.   So if I'm following, Mr. Colborn signed on to work

7      with Mr. Kratz, and Mr. Kratz was of the view that

8      if his project was going to succeed, Mr. Kratz

9      really needed MaM to stay in the news; is that

10     right?

11  A.   Correct.

12  Q.   And I know those are his words, not yours, but you

13     did reply, This is making them relevant.

14         Do you see that?

15  A.   Yes, m-hm.

16  Q.   And if, if MaM had died a quick death in 2016 or

17     2017, there wouldn't really be a market for

18     Convicting a Murderer; correct?

19  A.   Correct.

20  Q.   Did you all think about the cost to Mr. Colborn of

21     keeping MaM in the news?

22         MR. KURTZ:  Objection.  Vague.

23     Speculation.

24  A.   I didn't, I didn't want to keep them in the news.

25     My reply to Ken was this is making them relevant

1    A.    Yes.

2    Q.    Okay.  Did you ever draft any exhibit to any

3          Complaint like a comparison, a list of defamatory

4          statements or a comparison of trial testimony to

5          what was in Making a Murderer?

6    A.    In the first Complaint, yes, I did.  The second

7          Complaint, unless they used something from the

8          first Complaint, I had nothing to do with the

9          second when, again, I don't know what you call it,

10         the Amended Complaint, when April and George came

11         on.  The first one, yes.  The first one, yes, I

12         know I had an exhibit in there.

13               MS. WALKER:  Mark this as Exhibit 2070.

14               (Exhibit 2070 marked for identification)

15   Q.    So this is an email string with a lot of signature

16         block.

17   A.    Right.

18   Q.    Stuff we can ignore at the end, but if you flip

19         backwards from that, the first real email at the

20         bottom of the chain is from Deb Bursik to you

21         asking if there's a piece of paper regarding the

22         dispatch call Mr. Colborn received.

23               Do you see that on January 16th, 2019?

24   A.    What page are you on?

25   Q.    I'm on the 2829.

1   A.   Okay.

2   Q.   -- a couple texts down, you say, We could have

3        filmed them walking out of the building.

4                 Do you see that?

5   A.   Yes.

6   Q.   Out of the hearing, I mean; correct?

7   A.   Yes.

8   Q.   And then in the next text from Colborn, he

9        clarifies that it was done by Zoom.

10                Do you see that?

11  A.   Yes.

12  Q.   And that, quote, They are all, they are playing

13       COVID to the hilt.

14                Do you see that?

15  A.   Yes.

16  Q.   Did you encourage Mr. Colborn to file this

17       lawsuit?

18                MR. KURTZ:  Objection.  Vague.

19                MS. BARKER:  I'm sorry, I didn't hear

20       that question.  Could you read it back.

21                (Question read)

22  A.   I encouraged him, told him I would support him

23       regardless, whether he did or not.  He wasn't sure

24       if he wanted to.  It took him a long time to make

25       that decision until he had to.  I told him I would

```
 1        help him any way possible.  If I, if I could
 2        provide information that would help his case,
 3        yes.
 4   Q.   Did you ever talk to Shawn Rech about
 5        Mr. Colborn's decision to file a lawsuit?
 6   A.   Yes, I believe I did, yes.
 7   Q.   Okay.  Was Shawn Rech supportive?
 8   A.   I remember two situations, and they vary.  So I
 9        don't know what time frame they were, but one was
10        once he -- I don't think he wanted him to simply
11        because he had experience with that, okay.  So
12        that was one time I remember that he knew how, how
13        lawsuits worked and that he knew what would happen
14        going through everything.  On the other hand, Andy
15        was, really wanted to do that, so I remember a
16        conversation about potentially one of Shawn's
17        partners, not partners, not acquaintances, what is
18        he, I don't know, friends that was an attorney
19        that he worked with on prior projects, that he
20        asked him to, he put him in touch with him, and
21        nothing became of it because he's not that type of
22        lawyer is my understanding.
23   Q.   Did you ever talk to Mr. Rech about how
24        Mr. Colborn's lawsuit might impact Convicting a
25        Murderer?
```

1    A.    I'm sure it was a discussion that we would have to

2          include it to some degree, but we weren't able to

3          film any of it anyway, so it didn't matter.  Once

4          he got the lawyers, it became kind of a completely

5          moot point.  Would I have loved to follow through

6          this whole process and filmed it, yes, because of

7          how I felt about everything.  I think Shawn was

8          probably smarter knowing that that would never be

9          the case.

10   Q.    Do you know if Mr. Rech felt like the lawsuit in

11         any way has stolen the thunder of Convicting a

12         Murderer and that it'll be old news in some sense

13         by the time it's released?

14   A.    I don't know that the lawsuit would have affected

15         that he felt our film would be any less valuable.

16   Q.    I'm just asking; I don't know.

17   A.    Yeah, okay, okay.  As far as old news, I mean the

18         longer you get from anything, sure, I mean things

19         take time.  Do we wish we could have gotten it out

20         two years ago, absolutely.

21   Q.    Do you think this lawsuit is keeping it relevant

22         so that people will still be paying attention to

23         Convicting a Murderer when it's released?

24   A.    I don't think very many people are paying

25         attention to this lawsuit so, no.

1   STATE OF WISCONSIN)

2   MILWAUKEE COUNTY  )

3                    I, JANET D. LARSEN, a Notary Public in

4   and for the State of Wisconsin, do hereby certify that

5   the deposition of BRENDA SCHULER was taken before me

6   under and pursuant to the Federal Rules of Civil

7   Procedure on the 20th day of May, 2022.

8                    That before said witness testified,

9   she was first duly sworn by me to testify the truth.

10                   That I am not a relative or employee or

11  attorney or counsel of any of the parties, or a

12  relative or employee of such attorney or counsel, or

13  financially interested directly or indirectly in this

14  action.

15                   That the foregoing pages are a true and

16  correct transcription of my original shorthand notes

17  taken at said time and place.

18

19                   Dated this 24th day of May, 2022
                     at Milwaukee, Wisconsin.
20

21                   _____
                     JANET DONALDSON LARSEN
22                   REGISTERED PROFESSIONAL REPORTER
                     NOTARY PUBLIC, STATE OF WISCONSIN
23                   MY COMMISSION EXPIRES 1-22-26

24

25

```
1                        ERRATA SHEET

2

3    Deponent:  Brenda Schuler

4    Date:      5-20-22

5    Case:      Andrew Colborn v Netflix, Inc., et al

6
```

7   Page <u>14</u> Line <u>11/12</u> Change <u>"part to contrato</u> Reason <u>clarification</u>

8   Page <u>39</u> Line <u>26</u> Change <u>2013 to 2014</u> Reason <u>clarification</u>

9   Page <u>40</u> Line <u>5</u> Change <u>2019 to 2020</u> Reason <u>my error</u>

10  Page <u>47</u> Line <u>22-23</u> Change <u>Jan to March</u> Reason <u>my error</u>

11  Page <u>48</u> Line <u>15</u> Change <u>Mike to Lenk</u> Reason <u>Reporter error</u>

12  Page <u>49</u> Line <u>20</u> Change <u>several months to within a month</u> Reason <u>my error</u>

13  Page <u>80</u> Line <u>1</u> Change <u>lamb blastd to lankasted</u> Reason <u>Reporter error</u>

14  Page <u>43</u> Line <u>2</u> Change <u>2005 to 2007</u> Reason <u>Attorney error</u>

15  Page <u>48</u> Line <u>14</u> Change <u>About him to</u> Reason <u>my error</u>

16  Page <u>87</u> Line <u>1</u> Change <u>Don't to do By Kevak</u> Reason <u>my error</u>

17  Page <u>169</u> Line <u>17</u> Change <u>See below</u> Reason <u>context</u>

```
18   Page___Line___Change_____Reason_____

19   Page___Line___Change_____Reason_____

20   Page___Line___Change_____Reason_____

21   Page___Line___Change_____Reason_____

22   Page___Line___Change_____Reason_____

23   Page___Line___Change_____Reason_____

24   Page___Line___Change_____Reason_____

25   Page___Line___Change_____Reason_____
```

In regard to 17 above, the question by Ms Walker was taken out of context. She did not reference that my text, "we should shoot all liberal law professors" was in response to an attached article titled something to the effect of "UC Professor thinks all cops should be killed."

1

2

3

4                          SIGNATURE PAGE

5

6    I, Brenda Schuler, do hereby certify that I have read

7    the foregoing transcript of proceedings, taken the 20th

8    day of May, 2022, and the same is true and correct,

9    except for the list of corrections, if any, noted on

10   the errata sheet.

11

12

13   Dated this 23rd  day of    June                    , 2022

14   Deponent Signature

15

16

17

18   Subscribed and sworn to before me this____day of
                              , 2022 in_____County
19   State of _____
     My commission expires:_____
20   Notary Public Printed Name:_____
     Notary Public Signature_____
21

22

23

24

25

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 28 of 29   Document 289-2

1

2

3

4                    **SIGNATURE PAGE**

5

6    I, Brenda Schuler, do hereby certify that I have read

7    the foregoing transcript of proceedings, taken the 20th

8    day of May, 2022, and the same is true and correct,

9    except for the list of corrections, if any, noted on

10   the errata sheet.

11

12

13   Dated this ____ day of _____, 2022

14   Deponent Signature _____

15

16

17

18   Subscribed and sworn to before me this 24 day of
     JUNE _____, 2022 in OUTAGAMIE County
19   State of WISCONSIN
     My commission expires: 12-4-25
20   Notary Public Printed Name: CKORTH
     Notary Public Signature _____
21

22

23                                          C
                                          KORTH
24

25

                    **Colleen Reed Reporting LLC**
                       414.322.3621