# EXHIBIT 5

1    UNITED STATES DISTRICT COURT
   FOR THE EASTERN DISTRICT OF WISCONSIN
2   ------------------------------------------------------
   ANDREW COLBORN,
3
           Plaintiff,                  **COPY**
4
   -vs-                    CIVIL ACTION NO. 19-CV-0484-BHL
5
   NETFLIX, INC., ET AL.,          VOLUME I
6
           Defendants.
7   ------------------------------------------------------

8           VIDEOTAPED DEPOSITION OF

9             ANDREW L. COLBORN

10  ------------------------------------------------------

11

   DATE:              July 21, 2022
12
   TIME:              9:23 a.m. - 5:22 p.m.
13
   LOCATION:          Godfrey & Kahn, S.C.
14                    833 East Michigan Street
                    Suite 1800
15                    Milwaukee, Wisconsin  53202

16

17

18

19

20

21
   REPORTED BY:
22  Paula Huettenrauch, RMR, CRR
   365Reporting, LLC
23
   VIDEOGRAPHER:
24  Jon Hansen, CLVS
   Video Concepts
25  608.408.7411

                                                        1

1            A P P E A R A N C E S

2

3    LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C., BY
     R. GEORGE BURNETT, ATTORNEY AT LAW
4    231 South Adams Street
     Green Bay, Wisconsin  54301
5    Gb@lcojlaw.com
     appeared on behalf of the Plaintiff.
6

7    ROCKSTEAD LAW, LLC, BY
     APRIL ROCKSTEAD BARKER, ATTORNEY AT LAW
8    525 North Lincoln Avenue
     Beaver Dam, Wisconsin  53916
9    aprilrbarker@rocksteadlaw.com
     appeared on behalf of the Plaintiff.
10

11   BALLARD SPAHR LLP, BY
     LEITA WALKER, ATTORNEY AT LAW
12   2000 IDS Center
     80 South 8th Street
13   Minneapolis, Minnesota  55402
     walkerl@ballardspahr.com
14   appeared on behalf of Netflix, Inc.

15

     BALLARD SPAHR LLP, BY
16   ISABELLA SALOMAO NASCIMENTO, ATTORNEY AT LAW
     2000 IDS Center
17   80 South 8th Street
     Minneapolis, Minnesota  55402
18   salomaonascimentoi@ballardspahr.com
     appeared on behalf of Netflix, Inc.
19

20   BALLARD SPAHR LLP, by
     EMMY S. PARSONS, ATTORNEY AT LAW
21   1909 K Street NW, Suite 1200
     Washington, DC  20006-1157
22   parsonse@ballardspahr.com
     appeared via Zoom videoconference on
23   behalf of Netflix, Inc.

24

25

                                                                       2

1    BALLARD SPAHR LLP, by
     MATTHEW E. KELLEY, ATTORNEY AT LAW
2    1909 K Street NW, Suite 1200
     Washington, DC  20006-1157
3    kelleym@ballardspahr.com
     appeared via Zoom videoconference on
4    behalf of Netflix, Inc.

5
     JASSY VICK CAROLAN LLP, by
6    KEVIN L. VICK, ATTORNEY AT LAW
     355 South Grand Avenue, Suite 2450
7    Los Angeles, California  90071
     kvick@jassyvick.com
8    appeared on behalf of Chrome Media LLC,
     Laura Ricciardi, and Moira Demos.

9

10   JASSY VICK CAROLAN LLP, by
     MEGHAN E. FENZEL, ATTORNEY AT LAW
11   355 South Grand Avenue, Suite 2450
     Los Angeles, California  90071
12   mfenzel@jassyvick.com
     appeared via Zoom videoconference on
13   behalf of Chrome Media LLC, Laura Ricciardi, and
     Moira Demos.

14   ***

15

16   ALSO PRESENT:

17   Debra Bursik, Paralegal

18   Moira Demos, Defendant

19   Laura Ricciardi, Defendant

20   Melinda LeMoine, Director, Litigation, Netflix, Inc.

21

22

23

24

25

                                                                      3

1          MR. BURNETT:  I'll withdraw the

2     objection.  You can answer.

3          A    I disagree with that statement.

4          Q    On what basis?  Let me -- let me ask you.

5     You've not watched the whole thing?

6          A    Correct.

7          Q    In fact, you haven't even watched the last

8     three episodes at all according to your stipulated

9     facts, correct?

10         A    That is correct, yes.

11         Q    So you have no idea in those last three

12     episodes whether it tells both sides of the stories,

13     raises questions, or encourages viewers to reach

14     their own conclusion?  You just don't know, correct?

15         A    I don't know any of the content of the last

16     three episodes, that's correct.

17         Q    Can you point me to where in Making a

18     Murderer it contends that you planted evidence to

19     frame Avery for Teresa Halbach's murder?

20         A    I believe there's quite a few examples in

21     the Complaint that were -- so I'm not an attorney.

22         Q    I know.

23         A    I hired attorneys to do the research to find

24     that evidence.

25         Q    I'm just asking you -- yeah.  And your

                                                              58

1          Q     In fact, the best evidence of any testimony

2     at trial would be the trial transcript itself,

3     correct?

4          A     Yes.

5          Q     And I think this goes both ways, but would

6     you agree that the best evidence of what Making a

7     Murderer says about you is the documentary itself or

8     a transcript of the documentary, correct?

9          A     Well, I would surmise that there's probably

10    more to Making a Murderer than just the transcript of

11    it.  The video probably would be very telling --

12         Q     Of course.

13         A     -- inserting facial expressions and stuff.

14         Q     You misunderstood my question.  I'm just

15    asking, you would agree that the best evidence of

16    what Making a Murderer says and portrays is the

17    documentary itself?

18         A     Yes.

19         Q     And we should not attempt to reword or

20    characterize either the transcript or the

21    documentary, correct?

22         A     What do you mean by characterize the

23    documentary?

24         Q     Try to paraphrase it or summarize it or

25    characterize what it says.  We should instead just

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 6 of 108   Document 289-5
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1       Steven Avery?

2            A    I'm sorry.  Can you repeat that?  I'm sorry.

3            Q    So I'll represent to you in the three

4       episodes you didn't watch --

5            A    Yes.

6            Q    -- the reading of the verdict is shown --

7            A    Okay.

8            Q    -- and Steven Avery is walked out of the

9       courtroom in handcuffs to jail.  That detracts from

10      any strong and definite statement that you planted

11      evidence to frame him, correct?

12           A    I don't know.  Without watching it, I don't

13      know.  I don't know how -- in what context it was

14      shown, so I don't know.

15           Q    Do you have any intention of watching Making

16      a Murderer in its entirety?

17           A    No.

18           Q    Okay.

19           A    I don't.

20           Q    Despite litigating a federal lawsuit that

21      may go to trial, you don't plan to watch the

22      documentary that you've sued over?

23           A    It's ruined my life.  I'm not going to pay

24      to watch it.

25           Q    Well, that's not my question, and I'll move

Case 1:19-cv-00484-BHL  Filed 09/16/22  Page 7 of 108  Document 289-5
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    such a thing!  But a majority assumed he was

2    guilty--why would the police have arrested him if he

3    wasn't involved?"

4            I think I skipped over a sentence about

5    Nancy Grace, but otherwise, did I read that

6    correctly?

7        A    Yes.

8        Q    And do you agree with this assessment of the

9    local reaction to the murder of Teresa Halbach and

10   the arrest of Steven Avery?

11       A    I'll agree that there were some in the

12   community that thought he was innocent; some thought

13   he had done this again.  I don't know if the majority

14   was one way or the other.  That's Mike's opinion.

15               (Exhibit 15-B marked for identification.)

16       Q    Understood.  So I'll now hand you

17   Exhibit 15-B, which is also from The Innocent Killer.

18   This is from a few pages later in the book, page 215.

19   And in the third paragraph down, Mr. Griesbach wrote,

20   "The Avery case was naturally the chief topic of

21   discussion at Warren's from the date of Teresa

22   Halbach's appearance" [sic] "until the end of the

23   trial.  From Mike the window washer to the county

24   executive, everyone at Warren's had an opinion about

25   the case, and given what I do for a living, they

1   quote.  You would agree with Ms. Heinzen's

2   assessment, correct?

3        A    Mrs., I believe, and, you know, that might

4   be her interpretation of it, but yes, certainly Avery

5   had his supporters and not quite or anywhere near as

6   vocally.  Law enforcement probably had a few

7   supporters as well.

8        Q    So I want to turn again to Exhibit 1 and

9   those stipulations that we proposed.

10       A    Okay.

11       Q    And specifically numbers 11, 13, and 14.

12   I'll read them out loud.  Number 11 says, "Mr.

13   Colborn felt wronged by the frame-up theory put forth

14   by the defense at Mr. Avery's trial."

15            Number 13 says, "Mr. Colborn felt the

16   frame-up theory put forth by the defense at

17   Mr. Avery's trial harmed his reputation."

18            And number --

19       A    Hang on one second, okay?  So you're reading

20   11, 12, and 13, because mine says 13 blank --

21       Q    Yes.

22       A    -- and 11.

23       Q    I know.  If you could flip to the ones we

24   proposed --

25       A    Okay.

83

1      some documents to help me understand why you won't

2      agree to them, and we'll come back to them probably

3      at the end and I'll ask you again, just as I have

4      with some others.

5          A     Okay.

6          Q     So we're going to start by talking about

7      Ms. Schuler, and my first question is just when did

8      you last speak to her?

9          A     I can't give you an exact date, Ms. Walker,

10     but months ago.

11         Q     Okay.  Have you talked to her since she was

12     deposed in this case?

13         A     No.

14         Q     So she hasn't told you about her deposition?

15         A     She has not.

16         Q     And you previously testified she's a friend

17     of yours, correct?

18         A     She is.

19         Q     And would it surprise you that you produced

20     more than 4,000 text messages with her in this case?

21         A     I don't know how many text messages I've

22     shared with her.

23         Q     But it doesn't surprise you to hear that

24     it's over 4,000?

25         A     Do you have the 4,000 text messages?

86

1          Q    I'll represent to you it was over 4,000.

2     You don't have to agree or disagree.

3          A    Okay.

4          Q    Let me ask you just a few more questions to

5     get a sense of the nature of your friendship.  She

6     came to your retirement party, correct?

7          A    Yes.

8          Q    And you went to her son's wedding?

9          A    I did.

10         Q    And you've gone out to eat together?

11         A    Yes.

12         Q    And would you say you trust her?

13         A    I felt she was someone I could trust, yes.

14         Q    And would you say that you have confided in

15    her?

16         A    Yes.

17         Q    And have you trusted her to speak on your

18    behalf?

19         A    Yes.

20         Q    And she is working, as we've discussed, on

21    this documentary called Convicting a Murderer,

22    correct?

23         A    Yes.

24         Q    We asked you to admit that Convicting a

25    Murderer is meant to serve as a rebuttal to Making a

87

1    want to confirm that this Exhibit 23 is your second

2    interview for that film, correct?

3         A    So nothing's dated again.  I don't know

4    which -- what I said in my first interview, what I

5    said in my second interview.  You know, I was never

6    given a transcript of Convicting a Murderer.

7         Q    So I'll represent to you that Ms. Schuler

8    represented to us that you were interviewed twice and

9    that Exhibit 8 and Exhibit 23 are the transcripts for

10   the two separate interviews.  And you don't have any

11   reason to think she was dishonest with us in any way

12   on that, correct?

13        A    If she doesn't have the date straight, I

14   don't think she did it out of dishonesty, so no, I

15   don't.

16        Q    All right.  And you under -- you agree that

17   you sat for two recorded interviews with the

18   filmmakers?

19        A    That I do agree to, yes.

20        Q    Okay.  And it's fine that you don't remember

21   the exact date.  Do you know whether this Exhibit 8

22   or Exhibit 23 were first, which one came first?

23        A    This does look like it would have come from

24   the second.

25        Q    This is the second.  Okay.  Thank you.  So

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 12 of 108   Document 289-5
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1    conviction?"  And Brenda said, "Yes and no."  And I

2    said, "Okay."  And then she said, "Okay.  He felt

3    defamed, or in my opinion, I would say he felt very

4    wronged after the trial, during the trial, okay?"  I

5    said, "M-hm."  And she said, "But felt redeemed with

6    the verdict."

7              That's Ms. Schuler's testimony, and my

8    question for you is do you agree with her assessment?

9        A    No.

10       Q    Which part do you disagree with?

11       A    I didn't feel very wronged after the trial.

12       Q    Okay.  Any other part you disagree with?

13       A    No.

14            (Exhibit 35-B marked for identification.)

15       Q    Okay.  I'm going to hand you 35-B.

16       A    Okay.

17       Q    So I'm going to start on line 22 of page 141.

18   Do you see where I'm at?

19       A    Yes.

20       Q    And so I'm following up on Ms. Schuler's

21   testimony, and I say, "So you just testified that he

22   felt very wronged during the trial, and then he felt

23   vindicated by the verdict and that he was very upset

24   by Making a Murderer; is that a fair summary of what

25   you said?"  And she said, "Yes."  And I asked, "The

1    was my thought when I was done.

2         Q    Take a look at page 354, so flip a few

3    pages.

4         A    Same -- same exhibit?

5         Q    Exhibit 8, tracking number 354.

6         A    Okay.

7         Q    In the top --

8         A    Yeah.

9         Q    -- top row, four lines in, "Shortly after I

10   retired."  Do you see that?

11        A    Yes, I see it.

12        Q    "Shortly after I retired, Attorney Jerome

13   Buting, who should be well aware of what slander and

14   defamation is, found out through an unscrupulous

15   reporter who has gone out of his way to make life

16   miserable for me, partially on my own doing, that I

17   was retiring from law enforcement."  Did I read that

18   correctly?

19        A    Yes.

20        Q    Who was making your life miserable?

21        A    Do you want me to name the unscrupulous

22   reporter?

23        Q    Yes.

24        A    John Ferak.

25        Q    Okay.  I couldn't tell based on the sentence

108

1    on an unsolved hit-and-run at the time, and I believe

2    that's what that article was about.  Again, without

3    having the question, it's hard for me to determine,

4    but it's easy to research Mr. Ferak's work into

5    the -- trying to make it look like the sheriff's

6    department was somehow involved in covering up a

7    hit-and-run that's still unsolved.  So that's --

8         Q    I understand.  Thanks for that context.  I

9    would love to get the questions, and we're trying to

10   get the transcript, the audio.

11        Would you take a look at number 25 of the

12   proposed stipulations?

13        A    Is that 1 again?

14        Q    I think it's this loose-leaf one right

15   here.

16        A    Okay.  Got it.  Thank you.

17        Q    And, again, it's the ones we proposed, not

18   the ones you signed.

19        A    Okay.

20        Q    And my question is given the testimony and

21   the document you've just looked at, will you agree to

22   number 25?

23        A    So, Ms. Walker, even in this document, it

24   just says, "An article by Mr. Ferak prompted a lot of

25   death threats to be directed at Mr. Colborn."

1          I'll agree to number 25 with my former

2    statement that I don't know if the article has

3    anything at all to do with the Avery case or if it's

4    an article about an unsolved hit-and-run.

5          **Q    Okay.  That's helpful.  Thank you.  How many**

6    **death threats did you get because of any article that**

7    **Mr. Ferak wrote?**

8          A    You know, I didn't separate them into

9    categories of, Well, Mr. Ferak wrote this, so I got X

10   amount of death threats.  I just kind of cataloged

11   them all.  Several.

12         **Q    And you don't have really -- if I'm**

13   **understanding you, you don't really have any way of**

14   **knowing whether the death threats you received were**

15   **because of Mr. Ferak or because of something else?**

16         A    Oh, yes, I do.  Sometimes they'd mention

17   Making a Murderer specifically, telling me that

18   Making a Murderer prompted them to call and --

19         **Q    Any other way?**

20         A    Well, I didn't receive any death threats

21   until after the release of Making a Murderer, and

22   Making a Murderer gave John Ferak most of his

23   material.

24         **Q    Okay.  Any other way?**

25         A    No, that's it.

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 16 of 108   Document 289-5
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1      Q    So we've talked earlier today about a

2   statement --

3                MR. BURNETT:  That's getting pretty

4   close.

5                MS. WALKER:  Yeah.  Can you all still

6   hear?  Okay.  I'll keep going through it so we don't

7   waste time.

8                MR. BURNETT:  How tall is this building?

9                MS. BARKER:  We're on the 18th floor.

10     Q    I lost my train of thought.  So we talked

11  earlier today --

12               MR. BURNETT:  It's a cheap tactic for

13  depositions.

14               MS. WALKER:  You commissioned the Blue

15  Angels, is that it?

16               MR. BURNETT:  Yeah.

17     Q    We talked earlier today about a statement

18  you made at the end of trial to the press.  Do you

19  remember that?

20     A    Yes, I do recall that.

21     Q    And given the stipulation your counsel read

22  into the record, I assume you made that with the

23  permission of the sheriff's department, correct?

24     A    We're talking the end of Steven Avery's

25  murder trial?

                                                         124

1      Q    Correct.

2      A    Yes.  The sheriff's department instructed me

3   to do it.

4      Q    And did you know that that statement was

5   recorded and included in Episode 8 of Making a

6   Murderer?

7      A    Well, having not watched Episode 8, no, I

8   don't know that statement was made.

9      Q    And I'll --

10      A    So I wouldn't know what context or anything.

11      Q    I'll read the statement to you.  You told

12   the press, I hope and pray that this verdict helps

13   put to rest any suspicions or loss of confidence that

14   this community may have felt towards our department

15   because I assure everyone that this agency has some

16   of the finest law enforcement officers in the country

17   in its employ.

18           I know you don't remember it word for word,

19   but does that sound like what you said?

20      A    I certainly would have stood up for our

21   department, yes, and I certainly -- and still pray

22   for the Halbach family, so that sounds consistent.

23      Q    Does it make you feel better to know that

24   that was included in Episode 8?

25           MR. BURNETT:  Objection, form.

Case 1:19-cv-00484-BHL  Filed 08/16/22  Page 18 of 108  Document 289-5
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1      A    I would have to watch Episode 8 and see in

2  which context -- how it was used.  Like, was it used

3  to ridicule me?  So then no, I wouldn't feel better

4  about how it was used.

5      **Q    But you don't plan to watch Episode 8,**

6  **correct?**

7      A    As I sit here right now today and talk with

8  you, no, I don't plan on watching Episode 8, but

9  certainly there's no reason I can't change my mind at

10  some point.

11     **Q    Okay.**

12          MS. WALKER:  Let's go to Exhibit 37.

13          (Exhibit 37-A marked for identification.)

14     A    Do I have that one or no?

15     **Q    I'm going to give it to you.**

16     A    Oh, okay.

17          MS. WALKER:  Sure.  So Exhibit 37

18  collectively is Mr. Colborn's responses to

19  interrogatories in this case.  I have marked the

20  different responses and supplemental responses and

21  signature pages as Exhibits 37-A, B, C, and D.  It's

22  a little confusing given the way things kind of came

23  in.

24     **Q    But let's start with Exhibit 37-A, which,**

25  **Mr. Colborn, I'll represent to you are the first**

1          A     Like have I taken anything today?

2          **Q     Yeah.  Do you have --**

3          A     I have acid reflux, so I took an antacid.

4          **Q     Uh-huh.**

5          A     I have asthma, so I have to take an inhaler

6     every morning.  I'm on a medication for anxiety.  I

7     can't give you the name of it.  Not because I'm

8     trying to withhold it, because I don't know, but you

9     have my records.  I believe I took one of those this

10    morning.

11         **Q     Okay.**

12              MS. WALKER:  It's nearly 1:00.  I think

13    this is a good place to break and have lunch and come

14    back.

15              MR. BURNETT:  Sure.  What time do you

16    want to resume?

17              MS. WALKER:  Let's go off the record.

18              MR. BURNETT:  Let's go off.

19              THE VIDEOGRAPHER:  Going off the record

20    at 12:54.

21              (Lunch recess held.)

22              THE VIDEOGRAPHER:  We're back on the

23    record at 2:13.

24         **Q     (By Ms. Walker:)  All right, Mr. Colborn.  I**

25    **have some wrap-up questions from items we were**

1    discussing before the lunch break, and the first one

2    is would you agree with me that your integrity had

3    been questioned and your reputation harmed at the

4    time of trial?

5         A    Yes.

6         Q    And you can't as you sit here today quantify

7    the reputational harm arising from trial and the

8    contemporaneous media coverage that came along with

9    the trial, can you?

10                   MR. BURNETT:  Objection, form.

11        A    I can say after the verdict, my reputation

12   and everything went back to how it was.

13        Q    How do you know that?

14        A    Because after his conviction, the negative

15   press stopped, people began being more favorable

16   about the events of the trial, the unfolding of the

17   trial, the conviction.  It was just a general

18   atmosphere that was more supportive.

19        Q    So the publicity disappeared, but the

20   articles that were written remained out there,

21   correct?

22        A    That were written during the trial?

23        Q    Yes.

24        A    I don't know when they archive those, but I

25   don't recall a blitzkrieg of negative press like

1    after the release of Making a Murderer after Steven

2    Avery's conviction.

3         **Q     You experienced sadness and anger and**

4    **frustration around the time of the trial, correct?**

5         A    I don't know per se sadness, but the other

6    two, yes.

7         **Q    Okay.  Anxiety?**

8         A    I don't really recall anxiety.

9         **Q    What about distress at the time of trial?**

10        A    I can't differentiate between the two.

11        **Q    You can't differentiate between?**

12        A    Anxiety and distress.  It seems to be one

13   and the same.  I can't really say I was distressed;

14   more angry.

15        **Q    All right.  Let's take a look at Exhibit 38,**

16   **which I will hand to you.**

17                 (Exhibit 38 marked for identification.)

18        A    Okay.  Thank you.

19        **Q    And I'll just ask you to confirm that this**

20   **is a text message exchange between you and Ms. Schuler,**

21   **and the date at the top there is July 2nd, 2017.  Do**

22   **you see that?**

23        A    Yes.

24        **Q    And that was 18 months, approximately,**

25   **before Making a Murderer was released, correct?**

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 22 of 108   Document 289-5
920.585.2341   365Reporting, LLC   www.365reporting.net

1    are not going to have a Perry Mason moment here."

2    Did I read that correctly?

3          A    Yes.

4          Q    So Mr. Strang here is saying just because I

5    didn't ask Mr. Colborn directly did you plant

6    evidence doesn't mean we're abandoning the planted

7    evidence theory.  Is that your understanding of what

8    I just read to you?

9          A    No, not really.

10         Q    Okay.  We'll let the transcript speak for

11   itself, and we'll move on.

12         A    Okay.

13         Q    Did you ever sue Dean Strang?

14         A    No.

15         Q    Why not?

16             MR. BURNETT:  Um...

17         Q    I don't want to know about conversations

18   with your attorney.  So if there's any reason other

19   than your attorney told you not to, I'd like to know

20   why you decided not to sue Dean Strang.

21         A    There is no other reason than what you just

22   stated.

23         Q    Do you understand that you can't sue people

24   for defamatory things they say about you in court?

25   And I'm not asking for what your attorneys have told

1     you.  I'm just asking for your personal

2     understanding.

3          A    Yes, I was made aware of that.

4          Q    So it's possible, in your view, that Dean

5     Strang and Jerry Buting defamed you in court and

6     that's why you didn't sue them?

7                    MR. BURNETT:  Objection, form.  I assume

8     it's subject to the same limitations previously

9     articulated --

10                   MS. WALKER:  Yes.

11                   MR. BURNETT:  -- to exclude

12     conversations with counsel?

13         Q    Is that why you didn't sue them, because

14     even though you believed they defamed you, you can't

15     hold them accountable for things they say about you

16     in court?

17                   MR. BURNETT:  Same objection and

18     instruction.

19         A    Since the only person I talked about that

20     with was an attorney, I guess I'm going to have to

21     decline to answer that.

22         Q    Well, Mr. Buting went on to write a book

23     about the case, correct?

24         A    He did.

25         Q    And you believe that book hurt your

                                                                              148

1    reputation, correct?

2          A    I don't know.  I never read the book.

3          **Q    You have no sense at all about whether it**

4    **hurt your reputation?**

5          A    I can surmise that it probably, yes, wasn't

6    complimentary.

7          **Q    Well, you could --**

8          A    But I didn't read it.

9          **Q    And you could have sued Jerry Buting for**

10   **things he said out of court in a book, correct?**

11         A    Correct.

12         **Q    And why didn't you?**

13              MR. BURNETT:  The same instruction.

14         A    The only person I discussed that with,

15   Ms. Walker, was an attorney.

16              (Exhibit 43 marked for identification.)

17         **Q    I'm going to hand you what's been marked as**

18   **Exhibit 43.  This is an email from you to**

19   **Mr. Griesbach of January 8th, 2019.  Do you see that?**

20         A    I do see that, that it's from Mike Griesbach

21   to me, but I'm not exactly sure why it's -- like,

22   doesn't have any conversation between me and Mike

23   Griesbach.  It appears to be an email between Mike

24   Griesbach and Brenda Schuler.

25         **Q    Well, that's exactly right, actually, and I**

149

1      can give you some context here.  So the bottom emails

2      are between Mr. Griesbach and Ms. Schuler.

3           A    Okay.

4           Q    And then I don't know what's behind that

5      redacted bar.

6           A    Okay.

7           Q    But I think that's where Mr. Griesbach spoke

8      to you directly and your counsel redacted it on the

9      theory that that's privileged information.  But I

10     want to ask you about --

11          A    Okay.

12          Q    -- what Mr. Griesbach told Brenda.  She

13     said, "I wish we could sue his slandering ass too."

14     Do you see that?

15          A    Yes.

16          Q    And then Mr. Griesbach said, "We've talked

17     about it... Andy, me, and another lawyer who was

18     almost on board a month ago.  I'd love to sue Buting,

19     but it's a very bad idea strategically, even though

20     it would defeat federal jurisdiction.  Can't further

21     explain now."  Did I read that correctly?

22          A    Yes.

23          Q    And so here's Michael Griesbach telling

24     someone who is not his client about conversations he

25     had with you, correct?

                                                              150

1    A    Yes, I do.

2        Q    But unless Mr. Griesbach was in the room

3    with you or any of us sitting here today were in the

4    room with you, none of us can know with 100 percent

5    certainty, correct?

6        A    I would think that I drove that point home

7    in the trial, and based on the subsequent conviction,

8    I believe the jury was convinced of it.

9        Q    We would have to trust you, correct,

10   Mr. Colborn?

11       A    Yes, you would have to trust that I was

12   telling the truth under oath.

13       Q    And the jury found for the prosecution and

14   convicted Mr. Avery, correct?

15       A    Yes, they did.

16       Q    And the jury's findings were included in

17   Making a Murderer, correct?

18            MR. BURNETT:  Objection, form.

19       Q    Do you know?

20       A    I have not watched a clip of or any of

21   Making a Murderer when the jury verdict is read or --

22   so I can't answer you positively.  I don't know what

23   was included.  I don't know what episode that was in.

24       Q    You have no reason to dispute that it was

25   included, correct?

1    I'm not alleging that.

2         Q    Okay.  And you have no reason to believe

3    that anyone from Netflix attended any portion of any

4    proceeding against Mr. Avery, correct?

5         A    I don't know that.

6         Q    I'm asking you only based on your personal

7    knowledge, you don't have any reason --

8         A    No.

9         Q    -- to believe that?

10        A    No, I do not.

11        Q    So I'll take you back to Exhibit 1 that you

12   signed this morning, and if you could flip to

13   Exhibit A, which is the stipulations we proposed.

14        A    One sec.  I've got to find that.  Okay.

15        Q    And flip to Exhibit A, which is the initial

16   stipulations we proposed.

17        A    Okay.

18        Q    And I want to point you to the first

19   seven -- sorry, the first six.  You declined to admit

20   these, and my question for you is as you sit here

21   today in your personal capacity, knowing that you

22   rely on your lawyers to process all the evidence, but

23   personally, let me ask you about number 1.  Are you

24   personally aware of any evidence that any Netflix

25   employee attended any portion of any proceeding

                                                        182

1    involving Steven Avery?

2         A    I personally do not know, correct.

3         Q    Number 2, do you have any personal knowledge

4    or are you personally aware of any evidence that any

5    Netflix employee has ever been to Manitowoc County,

6    Wisconsin?

7         A    During '16, '17 we had an abundance of

8    protests out in front of our courthouse with people

9    screaming how corrupt we were and how they should be

10   freed, and I thought Netflix was involved in that,

11   but I don't have any personal knowledge or evidence.

12   Like, no one ever brought someone to me and said,

13   "This person works for Netflix."

14        Q    Are you personally aware of any evidence

15   that any Netflix employee ever spoke to anyone who

16   appears in Making a Murderer?

17        A    I personally have no knowledge.  I don't

18   know if they did or they didn't.

19        Q    Are you personally aware of any evidence

20   that any Netflix employee ever received or read any

21   transcript from any proceeding against Mr. Avery or

22   involving Mr. Avery?

23        A    Number 4, I believe I did see documents that

24   did say that Netflix employees had a few transcripts

25   of the criminal trial of Mr. Avery.

183

1          Q     Do you remember anything about those

2     documents?

3          A     No, I don't.

4                MS. WALKER:  So we would just ask on the

5     record that to the extent those documents exist and

6     can be identified, that plaintiff produce them to us.

7          Q     Number 5 here, do you personally have any --

8     are you personally aware of any evidence that any

9     Netflix employee ever received or watched any raw

10    footage of any proceeding involving Mr. Avery?

11         A     I believe my attorneys do have evidence that

12    Netflix employees did view both civil and criminal --

13    or, yes, civil and criminal video of me testifying

14    both in deposition and in his criminal trial for the

15    murder of Teresa Halbach.

16         Q     Okay.  Do you understand that to be raw

17    footage or footage that was produced by the

18    filmmakers and then provided to Netflix or do you not

19    know?

20         A     I don't know.

21         Q     Number 6, are you personally aware of any

22    evidence that any Netflix employee ever received or

23    watched any other raw footage used by the filmmakers

24    in creating Making a Murderer?

25         A     I personally don't know what they used,

                                                          184

1    so -- or watched, no.

2         Q    So going back to Exhibit 2, the Second

3    Amended Complaint, and referring you to paragraph 46.

4         A    Okay.

5         Q    Actually, it will be on the -- on page 16,

6    the last --

7         A    Okay.

8         Q    -- of the bullet points, and you say that

9    among the things omitted from Making a Murderer, in

10   the last bullet here, was that Avery had a history of

11   extreme violence and sexual aggression against women,

12   including beating, strangulation, death threats,

13   attempted abduction at gunpoint, and allegations of

14   rape.  Did I read that correctly?

15        A    Yes.

16        Q    All right.  So let's take each of those in

17   that bullet one at a time.  Do you know if there was

18   evidence presented at trial that Avery ever beat a

19   woman?

20        A    I don't -- I don't know because I wasn't

21   allowed to attend the trial other than the day I

22   testified, so I don't know.

23        Q    So if I told you that the judge excluded

24   that evidence, you would have no reason to dispute

25   me --

```
 1        A    No.

 2        Q    -- because you weren't there?

 3        A    Correct.

 4        Q    Okay.  And so I take it you also don't know

 5   if evidence came in at trial that Avery ever

 6   strangled a woman?

 7        A    Do not know.

 8        Q    And you don't know if evidence came in at

 9   trial that Avery ever made a death threat against a

10   woman?

11        A    Again, not during the time I was testifying

12   did that come up.

13        Q    You don't know if that evidence was

14   allowed --

15        A    I don't know.

16        Q    -- or not?  And you don't know if the judge

17   allowed evidence to be presented to the jury that

18   Avery attempted to abduct a woman at gunpoint?  You

19   don't know?

20        A    I didn't see her testimony, but I believe

21   I'm aware that she did testify at his criminal trial,

22   the victim.

23             MS. WALKER:  Let's go ahead and mark

24   Exhibit 57.

25             (Exhibit 57 marked for identification.)
```

1          Q     I'm handing you what's been marked as

2     Exhibit 57, and as you can see from the front page

3     here, this is a cover letter and then an order on the

4     State's Motion to Allow the Introduction of Nine

5     Items of Other Acts Evidence.  Do you see that?

6          A     What page are we on?

7          Q     The very first page --

8          A     Okay.

9          Q     -- of Exhibit 57.

10         A     Yes, I see that.

11         Q     Okay.  And we can take some time to read

12    through this whole thing, but I can represent to you

13    that the -- in this order, the Court excluded

14    evidence regarding Avery's conviction related to his

15    having followed Sandy Morris in a vehicle, striking

16    her with his vehicle and forcing her off the roadway

17    and then pointing a loaded rifle at her and ordering

18    her to get out.  That evidence was excluded in this

19    order.  You don't have any reason to dispute that,

20    correct?

21         A     No.

22         Q     Okay.  And you have no way of knowing

23    because you weren't there if the judge permitted

24    evidence to be presented to the jury that Avery had

25    raped a woman, correct?

1      A    Correct.

2      Q    And so if Making a Murderer didn't include

3    that evidence, that's consistent with what happened

4    at trial as far as you know, correct?

5              MR. BURNETT:  Objection, form.

6      A    Could you repeat?  Sorry.

7      Q    Yeah.  If these things weren't included at

8    trial --

9      A    Uh-huh.

10     Q    -- and if Making a Murderer didn't include

11   them, then Making a Murderer was consistent with what

12   happened at trial, correct?

13             MR. BURNETT:  Objection, form.

14     A    I'm not going to agree that I --

15     Q    Okay.

16     A    -- believe that Making a Murderer was

17   consistent with what happened at trial.

18     Q    Well, you can -- I think we can agree that

19   if we want to know what evidence was excluded, we can

20   look at this Exhibit 57, correct?  That's the judge's

21   order?

22     A    Yes.

23     Q    Okay.  So we talked about the exclusion from

24   the trial of the Sandy Morris incident, and I

25   actually want to play a clip for you now from Making

                                                            188

1    a Murderer.  This will be from Episode 1, which we'll

2    mark in its entirety as Exhibit 58, and then the clip

3    we're about to play we'll mark as Exhibit 58-A.

4                    (Exhibits 58 and 58-A marked for

5    identification.)

6                    (Video playing.)

7        Q    Had you ever seen that clip from Making a

8    Murderer?

9        A    No.

10       Q    Okay.  So if you look back at Exhibit 57, I

11   can point you now directly to page 10, onto page 11,

12   where the Court excluded acts of recklessly

13   endangering the safety of Sandy Morris.  And while

14   you look for that, I'll just ask you, isn't it true,

15   Mr. Colborn, that even though the judge did not

16   permit the jury to hear that evidence, Making a

17   Murderer included it?

18                    MR. BURNETT:  Objection, form.

19       A    Yes.  A portion of his inter -- a portion of

20   his interview with Detective Conrad and a very small

21   portion of her testimony was included in the clip you

22   showed me, yes.

23       Q    And so in that sense at least, Making a

24   Murderer painted a less flattering picture of Steven

25   Avery than the jury was permitted to hear, correct?

189

1          MR. BURNETT:  Objection, form.

2      A    It would appear to me, based on the reaction

3   by people around the globe --

4      Q    Well, I'm going to move to strike, and I'd

5   just ask that you answer my question, that this is a

6   very unflattering thing to publicize about Steven

7   Avery, not even the jury got to hear it because it

8   was so prejudicial according to the judge, but the

9   filmmakers put it in the documentary, correct?

10          MR. BURNETT:  Objection, form.

11     A    Yes, it was in the clip you just showed me.

12     Q    You also complained in the Second Amended

13  Complaint that Making a Murderer portrayed an

14  incident involving animal abuse as an accident and at

15  worst a childhood prank.  Do you remember that

16  allegation?

17     A    Yes.

18     Q    Okay.  But you acknowledge that this story

19  about the animal abuse was omitted from Avery's

20  trial, correct?

21     A    I don't know if it came up in his trial or

22  not.

23     Q    Okay.  Let me point you to Exhibit 57 again

24  and specifically page 7.  There's a subhead, 1982 Act

25  of Criminal Cruelty Involving the Killing of a Cat.

190

1    Do you see that?

2                    MR. BURNETT:  What page are we on?

3                    THE WITNESS:  7.

4                    MS. WALKER:  Page 7.

5         Q    And if you read to the end of that Section 3

6    in the Court's order, the last sentence is that "The

7    offered evidence fails all three parts of the

8    Sullivan test and is not admissible."  Do you see

9    that?

10        A    What page is it where it mentions the

11   Sullivan test?

12        Q    On page 10 at the top.

13        A    Oh, 10.  Okay.  Are they talking about the

14   animal cruelty there, because it's shifted to

15   something else by then, but --

16        Q    So the animal cruelty section begins on

17   page 7 --

18        A    Uh-huh.

19        Q    -- and it goes through page 8, 9, and

20   concludes at the top of page 10.

21        A    All right.  I see the area you're talking

22   about.

23        Q    So that animal cruelty evidence was excluded

24   from trial, correct?

25        A    It looks like it.

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 37 of 108   Document 289-5
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1      Q     Did you know that Making a Murderer included

2    that story and showed it to viewers?

3                    MR. BURNETT:  Objection, form.

4      A     No, I didn't.

5      Q     Okay.  Let's play that clip.

6                    (Exhibit 58-B marked for identification.)

7                    (Video playing.)

8      Q     Had you ever seen that clip there?

9      A     I have not.

10      Q     So based on this clip and the one of Sandy

11    Morris, you would agree with me that viewers of

12    Making a Murderer got a more complete picture of

13    Mr. Avery's criminal history than the jurors did,

14    correct?

15                    MR. BURNETT:  Objection, form.

16      A     I would agree that a watered-down version of

17    his acts were portrayed in Making a Murderer while

18    they weren't allowed in court.

19      Q     So at least the viewers of the documentary

20    heard about him attacking a woman and burning a cat,

21    correct?

22      A     Yes.

23      Q     The jury didn't get to hear about that, did

24    they?

25      A     No.

192

1          MS. BARKER:  Excuse me, Counsel.  Is

2    that clip 58-B?

3          MS. WALKER:  Yes.  Thank you.

4     **Q    So even though you've not watched Making a**

5    **Murderer, I want to make sure that you understand the**

6    **full scope of what it covers.  Do you understand that**

7    **it documents the wrongful conviction for the Penny**

8    **Beerntsen rape?**

9     A    Yes.

10    **Q    And do you understand that it documents**

11   **Steven Avery's exoneration?**

12    A    I haven't watched an episode that -- in its

13   entirety, so I can't say how it's portrayed, but yes,

14   I understand that that's included in there.

15    **Q    And then you understand it documents the**

16   **investigation of Teresa Halbach's murder?**

17    A    Yes.

18    **Q    And Mr. Avery's trial for that murder?**

19    A    Yes.

20    **Q    And did you know it documents Mr. Dassey's**

21   **trial and conviction as well?**

22    A    I don't know that personally, but --

23    **Q    Is this the first you're ever hearing that?**

24    A    That Mr. Dassey's in there?  No.

25    **Q    You knew he was featured in the documentary?**

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 39 of 108   Document 289-5
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1    Q    Okay.  And you don't think their

2    perspective, their pro law enforcement world view,

3    keeps them from making a fair and objective

4    documentary I take it?

5    A    No, I don't.

6    Q    You're very pro law enforcement?

7    A    Yes.

8    Q    Pro military?

9    A    Yes.

10   Q    Conservative?

11   A    Yes.

12   Q    And you have a bias in that you are

13   100 percent convinced that Avery is guilty, correct?

14        MR. BURNETT:  Objection, form.

15   A    I don't have a bias that way.  He was

16   convicted by a jury of his peers.

17   Q    Well, he was --

18   A    So I believe in that verdict, yes.

19   Q    Okay.  He was also convicted of rape,

20   correct?

21   A    Yes.

22   Q    And that jury verdict was flat-out wrong,

23   correct?

24   A    Correct.

25   Q    So juries can get it wrong, correct?

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 40 of 108   Document 289-5
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1    A    Certainly.

2    Q    And even if you lose this case, you're going

3    to believe that Mr. Avery killed Teresa Halbach,

4    correct?

5    A    Yes.

6    Q    Okay.  And you believe Brendan Dassey was

7    involved in that crime, correct?

8    A    Yes.

9    Q    Ms. Schuler told us at her deposition that

10   the documentary she's making is going to be, quote,

11   very anti-Steven Avery, end quote.  Did you know that

12   that is her goal and her perspective?

13   A    No, I didn't know that.

14   Q    Do you think there's any problem with making

15   a documentary that's very pro -- very anti-Steven

16   Avery?

17   A    If she has factual information to back that

18   up, I don't have an issue with it.

19   Q    So as long as she's factual and accurate,

20   making a very slant --

21   A    And truthful.

22   Q    -- and truthful, making a very slanted

23   anti-Avery documentary is just fine?

24   A    I don't know --

25        MR. BURNETT:  Objection, form.

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 41 of 108   Document 289-5
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1    once or is it every single time?

**2**       Q    Did what happen once?

3         A    This dramatic or suspenseful or cliffhanger

4    or music.  Like once or twice, probably not grounds

5    for a lawsuit.  Every single time one single person

6    appears, ah, that might be different.

**7**       Q    Okay.  But it depends on context?

**8**       A    Yes.

**9**       Q    And we should view -- we should view the

**10**   documentary in its entirety; is that -- do you agree

**11**   with that?

12                   MR. BURNETT:  Objection, form,

13   foundation, legal conclusion.

**14**      Q    Do you agree with that?

**15**      A    Yes.

**16**      Q    Okay.  Episodes 1 through 10, correct?

**17**      A    Uh-huh.

**18**      Q    Let's go to Exhibit 35-H.  And here I was

**19**   asking -- this is page 231 of Schuler's deposition,

**20**   and here I was asking her about some of the fallout

**21**   from Making a Murderer and the potential fallout

**22**   from -- for Convicting a Murderer.  And at line 22 I

**23**   said to her, "But you'd agree with me that what the

**24**   crazy people out in the world decide to do shouldn't

**25**   stop filmmakers from making content."  There was an

1               CERTIFICATION PAGE

2

3    STATE OF WISCONSIN       )

4    MILWAUKEE COUNTY         )

5

6            I, PAULA M. HUETTENRAUCH, RMR, CRR,
     Notary Public in and for the State of Wisconsin, do
     hereby certify:

7

8            That prior to being examined, the
     deponent named in the foregoing deposition,
     ANDREW L. COLBORN, was by me duly sworn to testify

9    the truth, the whole truth, and nothing but the
     truth.

10

11           That said deposition was taken before
     me at the time, date, and place set forth; and I
     hereby certify the foregoing is a full, true, and

12   correct transcript of my shorthand notes so taken and
     thereafter reduced to computerized transcription

13   under my direction and supervision.

14           I further certify that I am neither
     counsel for nor related to any party to said action,

15   nor in any way interested in the outcome thereof; and
     that I have no contract with the parties, attorneys,

16   or persons with an interest in the action that
     affects or has a substantial tendency to affect

17   impartiality, or that requires me to provide any
     service not made available to all parties to the

18   action.

19

20   IN WITNESS WHEREOF, I have hereunto
     subscribed my name this 28th day of July, 2022.

21

22   *Paula Huettenrauch*

23   Paula M. Huettenrauch, RMR, CRR
     Notary Public - State of Wisconsin

24   My Commission Expires 8/18/2023

25

                                                      251

1                    UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF WISCONSIN
2        ----------------------------------------------------
     ANDREW COLBORN,
3                                              COPY

                  Plaintiff,
4
     -vs-                    CIVIL ACTION NO. 19-CV-0484-BHL
5
     NETFLIX, INC., ET AL.,           VOLUME II
6
                  Defendants.
7        ----------------------------------------------------

8            CONTINUED VIDEOTAPED DEPOSITION OF

9                     ANDREW L. COLBORN

10       ----------------------------------------------------

11   DATE:                July 22, 2022

12   TIME:                9:02 a.m. - 4:40 p.m.

13   LOCATION:            Godfrey & Kahn, S.C.
                          833 East Michigan Street
14                        Suite 1800
                          Milwaukee, Wisconsin  53202
15

16

17

18

19

20

21

22   REPORTED BY:
     Paula Huettenrauch, RMR, CRR
23   365Reporting, LLC

     VIDEOGRAPHER:
24   Jon Hansen, CLVS
     Video Concepts
25   608.408.7411

                                                              252

1              A P P E A R A N C E S

2

3      LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C., BY
       R. GEORGE BURNETT, ATTORNEY AT LAW
4      231 South Adams Street
       Green Bay, Wisconsin  54301
5      Gb@lcojlaw.com
       appeared on behalf of the Plaintiff.
6

7      ROCKSTEAD LAW, LLC, BY
       APRIL ROCKSTEAD BARKER, ATTORNEY AT LAW
8      525 North Lincoln Avenue
       Beaver Dam, Wisconsin  53916
9      aprilrbarker@rocksteadlaw.com
       appeared on behalf of the Plaintiff.
10

11     BALLARD SPAHR LLP, BY
       LEITA WALKER, ATTORNEY AT LAW
12     2000 IDS Center
       80 South 8th Street
13     Minneapolis, Minnesota  55402
       walkerl@ballardspahr.com
14     appeared on behalf of Netflix, Inc.

15

       BALLARD SPAHR LLP, BY
16     ISABELLA SALOMAO NASCIMENTO, ATTORNEY AT LAW
       2000 IDS Center
17     80 South 8th Street
       Minneapolis, Minnesota  55402
18     salomaonascimentoi@ballardspahr.com
       appeared on behalf of Netflix, Inc.
19

20     BALLARD SPAHR LLP, by
       EMMY S. PARSONS, ATTORNEY AT LAW
21     1909 K Street NW, Suite 1200
       Washington, DC  20006-1157
22     parsonse@ballardspahr.com
       appeared via Zoom videoconference on
23     behalf of Netflix, Inc.

24

25

253

1    BALLARD SPAHR LLP, by
     MATTHEW E. KELLEY, ATTORNEY AT LAW
2    1909 K Street NW, Suite 1200
     Washington, DC  20006-1157
3    kelleym@ballardspahr.com
     appeared via Zoom videoconference on
4    behalf of Netflix, Inc.

5
     JASSY VICK CAROLAN LLP, by
6    KEVIN L. VICK, ATTORNEY AT LAW
     355 South Grand Avenue, Suite 2450
7    Los Angeles, California  90071
     kvick@jassyvick.com
8    appeared on behalf of Chrome Media LLC,
     Laura Ricciardi, and Moira Demos.

9

10   JASSY VICK CAROLAN LLP, by
     MEGHAN E. FENZEL, ATTORNEY AT LAW
11   355 South Grand Avenue, Suite 2450
     Los Angeles, California  90071
12   mfenzel@jassyvick.com
     appeared via Zoom videoconference on
13   behalf of Chrome Media LLC, Laura Ricciardi, and
     Moira Demos.

14
     ***

15

16   ALSO PRESENT:

17   Debra Bursik, Paralegal

18   Moira Demos, Defendant

19   Laura Ricciardi, Defendant

20   Melinda LeMoine, Director, Litigation, Netflix, Inc.

21

22

23

24

25

                                                                    254

1    us, quote, But there wasn't anything in the

2    documentary that I believed.  Again, I didn't watch

3    it.  To the extent Avery's accusations made it into

4    the documentary, those accusations didn't change my

5    opinion of Andy.  That's not what caused our divorce,

6    end quote.  Do you dispute that?

7         A    Yes.

8         Q    Which part?

9         A    I believe I've already stipulated to this

10   whole marriage thing, so --

11        Q    Correct.  Should we rely on your

12   stipulation?

13        A    Yes.

14        Q    Okay.  Anything else you dispute in that

15   statement?

16        A    No, nothing beyond that.

17        Q    Your ex-wife told us under penalty of

18   perjury, quote, This lawsuit also had an impact on

19   our marriage and exacerbated Andy's fixation.  Andy

20   just couldn't let go of Making a Murderer and Avery's

21   accusations that he planted evidence to frame Avery

22   for the murder of Teresa Halbach, end quote.  Do you

23   dispute what your ex-wife said there?

24        A    No.  That's one of the examples of how I've

25   changed.  I can't let go of it.

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 47 of 108   Document 289-5
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1          Q     Okay.  Finally, she told us, quote, I wanted

2     to move on.  I didn't want to let Avery or Making a

3     Murderer ruin our lives.  Andy couldn't let it go

4     though.  The lawsuit only did more damage to us, end

5     quote.

6          Do you dispute that?

7          A     No.

8          Q     Okay.  So now we're going to go back to

9     Exhibit 1 and look at your stipulation number 45.

10     And you can set the list of names to the side.

11          A     Okay.

12          Q     So 45 says, "Some members of my law

13     enforcement community supported me after the release

14     of Making a Murderer but some did not," and you

15     requested before signing it that we add "some did

16     not."  You recall that?

17          A     Correct.

18          Q     And so I'd like to know the names of people

19     within the law enforcement community who did not

20     support you.

21          A     Well, I can't give you those names because I

22     don't know the -- the author of the article, but I

23     can give you the department.

24          Q     Sure.

25          A     Scotland Yard.

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 48 of 108   Document 239-5
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1    Q    I don't need it.  Mr. Colborn, would you

2    agree that almost by definition the people who left

3    those voicemails for you were unreasonable?

4    A    Yes.

5    Q    No reasonable person would react this way to

6    a documentary, correct?

7    A    I've had reasonable people question me about

8    it, yes.

9    Q    Well, that's not my question.  No reasonable

10   person would watch a documentary and then call and

11   leave a death threat, correct?

12   A    Well, I would hope not, but maybe your

13   definition of reasonable and mine might be different.

14   Q    What about under your definition?

15   A    I could see how someone could be so moved by

16   such a production that they may contemplate it.

17   Q    Uh-huh.  And follow through, you think

18   that's reasonable?

19   A    No, I don't think it's reasonable.

20   Q    Okay.  So now I want to talk a little more

21   about Ms. Maurer.  You didn't list her in your

22   interrogatory responses, and I think your explanation

23   for that yesterday was you haven't talked to her

24   about the facts -- underlying facts in this case or

25   this lawsuit, correct?

1          Q    And I'm in Exhibit A --

2          A    Okay.

3          Q    -- of Exhibit 1, which is our initial

4     letter.

5          A    Got it.

6          Q    And I'm at number 63.

7          A    Oh, okay.  Okay.

8          Q    So let me rephrase the question.  You agreed

9     to number 61, and you agreed to number 62, that the

10    relationship with Ms. Maurer harmed your marriage and

11    it harmed your relationship with your children.

12         A    Yes.

13         Q    And I'm trying to understand how the -- how

14    you can deny that none of this caused you anxiety and

15    distress.  Can you explain that?

16         A    Well, I guess --

17         Q    I can rephrase.  Did the divorce cause you

18    anxiety?

19         A    Sure.

20         Q    Did the divorce cause you distress?

21         A    I don't know about anxiety.  So --

22         Q    What's the word --

23         A    I'm not exactly sure of the difference in

24    definition between the two, but I would say it

25    certainly caused me some distress, yes.

301

1      Q     Did it cause you to take anxiety medication?

2      A     I was already prescribed anxiety medication

3    long before this happened.

4      Q     Did you take the anxiety medication because

5    you were anxious about the divorce and the impacts it

6    was having on your relationships?

7      A     No.

8      Q     Did it raise your blood pressure?

9      A     Well, I'm on meds for hypertension, again,

10    long before the divorce came.  So I don't frequently

11    check my blood pressure anymore.

12      Q     Okay.  Did it cause you to lose sleep or to

13    lose or gain weight or to drink alcohol more?

14      A     No.

15      Q     Any other form of distress it caused you?

16      A     No.

17      Q     Did it make you sad?

18      A     Yes, of course.

19      Q     How long was the period of difficulty before

20    you resolved things with your children?

21      A     Probably from May of '21 through maybe

22    September of '21, so that time frame.

23      Q     What happened in May?  Is that when you told

24    your children you were divorcing?

25      A     Yes.  Yes.

303

1        Q    Okay.

2        A    Well, none of my children, with the

3   exception of the youngest one, lives in Manitowoc

4   County.  The youngest one I told right away.

5        Q    So you stipulated that you voluntarily

6   retired from the sheriff's department, correct?

7        A    Yes.

8        Q    And you stipulated you had a retirement

9   party, correct?

10       A    Yes.

11       Q    And people came to the party?

12       A    Yes.

13       Q    And you felt supported at that party?

14       A    By the attendees?

15       Q    Yes.

16       A    I should mention the retirement party wasn't

17  just mine.  There were three of us that retired the

18  exact same day, all from the detective bureau.  So it

19  was a -- it was all of our parties, not just mine.

20       Q    You felt supported at that party?

21       A    Yes.

22       Q    So if you can look at that Exhibit 1 and the

23  proposed stipulation number 49.  Yeah, I think just

24  back a page or two there.

25       A    Okay.  Yeah.

                                                      304

1    correct?

2         A    I don't recall having a resumé, no.

3         Q    Okay.  And so presumably you were hired at

4    the hospital based solely on your reputation; is that

5    right?

6         A    Well, I filled out a job application online.

7    That's how I got the job.

8         Q    Did you know the person hiring you?

9         A    No.

10        Q    Did Making a Murderer come up during the

11   interview?

12        A    Yes.

13        Q    Had the person who interviewed you watched

14   it?

15        A    They didn't tell me whether they watched it

16   or not.

17        Q    Okay.  But the existence of the documentary

18   did not keep them from hiring you?

19        A    Okay.

20        Q    You got the job?

21        A    That is correct, yes.

22        Q    And you have good relationships with your

23   coworkers?

24        A    Yes.

25        Q    Have you taken any other job since retiring

311

1    A    Yes, I see it.

2    Q    You told the interviewer, "When I announced

3    my retirement, I received calls from tens, if not

4    hundreds, of people who thanked me or told me that I

5    had helped them through a difficult time or they were

6    glad that I did this or glad that I did that, and

7    numerous people have apologized to me for not coming

8    forward."  Did I read that correctly?

9    A    Yes.

10    Q    So we had asked you to stipulate to the

11    following statement:  "Upon announcing his

12    retirement, Mr. Colborn received supportive calls

13    from dozens of people."  Here you said you received

14    calls from tens, if not hundreds, of people.

15        So my question is will you stipulate to that

16    statement?  I'll read it again.  "Upon announcing his

17    retirement" --

18    A    Where is this statement?

19    Q    Yeah, it's in Exhibit 1.

20    A    In your --

21    Q    My letter, number 51.

22    A    Okay.  Thank you.  Okay.

23    Q    Will you agree to that statement, having

24    seen where it came from?

25    A    Yes.

1              MR. BURNETT:  Wait until we get a copy.

2       Q    Do you remember signing it?

3       A    I don't even totally re -- the document

4  looks vaguely familiar.  I'm not saying I didn't sign

5  it, but I don't recall it.

6       Q    Okay.  Do you remember ever feeling

7  obligated not to defend yourself publicly because of

8  any agreement you had with Ken Kratz?

9       A    Well, no, not -- yeah, I don't -- I don't

10  know.  I'm not sure what this is in reference to.  I

11  know he was trying to do a project similar to

12  Convicting a Murderer but with a different production

13  company.  So I'm assuming it might be related to that

14  but I'm not 100 percent positive, but if I had signed

15  it, I probably would have tried to uphold my end of

16  the agreement, but I don't recall signing it.

17       Q    So as far as you know, it would just be your

18  relationship with Convicting and your obligations to

19  the sheriff's department along the lines of what you

20  stipulated to yesterday that prevented you from

21  defending yourself publicly; is that correct?

22       A    Yes.

23       Q    Okay.  Do you recall telling the

24  interviewers for Convicting a Murderer that you were

25  inundated with requests by the media for interviews?

1      And I can point you to a document, but I'll ask --

2      before we take that time, I'll just ask if you

3      remember that.

4           A    Is it Number 8 again?

5           Q    It is.

6           A    Okay.

7           Q    Page 353.

8           A    Thank you.

9           Q    It's the third box.

10          A    Okay.  I'm there.

11          Q    That third box begins, "The story,

12     unfortunately, was not over.  I thought it was over,

13     but it wasn't.  Interestingly, after the guilty

14     verdict came out, I was inundated with requests by

15     the media for an interview."  Did I read that

16     correctly?

17          A    Yes.

18          Q    And you testified yesterday that except for

19     that initial press statement that your department

20     authorized you to give, you've never spoken to the

21     media or anyone publicly about the accusations you

22     believed were levied at you, correct?

23          A    Not that I recall.

24          Q    Okay.  Mr. Colborn, you are -- let me ask

25     this.  Do you understand the downsides that had for

328

1    dollar figure on it.

2        Q    Okay.

3        A    I would need a jury to make that

4    determination.

5        Q    What about Jerome Buting, can you put a

6    dollar figure on how much he's harmed your

7    reputation?

8        A    That would be the same answer.

9        Q    And Kathleen Zellner?

10       A    Kathleen Zellner?  She hasn't -- so she's

11   flipped from different theory to different theory.

12   Now law enforcement isn't even a suspect anymore.

13   Plus, this is being used in the course of the defense

14   of her client, so I would have no standing in that.

15       Q    What about Dean Strang, can you put a dollar

16   figure on how much he's harmed your reputation?

17       A    I would just repeat the same answer that I

18   gave you for Jerome Buting and John Ferak.

19       Q    Okay.  Mr. Colborn, my last few pages here

20   is about your medical records, and I'm going to try

21   not to go through them one by one in the interest of

22   time.  So I'll just ask you a couple questions, and

23   then we'll see how deep we have to go into these.

24       A    Okay.

25       Q    Isn't it true that you were not prescribed

332

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 57 of 108   Document 289-5
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    anxiety and hypertension medication until two weeks

2    after you filed this lawsuit, December 28th, 2018?

3          A    That's two different prescriptions.

4          Q    Yeah.  I can ask it this way.  Isn't it true

5    you weren't prescribed anxiety medication at any

6    point before you filed this lawsuit?

7          A    I don't recall the date I was prescribed.

8          Q    Well, you didn't go on anxiety medication

9    when Making a Murderer was released, correct?

10         A    No.

11         Q    And you didn't go on anxiety medication that

12   first year when you have told us you were

13   experiencing all this backlash from Making a

14   Murderer, correct?

15         A    Correct.

16         Q    And you didn't go on it 2 -- within the

17   second year after its release in 2017, correct?

18         A    Do you have my medical record there so I can

19   look at the date?

20         Q    Yeah.  Exhibit 120.

21               (Exhibit 120 marked for identification.)

22         A    Thank you.

23         Q    Uh-huh.  So --

24         A    Where is the date?

25         Q    Yeah, I'm trying to find it for you.  So the

1    date is about halfway down the page.  It says Today's

2    Visit.  You saw Theresa Krueger-Junk, Nurse

3    Practitioner, on Friday, December 28th of 2018.  Do

4    you see that?  And then above there it says you

5    started taking buspirone and isinopril.

6         A    Lisinopril.

7         Q    Thank you.

8         A    Yes.

9         Q    Okay.

10         A    Yeah, I see the -- I see the date.

11         Q    Okay.  And does that jog your memory as to

12    whether it was December 28th, 2018 when you first

13    started taking those medications?

14         A    Yes.

15         Q    Okay.  So not one, not two, but three entire

16    years after Making a Murderer was released, correct?

17         A    Correct.

18         Q    And, in fact, it was filing the lawsuit that

19    seemed to raise your anxiety levels; is that correct?

20         A    No.

21         Q    Well, the lawsuit was filed in December

22    2018, and about eleven days later is when you went on

23    these anxiety and blood pressure medications,

24    correct?

25              A    I would have to check on the blood pressure

1    because I thought it was a preceding visit, but I'm

2    not 100 percent positive, but certainly I was on them

3    by this visit.  It was the fact that this just was

4    never going away probably --

5         Q    Okay.  When do you think you went on --

6         A    -- is the greatest --

7         Q    Oh, I didn't mean to interrupt.

8         A    That's okay.

9         Q    When did you think you went on blood

10   pressure medication?

11        A    So because I have asthma, I have to have a

12   visit every six months as opposed to a year.  So I

13   thought it was the six-month visit before that that I

14   would have gone on blood pressure medication.

15        Q    When would that have been approximately, the

16   date?

17        A    Well, I'm assuming June of '18.

18        Q    Okay.  Does asthma tend to cause high blood

19   pressure; do you know?

20        A    My asthma's pretty well controlled, but I

21   don't -- I don't know if hypertension is a by-product

22   of having asthma, for lack of a better word.

23              (Exhibit 117 marked for identification.)

24        Q    Okay.  I'm going to hand you what we've

25   marked as Exhibit 117.  This is another medical

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 60 of 108   Document 289-5
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    record.  You can see about a third of the way down

2    the page the date of this visit was December 14th,

3    2018, which would have been three or four days before

4    you filed the lawsuit in this case.  Do you see that?

5         A    Okay.

6         Q    And if you flip to the second page, at the

7    very bottom there's a note that says, "Informed

8    patient his blood pressure is slightly elevated.

9    Discussed diet/salt restriction/exercise.  He will

10   monitor blood pressure at home and follow up if he

11   notices it stays elevated."  Did I read that

12   correctly?

13        A    Yes, you did.

14        Q    Does this jog your memory that --

15        A    Yes.

16        Q    -- this was maybe the first time you had

17   elevated blood pressure?

18        A    Correct.  So --

19        Q    Three days or four days before you filed the

20   lawsuit?

21        A    Correct.

22             (Exhibit 112 marked for identification.)

23        Q    Okay.  I'm going to hand you Exhibit 112.

24   This is another medical report.

25        A    Okay.

336

1      Q      This is from February 2018.  Do you see that

2   at the top?

3      A      Where it says dictated on 2/9/18 or no?

4      Q      I was looking at filed on 2/12/18, but --

5      A      Okay.

6      Q      -- it says you were seen on 2/9/18.  So

7   anyway, February '18, correct?

8      A      Yes.

9      Q      Okay.  If you could flip to the third page.

10      A      Is it page 155 that you want?

11      Q      Yeah, and also 156.

12      A      Okay.

13      Q      You see it's just --

14      A      Got it.

15      Q      -- off by one.  So this would have been two

16   and a half years or so after Making a Murderer's

17   release, two years?  Do you see that?

18      A      Yes.

19      Q      Okay.  And you filled out two screening

20   questionnaires.  One was the Depression Questionnaire

21   where zero means not at all and 3 is nearly every

22   day, and you scored a 1 out of, I think, 30 points

23   here.  There's ten items.  Does that sound right to

24   you?

25      A      Yes.

337

1        Q     Okay.  So that's a very low score on the

2    Depression Scale, correct?

3        A     Yes.

4        Q     Okay.  And you were being honest when you

5    completed this questionnaire?

6        A     Maybe.  I don't know if I was honest or not.

7    I didn't want to be put on any sort of medication.

8        Q     Okay.  Well, this is --

9        A     So I may have stretched things, but I would

10   think that for the most part I was honest.

11       Q     Okay.  This is the only -- medical records

12   are the only evidence we have of your alleged

13   anxiety, correct?

14       A     Correct.

15       Q     Okay.  The second questionnaire is the GAD,

16   which is the General Anxiety Disorder questionnaire.

17   Again, zero means no anxiety at all, and in every

18   category you put a zero, correct?

19       A     Correct.

20       Q     Okay.  On the next page, toward the bottom,

21   in all caps there's a word that says PSYCH with a

22   colon.  Do you see that?

23       A     Is it on 157?

24       Q     Uh-huh.

25       A     No, I don't see that.

1          Q     I think -- so do you see there's -- there's

2     page 156 of the medical report and then there's

3     COLBORN 157?

4          A     Yeah, I have --

5          Q     So look at --

6          A     Oh, I see.  Okay.

7          Q     Look at COLBORN 157.

8          A     Yeah, that's the page I have, COLBORN 157.

9          Q     Correct.  And so do you see right here PSYCH

10    at the top?

11         A     Okay.

12         Q     It's actually at the top and the bottom,

13    PSYCH?

14         A     Yes.

15         Q     It says, "Denies anxiety, depression, or

16    mania."

17         A     Yes.

18         Q     Do you see that?

19         A     Yes.

20         Q     And that's accurate, correct?

21         A     It's accurate that I denied telling her I

22    had it, yes.

23         Q     Uh-huh.  Okay.  And, again, all we have to

24    go on in terms of your anxiety and distress and

25    emotional distress is your medical records, correct?

 1             MR. BURNETT:  Let me object to the form

 2     of the question.  Go ahead.

 3         Q    And your testimony here today, that's all

 4     we've got, correct?

 5         A    Correct.

 6         Q    Okay.  I don't think I've given you

 7     Exhibit 123, but I'm about to.

 8         A    Okay.

 9             (Exhibit 123 marked for identification.)

10         Q    And this is another medical record.  You can

11     see at the top under Encounter Information, it says

12     2/20 of 2019.  Do you see that?

13         A    Yes.

14         Q    Okay.  About a year later; is that right?

15         A    Yes.

16         Q    Okay.  Go to the second page of that

17     document.  At the very top it says Anxiety.  Do you

18     see that word?

19         A    Yes.

20         Q    And you told the doctor your personal

21     situation had improved.  Do you see that?

22         A    Uh-huh.

23         Q    Okay.  And then there's on that same page

24     another Generalized Anxiety Disorder Questionnaire.

25     Do you see that?

                                                              340

1        A    Yes.

2        Q    And you put mostly zeros.  You scored a 2

3   out of a possible 21 points.  Do you see that?

4        A    Uh-huh.  Yes.

5        Q    Okay.  You were accurate in answering that

6   questionnaire?

7        A    Yes.

8                MS. WALKER:  All right.  So let's go off

9   the record.  I think I'm done, but I just want to

10  check my notes.

11               THE VIDEOGRAPHER:  Going off the record

12  at 10:59.

13               (Brief recess held.)

14               THE VIDEOGRAPHER:  We're back on the

15  record at 11:18.

16               MR. BURNETT:  Kevin, can I go ahead and

17  make that statement before you start?

18               MR. VICK:  Sure.

19               MR. BURNETT:  We've had a chance to

20  discuss the time arrangement off the record, and I

21  suspect we've exceeded the general rule for seven

22  hours.  I've talked to Mr. Vick, and I'm going to let

23  him continue to question Mr. Colborn with the

24  recognition that most of his questions are going to

25  be in the -- on the subject matters -- on subject

1    the last question, the question before it?

2        Q    Oh, sure.

3        A    Can I have that read back to me --

4        Q    Yeah.

5        A    -- please?

6        Q    Do you agree that Mr. Kratz was asking

7    questions here to make it clear that this call didn't

8    motivate you to frame Mr. Avery for the murder of

9    Ms. Halbach?

10       A    Yes.

11       Q    And to make clear that you didn't plant

12   evidence against Mr. Avery?

13       A    I don't know if this had anything to do with

14   planting evidence.  He was -- well, I guess if we go

15   on to the next page, yes.  I'm only -- I'm only on

16   47.  Are we including 48?

17       Q    Oh, to be clear, I was asking about 47 and

18   48.

19       A    Okay.

20       Q    If you'd like a moment to review, that's

21   fine.

22       A    Okay.  I got it.  Yes, that came up as well.

23       Q    Is there anything I'm missing here that you

24   would say is, you know, a crucial point in your

25   testimony?

355

1          MR. BURNETT:  Objection, form.

2      A    They -- to start off, they eliminated the --

3  my identification of myself when I answered the

4  phone.  I answered the phone.  I said, "Manitowoc

5  County Jail, Officer Colborn."  I didn't identify

6  myself as a deputy.  By eliminating that, people

7  watching this -- and I'm dressed in a law enforcement

8  uniform, when I'm testifying, people automatically

9  assume that when I was working in '94, '95, I'm a

10  sworn law enforcement officer by eliminating that,

11  because if I was a sworn law enforcement officer, my

12  answering the phone would have been Manitowoc County

13  Jail, Deputy Colborn, but I wasn't a deputy at the

14  time.  I'm a non-sworn corrections officer.  So

15  people now are like, Hmm, he's a law enforcement

16  officer but he doesn't do nothing with this

17  information.

18      **Q    And is that why you transferred the call to**

19  **the detectives --**

20      A    Correct.

21      **Q    -- detective and the sheriff?**

22      A    I had no authority to --

23          MR. BURNETT:  You've got to let him

24  finish.

25          COURT REPORTER:  Yeah, I missed the end

356

1    of your question, Kevin.

2              THE WITNESS:  I'm sorry.

3         Q    Is that why you transferred the call to the

4    sheriff's office?

5              MR. BURNETT:  Go ahead.

6         A    Well, the jail is part of the sheriff's

7    office, but that's why I transferred the call to an

8    investigator, yes, sir.

9         Q    Do you know if that fact is reflected in

10   Making a Murderer, that you transferred the call to a

11   detective?  I'm not quizzing you on the contents of

12   that, Mr. Colborn.  I'm just asking if you know.

13        A    I don't know if it's in Making a Murderer or

14   not.

15        Q    Let's --

16        A    And I --

17        Q    Let's look at a different clip.

18        A    Okay.

19        Q    This is Episode 7 still, and I'm looking at

20   minute 17, second 36 to minute 19, second 10.  Am I

21   still sharing?  Yes.

22              (Video playing.)

23        Q    So the clip that we just saw, Mr. Colborn,

24   that makes clear that you received this call in 1994

25   or '95 when you were a corrections officer, right?

1    wishy-washy about that, pretty unsure of himself.

2    For instance, "Have you ever planted any evidence

3    against Mr. Avery?" my response at trial was, "That

4    is ridiculous, no, I have not."  And then the second

5    question Mr. Kratz asked me, "Have you ever planted

6    any evidence against anybody in the course of your

7    law enforcement career?" that whole question is

8    eliminated.  Instead, it looks like I answered, "Have

9    you ever planted evidence against Mr. Avery" by

10   saying, "I have to say this is the first time my

11   integrity has been questioned."  That doesn't come

12   across very forceful or convincing.  It's hardly

13   answering the question.  So I don't believe that's an

14   accurate portrayal.

15        **Q    Did you feel that accusations that you**

16   **planted evidence against Mr. Avery were calling into**

17   **question your integrity?**

18        A    The question was have you ever planted any

19   evidence against anybody in the course of your law

20   enforcement career.  That's my answer to that

21   question.

22        **Q    Mr. Colborn, I'm going to move to strike.**

23   **That wasn't my question.**

24        **My question is leaving this for a second,**

25   **did you feel that accusations against you that you**

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 70 of 108   Document 289-5
920.585.2341 │ 365Reporting, LLC │ www.365reporting.net

1    planted evidence against Mr. Avery, that that called

2    into question your integrity as a law enforcement

3    officer?

4         A    Yes.

5         Q    And do you feel like this scene shows you

6    denying that you planted any evidence against

7    Mr. Avery?

8         A    I'm sorry.  The scene on Making a

9    Murderer --

10        Q    Sure.

11        A    -- that you just showed me?

12        Q    The clip we just -- we just --

13        A    Is that what you are asking about?

14        Q    The clip we just looked at, you deny having

15   planted any evidence against Mr. Avery, right?

16        A    Yes.

17        Q    Okay.  Last one.  If you could move on to

18   page 52 of Exhibit B.

19        A    Okay.

20        Q    And what I'm interested in here is where it

21   starts, oh, maybe a quarter of the page down, it says

22   Redirect Examination.

23        A    Okay.  I see it.

24        Q    So just looking at that section.

25        A    Okay.

360

1       A     Yes.

2       Q     -- that Dean Strang asked about this subject

3   matter during his cross-exam.

4       A     Yes.

5       Q     And then Mr. Kratz on redirect wanted to

6   respond to some of the points that Mr. Strang had

7   raised, right?

8       A     Yes.

9       Q     Mr. Kratz wanted to make clear that you

10   hadn't written a report about the call in 1994 or

11   '95?

12       A     Yes.

13       Q     And that if you had written a report you

14   wouldn't have known what it was about; is that right?

15       A     Correct.

16       Q     That you didn't know the call was even about

17   Mr. Avery, right?

18       A     Correct.

19       Q     Is there anything I'm missing here that's

20   key to understanding your testimony?

21             MR. BURNETT:  Objection, form.

22       A     I explained in the presence of -- all these

23   questions were in the presence of the jury.  I

24   explained in the presence of the jury my reason that

25   I didn't write a report has been eliminated from my

362

1    testimony.  It just simply says, "I don't know what

2    it would have been about," and that was actually a

3    question, "that I received a call and transferred it

4    to the Detective Division."  There would have been no

5    need to write a report every time you receive a

6    telephone call and transfer it.  Certainly there's no

7    agency on the face of the Earth that does a report

8    about that, and that whole explanation has been

9    eliminated from my testimony there.

10          Q    Let's take a look at the clip.

11          A    Okay.

12          Q    And this is still in Episode 7.  It's at

13    minute 23, second 48 to minute 24, second 5.

14                (Video playing.)

15          Q    So the clip that we watched, again, it made

16    clear that you didn't write a report in 1994 or '95

17    about the call, correct?

18          A    Yes.

19          Q    That if you had written a report, you

20    wouldn't have known what it was about, right?

21          A    Correct.

22          Q    And we can agree that the line about whether

23    you knew the call was about Mr. Avery, that's not in

24    this clip, right?

25          A    Correct.

363

1       Steven Avery case with the first episode airing

2       tonight," right?

3              A     Yes.

4              Q     I'm looking down at about the fifth line in

5       the middle.  Do you see where it begins and it says,

6       "I didn't know Steven Avery"?

7              A     Yeah.  Yes.

8              Q     I'll read that.  It says, "I didn't know

9       Steven Avery from Adam until two years into my

10      employment with MTSO in 1994, and then only by name."

11      Did I read that correctly?

12             A     Yes.

13             Q     Does that refresh your recollection that it

14      would have been in 1994 when you first heard the name

15      Steven Avery?

16             A     I see it has 1994 on that.  I believe that's

17      a typo.  I don't recall anything in '94 when I was

18      working in the jail as it pertained to Steven Avery.

19      I really don't.

20             Q     You just told me that your employment began

21      with the Manitowoc Sheriff's Office in 1994, right?

22             A     No, '92.

23             Q     '92 rather, yes.  In '92, correct?

24             A     '92, yes.

25             Q     But this sentence says, "I didn't know Steve

1      Avery from Adam until two years into my employment

2      with MTSO in 1994," right?

3          A    Right.

4          Q    So wouldn't that timeline be correct then?

5          A    Well, the timeline is correct, but I -- I

6      was confusing it with something, I guess.  I don't

7      recall -- I can't sit here and tell you how I heard

8      the name Steven Avery in 1994 because I don't recall.

9          Q    But you would agree with me that that's what

10     it says here in this email that you wrote in 2015?

11         A    Yes, I agree with you that's -- yes, sir.

12         Q    Do you remember what you heard the first

13     time that you heard about Steven Avery?

14         A    Well, my recollection is the first time I

15     heard about Steven Avery was in '96.

16         Q    Okay.  We've talked about the timing --

17         A    Uh-huh.

18         Q    -- and that you're saying you think it's

19     1996 despite the fact this document is saying 1994.

20         A    Yes.

21         Q    I want to move on to the question of what

22     did you hear when you first heard Steven -- about

23     Steven Avery, regardless of the time of when that

24     occurred.

25         A    Okay.

                                                              367

1    So I thought it's probably a current jail inmate.  He

2    didn't give me a name, and I said -- again, I

3    identified myself as a corrections officer.  He

4    recognized that I wasn't a law enforcement officer

5    and that he had called the jail.  So I either told

6    him, "I think you're going to probably want to talk

7    to a detective" or he said, "Can you connect me to a

8    detective?"  And I gave him the number to which I was

9    transferring him, and then I transferred it to our --

10   the chief investigator, which that position has

11   changed to a lieutenant.  But at the time his rank

12   was CI, chief investigator, and I transferred it to

13   his office phone.

14        Q    **Who was the chief investigator at that time?**

15        A    Gene Kusche.

16        Q    **And that's whom you transferred the call to?**

17        A    Yes, sir.

18        Q    **Did the caller from the other county --**

19        A    Uh-huh.

20        Q    **-- did they mention anything about the**

21   **nature of the underlying crime?**

22        A    All they said was assault, which could be a

23   bar fight, it could be a DVO.

24        Q    **And location, they -- they -- he told -- was**

25   **it a he?**

1    looked at earlier, which was the statement you

2    prepared on September 12th?

3         A    Yes.

4         Q    Now -- so would you agree that based on this

5    document, at least what this document purports to say

6    is that your statement was, in fact, kept in the

7    sheriff's department safe?

8         A    Yes.

9         Q    And yesterday you stipulated to that fact,

10   right?

11        A    Yes.

12        Q    Okay.  Now, you said that James Lenk had

13   given some incorrect information to Sheriff Petersen?

14        A    Yes.

15        Q    How do you know that?

16        A    The paragraph that reads, "Sergeant Colborn

17   said he was later informed by someone that the case

18   was already solved and the right person was

19   arrested."  I never said that.

20        Q    And how do you know that that's what he

21   passed on to Sheriff Petersen?

22        A    I'm reading it off his statement, so -- I

23   wasn't there when he -- I don't know what he said

24   verbally to the sheriff.

25        Q    That was going to be my question, is whether

                                                              404

1    the lawsuit.  The other two I don't believe so.

2        Q    How much of Making a Murderer would you

3    estimate that you watched before you filed the

4    lawsuit?

5        A    Like in what context?  Minutes?

6        Q    Sure, minutes.

7        A    Less than 30.

8        Q    How about as you sit here today, do you have

9    a sense of total number of minutes?  And if you want

10   to give me a range, that's fine.

11       A    45 to 60.  Probably less than 60.  30 to 45.

12       Q    Is that -- so you've only -- let me make

13   sure I'm understanding this correctly.  Have you

14   watched 30 to 45 more minutes or is it still 30 to

15   45 minutes total, meaning --

16       A    No.

17       Q    -- you've only watched an extra --

18       A    30 to 45 more minutes, additional minutes.

19       Q    Oh, okay.  Gotcha.

20       A    Sorry.

21       Q    So then it's a total of like an hour to hour

22   15?

23       A    Possibly, yes.

24            MR. VICK:  Okay.  This is a good time to

25   take a break.

                                                              411

1    said, "Well, we're going to get a game plan together.

2    We might bring in one more detective, and we're going

3    to wait until he shows up."  I said, "Well, by now,

4    they might start to realize that this girl's missing.

5    I'm going to go sit on the Zipperers' residence until

6    you guys are ready to go out."  So I sat in a

7    different patrol car, because I had a marked unit.  I

8    had to turn that back over, I think.  I don't believe

9    I took a marked unit out there, but I might have.

10   And I sat in the parking lot of a church.  And

11   there's a point that Brenda thinks Dave Remiker asked

12   me to run the plate and that's when I called it in,

13   but I don't believe that to be the case, but I didn't

14   argue with her that it isn't possible.

15        Q    You're just not sure?

16        A    I'm relatively sure I called it in at 18:37.

17   I seem to remember doing that.  But I'm not saying

18   her theory isn't impossible.

19        Q    Let's look at Exhibit 1114.

20             (Exhibit 1114 marked for identification.)

21        Q    Is this another text chain between you and

22   Brenda Schuler?

23        A    I don't know why it says it -- like, theirs

24   has my phone number.  This says LT ALC, but the date

25   is 2020, so I'm out of law enforcement by that time.

1    Strang.

2         Q    I think you're right, but you made two of --

3    you made two denials that we saw in that clip

4    earlier, right?

5         A    Yes.

6         Q    I'd like you to look at Exhibit 2, which is

7    the -- your Second Amended Complaint.

8         A    Oh, I actually have that one handy for once.

9         Q    And I'd like for you to look at paragraph

10   33, and I'll read the paragraph.

11        A    Okay.

12        Q    It says, "A central part of Avery's defense

13   at trial was that Plaintiff and other Manitowoc

14   officers planted Halbach's HUV" [sic] "at the Avery

15   Salvage Yard where Avery resided in a house trailer.

16   With Plaintiff on the stand, Avery's attorneys played

17   portions of his call to dispatch in an effort to

18   convince jurors that he came upon the SUV at an

19   undisclosed location on November 3rd, two days before

20   it was found at the salvage yard.  Cross examining

21   Plaintiff about the contents of the call, Avery's

22   attorneys suggested that Plaintiff was looking

23   directly at Halbach's vehicle when he called

24   dispatch.  The claim is entirely baseless and false,

25   and Defendants knew of its falsity."  Did I read that

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 80 of 108   Document 289-5
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    right?

2         A    Yes.

3         Q    What is the basis for your allegation that

4    defendants knew of the falsity of this central part

5    of Avery's defense?

6              MR. BURNETT:  Objection, foundation.

7    Go ahead.

8         A    They were sitting in the courtroom and saw

9    my complete unedited testimony.

10        Q    Now, you were alone when you made the call

11   to dispatch you said, right?

12        A    Yes.

13        Q    So you're the only one that would know for

14   certain whether or not you were looking at Teresa

15   Halbach's car when you made that call, correct?

16        A    Yes.

17        Q    And Avery's --

18        A    I don't have an eyewitness with me, no.

19        Q    And Avery's attorneys were suggesting the

20   opposite, right?

21        A    I wasn't really sure what Avery's attorneys

22   were suggesting, and I don't want to speculate or

23   tell you that that's what they were doing because I

24   don't know.

25        Q    But your testimony at trial and your

1      Q    But it's a sentiment that some people were

2   saying at the time, right?

3                MR. BURNETT:  Objection, foundation.

4      A    Yeah.

5      Q    It's a sentiment that some people expressed

6   to you at the time?

7      A    Uh-huh.  Yes.

8      Q    So then, Mr. Colborn, how can you say that

9   my clients knew that Avery's defense attorneys'

10  theory was false?

11               MR. BURNETT:  Objection, form.

12     A    For the reason that I said.  They sat in the

13  courtroom the entire time, so they were privy to

14  information that the average citizen wouldn't have.

15     Q    What was that information?

16     A    Again, we had a gag order.  So when people

17  would ask me that question, I always had to say, "We

18  can't discuss the case."  There was a lot of people

19  that didn't know for a long time that Brendan Dassey

20  had confessed to investigators and then investigators

21  were able to locate evidence based on Brendan's

22  confession.  People may not have known that the

23  murder weapon was hanging over his bed.  People may

24  not have known her bones were in his backyard after

25  he mutilated her and burned her up in his pit.  They

                                                          441

1    needle."

2         A    Yes.

3         Q    "The hypodermic needle hole in this case was

4    made when a specimen of Avery's blood was drawn by a

5    phlebotomist and stored in the vial in connection

6    with a 1996 post-conviction motion in his wrongful

7    conviction case.  The procedure necessarily resulted

8    in the creation of a hole in the rubber stopper.  The

9    phlebotomist who drew the specimen from Avery in 1996

10   was prepared to testify that's what happened in this

11   instance."  Did I read that correctly?

12        A    Yes.

13        Q    What is the basis for your allegation in the

14   next sentence which is, "Having attended the trial in

15   its entirety, Defendants Ricciardi and Demos were

16   aware of the routine nature of the hole on the vial's

17   rubber stopper and that the phlebotomist who drew the

18   specimen from Avery was prepared to testify."

19             MR. BURNETT:  Objection, foundation.

20        Q    Or let me rephrase that.  Do you have a

21   personal knowledge basis for making the allegation in

22   that sentence I just read?

23        A    I'm personally aware that your clients were

24   in the court for its entirety, and I've seen the

25   Making a Murderer episode where it's portrayed as a

1    great day for the defense when they discovered this

2    vial that I'm assuming could have only been filmed by

3    your defendants -- your clients I mean.  I'm sorry.

4         Q    Would it surprise you to learn that they

5    didn't film it?

6         A    Yes, it would.

7         Q    Do you recall that Norm Gahn is in there, in

8    that section, when it's being discovered?

9         A    I viewed the portion where Jerome Buting is

10   making a call to co-counsel.

11        Q    Do you recall a little bit later Norm Gahn

12   is in it too, who is one of the prosecutors?

13        A    I know who Norm Gahn is, but I didn't view

14   that portion of it.

15        Q    So why do you think that my clients were

16   aware of the routine nature of the hole on the vial's

17   rubber stopper and that the phlebotomist who drew the

18   specimen from Avery was prepared to testify?

19             MR. BURNETT:  Objection, foundation.

20        Q    Do you have any personal knowledge to

21   support that portion of the allegation?

22        A    I don't recall the motion hearing where that

23   was discussed, if I was present or not, so I can't --

24   again, a lot of these documents are the work product

25   of my counsel.  I didn't compile all this information

1    and Deputy Kucharski, can you understand how they

2    might have some uncertainty about your three's

3    explanation about how the key came to be found that

4    day?

5                    MR. BURNETT:  Objection, form,

6    foundation.

7         A    I don't have an instinctive distrust of law

8    enforcement.  I trust law enforcement because I was

9    in it for 27 years.  So I like to think that my

10   testimony and when I say something, people understand

11   that I'm under oath and I'm saying the truth.  If I

12   don't know the answer to a question, I say I don't

13   know.

14        Q    But can you understand how people who didn't

15   know you personally, I'm not saying that they

16   necessarily think that you're lying, but how they

17   could walk away from hearing the explanation of how

18   the key was found and just say, "I'm not sure what

19   happened"?

20                   MR. BURNETT:  Objection --

21        Q    Can you understand that?

22                   MR. BURNETT:  Objection to form and

23   foundation.

24        A    My explanation at trial was the only

25   possible way I could think that that key got to where

1        A     Correct.

2        Q     And Ms. Walker talked yesterday about

3    certain things regarding a number of Mr. Avery's

4    prior crimes that were not presented to the jury

5    also, right?

6        A     Yes.  We talked about that yesterday, yes.

7        Q     So I won't repeat the stuff that you went

8    over yesterday, but I did want to talk about some

9    other things that are included in Making a Murderer

10   that present Steven Avery in a negative light that

11   were not even presented to the jury but are reflected

12   in Making a Murderer.

13            Are you aware that Making a Murderer

14   includes Chuck Avery's statement that after Brendan

15   Dassey's confession, he was, quote, pretty positive,

16   end quote, that Steven probably had murdered Teresa

17   Halbach?

18       A     No, I haven't seen that.

19       Q     And Chuck Avery is Steven Avery's brother,

20   right?

21       A     Yes.

22       Q     Are you aware that Making a Murderer

23   includes a scene where Barb Tadych tells Steven Avery

24   that she hopes he burns in hell for what he did?

25       A     Her name might be pronounced "Todd-ick," but

                                                            471

920.585.2341   |   365Reporting, LLC   |   www.365reporting.net

1    no, I'm not aware of that.

2         Q    Are you aware that there is a scene in

3    Making a Murderer where Steven Avery tells his

4    parents that if they didn't figure out how to get him

5    out on bail within two weeks, he was going to give up

6    and kill himself?

7         A    No, I'm not aware of that.

8         Q    Are you aware that there's a scene in Making

9    a Murderer where Steven Avery himself opines that the

10   prosecution was, quote, going to win anyway?

11        A    No, I'm not aware of that.

12        Q    Are you aware that Making a Murderer

13   contains interviews with some people who say violent

14   crime was in Steven Avery's character and others who

15   say it was not?

16        A    Well, I have seen interviews where people

17   say that the police did it on Making a Murderer.  I

18   haven't seen any clips or any video where people are

19   saying that they believe they -- law enforcement got

20   it.  So I'm unaware of that.

21        Q    I'm really trying to limit the number of

22   clips I show you given our time crunch.

23        A    Sure.

24        Q    So I'm going to pose these instead rather as

25   questions.

1        A    Okay.

2        Q    Are you aware that there's a scene where

3    Steven Avery's sister says that a violent assault was

4    not in his nature?

5        A    No.

6        Q    Are you aware that there's a scene where a

7    member of the media says that it was because he was

8    one of the usual suspects around Manitowoc County?

9        A    No.

10       Q    Are you aware that there's a scene where the

11   presiding judge in the Penny Beerntsen case says that

12   he believed Avery's propensity against violence --

13   against -- violence against women in particular, was

14   a fact?

15       A    No, I'm not aware of that.

16       Q    Isn't that a good example of Making a

17   Murderer showing different viewpoints and opinions

18   regarding Steven Avery's character?

19            MR. BURNETT:  Objection, form.

20   Go ahead.

21       A    I would have to watch the entire thing to

22   offer an intelligent answer on that, and I haven't

23   done that.

24       Q    Are you aware that Undersheriff Hermann is

25   interviewed in Making a Murderer?

473

1        A    No, I wasn't aware of that.

2        Q    Are you aware that he is extremely critical

3   of Steven Avery's allegations that evidence was

4   planted?

5        A    I'm not aware of that.

6        Q    Are you aware that there is a scene in

7   Making a Murderer where he not only denies the

8   planting allegations but characterizes them as,

9   quote, impossible, end quote, and quote, far-fetched,

10  end quote.

11       A    No, I'm not aware of that.

12       Q    Now, incidentally, you ran against

13  Undersheriff Hermann to replace Ken Petersen as the

14  sheriff of Manitowoc County, right?

15       A    Yes, I did.

16       Q    But Making a Murderer includes a clip of

17  him -- I'll represent that Making a Murderer includes

18  a clip of him very vigorously disputing the planting

19  allegations that were made against law enforcement

20  officers.  Are you aware of that?

21       A    No.

22       Q    Is it your position that Making a Murderer

23  is biased against law enforcement?

24       A    Yes.

25       Q    Are you aware that Laura Ricciardi has

                                                          474

1    yesterday or today, about the fact that there were

2    restrictions on your ability to comment on the case

3    while you were at the Manitowoc County Sheriff's

4    Office, right?

5         A    Yes, sir.

6         Q    But you testified that you were allowed to

7    give a statement after Steven Avery was found guilty,

8    correct?

9         A    Yes.

10        Q    Are you aware that Making a Murderer

11   contains press coverage where that statement is read

12   aloud?

13        A    Attorney Walker did tell me that yesterday,

14   yes.

15        Q    Are you surprised that Making a Murderer

16   included your public statement?

17        A    I'm not 100 percent sure what I told

18   Attorney Walker, but I would like to see the context

19   in which it was portrayed.

20        Q    Well, we don't have a ton of time, but this

21   one might be worth it then, so I'm going to go ahead

22   and show you that.

23        A    Can you tell me what episode that is?

24        Q    Yeah.  Sure.  It's Episode 8, which I

25   believe you said you never reached?

Case 1:19-cv-00484-BHL   Filed 08/16/22   Page 90 of 108   Document 289-5
920.585.2341   365Reporting, LLC   www.365reporting.net

1        A    Right, I never did.  So if they spent

2    Episodes 1 through 7 making me look like a villain,

3    I'm guessing Episode 8's inclusion of my statement

4    isn't going to -- my statement isn't going to be

5    taken very seriously by the viewing public who's

6    already made up their mind that I'm the villain.

7        Q    I'll move to strike that.  That wasn't what

8    my question was.

9        A    Okay.

10        Q    You just asked me what the -- what the

11    episode was.

12        A    Right.

13        Q    And I was trying to provide that

14    information.  You know, I don't -- time is precious

15    at this point.  I'll just say you might look for

16    yourself.  It's Episode 8 --

17        A    Okay.

18        Q    -- minute 33 to 34.  I think you may -- it's

19    up to you.  You may find that it's actually just a

20    pretty neutral presentation of a news coverage where

21    they're just reading your statement.

22        A    Okay.  Thank you.

23        Q    Did Brenda Schuler tell you that Making a

24    Murderer included coverage of your public statement

25    after Steven Avery's conviction?

477

```
 1        A    Not that I recall.

 2        Q    Did Michael Griesbach tell you that?

 3        A    Again, not that I recall.

 4             MS. BARKER:  Um...

 5        Q    I'm sorry.  Before you were -- before he was

 6   your attorney, did -- you said not that you recall,

 7   so it doesn't matter.

 8        A    Right.

 9        Q    But, again, to be clear, I don't want any

10   conversations between you and Mr. Griesbach once he

11   was your attorney.

12             MS. BARKER:  Thank you.

13        Q    Now, how was it that you got selected to

14   give that public statement?

15        A    I believe the department felt that I had had

16   the worst -- worst luck with the media, and I don't

17   know 100 percent, but I thought they also wanted Jim

18   Lenk to do one as well and he refused.

19        Q    So then it fell to you to do it?

20        A    Well, I think initially it was going to be

21   both of us.

22        Q    Yeah.

23        A    But, yes, then I -- I was the only one left,

24   and they coupled that with, "You will do it."

25        Q    I mean, were you happy to do it?  Did it
```

478

1    give you sort of a sense of vindication?

2         A    I can't say it gave me a sense of

3    vindication, but yes, I was hoping that the Halbachs

4    would appreciate that, you know, we can conducted

5    this investigation to the best of our ability and

6    ethically.

7         Q    Besides that public statement, did the

8    sheriff's office allow you to make other public

9    statements regarding the case?

10        A    Not that I recall.

11        Q    Now, if they had allowed you to make

12   statements about the case and if they'd allowed you

13   to be interviewed for Making a Murderer, what would

14   you have wanted to say?

15        A    I don't know.  I'm very distrustful of the

16   media now, so I can't say 100 percent whether I would

17   even do it.

18        Q    Would you have wanted to see -- would you

19   have wanted to have statements that, you know, you

20   weren't guilty of things that some people were saying

21   that you did?

22        A    If I were to give a statement that would be

23   included in there, I would emphasize a lot of these

24   media attempts are eroding the public's confidence in

25   law enforcement and the criminal justice system, and

479

1    while we're human and imperfect, for the most part

2    the criminal justice system does get it right.

3         Q    I already told you about Undersheriff

4    Hermann's calling the planting accusations

5    far-fetched and impossible, right?

6         A    Yes, sir.

7         Q    So I'm going to play you now something from

8    Episode 5, which I believe is one that you have

9    seen -- or parts of the episode.  I take that back.

10   I'm going to show you a clip of Norm Gahn.  Are you

11   familiar with this scene?

12        A    No.

13             (Video playing.)

14        Q    Would you agree that that shows prosecutors

15   pushing back quite vigorously against the planting

16   theory?

17             MR. BURNETT:  Objection, form.

18        A    Yes.

19        Q    And they refer to the officers being accused

20   as being good, solid, decent family men, right?

21        A    I don't think I saw that, but -- I don't

22   recall hearing that, hearing them say that.  I

23   thought it centered more around the testing of the

24   blood or that we have a right to have our reputations

25   protected or something to that extent.

1        Q     I'll go to another clip that's maybe more

2    directly about you.  This is in Episode 7.  Oh, the

3    one I just showed was Episode 5, 1:08 to 2:34.

4        A     Okay.

5        Q     The one I'm going to show now is Episode 7,

6    13:55 to 14:28.

7                    (Video playing.)

8                    MS. RICCIARDI:  You're in Episode 5.

9                    MR. VICK:  Oh, is this still in

10   Episode 5?  My apologies.  Now I'm in Episode 7.

11                   (Video playing.)

12       Q     Would you agree that that shows Ken Kratz

13   vigorously disputing the planting allegations?

14                   MR. BURNETT:  Objection, form.

15       A     That appeared to be an out-of-court

16   interview --

17       Q     Yeah.

18       A     -- with reporters, not in front of the judge

19   like the preceding one.

20       Q     Oh, you're absolutely correct.  I'm not

21   limiting this just to the in court.  I'm saying would

22   you agree that this is an instance of Ken Kratz out

23   of court to the media, I think the word he used was

24   deplorable to describe the planting theory; is that

25   accurate?

                                                          481

1     A     Yes.

2          Q     So this is another instance where Making a

3     Murderer shows people pushing back strongly against

4     the planting theory, right?

5                    MR. BURNETT:  Objection, form.

6     A     In that particular clip, yes.

7          Q     Had you ever seen that clip before?

8     A     No.

9          Q     Okay.  Same thing, Episode 27 -- or

10    Episode 7.  Now I'm going to 24:29 to 24:50.  Again,

11    this is going to be another one out of court.

12    A     Okay.

13                  (Video playing.)

14         Q     Is that another instance showing someone?

15    A     Yes.  I've seen that one.

16         Q     Yeah.  Did you appreciate that that one was

17    in this episode?

18    A     I have to be honest with you, I don't

19    appreciate anything about Making a Murderer, but I

20    appreciate that the reporter asked that question of

21    Attorney Strang.

22         Q     And do you appreciate that that reporter's

23    question was then included in this episode?

24    A     Without watching it in its entirety, I have

25    to stay by my original answer that I don't appreciate

482

1    anything about Making a Murderer.  I don't appreciate

2    it at all.

3          Q     But you've testified that you haven't seen

4    the whole series, right?

5          A     Correct.

6          Q     And I don't want to use my time showing you

7    all the episodes.

8          A     Okay.

9          Q     I'll represent Episode 7 at 34:45 to 35:08,

10   if you have any interest in seeing these later, I'm

11   sure your counsel could probably get it for you.

12         A     Yes.

13         Q     There's another episode of Norm -- there's

14   another instance of Norm Gahn sticking up for you.

15   Is that something you're aware is in Making a

16   Murderer?

17         A     No.  Well, is that the one you just showed

18   me or --

19         Q     It's a different one.

20         A     Okay.

21         Q     Are you aware that there is also footage, a

22   scene, of yet another instance of Norm Gahn, this

23   time at a press conference, where he's pushing back

24   on the planting theory?

25         A     No.

                                                                          483

1          Q     Are you aware that during that press

2     conference he calls it a, quote, despicable

3     allegation?

4          A     No, I'm not aware of it.

5          Q     Would you say that Norm Gahn there in

6     calling it a despicable allegation pretty accurately

7     captures your own views of those allegations made

8     against you and Lieutenant Lenk?

9          A     Certainly.

10          Q     Are you aware that there is a clip in

11     Episode 7 of Making a Murderer that shows Mike

12     Halbach giving his views on Steven Avery?

13          A     No.

14          Q     Are you aware that it -- that there's --

15     that it shows that Mike Halbach believes Steven Avery

16     was guilty and was lying when he claimed to be

17     innocent?

18          A     I'm not aware of that in Making a Murderer,

19     no.

20          Q     So nobody had ever told you that Mike

21     Halbach was in -- there was a scene involving Mike

22     Halbach giving his opinion that Steven Avery was

23     guilty and was lying?

24          A     As it pertains to Making a Murderer?

25          Q     Correct.

1     A    That's correct.

2     Q    **Are you aware that there is a scene in**

3  **Making a Murderer in which Judge Willis provides his**

4  **view that Steven Avery is, quote, probably the most**

5  **dangerous individual to set forth -- set foot in this**

6  **courtroom?**

7     A    In Making a Murderer?

8     Q    **Yes, in Making a Murderer.**

9     A    No, I'm not aware that that's in Making a

10  Murderer.

11    Q    **After this deposition, are you going to**

12  **watch the entire series do you think, Sergeant**

13  **Colborn?**

14           MR. BURNETT:  Objection, form, calls for

15  speculation.

16    A    As we sit here and talk right now, I don't

17  have that intention, but I certainly will seek the

18  advice of my counsel on it.

19    Q    **Prior to bringing this lawsuit, did anybody**

20  **tell you about the clips that you and I have**

21  **discussed in the last hour or so in which various**

22  **individuals defend you?**

23    A    No.

24    Q    **Do you think that could change your overall**

25  **view of the series?**

485

1        A    No.

2        Q    **How could you know without watching them?**

3        A    Well, I can't.  You just said what do I

4   think, so I thought you wanted me to render an

5   opinion.

6        Q    **Did John Ferak's columns typically include**

7   **quotes from people in law enforcement who were**

8   **defending you, who were telling -- who were saying**

9   **that these are despicable allegations that are being**

10  **made?**

11       A    Not that I recall.

12       Q    **I'd like to look at Exhibit -- Exhibit 1146.**

13            (Exhibit 1146 marked for identification.)

14       A    Thank you.

15       Q    **This is another text between you and Brenda**

16  **Schuler, right?**

17       A    Yes.

18       Q    **And she says at the top, "Andy, sorry to bug**

19  **you as I just deleted the emails not that long ago**

20  **from you.  Ken needs them again.  He lost them.  So**

21  **sorry!  Can you check your emails to me please?  Your**

22  **'sent' file please?"  And your response is, "I may**

23  **have hard copy but I think I deleted them from my**

24  **sent file and anywhere else after Ferak demanded all**

25  **our emails.  Would hard copy work???"  And she says,**

486

1          A     I don't specifically recall that statement,

2     sir.

3          Q     Would it surprise you to -- I don't want to

4     waste the time.  Would it surprise you to see a text

5     in which she says something like that?

6          A     Is the text to me?

7          Q     Yes.

8          A     Do you have the text?

9          Q     Sure.  Let's take a look at Exhibit 1144.

10          A     1144.  Do I have that one?

11          Q     You don't yet.

12          A     Okay.

13          Q     I've been jumping around out of order.

14          A     Okay.  Sorry.

15                (Exhibit 1144 marked for identification.)

16          Q     I'm looking at -- it's probably the third

17     page of the document.  It's the one at the bottom

18     that says 8179.

19          A     Okay.

20          Q     And down at the bottom, her last comment --

21     well, right above that you say, "I would guess they

22     aren't going to like this deposition!"  And then she

23     says, "I'll pay anything for a video.  I mean

24     ANYTHING."  And you respond, "Lol.  I know what you

25     mean!!"

Case 1:19-cv-00484-BHL-SCD   Filed 09/16/22   Page 101 of 108   Document 289-5
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1          Has Ms. Schuler asked you --

2      A    I don't know what she's talking about there.

3      Q    You're not sure if she's talking about --

4      A    Whose -- "I would guess they aren't going

5    to" -- I don't know whose deposition she's talking

6    about.

7      Q    Well, I'll --

8      A    I don't remember the conversation.  I'm not

9    denying that that's my text messages.

10      Q    I'll make the question a little bit broader.

11    Has Brenda Schuler asked you for any of the materials

12    that you've gotten in this case?

13      A    The civil case?

14      Q    Yes, the civil case.

15      A    No, I can't recall her making any sort of

16    request for me to give her materials for this case.

17    I think she knows that all the materials are in the

18    possession of my coun -- of counsel.

19      Q    And she hasn't asked you to --

20    notwithstanding that, to pass on some of those

21    materials to you?

22      A    Not that I'm aware of, no.  Not that I can

23    recall.

24      Q    Was she supportive about you bringing this

25    lawsuit?

491

```
 1        A    Yes.  Initially, yes.

 2        Q    I'd like to show you Exhibit 1145.

 3             (Exhibit 1145 marked for identification.)

 4        Q    And this is another text chain between you

 5   and Brenda Schuler, correct?

 6        A    Yes.

 7        Q    And it's dated 11/30/2018, right?

 8        A    Yes.

 9        Q    And that's less than three weeks before you

10   filed the initial Complaint in this action, correct?

11        A    Yes.

12        Q    At the top she says, "Can you talk to me?  I

13   need to call you," right?

14        A    Yes, she said -- yes, that's what the text

15   says.

16        Q    And you say, "Trust me my friend, you are

17   going to be up to your neck in this just like me.

18   Lol," correct?

19        A    Yes.

20        Q    And then she responds, "Andy, not going to

21   lie, I think him repping you and now alone is a

22   really bad idea.  If he had to go to internet ppl,"

23   do you understand ppl means people --

24        A    Yes.

25        Q    -- "to get simple questions like these
```

1          A      Is that the Amended Complaint?

2          **Q      It is, yeah.**

3          A      Okay.

4                  MR. BURNETT:  Are we in a position to

5      wrap this up?

6                  MR. VICK:  We are.

7                  MR. BURNETT:  Great.

8          **Q      I'd like you to look at paragraph 37**

9      **specifically.**

10         A      Okay.  Okay.

11         **Q      So here you say, "Defendants Ricciardi and**

12     **Demos strategically spliced 'reaction' shots of**

13     **plaintiff appearing nervous and apprehensive at trial**

14     **into other portions of his testimony where he did not**

15     **appear nervous or apprehensive in fact."  Do you see**

16     **that?**

17         A      Yes.

18         **Q      Do you recall what it was about your**

19     **demeanor in any of the shots that made you look**

20     **nervous or apprehensive?  Was there anything that you**

21     **can recall right now that made you feel that way?**

22         A      Specifically the clip that you showed me

23     that I commented on earlier where it appears that

24     Dean Strang is giving me some sort of staredown and

25     the -- it pans to the shot of me leaning back and

1    cracking my knuckles.

2              I did that during a recess out of the view

3    of the jury.  I certainly didn't do it in front of

4    Attorney Strang, but it certainly does make me look

5    nervous and apprehensive and that I've been caught in

6    some sort of lie.

7         **Q    Now, Mr. Colborn, I'm not sure if you're**

8    **aware, but during this deposition the last couple**

9    **days, you've kept your head down a decent amount.**

10   **Does that sound right?**

11        A    I'm frequently reading, but yes.

12        **Q    And you've sometimes had your head in your**

13   **hands or cracked your knuckles in the course of this**

14   **deposition.  Does that sound right?**

15        A    Okay.  I don't recall that, but I don't know

16   what -- what you want me to -- what you're trying

17   to -- can you clarify a little bit for me?

18        **Q    Well, is it possible that maybe things like**

19   **cracking your knuckles or looking down, that that's**

20   **just a natural mannerism of yours?**

21        A    The footage that I've watched of my trial

22   testimony, I frequently make contact with whoever

23   questioning me.  Now, I was not in trial given a

24   stack of documents like this and told frequently to

25   go to this page, go to that page, look at this, look

1    counseling session?

2         A    Knock it off.

3         Q    Now, if you do watch Making a Murderer in

4    its entirety, will you agree to supplement, either a

5    stipulation or some sort of answer, letting us know

6    that you've, in fact, watched the whole thing?

7                   MR. BURNETT:  That's a question for me,

8    and we will.

9                   MR. VICK:  Okay.  That's all we have.

10                  MR. BURNETT:  Thank you.  All righty.

11   Paula, we will read and sign.  We're done.

12                  THE VIDEOGRAPHER:  Going off the record

13   at 4:40.

14                  (Proceedings concluded at 4:40 p.m.)

15

16

17

18

19

20

21

22

23

24

25

                                                           499

1                    CERTIFICATION PAGE

2

3    STATE OF WISCONSIN        )

4    MILWAUKEE COUNTY          )

5

6              I, PAULA M. HUETTENRAUCH, RMR, CRR,
     Notary Public in and for the State of Wisconsin, do
     hereby certify:

7

8              That prior to being examined, the
     deponent named in the foregoing deposition,
     ANDREW L. COLBORN, was by me duly sworn to testify

9    the truth, the whole truth, and nothing but the
     truth.

10

11             That said deposition was taken before
     me at the time, date, and place set forth; and I
     hereby certify the foregoing is a full, true, and

12   correct transcript of my shorthand notes so taken and
     thereafter reduced to computerized transcription

13   under my direction and supervision.

14             I further certify that I am neither
     counsel for nor related to any party to said action,

15   nor in any way interested in the outcome thereof; and
     that I have no contract with the parties, attorneys,

16   or persons with an interest in the action that
     affects or has a substantial tendency to affect

17   impartiality, or that requires me to provide any
     service not made available to all parties to the

18   action.

19

20   IN WITNESS WHEREOF, I have hereunto
     subscribed my name this 28th day of July, 2022.

21

22   Paula M. Huettenrauch, RMR, CRR

23   Notary Public - State of Wisconsin

24   My Commission Expires 8/18/2023

25

                                                        500

ANDREW L. COLBORN,

                Plaintiff,

    vs.

NETFLIX, INC.,                              Case No. 19-CV-484
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

                Defendants.

**ERRATA SHEET FOR JULY 21-22, 2022, DEPOSITION OF ANDREW L. COLBORN**

| Location | Current Language | Corrected Language | Reason |
|---|---|---|---|
| Volume 1 Page 201, Line 4 | "Certainly there was exploration and thoughtful debate." | "Certainly if there was exploration and thoughtful debate." | Substantive / mis-statement |
| Volume 2 Page 392, Line 16 | "I don't believe to this day they would follow up on it." | "I don't believe to this day they would follow up on it with me." | Substantive / mis-statement |
| Volume 2 Page 447, Lines 6-7 | ". . . and I told him . . . ." | ". . . and I was told that . . . ." | Substantive / mis-statement |
| Volume 2 Page 447, Line 8 | "You are already there." | "You are already here." | Transcription error |
| Volume 2 Page 479 , Line 4 | "We can conducted . . . ." | "...we conducted ..." | Transcription error |
| Volume 2 Page 497, Line 22 | "I frequently make contact..." | "I frequently make eye contact..." | Substantive / mis-statement |

Dated: August 31th, 2022            Respectfully submitted,

                                          Andrew L. Colborn

4333303