# EXHIBIT 11

IS THE JEEP THE FOUR WHEELER IN THE PIT?? ...well as my mind."

Check these facts vis another witness and if this is true, insert it in the Lampe looks back section: USE THIS for media interview

Kusche testified that it was "approximately ten o'clock or so, nine-thirty, ten o'clock" when he interviewed Ms. Beerntsen in her hospital room at.

THEY WERE ALREADY TALKING ABOUT ARRESTING Avery AT 8PM (p442) of transcript

USE this for media interviews - have it on hand together w/ the AG opinion!

Griesbach0000454

**CORRESPONDENCE/MEMORANDUM**  **DEPARTMENT OF JUSTICE**

Date: December 17, 2003

To: Mark Rohrer
District Attorney
Manitowoc County

From: Peggy A. Lautenschlager
Attorney General

Subject: Avery Review

*[handwritten annotations: "8/14 have started prior interviews", "don't explain it even w/ a whitewash", "12/29/08 see the green", "+ Call it the Department of Justice"]*

## I. PURPOSE

The Wisconsin Department of Justice evaluated the facts and circumstances of the 1985 investigation and prosecution of Steven Avery, who was convicted of attempted first degree murder, first degree sexual assault, and false imprisonment on December 14, 1985. In September 2003, eighteen years after Avery commenced his prison term, DNA testing exonerated Avery and implicated another person, Gregory Allen. The Department's goal was to assess what, if any, errors occurred during the investigation and prosecution of Avery's case and whether any criminal or ethical violations were committed by anyone involved in handling the case.

## II. SUMMARY OF FACTS

On July 29, 1985, P.B. was jogging on the beach, north of Two Rivers, Manitowoc County, when she was abducted, brutally beaten and sexually assaulted at knifepoint. After the assault, P.B. was taken to the hospital where Manitowoc County Sheriff's Deputies interviewed her. P.B. provided a physical description of her assailant. She also assisted Chief Deputy Gene Kusche from the sheriff's department in developing a hand-drawn composite picture of her assailant. Once the investigators were given a physical description and while the composite was being created, Sheriff Tom Kocourek asked that members of the sheriff's department put together a photo array. P.B. reviewed the composite picture when it was completed and, a short time later, reviewed the photo array displayed by Sheriff Kocourek. She identified Steven Avery as her assailant. Three days later, on August 1, 1985, P.B. again identified Avery as her assailant from a live line-up.

Based on P.B.'s initial identification of Avery as her assailant, Avery was arrested and charged with first degree sexual assault, attempted first degree murder and false imprisonment. The arrest took place within eight hours of the assault.

A trial was held before the Honorable Judge Fred H. Hazlewood in December 1985. The prosecutor was Manitowoc County District Attorney Denis Vogel. Defense counsel was James Bolgert, who took over the case from Assistant Public Defender Reesa Evans-Marcinczyk in late

District Attorney Mark Rohrer
December 17, 2003
Page 2

October 1985. Avery had sixteen alibi witnesses as to his whereabouts on the day of the assault. However, he was convicted of the crimes and sentenced to a total of thirty-two years in prison.

In September 2003, the results of a second round of DNA tests on pubic hairs obtained after the 1985 assault were received. These tests revealed that Avery was not the perpetrator of the crimes. Avery was released from prison on September 11, 2003. Gregory Allen, whose DNA matched that of the pubic hair, is serving a sixty-year sentence for a sexual assault he committed in Green Bay in 1995.

On September 18, 2003, current Manitowoc County District Attorney Mark Rohrer requested that the Wisconsin Department of Justice conduct an independent review, and the Department agreed. Two Special Agents from the Division of Criminal Investigation, Amy Lehmann and Deb Strauss, conducted the investigation. This report is based on interviews with the victim, the sheriff, deputy sheriffs involved in the investigation, former Manitowoc County District Attorney Denis Vogel, personnel who worked in Vogel's office at the time of the prosecution, officers from the Manitowoc and Two Rivers Police Departments and defense counsel handling Avery's case in the trial court. The Department has also reviewed files from the sheriff's department, files of the prosecutor and defense attorneys handling the case, the transcripts from the Avery proceedings, including the trial and appellate records, and numerous police reports from the sheriff's department and the Manitowoc and Two Rivers Police Departments. This report examines the critical points of the investigation and prosecution of Avery's case.

### III. THE COMPOSITE DRAWING

After P.B. was transported to the hospital, she participated in creating a composite sketch of her assailant with Chief Sheriff's Deputy Gene Kusche. The composite drawing was completed at 10:20 p.m., approximately six hours after the assault occurred. At a suppression hearing, Deputy Kusche testified that before he did the drawing, a name was given to him as a suspect; however, he did not have any personal recollection of the individual and had no mental image of him at the time of the drawing. He was told they had a mug shot of the suspect; however, he told everyone not to show either him or the victim any photographs. P.B. testified at trial that she was never given any suggestions as to how the suspect should look. The Department has not uncovered any information challenging the integrity of the composite process.

[handwritten annotations: "whitewash"  "lawsuit?"]

District Attorney Mark Rohrer
December 17, 2003
Page 3

### IV. THE PHOTO ARRAY

Issues involving the photo array were addressed in Avery's first appeal.[1] While the photo array was not perfect, it met applicable legal standards and does not demonstrate any misconduct on the part of the sheriff's department.

Sheriff Kocourek told investigators that he did not know Avery at the time, but that after P.B. gave a physical description of her assailant, someone said that the description sounded like Avery. Deputy Sheriff Judy Dvorak had been called to the hospital to take a statement from P.B. and the Department's review indicates that it was Dvorak who made the comment that the description sounded like Avery. It was because of this statement that Kocourek asked that Avery's photograph be included in the photo array.

The photo array was conducted at approximately 10:20 p.m., after completion of the composite drawing. The sheriff laid out nine photographs on a table tray at the side of P.B.'s hospital bed. Avery was somewhere in the middle of the array. After P.B. chose Avery as her assailant, the sheriff told her he was going to apprehend the suspect.

In an unpublished decision of the court of appeals dated August 5, 1987, the court reviewed Avery's challenges to the identification procedure, namely, the photo array and the live line-up. Avery contended that the photo array was impermissibly suggestive because the sheriff testified that he put the array together and that he told P.B. that "'there was a chance that the suspect might be in there and that she should look at them and attempt to determine if in fact he was.'"

The court, relying on *Fells v. State*, 65 Wis. 2d 525, 537-38, 223 N.W2d 507 (1974), concluded that the sheriff's statement, standing alone, did not render the procedure impermissibly suggestive. The statement did no more than tell the victim what was already implied by conducting a photo array, that is, that the attacker's picture might be included. The court also examined photographs from both the photo array and the live line-up. With regard to the array, the court stated, "The pictures in the photo array display individuals who correspond to the description given by P.B. and who so closely resemble one another that Avery does not stand out from them. In fact, the photo array constitutes one of the fairest ones this court has seen." The array did not include a picture of Gregory Allen.

---

[1] The Department was not asked to review the two appeals in this case. However, review of the briefs and decisions in those cases do not indicate any impropriety or failures on the part of the parties or courts involved. An appellate court's review is limited; it only considers the arguments raised by the parties and cannot act as the fact-finder on the issue of guilt. The state's arguments and the court's conclusions on appeal were consistent with controlling legal standards.

District Attorney Mark Rohrer
December 17, 2003
Page 4

## V. THE LIVE LINE-UP

Avery challenged the legitimacy of the line-up in the appeal discussed above. A suppression hearing revealed the following circumstances surrounding the line-up. Avery was the only person in both the photo array and the live line-up. Assistant public defender Stephanie Stoltman was present during the line-up. The line-up was conducted three days after the assault. Stoltman testified that after District Attorney Vogel positioned the participants, he asked Stoltman if the line-up was okay and Stotlman requested that some of the participants be moved in order to get a closer height, age and coloration range. After they were re-positioned, P.B. was led into the room, which adjoined the room containing the line-up and had a one-way mirror for viewing the participants. At some point Stoltman requested that P.B.'s husband not talk to her during her observation and that he step away from her. There were eight males who participated. Stoltman stated that Avery appeared to be the youngest, the fairest and the shortest of the participants. A few of the people were fairly well dressed. One of the participants looked at Avery during most of the line-up.

P.B. testified that no one suggested to her whom to pick out during either the photo array or the line-up. At the suppression hearing, P.B. testified that there was nothing any of the participants did in the live line-up that suggested to her that the person to pick out was Avery or that drew attention to Avery. After she picked out Avery, she went to the sheriff's office, where she was told that the person she had picked in the line-up was the person they had in custody based on the photo identification.

Kocourek testified at the suppression hearing that in choosing the people for the live line-up, he looked for people with full beards and mustaches and people close in height to Avery, which was difficult because he was quite short. He believed three of the people in the live line-up were very close to Avery's height. He also believed that at some point P.B. was told they had arrested a suspect and that the suspect would be in the line-up. However, she was never told that the person she picked from the photo array would be in the line-up. The line-up contained one other individual who had a history of this type of crime, but it was not Allen.

On appeal, Avery alleged that the line-up was suggestive because he was the only person who was in both the photo array and the line-up and because he was the youngest, fairest and shortest person in the line-up and was the only one with straight hair. He also contended that some of the other participants were well dressed and that one participant turned toward him during most of the line-up.

The court of appeals concluded that the photographs of the line-up revealed that as a group, the participants reasonably resembled Avery in terms of age, hair color, complexion, size and manner of dress. In addition, like Avery, all of the participants had beards and mustaches.

Griesbach0000458

District Attorney Mark Rohrer
December 17, 2003
Page 5

Based on the pictures of the line-up, the court concluded that the police secured a fair and balanced presentation of alternative possibilities of identification.

Avery also argued that even if the identifications were admissible, P.B.'s identification of him was not sufficient to negate his alibi defense. The court rejected that argument based on well-established Wisconsin law indicating that the eyewitness testimony of a victim is sufficient to sustain a conviction even absent corroborating evidence. *See State v. Tarrell*, 74 Wis. 2d 647, 660, 247 N.W.2d 696 (1976). The court of appeals further stated, "Moreover, in this case P.B.'s identification could be deemed by the jury to be particularly convincing based on the testimony indicating that she had ample opportunity to view him, that she consciously determined to get a good look at him, that her initial description substantially matched Avery's appearance, and that only six and one-half hours passed between the assault and the initial identification."

There is nothing to indicate that the live line-up was unduly suggestive or otherwise improper. As with the photo array, the line-up did not include Allen.

## VI. THE DECISION TO ARREST AND CHARGE AVERY WHILE FAILING TO CONSIDER ALLEN AS A SUSPECT

### Avery was a reasonable suspect.

At the time of P.B.'s assault, the sheriff's department was familiar with Avery from an incident that had occurred only six months earlier, in January 1985, in which Avery ran a deputy sheriff's wife off the road at gunpoint and told her to get in his car. The woman told him that she had her baby in her vehicle and that the baby would freeze. After checking to see if the child was in fact in the car, Avery let the woman go. He confessed to the crime and stated that he had done this because the woman had been making allegations that he appeared naked in his front yard on several occasions. Avery was ultimately convicted of endangering safety for this offense and was sentenced to six years imprisonment, concurrent with the sentence in the assault against P.B. District Attorney Vogel told investigators that he assumed that the January incident involving Avery was sexually motivated. Avery was also convicted in Manitowoc County in 1981 of two counts of burglary, for which he received five years of probation, and was convicted in 1982 for cruelty to animals. These cases were not handled by Vogel, but by assistant prosecutors in his office.

The sheriff's department's suspicions regarding Avery were bolstered following P.B.'s positive identification of Avery as her assailant in both the photo array and the live line-up. Suspicions were further validated by Avery's statement to his wife upon arrest that he was being accused of murdering a "girl," although no one had identified the victim as female, and the fact that Avery's alibi was that he had been pouring cement all day, but his clothes tested negative for the presence of any cement dust.

[handwritten annotations: "whitewash", "you gotta be kidding me"]

District Attorney Mark Rohrer
December 17, 2003
Page 6

Facts undermining Avery as the assailant, all of which the jury heard, included sixteen alibi witnesses and the fact that Shopko employees and receipts confirmed that he was at the Shopko in Green Bay at 5:13 p.m., only an hour and fifteen minutes after the assault near Two Rivers. Sheriff's deputies did a timed drive from the location of the assault north of Two Rivers to the Green Bay Shopko. They were able to go through the check-out line fifty-seven minutes after leaving the crime scene, but the officers admitted that they went ten miles per hour over the speed limit to reach those numbers and the officers did not account for potential delays resulting from the presence of five children, including six-day old twins, all of whom were seen with Avery and his wife at the Shopko. Moreover, the reenactment did not allow any time for picking up Avery's family and would therefore assume that Avery's wife and five children were at the beach somewhere or in the car while he committed the assault.

Nonetheless, because of P.B.'s positive identification of Avery as her assailant on several occasions, Avery's semi-incriminating statement to his wife, the lack of cement dust on Avery's clothes and the fact that officers were able to fit the Shopko appearance within the required time frame, it was possible that Avery committed the assault. Both Vogel and Kocourek told investigators that they were convinced at the time of trial that Avery had committed the assault against P.B., particularly in light of P.B.'s positive identification.

### Allen was a viable suspect.

Both the sheriff's department and the district attorney's office should have been on notice that Allen was a reasonable suspect in the 1985 assault.

### The Sheriff Department's Knowledge of Allen

With regard to the sheriff's department, the Department's review reveals the following. The sheriff's file contained information regarding other potential suspects, but the file does not suggest that they were seriously considered. The file includes a letter from Defense Attorney Bolgert to Kocourek asking him to investigate one B.G. as a suspect. It also includes information regarding four other individuals; however, it is unclear how many were considered real suspects. One of the men was included in the line-up. Fingerprint cards of Avery and two other individuals were transported to the state crime laboratory. In addition, the file contains information indicating that three of the men had been "cleared." There is no information regarding an investigation into Allen, although a criminal complaint against Allen from a 1983 lewd and lascivious case, signed by Vogel, was in the sheriff's file.[2]

---

[2] This case is discussed in more detail, below.

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 8 of 19   Document 289-11

Griesbach0000460

District Attorney Mark Rohrer
December 17, 2003
Page 7

Moreover, reports from the Manitowoc County Sheriff's Department indicate that on December 15, 1983, the sheriff's department had information that Allen would expose himself and masturbate in front of children. Allen was also a chief suspect in a murder of a fifteen-year-old girl in North Carolina on June 16, 1975. Detective Conrad of the Manitowoc County Sheriff's Department had this information and gave it to Detective Thomas Bergner of the Manitowoc Police Department. (Bergner is now the Manitowoc Deputy Police Chief.)

Manitowoc Deputy Police Chief Thomas Bergner told investigators that he was working for the Manitowoc Police Department in 1985 and that all jurisdictions were very territorial at that time and did not like to share information or contact other agencies regarding investigations they were working on. Despite this relationship, shortly after the investigation began, Bergner went to Kocourek and discussed the 1985 assault against P.B. Bergner asked if Kocourek knew about Allen. Kocourek told Bergner that Allen had been ruled out as a suspect. Bergner got the impression that Kocourek knew about Allen and Allen's history. [Kocourek told investigators that he did not recall such an incident. He further stated that in 1985 he was not aware of Allen and did not think anyone else in the sheriff's department was].

Bergner believed that Allen should have been considered a suspect because he was a suspect in other sexual assaults around this same time. Allen was a suspect of an attempted sexual assault on July 14, 1985, in Manitowoc, two weeks prior to the assault against P.B. Allen was never charged in that matter because there was insufficient evidence.

P.B. told investigators that within weeks of the assault, she received a telephone call from someone at the Manitowoc Police Department. That individual told her they had someone in mind that matched the description of her assailant and that the subject was not Avery. Police asked P.B. if she ever noticed anyone watching her while she was at home, watching her at the YMCA where she worked or simply following her around. P.B. had in fact received harassing phone calls following her assault, even after Avery was arrested. Many of the phone calls were of a sexual nature, some of which occurred five minutes after she would return from home, indicating she might be being watched. [Such post-crime contact and stalking behavior was consistent with Allen's past offense history – see below].

P.B. contacted the sheriff's department and believes she spoke directly to Sheriff Kocourek. P.B. asked if there was another suspect and relayed the contents of the phone call from the Manitowoc Police Department. She was told the sheriff's department would contact the police department and that she should not worry about this phone call because the sheriff's department had jurisdiction over this case. [Kocourek told investigators he did not recall such a conversation with P.B.]

District Attorney Mark Rohrer
December 17, 2003
Page 8

Had the sheriff's department reviewed police reports from the Manitowoc Police Department, the following information would have been discovered, making Allen a prime suspect in the assault against P.B.:

➢ Allen had been convicted of an aggravated offense as a juvenile.

➢ The Manitowoc Police Department file contained a police report from the Two Rivers Police Department regarding a crime that Allen had committed in 1983. According to the police report from the Two Rivers Police Department, on August 2, 1983, Allen came up over some sand dunes on the same beach on which P.B. was assaulted, only some distance south of that point, and began walking behind a woman. He then pulled his shorts half-way down and began masturbating. He then lunged at her but the woman was able to run away.

Following the incident, Allen contacted the victim twice at her home and asked her to drop charges. The victim had moved to Green Bay for school and did not know how Allen knew this or how he knew her phone number. Allen also contacted the victim's mother five days after the offense and asked to talk to "Sue," which was the victim's name.

➢ Allen had been convicted on February 28, 1984, for disorderly conduct in the city of Two Rivers.

➢ On June 13, 1984, Allen was the suspect in a "prowler" case in which he attempted to gain entry into a woman's residence in Manitowoc after following her 16 year-old daughter and her daughter's friend.

➢ Allen was suspected of prowling on January 24, 1985, and February 2, 1985, in Manitowoc, involving walking into people's yards and up to their garages and homes.

➢ On January 26, 1985, Allen was the suspect in the following investigation: A woman told Manitowoc police that at 6:30 a.m. she saw a male subject wearing a ski mask between her yard and neighbors' yards. The suspect had taken a brick and moved it on the other side of a yard fence in order to stand on it and see into the neighbor's windows. That neighbor had a high school-age daughter.

Because he had been convicted twice on municipal charges for prowling, the Manitowoc Police Department turned the case over to the district attorney's office.

On February 20, 1985, the district attorney's office returned the complaint sheet and stated charges would not be issued because it was just prowling and there was no state statute available. The Manitowoc Police Department again cited him for prowling. On April 16, 1985, the city attorney's office dismissed the charge of prowling.

District Attorney Mark Rohrer
December 17, 2003
Page 9

> On June 26, 1985, just one month prior to P.B.'s assault, Allen was suspected of going to a woman's front door at 2:30 a.m. and exposing himself, wearing a red t-shirt wrapped around his head. The victim could see the man's eyes, nose and mouth. She found out later that her kitchen window had been removed. Also, a bedroom window on the north side of house had twelve Phillips screws removed from it.

Allen was stopped on his motorcycle a short distance away, wearing a red t-shirt. Allen matched the description except that he had a mustache and the victim said she did not think he had one. He was arrested for a traffic violation and for being a suspect in a vehicle entry that same day in which the vehicle owner had two daughters. Allen had two Phillips screwdrivers in his possession. The victim could not make a positive identification of Allen from photographs.

The Manitowoc police noted: "It would appear that this is getting very serious in regard to the suspect, GREGORY A. ALLEN. He in all probability is the suspect involved, however at this point [victim] could not make a positive identification." Allen "will have to be caught in the act as he is starting to become very bold."

> On July 14, 1985, just two weeks prior to P.B.'s assault, Allen was suspected of breaking into a man's home at 3:28 a.m. and attempting to assault his daughter. The daughter awoke to find a man straddling her, sitting on her thighs and fondling her breasts. The man then placed a knife to the girl's throat saying she should take off her clothes or he would kill her. He was nude and had a bathing suit wrapped around his head covering his entire face and hair. The victim stated she had her period and not to hurt her. He brought her hand onto his penis and made her masturbate him until he ejaculated on her nightgown. He asked where her sister was and she said her sister was not at home. He then ordered her to accompany him to the back door, where he had her let him out. As he was leaving he told her not to tell anyone or he would kill her.

A neighbor stated that he saw a man park his motorcycle near the victim's house at approximately 2:30 a.m. and then walk toward the victim's house. Allen had a motorcycle. Another neighbor stated that at approximately 2:42 a.m., she observed a man carrying a picnic bench between her house and the victim's house. The suspect had gained access to the house through the window. Another neighbor had seen a man duck into the bushes of the victim's home one month prior to the July 14 incident at approximately 8:30 p.m. He then saw a motorcycle parked in front of elderly couple's house nearby. Police were unable to obtain a positive identification of Allen.

> A police report from the Manitowoc Police Department dated July 17, 1985, stated:

District Attorney Mark Rohrer
December 17, 2003
Page 10

"This department has compiled several complaints recently concerning Prowling, Window Peeping, Indecent Exposure, and Sexual Assault, ranging from January 1985 through 7/14/85. In each case GREGORY A. ALLEN . . . has been listed as a suspect. Past record and intelligence concerning Gregory Allen reveals he is a dangerous individual with a potential for violence."

The Manitowoc Police Department then began monitoring Allen's whereabouts on a daily basis, often more than once. On the day of P.B.'s assault, there were two entries, one indicating the whereabouts of Allen's motorcycle and other vehicle and the other stating, "Unable to check due to other calls."

Kocourek told investigators that it would have been nice to have more information on Allen in 1985 but that the sheriff's department and police department did not have joint records or joint dispatch as they do now. *even after he T.K. knew of Bergren — what sall of that now. ASS.*

Other sheriff's deputies, including the captain of detectives in 1985, Don Belz, and Deputy Arland Avery voiced their concern to investigators that the case against Avery moved too quickly. This characterization was also confirmed by Lieutenant Leroy Beilke, who was in the traffic bureau for the sheriff's department in 1985. Beilke told investigators that he was informed by one of the sheriff's deputies that a man was seen in the area where the sexual assault took place at the time the assault took place. This man was known for committing these types of sexual crimes and matched P.B.'s description. Beilke believed the man was from the Sheboygan area. There is no information to indicate this man was Gregory Allen. Beilke immediately told Belz about this but Belz told Beilke that the sheriff's department was not going to bring this individual in for questioning. Belz said he could not do it because the sheriff wanted Avery convicted because the description provided by the victim matched Avery's. In contrast, Kocourek told investigators that any suspect brought to his attention would have been thoroughly investigated.

*(FYI - its Don Belz)*

### The District Attorney's Knowledge of Allen

With regard to the district attorney, the Department's review revealed the following. As stated above, two years prior to the assault against P.B., Allen was charged for an offense on the same beach, in which he masturbated while walking behind a woman and then lunged at her. The prosecutor in the 1983 case against Allen was Denis Vogel, the same prosecutor handling the 1985 charges against Avery. According to the docket sheet from the Manitowoc County court file, the charges were reduced from indecent exposure to disorderly conduct in February 1984 and Allen was convicted and fined one hundred dollars for the 1983 offense.

A copy of the criminal complaint and the Two Rivers police report for the 1983 incident involving Allen is contained in the prosecutor's file for the 1985 case against Avery, again

District Attorney Mark Rohrer
December 17, 2003
Page 11

indicating that District Attorney Vogel was aware of the 1983 offense at the time he prosecuted Avery. Police reports by the Two Rivers Police Department on another suspect, A.P., accused of a series of indecent exposures, are also contained in the file.

In addition, personnel from Vogel's office at the time told investigators that they did not believe that Avery was responsible for the 1985 assault, but believed Allen was. At least two employees claim they brought their concerns to Vogel's attention. Jill Martens worked in the Manitowoc County DA's office as a secretary or paralegal in 1985. She worked near Beverly Badker and Brenda Petersen. Neither Martens, Badker nor Petersen thought Avery was the one who committed this crime because there were too many inconsistencies. Martens stated she was familiar with Allen because he was a "peeper" who had a history of sexual assault. Martens never expressed her concerns directly to Vogel. She believed there was a sense of urgency to get the case done quickly because the victim was someone well known in the community and someone of stature.

Brenda Petersen is the Manitowoc County victim/witness coordinator and worked in the Manitowoc County Prosecutor's office in 1985. She told investigators that as soon as she saw the composite drawing, she thought it was Allen who committed the offense. She was familiar with Allen from court hearings. She said from what she knew of Allen's history, the attack on P.B. seemed to fit Allen. She stated that Allen had been in court for various reasons including charges of stalking, window peeping, watching women at Red Arrow Beach and stealing women's undergarments. She was aware that the Manitowoc Police Department was watching Allen because of his behavior. Throughout the trial, she never believed Avery committed the crime. She stated she was vocal about how she felt and had had conversations with the officers involved. She believes Vogel would have heard her make those comments. She heard that someone had checked with a probation officer in Door County who stated that Allen was in Sturgeon Bay at the time of the assault. She believes she heard this in Vogel's office.

Petersen also thought it was peculiar that Kocourek was so involved in the case, and that there were many closed door sessions between P.B., Kocourek and Vogel, which was odd because usually she would be in the room during an interview with a victim. She believes Kocourek put a lot of pressure on Vogel to prosecute. [Vogel denied being pressured to prosecute. Moreover, Kocourek stated that he handled the investigation only because no other detectives were available to handle the case and that he did not need to pressure Vogel.]

Beverly Badker currently works as paralegal in Manitowoc County DA's office. In 1985, she was a secretary there. She told investigators that when she saw the composite drawing, she immediately thought it was Allen. She was familiar with Allen because of his prior contacts with the DA's office. She believes he may have come to the front counter. She claimed that she told Vogel the drawing looked like Allen and not Avery. Vogel told her that Allen could not have committed the crime because he was on probation in Door County at the time the crime was

Grieshach0000465

District Attorney Mark Rohrer
December 17, 2003
Page 12

committed and that Allen's probation officer had been contacted and the probation officer verified that Allen had an alibi covering the time the crime was committed. [Investigators later discovered that Allen was not placed on probation until April 2, 1986, well after Avery's conviction.]

Vogel told investigators that he did not specifically recall anyone from his office making any comments regarding this case, but that office staff frequently discussed cases. He further stated that he did not receive any pressure from the sheriff regarding this case. He stated Allen never struck him as a big-time criminal, but only someone with some exposure cases.

In view of the foregoing, Allen would have been an even more logical suspect than Avery had all of the agencies shared their information. However, because the sheriff's department had only one suspect in mind at the time of the photo array and P.B. identified that suspect as her assailant, the sheriff, and eventually the district attorney became convinced that Avery, and no one else, was the responsible party.

## VII. COMPLIANCE WITH DISCOVERY REQUESTS BY DEFENSE COUNSEL

As stated, the prosecutor's file on the 1985 Avery case contains the criminal complaint and police report regarding the 1983 offense committed on the beach by Allen. It is clear that defense counsel's discovery requests included a request for information on all other suspects. Because the defense attorneys interviewed did not recall hearing Allen's name at the time of the investigation into the 1985 Avery case, a question arose as to whether the information had been turned over to defense counsel. The Department's review indicates that the information appears to have been timely disclosed

First, on August 6, 1985, original trial counsel Assistant State Public Defender Reesa Evans-Marcinczyk filed a "Motion for Exculpatory Evidence," in which she requested, among other things, "any and all evidence and/or information in the state's possession, knowledge or control" which would "tend to show that a person other than the defendant committed the crime charged" or which would "form the basis for further investigation by the defense." On October 10, 1985, the same attorney filed an "Additional Discovery Motion" asking for "[a]ny law enforcement reports of a 'suspicious person' or similar reports in the vicinity of Neshotah Beach and/or Point Beach Park and/or the vicinity of the alleged assault in the last year."

It appears the district attorney complied with these requests. Contained in the defense file is a copy of the Two Rivers police report involving the 1983 Gregory Allen incident. This police report is one in a series of police reports contained in the file. The first of these reports is a report of lewd and lascivious conduct involving another individual, A.P. It is stamped by the Office of the Public Defender in Manitowoc as "Received October 23, 1985." Notations on that same page cross-reference this police report with the 1983 Gregory Allen lewd and lascivious

Griesbach0000466

District Attorney Mark Rohrer
December 17, 2003
Page 13

charge. The file contains the Gregory Allen report, the lewd and lascivious report with A.P. as the suspect, and three other indecent exposure reports from the Two Rivers Police Department, two of which name A.P. as a suspect, and one of which does not name a suspect. The Allen police report and the four other police reports are the same reports contained in the prosecutor's file. In light of this information, it is reasonable to assume timely disclosure of the Allen reports.

Moreover, Vogel told investigators that he had an open file policy in every case and that he withheld nothing. He stated that he had a very good working relationship with the public defenders and always gave them access to what he had collected as part of his case file. Indeed, Assistant State Public Defenders Jack Schairer and Reesa Evans-Marcinczyk claimed in a June 1986 post-conviction motion for an in camera inspection of the DA's file that the open file policy of the DA's Office did not exist for post-conviction matters. This indicates that an open-file policy did exist pre-conviction. Additionally, there is a July 14, 1986 letter from trial counsel James Bolgert to Mr. Schairer indicating "(t)he reports section of the District Attorney's file was open to me. I reviewed it and compared against the Discovery provided to me, which reports I have in turn provided to you."

Finally, at some point prior to Avery's first appeal in 1986, Prosecutor Vogel filed an affidavit which stated, "[P]retrial discovery was complied with in that the entire file was made available for inspection to defense attorney James Bolgert, and that numerous contacts took place regarding information therein." (Item # 114 in 86-1831-CR)

Thus, it appears that defense counsel was provided with the police report involving the 1983 Allen lewd and lascivious incident and that Vogel complied with discovery requests.

VIII. CONCLUSIONS

There is no basis to bring criminal charges or assert ethics violations against anyone involved in the investigation and prosecution of this case. At worst, the sheriff's department failed to investigate a viable suspect, Gregory Allen, in its quest to capture P.B.'s assailant quickly. Had the sheriff's department taken more time in exploring potential suspects prior to the photo array and live line-up, it is possible that Allen's photograph might have been included in the photo array or that Allen himself might have been in the live line-up. While it is impossible to know whether P.B. would have chosen Allen as her assailant, including Allen obviously would have increased the chances that P.B. would have chosen the right person, especially considering that Allen and Avery had a similar appearance.

Once P.B. identified Avery as her assailant, the sheriff's department and prosecutor became convinced that he was the perpetrator, especially once some of the other circumstantial facts appeared to confirm her identification. Nonetheless, while in many cases eyewitness

Griesbach0000467

District Attorney Mark Rohrer
December 17, 2003
Page 14

testimony is reliable and strong evidence, it is by no means unassailable and should not be viewed as such by law enforcement agencies. Law enforcement agencies must and should investigate all reasonable suspects and alternative hypotheses consistent with innocence. Not only does this help assure that innocent people are not convicted of crimes they did not commit, but it also helps prevent the guilty from continuing a course of criminal conduct.

Moreover, this case also underscores the necessity of sharing information between law enforcement agencies.[3] Had the sheriff's department gathered all of the information in the possession of the Manitowoc and Two Rivers Police Departments, it is difficult to believe that Allen would not have been a suspect. Had Allen emerged as a viable suspect, it also would have been incumbent upon Vogel to follow up on the alibi reportedly provided by Allen's probation officer, if in fact Vogel was aware of such an alibi. It would have been an easy task to verify Allen's probationary status, had he been considered a suspect. The underlying problem in this case is that the investigators responsible for the investigation into the assault of P.B. never deemed Allen a suspect.

Finally, it bears emphasis that Avery's innocence was established through scientific analysis of evidence not available at the time of his conviction. In the interim, DNA evidence has gained acceptance in the criminal justice system as having forceful, potentially irrefutable probative value. In contrast, eyewitness identifications have been subject to pretrial and trial challenges based on myriad factors having to do with the witness's opportunity to observe as well as ability to recall the suspected perpetrator. Those challenges were made in this case, and evaluated in line with established legal standards. In the end, the jury unanimously concluded that the evidence before it satisfied the prosecution's burden to meet an even more established constitutional standard of proof: guilt beyond a reasonable doubt. Had the investigation into the assault of P.B. been conducted using currently available technology, it is reasonable to believe that the trial of Steven Avery never would have occurred.

---

[3] It should be noted that developing information technology affording police agencies throughout the state access to defendant information and police reports should facilitate such information sharing in the future. Moreover, such emerging technologies should also allow investigators opportunities to do thorough and targeted searches to determine potential suspects.

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 16 of 19   Document 289-11

Griesbach0000468

9/8/10

To: Monica Davey - NYT
From: Mike Griesbach
Re: Avery Case — Wis. Atty General Peg Lautenschlager's Report on her independent investigation.

Hi Monica,

Your daily pestering from Wis. —

I thought you might want to take a look at this. This isn't how the justice system is supposed to work!

Thanks. (Sorry for the scribbly notes on the report)

9/8/14

To: Dee Hall (Wisconsin Journal)

Re: Avery Story - A.G. Report
(* Sorry for the scribble notes on the report)

Hi Dee,

Here's the A.G.'s Report.
Any news on the reaction of Kocourek + Vogel?

Also, how bad are the pictures? If so, can I send one where I don't look so goofy.

Thanks,

9/8/10

To: HTR - Attn: Pat Pankratz and Charlie Matthews

From: Mike Griesbach

Re: Avery Book

— Here's the A.G. Report I referred to in my e-mail this morning. Thanks.