# EXHIBIT 31

ans that one or both
;otiations and refused
idant had nothing to

y beginning the game
endant actually had a
attorneys who could
case. Oddly, much of
ie same pieces of evi-
.very was guilty. Where
ey, a bullet, and some
m's car as proof of his
: evidence and, to con-
:ould almost hear the
-up, ladies and gentle-
igain. It's obvious they
ingly convict Mr. Avery

had been found guilty
Court of Appeals had
ir cases. So why did it
might be innocent, or
night that I wished I'd
it made me scratch my
for sure? Were Steven
As I would discover as
 sure.

, scene after scene de-
nder even more. Here
unknown party on the

day almost, waiting for
. drinking, you know,
mes to stop drinking. I

guess it sunk into her because she did stop and she's a different person now. I gotta give her a lot of credit. When Jodi gets out, hopefully, we can set a wedding date." (Jodi Stachowski was Avery's loyal girlfriend and fiancée at the time of his wrongful conviction lawsuit and subsequent murder charge.)

Then Avery was heard speaking on a more recent phone call from jail, to the documentarians, most likely.

"A lot of people told me to watch my back. Most of the time I didn't even believe 'em. But then, sitting and doing depositions, I don't know, it kinda changed my mind. They were covering something up. And they were still covering something up. Even with the sheriff who's on there now, he's . . . covering something up."

By the end of the night I had seen clips of videos from several of the officers' depositions and, I had to admit, they looked like they were being defensive. They were not happy about being grilled by a roomful of attorneys concerning a very black mark on their department, especially not with Steven Avery sitting there, watching them squirm. It's a rare cop who does well when the tables are turned, when they are the one on the receiving end of a blistering interrogation by their accusers.

Most people do get nervous when being deposed. It's not much different than testifying in court, especially with the lens of a video camera peering into your eyes from three or four feet away. You are sworn under oath and intense lawyers start by grilling you about uncomfortable topics that you may or may not know anything about. But as I tell witnesses before they testify during trials, if you stick only with what you know and tell the truth, you have nothing to fear. If you don't understand the question, say that. If you don't know the answer, say that. And by all means, don't let the lawyers get under your skin!

On the other hand, nearly all of them looked more defensive than they should have if they had nothing to hide—at least in the video clips the documentarians chose to include in the series. When I later watched the complete video of the depositions of

31



the officers who were most directly accused of wrongdoing—either in the first Avery case or in the second—my concern that they had something to hide, though significantly reduced, was not completely alleviated. This was not simply a case of only selective editing to make them look bad.

They say lawyers are the worst witnesses on the stand. We're either too wordy, too full of ourselves, too prone to analyze questions before we respond—or all of the above. But lawyers can have their fair share of these occupational hazards, and still be a halfway decent witness on the stand. On the three or four occasions I had to testify, I did not find it difficult at all. It helps, of course, if you have no skin in the game, which is the position I was in when it was my turn to be deposed in Steven's wrongful conviction lawsuit.

Almost a year to the day after Steven Avery was exonerated, my boss, DA Mark Rohrer, and I were both subpoenaed to appear for depositions at the local branch of a large Milwaukee law firm. Walt Kelly, one of Avery's lawyers who was prominently featured in the early episodes of *Making a Murderer*, would be our inquisitor that day.

Whether at trial or in depositions, when it comes to grilling reluctant witnesses, Kelly is one of the best. He's an aggressive attorney, but he's not just a hired gun. Kelly passionately believes in his client's cause, and to the extent he pushes the limits of civil advocacy, that's why. His gray beard and piercing blue eyes match the personality of this aging but still vibrant activist of the sixties, and although we'd never met, I liked him immediately. Besides, my feelings about what happened back in 1985 weren't a secret. I'd been open with the Wisconsin Department of Justice in the DOJ's independent review of the circumstances surrounding Steven Avery's wrongful conviction, and I intended to be the same the day I was deposed.

I walked into a not-big-enough conference room, where a crowd of red-eyed and weary attorneys were sitting around a table with pens and legal pads poised in front of them, ready to have at