# EXHIBIT 6

# United States District Court
# Eastern District of Wisconsin

## Avery v. Manitowoc County

### 04 C 986



Video Deposition of

## Michael Griesbach

Recorded 09/22/2005 in Manitowoc, WI

11:43 am - 1:06 pm, 84 mins. elapsed

### Magne-Script

(414) 352-5450

*23016 Condensed transcript with index*

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 2 of 4   Document 290-6

CHRM002679

### Page 5

1   not to take office. But in the intervening time
2   between actually the primary election which was in
3   September of 2002 until January of 2003 which was when
4   the new term was going to begin, I was still present
5   as was the former D.A., Jim Fitzgerald.
6  Q   Okay.
7  A   But the answer is basically no, I have not served as
8   the district attorney in Manitowoc County.
9  Q   Did you remain in office between January of '03 and
10   March of '03 when Mark Rohrer came on board?
11  A   Yes, I did.
12  Q   Okay. I don't want to go into the personal reasons,
13   but I do need to ask this. Did the personal reasons
14   have anything to do with this case, with the Steven
15   Avery case?
16  A   Not at all.
17  Q   Oh, okay. Fine. All right. So the period of time
18   that you've served as an assistant district attorney
19   in the Manitowoc County district attorney's office up
20   until January 1 of 2003, your boss was Jim Fitzgerald?
21  A   That's right.
22  Q   Okay. And then starting in March of 2003, your boss
23   became Mark Rohrer?
24  A   Yes.
25  Q   And he's still your boss.

### Page 6

1  A   Yes.
2  Q   Okay. So, then, you were in the office during some of
3   the postconviction proceedings in the Steven Avery
4   case.
5  A   That would be right.
6  Q   In particular, you were in office when Steve Glynn
7   represented Steven Avery in 1996 in an effort to
8   secure his release on the basis of DNA evidence at
9   that time.
10  A   In office in the sense that I worked there as an
11   assistant D.A.
12  Q   Okay.
13  A   Right.
14  Q   Let me ask you this. Did you have -- in any of those
15   proceedings, did you have any responsibilities
16   yourself?
17  A   No.
18  Q   Okay. In respect to the Steven Avery conviction,
19   during the period of time that you worked for Mr.
20   Fitzgerald, did you ever discuss the case with him?
21  A   I may have once. I recall being present more or less
22   as an observer during one of the postconviction
23   motions when Mr. Fitzgerald was appearing for the
24   state. And I thought Mr. Glynn but perhaps someone
25   from the Wisconsin Innocence Project was appearing for

### Page 7

1   Mr. Avery. Nothing in depth in terms of a
2   conversation at all.
3  Q   We've had some testimony about the fact that in early
4   September of '03, around September 3rd, Mark Rohrer
5   received a telephone call from the crime lab
6   concerning the analysis the crime lab had done and the
7   fact that the crime lab had by its analysis determined
8   that the person who had assaulted Penny Beerntsen was
9   Gregory Allen and not Steven Avery.
10  A   Yes, I re-- yes.
11  Q   And you were informed of that by Mark Rohrer?
12  A   Yes.
13  Q   Okay. Up until that moment, had you from any source
14   any knowledge concerning Gregory Allen?
15  A   None.
16  Q   Was it a new name to you when Rohrer told you about
17   what he had been told by the crime lab?
18  A   Yes, it was.
19  Q   Okay. Again, up until that time, you were serving in
20   an office that included Brenda Petersen as the
21   victim/witness coordinator and Beverly Badker as a
22   paralegal, right?
23  A   Yes.
24  Q   Up until you heard from Rohrer about what he had heard
25   from the crime lab, had you discussed Gregory Allen or

### Page 8

1   Steve Avery with either Brenda Petersen or Bev Badker?
2  A   No.
3  Q   Okay. Where did you go to law school?
4  A   I went to Marquette U.
5  Q   Okay. And when did you complete your studies at
6   Marquette?
7  A   It would have been 1983 undergrad, and then 1986 law
8   school.
9  Q   Okay. Between '86 and '91 when you entered the D.A.'s
10   office, what did you do?
11  A   Working backwards I guess from Manitowoc, I was an
12   assistant D.A. in Ozaukee County from -- I still
13   remember the date -- May 2nd of 1988 until I believe
14   it was September of 1991. Prior to working as an
15   assistant D.A. in Ozaukee, I was in private practice
16   for a couple years, I guess that would be two years
17   between law school and Ozaukee County, as an attorney
18   for a law firm by the name of Gonyo Law Office, which
19   was located in Berlin, Wisconsin, west of Oshkosh.
20  Q   Okay. When you were in private practice, did you do
21   any criminal work?
22  A   A small amount.
23  Q   Okay. So you were -- is it fair to say that you were
24   a relative rookie in criminal law when you started at
25   the Ozaukee office?

Page 25

1  during that meeting. Might have been, might not have
2  been.
3  BY MR. KELLY:
4  Q  Okay. I'm going to show you what's been marked as
5     Exhibit 124 and ask you if you'd take a moment and
6     examine that.
7  A  Yeah, I've taken a look at it.
8  Q  Okay. And, first of all, is this a document that
9     you've seen before today?
10 A  I think I have.
11 Q  It's dated September 18th of '03. Doug Jones was an
12    attorney in the D.A.'s office at that time, right?
13 A  Still is, yes.
14 Q  Okay. A colleague of yours?
15 A  Yes.
16 Q  And was this information that's in 124 made available
17    to you at the time that this memo was prepared?
18 A  Yeah. I think by the time that memo was prepared, I
19    was aware of the contents of that memo. My earlier, I
20    guess, hesitation was I don't recall that the contents
21    of that memo was discussed at the meeting with Sheriff
22    Peterson sometime earlier.
23 Q  All right.
24 A  It may have been, may not have been.
25 Q  Okay. Was any further investigation, to your

Page 26

1     knowledge, of the statements that are made in this
2     memorandum about the information that was provided to
3     Sheriff Kocourek and how he responded, was there any
4     further investigation of that by you or Mr. Rohrer as
5     far as you know?
6  A  No, I don't know.
7  Q  Okay. So was there any further discussion, to your
8     knowledge, of the information that's stated in here
9     about Mr. Allen by you or Mr. Rohrer with either
10    Colburn or Lenk?
11 A  There very well may have been. It was likely from Mr.
12    Rohrer. I, you know, vaguely remember this topic, the
13    contents of that memo being discussed here and there
14    over the -- you know, the following weeks. I was more
15    of a receiver of information. I was not directing
16    anybody to look into anything. But I do recall this
17    same topic coming up once or twice more.
18 Q  And what further information, if any, that you recall,
19    did you receive about that?
20 A  My recollection is just that it was confirmed that
21    indeed that Sheriff Kocourek had said, upon hearing
22    that somebody else did this, that we've got the right
23    guy and that he should not concern himself. My
24    impression is that that was what people were saying
25    was the case. I don't have personal knowledge that he

Page 27

1     said that, but...
2  Q  Okay. And when you say "what people were saying was
3     the case," can you identify the people that you're
4     talking about?
5  A  I believe it would be Officer Colburn, and he's the
6     only one I can say with any level of certainty that
7     confirmed that. Now, you know, what one reads into "I
8     think we have the right guy" is another story. I'm
9     not speaking to that issue. But as far as that having
10    been said by -- allegedly said by Sheriff Kocourek,
11    that is my understanding of Deputy Colburn's
12    recollection of what was said.
13 Q  All right. And do you have any understanding of what
14    Mr. Lenk says about that?
15 A  I don't.
16 Q  Okay. And who was your source of information as to
17    what Colburn was saying?
18 A  Probably Mark, Mr. Rohrer.
19 Q  All right. To your knowledge, was the information
20    concerning what Colburn said and how Kocourek
21    responded provided by Rohrer to the attorney general's
22    office?
23 A  I believe it probably was.
24 Q  And what's the basis for that belief?
25 A  Just from the general way in which Mark, the district

Page 28

1     attorney, and I, for whatever it's worth, were
2     handling this case. All information we had was
3     provided to the attorney general.
4  Q  To your knowledge, did Mark Rohrer make any notes of
5     any of the interviews he had with Brenda Petersen or
6     Beverly Badker or Colburn or Sheriff Peterson?
7  A  I don't know whether he did or not.
8  Q  Did you?
9  A  No.
10 Q  Is there some reason you didn't?
11       MR. COVELLI: Well, objection. He didn't --
12    lack of foundation. He never said he interviewed
13    these people.
14 BY MR. KELLY:
15 Q  You can answer.
16 A  I don't -- I didn't make any notes of whatever
17    conversations I heard. My main focus was on whether
18    or not Mr. Avery should be released, and quickly. And
19    after that, I think I memoed up a few things: a call
20    from Mr. Vogel that I'm sure you're aware of.
21 Q  I am.
22 A  And some conversations that I think I had with Penny
23    Beerntsen, the alleged victim, and I think with Janine
24    Geske as well. But I did not memo up much in the
25    office. Frankly, there wasn't a lot discussed in the