# EXHIBIT 7

United States District Court
Eastern District of Wisconsin

**Avery v. Manitowoc County**

04 C 986



Video Deposition of

**Andrew Colborn**

Recorded 10/13/2005 in Manitowoc, WI

4:06 pm - 4:27 pm, 22 mins. elapsed

**Magne-Script**

(414) 352-5450

*15858 Condensed transcript with index*

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 2 of 12   Document 290-7

CHRM002891

CONFIDENTIAL

### Page 1

Witness
Andrew Colborn

Thursday 10/13/2005 at 09:00 by: Jeff Joseph

Nash, Spinlder, Grimstad & McCracken
201 East Waldo Boulevard
Manitowoc, WI

Caption:  Avery v. Manitowoc County
Case No.: 04 C 986
Venue:    United States District Court
          Eastern District of Wisconsin

### Page 2

```
 1        A P P E A R A N C E S
 2   Walter F. Kelly
 3   Walter F. Kelly, S.C.
 4   700 W. Michigan St. #500
 5   Milwaukee, WI 53233
 6   On behalf of the Plaintiff
 7
 8   Stephen M. Glynn
 9   Glynn, Fitzgerald & Albee, S.C.
10   526 E. Wisconsin Ave.
11   Milwaukee, WI 53202
12   On behalf of the Plaintiff
13
14   Claude J. Covelli
15   Boardman, Suhr, Curry & Field
16   1 S. Pinckney St. #410, PO Box 927
17   Madison, WI 53701-0927
18   On behalf of Denis Vogel and Manitowoc County
19
20   Timothy A. Bascom
21   Bascom, Budish & Ceman, S.C.
22   2600 N. Mayfair Rd. #1140
23   Wauwatosa, WI 53226-1308
24   On behalf of Manitowoc County
25
```

### Page 3

```
 1   Raymond J. Pollen
 2   Crivello, Carlson & Mentkowski, S.C.
 3   710 N. Plankinton Ave. #500
 4   Milwaukee, WI 53203
 5   On behalf of Tom Kocourek and Manitowoc County
 6
 7   John F. Mayer
 8   Nash, Spindler, Grimstad & McCracken
 9   201 East Waldo Boulevard
10   Manitowoc, WI 54220
11   On behalf of Tom Kocourek
12
13   Also Present:  Steven Avery
14
```

### Page 4

```
 1              I N D E X
 2   EXAMINATION BY                   PAGE NO.
 3   Mr. Glynn . . . . . . . . . . . . . . . 4
 4   Mr. Bascom . . . . . . . . . . . . . . 20
 5       (There were no exhibits marked)
 6   (The sealed original transcript was sent to Mr. Kelly)
 7   =============
 8           E X A M I N A T I O N
 9   BY MR. GLYNN:
10   Q  Sergeant Colborn, my name is Steve Glynn. I'm going
11      to ask you a few questions. I'm here, along with Walt
12      Kelly, on behalf of Steve Avery. First, you have in
13      front of you a document that doesn't bear a sticker,
14      but I'll represent to you that that's a photocopy of
15      Exhibit 138 that's been earlier marked in these
16      proceedings, okay?
17   A  Yes, sir.
18   Q  Have you had a chance to look at that document today?
19   A  Yes.
20   Q  Have you seen it before today?
21   A  Yes.
22   Q  Can you tell me when the last time before today is
23      that you saw that?
24   A  I believe when I penned it, when I authored it.
25   Q  Okay. And from that time until today, you don't think
```

### Page 5

1  you've seen it?
2  A  I take that back. I had a -- Thursday, I believe, of
3     last week, or Friday of last week, I was shown this
4     document by Amy Doyle.
5  Q  As part of an interview with her?
6  A  Yes.
7  Q  Essentially prepping you for testimony here?
8  A  Yes.
9  Q  Okay. Did she show you anything else besides this
10    document?
11 A  I don't recall. I don't believe so.
12 Q  Okay. Well, let me ask a couple of background
13    questions and then we'll go into the document. And,
14    actually, let me start with the first sentence of the
15    document because that's part of the background. It
16    says that in 1994 or 1995, you were working as a
17    corrections officer in the Manitowoc County jail,
18    correct?
19 A  Yes, sir.
20 Q  How long had you been working as a corrections officer
21    in the jail?
22 A  I was hired in January or February of 1992, so roughly
23    two or three years I had been employed as a
24    corrections officer in the jail.
25 Q  Prior to that time, had you had any job connected with

### Page 6

1     the jail?
2  A  Prior to 1992?
3  Q  Yes, sir.
4  A  No, sir.
5  Q  Had you had any law enforcement job prior to that?
6  A  No, sir.
7  Q  Okay. So in the time period that's discussed in this
8     memo, which is '94 and '95, do you recall whether you
9     were in the custom or practice of keeping notes in a
10    log book, in a memo book, in any data entry form?
11 A  Prior to this?
12 Q  At this time...
13 A  At this time.
14 Q  ...in '94 and '95.
15 A  There was a computer daily log that you typed
16    significant events that occurred in the jail, but it
17    was a log that pertained specifically to the jail. I
18    did not keep a written notebook or notes of any kind
19    in the capacity as a corrections officer.
20 Q  Okay. So short of this computer entry which would
21    have been intended to relate to activities in the
22    jail, you did not record events that occurred at your
23    work; is that correct?
24 A  Only events that were occurring in the jail. Like,
25    you may have a prisoner on a suicide watch. There

### Page 7

1     would be a written hard copy of why that prisoner was
2     on a suicide watch and what he was doing during the
3     course of his day.
4  Q  Sure.
5  A  But outside of jail business, no, there's no log.
6  Q  How about your own private diary or calendar, memo
7     book, anything like that?
8  A  No. I usually keep my appointments in my head, and I
9     don't keep a diary or a journal.
10 Q  Okay. You've gone over what is Exhibit 138...
11 A  Yes, sir.
12 Q  ...today and earlier, correct?
13 A  Yes, sir.
14 Q  It describes you receiving a telephone call from
15    someone who identifies himself as a detective,
16    correct?
17 A  Yes.
18 Q  And am I correct in understanding that at the time you
19    wrote this memo, which is September 12, 2003, you
20    could not recall with certainty what law enforcement
21    agency that detective was associated with?
22 A  That's correct.
23 Q  Do you -- I hear your machine clicking. Does that
24    mean anything to you?
25 A  I'm okay.

### Page 8

1  Q  Okay. I'm just going to go ahead, operating on the
2     theory that if your machine is going off and it
3     matters, you'll tell us.
4  A  Yes, sir.
5  Q  Okay.
6  A  That would be great.
7  Q  All right. With respect to this report, it says,
8     "receiving a telephone call in the central control
9     area." What is that? Part of the jail?
10 A  Yes, sir.
11 Q  And there is another report prepared by a Lieutenant
12    Lenk?
13 A  Yes, sir.
14 Q  Do you recall that?
15 A  Yes.
16 Q  Do you know if you've seen that report?
17 A  No, sir.
18 Q  Okay. Have you discussed this matter with him, I
19    assume?
20 A  The fact --
21        MR. BASCOM: Object to the form. Vague as
22    to time.
23    BY MR. GLYNN:
24 Q  Anytime. Anytime prior to today, have you had a
25    conversation with Lieutenant Lenk about the matter

## Page 9

1  that is discussed in this statement?
2  A  Yes, sir.
3  Q  And do you recall in that conversation learning that
4     at least he had the belief that this was related to
5     Brown County or at least thought it might have been
6     related to Brown County?
7  A  He never relayed that information to me, so I don't
8     know.
9  Q  Let me show you what's been marked as Exhibit 125 and
10    ask you to take a look at that. Have you seen that
11    before, or do we need to give you a chance to read it?
12 A  I've never seen Lieutenant Lenk's statement, no.
13 Q  Okay.
14        MR. GLYNN: Then let's just go off the
15    record and give him a chance to read it.
16        REPORTER: Off the record.
17        (Off the record 4:12 - 4:13)
18        REPORTER: Back on the record.
19 BY MR. GLYNN:
20 Q  Have you had a chance now to read Exhibit 125?
21 A  Yes, sir.
22 Q  Do you recall telling Lieutenant James Lenk that the
23    person from whom you received the telephone call was a
24    detective and that you thought he might have been from
25    Brown County?

## Page 10

1  A  Actually, I thought I had told Lieutenant Lenk that I
2     thought the individual was from Sheboygan County, but
3     I wasn't sure.
4  Q  Okay. So as of today, you know, here we are in
5     October 2005, you're not sure what you told Lieutenant
6     Lenk back in 2003 with respect to the county?
7  A  That's correct, sir.
8  Q  Okay. At any rate, what the subject matter was of
9     this person's call was a statement apparently made to
10    the caller by a person who was in the caller's
11    custody; is that correct?
12 A  You know, we're going back to '94 or '95.
13 Q  Sure.
14 A  I'm a little gray on exactly --
15 Q  And you can use your own report, Exhibit 138, to
16    refresh your recollection if that helps you.
17 A  I don't know if the pers-- I gathered, yes, that they
18    had someone in custody. I don't know if this person
19    had commented directly to the person who called me or
20    had commented to other people within that jurisdiction
21    and this eventually got to my caller.
22 Q  But the detective indicated that there was a person in
23    custody who had made a statement about a Manitowoc
24    County offense, correct?
25 A  Yes.

## Page 11

1  Q  Okay. And what that person in custody had said was
2     that he had committed an assault in Manitowoc County
3     and someone else was in jail for it, correct?
4  A  Yes, sir.
5  Q  And that much you're pretty sure of, correct?
6  A  Yes.
7  Q  I mean, that's a significant event.
8  A  Right. That's what's stood out in my mind.
9  Q  Sure. And you knew by September 12, 2003 that Steven
10    Avery is someone who had been in jail for an assault
11    that he had been convicted of, correct? Had been in
12    jail.
13 A  Yes.
14 Q  He was recently released by then.
15 A  Yes. Mm-hmm.
16 Q  And you knew that someone else had committed that
17    crime, Gregory Allen; that was in the media as well,
18    correct?
19 A  Yes.
20 Q  And so one of the things you believed was that there
21    may be a relationship between the Gregory Allen matter
22    and this telephone call, correct?
23        MR. BASCOM: Are you talking about 2003?
24        MR. GLYNN: In 2003.
25 Q  Correct?

## Page 12

1  A  Yes. That -- Yes, sir.
2  Q  Sure. And, I mean, the fact of the matter is also,
3     again, as reported in the media, Mr. Allen, at the
4     time of Mr. Avery's being released by the court, had
5     been convicted of a sexual assault in Brown County and
6     sentenced to prison, correct?
7  A  That whole portion of it I wasn't aware of.
8  Q  Okay.
9  A  I am now. It's '05. At the time of '03, I really
10    wasn't -- can't say I was, like, following the case.
11    So I knew the name that you mentioned had come up, but
12    I didn't know where he was incarcerated; if he was
13    incarcerated, what his status was.
14 Q  Have you seen any of the reports of the district
15    attorney's office indicating that it would not be
16    prosecuting Mr. Allen for the crime on which Mr. Avery
17    had been exonerated due to the fact that a statute of
18    limitations had run, and in any event, Mr. Allen was
19    serving a 60 year sentence?
20 A  I can't recall viewing --
21 Q  Recall any of that?
22 A  -- no, viewing any reports from the district
23    attorney's office. No, sir.
24 Q  And I'm not really talking about reports at the
25    moment, sir. I'm including any source: media, and by

Page 13

1  that I mean television, radio, newspapers; talk around
2  the sheriff's department; talk in your own household,
3  anything.
4  A  Certainly in the media.
5  Q  Okay.
6  A  I mean, there was a lot of media coverage on this
7     case, and certainly I probably got most of the
8     information that I knew about the case through the
9     media.
10 Q  Sure. I mean, you yourself hadn't had any involvement
11    in the Avery prosecution or investigation, correct?
12 A  I wasn't even in this country when that occurred.
13 Q  Sure.
14 A  I was stationed oversees in the military.
15 Q  And when you came back and were involved in '94 and
16    '95 as a corrections officer, you were not otherwise
17    working as a deputy sheriff, correct?
18 A  No, sir.
19 Q  So you hadn't had any involvement in any of the post-
20    conviction investigative efforts with respect to Mr.
21    Avery's case.
22 A  No, sir.
23 Q  So your sources of information would necessarily have
24    been media-type sources, correct?
25 A  Correct.

Page 14

1  Q  Okay. At any rate, you recognized this was
2     significant enough that you should forward that call
3     that was coming in from another detective to someone
4     in the Manitowoc County Sheriff's Department to take
5     it further, correct?
6  A  Yes, sir.
7  Q  It wasn't within your jurisdiction to take it any
8     further, correct?
9  A  No, sir.
10 Q  And even if you had wanted to, you didn't have the
11    legal authority under your job duties to do that.
12 A  Correct.
13 Q  So what you did was to give the calling detective a
14    telephone number for a Manitowoc County Sheriff's
15    office detective, correct, or the detective bureau?
16 A  Right. I believe I would have just given him that
17    number in case -- I'm sure I tried to transfer the
18    call.
19 Q  Okay.
20 A  Because that would have been the protocol that was
21    required, you know, as my job. But I got in the habit
22    of, since that's sometimes iffy, I would have given
23    him the number of who I was trying to transfer him to.
24 Q  So let me see if I understand that because I think all
25    of us at one time or another have had their calls

Page 15

1  transferred, and sometimes people give you a number in
2  advance of the attempt to transfer and say in case we
3  lose each other or the call doesn't go through, the
4  number to call is such and such. Is that the way you
5  were doing it?
6  A  Yes.
7  Q  Okay. So you gave the person the number and then
8     attempted to transfer the call. And do you know
9     whether the call went through to the other detective?
10 A  I don't know. I didn't hear somebody pick up. But as
11    soon as the phone rang, I would have hung it up.
12 Q  Okay. Because at that stage, again, you've given the
13    person the contact information if he chooses to follow
14    up, correct?
15 A  Yes, sir.
16 Q  Did you ever make any inquiries of anybody in the
17    detective bureau to find out whether they had received
18    such a call?
19 A  No, sir.
20 Q  Or did you ever hear any feedback from anybody about
21    --
22 A  No, sir.
23 Q  -- whether they had gotten such a call?
24 A  No, sir.
25 Q  Okay. So that's what's going on in 2003, correct?

Page 16

1  A  No, the call --
2  Q  I'm sorry. That's what's going on in '94/'95.
3  A  Yes, sir.
4  Q  You then, in 2003, following the publicity that we've
5     already discussed relating to Mr. Allen and Mr. Avery,
6     and you're concerned that perhaps the caller that was
7     calling was speaking about Mr. Allen and Mr. Avery,
8     true?
9  A  I was wondering about that, yes.
10 Q  Sure. You brought that up to someone else, correct?
11 A  Yes, sir.
12 Q  And to whom did you bring that up?
13 A  To Lieutenant Lenk.
14 Q  And you and Lieutenant Lenk had a conversation about
15    it?
16 A  Yes, sir.
17 Q  And in that conversation, is it safe to say that you
18    told him what's reflected in Exhibit 138?
19 A  Yes, sir.
20 Q  There was also a conversation that followed that in
21    which you spoke to Sheriff Petersen, correct?
22 A  Yes, sir.
23 Q  And do you recall that Lieutenant Lenk was there as
24    well?
25 A  When I spoke with Sheriff Petersen?

Page 17

1 Q Yes. Was he or not; do you know?
2 A No, he was not.
3 Q He was not. Okay. Who all was there when you talked
4   to Sheriff Petersen; do you remember?
5 A I don't recall who was in the room. I remember coming
6   into work. Sheriff Petersen was downstairs where our
7   patrol division is, and I got the impression he was
8   waiting for me to come into work. There were other
9   people coming in and out of the room, but I don't
10  recall who.
11 Q Do you know what it is that gave you the impression he
12  was waiting for you? I mean, did he come right up to
13  you or ask you to come with him or something?
14 A I usually don't have contact with the sheriff, you
15  know. So that's what gave me the impression he was
16  waiting for me.
17 Q And when you and he connected that day, what happened?
18  I mean, did you say something to him? Did he say
19  something to you?
20 A No, he initiated the conversation by saying he had
21  spoken with Lieutenant Lenk and he felt that it would
22  be in the best interests of Lieutenant Lenk and myself
23  and the sheriff's department, I would suppose, that if
24  I was to give him a statement on the gist of our
25  conversation or what we had discussed. And I asked

Page 18

1   for clarification on that, you know. And he goes,
2   "Well, what you discussed about a telephone call that
3   you received while you were working in the jail." And
4   I said okay. And before I went out on patrol, I
5   provided this statement.
6 Q Do you know what time your patrolling duties were
7   then?
8 A Well, I worked noon to 8:00, but as a shift commander,
9   there's some times I don't get out on the road until
10  two, three o'clock depending on what sort of
11  administrative or office duties I have.
12 Q So if you look toward the upper right-hand portion of
13  that Exhibit 138, you see a time of 1330 hours. Does
14  1:30 seem like about an appropriate time?
15 A Yes. Sure.
16 Q And that would have been immediately after your
17  conversation with Sheriff Petersen?
18 A No. I believe my conversation with Sheriff Petersen
19  would have been like at quarter to twelve or 12:00.
20 Q Okay. Well, when I say immediately after, I mean
21  within an hour or two.
22 A Oh, yeah. Yes, sir.
23 Q Okay.
24 A Same day as the conversation with Sheriff Petersen.
25 Q All right. And do you recall any further

Page 19

1   conversations with Sheriff Petersen about this subject
2   matter?
3 A No.
4 Q How about any meetings with District Attorney Rohrer
5   about this subject matter, and again, I mean the
6   subject matter of Exhibit 138 that we've been
7   discussing.
8 A No, I've never had a meeting with the district
9   attorney about this.
10 Q Okay. How about an assistant district attorney named
11  Mike Griesbach?
12 A Never had a meeting with Mike Griesbach about this.
13 Q have you ever had any conversations with anybody else,
14  other than Sheriff Petersen and Lieutenant Lenk, about
15  the subject matter of Exhibit 138? Ever discuss it
16  with anyone else, any other officers, any friends, any
17  family?
18 A Not that I can specifically recall. I may have
19  mentioned it to other people, but I don't recall doing
20  it.
21 Q That is, as you're sitting here today, you don't have
22  any specific recollection of discussing it with
23  anybody else.
24 A No, sir.
25 Q But you're not ruling out the possibility that you may

Page 20

1   have discussed it.
2 A No, I'm not ruling out the possibility that I may have
3   discussed it with someone else, but I can't
4   specifically tell you names of people I may have
5   mentioned this to.
6 Q Okay.
7     MR. GLYNN: I think that's all I have.
8   That's all, thanks.
9     MR. BASCOM: I just have one question
10  because I'm confused about the testimony
11  concerning Sheboygan County versus Brown County.
12  And I wasn't sure if I heard you correctly. Let
13  me just ask you this question.
14        E X A M I N A T I O N
15 BY MR. BASCOM:
16 Q You said "Sheboygan County, but I'm not sure." And my
17  question is, is it that you heard that the detective
18  -- you think the detective that called you was from
19  Sheboygan County but you're not sure, or that you told
20  the Lieutenant that you thought the guy was from
21  Sheboygan County but you're not sure? Do you see the
22  difference between those two questions?
23 A Sure.
24 Q And I'm not sure which way your answer was aiming.
25 A You know, I can't recall the specifics of my

```
                              Page 21
 1      conversation with Lieutenant Lenk. I may have said he
 2      was either from Sheboygan or Brown County, I don't
 3      know, because I don't know. And I don't know why
 4      those two jurisdictions stand out in my head other
 5      than that is the area or outside jurisdictions that we
 6      have the most contact with, you know, being centered
 7      between the two of them. You know, I don't know if
 8      that answers your question --
 9   Q  Well, as we sit here today --
10   A  -- as it pertains to Lieutenant Lenk, I'm --
11   Q  No, as we sit here today --
12   A  Okay.
13   Q  -- do you have a sense or a feeling that the guy was
14      from Brown County or Sheboygan County, or don't you
15      know?
16   A  I really don't know, sir.
17   Q  That's fine.
18           MR. BASCOM: That's all I have.
19           MR. GLYNN: Nothing else.
20           MR. BASCOM: Great. Thanks.
21           REPORTER: Okay. There being no further
22      questions, this deposition is concluded at 4:27
23      p.m. Off the record.
```

Magne-Script Video Court Reporters                    414-352-5450

CHRM002897
CONFIDENTIAL

## A

activities 6:21
administrative 18:11
advance 15:2
agency 7:21
ahead 8:1
aiming 20:24
Albee 2:9
Allen 11:17,21 12:3,16,18 16:5 16:7
Amy 5:4
Andrew 1:2
answer 20:24
answers 21:8
anybody 15:16,20 19:13,23
Anytime 8:24,24
apparently 10:9
appointments 7:8
appropriate 18:14
area 8:9 21:5
asked 17:25
assault 11:2,10 12:5
assistant 19:10
associated 7:21
assume 8:19
attempt 15:2
attempted 15:8
attorney 19:4,9 19:10
attorney's 12:15 12:23
authored 4:24
authority 14:11
Ave 2:10 3:3
Avery 1:10 3:13 4:12 11:10 12:16 13:11 16:5,7
Avery's 12:4 13:21
aware 12:7

## B

back 5:2 9:18 10:6,12 13:15
background 5:12 5:15
Bascom 2:20,21 4:4 8:21 11:23 20:9,15 21:18 21:20
bear 4:13
behalf 2:6,12,18 2:24 3:5,11 4:12
belief 9:4
believe 4:24 5:2 5:11 14:16 18:18
believed 11:20
best 17:22
Boardman 2:15
book 6:10,10 7:7
Boulevard 1:7 3:9
Box 2:16
bring 16:12
brought 16:10
Brown 9:5,6,25 12:5 20:11 21:2 21:14
Budish 2:21
bureau 14:15 15:17
business 7:5

## C

C 1:11 2:1
calendar 7:6
call 7:14 8:8 9:23 10:9 11:22 14:2 14:18 15:3,4,8,9 15:18,23 16:1 18:2
called 10:19 20:18
caller 10:10,21 16:6
caller's 10:10
calling 14:13 16:7
calls 14:25
capacity 6:19
Caption 1:10
Carlson 3:2
case 1:11 12:10 13:7,8,21 14:17 15:2
Ceman 2:21
centered 21:6
central 8:8
certainly 13:4,7
certainty 7:20
chance 4:18 9:11 9:15,20
chooses 15:13
clarification 18:1
Claude 2:14
clicking 7:23
Colborn 1:2 4:10
come 12:11 17:8 17:12,13
coming 14:3 17:5 17:9
commander 18:8
commented 10:19 10:20
committed 11:2 11:16
computer 6:15,20
concerned 16:6
concerning 20:11
concluded 21:22
confused 20:10
connected 5:25 17:17
contact 15:13 17:14 21:6
control 8:8
conversation 8:25 9:3 16:14,17,20 17:20,25 18:17 18:18,24 21:1
conversations 19:1,13
convicted 11:11 12:5
conviction 13:20
copy 7:1
correct 5:18 6:23 7:12,16,18,22 10:7,11,24 11:3 11:5,11,18,22,25 12:6 13:11,17 13:24,25 14:5,8 14:12,15 15:14 15:25 16:10,21
corrections 5:17 5:20,24 6:19 13:16
correctly 20:12
country 13:12
county 1:10 2:18 2:24 3:5 5:17 9:5,6,25 10:2,6 10:24 11:2 12:5 14:4,14 20:11 20:11,16,19,21 21:2,14,14
couple 5:12
course 7:3
court 1:12 12:4
Covelli 2:14
coverage 13:6
crime 11:17 12:16
Crivello 3:2
Curry 2:15
custody 10:11,18 10:23 11:1
custom 6:9

## D

D 4:1
daily 6:15
data 6:10
day 7:3 17:17 18:24
Denis 2:18
department 13:2 14:4 17:23
depending 18:10
deposition 21:22
deputy 13:17
describes 7:14
detective 7:15,21 9:24 10:22 14:3 14:13,15,15 15:9,17 20:17 20:18
diary 7:6,9
difference 20:22
directly 10:19
discuss 19:15
discussed 6:7 8:18 9:1 16:5 17:25 18:2 20:1,3
discussing 19:7 19:22
district 1:12,13 12:14,22 19:4,8 19:10
division 17:7
document 4:13,18 5:4,10,13,15
doing 7:2 15:5 19:19
downstairs 17:6
Doyle 5:4
due 12:17
duties 14:11 18:6 18:11

## E

E 2:1,1,10 4:1,8 20:14
earlier 4:15 7:12
East 1:7 3:9
Eastern 1:13
efforts 13:20
either 21:2
employed 5:23
enforcement 6:5 7:20
entry 6:10,20
Essentially 5:7
event 11:7 12:18
events 6:16,22,24
eventually 10:21
exactly 10:14
EXAMINATION

4:2
**Exhibit** 4:15 7:10 9:9,20 10:15 16:18 18:13 19:6,15
exhibits 4:5
exonerated 12:17

**F**
F 2:2,3 3:7
fact 8:20 12:2,17
family 19:17
February 5:22
feedback 15:20
feeling 21:13
felt 17:21
Field 2:15
find 15:17
fine 21:17
first 4:12 5:14
Fitzgerald 2:9
follow 15:13
followed 16:20
following 12:10 16:4
form 6:10 8:21
forward 14:2
Friday 5:3
friends 19:16
front 4:13
further 14:5,8 18:25 21:21

**G**
gathered 10:17
gist 17:24
give 9:11,15 14:13 15:1 17:24
given 14:16,22 15:12
Glynn 2:8,9 4:3,9 4:10 8:23 9:14 9:19 11:24 20:7 21:19
go 5:13 8:1 9:14 15:3
goes 18:1

going 4:10 8:1,2 10:12 15:25 16:2
gotten 15:23
gray 10:14
great 8:6 21:20
Gregory 11:17,21
Griesbach 19:11 19:12
Grimstad 1:6 3:8
guy 20:20 21:13

**H**
habit 14:21
happened 17:17
hard 7:1
head 7:8 21:4
hear 7:23 15:10 15:20
heard 20:12,17
helps 10:16
hired 5:22
hour 18:21
hours 18:13
household 13:2
hung 15:11

**I**
identifies 7:15
iffy 14:22
immediately 18:16,20
impression 17:7 17:11,15
incarcerated 12:12,13
including 12:25
indicated 10:22
indicating 12:15
individual 10:2
information 9:7 13:8,23 15:13
initiated 17:20
inquiries 15:16
intended 6:21
interests 17:22
interview 5:5

investigation 13:11
investigative 13:20
involved 13:15
involvement 13:10,19

**J**
J 2:14 3:1
jail 5:17,21,24 6:1 6:16,17,22,24 7:5 8:9 11:3,10 11:12 18:3
James 9:22
January 5:22
Jeff 1:4
job 5:25 6:5 14:11 14:21
John 3:7
Joseph 1:4
journal 7:9
jurisdiction 10:20 14:7
jurisdictions 21:4 21:5

**K**
keep 6:18 7:8,9
keeping 6:9
Kelly 2:2,3 4:6,12
kind 6:18
knew 11:9,16 12:11 13:8
know 8:16 9:8 10:4,12,17,18 12:12 14:21 15:8,10 17:1,11 17:15 18:1,6 20:25 21:3,3,3,6 21:7,7,15,16
Kocourek 3:5,11

**L**
law 6:5 7:20
learning 9:3
legal 14:11

Lenk 8:12,25 9:22 10:1,6 16:13,14 16:23 17:21,22 19:14 21:1,10
Lenk's 9:12
let's 9:14
Lieutenant 8:11 8:25 9:12,22 10:1,5 16:13,14 16:23 17:21,22 19:14 20:20 21:1,10
limitations 12:18
little 10:14
log 6:10,15,17 7:5
long 5:20
look 4:18 9:10 18:12
lose 15:3
lot 13:6

**M**
M 2:8 4:8 20:14
machine 7:23 8:2
Madison 2:17
Manitowoc 1:8,10 2:18,24 3:5,10 5:17 10:23 11:2 14:4,14
marked 4:5,15 9:9
matter 8:18,25 10:8 11:21 12:2 19:2,5,6,15
matters 8:3
Mayer 3:7
Mayfair 2:22
McCracken 1:6 3:8
mean 7:24 11:7 12:2 13:1,6,10 17:12,18 18:20 19:5
media 11:17 12:3 12:25 13:4,6,9
media-type 13:24

meeting 19:8,12
meetings 19:4
memo 6:8,10 7:6 7:19
mentioned 12:11 19:19 20:5
Mentkowski 3:2
Michigan 2:4
Mike 19:11,12
military 13:14
Milwaukee 2:5,11 3:4
mind 11:8
Mm-hmm 11:15
moment 12:25

**N**
N 2:1,22 3:3 4:1,8 4:8 20:14,14
name 4:10 12:11
named 19:10
names 20:4
Nash 1:6 3:8
necessarily 13:23
need 9:11
never 9:7,12 19:8 19:12
newspapers 13:1
noon 18:8
notebook 6:18
notes 6:9,18
number 14:14,17 14:23 15:1,4,7

**O**
O 4:8 20:14
Object 8:21
occurred 6:16,22 13:12
occurring 6:24
October 10:5
offense 10:24
office 12:15,23 14:15 18:11
officer 5:17,20,24 6:19 13:16
officers 19:16

okay 4:16,25 5:9 5:12 6:7,20 7:10 7:25 8:1,5,18 9:13 10:4,8 11:1 12:8 13:5 14:1 14:19 15:7,12 15:25 17:3 18:4 18:20,23 19:10 20:6 21:12,21
operating 8:1
original 4:6
outside 7:5 21:5
oversees 13:14
o'clock 18:10

**P**

P 2:1,1
PAGE 4:2
part 5:5,15 8:9
patrol 17:7 18:4
patrolling 18:6
penned 4:24
people 10:20 15:1 17:9 19:19 20:4
period 6:7
pers 10:17
person 9:23 10:10 10:18,19,22 11:1 15:7,13
person's 10:9
pertained 6:17
pertains 21:10
Petersen 16:21,25 17:4,6 18:17,18 18:24 19:1,14
phone 15:11
photocopy 4:14
pick 15:10
Pinckney 2:16
Plaintiff 2:6,12
Plankinton 3:3
PO 2:16
Pollen 3:1
portion 12:7 18:12
possibility 19:25

20:2
post 13:19
practice 6:9
prepared 8:11
prepping 5:7
Present 3:13
pretty 11:5
prior 5:25 6:2,5 6:11 8:24
prison 12:6
prisoner 6:25 7:1
private 7:6
probably 13:7
proceedings 4:16
prosecuting 12:16
prosecution 13:11
protocol 14:20
provided 18:5
publicity 16:4
p.m 21:23

**Q**

quarter 18:19
question 20:9,13 20:17 21:8
questions 4:11 5:13 20:22 21:22

**R**

R 2:1
radio 13:1
rang 15:11
rate 10:8 14:1
Raymond 3:1
Rd 2:22
read 9:11,15,20
really 12:9,24 21:16
recall 5:11 6:8 7:20 8:14 9:3,22 12:20,21 16:23 17:5,10 18:25 19:18,19 20:25
received 9:23 15:17 18:3
receiving 7:14 8:8

recognized 14:1
recollection 10:16 19:22
record 6:22 9:15 9:16,17,18 21:23
reflected 16:18
refresh 10:16
relate 6:21
related 9:4,6
relating 16:5
relationship 11:21
relayed 9:7
released 11:14 12:4
remember 17:4,5
report 8:7,11,16 10:15
reported 12:3
REPORTER 9:16 9:18 21:21
reports 12:14,22 12:24
represent 4:14
required 14:21
respect 8:7 10:6 13:20
right 8:7 11:8 14:16 17:12 18:25
right-hand 18:12
road 18:9
Rohrer 19:4
room 17:5,9
roughly 5:22
ruling 19:25 20:2
run 12:18

**S**

S 2:1,16
safe 16:17
saw 4:23
saying 17:20
says 5:16 8:7
sealed 4:6

see 14:24 18:13 20:21
seen 4:20 5:1 8:16 9:10,12 12:14
sense 21:13
sent 4:6
sentence 5:14 12:19
sentenced 12:6
September 7:19 11:9
Sergeant 4:10
serving 12:19
sexual 12:5
Sheboygan 10:2 20:11,16,19,21 21:2,14
sheriff 13:17 16:21,25 17:4,6 17:14 18:17,18 18:24 19:1,14
sheriff's 13:2 14:4 14:14 17:23
shift 18:8
short 6:20
show 5:9 9:9
shown 5:3
significant 6:16 11:7 14:2
sir 4:17 5:19 6:3,4 6:6 7:11,13 8:4 8:10,13,17 9:2 9:21 10:7 11:4 12:1,23,25 13:18,22 14:6,9 15:15,19,22,24 16:3,11,16,19,22 18:22 19:24 21:16
sit 21:9,11
sitting 19:21
somebody 15:10
soon 15:11
sorry 16:2
sort 18:10
source 12:25

sources 13:23,24
speaking 16:7
specific 19:22
specifically 6:17 19:18 20:4
specifics 20:25
Spindler 3:8
Spinlder 1:6
spoke 16:21,25
spoken 17:21
St 2:4,16
stage 15:12
stand 21:4
start 5:14
statement 9:1,12 10:9,23 17:24 18:5
States 1:12
stationed 13:14
status 12:13
statute 12:17
Stephen 2:8
Steve 4:10,12
Steven 3:13 11:9
sticker 4:13
stood 11:8
subject 10:8 19:1 19:5,6,15
Suhr 2:15
suicide 6:25 7:2
suppose 17:23
sure 7:4 10:3,5,13 11:5,9 12:2 13:10,13 14:17 16:10 18:15 20:12,16,19,21 20:23,24
S.C 2:3,9,21 3:2

**T**

T 4:8 20:14
take 5:2 9:10 14:4 14:7
talk 13:1,2
talked 17:3
talking 11:23

12:24
telephone 7:14
  8:8 9:23 11:22
  14:14 18:2
television 13:1
tell 4:22 8:3 20:4
telling 9:22
testimony 5:7
  20:10
thanks 20:8 21:20
theory 8:2
things 11:20
think 4:25 14:24
  20:7,18
thought 9:5,24
  10:1,2 20:20
three 5:23 18:10
Thursday 1:4 5:2
time 4:22,25 5:25
  6:7,12,13 7:18
  8:22 12:4,9
  14:25 18:6,13
  18:14
times 18:9
Timothy 2:20
today 4:18,20,22
  4:25 7:12 8:24
  10:4 19:21 21:9
  21:11
told 10:1,5 16:18
  20:19
Tom 3:5,11
transcript 4:6
transfer 14:17,23
  15:2,8
transferred 15:1
tried 14:17
true 16:8
trying 14:23
twelve 18:19
two 5:23 18:10,21
  20:22 21:4,7
typed 6:15

U
understand 14:24

understanding
  7:18
United 1:12
upper 18:12
use 10:15
usually 7:8 17:14

V
v 1:10
Vague 8:21
Venue 1:12
versus 20:11
viewing 12:20,22
Vogel 2:18

W
W 2:4
waiting 17:8,12
  17:16
Waldo 1:7 3:9
Walt 4:11
Walter 2:2,3
wanted 14:10
wasn't 10:3 12:7
  12:10 13:12
  14:7 20:12
watch 6:25 7:2
Wauwatosa 2:23
way 15:4 20:24
week 5:3,3
went 15:9 18:4
we'll 5:13
we're 10:12
we've 16:4 19:6
WI 1:8 2:5,11,17
  2:23 3:4,10
Wisconsin 1:13
  2:10
Witness 1:1
wondering 16:9
work 6:23 17:6,8
worked 18:8
working 5:16,20
  13:17 18:3
written 6:18 7:1
wrote 7:19

X
X 4:1,8 20:14

Y
yeah 18:22
year 12:19
years 5:23

#
#1140 2:22
#410 2:16
#500 2:4 3:3

0
03 12:9
04 1:11
05 12:9
09:00 1:4

1
1 2:16
1:30 18:14
10/13/2005 1:4
12 7:19 11:9
12:00 18:19
125 9:9,20
1330 18:13
138 4:15 7:10
  10:15 16:18
  18:13 19:6,15
1992 5:22 6:2
1994 5:16
1995 5:16

2
20 4:4
2003 7:19 10:6
  11:9,23,24
  15:25 16:4
2005 10:5
201 1:7 3:9
2600 2:22

4
4 4:3
4:12 9:17
4:13 9:17

4:27 21:22

5
526 2:10
53202 2:11
53203 3:4
53226-1308 2:23
53233 2:5
53701-0927 2:17
54220 3:10

6
60 12:19

7
700 2:4
710 3:3

8
8:00 18:8

9
927 2:16
94 6:8,14 10:12
  13:15 16:2
95 6:8,14 10:12
  13:16 16:2
986 1:11

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 12 of 12   Document 290-7
CHRM002901
CONFIDENTIAL