# EXHIBIT 9

# United States District Court
# Eastern District of Wisconsin

## Avery v. Manitowoc County
## 04 C 986



Video Deposition of

### Eugene Kusche

Recorded 10/26/2005 in Manitowoc, WI

9:35 am - 1:10 pm, 191 mins. elapsed

---

**Magne-Script**

(414) 352-5450

*23017 Condensed transcript with index*

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 2 of 5   Document 290-9

CHRM003031

### Page 69

1     what you knew from that conversation, you had any
2     conversation with any of the detectives in the
3     department about that?
4 A  No.
5 Q  All right. And you're telling me that your
6     recollection is that amongst yourselves, you and
7     the detectives did not ever discuss Tom Beerntsen
8     pressuring the sheriff in this case.
9 A  No.
10 Q  Okay. You mentioned a bit earlier in your
11     testimony an Officer Colborn and a document that
12     you saw about that; is that right?
13 A  That's correct.
14 Q  Okay. I'm going to show you Exhibit 124 in this
15     case. And you've seen that before, right?
16 A  I saw this Monday.
17 Q  Had you seen it before Monday?
18 A  No.
19 Q  This document reflects a conversation between you
20     and Douglass Jones on September 18th, right?
21 A  That's correct.
22 Q  That's shortly after it became public knowledge
23     that Steven Avery had been exculpated by the DNA
24     evidence and that Gregory Allen had been
25     inculpated, right?

### Page 70

1 A  That's correct.
2 Q  Was the call that is reflected in this document
3     initiated by Mr. Jones?
4 A  Yes.
5 Q  Do you remember what he said to you initially
6     when he first introduced himself?
7 A  I think he wanted me to put up a -- this was a
8     call, if I have the sequencing correct, that a
9     campaign sign for someone for school board.
10 Q  Anything else that you recall that introduced the
11     subject matter of the Steven Avery case?
12 A  I really don't recall how it came up.
13 Q  All right. Look at the first sentence, if you
14     would. He says --
15 A  Okay.
16 Q  -- he called you on the afternoon --
17 A  Oh, okay.
18 Q  -- of September 11th to tell you that there was an
19     article in the Herald Times Reporter about the Avery
20     case and that Avery had been released. Do you see --
21 A  That may have been how it started.
22 Q  Okay.
23 A  I really don't recall that much about the
24     conversation.
25 Q  Okay. But in any event, you're not disagreeing

### Page 71

1     with the first sentence.
2 A  I wouldn't disagree with it.
3 Q  All right. And then he says in this memo that
4     you told him that you were already aware of the
5     article and about Steven Avery being released.
6 A  Correct.
7 Q  Then he says, "We chatted about unrelated
8     matters."
9 A  Right.
10 Q  Probably about the political campaign, right?
11 A  Perhaps.
12 Q  Okay. Any other unrelated matters that you
13     remember?
14 A  I don't recall.
15 Q  All right.
16 A  I don't have much recollection of the call.
17 Q  Then he says that your future plans, your health,
18     your exercise regimen, he told you things about
19     his family. Do you remember all of that
20     occurring?
21 A  No.
22 Q  All right. Then he says as he, Doug Jones, was
23     trying to close the conversation, you told him
24     that you would retain the drawing.
25 A  Yes.

### Page 72

1 Q  Do you remember telling him that?
2 A  No.
3 Q  At the time that you spoke to him, you in fact
4     had the drawing, though.
5 A  Yes.
6 Q  All right. Had he asked you to keep it?
7 A  No.
8 Q  Do you know why you told him that you would
9     retain the drawing?
10 A  I would imagine we were anticipating this event.
11 Q  Meaning that the question of the drawing would
12     come up --
13 A  Sure.
14 Q  -- in subsequent legal proceedings.
15 A  Of course.
16 Q  All right. He goes on and he says, referring to
17     you, "He then told me that in '95 or '96, Andy
18     Colborn had told Tom Kocourek, former Manitowoc
19     County Sheriff, that an officer from Brown County
20     had told Colborn that Allen, and not Avery, might
21     have actually committed the Beerntsen assault."
22     Okay? That is what Exhibit 124 says, correct?
23 A  That's correct.
24 Q  Okay. Did you in fact tell that to Douglass
25     Jones?

### Page 73

1  A   I don't recall.
2  Q   All right.  Does seeing this document, 124,
3      refresh your recollection?
4  A   No.
5  Q   All right.  Do you have any reason to disbelieve
6      what this document says you told Doug Jones?
7  A   I recall Colborn saying something to me, and I
8      might have said something to him on the side.  I
9      don't know if Tom Kocourek's name came into it.
10     I don't recall that.
11 Q   All right.  Anything else with respect to that
12     sentence that...
13 A   Again, that's all I can recall.
14 Q   So you knew about Gregory Allen in 1995 or '96 --
15 A   No.  No.  I --
16 Q   -- because Tom Colborn told you.
17 A   No.  He didn't tell me that in 1995, '96.
18 Q   Okay.  Then --
19 A   He said he had the conversation in '95, '96.
20 Q   All right.
21 A   I didn't hear about it till in passing talking to
22     Andy at one time, something being said within --
23     probably within a matter of a couple of -- a
24     couple, three months of this conversation
25     occurring.

### Page 74

1  Q   What happened within a couple, three months of
2      this conversation?
3  A   Andy making a comment to me about this.  Because
4      I said this thing comes up with conversations.
5      And he may have said something, and it would not
6      necessarily have been important to me that I
7      would file it away for future memory.  It might
8      have just made a -- been a side comment at the
9      end of a telephone conversation.
10         But I did not receive that information in '95,
11     '96.  At that time I was chief investigator and would
12     have done something.  I would have -- And then I made
13     this comment.  I probably asked him, was Lenk, who was
14     my replacement, aware of this.  And that's how I would
15     imagine I said he -- that Detective Lenk was aware.
16     He was not that until -- He didn't take command of
17     that bureau until 2003.
18 Q   You made a statement in the course of that long
19     narrative answer that within two or three months
20     of this time he told me.
21 A   I would say.
22 Q   Within two or three months of what time?
23 A   Of this telephone conversation that I had with
24     Doug Jones [indicating Exhibit 124].
25 Q   So your testimony is that within two or three

### Page 75

1      months prior to September 18th of 2003, Colborn
2      told you this?
3  A   Made a comment on something to that effect.
4  Q   So this is before there's been any public
5      knowledge or information, two to three months
6      before there's been any public knowledge or
7      information that Steven Avery has been
8      exonerated.  And you're telling us that Colborn
9      told you, "Hey listen, back in '95 or '96, I
10     found out that" --
11 A   When it came out -- It had happened aft-- well,
12     I'm assuming two to three months, I don't know.
13     After the information about Avery came out and
14     before this conversation with Jones, that comment
15     was made.
16 Q   Well, it's an absolute fact that the first time
17     the district attorney found out about the results
18     of the DNA examination was on September 3 of
19     2003.
20 A   Okay.  I have no --
21 Q   And this document -- look at it.  This document,
22     dated September 18th, is referring to a
23     conversation between you and Doug Jones that took
24     place on September 11th, 2003.  Do you see that?
25 A   Yes, I see that.

### Page 76

1  Q   So you're telling us that --
2  A   I don't --
3  Q   -- Colborn spoke to you before anybody knew
4      anything about Steven Avery being exonerated?
5  A   I don't know when it occurred.  It happened
6      before this con-- [indicating Exhibit 124].  It
7      may have happened that day.
8  Q   So you're changing your prior testimony that it
9      was two to three months before this conversation?
10 A   I don't know.  It happened before it.  It
11     happened after I left my position and before that
12     conversation, anytime in there.
13 Q   Okay.
14 A   I don't know.  I told you, I don't have very
15     specific recollection of this conversation.
16 Q   Well, you seem to have recovered some of your
17     recollection about it.  Apparently Colborn
18     identified Allen to you.
19 A   He -- I don't know that he identified Allen to
20     me.  I'm saying what my recollection was of this
21     conversation, which is not very strong, was that
22     Colborn made a comment to me about getting some
23     information.
24 Q   Yeah.  Okay.
25 A   And I related it in the phone conversation.

### Page 77

1 Q Okay. The statement goes on and says, the next
2   sentence says, "Gene stated," that's you.
3 A Mmm-hmm.
4 Q -- "that Colborn was told by Kocourek something
5   to the effect that we already have the right guy
6   and he should not concern himself." Now --
7 A That --
8 Q Did Colborn tell that to you?
9 A I don't recall it.
10 Q Did you tell that to Doug Jones?
11 A I don't recall it.
12 Q Do you have any reason to believe that Doug Jones
13   would misrecord what you told him?
14 A No.
15 Q Okay. Then it goes on to say that Doug Jones
16   asked you if this information was known. Do you
17   remember him asking you that?
18 A No.
19 Q Then it goes on to say that you said Lenk, MCSO
20   Lieutenant James Lenk, detective bureau command
21   officer, was aware. Did you tell that to Doug
22   Jones?
23 A If he put it there, I probably did.
24 Q And what was the basis for your knowledge about
25   that?

### Page 78

1 A It would had to have been from Andy Colborn.
2 Q Did you talk with Lenk about whether or not Lenk
3   was aware of this?
4 A No.
5 Q All right. At any time?
6 A Not to my recollection.
7 Q Okay. And then the statement goes on and says,
8   "He did not indicate in any way when Lenk first
9   learned about Colborn and Kocourek's
10   conversation." Is that true?
11 A I wouldn't know.
12 Q All right. "On late Thursday afternoon," he
13   says, "he found Mark Rohrer and apprised him of
14   the conversation with Gene," referring to you,
15   and then he says, "By the time I found Mark, he
16   indicated that he'd already been made aware of
17   conversation between Colborn and Kocourek."
18 A Okay.
19 Q Did he tell you that?
20 A No.
21 Q That you remember: he did not tell you that.
22 A Not to my recollection.
23 Q Okay. Now, you just testified a moment ago that
24   had you been in office at the time and chief
25   investigator that you would have had to do

### Page 79

1   something about that information, right?
2 A If there's information on somebody else having
3   committed the crime, yes.
4 Q Well, and that's what this is saying. This is
5   what this information --
6 A No, that's not what that's saying. I did not
7   have any information prior to my retirement that
8   someone else committed the crime.
9 Q Oh, I'm mis-- that was an ambiguous question on my
10   part. What I'm saying to you is, the information that
11   Colborn had about Greg Allen might have been the
12   actual assailant rather than Steven Avery would be
13   information about someone having committed a crime.
14       MR. BASCOM: Object to the form.
15 BY MR. KELLY:
16 Q Specifically Greg Allen.
17       MR. BASCOM: Same objection.
18 A I'm not really following that.
19 BY MR. KELLY:
20 Q Well, let's posit this.
21 A All right.
22 Q Let's say that it's before May of 2003 and you're
23   the chief investigator.
24 A Yes.
25 Q And an officer within the department comes and

### Page 80

1   says to you an officer in Brown County called me
2   and told me Greg Allen did the Penny Beerntsen
3   assault, not Steven Avery. Your testimony is you
4   would have to do something about that then.
5 A Yes.
6 Q Okay. And you would have to draw up a report of
7   having received that information from one of your
8   subordinates.
9 A Of course.
10 Q And you would have to follow-up on that lead; is
11   that right?
12 A Yes.
13 Q Okay. So the fact that you received this
14   information when you did would not cause you to
15   have to do that, you're saying, because you were
16   no longer in office.
17 A If the information here is that Lenk was aware of
18   it, I may have asked if that occurred. I'm
19   assuming that from this report.
20 Q Okay. Did you in fact at any time have any
21   discussion with the subject matter of Exhibit 124
22   with Tom Kocourek?
23 A No.
24 Q Did you at any time have any dealings with Jim
25   Gospodarek about the Steven Avery case?