# EXHIBIT 18

1   STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                                BRANCH 1
2   _____

3   STATE OF WISCONSIN,

4                       PLAINTIFF,        JURY TRIAL
                                          TRIAL - DAY 1
5   vs.                                   Case No. 05 CF 381

6   STEVEN A. AVERY,

7                       DEFENDANT.

8   _____

    **DATE:**    FEBRUARY 12, 2007
9
    **BEFORE:**   Hon. Patrick L. Willis
10            Circuit Court Judge

11  **APPEARANCES:**   KENNETH R. KRATZ
                    Special Prosecutor
12                   On behalf of the State of Wisconsin.

13                   THOMAS J. FALLON
                    Special Prosecutor
14                   On behalf of the State of Wisconsin.

15                   NORMAN A. GAHN
                    Special Prosecutor
16                   On behalf of the State of Wisconsin.

17                   DEAN A. STRANG
                    Attorney at Law
18                   On behalf of the Defendant.

19                   JEROME F. BUTING
                    Attorney at Law
20                   On behalf of the Defendant.

21                   STEVEN A. AVERY
                    Defendant
22                   Appeared in person.

23                   TRANSCRIPT OF PROCEEDINGS

24              Reported by Diane Tesheneck, RPR

25                   Official Court Reporter

                              1

CHRM006136

1   At this time we're going to take a very
2   short break so that the State may get its
3   equipment ready to present the opening statement.
4   We'll be back in just a few minutes.
5           (Jury not present.)
6           THE COURT:  Five minutes, counsel.
7           ATTORNEY KRATZ:  That's fine.
8               (Recess taken.)
9               (Jury present.)
10          THE COURT:  You may be seated.  Members of
11  the jury, at this time we're going to hear the
12  opening statement from the State.  Mr. Kratz, you
13  may begin.
14          ATTORNEY KRATZ:  Thank you, Judge.  May it
15  please the Court, ladies and gentlemen of the jury,
16  Mr. Strang, Mr. Buting, Mr. Avery, good morning.
17          MR. AVERY:  Good morning.
18          ATTORNEY KRATZ:  We're all a little nervous
19  this morning.  And I think that if we admit that,
20  we, being the lawyers, and the jurors asked to
21  decide this important matter, I think we're all
22  going to be better off.
23          And on behalf of the State, let me first
24  start by thanking you, thanking you for your jury
25  service, thanking you for your attention that you

                            37

CHRM006172

1    are about to give in this case, and thanking you

2    in detail for what in jury selection we talked

3    about may perhaps be the most important decision

4    that you will ever make, at least for the rest of

5    your lives.

6         You will note, and we have already

7    introduced, that there are three attorneys on

8    this case, myself, Ken Kratz, the Calumet County

9    District Attorney.  This is my courthouse.  And

10   I'm joined by Mr. Fallon who is seated directly

11   to my right.  Mr. Fallon is an Assistant Attorney

12   General with the Department of Justice.  And

13   joining us also is Mr. Norm Gahn.

14        ATTORNEY GAHN:  Good morning.

15        ATTORNEY KRATZ:  Mr. Gahn is an Assistant

16   District Attorney in Milwaukee County, Wisconsin.

17   You will learn that each of us are special

18   prosecutors in this case.  But what's so special

19   about a special prosecutor?  Why would some small

20   town lawyer from Chilton be in charge of this entire

21   prosecution, this big of a case?  Why would Ken

22   Kratz be asked to lead up this prosecution?

23        We'll talk about how this case was

24   assigned over, but just understand, at least for

25   this person, that although we are all experienced

38

CHRM006173

1    prosecutors, we're doing a favor for Manitowoc
2    County.  It's a rather big favor for Manitowoc
3    County, but it's a favor nonetheless.  It is
4    helping the Manitowoc County District Attorney's
5    Office in presenting this case.
6         Mr. Rohrer, your District Attorney,
7    asked me to take over the case early on.  You
8    will learn about when that happened.  But it is
9    still something that we were simply asked to and
10   we did, in fact, perform.
11        There's two investigators in this case.
12   Now, you are going to hear that there were
13   hundreds of law enforcement officers involved in
14   this investigation, but these kinds of cases
15   require direction.  They require leadership by
16   law enforcement officials that have experience.
17        The first lead investigator in the case
18   who is seated in the courtroom is Mark Wiegert.
19        MR. WIEGERT:  Good morning.
20        ATTORNEY KRATZ:  Mr Wiegert is an
21   investigator with the Calumet County Sheriff's
22   Department.
23        The other lead investigator in this case
24   is Tom Fassbender.  Mr. Fassbender works for the
25   Department of Justice.  He works for a law

39

CHRM006174

enforcement branch of the Department of Justice
which is called the Division of Criminal
Investigation.

And, again, knowing who we are, knowing
who the five of us are, the prosecution team, we
hope may help in determining what's important in
these cases.

The Judge has told you, at least in
brief terms, what an opening statement is. But
often times evidence comes in in bits and pieces,
especially in a six week trial. That isn't
something that you will expect all of the
evidence to come at you at once. And so if we
can provide a road map or an overview of what the
evidence is going to show, that should be helpful
for you.

Some juries that I have spoken to, it's
been helpful to describe this process as the
provision of the cover of a jigsaw puzzle box.
All right. You think of evidence as pieces in a
jigsaw puzzle. You wouldn't tell, if you were
handed one piece of a jigsaw puzzle, where that's
going to go. But if you got the box and if you
have the box, some of the pieces are obvious
where they go; some are not so obvious, but at

40

CHRM006175

```
 1    least it's a guide.  It's a help for you as to

 2    where these pieces all fit.

 3         Now, before I go any further, I want to

 4    talk to you about something that I know some of

 5    you, in your specific questions, expressed as

 6    some concern and that's the nature of the

 7    evidence that's going to be presented.  This is a

 8    very, very serious crime and potentially has

 9    very, very graphic kinds of details that may be

10    involved or may be presented.

11         But there is some uncertainty about how

12    much evidence is going to be presented.  And I

13    wanted to assure you, as the lead prosecutor, as

14    the person responsible for the presentation of

15    the case a couple of things.

16         Number one, and perhaps most importantly

17    for you, as the jury, I'm only going to present

18    those pieces of evidence that are necessary;

19    those pieces that are necessary to tell you the

20    entire story.  My job is not to present gruesome,

21    or overly graphic information for you.

22         And I think as we go through this

23    process, you are going to find that the evidence

24    is pretty straight forward.  It is not

25    necessarily gruesome or graphic, isn't something
```

41

CHRM006176

```
 1      that you should fear at this early stage.  All

 2      right.

 3              I understand the sensitivities not only

 4      of you, but of most of the people seated on the

 5      left hand side of the courtroom.  And I --

 6      actually, I want you to look over to the left

 7      side of the courtroom.  That's the Halbach

 8      family.

 9              You are going to see them throughout the

10      case, friends and family.  And I want to assure

11      you that before the first piece of evidence is

12      ever introduced in this case, everyone of those

13      people:  The mother, the father, the brothers,

14      the sisters, the friends, and any other family

15      members that wanted to, have already seen all of

16      this evidence.  All right.

17              I sat down with them and as sensitively

18      as I possibly could, allowed them an opportunity

19      to review the evidence.  That's just something

20      that a prosecutor should do and that's all been

21      done.  So as you see photographs being presented,

22      as you see physical evidence being brought into

23      the courtroom; I want to assure you that the

24      Halbach family already has seen it.

25              They have already known the kinds of
```

42

CHRM006177

1    evidence that are going to be presented.  And I
2    think that that was necessary for you to hear and
3    necessary for you to understand that this family
4    does have that information.

5         The Judge has told you that there's four
6    charges.  I'm very, very briefly going to talk
7    about those four, because I don't want to
8    reiterate what the Judge did.  But there are four
9    separate charges that the defendant is charged
10   with:  First degree intentional homicide,
11   mutilation of a corpse, felon in possession of a
12   firearm and false imprisonment.

13        Now, the Judge instructed you and my job
14   today in opening statement, again, this isn't
15   evidence, but it is a help for you; it's the
16   cover if you will; it's the road map; it's the
17   overview, to talk about the first legal concept
18   that you as a jury has to understand.  And that's
19   the concept called being a party to the crime.

20        The Judge has told you that that can be
21   satisfied either if the defendant committed an
22   offense himself or if the defendant aided and
23   abetted another in the commission of the offense.
24   Now, the first two counts, the homicide and the
25   mutilation of a corpse are charged as a party to

43

CHRM006178

1      the crime.

2               And so you will learn, at the conclusion

3      of the case, six weeks from now, if you fast

4      forward six weeks from now, that the jury

5      instructions will tell you that if the defendant

6      committed any of those elements himself, or if

7      the defendant aided in another -- another --

8      excuse me -- aided and abetted another in the

9      commission of those offenses, that you can and

10     should find him guilty.

11              Now, I can't stand up here and predict

12     what the defense is going to bring into this

13     case, what cross-examination they may encounter,

14     or if they even choose to present any kind of

15     defense, nor should I.  That isn't my job.

16              My job, as the prosecutor, is to present

17     our case, to present the physical evidence that

18     we have developed, to present the witnesses that

19     we have developed to prove our case.  But just

20     understand, and just remember this concept when

21     it comes time to deciding whether or not the

22     defendant is guilty.

23              The Judge also told you about something

24     called elements of the offense.  The State has

25     the burden of proof here.  The defense has

                          44

CHRM006179

1     absolutely no burden.  And our burden is to prove
2     the case, beyond a reasonable doubt.
3             The Judge explained to you already that
4     beyond a reasonable doubt means a doubt for which
5     a reason can be given when considering all the
6     evidence.  Let me tell you what it is not,
7     though.  Beyond a reasonable doubt is not beyond
8     all doubt.  It's not 100 percent.  And when we
9     are dealing with a human justice system, you
10    can't expect beyond all doubt, or beyond a shadow
11    of a doubt, or comments sometimes that we have
12    heard about that.
13            It's beyond a reasonable doubt.  A doubt
14    for which a reason can be given.  And I'm
15    standing before you, members of the jury, telling
16    you that I accept that burden.  I will prove this
17    case, beyond a reasonable doubt.  But we didn't
18    want you going into this case expecting one
19    hundred percent, or beyond all doubt, because
20    there are human factors or dynamics that go into
21    these cases.
22            Each charge, the Judge told you, has
23    elements of those offense, we're going to go
24    through those in just a minute.  But, also, each
25    of the four charges should be considered

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 11 of 128   Document 290-18

CHRM006180

```
 1    separately.  You shouldn't group them together
 2    and decide if he is guilty of all four or none.
 3    Each of the four counts are to be considered
 4    separately.  And, in fact, there is separate
 5    evidence for all four of those counts.
 6              And, finally, the defendant is presumed
 7    innocent.  As Mr. Avery sits here today, because
 8    you have heard no evidence in this case, he is
 9    presumed by you, or should be presumed by you, to
10    be innocent.  However, and this is a big however,
11    that presumption disappears at that very moment
12    when the evidence in this case satisfies you,
13    beyond a reasonable doubt, that he is guilty of
14    that offense.  That presumption disappears at the
15    moment that the evidence proves that he is
16    guilty.
17              Count 1, the Judge instructed you, has
18    two elements.  And why I'm telling you this and
19    why I'm showing them on the screen or on a
20    PowerPoint presentation is because these are
21    serious, serious crimes; in fact, the most
22    serious crimes that we have in the State of
23    Wisconsin.
24              The legal concepts aren't all that
25    complex.  We are talking about two things that we
```

46

have to prove, caused the death of somebody and
did it intentionally. Nothing magic about that,
nothing complex about that and all of you should
be able to understand that.

The same thing with mutilation of a
corpse, just the two elements; that he mutilated
a corpse and that he did so to conceal a crime
that had been committed. You will hear evidence
in this case about what that crime was that he
was trying to conceal. The crime, as you may
have already guessed, is the first degree
intentional homicide.

Mr. Avery is also charged with felon in
possession of a firearm; again, two elements, the
felon in possession. First, that he possessed
the firearm, that seems obvious. And, number 2,
that some time before November of 2005, he had
been convicted of a felony.

Now, the Judge has told you that that
second element is stipulated. Stipulation means
that the facts are agreed to by the parties; that
you can take that as already having been proved,
beyond a reasonable doubt, that Mr. Avery has
that felony conviction. And so it's just the
first element of that offense that the State has

47

CHRM006182

1    to prove. Do you all understand that? All
2    right.
3            Now, false imprisonment has five
4    separate elements to the offense. Those five
5    elements are that he confined or restrained, note
6    that that's in the disjunctive; he either
7    confined or restrained Teresa Halbach,
8    intentionally, without her consent. He didn't
9    have authority and he knew that he didn't have
10   authority to confine or restrain Ms Halbach.
11           All right. Enough of the civics lesson.
12   Let's talk about what the evidence is going to
13   show. On Monday, October 31st, 2005, beginning
14   at approximately 2:45 p.m., the State intends to
15   prove to you that the defendant restrained,
16   murdered, and mutilated a 25 year old
17   photographer named Teresa Halbach.
18           We're going to prove to you what
19   happened. We're going to prove to you who
20   committed this crime. We're going to prove to
21   you where it happened. We're going to prove to
22   you when, specifically, it happened. And those
23   will prove all of the elements of the offense.
24           What we're not going to prove to you,
25   what the Judge has already told you we don't have

                        48

CHRM006183

1    to and, in fact, can't prove to you, is why.  We
2    can't prove the why in a case like this.  That's
3    called motive, the reason behind the killing;
4    what was in Mr. Avery's mind when he decided to
5    kill this lovely young woman.

6         I'm going to introduce you to somebody.
7    This remarkable young woman was 25 years of age;
8    she was single; she was a freelance photographer.
9    She had her own photography business that was,
10   although in its infancy, was doing quite well.

11        This woman, and I will remind you
12   several times in this opening and throughout the
13   trial, I will remind you that we're talking about
14   a real person.  We're talking about somebody's
15   daughter, somebody's sister, a lot of people's
16   friend.  Teresa Halbach had her whole life in
17   front of her and the evidence is going to show
18   that on Halloween of 2005, that all ended, that
19   ended in the hands of the defendant, Steven
20   Avery.

21        It's such a big case, with such a big
22   job that we have to try to present all of this
23   investigation.  I'm going to start from the
24   beginning and I'm going to start talking about
25   the investigation itself.

49

CHRM006184

1      Ms Halbach was reported missing on the
2   third of November, 2005. Ms Halbach worked for
3   a -- at least part of her photography business
4   was that she worked for a publication called *Auto*
5   *Trader Magazine.* You are going to learn through
6   the case and you are going to hear from several
7   witnesses from *Auto Trader* that it is a magazine
8   that, basically, is responsible for selling
9   automobiles, some other things, trailers and the
10  like, but mostly automobiles. And it's a
11  publication that Teresa supplemented her income
12  with.

13      Teresa was mostly responsible or mostly
14  enjoyed taking photographs of weddings and was
15  already developing quite a niche and quite a
16  specialty taking pictures of little kids, of
17  babies and young children. But to supplement her
18  young business, she worked for *Auto Trader*
19  *Magazine.* So to understand how this case
20  transforms from a missing person investigation
21  into what became one of the largest criminal
22  investigations in Wisconsin history, starting
23  from the beginning, we're starting from the
24  investigation, is important for you to
25  understand.

CHRM006185

The investigation determined that Teresa Halbach took three pictures or at least had three business stops on the 31st of October. Now, one of those were a person by the name of Mr. Schmitz; one of those was a person by the name of Mr. Zipperer. And the third and the last stop that she made late in the afternoon on the 31st was at the Steven Avery Salvage Property.

The investigation early on determined that this man, Steven Avery, called *Auto Trader Magazine* at 8:12 that morning, on that very day, on the 31st of October. And Mr. Avery asked, specifically, that the same woman who has been out here before, the same woman who on at least six and perhaps more occasions had come out to take pictures. Mr. Avery wanted her out there the afternoon of the 31st.

Now, two very critical findings very early on in this investigation came to light: Number 1, that Steven Avery was the one who lured Ms Halbach out to the property on the 31st. But number 2, and perhaps as importantly, Steven Avery was the last person to see Teresa Halbach alive.

Who is this man? The Judge told you

51

CHRM006186

that there was a lawsuit which was filed against
Manitowoc County and many of you, in fact,
virtually all of you, knew something about Steven
Avery before serving on this particular jury.
Mr. Avery achieved some degree of notoriety back
in 2003 when he was exonerated for a 1985 sexual
assault conviction.

You should know that that exoneration
was based upon DNA evidence. You should know
that that DNA evidence was performed by the
Wisconsin State Crime Laboratory and it was
performed by an analyst, the head of the DNA unit
in Madison, a woman by the name of Sherry
Culhane. I want you to remember that name
because you are going to hear that name later on
in this case.

Mr. Avery, as you already heard, later
filed a civil lawsuit against Manitowoc County
seeking compensation, seeking money for the --
excuse me -- for the time that -- that he was
wrongfully convicted. And it's that degree of
notoriety, that's how Mr. Avery comes to you in
this case. That may or may not have some things
to do with this case.

Now, we understand and the evidence is

52

CHRM006187

1    going to be clear, that Mr. Avery never should

 2    have been convicted in 1985 based upon

 3    eyewitness -- or mistaken eyewitness testimony;

 4    that there wasn't any DNA evidence, at least the

 5    DNA analysis wasn't to the level or to the point

 6    that it is now and certainly isn't anything like

 7    you are going to hear about in this case; and, in

 8    fact, should have been exonerated and was in

 9    2003.

10          We'll also tell you and at the close of

11    this case I'm going to point to everyone of you

12    presenting jurors and say that that has

13    absolutely nothing to do with this case.  When

14    deciding who is accountable for the death of 25

15    year old Teresa Halbach, Mr. Avery's past and his

16    past exoneration have nothing to do with this

17    case.

18          Ms Halbach, as you have heard, or she

19    comes in this case as the -- part of a missing

20    persons investigation.  Now, Calumet County, and

21    Mr. Wiegert, as a matter of fact, was in charge

22    of that missing persons investigation early on.

23    That's through the 3rd and the 5th.  Those parts

24    of the missing persons investigation that

25    happened in Calumet County are Calumet County law

53

CHRM006188

1　　enforcement's responsibility.  Those parts of the

2　　missing persons investigation that happened in

3　　Manitowoc County necessarily and appropriately

4　　are Manitowoc County's responsibility.

5　　　　　When looking for a 25 year old freelance

6　　photographer, there is nothing improper about

7　　Manitowoc County being involved in that case.

8　　You are going to learn, however, that on the 5th,

9　　on the 5th of November, at about 2:00 in the

10　　afternoon, Judge Jerome Fox, another judge from

11　　Manitowoc County, one of the three sitting judges

12　　in Manitowoc County, assigned me to be

13　　responsible for the prosecution and to assist in

14　　the investigation of this particular case.

15　　　　　You have already heard that the reason

16　　for that was something called a perceived

17　　conflict, an apparent conflict; that is, it may

18　　look bad if Manitowoc County remained involved.

19　　You are going to hear evidence from many law

20　　·enforcement officers; in fact, the lead

21　　investigators in this case, that there was no

22　　actual conflict.

23　　　　　There was nothing that prohibited, or

24　　precluded, or legally made it impossible for

25　　Manitowoc County to keep performing or keep

54

CHRM006189

1    assisting in this case.  But we all felt it

2    better; myself, Mr. Rohrer, the two district

3    attorneys, Sheriff Pagel and the law enforcement

4    officials for Manitowoc, that the case be

5    transferred over to Calumet County and to DCI,

6    the Division of Criminal Investigation, with the

7    State to lead up the investigation.

8         Now, you are going to hear that

9    Manitowoc County officials remained involved in

10   the case.  They remained involved in the

11   investigation that when manpower, and we are

12   going to be talking about how many police

13   officers were necessary, that they remain in a

14   helping or a support role, but the case is, in

15   fact, turned over to Calumet County.

16        This particular photograph, I want you

17   to look at for quite a bit of time as I'm

18   talking.  This is the Avery Salvage Yard, located

19   in the Town of Gibson.  This is a photo that you

20   are going to see a lot during the course of this

21   case.  And this is, for the next six weeks, a

22   property that you are going to come to know very,

23   very well.

24        And so as Mr. Fallon and Mr. Gahn and I

25   were talking about this opening statement, we

55

CHRM006190

1   thought it appropriate that we introduce you to

2   the Avery salvage property.  First of all, it's a

3   40 acre property.  The entire square here is 40

4   acres.

5         What you also need to understand is that

6   all of these, appear to be little dots, are cars.

7   These are all junked vehicles in the Avery

8   salvage property.  And a number that you are

9   going to hear is that there are about 4,000

10  junked vehicles on the Avery Salvage property.

11        There's four residences, four places

12  where people live on the Avery salvage property.

13  The first, in the lower left hand corner, which

14  is the northwest corner of the property, is

15  Steven Avery's trailer.  That's where Steven

16  Avery lived on the 31st of October.

17        Living next to Steven was his sister,

18  Barb Janda.  Barb had four sons that were living

19  with her at the time.  But when you kind of look

20  at this property it's important to know where

21  Barb Janda's trailer is.

22        Steven's parents, Allen and Delores

23  Avery, also had a trailer, had a residence on the

24  property.  And that was up closer to what you

25  will find out are some business buildings, the

56

salvage business itself was kind of up in this
quadrant, or this corner of the yard.

And, finally, Steven's brother, Charles
Avery, Chuck, also had a trailer on the property.
All right.

Now, you are going to hear that
surrounding this property on three sides was an
active, working gravel quarry. And so we're
going to have some larger aerial photos that
we're going to show you in just a minute, but
just to give you an idea of what's around this
property, not just the 40 acres of search area,
but hundreds of acres that surrounded that that
were also included in the search.

Members of the jury, the evidence is
going to show and you are going to hear from
officers, when they talk about the search efforts
in this case, that a search area this size is
nothing short of overwhelming. All right. All
of the places that the officers can look is
absolutely overwhelming.

If you know anything about the case you
will understand this event. But on Saturday, the
5th of November, Pam and Nikole Sturm, two
citizens, two citizen searchers, were given

57

CHRM006192

permission and did search the Avery salvage
property.

Pam and Nikole found the needle in the
haystack. Pam and Nikole Sturm found the one
vehicle on the property that all of the citizen
searchers that you are going to hear about were
looking for.

Now, there are several things that the
evidence is going to show. And as you look at
this photograph, several things about the
attempts at whoever placed this vehicle here, to
disguise it, to hide it, attempts to obscure its
detection, you are going to learn, members of the
jury, through this evidence in the case, that the
vehicle was locked, that the four doors on this
vehicle were locked when Pam and Nikole came upon
it.

You are going to learn that the license
plates were both removed, both the front and back
license plates were removed from the vehicle.
You are going to learn the battery was
disconnected and you are also going to learn that
the vehicle identification number was necessary
to, in fact, identify this as Teresa Halbach's
vehicle.

58

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 24 of 128   Document 290-18

CHRM006193

1          Now, the evidence is also going to show
2     you where on the property Teresa Halbach's
3     vehicle was found.  It was found in -- not
4     accidentally -- the furthest point from the
5     defendant's trailer.  Again, you are going to
6     find that it was intentionally obscured, that it
7     had immediate access to something called a car
8     crusher on the property.
9          And, again, just to orient you, Steven
10    Avery's trailer is in the lower left hand portion
11    of this particular photograph.  Where it was
12    found was not an accident.  We'll also tell you,
13    during the course of the introduction of the
14    testimony, that it's important where it wasn't
15    found.  It wasn't found on a roadway.  Wasn't
16    found in some mall parking lot.  It was found on
17    the Avery salvage property, the family business
18    property.
19          I talked about the car crusher; you will
20    hear a little bit about that piece of equipment
21    that was near or right next to Teresa Halbach's
22    vehicle.  You are going to learn and you are
23    going to hear evidence sometime through this six
24    weeks how this piece of equipment works, how a
25    regular looking vehicle, car, SUV, truck, starts

59

CHRM006194

1      out looking like a regular vehicle and ends up

2      flattened or smashed.

3             You are going to learn why it's

4      important that Teresa's vehicle was next to the

5      car crusher and you are going to learn the

6      numbers of crushed vehicles and how easily Teresa

7      Halbach's vehicle could never have been found in

8      this case. Could have been slipped in between,

9      if you will, one of those other cars.

10            You will hear about a lot of

11      professionals that were asked to perform

12      assistance in this case. You are going to hear

13      about law enforcement professionals; you are

14      going to hear about Crime Lab analysts; you are

15      going to hear about some very, very, well

16      qualified expert witnesses.

17            And all of those professionals have two

18      legs. One of them, though, has four. It's a

19      Belgian Shepherd named Brutus. Brutus is a

20      search and rescue -- or search and recovery dog

21      that is insensitively called a "cadaver dog".

22            What Brutus does is one thing. Brutus

23      is highly trained. And you are going to hear

24      testimony from Brutus' handler, Julie Cramer.

25      Brutus does one thing and that's find where a

60

CHRM006195

1    deceased person has been.

2         The first official, first professional,

3    to approach this vehicle after it's found, after

4    law enforcement secures that area so nobody else

5    can get around there, the first professional was

6    a four legged variety.  It was Brutus.  It was a

7    canine.

8         And Brutus, you are going to hear, was

9    asked -- not directed towards this vehicle, but

10   asked to just search around this particular

11   location.  You are going to hear evidence that

12   late in the afternoon on the 5th, after the

13   vehicle was found, after a search warrant was

14   already obtained in this case, that Brutus, when

15   approaching Teresa Halbach's vehicle, alerted.

16        It's called hitting on the vehicle.  It

17   was quite a dramatic alert.  And you are going to

18   hear from Ms Cramer about that.  Sadly and

19   unfortunately, that meant one thing to the

20   handler and that meant one thing to the lead

21   investigators in the case.  Early on, they

22   suspected, because of Brutus, because of this

23   search and rescue dog, because of this cadaver

24   dog, that a deceased individual either was in the

25   back of this SUV, or at some point had been in

                          61

CHRM006196

1    the back of that SUV.

2            Now, importantly, you are also going to

3    hear that the police decided not to touch the

4    vehicle at that time.  The police decided not to

5    process it even when the Crime Lab was on the

6    scene.

7            You are going to hear that the Crime Lab

8    loaded this vehicle onto an enclosed trailer,

9    trucked the enclosed and intact SUV all the way

10   to Madison, where on a Sunday, for a very brief

11   amount of time, but mostly on Monday, that

12   vehicle was processed by the experts.  Processed

13   by those state agents, by those State Crime Lab

14   expert employees, analysts, when they made some

15   very dramatic and very important findings in the

16   case.

17           I don't want to get ahead of myself.

18   Because on November 5th, on that first night, on

19   that first afternoon, there were places to look,

20   as you can imagine.  After Teresa Halbach's

21   vehicle was found on the Avery salvage property,

22   Mr. Wiegert, Mr. Fassbender, directing many law

23   enforcement officials, had a job to do.

24           Now, you saw the size of the Avery

25   salvage property.  You are going to hear

62

CHRM006197

testimony from Mr. Fassbender. He's going to

provide you with an idea about the methodology,

about the plan, the search plan in this case.

You are going to hear Agent Fassbender

talk about missing persons investigations and

when they go from missing persons to criminal

investigations, how their thought process

changes. But at that early stage, when they find

the vehicle, when they don't know that there is

any blood in the back of the vehicle, when they

don't know if a body is involved in this case,

that Agent Fassbender and every other law

enforcement officer, you will hear, at that

scene, had one thing in mind and that was to find

Teresa. The job of the police at the time was to

find Karen Halbach's daughter.

And you are going to hear the evidence

that the officers made very, very quick work of

searching all of the residences on the Avery

salvage property, all of the four residences, all

of the outbuildings. They are searching for

Teresa Halbach and the search plan, again, is to

find the victim, find the victim's body.

But a secondary obligation of theirs is

also to look for obvious signs of evidence,

63

CHRM006198

right?  You don't have to watch CSI to know that.
At least a first kind of sweep, or a first kind
of look through, or a first kind of search of all
of these residences are to try to find obvious
signs of a crime if, in fact, a crime did occur,
or something that is going to help law
enforcement find Teresa Halbach.  Why I say all
that is because Steven Avery -- With search
warrant in hand, Steven Avery's residence was
searched on the 5th.

Now, again, we're looking for Teresa's
body, hopefully alive, but if not, it is
important to find if she's on that property.
Steven Avery's garage is searched, other
residences, all of the other buildings on the
residence are searched, the salvage business
itself.  But the 4,000 vehicles, in what you will
hear was a torrential downpour, were also
examined for the first time on the evening of the
5th.

Now, law enforcement officers were
involved in that, but Brutus' friends were also
involved in that, other canines, the rest of the
team, the other search and rescue animals, the
canines, were taken in a downpour, in the pitch

64

CHRM006199

1    dark, out on a 40 acre property. And everyone of

2    these cars was encircled by one of those dogs

3    trying to find Teresa Halbach.

4    Please recall, at this early stage, the

5    police don't know what they are looking for yet.

6    They don't really have an idea yet of the kinds

7    of things that they are looking for. So when you

8    remember this search plan, you will hear evidence

9    and some officers may even call it the funnel

10    approach, nothing fancy about calling it the

11    funnel approach, it makes sense.

12    It's a way to describe search efforts.

13    It is actually an interviewing technique as well.

14    But it's a way to find evidence in a funnel type

15    of approach. We're looking for the body first.

16    Then we're looking for obvious signs of evidence.

17    Then as you get closer and closer into more

18    detail, more thorough, more directed searches,

19    because you are able to go back into all of those

20    places and all of those properties, that's the

21    methodology.

22    And as you hear officers testify

23    throughout this case, when they testify on the

24    witness stand, remember that funnel approach.

25    Remember that kind of methodology as they talk

65

CHRM006200

about these kinds of things. But make no
mistake, that on the first night, they are
looking for Teresa and they are hoping to find
Teresa alive.

When that was unsuccessful, the next
morning, on the 6th, Mr. Fassbender, Mr. Wiegert,
were able to secure some help. They needed
bodies. They needed some cops. They needed some
volunteers. And so they got volunteer
firefighters from all over the Manitowoc and
Calumet County areas.

And they all showed up in force, en
masse, on the morning of Sunday, November 6th.
And for the first time, everyone of those 4,000
vehicles was opened up. Everyone of those 4,000
trunks was opened by a firefighter with a police
officer with them, looking for the body of Teresa
Halbach.

Also on Sunday, November 6th, a firearm
was found, or recovered; it was actually found
the evening before. But it was seized; it was
recovered. It was hanging over the bed of the
defendant, Steven Avery. He thought it was
appropriate to recover that as a piece of
evidence and, in fact, it was.

66

CHRM006201

1      You are going to hear that the brand
2      name of this semi-automatic .22 caliber rifle is
3      Marlin.  You are going to hear that it is
4      something called tube loaded.  Not that any of
5      these things are going to mean much to you at
6      this point, but there are a number of bullets
7      that are able to be loaded into this
8      semi-automatic rifle.

9           You are going to hear, by the way,
10     although hanging over Mr. Avery's bed and his
11     exercising control over that, should be obvious
12     that on the 31st of October, Mr. Avery exercised
13     a great deal more control.

14          A deserving piece of evidence was seized
15     on the -- Sunday, the 6th of November.  And it
16     is, what we believe, the last recorded voice of
17     25 year old Teresa Halbach.  When Mr. Avery, the
18     evidence will show, made arrangements to have
19     this young woman come out to his property that
20     afternoon, he didn't use his own name.

21          He didn't use the name Steven Avery.
22     Even though Ms Halbach had been out to the
23     property, as I told you, on a number of occasions
24     before; Mr. Avery used a different person's name.
25     He used the name B. Janda, the initial B. Janda,

67

CHRM006202

J-a-n-d-a. That's Barb Janda, can be Barb Janda,
but when we called the *Auto Trader Magazine*
people in Milwaukee, and you are going to hear
from Ms Schuster and Ms Pliszka, two employees of
*Auto Trader*, Mr. Avery used the name and used the
number for B. Janda.

Teresa Halbach doesn't know who B. Janda
is. You are going to hear evidence that Ms
Halbach called back the telephone number for Barb
Janda and she left this voice mail. This voice
mail was recovered, was retrieved. You are going
to hear this voice mail.

And you are going to hear from Teresa in
her own words, in this courtroom, that she got
the message, that she knows that you want me to
come out to the property. Teresa Halbach tells
B. Janda that she's going to be out there
sometime after 2:00 p.m., that very day, on the
31st of October.

This will be important for you in
determining a timeline. Where was Teresa all
that day; was this before or after she went to
the Schmitz photo shoot and the Zipperer photo
shoot. That's going to be uncontroverted.
Absolutely, this is the last stop that she made

CHRM006203

1    on the 31st of October.

2         Two days into this, folks, we're now on

3    Monday, the 7th of November, and the first

4    results come from the Wisconsin State Crime

5    Laboratory.  The first results find several

6    things.

7         First of all, in the back cargo area of

8    Teresa's SUV, they find that there's female

9    blood.  They find there is a lot of female blood

10   in the back of Teresa's SUV.  But they also

11   found, interestingly, male blood, at least at

12   that early stage with their early typing, they

13   could find that it was male blood.

14        And interestingly and importantly that

15   already on Monday, the 7th of November, there is

16   male blood found in the victim's vehicle in at

17   least six different locations.  Six different

18   places they find male blood.  Mr. Wiegert,

19   Mr. Fassbender, all of the investigators don't

20   understand the significance of the male blood

21   being in six different places.  They do, however,

22   understand the significance of a lot of female

23   blood.  And they suspect early on that something

24   horrible has come to Teresa Halbach.

25        Also on Monday, a burn barrel was

69

CHRM006204

1    discovered, not just any burn barrel. Again,
2    here's a picture, an overview, a part of the
3    aerial photograph of the Avery property itself.
4    There is Steven Avery's trailer and located
5    outside of Steven Avery's trailer was a burn
6    barrel that was recovered.
7         Now, again, not just any burn barrel,
8    but Steven Avery's burn barrel. And you will
9    hear later in my opening and you will hear a lot
10   of evidence about the trial, about what critical
11   pieces of information were found from that burn
12   barrel. But put it in perspective, on Monday,
13   that was found.
14        I provide this slide just as another
15   example for you of where that burn barrel was in
16   relationship, not only to the proximity of Steven
17   Avery's trailer, but the proximity to this red
18   Dodge Caravan. You may also have guessed, this
19   is the car that Steven Avery asked Teresa Halbach
20   to come take a picture of. All right. So the
21   proximity of the burn barrel to his front door
22   and also to the Dodge Caravan will be important
23   in the determination at the close of this case
24   when you decide who was responsible for these
25   crimes.

70

CHRM006205

1       The next day, three critical pieces of

2    evidence are found on Tuesday, the 8th.  Now, we

3    talked about these more detailed searches.  On

4    Tuesday, one of these more detailed searches

5    occurred in Mr. Avery's trailer.

6       You are going to hear evidence that this

7    bookcase was pulled out, was jostled about.  You

8    are going to hear evidence about this particular

9    binder having been pulled out of the bookcase.

10   And after the officers looked through it, how it

11   was slammed back in as the book case was actually

12   pulled out from the wall.

13       And after jostling and after searching

14   it, after slamming things around and after

15   putting the bookcase back in its location, you

16   are going to hear this is what the officers saw.

17   They saw a Toyota vehicle key in the bedroom of

18   Mr. Avery.  You are going to hear evidence that

19   it had obvious evidentiary value, that the

20   officers at that time stopped what they were

21   doing and Investigator Dan Kucharski of the

22   Calumet County Sheriff's Department seized or

23   took control of that key during that more

24   detailed search.

25       More detailed searches were also

71

CHRM006206

occurring at the same time of the entire Avery Salvage Yard, which included now officers, volunteer firefighters, going through all of the cars again; 4,000 searches occurred again, on Tuesday. But you are going to hear this time they weren't looking for a body, at this time they were looking for stuff. They were looking for evidence.

After the body wasn't found in their first search, they are going back and they are looking for items of obvious evidentiary value. You are going to hear testimony they found something of obvious evidentiary value; they found the victim, Teresa Halbach's, license plates crumpled up in a station wagon.

I just show you this slide to show you what the vehicle looked like, the station wagon that the license plates were found in. And also provide this aerial photograph to give you an idea of the vehicle that the license plates were found in.

Very quickly, I want to remind you of Steven Avery's trailer is down in the lower left hand corner; that the access road leading to Mr. Avery's trailer comes from the top of this

CHRM006207

```
 1      figure down towards the right.  Teresa Halbach's
 2      vehicle is found in the first vehicle (sic) next
 3      to the access road on its way to Steven Avery's
 4      trailer.  Again, the evidence is going to show,
 5      not by accident, the proximity to the defendant's
 6      roadway, the proximity to the defendant's
 7      trailer, all becoming important.
 8               Now, I told you that there were three
 9      important discoveries on the 8th.  And the third
10      and perhaps the most important discovery that day
11      is something that's being referred to as a burn
12      area.  Again, just to orient you, it's the same
13      kind of picture that we have been looking at:
14      Steven Avery's trailer; Steven Avery's garage.
15      The Dodge Caravan, the van that Ms Halbach was
16      taking pictures of, was located right there; and
17      there's the burn area.
18               The proximity of this burn area to the
19      garage is obvious; the proximity of this burn
20      area to Mr. Avery's trailer itself is obvious.
21      To provide you with another view of this burn
22      area, again located -- you can see his trailer,
23      you can see the garage on the right.
24               But, importantly, that burn area
25      contained human remains.  It contained obvious
```

73

bone fragments. Even to the untrained officers
that stumbled upon this particular burn area,
even when they called over the Crime Lab to
process this particular location, it was obvious
that there were human remains in this particular
burn area.

Now, this next picture is particularly
important because it was taken before any
processing begins. There's the burn area that
we're talking about. That's the burn area that
contained the obvious human remains. You will
see and you will hear from the officers who were
at the scene, that this burn area, from the first
night, was guarded, was guarded by Mr. Avery's
German Shepherd. I believe his name was Bear.

But this particular German Shepherd, not
of the friendly sort, did not allow law
enforcement officers to get close to this burn
area. Did not allow any of the canine help that
was out there to get close to that area. And any
time -- excuse me -- law enforcement even got
close to the burn area, Bear made sure that they
were shooed away.

But I think it's also important about
this case, when we talk about proximity, there

74

CHRM006209

isn't any question who exercises control over this burn area. And in the background, just -- just see how close it is to that van that Teresa Halbach was asked to take a picture of.

The next day, Wednesday, November 9th, was the first time that recovered bone fragments from that burn area are identified by an anthropologist. An anthropologist is a professional who looks at bones and can identify whether they are human, or that they are non-human, where they go. We'll talk about that a little bit later.

But even though these fragments are small, even though they are burned almost beyond recognition, on Wednesday, the 9th, they determined that those were, in fact, adult female remains found right behind the defendant's garage.

All right. This is the first image that is not a photograph that I'm showing you. This is computer generated. And we're going to hear from a man who created these images. His name is Tim Austin. He works for the State patrol, the State of Wisconsin, in scene reconstruction.

And what Tim Austin will tell you is

75

CHRM006210

1    that he was out at the scene -- and we'll talk

2    about this a little bit later -- but he was out

3    at the scene and took over 4100 measurements out

4    at the scene.  And after taking his own

5    photographs and after taking over 4100 images --

6    excuse me -- measurements, he was able to

7    recreate some of these scenes for you, for the

8    jury.

9         And these are created for the jury so

10   that you can see things that the naked eye can't

11   see; so that you can see things that photographs

12   can't show; so that you can see relationships

13   between some evidence and fixed objects or other

14   evidence that's found.  And so as you see this

15   perspective you will see that you are up, you

16   know, dozens of feet above the ground.  And it's

17   something, again, unless you are that tall, you

18   are not going to be able to see this kind of

19   location.

20        But this particular computer generated

21   animation is important to embrace or to -- for a

22   jury to look at in the case because the burn area

23   is clearly visible.  How close it is to

24   Mr. Avery's garage; how close it is to the

25   trailer; how close it is to the other area,

76

CHRM006211

1   what's called the curtilage, that is the area

2   that surrounds Mr. Avery's property, all becomes

3   important.

4        All right. So these are -- And when

5   something is not a picture, when it, in fact, was

6   created through computer animation or computer

7   generation, I will let you know that.

8        One of the bones that was recovered was

9   a long bone. And I'm showing you this for a

10  reason, in my opening statement, so that you

11  understand what we're looking at here. That we

12  aren't just looking at some bone in abstract.

13  We're not just looking at some DNA profile.

14       It's Teresa Halbach's shinbone. All

15  right. It's Karen Halbach's daughter's tibia.

16  And attached to Teresa Halbach's tibia was some

17  tissue. Now, despite Mr. Avery -- The evidence

18  will show, that despite Mr. Avery's effort to

19  completely obliterate all these bones, by

20  burning, to incinerate these bones completely,

21  this bone survived.

22       This tissue that was on the bone

23  survived, which allowed a DNA match, which

24  allowed the State of Wisconsin analyst, guess

25  who, Sherry Culhane, when she performed an

77

analysis on that tissue, to match it with the
blood found in the back of the SUV; with a soda
can that is found in the front of the SUV; and
with a standard.

Now, the standard is also called an
exemplar. You are going to hear those two
statements, but Teresa Halbach, before the 31st
of October, had a Pap smear performed, a cervical
swab that was performed. And thankfully for us,
that was kept at Bellin, up in Green Bay. Well,
Sherry, also -- Ms Culhane, also, was able to
develop a DNA profile from the Pap smear.

We know that's Teresa. And from that
exemplar, from that example, matches the tissue
on the leg bone; matches the blood; matches the
soda can. We can say with 100 percent certainty
that those human remains are those of Teresa
Halbach.

The first 11 days of this case become
extremely important. And for just about five
minutes here, I want to give you those 11 days
in. And what you have just heard, that part of
the investigation, you have only heard 11 days
worth of investigation, which has gone on 15
months now. But the first 11 days are important

78

CHRM006213

1  and I want to just run through those for you.

2  Ms Halbach is killed on the 31st of

3  October, at the Steven Avery salvage property,

4  sometime after 2:45 p.m. You are going to hear

5  from a gentleman by the name of Tom Pearce, who

6  is Teresa Halbach's business partner, that she

7  doesn't show up for work on the 1st or 2nd.

8            And on the 3rd, Teresa Halbach is

9  reported missing to law enforcement authorities.

10  That's when the missing persons investigation,

11  from a law enforcement standpoint, begins. I

12  think, if you will, as to the feelings of the

13  Halbach family and friends and how worried they

14  are even on the 3rd.

15            But on the 4th, you are going to hear

16  from a witness named Ryan Hillegas who helped

17  coordinate the citizen search efforts.

18            You are going to hear that there was

19  something called cell tracking. We're going to

20  hear a little bit about that. A cell phone

21  actually is almost a transmitting device and it

22  pings or beeps, if you will, off of cell towers

23  all over the state, whenever you carry it in your

24  pocket, whether it's on or not. You are going to

25  hear evidence about attempts to find Teresa's

79

CHRM006214

cell phone; if we find her cell phone, we can
find Teresa.

We also looked at those early stages for
whether or not she used any of her credit cards.
Where is Teresa Halbach?  We try to find that
out.

You are going to hear that a gentleman
by the name of Curt Drumm, a pilot in the
Manitowoc area, volunteered his airplane and
helped law enforcement fly over Mr. Zipperer's
residence and Mr. Schmitz's residence and the
Avery compound and any of the roads that may have
led to and from there to try and find Teresa
Halbach.

On the 5th, we know that Teresa's
vehicle was found at the Avery salvage property.
You will hear that search warrants were obtained.
You will hear during the course of this case that
a search warrant is nothing more than a piece of
paper.  It's a judicial authorization; a judge
authorizes law enforcement officers to search the
property, in private areas.  And we got many,
many search warrants in this case and searched
for her body.

You have heard already, that on the 6th,

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 46 of 128   Document 290-18

CHRM006215

1  firearms are obtained or taken from Mr. Avery's

2  bedroom; his garage is searched, at least the

3  first search of the garage for those items of

4  obvious evidentiary value. But remember, on that

5  Sunday we don't have any results yet, from the

6  Crime Lab. Those don't come until sometime on

7  Monday, when the Crime Lab determines that both

8  male and female blood is located in the SUV.

9      We search, for the first time, all of

10  the junked vehicles, at least all of the trunks

11  are searched.

12      And Mr. Avery's burn barrel is

13  discovered and searched.

14      And other things will happen and you are

15  going to hear from other officers that the

16  surrounding areas, not just the 40 acres, but

17  hundreds of acres of gravel pits and the like are

18  being searched in these early days.

19      On Tuesday, perhaps the most important

20  of all the days as far as discoveries go, those

21  three critical discoveries are made: The Toyota

22  key, the license plates, and the burn area behind

23  the defendant's property.

24      On Wednesday, the 9th, there is an

25  identification made of male blood in the victim's

81

CHRM006216

vehicle. That blood matches the DNA profile of
the defendant, Steven Avery. And bones are
recovered and determined to be that of an adult
female.

You will hear on the 10th, on Thursday,
the burn area is further excavated by arson
investigators and other Crime Lab and other types
of officials but, interestingly, the defendant's
DNA is now found on the key.

And, finally, on Friday, the 11th, the
female blood that was found, the great pool, if
you will, of female blood, in the cargo area, is
now matched. It is determined to match the soda
can -- the saliva from the diet Wild Cherry
Pepsi, I believe, soda can in the front of
Teresa's car. The blood is now presumed to be
that of the victim, Teresa Halbach.

You have heard the term that they told
me there would be no math, well, there is going
to be some science. And here's where I have to
at least give you an overview of what the science
of this case is going to be.

The science, the blood part of the
science, the DNA analysis and explanation of this
case is going to come from this gentleman right

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 48 of 128   Document 290-18

CHRM006217

here, Norm Gahn.  Mr. Gahn, you will learn by his
examination, is quite knowledgable in DNA and DNA
from a prosecution standpoint.  And in all
honesty and in all candor, that's why he was
added to the prosecution team, because this is
such an important part of the case.  The science
becomes very, very important.

You are going to hear about a DNA
analyst from the Wisconsin Crime Lab named Sherry
Culhane.  Again, Ms Culhane, almost unbelievably,
is the very analyst that exonerates Mr. Steven
Avery several years earlier.  She's the same
analyst that does the detailed DNA work on
Mr. Avery's work with the Innocence Project and
frees Mr. Avery from his incarceration.

Well, that same woman, Sherry Culhane,
processes this vehicle.  Because she's the unit
head, because this is such an important case, she
does the work herself.  She does all of the
analysis of all of the blood that's found in
these cases.

You are going to hear from Ms Culhane,
through the assistance of Mr. Gahn, what DNA is,
that it is a genetic fingerprint, if you will.
Provides an opportunity, as most of you may

83

CHRM006218

1    already know, to take a sample and to take a

2    unknown sample, something like blood that's found

3    in the back of an SUV and to take a known DNA

4    sample, since our DNA is all the same in all of

5    our bodily fluids.

6          Our blood has the same DNA as our

7    saliva, as our semen, as the skin cells, as our

8    tissue; it's all the same DNA.  So once you

9    develop a profile, each of us all has different

10   DNA; it's unique to each of us.  And Mr. Gahn

11   will explain all of that for you.

12         But with that as the background, Ms

13   Culhane was able to establish all of the places

14   in that SUV that had Teresa Halbach's DNA.  You

15   are going to learn that they found a large

16   quantity of the blood and DNA in the cargo floor

17   and the side panel.  The back cargo door, you are

18   going to hear that there were splatters, spatters

19   of Teresa's blood in the back cargo door.

20         You are going to hear that on the rear

21   tailgate there were droplets of Teresa's blood;

22   her DNA is found on the door handle; and, also,

23   as I have already alluded and you might expect,

24   the saliva from the soda can, Ms Culhane will

25   find DNA evidence.

84

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 50 of 128   Document 290-18

CHRM006219

I told you about male blood that was in
the SUV. On Wednesday, the 9th of November,
Steven Avery subjected to a very thorough medical
examination, again, as result of a warrant, as a
result of a judicial authorization to do that
particular kind of examination. And what they
found was a very, very deep cut to Mr. Avery's
right middle finger but, importantly, on the
outside of his right middle finger. And that's
where the cut was.

This cut was actively bleeding on the
31st of October. And I guess, thankfully, for
the State. And as a jury, I hope at the
conclusion of this case you will say thankfully
for you. Because DNA analysis was then possible
because of his actively bleeding, of his leaving
his DNA behind, inside of Teresa's vehicle.

Ms Culhane will tell you that the
defendant's blood was found in at least six
places in Teresa Halbach's SUV including the rear
passenger door, smeared or wiped on the rear
passenger door. Okay. There's a front door;
there's a back door; kind of like a four door
car. It was in the backdoor and it's along the
edge or along the metal of the rear passenger

85

CHRM006220

door. That's Steven Avery's blood. That's how
much blood he left on the side of the door.

         We have heard about the defendant's
blood on the ignition. That positively matched
that of Steven Avery. As you think about this
case and I will argue at the end of the case, but
there isn't any secret and the defense
understands this is as well, an actively bleeding
middle right finger. And when you look at the --
excuse me -- When you look at the smear, kind of
visualize turning the ignition and how that can
smear from the outside of the middle finger and
leave that particular kind of DNA evidence.

         Other places that the defendant bled
inside of the victim's car included blood on her
CD case in her front seat. Both front seats had
droplets of Mr. Avery's blood on it. The rear
tailgate, remember I told you there was a droplet
of Teresa's blood; because Mr. Avery is actively
bleeding, there is a droplet of his blood as
well. And also on the front console floor, is
kind of up in that particular area.

         Sherry Culhane and Mr. Gahn are better
able to explain all those for you, but it's
important for you to know. Now, again, the

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 52 of 128   Document 290-18

CHRM006221

1   jigsaw puzzle, when you hear the evidence and

2   when you have to decide who killed Teresa

3   Halbach, this evidence points to one person.

4           Now, Mr. Gahn and his questioning, and

5   Ms Culhane is going to tell you, that DNA

6   evidence, again, is not just from blood.  It can

7   be from skin cells which are left through

8   perspiration, sweat, okay, saliva and sweat and

9   all those other kinds of bodily fluids that we

10  talked about.  So when somebody's hands are

11  sweating and you handle something, it's possible

12  that you can leave your DNA on that thing that

13  you handled.

14          You heard a suggestion already in which

15  there will be evidence in this case that the

16  battery was disconnected on Ms Halbach's vehicle.

17  We'll tell you, or at least we'll argue as to why

18  that happened.  But importantly, in reaching up

19  underneath the hood, to open up Teresa Halbach's

20  vehicle, Mr. Avery was kind enough to leave his

21  DNA on the hood latch.  Okay.  That will come

22  from Sherry Culhane as well.

23          In handling Ms Halbach's key that starts

24  the ignition and putting it into his bedroom,

25  Mr. Avery was kind enough to leave his DNA on

87

CHRM006222

1     that portion of the Toyota key that was found.

2     So that's part of the science.

3          Other science is going to include things

4     like teeth, teeth that were recovered from the

5     burn area.  This part of the science, by the way,

6     will be handled by Mr. Fallon, and other expert

7     witnesses, but most importantly, through somebody

8     called a forensic odontologist.

9          That's a big word, kind of scared me

10    when I first heard it.  Gentleman's name is

11    Dr. Donald Simley.  Mr. Simley is a odontologist.

12    From a forensic standpoint, it's kind of a

13    dentist who matches stuff up.

14         So Mr -- or Dr. Simley, the dentist, the

15    odontologist, will show you a -- what's called a

16    panorex x-ray.  We went to Teresa's dentist.  We

17    got her x-rays from when she had work being done

18    and Dr. Simley will show you tooth number 31,

19    which is the second last tooth in the bottom left

20    jaw.

21         Dr. Simley will also tell you that

22    x-rays were taken of teeth that were found from

23    the burn area.  He will show you tooth number 31

24    that was actually recovered from the burn area

25    and will allow the jury to make their own

                           88

CHRM006223

```
 1    comparisons.

 2              We talked about an anthropologist.  Our

 3    anthropologist is Dr. Leslie Eisenberg.

 4    Dr. Eisenberg will tell you about her

 5    credentials, about how she does this -- this

 6    whole kind of work.  And although, unfortunately,

 7    the bones that she had to deal with and, again,

 8    we aren't talking about a full skeleton that was

 9    found in that -- that bone (sic) pit.

10              If we did, by the way, we may not be

11    including a charge against Mr. Avery for

12    mutilation of a corpse.  But mutilation of this

13    little girl -- excuse me -- not this little girl,

14    but this young woman, absolutely occurred.

15    Because this is what's left, small tiny pieces of

16    bone fragment.

17              And when you talk about a jigsaw puzzle,

18    when you talk about trying to put all of this

19    together; it's a very, very difficult process.

20    And when I asked -- And the testimony, actually,

21    of Dr. Eisenberg is going to allude to this

22    jigsaw puzzle kind of analogy and we don't even

23    have a box or a cover to go on.  Luckily for us

24    and luckily for you, Leslie Eisenberg is your

25    jigsaw puzzle covered box.
```

89

CHRM006224

```
 1              In other words, Dr. Eisenberg knows
 2       where everyone of these bones goes.
 3       Dr. Eisenberg will identify all of these bone
 4       fragments.  She'll identify, from a female
 5       skeleton and from examples that are used, all of
 6       the different parts of Teresa that were found.
 7       Okay.  And it will help you as far as
 8       identification processes go, as to what parts of
 9       Teresa's bones and what parts of the body were
10       actually recovered in this case.
11              Now, not all evidence is of equal
12       weight.  And two really important pieces of bone
13       were found.  And those were two pieces of what
14       are called the cranium, the skull, that were
15       burned very, very badly but were identified as
16       such by Dr. Eisenberg.
17              The parts of the skull, this picture
18       that you are looking at is actually a part of the
19       skull now.  This brilliant woman is going to tell
20       you that this isn't just part of the skull, but
21       this is a little piece of the skull that's just
22       on top of or over somebody's left ear.
23              How do you tell that kind of thing
24       looking at a bone like that, but that's what an
25       anthropologist apparently -- apparently does.
```

90

CHRM006225

1    And that's why she's an expert, and we're not, in

2    this area.  But, importantly, the damage, the

3    defect that's caused, the evidence is going to

4    show that you are looking at the inside, from the

5    inside out, the inside of Teresa's skull out;

6    that the circular or half circle -- because this

7    isn't the full piece, this is half of the

8    important piece here -- is extremely important.

9         The defect, the damage here, the

10    testimony will be, is caused by a high velocity

11    projectile.  We take this same bone fragment and

12    you are going to hear evidence about other

13    experts and it allows some other analysis of this

14    particular piece of bone, this particular piece

15    of cranium.

16         You are going to hear from a gentleman

17    by the name of Ken Olsen from the Crime Lab; he

18    is an expert in trace evidence, the CSI kind of

19    stuff, but the trace from an elemental

20    standpoint.  When you x-ray something, the

21    evidence is going to show bone and other kinds of

22    vascular or veins and things show up after you

23    x-ray even a burned piece of bone.

24         But what also shows up are things that

25    don't burn up.  All right.  When Mr. Olsen

91

1  testifies, he's going to point to these little

2  bright dots.  See those okay from there?  These

3  little bright dots that are right on the lip of

4  the cranial defect.

5      Those little bright dots he's going to

6  say he examined.  He recovered those and he did

7  his analysis on them, elemental analysis, and

8  found that they are lead.  These little dots are

9  lead, what's called lead spray.  You are going to

10  hear testimony that there's only one thing, only

11  one item that can travel fast enough, as a

12  projectile, to cause this kind of a defect and

13  also leave lead.  And as you might predict,

14  that's a bullet.  All right.  Lead spray is left

15  by bullets.

16      Dr. Eisenberg, then, with the assistance

17  of a gentleman by the name of Jeffrey Jentzen, is

18  the Milwaukee County Medical Examiner.

19  Dr. Jentzen, has -- and you will hear he has a

20  great deal of experience nationally, a national

21  expert in things like gunshot wounds.

22      Dr. Jentzen and Dr. Eisenberg will

23  render two expert opinions:  First of all, that

24  the left parietal region, the region just above

25  the left ear, the thing that you just saw, the

92

CHRM006227

1    combination of the projectile and the lead spray,

2    leads these two experts -- and especially the

3    pathologist -- especially Dr. Jentzen, who will

4    tell you that that's an entrance wound, just

5    above the left ear of Teresa Halbach.

6            They will also find a second and we will

7    show you a second entrance wound, similar kind of

8    defect that's found in a recovered bone that is

9    on what's called the occipital region of the

10   skull.  That's to the back and just to the left

11   side of the back of the skull and that was a

12   second entrance wound.

13           Finally, their opinion, when they put

14   together -- when you ask of the State, what was

15   the cause of death, what was the mechanism of

16   death, at the conclusion of this case I will be

17   able to tell you, this was a homicide and it

18   included at least two gunshot wounds to the head

19   of 25 year old Teresa Halbach.

20           I'm almost done so hang on.  Remember

21   this burn barrel, remember found outside of

22   Mr. Avery's trailer, well, this burn barrel, as I

23   told you, was examined.  And although Mr. Avery,

24   the evidence will show you, attempted to burn up

25   all of the stuff that was in the burn barrel, it

                        93

CHRM006228

1    didn't burn.  It didn't burn up.

2          And the things that didn't burn up were

3    electronic components.  All of these electronic

4    components were found in Mr. Avery's burn barrel.

5    This is other evidence.  This is more evidence,

6    not just the science, not just the DNA, not just

7    the blood, but at the conclusion of the case will

8    be other evidence that will be able to assist you

9    in pointing to who killed Teresa Halbach.

10          Of those electronic components, included

11   Teresa's cell phone.  You will hear evidence that

12   Teresa had a Motorola V3 RAZR cell phone.  And

13   when we look at and when the experts show you

14   those electronic components that are found within

15   the burn barrel, you will recognize or some of

16   you might, the Motorola sign.

17          But for those of you that don't, we're

18   going to have a gentleman by the name of

19   Mr. Thomas from the FBI come here from Virginia

20   and he's going to show you all those components

21   and he's going to show you what they looked like

22   when they were recovered from Mr. Avery's burn

23   barrel and what they used to look like on a

24   Motorola V3 RAZR cell phone.  All right.  So you

25   are going to be able to match up the components

                          94

CHRM006229

itself and what it used to look like before Mr.
Avery's attempts to destroy that evidence as
well.

You are going to hear about a digital
camera that Teresa Halbach had; digital camera
that she used to take pictures was a Canon A310,
PowerShot A310. You are going to hear all kinds
of interesting evidence about how a digital
camera -- and some of you may know this and
certainly our media friends know this. But when
you take a picture with a digital camera, that
photo, that image that you take with a digital
camera leaves a signature. It leaves an
electronic imprint on the image itself.

And so, if you put that picture on a
laptop computer or your home computer and you
take your little mouse and put what's called the
cursor, the little arrow thing, over the picture
itself, it gives you an incredible amount of
information. Gives you the date that that
picture was taken. It tells you things about the
picture itself, including what kind of camera was
used.

And you are going to learn and you are
going to see at least six different pictures that

CHRM006230

1    were taken at Steven Avery's property by Teresa
2    Halbach.  And all six of those include that
3    little imprint, include that signature, will tell
4    you conclusively that Teresa uses the Canon
5    PowerShot A310.  All right.

6          We'll have these even more blown up for
7    you, but that says PowerShot A310.  There isn't
8    going to be any question at all about whose
9    camera it was that Mr. Avery burned in his burn
10   barrel on the 31st of October.

11         You are going to hear about those other
12   electronic components, by the way.  I don't know
13   if you use a palm pilot or a PDA, a personal data
14   assistant.  Teresa had one of those.  That was
15   also burned up and found in that burn barrel with
16   some other information.

17         But when on the topic of what other
18   evidence, what additional evidence, we're not
19   done there folks.  All right.  We have other
20   evidence that we have developed in the last 15
21   months.  You are going to learn that in
22   Mr. Avery's garage, after shooting the bullets
23   into 25 year old Teresa Halbach, they ejected
24   what are called shell casings.

25         Those are the little brass casings that

96

CHRM006231

1    come out of a gun after you shoot the gun.  Well,

2    it's possible for experts, for toolmark experts

3    from the Crime Lab to match up those shell

4    casings with a specific gun.  And they will, in

5    fact, match that .22 caliber rifle that's hanging

6    over Mr. Avery's bed.

7         Now, March 1st and 2nd, 2 bullets were

8    found, also, in Mr. Avery's garage.  Through a

9    more detailed search, you will find out why that

10   happened.  Through a more detailed search of the

11   garage, two bullet fragments were found in

12   Avery's garage.  One of those bullet fragments,

13   after going through Teresa Halbach, included

14   Teresa's DNA.

15        And so as a matter, through Mr. Gahn and

16   through his experts, you will learn that Teresa

17   helped you too, that she left behind some

18   evidence for you to consider in this case.

19   Teresa left behind her DNA for you to consider on

20   one of the bullets that's found in the defendant,

21   Mr. Avery's, garage.

22        You will hear about things like phone

23   calls.  You'll hear about how phone calls can't

24   be changed in the records and we can provide a

25   timeline as to when certain things happened; when

                        97

CHRM006232

1    Mr. Avery called for Teresa; when he called her
2    two times before she ever got there; and when he
3    places a -- what we're going to be called an
4    alibi call, two hours after she's already at the
5    property.  You are going to hear about all those
6    kinds of phone calls.

7            And as I mentioned, at least briefly,
8    before other analysis of bone and tissue, other
9    things to point to, if in fact the State even
10   question whose bones and whose tissue it is
11   behind Mr. Avery's property.

12           Lastly, I just want to remind you of the
13   kinds of exhibits that you are going to hear in
14   this case.  You are going to see items that were
15   seized, stuff that was seized from the scene,
16   from Mr. Avery's property.  You are going to get
17   photographs from out at the scene, but you are
18   also going to see photographs after the evidence
19   was already obtained so that you have a more
20   pristine or a better view of some of this
21   evidence.

22           You are going to look at documents and
23   records.  You are going to hear from experts.
24   And they will provide some written expert reports
25   and also summary and demonstrative exhibits.

                           98

CHRM006233

1            Just a little bit on summary exhibits.

2    When there's lots of evidence like documents;

3    lots of things in documents, phone records, you

4    know, things like this; when it's hard for you to

5    digest, we'll try to create a one or a two page

6    summary of all that information to help the jury

7    and find out exactly what all of it means.

8            And, finally, audio and videotaped kinds

9    of evidence, you would expect to find those kinds

10    of things.

11            Remember I told you before, just talking

12    about different kinds of photos, about those

13    pictures that Teresa took, those six different

14    pictures; this is one of them.  It was taken on

15    June 20th, by Teresa Halbach.

16            I use this as the example because --

17    because I wanted to.  But it shows very clearly

18    Mr. Avery's trailer, his garage.  It's clear

19    through *Auto Trader Magazine*, when Mr. Avery, in

20    June of this year tried to sell this particular

21    trailer, Teresa Halbach took this picture, again,

22    with a Canon PowerShot A310.  You will hear all

23    those kind of things.

24            But the reason, at least for this part

25    of the presentation, I'm showing you this, is it

99

CHRM006234

1  tells you a difference between a scene photo and
2  things that I mentioned at least briefly before;
3  computer generated scene models.  Again, this
4  isn't a picture.  This is a -- provided by
5  Mr. Austin, but you will note that it's something
6  that you couldn't see with your eye.
7       Again, usually there's elevations that
8  are involved.  These kinds of models are, by the
9  way, within an inch, you will hear, accurate.
10  Every measurement is within an inch.  So this
11  isn't some blackboard that was taken down and you
12  just do the best you can.
13       And these are 4100 measurements that
14  make everything geometrically perfect,
15  geometrically accurate to within an inch.  But
16  these kinds of models should assist you.  Since
17  it's the middle of February, we're not going to
18  be traipsing off to the Avery property.
19       These kinds of things may help you in
20  understanding better and getting a better tour of
21  the Avery property.  But just this model, as an
22  example, shows you how close Mr. Avery's burn
23  barrel is to his front door; how close it is to
24  the vehicle that Ms Halbach took pictures of.
25  And even things like after taking the pictures,

100

CHRM006235

1       the path that Teresa Halbach took as she walked
2       towards Mr. Avery's property.
3               For those of you big picture people, not
4       detail oriented people, you all were asked that
5       question, we'll have aerial photographs for you.
6       Again, when we look at all of the surrounding
7       gravel pits on at least three sides of the Avery
8       property and how that may fit into some of those
9       kind of things.
10              We have interior photos as well.  Photos
11      of the inside of Mr. Avery's garage.  Now, you
12      will note a couple things about this photo.
13      First of all, you will note how cluttered, to say
14      the least, that it is.  And this might help you
15      understand how difficult it was for officers, not
16      knowing what they are looking for, in November,
17      to kind of go through this garage, not knowing
18      that the shooting -- not knowing that the
19      shooting happened in this garage.  The officers
20      didn't really know what they were looking for.
21              But in March, when this picture was
22      taken, and they know what they are looking for
23      and they know where to look in the garage, these
24      kind of pictures should be able to help you.  But
25      Mr. Austin also will help you in giving you a

                            101

CHRM006236

1   geometric perspective, ripping the roof off, if
2   you will, of the garage and show you models of
3   the insides of the garage.

4          By the way, just so there isn't any
5   question why I'm showing you this exhibit, one of
6   the bullets, number 9, which was found in the
7   crack of a -- the cement, that was not cleaned up
8   in this case. And tent number 23A, underneath
9   what was a air compressor, the evidence is going
10  to show, is the bullet that Teresa left her DNA
11  for you. Underneath that air compressor is where
12  they recovered that second bullet.

13         Other interior photos, you are going to
14  see photos of the interior of Mr. Avery's
15  bedroom, the gun rack that hangs over Mr. Avery's
16  bed with two firearms, one was a .50 caliber
17  muzzleloader and on top of that was a .22 caliber
18  automatic -- semi-automatic rifle.

19         But Mr. Austin, again, provides you
20  with, ripping off the roof, if you will, interior
21  scene models, where you are going to be able to
22  look at the living room of Mr. Avery and his
23  spare bedroom and his bathroom and Mr. Avery's
24  master bedroom, be able to kind of walk around
25  within that space. So it will help you

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 68 of 128   Document 290-18

CHRM006237

1      understand where some of these evidence -- or
2      some of this evidence was found.

3           Finally, the kinds of witnesses that you
4      are going to hear from, include citizens and law
5      enforcement officers and records kinds of people;
6      although, most of those will be agreed to between
7      Mr. Strang and us, as well as expert witnesses.

8           You will hear from various kinds of
9      citizens like Bobby Dassey, who is one of the
10     sons of Barb Janda, who you will hear testimony
11     about, that at about 2:45 on the 31st of October,
12     Bobby saw a young girl drive up to the Avery
13     property.

14          Bobby Dassey saw this young girl, later
15     identified as Teresa Halbach, get out of her
16     teal, or blue, or green colored SUV and actually
17     take pictures of the van that her mom had for
18     sale.  Bobby Dassey is going to tell you, that
19     after looking out the window and after seeing
20     Teresa Halbach take these photographs of this
21     vehicle and finish her job, that Teresa walked
22     towards Steven Avery's trailer.

23          You will hear evidence that she was
24     walking towards the main entrance of Steven
25     Avery's trailer and that Bobby thereafter took a

103

CHRM006238

shower and left to go deer hunting, bow hunting,
about 15 minutes later. You are going to hear
from Bobby that when he left 15 minutes later,
Teresa's SUV was there, but Teresa was nowhere to
be found.

You are going to hear that Bobby Dassey
was the last person, the last citizen that will
have seen Teresa Halbach alive. You are going to
hear from other citizens like that, other people
that will help place this case into context for
us.

Juries are triers of fact. You don't
decide what the law is, the judge does that. But
you decide what the facts of the case are. And
the facts in this case aren't just going to point
to who did it; it's not just a who done it case.
It's a what happened and where it happened and
when it happened.

But we're also going to provide you
evidence, not just that Steven Avery did it, but
to the exclusion of other people as well. In
other words, positive evidence about who done
know it, but also negative evidence of why that
necessarily excludes others. And so you get to
find those facts and at the end of this case, you

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 70 of 128   Document 290-18

CHRM006239

1     will search for the truth.  You are not to search

2     for doubt, you are to search for the truth.

3            I told you when you started this case

4     and when this opening statement started, that

5     this may, in fact, be the most important decision

6     that you will ever -- going to make.

7            That leaves us, then, with the end.  I'm

8     going to remind you through this case, I'm not

9     going to apologize about it, but this is Teresa

10    Halbach.  I'm not going to apologize about the

11    fact that this is not a DNA profile number.  This

12    isn't a box of recovered bones, but as I have

13    mentioned before, remembering the humanity of

14    Teresa Halbach.  Remembering who she is, what she

15    meant to these people, is an important part of

16    this process.

17           Ultimately, this process includes

18    assigning accountability.  It will require you to

19    assign responsibility for the murder and

20    mutilation of an innocent 25 year old young lady.

21    I'm confident, members of the jury, that after

22    the conclusion of this, what could in fact be a

23    six week trial, that you are going to agree with

24    me.  You are going to agree with the State that

25    we have met our burden, that is, beyond a

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 71 of 128   Document 290-18

CHRM006240

1    reasonable doubt. I will ask at the conclusion

2    of this case, that you return verdicts of guilty.

3    Thank you. Thank you, Judge.

4         THE COURT: Thank you, Mr. Kratz. Members

5    of the jury, it's quarter to 12. It's a little

6    earlier than we normally take our lunch break, but I

7    don't believe there is time enough to get started

8    with anything else before lunch.

9         During the course of the trial the Court

10   will attempt to give you a break every hour and a

11   half or so, because I realize that your attention

12   is required and sitting for much longer than that

13   can impair your attention.

14        I do want to remind you at this time, as

15   I will periodically throughout the trial, that

16   you are not to begin your deliberations and

17   discussion of the case until all of the evidence

18   is presented and I instruct you on law at the

19   conclusion of the case.

20        Do not discuss the case among

21   yourselves, including the opening statement given

22   today, or with anyone one else, until you begin

23   your final deliberations in the jury room. We'll

24   take our lunch break now and resume at 1:00.

25             (Jury not present.)

106

CHRM006241

```
 1              THE COURT:  You may be seated.  Counsel, in

 2    terms of the schedule for this afternoon, is the

 3    State going to have some evidence to present after

 4    the opening statement?

 5              ATTORNEY KRATZ:  We will, Judge, we'll have

 6    as many witnesses as the Court wants to proceed with

 7    this afternoon.

 8              THE COURT:  All right.  We'll see you back

 9    at 1:00.

10              ATTORNEY STRANG:  I have just one quick --

11              THE COURT:  Go ahead.

12              ATTORNEY STRANG:  -- matter if I might.

13              I decided against interrupting

14    Mr. Kratz's opening statement because I thought

15    this could wait, honestly, and I don't like to

16    interrupt someone's opening.  But probably in the

17    first 20 minutes of his opening, Mr. Kratz

18    explained to the jurors that the presumption of

19    innocence persists only until that moment when

20    the evidence overcomes it and proves guilt,

21    beyond a reasonable doubt.

22              I understand -- I understand the

23    argument.  I understand what was meant, no ill

24    intent was meant, but that's enough of a

25    variation from the actual instruction that the
```

107

CHRM006242

presumption of innocence attends the defendant
until after closing arguments and deliberations
begin, that I simply would ask the Court to
repeat part of that presumption of innocence
instruction this afternoon, before I start.

We don't have to make a big deal out of
it; I just thought an abbreviated reminder might
help. I also noted in the State's Power Point
slide that explained the element of false
imprisonment that the language, during her
lifetime, was omitted.

That's, I think, the kind of thing that
the Court already has covered and can cover
again, but it might be a good idea, and this
covers me too, for the Court simply to remind the
jury that all legal instructions come from the
Court in the end.

THE COURT: All right. I did -- I do
recall the statement regarding the presumption of
innocence that you referred to. And I do agree that
the precise extemporaneous statement for Mr. Kratz
is not technically correct. I'm going to grant your
request and repeat the presumption of innocence
instruction before you give your opening.

The other item about during the victim's

108

CHRM006243

```
1        lifetime, I think I covered in the initial
2        instructions, again, and I'm confident that six
3        weeks from now the jury will have forgotten any
4        subtle distinction that may have taken place in
5        the opening.  But I will repeat the presumption
6        of innocence instruction without giving any
7        specific reason why --
8                 ATTORNEY STRANG:  No.
9                 THE COURT:  -- because I doubt that the
10       jury caught the significance of it, but it was
11       technically incorrect.
12                ATTORNEY STRANG:  Right.  And it was
13       unintended and there doesn't have to be a big deal
14       made about this.
15                THE COURT:  All right.  Anything else
16       before we break?
17                ATTORNEY KRATZ:  No, that's fine, Judge,
18       thank you.
19                    (Noon recess taken.)
20                THE COURT:  Members of the jury, a question
21       came up during break concerning the definition of
22       presumption of innocence, so I'm going to read that
23       excerpt to you again at this time, from the opening
24       instructions I gave you earlier.  Then we'll hear
25       the opening statement from the defense.
```

109

CHRM006244

1     Defendants are not required to prove
2     their innocence.  The law presumes every person
3     charged with the commission of an offense to be
4     innocent.  This presumption requires a finding of
5     not guilty unless in your deliberations you find
6     it is overcome by evidence which satisfies you,
7     beyond a reasonable doubt, that the defendant is
8     guilty.  Mr. Strang, at this time you may begin.
9         ATTORNEY STRANG:  Thank you, your Honor.
10    Good afternoon.  This summer it will be 22 years, 22
11    years since a woman running on the beach in
12    Manitowoc was raped and beaten nearly to death.  The
13    Manitowoc County Sheriff's Department investigated
14    those awful crimes and they charged Steven Avery
15    with rape and attempted murder on that Manitowoc
16    beach, 22 summers ago.
17        He said consistently that he was
18    innocent, that he had not done it.  No one
19    believed him, no one but his own family believed
20    him.
21        And as that case was making its way
22    through the Manitowoc County Circuit Court, just
23    one county over, Teresa Marie Halbach was five
24    and was starting kindergarten.  Somewhere else,
25    somewhere we don't know, a man named Gregory

110

CHRM006245

1    Allen, presumably, was laughing and planning his

2    next violent rape.

3            Eleven years later, in 1996, Steven

4    Avery was trying, still, to make people

5    understand that he was innocent.  DNA testing was

6    in its infancy.  It was beginning to move into

7    courtrooms, out of scientific laboratories.  But

8    we have come a long way, just a few years since

9    1996, and it was not as advanced as it is today.

10           But in 1996, Steven Avery took a chance

11   and had blood drawn, a little vial of blood.  It

12   was sent off, through the help of his lawyers,

13   for early DNA testing.  It couldn't clear him

14   entirely.  It helped, but it did not conclusively

15   prove Steven Avery's innocence of the attempted

16   murder and rape on the Manitowoc beach.

17           And when the tests failed to prove him

18   entirely innocent, that blood was sent back, in a

19   box sealed with evidence tape, to the Manitowoc

20   County Clerk of Court.  And there, in 1996, that

21   blood vial, sealed in the box with evidence tape,

22   took up residence in the now 11 year old file of

23   the 1985 case; in a box, in the open, in the

24   Manitowoc County Clerk of Court's Office.  And

25   there it sat.

                        111

CHRM006246

And in 1996, here, just a few miles

north of here, Teresa Marie Halbach was learning

to drive at age 16, I assume.  And the irony --

         Could you hear me before?  Can you hear

me now?

         THE COURT:  We can hear you better now.

         ATTORNEY STRANG:  All right.  Is it the

Verizon guy who says that?

         Teresa was learning to drive, I assume,

at age 16.  And the irony -- the irony is that

the blood vial in the Clerk's Office probably is

what ends up in her car, eventually.

         And time moves forward, though, to 2002.

Science also has moved forward.  DNA testing has

improved, and a new effort is made to exonerate

Steven Avery.

         Now, the blood in the vial, in the box,

under the evidence tape, in the Clerk's Office,

is not, you will learn, what is used for the 2002

and 2003 DNA testing.  But, some materials from

that box, that file, the overall file from the

1985 case, some are sent to the Wisconsin State

Crime Laboratory in Madison, to Sherry Culhane,

to whom Mr. Kratz introduced you.

         And the person from the Manitowoc County

                        112

1    Sheriff's Department involved, low these many

 2    years later, the department was, but a person

 3    from the Manitowoc County Sheriff's Department

 4    who documented the things that were sent from

 5    that old court file to the Crime Laboratory and,

 6    therefore, presumably looked at the box and

 7    assisted in deciding what to send.  That person

 8    was, by that time, a lieutenant -- or a

 9    detective, now a lieutenant, named James Lenk.

10          Now, Detective Lenk was with the

11    Manitowoc County Sheriff's Department, had his

12    office in the Sheriff's Department that adjoins,

13    or is connected by a small courtyard, to the

14    Manitowoc County Circuit Court and the Clerk's

15    Office, by a small courtyard to the south of the

16    courthouse.  He was, as I say, a detective with

17    the Sheriff's Department.  Today he is the

18    lieutenant of the detectives and leads the

19    Detective Unit.

20          He documented, in 2002, what was sent to

21    the State Crime Laboratory from that file.  2002

22    is the year that Teresa Halbach graduated from

23    the University of Wisconsin at Green Bay and came

24    home a short distance back, here to Calumet

25    County, to start off a promising career.

                        113

CHRM006248

```
 1            In 2003, nearly a year after the

 2     necessary DNA samples were sent, the Wisconsin

 3     State Crime Laboratory was able to establish that

 4     Steven Avery did not rape and beat the woman on

 5     the Manitowoc beach, as he had been saying all

 6     along.  And because of the advance of science,

 7     the Crime Lab was better -- was able to do better

 8     than that.  It was able to establish that Gregory

 9     Allen did.

10            Now, unfortunately, in the time that

11     passed, Mr. Allen had raped violently, again,

12     because he had his liberty while that man did his

13     time.  But in the fall of 2003, as the weather

14     was cooling, the State of Wisconsin at long last

15     joined Steven Avery in a motion to set aside his

16     conviction, and an innocent man also went home.

17            Home for Steven Avery, home is the

18     salvage yard of which you have seen, now, many

19     glorious pictures, from up high, from down low,

20     from angles all over.  The pictures are a good

21     deal more glorious looking than the salvage yard

22     itself, but this was home.  It's the only home

23     that would take him back after this time.

24            Allen Avery, Steven's father, back there

25     in the working shirt, just as you might expect;
```

114

CHRM006249

Allen Avery started that business nearly 40 years
ago on the 40 acres that he scrimped to buy. He
raised sons and a daughter. And they didn't
wander far from the business.

Chuck and Earl joined it, Barb works
elsewhere, works a factory job, but lives on the
property. And this is the sort of business where
the family, as you saw, shares the perimeter of
this property with the 4,000 rusting, decaying
cars that are the refuse, the wreckage of other
people's lives.

This is not a glamorous business, but it
is a necessary business. It is a good business.
And, yes, as you will learn, you have got to get
your hands dirty if you're going to be in the
salvage business. Not just dirty, you get your
hands bloody, because you are working with
rusted, jagged metal disassembling cars. And the
dirt that grinds into your palms and that you
find under your fingernails doesn't wash off at
night.

But this was his family's business and
this was home. And he rejoined his brother's,
Chuck and Earl; and his father, Allen; his
mother, Delores, on the family's property and at

115

CHRM006250

1  the business. He became, again, one in the Avery

2  clan, one man in the Avery clan. And tried to

3  resume some normalcy of life, sharing the

4  perimeter of that salvage yard, not in a pretty

5  house in town, on a nice stone foundation, but in

6  a trailer home, down from his sister's trailer

7  home. Both of them down from the doublewide that

8  mom and dad have, and Chuck's trailer toward the

9  back, on the path toward the crusher.

10        And it is, although not glamorous, a

11  worthwhile business and it's work with its own

12  dignity. What would we do, if we didn't have the

13  salvage yards in which to find spare parts. I

14  guess we would be reliant entirely on the big

15  corporations that make the cars, to continue to

16  make spare parts for them and sell them at such

17  prices they might see fit.

18        So it would be pretty tough without the

19  Allen Averys and the Steven Averys of the world.

20  It would be pretty tough for the guy who is

21  restoring the 1968 Pontiac GTO hard top, in his

22  garage, to do that economically. It would be

23  pretty tough for the guy working on a 1965

24  Mustang convertible, in his spare time, to do

25  that.

116

CHRM006251

1      Maybe more importantly, it would be

2  pretty tough for the woman who's got young kids

3  to feed, and a job to hold down, and medical

4  bills, and she just has to get another

5  50,000 miles out of that 1988 Oldsmobile.  And

6  for these people, maybe for you, for many of us,

7  it's a good thing that that young woman's father,

8  or brother, or maybe she, can go to the salvage

9  yard and keep the 1988 Oldsmobile running a

10  little while longer.

11      Now, in 2003, when Steven went home,

12  Teresa Halbach also was home.  Her photography

13  business was flourishing and things were going

14  reasonably well.  In 2004, Steven Avery filed a

15  lawsuit seeking some recompense for the hole in

16  his life, the time he had spent as an innocent

17  man, for the crimes that Gregory Allen committed.

18      This was a serious lawsuit.  It was in

19  federal court, down in Milwaukee, and there was

20  no question but that a Manitowoc County Sheriff's

21  Department and, in the end, the court system, had

22  gotten the wrong guy.

23      And as that lawsuit crept forward, as

24  lawsuits do, we came to October 2005.  In October

25  2005, about the middle part of the month, James

117

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 83 of 128   Document 290-18

CHRM006252

1     Lenk and another ranking officer of the Manitowoc
2     County Sheriff's Department, Sergeant Andrew
3     Colborn, Mr. Lenk and Mr. Colborn both were
4     pulled into the lawsuit, not as defendants or
5     parties to the lawsuit, but as witnesses,
6     witnesses who had their depositions taken in the
7     middle of October, 2005.
8          Now, a deposition, typically in a civil
9     lawsuit, is an event where you get a subpoena as
10    a witness; you come normally to a lawyer's
11    office, the conference room, the library, the
12    lawyer's office; lawyers from both or all sides
13    are there.
14         A court reporter is there; these days
15    often a videographer as well.  And the court
16    reporter swears the witness under oath, the
17    lawyers ask questions of the witness under oath
18    and they are recorded, much as Mrs. Tesheneck is
19    recording what we're saying here.  There's no
20    judge; it happens, as I say, typically in a
21    lawyer's office.
22         And these two men, Lenk and Colborn,
23    were witnesses.  They were witnesses about their
24    own conduct.  Neither had been with the Manitowoc
25    County Sheriff's Department in 1985, but an event

118

CHRM006253

in 1995 or 1996 came up in that lawsuit. And as
to that event, both of them were witnesses being
questioned about their own activity and conduct
with respect to Mr. Avery's imprisonment.

5    By the end of that month, unfortunately,
6    those depositions would begin to matter. And
7    indeed, from the time it was filed in 2004, you
8    will learn, the lawsuit itself mattered. This
9    sort of lawsuit, or the public cry of the
10   innocent man wrongly convicted and imprisoned has
11   to be, as you will see here I think, it has to
12   be, as you get into the heads of law enforcement
13   and begin to understand the process of law
14   enforcement, this kind of thing has to be a
15   nightmare for every good law enforcement officer.

16   These folks do not want to put innocent
17   people in prison. They want to put guilty people
18   in prison. And when they get it wrong, when the
19   whole system gets it wrong, there understandably
20   are feelings of shame, of embarrassment, anger,
21   humiliation, conflicting feelings about this.

22   This is a good cops worst nightmare,
23   made all the more worse by the fact that Gregory
24   Allen, free, thanks to Steven Avery being
25   convicted instead, Gregory Allen went on to rape

119

CHRM006254

1    and beat again.

2         This lawsuit kindled real difficult

3    emotions.  And the focal point of those emotions,

4    naturally, was the Manitowoc County Sheriff's

5    Department which had investigated the rape many

6    years ago on the Manitowoc beach.

7         And so when October 31, 2005, Halloween,

8    rolls along, Lieutenant Lenk and Sergeant Colborn

9    not only have the lawsuit to contemplate, but

10   now, within the last three weeks, have been made

11   witnesses in it and had their depositions taken.

12        October 31, 2005, began at the Avery

13   Auto Salvage Yard, much as any workday would.

14   This was a Monday, the yard was open.  Not long

15   after 8:00 in the morning, about 8:12 in the

16   morning, Steven Avery called Auto Trader down

17   in -- actually I think in Hales Corners, Highway

18   100 down on the southwest side of Milwaukee,

19   called Auto Trader, as he had done a number of

20   times before, and said, we need a photographer,

21   we have a car for sale.

22        Now, the car belonged to Barb Janda, the

23   van, the mini van you saw computer images of and

24   actual photographs of.  It was there.  It was

25   hers.  It was for sale.  I don't expect there

                        120

1  will be any dispute about that.  And it was

2  Barb's to sell.  The calls about it were Barb's

3  to take, the price was Barb's to dicker or

4  negotiate with people interested in making an

5  offer, on the used van.

6       Steve left B. Janda as the name because

7  that was the name of the seller.  But Barb works

8  during the day at a factory in town.  She does

9  not work at the salvage yard as Steven did.  He

10  leaves her telephone number because that's where

11  the phone calls have to go if there's an

12  interested buyer.

13       And this, you will find out, is not at

14  all unusual or sinister.  It doesn't involve

15  luring anyone anywhere.  There was a car for

16  sale.  There were photographs to be taken.  And,

17  indeed, on that day alone, for Teresa Halbach,

18  with the three appointments we know about; this

19  was not the only appointment where the seller of

20  the car was not the person whose name was given

21  to *Auto Trader*.

22       The Schmitz car was called in by and

23  listed as an appointment for a Craig Sippel

24  (phonetic).  And that little bit of confusion was

25  quickly cleared up by the police.  Wasn't really

121

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 87 of 128   Document 290-18

CHRM006256

Sippel's car; it was Schmitz's car, no big deal. But she thought she was going to see a Craig Sippel, not a Steven Schmitz.

She thought that she was going to see a B. Janda, I suppose, not a Steven Avery. But here's what she knew, she knew the address. Steven gave the address. This is an address, as Mr. Kratz explained to you and I agree, to which Teresa Halbach had been a number of times, probably about a half dozen, five, six, maybe more times, to take photographs of cars or the trailer for sale, for example, the photograph you saw.

She knows the address. She knows where she's going. As you will see, this is not a surprise, or a secret to her or to anyone else. And at 11:45 that morning, she called Barb Janda's number and evidently left a voice mail message saying that she would be able to get there that day, sometime after 2:00.

Now, this Manitowoc County area was Teresa's territory so to speak, for *Auto Trader*. This was her freelance work as I understand, not her main source of income. Her photography studio work I think probably was her passion and

122

CHRM006257

this was a side job for a young photographer to
generate some more money.

She has a territory for Auto Trader.
Steven Avery wouldn't necessarily know what her
territory is or whether she's the only
photographer working it. And sometime close to
2:30, he's obviously getting fidgety. He makes
two phone calls to her cell phone from his cell
phone and he uses the *67 feature, you will find
out, which as I understand it on the -- on
Teresa's telephone, then, no telephone number
would come up; come up is unavailable, or
something like that, or blocked.

But he is on his own cell phone and he
may not want, not being entirely sure whose
number he is calling, he may not want to be
giving out his cell phone number. At least the
second of those calls goes unanswered.

And the time frame gets fuzzy here.
Mr. Kratz said that it was late afternoon that
Teresa arrived and I'm inclined to agree with
that; although it is difficult to nail down. But
I think the best evidence you will hear is that
although Teresa Halbach is in the neighborhood of
the Zipperers, who are really just -- I don't

123

CHRM006258

know how far, but not too far down Highway 147
and then south toward Manitowoc a little bit. So
they are in the general vicinity.

And I think at about 2:15 she's near the
Zipperers, trying to figure out exactly where
she's going to get to the Zipperers to take that
photograph of their car. But I think the best --
the best estimate we'll get out of the evidence
of when she actually arrives at Avery Road, which
is that gravel road that leads down towards,
first, Barb Janda's trailer and then Steven
Avery's trailer, which you saw on the north edge
of the 40 acre parcel; the best estimate of when
she swings her Toyota down that gravel road is
probably shortly before 3:30, probably not 2:45,
as one of Barb Janda's sons, Bobby Dassey,
recalls it.

Why do I say the best estimate, because
there is a school bus driver. Two of Barb
Janda's boys, Brendan and Blaine, are still in
Mishicot High School and it's Monday, as I said.
And they ride the school bus. And school
schedules being what they are, of course, unless
there is really terrible weather or something,
school lets out at the exact same time every day,

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 90 of 128   Document 290-18

CHRM006259

the bell rings and kids run out the door.

The bus is going to be leaving about the same time and the bus driver will be driving the same route every day. So this bus driver, who's no relation to the Avery family, or the Halbachs, or anybody else for that matter, just happens to be the school bus driver; her name is Lisa Buchner.

Lisa Buchner, when interviewed by the police says, you know, about 3:30 when I dropped the Dassey boys off at the head of Avery Road, I looked down the road and I saw a young woman taking a photograph, or photographs, of a van. Now, Buchner actually isn't sure when she's questioned about this whether it's Monday, Tuesday, or Wednesday of that week.

But Monday is the day that a young woman would have been taking a photograph of the van, down near the end of Avery Road. So she's got a pretty good reason to have a good bead on the time. She's going to know her route, this is something she's doing five days a week. And it's about 3:30 that she sees this young woman down the road, taking a photograph of the van.

Teresa Halbach does her business. And

125

CHRM006260

the way this works is the person selling the car

then gives the photographer $40. The

photographer makes out a receipt for the

transaction, typically also offers the customer

the current copy, current edition of the *Auto*

*Trader Magazine* and leaves.

And that's what Teresa Halbach did.

Steven Avery last sees her going back out Avery

Road and about to turn left to go back out to

Highway 147.

Now, somebody clearly sees her later.

We don't know who, I don't know where, I don't

know when. And I, like Mr. Kratz, don't know

why.

I do know this and can tell you that you

will hear this about the evidence. One of the

things that the photographers who freelance or

work for *Auto Trader* do, is to go take

photographs on appointments that have been set

for them through the *Auto Trader* office.

But there is another thing they can do,

they get some money for that, obviously. Some of

the $40 goes to the photograph. But there's

another thing they can do and that's called a

hustle shot. The hustle shot is exactly that,

126

CHRM006261

it's business that the photographer hustles up for herself, or for himself.

And as an incentive for the photographer, to hustle a little bit and, you know, thicken the *Auto Trader Magazine* with new customers selling cars, or boats, or trailers, or whatever, as an incentive for their photographers to do that, *Auto Trader* gives the photographer a little bigger cut on a hustle shot.

You are going to learn that Teresa Halbach was good at hustle shots. She drummed up a lot of these. She was likeable. She was hard working. She was good at getting hustle shots.

I have no idea -- I have no idea at all and I don't think you will either, unfortunately, whether she had a hustle shot, or two, or three, that day or not. It would not have been uncommon. But if, in fact, she's near the Zipperers at 2:15 and as I think is probable from the evidence, she doesn't show up to the Averys until about 3:30, it's possible there's a hustle shot in there or I suppose stopping for lunch or something, we don't know.

It's possible there are hustle shots that are not scheduled through *Auto Trader* after

127

CHRM006262

the Avery shot. Because after all, I mean, if
we're at 3:30, there's a good bit of daylight
left in the working day, I suppose. But we don't
know.

What we do know is that someone sees her
later. And Steven Avery calls her later, as a
matter of fact, from his cell phone. Again, he
calls her cell phone at about 4:35 that
afternoon. Why, because he thought, I have got
another car I would like to sell. I might as
well, if she's still around, or if she can swing
back, I might as well have her shoot that one
too.

But he doesn't get an answer from her,
doesn't answer the phone, when he calls at 4:35.
He sticks around. And at that point his
girlfriend, Jodi Stachowski, is in jail serving
some time for a drunk driving conviction. She's
in the Manitowoc County Jail.

Jodi, you will learn, calls Steven
regularly. Because she's in jail, she has to
call collect. And you can't call collect from a
jail to a cell phone. I don't know if you can
call collect to any cell phone from anywhere.
But in any event, you can't call a cell phone

128

CHRM006263

from the jail, calling collect. So you have got
to call a land line.

So that's exactly what Jodi Stachowski
does, first a little bit after 5:30 in the
evening she calls. And jail systems, I don't
know if you know this, but jail systems,
typically, and the Manitowoc County Jail clearly
does this, cut off phone calls after 15 minutes.
Inmates have a lot of time on their hands,
sometimes people they are calling don't. So the
call just ends at 15 minutes.

So Jodi calls about a little bit after
5:30 on the land line. And then she calls again
just shortly before 9:00 p.m. And Steven is
home. Steven answers the phone in his little red
trailer there, both times. And both of those
conversations go 15 minutes, almost to the
second.

He tells her that he's been doing a
little cleaning. He tells her that Brendan, his
nephew, Brendan Dassey, is over. They hassle.
These are inane conversations, honestly, but they
are tape recorded, because every phone call out
of the jail is tape recorded, so we know they
happen.

129

CHRM006264

1          Does it sound like he's just killed
2     someone, no.  Does he hide the fact that his
3     nephew, Brendan, from 50 yards away, or whatever
4     it is, Barb's trailer, has come over, no.
5     Doesn't have to tell Jodi that, if they were up
6     to something no good, but he does.  Brendan is
7     around.
8          And for all the world, as I say, these
9     conversations simply are inane, they don't ring
10    of someone who has committed a murder or in the
11    midst of committing a murder, or in the midst of
12    mutilating a corpse or falsely imprisoning
13    anyone, no screaming in the background.  They are
14    just inane telephone conversations between a
15    squabbling boyfriend and a squabbling girlfriend.
16         And October 31 comes to a close.  It's
17    about three days later, Thursday evening about
18    5:00, November 3, when Mrs. Halbach reports
19    Teresa missing.  Teresa lives almost next door to
20    the elder Halbachs; I mean, the two houses, you
21    can see the one from the other, on the dairy
22    farm, up north of here, in Calumet County.
23         So the report goes to the Calumet County
24    Sheriff's Department.  It's a missing person
25    report.  No one has seen Teresa since Sunday,

130

CHRM006265

actually. And the Calumet County Sheriff's office responds, interviews the family, a couple of close friends, and learns very quickly about these three appointments that Teresa had on Monday. Now, at least two of those -- at least two, maybe the third even, but at least two, are in Manitowoc County; Zipperers and Avery, or B. Janda.

So the Calumet County Sheriff's Department calls for help from the Manitowoc County Sheriff's Department on this missing person report; that very night, 5:00, the report is made. By the end the of the dinner hour, Calumet County is calling the Manitowoc County Sheriff's Department for a little bit of help.

And who do we get? We get Sergeant Andrew Colborn. And he's told, look, two places we would like to sort of check out and see if Teresa Halbach showed up on Monday, the Zipperer residence and Steven Avery. Well, that's a name that rings a bell, you better believe; less than three weeks, or about three weeks, after his deposition.

And it is interesting that of those two places that Sergeant Colborn is asked to check

131

CHRM006266

out and inquire after Teresa Halbach, he only goes to one. He goes to Steven Avery's home and Steven cooperates with him. Tells him essentially what I have told you about Teresa Halbach coming to take the picture of Barb Janda's van. Doesn't clam up, doesn't seem nervous, isn't uncooperative; that very night, November 3, around 7:00, when Sergeant Colborn knocks on his door.

Out of the blue, the same night, Lieutenant James Lenk, now the head of the Detective Unit in Manitowoc County Sheriff's Department, calls Calumet about this missing person report. Now, at this time, on Thursday night, November 3, this is -- let's be clear, this is just a missing person report, a young woman who hasn't been seen for three days.

It's in another county. It's not even Manitowoc County at all. And nobody has called for Lieutenant Lenk. And nobody's called looking for him. But the chief detective of Manitowoc County takes it upon himself, that night, to call Calumet and offer to get involved in the missing person investigation where one of the appointments that was to be kept was Steven

132

CHRM006267

1     Avery.
2             And the next morning, Lieutenant Lenk
3     does one better than that, he goes out himself to
4     Steven Avery's trailer with another officer from
5     Manitowoc.  And he knocks on the door again, just
6     as Sergeant Colborn had done the night before,
7     inquiring after Teresa Halbach.  Again, Steven
8     Avery is cooperative.
9             Lieutenant Lenk asks, could I take a
10    walk through your trailer, can I look around, do
11    you mind?  No, I don't mind.  Come on in.
12    Lieutenant Lenk walks through Steven's trailer,
13    sees nothing amiss, thanks him for his
14    cooperation and leaves.
15            November 5, Saturday, Steven has left to
16    go to the family cabin up in Crivitz, early that
17    morning, where Allen goes every weekend and most
18    of the family goes up too.  Steven has gone up on
19    Saturday morning.  But about 10:30 on Saturday
20    morning, Pam and Nikole Sturm find the Toyota
21    they suspect, correctly, as it turns out, is
22    Teresa's.  As it turns out, is Teresa's, in the
23    far diagonal corner of the salvage yard from
24    Steven Avery's trailer.
25            As you might expect, law enforcement

                              133

CHRM006268

1    officers descend on the property and the first to

2    arrive are Manitowoc County Sheriff's Department

3    officers at just about 11:00, in the morning, on

4    the nose.  And, folks, from that point forward,

5    from 11:00 a.m. on Saturday, November 5, 2005,

6    this is not so much a funnel approach, as you

7    will see.  It is a tunnel approach.  It is a

8    tunnel vision approach to this case.

9         All of the feelings about Steven Avery,

10   all of those churning emotions, all of that,

11   within the Manitowoc County Sheriff's Department,

12   floods out.  You can call it tunnel vision, you

13   can call it investigative bias, but from that

14   point on, this investigation is about Steven

15   Avery and not much else.

16        From 11:00 in the morning on Saturday,

17   November 5, 2005, before the police say they have

18   even opened the car; before they say they know of

19   any blood of any sort in or on the car; before

20   anybody even knows whether this young woman has

21   been hurt or killed, the focus is on Steven

22   Avery.

23        Other people are asked, her male

24   roommate; former boyfriend and current friend,

25   Ryan Hillegas; others are asked:  Do you know

134

CHRM006269

anything about her disappearance? Did you have
anything to do with it? All of them say no. And
those denials, those statements are accepted.

Not Steven Averys, not Steven Avery's
denials or expressions of innocence. Time and
again the police go back to Steven Avery and ask
the same questions. And he talks to them every
time.

Even by the time his lawyers in the
civil lawsuit down in federal court in Milwaukee
find out about it and are trying to encourage him
not to the talk to the police, he talks. On the
3rd to Colborn, on the 4th to Lenk, on the 5th to
officers up in Crivitz, on the 6th, on the 9th,
he talks. And he is not believed. Do they want
to go through his house, sure, come on in my
house, on November 4, Lieutenant Lenk.

After the Toyota is found and the police
arrive at about 11:00, that Saturday morning,
Lieutenant Lenk and Sergeant Colborn come in to
work and they too arrive at the Avery property.
You will hear that Lieutenant Lenk now has
changed his sworn version of when he arrived that
afternoon.

And he has the ability to change his

135

CHRM006270

sworn story about when he arrived that afternoon
at the Avery property, because somehow he avoided
signing in on the log, the log sheets that the
Calumet County Sheriff's Department was keeping
of that potential crime scene. He signed out,
but somehow he managed not to sign in.

And on that 40 acre parcel, after the
Toyota has been turned over to the Division of
Criminal Investigation in Madison, now, as search
efforts are to be begin on that parcel, now the
Manitowoc County Sheriff's Department nominally
turns over control of the investigation to
Sheriff Jerry Pagel of the Calumet County
Sheriff's Department, this county's sheriff's
department. Nominally, that afternoon, control
of this investigation was turned over to Calumet
from Manitowoc because of the apparent conflict
of interest that Mr. Avery's lawsuit represents
for the Manitowoc County Sheriff's Department.

Now, if you are thinking, though, that
the evidence will show you that Manitowoc County
bowed out because of the conflict of interest
after it turned the investigation over to Calumet
County; if you are thinking that, it's
reasonable, but you are wrong. Manitowoc County

136

CHRM006271

1    Sheriff's Department stays very much involved in

2    this investigation.

3          And what does Lieutenant Lenk and what

4    does Sergeant Colborn do by way of volunteering

5    to help, that very afternoon, Saturday

6    November 5. Do they volunteer to help look in

7    the 4,000 cars? No. Do they volunteer to search

8    Allen and Delores Avery's home? No. How about

9    the pole barns or the outbuildings of the salvage

10   property's business itself? No. They volunteer

11   to search Steven Avery's trailer. And they do,

12   on November 5.

13         And once they get into that trailer with

14   the search warrant, well, then, what these two

15   do -- and there are two other officers with them,

16   one from Manitowoc and one from Calumet -- what

17   Lenk and Colborn do is, they say, don't worry,

18   we'll take Steven's bedroom. And they search

19   this bedroom.

20         Now, this is a mobile home. If the

21   bedroom itself is 10 by 12, or 12 by 12, or 10 by

22   10, I would be surprised if it was much bigger

23   than that. From me to the wall in front of you

24   is about the depth and roughly the width of that

25   bedroom in the small trailer in which Steven

137

CHRM006272

Avery lives.

They search, that is, Lenk and Colborn
search his bedroom on the night of November 5.
And they find nothing of interest.  They see the
guns; they stay on the wall.  But don't bother
seizing guns on the 5th, come back to those the
next day.  And it is Lenk and Colborn who come
back the next day, not somewhere on the property,
but to Steven Avery's trailer.

On November 6, they search his garage,
garage is actually between him and his sister
Barb's trailer, but for our purpose here, let's
call it his garage.  You will find out that the
Dassey boys have access to the garage, Barb has
access, the family has access to this garage.

But it's Lenk and Colborn and another
detective from Manitowoc County named Dave
Remiker who searched the garage on Sunday, the
6th.  They find 10, maybe it's 11, something, 10
or 11 spent .22 casings.  And they pick all of
those up.

But remember -- remember the bullet
that's found under little tent number 9 on the
picture that Mr. Kratz showed you?  The bullet
that's apparently in a crack in the floor, right

138

CHRM006273

smack in the middle of the garage near the front
where the door is? That, no one sees or picks up
on November 6th, November 7th, November 8th and
so forth through November 12th.

Neither does anyone see a bullet back
under the air compressor. But you will see
photographs of that garage as it was in
November 2005, not as it was in March, 2006,
when, finally, low and behold, why there's
bullets, why don't we pick up these bullets.

You will see the garage in photographs,
not computer simulations, photographs, as it was
in November, 2005. You will be able to see, that
although the garage is very cluttered, there's no
clutter under the air compressor. There's no
clutter there, where four months later someone
finds a magic bullet, there, as you walk into the
garage, looking at the floor.

November 7, Steven Avery's trailer is
searched again, guess who; Lenk and Colborn. Now
there probably -- There certainly are over 50 law
enforcement officers on this property, 24 hours a
day, well before November 7th, probably by
sometime late the night of the 5th, certainly by
the 6th. There may be over 100 law enforcement

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 105 of 128   Document 290-18

CHRM006274

1     officers working this property.

2             They have got the family excluded.  They

3     have got a perimeter around the entire 40 acres

4     and more.  They are controlling traffic and

5     entry.  They are logging in who comes and goes.

6     They control this place.

7             And as you heard Mr. Kratz say, they

8     have got any number of people searching, but it's

9     Lenk and Colborn, again, who are searching

10    Mr. Avery's trailer, there in the northwest

11    corner of that salvage yard.  And on November

12    7th, they find nothing of interest in his home.

13            Tuesday, November 8, they are back.

14    They are back in Mr. Avery's home, back in that

15    small bedroom.  And now, Lieutenant Lenk, on what

16    you will hear is probably the seventh search of

17    that small bedroom, Lieutenant Lenk, now, when

18    he's the only one in that room, says, why, my

19    gosh, there's a key sitting in plain view, next

20    to the night stand.

21            There is, you saw a picture of it as he

22    says he found it, one solitary key on a ring,

23    connected to a fob.  That key fob is just like,

24    and probably is, the one that Teresa Halbach's

25    younger sister bought her as a little present.

                            140

CHRM006275

One key, and one key only, on the ring connected

to that fob, it's a Toyota key.

And the man whom the State would have

you believe bled all over Teresa's car, manages

not to bleed on her key.  His blood isn't found

there, although, apparently, somehow his DNA is,

but not his fingerprints.  And more

interestingly, although this is a 1999 Toyota and

I gather she's been using this key, the State

believes, every day to start her car and turn it

off, Teresa Halbach's DNA and fingerprints are

not found on her key.

For good measure, on November 8,

Lieutenant Lenk and Sergeant Colborn searched

Steven Avery's garage yet again.  No bullets, no

nothing.  And the case against Steven Avery,

largely, is made at that point.  And a whole lot

of it, as you will see, depends on lieutenant

James Lenk, Sergeant Andy Colborn.

And they, both of them, have elected

never to tell Sheriff Jerry Pagel, the man in

charge of the investigation for Calumet County;

they have elected not to tell him that they had

their depositions taken in Steven Avery's case

probably three weeks earlier.  They didn't tell

CHRM006276

1    anybody in the Calumet County Sheriff's
2    Department that.

3         November 8 is also the day that the bone
4    fragments are found in a burn area hardly 20
5    yards outside Steven Avery's master bedroom
6    window.  Hardly 20 yards.  Small burnt bone
7    fragments, human burnt bone fragments.  But what
8    you will learn and you do not hear this morning,
9    what you will learn is that burnt human bone
10   fragments also apparently are found in one of the
11   burn barrels behind Barb Janda's house.

12        Burnt the same way, fragmented about the
13   same way, and apparently human in origin.  Not
14   Steven Avery's burn barrel, not the one you heard
15   about, but there are four burn barrels to the
16   southeast, that is the most distant corner of
17   Barb Janda's trailer, from Steven Avery's
18   trailer.  Four burn barrels back there for Barb
19   Janda and the Dassey boys.  Burnt bone fragments.

20        And there are what seem to be probable
21   human burnt fragmented bones found in the Radandt
22   Gravel Quarry, probably a quarter mile south of
23   Steven Avery's property.

24        Now, I don't think that the State has
25   been able to link, through DNA analysis, those

142

CHRM006277

burnt bone fragments conclusively to Teresa
Halbach.

But how many burnt human bone fragments
are there supposed to be, and when you only have
one person missing.  And the burnt human bone
fragments in the Janda burn barrel, about which
you did not hear this morning, those are
fragments from bones that are not connected, not
part of one limb, not connected to one another
within the human body.  Sort of a random mix of
bone fragments, as apparently are those that are
found a quarter mile to the south in the Radandt
gravel pit.

And as you piece this evidence together,
here's what you are going to have to conclude,
bone fragments, parts of this body were found
where they were not burned.  They were burned and
moved because, again, the fragments aren't
connected to one another.

It's not that, you know, it's not that
an arm could have been removed and burned one
place and the rest of the body another place.  We
have got the fragments themselves mixed up and
found in three different places.  The body
couldn't have been burned in that way, in three

143

CHRM006278

different places or even two, if you set aside
the Radandt gravel pit.  These bone fragments
were moved.

The question then becomes, the question
you will have to decide eventually is, were they
moved from Steven Avery's burn area to the Janda
burn barrel or the gravel quarry, or were they
moved from somewhere else to Steven Avery's burn
area and maybe to one of the other places where
bone fragments, burnt, are found.

At least, did they start in the burn
area and get moved somewhere else, or did they
start somewhere else, burned somewhere else and
get moved to the burn area.  Now, an expert --
experts here, in what scientists will call
thermal injuries to bodies, cremation, an expert
or two, to the extent you hear that, may be able
to give you some help on that question, some
help, but I'm not sure that an expert can answer
this conclusively.

In the end, you folks are going to have
to do the hard work and the hard thinking on
that.  But I think when you have heard it all,
you will conclude that it's at least most likely,
more probable, that the bones were moved to

144

CHRM006279

```
1      Steven Avery's burn area, not burned there and
2      moved from that area to another place or two.
3           Why?  You are going to find out that
4      there are better places, even on the Avery
5      salvage yard property, in which to incinerate a
6      body.  The burn area is relatively flat and
7      scooped out a little bit, but it's relatively
8      flat and open.  It's a burn area, like many farms
9      or rural homes have, just folks have burn
10     barrels.
11          It doesn't have well developed sides to
12     focus heat back inward on the fuel or things
13     being burned.  Neither does it have a ready
14     external source of fuel.  But the aluminum
15     smelter, the aluminum smelter at the Avery Auto
16     Salvage property does.  Big propane jets, an
17     enclosed area, it will take an aluminum
18     transmission down to liquid in a few minutes.
19          The wood furnace that heats the
20     outbuildings of the Avery Auto Salvage business;
21     Chuck's home; Allen and Delores' home, that's an
22     enclosed area that will incinerate fuel in it
23     very quickly.
24          And because we have got probable human
25     burnt bone fragments found on the adjoining
```

145

CHRM006280

property, the gravel quarry to the south, we can't rule out other possible burn sites. And an expert won't be able to tell you what other possible burn sites there are. Expert or not, that's not something he or she will be able to tell you.

But once it's more likely, as I think you will find it to be more likely, that the body is burned somewhere else and bone fragments then are brought to Steven Avery's burn area, then he's not guilty. Because if he's the one who burned the body somewhere else, he's not going to bring the bones back to dump them 20 yards outside his bedroom window.

Neither is he going to dump a cell phone and a digital camera and a palm pilot in his own burn barrel. Too many other places where these things could be disposed of out in the salvage yard, whether the retention pond, whether the gravel quarry, or some other burn barrel in the woods. So once you understand that those bones probably were not burned in that burn area, the fact that they are found there, you will see tends to suggest he's not guilty, not that he is.

It is perfectly clear to anyone around

CHRM006281

1      this investigation on whom the focus of the

2      Manitowoc County Sheriff's Department and the

3      other investigators, to the extent that tunnel

4      vision, that investigative bias bled over, it's

5      perfectly clear on whom the focus of this

6      investigation is.

7              The police didn't kill Teresa Halbach,

8      obviously, they have that in common with Steven

9      Avery, but they wanted to believe he did.  They

10     very much wanted to believe that he did.  And

11     whoever did kill her, or burned that body,

12     exploited that tunnel vision pretty skillful.

13             Suggesting this sort of tunnel vision,

14     suggesting this kind of investigative bias,

15     planting blood in her car, fairly serious

16     allegations to make.  In fact, I will take away

17     the fairly, they are serious allegations.

18     Understand them, that bias and tunnel vision are

19     human anomalies.

20             And if you conclude, reluctantly, that

21     Mr. Lenk or Mr. Colborn, in addition to all the

22     other interests they took in searching and

23     focusing on Steven Avery, planted blood in her

24     car, you will also conclude that they put it

25     there because they figured it had to be there.

147

CHRM006282

```
 1    It should be there.  It must be him.
 2              This wasn't so much, I think the
 3    evidence will show you, an effort to frame an
 4    innocent man, it was an intense, intense desire
 5    to conclude that he, in fact, was the guilty man;
 6    all other possible leads for information not
 7    withstanding.  It was an immediate focus on this
 8    man, starting shortly after 11:00, Saturday,
 9    November 5, 2005.  But you do not have to take my
10    word for that.
11              I can make this work; I'm not as adept
12    at it as I should be.  I'm going to play for you,
13    two tapes, a part of it, just excerpts, short
14    excerpts of two tapes.
15              The first one is Saturday, November 5,
16    2005, at 11:35 in the morning, 35 minutes give or
17    take a minute or two, after the Manitowoc County
18    Sheriff's Department first has arrived at the
19    Avery property, because that Toyota has been
20    found; well before the police say they opened the
21    Toyota; well before they say they knew of any
22    blood; well before Brutus, the friendly cadaver
23    dog comes along and hits; 35 minutes after the
24    first officers arrived when the Sturm's called
25    and said, hey, we think we found something.
```

148

CHRM006283

1        What I'm going to do is scroll through a

2    transcript that we prepared and then I will play

3    the excerpt of the tape for you. It is not a

4    great recording. The transcript is not evidence,

5    the tape will be, I expect. So if you think my

6    transcript is wrong, listen to the tape; it's the

7    evidence, or it will be. That's the tape that

8    matters. The transcript may help you in

9    understanding it or hearing it.

10        Detective Remiker is calling in, he's

11   asking for dispatch. Dispatch responds, I put

12   unintelligible, I think it's go ahead, but I'm

13   not sure, you can decide. Maybe you won't

14   understand it for sure either.

15        Detective Remiker says to the

16   dispatcher, you will need to get ahold of the

17   Crime Lab for their evidence response team to

18   start responding to this location. Now, he's out

19   at the Avery Salvage Yard. As you will hear.

20   Dispatch says, 10-4, Crime Lab out of Madison,

21   Milwaukee, where?

22        Our Crime Lab has branches in Wausau,

23   Madison and Milwaukee. The main one is in

24   Madison. Detective Remiker says, it's going to

25   be the Madison response team and he was right.

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 115 of 128   Document 290-18

CHRM006284

Now, Detective Jacobs joins in, this

radio traffic, radio conversation.  Calls in with

his badge number, his squad number, I'm in code,

you will find out what that means, anything you

need other than a portable for Schetter.  And

what you'll find out is he's talking about a

portable radio for Deputy Inspector Greg Schetter

of the Manitowoc County Sheriff's Department who

is, I think, the number two or three ranking

officer in the Department and who's probably also

going out to the Avery property.  Detective

Remiker, not that I can think of right now,

Dennis.  Dennis Jacobs.  Let's see if this work.

            (Tape recording played.)

        DETECTIVE REMIKER:  Yeah, need to get a

hold of the Crime Lab for their evidence response

to start responding at this location.

        DISPATCH:  10-4.  Crime Lab out of

Madison, Milwaukee, where?

        DETECTIVE REMIKER:  Madison response

team.

        DETECTIVE JACOBS:  278, I'm in code,

anything you need other than a portable for

Schetter.

        ATTORNEY STRANG:  It cut off.  Sorry about

                        150

CHRM006285

1    that, you will hear -- You will get a chance to hear
2    the whole conversation.  And it continues, Dennis
3    Jacobs says, okay, other than the car, do we have
4    anything else.  He's talking to Remiker here.  Dave
5    Remiker says, not yet.  Detective Jacobs, Okay.  Is
6    he in custody?  Detective Remiker, Negative, nothing
7    yet.
8            Not who, not is who in custody, but
9    negative.  He is not in custody, nothing yet.
10   Detective Jacobs, Okay.  I'll gather my stuff and
11   head out.
12           (Tape recording played.)
13           DETECTIVE JACOBS:  Okay.  Other than the
14   car do we have anything else?
15           DETECTIVE REMIKER:  Not yet.
16           DETECTIVE JACOBS:  Is he in custody?
17           DETECTIVE REMIKER:  Not yet, nothing
18   happening.
19           DETECTIVE JACOBS:  Okay.  I will gather
20   my stuff and head out.
21           ATTORNEY STRANG:  Now, that's 11:35, is he
22   in custody yet.  Detective Remiker, clearly, I
23   gather, as I hear it, knows who Detective Jacobs is
24   talking about, but we don't, 35 minutes after the
25   police have arrived.

151

CHRM006286

1           And to get a better feel for that

2     conversation at 11:35, we have to go back five

3     minutes earlier when Detective Jacobs is calling

4     in on the land line, 5 minutes earlier, 30

5     minutes, 30 minutes after the police have arrived

6     at the Avery property after Teresa's car has been

7     found there.

8           Dispatcher answers the phone.  Detective

9     Jacobs, Katie -- the name of the dispatcher --

10    just rolled into the parking lot.  Can you tell

11    me, do we have a body or anything yet?  Do we

12    have a body or anything yet?  This is 30 minutes

13    after they found the car.

14          I don't believe so.  I believe they

15    wouldn't find the first bone fragment for three

16    days.  Do we have Steven Avery in custody,

17    though?  I have no idea.  You can hear it

18    yourself.

19          (Tape recording played.)

20          DISPATCH:  Good morning.  Manitowoc

21    County Sheriff's Department, Katie speaking.

22          DETECTIVE JACOBS:  Katie, I just rolled

23    into the parking lot.  Can you tell me, do we

24    have a body or anything yet?

25          DISPATCH:  I don't believe so.

152

CHRM006287

```
 1              DETECTIVE JACOBS:  Do we have Steven
 2    Avery in custody?
 3         (Tape recording starts playing again.)
 4              DISPATCH:  Good morning.  Manitowoc
 5    County Sheriff's Department, Katie speaking.
 6              DETECTIVE JACOBS:  Katie, I just rolled
 7    into the parking lot, can you tell me do we have
 8    a body or anything yet?
 9              DISPATCH:  I don't believe so.
10              DETECTIVE JACOBS:  Do we have Steven
11    Avery in custody at all?
12              DISPATCH:  I have no idea.
13              ATTORNEY STRANG:  Now, I will finish it out
14    so you can link it up to the call -- the discussion
15    with Detective Remiker 5 minutes later.  Oh, I heard
16    him say pick up that party.  Oh no, the dispatcher
17    says, Pete, who is just another Manitowoc County
18    Sheriff's officer, is sitting up there waiting and
19    stopping people from going in and that.  He found
20    someone with a body only warrant for our department.
21              A body only warrant is an arrest warrant
22    or a bench warrant where they are going to take
23    the person into custody, rather than immediately
24    grant him bail.  Okay.  Do we have -- All right.
25    I will talk to Remiker.  Yeah, your best bet is
```

153

```
 1    to talk -- because nothing has come through.  We

 2    have the vehicle, that I know.  But more than

 3    that, I don't know.  All right.  Bye.  Bye.

 4              (Tape recording played.)

 5              DETECTIVE JACOBS:  Oh, I heard him say

 6    pick up that party.

 7              DISPATCH:  Oh, no.  We have -- Well,

 8    Pete is sitting up there waiting and stopping

 9    people from going in and that.  He found somebody

10    with a body only warrant for our department.

11              DETECTIVE JACOBS:  Okay.  Do we have --

12    All right.  I will talk to Remiker.

13              DISPATCH:  Yeah, your best bet is to

14    talk to -- Nothing has come through.  We have the

15    vehicle, that I know.

16              DETECTIVE JACOBS:  All right.  Thank

17    you.

18              DISPATCH:  But what more, I don't know.

19    All right. Bye.

20              DETECTIVE JACOBS:  Bye.

21              ATTORNEY STRANG:  So you can take the

22    tunnel vision and investigative bias from them, not

23    from me.  Now, in the end here, in the end, when you

24    have heard it all, there's not a speck of Teresa

25    Halbach's blood anywhere in Steven Avery's trailer.
```

154

CHRM006289

1  There's not a piece of hair, nothing, nothing to

2  suggest she's ever been in the trailer. And only

3  the magic bullet found 4 months later to suggest

4  she's ever been anywhere near the garage.

5        And when you consider the forces, the

6  emotions, the very human failings at work here,

7  it's no surprise that the blood from that

8  unsecured vial, in the box, in the Clerk's

9  Office, that Lieutenant Lenk examined back in

10  2002, ends up in that Toyota. Because that's

11  where it ought to be. Is he in custody yet?

12        Jerome Buting and I will not ask you to

13  make that kind of snap judgment here. The

14  Halbachs deserve better than that. The police

15  deserve better than that. You owe it to

16  yourselves, in making this decision, to do better

17  than a snap judgment, a snap judgment 30 minutes

18  after that Toyota is found.

19        Jerome Buting and I are going to ask you

20  to do your job right. Think long and hard about

21  all of the evidence. But in the end, after the

22  full and fair consideration of everything and

23  everyone, the full and fair consideration that

24  Steven Avery did not get in 2005, from the

25  Manitowoc County Sheriff's Department; we're

155

CHRM006290

```
 1        going to ask you to send him home.  We're going
 2        to ask you to send him home, again.  We're going
 3        to ask you to get it right this time.  We're
 4        going to ask you to set it right when this case
 5        is over.
 6                 THE COURT:  Thank you, Mr. Strang.  Members
 7        of the jury, we're going to take an afternoon break
 8        now.  We'll resume in 15 minutes and the State will
 9        begin the presentation of evidence.  I will remind
10        you again, as I will a number of times throughout
11        the trial, do not discuss the case during the break
12        or at any other time until all the evidence has been
13        received.
14                      (Jury not present.)
15                 THE COURT:  All right.  Counsel, we should
16        be ready to go promptly at 2:45.
17                      (Recess taken.)
18                 THE COURT:  At this time the State may call
19        its first witness.
20                 ATTORNEY KRATZ:  State will call Mike
21        Halbach, your Honor.
22                 THE CLERK:  Please raise your right hand.
23                 MICHAEL D. HALBACH, called as a witness
24        herein, having been first duly sworn, was
25        examined and testified as follows:

                              156
```

CHRM006291

```
 1        photography business; can you tell us about that
 2        a little bit?
 3   A.   Yeah, through college she developed a passion for
 4        photography and, hence, why she declared that as
 5        her major.  I would say her sophomore and junior
 6        year she worked at Bay Park Square Mall in Green
 7        Bay at Picture People taking photos of children,
 8        mainly families.
 9              After she got done doing that, during
10        her last semester at Wisconsin, Green Bay, she
11        started this internship with Tom Pearce of Pearce
12        Photography in Green Bay, doing many of the same
13        things, taking pictures of children, families,
14        some, and also doing weddings on the weekends.
15        So she continued working with him and then later
16        on in 2002, she started her business, which she
17        named Photography by Teresa, which continued up
18        until Halloween of 2005.
19   Q.   Now, you indicated that you are familiar that at
20        least one of her clients was Auto Trader
21        Magazine; is that what you told us?
22   A.   Yes, that's correct.  She in, I think it was
23        October of 2004, she started working for Auto
24        Trader Magazine as a way to supplement her income
25        for her professional business.  Since she was
```

165

```
 1        just starting out with her own business, she
 2        wouldn't always have clients.  So.  Yeah, just as
 3        a way to have some steady income, she got this
 4        job with the *Auto Trader Magazine* to take
 5        pictures of vehicles in people's yards, that they
 6        were selling themselves.
 7   Q.   First photo I'm showing you has been marked as
 8        Exhibit No. 7, can you tell us what that is,
 9        please?
10   A.   Exhibit No. 7 is Canon PowerShot A310; it's the
11        box for the Canon camera.  It's not the camera
12        itself.
13   Q.   And, once again, were you familiar that that was
14        one of the cameras that Teresa had used in her
15        employment?
16   A.   Yes, I am, in her employment with *Auto Trader*,
17        yes.
18   Q.   The other exhibit, I think it was Exhibit No. 6;
19        is that correct?
20   A.   That's correct.
21   Q.   Can you tell me what that is, please?
22   A.   It's a box for a Palm 1 Zire 31 palm pilot.
23   Q.   And, once again, the large screen, does that
24        accurately depict the box, again, recovered from
25        your sister's home, the box that she saved for
```

166

CHRM006301

| | |
|---|---|
| 1 | Q. Can you tell me who Pam Sturm is? |
| 2 | A. Pam Sturm, to me, would be my first cousin once |
| 3 | removed. She would be my grandma's sister's |
| 4 | daughter. |
| 5 | Q. Okay. The involvement of Pam and her daughter, |
| 6 | Nikole, after your sister was missing, could you |
| 7 | describe that for the jury? |
| 8 | A. You said her involvement? |
| 9 | Q. Yes. |
| 10 | A. Pam Sturm was the person who ended up finding |
| 11 | Teresa's vehicle on the Avery salvage yard. I |
| 12 | recall coming home that day, after I had been |
| 13 | with my brother driving, in her -- being inside |
| 14 | my parents' house crying and my mom telling me |
| 15 | that we found the vehicle -- or Pam found the |
| 16 | vehicle, Pam and her daughter, Nikole. So, I |
| 17 | guess that would be her involvement. |
| 18 | Q. All right. Let's go back just a little bit, |
| 19 | Mike, if we can. After your mom reported your |
| 20 | sister missing on the 3rd of November, how was it |
| 21 | that you were informed of that? |
| 22 | A. On Thursday, November 3rd, I was working. I got |
| 23 | a call from my mom that afternoon at about 2:00 |
| 24 | or 2:30 wondering if I knew where -- or if I had |
| 25 | talked to my sister in the previous, you know, |

170

CHRM006305

```
 1        since Sunday.  And I said that I hadn't.

 2               And so I went on to call one of Teresa's

 3        good friends at her work and asked her if she had

 4        known where Teresa could be.  Because it was

 5        completely unlike her to go somewhere without

 6        telling anyone, especially a family member, a

 7        good friend, her roommate, or her boss.

 8               So, I guess after we made those calls it

 9        became very evident to me that something was

10        seriously wrong and I expressed that to my mom.

11        Then shortly after -- and she was, you know, she

12        was in agreement, obviously; she knew something

13        was wrong, just like everyone else did.

14   Q.   Did the family ask for some assistance and did

15        you receive it from some of Teresa's friends

16        regarding searching for her?

17   A.   In searching for her we, you know, all we had to

18        do was make a couple phone calls to some of

19        Teresa's friends and they would call numerous

20        other people.  We needed help passing -- passing

21        out posters on Friday, November 4th and also

22        doing searches by car on Saturday, the 5th and

23        doing searches by foot a few days following that.

24        So, whenever we needed help, we had help from

25        Teresa's friends, family members, community
```

171

CHRM006306

```
 1   A.   I don't think on her computer, no.

 2   Q.   Okay.  And you didn't have her voice mail?

 3   A.   I said I did -- did have her voice mail password.

 4   Q.   You did have her voice mail password.  Okay.  Did

 5        you check voice mails?

 6   A.   I did.

 7   Q.   Do you remember when you did that?

 8   A.   It was probably Thursday evening, early evening.

 9   Q.   After your mom --

10   A.   Yes.

11   Q.   -- had --

12   A.   Yes.

13   Q.   -- filed a missing persons report?

14   A.   Yes.

15   Q.   Okay.  So I take it you were at work earlier that

16        day?

17   A.   Correct.

18   Q.   And the missing person report was sort of at the

19        end of the day, 5:00 or something?

20   A.   Correct.

21   Q.   Were you familiar enough with Teresa Halbach's

22        everyday stuff to know what -- what she carried

23        keys to?

24   A.   I mean, yes, I think I would have an idea of what

25        keys she would have, yes.
```

185

CHRM006320

```
 1   STATE OF WISCONSIN   )
                          )ss
 2   COUNTY OF MANITOWOC  )

 3

 4              I, Diane Tesheneck, Official Court

 5       Reporter for Circuit Court Branch 1 and the State

 6       of Wisconsin, do hereby certify that I reported

 7       the foregoing matter and that the foregoing

 8       transcript has been carefully prepared by me with

 9       my computerized stenographic notes as taken by me

10       in machine shorthand, and by computer-assisted

11       transcription thereafter transcribed, and that it

12       is a true and correct transcript of the

13       proceedings had in said matter to the best of my

14       knowledge and ability.

15              Dated this 5th day of October, 2007.

16

17

18                        _Diane Tesheneck, RPR_

19                        Diane Tesheneck, RPR
                          Official Court Reporter
20

21

22

23

24

25


                          221
```

CHRM006356