# EXHIBIT 19

1    STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                              BRANCH 1
2    ─────────────────────────────────────────────────

3    STATE OF WISCONSIN,

4                    PLAINTIFF,        JURY TRIAL
                                       TRIAL - DAY 7
5    vs.                               Case No. 05 CF 381

6    STEVEN A. AVERY,

7                    DEFENDANT.

8    ─────────────────────────────────────────────────

     **DATE:**    FEBRUARY 20, 2007
9
     **BEFORE:**  Hon. Patrick L. Willis
10            Circuit Court Judge

11   **APPEARANCES:**  KENNETH R. KRATZ
                    Special Prosecutor
12                  On behalf of the State of Wisconsin.

13                  THOMAS J. FALLON
                    Special Prosecutor
14                  On behalf of the State of Wisconsin.

15                  NORMAN A. GAHN
                    Special Prosecutor
16                  On behalf of the State of Wisconsin.

17                  DEAN A. STRANG
                    Attorney at Law
18                  On behalf of the defendant.

19                  ATTORNEY JEROME F. BUTING
                    Attorney at Law
20                  On behalf of the defendant.

21                  STEVEN A. AVERY
                    Defendant
22                  Appeared in person.

23               TRANSCRIPT OF PROCEEDINGS

24          Reported by Diane Tesheneck, RPR

25               Official Court Reporter

                         1

CHRM008000

1                                    I N D E X

2    WITNESSES                                                    PAGE

3    SERGEANT WILLIAM TYSON
4    Cross-Examination by ATTORNEY BUTING                          3
5    Redirect Examination by ATTORNEY KRATZ                       62
6
7    SERGEANT ANDREW L. COLBORN
8    Direct Examination by ATTORNEY KRATZ                         64
9    Cross-Examination by ATTORNEY STRANG                        141
10   Redirect Examination by ATTORNEY KRATZ                      212
11   Recross-Examination by ATTORNEY STRANG                      215
12
13   LIEUTENANT JAMES LENK
     Direct Examination by ATTORNEY KRATZ                        216
14

15   EXHIBITS          MARKED        OFFERED        ADMITTED
16   158                              120            121
     206-207                          63             64
17   211               135           136            137
     212               179           243            243
18   213               200

19

20

21

22

23

24

25

                                       2

1                                    I N D E X

2    WITNESSES                                                    PAGE

3    SERGEANT WILLIAM TYSON
4    Cross-Examination by ATTORNEY BUTING                          3
5    Redirect Examination by ATTORNEY KRATZ                       62
6
7    SERGEANT ANDREW L. COLBORN
8    Direct Examination by ATTORNEY KRATZ                         64
9    Cross-Examination by ATTORNEY STRANG                        141
10   Redirect Examination by ATTORNEY KRATZ                      212
11   Recross-Examination by ATTORNEY STRANG                      215
12
13   LIEUTENANT JAMES LENK
     Direct Examination by ATTORNEY KRATZ                        216
14

15   EXHIBITS          MARKED        OFFERED        ADMITTED
16   158                              120            121
     206-207                          63             64
17   211               135           136            137
     212               179           243            243
18   213               200

19

20

21

22

23

24

25

                                       2

CHRM008001

|    |                                                      |
|----|------------------------------------------------------|
| 1  | (Jury present.)                                      |
| 2  | THE COURT: The Court calls State of                  |
| 3  | Wisconsin vs. Steven Avery, Case No. 05 CF 381.      |
| 4  | We're here this morning for the continuation of the |
| 5  | trial in this matter. Will the parties state their  |
| 6  | appearances for the record, please.                 |
| 7  | ATTORNEY KRATZ: Good morning, Judge, the            |
| 8  | State appears by Calumet County D.A. Ken Kratz,     |
| 9  | Assistant Attorney General Tom Fallon, Assistant    |
| 10 | D.A. Norm Gahn, appearing as Special Prosecutors.   |
| 11 | ATTORNEY BUTING: Good morning, your Honor,          |
| 12 | Attorney Jerome Buting and Dean Strang appearing    |
| 13 | with Mr. Avery today.                               |
| 14 | THE COURT: All right. I believe when we             |
| 15 | left yesterday the State had completed it's direct  |
| 16 | examination of Officer Tyson and the Defense will   |
| 17 | begin cross-examination today. Is the witness here? |
| 18 | THE CLERK: Please raise your right hand.            |
| 19 | **SERGEANT WILLIAM TYSON,** called as a             |
| 20 | witness herein, having been first duly sworn, was   |
| 21 | examined and testified as follows:                  |
| 22 | THE CLERK: Please be seated. Please state           |
| 23 | your name and spell your last name for the record.  |
| 24 | THE WITNESS: William Tyson, T-y-s-o-n.              |
| 25 | **CROSS-EXAMINATION**                               |

3

CHRM008002

BY ATTORNEY BUTING:

Q.   Good morning, Sergeant.

A.   Good Morning.

Q.   Let me start right off by directing your
     attention to November 5th, first arrival at the
     scene, okay, remember that?

A.   Yes, sir.

Q.   You testified yesterday that you arrived at, I
     believe about 2:45.  It was about five minutes to
     three by the time you got up to where the RAV4
     was located; does that fit with your
     recollection?

A.   Correct.

Q.   All right.  And I don't know if you need to
     refresh your recollection with your report, just
     let me know if you do, okay?

A.   Okay.

Q.   But from what I understand, it appears that you
     left that area at 3:10 p.m., just 15 minutes
     later?

A.   Correct.

Q.   You were called back to the command center to do
     some other assignments?

A.   Correct.

Q.   And during that 15 minutes, when you first

4

CHRM008003

```
 1        arrived, was the RAV4 covered with a tarp or was
 2        it uncovered?
 3   A.   It was uncovered.
 4   Q.   Okay.  But during that 15 minutes is the period
 5        of time when the tarps were put over the RAV;
 6        isn't that right?
 7   A.   Yes, they were attempting to get that tarp in
 8        place.
 9   Q.   Okay.  And you testified about that and you were
10        actually one of the people who helped put it over
11        the RAV4?
12   A.   I never physically touched the tarp.  I did
13        assist with getting some objects, I believe, from
14        a vehicle that was right next to it.
15   Q.   Okay.
16   A.   To secure it down, to prevent it from blowing
17        away.
18   Q.   Okay.  So you were just helping as others were
19        building this, like, tent, like, object over the
20        RAV?
21   A.   That would be accurate, yes.
22   Q.   Okay.  And you were taking extreme care,
23        everybody was taking extreme care so that it
24        wouldn't actually -- the tarp wouldn't actually
25        touch the RAV4 itself?
```

5

CHRM008004

| 1 | A. | Yes, all the officers were very conscious of that |
| 2 | | fact. |
| 3 | Q. | So there was space around it, underneath the |
| 4 | | tarp, right? |
| 5 | A. | They were trying to do the best they could to |
| 6 | | make sure that the top of the vehicle was not |
| 7 | | touched by the tarp. |
| 8 | Q. | Okay. And that was completed, that operation of |
| 9 | | putting the tarp over it was completed by the |
| 10 | | time you were called away to the command center, |
| 11 | | right? |
| 12 | A. | They were still working on it when I was relieved |
| 13 | | of my duties. There were some issues, the winds |
| 14 | | were picking up. I know they were trying their |
| 15 | | best to get that situated. I don't believe, to |
| 16 | | the best of my recollection, that that was |
| 17 | | totally finished by the time I was released. |
| 18 | Q. | Okay. But largely covered, being able to weigh |
| 19 | | it down still; is that the gist of it? |
| 20 | A. | I think that would be accurate. |
| 21 | Q. | Making some adjustments, perhaps? |
| 22 | A. | That would be accurate. |
| 23 | Q. | Okay. So, if -- if we heard other testimony that |
| 24 | | showed that the RAV4 was still completely covered |
| 25 | | with the tarp at 4:16 p.m., then that would mean, |

6

CHRM008005

| 1 | | for at least one hour, that RAV4 was covered; |
| 2 | | would that be right? |
| 3 | A. | Yeah, it was, you know, like I said, I left at 10 |
| 4 | | minutes after three, they were still doing some |
| 5 | | adjustments to it. So, yeah, if you heard |
| 6 | | testimony at 10 after 4, I was not down there so |
| 7 | | I don't know for sure. |
| 8 | Q. | So you never went back to that site? |
| 9 | A. | Correct. |
| 10 | Q. | The rest of the night you never went back to see |
| 11 | | the RAV4 yourself? |
| 12 | A. | I believe later on in the evening, after the |
| 13 | | canine dogs had searched the area, I was down in |
| 14 | | that area, but not near the RAV4. I was down by |
| 15 | | the pond area and through the lanes, but never |
| 16 | | really directly by the RAV. |
| 17 | Q. | By the way, did you see -- Can you -- can you |
| 18 | | tell me when you first saw Lieutenant Lenk at the |
| 19 | | Avery salvage that day? |
| 20 | A. | My recollection, the first time I saw Lieutenant |
| 21 | | Lenk would have been up at the command center on |
| 22 | | the top of the hill. |
| 23 | Q. | All right. Well, would that have been the first |
| 24 | | time you got there, or would that have been |
| 25 | | later, which time? |

7

CHRM008006

| | | |
|---|---|---|
| 1 | A. | It would have been after I cleared from the |
| 2 | | Toyota RAV. We were up at the command center. |
| 3 | | There were officers who I did not know at that |
| 4 | | time. I never met these officers, was introduced |
| 5 | | to those officers. |
| 6 | Q. | Okay. So around 3:15 or so is when you think you |
| 7 | | were introduced to Lieutenant Lenk up at that |
| 8 | | command center? |
| 9 | A. | I can't be sure if he was on scene immediately |
| 10 | | when I got there, or if he showed up a half hour |
| 11 | | later. I really don't know for sure what time he |
| 12 | | showed up on scene. |
| 13 | Q. | Okay. What about Sergeant Colborn? |
| 14 | A. | Same would apply to him, I never met Sergeant |
| 15 | | Colborn before so I didn't know who he was. I |
| 16 | | was introduced to him, but I can't be certain |
| 17 | | what time they actually showed up at the scene. |
| 18 | Q. | All right. Now, when you first arrived at the |
| 19 | | RAV4 location at approximately 3:00, you were |
| 20 | | actually the first Calumet officer to relieve any |
| 21 | | Manitowoc officer from security in that immediate |
| 22 | | area, right? |
| 23 | A. | That's my understanding. |
| 24 | Q. | All right. So that if the first officers -- |
| 25 | | Manitowoc officers arrived at about 11:00 a.m. to |

8

CHRM008007

```
 1        3:00 p.m., that means the first four hours that
 2        that vehicle was in that location Calumet was not
 3        securing it, Manitowoc was securing it, right?
 4   A.   I don't know exactly who was securing it.  All I
 5        know is I believe the Manitowoc deputy, if there
 6        were other DCI officers there, I really don't
 7        know.
 8   Q.   So you don't know what happened before you came,
 9        you just know as far as Calumet goes -- Calumet
10        officers, you were the first?
11   A.   That's what I was told.
12   Q.   All right.  Now, when you went to the Command
13        Post, the first time, when you first checked in
14        at 2:45 or so, you had the -- were you introduced
15        to who was in charge at that point?
16   A.   No, my recollection is, is when I arrived with
17        Deputy Bass, I was met by Investigator Wiegert
18        and Steier and they informed me to respond
19        directly down into the junkyard area.  I don't
20        believe I got out and socialized with the group
21        at all.  It was just, you need to go down there
22        and take care of whatever they need your
23        assistance with.
24   Q.   So you weren't told at that time about this
25        decision to transfer authority away from
```

9

| | | |
|---|---|---|
| 1 | | Manitowoc to Calumet County, or were you? |
| 2 | A. | I was not. |
| 3 | Q. | All right. That didn't come until later when you |
| 4 | | went back to the Command Post and were given some |
| 5 | | search assignments? |
| 6 | A. | Yes. |
| 7 | Q. | And you have been with Calumet for how long? |
| 8 | A. | Approximately 15 years. |
| 9 | Q. | So you are pretty familiar with the officers in |
| 10 | | your -- the other deputies and sergeants and |
| 11 | | detectives on your staff, right? |
| 12 | A. | Right. |
| 13 | Q. | And you know which ones are evidence collection |
| 14 | | people and which ones aren't, right? |
| 15 | A. | Yes. |
| 16 | Q. | Some have training in that and some don't, right? |
| 17 | A. | Correct. |
| 18 | Q. | But in your department, you mentioned yourself, |
| 19 | | that you had had some kind of training or |
| 20 | | experience since 1994? |
| 21 | A. | Yes. |
| 22 | Q. | Let me go through a list of some people and see |
| 23 | | if these aren't evidence collection qualified |
| 24 | | members of your department. All right. |
| 25 | A. | Okay. |

10

CHRM008009

| | | |
|---|---|---|
| 1 | Q. | Deputy Kucharski? |
| 2 | A. | Yes. |
| 3 | Q. | Deputy Riemer? |
| 4 | A. | Yes. |
| 5 | Q. | Investigator Wiegert? |
| 6 | A. | I don't believe Investigator Wiegert ever had any |
| 7 | | evidence -- |
| 8 | Q. | Really? |
| 9 | A. | -- technician class. He did some work with |
| 10 | | arsons and things like that. He was an arson |
| 11 | | investigator. He did collect all the evidence at |
| 12 | | arson scenes. |
| 13 | Q. | What about Detective Dedering? |
| 14 | A. | I don't believe Detective Dedering ever had the |
| 15 | | official evidence class. He may have had some |
| 16 | | on-the-job training from other officers, but |
| 17 | | officially I can't testify that he did. |
| 18 | Q. | Okay. Gary Steier? |
| 19 | A. | Yes. |
| 20 | Q. | Jeremy Hawkins? |
| 21 | A. | Yes. |
| 22 | Q. | How about Wendy Baldwin? |
| 23 | A. | I don't believe she had any evidence technician |
| 24 | | training. |
| 25 | Q. | Any other evidence technician training officers |

11

CHRM008010

```
 1        that you can think of on your force?
 2   A.   Yes.
 3   Q.   Who?
 4   A.   Keith Ristow and Nick Sablich.
 5   Q.   Okay.  So Ristow, Sablich, Hawkins, Steier,
 6        Riemer, Kucharski, and yourself?
 7   A.   Maybe a correction on that, Deputy Sablich didn't
 8        obtain his training until after the Avery case,
 9        the initial time on scene.  He first went through
10        the class after that.
11   Q.   All right.  So we'll take one away.  Six, right?
12        Six evidence qualified technicians, just on the
13        Calumet Sheriff's Department, right?
14   A.   That would be correct, with the exception that,
15        like, Investigator Steier, for example, when you
16        are promoted to, like, an investigator position,
17        you have different responsibilities, he doesn't
18        do -- not called out to things like that, for
19        crime scenes for that part.  But he is more of an
20        investigator than an evidence collector.
21   Q.   Well, hold on just one second there, sir.  Let's
22        fast forward here to March 1st and 2nd here for a
23        second.  Who was the officer who was collecting
24        evidence on those two days?
25   A.   Inside the residence, it was myself.
```

12

CHRM008011

| | | |
|---|---|---|
| 1 | Q. | And inside the garage was Gary Steier, was it |
| 2 | | not? |
| 3 | A. | He was present. I'm not sure what his |
| 4 | | responsibilities were in the garage. |
| 5 | Q. | Well, we'll deal with him later. Anyway moving |
| 6 | | back, so there's six officers on your force who |
| 7 | | were evidence collection qualified on November |
| 8 | | 5th, right? |
| 9 | A. | Correct. |
| 10 | Q. | And we also know, the very next day, you went out |
| 11 | | with a team of Manitowoc city police by the name |
| 12 | | of Jeff Tech, T-e-c-h? |
| 13 | A. | Correct. |
| 14 | Q. | Brian Swetlik? |
| 15 | A. | Correct. |
| 16 | Q. | And Robert Block? |
| 17 | A. | Correct. |
| 18 | Q. | All of whom were evidence collection technicians |
| 19 | | for that department, right? |
| 20 | A. | I don't know what their qualifications were. It |
| 21 | | was explained to me when I first was introduced |
| 22 | | to them that Brian Swetlik was a detective |
| 23 | | sergeant; and Jeff Tech was a detective; and Rob |
| 24 | | Block was a patrol officer and evidence |
| 25 | | collection -- |

13

CHRM008012

| | | |
|---|---|---|
| 1 | Q. | Right. |
| 2 | A. | -- officer. |
| 3 | Q. | And they were part of your team the very next |
| 4 | | day? |
| 5 | A. | Yes. |
| 6 | Q. | And they were going around and they were |
| 7 | | collecting evidence, right? |
| 8 | A. | Yes. |
| 9 | Q. | And you wouldn't let somebody collect evidence |
| 10 | | who wasn't trained to do so, would you? |
| 11 | A. | Well, I wasn't in charge of calling those people |
| 12 | | to assist me. If the investigators felt |
| 13 | | comfortable with them, they would have made that |
| 14 | | decision. They would know better than I would at |
| 15 | | that time what their qualifications were. I |
| 16 | | trusted the decisions that were being made at the |
| 17 | | command center. |
| 18 | Q. | All right, sir. So you watched those three |
| 19 | | officers all day when you were with them, right? |
| 20 | A. | Which day? |
| 21 | Q. | November 6th, that's the Manitowoc officers that |
| 22 | | we're having a little dispute about here: |
| 23 | | Mr. Tech, Swetlik and Block. |
| 24 | A. | I was with them. |
| 25 | Q. | You were them. You never had any concerns about |

14

CHRM008013

1      whether they were collecting evidence properly,

2      did you?

3  A.  I had no concerns of their abilities.

4  Q.  So those three were competent evidence collection

5      people, right?

6  A.  They appeared to be, yes.

7  Q.  Okay.  So, in addition to those two departments,

8      there were numerous other law enforcement

9      officers on site on November 5th; isn't this

10     right?

11         ATTORNEY KRATZ:  I'm going to object,

12     Judge.  We're assuming a fact that's not in

13     evidence.  Mr. Buting is assuming that those three

14     officers were there on the 5th, perhaps you should

15     ask that question before who else was on site on the

16     5th.

17         THE COURT:  All right.  Mr. Buting, I will

18     ask you to rephrase.

19 Q.  (By Attorney Buting)~ All right.  You don't know

20     who all was on site, but you know some of the

21     officers on site?

22 A.  Yes.

23 Q.  You know that there were numerous departments

24     represented on site on the 5th, right?

25 A.  Yes, there were several.

                         15

CHRM008014

| | | |
|---|---|---|
| 1 | Q. | Okay. And you knew that there were Crime Lab |
| 2 | | specialists on site on November 5th, right? |
| 3 | A. | Yes. |
| 4 | Q. | You didn't have any decision making |
| 5 | | responsibility yourself as to how these teams |
| 6 | | were put together? |
| 7 | A. | That is correct. |
| 8 | Q. | So, specifically, when you went back to the |
| 9 | | Command Post at around 3:15 or 3:30 on |
| 10 | | November 5th, that's the time when you were given |
| 11 | | the assignment to go search places; you were |
| 12 | | paired up with Lenk, Colborn, and Remiker? |
| 13 | A. | No. |
| 14 | Q. | That came later? |
| 15 | A. | That was later. |
| 16 | Q. | That's right, you went out with some dogs for |
| 17 | | awhile, right? |
| 18 | A. | Well, at 3:00, when I got back, they were |
| 19 | | orchestrating teams to go do the initial entries |
| 20 | | into the residences. My responsibility was to |
| 21 | | find out who was going with who, document the |
| 22 | | times as they reported back. |
| 23 | | So when the deputies, our officers, |
| 24 | | returned back to the command center, they would |
| 25 | | check in with me, tell me the times that they did |

16

CHRM008015

1    entry, if it was forcible entry, non-forcible

2    entry and the time that they exited the

3    residence.  So I was keeping a log for them and

4    their times were given to them.

5  Q.  Okay.  And those were what we heard earlier

6    described as the sweep searches?

7  A.  Right.

8  Q.  The brief entries?

9  A.  Yes.

10 Q.  Okay.  Then after that, you had a brief period of

11   time where you were with some dog handlers,

12   right?

13 A.  I met with the dog handlers, assigned officers to

14   go with the handlers, to take their dogs out,

15   yes.

16 Q.  And then you came back and is that when you were

17   then assigned to go to with Lieutenant Lenk,

18   Colborn and Remiker?

19 A.  Yes, it was after all that was done.

20 Q.  Now, is that the first time that you -- Well, let

21   me ask you this, before November 5th even dawned,

22   did you know about Mr. Avery's lawsuit against

23   Manitowoc County and the sheriff's department?

24 A.  Yes.

25 Q.  And that -- Would it be fair to say that that was

17

CHRM008016

```
 1        fairly general knowledge among law enforcement

 2        officers in the northeast Wisconsin area?

 3    A.  I don't know if law enforcement officers watch

 4        the news like I do, but I was well aware of it.

 5        I can't speak for any other officer --

 6    Q.  All right.

 7    A.  -- if they were following that story.

 8    Q.  So, at any rate, before you even got there, you

 9        knew about that.  And when were you first advised

10        that the -- because of that, the Manitowoc

11        sheriff had transferred authority over to

12        Calumet?

13    A.  It was shortly after arriving back at the Command

14        Post around, 3:10.  I know the district attorney

15        from Manitowoc County was there; I believe his

16        name is Mark Rohrer; and our district attorney

17        was there; sheriff; and I think there were some

18        high management people within the Manitowoc

19        County Sheriff's Department.

20    Q.  All right.  And then when you were given the

21        assignment to go into Mr. Avery's residence, this

22        was about 7:30 p.m. on Saturday evening,

23        November 5th?

24    A.  Yes, we made entry at 7:30.

25    Q.  Okay.  So you were assigned shortly before that I
```

18

| 1 | | assume, right? |
|---|---|---|
| 2 | A. | Correct. |
| 3 | Q. | Who was making that assignment, Mr. Fassbender or |
| 4 | | Mr. Wiegert? |
| 5 | A. | To tell you the truth, I don't know which one |
| 6 | | came up with that assignment. I don't know. |
| 7 | Q. | Okay. Were they both present? |
| 8 | A. | They were both in the command center area, yes. |
| 9 | Q. | All right. And you said on direct that you were |
| 10 | | advised to watch them, make sure that none of |
| 11 | | Manitowoc officers were alone in the property? |
| 12 | A. | That was the initial instruction from the |
| 13 | | district attorney of Manitowoc County. He made |
| 14 | | an announcement to all Manitowoc officers, that |
| 15 | | you are not to be alone on the property, period. |
| 16 | Q. | Were you there when that was made? |
| 17 | A. | Yes. |
| 18 | Q. | Okay. And so was there a discussion of that |
| 19 | | again with Mr. Wiegert or Mr. Fassbender when you |
| 20 | | were signed up, paired up with these three |
| 21 | | Manitowoc officers? |
| 22 | A. | I don't think that was reiterated; it was well |
| 23 | | understood. |
| 24 | Q. | Well, your assignment inside that trailer, the |
| 25 | | residence, was to, as I recall, was to not |

19

CHRM008018

| 1 | | actually do the searching yourself, you were just |
| 2 | | watching, making notes, documenting, right? |
| 3 | A. | Yes. |
| 4 | Q. | So of the four officers in that little trailer, |
| 5 | | only the Manitowoc officers were the ones |
| 6 | | actually doing the searching, right? |
| 7 | A. | Right. |
| 8 | Q. | You were doing the watching, right? |
| 9 | A. | I was doing the documentation. |
| 10 | Q. | And the watching, right? |
| 11 | A. | Yes. |
| 12 | Q. | You never let them out of your eye sight, did |
| 13 | | you? |
| 14 | A. | I cannot sit up here and look at you guys and |
| 15 | | tell you that three hours inside that residence |
| 16 | | that I didn't turn my back, walk away, glance |
| 17 | | away; so I can't say that every second of the |
| 18 | | close to three hours I was making direct eye |
| 19 | | contact with them or watching every move they |
| 20 | | made. |
| 21 | Q. | Well, you did, I think at one point, describe an |
| 22 | | incident or moment when -- |
| 23 | | ATTORNEY BUTING: Actually, let's put up -- |
| 24 | | Counsel, I am going to need your indulgence on this, |
| 25 | | please, because I don't have the computer animated |

20

CHRM008019

```
 1              diagram.  Would you be able to put that up?
 2                      ATTORNEY STRANG:  I do.
 3                      ATTORNEY BUTING:  Do we?  Let me figure out
 4              the exhibit number.
 5                      ATTORNEY FALLON:  What exhibit numbers,
 6              counsel?
 7                      ATTORNEY BUTING:  We're going to start with
 8              102.
 9                      ATTORNEY FALLON:  On the ELMO.
10                      ATTORNEY BUTING:  Yes.
11      Q.      (By Attorney Buting)  Okay.  I'm showing you up
12              on the screen here Exhibit 101, previously
13              marked, does that look familiar to you, sir, at
14              least what it depicts?
15      A.      Appears to be the Steve Avery residence.
16      Q.      And if you could go look at the bedroom area --
17              Actually, I'm going to put up a different one to
18              show you that; 104 is next.  Okay.  Do you see
19              that?
20      A.      Yes.
21      Q.      And is that a representation of the bedroom, back
22              bedroom, Mr. Avery's bedroom, and the hallway
23              bathroom area?
24      A.      Yes.
25      Q.      All right.  I apologize for that delay.  But, I
```

21

CHRM008020

| 1 | | believe you said that at one point you were |
| 2 | | watching them so carefully that Mr. Lenk, |
| 3 | | Lieutenant Lenk, excuse me, walked out of the |
| 4 | | bedroom into the bathroom area, right? |
| 5 | A. | Correct. |
| 6 | Q. | Through this hallway. And you were standing |
| 7 | | right here at the doorway while they were |
| 8 | | searching, right? |
| 9 | A. | Originally, yes. |
| 10 | Q. | In other words, this bedroom really wasn't even |
| 11 | | big enough for four grown men to be walking |
| 12 | | around and doing things, was it? |
| 13 | A. | With the bed, you know, as I previously had |
| 14 | | testified, Detective Remiker and Lieutenant Lenk |
| 15 | | were by the closet area. Sergeant Colborn was up |
| 16 | | by the desk and bookcase area? |
| 17 | Q. | All right. So you are indicating the lower part |
| 18 | | of the -- |
| 19 | A. | Yes. |
| 20 | Q. | -- is the closet; lower part of this screen here. |
| 21 | | And the upper is the desk bookcase area? |
| 22 | A. | Correct. |
| 23 | Q. | And you were standing in the door? |
| 24 | A. | Just inside the doorway. |
| 25 | Q. | Just inside the doorway, right. Okay. But you |

22

CHRM008021

```
 1        mentioned that when Lieutenant Lenk went out into
 2        the bathroom, you repositioned yourself in the
 3        doorway so you could see him in the bathroom and
 4        those in the bedroom, right?
 5   A.   Yes.
 6   Q.   You were keeping an eye on what was going on with
 7        Mr. Lenk and -- Lieutenant Lenk and the other
 8        officers?
 9   A.   I would say I was positioning myself to see if
10        they had located any evidence.
11   Q.   Well, and you were also trying to abide by the
12        directive that Manitowoc officers should not be
13        alone in any of this property, right?
14   A.   It was more of a documentation type thing.  I
15        mean, I did not treat these guys like I did not
16        trust them, okay.
17   Q.   Well, let me ask you this, sir.  You knew that
18        the district attorneys told those officers not to
19        be alone on any property, right?
20             ATTORNEY KRATZ:  Mischaracterization,
21        Judge, he said the Manitowoc County district
22        attorney, if he could rephrase the question.
23             ATTORNEY BUTING:  I don't particularly care
24        which district attorney, it's a district attorney.
25        All right.
```

23

```
 1   Q.   (By Attorney Buting) - You knew that?
 2   A.   Yes.
 3   Q.   You knew that it was important to the
 4        prosecution, or some attorneys on site, that
 5        these officers not be alone anywhere on that
 6        Avery property, right?
 7   A.   Yes.
 8   Q.   And you knew that this was Mr. Avery's trailer?
 9   A.   Yes.
10   Q.   And that if anything, of all the places that they
11        should not be alone, it would be in Mr. Avery's
12        trailer, right?
13   A.   We did not know that on that day.
14   Q.   Mr. Avery was the one who was suing them, right?
15        You knew that?
16   A.   I was aware of that fact, yes.
17   Q.   You knew that, that's right.  And you knew that's
18        why Manitowoc recused themselves, or transferred
19        authority over to Calumet, right?
20   A.   Yes.
21   Q.   It was because of this man right here, right?
22   A.   I believe that's correct.
23   Q.   And it was this man right here's trailer that you
24        were in?
25   A.   Yes.
```

24

CHRM008023

| | | |
|---|---|---|
| 1 | Q. | And so that, of all places, you knew was |
| 2 | | important that you make sure that these Manitowoc |
| 3 | | officers not be alone? |
| 4 | A. | Correct. |
| 5 | Q. | And so you kept an eye on them, didn't you? |
| 6 | A. | I was watching what they were doing, yes. |
| 7 | Q. | Had you ever, in any other search in your entire |
| 8 | | career, had to act like a babysitter, or a |
| 9 | | watchdog, for the officers who were conducting a |
| 10 | | search? |
| 11 | A. | I did not treat this as if I was babysitting. |
| 12 | Q. | Had you ever, in any of your years as an officer, |
| 13 | | had to watch the officers who were searching |
| 14 | | where you were, to make sure that they weren't |
| 15 | | alone? |
| 16 | A. | No. |
| 17 | Q. | This was a first for you, wasn't it? |
| 18 | A. | Yes. |
| 19 | Q. | And you made sure, because you were the watchdog |
| 20 | | here, you were the custodian, the representative |
| 21 | | of Calumet, you made sure that none of those |
| 22 | | officers could have planted anything, right? |
| 23 | A. | I watched them to the best of my ability, within |
| 24 | | those three hours. |
| 25 | Q. | And to the best of your ability meant you did |

25

CHRM008024

```
 1        everything you could to make sure that they knew

 2        they were being watched and that they couldn't

 3        plant any evidence if they wanted to?

 4   A.   They were told the same instructions that I were,

 5        that I was going into that residence to document

 6        and recover all evidence that was seized.

 7   Q.   Well, and you did a good job doing that, didn't

 8        you?

 9   A.   I believe to the best of my ability, yes.

10   Q.   All right.  And would you agree with me that it

11        was -- would have been very difficult for

12        Lieutenant Lenk or Sergeant Colborn to have

13        planted a Toyota key in that residence, under

14        your watch?

15   A.   I believe it would have been difficult.

16   Q.   Extremely difficult, right?

17   A.   It would have been difficult, yes.

18   Q.   Because you were watching them?

19   A.   To the best of my ability, yes.

20   Q.   Did you ever suggest to Mr. Fassbender or

21        Mr. Wiegert that maybe you would like to have

22        some of your own officers in there doing this

23        search that night, to Mr. Avery's residence?

24   A.   We didn't have all those officers that you

25        mentioned at the scene that day.
```

26

CHRM008025

| | | |
|---|---|---|
| 1 | Q. | You could call them in, right? |
| 2 | A. | They were in charge of making those decisions. I |
| 3 | | didn't know what information they were privy to. |
| 4 | Q. | You were off duty, right? You weren't working |
| 5 | | that day? |
| 6 | A. | I don't recall if that was my scheduled day or |
| 7 | | not. |
| 8 | Q. | I believe that was your testimony. |
| 9 | A. | I was at home when I got the phone call. |
| 10 | Q. | So you were called in? |
| 11 | A. | Yes. |
| 12 | Q. | And there's no reason that other officers that we |
| 13 | | went through that were evidence collection |
| 14 | | officers on your force also couldn't have been |
| 15 | | called in for this assignment, was there? |
| 16 | | ATTORNEY KRATZ: Objection, both |
| 17 | | argumentative and assuming a fact not in evidence. |
| 18 | | This officer wouldn't know that. |
| 19 | | ATTORNEY BUTING: I will withdraw it. |
| 20 | Q. | (By Attorney Buting) So your testimony, then, is |
| 21 | | that you never questioned Fassbender or Wiegert |
| 22 | | about their decision -- |
| 23 | A. | Absolutely not. |
| 24 | Q. | -- to send Manitowoc officers in. |
| 25 | A. | I did not question them or doubt their judgments, |

27

CHRM008026

1    no.

2  Q.  Of course, they out rank you, don't they? They

3    were the leaders of this entire investigation at

4    that time, right?

5  A.  Yes.

6  Q.  And you take orders from them?

7  A.  That's the way I looked at it, yes.

8        ATTORNEY BUTING:  I'm going to take this

9    down.

10  Q.  (By Attorney Buting)~ You testified about a

11    number of these exhibits that you found, right?

12  A.  Yes.

13  Q.  And you mentioned that you found this bottle of

14    bleach, which is Exhibit 195, in the bathroom; is

15    that right?

16  A.  I didn't find it, that was recovered by Deputy

17    Riemer.

18  Q.  On a different search, then?

19  A.  I believe so.

20  Q.  Wasn't even recovered on November 5th?

21  A.  I don't believe so.

22  Q.  Okay. But your -- but your testimony was that it

23    was found in the bathroom?

24  A.  I recalled seeing a bleach bottle in the

25    bathroom, if that's the very same exact one, I

28

CHRM008027

```
 1        believe it was.
 2   Q.   All right.  Showing you Exhibit 206 and 207,
 3        could you take a minute and just orient yourself
 4        with that and tell me what those are?
 5   A.   Sure.  Number 207 appears to be the washing
 6        machine in the bathroom.
 7   Q.   In the bathroom, right?  And what is 206?
 8   A.   206 would be the sink in the bathroom.
 9   Q.   Okay.  And this is the bathroom in Steven Avery's
10        residence, right?
11   A.   Yes.
12   Q.   Putting up Exhibit 207 in just a moment here.
13        That's what you have identified as Mr. Avery's
14        bathroom, right?
15   A.   Yes.
16   Q.   And you note the floor, the tiling -- linoleum on
17        the floor, the hamper.  And does that appear to
18        be a shower in the background there?
19   A.   Yes.
20   Q.   So when you say that you found -- or that someone
21        found a bottle of bleach in the bathroom, it was
22        actually in the laundry room, right?
23   A.   If you want to consider that front area to be a
24        laundry room, sure.
25   Q.   Well, that's where the washer and dryer is,
```

29

CHRM008028

1      right?

2   A.  Yes, but it's part of the bathroom.

3   Q.  Okay.

4   A.  It's not in the hallway.

5   Q.  Would it surprise you to find a bottle of

6       household bleach in someone's bathroom?

7   A.  No.

8   Q.  Do you have bleach in your bathroom?

9   A.  I believe it's under the sink in the kitchen.

10  Q.  Okay.  But certainly bleach is where people --

11      The laundry room is where people use bleach,

12      isn't it --

13  A.  Yes.

14  Q.  -- typically?

15  A.  Yes.

16  Q.  And no bleach was found in the garage, was it?

17  A.  I don't know, I never searched the garage.

18  Q.  I'm putting up now, on the screen, 206, which is

19      the other side of Mr. Avery's bathroom, right?

20  A.  Yes.

21  Q.  You recognize the floor, the linoleum, and the

22      hamper sitting there?

23  A.  Yes.

24  Q.  I'm just going to zoom in on this for a minute.

25      You see a toothbrush?

                            30

CHRM008029

1    A.    Yes.

2    Q.    Do you see more than one toothbrush?

3    A.    I see the one.

4    Q.    All right.  And razor, looks like a razor?

5    A.    Yeah.

6    Q.    We'll get to this again in a minute.  But you

7          mentioned buccal swabs.  You know what buccals

8          are, right?

9    A.    I didn't on that day.  When I got to the hospital

10         it was explained.

11   Q.    All right.  So now you know what buccal swabs

12         are?

13   A.    Yes.

14   Q.    And buccal swabs are basically like a Q-tip that

15         you take and swab inside someone's mouth, their

16         cheeks?

17   A.    Yes.

18   Q.    And from that you get DNA samples, right?

19   A.    Yes.

20   Q.    And it's a very good way of collecting DNA,

21         correct?

22   A.    That's what they tell me, yes.

23   Q.    Much like a toothbrush would be, right?

24   A.    I don't know what the capabilities are from a

25         toothbrush?

31

CHRM008030

| | |
|---|---|
| 1 | Q. Well, you know that people put toothbrushes in |
| 2 | their mouth all the time, right? |
| 3 | A. With toothpaste, yes. |
| 4 | Q. Okay. And so that it would be a fertile source |
| 5 | of one's DNA? |
| 6 | ATTORNEY KRATZ: Objection, Judge, beyond |
| 7 | the scope of this witness' expertise. |
| 8 | THE COURT: The objection is sustained. |
| 9 | Q. (By Attorney Buting) Did you ever work any |
| 10 | missing person cases besides this? |
| 11 | A. Yes. |
| 12 | Q. Did you ever have to go to the missing person's |
| 13 | house to try and get some personal items that |
| 14 | might have their DNA on it for future use? |
| 15 | A. I don't think it ever got to that level. |
| 16 | Q. Never got to, in your experience? |
| 17 | A. Yeah, they were located prior to a full-blown |
| 18 | investigation. |
| 19 | Q. Okay. Sure. All right. I'm showing you what I |
| 20 | believe is previously marked in your direct as |
| 21 | 163; is that -- does that appear right? |
| 22 | A. Yes. |
| 23 | Q. And that's a photograph of Mr. Avery's bedroom |
| 24 | that was taken on the night of November 5th, |
| 25 | right? |

32

CHRM008031

| | | |
|---|---|---|
| 1 | A. | I believe so. |
| 2 | Q. | And you can see the gun rack that you just |
| 3 | | identified, right? |
| 4 | A. | Yes. |
| 5 | Q. | And there's a -- some sort of a firearm in the |
| 6 | | lower tier of that -- right -- in this photo, |
| 7 | | right? |
| 8 | A. | Yes. |
| 9 | Q. | That's a black muzzleloader? |
| 10 | A. | I never identified what type of firearm. |
| 11 | Q. | Okay. Well, I don't know if you know guns and, |
| 12 | | frankly, I don't know them that well, but this |
| 13 | | thing that's hanging down here, do you know what |
| 14 | | that is? |
| 15 | A. | I believe they refer to that as a powder horn. |
| 16 | Q. | A powder horn. So that's what you used, |
| 17 | | presumably, with a powder rifle, to load it, |
| 18 | | right? |
| 19 | A. | I don't own one; I would assume that would |
| 20 | | probably be correct. |
| 21 | Q. | Okay. I just want to be clear, that's not some |
| 22 | | sort of bizarre sexual device or anything, is it? |
| 23 | A. | Not that I'm aware of. |
| 24 | Q. | Or any kind of torture device, right? |
| 25 | A. | I don't believe so. |

33

CHRM008032

1    Q.   All right.  Well, just in case not everybody

2          knows that, I wanted to make that clear.  You did

3          mention finding some handcuffs and leg irons,

4          right?

5    A.   Sergeant Colborn found those items, yes.

6    Q.   But you were watching and taking note?

7    A.   Yes.

8    Q.   I believe on direct you testified that it was

9          found in the bookcase; in fact, it was found on a

10         night stand; isn't that right?

11    A.   I believe it was the bookcase.

12    Q.   You wrote a report of your investigation that

13         day, right?

14    A.   Yes.

15    Q.   Would that refresh your recollection, if you took

16         a moment to review that?

17    A.   I think I know where you are going with this and

18         I don't think I need to see it.  When I did my

19         report, what is now known as the bookcase, I

20         looked at it to be a night stand.  I would use it

21         as a night stand myself.  So in my report I did

22         refer to it as being a night stand.

23    Q.   Okay.  All right.  So you cleared that up.  At

24         any rate, these handcuffs and leg irons, these

25         are novelty items that are sold at places like

34

CHRM008033

1   Intimate Treasures and things of that nature,

2   right?

3   A.  Yes, you can get them from stores, I guess.  I

4   never ...

5   Q.  And they are meant for consenting adults, for

6   whatever kind of experimenting or play they may

7   do, right?

8           ATTORNEY KRATZ:  Objection, Judge, I'm sure

9   they have a lot of uses.

10          THE COURT:  Well, I think if he knows he

11  can testify as to what he understands their intended

12  use to be, if he knows.

13          ATTORNEY KRATZ:  It's the term consenting

14  adults that I have objection with.

15          ATTORNEY BUTING:  Well, I think he can tell

16  us, what is it?

17          ATTORNEY KRATZ:  It could be unconsenting

18  adults, as well.

19          THE COURT:  Well, that's something you can

20  take up on redirect.

21  Q.  (By Attorney Buting)~ Isn't that right, I mean,

22  they are sold at these adult novelty type places

23  where their intended use is consenting adults

24  engaged in whatever kind of role playing, or

25  whatever, right?

35

CHRM008034

| | | |
|---|---|---|
| 1 | A. | Sure. |
| 2 | Q. | Okay. And I'm going to put back up that |
| 3 | | photograph from -- No. 163 again. There's a |
| 4 | | headboard in that photograph, right? |
| 5 | A. | Yes. |
| 6 | Q. | And that headboard was later seized by somebody |
| 7 | | and put into your department's property room, |
| 8 | | right? |
| 9 | A. | Yes. |
| 10 | Q. | And there came a time when you and some other |
| 11 | | officers took that headboard out from the |
| 12 | | property room to examine it, right? |
| 13 | A. | That would be myself and Deputy Hawkins. |
| 14 | Q. | And also Mr. Fassbender, correct? |
| 15 | A. | Not originally, I don't think. |
| 16 | Q. | Well, did you do a report of that day? |
| 17 | A. | Yes. |
| 18 | Q. | Would it refresh your recollection if you |
| 19 | | reviewed that? |
| 20 | A. | Sure. |
| 21 | Q. | Page 936. This report, by the way has -- |
| 22 | A. | Yes. |
| 23 | Q. | -- Deputy Jeremy Hawkins name on it. |
| 24 | A. | Right. |
| 25 | Q. | It reads as if it was written by you. |

36

CHRM008035

1    A.   It is written by me, it was a typo by the

2         secretarial staff.

3    Q.   Okay.  And it says -- Just take a minute and

4         review that, those first two paragraphs and then

5         we'll --

6    A.   I know where you're going with this as well.

7    Q.   Okay.  So you don't need to review it?

8    A.   I don't believe so.

9    Q.   All right.  Then I will put it aside and ask you

10        some questions.  This is Monday, April 3rd,

11        right, 2006?

12   A.   That would be the second day that we looked at

13        the headboard.  The first day we looked at the

14        headboard would have been March 28.

15   Q.   Okay.  Well, we're talking about this day.

16   A.   Okay.  That was the confusion then, when you

17        mentioned --

18   Q.   All right.

19   A.   -- Fassbender.

20   Q.   All right.  I understand.  So I apologize for

21        that.  On this day, though, you did have a

22        meeting with, actually, Sheriff Pagel, right,

23        Mark Wiegert, John Dedering, and Mr. Fassbender?

24   A.   Yes.

25   Q.   Special Agent Fassbender?

37

CHRM008036

1    A.    Yes.

2    Q.    And a decision was made for you and Deputy

3          Hawkins to take a very good look at the

4          headboard, right?

5    A.    We had looked at it previously, which is why we

6          had consulted with those persons, to get further

7          direction.

8    Q.    All right.  And so you took it out and put it on

9          freezer paper, examined it like any other piece

10         of evidence, right?

11   A.    Yes.

12   Q.    And didn't you, in fact, note, from your

13         observations, that we could not see any

14         striations around the spindles of the headboard

15         consistent with that of having handcuffs or leg

16         irons secured to the spindles of the headboard?

17   A.    That would be correct.

18   Q.    Meaning, you looked very, very closely at these

19         spindles depicted in Exhibit 163, on the

20         headboard, and saw no scratches.  When you say

21         striations you mean scratches, right?

22   A.    Yes.

23   Q.    Scratches you might see from somebody who is

24         chained, arms out, to that headboard, right?

25   A.    Correct.

38

CHRM008037

```
 1   Q.   Somebody struggling for their life, you would
 2        expect to see some scratches?
 3   A.   I would think so.
 4   Q.   And you saw none, right?
 5   A.   Nothing consistent with that going around the --
 6   Q.   All right.
 7   A.   -- entire spindle.
 8   Q.   Going back, for just one moment.  Sergeant
 9        Colborn, you mentioned, was --
10             ATTORNEY BUTING:  You can take that back,
11        please.
12   Q.   (By Attorney Buting) Sergeant Colborn, you
13        mentioned, was searching the desk and bookcase
14        area?
15   A.   Yes.
16   Q.   And at no time did Sergeant Colborn ever say,
17        hey, look at this, this -- the back of this
18        bookcase is loose?
19   A.   No.
20   Q.   Well, there's a gap here, right?
21   A.   No, I never saw him physically go behind and look
22        at it, he was going through the contents inside.
23   Q.   And he never mentioned, and you never saw, the
24        back of that moving as he was going through,
25        right?
```

39

CHRM008038

|     |    |                                                          |
| --- | -- | -------------------------------------------------------- |
| 1   | A. | No.                                                      |
| 2   | Q. | Okay. You mentioned some small blood drops or            |
| 3   |    | bloodstains that were found in Mr. Avery's               |
| 4   |    | bathroom; do you recall that?                            |
| 5   | A. | Yes.                                                     |
| 6   | Q. | Are you aware that none of those drops of blood          |
| 7   |    | ever proved to be Ms Halbach's?                          |
| 8   | A. | I was told that; I read a report.                        |
| 9   | Q. | All right. In fact, that no blood anywhere, from         |
| 10  |    | Teresa Halbach, was found on any of these                |
| 11  |    | bloodstains you made note of that night?                 |
| 12  | A. | I was told that, yes.                                    |
| 13  | Q. | Okay. So, do you know whose they did turn out to         |
| 14  |    | be?                                                       |
| 15  | A. | I can't testify --                                       |
| 16  | Q. | Well, we'll get to that. You testified about             |
| 17  |    | this Exhibit 200, which is an envelope that was          |
| 18  |    | found?                                                    |
| 19  | A. | Yes.                                                     |
| 20  | Q. | You saw this recovered?                                  |
| 21  | A. | I don't believe that was recovered on the 5th of        |
| 22  |    | November during the initial search.                      |
| 23  | Q. | Oh, okay. But you identified it, so you must             |
| 24  |    | have recognized it as an identifier?                     |
| 25  | A. | I saw it, yes.                                           |

40

CHRM008039

1  Q.  You saw it.  Okay.  And the letter is from --

2          ATTORNEY BUTING:  Put the ELMO back on,

3      please.

4  Q.  (By Attorney Buting)  The letter is from UW

5      Madison Law School, right?

6  A.  Yes.

7  Q.  The envelope itself?

8  A.  Yes.

9  Q.  And it actually contained a letter from the law

10     school dated November 1, 2005, right?

11  A.  Yes.

12  Q.  And it's an invitation --

13         ATTORNEY KRATZ:  Objection, hearsay, Judge.

14         ATTORNEY BUTING:  Well, this has been

15     introduced as an exhibit.

16         ATTORNEY KRATZ:  I don't care, it's

17     hearsay, Judge, it's being offered for the truth of

18     the matter.

19         THE COURT:  I'm going to sustain the

20     objection.

21         ATTORNEY KRATZ:  Thank you, Judge.

22  Q.  (By Attorney Buting)  You also introduced a

23     number of notebooks?

24  A.  Yes.

25  Q.  Just for the record, 199, 197, and 198, right?

41

CHRM008040

1    A.   Yes.

2    Q.   And these are pocket notebooks, right?

3    A.   Yes.

4    Q.   We only talked about the one page here that had

5        Teresa Halbach's number on it, right?

6    A.   Yes.

7    Q.   But, in fact, all or most of these notebooks have

8        numerous other phone numbers on them too, don't

9        they?  Need to look through them?

10   A.   I never paged through them, so.

11   Q.   Well, take just a moment.  Tell me if you see

12       other people's phone numbers, names, things of

13       that nature jotted down.

14   A.   I would like to also clarify something in

15       reference to my testimony yesterday as well.

16       These two notebooks right here, I did see them on

17       the night of the 5th.  Detective Remiker was

18       looking at them.  I'm not sure if my testimony

19       yesterday was that he collected them.  But

20       reviewing my stuff, he didn't collect these on

21       the night of the 5th.  A different officer would

22       have collected these on a day thereafter.  I just

23       wanted to correct that.

24   Q.   Okay.  That's just fine.  Thank you.  And when

25       you say these, just so the record is clear, you

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 43 of 246   Document 290-19

CHRM008041

| | | |
|---|---|---|
| 1 | | were holding up Exhibit 199, the red notebook? |
| 2 | A. | And 197. |
| 3 | Q. | And 197, the green notebook.  Okay.  Just take a |
| 4 | | moment and see if there's other phone numbers and |
| 5 | | names in some of these? |
| 6 | A. | Okay. |
| 7 | Q. | Is that a fair statement? |
| 8 | A. | I see numerous different phone numbers, but it's |
| 9 | | in somebody's handwriting. |
| 10 | Q. | Well, are you a handwriting expert, sir? |
| 11 | A. | Well, it's obviously not the one that had the |
| 12 | | same writing as on there. |
| 13 | Q. | Can you identify whose handwriting is it, back to |
| 14 | | the door? |
| 15 | A. | No. |
| 16 | Q. | But there are different phone numbers so if -- |
| 17 | | these are as if someone was using these to keep |
| 18 | | -- just jot down phone numbers and names, right? |
| 19 | | ATTORNEY KRATZ:  Objection, speculation. |
| 20 | | I'm sure counsel doesn't want us to read everything |
| 21 | | that's in that notebook.  It's hearsay, Judge, and |
| 22 | | it's speculation. |
| 23 | | ATTORNEY BUTING:  You can read everyone of |
| 24 | | them if you want to. |
| 25 | | THE COURT:  It's a fair summary question |

43

CHRM008042

1     based on what he already testified to; I will allow

2     it.

3  Q.  The exhibit that has the note that has Teresa

4     Halbach's phone number in it -- Well, first of

5     all, it's not torn out from the notebook, right?

6  A.  Correct.

7  Q.  Not as if this was posted on the door as a note

8     for somebody is it?

9        ATTORNEY KRATZ:  Objection, speculation,

10    Judge.

11 Q.  (By Attorney Buting)~ Do you see any tape on it,

12    scotch tape?

13       THE COURT:  I'm going to allow the

14    question.

15 A.  I don't see any tape.

16 Q.  Okay.  And there's two different colored inks,

17    too, correct?

18 A.  Yes.

19 Q.  Her phone number is in green ink and this

20    other -- whatever this other writing means, is in

21    a different color ink?

22 A.  Back to patio door is in black.

23 Q.  Okay.  As if maybe it was even written at

24    different times?

25       ATTORNEY KRATZ:  Objection, speculation,

                        44

CHRM008043

```
 1          Judge.
 2                  THE COURT:  Sustained.
 3     Q.   (By Attorney Buting)~ You also introduced a sign,
 4          a for sale sign, that -- I don't see the exhibit
 5          number here, but I will just show it to you.
 6                  ATTORNEY STRANG:  194.
 7     Q.   (By Attorney Buting)~ All right, 194.  This is --
 8          On one side it has a for sale sign, like you
 9          would buy at a hardware store or something,
10          right?
11     A.   Yes.
12     Q.   It's got 1995 Pontiac Grand Am listed, right?
13     A.   Yes.
14     Q.   And then, on the back it has got some other
15          writing, 3302 Zander Road, correct?
16     A.   Correct.
17     Q.   And then it's got the phone number here that
18          turns out to be Teresa Halbach's cell phone
19          number, right?
20     A.   Yes.
21     Q.   Are you aware that Teresa Halbach's never lived
22          at 3302 Zander Road.
23     A.   I'm not aware of any significance to the address.
24     Q.   So, as far as you know, there's no connection
25          whatsoever between this address and that phone
```

45

CHRM008044

| | | |
|---|---|---|
| 1 | | number, right? |
| 2 | A. | I don't know that. |
| 3 | Q. | You don't know that or you do know that? |
| 4 | A. | I do not know that. |
| 5 | Q. | Now, you do know, I assume, that Teresa Halbach |
| 6 | | had seen Mr. Avery on several occasions before |
| 7 | | October 31st? |
| 8 | A. | I was told that by Investigator Wiegert in |
| 9 | | advance. |
| 10 | Q. | Okay. Part of your briefing, right? |
| 11 | A. | Yes. |
| 12 | Q. | They sit down and they explain some of the |
| 13 | | background so you know what's going on, right? |
| 14 | A. | Yes. |
| 15 | Q. | Okay. And in fact, before October 31st, |
| 16 | | Mr. Avery had Teresa Halbach's phone number |
| 17 | | already because he had arranged a private sale |
| 18 | | with her; do you recall that? |
| 19 | A. | No, I don't recall him having her cell number, |
| 20 | | what time he had it. I don't know that |
| 21 | | information. |
| 22 | Q. | So you didn't know that information, okay. But, |
| 23 | | if that were the case, finding her phone number |
| 24 | | in his house on November -- or trailer, on |
| 25 | | November 5th, would have meant nothing, would it? |

46

CHRM008045

```
 1              ATTORNEY KRATZ:  Objection, Judge, calls
 2         for a conclusion, that's probably what the jury --
 3              THE COURT:  The objection is sustained.
 4    Q.   Well, when you collected those pieces of
 5         evidence, you didn't -- you don't know when those
 6         notes -- phone numbers were written, right?
 7    A.   Detective Remiker collected them, but I did not
 8         know when they were written.
 9    Q.   All right.  They could have been written weeks
10         ago, for all you know?
11    A.   True.
12    Q.   By the way, you said you weren't collecting the
13         evidence, you were just standing their watching
14         and writing down notes as to the times that
15         things were collected?
16    A.   Yes.
17    Q.   But the actual collection itself was done by --
18         or the bagging was done by Lieutenant Lenk?
19    A.   Yes.
20    Q.   Did you watch him seal every single bag?
21    A.   I can't say with 100 degree certainty every
22         single bag, but he was doing his duties, I was
23         there, yes.
24    Q.   Okay.  So when you say that you were --
25         ultimately you collected the evidence, it was at
```

47

CHRM008046

```
 1        the end of the night?

 2   A.   Yes.

 3   Q.   After all the bags were sealed and completed,

 4        right?

 5   A.   Yes.

 6   Q.   Then it's turned over to you?

 7   A.   Yes.

 8   Q.   All right.  And you never saw a Toyota key

 9        anywhere in Mr. Avery's bedroom that night, did

10        you?

11   A.   I did not, no.

12   Q.   And if you had seen a Toyota key anywhere in that

13        bedroom that night, you would have made note of

14        that, wouldn't you?

15   A.   Personally, I would not have known what a Toyota

16        key looked like.  I'm not too familiar with

17        automobiles and their keys.

18   Q.   Well, all right.  Let me ask it this way, you

19        knew that Teresa Halbach's vehicle was a Toyota

20        RAV4?

21   A.   Yes.

22   Q.   You went and looked at it, right?

23   A.   Yes.

24   Q.   And so if you found -- if someone had located a

25        key, a car key, inside that residence, you would
```

48

CHRM008047

|    |    |                                                    |
|----|----|----------------------------------------------------|
| 1  |    | have either seized it or at least made note of it  |
| 2  |    | as possible evidence in the case, right?           |
| 3  | A. | Absolutely.                                        |
| 4  | Q. | Particularly if it was a Toyota key, because that  |
| 5  |    | may be the key that would fit the victim's         |
| 6  |    | vehicle?                                           |
| 7  | A. | Absolutely.                                        |
| 8  | Q. | And you made no such note, right?                  |
| 9  | A. | Correct.                                           |
| 10 | Q. | And you stood in the doorway for at least a half   |
| 11 |    | hour?                                              |
| 12 | A. | Yes.                                               |
| 13 | Q. | Of his bedroom?                                    |
| 14 | A. | Yes.                                               |
| 15 | Q. | All right.  I just have one question about this    |
| 16 |    | -- another exhibit here and then I will move off   |
| 17 |    | of these exhibits.  You identified Exhibit 205 as  |
| 18 |    | a hood latch swab, right?                          |
| 19 | A. | Yes.                                               |
| 20 | Q. | I just want to make it clear here, this is         |
| 21 |    | actually a swab that's dated -- or a piece of      |
| 22 |    | evidence that's dated April 3rd, 2006?             |
| 23 | A. | That's correct.                                    |
| 24 | Q. | And that it was -- it was collected not at the     |
| 25 |    | Crime Lab?                                          |

49

CHRM008048

1   A.   Correct.

2   Q.   So whatever is in this little package is not

3        something that the Crime Lab found when they went

4        over it very, very carefully on November 8th, or

5        7th, whatever day they had it, right?

6   A.   I was just informed that they did request myself

7        and Deputy Hawkins to --

8   Q.   Who requested?

9   A.   Investigator Wiegert.

10  Q.   Okay.  So Investigator Wiegert told you to go do

11       this, right?

12  A.   Yes.

13  Q.   All right.  Let's move to the next day,

14       November 6th, you are paired with a different

15       team on that day, right?

16  A.   Yes.

17  Q.   And we talked about that, those were the three

18       Manitowoc city police officers?

19  A.   Right.

20  Q.   And you weren't given any kind of instruction

21       that you had to watch those three officers like a

22       hawk while you were doing the search, did you?

23  A.   Right.

24  Q.   There was no concern about whether or not you had

25       to leave those officers alone in any part of the

                            50

CHRM008049

| | | |
|---|---|---|
| 1 | | buildings that we're looking at, right? |
| 2 | A. | Right. |
| 3 | Q. | Because Mr. Avery wasn't suing them, right? |
| 4 | A. | To the best of my knowledge. |
| 5 | Q. | All right. And then the next day, November 7th, |
| 6 | | you were paired, again, with Lenk and Colborn, |
| 7 | | right? |
| 8 | A. | That's correct. |
| 9 | Q. | But not Mr. -- not Detective Remiker on this |
| 10 | | occasion? |
| 11 | A. | His wife was having a baby, or had a baby. |
| 12 | Q. | Okay. Good for him, good for her. So on that |
| 13 | | occasion, though, you didn't do a thorough search |
| 14 | | with Lenk and Colborn of Mr. Avery's residence, |
| 15 | | right? |
| 16 | A. | That's correct. |
| 17 | Q. | They -- The two of them were only in that |
| 18 | | residence briefly, with you, when you were trying |
| 19 | | to get a serial number from a computer, right? |
| 20 | A. | Yes. |
| 21 | Q. | Just a few minutes I think you said? |
| 22 | A. | Yes. |
| 23 | Q. | So it would have been difficult for them to have |
| 24 | | planted any evidence in front of you at that |
| 25 | | occasion -- on that occasion, right? |

51

CHRM008050

```
 1   A.   Yes.
 2   Q.   And besides, they were with you, the watchdog,
 3        right?
 4   A.   I wouldn't call myself a watchdog, but they were
 5        with me, yes.
 6   Q.   Okay.  And no key was discovered on that occasion
 7        was it?
 8   A.   By the computer, no.
 9   Q.   Anywhere in the house?
10   A.   We didn't search the house.  We just got the
11        serial number from the computer.
12   Q.   So no key -- no Toyota key was recovered on
13        November 7th when you were in there with
14        Mr. Colborn and Mr. Lenk, right?
15   A.   No key was recovered by the computer, no.
16   Q.   All right.  November 8th, I believe you testified
17        that you weren't even at the Avery Salvage Yard
18        on that day, right?
19   A.   Not until late in the day.  I was at the Calumet
20        Sheriff's Department, logging evidence.
21   Q.   So the watchdog wasn't there.
22             ATTORNEY KRATZ:  Judge, I am going to
23        object.  We hear that, Judge, one more time, we're
24        going to approach with a side bar.
25             THE COURT:  The objection is sustained.
```

52

CHRM008051

```
 1   Q.   (By Attorney Buting)~ In any event, you were not
 2        with Mr. Lenk and Mr. Colborn when they reentered
 3        Steven Avery's residence on November 8th, were
 4        you?
 5   A.   That's correct.
 6   Q.   And that is the occasion when a key was found,
 7        right?
 8   A.   That is my understanding.
 9   Q.   When you weren't with them?
10   A.   That's my understanding.
11   Q.   November 9th, you testified about having some
12        different duties and that was the DNA exemplars
13        were taken from people, right?
14   A.   Yes.
15   Q.   And fingerprints were taken?
16   A.   Yes.
17   Q.   And palm prints were taken?
18   A.   Yes.
19   Q.   And those items were taken for the purpose of
20        trying to see if they might match with some
21        fingerprints that the Crime Lab had found on the
22        RAV4; is that your understanding?
23   A.   I had no information as to what the Crime Lab had
24        found at that time.  We were just executing a
25        search warrant based on the specific information
```

53

```
 1           within those search warrants.
 2    Q.     All right.  And the search warrant included
 3           taking those buccal swabs from each individual
 4           that had been -- Well, let me just name them, the
 5           ones you were involved with, okay.  Mr. -- Was
 6           Mr. Avery one of them; he was, wasn't he?
 7    A.     Yes.
 8    Q.     Yes.  You testified about that?
 9    A.     Yes.
10    Q.     Also Delores Avery, right?
11    A.     Yes.
12    Q.     Barb Janda?
13    A.     Yes.
14    Q.     Chuck Avery?
15    A.     Yes.
16    Q.     Earl Avery?
17    A.     Yes.
18    Q.     And Bobby Dassey?
19    A.     Yes.
20    Q.     And these are what are called elimination type
21           exemplars?
22    A.     Yes.
23    Q.     To see if you can eliminate somebody from
24           something that may be found in a crime scene?
25    A.     Yes.
```

                              54

CHRM008053

| | | |
|---|---|---|
| 1 | Q. | Or match them? |
| 2 | A. | Sure. |
| 3 | Q. | Okay. And it included DNA fingerprints and palm |
| 4 | | prints, for all of them, right? |
| 5 | A. | Yes. |
| 6 | Q. | But at the end of that day, though, you received |
| 7 | | information from a special agent, Joseph |
| 8 | | Kapitany, I believe is the way you pronounce his |
| 9 | | name? |
| 10 | A. | Yes. |
| 11 | Q. | That the Crime Lab only wanted the palm prints |
| 12 | | and fingerprints of Mr. Steven Avery right away? |
| 13 | A. | Immediately, yes. |
| 14 | Q. | And so efforts were made to transfer Steven |
| 15 | | Avery's palm prints and fingerprints immediately |
| 16 | | to the Crime Lab, right? |
| 17 | A. | Agent Kapitany approached me and stated those |
| 18 | | words, that the Crime Lab wanted those items |
| 19 | | immediately. I did give them to him. He signed |
| 20 | | off on the document -- |
| 21 | Q. | Okay. |
| 22 | A. | -- for those items. |
| 23 | Q. | So he went off to the Crime Lab as far as you |
| 24 | | know, with those items? |
| 25 | A. | He left the Aurora Clinic; I assume, yeah, he was |

55

CHRM008054

```
 1          in route to Madison.
 2    Q.    But all the other ones you took and just booked
 3          into the Calumet Sheriff's Department?
 4    A.    Yes.
 5    Q.    Do you know the results of any of the comparisons
 6          of fingerprints; Mr. Avery's fingerprint
 7          standards to any fingerprints found on the RAV4?
 8    A.    No.
 9                ATTORNEY KRATZ:  I'm also going to object
10          as beyond the scope of this witness' expertise.
11          Probably hearsay as well.
12                ATTORNEY BUTING:  I wasn't asking for the
13          results, I just wondered if he knew it.
14                ATTORNEY KRATZ:  It seemed like that was
15          the question, do you know the results.
16                THE COURT:  As phrased, the objection is
17          overruled.
18                ATTORNEY BUTING:  He's answered.  That's
19          fine.
20    Q.    (By Attorney Buting)- All right.  Just a few more
21          questions, sir.  You talked about -- or we talked
22          about this April 3rd date, when you were -- I
23          think your report called it processing evidence,
24          right?
25    A.    Yes.
```

56

1  Q.  And there was actually a number of days, you
2      mentioned one in March, but there was a number of
3      days over the next several weeks, March, April,
4      May, when you were going through various items
5      that had been seized from Mr. Avery's residence,
6      or garage, on one of the searches, either
7      November or March, right?
8  A.  Yes.
9  Q.  And your purpose in going through these items of
10     evidence was to see if there was any way you
11     could determine if any of these items of evidence
12     had any link or importance to this crime, right?
13 A.  Yes.
14 Q.  And so you were doing things like testing,
15     examining it for blood, items for blood, right?
16 A.  Yes.
17 Q.  The bleach bottle, for instance, that's been
18     marked as whatever exhibit it was.  This was one
19     of the things that you examined to see if there
20     might be any blood on it, right?
21 A.  Yes.
22 Q.  Just a little brown mark on the bottom somewhere
23     that you weren't sure about?
24 A.  Right.
25 Q.  This is Exhibit 195.  And so you tested this with

57

CHRM008056

1   these presumptive tests that are very sensitive

2   to blood, right?

3   A.   Yes.

4   Q.   And it proved negative, right?

5   A.   Correct.

6   Q.   No blood.  All right.  You also looked at foot

7        boards for the bed, right?

8   A.   Yes.

9   Q.   You looked at a number of pieces of brown

10       paneling, right?

11  A.   Yes.

12  Q.   Paneling marked number one, number two, number

13       three, and each of those was negative for any

14       kind of blood, right?

15  A.   Correct.

16  Q.   And it's your understanding this is -- these are

17       the panels taken off the walls of Mr. Avery's

18       bedroom, right?

19  A.   Yes.

20  Q.   No blood, correct?

21  A.   We did not find any.

22  Q.   And there's also some molding, wooden molding

23       also taken from his room somewhere?

24  A.   Yes.

25  Q.   Tested for blood, negative, right?

58

CHRM008057

| | | |
|---|---|---|
| 1 | A. | Right. |
| 2 | Q. | There were also some paint thinner clans -- cans |
| 3 | | that apparently were recovered from the garage; |
| 4 | | do you recall that? |
| 5 | A. | I recall examining them, yes. |
| 6 | Q. | You weren't there when they were seized, but you |
| 7 | | examined them? |
| 8 | A. | Yes. |
| 9 | Q. | And it was determined that those cans had no |
| 10 | | evidentiary value whatsoever, right? |
| 11 | A. | We did some presumptive tests on them, I believe, |
| 12 | | and got negative results, correct. |
| 13 | Q. | And there was also some gas tank -- or a number |
| 14 | | of gas cans and I guess snowmobile gas tanks, or |
| 15 | | things of that nature? |
| 16 | A. | Correct. |
| 17 | Q. | You tested all of those, right? |
| 18 | A. | Yeah, we swabbed a lot of those gas cans, |
| 19 | | anything that we saw that was suspicious, we |
| 20 | | would do. |
| 21 | Q. | And they were are all negative? |
| 22 | A. | Yes. |
| 23 | Q. | No blood, right.  Then you also took -- and this |
| 24 | | would have been on May 1st, a piece of carpeting |
| 25 | | that was ripped out of the whole hallway of |

59

CHRM008058

```
 1        Mr. Avery's residence, right?
 2   A.   It was a small piece of carpeting that was,
 3        correct, cut from the entrance door by the
 4        bathroom to the entrance to the bedroom.
 5   Q.   Okay.  In that hallway right outside his bedroom?
 6   A.   Yes.
 7   Q.   Okay.  And you actually did a luminol?
 8   A.   Yes.
 9   Q.   And we have heard testimony about luminol.  I'm
10        not going to go over it in detail, but that's
11        something that can highlight anything that is
12        of -- could be blood, could be a lot of other
13        things, right?
14   A.   Yes.
15   Q.   And you found no heavy concentrations anywhere in
16        the carpet indicating any drops of blood had
17        fallen, right?
18   A.   There was no pattern, nothing that was consistent
19        with what you were talking about, correct.
20   Q.   All right.  And you even looked at the back of
21        that carpet, right?
22   A.   Yes.
23   Q.   That was actually a later date, June 23rd, right?
24   A.   I don't recall that.
25   Q.   You were told to pull the carpeting out of -- I'm
```

60

CHRM008059

```
 1        sorry this was a different piece of carpeting?
 2   A.   Okay.  That would be consistent.
 3   Q.   Okay.  You pull the carpeting that was ripped out
 4        of the bedroom of Mr. Avery, right?
 5   A.   Yes.
 6   Q.   And you actually looked at the very -- at the
 7        back of it?
 8   A.   Yes.
 9   Q.   The backside.  And you did presumptive tests for
10        blood?
11   A.   Yes.
12   Q.   And found nothing?
13   A.   Correct.
14   Q.   No blood?
15   A.   Nothing consistent with blood, correct.
16   Q.   You also, a number of times, I won't go into all
17        of them, but there were a number of knives,
18        kitchen knives, pocket knives, things like that,
19        that were seized either in the residence or the
20        garage, right?
21   A.   Yes.
22   Q.   And you looked at all of those, right?
23   A.   Some were sent to the Crime Lab; some we kept at
24        the office and processed ourselves.
25   Q.   All right.  And the ones you processed you looked
```

61

```
 1          for blood, right?
 2   A.     Yes.
 3   Q.     None, correct?
 4   A.     Correct.
 5                  ATTORNEY BUTING:  All right.  Thank you.
 6                  THE COURT:  Mr. Kratz, are you going to be
 7          doing redirect?
 8                  ATTORNEY KRATZ:  I am.
 9                  THE COURT:  How much time do you think?
10                  ATTORNEY KRATZ:  I just actually, I think I
11          have two questions, Judge, so.
12                  THE COURT:  All right.  Go ahead.
13                       REDIRECT EXAMINATION
14   BY ATTORNEY KRATZ:
15   Q.     Sergeant Tyson, Mr. Buting asked you about
16          that -- that sign that mentioned a Zander Road
17          address; do you recall him showing you that?
18   A.     Yes.
19   Q.     Do you know where that Zander Road address is?
20   A.     No.
21   Q.     Do you even know if it's in Calumet County?
22   A.     I heard Zander Road a couple of times on our
23          department radios, Manitowoc County either having
24          a crash or something like that, so I'm familiar
25          with Zander Road probably being in Manitowoc
```

62

```
 1         County, I know it rang a bell, but I don't know
 2         where it is.
 3    Q.   Something a Manitowoc officer might be better
 4         able to answer?
 5    A.   Yes.
 6    Q.   And lastly, Mr. Buting asked you about somebody
 7         relieving you from the scene security, that is,
 8         from watching over the SUV; do you remember those
 9         questions?
10    A.   Yes.
11    Q.   Do you remember what department relieved you; in
12         other words, the scene security from the point
13         that you took over, thereafter, do you know what
14         department was responsible?
15    A.   Calumet County Sheriff's Department.
16              ATTORNEY KRATZ:  I think that's all I have
17         for redirect.
18              ATTORNEY BUTING:  No questions.
19              THE COURT:  Very well, the witness is
20         excused, and at this time we'll take our morning
21         break.  Members of the jury, again, do not discuss
22         this case among yourselves during the break.  We'll
23         resume in about 15 minutes.
24              (Jury not present.)
25              ATTORNEY BUTING:  Your Honor, could I move
```

63

CHRM008062

206 and 207 into evidence?

        THE COURT:  Any objection?

        ATTORNEY KRATZ:  No.

        THE COURT:  They are admitted.

        (Recess taken.)

        (Jury present.)

        THE COURT:  Mr. Kratz, at this time you may call your next witness.

        ATTORNEY KRATZ:  State will call Andrew Colborn to the stand.

        THE CLERK:  Please raise your right hand.

        **SERGEANT ANDREW L. COLBORN,** called as a witness herein, having been first duly sworn, was examined and testified as follows:

        THE CLERK:  Please be seated.  Please state your name and spell your last name for the record.

        THE WITNESS:  Andrew L. Colborn, C-o-l-b-o-r-n.

        ATTORNEY KRATZ:  You don't have to be quite so close.

### DIRECT EXAMINATION

BY ATTORNEY KRATZ:

Q.  Mr. Colborn, can you tell us, how are you employed, please.

A.  I'm a patrol sergeant with the Manitowoc County

64

CHRM008063

| | | |
|---|---|---|
| 1 | | Sheriff's Department. |
| 2 | Q. | How long have you been a law enforcement officer? |
| 3 | A. | Since 1996. |
| 4 | Q. | Prior to 1996, what did you do? |
| 5 | A. | I was a Corrections Officer from 1992 to 1994, |
| 6 | | also with the Manitowoc County Sheriff's |
| 7 | | Department. |
| 8 | Q. | What does a Corrections Officer do? |
| 9 | A. | A Corrections Officer is a non-sworn, non-law |
| 10 | | enforcement officer, that is a responsibility for |
| 11 | | security of the jail. |
| 12 | Q. | All right. How was it that you became a sworn |
| 13 | | law enforcement officer? |
| 14 | A. | When a position opened up at the Manitowoc County |
| 15 | | Sheriff's Department, I did perform the State |
| 16 | | written test, performed an agility test, went on |
| 17 | | an eligibility list, and eventually I was |
| 18 | | selected. |
| 19 | Q. | What are your current duties with the Manitowoc |
| 20 | | County Sheriff's Department? |
| 21 | A. | I'm a assistant shift commander for the noon to 8 |
| 22 | | shift so I have some administrative duties and |
| 23 | | then I have some patrol duties. |
| 24 | Q. | Prior to being selected as a law enforcement |
| 25 | | officer, did you have any duties in your prior |

65

CHRM008064

```
 1        life that in any way prepared you for being a law

 2        enforcement officer?

 3   A.   No.

 4   Q.   Sergeant, you hold the rank of sergeant?

 5   A.   Yes, sir.

 6   Q.   And in early November of 2005, did you hold that

 7        same rank?

 8   A.   Yes, sir.

 9   Q.   What were your duties back in early November of

10        '05?

11   A.   Essentially the same duties that I hold today.  I

12        was a patrol supervisor on -- I work a six day

13        on, three day off rotation.  So on the days that

14        the lieutenant that's assigned to the shift is

15        off, I would be the shift commander.

16   Q.   So you have supervisory responsibilities as well?

17   A.   Yes, sir.

18   Q.   I'm going to direct your attention to

19        November 3rd of 2005, ask if you were employed on

20        that evening?

21   A.   Yes, sir.

22   Q.   Do you recall what your duties were on

23        November 3rd?

24   A.   I was the shift commander for the noon to 8

25        shift, that's the shift I'm assigned to.
```

66

CHRM008065

| | |
|---|---|
| 1 | Q. Sometime during that shift, Sergeant Colborn, |
| 2 | were you informed of a Calumet County missing |
| 3 | persons investigation that was ongoing? |
| 4 | A. Yes, sir. |
| 5 | Q. And being involved in that -- or excuse me, being |
| 6 | aware of that investigation, were you asked to |
| 7 | assist in any way? |
| 8 | A. Yes, sir. |
| 9 | Q. Tell the jury how you were asked to assist? |
| 10 | A. I was contacted by, I believe it was inspector or |
| 11 | Investigator Mark Wiegert from the Calumet County |
| 12 | Sheriff's Office, who contacted the dispatch |
| 13 | center by telephone, who then transferred the |
| 14 | call to my patrol car. |
| 15 | He asked if I could respond to, I |
| 16 | believe he gave me the address of 12928 Avery |
| 17 | Road. He asked if I knew where that was and I |
| 18 | told him, yes, I believe that that was the |
| 19 | address of Avery Auto Salvage. And he asked if I |
| 20 | could go there and check for a missing person |
| 21 | because they had a missing person report that had |
| 22 | generated in Calumet County and it had been |
| 23 | determined, through the course of their |
| 24 | investigation, that she had been out at the Avery |
| 25 | Salvage Yard, taking pictures of a vehicle that |

67

CHRM008066

```
 1        was for sale.
 2   Q.   At the time that Investigator Wiegert asked for
 3        your assistance, did Investigator Wiegert tell
 4        you other places within Manitowoc County that Ms
 5        Halbach had known to have been on the 31st of
 6        October?
 7   A.   I don't believe in the -- in the initial phone
 8        call that he did.
 9   Q.   All right.  Some time later that evening you
10        heard?
11   A.   Yes, sometime later that evening he gave me
12        another address on County Highway B and another
13        name and asked me to check there as well.
14   Q.   What name was that, just so -- we're going to
15        eventually get there?
16   A.   I believe the first name was George; I know the
17        last name was Zipperer.
18   Q.   Sergeant Colborn, are you at all familiar with
19        the Avery salvage business itself?
20   A.   Yes.
21   Q.   Tell the jury how you are familiar with that
22        business.
23   A.   I have been, personally, a customer of the Avery
24        Auto Salvage business; as well as, I have had
25        contacts there through with law enforcement.  And
```

68

CHRM008067

|    |    |                                                      |
|----|----|------------------------------------------------------|
| 1  |    | I have children that are the same age as some of     |
| 2  |    | the owners of Avery Auto Salvage, so I had           |
| 3  |    | contact with them through the course of school       |
| 4  |    | events.                                              |
| 5  | Q. | All right. Let's take those -- Well, when we         |
| 6  |    | discuss this, I'm going show you what's been         |
| 7  |    | received as Exhibit 86, can you tell us what that    |
| 8  |    | is, please.                                          |
| 9  | A. | That's an overhead, like an airplane view,           |
| 10 |    | birds-eye view of the Avery Auto Salvage.            |
| 11 | Q. | Prior to the 3rd of November, 2005, had you been     |
| 12 |    | to that property?                                    |
| 13 | A. | Prior to 2005?                                        |
| 14 | Q. | Prior to November 3rd of 2005, had you been to       |
| 15 |    | that property?                                       |
| 16 | A. | Yes.                                                 |
| 17 | Q. | And under what circumstances, can you tell the       |
| 18 |    | jury about that?                                      |
| 19 | A. | Again, as a customer.                                |
| 20 | Q. | Let's talk about that, first. What do you mean       |
| 21 |    | as a customer.                                        |
| 22 | A. | I have several older vehicles, one, as a matter      |
| 23 |    | of fact, is a 1950 Chevrolet pickup truck.  And      |
| 24 |    | I -- in the process of tinkering around with it,     |
| 25 |    | I have gone to several auto salvage and I have       |

69

CHRM008068

|    | always been referred to the Avery Auto Salvage as |
| 1  |  |
| 2  | the place to go if you are looking for an older |
| 3  | model vehicle parts -- or parts for an older |
| 4  | model vehicle. |
| 5  | Q. Was there one person in particular that you would |
| 6  | normally have contact with at the Avery Auto |
| 7  | Salvage? |
| 8  | A. No, actually, usually there were two; either I |
| 9  | had contact with Charles Avery or Earl Avery. |
| 10 | Q. All right.  They are brothers and, in fact, the |
| 11 | owners of the business; is that right? |
| 12 | A. Yes, sir. |
| 13 | Q. Let me ask you this, Sergeant Colborn, if you |
| 14 | know, prior to the 3rd of November, 2005, when |
| 15 | was the last time you were at the Avery Auto |
| 16 | Salvage business? |
| 17 | A. I think the last time I was at the Avery Auto |
| 18 | Salvage business would have been 1999. |
| 19 | Q. All right.  So at least six years previously? |
| 20 | A. Yes, sir. |
| 21 | Q. But you knew where it was? |
| 22 | A. Yes, sir. |
| 23 | Q. Then, on November 3rd, after Mr. Wiegert asked |
| 24 | for your help; did you proceed to this scene? |
| 25 | A. Yes, sir. |

70

CHRM008069

```
 1   Q.   And that's 2005; is that right?

 2   A.   Yes, sir.

 3   Q.   Can you tell the jury, please, what happened when

 4        you got there on November 3rd?

 5   A.   Again, I knew that Earl Avery, who was probably

 6        the person that I have had the most contact with

 7        or know the best, doesn't live on the Avery Auto

 8        Salvage property, so my initial -- what I was

 9        initially trying to do was to make contact with

10        Charles Avery, who does reside on there.

11             I knew Charles to -- I didn't know if he

12        owned the business, but I certainly knew that he

13        managed the business.  So I was going to make

14        contact with him and ask him if he had seen

15        someone on the property taking pictures of a

16        vehicle that was for sale.

17   Q.   In looking for Charles Avery, do you remember

18        what building you went to?

19   A.   Well, initially, I was kind of surprised when I

20        drove in, because the shop area, a lot of --

21        there were new buildings and things had changed

22        since the last time I was there.  But I was

23        attempting to make contact at his residence,

24        which I believe is right behind that large,

25        square shaped building.
```

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 72 of 246   Document 290-19

CHRM008070

```
1   Q.   We're handing you a laser pointer to assist you
2        in your --
3   A.   I believe that --
4   Q.   -- testimony.
5   A.   I thought that was his residence right there.
6   Q.   And you were pointing actually to the residence
7        which would be just the south of the --
8   A.   That one right there.
9   Q.   You have to wait until I finish my question, sir.
10       You are pointing to a trailer or a residence just
11       south of the Avery business itself.  And I think
12       counsel is willing to stipulate that is Charles
13       Avery's residence.
14            ATTORNEY STRANG:  Certainly my
15       understanding.
16            THE COURT:  All right.  The record will
17       reflect the stipulation.
18   Q.   (By Attorney Kratz)- Did you drive or walk into
19       this property?
20   A.   I drove.
21   Q.   Can you tell the jury where you came in from,
22       please.
23   A.   There is -- To my knowledge there is only one
24       entrance onto the property and that's off Avery
25       Road, which the whole of Avery Road isn't
```

72

```
 1        pictured on that picture.  But I ended up coming

 2        down that dirt road there and parking almost

 3        where there is a vehicle parked right now.

 4    Q.  Why don't you show us where you parked.  If I

 5        zoomed into that location would that help us?

 6        All right.  We have now zoomed in to Exhibit 86,

 7        could you, again, show the jury about where it

 8        was that you parked.

 9             You are pointing which would be just to

10        the north of the large building, which is

11        something we have been calling the new office or

12        the new shop building; is that correct?

13    A.  Yes, sir.

14    Q.  All right.  After parking at that location, tell

15        the jury what happened.  By the way, about what

16        time was this that you got there?

17    A.  I'm guessing around 7:00, between 6:30 and 7:30.

18    Q.  Was it light out or was it dark?

19    A.  It was dark.

20    Q.  After parking there, Sergeant Colborn, what

21        happened?

22    A.  I got -- I exited my squad car and I was going to

23        walk down the road, that road right there, in

24        order to access Charles' residence.  Almost as

25        soon as I got out of my car I heard something
```

73

CHRM008072

|    |    | behind me.  I turned and Steve Avery was walking |
| -- | -- | --- |
| 1  |    | behind me.  I turned and Steve Avery was walking |
| 2  |    | towards me and he had come out of that residence |
| 3  |    | right there. |
| 4  | Q. | Do you know whose residence that is? |
| 5  | A. | I believe that's Al and Delores Avery's |
| 6  |    | residence. |
| 7  | Q. | Did you have any conversation with Steven Avery |
| 8  |    | at that time? |
| 9  | A. | Yes, I did. |
| 10 | Q. | And could you describe that conversation for the |
| 11 |    | jury, please? |
| 12 | A. | I think Steve initiated the conversation with me |
| 13 |    | by asking me what I wanted, what I was doing |
| 14 |    | there. |
| 15 | Q. | Were you dressed similar to what you are dressed |
| 16 |    | today? |
| 17 | A. | Yes, I was in uniform. |
| 18 | Q. | Did you have a marked squad car? |
| 19 | A. | Yes, I did. |
| 20 | Q. | What did you tell Mr. Avery? |
| 21 | A. | I told Avery -- Mr. Avery, that there was -- I |
| 22 |    | had received a call from Calumet County and that |
| 23 |    | they had informed me that there was a girl |
| 24 |    | missing from Calumet County and asked him if she |
| 25 |    | had come out to their property to photograph a |

74

CHRM008073

| | | |
|---|---|---|
| 1 | | vehicle that they were selling. |
| 2 | Q. | Did Mr. Avery have a response for you? |
| 3 | A. | Yes, he said that she had been there. |
| 4 | Q. | Did he tell you what day she had been there? |
| 5 | A. | I think I might have told him that, what day that |
| 6 | | she should have been out there.  I don't recall |
| 7 | | if we mentioned a date, but I do remember asking |
| 8 | | him what time she had been out there. |
| 9 | Q. | Did Mr. Avery recall this young woman? |
| 10 | A. | Yes. |
| 11 | Q. | Did he name her for you? |
| 12 | A. | No. |
| 13 | Q. | Did he tell you what she had done at his property |
| 14 | | that day? |
| 15 | A. | He said that she was taking some pictures of a |
| 16 | | van that his sister was selling. |
| 17 | Q. | Mr. Avery tell you how long the woman had been on |
| 18 | | his property? |
| 19 | A. | He said 5 or 10 minutes. |
| 20 | Q. | Did you inquire of Mr. Avery whether or not he |
| 21 | | had personal contact with this woman on the date |
| 22 | | she was out there? |
| 23 | A. | I asked Mr. Avery if she had said where she was |
| 24 | | going.  And he said, I never talked to her.  She |
| 25 | | was only here 5 or 10 minutes and she left. |

75

CHRM008074

| | | |
|---|---|---|
| 1 | Q. | But he never talked to her? |
| 2 | A. | That's what he told me, he never talked to her. |
| 3 | Q. | Did he describe that further, how he knew she was |
| 4 | | there? |
| 5 | A. | He said he saw her out the window taking the |
| 6 | | pictures. |
| 7 | Q. | Okay.  Did you complete that conversation with |
| 8 | | Steven Avery?  Do you recall that conversation? |
| 9 | A. | I told Mr. Avery that her parents and her family |
| 10 | | were getting worried and was he sure that she |
| 11 | | didn't mention where she might have been going |
| 12 | | after she left.  And he said, no, I didn't talk |
| 13 | | to her.  She was only here a few minutes and then |
| 14 | | she left. |
| 15 | Q. | What was Mr. Avery's demeanor like as he was |
| 16 | | talking to you; was he cooperative? |
| 17 | A. | Yes, he was very cordial. |
| 18 | Q. | Mr. Avery indicate to you the time, that is, when |
| 19 | | this young woman had been on his property? |
| 20 | A. | He said he thought between 2:00 or 2:30. |
| 21 | Q. | What did you do then? |
| 22 | A. | I believe I thanked him for talking with me and I |
| 23 | | started to get back in my car.  And I believe |
| 24 | | Mr. Avery told me that he hoped she turned up |
| 25 | | soon. |

76

CHRM008075

| 1 | Q. | What did you do then? |
| 2 | A. | I left.  I left the property and I contacted -- |
| 3 | | he is the under sheriff of our department now, |
| 4 | | but at the time he was the deputy inspector of |
| 5 | | the operations division.  I called him. |
| 6 | Q. | What's his name? |
| 7 | A. | Greg Schetter.  And I let him know that Calumet |
| 8 | | County was investigating a missing persons case |
| 9 | | and that one of the places that it had been |
| 10 | | mentioned that this party was at was on -- at the |
| 11 | | Avery Salvage Yard and I just left there and made |
| 12 | | contact and that I was unable to locate that |
| 13 | | person.  And he suggested that I probably contact |
| 14 | | Lieutenant Lenk and see if he wanted -- if |
| 15 | | Lieutenant Lenk wanted any of our detectives to |
| 16 | | assist Calumet County in searching any place |
| 17 | | else. |
| 18 | Q. | Did you do that? |
| 19 | A. | Yes, I did. |
| 20 | Q. | And did you speak with Lieutenant Lenk that |
| 21 | | evening? |
| 22 | A. | Yes, by phone.  And then when I got into the |
| 23 | | department, because prior to going into the |
| 24 | | department I went past the other residence.  I |
| 25 | | must have also contacted Investigator Wiegert and |

77

CHRM008076

1     let him know that I hadn't located.

2           And he, I believe, at that time told me

3     of the other address.  So I purposely drove past

4     that residence.  I saw it was dark, but that

5     there were cars in the driveway.  But the

6     residence was dark.  I didn't see any lights on

7     there.  So I ended my tour of duty for patrol.

8  Q.  Let me just stop you.  Whose residence was this

9     that you drove past?

10 A.  George Zipperer's.

11 Q.  Go ahead.  What did you do?

12 A.  I ended my patrol tour of duty, but I remained on

13    duty to assist Calumet County Detective Dedering

14    and Detective Remiker in making contact at George

15    Zipperer's residence.

16 Q.  Was that done at that time?

17 A.  It was done, you know, within probably a half

18    hour or 45 minutes of my getting back to the

19    department.

20 Q.  The question, Sergeant Colborn, did you assist in

21    that process?

22 A.  Yes, sir.

23 Q.  You mentioned that there was a Calumet detective

24    that was involved, as well as Manitowoc; is that

25    right?

                        78

CHRM008077

```
 1   A.   Yes, sir.

 2   Q.   In meeting with the Zipperers?

 3   A.   Yes, sir.

 4   Q.   And, again, do you remember who they were?

 5   A.   I believe his name is John Dedering.

 6   Q.   All right.  When you -- I'm just going to go back

 7        just briefly to your contact with Mr. Avery.  You

 8        mentioned that he was cooperative; is that right?

 9   A.   Yes, sir.

10   Q.   I want you to remember back, as best you can,

11        Sergeant Colborn, at that initial meeting with

12        Mr. Avery, you, Sergeant Andy Colborn, did you

13        have any feelings or any inclination that

14        Mr. Avery may have been involved in Ms Halbach's

15        disappearance?

16   A.   Not at that time, no.

17   Q.   Did you do anything on the 3rd of November to

18        further investigate Mr. Avery?

19   A.   On November 3rd?

20   Q.   Yes.

21   A.   No, sir.

22   Q.   Did you ever go back onto his property on the

23        3rd?

24   A.   No, sir.

25   Q.   After going to the Zipperers with Detective -- I
```

79

```
 1            think it was Remiker and Dedering, what did you
 2            do after that?
 3   A.   After we were done, completed at the Zipperers?
 4   Q.   Yes.
 5   A.   I went home.  I was done with -- you know, I was
 6            already on overtime.  I checked out and went
 7            home.
 8   Q.   Do you know about what time that was?
 9   A.   10:30, 11:00 at night, maybe.
10   Q.   All right.  Do you remember what you did the rest
11            of that evening?
12   A.   Just probably fell asleep on the couch.  I went
13            to bed and, you know, fell asleep.
14   Q.   The next day, on the forth of November, were you
15            working that day?
16   A.   No, sir, I was off that day.
17   Q.   It's a Friday; is that right?
18   A.   Yes, sir.
19   Q.   Do you remember what you did on the 4th?  We'll
20            get back to that, but do you recall, generally,
21            your day on the 4th of November?
22   A.   Yes, sir.
23   Q.   Move your attention one day further, on the 5th,
24            Saturday, the 5th of November; do you recall what
25            you were doing that day or that morning?
```

80

CHRM008079

| 1 | A. | That was also a regularly scheduled day off for |
| 2 | | me. Yes, I recall what I did on that day. |
| 3 | Q. | We'll get into the morning, but let me just jump |
| 4 | | right to this investigation. Were you contacted |
| 5 | | at all by any supervisors or superiors that day |
| 6 | | and asked to participate in this case? |
| 7 | A. | I was contacted by the noon to 8 shift commander |
| 8 | | for that day, and he did ask me to come into work |
| 9 | | and pick up a patrol vehicle and respond out to |
| 10 | | the Avery Salvage Yard. |
| 11 | Q. | Did you do that? |
| 12 | A. | Yes. |
| 13 | Q. | In a marked vehicle? |
| 14 | A. | Yes, I did take a marked vehicle out there. |
| 15 | Q. | And about what time was it that you arrived at |
| 16 | | the Avery scene itself; do you recall? |
| 17 | A. | I know I left my house between 4:00 and 4:30. I |
| 18 | | probably got out to the Avery Salvage Yard |
| 19 | | between 5:15, 5:30 maybe. |
| 20 | Q. | To your best recollection? |
| 21 | A. | Yes. |
| 22 | Q. | What happened when you got to the Avery salvage |
| 23 | | business? |
| 24 | A. | I made contact with the same supervisor who had |
| 25 | | called me and I asked him, what do you want me to |

81

CHRM008080

```
 1          do.  And he informed me that there was a deputy

 2          there that had some personal business or matters

 3          to attend to.  She had been out there since

 4          apparently earlier in the day.  And he asked me

 5          to transport that deputy back to the department

 6          so that she could get her own private vehicle and

 7          go home.  And then come back out to the Avery

 8          Salvage Yard and provide security.

 9   Q.     Did you do that?

10   A.     Yes.

11   Q.     What did you do when you got back to the Avery

12          business?

13   A.     Tried to stay in the car as much as possible

14          because it was pouring rain.  But they directed

15          my attention to a place way off in the salvage

16          yard where I could see some lights.  And

17          somewhere up in this area here they just told me

18          to sit in the car and not let anyone go down any

19          of these roads.

20   Q.     Providing scene security up near what would be

21          the business buildings?

22   A.     Yes.

23   Q.     Did you do that?

24   A.     Yes.

25   Q.     How long did you have that responsibility.
```

82

CHRM008081

```
 1   A.   Maybe like an hour, hour and a half.  And I was
 2        then told that, actually, I could go home.  So I
 3        was preparing to do that.  I was checking all my
 4        equipment to make sure I had everything that I
 5        got out there -- came out there with.  And then I
 6        was told that I was going to be needed in a
 7        different capacity and not to go home.
 8   Q.   All right.  Let me ask you this, Sergeant
 9        Colborn, any time that day, any time on the 5th
10        of November, did you ever make your way down
11        towards the pond, or down towards the southeast
12        quadrant of the Avery salvage property?
13   A.   No, sir.
14   Q.   Could you point to that area for us, with the
15        laser pointer.  Point to the northeast corner of
16        the property.  I'll specifically ask you about
17        that area, did you go near that area at all on
18        the 5th of November?
19   A.   No, sir.
20   Q.   How about on the 3rd when you were there 2 days
21        earlier, talking to Steven Avery?
22   A.   No, sir.
23   Q.   And were you down there at all on the 4th of
24        November?
25   A.   No, sir.
```

83

CHRM008082

| | | |
|---|---|---|
| 1 | Q. | When initially being told that you could leave, |
| 2 | | or that you were in effect packing up to leave, |
| 3 | | who was it that approached you with other duties? |
| 4 | A. | Detective Remiker. |
| 5 | Q. | Do you know what you were being asked to do then? |
| 6 | A. | He just said, you may want to check in with |
| 7 | | Inspector Wiegert -- Detective Wiegert, before |
| 8 | | you go home, because you can see the huge area |
| 9 | | here, it's going to have to be checked, and we |
| 10 | | don't have a lot of people here to do that. |
| 11 | Q. | Do you know how many sworn law enforcement |
| 12 | | officers were on scene at that time, or is that |
| 13 | | something that you wouldn't even have a guess on? |
| 14 | A. | No, I didn't take a head count. I don't know. I |
| 15 | | would ball park it at 50 or less, but I don't |
| 16 | | know. |
| 17 | Q. | All right. Now, 50 sounds like a lot of police |
| 18 | | officers; do you think that's a lot for that size |
| 19 | | scene? |
| 20 | | ATTORNEY STRANG: Irrelevant. |
| 21 | | THE COURT: Sustained. |
| 22 | Q. | (By Attorney Kratz)- Did you check in with |
| 23 | | Investigator Wiegert before you left? |
| 24 | A. | Yes. |
| 25 | Q. | And can you tell the jury, please, what -- what |

84

CHRM008083

| | | |
|---|---|---|
| 1 | | that conversation was? |
| 2 | A. | I believe he asked me if I was an evidence |
| 3 | | technician and I said, yes, I am. And -- |
| 4 | Q. | Let me stop you there. What all goes into being |
| 5 | | an evidence technician? |
| 6 | A. | It's an investigative portion, it's an |
| 7 | | investigative duty some police officers are |
| 8 | | trained to do and some who may not be interested |
| 9 | | in that are not. Not every police officer is an |
| 10 | | evidence technician. You do get special training |
| 11 | | on how to do photographing, how to identify |
| 12 | | evidence, how to collect evidence without |
| 13 | | destroying it. |
| 14 | Q. | All right. And you had been through that |
| 15 | | training? |
| 16 | A. | Yes, sir. |
| 17 | Q. | With Manitowoc County, that is, with the |
| 18 | | sheriff's department, had you performed evidence |
| 19 | | collection duties prior to November 5th of 2005? |
| 20 | A. | Yes, sir. |
| 21 | Q. | How long had you been an evidence tech? |
| 22 | A. | Since 1997. |
| 23 | Q. | Have you ever executed a search warrant or |
| 24 | | collected evidence in that capacity before? |
| 25 | A. | Yes, sir. |

85

CHRM008084

```
 1   Q.   After Investigator Wiegert asked you if you were
 2        an evidence tech, what were you told to do?
 3   A.   I was just told to stand by, not to go home.  So
 4        I went back out to my patrol car.
 5   Q.   And, again, where was that parked, if you can
 6        show us?
 7   A.   I may, you know, have moved it closer to the
 8        Command Post, but initially I was parked right in
 9        this area here.
10   Q.   Again, near the business buildings?
11   A.   Yes, sir.
12   Q.   How long did you wait for further assignment?
13   A.   Maybe 5, 10 minutes.
14   Q.   Now, Sergeant Colborn, did you know what
15        assignment you were going to be given; in other
16        words, did you know where you were going to be
17        directed that night?
18   A.   No, sir.
19   Q.   What's the next direction that you recall
20        receiving?
21   A.   I believe the next person I made contact with was
22        Sergeant Bill Tyson from the Calumet County
23        Sheriff's Department.  And he was with Lieutenant
24        Lenk and Detective Remiker.  I believe he came
25        out of the Command Post.  They kind of motioned
```

86

CHRM008085

1     to me.  So walked up to them and Sergeant Tyson

2     said, you are going to be working for me and we

3     are going to be going to Steve Avery's trailer.

4  Q.  What did working for me mean, or what do you

5     believe it meant?

6  A.  Well, I had been told by this time that the

7     Calumet County Sheriff's Department was leading

8     up this investigation.  So I interpreted working

9     for me as, you are the boss and you are going to

10    tell me what to do.

11 Q.  Okay.  Were you okay with that?

12 A.  Yes.

13 Q.  Did you then proceed with Deputy Tyson to the

14    Steven Avery trailer?

15 A.  Yes, sir.

16 Q.  Do you remember how you got there, how you got

17    down there?

18 A.  I believe we took two cars.  I believe Sergeant

19    Tyson took his Calumet County patrol car and we

20    probably -- I don't think we took my marked unit,

21    I think I got in Detective Remiker's car, or

22    Lieutenant Lenk's car, whichever.  It was an

23    unmarked Manitowoc County car.

24 Q.  All right.  Tell us again, if you can look at

25    Exhibit 86, now where did you drive, where did

87

CHRM008086

```
 1        you guys go then?
 2   A.   I had never been to Steve Avery's trailer before
 3        so I really didn't know where it was.  But we
 4        drove down this road to that trailer right there.
 5   Q.   I will zoom in again on Exhibit 86; do you recall
 6        where the cars were parked?
 7   A.   I believe we parked them in this driveway here
 8        that goes up to that garage.
 9   Q.   Do you recall that particular search that
10        evening?
11   A.   Yes, sir.
12   Q.   How is it that you have a independent memory of
13        that first search of Steven Avery's trailer?
14   A.   Because I was involved in it.
15   Q.   Okay.  Did each of the search team members have a
16        specific responsibility within that trailer, if
17        you know?
18   A.   Not really.  I did have the specific
19        responsibility of photographing.  But as far as
20        collecting, I mean, we all worked as a team.  It
21        wasn't like one person went here and one person
22        went there.  We were always -- worked together as
23        a team, always within arm's length of one
24        another.
25   Q.   Was that by design, do you know?
```

88

| 1  | A. | I don't know if it was by design, per se, but it |
| 2  |    | just seemed that this would be the best way for |
| 3  |    | things to work and that we could be the most |
| 4  |    | careful and concise, working together as a team. |
| 5  | Q. | All right.  Let me ask you, Sergeant Colborn, did |
| 6  |    | you know the kinds of things that you were |
| 7  |    | looking for in Steven Avery's trailer? |
| 8  | A. | Not specific -- specifically, no. |
| 9  | Q. | Was there generally a term of things that you |
| 10 |    | were looking for? |
| 11 | A. | I was looking for any evidence that would |
| 12 |    | substantiate or eliminate her having been there. |
| 13 | Q. | Who's her? |
| 14 | A. | Teresa Halbach. |
| 15 | Q. | What rooms were it that the four of you searched? |
| 16 | A. | I believe that first night we did search the |
| 17 |    | entire trailer.  We started in what I term to be |
| 18 |    | the master bedroom or the largest bedroom. |
| 19 | Q. | All right.  We have already heard from Sergeant |
| 20 |    | Tyson so what responsibilities -- I'm just |
| 21 |    | talking about you now, not the others -- but what |
| 22 |    | responsibilities did you have in the search of |
| 23 |    | that bedroom? |
| 24 | A. | Again, initially, I did all the photographing |
| 25 |    | that night with a 35mm camera.  And then I was |

89

CHRM008088

|    |    |                                                        |
|----|----|--------------------------------------------------------|
| 1  |    | looking in -- there was a bookcase type piece of       |
| 2  |    | furniture next to the bed and a desk next to           |
| 3  |    | that.                                                  |
| 4  |    | And while I say it's the larger bedroom,               |
| 5  |    | it's still kind of a small bedroom so those            |
| 6  |    | pieces of furniture were almost tight together.        |
| 7  |    | And there was very little distance between the         |
| 8  |    | bed and those pieces of furniture, I mean, maybe       |
| 9  |    | 2 foot. And that's the area that I was                 |
| 10 |    | specifically searching --                              |
| 11 | Q. | How many --                                            |
| 12 | A. | -- in that bedroom.                                    |
| 13 | Q. | I'm sorry. How many men were in that bedroom?          |
| 14 | A. | There was myself, Detective Remiker, Lieutenant        |
| 15 |    | Lenk and Sergeant Tyson.                               |
| 16 | Q. | I'm going to put on the screen an exhibit which        |
| 17 |    | has already been received; it's Exhibit 103.           |
| 18 |    | It's a computer generated exhibit. Zoom in,            |
| 19 |    | specifically, into the bedroom; does that help         |
| 20 |    | you better orient yourself to Steven Avery's           |
| 21 |    | bedroom?                                               |
| 22 | A. | Yes.                                                   |
| 23 | Q. | Take the laser pointer, please, and tell the           |
| 24 |    | jurors in what area you had initial                    |
| 25 |    | responsibility to search on the 5th of November.       |

90

CHRM008089

```
 1    A.   This cabinet right here, I guess we could call
 2         that a bookcase, and this desk right here.
 3    Q.   All right.  And did you -- Let's talk about the
 4         cabinet first.  Mr. Wiegert is going to hand you
 5         what's been marked as Exhibit No. 203 and on 204,
 6         ask if you found those items in Mr. Avery's
 7         bedroom on the 5th of November?
 8    A.   Yes, sir.
 9    Q.   Tell the jury where you found them, please.
10    A.   That's a shelf right there, there's a little
11         space between that shelf and the top of the
12         cabinet.  I found them inside there, inside that
13         area.
14    Q.   Now, after finding or locating a piece of
15         physical evidence during this search, that is, on
16         the 5th, what did you do with that evidence?
17    A.   As soon as I located something that, in my
18         opinion, was of evidence, which doesn't
19         necessarily make it evidence, but if it was, in
20         my opinion, to be of evidentiary value, I stopped
21         what I was doing.  I informed Sergeant Tyson,
22         hey, I found some leg irons and handcuffs in
23         here.
24              Then Sergeant Tyson would come over.  I
25         would photograph them, then he collected them and
```

91

| | | |
|---|---|---|
| 1 | | put them -- you know, went through the |
| 2 | | administrative duties that the Calumet County |
| 3 | | Sheriff's Department requires for logging |
| 4 | | evidence. |
| 5 | Q. | The actual seizure, or the collection of them, |
| 6 | | was whose responsibility? |
| 7 | A. | Calumet County's. |
| 8 | Q. | Sergeant Tyson? |
| 9 | A. | Well, on that evening, yes, Sergeant Tyson, |
| 10 | | sorry. |
| 11 | Q. | When you look at Exhibit 103, this computer |
| 12 | | generated diagram, other than the roof being |
| 13 | | ripped off, for obvious reasons, does that look |
| 14 | | the same or similar as it did on the 5th of |
| 15 | | November? |
| 16 | A. | Yes, sir. |
| 17 | Q. | You see on the wall above the bed, the headboard, |
| 18 | | there is a gun rack; do you see that? |
| 19 | A. | Yes. |
| 20 | Q. | Is that how it looked on the 5th of November as |
| 21 | | well? |
| 22 | A. | Yes. |
| 23 | Q. | Did you see any firearms on that gun rack that |
| 24 | | aft -- that evening? |
| 25 | A. | There were two firearms on that gun rack, just |

92

CHRM008091

1   pretty much like it is in the picture.

2   Q.   Were you able, Sergeant Colborn, to identify

3        those guns, or at least what kind of guns they

4        were?

5   A.   I know as soon as we walked into the room we

6        noticed the guns right away.  I probably stood

7        right about here and I could see that one of the

8        guns, I believe it's this lower one, was a

9        muzzleloader, and it had a piece of masking tape

10       on the stock that said Steve.

11  Q.   What about the gun on top; is that a long gun as

12       well?

13  A.   It's a .22 caliber rifle.

14  Q.   Now, let me ask you, to the best of your

15       recollection, Sergeant Colborn, were those guns,

16       were those firearms seized from Mr. Avery's

17       bedroom on the 5th of November?

18  A.   I don't think we did take them on the 5th of

19       November, no.

20  Q.   So the jury understands, at that time, that is,

21       that first day, that first night that you guys --

22       you guys meaning the law enforcement -- got

23       there, had Teresa Halbach's body or any of her

24       remains been located?

25  A.   No, sir.

93

CHRM008092

| | | |
|---|---|---|
| 1 | Q. | Did you even know that you were dealing with a |
| 2 | | crime at that time? |
| 3 | A. | I -- Initially, we were still treating this more |
| 4 | | or less as a missing person. |
| 5 | Q. | All right. But you were looking for items that |
| 6 | | had obvious evidentiary value; is that right? |
| 7 | A. | Yes, sir. |
| 8 | Q. | What were some of the other rooms that -- or let |
| 9 | | me just -- let me just make this clear, while in |
| 10 | | that room, while in that bedroom searching, did |
| 11 | | you notice any -- anything on the floor; |
| 12 | | specifically, did you notice any car key on the |
| 13 | | floor? |
| 14 | A. | No, sir. |
| 15 | Q. | In looking at, or on top of, either the desk or |
| 16 | | the bookcase, did you notice any car key or |
| 17 | | something that may have had obvious evidentiary |
| 18 | | value in that regard? |
| 19 | A. | Not really, no. |
| 20 | Q. | Okay. What other rooms were searched that night? |
| 21 | A. | I believe we searched every -- every room in the |
| 22 | | trailer that evening. |
| 23 | Q. | Try to get to a overview here. This has been |
| 24 | | received as Exhibit No. 102, does this appear to |
| 25 | | be an overview of the Avery trailer, again, a |

94

CHRM008093

1      computer generated diagram?

2  A.   Yes, sir.

3  Q.   Lists both bedrooms, the bathroom, living room,

4      dining room and kitchen area; is that right?

5  A.   Yes, sir.

6  Q.   Each of those rooms searched that evening?

7  A.   Yes, sir.

8  Q.   You said you were taking 35mm photography in that

9      trailer; is that correct?

10  A.   Yes, sir.

11  Q.   Were there other photographs also being taken?

12  A.   I believe Detective Remiker had brought a small

13      digital camera in as well and he was taking some

14      digital photos as well.

15  Q.   I show you a photo that's been received as

16      evidence.  This is Exhibit No. 163 and ask if you

17      recognize this particular photo.

18  A.   That's a photograph of the master bedroom area I

19      was just talking about in Steve Avery's trailer.

20  Q.   Is that how it looked on the 5th of November?

21  A.   Yes, sir.

22  Q.   Exhibit No. 175, again, which has been received,

23      could you tell us what this is, if you know.

24  A.   That's in the living room area of that same

25      trailer, the same residence.  And this is like a

95

CHRM008094

```
 1        corner of the living room that was set up as a
 2        computer work area.
 3   Q.   Was that an area that you and your colleagues
 4        searched that evening?
 5   A.   Detective Remiker was the primary officer that
 6        looked at that area, but he did call me over a
 7        couple times to have me take pictures of items
 8        that he had found.
 9   Q.   You can't fit four grown men into that --
10   A.   No, sir.
11   Q.   -- corner; is that right?  After the search was
12        completed, or when the search was wrapping up,
13        could you tell us how that search ended, how that
14        effort ended?
15   A.   The items that we had decided were of evidentiary
16        value that night were placed in Sergeant Tyson's
17        patrol vehicle and he stayed with the evidence.
18        We all went back to the Command Post.  And not
19        exactly sure which Calumet County officer told us
20        what time to be there the next day, but we were
21        instructed to return the next day; myself,
22        Lieutenant Lenk, and Detective Remiker.  And we
23        all left at the same time.
24   Q.   After leaving the residence on the 5th, can you
25        tell the jury where you went, please.
```

96

CHRM008095

1    A.    I would have gone back to the Manitowoc County
2          Sheriff's Department, which is in the city of
3          Manitowoc and to get my personal vehicle, so I
4          could go home.
5    Q.    Do you know about what time you cleared the
6          scene; in other words, about what time you left,
7          if you remember?
8    A.    I'm sorry, I don't.  I know it was late, that's
9          all.
10   Q.    The next day, that is, on the 6th of November,
11         were you asked to come back to the scene?
12   A.    Yes, sir.
13   Q.    And what were you asked to do on the 6th?
14   A.    On the 6th, when I came out there, again, with
15         Detective Remiker and Lieutenant Lenk and I
16         believe just -- this time just Lieutenant Lenk
17         went into the Command Post to make contact with
18         who we would be working with with Cal County that
19         day.
20               And Detective Remiker and I just kind of
21         waited until he came back out.  And we were
22         introduced to Deputy Kucharski.  And then Deputy
23         Kucharski informed us what our assignment would
24         be for that day.
25   Q.    Okay.  Prior to arriving on the scene, once

                              97

CHRM008096

```
 1            again, did you know what your assignment was
 2            going to be?
 3    A.      No, I had no idea.
 4    Q.      Was an evidence collection team formed or
 5            developed that morning, on the 6th?
 6    A.      Yes, sir.
 7    Q.      Do you remember who was involved in that team?
 8    A.      It was myself, Lieutenant Lenk, Detective
 9            Remiker, and Deputy Kucharski, who's a employee
10            of the Calumet County Sheriff's Department.
11    Q.      Once again, was it determined who would be in
12            charge of that group of search individuals?
13    A.      After the first day, we didn't, you know -- I
14            didn't need to be told who was in charge, I knew.
15            But Deputy Kucharski told me that he would be
16            responsible for collecting and maintaining
17            security on any evidence that was located that
18            day.
19    Q.      All right.  What areas, then, of search were you
20            involved with, if any, on the 6th of November?
21    A.      Initially, we started at the garage, at Steve
22            Avery's residence.
23    Q.      Tell me about this garage, please?
24    A.      It's a wooden, frame structure, maybe like a car
25            and a half garage.  Not -- Not attached to the
```

98

```
1          residence.  It had a vehicle parked out in front
2          of it, a black Ford pickup truck.
3     Q.   I show you what's been received in evidence as
4          Exhibit No. 38, can you tell us what we're
5          looking at here, please.
6     A.   That's Steve Avery's residence.  That's his
7          garage.  That's his pickup truck.
8     Q.   All right.  And that garage was searched; is that
9          right?
10    A.   Yes, sir.
11    Q.   Who was that searched by?
12    A.   The aforementioned team; myself, Lieutenant Lenk,
13         Detective Remiker, and Deputy Kucharski.
14    Q.   Do you remember the interior of that garage on
15         the 5th of November?
16    A.   Yes, sir.
17    Q.   Can you briefly describe that for the jury?
18    A.   There was a smaller sport utility vehicle parked
19         in one half of the garage.  It was a Suzuki
20         Samurai.  There was a snowmobile also parked in
21         there, a Skidoo snowmobile.  And there were some
22         other benches and tools that kind of went all the
23         way around the garage.  There wasn't a lot of
24         room in there, with all the other apparatus that
25         was in there.
```

99

CHRM008098

1    Q.    In this case, already, and I think the defense
2          had asked and has been admitted, Exhibit No. 119,
3          ask you to take a look at Exhibit No. 119.  Tell
4          us what we're looking at here.
5    A.    That would be the interior of Steve Avery's
6          garage.
7    Q.    Fair to say there's a lot of stuff in there?
8    A.    Yes, sir.
9    Q.    What kind of search was performed of that garage?
10   A.    Well, the same type of, you know, search that we
11         had performed the night before in his residence.
12         We were looking for anything that would lead us
13         to believe that there was a missing person in
14         there.
15   Q.    Each of the items that we see, and we can even
16         zoom into some of these things, was each and
17         every one of those items removed from the garage
18         and thoroughly searched, or searched under each
19         and every one of these items?
20   A.    No.  No, sir.
21   Q.    Wasn't that kind of search?
22   A.    No.
23   Q.    In a very broad way, that is, in a overview
24         fashion, because we're going to hear from Deputy
25         Kucharski, but in a very broad sense, can you

                            100

CHRM008099

```
 1        tell us the kinds of things that were recovered
 2        or viewed while you were in that garage?
 3   A.   Almost as soon as we stepped in the garage I
 4        noticed, as did everyone else, that there were
 5        several spent shell casings lying on the floor of
 6        the garage.
 7   Q.   What's a shell casing?
 8   A.   It's the brass portion of a bullet.  After the
 9        bullet has been expended or fired, the casing is
10        usually ejected through from the firearm and
11        lands in close proximity to the shooter, usually
12        on the ground.
13   Q.   Let me ask you this, Sergeant Colborn, are you
14        familiar with shell casings for different kinds
15        of, or different calibers of firearms?
16   A.   Yes.
17   Q.   By visual inspection, that is, without picking
18        them up or without even taking a look at those
19        shell casings, were you able to determine what
20        caliber weapon was used to fire those bullets?
21   A.   Yes.
22   Q.   How were you are able to determine that?
23   A.   The shell casings that were laying on the ground
24        were small, for one.  They were brass and they
25        didn't have a center primer.  They had been fired
```

101

CHRM008100

1    on the corner of the bottom of the casing; in
2    other words, the rim of the casing.  And a
3    .22 caliber weapon is one of the only weapons
4    that is a rim fire weapon.  Most weapons have a
5    primer in the center of the bullet.  This does
6    not; it's fired off the rim.
7  Q.  How many, what you believed were .22 caliber
8      shell casings, were readily apparent or viewable
9      to the naked eye as you entered that garage?
10 A.  There were quite a few, 12 maybe, 12 plus.
11 Q.  Do you know for sure?
12 A.  No, sir, I don't.
13 Q.  During the course of that search, were the shell
14     casings that were at least out in plain view
15     seized by Deputy Kucharski?
16 A.  Yes, we photographed them first, where they were
17     lying.  Initially, Deputy Kucharski and I were
18     both doing photographs, but then we thought
19     perhaps that was a bit redundant.  So I just
20     let -- Deputy Kucharski felt more than
21     comfortable taking the photographs so I just
22     stopped taking pictures and assisted with
23     locating.
24 Q.  About how long did the search of this garage
25     take?

102

CHRM008101

| | | |
|---|---|---|
| 1 | A. | One hour, one and a half hours. |
| 2 | Q. | Looking at the stuff, I will call it junk; I |
| 3 | | don't know if I will get an objection about that, |
| 4 | | but probably not. Looking at the junk that we |
| 5 | | see here, in a one hour search, were you able to |
| 6 | | thoroughly search this garage? |
| 7 | A. | No. I mean, if we were looking for something |
| 8 | | minute, you could spend easily an hour just in |
| 9 | | this area right here. |
| 10 | Q. | All right. Were you given other search |
| 11 | | assignments that day? |
| 12 | A. | Yes, sir. |
| 13 | Q. | Can you tell us where you were next assigned to |
| 14 | | search? |
| 15 | A. | I believe the next assignment, I believe, was the |
| 16 | | Ford pickup truck that was parked right in front |
| 17 | | of the garage. |
| 18 | Q. | And that was Steve's black truck that we had seen |
| 19 | | before? |
| 20 | A. | I do have to mention, there were several times, |
| 21 | | and I believe this was one of them, where we |
| 22 | | would be searching a specific area, somebody from |
| 23 | | Cal County would come and say, I need your |
| 24 | | assistance doing this. So we would stop what we |
| 25 | | were doing and assist them with another project |

103

CHRM008102

| | | |
|---|---|---|
| 1 | | and then go back. So I believe before we started |
| 2 | | searching that Ford pickup truck, I was asked to |
| 3 | | photograph some burning barrels and assist in |
| 4 | | loading them up into a covered trailer. |
| 5 | Q. | All right. Did you do that? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Just as long as we have this picture up, first, |
| 8 | | we're going to go back to Exhibit 38; was that |
| 9 | | the truck that you assisted in searching? |
| 10 | A. | Yes. |
| 11 | Q. | Now, you talked about some burn barrels, where |
| 12 | | were these located? |
| 13 | A. | Behind or to the side of Steve's garage. There |
| 14 | | was three or four of them. |
| 15 | Q. | Did you know whose burn barrels those were? |
| 16 | A. | No, I didn't. |
| 17 | Q. | You said that there were others that were |
| 18 | | assisting in the recovery of those; do you know |
| 19 | | who those other individuals were? |
| 20 | A. | I didn't know, you know, everyone's name from the |
| 21 | | Calumet County Sheriff's Department, or the |
| 22 | | Department of Criminal Investigations that was |
| 23 | | working there. I just recognized that some of |
| 24 | | the officers were not at all connected with |
| 25 | | Manitowoc County, but they were uniformed. And I |

104

CHRM008103

| | | |
|---|---|---|
| 1 | | saw Calumet County, you know, Sheriff's |
| 2 | | Department patches on their uniforms, but I do |
| 3 | | not know them by name. |
| 4 | Q. | There were some Manitowoc officers also involved? |
| 5 | A. | Yes. |
| 6 | Q. | Those burn barrels, I think a picture of them has |
| 7 | | been received as Exhibit 52, I'm going to show |
| 8 | | you that picture; do you recognize that? |
| 9 | A. | Yes, I took that picture. |
| 10 | Q. | Who is that we see in the picture? |
| 11 | A. | That's Detective Dave Remiker from the Manitowoc |
| 12 | | Sheriff's Department. |
| 13 | Q. | These are the four burn barrels that you assisted |
| 14 | | in recovering and loading; is that right? |
| 15 | A. | Yes, sir. |
| 16 | Q. | Looks like it's raining here again; is that |
| 17 | | right? |
| 18 | A. | Yes.  I wanted to get a picture to show that we |
| 19 | | were trying our best to protect the contents of |
| 20 | | the barrel; that's the reason that tarp is on |
| 21 | | there. |
| 22 | Q. | After those barrels were loaded, did you proceed |
| 23 | | to complete the search of Steve's black truck? |
| 24 | A. | Yes, sir. |
| 25 | Q. | All right.  After that effort, what did you do |

105

CHRM008104

1    then?

2  A.   Again, this is going to be one of those times

3       that I was pulled away for another project.  We

4       were almost completed with the search of Steve's

5       truck when I was -- again, another Calumet County

6       supervisor told me -- or asked me where the

7       Maribel Caves Park was.  And I said, you know, I

8       described where it was, but not being from

9       Manitowoc County, he didn't really know where it

10      was.  And he said, well, some searchers have

11      found some things at the Maribel Caves Park, can

12      you go out there; see what they have, if you

13      think it's evidence, pick it up.  So myself and

14      Detective Remiker went out to Maribel Caves Park

15      where we made contact with a civilian search

16      party.  And they showed us some things that they

17      had found and we ended up bagging them up and

18      turning them over to the Calumet County Sheriff's

19      Department.

20 Q.   What did do you then?

21 A.   When I got back, then, I believe, the search of

22      Steve's truck, I think, had been completed then.

23      You know, in my absence, Deputy Kucharski had

24      completed the search and then I would have to

25      take a look at his report to see what our next

106

CHRM008105

| | | |
|---|---|---|
| 1 | | assignment was. I believe we were sent to Chuck |
| 2 | | Avery's residence -- no, either Chuck's or |
| 3 | | Steve's sister. And I'm not positive which one |
| 4 | | was next. |
| 5 | Q. | Who's Steve's sister? |
| 6 | A. | Her first name is Barb. I believe at that time |
| 7 | | her last name was Janda. |
| 8 | Q. | All right. Did you assist in the search of Barb |
| 9 | | Janda's trailer? |
| 10 | A. | Yes. |
| 11 | Q. | And we're going to hear from Detective Remiker |
| 12 | | later, but do you recall being present when a |
| 13 | | telephone answering machine was located. |
| 14 | A. | Yes. |
| 15 | Q. | This has been received as Exhibit No. 55, can you |
| 16 | | tell us what we're looking at, please. |
| 17 | A. | I believe that's the answering machine that was |
| 18 | | in Barb Janda's residence. |
| 19 | Q. | Who else was present when this answering machine |
| 20 | | was investigated or searched? |
| 21 | A. | It was the same search team that had gone into |
| 22 | | Steve Avery's garage; Lieutenant Lenk, myself, |
| 23 | | Detective Remiker, and Deputy Kucharski. |
| 24 | Q. | Were the messages on this machine examined? |
| 25 | A. | When we -- When we found the answering machine, I |

CHRM008106

```
 1        saw that there were messages on there.  I said,
 2        let's unplug it and take the answering machine.
 3        And, of course, the conversation between all of
 4        us, we said, well, what if somehow in the
 5        unplugging process we lose the messages.  So,
 6        yes, we hit the play button and listened to the
 7        messages and Detective Remiker recorded the
 8        messages as they were being played.
 9   Q.   Did you have occasion that day to reenter Steven
10        Avery's trailer?
11   A.   I believe that was the day that I was asked to --
12        our whole team was asked to go back into Steve's
13        trailer and obtain serial number -- I think that
14        was the day -- that we were asked to obtain a
15        serial number off Steve's computer, the tower
16        portion of his computer.
17   Q.   Are you sure about that, or are you guessing?
18   A.   I'm not positive if that was the day or not.  I
19        know that was one of the assignments that I
20        completed.  I thought it was that day, but I'm
21        not positive.  I do know, also, that that day we
22        had to go back into Steve Avery's trailer and
23        collect his weapons.
24   Q.   Can you, again, describe those weapons.
25   A.   He had a, like a two place or gun rack over his
```

108

CHRM008107

|     |     |                                                              |
| --- | --- | ------------------------------------------------------------ |
| 1   |     | bed.  There were two weapons on the gun rack; one            |
| 2   |     | was a .22 caliber rifle, and the other was a --              |
| 3   |     | if I remember correctly -- was a .50 caliber                 |
| 4   |     | muzzleloader.                                                |
| 5   | Q.  | We're going to have these marked, actually.                  |
| 6   |     | ATTORNEY KRATZ:  Mr. Fallon, if you could                    |
| 7   |     | have them marked.                                            |
| 8   |     | ATTORNEY FALLON:  They're marked.                            |
| 9   |     | ATTORNEY KRATZ:  Oh, I'm sorry.                              |
| 10  | Q.  | (By Attorney Kratz)~ Do you see a picture of the             |
| 11  |     | .22 caliber rifle?                                           |
| 12  | A.  | Yes, sir.                                                    |
| 13  | Q.  | And what exhibit number is that?                             |
| 14  | A.  | It is Exhibit 164.                                           |
| 15  | Q.  | See if I can find that here.  Do you recognize               |
| 16  |     | Exhibit No. 164?                                             |
| 17  | A.  | Yes, it's a .22 caliber rifle that we located in             |
| 18  |     | Steve Avery's bedroom.                                       |
| 19  | Q.  | I have put up a photograph of Exhibit No. 164;               |
| 20  |     | again, does that .22 caliber rifle look the same             |
| 21  |     | or similar as it did when it was seized on the               |
| 22  |     | 6th of November?                                             |
| 23  | A.  | Yes, sir.                                                    |
| 24  | Q.  | Did you, by the way, that day, on the 6th, have              |
| 25  |     | occasion to, at all, inspect or further inspect,            |

109

CHRM008108

1       that rifle?

2  A.   When we collected the rifle, in order to manage

3       an evidence room, we first needed to make sure

4       that the weapon wasn't loaded. So I did pull the

5       action back to see if it was going to eject a

6       round. And I believe I pulled the tube out,

7       which is under the barrel there.

8  Q.   Why don't you show you us with the laser pointer.

9  A.   That portion of the weapon is the magazine. To

10      load it, you pull a tube out, I believe, an

11      insert rounds through that notch right there.

12          This is the action of the magazine; it's

13      a semi-automatic weapon. So I pulled this action

14      back to see if there was a round inside the

15      barrel. And I believe the safety is right there

16      on the weapon and I would have checked to make

17      sure that the safety was on, because if someone

18      handling the weapon, obviously, if it was loaded

19      with the safety off, it could fire.

20  Q.   Sure. Are you familiar with a semi-automatic

21      rifle such as Exhibit No. 164?

22  A.   Yes, sir.

23  Q.   Now, a tube loaded or a tube fed magazine, for

24      those on the jury that aren't gun enthusiasts,

25      can you tell us just -- just generally how that

110

CHRM008109

1       works?

2   A.  This portion of the weapon right here is where

3       it's loaded.  At the very end here, you can twist

4       a knob and you pull out like a plastic plunger

5       and you load -- you would have to turn the weapon

6       almost upside down.  But if you can see that,

7       there's a little notch there, that's where you

8       put the rounds in and then you just slide this

9       tube back in until it locks.

10          And if it doesn't lock, you put too many

11      rounds in.  You have to get it so that that

12      locks.  As you fire the weapon, there's a spring

13      on there and it just keeps pushing the rounds

14      back to the chamber.

15  Q.  After a .22, you mentioned a rim fire bullets,

16      but after the shell casings are ejected, where do

17      they come out of?

18  A.  Out of that area right there, that silver area.

19  Q.  And with a semi-automatic weapon, do you have to

20      reload it, or cock it, or do anything that any --

21      any action like that that we might hear with

22      other weapons?

23  A.  No, sir.  A semi-automatic weapon will continue

24      to fire as fast as you can pull the trigger.  You

25      must release the trigger to its sear each time,

111

CHRM008110

```
 1        but it will continue to fire as fast as you can
 2        pull the trigger, until all the shells are
 3        expended.
 4   Q.   By the way, Sergeant Colborn, I don't know if you
 5        know this, but do you know what kind of weapon
 6        this is; what brand name weapon?
 7   A.   I know when we catalogued the weapon, when we
 8        took it, and when Deputy Kucharski took it in as
 9        evidence, I read the manufacturer name to him,
10        but I don't recall who manufactured that weapon.
11   Q.   That's fine.  Thank you.  You said there was a
12        second weapon that was seized; is that right?
13   A.   Yes, sir.  You gave me a photograph that's marked
14        Exhibit 165.
15   Q.   Why don't you tell us what that is?
16   A.   That's a muzzleloading weapon, similar to like a
17        musket from the Revolutionary War or frontier
18        period.  It's called muzzleloading because that's
19        where you load it, through the muzzle.
20   Q.   Where were these items seized from?
21   A.   Steve Avery's bedroom, on a gun rack that was
22        hanging above his bed.
23   Q.   Is there anything else that was seized from
24        Mr. Avery's trailer that day, that is, on the 6th
25        of November, that you can recall?
```

112

CHRM008111

```
1   A.   Not that I recall, no, sir.

2   Q.   Any other buildings that you were asked to search

3        that day?

4   A.   Not that I specifically recall, no.

5   Q.   All right.

6             ATTORNEY KRATZ:  Judge, before going into

7        the next day's search for the 7th, this might be a

8        good time for a lunch break.

9             THE COURT:  All right.  The Court agrees.

10       Members of the jury, we're going to take our lunch

11       break at this time.  Again, do not discuss the case

12       in any fashion and during the break and we'll resume

13       at 1:00.

14             (Jury not present.)

15             THE COURT:  You may be seated.  Go off the

16       record at this time.

17             (Off the record discussion.)

18             THE COURT:  At this time we'll go back on

19       the record.  Mr. Kratz.

20             ATTORNEY KRATZ:  Judge, before we break for

21       lunch, Mr. Strang was kind enough to alert me that

22       this witness may be cross-examined with the

23       assistance of a audio CD.  Mr. Strang gave me a CD

24       that has 24 tracks on it.  I don't know if he

25       intends to play all 24 tracks in the
```

113

CHRM008112

1    cross-examination, but it would certainly assist us
2    in orienting as to the time and the context of those
3    conversations, if those could be identified.  If
4    they can't, that's fine, but if the tracks
5    themselves, rather than listen to all 24 during the
6    lunch hour, could be identified, we would appreciate
7    that.

8            THE COURT:  Mr. Strang.

9            ATTORNEY STRANG:  Well, I provided the CD
10   out of an abundance of caution.  I think these --
11   these taped calls are all calls that the State, like
12   the defense, received during the hearing on
13   August 9, 2006, from the Manitowoc County Sheriff's
14   Department.  We should probably excuse the witness.

15           THE COURT:  I was just thinking about that
16   myself.  Mr. Colborn, if you can step out of the
17   courtroom for a minute, we'll continue here.  The
18   witness has now left the courtroom.

19           ATTORNEY STRANG:  Right.  As I say, I'm
20   quite confident that when we received the CD's from
21   the Manitowoc County Sheriff's Department on
22   August 9, 2006, the State also received the very
23   same recorded calls, both radio transmissions and
24   some land lines at the sheriff's department that are
25   answered by dispatchers.  Out of an abundance of

114

CHRM008113

```
  1        caution, I gave Mr. Kratz another copy of the disc
  2        I'm going to mark today.  But I'm not interested in
  3        disclosing my cross-examination over the lunch hour
  4        while, you know, the State is free to prepare
  5        including with the witness.
  6                  THE COURT:  All right.  If it's information
  7        that the parties already have, I don't know what's
  8        going to come in but, Mr. Kratz, if you need a break
  9        before redirect, I will take up a request at that
 10        time.
 11                  ATTORNEY KRATZ:  That's fine and counsel
 12        may hear the very same response later in the trial.
 13        That's fine.  Thank you, Judge.
 14                  THE COURT:  Okay.
 15                     (Noon recess taken.)
 16                  THE COURT:  Mr. Kratz, at this time you may
 17        resume your direct examination of Mr. Colborn.
 18                  ATTORNEY KRATZ:  Thank you, Judge.
 19                        **DIRECT EXAMINATION**
 20     BY ATTORNEY KRATZ:
 21     Q.   Sergeant Colborn, we left off with the next day,
 22          I believe, of your involvement with the -- on
 23          Monday, the 7th of November; do you remember that
 24          day?
 25     A.   Yes, sir.

                             115
```

```
1   Q.   Were you asked to return to the Avery property?

2   A.   Yes, I was.

3   Q.   And, by the way, who were you asked to return

4        there by?

5   A.   The Calumet County Sheriff's Office, or

6        Department of Criminal Investigation, one of

7        those officers.

8   Q.   If you could speak up just a little bit,

9        Sergeant, I would appreciate it.

10  A.   I was either asked to return by the Calumet

11       County Sheriff's Department, one of their

12       supervisors, or by the Department of

13       Corrections -- or Department of Criminal

14       Investigations, Agent Tom Fassbender.

15  Q.   Were you, for lack of a better word, volunteering

16       for this service, or these duties?

17  A.   No.

18  Q.   On the 7th of November, then, do you recall about

19       what time you returned to the salvage yard?

20  A.   Somewhere between 6:30 in the morning and 7:30 in

21       the morning, I believe.

22  Q.   Sergeant Colborn, what were you asked to do on

23       the 7th, if you recall?

24  A.   On the -- On Monday, I was informed that -- by

25       Sergeant Tice that I -- Tyson, that I would be
```

116

| | |
|---|---|
| 1 | working with him, again. This would be the same |
| 2 | Sergeant Tyson that I had worked with on |
| 3 | Saturday. |
| 4 | And he informed us that our assignment |
| 5 | that day was to go into the Avery Salvage Yard |
| 6 | and open any trunks of vehicles that had not yet |
| 7 | been searched, because the trunks, apparently, |
| 8 | they couldn't find the keys for these vehicles |
| 9 | and we were to look inside the trunks of these |
| 10 | vehicles. |
| 11 | Q. Were there any other members of your team, other |
| 12 | than you and Sergeant Tyson? |
| 13 | A. Also Lieutenant Lenk was with me that day. |
| 14 | Q. And did you, in fact, assist in opening up or |
| 15 | searching trunks that hadn't yet been opened? |
| 16 | A. Yes, I did. |
| 17 | Q. What else happened on the 7th? |
| 18 | A. That took the better part of the morning. I |
| 19 | believe in the afternoon we were instructed to |
| 20 | start collecting -- you know, specifically |
| 21 | instructed to collect -- I take that back. At |
| 22 | some point we were also asked to get a -- I |
| 23 | believe this was the day that we were asked to |
| 24 | get the serial number off Steven Avery's |
| 25 | computer. |

117

CHRM008116

1  Q.  Did you assist Sergeant Tyson in that regard?

2  A.  Yes, I did.

3  Q.  Can you tell the jury what you did, please.

4  A.  The serial number is on the back of the computer.

5      And the portion of the computer that we needed

6      the serial number was underneath a desk that had

7      been shown earlier, the photograph that was shown

8      earlier.  So I crawled underneath the desk and

9      used a flashlight to obtain the manufacturer and

10     the serial number of the computer, which Sergeant

11     Tyson wrote down.

12 Q.  All right.  How long did that process take?

13 A.  At the most, 10 minutes.

14 Q.  Did you go in any other part of the residence, or

15     did you confine yourself to the living room area?

16 A.  I just confined myself to the area where the

17     computer was that day.

18 Q.  What else did you do then?

19 A.  I believe then we were instructed to -- I believe

20     we were instructed, then, to start collecting

21     some firearms from the other residences that were

22     on the Avery property.  I believe, specifically,

23     Barb Janda's residence.

24 Q.  And did you do that?

25 A.  Yes, sir.

118

CHRM008117

```
 1   Q.   All right.  What's the next thing you did on the
 2        7th?
 3   A.   I know at one point I was asked to take some
 4        photographs, I believe, of a burning barrel that
 5        was on Steve Avery's property.  I did do that.
 6   Q.   Which -- Which burn barrel did you take
 7        photographs of?
 8   A.   It was a burn barrel that was on, I would -- that
 9        was in close proximity to Steve's trailer.  And I
10        remember it had a car wheel by it.
11   Q.   To orient us to that, there's an exhibit which
12        has been received, it's Exhibit 114.  It's,
13        again, an exterior computer animation.  If you
14        take your laser pointer up there, tell us what
15        we're looking at, and what burn barrel you were
16        asked to examine and photograph?
17   A.   That burn barrel right there.  I remember right
18        on one -- either this side or this side of it
19        there was a car wheel standing on its edge with a
20        tire missing.
21   Q.   Did it appear to you, at least as you went to
22        that scene and as you look at Exhibit 114, who
23        that burn barrel is attached to?
24   A.   Yes, it's the burn barrel for that residence,
25        right there, Steve Avery's residence.
```

119

CHRM008118

```
 1   Q.   Now, Sergeant, you talked about some different

 2        kinds of photography.  I think you talked about

 3        digital as well as 35mm photography; do you

 4        remember that day, the 7th of November, what kind

 5        of photography you were performing?

 6   A.   35mm, I did not do any digital photography the

 7        entire time I was out there, personally.

 8   Q.   That way you talked about a wheel next to the

 9        burn barrel, I'm going to show you what's been

10        marked as Exhibit No. 158, in fact, Mr. Fallon is

11        going to hand it to you, but I would ask you if

12        you could tell us what this is an image of.

13   A.   That is a car wheel, that's at the very edge of

14        Steve Avery's burn barrel.  And those wires, I

15        believe, that are around the wheel are actually

16        part of the make up of the tire, probably like

17        portions of the steel belt.

18   Q.   As we get closer, do a little bit of a close up,

19        can you see that better now on the screen?

20   A.   Yes, sir.

21   Q.   By the way, Exhibit 158, is that a photo that you

22        took or likely took?

23   A.   Yes, sir.

24             ATTORNEY KRATZ:  In all honesty, Judge, so

25        that I don't forget, I'm going to move the admission
```

CHRM008119

|     |    | of Exhibit 158 at this time.                       |
| --- | -- | -------------------------------------------------- |
| 1   |    | of Exhibit 158 at this time.                       |
| 2   |    | THE COURT:  Any objection?                         |
| 3   |    | ATTORNEY STRANG:  None.                            |
| 4   |    | THE COURT:  158 is received.                       |
| 5   | Q. | (By Attorney Kratz)~ Were you asked to do          |
| 6   |    | anything else on the 7th, Sergeant?                |
| 7   | A. | I believe I was also -- At some point, apparently  |
| 8   |    | the Command Post received word that some           |
| 9   |    | searchers had located an area that -- it looked    |
| 10  |    | suspicious, there was plastic poking up from the   |
| 11  |    | ground and it looked like the ground had been      |
| 12  |    | disturbed.  So I was asked to go to that area      |
| 13  |    | along with the Wisconsin State Crime Lab,          |
| 14  |    | Sergeant Tyson, and Lieutenant Lenk and help the   |
| 15  |    | Crime Lab, if they requested it, to excavate that  |
| 16  |    | area.                                              |
| 17  | Q. | Do you know on what roadway this was?              |
| 18  | A. | I believe it was off Kuss, White Cedar Road.       |
| 19  | Q. | This is something that Mr. Ertl, yesterday,        |
| 20  |    | talked about a potential burial site but what      |
| 21  |    | wasn't; was that your understanding, that it       |
| 22  |    | turned out not to be?                              |
| 23  | A. | Yes, it turned out to be nothing.                  |
| 24  | Q. | Did you do anything else on the 7th.               |
| 25  | A. | I think by the time we were down with that, that   |

121

| 1 | | consumed the rest of the day. |
| 2 | Q. | Let's move on then to the 8th, which would be |
| 3 | | Tuesday, the 8th of November, were you asked to |
| 4 | | return to the property? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Again, who were you asked to return there by? |
| 7 | A. | By -- No, I didn't get the -- the -- wasn't told |
| 8 | | to me directly. Usually Lieutenant Lenk met with |
| 9 | | members of the Calumet County Sheriff's |
| 10 | | Department and Department of Criminal |
| 11 | | Investigations at the completion of each day and |
| 12 | | then I would just check with Lieutenant Lenk, are |
| 13 | | we needed tomorrow or no. |
| 14 | Q. | I see. |
| 15 | A. | And then he said, we're needed tomorrow. |
| 16 | Q. | Did you show up then on the 8th? |
| 17 | A. | Yes, sir. |
| 18 | Q. | And who were you attached to, or who were you |
| 19 | | assigned to that day? |
| 20 | A. | I was assigned to Deputy Dan Kucharski from the |
| 21 | | Calumet County Sheriff's Department. |
| 22 | Q. | Do you know what you were asked to do on the 8th? |
| 23 | A. | Yes, Deputy Kucharski, Lieutenant Lenk, and |
| 24 | | myself were instructed, by Special Agent |
| 25 | | Fassbender, to look for some specific printed |

122

CHRM008121

| | | |
|---|---|---|
| 1 | | material inside Steven Avery's residence. |
| 2 | Q. | Okay. |
| 3 | A. | And to collect same. |
| 4 | Q. | Did you have occasion to enter Steven Avery's |
| 5 | | bedroom on the 8th of November? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Who did you enter that bedroom with. |
| 8 | A. | Deputy Kucharski and Lieutenant Lenk. |
| 9 | Q. | How long did you spend in that bedroom on the |
| 10 | | 8th, if you recall? |
| 11 | A. | An hour or so. |
| 12 | Q. | Were you directed to perform any search of that |
| 13 | | trailer, specifically of that bedroom? |
| 14 | A. | Before -- Actually, before we started on the |
| 15 | | bedroom, I was instructed to, with Deputy |
| 16 | | Kucharski, to remove the computer and to wait |
| 17 | | until the computer was picked up by another law |
| 18 | | enforcement officer. |
| 19 | Q. | Okay. Did you do that? |
| 20 | A. | Yes, sir. |
| 21 | Q. | Then, moving to the bedroom, my question is, |
| 22 | | whether you were to perform a search that day? |
| 23 | A. | Yes, sir. |
| 24 | Q. | I'm showing you what's been marked for |
| 25 | | identification as Exhibit No. 208; can you tell |

123

CHRM008122

| | |
|---|---|
| 1 | us what that is, please. |
| 2 | A. These are photographs of a cabinet that's right |
| 3 | next to the desk in Steve Avery's bedroom, that |
| 4 | would be the same bedroom where the firearms were |
| 5 | that I described before and -- |
| 6 | Q. We're just talking about the first one now, |
| 7 | Exhibit 208. |
| 8 | A. That's this photograph here. It's a picture |
| 9 | of -- this is a desk. |
| 10 | Q. I'm actually going to put a view up for the jury |
| 11 | so that we can -- Okay. If you want to use your |
| 12 | laser pointer where everybody can see what you |
| 13 | are talking about then. |
| 14 | A. This is a desk. There's an open area, that's the |
| 15 | picture. This is a cabinet, you can see how |
| 16 | closely it is positioned to the desk there. |
| 17 | Q. Let me just stop you, is this something that you |
| 18 | earlier called a bookcase. |
| 19 | A. This cabinet, I'm sorry, yes, I called it a |
| 20 | bookcase and that's actually, I guess, what it |
| 21 | is, a bookcase. |
| 22 | Q. Just so that the jury understands, was this the |
| 23 | item from which the handcuffs and the leg irons |
| 24 | were seized a couple days earlier? |
| 25 | A. Yes, sir. It's easier to see now, with this |

124

CHRM008123

```
 1          picture, the leg irons and handcuffs were located
 2          in this area here.
 3    Q.    Now, this particular photograph, you can see a
 4          pair of slippers, bedroom slippers next to it; is
 5          that right?
 6    A.    Yes, sir.
 7    Q.    You can see a electrical outlet or a socket; is
 8          that right?
 9    A.    Yes, sir.
10    Q.    Can you point to that, please.  Were you asked,
11          or at least as part of your responsibilities of
12          searching the bedroom, were you asked to do a
13          thorough search of this piece of furniture?
14    A.    Yes.
15    Q.    And did you do that?
16    A.    Yes.
17    Q.    In performing that search, Sergeant Colborn, did
18          you move or manipulate this piece of furniture at
19          all?
20    A.    Yes, sir.
21    Q.    Can you describe that for the jury, please.
22    A.    As I stated before, we were looking for specific
23          printed or photographs.  There is a narrow area
24          between this bookcase and this desk, right there.
25          And in order to make sure that there was no
```

125

CHRM008124

```
 1        evidence or anything else that we needed lodged
 2        between there, I actually tipped this to the side
 3        and twisted it away from the wall.
 4   Q.   If you can describe that further, I don't know if
 5        you can do it with your words, or show us with
 6        your hands, how you did it?
 7   A.   I will be the first to admit, I wasn't any too
 8        gentle, as we were, you know, getting
 9        exasperated.  I handled it rather roughly,
10        twisting it, shaking it, pulling it.
11   Q.   And that's the bookcase that you are talking
12        about?
13   A.   Yes, this piece of furniture right here, a
14        bookcase.
15   Q.   I'm sorry.  Sergeant, in shaking and twisting
16        that particular bookcase, did you pull it away
17        from the wall itself, that you can see behind
18        there?
19   A.   Yes, I did.
20   Q.   After that process was complete, were the
21        items -- The binder that we can see in the lower
22        left hand corner of the bookcase; can you point
23        to that, please.  Was that, and the other items
24        within that bookcase, removed and examined by
25        yourself and your -- other members of your team?
```

126

CHRM008125

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Did you have occasion to replace those items into |
| 3 | | that bookcase after having pulled it from the |
| 4 | | wall? |
| 5 | A. | Yes, sir. |
| 6 | Q. | What was done with the bookcase after that |
| 7 | | thorough search of the -- of those materials was |
| 8 | | completed? |
| 9 | A. | The items that we didn't use -- or collect as |
| 10 | | evidence, that binder and some of the other |
| 11 | | things there were kind of stuffed, rather |
| 12 | | forcefully, back in there.  And other items that |
| 13 | | we were going to collect as evidence were -- we |
| 14 | | had so many that we didn't have a container in |
| 15 | | the room large enough to hold them all.  So |
| 16 | | Lieutenant Lenk exited the bedroom to get a |
| 17 | | larger container and I began to search this desk |
| 18 | | here. |
| 19 | Q. | By a larger container, what are you talking |
| 20 | | about? |
| 21 | A. | A box. |
| 22 | Q. | Now, at this time, that is, as the search was |
| 23 | | completed, what was done with that piece of |
| 24 | | furniture; what was done with the bookcase |
| 25 | | itself? |

127

CHRM008126

| | | |
|---|---|---|
| 1 | A. | It was still kind of away from the wall, but it |
| 2 | | was more or less stuffed back into its original |
| 3 | | position. |
| 4 | Q. | The next exhibit, Exhibit No. 209, describe what |
| 5 | | that is, please. |
| 6 | A. | That's just a different photograph of the same |
| 7 | | bookcase. |
| 8 | Q. | I'm going to allow the jury to see that as well. |
| 9 | | Is this the photo that you are talking about |
| 10 | | of -- of the bookcase? |
| 11 | A. | Yes, sir. |
| 12 | Q. | The next exhibit, No. 210, can you describe what |
| 13 | | that is for us, please. |
| 14 | A. | 210 is a picture, a photograph of the -- Well, |
| 15 | | you can see that we have some materials there |
| 16 | | stuffed in a bag. Then there's the bedroom |
| 17 | | slippers. And now there is a key with a fob, |
| 18 | | lying between the bedroom slippers. |
| 19 | Q. | Sergeant Colborn, I'm going to direct your |
| 20 | | attention, then, to the large screen. I would |
| 21 | | like you to carefully take the laser pointer and |
| 22 | | describe for the jury what it is that we're |
| 23 | | looking at? |
| 24 | A. | These were some items that we had bagged up. I |
| 25 | | don't recall what that is. These were the same |

128

CHRM008127

1    bedroom slippers that were in the other

2    photograph, but you can see that they have been

3    jostled. That's the electrical outlet. And now

4    there is a key and with this connecting canvas or

5    nylon fob and a black plastic buckle, lying on

6    the floor.

7  Q.  The piece of furniture, that is, the bookcase

8      that we see in Exhibit 210, has that been removed

9      or replaced to its original position?

10 A.  I can't say we have got it exactly 100 percent

11     where it was, but it's very close to its original

12     position, yes.

13 Q.  So the jury understands the timing of these,

14     Exhibit No. 208 shows the slippers right next to

15     the outlet. And this exhibit, 210, shows the

16     slippers pushed to what would be the left and

17     actually a little bit closer to the photographer;

18     is that fair?

19 A.  That's correct.

20 Q.  Do you recognize this image, that is, did you see

21     this image on the 8th of November?

22 A.  Yes.

23 Q.  Can you describe that moment, or that event, for

24     the jury, please.

25 A.  As I had mentioned earlier, Lieutenant Lenk had

                        129

CHRM008128

1    exited -- That is the door coming into the

2    bedroom; he had gone through that door to get a

3    bigger container.  I was searching the desk here.

4    Deputy Kucharski was sitting on the bed, which

5    also isn't in the photograph, but is in very

6    close proximity to this piece of furniture, the

7    bookcase, filling out paperwork.

8            Lieutenant Lenk got about right here,

9    his feet would have been right here, so he was in

10   the room, and said something to the effect of,

11   there's a key on the floor here, or, look,

12   there's a key.  I don't know what his exact

13   verbiage was but he identified that there was a

14   key on the floor.

15           I turned around, as I wasn't very far

16   away, I turned around and looked and I observed

17   this key, lying right where it is.  And I

18   observed this key had this black rubberized or

19   plastic end on it, which they didn't -- you know,

20   that's a newer model car key, due to that plastic

21   or rubberized end.  And I also observed that

22   embossed on there was a Toyota emblem.

23           And we told Deputy Kucharski, get a

24   photograph of this, right away, which he did,

25   which is this photograph.  I did not take this

                    130

1          photograph.

2     Q.   By the way, as you and Deputy Kucharski and

3          Lieutenant Lenk observed this, did any of the

4          three of you approach or touch this piece of

5          evidence at that time?

6     A.   I may have been standing in this area here, you

7          know. This piece of furniture is only 2 and a

8          half, 3 feet tall, maybe. So I could easily see

9          over it to see the key.

10              I did not approach the key. Lieutenant

11         Lenk did not come into the room. Deputy

12         Kucharski photographed the key from, you know,

13         from whatever angle this picture was taken at.

14         That's as close as we got.

15    Q.   My question, again, was, did either yourself,

16         Lieutenant Lenk, or Deputy Kucharski, prior to

17         this photo was taken, touch that key?

18    A.   No, sir.

19    Q.   Why not?

20    A.   I think all three of us knew at the same time

21         that there was a very good chance, seeing a

22         Toyota emblem embossed on that key, knowing that

23         Teresa Halbach's vehicle was a Toyota, that this

24         was a very important piece of evidence. And, you

25         know, none of us were going to taint that.

                            131

CHRM008130

```
 1   Q.   Let me ask you, Sergeant Colborn, you guys -- you
 2        specifically, Lieutenant Lenk, and now Deputy
 3        Kucharski, had been in this room for quite some
 4        time before this key appears in this position;
 5        isn't that right?
 6   A.   Yes, sir.
 7   Q.   Did this surprise you, that you saw this key
 8        there?
 9   A.   Yes, I was very surprised.
10   Q.   Did the three of you talk about that, we hadn't
11        seen it before, anything like that?
12   A.   I -- I believe I said to myself, damn, how did I
13        miss that.
14   Q.   Now, other than the bedroom slippers being pushed
15        to the side, had anything else changed, other
16        than the pulling out and the twisting and the
17        jostling of the cabinet?
18   A.   As we looked at the cabinet, it appeared that in
19        the process of us stuffing everything back into
20        the cabinet, we had separated the back of the
21        cabinet, the small piece of paneling that would
22        be the back of the cabinet, from the frame of the
23        cabinet itself.
24   Q.   Let me stop you there.  Did you have occasion,
25        then, to go look at the back of this piece of
```

132

1   furniture, the back of the cabinet, after this

2   key was processed?

3   A.   Yes.

4   Q.   I know I'm jumping ahead just a little bit, but

5        could you describe what you saw; could you

6        describe the back panel of the cabinet?

7   A.   It would be made out of a -- I'm trying to think

8        of the right word, like a piece of wood, the same

9        thickness maybe as a piece of paneling that one

10       would put on a wall.  You know, it's a thin piece

11       of wood, it's not -- it's not like it's a quarter

12       inch piece of plywood nailed to the back of the

13       cabinet.  It's a thin piece of wood.

14            The piece of furniture itself is old and

15       not in the best state of repair.  And I believe

16       it was just very small, short brads or nails that

17       held the piece of paneling or the piece of wood

18       to the back of the cabinet.  And I'm sure that

19       when we were putting things in we exercised more

20       than enough force to push it away.  And there was

21       a gap now between the back of the -- the piece of

22       paneling on the back of the cabinet and the frame

23       of the cabinet itself.

24   Q.   I'm going to show you an exhibit that's been

25       received as Exhibit No. 169; although taken on a

                           133

CHRM008132

1    different day, we're all in agreement about that,

2    does Exhibit 169 look the same as when you

3    witnessed the back of this cabinet on the 8th of

4    November?

5    A.  Yes, sir.

6    Q.  What was done with the key, if you remember?

7    A.  Initially, it was photographed and Lieutenant

8        Lenk and I both -- when I say told, it was not

9        like we were ordering him, but we just

10       communicated to Deputy Kucharski that he needed

11       to make sure he put on a fresh set of gloves;

12       pick up that key, put it in a separate container,

13       totally by itself; and we needed to contact the

14       Command Post right away and let them know that we

15       had located a key that could possibly be a key to

16       Teresa's vehicle.

17   Q.  Did somebody from the Command Post come to your

18       location then?

19   A.  Two people from the Command Post came to our

20       location.  Special Agent Fassbender and

21       Investigator Wiegert.

22   Q.  Were you present when the lead investigators were

23       shown this key that was discovered?

24   A.  Yes.  We packaged the key and we went into the

25       living room and that's where we remained until

134

CHRM008133

```
 1              the two investigators came and looked at the key.
 2                   ATTORNEY KRATZ:  What exhibit number is
 3              next, Madam Clerk?
 4                   THE CLERK:  211.
 5    Q.   (By Attorney Kratz)~ Sergeant Colborn --
 6                   ATTORNEY KRATZ:  And, Judge, the record
 7              should reflect that the evidence bag is being opened
 8              with the assistance of Investigator Wiegert.
 9    Q.   (By Attorney Kratz)~ But Sergeant Colborn, you
10              are going to be shown the contents of what is
11              being marked as Exhibit No. 211.
12              (Exhibit No. 211 marked for identification.)
13                   ATTORNEY KRATZ:  Deputy Wiegert, if you
14              would be so kind as to show it to this witness.
15    Q.   (By Attorney Kratz)~ Sergeant Colborn, please
16              don't -- don't touch this exhibit.  But an
17              exhibit that has now been marked for
18              identification as Exhibit 211 is being shown to
19              you.
20                   ATTORNEY KRATZ:  If you stand to the side a
21              little bit, Investigator Wiegert, I would appreciate
22              it.
23    Q.   (By Attorney Kratz)~ Tell the jury what that is,
24              please.
25    A.   That appears to be the exact same key as pictured
```

135

CHRM008134

1    right there on that photograph. It's a long key,

2    with a black plastic end, with a Toyota emblem on

3    the end of it. And that same nylon, actually, I

4    think corresponds to something that someone would

5    wear around their neck and clip to the other

6    plastic end.

7        ATTORNEY KRATZ: With permission, Judge,

8    may Investigator Wiegert post it or at least show

9    the jurors?

10       THE COURT: Any objection?

11       ATTORNEY STRANG: Nope.

12       THE COURT: Yes, you may do so.

13       ATTORNEY KRATZ: Hold it up by one end,

14   Investigator, and show the jurors, please.

15       THE COURT: The record should probably also

16   reflect he's wearing rubber gloves at this time, or

17   unless you can describe them more accurately.

18       ATTORNEY KRATZ: Latex gloves. And

19   although Mr. Kucharski will be testifying as well,

20   Judge, I don't believe there is any contest as to --

21   as to this exhibit and I will move its admission at

22   this time.

23       THE COURT: Any objection?

24       ATTORNEY STRANG: Well, there's plenty of

25   contest as to that exhibit, but not as to it having

136

CHRM008135

```
1    been authenticated and identified.  And I don't have

2    any objection to it being received.

3              ATTORNEY KRATZ:  Thank you.

4              THE COURT:  All right.  The exhibit will be

5    received.

6              ATTORNEY KRATZ:  Thank you.

7    Q.   (By Attorney Kratz)~ After Special Agent

8         Fassbender and Investigator Wiegert were shown

9         that key, do you know what happened to that key?

10   A.   Just -- excuse me, we decided, between the three

11        of us, just to wait in the living room.  Special

12        Agent Fassbender and Investigator Wiegert said

13        that another law enforcement officer would be

14        coming down to take possession of the key.

15             So we all three just waited until he got

16        there.  We turned the key over and I believe we

17        were told that it would be going to Madison, to

18        the Crime Lab, where Teresa's vehicle already

19        was.

20   Q.   Sergeant Colborn, after this search, after this

21        thorough search of Mr. Avery's residence was

22        completed, were you asked to perform a similar

23        thorough search of somebody else's residence that

24        day?

25   A.   Yes, I believe it was Charles Avery's residence.
```

137

CHRM008136

```
 1   Q.   And was that search performed by the same team;
 2        that is, yourself, Lieutenant Lenk and Deputy
 3        Kucharski from Calumet County?
 4   A.   Yes, sir.
 5   Q.   Sergeant Colborn, we have heard some references
 6        this week, and even last, to your involvement in
 7        this case.  And now that you are here, now that
 8        you are in court, I have some questions regarding
 9        your knowledge of Mr. Avery.
10             First of all, prior to November of 2005,
11        had you been involved at all in the
12        investigation, testifying against, or prosecution
13        of Steven Avery in any previous criminal
14        proceedings?
15   A.   No, sir.
16   Q.   Had you ever been personally named in any civil
17        lawsuits, or ever personally been accused of any
18        wrongdoing regarding Mr. Steven Avery?
19   A.   No, sir.
20   Q.   You were asked, as I understand, as part of a
21        civil lawsuit, to provide what's called a
22        deposition, to be questioned by some lawyers; is
23        that right?
24   A.   Yes, sir.
25   Q.   Do you recall when that occurred?
```

138

CHRM008137

```
 1    A.    I believe it was in October of 2005.
 2    Q.    Do you remember how long that deposition, how
 3          long that -- that process took?
 4    A.    I thought it was less than an hour, but an hour
 5          or less.
 6    Q.    All right.  You were asked some questions, is
 7          that right, under oath?
 8    A.    Yes, sir.
 9    Q.    Did you answer those questions to the best of
10          your knowledge and ability?
11    A.    Yes, I did.
12    Q.    Do you recall the context in which you were asked
13          those questions; in other words, do you recall
14          what you were asked about?
15    A.    Yes, sir.
16    Q.    Can you tell the jury what you were asked about?
17    A.    In 1994 or '95 I had received a telephone call
18          when I was working as my capacity as a
19          corrections officer in the Manitowoc County Jail.
20          Telephone call was from somebody who identified
21          himself as a detective.  And I answered the
22          phone, Manitowoc County Jail, Officer Colborn.
23                Apparently this person's assumption was
24          that I was a police officer, not a corrections
25          officer, and began telling me that he had
```

139

```
 1        received information that somebody who had

 2        committed an assault, in Manitowoc County, was in

 3        their custody, and we may have somebody in our

 4        jail, on that assault charge, that may not have

 5        done it.

 6                I told this individual, you are probably

 7        going to want to speak to a detective, and I

 8        transferred the call to a detective, to the

 9        Detective Division, at the Manitowoc County

10        Sheriff's Department.  That's the extent of my

11        testimony.

12   Q.   That's it?  That's your connection to Mr. Avery?

13   A.   Yes, sir.

14   Q.   Well, did that cause you enough embarrassment and

15        enough angst in which to set up Mr. Avery for a

16        charge of murder?

17   A.   No.

18   Q.   Did that deposition cause you such problems from

19        within your department that you obtained and

20        planted blood, so that it would be found and

21        Mr. Avery would be wrongfully accused of a

22        homicide case?

23   A.   No, sir.

24   Q.   Have you ever planted any evidence against

25        Mr. Avery?
```

140

CHRM008139

1    A.    That's ridiculous, no, I have not.

        2    Q.    Have you ever planted any evidence against

        3          anybody in the course of your law enforcement

        4          career?

        5    A.    I have to say that this is the first time my

        6          integrity has ever been questioned and, no, I

        7          have not.

        8                ATTORNEY KRATZ:   That's all I have for

        9          Sergeant Colborn, Judge.

       10                THE COURT:   Mr. Strang.

       11                   CROSS-EXAMINATION

       12    BY ATTORNEY STRANG:

       13    Q.    This is the first time your integrity has been

       14          questioned?

       15    A.    As it applies to being a police officer, yes.

       16    Q.    Okay.  And it's not the first time Mr. Avery's

       17          has been, so I have some questions for you.  You

       18          were, in November of 2005, in the Road Patrol

       19          Division of the Manitowoc County Sheriff's

       20          Department?

       21    A.    Yes, sir.

       22    Q.    You were a sergeant in that division?

       23    A.    Yes, sir.

       24    Q.    Were there other sergeants in that division?

       25    A.    Yes, sir.

                              141

CHRM008140

```
 1   Q.   How many?

 2   A.   There's one lieutenant and two sergeants assigned

 3        per shift; there's three shifts.  We're looking

 4        at six sergeants, three lieutenants.

 5   Q.   Your shift particularly was noon to 8:00 p.m.?

 6   A.   Yes, sir.

 7   Q.   That made you the assistant shift commander as

 8        opposed to the other sergeant?

 9   A.   Yes, sir.

10   Q.   And the shift commander, himself, when the

11        lieutenant had a day off?

12   A.   Yes, sir.

13   Q.   The Road Patrol Division does exactly that, it

14        patrols the roads of Manitowoc County?

15   A.   Yes, sir.

16   Q.   Typically in marked squad cars?

17   A.   Yes, sir.

18   Q.   Speeding and other traffic law enforcement?

19   A.   Yes, sir.

20   Q.   Calls for help from citizens, a variety of calls?

21   A.   Yes, sir.

22   Q.   You might be the first to respond to a domestic

23        violence call, let's say?

24   A.   Yes, sir.

25   Q.   You might respond to a flat tire on the side of
```

142

CHRM008141

```
 1          the road?

 2   A.     Yes, sir.

 3   Q.     This division, during the noon to 8:00 shift,

 4          back in, let's say, November, 2005, had

 5          approximately how many officers out on the road

 6          during that noon to 8:00 shift?

 7   A.     Well, I believe that par -- four or five officers

 8          counting the shift commander.

 9   Q.     Roughly?

10   A.     Yes, sir.

11   Q.     I understand.  And the shift commander had some

12          administrative duties, but also had some road

13          patrol duties?

14   A.     Yes, sir.

15   Q.     Collection of evidence was not typically a duty

16          of the Road Patrol Division?

17   A.     Yes, it is.

18   Q.     That is, some members of the Road Patrol Division

19          may be trained in the collection of evidence,

20          correct?

21   A.     Correct.

22   Q.     Just as some members of the other divisions of

23          the Manitowoc County Sheriff's Department may

24          have special training as evidence technicians or

25          in evidence collection?
```

143

CHRM008142

```
 1    A.    Correct.

 2    Q.    The Sheriff's Department includes as one of its

 3          divisions, or bureaus, units, if you will, an

 4          Investigative Unit?

 5    A.    Yes, sir.  To make it easier, both patrol and

 6          investigations are assigned to the Operations

 7          Division of the Manitowoc County Sheriff's

 8          Department.

 9    Q.    Very well.  Thank you.  But they are separate

10          units within the operations division?

11    A.    Yes, sir.

12    Q.    You had been trained in evidence collection as a

13          technician?

14    A.    Yes, sir.

15    Q.    That went back to, I think, 1997?

16    A.    Yes, sir.

17    Q.    That was something for which you volunteered?

18    A.    Yes.

19    Q.    You were accepted or someone accepted your offer

20          and you got some special training?

21    A.    Yes, sir.

22    Q.    One of the people from whom you got that special

23          training is seated right over there, second to my

24          right in the back, true?

25    A.    Evidence tech training?
```

144

CHRM008143

| 1 | Q. | Yes. |
| 2 | A. | No, sir. |
| 3 | Q. | Didn't get that kind of training from Special |
| 4 | | Agent Fassbender? |
| 5 | A. | No, I did not. |
| 6 | Q. | What training did you get from Special Agent |
| 7 | | Fassbender? I'm talking about well before |
| 8 | | November, 2005 now. |
| 9 | A. | Special Agent Fassbender was my DAT, which is |
| 10 | | defense and arrest tactics, instructor during the |
| 11 | | recruit academy at Fox Valley Tech. |
| 12 | Q. | All right. Having nothing directly to do with |
| 13 | | evidence collection? |
| 14 | A. | That's correct, sir. |
| 15 | Q. | But you went through a recruit academy? |
| 16 | A. | Yes, sir. |
| 17 | Q. | As do all police recruits or candidate officers? |
| 18 | A. | Yes, sir. |
| 19 | Q. | How long did that academy last? |
| 20 | A. | It was 400 hours when I went through the academy. |
| 21 | | Ten weeks, roughly. |
| 22 | Q. | Roughly 10 weeks full-time? |
| 23 | A. | Yes, sir. |
| 24 | Q. | All right. We'll come back to that a little bit |
| 25 | | later in a different context. Did you have any |

145

CHRM008144

|     |     | training as an evidence technician from |
| --- | --- | --- |
| 1   |     | training as an evidence technician from |
| 2   |     | Lieutenant James Lenk? |
| 3   | A.  | Yes. |
| 4   | Q.  | He, you know, to be a lieutenant in charge of the |
| 5   |     | Detective Unit within the Operations Division? |
| 6   | A.  | Yes, sir. |
| 7   | Q.  | Are there more than one lieutenant in the |
| 8   |     | Detective Unit? |
| 9   | A.  | No, sir. |
| 10  | Q.  | So he's the chief detective, in fact, of |
| 11  |     | Manitowoc County? |
| 12  | A.  | Yes, sir. |
| 13  | Q.  | Within the Sheriff's Department.  He was involved |
| 14  |     | in training you as an evidence technician? |
| 15  | A.  | I am not exactly sure how to answer that without |
| 16  |     | elaborating somewhat. |
| 17  | Q.  | Well, let's start with a yes or a no. |
| 18  | A.  | Yes, he has given me training material during the |
| 19  |     | course of my career. |
| 20  | Q.  | Okay.  And has he given you anything more formal |
| 21  |     | than that; in other words, I'm going to let you |
| 22  |     | elaborate here, but we'll do this in a question |
| 23  |     | and answer format. |
| 24  | A.  | Lieutenant Lenk personally hasn't trained me on |
| 25  |     | any specific issue.  We would have semi-annual, |

146

CHRM008145

```
 1        or sometimes quarterly meetings, of all the

 2        evidence techs, where Lieutenant Lenk might

 3        present some new information or somebody who had

 4        recently gone to training might present some new

 5        information.  But Lieutenant Lenk never took me

 6        one-on-one and trained me in any sort of specific

 7        application of being an evidence technician.

 8   Q.   But you have sort of in house, in service,

 9        programs --

10   A.   Yes, sir.

11   Q.   -- if you will?  Sharing information on new

12        techniques or new teaching?

13   A.   Yes, sir.

14   Q.   Sometimes that comes from Lieutenant Lenk?

15   A.   Yes, sir.

16   Q.   Other times he may simply be involved in

17        overseeing the meeting?

18   A.   Yes, sir.

19   Q.   You have known Lieutenant Lenk, personally, how

20        long?

21   A.   Since 1996, so 10, 11 years.

22   Q.   Was it '96 that you actually became a sworn

23        officer?

24   A.   Yes, sir.

25   Q.   And if I understood you, the period as a
```

147

CHRM008146

| | | |
|---|---|---|
| 1 | | corrections officer in the Manitowoc County Jail |
| 2 | | was '92 to '94? |
| 3 | A. | '92 to '96. |
| 4 | Q. | I'm sorry, then I misunderstood you. You went |
| 5 | | directly from the jail to the recruit academy and |
| 6 | | then as a sworn officer? |
| 7 | A. | Yes, sir. |
| 8 | Q. | It was 1996, then, when you joined the department |
| 9 | | as a sworn officer, that you met the man who is |
| 10 | | now Lieutenant Lenk? |
| 11 | A. | Yes, sir. |
| 12 | Q. | He, at that time, was also in the road unit or |
| 13 | | the Road Patrol Unit? |
| 14 | A. | Yes, sir. |
| 15 | Q. | You became friendly with Lieutenant Lenk? |
| 16 | A. | Yes. |
| 17 | Q. | Let's call him James Lenk and not worry about his |
| 18 | | rank, at any given time, all right. Do you call |
| 19 | | him Jim? |
| 20 | A. | Yes, I do. |
| 21 | Q. | You worked closely with him for several years? |
| 22 | A. | Yes. I have worked with him several times, yes. |
| 23 | Q. | He is one of the people on the department to whom |
| 24 | | you feel personally close? |
| 25 | A. | We don't do anything together socially, but I |

148

CHRM008147

```
 1              feel he is an experienced officer and if I have a
 2              investigative type question, I feel comfortable
 3              talking with him about it.
 4    Q.        All right.  And the time came in 2005 or 2006
 5              when you decided that you aspired to some rank
 6              higher than sergeant within the department, true?
 7    A.        I'm sorry, could you repeat.
 8    Q.        The time came in 2005, or perhaps in 2006, I
 9              don't know when, but at some point, certainly
10              before the elections in 2006, you began to aspire
11              to a rank higher than sergeant in your
12              department?
13    A.        Yes.
14    Q.        You decided to run for sheriff?
15    A.        That's correct.
16    Q.        Of Manitowoc County?
17    A.        That is correct.
18    Q.        Another officer, within the department, at the
19              same time, also was running for sheriff in the
20              same 2006 election?
21    A.        Yes.
22    Q.        That created a situation in which two officers
23              from the same department were running against
24              each other?
25    A.        Yes.
```

149

CHRM008148

| | | |
|---|---|---|
| 1 | Q. | There was some tension, at least, in that |
| 2 | | situation? |
| 3 | A. | Are you talking about in 2006, last summer? |
| 4 | Q. | Well, whenever the campaign began to heat up. |
| 5 | A. | I don't really think the campaign ever got |
| 6 | | heated, but I didn't really feel any tension. |
| 7 | Q. | Okay.  But, one of the things you both were |
| 8 | | interested in doing, and the other gentleman is a |
| 9 | | man named Robert Hermann, correct? |
| 10 | A. | Yes. |
| 11 | Q. | The brother of Todd Hermann? |
| 12 | A. | Yes. |
| 13 | Q. | One of the things that you and Robert Hermann |
| 14 | | both did was sort of see who would support you |
| 15 | | and who might support the other fellow in the |
| 16 | | race for sheriff? |
| 17 | A. | No. |
| 18 | Q. | Weren't interested who was on your side? |
| 19 | A. | No, I wasn't. |
| 20 | Q. | Do you know whether Lieutenant Lenk was on your |
| 21 | | side? |
| 22 | A. | I have no idea how Lieutenant Lenk voted during |
| 23 | | the sheriff's campaign.  I would hope that he |
| 24 | | supported me, but it wouldn't change my feeling |
| 25 | | one iota if he didn't. |

150

CHRM008149

```
 1    Q.   I understand that.  But how long was it between

 2         the time you declared your candidacy publicly and

 3         the time of the election?

 4    A.   I thought we had to have our nomination papers

 5         filed in May of 2006 and the election was in

 6         November of 2006.

 7    Q.   Okay.  So let's call it five, six months,

 8         roughly.  I'm just trying to get a rough time

 9         frame here, okay.  Lieutenant Lenk's working

10         hours, you know, to overlap in part with your

11         own, on the days you are both at work?

12    A.   Yes.

13    Q.   That is, he would typically work something like

14         an 8 to 5 kind of shift?

15    A.   I'm not sure what his duty hours are, but

16         somewhere in that time frame.

17    Q.   In other words, in the afternoon, you two would

18         be on duty at the same time?

19    A.   Yes, sir.

20    Q.   And in all that time, he never approached you and

21         gave you an attaboy, or told you he was in his

22         corner -- in your corner, or that he couldn't be,

23         nothing?

24              ATTORNEY KRATZ:  Judge, I'm going to object

25         as irrelevant.  Is this sometime after November of
```

151

CHRM008150

2005?

ATTORNEY STRANG: It is.

ATTORNEY KRATZ: I can't see the relevance, then, to what happened at the Avery salvage property; I will interpose that objection then.

THE COURT: Mr. Strang.

ATTORNEY STRANG: Well, I'm happy to be heard out of the presence, if the Court wishes that.

THE COURT: All right. I think what I will do at this time is excuse the jury for a few minutes.

ATTORNEY STRANG: We can excuse the witness as well.

THE COURT: Mr. Colborn, you are excused as well.

(Jury not present.)

(Witness not present.)

THE COURT: Mr. Strang.

ATTORNEY STRANG: This isn't a long line of inquiry, your Honor, but clearly this is relevant to Sergeant Colborn's bias or potential for bias here. Lieutenant Lenk was his partner through several days of searching. Consistently, as the testimony has shown, they were paired together, usually with Detective Remiker as well.

152

CHRM008151

Together they were deposed, within 48
hours, in Steven Avery's lawsuit. I expect to
elicit testimony that they discussed their
depositions. Now, together, it is the two of
them who, in Sergeant Colborn's words, had their
integrity questioned.

Whether these two stood together and had
each other's back during a race for a higher
office that well could have been affected by the
lawsuit that Steven Avery had filed, by further
developments in that lawsuit, I think is directly
relevant to this witness' credibility and bias.

THE COURT: Mr. Kratz.

ATTORNEY KRATZ: We're talking about two
different things, Judge. Testimonial bias, which
would be today, and is this witness prepared to
shade his testimony to the benefit that perhaps of
Lieutenant Lenk or somebody like that, Mr. Strang's
area of inquiry is appropriate, if in fact the Court
finds that to be relevant.

However, what Mr. Strang is really
talking about is having each other's back, or
motive, or being in partnership, for lack of a
better term, in planting evidence or being
involved in criminal behavior and activity. Then

153

CHRM008152

1    that only becomes relevant if they had this

2    connection, if they had this friendship or this

3    bond, before November of 2005.

4         So, if that is in fact the dual purpose

5    of this, then I would ask Mr. Strang to confine

6    his bias inquiry, at least as it regards

7    Lieutenant Lenk and the election, and to that

8    which might affect his testimony today; it would

9    have no relevance as to what occurred in November

10   of 2005.

11        THE COURT:  How do you propose that that be

12   conveyed to the jury, what the purpose of his

13   questioning is?

14        ATTORNEY KRATZ:  Well, as asked, then,

15   Judge, it is -- it is irrelevant and should be

16   inadmissible.  If we direct it more towards

17   testimonial, that is, if he wants to get into, would

18   you do something to help your buddy, Jim Lenk,

19   today, in testifying, I think that's -- that that's

20   appropriate, but that should be made clear.

21        And if we're getting into more than

22   that, that is, as Mr. Strang, using his words, I

23   have your back, if we're talking about back in

24   November of 2005, their previous friendship may,

25   in fact, be relevant and all those kind of

154

CHRM008153

```
 1    things, but not what happened in the 2006
 2    election.
 3            ATTORNEY STRANG:  Let's bring us back to
 4    the actual line of questioning, because I don't know
 5    that we need to slice the salami that thin.  What
 6    I'm doing now is simply following up on and
 7    exploring his claim that he has no idea whether Jim
 8    Lenk supported him or not for sheriff.  He hopes he
 9    did, but if Mr. Lenk did not vote for him, it
10    wouldn't affect, by one iota, his view of Mr. Lenk.
11            And I'm following that up, since he's
12    already acknowledged that he thinks well of Mr.
13    Lenk and has worked with him and known him since
14    1996.  I'm also going to ask him when it is that
15    becoming sheriff popped into his head, since
16    presumably that was some -- some day before the
17    day in May, 2006, when he had to file his
18    candidacy papers.  And that's really,
19    essentially, all the farther I'm going with this.
20            THE COURT:  All right.  It seems to me of
21    marginal probative value, but if you are telling me
22    you are almost done, I will let you ask a few more
23    questions and then move on.  All right.  We can
24    bring the jurors back.  And then if the
25    Victim/Witness Coordinator is here, she can bring
```

155

```
 1          Mr. Colborn in.

 2                    (Jury present.)

 3               THE COURT:  You may be seated.  And

 4          Mr. Strang, you may resume your questioning.

 5               ATTORNEY STRANG:  Thank you.

 6     Q.   (By Attorney Strang)~ So the question was,

 7          Sergeant Colborn, in the months leading up to

 8          this election, are you telling this jury that

 9          there wasn't any time when Lieutenant Lenk

10          approached you and told you either that he was in

11          your corner or couldn't support you, for sure?

12     A.   No, I'm not saying that.

13     Q.   Well, what did he tell you about whether he was

14          supporting you?

15     A.   We did not have -- I tried my hardest not to have

16          any discussions about the election at work

17          because I didn't want it to distract from work.

18          Privately, Lieutenant Lenk gave me every

19          indication that he was supporting me.

20     Q.   Privately, you took him to be in your corner?

21     A.   Yes.

22     Q.   You may want to get just a little bit closer to

23          the mike, the mike is sort of touchy.  When was

24          it that you began to think seriously about

25          running for sheriff, yourself?
```

156

CHRM008155

```
 1    A.   January or February of 2006.

 2    Q.   Had the idea occurred to you back in 2005?

 3    A.   I can't recall, specifically.  I may have thought

 4         about it, but ...

 5    Q.   But at least by January or February, 2006, you

 6         had a building sense that, maybe I could do the

 7         top job in this department?

 8    A.   Yes, sir.

 9    Q.   Maybe I could do some things a little bit

10         differently than I see them being done?

11    A.   Yes, sir.

12    Q.   Maybe I could bring something important to the

13         job of sheriff and serve the citizens of

14         Manitowoc County?

15    A.   Yes, sir.

16    Q.   By May that idea had become strong enough to

17         cause you to go through all the steps necessary

18         to declare a candidacy?

19    A.   Yes, sir.

20    Q.   You had not run for an elected office before?

21    A.   Actually, yes, I had.

22    Q.   Okay.  At a countywide level?

23    A.   Yes.

24    Q.   All right.  So at least that process you were

25         familiar with and willing to undergo again?
```

157

|     |     |                                                        |
| --- | --- | ------------------------------------------------------ |
| 1   | A.  | Yes.                                                   |
| 2   | Q.  | Knocking on doors, speaking at Lion's Club             |
| 3   |     | dinners, that kind of thing?                           |
| 4   | A.  | Yes, sir.                                              |
| 5   | Q.  | Now, it was, I think, October 13, 2005, in             |
| 6   |     | specific, in which your deposition was taken in        |
| 7   |     | Mr. Avery's lawsuit?                                    |
| 8   | A.  | Yes, sir.                                              |
| 9   | Q.  | Was this the first time you had ever had your          |
| 10  |     | deposition taken?                                      |
| 11  | A.  | Yes, sir.                                              |
| 12  | Q.  | New experience for you?                                |
| 13  | A.  | Yes.                                                   |
| 14  | Q.  | You were not so much asked to attend a deposition      |
| 15  |     | as you were the recipient of a subpoena to do so?      |
| 16  | A.  | I believe so, yes, sir.                                |
| 17  | Q.  | That deposition process involved being sworn,          |
| 18  |     | same oath you took today, essentially?                 |
| 19  | A.  | Yes, sir.                                              |
| 20  | Q.  | But in a conference room or library of a lawyer's      |
| 21  |     | office?                                                |
| 22  | A.  | Yes, sir.                                              |
| 23  | Q.  | You were questioned by Mr. Avery's lawyers at          |
| 24  |     | that deposition?                                       |
| 25  | A.  | Yes, sir.                                              |

158

CHRM008157

```
 1   Q.   You sat across the table from Mr. Avery, himself,
 2        that day, October 13, 2005?
 3   A.   I know Mr. Avery was in the room, I don't -- no,
 4        it wasn't like I was directly across from him.
 5   Q.   No.
 6   A.   He was down at the end of the table.
 7   Q.   Yeah, and I didn't mean directly across, but the
 8        two of you shared this conference room and the
 9        table?
10   A.   Yes, sir.
11   Q.   Along with other people?
12   A.   Yes, sir.
13   Q.   Court reporter?
14   A.   Yes, sir.
15   Q.   Various lawyers?
16   A.   Yes, sir.
17   Q.   Some of the questions concerned a telephone call
18        that you had taken?
19   A.   Yes.
20   Q.   You understood the call, which today you can
21        place only as 1994 or 1995?
22   A.   That's correct, sir.
23   Q.   You understood the call to be coming from someone
24        who was a detective?
25   A.   Yes, sir.
```

159

CHRM008158

```
1   Q.   Detective with a law enforcement agency?

2   A.   Yes.

3   Q.   In an adjoining or nearby county?

4   A.   I believe so, yes, sir.

5   Q.   You don't remember the details today?

6   A.   No, I don't, sir.

7   Q.   And, indeed, on October 13, 2005, you didn't

8        remember many of the details either?

9   A.   No, sir.

10  Q.   But the gist of it was, we have got somebody here

11       in custody who we think maybe did an assault in

12       Manitowoc County, that was part of it?

13  A.   Yes, sir.

14  Q.   And we further think that you may have someone in

15       jail for the assault?

16  A.   That was the gist of the phone conversation, yes.

17  Q.   Right.  And I understand you don't remember the

18       exact words, but that was the gist?

19  A.   Yes, sir.

20  Q.   Now, as a corrections officer in the jail, this

21       was not directly your responsibility?

22  A.   No, sir.

23  Q.   You passed, or tried to pass the call, to the

24       Detective Unit?

25  A.   Yes, sir.
```

160

CHRM008159

1   Q.   But you understood that you were being told, by a
2        law enforcement officer, that Manitowoc County
3        may have someone locked up, who didn't commit the
4        crime for which he was imprisoned; that much you
5        understood?
6   A.   Yes, sir.
7   Q.   Was that a matter to shrug off for you?
8   A.   I didn't shrug it off, sir.  I did what the
9        caller asked me to do, connect him to a
10       detective.
11  Q.   I think, actually, you suggested that perhaps the
12       caller should talk to a detective?
13  A.   No, he specifically asked for a detective.
14  Q.   How he happened to call the jail and get to you,
15       you have no idea?
16  A.   No, I don't, sir.
17  Q.   Lieutenant Lenk, you were aware, also was
18       deposed, had his deposition taken, in this same
19       lawsuit?
20  A.   Yes, sir.
21  Q.   This was a federal lawsuit?
22  A.   I don't even know enough about it to know whose
23       jurisdiction it was.
24  Q.   Okay.
25  A.   I know there was a lawsuit.

161

CHRM008160

```
 1   Q.   All right.  Do you know if it was down in
 2        Milwaukee?
 3   A.   The deposition?  My deposition?
 4   Q.   Or the lawsuit, either one?
 5   A.   My deposition was in the City of Manitowoc.  I
 6        don't know where the lawsuit -- I don't know.
 7   Q.   Fair enough.  But you did -- you did have an
 8        opportunity to talk to Lieutenant Lenk about the
 9        fact that he, too, was having his deposition
10        taken?
11   A.   I don't recall discussing the deposition portion
12        of it with Lieutenant Lenk.
13   Q.   What did you discuss, about the civil lawsuit,
14        with Lieutenant Lenk?
15             THE COURT:  Excuse me, Counsel, are you
16        referring to some time before the deposition or
17        after?
18   Q.   I'm referring to the time immediately before the
19        deposition, after you would have gotten your
20        subpoena.
21   A.   Okay.  Yes, I knew that Lieutenant Lenk had a
22        subpoena for the same deposition that I did, yes.
23   Q.   Okay.  And I'm not interested in the content of
24        your conversation, which probably would be
25        hearsay, but the two of you established that one
```

162

CHRM008161

```
 1        another had subpoenas for depositions in that
 2        lawsuit?
 3   A.   Yes, sir.
 4   Q.   And, again, without going into the content,
 5        aft -- shortly after your depositions were taken,
 6        the two of you talked about the fact that your
 7        depositions had been taken?
 8   A.   Not really, not beyond the fact of, you know, did
 9        you go on the day that you were supposed to, yes,
10        and that was pretty much it.
11   Q.   Okay.  Fair enough.  Did you have any concern
12        that you would be added as a defendant in that
13        lawsuit?
14   A.   I don't know if concern is the correct word, I
15        know I expressed that I didn't have any knowledge
16        of that case.  I wasn't a Manitowoc County
17        resident at that time.
18   Q.   My question, though, was whether you had concern,
19        the thought crossed your mind, that you might be
20        added as a defendant in that civil lawsuit?
21   A.   Yes, the thought crossed my mind that I might be
22        added as the defendant.
23   Q.   You had never been the defendant in a lawsuit
24        before?
25   A.   Not that I recall, no.
```

163

```
 1    Q.   Do you think you would recall?

 2    A.   I would think, but ...

 3    Q.   This isn't something you were relishing?

 4    A.   No.

 5    Q.   How do you think having been a defendant in

 6         Mr. Avery's lawsuit, for his wrongful conviction,

 7         would have affected your prospects in the race

 8         for sheriff?

 9              ATTORNEY KRATZ:  Objection, speculation.

10    Q.   (By Attorney Strang)~ Did you consider that?

11              THE COURT:  Just a second.  I'm going to

12         sustain the objection.

13    Q.   (By Attorney Strang)~ Did you consider the

14         prospect of an effect on your race for sheriff,

15         if you were added to that lawsuit?

16    A.   No, I didn't, sir.

17    Q.   I would like to shift off the lawsuit and talk to

18         you about reports, police reports, for a little

19         bit.  And I promised you we were going to get

20         back to the recruit academy, and we will.

21              Reports are something that police

22         officers, and by that I mean broadly; sheriff's

23         deputies, municipal police officers, special

24         agents of the Division of Criminal Investigation,

25         just law enforcement officers generally.  All
```

164

CHRM008163

|  |  |  |
|---|---|---|
| 1 |  | right. Reports are something that is common to |
| 2 |  | the work of policemen? |
| 3 | A. | Is that a question? |
| 4 | Q. | It is. |
| 5 | A. | Yes, reports are common to policing. |
| 6 | Q. | That is one of the things you learned to do in |
| 7 |  | the recruit academy, was to prepare a report? |
| 8 | A. | That's correct, sir. |
| 9 | Q. | It is a regular routine, in policing, to prepare |
| 10 |  | reports of your activities, as they bear on a |
| 11 |  | criminal investigation? |
| 12 | A. | Yes, sir. |
| 13 | Q. | You were taught in the academy the basics of how |
| 14 |  | to prepare such a report? |
| 15 | A. | Yes, sir. |
| 16 | Q. | Reports have several purposes, I guess, one would |
| 17 |  | be to assure accurate collection of facts; that |
| 18 |  | would be one purpose of a police report? |
| 19 | A. | Yes, sir. |
| 20 | Q. | Another purpose would be to set down, on paper, |
| 21 |  | your memories before they begin to fade? |
| 22 | A. | Yes, sir. |
| 23 | Q. | A third purpose would be to allow others in the |
| 24 |  | department to benefit from knowing what facts you |
| 25 |  | had learned or steps you had taken in an |

165

CHRM008164

1       investigation?

    2   A.  That I don't -- that I don't know.  Sometimes

    3       reports are confidential and no other officers

    4       view them.

    5   Q.  Sometimes, but let expands on that.  In any sort

    6       of a larger jurisdiction, let's use Manitowoc

    7       County, the sheriff's department, policing is a

    8       24 hour a day business?

    9   A.  Yes, sir.

   10   Q.  365 days a year?

   11   A.  Yes, sir.

   12   Q.  That is, there may be very small towns that have

   13       only a part-time police officer, constable,

   14       police department, correct?

   15   A.  Yes, sir.

   16   Q.  But with the Manitowoc County Sheriff's

   17       Department, it's around the clock, 24/7, 365 days

   18       a year?

   19   A.  Yes, sir.

   20   Q.  Obviously, no single officer can work 24 hours,

   21       seven days a week, so you divide the day into

   22       shifts.

   23   A.  That's correct, sir.

   24   Q.  A criminal investigation that happens to begin on

   25       one shift, may be carried over on another?

                              166

CHRM008165

```
 1   A.   Yes, that's possible.
 2   Q.   Officers who actually don't work the same shift,
 3        may be working on the same investigation?
 4   A.   Yes, sir.
 5   Q.   Witnesses may have to be interviewed and their
 6        working hours may require officers who work on
 7        the late shift, or the overnight shift, to
 8        conduct the interviews?
 9   A.   Correct.
10   Q.   So by preparing reports, officers on one shift
11        can share their information with officers on the
12        other shifts?
13   A.   Absolutely.
14   Q.   And in this sense, there is a collective benefit
15        that allows the department to continue its
16        criminal investigative duties, around the clock?
17   A.   Yes, sir.
18   Q.   Yet another purpose of police reports is to
19        report upward, to supervisors, what it is you are
20        doing?
21   A.   Yes, sir.
22   Q.   Reports typically are reviewed by supervisors?
23   A.   Yes, they are.
24   Q.   For accuracy?
25   A.   Yes.
```

167

CHRM008166

| | | |
|---|---|---|
| 1 | Q. | For thoroughness? |
| 2 | A. | Yes. |
| 3 | Q. | For completeness? |
| 4 | A. | Yes. |
| 5 | Q. | Preparing reports is something that a thorough |
| 6 | | police officer does? |
| 7 | A. | Yes. |
| 8 | Q. | Preparing reports is something that a police |
| 9 | | officer should do in a timely fashion, true? |
| 10 | A. | Yes. |
| 11 | Q. | Because, again, one of the first purposes is to |
| 12 | | get the facts down on paper accurately while they |
| 13 | | are fresh in your mind? |
| 14 | A. | Yes, sir. |
| 15 | Q. | And preparing reports in a timely and thorough |
| 16 | | way is something that a fair police officer does, |
| 17 | | isn't it? |
| 18 | A. | I would imagine, yes, sir. |
| 19 | Q. | That is, you want the report to be objective? |
| 20 | A. | Yes. |
| 21 | Q. | Accurate in the sense of fair and factually |
| 22 | | correct? |
| 23 | A. | Yes. |
| 24 | Q. | Not tilted or biased in any fashion? |
| 25 | A. | Correct. |

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 169 of 246   Document 290-19

CHRM008167

```
 1   Q.   The idea is to lay out the facts and see where
 2        they lead?
 3   A.   Yes, sir.
 4   Q.   You prepare reports, then, and as they go up the
 5        stream, for a supervisors review, the supervisor
 6        typically will sign off or indicate approval in
 7        some fashion?
 8   A.   Yes, sir.
 9   Q.   Or may send the report back for further work?
10   A.   Yes, sir.
11   Q.   You are a supervisor, yourself, in the Road
12        Patrol Unit?
13   A.   Yes, sir.
14   Q.   You fill this function.  That's one of your
15        administrative duties, is to review reports
16        prepared by deputies under you, in the Road
17        Patrol Unit?
18   A.   Yes, sir.
19   Q.   You encourage them to file timely reports?
20   A.   Yes.
21   Q.   Thorough reports?
22   A.   Yes.
23   Q.   And fair reports?
24   A.   Yes, sir.
25   Q.   The reports, you know, after now 10, going on 11
```

169

CHRM008168

```
 1        years as a sworn law enforcement officer, then
 2        sometimes will go further, to a prosecutor?
 3   A.   Yes, sir.
 4   Q.   Prosecutors rely on those police reports in
 5        making charging decisions?
 6   A.   Yes, sir.
 7   Q.   If they elect to charge a case, you know as well,
 8        in your criminal justice system, that the
 9        reports, then, go to the defense, once a case has
10        been charged in court?
11   A.   Yes, sir.
12   Q.   The defense lawyers then rely on the thoroughness
13        of those reports?
14   A.   Yes, sir.
15   Q.   The accuracy of those reports?
16   A.   Yes, sir.
17   Q.   The timeliness of those reports?
18   A.   Yes, sir.
19   Q.   And at a very practical level, if later, you, as
20        the officer involved in some activity, have
21        forgotten exactly what happened, you can turn
22        back to your report?
23   A.   Yes.
24   Q.   Use it to refresh your recollection?
25   A.   Yes, sir.
```

170

CHRM008169

```
1   Q.   Sometimes use the report of other officers to

2        refresh your recollection?

3   A.   Yes, sir.

4   Q.   Which, again, is you relying on the accuracy and

5        the thoroughness and the timeliness of reports by

6        other officers?

7   A.   Yes, sir.

8   Q.   And if you were to change your explanation of

9        what happened, either the prosecution or the

10       defense might use the report to show that you had

11       said something different in the report?

12  A.   Yes, sir.

13  Q.   If you don't prepare a report, then you haven't

14       committed anything to paper, correct?

15  A.   Correct.

16  Q.   And someone who doesn't commit anything to paper,

17       then, can't be pinned down on the details as

18       would someone who had put the details on paper?

19  A.   Okay.  I mean, that makes sense.

20  Q.   Makes sense to you?

21  A.   Mm-hmm.

22  Q.   Now, let's go to this investigation, the

23       activities concerning this investigation, are you

24       with me?

25  A.   Yes, sir.
```

171

CHRM008170

```
 1   Q.   November 3, 2005, when you learned from
 2        Mr. Wiegert that Teresa Halbach was missing, was
 3        just about exactly, to the day, three weeks after
 4        your deposition in Steven Avery's lawsuit?
 5   A.   Yes, sir.
 6   Q.   You were the shift commander that day, as we have
 7        established?
 8   A.   Yes, sir.
 9   Q.   You learned about Ms Halbach being missing at
10        about what time?
11   A.   Somewhere between 6:30 and 7:30.
12   Q.   You were scheduled to get off shift at eight?
13   A.   Yes, sir.
14   Q.   Nearing the end of your day?
15   A.   Yes, sir.
16   Q.   As shift commander, you could have assigned
17        anyone in road patrol to go out to the address on
18        Avery Road?
19   A.   Yes.
20   Q.   You chose to do it yourself?
21   A.   Yes.
22   Q.   Did you go alone?
23   A.   Yes, I did.
24   Q.   At that time, all you knew is that this address
25        on Avery Road was one of the appointments that Ms
```

172

1    Halbach evidently had the day she was last seen

2    by family or friends?

3  A.  Yes, sir.

4  Q.  You happened to meet Steve Avery -- or not meet

5      him for the first time, but run into him, so to

6      speak, when you went out there that evening?

7  A.  Yes, sir.

8  Q.  You talked with him?

9  A.  Yes, I did.

10 Q.  He was very cordial?

11 A.  Yes, he was.

12 Q.  And as you followed through, you saw events

13     unfold, eventually it was Steven Avery who was

14     charged with killing Teresa Halbach?

15 A.  Yes, sir.

16 Q.  That came a week, roughly, after your first

17     conversation with him on Thursday, November 3rd?

18 A.  Yes, sir.

19 Q.  Mr. Avery then was charged with the most serious

20     crime someone can commit in this state?

21 A.  Yes, sir.

22 Q.  When, sir, did you first make a written report of

23     anything having to do with the November 3, 2005,

24     meeting with Mr. Avery?

25 A.  June of '06 I believe.

173

CHRM008172

| 1 | Q. | Does June 29, 2006 sound correct? |
|---|----|-----------------------------------|

1    Q.   Does June 29, 2006 sound correct?

2    A.   Yes.

3    Q.   A few days short of the 4th of July?

4    A.   Yes, sir.

5    Q.   Not quite 8 months after the conversation with

6       Mr. Avery?

7    A.   Yes, sir.

8    Q.   Was that a timely report?

9    A.   I wasn't even aware that Manitowoc County had our

10      own report. I didn't find out about it till

11      then.

12    Q.   You were aware that Manitowoc County sheriff's

13      deputies had played a substantial role at the

14      Avery property for a week, from November 5 to

15      November 12?

16    A.   Yes.

17    Q.   You saw literally dozens of fellow officers from

18      the Manitowoc County Sheriff's Department during

19      that week?

20    A.   Yes.

21    Q.   And your testimony today is you aren't aware that

22      any of them ever wrote any report?

23    A.   No, I wasn't. I knew Calumet County Sheriff's

24      Department was handling the report portion of it.

25    Q.   And somebody finally suggested to you, in June,

174

CHRM008173

```
 1            more than 7 months later, that maybe you ought to
 2            write a report about that first interview with
 3            Steven Avery?
 4       A.   They informed me that there was indeed a report
 5            and that I should make an entry on it, yes.
 6       Q.   You made an entry on it?
 7       A.   Yes, I did.
 8       Q.   And that entry was all of about a page?
 9       A.   I guess it was a few paragraphs; I don't know how
10            many.
11       Q.   Did you happen to notice when you were with
12            Mr. Avery on November 3, a big, fresh gash or cut
13            on his right middle finger?
14       A.   No, I did not notice that.
15       Q.   Didn't notice him bleeding?
16       A.   No, sir, I didn't.
17       Q.   Or notice anything that looked like it had been
18            recently bleeding or recently a fresh, open cut?
19       A.   No, sir, I didn't notice any injury.
20       Q.   That's why there is no mention of such an injury
21            in your report, true?
22       A.   Correct.
23                 ATTORNEY STRANG:   What time does the Court
24            wish to take the afternoon break, for my purposes,
25            your Honor?
```

175

CHRM008174

```
 1              THE COURT:  We'll go another 10 minutes.
 2              ATTORNEY STRANG:  Thank you.
 3    Q.   (By Attorney Strang)~ Now, did I understand you
 4         correctly, in your testimony earlier today,
 5         Sergeant Colborn, that today you remember what it
 6         is you were doing on your day off, Friday,
 7         November 4, 2005, the day after you first talked
 8         to Steven Avery?
 9    A.   Yes.
10    Q.   We were talking about timely and thorough and
11         accurate reports before.  And I wonder if you
12         recall, oh, a little over a month ago, not quite
13         six weeks ago, in fact, January 11, 2007, being
14         interviewed by Investigator Steier of the Calumet
15         County Sheriff's Department; do you remember
16         that?
17    A.   Yes.
18    Q.   And you knew that Investigator Steier was
19         interviewing you in connection with this case?
20    A.   Yes.
21    Q.   You know, as a law enforcement officer, that it's
22         important, if one speaks to another -- to a
23         police officer, to give accurate information to
24         the officer?
25    A.   Yes, sir.
```

176

```
 1   Q.   You know, in fact, that it's a crime in the state
 2        of Wisconsin, intentionally to give false
 3        information to a police officer?
 4   A.   Yes, sir.
 5   Q.   And on January 11, 2007, you recall Investigator
 6        Steier asking you if you could recall what you
 7        had done on Friday, November 4, 2005, your day
 8        off; do you recall him asking you that?
 9   A.   Yes.
10   Q.   And what you told him was, that you could not
11        recall what you had done on your off day; that's
12        what you told Investigator Steier?
13   A.   Yes, at that precise second that he asked me, I
14        could not recall everything that I had done on
15        that day.
16   Q.   You recalled later?
17   A.   Yes.
18   Q.   And when, sir, when did you call up Investigator
19        Steier and say, I'm sorry, I was wrong, I now
20        remember what I did on my day off, Friday,
21        November 4, 2005?
22   A.   I didn't call Investigator Steier.
23   Q.   One of the things the road patrol officers, under
24        your supervision, frequently do, is look for cars
25        that appear out of place?
```

177

CHRM008176

| | |
|---|---|
| 1 | A. Yes, sir. |
| 2 | Q. Or if they made a traffic stop, they will inquire |
| 3 | about the license plate or the registration |
| 4 | plates on an automobile? |
| 5 | A. Yes, sir. |
| 6 | Q. And they will call into dispatch and give the |
| 7 | dispatcher the license plate number of a car they |
| 8 | have stopped, or a car that looks out of place |
| 9 | for some reason, correct? |
| 10 | A. Yes, sir. |
| 11 | Q. And the dispatcher, very quickly these days, with |
| 12 | his or her computer screen, can get information |
| 13 | about who -- to whom a license plate is |
| 14 | registered? |
| 15 | A. Yes, sir. |
| 16 | Q. Also, the dispatcher can give you, right over the |
| 17 | phone or the radio, the information about what |
| 18 | car the license plate is registered to? |
| 19 | A. Yes, sir. |
| 20 | Q. This is useful so that you know who you may be |
| 21 | approaching, if there's a driver of the car |
| 22 | that's stopped? |
| 23 | A. Yes, sir. |
| 24 | Q. It's also useful to know whether the license |
| 25 | plate appears to be on the car for which it is |

178

CHRM008177

```
 1        registered?
 2    A.   Yes, sir.
 3    Q.   If the car is abandoned or there's nobody in the
 4         car, the registration tells you who the owner
 5         presumably is?
 6    A.   Yes, sir.
 7    Q.   Are you the only Andy, to your knowledge, in the
 8         Manitowoc County Sheriff's Department?
 9    A.   The only officer with the first name Andy?
10    Q.   Yes.
11    A.   No, I'm not.
12    Q.   All right.  I'm going to ask you to listen, if
13         you would, to a short phone call.  And I will ask
14         you, first, if you are the Andy speaking.  All
15         right?
16    A.   Mm-hmm.
17              ATTORNEY KRATZ:  Judge, before counsel does
18         this, could we have it identified as to the date and
19         time.
20              ATTORNEY STRANG:  Absolutely, I will do the
21         best I can.  In fact, I should mark it.
22         (Exhibit No. 212 marked for identification.)
23              ATTORNEY STRANG:  This is a CD Rom that we
24         obtained from the -- or a copy of the CD Rom that we
25         obtained from the Manitowoc County Sheriff's
```

179

CHRM008178

```
 1    Department, Exhibit 212, counsel.  Thank you.

 2              For counsel's benefit this will be track

 3    three.  All I'm told by the sheriff's department

 4    is that these are calls between November 3 and

 5    November 12, 2005.

 6              ATTORNEY KRATZ:  Judge, we don't know

 7    when -- what he is about to play them is within a 9

 8    day period?

 9              ATTORNEY STRANG:  If the witness made the

10    call, I'm going to ask him when he made the call.

11              THE COURT:  All right.  Go ahead.

12              Manitowoc County Sheriff's Department.

13    This is Lynn.

14              Lynn.

15              Hi, Andy.

16              Can you run Sam William Henry 582.  See

17    if it comes back to (Inaudible.)

18              Sam William Henry 582.

19              ATTORNEY STRANG:  Let me just stop it right

20    there.  In fact, I'm going to go back, because it

21    was so soft at the beginning.

22              Manitowoc County Sheriff's Department.

23    This is Lynn.

24              Lynn.

25              Hi Andy.
```

180

CHRM008179

```
 1                    Can you run --

 2    Q.   (By Attorney Strang) Is that you?

 3    A.   It sounds like me.  I believe it's me.

 4    Q.   Okay.  I'll --

 5                    Sam William Henry 582.  See if it comes

 6         back to (Inaudible.)

 7                    Lynn.

 8                    Hi Andy.

 9                    Can you run Sam William Henry 582.  See

10         if it comes back to (Inaudible.)

11                    Sam William Henry 582.  I (Inaudible.)

12         All righty.  You speak any Spanish there, Andy?

13         I just a call at the top of the list, is my on

14         call didn't call me back.  If I want to get in

15         trouble, Andy, I get in trouble.  You know, what

16         am I supposed to do?

17                    Well --

18                    My favorite one is in the city of

19         Manitowoc.  Okay.  Shows that she's a missing

20         person.  And it lists to Teresa Halbach.

21                    All set.

22                    Okay.  Is that what you're looking for,

23         Andy?

24                    '99 Toyota.

25                    Yup.

                            181
```

CHRM008180

```
 1              Okay.  Thank you.

 2              You're so welcome.  Bye, bye.

 3    Q.   Okay.  That's the entire call.  Hangs up.  That's

 4         your voice?

 5    A.   Yes, I believe that's my voice.  Yes.

 6    Q.   When did you make that phone call inquiring about

 7         a license plate?

 8    A.   I don't know.

 9    Q.   Do you have any recollection of making that phone

10         call?

11    A.   It would have had to have been 11/03/05 or -- I'm

12         guessing 11/03/05.

13    Q.   Okay.  But let's -- let's ask -- establish this

14         first, do you remember making the call?

15    A.   Not really, no.

16    Q.   What you're asking the dispatcher, whose name is

17         Lynn, is to run a plate that's Sam William Henry

18         582; did I hear that correctly?

19    A.   Yes, sir.

20    Q.   Sam William Henry is a phonetic code that law

21         enforcement officers use, because sometimes it's

22         hard to tell just a letter over radio?

23    A.   Yes, sir.

24    Q.   Sam William Henry would be SWH-582.

25    A.   Yes.
```

182

CHRM008181

```
 1   Q.   This license plate?

 2   A.   Yes, sir.

 3   Q.   I'm showing, for the benefit of the record, this

 4        is either Exhibit 152 or 153?

 5             THE CLERK:   It's on the plate itself.

 6             ATTORNEY STRANG:   This one happens to be

 7        153.

 8   Q.   (By Attorney Strang)~ And the dispatcher tells

 9        you that the plate comes back to a missing person

10        or woman?

11   A.   Yes, sir.

12   Q.   Teresa Halbach.  Mispronounces the last name, but

13        you recognize the name?

14   A.   Yes, sir.

15   Q.   And then you tell the dispatcher, Oh, '99 Toyota?

16   A.   No, I thought she told me that.

17             Manitowoc County Sheriff's Department.

18        This is Lynn.

19             Lynn.

20             Hi Andy.

21             Can you run Sam William Henry 582, see

22        if it comes back to (Inaudible.)

23             Sam William Henry 582.  I (Inaudible.)

24        All righty.  Do you speak any Spanish there,

25        Andy?  I just got a call that the top of my list,
```

183

CHRM008182

```
 1          is my on call didn't call me back.  If I want to
 2          get in trouble, Andy, I get in trouble.  You
 3          know, what am I supposed to do?
 4                  Well --
 5                  My favorite one is in the city of
 6          Manitowoc.  Okay.  Shows that she's a missing
 7          person.  And it lists to Teresa Halbach.
 8                  All set.
 9                  Okay.  That's what you're looking for,
10          Andy?
11                  '99 Toyota?
12                  Yup.
13                  Okay.  Thank you.
14                  You are so welcome.  Bye, bye.
15   Q.    Actually you who suggests this is a '99 Toyota?
16   A.    I asked if it was a '99 Toyota, yes.
17   Q.    And the dispatcher confirmed that?
18   A.    Yes.
19   Q.    Were you looking at these plates when you called
20          them in?
21   A.    No, sir.
22   Q.    And your best guess is that you called them in on
23          November 3, 2005?
24   A.    Yes, probably after I received a phone call from
25          Investigator Wiegert letting me know that there

                              184
```

CHRM008183

1     was a missing person.

2  Q.  Investigator Wiegert, did he give you the license

3     plate number for Teresa Halbach when he called

4     you?

5  A.  I don't remember the entire content of our

6     conversation but, obviously, he must have because

7     I was asking the dispatcher to run the plate for

8     me.

9  Q.  Did you not trust that Investigator Wiegert got

10    the number right?

11  A.  I don't -- That's just the way I would have done

12    it.  I don't -- It's not a trust or distrust

13    issue.

14         ATTORNEY STRANG:  I'm about to move to a

15    different area, your Honor.

16         THE COURT:  All right.  We'll take our

17    afternoon break at this time.  Members of the jury,

18    do not discuss the case during break.  And we'll

19    resume in about 15 minutes.

20         (Jury not present.)

21         THE COURT:  Counsel, you should report back

22    a little before 3:00.

23         ATTORNEY STRANG:  Thank you.

24         (Recess taken.)

25         THE COURT:  Mr. Strang, you may resume your

185

CHRM008184

1          cross-examination.

3    BY ATTORNEY STRANG:

4    Q.   So as you sit here today, Sergeant Colborn, you

5         don't recall whether Investigator Wiegert gave

6         you Ms Halbach's telephone number when he called

7         you that Thursday evening?

8    A.   He never asked me anything about a telephone

9         number.

10   Q.   But you think he must have given you her license

11        plate number?  Did I say telephone number?

12   A.   Yes, you did.

13   Q.   I'm sorry.  I apologize.  What I meant is, you

14        don't recall, as you sit here today, whether

15        Mr. Weigert gave you Teresa Halbach's license

16        plate number when he called you on November 3?

17   A.   No, I just don't remember the exact content of

18        our conversation then.

19   Q.   But --

20   A.   He had to have given it to me, because I wouldn't

21        have had the number any other way.

22   Q.   Well, and you can understand how someone

23        listening to that might think that you were

24        calling in a license plate that you were looking

25        at on the back end of a 1999 Toyota; from

                              186

CHRM008185

1    listening to that tape, you can understand why

2    someone might think that, can't you?

3         ATTORNEY KRATZ:  It's a conclusion, Judge.

4    He's conveying the problems to the jury.

5         THE COURT:  I agree, the objection is

6    sustained.

7    Q.  This call sounded like hundreds of other license

8    plate or registration checks you have done

9    through dispatch before?

10   A.  Yes.

11   Q.  But there's no way you should have been looking

12   at Teresa Halbach's license plate on November 3,

13   on the back end of a 1999 Toyota?

14        ATTORNEY KRATZ:  Asked and answer, your

15   Honor, he already said he didn't and was not looking

16   at the license plate.

17        THE COURT:  Sustained.

18   Q.  (By Attorney Strang)~ There's no way you should

19   have been, is there?

20   A.  I shouldn't have been and I was not looking at

21   the license plate.

22   Q.  Because you are aware now that the first time

23   that Toyota was reported found was two days later

24   on November 5?

25   A.  Yes, sir.

187

CHRM008186

```
 1   Q.   You were aware that it was found, without its
 2        license plates?
 3   A.   Yes, sir.
 4   Q.   You are aware that the license plates weren't
 5        reported found until November 8, 2005?
 6   A.   Yes, sir.
 7   Q.   Now, you spent a good bit of your time, your
 8        working hours at least, between November 5 and
 9        November 9, at the Avery salvage property.
10   A.   Yes, sir.
11   Q.   You were asked on direct examination if you
12        remembered when you first arrived on Saturday,
13        November 5, at that property; do you recall that?
14   A.   Yes, sir.
15   Q.   And if I heard you correctly, which you said is
16        you thought somewhere between 5 and 5:15?
17   A.   That's what I thought, yes.
18   Q.   Is that your recollection as you sit here now?
19   A.   Yes.
20   Q.   Okay.  Now, that's a question that you have been
21        asked at a prior hearing in this case, correct?
22   A.   Yes.
23   Q.   Back on August 9, 2006, you testified at a
24        hearing?
25   A.   Yes.
```

188

CHRM008187

1          ATTORNEY STRANG:  Page 42, counsel.

2    Q.   (By Attorney Strang)~ And on August 9, 2006, you

3         were asked the following question and gave this

4         answer?

5              QUESTION:  Okay.  Now, moving onto

6         Saturday, November 5th, did you -- can you tell

7         me what time you arrived at the Avery property?

8              And your answer was:

9              ANSWER:  Sometime between 6 and 6:30, in

10        the evening.

11             And I will show you the transcript.  Is

12        that the question you were asked and the answer

13        you gave on August 9?

14   A.   Yes, it is.

15   Q.   Now, since then, you have had a chance to get

16        prepared to testify for this trial?

17   A.   Yes, sir.

18   Q.   One of the things you have had the benefit of

19        doing is sitting down with the gentleman to my

20        right, at the prosecution table?

21   A.   Yes, sir.

22   Q.   And they ran through some of the areas they

23        expected to cover with you in your testimony?

24   A.   Yes, sir.

25   Q.   You did not have the benefit of doing that on, or

189

CHRM008188

| | | shortly before, August 9, 2006? |
|---|---|---|
| 1 | | shortly before, August 9, 2006? |
| 2 | A. | Yes, I did.  Actually, we did it on 6/29/06, the |
| 3 | | date you previously mentioned. |
| 4 | Q. | Okay.  Five or six weeks earlier? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Specifically, have you had a chance, though, |
| 7 | | since August 9, to look at the log sheet for |
| 8 | | November 5, 2005, at the Avery property? |
| 9 | A. | I have not. |
| 10 | Q. | How is it that your memory improved or changed |
| 11 | | and that you now think it was between 5 and 5:15 |
| 12 | | that you arrived, not 6 or 6:30? |
| 13 | A. | I -- I don't know.  I did review my time cards |
| 14 | | for that pay period and I saw what time I went on |
| 15 | | duty, so I -- when I answered Mr. Kratz's |
| 16 | | question, I didn't think it would have taken me |
| 17 | | from 6 or 6:30 to get there. |
| 18 | Q. | Okay.  So it's not so much that you actually |
| 19 | | remember now, it's just that you have spent some |
| 20 | | time trying to reconstruct time from your house |
| 21 | | and when you got the call and what your time |
| 22 | | records show? |
| 23 | A. | Yes. |
| 24 | Q. | Okay.  And we have got Exhibit 142 in evidence |
| 25 | | and I would say today you did pretty well.  I |

190

CHRM008189

```
1              will show you Exhibit 142.  I have got it open to
2              the page where I think you will find yourself
3              signing in; is that right?
4     A.       Yes, sir.
5     Q.       5:12 p.m.?
6     A.       Yes, sir.
7     Q.       That would be the sign in out by the Command
8              Post, true?
9     A.       I don't know.  I -- I have never seen this form
10             before today.  That's what it looks like.
11    Q.       Well, the question really is, where do you
12             remember logging in?
13    A.       I thought we logged in out by Avery Road and 147,
14             but if you say it's by the Command Post, that
15             could be.
16    Q.       No, no, no, I wasn't there.  Avery Road and 147,
17             in other words, even farther out from the Command
18             Post?
19    A.       Yes, sir.
20    Q.       To get anywhere near the property you had to log
21             in?
22    A.       Yes, sir.
23    Q.       All right.  5:12 p.m. you log in?
24    A.       Yes, sir.
25    Q.       Do you recall, now, whether Lieutenant James Lenk
```

191

CHRM008190

```
 1        was there when you arrived, on November 5?
 2   A.   I don't know if he was there or came later.  I
 3        don't know.
 4   Q.   Okay.  And you do know that you logged out with
 5        him and with Detective Remiker that evening; do
 6        you recall that?
 7   A.   Yes, sir.
 8   Q.   And, indeed, we can see that if you flip forward
 9        a couple three pages, can you find where you have
10        logged out, on Exhibit 142?
11   A.   Yes, sir.
12   Q.   The three of you, Lenk, Colborn, Remiker log out
13        another 10:41 p.m.?
14   A.   Yes, sir.
15   Q.   Now, you were, as I say, spending most of your
16        working hours out there, somewhere on the Avery
17        property, from November 5 through at least
18        November 9?
19   A.   Yes, sir.
20   Q.   You -- As you told us already, you went into
21        Steven Avery's trailer a number of different
22        times during those several days?
23   A.   Yes, sir.
24   Q.   You said on direct examination that, you know, at
25        least initially, you still viewed this as a
```

192

CHRM008191

```
 1        missing persons case?
 2    A.  Yes, sir.
 3    Q.  You also knew that by the time you entered
 4        Mr. Avery's trailer at 7:30 on Saturday,
 5        November 5, you were doing so with a search
 6        warrant?
 7    A.  Yes.
 8    Q.  A search warrant in which a fellow law
 9        enforcement officer had sworn that you were
10        looking for evidence of murder, among other
11        things?
12    A.  I didn't know what the content of the search
13        warrant was or how they obtained it.
14    Q.  Search warrants, though, you do know, are used in
15        criminal investigations?
16    A.  Yes, sir.
17    Q.  Not in missing person investigations?
18    A.  I can't really answer that.  I could imagine the
19        Court would give a search warrant for a missing
20        person if we could prove probable cause that that
21        missing person was at a certain spot.
22    Q.  Isn't a search warrant ordinarily used --
23    A.  Yes, it is.
24    Q.  -- when there is probable cause to believe you
25        will find evidence of a crime?

                        193
```

CHRM008192

| | | |
|---|---|---|
| 1 | A. | Yes, it is. |
| 2 | Q. | All right. And you were looking for evidence of |
| 3 | | a crime, beginning on the evening of November 5, |
| 4 | | true? |
| 5 | A. | Yes, sir. |
| 6 | Q. | One of the things you do, as an evidence |
| 7 | | technician, is you wear latex gloves, just like |
| 8 | | those that Mr. Wiegert had on earlier, when you |
| 9 | | searched someone's home, or garage, or whatever |
| 10 | | it is? |
| 11 | A. | Yes, sir. |
| 12 | Q. | You wear those, everybody involved, every law |
| 13 | | enforcement officer involved in the search wears |
| 14 | | them? |
| 15 | A. | Yes, sir. |
| 16 | Q. | That way you can't leave your own fingerprints at |
| 17 | | the scene or on evidence? |
| 18 | A. | Yes, sir. |
| 19 | Q. | And in theory, you shouldn't be leaving your own |
| 20 | | DNA on the scene or on evidence? |
| 21 | A. | Correct, sir. |
| 22 | Q. | So you're in the house on November 5, November 6, |
| 23 | | November 7, November 8, true? |
| 24 | A. | Yes, sir. |
| 25 | Q. | And, finally, on November 8, Mr. Kratz asked you, |

194

CHRM008193

|     |     |                                                      |
| --- | --- | ---------------------------------------------------- |
| 1   |     | were you doing a thorough search of the master       |
| 2   |     | bedroom of Mr. Avery's trailer; do you remember      |
| 3   |     | that?                                                |
| 4   | A.  | Yes.                                                 |
| 5   | Q.  | Now, that thorough search, had you working on the    |
| 6   |     | bookcase and on the desk?                            |
| 7   | A.  | Yes, sir.                                            |
| 8   | Q.  | You described yourself as being, I think you said    |
| 9   |     | none too gentle?                                     |
| 10  | A.  | That's true.                                         |
| 11  | Q.  | With the bookcase.  And explained, I wasn't any      |
| 12  |     | too gentle, as we were getting exasperated?          |
| 13  | A.  | Yes, sir.                                            |
| 14  | Q.  | What was exasperating you about the bookcase, or     |
| 15  |     | that bedroom, on November 8, 2005?                   |
| 16  | A.  | The content of the material that we were             |
| 17  |     | collecting.                                          |
| 18  | Q.  | So you felt exasperated and that caused you to       |
| 19  |     | take it out on the bookcase?                         |
| 20  | A.  | Didn't exactly take it out on the bookcase, it       |
| 21  |     | just caused us to not be gentle in the handling      |
| 22  |     | of the material.                                     |
| 23  | Q.  | You were back in again on November 9, I don't        |
| 24  |     | know that you covered that on direct, but you        |
| 25  |     | actually were back into Mr. Avery's trailer,         |

195

CHRM008194

1    briefly, on November 9, to look for a garage door
2    opener?
3    A.   Yes, sir.
4    Q.   That was also with Lieutenant Lenk, correct?
5    A.   And a Calumet County deputy, yes, sir.
6    Q.   Named Wendling, Deputy Wendling?
7    A.   Yes, sir.
8    Q.   From Calumet County?  There was no time that you
9         went in Mr. Avery's home during November of 2005
10        when you were not also with Lieutenant Lenk?
11   A.   Not that I recall.
12   Q.   No time you went into Mr. Avery's garage when
13        Lieutenant Lenk was not also with you?
14   A.   Not that I recall, no, sir.
15   Q.   This case, you would describe as the largest
16        investigation in which you personally had
17        participated as a law enforcement officer?
18   A.   Yes, sir.
19   Q.   Some of the lengthiest searches, if we take
20        November 5 through November 9 as a whole, in
21        which you have participated?
22   A.   Yes, sir.
23   Q.   Led to very serious charges against Mr. Avery?
24   A.   Yes, sir.
25   Q.   You now know that the law enforcement agencies

196

CHRM008195

| 1 | | involved, principally Calumet County Sheriff's |
| 2 | | Department and the Division of Criminal |
| 3 | | Investigation, have generated hundreds or |
| 4 | | thousands of pages of police reports? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Your total contribution to those reports, is |
| 7 | | what, a little bit under half a page, as of |
| 8 | | November 8, 2005? |
| 9 | A. | That's correct, sir. |
| 10 | Q. | And then about another page as of June 29, 2006? |
| 11 | A. | Correct. |
| 12 | Q. | The report that you filed on, or shortly after, |
| 13 | | November 8, 2005, makes no mention of the Toyota |
| 14 | | key? |
| 15 | A. | That's correct, sir. |
| 16 | Q. | Would you like to see it? |
| 17 | A. | No, I believe you. |
| 18 | Q. | In fact, the only thing you discuss in your |
| 19 | | report is that on November 8, 2005, you were |
| 20 | | using these cotton swabs, about which we have all |
| 21 | | heard a lot, and distilled water, to collect some |
| 22 | | blood spots in the bathroom and laundry room of |
| 23 | | Mr. Avery's trailer? |
| 24 | A. | Yes, sir. |
| 25 | Q. | Were there things that you did not want to commit |

197

CHRM008196

```
 1        to paper, in a report?

 2   A.   No, sir.

 3   Q.   And it all began, I guess, your involvement in

 4        this investigation began, that Thursday night,

 5        November 3, 2005?

 6   A.   Yes, sir.

 7   Q.   And that's the -- that's the report that we

 8        established you wrote more than 7, nearly 8

 9        months later?

10   A.   Yes, sir.

11   Q.   That is, it was almost 8 months after that

12        conversation with Steven Avery, the first

13        conversation with him in this investigation, that

14        you wrote down what you say he said to you, back

15        on November 3?

16   A.   Yes, sir.

17   Q.   Did you have any rough notes, note pad, anything

18        to work off when you wrote that report in the

19        heat of June, 2006?

20   A.   No, I did not, sir.

21   Q.   Well, about 8 months, but then, again, while

22        we're on Steven Avery and your reports about him,

23        that phone call, the phone call you took way back

24        in 1994 or 1995, when you were working in the

25        jail, the phone call where a detective from
```

198

CHRM008197

```
 1        another law enforcement agency told you you may
 2        have the wrong guy in jail, that one?
 3   A.   Yes, sir.
 4   Q.   Did you ever write a report about that?
 5   A.   No, sir.
 6   Q.   Well, actually you did, didn't you?  It was about
 7        8 years later, wasn't it?
 8   A.   I wrote a statement on it, yes, sir.
 9   Q.   You wrote a statement after Sheriff Peterson
10        suggested that maybe you should?
11   A.   Yes, sir.
12   Q.   You wrote that statement in 2003, about the 1994
13        or 1995 telephone call?
14   A.   Yes.
15   Q.   You wrote that statement in 2003, the day after
16        Steven Avery finally walked out of prison, didn't
17        you?
18   A.   I don't know what day Steve was released from
19        prison, but I wrote the statement in 2003.
20   Q.   September 12, 2003 sound right?
21   A.   I said, I don't know the date that I wrote the
22        statement, but I know it was in 2003.
23   Q.   Well, I think I do know the date you wrote it and
24        I'm a happy to show it to you.
25                ATTORNEY STRANG:  I will mark it for
```

CHRM008198

1     identification.

2          (Exhibit No. 213 marked for identification.)

3     Q.   (By Attorney Strang)~ What do you know as

4          Exhibit 213?

5     A.   That's the statement I wrote after speaking with

6          Detect -- or Sheriff Peterson.

7     Q.   What's the date of your statement?

8     A.   September 12, 2003.

9     Q.   Do you remember that now as the day after Steven

10         Avery finally walked out a free man?

11    A.   Sir, I already said I didn't know what day he got

12         released.

13              ATTORNEY STRANG:  That's all I have.

14              THE COURT:  Mr. Kratz.

15              ATTORNEY KRATZ:  I do have a issue outside

16         the presence of the jury, Judge.  I ask that I be

17         able to be heard.

18              THE COURT:  All right.  At this time we'll

19         excuse the jurors for a few minutes.

20                   (Jury not present.)

21              ATTORNEY KRATZ:  I think the witness should

22         be excused as well.

23              THE COURT:  All right.  Mr. Colborn, you

24         may step outside.  Mr. Kratz.

25                   (Witness not present.)

                         200

CHRM008199

ATTORNEY KRATZ:  Thank you, Judge.  As this
Court may know, this was a cross-examination which
was much anticipated.  It was the subject of a great
deal of pre-trial litigation.  It was the point in
the trial where the defense had represented to this
Court, in something that's called an offer of proof,
which is a lawyer's obligation, at least as this
Court presented it to the defense, to tell the Court
what the defense intended to show at trial.

When submitting the defense theory of
the case, in response to the State's motion to
exclude evidence of blood vial, of planting
evidence, the defense, in their offer of proof,
told this Court, promised this Court, that the
defense would -- with evidence, would show that
this witness, Mr. Colborn, or the next witness,
Mr. Lenk, somehow obtained a vial of blood from
the Clerk of Court's Office in Manitowoc County
and planted that evidence, or planted that blood
in Teresa Halbach's SUV.

Now, we have had heard Mr. Strang's
opening statement where planted evidence has been
eluded to.  We have heard cross-examination of
other law enforcement witnesses, by Mr. Buting,
specifically, where he asked whether those

201

CHRM008200

1    officers expected that their superiors would be

2    planting evidence in this case.

3            But now, when it would logically come up

4    in trial, now when evidence would logically be

5    presented, or when the very witness in the

6    defense offer of proof comes before this Court

7    and is able to be asked regarding sneaking into

8    the Clerk's Office, or stealing a vial of blood,

9    or planting evidence, we hear nothing.

10           And despite the contamination by the

11   defense throughout the entire jury selection

12   process, which this Court I think can take

13   judicial notice of, you heard all the questioning

14   about the vial of blood in the Clerk's Office in

15   jury selection, you heard the contamination in

16   press releases, you heard the contamination in

17   opening statements.

18           Now, for the first time, when evidence

19   should be placed into -- into the record, or at

20   least placed into this particular case, we hear

21   nothing.  And so, Judge, I'm asking for

22   alternative direction, or rulings from the Court,

23   first, if the defense is abandoning their

24   planting evidence theory.  The State needs to

25   know that and we need to know that now.

202

1  Because there shouldn't be any more --

2  any more questions of, are you friends with

3  Mr. Lenk, or any questions of any other witnesses

4  about a planting or about blood vials, if they

5  intend not to honor their offer of proof, if the

6  defense now intends not to, as they told this

7  Court in response to the State's motion to

8  exclude this very evidence, that they would prove

9  that evidence from the Clerk's Office, by way of

10  vial of blood would be brought into this case.

11  If they do, in fact, that is, if the

12  defense does in fact intend to abandon that

13  defense, then I will be asking for curative

14  instructions of this jury, at this time, that up

15  to this point in the trial they should disregard

16  Mr. Strang's opening statement, when he talked

17  about further evidence of planting evidence, of

18  any other witnesses that have been asked about

19  planting evidence, or any reference at all to

20  blood vial type evidence.

21  If, in fact, I'm mistaken, if I am

22  jumping the gun, if you will, if this is all

23  going to be Lieutenant Lenk now, rather than

24  Sergeant Colborn, then I am happy to be the first

25  one to stand corrected. But, if this defense is

203

CHRM008202

```
 1    going to be abandoned, before I redirect this
 2    particular witness, the State is entitled to that
 3    ruling and we're entitled to that information.
 4              THE COURT:  Mr. Strang.
 5              ATTORNEY STRANG:  I will stand on the
 6    written materials we made, we tendered to the Court
 7    and filed, with respect to a proffer of evidence and
 8    reasonable inferences from evidence as to the blood
 9    vial.  I will stand on the transcript that our
10    capable court reporter has made of my opening
11    statement and simply note that, while he means no
12    inaccuracy and he is simply trying to give the Court
13    a summary, Mr. Kratz's description of our written
14    materials and my opening statement are not exactly
15    correct, and I will simply stand on them rather than
16    characterize them.
17              Second, just by the by, we haven't
18    gotten to the defense case-in-chief yet at all.
19    We're in the prosecution case-in-chief.  So all
20    of this, at some level, would be wildly
21    premature.  But, beyond that, to confront it most
22    directly, I'm idealistic.  I'm certainly naive at
23    times.  I am not so naive to think that someone
24    who may have planted blood evidence, who may have
25    been involved in planting a key, would come into
```

204

CHRM008203

this courtroom, and simply, because asked under
oath, did you do it, say, oh, yes, I did it.  We
are not going to have a *Perry Mason* moment here.

We will at some point have to establish
the existence of the blood vial in the Clerk's
Office and its state of being there so to speak.
And that could be done in the defense
case-in-chief; it could be done on
cross-examination in the State's case-in-chief,
if the opportunity should present itself with an
appropriate witness.

But I do not expect anyone, Lieutenant
Lenk, Sergeant Colborn, anyone else, to make an
admission, that you would see in the *Perry Mason*
show, on the witness stand.  And the suggestion
that we should be held to getting one from such a
witness is preposterous.  This jury will be
asked, in the end, by both sides, to rely on
reasonable inferences and common sense and on all
of the evidence.

So I don't think there's any relief to
be granted at the moment and there's no point in
discussing now what reasonable inferences may be
available at this point, since neither the jury
nor the parties know what the whole of the

205

CHRM008204

1     evidence will be when the evidence is closed.

2              THE COURT:  Mr. Kratz, anything else?

3              ATTORNEY KRATZ:  Just -- I'm sure, Judge,

4     just one moment, if I could.  I appreciate

5     Mr. Strang's response, Judge.  And when Mr. Strang,

6     and I believe I wrote these words down correctly, we

7     will establish the blood vial in the Clerk's Office,

8     perhaps not through these witnesses; but it is, what

9     I have heard, that they are not abandoning that

10    defense.

11             That was my concern, because there's

12    nothing that requires Mr. Strang or Mr. Buting to

13    keep planting these little nuggets, if you will,

14    and then when the defense part comes, from them

15    saying, defense rests, or saying, now we have

16    abandoned it, when there is further contamination

17    of the jury.

18             That's our concern, Judge.  We're able

19    to meet this defense and we intend to meet this

20    defense.  But we have to do that in good faith

21    reliance, upon pre-trial rulings of this Court,

22    by pre-trial representations by the defense as to

23    where this trial is going, so that we don't

24    interrupt the flow of this case.

25             I don't want to object every time I hear

                        206

CHRM008205

1   the word planting. I don't want to object every

2   time I hear the word, are you friends with

3   Lieutenant Lenk, or anything that might go down

4   that road. In fact, the defense intends to, as

5   their offer of proof, indicates to prove that up

6   at some point, or to embrace that as one of their

7   defenses.

8          And I know that's a clumsy term, and

9   with my apology to Mr. Strang, but I still

10  believe that we're entitled to know that. We're

11  entitled at some point, before there is further

12  contamination, if in fact this defense is going

13  to be abandoned at some point, the State is

14  entitled to know that. That was my point in

15  putting it on the record at this very moment,

16  before I proceed with my redirect examination.

17         THE COURT: I don't know that the defense

18  disagrees that if they should abandon that defense

19  that you would be entitled to some notice, but I

20  don't understand the defense to be saying that they

21  are abandoning that defense.

22         ATTORNEY STRANG: The Court is right on

23  both counts. And this is, you know, I would like to

24  know too whether the State is abandoning the false

25  imprisonment charge, but until we at least get to

207

CHRM008206

1    the point where the State rests its case-in-chief,
2    that's all premature.

3         And I understand Mr. Kratz's concerns.
4    I don't know that if we were abandoning any
5    defense that I would have done the same
6    cross-examination, or for that matter, that
7    Mr. Colborn would have been called on direct at
8    all.

9         ATTORNEY KRATZ:  What I would, just as a
10   final point, Judge, I would ask then, that before
11   the State rests, before the State concludes its part
12   of the case, that we be allowed a hearing, that we
13   be allowed an opportunity on an admissibility
14   hearing, or to meet what at least has been presented
15   to this point.

16        We have heard about vials of blood.  We
17   have heard -- the jury has at least heard,
18   substantially during the voir dire process, about
19   a vial of blood in the Clerk's Office.  We don't
20   have, obviously, any results from the FBI at this
21   particular point yet.  But if and when we do get
22   those, I know that there is some disagreement as
23   to what's rebuttal evidence and can rebuttal, or
24   reply evidence, be put in even in the State's
25   case-in-chief.

208

CHRM008207

1          Because if the defense, technically,

2     wouldn't call one single witness and the State

3     relied upon the defense representation that they

4     intended to put this in and the defense changed

5     their mind, we would be precluded from meeting

6     the challenges, or at least meeting the

7     assertions that have been made up to this point.

8          So, perhaps more by way of prediction

9     between now and the close of the State's case, we

10    will be asking for a hearing on this very issue.

11    I don't intend to have this conversation again.

12    Mr. Strang is right, we'll wait to see how the

13    case plays out.

14         But prior to the State being precluded

15    from meeting this defense, or at least from

16    presenting evidence relevant to this particular

17    topic, and before the State rests, we will be

18    asking for a more extensive opportunity to be

19    heard, even if it's just in writing, Judge.  We

20    will submit something, but we will need some kind

21    of a ruling before the State does rest its case.

22         THE COURT:  All right.  If I'm reading your

23    comments correctly, you are not asking the Court to

24    do anything at this point in time, but you are

25    indicating that you may be asking for relief of some

209

CHRM008208

| 1 | kind at the close of the -- or before the close of |
| 2 | the State's case, pending whatever action the |
| 3 | defense takes between now and then. |
| 4 | ATTORNEY KRATZ: This was the earliest |
| 5 | opportunity and, in fact, the first obvious |
| 6 | opportunity to have heard that kind of evidence. |
| 7 | Since I didn't hear it, I'm putting the Court and |
| 8 | defense on notice of our position. |
| 9 | THE COURT: Mr. Strang. |
| 10 | ATTORNEY STRANG: Fair enough. And I -- I |
| 11 | think I should, you know, in the spirit of the |
| 12 | disclosure that Mr. Kratz has struck, add joining |
| 13 | part of what -- part of what he said. I mean, |
| 14 | clearly, because about half, I think, of the blood |
| 15 | vial sample has been sent off to the FBI for |
| 16 | testing, and we expect testing is ongoing, clearly |
| 17 | there will have to be a hearing. Mr. Kratz may have |
| 18 | one type of hearing in mind; we have another. |
| 19 | Certainly a *Walstad* hearing and there are a variety |
| 20 | of other issues that may arise with the FBI testing. |
| 21 | We are no closer to being able to |
| 22 | conduct any independent testing or to have an |
| 23 | expert to meet and assess the FBI's testing, than |
| 24 | we were when we first addressed this issue. We |
| 25 | have received a protocol from the FBI, thanks to |

210

CHRM008209

```
 1    Mr. Gahn for that; we got that, I don't know, at
 2    the end of last week, I think.

 3         And we'll be filing a motion addressing,
 4    in writing, the issues that this testing and the
 5    denial of defense opportunity for independent
 6    testing or even for a reasonable chance to find
 7    an expert to meet and help us assess, possibly
 8    contradict the FBI test results.  It raises a
 9    whole field of fair trial and due process issues
10    here.  I will address those in writing.

11         I hope to file that before the end of
12    this week.  I expect the State would want a
13    chance to respond in writing and, you know,
14    whatever I see as heading, is the Court needing
15    to schedule, conceivably.  I mean, on Wednesday,
16    gets FBI results and what they are, the Court
17    needing to set a fair amount of time aside to
18    address the whole cluster of issues surrounding
19    that FBI testing.

20         THE COURT:  All right.  Anything else
21    before we bring the jury back in and allow the State
22    to redirect?

23         ATTORNEY KRATZ:  No.  And Mr. Strang's
24    comments are certainly well stated and we actually
25    join that, Judge; we will need a day and whether
```

211

| 1 | it's going to be on a weekend or whether the Court |
| 2 | is going to allow a day or the better part of a day, |
| 3 | that the jury gets a probably much needed day off, |
| 4 | we'll need to schedule that within the trial. But I |
| 5 | am prepared with my redirect at this time, Judge. |
| 6 | THE COURT: Very well. We can bring the |
| 7 | witness back in and the jurors. |
| 8 | (Jury present.) |
| 9 | You may be seated. Mr. Kratz, at this |
| 10 | time you may begin your redirect. |
| 11 | ATTORNEY KRATZ: Thank you, Judge. |
| 12 | **REDIRECT EXAMINATION** |
| 13 | BY ATTORNEY KRATZ: |
| 14 | Q. Sergeant Colborn, just a very few follow-up |
| 15 | questions. Mr. Strang asked you if you had |
| 16 | written a report about that telephone call that |
| 17 | you had sometime in 1994 or '95; do you remember |
| 18 | that question? |
| 19 | A. Yes, sir. |
| 20 | Q. Do you remember your response? |
| 21 | A. My response was, no, that I did not write a |
| 22 | report about it. |
| 23 | Q. As you look back, back in 1994 or '95, if you |
| 24 | would have written a report, what would it have |
| 25 | been about? |

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 213 of 246   Document 290-19

CHRM008211

```
 1   A.   That is why I didn't do one, I don't know what it

 2        would have been about, that I received a call and

 3        transferred it to the Detective Division.  If I

 4        wrote a report about every call that came in, I

 5        would spend my whole day writing reports.

 6   Q.   Did this person ever identify the individual that

 7        they were talking about?

 8   A.   No, sir.  There were no names given.

 9   Q.   Let me ask you this, as you sit here today,

10        Sergeant Colborn, do you even know whether that

11        call was about Mr. Steven Avery?

12   A.   No, I don't.

13   Q.   Mr. Strang also played a telephone call for you,

14        a call to the dispatch center, wherein you asked

15        to verify a license plate; do you recall that?

16   A.   Yes, sir.

17   Q.   Do you know if you made that inquiry of the

18        dispatch center before or after you went to the

19        Avery property on the 3rd of November?

20   A.   I did not, no, sir.  I would think -- I don't

21        know.

22   Q.   Mr. Strang asked whether or not it was common for

23        you to check up on other agencies, or perhaps

24        I'm -- I'm misphrasing that, but when you are

25        assisting another agency, do you commonly verify
```

213

CHRM008212

1      information that's provided by another agency?

2  A.  All the time.  I'm just trying to get -- you

3      know, a lot of times when you are driving a car,

4      you can't stop and take notes, so I'm trying to

5      get things in my head.  And by calling the

6      dispatch center and running that plate again, it

7      got it in my head who that vehicle belonged to

8      and what type of vehicle that plate is associated

9      with.

10 Q.  All right.  Mr. Strang also asked you about a

11     interview that you had with a Investigator Steier

12     from the Calumet County Sheriff's Department

13     sometime in January of this year; is that

14     correct?

15 A.  Yes, sir.

16 Q.  Mr. Strang asked you if, when Investigator Steier

17     asked if you were able to, at that time, back in

18     January, to recreate your day, if you will, on

19     your day off on the 4th of November; is that the

20     substance?

21 A.  Yes, sir.

22 Q.  And in January, were you able to do that?

23 A.  No, sir.

24 Q.  Have you since been asked to recreate or to

25     reexamine your comings and goings on the 4th of

214

CHRM008213

```
 1      November?

 2   A.   Yes, sir.

 3   Q.   And have you now been able to do that?

 4   A.   Yes, sir.

 5   Q.   At any time during the 4th of November, were you

 6        anywhere near the Avery salvage property?

 7   A.   No, I was not.

 8   Q.   At any time other than what we have heard about

 9        on the 3rd, were you anywhere near that salvage

10        property.

11   A.   No, I was not.

12   Q.   Again, before arriving there on the 5th of

13        November, had you gone near or approached

14        anywhere around the Avery salvage property

15        itself?

16   A.   No, sir, I had not.

17            ATTORNEY KRATZ:  That's all the redirect I

18        have of this witness.  Thank you, very much, sir.

19            THE COURT:  Mr. Strang.

20                   **RECROSS-EXAMINATION**

21   BY ATTORNEY STRANG:

22   Q.   How many calls have you ever gotten in your law

23        enforcement career, from another police officer,

24        suggesting you had the wrong guy in jail?

25   A.   I don't know.  I can't recall any others.
```

215

CHRM008214

```
 1                    ATTORNEY STRANG:  That's all I have.

 2                    THE COURT:  All right.  You are excused.

 3          Mr. Kratz, the State may call its next witness.

 4                    ATTORNEY KRATZ:  The State would call

 5          Lieutenant James Lenk, then.

 6                    THE CLERK:  Please raise your right hand.

 7                    LIEUTENANT JAMES M. LENK, called as a

 8          witness herein, having been first duly sworn, was

 9          examined and testified as follows:

10                    THE CLERK:  Please be seated.  Please state

11          your name and spell your last name for the record.

12                    THE WITNESS:  James M. Lenk, L-e-n-k.

13                          DIRECT EXAMINATION

14   BY ATTORNEY KRATZ:

15   Q.     Mr. Lenk, how are you employed?

16   A.     I'm employed with the Manitowoc County Sheriff's

17          Department.

18   Q.     In what capacity, sir?

19   A.     I'm a lieutenant of detectives.

20   Q.     What are your duties as lieutenant?

21   A.     To distribute work amongst the other detectives,

22          to supervise other detectives, also to take cases

23          myself.

24   Q.     So, together with the supervisory responsibility,

25          you have an active case load; is that right?
```

216

CHRM008215

```
1    A.    That's correct.

2    Q.    How long have you been a law enforcement officer?

3    A.    Total of approximately 24 years.

4    Q.    And where did your law enforcement career begin?

5    A.    At the Detroit Police Department in Detroit,

6          Michigan.

7    Q.    How long were you employed in Detroit?

8    A.    Just over four years.

9    Q.    After your -- By the way, what did you do with

10         the Detroit Police Department?

11   A.    I started out at as a patrol officer.  I worked

12         undercover, vice unit.  And I also worked

13         juvenile investigations.

14   Q.    All right.  What was the next law enforcement

15         position that you held?

16   A.    I worked for Michigan Bell, Corporate Security,

17         Michigan Bell Telephone.

18   Q.    How long was that?

19   A.    Approximately two to three years; I don't recall

20         specifically.

21   Q.    All right.  Thereafter, what did you do?

22   A.    I moved to Wisconsin and applied for the

23         Manitowoc County Sheriff's Department.

24   Q.    And were you successful in obtaining that

25         position?
```

217

CHRM008216

| 1 | A. | Yes, I was. |
| 2 | Q. | When did that start? |
| 3 | A. | It started December, 1988. |
| 4 | Q. | Tell the jury, if you would, what your |
| 5 | | responsibilities first were with the Manitowoc |
| 6 | | Sheriff's Department? |
| 7 | A. | When I first got hired on the Manitowoc County |
| 8 | | Sheriff's Department, I worked as a jail officer |
| 9 | | for a year. |
| 10 | Q. | Did you move from that to something else? |
| 11 | A. | Yes, I moved from that to patrol officer. |
| 12 | Q. | How long were you a patrol officer? |
| 13 | A. | I was a patrol officer for a short period of time |
| 14 | | and then I went to the Metro Drug Unit. |
| 15 | Q. | How long were you with the drug unit? |
| 16 | A. | Approximately a year and a half. |
| 17 | Q. | Could you describe your progression, then, |
| 18 | | through the Manitowoc Sheriff's Department? |
| 19 | A. | After the Metro Drug Unit, I became a sergeant |
| 20 | | and I was assigned to the jail division; that |
| 21 | | lasted a couple months. Then I was reassigned to |
| 22 | | the Patrol Division as a sergeant. |
| 23 | Q. | At some point, did you move out of the patrol |
| 24 | | status? |
| 25 | A. | Yes, I did. |

218

CHRM008217

| 1 | Q. | And did you move into investigations or into the |
| 2 | | Detective Bureau? |
| 3 | A. | Yes, I did. |
| 4 | Q. | When did that happen, do you recall? |
| 5 | A. | That was in February of '98, I believe. |
| 6 | Q. | All right. At some point, Lieutenant Lenk, did |
| 7 | | you move into a supervisory capacity within the |
| 8 | | Detective Bureau? |
| 9 | A. | Yes, I did. |
| 10 | Q. | When was that; do you recall? |
| 11 | A. | That was May of 2003. |
| 12 | Q. | Lieutenant Lenk, I'm going to direct your |
| 13 | | attention to November 3rd of 2005, ask if you |
| 14 | | were first employed in the same capacity that you |
| 15 | | hold now, at that time? |
| 16 | A. | Yes, sir. |
| 17 | Q. | And as the lieutenant in the Detective Bureau, |
| 18 | | were you made aware of a missing persons |
| 19 | | investigation that Calumet County had begun? |
| 20 | A. | Yes, I was. |
| 21 | Q. | How were you made aware of that? |
| 22 | A. | I received a phone call from Investigator Wiegert |
| 23 | | asking for assistance on a missing female. |
| 24 | Q. | Is that something you worked on yourself on the |
| 25 | | 3rd, or assigned other officers? |

219

CHRM008218

| 1 | A. | I actually assigned the work to the other |
| 2 | | officers. I stayed in the headquarters building |
| 3 | | and did miscellaneous follow-up and paperwork. |
| 4 | Q. | You did what, I'm sorry? |
| 5 | A. | Miscellaneous follow- up and paperwork. |
| 6 | Q. | Regarding this case or just other work? |
| 7 | A. | This case and other work. |
| 8 | Q. | All right. Is there an individual from the |
| 9 | | Detective Bureau that you assigned to lead the |
| 10 | | Manitowoc part of this investigation? |
| 11 | A. | Yes, it would have been Detective Remiker. |
| 12 | Q. | And does he have a first name? |
| 13 | A. | Dave. |
| 14 | Q. | If you can assist the jury, Lieutenant Lenk, that |
| 15 | | first day, that is, the first day of the missing |
| 16 | | persons investigation, the 3rd of November, what |
| 17 | | was it that your agency, that Manitowoc, was |
| 18 | | asked to assist with? |
| 19 | A. | We were asked to assist with the missing female, |
| 20 | | Teresa Halbach, to assist the Calumet County |
| 21 | | officer that was coming to our county, to go to a |
| 22 | | couple locations. I believe at least one |
| 23 | | location, to see if they could gain information |
| 24 | | to her possible whereabouts. |
| 25 | Q. | As supervisor within the Detective Bureau, did |

220

CHRM008219

1     you speak directly with Detective Remiker
2     regarding those assignments?
3  A.  Yes, I did.
4  Q.  And were you informed.  Were you briefed, I think
5     is the term, by Detective Remiker, regarding his
6     findings that day?
7  A.  Yes, I believe I was.
8  Q.  Did you have any conversation, direct
9     conversation, with Calumet County that first day?
10 A.  Not direct conversation. I talked to Investigator
11    Dedering, who was also the one that came over to
12    our county.
13 Q.  All right.  Anything else happen on the 3rd,
14    other than what you have described regarding
15    the -- Manitowoc's limited role that day?
16 A.  No, sir.
17 Q.  All right.  On the 4th, that would be on Friday,
18    the 4th of November, did you personally become
19    involved in the Manitowoc County portion of this
20    investigation?
21 A.  Yes, sir.
22 Q.  Could you tell the jury how you became involved?
23 A.  Again, I received a telephone call from
24    Investigator Wiegert requesting that we go out
25    and reinterview Steven Avery.

221

CHRM008220

| | | |
|---|---|---|
| 1 | Q. | And did you proceed to Mr. Avery's property that |
| 2 | | day? |
| 3 | A. | Yes, I did. |
| 4 | Q. | Who did you go with? |
| 5 | A. | Detective Dave Remiker. |
| 6 | Q. | Now, Lieutenant Lenk, had you ever been to the |
| 7 | | Avery Salvage Yard as of the 4th of November? |
| 8 | A. | No, I hadn't. |
| 9 | Q. | Did you know where you were going on the |
| 10 | | property? |
| 11 | A. | No. |
| 12 | Q. | When you got to -- Or did you proceed to that |
| 13 | | scene? |
| 14 | A. | Yes. |
| 15 | Q. | When you got to the scene, where did you and |
| 16 | | Detective Remiker go? |
| 17 | A. | We turned to the right on Avery Lane, I guess it |
| 18 | | is, towards Steven's trailer. |
| 19 | Q. | To assist in your testimony, I'm going to show |
| 20 | | you a much referred to exhibit, it's Exhibit No. |
| 21 | | 86; do you recognize that exhibit? |
| 22 | A. | Yes, I do, sir. |
| 23 | Q. | What is that? |
| 24 | A. | That's the Avery Salvage Yard. |
| 25 | Q. | And when you and Detective Remiker got to this |

222

CHRM008221

```
 1              location, tell the jury where you went.  There's
 2              a laser pointer, if you need it, just to your
 3              right, if that would assist you.
 4    A.        We came in -- It's hard to tell the area here.
 5              We came in this road and we turned to the right.
 6    Q.        Why did you turn right?
 7    A.        Habit, I guess, just turned to the right.
 8    Q.        All right.  Tell the jury where you went, please.
 9    A.        We went down to the -- almost to the end of the
10              road and we exited the vehicle.  Detective
11              Remiker went up to the house trailer to knock on
12              the door, with no response; after which he went
13              to, I believe, the Janda trailer, again, knocked
14              on the door, no response.
15                   As we were getting ready to leave, there
16              was a golf cart coming down the lane towards us.
17    Q.        And who was on the golf cart?
18    A.        Steven Avery and his mother.
19    Q.        Did you have occasion to make contact with both
20              Steven and his mother at that time?
21    A.        We talked to Steven, yes.
22    Q.        Upon speaking to Mr. Avery, did you and Detective
23              Remiker ask for an opportunity to look in the
24              inside of his trailer?
25    A.        Yes.  Detective Remiker asked permission to look
```

223

| | | |
|---|---|---|
| 1 | | inside his trailer. |
| 2 | Q. | And was that done? |
| 3 | A. | Yes, it was. |
| 4 | Q. | How long did that take? |
| 5 | A. | Approximately five minutes. |
| 6 | Q. | Mr. Avery cooperative during that entire process? |
| 7 | A. | Yes, he was. |
| 8 | Q. | As you think back to that specific time, |
| 9 | | Lieutenant Lenk, do you have an independent |
| 10 | | memory of your sense of whether Mr. Avery may |
| 11 | | have been involved in Ms Halbach's disappearance? |
| 12 | A. | My memory at that point was that I did not think |
| 13 | | there was any involvement with Mr. Avery. |
| 14 | Q. | So you, Lieutenant James Lenk, the head of the |
| 15 | | Detective Bureau, on the 4th of November, didn't |
| 16 | | even think Steve was involved; is that what you |
| 17 | | are telling us? |
| 18 | A. | That's correct. |
| 19 | Q. | Let me ask you this, Lieutenant Lenk, with that |
| 20 | | having been said, did you take any steps from |
| 21 | | that point forward to either plant evidence or to |
| 22 | | ensure that Mr. Avery would be falsely accused of |
| 23 | | that homicide? |
| 24 | A. | No, sir, I definitely did not. |
| 25 | Q. | Is that something that you have ever done in your |

224

CHRM008223

```
 1         law enforcement career?
 2    A.   No, sir, I have never planted any evidence at any
 3         time.
 4    Q.   Would you ever do something like that?
 5    A.   No, sir, I would not.
 6    Q.   The next day, on Saturday, the 5th of November;
 7         do you remember that day?
 8    A.   Yes, sir.
 9    Q.   What were you doing that day, if you recall?
10    A.   I was with my wife over near Menasha, looking for
11         a trailer for camping.
12    Q.   Do you remember getting a call that day?
13    A.   Yes, sir.  I believe it was a page, initially.
14    Q.   Did you speak with somebody?
15    A.   Yes, I did.
16    Q.   Who was that?
17    A.   Detective Remiker.
18    Q.   After getting the call from Detective Remiker,
19         did that affect your activities that morning?
20    A.   Yes, sir.  We stopped looking for the trailer and
21         I advised my wife, I have to get back, I have to
22         go to work.
23    Q.   What did you do then?
24    A.   We left the trailer sales, started to head home.
25         We got to Oneida and 441, my wife insisted that I
```

225

CHRM008224

1        get something to eat because she knew that I

2        wouldn't eat the rest of the day, so we stopped

3        at Wendy's.

4  Q.  Was that your idea?

5  A.  No, it was not.

6  Q.  But you stopped any way?

7  A.  Yes, sir.

8  Q.  All right.  Where did you go then?

9  A.  After we had a quick lunch at Wendy's, I went

10     directly home.  And then from home, I went to the

11     department, to pick up my vehicle and my

12     supplies.

13  Q.  And when you talk about picking up a vehicle, can

14     you describe that vehicle for us, please.

15  A.  It's an unmarked police vehicle owned by

16     Manitowoc County Sheriff's Department.

17  Q.  What kind of supplies did you pick up at the

18     Sheriff's Department?

19  A.  Briefcase with various papers in it, radio, that

20     type of thing.

21  Q.  Okay.  Where did you go then?

22  A.  I went from there to the Avery Salvage Yard.

23  Q.  And, again, that's Exhibit No. 86; is that right?

24  A.  That's correct.

25  Q.  As you sit here today, Lieutenant Lenk, do you

226

CHRM008225

1    recall about what time you arrived at that scene?

2  A.   It was just shortly after 2:00, 2:05, somewhere

3       in there.

4  Q.   Now, when you got to the scene, the Avery salvage

5       scene, had there been any kind of log in or check

6       in procedure put in place yet?

7  A.   I don't recall a log in at that point.

8  Q.   All right.

9  A.   I just don't recall.

10 Q.   What did you do when you got to the scene?

11 A.   I met with the officers that were at the scene,

12      some from Manitowoc County, some from Calumet

13      County.

14 Q.   Where did you meet with them?

15 A.   Right at the beginning of the roadway where the

16      command center would have been set up.

17 Q.   Can you show us on the diagram -- or excuse me,

18      the photo?

19 A.   Would have been right in this area.

20 Q.   Be an area just to the south of what we now know

21      are the business buildings; is that right?

22 A.   That's correct, sir.

23 Q.   I'm sorry, the north of.  When you got there

24      Lieutenant Lenk, were there other members of your

25      department already on scene?

                           227

CHRM008226

```
 1   A.   Yes, there were.
 2   Q.   Do you remember who you met with or who you saw
 3        at that time?
 4   A.   I know I talked to Deputy Inspector Schetter.
 5        I'm not real sure who else was there from our
 6        department that I talked with, quite a few
 7        officers there.
 8   Q.   From a hierarchy standpoint, or who's the boss
 9        kind of a standpoint, is Deputy Inspector
10        Schetter, or was he at the time, ahead of you or
11        on top of you, regarding authority or rank within
12        the department?
13   A.   Yes, sir, he was.
14   Q.   Do you recall, Lieutenant Lenk, being involved,
15        or overhearing discussions regarding who should
16        lead up this investigation?
17   A.   I believe, by the time I got there, that they had
18        already decided that Calumet County would lead
19        the investigation.
20   Q.   All right.  Were there Calumet County officers on
21        scene?
22   A.   Yes, sir, I believe there were.
23   Q.   At some point later that afternoon, do you recall
24        other officials arriving at the scene, including
25        myself, with the signed search warrant?
```

228

CHRM008227

```
 1   A.   Yes, sir, I do.

 2   Q.   After D.A.'s and lead investigators got to the

 3        scene, were you asked to perform any duties at

 4        that scene?

 5   A.   Yes, sir.  We were asked to assist Calumet

 6        County.

 7   Q.   From Manitowoc County, other than Deputy

 8        Inspector Schetter, was there any individual of

 9        higher rank than you at the scene?

10   A.   I'm not sure.  You mean from the sheriff's

11        department?

12   Q.   Yes.

13   A.   No, sir.  I don't think so.

14   Q.   All right.  Now, looking at Exhibit No. 86 and

15        remembering back to that first late afternoon; do

16        you remember whether manpower issues were a

17        factor that afternoon?

18   A.   Yes, sir, they were a factor.

19   Q.   Could you describe that for the jury.  What does

20        that mean?

21   A.   That means that there was a very large area.  The

22        search warrants were already obtained and there

23        was limited manpower to search that area.

24   Q.   I'm sure most, if not all of these potential --

25        or these jurors have not been to a crime scene;
```

229

CHRM008228

```
 1        is this a typical crime scene by way of size or
 2        scope?
 3   A.   No, sir, it's not.
 4   Q.   Can you describe better or explain that for the
 5        jury, please.
 6   A.   Most crime scenes are a smaller area, either a
 7        house or a small yard, or a room, this area was
 8        immense.
 9   Q.   When you arrived, did you appreciate the size or
10        the scope of this effort?
11   A.   Yes.  I also got a further appreciation the more
12        I looked around the property.
13   Q.   All right.  What did you believe Manitowoc County
14        Sheriff's Department involvement was going to be
15        at that scene?
16   A.   Our involvement was to be part of the search
17        team, basically extra eyes and hands to do the
18        searching.
19   Q.   Are you familiar with the term evidence tech?
20   A.   Yes, sir.
21   Q.   What is that?
22   A.   It's an individual on the police department, or
23        sheriff's department, that has had some training
24        in how to gather evidence and package evidence,
25        at a crime scene.
```

230

CHRM008229

```
 1   Q.   You talked about manpower before, was there an
 2        abundance of evidence techs at that scene?
 3   A.   No, sir, there was not.
 4   Q.   Are you an evidence tech, or were you?
 5   A.   Yes, sir.
 6   Q.   Do you know, at that scene, what other members of
 7        Manitowoc County Sheriff's Department would have
 8        similar training or experience as an evidence
 9        tech?
10   A.   Yes, sir.  Sergeant Andy Colborn and Detective
11        Dave Remiker.
12   Q.   Now, Lieutenant Lenk, prior to your arrival at
13        the Avery Salvage Yard on the 5th, had you had
14        previous dealings or contact with Steven Avery?
15   A.   Just the contact on the 4th of November.
16   Q.   Do you recall being one of many individuals
17        involved in what's called a deposition, for
18        Mr. Avery?
19   A.   Yes, sir.
20   Q.   And can you tell the jury about that process,
21        please.
22   A.   Well, the process was, I received a subpoena to
23        give a deposition in the Avery lawsuit case
24        against Manitowoc County.
25   Q.   Did you respond to that subpoena, did you provide
```

231

| | | |
|---|---|---|
| 1 | | testimony? |
| 2 | A. | Yes, sir, I did. |
| 3 | Q. | And so the jury understands, when Mr. Avery was |
| 4 | | wrongfully convicted back in 1985, were you a |
| 5 | | member of the Manitowoc County Sheriff's |
| 6 | | Department? |
| 7 | A. | No, I was not. |
| 8 | Q. | Then, what involvement did you have; in other |
| 9 | | words, what was your part of the deposition? |
| 10 | A. | The part of the deposition was that I received a |
| 11 | | statement from Sergeant Colborn, in 2003, I |
| 12 | | believe, September, that he had taken a phone |
| 13 | | call back in 1997, from another department, I |
| 14 | | believe he said it was Brown County Sheriff's |
| 15 | | Department, that they had in custody an |
| 16 | | individual that had committed an assault in |
| 17 | | Manitowoc County and that Manitowoc County had |
| 18 | | someone in custody for that assault. |
| 19 | Q. | Is that all? |
| 20 | A. | That's all. |
| 21 | Q. | Did you even receive that call back in the |
| 22 | | mid-nineties? |
| 23 | A. | No, sir, I did not. |
| 24 | Q. | So your deposition was that you heard that Andy |
| 25 | | Colborn got such a call; is that right? |

232

CHRM008231

| | | |
|---|---|---|
| 1 | A. | Yes, sir, I received that information from Andy, |
| 2 | | himself. |
| 3 | Q. | Did that lawsuit cause you any personal or |
| 4 | | professional embarrassment? |
| 5 | A. | No, sir, it did not. |
| 6 | Q. | Did that lawsuit create any angst or ill feelings |
| 7 | | on your part? |
| 8 | A. | No, sir, it did not. |
| 9 | Q. | Did the fact of that lawsuit cause you any upset, |
| 10 | | or aggravation, or anger? |
| 11 | A. | No, sir, it did not. |
| 12 | Q. | Did that lawsuit cause you or compel you to -- to |
| 13 | | plant any evidence in this case? |
| 14 | A. | No, sir, definitely not. |
| 15 | Q. | What did you feel about that lawsuit; do you |
| 16 | | remember? |
| 17 | A. | I pretty much didn't care, one way or the other. |
| 18 | Q. | All right. How were individuals assigned |
| 19 | | responsibilities out at the Avery salvage |
| 20 | | property? |
| 21 | A. | I believe the assignments came through the two |
| 22 | | officers in charge, Agent Fassbender and |
| 23 | | Investigator Wiegert. |
| 24 | Q. | Was this a situation where you volunteered for a |
| 25 | | particular search or an area that you wanted to |

233

CHRM008232

| | | |
|---|---|---|
| 1 | | become involved? |
| 2 | A. | No, sir. |
| 3 | Q. | Did you even know when you got your assignments |
| 4 | | -- and we'll be talking about a couple later that |
| 5 | | week -- but did you know where you were going to |
| 6 | | be assigned? |
| 7 | A. | No, sir. |
| 8 | Q. | Lieutenant Lenk, were you made aware that search |
| 9 | | teams were being assembled? |
| 10 | A. | Yes, sir. |
| 11 | Q. | And was there anything unique about the law |
| 12 | | enforcement officers that were being selected for |
| 13 | | those search teams, if you know? |
| 14 | A. | I don't know, specifically, other than that they |
| 15 | | were to have a Calumet officer in charge of the |
| 16 | | team. |
| 17 | Q. | What I'm asking, though, is the other -- other |
| 18 | | than a Calumet County lead person involved, the |
| 19 | | others that were chosen to be on that team, did |
| 20 | | they have any unique or similar quality about |
| 21 | | them? |
| 22 | A. | Yes, sir.  They were requesting anyone that had |
| 23 | | evidence technician experience. |
| 24 | Q. | As a supervisor and as a long time law |
| 25 | | enforcement officer, do you have an opinion as to |

234

CHRM008233

```
 1       why that was being done?
 2    A. My opinion is they wanted the best people that
 3       they could get, at the scene, to do the
 4       searching.
 5    Q. All right. That first night, were you made a
 6       part of one of those teams?
 7    A. Yes, sir.
 8    Q. Who was in charge or who was the lead officer in
 9       your search team?
10    A. Sergeant Bill Tyson.
11    Q. Now, you are a lieutenant and he was a sergeant;
12       is that right?
13    A. That's correct, sir.
14    Q. Did you have any concern or problem with taking
15       directional orders from Sergeant Tyson?
16    A. No, sir.
17    Q. Did you believe at that time, or actually
18       throughout this entire investigation, that rank
19       had anything to do with who was calling the
20       shots?
21    A. No, sir, I did not.
22    Q. Tell the jury, if you recall, when that first
23       team was assembled, if there were particular
24       responsibilities that each officer had?
25    A. Each officer was assigned a certain area of
```

235

CHRM008234

```
 1          searching.  It was done as a team, but each
 2          officer was assigned a certain particular area of
 3          a room, or living room, or kitchen, of an area
 4          that he was responsible for, or a team of
 5          officers would be responsible for.
 6    Q.    All right.  Was there direction that your team
 7          received about items of evidentiary value and who
 8          should take them into custody or who should seize
 9          them?
10    A.    Yes, we were told that all evidence would be
11          collected by Calumet County officers.  All
12          reports would be done by Calumet County officers.
13          And basically we were there just to assist in the
14          searching process.
15    Q.    Let's talk about reports for a minute.  Wouldn't
16          it be typical for each individual officer at a
17          scene like this to do their own reports?
18    A.    Normally, yes.
19    Q.    Are you saying this was different or you were
20          given different direction?
21    A.    We were given different directions, yes.
22    Q.    The first area that you were involved personally,
23          in searching on the 5th, was what?
24    A.    Steven Avery's trailer.
25    Q.    Can you tell us who the other members of your
```

236

CHRM008235

```
 1          search team were?
 2   A.     Sergeant Tyson, Sergeant Colborn and Detective
 3          Remiker.
 4   Q.     The jury has already heard this a couple of times
 5          so we're not going to go piece by piece, I'm sure
 6          thankfully; but could you just tell us the rooms
 7          that were searched by the search team, please.
 8   A.     The rooms that were searched would be the
 9          southernmost bedroom, that would be Steven
10          Avery's bedroom; the hallway; the bathroom that
11          is next to the bedroom; next to the bathroom area
12          is a second bedroom that was searched; next to
13          the bath -- or the second bedroom is the living
14          room area; followed by the kitchenette area; and
15          the kitchen.
16   Q.     I'm not sure my math is that great, Lieutenant,
17          but how long have you been a police officer, just
18          total number of years?
19   A.     Around 24 year.
20   Q.     In 24 years of law enforcement experience, have
21          you been involved in searches of residences and
22          property before?
23   A.     Yes, I have.
24   Q.     Are there different kinds of searches?
25   A.     I'm not sure what you mean.
```

237

CHRM008236

| | | |
|---|---|---|
| 1 | Q. | Well, if a property, a residence, as an example, |
| 2 | | is to be searched by you or another law |
| 3 | | enforcement officer; are you familiar with the |
| 4 | | detail in which some of those searches are |
| 5 | | performed in? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Was this first search of the Avery property |
| 8 | | intended to be a thorough, tear the place apart, |
| 9 | | type search? |
| 10 | A. | No, sir, it was not. It was more of a general |
| 11 | | search. |
| 12 | Q. | All right. I guess that's my question, maybe |
| 13 | | tell the jury what you believed a general search |
| 14 | | was? |
| 15 | A. | At that time, a general search was looking for |
| 16 | | any obvious signs for the missing Teresa Halbach, |
| 17 | | in that trailer. It's pretty generalized at that |
| 18 | | point. |
| 19 | Q. | Do you know about how long you guys took in that |
| 20 | | trailer? |
| 21 | A. | I believe it was around two and a half hours. |
| 22 | Q. | All right. During that initial search, did you |
| 23 | | notice any firearms in Mr. Avery's bedroom? |
| 24 | A. | Yes, sir. |
| 25 | Q. | Can you describe what you saw, please. |

238

CHRM008237

```
 1   A.   There was a gun rack above the head of the bed,
 2        in the bedroom area.  There were two firearms in
 3        there.  I believe one was a .22 and one was a
 4        muzzleloader firearm.
 5   Q.   You said that you searched the entire trailer.
 6        After that first search was complete, of Steven's
 7        trailer, can you tell the jury what you did,
 8        please.
 9   A.   After that search was completed, I think we ended
10        for the day.
11   Q.   Was there some meeting or something that occurred
12        before you left?
13   A.   Yes, there was a meeting at the command center.
14   Q.   What's the purpose of that?
15   A.   To discuss what had been done and what needs to
16        be done the next day.
17   Q.   Lieutenant Lenk, any time on the 5th of November,
18        did you have any contact with Teresa Halbach's
19        SUV?
20   A.   No, sir, I did not.
21   Q.   Did you have any contact with her SUV on the 4th
22        of November, or the 3rd of November, or in fact
23        any time there before?
24   A.   No, sir, I did not.
25   Q.   Were you asked to return to the property the next
```

239

CHRM008238

```
 1        day, the 6th?
 2   A.   Yes, sir, I was.
 3   Q.   And can you describe for the jury what your
 4        responsibilities were on the 6th, please.
 5   A.   On the 6th we met at the command center.  We were
 6        assigned to Deputy Kucharski.  And I believe we
 7        were to search the garage on Steven Avery's
 8        portion of the property.
 9   Q.   Describe the kind of search that was, please.
10   A.   Again, that was a general search for any
11        indications of Teresa Halbach.
12   Q.   Where did you go after that?
13   A.   I believe we went -- got -- either went back to
14        the command center or received information from
15        them for the next place to search.
16   Q.   Do you remember how long you were in the garage,
17        roughly?
18   A.   Maybe an hour, hour and a half, I'm not exactly
19        sure.
20   Q.   Now, the question, Lieutenant Lenk, is searching
21        that garage for an hour, or an hour and a half,
22        do you believe that you found, or would have
23        found everything of any evidentiary value in that
24        garage?
25   A.   At that time we thought we found everything that
```

240

CHRM008239

1  was of evidentiary value, yes.

2 Q. All right. Do you remember the interior of that

3  garage, as you think back?

4 A. Yes, I do.

5 Q. Was there a lot of things in that garage?

6 A. Yes, sir, it was full of things.

7 Q. All right. Were you informed, Lieutenant Lenk,

8  of how long, that is, the estimated time that law

9  enforcement was going to keep control of this

10  scene? Did you know that first day?

11 A. No, I didn't know that first day.

12 Q. Did you know whether you were going to do

13  additional searches of either residences, or

14  garages, or outbuildings, or anything like that?

15 A. Yes, we planned on doing additional searches of

16  the buildings.

17 Q. Let me ask you, Lieutenant Lenk, on the 6th, that

18  is, on that Sunday, did you have occasion to

19  assist other officers in a search of the

20  defendant's sister's home, that's Barb Janda?

21 A. Yes, sir.

22 Q. Could you describe that search, generally, for

23  us, please.

24 A. That was, again, a general search looking for

25  items that might relate to Teresa Halbach.

241

CHRM008240

| | |
|---|---|
| 1 | Q. Do you remember Detective Remiker noticing and |
| 2 | investigating an answering machine at that time? |
| 3 | A. Yes, sir. |
| 4 | Q. Were you asked to return to Steve Avery's trailer |
| 5 | at all? |
| 6 | A. Yes, sir, I think we were. |
| 7 | Q. And do you remember the scope of that? |
| 8 | A. I believe we were asked to go back, as a team, to |
| 9 | collect the firearms, a vacuum cleaner and the |
| 10 | bedding, I believe, off the spare bedroom. |
| 11 | Q. Again, who was in charge of seizing and taking |
| 12 | control of the evidence on that day? |
| 13 | A. Calumet County officer Deputy Kucharski. |
| 14 | ATTORNEY KRATZ: I just have two other |
| 15 | points, Judge, and then I will recommend that we |
| 16 | quit for the day, but let me finish this day, if I |
| 17 | may. |
| 18 | Q. On the 6th, Lieutenant Lenk, were there other |
| 19 | buildings that you were asked to search? |
| 20 | A. Yes, sir, there were. |
| 21 | Q. What were those buildings? |
| 22 | A. There was a large business office area building, |
| 23 | I believe they called it the office. And we also |
| 24 | searched, I believe it was Mr. Chuck Avery's |
| 25 | residence. |

242

CHRM008241

```
 1   Q.   All right.  And the same search team that is
 2        headed by Kucharski was involved in those
 3        searches as well?
 4   A.   Yes, sir.
 5   Q.   All right.
 6             ATTORNEY KRATZ:  I do recommend, Judge, and
 7        this may be a good time to break for the day and
 8        call this witness tomorrow morning.
 9             THE COURT:  All right.  Members of the
10        jury, I will remind you, again, that you are not to
11        discuss this case at all and make sure you don't
12        watch any news accounts about the case this evening.
13        We'll see you tomorrow morning.
14             ATTORNEY STRANG:  Your Honor?
15             THE COURT:  Yes.
16             ATTORNEY STRANG:  While we still have the
17        jury, I forgot to move in Exhibit 212, Sergeant
18        Colborn; 213 was only marked and need not be moved
19        in.
20             ATTORNEY KRATZ:  No objection.
21             THE COURT:  212, you are asking for
22        admission?
23             ATTORNEY STRANG:  Yes.
24             THE COURT:  Court will admit 212.  Very
25        well, you are excused for the day.

                        243
```

CHRM008242

1                    (Jury not present.)

2              THE COURT:  All right.  Counsel, we'll see

3     you tomorrow morning.

4              ATTORNEY STRANG:  8:30?

5              THE COURT:  Yes.

6              ATTORNEY KRATZ:  Thank you, Judge.

7                 (Proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          244

CHRM008243

```
 1   STATE OF WISCONSIN  )
                          )ss
 2   COUNTY OF MANITOWOC )

 3

 4                  I, Diane Tesheneck, Official Court

 5        Reporter for Circuit Court Branch 1 and the State

 6        of Wisconsin, do hereby certify that I reported

 7        the foregoing matter and that the foregoing

 8        transcript has been carefully prepared by me with

 9        my computerized stenographic notes as taken by me

10        in machine shorthand, and by computer-assisted

11        transcription thereafter transcribed, and that it

12        is a true and correct transcript of the

13        proceedings had in said matter to the best of my

14        knowledge and ability.

15                  Dated this 7th day of NOVEMBER, 2007.

16

17

18

19                  Diane Tesheneck, RPR
                    Official Court Reporter
20

21

22

23

24

25


                            245
```

CHRM008244