# EXHIBIT 20

```
 1    STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                              BRANCH 1
 2
 3    _____

 4    STATE OF WISCONSIN,

 5                    PLAINTIFF,        JURY TRIAL
                                        TRIAL DAY 8
 6    vs.                               Case No. 05 CF 381

 7    STEVEN A. AVERY,

 8                    DEFENDANT.

 9    _____

10    DATE:    FEBRUARY 21, 2007

11    BEFORE:  HON. PATRICK L. WILLIS
                Circuit Court Judge
12
      APPEARANCES:
13
                KENNETH R. KRATZ
14              Special Prosecutor
                On behalf of the State of Wisconsin.
15
                THOMAS J. FALLON
16              Assistant Attorney General
                On behalf of the State of Wisconsin.
17
                NORM GAHN
18              Special Prosecutor
                On behalf of the State of Wisconsin.
19
                DEAN A. STRANG
20              Attorney at Law
                On behalf of the Defendant.
21
                JEROME F. BUTING
22              Attorney at Law
                On behalf of the Defendant.
23
                STEVEN A. AVERY
24              Defendant
                Appeared in person.
25
                                    1
```

COPY

CHRM007765

* * * * * * * *

TRANSCRIPT OF PROCEEDINGS

Reported by Jennifer K. Hau, RPR

Official Court Reporter

Case 1:19-cv-00484-BHL    Filed 09/16/22    Page 3 of 16    Document 290-20

CHRM007766

```
 1         what did you do?
 2    A    After the magazines and a binder were pushed back
 3         into the bookcase, I advised Deputy Kucharski that I
 4         would go out into the living room and retrieve bags
 5         or try to get boxes to put the items that we had
 6         recovered.
 7    Q    Did you do that?
 8    A    Yes, I did.
 9    Q    On your return to the bedroom, tell the jury what
10         you saw?
11    A    When I entered the bedroom, I caught my eye, I saw a
12         key laying in front of the slippers by the back
13         corner of that cabinet.
14    Q    Now, before Sergeant Colborn's manipulation or,
15         um, banging around of that piece of furniture,
16         had that key been there?
17    A    No, sir, it was not.
18    Q    If you could use your laser pointer again, tell
19         the jury about where in that bedroom you were
20         standing when you saw the key and where was the
21         key?
22    A    I was coming in that door, and the key was right at
23         the back corner of that cabinet on the floor.
24    Q    There's been another exhibit which has been
25         admitted into evidence.  It's Exhibit No. 210.
```

```
 1                ATTORNEY KRATZ:  Objection, relevance, Your
 2     Honor.
 3                THE COURT:  Uh, Mr., uh, Strang?
 4                ATTORNEY STRANG:  I'm -- I'm exploring
 5     his attitudes about the lawsuit and its
 6     consequences.
 7                ATTORNEY KRATZ:  This isn't a consequence
 8     of the lawsuit at all, Judge.
 9                THE COURT:  Yeah.  I'm going to sustain the
10     objection.
11  Q  (By Attorney Strang)  Do you care one way or the
12     other, Lieutenant Lenk, about whether your
13     Department gets the right guy in a criminal
14     investigation?
15  A  Definitely.
16  Q  That you do care about?
17  A  Yes, sir.
18  Q  And what's your preference?
19  A  I'm not sure what your question is, sir.
20  Q  Well, since you cared about whether they do or
21     don't get the right guy, what's your preference?
22  A  My preference is you always try to get the right
23     person.
24  Q  Now, this was the lawsuit that eventually led to
25     your deposition?
```

```
 1    A    Yes, sir.
 2    Q    Your deposition on, I think, October 11, 2005?
 3    A    I believe that's the date.  I'm not positive.
 4    Q    I won't even bother to mark this, but I don't
 5         want to have you have any questions about it.
 6         I'm showing you the transcript of your
 7         deposition.  What's the date of that deposition?
 8    A    October 11, 2005.
 9    Q    That's you with your picture on the front?
10    A    Yes, sir.
11    Q    Lieutenant Lenk, was October 11, 2005, the first
12         time you had ever had your deposition taken?
13    A    Regarding this lawsuit?
14    Q    Regarding anything.
15    A    No, sir.  I believe I've had done it at least once
16         before.
17    Q    Had -- had a deposition before.  All right.  Uh,
18         this was, though, something unusual for you?
19    A    Yes.
20    Q    You were subpoenaed?
21    A    Is that a question, sir, or --
22    Q    Yes.
23    A    Yes, I was.
24    Q    And, uh, you asked, uh -- or you were asked a
25         number of questions?
```

55

```
 1   A    That's correct.
 2   Q    You under -- you un -- you understand that this
 3        process here that we're doing, I'm the one asking
 4        questions?  So I'm speaking to you.  I'm asking
 5        you a question?
 6   A    Yes, sir.
 7   Q    Okay.  And you're providing answers?
 8   A    Yes, sir, I am.
 9   Q    Uh, you provided answers at the deposition in
10        much the same format, didn't you?
11   A    Yes, sir, I did.
12   Q    And I think you told us that one -- sort of the
13        major topic of this deposition was the telephone
14        call that Sergeant Colborn, in fact, when he was
15        in the jail, had received some years earlier?
16   A    That's correct.
17   Q    Sergeant Colborn told you about that telephone
18        call, didn't he?
19   A    Yes, in 2003.
20   Q    That is, he told you about it on the very day of
21        Steven Avery's release or the very next day,
22        didn't he?
23   A    I don't recall.  It could have been, yes.
24   Q    But you all were having a conversation about
25        Mr. Avery being released from prison; right?
```

```
 1   A    I don't know if we were having a conversation about
 2        that specifically, no.
 3   Q    But, in any event, uh, whether there was a
 4        conversation or not, uh, Officer Colborn had
 5        given you this information, uh, and you thought
 6        it may or may not be relevant?
 7   A    That's correct.
 8   Q    And, uh, you should -- you -- you told Officer
 9        Colborn he ought to pass it along to the sheriff?
10   A    Yes, sir.
11   Q    And the two of you went to Sheriff Peterson
12        together about it?
13   A    Yes, sir, I believe we did.
14   Q    And, uh, Sheriff Peterson suggested that maybe
15        the two of you ought to prepare a short report or
16        statement about that?
17   A    That's correct.
18   Q    You prepared that statement on September 12,
19        2003?
20   A    I believe it was that same day, yes.
21   Q    Do you recall that, or do you not, as being the
22        day after Steven Avery was released from prison?
23   A    I don't specifically recall if that was the same day.
24   Q    Did you consider the possibility that you might
25        be added as a defendant to that civil lawsuit?
```

```
 1   A    No, sir, I did not.
 2   Q    Never crossed your mind?
 3   A    No, sir.
 4   Q    Now, Teresa Halbach.  It's November 3, 2005 when
 5        you first learned that she is missing?
 6   A    That's correct, sir.
 7   Q    She's reported missing by another county?  Not
 8        Manitowoc County?
 9   A    Yes, it was Calumet County.
10   Q    The adjoining county, but a different county
11        altogether?
12   A    That's correct.
13   Q    Uh, this is, at that point, their missing person
14        investigation?
15   A    Yes, sir.
16   Q    You at -- at the time, November 3, 2005, uh, were
17        then, as you are now, the chief detective, if you
18        will, for Manitowoc County?
19   A    Lieutenant of detectives, yes, sir.
20   Q    That is in charge of all of the other detectives
21        in the Manitowoc County Sheriff's Department?
22   A    Correct.
23   Q    You also have some duties as a detective yourself
24        in the field, so to speak?
25   A    Yes, sir.
```

58

CHRM007822

```
 1         the 210.  What you did notice is that the, uh --
 2         the key is found not behind the bookcase, is it?
 3    A    No, sir, it was not.
 4    Q    Uh, not flush with the wall, was it?
 5    A    No, sir.
 6    Q    But to the sides of the bookcase?
 7    A    Back by the corner to the side.  Yes, sir.
 8    Q    And with -- with all of this which you've
 9         described, and I won't even go to later
10         November 8 or November 9, but with all of this,
11         we've got a page or page-and-a-half of police
12         reports from you, didn't we?
13    A    From myself, sir?
14    Q    Yes.
15    A    Yes, sir.
16    Q    Now, November 5, when you, uh -- you volunteered
17         with Mr. Colborn and Mr. Remiker to search Steven
18         Avery's trailer, uh, as of that time you
19         previously had talked with Sergeant Colborn about
20         the depositions the two of you gave?
21    A    I believe we did at some point.  Yes, sir.
22    Q    Talked before the depositions, didn't you?
23    A    He asked me if I got a -- a deposition subpoena, and
24         I said, yes.
25    Q    And the two of you had a little conversation
```

```
 1              about that?
 2    A         Yes.  I had no idea what I was getting subpoenaed
 3              for, and he said it was because of a statement he had
 4              made.
 5    Q         A statement -- you know, a phone call he had
 6              gotten?
 7    A         Correct, sir.
 8    Q         From a Brown County law enforcement agency?
 9    A         That's what he said, sir.
10    Q         From a detective?
11    A         Yes, sir.
12    Q         They had someone in custody?
13    A         Yes, sir.  I believe so.
14    Q         Someone who had committed a Manitowoc assault
15              some years prior?
16    A         It was a Manitowoc assault.  I don't know if there
17              was a time attached to it.  I'm not sure.
18    Q         At least what Sergeant Colborn told you was there
19              was a few years prior.  The detective from the
20              other Brown County agency was telling him.
21    A         Yes, if that's what's on there.
22    Q         And, uh, the detective also told Colborn that he
23              believed someone already was arrested for the
24              crime?
25    A         That's correct, sir.
```

```
 1   Q   So Sergeant Colborn fills you in on what he
 2       thinks the depositions are about and, uh, the two
 3       of you don't talk about the depositions after
 4       them?
 5   A   After the depositions?
 6   Q   Right.
 7   A   We may have mentioned it to each other.
 8   Q   Okay.  But it's less than four weeks later,
 9       November 5, and one thing you do know is that you
10       didn't mention that deposition to Special Agent
11       Fassbender?
12   A   That's correct, sir.
13   Q   You didn't mention it to Investigator Mark
14       Wiegert?
15   A   That's correct.
16   Q   Didn't hear Sergeant Colborn mention the
17       depositions to either of those two gentlemen
18       either?
19   A   Not to my recollection.  No, sir.
20   Q   Didn't tell Sheriff Pagel that you'd been deposed
21       three, four weeks earlier?
22   A   No, sir.
23   Q   Had Steven Avery actually been sitting there
24       during you deposition?
25   A   He came in after I had started giving my deposition.
```

```
 1        Yes, sir.
 2    Q   And, um, without you telling Mr. Fassbender, and
 3        Mr. Wiegert, Sheriff Pagel about the deposition,
 4        there's really no way they would have known about
 5        it, would they have?
 6    A   No, sir.
 7    Q   So that's not information they could consider in
 8        deciding whether to accept your offer to
 9        volunteer to search Mr. Avery's trailer?
10    A   They didn't have that information, sir.
11    Q   Because you didn't give it to them?
12    A   No, sir, I did not.
13    Q   In effect, you took the decision upon yourself
14        that this was information they didn't need to
15        have?
16    A   At that time I didn't even think about the
17        deposition.
18    Q   Would it have been a little bit fairer to
19        Mr. Fassbender if you had given him this
20        information so that he, as the lead -- one of the
21        two lead investigators, could have considered it?
22    A   It would have been more information for him.  I don't
23        know if it would have changed his decision.
24    Q   I don't know either, but would it have been fair
25        to give him that information?
```

106

1 A   Had I thought of it, yes, sir.
2 Q   Would it have been fair to give that to
3     Mr. Wiegert or Sheriff Pagel?
4 A   Same answer. Yes, sir.
5 Q   And before you went rummaging through Steven
6     Avery's bedroom once, twice, three times,
7     whatever it was, for hours, would it have been
8     fairer to Steven Avery if someone other than a
9     person who had been deposed in his lawsuit had
10    done that search?
11 A  No, sir, I don't think it would have been.
12          ATTORNEY STRANG: That's all I've got.
13    Oh. I'm -- I'm sorry.
14 Q  (By Attorney Strang) You came back to
15    Mr. Avery's four months later? Not quite four
16    months later?
17 A  Yes.
18 Q  March 1 and March 2 of 2006?
19 A  That's correct, sir.
20 Q  Much smaller search this time, wasn't it?
21 A  Yes, sir. I believe it was just the garage.
22 Q  The entire rest of the property was not closed
23    off to the public?
24 A  No, sir, it was not.
25 Q  The rest of the property was not closed off to

107

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 14 of 16   Document 290-20

CHRM007871

```
 1        Yes.
 2   Q    After their arrival, do you recall a discussion
 3        regarding who should head up both this
 4        investigation and, if necessary, uh, any, um,
 5        lawyer involvement, any D.A. involvement, in the
 6        case?
 7   A    There was a lot of discussion about that, yes.
 8   Q    Can you recount that for the jury, please?
 9   A    Um, obviously, uh, there were Calumet County people
10        there.  There were, um, Manitowoc County, uh,
11        investigators, administrative staff there.  In fact,
12        um, at one point, uh, Deputy Inspector Schetter
13        arrived, and, um, he had, obviously, more knowledge
14        or -- or understanding of what was going -- his
15        perception of maybe a conflict of inter -- interest
16        in some ongoing litigation between, uh, Steven Avery
17        and Manitowoc County.
18              And there was a decision made and a
19        discussion made amongst Manitowoc County
20        individuals, Calumet County individuals, and
21        individuals from each District Attorney's Office
22        that it was probably in the best interest to have
23        Calumet County officers, um, work on the
24        investigation, and, uh, they would even also, uh,
25        ask the State of Wisconsin or DCI to assist also.
```

143

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 15 of 16   Document 290-20

CHRM007907

```
STATE OF WISCONSIN   )
                     )SS.
COUNTY OF MANITOWOC  )
```

        I, Jennifer K. Hau, Official Court Reporter for Circuit Court Branch 3 and the State of Wisconsin, do hereby certify that I reported the foregoing matter and that the foregoing transcript has been carefully prepared by me with my computerized stenographic notes as taken by me in machine shorthand, and by computer-assisted transcription thereafter transcribed, and that it is a true and correct transcript of the proceedings had in said matter to the best of my knowledge and ability.

        Dated this 8th day of November, 2007.

        _____
        Jennifer K. Hau, RPR
        Official Court Reporter