# EXHIBIT 24

STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
BRANCH 1

STATE OF WISCONSIN,

        PLAINTIFF,        JURY TRIAL - DAY 24
                             CLOSING ARGUMENTS, CONTD.
vs.                       Case No. 05 CF 381

STEVEN A. AVERY,

        DEFENDANT.

**DATE:**    MARCH 15, 2007

**BEFORE:**  Hon. Patrick L. Willis
          Circuit Court Judge

**APPEARANCES:**  KENNETH R. KRATZ
              Special Prosecutor
              On behalf of the State of Wisconsin.

              THOMAS J. FALLON
              Special Prosecutor
              On behalf of the State of Wisconsin.

              NORMAN A. GAHN
              Special Prosecutor
              On behalf of the State of Wisconsin.

              DEAN A. STRANG
              Attorney at Law
              On behalf of the Defendant.

              JEROME F. BUTING
              Attorney at Law
              On behalf of the Defendant.

              STEVEN A. AVERY
              Defendant
              Appeared in person.

        **TRANSCRIPT OF PROCEEDINGS**

       Reported by Diane Tesheneck, RPR

        Official Court Reporter

1

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 2 of 29   Document 290-24

CHRM004546

1  a question. They are not advocating anything, as
2  far as I could pick up. Or as I say, sort of
3  selling you something, overselling something.
4  They are candid on cross-examination, just as
5  they were on direct examination. I thought, at
6  least, that's what this group of people shared.
7        Was I surprised that we had to call the
8  bus driver, rather than the State calling, to
9  help you with the time frame that afternoon,
10  yeah, I was surprised. But we did it, since they
11  didn't. And now you have got that information.
12        But, you know, these -- these people
13  rang true to my ear, at least. And it's your
14  ears that matter.
15        So let me move to my second question:
16  Can you believe the police? Can you believe the
17  law enforcement folks who are so sure that Steven
18  Avery's guilty? What do you see about their
19  behavior before they are on the stage here?
20  Well, look at what they say and do when they
21  don't know that you are going to be listening and
22  seeing.
23        Let's start with Andy Colborn, since I
24  sort of started with him on November 3. He calls
25  in, does a license check on Teresa Halbach's car.

31

CHRM004576

1    He says he thinks it was probably on November 3,

2    not sure, but probably November 3, that he did

3    that.  But remember he's working on November 3,

4    so he would have had his radio.

5              And it's Detective Remiker who says

6    ordinarily you would use your radio when you are

7    calling in a license check to dispatch.  He uses

8    his cell phone instead.  The tape you hear is

9    clearly a phone call, not a radio in.  So I think

10   it's probably more likely that this license check

11   is November 4, when Sergeant Colborn acknowledges

12   he was off.

13             Didn't work on November 4.  And you may

14   remember, Mr. Kratz asked him, do you remember

15   what you were doing on November 4, 2005.  He

16   says, yes, I do.  I was off.  I remember what I

17   was doing.  Doesn't tell you what he was doing,

18   other than to deny he went to the Avery Salvage

19   yard, or denied he had anything to do with

20   planting evidence.  But he is off.

21             And I'm not going to play it for you

22   again, it's in evidence, but -- Let's see if this

23   comes up.  That's -- That's what you hear on the

24   tape that we played.

25             SERGEANT COLBORN:  Lynn.

                          32

CHRM004577

```
1              DISPATCHER:  Hi Andy.
2              SERGEANT COLBORN:  Can you run Sam,
3    William, Henry, 582, see if it comes back to that
4    da da da da da -- then they start talking over
5    each other.  I can't make it out.  You can listen
6    to it if you want.  Then she goes off on talking
7    about needing a Spanish interpreter, chitty
8    chatting while she's doing the license check.
9              She's comes back and she confirms it's
10   Teresa Halbach's license plate, the missing
11   person.
12             Sergeant Colborn says, '99 Toyota, and
13   so on.
14             Why is he doing that?  Why is he doing
15   that?  Why is he calling in a license check on
16   November 3, or November 4, which ever day it is?
17   You can get that information from Investigator
18   Wiegert, or if you want to call your dispatcher,
19   ask your dispatcher.
20             This sounds a lot like what road patrol
21   officers do when they come across a stalled car,
22   an abandoned car, a car where it shouldn't be.
23   That's what this sounds like.  Draw your own
24   conclusions, obviously look at it like from any
25   other piece of evidence.  But what's important is
```

33

CHRM004578

1    he is doing this, not on a witness stand, he is
2    doing this when he doesn't know anybody is going
3    to be seeing, or hearing, or evaluating it later.

4         Stay -- Move off Sergeant Colborn, but
5    stay in the Manitowoc County Sheriff's Department
6    for the moment.  Mr. Kratz argued to you
7    yesterday that Special Agent Fassbender, starting
8    November 5, devoted his resources where this
9    thing was likely going.  Where this thing was
10   likely going.

11        True, I guess he did, in the sense that
12   it was certainly clear pretty quickly where this
13   thing, this investigation, was going.  In my
14   opening, and with Detective Remiker, we had a
15   chance to hear, at 11:30 in the morning, on
16   November 5, half an hour after the first police
17   officers arrived at the Avery property, there to,
18   you know, see the concealed Toyota that the
19   Sturm's had found.  Half an hour later, for you
20   to hear, at a time when he, you know, he wouldn't
21   have known it, Manitowoc detective, Dennis
22   Jacobs, talking to his dispatcher:
23        Can you tell me, do we have a body or
24   anything yet?
25        DISPATCHER:  I don't believe so.

                        34

CHRM004579

1          Very next thing he says:

2          Do we have Steven Avery in custody,

3     though?

4          Yeah, it's pretty clear where this is

5     going.  By the time Special Agent Fassbender

6     arrives, you know, at 2:25, 3 hours later that

7     afternoon almost, it's pretty clear where it's

8     going.  And five minutes after this one

9     conversation --

10         THE COURT:  Mr. Strang, I'm getting a

11    signal for a break, so we're going to take a short

12    break and then we'll resume in 10 minutes.

13               (Jury not present.)

14         THE COURT:  You may be seated.  Let's

15    report back at 10:15.

16                (Recess taken.)

17                (Jury present.)

18         THE COURT:  Mr. Strang, you may resume.

19         ATTORNEY STRANG:  Thank you.

20         So five minutes later, five minutes

21    after Detective Jacobs called with the

22    dispatcher, he is on the phone with Detective

23    Remiker, or the radio, I don't remember now, but

24    you got the tape in evidence.  Of course,

25    Detective Remiker does testify, and you may

35

remember him, kind of presented himself as
someone who thought they were barking up the
wrong tree, that Steve didn't do this, when he
testifies. That morning, just about an hour
after the Sturms have first found the Toyota.

Okay. Other than the car, do we have
anything else?

Not yet.

Okay. Is he in custody?

ATTORNEY STRANG: It's not who are you
talking about, who do you mean by he.

Negative, nothing yet.

One pronoun, he, and these guys know who
they are talking about at 11:35 in the morning.
Are these folks acting in a way that seems good
faith and honest to you, back then? Six days
after this, Special Agent Fassbender makes the
telephone call to Sherry Culhane at the Crime
Lab, try to give her some direction. And, you
know, she's holding herself out as a scientist,
that's how she holds herself out.

Is Special Agent Fassbender asking for
science, on the exhibit that Mr. Buting showed
you? Is he asking for science there, for a good
cautious, objective, let's see where the science

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 8 of 29   Document 290-24

CHRM004581

<pre>
 1     leads us kind of thing, when he's asking, try to
 2     put her -- put her in his house or garage.
 3     That's not a very good fit, in my view, with the
 4     State's, counsel's argument here, when they
 5     submit evidence, they are not looking for a
 6     specific answer.  Oh, really.
 7          The memo belies that.  The phone memo
 8     does.  And Sherry Culhane, on the stand, herself,
 9     tells you, that by the time these buccal swabs
10     are taken in November, 2005, from all kinds of
11     people other than Steven Avery, members of his
12     family, these are elimination samples.
13     Elimination samples.  We have already decided
14     they didn't do it, we're just trying to eliminate
15     if we find their DA -- their DNA anywhere.
16          Sherry Culhane, for that matter, had she
17     followed the protocol on her testing, the bottom
18     line folks, had she followed her protocol on the
19     testing of that bullet found in March.  She can't
20     say it's Teresa Halbach's DNA.  First time in her
21     career, 23 years, first time, on the last chance
22     to put Teresa Halbach in his house or garage, she
23     deviates from the protocol and includes Teresa
24     Halbach.
25          Now, it was just the control that was
</pre>

37

1    contaminated.  It was just Sherry Culhane's DNA.
2    That doesn't turn the evidentiary sample into
3    having Teresa Halbach's DNA.  Okay.  All right.
4    Fine.  But the protocol presumably is there for a
5    reason.  Protocols are the foundation of good
6    science.  And the protocol says, if you have got
7    contamination, you set that experiment aside and
8    you do it again, you don't rely on that one.
9         Science ought to be reliable.  It ought
10   to be consistent.  And it ought to be cautious,
11   otherwise, it's not science.  And the results
12   simply aren't reliable.  That's why you have a
13   control.  And when you get contamination, you now
14   know that something has gone wrong with this.
15        And to say that the contamination is
16   over here, but not over here, is a little like
17   saying, I don't know, maybe no one even eats TV
18   dinners any more, maybe they're microwave dinners
19   now, I guess, from what I see in the grocery
20   store.  But whatever, however you heat this stuff
21   up, when you pull off the plastic, or the tin, or
22   whatever covers the meal, you know, and the
23   little peach cobbler has a fly in it, in that
24   little compartment, you don't eat the Salisbury
25   steak either, okay.  You know, this is -- this is

38

CHRM004583

1
not fancy stuff in the end. It's -- It is and

should be common sense, at some level, in the

end. But she deviates, for the first time in 23

years.

The end -- This continues, the end of

January, 2007, bringing us up to six weeks ago.

Now, the State goes all the way to Virginia, to

Quantico, to get the FBI. Are they trying -- Is

the FBI trying to root out possible police

corruption? Are they concerned about the

integrity, of policing in northeastern Wisconsin?

Trying to find out if there's a bad cop or not?

I think the decision is already made.

You have this, too, Special Agent Gerald

Mullen of the FBI, memo to the FBI laboratory,

this January 30th --

ATTORNEY KRATZ: Judge, I'm sorry, I don't

mean to interrupt. I believe the defense is

entitled to one closing. Mr. Buting covered exactly

the same territory yesterday. I understood they

were going to split and talk about different items.

I simply wanted to interpose an objection. My

apologies to counsel, but that was my understanding

from the Court.

ATTORNEY STRANG: I would be more concerned

39

CHRM004584

1    about boring you.  Mr. Buting did cover it.  It's
2    there.
3              But I want to say something about EDTA
4    that Mr. Buting did not.  Janine Arvizu, who is
5    not a doctor, Mr. Buting misspoke, she didn't
6    complete her dissertation.  She did the other
7    Ph.D. work.  I want to make sure you got out of
8    that what she had to tell you.  And it's this,
9    the FBI protocol that they put together in a
10   couple of weeks here, is good for identifying and
11   confirming the presence of EDTA.  It is not
12   designed for confirming the absence of EDTA.  It
13   has to do with the detection limits.  The
14   instrument has a detection limit and the method
15   has a detection limit.
16             So, look, if you were interested in
17   finding out whether your friend is at home, and
18   the instrument you chose was a telephone, call
19   him at his house, ring his telephone number, if
20   he answers the phone, you have confirmed his
21   presence with your instrument.  He is there, you
22   have called his home, not his cell phone, he is
23   there.  He's got to be, if he's answering his
24   phone.  You have confirmed his presence.
25             However, if your instrument is your

40

CHRM004585

1   telephone and you call his home and it just rings
 2   and rings, and it's not answered, you have not
 3   confirmed his absence.  He could be in the
 4   shower.  He could be in the basement folding the
 5   laundry, he could be in bed sleeping.  He could
 6   be pouting and just not answering the phone
 7   because he sees it's you calling on the caller ID
 8   and he doesn't want to talk to you today.
 9   Whatever it is, you haven't confirmed his absence
10   with the telephone.  You haven't designed a
11   protocol to get you to that.
12         Your method, in other words, of
13   detection, isn't suited to confirming absence,
14   only presence.  If you like fresh baked hot apple
15   pie, and I put you in a room and I blindfold you
16   and we walk in, a fresh baked hot apple pie, your
17   nose is the instrument.  It has a detection
18   limit.
19         A dog has a better instrument, lower
20   detection limit, fancier instrument.  He can
21   detect less of the smell of apple pie than you
22   can, but you have got this instrument to use.  If
23   it's within your detection limits, and the pie
24   is, you know, slid on the table under you while
25   you are blindfolded, you will detect it with your

                            41

CHRM004586

1    instrument.

2         However, if the method is no good,

3    because we have got to consider that, you are not

4    smelling an apple pie.  Well, is the room too

5    big, are the windows open, is the pie too far

6    away, does the room smell badly of something else

7    that's interfering with your instrument detecting

8    the fresh baked apple pie?  We have method

9    detection problems and limits.  Or is the apple

10   pie, not fresh baked, but it's an 11 year old

11   apple pie?  You may not detect that either, with

12   your instrument.  I don't think Janine Arvizu was

13   really telling you more than that.  And,

14   unfortunately, Dr. LeBeau was trying to tell you

15   more than that and overselling his case.

16         Now, others who matter, in the law

17   enforcement group who think Steve is guilty.

18   Mr. Lenk and Mr. Colborn.  They denied here, of

19   course, but what are they doing, in 2002, when

20   the evidence slip has to be signed for

21   transmission of the hair sample and fingernail

22   clippings, or whatever it is, to the Crime Lab,

23   and the evidence custodian at the time, Detective

24   Sergeant James Lenk, signs off.

25         Is he really, as he claims here, simply

                          42

CHRM004587

signing the form, giving it to Sergeant Shallue

and allowing Sergeant Shallue to fill out the

otherwise blank form? You are entitled to

disbelieve that. Or at least to say he's not an

honest evidence custodian if he is doing that at

the time. He is begging to be fired, because he

is not documenting what's going where. Or if

he's just telling you here, to distance himself

from that file in the Clerk's Office, you are

entitled to consider that too.

Would Lieutenant Lenk lie, in the end?

Would he lie, as a sworn law enforcement officer?

Well, all I can tell you is, he did, twice, and

you heard it. I have the transcript from the

earlier hearing. Here he says he arrives at

2:00. When he's asked under oath before, it's

6:30 or 7, once when he's asked, and the other

time he's asked, it's late afternoon. This isn't

15 minutes off, folks. It's under oath and it's

a difference of four and a half or five hours.

At that time of year, November, 2005,

it's the difference between broad daylight and

pitch black. He was under oath, and he gave two

very different answers to the same question, at

two different times, under oath. He was the only

43

CHRM004588

1   witness, in five weeks, shown to have made

2   inconsistent statements, under oath.

3            Others made inconsistent statements and

4   were shown to have.  Blaine Dassey comes to mind.

5   Scott Tadych comes to mind.  Both of them are

6   asked, at first, by the police, was there a

7   bonfire, on Halloween, no, no bonfire.  Later

8   they get asked again, now there is a bonfire.  In

9   fact, Scott Tadych comes here and says big

10  bonfire, flames to the top of the roof.  Same

11  guy, again, I showed, when first asked by the

12  police, no bonfire.  Closer in time to October

13  31, no, didn't see a bonfire that night.

14           That's inconsistent statements, but they

15  are not under oath.  They still, as the Judge

16  instructed you yesterday, are something you can

17  consider, consistency or inconsistency of a

18  witness' statements, over time.  Still you can

19  consider those when you decide who you believe,

20  and not under oath.

21           Blaine explained that a little bit.

22  Explained his changes of his story.  Well, the

23  police kept asking him.  They didn't like the

24  answer, they asked him again.  Got angry with him

25  and his mother, at the restaurant, when they

44

CHRM004589

1    wouldn't reject Uncle Steve.  Is that because

2    Blaine is scared of Uncle Steve?

3            My recollection, yours will govern,

4    there's 12 of you and one of me, but my

5    recollection of that testimony is that the

6    question was whether Blaine Dassey was scared,

7    and the answer was something like, no, not

8    really, but he used to boss us around.  You will

9    decide that.

10           But in any event, Lieutenant Lenk, by

11   the time he gets to you folks, is telling you

12   some really implausible things.  Like, I had

13   never been to Steven Avery's house.  I have never

14   been on the Avery property, but somehow, just out

15   of habit, I turned right at the end of Avery

16   Road, and I -- I -- I just happened to drive

17   straight to Steven Avery's trailer.  Okay.

18           So this -- You know, what they are doing

19   and whether -- whether you think you can trust

20   them back when they are not aware they are going

21   to be observed or revealed later, is important in

22   the same way what he does, back before he knows

23   it's going to be played out to you, is important

24   in assessing who you believe.  Are they acting

25   honestly?  Is he acting like an innocent person

45

Case 1:19-cv-00484-BHL   Filed 09/16/22   Page 17 of 29   Document 290-24

CHRM004590

1  would act, or might act?

2  It is important because it comes down to

3  the bias in the end.  You know, would, in the

4  end, police officers plant evidence?  And that's

5  a hard one, you know.  That's why it's helpful to

6  say, boy, are they behaving honestly and in good

7  faith up to then.  Because in the end, would they

8  plant evidence against someone.  Now, you will

9  have to decide whether you have a reasonable

10  doubt about that, or whether, you know, we have

11  shown that to you at any level, or not.

12  But, look, it is a matter of bias, if it

13  happened.  And what you critically, I think, need

14  to understand, that if and when police officers

15  plant evidence, they are not doing it to frame an

16  innocent man.  They are doing it because they

17  believe the man guilty.  They are not doing it to

18  frame an innocent man.  They are doing it to

19  ensure the conviction of someone they have

20  decided is guilty.

21  That's why you plant evidence.  Other

22  than in the strangest, you know, most abandoned

23  of conscience sort of police officer, they aren't

24  after framing an innocent person, they are after

25  ensuring the conviction of someone they just

46

CHRM004591

1    believe is guilty.

2         So as you approach the whole concept of

3    planting you have got to understand the bias that

4    would drive it, not, you know, boy, they are out

5    to get an innocent guy. It's just the opposite.

6    It's just the opposite. But it's also just as

7    corrosive to do it. Because juries decide guilt,

8    not police officers who are involved in the hunt.

9    You know, they get invested too, in the outcome,

10    and in whom they suspect, who they think is good

11    for something.

12         And, you know, the State pooh-poohs the

13    idea that a civil lawsuit, for a whole lot of

14    money, against the Manitowoc Sheriff's

15    Department, would have caused anyone to so

16    dislike Steven Avery that they would plant

17    evidence against him. Well, look what the mere

18    suggestion that they did plant evidence has done,

19    in terms of a reaction here.

20         The defensiveness of the case that the

21    State presented to you, the anger about the mere

22    suggestion of planting evidence, the

23    self-righteousness, the hostility, the trying to

24    have it both ways with you. We trusted the

25    Manitowoc people, they were skilled. They were

47

CHRM004592

```
 1    honest.  They were the best available evidence
 2    technicians.
 3            But we also had somebody watching.  We
 4    were short of manpower.  We needed them.  But, in
 5    the first search of Steven Avery's -- first
 6    lengthy search of Steven Avery's house, on the
 7    evening of November 5, we got enough people that
 8    two of them can be taking photos.  Two of them
 9    can be taking photos, in this little trailer, as
10    you heard.  You hear the State trying to have it
11    both ways, here.
12            And in sort of getting at the bias that
13    would drive a police officer, potentially, to
14    plant evidence, it's this -- it's this need, this
15    belief that he is not really innocent.  He's
16    guilty, he's got to be guilty.  It's what you
17    hear from Detective Jacobs and Detective Remiker,
18    it's that quality.  It's the sense that this is
19    where this is going, three hours in, when all we
20    have got is the car, on a big property with a
21    whole lot of other people there.
22            It's the -- After five weeks of evidence
23    and 501 exhibits, it's the State standing up and
24    telling you it's clear.  What in the world is
25    clear and simple when it takes five weeks and 501
```

48

CHRM004593

1    exhibits to try to show.  And whatever this is,

2    whatever, whichever way you come out, this case

3    isn't clear and simple.

4         And that's where the civil lawsuit feeds

5    in.  It's not that it feeds in with bad cops.  It

6    feeds in with good cops, in the sense that it

7    erodes, fundamentally, the sense of identity, we

8    get the bad guys, we don't get the good guys.

9         And here it is, they got it wrong, that

10   department got it wrong.  Not only do they get it

11   wrong, but the right guy is still out there and

12   he commits another rape, Gregory Allen.  This

13   goes to my identity, if I wear that same uniform.

14   Even if I'm aligned with these people, as you

15   hear the sort of reaction from the prosecutors to

16   this.

17        And now, you know, since -- since he

18   really couldn't have been that innocent, he's got

19   to be guilty of this one.  He must be the right

20   guy this time.  So you -- you know, nobody means

21   to do this, but you start looking around things

22   that are inconvenient, that don't quite square up

23   with the theory that he did it.

24        One example, and one example only, from

25   the blood, Teresa Halbach's blood in her own car.

49

CHRM004594

1    Kucharski, talked about sitting on this bed, and

2    actually facing towards the door, his feet, I

3    think the testimony was, were facing where the

4    key ends up when Lieutenant Lenk exits the room

5    and comes back. Don't you have to kind of ask

6    yourself the question, how did the key get there?

7         If it was planted, how did that key get

8    there? Did Lieutenant Lenk, as he's walking

9    here, throw it? Did he kind of lob it over

10   Mr. Kucharski. Well, that's ridiculous.

11   Absolutely ridiculous. And although all three of

12   these officers, and in fact the prosecution team,

13   would have preferred, obviously, that the key

14   wouldn't have been found in this way, it was.

15   All right.

16        Cases come to you how they are. And

17   again, under the microscope of a case of this

18   magnitude, there is going to be some human

19   factors. And there's going to be some things

20   that you are going to have to wrestle with. And

21   this is one of those things. I'm not going to

22   short change you on that particular case.

23        And you may take a long time in deciding

24   whether or not that key is significant, or

25   whether the key is not significant. But let me

63

CHRM004608

1    ask you, just kind of for the sake of talking, as
2    Mr. Strang wanted to talk with you rather than at
3    you, I certainly have a style that I would prefer
4    that as well.  Let's assume they never found the
5    key.  Let's assume this key isn't part of this
6    case at all.

7              Let's assume Mr. Strang's theory is
8    correct, that these cops aren't trying to plant
9    an innocent person, but trying to make sure that
10   a guilty person is found guilty.  Well, can't you
11   then, with that argument, set the key aside?  Do
12   you have the ability, as a jury, to set that key
13   aside, if in fact it doesn't matter whether or
14   not Mr. Avery is guilty or not guilty in this
15   analysis?  Can you set that aside and decide is
16   there enough other evidence, or is the key the
17   only thing that points to Mr. Avery?

18             Well, if this was a CSI case, one of
19   those cases on TV where sometimes that key, or
20   sometimes one little piece of evidence like that
21   may decide the guilt or innocence, it would make
22   a difference.  But that key, in the big picture,
23   in the big scheme of things here, means very
24   little.  All right.

25             Now, I'm telling you that not because I

64

CHRM004609

1  lot, if you are like me sometimes and I forget

2  where I have parked my car.

3         Is that why Mr. Avery unhooked the

4  battery, so that the citizen searchers that he

5  knew were coming couldn't just press a button and

6  of the 40,000 (sic) cars, could walk right to

7  that.  That's possible.  All right.  That's an

8  inference, a logical inference, that could be

9  drawn.  But that's speculating, and that's not

10  what I'm going to do.  That's not what I'm asking

11  you to do.  I'm not asking you at all in this

12  case to speculate.  I'm simply answering

13  Mr. Buting's question.

14         Where was Teresa killed.  This is a easy

15  answer, or at least it is an answer that is

16  directed by all of the physical evidence in this

17  case.  Teresa Halbach, as we know, came to the

18  trailer of Steven Avery.  We know that they

19  completed their transaction.  How do we know

20  that, because the book and the bill of sale was

21  given to Mr. Avery.  That's something that, as

22  you heard, happens at the end of the transaction.

23  That's sitting on Mr. Avery's computer desk.

24         We know sometime later, that is, we know

25  sometime in the future, a bullet is found in this

96

CHRM004641

1    exact area, has Teresa Halbach's DNA on it. All
2    right. The inference, and this is an inference
3    that I'm asking you to draw, is that Teresa
4    Halbach was killed in the garage. She was killed
5    in Steven Avery's garage.

6         Now, we have heard testimony about
7    luminal finding blood, that is a reagent, a
8    chemical that is used by the Crime Lab is spread
9    out. There's two things that are most reactive
10   with luminal, one is human blood and the other is
11   bleach. Bleach coincidentally is the one thing
12   that eats up or destroys DNA.

13        We have heard about just to the left and
14   just to the back of this tractor, about a three
15   to 4 foot area, large area that lit up or glowed
16   very brightly. Mr. Ertl testified about that.
17   He was the person who processed that area. I'm
18   asking you to infer that Mr. Avery cleaned up
19   this area with bleach.

20        Now, you knew that inference, or that
21   suggestion from the State, I think, was coming.
22   We have put in the bleach. We have talked about
23   the luminal. We have gotten expert testimony
24   from Mr. Ertl that the two things that light up,
25   it wasn't blood, but it was, in fact, bleach.

97

one is that the defendant killed her and burned

it, and the other one, I guess, the defense wants

you to just come up with on your own.

That brings me to the conclusion, or the

last question, and that's, did the cops kill

Teresa Halbach.  Again, the defense says no.  But

if the cops had her blood, if the cops had her

bones, and before the 5th, if the cops knew she

was dead, let me say that again, if before the

5th the cops knew that Teresa Halbach was dead,

they were either told that by the real killer, or

they killed Teresa Halbach.

You have got to be willing to accept one

of those scenarios.  And I don't think you can.

And I don't think you should.  And I don't think

that the evidence points to that at all.

Mr. Strang, in his opening statement,

promised you what the defense was going to be.

Mr. Strang told you that it's no surprise that

the blood from an unsecured vial in the box in

the Clerk's Office, that Lieutenant Lenk examined

in 2002, ends up in the Toyota.  At the start of

the case, that was what the defense was.  That's

what the defense theory was.  That's what the

defense said their theory of defense and what the

110

CHRM004655

1              That's not reasonable.  That's not a
       2    reasonable doubt.  Reasonable doubts are for
       3    innocent people.  Reasonable doubts are things
       4    that juries adopt when all the evidence points to
       5    that.  And this planting, this vial planting
       6    defense, even from a common sense standpoint, is
       7    absolutely ludicrous.
       8              But what we were able to do, what you
       9    heard, is scientifically exclude that vial of
      10    blood.  You heard from Dr. LeBeau, who testified
      11    that this blood is loaded with EDTA and this
      12    blood, and this blood, and this blood, have no
      13    detectable levels of EDTA.  And so instead of
      14    calling all of the people with keys and with
      15    codes, and people in the Clerk's Office, and who
      16    might have seen Lieutenant Lenk or Colborn, or
      17    all those kinds of things, instead of doing it
      18    that way, we only had to call one witness, who
      19    scientifically could tell you that there is
      20    absolutely no way that that vial of blood was
      21    used to plant.
      22              In fact, that very question was asked of
      23    Dr. LeBeau, the head of the toxicology section,
      24    or the unit at the FBI.  And he said, by a
      25    reasonable degree of scientific certainty, this

                            114

CHRM004659

vial of blood is excluded, that means it's not
it, it's excluded as the source of those three
bloodstains.

Now, why is that important.  Lieutenant
Lenk and Sergeant Colborn, as I mentioned
earlier, are good, decent, honest cops, sworn to
uphold the law.  Kinds of officers Manitowoc
citizens should be proud to have on your police
force.  They are the kinds of guys that you want
investigating cases for you, for Manitowoc
County.  And again, they are not just some cops,
they are your cops, that's why a Manitowoc jury
decides this case.

This isn't just two guys, it's Jim Lenk
and it's Andy Colborn.  And when you accuse
police officers of official misconduct, that's
serious business.  Mr. Strang correctly predicted
that there would be some anger about this issue,
coming from the prosecution side, and there is.

Let me tell you why.  Their livelihood,
their reputations, their families, everything in
their 20 plus years of law enforcement are on the
line, when some lawyer accuses them of
misconduct.  Not just any misconduct, but
planting evidence in a murder case.  All right.

115

CHRM004660

```
1    STATE OF WISCONSIN  )
                         ) ss
2    COUNTY OF MANITOWOC )

3

4                    I, Diane Tesheneck, Official Court

5         Reporter for Circuit Court Branch 1 and the State

6         of Wisconsin, do hereby certify that I reported

7         the foregoing matter and that the foregoing

8         transcript has been carefully prepared by me with

9         my computerized stenographic notes as taken by me

10        in machine shorthand, and by computer-assisted

11        transcription thereafter transcribed, and that it

12        is a true and correct transcript of the

13        proceedings had in said matter to the best of my

14        knowledge and ability.

15                    Dated this 22nd day of January, 2008.

16

17

18                    Diane Tesheneck, RPR

19                    Diane Tesheneck, RPR
                      Official Court Reporter

20

21

22

23

24

25


                          131
```

CHRM004676