# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

|  |  |
|---|---|
| **ANDREW L. COLBORN,** | |
| **Plaintiff,** | |
| **vs.** | **Civil No.: 19-CV-484** |
| **NETFLIX, INC.; CHROME MEDIA LLC, F/K/A SYNTHESIS FILMS, LLC; LAURA RICCIARDI; AND MOIRA DEMOS,** | |
| **Defendants.** | |

### DEFENDANTS CHROME MEDIA LLC, F/K/ASYNTHESIS FILMS, LLC; LAURA RICCIARDI; AND MOIRA DEMOS STATEMENT OF PROPOSED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Civil Local Rule 56(b)(1)(C), the Defendants Chrome Media LLC (formerly known as Synthesis Films, LLC), Laura Ricciardi, and Moira Demos (collectively, "the filmmakers" or "the Producer Defendants") provide the following statement of proposed material facts in support of their Motion for Summary Judgment in the above-captioned case.

This statement contains numerous time-stamped citations to video excerpts from the Series, *Making a Murderer* ("*MaM*"). The Court may rely upon either (1) the ten episodes lodged at Dockets 120-1 through 120-10 or (2) the episodes as available for streaming on Netflix for definitive versions of the Series.

1. *Making a Murderer* chronicles the story of Steven Avery, a resident of Manitowoc County, Wisconsin who, after serving 18 years for a wrongful conviction, was exonerated through DNA evidence only to be arrested and

convicted for a new, serious crime. Declaration of Laura Ricciardi ("Ricciardi Decl.") ¶ 5, Declaration of Moira Demos ("Demos Decl.") ¶ 5.

**II.    1985–2005: Steven Avery's Wrongful Conviction and Exoneration**

2.    In 1985, the Manitowoc County Sheriff's Department ("MTSO") arrested Steven Avery for the sexual assault, attempted murder, and false imprisonment of Penny Beerntsen. *State v. Avery* ("*Avery II*"), 570 N.W.2d 573, 575 (Wis. Ct. App. 1997).

3.    Prior to July 1985, Manitowoc authorities had fielded complaints, arrested, and convicted Steven Avery for various crimes and misconduct in Manitowoc County, Wisconsin. *See* Ricciardi Decl. ¶ 109, Ex. 14, Order re Prior Bad Acts, CHRM034905 at CHRM034916 (conviction for recklessly endangering the life of his cousin, Sandra Morris, who was married to a Manitowoc County Sheriff's Deputy); Ricciardi Decl. ¶ 109, Ex. 14, at CHRM034913 (conviction for animal cruelty for burning pet cat on bonfire); Ricciardi Decl. ¶ 109, Ex. 14, at CHRM34910 (domestic violence complaints); *see also* Ricciardi Decl. ¶ 83.

4.    *MaM* depicted prior convictions of Avery and other misconduct for which he was never convicted, although Judge Willis later excluding all evidence of Avery's prior bad acts at trial. *See* Ricciardi Decl. ¶ 109, Ex. 14, Order re Prior Bad Acts, CHRM034905; *see also MaM* Ep. 1 at 5:18–7:24 (Morris allegations of indecent exposure); 9:30–9:59 (burglaries); 10:00–10:5340 (cat burning and conviction and probation); 10:40–10:53 (probation); 12:31– 13:59 (Morris reckless endangerment); 16:07 (Morris criminal charges); 36:53–37:38 (threatening letter to ex-wife); *MaM* Ep. 2 at 11:33–11:44 (threatening letter to ex-wife); Ricciardi Decl. ¶ 83; Demos Decl. ¶ 83.

2

5. At trial, the jury convicted Avery for attempted murder, sexual assault and false imprisonment of Penny Beerntsen on the basis of the victim's eyewitness testimony, discounting what Avery presented as sixteen alibi witnesses. *See Avery II*, 570 N.W.2d at 580–81; *see also MaM* Ep. 1 at 33:03–36 (presiding Judge Hazlewood recounting Penny Beerntsen's eyewitness testimony).

6. While serving a 60-year prison sentence, in 1995–97, Avery filed multiple unsuccessful motions for post-conviction relief, relying on DNA evidence that revealed the victim, Mrs. Beerntsen's, fingernail scrapings came from a DNA profile that matched neither Avery nor the victim. Avery argued that the sheriff's department had information that it failed to disclose to Avery regarding an "alternative suspect living in Sheboygan County who matched the description of the perpetrator." The court denied the motions, and Avery remained incarcerated for seven more years. *Avery II*, 570 N.W.2d at 575.

7. DNA evidence showed that Gregory Allen, who had since committed and been convicted of another brutal sexual assault, was the actual assailant of Penny Beerntsen. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281 at CHRM011282.

8. Avery was released on September 11, 2003, after spending 18 years in prison for a crime he did not commit. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281.

9. Plaintiff Andrew Colborn testified in his October 13, 2005 deposition in Avery's civil rights lawsuit that in 1994 or 1995, while he was a corrections officer at the Manitowoc County Jail, Plaintiff received a phone call from someone identifying

himself as a detective in another county, who said an inmate in their custody claimed to have committed an assault in Manitowoc County for which someone else was still incarcerated. (The "Jail Call"). Ricciardi Decl. ¶ 102*, Ex. 7, Avery Civil Lawsuit Deposition Transcript of Andrew Colborn ("Colborn Avery Dep."), CHRM002891 at 5:12–24 (timeline and role); 10:22–11:8 (detective's message); SAC ¶ 24; *see also MaM* Ep. 2 at 18:37–19:02.

10.    At Avery's 2007 trial, Kratz questioned Plaintiff about his connection to Avery's wrongful conviction case. As shown in the Series, Plaintiff testified: "In 1994 or '95 I had received a telephone call when I was working as my capacity as a corrections officer in the Manitowoc County Jail. The telephone call was from somebody who identified himself as a detective and began telling me that somebody who had committed an assault in Manitowoc County was in their custody and we may have somebody in our jail on that assault charge that may not have done it. I told this individual you're probably gonna want to speak to a detective, and I transferred the call to a detective." Kratz incredulously responded "That's it? That's your connection to Mr. Avery?" to which Plaintiff responded, "Yes, sir." Ricciardi Decl. ¶ 114, Ex. 19, CHRM008000 at CHRM008138–39; *MaM* Ep. 7 at 17:30–18:41.

11.    Plaintiff has testified that he transferred the Jail Call to an MTSO detective number but never heard any feedback or response regarding the call. Ricciardi Decl. ¶ 102, Ex. 7, Colborn Avery Dep., CHRM002891 at 15:7–24; Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479.

4

12.　　In this case, Plaintiff has stipulated that he "wrote a statement in September 2003 regarding a telephone call that I received in or around 1994 or 1995 while I was a corrections officer at the Manitowoc County Jail. That statement was provided to then-Sheriff Kenneth Peterson, who told me that he would put the statement in a safe. Shortly thereafter, the statement was turned over to investigators for the State of Wisconsin." Statement of Stipulated Material Facts, Dkt. 270 ¶ 2 (citing Declaration of Andrew Colborn, Dkt. 265 ¶ (C)(10)); *see* Declaration of Kevin Vick ("Vick Decl."), ¶ 34, Ex. 33. Deposition Transcript of Andrew Colborn (Colborn Dep.) at 404:4–8; Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479 (dated September 12, 2003); *see also* Ricciardi Decl. ¶ 99, Ex. 4, Wisconsin DOJ Strauss Report re safe, CHRM004724.

13.　　Several others in law enforcement have testified or otherwise stated that they believed someone in MTSO (some believed it was likely Sheriff Kocourek) relayed the message to Plaintiff not to worry about the Jail Call because MTSO had "the right guy." Vick Decl. ¶ 7, Ex. 6, Jones Memo produced by Wisconsin Department of Justice, DJ001; Vick Decl. ¶ 8, Ex. 7, Jones Memo metadata from Wisconsin DOJ, DJ002 ; *see also* Ricciardi Decl. ¶ 104, Ex. 9, Avery Civil Lawsuit Deposition Transcript of Eugene Kusche ("Kusche Dep.") at 72:16–78:6; Ricciardi Decl. ¶ 97, Ex. 2, Lenk 2003 Statement re Jail Call, CHRM004478 (dated September 12, 2003); *MaM* Ep. 2 at 24:21–26:56 (Rohrer and Kusche testifying re Jones Memo).

14.　　Plaintiff has testified that after the publicity regarding Avery's release from prison in 2003, he told Lieutenant James Lenk about the Jail Call, and Lenk then told

Sheriff Ken Petersen. Ricciardi Decl. ¶ 102, Ex. 7, Colborn Avery Dep., CHRM002891 at 8:24–10:7 (discussing Lenk's statement), 16:4–18:5 (discussing conversations with Lenk and Petersen in 2003).

15. On September 12, 2003, Sheriff Petersen issued a memo instructing all employees of MTSO not to comment on the Avery case. Ricciardi Decl. ¶ 96, Ex. 1, CHRM004480.

16. The Wisconsin Department of Justice's investigation related to Avery's wrongful conviction concluded that then-Manitowoc County Sheriff Thomas Kocourek and District Attorney Dennis Vogel had knowledge of Penny Beerntsen's actual assailant, Gregory Allen, in 1985, but they declined to consider Allen as a suspect despite a similar appearance and track record of similar sex. crimes. Still, the Wisconsin DOJ concluded, there was no basis for charges for ethical or criminal violations. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281 at CHRM011286–92.

17. Assistant District Attorney Michael Griesbach found the resulting Attorney General's report a "whitewash" and later wrote a book detailing what he saw as serious missteps by MTSO and prosecutors. Vick Decl. ¶ 12, Ex. 11, Griesbach000454–71 (showing Griesbach's handwritten notes on a copy of the report); *see* Vick Decl. ¶ 32, Ex. 31, Colborn Dep. Ex. 16-A, Michael Griesbach, INDEFENSIBLE 31–32 (2016).

18. Avery filed a civil rights lawsuit for $36 million in this Court in 2004, asserting claims against Manitowoc County, Kocourek, and Vogel for violating his constitutional right to due process by targeting him and failing to investigate

Allen; focusing the investigation on Avery because of personal hostility against him; failing to provide exculpatory information to his defense counsel; and continuing to withhold exculpatory evidence during his incarceration. *See Avery v. Manitowoc Cty.*, 428 F. Supp. 2d 891, 893 (E.D. Wis. 2006); *see also MaM* Ep. 2 at 9:43–10:24

### III. 2005–2007: Teresa Halbach's Murder Investigation

19. On October 31, 2005, a 25-year-old professional photographer from Calumet County, Wisconsin named Teresa Halbach disappeared after a day of appointments for *Auto Trader* magazine—including one at Avery's Auto Salvage. Ricciardi Decl. ¶ 113, Ex. 18, 2007 Avery Trial Day 1, CHRM006136 at 165:19–166:6; *see MaM* Ep. 2 at 32:05–33:29 (Avery telling local news Halbach had visited his home on assignment on multiple occasions).

20. On November 3, 2005, Halbach's family realized that no one had seen or heard from her since October 31, and reported her missing to Calumet County authorities, and a search was launched. Ricciardi Decl. ¶ 113, Ex. 18, 2007 Avery Trial Day 1, CHRM006136 at 170:18–171:13, 185:8–20; see *MaM* Ep. 2 at 31:24–32:02 (missing person); 35:15–37:10 (public search).

21. As shown in *MaM* and first memorialized in a June 29, 2006 report, Plaintiff went to the Avery's Auto Salvage the night of November 3, 2005 and spoke with Avery about the missing woman. Ricciardi Decl. ¶ 107, Ex. 12, MTSO Investigative Report July 18, 2006, CHRM020347; *see* Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM08000 at 173, 198; *see also MaM* Ep. 7 at 20:02-20:40 (Plaintiff testifying about his June 2006 report of his November 3, 2005 conversation with Avery).

7

22. Plaintiff testified that he called Manitowoc County dispatch and spoke with dispatcher Lynn Steckmesser to confirm the license plate number SWH-582 corresponded to a 1999 Toyota registered to Teresa Halbach. (the "Call to Dispatch"). Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM008000 at 180–183; *MaM* Ep 5 at 54:02–54:29.

23. The Series depicts Strang questioning Plaintiff at trial and Plaintiff responding affirmatively that road patrol officers "frequently" call in license plate numbers to confirm registration information about the car. *MaM* Ep. 5, 53:29–53:55; Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM008000 at 178–79.

24. None of the parties to this lawsuit appear to possess a definitive written record from law enforcement of the Call to Dispatch that on its face establishes the date, time, and origin of the call (name of caller or phone number) from Plaintiff. *See* Vick Decl. ¶ 10, Ex. 9, Petersen Dep. Ex. 66 at 32 (including an Attempt to Locate "ATL: Teresa Marie Halbach DOB 03211980. Vehicle listed to Teresa is a 99 Toyota RAV4 DR green in color WI RP SWH582. Subject WA."); Vick Decl. ¶ 11, Ex. 10, MANITOWOC-034510 (a dispatch log from MTSO with rows 321–23 showing a 2122 (9:22 p.m. CT) call on November 3, 2005 received by Lynn Steckmesser regarding license place SWH-582. The log does not include the name, number, or other identifying information about the caller); Vick Decl. ¶ 9, Ex. 8, MANITOWOC-034508 (cover email from MTSO attaching dispatch log for open records request); Vick Decl. ¶ 23, Ex. 22, COLBTXTS_0004983 (Colborn and Schuler confirming no phone records exist showing call); *see also* Ricciardi Decl. ¶ 67; Demos Decl. ¶ 72.

8

25.   Plaintiff has testified that he is unsure but believes he placed the Call to Dispatch on November 3, 2005. He testified in this lawsuit that he believes he placed the Call to Dispatch before the end of his shift at 7:45 p.m., but his friend Brenda Schuler believed he may have called in at 9:22 p.m. based on the log from law enforcement. Plaintiff testified, "I'm relatively sure I called it in at 18:37. I seem to remember doing that. But I'm not saying her theory isn't impossible." Vick Decl. ¶ 6, Ex. 5, Colborn Dep. 423:15–18; *see also* Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM008000 at 182, 184 (Plaintiff "guessing" the Call to Dispatch occurred on November 3 after he received plates information from Investigator Wiegert); Vick Decl. ¶ 23, Ex. 22, COLBTXTS_0004983 (Plaintiff and Schuler confirming that there are no cell phone records available that would show the time and date of Call to Dispatch).

26.   On November 5, 2005, Teresa Halbach's car was found on the edge of Avery's 40-acre salvage yard, and Avery became a suspect of the investigation. Ricciardi Decl. ¶ 113, Ex. 18, 2007 Avery Trial Day 1, CHRM006136 at 170; *see MaM* Ep. 2 at 37:13–38:01.

27.   There was extensive news coverage of Steven Avery's exoneration (as well as coverage of the state Legislature's Avery bill (subsequently renamed the Criminal Justice Reform Bill), Avery's civil rights lawsuit), the Wisconsin Department of Justice's Investigation, the disappearance of Teresa Halbach, the Halbach murder investigation, and the Avery and Dassey hearings and trials. Developments from the Halbach case frequently made the nightly news on multiple local television stations. *See, e.g.*, Ricciardi Decl. ¶ 121, Ex. 26, CHRM011297 (multiple

9

headlines regarding the Avery verdict in *Post-Crescent* newspaper); *see also* Ricciardi Decl. ¶ 10; Demos Decl. ¶ 10.

28. A mix of officers from Calumet and Manitowoc County, as well as officers from other county, state, and federal agencies, including the Wisconsin Department of Justice, and the Federal Bureau of Investigation, executed the search warrant on the Avery property. *See* Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7 CHRM008000 at 196–97.

29. Calumet County took over the investigation to avoid the appearance of conflict-of-interest issues related to Avery's ongoing lawsuit against Manitowoc County. *See MaM* Ep. 2 at 40:11–41:20 (November 7, 2005 press conference introducing Ken Kratz Calumet County District Attorney as Special Prosecutor in the case).

30. Calumet County Sheriff Jerry Pagel assured the public that "the Manitowoc County Sheriff's Department's role in this investigation was to provide resources to us when they were needed," and noted that providing "equipment" and "resources" were their "only role" in the investigation. *MaM* Ep. 2 at 47:57–48:30 (November 10, 2005 press conference).

31. Manitowoc County Sheriff Ken Petersen was recused from the investigation. Vick Decl. ¶ 2, Ex. 1. Deposition Transcript of Kenneth Petersen (Petersen Dep.) at 149:6–23.

32. Beginning on November 5, 2005 through November 8, 2005, MTSO Deputies Plaintiff and Lenk took part in several days' searches of the interior of Steven Avery's trailer and garage. *See* Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7 CHRM008000 at 196–97.

10

33.  Calumet County Deputy Dan Kucharski accompanied Plaintiff and Lenk during the search of Avery's trailer on November 8, 2005. As shown in *MaM*, Kucharski testified at trial that he had not witnessed the discovery of Teresa Halbach's RAV-4 key, as he was "doing other things." Ricciardi Decl. ¶ 116, Ex. 21, 2007 Avery Trial Day 9, CHRM005930 at 40; *MaM* Ep. 7 at 6:25–9:45.

34.  Calumet County Sergeant William Tyson testified that he accompanied Manitowoc County Detective David Remiker, Plaintiff, and Lenk in their searches of the Avery property and received instructions "to make sure that they [MTSO officers] weren't alone" "anywhere on that Avery property," so he "watched them to the best of [his] ability." Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM00800 at 21–25; *see also MaM* Ep. 7 at 4:20—6:17:

35.  As shown on *MaM*, Plaintiff testified at trial that when searching the bookcase in Avery's bedroom on November 8, 2005, he was handling it "rather roughly, twisting it, shaking it, pulling it" before Lenk discovered a Toyota key on the floor. The officers then stopped and photographed the key on the floor. Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery trial day 7, CHRM008000 at 125–131; *MaM* Ep. 7 at 16:18–17:30; *see also* Ricciardi Decl. ¶ 106, Ex. 11, MTSO Investigative Summary with November 8, 2005 entry, CHRM016566 at CHRM016583 (Lenk's report of finding the Key); *cf. id.* at CHRM016584 (Colborn's report for November 8, 2005 making no mention of the Key); *see also MaM* Ep. 7 at 8:26–9:45 (Buting questioning Kucharski about the theory that the Key fell out the back of the bookcase).

36.  As shown in *MaM*, in a press conference on November 15, 2005, Ken Kratz directly addressed media reports "that this key in his bedroom could've been left or planted or something of the like. Now that Mr. Avery's DNA is found on that particular key, I was left with the question that not only are they carrying around keys for Teresa's vehicle, but they're also carrying around vials of Mr. Avery's DNA with them, whether it's perspiration or whatever. It's absurd." *MaM* Ep. 2 53:21–49.

37.  No DNA evidence from Teresa Halbach was found inside Avery's trailer, but her human cremains were found in his burn pit and a burn barrel found behind his sister's neighboring trailer, and blood from both Avery and Teresa Halbach were found in her vehicle. *See MaM* Ep. 2 at 53:49–54:04 (Kratz detailing physical evidence at a November 15, 2005 press conference).

38.  Avery was arrested on November 9, 2005 and charged with homicide on November 15. *See MaM* Ep. 2 at 54:04–22.

39.  Depositions scheduled for Avery's civil lawsuit after November 9, 2015, including for former Sheriff Kocourek and DA Dennis Vogel, never occurred. *See See MaM* Ep. 3 at 15:41–15:52.

**IV.  2006–07: The Prosecutions and Convictions of Avery and Dassey**

40.  In February 2006, three months after his arrest, Avery settled his $36 million civil rights lawsuit for a reported $400,000, using his share of the funds to hire criminal defense attorneys Dean Strang and Jerome Buting. *See MaM* Ep. 3 at 15:41–15:52.

41.  Intrigued by a news article telling the story of a DNA exoneree newly charged with murder, graduate film students Laura Ricciardi and Moira Demos traveled to

12

Manitowoc in December 2005 to begin filming the project that would eventually become *Making a Murderer*. Ricciardi Decl. ¶¶ 6, 7; Demos Decl. ¶¶ 6, 7.

42. On March 1 and 2, 2006, Kratz and other Calumet County officials held two press conferences about the involvement of a 16-year-old relative of Avery in the murder, which changed the tenor of the investigation and made the case even more complex. Ricciardi Decl. ¶ 9, Demos Decl. ¶ 9; *see MaM* Ep. 3 at 23:35–25:10 (March 1, 2006 press conference); *id.* at 26:00–28:23 (March 2, 2006 press conference.

43. The March 2, 2006 press conference shared grisly details of the final hours of Teresa Halbach's life. Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 96–97; *MaM* Ep. 3 26:00–28:23 (March 2, 2006 press conference) *cf. MaM* Ep. 8 at 4:39–5:13 (Kratz closing argument explaining why no victim DNA found in Avery trailer).

44. The March 1 and 2, 2006 press conferences elicited changes in opinions from community members who had previously stood by Avery, including Dassey's mother and Steven's sister, Barb, who was shown on the news reacting to the news of her son's arrest, addressing Steven Avery: "I hate you for what you did to my kid. All right? So you can rot in hell," and Avery's brother Chuck, who said he was "pretty positive" Steven had murdered Teresa Halbach. *See MaM* Ep. 3 25:21–25:29 (Barb), 42:00–42:08 (Chuck); *see also* Ricciardi Decl. ¶ 9; Demos Decl. ¶ 9.

45. On August 22, 2006, Judge Willis held a hearing on various pretrial motions and issued an order approving the parties' stipulation that the trial be held in Calumet

County using jurors from Manitowoc County, which addressed the defense's request that MTSO have no contact with jurors. Ricciardi Decl. ¶ 108, Ex. 13, CHRM009598 at CHRM009621–22.

46. At the August 22, 2006 pretrial hearing, Judge Willis also issued "an order prohibiting members of either the Manitowoc County Sheriff's Department, or the Calumet County Sheriff's Department, from making any further public comment concerning this case, or the defendant, Steven Avery, until the trial is concluded." Ricciardi Decl. ¶ 108, Ex. 13, CHRM009598 at CHRM009629; *see* Ricciardi Decl. ¶ 15 (discussing inability to speak with MTSO except through spokesperson).

47. On September 22, 2006, Judge Willis issued an order denying the prosecution's motions to introduce evidence at trial of Avery's prior bad acts, including his assault of his cousin Sandra Morris, his animal cruelty to the family cat, and his history of domestic violence. *See* Ricciardi Decl. ¶ 109, Ex. 14, CHRM034905.

48. On January 30, 2007, Judge Willis issued an order allowing Steven Avery to introduce evidence of his wrongful conviction and eighteen years of incarceration to the jury to "adequately pursue his claim of bias against James Lenk and Andrew Colborn." *See* Ricciardi Decl. ¶ 110, Ex. 15, CHRM034924.

49. Avery's defense team was permitted to examine the contents of his 1985 case file, and Investigator Mark Wiegert and Special Prosecutor Norm Gahn observed while Buting examined the box with broken seals that contained a vial of Steven Avery's blood from 1996 with a small needle hole in the top. *See MaM* Ep. 4 1:02:26–104:14. Buting filmed the scene himself, which is why Buting received a

14

credit for that footage at the end of episode 4 of *Making a Murderer*. *See id.*;
Ricciardi Decl. ¶ 36.; *see also MaM* Ep. 4 at 1:05:11.

50.      On January 30, 2007, Judge Willis issued an order ruling that subject to limitations, the defense could present evidence relating to the blood vial taken from Avery in 1996 "to be used as part of a 'frame-up' defense" and explained, "Avery acknowledges that he has no direct proof that Lenk, Colborn, nor any other Manitowoc County Sheriff's Department officer took blood from the file in the Clerk of Court office or planted blood from the vial in Teresa Halbach's vehicle. He relies on the circumstantial evidence summarized as sufficient to justify the admission of the blood vial and other related evidence to support his position." See Ricciardi Decl. ¶ 111, Ex. 16, CHRM003721 at CHRM003722, CHRM003727; *see also id.* at CHRM003728 (Judge Willis noting "The court does not understand Avery will be attempting to implicate any members of the Sheriff's Department other than Mr. Lenk or Mr. Colborn in any frame-up.")

51.      Avery's trial began on February 12, 2007 and lasted nearly five weeks, with 60 witnesses and hundreds of exhibits. Ricciardi Decl. ¶ 33; Demos Decl. ¶ 33; *see generally* Ricciardi Decl. ¶ 113, Ex. 18, 2007 Avery Trial Day 1, CHRM006136; Ricciardi Decl. ¶ 118, Ex. 23, 2007 Avery Trial Day 23, CHRM006618; Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546.

52.      Kratz stated in his opening statement, "State intends to prove to you that the defendant restrained, murdered, and mutilated a 25-year-old photographer named Teresa Halbach." "When deciding who is accountable for the death of 25-year-old Teresa Halbach, Mr. Avery's past and his past exoneration have nothing to do

with this case." Ricciardi Decl. ¶ 113, Ex. 18, 2007 Avery Trial Day 1, CHRM006136 at 37–155; *MaM* Ep. 5 at 10:00–10:30.

53. Avery attorney Dean Strang stated near the beginning of his opening statement that Avery's wrongful conviction and civil rights lawsuit brought "shame" to MTSO, and the two MTSO officers most involved in the investigation of Teresa Halbach's murder were fact witnesses in that lawsuit. *See MaM* Ep. 5 at 14:05– 18:40; Ricciardi Decl. ¶ 113, Ex. 18, 2007 Avery Trial Day 1, CHRM006136 at 110–56; CHRM006136 at 110 (beginning of opening); 118 (first mention of Colborn; 119 ("get[ting]it wrong" led to "feelings of shame, of embarrassment, anger, humiliation")).

54. Plaintiff took the stand on February 20, 2007 for approximately three hours and forty minutes, with about three hours and ten minutes spent testifying. His testimony filled 152 pages of court transcript and covered significant ground across direct, cross, redirect and recross examinations. He is shown testifying at trial in *MaM* for a total of more than ten minutes, in Episode 5 starting at 53:20 and Episode 7 starting at 15:23. Ricciardi Decl. ¶ 33; Demos Decl. ¶ 33.

55. On cross-examination, Plaintiff confirmed that his first written record of the Jail Call was not until 2003. *See* Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM008000 at 199, *MaM* 22:57–23:43.

56. On redirect, closing out the *MaM* segment on Plaintiff's testimony, Plaintiff noted that, "If I wrote a report about every call that came in, I would spend my whole day writing reports." *See* Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM008000 at 212–15; *see also MaM* Ep. 7 at 23:43–24:30.

16

57.    Avery's attorney Strang hit the theme of gaps in Plaintiff's report-writing a few

times, noting how Plaintiff's first record of his November 3, 2005 conversation

with Avery was not made until June 2006, (see *supra* ¶ 21) and how his

November 8, 2005 entry on the MTSO investigative report was a mere half page

with no mention of the Key being discovered that day. Ricciardi Decl.¶ 106, Ex.

11, MTSO Investigative Summary with November 8, 2005 entry, CHRM016566

at CHRM016583 (Lenk's report of finding the Key); *cf. id.* at CHRM016584

(Colborn's report for November 8, 2005 making no mention of the Key); *MaM*

Ep. 7 at 21:38–22:57.

58.    Strang asked Plaintiff whether he was looking at Teresa Halbach's car when he

placed the Call to Dispatch, and Plaintiff testified that, "I shouldn't have been and

I was not looking at the license plate" while making the call and expressing his

belief that he must have gotten the license plate information from Calumet

Investigator Wiegert earlier that day when they discussed Teresa Halbach's

disappearance. Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7,

CHRM008000 at 186–87; *MaM* Ep. 5 at 55:35–57:00.

59.     The Series shows Kratz ending his direct examination of Colborn asking "Have

you ever planted any evidence against Mr. Avery?" and Plaintiff responding, "I

have to say that this is the first time my integrity has ever been questioned and,

no, I have not." Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7,

CHRM008000 at 140–41; *MaM* Ep. 7 at 18:42–19:15; *cf. MaM* Ep. 7 at 19:15–

19:33 (Strang opening his questioning using the word "integrity").

17

60.	In closing arguments, as shown in *MaM,* Kratz expressed outrage at the defense's frame-up theory, noting that, "This isn't just two guys. It's Jim Lenk, and it's Andy Colborn. Their livelihood their reputations, their families, everything in their 20-plus years in law enforcement are on the line when some lawyer accuses them of misconduct. Not just any misconduct, but planting evidence in a murder case. And this vial-planting defense is absolutely ludicrous." *See MaM* Ep. 8 at 7:00–7:38; *see also* Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 114–15.

61.	As depicted in *MaM*, Kratz also noted in his closing that it "shouldn't matter whether or not that key was planted" because "that key, in the big picture, in the big scheme of things, means very little" compared to the bulk of evidence against Steven Avery. *See MaM* Ep. 8 at 9:02, 9:30; *see also* Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 64.

62.	As shown in *MaM*, Strang's closing argument emphasized that the defense's theory was that officers planted evidence "to ensure the conviction of someone they've decided is guilty." *See MaM* Ep. 8 at 8:51–9:00; *see also* Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 46.

63.	The jury deliberated for three and a half days before finding Steven Avery guilty of intentional homicide and being a felon in possession of a firearm, but not guilty of mutilation of a corpse. Ricciardi Decl. ¶ 120, Ex. 25, 2007 Avery Trial Day 27, CHRM04124.

64.	Following the verdict, Plaintiff issued a media statement that was read on the local news, as depicted on Action 2 News in *MaM*: "I hope and pray that this

verdict helps put to rest any suspicions or loss of confidence that this community may have felt towards our department, because I assure everyone that this agency has some of the finest law enforcement officers in the country in its employ." *See MaM* Ep. 8 at 33:50-34:19; *see also* Vick Decl. ¶ 6, Ex. 5, Colborn Dep. At 476:6–479:6.

65. As shown in *MaM*, at Avery's sentencing, Judge Willis told Avery, "You are probably the most dangerous individual ever to set foot in this courtroom." *See MaM* Ep. 9 at 1:01:08–1:02:53; *see also* Ricciardi Decl. ¶ 85 (additional negative commentary Avery).

**V.     2005–2015: The Production and Release of *Making a Murderer***

66. Upon arrival in Manitowoc, the filmmakers had sought universal access to the key players and interviewed a significant number of individuals connected to Avery's various legal matters, but the Halbach family and the prosecutors in the Avery murder case declined. Ricciardi Decl. ¶¶ 12–15; Demos Decl. ¶¶ 12–15.

67. While law enforcement almost universally declined to participate in *MaM*, the filmmakers were able to interview Manitowoc ADA Michael Griesbach and Manitowoc Under-Sheriff Robert Hermann. *See* Ricciardi Decl.¶¶ 15, 16; *see also MaM* Ep. 3 22:51–23:22. (Hermann commenting that the idea that MTSO could "plant" DNA evidence discovered on Avery's property, was "not realistic," "impossible," and "so far-fetched" it could "never" happen.); *MaM* Ep 1 at 49:51–51:50 (Griesbach detailing his personal knowledge of Manitowoc DA's office in wrongful conviction).

68. In *Making a Murderer*, the filmmakers took steps to further show the viewpoints of the Halbach family, law enforcement, and the prosecution by including, among

19

other things, footage from press conferences, legal proceedings, and news reports featuring their opinions. *See, e.g.*, Ricciardi Decl. ¶¶ 13 (Halbach family), ¶ 14 (prosecutors); ¶ 86 (scenes in *MaM* that directly push back against Avery's planting allegations); *see also MaM* Ep. 3 at 22:51–23:22 (MTSO Undersheriff criticizing Avery's planting accusations against officers and characterizing them as "impossible"); *MaM* Ep. 7 at 13:55–14:28; 44:00–45:30 (Multiple scenes in which the prosecutors from Avery's murder trial push back against Avery's planting accusations by, among other things, calling those accusations "despicable" and "deplorable."); *MaM* Ep. 7 at 24:30–24:50 (scene in which a member of the media calls out Avery's criminal defense attorneys for accusing Plaintiff of planting); *MaM* Ep. 8 34:02–19 (newscast in which an anchorman reads Plaintiff's prepared public statement following the jury's guilty verdict in Avery's murder trial); *MaM* Ep. 7 at 18:42–19:15 (Footage from Plaintiff's testimony at Avery's murder trial in which Plaintiff expressly denies the planting and framing accusations).

69.  *Making a Murderer* revolves around its principal subject and main character's journey through the American criminal justice system and the community's reaction to it. Ricciardi Decl.¶ 5; Demos Decl. ¶ 5.

70.  There are numerous scenes in *MaM* that reflect negatively on Avery. *See, e.g.*, Ricciardi Decl. ¶ 84, Demos Decl. ¶ 90; *see also MaM* Ep. 3 at 42:00–42:08 (A scene with a statement by Chuck Avery, Steven Avery's brother, stating that he was "pretty positive" Steven murdered Teresa Halbach); *MaM* Ep. 3 25:21–25:29 (A scene in which Steven Avery's sister, Barbara Janda, tells Steven "I hate you

20

for what you did to my kid. All right? So you can rot in hell.") *MaM* Ep. 5 at

19:28–21:56 (Scenes showing Avery's nephew Bobby Dassey testifying against

him at his murder trial, with Dassey shown as being one of the prosecution's most

important witnesses); *MaM* Ep. 7, 59:12–1:00:04 (A scene showing Teresa

Halbach's brother Mike Halbach opining that he believed Avery was guilty);

*MaM* Ep. 1 at 5:18–7:24 (Morris allegations of indecent exposure by Avery);

*MaM* Ep. 1 at 9:30–9:59 (Avery's burglaries); *MaM* Ep. 1 at 10:00–10:53

(Avery's cat burning and conviction and probation); *MaM* Ep. 1 at 12:31– 13:59

(Avery's reckless endangerment of Morris); *MaM* Ep. 1 at 16:07 (Avery's

criminal charges for reckless endangerment of Morris); *MaM* Ep. 1, 26:36–28:18

(An interview in which Judge Hazlewood, the presiding judge in Avery's 1985

trial, opines that Avery had a propensity for violence against women); (A scene in

which Steven Avery tells his parents that he was going to kill himself if they did

not figure out a way to post bail for him); (A scene with Avery opining that the

prosecution was going to win at trial); (Interviews with various people who

opined that violent crime was in Avery's character, along with interviews of

people who disagreed with that opinion); *MaM* Ep 1 at 27:09 – 27:52 (An

interview with a member of the local media who said the arrest of Avery for the

Beerntsen assault was not a surprise because Avery was one of the "regular

names" on the crime beat in Manitowoc County and the assault was "in character"

for him); *MaM* Ep. 8 at 26:02–28:01 (The jury's guilty verdicts in Avery's trial

for the murder of Teresa Halbach); *MaM* Ep. 9 at 1:01:08–1:02:53 (A scene

showing Judge Willis, who presided over Avery's trial, opining that Avery was "probably the most dangerous individual to set foot in this courtroom").

71. Ricciardi researched and reviewed thousands of pages of investigative reports, transcripts, court filings, exhibits, legal decisions and orders, newspaper articles, video footage, audio recordings, and more. *See* Ricciardi Decl. ¶ 3 (legal background); ¶ 17–20 (research efforts).

72. Demos and Ricciardi filmed hundreds of hours of footage, and *MaM* uses an observational documentary style and no omniscient voiceover narration. Ricciardi Decl. ¶ 11, 12, 22, 48; Demos ¶¶ 11, 21, 48.

73. Judge Willis issued a trial administration order and met with members of the media to establish that there were to be three cameras feeding the media pool: the manned "A" camera facing the witness, the remote-controlled "B" camera facing attorneys, and the manned "C" camera to cover the rare moments when members of the prosecution or defense teams left the frame of the A or B cameras. Ricciardi ¶¶ 21, 22; Demos ¶¶ 21, 22; Ricciardi ¶ 112, Ex. 17, Judge Willis's Order Regarding Trial Administration, CHRM034811.

74. During the trial, Moira Demos operated the remote-control camera and executed a live edit, cutting between all three cameras, which resulted in a "mixed feed" that was fed to the local media and used for their daily news reports. Demos Decl. ¶¶ 20–23; Ricciardi Decl. ¶ 127, Ex. 32, CHRM034818 (Ricciardi explaining "Moira and I were upstairs operating the remote camera in the courtroom and the mixer"); Ricciardi Decl. ¶ 126, Ex. 31, CHRM034769 ("the news stations, however, were taking a 'mixed feed,' which Moira was providing to the entire television camera

22

pool by performing a live edit of the trial."); Ricciardi Decl. ¶ 124, Ex. 29, CHRM034730 (pool member recognizing "you did a lot of work for all of us switching the feed and it was after all a pool effort.").

75.     The camera feeds were used in different ways. Feeds from the A-camera, the B-camera and the live edit mixed feed were fed down to the media room in the basement where all of the media outlets including the Producer Defendants were set up. The Producer Defendants were recording the unedited footage of the A and B-camera feeds, but not the (edited) mixed feed. By contrast, all of the other media were recording the mixed feed, but not the A and B-camera feeds. Demos Decl. ¶¶ 21–24; Ricciardi ¶¶ 22–25.

76.     Due to a disconnected adapter between the witness cam (A-cam) feed and the mult-box, the witness cam footage feed was "unterminated," making the witness cam footage discolored and of insufficient technical quality to meet broadcast standards. Demos Decl. ¶¶ 25, 26.

77.     With the exception of a few witnesses on the first two days of trial, none of the A-camera footage of witnesses from the remainder of the four weeks of testimony was usable. Demos Decl. ¶¶ 25, 26.

78.     In response to the unterminated feed issue, the filmmakers made repeated efforts (first in 2007 and again in 2015) to reach out to people working at the local television stations who had covered Avery's trial in an attempt to obtain or make copies of their stations' mixed feed footage. *See* Demos Decl.¶¶ 26, 27; Ricciardi Decl. ¶ 123, Ex. 28, CHRM034819 (initial outreach email from Demos to pool re footage); Ricciardi Decl. ¶ 126, Ex. 31, CHRM034769 (Ricciardi explaining the

unterminated feed to producer); Ricciardi Decl. ¶ 124, Ex. 29, CHRM034730 (pool member recognizing contributions to the group); Ricciardi Decl. ¶ 125, Ex. 30, CHRM034747 (Hearst affiliate assisting with footage); Ricciardi Decl. ¶ 130, Ex. 35, CHRM034867 (CBS affiliate assisting with footage).

79. The filmmakers were able to duplicate footage from WISN and WBAY and pay a license fee of $10,000 to WGBA for their footage, but it still consisted of the mixed feed and did not always show the witness or the full testimony. Demos Decl.¶¶ 18, 27; Ricciardi Decl.¶ 28.

80. As a result, the Producer Defendants did not have every witness answer on camera and did not have many moments of witnesses listening. Demos Decl.¶ 29; Ricciardi Decl.¶ 29.

81. A review of the footage itself demonstrates the problem visually: the unterminated feed footage from the witness camera (A) is discolored, while the lawyer camera (B) and mixed feed footage are clear and defined. But often the B-camera and mixed feed footage do not show the witness speaking, listening, or reacting onscreen. Restricted Demos Decl. Exs. 1–32.

82. When editing and responding to the unterminated feed issue, the filmmakers took steps to portray the testimony accurately and to not materially alter witnesses' demeanor or the meaning of any of their testimony, including that of Plaintiff. Demos Decl.¶¶ 31, 84; Ricciardi Decl.¶¶ 30, 78; *see also* Vick Decl. ¶ 4, Ex. 3, Deposition of Mary Manhardt at 153:13-154:5 ("I was more confident than I have ever been on an editing job that what was given to me was, you know -- had been looked at extremely closely.").

24

83. The filmmakers used editorial practices universally to condense and summarize subjects' testimony, actions, and viewpoints. Demos Decl. ¶¶ 29, 35, 64; Ricciardi Decl. ¶¶ 29, 34, 62.

84. Demos and Ricciardi spent several years mapping out the first few episodes editing the footage to realize their vision of a documentary series that would become *Making a Murderer*. Ricciardi Decl. ¶ 37; Demos Decl.¶ 38.

85. Lisa Nishimura of Netflix recognized the complexity and appeal of the story and took a risk on the unconventional documentary series format. Ricciardi Decl. ¶¶ 37, 38; Demos Decl.¶¶ 38, 39.

86. The Netflix deal provided Demos and Ricciardi with financing after more than eight years self-financing the project through small grants and gig work as a contract attorney (Ricciardi) and lighting technician (Demos). Ricciardi ¶ 4; Demos ¶ 4.

87. Throughout post-production, Netflix creative executives provided notes, but the filmmakers chose how to implement them and retained creative control. Ricciardi Decl.¶ 39; Demos Decl. ¶ 40.

88. While they had initially planned for eight episodes, *MaM* expanded to ten episodes to devote more space to Avery and Dassey's trials. Ricciardi Decl.¶ 40; Demos Decl. ¶ 41.

89. The filmmakers had to edit down twenty-five years of historical context, fifteen months of investigation and pre-trial hearings in both cases, twenty-seven days of Avery's trial, Dassey's trial, and eight years of events post-convictions (including

appeals), all into ten hours of television. Ricciardi Decl. ¶¶ 5, 77; Demos Decl.
¶¶ 5, 83.

90.    Netflix marketed the show. The filmmakers had some input adjusting wording
and message in marketing to convey their themes. *See* Ricciardi Decl. ¶ 41; Demos
Decl. ¶ 42; *see also* Ricciardi Decl. ¶ 128, Ex. 33, CHRM000695 (rejecting
phrasing of "small-town corruption" and "true crime" prepared by marketing).

91.    At the suggestion of Netflix, the filmmakers provided guidance to a graphics
company who created graphics to help orient the viewer to different events, dates,
locations, and individuals. *See* Ricciardi Decl. ¶ 42; Demos Decl. ¶ 43.

92.    *Making a Murderer* became wildly popular within days of its release on
December 18, 2005, and Demos and Ricciardi were invited to and participated in
many interviews. *See* Ricciardi Decl. ¶¶ 43, 44; Demos Decl. ¶¶ 44, 45; *see also*
Vick Decl. ¶ 5, Ex. 4, Deposition of Lisa Dennis at 72:8–17 (*MaM* was
"immensely popular").

93.    Demos and Ricciardi received many messages, both positive and negative, after
the Series was released. Ricciardi Decl. ¶ 44; Demos Decl. ¶ 45. *See e.g.*,
Ricciardi Decl. ¶ 129, Ex. 34, CHRM002666 (Griesbach messaging the
filmmakers "Congratulations!" noting that he enjoyed the ten episodes
"immensely" and agreed with their recent interview describing their goal of
raising questions and promoting dialogue about ambiguity in the criminal justice
system).

## VI.    2015–2022: Plaintiff's Lawsuit and the *Convicting* Counter-Documentary

94.    Plaintiff has never watched *Making a Murderer* in its entirety and does not intend
to. Vick Decl. ¶ 33, Ex. 32, Dkt. 270 ¶ 3 (Colborn Decl. ¶ (C)(27)).

26

95. Plaintiff watched only snippets totaling less than 30 minutes before bringing this lawsuit and has since watched no more than an additional 30 to 45 minutes. *See* Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 411:2–23; Vick Decl. ¶ 33, Ex. 32, Dkt. 270 ¶ 4( Colborn Decl. ¶¶ (C)(35)–(37)).

96. Beginning as early as January 2016, Plaintiff tried to bring a defamation lawsuit related to *Making a Murderer*, but several attorneys turned him down. *See, e.g.* Vick Decl. ¶ 15, Ex. 14, MANITOWOC-000246 (email with attorney Patrick Dunphy saying after he watched seven episodes, he saw "nothing that would lead me to take on the investigation of a potential defamation case.").

97. Plaintiff has stipulated that he previously had wanted to sue Jerome Buting, Dean Strang, and *Post-Crescent* reporter John Ferak for defamation. Vick Decl. ¶ 33, Ex. 32, Dkt. 270 ¶¶ 14–16 (Colborn Decl. ¶¶ (C)(17)–(22)); *see also* Vick Decl. ¶ 13, Ex. 14, Manitowoc-000158 (email with attorney Patrick Dunphy explaining his ire at Buting and Strang, "In short, the defense was that I and another now retired police officer planted the evidence that led to Mr. Avery's conviction.").

98. Plaintiff has acknowledged that the planting allegations in *MaM* that offend him "mirror those claimed by the defense during the trial" and were "already in the public record." Vick Decl. ¶ 13, Ex. 12, MANITOWOC-000158 (email with attorney Patrick Dunphy acknowledging the Series mirrors Avery's criminal defense); Vick Decl. ¶ 14, Ex. 13, MANITOWOC-304130 (email with attorney Patrick Dunphy acknowledging that all the information is in the public record).

99. In response to an inquiry for defamation representation, an attorney whom Plaintiff approached, Matthew V. Fisher, responded that if Plaintiff was "looking

to generally counter that movie's presentation, then you might be better suited consulting with a public relations professional." Vick Decl. ¶ 16, Ex.15*, MANITOWOC-000264.

100. Following the verdict, as an MTSO employee, Plaintiff was bound by department policy and could not speak about the Avery case publicly until his retirement on March 16, 2018. *See* Vick Decl. ¶ 2, Ex. 1, Petersen Dep. 51:17–52:13; Vick Decl. ¶ 21, Ex. 20, COLBTXTS_0004696 (Plaintiff clarifying his restrictions while working for MTSO).

101. Other members of law enforcement and the prosecution team who appeared in *MaM* sought out avenues to share their narrative with the public. *See, e.g.* Vick Decl. ¶ 18, Ex. 17, COLBTXTS_0002133 – 2134 (messages with Kratz regarding a DatelineNBC appearance); Vick Decl. ¶ 19, Ex. 18, COLBTXTS_0000459 (messages with Marla Lenk regarding Kratz and Fassbender's DatelineNBC appearance); Vick Decl. ¶ 31, Ex. 30, Griesbach0026044 (Griesbach pitching another book after *MaM* release).

102. Colborn's former counsel of record, Michael Griesbach, wrote in a January 2016 email to his book agent that while he was "convinced [Avery] is guilty . . . I'm nowhere near as certain that the cops did not plant evidence to bolster their case." Vick Decl. ¶ 31, Ex. 30, Griesbach0026044.

103. Plaintiff is voluntarily participating in a self-professed "counter-documentary," *Convicting a Murderer*, including by sitting for two interviews for the documentary with *CaM* producer, Brenda Schuler. Vick Decl. ¶ 33, Ex. 32, Dkt.

270 ¶ 5 (Colborn Decl. ¶¶ (C)(38)); Vick Decl. ¶ 6, Ex. 5, Colborn Dep. 89:16–19.

104.  Plaintiff filmed an interview for a not-yet-released "counter-documentary" *Convicting a Murderer* on March 2, 2018, two weeks before he ended his employment with MTSO and was permitted to publicly speak about the Avery case. Vick Decl. ¶ 22, Ex. 21, COLBTXTS_0004904 (scheduling the interview), Vick Decl. ¶ 23, Ex. 22, COLBTXTS_0004983 (recapping the interview, also reference looking for 11/3 records); *cf.* Vick Decl. ¶ 21, Ex. 20, COLBTXTS_0004696 (stating inability to speak publicly until employment ends March 16, 2018); Vick Decl. ¶ 29, Ex. 28, COLBORN-004888 (*CaM* appearance release form signed and dated March 2, 2018); *see also* Vick Decl. ¶ 27, Ex. 26, SCHULER_00013–25 (*CaM* interview transcript with Plaintiff); Vick Decl. ¶ 28, Ex. 27, SCHULER_00330-362 (*CaM* interview transcript with Plaintiff)..

105.  Schuler has described *CaM* as the "full story" of the Avery case, that would "humanize the hell out of Andy" [Plaintiff] who is one of a few law enforcement protagonists. Vick Decl. ¶ 3, Ex. 2, Schuler Dep. 181:1–184:9.

106.  Kratz had previously reminded Schuler that, "The bottom line is if we ever hope to secure a movie or series deal, we need *MaM* to continue being relevant." Vick Decl. ¶ 20, Ex. 19, COLBTXTS_0004454–65 (messages between Schuler and Plaintiff regarding Kratz); Vick Decl. ¶ 3, Ex. 2, Schuler Dep. 263:7–266:19.

107.  While Schuler was not a formal member of Plaintiff's legal team, she sought behind the scenes access and drafted portions of the Complaint—specifically including Exhibit A, which detailed edits in the Series that Schuler considered

biased. *See* Schuler Dep. 321:2–12 (role drafting Complaint); Dkt. 1 (original Complaint); COLBORN-004614 (discussion of *CaM* filming after lawsuit filing), Schuler Dep. 199:17–202:12 (acknowledging initial interest for *CaM* to cover this lawsuit); Schuler Dep. 344:16–346:25 (role encouraging Plaintiff to bring this lawsuit).

**VII.  Plaintiff's Lack of IIED Claim**

108.  Plaintiff's medical record do not establish any extreme emotional distress caused by the Producer Defendants' conduct. Vick Decl. ¶ 25, Ex. 24, COLBORN00176 (December 28, 2018 record, complaints of anxiety); *cf.* Vick Decl. ¶ 26, Ex. 25, COLBORN00153 at COLBORN00156 (February 19, 2018 record, no anxiety reported).

109.  In his community, views were divided during the murder trial, but the Series did not alter those divisions much. *See, e.g.*, Dkt. 278, Declaration of Tom Pankow; Dkt. 277, Declaration of Betty Heinzen; Dkt. 276, Declaration of Paul Kopindlasky.

110.  Instead, what lowered Plaintiff in his witnesses' estimation was his affair and divorce from his third wife. *See id.*; *see also* Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 301:17–25; 303:19–25.

111.  Plaintiff referred to John Ferak of the Post-Crescent as "an unscrupulous reporter who has gone out of his way to make life miserable for me," regularly published negative articles about Plaintiff and MTSO, which resulted in Plaintiff receiving death threats. Vick Decl. ¶ 6, Ex. 5, Colborn Dep at 108:12–24, 122:20–123:11 (death threats).

112.     Hostile anonymous members of the public, whom Plaintiff acknowledged were "unreasonable," did call and message him. *See* Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 296:1–19.

113.     Plaintiff has admitted he just "can't let go" of the accusations that he planted evidence from the Avery lawsuit. Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 276:17–277:7

**VIII.    Plaintiff's Claims Fail as a Matter of Law**

114.     Because of the unterminated feed footage issue, the filmmakers substituted footage that they believed had the same meaning, for example replacing unusable "Not that I recall" with "No, sir." *See* Demos Decl. ¶ 78; Dkt. 105 Ex. B at 7 (including five instances of Plaintiff responding "No, sir."); *see also MaM* Ep. 7 at 21:59.

115.     The filmmakers excluded portions of the Call to Dispatch that were transcribed as "inaudible" because inaudibility would confuse and frustrate viewers. Ricciardi Decl. ¶ 62; Demos Decl. ¶ 64; *see* Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM08000 at 180–183.

116.     In Season Two,[1] *MaM* includes information from a post-conviction filing by Avery's appellate attorney Kathleen Zellner, including a sworn affidavit by a witness, Kevin Rahmlow, who claimed that he had encountered Plaintiff at a gas station on November 4, 2005, and told Plaintiff he had seen a car matching the description of Teresa Halbach's about a mile from the Avery Salvage Yard. *See*

---

[1] Season Two is not at issue in this lawsuit. *See* SAC ¶ 59, 63, 78 (no mention of ¶¶ 53–56 discussing Season Two).

31

Ricciardi Decl. ¶ 122, Ex. 27, Rahmlow Affidavit, CHRM013700; *see* Ricciardi Decl.¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 31–34.

117.    *MaM* presented but did not draw conclusions regarding discrepancies in sworn testimony regarding the Jail Call among Manitowoc County witnesses or between Plaintiff's own version of the facts in his 2003 statement, 2005 deposition testimony, and 2007 trial testimony. *See supra* II.13 (other witnesses), II.12 (Plaintiff testifying he never spoke to anyone about the Jail Call or recalled any names involved); *cf.* Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 372:5-17 (Plaintiff testifying in this case that Kusche received the Jail Call); Vick Decl. ¶ 24, Ex. 23, COLBTXTS_0006432 at COLBTXTS_0006437–39 (Plaintiff revealing he learned from Griesbach in 2016 that Kusche received the call); SAC ¶ 25 ("Plaintiff subsequently heard that higher-ups at MTSO had given assurances that the right man had been convicted."). *See also* Ricciardi Decl. ¶ 50; Demos Decl. ¶ 51.

118.    At his deposition, Plaintiff testified that he took issue with a brief shot in *MaM* of his trial testimony in which he leans back in the witness stand and may be cracking his knuckles, but the shot in question also shows him with his head held up and his eyes looking straight ahead. Vick Decl. ¶ 6, Ex. 5, Colborn Dep. 496:18–497:6; *MaM* Ep. 5 at 55:27–55:37.

119.    *MaM* includes out-of-courtroom commentary from individuals clearly identified as attorneys representing Steven Avery sharing arguments to make or that had previously been made in legal proceedings. *See, e.g.*, *MaM* Ep. 5 at 12:20–13:57 ("Jerry Buting Steven's Defense Lawyer" shown onscreen talking about

32

arguments he intended to make in opening arguments addressing physical evidence).

120.   *MaM* shows Jerome Buting saying that a conspiracy framing Avery could have been achieved by "two people … [m]aybe even one," followed by a cut to James Lenk on the witness stand, reflecting his closing argument that Lenk alone could have planted evidence. *See MaM*. Ep. 8 at 6:08–6:53.

121.   *MaM* shows an interrogating officer ask Avery whether someone told him that "a cop put that vehicle – Teresa's vehicle – out on your property," to which Avery responds "Yeah," followed by a cut to a visual of Plaintiff on the witness stand getting questioned about Teresa Halbach's vehicle. *MaM* Ep. 5 at 52:36–55:37.

122.   The person who testified for the prosecution regarding the blood vial was was FBI chemist Marc Lebeau, who, as depicted in *MaM*, gave the opinion that the blood in the car could not have come from the vial. *See MaM* Ep. 7 at 42:22–44:40, 47:21–50:47; *cf.* SAC ¶ 40.

123.   The Series depicts differing reactions to Steven Avery in the local community, with some who believed his framing defense, some who believed he was guilty, and some whose views were shown changing over time. *See, e.g.*, *MaM* Ep. 3 at 14:14–15:40 (bar patrons playing pool with Steven Avery's brother Chuck Avery expressing their belief in the framing theory); *MaM* Ep. 3 at 29:00–29:03 (local news segment after March 2, 2006 press conference with two local residents interviewed at a bar expressing the belief that Dassey and Avery killed Teresa Halbach, and one local resident interviewed in the street whose mind was changed

33

toward guilt); *see also MaM* Ep. 3 at 4:25 and 12:30 (identifying onscreen "Chuck Avery Steven's Brother"); Vick Decl. ¶ 6, Ex. 5, Colborn Dep. 77:8–14, 83:3–7.

124.    The Series devotes an entire episode to physical evidence, testing, and expert testimony in the 2007 Avery trial, and additional experts are shown testifying about the blood vial in Episode 7. *See MaM* Ep. 6 ("Testing the Evidence"); *MaM* Ep. 6 15:47–18:20, 23:03–25:40, 31:04–32:33 (expert testimony regarding Teresa Halbach's DNA on bullet); 34:44–38:28 (expert testimony regarding Teresa Halbach's cremains); 38:50–42:12 (expert testimony regarding burn pit); 44:26–45:41 (forensic testing and expert testimony regarding blood in Teresa Halbach's RAV-4); *see also MaM* Ep. 7 at 42:22–44:40, 47:21–53:13 (expert testimony regarding blood vial).

125.    Some members of the public who watched *Making a Murderer* were left with questions about whether Avery was guilty and whether officers planted evidence. *See e.g.* Vick Decl. ¶ 32, Ex. 31, Griesbach0026044 ("I've debated this for a week with my wife and children and in my own mind. I am convinced he is guilty [I said the same in the interview I sent you.] . . . but I'm nowhere near as certain that the cops did not plant evidence to bolster their case."); Vick Decl. ¶ 31, Ex. 30, Griesbach0014413 ("I went into the documentary determined to see through any bias the film might employ, but I came out of it more conflicted than ever. Not so much as to either defendants' guilt, but whether they received a fair trial."); Vick Decl. ¶ 3, Ex. 2, Schuler Dep. 45:2–47:11 (testifying that *MaM* raised questions thinking Avery was not guilty, she researched them, and she concluded Avery is guilty).

126. To the extent there are any material inaccuracies resulting from their editorial steps to summarize events and compress testimony in *MaM* (although the Producer Defendants do not believe there are), such inaccuracies were inadvertent, and the Producer Defendants entertained no doubts that *MaM* accurately captured the gist of the parties' contentions. *See* Ricciardi Decl. ¶¶ 30, 49, 51, 52, 54, 58, 59, 60, 61, 63, 69, 70, 71, 72, 73, 74, 78, 80, 86, 87, 95; Demos Decl. ¶¶ 31, 50, 52, 53, 55, 56, 60, 61, 62, 63, 65, 70, 72, 73, 74, 75, 76, 77, 78, 79, 80, 84, 86, 92, 93, 102.

127. The Producer Defendants' editing choices were made with the intent to summarize and compress voluminous material in a comprehensible manner for viewers. *See* Ricciardi Decl. ¶¶ 33, 34, 52, 54, 58, 60, 62, 69, 77, 78, 79, 95; Demos Decl. ¶ 34, 35, 53, 56, 60, 62, 64, 70, 72, 83, 84, 85, 102.

128. The Producer Defendants believe that *MaM* accurately portrays the Jail Call, including how it acknowledges slight differences in testimony between Plaintiff and others on whether anyone from MTSO communicated to Plaintiff that they had the right guy. Demos Decl. ¶¶ 50–60; Ricciardi Decl. ¶¶ 49–58.

129. The Producer Defendants believe that as of the time of *MaM*'s release in December 2015, there was no other evidence contradicting the information they had presented regarding the Jail Call. *See* Demos Decl. ¶¶ 50–60; Ricciardi Decl. ¶¶ 49–58; *cf.* Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 372:5–17 (Plaintiff testifying in this case that Kusche received the Jail Call); Vick Decl. ¶ 24, Ex. 23, COLBTXTS_0006432 at COLBTXTS_0006437–39 (Plaintiff revealing he learned from Griesbach in 2016 that Kusche received the call).

35

130. To the extent any details regarding the Jail Call in *MaM* are inaccurate, the Producer Defendants did not intend to present those inaccuracies. Demos Decl. ¶ 60; Ricciardi Decl. ¶ 58.

131. The Producer Defendants understand that Plaintiff has presented testimony in this case that might constitute new information about the Jail Call. *See* Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 372:5-17 (Plaintiff testifying in this case that Kusche received the Jail Call); Vick Decl. ¶ 24, Ex. 23, COLBTXTS_0006432 at COLBTXTS_0006437–39 (Plaintiff revealing he learned from Griesbach in 2016 that Kusche received the call); *cf. MaM* Ep. 2 at 24:21–26:56 (Rohrer and Kusche testifying re Jones Memo).

132. The Producer Defendants believe that *MaM* accurately portrays the Call to Dispatch, including how it acknowledges that there is no definitive time and date to confirm when the call occurred. Demos Decl. ¶¶ 61–72; Ricciardi Decl. ¶¶ 59–69.

133. To the extent any details regarding the Call to Dispatch in *MaM* are inaccurate, the Producer Defendants did not intend to present those inaccuracies. Demos Decl. ¶¶ 61–72; Ricciardi Decl. ¶¶ 59–69.

134. The Producer Defendants do not believe the reaction shots of Plaintiff testifying alter the meaning and tone of his testimony. Demos Decl. ¶¶ 65, 66; Ricciardi Decl. ¶ 63.

135. The Producer Defendants believe the visual device of cutting between footage of Plaintiff and footage of attorneys discussing officers planting evidence accurately

36

reflects that attorneys were accusing Plaintiff of being one of the officers who planted evidence. Demos Decl. ¶ 68; Ricciardi Decl. ¶ 65.

136. The Producer Defendants believe that *MaM* accurately portrays the discovery of the Key, including how it acknowledges Plaintiff's explanation for the Key's discovery on November 8, 2005 after several days of searching. *See* Demos Decl. ¶¶ 61–72; Ricciardi Decl. ¶¶ 59–69.

137. To the extent any details regarding the Key in *MaM* are inaccurate, the Producer Defendants did not intend to present those inaccuracies. Demos Decl. ¶ 72; Ricciardi Decl. ¶ 69.

138. The Producer Defendants believe that the scene about Sergeant Tyson testifying that he had to watch Plaintiff and Lenk during searches to make sure they weren't alone in Avery's trailer, and that it was the only time in his career he had been asked to do that, accurately captures the gist of Tyson's testimony and the editing did not alter that. Demos Decl. ¶ 74; Ricciardi Decl. ¶ 71.

139. The Producer Defendants note that there were other details they omitted regarding the discovery of the Key that were unfavorable to law enforcement, including the fact that the initial criminal complaint in the Avery case identified Deputy Kucharski as the officer who found the key, but they did not include those details. Ricciardi Decl. ¶ 75; Demos Decl. ¶ 81; *see, e.g.* Ricciardi Decl. ¶ 105, Ex. 10, State v. Avery Criminal Complaint, CHRM019831–34.

140. The Producer Defendants believe that *MaM* accurately portrays the opinion commentary from various individuals sympathetic to Avery. Ricciardi Decl. ¶ 76; Demos Decl. ¶ 82.

141. The Producer Defendants believe that any omissions to *MaM* were due to the challenge of compressing 30 years of history into 10 hours of television and did not alter the meaning of the Series of present Avery's criminal defense and opinions as "actual and unanswered facts." Ricciardi Decl. ¶¶ 77, 79–86; Demos Decl. ¶¶ 83, 85–92.

Dated: September 16, 2022            Respectfully submitted,


                                     *s/ Kevin L. Vick*
                                     Kevin L. Vick (*pro hac vice*)
                                     Meghan Fenzel (*pro hac vice*)
                                     JASSY VICK CAROLAN LLP
                                     355 South Grand Avenue, Suite 2450
                                     Los Angeles, CA 90071
                                     T: (310) 870-7048
                                     F: (310) 870-7010
                                     kvick@jassyvick.com
                                     mfenzel@jassyvick.com

                                     *Counsel for Defendant Laura Ricciardi, Moira*
                                     *Demos, and Chrome Media, LLC*

                                     James A. Friedman, SBN 1020756
                                     GODFREY & KAHN, S.C.
                                     One East Main Street
                                     Suite 500
                                     Madison, WI 53703-3300
                                     T: (608) 284-2617
                                     F: (608) 257-0609
                                     jfriedman@gklaw.com

                                     *Counsel for the Defendants*