**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

**ANDREW L. COLBORN,**

              **Plaintiff,**

    **vs.**

**NETFLIX, INC.; CHROME MEDIA LLC,
F/K/A SYNTHESIS FILMS, LLC; LAURA
RICCIARDI; AND MOIRA DEMOS,**

            **Defendants.**

**Civil No.: 19-CV-484**

**DEFENDANTS CHROME MEDIA LLC, F/K/A
SYNTHESIS FILMS, LLC, LAURA RICCIARDI, AND MOIRA DEMOS'
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1
BACKGROUND ................................................................................................................... 5
    I.    1985–2005: Steven Avery's Wrongful Conviction and Exoneration ................... 5
    II.   2005–2007: Teresa Halbach's Murder Investigation .......................................... 6
    III.  2006–2007: The Prosecutions and Convictions of Avery and Dassey ................. 8
    IV.  2005–2015: The Production and Release of *Making a Murderer* ...................... 10
          A.    The Producer Defendants Gather Material for *MaM* ............................... 10
          B.    After Years of Hard Work, *MaM* Is Released in 2015 on Netflix ............ 12
    V.   2015–2022: Plaintiff's Lawsuit and the *Convicting* Counter-Documentary ........ 13
SUMMARY JUDGMENT STANDARD ................................................................................. 14
ARGUMENT ....................................................................................................................... 14
    I.    Plaintiff's Defamation Claim Fails Because He Cannot Show Materially
        False and Unprivileged Statements by the Producer Defendants ........................ 14
          A.    *MaM* Documents Both Avery's Accusations and Plaintiff's
              Denials and *MaM*'s Editing Decisions Reflect the Need to
              Summarize ............................................................................................... 16
          B.    *MaM* Accurately Captures the Gist of Plaintiff's Testimony About
              the Jail Call and Related Subjects in the SAC ......................................... 18
          C.    *MaM* Accurately Captures the Gist of Plaintiff's Testimony
              Regarding the Call to Dispatch ................................................................ 21
          D.    *MaM* Accurately Captures the Gist of Plaintiff's Testimony
              Regarding the Discovery of the Key in Avery's Bedroom ...................... 25
          E.    Plaintiff's Complaints about Other Statements in *MaM* by Avery
              and His Defenders Fail for the Same Reasons ........................................ 26
          F.    The SAC's Complaints About Alleged Omissions Fail to
              Demonstrate Material Falsity and Are Not Even About Plaintiff ............ 29
          G.    The SAC Ignores the Variety of Viewpoints Reflected in *MaM* ............. 31
CONCLUSION ..................................................................................................................... 45

**INTRODUCTION**

In December 2005, Laura Ricciardi and Moira Demos traveled to Manitowoc County, Wisconsin after learning about the story of Steven Avery. Avery had been convicted for sexual assault and attempted murder in 1985, only to be exonerated by DNA evidence in 2003 after serving 18 years in prison. After a Wisconsin Attorney General's report found Manitowoc officials had not committed any criminal or ethical violations in connection with his wrongful conviction, in 2004, Avery filed a $36 million lawsuit against the County and its former Sherriff and former District Attorney. His story captured the attention of the public, the media, educators, students, forensic scientists, law enforcement, and state legislators, with whom he had become involved in reform efforts. Everything changed in November 2005, two years after his release, when Avery was arrested for the murder of 25-year-old Teresa Halbach. A man who seemingly had been given a new lease on life stood accused of taking a life in a senseless and brutal killing.

For Ricciardi and Demos, what began as one trip to Manitowoc ended up consuming most of their lives for the next decade, eventually resulting in the documentary series *Making a Murderer* ("*MaM*"). They wanted to chronicle the experiences of a unique individual like Avery who seemingly had travelled from one extreme of the criminal justice system to the other. They did not set out to create an advocacy piece or to "solve" the case or provide viewers with answers about guilt or innocence. Rather, they wanted to make a documentary that engaged with the legal processes and grappled with the complexity and uncertainty of legal, political and cultural issues. They sought and conducted dozens of interviews. They filmed press conferences with prosecutors and defense attorneys, as well as extensive legal proceedings. They obtained voluminous public records, archival news footage, and other materials. And they found that, as they dug deeper, questions led to more questions—not just about Avery's and his nephew and co-defendant Brendan Dassey's cases but the criminal justice system in general.

1

*MaM* reflects the filmmakers' approach. In terms of scope, it chronicles a story that spans 30 years. It documents numerous criminal and civil legal proceedings at the pre-trial, trial, appeal, and post-conviction stages. It covers many law enforcement investigations by state and local officials. In terms of method, *MaM* does not include any voiceover narration. Instead, it lets the documentary's subjects voice their own viewpoints in interviews, "fly on the wall" filming with those subjects, and at press conferences, pre-trial hearings, and in witness testimony from Avery's and Dassey's trials. *MaM* reflects the often-clashing viewpoints of its subjects and ambiguities in the story. Part of *MaM*'s success is probably due to the fact that different viewers can sit through the entire 10 hours of *MaM* and come away with divergent opinions about Avery's case—guilty, not guilty, unsure—and also about the legal processes documented in *MaM*—satisfied, unsatisfied, conflicted. *MaM* reflects that uncertainty.

Plaintiff Andrew Colborn has never even watched *MaM*. At his deposition, he said he watched "less than 30" minutes of selected scenes before filing suit and has watched only another 30 to 45 minutes since. Yet he sued Ricciardi, Demos and their production company, Chrome Media, LLC, (collectively "the Producer Defendants") and Netflix for defamation and infliction of emotional distress. His claims ignore both the contents of *MaM* and governing law.

With respect to *MaM*, Plaintiff ignores that he was a central player in the Avery murder case. *MaM* could not document the case without reflecting that, as Plaintiff's own Second Amended Complaint puts it, "[a]central part of Avery's defense at trial was that Plaintiff and other Manitowoc officers planted" evidence to frame Avery." Dkt. 105 (hereinafter "SAC") ¶ 33. Indeed, the judge at Avery's trial permitted Avery's attorneys to make planting allegations against Plaintiff and his colleague James Lenk—and only against those two. Plaintiff also ignores that *MaM* includes not just statements by Avery and his defenders, but extensive material

reflecting negatively on Avery and pushing back against Avery's planting accusations. The SAC ignores scenes in *MaM* showing, for example, Plaintiff's repeated denials of those accusations; law enforcement and prosecutors characterizing those accusations as "despicable" and "impossible"; Avery's own brother opining that Avery was probably guilty; Avery's sister saying that he "can rot in hell"; Teresa Halbach's family voicing their view that Avery is guilty; the judge in Avery's trial stating that Avery was "probably the most dangerous individual ever to set foot in this courtroom"; the jury's guilty verdict; and positive press coverage of a public statement that Plaintiff released after that verdict. The SAC is silent on all these points.

The governing law makes clear that Plaintiff's claims fail as a matter of law. Well-established Supreme Court and Seventh Circuit precedent bars claims such as Plaintiff's that seek to punish documentarians covering legal proceedings and public controversies who present the viewpoints of the persons involved. The substantial truth doctrine (sometimes referred to as the material falsity requirement) and the fair report privilege both bar Plaintiff's claims. Trying to avoid that bar, the SAC relies on inflammatory and inaccurate buzzwords like "fabricate," "splicing," and "omitting." But, as detailed below and in the concurrently filed Demos and Ricciardi declarations, those allegations do not hold up. Supposed "distortions" turn out to be nothing but routine editorial practices, such as summarization and compression of question-and-answer exchanges, that accurately reflect the core aspects of both Avery's accusations against Plaintiff and Plaintiff's denials. Those are editorial practices the Producer Defendants used not only for Plaintiff, but all subjects—Plaintiff is one of 25 witnesses at Avery's trial whose testimony is in *MaM*. Demos and Ricciardi have waited patiently for years to substantively respond to the SAC's allegations. They are confident the Court's own review of *MaM* and other materials, including their declarations, will show Plaintiff's allegations lack merit.

Plaintiff's claims also fail as a matter of law because he cannot meet his burden of proving with clear and convincing evidence that the Producer Defendants acted with actual malice. Far from making knowingly false statements or acting with reckless disregard to falsity, the Producer Defendants worked diligently and in good faith to make *MaM* accurately reflect both the viewpoints of Avery and his defenders, and also those of Plaintiff and law enforcement. Plaintiff's underlying complaint that *MaM* was obligated to accept his denials as unassailable truth and prohibited from including Avery's accusations is contrary to First Amendment law. Under Plaintiff's mistaken view of the law, no reporter or documentarian could ever report on legal proceedings involving divergent viewpoints and hotly contested accusations and evidence.

Plaintiff's erroneous and draconian re-imagining of First Amendment law is particularly inappropriate here. When Plaintiff filed this lawsuit, he was represented by Michael Griesbach. Griesbach is the author of three books on Avery and also was a prosecutor in the Manitowoc County D.A.'s office from the early 1990s to 2018, from which he knew Plaintiff personally. In January 2016, less than a month after *MaM*'s release, Griesbach was asked by his book agent whether he believed Avery was guilty of Teresa Halbach's murder. Griesbach responded by email: "I am convinced he is guilty . . . but I'm nowhere near as certain that the cops did not plant evidence to bolster their case." If someone in Griesbach's position was uncertain whether officers he knew personally had planted evidence, how can Plaintiff charge Defendants with "knowing" that the planting accusations were false? As Plaintiff admitted in his deposition, only the individuals actually present at the time could know for certain. Plaintiff cannot come close to meeting his constitutional burden of proving actual malice with clear and convincing evidence.

This Court should grant summary judgment in favor of the Producer Defendants.

**BACKGROUND**

*MaM* chronicles the story of Steven Avery, a resident of Manitowoc County, Wisconsin who after serving 18 years for a wrongful conviction, was exonerated through DNA evidence only to be arrested and convicted for a new, serious crime. PFOF ¶ 1.

**I.      1985–2005: Steven Avery's Wrongful Conviction and Exoneration**

In 1985, the Manitowoc County Sheriff's Office ("MTSO") arrested Avery for an assault of Penny Beerntsen. PFOF ¶ 2. Avery had been known to local law enforcement from prior crimes, including animal cruelty and reckless endangerment of a cousin married to an MTSO deputy. PFOF ¶¶ 3, 4. Also known to MTSO and the prosecutor at the time but never investigated in the Beernsten case was Gregory Allen, a man from a neighboring county with a history of sex crimes. PFOF ¶ 16. At trial, the jury convicted Avery for attempted murder, sexual assault, and false imprisonment based on the victim's testimony, discounting 16 Avery alibi witnesses. PFOF ¶ 5. Serving a 32-year sentence, Avery unsuccessfully sought post-conviction relief in 1995–97. PFOF ¶ 6. In 2003, DNA evidence showed Allen, who in 1995 had committed and been convicted of another assault, was the actual assailant of Beerntsen. PFOF ¶ 7. Avery was released in 2003, after spending 18 years in prison for a crime he did not commit. PFOF ¶ 8.

Plaintiff Andrew Colborn and Avery's stories first intersected in 1994 or 1995, when Plaintiff was working as a correctional officer at the Manitowoc County Jail. *See* PFOF ¶¶ 9–10. According to Plaintiff, he received a phone call from someone identifying himself as a detective in another county. *See id.* Plaintiff claims the detective said an inmate in their custody claimed to have committed an assault in Manitowoc County for which someone else was still incarcerated (the "Jail Call"). *Id.* Plaintiff has testified that he did not recall any names being exchanged, and that he forwarded the caller to an MTSO detective. PFOF ¶ 11. Plaintiff has said he did not speak about the call with anyone at MTSO at that time, but others have said they heard former Sheriff

5

Kocourek had assured Plaintiff not to worry because they already had "the right guy." PFOF ¶ 13. Plaintiff testified that following the publicity of Avery's release in 2003, Plaintiff told Lieutenant James Lenk about the Jail Call, and Lenk then told Sheriff Kenneth Petersen. PFOF ¶ 14. Petersen advised the two to deliver him written reports. PFOF ¶ 12.

Avery's exoneration became headline news. Sheriff Petersen issued a memo barring MTSO employees from commenting on the Avery case. PFOF ¶ 15. The Wisconsin Department of Justice ("DOJ") launched an investigation into any criminal or ethical violations related to Avery's wrongful conviction. PFOF ¶ 16. Agents visited MTSO and received copies of Plaintiff's and Lenk's statements as part of Avery's case file, which the Sheriff had in a safe.[1] *See id.*; *see also* PFOF ¶ 12. While the Wisconsin Attorney General's subsequent report acknowledged former MTSO Sheriff Kocourek's and former District Attorney Dennis Vogel's failures to act on or share with the defense evidence related to Gregory Allen, it found no basis for criminal charges or ethical violations. PFOF ¶ 16. Long-time Manitowoc Assistant District Attorney Michael Griesbach called the AG's report a "whitewash" and later wrote a book detailing what he saw as serious missteps by MTSO and prosecutors. PFOF ¶ 17. Disagreeing with the AG's report, Avery filed a $36 million civil rights lawsuit against the County, Kocourek and Vogel. PFOF ¶ 18. Multiple MTSO officials with relevant knowledge, including Plaintiff, Lenk, and Petersen, were deposed in that lawsuit in October 2005. See PFOF ¶ 9, 13.

## II. 2005–2007: Teresa Halbach's Murder Investigation

On October 31, 2005, a 25-year-old professional photographer from Calumet County, Wisconsin named Teresa Halbach disappeared after a day of appointments—including one at

---

[1] Plaintiff recently stipulated that his September 2003 statement was stored in Sheriff Petersen's safe, a fact long made clear by a 2003 DOJ report. PFOF ¶ 12. But Plaintiff's SAC alleged the exact opposite and he even falsely accused Defendants of "distort[ing] the facts" and knowingly "further[ing] their false narrative" by suggesting the statement was stored in a safe. SAC ¶ 29.

6

Avery's Auto Salvage. PFOF ¶ 19. Her family reported her missing on November 3, 2005, and a search was launched. PFOF ¶ 20. On November 3, Plaintiff went to Avery's Auto Salvage where he spoke to Steven about her. PFOF ¶ 21. Sometime after, Plaintiff called Manitowoc dispatch and spoke with the dispatcher to confirm the license plate number SWH-582 corresponded to a 1999 Toyota registered to Teresa Halbach. (the "Call to Dispatch"). *See* PFOF ¶¶ 22–24.

On November 5, 2005, Teresa Halbach's car was found on the edge of the Averys' 40–acre salvage yard. PFOF ¶ 25. Avery became a suspect of the investigation. *See id.* Local news media erupted with news that the DNA exoneree was implicated in Teresa's disappearance. *See* PFOF ¶ 26. A mix of officers from Calumet and Manitowoc County, as well as officers from other county, state, and federal agencies, including the Wisconsin DOJ, and the Federal Bureau of Investigation, descended on the Avery property to execute a search warrant. PFOF ¶ 27.

Calumet County took over the investigation for conflict-of-interest reasons related to Avery's ongoing lawsuit against Manitowoc County. PFOF ¶ 28, 29. Sheriff Petersen was recused, but MTSO officers, including Plaintiff and Lenk, continued to play active roles in the search of the Avery property, despite the fact Calumet County Sheriff Pagel later told the press that MTSO's "only role" was to "provide resources" and "equipment." *See id.*; PFOF ¶ 30. Beginning on November 5, 2005, Plaintiff and Lenk took part in several days' searches of the interior of Steven Avery's trailer and garage. PFOF ¶ 31. They were always accompanied by a Calumet officer, however, as Calumet officers had been instructed not to leave Manitowoc officers, including Plaintiff and Lenk, alone during searches. *See* PFOF ¶¶ 33, 34.

On November 8, 2005, Lenk discovered a Toyota key (the "Key") on the floor of Avery's bedroom that had not been found during any of the many previous searches by officers. PFOF ¶¶ 33, 35, 36. Plaintiff has testified that he shook a bookcase next to Avery's bed and shoved items

7

into the bookcase before the Key was discovered and he speculated that it might have fallen out. PFOF ¶ 36. The Key belonged to Teresa Halbach's car. *See* PFOF ¶ 35. Testing later reflected that the Key had Avery's DNA, but not Teresa's. *See id.* No DNA evidence from Teresa was found inside Avery's trailer, but her human cremains were found in his burn pit and in a burn barrel found behind his sister's neighboring trailer. PFOF ¶ 36.

Avery was arrested the next day. *See* PFOF ¶ 38. Remaining depositions scheduled for his lawsuit never occurred. PFOF ¶ 39. Blood from both Teresa Halbach and Avery was found inside her car. PFOF ¶ 37. As early as November 15, 2005, Calumet D.A. Kenneth Kratz, who had been appointed Special Prosecutor, publicly addressed talk in the local media "that this key in his bedroom could've been left or planted." PFOF ¶ 36. He dismissed the idea as "absurd." *Id.*

## III.     2006–2007: The Prosecutions and Convictions of Avery and Dassey

In February 2006, three months after his arrest, Avery settled his civil rights lawsuit for a reported $400,000, using his share of the funds to hire criminal defense attorneys Dean Strang and Jerome Buting. PFOF ¶ 40. On March 1, 2006, Kratz announced that a 16-year-old relative of Avery was implicated in the murder. PFOF ¶ 42. The next day, Kratz held another press conference and described in graphic detail how Avery's nephew Brendan Dassey and Avery had restrained, sexually assaulted and killed Teresa Halbach. PFOF ¶¶ 42, 43. Many community members who had previously stood by Avery turned on him. *See* PFOF ¶ 44.

Pre-trial publicity was the topic of one of several evidentiary motions. Addressing defense concerns of bias, Judge Willis issued orders barring involved law enforcement from publicly commenting on the case and approved the parties' stipulation that the trial take place in Calumet County, to avoid MTSO having the role of overseeing jurors. *See* PFOF ¶¶ 45, 56. Judge Willis excluded evidence of Avery's prior convictions for various crimes but admitted evidence of Avery's wrongful conviction and civil rights lawsuit against Manitowoc County.

PFOF ¶¶ 47, 48. After prevailing on a motion to gain access to Avery's 1985 case file, Buting discovered a vial of Avery's blood stored in a box with broken seals at the Manitowoc County Clerk of Court's Office. PFOF ¶ 49. The Avery defense was permitted to introduce evidence of that vial as part of Avery's "frame-up defense" including "circumstantial evidence" that Plaintiff and Lenk may have "planted blood from the vial in Teresa Halbach's vehicle." PFOF ¶ 50.

Avery's five-week jury trial began on February 12, 2007. PFOF ¶ 51. The parties questioned dozens of fact and expert witnesses and introduced hundreds of exhibits. *Id.* The prosecution focused on evidence tying Avery to Teresa Halbach's death, and on countering and dismissing Avery's accusations of planted evidence. PFOF ¶ 52. The defense opened with the history of how Avery's wrongful conviction and civil rights lawsuit brought "shame" to MTSO, and how two officers very involved in the Halbach investigation (Plaintiff and Lenk) were witnesses in that lawsuit with "tunnel vision" for Steven Avery. PFOF ¶ 53.

Plaintiff took the stand on February 20, 2007. *See* PFOF ¶ 54. His testimony lasted more than three hours, filled 152 pages of transcript, and covered significant ground across direct, cross, redirect and recross examinations. *See id.* Kratz asked him about his connection to Avery's civil lawsuit, and Plaintiff testified that his only link was receiving the Jail Call as a corrections officer and transferring it to MTSO. PFOF ¶ 10. On cross-examination, Plaintiff confirmed his first written record of the Jail Call was not until 2003. PFOF ¶¶ 55, 56. Strang hit the theme of gaps in Plaintiff's report-writing a few times, noting how Plaintiff's first record of his November 3, 2005 conversation with Avery was not made until June 2006, and how his November 8, 2005 entry on the MTSO investigative report was a mere half page with no mention of the Key being discovered that day. *See* PFOF ¶¶ 21, 57. Strang also asked Plaintiff whether he was looking at Teresa Halbach's car when he placed the Call to Dispatch. Plaintiff denied that. PFOF ¶ 58.

Several officers—including Calumet County Sergeant William Tyson, Calumet County Deputy Daniel Kucharski, Lenk, and Plaintiff—were questioned about the Key. PFOF ¶¶ 32, 33. Tyson testified that he was specifically advised to make sure MTSO officers were not left alone on the Avery property. PFOF ¶ 33. Plaintiff testified he handled the bookcase and its contents "rather roughly," which is how he believed the Key fell out before Lenk later spotted it. PFOF ¶ 34. Kratz directly asked Plaintiff if he planted evidence. PFOF ¶ 59. He denied it. *See id.*

In closing arguments, Kratz expressed outrage at the defense's "absolutely ludicrous" frame-up theory, noting that Plaintiff's and Lenk's livelihoods, reputations, and families were on the line "when some lawyer" accused them of planting evidence. PFOF ¶ 60. Regardless, Kratz noted, it "shouldn't matter whether or not that key was planted" because "that key, in the big picture, in the big scheme of things, means very little," compared to the bulk of evidence against Steven Avery. PFOF ¶ 61. Strang's closing emphasized the defense's theory that officers planted evidence "to ensure the conviction of someone they've decided is guilty." PFOF ¶ 62.

The jury deliberated for three and a half days before finding Steven Avery guilty of intentional homicide and being a felon in possession of a firearm but not guilty of mutilation of a corpse. PFOF ¶ 63. Following the verdict, Plaintiff issued a media statement saying that he hoped the verdict "put to rest any suspicions" about MTSO. A month later, a separate jury found Dassey guilty on all counts. *See* PFOF ¶ 89.

## IV.     2005–2015: The Production and Release of *Making a Murderer*

### A.     The Producer Defendants Gather Material for *MaM*

Intrigued by a news article telling the story of a DNA exoneree newly charged with murder, graduate film students Laura Ricciardi and Moira Demos traveled to Manitowoc in December 2005. PFOF ¶ 40. That was the beginning of the documentary film project that would eventually become *Making a Murderer. See id.* Upon arriving in Manitowoc in December 2005,

Ricciardi and Demos sought access to the key players. PFOF ¶ 66. While law enforcement almost universally declined, they were able to interview Manitowoc ADA Michael Griesbach and Manitowoc Undersheriff Robert Hermann, who apparently had been authorized to speak about the case. PFOF ¶ 45, 66. In *MaM*, the filmmakers further showed the viewpoints of law enforcement and the prosecution by including, among other things, footage from press conferences, legal proceedings, and news reports. PFOF ¶ 68; *See, e.g.*, PFOF ¶ 35, 36, 41, 43.

While Steven Avery was the main character, his journey was used by *MaM* as a window into the justice system. PFOF ¶ 69. *MaM* includes aspects of Avery's troubled and violent past that Judge Willis excluded from trial and criticism of both Avery and his defense team's theories from third parties. *See* PFOF ¶¶ 3, 4, 46, 65, 68. Ricciardi used her legal training when reviewing thousands of pages of investigative reports, transcripts, court filings, exhibits, legal decisions and orders, newspaper articles, and more. PFOF ¶71. Ricciardi and Demos obtained video and audio tapes of depositions, interrogations, jail calls, hearings, and news broadcasts. *Id.* They filmed hundreds of hours of footage, including footage from Avery's 2007 trial. PFOF ¶ 72.

The Judge presiding over Avery's trial permitted three cameras to film the trial, each facing different angles. PFOF ¶¶ 75, 73. Unfortunately, the raw/unedited feed from the camera facing the witness stand (the "A" camera) that the Producer Defendants were recording had almost no usable footage due to a technical problem called an unterminated feed. PFOF ¶ 76. Not until after Avery's 2007 trial, did the Producer Defendants realize the unterminated feed problem with the A-camera, which meant that, except for a few witnesses on the first two days of trial, none of their footage of witnesses from the remainder of the four weeks (including Plaintiff's testimony) was usable. PFOF ¶ 77. The Producer Defendants went to considerable effort and expense contacting local stations to try to replace their unusable footage with usable footage.

11

PFOF ¶¶ 78, 79. While they did obtain all the usable footage they could, local stations did not have footage of the entire trial, and what footage the stations had was not from the raw/unedited feed of the A-camera trained on the witnesses, but only "mixed" feed footage which was cutting back and forth between the witness, the attorneys, the judge, the defendant, the gallery and projection screen, meaning there was not usable footage of witnesses for all moments of their testimony. PFOF ¶¶ 78–82.

### B. After Years of Hard Work, *MaM* Is Released in 2015 on Netflix

Over time, Demos and Ricciardi mapped out the series and edited the footage that would become *Making a Murderer*. *See* PFOF ¶ 81. As explained in more detail in Ricciardi's and Demos' concurrently filed declarations, when editing the courtroom scenes of Avery's 2007 trial, despite having a limited amount of usable footage of witnesses, the Producer Defendants did their best to present witnesses in a manner that did not materially alter the overall presentation of such witnesses. PFOF ¶ 82. The editorial approach to dealing with witnesses who had limited footage (including Plaintiff) was the same for all witnesses. PFOF ¶¶ 79–80, 83.

The filmmakers spent several years assembling the first few episodes to pitch what at the time was an unconventional format: a documentary series. PFOF ¶¶ 84, 85. Lisa Nishimura of Netflix recognized the complexity and appeal of the story and took a risk, which provided Demos and Ricciardi with financing after more than eight years of self-financing. PFOF ¶¶ 82, 83. Throughout the remaining post-production, Netflix creative executives provided notes, but the filmmakers chose how to implement them and retained creative control. PFOF ¶ 84. While they had initially planned for eight episodes, *MaM* expanded to ten. PFOF ¶ 85. Still, they had to edit down 20 years of historical context, 15 months of investigation and pre-trial hearings in both cases, 27 days of Avery's trial, Dassey's trial, and eight years of post-conviction and appellate efforts and other events, all into 10 hours of television. *PFOF ¶ 86.* Netflix marketed the show,

and it became quite popular upon its release on December 18, 2015. PFOF ¶¶ 87, 88.

## V. 2015–2022: Plaintiff's Lawsuit and the *Convicting* Counter-Documentary

Even today, Plaintiff has not watched *Making a Murderer*, and he insists he does not intend to do so. PFOF ¶ 91. He only watched snippets totaling "less than 30" minutes before bringing this lawsuit and since then no more than 30 to 45 additional minutes of the approximately 10–hour series. PFOF ¶ 92. Plaintiff first started trying to find an attorney to bring a lawsuit in early 2016, initially hoping to sue Strang and Buting in addition to the Producer Defendants and Netflix, before eventually being advised against it. *See* PFOF ¶¶ 93, 94. Plaintiff has acknowledged that the planting allegations in *MaM* that offend him "mirror those claimed by the defense during the trial" and were "already in the public record." PFOF ¶ 95.

One attorney whom Plaintiff approached suggested PR efforts would rehabilitate his image better than a lawsuit. PFOF ¶ 96. But unlike other individuals who had appeared in *MaM* such as Ken Kratz, Plaintiff did not initially make efforts to promote his narrative in the public sphere. *See* ¶¶ 97, 98, 99. However, in 2018, while still working at MTSO, Plaintiff entered into an agreement offering an exclusive interview for a self-proclaimed "counter-documentary" *Convicting a Murderer* ("*CaM*"), and sat for a first filmed interview. PFOF ¶¶ 100, 101. Brenda Schuler, a producer of *CaM*, has described *CaM* as something that would "humanize the hell out of Andy" [Plaintiff] who is one of a few law enforcement protagonists. PFOF ¶ 101. *CaM* has not yet been released and reportedly has not found a distributor. PFOF ¶¶ 102–04.

On December 17, 2018, one day before the statute of limitations was set to expire on his defamation claim, Plaintiff filed this lawsuit, represented by former Manitowoc County Assistant District Attorney Michael Griesbach. *See* Dkt. 1; *see also* PFOF ¶ 105. The case was subsequently removed to federal court, and the complaint was amended twice. *See id.*; Dkt. 105.

13

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "The First Amendment requires courts to "make an independent examination of the whole record so as to assure [itself] that the judgment does not constitute a forbidden intrusion on the field of free expression." *N.Y. Times v. Sullivan*, 376 U.S. 254, 285 (1964). Because "[t]his duty entails a 'constitutional responsibility that cannot be delegated to the trier of fact,' summary judgment is an important and favored method for adjudicating public figure defamation actions." *Torgerson v. Journal/Sentinel, Inc.*, 563 N.W.2d 472, 479 (Wis. 1997) (internal quotation marks omitted)

## ARGUMENT

## I.  Plaintiff's Defamation Claim Fails Because He Cannot Show Materially False and Unprivileged Statements by the Producer Defendants

Among other elements of defamation, Plaintiff must prove that the challenged statements are both (1) unprivileged and (2) materially false. *In re Storms v. Action Wis. Inc.*, 750 N.W.2d 739, 748 (Wis. 2008); *see also Phila. Newspapers v. Hepps*, 475 U.S. 767, 775–76 (1986). He cannot do so. Two overlapping legal doctrines bar his claim: (1) the fair report privilege and (2) the substantial truth doctrine, sometimes referred to as the material falsity requirement. *E.g.*, *Fin. Fiduciaries, LLC v. Gannett Co., Inc.*, 46 F.4th —, 2022 WL 3585002, at *7–8 (7th Cir. Aug. 22, 2022) (treating material falsity/substantial truth and fair report privilege analyses together and affirming dismissal of defamation claim based on both grounds).

Under both the substantial truth doctrine and the fair report privilege, the measure of truth and accuracy is *not* whether the accusations made by litigants in underlying proceedings were true—i.e., whether Avery's defense was correct that Plaintiff planted evidence—but whether *MaM* accurately *reports* those accusations. *Global Relief Found., Inc. v. N.Y. Times* Co., 390

14

F.3d 973, 987 (7th Cir. 2004) ("We reject GRF's argument that these media defendants must be able to prove the truth of the government's charges before reporting on the investigation itself.").

Plaintiff must prove *material* falsity. A statement does not need to be precisely true in all details; it is sufficient that the "gist" and "sting" are accurate. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). "When determining the 'gist' or 'sting' of allegedly defamatory material, a trial court must look at the highlight of the article, the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement." *Global Relief*, 390 F.3d at 986 (internal quotation marks omitted). "Any inaccuracies which do no incremental damage to the plaintiff's reputation do not injure the only interest that the law of defamation protects. We will thus ignore inaccuracies that do no more harm to GRF than do the true statements in the articles." *Id.* (citation omitted). Thus, Plaintiff must prove challenged statements create "a different effect on the mind of the reader from that which the pleaded truth would have produced" *and* such difference must "bear[] upon their defamatory character." *Masson*, 501 U.S. at 517 (internal quotation marks omitted). A publication "that contains a false statement is actionable only when significantly greater opprobrium results from the report containing the falsehood than would result from the report without the falsehood." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993).

Similar principles govern the fair report privilege, which shields defendants from "libel actions based on 'a true and fair report of any judicial . . . proceeding . . . or of any public statement, speech, argument or debate in the course of such proceeding.'" *Fin. Fiduciaries*, 2022 WL 3585002, at *7 (omissions in original) (quoting Wis. Stat. § 895.05(1)). "It is enough that [the report] conveys to the persons who read it a substantially correct account of the proceedings." Restatement (Second) of Torts § 611 cmt. f (1977). One may "summarize the

15

proceedings rather than quote them," but a defendant "may not characterize the allegations in the [litigants'] pleadings as facts" and "must declare them for what they are: accusations subject to judicial review." *Fin. Fiduciaries*, 2022 WL 3585002, at *7. The fair report privilege is grounded in both Wisconsin common law, *Ilsley v. Sentinel Co.*, 113 N.W. 425, 426 (Wis. 1907), and the First Amendment, *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492–96 (1975).[2]

### A. *MaM* Documents Both Avery's Accusations and Plaintiff's Denials, and *MaM*'s Editing Decisions Reflect the Need to Summarize

The Producer Defendants spent a decade working on *MaM*. PFOF ¶¶ 84, 86. Part of that work included interviewing dozens of people. PFOF ¶¶ 66, 67 They sought access to individuals with knowledge of the events, but they could not control who decided or was permitted to participate. *Id.* Steven Avery and many of his attorneys, family members and supporters were willing to talk. *Id.* Most of them expressed views supporting Avery, although there are notable exceptions reflected in *MaM* such as his brother Chuck's opinion that Steven was likely guilty.

By contrast, MTSO imposed gag orders on its personnel beginning shortly after Avery's exoneration in September 2003 and continuing in one form or another to this day, while members of the prosecution team were unable or unwilling to participate. PFOF ¶ 67. There were a few exceptions like MTSO Undersheriff Robert Hermann, who had been authorized to speak and is shown in *MaM* vigorously disputing Avery's planting accusations against Plaintiff and other officers. Ep. 3 at 23:51–23:20. In addition, the Producer Defendants found other ways to further represent the viewpoints of law enforcement. *MaM* includes a number of scenes with prosecutors Kratz and Gahn speaking at press conferences before and during Avery's trial, where they set forth the prosecution's case and pushed back against Avery's planting allegations. *MaM*

---

[2] Wisconsin Statute § 895.05 broadens the common law privilege for newspapers, but does not (and could not consistent with the First Amendment or the common law) abrogate or narrow the constitutional and common law privilege for others. *Ilsley*, 113 N.W. at 426–27.

also includes statements from the two judges who presided over Avery's criminal trials, who speak of Avery's propensity for violence. The Producer Defendants also went to great time and expense obtaining copies of and reviewing 10,000+ pages of law enforcement reports, pleadings, transcripts and other documents from Avery's various legal proceedings. PFOF ¶ 71.

*MaM* documents events beginning in the early 1980s and continuing through 2015. *See generally MaM*. It covers Avery's early life and encounters with the criminal justice system and criminal offenses, his 1985 arrest and conviction, his related appeals and postconviction efforts, his 2003 exoneration and release, the Wisconsin Department of Justice's investigation into his wrongful conviction, the Avery Task Force, Avery's civil rights lawsuit filed in 2004, the 2005 disappearance of Teresa Halbach, Avery's subsequent arrest for her murder, the investigation into Avery and Brendan Dassey, the pre-trial period leading up to Avery's and Dassey's 2007 trials, Avery's trial, Dassey's separate trial, the juries' guilty verdicts and reactions to them, and Avery's and Dassey's postconviction efforts and appeals. *MaM* also explores their subjects' experiences in the legal system, as well as aspects of the legal system itself.

The process of making a documentary necessarily requires significant editing that entails summarizing, condensing, and compressing a huge volume of information and materials. Avery's 2007 trial alone lasted approximately five weeks, with 60 witnesses and hundreds of exhibits. PFOF ¶ 51. Season 1 of *MaM* spends a considerable amount of time in the courtroom for his trial (slightly less than two hours), but *MaM* necessarily could only include a portion of what occurred there. The Producer Defendants had to make editorial decisions about what to include, and how much detail to go into. The Producer Defendants also had to navigate the unusable unterminated feed issue discussed above.

17

While the Producer Defendants' editing practices applied universally to all the subjects in *MaM*, PFOF ¶ 83, Plaintiff's own testimony at Avery's trial is a good example of how those practices worked. Plaintiff was on the witness stand for over three hours total. PFOF ¶ 54. *MaM* includes over 10 minutes (over the 10 episodes) of Plaintiff on the stand, which the Producer Defendants edited to capture the gist of key aspects of Plaintiff's testimony, including his denials of wrongdoing. Plaintiff's suggestion that *MaM* should have included most, if not all, of his testimony is not just impractical (there were about 130 hours of witness testimony at Avery's trial alone), it is the sort of editorial second-guessing that well-established First Amendment case law rejects. *E.g.*, *Masson*, 501 U.S. at 517; *Riley v. Harr*, 292 F.3d 282. 290–91 (1st Cir. 2002).

### B. *MaM* Accurately Captures the Gist of Plaintiff's Testimony About the Jail Call and Related Subjects in the SAC

Plaintiff claims the Producer Defendants "spliced and omitted" portions of his testimony about the Jail Call to lead "viewers to falsely conclude that Plaintiff bears responsibility for seven or eight of Avery's 18 years of wrongful imprisonment, providing him with a motive to frame Avery for Halbach's murder." SAC ¶ 27. But it was *Avery and his attorneys* who accused Plaintiff of planting evidence and claimed he was motivated to do so by, among other things, Avery's civil rights lawsuit. *Id.* ¶ 33; PFOF ¶ 62, 98. He cannot conflate the Producer Defendants with subjects in *MaM* who made accusations against him. *See Global Relief*, 390 F.3d at 987.

Plaintiff's allegations also cannot be squared with the contents of *MaM*. While *MaM* shows Avery's attorneys arguing that Plaintiff should have prepared a written report in 1995, the attorneys do not suggest in *MaM* that Plaintiff himself should have known Avery was wrongfully imprisoned then. *See* PFOF ¶55, Ep. 2 at 17:19–28:15, Ep. 7 at 17:35–19:16 and 22:10–24:24. Even if they had, those would simply be their opinions, which would be consistent with Avery's

accusations against Plaintiff in his 2007 murder trial. PFOF ¶ 48. As for Exhibits A and B and

Paragraph 27, Exhibit A does not contain any testimony of Plaintiff related to the call.[3] While

Exhibit B does, it just shows that *MaM* condensed Plaintiff's testimony while continuing to

include the core aspects the SAC itself emphasizes: (1) Plaintiff did not know the call was about

Avery in 1995; (2) Plaintiff transferred the caller to the logical person, an MTSO detective; (3)

Plaintiff did not prepare a report in 1995 because he did not think one was necessary; and (4)

Plaintiff denied the call motivated him to plant evidence. Ex. B at 4–9; *see also* Ep. 7 at 23:55.[4]

Plaintiff also complains *MaM* compressed a Q&A sequence so that when Plaintiff was

asked, "Have you ever planted any evidence against Mr. Avery," *MaM* shows his final response

as "I have to say that this is the first time my integrity has ever been questioned, and no, I have

not"—instead of "that's ridiculous, no I have not." Ex. B at 5. There is nothing materially false

about that compression. *MaM* shows him denying the accusation that he planted evidence while

---

[3] Plaintiff alleges Exhibit A to the SAC represents "excerpts from Making a Murderer Episodes 1–10 which depict numerous inaccuracies in facts and therefore defame plaintiff." SAC ¶ 21. He also claims Exhibit B is a "transcription of excerpts of Plaintiff's trial testimony" that were "altered" by *MaM* "to present a false impression of Plaintiff's testimony." *Id.* ¶ 22. Plaintiff cannot simply point to Exs. A and B (cumulatively 28 pages long) and claim they allege defamation without both specifying *particular* statements within the documents and also adequately *explaining* why those statements are defamatory. Wis. Stat. § 802.03(6); *Tatur v. Solsrud*, 498 N.W.2d 232, 233 (Wis. 1993); *HWAG, LLC v. Racine Car Dealer LLC*, No. 17-CV-821, 2017 WL 6501914, at *5 (E.D. Wis. Dec. 19, 2017); *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007). While the Producer Defendants' address portions of Exhibits A and B here to underscore the SAC's lack of merit, the Court could simply disregard Exhibits A and B in their entirety, or at least to the extent they do not meet the requirements for alleging defamation.

[4] To the extent Plaintiff challenges aspects of *MaM*'s summary of his testimony, his challenges lack merit, not to mention materiality. For example, he complains that *MaM* does not include his testimony that he answered the phone, "Manitowoc County Jail, Officer Colborn." Ex. B at 4. But *MaM* shows him testifying that the call occurred "when I was working as my capacity as a corrections officer at the Manitowoc County Jail," Ep. 7 at 17:46–18:30; He also complains *MaM* did not include a portion of his testimony that the caller did not give him the names of persons involved. Ex. B at 5. But *MaM* includes Plaintiff testifying to similar effect that he did not know if the call had anything to do with Avery. Ep. 7 at 18:41–44.

simultaneously expressing that the accusations were not just wrong, but affronts to his integrity.

In Exhibit B, Plaintiff complains that *MaM* does not include his entire explanation of why he did not write a report about the Jail Call back in 1995. Ex. B at 9. But *MaM* includes (1) Plaintiff answering the question "what would it [a report in 1995] have been about?" with the answer "I don't know what it would have been about"; and (2) Plaintiff adding, ""if I wrote a report about every call that came in, I would spend my whole day writing reports." *Id.*; Ep. 7 at 23:48–24:02. *MaM* does not materially change the gist of his testimony.

In Paragraphs 28 and 29 of the SAC, Plaintiff objects to portions of *MaM* in which Avery attorney Stephen Glynn "mistakenly tells viewers that Plaintiff's [2003] written statement was kept hidden in a Sheriff's department safe as part of Plaintiff's and MTSO's effort to cover up their knowledge of Avery's wrongful conviction," and further alleges "Defendants knew Plaintiff's written report concerning the phone call was not left in the Sheriff's safe but chose to include Glynn's mistaken belief in order to further their false narrative." SAC ¶¶ 28–29. But Plaintiff now *admits* that his statement *was* kept in a safe in the Sheriff's office. PFOF ¶ 12. Moreover, Glynn's opinions are his own and Plaintiff cannot conflate Glynn with Defendants.

Ultimately, far from being materially false and making Plaintiff look worse, *MaM*'s coverage of the Jail Call is more *favorable* of Plaintiff than his testimony suggests it could have been. *MaM* indicates Plaintiff received the Jail Call, transferred it to a detective, *and somebody in the MTSO later assured Plaintiff that he did not need to worry because they already had the right guy locked up*. Ep. 2 at 22:04 & 26:00. But Plaintiff testified in 2005 that he did not make any inquiries to or receive any feedback from MTSO regarding the Jail Call—despite the fact

that, as he admitted at Avery's 2007 trial, it was the only instance in his career in which he received a call suggesting someone was in prison for a crime they did not commit.[5]

### C. *MaM* Accurately Captures the Gist of Plaintiff's Testimony Regarding the Call to Dispatch

Plaintiff also cannot show *MaM* materially changed the meaning of his testimony about the Call to Dispatch. The SAC admits: "With Plaintiff on the stand, Avery's attorneys played portions of his call to dispatch in an effort to convince jurors that he came upon the SUV at an undisclosed location on November 3rd, two days before it was found at the salvage yard," and that "Avery's attorneys suggested that Plaintiff was looking directly at Halbach's vehicle when he called dispatch." *Id.* ¶ 33.[6] But the SAC ignores that *MaM* also includes (1) Plaintiff's *repeated express denials* of those accusations; and (2) portions of the prosecution's questioning of Plaintiff that further push back against the accusations.

Paragraph 34 of the SAC alleges that *MaM* edited portions of Plaintiff's testimony to "manipulate viewers to falsely conclude" that Avery's attorneys' accusations were true. But the "side by side comparison" of the trial transcript with *MaM*'s treatment of the questioning reveals that *MaM* only edited to condense—*without* materially changing the meaning of the scene or the gist of Plaintiff's testimony. In both the trial transcript and *MaM*, the key points are (1) Avery's attorneys suggested Plaintiff was looking at Teresa Halbach's car when he made the Call to

---

[5] If *MaM* truly were the "hatchet job" Plaintiff accuses it of being, one would have expected *MaM* to focus on stark discrepancies between Plaintiff's account of events related to the Jail Call and those of his colleagues. For example, while Plaintiff testified that he never spoke with anyone in the MTSO about the Jail Call in the mid-90s, no less than *four* members of Manitowoc law enforcement contradicted him on that point.

[6] While Plaintiff alleges the Call to Dispatch occurred on November 3, 2005, there is no definitive record establishing when it occurred, and Plaintiff testified at Avery's trial that he was "guessing 11/03/05" was the date of the call. Ex. B at 12.

Dispatch; and (2) Plaintiff denied that. *Compare* Ep. 5 at 55:27 & 56:28 *with* PFOF ¶ 25, 118. *MaM* includes Plaintiff explicitly denying the accusation not once, but twice. *Id.*

Plaintiff is wrong that *MaM*'s editing "distort[ed]" the meaning of the scene and changed the gist of his testimony. His allegations in Paragraph 34 ignore a prior question-and-answer exchange earlier in the same scene in *MaM* that provides key context:

> <u>Avery's attorney</u>: One of the things road patrol officers frequently do is call into dispatch and give the dispatcher the license plate number of a car they stopped, or a call that looks out of place for some reason, correct?
>
> <u>Plaintiff</u>: Yes, sir.
>
> <u>Avery's attorney</u>: And the dispatcher can get information about to whom a license plate is registered?
>
> <u>Plaintiff</u>: Yes, sir.

Ep. 5, 53:29–53:55; PFOF ¶ 23. Avery's attorney elicited that Plaintiff frequently called dispatch and provided a plate number for a car he had stopped or come across while on patrol.

*MaM* then shows Avery's attorney playing an audio recording of the Call to Dispatch and asking questions about it. *Id.* at 53:56–55:25. Avery's attorney then asks if Plaintiff was looking at Teresa Halbach's license plate when he made the call—and Plaintiff denies that. *Id.* at 55:25– 55:32. After more questions and answers, *MaM* proceeds to the scene about which Paragraph 34 complains. But what the SAC calls a "manipulation" is simply a streamlining of the question-and-answer that saves time and removes an evidentiary objection (for which there was no footage of the objecting prosecutor Kratz, or the Judge, followed by Avery's attorney rephrasing his initial question. PFOF ¶ 59.

While the wording of the two questions may be different, *their gist is the same*, particularly in context. Avery's attorney is suggesting the audio recording of the Call to Dispatch sounds like one of the frequent calls Plaintiff had testified about where he had been looking at a car's license

22

plate when calling dispatch. The attorney was insinuating that Plaintiff was similarly looking at Teresa Halbach's license plate during the Call to Dispatch. And Plaintiff denies that. *MaM* does not materially change the gist of the exchange. Indeed, Episode 5 ends with Plaintiff explicitly denying the accusation a second time. *Cf.* SAC ¶ 48 (claiming *MaM* showed favoritism when a subject "received the last, apparently unrefuted word").[7]

Plaintiff's remaining challenges to *MaM*'s coverage of the Call to Dispatch are equally meritless. Paragraphs 35 and 36 of the SAC complain about omissions. In Paragraph 35, Plaintiff claims that *MaM* does not include an exchange related to how he believes he obtained the information regarding Teresa Halbach's car from another agency. But *MaM* includes Plaintiff's testimony that he believed he must have gotten that information from Calumet Investigator Wiegert, with whom he had spoken earlier about Teresa Halbach's disappearance, "because [Plaintiff] wouldn't have had the number any other way." Ep. 5 at 55:40–56:08; *see also id.* at 55:31–47. The alleged "omission" in Paragraph 36 is a portion of the audio recording of the Call to Dispatch that Plaintiff admits was "inaudible." SAC ¶ 36. Inaudible statements were not included in *MaM* because inaudibility would confuse and frustrate viewers. In any event, the SAC fails to explain how such omission could have materially changed the meaning of the scene.

Paragraph 37 falsely claims that the Producer Defendants "strategically spliced 'reaction' shots of plaintiff appearing nervous and apprehensive at trial…." As an initial matter, whether or

---

[7] The SAC also contains allegations regarding *MaM's* coverage of Avery's postconviction counsel's filings including statements from a witness, Kevin Rahmlow, that he had encountered Plaintiff at a gas station on November 4, 2005, and told Plaintiff he had seen a car matching the description of Teresa Halbach's about two miles from the Avery Salvage Yard. SAC ¶¶ 53–56; *see also* Ex. _ (Rahmlow Aff.). But the SAC expressly does *not* base its claims on those allegations. SAC ¶ 59, 63, 78. In any event, *MaM* merely includes statements by subjects that mirror legal arguments that Avery's postconviction counsel made on his behalf, which also relate to Avery's trial counsel's arguments. PFOF ¶ 98 [re Rahmlow; Day 24 Trial Tr. at 31–34.

not Plaintiff appears "nervous and apprehensive" is a subjective opinion, not the sort of

falsifiable statement of fact that can support a defamation claim. Moreover, if Plaintiff's opinion

is that he appears nervous in certain portions of *MaM*, that would be an opinion in line with the

views of one of the Avery trial jurors who viewed all of Plaintiff's testimony at trial. That juror

stated that he believed Plaintiff *was* looking at Teresa Halbach's car when he made the Call to

Dispatch, and that Plaintiff's demeanor on the witness stand "looked like he was sweating and he

wasn't being honest or he was trying to cover up a lot of things on the stand."[8]

Moreover, the SAC fails to specify where the allegedly defamatory reaction shots are in

*MaM* or how they supposedly result in a materially false statement about Plaintiff. SAC ¶ 37. At

his deposition, Plaintiff complained about a 3–second shot in which he leans back in the witness

stand and may be cracking his knuckles. PFOF ¶ 118. It is difficult to see what Plaintiff is

complaining about, as the shot in question shows him with his head held up and his eyes looking

straight ahead—hardly stereotypically "nervous" or "apprehensive" mannerisms.[9] In any event,

for a reasonable viewer, that shot would not materially change the meaning of the overall scene

in a manner defamatory to Plaintiff. *See Terry v. Journal Broad. Corp.*, 840 N.W.2d 255, 267–68

(Wis. Ct. App. 2013) (plaintiff "cannot maintain a defamation action for how she *feels* she was

portrayed").

Paragraph 38 consists of empty accusations of "splicing," "omitting" and "misleading"

(without specification), plus a suggestion that the Producer Defendants are guilty of defamation

---

[8] The juror also said that when the jury was initially polled at the outset of deliberations, the vote was seven not guilty, three guilty and two uncertain. *See* Ep. 8 at 34:53. That belies the SAC's contention that no reasonable person could have doubted Avery's guilt.

[9] As explained previously, because of the unterminated feed issue, the Producer Defendants had a limited amount of usable footage of Plaintiff. The shot about which Plaintiff complains was not used to try to manipulate viewers but because the Producer Defendants could only use those materials available to them.

because *MaM* includes Avery's planting accusations rather than just presenting Plaintiff's denials of such accusations as incontrovertible truth. *MaM* includes and captures the substance of *both* Avery's accusations *and* Plaintiff's denials about planting and the Call to Dispatch.

### D. *MaM* Accurately Captures the Gist of Plaintiff's Testimony Regarding the Discovery of the Key in Avery's Bedroom

Plaintiff objects to *MaM*'s editing of the testimony of Calumet Sgt. William Tyson, who accompanied Plaintiff and Lenk on a search of Avery's bedroom on November 5, 2005, although Tyson was not present when Lenk discovered the Key three days later. *Id.* ¶ 43–44. As reflected in *MaM*, Tyson testified that he accompanied Plaintiff and Lenk because he had been instructed that Manitowoc County officers should not be left alone on the Avery property. Dkt. 119-1 at 19–22; Ep. 7 at 4:18–5:58. Plaintiff criticizes a scene in *MaM* that compressed an exchange between Avery's attorney and Tyson related to that. SAC ¶ 44. Although Plaintiff uses scary-sounding buzzwords like "fabricate," "splicing" and "omitting," his accusations do not hold up. *Id.* ¶¶ 42–45. At trial, Avery's attorney asked Tyson whether "in any other search in [his] entire career, [he] had to act like a babysitter, or a watchdog for the officers who were conducting a search?" Tyson said that he "did not treat this as if I was babysitting." Dkt. 119-1 at 21. Buting's very next question—which the SAC does not include in Paragraph 44—asked Tyson whether "in any of your years as an officer, you had to watch the officers who were searching where you were, to make sure that they weren't alone." Tyson answered, "No." *Id.*; Ep. 7 at 23:6–26:19.

*MaM* simply condensed that two-question-and-answer sequence into a single question and answer, so Tyson answered "no" to the first question. Ep. 7 at 5:04–33. Plaintiff's complaint amounts to semantics between "babysitting" versus "watch[ing] the officers … to make sure that they weren't alone." *See Simonson v. United Press Int'l, Inc.*, 500 F. Supp. 1261, 1266 (E.D. Wis. 1980) (declining to engage in "game of semantics" over substantially true reports).

The SAC also complains *MaM* does not include "certain photographs clearly showing the crack in the back of the bookcase" where Plaintiff speculated Avery may have hidden the Key. SAC ¶ 44. But *MaM* includes witness testimony that the State's theory was that the Key probably fell out from the back of the bookcase as a result of Plaintiff's having "handled it rather roughly, twisting it, shaking it, pulling it." Ep. 7 at 16:40–16:49.

While portions of Exhibit B include Plaintiff's testimony regarding the Key, no additional defamatory statement is identified with the requisite specificity. *See supra* note 3. *MaM*'s condensing Plaintiff's testimony instead of including it in its entirety is no basis for defamation. *Fin. Fiduciaries*, 2022 WL 3585002, at *7; *Masson*, 501 U.S. at 515. Likewise, while Plaintiff suggests that replacing a response of his—"Not that I recall"—with "No, sir," (again something done due to the unterminated feed issue) might make him "look less credible," Ex. B at 7, that does not create a material change in meaning, let alone one that results in "significantly greater opprobrium" to Plaintiff, *Haynes*, 8 F.3d at 1228. Plaintiff also complains that *MaM* mentions a half-page report he made on November 8, 2005, but omits another one-page report that he filed on June 29, 2006. Ex. B at 7–8. However, *MaM* includes a scene of Avery's attorney asking him about the June 2006 report. PFOF ¶ __. In any event, whether Plaintiff submitted a half-page or one-and-a-half pages of reports does not make a material change to his testimony.

### E. Plaintiff's Complaints about Other Statements in *MaM* by Avery and His Defenders Fail for the Same Reasons

Plaintiff also complains about certain out-of-court statements by individuals such as Avery's attorneys and other supporters. Those statements are protected by the substantial truth doctrine that applies to *MaM*'s documenting of the public controversies surrounding Avery and his legal proceedings. *E.g.*, *Global Relief*, 390 F.3d at 390; *Fin. Fiduciaries*, 2022 WL 3585002, at *7.

26

### 1.    Allegations in the Body of the SAC

Paragraph 37 alleges that *MaM* "presented it as a foregone conclusion that the police, allegedly including Plaintiff, planted the Key at Avery's residence," because *MaM* includes a statement by one of Avery's criminal defense attorneys, Jerome Buting, that "[i]f they would be willing to go to that length of planting the key, which I think the jury's going to get . . . ." SAC ¶ 37. Buting does nothing more than say he later argued at Avery's trial, and what anyone would expect him to say given his role as Avery's defense attorney. Including Buting's statement does not materially change *MaM*'s presentation of the parties' respective arguments.

Likewise, Paragraph 48 challenges a statement by Buting in which he ruminates—in response to the prosecution's argument that a conspiracy was far-fetched because it would have required too many people—that framing Avery could have been achieved by "two people," "[m]aybe even one," followed by a cut to James Lenk on the witness stand. SAC ¶ 48. Besides focusing on Lenk, not Plaintiff, Buting's statement is not materially different from his closing arguments, which are included in *MaM*. Ep. 8 at 6:08–6:53. In a similar vein, Paragraph 39 focuses on a portion of *MaM* in which an interrogator asks Avery whether someone told him that "a cop put that vehicle – Teresa's vehicle – out on your property," to which Avery responds "Yeah," followed by a cut to a visual of Plaintiff. SAC ¶ 39. But Plaintiff admits "[a] central part of Avery's defense at trial was that Plaintiff and other Manitowoc officers planted Halbach's SUV at the Avery Salvage Yard." *Id.* ¶ 33; *see also* PFOF ¶ 50 [re Judge Willis order].[10] His complaint about what *MaM* is "implying" ignores Avery's attorneys' *express* arguments.

In Paragraph 40, Plaintiff again improperly conflates statements made by Avery's defense

---

[10] Plaintiff complains at times that *MaM* uses photos and graphics that include Plaintiff and show his place in the MTSO structure and in Avery's accusations against MTSO. Ex. A at 29, 30, 38. However, the graphics and visuals exist for clarity for viewers (*MaM* has lots of characters).

with statements supposedly made by the Producer Defendants. Paragraph 40 also is based on a false assumption. It accuses the Producer Defendants of having "dramatically re-enacted" the discovery of the blood vial by Avery's attorneys. But the footage in question is *not* a re-enactment, it was shot by one of Avery's attorneys as events unfolded, as is reflected in the credits at the end of Episode 4 of *MaM*. Prosecutor Norm Gahn and investigator Mark Wiegert appear in the scene, and obviously they would not be taking part in a re-enactment.[11]

## 2. Exhibit A of the SAC

Exhibit A includes many other statements by Avery, his attorneys, his relatives, and his supporters. *See generally* Ex. A. But Plaintiff's undeveloped references to those statements are not set forth with the specificity and clarity required of defamation claims. *See supra* fn. 3. Nonetheless, certain points that Exhibit A appears to emphasize are addressed below.

Episode 1. Avery and a supporter offer opinions consistent with arguments Avery made in his civil lawsuit and in his murder trial. *MaM* presents Avery and his supporters as voicing their opinions, not as authoritative sources of facts. *MaM* also includes contrary opinions that Avery was guilty and his accusations against Plaintiff were false. *See infra*, Section I.F.G.

Episode 2. Avery attorneys Glynn and Kelly offers opinions consistent with arguments they advanced in Avery's civil rights lawsuit and that Avery made at his murder trial. *MaM* also includes portions of depositions taken of Plaintiff and other MTSO officials in connection with Avery's civil suit. As explained above, *MaM* also includes statements that Plaintiff forwarded the Jail Call to an MTSO detective, and Plaintiff was given "reassurances" by someone in the Sheriff's office that he need not worry because they already had the "right guy." Ep. 2 at 22:04 &

---

[11] The SAC criticizes the Producer Defendants because a phlebotomist "was prepared to testify" at trial to counter Avery's arguments about the blood vial. SAC ¶ 40. That person did *not* testify. The person who *did* testify for the prosecution regarding the blood vial was Marc Lebeau, whose opinion that the blood in Teresa Halbach's car could not have come from the vial *is* in *MaM*.

26:00. It also includes Plaintiff's denial that the Jail Call motivated him to frame Avery. Ep. 7 at 18:45. In any event, Avery's attorneys' opinions are their own.

Episode 3. Local residents in a tavern express their opinions that Avery was framed. As Plaintiff acknowledged at his deposition, there were some in the local community who believed Avery's framing defense. Colborn Dep. 77:8–14, 83:3–7. *MaM* reflects that, but it also includes another scene of local bar patrons expressing their beliefs that Avery and Dassey were guilty (EP 3 at 29:00), as well as opinions of others who believed Avery was guilty—including Avery's own brother, Chuck Avery, and Teresa Halbach's family.

Episodes 4, 5, 6 and 7. Avery, his attorneys, his private investigator and his parents express their opinions, which unsurprisingly are consistent with Avery's planting defense presented at trial. *MaM* also includes local news coverage of Avery's planting defense, showing that Avery's trial and planting allegations were matters of public interest on which the media (not just *MaM*) reported. *See also supra* Section I.E.1 (discussing ¶¶ 39 and 48). As Exhibit A reflects, Episode 7 also includes footage from a news conference in which a reporter criticizes Avery's attorney for making accusations against Plaintiff. Ex. A; *see also* Ep. 7 at 24:30.

Episode 8. *MaM* includes portions of the closing arguments.

> ### F. The SAC's Complaints About Alleged Omissions Fail to Demonstrate Material Falsity and Are Not Even About Plaintiff

Plaintiff cannot meet his burden of showing material falsity with respect to any of the alleged "omissions" in Paragraphs 46 and 47 of the SAC.[12] Nor can Plaintiff equate Avery's guilt with Plaintiff's automatic innocence from Avery's planting allegations. At Avery's trial, the prosecution urged in closing that, even if jurors believed officers *had* planted evidence, they

---

[12] As explained below in Section III, the alleged omissions are not "of and concerning" Plaintiff.

could and should still convict Avery based on all the other evidence.. And, as Michael Griesbach stated in January 2016 after watching Season 1 of *MaM* (after years of knowing and working with Plaintiff): "I am convinced [Avery] is guilty . . . *but I'm nowhere near as certain that the cops did not plant evidence to bolster their case.*" PFOF ¶ 9 (emphasis added).

Also, Plaintiff's concept of defamatory "omissions" ignores the fact that, by definition, *MaM* could not include everything that anyone would have liked—not Plaintiff, not Avery and his attorneys, not the prosecution. Plaintiff's alleged omissions are also cumulative in kind to many similar facts already in *MaM*. For example, Plaintiff points to Avery's DNA being found on the hood latch of Teresa Halbach's vehicle, but *MaM* already devotes significant attention to Avery's blood being found in Halbach's car and also to scientific testing by the FBI and related expert witness testimony rebutting Avery's attorney's arguments that the blood had been planted. Ep. 5 at 42:15–50:45. Plaintiff points to certain of Teresa Halbach's possessions being found in a burn barrel on Avery's property, but *MaM* already includes the fact that her cremains were found in Avery's burn pit. Ep. 6 at 34:59. Plaintiff complains *MaM* does not include all the details of all the prior crimes for which Avery was accused and, in some instances, convicted. But Judge Willis excluded evidence of those crimes and accusations from the 2007 trial. Even so, *MaM did* include voluminous material regarding Avery's criminal and violent past, as discussed below.[13]

Finally, even if Plaintiff's complaints about omissions did not suffer from the above defects, the law does not permit defamation claims to be based on such complaints. "The First Amendment prohibits a rule that holds a media defendant liable for broadcasting truthful

---

[13] Aside from being cumulative, many of the alleged "omissions" listed in the SAC relate to items that were the subject of *disputes* between Avery and the prosecution. For the Producer Defendants, that meant including them in *MaM* would have taken a considerable amount of additional time because they would have had to include both sides and various complexities.

statements and actions because it failed to include additional facts which might have cast plaintiff in a more favorable or balanced light." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 (10th Cir. 2017) (cleaned up); *accord Machleder v. Diaz*, 801 F.2d 46, 55 (2nd Cir. 1986) (same); *see also Torgerson v. Journal Sentinel, Inc.*, 546 N.W.2d 886 (table), 1996 WL 56655, at *8 (Wis. Ct. App. Feb. 13, 1996) (unpublished), *aff'd*, 563 N.W.2d 472 (1997) (newspaper "is under no legal obligation to present a balanced view and cannot lose its constitutional protection because the plaintiff believed it failed to do so").

### G. The SAC Ignores the Variety of Viewpoints Reflected in *MaM*

*MaM* must be evaluated in its entirety. *See Kaminske v. Wis. Cent. Ltd.*, 102 F. Supp. 2d 1066, 1080 (E.D. Wis. 2000). Plaintiff agreed at his deposition that the "best evidence of what Making a Murderer says and portrays is the documentary itself," and that *MaM* should be viewed "in its entirety," all of "Episodes 1 through 10." Colborn Dep. 62:14–18, 247:9–17. Yet the SAC fails to acknowledge scenes reflecting negatively on Avery:

- A scene with a statement by Chuck Avery, Steven Avery's brother, stating that he was "pretty positive" Steven murdered Teresa Halbach. *MaM* Ep. 3 at 42:00–42:08.
- A scene in which Steven Avery's sister tells Steven "I hate you for what you did to my kid. All right? So you can rot in hell." See *MaM* Ep. 3 25:21–25:29.
- Scenes showing Avery's nephew Bobby Dassey testifying against him at his murder trial, with Dassey shown as being one of the prosecution's most important witnesses. See *MaM* Ep. 5 at 19:28–21:56.
- A scene showing Teresa Halbach's brother Mike Halbach opining that he believed Avery was guilty. See *MaM* Ep. 7, 59:12–1:00:04.
- Scenes about Avery's prior bad acts, including many crimes the Judge excluded from evidence. *See MaM* Ep. 1 at 5:18–7:24 (Morris allegations of indecent exposure); 9:30–9:59 (burglaries); 10:00–10:53 (cat burning and conviction and probation); 12:31– 13:59 (Morris assault); 16:07 (Morris criminal charges).
- An interview in which Judge Hazlewood, the presiding judge in Avery's 1985 trial, opines that Avery had a propensity for violence against women. See *MaM* Ep. 1, 26:36–28:18
- An interview with a member of the local media who said the arrest of Avery for the 1985 sexual assault was not a surprise because Avery was one of the "regular names" on the crime beat in Manitowoc County and the assault was "in character" for him. *See MaM* Ep 1 at 27:09 – 27:52

31

- The jury's guilty verdicts in Avery's trial for the murder of Teresa Halbach. See *MaM* Ep. 8 at 26:02–28:01.
- A scene showing Judge Willis, who presided over Avery's trial, opining that Avery was "probably the most dangerous individual to set foot in this courtroom." *MaM* Ep. 9 at 1:01:08–1:02:53.

Plaintiff admitted at his deposition that he was unaware *MaM* contained any of these scenes.

Colborn Dep. 174:16–23, 186:23–193:3, 471:7–473:9, 484:14–485:10.

The SAC also fails to acknowledge many scenes in *MaM* in which subjects push back against Avery's planting accusations against Plaintiff. Again, Plaintiff admitted at his deposition that he was not even aware *MaM* included these scenes. Colborn Dep. 124:17–126:14, 473:24–474:21, 477:13–478:3, 480:7–482:8–484:9.

- An interview with the MTSO Undersheriff criticizing Avery's planting accusations against officers, and calling them "impossible." See *MaM* Ep. 3 at 22:51–23:22.
- Multiple scenes in which the prosecutors from Avery's murder trial push back against Avery's planting accusations by, among other things, calling those accusations "despicable" and "deplorable." See, e.g., *MaM* Ep. 7 at 13:55–14:28; 44:00–45:30.
- A newscast in which an anchorman reads Plaintiff's prepared public statement following the jury's guilty verdict in Avery's murder trial. See *MaM* Ep. 8 34:02–19.
- Footage from Plaintiff's testimony at Avery's murder trial in which Plaintiff expressly denies the planting and framing accusations.

The Seventh Circuit has repeatedly held that presenting both sides of a disputed subject is not a materially false endorsement of the truth of either side's allegations. *See Fin. Fiduciaries*, 2022 WL 3585002, at *7; *Global Relief*, 390 F.3d at 98

## II. PLAINTIFF'S DEFAMATION CLAIM ALSO FAILS BECAUSE HE CANNOT MEET HIS BURDEN OF PROVING ACTUAL MALICE

Even assuming *arguendo* that Plaintiff could show some challenged statements are unprivileged and materially false in a defamatory manner, his claims still fail because he cannot meet his burden of proving actual malice. Dkt. 176 at 15. As the Supreme Court has stressed, "there is a significant difference between proof of actual malice and mere proof of falsity." *Bose*, 466 U.S. at 511. Plaintiff must prove actual malice with *clear and convincing* evidence. *Masson*,

32

501 U.S. at 510. This imposes a "heavy burden on plaintiffs, far in excess of the preponderance sufficient for most civil litigation." *Eastwood v. Nat'l Enquirer*, 123 F.3d 1249, 1252 (9th Cir. 1997); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (court must take clear and convincing burden into account when ruling on summary judgment). It is a question of law whether a plaintiff has shown actual malice with convincing clarity. *Bose*, 466 U.S. at 510–11.

To prove actual malice, Plaintiff must show the Producer Defendants acted with "knowledge that [a challenged statement] was false or with reckless disregard of whether it was false or not.'" *Masson*, 501 U.S. at 510 (quoting *Sullivan*, 376 U.S. at 279–80 (1964)). "Mere negligence does not suffice," *Masson*, 501 U.S. at 510, nor does "gross or even extreme negligence," *McCoy v. Hearst Corp.*, 42 Cal. 3d 835, 860 (1986). The term "knowledge of falsity means simply that the defendant was *actually aware* that the contested publication was false." *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 484 (7th Cir. 1986) (emphasis added). Similarly, to prove a defendant published a defamatory statement with "reckless disregard," a plaintiff must show a defendant "acted with a 'high degree of awareness of probable falsity." *Masson*, 501 U.S. at 510 (cleaned up). The actual malice standard is subjective, and "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also Woods*, 791 F.2d at 487–88 ("[R]equiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern. A publisher . . . cannot be charged with the intolerable burden of guessing what inferences [the public] might draw from an article and ruling out all possible false and defamatory innuendos that could be drawn from the article.").

### A.  *MaM*'s Inclusion of Avery's Accusations against Plaintiff Is Not Valid Grounds for Actual Malice Under Well-Established Constitutional Law

The gist of much of Plaintiff's SAC is that the Producer Defendants allegedly defamed him by including in *MaM* Avery's arguments that Plaintiff planted evidence to frame Avery. That is not a viable basis for actual malice. *MaM* could not document Avery's criminal trial without including those accusations, which Plaintiff concedes were a "central part of Avery's defense at trial." SAC ¶ 33. The First Amendment applies with particular force to coverage of court proceedings, which "bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox*, 420 U.S. at 491–92. "[T]he Constitution requires that we permit the people to be fully informed about the operations of government, including the operation of the judicial branch. It also requires that we tolerate individual expressions of opinion, hostile or otherwise, regarding the performance of those who carry out all aspects of our governmental functions." *Partington v. Bugliosi*, 56 F.3d 1147, 1159–60 (9th Cir. 1995).

Thus, courts have consistently rejected actual malice at summary judgment even when a member of the media simply regurgitates contentions of one side to a dispute *without* any meaningful attempt to present both sides or to perform any real investigation. Even "proof of failure to investigate, by itself, is not sufficient." *Woods*, 791 F.2d at 488; *see also Tucker v. Fischbein*, 237 F.3d 275, 286 (3rd Cir. 2001) (insufficient evidence of actual malice even though plaintiff alleged defendant engaged in "poor journalistic practices" and had "preconceived story line"). Another Seventh Circuit decision stressed that even if a source "might not be credible enough to have a good chance of persuading a jury, [that] does not mean that he was not credible enough to be a source for a news story." *Desnick v. ABC, Inc.*, 233 F.3d 514, 519 (7th Cir. 2000).

As the Wisconsin Supreme Court held in a decision affirming summary judgment, under established Supreme Court precedent, even a media defendant's deliberate decision to *wholesale*

*adopt* one interpretation of ambiguous and contested events concerning alleged police

lawlessness does not establish actual malice:

> The United States Supreme Court has said that a court cannot infer
> actual malice sufficient to raise a jury issue from the deliberate
> choice of a rational interpretation of ambiguous materials. The
> article at issue in *Time, Inc. v. Pape*, 401 U.S. 279, concerned police
> lawlessness. The article quoted summaries of an unproven civil
> complaint described in a government report, without indicating
> either that the quotes came from a complaint or that the events
> described were as yet unproven. Noting that the government report,
> taken as a whole, "bristled with ambiguities," the Court held that
> under such circumstances the deliberate choice of one interpretation
> from a number of possible rational interpretations was not enough
> to create a jury issue of actual malice. *Time, Inc. v. Pape*, 401 U.S.
> at 289–90. The Court reasoned as follows: "Where the document
> reported on is so ambiguous as this one was, it is hard to imagine a
> test of 'truth' that would not put the publisher virtually at the mercy
> of the unguided discretion of a jury." *Time, Inc. v. Pape*, 401 U.S. at
> 291.

*Torgerson v. J./Sentinel, Inc.*, 563 N.W.2d 472, 482 (1997); *see also In re Storms v. Action Wis.,*

*Inc.*, 750 N.W.2d 739, 750, 752 (Wis. 2008) (following *Torgerson* and *Pape* and affirming

summary judgment based on the plaintiff's failure to show actual malice).

    Similarly, in *Erdmann v. SF Broadcasting of Green Bay, Inc.*, the plaintiff argued that the

media defendant was liable for defamation based on its failure to include the word "alleged" in a

report about plaintiff's alleged assault on a 16-year old boy—an assault that, in truth, had never

occurred. 599 N.W. 2d 1, 8 (Wis. Ct. App. 1999). The media defendant—represented by

Plaintiff's counsel here, April Barker, as well as the predecessor firm to her co-counsel George

Burnett's firm of Conway, Olejniczak & Jerry, S.C—prevailed on summary judgment, relying on

*Time v. Pape* and the lack of actual malice. *Id.*

    Here, in *MaM*, it is *Avery and his defenders* who are accusing Plaintiff of planting

evidence. That leaves it to viewers to decide whether to accept those accusations— or to view

them skeptically based on their source. "[F]ull (or pretty full) publication of the grounds for

35

doubting a source tends to rebut a claim of malice, not to establish one." *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1304 (D.C. Cir. 1996). Plaintiff repeatedly ignores this principle in complaining that *MaM* includes the viewpoints of Avery and his defenders. *E.g.*, SAC ¶¶ 28–29, 37 (objecting to inclusion of comments from Avery's attorneys).

Plaintiff has claimed that the Producer Defendants had actual malice because, although they were privy to the arguments and evidence at Avery's trial, *MaM* did not present Plaintiff's and the prosecution's version of events and denials of misconduct as unassailable truth, but instead also presented Avery's positions. SAC ¶¶ 29, 33, 38, 43, 60. Plaintiff's argument that *MaM* was required to either *unquestionably credit* his denials of Avery's accusations or face defamation liability is contrary to well-established law cited above. As the Seventh Circuit held in *Saenz v. Playboy Enters, Inc.*, even a defendant's "*omission* of [plaintiff's] vehement denials" of wrongdoing "does not indicate that the defendants intended to distort or recklessly disregard the truth." 841 F.2d 1309, 1319 (7th Cir. 1988) (emphasis added). "When reporting charges made by others, failure to give the other side of the controversy is not of itself evidence of malice." *Saenz v. Playboy Enters, Inc.*, 653 F. Supp. 552, 572 (N.D. Ill. 1987), *aff'd,* 841 F.2d 1309. Indeed, "a publisher has no legal obligation to present a balanced view in its article." *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F. 3d 520, 527 (6th Cir. 2007) (quoting *Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 412 (6th Cir. 1991); *DeAngelis v. Hill*, 847 A.2d 1261, 1271 (N.J. 2004) (while writer's decision to omit portions of a taped conversation from a newsletter may have been unfair, it "is insufficient to meet plaintiff's heavy burden of proving actual malice by clear and convincing evidence").

Here, by contrast, *MaM includes* Plaintiff's denials of Avery's planting allegations, as well as denials by others including prosecutors and the MTSO Undersheriff. Plaintiff's claim that

inclusion of his denials in *MaM* is insufficient, and that defamation law required the Defendants to *exclude* Avery's team's accusations against him turns the First Amendment on its head. "To require that a reporter withhold such a story or face potential liability for defamation because a police officer denies a citizen's allegation of misconduct is exactly the type of self-censorship the *New York Times* rule was intended to avoid." *Smith v. Huntsville Times Co., Inc.*, 888 So. 2d 492, 501 (Ala. 2004) (internal quotation marks omitted). Moreover, as detailed below, the Producer Defendants—unlike many of the defendants in the cases above—conducted extensive research and strived to be accurate in documenting the two sides' contentions at Avery's trial.

### B.     Plaintiff Cannot Prove Actual Malice with Convincing Clarity

"[T]here is a significant difference between proof of actual malice and mere proof of falsity[.]" *Bose*, 466 U.S. at 511 (footnote omitted). Even if Plaintiff could show material falsity of a defamatory nature in *MaM*, he cannot satisfy his burden of proving by clear and convincing evidence that the Defendants made defamatory statements with actual awareness of their falsity or "acted with a high degree of awareness of probable falsity." *Masson*, 501 U.S. at 510.

### 1.     Avery's and His Defenders' Planting Accusations against Plaintiff

Plaintiff's actual malice allegations underscore his inability to show actual malice. First, Plaintiff's claim that "the purported conspiracy and scheme" to frame Avery "was the product of Defendants' imagination" is not just wrong, but it is contradicted by allegations in the SAC. SAC ¶ 60; *see also id.* ¶ 59(b). The SAC concedes that "[a] central part of Avery's defense at trial was that Plaintiff and other Manitowoc officers planted" evidence against Avery. *Id.* ¶ 33.

Second, Plaintiff's allegation that "Defendants knew that the statements and communications about the purported conspiracy and scheme were false" is also incorrect. *Id.* ¶ 60. The Producer Defendants do not know whether Steven Avery killed Teresa Halbach. Nor do they know whether Plaintiff or others planted evidence. While, after *MaM* was released in

37

response to media questions, the Producer Defendants expressed their opinion that in looking back on whether the legal system and processes documented in *MaM* were fair and met the standards that one would want in our criminal justice system (they believe there were shortcomings on those fronts), they do not have and have not expressed an opinion on Avery's guilt or innocence or on whether Plaintiff or others planted evidence. The reason is simple: they do not know the answers. As Plaintiff admitted at his deposition, the only people in a position to know for certain whether the Key was planted in Avery's bedroom are the people who were there, including Plaintiff. Everyone else has to either trust Plaintiff's and other officers' denials, reject those denials, or accept that they will never know for certain who was telling the truth.

The Producer Defendants' approach to *MaM* is acknowledged in an email that Plaintiff's former attorney Michael Griesbach wrote to the Producer Defendants on December 23, 2015, after he had just finished watching all of Season 1. Griesbach was no stranger to the Avery saga, having already written two books about it. He also had served in the Manitowoc County D.A.'s office since the early 1990s, giving him *personal knowledge* of key law enforcement personnel involved in the underlying events, including Plaintiff. Griesbach's email to the Producer Defendants begins: "Congratulations! I binged my way through all 10 episodes by Saturday afternoon and enjoyed it immensely." PFOF ¶ 28. He later adds, "By the way, I share most of the views you expressed below in your recent interview with the PostCrescent. In the end, the CJS [criminal justice system] must be about process, not results. All Best, Mike." *Id.* Below his salutation, Griesbach pasted portions of the *Post-Crescent* piece quoting Ricciardi and Demos:

- "Every question just led to more questions," said Moira Demos, who produced the series titled, "Making a Murderer," with Laura Ricciardi. "In the end we are not trying to provide any answers. We don't have a conclusion. We are really raising questions and our goal is to promote a dialogue about these things."
- "This is such a complex case and, you know, I think our takeaway through all of this is that one needs to be careful not to be too certain about any of this," Ricciardi said. "It's

an imperfect system, it's a human system and there's lots of room for ambiguity. And there are lots of questions here."

*Id.*; *see also* PFOF ¶ 12.

A few weeks later, on January 10, 2016, Griesbach sent an email to his book agent Ronald Goldfarb about Griesbach's plan to write a third book about Avery. Ex. 12. When Goldfarb asked Griesbach if he thought Avery was guilty of Teresa Halbach's murder, Griesbach answered, "I've debated this for a week with my wife and children and in my own mind. I am convinced he is guilty . . . *but I'm nowhere near as certain that the cops did not plant evidence to bolster their case.*" *Id.* (emphasis added). Those are the words of a man who, unlike the Producer Defendants, is not only from Manitowoc County but worked side-by-side with MTSO personnel for decades as a prosecutor in the Manitowoc D.A.'s office, and then went on to represent Plaintiff in this very case. If Griesbach was uncertain whether the cops he knew personally had planted evidence to bolster the case against Avery, how can Plaintiff charge the Producer Defendants with "knowing" those allegations were false or necessarily holding a "high degree of awareness" of their "probable falsity"?

Moreover, Plaintiff must not only "establish by clear and convincing evidence that the defendants acted with actual knowledge of or in reckless disregard for the falsity of their accusations," but, when, as here, "the plaintiff is claiming defamation by innuendo, he also must show with clear and convincing evidence that the *defendants intended or knew of the implications* that the plaintiff is attempting to draw from the allegedly defamatory material." *Saenz*, 841 F.2d at 1318 (emphasis added); *see also Woods*, 791 F.2d at 487–88. Plaintiff cannot remotely satisfy this additional requirement, let alone with clear and convincing evidence.

### 2.     The Jail Call, the Call to Dispatch, the Discovery of the Key, the Alleged Omissions and Any Other Challenged Statements

As detailed in the Producer Defendants' concurrently filed declarations, none of the challenged statements related to the Jail Call, the Call to Dispatch, the discovery of the Key, the alleged omissions, or any other challenges statements were included in *MaM* with knowledge of falsity or with a high degree of awareness of probable falsity. PFOF ¶¶ 114–141 To the contrary, the Producer Defendants believed in 2015 when *MaM* was released—and still believe now—that *MaM* accurately captures the gist of Avery's and others allegations against Plaintiff and also of Plaintiff's denials on those subjects. *Id.* To the extent there are any material inaccuracies resulting from their editorial steps to summarize events and compress testimony in *MaM* (although the Producer Defendants do not believe there are), such inaccuracies were inadvertent and the Producer Defendants entertained no doubts that *MaM* accurately captured the gist of the parties' contentions. *Id.* The Producer Defendants' editing decisions were not motivated by any desire or intent to present inaccurate statements or impressions of Plaintiff, let alone defamatory ones, but merely to summarize and compress voluminous material in a comprehensible manner for viewers utilizing the footage that they possessed. *Id.* Certain allegations of Plaintiff's are addressed in additional detail below.

### a.     The Jail Call

As explained above, Plaintiff's allegation that the Producer Defendants acted with actual malice in including Avery attorney Glynn's point that Plaintiff's September 12, 2003 statement was kept in the Sheriff's safe is not just wrong, but based on a premise that Plaintiff was forced to abandon. He now concedes his statement was, in fact, kept in the safe.

### b.  The Call to Dispatch

The Producer Defendants believed (and still believe) that the compression of question and answers referenced in Paragraph 34 of the SAC does not materially change the meaning of the testimony concerning the Call to Dispatch. PFOF ¶¶ 132–36. As explained *above* prior testimony reflected both in *MaM* and the trial transcript strengthens the Producer Defendants' belief that the scene accurately captures the substance of both sides' core contentions. The Producer Defendants did not intend to convey any assertion or implication that Plaintiff was admitting that he was looking at Teresa Halbach's car when he made the Call to Dispatch. *Id.* Nor did they contemplate that *MaM* might do so. *Id.* Nor do they believe today that *MaM*, in fact, does so. *Id.* The editing decisions about which Plaintiff complains in Paragraph 34 and elsewhere were not motivated by any desire to present a false impression of Plaintiff's testimony on the subject; Plaintiff's testimony was edited for compression and summarization reasons. *Id.*

The Producer Defendants believed (and still believe) that *MaM* does not contain any "reaction" shots of Plaintiff that materially change the gist of his trial testimony in a defamatory manner. PFOF ¶ __. At his deposition, Plaintiff complained about one particular shot in Episode __ of *MaM. Id.* However, in the Producer Defendants' opinion, that shot does not make Plaintiff look "nervous and apprehensive," as the SAC alleges. *Id.* Rather, Plaintiff is shown holding his head up and his eye level steady. *Id.* Plaintiff may hold a different opinion, but the Producer Defendants did not include that shot in *MaM* with the intention to make Plaintiff look nervous or apprehensive. *Id.* They did so because of the unterminated feed problem with the feed from the camera that was trained on the witness stand at trial, which meant there was limited footage of witnesses (including Plaintiff) when they were simply listening and not answering questions. *Id.*; *see also supra* Section IV.

### c. The Discovery of the Key

The Producer Defendants believed (and still believe) the scene in *MaM* showing Sgt. Tyson testifying that he had to watch MTSO officers during searches to make sure they weren't alone in Avery's trailer, and that it was the only time in his career he had been asked to do that, accurately captures the gist of his testimony. SAC ¶ 44; PFOF ¶ __; *see also supra* Section __. The Producer Defendants did not edit the scene to materially alter the gist of Tyson's testimony, let alone in order to defame Plaintiff. *Id.* Rather they believe that both the first question in the question-and-answer exchange (shown in *MaM*) and the second question (not shown) carried the same gist, i.e., whether Tyson had ever in his career been obligated to watch over fellow officers during a search to make sure they were never alone without supervision. *Id.*

The Producer Defendants believed (and still believe) *MaM* accurately presents the substance of Plaintiff's explanation for how he believes the Key was found on November 8, 2005, after numerous prior searches of Avery's bedroom had failed to locate it. PFOF ¶ __35; *see above*. *MaM*'s non-inclusion of a photograph later taken of the bookcase from which witnesses hypothesize that it may have fallen was not the result of any decision by the Producer Defendants to "le[a]d viewers to the inescapable but false conclusion that Plaintiff and MTSO Lt. James Lenk planted the ignition key." *Id.*; SAC ¶ 41. The Producer Defendants believed they had already captured the gist of witnesses' (Lenk's and Kucharski's) explanations for the discovery, as well as Plaintiff's testimony about handling the bookcase roughly. *Id.*

### d.    Other Statements by Avery and His Defenders

None of any of the other challenged statements in MaM, including but not limited to those made by Avery, his family members and supporters, and his attorneys (or any others), were included in *MaM* with knowledge of falsity or with a high degree of awareness of probable falsity. PFOF ¶ __. Rather the Producer Defendants believe those statements accurately reflect

42

the speakers' own opinions and viewpoints, and are not presented as authoritative statements of objective fact. *MaM* also includes others' statements opining that Avery was guilty and that his accusations against Plaintiff were false. *See supra* Section __.[14]

### e. The Alleged Omissions

Contrary to Plaintiff's allegation in Paragraphs 46 and 47, the Producer Defendants did not omit information because of a desire to "lead viewers to falsely conclude" that he planted evidence. PFOF ¶ 141. Rather, the Producer Defendants were motivated by concerns such as time constraints, avoiding cumulativeness, narrative flow, and too many digressions from what they saw as the core issues. *Id.* The Producer Defendants had to compress 30 years of events into approximately 10 hours. While the SAC complains about *MaM*'s not including certain items reflecting negatively on Avery, it ignores the voluminous materials *already* in *MaM* that could lead viewers to view Avery negatively. *See supra* Section __. The Producer Defendants also did not edit *MaM* in order to present arguments and opinions of Avery's attorneys "as actual and unanswered facts." SAC ¶ 48; PFOF ¶ 141.

## III. Plaintiff's Defamation Claim Fails for Additional Reasons

### A. Many of the Challenged Statements Are Not About Plaintiff

Plaintiff can only allege defamation claims regarding statements that are "of and concerning" him. *E.g.*, *Sullivan*, 376 U.S. at 291–92; *Thompson v. Nat'l Catholic Reporter Publ'g Co.*, 4 F. Supp. 2d 833, 840 (E.D. Wis. 1998); *Wesbrook v. Ulrich*, No. 13-cv-494-wmc, 2014 WL 811786, at *9 (W.D. Wis. Mar. 3, 2014). Yet Plaintiff challenges many statements in *MaM* that are not even about him. *See, e.g.*, SAC ¶¶ 40 ("possibly including plaintiff"), 46–47

---

[14] During depositions, Plaintiff suggested the music in *MaM* might be grounds for actual malice. But the SAC never even mentions music, let alone explains how it could be defamatory or show actual malice. Moreover, case law shows that a plaintiff's claims that "scary music" made him look bad do not establish defamation or actual malice. *Terry*, 351 Wis. 2d at 505-07.

43

(allegations about evidence that Plaintiff believes further supports Avery's guilt); Ex. A at 7–9, 14 (allegations about statements about "law enforcement" generally).[15]

### B. The Challenged Statements Are Barred by the Subsidiary Meaning Doctrine

Under the subsidiary meaning doctrine, if a particular challenged "statement implies the same ultimate conclusion as that of the remainder of the publication, which [is non-actionable], a plaintiff cannot 'base his defamation action solely on inaccuracies contained within statements subsidiary to these larger views.'" *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F. Supp. 589, 594 (S.D.N.Y. 1996), *aff'd* 238 F.3d 168. Here, Plaintiff's overarching complaint is *MaM* "falsely led viewers to the inescapable conclusion that Plaintiff and others planted evidence to frame Avery for Halbach's murder." SAC ¶ 20. As explained in Sections ___ above, that complaint is non-actionable. Thus, regardless of whether *MaM* contains any material inaccuracies as to certain details regarding more specific complaints (e.g., the Jail Call, the Call to Dispatch), those are not actionable because of the subsidiary meaning doctrine as they only imply the same overarching complaint Plaintiff has about *MaM* as a whole.

## IV. PLAINTIFF'S EMOTIONAL DISTRESS CLAIM ALSO FAILS

### A. The IIED Claim Necessarily Fails as a Result of Plaintiff's Inability to Establish His Defamation Claim

Plaintiff's inability to substantiate his defamation claim means his IIED claim necessarily fails too. First, Plaintiff's IIED claim is derivative of his defamation claim, as both claims are based on the same alleged acts or omissions by Defendants. Because his defamation claims fails, his IIED claim necessarily fails too. *See Terry*, 840 N.W.2d at 271–72. Second, because Plaintiff

---

[15] The SAC contains allegations about scenes including certain theories and experiments of Avery's postconviction counsel, Kathleen Zellner, SAC ¶ 52, although Plaintiff makes clear he is *not* basing either of his claims on those allegations, *id.* ¶ 59, 63, 78. Besides not being at issue, Paragraph 52 fails to identify any alleged defamatory "of and concerning" Plaintiff personally.

cannot prove actual malice with clear and convincing evidence with respect to his defamation claim, his IIED claim must fail for the same reason. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988). Third, because *MaM* covers issues of public concern and does not defame Plaintiff, his IIED claim is further barred by the First Amendment. *See Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *Dumas v. Koebel*, 841 N.W.2d 319, 328–29 (Wis. Ct. App. 2013).

### B.  His IIED Claim Would Still Fail as a Matter Of Law

Plaintiff also cannot establish numerous necessary elements of his IIED claim: (1) the defendant's conduct was intended to cause emotional distress; (2) the defendant's conduct was extreme and outrageous; (3) extreme and outrageous conduct was a cause-in-fact of plaintiff's emotional distress; and (4) the plaintiff suffered an extreme disabling emotional response to the defendant's conduct.*Rabideau v. City of Racine*, 627 N.W.2d 795, 802 (Wis. 2001).

With regard to the first element, the requisite intentionality is not established merely by the fact that the Producer Defendants intentionally engaged in the conduct that Plaintiff claims caused him emotional distress. Rather, "the plaintiff must show that the conduct was engaged in *for the purpose of causing emotional distress*." *Id.* at 803 (emphasis added). Plaintiff has no evidence the Producer Defendants' purpose in making *MaM* was to cause him emotional distress.

With regard to the second element, defamation alone does not rise to the level of "extreme and outrageous behavior" sufficient to support an IIED claim. *E.g.*, *Harp v. Glock*, No. 18-C-1039, 2019 WL 1859258, at *7–8 (E.D. Wis. Apr. 25, 2019).  As shown above in Sections ____, *MaM* documented legal proceedings on a matter of great public interest. That is not "extreme and outrageous behavior." With regard to the third and fourth elements, Plaintiff cannot prove that the Producer Defendants are the cause in fact of his emotional distress or that he suffered an extreme disabling emotional response to their conduct. Dkt. 269 at 43–45.

45

Dated: September 16, 2022   Respectfully submitted,


           *s/ Kevin L. Vick*
           Kevin L. Vick (*pro hac vice*)
           Meghan Fenzel (*pro hac vice*)
           JASSY VICK CAROLAN LLP
           355 South Grand Avenue, Suite 2450
           Los Angeles, CA 90071
           T: (310) 870–7048
           F: (310) 870–7010
           kvick@jassyvick.com
           mfenzel@jassyvick.com

           *Counsel for Defendant Laura Ricciardi, Moira Demos, and Chrome Media, LLC*

           James A. Friedman, SBN 1020756
           GODFREY & KAHN, S.C.
           One East Main Street
           Suite 500
           Madison, WI 53703–3300
           T: (608) 284–2617
           F. (608) 257–0609
           jfriedman@gklaw.com

           *Counsel for the Defendants*