IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| ANDREW L. COLBORN,<br><br>        Plaintiff,<br><br>        vs.<br><br>NETFLIX, INC.; CHROME MEDIA LLC, F/K/A SYNTHESIS FILMS, LLC; LAURA RICCIARDI; AND MOIRA DEMOS,<br><br>        Defendants. | Civil No.: 19-CV-484-BHL |

## DEFENDANT NETFLIX, INC.'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Andrew Colborn's Motion for Partial Summary Judgment ("MPSJ") must be denied. Colborn fails to set forth the standards he must meet to be entitled to summary judgment, ignores and denies that he has the burden of proof, and does not explain how the scant evidence he cites actually supports judgment in his favor. Instead, Colborn misstates much of the law and facts. He also advises the Court that no matter the outcome of his motion, he intends to present to the jury some unspecified number of other purportedly defamatory statements, video footage, graphics, and perhaps even music. Colborn's refusal to narrow the issues in this case—even when asking for summary judgment—continues.

Colborn's MPSJ lists 52 of what he calls "statements" or "embellishments," many of which are, on their face, not about him. He does not explain how these 52 disparate pieces of the ten-hour *Making a Murderer* ("MaM") series are false or defamatory—indeed, many of them are indisputably true. And Colborn now introduces a new theory into the case as it ages well into its

fourth year: defamation by implication. But he does not explain how any of these 52 statements support the purported defamatory implication that he either planted evidence to frame Steven Avery for the murder of Teresa Halbach or participated in a broader conspiracy to do so. Meanwhile he ignores Seventh Circuit case law on defamation by innuendo, apparently believing that he can prove a defamatory implication just by saying it exists, and he makes no attempt to actually prove, as is his burden, that the implication he imagines is false. The only proposed fact he proffers in support of his claim that he did *not* plant evidence is his own, self-serving denial. If that were sufficient to grant summary judgment in his favor, there could be no documentaries on any disputed issue without liability. Finally, he ignores the heightened burden he faces as a public official to prove that Netflix released MaM with constitutional actual malice.

Colborn's MPSJ must be denied.

## ARGUMENT

To obtain summary judgment on a defamation claim, a plaintiff must present evidence to prove that a defendant "(1) published (2) a false, (3) defamatory, and (4) unprivileged statement." *Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 665 (7th Cir. 2022). As a conceded public official, Colborn must also prove, by *clear and convincing evidence*, (5) that Netflix distributed MaM with the constitutionally mandated level of fault: actual malice, meaning publishing a false statement of fact knowingly or with a high degree of awareness of its probable falsity. *See, e.g.*, *Harris v. Quadracci*, 48 F.3d 247, 252 (7th Cir. 1995). This is an exceedingly high burden and, despite an exhaustive search, counsel for Netflix was unable to find a *single* decision from the Seventh Circuit or any federal or state court in Wisconsin in which a public-figure plaintiff like Colborn successfully moved for summary judgment on the

issue of actual malice against a media defendant like Netflix. Certainly, Colborn has not cited any such case, from this jurisdiction or any other.

In any event, Colborn does not cite record evidence that would meet his burden of proof on any of the five elements he must prove, other than publication of MaM (which Netflix has never disputed). He does not even *acknowledge* the heightened burden he faces under the First Amendment—or, frankly, that he has any burden at all. Colborn so badly misstates defamation law that a ruling in his favor would turn decades of settled precedent on its head.

I.       **Colborn Ignores or Upends the Burdens He Faces at Summary Judgment**

Colborn completely ignores, and thus does not begin to satisfy, the standards he must meet under Federal Rule of Civil Procedure 56. Where, as here, the movant has the burden of proof on the claim on which he is moving for summary judgment, he "must lay out the elements of the claim, cite the facts which [he] believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund.*, 778 F.3d 593, 601 (7th Cir. 2015). Colborn does not do that. Instead, he either misstates or ignores the standards that he, not Netflix, must meet to prevail on the disputed elements of his defamation claim.

A.       **Colborn Misstates His Burden to Prove Falsity**

Colborn fundamentally misstates the burden of proof on falsity, claiming that Defendants have the burden to prove truth. MPSJ at 5,[1] 16. He could not be more wrong. Colborn, not

---

[1] Colborn misleadingly cites *Gerol v. Arena*, 127 Wis. 2d 1, 8 n.3, 377 N.W.2d 618, 621 (Ct. App. 1985), in support of the notion that to defeat his MPSJ, Defendants must prove the truth of the "statements" he challenges. MPSJ at 5. That portion of *Gerol* involves a defendant's affirmative defense of truth in a private-figure case against a non-media defendant, *not* a public official's lawsuit against a media defendant where the plaintiff has the affirmative burden to prove falsity. *See Torgerson v. Journal/Sentinel Inc.*, 210 Wis. 2d 524, 543 n.18 (1997).

Defendants, must prove that MaM conveyed false statements of fact about him to reasonable viewers. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986); *Fin. Fiduciaries*, 46 F.4th at 666; *Torgerson*, 210 Wis. 2d at 543 n.18.

Since he never acknowledges that he has the burden to prove falsity, Colborn also never acknowledges that his burden is to prove *material* falsity: that the statements would have a different, and more damaging, effect on the mind of a reasonable viewer than the precise truth. *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991). He also disregards that only statements of verifiable fact can be false: opinions, speculation, and hyperbole are not actionable as defamation, nor are questions, theories or conjectures. *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993). And by pointing to dozens of scattered snippets of MaM, he ignores the settled law that such "statements" must be analyzed in the context of MaM as a whole to assess his (new and misguided) claim that the snippets somehow imply, as incontrovertible fact, that he participated in an evidence-planting conspiracy. *Bd. of Forensic Document Exam'rs, Inc. v. ABA*, 922 F.3d 827, 832 (7th Cir. 2019); *Mach v. Allison*, 2003 WI App 11, ¶31, 259 Wis. 2d 686, 712, 656 N.W.2d 766, 778.

Taken together, these settled principles mean that Colborn must prove that a reasonable viewer, considering the challenged statements in the context of the entire 10-hour span of MaM, would understand MaM (and, more specifically, Netflix) to be making affirmative statements of defamatory fact about Colborn. In other words, Colborn must cite record evidence conclusively demonstrating that reasonable viewers would understand MaM and Netflix to be *adopting* or *endorsing* Avery's accusations and presenting those accusations as fact, even though they constitute just one of the several inherently conflicting viewpoints that the series documents in telling the story of Avery's trial, where his accusations were obviously hotly disputed.

Assuming he can clear that hurdle (he cannot), Colborn must then prove those accusations to be false. Netflix does not have to prove that any one of the 52 statements Colborn points to is true—though many of them are. Netflix also does not have to prove Avery's innocence or that Colborn planted evidence to ensure Avery's conviction for Halbach's murder. Rather, for Colborn to succeed in establishing defamation by implication and innuendo, he must affirmatively prove the alleged implication is false—he must prove that he did *not* plant evidence to ensure Avery's conviction. He does not grapple with this at all.

### B. Colborn Ignores His Burdens on Innuendo and Other Elements

Colborn's new theory of defamation by implication by innuendo requires yet another showing, assuming the Court even permits him to introduce this never-before-pleaded theory of liability years into this case. Under clear Seventh Circuit precedent, to establish defamation by "innuendo," Colborn must prove by clear and convincing evidence that Netflix intended, or at least knew, that reasonable viewers would understand MaM itself to be drawing conclusions about Colborn's culpability. *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988); *Woods v. Evansville Press Co.*, 791 F.2d 480, 487 (7th Cir. 1986). He cannot do that. Instead, Colborn argues as if this requirement does not exist.

Beyond proof of falsity, Colborn also has the burden as to each challenged statement (as well as the overarching alleged "implication") to prove that each statement and implication (1) is about or "of and concerning" him, that (2) it is not privileged, and that (3) it is defamatory in the sense that it subjects him (not someone else) to public hatred, contempt or ostracism. *See, e.g.*, *Rosenblatt v. Baer*, 383 U.S. 75, 82-83 (1966); *Thompson v. Nat'l Catholic Reporter Publ'g Co.*, 4 F. Supp. 2d 833, 839-40 (E.D. Wis. 1998). Yet again, he ignores these burdens.

### C. Colborn Disregards His Heightened Burden on Actual Malice

Finally, Colborn disregards the extraordinary burden he faces as a public official regarding actual malice. Colborn must prove by clear and convincing evidence that Netflix distributed MaM knowing that each of the challenged statements and alleged implications about Colborn were false or being highly aware they were probably false. *Madison v. Frazier*, 539 F.3d 646, 658 (7th Cir. 2008). On summary judgment, Colborn must set forth undisputed material facts that would support a reasonable jury's finding of actual malice by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Madison*, 539 F.3d at 658; *Erdmann v. SF Broad. of Green Bay, Inc.*, 229 Wis. 2d 156, 169-71, 599 N.W.2d 1, 7-8 (Ct. App. 1999) (noting that the plaintiff is required to prove clearly and convincingly that "the defendant in fact entertained serious doubts as to the publication's truth").

This burden is, by design, a daunting one, and obviously demands significant time and attention. Yet the phrase "clear and convincing evidence" is nowhere to be found in Colborn's MPSJ. Nor does Colborn even attempt to tie any of his purported evidence of actual malice— pulled from just three discrete sets of notes Netflix provided to the Producer Defendants—to any of the 52 "statements" he puts at issue in his motion or the alleged evidence-planting implication. *See* MPSJ at 13-15. Colborn does not even bother to define what "actual malice" means, or address the fact that he has the burden to prove it.[2]

\*     \*     \*

Colborn's failure to cite the standards for determining the issues on which he seeks summary judgment, let alone apply those standards to the record evidence, warrants denial of his

---

[2] Colborn's counsel are well aware of the standards for showing actual malice on summary judgment, having successfully defended a television station on those grounds in a case that went to the Wisconsin Court of Appeals. *See Erdmann*, 229 Wis. 2d at 169-71, 599 N.W.2d at 7-8.

MPSJ. *Hotel 71*, 778 F.3d at 602 (court properly denied summary judgment where moving party "did not even cite the standard for determining [the relevant issue] let alone apply that standard to the record facts"). The Court need go no further to dispose of this meritless motion.

## II. Colborn Cannot Prove the Challenged "Statements" or Their Alleged Implications Are Actionable

Even if Colborn had properly acknowledged the relevant standards, Colborn's MPSJ fails because the facts he sets forth fail to satisfy his burden to prove that the portions of MaM he challenges are actionable as defamation.

### A. Standing alone, not one of the 52 challenged statements is actionable because not one is a false statement of fact about Colborn

More than a third of Colborn's MPSJ consists of a 52-item chart of what he calls "statement[s] and/or MAM embellishments." MPSJ at 6. Colborn does not present evidence showing that any one of these 52 statements is false. As a result of his failure to even attempt to show falsity, the Court can and should dismiss each of these 52 statements as non-actionable without further analysis.

Nevertheless, for the Court's convenience and the sake of completeness, Netflix attaches an Appendix hereto summarizing the multiple reasons why each of the 52 items is not actionable. Those reasons include:

- "Statements" 5, 8, 10, 12, 15, 17, 21, 23-24, 26, 43, 47, and 52 are not even statements; they are descriptions of video images, graphics and still photos displayed in MAM.

- Statements 4, 6-7, 11, 14, 16, 18, 25, 27-28, 30-31, 35-42, 45, 48, 50, and 54 are not statements of fact; rather, they consist of or contain either unverifiable speculation or conjecture, or are statements of hyperbole or the speaker's opinion and therefore are not actionable.

- Statements 8, 10, 12-15, 19, 21, 23-24, 43, and 52, to the extent construed as statements of verifiable fact, are true or substantially true.

- Statements 3, 4, 11, 29-30, 31, 33, 34, 36, and 54 are not about Colborn.

- Statements 39-41, 44, 48, and 50 are substantially identical to statements made at Avery's murder trial, and therefore not actionable because they are based on true or privileged facts.
- Colborn's descriptions of Statements 15, 21, 25, 26, 27, 30, 33, 37, 39, 42, 45, 46, 50, and 54 are incomplete, misleading, and/or lack proper context.

The majority of the entries on Colborn's chart are so subsidiary or peripheral to his claims that *he did not even mention them in the body of the SAC*, relegating them instead to Exhibit A and failing (even now) to explain how they are false or defamatory, despite his burden to do so. Take Statement 3 as an example: To meet his burden to show this statement is false, Colborn would need to prove that the Manitowoc County Sheriff's Office did *not* have evidence in 1985 that Avery was innocent, or that someone in the sheriff's office *did* say something about the lack of evidence against Avery. Colborn has no such evidence. Likewise, with regard to Statement 4, he would need to prove that Manitowoc County *was* prepared to hand Avery $36 million. Again, Colborn has no such evidence.

The list goes on, as Colborn has failed to come forward with *any* evidence of the falsity of *any* of these statements. Despite putting 52 statements at issue in his motion, his argument on falsity runs for a total of just three paragraphs covering less than half a page. See MPSJ at 15-16. Even though he bears the burden in this case and on summary judgment to prove falsity, he does not attempt to even explain what about these challenged "statements" is false.

### B. Collectively, the 52 challenged statements do not support Colborn's new, implied libel theory; regardless, he has not proved the alleged implication false.

Instead of explaining why he believes each of the 52 items is materially false, Colborn asserts in sweeping terms that they "collectively imply or insinuate that Plaintiff or a group of law enforcement officers that included him planted evidence to frame Steven Avery for murder." MPSJ at 2; *see also id.* at 15. And he claims that implication is false. His "proof"? He says he

didn't do it. There are many problems with this argument, beyond the fact that Colborn did not actually plead a defamation by implication claim in any of the three iterations of his complaint.

First, as the Appendix demonstrates, the vast majority of the 52 "statements" simply do not say what Colborn claims—that Colborn planted evidence. For example, Statements 3-29 and 38 cannot be reasonably interpreted as accusing Colborn of planting evidence in the Halbach case because they are exclusively about the "jail call" he received in or around 1995, the misconduct surrounding Avery's wrongful conviction in 1985, and Avery's post-exoneration civil rights lawsuit. At most, these statements go to the possibility that Colborn had a *motive* to frame Avery, which is true. In allowing Avery to accuse Colborn (and just one other officer, James Lenk) of evidence planting as part of Avery's defense for Halbach's murder, Judge Patrick Willis found as matter of law that Colborn did indeed have such a motive. *See* Dkt. 279, Ex. 3 (CHRM034924) at 034925; Dkt. 120-24 at 3. Regardless, a statement that a person has a motive to commit wrongdoing is not a statement accusing that person of actually committing wrongdoing.

Second, Colborn does not address his burden to show that, considering the documentary in full and the challenged statements in context, MaM actually conveyed to a reasonable viewer that, *as matter of incontrovertible fact*, Colborn planted evidence to frame Avery for Halbach's murder or conspired to do so. *See, e.g.*, *Woods*, 791 F.2d at 487; *Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶23, 351 Wis. 2d 479, 504, 840 N.W.2d 255, 266. MaM does not make any such assertion. It simply reflects the fact that such allegations were made by Avery and his defense counsel, then reiterated by his relatives and supporters, in the controversial Halbach

murder case. *See, e.g.*, *Fin. Fiduciaries*, 46 F.4th at 666; *Glob. Relief Found. v. N.Y. Times Co.*, 390 F.3d 973, 987 (7th Cir. 2004).[3]

Third, to prove defamation by implication, Colborn has to prove by clear and convincing evidence that Netflix *intended* for viewers to understand MaM to be asserting, as incontrovertible fact, that Colborn planted or conspired to plant evidence, or at least *knew* that reasonable viewers might interpret MaM as making such a factual assertion. *Saenz*, 841 F.2d at 1318; *Woods*, 791 F.2d at 487. Colborn does not even attempt to point to evidence that would support such a conclusion by any standard, let alone the clear and convincing standard, dooming his motion on this issue to failure. *Hotel 71*, 778 F.3d at 601. Nor could he. *See* Dkt. 271 ¶ 121; Dkt. 272 ¶ 10; Dkt. 275 ¶ 18; *see also Saenz*, 841 F.2d at 1318-19 (fact that alleged defamatory implication was reasonable did not overcome defendants' "uncontradicted affidavits" they were unaware of such implication).

Fourth, even if Colborn could somehow establish the implication he alleges (he cannot), he cannot meet his burden to prove falsity. *See Masson*, 501 U.S. at 516-17. In other words, if the crux of Colborn's lawsuit and his MPSJ is that MaM accuses him of planting evidence to frame Avery, then he has the burden to prove that he did *not* plant evidence to prevail on

---

[3] This body of law causes the foundation upon which Colborn's entire case is built—an overly simplistic summary of the republication doctrine—to crumble. This doctrine does not override the fact that courts evaluating whether statements are actionable must consider the full context in which they are published. *Bd. of Forensic Document Exam'rs*, 922 F.3d at 832 ("Context is key, as it matters not only what was said, but who said it, where it was said, and the broader setting of the challenged statements."). The Seventh Circuit has repeatedly held that reports presenting conflicting allegations *as allegations*, not fact—particularly in publications involving government activities such as investigations or court proceedings—are not actionable under the republication theory. *Fin. Fiduciaries*, 46 F.4th at 666; *Glob. Relief*, 390 F.3d at 987 (holding news media could report on government investigation without having to prove the truth of the allegations being investigated). Colborn's own brief acknowledges that the republication doctrine applies most often to unsubstantiated "rumors," MPSJ at 5—a far cry from the public trial and surrounding controversy that was the subject of MaM.

summary judgment on the issue of falsity. But the *only* evidence Colborn points to on the issue of falsity is his own testimony at Avery's murder trial that he did not plant evidence. MSPJ at 15. This is no more than what he did in the SAC. *See* SAC ¶ 13. This is insufficient to show MaM communicated a false statement of fact about him, particularly because MaM *included* Colborn's testimony denying he planted evidence. A plaintiff's self-serving testimony, standing alone, cannot entitle him to summary judgment on an issue where he has the burden of proof. *Aungst v. Westinghouse Elec. Corp.,* 937 F.2d 1216, 1221 (7th Cir. 1991); *see also Res. Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992) (summary judgment movant bearing burden of proof must show evidence "is so one-sided that they must prevail as a matter of law") (cleaned up).[4] If such evidence were sufficient, *every* defamation plaintiff would be entitled to summary judgment on the issue of material falsity because plaintiffs *always* deny that the thing defendants said about them is true—they must say that in order to state a claim. Yet plaintiffs rarely succeed in such efforts; Colborn has not cited a single case where a plaintiff established falsity as a matter of law.

Contrary to Colborn's false contentions, MPSJ at 16, Netflix does not have to affirmatively show that Colborn planted evidence to defeat his motion. In fact, Netflix does not

---

[4] Moreover, Colborn's view that he should be believed simply because he testified under oath as a sworn law enforcement officer, Netflix's Additional Proposed Findings of Fact ("APFOF") ¶¶ 7-8, reveals a degree of naiveté, if not entitlement. As current events have shown all too clearly and tragically, it is a fact that even sworn law enforcement officers sometimes engage in serious misconduct, including perjury. *See* Christopher Slobogin, *Testilying: Police Perjury and What to Do About It*, 67 U. Colo. L. Rev. 1037, 1040-41 (1996) ("Although both lying to convict the innocent and lying to convict the guilty [both] deserve condemnation, . . . the latter . . . is more resistant to change and the more prevalent. . . . [Lying to convict the guilty] is so common and so accepted in some jurisdictions that the police themselves have come up with a name for it: 'testilying.'"); Radley Balko, *How do we fix the police 'testilying' problem?* THE WASHINGTON POST (Apr. 16, 2014), *available at* https://perma.cc/83MD-S229 (describing various ways rules of criminal procedure encourage police to commit perjury to secure conviction, and difficulties inherent in trying to fix these incentives).

even have to point to contradictory facts in the record because "[a] party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance." *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325-26 (1986)). Because Colborn has failed to meet his burden to provide evidence that any of the challenged statements or alleged implications are false or otherwise actionable, his MPSJ must be denied.

### III. Colborn Cannot Prove Netflix Distributed MaM With Actual Malice

Even if Colborn had set forth the standards he must meet to prevail on actual malice at the summary judgment stage, his MPSJ would still be inadequate. Colborn's actual malice argument fails for two reasons.

First, as explained *supra*, Colborn has failed to carry his burden to prove the statements he puts at issue and the implications he alleges are false. There can be no knowledge of falsity where a statement is not false. *E.g.*, *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964) (to recover for defamation, public official must first prove statement at issue was false).

Second, Colborn does not address how the limited evidence he cites would support what he must clearly and convincingly prove: that Netflix knew the specific challenged statements and alleged implications were false or had a high degree of awareness they were probably false. *Id.*; *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Harris*, 48 F.3d at 252; *Torgerson*, 210 Wis. 2d at 534-35. To the contrary, not once in his MPSJ does Colborn assert—with or without evidence—that Netflix or any other Defendant knew or had any awareness that anything in MaM about Colborn was probably false. This failure alone dooms Colborn's MPSJ on the issue of actual malice. *Hotel 71*, 778 F.3d at 602.

Instead, Colborn relies on a preposterous mischaracterization of a seminal case—*St. Amant*—as the cornerstone of his entire actual malice argument. Colborn asserts that *St. Amant* stands for the proposition that actual malice can be shown by reliance on "sources that are unverified or anonymous," MPSJ at 5, and that "actual malice can be found as a matter of law under the standard articulated in *St. Amant* because of the evident inherent biases of the sources." MPSJ at 13. That is not what the Supreme Court said in that case, and Colborn's gross mischaracterization is the opposite of the law.

Actual malice may be found, the Supreme Court said, "where a story is fabricated by the defendant, is the product of his imagination, or is based *wholly* on an unverified anonymous telephone call." 390 U.S. at 732 (emphasis added). The Court did *not* say that quoting biased sources was evidence of actual malice, and it is well settled that bias—whether by the publisher or their sources—is insufficient. *See, e.g.*, *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) (speakers' strongly negative feelings about plaintiff were not proof of actual malice); *Storms v. Action Wis. Inc.*, 2008 WI 56, ¶¶66-68, 309 Wis. 2d 704, 732-33, 750 N.W.2d 739, 753-54 (allegations that speaker was an ideological opponent of plaintiff who published statements to further a political agenda did not show actual malice); *see also Fairfax v. CBS*, 2 F.4th 286, 294 (4th Cir. 2021) ("self-interest and politics motivate many news sources; if dealing with such persons were to constitute evidence of actual malice, much newsgathering would be severely chilled." (cleaned up)).

The purported evidence of actual malice that Colborn does cite—notes by Netflix employees and one of the filmmakers—do not even hint at any knowledge or awareness of any false statements of fact about Colborn. Many of the referenced notes undermine Colborn's argument. And most have nothing to do with the challenged "statements" at all. The notes

13

mention only one of the "statements" Colborn challenges while alluding to another. Neither shows that any change was made to the statements' content or placement within MaM as a result of Netflix's suggestions.

Colborn points to a note from Netflix that mentions what he has labeled as Statement 4: a statement by Avery's cousin Kim Ducat that she felt Manitowoc County was "not done" with Avery when he was released from prison in 2003. MPSJ at 13. Colborn falsely asserts that the note suggested the filmmakers use Ducat's quote "to impart 'a more explicit ending to [an early episode] that makes it clear that in the next episode the cops are going to seek revenge.'" MPSJ at 13 (quoting NFXCOL0001978). But the note does not suggest using the Ducat quote that way, or even changing its placement within the episode. *See* Dkt. 286 Ex. 9 at NFXCOL0001978. It simply states that Ducat's quote is near the beginning of the working version of Episode 1, where it remained in the final version distributed by Netflix. *Id.* ("Cousin says: 'Be careful . . . They aren't even close to being done with you.'"); *see also* Ep. 1 at 1:26-1:42. Meanwhile, the suggestion that "the cops are going to seek revenge"—which is nothing more than a summary of Avery's allegations at his murder trial—in no way indicates that the author knew or suspected that was a false statement of fact. In the cited portion of Lisa Nishimura's deposition testimony, she merely states that the document does appear to be a set of notes Netflix transmitted to the filmmakers; Nishimura specifically says she did not author the document but that she probably contributed to it. Dkt. 286 Ex. 8.

Colborn also refers to a statement in one of the notes that it "seems very thin that Colburn [sic] not having specific knowledge about who called him would be the key to the case," referring to the jail call Colborn received in or around 1995. MPSJ at 14. Colborn implies that this note somehow contradicts Statement 25 by one of Avery's civil lawyers, Stephen Glynn, that

the Manitowoc County Sheriff's Office's failure to follow up on the jail call was "as close to a conspiracy of silence as I think you could find in a case."[5] However, setting aside that Glynn's statement is a non-actionable opinion, the note is simply an observation about the significance of the jail call; it is not about its truth or falsity. No one disputes that the call occurred or that it played a central role in both Avery's civil lawsuit for wrongful imprisonment and his trial for Halbach's murder, least of all Colborn, who has testified about it repeatedly.

Beyond these two examples, there is otherwise a complete mismatch between the 52 items that are the subject of Colborn's motion and the "evidence" of actual malice he says he has. Without any evidence supporting his position, Colborn resorts to more false characterizations of the notes.

For example, Colborn cobbles together isolated phrases from two different sets of notes to assert that Netflix had some "preconceived law enforcement conspiracy narrative." MPSJ at 13. He cites a note that suggests providing theme music for "the baddies"—but the note explicitly names the "baddies," *and none of them is Colborn*. *Id.*; *see also* Dkt. 286 Ex. 9 at NFXCOL0002009. Similarly, the note Colborn cites that suggests using "bad guy theme" music in a specific scene names four people in that scene—and again, Colborn is not one of them. *Id.* at NFXCOL0002037. The suggestion from an entirely different set of notes that the documentary should have a "thriller atmospheric score" does not refer to Colborn and says nothing about truth or falsity. *Id.* None of this has anything whatsoever to do with actual malice. As a matter of

---

[5] Colborn's new contention that comments by Glynn imply a wide-ranging law enforcement conspiracy is not only several steps removed from the alleged implication that Colborn planted evidence against Avery years later, it is a dramatic departure from the SAC's focus on the notion that Glynn falsely stated that Colborn's 2003 report about the call had been kept in the sheriff's safe. *See* SAC ¶¶ 28-29. As Netflix noted in its own summary judgment papers, Colborn has now admitted that he knew all along that his report was kept in the sheriff's safe because the sheriff told Colborn that's where he put it. Dkt. 270 ¶ 2.

common sense and Wisconsin law, music does not make assertions of verifiable fact or render true statements false. *See Terry*, 2013 WI App 130, ¶ 25, 351 Wis. 2d at 506, 840 N.W.2d at 267 (television report's use of "scary music" was not a statement of fact).

Colborn says that another note shows "Defendants" "were actively looking for opportunities to use source material in such a way to 'allude to the fact that [cops] may have planted something . . .'" MPSJ at 13 (citing NFXCOL0001940). That document—a page of notes from a larger 2014 memo regarding Episodes 1 through 4—actually states, "Is there anything we can use/show to clarify whether or not the cops had a warrant to search his property and allude to the fact that they may have planted something when they were there without permission?" This note shows the *opposite* of actual malice. Here again, a Netflix employee was referring to *Avery's allegations at trial* of evidence planting. The Netflix employee sought additional factual information to clarify for viewers whether the searches that Avery contended were tainted had been conducted under a lawful warrant. In stating that officers "*may* have planted something," this note does not draw any conclusion as to whether that defense was factual or not, just like MaM itself does not draw any such conclusion.

Colborn also points out that Netflix "endorsed using Avery's father's statement, 'They framed an innocent man just like they did 20 years ago' as a 'cliffhanger'" to Episode 2. MPSJ at 13 (citing NFXCOL0001981). Whether a statement should serve as a "cliffhanger" is not legally significant. Regardless, in the final version of MaM, that statement is *not* used as a cliffhanger at the end of Episode 2 or any other episode; Allan Avery's quote is included at 13:49-14:04 of Episode 3. Not only does this note fail to show any knowledge of falsity, it also illustrates that Netflix's notes were merely suggestions that did not necessarily result in any changes to the finished series. *See* Dkt. 271 ¶¶ 91, 93, 97, 101, 119.

The MPSJ also refers to notes that Colborn says show a desire to portray Avery in a positive light. MPSJ at 14. They are irrelevant to the issue of actual malice, because they are not about Colborn and thus cannot indicate anything about whether anyone knew or suspected anything about Colborn was false.

Finally, the motion refers to an email from filmmaker Moira Demos (that was not sent to any member of the Netflix team responsible for MaM) about images used in the "trailer" advertisement for the series. MPSJ at 14. The trailer is not at issue in this case. Colborn has never mentioned it in any of his pleadings, and does not include it in his 52 challenged statements. This email has no probative value here (and has nothing to do with truth or falsity in any event).

The MPSJ simply does not identify any evidence in the record from which a reasonable jury could find that Netflix distributed MaM with knowledge or awareness that it contained falsehoods about Colborn—much less by clear and convincing evidence.

## IV.     If Accepted, Colborn's Arguments Would, Upend More Than A Century of Settled Defamation Law

Colborn's fundamental misrepresentations about the First Amendment and defamation law are so jarring, it is worth reflecting on what it would mean to accept them.

Under Colborn's theory, because he denied planting evidence during his trial testimony, and because the jury convicted Avery, that's the end of the story. *See* APFOF ¶¶ 7-8. The verdict vindicated him and marked the moment the public was no longer permitted to debate Avery's guilt, law enforcement's conduct, or the possibility that a miscarriage of justice had occurred.

In other words, under Colborn's theory, MaM could not be safely released to the public unless and until Avery's post-conviction appellate attorney Kathleen Zellner actually succeeds in exonerating him. It would mean that no one could safely have debated whether Avery was

17
Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 17 of 20   Document 307

wrongly convicted in 1985, or accused the public officials involved in that conviction of misconduct or incompetence until Avery's exoneration.

But, of course, documentaries consider issues like this all the time without concern for liability. As one example, consider the "Serial" podcast, https://serialpodcast.org/, which highlighted questions and inconsistencies in the conviction of Adnan Syed. That podcast was released while Syed sat in prison for a 1999 killing, and questions about the verdict the podcast explored resulted in Syed's vacated conviction in September—at the prosecution's request—for law enforcement and prosecutorial misconduct. *See State of Maryland v. Adnan Syed*, Case Nos. 19910342, -043, -044, -045, -046, Mot. to Vacate (Sept. 15, 2022), *available at* https://www.documentcloud.org/documents/22414745-adnan_syed_motion. Prosecutors recently dropped all charges against Syed, declining to retry him. *See* Amanda Holpuch, *Baltimore Prosecutors Drop Charges Against Adnan Syed*, THE NEW YORK TIMES (Oct. 11, 2022), https://www.nytimes.com/2022/10/11/us/adnan-syed-charges-dropped.html. Under Colborn's theory, however, publication of the podcast prior to Syed's release would have been "false" and "defamatory," leading to the absurd result that no publisher could, without fear of liability, uncover and report on potential miscarriages of justice when such investigative reporting matters most—while a defendant sits in prison, deprived of his liberty.

Closer to home, it would mean that because Kyle Rittenhouse was acquitted, publication of photos like this, which merely reflect one side of a raging debate on a matter of intense public interest and concern, are somehow defamatory:

18

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 18 of 20   Document 307



*Credit: Washington Post*

This cannot be the law. And fortunately, it is not, due to the overlapping common law and constitutional doctrines discussed above. As the Seventh Circuit observed recently, the Wisconsin Supreme Court has long recognized the value to the legal system of reports about controversial cases, holding that the public

> needs to kn[ow] what its court does, and, since this cannot be intelligibly reported without stating the charges and issues upon which the court's action is based, the latter may be reported also, although as an incidental result the fact of defamatory charges against some individual becomes public to his injury.

*Fin. Fiduciaries*, 46 F.4th at 666 (quoting *Ilsley v. Sentinel Co.*, 113 N.W. 425, 426 (Wis. 1907)).

Colborn, in essence, asks this Court to rewrite more than a century of Wisconsin defamation law to prohibit public discussion of allegations made by the losing side in a contested court proceeding. The public would be the loser should he prevail.

## **CONCLUSION**

For all of the foregoing reasons, Netflix respectfully requests that this Court deny Plaintiff's Motion for Partial Summary Judgment.

Dated: November 4, 2022	Respectfully submitted,

*s/ Leita Walker*
Leita Walker
Isabella Salomão Nascimento
Ballard Spahr LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
T: (612) 371-6222
F: (612) 371-3207
walkerl@ballardspahr.com
salamaonascimentoi@ballardspahr.com

Matthew E. Kelley
Emmy Parsons
Ballard Spahr LLP
1909 K Street, NW, Suite 1200
Washington, D.C. 20006-1157
T: (202) 508-1112
F: (202) 661-2299
kelleym@ballardspahr.com
parsonse@ballardspahr.com

James A. Friedman
Godfrey & Kahn, S.C.
One East Main Street
Suite 500
Madison, WI 53703-3300
T: (608) 284-2617
F. (608) 257-0609
jfriedman@gklaw.com

*Counsel for Netflix, Inc.*