# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

ANDREW L. COLBORN,

    **Plaintiff,**

  **vs.**

NETFLIX, INC.; CHROME MEDIA
LLC, F/K/A SYNTHESIS FILMS, LLC;
LAURA RICCIARDI; AND MOIRA
DEMOS,

    **Defendants.**

Civil No.: 19-CV-484-BHL

---

### DEFENDANT NETFLIX, INC.'S RESPONSE TO
### PLAINTIFF ANDREW COLBORN'S PROPOSED FINDINGS OF FACT AND
### NETFLIX'S ADDITIONAL PROPOSED FINDINGS OF FACT

Pursuant to Civil Local Rule 56(b)(2)(B), Defendant Netflix, Inc. ("Netflix"), by and

through undersigned counsel, for its Response to Plaintiff Andrew Colborn's Proposed Findings

of Fact and Netflix's Additional Proposed Findings of Fact, states as follows:

### GENERAL OBJECTIONS

The vast majority of Plaintiff Andrew Colborn's 78 Proposed Findings of Fact are

challenged "statements" from *Making a Murderer* ("MaM")—52 in all—that he contends, taken

"individually or collectively," imply or insinuate that (1) Steven Avery was wrongly convicted of

the murder of Teresa Halbach; (2) that Manitowoc County law enforcement officers framed

Avery for Halbach's murder; and (3) that Colborn was a key participant in that conspiracy to

frame Avery. *See* Dkt. 287 ¶¶ 3-57. All of the statements have been removed from their broader

context. Many of them have nothing at all to do with the investigation of Halbach's murder or

Avery's allegations that Colborn planted evidence to frame him for it. In that sense, they are wholly immaterial to Colborn's implied libel theory. In any event, Colborn does not actually ask the Court to find that any of the 52 statements, standing alone, is materially false or defamatory, much less cite evidence that would support such a finding. In fact, many of the statements are not about him, do not constitute verifiable statements of fact, and/or are substantially true. Others do nothing more than repeat allegations made in open court. Rather than burden the Court with lengthy, repetitive responses to each enumerated statement, Netflix here explains the various and overlapping reasons the statements are not actionable and are otherwise immaterial to Colborn's partial motion for summary judgment and his newfound implied libel theory.

1.      ***First***, in both his proposed facts and his motion for partial summary judgment, Colborn fails to analyze the challenged statements in the context of the whole documentary series, as required under the law. *See Bd. of Forensic Document Exam'rs, Inc. v. ABA*, 922 F.3d 827, 832 (7th Cir. 2019); *Mach v. Allison*, 2003 WI App 11, 31, 259 Wis. 2d 686, 712, 656 N.W.2d 766, 778. The documentary speaks for itself, the Court must review the challenged statements in the context of the entire 10-hour series, and Netflix objects to Colborn's descriptions and characterizations of the content of MaM.

2.      ***Second***, Colborn fails to explain the materiality of any of the challenged statements he enumerates as proposed facts. A fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Forty-eight of the 52 statements Colborn challenges are so subsidiary or peripheral to his claims that Colborn did not even bother to mention them in the body of the Second Amended Complaint ("SAC"), relegating them instead to Exhibit A and failing (even now) to explain how they are false or defamatory, despite his burden to do so. What's more, proposed

fact Nos. 3-29 and 38 cannot be reasonably interpreted as accusing Colborn of planting evidence in the Halbach case or otherwise defaming him because they are exclusively about the "jail call" he received in or around 1995, the misconduct surrounding Avery's wrongful conviction in 1985, and Avery's post-exoneration civil rights lawsuit. At most, these statements imply Colborn may have been motivated to plant evidence and ensure Avery's conviction, but that implication is substantially true: in the run-up to Avery's trial, the Honorable Judge Patrick Willis found that Colborn had such motive. *See* Dkt. 271 ¶ 14. Accordingly, Netflix disputes the materiality of the 52 challenged statements, in particular those not properly pleaded in the SAC and those that, on their face, have nothing to do with Colborn's implied libel theory.

3. ***Third***, although a defamation plaintiff can only recover for statements that are "of and concerning" him, *see Barlass v. City of Janesville*, No. 10-cv-454-slc, 2011 U.S. Dist. LEXIS 165826, at *36 (W.D. Wis. Nov. 28, 2011), Colborn has challenged many statements that are clearly about individuals other than him, and he does not explain how these statements purport to defame him. For example, proposed fact No. 3 is a quotation of Avery that "[t]hey had the evidence back then that I didn't do it. But nobody said anything." The surrounding context makes clear that Avery is talking about law enforcement involved in investigating and convicting him for the 1985 rape of Penny Beerntsen. This statement cannot possibly be about Colborn because he did not work for the Manitowoc County Sheriff's Office at the time that Avery was wrongly convicted of rape. *See* SAC ¶ 9. This proposed fact and others like it are not material.

4. ***Fourth***, Colborn disregards that only statements of verifiable fact, and not opinion or hyperbole, can be false. Further, "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *See Haynes v. Alfred*

*A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993). Many of the challenged statements, including, for example, Proposed Fact No. 49 (which Colborn misleadingly truncates), are not actionable for this reason. This proposed fact and others like it are not material.

5.    ***Fifth***, to the extent any of the 52 challenged statements can be construed as a verifiable statement of fact, Colborn has not presented any evidence that any portion of the statements is materially false, a burden which is entirely his. *Torgenson v. Journal/Sentinel Inc.*, 210 Wis. 2d 524, 543 n.18 (1997); *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991). To the contrary, a substantial majority of the statements are demonstrably and substantially true. By way of example, in proposed fact No. 12, Colborn puts at issue a graphic included in Episode 2 of MaM, which depicts that in "1995 ● Gregory Allen is arrested for sexual assault in Brown County / Andrew Colborn receives call about inmate confession." Every component of that statement is true: In 1995, Allen was in custody in Brown County, *see* Ex. 11 (Dkt. 120-11) at 3 (005028). At or around that time, Colborn received a call about an inmate confession, *see* Dkt. 271 ¶¶ 4, 5. And Allen, not Avery, raped Beerntsen. *See* Dkt. 269 at 4. Other examples abound and none of these proposed facts are material.

6.    Finally, and separate and apart from the 52 challenged statements, Colborn contends in proposed fact Nos. 62-69 that he received voicemail messages from anonymous callers, but he fails to explain their relevance or materiality in either his proposed findings of fact *or* his summary judgment briefing. In fact, they are completely immaterial—*i.e.*, they cannot impact the outcome of his motion. *See Liberty Lobby*, 477 U.S. at 248. Moreover, these proposed facts are inadmissible in a defamation action, as Colborn has made no effort to authenticate the recordings, which are irrelevant and hearsay, at least to the extent offered to prove the truth of what the callers said regarding their opinions of Colborn. Courts across the country have soundly

rejected litigants' attempts to prove defamation by relying on anonymous comments.[1] Further, as

Colborn himself conceded at his deposition, any individuals who called him and left anonymous

voicemails are not representative of the reasonable viewer and many may not have even watched

MaM—he does not know unless they expressly said so in their voicemail message. *See* Dkt. 271

¶ 128. Netflix accordingly disputes each and every one of these proposed facts, and objects to the

Court's consideration thereof.

### NETFLIX'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

1.      Defendants published the 10-part series "Making a Murderer." Netflix, Inc., Answer, Dkt #181, p. 5, ¶15; Barker Decl., Ex. 1, Demos Tr. at pp. 94-95, 103.

**Netflix Response**: Undisputed, as the parties have already stipulated to this fact. *See* Dkt.

270 ¶ 1.

2.      The following statements, made by the identified individuals, are contained in MAM where or approximately where indicated, together with graphics, images and video as described below. (Declaration of Matthew Kelley, previously filed in this action as Dkt #120 at pp. 1-3, ¶¶ 2-11; specific references are cited below).

**Netflix Response**: Undisputed that certain individuals are quoted in MaM at or around

the indicated time stamps, *but see* General Objection No. 1.

3.      Steven Avery voiceover: "They had the evidence back then that I didn't do it. But nobody said anything . . . ." Ep. 1 (Dkt. 120-1) at 4:35-4:45.

**Netflix Response**: Undisputed that this quotation of Avery is included at or around the

indicated time stamp, *but see* General Objection Nos. 1-5.

4.      Kim Ducat (Avery relative) states on camera: "They weren't just gonna let Stevie out. They weren't gonna hand that man 36 million dollars. They weren't gonna be made a laughing stock, that's for sure. They just weren't gonna do all that. And something in my gut said they're not done with him. Something's gonna happen. They're not handing that kind of money over to Steven Avery." Ep. 1 (Dkt. 120-1) at 1:01:19-1:01:42.

**Netflix Response**: Undisputed that this quotation of Kim Ducat is included at or around the indicated time stamp, *but see* General Objection Nos. 1-5.

5.  Photos of Plaintiff and others are shown during Kim Ducat's statement. Ep. 1 (Dkt. 120-1) at 1:01:29-1:01:44; *id*. at 1:01:33 (photograph).

**Netflix Response**: Disputed that this is a statement. Undisputed that MaM shows a video clip (without audio) of Colborn's deposition in Avery's civil lawsuit against Manitowoc County at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 5.

6.  Steve Glynn, identified as Avery's counsel in the civil case against Manitowoc County, states, "The day of or on the day after Steven's release, law enforcement officers in Manitowoc are writing memos to describe activity that had occurred almost ten years earlier. They don't do that unless they feel threatened." Ep. 2 (Dkt. 120-2) at 49:22-49:39.

**Netflix Response**: Disputed. This quotation of Glynn is not included in Episode 2—it is included in Episode 1. *Compare* Ep. 1 (Dkt. 120-1) at 49:22-49:39 (Glynn's statement) *with* Ep. 2 (Dkt. 120-2) at 49:22-49:39 (clip of interrogation of Avery). *See also* General Objection Nos. 1-2, 4-5.

7.  Steve Glynn states, "We learned during litigation something that we had absolutely no knowledge of before the lawsuit got started. That 1995 was a very, very significant point in this thing." Ep. 2 (Dkt. 120-2) at 17:20-17:34.

**Netflix Response**: Undisputed that this quotation of Glynn is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

8.  Video deposition of Mr. Colborn is shown in the background with Steve Glynn voice over (image of Mr. Colborn). Ep. 2 (Dkt. 120-2) at 17:34-17:43.

**Netflix Response**: Disputed that this is a statement. Undisputed that MaM shows a video clip (without audio) of Colborn's deposition in Avery's civil lawsuit against Manitowoc County at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 5.

9.  Steve Glynn continues, "And that there is not only something to this idea that law enforcement had information about somebody else, but there is serious meat on those bones, I mean serious meat. What we learn is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department [image of Mr.

Colborn's report is shown in background] from another law enforcement agency . . . saying that they had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison." Ep. 2 (Dkt. 120-2) at 17:37-18:24.

**Netflix Response**: Undisputed that this quotation of Glynn is included at or around the

indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

10.     Video footage of Mr. Colborn's testimony in civil case in response to questioning by Glynn. Ep. 2 (Dkt. 120-2) at 18:28-19:04.

**Netflix Response**: Undisputed that MaM shows a video clip of Colborn's deposition in

Avery's civil lawsuit against Manitowoc County at or around the indicated time stamp, *but see*

General Objection Nos. 1-2, 5.

11.     Steve Glynn continues, "Manitowoc doesn't have huge numbers of major assaults where people go to prison and certainly where people would still be in prison. There is a very distinct possibility, I would say likelihood, that it's Gregory Allen. It's the Brown County Sheriff's Department that is in 1995 on the Gregory Allen case, that Gregory Allen has said something about Steven Avery, and at a minimum, somebody ought to check this out." Ep. 2 (Dkt. 120-2) at 19:05-19:41.

**Netflix Response**: Undisputed that this quotation of Glynn is included at or around the

indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

12.     Graphic shown during a cutaway from Glynn's interview, while Glynn is still speaking, shows, "1995 ● Gregory Allen is arrested for sexual assault in Brown County / Andrew Colborn receives call about inmate confession." Ep. 2 (Dkt. 120-2) at 19:24-19:41.

**Netflix Response**: Undisputed that MaM includes a graphic at or around the indicated

time stamp, *but see* General Objection Nos. 1-2, 5.

13.     Cuts to video of Mr. Colborn's deposition testimony in Avery's civil case, with the following exchange:

Glynn: "I mean that's a significant event.

Mr. Colborn: Right, that's what stood out in my mind."

Ep. 2 (Dkt. 120-2) at 19:41-19:47.

**Netflix Response**: Undisputed that MaM shows a video clip of Colborn's deposition in Avery's civil lawsuit against Manitowoc County at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

14.     Returns to interview with Glynn, who says, "The fellow who got that call was a guy named Colborn. And you might say that there should be a record of him immediately making a report on this, there might be a record of his immediately contacting a supervising officer, there might be a record of him contacting a detective who handles sexual assault cases, ahh, there might be some record of it. But if you thought any of those things, you'd be wrong, because there isn't any record in 1995, 1996, 1997, 1998, 2000, 2001, 2002, 2003 . . . ." Ep. 2 (Dkt. 120-2) at 19:47-20:26.

**Netflix Response**: Undisputed that this quotation of Glynn is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

15.     Visual cuts to graphic with years running from a timeline image with Mr. Colborn's photograph above it, and a statement after the year "2003" that states, 'DNA evidence exonerates Steven Avery." Ep. 2 (Dkt. 120-2) at 20:14-20:25.

**Netflix Response**: Disputed that this graphic appears at the indicated time stamp—it appears from 20:26-20:34. Disputed that Colborn's photograph is the only one in the graphic; other individuals also are pictured. *See also* General Objection Nos. 1-2, 5.

16.     Glynn continues, "Now 2003 is a year that has meaning because that's when Steven Avery got out. And the day he got out, or the day after, that's when Colborn decides to contact his superior officer, named Lenk. And Lenk tells him to write a report. And they then go have contact with t the Sheriff. Now, let's just stop and think about that for a minute. Why does that happen, why does it happen then, when it didn't happen eight years earlier? Um, ahh, I mean, I think I know the answer. I think the answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk as his superior realized it, and the Sheriff realized it." Ep. 2 (Dkt. 120-2) at 20:26-21:14.

**Netflix Response**: Undisputed that this quotation of Glynn is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

17.     Images of Mr. Colborn, James Lenk, and the Sheriff are shown. Ep. 2 (Dkt. 120-2) at 21:08-21:12.

**Netflix Response**: Disputed that this is a statement. Undisputed that MaM shows a video clip (without audio) of Colborn's deposition in Avery's civil lawsuit against Manitowoc County at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 5.

18. Glynn continues, "So Lenk tells Colborn to write a report, the Sheriff tells Lenk, 'Get me the report.' The Sheriff puts the report in a safe. That's how much he cares about documenting this thing. Well obviously it doesn't do anybody, it certainly doesn't do Steven Avery any good to document that eight years after the fact, because Steve Avery has been sitting in a cage for those eight years." Ep. 2 (Dkt. 120-2) at 21:12-21:39.

**Netflix Response**: Undisputed that this quotation of Glynn is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

19. Footage of James Lenk and Sheriff Peterson being questioned by Glynn in depositions at Avery's civil trial that includes Glynn getting Lenk to say that Mr. Colborn "wasn't sure" who told him that the rape in question was already solved and that the right person was arrested, and that includes a close-up of Mr. Colborn's signature identified on an exhibit. Ep. 2 (Dkt. 120-2) at 21:48-22:52.

**Netflix Response**: Undisputed that MaM shows video clips of the depositions of Lenk and Petersen in Avery's civil lawsuit against Manitowoc County at or around the indicated time stamp, *but see* General Objection Nos. 1-5. Undisputed that MaM includes a close-up of Colborn's signature on a copy of his 2003 statement about the jail call, but disputed that this is a statement. *See also* General Objection Nos. 1-2, 5.

20. Avery voiceover stating, "A lot of people told me to watch my back. Most of the time, I didn't even believe them. But then, sitting and doing depositions, I don't know. It kind of changed my mind. They were covering something up." Ep. 2 (Dkt. 120-2) at 22:55-23:14.

**Netflix Response**: Undisputed that this quotation of Avery is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

21. Image with close-up of Mr. Colborn's signature. Ep. 2 (Dkt. 120-2) at 22:45-22:50.

**Netflix Response**: Disputed that this is a statement. Undisputed that MaM includes a close-up of Colborn's signature on a copy of his 2003 statement about the jail call at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 5.

22.     Avery continues, "And they were still covering something up. Even with the sheriff's who's on there now – he's covering something up." Ep. 2 (Dkt. 120-2) at 23:14-23:26.

**Netflix Response**: Undisputed that this quotation of Avery is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

23.     Cuts to footage of Mr. Colborn's videotaped deposition. Ep. 2 (Dkt. 120-2) at 23:28-23:50.

**Netflix Response**: Undisputed that MaM shows a video clip of Colborn's deposition in Avery's civil lawsuit against Manitowoc County at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 5.

24.     Video image of Mr. Colborn. Ep. 2 (Dkt. 120-2) at 26:52-26:56.

**Netflix Response**: Disputed that this is a statement. Undisputed that MaM shows a video clip of Colborn's deposition in Avery's civil lawsuit against Manitowoc County at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 5.

25.     Steve Glynn is shown, asserting, "This was an unconscionable withholding of information that would have been of use to Steven Avery's lawyers . . . If that information had come to light in 1995, Steven Avery would have gotten out in 1995. So they cost Steve Avery eight years of his life. This is as close to a conspiracy of silence as I think you could find in a case." Ep. 2 (Dkt. 120-2) at 26:56-27:33.

**Netflix Response**: Undisputed that this partial quotation of Glynn is included at or around the indicated time stamp. Disputed that this is Glynn's entire statement. *See also* General Objection Nos. 1-2, 4-5.

26.     Rotating footage of Mr. Colborn and other alleged conspirators is shown. Ep. 2 (Dkt. 120-2) at 28:24-29:07.

**Netflix Response**: Disputed that this is a statement. Undisputed that MaM shows video clips (without audio) of the depositions of Colborn, Lenk, Petersen, Mark Rohrer, Sandra Morris, Judy Dvorak, and Eugene Kuche at the indicated time stamp, but disputed that MaM identifies the people shown as "alleged conspirators." *See also* General Objection Nos. 1-2, 5.

27.     Walt Kelly, also identified as an Avery attorney, states, "October of 2005, from the perspective of the Manitowoc County government and their defense lawyers, I believe they all knew they were in the most serious kind of trouble. There was a very grave prospect of a very, very substantial verdict. [Their] insurers have taken the position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the Sheriff and the DA, would be on the hook for those damages in the civil suit." Ep. 2 (Dkt. 120-2) at 28:35-29:37.

**Netflix Response**: Disputed as incomplete. Undisputed that this partial quotation of Walter Kelly is included at or around the indicated time stamp, but Colborn omits any indication that he has truncated it. The complete quotation is,

> October of 2005, from the perspective of the Manitowoc County government and their defense lawyers, I believe they all knew they were in the most serious kind of trouble. There was a very grave prospect of a very, very substantial verdict. Manitowoc County and the sheriff and the district attorney are arguably covered by insurance policies and there's a good half dozen insurance policies. However, the insurers have taken the position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the Sheriff and the DA, would be on the hook for those damages in the civil suit.

*See* Ep. 2 (Dkt. 120-2) at 28:35-29:37. *See also* General Objection Nos. 1-5.

28.     Glynn continues, "We don't need to have somebody tell us that this is going to have an effect on law enforcement. Of course it has an effect on law enforcement. Are you kidding me? I mean law enforcement officers get uptight there is even a suggestion that they have said something wrong in a courtroom. Imagine what it's like when you're going to say that you're a liar, and that you hid evidence, and that you deliberately prosecuted a person that you knew, or at least had reason to know, wasn't guilty of the crime? And putting all that aside, by the way, in terms of your own professionalism, there's a guy out there raping and beating women while the guy that you put in prison is sitting in a cell." Ep. 2 (Dkt. 120-2) at 29:40-30:22.

**Netflix Response**: Undisputed that this quotation of Glynn is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

29.     Glynn continues, "We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt [Kelly] who tells me that he has gotten a call from a journalist asking if either of us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach." Ep. 2 (Dkt. 120-2) at 30:29-31:04.

**Netflix Response**: Undisputed that this quotation of Glynn is included at or around the

indicated time stamp, *but see* General Objection Nos. 1-5.

30.     News report excerpt regarding Halbach's disappearance is followed by footage of Avery interview in which he says that anyone could have access to his property to plant evidence and accuses the county of possibly doing "something" with Teresa Halbach and trying "to plant evidence on me," adding that he "wouldn't put nothing past the county." Ep. 2 (Dkt. 120-2) at 39:30-40:08.

**Netflix Response**: Undisputed that MaM includes footage from a local news report in

which Avery is interviewed at or around the indicated time stamp, *but see* General Objection

Nos. 1-5.

31.     Avery voiceover, "All I can think is they're trying to railroad me again." Ep. 2 (Dkt. 120-2) at 41:19-41:24.

**Netflix Response**: Undisputed that this quotation of Avery is included at or around the

indicated time stamp, *but see* General Objection Nos. 1-4.

32.     Avery continues, "I ain't been home. They's been searching. How hard is it to put evidence in the house or on the property? . . . .The . . . . Sheriff . . . was out to get me the first time. How do I know he ain't got nothing to do with it this time?" Ep. 2 (Dkt. 120-2) at 42:45-43:02.

**Netflix Response**: Undisputed that this quotation of Avery is included at or around the

indicated time stamp, *but see* General Objection Nos. 1-5.

33.     Avery continues, "all these memories and everything else, and they're just sketching me out again. And deep down, it hurts. [more news footage] You know we're all victims, and they just won't leave us alone. They just keep it up and keep it up. You know a person can only take so much, you know." Ep. 2 (Dkt. 120-2) at 44:24-44:35, 46:37-46:52.

**Netflix Response**: Undisputed that these quotations of Avery are included at or around

the indicated time stamps. Disputed that this constitutes a single statement; these are portions of

two separate interviews separated in MaM by several minutes. *See also* General Objection Nos.

1-5.

34.    Avery states during an apparent interrogation: "See, if somebody else plants that shit there, you ain't going to see . . . ." Ep. 2 (Dkt. 120-2) at 52:24-52:29.

**Netflix Response**: Undisputed that this quotation of Avery is included at or around the

indicated time stamp, *but see* General Objection Nos. 1-4.

35.    Unidentified woman in a bar states, "I really do think he was framed. . . .There's a lot that points to where the Sheriff's Department could've had something to do with it. And then I don't know if it's true or not, but I also heard that Manitowoc County was not supposed to be allowed in to search, and they were in there and they searched. And that's who found the key apparently after the third day was the Manitowoc County Sheriff's Department . . . ." Ep. 3 (Dkt. 120-3) 14:14-14:42.

**Netflix Response**: Undisputed that this quotation by a speaker who is not identified for

viewers is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-

5. Episode 3 also includes statements by Chuck Avery, Steven Avery's brother, that he believes

Steven is guilty of murdering Halbach. *See* Dkt. 271 ¶ 38 (at 41:55-42:03).

36.    Male bar patron adds, "I only have one word, from the cops on up: it's corruption. Big time. I mean, if people dig far enough, they'll see that." Ep. 3 (Dkt. 120-3) at 14:43-15:05.

**Netflix Response**: Undisputed that this quotation by a speaker who is not identified for

viewers is included at or around the indicated time stamp, *but see* General Objection Nos. 1-5.

Episode 3 also includes statements by Chuck Avery, Steven Avery's brother, that he believes

Steven is guilty of murdering Halbach. *See* Dkt. 271 ¶ 38 (at 41:55-42:03).

37.    Unidentified female bar patron continues, "I don't care what anybody says, that's a lot of money to pay out from here in Manitowoc County. It's a small area and I really, truly believe the county didn't have the funds to pay it out . . . . And they can say, 'Oh, you really believe the Manitowoc County police department and the FBI and everybody came in and they set all this up just to have Steven Avery guilty of this thing? Yes, I do.'" Ep. 3 (Dkt. 120-3) at 15:06-15:36.

**Netflix Response**: Undisputed that this quotation by a speaker who is not identified for

viewers is included at or around the indicated time stamp. Disputed that this statement is a

continuation, because this person is someone entirely distinct from those individuals quoted in Nos. 35 and 36. *See also* General Objection Nos. 1-5. Episode 3 also includes statements by Chuck Avery, Steven Avery's brother, that he believes Steven is guilty of murdering Halbach. *See* Dkt. 271 ¶ 38 (at 41:55-42:03).

38.     MAM depicts a telephone call between Avery and his sister in which Avery says, "This way, they figure they just got away with it, they can do it again . . . . You know it ain't gonna stop 'em." Ep. 3 (Dkt. 120-3) at 16:45-16:55.

**Netflix Response**: Undisputed that this quotation of Avery is included at or around the indicated time stamp, *but see* General Objection Nos. 1-5.

39.     Dean Strang, speaking out of court, is shown stating, "I didn't see them plant evidence with my own two eyes. I didn't see it. But do I understand how human beings might be tempted to plant evidence under the circumstances in which the Manitowoc County Sheriff's Department found itself. . . . I don't have any difficulty understanding those human emotions at all." Ep. 3 (Dkt. 120-3) at 20:21-21:03.

**Netflix Response**: Undisputed that this partial quotation of Strang is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

40.     Attorney Buting, speaking out of court, states, "So, you've got motivation for the officers to want to get him. And then when lo and behold there's this woman who disappears and one of the last people she saw was Steven Avery. . . . 'Now, we've got him. A-ha. We knew it.' They conclude that he's guilty, right off the bat. And they thought, 'We're going to make sure he's convicted.' And they helped it along by planting his blood in the RAV4 and by planting that key in his bedroom." Ep. 3 (Dkt. 120-3) at 21:16-21:49.

**Netflix Response**: Undisputed that this quotation of Buting is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

41.     Attorney Buting, speaking out of court, states "Some would – might think, 'Well, you know we – our hands were tied . . . . That you got a client who's saying that he's being framed. Publicly, that's kind of the defense you'd better go with' . . . . But it really wasn't that way here. The defense was raised because we think the evidence pointed that way." Ep. 4 (Dkt. 120-4) at 32:41-33:04.

**Netflix Response**: Undisputed that this quotation of Buting is included at or around the indicated time stamp, *but see* General Objection Nos. 1-5.

42. Buting says out of court, "Sheriff Peterson . . . clearly, clearly has a strong dislike for Avery. If the very top guy has this kind of attitude . . . that's gonna permeate the department, the whole department. If not, at least it's going to permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants." Ep. 4 (Dkt. 120-4) at 1:00:05-1:00:43.

**Netflix Response**: Disputed as incomplete. Undisputed that this quotation of Buting is included at or around the indicated time stamp, but the quotation is immediately followed by Buting stating,

> So we looked around and one guy's name just kept coming up over and over and over every place we looked. At critical moments. And that was Lieutenant James Lenk. Lenk is the guy who finds the key in the bedroom on the seventh entry at supposedly in plain view. Lenk is deposed just three weeks before this Halbach disappearance. And then, most peculiar of all, is when we looked in Steven's old 1985 case file in the clerk's office. Some items from that court file ultimately proved to exonerate Steven. Interestingly enough, the transmittal form that goes with the evidence in 2002 to the crime lab is filled out by none other than at that time, Detective Sergeant James Lenk.

*See* Ep. 4 (Dkt. 120-4) at 1:00:43-1:01:45. *See also* General Objection Nos. 1-5.

43. Mr. Colborn's photograph is shown immediately after the above comments, underneath a hierarchy of photographs of the Sheriff's Department chain of command, with the lower levels (including the photograph of Mr. Colborn) illuminated. Ep. 4 (Dkt. 120-4) at 1:00:25-1:00:47.

**Netflix Response**: Disputed that this is a statement. Undisputed that MaM shows a graphic which includes Colborn's photograph (along with the photographs of ten other MCSO employees) at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 5.

44. Buting says in an apparent telephone call to Strang that the supposed tampering with a blood vial containing Avery's blood shows that "Some officer went into that file, opened it up, took a sample of Steve Avery's blood and planted it in the RAV4." Ep. 4 (Dkt. 120-4) at 1:03:00-1:04:15.

**Netflix Response**: Undisputed that this quotation of Buting is included at or around the indicated time stamp, *but see* General Objection Nos. 1-5.

45. Buting states, out of court, "Somebody knew that [Ms. Halbach's] vehicle was there before they ever went there. I'm convinced of it." Ep. 5 (Dkt. 120-5) at 52:03-52:12.

**Netflix Response**: Undisputed that this quotation of Buting is included at or around the indicated time stamp, *but see* General Objection Nos. 1-5.

46. Interrogation of Avery follows Buting's statement; Avery tells an officer that he was told by a woman identified only as "Tammy" that "a cop" put Ms. Halbach's vehicle on Avery's property "and planted evidence." Ep. 5 (Dkt. 120-5) at 52:13-53:20.

**Netflix Response**: Disputed as incomplete. Undisputed that this partial quotation of Avery is included at or around the indicated time stamp, but a more complete quotation is that "Tammy" "told me *that she heard* that a cop put it [Halbach's vehicle] out there [on Avery's property] and planted evidence." (emphasis added). Netflix proposed this as a potential fact stipulation between the parties, but Plaintiff refused, forcing Netflix to put it as one of its own proposed material facts. *See* Dkt. 271 ¶ 45.

47. Immediately after the above, cuts to footage of Mr. Colborn about to testify. Ep. 5 (Dkt. 120-5) at 53:20-53:24.

**Netflix Response**: Disputed that this is a statement. Undisputed that MaM shows a video clip (without audio) of Colborn on the witness stand to testify in Avery's 2007 trial for the murder of Halbach at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 5.

48. Buting, in an interview with MAM, states, "One of the things that the state argued was that it would have taken a wide-ranging conspiracy . . . . Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?" Ep. 6 (Dkt. 120-6) at 56:26-57:11.

**Netflix Response**: Undisputed that this quotation of Buting is included at or around the indicated time stamp, *but see* General Objection Nos. 1-2, 4-5.

49. Statement by Avery's father: "They had Steve picked . . . right away. They set him up. Right from the beginning . . . ." Ep. 7 (Dkt. 120-7) at 1:04-1:17.

**Netflix Response**: Disputed as incomplete. Undisputed that this partial quotation of Allan Avery, Steven's father, is included at or around the indicated time stamp, but the complete

quotation is, "They had Stevie picked, *as far as I'm concerned*, right away. They set him up.

Right from the beginning[.]" *See* Ep. 7 (Dkt. 120-7) at 1:04-1:17 (emphasis added). *See also*

General Objection Nos. 1-4.

50.     Buting and Strang are shown in an out-of-court conversation filmed by MAM, stating:

Buting: "It's not enough to just get the key. He wants Avery's DNA on that. And so he is gonna wait until it is the right time. And there is a Calumet County deputy with him on all of their searches.

Strang: Yep. There is . . . .

Buting: Somewhere nearby, and he was just waiting for the right time . . . when he could do it.

Strang: That key does not fall from, you know, in between the backboard and the frame of that little bookcase. . . .

Buting: And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?

Strang: Blood's easy . . . .

Buting: The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation . . . because of that lawsuit. They were deposed in the lawsuit. They didn't tell . . . ."

Ep. 7 (Dkt. 120-7) at 10:45-12:00.

**Netflix Response**: Disputed as incomplete. Undisputed that these quotations of Buting

and Strang are included at or around the indicated time stamp, but it omits Strang's statement,

"Yeah, I'll—I'll connect that," referring to a line of cross-examination Strang would pursue in

court in the course of Avery's murder trial. *See* Ep. 7 (Dkt. 120-7) at 10:45-12:05. *See also*

General Objection Nos. 1-5.

51.     Avery states, "I'm in the same situation that I was before. Just a couple of them wanting to nail me. And the other ones didn't. But nobody speaks up. I gotta go through this over and over." Ep. 7 (Dkt. 120-7) at 14:48-15:15.

**Netflix Response**: Undisputed that this quotation of Avery is included at or around the

indicated time stamp, *but see* General Objection Nos. 1-2, 4.

52.     Directly after Avery's comments above, MAM displays image of Mr. Colborn, and audio of Avery continues; video then switches between images of Mr. Colborn waiting to testify, Avery looking sad, and Mr. Colborn in court. Ep. 7 (Dkt. 120-7) at 15:15.

**Netflix Response**: Disputed that this is a statement. Undisputed that MaM shows a video

clip (without audio) of Colborn on the witness stand to testify in Avery's 2007 criminal trial for

the murder of Halbach at or around the indicated time stamp, *but see* General Objection Nos. 1-

2, 5.

53.     Switches to exchange with reporter in which she questions Strang about whether the defense went too far by accusing Mr. Colborn of being a "bad cop," which includes the following:

Strang: "This was a hard day, and there've been some hard days for Sgt. Colborn . . . .

Reporter: But my question is though, that if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place.

Strang: You're hearing evidence of the conspiracy. And I've sat in many a federal courtroom and heard federal prosecutors prove a conspiracy on less than we've heard already here and that you will hear by the end of this trial."

Ep. 7 (Dkt. 120-7) at 24:28-26:01.

**Netflix Response**: Undisputed that these quotations of Strang and an unidentified

reporter are included at or around the indicated time stamp. They are not defamatory because

Colborn cannot credibly say omitting this exchange, in which a reporter is defending him, would

have made MaM *less* harmful to his reputation. *See also* General Objection Nos. 1-2, 4-5.

54.     Telephone conversation shown between Avery and his mother:

Avery's mother: It seems suspicious.

Avery: Yeah.

Avery's mother: Them people ain't gonna get away with everything.

Ep. 7 (120-7) at 37:43-37:57.

**Netflix Response**: Undisputed that these quotations of Steven and Dolores Avery, his

mother, are included at or around the indicated time stamp, *but see* General Objection Nos. 1-5.

55.     The statements identified in the table set forth in paragraph 3-54, above, are
capable of being understood, individually or collectively, as implying or making innuendos that
Steven Avery was wrongly convicted of the murder of Teresa Halbach.

**Netflix Response**: This is not a fact, but a legal conclusion. It is inappropriate for

inclusion here as proposed material fact, and the Court should therefore disregard it. To the

extent construed as a fact, Netflix disputes and denies this allegation. Netflix further notes that

the allegation is immaterial as statements about Avery's guilt or innocence (or whether he

received a fair trial such that he was not "wrongly convicted") are not about or "of and

concerning" or actionable by Colborn, *see* General Objection No. 3, including because Avery's

culpability is not dispositive on the issue of Colborn's culpability. It is possible both that Avery

murdered Halbach and Colborn planted evidence to ensure Avery's conviction.

56.     The statements identified in paragraph 3-54, above, are capable of being
understood, individually or collectively, as implying or making innuendos that Manitowoc
County law enforcement officers framed Steven Avery for the murder of Teresa Halbach.

**Netflix Response**: This is not a fact, but a legal conclusion. It is inappropriate for

inclusion here as a proposed material fact, and the Court should therefore disregard it. To the

extent construed as a fact, Netflix disputes and denies this allegation. Netflix further notes that

the allegation is immaterial as statements about Manitowoc County law enforcement generally

are not about or "of and concerning" Colborn and are not actionable by him. *See also* General

Objection No. 3.

57.     The statements identified in paragraph 3-54, above, are capable of being
understood, individually or collectively, as implying or making innuendos that Plaintiff was one
of the key participants in a law enforcement conspiracy to frame Steven Avery for the murder of
Teresa Halbach.

**Netflix Response**: This is not a fact, but a legal conclusion. It is inappropriate for inclusion here as a proposed material fact, and the Court should therefore disregard it. To the extent construed as a fact, Netflix disputes and denies this allegation. MaM documents Avery's public allegations against Colborn, which allegations the Honorable Judge Patrick Willis permitted based in part on his finding that Colborn had a motive to plant evidence. *See* General Objection Nos. 2, 5. However, no reasonable viewer would understand MaM itself to take the position that Colborn planted evidence to frame Avery as a matter of fact. No one at Netflix intended for viewers to walk away with that impression or even knew that they would. *See* Dkt. 271 ¶¶ 120-121. Colborn has presented no evidence to the contrary. Netflix further notes that Colborn did not plead a defamation by implication claim in any of his three complaints in this case.

58.     Steven Avery was convicted of murder in 2007. Barker Decl., Ex. 2.

**Netflix Response**: Undisputed. *See* Dkt. 269 at 5. Indeed, Netflix proposed this as a potential stipulated fact between the parties, though not a material fact, to orient the Court. Plaintiff refused to stipulate, forcing Netflix to rely on published judicial decisions to establish this fact.

59.     The Netflix representatives of the creative team that participated in the production of MAM reviewed and approved the final versions of all episodes of MAM prior to its being published. Barker Decl., Ex. 3, Nishamura Tr. at pp. 170-71; Ex. 4, Del Deo Tr. at p. 141.

**Netflix Response**: Undisputed.

60.     Defendants' representatives admitted that [sic] had little to no knowledge about the individuals shown in Episode 3 of MAM in a bar and making statements that Manitowoc County law enforcement framed Avery, including no knowledge regarding their contacts with the Averys (other than as stated in paragraph 9, below) or law enforcement. Barker Decl., Ex. 5, Demos Tr. pp. 148-54; Ex. 3, Nishamura Tr. pp. 172-73; Ex. 6, Del Deo Tr. p. 156.

**Netflix Response**: Disputed as vague, misleading, and incomplete. Netflix does not know who Colborn means in referring to the collective "Defendants' representatives." There are four

defendants in this case. Netflix representative Lisa Nishimura testified that she does not know the identities of the unidentified bar patrons who appear in Episode 3 of MaM. *See* Barker Decl. Ex. 3 (Nishimura Tr.) at 172:18-20. With respect to whether Nishimura knew anything regarding these individuals' contacts with the Averys or law enforcement, she was never asked that at her deposition; rather, Plaintiff's counsel asked her the following compound question: " . . . I meant as far as any details about that that may have been provided to you, you *either don't know or don't recall*; is that correct?" to which Nishimura responded, "I don't know." *Id*. at 172:25-173:3 (emphasis added). Netflix representative Adam Del Deo testified that he does not recall whether he knew "the identities of any of those people at the time" of producing MaM. *See* Barker Decl. Ex. 6 (Del Deo Tr.) at 156:5-7. Del Deo further testified that he does not now know how those individuals were solicited to participate in MaM, or whether any of them had a connection to the Averys or law enforcement. *Id*. at 156:8-16. Plaintiff's counsel did not ask about his knowledge at the time of producing MaM.

61.     At least one of the bar patrons who make statements in Episode 3 of MAM is shown playing pool with Chuck Avery, Steven Avery's brother. Barker Decl., Ex. 5, Demos Tr. at p. 150.

**Netflix Response**: Undisputed that Episode 3 of MaM includes a scene at a bar in Manitowoc, in which individuals, including Chuck Avery, Steven's brother, are shown playing pool. Episode 3 also includes statements by Chuck Avery that he believes Steven Avery is guilty of murdering Halbach. *See* Dkt. 271 ¶ 38 (at 41:55-42:03).

62.     Mr. Colborn received voicemail messages from callers who were critical of him after the release of MAM, most of whom did not identify themselves, including messages stating the following.

**Netflix Response**:     Undisputed that Colborn claims to have received such voicemails, *but see* General Objection No. 6.

63.     "I'm just calling in regards to the documentary that I just finished watching it and it appears pretty clearly that you were obviously involved beyond a detective role . . . ." Colborn Decl., Dkt #130, and Ex. 1, 1-7-16 4:04 PM.

**Netflix Response**: Undisputed that Colborn claims to have received such voicemail, *but*

*see* General Objection No. 6. Netflix further notes that this proposed fact does not pertain to

Colborn's allegation that MaM conclusively accuses him of planting evidence.

64.     "Hi Detective Colborn, I'm calling about the Steven Avery case – I wanted to know if you planted evidence with Detective Lenk. It sure seems like that from the documentary. . . . I think you definitely planted evidence . . . ." *Id.*, Ex. 1, 1-20-16 1:16 PM.

**Netflix Response**: Undisputed that Colborn claims to have received such voicemail, *but*

*see* General Objection No. 6.

65.     "Hi. This is regarding the Steven Avery case . . . . You know what you have done. This is completely unprofessional. You framed him and I don't care if the documentary was one-sided. You know what you did . . . . You are going to hell . . . ." *Id.*, Ex. 1, 1-21-16 10:54 AM.

**Netflix Response**: Undisputed that Colborn claims to have received such voicemail, *but*

*see* General Objection No. 6.

66.     " . . . I've been calling numerous times and been getting no answer . . . only awful disgusting human beings would do such a thing to innocent people, not only once, but twice, Colborn. The whole world has observed your lies . . . . I hope you're harassed . . . until the day you die. I hope that your wife is the next victim . . . ." *Id.*, 1-21-16 11:14 AM.

**Netflix Response**: Undisputed that Colborn claims to have received such voicemail, *but*

*see* General Objection No. 6.

67.     "Hi Detective Colborn. I just watched Making a Murder and you are soooo guilty. You were at the . . . you were at the the lot . . . the Avery yard, and you saw the car before, um and you're in it with Lenk. You guys are so shady and corrupt . . . ." *Id.*, 1/26/16 to 1/27/16, 3:42 PM.

**Netflix Response**: Undisputed that Colborn claims to have received such voicemail, *but*

*see* General Objection No. 6.

68.     "Hey Andy . . . . You're probably out planting evidence on somebody right now, but um I just want to let you know that I saw your appearance on the television program and I really couldn't believe how scared you were in that one scene. I just wanted to talk to you about it,

when you were upon the stand. Um, I actually thought you were going to wet your pants you were so scared." *Id.*, Ex. 1, 2/15/16 to 2/19/16 2:13 PM (emphasis added).

**Netflix Response**: Undisputed that Colborn claims to have received such voicemail, *but see* General Objection No. 6.

69. "Mr. Colborn, this is a concerned citizen of the state of California. I've seen the case with Steven Avery. . . everybody knows what is going on here with you guys setting up and framing this poor man Steven Avery . . . be ready to sit in federal prison for a long long time. I hope you rot in hell, you son of a ****." *Id.*, Ex. 1, 1-15-16 to 1-18-16 4:34 PM.

**Netflix Response**: Undisputed that Colborn claims to have received such voicemail, *but see* General Objection No. 6.

70. Mr. Colborn denied in sworn testimony during the Avery criminal trial that he planted evidence to frame Steven Avery. Barker Decl., Ex. 7 (excerpts from Avery criminal trial transcript at pp. 140-41).

**Netflix Response**: Undisputed. Episode 7 of MaM shows Colborn denying that he planted evidence to frame Avery. Specifically, it shows Ken Kratz asking Colborn, "Have you ever planted any evidence against Mr. Avery?" And MaM shows Colborn responding, "I have to say that this is the first time my integrity has ever been questioned, and no, I have not." *See* Ep. 7 (Dkt. 120-7) at 18:45-19:11. Netflix proposed this as a potential fact stipulation between the parties, but Plaintiff refused, forcing Netflix to put it as one of its own proposed material facts. *See* Dkt. 271 ¶ 63.

71. Netflix series notes advised Chrome to use Ms. Ducat's statement that the County was "not done" with Mr. Avery to impart "a more explicit ending [to an early episode] that makes it clear that in the next episode the cops are going to seek revenge." Barker Decl., Ex. 8, Nishamura Tr. pp. 131-32; Ex. 9 at exhibit p.5, excerpt from Deposition Ex. 7 (NFXCOL 0001978).

**Netflix Response**: Disputed as misleading, removed from the context of the entire note, and immaterial. NFXCOL0001978 is a note about Episode 1 of MaM. It actually reads, "There should be a more explicit ending that makes it clear that in the next episode the cops are going to seek revenge. We should have a really tight Episode 1 with a strong cliffhanger that immediately

engages the audience to come back for Episode 2." Dkt. 279 Ex. 27 (NFXCOL0001976) at 1978.

There is no reference to using Ducat's statement to accomplish this. *See id.* Indeed, Ducat's

statement that the County is "not done" with Avery actually appears in the first 2 minutes of the

Episode 1 of MaM, so it in no way served to "impart 'a more explicit ending'" of any kind for

any episode of MaM. *See* Ep. 1 (Dkt. 120-1) at 0:00-2:00. It is also substantially true that

Avery's defense at his trial for Halbach's murder was that the law enforcement planted evidence

to ensure his conviction due to embarrassment over his exoneration and fear of a $36 million

damages award in his civil lawsuit—*i.e.*, Avery alleged that the cops were "seek[ing] revenge"

against him. *See* Dkt. 271 ¶¶ 13-15.

72.     Netflix representatives also endorsed using Avery's father's statement, "They
framed an innocent man just like they did 20 years ago" as a "cliffhanger." *Id.*, Ex. 9 at exhibit
page 8 (NFXCOL 0001981).

**Netflix Response**: Disputed as misleading, removed from the context of the entire note,

and immaterial. Netflix did not "endorse" any statement by Avery's father or anyone else in

MaM, and to suggest otherwise is a conclusion of law that the Court should disregard, not a

proposed finding of fact. With regard to how Netflix proposed incorporating Avery's father's

statement: Upon reviewing a cut Netflix would provide to the filmmakers "notes," which served

as suggestions and jumping-off points for discussion, not demands; just because a suggestion

was made does not mean it was implemented. *See* Dkt. 271 ¶ 97. Here, Netflix's suggestion was

apparently *disregarded* as no statement by Allan Avery appears anywhere in Episode 2.

*Compare* Dkt. 279 Ex. 27 (NFXCOL0001976) at 1981 (suggesting to "[p]otentially add Allan's

quote from the top of Ep3 saying 'They framed an innocent man just like they did 20 years ago'

to the cliffhanger here" in Episode 2) *with* Ep. 2 (Dkt. 120-2) (containing no quotes or statements

from Allan Avery in Episode 2 at all). It is also substantially true that Avery's defense at his trial

24

for Halbach's murder was that the law enforcement framed him, just like they had approximately 20 years prior for the Beerntsen rape. *See* Dkt. 271 ¶¶ 13-15.

73.     In series notes, Defendants referred to those associated with Manitowoc County law enforcement as "the baddies" for whom a specific "bad guy theme" music was to play during their appearances as part of an overall "thriller atmospheric score." Barker Decl., Ex. 8, Nishamura Tr., pp. 131-32, 136-37; Ex. 9 at exhibit pp. 36, 64 (Deposition Ex. 7 at NFXCOL 0002009, 2037); Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001934.

**Netflix Response**: Disputed as misleading, removed from the context of the entire note, and immaterial. The referenced notes do not relate to any of the 52 challenged statements Colborn puts at issue in his motion, and Colborn fails to explain how it demonstrates Netflix's purported actual malice with regard to any of those statements. Plaintiff misrepresents Netflix's notes here, splices notes together that do not actually correspond to one another, and omits crucial information. First, the note on "the baddies" is as follows: "Can we work to establish a subtle but impactful 'theme' track for the baddies, *e.g. Lenk, Petersen, Kratz* and certainly for *Len Kachinsky & Michael O'Kelly* to help clearly support that despite their appointed roles to protect Brendan—they are doing him great harm." *See* Dkt. 279 Ex. 27 (NFXCOL0001976) at 2009 (emphasis added). In other words, Colborn was expressly omitted from the list of "baddies." Second, the note on the "bad guy theme" references a scene in Episode 8 that has nothing to do with Colborn. The note itself makes this clear, stating, "42:00—learning that Tom Fassbender is calling Scot Tadych to convince Barbara make Brendan take a plea—perfect moment for 'bad guy theme.'" *See* Dkt. 286 Ex. 9 at NFXCOL0002037. Third, all of these notes are about music in the series, and therefore are not statements that can defame Colborn. *See* Dkt. 269 at 25 ("using music to underscore emotional points or to engage an audience does not transform a true depiction of events into a false one and thus cannot be false or defamatory" (citing cases)); Dkt. 271 ¶ 150.

74. Netflix production notes, which were forwarded to Chrome, include a suggestion that source material be reviewed for the purpose of finding material to "allude to the fact that [cops] may have planted something . . . " during a search at the Avery property. Barker Decl., Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001940.

**Netflix Response**: Disputed as incomplete, misleading, removed from the context of the entire note, and immaterial. The referenced note does not relate to any of the 52 challenged statements Colborn puts at issue in his motion, and Colborn fails to explain how it demonstrates Netflix's purported actual malice with regard to any of those statements. The note reads in full, "21:23—Is there anything we can use/show to clarify whether or not the cops had a warrant to search his property and allude to the fact that they may have planted something when they were there without permission?" Dkt. 286 Ex. 11 at NFXCOL0001940. It is also substantially true that Avery's defense at his trial for Halbach's murder was that the law enforcement planted evidence to ensure his conviction. *See* Dkt. 271 ¶¶ 13-15.

75. In MAM production notes that were shared with Chrome, Netflix's creative team admitted that it seemed "very thin" that the call by Mr. Colborn "would be the key to the case." Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001938.

**Netflix Response**: Disputed as incomplete and immaterial. The referenced note does not relate to any of the 52 challenged statements Colborn puts at issue in his motion, and Colborn fails to explain how it demonstrates Netflix's purported actual malice with regard to any of those statements. This is the observation of one Netflix executive, Adam Del Deo, that it "seems very thin that Colburn not having specific knowledge of who called him would be the key to the case," and that the call "is [a] weak revelation to me." *See* Dkt. 271 ¶ 148; *see also* Dkt. 269 at 22-23 (Colborn's "responses to written discovery point to just two documents in which Del Deo expressed some skepticism about the weight of the evidence. Whether Del Deo thought the jail call was 'the key to the case' or a 'weak revelation' is merely his opinion." (citation omitted)). It is not an expression of a view about the truth or falsity of the jail call. It is also substantially true

that Avery's defense at his trial for Halbach's murder was that the law enforcement planted evidence to ensure his conviction due to embarrassment over his exoneration and fear of a $36 million damages award in his civil lawsuit—an award that would have included compensation for the time Avery spent incarcerated between the 1995 phone call Colborn and 2003 when Avery was released. *See* Dkt. 271 ¶¶ 13-15.

76.     In MAM production Netflix sought family pictures of the Averys to include in the series, saying, "Let's make them look like a very happy family." Barker Decl., Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001935.

**Netflix Response**: Disputed as immaterial. The referenced note does not relate to any of the 52 challenged statements Colborn puts at issue in his motion, and Colborn fails to explain how it demonstrates Netflix's purported actual malice with regard to any of those statements. Nor is this note about Colborn, so it cannot indicate anything about whether anyone knew or suspected anything in MaM about Colborn to be false. Finally, Colborn has not presented any evidence that the Averys were *not* "a very happy family."

77.     They also identified an image of Avery "looking a little smug" as one that should be replaced with a different shot while discussing a version of an MAM episode. Barker Decl., Ex. 12 at NFXCOL 0001974.

**Netflix Response**: Disputed as immaterial. The referenced note does not relate to any of the 52 challenged statements Colborn puts at issue in his motion, and Colborn fails to explain how it demonstrates Netflix's purported actual malice with regard to any of those statements. Nor is this note about Colborn, so it cannot indicate anything about whether anyone knew or suspected anything in MaM about Colborn to be false.

78.     Defendants worked to replace another image of Mr. Colborn in an early version of the MAM trailer with what they called a "squirmy shot" instead. Barker Decl., Ex. 13, Demos Tr. pp. 218-19; Ex. 14 at CHRM 481-82.

**Netflix Response**: Disputed as immaterial. The referenced note does not relate to any of the 52 challenged statements Colborn puts at issue in his motion, and Colborn fails to explain

how it demonstrates Netflix's purported actual malice with regard to any of those statements. The trailer of MaM was never put at issue in any of Colborn's three complaints. What's more, despite Colborn's reference to "defendants" collectively, this fact has nothing to do with Netflix, as it was a description made by Moira Demos, one of the filmmakers, and none of the members of Netflix's creative team who worked on MaM (Lisa Nishimura, Adam Del Deo, Ben Cotner, or Marjon Javadi) are copied on the email in which the descriptive comment appears. *See* Dkt. 286 Ex. 14 at CHRM000481-482; *see also* Dkt. 269 at 15.

## NETFLIX'S ADDITIONAL PROPOSED FINDINGS OF FACT

1.　　MaM used graphical elements to enhance the clarity and factual accuracy of the series for viewers, especially because Avery's story spanned several decades and involved key players. *See* Dkt. 271 ¶¶ 99, 103. In Episode 2, one such graphic, which included the photographs of several individuals including Colborn, Lenk, and Petersen, was used to orient viewers. *See* Ep. 2 (Dkt. 120-2) at 20:26-20:34.

2.　　Immediately following the partial quotation of Avery's counsel, Buting, referenced in Colborn's Proposed Fact No. 42, Episode 4 also includes Buting stating,

> So we looked around and one guy's name just kept coming up over and over and over every place we looked. At critical moments. And that was Lieutenant James Lenk. Lenk is the guy who finds the key in the bedroom on the seventh entry at supposedly in plain view. Lenk is deposed just three weeks before this Halbach disappearance. And then, most peculiar of all, is when we looked in Steven's old 1985 case file in the clerk's office. Some items from that court file ultimately proved to exonerate Steven. Interestingly enough, the transmittal form that goes with the evidence in 2002 to the crime lab is filled out by none other than at that time, Detective Sergeant James Lenk.

*See* Ep. 4 (Dkt. 120-4) at 1:00:43-1:01:45.

3.　　Episode 7 includes a scene in which Avery's attorneys, Strang and Buting, are strategizing over the theory of the defense and preparing for forthcoming witness examinations in Avery's criminal trial for the murder of Halbach. After the lengthy exchange in Colborn's

Proposed Fact No. 50, Strang states, "Yeah, I'll—I'll connect that," referring to a line of cross-examination Strang would pursue in court. *See* Ep. 7 (Dkt. 120-7) at 10:45-12:05. The rest of the episode shows those series of cross-examinations. *See* Dkt. 271 ¶¶ 57-71.

4.     The note from the Netflix creative team about "bad guy theme" music from which Colborn selectively quotes in Proposed Fact No. 73 reads in full, "42:00—learning that Tom Fassbender is calling Scot Tadych to convince Barbara make Brendan take a plea—perfect moment for 'bad guy theme.'" *See* Dkt. 286 Ex. 9 at NFXCOL0002037. It makes no mention of or implication toward Colborn. *See id.*

5.     The note from the Netflix creative team from which Colborn selectively quotes in Proposed Fact No. 74 reads in full, "21:23—Is there anything we can use/show to clarify whether or not the cops had a warrant to search his property and allude to the fact that they may have planted something when they were there without permission?" *See* Dkt. 286 Ex. 11 at NFXCOL0001940.

6.     The email from filmmaker Moira Demos regarding the trailer for MaM referenced in Colborn's Proposed Fact No. 78 was not sent to any of the members of Netflix's creative team who worked on the production of MaM (Lisa Nishimura, Adam Del Deo, Ben Cotner, or Marjon Javadi), through whom Colborn must prove actual malice by clear and convincing evidence. *See* Dkt. 286 Ex. 14 at CHRM000481-482.

7.     At his deposition in this case, Colborn testified that, to accept his denial at Avery's murder trial that he planted evidence, "you would have to trust that I was telling the truth under oath," but that "I like to think that my testimony and when I say something, people understand that I'm under oath and I'm saying the truth." Second Decl. of Leita Walker

("Second Walker Decl.") Ex. 1 (July 21 & 22, 2022 Colborn Tr.Excerpts) at 174:9-12, 462:24-463:13.

8. In response to a question about whether he could "understand how someone who wasn't there" when he searched Avery's property "might have some uncertainty about" his explanation of how he and others found the evidence that led to Avery's conviction for Halbach's murder, Colborn testified that "I don't have an instinctive distrust of law enforcement." *See id.* at 462:24-463:13.

Dated: November 4, 2022

Respectfully submitted,

*s/ Leita Walker*
Leita Walker
Isabella Salomão Nascimento
Ballard Spahr LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
T: (612) 371-6222
F: (612) 371-3207
walkerl@ballardspahr.com
salamaonascimentoi@ballardspahr.com

Matthew E. Kelley
Emmy Parsons
Ballard Spahr LLP
1909 K Street, NW, Suite 1200
Washington, D.C. 20006-1157
T: (202) 508-1112
F: (202) 661-2299
kelleym@ballardspahr.com
parsonse@ballardspahr.com

James A. Friedman
Godfrey & Kahn, S.C.
One East Main Street
Suite 500
Madison, WI 53703-3300
T: (608) 284-2617
F. (608) 257-0609
jfriedman@gklaw.com

*Counsel for Netflix, Inc.*