Exhibit 2

| Pltf.'s Prop. Fact No. | MaM Episode and time stamp | Plaintiff's claimed "Statement and/or MAM Embellishment" | Reasons not actionable (besides no evidence of actual malice) |
|---|---|---|---|
| 3 | 1 ECF # 120-1 4:35 – 4:45 | Steven Avery voiceover: "They had the evidence back then that I didn't do it. But nobody said anything . . ." | This is Avery's unverifiable opinion about his wrongful conviction; it is not a statement of fact by Netflix. *See Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) ("[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."). <br><br> To the extent this is a verifiable statement of fact, it is true. *See* Dkt. 271 ¶¶ 1-2.[1] <br><br> This statement is not about Colborn; Colborn did not work for the Manitowoc County Sheriff's Office at the time of Avery's wrongful conviction. *See* SAC ¶ 9; *see also Barlass v. City of Janesville*, No. 10-cv-454-slc, 2011 U.S. Dist. LEXIS 165826, at *36 (W.D. Wis. Nov. 28, 2011). <br><br> This statement cannot possibly convey the allegedly defamatory meaning that Colborn planted evidence to frame Avery for the Halbach murder because it is not about that case. To the extent this |

---

[1] By citing to evidence that discrete statements are true here and elsewhere, Netflix in no way intends to suggest it has the burden of proving substantial truth. It does not. Colborn has the burden to prove material falsity. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986); *Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 666 (7th Cir. 2022); *Torgerson v. Journal/Sentinel Inc.*, 210 Wis. 2d 524, 543 n.18 (1997). He has made no attempt to prove that any of the 52 statements his motion puts at issue are materially false.

| | | | statement can be read to imply Colborn had a motive to plant evidence, that is true, as found by Judge Patrick Willis. Dkt. 271 ¶ 14.[2] |
|---|---|---|---|
| 4 | 1<br>ECF # 120-1<br>1:01:19 –<br>1:01:42 | Kim Ducat (Avery relative) states on camera: "They weren't just gonna let Stevie out. They weren't gonna hand that man 36 million dollars. They weren't gonna be made a laughing stock, that's for sure. They just weren't gonna do all that. And something in my gut said they're not done with him. Something's gonna happen. They're not handing that kind of money over to Steven Avery." | This is Ducat's unverifiable opinion and speculation about how "they" were responding to Avery's exoneration and civil lawsuit; it is not a statement of fact by Netflix. *See Haynes*, 8 F.3d at 1227 (theory, conjecture, surmise not actionable); *see also id.* ("[A]nyone is entitled to speculate on a person's motives from the known facts of his behavior.").<br><br>To the extent this is a verifiable statement of fact, it is true. Defendants in the civil suit vigorously defended and ultimately negotiated a settlement of $400,000, far less than the $36 million Avery sought. *See Avery v. Manitowoc Cty.*, 428 F. Supp. 2d 891, 893 (E.D. Wis. 2006).<br><br>This statement is not about Colborn, who was not involved in Avery's rape conviction and who was not a named defendant in his civil lawsuit. *See* SAC ¶ 9; Dkt. 271 ¶ 1; *see also Barlass*.<br><br>Judge Willis found motive. |
| 5 | 1<br>ECF # 120-1<br>1:01:29-<br>1:01:44;<br>1:01:33 –<br>Photograph | Photos of Plaintiff and others are shown during Kim Ducat's statement. | This is not a statement.<br><br>The brief video clip of Colborn is from his deposition in Avery's civil case and it is undisputed and true that he was deposed.<br><br>Judge Willis found motive. |

---

[2] For simplicity, this point is hereafter referred to as "Judge Willis found motive."

| 6 | 2<br>ECF # 120-1<br>49:22-49:39 | Steve Glynn, identified as Avery's counsel in the civil case against Manitowoc County, states, "The day of or on the day after Steven's release, law enforcement officers in Manitowoc are writing memos to describe activity that had occurred almost ten years earlier. They don't do that unless they feel threatened." | This statement appears in Episode 1 at 49:22-49:39, not at that timestamp in Episode 2.<br><br>Factual parts are true, Dkt. 271 ¶ 1-4; remaining parts are Glynn's opinion. *See Haynes*.<br><br>Judge Willis found motive 14. |
|---|---|---|---|
| 7 | 2<br>ECF# 120-2<br>17:20 – 17:34 | Steve Glynn states, "We learned during litigation something that we had absolutely no knowledge of before the lawsuit got started. That 1995 was a very, very significant point in this thing." | It is undisputed and true that Colborn took a phone call in 1995 while working at the jail that played a central role in Avery's civil case and later in his defense at his murder trial. *See* Dkt. 271 ¶¶ 13-15.<br><br>Glynn's statement that "1995 was a very, very significant point in this thing" is his opinion. *See Haynes*.<br><br>Judge Willis found motive. |
| 8 | 2<br>ECF # 120-2<br>17:34-17:43 | Video deposition of Mr. Colborn is shown in the background with Steve Glynn voice over (image of Mr. Colborn) | This is not a statement.<br><br>The brief video clip of Colborn is from his deposition in Avery's civil case and it is undisputed and true that he was deposed.<br><br>Judge Willis found motive. |
| 9 | 2<br>ECF # 120-2<br>17:37-18:24 | Steve Glynn continues, "And that there is not only something to this idea that law enforcement had information about somebody else, but there is serious meat on those bones, I mean serious meat. What we learn is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department | Factual parts are true, Dkt. 270 ¶ 2; *see also* Dkt. 271 ¶¶ 5, 7; remaining parts are Glynn's opinion. *Haynes*.<br><br>Judge Willis found motive. |

3

| | | | |
|---|---|---|---|
| | | [image of Mr. Colborn's report is shown in background] from another law enforcement agency . . . saying that they had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison." | |
| 10 | 2 ECF # 120-2 18:28 -19:04 | Video footage of Mr. Colborn's testimony in civil case in response to questioning by Glynn | The authenticity of the video clip of Colborn's deposition testimony is undisputed, and Colborn does not claim he testified falsely. The footage shows Colborn confirming some of the contents of the report he wrote about the jail call in 2003. Judge Willis found motive. |
| 11 | 2 ECF # 120-2 19:05 – 19:41 | Steve Glynn continues, "Manitowoc doesn't have huge numbers of major assaults where people go to prison and certainly where people would still be in prison. There is a very distinct possibility, I would say likelihood, that it's Gregory Allen. It's the Brown County Sheriff's Department that is in 1995 on the Gregory Allen case, that Gregory Allen has said something about Steven Avery, and at a minimum, somebody ought to check this out." | Factual parts are true, Dkt. 269 at 4; Dkt. 271 ¶ 1; remaining parts are Glynn's opinion. *See Haynes*. Judge Willis found motive. |
| 12 | 2 ECF # 120-2 19:24 – 19:41 | Graphic shown during a cutaway from Glynn's interview, while Glynn is still speaking, shows, "1995 ● Gregory Allen is arrested for sexual assault in Brown County / Andrew Colborn receives call about inmate confession" | This statement is true. Dkt. 120-11 at 3; Dkt. 271 ¶¶ 4, 5. Judge Willis found motive. |

4

| 13 | 2<br>ECF # 120-2<br>19:41 – 19:47 | Cuts to video of Mr. Colborn's deposition testimony in Avery's civil case, with the following exchange:<br><br>Glynn: I mean that's a significant event.<br><br>Mr. Colborn: Right, that's what stood out in my mind. | It is undisputed and true that Colborn gave a deposition in Avery's civil case and that this exchange occurred in that deposition. Dkt. 120-14 at 11:7-8.<br><br>Remaining parts are Glynn's opinion. *See Haynes*.<br><br>Judge Willis found motive. |
|---|---|---|---|
| 14 | 2<br>ECF # 120-2<br>19:47 – 20:26 | Returns to interview with Glynn, who says, "The fellow who got that call was a guy named Colborn. And you might say that there should be a record of him immediately making a report on this, there might be a record of his immediately contacting a supervising officer, there might be a record of him contacting a detective who handles sexual assault cases, ahh, there might be some record of it. But if you thought any of those things, you'd be wrong, because there isn't any record in 1995, 1996, 1997, 1998, 2000, 2001, 2002, 2003 . . . ." | Factual parts are true, Dkt. 270 ¶ 2; Dkt. 271 ¶¶ 4, 7; remaining parts are Glynn's opinion. *See Haynes*.<br><br>Judge Willis found motive. |
| 15 | 2<br>ECF# 120-2<br>20:14 -20:25 | Visual cuts to graphic with years running from a timeline image with Mr. Colborn's photograph above it, and a statement after the year "2003" that states, 'DNA evidence exonerates Steven Avery." | This graphic does not appear at the listed timestamp; it appears at 20:26-20:34.<br><br>Misstates the content of the graphic; Colborn's photo is not the only one shown.<br><br>This statement is true. *See State v. Avery*, 2022 WI App 7 n.2, 400 Wis. 2d 541, 970 N.W.2d 564.<br><br>Judge Willis found motive. |

5

| 16 | 2<br>ECF# 120-2<br>20:26 -21:14 | Glynn continues, "Now 2003 is a year that has meaning because that's when Steven Avery got out. And the day he got out, or the day after, that's when Colborn decides to contact his superior officer, named Lenk. And Lenk tells him to write a report. And they then go have contact with t the Sheriff. Now, let's just stop and think about that for a minute. Why does that happen, why does it happen the, when it didn't happen eight years earlier? Um, ahh, I mean, I think I know the answer. I think the answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk as his superior realized it, and the Sheriff realized it. | Factual parts are true, Dkt. 270 ¶ 2; Dkt. 271 ¶ 4; remaining parts are Glynn's opinion. *See Haynes*.<br><br>Judge Willis found motive. |
|---|---|---|---|
| 17 | 2<br>ECF # 120-2<br>21:08-21:12 | Images of Mr. Colborn, James Lenk, and the Sheriff are shown. | This is not a statement.<br><br>It is true and undisputed that Colborn, Lenk, and then-Sheriff Petersen were deposed in Avery's civil lawsuit. *See* Dkts. 120-14 (Colborn deposition transcript); 120-16 (Petersen deposition transcript); 120-17 (Lenk deposition transcript).<br><br>Judge Willis found motive. |
| 18 | 2<br>ECF # 120-2<br>21:12 –<br>21:39 | Glynn continues, "So Lenk tells Colborn to write a report, the Sheriff tells Lenk, `Get me the report.' The Sheriff puts the report in a safe. That's how much he cares about documenting this thing. Well obviously it doesn't do anybody, it certainly doesn't do Steven Avery any good to document that eight years | Factual parts are true. After falsely alleging otherwise in each of his three complaints, Colborn admitted his statement was kept in a safe. Dkt. 270 ¶ 2; Dkt. 271 ¶¶ 8-9. Remaining parts are Glynn's opinion. *See Haynes*.<br><br>Judge Willis found motive. |

| | | | |
|---|---|---|---|
| | | after the fact, because Steve Avery has been sitting in a cage for those eight years. | |
| 19 | 2 ECF # 120-2 21:48 – 22:52 | Footage of James Lenk and Sheriff Peterson being questioned by Glynn in depositions at Avery's civil trial that includes Glynn getting Lenk to say that Mr. Colborn "wasn't sure" who told him that the rape in question was already solved and that the right person was arrested, and that includes a close-up of Mr. Colborn's signature identified on an exhibit | The authenticity of the video clip of Lenk's and then-Sheriff Peterson's deposition testimony is undisputed, and Colborn does not claim that either Lenk or Peterson testified falsely. The images of Colborn's 2003 report about the jail call, including a close-up of his signature, are shown while Petersen is testifying about the document, which was a deposition exhibit in Avery's civil case. *See* Dkt. 120-15 (copy of statement). Judge Willis found motive. |
| 20 | 2 ECF # 120-2 22:55-23:14 | Avery voiceover stating, "A lot of people told me to watch my back. Most of the time, I didn't even believe the[m]. But then, sitting and doing depositions, I don't know. It kind of changed my mind. They were covering something up." | This is Avery's opinion. *See Haynes*. Judge Willis found motive. |
| 21 | 2 ECF # 120-2 22:45-22:50 | Image with close-up of Mr. Colborn's signature. | This is not a statement. Judge Willis found motive. |
| 22 | 2 ECF # 120-2 23:14-23:26 | Avery continues, "And they were still covering something up. Even with the sheriff's who on there now—he's covering something up." | This is Avery's opinion. *See Haynes*. Judge Willis found motive. |
| 23 | 2 ECF # 120-2 23:28-23:50 | Cuts to footage of Mr. Colborn's videotaped deposition. | The authenticity of the video clip of Colborn's deposition testimony is undisputed, and Colborn does not claim that he testified falsely. Judge Willis found motive. |
| 24 | 2 ECF # 120-2 | Video image of Mr. Colborn | This is not a statement. |

| | | | |
|---|---|---|---|
| | 26:52-26:56 | | It is true and undisputed that Colborn was deposed in Avery's civil lawsuit and that this image is from the recording of that deposition.<br><br>This footage of Colborn is shown after footage from the deposition of investigator Eugene Kusche, who testified about a report that stated that Colborn told Kusche that the jail caller was from Brown County and that Allen and not Avery was responsible for the Beernsten assault.<br><br>Judge Willis found motive. |
| 25 | 2<br>ECF # 120-2<br>26:56-27:33 | Steven Glynn is shown, asserting, "This was an unconscionable withholding of information that would have been of use to Steven Avery's lawyers . . . If that information had come to light in 1995, Steven Avery would have gotten out in 1995. So they cost Steve Avery eight years of his life. This is as close to a conspiracy of silence as I think you could find in a case." | Misstates the content of MaM by omitting the fact that Glynn says that Avery's lawyers "were right at that time in the middle of litigation asserting, based on the fingernail scrapings, that there may have been somebody else involved in this."<br><br>This is Glynn's opinion. *See Haynes*.<br><br>Judge Willis found motive. |
| 26 | 2<br>ECF # 120-2<br>28:24-29:07 | Rotating footage of Mr. Colborn and other alleged conspirators is shown. | This is not a statement.<br><br>Misstates the content of MaM; the video footage does not identify anyone as an "alleged coconspirators." Rather, the footage and captions show that their depositions were taken in October 2005, which is true and undisputed.<br><br>Judge Willis found motive. |
| 27 | 2<br>ECF # 120-2<br>28:35-29:37 | Walt Kelly, also identified as an Avery attorney, states, "October of 2005, from the perspective of the Manitowoc County government and their | Misstates the content of MaM; Colborn omits much of what Kelly said. Kelly's full statement in this scene is: "October of 2005, from the perspective of the Manitowoc County |

8

| | | | |
|---|---|---|---|
| | | defense lawyers, I believe they all knew they were in the most serious kind of trouble. There was a very grave prospect of a very, very substantial verdict. [Their] insurers have taken the position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the Sheriff and the DA, would be on the hook for those damages in the civil suit." | government and their defense lawyers, I believe they all knew they were in the most serious kind of trouble. There was a very grave prospect of a very, very substantial verdict. Manitowoc County and the sheriff and the district attorney are arguably covered by insurance policies and there's a good half dozen insurance policies. However, the insurers have taken the position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the Sheriff and the DA, would be on the hook for those damages in the civil suit."

This statement is not about Colborn. *See Barlass*.

Colborn does not assert or provide evidence that any factual portion of this statement is false.

Remaining parts are Kelly's opinion. *See Haynes*.

Judge Willis found motive. |
| 28 | 2<br>ECF # 120-2<br>29:40-30:22 | Glynn continues, "We don't need to have somebody tell us that this is going to have an effect on law enforcement. Of course it has an effect on law enforcement. Are you kidding me? I mean law enforcement officers get uptight [if] there is even a suggestion that they have said something wrong in a courtroom. Imagine what it's like when you're going to say that you're a liar, and that you hid evidence, and that you deliberately prosecuted a | Factual parts are true, Dkt. 120-11 at 3; remaining parts are Glynn's opinion. *See Haynes*.

Judge Willis found motive. |

| | | person that you knew, or at least had reason to know, wasn't guilty of the crime? And putting all that aside, by the way, in terms of your own professionalism, there's a guy out there raping and beating women while the guy that you put in prison is sitting in a cell." | |
|---|---|---|---|
| 29 | 2<br>ECF # 120-2<br>30:29-31:04 | Glynn continues, "We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt [Kelly] who tells me that he has gotten a call from a journalist asking if either of us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach." | This statement is true. *State v. Avery* ("*Avery III*"), 2011 WI App 124, ¶ 4, 804 N.W.2d 216, 220.<br><br>This statement is not about Colborn. *See Barlass*.<br><br>Judge Willis found motive. |
| 30 | 2<br>ECF # 120-2<br>39:30-40:08 | News report excerpt regarding Halbach's disappearance is followed by footage of Avery interview in which he says that anyone could have access to his property to plant evidence and accuses the county of possibly doing "something" with Teresa Halbach and trying "to plant evidence on me," adding that he "wouldn't put nothing past the county." | Misstates the content of MaM; Avery does not explicitly accuse "the county" of anything. The exchange with the reporter is:<br><br>Reporter: "So who do you think did something with her [Halbach]?"<br><br>Avery: "I got no idea. And if the county did something, or whatever, and tried to plant evidence on me, or something, I don't know. I wouldn't put nothing past the county."<br><br>Nothing in this section of MaM is about Colborn. *See Barlass*.<br><br>The factual portion of this section of MaM—the news footage—is true in |

10

| | | | that it accurately reproduces the news interview with Avery.<br><br>The statements by Avery are opinion. *See Haynes*. |
|---|---|---|---|
| 31 | 2<br>ECF # 120-2<br>41:19-41:24 | Avery voiceover, "All I can think is they're trying to railroad me again." | This statement is not about Colborn. *See Barlass*.<br><br>This is Avery's opinion. *See Haynes*. |
| 32 | 2<br>ECF # 120-2<br>42:45-43:02 | Avery continues, "I ain't been home. They's been searching. How hard is it to put evidence in the house or on the property? . . . .The . . . . Sheriff . . . was out to get me the first time. How do I know he ain't got nothing to do with it this time?" | This statement is not about Colborn. *See Barlass*.<br><br>Factual parts are true, Dkt. 291 ¶ 38 (showing Avery arrested Nov. 9, 2005 for Halbach's murder); remaining parts are Avery's opinion. *See Haynes*. |
| 33 | 2<br>ECF # 120-2<br>44:24-44:35<br>46:37-46:52 | Avery continues, "all these memories and everything else, and they're just sketching me out again. And deep down, it hurts. [more news footage] You know we're all victims, and they just won't leave us alone. They just keep it up and keep it up. You know a person can only take so much, you know." | Misstates content of MaM; these are portions of two separate interviews, shown minutes apart.<br><br>These statements are not about Colborn. *See Barlass*.<br><br>This is Avery's opinion. *See Haynes*. |
| 34 | 2<br>ECF # 120-2<br>52:24-52:29 | Avery states during an apparent interrogation: "See, if somebody else plants that shit there, you ain't going to see . . ." | This statement is not about Colborn. *See Barlass*.<br><br>This is Avery's opinion. *See Haynes*. |
| 35 | 3<br>ECF # 120-3<br>14:14-14:42 | Unidentified woman in a bar states, "I really do think he was framed. . . There's a lot that points to where the Sheriff's Department could've had something to do with it. And then I don't know if it's true or not, but I also heard that Manitowoc County was not supposed to be allowed in to search, and they were in | Factual parts are true, Dkt. 271 ¶ 11; remaining parts are the woman's opinion. *See Haynes*. |

| | | there and they searched. And that's who found the key apparently after the third day was the Manitowoc County Sheriff's Department. . ." | |
|---|---|---|---|
| 36 | 3<br>ECF # 120-3<br>14:43-15:05 | Male bar patron adds, "I only have one word, from the cops on up: it's corruption. Big time. I mean, if people dig far enough, they'll see that." | This statement is not about Colborn. *See Barlass*.<br><br>This is the man's opinion. *See Haynes*. |
| 37 | 3<br>ECF # 120-3<br>15:06 -15:36 | Unidentified female bar patron continues, "I don't care what anybody says, that's a lot of money to pay out from here in Manitowoc County. It's a small area and I really, truly believe the county didn't have the funds to pay it out. . . And they can say, "Oh, you really believe the Manitowoc County police department and the FBI and everybody came in and they set all this up just to have Steven Avery guilty of this thing?' Yes, I do. . . ." | Misstates the content of MaM; this is not a continuation of the statement by the woman in No. 35; it is by a different woman.<br><br>This statement is not about Colborn. *See Barlass*.<br><br>This is the woman's opinion. *See Haynes*. |
| 38 | 3<br>ECF # 120-3<br>16:45-16:55 | MAM depicts a telephone call between Avery and his sister in which Avery says, "This way, they figure they just got away with it, they can do it again . . . . You know it ain't gonna stop 'em." | This statement is not about Colborn. *See Barlass*.<br><br>This is Avery's opinion. *See Haynes*.<br><br>Judge Willis found motive. |
| 39 | 3<br>ECF # 120-3<br>20:21 –<br>21:03 | Dean Strang, speaking out of court, is shown stating, "I didn't see them plant evidence with my own two eyes. I didn't see it. But do I understand how human beings might be tempted to plant evidence under the circumstances in which the Manitowoc County Sheriff's Department found itself. . . . I don't have any difficulty | Misstates the content of MaM by omitting several sentences. Strang's full statement is: "I didn't see them plant evidence with my own two eyes. I didn't see it. But do I understand how human beings might be tempted to plant evidence under the circumstances in which the Manitowoc County Sheriff's Department found itself after Steven's exoneration, of the lawsuit, of the Avery commission, of the governor hugging Steven and holding him up as |

| | | understanding those human emotions at all." | an example of the criminal justice system gone wrong? Do I have any difficulty understanding what human emotions might have driven police officers to want to augment or confirm their beliefs that he must have killed Teresa Halbach? I don't have any difficulty understanding those human emotions at all."<br><br>This is Strang's opinion. *See Haynes*.<br><br>This statement is substantially identical to statements made at Avery's murder trial. Statements of opinion based on true or privileged facts are not actionable. *See Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶23, 351 Wis. 2d 479, 503-04, 840 N.W.2d 255, 266.[3] |
|---|---|---|---|
| 40 | 3<br>ECF # 120-3<br>21:16-21:49 | Attorney Buting, speaking out of court, states, "So, you've got motivation for the officers to want to get him. And then when lo and behold there's this woman who disappears and one of the last people she saw was Steven Avery. . . . 'Now, we've got him. A-ha. We knew it.' They conclude that he's guilty, right off the bat. And they thought, 'We're going to make sure he's convicted.' And they helped it along by planting his blood in the RAV4 and by planting that key in his bedroom." | Factual parts are true, Dkt. 269 at 4; Dkt. 271 ¶ 14; remaining parts are Buting's opinion. *See Haynes*.<br><br>Mirrors statements at trial. |

---

[3] For simplicity, this point is hereafter referred to as "Mirrors statements at trial."

| 41 | 4<br>ECF # 120-4<br>32:41 – 33:04 | Attorney Buting, speaking out of court, states "Some would—might think, 'Well, you know we—our hands were tied . . . That you got a client who's saying that he's being framed. Publicly, that's kind of the defense you'd better go with' . . . . But it really wasn't that way here. The defense was raised because we think the evidence pointed that way. . . ." | Factual parts are true, Dkt. 271 ¶¶ 13-15; remaining parts are Buting's opinion. *See Haynes*.<br><br>Mirrors statements at trial. |
|---|---|---|---|
| 42 | 4<br>ECF # 120-4<br>1:00:05 – 1:00:43 | Buting says out of court, "Sheriff Peterson . . . .clearly, clearly has a strong dislike for Avery. If the very top guy has this kind of attitude . . . that's gonna permeate the department, the whole department. If not, at least it's going to permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants." | Misstates the content of MaM by omitting portions of Buting's statement, which is:<br><br>"Sheriff Petersen was the arresting officer of Avery in 1985. He's now the head of that office, and clearly, clearly has the strong dislike for Avery. If the very top guy has this kind of attitude about Avery, and that kind of personal involvement in the case of Avery, that's gonna permeate the whole department. If not, at least it's gonna permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants."<br><br>This quotation is also immediately followed by Buting stating: "So we looked around and one guy's name just kept coming up over and over and over every place we looked. At critical moments. And that was Lieutenant James Lenk. Lenk is the guy who finds the key in the bedroom on the seventh entry at supposedly in plain view. Lenk is deposed just three weeks before this Halbach disappearance. And then, most peculiar of all, is when we looked in Steven's old 1985 case file in the clerk's office. Some items from that |

14

| | | | court file ultimately proved to exonerate Steven. Interestingly enough, the transmittal form that goes with the evidence in 2002 to the crime lab is filled out by none other than at that time, Detective Sergeant James Lenk." |
|---|---|---|---|
| | | | Factual parts are true; Dkt. 271 ¶¶ 3, 12; Ep. 4 (Dkt. 120-4) at 1:00:53-1:00:43; remaining parts are Buting's opinion. *See Haynes*. |
| 43 | 4 ECF # 120-4 1:00:25 – 1:00:47 | Mr. Colborn's photograph is shown immediately after the above comments, underneath a hierarchy of photographs of the Sheriff's Department chain of command, with the lower levels (including the photograph of Mr. Colborn) illuminated | This graphic is a true and undisputed depiction of the chain of command of the Manitowoc County Sheriff's Office at the time. |
| 44 | 4 ECF # 120-4 1:03:00 – 1:04:15 | Buting says in an apparent telephone call to Strang that the supposed tampering with a blood vial containing Avery's blood shows that "Some officer went into that file, opened it up, took a sample of Steve Avery's blood and planted it in the RAV4." | This statement is not about Colborn. *See Barlass*. This is Buting's opinion. *See Haynes*. To the extent this is a verifiable statement of fact, Colborn has not presented any evidence that would prove this statement is false. Mirrors statements at trial. |
| 45 | 5 ECF # 120-5 52:03- 52:12 | Buting states, out of court, "Somebody knew that [Ms. Halbach's] vehicle was there before they ever went there. I'm convinced of it." | Misstates the content of MaM by leaving out context indicating the statement is not about Colborn; after footage of the testimony of Pamela Sturm, who found Halbach's RAV4 at the Avery Salvage Yard, Buting is shown stating: "I never believed, and to this day don't believe, Sturm's 'Holy Spirit guided me there' theory. Not that I don't believe that it's possible. But I just don't believe her. I do not believe her at all. I, I never— |

| | | | |
|---|---|---|---|
| | | | she just seemed too weird. And, you know, it's—they went right to that thing. Somebody knew that vehicle was there before they ever went there. I'm convinced of it."

This is Buting's opinion. *See Haynes*.

To the extent this is a verifiable statement of fact, Colborn has not presented any evidence that would prove this statement is false. |
| 46 | 5 ECF # 120-5 52:13 – 53:20 | Interrogation of Avery follows Buting's statement; Avery tells an officer that he was told by a woman identified only as "Tammy" that "a cop" put Ms. Halbach's vehicle on Avery's property "and planted evidence." | Misstates the content of MaM; during the interrogation Avery said that "Tammy" told him "that she heard that a cop put it out there and planted evidence."

This is Avery's opinion, *see Haynes*, and reasonable viewers do not understand statements made by accused criminals during interrogations as statements of actual fact by the filmmakers. |
| 47 | 5 ECF # 120-5 53:20-:24 | Immediately after the above, cuts to footage of Mr. Colborn about to testify | This is not a statement.

It is true that Colborn testified at Avery's trial and that Avery's attorneys implied Colborn could have been involved in planting the vehicle at the Avery Salvage Yard.

Judge Willis found motive. |
| 48 | 6 ECF # 120-6 56:26 – 57:11 | Buting, in an interview with MAM, states, "One of the things that the state argued was that it would have taken a wide-ranging conspiracy . . . . Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument why would they risk doing this and risk | Factual parts are true, Dkt. 271 ¶ 56; remaining parts are Buting's opinion. *See Haynes*.

Mirrors statements at trial. |

16

| | | | |
|---|---|---|---|
| | | getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?" | |
| 49 | 7<br>ECF # 120-7<br>1:04 – 1:17 | Statement by Avery's father: "They had Steve picked . . . right away. They set him up. Right from the beginning. . . ." | This vague statement is not about Colborn. *See Barlass*.<br><br>This is Allan Avery's opinion, *see Haynes*, and reasonable viewers do not understand statements by the father of an accused (and later convicted) murderer to be statements of actual fact by the filmmakers. |
| 50 | 7<br>ECF # 120-7<br>10:45 – 12:00 | Buting and Strang are shown in an out-of-court conversation filmed by MAM, stating:<br>Buting: "It's not enough to just get the key. He wants Avery's DNA on that. And so he is gonna wait until it is the right time. And there is a Calumet County deputy with him on all of their searches.<br>Strang: Yep. There is . . . .<br>Buting: Somewhere nearby, and he was just waiting for the right time . . . when he could do it.<br>Strang: That key does not fall from, you know, in between the backboard and the frame of that little bookcase. . . .<br>Buting: And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?<br>Strang: Blood's easy. . . . | These are Buting's and Strang's opinions. *See Haynes*.<br><br>The references to "he" are to James Lenk, not Colborn; Lenk's testimony is shown immediately before and immediately after this scene. *See Barlass*.<br><br>Mirrors statements at trial. |

| | | Buting: The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation . . . because of that lawsuit. They were deposed in the lawsuit. They didn't tell. . . ." | |
|---|---|---|---|
| 51 | 7<br>ECF # 120-7<br>14:48 –<br>15:15 | Avery states, "I'm in the same situation that I was before. Just a couple of them wanting to nail me. And the other ones didn't. But nobody speaks up. I gotta go through this over and over." | This is Avery's opinion, *see Haynes*, and reasonable viewers do not consider statements by accused (and later convicted) murderers to be statements of fact by the filmmakers. |
| 52 | 7<br>ECF # 120-7<br>15:15 | Directly after Avery's comments above, MAM displays image of Mr. Colborn, and audio of Avery continues; video then switches between images of Mr. Colborn waiting to testify, Avery looking sad, and Mr. Colborn in court | This is not a statement.<br><br>Colborn presents no evidence that would show this scene is not an accurate portrayal of him waiting to testify and of Avery's demeanor at that point of the trial. |
| 53 | 7<br>ECF # 120-7<br>24:28 –<br>26:01 | Switches to exchange with reporter in which she questions Strang about whether the defense went too far by accusing Mr. Colborn of being a "bad cop," which includes the following: Strang: This was a hard day, and there've been some hard days for Sgt. Colborn. . . . Reporter: "But my question is though, that if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place." | This scene shows the reporter defending Colborn and challenging Avery's defense lawyer about the planting allegations. That portion is the opposite of defamatory of Colborn; it supports him. Colborn cannot credibly contend that omitting this exchange from MaM would have made the documentary *less* harmful to his reputation.<br><br>Strang's statements are unverifiable opinion and/or speculation; they are not statements of fact by Netflix, any more than the reporter's statements are statements of fact by Netflix. *See Haynes*. |

| | | | |
|---|---|---|---|
| | | Strang: You're hearing evidence of the conspiracy. And I've sat in many a federal courtroom and heard federal prosecutors prove a conspiracy on less than we've heard already here and that you will hear by the end of this trial." | |
| 54 | 7<br>ECF # 120-7<br>37:43 – 37:57 | Telephone conversation shown between Avery and his mother:<br>Avery's mother: It seems suspicious.<br>Avery: Yeah.<br>Avery's mother: Them people ain't gonna get away with everything. | These are Avery's and his mother's opinions, *see Haynes*, and reasonable viewers do not understand statements by accused (and later convicted) murderers and their parents to be statements of fact by filmmakers.<br><br>These statements are not about Colborn; they are presented after Buting discusses the defense's implications that Lenk would have known about the presence of the blood vial in the Manitowoc County court clerk's office, and the clerk's testimony that the sheriff's office had master keys to the clerk's office where the vial was kept. *See Barlass*. |