

sixteen-year-old learning disabled nephew and accomplice in Teresa Halbach's murder.

So I decided to journey through the trial again, but this time more carefully—as if my life depended on it—because it might. Half the country, it seemed, was convinced the police had set up Avery again, that lightning had struck twice and that he had been wrongly convicted a second time. Many people were angry. Some made threats on my life and the lives of others because we were part of Manitowoc County law enforcement and had spoken out publicly of Avery's guilt in the wake of *Making a Murderer*.

*Indefensible* recounts my independent search for the truth about the Steven Avery case. I thought I knew that truth, but it was to some extent fractured by *Making a Murderer*. As I delved deeper into the circumstances surrounding Teresa Halbach's murder, the truth became whole again.

As in any issue as complicated and as controversial as this one, the truth is elusive in the Avery case. Peruse the Reddit pages on the topic of Steven Avery for an hour and you will see what I mean. I tried to be as careful and unbiased as possible when I conducted my research for this book, but in the end perfect objectivity is only something we can strive for.

I'm still a prosecutor in Manitowoc County, Wisconsin. This is the background I come from. I'm not "pro prosecution" in the usual sense. I have believed for a long time that the criminal justice system is broken to some degree, and needs to be reformed. I have given presentations about wrongful convictions and police and prosecutor misconduct. I have written about these issues as well and about what can go wrong if prosecutors lose sight of their calling and seek convictions instead of justice.

I share with the creators of *Making a Murderer* a desire to draw attention to broken aspects of the criminal justice system so that it can be reformed where needed. I also serve on the advisory board at the Wisconsin Innocence Project, a role that should not be—but is—a rarity among prosecutors. That's not to say my

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 2 of 4   Document 315-1

of law enforcement, and combined with the resurgence of true crime in the popular media and a rapidly expanding effort of Internet giants, such as Netflix, to produce original programming, *Making a Murderer* rode a perfect storm to the screens of tens of millions of viewers across the globe.

For months it was the most common fodder for watercooler and coffee break discussions across the land. It made it onto the front page of the *Beijing News,* and Al Jazeera devoted a piece on its website to a topic close to its heart—coercive interrogation techniques of U.S. law enforcement agencies—although it's hard to imagine a wider chasm than that which exists between county sheriff's department detectives in rural Wisconsin and the CIA.

By its skillful use of film and sound techniques and omission of facts that belied its conclusion, *Making a Murderer* has all but convicted two intelligent, honest, and well-respected police officers of planting evidence to frame Avery a second time. This is a narrative now widely accepted by legions of Netflix viewers whose only familiarity with the Avery case is the documentary itself.

Transformed into would-be jurors, who are cleverly manipulated by an all-knowing judge in the form of the documentarians, viewers are shown only one side of the evidence. The prosecution's refutation of evidence-planting claims during cross-examination and rebuttal—the "truth-seeking machinery" of jury trials, as one legal scholar put it—is minimal. Avery's criminal history is deconstructed beyond credulity. His lighting a cat afire after dousing it with gasoline when he was twenty years old is passed off as an accident while horsing around with friends. He didn't intend to cause any harm to his neighbor after he ran her off the road and held her at gunpoint. As *Making a Murderer* would have it, he did so because the woman was spreading rumors about him. Never mind that he had been using a pair of binoculars to watch her for weeks, sexually gratifying himself as she drove by. I had to admit, though, I was impressed. The skill with which the documentarians made light of Avery's criminal history rivaled that of

seasoned criminal defe
ners into saints countle

Nor are viewers info
by police in Avery's tra
evidence he used the
peared, but they were i
on his mind in the day:
was his sketch of a "tort
inmates about using it tc
when he got out, forete
victim's final hour.

Clinging to claims
pointed out that truth i
true enough. However,
and manipulating othe
recognition and have c
believe. "High-brow vig
Schulz put it in her col
*Yorker* ("Dead Certainty

Aiming to draw atte
justice system badly in n
a laudable goal, and tl
tributing mightily to the
justice reform. The unw
prosecutors have in thei
with the overzealousnes
toward a self-righteous b
combined with our awes
too often led to the abu:
willingness to treat with
rung of the economic a
suffering for many who f
they drew the attention
in crime.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 3 of 4   Document 315-1

seasoned criminal defense attorneys whom I have seen turn sinners into saints countless times at sentencing.

Nor are viewers informed of the handcuffs and leg irons found by police in Avery's trailer home after the murder. There was no evidence he used the items on the day Teresa Halbach disappeared, but they were in keeping with what appears to have been on his mind in the days leading up to her murder. Left out, too, was his sketch of a "torture chamber" and his fantasizing to fellow inmates about using it to sexually assault and murder young women when he got out, foretelling the atmosphere surrounding his real victim's final hour.

Clinging to claims of objectivity, the documentarians have pointed out that truth is elusive in the Steven Avery case, which is true enough. However, by excluding facts that don't fit their aim and manipulating others, they have distorted the truth beyond recognition and have decided for the rest of us what we are to believe. "High-brow vigilante justice" is how columnist Kathryn Schulz put it in her column about the documentary in *The New Yorker* ("Dead Certainty"). To which I respond, "Right on."

Aiming to draw attention to the shortcomings of a criminal justice system badly in need of reform, the producers set out with a laudable goal, and the fruits of their labor are already contributing mightily to the ongoing discussion concerning criminal justice reform. The unwarranted certainty that some police and prosecutors have in their interpretation of equivocal facts, along with the overzealousness of some in our ranks and our tendency toward a self-righteous belief that we are always in the right, when combined with our awesome and often unchecked authority, has too often led to the abuse of power. The system's inability or unwillingness to treat with dignity and respect those on the bottom rung of the economic and social ladder has caused unnecessary suffering for many who faced long odds of making it even before they drew the attention of the police and the courts by engaging in crime.