**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

|  |  |
|---|---|
| **ANDREW L. COLBORN,**<br><br>        **Plaintiff,**<br><br>    **vs.**<br><br>**NETFLIX, INC.; CHROME MEDIA LLC,<br>F/K/A SYNTHESIS FILMS, LLC;<br>LAURA RICCIARDI; AND MOIRA<br>DEMOS,**<br><br>        **Defendants.** | **Civil No.: 19-CV-484-BHL** |

**DEFENDANTS LAURA RICCIARDI, MOIRA DEMOS, AND CHROME MEDIA LLC'S
<u>OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**INTRODUCTION**

Plaintiff's Motion for Partial Summary Judgment ("MPSJ") should be denied in its entirety. As an initial matter, the MPSJ fails because it requests partial summary judgment of certain defamation elements with respect to 52 alleged third-party "statements" or "embellishments" in *Making a Murderer* ("*MaM*")—but neither the MPSJ nor Plaintiff's Proposed Findings of Fact ("Pl. PFOF") contain any specific arguments or discussion about any of those 52 statements. Instead, the 52 statements are simply listed without explanation. As a result, Plaintiff fails to provide even a hypothetically viable basis for summary judgment.

Additional defects further demonstrate why Plaintiff is not entitled to summary judgment. His MPSJ is inconsistent on whether he seeks summary judgment as to falsity, but to the extent he does, his MPSJ fails to acknowledge, let alone address, the applicable legal standard. Under *Global Relief Found., Inc. v. N.Y. Times Co.*, 390 F.3d 973 (7th Cir. 2004), the relevant inquiry is not whether third parties' allegations in *MaM* that Plaintiff planted evidence are correct, but whether *MaM* accurately captured the gist of those allegations. As the Seventh Circuit held, "[w]e reject [plaintiff's] argument that these media defendants must be able to prove the truth of the government's charges before reporting on the investigation itself… Whether the government was justified in its probe is irrelevant to the defamation claims when these media defendants accurately reported on the investigation itself." *Id.* at 987, 990. Moreover, even if the truth of third parties' allegations against Plaintiff were the relevant issue for falsity (although it is not under *Global Relief*), he still would not be entitled to summary judgment because he does not come close to meeting his evidentiary burden and he ignores contradictory evidence.

Plaintiff's MPSJ also erroneously claims that the Producer Defendants made defamatory statements about him through *MaM*'s inclusion of the viewpoints of Steven Avery and his

defenders. But Plaintiff ignores that *MaM* also includes Plaintiff's and others' denials of Avery's planting allegations and their views that Avery is guilty. The governing law is clear that presenting both sides of a contested issue is not a materially false endorsement of the truth or falsity of either side's allegations. Plaintiff cannot conflate the statements of third-party subjects in *MaM* with statements by the Producer Defendants themselves.

Plaintiff's MPSJ also lacks merit regarding actual malice. His inability to prove falsity dooms his request for summary judgment on actual malice, as falsity is a prerequisite to actual malice. His MPSJ also lacks any argument and evidence related to the Producer Defendants' alleged actual malice. Instead, the MPSJ focuses on a handful of notes written by Netflix executives, which cannot be attributed to the Producer Defendants (and regardless do not remotely show actual malice by Netflix). Furthermore, the fact that those handful of unremarkable notes are the best evidence that Plaintiff could muster in support of his MPSJ—after a year of discovery including ten depositions and more than 150,000 pages of documents produced in the case—underscores just how meritless his claims are.

The Court should deny Plaintiff's MPSJ in its entirety. And, as explained in the Producer Defendants' own Motion for Summary Judgment, the Court should grant summary judgment in favor of the Producer Defendants.

## BACKGROUND

The Producer Defendants' Motion for Summary Judgment papers detailed the relevant factual background, accompanied by supporting evidence. Dkt. 294 at 5–13; Dkts. 288–291. The Producer Defendants incorporate that factual background and evidence here, as it addresses many of the same subjects at issue in Plaintiff's MPSJ, e.g., the Producer Defendants' lack of actual malice. The additional facts below provide further background relevant to the MPSJ.

## I.    Responses to Plaintiff's Proposed Findings of Facts

In response to Plaintiff's chart of 52 third-party "statements" and "embellishments," Dkt. 285, MPSJ at 6–12, the Producer Defendants maintain that *MaM* speaks for itself and must be considered as a whole. *See* F.R.E. 106, 1001–08; Pl. PFOF ¶¶ 2–54. Considered as a whole, *MaM* presents a variety of viewpoints, including that of Plaintiff and other law enforcement officials, despite Plaintiff's MPSJ's restricting its focus to statements by Avery, his attorneys and other Avery supporters. *See* Supplemental Proposed Findings of Fact ("SPFOF") ¶¶ 15–22.

Plaintiff's selective quoting of third-party statements in his MPSJ often excludes material context. *See* Pl. PFOF ¶ 3–54.[1] For example, Plaintiff cites an exchange between a reporter, Angenette Levy, and Avery's attorney Dean Strang regarding Plaintiff's trial testimony and the defense's frame-up theory. Pl. PFOF ¶ 53. But Plaintiff's chart excludes the portion of the exchange shown in *MaM* where Levy criticizes Strang about the effect of accusing an officer of misconduct. *See id.*. Plaintiff also cites a statement made by Avery during a police interrogation in which Avery suggests that evidence was planted against him. Pl. PFOF ¶ 34. But his chart excludes the portion of that interrogation (shown in *MaM*) where Investigator Mark Wiegert pushes back against Avery, stating "Steve, come back to reality here." *MaM* Ep. 2 at 51:30–52:58. There are also duplicate "statements" of *MaM* showing the same image onscreen listed out of order, giving the misleading impression that Plaintiff's signature was onscreen during dialogue about the Sheriff. Pl. PFOF ¶¶ 19–21. These are but three examples.[2]

---

[1] Plaintiff's chart contains many material transcription errors, further underscoring why the best evidence is *MaM* itself. *See* Pl. PFOF ¶¶ 3–54; F.R.E. 1001–08.

[2] Plaintiff concedes other facts are immaterial to the MPSJ by failing to mention them in his brief. For example, he claims to have received critical voicemails from unidentified members of the public and selectively quotes them in his PFOF. Pl. PFOF ¶¶ 62–69. Setting aside their evidentiary deficiencies, Plaintiff fails to even mention these messages, let alone show their relevance to his MPSJ. *See* Dkt. 285. He admits the callers are unreasonable. SPFOF ¶ 47

## II. Supplemental Proposed Findings of Fact

### A. Differing Viewpoints in *MaM*

Both the Producer Defendants and Netflix have repeatedly attested that *MaM* itself comes to no conclusion about whether Avery and Dassey are guilty or whether law enforcement planted evidence. *See* SPFOF ¶¶ 11–14. Rather, *MaM* presents different people's viewpoints on those subjects, leaving viewers with open questions they ultimately must decide for themselves or choose to live with the uncertainty and ambiguities in the cases. *See id.* The Producer Defendants did not investigate the crime; they chronicled others' investigation. *See id. MaM* conveys the Manitowoc community's varied viewpoints regarding the Averys, the Manitowoc County Sheriff's Department ("MTSO"), and Teresa Halbach's murder. *See* SPFOF ¶¶ 16, 18, 21, 22.

Plaintiff has never watched *MaM* in its entirety; he watched snippets totaling less than 30 minutes before bringing this lawsuit and has since watched no more than an additional 30 to 45 minutes. SPFOF ¶ 15. If Plaintiff had watched *MaM*, he would know that the episode that shows bar patrons socializing with Chuck Avery later shows other community members expressing their belief that Avery and Dassey killed Teresa Halbach. *See* SPFOF ¶ 16. A full viewing would also clarify that *MaM* showed that Avery's defense presented a theory at trial that Plaintiff and Lenk had planted evidence, that *MaM* also showed that Plaintiff and Lenk denied those accusations, that Avery and Dassey were convicted of murder, and that their post-conviction motions and appeals were unsuccessful. SPFOF ¶¶ 17, 18, 22.

In closing arguments, Avery's attorney argued that officers planted evidence "to ensure the conviction of someone they've decided is guilty." SPFOF ¶ 19. For his part, prosecutor Ken Kratz urged the jury to disregard the planting theory, noting that it "shouldn't matter whether or not that key was planted" because "that key, in the big picture, in the big scheme of things,

means very little" compared to the bulk of evidence against Avery. SPFOF ¶ 20. No finder of fact has ruled on whether Plaintiff planted evidence; they ruled on Avery and Dassey's guilt.

### B. Relevant Underlying Events

While the full factual background of Avery's case is incorporated by reference from the Producer Defendants' Motion for Summary Judgment, certain specific facts are material to rebut and place in context Plaintiff's loose allegations. *See* Dkt. 294.

1995 was an important time in Avery's wrongful conviction because he had hearings on multiple motions for post-conviction relief, which included arguments that law enforcement had information on an alternative suspect they did not disclose. SPFOF ¶ 23. Meanwhile, Penny Beerntsen's actual assailant, Gregory Allen, was convicted of a subsequent brutal assault in 1995. SPFOF ¶ 24. After DNA evidence identified Allen and exonerated Avery, a Wisconsin Department of Justice review confirmed that law enforcement had alibi evidence for Avery and information that should have made them consider Allen a suspect, but they failed to pursue Allen "because the sheriff's department had only one suspect in mind:" Avery. SPFOF ¶¶ 25–27.

Upon Avery's 2003 release, there were a number of law enforcement responses. For the first time, Plaintiff wrote a statement and submitted it to then-Sheriff Ken Petersen regarding a Jail Call that Plaintiff received in 1994 or 1995. SPFOF ¶¶ 28, 29. The Sheriff stored the statement in a safe. *See id.* Plaintiff testified that he never spoke to anyone about the Jail Call between receiving it in 1994 or 1995 and writing his 2003 statement, but several others in law enforcement have testified or otherwise stated that someone in MTSO (some believed it was likely former Sheriff Kocourek, who left office in 2001, two years before Avery was released) relayed the message to Plaintiff not to worry about the Jail Call because MTSO had "the right guy." SPFOF ¶¶ 30, 31. After a Wisconsin DOJ review found a failure to investigate Allen but no ethical or legal violations by Manitowoc County, Avery filed a civil rights suit against the

County, former Sheriff Thomas Kocourek, and former District Attorney Dennis Vogel. SPFOF ¶ 32. Plaintiff was deposed in that lawsuit but was not named as a defendant. *See id.*

After Teresa Halbach's disappearance on October 31, 2005, there were concerns about a conflict of interest with Manitowoc County based on Avery's pending lawsuit and the County's prior involvement with Avery's 1985 wrongful conviction, so Calumet County took over the investigation and MTSO Sheriff Petersen was recused. SPFOF ¶¶ 33, 34. Plaintiff and MTSO Lieutenant James Lenk took part in several days' searches of Avery's trailer starting November 5, 2005, but the key to Teresa Halbach's Toyota was only found by Lenk on November 8. SPFOF ¶ 35. In pretrial orders, Judge Willis ruled that Plaintiff was one of two officers (along with Lenk) whom Avery could accuse at trial of planting through circumstantial evidence. SPFOF ¶ 38. *MaM* showed Plaintiff's trial testimony denying that he planted evidence and claiming Lenk found the key after Plaintiff had shaken a bookcase. SPFOF ¶¶ 17, 36. As shown in *MaM*, the defense pointed to circumstantial evidence of a frame-up through their closing arguments, but the State disputed the theory as irrelevant. SPFOF ¶¶ 19, 20.

## RELEVANT LEGAL STANDARDS

Plaintiff's MPSJ repeatedly misrepresents and ignores the relevant legal standards. In addition to ignoring the relevant inquiry for falsity/substantial truth under *Global Relief*, as discussed in the Introduction, Plaintiff wrongly suggests Defendants bear the burden of proving the truthfulness of the statements at issue "to overcome" his MPSJ. Dkt. 285 at 15–16.[3] But in a defamation case involving a public official, there is "a constitutional requirement that the

---

[3] The MPSJ is inconsistent about whether Plaintiff is moving on falsity. The Introduction and Conclusion identify three issues for summary judgment: (1) publication of *MaM*; (2) the defamatory nature of statements in *MaM*; and (3) actual malice. Dkt. 285 at 1, 16. But the fourth subheading asserts: "*MaM* is false as to accusations that Mr. Colborn participated in a conspiracy to plant evidence and/or planted evidence." *Id.* at 15. In any event, he cannot show falsity.

plaintiff bear the burden of showing falsity, as well as fault[.]" *Phila. Newspapers v. Hepps*, 475 U.S. 767, 775–76 (1986). Moreover, to show fault (actual malice), Plaintiff faces an extremely heightened evidentiary standard: "The burden of proving 'actual malice' requires the plaintiff to demonstrate with *clear and convincing* evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984) (emphasis added).

Rather than address the relevant legal standards and burdens, Plaintiff relies on inapposite Rule 56 cases outside the context of the special constitutional considerations applicable here. Dkt. 285 at 4, 16 (citing *Liu v. T&H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1990) (Illinois contract law) and *Scott v. Harris*, 550 U.S. 372, 380 (2007) (excessive force)). Plaintiff is a former public official who has brought a defamation suit targeting speech on a matter of public interest, and "[t]he First Amendment requires courts to 'make an independent examination of the whole record so as to assure [themselves] that the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Torgerson v. Journal/Sentinel Inc.*, 563 N.W.2d 472, 481 (Wis. 1997) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 285 (1964)).

## ARGUMENT

### III. Plaintiff Seeks Partial Summary Judgment of 52 Statements that His MPSJ Fails to Address and for Which His SAC Does Not Validly Allege Defamation

Plaintiff seeks partial summary judgment with respect to the elements of publication, defamatory nature, and actual malice with respect to certain "republished third-party statements that were included in *MaM*." Dkt. 285 at 1. However, he simply drops into the middle of his brief a chart of 52 "statements" and "embellishments"—*without* addressing any of those 52 statements in any substance, let alone demonstrating how any of them satisfy the elements of defamation that his MPSJ purports to cover or what connection, if any, they have to the SAC. *Id.* at 6–12.

7

Instead, his MPSJ only asserts that the 52 statements, as an undifferentiated mass, "repeat or embellish third-party accusations against Colborn and the 'law enforcement conspiracy.'" *Id.* at 5. But he ignores his legal burden by providing no explanations on that score, let alone ones tailored to the 52 statements with respect to any specific elements of the defamation claim pleaded in his SAC. *See Hotel 71 Mezz Lender Ltd. Liab. Co. v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (party moving for summary judgment must "lay out the elements of the claim, cite the facts which [he] believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim").

Plaintiff's PFOF is no better. It again just lists the 52 statements as having been included in *MaM*. Pl. PFOF ¶¶ 3–54. It fails to address any of them specifically, but instead asserts that, again as an undifferentiated mass, "the statements identified in the table set forth in paragraphs 3–54, above, are capable of being understood, individually or collectively, as implying or making innuendos" that Avery was wrongfully convicted, that law enforcement officers framed Avery, and that Plaintiff participated in a conspiracy to frame Avery. Pl. PFOF ¶¶ 55–57.[4] No explanation is provided with respect to any individual statement, let alone one tailored to satisfying the defamation elements on which Plaintiff seeks partial summary judgment.

As a result, Plaintiff fails to provide even a hypothetically sufficient basis for partial summary judgment with respect to the 52 statements. Defamation plaintiffs are required to identify *specific* allegedly defamatory statements and to explain why those statements satisfy *particular* elements of defamation. *HWAG, LLC v. Racine Car Dealer LLC*, No. 17-CV-821, 2017 WL 6501914, at *5 (E.D. Wis. Dec. 19, 2017) ("To satisfy the requirements of Wis. Stat.

---

[4] The SAC does *not* allege libel by implication or innuendo, a special species of defamation. Plaintiff is not allowed to amend his complaint for a third time *sub rosa* under the guise of an MPSJ. *See also infra*, Section VI.A (Plaintiff does not satisfy implication/innuendo criteria).

§802.03(6), the plaintiff must specify what statements were allegedly false, as opposed to simply stating that defendant made false statements"); *Mitchell v. Plano Police Dep't*, No. 16-CV-07227, 2017 WL 4340118, at *6 (N.D. Ill. Sept. 29, 2017) (plaintiff must "identify any particular statement" alleged to be defamatory and must "allege facts suggesting that the statement was false," and may not rely on mere "legal conclusion" devoid of detail about particular statements); *Anderson v. Indep. Sch. Dist.*, 357 F.3d 806, 809 (8th Cir. 2004) (affirming judgment as a matter of law in favor of defendant because plaintiff "failed to meet his burden as to an essential element" with respect to "each of the above statements" that plaintiff claimed was defamatory).[5] Nor has he presented admissible evidence to meet his burden. In discovery, Plaintiff conceded he had no contemporaneous records about the underlying events and has produced nothing that rebuts the thousands of pages of official records the Producer Defendants relied on. SPFOF ¶ 39.

Moreover, the 52 statements themselves only underscore Plaintiff's failure to provide the tailored arguments necessary for a *bona fide* motion for partial summary judgment. Take, for example, the first statement: "*Steve Avery voiceover: 'They had the evidence back then that I didn't do it. But nobody said anything . . .*" Pl. PFOF ¶ 3. As with every other of the 52 statements, neither Plaintiff's Brief nor his PFOF include any explanation how that statement is false, defamatory, or made with actual malice by Producer Defendants—despite the fact those are the ostensible focus of Plaintiff's MPSJ. Plaintiff does not even meet his threshold constitutional burden of showing that this particular statement is "of and concerning" him personally. In the *MaM* scene in question, Avery's voiceover is accompanied by images from a

---

[5] *See also Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007); *Ashker v. Aurora Med. Grp.*, 841 N.W.2d 297, 300 (Wis. Ct. App. 2013) (defamation claim violated Wis. Stat. § 802.03(6) where plaintiff "did not specify in his complaint what statements were allegedly false"); *Tatur v. Solsrud*, 498 N.W.2d 232, 233 (Wis. 1993) (same where the "plaintiffs merely attached the eight letters to the complaint" without specifying particular statements in those letters).

MTSO organization chart that *does not feature Plaintiff* but instead includes MTSO individuals involved in the investigation into the 1985 assault for which Avery was wrongfully convicted, including former Sheriff Tom Kocourek, who was named as a defendant in Avery's civil suit. *MaM* Ep. 1 at 4:35–4:45. Plaintiff also artificially cuts off Avery's statement. Immediately after saying "nobody said anything," Avery continues (while visual is focused on Kocourek), "I don't see what I really did wrong to the sheriff for him to pick on me like that." *Id.*

This is just one example. Plaintiff fails to explain how *any* of the 52 challenged statements satisfy the elements of falsity, defamatory meaning or actual malice by the Producer Defendants, or to address the threshold "of and concerning" requirement. Plaintiff devotes seven pages of a seventeen-page brief to this statement chart and only six pages to any form of applied legal argument. *See* Dkt. 285 at 6–12 (chart); 4–5, 13–16 (argument). Moreover, Plaintiff's list of 52 statements is substantially comprised of statements that, on their face: (1) are not of and concerning Plaintiff; (2) are not defamatory; (3) are nonactionable opinion and conjecture of third-party speakers; (4) are not false, let alone indisputably so, and (5) in no way demonstrate actual malice by any Defendants. In fact, many of the 52 statements are not statements at all, but rather unremarkable descriptions of images in *MaM*. S*ee* Pl. PFOF ¶¶ 5, 8, 21, 24, 26, 43, 47, and 52. Others fail to accurately describe the contents of *MaM*. To avoid duplicative briefing, the Producer Defendants incorporate by reference Netflix's Opposition Appendix, which applies with equal force to the Producer Defendants. Dkt. 308.

The shortcomings in Plaintiff's MPSJ mirror those in his SAC, which further demonstrate why, far from Plaintiff being entitled to summary judgment, large swaths of his SAC fail to comply with basic legal requirements for defamation claims. Dkt. 105. He fails to identify particular allegedly defamatory statements and fails to explain *how each* of those particular

statements satisfy all of the elements of defamation. *See WAG, LLC*, 2017 WL 6501914 at *5; *Mitchell*, 2017 WL 4340118 at *6; *Anderson*, 357 F.3d at 809. The SAC alleges that unspecified "statements described in Paragraphs 27–29, 33–40, 44–48, and Exs. A and B" are supposedly defamatory. SAC ¶¶ 59(a), *see also id.* ¶ 78. While a handful of the referenced paragraphs identify particular statements in *MaM* that Plaintiff alleges are defamatory[6], the remaining paragraphs do not. The same is true of Exhibits A and B. Plaintiff alleges that Exhibit A represents "excerpts from Making a Murderer Episodes 1–10 which depict numerous inaccuracies in facts and therefore defame plaintiff." SAC ¶ 21. But Exhibit A is a 15-page document and the SAC fails to specify *which* particular statements in Exhibit A are supposedly defamatory, let alone explain *why* any particular statements in Exhibit A are defamatory. Likewise, Exhibit B is a 13-page document that Plaintiff claims to be a "transcription of excerpts of Plaintiff's trial testimony" that were "altered" by *MaM* "to present a false impression of Plaintiff's testimony." *Id.* ¶ 22. Once again, the SAC fails to specify *particular* statements in Exhibit B and also fails to adequately explain why any such statements are defamatory.

Finally, Plaintiff's MPSJ does not even attempt to connect any of the 52 statements and embellishments in his chart to any particular allegations in the SAC. Instead, Defendants and the Court are left to guess what, if any, connection there is between those 52 items and the SAC.

### IV. Plaintiff Cannot Show Material Falsity

#### A. Plaintiff Misstates the Legal Standard for Falsity/Substantial Truth

Plaintiff's entire MPSJ is based on a misrepresentation of the governing law regarding falsity/substantial truth for defamation claims like his. As mentioned previously, Plaintiff

---

[6] *See, e.g., id.* ¶¶ 28–29 (statement by Avery attorney that Plaintiff's statement kept in Sheriff's safe), ¶ 37 (statement by Avery attorney regarding his contention that law enforcement planted key in Avery's bedroom). *However*, Plaintiff's MPSJ makes no attempt to link the allegations in these Paragraphs (or any others in the SAC) to the arguments or the 52 items in his chart.

erroneously claims that Defendants must prove truth, but it is his burden to prove falsity. *Phila.*

*Newspapers*, 475 U.S. at 775–76. Moreover, under the relevant law, the measure of truth and

accuracy is *not* whether the allegations made by Avery and his supporters were true—i.e.,

whether Plaintiff, in fact, planted evidence to frame Avery—but whether *MaM* accurately reports

the substance or gist of those allegations. *Global Relief*, 390 F.3d at 987. In *Global Relief*, the

plaintiff sued a newspaper for defamation based on articles about a governmental investigation

into the plaintiff concerning alleged connections to terrorism. The plaintiff advanced a theory of

defamation by republication that parallels Plaintiff's arguments in his MPSJ: "GRF maintain[ed]

that the defendants should be required to demonstrate not only that they accurately reported the

government's suspicions but that GRF was actually guilty of the conduct for which the

government was investigating the group." *Id.* at 980; *see also* Dkt. 285 at 15 (similar argument).

The Seventh Circuit rejected that theory: "We reject [the plaintiff's] argument that these media

defendants must be able to prove the truth of the government's charges [against plaintiff] before

reporting on the investigation itself." 390 F.3d at 987. The court added, "[w]hether the

government was justified in its probe is irrelevant to the defamation claims when these media

defendants accurately reported on the investigation itself." *Id.* at 990.

     The Seventh Circuit reaffirmed this principle in *Fin. Fiduciaries, LLC v. Gannett Co.,*

*Inc.*, 46 F.4th 654, 666 (7th Cir. 2022). There, the Court of Appeals affirmed summary judgment

in favor of the defendant based on, among other things, the substantial truth/lack of falsity of the

defendant's fair reporting of accusations made against the plaintiff. *Id.* at 664–67. The court held

that the plaintiff could not meet his burden of showing falsity as defendant's "article said

Batterman was *accused* of mishandling funds, committing wrongdoing, and putting Geisler's

money in 'jeopardy'" and "[t]hese statements, as the district court correctly found, were fully supported by court records" in which those accusations were made. *Id.* at 666 (emphasis added).[7]

This Court previously noted the applicability of *Global Relief* in its Order on Netflix's motion to dismiss. Dkt. 176 at 13–14 ("If the record at summary judgment establishes that defendants' reporting on the Avery case was substantially true, they, like the defendants in *Global Relief*, will be entitled to summary judgment"). Yet Plaintiff's MPSJ simply ignores the Court's Order and *Global Relief*. The Seventh Circuit's decisions in *Global Relief* and *Fin. Fiduciaries* are not just controlling authority, but essential vindications of First Amendment rights. Otherwise, no newspaper reporter or documentary filmmaker could report on allegations made in connection with legal proceedings without risking liability on the same "republication" theory that Plaintiff advances here. That would devastate the ability to cover contested legal proceedings of public interest such as the Avery trial. Thus, it is no surprise that the Seventh Circuit rejected such a result in *Fin. Fiduciaries* and *Global Relief* as antithetical to the First Amendment. As explained below and in the Producer Defendants' Motion for Summary Judgment, Dkt. 294 at 14–32, the same result reached in *Global Relief* and *Fin. Fiduciaries* holds true here for *MaM*'s coverage of Avery's and his defenders' allegations against Plaintiff.[8]

---

[7] *See also Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120 (2nd Cir. 1977) (media may report "serious charges" on matters of public concern "regardless of the reporter's private views regarding their validity" and if "[w]hat is newsworthy about such accusations is that they were made," so truthfully reporting those accusations is not actionable); *Konikoff v. Prudential Ins. Co.*, 234 F.3d 92, 104–05, n.11 (2d Cir. 2000) (media may report allegations of public concern regarding public officials even if the media believes the allegations are "likely false").

[8] Plaintiff further misrepresents the legal standards governing the element of falsity by ignoring the fact that he must prove *material* falsity. A statement does not need to be precisely true in all details; it is sufficient that the "gist" and "sting" are accurate. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). A publication "that contains a false statement is actionable only when significantly greater opprobrium results from the report containing the falsehood than would result from the report without the falsehood." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993); *accord Pope v. Chronicle Publ'g*, 95 F.3d 607 (7th Cir. 1996).

### B. Plaintiff's MPSJ Does Not Dispute that *MaM* Accurately Captures the Gist of Avery's and His Defenders' Planting Allegations

Once the proper legal standard for falsity/substantial truth is applied, it is clear Plaintiff cannot meet his burden of justifying summary judgment. Indeed, he does not even attempt to meet his legal burden under *Global Relief* and *Fin. Fiduciaries* to prove that *MaM* fails to accurately capture the gist of Avery's and his defenders' planting allegations against Plaintiff. Dkt. 285 at 15–16 (failing to address whether *MaM* accurately captures the substance of such allegations). Moreover, as shown in Defendants' Motions for Summary Judgment, while substantial truth/falsity may be decided on summary judgment, judgment is warranted in favor of the Producer Defendants, not Plaintiff. Dkt. 294 at 14–32. *MaM* accurately captures the gist of Avery's and his defenders' accusations against Plaintiff, and also includes Plaintiff's and other law enforcement personnel's denials of those accusations. *Id.* Under *Global Relief* and *Fin. Fiduciaries*, that means Defendants are entitled to summary judgment.[9]

### C. Even if *Global Relief* and *Fin. Fiduciaries* Did Not Govern, Plaintiff Still Would Not Be Entitled to Summary Judgment as to Falsity

Even if *Global Relief* and *Fin. Fiduciaries* did not exist and falsity turned on whether Avery and his defenders' underlying planting allegations against Plaintiff were true, Plaintiff still would not be entitled to summary judgment for numerous reasons. As an initial matter, while Plaintiff's moving papers claim that he did not plant evidence to frame Steven Avery, he fails to provide a declaration backing up such denials under penalty of perjury. Instead, he purports to rely on excerpts from his trial testimony at the 2007 Avery trial. Pl. PFOF ¶ 70. But his 15-year old trial testimony in that case is inadmissible here. *Dressler v. Rice*, 2017 WL 3033877, at *2 (S.D. Ohio July 18, 2017) (declining to consider on summary judgment the defendant's prior

---

[9] The arguments and evidence contained in the Producer Defendants' MSJ and supporting PFOF with respect to material falsity/substantial truth are incorporated by reference in this Opposition.

trial testimony, which was hearsay, and noting, "[f]or purposes of summary judgment . . . Rice should have reduced his anticipated testimony to an affidavit that meets the requirements of Federal Rule of civil Procedure 56(c)(4), rather than rely on prior trial testimony.")[10] Moreover, while Plaintiff's SAC and MPSJ claim *MaM* defamed him by suggesting he was part of a conspiracy to plant evidence, Plaintiff's 15-year-old trial testimony does not contain any denial of his knowledge of or complicity with others such as Lenk in *their* planting evidence. This obvious lack of fit between Plaintiff's 2007 testimony and the wider allegations in his SAC and MPSJ make his refusal to provide a sworn declaration with his MPSJ all the more curious.

Even if Plaintiff had been willing to provide a declaration, he still would not be entitled to summary judgment. His declaration would not constitute unassailable truth but would need to be considered alongside other evidence that his MPSJ studiously ignores. For example, his MPSJ ignores the strange circumstances under which the key to Teresa Halbach's SUV was found during Plaintiff's and Lenk's November 8, 2005 search of Avery's bedroom. Law enforcement had previously searched Avery's bedroom many times in prior days, yet, according to Plaintiff and Lenk, the key suddenly appeared in plain view on the carpet during their November 8, 2005 search. SPFOF ¶¶ 35, 36. Plaintiff testified that he believed he may have knocked the key loose from the back of a bookcase while returning items to the bookcase that day. SPFOF ¶ 36. But Plaintiff has never explained why the key had not been discovered in prior searches when those items were taken out of the bookcase in the first place. Nor has Plaintiff explained how, if he shook the key loose from the bookcase on November 8, 2005, he failed to notice the key on the

---

[10] Plaintiff's 2007 testimony is also beyond the statute of limitations for perjury. Wis. Stat. §§ 946.31(1) & 939.74(1) (six-year statute of limitations for most felonies, including perjury); *DeLeon-Reyes v. Guevara*, 2020 WL 5800727, at *5 (N.D. Ill. Sept. 29, 2020) ("federal statute of limitations for perjury is 5 years").

carpet after doing so, instead leaving Lenk to discover the key in plain sight later on when he entered the room. These and other peculiar circumstances surrounding the key's discovery and Plaintiff's incomplete-at-best explanation for its sudden appearance on the carpet on November 8, 2005, raise questions about what happened in the room that day that preclude summary judgment. Plaintiff has acknowledged that unless someone was in the room with him at the time, they could not know with 100% certainty whether he or Lenk planted the key in Avery's bedroom and would have to trust that he was telling the truth. SPFOF ¶ 40.

The circumstances surrounding the discovery of the key were sufficiently questionable that even the *prosecutor* at Avery's trial, Ken Kratz, took pains during closing arguments to put distance between Plaintiff and Lenk and their explanation for the key's discovery and the rest of the prosecution's case and evidence against Avery. Kratz said that it "shouldn't matter whether or not that key was planted" because "that key, in the big picture, in the big scheme of things, means very little," compared to the bulk of evidence against Steven Avery. SPFOF ¶ 20.[11]

One Avery juror has stated publicly that he believes Plaintiff testified falsely at Avery's trial and added that Plaintiff "looked like he was sweating and he wasn't being honest or he was trying to cover up a lot of things on the stand." SPFOF ¶ 54. It also was revealed that when the jury was polled at the outset of deliberations, the vote was seven not guilty, three guilty and two uncertain. *See* SPFOF ¶ 55. While the jury eventually convicted Avery of murder, it is possible that the jury only did so after following Kratz's line of reasoning that Avery could still be guilty even if jurors believed that Plaintiff and Lenk had planted evidence to ensure his conviction.

Indeed, Michael Griesbach—Plaintiff's former attorney, a prosecutor in the Manitowoc

---

[11] Kratz's closing argument was not the first time the prosecution distanced itself from Lenk's discovery of the key. The initial criminal complaint in the Avery case named Calumet Deputy Daniel Kucharski—not Lenk—as the officer who found the key. SPFOF ¶ 37.

County D.A.'s office from the early 1990s to 2018, and the author of three books about Avery—candidly told his book agent in January 2016, less than a month after *MaM*'s release, that while he was convinced Avery was guilty, "I'm nowhere near as certain that the cops did not plant evidence to bolster their case." SPFOF ¶ 21. Griesbach's 2016 statement is particularly damning because he was not a stranger to Plaintiff, but a longtime Manitowoc County resident who, in his role as a prosecutor, worked side-by-side with MTSO personnel, including Plaintiff, for years.

Finally, Plaintiff's own conduct in this litigation further demonstrates why any denial by him cannot be treated as unassailable truth:

- Plaintiff falsely blamed *MaM* for destroying his marriage of 30 years, but he was forced to backtrack when it came to light that Plaintiff had engaged in an extramarital affair that was the true cause of his marriage's demise. SPFOF ¶ 48.

- Plaintiff violated the confidentiality of the Court-ordered Mediation in this case by telling his friend Brenda Schuler, a producer of the *Convicting* documentary, about what had happened at the mediation, including the parties' positions. SPFOF ¶ 49.

- The depositions of Plaintiff and Schuler revealed that Plaintiff had violated MTSO regulations by sitting for an interview for *Convicting* producers while Plaintiff was still employed by the MTSO. SPFOF ¶ 50.

- Plaintiff testified that he never discussed the 1994/1995 Jail Call with anyone until Avery's release from prison in 2003. SPFOF ¶ 30. But several other officers testified that they understood that someone in MTSO had spoken to Plaintiff years before 2003 and had told Plaintiff not to worry about the alternate suspect. SPFOF ¶¶ 31.

- The deposition of Sheriff Ken Petersen revealed that, after Petersen instructed Plaintiff in September 2003 to prepare a report regarding the Jail Call, Plaintiff

instead utilized a "statement" form ordinarily used by civilian witnesses (not MTSO personnel), which Petersen believed had the effect of burying Plaintiff's report to make it less likely that others would locate it in the future. SPFOF ¶ 51.

- Plaintiff's SAC falsely alleges that "Defendants knew Plaintiff's written report concerning the phone call was not left in the Sheriff's safe but chose to include Glynn's mistaken belief in order to further their false narrative." SAC ¶¶ 28–29. But Plaintiff now has been forced to admit that his statement *was* kept in a safe in the Sheriff's office—just as contemporaneous December 2005 reports from the Wisconsin Attorney General provided all along. SPFOF ¶¶ 29, 52.

- During his deposition in this lawsuit, Plaintiff repeatedly refused to acknowledge that Avery's criminal defense presented a theory at trial that Plaintiff planted evidence. He insisted that his position was that he was never accused of planting evidence, even when confronted with his own emails and prior statements and allegations in his SAC acknowledging the planting accusations levied against him at trial. SPFOF ¶ 53.

## V. Plaintiff Fails to Prove the Producer Defendants Made Defamatory Statements About Him

Plaintiff's MPSJ falsely attributes Avery's and his defenders' planting allegations to the Producer Defendants themselves. That is a fundamental mischaracterization of *MaM*. *MaM* does not include any voiceover narration, but instead lets the documentary's subjects voice their own viewpoints. SPFOF ¶ 13. To get around the fact that there are no statements by the Producer Defendants in *MaM*, Plaintiff's MPSJ resorts to conflating Avery and his defenders' planting allegations with what he erroneously tries to pass off as "Defendants" or "*MaM*'s" speech. *See* Pl. PFOF ¶¶ 71–78. But viewing these third-party statements in the context of the entire documentary—as required, *see Kaminske v. Wis. Cent. Ltd.*, 102 F. Supp. 2d 1066, 1080 (E.D.

Wis. 2000)—demonstrates that a reasonable viewer would not understand those statements as assertions of defamatory facts by the Producer Defendants. Indeed, *MaM* includes *both* Avery and his defenders' allegations *and also* Plaintiff's and other law enforcement officials' strenuous denials of those allegations, as well as scores of other scenes reflecting negatively on Avery. *See* SPFOF ¶¶ 16, 18, 21, 22. Under Plaintiff's misunderstanding of the law, the Producer Defendants would be treated as if they had a split personality, being charged with both accusing Plaintiff of planting evidence and of strenuously denying that he planted evidence.

The law is clear that *MaM* must be considered as a whole and that its presentation of both sides of a contested issue is not a materially false endorsement of the truth or falsity of either side's allegations. *See e.g.*, *Fin. Fiduciaries*, 46 F.4th at 666; *Glob. Relief*, 390 F.3d at 987; *Riley v. Harr*, 292 F.3d 282, 291–92 (1st Cir. 2002) (reasonable readers would consider statements in book written in attorney's "voice" as statements by attorney, not the author, and not as assertions of fact by author whose book covered trial). Accordingly, a reasonable viewer of *MaM* would not conclude that third-party allegations against Plaintiff in *MaM* constitute assertions of defamatory facts by the Producer Defendants themselves. *See id.*; *see also Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 487 (7th Cir. 1986) ("[R]equiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern. A publisher . . . cannot be charged with the intolerable burden of guessing what inferences [the public] might draw from an article and ruling out all possible false and defamatory innuendos that could be drawn from the article."); *see also Terry v. Journal Broad. Corp.*, 840 N.W.2d 255, 266 (Wis. Ct. App. 2013).

## VI.    Plaintiff Fails to Prove the Producer Defendants Acted with Actual Malice

As an initial point, Plaintiff's failure to prove entitlement to summary judgment as to falsity, *supra* Section IV, necessarily means he is not entitled to summary judgment as to actual

malice. There can be no actual malice if allegedly defamatory statements are not false. *See Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). In addition, Plaintiff's MPSJ papers fail to connect his supposed evidence of actual malice to any of the 52 statements in his chart or to any of the allegations in his SAC, further dooming his MPSJ. *See Hotel 71*, 778 F.3d at 601.

Even putting those threshold defects aside, Plaintiff's MPSJ does not set forth any valid grounds for actual malice as to the Producer Defendants, let alone a basis sufficient to establish summary judgment in his favor as a matter of law. *See Bose*, 466 U.S. at 511 n. 30 (public figure plaintiff has "burden of proving 'actual malice' . . . with clear and convincing evidence"); *Eastwood v. Nat'l Enquirer*, 123 F.3d 1249, 1252 (9th Cir. 1997) (clear and convincing standard imposes a "heavy burden" on plaintiffs, "far in excess of the preponderance sufficient for most civil litigation").[12] Rather, the MPSJ includes only two purported bases for actual malice: (1) *MaM*'s inclusion of statements by "biased sources," i.e. Avery and his defenders, and (2) a handful of communications between Netflix executives and the Producer Defendants. Dkt. 285 at 5–6, 13–15. These do not come close to proving actual malice. To the contrary, they only underscore the Producer Defendants' *lack* of actual malice.

### A. *MaM*'s Inclusion of Avery and His Defenders' Viewpoints Is Not a Valid Basis for Actual Malice

Plaintiff is wrong that actual malice can be based on *MaM*'s inclusion of statements in which Avery and his supporters voice their views that Plaintiff planted evidence to frame Avery.

---

[12] To prove actual malice, Plaintiff must prove the Producer Defendants acted with "knowledge that [a challenged statement] was false or with reckless disregard of whether it was false or not." *Masson*, 501 U.S. at 510 (quoting *Sullivan*, 376 U.S. at 279–80). "[K]nowledge of falsity means simply that the defendant was actually aware that the contested publication was false." *Woods*, 791 F.2d at 484. Similarly, to prove "reckless disregard," a plaintiff must show the defendant "acted with a 'high degree of awareness of probable falsity.'" *Masson*, 501 U.S. at 510 (cleaned up). The actual malice standard is subjective, and "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

*MaM* could not document Avery's criminal trial without including those accusations, which Plaintiff concedes were a "central part of Avery's defense at trial." SAC ¶ 33. By Plaintiff's logic, no journalist or documentarian could report on contested legal proceedings without facing liability for informing the public about the parties' core legal arguments. This would turn First Amendment jurisprudence on its head. The Supreme Court has stressed that speech protections apply with special force to coverage of court proceedings, which "bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491–92 (1975). As the Seventh Circuit recently held, the public "needs to kn[ow] what its court does, and, since this cannot be intelligibly reported without stating the charges and issues upon which the court's action is based, the latter may be reported also, although as an incidental result the fact of defamatory charges against some individual becomes public to his injury." *Financial Fiduciaries*, 46 F.4th at 666 (quoting *Ilsley v. Sentinel Co.*, 113 N.W. 425, 426 (Wis. 1907)); *accord Partington v. Bugliosi*, 56 F.3d 1147, 1159–60 (9th Cir. 1995).

Courts have consistently held actual malice does not exist even when a defendant repeats the contentions of one side to a dispute *without* even presenting the other side's or performing any independent research. Even "proof of failure to investigate, by itself, is not sufficient." *Woods*, 791 F.2d at 485; *Tucker v. Fischbein*, 237 F.3d 275, 286 (3rd Cir. 2001) (insufficient evidence of actual malice although plaintiff alleged defendant engaged in "poor journalistic practices" and had "preconceived story line"); *Desnick v. ABC, Inc.*, 233 F.3d 514, 519 (7th Cir. 2000) (although a source "might not be credible enough to have a good chance of persuading a jury, [that] does not mean that he was not credible enough to be a source for a news story").

The Wisconsin Supreme Court's decision in *Torgerson v. J./Sentinel, Inc.*, 563 N.W.2d 472 (1997) is particularly on point and demonstrates why Plaintiff's actual malice argument fails.

*Torgerson* affirmed summary judgment in favor of the defendant based on a *lack* of actual malice, and explained that actual malice does not exist as a matter of law even when a media report adopts wholesale one side's interpretation of ambiguous and contested events concerning alleged police misconduct. *Id.* at 482. The court explained:

> The United States Supreme Court has said that a court cannot infer actual malice sufficient to raise a jury issue from the deliberate choice of a rational interpretation of ambiguous materials. The article at issue in *Time, Inc. v. Pape*, 401 U.S. 279, concerned police lawlessness. The article quoted summaries of an unproven civil complaint described in a government report, without indicating either that the quotes came from a complaint or that the events described were as yet unproven.
>
> Noting that the government report, taken as a whole, "bristled with ambiguities," the Court held that under such circumstances the deliberate choice of one interpretation from a number of possible rational interpretations was not enough to create a jury issue of actual malice. *Time, Inc. v. Pape*, 401 U.S. at 289–90. The Court reasoned as follows: "Where the document reported on is so ambiguous as this one was, it is hard to imagine a test of 'truth' that would not put the publisher virtually at the mercy of the unguided discretion of a jury." *Time, Inc. v. Pape*, 401 U.S. at 291.

*Id.*; *accord In re Storms v. Action Wis., Inc.*, 750 N.W.2d 739, 750, 752 (Wis. 2008); *Erdmann v. SF Broadcasting of Green Bay, Inc.*, 599 N.W.2d 1, 8 (Wis. Ct. App. 1999).

The case here for Defendants' actual malice is even weaker than in *Pape*, *Torgerson* and their progeny. First, *MaM* makes it clear to viewers that it is *Avery and his defenders* who are accusing Plaintiff of planting evidence. That leaves it to viewers to decide whether to accept those accusations—or to view them skeptically based on their source. "[F]ull (or pretty full) publication of the grounds for doubting a source tends to rebut a claim of malice, not to establish one." *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1304 (D.C. Cir. 1996).

Second, *MaM* includes not only Avery and his defenders' planting allegations, but also Plaintiff's denials of those allegations, as well as denials by others including prosecutors and the

MTSO Undersheriff. Dkt. 294 at 16–18, 21–26, 31–32, 36–37; SPFOF ¶¶ 17, 22. Plaintiff's argument that inclusion of his denials in *MaM* is insufficient, and that Defendants had to *exclude* Avery's team's accusations is contrary to law. *Torgerson*, 563 N.W.2d at 482; *Pape*, 401 U.S. at 289–90. "To require that a reporter withhold such a story or face potential liability for defamation because a police officer denies a citizen's allegation of misconduct is exactly the type of self-censorship the *New York Times* rule was intended to avoid." *Smith v. Huntsville Times Co., Inc.*, 888 So. 2d 492, 501 (Ala. 2004) (internal quotation marks omitted).[13] As the Seventh Circuit held in *Saenz v. Playboy Enters., Inc.*, even a defendant's "*omission* of [plaintiff's] vehement denials" of wrongdoing "does not indicate that the defendants intended to distort or recklessly disregard the truth." 841 F.2d 1309, 1319 (7th Cir. 1988) (emphasis added). "When reporting charges made by others, failure to give the other side of the controversy is not of itself evidence of malice." *Saenz v. Playboy Enters., Inc.*, 653 F. Supp. 552, 572 (N.D. Ill. 1987), *aff'd*, 841 F.2d 1309. Indeed, "a publisher has no legal obligation to present a balanced view in its article." *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F. 3d 520, 527 (6th Cir. 2007) (quotation marks omitted). Here, by contrast, *MaM does* include Plaintiff's and others' denials, leaving it to viewers to decide whom or what to believe.[14]

Plaintiff misrepresents *St. Amant* to try to bolster his MPSJ, but that case only helps show why Plaintiff cannot prove actual malice. Dkt. 285 at 5, 13. In *St. Amant*, the Court held that

---

[13] *See also Edwards*, 556 F.2d at 12 (actual malice "cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error").

[14] *See also Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094, 1098 (4th Cir. 1993) (raising "pointed" questions about allegations without "ultimately adopt[ing] any particular answer" is not defamation, "however embarrassing or unpleasant to its subject") *accord Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union*, 39 F.3d 191, 195 (8th Cir. 1994).

there was *no* actual malice because the defendant speaker did not subjectively entertain serious doubts as to the truth of the statements at issue, and the plaintiff failed to prove evidence of reckless disregard of truth or bad faith. 390 U.S. at 731–33. As in *St. Amant*, Plaintiff has failed to provide evidence or develop any meaningful arguments that the Producer Defendants acted with actual malice. Moreover, Plaintiff is wrong that *St. Amant* stands for the proposition that actual malice can be established by a defendant's reliance on unverified and biased sources. *St. Amant* said that actual malice might be found "where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." 390 U.S. at 732. That is a far cry from presenting the viewpoint of sources appearing on screen whose partiality towards one side in a highly publicized legal proceeding is clear for viewers to see themselves, as is the case with *MaM*. This case is also a far cry from *St. Amant* because it includes Plaintiff's and other law enforcement's denials of Avery's and his defenders' allegations, as well as voluminous material reflecting negatively on Avery.[15]

Furthermore, as detailed in the Producer Defendants' papers supporting their Motion for Summary Judgment, no statements in *MaM* were included with knowledge of falsity or with a high degree of awareness of probable falsity. SPFOF ¶¶ 11–14; 41–43. To the contrary, the Producer Defendants believed in 2015 when *MaM* was released—and still believe now—that *MaM* accurately captures the gist of Avery's and others' allegations against Plaintiff and also of Plaintiff's denials on those subjects. *Id.* None of the statements made by Avery, his attorneys, family members, and other Avery supporters were included in *MaM* with knowledge of falsity or with a high degree of awareness of probable falsity. SPFOF ¶ 41–44. Rather, the Producer

---

[15] Bias of a defendant or of sources whose views are included in a defendant's work does not establish actual malice. *See, e.g.*, *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994); *Desnick*, 233 F.3d at 519; *see also McFarlane*, 74 F.3d at 1304.

Defendants believe those statements accurately reflect the speakers' own opinions and viewpoints. They are not presented as authoritative statements of objective fact, but as the views of those particular individuals, whose pro-Avery inclinations are clear for *MaM* viewers to see and judge for themselves. *See* SPFOF ¶¶ 16, 18, 21, 22.

Finally, Plaintiff's SAC does not allege a defamation by implication/innuendo claim and, even if it had, his MPSJ fails to address the legal requirements of such a claim, let alone prove his entitlement to summary judgment under those rules. If "the plaintiff is claiming defamation by innuendo, he also must show with clear and convincing evidence that the *defendants intended or knew of the implications* that the plaintiff is attempting to draw from the allegedly defamatory material." *Saenz*, 841 F.2d at 1318 (emphasis added); *see also Woods*, 791 F.2d at 487–88. Plaintiff does not even attempt to prove this, or even acknowledge that it is required by law.

### B.    Netflix's Notes Do Not Prove Actual Malice

Netflix's creative notes do not support a finding of actual malice by the Producer Defendants (or by Netflix, for that matter). As one threshold matter, Plaintiff cannot simply lump all Defendants together and rely on Netflix's representatives' notes to try to ascribe actual malice to the Producer Defendants. Actual malice is based on an individual defendant's *subjective* state of mind, *St. Amant*, 390 U.S. at 731, and one defendant's intent cannot just be imputed to another. Yet Plaintiff attempts to muddy the waters with references to "Defendants," or "they" with regard to notes from Netflix. SPFOF ¶ 4; *cf.* Pl. PFOF ¶¶ 72, 73, 77. Netflix creative executives' suggestions for *MaM* might reflect *Netflix's* state of mind, but they are a function of those Netflix executives' opinions and communication styles—not of the Producer Defendants' subjective state of mind. *See* SPFOF ¶¶ 3–8. As another threshold issue, Plaintiff was required to explain *how* the notes showed actual malice with respect to *specific* statements that his SAC's defamation claim put at issue, but his MPSJ fails to do so. *Hotel 71*, 778 F.3d at 601.

Furthermore, as Plaintiff acknowledges, the Producer Defendants and Netflix played different roles in the production of *Making a Murderer*. *See* Pl. PFOF ¶¶ 59, 71–78. Defendants Ricciardi and Demos researched, filmed, edited, and retained creative control of *MaM*. SPFOF ¶¶ 1–4. They presented what they believe to be an accurate depiction of a complex story, acknowledging ambiguities where they existed SPFOF ¶¶ 1, 2, 13, 14, 41–43; *see also supra* Section VI.A. They developed deep knowledge of the case, the record, and the community response. *MaM* reflects their understanding of Avery's and law enforcement's divergent contentions. To this day, the Producer Defendants do not believe there are material inaccuracies in *MaM*, and, if any such inaccuracies exist, they were not intentional. SPFOF ¶¶ 41–43.

For its part, Netflix provided notes suggesting ways to make *MaM* easier to follow and engaging to viewers. SPFOF ¶¶ 4–10. But regardless of their suggestions, Netflix deferred to the filmmakers, who chose whether to implement Netflix's notes. SPFOF ¶ 4. For example, the filmmakers retained the "lulling guitar" that added to the rural, Manitowoc atmosphere of *MaM*, disregarding Netflix's suggestion to adopt a "thriller atmospheric score." *See* SPFOF ¶ 9; *cf.* Pl. PFOF ¶ 73. Plaintiff has not presented evidence that either the Producer Defendants or Netflix saw a factual problem with a note but implemented it anyway. Nor has Plaintiff presented evidence linking Netflix's notes to any alleged inaccuracies in *MaM*. Instead, Netflix asked the filmmakers to, for example, make changes *if the footage was available*, but not if the suggested moments did not occur. *See* SPFOF ¶ 4. This reflects active consideration of the truth, not reckless disregard. *Cf. Masson*, 501 U.S. at 510. Netflix deferred to the filmmakers on factual questions, and they did not doubt the accuracy of *MaM*. *See* SPFOF ¶¶ 1–4. Like the Producer Defendants, Netflix has consistently expressed that *MaM* does not reach any conclusions on whether law enforcement planted evidence. SPFOF ¶¶ 11–14. Rather, Netflix has maintained

that *MaM* presents the various viewpoints and theories of the Avery and Dassey cases, along with their guilty verdicts and unsuccessful post-conviction motions and appeals. *See id.*; ¶ 18.

In any event, the particular Netflix notes Plaintiff cites in his MPSJ in no way reflect actual malice by the Producer Defendants. Read in context, the notes do not even represent what Plaintiff asserts, and he repeatedly mischaracterizes them. For example, Plaintiff incorrectly claims Netflix was suggesting that a statement by Steven Avery's cousin Kim Ducat that the County was "not done" with Avery should be moved to the end of the episode to convey "a more explicit ending [to an early episode] that makes it clear that in the next episode the cops are going to seek revenge." See Pl. PFOF ¶ 71. But the notes themselves provide that Ducat's statement was at the *beginning* of the working version of the first episode and they do not propose moving it to the end. Indeed, Ducat's statement remains at the beginning of the final version of Episode 1 of *MaM* that streamed on Netflix. Ep. 1 at 1:26–1:42. The end of Episode 1 does not feature Ducat, but rather audio from police dispatch discussing whether they had Avery in custody for the murder of Teresa Halbach. Ep. 1 at 1:02:03–1:02:35.[16]

As another example, Plaintiff claims that "Defendants" sought to "advance a preconceived law enforcement conspiracy narrative" and cite Netflix notes referring to certain law enforcement personnel as "baddies" and suggesting a "thriller atmospheric score." Pl. PFOF ¶ 73; *see also* SPFOF ¶ 9. As to the "baddies" comment, that is nothing but colorful language from a Netflix executive, not the Producer Defendants, and, in any event, the note lists specific "baddies" and they do *not* include Plaintiff. Finally, the SAC acknowledges that "[a]central part

---

[16] The Netflix note's reference to "cops are going to seek revenge" simply echoes Avery's core defense at trial that law enforcement was motivated to target him for prosecution because of his prior exoneration for the 1985 assault and the resulting embarrassment to and lawsuit against Manitowoc County and its former Sheriff and District Attorney. SPFOF ¶ 38.

of Avery's defense at trial was that Plaintiff and other Manitowoc officers planted" evidence to frame Avery. SAC ¶ 33. The "law enforcement conspiracy narrative" was not something Defendants "conceived," but rather a core part of Avery's trial defense.

Along similar lines, Plaintiff selectively quotes Netflix notes to suggest that the Producer Defendants were instructed to "find[] material" for Episode 3 to support a planting theory. *See* Pl. PFOF ¶ 74. But Episode 3 includes a search of the Avery property as events unfolded and simply foreshadows the planting theory that indisputably was central to Avery's defense at trial. *See id.*; SPFOF ¶¶ 17–20, 53; *see also* Dkt. 105, SAC ¶ 33. Contrary to Plaintiff's characterization, this was not an effort to "enhance" the accusations against law enforcement but rather to connect the narrative across episodes. *Cf.* Dkt. 285 at 14. Netflix's notes suggest *MaM* "clarify whether or not the cops had a warrant to search his property." *See* Pl. PFOF ¶ 74. These notes were previewing the circumstantial evidence Avery's defense relied on at trial in their frame-up theory directed at Plaintiff and Lenk. *See* SPFOF ¶¶ 18–20, 38, 53.

In another example, Plaintiff notes that one Netflix executive found Colborn's role in 1994 or 1995 Jail Call "very thin" but omits the rest of Netflix's discussion of the call, including their observation that others at Manitowoc County had a more substantial role in Avery's ongoing incarceration. *See* Pl. PFOF ¶ 75; *see also* SPFOF ¶¶ 28–32. Regardless of those others' roles—former MTSO Sheriff Kocourek and former D.A. Vogel were named as individual defendants in Avery's civil rights lawsuit, for example—the judge at Avery's murder trial allowed Avery to argue that Plaintiff and Lenk were motivated to and did frame Avery because of their involvement with the Jail Call and Avery's civil lawsuit. SPFOF ¶¶ 32, 38.

Plaintiff also claims law enforcement was subject to "damning portrayals" while Netflix urged the filmmakers to show the Averys as "a very happy family." Dkt. 285 at 14; Pl. PFOF ¶

76. But the note in question highlighted the contrast between the Averys' life "before the crimes" with the misery that followed. *See id.* As detailed in the notes, the Avery family's background was one chapter, followed by "public exposure allegations, the Penny Beernsten [sic] rape allegations, and then Steve suing the county." *See id.* Plaintiff also ignores the complex Avery family dynamic *MaM* explores, with some family members against him, some uncertain, and only his parents resolutely on his side. *See* SPFOF ¶ 44. Plaintiff misreads deeper meaning into two notes suggesting the filmmakers swap out images incongruous with the dialogue. Pl. PFOF ¶¶ 77, 78. Netflix suggested a change in the "smug" image of Avery during a "Dean Strang soliloquy on the difficulty of this type of trial." *See id.* That soliloquy did not occur in Avery's presence. *See id.* And *MaM* repeatedly featured Avery voicing despair at his chances at trial, not acting smug in response to attorneys' warnings, so the image was a mismatch. *See* SPFOF ¶ 44.

Similarly, Plaintiff claims the substitution in the trailer for *MaM* of a "squirmy shot" of Plaintiff testifying reflects a negative portrayal of law enforcement. Pl. PFOF ¶ 78.[17] Plaintiff does not deny that he squirmed while testifying. In fact, at his deposition for this lawsuit, he acknowledged he gets nervous testifying. SPFOF ¶ 45. Even Plaintiff's former counsel of record in this lawsuit described watching Avery civil lawsuit deposition testimony of "the officers who were most directly accused of wrongdoing—either in the first Avery case or in the second" as "watching them squirm." SPFOF ¶ 46; *see also* SPFOF ¶ 55.

---

[17] The *MaM* trailer is not even at issue in this case, as it is not mentioned in the SAC and is not included in any of the 52 statements in his MPSJ. Moreover, Defendant Demos explained the reason for the substitution of the "squirmy" shot in the *MaM* trailer, which was not to make Plaintiff look bad. Dkt. 288, Declaration of Moira Demos in support of MSJ at ¶ 98.

## CONCLUSION

Defendants—not Plaintiff—are entitled to summary judgment. Plaintiff's MPSJ only underscores this conclusion by failing to substantiate his allegations in his SAC with admissible evidence. Despite having the opportunity to take extensive discovery, Plaintiff fails to come forward with any evidence demonstrating actual malice by the Producer Defendants. As explained in the Producer Defendants' own summary judgment papers, no such evidence exists, let alone the sort of clear and convincing evidence that the Constitution requires of Plaintiff.

Furthermore, at summary judgment, Plaintiff may no longer rely on mere allegations about what *MaM* supposedly shows. As the Wisconsin Supreme Court has emphasized, "[t]he First Amendment requires courts to 'make an independent examination of the whole record so as to assure [themselves] that the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Torgerson*, 563 N.W.2d at 481 (quoting *Sullivan*, 376 U.S. at 285). As shown by *MaM* itself and further explained in Defendants' summary judgment papers, such an examination reveals that, far from being false and defamatory, *MaM* accurately captures the gist and sting of the viewpoints of its subjects. And *MaM*'s subjects include the broader Manitowoc community: not just Avery and his supporters, but also news media, Plaintiff, other law enforcement officials including the prosecution, and others who believe Avery was guilty, including Avery's own brother. Plaintiff cannot remotely substantiate the allegations in his SAC. This Court should deny his MPSJ and grant the Defendants' motions for summary judgment.

/ / /

Dated: November 4, 2022                    Respectfully submitted,


                                           *s/ Kevin L. Vick*
                                           Kevin L. Vick (*pro hac vice*)
                                           Meghan Fenzel (*pro hac vice*)
                                           JASSY VICK CAROLAN LLP
                                           355 South Grand Avenue, Suite 2450
                                           Los Angeles, CA 90071
                                           T: (310) 870-7048
                                           F: (310) 870-7010
                                           kvick@jassyvick.com
                                           mfenzel@jassyvick.com

                                           *Counsel for Defendants Laura Ricciardi,*
                                           *Moira Demos, and Chrome Media, LLC*

                                           James A. Friedman, SBN 1020756
                                           GODFREY & KAHN, S.C.
                                           One East Main Street
                                           Suite 500
                                           Madison, WI 53703-3300
                                           T: (608) 284-2617
                                           F. (608) 257-0609
                                           jfriedman@gklaw.com

                                           *Counsel for the Defendants*