# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WISCONSIN MILWAUKEE DIVISION

ANDREW L. COLBORN,

Plaintiff,

vs.

NETFLIX, INC.; CHROME MEDIA LLC, F/K/A SYNTHESIS FILMS, LLC; LAURA RICCIARDI; AND MOIRA DEMOS,

Defendants.

Civil No.: 19-CV-484

## PRODUCER DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S STATEMENT OF PROPOSED UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PRODUCER DEFENDANTS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT

Pursuant to Civil Local Rule 56(b)(2)(B), the Defendants Chrome Media LLC (formerly known as Synthesis Films, LLC), Laura Ricciardi, and Moira Demos (collectively, "the filmmakers" or "the Producer Defendants") provide the following objections and responses to Plaintiff's Statement of Proposed Undisputed Facts in support of Plaintiff's Motion for Partial Summary Judgment (Dkt. 287) and the Producer Defendants' supplemental statement of proposed findings of fact in the above-captioned case.

This statement contains numerous time-stamped citations to video excerpts from the Series, *Making a Murderer* ("*MaM*"). The Court may rely upon either (1) the ten episodes lodged at Dockets 120-1 through 120-10 or (2) the episodes as available for streaming on Netflix for definitive versions of the Series.

# I. THE PRODUCER DEFENDANTS INCORPORATE BY REFERENCE NETFLIX'S GENERAL OBJECTIONS TO PLAINTIFF'S PROPOSED UNDISPUTED FACTS

The Producer Defendants incorporate by reference co-Defendant Netflix's General Objections to Plaintiff's Proposed Findings of Fact. Dkt. No. 309 at 1–5. The Producer Defendants also incorporate by reference Netflix's Appendix submitted with Netflix's Opposition to Plaintiff's MPSJ addressing each of the "statements" in ¶¶ 3–54 below. Dkt. 308. Netflix's General Objections and Appendix apply with equal force to the Producer Defendants, who incorporate them by reference here to avoid burdening the Court with duplicative papers.

# II. PLAINTIFF'S PROPOSED UNDISPUTED FACTS AND THE PRODUCER DEFENDANTS' OBJECTIONS AND RESPONSES

1. Defendants published the 10-part series "*Making a Murderer*." Netflix, Inc., Answer, Dkt #181, p. 5, ¶15; Barker Decl., Ex. 1, Demos Tr. at pp. 94-95, 103.

   **OBJECTION:** Vague and ambiguous as to "Defendants," as this PFOF does not state whether it is referring to all Defendants or only certain of them.

   **RESPONSE TO PFOF NO. 1: Undisputed.**

2. The following statements, made by the identified individuals, are contained in MAM where or approximately where indicated, together with graphics, images and video as described below. (Declaration of Matthew Kelley, previously filed in this action as Dkt #120 at pp. 1-3, ¶¶2-11; specific references are cited below).

   **OBJECTION:** Plaintiff's selective quoting of *Making a Murderer* fails to consider the work as a whole and other related excerpts that, in fairness, ought to be considered at the same time. Fed. R. Evid. 106; *see also Bd. of Forensic*

*Document Exam'rs, Inc. v. ABA*, 922 F.3d 827, 832 (7th Cir. 2019). Also, the Producer Defendants object to the extent that any of the following statements misrepresent the contents of *Making a Murderer*, which speak for themselves. Fed. R. Evid. 1001–08; *see infra* re PFOFs ¶¶ 3–54.

**RESPONSE TO PFOF NO. 2: Undisputed that these statements and visuals are included in *MaM*, but disputed in part as immaterial, incomplete or inaccurate in certain instances, as explained in more detail below in response to PFOF Nos. 3 through 54.** *MaM* must be considered as a whole. The Producer Defendants provide specific additional context to each enumerated statement in turn below. In addition to substantive omissions, there are a number of material transcription errors in Plaintiff's chart. This further underscores how Plaintiff's characterization of the *MaM* is unreliable, and the best evidence remains *MaM* itself.

| Fact No. | Episode / Time into Broadcast | Statement and/or MAM Embellishments |
|---|---|---|
| 3 | 1 ECF # 120-1 4:35 – 4:45 | Steven Avery voiceover: " They had the evidence back then that I didn't do it. But nobody said anything . . . ". **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Evidence that is not of and concerning the Plaintiff is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. **RESPONSE TO PFOF NO. 3: Undisputed that this is included in *MaM*, but disputed as immaterial, inaccurate, and incomplete.** The statement is not about the Plaintiff and therefore not material. This statement is Avery expressing his opinions. The full transcript of Avery's statement at [4:36] is as follows: Steven Avery voiceover: "They had the evidence back then that I didn't do it. But nobody said anything. I don't see what I really did wrong to the Sheriff for him to pick on me like |

3

| | | |
|---|---|---|
| | | that. The only thing I can think of is I ran my cousin off the road. . . .” The Wisconsin Department of Justice’s Avery Review found that the Manitowoc County Sheriff’s Department (“MTSO”) and District Attorney had exculpatory evidence about Avery and pointing to Gregory Allen, but they failed to pursue it. Dkt. 290, Declaration of Laura Ricciardi (“Ricciardi Decl.”) ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281. |
| 4 | 1<br>ECF # 120-1<br>1:01:19 –<br>1:01:42 | Kim Ducat (Avery relative) states on camera: “They weren’t just gonna let Stevie out. They weren’t gonna hand that man 36 million dollars. They weren’t gonna be made a laughing stock, that’s for sure. They just weren’t gonna do all that. And something in my gut said they’re not done with him. Something’s gonna happen. They’re not handing that kind of money over to Steven Avery.”<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff’s presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Evidence that is not of and concerning the Plaintiff is irrelevant to Plaintiff’s motion. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 4: Undisputed that this is included in *MaM*, but disputed as immaterial.** This statement is not of and concerning the Plaintiff, who was not a party to Avery’s civil lawsuit. *See State v. Avery* (*“Avery II”*), 570 N.W.2d 573 (Wis. Ct. App. 1997). This statement is Ducat expressing her opinions. |
| 5 | 1<br>ECF # 120-1<br>1:01:29-<br>1:01:44;<br>1:01:33 –<br>photograph | Photos of Plaintiff and others are shown during Kim Ducat’s statement.<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff’s presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff’s allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 5: Undisputed that video footage of Plaintiff is included in *MaM*, but disputed as immaterial and inaccurate in part.** *Video* footage, not photos, of Plaintiff and others are shown during Kim Ducat’s statement. Moreover, the video footage itself is not a statement and not material. |
| 6 | 2<br>ECF # 120-1 | Steve Glynn, identified as Avery’s counsel in the civil case against Manitowoc County, states, “The day of or on the day |

4

| | | after Steven's release, law enforcement officers in Manitowoc are writing memos to describe activity that had occurred almost ten years earlier. They don't do that unless they feel threatened."<br><br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br><br>**RESPONSE TO PFOF NO. 6: Disputed as inaccurate in part.** This segment does not appear in Episode 1, as Plaintiff claims. It appears in Episode 2, which is available at Dkt. 120-2. Plaintiff has stipulated and testified that he wrote a statement on September 12, 2003 about the 1994 or 1995 call. *See* Dkt. 270, Statement of Stipulated Facts, ¶ 2; *see* Dkt. 289, Declaration of Kevin Vick ("Vick Decl."), ¶ 34, Ex. 33. Deposition Transcript of Andrew Colborn ("Colborn Dep.") at 404:4–8; Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479 (dated September 12, 2003). This statement includes opinions of Glynn. |
|---|---|---|
| 7 | 2<br>ECF# 120-2<br>17:20 – 17:34 | Steve Glynn states, "We learned during litigation something that we had absolutely no knowledge of before the lawsuit got started. That 1995 was a very, very significant point in this thing."<br><br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of making a murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br><br>**RESPONSE TO PFOF NO. 7: Undisputed that this is included in *MaM*.** Avery's attorneys had pending post-conviction motions in 1995, and only during depositions in Avery's civil lawsuit did they learn of the Jail Call that may have resulted in more exculpatory evidence. *See Avery II*, 570 N.W.2d at 575. This statement is Glynn expressing his opinion. |
| 8 | 2<br>ECF # 120-2<br>17:34-17:43 | Video deposition of Mr. Colborn is shown in the background with Steve Glynn voice over (image of Mr.Colborn)<br><br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the |

| | | |
|---|---|---|
| | | statement is defamatory. Fed. R. Evid. 401, 402, 403. **RESPONSE TO PFOF NO. 8: Undisputed that video footage of Plaintiff is included in *MaM*, but disputed as immaterial.** Video footage alone is not a statement and not material. |
| 9 | 2 ECF # 120-2 17:37-18:24 | Steve Glynn continues, "And that there is not only something to this idea that law enforcement had information about somebody else, but there is serious meat on those bones, I mean serious meat. What we learn is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department [image of Mr. Colborn's report is shown in background] from another law enforcement agency . . . saying that they had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison." **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. **RESPONSE TO PFOF NO. 9: Undisputed that this is included in *MaM*.** Plaintiff has stipulated and testified that he fielded such a call and transferred it to MTSO. *See* Ricciardi Decl. ¶ 102, Ex. 7, Avery Civil Lawsuit Deposition Transcript of Andrew Colborn ("Colborn Avery Dep."), CHRM002891 at 5:12–24 (timeline and role); 10:22–11:8 (detective's message); SAC ¶ 24; *see also MaM* Ep. 2 at 18:37–19:02. This statement is Glynn expressing his opinions. |
| 10 | 2 ECF # 120-2 18:28 -19:04 | Video footage of Mr. Colborn's testimony in civil case in response to questioning by Glynn **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403. **RESPONSE TO PFOF NO. 10: Undisputed that this footage is included in *MaM*.** |
| 11 | 2 ECF # 120-2 19:05 – 19:41 | Steve Glynn continues, "Manitowoc doesn't have huge numbers of major assaults where people go to prison and certainly where people would still be in prison. There is a very distinct possibility, I would say likelihood, that it's Gregory Allen. It's the Brown County Sheriff's Department |

6

| | | |
|---|---|---|
| | | that is in 1995 on the Gregory Allen case, that Gregory Allen has said something about Steven Avery, and at a minimum, somebody ought to check this out." **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Evidence that is not of and concerning the Plaintiff is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. **RESPONSE TO PFOF NO. 11: Undisputed that this is included in *MaM*, but disputed as immaterial.** This statement is not about Plaintiff and therefore not material. MTSO was the investigative body responsible for following up on tips, and the Wisconsin DOJ determined they failed to do so. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281. This statement is Glynn expressing his opinions. |
| 12 | ECF # 120-2 19:24 – 19:41 | Graphic shown during a cutaway from Glynn's interview, while Glynn is still speaking, shows, "1995 ● Gregory Allen is arrested for sexual assault in Brown County / Andrew Colborn receives call about inmate confession" **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403. **RESPONSE TO PFOF NO. 12: Undisputed that this graphic is included in *MaM*.** Plaintiff has stipulated and testified that he received the Jail Call in 1994 or 1995. *See* Dkt. 270, Statement of Stipulated Facts, ¶ 2; Ricciardi Decl. ¶ 102, Ex. 7, Colborn Avery Dep., CHRM002891 at 5:12–24 (timeline and role). |
| 13 | 2 ECF # 120-2 19:41 – 19:47 | Cuts to video of Mr. Colborn's deposition testimony in Avery's civil case, with the following exchange: Glynn: I mean that's a significant event. Mr. Colborn: Right, that's what stood out in my mind. **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. |

7

| | | |
|---|---|---|
| | | **RESPONSE TO PFOF NO. 13: Undisputed that this is included in *MaM*.** Plaintiff has stipulated and testified that he wrote a statement in 2003 about the 1994 or 1995 call. *See* Dkt. 270, Statement of Stipulated Facts, ¶ 2; *see* Vick Decl., ¶ 34, Ex. 33. Colborn Dep. at 404:4–8; Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479 (dated September 12, 2003). This statement is Glynn expressing his opinions. |
| 14 | 2<br>ECF # 120-2<br>19:47 – 20:26 | Returns to interview with Glynn, who says, "The fellow who got that call was a guy named Colborn. And you might say that there should be a record of him immediately making a report on this, there might be a record of his immediately contacting a supervising officer, there might be a record of him contacting a detective who handles sexual assault cases, ahh, there might be some record of it. But if you thought any of those things, you'd be wrong, because there isn't any record in 1995, 1996, 1997, 1998, 2000, 2001, 2002, 2003"<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 14: Undisputed that this is included in *MaM*.** Plaintiff has testified and stipulated that he wrote his first record about the 1994 or 1995 Jail Call in 2003. *See* Dkt. 270, Statement of Stipulated Facts, ¶ 2; *see* Vick Decl., ¶ 34, Ex. 33. Colborn Dep. at 404:4–8; Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479 (dated September 12, 2003). This statement is Glynn expressing his opinions. |
| 15 | 2<br>ECF#<br>120-2<br>20:14 -20:25 | Visual cuts to graphic with years running from a timeline image with Mr. Colborn's photograph above it, and a statement after the year "2003" that states, 'DNA evidence exonerates Steven Avery."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. |

| | | R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 15: Disputed as inaccurate.**<br>Plaintiff's photo is not the only photo shown, other individuals' photos are shown too, and the correct timestamp runs through 20:34, overlapping with the dialogue in PFOF ¶ 14. Also, DNA evidence exonerated Avery in September 2003. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281. Plaintiff wrote his statement about the Jail Call on September 12, 2003. Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479 (dated September 12, 2003) |
|---|---|---|
| 16 | 2<br>ECF#<br>120-2<br>20:26 -21:14 | Glynn continues, "Now 2003 is a year that has meaning because that's when Steven Avery got out. And the day he got out, or the day after, that's when Colborn decides to contact his superior officer, named Lenk. And Lenk tells him to write a report. And they then go have contact with t the Sheriff. Now, let's just stop and think about that for a minute. Why does that happen, why does it happen the, when it didn't happen eight years earlier? Um, ahh, I mean, I think I know the answer**.** I think the answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk as his superior realized it, and the Sheriff realized it.<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 16: Undisputed that this is included in *MaM*.** Plaintiff has stipulated and testified that he wrote a statement in 2003 at the instruction of his MTSO superiors. *See* Dkt. 270, Statement of Stipulated Facts, ¶ 2; *see* Vick Decl., ¶ 34, Ex. 33. Colborn Dep. at 404:4–8; Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479 (dated September 12, 2003). This statement is Glynn expressing his opinions. |
| 17 | 2<br>ECF # 120-2<br>21:08-21:12 | Images of Mr. Colborn, James Lenk, and the Sheriff are shown.<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments |

| | | |
|---|---|---|
| | | from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 17: Undisputed that these images are included in *MaM* but disputed as immaterial** The images accurately show Colborn, Lenk, and Petersen during depositions, but the images alone are not a statement and not material. |
| 18 | 2<br>ECF # 120-2<br>21:12 – 21:39 | Glynn continues, "So Lenk tells Colborn to write a report, the Sheriff tells Lenk, `Get me the report.' The Sheriff puts the report in a safe. That's how much he cares about documenting this thing. Well obviously it doesn't do anybody, it certainly doesn't do Steven Avery any good to document that eight years after the fact, because Steve Avery has been sitting in a cage for those eight years.<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 18: Undisputed that this is included in *MaM*.** Plaintiff has stipulated and testified that he wrote a statement in 2003 at the instruction of his MTSO superiors. *See* Dkt. 270, Statement of Stipulated Facts, ¶ 2; *see* Vick Decl., ¶ 34, Ex. 33. Colborn Dep. at 404:4–8; Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479 (dated September 12, 2003). This statement is Glynn expressing his opinions. |
| 19 | ECF # 120-2<br>21:48 – 22:52 | Footage of James Lenk and Sheriff Peterson being questioned by Glynn in depositions at Avery's civil trial that includes Glynn getting Lenk to say that Mr. Colborn "wasn't sure" who told him that the rape in question was already solved and that the right person was arrested, and that includes a close-up of Mr. Colborn's signature identified on an exhibit<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. The Producer Defendants object to this paragraph as duplicative of Paragraph 21.<br>**RESPONSE TO PFOF NO. 19: Undisputed that this is included in *MaM*.** Lenk and Petersen were deposed in |

10

| | | |
|---|---|---|
| | | Avery's civil lawsuit and testified about both Lenk and Colborn's September 2003 statements, which were introduced as exhibits in those depositions.  Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479 (dated September 12, 2003); Ricciardi Decl. ¶ 97, Ex. 2, Lenk 2003 Statement re Jail Call, CHRM004478 (dated September 12, 2003); Ricciardi Decl. ¶ 103, Ex. 8, Avery Civil Lawsuit Deposition Transcript of Kenneth Petersen. |
| 20 | 2<br>ECF # 120-2<br>22:55-23:14 | Avery voiceover stating, "A lot of people told me to watch my back. Most of the time, I didn't even believe them. But then, sitting and doing depositions, I don't know. It kind of changed my mind. They were covering something up."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole.  Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 20: Undisputed that this is included in *MaM*.** This statement is Avery expressing his opinions. |
| 21 | 2<br>ECF # 120-2<br>22:45-22:50 | Image with close-up of Mr. Colborn's signature.<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole.  Fed. R. Evid. 106, 1001–08. The Producer Defendants object to this paragraph as duplicative of Paragraph 19 and misleading as to its juxtaposition with Paragraph 20. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 21: Disputed as an immaterial and duplicative mischaracterization.** This is not a statement and is duplicative of PFOF ¶ 19, above. Further, the image of Plaintiff's signature appears when Ken Petersen is testifying and identifying the author of deposition exhibit 138. Avery begins speaking after that. The only visuals shown while Avery is speaking is Petersen being deposed and some text from exhibit 138, but not Plaintiff's signature. To the extent the juxtaposition aims to imply the image of Plaintiff's signature occurs during the voiceover in PFOF ¶ 20, that is inaccurate. This paragraph is listed after PFOF ¶ 20 but occurs before PFOF ¶ 20 in *MaM*. |

| | | |
|---|---|---|
| 22 | 2<br>ECF # 120-2<br>23:14-23:26 | Avery continues, "And they were still covering something up. Even with the sheriff's who on there now – he's covering something up."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Evidence that is not of and concerning the Plaintiff is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 22: Undisputed that this is included in *MaM*, but disputed as immaterial.** This statement is not about Plaintiff, and therefore is not material. This statement is Avery expressing his opinions. |
| 23 | 2<br>ECF # 120-2<br>23:28-23:50 | Cuts to footage of Mr. Colborn's videotaped deposition.<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 23: Undisputed that this footage is included in *MaM*.** |
| 24 | 2<br>ECF # 120-2<br>26:52-26:56 | Video image of Mr. Colborn<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 24: Undisputed that this footage is included in *MaM*, but disputed as immaterial.** The image is not a statement and therefore not material. |
| 25 | 2<br>ECF # 120-2<br>26:56-27:33 | Steven Glynn is shown, asserting, "This was an unconscionable withholding of information that would have been of use to Steven Avery's lawyers . . . If that information had come to light in 1995, Steven Avery would have gotten out in 1995. So they cost Steve Avery eight years of his life. This is as close to a conspiracy of silence as I think you could find in a case." |

| | | |
|---|---|---|
| | | **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 25: Undisputed that this is a partial quotation of what is included in *MaM*, but disputed as immaterial.** This statement is not about Plaintiff and is therefore not material. Avery sued the county, Manitowoc County Sheriff's Department, Thomas Kocourek, and Denis Vogel for his wrongful conviction and withholding exculpatory evidence. Plaintiff was not employed with MTSO in 1995, and his role in the Jail Call was not known to Avery until after the lawsuit was filed. *See Avery II*, 570 N.W.2d 573. This statement is Glynn expressing his opinions. |
| 26 | 2<br>ECF # 120-2<br>28:24-29:07 | Rotating footage of Mr. Colborn and other alleged conspirators is shown.<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 26: Undisputed that footage is included in *MaM*, but disputed as an immaterial and inaccurate mischaracterization.** The Series depicts rotating footage from the depositions taken in connection to Avery's civil case of Mark Rohrer, James Lenk, Sandra Morris, Plaintiff and others. There is no reference to "conspirators." The footage is not a statement and therefore not material. |
| 27 | 2<br>ECF # 120-2<br>28:35-29:37 | Walt Kelly, also identified as an Avery attorney, states, "October of 2005, from the perspective of the Manitowoc County government and their defense lawyers, I believe they all knew they were in the most serious kind of trouble. There was a very grave prospect of a very, very substantial verdict. [Their] insurers have taken the position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the Sheriff and the DA, would be on the hook for those damages in the |

| | | civil suit." |
|---|---|---|
| | | **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. |
| | | **RESPONSE TO PFOF NO. 27: Undisputed that this is a partial quotation of what is included in *MaM* but disputed as immaterial.** This statement is not about Plaintiff and is therefore not material. Avery sued the county, Manitowoc County Sheriff's Department, Thomas Kocourek, and Denis Vogel. Plaintiff was not a party to the lawsuit and would face no damages liability. *See Avery II*, 570 N.W.2d 573**.** This statement is Kelly expressing his opinions. |
| 28 | 2<br>ECF # 120-2<br>29:40-30:22 | Glynn continues, "We don't need to have somebody tell us that this is going to have an effect on law enforcement.  Of course it has an effect on law enforcement. Are you kidding me? I mean law enforcement officers get uptight there is even a suggestion that they have said something wrong in a courtroom**.** Imagine what it's like when you're going to say that you're a liar, and that you hid evidence, and that you deliberately prosecuted a person that you knew, or at least had reason to know, wasn't guilty of the crime? And putting all that aside, by the way, in terms of your own professionalism, there's a guy out there raping and beating women while the guy that you put in prison is sitting in a cell." |
| | | **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole.  Fed. R. Evid. 106, 1001–08. |
| | | **RESPONSE TO PFOF NO. 28: Undisputed that this is included in *MaM*.** This is an expression of Glynn's opinions. |
| 29 | 2<br>ECF # 120-2<br>30:29-31:04 | Glynn continues, "We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt [Kelly] who tells me that he has gotten a call from a journalist asking if either of us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach." |

| | | |
|---|---|---|
| | | **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Evidence that is not of and concerning the Plaintiff is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. **RESPONSE TO PFOF NO. 29: Undisputed that this appears in *MaM*, but disputed as immaterial.** The statement is not about Plaintiff and therefore not material. The named defendants were Thomas Kocourek and Denis Vogel. *See Avery II*, 570 N.W.2d 573. |
| 30 | 2 ECF # 120-2 39:30-40:08 | News report excerpt regarding Halbach's disappearance is followed by footage of Avery interview in which he says that anyone could have access to his property to plant evidence and accuses the county of possibly doing "something" with Teresa Halbach and trying "to plant evidence on me," adding that he "wouldn't put nothing past the county." **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Evidence that is not of and concerning the Plaintiff is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. **RESPONSE TO PFOF NO. 30: Undisputed that this appears in *MaM*, but disputed as immaterial.** The statement is not about Plaintiff and therefore not material. At the time Avery made this statement to a reporter, Avery had sued the County, former Manitowoc County Sheriff Thomas Kocourek, and former District Attorney Denis Vogel. Plaintiff was not then or subsequently a party to the lawsuit. *See Avery II*, 570 N.W.2d 573. |
| 31 | 2 ECF # 120-2 41:19-41:24 | Avery voiceover, "All I can think is they're trying to railroad me again." **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Evidence that is not of and concerning the Plaintiff is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. |

| | | |
|---|---|---|
| | | **RESPONSE TO PFOF NO. 31: Undisputed that this appears in *MaM*, but disputed as immaterial.** This statement is not about Plaintiff and therefore not material. This statement is Avery expressing his opinions and speculation. |
| 32 | 2<br>ECF # 120-2<br>42:45-43:02 | Avery continues, "I ain't been home. They's been searching. How hard is it to put evidence in the house or on the property? . . . .The . . . . Sheriff . . . was out to get me the first time. How do I know he ain't got nothing to do with it this time?"<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole.  Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 32: Undisputed that this is included in *MaM*.** Avery filed a civil rights lawsuit against the prior sheriff, Tom Kocourek and the sheriff in 2005, Kenneth Petersen, was personally recused from the Avery investigation. *See Avery II*, 570 N.W.2d 573; Vick Decl. ¶ 2, Ex. 1, Deposition Transcript of Kenneth Petersen ("Petersen Dep.") at 149:6–23. This statement is Avery expressing his opinions and speculation. |
| 33 | 2<br>ECF # 120-2<br>44:24-44:35<br>46:37-46:52 | Avery continues, "all these memories and everything else, and they're just sketching me out again. And deep down, it hurts. [more news footage] You know we're all victims, and they just won't leave us alone. They just keep it up and keep it up. You know a person can only take so much, you know          "<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole.  Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 33: Undisputed that this appears in *MaM*, but disputed as inaccurate and incomplete insofar to the extent that Plaintiff is claiming that this consists of a single statement by Avery.** The footage consists of two separate interviews interrupted by a news segment about Teresa Halbach at 44:36–46:36. This statement is Avery expressing his opinions. |
| 34 | 2<br>ECF # 120-2 | Avery states during an apparent interrogation: "See, if somebody else plants that shit there, you ain't going to see . |

| | | |
|---|---|---|
| | 52:24-52:29 | . . ." |

**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Evidence that is not of and concerning the Plaintiff is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403.

**RESPONSE TO PFOF NO. 34: Undisputed that this is included in *MaM*.** This statement is Avery expressing his opinions and speculation. Avery made this statement to law enforcement in a videotaped interrogation. *MaM* features both this statement and Investigator Wiegert's responses. The full transcript of the Interrogation of Steven Avery, dated 11/09/2005 shown in *MaM* at [51:30-52:58] is as follows:

Investigator Wiegert: "I know you're scared Steve. I know you're scared."

Avery: "I'm not scared."

Investigator Wiegert: "Because you didn't mean to kill her. I don't think you meant to kill her."

Avery: "No. I did not kill her."

Investigator Fassbender: "This wasn't a planned thing."

Avery: "No."

Investigator Wiegert: "Did you plan it?"

Avery: "No."

Investigator Wiegert: "Ok, I didn't think so. I didn't think you're that kind of a guy from meeting you. I think what happened, you come out of prison for serving time for something that you didn't even do —"

Avery: "I did not do it."

Investigator Wiegert: "—and it screws you up in the head. Like it screws everybody up. They didn't give you any counseling. You said that before they gave no counseling."

Avery: "I did not kill her."

Investigator Wiegert: "The body is on your property. The key is in your bedroom. You know the key is there because you put the key there. That's the only way the key gets there."

Avery: "No."

Investigator Wiegert: "Yes, Steve, yes. That's the fact. You can deny it all you want. The evidence will show that. Ok? That's the way it is."

Avery: "But the evidence, the cops got the evidence."

Investigator Wiegert: "Yeah, two independent investigators

| | | |
|---|---|---|
| | | who have never met you. Two people who have never met you. Have nothing against you. I know nothing about you."<br>Avery: "No, you see, if somebody else plants that shit there, you ain't going to see it –".<br>Investigator Wiegert: "Then why are your – Why is your DNA there? Why is her blood in your house? How are they going to get her blood in your house?"<br>Avery: "How is her blood in my house? It can't be. I used to—"<br>Investigator Wiegert: "How does your DNA get inside of her truck?"<br>Avery: "—I used to leave my house open all the time."<br>Investigator Wiegert: "How does your DNA get inside of her truck?"<br>Avery: "My DNA ain't. That's because they got blood out of me. How much blood they get out of me? A lot of blood."<br>Investigator Wiegert: "Steve."<br>Avery: "They got a lot of blood outta me."<br>Investigator Wiegert: "Steve—"<br>Avery: "That Sheriff?"<br>Investigator Wiegert: "Steve. Steve. Come back to reality here."<br>Avery: "I am."<br>Investigator Wiegert: "No, you're not."<br>Avery: "I did 18 years. You think I want to do any more ?" |
| 35 | 3<br>ECF # 120-3<br>14:14-14:42 | Unidentified woman in a bar states, "I really do think he was framed...... There's a lot that points to where the Sheriff's Department could've had something to do with it. And then I don't know if it's true or not, but I also heard that Manitowoc County was not supposed to be allowed in to search, and they were in there and they searched. And that's who found the key apparently after the third day was the Manitowoc County Sheriff's Department"<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 35: Undisputed that this is included in *MaM*.** This statement is a member of the community expressing her opinions. Episode 3 also includes statements by other community members expressing contrary opinions that Avery is guilty. |

| 36 | 3<br>ECF # 120-3<br>14:43-15:05 | Male bar patron adds, "I only have one word, from the cops on up: it's corruption. Big time. I mean, if people dig far enough, they'll see that."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Evidence that is not of and concerning the Plaintiff is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 36: Undisputed that this is included in *MaM*.** This statement is a member of the community expressing his opinions. Episode 3 also includes statements by other community members expressing contrary opinions that Avery is guilty. |
| 37 | 3<br>ECF # 120-3<br>15:06 -15:36 | Unidentified female bar patron continues, "I don't care what anybody says, that's a lot of money to pay out from here in Manitowoc County. It's a small area and I really, truly believe the county didn't have the funds to pay it out . . . .And they can say, `Oh, you really believe the Manitowoc County police department and the FBI and everybody came in and they set all this up just to have Steven Avery guilty of this thing? Yes, I do."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 37: Undisputed that this is included in *MaM*.** This statement is a member of the community expressing her opinions. Episode 3 also includes statements by other community members expressing contrary opinions that Avery is guilty. |
| 38 | 3<br>ECF # 120-3<br>16:45-16:55 | MAM depicts a telephone call between Avery and his sister in which Avery says, "This way, they figure they just got away with it, they can do it again ........You know it ain't gonna stop 'em."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 38: Undisputed that this is** |

| | | included in *MaM*. This statement is Avery expressing his opinions. |
|---|---|---|
| 39 | 3<br>ECF # 120-3<br>20:21 – 21:03 | Dean Strang, speaking out of court, is shown stating, "I didn't see them plant evidence with my own two eyes. I didn't see it. But do I understand how human beings might be tempted to plant evidence under the circumstances in which the Manitowoc County Sheriff's Department found itself........I don't have any difficulty understanding those human emotions at all."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 39: Undisputed that this is included in *MaM*.** This statement is Avery's defense attorney expressing his opinions. |
| 40 | 3<br>ECF # 120-3<br>21:16-21:49 | Attorney Buting, speaking out of court, states, "So, you've got motivation for the officers to want to get him. And then when lo and behold there's this woman who disappears and one of the last people she saw was Steven Avery ...... `Now, we've got him. A-ha. We knew it.' They conclude that he's guilty, right off the bat. And they thought, `We're going to make sure he's convicted.'' And they helped it along by planting his blood in the RAV4 and by planting that key in his bedroom."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 40: Undisputed that this is included in *MaM*.** This statement is an Avery attorney laying out his defense argument made at trial. |
| 41 | 4<br>ECF # 120-4<br>32:41 – 33:04 | Attorney Buting, speaking out of court, states "Some would – might think, `Well, you know we – our hands were tied . . . .That you got a client who's saying that he's being framed. Publicly, that's kind of the defense you'd better go with' . . . . . But it really wasn't that way here. The defense was raised because we think the evidence pointed that way ................................................................................ "<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which |

| | | speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. |
|---|---|---|
| | | **RESPONSE TO PFOF NO. 41: Undisputed that this is a partial quotation of what is included in *MaM*.** This statement is an Avery attorney laying out his defense argument made at trial. The full transcript of the statement at [32:41–34:24] is as follows: Attorney Buting, speaking out of court, states "Some would – might think, `Well, you know we – our hands were tied. You know. That you got a client who's saying that he's being framed. Publicly, that's kind of the defense you'd better go with or you're contradicting your own client. But it really wasn't that way here. The defense was raised because we think the evidence pointed that way" |
| | | [33:07] Attorney Buting offscreen continues: "Here's what we saw. The RAV4, the victim's RAV4 is found on the Avery Salvage Yard property. A ridiculous place to leave it if he was the killer. There's a crusher on the property. He knows how to use the crusher. He was operating the crusher the day before it was found. And yet, this vehicle wasn't crushed. Why not? I mean, that's something that most killers don't have the opportunity to do. |
| | | [33:30] Attorney Buting returns to screen and continues: "You know? If you're a killer and you happen to run an auto salvage, you have a crusher, you can get rid of the victim's car. But he didn't. Second, his blood was found inside the vehicle, but only in a few areas. Spots, so to speak. There was evidence that he had a cut on his finger, but what didn't make sense there was no fingerprints of Avery's at all, in or on the vehicle. That would mean, if Avery was the killer, he had to have had gloves. But, if he's got gloves on, how could he be actively bleeding and leaving his blood behind? That was totally inconsistent. So, it looked to us like, maybe his argument that 'If my blood is in that vehicle somebody planted it there,' maybe the evidence was pointing that way." |
| 42 | 4<br>ECF # 120-4<br>1:00:05 –<br>1:00:43 | Buting says out of court, "Sheriff Peterson........clearly, clearly has a strong dislike for Avery. If the very top guy has this kind of attitude...... that's gonna permeate the department, the whole department. If not, at least it's going to permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants."<br>**OBJECTION:** The Producer Defendants object to the |

extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.

**RESPONSE TO PFOF NO. 42: Undisputed that this is a partial quotation of what is included in *MaM*, but it cuts off right before Buting directs his statements towards Lenk, not Plaintiff.** This statement is Avery's attorney expressing his opinions. The full transcript of the statement at [1:00:05–1:01:45] is as follows: Buting says out of court, "Sheriff Peterson was the arresting officer of Avery in 1985. He's now the head of that office, and clearly, clearly has a strong dislike for Avery. If the very top guy has this kind of attitude about Avery, and that kind of personal involvement with Avery, that's gonna permeate the department, the whole department. If not, at least it's going to permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants. So we looked around and one guy's name just kept coming up over and over and over every place we looked. At critical moments. And that was Lieutenant James Lenk. Lenk is the guy who found the key in the bedroom on the seventh entry, supposedly in plain view. Lenk is deposed just three weeks before this Halbach disappearance. And, then, most peculiar of all, is when we looked in Steven's old 1985 case file in the clerk's office. Some items in that court file ultimately proved to exonerate Steven. Interestingly enough, the transmittal form that goes with the evidence in 2002 to the crime lab is filled out by none other than, at that time, Detective Sergeant James Lenk. And, I said to myself, 'Whoa. This is starting to sound more than just coincidental.'"

| 43 | 4 ECF # 120-4 1:00:25 – 1:00:47 | Mr. Colborn's photograph is shown immediately after the above comments, underneath a hierarchy of photographs of the Sheriff's Department chain of command, with the lower levels (including the photograph of Mr. Colborn) illuminated

**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403.

**RESPONSE TO PFOF NO. 43: Undisputed that the** |

| | | |
|---|---|---|
| | | **photograph is included in *MaM*, but disputed as immaterial and incomplete characterization.** The image that appears at 1:00:25 is an organizational chart of the Manitowoc County Sheriff's Department. The chain of command is illuminated, and Plaintiff is not singled out in this image. The image is not a statement and therefore not material. |
| 44 | 4<br>ECF # 120-4<br>1:03:00<br>1:04:15 | Buting says in an apparent telephone call to Strang that the supposed tampering with a blood vial containing Avery's blood shows that "Some officer went into that file, opened it up, took a sample of Steve Avery's blood and planted it in the RAV4."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 44: Undisputed that this is included in *MaM*.** This statement is Avery's defense attorney discussing with co-counsel a legal theory that they later raised at trial. |
| 45 | 5<br>ECF # 120-5<br>52:03- 52:12 | Buting states, out of court, Somebody knew that [Ms. Halbach's] vehicle was there before they ever went there. I'm convinced of it."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 45: Undisputed that this is included in *MaM*.** This statement is Avery's defense attorney providing his opinions and discussing a legal theory. The full transcript of Buting and Strang's out-of-court conversation related to the testimony of Pamela Sturm re discovering Halbach's RAV4 at [51:46–52:12] is as follows:<br>Buting: "I never believed and to this day don't believe Sturm's 'Holy Spirit guided me there' theory. Not that I don't believe that that's possible. But I just don't believe her. I do not believe her at all. I never – she just seemed too weird.<br>Strang: "Right."<br>Buting: And, um – you know, it's — they went right to that thing. Somebody knew that vehicle was there before they ever went there. I'm convinced of it." |

| 46 | 5<br>ECF # 120-5<br>52:13 – 53:20 | Interrogation of Avery follows Buting's statement; Avery tells an officer that he was told by a woman identified only as "Tammy" that "a cop" put Ms. Halbach's vehicle on Avery's property "and planted evidence."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 46: Undisputed that this is partial quotation of what appears in *MaM*.** This statement is Avery speculating during a police interrogation. |
|---|---|---|
| 47 | 5<br>ECF # 120-5<br>53:20-:24 | Immediately after the above, cuts to footage of Mr. Colborn about to testify<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 47: Undisputed that this is included in *MaM*, but disputed as immaterial.** The footage is not a statement and therefore not material. It is undisputed that Plaintiff testified at trial on topics including the location of Teresa Halbach's vehicle. Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM08000 at 184–88. |
| 48 | 6<br>ECF # 120-6<br>56:26 – 57:11 | Buting, in an interview with MAM, states, "One of the things that the state argued was that it would have taken a wide-ranging conspiracy........ Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?"<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 48: Undisputed that this is included in *MaM* but disputed in part as misleading.** |

| | | |
|---|---|---|
| | | Footage of James Lenk, not Plaintiff, immediately follows this dialogue. This statement is Avery's defense attorney providing his opinions and discussing a legal theory. |
| 49 | 7<br>ECF # 120-7<br>1:04 – 1:17 | Statement by Avery's father: "They had Steve picked . . . right away. They set him up. Right from the beginning ................................ "<br><br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br><br>**RESPONSE TO PFOF NO. 49: Undisputed that this is a partial quotation of what appears in *MaM*.** This statement is Avery's father expressing his opinions and speculation. The full transcript of the statement appearing in *MaM* at [1:04–1:42] is as follows:<br>Statement by Avery's father: "They had Stevie picked, as far as I'm concerned, right away. They set him up. Right from the beginning. But they said, 'Oh, he's not no suspect.' What was he? They didn't find nothing down that – by his trailer for three or four days. Then all of a sudden stuff starts… 'Oh, we found this' and 'We found that.' And then the Manitowoc cops found the key. But they weren't supposed to be investigating this at all. Right? . . ." |
| 50 | 7<br>ECF # 120-7<br>10:45 – 12:00 | Buting and Strang are shown in an out-of-court conversation filmed by MAM, stating:<br>Buting: "It's not enough to just get the key. He wants Avery's DNA on that. And so he is gonna wait until it is the right time. And there is a Calumet County deputy with him on all of their searches.<br>Strang: Yep. There is . . . .<br>Buting: Somewhere nearby, and he was just waiting for the right time . . . when he could do it.<br>Strang: That key does not fall from, you know, in between the backboard and the frame of that little bookcase. . . . .<br>Buting: And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?<br>Strang: Blood's easy. . . .<br>Buting: The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation . . . because of that lawsuit. They were deposed in the lawsuit. They didn't tell       " |

**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.

**RESPONSE TO PFOF NO. 50: Undisputed that this is partial quotation of what appears in *MaM* but disputed as lacking context and incomplete.** The attorneys are making statements related to the defense they intended to raise for Avery at trial. Sheriff Petersen was recused from the investigation and Calumet County took over to avoid the appearance of conflict due to the pending lawsuit. Vick Decl. ¶ 2, Ex. 1, Petersen Dep. at 149:6–23; *MaM* Ep. 2 at 40:11–41:20. The scene immediately follows footage of Lenk testifying, not Plaintiff. The full transcript of Buting and Strang's out-of-court conversation at [10:45] is as follows:

Buting: "It's not enough to just get the key. He wants Avery's DNA on that. And so he is gonna wait until it is the right time. And there is a Calumet deputy with him on all of these searches.

Strang: "Yep. There is, somewhere near —"

Buting: "Somewhere nearby, and he was just waiting for the right time — when he could do it."

Strang: That key does not fall from, you know, in between the backboard and the frame of that little bookcase —

Buting: "—And, find its way underneath a pair of slippers."

Strang: "Yeah it just does – you know things fall straight down, thanks to gravity."

Buting: "Right."

Strang: "It's, you know—"

Buting: And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?

Strang: "Blood's easy –"

Buting: "Yeah."

Strang: "Blood's easy if you —"

Buting: "Blood's easy."

Buting: "The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation to the neighboring department because of that lawsuit. They were deposed in the lawsuit. They didn't tell – you know."

| | | |
|---|---|---|
| | | Strang: "I'll connect that." |
| 51 | 7<br>ECF # 120-7<br>14:48 – 15:15 | Avery states, "I'm in the same situation that I was before. Just a couple of them wanting to nail me. And the other ones didn't. But nobody speaks up. I gotta go through this over and over."<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08.<br>**RESPONSE TO PFOF NO. 51: Undisputed that this is included in *MaM*.** This statement is Avery expressing his opinions. |
| 52 | 7<br>ECF # 120-7<br>15:15 | Directly after Avery's comments above, MAM displays image of Mr. Colborn, and audio of Avery continues; video then switches between images of Mr. Colborn waiting to testify, Avery looking sad, and Mr. Colborn in court.<br>**OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Visual moments from the Series that are not statements are irrelevant to Plaintiff's allegation that the statement is defamatory. Fed. R. Evid. 401, 402, 403.<br>**RESPONSE TO PFOF NO. 52: Undisputed that these are included in *MaM*, but disputed as immaterial.** The images are not statements and therefore not material. |
| 53 | 7<br>ECF # 120-7<br>24:28 – 26:01 | Switches to exchange with reporter in which she questions Strang about whether the defense went too far by accusing Mr. Colborn of being a "bad cop," which includes the following:<br>Strang: This was a hard day, and there've been some hard days for Sgt. Colborn. . . .<br>Reporter: "But my question is though, that if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place."<br>Strang: You're hearing evidence of the conspiracy. And I've sat in many a federal courtroom and heard federal prosecutors prove a conspiracy on less than we've heard |

| | | already here and that you will hear by the end of this trial." |
|---|---|---|
| | | **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole.  Fed. R. Evid. 106, 1001–08. |
| | | **RESPONSE TO PFOF NO. 53: Undisputed that this is partial quotation of what appears in *MaM* but disputed as lacking context and incomplete.** Plaintiff does not inclue the portions of the reporter's statements shown in this scene in *MaM* in which she is *defending* Plaintiff and appears to be *criticizing* Avery's attorneys for making accusations and Plaintiff and Lenk. The full transcript of the exchange between a Reporter and Strang after a court session at [24:28] is as follows: |
| | | Reporter: "Sergeant Colborn was up there for quite some time today. This is a gentleman who I think's been a law enforcement officer for 13 years. He puts on a uniform, a badge and a gun every day and goes to work and tries to do his best. We're all here. We're putting this on TV. This guy is gonna go home tonight and listen to his son maybe cry about how everybody at school made fun of him 'cause his dad's a bad cop." |
| | | Strang: "This was a hard day, and there have been some hard days for Sergeant Colborn. But, any pain, any burden that he's bearing, pales in comparison to what the State of Wisconsin and the people working for it have inflicted on Steven Avery and his family. And right now Steven Avery needs Jerry Buting and Dean Strang and anybody out there who believes in him badly. We do believe in him. We are willing to do hard things to advance his cause and he's been saying since November 2005, that someone must have planted his blood if it's in that car." |
| | | Reporter: "But my question is though, that if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place." |
| | | Strang: "You're hearing evidence of the conspiracy. And I've sat in many a federal courtroom and heard federal prosecutors prove a conspiracy on less than we've heard already here and that you will hear by the end of this trial, I think." |
| 54 | 7<br>ECF # 120-7 | Telephone conversation shown between Avery and his mother: |

| | 37:43 – 37:57 | Avery's mother: It seems suspicious. |
| | | Avery: Yeah. |
| | | Avery's mother: Them people ain't gonna get away with everything. |
| | | **OBJECTION:** The Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of Making a Murderer, which speak for themselves, and to the extent Plaintiff's presentation of the statements fails to consider the work as a whole. Fed. R. Evid. 106, 1001–08. Evidence that is not of and concerning the Plaintiff is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. |
| | | **RESPONSE TO PFOF NO. 54: Undisputed that appears in *MaM* but disputed as immaterial.** The statement is not about Plaintiff and therefore not material. This statement is Avery's mother expressing here opinions. The full transcript of the phone conversation between Steven Avery and his mother at [37:43–38:00] is as follows: |
| | | Telephone conversation shown between Avery and his mother: |
| | | Avery's mother: "It seems suspicious." |
| | | Avery: "Yeah." |
| | | Avery's mother: "Them people ain't gonna get away with everything." |
| | | Avery: "No, no. That's why Kratz is worried about it." |
| | | Avery's mother: "Yeah." |
| | | Avery: "Yeah he's scared now." |
| | | Avery's mother: "Oh, yeah?" |
| | | Avery: "Well, why wouldn't he be?" |

55.  The statements identified in the table set forth in paragraph 3-54, above, are capable of being understood, individually or collectively, as implying or making innuendos that Steven Avery was wrongly convicted of the murder of Teresa Halbach.

**OBJECTION:** Plaintiff's selective quoting of *Making a Murderer* fails to consider the work as a whole and other related excerpts that, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. Also, the Producer Defendants object to the extent that any of the statements in Paragraphs 3–54

29

misrepresent the contents of *Making a Murderer*, which speak for themselves. Fed. R. Evid. 1001–08. Furthermore, the Producer Defendants object to this PFOF as compound insofar as it purports to summarize the contents of 52 separate statements and also seeks to characterize them "individually *or* collectively," without explanation. (emphasis added). The Producer Defendants further object that this PFOF states a proposed legal conclusion rather than a proposed fact.

**RESPONSE TO PFOF NO. 55: Disputed.** Plaintiff improperly lumps together 52 separate statements without addressing any of them individually, rendering this PFOF meaningless and inappropriate for consideration in connection with Plaintiff's MPSJ. It is impossible for Defendants to meaningfully craft a response to a PFOF that combines 52 separate statements in such an undifferentiated manner, and does so "individually or collectively," without explanation. In addition, most (if not all) of the 52 statements are not adequately pleaded in the SAC to state a valid defamation claim based on such statements. For example, most if not all of the statements are not even mentioned in the body of the SAC, and even those that are not developed sufficiently in the SAC to support a potentially viable defamation claim. Furthermore, the SAC does not purport to allege defamation by implication and innuendo, yet this PFOF seeks to set the foundation for such a claim. Plaintiff may not amend his SAC *sub rosa* through the guise of a motion for partial summary judgment. Also, each and every one of the 52 statements is non-actionable, individually and collectively, based on numerous grounds

including (a) they are not of and concerning Plaintiff; (b) they are not defamatory; (c) they are not actionable statements of fact by Defendants; (d) they are non-actionable opinions of third parties; (e) they are not materially false but rather substantially true under the governing case law; (f) they were not made with actual malice. *See also* Dkt. No. 308 (Netflix's Appendix). Finally, *MaM* accurately reflects both the viewpoints of Avery and his defenders, and also those of Plaintiff and law enforcement; *MaM* does not itself imply or make innuendos as to whether Avery was, in fact, wrongly convicted of the murder of Teresa Halbach. Finally, Plaintiff's motion for partial summary judgment and this PFOF appear to be based on the faulty premise that if Avery murdered Teresa Halbach, that necessarily means that Plaintiff did not plant evidence to try to ensure Avery's conviction. *Cf.* Dkt. 294, Prod. Def. MSJ at Section II.B, 37–43. However, as the prosecutor in the case suggested in his closing argument, it is possible that Avery killed Teresa Halbach and that Plaintiff or other law enforcement personnel planted evidence against him to strengthen the case for conviction. *See MaM* Ep. 8 at 9:02, 9:30; *see also* Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 64. Plaintiff's former counsel of record, Michael Griesbach, expressed to his book agent in January 2016 that he believed that was a distinct possibility.  Vick Decl. ¶ 32, Ex. 31, Griesbach0026044.

56. The statements identified in paragraph 3-54, above, are capable of being understood, individually or collectively, as implying or making innuendos that Manitowoc County law enforcement officers framed Steven Avery for the

murder of Teresa Halbach.

**OBJECTION:** Plaintiff's selective quoting of *Making a Murderer* fails to consider the work as a whole and other related excerpts that, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. Also, the Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of *Making a Murderer*, which speak for themselves. Fed. R. Evid. 1001–08. Furthermore, the Producer Defendants object to this PFOF as compound insofar as it purports to summarize the contents of 52 separate statements and also seeks to characterize them "individually *or* collectively," without explanation. (emphasis added). The Producer Defendants further object that this PFOF states a proposed legal conclusion rather than a proposed fact.

**RESPONSE TO PFOF NO. 56: Disputed.** Plaintiff improperly lumps together 52 separate statements without addressing any of them individually, rendering this PFOF meaningless and inappropriate for consideration in connection with Plaintiff's MPSJ. It is impossible for Defendants to meaningfully craft a response to a PFOF that combines 52 separate statements in such an undifferentiated manner, and does so "individually or collectively," without explanation. In addition, most if not all of the 52 statements are not adequately pleaded in the SAC to state a valid defamation claim based on such statements. *See* Dkt. 105. Furthermore, the SAC does not purport to allege defamation by implication and innuendo, yet this PFOF seeks to set the foundation for such a claim. Plaintiff may not amend his SAC *sub rosa*

through the guise of a motion for partial summary judgment. Also, each and every one of the 52 statements is non-actionable, individually and collectively, based on numerous grounds including (a) they are not of and concerning Plaintiff; (b) they are not defamatory; (c) they are not actionable statements of fact by Defendants; (d) they are non-actionable opinions of third parties; (e) they are not materially false but rather substantially true under the governing case law; (f) they were not made with actual malice. *See also* Dkt. 308 (Netflix's Appendix). Finally, *MaM* accurately reflects both the viewpoints of Avery and his defenders, and also those of Plaintiff and law enforcement. *See, e.g.*, *MaM* Ep. 3 at 14:14–15:40 (bar patrons playing pool with Steven Avery's brother Chuck Avery expressing their belief in the framing theory); *MaM* Ep. 3 at 29:00–29:03 (local news segment after March 2, 2006 press conference with two local residents interviewed at a bar expressing the belief that Dassey and Avery killed Teresa Halbach, and one local resident interviewed in the street whose mind was changed toward guilt); *see also MaM* Ep. 3 at 4:25 and 12:30 (identifying onscreen "Chuck Avery Steven's Brother"); Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 77:8–14, 83:3–7; *see also* Nishimura Decl.¶ 14. *MaM* does not itself imply or make innuendos as to whether Manitowoc County law enforcement officers, in fact, framed Steven Avery for the murder of Teresa Halbach. *See* Dkt. 294, Prod. Def. MSJ at Section II.B, 37–43; *MaM* Ep. 8 at 9:02, 9:30; *see also* Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 64; Vick Decl. ¶ 32, Ex. 31, Griesbach0026044. Finally, any statements about "law enforcement

33

officers" generally would not be "of and concerning" Plaintiff personally and thus could not even provide the basis for a potentially viable defamation claim.

57. The statements identified in paragraph 3-54, above, are capable of being understood, individually or collectively, as implying or making innuendos that Plaintiff was one of the key participants in a law enforcement conspiracy to frame Steven Avery for the murder of Teresa Halbach.

**OBJECTION:** Plaintiff's selective quoting of *Making a Murderer* fails to consider the work as a whole and other related excerpts that, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. Also, the Producer Defendants object to the extent that any of the statements in Paragraphs 3–54 misrepresent the contents of *Making a Murderer*, which speak for themselves. Fed. R. Evid. 1001–08. Furthermore, the Producer Defendants object to this PFOF as compound insofar as it purports to summarize the contents of 52 separate statements and also seeks to characterize them "individually *or* collectively," without explanation. (emphasis added). The Producer Defendants further object that this PFOF states a proposed legal conclusion rather than a proposed fact.

**RESPONSE TO PFOF NO. 57: Disputed**.  Plaintiff improperly lumps together 52 separate statements without addressing any of them individually, rendering this PFOF meaningless and inappropriate for consideration in connection with Plaintiff's MPSJ. It is impossible for Defendants to meaningfully craft a response to a PFOF that combines 52 separate statements

in such an undifferentiated manner, and does so "individually or collectively," without explanation. In addition, most if not all of the 52 statements are not adequately pleaded in the SAC to state a valid defamation claim based on such statements. For example, it is unclear how many of the statements are even mentioned in the body of the SAC, and even those included are not developed sufficiently in the SAC to support a potentially viable defamation claim. *See* Dkt. 105, SAC. Furthermore, the SAC does not purport to allege defamation by implication and innuendo, yet this PFOF seeks to set the foundation for such a claim. Plaintiff may not amend his SAC *sub rosa* through the guise of a motion for partial summary judgment. Also, each and every one of the 52 statements is non-actionable, individually and collectively, based on numerous grounds including (a) they are not of and concerning Plaintiff; (b) they are not defamatory; (c) they are not actionable statements of fact by Defendants; (d) they are non-actionable opinions of third parties; (e) they are not materially false but rather substantially true under the governing case law; (f) they were not made with actual malice. Finally, *MaM* accurately reflects both the viewpoints of Avery and his defenders, and also those of Plaintiff and law enforcement. *See, e.g.*, *MaM* Ep. 3 at 14:14–15:40 (bar patrons playing pool with Steven Avery's brother Chuck Avery expressing their belief in the framing theory); *MaM* Ep. 3 at 29:00–29:03 (local news segment after March 2, 2006 press conference with two local residents interviewed at a bar expressing the belief that Dassey and Avery killed Teresa Halbach, and one local resident interviewed in the street whose mind was

35

changed toward guilt); *see also MaM* Ep. 3 at 4:25 and 12:30 (identifying onscreen "Chuck Avery Steven's Brother"); Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 77:8–14, 83:3–7; *see also* Nishimura Decl.¶ 14.*MaM* does not itself imply or make innuendos as to whether Plaintiff was, in fact, one of the key participants in a law enforcement conspiracy to frame Steven Avery for the murder of Teresa Halbach. *See* Ricciardi Decl. ¶ 111, Ex. 16, CHRM003721 at CHRM003722, CHRM003727–28; *see also infra* SPFOF ¶ 38 (pretrial order identifying Plaintiff as one of two officers Avery could accuse of planting evidence).

58.    Steven Avery was convicted of murder in 2007. Barker Decl., Ex. 2.

     **OBJECTION:** None.

     **RESPONSE TO PFOF NO. 58: Undisputed.**

59.    The Netflix representatives of the creative team that participated in the production of MAM reviewed and approved the final versions of all episodes of MAM prior to its being published. Barker Decl., Ex. 3, Nishamura Tr. [*sic*] at pp. 170-71; Ex. 4, Del Deo Tr. At p. 141.

     **OBJECTION:** Vague and ambiguous as to "Netflix representatives of the creative team that participated in production of *MaM*" and as to "approved.".

     **RESPONSE TO PFOF NO. 59: Disputed in part.** Certain Netflix participated in the production of *MaM*, with various levels of involvement in certain portions of the production process, but this PFOF's failure to identify any particular Netflix personnel makes it impossible for the Producer Defendants to respond whether unspecified Netflix executives reviewed final

36

versions of certain episodes of *MaM* prior to its being published. Moreover, the Producer Defendants do not know whether unspecified Netflix executives "approved" such versions.

60.    Defendants' representatives admitted that [*sic*] had little to no knowledge about the individuals shown in Episode 3 of MAM in a bar and making statements that Manitowoc County law enforcement framed Avery, including no knowledge regarding their contacts with the Averys (other than as stated in paragraph 9, below) or law enforcement. Barker Decl., Ex. 5, Demos Tr. Pp. 148-54; Ex. 3, Nishamura Tr. Pp. 172-73; Ex. 6, Del Deo Tr. P. 156.

**OBJECTION:** Vague and ambiguous as to "Defendants representatives," as this PFOF fails to distinguish between the four Defendants and does not specify who the unspecified Defendants' "representatives" are. Vague and ambiguous as to "individuals shown in Episode 3 of MAM in a bar." Also, this PFOF contains a nonsensical reference to "paragraph 9 below" when paragraph 9 is above and relates to a different subject and paragraph 69 below is also on a different subject.

**RESPONSE TO PFOF NO. 60: Disputed as vague.** This PFOF's nonsensical citation to Paragraph 9 below, its failure to specify particular Defendants or representatives, and its absence of a subject after the word "that" and before "had little" makes it difficult if not impossible for the Producer Defendants to formulate a substantive response without guessing at Plaintiff's proposed meaning. To the extent the Producer Defendants understand this PFOF, it is disputed insofar as *MaM* shows people in a bar

37

playing pool with Chuck Avery, Steven Avery's brother, which speaks to their "contacts with the Averys." In the testimony Plaintiff cites in support of this paragraph, Demos notes that the segment in the bar was "a way to try to find local residents who might have been willing to share their views." Dkt. 286, Ex. 5 at 148:2–21. In addition to these bar patrons' views, *MaM* featured the different reactions to Steven Avery in the local community, with some who believed his framing defense, some who believed he was guilty, and some whose views were shown changing over time. *See, e.g.*, *MaM* Ep. 3 at 14:14–15:40 (bar patrons playing pool with Steven Avery's brother Chuck Avery expressing their belief in the framing theory); *MaM* Ep. 3 at 29:00–29:03 (local news segment after March 2, 2006 press conference with two local residents interviewed at a bar expressing the belief that Dassey and Avery killed Teresa Halbach, and one local resident interviewed in the street whose mind was changed toward guilt); *see also MaM* Ep. 3 at 4:25 and 12:30 (identifying onscreen "Chuck Avery Steven's Brother"); Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 77:8–14, 83:3–7.

61.    At least one of the bar patrons who make statements in Episode 3 of MAM is shown playing pool with Chuck Avery, Steven Avery's brother. Barker Decl., Ex. 5, Demos Tr. At p. 150.

**OBJECTION:** None.

**RESPONSE TO PFOF NO. 61: Undisputed.**

62.    Mr. Colborn received voicemail messages from callers who were critical of him after the release of MAM, most of whom did not identify themselves,

including messages stating the following.

**OBJECTION:** Evidence relating to unspecified communications Plaintiff claimed to receive from unidentified members of the public after *MaM* aired is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. Unspecified voicemail messages from unidentified members of the public are inadmissible hearsay. Fed. R. Evid. 801, 802. Plaintiff fails to provide evidentiary support for the proposed material fact as required by the local rules. Civil L.R. 56(b)(1)(C)(i).

**RESPONSE TO PFOF NO. 62: Disputed as immaterial.** Neither this paragraph nor the voicemails generally are cited or discussed in Plaintiff's brief in support of his motion for partial summary judgment. *See* Dkt. 285. Thus, they and their purported provenance and contents are irrelevant.

63. . . . I'm just calling in regards to the documentary that I just finished watching it and it appears pretty clearly that you were obviously involved beyond a detective role. . .

Colborn Decl., Dkt. #130, and Ex. 1, 1-7-16 4:04 PM

**OBJECTION:** Evidence relating to communications Plaintiff claimed to receive from unidentified members of the public after *MaM* aired is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. Voicemail messages from unidentified members of the public are inadmissible hearsay. Fed. R. Evid. 801, 802. Plaintiff's selective quoting of the voicemail fails to consider the message as a whole, which, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. Plaintiff cites to audio recordings lodged with the

39

Court at Dkt. 130-1 as exhibits to Plaintiff's declaration at Dkt. 130. That declaration fails to provide sufficient details to identify the date and time of the individual recordings and authenticate the recordings as cited. Fed. R. Evid. 901.

**RESPONSE TO PFOF NO. 63: Disputed as immaterial.** Neither this paragraph nor the voicemails generally are cited or discussed in Plaintiff's brief in support of his motion for partial summary judgment. *See* Dkt. 285. Thus, they and their purported provenance and contents are irrelevant.

64.     Hi Detective Colborn, I'm calling about the Steven Avery case – I wanted to know if you planted evidence with Detective Lenk. It sure seems like that from the documentary. . . . I think you definitely planted evidence . . . .

*Id.*, Ex. 1, 1-20-16 1:16 PM

**OBJECTION:** Evidence relating to communications Plaintiff claimed to receive from unidentified members of the public after *MaM* aired is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. Voicemail messages from unidentified members of the public are inadmissible hearsay. Fed. R. Evid. 801, 802. Plaintiff's selective quoting of the voicemail fails to consider the message as a whole, which, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. Plaintiff cites to audio recordings lodged with the Court at Dkt. 130-1 as exhibits to Plaintiff's declaration at Dkt. 130. That declaration fails to provide sufficient details to identify the date and time of the individual recordings and  authenticate the recordings as cited. Fed. R. Evid. 901.

**RESPONSE TO PFOF NO. 64: Disputed as immaterial.** Neither this paragraph nor the voicemails generally are cited or discussed in Plaintiff's brief in support of his motion for partial summary judgment. *See* Dkt. 285. Thus, they and their purported provenance and contents are irrelevant. This caller's voice sounds similar to the voice of the caller in ¶ 67.

65.     Hi. This is regarding the Steven Avery case . . . . You know what you have done. This is completely unprofessional. . . . . You framed him and I don't care if the documentary was one-sided. You know what you did . . . . You are going to hell. . . .

*Id.*, Ex. 1, 1-21-16 10:54 AM

**OBJECTION:** Evidence relating to communications Plaintiff claimed to receive from unidentified members of the public after *MaM* aired is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. Voicemail messages from unidentified members of the public are inadmissible hearsay. Fed. R. Evid. 801, 802. Plaintiff's selective quoting of the voicemail fails to consider the message as a whole, which, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. Plaintiff cites to audio recordings lodged with the Court at Dkt. 130-1 as exhibits to Plaintiff's declaration at Dkt. 130. That declaration fails to provide sufficient details to identify the date and time of the individual recordings and authenticate the recordings as cited. Fed. R. Evid. 901.

**RESPONSE TO PFOF NO. 65: Disputed as immaterial.** Neither this paragraph nor the voicemails generally are cited or discussed in Plaintiff's

brief in support of his motion for partial summary judgment. *See* Dkt. 285. Thus, they and their purported provenance and contents are irrelevant. This caller's voice sounds similar to the voice of the caller in ¶ 66.

66.    . . . I've been calling numerous times and been getting no answer . . . . only awful disgusting human beings would do such a thing to innocent people, not only once, but twice, Colborn. The whole world has observed your lies . . . . I hope you're harassed . . . until the day you die. . . . . I hope that your wife is the next victim. . .

*Id.*, 1-21-16 11:14 AM

**OBJECTION:** Evidence relating to communications Plaintiff claimed to receive from unidentified members of the public after *MaM* aired is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. Voicemail messages from unidentified members of the public are inadmissible hearsay. Fed. R. Evid. 801, 802. Plaintiff's selective quoting of the voicemail fails to consider the message as a whole, which, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. Plaintiff cites to audio recordings lodged with the Court at Dkt. 130-1 as exhibits to Plaintiff's declaration at Dkt. 130. That declaration fails to provide sufficient details to identify the date and time of the individual recordings and authenticate the recordings as cited. Fed. R. Evid. 901.

**RESPONSE TO PFOF NO. 66: Disputed as immaterial.** Neither this paragraph nor the voicemails generally are cited or discussed in Plaintiff's brief in support of his motion for partial summary judgment. *See* Dkt. 285.

42

Thus, they and their purported provenance and contents are irrelevant. This caller's voice sounds similar to the voice of the caller in ¶ 65.

67.     Hi Detective Colborn. I just watched Making a Murder and you are soooo guilty. You were at the . . . you were at the the lot . . . the Avery yard, and you saw the car before, um and you're in it with Lenk. You guys are so shady and corrupt. . . .

*Id.*, 1/26/16 to 1/27/16, 3:42 PM

**OBJECTION:** Evidence relating to communications Plaintiff claimed to receive from unidentified members of the public after *MaM* aired is irrelevant to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. Voicemail messages from unidentified members of the public are inadmissible hearsay. Fed. R. Evid. 801, 802. Plaintiff's selective quoting of the voicemail fails to consider the message as a whole, which, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. Plaintiff cites to audio recordings lodged with the Court at Dkt. 130-1 as exhibits to Plaintiff's declaration at Dkt. 130. That declaration fails to provide sufficient details to identify the date and time of the individual recordings and authenticate the recordings as cited. Fed. R. Evid. 901.

**RESPONSE TO PFOF NO. 67: Disputed as immaterial.** Neither this paragraph nor the voicemails generally are cited or discussed in Plaintiff's brief in support of his motion for partial summary judgment. *See* Dkt. 285. Thus, they and their purported provenance and contents are irrelevant. This caller's voice sounds similar to the voice of the caller in ¶ 64.

43

68.     Hey Andy . . . . You're probably out planting evidence on somebody right

now, but um I just want to let you know that I saw your appearance on the

television program and I really couldn't believe how scared you were in that

one scene. I just wanted to talk to you about it, when you were upon the stand.

Um, I actually thought you were going to wet your pants you were so scared. .

. . .

*Id.*, Ex. 1, 2/15/16 to 2/19/16 2:13 PM (emphasis added)

**OBJECTION:** Evidence relating to communications Plaintiff claimed to

receive from unidentified members of the public after *MaM* aired is irrelevant

to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. Voicemail messages from

unidentified members of the public are inadmissible hearsay. Fed. R. Evid.

801, 802. Plaintiff's selective quoting of the voicemail fails to consider the

message as a whole, which, in fairness, ought to be considered at the same

time. Fed. R. Evid. 106. Plaintiff cites to audio recordings lodged with the

Court at Dkt. 130-1 as exhibits to Plaintiff's declaration at Dkt. 130. That

declaration fails to provide sufficient details to identify the date and time of

the individual recordings and authenticate the recordings as cited. Fed. R.

Evid. 901.

**RESPONSE TO PFOF NO. 68: Disputed as immaterial.** Neither this

paragraph nor the voicemails generally are cited or discussed in Plaintiff's

brief in support of his motion for partial summary judgment. *See* Dkt. 285.

Thus, they and their purported provenance and contents are irrelevant.

44

69.     Mr. Colborn, this is a concerned citizen of the state of California. I've seen the

case with Steven Avery. . . everybody knows what is going on here with you

guys setting up and framing this poor man Steven Avery . . . be ready to sit in

federal prison for a long long time. I hope you rot in hell, you son of a ****

*Id.*, Ex. 1, 1-15-16 to 1-18-16 4:34 PM

**OBJECTION:** Evidence relating to communications Plaintiff claimed to

receive from unidentified members of the public after *MaM* aired is irrelevant

to Plaintiff's motion. Fed. R. Evid. 401, 402, 403. Voicemail messages from

unidentified members of the public are inadmissible hearsay. Fed. R. Evid.

801, 802. Plaintiff's selective quoting of the voicemail fails to consider the

message as a whole, which, in fairness, ought to be considered at the same

time. Fed. R. Evid. 106. Plaintiff cites to audio recordings lodged with the

Court at Dkt. 130-1 as exhibits to Plaintiff's declaration at Dkt. 130. That

declaration fails to provide sufficient details to identify the date and time of

the individual recordings and authenticate the recordings as cited. Fed. R.

Evid. 901.

**RESPONSE TO PFOF NO. 69: Disputed as immaterial.** Neither this

paragraph nor the voicemails generally are cited or discussed in Plaintiff's

brief in support of his motion for partial summary judgment. *See* Dkt. 285.

Thus, they and their purported provenance and contents are irrelevant.

70.     Mr. Colborn denied in sworn testimony during the Avery criminal trial that he

planted evidence to frame Steven Avery. Barker Decl., Ex. 7 (excerpts from

Avery criminal trial transcript at pp. 140-41).

**OBJECTION:** Plaintiff's 15-year-old trial testimony is inadmissible hearsay from Avery's criminal case and cannot be relied on for truth of the matter asserted in a separate lawsuit. Fed. R. Evid. 801; s*ee Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 170 (3d Cir. 1995); *Dressler v. Rice*, 2017 WL 3033877, at *2 (S.D. Ohio July 18, 2017); *Hill v. City of Chicago*, 2011 WL 3876915, at *2–5 (N.D. Ill. Sept. 1, 2011). Because Plaintiff remains available, he cannot claim the prior testimony hearsay exception applies. *See* Fed. R. Evid. 804(b)(1). The reference to "sworn testimony" holds little weight and is misleading when the testimony is 15 years old and the statute of limitations for perjury is six years in Wisconsin law and five years in federal law. *See* Wis. Stat. § 946.31(1) (perjury is Class H felony); Wis. Stat. § 939.74(1) (six-year statute of limitations for most felonies, including perjury); 18 U.S.C. 3282(a) (five-year statute of limitations for non-capital offenses); *DeLeon-Reyes v. Guevara*, 2020 WL 5800727, at *5 (N.D. Ill. Sept. 29, 2020) ("federal statute of limitations for perjury is 5 years").

**RESPONSE TO PFOF NO. 70: Undisputed that Plaintiff so testified at Avery's trial in 2007, but disputed that Plaintiff has provided admissible evidence addressing the subject of his testimony in support of his motion for partial summary judgment**.

71.     Netflix series notes advised Chrome to use Ms. Ducat's statement that the County was "not done" with Mr. Avery to impart "a more explicit ending [to an early episode] that makes it clear that in the next episode the cops are going to seek revenge." Barker Decl., Ex. 8, Nishamura Tr. Pp. 131-32; Ex. 9 at

46

exhibit p.5, excerpt from Deposition Ex. 7 (NFXCOL 0001978).

**OBJECTION:** The Producer Defendants object to the extent that Plaintiff's characterization misrepresents the contents of Netflix's notes, which speak for themselves. Fed. R. Evid. 1001–08. The Producer Defendants also object to Plaintiff's excerpting of transcripts, which fail to adequately identify the witness and authenticate the document. Fed. R. Evid. 902, 1007; *see infra* Section IV.I.

**RESPONSE TO PFOF NO. 71: Disputed as inaccurate, incomplete and immaterial.** The document at NFXCOL0001978 is divided into two columns, with "current" Episode 1 plot summary on the left and "suggestions" on the right. The phrase "not done" does not appear anywhere on the page. Instead, the current "cold open" reads: "S.A. gets out of prison. Background that he was wrongfully imprisoned for 18 years. Cousin says: 'Be careful… They aren't even close to being finished with you.'" The Netflix "suggestions" for a "more explicit ending" appear in line with the bullet point list of plot developments featured in Episode 1. The actual episode ends with Stephen Glynn's quote as shown in the "cliffhanger" followed by video of patrol cars and audio from dispatch: "[officer]: Do we have a body or anything yet? [female dispatcher] I don't believe so. [officer] do we have Steven Avery in custody though?" *MaM* Ep. 1 at 1:02:03–1:02:35. Netflix's notes are immaterial to Plaintiff's motion as brought against the Producer Defendants. *See* Prod. Def. Opp. Brief at Section IV.B.

47

72.     Netflix representatives also endorsed using Avery's father's statement, "They framed an innocent man just like they did 20 years ago" as a "cliffhanger." *Id.*, Ex. 9 at exhibit page 8 (NFXCOL 0001981).

**OBJECTION:** The Producer Defendants object to the extent that Plaintiff's characterization misrepresents the contents of Netflix's notes, which speak for themselves. Fed. R. Evid. 1001–08. The Producer Defendants also object to Plaintiff's excerpting of transcripts, which fail to adequately identify the witness and authenticate the document. Fed. R. Evid. 902, 1007; *see infra* Section IV.1.

**RESPONSE TO PFOF NO. 72: Disputed in part as inaccurate and immaterial.** Netflix's note regarding Allan Avery's quote is included under "Suggestions." There is no evidence of any "endorsement" nor any proposal by the Producer Defendants to that effect that Netflix then "endorsed." Netflix's notes are immaterial to Plaintiff's motion as brought against the Producer Defendants. *See* Prod. Def. Opp. Brief at Section IV.B.

73.     In series notes, Defendants referred to those associated with Manitowoc County law enforcement as "the baddies" for whom a specific "bad guy theme" music was to play during their appearances as part of an overall "thriller atmospheric score." Barker Decl., Ex. 8, Nishamura Tr., pp. 13132, 136-37; Ex. 9 at exhibit pp. 36, 64 (Deposition Ex. 7 at NFXCOL 0002009, 2037); Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001934.

**OBJECTION:** Vague and ambiguous as to "Defendants," as this PFOF does

48

not state whether it is referring to all Defendants or only certain of them. The Producer Defendants object to the extent that Plaintiff's characterization misrepresents the contents of Netflix's notes, which speak for themselves. Fed. R. Evid. 1001–08. The Producer Defendants also object to Plaintiff's excerpting of transcripts, which fail to adequately identify the witness and authenticate the document. Fed. R. Evid. 902, 1007; *see infra* Section IV.1.

**RESPONSE TO PFOF NO. 73: Disputed in part as inaccurate and immaterial.** Notes from Lisa Nishimura, Adam Del Deo, and Ben Cotner at Netflix included the "baddies" language. The Producer Defendants did not use that language, nor was it attributed to any specific Netflix personnel on the email thread. Netflix's notes are immaterial to Plaintiff's motion as brought against the Producer Defendants. *See* Prod. Def. Opp. Brief at Section IV.B. Moreover, the notes themselves identify specific individual "baddies," but those individuals do not include Plaintiff, so the statement is not of and concerning him.

74. Netflix production notes, which were forwarded to Chrome, include a suggestion that source material be reviewed for the purpose of finding material to "allude to the fact that [cops] may have planted something . . . ." during a search at the Avery property. Barker Decl., Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001940.

**OBJECTION:** Plaintiff's selective quoting of Netflix notes fails to consider the documents as a whole and other related excerpts that, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. The Producer Defendants

49

object to the extent that Plaintiff's characterization misrepresents the contents of Netflix's notes, which speak for themselves. Fed. R. Evid. 1001–08. The Producer Defendants also object to Plaintiff's excerpting of transcripts, which fail to adequately identify the witness and authenticate the document. Fed. R. Evid. 902, 1007; *see infra* Section IV.1.

**RESPONSE TO PFOF NO. 74: Disputed in part as incomplete, inaccurate, and immaterial.** The Netflix notes for a draft version of Episode 3 at 21:23 read "Is there anything we can use/show to clarify whether or not the cops had a warrant to search his property and allude to the fact that they may have planted something when they were there without permission?" Dkt. 286-11 at 9 (NFXCOL0001940). Moreover, Avery's core defense theory at his trial was that law enforcement planted evidence to frame him for the murder of Teresa Halbach, and that theory is referenced and foreshadowed in Episode 3. Netflix's notes are immaterial to Plaintiff's motion as brought against the Producer Defendants. *See* Prod. Def. Opp. Brief at Section IV.B.

75.   In MAM production notes that were shared with Chrome, Netflix's creative team admitted that it seemed "very thin" that the call by Mr. Colborn "would be the key to the case." Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001938.

**OBJECTION:** Plaintiff's selective quoting of Netflix notes fails to consider the documents as a whole and other related excerpts that, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. The Producer Defendants object to the extent that Plaintiff's characterization misrepresents the contents

of Netflix's notes, which speak for themselves. Fed. R. Evid. 1001–08. The Producer Defendants also object to Plaintiff's excerpting of transcripts, which fail to adequately identify the witness and authenticate the document. Fed. R. Evid. 902, 1007; *see infra* Section IV.1.

**RESPONSE TO PFOF NO. 75: Disputed in part as incomplete and immaterial.** The Netflix notes for a draft version of Episodes 1 and 2 at 55:00 read: "Seems very thin that Colburn not having specific knowledge of who called him would be the key to the case. Who called Colburn? No email? Not fax? Could they track the call? If you are Colburn, why even disclose?" [*sic*]. Dkt. 286-11 at 7 (NFXCOL0001938). Netflix's notes are immaterial to Plaintiff's motion as brought against the Producer Defendants. *See* Prod. Def. Opp. Brief at Section IV.B.

76.     In MAM production Netflix sought family pictures of the Averys to include in the series, saying, "Let's make them look like a very happy family." Barker Decl., Ex. 10, Del Deo Tr., pp. 88-89; Ex. 11 (Deposition Ex. 5) at NFXCOL 0001935.

**OBJECTION:** Plaintiff's selective quoting of Netflix notes fails to consider the documents as a whole and other related excerpts that, in fairness, ought to be considered at the same time. Fed. R. Evid. 106. The Producer Defendants object to the extent that Plaintiff's characterization misrepresents the contents of Netflix's notes, which speak for themselves. Fed. R. Evid. 1001–08. The Producer Defendants also object to Plaintiff's excerpting of transcripts, which fail to adequately identify the witness and authenticate the document. Fed. R.

Evid. 902, 1007; *see infra* Section IV.1.

**RESPONSE TO PFOF NO. 76: Disputed in part as incomplete and immaterial.** The Netflix notes for a draft version of Episodes 1 and 2 note in the Introduction, "The first five minutes gives us a peek into how this town has treated the Averys before the crimes." And under "Chapters: There are 4 key parts of this section that lead up to Teresa's murder: The policy/community's dislike for Steve/Averys, the public exposure allegations, the Penny Beernsten [*sic*] rape allegations, and then Steve suing the county." Dkt. 286-11 at 4 (NFXCOL0001935). Netflix's notes are immaterial to Plaintiff's motion as brought against the Producer Defendants. *See* Prod. Def. Opp. Brief at Section IV.B.

77. They also identified an image of Avery "looking a little smug" as one that should be replaced with a different shot while discussing a version of an MAM episode. Barker Decl., Ex. 12 at NFXCOL 0001974.[1]

**OBJECTION:** Fed. R. Evid. 106. Plaintiff's selective quoting of Netflix notes fails to consider the documents as a whole and other related excerpts that, in fairness, ought to be considered at the same time. The Producer Defendants also generally object to Plaintiff's excerpting of transcripts. Fed. R. Evid. 902, 1007; *see infra* Section IV.1

**RESPONSE TO PFOF NO. 77: Disputed in part as immaterial and incomplete.** The Netflix notes for a draft version of Episode 5 note at 42:55, "Dean Strang soliloquy on the difficulty of this type of trial. v/o over shot of

_____

[1] Netflix has stipulated through counsel that documents within this Bates range are authentic.

Steven looking a little smug – might be better to use a different shot?" Dkt. 286-12 at 3 (NFXCOL0001974). The note is not of and concerning the Plaintiff so it is immaterial to Plaintiff's defamation claim. Netflix's notes are immaterial to Plaintiff's motion as brought against the Producer Defendants. *See* Prod. Def. Opp. Brief at Section IV.B.

78. Defendants worked to replace another image of Mr. Colborn in an early version of the MAM trailer with what they called a "squirmy shot" instead. Barker Decl., Ex. 13, Demos Tr. Pp. 218-19; Ex. 14 at CHRM 481-82.

**OBJECTION:** Vague and ambiguous as to "Defendants," as this PFOF does not state whether it is referring to all Defendants or only certain of them. The Producer Defendants object to the extent that Plaintiff's characterization misrepresents the contents of Netflix's notes, which speak for themselves. Fed. R. Evid. 1001–08. The Producer Defendants also object to Plaintiff's excerpting of transcripts, which fail to adequately identify the witness and authenticate the document. Fed. R. Evid. 902, 1007; *see infra* Section IV.1.

**RESPONSE TO PFOF NO. 78: Disputed as vague and immaterial.**

Disputed insofar as this PFOF refers to "Defendants" generally without specifying any particular Defendant, which makes it difficult if not impossible for the Producer Defendants to formulate a substantive response without guessing at Plaintiff's proposed meaning. *See* Prod. Def. Opp. Brief at Section IV.B. The *MaM* trailer is not even at issue in this case, as it is not mentioned in the SAC and is not included in any of the 52 statements in his MPSJ. Moreover, Defendant Demos explained the reason for the substitution of the

"squirmy" shot in the *MaM* trailer, which was not to make Plaintiff look bad. Dkt. 288, Declaration of Moira Demos in support of MSJ at ¶ 98. Plaintiff does not deny that he squirmed while testifying. In fact, at his deposition for this lawsuit, he acknowledged he gets nervous testifying. *See infra*, SPFOF ¶ 45. Even Plaintiff's former counsel of record in this lawsuit described watching Avery civil lawsuit deposition testimony of "the officers who were most directly accused of wrongdoing—either in the first Avery case or in the second" as "watching them squirm." *See infra*, SPFOF ¶ 46.

# III. PRODUCER DEFENDANTS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT

## a. Working with Netflix

1. Netflix creative executive Lisa Nishimura has attested that, "From the moment I met Laura and Moira, they impressed me. They had conducted exhaustive research into Steven Avery's story and had full command of the facts. They struck me as fastidious and meticulous and devoted to telling Avery's compelling story with accuracy and respect for all involved. As I worked with the filmmakers to bring *MaM* to fruition, my initial impression of them was confirmed. I trusted Laura and Moira. They never gave those of us at Netflix reason to doubt them or their work, and we relied on them to get the facts right." Dkt. 275, Declaration of Lisa Nishimura ("Nishimura Decl.") ¶ 4.

2. At his deposition in this case, Netflix creative executive Adam Del Deo testified to the following: "I was very impressed at how . . . how they wanted to . . . capture, you know, accurate, factual events, really follow the story from the Steven Avery perspective and also from the perspective of the police officers involved in the case, Manitowoc, and let—let the subjects capture in an objective way what was happening[.]" Dkt. 279, Declaration of Leita Walker ("Walker Decl.") ¶ 14, Ex. 13, Deposition Transcript of Adam Del Deo ("Del Deo Dep.") at 62:21–63:5.

3. Throughout post-production, Netflix creative executives provided notes, but those were suggestions, not demands. The filmmakers chose how to implement notes and retained creative control. Dkt. 290, Declaration of Laura Ricciardi ("Ricciardi Decl.") ¶ 39; Dkt. 288, Declaration of Moira Demos ("Demos Decl.") ¶ 40; Walker Decl. ¶ 22, Ex. 21, Deposition Transcript of

55

Lisa Nishimura ("Nishimura Dep.") at 126:21–25; *id.* ¶ 10, Ex. 9 Deposition

Transcript of Laura Ricciardi ("Ricciardi Dep.") at 94:9–17; *see also* Dkt.

272, Declaration of Adam Del Deo ("Del Deo Decl.") ¶¶ 4–5; *cf. supra* Pl.

PFOF¶¶ 59; 71–78.

4.      Netflix deferred to the filmmakers on presenting an accurate story, and Netflix

did not suggest that the filmmakers sacrifice accuracy in order to speed up the

pace of a scene or make a scene more impactful. *See* Del Deo Decl. ¶¶ 11, 13;

*see also* Nishimura Decl. ¶ 8; Walker Decl. ¶ 25, Ex. 24 (NFXCOL0000212)

at 213 (suggesting holding one scene longer if possible, but acknowledging

"[w]e know this is court footage that may not exist.")

5.      Nishimura stated in her declaration that edits regarding pacing were intended

to "engage the viewer" and help the viewer digest the most salient points of a

long and sprawling account. Nishimura Decl. ¶¶ 8, 13–14.

6.      Del Deo has attested that Netflix employees suggested that episodes should

end on a cliffhanger in order to keep viewers engaged so they watch the next

episode. *See* Del Deo Decl. ¶ 12; *compare* Walker Decl. ¶ 24, Ex. 23 (Pl.'s

Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 2

(citing *id.* ¶ 25, Ex. 24 (NFXCOL0000212) at 213) with *id.* ¶ 31, Ex. 30

(NFXCOL0000226) at 229; *id.* ¶ 32, Ex. 31 (NFXCOL0000273) at 274; *id.* ¶

20, Ex. 19 (NFXCOL0000335) at 339; *id.* ¶ 33, Ex. 32 (NFXCOL0002059) at

2063; *cf. supra* Pl. PFOF ¶¶ 71, 72.

7.      Nishimura has attested that, "In the notes we recommended that the

filmmakers "foreshadow" future plot points in early episodes in order to keep

56

viewers engaged, so they would watch coming episodes and benefit from receiving a complete account. This is not an unusual suggestion. We wanted viewers to watch all ten episodes of the series to get the full story *MaM* was intended to capture." Nishimura Decl.¶ 14; *cf. supra* Pl. PFOF ¶¶ 71, 72.

8. Creative executives sometimes use colorful language and terms of art when providing notes to filmmakers. *See* Del Deo Del. ¶ 11–13; *cf. supra* Pl. PFOF¶ 73.

9. Netflix creative executives repeatedly suggested changes to the Series' music, including the "lulling guitar" and "prod rock type guitar music," but their suggestions were not implemented, and those themes remain an integral part of the Series' musical score. Dkt. 286-9, Barker Declaration ¶ 10, Ex. 9 at 36 (NFXCOL0002009), 64 (NFXCOL0002037); *c.f., e.g.*, *MaM* Ep. 1 at 3:11 (guitar background immediately after opening credits), 1:02:38 (guitar theme during credits); *cf. supra* Pl. PFOF ¶ 73.

10. At Netflix's suggestion, Ricciardi and Demos integrated graphical elements to enhance the clarity and factual accuracy of the Series, especially because Avery's prosecution for Halbach's murder involved a large number of facts, events, dates, locations, and individuals, including numerous MTSO officers, to keep track of. Ricciardi Decl. ¶ 42; Demos Decl. ¶ 43; Nishimura Decl. ¶ 16; Del Deo Decl. ¶¶ 13–14; *compare* Walker Decl. ¶ 24, Ex. 23 (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 3–4 with *id.* ¶ 34, Ex. 33 (NFXCOL0000208) at 210; *id.* ¶ 15, Ex. 14 (NFXCOL0000215) at 219; *id.* ¶ 35, Ex. 34 (NFXCOL0000288); *id.* ¶ 28,

Ex. 27 (NFXCOL0001976) at 1982; *id.* ¶ 36, Ex. 35 (NFXCOL0000293); *id.* ¶ 37, Ex. 36 (NFXCOL0000245); *id.* ¶ 17, Ex. 16 (NFXCOL0000265); *cf. supra* Pl. PFOF ¶¶ 2, 12, 15.

11.    Del Deo unequivocally denied that he believes *MaM* to be asserting that Colborn planted evidence to frame Avery. Walker Decl. ¶ 14, Ex. 13, Del Deo Dep. at 173:15–19; *id.* 174:2–7; *cf. supra* Pl. PFOF ¶¶ 55–57.

12.    Both Del Deo and Nishimura likewise have averred that Netflix did not intend for *MaM* to convey that Colborn in fact planted evidence and that it never occurred to them that any reasonable viewer would understand either the series or Netflix to be reaching a conclusion about Colborn's culpability. *See* Nishimura Decl. ¶ 18; Del Deo Decl. ¶ 10; *cf. supra* Pl. PFOF ¶¶ 55–57.

13.    The filmmakers purposely did not present voiceover narration or a conclusion at the end of the Series regarding whether Avery and/or Dassey were guilty, leaving viewers with open questions. Ricciardi Decl. ¶¶ 47, 48; Demos Decl. ¶¶ 48, 49.

14.    The filmmakers do not know whether Plaintiff or others in law enforcement planted evidence against Avery. They intended to convey the ambiguity and uncertainty they feel in the Series and deliberately raise questions without telling viewers what to think. Ricciardi Decl. ¶¶ 47, 48; Demos Decl. ¶¶ 48, 49.

b.    **Differing Viewpoints in and about *MaM***

15.    Plaintiff has never watched *MaM* in its entirety and watched only snippets totaling less than 30 minutes before bringing this lawsuit. He has since watched no more than an additional 30 to 45 minutes. *See* Dkt. 279, Statement

58

of Stipulated Facts, ¶¶ 3, 4; Dkt. 289, Declaration of Kevin Vick ("Vick Decl.") ¶ 6, Ex. 5, Colborn Dep. at 411:2–23.

16.     The Series depicts differing reactions to Steven Avery in the local community, with some who believed his framing defense, some who believed he was guilty, and some whose views were shown changing over time. *See, e.g.*, *MaM* Ep. 3 at 14:14–15:40 (bar patrons playing pool with Steven Avery's brother Chuck Avery expressing their belief in the framing theory); *MaM* Ep. 3 at 29:00–29:03 (local news segment after March 2, 2006 press conference with two local residents interviewed at a bar expressing the belief that Dassey and Avery killed Teresa Halbach, and one local resident interviewed in the street whose mind was changed toward guilt); *see also MaM* Ep. 3 at 4:25 and 12:30 (identifying onscreen "Chuck Avery Steven's Brother"); Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 77:8–14, 83:3–7.

17.     *MaM* shows Plaintiff denying in sworn testimony that he planted evidence to frame Steven Avery. Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM008000 at 140–41; *MaM* Ep. 7 at 18:42–19:15; *cf. supra* Pl. PFOF¶ 70.

18.     Nishimura has attested that, "*MaM* included not only the fact that Avery accused law enforcement of planting evidence to frame him for Halbach's murder, but also that the jury did not find this accusation credible, that it convicted him, and that his post-trial motions were unsuccessful." Nishimura Decl.¶ 14; *cf. supra* Pl. PFOF ¶¶ 55–57.

59

19. As shown in *MaM*, Avery's attorney Dean Strang's closing argument at trial emphasized that the defense's theory was that officers planted evidence "to ensure the conviction of someone they've decided is guilty." *See MaM* Ep. 8 at 8:51–9:00; *see also* Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 46.

20. Kratz noted in his closing that it "shouldn't matter whether or not that key was planted" because "that key, in the big picture, in the big scheme of things, means very little" compared to the bulk of evidence against Steven Avery. *See MaM* Ep. 8 at 9:02, 9:30; *see also* Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 64.

21. Some members of the public who watched *Making a Murderer* were left with questions about whether Avery was guilty and whether officers planted evidence. *See e.g.*, Vick Decl. ¶ 31, Ex. 30, Griesbach0026044 ("I've debated this for a week with my wife and children and in my own mind. I am convinced he is guilty [I said the same in the interview I sent you.] . .'. but I'm nowhere near as certain that the cops did not plant evidence to bolster their case."); Vick Decl. ¶ 32, Ex. 31, Griesbach0014413 ("I went into the documentary determined to see through any bias the film might employ, but I came out of it more conflicted than ever. Not so much as to either defendants' guilt, but whether they received a fair trial."); Vick Decl. ¶ 3, Ex. 2, Deposition Transcript of Brenda Schuler ("Schuler Dep.") at 45:2–47:11 (testifying that *MaM* raised questions thinking Avery was not guilty, she researched them, and she concluded Avery is guilty).

60

22.     In *Making a Murderer*, the filmmakers took steps to further show the
        viewpoints of the Halbach family, law enforcement, and the prosecution by
        including, among other things, footage from press conferences, legal
        proceedings, and news reports featuring their opinions. *See, e.g.*, Ricciardi
        Decl. ¶¶ 13 (Halbach family), ¶ 14 (prosecutors); ¶ 86 (scenes in *MaM* that
        directly push back against Avery's planting allegations); see also *MaM* Ep. 3
        at 22:51–23:22 (MTSO Undersheriff criticizing Avery's planting accusations
        against officers and characterizing them as "impossible"); *MaM* Ep. 7 at
        13:55–14:28; 44:00–45:30 (Multiple scenes in which the prosecutors from
        Avery's murder trial push back against Avery's planting accusations by,
        among other things, calling those accusations "despicable" and "deplorable.");
        *MaM* Ep. 7 at 24:30–24:50 (scene in which a member of the media calls out
        Avery's criminal defense attorneys for accusing Plaintiff of planting); *MaM*
        Ep. 8 34:02–19 (newscast in which an anchorman reads Plaintiff's prepared
        public statement following the jury's guilty verdict in Avery's murder trial);
        *see also* Dkt. 294, Prod. Def. MSJ at 16–18, 21–26, 31–32, 36–37.

c.      **Relevant Underlying Events**

23.     While serving a 60-year prison sentence, in 1995–97, Avery filed multiple
        unsuccessful motions for post-conviction relief, relying on DNA evidence that
        revealed the victim, Penny Beerntsen's, fingernail scrapings came from a
        DNA profile that matched neither Avery nor the victim. Avery argued that the
        sheriff's department had information that it failed to disclose to Avery
        regarding an "alternative suspect living in Sheboygan County who matched
        the description of the perpetrator." The court denied the motions, and Avery

remained incarcerated for seven more years. *State v. Avery* (*"Avery II"*), 570 N.W.2d 573, 575 (Wis. Ct. App. 1997).

24.    DNA evidence showed that Gregory Allen, who had committed and been convicted of another brutal sexual assault in 1995, was the actual assailant of Penny Beerntsen. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281 at CHRM011282.

25.    The Wisconsin Department of Justice determined in their December 2003 Avery Review that Manitowoc County law enforcement had evidence that Avery had sixteen alibi witnesses and corroborating time-stamped receipts at the time of Penny Beerntsen's assault. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281 at CHRM011286.

26.    The Wisconsin Department of Justice determined in their December 2003 Avery Review that Manitowoc County law enforcement had information that should have led them to consider Gregory Allen as a suspect in the Penny Beerntsen assault, including a similar assault two weeks prior. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281 at CHRM011287.

27.    The Wisconsin Department of Justice determined in their December 2003 Avery Review that Manitowoc County law enforcement did not investigate Gregory Allen as a suspect in the Penny Beerntsen assault "because the sheriff's department had only one suspect in mind" and "the sheriff, and eventually the district attorney became convinced that Avery, and no one else,

was the responsible party." Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ

Avery Review, CHRM011281 at CHRM011292.

28. Plaintiff Andrew Colborn testified in his October 13, 2005 deposition in

Avery's civil rights lawsuit that in 1994 or 1995, while he was a corrections

officer at the Manitowoc County Jail, he received a phone call from someone

identifying himself as a detective in another county, who said an inmate in

their custody claimed to have committed an assault in Manitowoc County for

which someone else was still incarcerated. (The "Jail Call"). Ricciardi Decl. ¶

102, Ex. 7, Avery Civil Lawsuit Deposition Transcript of Andrew Colborn

("Colborn Avery Dep."), CHRM002891 at 5:12–24 (timeline and role);

10:22–11:8 (detective's message); SAC ¶ 24; *see also MaM* Ep. 2 at 18:37–

19:02.

29. Colborn "wrote a statement in September 2003 regarding a telephone call that

[he] received in or around 1994 or 1995 while [he] was a corrections officer at

the Manitowoc County Jail. That statement was provided to then-Sheriff

Kenneth Peterson, who told [Colborn] that he would put the statement in a

safe." Dkt. 270, Statement of Stipulated Facts, ¶ 2; *see* Vick Decl., ¶ 34, Ex.

33; Colborn Dep. at 404:4–8; Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003

Statement re Jail Call, CHRM004479 (dated September 12, 2003); *see also*

Ricciardi Decl. ¶ 99, Ex. 4, Wisconsin DOJ Strauss Report re safe,

CHRM004724.

30. Plaintiff has testified that he transferred the Jail Call to an MTSO detective

number but never heard any feedback or response regarding the call. Ricciardi

63

Decl. ¶ 102, Ex. 7, Colborn Avery Dep., CHRM002891 at 15:7–24; Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479.

31. Several others in law enforcement have testified or otherwise stated that they believed someone in MTSO (some believed it was likely Sheriff Kocourek) relayed a message to Plaintiff that Plaintiff should not worry about the Jail Call because MTSO had "the right guy." Vick Decl. ¶ 7, Ex. 6, Jones Memo produced by Wisconsin Department of Justice, DJ001; Vick Decl. ¶ 8, Ex. 7, Jones Memo metadata from Wisconsin DOJ, DJ002 ; *see also* Ricciardi Decl. ¶ 104, Ex. 9, Avery Civil Lawsuit Deposition Transcript of Eugene Kusche ("Kusche Dep.") at 72:16–78:6; Ricciardi Decl. ¶ 97, Ex. 2, Lenk 2003 Statement re Jail Call, CHRM004478 (dated September 12, 2003); *MaM* Ep. 2 at 24:21–26:56 (Rohrer and Kusche testifying re Jones Memo).

32. Avery filed a civil rights lawsuit for $36 million in this Court in 2004, asserting claims against Manitowoc County, former Manitowoc County Sheriff Thomas Kocourek, and District Attorney Dennis Vogel for violating his constitutional right to due process by targeting him and failing to investigate Allen; focusing the investigation on Avery because of personal hostility against him; failing to provide exculpatory information to his defense counsel; and continuing to withhold exculpatory evidence during his incarceration. *See Avery v. Manitowoc Cty.*, 428 F. Supp. 2d 891, 893 (E.D. Wis. 2006); *see also MaM* Ep. 2 at 9:43–10:24.

33. Calumet County took over the investigation of Teresa Halbach's murder to avoid the appearance of conflict-of-interest issues related to Avery's ongoing

lawsuit against Manitowoc County. *See MaM* Ep. 2 at 40:11–41:20

(November 7, 2005 press conference introducing Ken Kratz Calumet County

District Attorney as Special Prosecutor in the case).

34.  Manitowoc County Sheriff Ken Petersen was recused from the Teresa

Halbach investigation. Vick Decl. ¶ 2, Ex. 1, Deposition Transcript of

Kenneth Petersen ("Petersen Dep.") at 149:6–23.

35.  Beginning on November 5, 2005 through November 8, 2005, MTSO Deputies

Plaintiff and Lenk took part in several days' searches of the interior of Steven

Avery's trailer and garage and only found the Toyota key on November 8,

2005. *See* Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7

CHRM008000 at 196–97.

36.  As shown on *MaM*, Plaintiff testified at trial that when searching the bookcase

in Avery's bedroom on November 8, 2005, he was handling it "rather roughly,

twisting it, shaking it, pulling it" before Lenk discovered a Toyota key on the

floor later that day. The officers then stopped and photographed the key on the

floor. Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery trial day 7, CHRM008000 at

125–131; *MaM* Ep. 7 at 16:18–17:30; *see also* Ricciardi Decl. ¶ 106, Ex. 11,

MTSO Investigative Summary with November 8, 2005 entry, CHRM016566

at CHRM016583 (Lenk's report of finding the Key); *cf. id.* at CHRM016584

(Colborn's report for November 8, 2005 making no mention of the Key); *see

also MaM* Ep. 7 at 8:26–9:45 (Buting questioning Kucharski about the theory

that the Key fell out the back of the bookcase).

37. The initial criminal complaint in the Avery case identified Deputy Kucharski as the officer who found the key to Teresa Halbach's Toyota, instead of James Lenk. Ricciardi Decl. ¶ 75; Demos Decl. ¶ 81; Ricciardi Decl. ¶ 105, Ex. 10, State v. Avery Criminal Complaint, CHRM019831–34.

38. In a January 30, 2007 pretrial order admitting evidence of a vial of Avery's blood taken in 1996, Judge Willis explicitly identified Plaintiff as one of two Manitowoc officers that the defense could accuse at trial of planting evidence: "The court does not understand Avery will be attempting to implicate any members of the Sheriff's Department other than Mr. Lenk or Mr. Colborn in any frame-up." Ricciardi Decl. ¶ 111, Ex. 16, CHRM003721 at CHRM003722, CHRM003727–28; *cf. supra* Pl. PFOF ¶ 57.

39. Plaintiff produced no evidence contemporaneous to the underlying events at issue in this lawsuit. Declaration of Meghan Fenzel ("Fenzel Decl.") ¶ 5, Ex. 4, April 12, 2022 Meet and Confer Correspondence (confirming Plaintiff did not retain or produce "documents relating to the events that were the underlying subject of *MaM*").

40. Plaintiff acknowledged that unless someone was in the room with him at the time, they could not know with 100% certainty whether he planted Teresa Halbach's Toyota key in Avery's bedroom and would have to trust that he was telling the truth in his trial testimony. Fenzel Decl. ¶ 3, Ex. 2, Colborn Dep. at 173:7–174:12.

41. To the extent that there are any inaccuracies in the Series, such inaccuracies were inadvertent, and the Producer Defendants entertained no doubts that

*MaM* accurately captured the gist of the parties' contentions. *See* Ricciardi Decl. ¶¶ 30, 49, 51, 52, 54, 58, 59, 60, 61, 63, 69, 70, 71, 72, 73, 74, 78, 80, 86, 87, 95; Demos Decl. ¶¶ 31, 50, 52, 53, 55, 56, 60, 61, 62, 63, 65, 70, 72, 73, 74, 75, 76, 77, 78, 79, 80, 84, 86, 92, 93, 102.

42.     The Producer Defendants believe that *MaM* accurately portrays the opinion commentary from various individuals sympathetic to Avery. Ricciardi Decl. ¶ 76; Demos Decl. ¶ 82.

43.     The Producer Defendants believe that any perceived omissions to *MaM* were due to the challenge of compressing 30 years of history into 10 hours of television and did not alter the meaning of the Series or present Avery's criminal defense and the opinions of Avery and his defenders as "actual and unanswered facts." Ricciardi Decl. ¶¶ 77, 79–86; Demos Decl. ¶¶ 83, 85–92.

44.      There are numerous scenes in *MaM* that reflect negatively on Avery. *See, e.g.*, Ricciardi Decl. ¶ 84, Demos Decl. ¶ 90; *see also MaM* Ep. 3 at 42:00–42:08 (A scene with a statement by Chuck Avery, Steven Avery's brother, stating that he was "pretty positive" Steven murdered Teresa Halbach); *MaM* Ep. 3 25:21–25:29 (A scene in which Steven Avery's sister, Barbara Janda, tells Steven "I hate you for what you did to my kid. All right? So you can rot in hell.") *MaM* Ep. 5 at 19:28–21:56 (Scenes showing Avery's nephew Bobby Dassey testifying against him at his murder trial, with Dassey shown as being one of the prosecution's most important witnesses); *MaM* Ep. 7, 59:12–1:00:04 (A scene showing Teresa Halbach's brother Mike Halbach opining that he believed Avery was guilty); *MaM* Ep. 1 at 5:18–7:24 (Morris

67

allegations of indecent exposure by Avery); *MaM* Ep. 1 at 9:30–9:59 (Avery's burglaries); *MaM* Ep. 1 at 10:00–10:53 (Avery's cat burning and conviction and probation); *MaM* Ep. 1 at 12:31– 13:59 (Avery's reckless endangerment of Morris); *MaM* Ep. 1 at 16:07 (Avery's criminal charges for reckless endangerment of Morris); *MaM* Ep. 1, 26:36–28:18 (An interview in which Judge Hazlewood, the presiding judge in Avery's 1985 trial, opines that Avery had a propensity for violence against women); *MaM* Ep. 3 at 9:30– 11:14 (A scene in which Steven Avery tells his parents that he was going to kill himself if they did not figure out a way to post bail for him); *MaM* Ep. 6 at 43:20–43:37 (A scene with Avery opining that the prosecution was going to win at trial); Interviews with various people who opined that violent crime was in Avery's character, along with interviews of people who disagreed with that opinion); *MaM* Ep. 1 at 27:09 – 27:52 (An interview with a member of the local media who said the arrest of Avery for the Beerntsen assault was not a surprise because Avery was one of the "regular names" on the crime beat in Manitowoc County and the assault was "in character" for him); *MaM* Ep. 8 at 26:02–28:01 (The jury's guilty verdicts in Avery's trial for the murder of Teresa Halbach); *MaM* Ep. 9 at 1:01:08–1:02:53 (A scene showing Judge Willis, who presided over Avery's trial, opining that Avery was "probably the most dangerous individual to set foot in this courtroom").

45.     Plaintiff testified in this lawsuit that as an "introvert" who doesn't like being the "center of attention," the act of testifying makes him feel uncomfortable. Fenzel Decl. ¶ 3, Ex. 2, Colborn Dep. at 495:4–498:2.

46.     Plaintiff's former attorney of record Michael Griesbach wrote the following in

his 2016 book INDEFENSIBLE about the Avery case, discussing the officers'

demeanor during depositions in the civil lawsuit: "By the end of the night I

had seen clips of videos from several of the officers' depositions and, I had to

admit, they looked like they were being defensive. They were not happy about

being grilled by a roomful of attorneys concerning a very black mark on their

department, especially not with Steven Avery sitting there, watching them

squirm. . . . Most people do get nervous when being deposed. . . . On the other

hand, nearly all of them looked more defensive than they should have if they

had nothing to hide-at least in the video clips the documentarians chose to

include in the series. When I later watched the complete video of the

depositions of the officers who were most directly accused of wrongdoing—

either in the first Avery case or in the second—my concern that they had

something to hide, though significantly reduced, was not completely

alleviated. This was not simply a case of only selective editing to make them

look bad." Vick Decl. ¶ 32, Ex. 31, Colborn Dep. Ex. 16-A, Michael

Griesbach, INDEFENSIBLE 31–32 (2016).

47.     In sworn testimony, Plaintiff has acknowledged that, by definition, the

anonymous people who left him abusive voicemails were unreasonable.

Walker Decl. ¶ 3, Ex. 2 at 296:1–19.

48.     At the outset of this case, Plaintiff blamed *MaM* for his divorce, but it

subsequently came to light that Plaintiff filed for divorce from his third wife

after engaging in an extramarital affair. *See* Dkt. 270, Statement of Stipulated

Material Facts, ¶¶ 9–12; *see also id.* ¶ 13 ("For the purposes of this case, I have agreed not to assert that Making a Murderer caused my divorce."); Walker Decl. ¶ 49, Ex. 48 (Pl.'s Response to Chrome Defs.' First Set of Interrogs. (Jan. 28, 2022)), Interrog. 8 (" . . . MAM has destroyed my 30 year marriage and the marriage ended in divorce"); Dkt. 273, Declaration of Barbara Colborn ¶¶ 28, 29; Dkt. 274, Declaration of Betty Heinzen ¶ 4; Dkt. 276, Declaration of Paul Kopidlansky ¶¶ 5–7, 9.

49.    Plaintiff violated the confidentiality of the Court-ordered Mediation in this case by telling his friend Brenda Schuler, a producer of the Convicting documentary, about what had happened at the mediation, including the parties' positions. Declaration of Kevin Vick in support of Expedited Motion to Depose Plaintiff ("Vick Dep. Decl."), Dkt. 253 ¶ 2.f, Ex. 1 at 316–22, 341–44.

50.    Plaintiff filmed an interview for a not-yet-released "counter-documentary" *Convicting a Murderer* on March 2, 2018, two weeks before he ended his employment with MTSO and was permitted to publicly speak about the Avery case. Vick Decl. ¶ 22, Ex. 21, COLBTXTS_0004904 (scheduling the interview), Vick Decl. ¶ 23, Ex. 22, COLBTXTS_0004983 (recapping the interview, also reference looking for 11/3 records); *cf.* Vick Decl. ¶ 21, Ex. 20, COLBTXTS_0004696 (stating inability to speak publicly until employment ends March 16, 2018); Vick Decl. ¶ 29, Ex. 28, COLBORN-004888 (*Convicting a Murderer* appearance release form signed and dated

March 2, 2018); *see also* Vick Decl. ¶ 27, Ex. 26, SCHULER_00013–25;

Vick Decl. ¶ 28, Ex. 27, SCHULER_00330–362.

51.    The deposition of Plaintiff's former boss, Sheriff Ken Petersen, revealed that,

after Petersen instructed Plaintiff in September 2003 to prepare an incident

report regarding the 1994/1995 Jail Call, Plaintiff instead utilized a

"statement" form ordinarily utilized by civilian witnesses (not MTSO

personnel), which Petersen believed had the effect of burying Plaintiff's report

to make it less likely that others would locate it in the future or learn of its

contents. Fenzel Decl. ¶ 2, Ex. 1, Petersen Dep. at 94:3–96:14.

52.    Plaintiff's SAC falsely alleges that "Defendants knew Plaintiff's written

report concerning the phone call was not left in the Sheriff's safe but chose to

include Glynn's mistaken belief in order to further their false narrative." SAC

¶¶ 28–29. But Plaintiff now has been forced to admit that his statement was

kept in a safe in the Sheriff's office—just as contemporaneous December

2005 reports from the Wisconsin Attorney General provided all along. *See*

Dkt. 270, Statement of Stipulated Material Facts ¶ 2; Ricciardi Decl. ¶ 99, Ex.

4, Wisconsin DOJ Strauss Report re safe, CHRM004724.

53.    In this lawsuit, Plaintiff has, at times, refused to admit that Steven Avery's

criminal defense at his 2007 trial included a theory that law enforcement

planted evidence to frame Avery. These refusals persisted even when

confronted with his contradictory prior writings and the Second Amended

Complaint specifically referencing the Avery defense's planting theory. *See*

Fenzel Decl. ¶ 3, Ex. 2, Colborn Dep. 14:3–17:18 (refusing to stipulate that

71

planting defense was a central theme at Avery's trial); 21:24–26:12 (stating that his position was that he didn't know what the theory was at trial and was never accused of planting evidence); 53:10–25 (acknowledging that he made statement to the news to respond to negative portrayal at trial but still insisted he was never accused of planting evidence); 54:2–56:13 (acknowledging request for admission introduced as Exhibit 11 that denied that Avery's defense "contended" at trial that law enforcement planted evidence); 102:20–103:20 (discussing Brenda Schuler's testimony about how Plaintiff felt wronged for being accused of planting evidence at trial; 107:6–25 (again refusing to acknowledge planting theory); 144:6–147:12 (reading Avery Day 7 trial transcript at pages 201–04 with Kratz and Strang discussing planting theory with the judge yet still not agreeing that the defense had a plaintiff theory); 158:1–163:10 (refusing to acknowledge planting theory when reviewing email Plaintiff wrote to lawyer Patrick Dunphy describing being accused of planting evidence); 408:9–409:16 (after watching *MaM* excerpt of Avery trial with Kratz questioning Plaintiff if he planted evidence, again denying that he was accused of planting evidence at trial); 456:1–458:1 (acknowledging there were implications about police misconduct surrounding the Toyota key, but claiming he thought it was procedural defects rather than a planting theory); *see also* Vick Decl. ¶ 13, Ex. 14, Manitowoc-000158 (email with attorney Patrick Dunphy explaining his ire at Buting and Strang, "In short, the defense was that I and another now retired police officer planted the evidence that led to Mr. Avery's conviction."); Ricciardi Decl. ¶ 114, Ex. 19,

72

2007 Avery Trial Day 7, CHRM08000 at 201–04 (attorneys and Judge Willis discussing planting theory).

54.     One Avery juror has stated publicly that he believes Plaintiff testified falsely at Avery's trial and that Plaintiff "looked like he was sweating and he wasn't being honest or he was trying to cover up a lot of things on the stand." Fenzel Decl. ¶ 4, Ex. 3, Rick Maher Interview Part 2 at 15:24–15:37.

55.     After deliberations, it was revealed that when the jury was initially polled at the outset of deliberations, the vote was seven not guilty, three guilty, and two uncertain. *See MaM* Ep. 8 at 34:53–36:50.


## IV.     ADDITIONAL EVIDENTIARY OBJECTIONS TO PLAINTIFF'S PFOF

1.      The Producer Defendants object to the consideration of any inadmissible evidence in support of Plaintiff's MPSJ. Evidence relied upon for summary judgment "must be competent evidence of a type otherwise admissible at trial. Thus, a party may not rely upon inadmissible hearsay in an affidavit or deposition." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

2.      The Producer Defendants object to incomplete and inaccurate characterizations of the *MaM* and contend that the best evidence remains the original Series, considered as a whole. Fed. R. Evid. 1001–08. The Producer Defendants contend that the Series speaks for itself.

3.      The Producer Defendants object to Plaintiff's excerpting of sworn deposition testimony to the extent that the excerpts do not on their face identify the

witness testifying, the date of testimony, or the foundation of the testimony.

Fed. R. Evid. 901, 1007. The excerpts skip between witnesses without

identifying them on the page—for example, Exhibits 4 and 6 feature

testimony from Del Deo but Exhibit 5 features testimony from Demos—

risking confusion regarding which witness offered the testimony at issue. The

Producer Defendants accordingly reserve objections as to the accuracy of

these excerpts listed below:

1. Excerpts of the transcript from the Deposition of Lisa Nishimura, attached as the following exhibits to the Declaration of April Rockstead Barker at Dkt. 286: Exhibits 3, 8, 9, and 11;

2. Excerpts of the transcript from the Deposition of Adam Del Deo, attached as the following exhibits to Declaration of April Rockstead Barker at Dkt. 286: Exhibits 4, 6, and 10;

3. Excerpts of the transcript from the Deposition of Moira Demos, attached as the following exhibits to Declaration of April Rockstead Barker at Dkt. 286: Exhibits 5 and 13.

/ / /

Dated: November 4, 2022                    Respectfully submitted,

_s/ Kevin L. Vick_
Kevin L. Vick (*pro hac vice*)
Meghan Fenzel (*pro hac vice*)
JASSY VICK CAROLAN LLP
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
T: (310) 870-7048
F: (310) 870-7010
kvick@jassyvick.com
mfenzel@jassyvick.com

*Counsel for Defendant Laura Ricciardi, Moira Demos, and Chrome Media, LLC*

James A. Friedman, SBN 1020756
GODFREY & KAHN, S.C.
One East Main Street
Suite 500
Madison, WI 53703-3300
T: (608) 284-2617
F. (608) 257-0609
jfriedman@gklaw.com

*Counsel for the Defendants*