# EXHIBIT 2

1          UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF WISCONSIN
2    -------------------------------------------------------
   ANDREW COLBORN,
3                                    **COPY**

              Plaintiff,
4
   -vs-                      CIVIL ACTION NO. 19-CV-0484-BHL
5
   NETFLIX, INC., ET AL.,              VOLUME I
6
              Defendants.
7    -------------------------------------------------------

8              VIDEOTAPED DEPOSITION OF

9                  ANDREW L. COLBORN

10   -------------------------------------------------------

11

     DATE:               July 21, 2022
12
     TIME:               9:23 a.m. - 5:22 p.m.
13
     LOCATION:           Godfrey & Kahn, S.C.
14                       833 East Michigan Street
                         Suite 1800
15                       Milwaukee, Wisconsin  53202

16

17

18

19

20

21

     REPORTED BY:
22   Paula Huettenrauch, RMR, CRR
     365Reporting, LLC
23

     VIDEOGRAPHER:
24   Jon Hansen, CLVS
     Video Concepts
25   608.408.7411

                                                              1

1                      A P P E A R A N C E S

2

3     LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C., BY
      R. GEORGE BURNETT, ATTORNEY AT LAW
4     231 South Adams Street
      Green Bay, Wisconsin  54301
5     Gb@lcojlaw.com
      appeared on behalf of the Plaintiff.
6

7     ROCKSTEAD LAW, LLC, BY
      APRIL ROCKSTEAD BARKER, ATTORNEY AT LAW
8     525 North Lincoln Avenue
      Beaver Dam, Wisconsin  53916
9     aprilrbarker@rocksteadlaw.com
      appeared on behalf of the Plaintiff.
10

11    BALLARD SPAHR LLP, BY
      LEITA WALKER, ATTORNEY AT LAW
12    2000 IDS Center
      80 South 8th Street
13    Minneapolis, Minnesota  55402
      walkerl@ballardspahr.com
14    appeared on behalf of Netflix, Inc.

15

      BALLARD SPAHR LLP, BY
16    ISABELLA SALOMAO NASCIMENTO, ATTORNEY AT LAW
      2000 IDS Center
17    80 South 8th Street
      Minneapolis, Minnesota  55402
18    salomaonascimentoi@ballardspahr.com
      appeared on behalf of Netflix, Inc.
19

20    BALLARD SPAHR LLP, by
      EMMY S. PARSONS, ATTORNEY AT LAW
21    1909 K Street NW, Suite 1200
      Washington, DC  20006-1157
22    parsonse@ballardspahr.com
      appeared via Zoom videoconference on
23    behalf of Netflix, Inc.

24

25

                                                                        2

1    BALLARD SPAHR LLP, by
     MATTHEW E. KELLEY, ATTORNEY AT LAW
2    1909 K Street NW, Suite 1200
     Washington, DC  20006-1157
3    kelleym@ballardspahr.com
     appeared via Zoom videoconference on
4    behalf of Netflix, Inc.

5
     JASSY VICK CAROLAN LLP, by
6    KEVIN L. VICK, ATTORNEY AT LAW
     355 South Grand Avenue, Suite 2450
7    Los Angeles, California  90071
     kvick@jassyvick.com
8    appeared on behalf of Chrome Media LLC,
     Laura Ricciardi, and Moira Demos.

9

10   JASSY VICK CAROLAN LLP, by
     MEGHAN E. FENZEL, ATTORNEY AT LAW
11   355 South Grand Avenue, Suite 2450
     Los Angeles, California  90071
12   mfenzel@jassyvick.com
     appeared via Zoom videoconference on
13   behalf of Chrome Media LLC, Laura Ricciardi, and
     Moira Demos.

14   ***

15

16   ALSO PRESENT:

17   Debra Bursik, Paralegal

18   Moira Demos, Defendant

19   Laura Ricciardi, Defendant

20   Melinda LeMoine, Director, Litigation, Netflix, Inc.

21

22

23

24

25

                                                                                         3

1    Ms. Walker sent but not necessarily to the final

2    declaration signed by Mr. Colborn.

3         Q    So we're going to come back to this

4    Exhibit 1 throughout the day, and I want to thank you

5    and your counsel for taking a look at it and agreeing

6    to what you could agree.  I hope it will expedite

7    things today, but I'm mostly going to point you right

8    now to Exhibit A, attachment A of Exhibit 1, which is

9    my original letter.

10        A    Okay.

11        Q    And there were a handful of enumerated items

12   to which you declined to agree, and I want to point

13   you initially to items number 7, 8, and 9.  Do you

14   see those?

15        A    Yes.

16        Q    And I'll read them out loud for the record.

17   Number 7 asked you to agree that "At the trial of

18   Mr. Avery for the murder of Teresa Halbach, a central

19   part of Mr. Avery's defense was that law enforcement,

20   including Mr. Colborn, planted evidence to frame him

21   (hereafter, the 'frame-up theory')."  Do you see

22   that?

23        A    Yes.

24        Q    And number 8 says, "One part of the frame-up

25   theory put forth by the defense at Mr. Avery's trial

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 5 of 43   Document 321-2
920.365.2341 | 365Reporting, LLC | www.365reporting.net

1    was that Mr. Colborn was looking directly at

2    Ms. Halbach's vehicle when he made a November 3rd,

3    2005 call to dispatch."  Did I read number 8

4    correctly?

5         A    Yes.

6         Q    And number 9 says, "A second part of the

7    frame-up theory put forth by the defense at

8    Mr. Avery's trial was that Mr. Colborn was involved

9    in planting the key to Ms. Halbach's vehicle in

10   Mr. Avery's bedroom."  Did I read that correctly?

11        A    Yes.

12        Q    And you declined to admit to these three

13   factual allegations, correct?

14        A    Yes, I declined to admit to those.

15             (Exhibit 2 marked for identification.)

16        Q    So I'm handing you what we've previously

17   marked as Exhibit 2.  You can set aside Exhibit 1 for

18   a second but keep it handy.  Often what witnesses do

19   is they'll just make a stack in order so they can

20   find things later in the day.

21        A    Okay.

22        Q    Exhibit 2 is the operative complaint in this

23   case, the Second Amended Complaint.  Do you see that

24   at the top?

25        A    Yes.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 6 of 43   Document 321-2
920.365.2341 | 365Reporting, LLC | www.365reporting.net

1          Q     And I'd like to point you to paragraph 33,

2     if you could flip there.

3          A     Got it.

4          Q     And paragraph 33 begins, "A central part of

5     Avery's defense at trial was that Plaintiff and other

6     Manitowoc officers planted Halbach's SUV at the Avery

7     Salvage Yard."  Did I read that correctly?

8          A     Yes.

9          Q     And so I'm wondering if you can explain to

10    me why you did not -- why you refused to admit

11    number 7 on Exhibit 1.  And I'll read it again.  "At

12    the trial of Mr. Avery for the murder of Teresa

13    Halbach, a central part of Mr. Avery's defense was

14    that law enforcement, including Mr. Colborn, planted

15    evidence to frame him (hereafter the 'frame-up

16    theory')."  Your counsel has an objection.

17               MR. BURNETT:  I do.  Mr. Colborn's -- I

18    object to the form and a lack of foundation.  I'm

19    going to give Mr. Colborn an instruction.  To the

20    extent that answering that question would require you

21    to reveal communications, information you learned

22    from counsel, you should decline to answer that

23    question on grounds of privilege.  To the extent that

24    you can answer the question as phrased without

25    revealing privilege, you should go ahead and answer.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 7 of 43   Document 321-2
920.365.2341 | 365Reporting, LLC | www.365reporting.net

1        Q     Do you need me to repeat the question?

2        A     Please.

3        Q     So my question boils down to if your

4    Complaint alleges in paragraph 33 that a central part

5    of Avery's defense at trial was that plaintiff and

6    other Manitowoc officers planted Halbach's SUV at the

7    Avery salvage yard, then why will you not admit to

8    proposed stipulation number 7?

9              MR. BURNETT:  Same objection.  Same

10   instruction.

11       Q     You can answer if you feel you can.

12       A     I'm going to decline to answer then.

13       Q     Okay.  Do you stand by the allegations in

14   your Complaint, Mr. Colborn?

15             MR. BURNETT:  Same objection, form and

16   foundation.  To the extent that you can answer that

17   question based on your personal knowledge, go ahead.

18       A     Yes, I do.

19       Q     All right.  I'm going to hand you what we've

20   previously marked as Exhibits 3 and Exhibit 4.

21             (Exhibits 3 and 4 marked for

22   identification.)

23             MR. BURNETT:  Thank you.

24       Q     All right.  I'm handing you Exhibits 3 and 4

25   together, Mr. Colborn, because as you'll see,

17

1    question.

2         Q    And I can just state at the outset that

3    whenever I ask you about who you've talked to or what

4    they've said, I don't ever mean to ask you about your

5    conversations with your attorneys.

6              So other than your attorneys, are you

7    telling me you don't know anything about Kathleen

8    Zellner's motion on behalf of Steven Avery?

9         A    I can't answer as to what is going through

10   Attorney Zellner's mind and her motion.

11        Q    Let me -- let me stop you because that

12   wasn't my question.  My question is you testified you

13   haven't read her motion; is that correct?

14        A    I have not read her motion in its entirety,

15   that is correct.

16        Q    Have you read part of it?

17        A    Yes.

18        Q    And have you talked about it with people

19   other than your attorney?

20        A    Not that I can specifically recall, but I

21   have read it --

22        Q    And so would you agree --

23        A    -- in part.  Sorry.

24        Q    Would you -- that's okay.  It's a habit we

25   all fall into.  Would you agree with me that the

1     parts of her motion you have read or heard about or

2     talked with people about is a continuation of the

3     theory of the defense presented by Avery's attorneys

4     during the trial?

5          A    No, I can't make that connection.  I'm not

6     entirely sure what the attorneys at trials -- because

7     I was never accused in trial of planting evidence, so

8     I don't know if they were accusing me of that or not.

9          Q    Do you think Mr. Avery had a theory at his

10    trial?

11               MR. BURNETT:  Can I hear that question

12    again?

13         Q    Do you think Mr. Avery had a theory at his

14    trial?

15               MR. BURNETT:  Same objection,

16    foundation.

17         A    I wouldn't be able to speculate what

18    Mr. Avery's theory was.

19         Q    Well, you attended parts of the trial,

20    correct?

21         A    I testified at the trial.

22         Q    Meaning you attended parts of it?

23         A    Yes.

24         Q    Did you attend any portion where you did not

25    testify?

Case 1:19-cv-00484-BHL Filed 11/04/22 Page 10 of 43 Document 221-2
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1        A    I believe I was present in the courtroom for

2    his sentencing.

3        Q    And did you read media reports about the

4    trial at the time it was happening?

5        A    Not at the time it was happening.

6        Q    After it happened?

7        A    Certainly.

8        Q    And let me just ask point-blank.  Are you

9    sitting here today and is it going to be your

10   position today that you have no theory of what

11   Mr. Avery's defense was at his trial?

12       A    That is going to be my position, yes.  I'm

13   not going to speculate as to what his defense

14   attorney's theory was.

15       Q    I'm asking you as you -- based on your

16   personal knowledge, I'm not asking you to speculate.

17   Let me rephrase the question.

18            Based on your personal knowledge as a

19   Manitowoc sheriff -- a Manitowoc sheriff's deputy, as

20   a person who testified at the trial, as a person who

21   attended parts of the trial, as a person who read

22   nearly contemporaneous media reports about the trial,

23   and as a plaintiff in this lawsuit many years later,

24   tell me what you think his theory was as best you

25   can.  And I'm not asking you to speculate.  Just

1    describe it for me.

2         A    I think the defense's theory was to throw as

3    much mud against the wall and see what would stick.

4         Q    **What kind of mud did they throw?**

5         A    A lot of procedural questions.  That's what

6    I interpreted the license plate rigma -- numerous

7    questions about my running the license plate seemed

8    very procedural to me, and I took that as a desperate

9    act to get an obviously guilty client off.

10        Q    **So they were trying to get a guilty client**

11   **off by throwing mud.  That's your explanation of the**

12   **theory of his case?**

13        A    Well, to put it more articulately, I'm sure

14   they were trying to raise reasonable doubt so that a

15   jury wouldn't convict him.

16        Q    **Besides the license plate, what other**

17   **examples or pieces of the theory can you remember and**

18   **articulate for me?**

19        A    Could I ask you to be more specific, ma'am?

20        Q    **Well, sure.  There was something about a**

21   **key, finding a key, correct, at trial?**

22        A    Yes.

23        Q    **What do you remember about that?**

24        A    One of Avery's defense attorneys asked me

25   numerous questions about how I happened to locate the

                                                                          24

1    key, which I didn't locate it; how the key happened

2    to be in the position where it was when it was found;

3    and asked me to describe how that key might have

4    fallen from a bookcase that we were searching.

5         **Q     You would agree with me that they certainly**

6    **meant to insinuate or suggest that you or Officer**

7    **Lenk or some law enforcement officer planted the key,**

8    **correct?**

9              MR. BURNETT:  Objection, form,

10   foundation, calls for speculation.

11        A     Again, I'm not going to speculate as to what

12   their theory was.

13        **Q     I'm not asking you to speculate.  I'm asking**

14   **based on your personal recollection as a personal**

15   **witness to the proceedings and a participant in them,**

16   **how you would describe their theory and whether**

17   **finding the key was part of their theory.  That's not**

18   **asking for speculation, Mr. Colborn.**

19        A     Well, I would like to think that my answers

20   were such that they moved on from that.

21        **Q     That's not my question.  I'm asking you to**

22   **describe what your personal understanding of their**

23   **theory was.**

24        A     They were trying to understand how we found

25   the key and why we didn't find it earlier.  Again, I

                                                              25

1    was never accused of planting evidence.

2         Q    Who were they throwing mud at?  Were they

3    throwing it at you?

4         A    I'm sure they were hoping that I was going

5    to make some sort of --

6         Q    That's not my question.  You used the phrase

7    they were throwing mud.

8         A    Uh-huh.

9         Q    And I'm asking were they throwing mud at

10   you?

11        A    I think they were questioning our procedure

12   during the searches, yes.

13             MS. WALKER:  So I'm just going to pause

14   for a minute and direct a comment to your client --

15   counsel, which is this is going to take a while today

16   if this is -- if we're going to show him -- have to

17   show him a lot of documents to get him to articulate

18   the theory of the case.

19             MR. BURNETT:  Well --

20             MS. WALKER:  I just want to say that at

21   the outset so you're not surprised when this drags on

22   for many hours.

23             MR. BURNETT:  Well, if you want, I'll

24   respond to that.  What Mr. Colborn's trying to tell

25   you is that he attended some parts of the trial and

1    served on you -- I'm just going to give you a date as

2    to when those were finalized -- back in January,

3    okay?  So about eight months ago or so.

4         A    Okay.

5         Q    And the second document, which I've sort of

6    pieced out there for you, is revised responses to the

7    requests for admissions --

8         A    Okay.

9         Q    -- that they served, I think, a few days

10   ago, the 19th of July.  Have you ever seen these

11   before?

12        A    Yes.

13        Q    Okay.  And you agree with everything in your

14   responses to both documents?

15             MR. BURNETT:  Objection, form.

16        Q    Let me ask it differently.  Your clients --

17   or your attorneys did not draft and serve these

18   responses without your approval, correct?

19             MR. BURNETT:  That calls for privileged

20   communications.  Decline to answer that.

21        A    And based on the advice of my counsel --

22        Q    Let's talk about a specific one.  So --

23        A    Okay.

24        Q    -- three pages in is Request for Admission

25   Number 3.

1        A    On the first one?

2        Q    On the first one.  And the question posed

3    was, "Admit that at the Criminal Trial of Steven

4    Avery, Avery's counsel contended that Plaintiff

5    planted evidence to frame Avery for Teresa Halbach's

6    murder."  Do you see that that's the question?

7        A    Yes, I see it.

8        Q    And then a response is right beneath it, and

9    it says, "Subject to Plaintiff's general objections,

10   deny.  To 'contend' is defined by Merriam-Webster as

11   to 'assert,' which is in turn defined as 'to state

12   (something) in a strong and definite way.'  Avery's

13   attorneys' opening and closing arguments reveal no

14   strong and definite statement that Plaintiff planted

15   evidence to frame Avery for Teresa Halbach's murder."

16   Did I read that correctly?

17       A    Yes.

18       Q    Have you ever reviewed this response before?

19       A    Yes.

20       Q    And you approved of it being your response

21   to these requests for admissions, correct?

22       A    Yes.

23       Q    Okay.  And you denied this in the first

24   instance.  We'll come back to your amended responses

25   in a minute, but you denied this in the first

                                                            54

1      instance because you said contend means to state

2      something in a strong and definite way.  Do you see

3      that?

4           A    Yes.

5           Q    And it was your position, at least at the

6      time of these responses back in January, that his

7      attorneys did not do that, correct?

8           A    That definition was the work product of my

9      attorneys.  I didn't personally write that.

10          Q    But you agreed with what they were saying

11     here?

12          A    Yes, I agreed with them.

13          Q    And you similarly responded.  Sort of the

14     same boilerplate language appears in number 5, 6, 7,

15     8, 9, 10, and 11.  Do you see that?  I can represent

16     to you that it does and maybe point you to number 6

17     just as another concrete example.

18          A    Okay.

19          Q    So here you were asked to "Admit that at the

20     Criminal Trial of Steven Avery, Avery's attorneys

21     contended that Plaintiff made the call to dispatch

22     referenced in Paragraphs 30 through 32 of the Second

23     Amended Complaint after Plaintiff had located Teresa

24     Halbach's SUV."  Do you see that?

25          A    Yes.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 17 of 43   Document 321-2
920.585.2344 | 365Reporting,LLC | www.365reporting.net

1        Q     I read it correctly?

2        A     Yes.

3        Q     And you made the same objection here, you

4    said essentially I can't admit that because contend

5    means to state something in a strong and definite

6    way.  Do you see that?

7        A     Yes.

8        Q     And you don't think Avery's attorneys

9    contended that you made the call to dispatch after

10   you had located the SUV, correct?  You don't think

11   they contended that?

12             MR. BURNETT:  Objection, foundation.

13       A     No, I don't think they did.

14       Q     Do you stand by that definition of contend

15   as you sit here today, that to contend something, it

16   has to be stated in a strong and definite way?

17       A     Yeah.  Yes.

18       Q     All right.  So, you know, we haven't gotten

19   to the documentary yet, but when we do, we're going

20   to use your definition, and I'm going to ask you

21   things like what did Making a Murderer contend in a

22   strong and definite way, and I just want to put that

23   idea in your head so you're ready for it down the

24   road --

25       A     Uh-huh.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 18 of 43   Document 321-2
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1    conviction?"  And Brenda said, "Yes and no."  And I

2    said, "Okay."  And then she said, "Okay.  He felt

3    defamed, or in my opinion, I would say he felt very

4    wronged after the trial, during the trial, okay?"  I

5    said, "M-hm."  And she said, "But felt redeemed with

6    the verdict."

7               That's Ms. Schuler's testimony, and my

8    question for you is do you agree with her assessment?

9         A    No.

10        Q    Which part do you disagree with?

11        A    I didn't feel very wronged after the trial.

12        Q    Okay.  Any other part you disagree with?

13        A    No.

14             (Exhibit 35-B marked for identification.)

15        Q    Okay.  I'm going to hand you 35-B.

16        A    Okay.

17        Q    So I'm going to start on line 22 of page 141.

18   Do you see where I'm at?

19        A    Yes.

20        Q    And so I'm following up on Ms. Schuler's

21   testimony, and I say, "So you just testified that he

22   felt very wronged during the trial, and then he felt

23   vindicated by the verdict and that he was very upset

24   by Making a Murderer; is that a fair summary of what

25   you said?"  And she said, "Yes."  And I asked, "The

102

1    reason he felt wronged during the trial by Mr. Buting

2    and Mr. Strang is because in defending Steven Avery,

3    they accused Mr. Colborn of planting evidence to

4    secure Avery's conviction; is that correct?"  And

5    Ms. Schuler said, "That is correct."  Did I read that

6    correctly?

7         A    You did.

8         Q    Okay.  And I know you disagree with her

9    description that you felt wronged, but is there

10   anything else here in her testimony that you disagree

11   with?

12        A    I -- the sole -- the reason that I didn't

13   feel -- that I felt wronged, using your word there,

14   is not necessarily because of Mr. Buting and

15   Mr. Strang using as a possible defense planting

16   evidence.  The whole media support of them and lack

17   of support of us and people in my community that I

18   know I've helped that may have not believed in law

19   enforcement, believed in the conviction, that's the

20   reason I felt wronged.

21        Q    Okay.  So I just -- I'm a little confused,

22   so I just want to clarify.  You felt wronged at trial

23   but not because of Mr. Buting and Mr. Strang; is that

24   what you're saying?

25        A    Not solely, correct.

                                                              103

1    interviewed for Convicting a Murderer, correct?

2        A    Yes.

3        Q    And this is how you feel sitting here today,

4    correct?

5        A    Yes.

6        Q    Mr. Colborn, are you comfortable at this

7    point articulating the defense's theory during the

8    murder trial for Teresa Halbach?

9        A    I am not.

10       Q    But you dispute that their theory was that

11   you planted evidence to frame Steven Avery?

12       A    As I said earlier, I believe it might be

13   part of -- part of their defense, yes.

14       Q    Okay.

15       A    But, again, I must reiterate I was never

16   accused of planting evidence in trial.

17       Q    I'm struggling to see the difference.  I

18   mean, can you explain it to me?  You say it was part

19   of their defense theory that you were not accused.

20       A    To be totally honest, I was as shocked as

21   you.  When I'm all done testifying, it's like where's

22   the planting defense?  So I don't know.  I don't know

23   where they were going.  I thought maybe they were

24   shifting gears and going to something else, that they

25   had realized that we hadn't planted evidence.  That

                                                          107

1    Go ahead.

2          A    So, again, I wasn't privy to closing

3    arguments, to all the other witnesses that testified,

4    but I know that that was part of their defense.

5                    (Exhibit 161 marked for identification.)

6          Q    I'm handing you what we've marked as

7    Exhibit 161, and I'll represent to you that this is

8    part of the transcript from day 7 of Steven Avery's

9    jury trial.

10         A    Okay.

11         Q    Do you see that on the very front page?

12         A    Yes.

13         Q    And I've given you the front two pages of

14   that transcript, but I'd ask you to flip to the third

15   page, which is page 201.

16                    MR. BURNETT:  Did you say this is

17   Exhibit 161?

18                    MS. WALKER:  Yeah.

19         Q    On page 201 Attorney Kratz is speaking.  Do

20   you see that at the top?

21         A    Yes.

22         Q    And if you jump to the paragraph at the

23   bottom of that page, he said, "Now, we've heard

24   Mr. Strang's opening statement where planted evidence

25   has been eluded to."  Do you see that in the third

                                                          144

1    paragraph at the bottom?

2        A    Yes.

3        Q    And that's Mr. Kratz referring to this

4    theory as one of planted evidence.  Do you see that?

5        A    Yes, I see -- yes.

6        Q    Okay.  Now skip to the next page, 202.

7        A    Okay.

8        Q    And I'll tell you, I'll represent to you,

9    that this is a transcript of argument Mr. Kratz was

10    making to the judge directly after you left the

11    stand, okay?  At the bottom of page 202, he says,

12    "Now, for the first time, when evidence should be

13    placed into the record, or at least placed into this

14    particular case, we hear nothing.  And so, Judge, I'm

15    asking for alternative direction, or rulings from the

16    Court, first, if the defense is abandoning their

17    planting evidence theory."

18            Do you see he called it a planting evidence

19    theory right there?

20        A    Yes, I see he called it that, but he's also

21    asking if it was abandoned.

22        Q    And I'll represent to you that the judge at

23    the end of this transcript says it had not been

24    abandoned.  Are you aware of that?

25        A    No, because I wasn't there for this.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 23 of 43   Document 221-2
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1    Q    But I just want to ask then if you agree

2    with Mr. Kratz and if for the rest of the day we can

3    call this theory the planting evidence theory?

4    A    Well, I'm not going to agree that there was

5    an evidence planting theory with me.  As I've said

6    numerous times this morning, I was never accused of

7    planting evidence in trial.

8    Q    So let me point you to page 204.

9    A    Okay.

10   Q    And here we have Attorney Strang responding

11   to Mr. Kratz, and he starts a paragraph at the bottom

12   of the page with the word "second."  Do you see that?

13   A    Yes.

14   Q    Keep in mind, this is just after you stepped

15   down from the stand.  Do you see that?  He says,

16   "Second, just by the by, we haven't gotten to the

17   defense case-in-chief yet at all.  We're in the

18   prosecution case-in-chief.  So all of this, at some

19   level, would be wildly premature.  But, beyond that,

20   to confront it most directly, I'm idealistic.  I'm

21   certainly naive at times.  I am not so naive to think

22   that someone who may have planted blood evidence, who

23   may have been involved in planting a key, would come

24   into this courtroom, and simply, because I asked

25   under oath, did you do it, say, oh, yes, I did.  We

146

1    are not going to have a Perry Mason moment here."

2    Did I read that correctly?

3         A    Yes.

4         Q    So Mr. Strang here is saying just because I

5    didn't ask Mr. Colborn directly did you plant

6    evidence doesn't mean we're abandoning the planted

7    evidence theory.  Is that your understanding of what

8    I just read to you?

9         A    No, not really.

10        Q    Okay.  We'll let the transcript speak for

11   itself, and we'll move on.

12        A    Okay.

13        Q    Did you ever sue Dean Strang?

14        A    No.

15        Q    Why not?

16             MR. BURNETT:  Um...

17        Q    I don't want to know about conversations

18   with your attorney.  So if there's any reason other

19   than your attorney told you not to, I'd like to know

20   why you decided not to sue Dean Strang.

21        A    There is no other reason than what you just

22   stated.

23        Q    Do you understand that you can't sue people

24   for defamatory things they say about you in court?

25   And I'm not asking for what your attorneys have told

147

1        Q      So if you could flip back to Exhibit 7,

2     that's that email with Mr. Dunphy we spoke about

3     earlier today.

4        A      Yeah, got it.

5        Q      And you sent this email on January 12th,

6     2016, correct?

7        A      Yes.

8        Q      So, again, as you said, that was pretty

9     quickly after the release of Making a Murderer,

10    right?

11       A      Yes.

12       Q      Okay.  So we talked about -- on the first

13    page of this email to Mr. Dunphy, we've already

14    talked about your statement to him that the claims by

15    the Netflix documentary mirror those claimed by the

16    defense during trial.  You remember discussing that

17    this morning, correct?

18       A      Yes.

19       Q      So let me direct you to the second page here

20    of the same exhibit.

21       A      I'm sorry.  What was the exhibit number

22    again?  Sorry about that.

23       Q      Number 7.

24       A      7.  Got it.  Okay.

25       Q      So if you go to the second page --

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 26 of 43   Document 321-2
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1        A     Okay.

2        Q     -- the fourth line down, about midway in it

3    says, "During the trial."  Do you see that?

4        A     Yes.

5        Q     And I'll read it out loud.  You wrote to

6    Mr. Dunphy, "During the trial Mr. Avery was very well

7    represented by Attorney Dean Strang from Madison,

8    Wisconsin and Attorney Jerome Buting from Brookfield,

9    Wisconsin.  In short, the defense was that I and

10   another now retired police officer planted the

11   evidence that led to Mr. Avery's conviction."  Did I

12   read that correctly?

13       A     Yes.

14       Q     Okay.  And you stand by that statement as

15   you sit here today?

16       A     I stand by the statement that I authored

17   that, but, again, I feel that the planting of

18   evidence defense was never truly presented to me in

19   the trial and it was only one aspect of their

20   defense.

21       Q     Well, then why did you say that to someone

22   you were trying to hire?  Do you think what you told

23   Mr. Dunphy is inaccurate?

24       A     Well, one, I wasn't very happy when I penned

25   this, and two, you know, the whole email was written

1    more out of emotion than it was with forethought, and

2    I probably should have referred Mr. Dunphy to

3    Mr. Strang's and Mr. Buting's out-of-court comments.

4         **Q    So you didn't think as carefully about how**

5    **to phrase it in this email as you've thought about**

6    **how to phrase it at today's deposition; is that fair?**

7         A    Well, I've had a lot more years of getting

8    it thrown in my face.  So, you know, it's probably

9    by -- in January, what was it, 12th of '16 after

10   Making a Murderer had been out exactly one month, I

11   didn't phrase it as well as I should have.

12        **Q    So you weren't accurate when you were**

13   **describing the case to people you were hoping to hire**

14   **as an attorney; is that correct?**

15        A    I probably wasn't as accurate as I should

16   have been, no.

17        **Q    Let's take a look at Exhibit 49.**

18             (Exhibit 49 marked for identification.)

19        A    I don't think I have that.

20        **Q    I'm giving you that one.**

21        A    Oh, okay.

22        **Q    Would you like us to get those in order for**

23   **you?**

24        A    We can do it at a break.

25        **Q    Okay.**

160

1      A     I'll page through it, but thank you.

2      Q     This is another email that you sent to

3   Patrick Dunphy on January 12th, 2016.  Do you see

4   that?

5      A     Yes.

6      Q     You wrote, "Dear Sir, I now see Attorney

7   Strang will be giving a presentation on the Avery

8   case on 1/27/16 in Minneapolis, Minnesota at Sisyphus

9   Brewing.  It's sold out or I would try to obtain a

10   record of the 'event' for you as I am guessing my

11   name will be bantered about quite a bit.

12   Specifically the claims against me are these:  That

13   all evidence gathered at the crime scene was planted,

14   including the victims bones which were located in a

15   fire pit next to the Avery's residence where he

16   burned her body after dismembering her.  In Avery's

17   home was located the key to the victim's vehicle,

18   which had Avery's DNA on it.  Their story is I

19   planted the key.  I am being accused of breaking into

20   our own courthouse and stealing a vial of blood that

21   was used as an exhibit in Avery's first trial.  Next

22   I am accused of either killing the victim, or giving

23   her to someone else who killed her and then planting

24   her body at Avery's residence.  I know this sounds

25   unbelievable but you can't make this stuff up."  I

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 29 of 43   Document 221-2
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1   lost my place for just a minute.  If you skip down a

2   few lines, two, three, four, five, six, seven, it

3   goes on to say, "If you are in disbelief I assure

4   this is all in the court records of this case."  Do

5   you see where I stopped there?

6        A    Yes.

7        Q    Okay.  So you're telling Patrick Dunphy that

8   all of these accusations against you about planting

9   evidence are in the court records of the case,

10  correct?

11       A    Yes, that's what I'm telling him.

12       Q    Okay.  Do you want to change your story

13  today?

14       A    No.

15       Q    You stand by that statement?

16       A    What do you mean by change my story?  I

17  guess can you clarify?

18       Q    Well, do you -- yeah.  When you tell Patrick

19  Dunphy that at trial you were accused of all of these

20  things and that you can assure him that this is all

21  in the court records for this case, do you stand by

22  that statement as you sit here today?

23       A    Yes, I did tell him that, but I didn't have

24  the trial transcript in front of me and reviewed the

25  trial transcript for a case that had happened ten

162

1    years ago.

2         Q    So you're changing your story?

3              MR. BURNETT:  Objection, form.

4         A    I'm saying I based a lot of this information

5    off social media, threats that were being made to me,

6    and I didn't have the trial transcript in front of

7    me.

8         Q    Any other reason you're departing from that

9    statement?

10        A    No, no other reason.

11        Q    Two lines down from there you say, "The

12   defense continues, in part thru Netflix, to maintain

13   and keep alive these lies to this day.  Just last

14   week Strang was on WTMJ Radio saying these things I

15   just mentioned.  The trial was over 10 years ago, how

16   much longer can the defense attorneys continue this

17   crusade against my agency and me personally??"  Did I

18   read that correctly?

19        A    Yes.

20        Q    And if I'm reading this, you believe the

21   defense team lied about you during the trial,

22   correct?

23        A    Yes.

24        Q    Okay.  That's when their crusade against you

25   began, correct?

163

1    aware of the amount of video splicing that had

2    occurred to, for instance, take my image from one

3    area and transplant it to another.

4         Q    Okay.

5         A    I believe that was the idea behind it, to

6    make me appear more guilty.

7         Q    I'm going to hand you what we've marked as

8    Exhibit 16-E.

9              MS. WALKER:  I think my numbering might

10   be a little off.  Okay.  16-B.

11             (Exhibit 16-B marked for identification.)

12        Q    This is from page 103 of Mr. Griesbach's

13   book Indefensible, and I'll just read you starting

14   with the word "after" at the top of page 103.  "After

15   all, I could imagine without justifying it for a

16   minute that convinced of Stevens Avery's guilt, but

17   concerned there was not evidence to convict him.

18   Colborn and/or Lenk could have planted the key to

19   strengthen the case.  Short of being in the room

20   where they found the key, I realize it's impossible

21   to know with 100 percent certainty."  Did I read that

22   correctly?

23        A    Yes.

24        Q    And you know what happened in that room when

25   the key was found, don't you, Mr. Colborn?

                                                        173

1        A    Yes, I do.

2        Q    But unless Mr. Griesbach was in the room

3    with you or any of us sitting here today were in the

4    room with you, none of us can know with 100 percent

5    certainty, correct?

6        A    I would think that I drove that point home

7    in the trial, and based on the subsequent conviction,

8    I believe the jury was convinced of it.

9        Q    We would have to trust you, correct,

10   Mr. Colborn?

11       A    Yes, you would have to trust that I was

12   telling the truth under oath.

13       Q    And the jury found for the prosecution and

14   convicted Mr. Avery, correct?

15       A    Yes, they did.

16       Q    And the jury's findings were included in

17   Making a Murderer, correct?

18            MR. BURNETT:  Objection, form.

19       Q    Do you know?

20       A    I have not watched a clip of or any of

21   Making a Murderer when the jury verdict is read or --

22   so I can't answer you positively.  I don't know what

23   was included.  I don't know what episode that was in.

24       Q    You have no reason to dispute that it was

25   included, correct?

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 33 of 43   Document 321-2
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    motivation that you had for wanting to see Steven

2    Avery convicted for Teresa Halbach's murder?

3              MR. BURNETT:  Same objection.

4         A    Not until the Kratz redirect.  I wasn't -- I

5    didn't know where Dean Strang was going with his

6    questions about the -- this phone call, but the Ken

7    Kratz redirect seemed to have summed it up or pointed

8    it out that that's where he was headed with it.

9         Q    And I think Ken Kratz's redirect, it even

10   went one step further, right, in that he's saying

11   this didn't give you motivation to frame Steven

12   Avery?

13        A    Yes, that's correct.

14        Q    And it didn't give -- and it didn't give you

15   motivation to plant evidence against Steven Avery,

16   right?

17        A    Correct.

18        Q    And then you denied, you said, "I never did

19   plant evidence against Steven Avery," right?

20        A    Or anyone.

21        Q    Or anyone.

22        A    Correct.

23              MR. BURNETT:  When we get to a stopping

24   point, can we take a break?

25              MR. VICK:  Yeah.  Sure.  Probably just a

                                                              408

```
1    couple more minutes.  Then I've got a natural spot.

2              MR. BURNETT:  Take your time.

3              MR. VICK:  Then we're done with this --

4    the '94, '95 call.

5              MR. BURNETT:  That makes sense.

6         Q    And one of your complaints in this case

7    about Making a Murderer is that it shows this line of

8    argument, right, that Steven Avery's attorneys were

9    suggesting that you had planted evidence against him,

10   right?

11        A    We discussed this yesterday at length.  I

12   was never accused of planting evidence, so I'm not

13   going to say that that's what their defense was.

14        Q    Would you agree with me that they were

15   strongly suggesting that?

16        A    No.

17        Q    Would you agree with me that Ken Kratz's

18   redirect shows that he understood that that's what

19   they were driving at?

20             MR. BURNETT:  Objection, form,

21   foundation.

22        Q    Let me rephrase that.  Did it occur to you

23   that Ken Kratz was asking you to deny that you were

24   motivated to frame Steven Avery based on the '94, '95

25   call?  Did that suggest to you that Ken Kratz
```

409

1       Q    Was that just a coincidence or was that an

2   arrangement where if you and Lieutenant Lenk were

3   doing a search, there had to be someone from Calumet

4   County there?

5       A    My understanding is as it pertained to

6   myself and Lieutenant Lenk or myself and Dave

7   Remiker, but he wasn't out there all that long due to

8   a family issue, or the three of us together, there

9   would also be somebody with Calumet County with us.

10      Q    Was that the only instance in your law

11  enforcement career where when you were conducting

12  searches of a premises, you had to have someone from

13  another county with you?

14      A    Yes.  That was definitely a unique

15  situation.

16      Q    Did you resent it a little bit?

17      A    No.

18      Q    Did you understand it?

19      A    Yes.

20      Q    What did you think was the justification for

21  it?

22      A    I imagine that they wanted the lead -- two

23  lead investigators, which were Calumet County --

24  investigating agencies I should say, which was

25  Calumet County and Wisconsin Department of Justice,

456

1    wanted to make sure that there was somebody from

2    Calumet County to rebut any unfounded accusations

3    that Manitowoc County had done something improper.

4         Q    But despite that, there were accusations

5    along those lines at Steven Avery's trial, right?

6         A    I wasn't privy to Steven Avery's entire

7    trial.  No accusations were made of me, if that

8    helps.

9         Q    While you were on the stand?

10        A    Correct.

11        Q    Would you agree that suggestions were made

12   or implications were made that you or Lieutenant Lenk

13   had planted the key that was later found in Steven

14   Avery's bedroom that turned out to be the key to

15   Teresa Halbach's car?

16             MR. BURNETT:  Objection, form,

17   foundation.

18        A    I was just waiting for the aircraft.  My

19   impression was that while there were questions asked

20   by defense counsel on how -- you know, how we hadn't

21   found the key until the seventh search, it appeared

22   to me that they had abandoned the planting theory and

23   had switched, in my opinion or my perception, to some

24   sort of procedural defense, that I had missed some

25   sort of procedure or that Lieutenant Lenk had missed

457

1    some sort of procedure.

2         Q    Switching back to November 8th of 2005, that

3    was the date when the key was found in his bedroom,

4    right?

5         A    On November 8th?

6         Q    8th.

7         A    Yes, I believe so.

8         Q    And you were there that day in your capacity

9    as an evidence tech; is that correct?

10        A    Yes.

11        Q    Now, in your Second Amended Complaint, you

12   allege that Making a Murderer -- Making a Murderer

13   did not include a photograph of the bookcase that you

14   testified about when you were on the stand at the

15   criminal trial; is that correct?  I can show you

16   where in the Complaint it is if you'd like.

17        A    Yeah, please.

18        Q    Sure.  It's paragraph 44.

19        A    Okay.  Okay.  I've read it.  Thank you.

20        Q    Are you familiar with the photograph in

21   question that the Complaint's referring to here?

22        A    I know there's a photograph that was taken

23   showing that the veneer back of the bookcase had

24   separated from the actual frame of the piece of

25   furniture.

1      Q     How about Brenda Schuler, did she volunteer

2   to get involved or did you ask her?

3      A     I believe Michael asked her.

4      Q     Now, you've mentioned a few times today that

5   you're an introvert, right?

6      A     I don't recall if I mentioned it today, but

7   certainly during my deposition with Attorney Walker I

8   did.

9      Q     And so probably being in the spotlight,

10  that's not your idea of a good time, right?

11     A     No, it's not.

12     Q     Does it make you nervous?

13     A     I'm not -- I don't like being in the

14  spotlight.  I can't necessarily say that it's because

15  it makes me nervous.  I just don't like to be the

16  center of attention.

17     Q     Uncomfortable would be a fair

18  characterization?

19     A     Sure.

20     Q     Has this deposition made you feel nervous or

21  uncomfortable?

22     A     Well, I'm a private person.  It's what an

23  introvert is.  I'm being asked very private, personal

24  questions.  Yes, it makes me feel uncomfortable.

25     Q     I'd like to look back at Exhibit 2.

Case 1:19-cv-00484-BHL Filed 11/04/22 Page 39 of 43 Document 321-2
920.585.2344 | 365Reporting, LLC | www.365reporting.net

1        A     Is that the Amended Complaint?

2        Q     It is, yeah.

3        A     Okay.

4              MR. BURNETT:  Are we in a position to

5    wrap this up?

6              MR. VICK:  We are.

7              MR. BURNETT:  Great.

8        Q     I'd like you to look at paragraph 37

9    specifically.

10       A     Okay.  Okay.

11       Q     So here you say, "Defendants Ricciardi and

12   Demos strategically spliced 'reaction' shots of

13   plaintiff appearing nervous and apprehensive at trial

14   into other portions of his testimony where he did not

15   appear nervous or apprehensive in fact."  Do you see

16   that?

17       A     Yes.

18       Q     Do you recall what it was about your

19   demeanor in any of the shots that made you look

20   nervous or apprehensive?  Was there anything that you

21   can recall right now that made you feel that way?

22       A     Specifically the clip that you showed me

23   that I commented on earlier where it appears that

24   Dean Strang is giving me some sort of staredown and

25   the -- it pans to the shot of me leaning back and

496

1    cracking my knuckles.

2            I did that during a recess out of the view

3    of the jury.  I certainly didn't do it in front of

4    Attorney Strang, but it certainly does make me look

5    nervous and apprehensive and that I've been caught in

6    some sort of lie.

7        **Q     Now, Mr. Colborn, I'm not sure if you're**

8    **aware, but during this deposition the last couple**

9    **days, you've kept your head down a decent amount.**

10   **Does that sound right?**

11       A    I'm frequently reading, but yes.

12       **Q     And you've sometimes had your head in your**

13   **hands or cracked your knuckles in the course of this**

14   **deposition.  Does that sound right?**

15       A    Okay.  I don't recall that, but I don't know

16   what -- what you want me to -- what you're trying

17   to -- can you clarify a little bit for me?

18       **Q     Well, is it possible that maybe things like**

19   **cracking your knuckles or looking down, that that's**

20   **just a natural mannerism of yours?**

21       A    The footage that I've watched of my trial

22   testimony, I frequently make contact with whoever

23   questioning me.  Now, I was not in trial given a

24   stack of documents like this and told frequently to

25   go to this page, go to that page, look at this, look

497

1    at that, read that.  So that requires me to look down

2    in order to be able to see it.

3                    MR. VICK:  George, I think I'm done.

4    Could I take two minutes?

5                    MR. BURNETT:  Sure.  Thank you.

6                    THE VIDEOGRAPHER:  Going off the record

7    at 4:32.

8                    (Brief recess held.)

9                    THE VIDEOGRAPHER:  Back on the record at

10    4:38.

11                    MR. VICK:  I wanted to make one

12    correction.  I had said that Ms. Ricciardi had --

13    that it was with the U.S. Attorney's Office.  I've

14    been informed it's actually the Manhattan DA's

15    Office.  I just didn't want to have anything wrong

16    there.

17        Q    (By Mr. Vick:)  Question for you.  Was there

18    any disciplinary action gains you by the Manitowoc

19    County Sheriff's Department after Making a Murderer

20    came out?

21        A    Not that I recall, no.  The fact that I sent

22    that email to John Ferak didn't go over very well,

23    but I wasn't disciplined out of a verbal counseling

24    session.

25        Q    What did they tell you in the verbal

                                                                          498

1                    CERTIFICATION PAGE

2

3     STATE OF WISCONSIN        )

4     MILWAUKEE COUNTY          )

5

6              I, PAULA M. HUETTENRAUCH, RMR, CRR,
      Notary Public in and for the State of Wisconsin, do
7     hereby certify:

8              That prior to being examined, the
      deponent named in the foregoing deposition,
      ANDREW L. COLBORN, was by me duly sworn to testify
9     the truth, the whole truth, and nothing but the
      truth.
10
               That said deposition was taken before
11    me at the time, date, and place set forth; and I
      hereby certify the foregoing is a full, true, and
12    correct transcript of my shorthand notes so taken and
      thereafter reduced to computerized transcription
13    under my direction and supervision.

14             I further certify that I am neither
      counsel for nor related to any party to said action,
15    nor in any way interested in the outcome thereof; and
      that I have no contract with the parties, attorneys,
16    or persons with an interest in the action that
      affects or has a substantial tendency to affect
17    impartiality, or that requires me to provide any
      service not made available to all parties to the
18    action.

19
      IN WITNESS WHEREOF, I have hereunto
20    subscribed my name this 28th day of July, 2022.

21

22    Paula M. Huettenrauch, RMR, CRR
23    Notary Public - State of Wisconsin

24    My Commission Expires 8/18/2023

25

                                                              500