IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

ANDREW L. COLBORN,

                              Plaintiff,

        vs.

NETFLIX, INC.,                                          Case No. 19-CV-484
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

                              Defendants.

## PLAINTIFF ANDREW L. COLBORN'S RESPONSE TO DEFENDANT NETFLIX, INC.'S STATEMENT OF PROPOSED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

        Plaintiff, Andrew L. Colborn, by his attorneys, the Law Firm of Conway, Olejniczak &

Jerry, S.C., responds to Defendant Netflix, Inc.'s Statement of Proposed Material Facts as

follows:

## I.      AVERY'S CIVIL CASE FOR WRONGFUL IMPRISONMENT AND THE MANITOWOC COUNTY SHERIFF'S OFFICE'S CONFLICT OF INTEREST

        1.      After Avery was exonerated for the rape of Penny Bernsteen in 2003, the
Wisconsin Department of Justice conducted an independent review of the case and concluded
that then-Manitowoc County Sheriff Tom Kocourek and then-District Attorney Denis Vogel, as
well as their subordinates, had strong reasons to believe that another man assaulted Bernsteen
and that Avery was innocent, but went ahead with the case against Avery anyway. *See* Dkt. 120-
11 at 2, 6-12; Dkt. 120-12 at 73:16-74:11; Dkt. 120-13 at 7:3-12; *see also* Ep. 1 at 53:18-55:09,
56:31-58:10.

        RESPONSE:  Plaintiff objects to this Proposed Fact as relying on hearsay to the

extent that they purport to be submitted for the truth of the matters asserted. Plaintiff

further objects to all references to MAM episodes in the proposed Findings of Fact to the

extent they are intended to provide "evidence" of what is depicted. They are hearsay and

were substantially edited, even as to purported trial "footage," as conceded by Moira

Demos at her deposition. Barker Decl., Ex. 10 pp. 180-207. Defendants have refused in

discovery to provide access to unedited source material with the exception of Plaintiff's

own trial testimony. Barker Decl., Ex. 21.

This objection is referenced hereafter in these responses as the "MAM

objection." Subject to the objections, and to the extent that the report is considered for

any purpose, Plaintiff further disputes Netflix's characterization of The Wisconsin

Department of Justice report. The report states that there "was no basis to bring criminal

charges or assert ethics violations against anyone involved in the investigation and

prosecution of this case. At worst, the sheriff's department failed to investigate a viable

suspect, Gregory Allen...". Dkt. 120-11 p. 14.

2.      Also following his exoneration, Avery filed a civil rights lawsuit for $36 million
in this Court in 2004, asserting claims against Manitowoc County, Kocourek, and Vogel for
violating his constitutional right to due process by targeting him and failing to investigate the
actual rapist; focusing the investigation on Avery because of personal hostility against him;
failing to provide exculpatory information to his defense counsel; and continuing to withhold
exculpatory evidence during his incarceration. *See* Decl. of Leita Walker ("Walker Decl.") Ex. 1
(Compl., *Avery v. Manitowoc Cnty.*, 1:04-cv-00986-LA (E.D. Wis. Oct. 12, 2004), Dkt. 1); see
also Ep. 2 at 9:43-10:24.

RESPONSE:  Plaintiff asserts the MAM objection described in his response to

Proposed Fact No. 1 as to the reference to Episode 2 of MAM. Subject to his objection,

Plaintiff does not dispute the substance of the proposed fact.

3.      Discovery in Avery's civil suit was underway in the fall of 2005: then-Lt. James
Lenk was deposed on October 11, 2005, *see* Dkt. 120-17; then-Sgt. Andrew Colborn and then-
Manitowoc County Sheriff Ken Petersen were deposed two days later, *see* Dkts. 120-14, 120-16;
and former Manitowoc County Sheriff's Office Chief Investigator Eugene Kusche was deposed
on the 26th, *see* Dkt. 120-19; *see also* Ep. 2 at 31:05-16.

RESPONSE:   Plaintiff does not dispute this proposed Finding of Fact.

4.      During Colborn's deposition in Avery's civil lawsuit, he testified that,
immediately after Avery's 2003 release from prison, Colborn recalled an unusual phone call he
received in 1994 or 1995 when he was a corrections officer at the Manitowoc County Jail
(hereafter referred to as the "jail call"). Dkt. 120-14 at 16:4-13; Ep. 7 at 17:36-19:04.

RESPONSE:  Plaintiff asserts the MAM objection described in his response to

Proposed Fact No. 1 as to the reference to Episode 7 of MAM. Subject to his objection,

Plaintiff  agrees that Colborn testified in his October 2003 deposition that he received a phone

call in 1994 or 1995 and was then wondering if the caller was speaking about  Mr. Avery, but

disputes the proposed fact to the extent that it suggests that  the words "unusual" or "recall" or

"recalled" were used in his testimony.  The following is an excerpt of how Mr. Colborn in fact

testified at Dkt. 120-14 16:4-13.



```
                              Page 16

         1    A   No, the call --
         2    Q   I'm sorry.  That's what's going on in '94/'95.
         3    A   Yes, sir.
         4    Q   You then, in 2003, following the publicity that we've
         5        already discussed relating to Mr. Allen and Mr. Avery,
         6        and you're concerned that perhaps the caller that was
         7        calling was speaking about Mr. Allen and Mr. Avery,
         8        true?
         9    A   I was wondering about that, yes.
        10    Q   Sure.  You brought that up to someone else, correct?
        11    A   Yes, sir.
        12    Q   And to whom did you bring that up?
        13    A   To Lieutenant Lenk.
```

Barker Decl., Ex 19.

5.     Colborn further testified that, during the jail call, the caller identified himself as a
detective from another jurisdiction, and said an inmate there had claimed he was responsible for
an assault in Manitowoc County for which another man was imprisoned. Dkt. 120-14 at 10:22-
11:8; SAC ¶ 24; *see also* Ep. 7 at 17:36-18:30.

RESPONSE:  Plaintiff asserts the MAM objection described in his response to

Proposed Fact No. 1 as to the reference to Episode 7 of MAM. Subject to his objection,

Plaintiff disputes the summary of his testimony as stated in the proposed fact.  Mr. Colborn

testified that the caller had claimed another man was in "jail".  The words "prison" or

"imprisoned" were not used.  Dkt. 120-14 at 11:1-6 and Dkt 120-15 p. 2.

6.     Colborn also testified that he tried to transfer the call to a Manitowoc County
detective and provided that phone number to the caller in case the call did not go through. Dkt.
120-14 at 14:13-15:15.

RESPONSE: Plaintiff does not dispute this proposed fact.

7.    Colborn did not document his recollection of the jail call in a written statement until September 12, 2003, in which he wrote that he "supplied the [caller] with a telephone number to one of [Manitowoc County]'s detectives" and that he did not recall the detective mentioning any names. Dkt. 120-15.

RESPONSE: Plaintiff agrees that Mr. Colborn supplied a written statement

regarding the jail call on September 12, 2003, in response to a request from a superior.

**Dkt. 290-27 pp. 17-18**. He wrote that he "supplied the 'detective' with a telephone

number to one of MTSO's detectives". Dkt. #120-15. The pertinent excerpt of the

Statement is copied below:

> of what case this detective was referring to, I supplied the dective with a telephone
> number to one of MTSO's detectives. I do not specifically recall but I may have tried

8.    Both Colborn and Lenk testified in Avery's civil rights case that they provided their written reports on the jail call to the sheriff. Dkt. 120-17 at 33:4-8; Dkt. 120-14 at 17:20-18:5.

RESPONSE: Plaintiff does not dispute this proposed Finding of Fact.

9.    Colborn testified in this case that his statement was kept in the sheriff's safe. Walker Decl. Ex. 2 (Colborn Tr.) at 404:4-11.

RESPONSE: Plaintiff does not dispute this Proposed Finding of Fact.

10.    Avery was arrested for killing Teresa Halbach in the midst of discovery in his civil case. In jail and facing a costly criminal trial, he settled his lawsuit against Manitowoc County for $400,000, from which his attorneys were paid $160,000. *Avery v. Manitowoc Cnty.*, 428 F. Supp. 2d 891, 893 (E.D. Wis. 2006); Ep. 3 at 15:39-15:52.

RESPONSE:

Plaintiff asserts the MAM objection described in his response to Proposed Fact

No. 1 as to the reference to Episode 3 of MAM. Subject to his objection,

Plaintiffdoes not dispute the proposed Finding of Fact except the portion that states, "In jail and

facing a costly criminal trial," as that appears to represent an attempt to summarize Mr. Avery's

motivations and there is no foundation for its content apart from any objectionable material that may appear in MAM and which may be product of Defendants' edits to source material that they did not disclose.

11. Meanwhile, because of the conflict of interest presented by Avery's pending lawsuit against Manitowoc County, authorities decided that Calumet County would take the lead in the investigation. Dkt. 120-30 at 143:2-25.

RESPONSE:

```
 9   A    Um, obviously, uh, there were Calumet County people
10        there.  There were, um, Manitowoc County, uh,
11        investigators, administrative staff there.  In fact,
12        um, at one point, uh, Deputy Inspector Schetter
13        arrived, and, um, he had, obviously, more knowledge
14        or -- or understanding of what was going -- his
15        perception of maybe a conflict of inter -- interest
16        in some ongoing litigation between, uh, Steven Avery
17        and Manitowoc County.
18                And there was a decision made and a
19        discussion made amongst Manitowoc County
20        individuals, Calumet County individuals, and
21        individuals from each District Attorney's Office
22        that it was probably in the best interest to have
23        Calumet County officers, um, work on the
24        investigation, and, uh, they would even also, uh,
25        ask the State of Wisconsin or DCI to assist also.

                              143
```

.Plaintiff objects to the substance of the cited testimony as hearsay, but does not dispute that a detective testified as shown above at Avery's trial and that lead investigators for the Halbach investigation were Mr. Weigert and Mr. Fassbender. Also this contradicts what Sheriff Peterson said in deposition that only he was conflicted out. Barker Decl. Ex. 12, depo. pp. 149-150.

12. While under the supervision of Calumet County Deputy Dan Kucharski, Colborn and fellow Manitowoc County Sheriff's Office ("MCSO") employee James Lenk purported to find the key to Halbach's SUV, which appeared on the floor of Avery's bedroom after Colborn

had roughly handled a small bookshelf in the room. Dkt. 120-29 at 125:10-126:10, 127:9-12, 130:8-14; Dkt. 120-30 at 12:9-17; Dkt. 120-31 at 35:12-37:22; *see also* Ep. 3 at 6:21-7:14.

RESPONSE: Plaintiff asserts the MAM objection described in his response to

Proposed Fact No. 1 as to the reference to Episode 3 of MAM. Subject to his objection,

Plaintiff disputes that Colborn and Lenk were "under the supervision" of Calumet

County Deputy Kucharski. The words "supervision" and "purported" are Defendants'

comments and additions, and are not contained in the cited materials. .

## II.    AVERY'S TRIAL FOR HALBACH'S MURDER

13.    Accusations that Colborn and others planted evidence were a central part of Avery's defense at his trial. SAC ¶ 33; *see also, e.g.*, Dkt. 120-28 at 117:23-120:11; Dkt. 120-24.

RESPONSE:    Plaintiff disputes this Proposed Fact to the extent that Defendants

are attempting to use it to claim that Avery's attorneys made direct statements during the

trial that identified Mr. Colborn as positively having planted evidence or as having

conspired to plant evidence. Attorneys Buting and Strang, in their closing arguments,

disclaimed any burden to prove any facts, instead limiting their argument to an attempt to

persuade the jury that if the jurors believed that any officers could have planted evidence,

then there was reasonable doubt as to whether Mr. Avery was guilty and the jury should

return a verdict of not guilty. Barker Decl., Ex.17 transcript p. 18, Barker Decl., Ex.18

transcript p. 46 – 48.

14.    The prosecution moved to exclude such "frame-up" evidence, but Judge Patrick Willis denied that motion. He specifically identified Lenk and Colborn as the only two officers the defense could attempt to implicate as participants in this alleged conspiracy and explained that "[t]he jurors are entitled to some explanation as to why the prosecution of this matter is being handled by Calumet County and why they are being transported to Calumet County to hear the case," and "Avery's charges against Lenk and Colborn in the federal lawsuit could have provided such motive, whether or not Lenk and Colborn were actually parties to the lawsuit." Walker Decl. Ex. 3 (CHRM034924) at 034925, 034927; Dkt. 120-24 at 3.

RESPONSE: Plaintiff denies the words "frame-up evidence" were used by Judge

Patrick Willis as the motion filed was "seeking to preclude the introduction of any

evidence pertaining to the Avery's wrongful conviction on charges of sexual assault and

attempted homicide in Case no. 85 FE 118." See Dkt. 279-3 p. 2. Also deny that Judge

Willis specifically identified Lenk and Colborn as the only two officers the defense could

attempt to implicate as participants in this alleged conspiracy as the Decision reads at

Dkt. 279-3 p. 4:

> The defendant seeks to introduce evidence relating to the defendant's
> wrongful conviction in the 1985 case and subsequent lawsuit against Manitowoc
> County because he asserts it is relevant to show bias on the part of two members of
> the Manitowoc County Sheriff's Department, James Lenk and Andrew Colborn.

Plaintiff does

not dispute the quotations noted in Statement 14 above appear in the Judge's decision at

Dkt. 279-3 pp. 3 and 5. However, Judge Willis' decision also contained the following

statement, which should be considered in context with the portions identified by

Defendants:

[as] pointed out by the State at oral argument: How could Lenk or Colborn have known
that Teresa Halbach was dead at the time they are alleged to have planted the defendant's
blood in her vehicle? Under the defendant's theory, either Lenk, Colborn, or both would
have had to have formulated a plan involving their own commission of serious felonies
and executed that plan within a very short period of time, motivated apparently only by
their embarrassment for not allegedly having acted more responsibly on information that
could have led to Mr. Avery's exoneration back in 1995 or 1996.

15.    Because Avery's defense centered on the contention that law enforcement
officials, in particular Colborn and Lenk, had framed him, both prosecutors and Avery's counsel
questioned the officers about the underlying events, including their depositions in the civil case
and the jail call. Dkt. 120-29 at 138:20-140:13, 158:5-163:22, 231:16-233:17; Dkt. 120-30 at
54:24-58:3, 103:16-107:11.

RESPONSE: Plaintiff objects to this Proposed Finding of Fact to the extent that it

claims without supporting citations to factual material the reasons why Avery's counsel

allegedly questioned officers at his trial. Subject to his objection, Plaintiff further disputes

this proposed Finding Fact to the extent it claims that "Avery's defense centered on the

contention that law enforcement officials, in particular Colborn and Lenk, had framed

him." Attorneys Buting and Strang, in their closing arguments, disclaimed any burden to

prove any facts, instead limiting their argument to an attempt to persuade the jury that if

the jurors believed that any officers could have planted evidence, then there was

reasonable doubt as to whether Mr. Avery was guilty and the jury should return a verdict

of not guilty. Barker Decl., Ex.17 transcript p. 18, Barker Decl., Ex.18 transcript p. 46 –

48. In addition, the cited material identifies only testimony pertaining to the 1994 / 1995

jail call.

16.     Avery's counsel also argued to the jury that a call Colborn made to dispatch
regarding the RAV4's license plate number (hereafter, the "dispatch call") indicated Colborn had
located the SUV before it was discovered in the salvage yard. Dkt. 120-35 at 32:21-34:3.

        RESPONSE:  Plaintiff disputes this Proposed Finding of Fact as inconsistent with

th arguments made by Avery's counsel to the jury.  What was argued by Avery's counsel

at Dkt. 120-35 p. 5 is below:



```
20          This sounds a lot like what road patrol
21     officers do when they come across a stalled car,
22     an abandoned car, a car where it shouldn't be.
23     That's what this sounds like.  Draw your own
24     conclusions, obviously look at it like from any
25     other piece of evidence.  But what's important is

                          33
```

Case 1:19-cv-00484-PP   Filed 03/03/20   Page 5 of 36   Document 120-35

17.     In his rebuttal closing, defense counsel Dean Strang recounted the dispatch call
and said "[t]his sounds a lot like what road patrol officers do when they come across a stalled
car, an abandoned car, a car where it shouldn't be." Dkt. 120-35 at 32:21-34:3.

        RESPONSE:  Plaintiff does not dispute this proposed Finding of Fact.

18.     To account for Avery's blood found in Halbach's SUV, Avery's counsel also argued that it could have been planted there by law enforcement, along with the RAV4 key in Avery's bedroom. *See* Dkt. 120-24 at 1-2.

<u>RESPONSE</u>:   Plaintiff disputes that the proposed Finding of Fact accurately

describes the arguments made by Avery's counsel, who argued that the blood in the vial

was "a possible source" of the blood in the SUV and, with respect to the RAV4 key, that

the jury would have to consider the circumstances of the searches of Avery's property "in

deciding whether Lieutenant Lenk dropped the key on the floor" and argued as follows:

```
14 And then they are in there again, very
15 briefly the next day, again, with Tyson. Note
16 that each entry they are -- they are -- each time
17 they go in there, they were with Tyson, except
18 for November 8th and they go in with Deputy
19 Kucharski, who tried to make light of it by
20 saying that, you know, the possibility of
21 planting is about as likely as aliens coming down
22 and planting it.
23 But he had to admit, he was not told to
24 watch those officers. He was there with Lenk and
25 Colborn. He's told to search and that's what he's doing, he's
1 doing his job. And he's sitting
2 on the bed, after one hour. In fact, I think he
3 said he was getting almost done and took off his
4 gloves. He's sitting here, going through this
5 drawer.
6 Lieutenant Lenk is right here with his
7 back to him, like this, crouched down on the
8 floor, so he's not going see what's going on.
9 Lenk gets up, walks out the door, comes back in a
10 minute later, oh, my gosh, look at that, there's
11 a key. Low and behold, it's in plain view.
12 And so they come up with this theory,
13 this absolutely preposterous theory on how this
14 magic key, that no one ever finds before,
15 suddenly appears in plain view, out of this
16 bookcase. They find it right there, where those
17 slippers are. Right like that.
18 And how does it happen, well, they
19 decide, maybe they help the back of this cabinet
20 a little bit, but they decide that somehow this
21 key must be secreted in this cabinet, by Mr.
```

```
22 Avery, in his own bedroom, with everybody looking
23 at him, and that it somehow magically fell out
24 this -- this gap, bounces off the wall. And by
25 the way, we're talking about key, fob, and plastic clip.
1  Somehow bounces off the wall,
2  turns around the corner and lands, what is it 90
3  degrees from where it should be, where it would
4  have fallen.
```

Barker Decl., Ex. 17 pp. 165 – 166. The RAV4 key is not mentioned in the materials cited by

Defendants in the proposed Finding of Fact.

19.    Both Colborn and Lenk testified at trial that the Avery civil lawsuit did not cause
them to plant evidence or otherwise try to frame Avery. Dkt. 120-29 at 140:14-141:7, 233:3-17.

RESPONSE:  Plaintiff does not dispute this proposed Finding of Fact.

20.    Colborn, Lenk, and Kucharski testified that they believed the RAV4 key fell out
of a gap in the back of the bookcase Colborn had searched and then wrestled back into place.
Dkt. 120-29 at 125:10-126:10, 127:9-12, 130:8-14; Dkt. 120-30 at 12:9-17; Dkt. 120-31 at
35:12-37:22.

RESPONSE:  Plaintiff disputes this proposed Finding of Fact as described by Defendants; only

Kucharski theorized where they key came from.  The materials cited by Defendants mention

locating the key but do not speculate on where the key came from.   The term "wrestled" was not

used in the cited passages

21.    Colborn's former counsel of record, Michael Griesbach, would later write in a
January 2016 email that while he was "convinced [Avery] is guilty . . . I'm nowhere near as
certain that the cops did not plant evidence to bolster their case." Walker Decl. Ex. 4
(Griesbach0026044).

RESPONSE:  Plaintiff objects to this proposed Finding of Fact as relying on

hearsay, as an improper attempt to rely upon lay opinion evidence, and as relying on

material that is irrelevant as Mr. Griesbach was not Mr. Colborn's counsel when he made

the statements in question. Dkt #73  at ¶7.  Subject to these objections, Mr. Griesbach

later changed his mind regarding the statements that he made. Decl. of Michael

Griesbach ¶¶3-10.

22.    In another email from January 2016, Griesbach wrote, "Dean as much as admitted that he knows his guy did it . . . which is not to say that the cops did not plant evidence to make their case." Walker Decl. Ex. 5 (Griesbach0015978).

RESPONSE:  Plaintiff objects to this proposed Finding of Fact as relying on

hearsay, as an improper attempt to rely upon lay opinion evidence, and as relying on

material that is irrelevant as Mr. Griesbach was not Mr. Colborn's counsel when he made

the statements in question. Dkt. 73 at ¶7.  Subject to these objections, Mr. Griesbach later

changed his mind regarding the statements that he made. Declaration of Michael

Griesbach ¶¶ 3-10.

23.    After the jury returned its guilty verdict, Colborn issued a statement that was featured on the local nightly news, in which he said, "I hope and pray that this verdict helps put to rest any suspicion or loss of confidence that this community may have felt towards our department, because I assure everyone that this agency has some of the finest law enforcement officers in the country in its employ." Ep. 8 at 33:58-34:19.

RESPONSE:  Plaintiff responds that this is what is shown in MAM but deny as

Plaintiff does not have the actual statement or raw news feed to know if what they

portrayed is accurate.   At his deposition in this case, Colborn testified that Judge Willis

permitted Avery and his defense team to "point [the] finger at deputies" and attempt to

prove Avery was "framed." Walker Decl. Ex. 2 (Colborn Tr.) at 31:19-33:15

24.    At his deposition in this case, Colborn testified that Judge Willis permitted Avery and his defense team to "point [the] finger at deputies" and attempt to prove Avery was "framed." Walker Decl. Ex. 2 (Colborn Tr.) at 31:19-33:15.

RESPONSE:  Plaintiff objects to this proposed Finding of Fact as relying on

testimony for which proper foundation was not laid, as noted by objection at Mr.

Colborn's deposition, DKT 279-2 Walker Decl., Ex. 2 at 31:19-33:15; and as relying on

improper lay opinion testimony; and testimony that is not relevant because it does not

tend to make a fact in evidence more or less likely because the Avery criminal trial

transcripts, which are in the record, reveal that Avery and his defense team disavowed any attempt to "prove" any facts; instead, they argued that if jurors believed that officers could have framed Avery, then there was reasonable doubt as to his guilt and a "not guilty" verdict should be returned. Barker Decl., Ex.17 transcript p. 18, Barker Decl., Ex.18 transcript p. 46 – 48.

Subject to the objections, Mr. Colborn further disputes the proposed Finding of Fact as an inaccurate summary of the testimony cited. In deposition, Mr. Colborn was asked if he agreed with the newspaper articles (the apparent source of the quoted statements in the proposed finding). Upon questioning merely agreed that his understating was consistent with the articles and that and that he did not dispute the headline.

## III.    MAM'S PORTRAYAL OF EVENTS

25.    MaM, a ten-part documentary series, chronicles the story of Avery's experiences in the criminal justice system through the words and actions of its participants, including through footage of actual events such as Avery's murder trial and related press conferences, interviews of those with first-hand knowledge, trial and deposition transcripts and exhibits, other documents and photos, and third-party news coverage. *See generally* Eps. 1-10.

RESPONSE:  Plaintiff  asserts the MAM objection described in his response to Proposed Fact No. 1 as to the reference to what episodes of MAM allegedly included. Subject to his objection, Plaintiff asserts that the description of MAM is inadequate and fails to reflect the actual content of the series, which is more accurately summarized in the Addendum hereto. In addition, MAM did not show footage of "actual events" but rather footage taken at actual events which was then extensively edited by Defendants, as acknowledged by Moira Demos at her deposition. Barker Decl., Ex. 11 at p. 180-207; Ex. 19.

26.     Colborn testified at his deposition that MaM presented "Avery's evidence," not "something [Defendants] made up out of whole cloth." Walker Decl. Ex. 2 (Colborn Tr.) at 228:18-21.

   RESPONSE:  Plaintiff objects to the proposed Finding of Fact as relying on

improper lay opinion testimony; and testimony that is not relevant because it does not

tend to make a fact in evidence more or less likely because the Avery criminal trial

transcripts, which are in the record, reveal that Avery and his defense team disavowed

any attempt to "prove" any facts; instead, they argued that if jurors believed that officers

could have framed Avery, then there was reasonable doubt as to his guilt and a "not

guilty" verdict should be returned. Barker Decl., Ex.17 transcript p. 18, Barker Decl.,

Ex.18 transcript p. 46 – 48. Subject to the objections, Mr. Colborn further disputes the

proposed Finding of Fact as an inaccurate summary of the testimony cited.  In deposition,

Mr. Colborn was questioned about "instances" in MaM, not the entirety of the series.

27.     Prior to filing suit, he also acknowledged: "The claims by the Netflix documentary mirror those claimed by the defense during the trial." Walker Decl. Ex. 6 (Manitowoc-000158).

   RESPONSE:  Plaintiff objects to the proposed Finding of Fact as relying upon

improper lay opinion testimony; and testimony that is not relevant because it does not

tend to make a fact in evidence more or less likely because the Avery criminal trial

transcripts, which are in the record, reveal that Avery and his defense team disavowed

any attempt to "prove" any facts; instead, they argued that if jurors believed that officers

could have framed Avery, then there was reasonable doubt as to his guilt and a "not

guilty" verdict should be returned. Barker Decl., Ex.17 transcript p. 18, Barker Decl.,

Ex.18 transcript p. 46 – 48.  In contrast, in MAM, the following changes are made and

materials included that are not in the Avery trial, including edits to Plaintiff's testimony,

see Barker Decl., Ex. 11 at p. 180-207; Ex. 19.  and numerous out-of-court statements,

see Addendum hereto. Plaintiff further responds that Plaintiff wrote an email message on January 12, 2016 that contains the quote above but Plaintiff's summary in 2016, at a time when Plaintiff had not watched MAM, as Netflix acknowledges, is contradicted by an examination of the actual content of MAM. Mr. Colborn later discovered that there was more portrayed in MAM than he realized in 2016. Andrew Colborn Decl. ¶26.

28.     Colborn's friend, confidante, and advocate, Brenda Schuler, wrote in an email that "[t]here is nothing new in Making a Murderer," Walker Decl. Ex.7 (Manitowoc-000063), a statement with which Colborn agreed at his deposition, *see id.* Ex. 2 (Colborn Tr.) at 44:10-45:18.

RESPONSE:  Plaintiff objects to the proposed Finding of Fact as consisting of hearsay as to the statement of Ms. Schuler, and as relying on improper lay opinion, and which does not tend to make any fact in evidence more likely than not and is therefore irrelevant.  With respect to the testimony by Mr. Colborn, Plaintiff again objects that Defendants are attempting to proffer it as improper lay opinion testimony; and because it is testimony that is not relevant because it does not tend to make a fact in evidence more or less likely because the Avery criminal trial transcripts, which are in the record, reveal that Avery and his defense team disavowed any attempt to "prove" any facts; instead, they argued that if jurors believed that officers could have framed Avery, then there was reasonable doubt as to his guilt and a "not guilty" verdict should be returned. Barker Decl., Ex.17 transcript p. 18, Barker Decl., Ex.18 transcript p. 46 – 48.  In contrast, MAM includes materials included that are not in the Avery trial, including edits to Plaintiff's testimony, see Barker Decl., Ex. 11 at p. 180-207; Ex. 19, and numerous out-of-court statements, see Addendum hereto.

29.     In pre-suit correspondence, Colborn also wrote that MaM "maintain[s] and keep[s] alive [Avery's] lies" about him. *See* Walker Decl. Ex. 2 (Colborn Tr.) at 163:11-23 (referencing *id.* Ex. 8 (Manitowoc-000270)).

RESPONSE:   Plaintiff objects to this proposed Finding of Fact as relying upon improper lay opinion testimony; and because the testimony that is not relevant because it does not tend to make a fact in evidence more or less likely because the Avery criminal trial transcripts, which are in the record, reveal that Avery and his defense team disavowed any attempt to "prove" any facts; instead, they argued that if jurors believed that officers could have framed Avery, then there was reasonable doubt as to his guilt and a "not guilty" verdict should be returned. Barker Decl., Ex.17 transcript p. 18, Barker Decl., Ex.18 transcript p. 46 – 48.  In contrast, in MAM, as explained above, numerous materials that were not presented by Avery or his lawyers at the trial were included, and Avery himself, who did not testify at his trial, (Barker Decl. Ex. 8) makes numerous direct accusations against Plaintiff in MAM that were not made at his trial. See Addendum (summarizing MAM content).

Subject to his objections, Plaintiff disputes the substance of the proposed Finding of Fact as the  quoted material states that "The defense continues, in part thru Netflix, to maintain and keep alive these lies to this day."

30.     At her deposition in this case, Laura Ricciardi testified that Steven Avery was the "main character or a principal subject" of MaM. Walker Decl. Ex. 9 (Ricciardi Tr.) at 49:9-12.

RESPONSE:  Plaintiff does not dispute that Ms. Ricciardi so testified. Ricciardi testified that MaM's filmmakers documented Avery's frame-up theory but did not "adopt it," and overall "did not take sides." Walker Decl. Ex. 9 (Ricciardi Tr.) 47:3-10; 48:19-24.

31.     Ricciardi testified that MaM's filmmakers documented Avery's frame-up theory but did not "adopt it", and overall "did not take sides."  Walker Decl. Ex. 9 (Ricciardi Tr.)  47:3-10; 48:19-24.

RESPONSE:  Plaintiff objects to the proposed Finding of Fact as self-serving statements by Defendants do not negate evidence to the contrary. Further, while Ms.

Ricciardi so testified, her testimony is inconsistent with MAM itself, which includes

numerous elements that a jury may determine "adopted" a "frame-up theory" and "took

sides." See Addendum (summarizing content of episodes).

32.     Episode 1 shows Avery's criminal history as a troubled young man, including documenting felony convictions for burglary, animal cruelty for burning the family cat to death, and a January 1985 confrontation where Avery ran his cousin, Sandra Morris, off the road and threatened her with a gun. Ep. 1 at 9:30-10:36, 12:00-16:03.

RESPONSE:  Plaintiff does not dispute that the above incidents are referenced in

MaM but disputes that they are mentioned with completeness or accuracy and disputes

that they are shown as felonies.    The animal abuse incident is portrayed, using Steve

Avery's voiceovers, as essentially an accident and hanging out with the wrong friends,

Dkt #120-1 at 10:00 – 10:29.  However Judge Willis' Decision and Order describes the

cat incident as the "defendant built a bonfire in his back yard, soaked a cat in gasoline

and oil, and threw the cat in the fire.  After the cat ran out of the fire, the defendant

poured more gasoline on it before the animal died." DKT 290-14, pp. 10-13.  Avery has a

voiceover and describes the burglaries occurring when they were looking for something

to do and decided to rob a tavern.  The scenes flashing $14.00 in quarters and two six

packs of Pabst beer and two cheese sandwiches, implying this what was taken Dkt #120-

1 at 9:30 - 10:00.  The incident with Sandy Morris is portrayed as brought on by her

alleged "spreading rumors" of Avery, leading him befuddled as to how else to handle it,

Dkt #120-1 at 12:31 – 14:00.

33.     The episode then depicts Avery's arrest and conviction for the 1985 rape he did not commit. *Id.* at 27:53-28:13.

RESPONSE:  Plaintiff does not dispute that Episode 1 includes discussion of

Avery's arrest and conviction for the 1985 rape, though this is not what is shown at the

citation provided. However, Plaintiff again disputes that the proposed Findings of Fact relating to Episode 1's content are fair summaries because they cherry-pick certain portions and fail to describe the episode in its entirety. Plaintiff again refers to the attached episode summaries, including, but not limited to, the summary of Episode 1.

34.     In an interview appearing in MaM Episode 1, Judge Fred Hazlewood, who presided over the 1985 rape trial, said that "violence was a real reoccurring regular part of [Avery's] life, [and] that women seemed to be the victims." *Id.* at 27:53- 28:13.

RESPONSE:  Plaintiff does not dispute that Judge Hazelwood is depicted making the quoted statement in MAM Episode 1, but Plaintiff reiterates the MAM objection set forth in his response to Netflix's proposed Finding of Fact No. 1, as the statement may not be what Judge Hazelwood actually said during any interview with MAM's creators. In addition, Plaintiff disputes that the proposed Finding of Fact provides an accurate depiction of the content of Episode 1 taken in context  Plaintiff again refers to the Episode summaries attached as an Addendum hereto, including the summary for Episode 1.

35.     Episode 2 documents Avery's civil rights lawsuit against Manitowoc County, including portions of Colborn's deposition about the jail call he received while working as a jailer in the 1990s. *See* Ep. 2 at 18:27-19:59.

RESPONSE:  Plaintiff disputes that Episode 2 "documents" Avery's civil rights lawsuit, as it instead includes information that is not in the record of the civil rights case. Addendum to these responses (Episode Summary). Plaintiff does not dispute that portions of Colborn's deposition from the civil rights lawsuit is shown in Episode 2 at 18:27 – 19:59 but deny that he is portrayed accurately or completely. Similarly, MAM does not fairly represent Mr. Colborn in excerpts from video depositions taken during Avery's civil trial. The full video deposition of Mr. Colborn's testimony in Avery's civil case

demonstrates that Mr. Colborn appeared confident and relaxed and made regular eye contact with the examining attorney.  Dkt # 129, Burnett Decl., Ex. 1, In contrast, in the clips of Mr. Colborn's testimony at Mr. Colborn's civil suit deposition that appear in MAM, his gaze is frequently not matched to the examining attorneys. Moreover, the deposition footage was not displayed in full screen in MAM, so that Mr. Colborn appears to be looking down in answering questions, but the full-screen video shows that he was looking at an exhibit. Dkt # 129, Burnett Decl., Ex. 1 at 4:10 PM, 4:13-4:17 PM. The document cannot be seen on MAM. *See* Dkt# 120-2 at 18:30-19:05.

 In addition,  during the clip cited in the proposed Finding of Fact, Attorney Steven Glynn is providing commentary that was not part of the record of the civil rights case., as he is referring to it retroactively. Dkt #120-2 at 17:20 – 18:25, 19:05 – 21:45, 29:40 -30:25.

36.     The episode also shows an interview with one of Avery's lawyers in the civil case, Steven Glynn, who says:

> "And the day [Avery] got out, or the day after, that's when Colborn decides to contact his superior officer named Lenk. And Lenk tells him to write a report and they then go have contact with the sheriff. Now let's just stop and think about that for a minute. Why does that happen? Why does it happen then when it didn't happen eight years earlier? I mean, I think I know the answer. I mean, I think the answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk, as his superior realized it, and the sheriff realized it. So Lenk tells Colborn to write a report, the sheriff tells Lenk, 'Get me the report.' The sheriff puts the report in a safe. That's how much he cares about documenting this thing."

*Id.* at 20:33-21:24.

> RESPONSE:  Plaintiff does not dispute that this quote is present in MAM, but disputes that individual portions of episodes can be considered out of context of the entire episodes, and refers to the Episode Summary attached hereto as an addendum.

37. The episode ends with Halbach's disappearance, Avery's arrest, and law enforcement searches of the Avery compound. *Id.* at 31:16-56:34.

RESPONSE: Plaintiff does not deny that the foregoing subjects are discussed in MAM at Episode 2, but Plaintiff disputes that the proposed Finding of Fact fairly represents the import, content or tone of the episode and refers to the Episode Summary attached hereto as an addendum, including the summary for Episode 2. The episode ending is not 25 minutes long.

38. Episode 3 depicts the split in opinion in Manitowoc, including with interviews of some who believed Avery's claims he was framed, *id.* at 14:16-15:36, and others expressing belief of Avery's guilt—including Avery's own brother, Chuck, *id.* at 41:55-42:03.

RESPONSE: Plaintiff objects to the proposed Finding of Fact to the extent it attempts to represent as admissible facts the statements allegedly shown in MAM; again, Plaintiff asserts the MAM objection as the statements shown almost certainly were edited. In addition, the statements are hearsay to the extent Netflix attempts to offer them for the truth of the matters asserted. For the limited purpose of showing what is contained in MAM, Plaintiff disputes that the summary provided is accurate. Defendants were not able to identify the individuals speaking or provide any information about them at their depositions. Dkt # 286-6 and 286-3. Therefore, they cannot establish that the individuals who are represented as claiming that Avery was framed were from Manitowoc or that the bar was in Manitowoc where the individuals were playing pool. Plaintiff again refers to the addendum to the proposed Findings of Fact as a more accurate summary of MAM in context, including the summary of Episode 3.

39. At his deposition in this case, Colborn acknowledged that local residents had divergent views at the time of Avery's arrest and trial, stating "I'll agree that there were some in the community that thought he was innocent; some thought he had done this again" and "Avery had his supporters . . . . Law enforcement probably had a few supporters as well." *See* Walker Decl. Ex. 2 (Colborn Tr.) at 77:8-14, 83:3-7.

RESPONSE:  Plaintiff does not dispute that Mr. Colborn so testified.

40.     The episode also includes the views of law enforcement, such as footage from an interview with Manitowoc County Undersheriff Robert Hermann, who says that "some of the evidence—the DNA evidence at the scene—it's impossible for us to have that type of evidence, you know, to plant. It's just—it's not realistic." Ep. 3 at 22:50-23:19.

RESPONSE:  Plaintiff asserts the MAM objection as it is impossible to know

whether and how much editing occurred to Undersheriff Herma's statement. Plaintiff also

objects that the statement is hearsay to the extent Netflix purports to offer it for the truth

of the matters asserted. In addition, one statement does not represent "the views of law

enforcement."  Further, Plaintiff disputes that MAM represented the "views of law

enforcement" as legitimate. To the contrary, Netflix and Chrome sought to undermine

law enforcement views, such as by using theme music to identify them as the "baddies"

and the "villains." Barker Decl., Ex. 1, NFXCOL0002009 and 2133, Barker Decl. Ex. 2,

MANHARDT00000793. In addition, MAM sought to portray the views of law

enforcement as a precursor to having their stories retold by their "more reliable"

narrators, *i.e.,* Avery and his family, and to "have the audience kicking themselves" for

having believed law enforcement. Barker Decl., Ex. 2, Manhardt 00000149.

41.     The episode ends with footage of authorities' announcement that Brendan Dassey, Avery's nephew, had confessed to helping kill Halbach and footage of the confession itself. *Id.* at 23:39-1:00:52.

RESPONSE:  Plaintiff asserts the MAM objection as it is likely that the alleged

"footage" was edited, as described in the response to proposed Finding of Fact 1. Plaintiff

further refers to the Episode Summary attached as an addendum as a more appropriate

summary of MAM in context, including the summary for Episode 3. Plaintiff further

disputes that the episode ending is  over 37 minutes long but does not dispute that the

episode spends time featuring Brendan Dassey and provides what is represented to be footage of a portion of his confession.

42.     While Episode 4 focuses largely on pretrial events in the case against Dassey, the episode closes with footage of Avery's counsel Jerome Buting, prosecutor Norm Gahn, and Investigator Weigert inspecting the vial of Avery's blood in the court clerk's office which Avery's attorneys speculated was the source of Avery's blood in Halbach's SUV, and then footage of a phone call from Buting to Strang in which Buting claims that the hole in the rubber stopper indicated the vial had been tampered with. Ep. 4 at 1:01:45-1:04:20.

      RESPONSE:  Plaintiff asserts the MAM Objection as it is not possible to know how much editing occurred to the alleged "footage" shown. Plaintiff further refers to the more complete summary attached as an addendum, including the summary of Episode 4. Plaintiff does not dispute that the episode ends with the blood vial as a "cliffhanger" but disputes that the episode shows who was present at the time. Although text on screen states that Wiegert and Gahn are present, neither is shown.

43.     Episode 5 starts a four-episode arc depicting Avery's murder trial. *See generally* Eps. 5-8.

      RESPONSE:  .  Plaintiff asserts the MAM Objection as the trial sequences were heavily edited, as shown by the edits to Plaintiff's own testimony. Plaintiff further disputes the summary referenced in the proposed Finding of Fact and refers to the more complete summary attached as an addendum, including the summary of Episodes 5-8. Plaintiff further disputes that Episodes 5-8 accurately "depict" the Avery murder trial and nothing else, as the episodes also contain edited testimony of Plaintiff, as well as numerous other additions that are not part of the trial, including Avery's and others' out-of-court statements. See Addendum.

44.     Episode 5 includes footage of prosecutor Norm Gahn defending Manitowoc County law enforcement by saying, "when officers are accused of what they're being accused of, they deserve to have their reputations protected. They're good solid decent family men. . . . Again, I just cannot emphasize too much, give us the chance to meet this planting frame-up defense." MaM shows the court granted that request. Ep. 5 at 1:09-2:18.

RESPONSE:  Plaintiff asserts the MAM objection.  Plaintiff also refers to his attached episode summary, including the summary for Episode 5, as the statement referenced must be considered in context. Plaintiff also disputes that MAM's aim was to fairly represent Gahn's point of view; to the contrary, Netflix and Chrome sought to undermine law enforcement views, such as by using theme music to identify them as the "baddies" and the "villains." Barker Decl., Ex. 1, NFXCOL0002009 and 2133, Barker Decl. Ex. 2, MANHARDT00000793. In addition, MAM sought to portray the views of law enforcement just to have their stories retold by MAM's preferred narrators and to "have the audience kicking themselves" for having believed them. Barker Decl., Ex. 2, Manhardt00000149.

45.     It also includes footage of law enforcement interrogating Avery, during which Avery claims someone named "Tammy" told him that "a cop" put Halbach's vehicle on the Avery Salvage Yard property. *Id.* at 52:12-53:20.

RESPONSE:  Plaintiff asserts the MAM objection described above in response to proposed Finding of Fact #1 to the extent that Netflix is attempting to claim that the "footage" of the apparent interrogation was allegedly genuine and unedited as shown in MAM.  Plaintiff also objects to the statements made in the purported "footage" as containing at least two levels of hearsay (Avery's statements and the supposed statements by "Tammy" to Avery). Plaintiff does not dispute that MAM includes a segment that appears to show law enforcement interrogating Avery, who appears to state that someone told  a person named "Tammy" that "a cop" put Teresa's vehicle on his property.

46.     The final three and one-half minutes of the episode show excerpts of Colborn's testimony regarding the call he made to a county dispatcher before Halbach's SUV was found. *Id.* at 53:20-56:55.

RESPONSE: Plaintiff disputes the proposed Finding of Fact as the last three and

a half minutes of Episode 5 of MAM do not show "excerpts" of Plaintiff's testimony, but

rather, amalgamated and reformulated versions of his testimony that are spliced together.

See Barker Decl., Ex. 10 pp. 180-207 and Barker Decl. Ex. 19.

47.    MaM's presentation of Colborn's testimony about the dispatch call begins by
showing Avery defense lawyer Dean Strang eliciting testimony from Colborn that patrol officers
often call a dispatcher to check the license plate number "of a car they have stopped, or a car that
looks out of place for some reason," to get information about the person to whom the vehicle is
registered. Ep. 5 at 53:17-53:50.

RESPONSE: Plaintiff does not dispute that MAM's edited version of Mr.

Colborn's trial testimony includes an apparent exchange in which Avery defense lawyer

Dean Strang elicits testimony from Mr. Colborn as described. Plaintiff disputes that his

testimony as represented in MAM is an accurate representation of the testimony at the

Avery trial  See Barker Decl., Ex. 10  pp. 180-207 (Demos testimony confirming edits

made to trial testimony as shown in Exhibit 62); Ex. 19.

48.    Also in Episode 5, MaM then shows Strang playing a tape of the call, in which
Colborn asks a dispatcher to "run" a license plate SWH-582, which the dispatcher says "shows
that she's a missing person, and it lists to Teresa Halbach." *Id.* at 54:03-54:20.

RESPONSE: Plaintiff does not dispute that MAM's edited version of Mr.

Colborn's trial testimony includes an apparent exchange in which Avery defense lawyer

Dean Strang appears to play a tape of a call in which Mr. Colborn asks a dispatcher to

"run" a license plate SWH 582, and the dispatcher is heard apparently responding, in

part, "shows that she's a missing person, and it lists to Teresa Halbach." Plaintiff disputes

that the call as represented in MAM is an accurate representation of the portions of the

call that were played at the Avery criminal trial. *See* Barker Decl., Ex. 10 pp. 180-207

(Demos testimony confirming edits made to trial testimony as shown in Exhibit 62); Ex.

19 pp. 180-82.

49.     Colborn is heard asking the dispatcher, "'99 Toyota?" and she replies, "Yup." *Id.* at 54:19-54:23.

RESPONSE:  Plaintiff does not dispute that the above exchange is included in

Episode 5 of MAM.

50.     Amid further cross-examination, MaM shows Strang asking Colborn, "Were you looking at these plates when you called them in?" and Colborn responding, "No, sir." *Id.* at 55:26-55:30; *see also* Dkt. 119-1 at 5.

RESPONSE:   Plaintiff does not dispute that MAM's edited version of Mr.

Colborn's trial testimony includes an apparent exchange in which Avery defense lawyer

Dean Strang elicits testimony from Mr. Colborn as described. Plaintiff disputes that his

testimony as represented in MAM is an accurate representation of the testimony at the

Avery trial. Following his response at trial, Strang immediately moves on to the next

question. Barker Decl., Ex. 3.  In MAM, after Mr. Colborn's response, there is a pause

during which Mr. Strang appears to glare at Mr. Colborn, and then Mr. Colborn is shown

appearing to shift uncomfortably in his chair, lean back, and crack his knuckles. Barker

Decl. Ex. 3.

51.     After that denial, MaM shows Colborn testifying he believed the call happened on November 3, 2005, "[p]robably after I received a phone call from [Calumet County] Investigator [Mark] Weigert letting me know that there was a missing person." Ep. 5 at 55:37-55:52.

RESPONSE:   Plaintiff does not dispute that MAM shows what is described, but

disputes that his testimony is accurately represented as it is edited. Barker Decl., Ex. 19.

52.     Strang asks Colborn whether Weigert had provided the license plate number, and Colborn testifies that he does not remember exactly, but "[h]e had to have given it to me, because I wouldn't have had the number any other way." *Id.* at 55:53-56:09; *see also* Dkt. 119-1 at 6-7.

RESPONSE:  Plaintiff disputes the proposed Finding of Fact as the referenced

portions of Episode 5 of MAM do not show Plaintiff's testimony, but rather,

amalgamated and reformulated versions of his testimony that are spliced together.

See Barker Decl., Ex. 10 pp. 180-207 and Ex. 19 at p. 186.

53.     Then, Strang asks whether someone listening to the call could reasonably conclude that Colborn was looking at the SUV when he made the dispatch call, followed by Colborn's affirmative answer to another question asking whether the call sounded like hundreds of other calls he had made before. Ep. 5 at 56:10-56:26; *see also* Dkt. 119-1 at 7-8.

        RESPONSE:  Plaintiff disputes the proposed Finding of Fact as the referenced

        portions of Episode 5 of MAM do not show Plaintiff's testimony, but rather,

        amalgamated and reformulated versions of his testimony that are spliced together.

        See Barker Decl., Ex. 10 pp. 180-207 and Ex. 19 at pp. 186-187.

54.     MaM also shows the very next exchange, in which Strang asks, "But there's no way you should have been looking at Teresa Halbach's license plate on November 3, on the back end of a 1999 Toyota?" followed by Colborn's answer, "I shouldn't have been and I was not looking at the license plate." Ep. 5 at 56:26-56:42; *see also* Dkt. 119-1 at 8.

        RESPONSE:  Plaintiff disputes the proposed Finding of Fact as the referenced

        portions of Episode 5 of MAM do not show Plaintiff's testimony, but rather,

        amalgamated and reformulated versions of his testimony that are spliced together as

        follows:

                See Barker Decl., Ex. 10 at pp. 180-207  and Ex. 19 p. 187. Taken together

        with the edit made in the preceding proposed Finding of Fact – which has Mr. Colborn

        purportedly admitting that his call sounded like he was looking at the license plate when

        he made it – the passage included in this proposed Finding of Fact now has Mr. Colborn

        appearing to contradict his own testimony of a few moments prior.

```
18    Q.   (By Attorney Strang)~ There's no way you should
19         have been, is there?
20    A.   I shouldn't have been and I was not looking at
21         the license plate.
22    Q.   Because you are aware now that the first time
23         that Toyota was reported found was two days later
24         on November 5?
25    A.   Yes, sir.

                              187
```

55.     Colborn acknowledged at his deposition that MaM included not one, but two of his explicit denials, while he was testifying in uniform and under oath, that he was looking at Halbach's vehicle at the time of the call. Walker Decl. Ex. 2 (Colborn Tr.) at 344:23-345:1.

RESPONSE:  Plaintiff does not dispute that some denials were included in MAM, but the denials were made less apparently credible by the edits made by MAM to his testimony and by splicing in apparent physical reactions that made him look more nervous. Netflix representatives knew that the denial at the conclusion of Episode 5 would not be portrayed in a manner that would be construed by viewers as a truthful statement, as they referenced the ending as the "Colborn license plates bomb" during production, and they indicated that because of it, "setting Colborn up as the potential cop to plant the car works really well now." Barker Decl., Ex. 1, NFXCOL0001990 and 2150.

56.     Episode 6 shows more testimony from Avery's trial, as well as an out-of-court statement by Buting responding to the prosecution's assertion that framing Avery would require a conspiracy among a large group of people to succeed, musing rather that "two people could've done this easily enough if they had the motive to do it. Maybe one, even. . . . [W]ho better than a police officer would know how to frame somebody?" Ep. 6 at 56:26-57:08.

RESPONSE:  Plaintiff asserts the MAM Objection with respect to alleged testimony shown from Avery's trial in Episode 6. Subject to his objection, Plaintiff does not dispute that Episode 6 includes an out-of-court statement by Buting, but disputes that the proposed Finding of Fact accurately and fully represents the statement.

57.     Episode 7 includes excerpts of Colborn's testimony regarding the jail call, which Colborn criticized in his opposition to Netflix's Motion to Dismiss the SAC for leaving out the portion of his testimony in which he "corrected" his reference to transferring the call to a detective and said he transferred the call to the detective division of the sheriff's office. Ep. 7 at 17:46-18:30; SAC Ex. B at 4; Dkt. 79 at 6-8.

RESPONSE: Plaintiff disputes that Episode 7 includes "excerpts" of Mr.

Colborn's testimony; rather, the Episode includes spliced and reformulated version of his

testimony.

.Plaintiff does not dispute that Mr. Colborn made criticism in his opposition to Netflix's

Motion to Dismiss the SAC as stated above but dispute that his criticism is portrayed in

this statement in a fair manner or in context. See Dkt. 79 at 6 – 8 and Dkt. 105 at pp. 6-8

and p. 47.

58.     At his deposition in this case, Colborn criticized MaM for leaving out testimony that he answered the phone, "Manitowoc County Jail, Officer Colborn." Walker Decl. Ex. 2 (Colborn Tr.) at 355:23-357:8.

RESPONSE: Plaintiff does not dispute that Mr. Colborn criticized MAM at his

deposition for leaving out testimony that he answered the phone, "Manitowoc County

Jail, Officer Colborn," but he disputes that the proposed Finding of Fact represents Mr.

Colborn's complete answer to the question. See Dkt. 279-2 Depo. p. 356.

59.     However, the episode includes Colborn's testimony that he received that call "when I was working [in] my capacity as a corrections officer at the Manitowoc County Jail." Ep. 7 at 17:46-18:30; SAC Ex. B. at 4.

RESPONSE: Plaintiff does not dispute this proposed Finding of Fact, but

disputes that Episode 7 fairly represents Mr. Colborn's testimony at the Avery trial. The

edits made were confirmed by Ms. Demos. Barker Decl., Ex. 19. In Episode 2, when the

jail call was first discussed by Steven Glynn, all references to Mr. Colborn's status as a

jail employee at the time of the call were omitted. Dkt #120-2 17:20 – 18:25, 19:05 – 21:

*see also* Barker Decl., Ex. 2 Mary Manhardt #509.

60.     Colborn also testified that "my reason that I didn't write a report has been eliminated from my testimony. . . . There would have been no need to write a report every time you receive a telephone call and transfer it." Walker Decl. Ex. 2 (Colborn Tr.) at 362:22-363:9.

RESPONSE:  Plaintiff disputes the testimony as parsed above as an incomplete

summary of the deposition testimony that is taken out of context.

See Barker Decl. Ex. 14, Depo. Pp. 360-362 see Colborn Trial testimony at Dkt.

290-19, transcript pp. 212-213.

61.     But the episode includes Colborn's statement that "[i]f I wrote a report about every call that came in, I would spend my whole day writing reports." SAC Ex. B at 9; *see also* Ep. 7 at 23:54-24:02.

RESPONSE:  Plaintiff does not dispute that the quoted statement is included in

MAM, but it is contained in an edited exchange that eliminates Mr. Colborn's

explanation that downplays the transfer of the call as it is more unreasonable to expect

that a report would be written about a transferred call than one that was not transferred.

The more complete exchange at trial is at Dkt. 290-19, Transcript pp. 199 -200, 212-213.

62.     Episode 7 also includes Colborn's testimony that he did not know if the call had anything to do with Avery. SAC Ex. B at 5; Ep. 7 at 18:36-18:44.

RESPONSE:  Plaintiff does not dispute that in Episode 7, he is shown testifying

that he did not know if the call had anything to do with Avery. However, he disputes that

the context is accurately represented in MAM as the question and answer in MaM at the

above clip were spliced together and are not accurate with the trial testimony.  In MaM it

shows prosecutor Ken Kratz's question spliced together and Mr. Colborn answering "No

Sir" to the question when he actually stated "No, I don't".  See Dkt. 105:52 and Colborn

Trial Testimony at Dkt. 290-19, transcript p. 213 as shown below:

```
 9    Q.   Let me ask you this, as you sit here today,
10         Sergeant Colborn, do you even know whether that
11         call was about Mr. Steven Avery?
12    A.   No, I don't.
```

63.     The episode also includes Colborn's denial that he planted evidence to frame Avery. Specifically, Kratz asked Colborn, "Have you ever planted any evidence against Mr. Avery?" SAC Ex. B at 5. And MaM shows Colborn responding, "I have to say that this is the first time my integrity has ever been questioned, and no, I have not." Ep. 7 at 19:09.

RESPONSE:  Plaintiff does not dispute that MAM shows what appears to be the

exchange as characterized in the proposed Finding of Fact, but Plaintiff disputes that it is

an accurate representation of Mr. Colborn's trial testimony.  The court testimony is

shown below – see Colborn Testimony at Dkt. 290-19, transcript pp. 140-141:

```
24    Q.   Have you ever planted any evidence against
25         Mr. Avery?

                              140
```

```
 1    A.   That's ridiculous, no, I have not.
 2    Q.   Have you ever planted any evidence against
 3         anybody in the course of your law enforcement
 4         career?
 5    A.   I have to say that this is the first time my
 6         integrity has ever been questioned and, no, I
 7         have not.
```

64.     Colborn objects that this scene omits his previous response, "that's ridiculous, no I have not," and at his deposition testified that it was because the answer included in MaM "doesn't come across very forceful or convincing," though he admitted that MaM did convey that he expressly denied planting evidence against Avery. Walker Decl. Ex. 2 (Colborn Tr.) 359:2-14; 360:14-16.

<u>RESPONSE</u>:   Plaintiff does not dispute that he objects that this scene omits his

actual  response, but  the testimony as characterized above that "MaM did convey that he

expressly denied planting evidence against Avery".  Dkt. 290-19 pp. 140-141), Barker

Decl. Ex. 14, Colborn depo. pp. 358-359.

| | |
|---|---|
| 14 | Q   So would you agree that this episode got |
| 15 | across the most crucial points of this portion of |
| 16 | your direct testimony by Mr. Kratz? |
| 17 | MR. BURNETT:  Objection, form. |
| 18 | Go ahead. |
| 19 | A   No, I don't believe it did. |
| 20 | Q   Why not? |
| 21 | A   There were too many things that -- too many |
| 22 | forceful points that were eliminated to clearly get |
| 23 | it across.  I come across as -- you know, looking at |
| 24 | this -- if I was looking at this and I didn't know it |
| 25 | was me, I would think, Boy, this officer's pretty |

358

| | |
|---|---|
| 24 | Q.   Have you ever planted any evidence against |
| 25 | Mr. Avery? |

140

| | |
|---|---|
| 1 | A.   That's ridiculous, no, I have not. |
| 2 | Q.   Have you ever planted any evidence against |
| 3 | anybody in the course of your law enforcement |
| 4 | career? |
| 5 | A.   I have to say that this is the first time my |
| 6 | integrity has ever been questioned and, no, I |
| 7 | have not. |

65.     Colborn also complains of the scene in Episode 7 that appears at 24:19-24:30, in which Colborn says that a brief shot of him leaning back in the witness chair and cracking his knuckles "make[s] me look nervous and apprehensive and that I've been caught in some sort of lie," and asserted that footage was recorded when the jury was not present. Walker Decl. Ex. 2 (Colborn Tr.) at 496:18-497:6.

RESPONSE:  Plaintiff does not dispute that Mr. Colborn's testimony was in part

as cited above, but Plaintiff disputes that his testimony refers to Episode 7 at 24:19 –

24:30, but rather applies to Episode 5 – see  Dkt. 120-5 at 55:31 – 55:40.

66.     Episode 7 also shows excerpts of testimony regarding the RAV4 key found in Avery's bedroom, including Colborn testifying that the key appeared after he handled the bookcase "rather roughly, twisting it, shaking it, pulling it," and jammed items back into it. Ep. 7 at 16:42-17:30; *see also* Walker Decl. Ex. 2 (Colborn Tr.) at 351:17-25 (admitting this scene conveys the important parts of his testimony, including that he handled the bookcase roughly and didn't touch the key).

RESPONSE:  Plaintiff disputes the proposed Finding of Fact as the referenced

portions of Episode 7 of MAM do not show Plaintiff's testimony, but rather,

amalgamated and reformulated versions of his testimony that are spliced together

*See* Barker Decl., Ex. 10 at pp. 180-207; Ex.19 at p. 186.

Plaintiff does not dispute that at his deposition, Mr. Colborn testified that "Yes, I

will agree that the portions – that a portion of my testimony about how I handled the

bookcase and that I didn't touch the key are on this clip" but disputes Netflix's

characterization that MAM "conveys the important parts of his testimony".

67.     The episode includes excerpts of the testimony of Calumet County Sheriff's Sgt. William Tyson, who testified that he accompanied the Manitowoc County officers on a November 5, 2005 search of the trailer because he had been told that Manitowoc County deputies should not be left alone on the Avery property. Ep. 7 at 4:18-5:58.

RESPONSE:  Plaintiff disputes that the proposed Finding of Fact is an accurate

representation of Sgt. Tyson's testimony. .  Sgt. Tyson did not say he had been told that

the Manitowoc County deputies should not be left alone, but he knew that the Manitowoc

County District attorney had told the officers not to be alone.  *See* Tyson trial testimony

at Dkt. 290-19, transcript pp. 23:17 – 25:4

68.     At trial, defense attorney Jerome Buting asked Tyson whether he ever "had to act like a babysitter, or a watchdog, for the other officers who were conducting a search," to which Tyson responded that he "did not treat this as if [he] was babysitting." Dkt. 119-1 at 21.

RESPONSE:  Plaintiff does not dispute this proposed Finding of Fact.

69.     Buting immediately follow ed up by asking whether, "in any of [his] years as an officer, [he] had to watch the officers who were searching where you were, to make sure that they weren't alone," to which Tyson answered "no." Dkt. 119-1 at 21.

RESPONSE:  Plaintiff does not dispute this proposed Finding of Fact.

70.     Colborn complains that, in MaM, this exchange is condensed to a single question and answer:

Buting: Had you ever in any other search in your entire career had to act like a babysitter, or a watchdog, for the officers who were conducting a search?

Tyson: No.

Ep. 7 at 5:18-5:31.

RESPONSE:  Plaintiff does not dispute  that Mr. Colborn complains that MAM

inserted an incorrect answer to a question between Buting and Tyson and eliminated Mr.

Tyson's response that he did not treat the assignment as if he was babysitting.  The trial

<div style="margin-left:2em">

```
 7   Q.   Had you ever, in any other search in your entire
 8        career, had to act like a babysitter, or a
 9        watchdog, for the officers who were conducting a
10        search?
11   A.   I did not treat this as if I was babysitting.
12   Q.   Had you ever, in any of your years as an officer,
13        had to watch the officers who were searching
14        where you were, to make sure that they weren't
15        alone?
16   A.   No.
17   Q.   This was a first for you, wasn't it?
18   A.   Yes.
```

</div>

transcript is:

*See* Tyson Trial Transcript at Dkt. 290-19, transcript p. 25:7-18.

71.    Episode 7 also shows Colborn's and Lenk's testimony denying planting blood, *id.* at 18:44-19:10, 32:53-33:09, and prosecutors criticizing the defense's "frame-up" theory, *id.* at 44:38-45:34.

RESPONSE:  Plaintiff does not dispute that the cited portions of MAM  include what appears to be testimony of Colborn and Lenk denying planting blood, but he disputes s that MaM accurately depicts trial testimony. See Colborn Trial testimony at Dkt. 290-19, p.140:14 – 141:7 and Lenk Trial testimony at Barker Decl. Exhibit 7, transcript pp.  18:18 – 19:1.  The testimony shown below shows how the questions were combined in MaM with only one answer provided.

```
18   Q    Lieutenant Lenk, did you ever, um, obtain any
19        blood from the clerk's office or did you obtain
20        any blood from any location and plant it anywhere
21        on the Avery salvage property?
22   A    No, sir, absolutely not.
23   Q    Did you ever plant it anywhere in Teresa
24        Halbach's vehicle or anywhere where it could be
25        found as part of this investigation?

                            18
```

```
1    A    No, sir, definitely not.
```

Plaintiff does not dispute that MAM  MaM shows news coverage of  prosecutor Gahn defending law enforcement at the identified passage, but asserts the MAM Objection described in his response to proposed Finding of Fact #1 as Defendants have refused to produce raw footage of the press conference, as explained in the response to proposed Finding of Fact #1.  In addition, the segment was  included in order for MAM to retell prosecutors' versions of events with  rebuttals from Avery, his family, and his attorneys' out-of-court statements. Barker Decl., Ex. 2 Manhardt 493.

72.     It includes Kratz telling reporters, "around these parts if you're going to suggest that a cop is crooked, you're going to suggest that a cop committed crimes, then you better have something other than your elbow was on the table. And in this case, to suggest that these police officers planted evidence with nothing, that is with not with one shred, at least anything that I've seen that approaches evidence, uh, I think is absolutely deplorable." *Id.* at 14:04-14:29.

      <u>RESPONSE</u>:   Plaintiff does not dispute that MAM  MaM shows news coverage

of  prosecutor Kratz appearing to make the identified statements at the identified

passage,, but asserts the MAM Objection described in his response to proposed Finding

of Fact #1 as Defendants have refused to produce raw footage of the press conference, as

explained in the response to proposed Finding of Fact #1.  In addition, the segment was

apparently included in order for MAM to  retell the perspective of law enforcement with

rebuttals from Avery, his family, and his attorneys' out-of-court statements. Barker Decl.,

Ex. 2 Manhardt 493.

73.     The episode also includes local reporter Angenette Levy describing Colborn at a news conference as "a law enforcement officer for thirteen years. He puts on a uniform, a badge and a gun every day and goes to work and tries to do his best," and challenging Strang by asking, "if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place." *Id.* at 24:30-25:47.

      <u>RESPONSE</u>:  Plaintiff does not dispute that MAM shows news coverage of a

reporter (who is unidentified) appearing to make the identified statements at the identified

passage, but asserts the MAM Objection described in his response to proposed Finding of

Fact #1 as Defendants have refused to produce raw footage of the press conference, as

explained in the response to proposed Finding of Fact #1. Plaintiff further disputes that

the excerpt cited in the proposed Finding of Fact is fairly taken in context, as it is used in

MAM as a set-up for Strang's response in which he is shown making an out-of-court

statement in response to the reporter that states that the evidence of the conspiracy in

which Mr. Colborn is alleged by them to have participated is greater than that on which

he has seen federal prosecutors convict defendants in conspiracy cases. Dkt #120-7 24:30

– 25:47.

74.    It also includes Gahn's saying of Manitowoc County law enforcement: "My blood starts to boil when . . . I hear this, that these police officers, these good solid citizens, good decent men are accused of planting this evidence." *Id.* at 34:45-34:58.

RESPONSE: Plaintiff does not dispute that MAM  shows news coverage of

prosecutor Kratz appearing to make the identified statements at the identified passage,

but asserts the MAM Objection described in his response to proposed Finding of Fact #1

as Defendants have refused to produce raw footage of the press conference, as explained

in the response to proposed Finding of Fact #1.  In addition, the segment was apparently

included in order for MAM to retell the perspectives of law enforcement with rebuttals

from Avery, his family, and his attorneys' out-of-court statements. Barker Decl., Ex. 2

Manhardt 493.

75.    Episode 8 includes more than eight minutes of excerpts from both sides' closing arguments, intercutting those arguments (*i.e.*, shifting back and forth between them) to show viewers key assertions from each side. Ep. 8 at 3:40-12:04.

RESPONSE:  Admit that Episode 8 includes excerpts from closing arguments on

both sides, but the Deny that the closing arguments are presented in their entirety as the

testimony is spliced together.  See closing statements at Barker Decl. Ex. 17 and 18.

76.    The episode depicts Buting arguing that evidence could have been planted by one officer working alone—naming Lenk, *id.* at 6:08-6:50, and then Kratz's response to this that "th[e] vial planting defense is absolutely ludicrous," *id.* at 7:22-7:27.

RESPONSE:  Plaintiff does not dispute that the described statements are in MAM

but disputes that the closing arguments are fairly represented in MAM.   The proposed

Finding of Fact also omits numerous elements of Episode 8 that are slanted toward Avery

and his supporters, as described in the Episode Summary in the Addendum.

77.     And it reaches its climax with footage of Judge Willis reading the jury's verdict convicting Avery of murder. *Id.* at 26:02-27:46.

     RESPONSE:  Plaintiff does not dispute  that Judge Willis is shown reading the

verdict at the above timestamp for Episode 8.  but objects to Netflix's characterization of

that as the  "climax" as non-factual and irrelevant.

78.     Episode 8 also includes footage of a local news anchor reading Colborn's post-verdict statement praising the verdict. *Id.* at 33:57-34:16.

     RESPONSE:  Plaintiff does not dispute that Episode 8 includes what appears to

be video of a local news anchor reading Mr. Colborn's statement, but Plaintiff is not in

possession of the raw news footage and Defendants refused to produce it in discovery;

accordingly, Plaintiff asserts the MAM Objection as to any finding about the alleged

accuracy of the footage.

79.     Episode 9 shows footage of Dassey's trial and conviction and from Avery's sentencing, where Judge Willis tells Avery, "you are probably the most dangerous individual ever to set foot in this courtroom." Ep. 9 at 53:00-54:00; *id.* 1:01:59-1:02:03.

     RESPONSE:  Plaintiff does not dispute that the described statement appears in

MAM, but disputes that this proposed Finding of Fact fairly summarizes Episode 9, as it

omits most of the items heavily favoring Avery and his supporters that are described in

the Episode Summary for Episode 9 that is contained in the Addendum hereto.

80.     Episode 10 describes post-verdict developments, such as the fact that Avery and Dassey both lost their first rounds of appeals. *See generally* Ep. 10.

     RESPONSE: Plaintiff does not dispute that the described statement appears in

MAM, but disputes that this proposed Finding of Fact fairly summarizes Episode 10, as it

omits most of the items heavily favoring Avery and his supporters that are described in

the Episode Summary for Episode 10 that is contained in the Addendum hereto.

81.     [This enumerated item intentionally left blank.]

82.     On October 19, 2018, Netflix premiered a second 10-episode season of Making a Murderer, which follows the post-conviction appeals of Avery and Dassey. SAC ¶ 49.

RESPONSE:  Plaintiff does not dispute that on October 19, 2018, Netflix

premiered a second 10-episode season of Making a Murderer, but disputes that the only

content of the second season is the post-conviction appeals of Avery and Dassey. [=

83.     None of the statements challenged in the SAC are from the second season of MaM. *See* SAC ¶¶ 57-82 (detailing claims at issue, referencing and challenging only S1 statements).

RESPONSE:   Plaintiff disputes the Defendants' characterization of the Second

Amended Complaint. Dkt. 105 p. 17 – 19 describe defamatory content in the second

season of MaM.

## IV.     NETFLIX'S INVOLVEMENT IN MAM

84.     Netflix licensed MaM from Laura Ricciardi and Moira Demos in July 2014. (hereinafter, the "Producer Defendants"). Walker Decl. Ex. 10 (excerpts of NFXCOL0000091) at 1.

RESPONSE:  Plaintiff does not dispute this proposed Finding of Fact

85.     Prior to Netflix's acquisition of the film, Moira Demos wrote in July 2013 that "[t]he series is 90% shot and we currently have rough cuts of the first three episodes. To date this project has been exceedingly independent. The series has been entirely produced, directed, shot and edited by my partner Laura Ricciardi and myself." Walker Decl. Ex. 11 (E. Dailly Subp. Prod. 31-0001) at 0002.

RESPONSE:  Plaintiff objects to the proposed Finding of Fact as relying on

hearsay to the extent it is submitted for the truth of the matters asserted.

86.     The license agreement, signed on or about July 28, 2014, contained a warranty that the Producer Defendants would provide a "truthful and accurate" series to Netflix that did not defame anyone. *See* Walker Decl. Ex. 10 (excerpts of NFXCOL0000091) at 107.

RESPONSE:  Plaintiff does not dispute that the license agreement states the

Distributor represents, warrants and covenants that …  "(o) the Series shall be truthful

and accurate." but Plaintiff disputes that the licensing agreement referenced defamation at

p. 107.

87.     The Producer Defendants hired their own lawyers for the production. Walker Decl. Ex. 12 (CHRM003641); *see also* Decl. of Lisa Nishimura ("Nishimura Decl.") ¶ 6.

    RESPONSE:  Plaintiff objects to this proposed Finding of Fact as irrelevant, as

the motions for summary judgment are not premised on any "advice of counsel" defense

and if any such defense is not raised, Defendants should not have withheld documents

with pre-suit counsel based on assertions of attorney-client privilege.  Subject to the

objection, Plaintiff does not dispute this proposed Finding of Fact.

88.     Netflix's core team for MaM consisted of Lisa Nishimura, Adam Del Deo, Ben Cotner, and—to a lesser extent—Marjon Javadi. *See* Walker Decl. Ex. 13 (Del Deo Tr.) at 65:9-66:22.

    RESPONSE:  Plaintiff does not dispute that  Netflix's core team for MAM

consisted of Nishimura, Del Deo, Cotner and Javadi, but disputes that the transcript

excerpt referenced indicates that Javadi was involved "to a lesser extent."

89.     No one at Netflix was responsible for vetting MaM for accuracy or for defamation, or engaged in such vetting. Nishimura Decl. ¶ 6; *see also* Decl. of Adam Del Deo ("Del Deo Decl.") ¶ 8.

    RESPONSE:  Plaintiff objects to this proposed Finding of Fact as calling for a

legal conclusion as to Netflix's responsibility to avoid defaming others, which is not a

matter that a party can simply deny by affidavit nor contract out of by agreement with

someone other than the defamed party. Subject to the objection, Plaintiff  disputes the

proposed Finding of Fact as Netflix representatives noted the presence of potentially

defamatory material on more than one occasion, and on at least one occasion, indicated

that the material should be left in the series without alerting the Chrome Defendants

because it would be contrary to the direction Netflix had been "pushing them in" to dial

back the statements. Barker Decl., Ex. 1, NFXCOL0000294 ; Barker Decl., Ex. 1, NFXCOL0002071.

90.     On the business side, in addition to financing the film, Netflix helped the Producer Defendants with budgeting, meeting deadlines, and facilitating introductions to third-party specialists who could help with elements of the filmmaking such as music and graphics. Nishimura Decl. ¶ 5; Del Deo Decl. ¶ 4; Walker Decl. Ex. 13 (Del Deo Tr.) 63:14-24; *id.* Ex. 14 (NFXCOL0000215) at 216; *id.* Ex. 15 (NFXCOL0000242); *id.* Ex. 16 (NFXCOL0000265); *id.* Ex. 17 (NFXCOL0000282) at 287; *id.* Ex. 18 (NFXCOL0000294) at 296; *id.* Ex. 19 (NFXCOL0000335) at 339; *id.* Ex. 20 (NFXCOL0002099).

RESPONSE:   Plaintiff does not dispute the proposed Finding of Fact but adds that Netflix also helped in the editing process.  See Dkt. 275, p. 2 ¶5 where Lisa Nishimura states "I helped the filmmakers refine their edited, assembled footage (known as cuts).  Netflix was also heavily involved in the editing process and provided numerous notes and suggestion, along with significant direction to the Chrome Defendants during production. See also Dkt. 275, p. 2 ¶5 (Nishamura declaration).  Netflix also approved the final versions of all episodes. Dkt. # 286-4 Depo p. 141 and DKT # 286-3 Del Deo testimony (Del Deo transcript p. 155-156).

91.     No one at Netflix edited the series. Walker Decl. Ex. 21 (Nishimura Tr.) at 16:7; 56:23-57:3; Nishimura Decl. ¶ 7; *see also* Del Deo Decl. ¶ 5.

RESPONSE:   Plaintiff objects to this proposed Finding of Fact as phrased. While Netflix may be attempting to use "edit" as a term of art that means specifically doing the work of cutting video clips, in common parlance, it is a broader term that includes "to direct the publication of something" [as in a newspaper]. Edit Definition & Meaning - Merriam-Webster  In this sense, Netflix was heavily involved in the editing process and provided numerous notes and suggestion, along with significant direction to the Chrome Defendants during production. See, e.g., .  See Barker Decl. Ex. 1 NFXCOL0000199 -

0000202, 0000208-0000210, 0000215-219.  See also Dkt. 275, p. 2 ¶5 (Nishamura

declaration). Netflix also approved the final versions of all episodes.

92.     At her deposition in this case, Nishimura testified that "[a]ll of the editing was
controlled purely by the filmmakers. . . . [T]o be clear, no one on my team is a trained editor.
And the software and the actual mechanism of editing is not one that I myself or anyone on my
creative team is trained in." Walker Decl. Ex. 21 (Nishimura Tr.) at 56:9-14, 56:23-57:1; *see also
id.* at 16:6-7.

RESPONSE:  Plaintiff does not dispute that Nishamura testified as stated in the

proposed Finding of Fact, but disputes that the statement is consistent with the facts of

Netflix's  exercise of final approval for the series, Barker Decl., Ex. 21 and 15, nor with

the direction that Netflix provided to Chrome. On numerous occasions, Netflix

representatives provided direction indicating what was needed for the next round of edits

and suggested, through their comments, that while the versions of the episodes describing

additional changes that they wanted to see made. *See, e.g.,* Barker Decl., Ex.  Barker

Decl. Ex. 1, NFXCOL0000199 -0000202, 0000208-0000210, 0000215-219.

93.     Likewise, at his deposition in this case, Del Deo testified that "Laura and Moira
were the filmmakers. They were looking at the footage—the trial footage, you know, all the
assets they had. They would be the ones to make the call as to what ends up in the documentary
or not." Walker Decl. Ex. 13 (Del Deo Tr.) at 144:13-17; *see also id.* at 161:13-15; Walker Decl.
Ex. 9 (Ricciardi Tr.) at 178:15-25.

RESPONSE:  Plaintiff does not dispute that Del Deo testified as stated in the

proposed Finding of Fact, but disputes that the statement is consistent with the facts of

Netflix's right to and exercise of final approval rights for the series, Barker Decl., Ex. 21

and 15, nor with the direction that Netflix provided to Chrome. On numerous occasions,

Netflix representatives provided direction indicating what was needed for the next round

of edits and suggested, through their comments, that  there were additional changes that

they wanted to see made. Barker Decl. Ex. 1, NFXCOL0000199 -0000202, 0000208-

0000210, 0000215-219.

94. Laura Ricciardi testified at her deposition that "if I think about the workflow, we—you know, we were working in separate locations. I think we were, you know, mainly communicating on phone calls. There was an occasional meeting, but, you know, for the most part, we -- Moira and I were most interested in, you know, being able to do the creative work, and then, at times we were required to share it with Netflix and that would, you know, lead to notes and conversations, and then we would go back and we would work creatively[.]" Walker Decl. Ex. 9 (Ricciardi Tr.) at 178:15-25.

RESPONSE: Plaintiff does not dispute that Ricciardi made the statement

described in the proposed Finding of Fact.

95. Creatively, the Netflix team did help shape the series by reviewing edited, assembled footage—"cuts"— for their overall look and feel and from the perspective of a Netflix subscriber. Nishimura Decl. ¶¶ 5, 7; Del Deo Decl. ¶¶ 4-5.

RESPONSE: Plaintiff does not dispute this proposed Finding of Fact.

96. However, members of the team did not conduct side-by-side comparisons of cuts to previous iterations in an attempt to understand what precisely the filmmakers added or cut to improve flow. Nishimura Decl. ¶ 7; Del Deo Decl. ¶ 5.

RESPONSE: Plaintiff does not dispute that members of the Netflix team did not

"conduct side-by-side comparisons of cuts to previous iterations" but disputes that they

did not "attempt to understand what precisely the filmmakers added or cut to improve

flow" because a jury could infer from the comments and notes provided by Netflix that

they were noting and were aware of cuts compared to previous iterations. For example,

after the revised version of Episode 5, Netflix's observation that "setting up Coborn as

the cop to potentially plant the car works really well now" shows that they were aware of

changes between episode versions.

97. Upon reviewing a cut Netflix would provide to the filmmakers "notes," which served as suggestions and jumping-off points for discussion, not demands; just because a suggestion was made does not mean it was implemented. Walker Decl. Ex. 21 (Nishimura Tr.) at 126:21-25; id. Ex. _9 (Ricciardi Tr.) at 94:9-17; see also Del Deo Decl. ¶¶ 4-5.

RESPONSE: Plaintiff does not dispute that Netflix provided "notes" to the

filmmakers and the above testimony indicates they were suggestions, but Plaintiff

disputes the statements as inconsistent with the fact of Netflix's exercise of final approval rights for the series, Barker Decl., Ex. 21 and 15, nor with the direction that Netflix provided to Chrome. *See, e.g.,* See Barker Decl. Ex. 1 NFXCOL0000199 - 0000202, 0000208-0000210, 0000215-219. Plaintiff further disputes Netflix's characterization of the notes as "jumping-off points for discussion" and disputes that there was any reference to the statement "just because a suggestion was made does not mean it was implemented" in the materials referenced.

98.     Although Colborn asserts Netflix's suggestions to improve pacing show actual malice, such suggestions are a common form of feedback in documentary filmmaking and have "to do with the way you're moving the viewer through the story." Walker Decl. Ex. 22 (Dennis Tr.) at 40:14-22; *compare id.* Ex. 23 (Pl.'s Responses to Netflix's First Set of Interrogs. (Oct. 6. 2021)), Interrog. 2 at 9; *with id.* Ex. 24 (NFXCOL0000212); *id.* Ex. 25 (NFXCOL0001943) at 1946; *id.* Ex. 26 (NFXCOL0001959); *id.* Ex. 27 (NFXCOL0001976) at 1996; *id.* Ex. 28 (NFXCOL0002075) at 2078; *id.* Ex. 29 (NFXCOL0002131).

RESPONSE:  Plaintiff objects to the proposed Finding of Fact to the extent that Netflix is attempting to use Lisa Dennis to provide expert testimony about what is common in filmmaking, as she was not disclosed as an expert witness, and objects to the proposed Finding of Fact as irrelevant as to what is common for forms of documentary feedback as the question is whether the suggestions are made in such a way as to knowingly or recklessly produce defamatory material. Subject to the objections, Plaintiff does not dispute that Dennis testified that suspense pacing has "to do with the way that you're moving the viewer through the story" but disputes Netflix's characterization in the statement as there are no citations for the balance of the statement that it is allegedly a common form of feedback in documentary filmmaking

99.     Nishimura stated in her declaration that edits regarding pacing were intended to "engage the viewer" and help the viewer digest the most salient points of a long and sprawling account. Nishimura Decl. ¶¶ 8, 13-14.

RESPONSE:  Plaintiff objects to the proposed Finding of Fact as self-serving

statements by Defendants are not entitled to weight on summary judgment, particularly in

defamation cases. Subject to the objection, Plaintiff does not dispute that Nishimura's

declaration at the cited paragraphs states "Our notes on the pacing of the series were

intended to help the filmmakers engage the viewer," but Plaintiff denies defendants'

characterization that it helped the viewer to digest the most salient points of a long and

sprawling account as that statement is not referenced in the citations listed. Plaintiff

further responds that the statement in the Declaration is not inconsistent with knowing or

reckless disregard for the truth and in fact supports the inference that engaging the viewer

at all costs was the goal of the series and Netflix.

100.    So too for "cliffhangers": Del Deo attests that Netflix employees suggested that
episodes should end on a cliffhanger—a standard documentary series technique—in order to
keep viewers engaged so they watch the next episode, including those episodes in which Avery
is ultimately convicted. *See* Del Deo Decl. ¶ 12; *compare* Walker Decl. Ex. 23__ (Pl.'s Response
to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 2 (citing *id.* Ex. 24
(NFXCOL0000212) at 213) *with id.* Ex. 30 (NFXCOL0000226) at 229; *id.* Ex. 31
(NFXCOL0000273) at 274; *id.* Ex. 19 (NFXCOL0000335) at 339; *id.* Ex. 32
(NFXCOL0002059) at 2063.

RESPONSE:  Plaintiff objects to the extent that Netflix is proffering Del Deo's

testimony as an expert as to "standard documentary technique" as he was not listed nor

disclosed as an expert witness. Subject to the objection, Plaintiff does not dispute that Del

Deo's declaration states that Netflix employees suggested that episodes should end on a

cliffhanger to keep viewers engaged so they watch the next episode, but Plaintiff does

dispute  that Del Deo stated in his declaration this was a standard documentary series

technique.  Plaintiff further responds that the statement in the Declaration is not

inconsistent with knowing or reckless disregard for the truth and in fact supports the

inference that engaging the viewer at all costs was the goal of the series and Netflix.

101. No one at Netflix ever suggested (or would suggest) that filmmakers sacrifice accuracy in order to speed up the pace of a scene or to make a scene more impactful. Del Deo Decl. ¶¶ 11, 13; *see also* Nishimura Decl. ¶ 8.

RESPONSE: Plaintiff does not dispute that Nishimura's declaration at ¶ 8 states "Our notes on the pacing of the series were intended to hep the filmmakers engage the viewer. We never suggested or intended to suggest that the filmmakers should sacrifice accuracy in favor of speed" and that Del Deo's declaration ¶ 13 states "But no one at Netflix ever suggested here (or would suggest) that filmmakers sacrifice accuracy in order to speed up the pace of a scene or to make a scene more impactful." However, Plaintiff disputes the substance of the statements in the declarations because Netflix's notes and comments regarding the series demonstrate that they encouraged biased edits and efforts to portray law enforcement as "baddies" and "villains," Barker Decl., Ex. 1, NFXCOL0002009 and 2133, Barker Decl. Ex. 2, MANHARDT00000793, while Del Deo suggested regarding the Averys, "Let's portray them as a very happy family," Barker Decl., Ex. 1 NFXCOL 000009, and accordingly, jurors may draw the inference that the suggestions to cut testimony were consistent with their overall intent to shape the series to portray Mr. Colborn as a principal villain and the Averys as heroes regardless of the truth. In addition, jurors may find support for the opposite conclusion to this proposed Finding of Fact because Netflix can point to nothing in its creative notes that cautioned Chrome to avoid sacrificing accuracy in order to speed up the pace of a scene.

102. An example of this is Netflix's note suggesting the Producer Defendants hold on a particular scene a bit longer, while expressly acknowledging that "[w]e know this is court footage that may not exist." *See* Walker Decl. Ex. 24 (NFXCOL0000212) at 213.

RESPONSE: Plaintiff does not dispute that the Netflix note states "Can we hold a bit longer on Colborn's face here. He looks caught." And goes on to state "We know that this is court footage that may not exist." However, Plaintiff disputes Netflix's

proposed Finding of Fact to the extent it is asserted to constitute an example of an

exhortation for accuracy. To the contrary, jurors may infer that the statement could be

interpreted as encouraging the Chrome Defendants to manufacture footage if necessary,

which in fact, they did, by extending the scene in question to show Mr. Colborn

purportedly being stared down by Mr. Strang while shifting uncomfortably in his chair

and cracking his knuckles – footage that was taken from a different court scene. See

Barker Decl., Ex. 3 CHRM 867 14:35 – 15:08 vs. Episode 5 55:31 –55:54.  Moreover,

Netflix can point to no instruction advising the Chrome Defendants not to replace or

substitute reactions or footage, and jurors may infer that this was consistent with their

intent to "engage the viewer" at all costs, including the truth.

103.    Other notes Colborn highlighted in his discovery responses suggested the use of
graphical elements to enhance the clarity and factual accuracy of the series, especially because
Avery's prosecution for Halbach's murder involved a large number of facts and relevant players,
including several law enforcement agencies and legal teams. Nishimura Decl. ¶ 16; Del Deo
Decl. ¶¶ 13-14; *compare* Walker Decl. Ex.23 (Pl.'s Response to Netflix's First Set of Interrogs.
(Oct. 6, 2021)), Interrog. 1 at 3-4 *with id.* Ex. 33 (NFXCOL0000208) at 210; *id.* Ex. 14
(NFXCOL0000215) at 219; *id.* Ex. 34 (NFXCOL0000288); *id.* Ex. 27 (NFXCOL0001976) at
1982; *id.* Ex. 35 (NFXCOL0000293); *id.* Ex. 36 (NFXCOL0000245); *id.* Ex. 16
(NFXCOL0000265).

        RESPONSE:  Plaintiff does not dispute that Netflix suggested the use of graphical

elements" but Plaintiff disputes  Netflix's after-the-fact characterization of those as

strictly to enhance the clarity and factual accuracy of the series, especially because

Avery's prosecution for Halbach's murder involved a large number of facts and relevant

players, including several law enforcement agencies and legal terms; jurors may draw the

inference that the graphical elements were inserted to emphasize Mr. Colborn's role as an

alleged principal in the conspiracy.

104.    At his deposition in this case, Colborn testified that "defendants" knew MaM was
false because "[t]hey were sitting in the courtroom and saw my complete unedited testimony."
Walker Decl. Ex. 2 (Colborn Tr.) at 435:12-436:9, *see also id.* 441:8-14, 444:13-445:3.

RESPONSE: Plaintiff does not dispute this proposed Finding of Fact.

105. Asked how others could know Avery's frame-up theory was false when even Griesbach—a local resident who personally knew the accused officers—believed the theory was plausible, Colborn further testified: "I don't have an answer other than Mr. Griesbach didn't attend the trial." Walker Decl. Ex. 2 (Colborn Tr.) at 464:11-465:17.

RESPONSE: Plaintiff objects to the proposed Finding of Fact as irrelevant.

Michael Griesbach's initial beliefs as to the subject matter of MAM do not tend to make

any fact of consequence more likely than not. Subject to the objection, Plaintiff admits

that he testified as set forth in the quoted portion of the proposed Finding of Fact, but

responds that Mr. Griesbach's Declaration submitted with this response answers Netflix's

counsel's question. Declaration of Michael Griesbach, ¶¶ 3-10.

106. No Netflix employee who worked on MaM attended any portion of any court proceeding involving Steven Avery. Walker Decl. Ex. 21 (Nishimura Tr.) at 173:23; *see also* Nishimura Decl. ¶ 10; Del Deo Decl. ¶ 7.

RESPONSE: Admit that Nishimura's and Del Deo's declarations, as cited above,

state Netflix employees did not attend any portion of the court proceeding, but Deny Dkt.

279-21 p. 11 addresses attending the court proceeding.

107. No Netflix employee who worked on MaM ever visited Manitowoc County. Walker Decl. Ex. 21 (Nishimura Tr.) at 173:23; Nishimura Decl. ¶ 10; Del Deo Decl. ¶ 7.

RESPONSE: Plaintiff does not dispute that the declarations cited make the

assertion in the proposed Finding of Fact.

108. No Netflix employee who worked on MaM attended or conducted any interview of any person for MaM. Nishimura Decl. ¶ 10; Del Deo Decl. ¶ 7.

RESPONSE: Plaintiff does not dispute that the declarations cited make the

assertion in the proposed Finding of Fact.

109. No Netflix employee who worked on MaM has ever spoken to anyone depicted in MaM. Nishimura Decl. ¶ 10; Del Deo Decl. ¶ 7.

RESPONSE: Plaintiff does not dispute that the declarations cited make the

assertion in the proposed Finding of Fact.

110.    No Netflix employee who worked on MaM ever received or reviewed raw footage of the underlying events depicted in MaM. Nishimura Decl. ¶ 9; Del Deo Decl. ¶ 6; *see also* Walker Decl. Ex. 37 (NFXCOL0000138) (all raw footage was in the exclusive possession and control of the Producer Defendants).

RESPONSE: Plaintiff does not dispute that the declarations cited make the

assertion in the proposed Finding of Fact., However Netflix did receive access to "cuts"

that were never provided to plaintiff.  Dkt. 272 p. 2 ¶5 and Dkt. 275 p. 2 ¶5.

111.    Beyond raw footage, no Netflix employee who worked on MaM ever received or reviewed any other source material from the events MaM documents such as deposition or trial transcripts or exhibits. Nishimura Decl. ¶¶ 9, 10; Del Deo Decl. ¶ 6.

RESPONSE: : Plaintiff does not dispute that the declarations cited make the

assertion in the proposed Finding of Fact.  However, Netflix did receive access to "cuts"

that were never provided to plaintiff.  Dkt. 272 p. 2 ¶5 and Dkt. 275 p. 2 ¶5.

112.    Colborn admits he has no evidence to contradict the preceding six statements. Walker Decl. Ex. 2 (Colborn Tr.) at 182:2-10, 182:23-183:2, 183:3-18, 184:21-185:1; *id.* Ex. 38 (email from Colborn's counsel confirming Colborn has no such evidence).

RESPONSE: Plaintiff does not dispute that Mr. Colborn testified that he

personally had no such evidence, but Plaintiff is aware that such evidence does exist, as

identified in the preceding responses, and including Dkt. 279-38 p. 2, which indicates that

Netflix representatives visited Chrome's editing studio. Jurors may infer that Netflix

viewed raw footage and/or other source materials at the visit despite their claims that they

have little to no recollection of what occurred at those visits. See Barker Decl. Ex. 15.

Depo. Pp 51-52 (Nishamura saying she doesn't recall)**.**

113.    At her deposition in this case, Nishimura testified as follows: "I'd like to clarify how you define 'raw footage.' So, you see here when they refer to 'assembled footage,' you know, that is what the filmmakers do, right? So, they had been working on the project for many, many years, and I imagine, at that point, had hundreds, if not thousands of hours of footage. So,

we would review material, but material as provided by the filmmakers in an assembled form. So, edited by them." Walker Decl. Ex. 21 (Nishimura Tr.) at 49:10-19; *see also id.* 106:2-22, 107:14-17.

> RESPONSE:  Plaintiff does not dispute that Nishamura made the quoted statement during her deposition.

114.    Del Deo similarly testified that the Netflix creative team "looked at the cuts that came in," but did not, for example, review any of the videotaped depositions from Avery's civil lawsuit against Manitowoc County. Walker Decl. Ex. 13 (Del Deo Tr.) at 145:12-17.

> RESPONSE:  Plaintiff does not dispute  that Del Deo testified "we looked at the cuts that came in" but disputes  the remainder of the statement as it was not referenced in Del Deo's cited testimony.

115.    Not even the third-party editors the filmmakers hired to work on MaM reviewed all of the raw footage. Walker Decl. Ex. 39 (Manhardt Tr.) at 153:17-22.

> RESPONSE:  Deny as the referenced transcript refers to reviewing "case file materials that were obtained from the civil case clerk". See also *See also* Barker Decl., Ex. 13 depo p. 44-45, 60-61.

116.    Moreover, Netflix employees were not aware of the specific edits at issue in this case until their depositions in April 2022. Nishimura Decl. ¶ 11; Del Deo Decl. ¶ 15.

> RESPONSE:  Plaintiff does not dispute that Nishamura and Del Deo so claim in their declarations but disputes the statements as patently not credible given that they were both originally named in the original Complaint that described edited testimony and the Complaint was the subject of significant media attention. It is further not credible given that as Netflix pointed out in proposed Finding of Fact # 86, the agreement with Chrome (f/k/a Synthesis) purported to require a "truthful" product so it is difficult to believe that Netflix representatives did not broach the subject of edited testimony with Chrome after the Complaint was filed. Their apparent failure to do so, based on the lack of any such produced communications, supports an inference that they already knew about the edits.

117.     At her deposition in this case, Nishimura testified that she did not personally have "any knowledge of changes that are made, and, so, it's hard for me to speculate on motive for change." Walker Decl. Ex. 21 (Nishimura Tr.) at 95:7-19; *see also* Nishimura Decl. ¶ 11.

RESPONSE:  Plaintiff does not dispute that Nishamura made the quoted

statement at her deposition but disputes the statement as patently not credible.

118.     Questioned about editing to the scene where Colborn testifies about the dispatch call, Nishamura testified that "Colborn successfully makes his point saying, 'I should not have been and I was not looking at the license plate.' So I believe he made his point. . . . And speaking to the macro, you know, the jury found Steven Avery guilty. So I think [viewers] must have heard this as well." Walker Decl. Ex. 21 (Nishimura Tr.) at 176:16-25; Nishimura Decl. ¶ 11 ("I would not have had questions or concerns about the edits had I known about them at the time, which I did not.").

RESPONSE:  Plaintiff objects to the statement as non-responsive to the question

that was posed to Nishamura and therefore subject to a motion to strike at trial. Subject to

the objection, Plaintiff does not dispute that  Nishimura made the statements quoted in

her deposition but  disputes Netflix's editing of the quotation in the proposed Finding of

Fact, adding "viewers" when Nishimura was likely referring to the jury when she said

"they".  In addition, Plaintiff disputes the substance of Nishamura's comment as the

"point" Mr. Colborn attempted to make in his testimony appeared to contradict testimony

delivered moments earlier when, based on Netflix's edits, he was shown as allegedly

having admitted that his call to dispatch was reasonably interpreted as that he was

looking at the license plates.

119.     At his deposition in this case, Del Deo similarly testified, "[W]e trusted them to edit the show . . . [s]o I'm not in a position to comment—to make a snap judgment here today as to whether or not a piece of footage that's raw footage should be swapped out or used within the context of the series." Walker Decl. Ex. 13 (Del Deo Tr.) at 161:13-21.

RESPONSE:  Plaintiff does not dispute that Del Deo testified as quoted in the

proposed Finding of Fact, but disputes that the Finding of Fact consists of any testimony

of any material fact as Del Deo stated that he was not in a position to answer the question posed.

120.     Del Deo unequivocally denied that he believes MaM to be asserting that Colborn planted evidence to frame Avery. Walker Decl. Ex. 13 (Del Deo Tr.) at 173:15-19; *id.* 174:2-7.

RESPONSE:  Plaintiff does not dispute that Del Deo so testified, but asserts that the testimony is inconsistent with the Netflix series notes, including the note that states, "Setting Colborn up as the potential cop to plant the car works really well now," Barker Decl., Ex. 1, NFX000274, , and Del Deo admitted that he reviewed the series notes. Barker Decl., Ex. 16, Del Deo transcript pp. 89-90, 96.  Plaintiff further responds that this is inconsistent with Del Deo's exchange with Ben Cotner in which Del Deo wrote that it seemed that Buting's statements in the series were directly accusing officers of planting evidence and even murdering Teresa Halbach to frame Avery for it. Barker Decl., Ex. 1, NFXCOL0002079.

121.     Both he and Nishimura likewise have averred that Netflix did not intend for MaM to convey that Colborn *in fact* planted evidence and that it never occurred to them that any reasonable viewer would understand either the *series or Netflix* to be reaching a conclusion about Colborn's culpability. *See* Nishimura Decl. ¶ 18; Del Deo Decl. ¶ 10.

RESPONSE:  Plaintiff does not dispute that the Nishimura and Del Deo declarations state that they did not intend for Ma\AM to convey in fact that Colborn planted evidence, but disputes that the declarations include the statement that "it never occurred to them that any reasonable viewer would understand either the series or Netflix to be reaching a conclusion about Colborn's culpability." Plaintiff further disputes the substance of the statements as there is no reason that Nishamura and Del Deo would have been encouraging the Chrome Defendants to use techniques to portray law enforcement officers as "the baddies" and as "villains" of the series if they were not intending MAM to convey that they planted evidence, or at least were being reckless as to truth or falsity.

In addition, the testimony is inconsistent with the Netflix series notes, including the note that states, "Setting Colborn up as the potential cop to plant the car works really well now," Barker Decl., Ex. 1, NFX000274, and Del Deo and Nishamura admitted that they reviewed the series notes. Barker Decl., Ex. 16, Del Deo transcript pp. 89-90, 96.  Barker Decl. Ex. 15, Nishamura transcript pp. 54-55.  Plaintiff further responds that this is inconsistent with Del Deo's exchange with Ben Cotner in which Del Deo wrote that it seemed that Buting's statements in the series were directly accusing officers of planting evidence and even murdering Teresa Halbach to frame Avery for it. Barker Decl. Ex. 1, NFXCOL0000295. In the exchange between Del Deo and Cotner, which was also copied to Nishamura, in which Del Deo questioned whether the series was making a direct accusation by Buting against the officers, Cotner stated, "I hope people know it's just a theory. . . ."  Barker Decl. Ex. 1, NFXCOL0000294.

122.    The Netflix employees who worked on MaM did not doubt—or have any reason to doubt—the Producer Defendants' commitment to accuracy. Walker Decl. Ex. 13 (Del Deo Tr.) at 62:21-63:5, 146:23-24; Nishamura Decl. ¶ 4.

RESPONSE:  Plaintiff does not dispute that the Nishimura Declaration states "They never gave those of us at Netflix reason to doubt them or their work, and we relied on them to get the facts right." However, in the exchange between Del Deo and Cotner, which was also copied to Nishamura, in which Del Deo questioned whether the series was making a direct accusation by Buting against the officers, Cotner stated, "I hope people know it's just a theory. . . ." evidencing knowing disregard for the truth or at a minimum, recklessness as to whether people would know it was a theory or not. In addition, Netflix was a partner all the way in attempting to shape the series to portray law enforcement in "baddies" and "villains," as they urged Chrome, so of course they had no problem with the series' objectives to do so. In addition, Nishamura and Del Deo

approved the final cutes of the episodes in the series and were aware of all of the direct out-of-court accusations contained in it by Avery, Avery's family members, and Avery's various attorneys, and pool hall strangers. Dkt. # 286-3 and 286-6; Dkt. # 286-4 Depo p. 141.  Likewise, Plaintiff does note dispute that  Del Deo testified "I was impressed at how well they were articulated and how they wanted to go in eyes wide open and capture, you know, accurate, factual events..."  and that "we trusted them" but Plaintiff disputes that this testimony is evidence of a "commitment to accuracy" by any Netflix or Chrome, for the reasons stated above.

123.    At his deposition in this case, Del Deo testified to the following: "I was very impressed at how . . . how they wanted to . . . capture, you know, accurate, factual events, really follow the story from the Steven Avery perspective and also from the perspective of the police officers involved in the case, Manitowoc, and let—let the subjects capture in an objective way what was happening[.]" Walker Decl. Ex. 13 (Del Deo Tr.) at 62:21-63:5.

RESPONSE:  Plaintiff does not dispute that Del Deo testified as stated but disputes that the testimony has any substantive value as to any issue in this case. In addition, the testimony contradicts Netflix's series notes, which demonstrate that the "perspective' of the police officers involved in the case was that they were to be portrayed as villains and "baddies." Barker Decl., Ex. 1 NFXCOL0002009, 2043, 2174.

124.    Nishimura and Del Deo attest that, if they had ever been concerned about the accuracy of a cut or episode, they would have raised the concern with the Producer Defendants— but they never experienced such concern. Nishimura Decl. ¶ 8; Del Deo Decl. ¶ 9.

RESPONSE:  Plaintiff does not dispute that Nishamura's and Del Deo's declarations so state, but disputes the proposed Finding of Fact as neither Nishimura nor Del Deo are credible in asserting that they were concerned about accuracy as opposed to their stated goals of ensuring that the series was produced with the objective of "marketing" and "awards qualifying," not accuracy. Barker Decl., Ex. 1 NFXCOL0000308 Barker Decl., Ex. 1 NFXCOL0001952

## V. COLBORN'S ALLEGATIONS IN THE SAC

125.    Colborn asserts that because Netflix wanted to sensationalize an old, forgotten story and hook viewers to make more money, MaM is biased and unfair, and that Netflix—unlike him—"ha[s] an instinctive distrust of law enforcement." SAC ¶¶ 15, 17, 48, 59(c), 62, 66; Walker Decl. Ex. 2 (Colborn Tr.) at 174:9-12; 463:7-13; *see also id.* Ex. 23 (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 1-3 (Netflix intended to "inflame viewers to dislike him"); *id.* Ex 49 (Pl.'s Suppl. Response to Netflix's Interrog. No. 1 (July 15, 2022)) at 4 (Netflix employees wanted viewers to "see police as adversaries").

> RESPONSE:    Plaintiff denies Netflix's characterization of the Second Amended
>
> Complaint. The paragraphs cited do not state that MAM is biased and unfair "because
>
> Netflix wanted to sensationalize an old, forgotten story and hook viewers to make
>
> money." However, as noted in the immediately preceding proposed Finding of Fact,
>
> Netflix did act with stated goals of ensuring that the series was produced with the
>
> objective of "marketing" and "awards qualifying." Barker Decl., Ex. 1
>
> NFXCOL0000308;  Plaintiff's quoted deposition testimony is "I don't have an instinctive
>
> distrust of law enforcement" but does not say Netflix does.  Plaintiff does not dispute that
>
> Plaintiff asserted in discovery answers that Netflix intended to "inflame viewers to dislike
>
> him" and Netflix employees wanted viewers to "see police as adversaries".

126.    But, at the time of his deposition, Colborn had watched only slightly more than an hour of the entire series; he had not watched even a second of Episodes 8, 9, or 10; and he had no intention of watching any more. Walker Decl. Ex. 2 (Colborn Tr.) at 58:7-10; 67:15-17; 411:2-23; 485:24-486:5.

> RESPONSE:  Plaintiff objects to the proposed Finding of Fact as irrelevant,
>
> because Plaintiff can and did hire attorneys who represent him in this matter and who can
>
> present the series to the jury, but subject to the objection, Plaintiff does not dispute the
>
> substance of the proposed Finding of Fact.

127.    In response to a series of questions at his deposition regarding whether unchallenged portions of MaM might counterbalance the portions Colborn believes portray him negatively, Colborn repeatedly said he did not know because he had not watched the entire

series. Walker Decl. Ex. 2 (Colborn Tr.) at 125:4-10, 125:23-126:10; *see also, e.g., id.* 188:23-190:11, 190:12-192:25, 471:13-474:21, 480:7-486:5.

RESPONSE:  Plaintiff objects to the proposed Finding of Fact as irrelevant,

because Plaintiff can and did hire attorneys who represent him in this matter and who can

present the series to the jury, but subject to the objection, Plaintiff does not dispute the

substance of the proposed Finding of Fact.

128.    Colborn's only basis for claiming that MaM was biased against him or that it somehow conclusively asserted he planted evidence, thereby defaming him, were calls and messages he received from anonymous individuals who he concedes were not reasonable viewers and who many not even have watched MaM. Walker Decl. Ex. 2 (Colborn Tr.) at 205:2-8, 292:16-294:3, 293:13-19; 296:1-19.

RESPONSE:   Plaintiff disputes the interpretation of his testimony as asserted in

the proposed Finding of Fact. Plaintiff testified that he relied on counsel to analyze the

basis for claims against the Defendants based on the series. Barker Decl., Ex. 14, Colborn

Depo. P. 58, 59, 294.   Furthermore, Plaintiff identified other instances where MAM's

interpretation by the public was made apparent to him  including, but not limited to,

having his car put on Facebook, having someone at the hospital make social media posts

about seeing him and Scotland Yard issuing a statement that he was not credible. (Barker

Decl. Ex. 14 Colborn Depo p. 261-264; 277-278) .

129.    In text message exchanges with Colborn, Schuler—who is a producer of a "rebuttal" documentary tentatively titled Convicting a Murderer ("CaM")—said that its director was "very pro LE," meaning pro law enforcement; that CaM would convey to viewers that Avery was "gaf," meaning guilty as f***; and that it will "humanize" Colborn. Walker Decl. Ex. 41 (Schuler Tr.) 172:11-24, 174:2-175:11, 176:14-17.

RESPONSE:  Plaintiff objects to this proposed Finding of Fact because as a lay

witness,  Brenda Schuler's opinions are not relevant or admissible.  Without waiving said

objection, Plaintiff does not dispute the testimony  of Ms. Schuler as quoted.

130.    Colborn does not believe the CaM filmmakers' perspective prevents them from making a fair and objective documentary. Walker Decl. Ex. 2 (Colborn Tr.) at 236:1-5.

RESPONSE: Plaintiff objects to the proposed Finding of Fact as irrelevant, as not

tending to make any fact in evidence more probable than not, but subject to the objection,

Plaintiff does not dispute that the statement describes Mr. Colborn's testimony.

131.    Schuler likewise testified that she also believes CaM will be "a fair and accurate
and transparent documentary" despite her bias against Avery, and she does not believe there is
anything unethical or irresponsible about making a documentary that has a point of view. Walker
Decl. Ex. 40 (Schuler Tr.) at 190:16-191:20; *see also id.* 220:4-221:11.

RESPONSE: Plaintiff objects to this proposed Finding of Fact because as a lay

witness,  Brenda Schuler's opinions are not relevant or admissible. In addition, the

opinions themselves are so generic and vague as to be inapposite to the case at bar and

therefore likewise irrelevant and based on incomplete hypotheticals.   Subject to the

objections, Plaintiff does not dispute that the quoted text accurately quotes Ms. Schuler's

testimony but disputes the additional characterization in paraphrase that she testified she

had a bias against Avery. Plaintiff further does not dispute that Schuler stated that that

she does not believe there is anything unethical or irresponsible about making a

documentary with a point of view.

132.    Colborn admits that any physical manifestations of his alleged emotional distress
are so mild that not even the woman he lives with is able to observe them. Walker Decl. Ex. 2
(Colborn Tr.) at 131:16-132:18, 133:22-25, 296:20-297:10.

RESPONSE:  Plaintiff does not dispute that Colborn testified that any physical

manifestations are not known to the woman he lives with but disputes the

characterization of the reason, as he testified that they do not discuss them.

133.    Colborn testified in his deposition that the only documentary evidence regarding
his alleged emotional distress is his medical records and testimony.  Walker Decl. Ex. 2 (Colborn
Tr.) at 339:23-340:5.

RESPONSE:  Plaintiff does not dispute the proposed finding of fact.

134.    Colborn's medical records show that, for years after MaM's release, he did not
experience any anxiety, distress, or depression. *See* Walker Decl. Ex. 42 (Colborn 00153) at 154-

62 (self-reporting no depression or anxiety on generalized screening questionnaires); *id.* at 157 ("PSYCH: Denies anxiety, depression, or mania").

> RESPONSE:  Plaintiff does not dispute the proposed Finding of Fact as to the
>
> cited medical records identified therein, with the exception of the 2/12/2018
>
> questionnaire showed plaintiff had difficulty falling asleep. Dkt. 279-44, p. 155.

135.    Colborn's medical records show that he did not begin taking anxiety and blood pressure medication until December 28, 2018, 11 days after he filed this lawsuit. *See* Walker Decl. Ex. 43 (Colborn 00061) (prescribing Buspirone for anxiety and Lisinopril for hypertension for the first time).

> RESPONSE:  Plaintiff does not dispute the proposed finding of fact.

136.    Colborn admitted at his deposition that his medical records are accurate in this regard. Walker Decl. Ex. 2 (Colborn Tr.) at 332:25-341:7.

> RESPONSE:  Plaintiff does not dispute the proposed finding of fact.

137.    Colborn received supportive calls from dozens of people upon announcing his voluntary retirement from the Manitowoc County Sheriff's Office in 2018. Walker Decl. Ex.2 (Colborn Tr.) at 313:2-25.

> RESPONSE:  Plaintiff does not dispute the proposed finding of fact.

138.    Colborn held a leadership position in his church for years after MaM premiered, ending in 2020 after approximately six years. Decl. of Rev. Tom Pankow ("Pankow Decl.") ¶¶ 9-10; Walker Decl. Ex. 44 (COLBTXTS_0006758) at 6761.

> RESPONSE:  Plaintiff does not dispute the proposed finding of fact.  Pankow
>
> Declaration ¶ 4 (Dkt. 278) states Colborn served as a church elder for 6 years until 2020.

139.    Colborn testified at his deposition that the evidence-planting allegations raised in Avery's murder trial harmed his reputation years before MaM's release. Walker Decl. Ex. 2 (Colborn Tr.) at 136:24-137:5.

> RESPONSE:  Plaintiff does not dispute that Colborn testified at his deposition
>
> that his reputation was harmed at the time of the trial, but disputes the implication that the
>
> harm was permanent as he testified that after the verdict, his reputation went back to how
>
> it was prior to the trial.  See Dkt. 279-2  Colborn Tr. at 136:24-137:5:

```
24        Q    (By Ms. Walker:)  All right, Mr. Colborn.  I
25   have some wrap-up questions from items we were
                                                    138
```

```
Andrew Colborn vs.                              Andrew L. Colborn
Netflix, Inc., et al.                               July 21, 2022

 1   discussing before the lunch break, and the first one
 2   is would you agree with me that your integrity had
 3   been questioned and your reputation harmed at the
 4   time of trial?
 5        A    Yes.
 6        Q    And you can't as you sit here today quantify
 7   the reputational harm arising from trial and the
 8   contemporaneous media coverage that came along with
 9   the trial, can you?
10             MR. BURNETT:  Objection, form.
11        A    I can say after the verdict, my reputation
12   and everything went back to how it was.
```

140.     He likewise admitted that statements by several third parties during and after the Avery trial defamed him and led to death threats. Walker Decl. Ex. 2 (Colborn Tr.) at 120:23-121:17, 141:8-20; *id.* Ex. 45 (COLBORN-004486); *id.* Ex. 46 (COLBORN-004586); *id.* Ex. 47 (COLBORN-004611).

      RESPONSE:     Plaintiff disputes the proposed Finding of Fact. Mr. Colborn

testified  that statements by third parties after the release of MaM harmed his reputation.

See Dkt. 279-2 Colborn Transcript 141:8-20.

141.     His ex-wife, Barbara Colborn, stated that, during the Avery trial, Colborn was stressed, agitated, withdrawn, quiet and not himself; that he would "pace in the house" and "started drinking a little more;" and that he "didn't want to go anywhere in public. Decl. of Barbara Colborn ("B. Colborn Decl.") ¶¶ 8-9; *see also* Decl. of Kathleen Heinzen ¶ 6 ("[Colborn] was not himself during the trial."); Pankow Decl. ¶ 12 ("[Colborn] took Avery's claims at trial that he planted evidence very personally.").

      RESPONSE:  Plaintiff does not dispute the proposed finding of fact.

142.     At his deposition, Colborn agreed that the Avery murder trial was emotionally difficult for him; specifically, that he "wasn't himself" during the trial, that he was quiet, that he could only focus on the trial, and that he stopped going out in public during the trial. Walker Decl. Ex. 2 (Colborn Tr.) at 113:15-17; 114:9-11.

      RESPONSE:  Plaintiff does not dispute the proposed finding of fact.

143.     At the outset of this case Colborn blamed MaM for his divorce, *see* Walker Decl. Ex. 48 (Pl.'s Response to Chrome Defs.' First Set of Interrogs. (Jan. 28, 2022)), Interrog. 8.

RESPONSE: Plaintiff objects to this proposed Finding of Fact as irrelevant because at Netflix's request, the parties entered into a stipulation that Mr. Colborn would no longer make that assertion in this case. Netflix's attempt to introduce evidence on a stipulated matter may open the door to the evidence despite the stipulation, and Mr. :Colborn reserves the right to seek appropriate relief from the Court. Subject to the objection, Plaintiff does not dispute that plaintiff stated in the above referenced interrogatory answer that "my inability to go back to the person I was before MaM destroyed my 30 year marriage and the marriage ended in divorce."

144. His ex-wife subsequently explained they divorced in large part because Colborn was unfaithful to her. *See* B. Colborn Decl. ¶ 28.

RESPONSE: Plaintiff does not dispute that Barbara Colborn's declaration stated "Andy's affair is a big cause of our divorce."

145. Colborn admitted that his divorce caused him anxiety and distress. Walker Decl. Ex. 2 (Colborn Tr.) at 301:17-25.

RESPONSE: Plaintiff does not dispute the proposed finding of fact.

146. Colborn's affair and divorce also harmed his relationship with his in-laws, as Ms. Betty Heinzen, Colborn's former mother-in-law, stated that she "no longer consider[s] Andrew Colborn a relative because he ran off with another woman and divorced my daughter, Barb, who suffers from problems with her peripheral vision." Decl. of Betty Heinzen ¶ 4.

RESPONSE: Plaintiff does not dispute the proposed finding of fact.

147. Likewise, Ms. Heinzen's husband and Colborn's former father-in-law, Paul Kopidlansky stated, while MaM had no impact on his opinion of Colborn because he didn't watch it, he is "not proud of [Colborn]" because he "ran off with another woman when his wife Barbara needed him most." Decl. of Paul Kopidlansky ¶¶ 5-6, 9.

RESPONSE: Plaintiff does not dispute the proposed finding of fact.

148. Colborn contends that two references in Netflix documents to the jail call show actual malice, but in those documents Del Deo simply states his opinion that it "seems very thin that Colburn not having specific knowledge of who called him would be the key to the case," and that the call "is [a] weak revelation to me." *Compare* Walker Decl. Ex. 23 (Pl.'s Response to

Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 2-3 *with id.* Ex. 33 (NFXCOL0000208) at 210; *id.* Ex. 30 (NFXCOL0000226) at 227.

      RESPONSE: Plaintiff does not dispute that Netflix documents 210 and 227 (Dkt. 279-30 p. 3 and Dkt. 279-33 p. 4) show actual malice but deny these are the only two references of actual malice related to the jail call. Additional evidence of actual malice related to the jail call specifically appear are described in Walker Decl. Ex. 23 (Dkt. 279-23 p. 3-10). Additionally, Netflix included in MaM commentary by Steve Glynn regarding the jail call. Dkt. 120-2 at 18:20 – 19:20. In addition, Plaintiff has repeatedly summarized evidence of actual malice generally for Defendants in numerous interrogatory responses and supplemental responses. Plaintiff disputes Netflix's downplaying of the substance of the documents referenced in the proposed Finding of Fact that Netflix recognized that the jail call as a supposed motivation for Mr. Colborn to plant Avery "seemed very thin" and that it was a "weak" reveal, as these establish that Netflix and Chrome both recognized that there were significant reasons to doubt the linchpin of accusations that Mr. Colborn conspired to plant evidence.

      149. Colborn similarly contends that internal communications among the Netflix team regarding the discovery of the key to Halbach's SUV show actual malice, but in them Cotner only expresses the opinion that the discovery of the key is among "the weaker arguments" at Avery's trial. *Compare* Walker Decl. Ex. 23 (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 3-4; *with id.* Ex. 34 (NFXCOL0000288).

      RESPONSE: Admit that NFXCOL0000288 (Dkt. 288 p. 2) has Ben Cotner stating "This is a bridge episode that really covers a lot of the weaker arguments (key falling on the floor, police log, access to Clerk's office, …). Deny this is the only evidence of actual malice. Walker Decl. Ex. 23 (Dkt. 279-23 p. 3-10), as Plaintiff has repeatedly summarized it in his interrogatory responses.

150.    Colborn also points to Netflix employees' notes and communications regarding music in the series, but those documents show that Netflix employees suggested "a thriller atmospheric score," that would "punctuate" "key point[s]" and "really up[] the stakes" for viewers, such as with "danger music" at a climactic point. *Compare* Walker Decl. Ex. 23 (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 3; *with id.* Ex. 14 (NFXCOL0000215) at 216; *id.* Ex. 15 (NFXCOL0000242); *id.* Ex. 16 (NFXCOL0000265); *id.* Ex. 17 (NFXCOL0000282) at 287; *id.* Ex. 18 (NFXCOL0000294) at 296; *id.* Ex. 19 (NFXCOL0000335) at 339; *id.* Ex. 20 (NFXCOL0002099).

RESPONSE:  Plaintiff does not dispute that Netflix employees suggested music

to fit the quoted terms above, but the documents also show that Netflix employees sought

to include music to help identify law enforcement representatives as "baddies" and

"villains" of the series, Barker Decl., Ex. 1, NFXCOL 2009 and 2133, Barker Decl. Ex.

2, Manhardt 793, from which jurors can draw inferences of actual malice toward law

enforcement by Netflix in its participation in the production of the series

Dated this 4th day of November, 2022.

By: /s/ George Burnett
    George Burnett, State Bar No.: 1005964
    LAW FIRM OF CONWAY, OLEJNICZAK & JERRY,
    S.C.
    231 S. Adams Street
    Green Bay, WI 54301
    P.O. Box 23200
    Green Bay, WI  54305-3200
    Phone: (920) 437-0476
    Fax: (920) 437-2868

    April Rockstead Barker, State Bar No. 1026163
    ROCKSTEAD LAW, LLC
    525 N. Lincoln Ave.
    Beaver Dam, WI 53916
    (920) 887-0387
    (262) 666-6483 (facsimile)
    aprilrbarker@rocksteadlaw.com

*4403717*