# ADDENDUM TO RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT: EPISODE SUMMARIES

This Addendum supplements Plaintiff's Response to the following of Defendants' Proposed Findings of Fact, which purport to summarize MAM and/or particular episodes thereof.

### Episode 1, Dkt #120-1

Viewers are initially introduced to Steven Avery through what appears to be home video footage of his joyous return to the Avery family salvage yard and homestead after his prior conviction for rape was set aside. From there, the series portrays Avery's identification as the suspect for the rape as something that was engineered entirely by representatives of the Manitowoc County Sheriff's Department. ("They made the case against him that night" (Walt Kelly)). The series includes testimony of Sheriff's Department employees from depositions given in a civil case that Avery later brought against the County, the excerpts from which are interspersed with interpretive comments from Avery's civil suit attorneys, Steven Glynn and Walt Kelly; Avery's criminal defense attorneys from both the circuit court and appellate level in the rape case; Avery's family members; and Avery himself. The unanimous conclusion of all of these individuals is that the law enforcement community knew or should have known at the time they pursued the rape charge against Avery that the actual perpetrator of the rape, Gregory Allen, was responsible. Avery's father is featured angrily calling the judge who presided over the trial as a "son of a bitch," and Avery's parents are also shown describing their pain watching Avery endure the rape trial.

The motive for the Sheriff's Department to attempt to pin the crime on Avery is described as two-fold: In part, they were allegedly motivated by class bias against Avery for his family's salvage yard business; and in part, they were allegedly seeking revenge for an incident for which charges were already then pending against Avery in which he ran the wife of a Sheriff's Department deputy off the road and threatened her with a gun. Viewers are informed that the victim, Sandy Morris, also happened to be Avery's cousin, and that according to Avery, she had badmouthed him.

Viewers also learn that while Avery had prior brushes with the law, most of them were essentially harmless snafus of happenstance or bad luck rather than evidence of his character. For example, Avery's animal abuse conviction for tossing a cat into a campfire is described by Avery in voiceover commentary as the product of friends "egging" him on; and likewise, Avery attributes his decision to participate in a robbery of a local establishment as the product of hanging around with the wrong friends. According to Avery's family, Avery was not the type to commit a serious criminal offense because he was always such a happy, jovial guy. (Ducat: he was always "just happy, happy, happy . .. .")

Avery's civil suit attorneys, Glynn and Kelly, feature prominently in the episode as they describe what is apparently the evidence that they intended to use to prove the civil case against the County, including, among other things, (1) an alleged friendship between Sandy Morris and the detective who purportedly suggested to the rape victim that her description of the perpetrator sounded like Steven Avery; (2) a sketch of the perpetrator prepared by a high-ranking member of the Sheriff's Department whom Glynn and Kelly allege had access to Avery's mug shot as a guide for the sketch; (3) a claim that City of Manitowoc police officer told the Sheriff that Allen might be the suspect; (4) Assistant District Attorneys' warnings to then District Attorney Dennis

Vogel that Allen rather than Avery may have committed the crime; and (5) the discovery that in the Avery case file, there was a copy of a complaint against Allen for a prior sexual assault charge for which he had been prosecuted by Vogel.

As a result, Glynn and Kelly suggest, the case against the County for which they had demanded $36 million was essentially a slam dunk. Avery's former public defender is shown commenting that it was a "crock of shit" that the Attorney General's office refused to pursue criminal charges against law enforcement representatives in connection with Avery's prosecution. Glynn is also shown intoning mysteriously that the Sheriff's Department representatives are so "threatened" by the lawsuit that they are writing "memos" of things that happened "10 years earlier" over a copy of a document that will later be revealed as a memorandum written by Plaintiff, Andrew Colborn.

As the episode draws to a close, viewers are informed by an Avery relative that "something told her" that the County was "not done with" Avery and that they would make sure that they did not have to "hand that man $36 million." Glynn is heard stating, as images of police cars are shown, that the one thing they did not warn Avery about was that if you pursue a civil rights case against a County in which you still live, you could be "charged with murder." At that point, images of Sheriff's Department representatives, including Plaintiff, rotate ominously on screen over foreboding music. This is the audience's first introduction to the Plaintiff in this case, Andrew Colborn, who is shown as one of the looming threats waiting to exact revenge on Avery. The episode concludes with brief audio of an apparent conversation between a law enforcement officer and a dispatcher asking in the early stages of the Halbach criminal investigation whether Steven Avery is in custody.

**Episode 2, Dkt #120-2**

The second episode opens with audio of the phone call that Theresa Halbach placed indicating what time she would be arriving at the Avery salvage yard on what would be the last day anyone else saw her alive. It then launches into a disturbing home video of Ms. Halbach, several years prior to her death, in which she says that she wanted people to know if she dies that she was happy with what she did with her life. From there, MAM jumps back to Avery's release and an upbeat music track plays over video and photos of Avery and his new girlfriend, while Avery and others explain that he had set out to live his life anew.

Glynn also explains that Avery has become something of a "celebrity" in the criminal justice field, with politicians posing for photos with him. The audience learns that in October 2005, a criminal justice reform bill was introduced as "the Avery bill" and Avery was likely to receive $450,000 from the State of Wisconsin as compensation for years wrongly served for the Beernsteen rape. Glynn explains that this will keep Avery from accepting a "lowball" settlement in his civil suit. What appear to be "greatest hits" excerpts from the civil suit depositions followed, in which it appears that Kelley is decimating Manitowoc County witnesses.

With the air of an amiable gossip relishing his role as raconteur, Glynn then dishes that they learned in the lawsuit about some "serious meat" in the form of a telephone call that was received by Mr. Colborn when he previously worked as a jailor. While Glynn speaks, video imagery of Mr. Colborn appears in the background. "What we learn," Glynn says dramatically, "is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department (an image of Mr. Colborn's report is shown in background while Glynn is speaking) from another law enforcement agency . . . saying that they

had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison."

The series next jumps to scenes from Mr. Colborn's deposition in the Avery case, but the episode omits scenes that would have disclosed that Mr. Colborn testified that he transferred the call to the Detective Division. Glynn then continues, "Manitowoc doesn't have huge numbers of major assaults where people go to prison and certainly where people would still be in prison. . . . . at a minimum, somebody ought to check this out." MAM also includes a graphic as Glynn is speaking that states, "1995 ● Gregory Allen is arrested for sexual assault in Brown County / Andrew Colborn receives call about inmate confession."

Glynn continues speaking thereafter, stating, "The fellow who got that call was named Colborn. And you might say that there should be a record of him immediately making a report on this, there might be a record of his immediately contacting a supervising officer, there might be a record of him contacting a detective who handles sexual assault cases, ahh, there might be some record of it. But if you thought any of those things, you'd be wrong, because there isn't any record in 1995, 1996, 1997, 1998, 2000, 2001, 2002, 2003 . . . ." . MAM then displays a graphic with years running from a timeline image with Mr. Colborn's photograph above it, and a statement after the year "2003" that states, 'DNA evidence exonerates Steven Avery."

Episode 2 then continues to feature Glynn explaining how Mr. Colborn, allegedly realizing that he had "screwed up, big time" by doing nothing with the call, purportedly joined with other Sheriff's Department personnel to participate in a "conspiracy of silence" at Avery's expense. As Glynn ultimately intimates, this directly sets the stage for accusations, made directly by Avery onscreen, that the Sheriff's Department framed him for the Halbach murder:

| | |
|---|---|
| ECF # 120-2<br><br>20:25 – 21:13 | Glynn continues, "Now 2003 is a year that has meaning because that's when Steven Avery got out. And the day he got out, or the day after, that's when Colborn decides to contact his superior officer, named Lenk. And Lenk tells him to write a report. And then they go have contact with the Sheriff. . . . .why does it happen . . . when it didn't happen eight years earlier? Um, ahh, I mean, I think I know the answer. I think the answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk as his superior realized it, and the Sheriff realized it. |
| ECF # 120-2<br>21:08-21:12 | Images of Mr. Colborn, James Lenk, and the Sheriff are shown. |
| ECF # 120-2<br>21:12 – 21:39 | Glynn continues, "So Lenk tells Colborn to write a report, the Sheriff tells Lenk, 'Get me the report.' The Sheriff puts the report in a safe. That's how much he cares about documenting this thing. Well obviously it doesn't do anybody, it certainly doesn't do Steven Avery any good to document that eight years after the fact, because Steve Avery has been sitting in a cage . . . ." |
| ECF # 120-2<br><br>22:55-23:14 | Avery voiceover after civil deposition excerpts, stating, "A lot of people told me to watch my back. Most of the time, I didn't even believe them. But then, sitting and doing depositions, I don't know. It kind of changed my mind. They were covering something up." |
| ECF # 120-2<br>22:45-22:50 | Cuts to image with close-up of Mr. Colborn's signature. |

| | |
|---|---|
| ECF # 120-2<br><br>23:14-23:26 | Avery states, "And they were still covering something up. Even with the sheriff who's on there now – he's covering something up." |
| ECF # 120-2<br>23:28-23:50 | Cuts to footage of Mr. Colborn's videotaped deposition |
| ECF # 120-2<br>26:52-26:56 | Video image of Mr. Colborn |
| ECF # 120-2<br><br>26:56-27:33 | Steven Glynn asserts, "This was an unconscionable withholding of information that would have been of use to Steven Avery's lawyers . . . If that information had come to light in 1995, Steven Avery would have gotten out in 1995. So they cost Steve Avery eight years of his life. This is as close to a conspiracy of silence as I think you could find in a case." |
| ECF # 120-2<br>28:24-29:07 | Rotating images of Mr. Colborn, other alleged conspirators shown. |
| ECF # 120-2<br>28:35-29:37 | Interview with Walt Kelly, who states, "October of 2005, from the perspective of the Manitowoc County government and their defense lawyers, I believe they all knew they were in the most serious kind of trouble. There was a very grave prospect of a very, very substantial verdict. [Their] insurers have taken the position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the Sheriff and the DA, would be on the hook for those damages in the civil suit. |
| ECF # 120-2<br>29:40-30:22 | Glynn interview continues, "We don't need to have somebody tell us that this is going to have an effect on law enforcement. Of course it has an effect . . . . Imagine what it's like when you're going to say that you're a liar, and that you hid evidence, and that you deliberately prosecuted a person that you knew, or at least had reason to know, wasn't guilty of the crime? And putting all that aside, by the way, in terms of your own professionalism, there's a guy out there raping and beating women while the guy that you put in prison is sitting in a cell." |
| ECF # 120-2<br>30:29-31:04 | Glynn continues, "We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt [Kelly] who tells me that he has gotten a call from a journalist asking if either of us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach." |

Episode 2 then shows what appears to be video footage of the search for Ms. Halbach's vehicle on the Avery Salvage yard, as well as audio of the call made by the woman who located Ms. Halbach's green RAV 4 on the property. Low, staccato tones can be heard ominously in the background. News footage regarding Teresa Halbach's disappearance is followed by footage of an Avery interview in which he says that anyone could have access to his property to plant evidence

and accuses the county of possibly doing "something" with Teresa Halbach and trying "to plant evidence on me," adding that he "wouldn't put nothing past the county."

After footage from press conferences by authorities, Avery is heard saying, "All I can think is they're trying to railroad me again." Likewise, after a search of Avery's property is shown, Avery continues, "I ain't been home. They's been searching. You know, how hard is it to put evidence in the house or on the property? . . . .The . . . . Sheriff . . . was out to get me the first time. How do I know he ain't got nothing to do with it this time?" After more news footage, Avery continues, "all these memories and everything else, and they're just sketching me out again. . . . Following a montage of news reports, video of Ms. Halbach's family speaking to interviewers, a vigil for Ms. Halbach, and excerpts from a law enforcement press conference, Avery says tearfully, "You know we're all victims, and they just won't leave us alone. They just keep it up. . . . ." A press conference discloses that Avery has been arrested, but Walt Kelly is heard allegedly telling a news reporter that he does not know where Avery is being held.

Footage of an interrogation of Avery is shown in which he says that Ms. Halbach's bones and vehicle key and Avery's blood were planted on his property, stating, "See, if somebody else plants that shit there, you ain't going to see . . . ." The investigator is heard asking him, "You think two officers who don't know you . . ." The Halbach special prosecutor, Ken Kratz, is then shown explaining that Avery's DNA was found on the Toyota key. Afterward, Avery is heard telling the news media as he is transported to jail, "I'm innocent." The episode concludes as Avery is heard saying, "You know last time, it took me 18 years to prove my innocence. This time, I don't know how long," over the series' theme music.

### **Episode 3, Dkt #120-3**

The next episode begins with discussion of the fact that while the legislative reform initiated as the "Avery bill" would be signed, politicians were distancing themselves from him. Walt Kelley laments Avery's "transformation" from victim to accused, stating that Avery was "endangered" in his new role. The series then includes excerpts from the preliminary hearing in the Halbach case, showing Avery's brother stating, outside the courtroom, that the Averys were willing to pledge their property as bond and "risk everything" for Avery's defense. Fast-paced guitar strumming signals that something dangerous is underway.

After the probable cause finding, MAM shows Ms. Halbach's brother remarking in an apparent statement to press that he "doesn't believe" Avery's attempt to point blame at the "Manitowoc County police," followed by additional montage-style footage of news reports and other material. A sad conversation between Avery's parents and Avery in jail is shown in which Avery says that he's ready to give up, as well as a segment that includes Avery's family members reading angry letters from community members, followed by footage of a jail visit by Avery's relatives. Avery's father is heard thereafter saying, "They don't care. They'll take an innocent man and make him guilty . . . . we went through this 20 years ago and we're going through it now again."

The episode then features a number of unidentified individuals playing pool with Avery's brother, Chuck, in a bar. The substance of their comments is as follows.

| ECF # 120-3 14:14-14:42 | Unidentified woman in a bar states, "I really do think he was framed. . . .There's a lot that points to where the Sheriff's | Bar patron statement follows visuals of Mr. Colborn |
|---|---|---|

|   |   |   |
|---|---|---|
|   | Department could've had something to do with it. And then I don't know if it's true or not, but I also heard that Manitowoc County was not supposed to be allowed in to search, and they were in there and they searched. And that's who found the key apparently after the third day was the Manitowoc County Sheriff's Department. . . " |   |
| 3<br>ECF # 120-3<br><br>14:43-15:05 | Male bar patron adds, "I only have one word, from the cops on up: corruption. I mean, big time. I mean, if people dig far enough, they'll see that." |   |

| ECF # 120-3<br><br>15:06 -15:36 | Unidentified female bar patron continues, "I don't care what anybody says, that's a lot of money to pay out from here in Manitowoc County. It's a small area and I really, truly believe the county didn't have the funds to pay it out . . . .And they can say, "'Oh, you really believe the Manitowoc County police department and the FBI and everybody came in and they set all this up just to have Steven Avery guilty of this thing? Yes, I do. . . ." |

      The series then reveals Avery's settlement of his civil suit for $400,000, of which Avery is described as receiving $240,000, while his attorneys receive $160,000. In a telephone call with his sister, Avery is heard explaining that he "had to do it" in order to obtain funds to pay a private lawyer for the Halbach defense. He adds, "This way, they figure they just got away with it, they can do it again . . . . You know it ain't gonna stop 'em." Glynn describes the consequences of the settlement as "horrendous" because "nobody was being held responsible for what happened to Steven Avery." In a telephone call from Glynn to Avery, Glynn also introduces viewers to Avery's new private attorneys, Dean Strang and Jerry Buting. Glynn praises them and states that the "Manitowoc cops" respect Strang and that Buting has handled cases involving high notoriety. Buting and Strang are then shown on the salvage yard investigating the scene, followed by Strang's comments:

| ECF # 120-3<br><br>20:21 – 21:03 | Strang says in an apparent MAM interview, "I didn't see them plant evidence with my own two eyes. I didn't see it. But do I understand how human beings might be tempted to plant evidence under the circumstances in which the Manitowoc County Sheriff's Department found itself after Steven's exoneration of the lawsuit, of the Avery Commission, of the governor hugging Steven and holding him up as an example of the criminal justice system gone wrong . . . . I don't have any difficulty understanding those human emotions at all." |

| ECF # 120-3<br><br>21:16-21:49 | Buting, in an interview that was apparently also for MAM, states, "So, you've got motivation of the officers to want to get him. And then when lo and behold there's this woman who disappears and one of the last people she saw was Steven Avery. . . .`Now, we've got him. A-ha. We knew it.' They conclude that he's guilty, right off the bat. And they thought, `We're going to make sure he's convicted.'' And they helped it along by planting his blood in the RAV4 and by planting that key in his bedroom." |
|---|---|

Avery then says in a voiceover, "I got a better chance now. I got lawyers – the best ones in Wisconsin. Both of 'em. . . . . And there's so many ways they can go on this, to prove my innocence." Avery then goes on to identify law enforcement officers as suspects in Halbach's murder: "I just hope the truth comes out, of who did this. And if it's the cops, I don't know if we'll ever know that or not. See, that's the only thing that scares me." Avery's statements are also shown on the screen.

     The Undersheriff is shown indicating that it is "far-fetched" and "impracticable" that the evidence could have been planted. MAM then cuts to a press conference announcing a confession by Brendan Dassey, Avery's nephew, that he participated in Avery's rape and murder of Halbach. Authorities also explain that they conducted additional searches of the Avery property with the benefit of the information provided by Dassey. Via a news report excerpt, we learn that the Wisconsin Innocence Project removed Avery from its website. A call between Dassey's mother, Avery's sister, Barb Janda, and Avery in jail is played, in which Avery repeatedly denies any involvement in the Halbach murder and tells Janda that she needs to "figure out" why Dassey would admit to it. Janda is then shown stating that authorities "interrogated [Dassey] and made him say what they wanted him to." Additional news reports indicate that prosecutors added charges against Avery because of Dassey's confession and that the judge denied a request for the Averys to post their property as bail, instead increasing Avery's bail. Strang is featured telling the Court that Avery "is innocent." In a voiceover, Avery reiterates that he is innocent and should have been allowed to be released on bail, because "I'm innocent. Innocent people don't run." The series then features Avery's family members, including his father complaining that "They got our family all tore apart. It ain't right." A personal call between Avery and his girlfriend is shown in which they profess affection for each other.

     Reesa Evans, Avery's public defender in the Beersteen case, opines that it "doesn't seem likely" that Avery would have killed Halbach, as it was "a little too sophisticated" for Avery to have pulled off, but that if he did it, his anger at being wrongly accused for the Beernstein case could explain it. Next, Avery's girlfriend says that she was pressured by investigators to turn against Avery while she was in jail for a drunk driving offense. Dassey's mother then explains that it was only after Avery's girlfriend refused to cooperate that they "went after" Dassey. It is explained that he is a "slow learner." MAM graphics assert that Dassey was questioned three times without a lawyer present. Excerpts from video of Dassey's interrogation are contrasted with Avery's attorneys' expert asserting that investigators were "shaping' Dassey's statements. Buting is also shown in detail asserting that investigators "really messed up" in their handling of the interrogation. Dassey is then shown talking to his mother and stating in response to her question whether he did the things he said, "Not really." He tells her that the investigators "got into [his] head." Strang explains that for the authorities, charging Dassey was a strategic ploy

that took away Avery's alibi witness and made him a state witness instead. He also tells viewers that the evidence contradicts Dassey's statement and that the events described in the confession "didn't happen." Dassey is shown being arrested, and his mother laments at the end that he has been presented an offer that if he testifies against Avery, he will receive a much more lenient sentence than if he does not.

### Episode 4, Dkt #120-4

Episode 4 opens with more of Brendan Dassey and his mother agreeing that he is not guilty, followed by photographs of him as a child. Avery is then heard saying that he "feels sorry" for Dassey even though Dassey's statements made Avery "look bad." The viewers are also introduced to Dassey's new attorney, who describes his client as subject to the influence of "evil incarnate," an apparent reference to Avery. Avery is also heard explaining that he knows that Dassey was coerced into his confession because Avery himself did not do anything. The Court denies Dassey's motion to suppress the statements made to investigators. Teresa Halbach's brother is shown saying that the decision as "a big victory" for the Halbachs, but he is shown admitting to a reporter that he had not seen video of the confession. Dassey's investigator is then shown eliciting a written statement from Dassey that is also incriminating even though Dassey says several times that to the investigator that Dassey was "only there for the fire." Law enforcement officers are then shown interviewing Dassey outside his attorney's presence, apparently at his attorney's request. Another confession ensues, with investigators shown telling Dassey that if he lies to them, they will tell his mother. In audio of a phone call between Dassey and his mother, he says that he was there and that Avery did commit the crime. Avery's mother is shown saying that she knows they are innocent, but now Janda doesn't believe her.

Avery is then heard complaining that he won't get a fair trial because of the amount of media coverage of the case, and asking, "Where's the justice?" His girlfriend says in an interview that she spoke with Avery twice night of the Halbach murder and he sounded normal. Avery's father says that he doesn't think that Avery would kill Halbach when everyone knew she was coming there that day. Avery's investigator then criticizes the number of searches of the Avery property during the investigation. He says that as a result of the number of searches, "[t]he key was worthless." He also claims that investigators' claim that the only DNA found on the Toyota key is "patently ridiculous" and indicates to him that the key was "scrubbed clean" and Avery's DNA was placed on it.

Buting is shown criticizing the State's evidence. Attorney Buting, in an interview for MAM, states "Some would – might think, `Well, you know we – our hands were tied . . . .That you got a client who's saying that he's being framed. Publicly, that's kind of the defense you'd better go with . . . . But it really wasn't that way here. The defense was raised because we think the evidence pointed that way. . . ." In clips of an apparent news broadcast, then-Sheriff Peterson is heard rejecting the notion that law enforcement would have framed Avery, saying it would have been "easier just to kill him." Strang is shown calling the statement "insane." Brendan is then heard telling his mother in another call that he was not involved in Halbach's murder.

Avery's girlfriend suggests that she is drinking again in order to deal with the stress of the charges against Avery/ She is then re-arrested for drinking, and prosecutors allegedly pressure her to have no contact with Avery in order to stay out of jail. Avery's father is then shown looking at pictures of Sheriff Department representatives. Sheriff Peterson is then shown testifying at the Halbach trial in cross-examination by Strang. Dassey's mother is heard on the phone telling

Dassey not to agree to plead guilty, despite his attorney's apparent recommendation. Avery's father says angrily, "An attorney's supposed to work for you. That ain't no lawyer." Dassey's attorney is shown suggesting to a news reporter that Avery is orchestrating Dassey's request to terminate his appointment as Dassey's counsel. However, Dassey fails to persuade the Court that he should be provided a different attorney. Dassey's mother is heard saying afterward on the way out of the courthouse, "Dirty bastards." A news report of a statement by Strang then says that he denies that Avery is involved in Dassey's request for another lawyer, but that the family is frustrated that no lawyer is really defending Dassey. Meanwhile, Avery's father is heard informing Avery that Avery's girlfriend is breaking off their relationship, apparently in response to pressure from authorities.

      Dassey's attorney summarizes a letter that was sent by Dassey to the judge indicating that Dassey was not involved in Halbach's murder and that he was merely at a bonfire later. He calls the letter "kind of dumb" and says that it helps Avery by limiting Dassey's value as a witness. Strang is shown speaking sadly about Dassey's situation while driving. Dassey's attorney is dismissed and is shown justifying his decisions in response to questions from reporters. Avery is heard saying that it's "hard" that he is in jail by himself and can't talk to anyone.

      Buting says in another MAM interview, "Sheriff Peterson . . . .clearly, clearly has a strong dislike for Avery.  If the very top guy has this kind of attitude . . . that's gonna permeate the department, the whole department.  If not, at least it's going to permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants."At that point, a graph showing photographs of a Sheriff's Department hierarchy appears on screen.  The photographs of two lieutenants and sergeants, including Mr. Colborn, are then suddenly illuminated during the words "lieutenants and sergeants." Buting then states that in their view, Lenk's name "just kept coming up, over and over and over, at critical moments." Buting says he did not believe that it was a coincidence that Lenk signed a form relating to the transmittal evidence for the prior rape case to the State. Buting then tells Strang says in telephone call as they are examining a blood vial containing Avery's blood that because the tube contains a needle hole, this shows that "Some officer went into that file, opened it up, took a sample of Steve Avery's blood and planted it in the RAV4." He says, "Game on," to conclude the episode.

**Episode 5. Dkt #120-5**

      The episode opens with continued apparent reaction by Avery and Buting to the vial of evidence. The prosecution and defense are shown arguing to the Court whether the State should be permitted time to address the claim regarding the blood vial as support for a defense that evidence was planted. Another segment shows the respective attorneys arguing whether the State should be penalized for dropping charges that would depend on Dassey's testimony so close to Avery's trial. The judge permits the State to drop the charges without penalty. Buting and Strang are shown ruing jury questionnaires in which responses apparently assert that Avery is guilty. Avery's mother is shown watching a news report regarding jury selection. Attorneys and spectators are shown congregating at the courtroom as ominous music plays.

      Excerpts of the State's opening statement are shown. Avery is then heard saying in an apparent telephone interview with MAM, "They wouldn't look at nobody else. They're paying all their attention to me. And they shouldn't be doing that. That's what they did before." Again, Avery's words are shown in print on screen. Buting discusses the strategy for responding to the prosecution's opening, again in a private interview with Buting. He tells the audience that the

jury doesn't yet know that "there is evidence that [Halbach's] bones were moved." He also says that he is now "more worried" about the blood vial argument because the FBI may come up with some "dishonest" test to claim that the blood in the vial from Avery's former prosecution is different from the blood in the RAV. He adds that, "If they would go to the length of planting the key, which I think the jury's going to get, then the blood follows easily." MAM includes excerpts from Strang's opening, including reference to Mr. Colborn's discussion with Avery during the missing persons phase of the investigation and Mr. Lenk's alleged offer to assist in the investigation. Strang argues that whomever killed Theresa Halbach "exploited" the Sheriff's Department's tunnel vision in focusing on Avery. MAM then shows an apparent excerpt of Avery being interrogated, played over eerie music.

 Avery's nephew Bobby Dassey testifies (in presumably heavily edited footage) that he saw Ms. Halbach walking toward Avery's trailer after she arrived and that her vehicle was still on the Avery property at about 2:45 p.m. He also testifies that Avery made a comment to him later that day, which Dassey interpreted as a joke, asking if he wanted to help Avery get rid of a body. Strang is shown arguing to the judge that the Court should declare a mistrial or instruct the jury to disregard the testimony as false because the substance of Dassey's testimony was not disclosed to Avery's counsel. Excerpts from press conferences with the respective attorneys follow, concluding with a reporter asking, "How can Ken ask that question?" Viewers are informed that Willis denies the motion for a mistrial. Avery's mother says, "We always thought Bobby liked Steven. Now it doesn't seem like he does." Buting is shown in an interview saying that because law enforcement had "tunnel vision," the opportunity to pursue leads about other suspects was lost. Ms. Halbach's brother testifies regarding his listening to Halbach's voicemail messages, but he denies erasing any of them. Buting is shown examining a witness who contends that some messages were apparently erased because the voicemail was not full anymore as it allegedly had been previously. A witness testifies that Ms. Halbach had been receiving nuisance calls prior to her death. Buting is shown arguing that "something was going on" with Halbach's phone while Halbach was being described as missing. The judge states that he does not see the relevance of the defense's intended evidence. Avery is heard saying, "I saw her leave. So I'm not the last one [to see Ms. Halbach.] Whoever did this is the last one."

 Strang makes an argument in an interview with MAM that uncertainty in the criminal justice system should result in any error being decided against the State and for the individual. An investigator testifies that as Avery was the last person to see Ms. Halbach alive, he was the most logical place to start. Buting asks whether they should have investigated her roommate, who failed to report her missing for several days. Buting is shown out of court in an apparent interview stating that while in most cases, the people closest to the victim are investigated, that did not happen in this case. Ms. Halbach's roommate testifies about learning that Ms. Halbach was missing and what he did next. He testifies that the police never asked him for an alibi and he was not treated as a suspect. After a swell of foreboding music and a glimpse of footage apparently from the missing persons search, Kratz and Buting examine the roommate, and he acknowledges that the only person to whom he gave a camera on the date of the search is the woman who ultimately found the RAV4, Pam Sturm. Ms. Sturm is then shown testifying regarding the search. Buting is then shown stating in an out-of-court conversation with Strang, apparently filmed by MAM, that he does not believe Sturm.

| ECF # 120-5<br>52:03- 52:12 | Buting states, "Somebody knew that [Ms. Halbach's vehicle]" was there before they ever went in there. I'm convinced of it." |
|---|---|
| ECF # 120-5<br>52:13 – 53:20 | Interrogation of Avery regarding follows Buting's statement; Avery tells an officer that he was told by a woman identified only as "Tammy" that "a cop" put Ms. Halbach's vehicle on Avery's property "and planted evidence." |
| ECF # 120-5<br>53:20-:24 | Immediately after the above, cuts to footage of Mr. Colborn about to testify |

After Avery's statements that he heard from someone else that "a cop" had "planted evidence" and put the RAV 4 on his property, MAM cuts directly to what is implied to be actual footage of Mr. Colborn's testimony at the trial. Strang plays a recording of Mr. Colborn's call asking a dispatcher to run Ms. Halbach's plate. Strang asks, "And then, you tell the dispatcher, 99 Toyota?" Mr. Colborn responds, "No, I thought she told me that." The call is replayed. In his actual testimony at trial, Mr. Colborn acknowledged that he made the statement to the dispatcher, conceding the mistake in his prior response. However, in MAM, Mr. Colborn appears to make no such correction; rather, the camera simply pans to him after Strang shuts off the audio of the call.

Strang is shown asking Mr. Colborn, "Were you looking at those plates when you called them in?" Mr. Colborn responds, "No." MAM shows Strang asking, "Do you have any recollection of making that call?" Strang is then shown asking Mr. Colborn, "Investigator Wiegert, did he give you that plate number before you called it in?" Mr. Colborn appears to respond, "No, I just don't recall the exact content of our conversation back then, but he had to have given it to me, as I wouldn't have had the number any other way."

In MAM, Strang next asks, "Well, you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota." In MAM, Mr. Colborn appears to damagingly admit, "Yes." Strang then says, "But there is no way that you should have been looking at Teresa Halbach's license plate on November 3, 2005." Mr. Colborn responds, "I shouldn't have been and I was not looking at the license plate." Strang states, "Because you're aware now that the first time that the license plate was reported found was two days later . . . ." At this point, eerie music that had been pulsing and swelling during Mr. Colborn's testimony is punctuated by spooky chime tones. Mr. Colborn responds, "Yes sir," followed by an immediate cut to the MAM theme music.

**Episode 6, 120-6**

At the beginning of the next episode, MAM flashes back to a press conference that occurred in 2006 and during which prosecutor Ken Kratz goes into great detail regarding the events described in Brendan Dassey's confession. Buting and Strang are shown brainstorming how to deal with the State's decision not to call Brendan Dassey as a witness even though "everybody knows" about the confession. MAM then shows what appears to be footage of the search of Avery's garage that occurred after Dassey's confession, as an investigator testifies

about the search. Strang and Buting are then shown in another apparent brainstorming session in which Strang questions why Manitowoc County representatives needed to participate in the search. Buting is then shown cross-examining an investigator. Buting asks him to admit that after four months of investigating that they had not found Ms. Halbach's DNA in Avery's trailer or the garage.

The State's bone expert is shown testifying that Ms. Halbach died by homicidal violence. Ken Kratz is then shown talking to reporters outside of court. More footage of the search of the garage is followed by examination of crime lab witness Sherry Culhane. She testifies that she found that the DNA of Teresa Halbach matched a bullet found in the Avery garage. She also acknowledges that she inadvertently introduced her own DNA into a control sample, but she says that it did not have an impact on the profile of the evidence sample. A reporter is shown questioning prosecutors as to whether the Halbach DNA could also have been introduced by mistake, which they deny. Buting is then shown at the press conference questioning the accuracy of the testing. He also asserts that because the bullet was found during a later search, it was found "under suspicious circumstances." Buting is shown examining Culhane, who acknowledges that she was asked by investigators to try to use the testing to confirm that Ms. Halbach was in the Avery trailer or garage. She also concedes that protocol would usually call for her to classify a test as "inconclusive" if a control is contaminated, but an exception was made in that case. She concedes that it is the first time she has made such an exception. Reporters are shown questioning prosecutors about the testimony. Avery is next hear stating in voiceover, "Somethin' ain't right. That's all I know. . . ." with the text of his statements appearing onscreen.

A meeting between Strang, Buting and Aery's parents is shown in which they all agree that there is too much blood in the human body for there to have been no blood found in Avery's trailer. Buting and Strang are then shown with Buting discussing how difficult it is to clean up blood splatter from a gunshot. Further cross-examination of Culhane is interspersed with criticism from Avery's investigator that indicates that Avery would not have been able to clean up the blood in the garage if Ms. Halbach had been shot there. Culhane admits on cross-examination that several other items did not test positive for Ms. Halbach's DNA nor for Dassey's DNA. At a press conference, Kratz indicates he will not spell out his theory entirely until closing argument. Buting and Strang are shown driving and discussing the case. The State's witness is shown testifying again regarding the bones that were examined for the case. The vast majority of the bone fragments were found in the burn pit behind Avery's garage, but she could not rule out another burn site. An investigator is examined regarding the process of colleting the bones. Avery's expert criticizes the collection as procedurally improper. He also testifies that his experience is that the place where the most bones are found is usually where they were moved. Strang is shown talking while driving in his car about the bone movement arguments. In a voiceover, Avery says that he can't figure it out, "just like the last case." His words appear onscreen again. Avery's parents are shown waiting for a visit, followed by photographs of the RAV 4. An expert testifies about the stains in the RAV4. Buting is shown indicating that the blood in the RAV4 "helps" the defense as evidence that she was killed off the Avery property. Avery's brother-in-law, Scott Tadych, testifies that he saw Avery standing next to a large fire. Buting suggests in more out-of-court interview commentary that it is odd that Tadych and Bobby Dassey identify each other as they drove past each other the day that Ms. Halbach was last seen.

A bus driver is shown testifying that she saw a woman taking photographs of a van at approximately 3:30 p.m. Strang explains to reporters out of court that the bus driver is the most

reliable witness regarding time and her testimony contradicted Bobby Dassey's timeline, Avery is then heard in voiceover saying, "The evidence don't make no sense . . . .. and how do you prove the Sheriff's Department's doing something?" His comments are again shown in text on the screen. Strang is shown in an interview with MAM indicating that "no sane lawyer" looks forward to presenting a framing defense because people implicitly tend to trust the police. As ominous music plays, Buting, in an interview with MAM, states, "One of the things that the state argued was that it would have taken a wide-ranging conspiracy . . . . Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?" James Lenk is then shown being sworn in to testify, and the episode ends over the series' theme music.

**Episode 7, Dkt #120-7**

Calumet County Sheriff Pagel is shown at a press conference stating that the Manitowoc County Sheriff's Department was only to provide support and equipment. Avery's father says, "They had Steve picked . . . right away. They set him up. Right from the beginning. . . .They didn't find nothing down at his trial for three or four days, then all the sudden . . . oh, we found this, and we found that. And then the Manitowoc cops found they key! They weren't supposed to be investigating this at all. Right?"

Footage is shown of the search. Calumet County Sgt. Tyson testifies that he was told that no Manitowoc County officer was to be alone on the property and that if they were to locate evidence, it was to be turned over to Manitowoc County. Tyson acknowledged that he knew that Avery was suing Manitowoc County. He said that he watched what the Manitowoc County officers were doing. Buting asks Tyson whether he ever had to "act like a babysitter" while other officers were conducting a search. He is shown as responding, "No." Tyson indicates he was not present on the date that the Toyota key was found. The Calumet County Sergeant, Sergeant Kucharski, who was present for that search, indicated that it was "possible" that Mr. Colborn and Mr. Lenk planted the key in the sense that it was "possible" that aliens were in the room. Sergeant Kucharski testifies that the key might have fallen out of a bookcase. Strang cross-examines Mr. Lenk who testifies that objects were removed from the bookcase. An out-of-court conversation between Buting and Strang follows:

> Buting: "It's not enough to just get the key. He wants Avery's DNA on that. And so he is gonna wait until it is the right time. And there is a Calumet County deputy with him on all of their searches.
>
> Strang: Yep. There is . . . .
>
> Buting: Somewhere nearby, and he was just waiting for the right time . . . when he could do it.
>
> Strang: That key does not fall from, you know, in between the backboard and the frame of that little bookcase.
> . . . .

> Buting: And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?
>
> Strang: Blood's easy. . . .
>
> Buting: The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation . . . because of that lawsuit. They were deposed in the lawsuit. They didn't tell. . . ."

Strang then cross-examines Mr. Lenk and asks if it would have been fairer if he had disclosed that he had been deposed in Avery's lawsuit before he joined the search on Avery's property. After Mr. Lenk's testimony, images of Avery's mother cooking in her kitchen are shown as Avery states, "I'm in the same situation that I was before. Just a couple of them wanting to nail me. And the other ones didn't. But nobody speaks up. I gotta go through this over and over." MAM displays an image of Mr. Colborn, as audio of Avery continues; video then switches between images of Mr. Colborn waiting to testify, Avery looking sad, and Mr. Colborn in court.

Mr. Colborn is shown testifying after Avery's comments. Spooky music plays while Mr. Colborn is asked to describe the call that he received while he was working in the Manitowoc County jail. Ken Kratz asks him, "Do you even know whether that call was about Steven Avery?" He responds, "No sir." In further questioning by Kratz, Mr. Colborn is shown testifying, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not."

Strang then cross-examines Mr. Colborn. MAM cuts to an Avery investigator speaking in an interview. He criticizes Manitowoc County officers as having a conflict of interest, which he says brings into question their "actions and credibility" throughout the case. Mr. Colborn is then shown acknowledging that he was with Lt. Lenk while searching the Avery property. He is asked about police reports. He asks Mr. Colborn, "Your total contribution is a little less than half a page?" Mr. Colborn appears to respond yes to the question. MAM then appears to show the following exchange between the prosecutor and Mr. Colborn to which he answers, "If I wrote a report about every call that came in, I would spend my whole day writing reports."

Strang concludes his cross-examination, saying, "That's all I have." At the Halbach trial, the judge immediately says, "You're excused," to Mr. Colborn. Without hesitation, Mr. Colborn stands and exits the witness stand. However, in MAM, Mr. Colborn is shown sitting on the stand for several seconds looking deflated while ominous, pounding music plays in the background. MAM next shows excerpts from a news conference footage of exchange with reporter in which she questions Strang about whether the defense went too far by accusing Mr. Colborn of being a "bad cop," which includes the following:

> Strang: This was a hard day, and there've been some hard days for Sgt. Colborn. . . ."
> Reporter: "But my question is though, if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place."
>
> Strang: You're hearing evidence of the conspiracy. And I've sat in many a federal courtroom and heard federal prosecutors prove a conspiracy on less than we've heard already hear and that you will hear by the end of this trial."

Buting says off camera, "The way the case is coming in at this point is much better for the defense than I would have thought, much better. Every single day, we're reminding them of Manitowoc County's bias in the investigation."

A Sherriff's Department representative is shown testifying that no person or citizen approached the RAV4 while he was standing watch over it. He did not see Mr. Lenk or Mr. Colborn near it. Buting cross-examines about the log for the RAV 4 scene. An investigator testifies that he saw no one tamper with the vehicle. Buting asks him whether he was concerned that for four hours, the vehicle was under the control of Manitowoc County officers. Buting elicits testimony that Mr. Lenk signed out of the scene one day but did not sign in.

Mr. Lenk testifies that he arrived at the scene shortly after 2 p.m. on November 5 but he did not recall a there being a log-in sheet at that point. He testifies that he did not have any contact with Ms. Halbach's SUV at any time that he was on the property. Spooky music plays in the background. Mr. Lenk admits that he previously testified that he arrived at the property at 6:30 p.m. or 7 p.m. on November 5.

ADA Norman Gahn is shown stating that his blood boils when the officers are accused of planting evidence. Buting is shown at the same press conference criticizing Manitowoc County's handling of the investigation. A shift leads to foreboding music as Buting states in a private interview that Mr. Lenk "would have known" that Mr. Lenk's blood was available in the clerk's office.

Buting is then shown examining a clerk who testifies that it is "not unusual" for officers to be in the clerk's office and that the security bailiffs would have "master keys" that would enable them to access any room in the courthouse even when the clerk's office is closed.

Audio of a telephone conversation between Avery and his mother follows:

Avery's mother: It seems suspicious.

Avery: Yeah.

Avery's mother: Them people ain't gonna get away with everything.

Mrs. Avery is shown leaving the jail and remaining silent while reporters pepper her with questions about her visit with Avery.

Buting is shown explaining in an out-of-court MAM interview that no one tested blood for the presence of the preservative EDTA at the time the case started, but that the FBI "somehow" managed to create a test for EDTA after the trial. Buting is shown at a press conference stating that the judge is the first to rule that EDTA evidence is admissible. "It's scary," Avery says in a voiceover. An FBI agent testifies that they are responsible for investigating crimes of public corruption. He testifies that he concluded that the blood samples from the RAV 4 did not indicate the presence of EDTA and did not come from the vial of blood in the Manitowoc County Clerk of Court's office. Dkt # # 120-7 37:43. Following segments regarding testing of the blood by the FBI, Buting is shown stating, "Look how quickly they got the FBI to retool their instruments . . . . It shows the imbalance between the individual and the power of the government. The full force of which they're trying to bring to bear on this man. Why? . . . Because we have accused – and the evidence suspiciously points to – framing by one of them. . . . . Again, it's not like they think they're framing an innocent man. But they are."

Because the final three episodes do not focus as much on Mr. Colborn, instead of the narrative style used for the entirety of the first seven episodes, Plaintiff provides the following highlights:

**Episode 8 (Dkt. #120-8)**

● Eerie, foreboding music plays as the Averys and their lawyers in the courtroom (25:50-26:00).
● Avery is shown shaking head as the verdict is read (26:50-27:30).
● There is a long take on Avery, with sad music playing in the background, and shots of his mother looking upset (27:30-27:50).
● In footage of press conferences, first brief remarks by Kratz are shown, then comments are made by Strang and Buting are shown going to the podium. Strang says that the verdicts are clearly inconsistent. He says, "Our criminal justice system failed [Avery] before and I fear this is another example." He adds that it's "sad" that as a society, "we haven't mastered justice any better than we have." (29:35-31:55).
● A reporter asks, "So do you think there's a killer out there who has not been caught?" (31:56-32:08).
● Buting replies, "Absolutely. That's been our position all along." (31:56-32:08).
● Avery's father is shown saying, "They got their way, period. Manitowoc County won again." (33:24-33:31).
● Shortly thereafter in the episode, MAM features an interview with an excused juror that says that he felt that there were "biased jurors" who had their minds made up. He said that other jurors were "weak and tired" and that, as a result, the verdict "may have been a compromise." The excused juror states that there are, in fact, "a lot of unanswered questions," adding "I believe we don't know for sure. . . . .who killed Teresa . . . ." (35:40-36:35).
● Following the interview with the excused juror, MAM includes footage from an interview with Avery's investigator in which he accuses the prosecutor of acting "unprofessionally" and states angrily, "This wasn't seeking a truth, this was seeking a conviction." (37:00-37:50).
● Kim Ducat, Avery's cousin, is then shown stating that the conviction proves that "they" were "hellbent" on "nailing" Avery (37:50-38:10).

**Episode 9 (Dkt. #120-9)**

● Strang directly criticizes the Dassey verdict and says he does not believe that Dassey committed the offenses for which he was convicted (56:45-57:50).
● Avery's mother states, "I love [you] guys and I know you're innocent." (57:50-58:00).
● Clips are shown from the Avery sentencing hearing, at which he denies killing Teresa Halbach and states that he will prove his innocence (1:00:05-1:01:00).
● Strang is shown stating to the camera, "Most of what ails our criminal justice system lie in unwarranted certitude on the part of police officers and prosecutors and defense lawyers and judges and jurors that they're getting it right." (1:03:11-1:03:30).
● Buting is shown stating to the camera, "We can never be guaranteed that no one's ever going to accuse us of committing a crime. And if that happens, then you know, good luck, in this criminal justice system." (1:03:49-1:04:06).

**Episode 10 (Dkt. #120-10)**

● A reporter for a local radio station is interviewed noting that everyone was convinced that Avery was guilty of rape until evidence proved otherwise and that now, with the Halbach case, investigative techniques are better and that in the community, the feeling is that Avery "got what he deserved." (2:40-3:20)
● Allan Avery is shown stating, "They ruined us. They ruined our business." (3:54-4:00)
● Avery says, "I gotta prove my innocence again. Just like my first case." (5:06-5:30).
● Post-conviction, most hearing footage is shown with a voiceover of Avery stating, "The appellate attorneys – they gotta find a loophole that what they did, it's not legal." (6:23-6:37)
●Allan Avery states that Avery's mother has "a lot of hope for a new trial" as a result of Avery's appeal. (7:13-7:20).
● Avery's girlfriend states in an interview with MAM that she "truly did not believe" that Avery was guilty. (8:25-8:40)
● Dassey's mother (Avery's sister) is shown stating in 2010, "If Steven would have done it, I think he would have confessed by now. And he hasn't confessed. I believe he's innocent." (10:40-10:55).
● Printed words on screen state, "In August 2011, the Wisconsin Court of Appeals upholds Judge Willis' decision denying Steven a new trial." Immediately following that statement, Avery states, "I always feel like they kicked me in the gut again . . . ." (39:36-39:45)
● Printed words state, "Four months later, in December 2011, the Wisconsin Supreme Court refuses to hear Steven's case." Immediately after, Avery states, "They shoulda did something. They shoulda heard it. Because the case doesn't make no sense. You always get let down by the court system." (39:57-40:13)
● Printed words on the screen state, "At the filmmaker's request, Steven's former lawyers meet to discuss Steven's remaining legal options." Those present are shown as including Glynn, now identified as part of the post-conviction team; Strang; and Buting. During the meeting, Buting states, "I've still got my suspicions about whether something improper occurred during the deliberations." (41:14-42:35).
● MAM next cuts to an interview with the excused juror, who states, "I feel terrible that Teresa's gone . . . but I also on the other hand feel bad because Steven and Brendan's life has been taken from them, basically . . . . deep in my heart, with all the evidence and all of the things that I know . . . whoever did this to Teresa is still out there." (43:39-45:01)
● Avery's mother is shown stating, "I'm stickin' by Steven." She is also shown displaying a home listing for a house that she has "picked" for Avery "when he gets out so that he has got a good place to live. After being in prison for something he don't even do." (45:48-46:21)
● Avery is next heard stating, "I'm trying to fight for a new trial." (46:40-46:50)
● The broadcast features Avery's *pro se* post-conviction motion. (46:32-49:08)
● Following sentimental footage of Avery's parents, Kim Ducat, Avery's cousin, is shown stating, "I hope when the day comes when he's freed, his name is finally cleared, that his parents are still there . . ." (58:25-58:45)
● Buting is shown stating, ". . . . This may take a while to right this wrong. It took 18 years last time. I certainly hope that it doesn't take another 18 years." (1:00:00-1:00:14)
Case 1:19-cv-00484-BHL Filed 04/30/20 Page 45 of 90 Document 131 46
● Avery states, "I want my life. But they keep on taking it . .