IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

ANDREW L. COLBORN,

                  Plaintiff

v.

NETFLIX, INC., et al.,                              Case No. 19-CV-484

                  Defendants.

---

## PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF FACT

---

1.      This case arises out of the Netflix series, "Making a Murderer" ("MAM").
Defendants Chrome Media, LLC (Chrome") and its principals, Laura Ricciardi and Moira
Demos, take significant credit for the content of MAM, contending that they are "producers" of
the series. However, Netflix was also undeniably heavily involved in the creative development of
each and every episode, as described further below. Netflix approved the final cuts of all MAM
episodes. Dkt #286, . Barker Decl., Ex. 3, Nishamura Tr. at pp. 170-71; Ex. 4, Del Deo Tr. at p.
141; *see also* Barker Decl., Ex. 21. Netflix aimed to craft the series from "a marketing
perspective" and also from an "awards qualifying perspective." Barker Decl., Ex. 1 (NFXCOL
¶308).

2.      During the course of MAM's production, Netflix's creative team and the creative
team for Chrome participated in calls that were held for the most part on a weekly basis.  Barker
Decl., Ex. 2 (Manhardt 65). At these calls, Netflix provided its comments and direction for the
series. *Id.* Netflix creators viewed numerous versions of the respective editors and had seen early
"assemblies," or what amounted to very rough drafts, of the earliest episodes. *Id.* Ex. 1
(NFXCOL 1906).

3.      Chrome intended that the "storyline" of MAM would assist viewers to "regain
faith" in Steven Avery despite his conviction for the Halbach murder and persuade them to

"question the evidence" against him. Barker Decl., Ex. 2 (Manhardt 141); *see also* Barker Decl., Ex. 2 (Manhardt 149) (MAM's creators hoped that the audience would "feel guilty" for initially believing prosecutors' allegations against Avery); Barker Decl., Ex. 2 (Manhardt 63) (Chrome's primary editor treated the Averys as the "underdog heroes" of the series, while law enforcement representatives were portrayed as the "overdogs."); (Manhardt 86, 432, 469, 473, 549) (Chrome editors also expressed personal affection – "lots of love" – to Avery and his family).

4.     Chrome was so invested in Avery's quest to prove his alleged innocence that they were also involved in efforts to brainstorm with Avery's defense attorneys to attempt to obtain additional testing of evidence presented in his defense, news that Netflix embraced. Barker Decl., Ex. 1 (NFXCOL 1907, 1930). Netflix likewise started from the point of view that Avery was "innocent" of the Halbach murder and that the judge was "biased" against him. Barker Decl., Ex. 1 (NFXCOL 1949, 1961, 2131).

5.     In telling its story, MAM relies heavily on Avery and people who were friendly to him as "reliable narrators." Barker Decl., Ex. 2 (Manhardt 381, 406, 483, 493, 529). In particular, Netflix sought to augment the series' reliance on "voiceovers" by Avery himself to tell Avery's "narrative." *Id.* Ex. 1 (NFXCOL 199, 2011).

6.     The final product for MAM, according to Netflix's creative team, was to provide "an immersive and all-encompassing experience for the viewer including deft and unexpected foreshadowing of key elements, pitch perfect call-backs of evidence and breathtaking reveals," accompanied by a "thriller" atmosphere imparted through the music score. *Id.* Ex. 1 (NFXCOL 1933-34). Netflix advised Chrome that Netflix was looking for the series to leave viewers feeling "terrified and enraged, to feel as though it's their responsibility and need to discuss this case, to raise it in the social consciousness and to drive awareness . . . . Leave the audience feeling angry!" Barker Decl., Ex. 1 (NFXCOL 1964, 2125). They further directed, "Our audience needs

to be left not only feeling extremely upset and saddened for Steven and Brendan but also incredibly angry." *Id*. "We want to feel the swells of hope, the range of injustice, the horror of the defenseless," Netflix continued. "Viewers across the globe should be in tears and shouting at their screens throughout." *Id.* Ex. 1 (NFXCOL 1977). Netflix directed Chrome to "ratche[t] up" the episode in which the guilty verdict against Avery is returned, stating, "Currently the beat emits anger and we feeling justice was done, but given the overall investment made in watching 8 hours thus far, the audience should be feeling more intense anger, sadness, bewilderment, and perhaps even fury at this jury decision." *Id*. (NFXCOL 2163-64, 2186-87) In order to further infuriate viewers, Netflix encouraged Chrome to look for footage of Avery and his family looking disappointed and footage of law enforcement officers, including Mr. Colborn, "showing satisfaction*." Id.*

7.     Netflix advised Chrome that Avery's civil suit was to be portrayed as a virtually assured victory prior to the Halbach murder. Barker Decl., Ex. 1 (NFXCOL 1946). None of the attorneys who were involved in the defense of the Avery suit appear in the episode, nor is there any independent legal commentary that might describe, for example, the legal standard that a plaintiff is required to meet in order to prevail on a claim like Avery's. *Cf*. Dkt. #120-2 (Episode 2, featuring Steven Glynn and Walt Kelly discussing the civil case). Chrome's editor testified that while some films include objective commentators, this was "not that sort of film." Barker Decl., Ex. 13 at pp. 94-95.

8.     Netflix also provided direction that the episode should "set up" for viewers the notion that Manitowoc County law enforcement were going to "seek revenge" against Avery because of his civil suit. Barker Decl., Ex. 1 (NFXCOL 1940, 1978).

9.     Netflix encouraged Chrome to include photos of Avery and his family to "make them look like a very happy family." Barker Decl., Ex. 1 (NFX 1935). Netflix likewise encouraged the

3

use of "sweet photos" of Avery and his nephew, Brendan Dassey as children "to reinforce the sense of injustice and calamity" that was the series' goal. *Id.*, (NFX 1952). Where convenient, Chrome's editor expressed willingness to use footage from one family gathering to represent it as another or to swap images of children regardless of their actual identities. Barker Decl., Ex. 2 (Manhardt 0000328, 553-54)

10.     During his deposition in the Avery civil case, Mr. Colborn testified that he received a call in 1994 or 1995, when he was working for the Manitowoc County jail, and the caller indicated that someone in another county may have committed an assault and that someone might be in the Manitowoc County jail for that same assault.[1] Dkt. #120-14 depo. pp. 10-11. Mr. Colborn testified that he transferred the call to the Detective Division. Dkt. #120-14 pp. 14-15; Dkt. #129-1 at 12:41-14:30. MAM's editor had full access to the deposition videos and transcripts from the civil case from which the excerpts were taken. Barker Decl., Ex. 13 pp. 70-73, but a Chrome production email message noted that information about the call did not fit neatly with Glynn's accusation that nothing was done with the call at the time. Barker Decl., Ex. 2 (Manhardt 00000509, 524).

11.     During the early stages of production, Netflix representatives complained that the details surrounding the call were "confusing" and that "it seemed very thin that Colborn not having specific knowledge of who called him would be key to the case." Barker Decl., Ex. 1 (NFXCOL 210, 1937-38, 1981-82). Netflix added that this revelation initially seemed "weak." Despite these concerns, Netflix and Chrome jointly thereafter crafted a "clear" storyline that "sharpened" the impression created by stacking excerpts from other witness' depositions in the Avery civil case. *Id.* Ex. 1 (NFXCOL 227, 231, 1946, 2019); MM 244-45, 280. In addition, because the phone call was

---

[1] As shown in Episode 1 of MAM, Avery was transferred between several Wisconsin state prisons throughout his sentence for the rape; he was not housed in the Manitowoc County jail in 1995. Dkt #120-1.

"something we keep going back to throughout the series," Netflix recommended bolstering it with a chart to emphasize "connections between various law enforcement officers" referenced in the segment. *Id.* (NFXCOL 293, 329).

12.     Netflix representatives encouraged Chrome to maintain bar patrons' statements that Avery had been framed by Manitowoc County law enforcement in the series. Barker Decl., Ex. 1 (NFXCOL 1953, 2050, 300).

13.     Avery was used as a "narrator" for his trial in the series. *See, e.g.,* Barker Decl., Ex. 2 Manhardt 381, 406, 483, 493; screeners "Andrew and Catherine" note that using Avery as narrator for his own trial works well. *Id.* at Manhardt 528 – 530. As he speaks, Avery's statements are often also shown on the screen, a technique that Chrome used to highlight the "very important" things that Avery said in the series.  Barker Decl., Ex. 2, Manhardt 493.

14.     Near the end of Episode 5 of MAM, Strang is shown asking Mr. Colborn, in what appears to be actual, unedited trial footage, "And then, you tell the dispatcher, 99 Toyota?" Mr. Colborn responds, "No, I thought she told me that." Dkt. #120-5 at 55:05-55:15.  The call is replayed.  In his actual testimony at trial, Mr. Colborn acknowledged that he made the statement to the dispatcher, conceding the mistake in his prior response. Barker Decl., Ex. 19 pp. 180-186. However, in MAM, Mr. Colborn appears to make no such correction; rather, the camera simply pans to him after Strang shuts off the audio of the call. Dkt. #120-5 at 55:15-55:30.  Netflix's creative team praised this point in the episode – which had been revised from a prior version, as making Mr. Colborn look "caught in a clear lie." Barker Decl., Ex. 1 (NFXCOL 2063).  The edit also gave viewers the impression that he "didn't have much of a response after [Steven Avery's] defense attorney played the recording twice. At least not from what the documentary showed." Dkt. #132-7.

15.     Immediately following that edited footage, Strang is shown asking Mr. Colborn, "Were you looking at those plates when you called them in?" Mr. Colborn responds, "No." Dkt. #120-5 at 55:25-55:35. In the Halbach trial, Strang moves right into the next question; there is virtually no pause. Barker Decl., Ex. 19 pp. 184-186; Barker Decl. Ex. 3. In MAM, Mr. Colborn's response appears to be followed by a long pause, during which the camera first pans to Mr. Strang, standing at counsel table and appearing to glare at Mr. Colborn, then to Mr. Colborn, who appears to shift uncomfortably in his chair and then cracks his knuckles. Barker Decl. Ex. 3.

16.     Netflix's production notes instructing Chrome to "hold a bit longer" on Mr. Colborn in another instance to ensure that he would look "caught in a lie," despite acknowledging that it might require "court footage that might not exist." Barker Decl., Ex. 1 (NFXCOL 213, 215).

17.     When asked about changes in Mr. Colborn's responses that appear in MAM, Demos testified that some of Chrome's footage was not usable because it was unusable in its appearance. Barker Decl., Ex. 10 at 210-213.  She claimed that as a result, Chrome was "forced" to seek other news reporters' footage, and that because it was not necessarily co-extensive with their footage, they had to "find sections" that appeared to be similar and insert them. *Id.*

18.     Immediately following that edited segment, MAM shows Strang asking, "Do you have any recollection of making that call?" MAM substitutes a response that appears far more equivocal than his trial testimony. Dkt. #120-5 at 55:35-56:10; *cf.* Barker Decl., Ex. 19 pp. 182-185. A portion of a different sentence in Mr. Colborn's testimony is inserted to start his response with the words, "I'm guessing 11/3/05. . ." *Id.* Strang is then shown asking Mr. Colborn, "Investigator Wiegert, did he give you that plate number before you called it in?" *Id.* Again, in MAM, Mr. Colborn seems far less certain than his response at trial, appearing to respond, "No, I just don't recall the exact content of our conversation back then, but he had to

6

have given it to me, as I wouldn't have had the number any other way." Dkt. #120-5 at 55:35-56:10; *cf.* Barker Decl., Ex 19 trans. pp. 182-185.

19.     The technique of creating an amalgamated statement by inserting words spoken at a different time into a statement in order to revise the portrayed statement was something that the Chrome team referenced as the "frankenbite." Barker Decl., Ex. 13 (Manhardt depo. pp. 90-91; Barker Decl., Ex. 2 (Manhardt 0000142, 244-45, and 385). Netflix encouraged Chrome to shorten trial sequences by "clip[ping] bits and pieces together." *Id.* Ex. 2 (Manhardt 1055). When asked in deposition whether viewers should be advised that segments of trial footage were "Frankenstein" versions of the testimony rather than verbatim recordings of the testimony, Chrome's editor asserted that it was not necessary because a documentary like MAM is "not journalism." Barker Decl., Ex. 13 depo. p. 207.

20.     The edits to testimony were made by Manhardt, after Netflix's involvement, for the first two episodes and by Demos for the trial sequences in the later episodes. Barker Decl., Ex. 13 at pp. 52-55.

21.     In MAM, Strang next asks, "Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota" Dkt. #120-5 at 56:10-56:28. In the Halbach trial, Mr. Colborn did not respond to that question, because the judge sustained an objection to it. Barker Decl., Ex. 19 trans. pp. 186-187. However, in MAM, Mr. Colborn instead appears to damagingly admit, "Yes." Dkt. #120-5 at 56:20-56:28. Strang then says, "But there is no way that you should have been looking at Teresa Halbach's license plate on November 3, 2005." Mr. Colborn responds, "I shouldn't have been and I was not looking at the license plate." Strang states, "Because you're aware now that the first time that the license plate was reported found was two days later . . . ." Dkt. #120-5 at 56:20-56:28.

22.     Netflix refers to this segment in its production notes as the "Colborn license plates bomb" and celebrated it as a perfect "cliffhanger" and as a "[s]ensational and strong end" the episode. (NFXCOL 229, 278, 2150). In the series notes shared with Chrome, Netflix creative team members likewise chortled that because of the edits made since the prior version, "setting up Colborn as the potential cop to plant the car really works well now." *Id.* (NFXCOL 278, 2150).

23.     In Episode 7, Calumet County Sgt. Tyson is shown testifying that he was told that no Manitowoc County officer was to be alone on the property and that if they were to locate evidence, it was to be turned over to Manitowoc County. Dkt. #120-7 at 4:20-4:40. Buting asks Tyson whether he ever had to "act like a babysitter" while other officers were conducting a search. He is shown as responding, "No*." Id*. at 5:20-5:35. In the trial transcript, he denies that he felt like a babysitter Dkt. #290-19 trans. pp. 25-26.

24.     Netflix creative team members recognized at numerous times that the claims of planting evidence needed to be buttressed because they were not very credible on their own. For example, representatives proposed cuts to Lenk's testimony as shown in MAM because it never really delivered "enough of a silver bullet" to support a direct claim that Lenk planted evidence. Barker Decl., Ex. 1 (NFXCOL 273). They also noted that "Buting's claim that [Lenk] put the DNA on the key is really weak." *Id*. at NFXCOL 2078. In addition, Netflix representatives noted that it could have been a "simple oversight" that Lenk didn't sign in at one point during the search of the Avery property, but recommended that a "timeline" be added to ensure that the segment didn't appear to viewers to be "speculative and grasping for conspiracy." *Id*. at NFXCOL 288.

25.     Netflix advised Chrome during production to avoid using images of Avery in court that made him look "smug." Barker Decl., Ex. 1 (NFXCOL 1974). In contrast, Chrome suggested

to Netflix that they incorporate a shot of Mr. Colborn looking "squirmy" to include in the trailer for the series. Barker Decl., Ex. 6 (CHRM 395).

26.     In Episode 7, spooky music plays while Mr. Colborn is asked to describe the call that he received while he was working in the Manitowoc County jail. Ken Kratz asks him, "Do you even know whether that call was about Steven Avery?" He responds, "No sir." Dkt. #120-7 at 18:35-18:45. Mr. Colborn's response that no names were given is omitted. *Cf.* Barker Decl., Ex. 19 trans. p. 213.

27.     In further questioning by Kratz, MAM eliminates Mr. Colborn's emphatic denial that he ever planted any evidence against Mr. Avery, which was "That's ridiculous, no I have not." Dkt. #120-7 at 19:00-19:15; *cf.* Barker Decl., Ex. 19 trans. pp. 140-141.  It instead substitutes his answer to a different question, "Have you ever planted any evidence against anybody in the course of your law enforcement career," to which Mr. Colborn responded, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not." *Id.*

28.     In Episode 7, MAM shows what appears to be Mr. Colborn's testimony as Strang asks him about reports concerning the Halbach investigation. He asks Mr. Colborn, "Your total contribution is a little less than half a page?" Dkt. #120-7 at 22:29-22:40. Mr. Colborn appears to respond yes to this question, *id.* at 22:35-22:40, but in fact, MAM edits out from this exchange discussion of a second report written by Mr. Colborn. Barker Decl., Ex. 62.

29.     MAM then appears to show the following exchange between the prosecutor and Mr. Colborn:

> Mr. Kratz:     As you look back, back in 1994 or '95, if you would have written a report, what would it have been about?
>
> Mr. Colborn:   That is why I didn't do one. I don't know what it would have been about, that I received a call and transferred it to the Detective Division. If I wrote a report about every call that came in, I would spend my whole day writing reports.

9

Dkt. #120-7 at 23:46-24:03; Dkt. #290-19 pp. 212-213, Ex. 62. MAM includes the exchange but omits the words, "that I received a call and transferred it to the Detective Division." *Id.*

30.　　Strang concludes his cross-examination, saying, "That's all I have." Dkt. #120-7 at 24:20-24:30. At the trial, the judge immediately says, "You're excused," to Mr. Colborn. Barker Decl., Ex. 4.  Without hesitation, Mr. Colborn stands and exits the witness stand. *Id.* However, in MAM, Mr. Colborn is shown sitting on the stand for several seconds looking deflated while ominous, pounding music plays in the background. Dkt. #120-7 at 24:20-24:30.

31.　　During production, Netflix commented to Chrome that it was "unlikely" that FBI representatives would "aid and abet" Manitowoc County as part of a conspiracy to frame Avery unless the department had a "deep history" with the agency. Barker Decl., Ex. 1 (NFX 2132).

32.　　In episodes 8 through 10, MAM includes essentially extended reactions to the guilty verdict returned against Avery for Halbach's murder and the verdict returned against Dassey, including the points described in the Addendum / Episode Summary. Chrome creatives commiserated with one another that the sequences involving the verdicts were "devastating" for them. Barker Decl., Ex. 2 (Manhardt 271, 288, 361-62, 432).

33.　　To avoid viewers losing interest through the actual details of the Halbach trial or the Avery civil suit, Netflix repeatedly directed Chrome to edit, cut and tighten scenes, especially those involving courtroom testimony, to tell a clearer "story" and to avoid the potential for "a really dry episode." Barker Decl., Ex. 1 (NFXCOL 224-25, 212, 1949, 1959, 1996, 2131, 2062, 2076, 2078, 2083). Netflix also advised that Chrome should look for ways to use the series to "allude to" planting of evidence by officers during their visits to the property. Barker Decl., Ex. 1 (NFXCOL 202, 1940). They also complained about commentary by Buting in a draft version of MAM that "actually detracts" from the argument that "Lenk/Colborn" could have "planted" Ms. Halbach's vehicle key. *Id*. at NFXCOL 2078.

10

34.     Likewise, Netflix encouraged Chrome to look for opportunities in MAM to include music that would help identify the "baddies" – i.e., law enforcement representatives, Barker Decl., Ex. 1 (NFXCOL 1953; *see also* 2009-2010, 243, 2174), – and to convey a "bad guy theme" or "villain theme" when they appeared on screen. *Id.* Ex. 2 (Manhardt 793, 817); *see also* Ex. 1, NFXCOL 2133 (identifying law enforcement character as a "key villain" in the series); NFXCOL 241-43, 339, 296 (music was to "really up the stakes"). This advice from Netflix was consistent with Chrome's intent to portray law enforcement representatives as "villains" in the series. *Id.* Ex. 2 (Manhardt 829).

35.     Netflix also recommended and approved the series' graphics. *Id.* Ex. 1 (NFXCOL 219).

36.     Netflix representatives' notes demonstrate that they were brainstorming with Chrome to determine whom should be portrayed as the "mastermind" of the alleged law enforcement conspiracy and that they approved using Avery's lawyers' analysis of law enforcement officers' alleged motive and content. Barker Decl., Ex. 1 (NFXCOL 2134).

37.     Chrome held in high personal regard Glynn, who appears early on to interpret and explain the events as told by MAM. Barker Decl., Ex. 2 (Manhardt 262, 429).  After the release of the series, Chrome's editor expressed giddiness at the prospect of sharing a stage with Glynn in public comments about the series. *Id.*

38.     In contrast, Netflix and Chrome traded snide emails about MAM viewers giving negative Yelp! Reviews to the Avery prosecutors. Barker Decl., Ex. 2 (Manhardt 411).

39.     Early on, Chrome's editor asked whether the Avery civil lawsuit claims should be clarified as allegations rather than fact, Barker Decl., Ex. 2, but as the series' content demonstrates, the question was resolved in favor of the latter.

40.     Netflix also looked for ways to draw attention to Plaintiff's appearances in footage throughout the series, in order to enhance the "shock" for the audience of seeing him performing his duties because according to MAM's storyline, he was "always a suspect" in alleged "tampering with evidence." Barker Decl., Ex. 1 (NFXCOL 245, 2039, 2043, 2167, 2174, 2089). Likewise, Netflix lauded Chrome's use of "danger" music to accompany images of Mr. Colborn in the series. *Id*. Ex. 1 (NFXCOL 287).

41.     Netflix notes recognize that its creative team was aware that out-of-court statements by Avery's attorneys in MAM were "directly claiming that [law enforcement officers] framed Steven" or that law enforcement officers went so far as to Halbach in order to frame Avery. Barker Decl., Ex. 1 (NFXCOL 2071, 2079); NFXCOL 294-95. However, Netflix team members confided to one another that despite these concerns, they were reluctant to confuse Chrome because asking to dial these references back would be "contrary to the direction" Netflix had been pushing them. Barker Decl., Ex. 1 (NFXCOL 294-95). Their exchange, in pertinent part, was as follows:

Adam Del Deo:

. . . .

In this sequence, it feels like Jerry Buting, on an almost definitive basis, is accusing the officers. Although I think the officers have the strongest motive, I think Jerry's statement come across at [sic] fact . . .they thought, for sure, we're going to make sure he's convicted." It may be worth soften his statement so it doesn't come across so subjective.

Benjamin Cotner:

I will do a last pass and draft an email for you, Lisa, to review and send in the morning.

Adam, I am kind of worried that this note goes contrary to the direction we've been pushing them in. I've been under the impression that we are desperate to say that someone else could have done it. I'm afraid that if we tell them to soften something it is going to really confuse the filmmakers . . . . I don't think that subjective is necessarily bad, but if it is complete unfounded then you might be right. Let me know what you think . . . .

Adam del Deo:

I hear you. Let me try to clarify.

12

I think the statement as Jerry currently communicates it comes across, to me, as a matter of fact that the officers did it (as oppose to highly likely they did it). In other words, I think if Jerry's statement involving the officers can come across as a highly possible/very likely scenario (since the officers had a very strong motive to kill Steven) it would be convincing that someone else, most likely one of/some of the officers, were involved.

I think we're saying the same thing. However, I just wanted to make sure Jerry isn't saying the officers killed as a matter of pure fact since there's no physical evidence to really prove the officers were there, rather just very strong motive. Take a look at Jerry's statement again and see if you agree. If not, leave the way it is.

Benjamin Cotner:

I think its a really valid point but I would rather leave it in for now – it is something we can always pull out later, but I am so happy that they finally have a point of view. I hope people know it is just a theory . . . .

42. Besides production notes and comments from Netflix, Chrome also received feedback through screenings with people they knew in the industry. Through these screenings, Chrome sought to ensure that audience members would have a sense of the "antagonists" and "what they were accused of doing." The reviewers opined that the technique of using Avery as a "narrator" for his own trial was "effective." Barker Decl., Ex. 2 (Manhardt 525).

43. A preliminary decision by Judge Willis at Avery's trial permitted his attorneys to introduce evidence of framing despite its low probative value, in deference to the constitutional rights afforded a criminal defendant. Excerpts from the hearing are included in MAM. In describing Avery's attorneys' arguments, the judge noted the highly unlikely nature of the basis for the defense in a written decision:

> [as] pointed out by the State at oral argument: How could Lenk or Colborn have known that Teresa Halbach was dead at the time they are alleged to have planted the defendant's blood in her vehicle? Under the defendant's theory, either Lenk, Colborn, or both would have had to have formulated a plan involving their own commission of serious felonies and executed that plan within a very short period of time, motivated apparently only by their embarrassment for not allegedly having acted more responsibly on information that could have led to Mr. Avery's exoneration back in 1995 or 1996.

13

*See* Ricciardi Decl. ¶ 110, Ex. 15, CHRM034924.MAM does not incorporate this portion of the judge's decision nor explain that Avery was permitted to introduce the defense because of the very "low bar" that the constitution requires be set for criminal defendants.

44.     Nor does MAM acknowledge that in opening and closing arguments to the jury, Avery's attorneys conspicuously avoided statements that made positive accusations of planting evidence. In fact, they carefully limited their argument to an effort to persuade the jury that the fact that if they believed that any officer may have planted evidence, that meant they also had to find that there was reasonable doubt as to Avery's guilt and return a not-guilty verdict. Barker Decl., Ex. 17 trans. p. 18; Barker Decl., Ex. 18 trans. pp. 46-48.

45.     Defendants can point to nothing in the public or court record of Avery's civil suit that mentions Mr. Colborn.

46.     Viewers' reactions to MAM, both online and in angry verbal attacks directed at Mr. Colborn, reflect that they understood MAM as irrefutably establishing that Mr. Colborn was a central figure in a law enforcement conspiracy to plant evidence and frame Steven Avery for Ms. Halbach's murder. The following represent a sampling of messages received by Mr. Colborn following the release of MAM:

> . . . I'm just calling in regards to the documentary that I just finished watching it and it appears pretty clearly that you were obviously involved beyond a detective role. . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 4:04 PM.

> Hi Detective Colborn, I'm calling about the Steven Avery case – I wanted to know if you planted evidence with Detective Lenk. It sure seems like that from the documentary. . . . I think you definitely planted evidence . . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/20/16 1:16 PM.

> Hi. This is regarding the Steven Avery case . . . . You know what you have done. This is completely unprofessional. . . . . You framed him and I don't care if the

14

documentary was one-sided. You know what you did . . . . You are going to hell. . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 10:54 AM.

Some callers' messages make it apparent that they formed the belief, based on the edited versions of testimony presented in MAM, that Mr. Colborn had been "caught" in lies under oath:

. . . . This man was innocent. . . .The Sheriff Sergeant Colborn and Lieutenant Lenk, they were caught in lies under oath . . . . Shame on those corrupt cops . . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 11:26 AM.

Detective Colborn should be out of a job. Steven Avery and Brendan Dassey are both innocent. . . . You lied under oath multiple times along with all of your other fellow employees. I'm disgusted by the Sheriff's Department completely and fully. . . . I hope you know that everyone knows that you're a **** liar.

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/14/16 2:16 PM.

. . . I've been calling numerous times and been getting no answer . . . . only awful disgusting human beings would do such a thing to innocent people, not only once, but twice, Colborn. The whole world has observed your lies . . . . I hope you're harassed . . . until the day you die. . . . . I hope that your wife is the next victim. . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 11:14 AM.

. . . You lied . . . You are a horrible disgusting person for . . . planting evidence in the Steven Avery case . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 4:27 PM.

Hi Detective Colborn. I just watched Making a Murder and you are soooo guilty. You were at the . . . you were at the the lot . . . the Avery yard, and you saw the car before, um and you're in it with Lenk. You guys are so shady and corrupt. . . .

Dkt. #130-1 and Colborn Decl., Ex 1, 1/26/16 to 1/27/16, 3:42 PM.

Yeah, I believe that Lt. Andrew Colborn needs to be investigated for his involvement and manipulating a crime scene and um ah his involvement and I, I think he should probably be in prison right now um for his ah for his behavior because he's obviously perverted justice and manipulated evidence and he has lied under oath, he's perjured himself. And, um everyone knows that man drove Teresa Halbach's car and placed it on Steven Avery's property and um, that man deserves justice and Andrew Colborn needs to be held accountable for his criminal behavior. Thank you.

Dkt. #130-1 and Colborn Decl., Ex. 1, 2/8/16 to 2/14/15 11:09 PM.

> My theory is that ah, [*laughter*] in the ah, Colborn was a dimwitted corrections officer who felt like a loser and committed a crime in order to advance his career and he's a corrupt public servant. . . . it is quite obvious that he is not just a crooked cop but he's a **liar. Um and he's got some some sick perversions and when you watched him in that documentary you could just see his eyes twitching. Um, and ah, he just looks like he is guilty of something.** And probably of ah, corroborating ah, him and James Lenk, framing Steve Avery for Theresa Halbach's murder. It's just a disgusting thing . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 2/8/16 to 2/14/15 12:46 AM (emphasis added).

> Hey Andy . . . . You're probably out planting evidence on somebody right now, but um I just want to let you know that **I saw your appearance on the television program and I really couldn't believe how scared you were in that one scene. I just wanted to talk to you about it, when you were upon the stand. Um, I actually thought you were going to wet your pants you were so scared**. . . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 2/15/16 to 2/19/16 2:13 PM (emphasis added).

> . . . . I can't even sleep watching this show . . . . you're disgusting. **I can see it in your eyes on every interview**. . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 11/16/16 3:31 AM (emphasis added).

> . . . . Hello, so, I'm from Canada, and I've watched the Netflix series, called Making a Murderer. . . . Every viewer knows your mistake. So why did you volunteer exactly to view the case when you had problems with this individual in in the past, with the last case? Is it possible that you were trying to take revenge back on this person? Because the Calumet County Department could have clearly taken over this case. Because it is quite obvious that you guys are quite mad with the fact that you caught the wrong guy ruining your reputation as a police officer. . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 11:19 AM.

> . . . . My biggest question to you, sir, is why were you on the scene when the key was found? . . . That scene was searched seven times before that key was found by other investigators not yourself. So, do you really believe that these other investigators were that incompetent, to find such an item in plain sight? . . . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/15/16 to 1/18/16 4:35 PM.

47.     Viewers also criticized Mr. Colborn based on the series' failure to fairly convey to viewers Mr. Colborn's reasonable explanation that he received the license plate number from the officer who asked him to look for the vehicle:

> . . . Also when you called the dispatcher and asked her about that license and where it was registered to, where you were reading that license plate number from . . . I just don't understand how you would have that number and how you would know what the car was registered to . . . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/15/16 to 1/18/16 4:35 PM.

48.     *Intentionally left blank.*

49.     Other callers' messages showed that Avery's alleged innocence was linked in their minds with the conclusion that Mr. Colborn had planted evidence:

> Hi Sir.  I was just wondering if you felt bad for sending an innocent man to prison and planting evidence. It's not good police work.

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 3:38 PM.

> Why the **** did you frame Steven? You **** son of a *****. You're a sick, crooked, disgusting cop. . . . . You should be in prison, you son of a *****

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/3/16 12:03 PM.

50.     Others took to heart out-of-court accusations by Avery's defense attorneys and others that asserted that federal prosecutors had proven conspiracy cases on less evidence than the defense allegedly mounted against Mr. Colborn:

> Mr. Colborn, this is a concerned citizen of the state of California. I've seen the case with Steven Avery. . . everybody knows what is going on here with you guys setting up and framing this poor man Steven Avery . . . be ready to sit in federal prison for a long long time. I hope you rot in hell, you son of a ****

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/15/16 to 1/18/16 4:34 PM.

> . . . Everybody knows you're **** guilty . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 11:11 AM.

17

51.     Many other messages left for Mr. Colborn are simply strings of profanity or insults. Mr. Colborn received hundreds of similar calls. Countless online commenters and bloggers have likewise explained that, after viewing MAM, they are convinced that Avery was framed by law enforcement officers, including Mr. Colborn. *See, e.g.,* Dkt. #139-7, Andrew Colborn Decl. Ex. 2.

52.     As Mr. Colborn explained at his deposition, MAM's edits made him seem more "wishy washy" and therefore, less believable. Barker Decl., Ex. 14 depo pp. 358-359.

53.     At her deposition, the head of Netflix's creative team, Lisa Nishamura, responded to the complaint that this alteration changed Mr. Colborn's testimony. Nishamura claimed that Mr. Colborn "made his point" in a line included thereafter, in which he denies having looked at the plate when he called it in. Dkt #279, Walker Decl. Ex. 21 (Nishimura Tr.) at 176:16-25.

53.     The altered version of Mr. Colborn's testimony regarding the call to dispatch that left out his testimony that "obviously" he had been provided it by the investigator with whom he had previously spoken was effective in leading viewers to conclude that Mr. Colborn did not testify that he received the license number prior to the call. Dkt # 132-7 ("Maybe he was given the license plate number before calling dispatch and just wanted to verify it? Still doesn't make sense why he just wouldn't say that in court.")

54.     MAM omits from a response Mr. Colborn's statement that he answered the jail call identifying himself as "Manitowoc County Jail, Officer Colborn." Dkt. #290-19 trans. p. 139; *cf.* Dkt. #120-5 55:53-56:10.

55.     MAM omits from the above response Mr. Colborn's testimony that it was his impression that the person who called him mistook him for a police officer despite his identification of himself as a jail officer. *Id.*

18

56.     MAM omits testimony that further underscores the internal consistency of Mr. Colborn's testimony in this exchange. In Episode 7, after suggesting otherwise in Episode 2, MAM finally includes testimony in which Mr. Colborn explains that he transferred the call to a detective, but MAM edits from the conclusion of the sentence Mr. Colborn's clarification that he transferred the call to the Detective Division (identifying the proper division to address the call as an entirely separate division). *Id.*

57.     MAM incorporates into Mr. Kratz's supposed direct examination what are in fact redirect examination questions as to allegations by the defense that Mr. Colborn had animosity toward Avery because of the prior civil case.

The exchange on redirect, in full was:

Mr. Kratz:      "Did this person ever identify the individual that they were talking about?"

Mr. Colborn:  "No sir. There were no names given."

Mr. Kratz:      Let me ask you this, as you sit here today, Sergeant Colborn, do you even know whether that call was about Mr. Steven Avery?

Mr. Colborn:  No, I don't.

Dkt. #290-19 trans. p. 213. MAM removes from its amalgamation of direct and re-direct testimony the first two lines of the redirect testimony, which emphasize that "no names were given" in the call. Dkt. #120-7 at 18:35-18:43. Only the portion that focuses on what Mr. Colborn subjectively claims to be the case – that he does not know whether the call about Avery – is included, eliminating the objective basis for that assertion, *i.e.,* the caller's failure to state any names. Moreover, the response, "No, I don't," which is a more forceful response, was replaced with "No sir." Dkt. #105 at p. 48. (In contrast, MAM substitutes a more forceful response to a question – "No, I did not sir," for a response that was "No sir," – when it attempts

19

to portray Mr. Colborn as later inconsistently admitting that he wrote a statement about the jail call. Dkt. #290-19 trans. p. 199; *cf.* Dkt. #120-7 at 23:10-23:43.

58.     MAM removes from Mr. Colborn's answer to the testimony immediately preceding the above exchange Mr. Colborn's explanation why he did not prepare a report of the call in 1995. The actual exchange, as represented in the trial transcript, is as follows:

> Mr. Kratz:     As you look back, back in 1994 or '95, if you would have written a report, what would it have been about?
>
> Mr. Colborn:   That is why I didn't do one. I don't know what it would have been about, that I received a call and transferred it to the Detective Division. If I wrote a report about every call that came in, I would spend my whole day writing reports.

Dkt. #290-19 trans. p. 212-213. MAM removed the explanation, "That is why I didn't do one," dkt. #120-7 at 23:46-24:03, which would directly respond to the numerous criticisms that the series levels at Mr. Colborn because no report was written in 1995. In addition, starting the response instead with the phase, "I don't know what it would have been about" makes it look as though Mr. Colborn did not answer the question or respond in a normal way of speaking, which is pertinent to an assessment of his credibility by viewers. In addition, MAM again omitted the conclusion of his first sentence, consisting of the words, "that I received a call and transferred it to the Detective Division." *Id.*

59.     MAM splices together an edited version of a question-and-answer exchange between cross-examining counsel and Mr. Colborn that appeared as follows in the trial transcript:

> Attorney Strang:     You wrote a statement after Sheriff Peterson suggested that maybe you should?
>
> Mr. Colborn:         Yes, sir.
>
> Attorney Strang:     You wrote that statement in 2003, about the 1994 or 1995 telephone call?

| Mr. Colborn: | Yes. |

Dkt. #290-19 trans. p. 199. MAM's version of the exchange is as follows:

| Attorney Strang: | You wrote a statement in 2003, about the 1994 or 1995 telephone call? |
| Mr. Colborn: | Yes. |

Dkt. #120-7 at 23:10-23:43.

60.     MAM removes language from a question-and-answer exchange that would have included references to the fact that the call to the jail was "way back in 1994 or 1995" and that it occurred "when you [Mr. Colborn] were working in the jail." Dkt. #105, p. 51; *cf.* Dkt. #290-19 pp. 65, 139, 198-199.

61.     With respect to testimony regarding the discovery of Teresa Halbach's vehicle key in Avery's bedroom, MAM again makes numerous edits to testimony without any indication that the testimony has been edited. For example, MAM eliminates Mr. Colborn's emphatic denial that he ever planted any evidence against Mr. Avery, which was "That's ridiculous, no I have not." Barker Decl., Ex. 62. It instead substitutes his answer to a different question, "Have you ever planted any evidence against anybody in the course of your law enforcement career," to which Mr. Colborn responded, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not." *Id.*

62.     MAM revises Mr. Colborn's answers about reports that he wrote in connection with the search at the Avery property so that it appears that he wrote only one report that was less than half a page, when in fact, he wrote two reports, as the actual answers to the questions would have made clear. Dkt. #290-19 at 196-199; Dkt. #120-7 22:22-22:39, 22:54-23:43.

63.     MAM omits an entire "soft cross" that immediately follows the above discussion. Dkt. #105 p. 47; Dkt. #290-19 trans. p. 132; Dkt. #120-7 at 17:06-17:32. In his response to

questions in the "soft cross," Mr. Colborn testified that he was "very surprised" that the key was there given that he and the other officers had been in the room "for quite some time" before it was discovered. *Id.* Mr. Colborn also emphasized this by stating, "I believe I said to myself, damn, how did I miss that." *Id.*

64. Mr. Colborn's repeated denials in direct examination that he planted evidence, in questions that were obviously intended to build emphasis and effect, are also blunted by cutting and splicing them together into one question and eliminating Mr. Colborn's straightforward, "No" response to whether he "set up Mr. Avery for a charge of murder." Dkt. #290-19 trans. p. 140; *cf.* Dkt. #120-7 at 18:43-19:15.

65. MAM omits from Mr. Colborn's statements his testimony that the Toyota emblem was on the key and his knowledge that Ms. Halbach's vehicle was a Toyota as influencing why he thought this "was a very important piece of evidence." Dkt. #290-19 trans. p. 131; Dkt. #120-7 at 17:06-17:32. The omission removes a credible explanation by Mr. Colborn that contradicts MAM's insinuation that Mr. Colborn already knew the key was Ms. Halbach's because he conspired to plant it in the bedroom.

66. MAM omits Plaintiff's direct and forthright response, "yes," to the question whether he manipulated "this piece of furniture" – the furniture is not identified in the lead-up in MAM because it has been edited out, but refers to the small bookcase from which law enforcement officers believe the key fell – and severely truncates Mr. Colborn's testimony regarding that critical issue. Dkt. #105 p. 45; *cf.* Dkt. #290-19 trans. pp. 125-129. Instead, MAM substitutes a response that does not appear to directly answer the question, and which therefore appears evasive and as volunteering unrequested information, which is often interpreted as done by those who are not being truthful: "I will be the first to admit, I handled it rather roughly, twisting it, shaking it, pulling it." Dkt. #120-7 at 16:34-16:50. The question that was in fact

22

asked prior to the shown response was "If you can describe that further, I don't know if you can do it with your words or show us with your hands, how you did it?" *Id.* The response was also edited; it began, "I will be the first to admit, I wasn't any too gentle, as we were, you know, getting exasperated. . . ." *Id.*

67.    MAM omits critical context from Mr. Colburn's testimony regarding the exact moment of discovery of the key, including omission of testimony that explains that Deputy Kucharski, who is portrayed as likely not in on the alleged conspiracy to plant evidence, was "in very close proximity" to the bookcase near the place where the key was discovered at the time of its discovery, and that Mr. Colborn also "wasn't very far away" and that he had to turn around to see the key at the time that Lieutenant Lenk mentioned it. Dkt. #290-19 trans. p. 140; Dkt. #120-7 at 16:19-17:32. The omitted testimony also reduces Mr. Colborn's testimony about Mr. Lenk's statements upon noticing the key, omits his description of what he could see of the key, omits his direction to Deputy Kurcharski to photograph the key, and omits direct testimony that the spot from which the key was photographed was "as close as [they] got" to the key at the time. Dkt. #290-19 trans. pp. 128-134; *cf.* Dkt. #120-7.

68.    MAM omits 20 lines of trial testimony elicited by prosecutor Ken Kratz. Dkt. #105, p. 45 (referencing pages 122-23 of trial testimony). The testimony provides context for Mr. Colborn's assignment to return to the Avery property on the date in question. *See* Dkt. #290-19 trans. p. 122-23; Dkt. #120-7 at 16:19-17:32.  Elsewhere, MAM includes accusations, including direct accusations by Avery's defense team investigator, that it was improper for Mr. Colborn and other Manitowoc County Sheriff's deputies to be on the property.

69.    MAM also omitted 30 pages of testimony regarding the lead-up to the search of the Avery property, including Mr. Colborn's background and training as an evidence technician. Dkt. #105, p. 49; Dkt. 290-19 trans. pp. 141-71.

23

70.     MAM omits numerous transcript pages in which Mr. Colborn describes searches

on the Avery property before the key was found. Dkt. #132-1 trans. pp. 76-121.

71.     Contrary to the Glynn accusations repeated in MAM, Glynn elicited testimony

from Mr. Colborn that establishes that there would have been no reason, under the jail's record-

keeping practices, for Mr. Colborn to make a report of the call that he transferred from the jail.

Dkt. #120-14 at 14:1-23; Dkt. #129-1 at 2:46-4:19.

72.     Glynn also elicited testimony that established that Mr. Colborn had no authority

to investigate the call further, directly contrary to Glynn's accusations in MAM:

| | |
|---|---|
| Glynn: | At any rate, you recognized that this was significant enough that you should forward that call that was coming in from another detective to someone in the Manitowoc County Sheriff's Department to take it further, correct? |
| Mr. Colborn: | Yes. |
| Glynn: | It wasn't within your jurisdiction to take it any further, correct? |
| Mr. Colborn: | No, sir. |
| Glynn: | I mean, even if you had wanted to, you didn't have the legal authority under your job duties to do that. |
| Mr. Colborn: | Correct. |

Dkt. #129-1 at 12:41-14:30; Dkt. #120-14 p. 14.

73.     MAM also portrays Mr. Colborn as furthering the cover-up in his deposition

testimony that he did not recall with whom he may have discussed, in 2003, the prior call to the

jail. Through juxtaposition with other witnesses' testimony that is pieced together to suggest that

Mr. Colborn may have discussed the report with an assistant district attorney in 2003, MAM

implies that the other witnesses' testimony exposes Mr. Colborn's testimony as untruthful. Dkt.

#120-2 at 23:50-26:52. The testimony by Mr. Colborn that MAM includes stops just short of a

clarification that would have dispelled any nefarious construction of Mr. Colborn's testimony:

Glynn asks Mr. Colborn, "But you're not ruling out the possibility that you may have discussed

24

it," to which Mr. Colborn replies, "No I'm not ruling out the possibility that I may have discussed it with someone else." Dkt. #129-1 at 19:06-19:34. The omission of this clarification is used to attempt to portray a more stark contrast between Mr. Colborn's testimony and that of others.

74.     In general, a comparison between Mr. Colborn's actual testimony at the Halbach trial and the MAM version reveals striking differences. At the trial, Mr. Colborn is virtually always shown looking up at the questioner and making eye contact after speaking into the microphone on the witness stand. Barker Decl., Exs. 3, 4 and 5. In MAM, he is rarely if ever shown making eye contact. He appears to be looking down much of the time. Dkt. #120-7 at 16:03-20:33, 21:43-24:30.

74.     Additional edits to Mr. Colborn's testimony appear to change his physical reaction, including those summarized below:

- Different visual into footage of testimony at Barker Decl. Ex. 5A CHRM 864 at 14:45-14:55. Plaintiff testified, "That's what he told me, he never talked to her." After that statement in raw footage, Mr. Colborn continues to hold direct eye contact with the questioner. In MAM, after that statement [Dkt. #120-7 at 16:10-16:20], he looks down, then up, then down again (and it cuts to Steven Avery staring intently at him). Defendants substituted a different visual following this response.

- Barker Decl. Ex. 5B CHRM 866 at 5:54-6:00 is audio of Ken Kratz during which he begins a question by stating "Sergeant Colborn," Mr. Colborn looks up toward the questioner when his name is mentioned. In MAM, over those words, he looks down and fiddles with his glasses instead. MAM then splices in "You were asked, as I understand as part of a civil lawsuit" – Mr. Colborn is shown in MAM (Dkt. #120-7 at 17:34-17:47) as looking down during this question. In Barker Decl. Ex. 5C CHRM 866 at 7:10-7:25, during the question, he makes eye contact with the questioner as the question is asked.

- A completely different "reaction shot" to Dean Strang saying "I have some questions for you" in MAM (Dkt. #120-7 at 19:24-19:35), as compared to Barker Decl. Ex. 5D CHRM 866 at 10:58-11:05, during which Mr. Colborn looks more confident in the footage of his original reaction.

25

- In Episode 7 (Dkt. #120-7 at 21:59-22:11), Mr. Colborn's response to a spliced question that asked him whether there was "no time" that he was at the Avery property that he was not there with Lieutenant Lenk, is edited so that his "Not that I can recall" response (Barker Decl. Ex. 5E CHRM 867 at 29:40-30:2___), and a corresponding pause that demonstrated Plaintiff's genuine attempt to recall and formulate an answer to the question, was instead replaced with a definite and quick ''No sir," in an apparent attempt to buttress the impression for viewers that Plaintiff definitively was always at the property with Lt. Lenk and that Plaintiff knew that fact immediately and for certain, without having to think about it, in support of their allegation of a conspiracy involving Lt. Lenk and Mr. Colborn. Although the response "not that I can recall" is included in another responses immediately following that question positing that there was no time that Plaintiff was not there with Mr. Lenk, the omission of the "Not that I can recall" response to the prior question undermines the consistency of Plaintiff's testimony in response to these questions.

- In Episode 7 (Dkt. #120-7 at 22:20-22:27), MAM swaps out a "Yes, sir" response that shows Plaintiff looking down as he answers and during the next question posed by Mr. Strang, when in fact, Plaintiff responds to the question (whether the case was the largest investigation in which he had been involved), by briefly looking down to speak into the microphone and then immediately looking back up at Mr. Strang (Barker Decl. Ex. 5E CHRM 867 at 29:40-30:21).

- In Episode 7 (Dkt. #120-7 at 22:35-22:40), MAM inserts a response of "Correct" that shows Plaintiff appearing to pause and look down after responding to an altered question about his reports (and MAM omits information about the extent of his report to downplay Mr. Colborn's total contribution to the reports, as explained in Exhibit B to the Second Amended Complaint at Dkt. #105 pp. 50-51), omitting and replacing two "That's correct, sir" and "Correct'' responses that show Plaintiff looking down briefly to the microphone for each answer but then looking back up to the questioner each time (Barker Decl. Ex. 5F CHRM 867 at 31:00-31:17).

75.     MAM does not fairly represent Mr. Colborn in excerpts from video depositions taken during Avery's civil trial. The full video deposition of Mr. Colborn's testimony in Avery's civil case demonstrates that Mr. Colborn appeared confident and relaxed and made regular eye contact with the examining attorney. Dkt. #129-1.  In contrast, in the clips of Mr. Colborn's testimony at Mr. Colborn's civil suit deposition that appear in MAM, his gaze is not matched to the examining attorneys. Dkt. #120-2 at 17:34-17:44, 18:27-19:05, 19:42-20:00. Moreover, the

deposition footage was not displayed in full screen in MAM, so that Mr. Colborn appears to be looking down in answering questions, but the full-screen video shows that he was looking at an exhibit. Dkt. #129-1 at 4:10 PM, 4:13-4:17 PM. The document cannot be seen on MAM. *See* Dkt. #120-2 at 18:30-19:05.

76. Barbara and Andrew Colborn divorced on February 23, 2022, after filing for divorce on March 10, 2021. (B. Colborn Decl. ¶2).

77. Andrew Colborn acted differently after *Making a Murderer* was released because of the allegations made about him there: He drank more, though he did not overindulge. He was quieter, avoided going out in public, was suspicious of everybody, and was continually apprehensive and hypervigilant about threats he had received and about confrontations with strangers. He worried about these things constantly. He was always anxious,. He never returned to normal after *Making a Murderer* was released, and he was never able to let go of the defamation he endured; in Barbara Colborn's view, it consumed him. (B. Colborn Decl. ¶¶5, 6, 7, 8; A. Colborn Decl. ¶4, 5).

78. Andrew Colborn always took his job in law enforcement seriously and was disturbed, troubled, and offended by how *Making a Murderer* portrayed him and about its negative effect on his reputation. (B. Colborn Decl. ¶9; A. Colborn Decl. ¶24).

79. Colborn received many threatening e-mails and threatening voice mail messages. He received mail from strange addresses and instructed his wife not to open any of the mail. He received exploding graffiti and other things from strangers. (B. Colborn Decl. ¶10; A. Colborn Decl. ¶¶10, 11, 12).

80. After *Making a Murderer*, Andrew Colborn became hypervigilant and did things, such as boarding up the door at his home, because he feared the risk of attack or robbery. If

strange cars sometimes appeared in the driveway, his fear became heightened. He was extra vigilant when rallies to free Steven Avery were scheduled and occurred. (B. Colborn Decl. ¶12).

81. Andrew Colborn worried about his children and told them to be on the lookout whenever anything about Steven Avery came on the news. (B. Colborn Decl. ¶13).

82. Andrew Colborn received voice mails while working at the Manitowoc County Sheriff's Department intended for him and other law enforcement and e-mails at home. The messages were vile, profane, menacing, and intimidating. Strangers sent a package that looked like a bomb and insults accompanied by sinister warnings, circulated pictures of Colborn and his family on the Internet, took pictures of Colborn and his automobile license plate to circulate, and chastised him publicly, all because of *Making a Murderer*'s accusations. (A. Colborn Decl. ¶¶2, 3, 10, 12, 15, Exs. 1, 2).

83. Colborn's employer hides him from publicity and public events even now. (A. Colborn Decl. ¶16).

84. When Colborn attended car shows, he used a false name so his car would not be vandalized. (A. Colborn Decl. ¶6; B. Colborn Decl. ¶11).

85. Because of *Making a Murderer*, when sitting in a restaurant, Colborn typically sits so he can see the door. (A. Colborn Decl. ¶10).

86. Although he was in law enforcement, because of *Making a Murderer*, Colborn made especially sure his weapon was loaded and ready to be used if needed. (A. Colborn Decl. ¶8).

87. Colborn's circle of friends has decreased since *Making a Murderer*, and he is closely guarded with even close friends and relatives. He trusts few people because of *Making a Murderer*. *Making a Murderer* affected Colborn's important social, family, and employment

relationships.  He lives in a constant state of anxiety because of *Making a Murderer*.  (A. Colborn Decl. ¶¶9, 14).

88.     He instructed his wife not to pick up the mail out of fear that it may harm her. One day he received a package that looked like it contained an explosive, and dismantled it with the help of the sheriff's department.  The package was sent regarding the events portrayed by *Making a Murderer*.  (A. Colborn Decl. ¶10).

89.     He always answered the phone at home because he did not want his wife to be exposed to the threats that often occurred on those calls.  (A. Colborn Decl. ¶11).

90.     Colborn did not seek professional help because he was concerned that a diagnosis of anxiety or worse could affect his employment as a law enforcement officer carrying a weapon. (A. Colborn Decl. ¶14).

91.     Because of *Making a Murderer*, Colborn is stopped in public by strangers who ask his identity or confront him and often finds people staring at him in public.  Strangers sometimes take his picture.  (A. Colborn Decl. ¶¶17-20, Ex. 3).

92.     Scotland Yard issued a public statement condemning Colborn and law enforcement in Manitowoc over the Avery case after *Making a Murderer* occurred.  (A. Colborn Decl. ¶21, Ex. 4).

93.     A current Google search shows that his name generates over 500,000 hits with videos.  (A. Colborn Decl. ¶30).

94.     He continues to be the subject of Internet articles referencing *Making a Murderer*, and those articles are critical of him.  (Dkt. 316 D. Bursik Decl. ¶ Ex 4 .)

Dated this 4th day of November, 2022.

By: /s/ George Burnett
    George Burnett, State Bar No.: 1005964
    LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
    231 S. Adams Street
    Green Bay, WI 54301
    P.O. Box 23200
    Green Bay, WI  54305-3200
    Phone: (920) 437-0476
    Fax: (920) 437-2868

    April Rockstead Barker, State Bar No. 1026163
    ROCKSTEAD LAW, LLC
    525 N. Lincoln Ave.
    Beaver Dam, WI 53916
    (920) 887-0387
    (262) 666-6483 (facsimile)
    aprilrbarker@rocksteadlaw.com

30