1986 WL 12966
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Fifth District, Stark County.

Robert PEREZ, Plaintiff-Appellant,
v.
WEWS, et al., Defendants-Appellees.

No. CA-6874.
|
Nov. 10, 1986.

Civil Appeal from the Court of Common Pleas Case No. 80-1514

**Attorneys and Law Firms**

Harry Schmuck, James Adlon, Canton, for plaintiff-appellant.

Louis Columbo, Cleveland, for defendants-appellees.

*OPINION*

PUTMAN, Presiding Judge.

**\*1** In *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 279-280, the U.S. Supreme Court held that in a libel suit brought by a public official, the First Amendment requires the plaintiff to show that in publishing the defamatory statement, the defendant acted with actual malice-"with knowledge that it was false or with reckless disregard of whether it was false or not." It was further held that such malice must be shown with "convincing clarity." Id. at 285-286. See also *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 342. These *New York Times* requirements have since been extended to libel suits brought by public figures as well. See e.g., *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130.

In 1986, the rule was laid down that the clear and convincing requirement must be considered by a trial court ruling upon a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure in a case to which *New York Times* applies. See *Jack Anderson, et al, Petitioners v. Liberty Lobby, Inc., and Willis A. Carto* (1986) 477 U.S. 242 106 S.Ct. 2505, 91 L.Ed.2d 202, No. 84-1602, decided June 25, 1986, 46 CCH S.Ct. Bull.P. The Ohio Civil Rule is the same in number and substantial text as the Federal Rule.

In this case, we reverse and remand for trial because the evidence is such that reasonable jurors could find that the defendants not only knew the publication was false, but actually created the falsehood intentionally.

Rule 56(e) provides that when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."

There is no requirement that the trial judge must make findings of fact. The threshold inquiry is that of determining whether there is the need for a jury trial-whether, in other words, there are any genuine factual issues that can reasonably be resolved only by a finder of fact.

We conclude that there was sufficient evidence of high enough quality so as to mandate the submission of it to a jury for resolution.

We consider it to be clear that the plaintiff was a public official so as to bring the defendants within the scope of the *New York Times* rule.

We first set forth a history of the litigation, also known as a statement of the case.

On October 31, 1980, the plaintiff-appellant, Robert Perez, filed a complaint in the Court of Common Pleas of Stark County, Ohio, against the defendants-appellees, Scripps Howard Broadcasting (television station WEWS) and Bill Younkin, alleging libel and defamation of character arising out of a series of television broadcast "investigative reports" which represented that the plaintiff-appellant, then an officer in the Stark County Sheriff's Department, seized illegal narcotics and then re-sold them on the street.

On March 6, 1981, with leave of court, the plaintiff-appellant filed an amended complaint which

Case 1:19-cv-00484-BHL Filed 10/03/22 Page 1 of 13 Document 328

joined an additional party-defendant, Edward Ferren.

To the amended complaint, all of the defendants filed their respective answers denying the allegations contained in the amended complaint.

**\*2** Extensive discovery was performed by all parties to the action, and, over a period of several years, the case was repeatedly assigned for trial and continued. Affidavits of prejudice were filed by the defendant-appellees, Scripps Howard Broadcasting and Bill Younkin, and dismissed by the Ohio Supreme Court, and eventually, on July 30, 1984, three years and nine months after the filing of the complaint, the defendants-appellants, Scripps Howard Broadcasting and Bill Younkin, without leave of court, filed a motion for summary judgment.

In support of their motion for summary judgment, the defendants-appellees offered the affidavit of William Younkin, and relied upon the answers to interrogatories of the plaintiff-appellant, Robert Perez.

Previously filed in the record was the deposition of Robert Perez. The plaintiff-appellant filed a brief in opposition to the motion for summary judgment of the defendants-appellees, and in support thereof, offered the affidavit of Robert Perez, which incorporated the deposition of Edward Ferren.

On January 31, 1986, the Hon. Joseph P. Malone, sitting upon the case by assignment, sustained the motion of the defendants-appellees for summary judgment.

In his judgment entry, Judge Malone held as a matter of law that the plaintiff was a "public official."

The court then considered the issue of "actual malice," and stated, "the court finds that a jury acting reasonably could not find actual malice with convincing clarity."

Based upon the foregoing, the court granted the motion for summary judgment. Additionally, in the judgment entry, the court noted, "no just cause for delay." (See Civ.R. 56(B). This made the judgment appealable.

On February 26, 1986, the plaintiff-appellant, Robert Perez, filed his notice of appeal to the Court of Appeals for Stark County, Ohio, from the judgment entry of January 31, 1986.

Perez assigned two errors:

ASSIGNMENT OF ERROR NO. I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DETERMINED AS A MATTER OF LAW THAT THE PLAINTIFF-APPELLANT, ROBERT PEREZ, A DEPUTY IN THE STARK COUNTY SHERIFF'S DEPARTMENT WAS A "PUBLIC OFFICIAL."

ASSIGNMENT OF ERROR NO. II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED SUMMARY JUDGMENT TO THE DEFENDANTS-APPELLEES, SCRIPPS HOWARD BROADCASTING AND BILL YOUNKIN, WHERE THE PLEADINGS, DEPOSITIONS, AFFIDAVITS, AND OTHER DOCUMENTARY MATERIAL FILED IN THE RECORD ESTABLISH GENUINE ISSUES OF MATERIAL FACT WHICH ARE IN DISPUTE AND WHERE THE DEFENDANTS-APPELLEES WERE NOT ENTITLED TO A JUDGMENT AS A MATTER OF LAW.

A recital of the facts will illuminate the assignments of error.

In October of 1980, Robert Perez and Sam Sainer were Stark County Deputy Sheriffs and Robert Berens was an auxiliary Deputy Sheriff. Their boss, Sheriff George Papadopulous, a Democrat, was a candidate for re-election in the up-coming November general election. But Berens was running as a Republican against his boss, Papadopulous, and Sainer was actively campaigning for Berens.

**\*3** In 1980, the plaintiff-appellant, Robert Perez, hereinafter referred to as Perez, was employed by the Stark County Sheriff's Department as a "Captain."

Perez had joined the Stark County Sheriff's Department in 1954 as a "road man." In 1959, Perez became a Detective. During the tenure of Sheriff Papadopulous, Perez was made a Captain in the Stark County Sheriff's Department. Perez remained a Captain until he resigned from the Stark County Sheriff's Department following the defeat of Sheriff Papadopulous by Robert Berens.

As a Captain in the Stark County Sheriff's Department, Perez's duties included investigation of criminal offenses, administration of the detective bureau, along with helping out with the patrol division. While he was a Captain, he was responsible to report directly to the Sheriff.

Perez participated in the development of the Stark County Metropolitan Narcotics Unit, and worked under Don

Jones, its first administrator.

The defendant-appellee, William Younkin, was in 1980 employed by Scripps Howard Broadcasting Company as a reporter for television station WEWS, Channel 5, Cleveland, Ohio.

In August of 1980, Younkin investigated and prepared a series of "investigative reports" on activities in and about the Stark County Sheriff's Department.

On September 25, 1980, television station WEWS, Channel 5, Cleveland, Ohio, broadcast on the 11:00 News an "investigative report" by William Younkin.

As a lead-in to the investigative report of William Younkin, the following statement was made by Mr. Maynor of WEWS:

Mr. Maynor: For the past several days Bill Younkin has been putting together another puzzle, this one linking men behind the badges and their own illegal drug business. Tonight he's here for the startling finale of this series.

In his investigative report, Mr. Younkin interviewed one Edward Ferren. The following broadcast of a portion of that interview was made:

Ed Ferren used to deal heavily in drugs. But like many others I've talked with, he was never convicted of any drug law violations in Stark County.

A couple of years ago he was in the Stark County Jail following a New Year's prank. During his stay in jail he tells me Captain Robert Perez had him taken out of his cell and into Perez' office.

Mr. Ferren: He proposed that I, you know, sell drugs.

Mr. Younkin: As an undercover agent?

Mr. Ferren: Never mentioned being undercover. He never mentioned nothing about being a cop. He just wanted me to do drugs. He just said "I want you to do the runs between here and Michigan."

Mr. Younkin: For him?

Mr. Ferren: That's what he was asking. He didn't ask me to do it for myself. I was already in custody.

Mr. Younkin: He actually said the runs, make the runs?

Mr. Ferren: He knew the same runs I did. He mentioned the same people I knew between Canton, Ohio and Michigan. He knew the same runs, he knows the same people. Only he might not know the exact people but he knows the same connections.

Mr. Younkin: And he actually said to you, "I want you to make the runs"?

**\*4** Mr. Ferren: Yeah. He told me, he said-he didn't talk about nothing about being a cop. He just talking about doing drugs out on the streets.

Mr. Younkin: And wheeling and dealing?

Mr. Ferren: Yeah. He told me, he says "Set you up and you can wheel and deal," he says, "but you'll be working for me."

On October 17, 1980, on the 6:00 P.M. News, television station WEWS, Channel 5, Cleveland, Ohio, broadcast another investigative report by William Younkin.

During that broadcast, Mr. Younkin made the following statements:

Mr. Younkin: In a prepared news release, Stark County Sheriff George Papadopulous has announced that his special Board of Inquiry, made up of his own deputies can find no basis for the allegations raised in our probe of his Department.

Mr. Ferren, an admitted former drug dealer, said one of Sheriff Papadopulous' top officers was involved in his own drug deals.

Ferren told me he was in the Stark County Jail when Captain Robert Perez offered him a deal to make the drug runs for him, Captain Perez.

According to the Sheriff's news release, the five-member panel could find no one who could name Perez, even though they did talk with Ed Ferren. I talked with Ferren by phone this afternoon. He told me he never changed his story at all.

Mr. Ferren: I'll just tell you, man, I stand by what I said.

Mr. Younkin: The Sheriff questioned my source's credibility and he says he considers the case closed. I'm Bill Younkin, TV-5 Eyewitness News.

In a lengthy affidavit filed in support of the motion for summary judgment, William Younkin stated that in September, 1980, he was contacted by Deputy Sam Sainer

of the Stark County Sheriff's Department who told him that he knew some people who might be able to confirm a link between the Sheriff's Department and illegal drug sales. Younkin stated that because Deputy Sainer had in the past been "a reliable source of leads and information for me," Younkin decided to investigate further and arranged to meet him with Jim Nash, Ed Ferren, Mike Norris, Bill Nut, Danny Van Allman, and Jackie Chisolm, which was attended by Sam Sainer.

In his affidavit, William Younkin stated as follows:

16. At the meeting described in paragraph 14, Edward Ferren informed me of a specific incident involving him and Captain Perez when he was in jail following a New Year's prank involving the theft of a phone booth. He told me that Captain Perez had had him taken out of his cell for a conversation in Perez's office in which Perez asked him to work for Perez personally in the illegal drug business, to "do the runs" between Ann Arbor, Michigan and Stark County. Ferren specifically stated that he was not asked to do this in an undercover capacity. He said no one else was present during this conversation between himself and Perez.

17. Ferren admitted to me that he was a former drug dealer, but said that he had never been convicted of any drug-related crimes. He indicated that he had stopped dealing in drugs, that he had a good job with the Hoover Company and (sic) that he wanted to retain, and that he was trying to straighten out his life.

*5 ...

19. Based upon his demeanor and apparent sincerity, his articulated motivation, his ability to corroborate through photos and the statements of others (sic) various circumstantial details of his statements, his ability to give me a detailed account of his private interview with Captain Perez, and his willingness to be interviewed on camera despite his fear of repercussions, I believed Ferren.

...

39. I have never held any personal malice or ill will towards Robert Perez and I have never had any desire or intention to do him personal harm. I have no personal interest in the affairs of Robert Perez. My intention in broadcasting these reports was to expose to the public view serious and, in my estimation, credible charges concerning improprieties and possible illegal activity in the Stark County Sheriff's Department.

40. I believed that the reports that I broadcast faithfully, fairly and accurately reported the facts contained therein and the charges being made about Captain Perez and, to the extent I had access to them, his response to those charges. At no time did I doubt that the reports that I made were substantially true. In my career as a journalist, I have always attempted to be factual and accurate in every respect, and I have never broadcast a statement that I did not believe to be true.

The plaintiff-appellant, Robert Perez, in his affidavit filed in opposition to the motion for summary judgment stated:

3. That he was one of the first members of the "Metro Squad", a special unit composed of sheriff deputies, city police and representatives of law enforcement in Stark County, Ohio to eliminate drug trafficking in the Stark County area.

4. That as part of his duties he, by securing information especially from persons who were involved in drug trafficking or had been convicted of drug abuse or drug sale, became acquainted with sources of supply from persons who knew of the source of supply and persons who were dealing in the drug trade and the location of said sources.

5. Affiant says that he was informed by another officer that one Ed Ferren might have information that would assist law enforcement officers to infiltrate and learn of drug dealers and suppliers who sold and supplied drugs to persons in this area.

6. That while Ed Ferren was in jail he interviewed him with the knowledge of his mother and step-father to determine if he could assist the metro group by acting as an informant to affiant or other persons in law enforcement.

7. That said interview involved discussions of sources of drugs including locations in Columbus and Michigan.

8. That affiant did not determine that Ferren would be helpful as an informant and the discussions were not followed by further action.

9. That thereafter the defendant Younkin broadcast an interview of said Ed Ferren implying that the interview was spontaneous, unrehearsed and without prompting.

10 That attached hereto is the deposition of said Ed Ferren which reveals the method of the interview.

*6 11. That a casual examination of this deposition shown

it was not only done with reckless disregard but with actual malice.

12. Affiant further states that other acts of the defendant Younkin, in addition to this report, were equally vicious, intential (sic) and demeaning to this affiant.

The affidavit of Robert Perez incorporated the deposition of Ed Ferren taken as on cross-examination by the plaintiff-appellant.

In his deposition, Edward Ferren testified that he talked to Perez three times and that the first two times Perez asked him (Ferren) to work as an undercover agent. (See Ferren depos. p. 46). Ferren further testified that during the meeting with Mr. Younkin, he told Younkin that the discussion that he had had with Perez involved Perez attempting to solicit him for work as an undercover agent, but Younkin left that out of his broadcasts. We consider the evidence of that fact to be crucial. Further, Ferren testified that during the meeting with Younkin, he observed Sheriff Robert Berens in a vehicle outside the house where Younkin was interviewing him.

Ferren also testified that Younkin asked him to make his statements differently (Ferren depos., p. 20, 1.4); that Younkin offered to pay his legal fees in the event that there were any legal problems from the broadcast (Ferren depos., p. 22); and that Younkin cut-out portions of the interview which were not aired on the broadcast, rehearsed him two or three times before taping and, asked him to make his statements stronger (Ferren depos., pp. 27, 29).

In other broadcasts during the same series, Mr. Younkin stated that Perez had accepted a pay-off.

We have previously stated that the basis of the first assignment of error is not well taken because Perez was, in our judgment, a public official. See *Milkovich v. News-Herald* (1984), 15 Ohio St.3d 292, 297.

We move now to the second assignment of error and determine that the trial court should not have entered a summary judgment, but rather, held the case for trial. Rule 56(C) of the Ohio Rules of Civil Procedure states in pertinent part as follows:

Summary judgment shall be rendered forthwith in the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor.

The Ohio Supreme Court in the case of *Williams v. Church,* 37 Ohio St.2d 150 (1974), held that on summary judgment, the inferences to be drawn from the underlying facts contained in such material as depositions, affidavits, and exhibits must be viewed in the light most favorable to the party opposing the motion, and if, when so viewed, reasonable minds can come to differing conclusions, the motion should be overruled.

**\*7** In Ohio, it is well settled that it is outside the province of a summary judgment hearing to resolve issues of credibility. *Duke v. Sanymetal Products Co., Inc.* (1972), 31 Ohio App.2d 78.

In the judgment entry granting summary judgment to the defendants-appellees, the trial court concluded that there was no evidence that may be construed to show that the alleged false statements were made with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana* (1964), 379 U.S. 64.

The court further stated in the judgment entry that "a jury acting reasonable could not find actual malice with convincing clarity."

However, given the conflicts between the testimony of Edward Ferren contained in the deposition of Edward Ferren as to the rehearsals of his interview by Mr. Younkin, the requests of Mr. Younkin to make his testimony stronger, and the omission from the telecasts of the testimony of Edward Ferren that he had told Mr. Younkin that the alleged recruitment was that as an undercover (enforcement) agent (Ferren depos., pp. 20, 27, 29), it is clear that there are genuine issues of material fact as to the existence of actual malice on the part of the defendants-appellees, Scripps Howard Broadcasting and Bill Younkin.

Reasonable jurors could conclude that actual malice appears with convincing clarity. Specifically, it is material and genuinely disputed:

1. Whether the entire Ferren interview showed no more than that Perez was recruiting Ferren to work as an

Case 1:19-cv-00484-BHL   Filed 10/04/21   Page 5 of 13   Document 328

"undercover cop" and whether Younkin intentionally omitted that part of the interview so as to make corruption falsely appear;

2. Whether Younkin intentionally manufactured falsehood out of innocence, motivated by a malicious purpose to destroy Sheriff Papadopulous so as to elect Robert Berens.

Younkin's failure to disclose in his broadcast that Sainer was present at the Ferren-Younkin interview he broadcast and that Berens was outside at that time (Ferren depos., p. 30); the failure to disclose Sainer's urging Ferren at that interview to post "Elect Berens Sheriff" campaign signs (Ferren depos., p. 30, 11. 1-15); Younkin's repeated rehearsals of Ferren coupled with repeated urgings to "make it stronger" (Ferren depos., p. 20, 1.5; p. 27, 1. 10; p. 29, 1. 23), all might be considered to be corroborative of a malicious motivation behind the act of intentionally creating falsehood by omitting from the telecast the fact that Perez' first contacts with Ferren were to recruit him as an undercover law enforcement agent.

Thus, reasonable jurors could not only conclude more than a "high degree of awareness of the falsehood," but actually the intentional creation of it.

In 1918, Justice Oliver Wendell Holmes wrote:

A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and context according to the circumstances and the time in which it was used.

*Towne v. Eisner* (1918), 245 U.S. 418, 425

Stripped of the context of the two preceding conversations and emptied of the vital occasions that gave them birth and meaning, the rehearsal and strengthened re-creation of the isolated third conversation appears, with convincing clarity, to have been maliciously planned to cast large upon the television screen a shadow of the appearance of guilt caused solely by hiding from view the actual figure of innocence, and reasonable jurors could so conclude.

**\*8** Credibility of the witnesses is never at issue on summary judgment. The judicial task is not to decide what the actual truth is, but merely whether reasonable jurors, exercising their exclusive power to judge credibility, reasonably could find the evidence showed malice with convincing clarity.

We find the evidence to be such as to preclude a summary judgment for the defendants.

Pertinent portions of the deposition of Ferren are photocopied and attached hereto.

For the foregoing reasons, the judgment of the Court of Common Pleas of Stark County is reversed and this cause is remanded to that court for further proceedings according to law.

MILLIGAN and WISE, JJ., concur.

(Appendix to Stark County App. No. CA-6874)

Q. Short visit, is that it?

A. It was a nice town, friendly people.

Q. Okay. Now, you knew that Nelson was a guy that was pretty hard on drugs?

A. He was hard on everything.

Q. And he came to the jail to see you, is that what you're saying?

A. No. He had me in his cooler down in Minerva and-it's a cooler. And he took me over to Alliance. We was just bullshitting around. He's pretty fair about everything, and we was just bullshitting around.

Q. Okay.

A. And we got in there, and I got six months for petty theft; and he told me he didn't like the idea. So he took me out to the County, and then he come back and said I'm going to take you up to Perez's office. He wants to talk to you. I said okay.

So we went up there. There was another guy. I think he was the Chief of Police out by Marlboro. I forget his name. I know him real well. He always chased me around at night.

We went in there, and Bob was talking to me about Bobby VanAlmen and that. And he was telling me he knew these roots and those roots.

Q. What do you mean roots? What are you talking about?

A. Well, he almost knew step by step where we went up into Michigan.

Q. For what?

A. Drugs.

Q. Sell drugs or buy drugs or what?

A. Bring drugs back in the State of Ohio.

Q. I see. You mean Perez told you that?

A. Yes. He almost knew everything, but he didn't know one or two little details, which I told Younkin I talked to Perez three times. The second time I talked to Perez I was sitting in lockup and my mother and my stepfather were there.

Q. Okay.

A. And Bob was talking to me about being a cop, and I told him-

Q. You're talking about Bob Perez?

A. Yeah.

Q. Okay.

A. About being a police officer, and I told him I couldn't handle that and I didn't want-

Q. You mean as an undercover agent?

A. Yes. He said I could disappear for six months or so then come back and work for him.

Q. Okay.

A. So time went by. I got called back up to the office again, and this is what I was telling Mr. Younkin about. He didn't mention nothing this time about being a police officer. And he knew pretty well the roots that Bob and I would take.

Q. Are you talking the routes between here and Michigan, the drug routes?

A. Yes. He told me that I could wheel and deal out on the street for him. And I conveyed this conversation as best I could to Mr. Younkin after we rehearsed it three or four times.

*9 Q. Now, wait a minute. You said you could work there for him, and, of course, he meant that you were to work as an undercover agent?

A. He never mentioned nothing the third time about an undercover job.

Q. I see. But the second time he said I'll give you a badge and make you an undercover agent; right?

A. Yes. I told Mr. Younkin that, and that part was left out.

Q. He never put that on there?

A. No. I told him I had three meetings with him, and I told Mr. Younkin as best I could remember about it. I tried remembering the guard's name that took me back. He said he contacted the guard, and the guard wouldn't talk to him.

Q. You mean Younkin told you that?

A. Yeah.

Q. You don't know who the guard was?

A. No. He was tall, black guard. He said that-I talked with Younkin later. He said that he tried talking to the guy, and the guy wouldn't talk to him.

Q. Okay.

A. And I told Younkin there was no way I could prove this because it was just Bob Perez and me in the room. He said for me not to worry, that he'll be able to prove it because he said he'd have some people that worked with Bob that could collaborate what I said.

Q. Now, you also told him that you didn't want to be no political football; didn't you?

A. Yes, because-I asked him about that because I knew the elections were coming up, and I told him I didn't want to get into being a political football. He said his only intentions were to clean up the corruption in our town.

Q. Now, you're talking about Younkin?

A. Yes. And I told him about how-that the City of Canton Police Department had mistaken me for Bob VanAlmen and beat me up, and I showed him photos. And that's what I was, you know, really trying to get him into

because he said he wanted to clean up-you know.

Q. Corruption?

A. Corruption and that you've got police officers out there beating people up. And I told him that Stark County never laid a hand on me anytime that they have ever arrested me.

Q. You mean the Sheriff's Department?

A. Yeah.

Q. Now, didn't they tell you that Sainer was there as an inside security man? Right?

A. Yes.

Q. And did they tell you they had an outside security man?

A. Yes, because I asked him, I said what happens if somebody breaks in here because he said he was under cover. I said what happens if somebody tries getting in here. He said we got Sam in here, and we got another man outside.

Q. Did you look at that other man who was outside?

A. After the interview, they sent the tape out.

Q. And you saw the-

A. And there was a guy sitting like in the middle part of the lot.

Q. They never introduced you to him, did they?

A. No.

Q. You did look at him?

A. Yes. They said they was going to give him the tape, and he was going to put it in a safe.

Q. The safe to protect it, is that correct?

A. Yes. He was supposed to be able to warn us if anybody was in the parking lot.

Q. Now, you saw him at that particular time?

A. Uh-huh.

Q. Nobody ever introduced you to him?

A. No, never got introduced to him.

*10 Q. But you were able to later on identify him?

A. Yes. I was looking in the paper.

Q. And who was the man who was the outside security man to protect you and to be your protecter?

A. Well, like I told my wife, it was our crusading sheriff.

Q. You mean Sheriff Berens?

A. Yes.

Q. And that's when he was running for Sheriff, is that right?

A. Uh-huh.

Q. And he was the outside man to protect you from somebody busting in there and causing some problems?

A. Yep, because I didn't know who he was. He just looked like almost-you know. He just looked like a guy with black hair and sunglasses.

Q. Now, let me ask you this. You did three interviews there?

A. Well, two of them were without tape. It was like we were just sitting there, and he kept saying we have to cut this down, and can you use a different word.

Q. In fact, you rehearsed it two times?

A. Yes.

Q. And didn't he tell you that can't you make it a little stronger, words to that effect?

A. Yes. Even when I called him up a couple times on the phone because I was having problems down here, I'd say something on the phone; and he'd say well, can't you say it differently.

Q. Indicating that he wanted you to say it stronger and make more specifics?

A. Uh-huh. One particular time I called him up, Pinkey Arnold and a few of-I think it was one police officer from Canton and one from Stark County come over to talk to

Case 1:19-cv-00434-BHL    Filed 10/04/21    Page 8 of 13    Document 32-8

me about Bob Perez. And I called up Younkin, and I told him I just wanted to be left alone. I wish he'd take the tape off the TV because he was playing it like a Saturday night rerun.

Q. Who was doing that?

A. Younkin. He was playing that tape everyday, and I told him-

Q. You mean on the television?

A. Yes. He told me that he wasn't going to play it until he had further evidence. And I called him up and told him he had to get that tape off of there because I was getting too much flack.

Q. Didn't you tell him that you couldn't prove what happened there?

A. I told him that a couple times.

Q. That it was a matter between you and Perez and you still couldn't prove it?

A. Yes. I told him he'd have a hard time proving it unless he gets somebody that works with Bob. I told him why we thought-I mean why I thought that. I told him that how drugs would be confiscated or people would be busted and everybody has got a little trade market on their drugs. They wrap them a certain way or-you know.

And I told him when certain people get busted-you know. Some grams of T will wind up in the courtroom, and you'll be talking with the guy, and he'll tell you how many grams he got busted with; but not all of them will be in there. And then you'd be in a bar one night and you see the guy's brand just the way he wraps it, a certain kind of seal he'll use. I told him about that just like as he had wrapped it up a certain way, use a certain kind of rubber band.

But he said he had some people from Metro that could collaborate about drugs being put back on the streets and that.

**\*11** Q. Now, wait a minute. Younkin told you that he had people from Metro?

A. Yes. He said he had a couple undercover guys that used to work for Bob or worked with Bob still.

Q. That's on the Metro Squad?

A. Yes, who knew that drugs were being confiscated and were being put back out on the street.

Q. Did you ever hear who that was?

A. No. He never gave no names.

Q. He just told you that he could prove that, right?

A. Yeah.

Q. Well, didn't you call him a couple times and raise an issue with him about hey, I can't prove this, or words to that effect?

A. Yes. He told me not to worry about it.

Q. Not to worry about it?

A. He said everything would be taken care of.

Q. What did he tell you would be taken care of?

A. He said I'd be taken care of. Everything would be taken care of.

Q. Has he taken care of you?

A. No. I haven't heard from him, haven't seen him, haven't heard from his lawyers. I asked him about-because when the interview was over, I asked him about, you know, the legal aspects of it because I knew there'd be something coming off. He said for me not to worry, that I'd be taken care of. I said I have my own lawyer. He said that he would take care of the-they would take care of the legal fees.

Q. In other words, they told you that if there were any legal problems they'd take care of you?

Q. You're talking about Younkin?

A. I told him who my lawyer was, and he said he knew Michael; and I told him that's the lawyer I would step into a courtroom with.

Q. Now, he knows you have had a lawyer and you have been sued in this, doesn't he?

A. I called him up the day I got served with the papers. I got served at work. He told me not to worry about it. It will never get to Court.

Q. Never get to Court. Now, you told him who your

lawyer was?

A. Yes.

Q. To your knowledge, did he ever pay your lawyer fees or pay any money for you?

A. He told me not to worry about it. And Michael sent him a-what do you call that?

MR. FREEMAN: Letter of representation.

A. And we got a good-bye note.

Q. A what?

A. A good-bye note.

Q. Did you read it? What did it say?

A. It was like a dear John letter. They have never contacted me. I've seen Sam Sainer since then, and he always tells me he's got to talk to me. That's the only contact I've had with him since.

Q. Have you ever talked to Sam since then?

A. Yes. A couple times I have went out to see Danny at the County when he was out there.

Q. That was how long ago?

MR. FREEMAN: At least a year, right?

A. I think it's been about eight months since I've seen him. And Sam showed me a file they have on Bob Perez.

Q. About Bob Perez?

A. Yes.

Q. Now, since, say, in the last three months, have you been contacted by the lawyer for WEWS or Younkin?

A. I haven't been contacted by anybody.

Q. Nobody from Berens' office or Sainer or anybody like that?

A. No.

Q. Younkin?

A. No.

Q. You've been contacted by nobody, is that correct?

A. Nope.

Q. And to this date, they have never paid any money to your lawyer that they promised?

*12 A. Nope. I have not received no legal fees, or I've not talked with any of their lawyers about this case.

Q. But during this interview and even after it, didn't you tell him that I can't prove these facts?

A. Yes.

Q. But he put it on the television? You saw it anyway, didn't you?

A. I told him I couldn't prove it. I said it was just Bob and I in the room. I told him what I believed, how I believed it and how it come off that day as best I could remember it.

Q. And the second time you were in there to see Perez-

A. I told him about that one.

Q. And he suggested to you that you might become or be available as an undercover agent for Metro?

A. Yes.

Q. Now, you were not a drug user yourself; were you?

A. Yeah.

Q. You were?

A. Yes.

Q. Okay.

A. I was going through withdrawal symptoms at that time.

Q. I see. And you knew all these routes from Michigan to Canton here?

A. Down to Columbus.

Q. To Columbus?

A. Cincinnati.

Q. Perez knew all the same routes that you did, is that

correct?

A. Well, the way he was talking to me, he knew-I mean he even mentioned the castle.

Q. Tell me about the castle.

A. It's a landmark.

Q. Where?

A. Outside of Ypsilanti, Michigan. It's where the Black Panthers run. A couple Black Panthers were dealing up there. They were dealing through a motorcycle gang up there.

A. We didn't know that until later.

Q. And of course before that, he told you and you knew that he was a Metro agent?

A. Yes. I've seen him from a distance.

Q. From a distance, yes. And of course that was the method that the Metro used to get people to work undercover for them. You knew that, didn't you?

A. What method?

Q. That they get somebody like you and say hey, work for us undercover.

A. No. They get you jammed up first and give you a hundred years; then they get you to work for them.

Q. And you knew that's the method they used, and that's what he was going to talk about to you to try to get you to work undercover; right?

A. Yes.

Q. In fact, you were brought to him by your mother, Nelson and your mother. Did they come and ask you to go to see Perez?

A. Well, Nelson took me back, like I told you earlier, the first time. And they come back and got me when I was in lockup, and my mother and my stepdad and Nelson were there the second time. And Bob wanted to hit me. My mom said he couldn't.

Q. But, in any event, on several occasions-

A. I told Younkin about all the meetings. And we talked for a long time before we did the taping, and everything was just being cut down and cut down and cut down.

Q. But then in addition to that besides being cut down, he said can't you make it a little stronger, or words to that effect?

A. Yes, because I don't know just-it was strange that day, just like I was telling him everything that I thought and certain things that happened to me. And it was just-a lot of things were cut out.

Like if you see that tape, he has me talking about Bob Perez; and then it sort of cuts into where I got beat up. But I don't know-I can't remember exactly if the tape says Canton Police Department did it or they sort of show it to where it looks like Bob Perez's people did it.

**\*13** Q. Did you go to the Stark County Fair? Do you remember?

A. What, that year?

Q. Yes.

A. No.

Q. Were you out at the Mellett Mall that year after that taping that you gave?

A. I didn't go nowhere after that taping.

Q. But you did see it on television?

A. I mean I couldn't even go to a donut shop.

Q. You did see it on television?

A. Yes, once.

Q. Once?

A. See, he said he wasn't going to play it until he got more supporting evidence. And then the next night, I was on-or that night.

Q. How many times did you call Younkin after that?

A. A lot.

Q. For what reason?

A. Well, I don't know. I was trying to help him out because I knew I was going to get into legal problems if I

didn't try to find him some people that could collaborate what I had said. And I was bringing a couple ex-sheriffs over to his radio station in the morning that he could talk to, but I guess they really didn't have nothing much to say.

Q. Who did you bring over?

A. Kenny Cross. Most of what he said was like rumors that he heard through the department, you know. Anywhere you work there's rumors.

Q. Right, including Hoover's.

A. Yes. And Jeff Nash told him about a couple guys that were in prison that were arrested on drugs. And there was one guy who supposedly got caught with a large amount of quaaludes, and when he went to Court, like a third of them wasn't there. And Younkin was supposed to talk with him. I don't know if he ever did.

Q. So he asked you to give him information about the Sheriff's Department?

A. Yes. He wanted me to introduce him to more people on the streets, and he said he had some guys that used to work with Bob or had one or two guys that worked with Bob that he was going to put on TV, too.

Q. You never saw any of them though on TV, did you?

A. He had one guy behind the screen. He didn't say nothing. He had a guy in front of the screen that wasn't even a Metro officer anymore.

Q. If I understand you right now, the night that you gave this interview, first of all, he rehearsed you at least two or three times before he ran it.

A. Well, that's what I call it now, rehearsing. At the time I thought we was just going over everything, but a lot of stuff that I told him was just cut out.

Q. He told you on several occasions that can't you make it stronger, or words to that effect?

A. Yes.

Q. And you were there with an inside Deputy Sheriff by the name of Sainer?

A. Yes. And after the interview, Sam Sainer gave me two posters.

Q. Two posters?

A. Yes.

Q. What kind of posters?

A. Oh, them little red, white and blue ones, political posters.

Q. For what?

A. Elect Berens.

Q. Elect Berens. That's after the interview that he gives you two posters?

A. Uh-huh.

Q. And then you went outside, and you saw a man who you didn't know but later on you recognized as being Berens?

A. I didn't go outside and see him. I looked through the sliding glass window-doors in Jackie's house because her apartment overlooks the parking lot.

Q. And this was in the daytime?

**\*14** A. Uh-huh.

Q. And you definitely could identify the person that was there?

A. I didn't know who he was at the time.

Q. Later on, you did see his picture and you know now that he was Sheriff, the present Sheriff Berens?

A. Right. That's when I told the old lady that I got used.

Q. You got used. You became the political football unintentionally, right?

A. Yes. I put my head in a noose.

Q. I have nothing further at this time.

MR. FREEMAN: We'll waive signature on that.

Q. This man might want to ask you a question.

MR. COLOMBO: I won't agree to the waiver of signature, and I'm going to reserve questioning, except that I'm going to ask Mr. Ferren one question.

Now, when Mr. Younkin introduced you on videotape the evening we've been discussing-okay? When you were being taped, did you tell him the truth to the best of your understanding at that time?

A. Yes.

MR. COLOMBO: Okay. That's the only question I have today.

(Deposition was concluded at 1:50 p.m.)

JUDGMENT ENTRY

For the reasons stated in the Memorandum-Opinion on file, the judgment of the Court of Common Pleas of Stark County, Ohio, is reversed and this cause is remanded to that court for further proceedings according to law.

Pursuant to the doctrine of *North v. Pennsylvania Railroad Co.* (1969), 9 Ohio St.2d 169, we certify that a genuine dispute exists as to the following material facts:

1. Did the entirety of the Perez-Ferren conversations as told to Younkin by Ferren show nothing more than Perez attempting to recruit Ferren to work "undercover" as a law enforcement agent?

2. Did Younkin believe that if he told the whole story, there would be "no news"?

3. Did Younkin, in his broadcast, take away the context and surrounding circumstances from the third Perez-Ferren interview intending thereby to alter the meaning of the spoken words from innocence to guilt?

4. Did Younkin conceal the Sainer-Berens part of the story because he believed it would show a motive to falsify, thus impairing the credibility of his report?

5. Did Younkin intend unjustifiably to injure the reputation of Perez so as to destroy Sheriff Papadopulous and elect Robert Berens Sheriff?

NORMAN J. PUTMAN, P.J.

JOHN R. MILLIGAN, J.

EARLE E. WISE, J.

**All Citations**

Not Reported in N.E.2d, 1986 WL 12966