In the Matter of:

Andrew Colborn vs.

Netflix, Inc., et al.

Case No. 19-CV-0484-BHL

Andrew L. Colborn

July 21, 2022

# 365Reporting LLC

freelance court reporters

1081 Lamers-Clancy Road  Greenleaf, WI  54126
920.585.2341 | www.365reporting.net | paula@365reporting.net


EXHIBIT 14

In the Matter of:

Andrew Colborn vs.

Netflix, Inc., et al.

Case No. 19-CV-0484-BHL

———————————————————————

Andrew L. Colborn

July 22, 2022

———————————————————————



1081 Lamers-Clancy Road  Greenleaf, WI  54126
920.585.2341 | www.365reporting.net | paula@365reporting.net

1　　　　　　　　MR. BURNETT:  I'll withdraw the

2　　　objection.  You can answer.

3　　　　　A　　I disagree with that statement.

4　　　　　Q　　On what basis?  Let me -- let me ask you.

5　　　You've not watched the whole thing?

6　　　　　A　　Correct.

7　　　　　Q　　In fact, you haven't even watched the last

8　　　three episodes at all according to your stipulated

9　　　facts, correct?

10　　　　A　　That is correct, yes.

11　　　　Q　　So you have no idea in those last three

12　　　episodes whether it tells both sides of the stories,

13　　　raises questions, or encourages viewers to reach

14　　　their own conclusion?  You just don't know, correct?

15　　　　A　　I don't know any of the content of the last

16　　　three episodes, that's correct.

17　　　　Q　　Can you point me to where in Making a

18　　　Murderer it contends that you planted evidence to

19　　　frame Avery for Teresa Halbach's murder?

20　　　　A　　I believe there's quite a few examples in

21　　　the Complaint that were -- so I'm not an attorney.

22　　　　Q　　I know.

23　　　　A　　I hired attorneys to do the research to find

24　　　that evidence.

25　　　　Q　　I'm just asking you -- yeah.  And your

58

1    attorneys will make arrangements for you after this
2    deposition, but I'm asking -- all of my questions
3    today Mr. Colborn, just so we can do a level set,
4    they're all directed to you and your personal
5    knowledge as you sit here today, and I'm just asking
6    you can you tell me where MAM, Making a Murderer,
7    contends, states something in a strong and definite
8    way, that you planted evidence to frame Avery for
9    Teresa Halbach's murder?
10        A    I can't tell you the exact episode, no.
11        Q    Okay.  Try a couple more.  Where does MAM
12   contend or state in a strong and definite way that
13   you made a call to dispatch after you located Teresa
14   Halbach's SUV; do you know?
15        A    No, I don't know the exact episode.  I
16   haven't committed all that to memory.
17        Q    Would you rely on everything in your
18   Complaint I take it?
19        A    Yes, I would rely --
20        Q    Okay.
21        A    -- on things in my Complaint and other
22   evidence that my attorneys have uncovered since
23   discovery.
24        Q    We'll talk about that and we'll look at
25   those, and I'll ask you how you think they contend

59

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 4 of 18   Document 330-15
920.585.2341  |  365Reporting, LLC  |  www.365reporting.net

1    name anyone who you believe has treated you
2    differently since the release of Making a Murderer?
3         A    I have some examples, yes, but I don't know
4    their name per se.
5         Q    Okay.  How many examples do you have?
6         A    Oh, for sure one.
7         Q    Okay.  What's that example?
8         A    Well, that example is I've been going to the
9    exact same place to get my car serviced, the
10   dealership where I bought my car, for years.  All of
11   a sudden the service manager is now taking pictures
12   of me in the waiting room, my car up on the lift and
13   sending that out on Facebook saying, "Look who I got
14   here, the person who set up Steven Avery.  Here's the
15   car he drives, along with my license plate number."
16   That had never happened prior to this.
17        Q    Have you produced those social media
18   postings to us in this case?
19        A    No.  I tried to get them from the sheriff's
20   department, and I wasn't able to.  She was instructed
21   by her employer prior to being terminated to take it
22   down off Facebook.
23        Q    So it's no longer online?
24        A    Not that I am aware of, no.  I don't have
25   any social media accounts, so I can't research that.

261

Case 1:19-cv-00484-BHL    Filed 11/04/22    Page 5 of 18    Document 330-15
920.585.2341 | 365Reporting, LLC | www.365reporting.net

 1     Q    And you think the sheriff's department had
 2   copies?
 3     A    I don't know.
 4     Q    But you -- for some reason you thought they
 5   might because you asked the sheriff's department for
 6   them?
 7     A    Correct.  I reported that to the sheriff's
 8   department, actually.
 9     Q    Okay.  Would there be a written report of
10   that?
11     A    I don't know.
12     Q    Did you ask for the written report?
13     A    I did not.  I try not to bother law
14   enforcement with this.  They put up with it enough
15   while I worked there.
16     Q    Do you have any way of knowing whether the
17   person at the dealership who was posting this had
18   ever watched Making a Murderer?
19     A    I didn't talk to the person who did this.  I
20   was advised not to.
21     Q    So the answer is you don't know?
22     A    Correct.
23     Q    And other than the names on this list and
24   the person at the car dealership, is there anyone
25   else who you believe has treated you differently

262

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 6 of 18   Document 330-15
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1    since the release of Making a Murderer?

2         A    I've had -- I don't know.  I supplied it to

3    my attorneys.  I can't remember the guy's name, but

4    he ran for mayor for the City of Green Bay, and I

5    took a part-time job after I retired from law

6    enforcement so I had health insurance.  He came to

7    the hospital because he had a sick child, so I showed

8    him where the NICU is.  Do you know what the NICU is?

9         Q    (Nodding head up and down.)

10        A    Okay.  So he immediately leaves the hospital

11   and posts on Facebook that he felt -- you know, he

12   was more concerned or -- and aghast that I was the

13   one working at the hospital than his sick child who's

14   in the NICU.  His whole Facebook post was about me.

15   And I've purposely tried to change my appearance, but

16   this was pre-COVID, so I wasn't wearing a mask.  But

17   I've allowed my hair to grow longer.  I sometimes

18   grow facial hair, although I'm not a fan of it.  So

19   he still managed to recognize me, plus I'm required

20   to wear a name tag that has my name on it.  So that

21   was another instance.  And, of course, his comments

22   on Facebook weren't exactly favorable.

23        Q    Did you preserve the comments on Facebook?

24        A    I printed them out or emailed them to my

25   counsel.

263

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 7 of 18   Document 330-15
920.585.2341 | 365Reporting, LLC | www.365reporting.net

**1**      Q    Okay.  And you may have produced them to us.
**2**   We'll look for them.
3                MS. WALKER:  If we didn't, we'd request
4    a copy.
5                MR. BURNETT:  Sure.
**6**      Q    What's the mayoral candidate's name; do you
**7**   recall?
8       A    I sent -- no, I don't recall the gentleman's
9    name.
**10**     Q    Okay.  Anyone else you can identify who you
**11**  believe treated you differently?
12      A    There probably are other examples,
13   Ms. Walker, but I can't remember them specifically
14   outside of those two.
**15**     Q    Do you --
16      A    I've had people come up to -- I work in a
17   booth at the hospital, and I've had people come up to
18   the booth, and all of a sudden I'll see a flash and
19   they'll tell me, Oh, I got your picture.  I'm going
20   to put it on Facebook that -- where you're working
21   or Now I've got a good souvenir.  And I'm very
22   careful, I try to be.  I don't allow any family
23   members to take my photograph.  I don't -- I don't
24   want my picture all over social media, for obvious
25   reasons.

264

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 8 of 18   Document 330-15
920.585.2341   |   365Reporting, LLC   |   www.365reporting.net

1      Q    Okay.  Finally, she told us, quote, I wanted
2  to move on.  I didn't want to let Avery or Making a
3  Murderer ruin our lives.  Andy couldn't let it go
4  though.  The lawsuit only did more damage to us, end
5  quote.
6           Do you dispute that?
7      A    No.
8      Q    Okay.  So now we're going to go back to
9  Exhibit 1 and look at your stipulation number 45.
10 And you can set the list of names to the side.
11     A    Okay.
12     Q    So 45 says, "Some members of my law
13 enforcement community supported me after the release
14 of Making a Murderer but some did not," and you
15 requested before signing it that we add "some did
16 not."  You recall that?
17     A    Correct.
18     Q    And so I'd like to know the names of people
19 within the law enforcement community who did not
20 support you.
21     A    Well, I can't give you those names because I
22 don't know the -- the author of the article, but I
23 can give you the department.
24     Q    Sure.
25     A    Scotland Yard.

277
Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 9 of 18   Document 330-15
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1    Q    What is --

2    A    So Scotland Yard is an investigative agency

3    within the City of London Police Department in Great

4    Britain.  I received an article -- I think I got it

5    via email; I don't have a hard copy of it -- where

6    they had interviewed members of Scotland Yard, showed

7    them snippets of -- and clips of Making a Murderer,

8    and after that, Scotland Yard was united in saying,

9    Yes, certainly that officer did a put-up, which is

10   British talk, I understand, for set-up, of Steven

11   Avery.

12        So we're talking an entire agency overseas

13   is now saying that about a police officer.  And I was

14   still an active duty police officer at the time, and

15   I've worked international cases.  So it's difficult

16   having a law enforcement agency that you may have to

17   work with thinking that you set up a guy here in the

18   United States.  So that's one example.

19   **Q    You said that was an article or a television**

20   **special or what was --**

21   A    I don't know if it made it on television or

22   no.  It was an article.  I don't re -- you know, I

23   don't know if I printed that one and gave it to the

24   attorney who was helping me at the time or not.

25   **Q    Okay.**

278  
Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 10 of 18   Document 330-15  
920.585.2341 | 365Reporting, LLC | www.365reporting.net

1            MR. BURNETT:  Objection, foundation.

2       Q    You don't know?

3       A    Correct.

4       Q    You do know that some of them were convicted
5    felons, correct?  I'll show you an example to jog
6    your -- a document to jog your memory.

7       A    Thank you.

8       Q    Could you go to Exhibit 8?

9       A    Do I have that?

10      Q    Yeah.

11      A    Got it.

12      Q    And flip about 20 pages in to tracking
13   number 355, if you could.  Sorry, 356.

14      A    Okay.

15      Q    And just to refresh your memory, this is a
16   transcript of the interview you gave for Convicting a
17   Murderer, correct?

18      A    Well, it's my answers.  Again, like I said
19   yesterday, the question doesn't appear.

20      Q    Okay.

21      A    And I can't determine which interview it is,
22   but it's either interview one or two of Convicting a
23   Murderer interviews.

24      Q    Okay.  So I'm going to start reading at the
25   top of that third row.  "Unwisely, I invited him to

294

1      A    Correct.

2      Q    That you transferred the call to a

3  detective, right?

4      A    Correct.

5      Q    That you didn't know the call was about

6  Mr. Avery, right?

7      A    That is correct.

8      Q    That the call did not motivate you to frame

9  Mr. Avery for the murder of Ms. Halbach, right?

10     A    That is correct.

11     Q    And that you didn't plant evidence against

12 Mr. Avery, right?

13     A    That is correct, yes.

14     Q    So would you agree that this episode got

15 across the most crucial points of this portion of

16 your direct testimony by Mr. Kratz?

17          MR. BURNETT:  Objection, form.

18 Go ahead.

19     A    No, I don't believe it did.

20     Q    Why not?

21     A    There were too many things that -- too many

22 forceful points that were eliminated to clearly get

23 it across.  I come across as -- you know, looking at

24 this -- if I was looking at this and I didn't know it

25 was me, I would think, Boy, this officer's pretty

358

1  wishy-washy about that, pretty unsure of himself.
2  For instance, "Have you ever planted any evidence
3  against Mr. Avery?" my response at trial was, "That
4  is ridiculous, no, I have not."  And then the second
5  question Mr. Kratz asked me, "Have you ever planted
6  any evidence against anybody in the course of your
7  law enforcement career?" that whole question is
8  eliminated.  Instead, it looks like I answered, "Have
9  you ever planted evidence against Mr. Avery" by
10 saying, "I have to say this is the first time my
11 integrity has been questioned."  That doesn't come
12 across very forceful or convincing.  It's hardly
13 answering the question.  So I don't believe that's an
14 accurate portrayal.
15     **Q   Did you feel that accusations that you**
16 **planted evidence against Mr. Avery were calling into**
17 **question your integrity?**
18     A   The question was have you ever planted any
19 evidence against anybody in the course of your law
20 enforcement career.  That's my answer to that
21 question.
22     **Q   Mr. Colborn, I'm going to move to strike.**
23 **That wasn't my question.**
24         **My question is leaving this for a second,**
25 **did you feel that accusations against you that you**

359

```
 1    planted evidence against Mr. Avery, that that called
 2    into question your integrity as a law enforcement
 3    officer?
 4         A    Yes.
 5         Q    And do you feel like this scene shows you
 6    denying that you planted any evidence against
 7    Mr. Avery?
 8         A    I'm sorry.  The scene on Making a
 9    Murderer --
10         Q    Sure.
11         A    -- that you just showed me?
12         Q    The clip we just -- we just --
13         A    Is that what you are asking about?
14         Q    The clip we just looked at, you deny having
15    planted any evidence against Mr. Avery, right?
16         A    Yes.
17         Q    Okay.  Last one.  If you could move on to
18    page 52 of Exhibit B.
19         A    Okay.
20         Q    And what I'm interested in here is where it
21    starts, oh, maybe a quarter of the page down, it says
22    Redirect Examination.
23         A    Okay.  I see it.
24         Q    So just looking at that section.
25         A    Okay.
```

360

1       Q    Have you had a chance to review this already
2   or would you like more time?
3       A    Page 52?  No, I reviewed it.
4       Q    Would you agree that Mr. Kratz was trying to
5   elicit testimony from you to clarify or rebut some of
6   the points raised during Mr. Strang's
7   cross-examination of you regarding this phone call?
8       A    From what you're asking me to look at here,
9   it looks like Mr. Kratz is trying to get me to
10  explain about not writing a report about the '94 or
11  '95 call.
12      Q    And was that in response to some questions
13  that Mr. Strang had asked you during the
14  cross-examination that preceded this?
15      A    I don't have the entire cross-examination
16  committed to memory, and it says here, "15 lines of
17  testimony omitted."  So I don't have a -- I don't
18  have a reference of what Mr. Strang was asking me.
19      Q    Do you have any personal recollection of
20  Mr. Strang asking you about that?
21      A    Yes, but I can't tell you verbatim our --
22  the -- his questions.
23      Q    And I'm not going to quiz you on that,
24  Mr. Colborn.  I really just wanted to ask if you had
25  a recollection --

361

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 15 of 18   Document 330-15
920.585.2341 | 365Reporting,LLC | www.365reporting.net

1      A    Yes.

2      Q    -- that Dean Strang asked about this subject

3 matter during his cross-exam.

4      A    Yes.

5      Q    And then Mr. Kratz on redirect wanted to

6 respond to some of the points that Mr. Strang had

7 raised, right?

8      A    Yes.

9      Q    Mr. Kratz wanted to make clear that you

10 hadn't written a report about the call in 1994 or

11 '95?

12     A    Yes.

13     Q    And that if you had written a report you

14 wouldn't have known what it was about; is that right?

15     A    Correct.

16     Q    That you didn't know the call was even about

17 Mr. Avery, right?

18     A    Correct.

19     Q    Is there anything I'm missing here that's

20 key to understanding your testimony?

21          MR. BURNETT:  Objection, form.

22     A    I explained in the presence of -- all these

23 questions were in the presence of the jury.  I

24 explained in the presence of the jury my reason that

25 I didn't write a report has been eliminated from my

362

```
 1    should not concern himself."
 2             Did I read that correctly?
 3        A    Yes.
 4        Q    Did you tell that to Tom Kocourek back in
 5    the mid '90s?
 6        A    No.
 7        Q    Any idea why Gene Kusche would say that you
 8    did?
 9        A    I don't know.  He's clearly confused.  He
10    doesn't even have the right dates.  So I would
11    suspect that the story started here, and by the time
12    it got here, it's definitely kittywampus, not correct
13    if that would be easier to put on.
14        Q    Thank you.  Do you have any reason to think
15    that Mr. Kusche would lie about anything here as
16    opposed to having just made a mistake?
17        A    I think he might have thought that that's
18    what he heard or that -- but he has it all confused.
19    And I've never had a conversation with then Sheriff
20    Kocourek or retired Sheriff Kocourek about that.
21        Q    So did you ever have a conversation with
22    Mr. Kocourek about this phone call at any time?
23        A    No.
24        Q    And so he never told you, "Hey, don't worry
25    about it.  We've got the right guy"?
```

382

1    A    That is correct, he never told me that.

2    Q    Did anybody else in the sheriff's department
3    tell you something to that effect?

4    A    Not that I recall.

5    Q    And besides what you've already told me, do
6    you have any idea how Eugene Kusche would have gotten
7    that impression?

8    A    I don't know.  No, I don't, but I will tell
9    you that Gene Kusche's health wasn't very good, and
10   he passed away shortly after this, I believe in '6.

11   Q    Looking down at the bottom, the last two
12   sentences, I'll go ahead and read them out, "On late
13   Thursday afternoon I found Mark Rohrer and apprised
14   him of the conversation with Gene.  By the time I
15   found Mark he indicated that he had already been made
16   aware of the conversation between Colborn and
17   Kocourek."  Did I read that correctly?

18   A    Yes.

19   Q    Do you have any idea how Mark Rohrer would
20   have gotten the idea that you and Mr. Kocourek had a
21   conversation back in the mid '90s about the phone
22   call and Mr. Kocourek had, you know, told you, "Don't
23   worry about it"?

24   A    I have no idea.

25   Q    Are you aware that Michael Griesbach was

383
Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 18 of 18   Document 330-15
920.585.2341 | 365Reporting,LLC | www.365reporting.net