1  STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                         BRANCH 1
2  _____

3  STATE OF WISCONSIN,

4                  PLAINTIFF,        JURY TRIAL
                                     TRIAL - DAY 23
5  vs.                               Case No. 05 CF 381

6  STEVEN A. AVERY,

7                  DEFENDANT.

8  _____

   **DATE:**    MARCH 14, 2007
9
   **BEFORE:**  Hon. Patrick L. Willis
10          Circuit Court Judge

11 **APPEARANCES:**  KENNETH R. KRATZ
                     Special Prosecutor
12                   On behalf of the State of Wisconsin.

13                   THOMAS J. FALLON
                     Special Prosecutor
14                   On behalf of the State of Wisconsin.

15                   NORMAN A. GAHN
                     Special Prosecutor
16                   On behalf of the State of Wisconsin.

17                   DEAN A. STRANG
                     Attorney at Law
18                   On behalf of the Defendant.

19                   JEROME F. BUTING
                     Attorney at Law
20                   On behalf of the Defendant.

21                   STEVEN A. AVERY
                     Defendant
22                   Appeared in person.

23            **TRANSCRIPT OF PROCEEDINGS**

24        Reported by Diane Tesheneck, RPR

25            Official Court Reporter

                         1

**EXHIBIT**
17

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 1 of 229   Document 330-18
CHRM006618

# I N D E X

|                              | PAGE |
|------------------------------|------|
| **INDIVIDUAL VOIR DIRE**     |      |
| LAURA BARBER                 | 3-7  |
| **INSTRUCTIONS**             | 8    |
| **CLOSING ARGUMENTS**        |      |
| ATTORNEY KRATZ               | 31   |
| ATTORNEY BUTING              | 132  |
| **PEREMPTORY STRIKES**       |      |
| TERRI TEMME                  | 227  |
| LAURA BARBER                 | 227  |

2

CHRM006619

```
 1    (Individual voir dire of Juror Laura Barber.)

 2              THE COURT:  In a trial like this, whenever

 3    the Court gets any information, the Court is

 4    obligated to follow it up and that's what we're

 5    doing this morning.

 6              MS BARBER:  Okay.

 7              THE COURT:  There was a report that was

 8    received yesterday, that was passed on to me

 9    yesterday, involving a citizen providing information

10    about a juror.  And that's what I'm going to be

11    talking to you about.

12              MS BARBER:  Okay.

13              THE COURT:  The incident happened at the --

14    or reported was at the Manitowoc Eagle's Club on

15    Friday, March 2nd, which would be the Friday before

16    this past Friday.

17              MS BARBER:  All right.

18              THE COURT:  For a fish fry, I think, in the

19    evening.  First, were you there?

20              MS BARBER:  Yes, I was.

21              THE COURT:  Okay.  Can you tell me who you

22    were there with?

23              MS BARBER:  My mother and my husband.

24              THE COURT:  Okay.  And do you know about

25    what time you were there, like from when until when,
```

3

CHRM006620

```
 1   say approximately?

 2           MS BARBER:  I'm going to guess 5:30 to

 3   9.

 4           THE COURT:  Okay.  During the time that you

 5   were there, would you have said anything to anyone

 6   that would have given them the impression that you

 7   are a juror in this case?

 8           MS BARBER:  No, I didn't.  A lot of

 9   them, that I belong to the auxiliary with, knew I

10   was on, but they -- they don't question me about

11   things.

12           THE COURT:  Okay.

13           MS BARBER:  They do know I am a juror

14   and they make comments like, I wouldn't want to

15   be in your shoes.

16           THE COURT:  Okay.

17           MS BARBER:  And I just shrug my

18   shoulders and say, I can't say anything.

19           THE COURT:  Okay.  Was anything said to you

20   or was there any mention that you heard from anyone

21   at the Eagle's Club that evening involving the guilt

22   or innocence of the defendant in this case?

23           MS BARBER:  I have to think about that.

24   I don't recall anybody saying something to me

25   because I -- I have my own opinions.  I don't
```

4

CHRM006621

```
 1      want to listen to anybody else.  And no matter
 2      what they say, I don't listen to them.
 3              THE COURT:  Okay.  Did you discuss the case
 4      at the Eagle's Club with anyone that evening?
 5              MS BARBER:  No, I didn't.
 6              THE COURT:  Did you give any opinions or
 7      say anything about your feelings about the case so
 8      far?
 9              MS BARBER:  No.  And that's -- I just
10      refuse to, because I don't -- I don't want
11      somebody telling me what to think.
12              THE COURT:  Okay.  Can you think of
13      anything that was said or that happened that night
14      that -- that would have led a citizen to report
15      something?
16              MS BARBER:  Honestly, I don't.  We go
17      for fish.  I have a couple old fashions.  We sit
18      upstairs in the bar afterward for a couple hours.
19      And I don't -- I don't make it a known thing that
20      this is what I'm doing.
21              THE COURT:  Okay.  You are saying, though,
22      that there are other -- there were other people
23      there who may have known you were a juror.
24              MS BARBER:  Right.
25              THE COURT:  And may have said something?
```

5

CHRM006622

```
 1              MS BARBER:  Exactly.  I don't know who
 2      they were.
 3              THE COURT:  Okay.
 4              MS BARBER:  They talk amongst
 5      themselves.  I really don't listen.  I have made
 6      it a point that I don't want to have any
 7      influence.
 8              THE COURT:  Okay.
 9              MS BARBER:  However, you want to take
10      that, that's fine, but I don't -- I don't want
11      somebody telling me how to think.  And I have
12      always been that way.
13              THE COURT:  Okay.  Thank you.  I'm going to
14      have you step outside with the sheriff.
15              MS BARBER:  Sure.
16              THE COURT:  Counsel, anything else that you
17      would like asked?
18              ATTORNEY STRANG:  I think I caught this,
19      but we were clear that it was the Manitowoc Eagle's
20      Club?
21              ATTORNEY BUTING:  Yes.
22              ATTORNEY STRANG:  I thought so, but.
23              THE COURT:  Otherwise we'll retreat to
24      chambers.
25              ATTORNEY FALLON:  Did you want to ask her
```

6

CHRM006623

1     point blank the question, it's been pointed out this
2     comment was attributed to someone meeting your
3     description.  That's the only question left, if you
4     think you circumstantially have to.
5               ATTORNEY KRATZ:  Does she know this woman?
6     But then you out the reporter.
7               THE COURT:  I don't think the woman claimed
8     that she knew the juror.
9               ATTORNEY KRATZ:  I think we can do this in
10    chambers.
11              THE COURT:  All right.  Let's go off the
12    record at this time.
13              (Individual voir dire concluded.)
14                 (Jury not present.)
15              THE COURT:  At this time the Court calls
16    State of Wisconsin vs. Steven Avery, Case No. 05 CF
17    381.  We're here today for a continuation of the
18    trial, specifically, final instructions and closing
19    arguments.  Will the parties state their appearances
20    for the record, please.
21              ATTORNEY KRATZ:  Good morning, Judge.  The
22    State of Wisconsin appears by Calumet County
23    District Attorney Ken Kratz.  Also Tom Fallon and
24    Norm Gahn, all appearing as Special Prosecutors.
25              ATTORNEY STRANG:  Steven Avery appears in

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 7 of 229   Document 330-18

CHRM006624

```
 1    person, Jerome Buting and Dean Strang on his behalf.
 2           THE COURT:  Before we bring in the jury,
 3    after the formal instruction conference yesterday
 4    afternoon I prepared a proposed final set of jury
 5    instructions.  I also provided a copy of the final
 6    draft to each of the attorney's before we left
 7    yesterday.  Mr. Kratz, are the instructions as
 8    proposed acceptable to the State?
 9           ATTORNEY KRATZ:  They are, Judge.
10           THE COURT:  And, Mr. Strang, subject to the
11    requested instructions of the defense the Court did
12    not give, do they, the instructions as submitted,
13    reflect your understanding?
14           ATTORNEY STRANG:  The instructions, as
15    tendered to us this morning, do reflect our
16    understanding of the resolution, the jury
17    instruction conference, and what we understood the
18    Court would say to the jurors.
19           THE COURT:  Very well.  Does either party
20    have anything else before we bring the jury out?
21           ATTORNEY KRATZ:  Not the State, your Honor.
22           ATTORNEY STRANG:  (Shakes head negatively.)
23           THE COURT:  All right.  We'll bring in the
24    jurors at this time.
25                 (Jury present.)
```

8

CHRM006625

```
 1              THE COURT:  You may be seated.  Members of

 2    the jury, at this time the Court is going to read

 3    the final instructions to you.  We'll then proceed

 4    to closing arguments of the parties.

 5              Mr. Ward, I'm going to ask you if you

 6    can take these instructions and provide one set

 7    to each member of the jury.

 8              ATTORNEY STRANG:  Your Honor, maybe we can

 9    have just a very brief side bar.

10              THE COURT:  Okay.

11                 (Side bar taken.)

12              THE COURT:  All right.  Members of the jury

13    you may follow along with the Court if you wish.

14    Members of the jury, the Court will now instruct you

15    upon the principles of law which you are to follow

16    in considering the evidence and in reaching your

17    verdict.

18              It is your duty to follow all of these

19    instructions.  Regardless of any opinion you may

20    have about what the law is or ought to be, you

21    must base your verdict on the law I give you in

22    these instructions, apply that law to the facts

23    in the case which have been properly proven by

24    the evidence.  Consider only the evidence

25    received during this trial and the law as given
```

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 9 of 229   Document 330-18

CHRM006626

to you by these instructions, and from these
alone, guided by your soundest reason and best
judgment, reach your verdict.

If any member of the jury has an
impression of my opinion as to whether the
defendant is guilty or not guilty, disregard that
impression entirely and decide the issues of fact
solely as you view the evidence. You the jury
are the sole judges of the facts and the Court is
the judge of the law only.

Evidence is, first, the sworn testimony
of witnesses, both on direct and
cross-examination, regardless of who called the
witness.

Second, the exhibits the Court has
received, whether or not an exhibit goes to the
jury room.

Third, any facts or testimony to which
the lawyers have agreed or stipulated or which
the Court has directed you to find.

Anything you may have seen or heard
outside the courtroom is not evidence. You are
to decide the case solely on the evidence offered
and received at trial.

The defendant in this case is charged

10

CHRM006627

with three counts. A fourth count of false
imprisonment has been dismissed. The
instructions for the three remaining counts have
been modified somewhat from the opening
instructions given to you at the beginning of the
trial to conform to the evidence introduced at
trial.

The first count of the Information in
this case charges that: Steven Avery, on Monday,
October, 31, 2005, at 12932 Avery Road, Town of
Gibson, Manitowoc, Wisconsin, did cause the death
of Teresa M. Halbach, with intent to kill that
person, contrary to Section 940.01 (1)(a) of the
Wisconsin Statutes.

To this charge, the defendant has
entered a plea of not guilty, which means the
State must prove every element of the offense
charged beyond a reasonable doubt.

First degree intentional homicide, as
defined in Section 940.01 of the Criminal Code of
Wisconsin, is committed by one who causes the
death of another human being with intent to kill
that person or another.

Before you may find the defendant guilty
of first degree intentional homicide, the State

11

CHRM006628

1  must prove, by evidence which satisfies you,

2  beyond a reasonable doubt, that the following two

3  elements were present:

4      One, the defendant caused the death of

5  Teresa Halbach.  Cause means that the defendant's

6  act was a substantial factor in producing the

7  death.

8      Two, the defendant acted with the intent

9  to kill Teresa Halbach.

10     Intent to kill means that the defendant

11  had the mental purpose to take the life of

12  another human being or was aware that his conduct

13  was practically certain to cause the death of

14  another human being.

15     While the law requires that the

16  defendant acted with intent to kill, it does not

17  require that the intent exist for any particular

18  length of time before the act is committed.  The

19  act need not be brooded over, considered, or

20  reflected upon for a week, a day, an hour, or

21  even for a minute.  There need not be any

22  appreciable time between the formation of the

23  intent and the act.  The intent to kill may be

24  formed at any time before the act, including the

25  instant before the act, and must continue to

12

CHRM006629

1   exist at the time of the act.

2            You cannot look into a person's mind to
3   find intent.  Intent to kill must be found, if
4   found at all, from the defendant's acts, words,
5   and statements, if any, and from all the facts
6   and circumstances in this case bearing upon
7   intent.

8            Intent should not be confused with
9   motive.  While proof of intent is necessary to a
10  conviction, proof of motive is not.  Motive
11  refers to a person's reason for doing something.
12  While motive or lack of motive is relevant and
13  may be shown as a circumstance to aid in
14  establishing the guilt or innocence of a
15  defendant, the State is not required to prove
16  motive on the part of a defendant in order to
17  convict.  Evidence of motive does not by itself
18  establish guilt.  You should give it the weight
19  you believe it deserves under all the
20  circumstances.

21           If you are satisfied, beyond a
22  reasonable doubt, that the defendant caused the
23  death of Teresa Halbach, with the intent to kill,
24  you should find the defendant guilty of first
25  degree intentional homicide.

                          13

CHRM006630

1    If you are not so satisfied, you must
2    find the defendant not guilty.
3    The second count of the Information
4    charges that:  Steven Avery, between Monday,
5    October 31, 2005, and Friday, November 4, 2005,
6    at a 12932 Avery Road, Manitowoc County,
7    Wisconsin, did mutilate, disfigure, or dismember
8    a corpse with the intent to conceal a crime,
9    contrary to Section 940.11 (1), 939.50 (3)((f) of
10   the Wisconsin Statutes.
11   To this charge, the defendant has also
12   entered a plea of not guilty, which means the
13   State must prove every element of the offense
14   charged beyond a reasonable doubt.
15   Mutilating a corpse, as defined in
16   Section 940.11 (1) of the Criminal Code of
17   Wisconsin, is violated by one who mutilates a
18   corpse with intent to conceal a crime or avoid
19   apprehension, prosecution, or conviction for a
20   crime.
21   Before you may find the defendant guilty
22   of this offense, the State must prove, by
23   evidence which satisfies you, beyond a reasonable
24   doubt, that the following two elements were
25   present:

14

CHRM006631

One, Steven Avery mutilated the corpse of Teresa Halbach.

Two, in mutilating the corpse of Teresa Halbach, Steven Avery acted with the intent to conceal a crime.

This requires that the defendant acted with the purpose to conceal a crime.

You cannot look into a person's mind to find out intent. Intent must be found, if found at all, from the defendant's acts, words and statements, if any, and from all the facts and circumstances in this case bearing upon intent.

If you are satisfied, beyond a reasonable doubt, that both elements of this offense have been proved, you should find the defendant guilty.

If you are not so satisfied, you must find the defendant not guilty.

The defendant's theory of defense on the charges of first degree intentional homicide and mutilation of a corpse is that another person or persons tried to frame him for the murder of Teresa Halbach and the burning of her body. If the facts introduced in support of the defendant's theory raise a reasonable doubt in

15

CHRM006632

your mind, or if you otherwise find that a reasonable doubt arises from the evidence, then you must find the defendant not guilty of the charges.

The third count of the Information charges that: Steven Avery, on Saturday, November 5, 2005, at 12932 Avery Road, Manitowoc County, Wisconsin, did possess a firearm subsequent to the conviction for the felony or other crime, as specified in sub. (1)(a) or (b), contrary to Section 941.29 (2)(a), and 939.50 (3)(g) of the Wisconsin Statutes.

To this charge, the defendant has also entered a plea of not guilty, which means the State must prove every element of the offense charged, beyond a reasonable doubt.

Section 941.29 of the Criminal Code of Wisconsin is violated by a person who possesses a firearm, if that person has been convicted of a felony.

Before you may find the defendant guilty of this offense, the State must prove, by evidence which satisfies you, beyond a reasonable doubt, that the following two elements were present:

16

CHRM006633

One, the defendant possessed a firearm. Firearm means a weapon which acts by the force of gun powder. It is not necessary that the firearm was loaded or capable of being fired.

Possess means that the defendant knowingly had actual physical control of a firearm.

An item is also in a person's possession if it is in an area over which the person has control and the person intends to exercise control over the item. It is not required that a person own an item in order to possess it. What is required is that the person exercise control over the item.

Two, the defendant had been convicted of a felony before November 5, 2005.

The parties have agreed that Steven Avery was convicted of a felony before November 5, 2005, and you must accept this as conclusively proved.

If you are satisfied, beyond a reasonable doubt, that both elements of this offense have been proved, you should find the defendant guilty.

If you are not so satisfied, you must

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 17 of 229   Document 330-18

CHRM006634

find the defendant not guilty.

In reaching your verdict, examine the evidence with care and caution. Act with judgment, reason, and prudence.

Defendants are not required to prove their innocence. The law presumes every person charged with the commission of an offense to be innocent. This presumption requires a finding of not guilty, unless in your deliberations you find it is overcome by evidence which satisfies you, beyond a reasonable doubt, that the defendant is guilty.

The burden of establishing every fact necessary to constitute guilt is upon the State. Before you can return a verdict of guilty, the evidence must satisfy you, beyond a reasonable doubt, that the defendant is guilty.

If you can reconcile the evidence upon any reasonable hypothesis, consistent with the defendant's innocence, you should do so and return a verdict of not guilty.

The term reasonable doubt means a doubt based upon reason and common sense. It is a doubt for which a reason can be given, arising from a fair and rational consideration of the

18

CHRM006635

evidence or lack of evidence. It means such a
doubt as would cause a person of ordinary
prudence to pause or hesitate when called upon to
act in the most important affairs of life.

A reasonable doubt is not a doubt which
is based on mere guesswork or speculation. A
doubt which arises merely from sympathy or from
fear to return a verdict of guilt is not a
reasonable doubt. A reasonable doubt is not a
doubt such as may be used to escape the
responsibility of a decision.

While it is your duty to give the
defendant the benefit of every reasonable doubt,
you are not to search for doubt. You are to
search for the truth.

An Information is nothing more than a
written formal accusation against the defendant
charging the commission of one or more criminal
acts. You are not to consider it as evidence
against the defendant in any way. It does not
raise any inference of guilt.

Disregard entirely any question that the
Court did not allow to be answered. Do not guess
at what the witness' answer might have been. If
the question itself suggested that certain

19

CHRM006636

1    information might be true, ignore the suggestion
2    and do not consider it as evidence.

3        Attorneys for each side have the right
4    and the duty to object to what they consider are
5    improper questions asked of witnesses and to the
6    admission of other evidence which they believe is
7    not properly admissible. You may not draw any
8    conclusions from the fact an objection was made.

9        By allowing testimony or other evidence
10   to be received over the objection of counsel, the
11   Court is not indicating any opinion about the
12   evidence. The jurors are the judges of the
13   credibility of the witnesses and the weight of
14   the evidence.

15       During the trial the Court has ordered
16   certain testimony to be stricken. Disregard all
17   stricken testimony.

18       An exhibit becomes evidence only when
19   received by the Court. An exhibit marked for
20   identification and not received is not evidence.
21   An exhibit received is evidence whether or not it
22   goes to the jury room.

23       You will not have a copy of the written
24   transcript of the trial testimony available for
25   use during your deliberations. You may ask to

20

CHRM006637

have specific portions of the testimony read to you. You must continue to rely primarily on your memory of the evidence and the testimony introduced during the trial.

Remarks of the attorneys are not evidence. If the remarks suggested certain facts not in evidence, disregard the suggestion.

Consider carefully the closing arguments of the attorneys, but their arguments and conclusions and opinions are not evidence. Draw your own conclusions from the evidence and decide upon your verdict according to the evidence, under the instructions given to you by the Court.

It is not necessary that every fact be proved directly by a witness or an exhibit. A fact may be proved indirectly by circumstantial evidence. Circumstantial evidence is evidence from which a jury may logically find other facts, according to common knowledge and experience. Circumstantial evidence is not necessarily better or worse than direct evidence. Either type of evidence can prove a fact.

Whether evidence is direct or circumstantial, it must satisfy you, beyond a reasonable doubt, that the defendant committed

21

CHRM006638

the offense before you may find the defendant guilty.

The State has introduced evidence of statements which it claims were made by the defendant. It is for you to determine how much weight, if any, to give to each statement.

In evaluating each statement, you must determine three things:

Whether the statement was actually made by the defendant. Only so much of a statement as was actually made by a person may be considered as evidence.

Whether the statement was accurately restated here at trial.

Whether the statement, or any part of it, ought to be believed.

You may also consider the consistency or inconsistency with any other statements made by the defendant.

You should consider the facts and circumstances surrounding the making of each statement, along with all the evidence, in determining how much weight, if any, a statement deserves.

The weight of evidence does not depend

22

CHRM006639

on the number of witnesses on each side. You may
find that the testimony of one witness is
entitled to greater weight than that of another
witness or even of several other witnesses.

In weighing the evidence, you may take
into account matters of your common knowledge and
your observations and experience in the affairs
of life.

Ordinarily, a witness may testify only
about facts. However, a witness with expertise
in a particular field may give an opinion in that
field.

You should consider the qualifications
and credibility of the expert, the facts upon
which the opinion is based, and the reasons given
for the opinion.

Opinion evidence was received to help
you reach a conclusion. However, you are not
bound by any expert's opinion. You may give as
much or as little weight to the opinion of any
expert as you conclude it is entitled to receive.

In resolving conflicts in expert
testimony, weigh the different expert opinions
against each other. Also consider the
qualifications and credibility of the experts and

23

CHRM006640

the facts supporting their opinions.

During the trial, an expert witness was told to assume certain facts and then was asked for an opinion, based on that assumption. This is called a hypothetical question.

The opinion does not establish the truth of the facts upon which it is based. Consider the opinion only if you believe the assumed facts upon which it is based have been proved. If you find the facts stated in the hypothetical question have not been proved, then the opinion based on those facts should not be given any weight.

It is the duty of the jury to scrutinize and to weigh the testimony of the witnesses and to determine the effect of the evidence as a whole. You are the sole judges of the credibility, that is, the believability of the witnesses and of the weight to be given to their testimony.

In determining the credibility of each witness, and the weight you give to the testimony of each witness, consider these factors:

Whether the witness has an interest or lack of interest in the result of this trial.

24

CHRM006641

1    The witness' conduct, appearance, and

2    demeanor on the witness stand.

3    The clearness, or lack of clearness of

4    the witness' recollections.

5    The opportunity the witness had for

6    observing and for knowing the matters the witness

7    testified about.

8    The reasonableness of the witness'

9    testimony.

10    The apparent intelligence of the

11    witness.

12    Bias or prejudice, if any has been

13    shown.

14    Consistency or inconsistency with any

15    prior statements of the witness.

16    Possible motives for falsifying

17    testimony.

18    And all other facts and circumstances

19    during the trial which tend either to support or

20    to discredit the testimony.

21    Then give to the testimony of each

22    witness the weight you believe it should receive.

23    There is no magic way for you to

24    evaluate the testimony; instead, you should use

25    your common sense and experience.  In everyday

CHRM006642

life, you determine for yourselves the
reliability of things people say to you. You
should do the same thing here.

A defendant in a criminal case has the
absolute constitutional right not to testify.

The defendant's decision not to testify
must not be considered by you in any manner and
must not influence your verdict in any manner.

Now, at this time the closing
instructions will not be given until after the
closing arguments have been completed.

We're going to take a very short break,
not our normal morning break, at this time, to
allow the parties to get ready to present their
closing arguments.

I will continue to remind you not to
discuss this case until you have heard all the
closing arguments and the Court orders that you
begin deliberating.

(Jury not present.)

THE COURT: You may be seated.

ATTORNEY BUTING: Judge, one thing that
might be helpful just to explain to the jury so they
have some idea how the day will proceed, that the
State goes first, then the defense, and then the

26

CHRM006643

```
 1    State, actually, has a follow-up rebuttal.
 2    Otherwise they may be unclear on how that works.
 3              THE COURT:  Any objection from the State?
 4         ATTORNEY KRATZ:  No.
 5              THE COURT:  I should indicate during the
 6    side bar, requested by the defense -- Well,
 7    Mr. Strang, I will let you reiterate what you told
 8    the court.
 9              ATTORNEY STRANG:  I asked for a side bar
10    shortly before instructions began, but after written
11    instructions had been distributed to the jurors.  I
12    raised my concern simply that I did not think the
13    jurors should have written instructions in their
14    hands or with them at their chairs during closing
15    arguments; although, I certainly agree they should
16    have a copy of the written instructions during
17    deliberations.
18              As I understand, without objection from
19    Mr. Kratz on behalf of the State, the Court
20    agreed to collect the written instructions again
21    at this point, from the jurors, and redistribute
22    them again after the jury is sworn to begin
23    deliberations.
24              THE COURT:  Mr. Kratz?
25         ATTORNEY KRATZ:  That's fine.
```

27

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 27 of 229   Document 330-18

CHRM006644

1    THE COURT:  I'm just -- If I understand, I
2    was told what the parties were requesting; I don't
3    remember the part about ordering them being
4    collected.  My concern is this, I generally
5    instruct, before closing arguments and hand out the
6    instructions because sometimes the attorneys in
7    their closing argument wish to refer to specific
8    instructions.
9        I don't know if either of you intend to
10   do that, but if you do, I generally allow --
11   first of all, I allow the attorneys to invite the
12   jurors to flip to a page so that the jurors can
13   follow along with what the attorney is reading
14   and not have to take the attorney's word for it
15   that that is the instruction.
16       Let me suggest this, I could tell the
17   jurors, when they come back for closing
18   arguments, to set the instructions down under
19   their chair and only refer to them if one side or
20   another, in its closing argument, invites them
21   to.  Does that address your concern?
22       ATTORNEY STRANG:  I think it would.  It had
23   been our plan simply to put an instruction up on the
24   ELMO if we intended to use much of it, but I think
25   what the Court is proposing would do the same thing.

28

CHRM006645

The concern here is for the same reason we don't allow jurors to take notes during the closing arguments, we don't want divided attention.

THE COURT: Mr. Kratz.

ATTORNEY KRATZ: That's fine.

THE COURT: All right. Well, I also, as a practical matter, don't want them to misplace theirs. I don't think they have written their names on them. I will do this, I will instruct them to place the instructions on the floor and not pick them up to look at them during closings, unless the attorney making the closing invites them to.

ATTORNEY STRANG: I'm going to duck out for two minutes, if we have two minutes.

THE COURT: All right. We'll do that. We'll take a couple quick minutes before we start.

(Brief recess taken.)

(Jury present.)

THE COURT: Members of the jury, before we get started, I have a couple of announcements for you. First, with respect to the format, in closing arguments the State, because the State has the burden of proof, goes first. We will, I believe, take a break sometime this morning, in the middle of the State's closing argument. The defense, then,

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 29 of 229   Document 330-18

CHRM006646

1  gets a chance to make its closing argument. And the

2  State has a final chance to make argument in

3  rebuttal, after they have heard what the defense

4  argument is.

5        The other thing is, I'm going to ask you

6  at this time to take your copy of the closing

7  instructions -- the jury instructions, if you

8  brought them out, set them on the floor upside

9  down. We do this to make sure that everybody is

10  paying attention to the closing arguments.

11        The attorneys are permitted, if they

12  wish, to make reference to the jury instructions

13  in their closings. If they ask you to take a

14  look at any instruction, you may pick them up at

15  that point, otherwise set them down. I believe

16  nobody has pens or notebooks, correct, because

17  you are not permitted to take notes during

18  closing arguments. With that, Mr. Kratz, you may

19  proceed.

20        ATTORNEY KRATZ: Thank you, Judge. I don't

21  know how the volume is on this mike.

22        THE COURT: Do you know if you are number

23  seven or eight?

24        ATTORNEY STRANG: Eight.

25        ATTORNEY KRATZ: I guess I'm eight, Judge.

30

CHRM006647

1    THE COURT:  Okay.

2    ATTORNEY KRATZ:  Can everybody hear me

3    okay?  Is that all right?  Thank you.  Then, I will

4    begin.  May it please the Court.  Let me start

5    ladies and gentlemen by thanking you for the time

6    and attention that you have given to this very

7    important case for the last five weeks.

8    This is an important duty.  It's an

9    important duty not just for the 12 of you that

10   are going to decide the case, but for really all

11   of Manitowoc County.  You are representatives of

12   the citizens of Manitowoc County.

13   And I'm going to be highlighting some of

14   the facts in this case that the State believes

15   was important.  The last thing I'm going to do is

16   reiterate -- or try to reiterate all of the

17   facts, all the evidence that has been presented.

18   I don't think you want to hear lawyers any more

19   talking for you incessantly or hours upon hours.

20   But there are some important parts of this case.

21   We start with why are we here.  It would

22   be a natural thought process for a jury to think,

23   you know, we have been sitting here for five

24   weeks, there must be a reason.  There's got to be

25   a reason why, for five weeks, we have had to

31

CHRM006648

listen to over 500 exhibits, something approaching 60 witnesses, and there must be a conflict. There must be a controversy that has to be tried in this case.

We're here because Steven Avery pled not guilty. We're here because Mr. Avery has a constitutionally protective right to be tried when he pleads not guilty, like anybody else who pleads not guilty. There hasn't been any question and I don't want you to sit in that jury box and think that there is any question about who is responsible for the death and the mutilation of Teresa Halbach.

The fact that we have been here five weeks is because it's my duty, it's my job, to prove all the elements of the offenses for which Mr. Avery is charged. Not because there are questions. And I start by saying that for, I think, obvious reasons. Because as jurors, you must be thinking, or you would naturally be thinking, that there's got to be two sides to this. And as the State and as we, I think, have presented in this case, all of the evidence points to one person. That's the one person being responsible.

32

CHRM006649

I'm going to argue at the conclusion of this case who that one person is. I bet you can guess who I'm going to suggest was -- was responsible. But, again, please keep, before any of the evidence I talk about, please keep that in mind, that we're here because that man pled not guilty and because that man is entitled to a trial.

Cases are decided on facts, at least from the State's perspective. We don't present speculation. We don't ask you to perform guesswork when deciding what happens. You know the funny thing about facts is facts are stubborn. Facts don't change. You can twist them and you can beat them up, you can try to massage, if you will, the facts, but facts don't change.

The facts in this case, as presented, and as I will present to you, are very much so uncontested, uncontroverted, at least most of the facts in this case are uncontroverted. But my job is going to be to take you through what I think are the important facts of this case, why we think we have proved the case, beyond a reasonable doubt, against Steven Avery. And I

CHRM006650

intend do that.

The first fact that I would like to talk
about is a starting point in the case. Now,
every case has a starting point. When you think
about a case this big, and by now you realize and
you have heard just how big of a case this is.
You have heard that the Crime Lab received the
most submissions ever in the history of the
Wisconsin State Crime Lab, that more law
enforcement officers were used in this case, from
an investigative standpoint, than any other case.

But what does that mean. Try and put
that in perspective in -- in kind of an
historical perspective. That means that this is
a pretty darn big case. And when a case is that
big, the natural tendency is to try to look at
the big picture, and to try to absorb it all, if
you can. But I'm not going to do that.

I want you to pick one particular point
in time. I want to start the presentation that I
have with one moment in time. Now, we could have
started any number of moments. There's been what
we call watershed moments, real important moments
in the case when Teresa Halbach was shot, when
she was murdered. That's a particularly

34

important moment.

We could start with the moment or with the visual or with the image of that man, Steven Avery, standing outside of a big bonfire, with flames over the roof, or at least over the garage roof, and the silhouette of Steven Avery, with the bonfire in the background and the observations made by some witnesses.

Can you all picture that? Can you picture that as a moment, as a moment in time? And that moment, by the way, although dramatic and although important, should tell the whole story. That moment of Steven Avery, after the murder was committed, of Steven Avery tending the fire, of Steven Avery disposing of and mutilating the body of 25 year old Teresa Halbach. That would be a good place to start.

But I'm not going to start there. I'm going to start somewhere else. I'm going to start with the Toyota RAV4. The Toyota RAV4, which was owned by Teresa Halbach, which was discovered on the 5th of November, at the Avery Salvage Property, is less dramatic, it's a less dramatic place to start, than those other moments in time that I talked about. But it's equally

35

CHRM006652

important.

Because the discovery of that RAV4, the discovery of Teresa Halbach's vehicle, changed the course of not only this case, but the clues and the secrets found in that vehicle changed the lives of everybody in this room. Look around, everybody.

The clues found in that vehicle, on the 5th of November, changed everybody's lives, yours included. Your lives will never be the same, ours won't, families won't. That moment is particularly important. And that is where we're going to begin.

This woman, Pam Sturm, of the 60 witnesses -- by the way, I'm going to be helping you remember some of these faces as we go along. I don't expect you to remember 60 people and what they look like. And when I talk about witnesses, I'm going to try to help the jury with some photos to jog your memories.

But on the 5th of November, Pam Sturm and Ryan Hillegas had a conversation. They had a conversation about where should Pam search for Teresa's vehicle. And, importantly, in that conversation, they decided to search the Avery

36

CHRM006653

salvage property, the last place where Teresa
Halbach was seen alive.

Now, as I mentioned, this case
dramatically changes at that moment. This
changes from a missing persons investigation to
where something horribly bad has happened to
Teresa Halbach.

It's also the first opportunity that we
hear where we talk about law enforcement bias.
And we have heard that a lot from the defense,
throughout this case. But the perception or the
finding of the vehicle on the Avery property, in
fact, the very decision to look for this vehicle
on the Avery property, should tell you something.
What should it tell you?

Well, if Pam Sturm and Ryan Hillegas can
figure it out. If Pam Sturm and Ryan Hillegas,
when they talk to each other, say to themselves,
you know what, common sense would tell us that
the first place that we should look for Teresa
was the last place that she was seen alive, that
should put a lot of the defense suggestion of law
enforcement bias by Mr. Fassbender and
Mr. Wiegert, into perspective.

Because you don't have to be Sherlock

37

CHRM006654

Holmes to figure out that that's where the
investigation should start. Pam and Ryan figured
that out, when Pam Sturm decided, let's go look
at the Avery property for this particular
vehicle.

Now, we also remember that Pam's
daughter, Nikole, went with her. Nikole,
importantly, did some things at the scene. She
took the photograph. She realized that the doors
were locked. She realized that it was too dark
to see inside, or to see any blood inside. She
realized that there were no plates on the
vehicle. But, importantly, both ladies never
took their eyes off of that vehicle until the law
enforcements arrived.

Now, photographs that were taken from
Pam are important; they are important in this
case. It was a camera lent to them by Scott
Bloedorn, as we understand. But what we do find
is that there were obvious attempts to obscure
the view of this car. There's no question that
this car was found by the car crusher.

Doesn't take a great leap of
interpretation to suggest that Steven Avery
intended to crush this car. But you don't have

38

CHRM006655

1  to make that finding in this case. I'm just

2  saying that parenthetically for you. In other

3  words, that where it was located was not an

4  accident. There was no accident where Teresa

5  Halbach's vehicle was located.

6        Think also, if you will, about how

7  important this particular event was, finding this

8  car. Pam Sturm described it as divine

9  intervention, or words to that effect, that it

10  was the hand of God, I think was the term that

11  she said, as to where we should look at the 4,000

12  cars that were on this property. Pam Sturm

13  looked in that one place. She never would have

14  gotten through all those cars.

15        But on that Saturday morning, or going

16  into that Saturday afternoon, think of what would

17  have happened if this car wouldn't have been

18  found. Think about what would have happened if

19  this car was crushed, like the other 54 crushed

20  cars that were there. Think of what would happen

21  if the law enforcement officials wouldn't have

22  known that this car was there and this car would

23  have secretly been taken off the property and the

24  blood wouldn't have been found, both Teresa's

25  blood and Steven's blood.

39

CHRM006656

1          Think how close he got to getting away
2     with that.  Pam Sturm doesn't find this car, this
3     case doesn't change at that moment, we may not be
4     standing here today.  All right.  And that's why
5     that's the important place to start in this case.
6     That's why the investigation changes so
7     dramatically upon the recovery -- excuse me --
8     and observation of this particular car.  All
9     right.  That's the first fact.
10         Usually, when I would talk to a jury, I
11    wouldn't be concerned with things like security
12    issues, but part of the prosecution's job, not
13    only is to present my case, but to dispel any
14    defense suggestions that they have made in this
15    case.  I'm not going to identify what the defense
16    has told you is evidence in the case, because
17    evidence has a meaning.  Evidence suggests that
18    there were witnesses that said things about it or
19    that there were witnesses that agreed with the
20    questions that the defense gave.
21         Remember evidence in the case -- excuse
22    me -- evidence is the answers that witnesses
23    give.  Evidence aren't the questions that
24    Mr. Buting or Mr. Strang asked.  I know this is a
25    little bit of a diversion, but I'm the

                          40

CHRM006657

prosecutor, I get to do this. The questions of witnesses, did you plant evidence in this case, and when witnesses consistently indicate that, no, sir, I did not, that's the evidence.

The evidence is the answer. The evidence isn't the question. Okay. So keep that in mind as not only I go through my closing argument, but as the defense may stand before you and may suggest to you theories, or speculation, or supposition, or maybe what questions they might have asked. But you are also collectively going to have to remember what the answers were, because it's the answers that are the evidence, not the question.

Scene security. Scene security was talked to you by several witnesses. I'm not going to spend a great deal of time, but we know that law enforcement early on, number one, knew the significance of this SUV; number two, knew the -- at least perception of Manitowoc County being involved in the case. But as importantly, number three, knew the importance of something called scene security, of making sure that nobody was allowed to have access to that car. Nobody was going to tamper with the SUV after it had

41

CHRM006658

been located.

We first heard from Deputy Pete O'Connor. Deputy O'Connor was the perimeter security guy. Deputy O'Connor, as you recall, and as we come right off of Highway 147, was stationed right at the entrance to the Avery salvage property. Importantly, I guess, not only did he note the people that were leaving and that he stopped, but that Sergeant Orth was the first one to arrive.

And as you might expect, we then called those officers in order of arrival on the scene. When Sergeant Orth said that he got there about 10:59 a.m., that he talked to both of the Sturms, that they were very upset, that they were visibly upset, and they should be, the Sturms knew at that time the significance of what they had found. They knew about their cousin. They knew about where this case was going and where it was going to lead.

And Sergeant Orth testified that his job, when he was on the Avery salvage property, was to protect that particular vehicle. All right. It's called scene security. That's a fancy word for guarding a piece of property, or

42

CHRM006659

maintaining the integrity of a piece of evidence
in a case. And we heard that he was, really,
just a few feet, what would be to the east of the
SUV that was located.

Remember also, though, that other
witnesses, including the Sturms, including some
other supervisors, including Calumet County, when
they arrive, they never take their eyes off of
that particular vehicle. And Sergeant Orth was
one of those. Remember his testimony, he said, I
didn't take my eyes off that vehicle. Nobody
entered that vehicle. Nobody tampered with that
vehicle.

We even called witnesses like Lieutenant
Todd Hermann who, at the time, provided short
breaks for Sergeant Orth. We do that for
something called chain of custody, to make sure
that even for those couple of minute gaps and
Sergeant Orth said, even when I was taking a
little break in the staging area, I could
still -- I could still see the car. But, again,
under the category of lead prosecutor, crossing
all of my T's, I wanted you to know, and wanted
to make sure that you knew that all the witnesses
were called.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 43 of 229   Document 330-18

CHRM006660

We heard from Detective Dave Remiker,
several times in the case. But Detective
Remiker, who was involved early on, Detective
Remiker was, I guess, the lead investigative
individual from Manitowoc County, both in the
missing persons part of the case, and also in
these early stages Detective Remiker, we heard,
confirmed the VIN. Remember, confirmed that this
was, in fact, Teresa Halbach's car. And you will
remember everything that Detective Remiker said
to you about that case.

But I want you to think back and I want
you to remember Detective Remiker looking. I
want you to remember how Detective Remiker told
you about scene security. This is a detective, a
young detective, but a good detective, a guy who
knows his job. A guy who, on the scene, knew the
importance of scene security.

Detective Remiker looked at you, without
apology, didn't bat an eye, and he told you,
nobody entered that vehicle. Remember that?
Remember when Detective Remiker told all of you,
all of the jurors, that nobody entered that
vehicle, because it was so important. Because
the integrity, the perception about this case,

44

CHRM006661

making sure that nobody was going to tamper with, at that time, his evidence, was an important factor to Detective Remiker.

And when you look at his credibility -- This is the first opportunity I will have to talk about credibility of witnesses. It's not something -- and the judge has instructed you -- not something that you do just as a juror. We do it everyday.

When we listen to lawyers, or when we listen to people who are trying to sell us something, car salesmen, as an example. We weigh their credibility. All right. The car salesman comes up and tells you that this little baby was only driven on Sunday, by a little old lady to church. You might weigh some of those factors into that particular salesman. What's he trying to sell me and why is he trying to sell me that? Does he have any interest in the outcome of what he's saying? Does he have some kind of a bias or does he have some kind of a prejudice?

And, of course he does. And you weigh those kind of factors, not just how they say it, but whether or not they have those -- those influences. You do the same thing as -- it's a

45

CHRM006662

little more formalized, but you do the same thing

as a juror. It's not just what they say, it's

how they say it and were they in a position to

know the things that they are talking to you

about.

And my suggestion to you, my argument to

you, as the lead prosecutor, when the guy who's

in charge of the case points to you and looks at

you, without apology and emphatically says,

nobody, nobody entered that vehicle, and nobody

tampered with that vehicle, that's something that

you should give great credibility and great

weight to.

We finish what's called the chain of

custody, or the transfer of -- from Manitowoc to

Calumet County, with Sergeant Tyson. You have

heard from Sergeant Bill Tyson who completes, if

you will, the chain; that is, who watched the

vehicle and who took over. And about 3:00, and

at least from 3:00 on, we learned, then, that

Calumet County takes over.

Calumet County takes over, then, with

not just perimeter security, but takes over

security of the SUV, of that particular part of

the scene. It's the transfer of management

46

CHRM006663

1    control about this case, that's why Calumet
2    County and DCI got involved.  Let me just spend a
3    couple minutes about that.
4              Manitowoc County sheriff's deputies were
5    never, never, precluded from being involved in
6    this case.  The resources of Manitowoc County law
7    enforcement officers was critical, was crucial.
8    Mr. Fassbender never apologized for that.
9              And think about why.  Because we're in
10   Manitowoc County.  It's the Manitowoc County
11   sheriff's deputies that are going to know if we
12   need a wrecker, where are we going to go.  If we
13   need some tarps, where are we going to go.  If we
14   need some ropes, where are we going to go.  If we
15   need some bodies, to do some searching, if we
16   need trained evidence techs, it's a logical place
17   to find them.  And that's why Manitowoc County
18   remained involved in this case.
19             You heard the testimony from
20   Mr. Fassbender, that it was the management
21   decisions, that it was the control decisions,
22   over this particular investigation, that was
23   removed from Manitowoc County.  Never, ever,
24   ever, the resources.  Never that we couldn't, or
25   shouldn't, use Manitowoc County law enforcement

47

CHRM006664

officers. All right.

I hope you all understand that. I hope you understand the difference, then, between decision making, how a case should be directed, and whether or not a Manitowoc County law enforcement officer should have been used in this case.

All right. Fact number three, the vehicle is locked. We learned at this time the weather is worsening, it's getting dark. The Crime Lab is called in. And so our third uncontested fact, my third fact that I want you to consider when deciding this entire case, is something called a recovery process. The SUV recovery.

And for the first time, I guess, we learn, and it's the first example of the diversity of agencies that are involved in this investigative effort, this largest criminal investigation, that we have talked about, of the resources that need to be allocated.

We have civilian searchers, like canine handlers. We have law enforcement officers, like from DCI and Calumet County. We have scientists that are brought in, like people from the Crime

48

CHRM006665

Lab. We have, as you heard, other civilians
brought in to help, like the wrecker operator,
and the tow truck driver, and the driver of the
trailer in this recovery effort.

But this is a good place to really kind
of get your mind around the expanse of this
investigation. And remember, we're an hour into
it. We're only an hour into the investigation
and already the resources are being called in,
because the enormity of this investigative effort
is so, so apparent to everybody.

I told you on my opening statement about
what I called a four legged hero. That may have
overstated Brutus a little bit, but Brutus is
certainly a qualified asset that you should be
considering in this case. Brutus hit on the SUV.
All right. And if the officers didn't have
enough suspicion before that particular moment,
all right, that should have been, and was, in
fact, a very important part of this case.

Because Brutus hitting on the SUV, told
the handler, told Julie Cramer, who you have
heard from, one very important thing, that either
a dead body was still in that particular SUV, or
a dead body had been in that SUV. This is

49

CHRM006666

1    another changing moment.  It's another time in
2    this investigation where very important, the
3    investigation changes and becomes much more of a
4    criminal investigation, that of a missing person
5    investigation.

6        We heard about Brutus' search that he
7    did, real methodical kind of search.  As I was
8    thinking about it, even though Brutus is a dog,
9    Brutus approached that search much like our law
10   enforcement officers, very methodically, very
11   professionally, and came up with the same kinds
12   of results that our other officers have in this
13   case, as well.

14       One of the two lead investigators, Tom
15   Fassbender, from the Division of Criminal
16   Investigation, talked to you about the agencies
17   that were involved.  I will talk to you about
18   that a little bit later.  But mentioned something
19   called resource allocation, putting the teams
20   together for searching all the different
21   properties.

22       That first night, Mr. Fassbender clearly
23   was in charge of deciding who's going to go into
24   what house and why those people were going to do
25   that.  And talked about the search plan.  Talked

50

CHRM006667

about why Steven Avery was a person of interest.
Gave you that obvious answer that everybody is
giving you, is because Steven Avery was the last
person to see Teresa alive.

And Mr. Fassbender knew, that first
afternoon, what an overwhelming task this was.
He knew what an overwhelming job the coordination
of this largest investigative effort was going to
include. And, again, without apology, without
apology, Mr. Fassbender told you at that early
stage, all the early clues pointed to one man.

They pointed to one person, even early
on. Who's the last person to see her alive?
Where was the vehicle that was found? Was there
an attempt by Mr. Avery to lure, or to invite, if
you want to use a more polite term, this woman
onto the property? It all pointed to one person.

And although Investigator Fassbender
said that, he had other irons in the fire, he was
looking at other individuals, he was looking at
other family members, he was looking at possibly
old boyfriends, or people that might have had
contact with Teresa, or who else she might have
seen that day, Mr. Zipperer, or Mrs. Zipperer, or
Mr. Schmitz, or where she might have been going.

51

CHRM006668

And all those things are important. And
a law enforcement officer does all those things.
But law enforcement officers aren't stupid
either. Law enforcement officers understand that
when you have limited resources, when there is
just so many officers to go around, you better
direct your resources to where this thing is
likely going.

And that night the likely place that
this was going was towards Steven Avery. And so
a team was put together to search Steven Avery's
trailer, that very first night, on the 5th,
subject to a search warrant. Getting ahead of
myself just a little bit.

I apologize, because we're still talking
about the recovery of the SUV. The scientist,
Mr. Ertl, who himself is a DNA analyst, that's
what he does during the day. But on weekends,
like many other Crime Lab employees, Mr. Ertl
volunteers to go on field responses. He
volunteers to go to crime scenes and look at
evidence and things just like this.

So Mr. Ertl, gave his opinion, gave his
expertise to, and opinions to, Mr. Fassbender.
Made the decision that because the weather was

CHRM006669

1   becoming progressively worse, I think Mr. Ertl
2   used the term dramatic weather had occurred on
3   the evening of the 5th, after he had got there.
4   Mr. Ertl verified, if you remember, and
5   importantly, verified that the vehicle was
6   locked, that all the doors were locked in the
7   vehicle.  And decided that although they were
8   going to process the outside of the vehicle, that
9   the real processing of this car was going to take
10  place in Madison.
11          But the SUV was going to be transported,
12  as it was, to a more pristine type of location,
13  to a place where the climate could be controlled
14  and where they could control the processing of
15  the vehicle.  Mr. Ertl also told you that this
16  vehicle was obviously obscured, or attempted to
17  be obscured, you couldn't see it from, as an
18  example, an airplane.  Mr. Drumm told you that
19  they couldn't see a car like that from an
20  airplane when they did their air search a day or
21  two before.
22          Mr. Ertl also told you, and if you
23  remember, we'll to go to a picture of Mr. Ertl
24  who is standing right here with Mr. Fassbender
25  and some other -- one other Crime Lab person.

53

CHRM006670

Mr. Ertl told you that, right on the other side,
see this, right on the other side of the SUV,
running all the way along this ridge, was this
berm.  Mr. Ertl talked about this being 15 to
20 feet high.

Remember he talked about walking over
that particular berm where he -- after he got to
the top of it, kind of slid down, or gravity kind
of assisted this going down the other side of
that berm.  That is important, or it may be for
you, important, when deciding whether or not
somebody knew to put this car here.

It certainly couldn't be driven in from
the south.  That's the point.  All right.  The
point is that it couldn't be driven into that
property unless somebody knew that property,
unless who ever put that car there, knew how to
get the car into this location.  Again, it's near
the car crusher.  It's near a place where other
cars are to be crushed.  It's near cars that have
been crushed.  The 54 cars that we talked about.

But Mr. Ertl's job, primary job, at this
location, is to process the outside of the
vehicle.  But then to get a wrecker, to get a tow
assembly set up, and to put this on an enclosed

54

CHRM006671

```
 1    trailer and take to it Madison for processing.
 2    And so we move to our next uncontested fact, fact
 3    number four.  We move our investigation to
 4    Madison.
 5              ATTORNEY STRANG:  Your Honor, excuse me.
 6    Excuse me, Mr. Kratz.  I think it's unwise and
 7    improper to be describing facts necessarily as
 8    uncontested.
 9              THE COURT:  Mr. Kratz.
10              ATTORNEY KRATZ:  Well, however unwise it
11    may be, this is argument, Judge.  And if the jury
12    decides that they are, in fact, contested, they can
13    make that conclusion as well.
14              THE COURT:  All right.  Members of the
15    jury, I think I will simply remind you about one of
16    the instructions that you read and that is that the
17    closing arguments are just that, arguments.  They
18    are not facts.  You should take anything that is
19    said by either party as argument.
20              The fact, for example, that one side
21    said something is uncontested, may not
22    necessarily make it so.  It depends on your
23    interpretation of the evidence.  And the other
24    side will also have a chance to respond in its
25    argument.  Mr. Kratz, you may proceed.
```

55

CHRM006672

1    ATTORNEY KRATZ:  Thank you, Judge.  And the
2    Judge is absolutely right and Mr. Strang is
3    absolutely right.  And if you remember one of them,
4    one of the defense attorneys putting on some
5    evidence that this car wasn't taken to Madison for
6    processing, then you should adopt that.  You should
7    adopt your memory.  I'm calling it uncontested as an
8    argument.  I'm saying because we haven't heard any
9    evidence to the contrary, we haven't heard any
10   answers from a witness to the contrary, that's why
11   I'm characterizing this as uncontested.  But as I
12   mentioned --
13   ATTORNEY STRANG:  I would like to be heard
14   about that, at an appropriate time, as if now.
15   THE COURT:  I'm sorry, I didn't hear the
16   last part of your comment.
17   ATTORNEY STRANG:  I would like to be heard
18   about that at an appropriate time, as if now.
19   THE COURT:  Very well.  You may proceed,
20   Mr. Kratz.
21   ATTORNEY KRATZ:  The evidence in this case
22   was that this particular SUV was taken to Madison,
23   that it was taken to a garage in Madison.  It was
24   taken to the Crime Lab, where this vehicle could be
25   processed.  And we heard from Mr. Groffy and Ms

56

CHRM006673

Culhane, and Mr. Riddle. And, in fact, we heard and
we'll talk about a fourth individual, Mr. Stahlke,
about the processing or the looking at this vehicle
in a more controlled environment.

Mr. Groffy testified that after the
vehicle was initially looked at, that when the
vehicle was open, that Mr. Groffy started
photographing. But, importantly, photographing
from the outside of the vehicle, not from the
inside. And that's why his testimony included
that he photographed both on the 6th, that's
Sunday, and also on the 7th.

Because on the 6th, Mr. Groffy testified
that he photographed from the outside of the
vehicle, that he could photograph things where he
didn't have to crawl into the vehicle, because he
couldn't get the inside shots yet. Didn't want
to contaminate the inside of the vehicle and
waited for the vehicle to be what's called
processed, by the lead individual who was in
charge of processing the car. And that was
Sherry Culhane.

Now, Ms Culhane has lots and lots of
involvement in this particular case. Ms Culhane,
you heard, was the unit leader or the unit head

57

CHRM006674

of the DNA Section of the Madison Crime Lab.  And
she was chosen or she assigned herself the
responsibility of this case.  And it was the unit
head, the head of the DNA section who, herself,
processed this particular vehicle.

Ms Culhane, as you heard testimony, took
some swabs, took some samples of the interior of
the vehicle.  It's more than just the four
pictures that I'm putting up before you, but the
swabs of around the ignition area, the swabs of
the seats -- excuse me -- the cuttings, as she
cut out portions of the seat, I believe the
testimony was.  Swabs of the CD case, swabs of
the back door, and also on the interior of the --
what's called the cargo area of the SUV.

The defense will have an opportunity to
present a argument in this case.  We heard some
questions of some law enforcement officers, about
planting evidence.  We didn't hear anything about
how an officer might plant a stain like this,
what's called by Mr. Stahlke, a contact stain,
which common sense would tell you requires active
bleeding.  How stains which require gravity, that
is, which require dripping kinds of actions might
be planted, how smear or movement kinds of stains

58

CHRM006675

might be planted as well.

Now, I say that, again, not for my argument, not at this particular time telling you what the evidence has shown, or is going to show, but I am interested to hear theories of how these things might have actually happened. Mr. Avery's blood is in six different places in this vehicle. Other DNA, that is, without blood being visible, is in yet another, that would be the hood latch on this particular vehicle.

And so the sheer volume, the sheer numbers of places, made this quite a job. Made this processing or the recovery of this evidence quite important, indeed.

We heard from Mr. Riddle, who is primarily a fingerprint guy. And although he didn't obtain any identifiable prints, at least those that were suitable for comparison, Mr. Riddle also had the responsibility of inventorying the car. Mr. Riddle told you about what that means, to inventory a vehicle. And it's the little things that he found, the little things within the inventory that become so important.

Things like the blue lanyard, that was

59

CHRM006676

1     given from Katie Halbach to her sister Teresa.

2     You saw Katie, with the assistance of, I think it

3     was Mr. Wiegert, actually fitting the key

4     assembly, or what's called the fob, right onto

5     this particular lanyard that was given to Teresa.

6              And I had a sense, and I'm allowed to,

7     and I will argue to you, that that showed where

8     this case fits together.  Fits together just like

9     the fob and just like the lanyard that was given.

10             Now, Nick Stahlke, I told you I was

11    going the talk about, and I'm going to add a

12    little bit of Mr. Stahlke's testimony in at this

13    point, because although an analysis was given, it

14    does fit also into the processing of the vehicle

15    when Mr. Stahlke talked about the blood that was

16    found in the back of the RAV4.

17             This area right here, where Mr. Stahlke

18    said that that was a very identifiable impression

19    to him.  Sadly, this is a impression, or an

20    impression, of a individual whose head, whose

21    hair, is soaked with blood.  And it leaves an

22    impression.  It leaves a stamp, if you will.  And

23    you can see that and you may get a chance even to

24    see some photos, close up photos, when you

25    deliberate in this case.

60

CHRM006677

But the point of Mr. Stahlke's testimony was that, how Ms Halbach was laying in the back, that her hair was blood soaked, becomes real important, obviously. Because what we're going to hear about gunshots to the head, what we're going to hear about where Ms Halbach was placed thereafter, when it ties in with Brutus hitting on this particular vehicle, as an individual was either bleeding, or was deceased in this particular SUV, again, becomes very, very important.

Mr. Stahlke also told you the difference between contact and transfer kinds of stains, which Mr. Avery -- the blood attributed to Mr. Avery suggests impact, or what's called projected blood, as if an individual was thrown into the back of the SUV. That was on the back gate, that Mr Stahlke talked about. We'll show you some pictures about that, as if the blood is splattering, or is actually in movement as it hits the side of, or the back gate of, the SUV.

We talked about passive bleeding. Again, those attributed to Mr. Avery; that is, the back passenger seat and also on the front seats where there's droplets, where there's

61

CHRM006678

1     active bleeding that's going on.

2          Mr. Stahlke also testified, if you

3     recall, that upon his expert opinion, his opinion

4     as a blood spatter expert, and he does this for a

5     living, that this particular stain by the

6     ignition is absolutely consistent with somebody

7     with a cut to the outside of the right hand and

8     turning an ignition, this transfer -- contact

9     transfer stain was absolutely consistent.

10         Now, the Judge promised you a break and

11    you are going to get one right after fact number

12    five. So I want you to know that I'm not just

13    going to drone on and on. I'm going to provide

14    you a break after this next section. Because you

15    probably, since you have been sitting for about

16    45 minutes now, probably not more than an hour

17    should go by before you get a break.

18         Fact number five, we go back to the

19    salvage yard. Fact number five becomes a

20    critical or critically important piece of

21    evidence, the State is referring to as

22    Mr. Avery's burn barrel. And we have heard about

23    the discovery, and the recovery, and the

24    processing of this burn barrel. But all of the

25    aspects of this particular burn barrel, again,

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 62 of 229   Document 330-18

CHRM006679

1     become very, very important.

2           It is important because of the obvious

3     evidentiary value that we have had. But it's

4     also obvious -- or excuse me -- it's also

5     important for what we haven't heard. What we

6     haven't heard about explanations, if you will,

7     about how some of this evidence gets in there.

8     But, again, I'm jumping ahead, I will talk about

9     that in just a moment.

10          Deputy Siders was the individual that

11    you heard found or discovered the burn barrel on

12    a sweep of an adjoining property of Mr. Avery's

13    on Monday, the 7th of November. Deputy Siders

14    finds the burn barrel with a tire, with the tire

15    rim being inside of the vehicle (sic). And he,

16    as you recall, takes the tire rim out.

17          Tires, again, you have heard by later

18    witnesses, are accelerants. They can be used to

19    keep a fire going, to keep it certainly going hot

20    enough to destroy, or what should be, destroy

21    most of the things that it comes in contact with.

22          Deputy Siders, we hear, turns over

23    responsibility for the photography and the taking

24    control of this piece of evidence to Special

25    Agent Kevin Heimerl. Mr. Heimerl takes some

63

CHRM006680

pictures of the inside.  But even Deputy Siders
told you, upon looking in the burn barrel, it was
obvious that a Motorola cellphone was inside
there, because you could see the M, the very
distinctive M from inside of the burn barrel.

Mr. Ertl, again, another one of his
responsibilities, later, I think it was at the
Calumet County Sheriff's Department, processed
the contents of this burn barrel, which was
anywhere between a third and a half full.  But
Mr. Ertl didn't identify those components.  He
doesn't identify the obvious electronics that are
found within.  He leaves that to the FBI.

Now, Mr. Thomas, although a very young
looking individual, is in fact an expert, here to
provide you with expert testimony.  These
components were sent to Virginia.  And these
components, we heard, were all laid out and were
all identified by Mr. Thomas.

When you look at these pictures and you
look at the kinds of things that didn't burn, and
when I asked Mr. Thomas, what are we looking at
here, what's left over, what didn't burn,
Mr. Thomas mentioned that the metal didn't burn.
He mentioned that the glass didn't burn.  And I

64

CHRM006681

said, well, what does that leave. I asked him
the question, what components aren't here, what
aren't we looking at.

Mr. Thomas told you plastic. He said it
was the plastic components of the camera, and of
the cellphone, and of the PDA, the personal data
assistant, that we're missing from this
constellation of things.

Mr. Thomas was able to positively
identify three specific things, obviously, the
cellphone. He talked to you about the large
circuit board for the PDA, the Palm Pilot type
thing, and also the components for the digital
camera, the Canon A310. Didn't just say it was
any camera, said it was a Canon A310 digital
camera.

I showed you a blow up of this
particular exterior of that camera. And it says,
you know, PowerShot A310 on it, so you probably
don't have to be an expert to determine what kind
of camera that was. Not surprisingly, the State
tied this up as well, as you might expect. We
meticulously, I think, matched the recovered
items and showed you that Teresa Halbach owned
all of those items. So at least the three items

65

CHRM006682

that Mr. Thomas was able to positively identify.

Teresa owned a Motorola V3 RAZR cellphone. She owned a PowerShot A310 digital camera and she owned a Palm Zire 31 PDA. We saw the boxes that Teresa had kept her or had purchased her Palm Pilot. The box that *Auto Trader* had given her her digital camera in, the Canon PowerShot A310. And you also heard testimony about Teresa owning the Motorola RAZR cellphone, which is a very common kind of cell phone.

But Steven Avery's burn barrel becomes important, not just for what is found in it, but what witnesses, what other citizens, what other people on the property saw on the 31st. One of those people is Blaine Dassey, is the nephew of Steven Avery.

And when considering credibility, you can consider a young man like this sitting in front of his uncle and having to testify against his uncle, and doing the best job that he can, and telling you that he is generally scared of his Uncle Steve, but does the best he can in telling you that he and Brendan Dassey, his brother, get off the bus, sometime between 3:40

66

CHRM006683

1    and 3:45, everyday.

2         That on this day, on Halloween, he

3    remembers particularly, while walking home, while

4    coming down their dirt road towards their house,

5    that he saw his Uncle Steve walking from his

6    trailer and putting a bag, a white bag is what he

7    described, a white plastic bag, into an already

8    burning burn barrel.  Okay.

9         So by 3:45 or 3:50 in the afternoon, the

10   State is arguing, Mr. Avery is already getting

11   rid of Teresa Halbach's stuff.  The electronics,

12   the phone, the PDA, the digital camera are

13   already being disposed of, they are already being

14   destroyed at that time.

15        Mr. Dassey, importantly, also testified,

16   and please remember this, before our break,

17   Mr. Dassey testified that the Suzuki and the

18   snowmobile that you see pictures of inside of the

19   garage, on the 31st of October, weren't in the

20   garage, remember that.  They weren't inside of

21   the garage as the picture shows.  But the 31st,

22   the Suzuki and the snowmobile are on the side of

23   the garage, leaving this garage opened, at least

24   opened to the point where something else can fit

25   into that particular garage.

67

CHRM006684

Brings us to our next witness, who's
Mr. Fabian. Mr. Fabian is Earl Avery's friend,
that they were rabbit hunting. Mr. Fabian told
you that he parked the golf cart, that the burn
barrel was already burning, that he smelled the
distinct odor of plastic burning at the time,
that the smoke was so bad that, although parked
in a golf cart to the south or next to the burn
barrel, eventually he had to move this golf cart
because the smell of burning plastic and the
smoke was getting so bad.

Mr. Fabian also tells you, at that time,
just before dark, he places that just before
dark, when the rabbit hunt was just about
completed, that Mr. Avery's garage was closed.
He couldn't see what was inside of the garage.
There isn't any SUV any more. There is nothing
to be seen. The garage is closed, but the Suzuki
and the snowmobile are on the side of the garage.
All right.

So I have given you five so far, five
pieces of evidence, five pieces of crucial
evidence of the evidence that the State believes
is necessary to prove this case, beyond a
reasonable doubt.

68

CHRM006685

When you return, after whatever break
the Judge may give you, I will conclude, then,
with the other pieces of evidence and instruct
you, or at least argue to you, what I believe
that you should do, after considering all these
pieces of evidence.

It's a good time for a break, Judge.
Thank you.

THE COURT: All right. Members of the
jury, what we're going to do is this, we're going to
take a break of 10 minutes or so, at this time, then
come back and have the State complete its closing
argument. I have informed the lunch people to bring
in lunch at quarter to one. So, because we will be
eating lunch later than normal, if you want to have
a snack during the break, go ahead and do so.

And, again, I will remind you not to
begin discussing anything about this case until
all the closing arguments have been given and
until I tell you to begin deliberating. You are
excused at this time.

(Jury not present.)

THE COURT: You may be seated. Mr. Strang,
you have something you wish to place on the record
at this time?

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 69 of 229   Document 330-18

CHRM006686

ATTORNEY STRANG: I do. Thank you. I initially interrupted Mr. Kratz's argument, reluctantly, and trying to be polite and somewhat circumspect about my comment that it was unwise and improper to describe facts as uncontested. I waited until we got to the PowerPoint slide that said fact number four, and by my recollection, that was the fourth time that the -- counsel for the State returned to the theme of an uncontested fact.

As I say, I was trying to be circumspect, but the concern, of course, was that this comes too close to commenting on the decision of the defendant not to take the stand. Or, for that matter, not to offer witnesses that he did not.

Mr. Kratz, in responding to my interruption and objection, I think made the problem substantially worse. I don't have committed to memory, we could go back to the court reporter's notes if we need to, but the rejoinder from counsel for the State was that, you know, if you remember a witness being called, or if you remember someone saying this didn't happen, something to that effect, well, then that's fine, but, of course, the suggestion was

CHRM006687

1     that the witness was not called and no one did

2     speak up to contest the fact.

3          Doesn't warrant a mistrial, but comes

4     way too close to commenting on the Fifth

5     Amendment privilege not to testify and I think

6     warrants some curative step, either by counsel

7     himself, or by the Court, or both.

8          THE COURT: Mr. Kratz.

9          ATTORNEY KRATZ: That's absurd, Judge.  I

10    get to, on closing argument, suggest that Mr. Strang

11    is going to place a theory of defense into play in

12    this case.  There's absolutely no evidence that

13    would suggest that.  If there are facts that I

14    believe have not been contested, either by

15    cross-examination, or are not contested through the

16    defense calling its own witnesses, that's fair game

17    for me to comment upon.

18          I have not, and I will not, comment on

19    Mr. Avery's decision not to take the stand.  I

20    understand and the jury has been instructed that

21    the defense, or the defendant, I guess, is how

22    the instruction reads, has no burden in this

23    case, but certainly if something is not

24    contested, if there is a fact that I believe has

25    been proven and is an important part of the

71

CHRM006688

State's theory of the prosecution and there hasn't been a challenge, at least through evidence in the case, I feel very much so entitled to comment upon that.

THE COURT: Anything else, Mr. Strang?

ATTORNEY STRANG: Well, it's certainly fair game to argue what the State, or for that matter the defense, thinks the evidence shows. It's fair game to argue -- a little bit more dangerous for the State, I suppose -- but fair game to argue what the evidence does not show, draw conclusions from the evidence.

But describing something as uncontested or, you know, we could go to other cases, this word hasn't been chosen here, but we could go to other cases where un-rebutted or unchallenged comes, I think, way too close to commenting, not on the strength of the evidence, or the conclusions, affirmatively, the State wants drawn, but on the decision of the defendant not to testify to something himself, or not to call a witness on a point. And I don't think the suggestion was absurd at all. But that's at least for this Court, in the first instance, to decide.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 72 of 229   Document 330-18

CHRM006689

THE COURT: All right. The note I took down at the time the objection was made that the specific alleged fact involved I believe had something to do with the vehicle being transported to Madison for inspection. Frankly, that wasn't something that struck a chord in my mind that somehow there was any relationship with the defendant's decision not testify.

I appreciate the fact defense counsel has alerted the Court to that possibility. I agree that the -- there is the potential, when you start using the approach that's been used as far as undisputed facts, I can see where it could lead to that. I do not know what the rest of the State's argument is going to be.

At least based on what I have heard so far, I do not believe it relates in any way to any suggestion to the jury that somehow they should take the defendant's failure to testify into account in evaluating the State's evidence, based on the facts that have been discussed.

ATTORNEY STRANG: And I -- I want to add, I will -- I will go one step further, I agree with the Court that the particular fact described, where actually Mr. Kratz quite acceptably is using fact

73

CHRM006690

number one, and fact number two, fact number three,
really, to describe a constellation of facts around
some single event, I agree that -- and I haven't
moved for a mistrial -- that this was not a topic on
which a juror would say, boy, the one who probably
has the best knowledge about that is Mr. Avery.  And
that's something exclusively within Mr. Avery's
knowledge.

I agree and I will go the one step
further and say that facts one, two, and three,
similarly, were not matters that immediately
would suggest whether the defendant is in the
best position to know.  I used the term,
initially, unwise and incorrect, because I wanted
to alert counsel and the Court, that if, you
know, we could get to a point where this would
become a real serious concern.

Unfortunately, the response made the
concern more immediate.  Still not rising to the
level of requiring a mistrial, in my view, and
perhaps the Court's admonition now will be
enough, but I -- if -- if we go much further down
there, I will be heard again.

THE COURT:  I'm assuming that both parties
are aware there are permissible and impermissible

74

CHRM006691

ways of suggesting the same thing. If the State says there's no evidence in the record to show this or that, then that's generally okay. But if the argument relates to something that might implicate the defendant's decision not to testify, and the language, whatever it may be, is construed as something that somehow the defense should have produced, then that danger arises.

I'm assuming that all counsel for the State understand that. I haven't heard that yet. And I'm trusting, Mr. Kratz, we're not going to have to go there.

ATTORNEY KRATZ: Except on the planting issue, Judge, where the defense has affirmatively put that into play. The State didn't. And as to, have we heard anything about planting, I do intend to go into that. And that may be on rebuttal. I may wait to see what the defense does. And with the Court's comments, I may, in fact, do that.

But I at least want the Court to understand that since the defense has asked for the theory of defense, and since the defense has intended, throughout this trial, to discuss planting of evidence as its theory, I think my comment on the lack of evidence, at least on that

75

CHRM006692

issue, without mentioning Mr. Avery, without
mentioning his decision to testify or not, is
certainly fair game in my argument, or whether I
choose to do it now, or whether I choose to do it
in my rebuttal.

ATTORNEY STRANG: Well, and you'll know
when we get there. I simply would point out now
that planting and being framed is not an affirmative
defense. It's not something on which a defendant
has a burden of production or going forward, let
alone a burden of persuasion. So this would be
different if the defense here were self-defense, or
involuntary intoxication, something like that, it's
an affirmative defense.

I, too, trust counsel is aware of the
boundaries and now I have elaborated my concerns.
But I do want to be clear, the defense that's
been presented here is not an affirmative
defense. So we'll ...

THE COURT: All right. I'm sure, now that
the matter has been brought to the parties'
attention and the parties will be careful about it.
We'll take a break at this time. I guess we will be
resuming in 10 minutes. The jury gets a little
longer.

76

CHRM006693

1          (Recess taken.)

2          THE COURT: Mr. Kratz, I understand you are

3    now on mike seven.

4          ATTORNEY KRATZ: I am. I switched mikes,

5    Judge, they couldn't hear in the back, so. I don't

6    think the jury was having a problem hearing.

7          THE COURT: All right. You may resume.

8          ATTORNEY KRATZ: I appreciate it. Thank

9    you, Judge.

10          Fact number six, we talked about the

11    instrumentality of the murder and here we talk

12    about the .22 caliber rifle. Remember both the

13    felon in possession of a firearm charge, the

14    instruction that was given to you, it's not

15    ownership of the weapon, it is possession of.

16    You heard the Judge give you the instruction that

17    it is the exercise of control, especially in an

18    area where an individual would have control of

19    that weapon becomes important.

20          Mr. Johnson, although a entertaining

21    fellow, also provided important information for

22    the jurors that he certainly knew of the

23    .22 caliber rifle, owned the black powder rifle

24    as well, and knew that they were hanging just a

25    few feet above Mr. Avery's bed. Also knew of the

77

CHRM006694

1   ammunition. We have seen photographs and we have

2   actually seen these rifles.

3           Let me just tell you, and this goes to

4   Count 3, and this, interestingly, might be the

5   last time I talk about possession of a firearm by

6   a felon. You are to, and you must, consider the

7   fact that the defendant was previously convicted

8   of a felony that element has been proved and

9   we're now just responsible to prove to you

10  whether or not he possessed those firearms.

11          Either of these weapons are rifles,

12  either of these weapons qualify as weapons for

13  possession of a firearm. We were -- of course,

14  claim in this case that the .22 caliber Marlin

15  not just was, what's called constructively

16  possessed, that is, over an area of which

17  Mr. Avery had control, but we will actually be

18  arguing to you that Mr. Avery handled, held that

19  weapon in his hands, when Ms Halbach was killed.

20          Some quick testimony, or at least a

21  review of some testimony on these issues.

22  Mr. Tyson, although he didn't seize the guns,

23  observed the guns that first night, on the 5th.

24  Mr. Kucharski is the gentleman who actually

25  seized the weapons on the 6th.

78

CHRM006695

1          So there was some further evidence about

2     the dogs demeanor being vicious, and that is

3     further testament as to why the burn pit, or the

4     burn area, wasn't searched before it was.

5          Mr. Austin was kind enough to provide

6     us -- the trooper reconstruction expert was kind

7     enough to provide us with some diagrams and

8     things that have helped us throughout this case.

9     And I think they have been very helpful to the

10    jury.

11         Deputy Kucharski also, however, found 11

12    shell casings in the garage on the 6th of

13    November; obviously, in plain view, obviously

14    something that you should consider.

15         When we move to March, though, when we

16    move to March 1st and 2nd, when there's been

17    additional search warrants being executed on --

18    in Mr. Avery's garage, an important discovery

19    occurs, that you heard about. And that is, two

20    separate bullets, a bullet up in front here where

21    we have tent number nine, and a bullet underneath

22    this compressor, actually having to move these

23    items by tent number 23, which is the bullet

24    which later we'll find has Teresa's DNA on it.

25         Remember the different kind of search

                          79

CHRM006696

1   that this is in March, compared to November when

2   the agents and the officers talked about taking

3   all of this junk and moving it one by one, one

4   piece by one piece, and doing that kind of

5   search.  In March, the officers, pursuant to

6   their search warrant, did, in fact, just that.

7          Mr. Newhouse, we heard from the firearms

8   expert.  I think the kind of expert that you

9   might hope and expect to find, from the Crime

10  Lab, talking about shell casing matches and also

11  bullet matches, at least the bullet that had

12  Teresa's DNA on it.

13         All of these photos and all this

14  evidence is in evidence in this case.  The

15  bullets that were taken from Mr. Avery's bedroom,

16  you will be able to see, no pun intended, bear

17  the same letter as those that were identified by

18  Mr. Newhouse.  That is, as having been shot from

19  that specific gun, that is, the Marlin Glenfield

20  .22 hanging over Mr. Avery's bed.  That's

21  important, that's important stuff, that the shell

22  casings that are found in this case are from that

23  very same weapon.

24         We heard about the bullet analysis as

25  well, the bullet with the DNA is from that very

80

CHRM006697

same weapon.  And interestingly and importantly,
Mr. Newhouse tells you, to the exclusion of all
other weapons.  All right.  That's the kind of
identification that these experts can do, at
least the ballistics and firearms experts.  And
so the .22 caliber bullet is an important fact.

Fact number seven, some background
information.  We will hear, or I'm sure -- I'm
sorry, you have heard about the prior *Auto Trader*
contacts, that is, prior contacts, the history
between Steve and Teresa.  You heard from Mr.
Pearce, that she and Mr. Pearce had talked about
Ms Halbach already having gone to the Avery
property, something of the nature of, you are not
going to believe whose photos we were taking.
And you heard the testimony of Mr. Pearce about
his reminder not to -- generally, reminder not to
go into people's homes, or not to have that kind
of contact with them.

Ms Pliszka talked about the history,
knowing about the history.  Ms Pliszka is from
*Auto Trader*; she's the receptionist.  And the
important part, at least for this part of our
argument, is that that photographer, Ms Halbach,
had been there on a number of occasions before.

81

CHRM006698

1    And when Mr. Avery called at 8:12 on the
2    31st of October, he asked for that same
3    photographer.  Although, he didn't use the name
4    Teresa, asked for that same female photographer
5    that had been out there before.  Again, although
6    using a different name, although using the name
7    B. Yanda, he specifically was asking for Teresa
8    to come out.

9        You heard from the supervisor of *Auto*
10   *Trader*, Ms Schuster, that Ms Halbach had taken
11   six prior photos at the Avery salvage property.
12   And we put these six photos, early on, into the
13   case, into evidence.  You can note on most of the
14   photos, just how close they are in proximity to
15   Mr. Avery's trailer.

16       These photos, as you heard, were taken,
17   the first on June 20th, and the last on October
18   10th, of 2005.  I think the inference that you
19   also may want to draw on as you think weeks ahead
20   from the presentation of this evidence is, after
21   these photos are taken, after a car goes into
22   *Auto Trader Magazine*, what's done with it.

23       You can actually answer that question by
24   some of the other photos that I showed you.
25   What's done with these cars doesn't do Mr. Avery

82

CHRM006699

1    any good, or whoever is selling a car, any good,

2    to leave these items back by Mr. Avery's garage,

3    or back by his trailer.

4         But after the *Auto Trader* picture is

5    taken, these items are put up on the corner, what

6    is called the corner by the business property.

7    We know that because of Ms Buchner, Lisa Buchner,

8    when she testified in this case, that she

9    testified that she saw a woman taking pictures of

10   cars that were for sale. And, in fact, we

11   pointed out these two vehicles, the Grand Prix

12   and the Blazer, that Ms Halbach had earlier, or

13   just within the last month or six weeks had taken

14   photographs of.

15        And, so, when a photo is taken, when it

16   goes into the *Auto Trader*, and when it has to be

17   sold, it makes sense to put those vehicles up in

18   a place where people will see them. People that

19   are coming into the auto salvage business, people

20   that will drive by, as you remember the overall

21   view of this property, that will drive by those

22   vehicles and might naturally get out and take a

23   picture and they might want to buy that kind of

24   vehicle.

25        Now, we have also heard, and I will

83

CHRM006700

1    argue, importantly, that the van that Ms Halbach
2    took a picture of, remained in exactly the same
3    location, remained there from the 31st, when Ms
4    Halbach took the picture, at least through the
5    5th, when the officers took control of the scene.
6           Now, I'm going to argue and you should
7    ask yourself why, you should ask yourself why,
8    what inference can I draw by that.  I will argue
9    that the inference is that Mr. Avery knows that
10   the van is not going in the *Auto Trader Magazine*.
11   Mr. Avery knows that that picture is never going
12   to make it to *Auto Trader*, because he's taken the
13   camera and he's burned it.  He's put it into the
14   burn barrel.
15          There is no reason to move the van from
16   its original location near Mr. Avery's property,
17   up towards where the other cars that are for sale
18   on this property.  Again, has inferences that you
19   can draw, or that you don't have to draw, but,
20   again, I'm arguing that it's something that you
21   may want to consider, again, to reconcile Ms
22   Buchner's testimony, what she had given.
23          Fact number eight, we're able to piece
24   together some of the history of Teresa for the
25   31st.  It's what's called a timeline for Teresa

84

CHRM006701

1    Halbach.  And we were able to do that through all

2    of these particular witnesses.

3         Ms Pliszka, of course, the 8:12 call for

4    Mr. Avery triggers Ms Pliszka's 9:46 voice

5    message call to Teresa.  Remember Ms Pliszka's

6    testimony, again, this is hard, because it's five

7    weeks ago.  Her testimony was, she left the voice

8    mail that there's a person who wants you to come

9    out and do a shoot.  There is a phone number

10   that's been left.

11        You will hear later on in my

12   presentation, that at 11:43, Ms Halbach calls

13   that number.  It's the voice message that we hear

14   to B. Yanda, to Barb Yanda's house saying, I'm

15   able to come out today and to take that -- to

16   take that call.  But it's this 9:46 call, when

17   we're setting the timeline for Teresa, where was

18   she, excuse me, at all these times that become

19   important.

20        The most, probably, important thing that

21   Ms Pliszka talks about is the call at 2:27, the

22   call to Teresa, which is verified through the

23   phone records that she did receive a telephone

24   call at 2:27, from *Auto Trader Magazine*.  That

25   telephone call from Ms Pliszka, to Ms Halbach, is

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 85 of 229   Document 330-18

CHRM006702

1      not so important for talking about

2      trick-or-treating and the things that Dawn

3      Pliszka said that they were talking about, but

4      what came from Teresa's side of that

5      conversation.

6           Remember the testimony from Dawn Pliszka

7      that Teresa said, I'm on my way to the Avery's.

8      All right.  I'm on my way to the Avery's.  So at

9      2:27, this is the best, at least from a timeline

10     standpoint, the best opportunity for you to put

11     these things into place and to determine what

12     time was it that Teresa arrived.

13          Mr. Remiker, an investigator in this

14     case, testified that, upon searching the

15     residence of Barb Yanda, he came across this

16     particular voice mail:  Hello.  This is Teresa

17     with *Auto Trader Magazine*, the photographer.  And

18     I'm just giving you a call to let you know that I

19     can come out there today, in the afternoon.  And

20     it will probably be around 2:00 or, you know, a

21     little later.  If you could, please, give me a

22     call back and let me know if that will work for

23     you, because I don't have your address or

24     anything.  So I can't stop by without getting a

25     call back from you.  And my cellphone is

86

CHRM006703

737-4731. Again, that's Teresa, 920-737-4731. Thank you.

Other than the obvious impact that that call has, it has substantial evidentiary value. That call from Teresa talks about when she's coming out to the property. The call from Teresa says it will be some time after 2:00, or even around 2:30, which turns out to be almost exactly correct.

But she also indicates that, because of the name that was given, because of the number that was called, she doesn't know how to get there because she hasn't been there. Well, that's not true. That's not true, because if Steven Avery would have given his name, Teresa Halbach wouldn't have had to say, I don't know how to get there, or I haven't been out to the property before.

And so the purpose what I argued, or at least what I -- the opening statement that I gave, was that Mr. Avery lured Ms Halbach out to the property, I think is a valid inference for you to draw. But more importantly, it's the timing, more importantly it's when Teresa says through this voice mail message, when it is that

87

CHRM006704

1    she's planning to come to that location.

2        Mr. Schmitz, at 1:30, testified, we put

3    the rest of the timeline together for you.  So at

4    1:30 we know Teresa is out at the Schmitz

5    property.  We know that she's wearing a light

6    colored or a white shirt, a waist length jacket.

7    We know she's wearing jeans.  We know she's there

8    for 10 minutes.  She leaves an *Auto Trader* book

9    and she leaves a receipt.

10        Right after she is done with Mr.

11   Schmitz, she goes to the Zipperer residence,

12   sometime between 2:00 and 2:30.  In fact, you

13   will note from the calls and the testimony later

14   from the cellphone people, that at 2:12 a call is

15   made to the Zipperer residence.  You heard some

16   reference to that.

17        It may have been lost in some of the

18   other testimony, about Teresa being lost and on

19   her way.  But Teresa finds her way there.  And we

20   know that about 2:15 or so, she does her photo

21   shoot at the Zipperer's.  We also -- excuse me --

22   We also know, just like the Schmitz photo shoot,

23   just like every other photo shoot that you have

24   heard testimony about, that it lasts 10 minutes.

25   She leaves an *Auto Trader* book.  She leaves a

                        88

CHRM006705

receipt, which is actually called a bill of sale.
These things are particularly important.

You will see testimony later, or you
will see exhibits later, that were seized from
Mr. Avery on the 5th, that exactly the same *Auto
Trader Magazine* is found on his computer.
Exactly the same kind of bill of sale is found.
So the significance, or the habit, if you will,
of these contacts, become critically important.

Ms Schadrie, again, although providing
some confusing testimony that had to be cleared
up by a Mr. Zimmerman, later, at least provided
the records, at least provided what has been
received as Exhibit No. 361, the cellphone
records for Teresa Halbach.

Ms Schadrie provides some important
parts of this particular record. Specifically,
at 11:43, that was the call to Barb Janda's that
you heard about. The answering machine call that
was made.

You have heard about the call from -- at
2:27, from Ms Pliszka, I'm on my way to the
Avery's. And we have heard about -- or the
records reflect this last call at 2:41.

Now, the testimony, you have to next

89

turn to the testimony of Mr. Zimmerman, Exhibit
No. 372. And although that call starts at 2:41,
it's a voice mail. And on page two of document
372, page two of this exhibit, we learned,
importantly, this incoming call to Teresa is
never retrieved. It's never retrieved by Teresa.
All right.

Look at Teresa, how many times she
checks her voice mail. Mike Halbach talked about
Teresa Halbach being very conscientious about
checking her voice mail. And after, sometime
after her visit, assuming she wasn't harmed or
killed by Mr. Avery, you would have expected her
to check her voice mail.

Mr. Zimmerman also cleared it up and
said that after 2:41, on the 31st, this
particular cellphone, the cellphone of our
victim, Ms Halbach, was out of service. Wasn't
used after that particular point.

Remember the testimony that by 3:30 a
bag of something is being placed in the burn
barrel where this particular phone is later
found. It all starts to make sense now. It all
starts to be put together. Again, the
combination of observations of Blaine Dassey,

90

CHRM006707

combination of phone records, combination of
explanation of voice mails, combination of
testimony from Mike Halbach.

You put all of that together and it
paints the picture for you. It provides the
timeline for you, for Teresa Halbach, not just
what happens to her phone, but by inference, what
happens to her, and when, when it's happening to
her. All right.

We talked more about the timeline and we
heard from Bobby Dassey, again, in the same kind
of a position to be -- his credibility to be
weighed by you, but is an eyewitness. Again, an
eyewitness without any bias. It is a individual
that deserves to be given a lot of credit.
Because sometime between 2:30 and 2:45 he sees
Teresa Halbach. He sees her taking photographs.
He sees her finishing the photo shoot. And he
sees her walking up towards Uncle Steve's
trailer.

Now, we heard about taking a shower.
And we heard about him leaving for hunting. That
all becomes important and becomes more important
when, after leaving for hunting, he sees Teresa's
SUV still parked next to the van, next to his

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 91 of 229   Document 330-18

CHRM006708

1    mom's van that's for sale, but Teresa is nowhere
2    to be found. All right.
3         If this event, if a photo shoot is only
4    supposed to take between five and 10 minutes, and
5    you see the habit, and you see that that's how
6    long that it does take, this is a longer period
7    of time. Teresa, although we don't know, that
8    is, we don't have an eyewitness seeing her going
9    into Mr. Avery's trailer, that's the inference
10   that the State is asking you to draw. She's
11   walking towards the trailer. She's walking
12   towards Mr. Avery's property, after doing the
13   photo shoot.
14        Mr. Dassey is looking out this window, a
15   clear view, sees the pictures being taken of the
16   SUV, a clear pathway, and that as she walks
17   towards Mr. Avery's, that's the last Ms Halbach
18   is seen. That's the last she's seen alive. All
19   right. So that's the timeline. That's the
20   pathway, if you will, towards what happens to Ms
21   Halbach.
22        Now, the State has done the same thing
23   with Mr. Avery's timeline; that is, through
24   conversations and through observations, the same
25   thing with Mr. Avery, from the other side of the

92

CHRM006709

```
 1    coin, if you will, what's Mr. Avery doing on the

 2    31st of October.

 3            We hear, at least, at 8:12, Mr. Avery is

 4    making a call asking for that same female

 5    photographer to come out and visit him at his

 6    property; although, he uses a different -- a

 7    different name.  And from a timing standpoint,

 8    although we don't have Mr. Avery on the phone, we

 9    do have Teresa on the phone.

10            But Ms Dohrwardt helps, from that

11    perspective.  Ms Dohrwardt, who is a witness for

12    Cellcom, Mr. Avery's cell provider, provided you

13    with those records and provided you with

14    testimony of those records.  She's a tech support

15    person.  She's a technical individual who can

16    tell you more about those calls.  Told you about

17    the 8:12 call, but also these two important calls

18    to Teresa Halbach's cellphone, using what's

19    called the *67, or blocked feature, where the

20    recipient of that call can't tell who it is

21    that's calling.

22            The State is calling the 4:35 call a

23    alibi call, if you will.  After her phone is

24    already burned.  After Mr. Avery knows that the

25    phone is out of service, which is reflected in
```

93

CHRM006710

what you saw, not only by Mr. Zimmerman's
testimony, but by also -- by the records there's
no reason to call her phone.  He knows where her
phone is.

Mr. Avery knows where Teresa's phone is,
but Mr. Avery is also -- has the ability to think
ahead, has the ability to know that these phone
records may, in fact, be gleaned, or may, in
fact, be reviewed at some point in the future.
And so, although he doesn't block, because there
is no reason to block the 4:35 call, he still
calls Teresa Halbach.  And you can see, or you
can ask for those records if you need to.

The rest of the application, or putting
together of Mr. Avery's timeline comes from
eyewitnesses, comes from people like Blaine
Dassey, at 3:45, seeing him in the burn barrel
(sic).  You have to skip ahead, I guess, to about
11:00, when he sees that image that I talked
about, where he sees this large fire behind Uncle
Steve's garage.  Again, the date of the fire, the
time of the fire, becomes ever so important.

There shouldn't be any question, at
least, any more, at this time, regarding the
place of the investigation, or the direction of

94

CHRM006711

the investigation.  Blaine certainly adds to
that.

Mr. Fabian provides nothing other than
around at dusk, plastic is being burned and he
sees that.

But Mr. Tadych, who at the time was the
boyfriend, is now the husband, of Barb Janda,
provides testimony that between 7:00 and
7:30, the fire is already going.  Mr. Avery
already has a large fire.  Again, the testimony
was flames above the garage roof, already has a
big fire going at that particular time.

The State will argue and we'll ask you
to adopt the inference, that between 7:30 and
7:45, Teresa Halbach is already killed.  We know
that because Mr. Avery is planning to, or in the
process, after dark, which is between 7:30 and
7:45, of destroying, mutilating and burning her
body.

Fact number 10, although the fire is
included in the aspect of the timeline for
Mr. Avery, I have made Item No. 10 or fact number
10, it's own fact.  These two witnesses, again, I
just wanted to reiterate, from Mr. Tadych, in a
position of where he is parked, remember his

CHRM006712

testimony, that he was parked in the circle drive and could clearly see the fire at the time. And the same thing from Blaine Dassey at 11:00, after he gets back from trick-or-treating, there isn't any obstruction to the view of that particular fire.

Remember the later evidence, as to the amount of time that's necessary to destroy, or to cremate a body. This is going to come later, from some experts in the testimony, or at least when we talk about that later. But at or about 1600 degrees, which actually was the defense expert, Mr. Fairgrieve, when talking about BTUs and 300,000 BTUs per average tire.

That's the amount of heat that's thrown off by a tire. Plenty of fuel, plenty of solid fuel to burn, or incinerate, or cremate a human body, that that would take between an hour and a half and two and a half hours, at that 1600 degree level. If it starts at, the very latest, 7:30 or 7:45, and it's still going at 11:00, that's plenty of time. That's an amount of time, through the timeline, and through the fire, and through a combination of witnesses, for you, the jury, to conclude that, in fact, that body was

96

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 96 of 229   Document 330-18

CHRM006713

1    incinerated, was mutilated, was cremated.  As a

2    way, and for the reason, to hide a crime that had

3    already been committed.  The crime is obvious,

4    it's a crime of homicide.

5         After the burning event, we ask

6    ourselves what's left, what's in the burn area.

7    And we talk now about some highly specialized

8    experts.  We talked about, and we hear from,

9    Mr. Sturdivant, who's an arson investigator who

10   found the zipper, which I guess is important.

11        But more importantly, he found the

12   bones, the small bone fragments intertwined, or

13   mixed in with the steel belt from tires.  All

14   right.  The bones being intertwined and mixed in

15   is the State's, or one of the State's, strongest

16   argument for this being the primary burn site.

17        Mr. Sturdivant also talked about the dog

18   being vicious.  This particular picture, I think

19   it's Exhibit No. 50, is probably all you need to

20   see.  It's all you need to know as to why

21   officers were reluctant to kind of check out and

22   investigate this particular area.

23        This dog, whose name is Bear, we heard,

24   who's a German Shepherd, we heard being described

25   as vicious, who Deputy Kucharski said the only

97

CHRM006714

way they could get by that dog was to destroy or
to kill the dog. Certainly was guarding or had
access to this entire area. Not only does the
testimony prove that, but this particular photo,
before any excavation, before any processing,
which is obvious has been done, has occurred.

Mr. Ertl, we heard, was the first Crime
Lab person with Mr. Sturdivant to get, on the
8th, to that burn area. And, importantly, we
heard about the careful processing, that he did
his best. Although a shovel was used, it wasn't
a, I think the word, the term "scoop and swoop",
wasn't that at all. It was very carefully done
to recover what the agents could at the time in
order to get those items to the Crime Lab, to
determine, first of all, are they human;
secondly, are they female; and, thirdly, do they
belong to our victim.

We need to know those things, obviously,
at the time. And photographs that were shown to
Mr. Ertl, and as you have seen these photographs,
the car seat that was used as additional fuel in
this case. The tires you will see, a hose, and
you will see rakes, and you will see shovels, and
other instrumentalities, what I call, at least,

CHRM006715

are instrumentalities of mutilation, that is,
tending the fire, or without being particularly
insensitive, chopping up the remains of the body
as it's being burned, to make sure that a total
consumption occurs in these cases. You will be
able to see some of those exhibits to show that
that was in fact done.

Mr. Pevytoe, we hear later, DCR -- DCI
agent who, on the 10th, takes over the processing
of the burn area, does a more detailed
examination; here's where we hear the word
excavation, does a couple of things. First of
all, we hear that on the 9th and 10th he talks to
the anthropologist. He talks to Leslie
Eisenberg. He gets some information from Ms
Eisenberg as to the processing of the scene.

Mr. Pevytoe, as you heard, however, also
recalled that the bone fragments were intertwined
with the steel belts and, I believe, rendered
similar opinions as to the primary burn site.
Mr. Pevytoe also eliminates other burn locations.
Mr. Pevytoe's opinion about the smelter and about
the wood burner, whatever that may have had to do
with, on another part of the property, looked in
both, crawled up in, put his hands in, moved

99

CHRM006716

1    things around.  Didn't find any human remains.
2    Didn't find anything at all that would suggest
3    that that was a primary burn area.
4           And so who's involved, of the
5    individuals that law enforcement is supposed to
6    focus on, who's involved in the mutilation
7    process, who's involved in covering up the
8    homicide.  Again, common sense should come into
9    play here, you don't leave that on the steps when
10   you walk into the courtroom.  When the burn area
11   is directly behind Mr. Avery's garage, when it's
12   only a few feet from Mr. Avery's trailer, that's
13   the kind of common sense that you should and can
14   use in this case.  Again, the evidence keeps
15   pointing only to one individual.
16          Additional processing after the fact,
17   that is, after the items are recovered, occur by
18   DCI agents and Ms Eisenberg, the anthropologist,
19   the doctor.  Here is Mr. Heimerl, they find five
20   of the six Daisy Fuentes rivets.
21   Demonstratively, we had these jeans purchased for
22   you so that you can look at where the Daisy
23   Fuentes rivets are located.
24          These are rivets that hold blue jeans,
25   dress type blue jeans that Katie Halbach

                          100

CHRM006717

1    indicated not only was the kind of blue jeans

2    that Ms Halbach owned, but after Ms Halbach's

3    death, remember, weren't there.  They looked for

4    them, those are the pair of jeans, that is, the

5    Daisy Fuentes jeans, are the ones that are gone.

6         So what does that mean, five rivets are

7    found that say Daisy Fuentes on it.  They are

8    mixed in with the human fragments.  The

9    inference, of course, is that those jeans, the

10   clothing of Ms Halbach, are burned at exactly the

11   same time.  There is a picture of Katie.

12        And, again, the credibility that her

13   testimony should be given, I think, is very, very

14   high.  They are sisters.  Katie knows the kind of

15   clothes.  She knew, in fact, made fun of these

16   being old person jeans that her sister had

17   purchased, showed them when she purchased the

18   Daisy Fuentes jeans, would know, and, in fact,

19   was asked to and did look for those jeans, they

20   were missing.

21        We also need to identify the remains.

22   We need to identify who is the person that was

23   burned, who is this individual.  We have heard

24   testimony that it was just one person, that it's

25   only talking about one person.  But we still have

101

CHRM006718

1   to, although, we can guess I suppose, or

2   speculate, that it's Teresa Halbach.  We have to

3   show you, through evidence, that it's Teresa

4   Halbach.

5        We first do that through Dr. Donald

6   Simley.  Mr. Simley, although unwilling because

7   of his scientist nature, make 100 percent match,

8   used these words, it's as close to a positive

9   match as you can get, using one tooth.

10  Dr. Simley talked about tooth No. 31, from Ms

11  Halbach's dentist, Dr. Krupka, having been

12  received.

13       Here's a blow up of that particular

14  tooth.  And here is an x-ray of this particular

15  structure that was recovered from the burn area,

16  the fragmented and delicate, what Dr. Eisenberg

17  talked about were, dental structures.  You can

18  look for yourself as to the similarities,

19  Dr. Simley's used in disaster relief efforts and

20  disaster kind of identifications and I think can

21  help you with that particular process.

22       The charred remains, one piece of bone

23  and tissue was recovered.  One piece.  One piece

24  was not completely burned up, was not completely

25  charred, to the point where a nuclear

102

CHRM006719

identification by Ms Culhane could be made.

And although she made a partial profile, that is, in 7 -- they are called loci -- 7 of the 13 areas that all labs look for to make a positive match, 7 out of 7 match was made. She gave you the frequency number, if you recall, that being one in a billion, that's with a B, that an individual would randomly have this -- this DNA.

So the State believes, and the State argues, that there isn't any question that it is, in fact, Teresa Halbach, and her bones, and her remains, and her teeth, that are recovered just a few feet behind Mr. Avery's garage and trailer.

Leslie Eisenberg, the State argues, is an amazing expert, an amazing person, one of only a handful of Board Certified Forensic Anthropologists in the entire country. She happens to live here in Wisconsin.

Leslie Eisenberg, you heard, was brought on early in the case. And she says a lot about this case and says a lot about what is important. Her expertise, again, she talks about being one of these people that goes to disaster scenes and helps make these identifications.

103

CHRM006720

But she didn't just look at some
pictures or some reports, she was actually
involved in the sifting and the sorting of these
bones.  She was handling these bones.  You could
tell how fragile they were, how very delicate
some of the dental structures was.

She was able to identify these bones as
having come from an adult female, no older than
age 35, believing -- or excuse me, finds these
entrance wounds, that we'll talk about in just a
minute, that happened before the burning episode.

Dr. Eisenberg testified there was a
clear attempt to obscure the identity of an
individual.  By the way, that's evidence, that's
an opinion, that's important to the mutilation
count.  All right.

Obstructing or obscuring the identity
for the purpose of covering up a crime, is the
essence of mutilation of a corpse.  And that was
the testimony of Dr. Eisenberg.

Importantly, though, Dr. Eisenberg,
because she saw all of these bones, because she
was involved for such a long period of time, was
able to render the opinion that the primary burn
area, the primary burn site was behind

104

CHRM006721

Mr. Avery's garage. And, again, talked about, or commented on the great take -- care taken by arson agents in the recovery of these bones.

Dr. Eisenberg goes through the labor intensive method of the recovery of these particles and pieces of bone, puts them together again, as to the face, as to some of the other areas of Ms Halbach and then able, again, with the assistance of Mr. Austin, is able to show you just from where those pieces come, on diagrams, or on skeletons, or on diagrams -- excuse me -- of human skeletons.

What she also tells you, is that every bone, at least a part of every major bone group has been recovered from the burn area, from that which is behind Steven Avery's garage. And that's this exhibit up on -- up on the right. All of those bones, or at least portions of everyone of those bones identified, comes from Mr. Avery's burn area. We hear about the -- what she calls defects or damage to an area, just above Ms Halbach's left ear, to that just behind and to the left of Ms Halbach's skull as well.

Judge, I will have to alert you that I do probably have perhaps a half an hour or so of

105

CHRM006722

my closing left to give. I know that we got a
late start. I know that lunch was being brought
at this time. I'm happy to give it afterwards, I
don't have any problem with that, but I wanted to
give the Court at least an opportunity --

THE COURT: All right. I don't want it to
go too long, after all, it is supposed to be lunch
and I think we're going to keep it that way.

So, members of the jury, we're going to
take a break at this time. We'll resume at 1:30.
We're going to take a little shorter than normal
lunch break. We'll come back, have the State
finish its closing argument and then hear from
the defense.

Again, I will remind you, the case is
not over, do not begin discussing the case at
this time. You are excused.

(Jury not present.)

THE COURT: You may be seated. Counsel,
let's prepare to resume promptly, then, at 1:30
because I don't want to keep the jury too late with
closing argument.

ATTORNEY BUTING: Judge, just so you know,
after Mr. Kratz finishes, I'm going to need a little
bit of time to set up some exhibits.

106

CHRM006723

```
 1            THE COURT:  I'm sure you will, and you will

 2       get it.

 3            ATTORNEY BUTING:  All right.

 4                (Noon recess taken.)

 5                (Jury present.)

 6            THE COURT:  And, Mr. Kratz, at this time

 7       you may resume.

 8            ATTORNEY KRATZ:  Thank you, Judge.  Is the

 9       volume okay with the Court; I assume it's okay.

10            We're going to break one rule today

11       never give an important speech after lunch it's a

12       difficult thing to do.  I will try to get through

13       the rest of my closing in a manner that makes the

14       most sense.  And I beg your indulgence as to how

15       important this is, to allow me to talk about our

16       remaining several facts.

17            Dr. Eisenberg, just to review our

18       transition, talked about two gunshot wounds to

19       the head of Teresa Halbach.  Remember her

20       testimony, that it was before burning, that this

21       was a pre-burning event, gunshot events.  She

22       knows exactly where.  That speaks to

23       Dr. Eisenberg's quality, as far as an

24       anthropologist, forensic anthropologist, at that,

25       and to something I think that you should give,
```

                              107

CHRM006724

obviously, great weight to. Our next important
fact, what I believe, although Dr. Eisenberg was
a extremely important witness, may well be the
State's most important scientific evidence.

And that's the DNA part of the case.
Sherry Culhane from the Crime Lab was the State's
DNA expert. And you learned what DNA was. You
learned that it was a genetic fingerprint and,
importantly, you learned that it is in every
fluid in our bodies, in every tissue in our
bodies.

And it's the same, that is, it never
changes. Never changes, not only throughout our
body, but never changes throughout our lives and
so DNA is stubborn as well. I talked about the
fact that it's stubborn; DNA is stubborn in that
sense in that it doesn't change.

Sherry Culhane, the Crime Lab analyst, a
great deal was said about her. And, again, you
are going to have to weigh the credibility of Ms
Culhane. Either Ms Culhane doesn't know what
she's talking about, or Ms Culhane is a very
talented scientist, very talented DNA expert.

Ms Culhane, I will remind you her
testimony, was in 2003, the analyst that tested

108

CHRM006725

```
 1    the single sample, the single hair that
 2    exonerated Mr. Avery.  That Ms Culhane's talent
 3    in examining one hair was able, quite properly
 4    to, through DNA evidence, because it's so
 5    stubborn, because it's so reliable, was able to,
 6    this woman was able to have Mr. Avery released,
 7    with the other parts of that case as well.  But
 8    the analyst was, in fact, Ms Culhane.
 9            She testified in this case, however,
10    that she received samples, that it was the most
11    samples ever sent to the Crime Lab for analysis.
12    It was the most DNA requests, 180, ever made to a
13    single analyst, on a single case.
14            And despite their backlog, you heard how
15    Ms analyst -- excuse me, how Ms Culhane set aside
16    her other work and got results, quality results,
17    to the State, to the investigators, in a time
18    when it mattered; in a time when the officers
19    needed to know whose DNA matched; whether we're
20    talking about female blood or male blood; and in
21    a time when Mr. Fassbender and Mr. Wiegert could
22    refocus or direct their investigation.  That's
23    important.
24            It's important in a case like this and,
25    actually, it's reassuring to know that our Crime
```

109

CHRM006726

Lab, our Wisconsin Crime Lab, we can take pride
in. We can take pride in the fact that such an
important case and an important investigative
responsibility and need was met, by Ms Culhane.

Again, she processed the vehicle,
starting on the 7th, developed DNA profiles, as
you heard on, not all 180 samples, I don't mean
to mislead at all. But she received 180 and
developed many, many, many profiles, all the
exemplars, all of the evidence samples in this
case, and then compared the profiles of the
evidence samples to what are called known
samples, or exemplars. We're going to go through
her findings because they are so critically
important in this case and, again, the State will
argue that this is a very talented lab analyst.

Again, she's the head of the unit.
She's the head of the DNA Unit for the Wisconsin
Crime Lab in Madison. Her experience should
speak for itself and, certainly, the quality work
that she had done within human boundaries should
speak as well.

We first start with Teresa, start with
Teresa Halbach's DNA. And what we start with is
a known sample, her Pap smear. You heard about,

110

CHRM006727

at Bellin Health, that Ms Halbach, a couple years
ago, had a Pap smear done and that was used as
the standard they need because we don't have a
live person to take a cheek, or a buccal swab
from, or even a blood sample from. We need
something that we know is Teresa Halbach. And
the best sample, you heard, was this Pap smear
and this analysis and profile is developed.

All of these different markers, as you
heard, are different places on a strand of DNA
that analysts are trained to look. And they, in
fact, do look for and assign values, or actually
the machine that's used assigns values at each of
those places. And what's important, and what you
heard Mr. Gahn ask Ms Culhane to explain for you,
as best that we can understand, is that all of
these different locations, there are a whole
bunch of different profiles that are possible.
You heard, at least some examples of, at the
D3S13 location, you know, how many variations.
This is a 16/18 profile, but how many
possibilities are there.

And I'm not going to reiterate all of
that testimony because you took good notes about
that, I'm sure. But what's important is that

111

CHRM006728

each of these is different. They are unique to

an individual, or at least this entire profile is

unique to an individual. In other words, there's

one, absent identical twins, which didn't come up

in this case and isn't part of this case, I add

that just out of intellectual integrity, but

other than identical twins, no two people share

the same DNA profile.

No two people, not brothers, not son and

daughter, nobody shares the same nuclear DNA

profile. And that's why it's so important.

That's why it is so discriminating, as far as who

does this belong to. You can take known samples,

then, and you can test them about -- or with

evidence samples. All right.

So the evidence samples of, in this

case, Exhibit A, those are all of the different

evidence samples, including the swabs that were

taken from the back of the RAV4, the back

tailgate, and the actual door itself that

Mr. Stahlke talked about the flying blood, the

blood spatter analysis, the saliva or the swab

taken from the Pepsi can. That's all evidence

that Ms Culhane developed and, again, compared to

this known -- excuse me, this known sample.

112

CHRM006729

And so all of those blood samples, and A-14 is the Pepsi can, they all developed exactly the same. It's called a full profile, this isn't the seven out of seven partial profile. At all 15 different locations a pattern, a analysis, is developed for these unknown -- these unknown samples.

And as Ms Culhane talked about, for all the different bloodstains and Pepsi can, she was able to compare, as you can, the results from the RAV4 samples, to the known Pap smear, to Teresa Halbach. And it is a perfect match, 15 out of 15 exactly, exactly a perfect match.

The blood or bullet fragment, which is recovered on the 2nd, same thing is done with that, you heard about the extraction process of having to wash the DNA off of the bullet, but it was able to provide a profile by which a match can be made, or an attempted match can be made.

Remember that bullet that was found by Mr. Heimerl, later processed and later developed. And Ms Culhane, then, is able to make that comparison. And although the item has, in two separate locations, one of the values or the spikes, it is not at all inconsistent with the

113

CHRM006730

results. And so Ms Culhane says that is
insignificant as far as -- as the match.

Now, as you have heard, there is, not in
the bullet, not in the bullet extract itself, not
in the evidence, but in a control sample, in a --
what I understand to be a tube of some solution,
water, some saline, something, that's supposed to
have nothing on it, Ms Culhane's own DNA shows up
on that particular run, on that particular
sample. And she called that, quite
appropriately, contamination.

And that's a hard word for jurors, I
believe, at least I argue, to understand. But as
Mr. Gahn and Ms Culhane talked about
contamination, that that's expected, especially
in cases with this kind of volume. It's happened
89 separate times, unfortunately. This is one of
the cases that it happened.

But because it wasn't on the bullet,
because it wasn't on the piece of evidence
itself, Ms Culhane testified, and you can believe
her or not, but this expert witness testified
that it does nothing for the comparison purposes.
It does nothing to diminish whether or not Teresa
Halbach's DNA is on that bullet.

114

CHRM006731

1          And stated another way, the fact that

2    Sherry's DNA is on some water or some control

3    somewhere should not, and in fact in this case,

4    did not, keep from you, the jurors, the fact

5    finders in the case, whether or not Teresa

6    Halbach's DNA is on the bullet.  All right.

7          That's important evidence.  You would

8    want to know that.  You would want to know

9    whether or not Teresa Halbach's DNA is on this

10   bullet, this bullet that's found in the garage,

11   in Steven Avery's garage, is Teresa's DNA.

12         And as Ms Culhane said, there isn't

13   anything that can change one person's DNA into

14   another.  There is no process, there is no

15   trickery, there's nothing that can go on that can

16   convert, if you will, somebody else's, in this

17   case Sherry's, DNA, into Teresa's.  Teresa's DNA

18   is on the bullet.

19         It is your decision and your duty to

20   decide how much, how little, weight, to give to

21   the contamination on the control sample, again, a

22   sample that has nothing to do with this

23   particular bullet.  Again, another match.

24         And the frequency, and what we're

25   talking about with all of these matches, and not

                            115

CHRM006732

```
 1      just these, but also the seven out of seven that

 2      we talked about before, although one in a

 3      billion, the frequency of all of these blood and

 4      saliva matches for our victim, for Teresa, is you

 5      would expect to find that DNA profile that we

 6      just saw, at random, one time in every 416

 7      quadrillion times in the Caucasian population.

 8              Well, that's a number that's so big that

 9      many of us, most of us, don't really have a good

10      concept about.  It's a lot, it's a lot of zeros.

11      Okay.  And it is a number that you can call that

12      an exact match.  All right.  An exact match.

13              When we talked about 6 billion people or

14      so in the world, 6 billion only, and this is a

15      quadrillion, lots and lots more.  We're going to

16      talk about quintillions next.  But we're talking

17      about such big numbers that it is absolutely --

18      has no impact on the results.

19              But more than that, what does this mean?

20      What does -- what does finding Teresa Halbach's

21      DNA mean, in this case?  And where was it found?

22      Because DNA can't change, because DNA is so

23      stubborn, because DNA is what DNA is, I told you

24      at the opening statement, that I'm going to

25      reiterate now, that Teresa Halbach cries out to
```

116

CHRM006733

1    you, the jurors, at this case.  And it tells you
2    to listen and to look.

3         Teresa Halbach, by her DNA and where
4    it's found, is telling you a story.  She's
5    telling you, this is where I was.  She's telling
6    you, this is what happened to me.  She's telling
7    you, this is how I was killed.  She's telling
8    you, this is how this person tried to hide me and
9    where they tried to hide me.

10        And it's the kind of evidence, it's the
11   kind of powerful evidence that you can't ignore.
12   I told you at the opening statement and I'm
13   telling you now, that Teresa Halbach left this
14   evidence for you to see, and left this evidence
15   for you to hear, to hear about this evidence.
16   And I simply hope that this evidence has that
17   impact, that you can see where she was; you can
18   see where her body was placed; you can see how
19   she was killed, in this case; not through
20   speculation, not through guesswork, but by
21   scientific evidence.

22        Mr. Avery's DNA is also collected.  And
23   the stubbornness about DNA applies to Mr. Avery's
24   DNA, just like it does to a victim of a crime.
25   Blood that's left behind, in this case, is

117

CHRM006734

1    evidence; it's evidence against Mr. Avery.  It's

2    important evidence, very, very important evidence

3    because DNA doesn't forget.

4              DNA kinds of evidence can't be confused,

5    it can't be tricked on cross-examination.  DNA

6    evidence is what it is.  And only through human

7    failure, failure to collect it properly, or

8    failure to analyze it properly, or failure on my

9    part to explain it properly to the jury, is the

10   limitation of DNA evidence.

11             Because the DNA evidence in this case is

12   incredibly powerful.  You heard testimony that

13   Mr. Avery had a cut to his hand.  Had a cut to

14   the outside of his right hand, what we're calling

15   the source of Mr. Avery's blood.  This is how

16   Mr. Avery leaves those six different blood

17   samples within the SUV.

18             And from a prosecutor's standpoint, it's

19   fortunate to have that kind of evidence.  It's

20   fortunate to be able to stand up here and tell a

21   story, to be able to tell you that story from

22   Steven Avery.  Because just like the victim, just

23   like Ms Halbach's DNA telling you, here is where

24   I was, and here's what happened to me, and here's

25   how I was killed, Mr. Avery's blood tells a story

                            118

CHRM006735

as well.

Now, we don't have the same kind of standards used for Mr. Avery. We have what's called a buccal swab, a cheek -- kind of a Q-tip that's placed in his cheek. By the way, this is the same kind of test Ms Culhane said was used in Mr. Avery's exoneration, a buccal swab. You saw that they were still sealed in the Manitowoc County Sheriff's Department, after they were used, analyzed and sent back.

But the Crime Lab never had Mr. Avery's blood sample, it was all used through, as you hear it is now days, through buccal swabs, through standards. And the standard for Mr. Avery, just like for Ms Halbach, is developed at all 15 of these different locations that are called loci, for Mr. Avery.

So what Ms Halbach (sic) does, then, is she does test samples of different swabs, or different swatches, or different things that there are to analyze. She develops DNA profiles for the hood latch. And you are able to see, then, that the -- although not blood, no visible blood available, you heard about from handling a hood latch or a piece of metal, that depending

119

CHRM006736

how much your hands sweat, skin cells and other
manners of DNA can be transferred onto a hood
latch.

Well, it was, in this case. On this
hood latch, Mr. Avery's DNA, on the Teresa
Halbach SUV. Reaching underneath the hood, is
Mr. Avery's DNA; an exact, perfect profile of
Mr. Avery's DNA, that does not include, at least
visibly, his blood.

Well, the same kind of analysis is done
on this Toyota key. And you will see the
analysis, the Toyota key, the evidence is
analyzed. And you will see that right down the
line, all 15 places, it's a perfect match for
that of Steven Avery. And, again, you heard that
by handling a key and, importantly, the last
person to handle the key is the most likely
source of the DNA that's going to be found on
that particular piece of evidence.

That was the testimony, that was the
testimony in this case. Mr. Avery was the last
person to handle this key. This key is the key
for Teresa Halbach's vehicle. This key, found in
Mr. Avery's bedroom, has a full, a complete, a 15
out of 15 match for Mr. Avery's DNA. That is

120

CHRM006737

significant evidence.

We then talk about the blood and the other stains that are found within the SUV. The other five places in the front part: The driver's seat; front console; the ignition area; which is perhaps the most damning of all of the DNA that's found; passenger seat; and the CD case.

Now, each of these locations, Ms Culhane is able to develop a profile on, a full 15 out of 15 profile, on these bloodstains. So these aren't small bloodstains. These aren't one microliter as you heard later in the trial about. These are large bloodstains, a drop, as you heard, one droplet of blood is 50 microliters. And so these stains, although we do have a one droplet stain of Teresa's, all of these stains are much, much larger than that.

So, in the front, that is, from the front seats forward, five different bloodstains left by Mr. Avery in Teresa Halbach's vehicle. Again, we're pointing to one person being responsible for Ms Halbach's death.

In the rear, that is, on the rear passenger door, that bloodstain is left. And we

121

CHRM006738

hear that it is, in fact, Steven Avery's; again,
a perfect match for Steven Avery.

Now, each stain, Ms Culhane testified,
she's able to develop a frequency. Again, how
likely is it in the Caucasian population that you
would find, randomly, that exact DNA profile.
And she said one in four quintillion. Okay.

This is a number that is absolutely
huge. People can't even really picture how much
a billion is, finding a billion, one thing in a
billion. Finding one thing in a billion is -- is
hard enough, but I'm going to take 45 seconds and
I'm going to tell you what a billion is. All
right.

To get to a billion, you first have to
know what one out of a hundred is. Pick up 1
white marble and think of 99 black marbles. Can
you picture that? You put them together, and if
you randomly drew the one white marble out, it
would be one out of a hundred. Well, if you take
five times that, you're 1 out of 500, 1 white
marble in 5 -- 499, 500, if you will, black
marbles.

Would be like a shovelful or a coal
shovelful of marbles and you kind of throw them

122

CHRM006739

1     out onto the floor.  One of them is going to be
2     white and the other 500 are going to be black.
3     And that's 1 out of 500 black marbles.  Okay.
4     You can kind of picture 1 out of 500.
5          A billion is such a big number, that if
6     every day, let's say you had a reservoir of black
7     marbles and you had one white marble in there.
8     All right.  And every hour, every hour, of every
9     day, you took your coal shovel and you got out
10    500 marbles and you threw them onto the floor and
11    you said, is there a white marble there.  To
12    randomly look for that match.  And you don't see
13    it.
14         And then the next hour comes and you do
15    the same thing.  Every hour of every day.  Let's
16    say that you had the time to do that and you had
17    a big enough reservoir, here's how big a billion
18    is.  To find one white marble out of a billion,
19    you would have to do this 500 marble exercise
20    every hour, of every day.  And you would expect,
21    at random, you would expect, at random, to find
22    that white marble -- are you ready for this --
23    right about the time that Thomas Jefferson was
24    signing the Declaration of Independence.  If you
25    did it every hour, of every day, 500 marbles

                          123

CHRM006740

```
 1          each, that's how often you would have to go to
 2          get to a billion, to get to one out of a billion,
 3          one white marble out of a billion black marbles.
 4                  That's a partial profile that we're
 5          talking about.  That's the numbers that we're
 6          talking about, you need to visualize something.
 7          Well, four quintillion, four quintillion, a
 8          quintillion -- I hope you get this -- a
 9          quintillion is a million billion, it's a million
10          times more than what I just talked about.  A
11          million times you would have to do that with the
12          black marbles going back to the time of the late
13          1700s.  So one in four quintillion, I need you to
14          appreciate the size that we're talking about, the
15          frequency that we're talking about here.  All
16          right.
17                  So when Sherry Culhane talks about when
18          we randomly see that same profile, one out of
19          four quintillion times, I hope that at least is a
20          way, something that you can visualize, as to how
21          big of a number that we're talking about.
22                  That leads me to beyond a reasonable
23          doubt.  Beyond a reasonable doubt is what do we,
24          the State of Wisconsin, have the obligation to
25          prove in this case.  The judge has already
```

124

CHRM006741

instructed you that a reasonable doubt is a doubt
for which a reason can be given, from a fair and
rational consideration of the evidence.

That means, a fair and rational
consideration of all of the evidence. Not just
some of it, but considering all of the evidence,
do we have a reasonable doubt in this case.
Doesn't mean beyond all doubt, in other words,
from a percentage standpoint, doesn't mean a
hundred percent, because the human system that we
have, it's a human justice system. My burden,
which I fully accept, in proving the defendant
guilty, beyond a reasonable doubt, is something
that I think, clearly, all of the evidence points
to in the case.

I told you at the beginning of the case
that there were agencies that were involved.
Mr. Fassbender talked about DCI and Calumet
County Sheriff's Department and Manitowoc County
Sheriff's Department and Manitowoc Police
Department, Marinette County, and Two Rivers
Police Department, New Holstein Police
Department, Brillion Police Department, Kiel
Police Department, Manitowoc Sheriff, and FBI,
and State Patrol, and all the volunteer

CHRM006742

```
 1        firefighters and everybody else pitched in in

 2        this case, who did their professional job to find

 3        out what happened to Teresa Halbach.

 4              Law enforcement looked at the

 5        possibilities, looked at all of the possibilities

 6        that were presented to them, submitted results.

 7        They didn't know what the results were going to

 8        be.  They didn't know the evidence was going to

 9        come back to Steven Avery, but it did.

10              They didn't know that the bones were

11        going to come back as matching Teresa Halbach's

12        DNA, but it did.  And so when they submit

13        evidence, again, they are not looking for a

14        particular answer, they are just seeing where the

15        answers come.  And in this case, as I mentioned,

16        it's all been directed towards one person.

17              This 25 year old person that I called an

18        amazing young lady, this 25 year old lady was

19        murdered.  That's real.  All right.  That's real

20        for family, and it's real for friends, and it's

21        real for Teresa Halbach.  And I'm able to argue

22        to you what that means.

23              I'm able to argue to you that that means

24        that Teresa Halbach's dreams, and that her

25        potential and her future aspirations were snuffed
```

126

CHRM006743

out by one act, and by one act from one person;
her chance to be loved and her chance to love,
and -- on the 31st of October.

Tom Pearce described this young woman as
somebody that he saw great potential in. I think
he said the words that she was really going to be
someone. I think there's a lot of people in this
room who might argue that she already was
someone. She already was someone that was very
accomplished and somebody that obviously is very
missed.

And that brings me to my last fact,
brings me to fact number 13, how was Teresa
Halbach killed. The manner and cause of death
was provided to you by three witnesses.
Dr. Eisenberg, Mr. Olson, and Dr. Jentzen. And
they all are in concert, they all agree, with how
this 25 year old woman was killed.

Dr. Eisenberg testified about those
cranial fragments showing entrance defects,
again, suggesting gunshot wounds to the parietal
and the occipital reason -- regions. The
beveling was prior to the burning. The manner of
death she described as homicidal violence. I
think Dr. Eisenberg, in her own anthropological

127

CHRM006744

way, explained to all of you, well, she didn't
just jump into the fire, it was homicidal
violence that caused her death.

Dr. Eisenberg was able to show you and
tell you, through photographs, that the -- this
particular bone piece, we wouldn't know it was
right above the left ear, but this is a piece of
the parietal bone that's right above the left
ear, that shows the characteristic sign of an
entrance bullet wound. And this particular
defect that is shown, again, that we wouldn't
know, is the occipital region of the skull, that
Teresa was also shot in the back of the head with
a .22 caliber gun.

Mr. Olson, our trace metals expert,
talks about instrumentality. That is, what are
these defects caused by. And Mr. Olson,
importantly, talked about lead deposits, talked
about bullets, and bullets having 99 percent
lead, but was able to show you x-rays of these
defects that we talked about, the x-rays of the
parietal region, where these things that light up
are actually particles of lead, which are
characteristic of a bullet, a bullet entering the
skull of an individual. And there's many more of

128

CHRM006745

them, actually, back in the occipital area, many more of these lead particles that he -- the elemental analysis, and found, in fact, that these were lead.

And, finally, Dr. Jeffrey Jentzen, an expert, perhaps the expert, in the State of Wisconsin, the medical examiner for Milwaukee County Wisconsin, hundreds of gunshot wounds he reviews. He was asked by Mr. Gahn to review this case and see if he could render an opinion as to both the manner and the cause of death.

Dr. Jentzen didn't have any question at all about either one, that there was a gunshot wound to the parietal region, agreeing with Dr. Eisenberg it was a gunshot wound to the back of the head. Manner of death is homicide. Cause of death is gunshot.

There's three charges that you are going to need to consider in this case: Homicide, first-degree intentional homicide; mutilation of a corpse; and the felon in possession. And it's the State's obligation to prove to you several things with those. They are called elements, but what we really have to prove is what, and when, and how, and, finally, who.

129

CHRM006746

What is clear, that a homicide and
mutilation occurred. When, the 31st of October,
sometime after 2:45 p.m., when Ms Halbach makes
contact at the Avery salvage property. How, the
doctors and the trace metals and other experts
tell you, by gunshot.

And, so, when it comes down to the role
of the jury, when it comes down to you as the
trier of fact, searching for the truth, not
speculating, not searching for doubt, but
searching for the truth, it's that last answer.
It's the who, that you have to decide.

And you have got to decide whether or
not the State has satisfied you, beyond a
reasonable doubt, who killed Teresa Halbach.
Again, based upon the facts, based upon the
evidence, not based upon speculation.

I told you when I first stood up before
you this morning, there was no question, no
question at least from the State's perspective,
who was responsible. And despite having been
here for five weeks, I'm hopeful at this time
that you are able to agree with the State of
Wisconsin that all of the evidence, all of the
evidence, points to only one person. All the

130

CHRM006747

circumstantial evidence, all the scientific
evidence, all the direct evidence, points to one
individual.

The law enforcement officers have done
their duty. All of the citizen searchers and
citizens that helped have done theirs. The
prosecution team, I believe, has set forth a very
methodical, very compelling case. And so we're
finally asking you, the citizens -- the jurors in
this case, the citizens of Manitowoc County, to
return verdicts of guilty, as it is your duty to
do so.

That's all I have, Judge, thank you.

THE COURT: Members of the jury, we're
going to take a 10 minute break at this time to give
the defense a chance to get ready for its closing
argument. Again, do not begin your deliberations at
this time. We'll call you back in as soon as we're
ready. I anticipate it being about 10 minutes.

(Jury not present.)

THE COURT: You may be seated.

ATTORNEY BUTING: Maybe a little bit longer
than 10 minutes, I have to get these exhibits
together.

THE COURT: All right. I will come back at

131

CHRM006748

1    2:25 and see how you are doing.

2             (Recess taken.)

3             (Jury present.)

4        THE COURT:  Mr. Buting, at this time you

5    may begin the defense closing.

6        ATTORNEY BUTING:  Thank you, Judge.  Good

7    afternoon, ladies and gentlemen.  This is the first

8    time I have actually had a chance to talk to you.  I

9    have sort of been talking at you as we walk by the

10    witnesses for 6, 5 weeks, whatever.  And I'm

11    really -- I feel honored and privileged to do so,

12    just as I am honored and privileged to defend

13    Mr. Steven Avery here, in this very, very serious

14    case.

15        Let me make one thing very clear, right

16    here at the outset.  We do not and have never

17    claimed that the police killed Teresa Halbach.

18    But in that respect they have that in common with

19    Steven Avery.  However, the person or persons who

20    did kill Teresa, knew exactly who the police

21    would really want to blame for this crime.

22        And they were aided in that respect, by

23    widespread media publicity as early as Friday

24    morning, November 4th, the very morning after the

25    day she was first reported.  Widespread publicity

132

CHRM006749

1    that identified Mr. Steven Avery as one of the

2    last people known to have seen her.  And because

3    of who he is, that drew even more media attention

4    than perhaps it might other wise have.  And the

5    focus was on Mr. Avery, rather than one of the

6    other customers that she saw that day.

7           And this was the very same Steven Avery

8    who was suing the Manitowoc County and the

9    Sheriff's Department, with a lawsuit asking for a

10   whole lot of money, for the wrongful conviction

11   and all the years in prison that he spent, from a

12   1985 wrongful conviction.

13          I believe that when the Manitowoc

14   officers saw this, they very badly wanted to

15   believe that he was guilty and that this was

16   their way out.  And that from that point forward,

17   that they had this investigative bias, focused on

18   Steven Avery, that was, then, skillfully

19   exploited by the real perpetrator of this crime.

20          Now, from the very beginning, Steven

21   Avery has proclaimed his innocence in this case.

22   He told that -- everybody that had a camera,

23   anybody who talked to him, that he was not

24   guilty, and that he was being framed.  That the

25   police planted his blood.

133

CHRM006750

1          And I want you to think for just a
2     moment how difficult a situation you would be in
3     if that had occurred to you.  How, after all of
4     this evidence comes out, and police, who better
5     than anyone else would know how to plant
6     evidence, how you would get back the presumption
7     of innocence.  How do you go about trying to get
8     the community, and ultimately a jury such as you,
9     to believe in our system of justice, to believe
10    that in America you are presumed innocent, unless
11    the State, which has the entire burden of proof,
12    can prove you guilty, beyond a reasonable doubt.
13         What would you do?  Remember, this
14    morning and five weeks ago, you promised that you
15    would do that, despite all of the pre-trial
16    publicity you may have been exposed to and may or
17    may not have retained.  You promised each of us
18    and the Court, and the Judge instructed you
19    today, that you must presume Mr. Avery innocent,
20    and that you must hold the State to the burden of
21    proof, beyond a reasonable doubt.  We will talk a
22    little bit more about that later, but I want you
23    to keep that in mind.  Because as you go through
24    this evidence, you have to apply that, because
25    that is your sworn duty.

                            134

CHRM006751

Now, we have offered a theory of
defense.  And that's what it is, it's a theory.
Because if someone frames you, you are obviously
not there to see how, exactly, it happened;
where, how, when, the kinds of things that
Mr. Kratz is going to argue we haven't presented.
There is no videotape showing how this was done.
There's no cop who, in a *Perry Mason* moment,
breaks down on the witness stand and says, yes, I
did it, I did it, you got me.  This is real life,
that doesn't happen.

You are entitled to reasonable
inferences, however, and we're entitled to the
inferences that can be drawn from circumstantial
evidence, just as much as they are.  And so you
ask yourself, what would it look like, what would
it look like, what would a case look like if
somebody was being framed.

And we're going to do that for a little
bit now.  And I think when you do, you are going
to see that it would look a lot like this case.
You would look first and you would see, well,
what about the lack of evidence, in areas that
you would expect there to be evidence.  And,
then, you would look at the areas where there

135

CHRM006752

1  appears to be evidence linking the person to the

2  crime and ask yourself why does all of that

3  evidence appear suspicious or unreliable.

4  And we're going to go back and forth on

5  that a little bit, but those are the two main

6  areas I want to talk about first. Evidence

7  that's not there, that should be. And evidence

8  that is there that appears suspicious or

9  unexplained. And let me turn to that first.

10  In fact, let me turn to what probably

11  is, at least on its face, the most damning piece

12  of evidence in this case, and that is, Teresa

13  Halbach's remains, found in the burn pit, outside

14  Mr. Avery's garage, trailer, whatever.

15  We'll look at the -- what the evidence

16  shows first. We know that not all of her remains

17  have ever been found. I believe Dr. Eisenberg

18  said only 40 percent of her skeletal remains.

19  We're not talking the rest, obviously, that you

20  would expect might be gone, but skeletal remains,

21  only 40 percent. Not because the other 60

22  percent gets burned up. No expert has ever came

23  into this court and said fire would consume bone

24  completely.

25  What fire does, according to these

136

CHRM006753

experts, is it goes through these phases of charred to ultimately calcined -- calcinated, I believe the word was. Sixty percent of it is missing. All right. That's -- That's peculiar to begin with. But, then --

Well, before I move off that, there's something else that's missing and that is, Mr. Kratz points out, well, the jeans, we found these rivets in this pair of jeans here. But they only found five of six, assuming that these are the same jeans, and these are just a representative example. But what did they not find, the biggest item of all, the button that closes the waist.

They have got magnets they are using through all this dirt. They are the sifting through every thing and they don't find this button anywhere. They don't find her house keys anywhere, her work keys anywhere. They find one single key, which we'll certainly talk about.

But most importantly, all the experts agree, these bones were moved. And I have got to tell you, we have been here, now, for five weeks and we have still not heard any explanation from this side about how that happens.

137

CHRM006754

In fact, we haven't heard any
explanation about a lot of things.  We have heard
manner and cause of death, but that's not really
how Teresa Halbach was killed, or even where
Teresa Halbach was killed.

Unfortunately, from my standpoint on
this point anyway, the State gets to go last.
This is called sandbagging.  This is where we
don't get to respond to the theory or the
argument that they have been harboring all this
time and haven't told you folks either.  So they
are going to get up here after Mr. Strang and I
are done and they are going to say, hey, this is
the explanation, take our word for it.  And we
don't -- of course, don't have a chance to
respond.

Well, I'm going to trust that between
the 12 of you, ultimately 12, you will be able to
answer those questions that they raise.  You will
be able to pick apart, as well as I can, whatever
theory they come up with, because we have not
heard any yet.

The bones were moved.  The question is,
were they moved to Mr. Avery's burn pit, or were
they moved from Mr. Avery's burn pit.  The State

138

CHRM006755

would have you believe that the original site of
burning was the burn pit, behind his garage. But
they have offered no explanation for why bones,
human bones, would be found in the Janda burn
barrel, some 150 feet, or whatever it is, away,
in the other yard.

And Dr. Eisenberg told you -- By the
way -- I can't believe I forgot this -- there's a
third site. There's actually three different
sites where human, or possible suspected human
bones were found. Clearly identified human bones
were found in the burn pit. And clearly
undisputed human bones were found in the burn
barrel.

But there's also this mysterious quarry
site, a quarter mile or so away that -- You will
have to forgive me, but I'm not as
technologically savvy as Mr. Kratz, and so we're
going to be using the ELMO instead of a laptop.
But this is -- this is the map that was shown to
you. This is the diagram that was created by
Mr. Austin, with the assistance of Dr. Eisenberg.

This flag down here, is the third site,
where pelvic bones were found, according to
Dr. Eisenberg. They were sent to the FBI to do

139

CHRM006756

1    mito-typing (phonetic).  We did a stipulation
2    that nothing could be determined from them.  But
3    what she said was, all three locations where
4    bones were found, or possible human bones in the
5    case of the quarry, were all burned to the same
6    degree, same amount of calcination.
7              So there is a similarity here that
8    continues forward through all of them.  And, very
9    important, no evidence of more than one body.  I
10   don't even know if there are other bodies missing
11   in Manitowoc County, or people missing, but in
12   this instance, Dr. Eisenberg concluded, and
13   Dr. Fairgrieve agreed, no evidence of more than
14   one body.  So we have got these bones in three
15   different locations.
16             Now, curiously, you have never seen a
17   photograph of what this site looks like, or what
18   the bones looked like, and neither have I.  And
19   neither has, I assume, any of the prosecution
20   team because, for some curious reason, no
21   photographs were taken of that site.
22             The method of recovery in this case was
23   not skillfully done, as Mr. Kratz tried to argue,
24   by these experienced arson experts.  This
25   investigation needed a forensic anthropologist to

                            140

CHRM006757

1    be called to that scene, before anything was
2    touched.  And Dr. Fairgrieve explained why.
3            Dr. Eisenberg admitted that by the time
4    she got the bones, she was unable to determine
5    some important information about its location,
6    how it was sited.  And not only was nobody called
7    to the scene, but no photographs.
8            Have you seen one photograph of any of
9    those bones in the burn pit, in this location,
10   before it's picked up?  One photograph?  No, you
11   see boxes of bones, tables where they are thrown
12   out.  You don't see them in their site.  And
13   Dr. Fairgrieve explained to you why that's
14   important, especially important, if you're going
15   to try and answer the question of, was that the
16   burn site.
17           Dr. Fairgrieve is probably the expert in
18   the world, or at least in this North America, on
19   the forensic identification and interpretation of
20   cremains, much more experienced than
21   Dr. Eisenberg in this area.  I don't have a
22   problem with Dr. Eisenberg; she's a fine person,
23   and a fine anthropologist.
24           But Dr. Fairgrieve has much more
25   experience in the field, dealing with cremains.

141

CHRM006758

1    He's written a book that's coming out soon. He's
2    worked for the Crown all of his life. This is
3    the first case he's ever testified for the
4    defense. So this is not some paid defense expert
5    that we have just brought in here to try and --
6    try and do a smoke screen or something.

7          This is a world renown expert. And what
8    he says is, he's had a lot of cases, or he's been
9    called in and that very question has been
10   presented, the bones were moved, where is the
11   original site. Was it over here, or was it where
12   the bones were found.

13         Dr. Eisenberg says, you have to listen
14   carefully to her opinion, she concluded -- First
15   of all, she could not rule out other possible
16   burn sites, but her opinion was that it was most
17   likely the original site was behind the garage.
18   And that was based on the fact that most of the
19   bones that were recovered were found in that
20   location, that she would have expected more
21   breakage, and that she found a lot of small
22   delicate type of bones in that area, and so,
23   therefore, she concludes this must be where the
24   burn took place.

25         But Dr. Fairgrieve told you, that from

                          142

CHRM006759

1   his own case experience, real world case

2   experiences, he has found the tiniest bones in

3   the human body, the little bones in your middle

4   ear.  He has found those moved into the secondary

5   site, not at the original burn site.

6           And he told you something else that,

7   frankly, just makes common sense.  In his

8   experience, where the majority of the bones are

9   found, that's the location where the bones were

10  moved to.  Why?  Why does that make common sense?

11  Because if you're -- if for whatever reason you

12  are trying to disguise the original site where

13  the burn took place, and you are going to plant

14  them, or put them some place else, of course you

15  are going to move as many of them as you can to

16  the second location.  That makes common sense.

17  It would make perfect sense.  And it fits with

18  Dr. Fairgrieve's own real case experience.

19          The other thing Dr. Fairgrieve said is

20  that, had an expert been called to the scene, a

21  real forensic anthropologist, you can determine

22  things about that.  I believe he talked about a

23  case where he was able to tell that this was the

24  first, the original spot of burning, because

25  there was some anatomically connected bones.

143

CHRM006760

Even though burned, they are close together,
anatomically, so you can tell that's where they
were burned.  If you moved them, they would fall
apart and they would be rearranged.

Unfortunately, Dr. Fairgrieve, again, he
didn't go out on a limb.  He said, I cannot tell
you for certain, where the original burn site is,
nobody can, because of the collection effort.

And I'm not faulting these officers,
there's nothing deliberate going on here.  They
probably never encountered a case like this
before.  And what they should have probably done
is just put a tarp over it.  Instead, Agent
Sturdivant recalls -- I think it took five hours
before Mr. Ertl to come to the scene.  And it's
already starting to get towards dark, 3:00, 3:30
or something.  So they're hurriedly trying to get
as much as they can, working up to dark, until it
gets too dark, without light.

It's not that they deliberately
destroyed the evidence at the scene, but by
moving it without the kind of knowledge -- Well,
you have seen archaeologists on TV and in movies,
you know how they do it, how they move very
carefully with brushes.  They want to make sure

144

CHRM006761

1    that they can determine exactly where the

2    location of these bones are.  Because, if they

3    are not in any kind of anatomical connection,

4    that tells you something.

5         So, Dr. Fairgrieve -- I'm sorry --

6    Dr. Eisenberg tells us that these bones were

7    found in the burn barrel.  Zoom in first so you

8    can read the top.  This is Exhibit 401.  Evidence

9    Tag 7964, she told you was bones recovered from

10   one of the four Janda burn barrels that were

11   located.

12        She finds long bone shafts, metacarpal

13   fragments, vertebral -- vertebral fragments, and

14   a scapula fragment.  And the helpful little

15   diagram here describes where you would find these

16   in your body.  Now, obviously these are scattered

17   all over ones skeleton.  It's not like somebody

18   dismembers an arm and burns that in the burn

19   barrel and you would expect to find only those

20   items.  These were scattered and we'll talk about

21   why in just one second.

22        I think this was -- This is Exhibit 402,

23   the pelvic bones that were found in the quarry.

24   Now, again, possible, I'm not going to overstate

25   here.  She was not conclusively able to determine

                          145

CHRM006762

that they were human, but they were all burned to

the same degree.  And she certainly could not

rule it out.

What explanation is there for finding

scattered bones of Teresa Halbach in the burn

barrel and in the burn pit.  I'm going to propose

one possible theory, there could be others.  You

may come up with others on your own.  But I want

to show you, first, one of the instructions the

judge read you that's in your packet.

Focusing here on the reasonable

hypothesis.  If you can reconcile the evidence

upon any reasonable hypothesis, consistent with

the defendant's innocence, you should do so and

return a verdict of not guilty.

I suggest that a reasonable hypothesis

is that somebody else burned Teresa Halbach's

body elsewhere, maybe in the quarry, maybe

somewhere else.  And then they used that burn

barrel that was found on the Janda's property as

a container to transport the remains, as many as

they could scoop in, to Mr. Avery's backyard.

And they dump it in the burn pit, or

scatter it about, whichever, think that they've

got it all, turn it back over.  And think about

146

CHRM006763

1  how heavy these burn barrels are, you are not

2  going to be able to lift them up and turn them

3  upside down as easily as you would be tipping

4  them over.  And they inadvertently leave a few

5  behind.  This is most likely happening in the

6  dark.

7          And the barrel gets, then, placed over

8  on the Janda property, along with the other three

9  that were there, and so there's four barrels

10  found.  That explains why there's scattered bones

11  from all over, skeleton, found in the barrel.

12  Explains why most of them are there in

13  Mr. Avery's.  And explains why any would be found

14  in the burn barrel at all.

15          If Mr. Avery wanted to get rid of the

16  bones, from his burn area, he would not put a

17  scattered few in someone else's burn barrel and

18  leave all the rest behind.  That's not making

19  sense.  It doesn't make sense.  No one would do

20  that.

21          One other little interesting bit of

22  testimony that almost slid by me, actually, was

23  Mr. Dassey, Bobby Dassey's testimony.  Sometimes

24  the truth comes out in little dribs and drabs

25  when people aren't expecting it.  And on direct

147

CHRM006764

1    examination, as Mr. Kratz, I believe it was, was

2    trying to lead Mr. Dassey through a number of

3    photographs.

4         He asks him about the burn barrels that

5    your mom has out back. And Bobby says, we have

6    three. And then they try to correct him, and

7    he's like, I thought we had three. And yet four

8    are found on November 5th.

9         Where did that fourth one come from? I

10   submit it was the transport item used, perhaps

11   picked up, used to transport the bones and then

12   placed over where the others would -- where the

13   others were.

14        Let me tell you something about who

15   another possible suspect is. It may not, but

16   it's a reasonable hypothesis to explain the bones

17   the way they are. Now, when you realize -- The

18   reason I'm spending some time on this, is when

19   you realize that this is what may have happened

20   here, then you realize why it's so important.

21        Because if that body was burned

22   elsewhere and then moved and dumped on

23   Mr. Avery's burn pit, then Steven Avery is not

24   guilty, plain and simple. Because no one would

25   burn a body somewhere else and then move the

148

CHRM006765

1   remains and dump them in your own backyard.  No

2   one would do that.

3        Now, that's why the State has gone to

4   such trouble avoiding the fact that the bones

5   were moved, that's why you heard nothing about it

6   here.  Because it does not fit with their theory

7   that Avery is guilty.  They know that if you come

8   to believe that there is reasonable doubt about

9   whether those bones were moved to Mr. Avery's

10  backyard, then you are going to find him not

11  guilty.

12       You have to find him not guilty.  Even

13  if, in the end, you aren't completely satisfied

14  how it occurred.  Because although we offer you a

15  theory of defense, that does not mean that we

16  take on the burden of proof.  The State has the

17  burden of proof.  They have to answer the

18  questions that come to your mind, beyond a

19  reasonable doubt.

20       If someone is framed, they are not going

21  to be there.  They are not going to see how

22  exactly it is done, but this is consistent with

23  the evidence, I submit.

24       Now, let's turn from the evidence that

25  appears to be incriminating, but is suspicious.

149

CHRM006766

1    Let me turn for a moment to some of the evidence

2    that is lacking, that you would expect to find,

3    if Mr. Avery was really guilty.

4         There was blood identified in the RAV4,

5    that is, Mr. Avery's. And I don't know why,

6    frankly, we went through this exercise in

7    statistics in figuring out what a billion means,

8    when we're not, we've never challenged that. We

9    don't challenge that -- whether his profile --

10   when they come in and they say this is his blood,

11   this is not his blood, or whatever, there is no

12   dispute on that.

13        The question is, how did that blood get

14   there. And as you think, again, what a case

15   would look like if someone is framed, this is

16   very important as well. Because in the RAV4,

17   they find five, ultimately six stains, I believe,

18   which they theorize must have come from an

19   actively bleeding person, which means, the person

20   was not wearing gloves, and yet, they find no

21   fingerprints.

22        Why, because fingerprints are very

23   difficult to plant. Can't say it's never been

24   done, but it's extremely difficult to plant

25   someone's fingerprints. Much easier to plant

150

CHRM006767

someone's blood, if you can get ahold of some.
So that right there is peculiar.

Now, is it because he wiped off his
fingerprints, took the time to wipe off all his
fingerprints, but missed the blood. Come on,
that doesn't make sense at all. Besides, we know
that there are eight unidentified fingerprints,
at this moment, that were found on that vehicle,
including some very incriminating locations.

I went through it with Mr. Riddle.
Right on the back rear cargo door of the RAV4 --
which of course I don't have -- right where you
would expect, if somebody is opening that door to
put a body in, they are going to find your
fingerprints, if you're not wearing gloves. And
if you're bleeding you're not wearing gloves.
You can't be. You can't have it both ways.

I would also point out, Dr. --
Mr. Riddle, I asked him, well, you took the
fingerprint standards of Lieutenant Lenk and
Sergeant Colborn. You know what the defense here
is. You know what we have been accusing them of
for the last month or more. Did they ask you to
compare these unidentified latents that were
found on Teresa Halbach's vehicle with Sergeant

151

CHRM006768

1   Colborn or Lieutenant Lenk's standards, to see if

2   you could rule them out, or match. The answer,

3   no. Why, because they don't want you to know.

4         You cannot open this vehicle without

5   touching that latch. And this is where he said

6   he found them, the fingerprints. There, there,

7   and there. Riddle also found them on the hood.

8   Isn't that interesting. He says the lifting up

9   of the hood has been a big part of the State's

10  case. No one has compared those to Lenk and

11  Colborn.

12        The other thing that's kind of curious

13  is that no one at the scene sees any blood in the

14  vehicle. Granted it's -- part of the windows are

15  tinted, and it's -- but it's not dark. This

16  vehicle was found at 10:30, 11:00 a.m. in the

17  morning, on a Saturday.

18        And I believe Mr. -- or Special Agent

19  Fassbender, I believe he was the one, that says

20  he came with his flashlight. Maybe that was

21  Ertl. Was looking 5 or 10 minutes inside that

22  vehicle and didn't see any blood. Now, maybe you

23  won't see the blood on the black CD case, but if

24  indeed the vehicle is locked, you might want to

25  be looking inside to see if there's a key,

152

CHRM006769

1   wouldn't you think.

2       You are going to be shining your

3   flashlight right there to see if maybe the key is

4   in the ignition, no one sees this rather peculiar

5   looking bloodstain that looks sort of like you

6   might get if you take a Q-tip and dab it.

7   Doesn't look consistent with the State's theory,

8   as I understand it.

9       And then you look at maybe the most

10  obvious lack of evidence.  And that is the

11  complete lack of any blood or DNA of Teresa

12  Halbach anywhere inside Mr. Avery's entire

13  trailer and you heard what the police did with

14  that trailer.  They peeled off the paneling, they

15  ripped up the carpeting.

16      You heard Mr. Ertl talk about how in one

17  instance he was familiar with, the suspect had

18  cleaned up the carpet with carpet cleaner and it

19  wasn't noticeable.  When they peeled the carpet

20  back, it had soaked through to the pad.  Well,

21  the police were at least smart enough to look for

22  that.

23      Here no blood on that pad.  No blood on

24  the carpet.  No bloody bedding.  Admittedly, you

25  could burn the bedding, sure.  You could get rid

153

CHRM006770

1    of the bedding.  But no blood on the mattress.

2    And there's no evidence that there was any change

3    in the mattress.  And there's no evidence that

4    any mattress or box springs or any of that was

5    burned.

6          No blood spatter on the walls or the

7    ceiling.  No bloody trail of a body being carried

8    out of that bedroom into the garage or into the

9    burn pit.  Nothing on the carpet.  Nothing on the

10   back stoop, the deck, anywhere.  No scratches on

11   the headboard.  No rope fibers on the headboard.

12   Nothing that would indicate somebody restrained,

13   struggling for their life, was murdered in that

14   bedroom.

15         Why am I telling you this?  The State is

16   now saying he was -- I believe they are trying to

17   argue that she was killed in the garage, although

18   that's still not clear either.  Why do I care

19   about the bedroom, because the Judge has told you

20   that you bring your common experiences too, you

21   can rely on those common experiences.  And one of

22   the common experiences that you have all,

23   unfortunately, been exposed to, was the pre-trial

24   publicity in this case.

25         ATTORNEY KRATZ:  Judge, I'm going to

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 154 of 229   Document 330-18

CHRM006771

```
1    interpose an objection.  He is commenting on
2    pre-trial or out of court statements, whether by
3    counsel or by other witnesses.  That is absolutely
4    improper.  That is not a common experience that they
5    bring to the courtroom.
6              THE COURT:  All right.  Just a second, I'm
7    going to excuse the jury for a couple minutes.
8              (Jury not present.)
9              THE COURT:  You may be seated.
10             ATTORNEY BUTING:  Judge, I'm actually
11   bringing this up only to show them, and my next
12   explanation would be how important it is not to leap
13   to a quick judgment and why it's so important that
14   they disregard all of that kind of information they
15   may have heard before and focus on the evidence in
16   this case.  That's where I'm going with this.
17             THE COURT:  Okay.  I wasn't sure from the
18   introduction comment if you were going to refer to
19   any information that was not introduced as evidence.
20   As I understand it, you are telling me you are not.
21             ATTORNEY BUTING:  That's correct.  That's
22   all I intend to say about it.
23             THE COURT:  Mr. Kratz.
24             ATTORNEY KRATZ:  When he starts with,
25   unfortunately, you were exposed to information, he
```

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 155 of 229   Document 330-18

CHRM006772

1     is pre-supposing, first of all, that they know that.

2            Secondly, Mr. Strang and Mr. Buting, in

3     jury selection, referred in great detail to out

4     of court statements in this particular case.

5            But, third, and most importantly, the

6     jury has already been instructed not to consider

7     anything that was outside the courtroom.  So to

8     highlight some -- something they may have heard

9     on the news, or something earlier, is absolutely

10     improper and I'm suggesting that Mr. Buting knows

11     that.

12            ATTORNEY BUTING:  I disagree.  This jury

13     was exposed to false, misleading information for

14     months.  And it's not until they came into this

15     courtroom that they heard the other side.  That's

16     the point -- this is the best example I can think of

17     on why a case has to be decided and tried in the

18     courtroom.

19            The Court's instructed them.  We talked

20     about it in voir dire.  We couldn't ignore the

21     fact that at least three of these jurors who are

22     sitting here today came in saying, I think he's

23     guilty.  They promised to put it aside, but

24     that's all I'm doing is reminding them of that.

25            THE COURT:  One of the problems, as I

156

CHRM006773

recall, is that the jurors, and I don't have each
individual juror's answer committed to memory, but
it's my understanding that they were exposed to
pre-trial publicity in varying degrees. For the
most part we wound up with jurors who weren't as
exposed to the publicity as some others. But I also
agree that we do not have a jury composed completely
of people who were not exposed to any pre-trial
publicity.

I'm a little concerned that, even the
reference to publicity, for the same reasons I
expressed as one of the reasons for dismissing
the false imprisonment charge is, references to
it could possibly lead the jurors to talking
about it in deliberations and that's something
that I don't think we want.

ATTORNEY BUTING: I agree. And that's as
far as I was going with it. I wasn't going to draw
any more references to it, other than to remind them
how I think this is the best example, now that they
have been through the process, to understand why it
is so important for them to only judge the case on
the facts, not speculating.

THE COURT: All right. I'm going to ask
you -- you can refer to speculation, but I'm going

157

CHRM006774

1  to ask you to phrase it in some other way that

2  doesn't involve referring to pre-trial publicity, in

3  order to avoid the problems with it.

4        ATTORNEY BUTING:  That's fine.  I will just

5  finish by saying, that this case is an example of

6  why you can't leap to quick judgments and why you

7  should base your decision on the evidence in court.

8        THE COURT:  That's fine.  Anything else,

9  Mr. Kratz?

10        ATTORNEY KRATZ:  I'm not sure how to

11  un-ring that bell, Judge.

12        ATTORNEY BUTING:  Well, I wish I could

13  un-ring it too.

14        THE COURT:  Both parties have made

15  arguments about un-ringing bells.  I don't think the

16  comments that have been made thus far get us

17  significantly into that problem to require

18  corrective action.  So as long as there's not going

19  to be a reference -- any further reference to any

20  pre-trial publicity, lets bring the jurors back and

21  allow Mr. Buting to continue.

22        ATTORNEY BUTING:  Thank you.

23        (Jury present.)

24        THE COURT:  You may be seated.  Members of

25  the jury, we're hoping that our sound problems are

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 158 of 229   Document 330-18

CHRM006775

1   related to a bad battery, so the battery is being

2   replaced.  In a minute, we'll resume.

3            ATTORNEY BUTING:  All right.  Where were

4   we.  What I think this case is, is a good example of

5   why it is so important that people not leap to quick

6   judgments about a case, maybe decide something

7   that's based -- that's not based on the evidence you

8   hear in court.  You promised, and I'm confident you

9   all will decide this case based only on the evidence

10  you have heard in court, and this case is a good

11  example why.

12           Let's look at what else evidence -- what

13  other evidence is lacking.  Now, if the State's

14  theory is that she was shot in the garage, where

15  is her blood?  None of her blood is found in that

16  garage.

17           We have heard testimony about high

18  velocity blood spatter that comes when someone is

19  shot from a bullet.  There's none on the floor.

20  Maybe even more important, there's none on any of

21  all that -- any of that clutter that you saw.

22  When it's high velocity spatter, it can go

23  anywhere.

24           How would Mr. Avery be able to clean up

25  everything, not just on a floor, but every little

                        159

CHRM006776

item. Because, remember, at least in March, they
picked up and handled every single, and examined
every piece of evidence. Every cooler, every
box, every can, every piece of junk that we all
have in our garage, they looked at. And that's
where you would expect to find spatter that no
one would be able to clean up, even if they tried
to clean up.

Now, is there evidence that he did clean
up at all? Well, his blood was found in the
garage. Why is that? If he's cleaning up, how
is it that his blood is found there. Is he able
to see a blood spot and say, oh, that's Teresa
Halbach's blood. Oh, that's mine, I can leave
mine, I will just clean up hers. Come on.

They have you believe that -- I'm
assuming he's going to get up here and say, this
is what happened because, of course, we haven't
heard it yet, that the bottle of bleach is so
incriminating. I don't know anybody who doesn't
have a bottle of a bleach somewhere in their
house. And an important part is, it was in his
house. They say it's in his bathroom, what they
didn't tell you until I got up and cross-examined
them, is that the bathroom is the laundry room.

CHRM006777

So even there they try and mislead you into thinking something means more than it does. A bottle of bleach found in ones laundry room means nothing. And it means nothing in this case.

And, by the way, if the theory is that there's no blood of Teresa Halbach anywhere on the floor of that garage, is that because he is such a good cleaner, then why are there 10, 11 .22 shells laying all over the floor right in the open. Don't you think if they are going to go to the trouble of cleaning up the blood, after you kill somebody, that maybe you might pick up the shells that are right out there in plain view for the police to find. Don't you think that would be what you would do?

So those are some examples of the kind of evidence, that if someone is being framed, you might expect to find -- you might expect to find lacking, because it doesn't fit with the reality of what would have happened if the crime actually occurred as the State apparently alleges.

We talked about one piece of incriminating evidence and how that looked suspicious. Let's look at maybe the biggest, most glaring suspicious piece of evidence in this

161

CHRM006778

case. The magic key, Exhibit A, in this theory
that the police planted evidence in this case.

Because if you believe that those police
officers put that key in his room, that they are
capable of planting that kind of evidence to try
and link him, then why not plant -- why couldn't
they have also planted blood. If they go to that
extent that they -- that they plant Teresa
Halbach's key in his bedroom to try and convict
him, then that's it, it's over, case over,
because you can't rely on anything else they have
given you.

Now, let's look at this key. First of
all, why would he bring the key in his house and
put it in his own bedroom. Why would you do
that? If you still got the vehicle, and you
still wanted somehow to use the key, to drive it
some place -- by the way, why would you want to
disconnect the battery, if you're still going to
use the key? What good does the key do if the
battery is disconnected? So that's a disconnect,
no pun intended here.

But why wouldn't you just leave the key
in the car? Why wouldn't you hide the key under
the -- neath the car, or somewhere where you know

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 162 of 229   Document 330-18

CHRM006779

1    it is?  Why would you bring an incriminating item
2    like that into your own bedroom, especially since
3    you know, as of November 3rd, when Sergeant
4    Colborn comes to visit him, and November 4th,
5    when Lieutenant Lenk and Detective Remiker come
6    to visit him and all the television cameras are
7    there, that you are a person of interest, right?
8    You are not going to put the key in your bedroom.
9    Doesn't make sense.
10           And, then, the key is not found until
11   the 7th search of that trailer.  You already had
12   four grown men in that little trailer.  I'm
13   sorry, in that little bedroom they had four men,
14   for three hours, on Saturday night, November 5th.
15   And they come in here and they try to tell you
16   that's not really a thorough search.  Three hours
17   in a little bedroom with four men, is not enough
18   time to do a thorough search?  Who are they
19   trying to kid here.
20           And, then, it's not until November 8th,
21   when they have been in the bedroom, again, with
22   three men:  Lenk, and Colborn, and Kucharski,
23   it's another hour or more before they find it
24   then.  There's a common theme, by the way, that
25   we've been hearing in this case, whenever

163

CHRM006780

1  something is mysteriously found much, much later
2  when it should have been, but earlier searches
3  didn't count, those were just cursory searches,
4  three hours cursory searches.
5          This computer rendering of the bedroom
6  is helpful just to show you how small this
7  bedroom is. How long does it take four men to go
8  through a closet, a dresser that's over here, a
9  desk and a bookcase, or World War II record album
10  holder, whatever it is. Seven entries.
11         Now, I submit that the reason it wasn't
12  found in the first entry is because there was a
13  watchdog along, Sergeant Tyson. The one thing
14  that they did was, they say it's okay to use
15  these Manitowoc officers for searches because
16  we're going to have a Calumet person there with
17  them to make sure nothing goes wrong.
18         Sergeant Tyson admitted he had never
19  been in a situation before where he had been told
20  to keep an eye on those guys, your fellow cops,
21  keep an eye on them. What are you doing putting
22  those three men into the person of interest, he's
23  a suspect in their eyes, what are you doing
24  putting three cops who have that kind of
25  potential conflict in that person's bedroom, that

CHRM006781

1   you need to have another officer from another

2   agency watching over them, babysitting them.

3   That is absurd.

4          Lenk and Colborn volunteered for that

5   duty and they volunteered for a reason.  But in

6   the first search Sergeant Tyson did his job.  I

7   believe it when he says that he watched them.  He

8   looked like a watchdog.  He was watching them

9   like a hawk and he wasn't searching.  That's

10  important too.  They were doing the searching and

11  he was just doing the collecting.  So the

12  opportunity wasn't there for Lenk or Colborn to

13  plant the key.

14          And then they are in there again, very

15  briefly the next day, again, with Tyson.  Note

16  that each entry they are -- they are -- each time

17  they go in there, they were with Tyson, except

18  for November 8th and they go in with Deputy

19  Kucharski, who tried to make light of it by

20  saying that, you know, the possibility of

21  planting is about as likely as aliens coming down

22  and planting it.

23          But he had to admit, he was not told to

24  watch those officers.  He was there with Lenk and

25  Colborn.  He's told to search and that's what

he's doing, he's doing his job. And he's sitting on the bed, after one hour. In fact, I think he said he was getting almost done and took off his gloves. He's sitting here, going through this drawer.

Lieutenant Lenk is right here with his back to him, like this, crouched down on the floor, so he's not going see what's going on. Lenk gets up, walks out the door, comes back in a minute later, oh, my gosh, look at that, there's a key. Low and behold, it's in plain view.

And so they come up with this theory, this absolutely preposterous theory on how this magic key, that no one ever finds before, suddenly appears in plain view, out of this bookcase. They find it right there, where those slippers are. Right like that.

And how does it happen, well, they decide, maybe they help the back of this cabinet a little bit, but they decide that somehow this key must be secreted in this cabinet, by Mr. Avery, in his own bedroom, with everybody looking at him, and that it somehow magically fell out this -- this gap, bounces off the wall. And by the way, we're talking about key, fob, and

166

CHRM006783

plastic clip. Somehow bounces off the wall, turns around the corner and lands, what is it 90 degrees from where it should be, where it would have fallen.

Now, here is something else. I want you to contrast what the State -- what kind of evidence the State has given you. In this case, we have been presented with a wooden gun rack, as an Exhibit No. 196. This has really been important in this case, hasn't it, this wooden gun rack. It's meaningless. They have got -- And we have a got a photograph of it too. We have the real thing and the photograph. What do you need this for? Why do need this for? Why is this in evidence. This is totally irrelevant. They have pictures to show the guns are on the wall, okay.

We have got a photograph of an empty box. And we have got the box right here. We have got a photograph of another empty box, and we have got the empty box here too. What did they give you on this bookcase, that, a photograph. Where is the bookcase? Where is the bookcase? Don't you think that's a little more important in this case than that wooden gun rack.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 167 of 229   Document 330-18

CHRM006784

```
 1              They don't want you experimenting with

 2      that bookcase and this key, because they know you

 3      will see that it is incredibly improbable that

 4      this key is going to find it's way out, the key,

 5      the ring, the cloth fob, the plastic clip, and

 6      not get hung up on anything.  It's going to

 7      bounce around like they say it will.  So you ask

 8      yourself why you haven't seen that, right there

 9      in the property room.  Nice picture of it.

10              ATTORNEY KRATZ:  Judge, I'm going to

11      interpose an objection.  Counsel is suggesting that

12      only the State could have introduced that, instead

13      of the defense.

14              ATTORNEY BUTING:  State's burden.

15              THE COURT:  I'm over --

16              ATTORNEY KRATZ:  He's suggesting only the

17      State.

18              THE COURT:  This is closing argument, the

19      objection is overruled.

20              ATTORNEY BUTING:  While we're at it, while

21      we're talking about candor with the jury, I don't

22      know if you recall, but I do, in the opening

23      statements, these nice PowerPoint presentations that

24      Mr. Kratz has prepared, one of them he puts up there

25      in his opening statement and he shows this tailgate.
```

168

1   Puts up a nice PowerPoint slide showing the rear of
2   the vehicle like this.
3           And he's going through where Mr. Avery's
4   blood, DNA, was found on Teresa Halbach's
5   vehicle.  And he's got one of his nice slick
6   arrows pointing right here with a circle.  I see
7   that and I think, my gosh, I have been working on
8   this case for months, did I miss that; how could
9   I miss that the client's blood is supposedly on
10  the back tailgate.  Well, when I looked more
11  carefully, and as we heard from Sherry Culhane,
12  he was wrong.  There was no blood of Mr. Avery
13  ever found on the rear of that vehicle on the
14  tailgate.  Now, Mr. Kratz is human, we all make
15  mistakes; I have certainly made plenty here.  But
16  that's a pretty big mistake.
17          The key, also, by the way, has no blood.
18  Remember, she swabbed it and the stains were
19  clean and it only has his DNA.  And, frankly,
20  counsel misspoke when he said, it's always the
21  last person -- when you are talking about trace
22  DNA from the fingers, it's always the last person
23  that touches it that's going to be on there, not
24  what the testimony was as I recall it.  Testimony
25  was, the last person may have more of it, but you

169

CHRM006786

1    are going to find a multiple, most likely, at

2    least two people.  Particularly when it's an item

3    like a key that someone handles every day and

4    deposits their own DNA on.

5            And, finally, before we take a break

6    here, the source of Mr. Avery's DNA in his house

7    is plentiful.  Toothbrushes, razors, all kind of

8    personal items in ones home, if Mr. Lenk and

9    Mr. Colborn wanted to put Mr. Avery's DNA on that

10   key, that was easily available.  It doesn't have

11   Mr. Avery's fingerprints on the key; doesn't have

12   any of Teresa Halbach's DNA on the key.

13           Keep in mind, also, when you think about

14   the evidence that's lacking and evidence that's

15   suspicious, you came into this case, and as I

16   recall seeing up there on the PowerPoint slides,

17   there were four charges, now there's three.

18   Think about that, while we take our break.  Is

19   this okay, your Honor?

20           THE COURT:  Yes.  All right.  Members of

21   the jury, we'll take a break at this time.  Again,

22   do not begin your discussions of the case until all

23   the arguments have been completed and the Court

24   submits the case to you.  You are excused.

25           (Jury not present.)

                        170

1    THE COURT:  Counsel, can I see you briefly

2    in chambers at the start of the break.

3    ATTORNEY BUTING:  Sure.

4    (Recess taken.)

5    (Jury present.)

6    THE COURT:  Members of the jury, before we

7    resume, I can report to you that I met with counsel

8    during the break.  I just wanted to give you some

9    idea about where we were going from here.  But we

10   are probably going to go late today in order to

11   finish the closing arguments of the parties.  There

12   isn't going to be any time to begin deliberations

13   today.

14       After the closings are finished, we will

15   take a brief break to identify the alternate

16   jurors who will not be deliberating and then we

17   will adjourn for the day and begin deliberations

18   tomorrow morning.  We are going to take breaks,

19   probably at faster intervals than normal, to keep

20   you fresh enough to follow the closing arguments,

21   but closing arguments will be what we will

22   complete today.  Mr. Buting, you may resume.

23   ATTORNEY BUTING:  Thank you, Judge.  Before

24   I leave the magic key for a minute, I just want to

25   make sure I was clear enough that, again, this is

171

CHRM006788

her car key, that obviously she used every single day. It was Teresa Halbach's key.

And I believe Ms Culhane said she swabbed all the way around that whole plastic holder, all the way around it. Not just along one edge of it. And yet she found none of Teresa Halbach's DNA, not a shred of it. And found only Mr. Avery's DNA, as if somehow the key had been wiped clean and his DNA was placed on it. He certainly is not going to do that. He's not going to wipe off her DNA and leave his behind.

And as to the bookcase, why it's not here, think about, again, it's their theory, that this key could have found it's way magically out of that bookcase and into its position. Their burden of proof in the entire case, and also their theory to explain to you how this very unusual key materializes out of nowhere and yet it is not here.

All right. Now, let's look at another piece of evidence that initially appears, certainly incriminating, but as you look more closely, looks more and more suspicious. And that is, Mr. Avery's blood in the RAV4.

Keep in mind that we're talking about a

172

1     very little amount of blood here. Mr. Kratz

2     maybe confused you when he made it seem like

3     there was a lot. Yeah, there's not one

4     microliter, but we're talking very small amounts

5     of blood. As a matter of fact, the photographs

6     that were taken by Mr. Groffy, before any swabs

7     were taken, before any of the blood is wiped off.

8     This is the front seat, I can barely see

9     anything, unless that -- if that's the spot of

10    blood, right there, that's awfully small,

11    particularly when you are talking about fabric.

12         The CD case, can't even find any blood,

13    can't see any blood. I believe Mr. Stahlke must

14    have misspoke when he said it seemed like it was

15    covered, that there was lots of blood on it.

16         The FBI guy who looked at it, the swabs,

17    we'll talk about that, Mr. -- Dr. LeBeau, later.

18    But he showed you pictures of those swabs and

19    there was hardly any blood on it. If fact, they

20    looked gray, like fingerprint dust, or something.

21         So, really, we have this and this, which

22    Mr. Stahlke says is consistent with active

23    bleeding. It is also consistent with active

24    planting. So when I first saw this, I thought,

25    you know, what is the source of Mr. Avery's

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 173 of 229   Document 330-18

CHRM006790

1  blood.

2          Well, we have heard about how his -- he

3  had blood in the bathroom.  And so I looked at

4  these pictures, these were pictures that I

5  believe either Detective Remiker or Sergeant

6  Colborn testified that they went around and took

7  on Saturday night, at the apartment, before there

8  was any kind of seizures of swabs.

9          The first thing you do when you go in is

10 you take pictures and then you start collecting

11 evidence.  Well, you look at this particular

12 swab, we'll do a close up on it.  It's an awful

13 odd looking blood drop, with a little whole in

14 the middle, as if somebody would dab a Q-tip in

15 it, that was my first thought.

16         And, then, the blood vial.  And I offer

17 that -- and we have offered that as a possible

18 source of the blood that's found, Mr. Avery's

19 blood that's found in the RAV4.  It was in a

20 public office, in an unsecured area; not in a

21 vault where they keep locked up exhibits only;

22 not down in the basement where they normally keep

23 old files; but in that battered old cardboard box

24 that we saw sitting in the Clerk's Office,

25 because it was -- there were so many requests to

                        174

CHRM006791

see it, from the media and the public, that that
made it more convenient.

They kept no good log back then, of
people who were asking to see files, see any
file, that one not withstanding.  The clerk, Ms
Zigmunt, later tightened that up in, I think it
was October of '06, this past year.  Now
everybody has to sign in before they can look at
any file.  But back then she admitted that the
deputy clerks would be more casual about it.  And
who would you be more casual about making someone
sign in than a police officer, who you would
normally trust.

So there would certainly be no reason
for these clerks to take note or think that some
police officer, Lieutenant Colborn, or Sergeant
Colborn, I'm sorry, Lieutenant Lenk or Sergeant
Colborn, would have any nefarious intent by
looking at Mr. Avery's file.  And that area of
the file where it's kept is sort of screened off
from the rest of the unit.

And probably more likely, though, is the
after hours access that the deputies have.  The
Manitowoc Sheriff's Department is responsible for
security in the courthouse so, understandably,

175

CHRM006792

they have master keys that fit all the doors.
And how difficult, really, would it be for
someone like Lieutenant Lenk or Sergeant Colborn,
veteran officers, to come in after hours, or on
Saturday morning, and get what they needed. I
submit it would be not difficult at all.

Now, Mr. Kratz, I can hear him now, he's
going to get up here and say, where is the
evidence. This is all speculation. Where is the
evidence. As if he would expect anybody who was
being framed to have a videotape of the officer
taking the vial of blood and planting it.

Or as if he expects one of these police
officers, in front of everybody, under oath, on
streaming video on the internet, to admit, oh,
yes, of course, I took the blood and planted it.
Yes, I would admit that if I did it. Sure, I
would go away to federal prison probably but,
yeah, rather than lie under oath, I would rather
go to prison than admit that.

Come on. This is real life. It's not
TV. You can't expect a *Perry Mason* moment where
you're going to get somebody to admit, to you
guys, and everyone else in the world, that they
did this.

176

CHRM006793

1  So what do we have, though.  We have

2  reasonable inferences that can be drawn and

3  circumstantial evidence, just like they do.

4  The box, you have seen the video, I'm

5  not going to go through all that again, but I

6  want to just remind you, show you the box.

7  Evidence tape is very clearly cut, opened, and

8  the box is resealed with nothing but a piece of

9  scotch tape.

10  This one may show up a little better.

11  Inside the box was the styrofoam container, and

12  it was opened by all of us together, which also

13  had -- which also had evidence tape sealing it,

14  right along here.  And on the video, you could

15  see very clearly that that was slit, as if by a

16  razor or scissors, or something sharp.  So that

17  one would easily open this sort of clam shell

18  styrofoam container, and there is the vial of

19  blood.

20  The vial of blood has a hole, what

21  appeared to be any way, a hole in the middle,

22  right there, which is where professionals would

23  gain access to the blood, if they need it.  But

24  this vial has something more, as even Dr. LeBeau

25  admitted.  This vial has blood in between the

177

CHRM006794

rubber stopper and the glass, so that the experts who use these things all time, could say, even Dr. LeBeau, I believe is the one, who said this vial, clearly the top had clearly been taken off.

So, there's evidence that the box was unsecured and the top had been removed at some point. And the blood is still liquid. Can't really show you it in there, the way they have got it incapsulated in yet another glass tube. You can't really see it, but you did see, I think, in the video, as it was rocked back and forth, the blood was still liquid and, therefore, easily available to plant. And we're only talking about a few drops. That's all that's necessary to leave the amount of blood that they found in that RAV4, a few drops, that's all.

Now, Lieutenant Lenk, whose name keeps coming up at every important part of this case, had reason to know that that blood of Mr. Avery's was sitting in the courthouse. Because he was the evidence tech -- the whole head of the evidence department for Manitowoc. And he signs, in 2000 -- what's the date here -- 2002, September, he signed Exhibit 214, as the transmitting, or submitting officer to submit

178

CHRM006795

1    these items to the Crime Lab.

2         Now, I'm not trying to mislead you here,

3    these items do not include the vial that we're

4    talking about.  But they clearly show that these

5    came from exhibits held by the court since the

6    end of the trial.  And yet Lieutenant Lenk would

7    have you believe, in his testimony, that he had

8    no idea that that 1985 court file had any kind of

9    exhibits like that in there.

10        The one thing they did look for

11   fingerprints on, they looked for Lenk and

12   Colborn's fingerprints on the blood vial.  No

13   surprise there.  Second nature with cops when

14   they handle anything like that, a biological

15   piece of evidence, they are going to put their

16   gloves on.  So, okay, they look there, don't find

17   any.  But, again, they're looking for something

18   that they know isn't going to be there in the

19   first place, and trying to present that as if it

20   means something.

21        So then there's the question of the

22   opportunity to plant blood.  And that's why we

23   heard all this testimony about the scene and

24   whether it was secure or not secure.  Well, keep

25   in mind that that sheriff's department, even

179

CHRM006796

though their bosses said, within 45 minutes of
getting there, that we're turning over this
investigation to Calumet, the one item, the one
item on that 40 acre property that they knew was
important, the main piece of evidence, was that
RAV4.

And they kept their officers in control
of it for four hours. Talk about the fox
guarding the hen house here, ladies and
gentlemen. Come on. Is that just a coincidence,
or is that Lenk and Colborn having some influence
here?

How carefully was it being watched?
Mr. Kratz told you that it was being maintained
very securely and carefully. Well, we heard that
until Special Agent Fassbender arrived at 2:25,
there was no log at all of who was coming and
going, looking at this main piece of evidence
that they knew about.

They rely on two civilians, Nikole and
Pamela Sturm, to be their watch dogs, so they can
see from this crusher, distance 369 feet, I think
it was, Mr. Austin measured. And, you know, I
don't fault the Sturms. I mean, its revision is
history, for them to say that they were watching

180

CHRM006797

that carefully the whole time they were there,
that far away, to make sure nobody, even a police
officer, approached.

Why would they care. Once they knew it
was Teresa's vehicle, you know, the sad news that
it was, that's where their attention would be
drawn. They weren't watching this to see who
approached the RAV4.

And there was a tarp over the RAV4, for,
now, we find out, for an hour apparently,
according to the digital signatures that we can
find on digital photographs. And a tarp that's
built up in such a way that it's practically a
tent. That's not the best picture, but from a
distance, this large tented over object, being
very careful not to have the tarp touch the
sides, with a nice little opening here.

Now, maybe that's not when it was
planted, but it's certainly an opportunity.
Probably more likely is that it's getting dark,
and while the officer -- I don't believe, by the
way, that there was any testimony that Mr. -- or
Sergeant Orth was seated where Mr. Kratz said he
was. But even not withstanding that, what we did
hear was that there's other means of ingress and

181

CHRM006798

1    egress to that property.

2            Sergeant Orth testified that while the

3    officers were somewhere in this area, remember

4    this picture was taken after the vehicle had been

5    removed, but that there's -- there's ways in and

6    out from the west.  I will show you in a moment,

7    if I can find the overhead.

8            A little farther up, one can see the --

9    how the roads down here, we have lots of ways to

10   get in and put that -- First of all, for someone

11   to plant the vehicle.  And, secondly, for anyone

12   to approach it while it's there.  And an even

13   more distant shot that shows all the ways in to

14   this plot of land.

15           So while maybe directly to the south of

16   that berm it is not immediately accessible,

17   there's all these other ways in from here, or

18   from here.  When somebody who knows the area,

19   perhaps someone who's been a patrol sergeant for

20   many years, knows the county like the back of his

21   hand, is going to know how to get to that RAV4.

22           Then we have this whole question of

23   whether the vehicle is locked or not.  Well, the

24   Sturms said they thought it was locked, but then

25   when they were questioned more carefully it turns

182

CHRM006799

out that Nikole didn't check the rear tailgate.
She checked it with her sleeve, the other four
doors, but not the rear tailgate.

If it was locked, by the way, who do you
go to when you lock your keys out. Most of the
time you go to call the cops. Who better knows
how to open up a car, quickly, than police? So
the fact that it was or wasn't locked isn't
crucial in this case, in my estimation.

But on this evidence, it's not entirely
clear, when it gets to the Crime Lab, it really
is locked. You will have to rely on your memory
for that, but I think the record is unclear,
frankly.

There is also, I want to point out, all
you would have to open, by the way, are two
doors, to put the blood where it was found. The
driver's side, you can reach everything in that
front seat and that one rear passenger door. So
you wouldn't have to have them all open and
sitting in the car in order to do this.

And then we have the interesting
circumstance of Lieutenant Lenk and his behavior
on November 5th and since then, in which he
testified, in a prior hearing in this case.

183

CHRM006800

1    Lieutenant Lenk is the only officer, the only

2    witness in this case who was -- who has lied

3    under oath.  He gave sworn testimony one day that

4    he didn't get to this site until 6:30 or 7:00,

5    when it is getting dark, but came in front of you

6    today and says, again, under oath, that it was

7    2:00.

8            Well, what happened in the interim?  He

9    forgot about the logs.  And when you look at the

10   logs, he signs out, but he never signs in.

11   Fassbender had those logs starting at 2:25.  So

12   lo and behold, Lenk now appears on the scene at

13   2:00, to explain why he never logged in.  Because

14   otherwise the alternative is, he comes at 6:30 or

15   7:00 and evades the guard that's doing the log.

16   That doesn't look good either.

17           So ask yourself, what evidence there is,

18   what inferences you can draw from a witness who

19   gives two different versions, under oath, about a

20   critical point like this.  His whereabouts, by

21   the way, that entire day, he never writes a

22   report.

23           So, I also expect, again, because they

24   get to go last, I'm having to anticipate, and you

25   may have to answer some other questions that they

184

CHRM006801

raise. But I expect that they are going to say
this would have to be this complicated wide
ranging conspiracy in order to frame Mr. Avery.
Not true. Not true at all. This could be done
by two officers, really one officer, the one
officer who keeps coming up, Lieutenant Lenk,
whose name is on the evidence transmittal from
the 1985 case, just a couple years earlier.

Lieutenant Lenk, who shows up on
November 5th without logging in. Lieutenant
Lenk, who finds the magic key. Lieutenant Lenk,
who four months later, four months after
Manitowoc no longer is needed, with no legitimate
reason, is back at that scene on March 1st and
what's found the next day, the magic bullet,
which we'll talk about in a moment.

Actually, let's talk about it now.
Again, every time they try and -- Every time they
find something that they should have found
before, it was because, oh, that prior search was
just for a missing person. We signed a search
warrant affidavit in which we said we were
looking for evidence of a homicide. But, oh, we
were just looking for a missing person, we didn't
know what we were looking for.

185

CHRM006802

1    They are in that garage on November 6th,
2    for an hour and 47 minutes, three officers.  They
3    find 10 or 11 shell casings, but they found -- if
4    they saw a bullet, don't you think they would
5    pick up that bullet?  Don't you think that might
6    be important?
7         Now, where was it found?  Right smack
8    dab in the middle, one of them.  This is the
9    March 1st photo, but No. 9, right as you walk in
10   the door, the main overhead door, it's sitting
11   right there in a crack.  Now, to you and I, that
12   may not look like much, but to an officer who's
13   looking for -- if they found .22 shell
14   cartridges, is going to be looking for a bullet,
15   that's going to be pretty obvious.  But it's not
16   found until March 1st.  And then the other, most
17   important one, is found back here, up against the
18   wall.
19        Now, one or two things had to happen,
20   either they missed it, during the first search,
21   or the scene had been altered between the first
22   search and March 1st.  And, in fact, we know
23   that's what happened.  We had the officers
24   identify, look at this, there's a different car
25   in there, there's this big engine hoist.

186

CHRM006803

Mr. Avery wasn't altering it, but other people in his family obviously had access, someone's car was parked in there. Things probably moved around, who knows.

But then we have testimony from Rollie Johnson, about his many gofer hunts. He says that if you go out there now, when the snow melts, you will find his .22 shells all over the place, including right -- most likely in that garage. His gun, his .22 and, yeah, those shell casings were fired in that .22, from that .22, you can tell that because of the way the pin hits.

But, according to Mr. Johnson, his -- the remnants of his firings, even years from now, are probably still there. Especially if you think about that, the Item FL, No. 23 that's under the air compressor. That probably hasn't been moved in years. Who knows how long that bullet had been there.

It didn't have Teresa Halbach's DNA on it, which we will talk about it in a moment. And that bullet is probably totally irrelevant to this case. Just one of many residues left over from Mr. Johnson's target practices and whatnot.

187

CHRM006804

1    I'm not sure it was entirely clear, so I

2    just want to go over with you and make sure it's

3    clear.  The shell casings, we have two bullets

4    and 11 shell casings.  The shell casings,

5    Mr. Newhouse was able to identify, came from that

6    gun, but he can't say that the bullet, the

7    ultimate bullet, FL, came from any of those shell

8    casings.  And he can't say that Mr. Avery, for

9    that matter, ever handled any of them because

10   nobody did any fingerprints of them.

11        And, then, the second bullet, the one

12   they showed you that's down in the crack, that

13   was designated as Item FK, Mr. Newhouse said he

14   could not match to the gun, the .22 caliber

15   Glenfield Marlin that was found in Mr. Avery's

16   bedroom.  He said that all he could say was that

17   it would come from a class -- gun of a similar

18   class, which I think included even a pistol that

19   we talked about, with a different brand name.

20        But we know, that on that very property,

21   the Avery 40 acre salvage yard area, there were

22   other, at least one other, maybe two, .22

23   Glenfield Marlin rifles.  In Bobby Dassey's

24   bedroom, is one of them, exactly the same model,

25   one of the most common models in the world.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 188 of 229   Document 330-18

CHRM006805

1    So, even Mr. Newhouse couldn't say

2    whether that bullet had any connection at all to

3    this case, or to Teresa Halbach, or even to the

4    gun that was found in Mr. Avery's bedroom, Rollie

5    Johnson's gun. He did say, however, that that

6    one item, under the air compressor, came from

7    that gun and no other.

8         And when I questioned that, how reliable

9    is that degree of science anyway. We're talking

10   about these eyeball comparisons to these --

11   comparison microscopes. It sounds very much like

12   the hair comparison analysis that had been

13   discredited years ago. And I predict this

14   so-called science is the next to go.

15        But at any rate, he was very defensive

16   about his field, perhaps understandably, but when

17   he wouldn't even admit that DNA is more objective

18   than this comparison thing he does, you got to

19   wonder. And, you also got to wonder why he

20   didn't show you the photos of the comparison of

21   the bullets, side by side, and neither did the

22   State.

23        He didn't want you to see those

24   comparison's, Mr. Newhouse, because he was afraid

25   when you looked at them you would see what I saw,

189

CHRM006806

1  which is there's a lot of differences between

2  those two fields of view. And that his opinion,

3  that it came -- that they are one in the same,

4  they came from the same rifle, is questionable.

5      But, putting all that aside for a

6  second, even if he is correct, that that Item FL

7  that was fired from the .22 rifle that was

8  found -- Rollie Johnson's rifle, found in

9  Mr. Avery's bedroom, that still doesn't mean it's

10  connected to this case with any relevance.

11      Look at first, Mr. Olson, who does the

12  lead analysis from the fragments of the cranium

13  bones that he found. He said it's 99 percent

14  lead. Well, Mr. Newhouse, in his notes, and I

15  talked to him about this as well, he made a point

16  that this -- Remember he talked about the two

17  kind of bullets, some which are lead and some

18  which were coated.

19      And this one, I believe he said, was

20  coated with copper coating. Both of these

21  bullets -- fragments that he found, were coated

22  with copper. Where's the copper? I asked

23  Newhouse, did you -- did you try and compare that

24  -- the lead, little pieces of lead that he saw in

25  those x-rays, with the type of lead that's in

190

CHRM006807

Item FL.  And he said, no, he wasn't asked to.

So without some kind of connection between Teresa Halbach and that bullet, the bullet has no relevance in this case.  It's just a random fragment, that's found in an old garage, that means nothing.

And so we come to Sherry Culhane.  Now, you know, one of the odd things about trying a case with this kind of publicity, where other people can watch at home, or wherever, is that you get some feedback about how you do.  Some of it not so good.  And some people told me maybe I was a little hard on Sherry Culhane.

And if you think that, you know, I apologize if I offended anybody with my cross-examination of her, but I ask you not to hold it against Mr. Avery.  Because I have a job to do and as an advocate, I need to point out, if someone goes over the line and goes too far, you have to understand it.

Now, I don't have a problem with almost everything that Sherry Culhane did in this case, and I said so.  I haven't been up here disputing her statistical calculation.  I haven't disputed any of her -- the Power Points where she's lining

191

CHRM006808

up the profile of one to the next.

    And it's true that she did help exonerate Mr. Avery in 2003, although she sat on it for a year and he spent an extra year in prison, she did exonerate him by finding an exclusion and then a match to Mr. Gregory Allen. And we appreciate that. And I didn't mean to not appreciate that.

    But I also pointed out, it's not like she's a defense witness either. She helped convict him in 1985, with this now discredited science of hair comparison analysis, where she rendered opinions to jurors just like yourself. So most of what she did in this case was fine; in fact, it was more than fine. Because it really excluded Mr. Avery from -- either Teresa Halbach from all these items, or Mr. Avery from the other items. Really the other way around, she's looking for Teresa Halbach's DNA in incriminating places. And she doesn't find it.

    So I can imagine how frustrating it might be when you get a phone message that tells you this, early on, try to put her in his house or garage. Now, this is not blind testing, by any means. These agents are telling Ms Culhane

192

CHRM006809

1   what they want.  And this is November 11th.

2          Well, here it is, she's working on this
3   bullet fragment now, in March.  And she still has
4   not found one item that links Teresa Halbach to
5   Mr. Avery's house or garage.  So she's got to
6   feel some pressure.  This is the biggest case of
7   her career.  The biggest case the Crime Lab has
8   ever had: 380 items, 180, I think, submitted just
9   to her unit.

10         It's almost five months late and nothing
11  has been found.  So when she gets this last
12  bullet fragment, she recognizes, I think she
13  said, it's a probative piece of evidence.  She
14  knew what it was.  And when she gets this
15  contaminated test, the pressure is on for her to
16  go way out on a limb, farther than she's ever
17  gone in her life.  Never before has she ever
18  asked to deviate from a protocol to make an
19  inclusion, until this case.

20         Now, she probably convinced herself that
21  it's okay because it's just in the control, who
22  cares.  There's no evidence that the bullet is
23  contaminated, right?  Well, we talked about that,
24  what controls are, and why they have them, and
25  how you can find contamination in controls very

193

CHRM006810

easily, because if a control has anything but
zero DNA, it's been contaminated.

What you can't tell is when a piece of
evidence shows up with someone's DNA, you can't
tell whether it's there because it has been
contaminated or not. And so what you do is, you
run a control. And the protocol says, if that
control is contaminated, you toss it out, and
that's the end of it. Because they know, from
their own tests, that there's cross contamination
that can occur from one evidence item to the
next. And they can never rule it out if there's
a contaminated control.

So where is Teresa Halbach's DNA coming
from? Ms Culhane says, she's theorizing and she
thinks, well, maybe -- maybe I'm talking too much
or I'm too close to the bench and that that's how
her DNA got on there. But in truth, she doesn't
know how her DNA got on there.

And what we do know is, that Teresa
Halbach's DNA was right there at her bench, right
underneath the same bench that she's working on,
is her storage area. We talked about the central
storage area for evidence. She checked it out in
November. She never put it back until mid April,

194

CHRM006811

I think it was.

And all that while, she's got Teresa Halbach's DNA, from the RAV4, in the cargo area, sitting right there on her bench. That's a bad practice right there. But when you get a contaminated control, you can't tell how and whether Teresa Halbach's DNA ended up there in the same extraction mechanism that she's doing or not. You just can't tell.

And their own logs, their own contamination logs that I introduced, talk about how difficult it is. We went through it. I won't go through it again with you. But there are instances in here where it specifically says, evidence from one case has been contaminated into another.

And they look and they try and figure out why, corrective measures. And they can't figure it out. They can't figure it out. So how are we supposed to figure it out? How are you supposed to figure it out? You can't. And that's why the protocol says, you toss it out and you do it over.

Only she had a problem, because she had used it all up. She took a chance, rather than

195

CHRM006812

1  trying to swab it, to put it in this buffer and
2  dissolve it all.  And she had a one shot, one
3  chance with this DNA test.  And when it came back
4  contaminated, she was kind of stuck, you know,
5  this was probative.
6      And so she went out on that limb and
7  said, I'm asking for a deviation from the
8  protocol.  We're going to call this Teresa
9  Halbach's DNA.  And why is that so important?
10  Why -- Why do we know that it's unreliable?  What
11  else is there to tell us, maybe, that it's an
12  unreliable conclusion?  It's the only place.  All
13  these other items, it's the only thing that's
14  ever come up with Teresa Halbach's DNA.
15      You people look a little bit tired,
16  anybody want to stretch for a moment?  Would you
17  like to get up and stretch?  Is that okay, Judge?
18      THE COURT:  That's a good idea.
19      ATTORNEY BUTING:  All right.  Let me --
20  There's one other area, though, where -- that we
21  have to talk about, that Mr. Avery's DNA is found
22  on.  And that's the hood latch.  But that's the most
23  easy -- easiest to understand, really, because --
24  First of all, note that it's not found until month's
25  later, which means that it wasn't found in the first

196

CHRM006813

sweep of the car that Sherry Culhane does.

And who followed Sherry Culhane into that vehicle, who's the next person? The first thing they do is DNA, so that no one is contaminating anything. Next one to come in is Mr. Stahlke, the blood spatter guy.

He admits he is leaning in, he's got his hands in there. He's touching. And I think he's even -- I don't remember if he admits actually touching the blood itself, but he's certainly all over the area where it was, with his gloves.

And then someone asked him to get the odometer reading. So he turns the key and there's nothing. So he realizes maybe the battery is dead. He comes around to the hood, and he said, he didn't change his gloves. And he opens the hood and, then, of course, sees the battery is disconnected. And they have to do something else to get the odometer reading.

But that's -- that's the problem with DNA, it's so easily translated -- or transferred in the environment. That's why you are supposed to peal off your gloves. And he didn't.

Let's move on to some of the other aspects of this case that are really peculiar.

197

CHRM006814

How about a complete lack of any motive for
Mr. Avery to kill Teresa Halbach. Why would he
kill Teresa Halbach? It's a man who's wrongly
incarcerated, spent years in prison. Gets out,
has a good lawsuit pending; he's going to get a
whole lot of money, in all likelihood. Why would
he kill somebody? That makes no sense.

First thing that leaps out at you when
you heard about this charge, maybe more peculiar,
is why Teresa Halbach? Why kill some woman that
just comes over and takes pictures of your car
four or five times? Why her?

And just quickly, this theory that
somehow he was luring her over by using the name
B. Janda, is completely bogus, because the very
same day, one of the other customers did the same
thing. You give the name of the owner. Mr. -- I
may have it backyards, Mr. Schmitz, I believe,
called for -- Mr. Sippel called and left
Mr. Schmitz's name because he's the owner and he
was the one who was going to be there when the
car was looked at.

If he is really going to plan to kill
Teresa Halbach, specifically, why not just call
her on the cell phone? Why leave a paper trail?

198

CHRM006815

Why call the office, you know, leave your
address, Avery Road?  I mean, hello, Avery Road,
doesn't take a rocket scientist to trace it back
to him.

And where was she killed?  In the
garage?  We still don't know, from the State's
theory.  But think about this, maybe he's got
some explanation he's going to come up with here,
but if she's killed in the garage and she's
burned in the burn pit, what's she doing in the
back of the RAV4?

He put's her into the cargo area of the
RAV4 so he can drive 20 feet around the other
side of the building to take her out and put her
into the burn pit?  Makes no sense at all.  It's
another reason to suspect that that burn pit is
not the original site of burning, because her
body was very clearly inside that rear of that
RAV4.

Why burn the phone, and the camcorder,
and the -- or I'm sorry, the camera, and the palm
pilot?  Why burn those items in your own burn
barrel?  You are surrounded by quarries.  You are
out in a rural area.  You have got 4,000 junk
cars.  You have crushed cars you can put it in.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 199 of 229   Document 330-18

CHRM006816

1          Why do you burn it?  What's the point?

2     Get rid of it.  It's easy to get rid of.  Toss it

3     in one of the ponds.  Bury it.  No one is going

4     to find pieces of metal.  Especially, again, if

5     after November 3rd and 4th, it's obvious, the

6     police are looking at you.

7          Mr. Kratz says, the location of that car

8     tells us it was going to be crushed.  And think

9     what would have happened if that car -- if

10    Patricia Sturm had not found that car on Saturday

11    afternoon, that car would have been crushed and

12    we would have lost that evidence forever.

13         Well, ask yourself, why wasn't it

14    crushed, already?  You got a crusher, I mean, you

15    got a crusher on your property.  You got -- 54

16    cars are crushed there.  It's obviously used all

17    the time.  Why isn't it already crushed on

18    November 5th, especially if you know the cops are

19    looking at you?  Common sense.

20         And why try and build this complicated

21    outdoor fire to get rid of a body, when you have

22    got something like this on your property, that

23    can melt aluminum to liquid.  Big enough, easily,

24    to do the job you need, if that's what you are

25    going to do.  You would use that.  But, of

                          200

CHRM006817

course, that doesn't fit with the State's theory, because if you did use the smelter, you wouldn't move the bones back on your property.

All right. Let me talk about the FBI, Dr. LeBeau. I suggest he is not a credible witness. And more importantly, the test, for what it was used, for the opinions that were given, is not credible for that.

He gets the award for the most absurd expert opinion of anybody that's come into this courtroom and this trial. When he says, I can conclude to a reasonable degree of scientific evidence, that when I test those three items, and don't find EDTA, these other three items that I never bothered to test, they don't have EDTA either.

How can you ever make that kind of conclusion? That tells you how sloppy he is with his opinions, how willing he is to give them what they want.

Compare his testimony to Dr. Janine Arvizu, who was forthright, not dogmatic. She gave Mr. -- Dr. LeBeau his due. She agreed with him when he was right and pointed out where he was wrong.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 201 of 229   Document 330-18

CHRM006818

1          She said that this protocol is fine,

2     perhaps, the test, if EDTA is, in fact, present.

3     But to then use it beyond that and say that the

4     absence of it, the absence of EDTA by doing this

5     test proves it's not there, goes too far.  It

6     even goes beyond the scope of the protocol

7     itself.

8          Because the protocol says that this

9     procedure allows for the screening and

10    confirmation of EDTA in the suspected bloodstain.

11    Doesn't say that you can then conclude, if you

12    don't get it, that's it's not there.  And the

13    reason why is -- it took Dr. Arvizu to figure

14    out, I certainly couldn't -- it's this whole idea

15    of limit of detection.

16         The test that he did, injecting

17    something right into the -- into this instrument,

18    this whatever it was, MS/MS thing, that's easy.

19    I mean, yeah, you are going to get a low -- you

20    know, you are going to be able to get a low limit

21    of detection because it's pure, put right into

22    there.

23         It's the extraction process, where you

24    are taking something out of the fabric or a swab,

25    diluting it, extracting it and going through that

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 202 of 229   Document 330-18

CHRM006819

whole process of filtering, that it becomes more
difficult. Your level of detection is now much
higher.

In addition, the protocol was rushed.
Think about that. Think about how this whole
thing came about. The FBI has not tested for
EDTA in 10 years, since the O.J. Simpson case.
His explanation is, because no one asked. Think
about that. Why do you think no one asked?

First of all, we can't ask for it, as
the defense, the defense bar. Only the
prosecution can ask for it. What did they do in
that case? They screwed it up. They found EDTA
and later argued, whether they were right or
wrong, we will never know, later claimed, oh,
that was just a carryover from a different
sample. Well, the jury was told that there was
EDTA in that case, look what happened.

What prosecutor is going to trust them
to do this same kind of test and not screw up
their case? This prosecution team. Because they
were desperate to try and do something to
discredit the defense of planting, whatever it
took.

And, so, when it normally takes three to

203

CHRM006820

four months to develop one of these protocols,
they suddenly come up with one in two weeks. And
they are testing it and validating it and
actually doing the test samples before, as
Dr. Arvizu said, before they even got their
results of their own competency tests from this
procedure.

So why is the FBI involved in this case
at all? Again, this shows credibility, a lack of
it. They try to say, oh, we're concerned about
police misconduct. We want our public officials
to be truthful. And if there's some officer who
is planting, we want to know about it.

Well, I asked them, what investigation
did you start? Where is the grand jury? What's
the U.S. attorney doing? Is there even any
investigator on the case from the whole FBI,
that's talked to any witness? No.

All they have got is this lab that's
asked to do this new protocol and here's what
they are told. Purpose of this request is to
establish the presence of EDTA in the vial of
blood, thereby eliminating the allegation that
this vial was used to plant evidence. That's it.
It's not to find out whether these cops are

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 204 of 229   Document 330-18

CHRM006821

```
 1      corrupt.  It's to eliminate the defense.  So are
 2      we surprised at the results?  I'm certainly not.
 3              The real reason the FBI got involved in
 4      this case is because Mr. Avery had the audacity,
 5      and, you know, this is what I'm going to hear,
 6      probably, how dare he accuse these fine officers
 7      and besmirch their reputations.
 8              And when that happens, they circle the
 9      wagons.  Cops, when they get accused of
10      misconduct, they circle the wagons.  That's the
11      code of silence, or that's the bond they have.
12      And that's why Calumet and DCI were so quick to
13      jump on the bandwagon, when Lenk and Colborn were
14      professing they did nothing wrong.  They had
15      nothing to do with this.  And Lenk and Colborn
16      probably counted on that.
17              Quickly, a couple of other peculiar
18      things about the timeline.  The -- Bobby Dassey
19      says that he sees Teresa Halbach at 2:45, he
20      leaves at three, and the vehicle is still there,
21      something like that.  He has no good way of
22      verifying the time, but he tells the officer,
23      talk to Scott Tadych -- Tadych, he can tell you
24      precisely, is the word he used, precisely what
25      time it was.
```

CHRM006822

1          Well, how does he know that Tadych can
2     tell precisely what time it was that he
3     supposedly is being seen, unless the two of them
4     maybe got together, talked about a story they had
5     come up with.
6          Remember, those two people, unlike
7     anybody else that was asked about an alibi and
8     maybe weren't, but those two people alibied
9     themselves.  Without each other, there is no
10    alibi for either one of them.  Nobody sees Dassey
11    go hunting in the woods.  Taking a shower, by the
12    way, before he goes off hunting, like his Irish
13    Spring soap is going to help attract deer.  Come
14    on.
15         And he goes there so that -- he wants to
16    get there before dusk, because that's when the
17    deer feed.  I'm not a hunter, but we know what
18    time he left and came home.  It was well before
19    dusk, he is home at 5.  That doesn't make sense.
20         More importantly, Lisa Buchner, the
21    school bus driver, is a completely disinterested
22    party and she does have a reason to know the
23    time, precisely, because she has got a regular
24    route that she drives, 3:30 to 3:40 every day.
25    School lets out 3:05.  She's drives, drops the

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 206 of 229   Document 330-18

CHRM006823

people off. She's dropping those Dassey boys off
at that time.

What does she say? She says she saw a
woman taking pictures of a van. Now, how many
women are out there taking pictures of a van at
that same time period. She's honest and says I
don't remember if it was Monday, the 31st,
Tuesday, the 1st, or Wednesday, November 2nd.
That's what she tells Investigator Wiegert on
November 7th, just one week afterwards now, when
it's fresh in mind.

And she's so concerned about it, she
went to the barricades on November 5th and said,
hey, I think I saw her. I think I saw her. I
don't remember what day but, you know. That's
what she describes, this woman taking pictures.
The State, 16, 17 months later, is able to
confuse her, and say, well, yeah, maybe it was a
week earlier, maybe it was a couple weeks
earlier, but that's not what she said when it was
fresh in her mind.

The State will argue that the location
wasn't right. She said she saw someone taking --
she saw her taking the pictures of something down
around the turn around circle. And it's true,

CHRM006824

that's not where Barb Janda's car was, or this
van was. It was up the road a ways. Well,
either she's mistaken about that or -- and I
submit this is a very real possibility -- she is
doing a hustle shot, because she's been flagged
down on her way out and asked to take another
picture. By who?

　　　　We know it's happened before. We have
evidence. Angela Schuster said, just a few weeks
earlier, Tom Janda had flagged her down and taken
a hustle shot, on the way out.

　　　　And John Leurquin, the propane driver,
yeah, he's not as certain, but he does
corroborate Lisa Buchner in that he sees this
green SUV around the same time. He doesn't know
who's driving, and maybe it wasn't Teresa Halbach
at that point. This person who was hustling a
shot perhaps, was driving away with. But he
recalled it because it was different, wasn't the
usual regular vehicles that he always sees.

　　　　So when the State tells you that Bobby
Dassey is this credible witness, who's the last
person to see Teresa Halbach alive, maybe he's
right, if he's the killer. Or Scott Tadych, his
only alibi. He tells him --

ATTORNEY KRATZ: Judge, I'm sorry, I'm going to interpose an objection on third party liability. I would like to be heard.

ATTORNEY BUTING: I will rephrase that. I will withdraw that.

ATTORNEY KRATZ: I don't want it rephrased, I want to be heard.

THE COURT: I'm going to let Mr. Buting finish up, then I will hear your objection.

ATTORNEY KRATZ: Thank you, Judge.

ATTORNEY BUTING: Police, when they interview Mr. Dassey, just accept his story, unquestioning -- unquestioningly. And they accept Mr. Tadych's story. They don't go check out his alibi for later, where he says he is visiting his mother at the hospital. Well, where is the proof of that?

Why do you believe him, especially when he tells you that, when he comes back, he sees this fire, and then he knows what time it is because he leaves around 7:45, he wants to get home so he can watch *Prison Break*. *Prison Break*, at 8:00, in Wisconsin. Did they check that out to see what time it comes on?

Do you still want to be heard or?

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 209 of 229   Document 330-18

CHRM006826

1           THE COURT:  You can continue.

2           ATTORNEY BUTING:  All right.  I will talk

3    briefly about the other, since Mr. Kratz said that

4    these -- Mr. Fassbender and Wiegert were

5    investigating, parallel, these other suspects,

6    including the boyfriends, ex-boyfriends, whatever,

7    but look at what they did.  They admit that, yeah,

8    sure, Mr. Avery may be a suspect or a person of

9    interest because we know he was one of the people

10   who saw her on the last day.

11          But who else saw her on the last day,

12   George Zipperer, and look how he behaved.  Mr.

13   Avery says, come on in, very cooperative.

14   Zipperer is belligerent.  But we didn't know

15   that.

16          Hillegas, former boyfriend, no alibi,

17   didn't even ask him.

18          Male roommate, Mr. Bloedorn, who doesn't

19   report her missing for four days.  What's up with

20   that?  Don't ask him for an alibi.  Where was he?

21          Bradley Czech, male friend with a little

22   bit more personal relationship with her, perhaps.

23   Again, no alibis checked.

24          Mr. Pearce, an employer who never

25   bothers to report her missing, for four days.

                          210

CHRM006827

All of these roles that these people
play, the officers admitted would normally, in a
normal missing person or homicide investigation,
be considered possible suspects that you would at
least look at and check out, but not here.

And what about all the other people on
the Avery property on October 31st?  What's up
with that?  Where are their alibis?  Customers
and other people who work and live there.

And, interestingly, going quickly back
to this hustle shot for a minute, I asked, you
know, you think maybe -- well, of course, if she
was flagged down, there wouldn't be any record in
her palm pilot.

But if it was a different kind of hustle
shot that she was on her way to go do, the FBI
technician, or whatever, that came here and
talked about the electronics, said that he might
have been able to recover that kind of data from
the palm pilot, but wasn't asked to.  They were
concerned about him trying to prove that it was
Teresa Halbach's palm pilot, not what was on it.

And, then, there's what I consider the
mysterious part of Teresa Halbach's life.  And I
mean no disrespect to the Halbach's family,

CHRM006828

whatsoever, when I say this. But Teresa had her own private life. We know that. She had at least three circles of friends, I think it was described: Her family, people that she worked with in the community, marketing and whatnot, and the Green Bay friends.

And apparently they didn't intersect very much. Because she's missing for four days before anyone reports it. And maybe most interestingly is, we know that on Saturday night she was out, with somebody, or she was -- I can't say she was out with somebody, but we know that she went out, some Halloween party somewhere, bar, wherever, in Green Bay area is what Mr. Hillegas, I think, said he thought, or maybe Mike Halbach.

And yet, despite all those fliers that were sent around, all over the state, thousands of them, not one person has come forward to say I was with her Saturday night. Something is weird about that. Especially when you combine it -- I believe Mr. Pearce, I may be misquoting him, but I believe he, at one point, had some thought that maybe she had met somebody on the weekend and that's where she was and why she wasn't showing

CHRM006829

up.

But then we have the weird thing about
the voice mail. Why did the police not follow up
on this. We were not confused about these
records, but I'm glad that Mr. Zimmerman was able
to enlighten us, that the messages that are on
this exhibit, 372, 18 of them, would not
constitute a full mailbox. He said that very
clearly.

And what he said was, when I asked him
if this -- if this persons account was sending
out a message when you called, that said mailbox
is full, would something more have to be on it
than what's on these records. And he said, yes.
And he said that, yes, that meant something had
to have been erased. Something on her voice mail
was erased by somebody.

And to do that, you would have to have
her password. And I'm not at all accusing the
Halbachs of that. But somebody else close, that
had her password, and for some reason thought it
necessary to erase a message. What was so
important on her voice mail, or perhaps so
incriminating on her voice mail, that would
necessitate somebody, close enough to her that

213

CHRM006830

1    has her password, erasing one or more messages.

2    These are all reasonable doubts, ladies

3    and gentlemen. These are all questions that

4    police and law enforcement ignored, because it

5    points away from Steven Avery, who wouldn't have

6    had her password and points to someone else.

7    Mr. Strang will finish up and give you a

8    little bigger picture in a moment, but I'm

9    confident that you are going to find more than

10    reasonable doubt and find Mr. Avery not guilty.

11    Thank you.

12    THE COURT: All right. Members of the

13    jury, we're going to take a break at this time. I'm

14    going to talk to the attorneys about scheduling.

15    Again, do not discuss this matter during the break.

16    We'll call you back shortly.

17    (Jury not present.)

18    THE COURT: You may be seated. First of

19    all, Mr. Kratz, I will hear your objection at this

20    time.

21    ATTORNEY KRATZ: Thank you, Judge. This

22    Court has entered numerous pre-trial rulings for

23    which Mr. Buting was a party. One of those

24    pre-trial rulings prohibited any reference to a

25    possible third party, that is, a killer, other than

214

CHRM006831

Brendan Dassey, without advance ruling of the Court.
This Court entered a written order, as I recall, as
to that matter.

Mr. Buting, in front of this jury,
indicated that maybe Bobby Dassey is the killer.
There's two things that I ask the Court to
entertain: First of all, inquire of Mr. Buting
whether that was an intentional violation of the
Court's previous ruling; that is, whether he
recalled the Court's previous ruling as to third
party liability and whether or not Mr. Buting was
fishing for a mistrial.

And if not, that is, if the Court is
unwilling or otherwise able to make its own
ruling as to intentional versus negligent
reference to Bobby Dassey, we are asking for an
admonishment in front of the jury as to the
nature; that is, that it intentionally or
purposely violated a pre-trial ruling of this
Court.

Certainly earlier, in Mr. Buting's
testimony, when referring to the burn barrels
with Bobby Dassey, he had referred to Bobby
Dassey as a possible other suspect. However, it
wasn't as blatant in calling Bobby Dassey the

215

CHRM006832

killer.

And I don't know whether Mr. Buting thinks that he's entitled, because he's representing Mr. Avery, to play by a separate set of rules, or to ignore pre-trial rulings of the Court, and it certainly does call for an admonishment and I would suggest it calls for a colloquy, with the Court, as to whether this was an intentional violation of a previous Court order.

I would note that, Judge, both Dassey and Tadych were specifically ruled out in the pre-trial rule or the pre-trial order.

THE COURT: Mr. Buting.

ATTORNEY BUTING: Judge, I'm aware of the pre-trial ruling. I don't believe I exceeded the Court's ruling. When you are doing closing arguments, of course, sometimes you say things differently than you intend. If I did, I certainly, I think, brought it back within the realm of investigative bias, which was the primary point that we're trying to make and throughout this case.

But maybe more importantly, the Court's ruling was that we were not allowed to present any evidence, extrinsic evidence, of a third

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 216 of 229   Document 330-18

CHRM006833

party.  But I don't know that that included that

we couldn't argue reasonable inferences from what

the evidence presented.

I don't think I was -- I wasn't even

intending to go that far, quite frankly.  I was

trying to keep a little farther back from that.

But I don't think that under *Denny* there's --

what they're talking about is presenting evidence

trying to point the finger at somebody else.

Reasonable inferences, I think, is another matter

and I think it's reasonable inference from the

evidence.

THE COURT:  Mr. Kratz.

ATTORNEY KRATZ:  No further argument,

Judge.

THE COURT:  All right.  I'm taking a look

at my order, after a 14 page decision, the order is

that the defense is precluded from offering any

direct evidence to a third party, other than Brendan

Dassey participated in the commission of the crimes

as charged in the Amended Information.  I don't

recall that I was asked to place a limit on closing

argument.  I think there is a differentiation

between the two.

I don't know how I would have ruled on

*difference between evidence and closing*

CHRM006834

it, frankly, had I had one, because I don't know
that the *Denny* case specifically addresses the
issue. I don't know that another case
specifically addresses the issue.

But my recollection is, and the wording
of my order is, that it was directed to the
introduction of evidence. I'm not sure that the
Court can prevent the defense from arguing
inferences on the evidence as it was presented.
The State gets a chance to respond in rebuttal.

I don't know. I will hear further from
the State if you wish, Mr. Kratz, but I'm looking
at my order and it only relates to direct
evidence. I don't know that I can rely on that
order to address your concerns.

ATTORNEY KRATZ: If the Court excludes
evidence of third party liability, and there's no
evidence in the record, how does Mr. Buting think
that he can comment on that evidence, or lack of
evidence. He can't. I mean, it absolutely flies in
the face of the third party liability court order.

In other words, Judge, to be precluded
from presenting any evidence, but then to be
allowed to stand up in front of this jury and say
maybe Bobby Dassey is the killer, how could we

218

CHRM006835

1     possibly have notice to either predict that, or

2     to present evidence that -- that might suggest

3     differently.  That absolutely flies in the face

4     of the -- if not the words of the order,

5     certainly the intent of that order.

6           THE COURT:  Mr. Buting.

7           ATTORNEY BUTING:  Well, Judge, as the Court

8     I think has made clear, Mr. Avery, by his not guilty

9     plea, means he isn't the killer, so somebody else

10     has to be.  What I was trying to do was simply point

11     out all of the other avenues that the police could

12     have examined and didn't.

13          And I think in the context, overall, of

14     every -- everything else that I have argued in

15     the argument, I think I'm within that.  And I

16     don't think there is anything close to a

17     violation of the Court's order barring any kind

18     of direct evidence.

19          Again, it wasn't even my intent to go

20     outside the realm of investigative bias, failure

21     to look at suspects.  But if I did, I think in

22     the overall context of the whole argument we have

23     been making throughout this case, I think the

24     jury is not going to be confused and it's going

25     to be clear that that's the purpose for which

CHRM006836

1    it's being offered.

2          THE COURT: I -- I don't know, without

3    doing some research, the answer to the question the

4    State is raising here; that is, whether the logical

5    inference from a *Denny* decision that denies the

6    right to introduce evidence provide -- or prevents

7    the defense from arguing on the basis of evidence

8    that was presented, that there's third party

9    liability.

10         Let me suggest this, as I understand

11    what Mr. Buting is saying, he is saying, I may

12    have gotten carried away in the way I worded it.

13    My purpose in making the references was not to

14    suggest that there was evidence in the record

15    that any of these parties committed the crime,

16    but rather that the State did not sufficiently

17    investigate other parties.

18         We're still going to be hearing from

19    Mr. Strang. If Mr. Strang, at the beginning of

20    his argument, clarifies that point for the jury,

21    is that sufficient to address the State's

22    concerns?

23         ATTORNEY KRATZ: We would ask for an

24    admonishment. If that's the Court's ruling,

25    however, that the Court believes that that is a more

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 220 of 229   Document 330-18

CHRM006837

1    appropriate resolution of the case, I understand

2    that that's the Court's order.

3            THE COURT: Here's what I am going to do.

4    I'm going to give Mr. Strang a chance to do that

5    when he makes his argument, to clarify it, assuming,

6    Mr. Strang, that you feel the way your co-counsel

7    does about what the intention was.

8            ATTORNEY STRANG: Yeah, I -- More to the

9    point, I have to apologize, I was shortening my

10    closing argument --

11            THE COURT: Don't worry about it, because

12    that's something I'm going to discuss with the

13    parties in chambers. The juror's eyes are starting

14    to glass over. We're looking at your closing, plus

15    rebuttal from the State, I don't think it's fair to

16    the jurors to keep them here as long as that may

17    take.

18         I think both parties will be better

19    served if we come back tomorrow, when the jurors

20    are fresh. I do think, however, it's necessary

21    to address the alternate juror issue, and I'm

22    going to talk with the parties about that, in

23    chambers, before we come back.

24            ATTORNEY STRANG: Do we want to just

25    address, in chambers, what it is I should say, or

221

CHRM006838

consider saying? I'm sorry, I just missed that.

THE COURT: You will have the evening to think about that.

ATTORNEY STRANG: Okay.

THE COURT: I'm going to go off the record right now. I will see counsel in chambers for a short conference.

(Recess taken.)

THE COURT: I will indicate for the record, I met with counsel in chambers and I indicated that, based on the time of day and the fact we have got part of defense argument, plus State rebuttal left, I was concerned that the jurors, certainly by the time we got to the State's rebuttal, would be too tired to appreciate what was being said.

The Court has an interest in making sure that the jurors have an opportunity to digest, understand and comprehend the arguments that are given. And while at the start of today, it would have been my preference to complete closing arguments today, sometimes justice takes more time than we plan on in the morning.

So what I'm going to do, when the jurors come back, is adjourn for the day. The Court is going to begin the -- because we're as far into

222

CHRM006839

```
 1    closing arguments as we are, I'm going to begin
 2    the sequestration process and the jurors will be
 3    staying in a hotel tonight.  It's my
 4    understanding that the parties have a stipulation
 5    to propose to the Court concerning the -- at
 6    least two of the three alternate jurors.
 7    Mr. Strang.
 8              ATTORNEY STRANG:  We do, your Honor.  And I
 9    would be happy to take a first stab at the
10    agreement, as I understand it, between the parties.
11    I will preface that by saying that I have explained
12    this agreement to Mr. Avery and I think it's
13    entirely acceptable to him.  It's not complicated.
14    We had enough time to talk about it.  And I'm
15    satisfied that he both understands and approves the
16    agreement that I will try to articulate now, late in
17    the day.
18              In short, the parties have agreed that
19    each will have an extra peremptory strike, in
20    effect, to be exercised here in the ordinary
21    manner of exercising peremptory strikes.  That
22    will remove 2 of the 15 jurors that we presently
23    have, leaving 13, which would be 12 and 1
24    alternate.
25              And, of course, whether the Court keeps
```

223

CHRM006840

an alternate, or how to handle the designation of
an alternate, and then what to do with an
alternate, is the Court's prerogative and not the
parties. But as I understand the agreement here,
for purposes of the record, it does encompass one
extra peremptory strike for each party, to be
exercised now.

THE COURT: Mr. Kratz.

ATTORNEY KRATZ: For today's purposes,
Judge, that is the scope of our agreement, that each
party intends to exercise an additional peremptory
strike this afternoon.

THE COURT: Okay. And this is in lieu of
drawing the names of the jurors out by lot, which
would be the process contemplated by the statute, in
the absence of agreement by the parties.

ATTORNEY STRANG: It is, your Honor, from
the defense advantage point.

THE COURT: Mr. Kratz.

ATTORNEY KRATZ: That's my understanding,
Judge.

THE COURT: And, Mr. Avery, it's correct
that you have discussed this with your counsel and
you are in agreement with this procedure.

THE DEFENDANT: Yes, I am.

224

CHRM006841

THE COURT:  Thank you.  Anything else

before we bring the jurors back in?

          ATTORNEY KRATZ:  If I could have just a

moment with counsel, your Honor.

          THE COURT:  Go ahead.

          ATTORNEY KRATZ:  We're all set, Judge.

          THE COURT:  All right.  You can bring the

jury in.

          (Jury present.)

          THE COURT:  You may be seated.  Members of

the jury, I understand I told you an hour and a half

or two hours ago or so, I don't remember when, that

we were going to attempt to complete closing

arguments this evening.  In light of the point that

we're at in the proceedings now, I am concerned that

fatigue might be a factor that prevents you, as

jurors, from giving the attention that is deserved

for the closing arguments.

          So what we're going to do is adjourn for

today and resume the completion of closing

arguments tomorrow morning.  As I told you at the

beginning of the trial, we started out, initially

we had four extra jurors, we are now down to

three.  Because of the fact we're this close to

the end of the trial, and I don't want to require

                         225

CHRM006842

the extra jurors to participate longer than is

necessary, we have decided that we're going to

excuse two of the three extra jurors today.

    The parties have agreed to a procedure

whereby each of the parties will exercise one --

will exercise a peremptory strike.  If you recall

back at the time of initial jury selection,

that's how we got from 30 down to 16.  So they

are going to do that today.

    When they are done, the strikes will be

shown to me.  I will identify the two jurors that

the parties have selected.  I will meet with

those two jurors before excusing you today, as is

my practice any time alternate jurors are

excused.

    For the 13 of you who are remaining,

because of the fact we are well into closing

arguments, we are going to begin sequestration

this evening.  We have hotel accommodations for

you.  We have dinner arranged for you.  And you

can decide, when you get on the bus, I guess,

whether you want to check in at the hotel first

or go to dinner first.  But because of the fact

we're at this late stage of the proceedings,

that's how we're going to handle things.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 226 of 229   Document 330-18

CHRM006843

1      At this time I think the Clerk has a

2  sheet and we will allow the parties to make their

3  stipulated peremptory strike.

4      ATTORNEY KRATZ:  Judge, could Mr. Strang

5  and I approach, just very briefly.

6      THE COURT:  Yes.

7          (Side bar taken.)

8      THE COURT:  Counsel, raised an issue for me

9  that I believe has been dealt with through the media

10  coordinator, but I will address it on the record,

11  since it was raised.  And that is, there was some

12  conversation about whether the excused jurors would

13  be available to the media.

14      I'm not going to allow that at this time

15  until a verdict is reached at this case.  It is

16  unlikely, but not impossible, that the jurors

17  could be called back.  And for that reason I'm

18  not going to have the excused jurors available to

19  the media until a verdict is reached in this

20  case.

21      All right.  Based on the information on

22  the sheet, the excused jurors are Terri Temme and

23  Laura Barber.  I will meet with Ms Barber and Ms

24  Temme before we leave today.  And I am going to

25  excuse the remainder of the jury at this time.

                        227

CHRM006844

I will remind the rest of you, again,

that as usual, you are not to discuss the case.

It's especially important, even though you have

heard some of the closing arguments, you cannot

begin your deliberations until all the closing

arguments have been made.  So make sure you do

not discuss the case.

        The televisions and radios have already

been disconnected in your hotel room, so

hopefully between the lack of available media and

supervision by the sheriff's deputies, that won't

be a problem.  But, again, do not discuss the

case, in any fashion, until the Court excuses you

to begin deliberations tomorrow.  The 13 people

who are still on the jury are excused at this

time.

                (Jury not present.)

        ATTORNEY STRANG:  Your Honor, maybe just

one -- another quick moment at side bar.

        THE COURT:  Okay.

                (Side bar taken.)

                (Proceedings concluded.)

CHRM006845

```
 1    STATE OF WISCONSIN   )
                           )SS
 2    COUNTY OF MANITOWOC  )

 3

 4            I, Diane Tesheneck, Official Court

 5    Reporter for Circuit Court Branch 1 and the State

 6    of Wisconsin, do hereby certify that I reported

 7    the foregoing matter and that the foregoing

 8    transcript has been carefully prepared by me with

 9    my computerized stenographic notes as taken by me

10    in machine shorthand, and by computer-assisted

11    transcription thereafter transcribed, and that it

12    is a true and correct transcript of the

13    proceedings had in said matter to the best of my

14    knowledge and ability.

15            Dated this 22nd day of January, 2008.

16

17

18

19                         Diane Tesheneck, RPR
                           Official Court Reporter
20

21

22

23

24

25


                            229
```

CHRM006846