STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                                BRANCH 1

---

STATE OF WISCONSIN,

       PLAINTIFF,       JURY TRIAL - DAY 24
                          CLOSING ARGUMENTS, CONTD.
vs.                  Case No. 05 CF 381

STEVEN A. AVERY,

       DEFENDANT.

---

**DATE:**    MARCH 15, 2007

**BEFORE:**  Hon. Patrick L. Willis
         Circuit Court Judge

**APPEARANCES:**  KENNETH R. KRATZ
             Special Prosecutor
             On behalf of the State of Wisconsin.

             THOMAS J. FALLON
             Special Prosecutor
             On behalf of the State of Wisconsin.

             NORMAN A. GAHN
             Special Prosecutor
             On behalf of the State of Wisconsin.

             DEAN A. STRANG
             Attorney at Law
             On behalf of the Defendant.

             JEROME F. BUTING
             Attorney at Law
             On behalf of the Defendant.

             STEVEN A. AVERY
             Defendant
             Appeared in person.

### TRANSCRIPT OF PROCEEDINGS

Reported by Diane Tesheneck, RPR

Official Court Reporter

1

EXHIBIT
tabbies
18

I N D E X

                                                   PAGE

**CLOSING ARGUMENT**

ATTORNEY DEAN STRANG                                 5

**REBUTTAL ARGUMENT**

ATTORNEY KENNETH KRATZ                              54

**FINAL INSTRUCTIONS**                             119

**ALTERNATE JUROR**

NANCY STIENMETZ                                    122

2

CHRM004547

1     (Jury not present.)

2         THE COURT:  At this time we're back on the

3     record in the case of State of Wisconsin vs. Steven

4     Avery, Case No. 05 CF 381.  We're here for a

5     continuation of closing arguments this morning.

6     Will the parties present state their appearances for

7     the record.

8         ATTORNEY KRATZ:  Good morning, Judge.  The

9     State appears by Calumet County D.A. Ken Kratz,

10    Assistant Attorney General Tom Fallon, Assistant

11    D.A. Norm Gahn appearing as Special Prosecutors.

12        ATTORNEY STRANG:  Good morning as well.

13    Steven Avery is present, again.  And Jerome Buting

14    and Dean Strang standing for him.

15        THE COURT:  All right.  Before we bring in

16    the jury and continue with closing arguments there

17    was one matter I wanted to clarify for the record.

18    During the course of these proceedings we have had

19    some individual voir dire with the jurors.  And I

20    wanted to clarify the Court's understanding that

21    neither party is asking that any of the jurors be

22    excused for cause, based on any of the information

23    adduced at the voir dire.  Mr. Kratz.

24        ATTORNEY KRATZ:  That's correct, Judge.

25        THE COURT:  Mr. Strang.

3

CHRM004548

ATTORNEY STRANG:  That is also correct.

        THE COURT:  Very well.  Is there anything
else the parties wish to take up outside the
presence of the jury before we resume with closings.

        ATTORNEY KRATZ:  No, Judge.

        ATTORNEY STRANG:  No, sir.

        THE COURT:  All right.  We'll bring the
jurors in at this time.

                (Jury present.)

        THE COURT:  You may be seated.  Good
morning, again, members of the jury.  At this time
we're ready to resume closing arguments.  Mr. Strang
will be speaking first on behalf of the defendant.

        ATTORNEY STRANG:  Thank you.  Good morning.

        JURORS:  Good morning.

        ATTORNEY STRANG:  You know, I -- what's it
been, five weeks, or six weeks, or whatever it's
been, and the rules within which we operate
fundamentally allow me only to speak at you.  At
this point, I would be ready to speak with you.  I
can't exactly.  But I do want to do my best to talk
with you this morning.  Can't hear?

        JUROR:  It's kind of soft.

        ATTORNEY STRANG:  Kind of soft.

        THE COURT:  Which number is that?

                           4

CHRM004549

1          ATTORNEY STRANG:  I'm No. 7.  I'm getting
2    nods, you hear me, whether you want to or not.
3          I want -- I want you to step back just a
4    little bit here and let's try to work at
5    assembling a bit what you might do in approaching
6    your task.  And you have got such a mass of
7    information, really, over the last five weeks,
8    let's call it.  There are some things you are not
9    going to be able to do, I think.  But there are
10   also some things you can do.  And I want to talk
11   about what I see as the line between those
12   things.
13         You, unfortunately, are not going to be
14   able to solve the murder here.  And I say that
15   for this reason, if Steven Avery did it, if -- if
16   he's the guy who murdered Teresa Halbach, then --
17   then, in a sense you are not going to solve that.
18   They already think that.
19         This is the person they think all the
20   evidence points to, the person they have
21   identified as doing it.  You can agree or
22   disagree with that, with that -- that theory of
23   prosecution.  But, fundamentally, you and I
24   aren't solving a murder, because if Steven Avery
25   didn't do it, we can't tell you who did.

5

CHRM004550

1    You know, Jerry Buting, Jerome Buting,

2    in Court, you know, is not going to tell you --

3    doesn't mean to tell you that, for instance,

4    Bobby Dassey murdered Teresa Halbach.  We don't

5    mean to tell you that someone else murdered

6    Teresa Halbach.  It's really kind of a point, we

7    don't have a police department, you don't have a

8    police department.

9            We're not going to be able to solve the

10   murder, if Steven Avery did not do it.  So, you

11   know, you can agree with the State, you can agree

12   with the defense, but at some level you are not

13   solving the murder, as much as it's natural for

14   all of us to want do that.

15           Second thing I think you are not going

16   to be able to do, I'm quite certain you are not

17   going to be able to do, is bring Teresa Halbach

18   back through that door, or better yet, back

19   through the door of her mom's house.  We are not

20   going to be able to do that.  Convicting a guilty

21   guy, convicting the person who killed her,

22   wouldn't do it.  Convicting someone who didn't

23   kill her, certainly won't do it.

24           The life that was before October 31,

25   2005, never will be lost.  It's etched in mom's

CHRM004551

heart. It's etched in her brother's, and her sister's minds, in their memories, in the people they are. That life is not lost. The life that could have been, going forward beginning November 1, 2005 is forever lost, not forgotten, but lost.

This is human tragedy, and if you or I understood why people have been killing each other since we crawled out of caves, we would stop it. But somebody killed this woman and that life going forward is lost. You can't get it back. I can't get it back. The gentleman at this table can't get it back.

The other thing I think that you are not going to be able to do, you can't do, 13 people, 12 people, can't do, is we can't provide closure here in any real meaningful way. It's not what courtrooms are good for. You would like to be able to do that for Teresa Halbach's family.

I think you would like to be able to do that for Steven Avery's family, provide some closure. Provide it for him, for crying out loud. You would probably like to do that, too, if you could. But there again, the time since November of 2005 really, fundamentally, is lost,

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 7 of 131   Document 330-19

CHRM004552

1  as a matter of closure for Steven Avery.

2          He's never really, in the broader

3  public, been presumed innocent. He's never

4  really had the presumption to which he was

5  entitled as an American, as a citizen accused.

6  You folks may be the only people in the world,

7  other than those of us at my table, who do

8  presume him innocent.

9          You can't do anything about it. We

10  can't do anything about that, for the rest of the

11  world. And as I say, courtrooms are pitiful,

12  pathetic places to try and provide closure for

13  Delores, closure for the Halbach family. Not

14  that it's not important that the system not work,

15  it is important that the system work. Because

16  when it works, we can provide justice, or some

17  semblance of justice. But justice and closure

18  are -- are two different things.

19          Nobody is always happy with justice, or

20  at peace necessarily with justice. And in that

21  sense, closure would be something more.

22  Something more personal for that family, and for

23  this family, and for Steven. You'd provide it if

24  you could, I know you would. You won't be able

25  to do it.

8

CHRM004553

And in some ways you are going to be told that you ought not try to do any of these things. Because I think Judge Willis will tell you, after the lawyers are done speaking at long last, I think he will tell you that you have got to decide this case, as finders of fact, without sympathy, without prejudice, without passion, without all the things that might go into solving murders or providing closure. You will be told instead that you won't, you can't, be swayed by sympathy, or prejudice, or passion.

But there are some very important things that you can do here, now that I have identified the things you can't. There are some very important things you can do. You can honor your oath. You can keep a promise that you made before the world, more importantly, that you made for yourself. You put your own conscience on the line. You can honor the oath that you have taken and that you will take, as jurors. You can obey the oath.

That's no small thing. You are under an enormous amount of pressure, internally and externally. This table, my table, a courtroom full of people, a community at large, terribly

9

CHRM004554

serious issues for everybody. So when I say you
can honor and obey your oath, it's a big deal.

You also can apply the law, honestly and
courageously, part of what you are duty bound to
do, as the Judge delivers the law to you in the
form of those jury instructions. You can apply
that. You can decide this case, if you choose,
on the evidence in the courtroom and only the
evidence in the courtroom.

You have the power to do that. You have
a duty to do it, but more importantly you have
the power to do it. You get to make the choice
to do that. It's something you can do. You can
decide whether allegations have been proved,
beyond a reasonable doubt, in considering all of
the evidence.

I don't take it for granted that jurors
do that, in the end. Because jurors are all
human, just like I am. But if you choose to do
that, you can. It's within your grasp. And I
think, finally, you can, if you choose, you can
get it right.

In the limited parameters available to
you, you can get it right. You can go home,
whenever you are done, and say, I know in my

10

CHRM004555

1   head, because I used my head, I know in my heart,

2   because I used my heart, I know in my conscience,

3   because I listened to my conscience, that I got

4   it right. You can do that. And if you do, you

5   will also have set it right.

6           Just as I said I was going to ask you,

7   when I spoke in opening statement, when it was

8   about 19 below zero outside, or whatever it was

9   that day, you will set a lot of things right, if

10  you get it right, here. The 1985 case won't

11  matter so much any more, if justice is done this

12  time.

13          Will that ever go away? No, but it just

14  won't matter so much any more, the injustice that

15  was done to Steven then, because there is --

16  there is something redemptive in human beings

17  going back and trying again and getting it right

18  eventually.

19          So I want to ask you simply to commit to

20  doing the things you can do, and to living with,

21  reconciling yourself to the things you can't do.

22  You are not going to solve a murder -- a murder,

23  but you may spare someone who's not a murderer.

24  You are not going to bring Teresa Halbach back to

25  her family, but at some level, just by this trial

                              11

CHRM004556

```
 1   ending, you can give her back to her family.

 2         What I mean by that, I mean for crying

 3   out loud, what an artificial thing we do -- and I

 4   love this, I love being a lawyer, I love it --

 5   but what an artificial strange thing it is that

 6   we do here, rules of evidence, formal procedures.

 7   And for crying out loud, right down to taking

 8   body parts and putting exhibit numbers on them,

 9   explain a person's phone records on a screen for

10   a room full of strangers to look at.

11         It is what we do.  It's what we have to

12   do here, at some level.  Clinical discussions of

13   death, dry discussions of who you are calling, or

14   who's calling you, on your cell phone, just for

15   example.  It's important.  It's necessary.

16         But, when this trial ends, with a just

17   verdict, although you can't bring her back, in

18   some ways you can give her back, you know.  We

19   can be past that and remember the Teresa Halbach

20   who was, rather than the 15 loci of her DNA.

21         You won't give closure, but maybe,

22   maybe, you can create an opening; if not closure,

23   an opening when we finish this trial, for people

24   to get out of these pews, out of these

25   uncomfortable pews, go back about their lives,
```

12

1  and in church, and in community, and wherever --
2  wherever the heck people hang out, in family
3  rooms, there pursue closure.

4         And the sense of restoration or
5  reconciliation that we find, or seek, in places
6  other than courtrooms, with uncomfortable pews to
7  sit in.  So maybe, as you finish this case,
8  although you can't give closure, maybe you can
9  give the opening for it.

10        How do you undertake then, to do the
11  things that you can do.  It's witnesses, it was
12  helpful for Mr. Kratz to give you pictures of the
13  witnesses so you can associate the face with the
14  name again.  But much more fundamentally, how do
15  you -- how do you assemble and assimilate this
16  mass of information and approach it in a
17  practical way.

18        You can't do it by hoping the DNA will
19  tell you a story.  You know, unfortunately, for
20  example, DNA, doesn't tell stories.  People tell
21  stories.  People have stories.  DNA is
22  submicroscopic bits of protein.  Mine's a little
23  different than yours, but, you know,
24  fundamentally we're all about 99.9 percent the
25  same, probably.  Doesn't tell a story.  It

13

CHRM004558

1    doesn't tell why someone did something, doesn't

2    tell when it got where it got.

3         If a human being made a mistake with the

4    DNA, it doesn't tell you anything at all about

5    whether -- whether it should have been here, or

6    wasn't here, or whatnot. It doesn't -- It

7    doesn't tell you a story, unfortunately, although

8    it makes good rhetoric, in a closing argument.

9         So what you have to do in the end is,

10   you have to look and listen to people here. Even

11   when they are talking about science, or filling

12   their -- with the propane truck, or whatever. In

13   this process, to do your job, to do the thing you

14   can, you have got to look at real intently on the

15   witness stand and listen to people. And you have

16   got to sort out who you believe and who you

17   don't, in the end.

18        So I want to at least suggest that you

19   ask two very basic questions here as -- as a

20   framework, a possible framework for getting at

21   the things you can do here, if you choose. First

22   question, you know, he says he is innocent.

23   Anybody can say they are innocent.

24        Back at the time before you were around,

25   before anybody was really looking at him, you

14

might ask first, was he doing the things that an innocent person might do. As you look back at it, was he acting and was he behaving like an innocent man. That's one question you could ask, sort of approaching this whole mass of evidence.

A second question you might ask yourself is, for the law enforcement professionals and the prosecutors, primarily the state employees and state witnesses, call them law enforcement people generally, the ones who are so convinced he is guilty, back before they got here, were -- were they behaving as honest people acting in good faith do.

You could ask yourself that question, again, as sort of a framework for approaching this mass of evidence. Back before they knew you were going to look at them, as you see it now, were they behaving honestly, were they acting in good faith. Now, these -- these are just two suggestions, just some lawyer's idea. You can go about this whatever way you want. But this might be helpful.

And ask yourself, as to the folks who think Steven Avery is guilty, do you believe them in the end, and believe them to a level that you

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 15 of 131   Document 330-19

CHRM004560

```
 1    would not even pause or hesitate, when called
 2    upon to act in the most important affairs of
 3    life.  That's language right out of this
 4    reasonable doubt instruction that you got.
 5            And just taking a part of it, and it's
 6    sitting under your chairs, or wherever your
 7    instructions are, you don't have to pick it up
 8    and look at it now, but you will find that.  I
 9    think it's a helpful practical guide in deciding
10    whether something is proven, whether you believe
11    it, beyond a reasonable doubt.  It's, you know,
12    would you -- given the information you have in
13    the end, would you pause or hesitate in the most
14    important affairs of life.
15            There's no getting around that this is
16    one of the most important affairs of your life,
17    of your lives.  A young woman is dead, for no
18    conceivable good reason.  And a man is on trial
19    for doing it.  Enormous consequences.
20            And Mrs. Halbach, and everybody who
21    loved and cared about this young woman, brothers,
22    sisters, friends, uncles, aunts, you name it.
23    And to Mrs. Avery, whose own story is tragic.
24    You know, and to the people who fought for his
25    innocence, the handful of people who believed
```

16

CHRM004561

him, before the rest of the world finally got it
right, who went through all that, Mrs. Avery, and
then two years later to have this come crashing
down on her. This is an important affair. And
it is for you now, too.

So, I start with my first question, did
he behave as an innocent man might behave. Let's
go back, let's go back to roughly October, 2005.
What's he doing? What's Steven Avery doing?
Well, he is living in a trailer that he borrowed
from Rollie Johnson. That's pretty modest.
That's a damn sight better than a prison cell,
that he had been in. He's got himself a
girlfriend. He's working in the family business.
This is all honest stuff. So far.

He has a lawsuit started, for a whole
lot of money, based on he's got two indisputable
points on his side in that lawsuit. One, he was
innocent of the earlier case, but, you know, he
rotted in prison for a while anyway. So, you
know, he is innocent, but he went to prison.
He's got two pretty good starting points in a
lawsuit, in getting some money. And that's what
he's got two other lawyers pursuing for him, back
in 2005. He's got his mom and dad back. I don't

17

CHRM004562

1    mean to be ignoring Allen, but when I speak of

2    Delores and anybody else, he's got his family

3    back, is the point.

4           And as this -- as this case starts to

5    take shape, you know, as Teresa gets reported

6    missing, and they find out that she had a photo

7    shoot out at the Avery property.  The very night,

8    November 3, she's reported missing, Sergeant

9    Colborn comes out to the property, bumps into

10   Steven Avery.

11          Steven is not expecting the police.

12   There's no way he would have even known she had

13   been reported missing at this point.  Bumps into

14   Sergeant Colborn and he is cooperative.  By

15   Sergeant Colborn's own account, he is

16   cooperative, open, talks to Sergeant Colborn.

17   Doesn't say I'm not talking to you, you know.

18          The next morning, same thing.  Detective

19   Remiker and Lieutenant Lenk come out to visit

20   him.  He's cooperative, cooperative to the point

21   of saying you can come into my house, when they

22   ask, go ahead, come in my house.

23          I think it's later on Friday,

24   November 4, when David Beach comes and, you know,

25   has the poster.  He wants to put the poster up.

18

CHRM004563

1    This is Teresa's relative, nice younger guy who

2    testified, I think the first day of testimony.

3    And David Beach has a conversation with Steve

4    Avery and Steve is forthright.  He's calm.  He

5    appears concerned, according to Mr. Beach.

6         To me, this is useful, because at that

7    point he is not posing.  He is not in a

8    courtroom.  He doesn't know how this is all going

9    to play out.  These -- These are people who are

10   seeing him real, if you will, just having, you

11   know, encounters with him.  And this is their

12   take on what -- on what they are getting from his

13   behavior and what he says.

14        Is he behaving like an innocent man?

15   Well, he has Teresa Halbach's cell phone number.

16   We get a glimpse of her, she's obviously willing

17   to give this out.  She says so in the voice mail

18   message.  She leaves her cell phone number on the

19   voice mail message.  They caught that, that she

20   leaves on the Janda voice -- or answering

21   machine.

22        And Steve has her cell phone number.  He

23   has got it written down in two places in his

24   house.  They are on his computer desk somewhere.

25   They are there on November 5 when the police

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 19 of 131   Document 330-19

CHRM004564

descend and the -- the Avery people get excluded
from the property. And the police have it for a
week. They are there. He hasn't destroyed her
cell phone number, hasn't tried to get rid of it,
you know. It is there in not one, but two
places.

So, you know, I don't know, if you can
burn a cell phone, and if you can burn an A310
Digital Power Shot Camera, I don't know why you
can't burn two pieces of paper that have a cell
phone number on it. That's not what he does,
obviously.

There was a van for sale. Heaven knows
there was a van, you saw about 10 pictures of
this silly maroon van sitting out there. Why --
Why do I, you know, why do I suggest that's
evidence, if you will, of Steve behaving like an
innocent guy would behave? Well, you know, if
you're -- if you are going to lure the
photographer to your property so you can have
your evil way with her, and kill her, you don't
need a car, you don't need anything for sale.
You just lie and say, you know, I want you to
come out and take a picture of a '73 Eldorado,
or, you know, whatever it is.

20

CHRM004565

There's a van.  It's the van he tells *Auto Trader*.  It's owned by Barb Janda, just like he tells *Auto Trader*, B. Janda.  And gives B. Janda's telephone number.  Turns out there is no dispute, of which I'm aware.  The Dassey boys, you know, Scott Tadych, the people who know about this, who testified, yeah, there's a van.  It's sitting there.  She's trying to sell it.  It's hers.

I think that's suggestive of innocent behavior.  Not of, you know, luring, or concocting some scheme so that you can murder somebody.

Look, again, what he's doing in October and early November, 2005, while he's still in his house.  The gun's over the bed.  Are they hidden?  Has he -- you know, has he run off and burned them, or asked his nephew to take them and thrown them in the bottom of a pond or something, or even moved them to the spare bedroom?  No, the guns are where they are.  They are right where Rollie Johnson left them.

Did he crush the car, no.  Did he empty the burn barrel, try to hide, you know, whatever is in the burn barrel?  Did he melt the license

21

CHRM004566

plates?  Did he get rid of the key that
supposedly is found, you know, next to the foot
of his bed, or across the way from the foot of
his bed, next to his desk?  No, you know, he
doesn't do any of that.  I don't think the key is
there.  But if you believe that it's -- that it's
there, you know, if you believe it's there, then
it's awfully incriminating, if you believe he put
it there.

But, you know, I don't know why he would
keep the key, and that key alone, of all of
Teresa Halbach's possessions, if he has
previously disconnected the battery so that the
key won't work, unless he reconnect the battery
for some reason.  And he's got a junkyard, for
crying out loud.  Leave the key in the trunk
where the keys are for all the other junk
vehicles.  Leave it in the ignition, put it in
the grass, I don't know.  Bring that, and that
alone, to your bedroom.

But you know, in general, the behavior
you are seeing from Steven Avery on November 3
and November 4 is open, cooperative, sure you can
search my house, contrasted to the behavior of a
George Zipperer, who is one of the other

22

CHRM004567

1  appointments Teresa has that afternoon.
2  Uncooperative, hostile, dishonest with the
3  police, won't let him in the house for a long
4  time, even after he knows this young woman is
5  missing.  You get this from -- some of it from
6  JoEllen Zipperer and some of it from Detective
7  Remiker.
8          How about burning trash, plastic smell,
9  burning trash at about, give or take, 3:45 on
10 Monday afternoon, how about.  Well, that really
11 sort of takes you to Bobby Dassey, and Blaine
12 Dassey, and Lisa Buchner, and John Leurquin, to
13 decide what burning trash means.
14         If Bobby Dassey is right and Teresa
15 Halbach has been there at 2:45, then burning
16 trash at 3:45 with a plastic smell is potentially
17 incriminating.  Bob Fabian sees this, smells the
18 plastic burning as well.  That's potentially
19 incriminating if Bobby is right.
20         I'm wondering why Bob Fabian doesn't
21 smell the quite distinctive odor of a burning
22 tire.  You know, rubber burning, with black smoke
23 pouring thickly out of the burning barrel, if
24 supposedly the tire is being used to burn the
25 cell phone, the camera, and the palm pilot.

23

CHRM004568

But setting that aside, to me there is a
more fundamental problem with that. I don't
think Bobby Dassey is right. You know, Blaine
Dassey has a good reason to know when he gets off
the bus every day, it's 3:30 to 3:40. He comes
home, Bobby is sleeping. Bobby is there and he's
sleeping. This is what his own brother
remembers.

More, the bus driver has a pretty good
reason to know what time. She's driving the same
route every afternoon, dropping off the same
kids, in the same place, at about the same time,
every afternoon.

She's no friend of Steven Avery. She's
not connected to Steven Avery. She's not
coached. She's not trying to oversell what she
remembers. But that's when she drops the Dassey
boys off. And one of the days that week, either
Halloween, or Tuesday, the 1st, or Wednesday,
November 2nd, she remembers seeing a female
photographer taking pictures of a van.

If facts are stubborn, as counsel says,
then that -- then that's a pretty stubborn fact.
Just because she's not overselling it, and she
has no reason to want -- to care how this case

24

CHRM004569

comes out, you know.

So is it possible that some other female photographer was there on Tuesday, November 2nd, taking a picture of a van? Well, is it possible? Sure, it's possible. But even Investigator Wiegert concedes, when pushed a little bit about that, that he doesn't have any information about another female photographer coming to take a picture of another van.

So this is pretty reliable stuff, that Teresa is there at more like 3:30 or 3:40, not 2:45. John Leurquin sees a green SUV leaving. What does he care about Steven Avery? For that matter, what does he really care about Teresa Halbach. And he doesn't have -- he doesn't have a dog in this fight.

What he has to do is sit and stare out the front windshield of his truck, every day for half an hour, 3:30 to 4, quitting time, as he fills the LP truck. He has got nothing to do except look at the world. Filters out the school bus, filters out, you know, the cars he sees coming and going every day. That's common sense, that makes sense.

When something new goes by, it's not a

25

CHRM004570

```
 1    heavily traveled road, he notices.  Is he
 2    overselling the point, no.  Can't say it's that
 3    SUV, can't say it's a Toyota RAV4.  Looks
 4    similar, can't say who is driving it.  Didn't see
 5    whether it turned right or left at the stop sign
 6    on Highway 147.  You know, he's not gilding the
 7    lily, so to speak.  He's not overselling what he
 8    saw.
 9              So, to me -- you guys are the ones that
10    matter -- but to me, that's fairly reliable
11    stuff.  It's reported to the police, candidly,
12    when they ask.  Lisa Buchner for that matter goes
13    up to the barricade, that Saturday, says I have
14    some information maybe you want.  They interview
15    her two days later, you know, the following
16    Monday, when it's fresh in mind.  And she tells
17    them what she knows.  Tells them what she doesn't
18    know, for that matter.
19              So, you know, you got Bobby stacked up
20    against Blaine, Lisa Buchner and John Leurquin,
21    and it looks to me like the more probable time
22    frame is 3:30ish that she's there.  And if that's
23    so, then burning garbage in your burn barrel at
24    3:45 is just burning garbage in your burn barrel.
25    It's innocent.  Bob Fabian smells plastic, so
```

26

CHRM004571

what. It's a white plastic garbage bag that, you
know, Blaine sees.

And you got plastic in your garbage, you
know, I'll bet you do, unless you live in town
where you've got a nice blue recycling tub or
something, and you separate that stuff out. But
this doesn't look like much, if the time frame is
different than Bobby Dassey has it.

So how about -- how about the 4:35 p.m.
phone call to Teresa's cell phone, what my
colleague referred to as the alibi phone call.
And the State argues he is doing that to create
an alibi, because he knows that will create a
record on the cell phone bills, cell phone
company records.

Okay. All right. I mean, first of all,
it makes the *67 calls not very important,
because they are going to create a record too.
And if he knows a 4:35 call is going to create a
record, then he also knows that the 2:24 and 2:33
call are going to create a record. But maybe
more importantly than that, this isn't much of a
alibi.

It's a cell phone, calling a cell phone,
you can be anywhere, doesn't place you in any

27

CHRM004572

1   particular, you know, spot on the planet. It's
2   not like you are at home in your kitchen, because
3   you called on your land line, you know, with a 6
4   foot cord keeping you from going any further.
5   It's a cell phone. It's not a good alibi, you
6   know, it doesn't get you anywhere, or suggest
7   that it's guilty behavior.

8          This call, also, draws more attention to
9   you, not less. I mean, you are going to show up
10  on the cell phone records. It is your cell phone
11  you are using. It's not -- This isn't something
12  you do if you are trying to alibi yourself.

13         But if, while we're looking at phone
14  calls and moving through Steve's behavior on
15  October 31, you know, hey, there are two
16  telephone calls the State hasn't talked much
17  about yet, if at all, but they stipulate on this.
18  They agreed. There are two phone calls from the
19  Manitowoc County Jail to Steven Avery's land
20  line.

21         He's got a cordless phone, it may even
22  be in one of the pictures in the bedroom, so he
23  can wander around. But it is, you know, it is a
24  cordless land line phone, they have stipulated.
25  These phone calls come in from his girlfriend,

                            28

CHRM004573

```
1    Jodi, from the jail.  First one is at 5:36 in the
2    afternoon, 15 minutes of talking, tape recorded.
3    Investigator Wiegert has listened to it.  And
4    then another one at 8:57 p.m., tape recorded,
5    then listened to by the police, 15 minutes long,
6    talking to his girlfriend.
7              This is what somebody who's in the
8    process of burning a body is going to be doing?
9    Are you kidding me?  You know, I mean, you think
10   maybe you would have heard those tapes played if
11   there had been something incriminating, or out of
12   the ordinary about the 15 minute conversations
13   with the girlfriend, that night, Halloween night?
14   It's more just evidence of every day life, doing
15   what an innocent person might well be doing.  And
16   that's how October 31 comes to an end.
17             Later that week -- and I, you know,
18   Blaine Dassey tells you this, he didn't make a
19   big point out of it, but he told you, and I want
20   to remind you about that, later that week Steve
21   Avery suggests to Blaine, maybe he wants to
22   invite some of his friends over for a bonfire, at
23   Steve's place.  Blaine's in high school, high
24   school kids, bonfire, he makes the suggestion.
25   It never happens, for whatever -- I don't even
```

29

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 29 of 131   Document 330-19

CHRM004574

1    know that Blaine explained why, but it just --

2    the bonfire never happens later in the week.

3           But, you know, if you had burned a body

4    in your burn pit, or you even knew that there

5    were bones in your burn pit, spread around, human

6    remains, you are going to invite some high school

7    kids over to have a bonfire and sit around the

8    same burn area?  I'm not.  That doesn't seem to

9    me that somebody who's guilty, that that's

10   something he would do, an invitation he would

11   extend to his nephew.  A bunch of random high

12   school kids, come on over to my make shift

13   crematorium for a bonfire and stand around.

14          What does he do here, in terms of

15   behaving like an innocent guy, or not.  Well,

16   look at the witnesses we called on his behalf.

17   Now, all walks of life, many fewer witnesses than

18   the State called, but as I say, all walks of

19   life.  And what struck me, at least, about the

20   folks who testified for you, because we called

21   them, is I thought to a person, these folks were

22   natural, they were real.

23          They weren't swiveling in their chair to

24   look at you and give you a talk, as if they were

25   an old friend of yours every time they are asked

30

CHRM004575

1     a question. They are not advocating anything, as
2     far as I could pick up. Or as I say, sort of
3     selling you something, overselling something.
4     They are candid on cross-examination, just as
5     they were on direct examination. I thought, at
6     least, that's what this group of people shared.

7          Was I surprised that we had to call the
8     bus driver, rather than the State calling, to
9     help you with the time frame that afternoon,
10    yeah, I was surprised. But we did it, since they
11    didn't. And now you have got that information.

12         But, you know, these -- these people
13    rang true to my ear, at least. And it's your
14    ears that matter.

15         So let me move to my second question:
16    Can you believe the police? Can you believe the
17    law enforcement folks who are so sure that Steven
18    Avery's guilty? What do you see about their
19    behavior before they are on the stage here?
20    Well, look at what they say and do when they
21    don't know that you are going to be listening and
22    seeing.

23         Let's start with Andy Colborn, since I
24    sort of started with him on November 3. He calls
25    in, does a license check on Teresa Halbach's car.

                              31

CHRM004576

He says he thinks it was probably on November 3,
not sure, but probably November 3, that he did
that.  But remember he's working on November 3,
so he would have had his radio.

And it's Detective Remiker who says
ordinarily you would use your radio when you are
calling in a license check to dispatch.  He uses
his cell phone instead.  The tape you hear is
clearly a phone call, not a radio in.  So I think
it's probably more likely that this license check
is November 4, when Sergeant Colborn acknowledges
he was off.

Didn't work on November 4.  And you may
remember, Mr. Kratz asked him, do you remember
what you were doing on November 4, 2005.  He
says, yes, I do.  I was off.  I remember what I
was doing.  Doesn't tell you what he was doing,
other than to deny he went to the Avery Salvage
yard, or denied he had anything to do with
planting evidence.  But he is off.

And I'm not going to play it for you
again, it's in evidence, but -- Let's see if this
comes up.  That's -- That's what you hear on the
tape that we played.

SERGEANT COLBORN:  Lynn.

32

CHRM004577

1          DISPATCHER:  Hi Andy.

2          SERGEANT COLBORN:  Can you run Sam,

3     William, Henry, 582, see if it comes back to that

4     da da da da da -- then they start talking over

5     each other.  I can't make it out.  You can listen

6     to it if you want.  Then she goes off on talking

7     about needing a Spanish interpreter, chitty

8     chatting while she's doing the license check.

9          She's comes back and she confirms it's

10    Teresa Halbach's license plate, the missing

11    person.

12         Sergeant Colborn says, '99 Toyota, and

13    so on.

14         Why is he doing that?  Why is he doing

15    that?  Why is he calling in a license check on

16    November 3, or November 4, which ever day it is?

17    You can get that information from Investigator

18    Wiegert, or if you want to call your dispatcher,

19    ask your dispatcher.

20         This sounds a lot like what road patrol

21    officers do when they come across a stalled car,

22    an abandoned car, a car where it shouldn't be.

23    That's what this sounds like.  Draw your own

24    conclusions, obviously look at it like from any

25    other piece of evidence.  But what's important is

33

CHRM004578

1    he is doing this, not on a witness stand, he is

2    doing this when he doesn't know anybody is going

3    to be seeing, or hearing, or evaluating it later.

4          Stay -- Move off Sergeant Colborn, but

5    stay in the Manitowoc County Sheriff's Department

6    for the moment.  Mr. Kratz argued to you

7    yesterday that Special Agent Fassbender, starting

8    November 5, devoted his resources where this

9    thing was likely going.  Where this thing was

10   likely going.

11          True, I guess he did, in the sense that

12   it was certainly clear pretty quickly where this

13   thing, this investigation, was going.  In my

14   opening, and with Detective Remiker, we had a

15   chance to hear, at 11:30 in the morning, on

16   November 5, half an hour after the first police

17   officers arrived at the Avery property, there to,

18   you know, see the concealed Toyota that the

19   Sturm's had found.  Half an hour later, for you

20   to hear, at a time when he, you know, he wouldn't

21   have known it, Manitowoc detective, Dennis

22   Jacobs, talking to his dispatcher:

23          Can you tell me, do we have a body or

24   anything yet?

25          DISPATCHER:  I don't believe so.

34

CHRM004579

```
 1              Very next thing he says:
 2              Do we have Steven Avery in custody,
 3       though?
 4              Yeah, it's pretty clear where this is
 5       going.  By the time Special Agent Fassbender
 6       arrives, you know, at 2:25, 3 hours later that
 7       afternoon almost, it's pretty clear where it's
 8       going.  And five minutes after this one
 9       conversation --
10              THE COURT:  Mr. Strang, I'm getting a
11       signal for a break, so we're going to take a short
12       break and then we'll resume in 10 minutes.
13                   (Jury not present.)
14              THE COURT:  You may be seated.  Let's
15       report back at 10:15.
16                   (Recess taken.)
17                   (Jury present.)
18              THE COURT:  Mr. Strang, you may resume.
19              ATTORNEY STRANG:  Thank you.
20              So five minutes later, five minutes
21       after Detective Jacobs called with the
22       dispatcher, he is on the phone with Detective
23       Remiker, or the radio, I don't remember now, but
24       you got the tape in evidence.  Of course,
25       Detective Remiker does testify, and you may
```

35

CHRM004580

1    remember him, kind of presented himself as

2    someone who thought they were barking up the

3    wrong tree, that Steve didn't do this, when he

4    testifies.  That morning, just about an hour

5    after the Sturms have first found the Toyota.

6         Okay.  Other than the car, do we have

7    anything else?

8         Not yet.

9         Okay.  Is he in custody?

10        ATTORNEY STRANG:  It's not who are you

11   talking about, who do you mean by he.

12        Negative, nothing yet.

13        One pronoun, he, and these guys know who

14   they are talking about at 11:35 in the morning.

15   Are these folks acting in a way that seems good

16   faith and honest to you, back then?  Six days

17   after this, Special Agent Fassbender makes the

18   telephone call to Sherry Culhane at the Crime

19   Lab, try to give her some direction.  And, you

20   know, she's holding herself out as a scientist,

21   that's how she holds herself out.

22        Is Special Agent Fassbender asking for

23   science, on the exhibit that Mr. Buting showed

24   you?  Is he asking for science there, for a good

25   cautious, objective, let's see where the science

                          36

CHRM004581

1   leads us kind of thing, when he's asking, try to
2   put her -- put her in his house or garage.
3   That's not a very good fit, in my view, with the
4   State's, counsel's argument here, when they
5   submit evidence, they are not looking for a
6   specific answer.  Oh, really.
7           The memo belies that.  The phone memo
8   does.  And Sherry Culhane, on the stand, herself,
9   tells you, that by the time these buccal swabs
10  are taken in November, 2005, from all kinds of
11  people other than Steven Avery, members of his
12  family, these are elimination samples.
13  Elimination samples.  We have already decided
14  they didn't do it, we're just trying to eliminate
15  if we find their DA -- their DNA anywhere.
16          Sherry Culhane, for that matter, had she
17  followed the protocol on her testing, the bottom
18  line folks, had she followed her protocol on the
19  testing of that bullet found in March.  She can't
20  say it's Teresa Halbach's DNA.  First time in her
21  career, 23 years, first time, on the last chance
22  to put Teresa Halbach in his house or garage, she
23  deviates from the protocol and includes Teresa
24  Halbach.
25          Now, it was just the control that was

37

CHRM004582

1   contaminated.  It was just Sherry Culhane's DNA.

2   That doesn't turn the evidentiary sample into

3   having Teresa Halbach's DNA.  Okay.  All right.

4   Fine.  But the protocol presumably is there for a

5   reason.  Protocols are the foundation of good

6   science.  And the protocol says, if you have got

7   contamination, you set that experiment aside and

8   you do it again, you don't rely on that one.

9       Science ought to be reliable.  It ought

10  to be consistent.  And it ought to be cautious,

11  otherwise, it's not science.  And the results

12  simply aren't reliable.  That's why you have a

13  control.  And when you get contamination, you now

14  know that something has gone wrong with this.

15      And to say that the contamination is

16  over here, but not over here, is a little like

17  saying, I don't know, maybe no one even eats TV

18  dinners any more, maybe they're microwave dinners

19  now, I guess, from what I see in the grocery

20  store.  But whatever, however you heat this stuff

21  up, when you pull off the plastic, or the tin, or

22  whatever covers the meal, you know, and the

23  little peach cobbler has a fly in it, in that

24  little compartment, you don't eat the Salisbury

25  steak either, okay.  You know, this is -- this is

38

CHRM004583

```
1    not fancy stuff in the end.  It's -- It is and

2    should be common sense, at some level, in the

3    end.  But she deviates, for the first time in 23

4    years.

5              The end -- This continues, the end of

6    January, 2007, bringing us up to six weeks ago.

7    Now, the State goes all the way to Virginia, to

8    Quantico, to get the FBI.  Are they trying -- Is

9    the FBI trying to root out possible police

10   corruption?  Are they concerned about the

11   integrity, of policing in northeastern Wisconsin?

12   Trying to find out if there's a bad cop or not?

13   I think the decision is already made.

14             You have this, too, Special Agent Gerald

15   Mullen of the FBI, memo to the FBI laboratory,

16   this January 30th --

17             ATTORNEY KRATZ:  Judge, I'm sorry, I don't

18   mean to interrupt.  I believe the defense is

19   entitled to one closing.  Mr. Buting covered exactly

20   the same territory yesterday.  I understood they

21   were going to split and talk about different items.

22   I simply wanted to interpose an objection.  My

23   apologies to counsel, but that was my understanding

24   from the Court.

25             ATTORNEY STRANG:  I would be more concerned
```

39

CHRM004584

1  about boring you. Mr. Buting did cover it. It's
2  there.
3       But I want to say something about EDTA
4  that Mr. Buting did not. Janine Arvizu, who is
5  not a doctor, Mr. Buting misspoke, she didn't
6  complete her dissertation. She did the other
7  Ph.D. work. I want to make sure you got out of
8  that what she had to tell you. And it's this,
9  the FBI protocol that they put together in a
10  couple of weeks here, is good for identifying and
11  confirming the presence of EDTA. It is not
12  designed for confirming the absence of EDTA. It
13  has to do with the detection limits. The
14  instrument has a detection limit and the method
15  has a detection limit.
16       So, look, if you were interested in
17  finding out whether your friend is at home, and
18  the instrument you chose was a telephone, call
19  him at his house, ring his telephone number, if
20  he answers the phone, you have confirmed his
21  presence with your instrument. He is there, you
22  have called his home, not his cell phone, he is
23  there. He's got to be, if he's answering his
24  phone. You have confirmed his presence.
25       However, if your instrument is your

40

CHRM004585

1     telephone and you call his home and it just rings

 2     and rings, and it's not answered, you have not

 3     confirmed his absence.  He could be in the

 4     shower.  He could be in the basement folding the

 5     laundry, he could be in bed sleeping.  He could

 6     be pouting and just not answering the phone

 7     because he sees it's you calling on the caller ID

 8     and he doesn't want to talk to you today.

 9     Whatever it is, you haven't confirmed his absence

10     with the telephone.  You haven't designed a

11     protocol to get you to that.

12            Your method, in other words, of

13     detection, isn't suited to confirming absence,

14     only presence.  If you like fresh baked hot apple

15     pie, and I put you in a room and I blindfold you

16     and we walk in, a fresh baked hot apple pie, your

17     nose is the instrument.  It has a detection

18     limit.

19            A dog has a better instrument, lower

20     detection limit, fancier instrument.  He can

21     detect less of the smell of apple pie than you

22     can, but you have got this instrument to use.  If

23     it's within your detection limits, and the pie

24     is, you know, slid on the table under you while

25     you are blindfolded, you will detect it with your

                            41

CHRM004586

1     instrument.

2           However, if the method is no good,

3     because we have got to consider that, you are not

4     smelling an apple pie.  Well, is the room too

5     big, are the windows open, is the pie too far

6     away, does the room smell badly of something else

7     that's interfering with your instrument detecting

8     the fresh baked apple pie?  We have method

9     detection problems and limits.  Or is the apple

10    pie, not fresh baked, but it's an 11 year old

11    apple pie?  You may not detect that either, with

12    your instrument.  I don't think Janine Arvizu was

13    really telling you more than that.  And,

14    unfortunately, Dr. LeBeau was trying to tell you

15    more than that and overselling his case.

16          Now, others who matter, in the law

17    enforcement group who think Steve is guilty.

18    Mr. Lenk and Mr. Colborn.  They denied here, of

19    course, but what are they doing, in 2002, when

20    the evidence slip has to be signed for

21    transmission of the hair sample and fingernail

22    clippings, or whatever it is, to the Crime Lab,

23    and the evidence custodian at the time, Detective

24    Sergeant James Lenk, signs off.

25          Is he really, as he claims here, simply

                          42

CHRM004587

signing the form, giving it to Sergeant Shallue
and allowing Sergeant Shallue to fill out the
otherwise blank form?  You are entitled to
disbelieve that.  Or at least to say he's not an
honest evidence custodian if he is doing that at
the time.  He is begging to be fired, because he
is not documenting what's going where.  Or if
he's just telling you here, to distance himself
from that file in the Clerk's Office, you are
entitled to consider that too.

Would Lieutenant Lenk lie, in the end?
Would he lie, as a sworn law enforcement officer?
Well, all I can tell you is, he did, twice, and
you heard it.  I have the transcript from the
earlier hearing.  Here he says he arrives at
2:00.  When he's asked under oath before, it's
6:30 or 7, once when he's asked, and the other
time he's asked, it's late afternoon.  This isn't
15 minutes off, folks.  It's under oath and it's
a difference of four and a half or five hours.

At that time of year, November, 2005,
it's the difference between broad daylight and
pitch black.  He was under oath, and he gave two
very different answers to the same question, at
two different times, under oath.  He was the only

43

CHRM004588

witness, in five weeks, shown to have made
inconsistent statements, under oath.

Others made inconsistent statements and
were shown to have. Blaine Dassey comes to mind.
Scott Tadych comes to mind. Both of them are
asked, at first, by the police, was there a
bonfire, on Halloween, no, no bonfire. Later
they get asked again, now there is a bonfire. In
fact, Scott Tadych comes here and says big
bonfire, flames to the top of the roof. Same
guy, again, I showed, when first asked by the
police, no bonfire. Closer in time to October
31, no, didn't see a bonfire that night.

That's inconsistent statements, but they
are not under oath. They still, as the Judge
instructed you yesterday, are something you can
consider, consistency or inconsistency of a
witness' statements, over time. Still you can
consider those when you decide who you believe,
and not under oath.

Blaine explained that a little bit.
Explained his changes of his story. Well, the
police kept asking him. They didn't like the
answer, they asked him again. Got angry with him
and his mother, at the restaurant, when they

44

CHRM004589

1    wouldn't reject Uncle Steve.  Is that because

2    Blaine is scared of Uncle Steve?

3            My recollection, yours will govern,

4    there's 12 of you and one of me, but my

5    recollection of that testimony is that the

6    question was whether Blaine Dassey was scared,

7    and the answer was something like, no, not

8    really, but he used to boss us around.  You will

9    decide that.

10           But in any event, Lieutenant Lenk, by

11   the time he gets to you folks, is telling you

12   some really implausible things.  Like, I had

13   never been to Steven Avery's house.  I have never

14   been on the Avery property, but somehow, just out

15   of habit, I turned right at the end of Avery

16   Road, and I -- I -- I just happened to drive

17   straight to Steven Avery's trailer.  Okay.

18           So this -- You know, what they are doing

19   and whether -- whether you think you can trust

20   them back when they are not aware they are going

21   to be observed or revealed later, is important in

22   the same way what he does, back before he knows

23   it's going to be played out to you, is important

24   in assessing who you believe.  Are they acting

25   honestly?  Is he acting like an innocent person

                          45

CHRM004590

1   would act, or might act?

2          It is important because it comes down to

3   the bias in the end. You know, would, in the

4   end, police officers plant evidence? And that's

5   a hard one, you know. That's why it's helpful to

6   say, boy, are they behaving honestly and in good

7   faith up to then. Because in the end, would they

8   plant evidence against someone. Now, you will

9   have to decide whether you have a reasonable

10  doubt about that, or whether, you know, we have

11  shown that to you at any level, or not.

12         But, look, it is a matter of bias, if it

13  happened. And what you critically, I think, need

14  to understand, that if and when police officers

15  plant evidence, they are not doing it to frame an

16  innocent man. They are doing it because they

17  believe the man guilty. They are not doing it to

18  frame an innocent man. They are doing it to

19  ensure the conviction of someone they have

20  decided is guilty.

21         That's why you plant evidence. Other

22  than in the strangest, you know, most abandoned

23  of conscience sort of police officer, they aren't

24  after framing an innocent person, they are after

25  ensuring the conviction of someone they just

46

CHRM004591

```
 1    believe is guilty.
 2              So as you approach the whole concept of
 3    planting you have got to understand the bias that
 4    would drive it, not, you know, boy, they are out
 5    to get an innocent guy.  It's just the opposite.
 6    It's just the opposite.  But it's also just as
 7    corrosive to do it.  Because juries decide guilt,
 8    not police officers who are involved in the hunt.
 9    You know, they get invested too, in the outcome,
10    and in whom they suspect, who they think is good
11    for something.
12              And, you know, the State pooh-poohs the
13    idea that a civil lawsuit, for a whole lot of
14    money, against the Manitowoc Sheriff's
15    Department, would have caused anyone to so
16    dislike Steven Avery that they would plant
17    evidence against him.  Well, look what the mere
18    suggestion that they did plant evidence has done,
19    in terms of a reaction here.
20              The defensiveness of the case that the
21    State presented to you, the anger about the mere
22    suggestion of planting evidence, the
23    self-righteousness, the hostility, the trying to
24    have it both ways with you.  We trusted the
25    Manitowoc people, they were skilled.  They were
```

47

CHRM004592

1    honest.  They were the best available evidence
2    technicians.

3            But we also had somebody watching.  We
4    were short of manpower.  We needed them.  But, in
5    the first search of Steven Avery's -- first
6    lengthy search of Steven Avery's house, on the
7    evening of November 5, we got enough people that
8    two of them can be taking photos.  Two of them
9    can be taking photos, in this little trailer, as
10   you heard.  You hear the State trying to have it
11   both ways, here.

12           And in sort of getting at the bias that
13   would drive a police officer, potentially, to
14   plant evidence, it's this -- it's this need, this
15   belief that he is not really innocent.  He's
16   guilty, he's got to be guilty.  It's what you
17   hear from Detective Jacobs and Detective Remiker,
18   it's that quality.  It's the sense that this is
19   where this is going, three hours in, when all we
20   have got is the car, on a big property with a
21   whole lot of other people there.

22           It's the -- After five weeks of evidence
23   and 501 exhibits, it's the State standing up and
24   telling you it's clear.  What in the world is
25   clear and simple when it takes five weeks and 501

                            48

CHRM004593

1    exhibits to try to show.  And whatever this is,

2    whatever, whichever way you come out, this case

3    isn't clear and simple.

4         And that's where the civil lawsuit feeds

5    in.  It's not that it feeds in with bad cops.  It

6    feeds in with good cops, in the sense that it

7    erodes, fundamentally, the sense of identity, we

8    get the bad guys, we don't get the good guys.

9         And here it is, they got it wrong, that

10   department got it wrong.  Not only do they get it

11   wrong, but the right guy is still out there and

12   he commits another rape, Gregory Allen.  This

13   goes to my identity, if I wear that same uniform.

14   Even if I'm aligned with these people, as you

15   hear the sort of reaction from the prosecutors to

16   this.

17        And now, you know, since -- since he

18   really couldn't have been that innocent, he's got

19   to be guilty of this one.  He must be the right

20   guy this time.  So you -- you know, nobody means

21   to do this, but you start looking around things

22   that are inconvenient, that don't quite square up

23   with the theory that he did it.

24        One example, and one example only, from

25   the blood, Teresa Halbach's blood in her own car.

49

CHRM004594

If it were true, as the State now says, that
Steven Avery shot Teresa Halbach in his own
garage, killed her there, and if it were true
that he then burned her in the area immediately
behind the garage, why, why is her bloody head
ever in the Toyota at all. It's farther to take
her back to her car than it is to take her around
the corner of your garage, to the burn site, if
that's what it is.

So the State sort of ignore's the fact
that if Steve Avery had done it, and done it in
the way they say, her blood wouldn't be in the
car. The bloody hair stain wouldn't be there.
It is there, of course, so it suggests that
somebody did have to use the car as a transport.
She wasn't burned there -- or wasn't killed
there, but that's inconvenient. You guys have to
be, in the end, if you're going to do what you
can do here, more objective than that.

You can't overlook the inconvenient,
because it doesn't fit. You can't overlook, for
example, in deciding whether Lieutenant Lenk
dropped the key on the floor, rather than finding
it honestly.

You can't overlook the fact that all her

1   other keys are gone, the three or four other keys
2   that Tom Pearce described, and which common sense
3   would tell you would be on your key ring, and
4   they are not there.  It's the kind of thing
5   that's inconvenient, but you can't overlook it,
6   even if they do.
7           The overlooking of the inconvenient,
8   really, I think, reaches its peak, if you will,
9   here in the State's opening statement, where
10  knowing that human bone fragments are found, at
11  least in the burn barrel, a long way from the
12  burn area behind Steve's garage.  And maybe, in
13  the quarry, to the south.
14          Knowing, in other words, that their own
15  experts will say, yeah, bones were moved here,
16  the State never tells you in its opening
17  statement, there's a second place, and maybe even
18  a third, where human bone fragments, burnt human
19  bone fragments, are found.  And we have no
20  evidence that it's more than one person.  You
21  don't get told that, it's inconvenient.
22          But it also is true.  And that's why, in
23  the end, it does become so important to decide,
24  burned here and a few moved elsewhere, or burned
25  somewhere else and most of them dumped here,

51

CHRM004596

1    behind Avery's garage.  That's why that says so

2    much about his guilt or innocence, in the end.

3         Look, I have got to sit down.  Which no

4    defense lawyer ever likes to do because, in the

5    closing argument, because the prosecution gets to

6    stand back up.  In a sense, they get the last

7    word, in closing argument.

8         I'm not going to get to answer the

9    passion, or the anger, or the replies that will

10   come, when I sit down.  I got to turn him over to

11   you and let them have the last word.  And as hard

12   as that is on me, the greater burden is on you.

13   The greater burden is on you.  Because you have

14   got to try to do the things you can do here, and

15   you have got to find a way to live with the

16   things you can't do, but would like to do here.

17        You have got the great burden of

18   reaching a just, fair, and conscientious

19   decision.  And so, in a sense, I'm -- in a sense

20   I'm going to rely on Judge Willis to give my

21   rebuttal to their rebuttal, in a sense.  Because

22   I think he will tell you, when all is said and

23   done, that you won't be swayed by sympathy,

24   prejudice, or passion.

25        And I think that will be an answer to

52

CHRM004597

what's about to come.  I think he will, Judge
Willis will, I think, in the end, tell you,
charge you, to be very careful and deliberate --
deliberate in weighing the evidence, and to keep
your duty steadfastly.  And that will be
sufficient answer, for me, to what's about to
come.

So I ask you, please, give it your full
and fair consideration.  Do that critically here,
as citizens of Manitowoc County, where we stayed
to pick a jury, where we stayed to pick the 12 of
you, the 13 of you.  And get it right.  Get it
right.

Steven Avery has not been proved guilty
of murdering or mutilating the corpse of Teresa
Halbach.  He's not been proved guilty of that,
beyond a reasonable doubt.  It's because he is
not guilty.  And that's what I'm asking you to
say in getting it right.

THE COURT:  Members of the jury, there
is -- as counsel indicated, there's one more
argument, the State gets a chance for rebuttal. I'm
going to take a 10 minute break at this time, then
we'll come back to hear the State's argument and I
will give you final instructions.

53

CHRM004598

1          Again, as I reminded you yesterday,

2    because the arguments are not complete yet, do

3    not begin your deliberations until all the

4    arguments have been made and I give you final

5    instructions.

6                   (Jury not present.)

7          THE COURT:  You may be seated.  Counsel, I

8    will see you back at 11.

9                   (Recess taken.)

10                  (Jury present.)

11         THE COURT:  And, Mr. Kratz, you may begin.

12         ATTORNEY KRATZ:  Thank you, Judge.

13         This part of the case is the shortest

14   part, that is, the shortest argument, thankfully,

15   but it's also the most difficult, because I have

16   to limit my comments to what the defense has

17   argued.  And it's also the part that it's a

18   little bit out of my comfort zone.

19         As you may have noticed throughout this

20   trial, I have tried to be courteous.  I have

21   tried to examine witnesses with the fairness, and

22   the dignity, and the respect for which they

23   deserve in the courtroom.  I have tried never to

24   cut off a juror (sic).  When a juror (sic) wanted

25   to explain an answer, I tried never to say, stop,

54

CHRM004599

1    I don't want to hear it, or the jury doesn't want

2    to hear what the answer might be.  And so this

3    argument is different than that.  It's

4    necessarily not as civil.  It's necessarily not

5    my style, so I want to say that upfront.

6            Highly charged statements have been

7    given by the defense in their closing arguments.

8    And it's my responsibility to meet those,

9    hopefully, with compelling argument, the things

10   that you will find important when dismissing or

11   discarding some of what the defense has tried to

12   have you believe here.

13           I may personally like Mr. Strang, and I

14   may personally like Mr. Buting, but their

15   arguments I most certainly do not like.  I think

16   they are unfair.  I think they are unfair to you.

17   I think in many instances they have been what's

18   called disingenuous, which means that I don't

19   think that they have been totally truthful.  And

20   in all candor towards you, I think they have

21   tried to fool you on a number of occasions.

22           I have got a job to do.  I have got a

23   job to do as the lead prosecutor in this case, to

24   make sure that you are not fooled, to make sure

25   that you aren't sold something that isn't true.

55

CHRM004600

1    And that's what this argument is all about.

2         The very first argument that Mr. Strang

3    made in the beginning of his opening statement,

4    he made it again in the beginning of his closing

5    statement, and at the end of his closing

6    statement, referenced the 1985 wrongful

7    conviction of that man, Steven Avery.

8         Steven Avery was wrongfully convicted in

9    1985.  We all understand that.  We all believe

10   that.  But don't one of you consider anything

11   about that case when deciding the facts of Teresa

12   Halbach.  Teresa Halbach, the Halbach family, and

13   the interests of justice deserve that you decide

14   it on this case, not on whether or not Mr. Avery

15   deserves some sympathy, or whether or not

16   Mr. Avery deserves to set it right.  That's

17   something for civil lawsuits.  That's something

18   for other jurisdictions to deal with and to

19   handle.

20        It is absolutely improper for Mr. Strang

21   to ask you to, in any way, consider that 1985

22   lawsuit, when finally coming to a decision in

23   this case, and in Mr. Strang's statement, in his

24   opening statement, to send him home.  Sending

25   Mr. Avery home, if that is going to happen, is

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 56 of 131   Document 330-19

CHRM004601

1    going to be because the State, the prosecution

2    team, all of the agencies that you heard about,

3    didn't meet its burden, we didn't meet our burden

4    of proof on this case, not because Mr. Avery was

5    convicted in 1985.

6         Let me also suggest to you that any case

7    this big, especially what we have called the

8    largest criminal investigation.  I don't know if

9    it is the largest in state history, but it is

10   certainly the largest that anybody that you have

11   heard of has ever talked about.  Any case that

12   big, with that many witnesses, and you have just

13   gotten a sliver of the number of witnesses, and a

14   sliver of the number of exhibits that are

15   available in this case.

16        Five or six weeks may seem like a long

17   trial.  Let me assure you, it could have been a

18   lot, lot longer, if we would have done the kinds

19   of things that Mr. Strang asked us to do.  As an

20   example, if we would have followed every what's

21   called "blind alley", if we would have put in

22   what's called "negative evidence"; that is,

23   eliminate everybody who's not even a suspect in

24   this case, which is what law enforcement did.

25   That's their job.  That's law enforcement's job.

57

CHRM004602

1   And then, once we get to the prosecution

2   stage, it is our job to present evidence on who

3   we believe committed the crime. Does everybody

4   understand that? So, if we put in the entire

5   case, if you will, that would certainly be

6   something more than what would be relevant for

7   State of Wisconsin vs. Steven Avery. That's what

8   this case is about, not the '85 case.

9   The very first issue that I want to talk

10  about is perhaps the most problematic for the

11  jurors. I want to address this upfront, because

12  I believe that there were misrepresentations made

13  in the defense closing. I believe they tried to

14  fool you in their closing when they indicate that

15  Mr. Lenk comes in and all of a sudden there's a

16  key there.

17  Well, that's part of the story, and

18  that, of course, is a true statement. But what

19  the defense neglected, in their closing, to tell

20  you, was everything that Sergeant Colborn told

21  you about this particular investigation. I put

22  these two photos up because I'm calling them the

23  before and the after shot. And I put them next

24  to each other for a very, very important reason,

25  because they say a picture states a thousand

58

CHRM004603

1   words.

2           This should do that for you, the before

3   and the after picture.  These are taken just a

4   couple of minutes apart from each other, but

5   importantly, they are taken before the search,

6   before what Mr. Colborn talked about, not so

7   gently, or never so gently manipulating the

8   cabinet, and then after that had already been

9   accomplished.

10          A couple of important things to note.

11  First of all, we talked, I think in my closing or

12  in my opening perhaps even, about the slippers,

13  about how you, through your common sense, can

14  reconcile those slippers, that piece of evidence,

15  not just where they are situated with the wall

16  socket there, but you can understand how both

17  this cabinet was pushed to the left, pushing the

18  left slipper over to the left, and pushing the

19  right slipper over and actually flipping the left

20  slipper over.  All right.

21          And then after jostling, and after

22  pushing, and after removing all the books, and

23  after Sergeant Colborn talked about putting those

24  books back in, and I want to get a correct

25  verbiage, "handled them none too gently", a key

59

CHRM004604

1    comes out the back end of this particular

2    cabinet.  Now, what hasn't been pointed out to

3    you yet, many of you being observant, may have

4    already noticed the before and the after.

5            This is the book that they were talking

6    about, that particular binder that was slammed

7    back into the cabinet.  The before picture has

8    the binder virtually adjacent, or next to the

9    cabinet itself.  The after picture has it several

10   inches back in.  Why is that important?  Why does

11   that one fact corroborate or lend credence to

12   Sergeant Colborn?

13           Sergeant Colborn said he slammed that

14   book back, none too gently.  You have to kind of

15   envision this cabinet cocked, and the back of the

16   cabinet opened, the book slamming back, and the

17   key falling through that particular cabinet.  And

18   so the testimony in connection with all of the

19   physical evidence, and not just what Mr. Strang

20   or Buting might tell you some of the evidence is,

21   where Lieutenant Lenk comes in and says, oh,

22   there's a key, which did happen, but the

23   explanation is absolutely plausible.

24           But more than that, we're going to need

25   to delve into this key and into this planting

                        60

CHRM004605

1   issue, whether or not the key was planted.  Was

2   the key planted.  All right.  To get to that

3   supposition, or to get to that conclusion, which

4   really is a supposition, because you are going to

5   have to guess, you have to know some things about

6   Sergeant Lenk -- excuse me -- Lieutenant Lenk,

7   and Sergeant Colborn.  You have to know if they

8   are good, honest, decent cops, or if they are

9   not.

10         Now, we asked some questions, and you

11  can weigh their credibility.  And they both

12  appeared indignant about this.  They both

13  appeared upset about even being accused of such a

14  thing.  And that demeanor, that credibility, is

15  something that you can and you should take into

16  consideration, in fact, when each of them said

17  absolutely not, absolutely not would I ever plant

18  evidence in this case.

19         But as importantly than that is the lack

20  of evidence.  Mr. Strang was allowed, quite

21  properly, to talk about the lack of evidence that

22  the State would have presented.  Wouldn't you

23  have expected evidence, is I think the way

24  Mr. Strang had placed it.  Well, that works both

25  ways.  And subpoena power and power to bring in

61

CHRM004606

1    physical evidence applies equally to the State as

2    it does to the defense.

3        We know that because the defense has

4    subpoenaed some witnesses.  They have brought

5    some witnesses in here.  They have subpoenaed

6    some documents, and you have seen those

7    subpoenaed documents in this case.

8        Well, don't you think, folks, that if

9    either Sergeant Colborn or Lieutenant Lenk had a

10   pimple, had a blemish on their record for

11   truthfulness, or for honesty, or for planting

12   evidence, or for doing anything that was opposed

13   to the oath that they took to uphold the law in

14   Manitowoc County, don't you think you would have

15   heard about that.  Don't you think that those two

16   good lawyers, excellent, in fact, defense

17   attorneys, would have presented that to you.

18       So when Mr. Strang tells you to look at

19   the big picture, and when he talks about, let's

20   see how they acted beforehand, beforehand you

21   didn't hear any evidence at all about Mr. Lenk or

22   Mr. Colborn.  That is significant.  But as

23   significant is the facts and circumstances

24   surrounding this particular bedroom.

25       And when Mr. Kucharski, Deputy

62

CHRM004607

1    Kucharski, talked about sitting on this bed, and

2    actually facing towards the door, his feet, I

3    think the testimony was, were facing where the

4    key ends up when Lieutenant Lenk exits the room

5    and comes back. Don't you have to kind of ask

6    yourself the question, how did the key get there?

7         If it was planted, how did that key get

8    there? Did Lieutenant Lenk, as he's walking

9    here, throw it? Did he kind of lob it over

10   Mr. Kucharski. Well, that's ridiculous.

11   Absolutely ridiculous. And although all three of

12   these officers, and in fact the prosecution team,

13   would have preferred, obviously, that the key

14   wouldn't have been found in this way, it was.

15   All right.

16        Cases come to you how they are. And

17   again, under the microscope of a case of this

18   magnitude, there is going to be some human

19   factors. And there's going to be some things

20   that you are going to have to wrestle with. And

21   this is one of those things. I'm not going to

22   short change you on that particular case.

23        And you may take a long time in deciding

24   whether or not that key is significant, or

25   whether the key is not significant. But let me

63

CHRM004608

1    ask you, just kind of for the sake of talking, as
2    Mr. Strang wanted to talk with you rather than at
3    you, I certainly have a style that I would prefer
4    that as well.  Let's assume they never found the
5    key.  Let's assume this key isn't part of this
6    case at all.
7         Let's assume Mr. Strang's theory is
8    correct, that these cops aren't trying to plant
9    an innocent person, but trying to make sure that
10   a guilty person is found guilty.  Well, can't you
11   then, with that argument, set the key aside?  Do
12   you have the ability, as a jury, to set that key
13   aside, if in fact it doesn't matter whether or
14   not Mr. Avery is guilty or not guilty in this
15   analysis?  Can you set that aside and decide is
16   there enough other evidence, or is the key the
17   only thing that points to Mr. Avery?
18        Well, if this was a CSI case, one of
19   those cases on TV where sometimes that key, or
20   sometimes one little piece of evidence like that
21   may decide the guilt or innocence, it would make
22   a difference.  But that key, in the big picture,
23   in the big scheme of things here, means very
24   little.  All right.
25        Now, I'm telling you that not because I

64

CHRM004609

1    don't want you to consider it, not because I
2    think that it's not important, or not because the
3    credibility of these officers is in question to
4    the State at all.  What I am suggesting, though,
5    is that if you buy Mr. Strang's argument, if you
6    buy Mr. Strang's argument that they were trying
7    to make sure that a guilty person was found
8    guilty, then assigning accountability to the
9    murder for Teresa Halbach, shouldn't matter
10   whether or not that key was planted.

11           In other words, it shouldn't matter to
12   the Halbach family.  You shouldn't be punishing
13   the police officers, in other words, the other
14   officers that were involved in this
15   investigation, if you come to that conclusion.
16   You are not going to.  You are not going to come
17   to that conclusion because you have heard nothing
18   about these police officers that they would do
19   such a thing.  But my suggestion is simply not to
20   focus all your attention.

21           In the law, that's called searching for
22   doubt.  The Judge has told you, and may even tell
23   you again in your closing instruction, that you
24   are to search for the truth, you are not to
25   search for doubt.  In other words, you don't go

                            65

CHRM004610

1  into this case saying, well, let's look at where

2  all the discrepancies are first. That's the

3  place maybe that we should start, because as my

4  closing argument suggested to you, there's got to

5  be a reason, right. There's got to be a reason

6  that we have been here for five weeks.

7          No, there doesn't. There doesn't have

8  to be a reason why you have been here for five

9  weeks, other than the defendant's constitutional

10  right to a trial. And so the Judge will tell you

11  not to start there. The Judge will tell you not

12  to start at searching for doubt.

13          The Judge will tell you that the whole

14  process, the beginning of the process, the

15  middle, and the end, is to search for the truth.

16  To search for the truth in this case is who

17  killed Teresa Halbach, not whether or not we can

18  find some discrepancies.

19          More about the key. Mr. Buting, I

20  believe it was, had the imagination, let's call

21  it, to suggest to you that maybe officers were

22  taking a toothbrush and were kind of rubbing Mr.

23  Avery's toothbrush on the key and that's how the

24  DNA got on the key. Common sense should tell you

25  that these kind of motions, what are called

66

CHRM004611

furtive motions, or for lay people, for people
like you, it's called suspicious looking things,
is something that you should probably discard.
Because if they take Mr. Avery's toothbrush and
start rubbing it on the key, you know, and then
kind of hold it behind their back, that becomes
almost cartoonish, that becomes something that is
not at all plausible.

But as important, when did that happen,
when did they plant the DNA on Mr. Avery's key.
Because we're not just talking about planting a
key. If it was planting a key, that's damning
enough. It's damning enough to have this
particular key found in Mr. Avery's bedroom. But
what makes it irrefutable is that Mr. Avery's
DNA, positive, hundred percent match, is on that
key. Right?

And you heard the testimony from Ms
Culhane, and perhaps others, that the last person
to handle a key or an object is most likely to
leave the DNA on the key. Now, Mr. Strang and
Mr. Buting have asked you to just discard that,
ignore it, ignore that expert opinion. I don't
know why they are asking you to do that, because
it doesn't fit with their theory of defense. But

67

CHRM004612

1   it's the DNA on the key that has to be planted

2   too.  Please understand that.  It's not just

3   planting the key, it's planting the DNI -- the

4   DNA on the key as well.

5         If they planted the key, where did they

6   get the key?  Now, that leads to an interesting

7   series of questions as well.  There are only two

8   ways that law enforcement can get this key.  All

9   right.  Because the vehicle was locked, and

10  because on the 5th of November officers don't

11  really have access, as you have seen by the scene

12  security.  They had to have access to the key

13  before the 5th.

14        And so there's only two ways to do that.

15  One, they can kind of stumble across it in a

16  scenario that Mr. Strang suggests, maybe off duty

17  or something like that.  Or the last person to

18  hold that key, other than Teresa Halbach, is the

19  person who killed her.

20        Now, you heard that testimony in this

21  case.  It may have drawn an objection, I don't

22  remember right now, use your own collective

23  knowledge as to whether it did.  But that makes

24  sense, that the last person, other than Teresa,

25  to hold this key, is the person who killed her.

68

CHRM004613

1    And if that's the case, then you hold these two
2    gentlemen responsible for suggesting that to you.
3         In other words, despite Mr. Buting
4    standing up here, I think it was the beginning of
5    yesterday, saying, look, folks, we're not saying
6    that the cops killed Teresa Halbach, what we're
7    saying is that somebody else, I think his words
8    were, "skillfully exploited law enforcement
9    bias", as if there's somebody smart enough out
10   there that could do that.  We're going to talk
11   about that in just a minute.
12        But when you go down one layer, when you
13   scrape one layer of this manure off of the
14   topsoil, which is what it is, you scrape one
15   layer, you will realize that the cops had to kill
16   her.  The cops had to be involved in killing
17   Teresa Halbach.
18        Now, are you prepared to say that?  Are
19   you, as the jury, in order to find Mr. Avery not
20   guilty, willing to say that your cops, that your
21   Manitowoc County Sheriff's deputies, Lieutenant
22   Lenk, Sergeant Colborn, because of Mr. Avery's
23   lawsuit, that Sergeant Colborn and Lieutenant
24   Lenk didn't have a dime of stake in, at least
25   financially, that they weren't involved in in

                           69

CHRM004614

1  1985, that they gave a deposition in about

2  receiving a phone call and transferring the phone

3  call, and that's the extent to it, but because of

4  that involvement, are you willing to say that

5  these two otherwise honest cops came across a 25

6  year old photographer, killed her, mutilated her,

7  burned her bones, all to set up and to frame

8  Mr. Avery. You have got to be willing to say

9  that. You have got to make that leap. Because

10  of this question right there, where did they get

11  the key.

12       The key isn't alone. The key is

13  attached, at least at some point, to something

14  called a lanyard, something that's around the

15  neck, similar to what you all are wearing as

16  juror badges. We know that that comes from Katie

17  Halbach. We know that that is found inside of

18  Teresa's SUV. And so where one is the other one

19  is. All right.

20       So I hope that makes sense. I hope you

21  understand that, at least for the first time in

22  my rebuttal, I'm going to be suggesting that you

23  dig down that one further step and understand

24  exactly what these two gentlemen are suggesting

25  to you. Despite Mr. Buting trying to sell you on

70

CHRM004615

the fact that we're not saying the cops did it,

that's exactly what they are saying.  That's

exactly what they are arguing to you, and you

have to be prepared to go there.

The next time that Mr. Buting tried to

fool you was when he told you that the police

never checked out other suspects in this case.

Well, you heard from Mr. Wiegert, you heard from

Mr. Fassbender, more particularly, that other

suspects were checked out.  But let's think about

other suspects.  Who were the other suspects in

this case?  Where was the evidence pointing so

strongly, other than to Mr. Avery?  Where was it?

Where was the evidence pointing?

Well, one choice was, Mr. Schmitz was

one of the people that saw Ms Halbach.  Mr.

Schmitz, as you heard, was interviewed, was

checked out, but guess what, folks, Teresa

Halbach left that photo shoot alive.  That kind

of eliminates Mr. Schmitz, doesn't it, from being

a suspect in this case.

Number two, was JoEllen Zipperer.  And

although a nice little old lady like that

probably could have killed and mutilated Teresa

Halbach, guess what, folks, Teresa Halbach left

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 71 of 131   Document 330-19

CHRM004616

Mrs. Zipperer alive at about 2:27 p.m.

The third suspect then, or the third logical person, was Mr. Avery, that's the third customer that Teresa sees that day. That's the only person that Teresa Halbach doesn't leave alive, or at least isn't seen alive, after meeting with Mr. Avery. So Schmitz and Zipperer can be and were, early on, I will admit that, were early on, eliminated as suspects in the case.

As the case develops though, you heard from Mr. Fassbender, that all the clues started pointing towards one person. All right. So when we talk about roommates and we talk about old boyfriends, what you would think about as typical suspects that may in fact be investigated, doesn't make a whole lot of sense in devoting a lot of resources in investigating those people when the car is found in a different location. When blood is found in that car, that turns out to be that of Mr. Avery.

But I guess most importantly, when the bones of the victim are found 20 feet or so behind the property belonging to Mr. Avery, you stop looking. You stop looking for people like

72

CHRM004617

boyfriends, or other customers, or this kind of a
search.  And you narrow it to who had access to
Teresa Halbach at that particular time.  So it's
disingenuous, it's what I'm calling fooling you,
to suggest that other suspects in this case were
not ever checked out.

Mr. Strang talked about this phone call.
Now, this is going to take a really, really good
memory.  And I hope one of you, and the 12 of you
collectively, we call it collective memory, which
means that when you deliberate in this case you
can talk about those kinds of -- those kinds of
things.  When Mr. Strang first played this, or
attempted to play this particular tape, for
Mr. Colborn, I wonder if anybody remembers the
very next thing that happened.

I raised my hand and I said, objection,
your Honor.  I said, I want some authentication.
Before Mr. Strang can play this tape, I objected
and said, I want to know the date and the time of
the tape.  Because it's unfair to play this tape
for the jury without telling them the date and
the time that it's played.  All right.

So it's foreseeing this very argument
that Mr. Strang made about a half an hour ago, or

73

CHRM004618

an hour ago; that is, the tape could have been
the 3rd, but I think it was the 4th. Okay.
That's what Mr. Strang said to you, that
Mr. Colborn, the answer by Mr. Colborn was it was
on the third, but I think it was the 4th.

What the heck do I care, Mr. Strang,
what you think. What do I care if you think that
it was the 4th, or that it fits into your theory
of defense. This case is about evidence. It's
not about what Mr. Strang thinks. The answer
given on the witness stand was, it was the 3rd,
while on duty.

And the explanation about why it was a
phone call rather than a radio transmission, or a
dispatch kind of call, is because Mr. Wiegert had
called Mr. Colborn, if you remember, on the
phone. All right. He called him on the phone
and said can you check this out.

So in turn, Mr. Colborn called dispatch
and said I want to verify this particular plate.
Nothing sinister about that. Nothing unusual
about that. This isn't a traffic stop. It's not
a stop where you would radio it in, where your
time and your date become important and you want
to log in that kind of thing. It's not a traffic

74

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 74 of 131   Document 330-19

CHRM004619

stop at all. It's simply verifying Mr. Wiegert's information, verifying the year, the license plate, the make and model of the vehicle, nothing sinister.

Now, I'm going to ask you to reject what Mr. Strang said because that's not evidence. In fact, what I'm saying to you right now is not evidence. Evidence comes from the witness stand. All right.

The answer to that question was the 3rd of November. That is important. It's important whether it was the 3rd, or whether it was the 4th. Now, when Mr. Strang answered my objection by saying, well, we'll let the witness tell the jury when it is. And the Judge allowed that, and the witness did tell the jury when that was, that it was the 3rd.

Mr. Strang still today, still today, fools you, and stands before you and says, don't believe Mr. Colborn, I think it was the 4th. All right. That's the difference between evidence and speculation. That's the difference between the State's case and what the defense is trying to sell you in their arguments.

Bones were moved in this case. There's

75

CHRM004620

no question of that. Who moved the bones, to the State, or for the theory of the prosecution is easy. Mr. Avery moved the bones. He moved the big bones. He moved the big bones, the ones he could identify as human bones, from his burn pit, over to his sister's burn barrel. All right. That's a couple hundred feet away.

If you think about the selfishness involved in that particular act, that I think is -- is one factor. But I guess more importantly is directing attention away from himself. Might be that first night, might be the 31st, might be the 1st or the 2nd, because he has got a couple of days, as it turns out, before the police officers actually start the investigation.

But let's also remember this, collectively, I want the 12 of you to remember this when you deliberate. I want at least one of you to say this when you are back in the jury room. Although now we know that the cops didn't get the search warrant, and they didn't come on the property until the 5th of November, okay. We know that now. Steven Avery didn't know that.

Steven Avery didn't know that Teresa Halbach wasn't going to be reported missing until

76

CHRM004621

the third, or that the flyover search wasn't

going to find the car, or that Ms Sturm even was

going to find the car on the 5th. For all Steven

Avery knows, the cops are on their way. Right

away. On their way, right away, the afternoon,

the late afternoon or early evening of the 31st.

Why is that important? Because as it

goes through some of this evidence and your

collective memories, and as you deliberate this

case, please remember that. Because there are

things that Mr. Avery does that the defense is

saying, well, why would he do all of those kind

of things.

Mr. Avery did all of those things on the

31st because he didn't know that the cops weren't

going to be knocking on his door, that very

night. They didn't know that -- Mr. Avery didn't

know that Teresa wasn't meeting a friend for

dinner, or that she wasn't going to be missed, or

that she didn't have another appointment, after

she was killed by Mr. Avery.

And so that's why he starts burning

things right away. That's why at 3:45 the

electronics are already being burned. That's

why, as we will be arguing and showing you,

77

CHRM004622

1    Mr. Avery disposes of the body at the earliest
2    possible moment, that he moves the SUV at the
3    earliest possible moment, that he removes the
4    license plates.

5         He does all of those things, again, with
6    the benefit, as you saw in the photograph that
7    Mr. Remiker put in, of a police scanner, that's
8    inside and on top of the bar in Mr. Avery's.  The
9    police scanner, so that Mr. Avery can hear, are
10   the cops on their way.  Which, again, should
11   bolster, or should tell you why Sergeant Colborn
12   uses the telephone rather than using the radio,
13   it's because of things just like that, things
14   like officer's safety.  But, again, I'm advancing
15   a little bit, and I want to make sure that I get
16   to those points.

17        The bones were moved, but they were
18   moved by Mr. Avery.  These bones in the quarry,
19   I'm going to take about 20 seconds to talk about,
20   because the best anybody can say is that they are
21   possible human.  What does possible human mean?
22   Well, it means we don't know what it is.  All
23   right.

24        The best anthropologists in the world
25   don't know what these bones are.  Dr. Eisenberg

                              78

CHRM004623

didn't know what they were. Dr. Fairgrieve

didn't know what they were, he agreed with that.

And you heard a stipulation being read

to you by a person by the name of Les McCurdy.

Stipulation just means an agreement between the

parties, that these bones, we felt it important

enough, were sent out to the FBI. And Les

McCurdy from the FBI determined that these bones

were so degraded, that they were in such a shape

that even through testing, what's called

mitochondrial DNA testing, whether they are human

or not, could not, even by the FBI, be

determined.

So the bones in the quarry are really

not evidence in this case. And so Mr. Strang has

made a big deal out of showing you maps, and a

little flag, and things like that about a

possible bones. Again, speculation, conjecture,

is not part of this case. Facts are going to be

what decides this case.

ATTORNEY STRANG: Your Honor, I'm going to

interpose an objection. Like the 1985 case, there

is evidence here concerning the bones from the

quarry, possible human bones. It is proper for any

lawyer to argue all of the evidence, or any of the

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 79 of 131   Document 330-19

CHRM004624

1    evidence, in the case, including the 1985 case, or

2    the quarry bones, and I would like the jury so

3    instructed.

4         THE COURT:  What I will instruct the jurors

5    is, remind you again, what you are hearing at this

6    time are arguments, not evidence.  Your job, when

7    you are deliberating, is to remember the evidence as

8    it's been submitted, and draw your own conclusions

9    from that evidence.  Mr. Kratz, you may proceed.

10        ATTORNEY KRATZ:  Thank you, Judge.

11        The primary burn site, that is, where

12   the bones started burning, are important in a

13   sense and they are not important in a sense.  All

14   right.  It seems obvious what the answer is, but

15   if, again, you drag that first layer off of the

16   defense argument, it isn't going to make any

17   difference.  But, of course, the primary burn

18   location is in Mr. Avery's pit.  This is the

19   primary burn location.

20        And why do we say that?  Dr. Fairgrieve,

21   I'm going to start from the other side,

22   Dr. Fairgrieve, the defense expert in this case,

23   said that he's had a case where bones were moved

24   from one location to the other, and that in that

25   case the bones moved to -- to the location had

80

CHRM004625

more bones than were actually there. But what
Dr. Fairgrieve didn't do, and what he doesn't
know, are all the things that Dr. Eisenberg did,
and all the things that Dr. Eisenberg knows.

Dr. Eisenberg, of course, looked at the
bones. I guess that's the most important factor.
But this is one of those things that's common
sense. This is one of those things that
shouldn't take you a long time collectively.
Shouldn't take the 12 of you very long to decide
where the primary burn location is. It is the
pit. It's not most likely the burn pit, it is
this location.

How do we know that? Well, Teresa was
invited, or lured, whatever term you want to use,
on to that property. Her vehicle is there.
That's the last place that she is seen alive, is
just several feet from this location. Her burned
affects are on that particular property, just a
few feet away. Importantly though, her bone, her
tissue, especially her skull fragments, all of
them, all of them, are in this location.

Her clothes are there, at least what's
left of her clothes, are mixed in with those
bones, the rivets for her jeans are there. And

CHRM004626

common sense, her bones and her jeans are in the same place, because she's burned their. She's burned in that location.

She was called there by Mr. Avery. And the number one, if we're doing -- I'm going to switch them around. The number one reason why this is the primary burn location is that on October 31st, Mr. Avery had a big whopping fire there, on the 31st of October. And we haven't heard any evidence of a big whopping fire, the kind that would consume, fully consume a human body, anywhere else on that property. That's the primary burn location, ladies and gentlemen. You can find that, and you should find that, beyond a reasonable doubt. That shouldn't be a question for you.

Mr. Buting said that there were no fingerprints found on the SUV. I will just, again, in 20 seconds, tell you that the testimony, that perhaps Mr. Buting is ignoring, from Mr. Riddle, or at least didn't tell you about, from Mr. Riddle, the fingerprint guy, was that of the eight latent prints that were lifted in the case, none of them were suitable for identification. All right.

82

CHRM004627

1    So what Mr. Riddle also told you is

2    that, if you took your hand right now and placed

3    it onto an object, it's very likely that you

4    wouldn't leave fingerprints.  That's why DNA

5    evidence is so much more powerful than

6    fingerprint evidence, at least nowadays, because

7    of those dynamics that are involved.  Because of

8    the amount of sweat in your hands, and the oils,

9    and all of those kind of things, all are called

10   into question.  I just mention that because I am

11   obligated to because Mr. Buting had mentioned

12   that.

13        They also, they meaning the defense,

14   talked about Teresa's body in the SUV.  Once

15   again, expert testimony was that a 5 foot 6 inch

16   person could, in fact, fit in this particular

17   compartment of the RAV 4.  And I guess you need

18   look no further than this area, the stamp, as I

19   talked about, the hair impression 25 year old

20   Teresa has left in that location.  You can almost

21   see Teresa being pushed in, or shoved in, or

22   stuck in that location, which brings me, or will

23   bring me, to a point in just a moment.

24        Mr. Strang -- excuse me -- Mr. Buting,

25   actually asked you whether or not it would be

83

CHRM004628

reasonable for police, by use of flashlights, to
see the stain that was by the ignition.  When I
heard that I just about dropped my pen.  All
right.  There's the location, and that's the
stain that Mr. Buting is saying, why didn't the
cops see this.

Somebody want to tell me where a
flashlight has to be shined -- shown, from the
outside, to see that stain.  You can see that
through the front window?  You can see that
through one of the side windows?  Are you going
to see that through the very back?  Where are you
going to shine a flashlight that you are going to
be able to see that particular stain.  All right.
That's disingenuous.  It's the kind of argument
that you should be discarding, that you should be
saying it doesn't make any sense at all.

Mr. Buting also asked, well, if this
piece of evidence is -- excuse me -- if the
cabinet, the bookcase, is so important, why
didn't the State bring it into the courtroom.  I
mentioned before, I think it's obvious, the State
doesn't have exclusive control over any evidence
in this particular case, at least as is presented
in court.  The defense has just as much right to

84

CHRM004629

1    bring that up here as the State did.  All right.
2          We have taken photos, and I'm not going
3    to apologize for that.  I'm not going to
4    apologize for what Mr. Buting calls my slick
5    PowerPoints.  My God, a second grader can do a
6    PowerPoint examination.  And the fact that
7    Mr. Buting wants to fumble around, he can do
8    that.  I'm not going to do that to the jury.
9          But what we did do, is we took
10   photographs of all of the evidence to make it
11   easier to present, so that you could see all the
12   evidence.  We brought in boxes of items like the
13   Palm Zire palm pilot box.  We have the item
14   itself, but we also have a picture of it.  We
15   have a picture of everything, as you have seen.
16   And so we're using pictures instead of the thing
17   itself.
18          And you can see, and at least
19   understand, with big clumsy kinds of items, the
20   reasons that we're doing that, for ease for the
21   jury.  So that you can see big things, and you
22   can see small things, so we can zoom into areas,
23   and sometimes we don't need to do that.
24          Defense also suggested that there was no
25   blood on the CD case.  Are you kidding me?

85

CHRM004630

Mr. Buting may have showed you a picture, and I
didn't know where he got his picture from, but
the blood is obvious on the CD case. By the way,
I believe you are going to be getting the
photographs back into the jury room. That's
something the Judge will decide, not me. But you
can look at the picture itself and determine
whether or not there is blood on the CD case.
Again, another example of being disingenuous,
another example of trying to fool you.

Next time this happened in Mr. Buting's
argument yesterday was when he talked about this
stain, on the bathroom floor. Mr. Buting
actually walked up to this particular exhibit and
said, well, it looks like somebody took a Q-tip
and put it right into that sample of blood.
Which you heard some of the blood from
Mr. Avery's bathroom was analyzed, that it was in
fact Mr. Avery's blood, there isn't any question
about that.

But what Mr. Buting didn't tell you,
and what you heard testimony of, is when this
blood sample was collected. Do you remember? Do
you remember when this blood sample was
collected? Remember Detective Remiker and

86

CHRM004631

```
1     Mr. Tyson, on the first night, talking about
2     going through the entire trailer and collecting
3     all the blood, and that they finished sometime
4     after 10:00 p.m., as it was approaching
5     11:00 p.m., it was pouring rain outside.  You all
6     remember that, you remember that from the 5th of
7     November.
8          Mr. Buting is trying to sell you, he is
9     trying to fool you into thinking that maybe this
10    is the source of the blood in the SUV.  Folks,
11    the SUV was already in an enclosed and locked
12    trailer, on its way to Madison, with Crime Lab
13    personnel and law enforcement personnel all
14    surrounding it.
15         To suggest to you that this might be the
16    source of any of all of that blood that you saw
17    in the SUV is, again, disingenuous.  It's trying
18    to fool you.  And it's my job, as the prosecutor,
19    to point those things out to you.  It's my job to
20    show you just how absurd and ridiculous some of
21    those arguments are.
22         Mr. Buting then talked about the bullet,
23    and about the DNA, and suggested that, well, they
24    are both in the same room with Sherry Culhane, Ms
25    Culhane, the analyst in this particular case.
```

87

CHRM004632

What Mr. Buting doesn't tell you, though, doesn't
remind you, though, when Mr. Gahn made this point
very clear, because of what's called the
contamination issue with the bullet in this case,
is that the extract for a sample of evidence is
done separately, and at a separate time than the
extract or the control is done.

Remember Ms Culhane telling you that the
samples are locked away in a cabinet. She was
talking about her bench, and how it's cleaned
off, and those kind of things. And I don't know
if Mr. Buting, I suspect he wants you to believe,
if you remember collectively, if you remember
about Ms Culhane, if he's suggesting that the Pap
smear, or the DNA from Teresa Halbach, somehow
got out of the sealed envelope that it was in,
the standard, somehow maybe walked across her
desk, somehow it jumped into the vial, or onto
the bullet. And that's the kind of thing that
Mr. Buting wants you to believe. That's
disingenuous, doesn't happen that way.

Mr. Gahn knew that was an important
point and he took time, meticulous time with Ms
Culhane, to explain that process for you. It's
Teresa Halbach's DNA on that bullet because,

88

CHRM004633

1  unfortunately, it went through her body.  Not
2  because the DNA from her Pap smear or from other
3  standard that was within the Crime Lab somehow
4  transmitted itself or made its way onto that
5  bullet.
6          There are areas of agreement and this
7  is, I guess, a positive part of the trial.  There
8  are some areas of agreement between expert
9  witnesses in this case.  Ms Arvizu, and I'm so
10 happy that Mr. Strang cleared that up, it's not
11 Dr. Arvizu.  Mr. Strang called it a mistake that
12 Mr. Buting made, calling her, or raising her to
13 the level of doctor.  She doesn't have her Ph.D.,
14 like Dr. LeBeau does, the Ph.D., the head of the
15 toxicology unit at the FBI lab.
16         But Ms Arvizu, even the defense expert
17 conceded on cross-examination, from Mr. Gahn, a
18 couple of things.  Number one, that a qualitative
19 procedure is a solid scientific procedure.  Don't
20 have to do quantitative.  In fact, in this case,
21 when there's nothing there; in other words, when
22 three of the samples don't have any EDTA, you
23 can't quantitate it.  How do you quantitate
24 nothing?  All right.  You can't do that.
25         And so for your purposes, when these

89

CHRM004634

tests had to be done at the last minute, you
heard why, you heard why we didn't get these to
the FBI until the last minute.  You heard from
Mr. Wiegert, that Mr. Wiegert and the State
didn't even know about this vial of blood until
sometime in December.  And you heard that on
February 5th, the 5th of February, when you were
being selected is when this was sent out to the
FBI.

Back to Ms Arvizu, though, she
recognized that the protocol that was developed
was a good protocol, that it was based upon
scientific articles, that Dr. LeBeau had made,
what she called, significant improvements to any
prior protocols that the FBI had done, based upon
those articles, and was no question at all that
Dr. LeBeau was able to find several things.

First of all, that there was EDTA in the
vial of blood.  Number two, that there was no
detectable EDTA on the three blood samples.  Now
what Ms Arvizu did have some concern was about is
that this expert only tested three of the
samples.  All right.  Three of the swabs that --
that we're talking about.  And I think -- I don't
think that's the next slide, it is not.  I will

90

CHRM004635

show those in just a minute, when we get to the
EDTA part of this case. But there wasn't any
question that EDTA was present in the vial and no
EDTA was detectable on the samples.

We also heard agreement between
Dr. Fairgrieve and Dr. Eisenberg. The agreement
that we have heard. In fact, we liked
Dr. Fairgrieve very much, from Canada, and
although he is not board certified, you should
not hold that against him. Dr. Eisenberg is, and
that is only a handful of anthropologists that
reach that level. But we actually thought
Dr. Fairgrieve was a very, very nice man and a
very good expert.

And he testifies mostly for -- in
Canada, for -- for the prosecution. And I
suspect that's why he conceded several things
about his colleague, Dr. Eisenberg. First of
all, that the gunshot wounds were present. That
there were gunshot wounds that were found in this
case, two of them, one in the left parietal, one
in the occipital region.

He called them peri-mortem, meaning that
they were about or around the time of death. He
agreed that there was only one person, the bones

91

CHRM004636

of one person that we're talking about, which
makes sense, and that the gunshot wounds were
inflicted in this case before this burning
process. All right. So Dr. Fairgrieve and
Dr. Eisenberg had many -- and other than the
primary burn site, which Dr. Eisenberg rendered
an opinion about, and Dr. Fairgrieve was
unwilling to do that -- most other areas were, in
fact, something that -- that they had agreed
upon.

Judge, should we take just a couple
minutes for a stretch break?

THE COURT: Very well, we can do that.

ATTORNEY KRATZ: I know it's been about 45,
50 minutes. Let's do that and then I will conclude
my remarks.

THE COURT: Let's take five minutes, at the
request of one of the jurors.

ATTORNEY KRATZ: We'll do that judge.

(Recess taken.)

(Jury present.)

THE COURT: Mr. Kratz, you may continue.

ATTORNEY KRATZ: I appreciate it, Judge,
thank you.

Defense argued that there was no blood

92

CHRM004637

found in the trailer. Since Teresa wasn't killed
in the trailer, there shouldn't be. But what was
found in the trailer is extremely important.
Remember the testimony early on in this case,
that on the 5th, on the very first search of
Mr. Avery's trailer, they found the very same
*Auto Trader Magazine*, the very same type of bill
of sale that we put in this exhibit, that's from
Mrs. Zipperer, the very same *Auto Trader*
*Magazine*, very same bill of sale. Teresa was in
that trailer. She was in the trailer, but she
was not killed in that trailer.

Defense has a hard decision to make
regarding Ms Culhane, is she competent, or is she
incompetent. And you guys already know why that
question has arisen and why it is such a pointed
question. Because if she's talented enough with
one hair, with one piece of evidence, to
exonerate Mr. Avery, why isn't she talented
enough with 180 items of physical evidence to
contribute to his conviction.

So it's a hard argument to make that in
one case, and in one circumstance, a couple years
ago, she was very talented, she knew exactly what
she was doing, but all of a sudden, she's

93

CHRM004638

1   bumbling, some mill worker, some person on a line

2   type person, who really doesn't have any

3   expertise.  Well, you don't get it both ways.

4   She's either talented, she either knows what

5   she's doing, as the head of the DNA Unit at the

6   Madison Crime Lab, or she's incompetent.

7          You already know the State's opinion

8   regarding Ms Culhane.  We have heard a lot about

9   the Crime Lab Contamination Logs, 89 out of the

10  50,000 or so cases.  I will let you guys do the

11  math, as far as what the rate of error, or the

12  contamination rate is.

13         Mr. Buting mentioned yesterday that

14  perhaps the hood latch, perhaps the DNA that is

15  found here was caused by that of Mr. Stahlke,

16  because Mr. Stahlke reached up under and opened

17  up and found that the battery cable was

18  disconnected.  Well, so what.  Mr. Stahlke talked

19  about he was rummaging around, he was actually

20  touching all kinds of DNA and touching all kinds

21  of blood, or any of those kind of things?

22  Absolutely not.

23         These are professionals.  These are

24  people that process evidence for a living.

25  Mr. Stahlke had gloves on when he opened -- latex

94

CHRM004639

gloves when he opened this particular vehicle.
So it is not Mr. Stahlke's, it was Mr. Avery's
DNA that is on the hood latch.

Now, the defense also asked why would
Mr. Avery disconnect the battery. You heard them
asking for speculation, guessing why Mr. Avery
would disconnect a battery. I have got an answer
and I'm going to tell you right now, right now,
that this is speculation. This is guessing. All
right. This isn't evidence. It's not even close
to it. It's kind of what the defense has been
doing through at least their closing arguments.

But I am going to speculate and I'm
going to guess that a man who hid the SUV and
knew that people were going to come looking for
that SUV, thought a little bit ahead, not just to
crush the car, and taking -- or in unhooking the
battery. But when citizen searchers looked at
40 acres of cars, and they looked and they go,
oh, my goodness gracious, how am I going to find
that. Mr. Avery may have thought about those
little devices that most of us have on our newer
cars. Where we're able to press a button and our
lights go on, or an alarm goes on, or something
flashes, where you can find your car in a parking

95

CHRM004640

lot, if you are like me sometimes and I forget
where I have parked my car.

Is that why Mr. Avery unhooked the
battery, so that the citizen searchers that he
knew were coming couldn't just press a button and
of the 40,000 (sic) cars, could walk right to
that.  That's possible.  All right.  That's an
inference, a logical inference, that could be
drawn.  But that's speculating, and that's not
what I'm going to do.  That's not what I'm asking
you to do.  I'm not asking you at all in this
case to speculate.  I'm simply answering
Mr. Buting's question.

Where was Teresa killed.  This is a easy
answer, or at least it is an answer that is
directed by all of the physical evidence in this
case.  Teresa Halbach, as we know, came to the
trailer of Steven Avery.  We know that they
completed their transaction.  How do we know
that, because the book and the bill of sale was
given to Mr. Avery.  That's something that, as
you heard, happens at the end of the transaction.
That's sitting on Mr. Avery's computer desk.

We know sometime later, that is, we know
sometime in the future, a bullet is found in this

96

CHRM004641

1    exact area, has Teresa Halbach's DNA on it. All

2    right. The inference, and this is an inference

3    that I'm asking you to draw, is that Teresa

4    Halbach was killed in the garage. She was killed

5    in Steven Avery's garage.

6    Now, we have heard testimony about

7    luminal finding blood, that is a reagent, a

8    chemical that is used by the Crime Lab is spread

9    out. There's two things that are most reactive

10   with luminal, one is human blood and the other is

11   bleach. Bleach coincidentally is the one thing

12   that eats up or destroys DNA.

13   We have heard about just to the left and

14   just to the back of this tractor, about a three

15   to 4 foot area, large area that lit up or glowed

16   very brightly. Mr. Ertl testified about that.

17   He was the person who processed that area. I'm

18   asking you to infer that Mr. Avery cleaned up

19   this area with bleach.

20   Now, you knew that inference, or that

21   suggestion from the State, I think, was coming.

22   We have put in the bleach. We have talked about

23   the luminal. We have gotten expert testimony

24   from Mr. Ertl that the two things that light up,

25   it wasn't blood, but it was, in fact, bleach.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 97 of 131   Document 330-19

CHRM004642

You heard from Blaine Dassey,
importantly, that the garage, other than the junk
on the surrounding edges of this garage, looked
pretty much like this, from the sense of the
Suzuki and the snowmobile, which were in there
later on that week, were on the side of the
garage at the time. So Teresa Halbach's vehicle
is backed in, backed into the garage.

Teresa Halbach is killed. She's laying
down. She's shot twice, once in the left side of
her head, once in the back of her head, or I
guess I should more accurately say she's shot at
least twice. Because two bullet's were found,
two entrance wounds were found to her head. We
do have the 11 shell casings on the 6th that were
recovered. How many times Mr. Avery actually
shot this poor girl, you probably aren't going to
be able to determine, but it's at least twice,
and it's at least twice to the head.

What does he do though, later, with
Teresa Halbach. It's the State's theory in this
case, and we're entitled to a theory, just like
the defense, that after backing in the SUV, into
the garage, which was, again, empty at the time,
after closing the garage door, which Mr. Fabian

98

CHRM004643

1     testified is how he saw it at around dusk,

2     Mr. Avery does a couple of things.

3           Remember he doesn't know if the cops or

4     somebody is coming looking for Teresa. He has

5     got lots to do. He has got lots of things in the

6     next several hours to do in this case. He has to

7     get rid of all of Teresa's stuff, her camera, her

8     cell phone, her PDA, which very well may be in a

9     purse or something, in the vehicle, which he

10    burns. We know that those are in the burn

11    barrel. We're going to talk about that in just a

12    minute.

13         And he places Teresa Halbach in the

14    back, or the cargo area of her own SUV. Now, in

15    doing that, Mr. Avery does a couple of things.

16    He doesn't do it very gently, because we know

17    that there's motion involved. He throws, if you

18    will, Teresa, in the back, because of the blood

19    spatter across the back of the open gate. But

20    Teresa is laying at rest; she is resting at

21    peace, having been killed by Mr. Avery, kind of

22    diagonally in the back of that SUV.

23         And because of her hair imprint, you are

24    able to deduce that. You are able to know that.

25    Again, remember my closing argument, those are

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 99 of 131   Document 330-19

CHRM004644

1    more indications of Teresa telling you this is

 2    where I was.  All right.  This is where he put

 3    me.  And those are inferences, again, that you

 4    should and can adopt.  Why, because it's not dark

 5    yet, and he needs a big rip roaring fire before

 6    he can dispose of and mutilate this body.

 7          Again, he has got to do all of this

 8    stuff quickly, because he doesn't know if the

 9    police are coming.  So we hear then, at at least

10    7:30, perhaps before then, but at 7:30 there's

11    already a fire, a big fire in the back.  Although

12    it's dark out, there's a big fire in the back of

13    his garage.  And we'll talk about some of the

14    more details there.  But as long as Mr. Buting

15    asked about the theory of prosecution, again,

16    which we are entitled, that is, in fact, the

17    theory of the State's prosecution.

18          Mr. Buting then asked, why would you

19    build a fire when you have a smelter.  The

20    smelter, as we know, or at least this is from the

21    top of the smelter, which kind of melts aluminum

22    as I understand it, is, if you heard the

23    testimony, or if you saw the business buildings,

24    the out buildings, much closer to the residences

25    of the parents, of Delores and Allen.  Much

                           100

```
1    closer to the residence of Charles Avery, the

2    brother.  Early on in this case we identified

3    what all those buildings were and what were in

4    all of those separate buildings.

5         But what Mr. Avery had to do required

6    some alone time.  Mr. Avery needed some privacy.

7    And so Mr. Avery chose his burn area.  He chose

8    the place where somebody wouldn't happen upon

9    him, or ask him what he was doing.  He was

10   building a fire like he had done many times

11   before.

12        It's an area over which he had control.

13   No other family members would be.  And,

14   importantly, Mr. Pevytoe, the arson investigator,

15   remember he went through the smelter, eliminates

16   the smelter as a possible burn location for the

17   body.

18        Mr. Buting asked yesterday did we

19   confuse Lisa Buchner in the case.  When she

20   originally testified, Mr. Strang, I believe,

21   questioned her.  Mr. Strang provided the answer.

22   Again, this takes a good memory.  This takes a

23   lot of you to remember Lisa Buchner's question

24   and answer.  But the question was that -- I'm

25   paraphrasing but -- directing your attention to
```

101

CHRM004646

```
1    the 31st of October, what did you see?  Well,

2    what that does, when you ask a question like

3    that, as a skilled lawyer, and Mr. Strang

4    certainly is a skilled lawyer, Mr. Strang can

5    then come up here and can say, well, she said it

6    was the 31st of October.

7         But she didn't, did she.  She never said

8    that it was the 31st of October.  When

9    questioned, very courteously by Mr. Gahn, again,

10   about what date really was it, she said, I don't

11   know.  When Mr. Gahn asked her, where was the

12   location, that she was clear about.  Wasn't down

13   by Mr. Avery's trailer at all.  It was one of

14   these cars that's parked at the corner that are

15   for sale.

16        Well, importantly, that excludes,

17   excludes, Teresa Halbach as the person taking

18   this picture.  Not only is the time wrong,

19   because we have Bobby Dassey who doesn't have any

20   questions about what this person looks like, or

21   the time this happened, or that it was before he

22   went deer hunting and knew and was able to

23   recognize that that was Teresa Halbach.

24        But we have the defense own witness

25   saying, I don't know.  I don't know the date that
```

102

1    this happened.  Could have been the 1st, could

2    have been the 2nd.  Mr. Gahn said, could it have

3    been a week ago, yeah, a week before.  Could it

4    have been two weeks before, yeah, it could have

5    been two weeks before.

6         What does that do, how does that help?

7    As Mr. Strang argued in his closing, do you

8    believe that that's the truth, or do you believe

9    that that's disingenuous, again?  Is that a

10   misrepresentation of what Ms Buchner actually

11   said?  In other words, how does it help?  How

12   does it help you?  Between Bobby Dassey and Lisa

13   Buchner, who has the better memory?  Who was in a

14   position to see what was going on that day?  And

15   those kinds of questions you are going to need to

16   answer.

17        Same kind of thing with the other lay

18   witness that was called in this case, some

19   gentleman who was a propane employee, as I

20   understand, who talked about seeing a green

21   mid-sized SUV.  Well, ask yourselves, is that a

22   green, mid-sized SUV?  I will argue, no, that

23   that's not a green mid-size SUV.

24        But there's interpretations and there

25   are things that may or may not be important about

103

CHRM004648

```
 1    that.  However, it hardly helps the equation.  It
 2    hardly helps you decide in this case whether or
 3    not that was Ms Halbach.  In fact, we know it
 4    wasn't, because Ms Halbach never did leave that
 5    property.
 6         All right.  You need to buckle up here.
 7    Because here's where the absurdity starts.
 8    Mr. Buting wants you to believe that some unknown
 9    person, somebody that Mr. Buting can't identify,
10    somebody that the defense cannot identify,
11    actually undetected, took one of the four burn
12    barrels belonging to Barb Janda.
13         Suggested that that theory also
14    includes -- By the way, that would take more than
15    one person if you think about it, 55 gallon drum,
16    carrying this, we're talking about more than one
17    person.  But we're going to go just for now with
18    Mr. Buting's theory in this case, and that at
19    some remote location, Teresa's burned, that the
20    bones are dumped, and that the burn barrel is put
21    back.
22         Mr. Buting doesn't tell you, though, are
23    the eight or nine steps in between that you as a
24    jury have to find as facts, in order to kind of
25    buy this.  Okay.  When somebody is trying to sell
```

104

1      you something, and when you decide whether or not

2      you are going to buy that, you should understand

3      all of the steps that you have to buy.

4            You have to buy that they could first of

5      all take one of these barrels undetected.  All

6      right.  Next, that they have Teresa Halbach lying

7      dead somewhere.  Whoever this is, has Teresa

8      already lying dead in some remote location.  And

9      rather, rather than dispose of Teresa Halbach, if

10     they were inclined to do so, at that remote

11     location, Mr. Buting is asking you to believe

12     that she's burned, that her body is mutilated,

13     that her body is then loaded, apparently, into

14     this 55 gallon drum of Barb Janda, that has been

15     stolen, it's a theft, that's been somehow

16     secreted off of the property.

17            What you are then being asked to believe

18     is that they loaded back on whatever vehicle it

19     is that they are able to transport Ms Halbach,

20     after, remember, the at least hour and a half to

21     2 and a half hours at 1600 degrees that it takes

22     to fully cremate a body, that they load all of

23     these remains.  And rather than dumping them

24     someplace else, they bring them back to the very

25     place that Steven Avery, on the day that Teresa

                            105

CHRM004650

1    Halbach was killed, had a big fire.

2         And they decide to dump the bones.  Now,
3    they don't decide to dump all the bones,
4    Mr. Buting's theory goes.  They only dump the
5    bones, some of them, and they leave some of them.
6    But interestingly, the ones they dump are the
7    little ones, and the ones they leave in the
8    barrel are the big ones.

9         Undetected.  But they are able to do
10   this, undetected, just a couple of feet from
11   Mr. Avery's trailer.  Then Mr. Buting wants you
12   to believe that they are able to put back the
13   barrel that has been taken off of the property,
14   again, undetected, and leave.

15        Now, Mr. Buting called that a plausible
16   explanation, one theory as to how these bones can
17   be in two different places.  I hope you agree
18   with me as to the plausibility of that defense
19   theory.

20        Coupled with that theory, what you have
21   to buy into, what you have to believe, is that
22   there is somebody else out there, that there is
23   somebody, not a police officer.  All right.  So
24   that narrows the scope of people that are able to
25   do this.  Somebody who's not a police officer,

106

CHRM004651

who skillfully exploited the law enforcement
bias. That the real killer knew about,
apparently, the lawsuit, or the animosity, or the
embarrassment, or something about the 1985 case
enough, where it was important enough to them to
kill some innocent 25 year old victim and plant
it on Mr. Avery's property.

That's absurd. If this wasn't such a
important decision that you had to make, it would
be laughable. It would be something that if
somebody told you at a party, or somebody told
you at your home, you would say nobody would
believe that. And nobody should. Nobody should
believe this series of situations or coincidences
that would necessarily lead you to find Mr. Avery
not guilty.

The SUV was planted in this case, or at
least the defense will have you believe that the
SUV was planted, that somebody planted the SUV.
The fact of the matter is that this SUV was
concealed. It was obscured. Somebody didn't
want it to be found. Let me say that again.
What you are looking at right here, how the SUV
was found by Ms Sturm, was by somebody who didn't
want this SUV to be found. All right. That

107

CHRM004652

1    makes sense.

2         Well, if you are going to plant

3    evidence, you have to want it to be found.

4    Because if Mr. Avery is going to be accused of

5    some murder that he didn't do in this case, you

6    would expect to find this vehicle, if it was

7    planted, in the Avery parking lot, or by

8    Mr. Avery's trailer, or in some location where it

9    would be found.

10        Again, it was only through happenstance

11   and by very fortuitous intervention that vehicle

12   was ever found.  Very important, collectively

13   again, and using your common sense to understand

14   that concept, that this vehicle was obscured in

15   such a way that whoever put it there, like this,

16   didn't want it to be found.

17        Defense wants you to ignore this, and

18   for good reason.  The defense wants you to ignore

19   the electronics that were found in the burn

20   barrel.  Why, because there's no explanation for

21   it.  Because it doesn't fit in any, in any theory

22   that the defense has advanced in this case.  All

23   right.  No law enforcement planting theory, no

24   civilian planting theory, no individual who

25   skillfully exploited the law enforcement bias

                        108

CHRM004653

theory, explains why these things are burned in
Mr. Avery's burn barrel.

And so apparently the defense wants you
to ignore that. Well, remember the instruction,
and reasonable doubt is not -- is a doubt based
upon reason and common sense, but in
consideration of the evidence, which means all of
the evidence in this case, not just some of it.

So my point, ladies and gentlemen, is if
you are going to buy into one of these theories,
you have got to ask yourself, collectively, what
the heck is this. Her phone, her PDA, her
camera, are all found about 20 feet from
Mr. Avery's door, and he is found, that day,
burning in that particular barrel. If Mr. Avery
is not involved in the death and mutilation of
Teresa Halbach, then why are these things in that
barrel.

Also, you can't ignore the fact, please,
collectively remember, that after 2:41 p.m.,
after 2:41 p.m. on the 31st, Teresa Halbach's
phone is never used again. Never used again.
Her phone is in that burn barrel. Her phone is
being burned. And you, as the jury, have to
decide why. There's a couple of explanations,

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 109 of 131   Document 330-19

CHRM004654

one is that the defendant killed her and burned

it, and the other one, I guess, the defense wants

you to just come up with on your own.

That brings me to the conclusion, or the

last question, and that's, did the cops kill

Teresa Halbach. Again, the defense says no. But

if the cops had her blood, if the cops had her

bones, and before the 5th, if the cops knew she

was dead, let me say that again, if before the

5th the cops knew that Teresa Halbach was dead,

they were either told that by the real killer, or

they killed Teresa Halbach.

You have got to be willing to accept one

of those scenarios. And I don't think you can.

And I don't think you should. And I don't think

that the evidence points to that at all.

Mr. Strang, in his opening statement,

promised you what the defense was going to be.

Mr. Strang told you that it's no surprise that

the blood from an unsecured vial in the box in

the Clerk's Office, that Lieutenant Lenk examined

in 2002, ends up in the Toyota. At the start of

the case, that was what the defense was. That's

what the defense theory was. That's what the

defense said their theory of defense and what the

110

CHRM004655

1    evidence was going to show in this case.

2            Vial planting, though, causes some

3    risks, risks to, what I'm characterizing as risks

4    to the defense.  Because when you announce that

5    defense, the State gets to meet that defense.  We

6    get an opportunity to tell you, the jury, through

7    witnesses, whether or not that's plausible,

8    whether or not that could happen, or whether or

9    not that's implausible.

10           And there's two ways to do that.  First,

11   is the common sense way to do that.  The vial

12   planting defense for Mr. Avery, and for the

13   defense team, is that either Mr. Lenk or

14   Mr. Colborn got through this door.  All right.

15   They got through a door that they didn't have a

16   key to, and they got through a door that they

17   didn't have the code to.  That's the first part

18   of this.

19           The next thing that they are asking you

20   to buy is that they knew that there was a file

21   someplace in the Clerk of Court's Office,

22   sometime between the 3rd and the 5th of November.

23   Now, why do I say the 3rd and the 5th, because

24   the 3rd is when Teresa is reported missing,

25   doesn't pay to plant evidence and to steal a vial

                         111

CHRM004656

1    of blood before we know that it's going to do any

2    good.  And the 5th is when Pam Sturm finds her.

3    So between the 3rd and the 5th they have to know

4    that this box actually exists.

5           They also need you to buy that they know

6    that there is a box within the box.  That there

7    is a vial of blood inside of that particular box

8    in the Clerk's Office.  They need you to

9    believe -- They need you to believe that they get

10   through a door they have no key, that they have

11   no code, they find a box that they don't know the

12   existence of, they find the vial that they don't

13   know the existence of, and then they are able to

14   get their hands on that vial of blood.

15          They also need you to believe that

16   nobody sees them do this, that they are able to

17   do that undetected, to secret it, again, to

18   remove it from the Clerk of Court's Office in

19   Manitowoc, to plant the blood, assuming they know

20   how to do that, in six different places.

21          I'm stopping right here, because I need

22   to.  Because for the defense version to hold any

23   water at all, the van -- excuse me -- the SUV

24   can't be found yet.  They have to plant the blood

25   before it's found.  Again, there's only two ways

                              112

CHRM004657

```
 1   that they can do that.  Either they kill this 25
 2   year old girl, or they found her murdered
 3   somewhere else.
 4          And if they found her murdered somewhere
 5   else, then weren't they taking quite a chance,
 6   weren't Mr. Lenk and Colborn, if you admit or buy
 7   what it is that these two gentlemen are selling,
 8   wouldn't you have to agree that they took a
 9   chance that this very 25 year old photographer
10   was also last seen alive by that man.
11          My God, they got lucky, didn't they.  To
12   go and find the vial of blood, even assuming they
13   knew where it was, that the dead woman that they
14   had in their possession, theoretically, was also
15   the last person to have seen Mr. Avery.  It
16   doesn't make sense.  All right.
17          That's the common sense way to deal with
18   the vial of blood planting.  By the way, because
19   the vial of blood is still in the Clerk's Office,
20   you have to reverse this process.  You have got
21   to get the blood back after we do the planting.
22   We have to get through, again, the door that we
23   have no key to, and we have no code to, and into
24   the box, and get this thing secreted back in
25   there, undetected, with nobody seeing.
```

113

CHRM004658

That's not reasonable. That's not a
reasonable doubt. Reasonable doubts are for
innocent people. Reasonable doubts are things
that juries adopt when all the evidence points to
that. And this planting, this vial planting
defense, even from a common sense standpoint, is
absolutely ludicrous.

But what we were able to do, what you
heard, is scientifically exclude that vial of
blood. You heard from Dr. LeBeau, who testified
that this blood is loaded with EDTA and this
blood, and this blood, and this blood, have no
detectable levels of EDTA. And so instead of
calling all of the people with keys and with
codes, and people in the Clerk's Office, and who
might have seen Lieutenant Lenk or Colborn, or
all those kinds of things, instead of doing it
that way, we only had to call one witness, who
scientifically could tell you that there is
absolutely no way that that vial of blood was
used to plant.

In fact, that very question was asked of
Dr. LeBeau, the head of the toxicology section,
or the unit at the FBI. And he said, by a
reasonable degree of scientific certainty, this

114

CHRM004659

vial of blood is excluded, that means it's not
it, it's excluded as the source of those three
bloodstains.

Now, why is that important. Lieutenant
Lenk and Sergeant Colborn, as I mentioned
earlier, are good, decent, honest cops, sworn to
uphold the law. Kinds of officers Manitowoc
citizens should be proud to have on your police
force. They are the kinds of guys that you want
investigating cases for you, for Manitowoc
County. And again, they are not just some cops,
they are your cops, that's why a Manitowoc jury
decides this case.

This isn't just two guys, it's Jim Lenk
and it's Andy Colborn. And when you accuse
police officers of official misconduct, that's
serious business. Mr. Strang correctly predicted
that there would be some anger about this issue,
coming from the prosecution side, and there is.

Let me tell you why. Their livelihood,
their reputations, their families, everything in
their 20 plus years of law enforcement are on the
line, when some lawyer accuses them of
misconduct. Not just any misconduct, but
planting evidence in a murder case. All right.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 115 of 131   Document 330-19

CHRM004660

Serious, serious business.

And as a representative of the State, as the prosecutor in this case, I'm here to tell you folks, that if you are going to allege that some Manitowoc cop is crooked, that some Manitowoc cop committed a crime, you better have something to back it up. And when you don't, and when there is a witness from the FBI who says that didn't happen, and when common sense said, that didn't happen, these men are owed an apology. Their good name, their reputations, need to be restored to them.

And Mr. Strang talked about what a guilty verdict, or a not guilty verdict, may do in this case. A guilty verdict is most importantly attributed to whether or not Mr. Avery committed these horrific acts in these cases. But also the issue of official or police misconduct should be something that angers you, just as its angers me.

Mr. Buting said that he might have been a little rough on Ms Culhane, that he owed her an apology. I'm hoping that the comments that have been directed towards Jim Lenk and towards Andy Colborn, at the conclusion of this case, are also

116

CHRM004661

met with an apology.

But what I heard yesterday, what I heard yesterday, from Mr. Buting, when he suggested that perhaps it was Teresa's lifestyle that contributed to her homicide, I'm paraphrasing, but he said, because she was at some party, what do we know about this party that she was at on Saturday, or what do we know about some phone calls that she had gotten, or what do we know about her living arrangements.

Do you blame a 25 year old homicide victim? And when you suggest that that victim had some responsibility, or something to do with her own demise, you need to be held accountable for that. You need to be taken to task for that. And, again, as the prosecutor, I'm expressing my indignance about that.

Any suggestion that these good people of the Halbach family have to endure in listening to Mr. Buting stand before you and say, what about this woman's lifestyle, or what about this party, or what about who she's living with, is absolutely out of bounds, absolutely improper, has no place in this case.

What does have a place in this case is

117

CHRM004662

the facts.  And now I have come full circle.  And
at the conclusion of this, my final argument
before you, the jurors, you have seen, and should
see by now, the stark difference between the
State's facts, between our reliance on the facts,
and the defense necessarily relying upon
speculation.

Physical evidence, the DNA evidence, the
eyewitness testimony, the scientific evidence,
the big fire that Mr. Avery had, common sense all
point to one person and there's a reason for
that.  As the jury in this case, you have a duty.
You have a duty to return what's called a true
verdict.  You have a duty to search for the
truth.

I agree with Mr. Strang that you do have
a duty in this case, but I disagree when Mr.
Strang tells you that your finding of guilt in
this case is not going to solve the crime.  It
is.  It's going to solve the crime.

And I'm here to tell you, also, as the
prosecutor, and collectively, the three of us
prosecutors, with lots and lots of years of
experience, are also going to tell you that it
will provide closure.  It will provide closure

118

CHRM004663

for the Halbach family, at least in the legal
sense. And it's in the sense for what you are
charged to do, and that is to assign
responsibility. It's to assign accountability
for the death of Teresa Halbach.

I don't believe it is a difficult
decision. It's a complex series of facts. And
it is a very, very serious case. But it's not a
difficult case. It's not a difficult decision
that you have to make, because everything in this
case pointed towards one person, towards one
defendant.

I'm thanking you, at the conclusion of
this case, on behalf of the State of Wisconsin.
And urging you, urging you, to follow the Court's
instructions, to follow the evidence in the case,
and return verdicts of guilty. Thank you. Thank
you, Judge.

THE COURT: Now, members of the jury, the
duties of counsel and the Court have been performed.
The case has been argued by counsel. The Court has
instructed you regarding the rules of law which
should govern you in your deliberations. The time
has now come when the great burden of reaching a
just, fair, and conscientious decision of this case

119

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 119 of 131   Document 330-19

CHRM004664

1    is to be thrown wholly upon you, the jurors selected

2    for this important duty.

3            You will not be swayed by sympathy,

4    prejudice, or passion.  You will be very careful

5    and deliberate in weighing the evidence.  I

6    charge you to keep your duty steadfastly in mind

7    and, as upright citizens, to render a just and

8    true verdict, or in this case, just and true

9    verdicts.

10           The following six forms of verdict will

11   be submitted to you concerning the charges

12   against the defendant, Steven A. Avery.

13           One reading:  We, the jury, find the

14   defendant, Steven A. Avery, guilty of first

15   degree intentional homicide, as charged in the

16   first count of the Information.

17           A second reading:  We, the jury, find

18   the defendant, Steven A. Avery, not guilty of

19   first degree intentional homicide, as charged in

20   the first count of the Information.

21           A third reading:  We, the jury, find the

22   defendant, Steven A. Avery, guilty of mutilating

23   a corpse, as charged in the second count of the

24   Information.

25           And a fourth reading:  We, the jury,

120

CHRM004665

1  find the defendant, Steven A. Avery, not guilty
2  of mutilating a corpse, as charged in the second
3  count of the Information.
4        A fifth reading:  We, the jury, find the
5  defendant, Steven A. Avery, guilty of possession
6  of a firearm, as charged in the third count of
7  the Information.
8        And a sixth reading:  We, the jury, find
9  the defendant, Steven A. Avery, not guilty of
10 possession of a firearm, as charged in the third
11 count of the information.
12        It is for you to determine whether the
13 defendant is guilty, or not guilty, of each of
14 the offenses charged.  You must make a finding as
15 to each count of the Information.
16        Each count charges a separate crime and
17 you must consider each one separately.  Your
18 verdict for the crime charged in one count must
19 not affect your verdict on any other count.
20        This is a criminal, not a civil case,
21 therefore, before the jury may return a verdict
22 which may legally be received, the verdict must
23 be reached unanimously.  In a criminal case, all
24 12 jurors must agree in order to arrive at a
25 verdict.

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 121 of 131   Document 330-19

CHRM004666

When you return to the jury room, select
one of your members to preside over your
deliberations. That person's vote is entitled to
no greater weight than the vote of any other
juror.

When you have agreed upon your verdicts,
have them signed and dated by the person you have
selected to preside. I ask that you return the
unsigned verdict forms as well.

At this point, I'm going to ask the
media folks to shut the audio down because the
Court is going to be identifying one of the
jurors by name. I believe somebody is supposed
to signal me once that's been done. Thank you.

Members of the jury, as I previously
indicated, just before the beginning of
deliberations, any remaining alternate jurors
would be selected. We are now at that point in
the trial.

The alternate juror will be sequestered
separately from the other jurors until
deliberations are completed, to be available in
the event one of the other 12 jurors becomes
unable to complete deliberations.

The alternate juror in this case has

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 122 of 131   Document 330-19

CHRM004667

1    been determined to be Nancy Stienmetz.  Ms

2    Stienmetz, with the consent of counsel for both

3    parties, I will be meeting with you shortly, in

4    chambers, to explain your remaining role in this

5    case.

6              At this time I will ask the Clerk to

7    swear the officer.

8              (Jury bailiff sworn.)

9              THE COURT:  The jury is excused.  Ms

10   Stienmetz, you'll be waiting in the hallway to meet

11   with me.

12             (Jury not present.)

13             THE COURT:  You may be seated.  Counsel, if

14   you should leave the courtroom area, I ask you to

15   keep the Clerk's Office informed of your

16   whereabouts.

17             ATTORNEY STRANG:  The remaining task to

18   tend to is that we had agreed, I think, that all

19   photographs would go to the jury without a request.

20   But since then, I don't remember if I did this on

21   the record or not, but had moved to exclude some of

22   the exhibits already admitted, and photographs of

23   those.

24             I have numbers of them in my brief case,

25   but they are the handcuffs, leg irons, electrical

                        123

CHRM004668

cords, and as I say, related pictures. So the
Court would need to rule on those, because if to
be excluded, of course, those photographs ought
not go.

THE COURT: I recall being informed that I
could anticipate the receipt of such a motion; I
don't know that I have received it yet. But I was
notified of it and my recollection is that the
parties were going to discuss the potentially
disputed items of evidence in order to determine
whether there would be a stipulation proposed.

ATTORNEY STRANG: I don't know that we had
much further conversation, so the question may be
best put to the State.

ATTORNEY KRATZ: If I could just have a
moment, Judge, I will be happy to identify those for
the Court. Exhibit 173, Exhibit 174.

ATTORNEY STRANG: 228 and 229.

ATTORNEY KRATZ: Thank you, counsel. 228,
and 229, although those are items themselves.

ATTORNEY STRANG: Yes, some of these are
photographs and some are the items themselves. And
I don't have which is which.

ATTORNEY KRATZ: All right. 228 -- 229 has
already been withdrawn, I think, as an exhibit. 228

124

CHRM004669

```
 1    is the other photo that is at issue in the case.
 2    And those three photos, then, that have been
 3    identified, we have no objection they be removed
 4    from the binder of photos, and that the balance of
 5    the photos be tendered to the jury at this time.
 6              THE COURT:  All right.  Can you give me the
 7    numbers of the photos again.
 8              ATTORNEY STRANG:  173, 174, 228, and
 9    Mr. Kratz says that 229 already was withdrawn.
10              ATTORNEY KRATZ:  Right.  Those are the
11    three exhibits.
12              ATTORNEY STRANG:  Then the items themselves
13    are Exhibits 203, 204, and 249.  Those are the
14    actual items.
15              ATTORNEY KRATZ:  They wouldn't be going
16    back anyway, Judge.
17              THE COURT:  Pardon me?
18              ATTORNEY KRATZ:  The items wouldn't be
19    going back anyway.
20              THE COURT:  I understand the motion to be
21    going beyond that.
22              ATTORNEY STRANG:  Right.  But they -- I'm
23    asking that they be excluded, that is, that the
24    Court reconsider the ruling admitting them, exclude
25    those things as exhibits.  I agree, of course, with
```

125

CHRM004670

1   Mr. Kratz, that these things wouldn't be going to

2   the jury anyway, absent a request, but I'm looking

3   to have them excluded as evidence altogether.

4           THE COURT:  My only hesitation there is,

5   given the stage of the trial at which this is being

6   raised.  I take it you are not asking for some type

7   of further instruction to the jury that they have

8   been withdrawn.

9           ATTORNEY STRANG:  I'm not, no.  I mean, we

10  would have addressed that before closing arguments.

11          THE COURT:  Does the State have any

12  objection?

13          ATTORNEY KRATZ:  The only issue, Judge, is

14  if they would ask to see those items, I think that

15  could be addressed at that time.  I don't believe

16  that the items themselves, that is the physical

17  items themselves, need to be addressed at this time.

18  Certainly an argument could be made as to the

19  relevance, they are part of the record.  And up and

20  until the time that those may be asked for, I

21  believe that request by counsel is premature.

22          THE COURT:  Let me ask this.  Is the

23  defense, with the understanding that both parties

24  agree that these six exhibits that have been

25  identified, that is, three photos and three physical

126

CHRM004671

```
 1    items, with the understanding that they will not be

 2    sent to the jury, and I believe there's a

 3    stipulation that the three photos can simply be

 4    withdrawn, is the defense willing to postpone

 5    further consideration of its request to withdraw the

 6    other exhibits to such time as the jury requests to

 7    see them?

 8         ATTORNEY STRANG:  Sure, because there is --

 9    it's true, there is no practical effect other than

10    cleaning up the record, and that can be done any

11    time.

12         THE COURT:  So, based on the stipulation of

13    the parties then, items -- Exhibits 173, 174 and 228

14    that are photos, are withdrawn, and items 203, 204,

15    and 249, will not be sent to the jury room if

16    requested.

17         ATTORNEY STRANG:  That's right.  Now, I

18    have to say, I had -- our exhibit shows 229.

19         THE COURT:  I have been told -- my

20    understanding was that's already been withdrawn.

21         ATTORNEY STRANG:  Let's just confirm that

22    with the clerk, I probably am wrong, but 229, Janet.

23         THE CLERK:  I didn't show that as

24    withdrawn.

25         ATTORNEY KRATZ:  It should be, I have no
```

127

CHRM004672

1    problem with that.

2              THE COURT:  All right.  229, then, is also

3    withdrawn.

4              ATTORNEY STRANG:  Very well.

5              ATTORNEY KRATZ:  Thank you.

6              THE COURT:  Very well, we're in recess.

7              ATTORNEY BUTING:  Judge, one other matter.

8              THE COURT:  Yes.

9              ATTORNEY BUTING:  I don't know what other

10   exhibits you intend to send back to the jury, other

11   than the photographs, but certainly we would object

12   to the expert's reports going back.

13             THE COURT:  Let me clarify my understanding

14   further.  If I understand what the parties are

15   telling me, and I want to make sure I'm not reading

16   too much in, I'm glad, Mr. Buting, that you brought

17   this up.  If the jury requests permission to see any

18   of the other photos, are the parties saying I can

19   send them back, or the parties wish to be heard

20   before they are sent back?

21             ATTORNEY STRANG:  Photos can be sent

22   without jury request.

23             ATTORNEY KRATZ:  Right now.

24             ATTORNEY STRANG:  That's what we agreed.

25             THE COURT:  You are asking the Court to

                          128

CHRM004673

```
 1    send them back.

 2              ATTORNEY KRATZ:  Right now, yes.

 3              THE COURT:  Okay.

 4              ATTORNEY KRATZ:  But any other exhibits, if

 5    they ask to be seen, we would all like to be heard

 6    on that.

 7              ATTORNEY STRANG:  And maybe we didn't have

 8    an agreement on this, I expressed the view to

 9    counsel that we also could send CV's for all experts

10    back, without request.  If they are not in

11    agreement --

12              ATTORNEY KRATZ:  No, that--

13              THE COURT:  I'm a little concerned if we're

14    sending all photos, that's one thing.  I hate to

15    send back nothing but all CV's and nothing else, for

16    fear that it might draw undue attention to them.  So

17    I'm going to wait, and if the jury requests to see

18    anything other than the remaining photos, I will

19    notify the parties, just as I would if I receive a

20    question from the jury, and the parties will have a

21    chance to be heard before they go back.

22              ATTORNEY KRATZ:  That sounds good.

23              THE COURT:  Fair enough?

24              ATTORNEY KRATZ:  Thank you, Judge.

25              ATTORNEY STRANG:  Yes.
```

129

CHRM004674

1          THE COURT:  All right.  We're adjourned for

2     this time.

3          (Court in recess, jury deliberating.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              130

CHRM004675

STATE OF WISCONSIN    )
                      )ss
COUNTY OF MANITOWOC   )

I, Diane Tesheneck, Official Court Reporter for Circuit Court Branch 1 and the State of Wisconsin, do hereby certify that I reported the foregoing matter and that the foregoing transcript has been carefully prepared by me with my computerized stenographic notes as taken by me in machine shorthand, and by computer-assisted transcription thereafter transcribed, and that it is a true and correct transcript of the proceedings had in said matter to the best of my knowledge and ability.

Dated this 22nd day of January, 2008.


_Diane Tesheneck, RPR_
Diane Tesheneck, RPR
Official Court Reporter

131

CHRM004676