```
 1      206 and 207 into evidence?

 2              THE COURT:  Any objection?

 3              ATTORNEY KRATZ:  No.

 4              THE COURT:  They are admitted.

 5                  (Recess taken.)

 6                  (Jury present.)

 7              THE COURT:  Mr. Kratz, at this time you may

 8      call your next witness.

 9              ATTORNEY KRATZ:  State will call Andrew

10      Colborn to the stand.

11              THE CLERK:  Please raise your right hand.

12              SERGEANT ANDREW L. COLBORN, called as a

13      witness herein, having been first duly sworn, was

14      examined and testified as follows:

15              THE CLERK:  Please be seated.  Please state

16      your name and spell your last name for the record.

17              THE WITNESS:  Andrew L. Colborn,

18      C-o-l-b-o-r-n.

19              ATTORNEY KRATZ:  You don't have to be quite

20      so close.

21                  DIRECT EXAMINATION

22      BY ATTORNEY KRATZ:

23      Q.  Mr. Colborn, can you tell us, how are you

24          employed, please.

25      A.  I'm a patrol sergeant with the Manitowoc County
```

64

**EXHIBIT**

19

| | | Sheriff's Department. |
|---|---|---|
| 1 | | Sheriff's Department. |
| 2 | Q. | How long have you been a law enforcement officer? |
| 3 | A. | Since 1996. |
| 4 | Q. | Prior to 1996, what did you do? |
| 5 | A. | I was a Corrections Officer from 1992 to 1994, |
| 6 | | also with the Manitowoc County Sheriff's |
| 7 | | Department. |
| 8 | Q. | What does a Corrections Officer do? |
| 9 | A. | A Corrections Officer is a non-sworn, non-law |
| 10 | | enforcement officer, that is a responsibility for |
| 11 | | security of the jail. |
| 12 | Q. | All right. How was it that you became a sworn |
| 13 | | law enforcement officer? |
| 14 | A. | When a position opened up at the Manitowoc County |
| 15 | | Sheriff's Department, I did perform the State |
| 16 | | written test, performed an agility test, went on |
| 17 | | an eligibility list, and eventually I was |
| 18 | | selected. |
| 19 | Q. | What are your current duties with the Manitowoc |
| 20 | | County Sheriff's Department? |
| 21 | A. | I'm a assistant shift commander for the noon to 8 |
| 22 | | shift so I have some administrative duties and |
| 23 | | then I have some patrol duties. |
| 24 | Q. | Prior to being selected as a law enforcement |
| 25 | | officer, did you have any duties in your prior |

65

|   |    |                                                    |
|---|----|----------------------------------------------------|
| 1 |    | life that in any way prepared you for being a law  |
| 2 |    | enforcement officer?                               |
| 3 | A. | No.                                                |
| 4 | Q. | Sergeant, you hold the rank of sergeant?           |
| 5 | A. | Yes, sir.                                          |
| 6 | Q. | And in early November of 2005, did you hold that   |
| 7 |    | same rank?                                         |
| 8 | A. | Yes, sir.                                          |
| 9 | Q. | What were your duties back in early November of    |
| 10|    | '05?                                               |
| 11| A. | Essentially the same duties that I hold today.  I  |
| 12|    | was a patrol supervisor on -- I work a six day     |
| 13|    | on, three day off rotation.  So on the days that   |
| 14|    | the lieutenant that's assigned to the shift is     |
| 15|    | off, I would be the shift commander.               |
| 16| Q. | So you have supervisory responsibilities as well?  |
| 17| A. | Yes, sir.                                          |
| 18| Q. | I'm going to direct your attention to              |
| 19|    | November 3rd of 2005, ask if you were employed on  |
| 20|    | that evening?                                      |
| 21| A. | Yes, sir.                                          |
| 22| Q. | Do you recall what your duties were on             |
| 23|    | November 3rd?                                      |
| 24| A. | I was the shift commander for the noon to 8        |
| 25|    | shift, that's the shift I'm assigned to.           |

66

```
 1   Q.   Sometime during that shift, Sergeant Colborn,
 2        were you informed of a Calumet County missing
 3        persons investigation that was ongoing?
 4   A.   Yes, sir.
 5   Q.   And being involved in that -- or excuse me, being
 6        aware of that investigation, were you asked to
 7        assist in any way?
 8   A.   Yes, sir.
 9   Q.   Tell the jury how you were asked to assist?
10   A.   I was contacted by, I believe it was inspector or
11        Investigator Mark Wiegert from the Calumet County
12        Sheriff's Office, who contacted the dispatch
13        center by telephone, who then transferred the
14        call to my patrol car.
15             He asked if I could respond to, I
16        believe he gave me the address of 12928 Avery
17        Road.  He asked if I knew where that was and I
18        told him, yes, I believe that that was the
19        address of Avery Auto Salvage.  And he asked if I
20        could go there and check for a missing person
21        because they had a missing person report that had
22        generated in Calumet County and it had been
23        determined, through the course of their
24        investigation, that she had been out at the Avery
25        Salvage Yard, taking pictures of a vehicle that
```

| | | |
|---|---|---|
| 1 | | was for sale. |
| 2 | Q. | At the time that Investigator Wiegert asked for |
| 3 | | your assistance, did Investigator Wiegert tell |
| 4 | | you other places within Manitowoc County that Ms |
| 5 | | Halbach had known to have been on the 31st of |
| 6 | | October? |
| 7 | A. | I don't believe in the -- in the initial phone |
| 8 | | call that he did. |
| 9 | Q. | All right. Some time later that evening you |
| 10 | | heard? |
| 11 | A. | Yes, sometime later that evening he gave me |
| 12 | | another address on County Highway B and another |
| 13 | | name and asked me to check there as well. |
| 14 | Q. | What name was that, just so -- we're going to |
| 15 | | eventually get there? |
| 16 | A. | I believe the first name was George; I know the |
| 17 | | last name was Zipperer. |
| 18 | Q. | Sergeant Colborn, are you at all familiar with |
| 19 | | the Avery salvage business itself? |
| 20 | A. | Yes. |
| 21 | Q. | Tell the jury how you are familiar with that |
| 22 | | business. |
| 23 | A. | I have been, personally, a customer of the Avery |
| 24 | | Auto Salvage business; as well as, I have had |
| 25 | | contacts there through with law enforcement. And |

68

```
 1        I have children that are the same age as some of

 2        the owners of Avery Auto Salvage, so I had

 3        contact with them through the course of school

 4        events.

 5    Q.  All right.  Let's take those -- Well, when we

 6        discuss this, I'm going show you what's been

 7        received as Exhibit 86, can you tell us what that

 8        is, please.

 9    A.  That's an overhead, like an airplane view,

10        birds-eye view of the Avery Auto Salvage.

11    Q.  Prior to the 3rd of November, 2005, had you been

12        to that property?

13    A.  Prior to 2005?

14    Q.  Prior to November 3rd of 2005, had you been to

15        that property?

16    A.  Yes.

17    Q.  And under what circumstances, can you tell the

18        jury about that?

19    A.  Again, as a customer.

20    Q.  Let's talk about that, first.  What do you mean

21        as a customer.

22    A.  I have several older vehicles, one, as a matter

23        of fact, is a 1950 Chevrolet pickup truck.  And

24        I -- in the process of tinkering around with it,

25        I have gone to several auto salvage and I have
```

69

| | | |
|---|---|---|
| 1 | | always been referred to the Avery Auto Salvage as |
| 2 | | the place to go if you are looking for an older |
| 3 | | model vehicle parts -- or parts for an older |
| 4 | | model vehicle. |
| 5 | Q. | Was there one person in particular that you would |
| 6 | | normally have contact with at the Avery Auto |
| 7 | | Salvage? |
| 8 | A. | No, actually, usually there were two; either I |
| 9 | | had contact with Charles Avery or Earl Avery. |
| 10 | Q. | All right. They are brothers and, in fact, the |
| 11 | | owners of the business; is that right? |
| 12 | A. | Yes, sir. |
| 13 | Q. | Let me ask you this, Sergeant Colborn, if you |
| 14 | | know, prior to the 3rd of November, 2005, when |
| 15 | | was the last time you were at the Avery Auto |
| 16 | | Salvage business? |
| 17 | A. | I think the last time I was at the Avery Auto |
| 18 | | Salvage business would have been 1999. |
| 19 | Q. | All right. So at least six years previously? |
| 20 | A. | Yes, sir. |
| 21 | Q. | But you knew where it was? |
| 22 | A. | Yes, sir. |
| 23 | Q. | Then, on November 3rd, after Mr. Wiegert asked |
| 24 | | for your help; did you proceed to this scene? |
| 25 | A. | Yes, sir. |

15:41 € p. 7

70

| | | |
|---|---|---|
| 1 | Q. | And that's 2005; is that right? |
| 2 | A. | Yes, sir. |
| 3 | Q. | Can you tell the jury, please, what happened when |
| 4 | | you got there on November 3rd? |
| 5 | A. | Again, I knew that Earl Avery, who was probably |
| 6 | | the person that I have had the most contact with |
| 7 | | or know the best, doesn't live on the Avery Auto |
| 8 | | Salvage property, so my initial -- what I was |
| 9 | | initially trying to do was to make contact with |
| 10 | | Charles Avery, who does reside on there. |
| 11 | | I knew Charles to -- I didn't know if he |
| 12 | | owned the business, but I certainly knew that he |
| 13 | | managed the business. So I was going to make |
| 14 | | contact with him and ask him if he had seen |
| 15 | | someone on the property taking pictures of a |
| 16 | | vehicle that was for sale. |
| 17 | Q. | In looking for Charles Avery, do you remember |
| 18 | | what building you went to? |
| 19 | A. | Well, initially, I was kind of surprised when I |
| 20 | | drove in, because the shop area, a lot of -- |
| 21 | | there were new buildings and things had changed |
| 22 | | since the last time I was there. But I was |
| 23 | | attempting to make contact at his residence, |
| 24 | | which I believe is right behind that large, |
| 25 | | square shaped building. |

71

```
 1   Q.   We're handing you a laser pointer to assist you
 2        in your --
 3   A.   I believe that --
 4   Q.   -- testimony.
 5   A.   I thought that was his residence right there.
 6   Q.   And you were pointing actually to the residence
 7        which would be just the south of the --
 8   A.   That one right there.
 9   Q.   You have to wait until I finish my question, sir.
10        You are pointing to a trailer or a residence just
11        south of the Avery business itself.  And I think
12        counsel is willing to stipulate that is Charles
13        Avery's residence.
14             ATTORNEY STRANG:  Certainly my
15        understanding.
16             THE COURT:  All right.  The record will
17        reflect the stipulation.
18   Q.   (By Attorney Kratz)~ Did you drive or walk into
19        this property?
20   A.   I drove.
21   Q.   Can you tell the jury where you came in from,
22        please.
23   A.   There is -- To my knowledge there is only one
24        entrance onto the property and that's off Avery
25        Road, which the whole of Avery Road isn't
```

72

```
 1            pictured on that picture.  But I ended up coming
 2            down that dirt road there and parking almost
 3            where there is a vehicle parked right now.
 4    Q.      Why don't you show us where you parked.  If I
 5            zoomed into that location would that help us?
 6            All right.  We have now zoomed in to Exhibit 86,
 7            could you, again, show the jury about where it
 8            was that you parked.
 9                   You are pointing which would be just to
10            the north of the large building, which is
11            something we have been calling the new office or
12            the new shop building; is that correct?
13    A.      Yes, sir.
14    Q.      All right.  After parking at that location, tell
15            the jury what happened.  By the way, about what
16            time was this that you got there?
17    A.      I'm guessing around 7:00, between 6:30 and 7:30.
18    Q.      Was it light out or was it dark?
19    A.      It was dark.
20    Q.      After parking there, Sergeant Colborn, what
21            happened?
22    A.      I got -- I exited my squad car and I was going to
23            walk down the road, that road right there, in
24            order to access Charles' residence.  Almost as
25            soon as I got out of my car I heard something
```

73

|  |  | behind me.  I turned and Steve Avery was walking |
| 1 |  | behind me.  I turned and Steve Avery was walking |
| 2 |  | towards me and he had come out of that residence |
| 3 |  | right there. |
| 4 | Q. | Do you know whose residence that is? |
| 5 | A. | I believe that's Al and Delores Avery's |
| 6 |  | residence. |
| 7 | Q. | Did you have any conversation with Steven Avery |
| 8 |  | at that time? |
| 9 | A. | Yes, I did. |
| 10 | Q. | And could you describe that conversation for the |
| 11 |  | jury, please? |
| 12 | A. | I think Steve initiated the conversation with me |
| 13 |  | by asking me what I wanted, what I was doing |
| 14 |  | there. |
| 15 | Q. | Were you dressed similar to what you are dressed |
| 16 |  | today? |
| 17 | A. | Yes, I was in uniform. |
| 18 | Q. | Did you have a marked squad car? |
| 19 | A. | Yes, I did. |
| 20 | Q. | What did you tell Mr. Avery? |
| 21 | A. | I told Avery -- Mr. Avery, that there was -- I |
| 22 |  | had received a call from Calumet County and that |
| 23 |  | they had informed me that there was a girl |
| 24 |  | missing from Calumet County and asked him if she |
| 25 |  | had come out to their property to photograph a |

15:42 Ex 7

15:46 Ex 7

74

```
 1        vehicle that they were selling.
 2   Q.   Did Mr. Avery have a response for you?
 3   A.   Yes, he said that she had been there.
 4   Q.   Did he tell you what day she had been there?
 5   A.   I think I might have told him that, what day that
 6        she should have been out there.  I don't recall
 7        if we mentioned a date, but I do remember asking
 8        him what time she had been out there.
 9   Q.   Did Mr. Avery recall this young woman?
10   A.   Yes.
11   Q.   Did he name her for you?
12   A.   No.
13   Q.   Did he tell you what she had done at his property
14        that day?                              15:57
15   A.   He said that she was taking some pictures of a
16        van that his sister was selling.
17   Q.   Mr. Avery tell you how long the woman had been on
18        his property?
19   A.   He said 5 or 10 minutes.
20   Q.   Did you inquire of Mr. Avery whether or not he
21        had personal contact with this woman on the date
22        she was out there?
             and   16:00
23   A.   I asked Mr. Avery if she had said where she was
24        going.  And he said, I never talked to her.  She
25        was only here 5 or 10 minutes and she left.

                          75
```

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 12 of 153   Document 330-20

| | | |
|---|---|---|
| 1 | Q. | But he never talked to her? |
| 2 | A. | That's what he told me, he never talked to her. |
| 3 | Q. | Did he describe that further, how he knew she was |
| 4 | | there? |
| 5 | A. | He said he saw her out the window taking the |
| 6 | | pictures. |
| 7 | Q. | Okay. Did you complete that conversation with |
| 8 | | Steven Avery? Do you recall that conversation? |
| 9 | A. | I told Mr. Avery that her parents and her family |
| 10 | | were getting worried and was he sure that she |
| 11 | | didn't mention where she might have been going |
| 12 | | after she left. And he said, no, I didn't talk |
| 13 | | to her. She was only here a few minutes and then |
| 14 | | she left. |
| 15 | Q. | What was Mr. Avery's demeanor like as he was |
| 16 | | talking to you; was he cooperative? |
| 17 | A. | Yes, he was very cordial. |
| 18 | Q. | Mr. Avery indicate to you the time, that is, when |
| 19 | | this young woman had been on his property? |
| 20 | A. | He said he thought between 2:00 or 2:30. |
| 21 | Q. | What did you do then? |
| 22 | A. | I believe I thanked him for talking with me and I |
| 23 | | started to get back in my car. And I believe |
| 24 | | Mr. Avery told me that he hoped she turned up |
| 25 | | soon. |

76

```
1   Q.  What did you do then?
2   A.  I left.  I left the property and I contacted --
3       he is the under sheriff of our department now,
4       but at the time he was the deputy inspector of
5       the operations division.  I called him.
6   Q.  What's his name?
7   A.  Greg Schetter.  And I let him know that Calumet
8       County was investigating a missing persons case
9       and that one of the places that it had been
10      mentioned that this party was at was on -- at the
11      Avery Salvage Yard and I just left there and made
12      contact and that I was unable to locate that
13      person.  And he suggested that I probably contact
14      Lieutenant Lenk and see if he wanted -- if
15      Lieutenant Lenk wanted any of our detectives to
16      assist Calumet County in searching any place
17      else.
18  Q.  Did you do that?
19  A.  Yes, I did.
20  Q.  And did you speak with Lieutenant Lenk that
21      evening?
22  A.  Yes, by phone.  And then when I got into the
23      department, because prior to going into the
24      department I went past the other residence.  I
25      must have also contacted Investigator Wiegert and
```

77

1     let him know that I hadn't located.

2              And he, I believe, at that time told me

3     of the other address.  So I purposely drove past

4     that residence.  I saw it was dark, but that

5     there were cars in the driveway.  But the

6     residence was dark.  I didn't see any lights on

7     there.  So I ended my tour of duty for patrol.

8  Q.  Let me just stop you.  Whose residence was this

9     that you drove past?

10 A.  George Zipperer's.

11 Q.  Go ahead.  What did you do?

12 A.  I ended my patrol tour of duty, but I remained on

13    duty to assist Calumet County Detective Dedering

14    and Detective Remiker in making contact at George

15    Zipperer's residence.

16 Q.  Was that done at that time?

17 A.  It was done, you know, within probably a half

18    hour or 45 minutes of my getting back to the

19    department.

20 Q.  The question, Sergeant Colborn, did you assist in

21    that process?

22 A.  Yes, sir.

23 Q.  You mentioned that there was a Calumet detective

24    that was involved, as well as Manitowoc; is that

25    right?

78

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | In meeting with the Zipperers? |
| 3 | A. | Yes, sir. |
| 4 | Q. | And, again, do you remember who they were? |
| 5 | A. | I believe his name is John Dedering. |
| 6 | Q. | All right. When you -- I'm just going to go back |
| 7 | | just briefly to your contact with Mr. Avery. You |
| 8 | | mentioned that he was cooperative; is that right? |
| 9 | A. | Yes, sir. |
| 10 | Q. | I want you to remember back, as best you can, |
| 11 | | Sergeant Colborn, at that initial meeting with |
| 12 | | Mr. Avery, you, Sergeant Andy Colborn, did you |
| 13 | | have any feelings or any inclination that |
| 14 | | Mr. Avery may have been involved in Ms Halbach's |
| 15 | | disappearance? |
| 16 | A. | Not at that time, no. |
| 17 | Q. | Did you do anything on the 3rd of November to |
| 18 | | further investigate Mr. Avery? |
| 19 | A. | On November 3rd? |
| 20 | Q. | Yes. |
| 21 | A. | No, sir. |
| 22 | Q. | Did you ever go back onto his property on the |
| 23 | | 3rd? |
| 24 | A. | No, sir. |
| 25 | Q. | After going to the Zipperers with Detective -- I |

79

```
 1          think it was Remiker and Dedering, what did you
 2          do after that?
 3    A.    After we were done, completed at the Zipperers?
 4    Q.    Yes.
 5    A.    I went home.  I was done with -- you know, I was
 6          already on overtime.  I checked out and went
 7          home.
 8    Q.    Do you know about what time that was?
 9    A.    10:30, 11:00 at night, maybe.
10    Q.    All right.  Do you remember what you did the rest
11          of that evening?
12    A.    Just probably fell asleep on the couch.  I went
13          to bed and, you know, fell asleep.
14    Q.    The next day, on the forth of November, were you
15          working that day?
16    A.    No, sir, I was off that day.
17    Q.    It's a Friday; is that right?
18    A.    Yes, sir.
19    Q.    Do you remember what you did on the 4th?  We'll
20          get back to that, but do you recall, generally,
21          your day on the 4th of November?
22    A.    Yes, sir.
23    Q.    Move your attention one day further, on the 5th,
24          Saturday, the 5th of November; do you recall what
25          you were doing that day or that morning?
```

80

```
 1    A.    That was also a regularly scheduled day off for
 2          me.  Yes, I recall what I did on that day.
 3    Q.    We'll get into the morning, but let me just jump
 4          right to this investigation.  Were you contacted
 5          at all by any supervisors or superiors that day
 6          and asked to participate in this case?
 7    A.    I was contacted by the noon to 8 shift commander
 8          for that day, and he did ask me to come into work
 9          and pick up a patrol vehicle and respond out to
10          the Avery Salvage Yard.
11    Q.    Did you do that?
12    A.    Yes.
13    Q.    In a marked vehicle?
14    A.    Yes, I did take a marked vehicle out there.
15    Q.    And about what time was it that you arrived at
16          the Avery scene itself; do you recall?
17    A.    I know I left my house between 4:00 and 4:30.  I
18          probably got out to the Avery Salvage Yard
19          between 5:15, 5:30 maybe.
20    Q.    To your best recollection?
21    A.    Yes.
22    Q.    What happened when you got to the Avery salvage
23          business?
24    A.    I made contact with the same supervisor who had
25          called me and I asked him, what do you want me to

                         81
```

| | | |
|---|---|---|
| 1 | | do. And he informed me that there was a deputy |
| 2 | | there that had some personal business or matters |
| 3 | | to attend to. She had been out there since |
| 4 | | apparently earlier in the day. And he asked me |
| 5 | | to transport that deputy back to the department |
| 6 | | so that she could get her own private vehicle and |
| 7 | | go home. And then come back out to the Avery |
| 8 | | Salvage Yard and provide security. |
| 9 | Q. | Did you do that? |
| 10 | A. | Yes. |
| 11 | Q. | What did you do when you got back to the Avery |
| 12 | | business? |
| 13 | A. | Tried to stay in the car as much as possible |
| 14 | | because it was pouring rain. But they directed |
| 15 | | my attention to a place way off in the salvage |
| 16 | | yard where I could see some lights. And |
| 17 | | somewhere up in this area here they just told me |
| 18 | | to sit in the car and not let anyone go down any |
| 19 | | of these roads. |
| 20 | Q. | Providing scene security up near what would be |
| 21 | | the business buildings? |
| 22 | A. | Yes. |
| 23 | Q. | Did you do that? |
| 24 | A. | Yes. |
| 25 | Q. | How long did you have that responsibility. |

82

| | | |
|---|---|---|
| 1 | A. | Maybe like an hour, hour and a half. And I was |
| 2 | | then told that, actually, I could go home. So I |
| 3 | | was preparing to do that. I was checking all my |
| 4 | | equipment to make sure I had everything that I |
| 5 | | got out there -- came out there with. And then I |
| 6 | | was told that I was going to be needed in a |
| 7 | | different capacity and not to go home. |
| 8 | Q. | All right. Let me ask you this, Sergeant |
| 9 | | Colborn, any time that day, any time on the 5th |
| 10 | | of November, did you ever make your way down |
| 11 | | towards the pond, or down towards the southeast |
| 12 | | quadrant of the Avery salvage property? |
| 13 | A. | No, sir. |
| 14 | Q. | Could you point to that area for us, with the |
| 15 | | laser pointer. Point to the northeast corner of |
| 16 | | the property. I'll specifically ask you about |
| 17 | | that area, did you go near that area at all on |
| 18 | | the 5th of November? |
| 19 | A. | No, sir. |
| 20 | Q. | How about on the 3rd when you were there 2 days |
| 21 | | earlier, talking to Steven Avery? |
| 22 | A. | No, sir. |
| 23 | Q. | And were you down there at all on the 4th of |
| 24 | | November? |
| 25 | A. | No, sir. |

83

```
1    Q.   When initially being told that you could leave,
2         or that you were in effect packing up to leave,
3         who was it that approached you with other duties?
4    A.   Detective Remiker.
5    Q.   Do you know what you were being asked to do then?
6    A.   He just said, you may want to check in with
7         Inspector Wiegert -- Detective Wiegert, before
8         you go home, because you can see the huge area
9         here, it's going to have to be checked, and we
10        don't have a lot of people here to do that.
11   Q.   Do you know how many sworn law enforcement
12        officers were on scene at that time, or is that
13        something that you wouldn't even have a guess on?
14   A.   No, I didn't take a head count. I don't know.  I
15        would ball park it at 50 or less, but I don't
16        know.
17   Q.   All right.  Now, 50 sounds like a lot of police
18        officers; do you think that's a lot for that size
19        scene?
20             ATTORNEY STRANG:  Irrelevant.
21             THE COURT:  Sustained.
22   Q.   (By Attorney Kratz)~ Did you check in with
23        Investigator Wiegert before you left?
24   A.   Yes.
25   Q.   And can you tell the jury, please, what -- what

                        84
```

1      that conversation was?

2 A.   I believe he asked me if I was an evidence

3      technician and I said, yes, I am. And --

4 Q.   Let me stop you there. What all goes into being

5      an evidence technician?

6 A.   It's an investigative portion, it's an

7      investigative duty some police officers are

8      trained to do and some who may not be interested

9      in that are not. Not every police officer is an

10      evidence technician. You do get special training

11      on how to do photographing, how to identify

12      evidence, how to collect evidence without

13      destroying it.

14 Q.   All right. And you had been through that

15      training?

16 A.   Yes, sir.

17 Q.   With Manitowoc County, that is, with the

18      sheriff's department, had you performed evidence

19      collection duties prior to November 5th of 2005?

20 A.   Yes, sir.

21 Q.   How long had you been an evidence tech?

22 A.   Since 1997.

23 Q.   Have you ever executed a search warrant or

24      collected evidence in that capacity before?

25 A.   Yes, sir.

85

| | | |
|---|---|---|
| 1 | Q. | After Investigator Wiegert asked you if you were |
| 2 | | an evidence tech, what were you told to do? |
| 3 | A. | I was just told to stand by, not to go home. So |
| 4 | | I went back out to my patrol car. |
| 5 | Q. | And, again, where was that parked, if you can |
| 6 | | show us? |
| 7 | A. | I may, you know, have moved it closer to the |
| 8 | | Command Post, but initially I was parked right in |
| 9 | | this area here. |
| 10 | Q. | Again, near the business buildings? |
| 11 | A. | Yes, sir. |
| 12 | Q. | How long did you wait for further assignment? |
| 13 | A. | Maybe 5, 10 minutes. |
| 14 | Q. | Now, Sergeant Colborn, did you know what |
| 15 | | assignment you were going to be given; in other |
| 16 | | words, did you know where you were going to be |
| 17 | | directed that night? |
| 18 | A. | No, sir. |
| 19 | Q. | What's the next direction that you recall |
| 20 | | receiving? |
| 21 | A. | I believe the next person I made contact with was |
| 22 | | Sergeant Bill Tyson from the Calumet County |
| 23 | | Sheriff's Department. And he was with Lieutenant |
| 24 | | Lenk and Detective Remiker. I believe he came |
| 25 | | out of the Command Post. They kind of motioned |

86

```
 1        to me.  So walked up to them and Sergeant Tyson
 2        said, you are going to be working for me and we
 3        are going to be going to Steve Avery's trailer.
 4    Q.  What did working for me mean, or what do you
 5        believe it meant?
 6    A.  Well, I had been told by this time that the
 7        Calumet County Sheriff's Department was leading
 8        up this investigation.  So I interpreted working
 9        for me as, you are the boss and you are going to
10        tell me what to do.
11    Q.  Okay.  Were you okay with that?
12    A.  Yes.
13    Q.  Did you then proceed with Deputy Tyson to the
14        Steven Avery trailer?
15    A.  Yes, sir.
16    Q.  Do you remember how you got there, how you got
17        down there?
18    A.  I believe we took two cars.  I believe Sergeant
19        Tyson took his Calumet County patrol car and we
20        probably -- I don't think we took my marked unit,
21        I think I got in Detective Remiker's car, or
22        Lieutenant Lenk's car, whichever.  It was an
23        unmarked Manitowoc County car.
24    Q.  All right.  Tell us again, if you can look at
25        Exhibit 86, now where did you drive, where did
```

87

```
1        you guys go then?
2   A.   I had never been to Steve Avery's trailer before
3        so I really didn't know where it was.  But we
4        drove down this road to that trailer right there.
5   Q.   I will zoom in again on Exhibit 86; do you recall
6        where the cars were parked?
7   A.   I believe we parked them in this driveway here
8        that goes up to that garage.
9   Q.   Do you recall that particular search that
10       evening?
11  A.   Yes, sir.
12  Q.   How is it that you have a independent memory of
13       that first search of Steven Avery's trailer?
14  A.   Because I was involved in it.
15  Q.   Okay.  Did each of the search team members have a
16       specific responsibility within that trailer, if
17       you know?
18  A.   Not really.  I did have the specific
19       responsibility of photographing.  But as far as
20       collecting, I mean, we all worked as a team.  It
21       wasn't like one person went here and one person
22       went there.  We were always -- worked together as
23       a team, always within arm's length of one
24       another.
25  Q.   Was that by design, do you know?
```

88

```
 1   A.   I don't know if it was by design, per se, but it
 2        just seemed that this would be the best way for
 3        things to work and that we could be the most
 4        careful and concise, working together as a team.
 5   Q.   All right.  Let me ask you, Sergeant Colborn, did
 6        you know the kinds of things that you were
 7        looking for in Steven Avery's trailer?
 8   A.   Not specific -- specifically, no.
 9   Q.   Was there generally a term of things that you
10        were looking for?
11   A.   I was looking for any evidence that would
12        substantiate or eliminate her having been there.
13   Q.   Who's her?
14   A.   Teresa Halbach.
15   Q.   What rooms were it that the four of you searched?
16   A.   I believe that first night we did search the
17        entire trailer.  We started in what I term to be
18        the master bedroom or the largest bedroom.
19   Q.   All right.  We have already heard from Sergeant
20        Tyson so what responsibilities -- I'm just
21        talking about you now, not the others -- but what
22        responsibilities did you have in the search of
23        that bedroom?
24   A.   Again, initially, I did all the photographing
25        that night with a 35mm camera.  And then I was
```

89

|    |    |                                                      |
|----|----|------------------------------------------------------|
| 1  |    | looking in -- there was a bookcase type piece of     |
| 2  |    | furniture next to the bed and a desk next to         |
| 3  |    | that.                                                |
| 4  |    | And while I say it's the larger bedroom,             |
| 5  |    | it's still kind of a small bedroom so those          |
| 6  |    | pieces of furniture were almost tight together.      |
| 7  |    | And there was very little distance between the       |
| 8  |    | bed and those pieces of furniture, I mean, maybe     |
| 9  |    | 2 foot.  And that's the area that I was              |
| 10 |    | specifically searching --                            |
| 11 | Q. | How many --                                          |
| 12 | A. | -- in that bedroom.                                  |
| 13 | Q. | I'm sorry.  How many men were in that bedroom?       |
| 14 | A. | There was myself, Detective Remiker, Lieutenant      |
| 15 |    | Lenk and Sergeant Tyson.                             |
| 16 | Q. | I'm going to put on the screen an exhibit which      |
| 17 |    | has already been received; it's Exhibit 103.         |
| 18 |    | It's a computer generated exhibit.  Zoom in,         |
| 19 |    | specifically, into the bedroom; does that help       |
| 20 |    | you better orient yourself to Steven Avery's         |
| 21 |    | bedroom?                                             |
| 22 | A. | Yes.                                                 |
| 23 | Q. | Take the laser pointer, please, and tell the         |
| 24 |    | jurors in what area you had initial                  |
| 25 |    | responsibility to search on the 5th of November.     |

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 27 of 153   Document 330-20

1    A.    This cabinet right here, I guess we could call
         2          that a bookcase, and this desk right here.
         3    Q.    All right. And did you -- Let's talk about the
         4          cabinet first. Mr. Wiegert is going to hand you
         5          what's been marked as Exhibit No. 203 and on 204,
         6          ask if you found those items in Mr. Avery's
         7          bedroom on the 5th of November?
         8    A.    Yes, sir.
         9    Q.    Tell the jury where you found them, please.
        10    A.    That's a shelf right there, there's a little
        11          space between that shelf and the top of the
        12          cabinet. I found them inside there, inside that
        13          area.
        14    Q.    Now, after finding or locating a piece of
        15          physical evidence during this search, that is, on
        16          the 5th, what did you do with that evidence?
        17    A.    As soon as I located something that, in my
        18          opinion, was of evidence, which doesn't
        19          necessarily make it evidence, but if it was, in
        20          my opinion, to be of evidentiary value, I stopped
        21          what I was doing. I informed Sergeant Tyson,
        22          hey, I found some leg irons and handcuffs in
        23          here.
        24                Then Sergeant Tyson would come over. I
        25          would photograph them, then he collected them and

                                    91

```
 1        put them -- you know, went through the
 2        administrative duties that the Calumet County
 3        Sheriff's Department requires for logging
 4        evidence.
 5    Q.  The actual seizure, or the collection of them,
 6        was whose responsibility?
 7    A.  Calumet County's.
 8    Q.  Sergeant Tyson?
 9    A.  Well, on that evening, yes, Sergeant Tyson,
10        sorry.
11    Q.  When you look at Exhibit 103, this computer
12        generated diagram, other than the roof being
13        ripped off, for obvious reasons, does that look
14        the same or similar as it did on the 5th of
15        November?
16    A.  Yes, sir.
17    Q.  You see on the wall above the bed, the headboard,
18        there is a gun rack; do you see that?
19    A.  Yes.
20    Q.  Is that how it looked on the 5th of November as
21        well?
22    A.  Yes.
23    Q.  Did you see any firearms on that gun rack that
24        aft -- that evening?
25    A.  There were two firearms on that gun rack, just
```

92

1          pretty much like it is in the picture.

2     Q.   Were you able, Sergeant Colborn, to identify

3          those guns, or at least what kind of guns they

4          were?

5     A.   I know as soon as we walked into the room we

6          noticed the guns right away.  I probably stood

7          right about here and I could see that one of the

8          guns, I believe it's this lower one, was a

9          muzzleloader, and it had a piece of masking tape

10         on the stock that said Steve.

11    Q.   What about the gun on top; is that a long gun as

12         well?

13    A.   It's a .22 caliber rifle.

14    Q.   Now, let me ask you, to the best of your

15         recollection, Sergeant Colborn, were those guns,

16         were those firearms seized from Mr. Avery's

17         bedroom on the 5th of November?

18    A.   I don't think we did take them on the 5th of

19         November, no.

20    Q.   So the jury understands, at that time, that is,

21         that first day, that first night that you guys --

22         you guys meaning the law enforcement -- got

23         there, had Teresa Halbach's body or any of her

24         remains been located?

25    A.   No, sir.

                          93

| | | |
|---|---|---|
| 1 | Q. | Did you even know that you were dealing with a |
| 2 | | crime at that time? |
| 3 | A. | I -- Initially, we were still treating this more |
| 4 | | or less as a missing person. |
| 5 | Q. | All right. But you were looking for items that |
| 6 | | had obvious evidentiary value; is that right? |
| 7 | A. | Yes, sir. |
| 8 | Q. | What were some of the other rooms that -- or let |
| 9 | | me just -- let me just make this clear, while in |
| 10 | | that room, while in that bedroom searching, did |
| 11 | | you notice any -- anything on the floor; |
| 12 | | specifically, did you notice any car key on the |
| 13 | | floor? |
| 14 | A. | No, sir. |
| 15 | Q. | In looking at, or on top of, either the desk or |
| 16 | | the bookcase, did you notice any car key or |
| 17 | | something that may have had obvious evidentiary |
| 18 | | value in that regard? |
| 19 | A. | Not really, no. |
| 20 | Q. | Okay. What other rooms were searched that night? |
| 21 | A. | I believe we searched every -- every room in the |
| 22 | | trailer that evening. |
| 23 | Q. | Try to get to a overview here. This has been |
| 24 | | received as Exhibit No. 102, does this appear to |
| 25 | | be an overview of the Avery trailer, again, a |

94

| | | |
|---|---|---|
| 1 | | computer generated diagram? |
| 2 | A. | Yes, sir. |
| 3 | Q. | Lists both bedrooms, the bathroom, living room, |
| 4 | | dining room and kitchen area; is that right? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Each of those rooms searched that evening? |
| 7 | A. | Yes, sir. |
| 8 | Q. | You said you were taking 35mm photography in that |
| 9 | | trailer; is that correct? |
| 10 | A. | Yes, sir. |
| 11 | Q. | Were there other photographs also being taken? |
| 12 | A. | I believe Detective Remiker had brought a small |
| 13 | | digital camera in as well and he was taking some |
| 14 | | digital photos as well. |
| 15 | Q. | I show you a photo that's been received as |
| 16 | | evidence.  This is Exhibit No. 163 and ask if you |
| 17 | | recognize this particular photo. |
| 18 | A. | That's a photograph of the master bedroom area I |
| 19 | | was just talking about in Steve Avery's trailer. |
| 20 | Q. | Is that how it looked on the 5th of November? |
| 21 | A. | Yes, sir. |
| 22 | Q. | Exhibit No. 175, again, which has been received, |
| 23 | | could you tell us what this is, if you know. |
| 24 | A. | That's in the living room area of that same |
| 25 | | trailer, the same residence.  And this is like a |

95

corner of the living room that was set up as a
         computer work area.

Q.      Was that an area that you and your colleagues
         searched that evening?

A.      Detective Remiker was the primary officer that
         looked at that area, but he did call me over a
         couple times to have me take pictures of items
         that he had found.

Q.      You can't fit four grown men into that --

A.      No, sir.

Q.      -- corner; is that right?  After the search was
         completed, or when the search was wrapping up,
         could you tell us how that search ended, how that
         effort ended?

A.      The items that we had decided were of evidentiary
         value that night were placed in Sergeant Tyson's
         patrol vehicle and he stayed with the evidence.
         We all went back to the Command Post.  And not
         exactly sure which Calumet County officer told us
         what time to be there the next day, but we were
         instructed to return the next day; myself,
         Lieutenant Lenk, and Detective Remiker.  And we
         all left at the same time.

Q.      After leaving the residence on the 5th, can you
         tell the jury where you went, please.

                          96

```
 1    A.    I would have gone back to the Manitowoc County
 2          Sheriff's Department, which is in the city of
 3          Manitowoc and to get my personal vehicle, so I
 4          could go home.
 5    Q.    Do you know about what time you cleared the
 6          scene; in other words, about what time you left,
 7          if you remember?
 8    A.    I'm sorry, I don't.  I know it was late, that's
 9          all.
10    Q.    The next day, that is, on the 6th of November,
11          were you asked to come back to the scene?
12    A.    Yes, sir.
13    Q.    And what were you asked to do on the 6th?
14    A.    On the 6th, when I came out there, again, with
15          Detective Remiker and Lieutenant Lenk and I
16          believe just -- this time just Lieutenant Lenk
17          went into the Command Post to make contact with
18          who we would be working with with Cal County that
19          day.
20                And Detective Remiker and I just kind of
21          waited until he came back out.  And we were
22          introduced to Deputy Kucharski.  And then Deputy
23          Kucharski informed us what our assignment would
24          be for that day.
25    Q.    Okay.  Prior to arriving on the scene, once
```

97

| | | |
|---|---|---|
| 1 | | again, did you know what your assignment was |
| 2 | | going to be? |
| 3 | A. | No, I had no idea. |
| 4 | Q. | Was an evidence collection team formed or |
| 5 | | developed that morning, on the 6th? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Do you remember who was involved in that team? |
| 8 | A. | It was myself, Lieutenant Lenk, Detective |
| 9 | | Remiker, and Deputy Kucharski, who's a employee |
| 10 | | of the Calumet County Sheriff's Department. |
| 11 | Q. | Once again, was it determined who would be in |
| 12 | | charge of that group of search individuals? |
| 13 | A. | After the first day, we didn't, you know -- I |
| 14 | | didn't need to be told who was in charge, I knew. |
| 15 | | But Deputy Kucharski told me that he would be |
| 16 | | responsible for collecting and maintaining |
| 17 | | security on any evidence that was located that |
| 18 | | day. |
| 19 | Q. | All right. What areas, then, of search were you |
| 20 | | involved with, if any, on the 6th of November? |
| 21 | A. | Initially, we started at the garage, at Steve |
| 22 | | Avery's residence. |
| 23 | Q. | Tell me about this garage, please? |
| 24 | A. | It's a wooden, frame structure, maybe like a car |
| 25 | | and a half garage. Not -- Not attached to the |

98

```
 1          residence.  It had a vehicle parked out in front
 2          of it, a black Ford pickup truck.
 3    Q.    I show you what's been received in evidence as
 4          Exhibit No. 38, can you tell us what we're
 5          looking at here, please.
 6    A.    That's Steve Avery's residence.  That's his
 7          garage.  That's his pickup truck.
 8    Q.    All right.  And that garage was searched; is that
 9          right?
10    A.    Yes, sir.
11    Q.    Who was that searched by?
12    A.    The aforementioned team; myself, Lieutenant Lenk,
13          Detective Remiker, and Deputy Kucharski.
14    Q.    Do you remember the interior of that garage on
15          the 5th of November?
16    A.    Yes, sir.
17    Q.    Can you briefly describe that for the jury?
18    A.    There was a smaller sport utility vehicle parked
19          in one half of the garage.  It was a Suzuki
20          Samurai.  There was a snowmobile also parked in
21          there, a Skidoo snowmobile.  And there were some
22          other benches and tools that kind of went all the
23          way around the garage.  There wasn't a lot of
24          room in there, with all the other apparatus that
25          was in there.
```

99

```
1    Q.   In this case, already, and I think the defense
2         had asked and has been admitted, Exhibit No. 119,
3         ask you to take a look at Exhibit No. 119.  Tell
4         us what we're looking at here.
5    A.   That would be the interior of Steve Avery's
6         garage.
7    Q.   Fair to say there's a lot of stuff in there?
8    A.   Yes, sir.
9    Q.   What kind of search was performed of that garage?
10   A.   Well, the same type of, you know, search that we
11        had performed the night before in his residence.
12        We were looking for anything that would lead us
13        to believe that there was a missing person in
14        there.
15   Q.   Each of the items that we see, and we can even
16        zoom into some of these things, was each and
17        every one of those items removed from the garage
18        and thoroughly searched, or searched under each
19        and every one of these items?
20   A.   No.  No, sir.
21   Q.   Wasn't that kind of search?
22   A.   No.
23   Q.   In a very broad way, that is, in a overview
24        fashion, because we're going to hear from Deputy
25        Kucharski, but in a very broad sense, can you
```

100

|     |    |                                                    |
|-----|----|----------------------------------------------------|
| 1   |    | tell us the kinds of things that were recovered    |
| 2   |    | or viewed while you were in that garage?           |
| 3   | A. | Almost as soon as we stepped in the garage I       |
| 4   |    | noticed, as did everyone else, that there were     |
| 5   |    | several spent shell casings lying on the floor of  |
| 6   |    | the garage.                                        |
| 7   | Q. | What's a shell casing?                             |
| 8   | A. | It's the brass portion of a bullet.  After the     |
| 9   |    | bullet has been expended or fired, the casing is   |
| 10  |    | usually ejected through from the firearm and       |
| 11  |    | lands in close proximity to the shooter, usually   |
| 12  |    | on the ground.                                     |
| 13  | Q. | Let me ask you this, Sergeant Colborn, are you     |
| 14  |    | familiar with shell casings for different kinds    |
| 15  |    | of, or different calibers of firearms?             |
| 16  | A. | Yes.                                               |
| 17  | Q. | By visual inspection, that is, without picking     |
| 18  |    | them up or without even taking a look at those     |
| 19  |    | shell casings, were you able to determine what     |
| 20  |    | caliber weapon was used to fire those bullets?     |
| 21  | A. | Yes.                                               |
| 22  | Q. | How were you are able to determine that?           |
| 23  | A. | The shell casings that were laying on the ground   |
| 24  |    | were small, for one.  They were brass and they     |
| 25  |    | didn't have a center primer.  They had been fired  |

101

```
 1         on the corner of the bottom of the casing; in

 2         other words, the rim of the casing.  And a

 3         .22 caliber weapon is one of the only weapons

 4         that is a rim fire weapon.  Most weapons have a

 5         primer in the center of the bullet.  This does

 6         not; it's fired off the rim.

 7    Q.   How many, what you believed were .22 caliber

 8         shell casings, were readily apparent or viewable

 9         to the naked eye as you entered that garage?

10    A.   There were quite a few, 12 maybe, 12 plus.

11    Q.   Do you know for sure?

12    A.   No, sir, I don't.

13    Q.   During the course of that search, were the shell

14         casings that were at least out in plain view

15         seized by Deputy Kucharski?

16    A.   Yes, we photographed them first, where they were

17         lying.  Initially, Deputy Kucharski and I were

18         both doing photographs, but then we thought

19         perhaps that was a bit redundant.  So I just

20         let -- Deputy Kucharski felt more than

21         comfortable taking the photographs so I just

22         stopped taking pictures and assisted with

23         locating.

24    Q.   About how long did the search of this garage

25         take?
```

102

```
1    A.   One hour, one and a half hours.
2    Q.   Looking at the stuff, I will call it junk; I
3         don't know if I will get an objection about that,
4         but probably not.  Looking at the junk that we
5         see here, in a one hour search, were you able to
6         thoroughly search this garage?
7    A.   No.  I mean, if we were looking for something
8         minute, you could spend easily an hour just in
9         this area right here.
10   Q.   All right.  Were you given other search
11        assignments that day?
12   A.   Yes, sir.
13   Q.   Can you tell us where you were next assigned to
14        search?
15   A.   I believe the next assignment, I believe, was the
16        Ford pickup truck that was parked right in front
17        of the garage.
18   Q.   And that was Steve's black truck that we had seen
19        before?
20   A.   I do have to mention, there were several times,
21        and I believe this was one of them, where we
22        would be searching a specific area, somebody from
23        Cal County would come and say, I need your
24        assistance doing this.  So we would stop what we
25        were doing and assist them with another project
```

103

|     |    |                                                      |
| --- | -- | ---------------------------------------------------- |
| 1   |    | and then go back.  So I believe before we started   |
| 2   |    | searching that Ford pickup truck, I was asked to    |
| 3   |    | photograph some burning barrels and assist in       |
| 4   |    | loading them up into a covered trailer.             |
| 5   | Q. | All right.  Did you do that?                        |
| 6   | A. | Yes, sir.                                           |
| 7   | Q. | Just as long as we have this picture up, first,     |
| 8   |    | we're going to go back to Exhibit 38; was that      |
| 9   |    | the truck that you assisted in searching?           |
| 10  | A. | Yes.                                                |
| 11  | Q. | Now, you talked about some burn barrels, where      |
| 12  |    | were these located?                                 |
| 13  | A. | Behind or to the side of Steve's garage.  There     |
| 14  |    | was three or four of them.                          |
| 15  | Q. | Did you know whose burn barrels those were?         |
| 16  | A. | No, I didn't.                                        |
| 17  | Q. | You said that there were others that were           |
| 18  |    | assisting in the recovery of those; do you know     |
| 19  |    | who those other individuals were?                   |
| 20  | A. | I didn't know, you know, everyone's name from the   |
| 21  |    | Calumet County Sheriff's Department, or the         |
| 22  |    | Department of Criminal Investigations that was      |
| 23  |    | working there.  I just recognized that some of      |
| 24  |    | the officers were not at all connected with         |
| 25  |    | Manitowoc County, but they were uniformed.  And I   |

104

|   |   | saw Calumet County, you know, Sheriff's |
|---|---|---|
| 1 |   | saw Calumet County, you know, Sheriff's |
| 2 |   | Department patches on their uniforms, but I do |
| 3 |   | not know them by name. |
| 4 | Q. | There were some Manitowoc officers also involved? |
| 5 | A. | Yes. |
| 6 | Q. | Those burn barrels, I think a picture of them has |
| 7 |   | been received as Exhibit 52, I'm going to show |
| 8 |   | you that picture; do you recognize that? |
| 9 | A. | Yes, I took that picture. |
| 10 | Q. | Who is that we see in the picture? |
| 11 | A. | That's Detective Dave Remiker from the Manitowoc |
| 12 |   | Sheriff's Department. |
| 13 | Q. | These are the four burn barrels that you assisted |
| 14 |   | in recovering and loading; is that right? |
| 15 | A. | Yes, sir. |
| 16 | Q. | Looks like it's raining here again; is that |
| 17 |   | right? |
| 18 | A. | Yes. I wanted to get a picture to show that we |
| 19 |   | were trying our best to protect the contents of |
| 20 |   | the barrel; that's the reason that tarp is on |
| 21 |   | there. |
| 22 | Q. | After those barrels were loaded, did you proceed |
| 23 |   | to complete the search of Steve's black truck? |
| 24 | A. | Yes, sir. |
| 25 | Q. | All right. After that effort, what did you do |

105

1    then?
2    A.   Again, this is going to be one of those times
3         that I was pulled away for another project.  We
4         were almost completed with the search of Steve's
5         truck when I was -- again, another Calumet County
6         supervisor told me -- or asked me where the
7         Maribel Caves Park was.  And I said, you know, I
8         described where it was, but not being from
9         Manitowoc County, he didn't really know where it
10        was.  And he said, well, some searchers have
11        found some things at the Maribel Caves Park, can
12        you go out there; see what they have, if you
13        think it's evidence, pick it up.  So myself and
14        Detective Remiker went out to Maribel Caves Park
15        where we made contact with a civilian search
16        party.  And they showed us some things that they
17        had found and we ended up bagging them up and
18        turning them over to the Calumet County Sheriff's
19        Department.
20   Q.   What did do you then?
21   A.   When I got back, then, I believe, the search of
22        Steve's truck, I think, had been completed then.
23        You know, in my absence, Deputy Kucharski had
24        completed the search and then I would have to
25        take a look at his report to see what our next

                              106

|  |  | assignment was. I believe we were sent to Chuck |
| 1 |  | assignment was. I believe we were sent to Chuck |
| 2 |  | Avery's residence -- no, either Chuck's or |
| 3 |  | Steve's sister. And I'm not positive which one |
| 4 |  | was next. |
| 5 | Q. | Who's Steve's sister? |
| 6 | A. | Her first name is Barb. I believe at that time |
| 7 |  | her last name was Janda. |
| 8 | Q. | All right. Did you assist in the search of Barb |
| 9 |  | Janda's trailer? |
| 10 | A. | Yes. |
| 11 | Q. | And we're going to hear from Detective Remiker |
| 12 |  | later, but do you recall being present when a |
| 13 |  | telephone answering machine was located. |
| 14 | A. | Yes. |
| 15 | Q. | This has been received as Exhibit No. 55, can you |
| 16 |  | tell us what we're looking at, please. |
| 17 | A. | I believe that's the answering machine that was |
| 18 |  | in Barb Janda's residence. |
| 19 | Q. | Who else was present when this answering machine |
| 20 |  | was investigated or searched? |
| 21 | A. | It was the same search team that had gone into |
| 22 |  | Steve Avery's garage; Lieutenant Lenk, myself, |
| 23 |  | Detective Remiker, and Deputy Kucharski. |
| 24 | Q. | Were the messages on this machine examined? |
| 25 | A. | When we -- When we found the answering machine, I |

107

1    saw that there were messages on there.  I said,
2    let's unplug it and take the answering machine.
3    And, of course, the conversation between all of
4    us, we said, well, what if somehow in the
5    unplugging process we lose the messages.  So,
6    yes, we hit the play button and listened to the
7    messages and Detective Remiker recorded the
8    messages as they were being played.
9  Q.  Did you have occasion that day to reenter Steven
10     Avery's trailer?
11 A.  I believe that was the day that I was asked to --
12     our whole team was asked to go back into Steve's
13     trailer and obtain serial number -- I think that
14     was the day -- that we were asked to obtain a
15     serial number off Steve's computer, the tower
16     portion of his computer.
17 Q.  Are you sure about that, or are you guessing?
18 A.  I'm not positive if that was the day or not.  I
19     know that was one of the assignments that I
20     completed.  I thought it was that day, but I'm
21     not positive.  I do know, also, that that day we
22     had to go back into Steve Avery's trailer and
23     collect his weapons.
24 Q.  Can you, again, describe those weapons.
25 A.  He had a, like a two place or gun rack over his

108

```
1    bed.  There were two weapons on the gun rack; one
2    was a .22 caliber rifle, and the other was a --
3    if I remember correctly -- was a .50 caliber
4    muzzleloader.
5  Q.  We're going to have these marked, actually.
6         ATTORNEY KRATZ:  Mr. Fallon, if you could
7    have them marked.
8         ATTORNEY FALLON:  They're marked.
9         ATTORNEY KRATZ:  Oh, I'm sorry.
10 Q.  (By Attorney Kratz)~ Do you see a picture of the
11   .22 caliber rifle?
12 A.  Yes, sir.
13 Q.  And what exhibit number is that?
14 A.  It is Exhibit 164.
15 Q.  See if I can find that here.  Do you recognize
16   Exhibit No. 164?
17 A.  Yes, it's a .22 caliber rifle that we located in
18   Steve Avery's bedroom.
19 Q.  I have put up a photograph of Exhibit No. 164;
20   again, does that .22 caliber rifle look the same
21   or similar as it did when it was seized on the
22   6th of November?
23 A.  Yes, sir.
24 Q.  Did you, by the way, that day, on the 6th, have
25   occasion to, at all, inspect or further inspect,
```

109

```
 1          that rifle?
 2    A.    When we collected the rifle, in order to manage
 3          an evidence room, we first needed to make sure
 4          that the weapon wasn't loaded.  So I did pull the
 5          action back to see if it was going to eject a
 6          round.  And I believe I pulled the tube out,
 7          which is under the barrel there.
 8    Q.    Why don't you show you us with the laser pointer.
 9    A.    That portion of the weapon is the magazine.  To
10          load it, you pull a tube out, I believe, an
11          insert rounds through that notch right there.
12                This is the action of the magazine; it's
13          a semi-automatic weapon.  So I pulled this action
14          back to see if there was a round inside the
15          barrel.  And I believe the safety is right there
16          on the weapon and I would have checked to make
17          sure that the safety was on, because if someone
18          handling the weapon, obviously, if it was loaded
19          with the safety off, it could fire.
20    Q.    Sure.  Are you familiar with a semi-automatic
21          rifle such as Exhibit No. 164?
22    A.    Yes, sir.
23    Q.    Now, a tube loaded or a tube fed magazine, for
24          those on the jury that aren't gun enthusiasts,
25          can you tell us just -- just generally how that
```

110

1    works?

2    A.    This portion of the weapon right here is where

3          it's loaded.  At the very end here, you can twist

4          a knob and you pull out like a plastic plunger

5          and you load -- you would have to turn the weapon

6          almost upside down.  But if you can see that,

7          there's a little notch there, that's where you

8          put the rounds in and then you just slide this

9          tube back in until it locks.

10             And if it doesn't lock, you put too many

11         rounds in.  You have to get it so that that

12         locks.  As you fire the weapon, there's a spring

13         on there and it just keeps pushing the rounds

14         back to the chamber.

15   Q.    After a .22, you mentioned a rim fire bullets,

16         but after the shell casings are ejected, where do

17         they come out of?

18   A.    Out of that area right there, that silver area.

19   Q.    And with a semi-automatic weapon, do you have to

20         reload it, or cock it, or do anything that any --

21         any action like that that we might hear with

22         other weapons?

23   A.    No, sir.  A semi-automatic weapon will continue

24         to fire as fast as you can pull the trigger.  You

25         must release the trigger to its sear each time,

111

```
 1        but it will continue to fire as fast as you can

 2        pull the trigger, until all the shells are

 3        expended.

 4   Q.   By the way, Sergeant Colborn, I don't know if you

 5        know this, but do you know what kind of weapon

 6        this is; what brand name weapon?

 7   A.   I know when we catalogued the weapon, when we

 8        took it, and when Deputy Kucharski took it in as

 9        evidence, I read the manufacturer name to him,

10        but I don't recall who manufactured that weapon.

11   Q.   That's fine.  Thank you.  You said there was a

12        second weapon that was seized; is that right?

13   A.   Yes, sir.  You gave me a photograph that's marked

14        Exhibit 165.

15   Q.   Why don't you tell us what that is?

16   A.   That's a muzzleloading weapon, similar to like a

17        musket from the Revolutionary War or frontier

18        period.  It's called muzzleloading because that's

19        where you load it, through the muzzle.

20   Q.   Where were these items seized from?

21   A.   Steve Avery's bedroom, on a gun rack that was

22        hanging above his bed.

23   Q.   Is there anything else that was seized from

24        Mr. Avery's trailer that day, that is, on the 6th

25        of November, that you can recall?
```

112

```
 1    A.   Not that I recall, no, sir.

 2    Q.   Any other buildings that you were asked to search

 3         that day?

 4    A.   Not that I specifically recall, no.

 5    Q.   All right.

 6              ATTORNEY KRATZ:  Judge, before going into

 7         the next day's search for the 7th, this might be a

 8         good time for a lunch break.

 9              THE COURT:  All right.  The Court agrees.

10         Members of the jury, we're going to take our lunch

11         break at this time.  Again, do not discuss the case

12         in any fashion and during the break and we'll resume

13         at 1:00.

14              (Jury not present.)

15              THE COURT:  You may be seated.  Go off the

16         record at this time.

17              (Off the record discussion.)

18              THE COURT:  At this time we'll go back on

19         the record.  Mr. Kratz.

20              ATTORNEY KRATZ:  Judge, before we break for

21         lunch, Mr. Strang was kind enough to alert me that

22         this witness may be cross-examined with the

23         assistance of a audio CD.  Mr. Strang gave me a CD

24         that has 24 tracks on it.  I don't know if he

25         intends to play all 24 tracks in the

                        113
```

1      cross-examination, but it would certainly assist us
2      in orienting as to the time and the context of those
3      conversations, if those could be identified.  If
4      they can't, that's fine, but if the tracks
5      themselves, rather than listen to all 24 during the
6      lunch hour, could be identified, we would appreciate
7      that.
8                  THE COURT:  Mr. Strang.
9                  ATTORNEY STRANG:  Well, I provided the CD
10     out of an abundance of caution.  I think these --
11     these taped calls are all calls that the State, like
12     the defense, received during the hearing on
13     August 9, 2006, from the Manitowoc County Sheriff's
14     Department.  We should probably excuse the witness.
15                 THE COURT:  I was just thinking about that
16     myself.  Mr. Colborn, if you can step out of the
17     courtroom for a minute, we'll continue here.  The
18     witness has now left the courtroom.
19                 ATTORNEY STRANG:  Right.  As I say, I'm
20     quite confident that when we received the CD's from
21     the Manitowoc County Sheriff's Department on
22     August 9, 2006, the State also received the very
23     same recorded calls, both radio transmissions and
24     some land lines at the sheriff's department that are
25     answered by dispatchers.  Out of an abundance of

114

1    caution, I gave Mr. Kratz another copy of the disc
2    I'm going to mark today.  But I'm not interested in
3    disclosing my cross-examination over the lunch hour
4    while, you know, the State is free to prepare
5    including with the witness.
6              THE COURT:  All right.  If it's information
7    that the parties already have, I don't know what's
8    going to come in but, Mr. Kratz, if you need a break
9    before redirect, I will take up a request at that
10   time.
11             ATTORNEY KRATZ:  That's fine and counsel
12   may hear the very same response later in the trial.
13   That's fine.  Thank you, Judge.
14             THE COURT:  Okay.
15             (Noon recess taken.)
16             THE COURT:  Mr. Kratz, at this time you may
17   resume your direct examination of Mr. Colborn.
18             ATTORNEY KRATZ:  Thank you, Judge.
19                  **DIRECT EXAMINATION**
20   BY ATTORNEY KRATZ:
21   Q.   Sergeant Colborn, we left off with the next day,
22        I believe, of your involvement with the -- on
23        Monday, the 7th of November; do you remember that
24        day?
25   A.   Yes, sir.

115

```
1   Q.   Were you asked to return to the Avery property?
2   A.   Yes, I was.
3   Q.   And, by the way, who were you asked to return
4        there by?
5   A.   The Calumet County Sheriff's Office, or
6        Department of Criminal Investigation, one of
7        those officers.
8   Q.   If you could speak up just a little bit,
9        Sergeant, I would appreciate it.
10  A.   I was either asked to return by the Calumet
11       County Sheriff's Department, one of their
12       supervisors, or by the Department of
13       Corrections -- or Department of Criminal
14       Investigations, Agent Tom Fassbender.
15  Q.   Were you, for lack of a better word, volunteering
16       for this service, or these duties?
17  A.   No.
18  Q.   On the 7th of November, then, do you recall about
19       what time you returned to the salvage yard?
20  A.   Somewhere between 6:30 in the morning and 7:30 in
21       the morning, I believe.
22  Q.   Sergeant Colborn, what were you asked to do on
23       the 7th, if you recall?
24  A.   On the -- On Monday, I was informed that -- by
25       Sergeant Tice that I -- Tyson, that I would be
```

116

1    working with him, again.  This would be the same
2    Sergeant Tyson that I had worked with on
3    Saturday.

4              And he informed us that our assignment
5    that day was to go into the Avery Salvage Yard
6    and open any trunks of vehicles that had not yet
7    been searched, because the trunks, apparently,
8    they couldn't find the keys for these vehicles
9    and we were to look inside the trunks of these
10   vehicles.

11   Q.  Were there any other members of your team, other
12       than you and Sergeant Tyson?

13   A.  Also Lieutenant Lenk was with me that day.

14   Q.  And did you, in fact, assist in opening up or
15       searching trunks that hadn't yet been opened?

16   A.  Yes, I did.

17   Q.  What else happened on the 7th?

18   A.  That took the better part of the morning.  I
19       believe in the afternoon we were instructed to
20       start collecting -- you know, specifically
21       instructed to collect -- I take that back.  At
22       some point we were also asked to get a -- I
23       believe this was the day that we were asked to
24       get the serial number off Steven Avery's
25       computer.

117

```
 1    Q.    Did you assist Sergeant Tyson in that regard?

 2    A.    Yes, I did.

 3    Q.    Can you tell the jury what you did, please.

 4    A.    The serial number is on the back of the computer.

 5          And the portion of the computer that we needed

 6          the serial number was underneath a desk that had

 7          been shown earlier, the photograph that was shown

 8          earlier.  So I crawled underneath the desk and

 9          used a flashlight to obtain the manufacturer and

10          the serial number of the computer, which Sergeant

11          Tyson wrote down.

12    Q.    All right.  How long did that process take?

13    A.    At the most, 10 minutes.

14    Q.    Did you go in any other part of the residence, or

15          did you confine yourself to the living room area?

16    A.    I just confined myself to the area where the

17          computer was that day.

18    Q.    What else did you do then?

19    A.    I believe then we were instructed to -- I believe

20          we were instructed, then, to start collecting

21          some firearms from the other residences that were

22          on the Avery property.  I believe, specifically,

23          Barb Janda's residence.

24    Q.    And did you do that?

25    A.    Yes, sir.
```

118

```
1    Q.  All right.  What's the next thing you did on the
2        7th?
3    A.  I know at one point I was asked to take some
4        photographs, I believe, of a burning barrel that
5        was on Steve Avery's property.  I did do that.
6    Q.  Which -- Which burn barrel did you take
7        photographs of?
8    A.  It was a burn barrel that was on, I would -- that
9        was in close proximity to Steve's trailer.  And I
10       remember it had a car wheel by it.
11   Q.  To orient us to that, there's an exhibit which
12       has been received, it's Exhibit 114.  It's,
13       again, an exterior computer animation.  If you
14       take your laser pointer up there, tell us what
15       we're looking at, and what burn barrel you were
16       asked to examine and photograph?
17   A.  That burn barrel right there.  I remember right
18       on one -- either this side or this side of it
19       there was a car wheel standing on its edge with a
20       tire missing.
21   Q.  Did it appear to you, at least as you went to
22       that scene and as you look at Exhibit 114, who
23       that burn barrel is attached to?
24   A.  Yes, it's the burn barrel for that residence,
25       right there, Steve Avery's residence.

                        119
```

1    Q.   Now, Sergeant, you talked about some different

2         kinds of photography.  I think you talked about

3         digital as well as 35mm photography; do you

4         remember that day, the 7th of November, what kind

5         of photography you were performing?

6    A.   35mm, I did not do any digital photography the

7         entire time I was out there, personally.

8    Q.   That way you talked about a wheel next to the

9         burn barrel, I'm going to show you what's been

10        marked as Exhibit No. 158, in fact, Mr. Fallon is

11        going to hand it to you, but I would ask you if

12        you could tell us what this is an image of.

13   A.   That is a car wheel, that's at the very edge of

14        Steve Avery's burn barrel.  And those wires, I

15        believe, that are around the wheel are actually

16        part of the make up of the tire, probably like

17        portions of the steel belt.

18   Q.   As we get closer, do a little bit of a close up,

19        can you see that better now on the screen?

20   A.   Yes, sir.

21   Q.   By the way, Exhibit 158, is that a photo that you

22        took or likely took?

23   A.   Yes, sir.

24             ATTORNEY KRATZ:  In all honesty, Judge, so

25        that I don't forget, I'm going to move the admission

120

| 1 | | of Exhibit 158 at this time. |
| 2 | | THE COURT: Any objection? |
| 3 | | ATTORNEY STRANG: None. |
| 4 | | THE COURT: 158 is received. |
| 5 | Q. | (By Attorney Kratz)~ Were you asked to do |
| 6 | | anything else on the 7th, Sergeant? |
| 7 | A. | I believe I was also -- At some point, apparently |
| 8 | | the Command Post received word that some |
| 9 | | searchers had located an area that -- it looked |
| 10 | | suspicious, there was plastic poking up from the |
| 11 | | ground and it looked like the ground had been |
| 12 | | disturbed. So I was asked to go to that area |
| 13 | | along with the Wisconsin State Crime Lab, |
| 14 | | Sergeant Tyson, and Lieutenant Lenk and help the |
| 15 | | Crime Lab, if they requested it, to excavate that |
| 16 | | area. |
| 17 | Q. | Do you know on what roadway this was? |
| 18 | A. | I believe it was off Kuss, White Cedar Road. |
| 19 | Q. | This is something that Mr. Ertl, yesterday, |
| 20 | | talked about a potential burial site but what |
| 21 | | wasn't; was that your understanding, that it |
| 22 | | turned out not to be? |
| 23 | A. | Yes, it turned out to be nothing. |
| 24 | Q. | Did you do anything else on the 7th. |
| 25 | A. | I think by the time we were down with that, that |

121

```
 1        consumed the rest of the day.
 2    Q.  Let's move on then to the 8th, which would be
 3        Tuesday, the 8th of November, were you asked to
 4        return to the property?
 5    A.  Yes, sir.
 6    Q.  Again, who were you asked to return there by?
 7    A.  By -- No, I didn't get the -- the -- wasn't told
 8        to me directly.  Usually Lieutenant Lenk met with
 9        members of the Calumet County Sheriff's
10        Department and Department of Criminal
11        Investigations at the completion of each day and
12        then I would just check with Lieutenant Lenk, are
13        we needed tomorrow or no.
14    Q.  I see.
15    A.  And then he said, we're needed tomorrow.
16    Q.  Did you show up then on the 8th?
17    A.  Yes, sir.
18    Q.  And who were you attached to, or who were you
19        assigned to that day?
20    A.  I was assigned to Deputy Dan Kucharski from the
21        Calumet County Sheriff's Department.
22    Q.  Do you know what you were asked to do on the 8th?
23    A.  Yes, Deputy Kucharski, Lieutenant Lenk, and
24        myself were instructed, by Special Agent
25        Fassbender, to look for some specific printed
```

122

```
 1        material inside Steven Avery's residence.
 2   Q.   Okay.
 3   A.   And to collect same.        search    16:21
 4   Q.   Did you have occasion to enter Steven Avery's
 5        bedroom on the 8th of November?
 6   A.   Yes, sir.
 7   Q.   Who did you enter that bedroom with.
 8   A.   Deputy Kucharski and Lieutenant Lenk.
 9   Q.   How long did you spend in that bedroom on the
10        8th, if you recall?
11   A.   An hour or so.
12   Q.   Were you directed to perform any search of that
13        trailer, specifically of that bedroom?
14   A.   Before -- Actually, before we started on the
15        bedroom, I was instructed to, with Deputy
16        Kucharski, to remove the computer and to wait
17        until the computer was picked up by another law
18        enforcement officer.
19   Q.   Okay.  Did you do that?
20   A.   Yes, sir.
21   Q.   Then, moving to the bedroom, my question is,
22        whether you were to perform a search that day?
23   A.   Yes, sir.
24   Q.   I'm showing you what's been marked for
25        identification as Exhibit No. 208; can you tell
```

123

| | | |
|---|---|---|
| 1 | | us what that is, please. |
| 2 | A. | These are photographs of a cabinet that's right |
| 3 | | next to the desk in Steve Avery's bedroom, that |
| 4 | | would be the same bedroom where the firearms were |
| 5 | | that I described before and -- |
| 6 | Q. | We're just talking about the first one now, |
| 7 | | Exhibit 208. |
| 8 | A. | That's this photograph here. It's a picture |
| 9 | | of -- this is a desk. |
| 10 | Q. | I'm actually going to put a view up for the jury |
| 11 | | so that we can -- Okay. If you want to use your |
| 12 | | laser pointer where everybody can see what you |
| 13 | | are talking about then. |
| 14 | A. | This is a desk. There's an open area, that's the |
| 15 | | picture. This is a cabinet, you can see how |
| 16 | | closely it is positioned to the desk there. |
| 17 | Q. | Let me just stop you, is this something that you |
| 18 | | earlier called a bookcase. |
| 19 | A. | This cabinet, I'm sorry, yes, I called it a |
| 20 | | bookcase and that's actually, I guess, what it |
| 21 | | is, a bookcase. |
| 22 | Q. | Just so that the jury understands, was this the |
| 23 | | item from which the handcuffs and the leg irons |
| 24 | | were seized a couple days earlier? |
| 25 | A. | Yes, sir. It's easier to see now, with this |

124

| 1 | | picture, the leg irons and handcuffs were located |
| 2 | | in this area here. |
| 3 | Q. | Now, this particular photograph, you can see a |
| 4 | | pair of slippers, bedroom slippers next to it; is |
| 5 | | that right? |
| 6 | A. | Yes, sir. |
| 7 | Q. | You can see a electrical outlet or a socket; is |
| 8 | | that right? |
| 9 | A. | Yes, sir. |
| 10 | Q. | Can you point to that, please. Were you asked, |
| 11 | | or at least as part of your responsibilities of |
| 12 | | searching the bedroom, were you asked to do a |
| 13 | | thorough search of this piece of furniture? |
| 14 | A. | Yes. |
| 15 | Q. | And did you do that? 16:34 |
| 16 | A. | Yes. |
| 17 | Q. | In performing that search, Sergeant Colborn, did |
| 18 | | you move or manipulate this piece of furniture at |
| 19 | | all? |
| 20 | A. | Yes, sir. |
| 21 | Q. | Can you describe that for the jury, please. |
| 22 | A. | As I stated before, we were looking for specific |
| 23 | | printed or photographs. There is a narrow area |
| 24 | | between this bookcase and this desk, right there. |
| 25 | | And in order to make sure that there was no |

125

1    evidence or anything else that we needed lodged
2    between there, I actually tipped this to the side
3    and twisted it away from the wall.
4  Q.  If you can describe that further, I don't know if
5    you can do it with your words, or show us with
6    your hands, how you did it?  16:41
7  A.  I will be the first to admit, I wasn't any too
8    gentle, as we were, you know, getting
9    exasperated.  I handled it rather roughly,
10    twisting it, shaking it, pulling it.
11  Q.  And that's the bookcase that you are talking
12    about?
13  A.  Yes, this piece of furniture right here, a
14    bookcase.
15  Q.  I'm sorry.  Sergeant, in shaking and twisting
16    that particular bookcase, did you pull it away
17    from the wall itself, that you can see behind
18    there?
19  A.  Yes, I did.
20  Q.  After that process was complete, were the
21    items -- The binder that we can see in the lower
22    left hand corner of the bookcase; can you point
23    to that, please.  Was that, and the other items
24    within that bookcase, removed and examined by
25    yourself and your -- other members of your team?

126

```
1   A.   Yes, sir.
2   Q.   Did you have occasion to replace those items into
3        that bookcase after having pulled it from the
4        wall?
5   A.   Yes, sir.
6   Q.   What was done with the bookcase after that
7        thorough search of the -- of those materials was
8        completed?
9   A.   The items that we didn't use -- or collect as
10       evidence, that binder and some of the other
11       things there were kind of stuffed, rather
12       forcefully, back in there.  And other items that
13       we were going to collect as evidence were -- we
14       had so many that we didn't have a container in
15       the room large enough to hold them all.  So
16       Lieutenant Lenk exited the bedroom to get a
17       larger container and I began to search this desk
18       here.
19  Q.   By a larger container, what are you talking
20       about?
21  A.   A box.
22  Q.   Now, at this time, that is, as the search was
23       completed, what was done with that piece of
24       furniture; what was done with the bookcase
25       itself?
```

127

```
 1   A.   It was still kind of away from the wall, but it
 2        was more or less stuffed back into its original
 3        position.
 4   Q.   The next exhibit, Exhibit No. 209, describe what
 5        that is, please.
 6   A.   That's just a different photograph of the same
 7        bookcase.
 8   Q.   I'm going to allow the jury to see that as well.
 9        Is this the photo that you are talking about
10        of -- of the bookcase?
11   A.   Yes, sir.
12   Q.   The next exhibit, No. 210, can you describe what
13        that is for us, please.
14   A.   210 is a picture, a photograph of the -- Well,
15        you can see that we have some materials there
16        stuffed in a bag.  Then there's the bedroom
17        slippers.  And now there is a key with a fob,
18        lying between the bedroom slippers.
19   Q.   Sergeant Colborn, I'm going to direct your
20        attention, then, to the large screen.  I would
21        like you to carefully take the laser pointer and
22        describe for the jury what it is that we're
23        looking at?
24   A.   These were some items that we had bagged up.  I
25        don't recall what that is.  These were the same
```

128

```
1        bedroom slippers that were in the other
2        photograph, but you can see that they have been
3        jostled.  That's the electrical outlet.  And now
4        there is a key and with this connecting canvas or
5        nylon fob and a black plastic buckle, lying on
6        the floor.
7    Q.  The piece of furniture, that is, the bookcase
8        that we see in Exhibit 210, has that been removed
9        or replaced to its original position?
10   A.  I can't say we have got it exactly 100 percent
11       where it was, but it's very close to its original
12       position, yes.
13   Q.  So the jury understands the timing of these,
14       Exhibit No. 208 shows the slippers right next to
15       the outlet.  And this exhibit, 210, shows the
16       slippers pushed to what would be the left and
17       actually a little bit closer to the photographer;
18       is that fair?
19   A.  That's correct.                    Sergeant 16:50
20   Q.  Do you recognize this image, that is, did you see
21       this image on the 8th of November?
22   A.  Yes.
23   Q.  Can you describe that moment, or that event, for
24       the jury, please.
25   A.  As I had mentioned earlier, Lieutenant Lenk had
```

129

1    exited -- That is the door coming into the
2    bedroom; he had gone through that door to get a      16:55
3    bigger container. I was searching the desk here.
4    Deputy Kucharski was sitting on the bed, which
5    also isn't in the photograph, but is in very
6    close proximity to this piece of furniture, the
7    bookcase, filling out paperwork.
8            Lieutenant Lenk got about right here,
9    his feet would have been right here, so he was in
10   the room, and said something to the effect of,
11   there's a key on the floor here, or, look,
12   there's a key. I don't know what his exact
13   verbiage was but he identified that there was a
14   key on the floor.
15           I turned around, as I wasn't very far
16   away, I turned around and looked and I observed
17   this key, lying right where it is. And I
18   observed this key had this black rubberized or
19   plastic end on it, which they didn't -- you know,
20   that's a newer model car key, due to that plastic
21   or rubberized end. And I also observed that
22   embossed on there was a Toyota emblem.
23           And we told Deputy Kucharski, get a
24   photograph of this, right away, which he did,
25   which is this photograph. I did not take this

130

```
1      photograph.
2   Q.  By the way, as you and Deputy Kucharski and
3       Lieutenant Lenk observed this, did any of the
4       three of you approach or touch this piece of
5       evidence at that time?
6   A.  I may have been standing in this area here, you
7       know.  This piece of furniture is only 2 and a
8       half, 3 feet tall, maybe.  So I could easily see
9       over it to see the key.
10          I did not approach the key.  Lieutenant
11      Lenk did not come into the room.  Deputy
12      Kucharski photographed the key from, you know,
13      from whatever angle this picture was taken at.
14      That's as close as we got.
15  Q.  My question, again, was, did either yourself,
16      Lieutenant Lenk, or Deputy Kucharski, prior to
17      this photo was taken, touch that key?
18  A.  No, sir.
19  Q.  Why not?
20  A.  I think all three of us knew at the same time
21      that there was a very good chance, seeing a
22      Toyota emblem embossed on that key, knowing that
23      Teresa Halbach's vehicle was a Toyota that this
24      was a very important piece of evidence.  And, you
25      know, none of us were going to taint that.

                        131
```

17:06 let me ask you, Sergeant Colborn,

| | | |
|---|---|---|
| 1 | Q. | Let me ask you, Sergeant Colborn, you guys -- you |
| 2 | | specifically, Lieutenant Lenk, and now Deputy |
| 3 | | Kucharski, had been in this room for quite some |
| 4 | | time before this key appears in this position; |
| 5 | | isn't that right? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Did this surprise you, that you saw this key |
| 8 | | there? |
| 9 | A. | Yes, I was very surprised. |
| 10 | Q. | Did the three of you talk about that, we hadn't |
| 11 | | seen it before, anything like that? |
| 12 | A. | I -- I believe I said to myself, damn, how did I |
| 13 | | miss that. |
| 14 | Q. | Now, other than the bedroom slippers being pushed |
| 15 | | to the side, had anything else changed, other |
| 16 | | than the pulling out and the twisting and the |
| 17 | | jostling of the cabinet? |
| 18 | A. | As we looked at the cabinet, it appeared that in |
| 19 | | the process of us stuffing everything back into |
| 20 | | the cabinet, we had separated the back of the |
| 21 | | cabinet, the small piece of paneling that would |
| 22 | | be the back of the cabinet, from the frame of the |
| 23 | | cabinet itself. |
| 24 | Q. | Let me stop you there. Did you have occasion, |
| 25 | | then, to go look at the back of this piece of |

132

|    |    | furniture, the back of the cabinet, after this |
| 1  |    |                                                |
| 2  |    | key was processed?                             |
| 3  | A. | Yes.                                           |
| 4  | Q. | I know I'm jumping ahead just a little bit, but |
| 5  |    | could you describe what you saw; could you     |
| 6  |    | describe the back panel of the cabinet?        |
| 7  | A. | It would be made out of a -- I'm trying to think |
| 8  |    | of the right word, like a piece of wood, the same |
| 9  |    | thickness maybe as a piece of paneling that one |
| 10 |    | would put on a wall.  You know, it's a thin piece |
| 11 |    | of wood, it's not -- it's not like it's a quarter |
| 12 |    | inch piece of plywood nailed to the back of the |
| 13 |    | cabinet.  It's a thin piece of wood.            |
| 14 |    | The piece of furniture itself is old and |
| 15 |    | not in the best state of repair.  And I believe |
| 16 |    | it was just very small, short brads or nails that |
| 17 |    | held the piece of paneling or the piece of wood |
| 18 |    | to the back of the cabinet.  And I'm sure that |
| 19 |    | when we were putting things in we exercised more |
| 20 |    | than enough force to push it away.  And there was |
| 21 |    | a gap now between the back of the -- the piece of |
| 22 |    | paneling on the back of the cabinet and the frame |
| 23 |    | of the cabinet itself.                          |
| 24 | Q. | I'm going to show you an exhibit that's been    |
| 25 |    | received as Exhibit No. 169; although taken on a |

133

```
 1        different day, we're all in agreement about that,

 2        does Exhibit 169 look the same as when you

 3        witnessed the back of this cabinet on the 8th of

 4        November?

 5   A.   Yes, sir.

 6   Q.   What was done with the key, if you remember?

 7   A.   Initially, it was photographed and Lieutenant

 8        Lenk and I both -- when I say told, it was not

 9        like we were ordering him, but we just

10        communicated to Deputy Kucharski that he needed

11        to make sure he put on a fresh set of gloves;

12        pick up that key, put it in a separate container,

13        totally by itself; and we needed to contact the

14        Command Post right away and let them know that we

15        had located a key that could possibly be a key to

16        Teresa's vehicle.

17   Q.   Did somebody from the Command Post come to your

18        location then?

19   A.   Two people from the Command Post came to our

20        location.  Special Agent Fassbender and

21        Investigator Wiegert.

22   Q.   Were you present when the lead investigators were

23        shown this key that was discovered?

24   A.   Yes.  We packaged the key and we went into the

25        living room and that's where we remained until
```

134

1          the two investigators came and looked at the key.
2                    ATTORNEY KRATZ:    What exhibit number is
3          next, Madam Clerk?
4                    THE CLERK:    211.
5     Q.   (By Attorney Kratz)~ Sergeant Colborn --
6                    ATTORNEY KRATZ:    And, Judge, the record
7          should reflect that the evidence bag is being opened
8          with the assistance of Investigator Wiegert.
9     Q.   (By Attorney Kratz)~ But Sergeant Colborn, you
10         are going to be shown the contents of what is
11         being marked as Exhibit No. 211.
12         (Exhibit No. 211 marked for identification.)
13                   ATTORNEY KRATZ:    Deputy Wiegert, if you
14         would be so kind as to show it to this witness.
15    Q.   (By Attorney Kratz)~ Sergeant Colborn, please
16         don't -- don't touch this exhibit.    But an
17         exhibit that has now been marked for
18         identification as Exhibit 211 is being shown to
19         you.
20                   ATTORNEY KRATZ:    If you stand to the side a
21         little bit, Investigator Wiegert, I would appreciate
22         it.
23    Q.   (By Attorney Kratz)~ Tell the jury what that is,
24         please.
25    A.   That appears to be the exact same key as pictured

                              135

1    right there on that photograph.  It's a long key,
2    with a black plastic end, with a Toyota emblem on
3    the end of it.  And that same nylon, actually, I
4    think corresponds to something that someone would
5    wear around their neck and clip to the other
6    plastic end.
7         ATTORNEY KRATZ:  With permission, Judge,
8    may Investigator Wiegert post it or at least show
9    the jurors?
10        THE COURT:  Any objection?
11        ATTORNEY STRANG:  Nope.
12        THE COURT:  Yes, you may do so.
13        ATTORNEY KRATZ:  Hold it up by one end,
14   Investigator, and show the jurors, please.
15        THE COURT:  The record should probably also
16   reflect he's wearing rubber gloves at this time, or
17   unless you can describe them more accurately.
18        ATTORNEY KRATZ:  Latex gloves.  And
19   although Mr. Kucharski will be testifying as well,
20   Judge, I don't believe there is any contest as to --
21   as to this exhibit and I will move its admission at
22   this time.
23        THE COURT:  Any objection?
24        ATTORNEY STRANG:  Well, there's plenty of
25   contest as to that exhibit, but not as to it having

136

1    been authenticated and identified.  And I don't have

2    any objection to it being received.

3              ATTORNEY KRATZ:  Thank you.

4              THE COURT:  All right.  The exhibit will be

5    received.

6              ATTORNEY KRATZ:  Thank you.

7    Q.   (By Attorney Kratz)~ After Special Agent

8         Fassbender and Investigator Wiegert were shown

9         that key, do you know what happened to that key?

10   A.   Just -- excuse me, we decided, between the three

11        of us, just to wait in the living room.  Special

12        Agent Fassbender and Investigator Wiegert said

13        that another law enforcement officer would be

14        coming down to take possession of the key.

15             So we all three just waited until he got

16        there.  We turned the key over and I believe we

17        were told that it would be going to Madison, to

18        the Crime Lab, where Teresa's vehicle already

19        was.

20   Q.   Sergeant Colborn, after this search, after this

21        thorough search of Mr. Avery's residence was

22        completed, were you asked to perform a similar

23        thorough search of somebody else's residence that

24        day?

25   A.   Yes, I believe it was Charles Avery's residence.

                          137

1    Q.    And was that search performed by the same team;
2          that is, yourself, Lieutenant Lenk and Deputy
3          Kucharski from Calumet County?
4    A.    Yes, sir.
5    Q.    Sergeant Colborn, we have heard some references
6          this week, and even last, to your involvement in
7          this case.  And now that you are here, now that
8          you are in court, I have some questions regarding
9          your knowledge of Mr. Avery.
10              First of all, prior to November of 2005,
11         had you been involved at all in the
12         investigation, testifying against, or prosecution
13         of Steven Avery in any previous criminal
14         proceedings?
15   A.    No, sir.
16   Q.    Had you ever been personally named in any civil
17         lawsuits, or ever personally been accused of any
18         wrongdoing regarding Mr. Steven Avery?
19   A.    No, sir.                              17:37
     Sergeant Colborn,
20   Q.    You were asked, as I understand, as part of a
21         civil lawsuit, to provide what's called a
22         deposition, to be questioned by some lawyers; is
23         that right?
24   A.    Yes, sir.
25   Q.    Do you recall when that occurred?

                          138

1   A.   I believe it was in October of 2005.

2   Q.   Do you remember how long that deposition, how

3        long that -- that process took?

4   A.   I thought it was less than an hour, but an hour

5        or less.

6   Q.   All right.  You were asked some questions, is

7        that right, under oath?

8   A.   Yes, sir.

9   Q.   Did you answer those questions to the best of

10       your knowledge and ability?

11  A.   Yes, I did.

12  Q.   Do you recall the context in which you were asked

13       those questions; in other words, do you recall

14       what you were asked about?

15  A.   Yes, sir.                              17:47

16  Q.   Can you tell the jury what you were asked about?

17  A.   In 1994 or '95 I had received a telephone call

18       when I was working as my capacity as a

19       corrections officer in the Manitowoc County Jail.

20       Telephone call was from somebody who identified

21       himself as a detective.  And I answered the

22       phone, Manitowoc County Jail, Officer Colborn.

23            Apparently this person's assumption was

24       that I was a police officer, not a corrections

25       officer, and began telling me that he had

139

```
1        received information that somebody who had
2        committed an assault, in Manitowoc County, was in
3        their custody, and we may have somebody in our
4        jail, on that assault charge, that may not have
5        done it.
6              I told this individual, you are probably
7        going to want to speak to a detective, and I
8        transferred the call to a detective, to the
9        Detective Division, at the Manitowoc County
10       Sheriff's Department.  That's the extent of my
11       testimony.
12  Q.   That's it?  That's your connection to Mr. Avery?
13  A.   Yes, sir.  18:45                            to p. 213
14  Q.   Well, did that cause you enough embarrassment and
             that you obtained and planted blood
15       enough angst in which to set up Mr. Avery for a
16       charge of murder?
17  A.   No.
18  Q.   Did that deposition cause you such problems from
19       within your department that you obtained and
20       planted blood, so that it would be found and
21       Mr. Avery would be wrongfully accused of a
22       homicide case?
23  A.   No, sir.
24  Q.   Have you ever planted any evidence against
25       Mr. Avery?

                          140
```

```
1    A.   That's ridiculous, no, I have not.

2    Q.   Have you ever planted any evidence against

3         anybody in the course of your law enforcement

4         career?                    19:04

5    A.   I have to say that this is the first time my

6         integrity has ever been questioned and, no, I

7         have not.

8              ATTORNEY KRATZ:   That's all I have for

9         Sergeant Colborn, Judge.

10             THE COURT:   Mr. Strang.

11                    CROSS-EXAMINATION

12   BY ATTORNEY STRANG:

13   Q.   This is the first time your integrity has been

14        questioned?

15   A.   As it applies to being a police officer, yes.

16   Q.   Okay.   And it's not the first time Mr. Avery's

17        has been, so I have some questions for you.  You

18        were, in November of 2005, in the Road Patrol

19        Division of the Manitowoc County Sheriff's

20        Department?

21   A.   Yes, sir.

22   Q.   You were a sergeant in that division?

23   A.   Yes, sir.

24   Q.   Were there other sergeants in that division?

25   A.   Yes, sir.
```

141

```
1   Q.   How many?
2   A.   There's one lieutenant and two sergeants assigned
3        per shift; there's three shifts.  We're looking
4        at six sergeants, three lieutenants.
5   Q.   Your shift particularly was noon to 8:00 p.m.?
6   A.   Yes, sir.
7   Q.   That made you the assistant shift commander as
8        opposed to the other sergeant?
9   A.   Yes, sir.
10  Q.   And the shift commander, himself, when the
11       lieutenant had a day off?
12  A.   Yes, sir.
13  Q.   The Road Patrol Division does exactly that, it
14       patrols the roads of Manitowoc County?
15  A.   Yes, sir.
16  Q.   Typically in marked squad cars?
17  A.   Yes, sir.
18  Q.   Speeding and other traffic law enforcement?
19  A.   Yes, sir.
20  Q.   Calls for help from citizens, a variety of calls?
21  A.   Yes, sir.
22  Q.   You might be the first to respond to a domestic
23       violence call, let's say?
24  A.   Yes, sir.
25  Q.   You might respond to a flat tire on the side of
```

142

1    the road?

2  A.  Yes, sir.

3  Q.  This division, during the noon to 8:00 shift,

4      back in, let's say, November, 2005, had

5      approximately how many officers out on the road

6      during that noon to 8:00 shift?

7  A.  Well, I believe that par -- four or five officers

8      counting the shift commander.

9  Q.  Roughly?

10 A.  Yes, sir.

11 Q.  I understand.  And the shift commander had some

12     administrative duties, but also had some road

13     patrol duties?

14 A.  Yes, sir.

15 Q.  Collection of evidence was not typically a duty

16     of the Road Patrol Division?

17 A.  Yes, it is.

18 Q.  That is, some members of the Road Patrol Division

19     may be trained in the collection of evidence,

20     correct?

21 A.  Correct.

22 Q.  Just as some members of the other divisions of

23     the Manitowoc County Sheriff's Department may

24     have special training as evidence technicians or

25     in evidence collection?

143

| | | |
|---|---|---|
| 1 | A. | Correct. |
| 2 | Q. | The Sheriff's Department includes as one of its |
| 3 | | divisions, or bureaus, units, if you will, an |
| 4 | | Investigative Unit? |
| 5 | A. | Yes, sir. To make it easier, both patrol and |
| 6 | | investigations are assigned to the Operations |
| 7 | | Division of the Manitowoc County Sheriff's |
| 8 | | Department. |
| 9 | Q. | Very well. Thank you. But they are separate |
| 10 | | units within the operations division? |
| 11 | A. | Yes, sir. |
| 12 | Q. | You had been trained in evidence collection as a |
| 13 | | technician? |
| 14 | A. | Yes, sir. |
| 15 | Q. | That went back to, I think, 1997? |
| 16 | A. | Yes, sir. |
| 17 | Q. | That was something for which you volunteered? |
| 18 | A. | Yes. |
| 19 | Q. | You were accepted or someone accepted your offer |
| 20 | | and you got some special training? |
| 21 | A. | Yes, sir. |
| 22 | Q. | One of the people from whom you got that special |
| 23 | | training is seated right over there, second to my |
| 24 | | right in the back, true? |
| 25 | A. | Evidence tech training? |

144

```
 1   Q.   Yes.
 2   A.   No, sir.
 3   Q.   Didn't get that kind of training from Special
 4        Agent Fassbender?
 5   A.   No, I did not.
 6   Q.   What training did you get from Special Agent
 7        Fassbender?  I'm talking about well before
 8        November, 2005 now.
 9   A.   Special Agent Fassbender was my DAT, which is
10        defense and arrest tactics, instructor during the
11        recruit academy at Fox Valley Tech.
12   Q.   All right.  Having nothing directly to do with
13        evidence collection?
14   A.   That's correct, sir.
15   Q.   But you went through a recruit academy?
16   A.   Yes, sir.
17   Q.   As do all police recruits or candidate officers?
18   A.   Yes, sir.
19   Q.   How long did that academy last?
20   A.   It was 400 hours when I went through the academy.
21        Ten weeks, roughly.
22   Q.   Roughly 10 weeks full-time?
23   A.   Yes, sir.
24   Q.   All right.  We'll come back to that a little bit
25        later in a different context.  Did you have any
```

145

| | | |
|---|---|---|
| 1 | | training as an evidence technician from |
| 2 | | Lieutenant James Lenk? |
| 3 | A. | Yes. |
| 4 | Q. | He, you know, to be a lieutenant in charge of the |
| 5 | | Detective Unit within the Operations Division? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Are there more than one lieutenant in the |
| 8 | | Detective Unit? |
| 9 | A. | No, sir. |
| 10 | Q. | So he's the chief detective, in fact, of |
| 11 | | Manitowoc County? |
| 12 | A. | Yes, sir. |
| 13 | Q. | Within the Sheriff's Department. He was involved |
| 14 | | in training you as an evidence technician? |
| 15 | A. | I am not exactly sure how to answer that without |
| 16 | | elaborating somewhat. |
| 17 | Q. | Well, let's start with a yes or a no. |
| 18 | A. | Yes, he has given me training material during the |
| 19 | | course of my career. |
| 20 | Q. | Okay. And has he given you anything more formal |
| 21 | | than that; in other words, I'm going to let you |
| 22 | | elaborate here, but we'll do this in a question |
| 23 | | and answer format. |
| 24 | A. | Lieutenant Lenk personally hasn't trained me on |
| 25 | | any specific issue. We would have semi-annual, |

146

```
 1          or sometimes quarterly meetings, of all the
 2          evidence techs, where Lieutenant Lenk might
 3          present some new information or somebody who had
 4          recently gone to training might present some new
 5          information.  But Lieutenant Lenk never took me
 6          one-on-one and trained me in any sort of specific
 7          application of being an evidence technician.
 8    Q.    But you have sort of in house, in service,
 9          programs --
10    A.    Yes, sir.
11    Q.    -- if you will?  Sharing information on new
12          techniques or new teaching?
13    A.    Yes, sir.
14    Q.    Sometimes that comes from Lieutenant Lenk?
15    A.    Yes, sir.
16    Q.    Other times he may simply be involved in
17          overseeing the meeting?
18    A.    Yes, sir.
19    Q.    You have known Lieutenant Lenk, personally, how
20          long?
21    A.    Since 1996, so 10, 11 years.
22    Q.    Was it '96 that you actually became a sworn
23          officer?
24    A.    Yes, sir.
25    Q.    And if I understood you, the period as a
```

147

```
 1        corrections officer in the Manitowoc County Jail
 2        was '92 to '94?
 3    A.  '92 to '96.
 4    Q.  I'm sorry, then I misunderstood you.  You went
 5        directly from the jail to the recruit academy and
 6        then as a sworn officer?
 7    A.  Yes, sir.
 8    Q.  It was 1996, then, when you joined the department
 9        as a sworn officer, that you met the man who is
10        now Lieutenant Lenk?
11    A.  Yes, sir.
12    Q.  He, at that time, was also in the road unit or
13        the Road Patrol Unit?
14    A.  Yes, sir.
15    Q.  You became friendly with Lieutenant Lenk?
16    A.  Yes.
17    Q.  Let's call him James Lenk and not worry about his
18        rank, at any given time, all right.  Do you call
19        him Jim?
20    A.  Yes, I do.
21    Q.  You worked closely with him for several years?
22    A.  Yes.  I have worked with him several times, yes.
23    Q.  He is one of the people on the department to whom
24        you feel personally close?
25    A.  We don't do anything together socially, but I
```

148

|    |    |                                                       |
|----|----|-------------------------------------------------------|
| 1  |    | feel he is an experienced officer and if I have a     |
| 2  |    | investigative type question, I feel comfortable       |
| 3  |    | talking with him about it.                            |
| 4  | Q. | All right.  And the time came in 2005 or 2006         |
| 5  |    | when you decided that you aspired to some rank        |
| 6  |    | higher than sergeant within the department, true?    |
| 7  | A. | I'm sorry, could you repeat.                          |
| 8  | Q. | The time came in 2005, or perhaps in 2006, I          |
| 9  |    | don't know when, but at some point, certainly         |
| 10 |    | before the elections in 2006, you began to aspire     |
| 11 |    | to a rank higher than sergeant in your               |
| 12 |    | department?                                            |
| 13 | A. | Yes.                                                   |
| 14 | Q. | You decided to run for sheriff?                        |
| 15 | A. | That's correct.                                        |
| 16 | Q. | Of Manitowoc County?                                   |
| 17 | A. | That is correct.                                       |
| 18 | Q. | Another officer, within the department, at the        |
| 19 |    | same time, also was running for sheriff in the        |
| 20 |    | same 2006 election?                                    |
| 21 | A. | Yes.                                                   |
| 22 | Q. | That created a situation in which two officers        |
| 23 |    | from the same department were running against         |
| 24 |    | each other?                                            |
| 25 | A. | Yes.                                                   |

149

```
 1   Q.   There was some tension, at least, in that
 2        situation?
 3   A.   Are you talking about in 2006, last summer?
 4   Q.   Well, whenever the campaign began to heat up.
 5   A.   I don't really think the campaign ever got
 6        heated, but I didn't really feel any tension.
 7   Q.   Okay.  But, one of the things you both were
 8        interested in doing, and the other gentleman is a
 9        man named Robert Hermann, correct?
10   A.   Yes.
11   Q.   The brother of Todd Hermann?
12   A.   Yes.
13   Q.   One of the things that you and Robert Hermann
14        both did was sort of see who would support you
15        and who might support the other fellow in the
16        race for sheriff?
17   A.   No.
18   Q.   Weren't interested who was on your side?
19   A.   No, I wasn't.
20   Q.   Do you know whether Lieutenant Lenk was on your
21        side?
22   A.   I have no idea how Lieutenant Lenk voted during
23        the sheriff's campaign.  I would hope that he
24        supported me, but it wouldn't change my feeling
25        one iota if he didn't.
```

150

```
1   Q.   I understand that.  But how long was it between
2        the time you declared your candidacy publicly and
3        the time of the election?
4   A.   I thought we had to have our nomination papers
5        filed in May of 2006 and the election was in
6        November of 2006.
7   Q.   Okay.  So let's call it five, six months,
8        roughly.  I'm just trying to get a rough time
9        frame here, okay.  Lieutenant Lenk's working
10       hours, you know, to overlap in part with your
11       own, on the days you are both at work?
12  A.   Yes.
13  Q.   That is, he would typically work something like
14       an 8 to 5 kind of shift?
15  A.   I'm not sure what his duty hours are, but
16       somewhere in that time frame.
17  Q.   In other words, in the afternoon, you two would
18       be on duty at the same time?
19  A.   Yes, sir.
20  Q.   And in all that time, he never approached you and
21       gave you an attaboy, or told you he was in his
22       corner -- in your corner, or that he couldn't be,
23       nothing?
24            ATTORNEY KRATZ:  Judge, I'm going to object
25       as irrelevant.  Is this sometime after November of
```

151

1      2005?

2                ATTORNEY STRANG:  It is.

3                ATTORNEY KRATZ:  I can't see the relevance,

4      then, to what happened at the Avery salvage

5      property; I will interpose that objection then.

6                THE COURT:  Mr. Strang.

7                ATTORNEY STRANG:  Well, I'm happy to be

8      heard out of the presence, if the Court wishes that.

9                THE COURT:  All right.  I think what I will

10     do at this time is excuse the jury for a few

11     minutes.

12               ATTORNEY STRANG:  We can excuse the witness

13     as well.

14               THE COURT:  Mr. Colborn, you are excused as

15     well.

16                    (Jury not present.)

17                    (Witness not present.)

18               THE COURT:  Mr. Strang.

19               ATTORNEY STRANG:  This isn't a long line of

20     inquiry, your Honor, but clearly this is relevant to

21     Sergeant Colborn's bias or potential for bias here.

22     Lieutenant Lenk was his partner through several days

23     of searching.  Consistently, as the testimony has

24     shown, they were paired together, usually with

25     Detective Remiker as well.

                            152

1          Together they were deposed, within 48
2      hours, in Steven Avery's lawsuit. I expect to
3      elicit testimony that they discussed their
4      depositions. Now, together, it is the two of
5      them who, in Sergeant Colborn's words, had their
6      integrity questioned.
7          Whether these two stood together and had
8      each other's back during a race for a higher
9      office that well could have been affected by the
10     lawsuit that Steven Avery had filed, by further
11     developments in that lawsuit, I think is directly
12     relevant to this witness' credibility and bias.
13          THE COURT: Mr. Kratz.
14          ATTORNEY KRATZ: We're talking about two
15     different things, Judge. Testimonial bias, which
16     would be today, and is this witness prepared to
17     shade his testimony to the benefit that perhaps of
18     Lieutenant Lenk or somebody like that, Mr. Strang's
19     area of inquiry is appropriate, if in fact the Court
20     finds that to be relevant.
21          However, what Mr. Strang is really
22     talking about is having each other's back, or
23     motive, or being in partnership, for lack of a
24     better term, in planting evidence or being
25     involved in criminal behavior and activity. Then

153

1       that only becomes relevant if they had this
2       connection, if they had this friendship or this
3       bond, before November of 2005.
4              So, if that is in fact the dual purpose
5       of this, then I would ask Mr. Strang to confine
6       his bias inquiry, at least as it regards
7       Lieutenant Lenk and the election, and to that
8       which might affect his testimony today; it would
9       have no relevance as to what occurred in November
10      of 2005.
11             THE COURT:  How do you propose that that be
12      conveyed to the jury, what the purpose of his
13      questioning is?
14             ATTORNEY KRATZ:  Well, as asked, then,
15      Judge, it is -- it is irrelevant and should be
16      inadmissible.  If we direct it more towards
17      testimonial, that is, if he wants to get into, would
18      you do something to help your buddy, Jim Lenk,
19      today, in testifying, I think that's -- that that's
20      appropriate, but that should be made clear.
21             And if we're getting into more than
22      that, that is, as Mr. Strang, using his words, I
23      have your back, if we're talking about back in
24      November of 2005, their previous friendship may,
25      in fact, be relevant and all those kind of

154

1    things, but not what happened in the 2006
2    election.
3         ATTORNEY STRANG:  Let's bring us back to
4    the actual line of questioning, because I don't know
5    that we need to slice the salami that thin.  What
6    I'm doing now is simply following up on and
7    exploring his claim that he has no idea whether Jim
8    Lenk supported him or not for sheriff.  He hopes he
9    did, but if Mr. Lenk did not vote for him, it
10   wouldn't affect, by one iota, his view of Mr. Lenk.
11        And I'm following that up, since he's
12   already acknowledged that he thinks well of Mr.
13   Lenk and has worked with him and known him since
14   1996.  I'm also going to ask him when it is that
15   becoming sheriff popped into his head, since
16   presumably that was some -- some day before the
17   day in May, 2006, when he had to file his
18   candidacy papers.  And that's really,
19   essentially, all the farther I'm going with this.
20        THE COURT:  All right.  It seems to me of
21   marginal probative value, but if you are telling me
22   you are almost done, I will let you ask a few more
23   questions and then move on.  All right.  We can
24   bring the jurors back.  And then if the
25   Victim/Witness Coordinator is here, she can bring

155

```
 1          Mr. Colborn in.

 2                    (Jury present.)

 3               THE COURT:  You may be seated.  And

 4          Mr. Strang, you may resume your questioning.

 5               ATTORNEY STRANG:  Thank you.

 6    Q.   (By Attorney Strang)~ So the question was,

 7          Sergeant Colborn, in the months leading up to

 8          this election, are you telling this jury that

 9          there wasn't any time when Lieutenant Lenk

10          approached you and told you either that he was in

11          your corner or couldn't support you, for sure?

12    A.   No, I'm not saying that.

13    Q.   Well, what did he tell you about whether he was

14          supporting you?

15    A.   We did not have -- I tried my hardest not to have

16          any discussions about the election at work

17          because I didn't want it to distract from work.

18          Privately, Lieutenant Lenk gave me every

19          indication that he was supporting me.

20    Q.   Privately, you took him to be in your corner?

21    A.   Yes.

22    Q.   You may want to get just a little bit closer to

23          the mike, the mike is sort of touchy.  When was

24          it that you began to think seriously about

25          running for sheriff, yourself?
```

156

```
1   A.   January or February of 2006.
2   Q.   Had the idea occurred to you back in 2005?
3   A.   I can't recall, specifically.  I may have thought
4        about it, but ...
5   Q.   But at least by January or February, 2006, you
6        had a building sense that, maybe I could do the
7        top job in this department?
8   A.   Yes, sir.
9   Q.   Maybe I could do some things a little bit
10       differently than I see them being done?
11  A.   Yes, sir.
12  Q.   Maybe I could bring something important to the
13       job of sheriff and serve the citizens of
14       Manitowoc County?
15  A.   Yes, sir.
16  Q.   By May that idea had become strong enough to
17       cause you to go through all the steps necessary
18       to declare a candidacy?
19  A.   Yes, sir.
20  Q.   You had not run for an elected office before?
21  A.   Actually, yes, I had.
22  Q.   Okay.  At a countywide level?
23  A.   Yes.
24  Q.   All right.  So at least that process you were
25       familiar with and willing to undergo again?
```

157

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Knocking on doors, speaking at Lion's Club |
| 3 | | dinners, that kind of thing? |
| 4 | A. | Yes, sir. |
| 5 | Q. | Now, it was, I think, October 13, 2005, in |
| 6 | | specific, in which your deposition was taken in |
| 7 | | Mr. Avery's lawsuit? |
| 8 | A. | Yes, sir. |
| 9 | Q. | Was this the first time you had ever had your |
| 10 | | deposition taken? |
| 11 | A. | Yes, sir. |
| 12 | Q. | New experience for you? |
| 13 | A. | Yes. |
| 14 | Q. | You were not so much asked to attend a deposition |
| 15 | | as you were the recipient of a subpoena to do so? |
| 16 | A. | I believe so, yes, sir. |
| 17 | Q. | That deposition process involved being sworn, |
| 18 | | same oath you took today, essentially? |
| 19 | A. | Yes, sir. |
| 20 | Q. | But in a conference room or library of a lawyer's |
| 21 | | office? |
| 22 | A. | Yes, sir. |
| 23 | Q. | You were questioned by Mr. Avery's lawyers at |
| 24 | | that deposition? |
| 25 | A. | Yes, sir. |

158

```
 1    Q.   You sat across the table from Mr. Avery, himself,
 2         that day, October 13, 2005?
 3    A.   I know Mr. Avery was in the room, I don't -- no,
 4         it wasn't like I was directly across from him.
 5    Q.   No.
 6    A.   He was down at the end of the table.
 7    Q.   Yeah, and I didn't mean directly across, but the
 8         two of you shared this conference room and the
 9         table?
10    A.   Yes, sir.
11    Q.   Along with other people?
12    A.   Yes, sir.
13    Q.   Court reporter?
14    A.   Yes, sir.
15    Q.   Various lawyers?
16    A.   Yes, sir.
17    Q.   Some of the questions concerned a telephone call
18         that you had taken?
19    A.   Yes.
20    Q.   You understood the call, which today you can
21         place only as 1994 or 1995?
22    A.   That's correct, sir.
23    Q.   You understood the call to be coming from someone
24         who was a detective?
25    A.   Yes, sir.
```

159

| | | |
|---|---|---|
| 1 | Q. | Detective with a law enforcement agency? |
| 2 | A. | Yes. |
| 3 | Q. | In an adjoining or nearby county? |
| 4 | A. | I believe so, yes, sir. |
| 5 | Q. | You don't remember the details today? |
| 6 | A. | No, I don't, sir. |
| 7 | Q. | And, indeed, on October 13, 2005, you didn't |
| 8 | | remember many of the details either? |
| 9 | A. | No, sir. |
| 10 | Q. | But the gist of it was, we have got somebody here |
| 11 | | in custody who we think maybe did an assault in |
| 12 | | Manitowoc County, that was part of it? |
| 13 | A. | Yes, sir. |
| 14 | Q. | And we further think that you may have someone in |
| 15 | | jail for the assault? |
| 16 | A. | That was the gist of the phone conversation, yes. |
| 17 | Q. | Right. And I understand you don't remember the |
| 18 | | exact words, but that was the gist? |
| 19 | A. | Yes, sir. |
| 20 | Q. | Now, as a corrections officer in the jail, this |
| 21 | | was not directly your responsibility? |
| 22 | A. | No, sir. |
| 23 | Q. | You passed, or tried to pass the call, to the |
| 24 | | Detective Unit? |
| 25 | A. | Yes, sir. |

160

| | | |
|---|---|---|
| 1 | Q. | But you understood that you were being told, by a |
| 2 | | law enforcement officer, that Manitowoc County |
| 3 | | may have someone locked up, who didn't commit the |
| 4 | | crime for which he was imprisoned; that much you |
| 5 | | understood? |
| 6 | A. | Yes, sir. |
| 7 | Q. | Was that a matter to shrug off for you? |
| 8 | A. | I didn't shrug it off, sir. I did what the |
| 9 | | caller asked me to do, connect him to a |
| 10 | | detective. |
| 11 | Q. | I think, actually, you suggested that perhaps the |
| 12 | | caller should talk to a detective? |
| 13 | A. | No, he specifically asked for a detective. |
| 14 | Q. | How he happened to call the jail and get to you, |
| 15 | | you have no idea? |
| 16 | A. | No, I don't, sir. |
| 17 | Q. | Lieutenant Lenk, you were aware, also was |
| 18 | | deposed, had his deposition taken, in this same |
| 19 | | lawsuit? |
| 20 | A. | Yes, sir. |
| 21 | Q. | This was a federal lawsuit? |
| 22 | A. | I don't even know enough about it to know whose |
| 23 | | jurisdiction it was. |
| 24 | Q. | Okay. |
| 25 | A. | I know there was a lawsuit. |

161

```
 1   Q.   All right.  Do you know if it was down in
 2        Milwaukee?
 3   A.   The deposition?  My deposition?
 4   Q.   Or the lawsuit, either one?
 5   A.   My deposition was in the City of Manitowoc.  I
 6        don't know where the lawsuit -- I don't know.
 7   Q.   Fair enough.  But you did -- you did have an
 8        opportunity to talk to Lieutenant Lenk about the
 9        fact that he, too, was having his deposition
10        taken?
11   A.   I don't recall discussing the deposition portion
12        of it with Lieutenant Lenk.
13   Q.   What did you discuss, about the civil lawsuit,
14        with Lieutenant Lenk?
15                 THE COURT:  Excuse me, Counsel, are you
16        referring to some time before the deposition or
17        after?
18   Q.   I'm referring to the time immediately before the
19        deposition, after you would have gotten your
20        subpoena.
21   A.   Okay.  Yes, I knew that Lieutenant Lenk had a
22        subpoena for the same deposition that I did, yes.
23   Q.   Okay.  And I'm not interested in the content of
24        your conversation, which probably would be
25        hearsay, but the two of you established that one
```

162

|     |     |                                                    |
| --- | --- | -------------------------------------------------- |
| 1   |     | another had subpoenas for depositions in that       |
| 2   |     | lawsuit?                                             |
| 3   | A.  | Yes, sir.                                            |
| 4   | Q.  | And, again, without going into the content,          |
| 5   |     | aft -- shortly after your depositions were taken,    |
| 6   |     | the two of you talked about the fact that your       |
| 7   |     | depositions had been taken?                          |
| 8   | A.  | Not really, not beyond the fact of, you know, did    |
| 9   |     | you go on the day that you were supposed to, yes,    |
| 10  |     | and that was pretty much it.                         |
| 11  | Q.  | Okay.  Fair enough.  Did you have any concern        |
| 12  |     | that you would be added as a defendant in that       |
| 13  |     | lawsuit?                                             |
| 14  | A.  | I don't know if concern is the correct word, I       |
| 15  |     | know I expressed that I didn't have any knowledge    |
| 16  |     | of that case.  I wasn't a Manitowoc County           |
| 17  |     | resident at that time.                               |
| 18  | Q.  | My question, though, was whether you had concern,    |
| 19  |     | the thought crossed your mind, that you might be     |
| 20  |     | added as a defendant in that civil lawsuit?          |
| 21  | A.  | Yes, the thought crossed my mind that I might be     |
| 22  |     | added as the defendant.                              |
| 23  | Q.  | You had never been the defendant in a lawsuit        |
| 24  |     | before?                                              |
| 25  | A.  | Not that I recall, no.                               |

163

```
 1   Q.   Do you think you would recall?

 2   A.   I would think, but ...

 3   Q.   This isn't something you were relishing?

 4   A.   No.

 5   Q.   How do you think having been a defendant in

 6        Mr. Avery's lawsuit, for his wrongful conviction,

 7        would have affected your prospects in the race

 8        for sheriff?

 9             ATTORNEY KRATZ:   Objection, speculation.

10   Q.   (By Attorney Strang)~ Did you consider that?

11             THE COURT:   Just a second.   I'm going to

12        sustain the objection.

13   Q.   (By Attorney Strang)~ Did you consider the

14        prospect of an effect on your race for sheriff,

15        if you were added to that lawsuit?

16   A.   No, I didn't, sir.

17   Q.   I would like to shift off the lawsuit and talk to

18        you about reports, police reports, for a little

19        bit.   And I promised you we were going to get

20        back to the recruit academy, and we will.

21             Reports are something that police

22        officers, and by that I mean broadly; sheriff's

23        deputies, municipal police officers, special

24        agents of the Division of Criminal Investigation,

25        just law enforcement officers generally.   All
```

164

```
 1         right.  Reports are something that is common to
 2         the work of policemen?
 3    A.   Is that a question?
 4    Q.   It is.
 5    A.   Yes, reports are common to policing.
 6    Q.   That is one of the things you learned to do in
 7         the recruit academy, was to prepare a report?
 8    A.   That's correct, sir.
 9    Q.   It is a regular routine, in policing, to prepare
10         reports of your activities, as they bear on a
11         criminal investigation?
12    A.   Yes, sir.
13    Q.   You were taught in the academy the basics of how
14         to prepare such a report?
15    A.   Yes, sir.
16    Q.   Reports have several purposes, I guess, one would
17         be to assure accurate collection of facts; that
18         would be one purpose of a police report?
19    A.   Yes, sir.
20    Q.   Another purpose would be to set down, on paper,
21         your memories before they begin to fade?
22    A.   Yes, sir.
23    Q.   A third purpose would be to allow others in the
24         department to benefit from knowing what facts you
25         had learned or steps you had taken in an
```

165

```
 1              investigation?
 2     A.   That I don't -- that I don't know.  Sometimes
 3          reports are confidential and no other officers
 4          view them.
 5     Q.   Sometimes, but let expands on that.  In any sort
 6          of a larger jurisdiction, let's use Manitowoc
 7          County, the sheriff's department, policing is a
 8          24 hour a day business?
 9     A.   Yes, sir.
10     Q.   365 days a year?
11     A.   Yes, sir.
12     Q.   That is, there may be very small towns that have
13          only a part-time police officer, constable,
14          police department, correct?
15     A.   Yes, sir.
16     Q.   But with the Manitowoc County Sheriff's
17          Department, it's around the clock, 24/7, 365 days
18          a year?
19     A.   Yes, sir.
20     Q.   Obviously, no single officer can work 24 hours,
21          seven days a week, so you divide the day into
22          shifts.
23     A.   That's correct, sir.
24     Q.   A criminal investigation that happens to begin on
25          one shift, may be carried over on another?
```

166

```
1   A.   Yes, that's possible.
2   Q.   Officers who actually don't work the same shift,
3        may be working on the same investigation?
4   A.   Yes, sir.
5   Q.   Witnesses may have to be interviewed and their
6        working hours may require officers who work on
7        the late shift, or the overnight shift, to
8        conduct the interviews?
9   A.   Correct.
10  Q.   So by preparing reports, officers on one shift
11       can share their information with officers on the
12       other shifts?
13  A.   Absolutely.
14  Q.   And in this sense, there is a collective benefit
15       that allows the department to continue its
16       criminal investigative duties, around the clock?
17  A.   Yes, sir.
18  Q.   Yet another purpose of police reports is to
19       report upward, to supervisors, what it is you are
20       doing?
21  A.   Yes, sir.
22  Q.   Reports typically are reviewed by supervisors?
23  A.   Yes, they are.
24  Q.   For accuracy?
25  A.   Yes.
```

167

```
 1   Q.   For thoroughness?

 2   A.   Yes.

 3   Q.   For completeness?

 4   A.   Yes.

 5   Q.   Preparing reports is something that a thorough

 6        police officer does?

 7   A.   Yes.

 8   Q.   Preparing reports is something that a police

 9        officer should do in a timely fashion, true?

10   A.   Yes.

11   Q.   Because, again, one of the first purposes is to

12        get the facts down on paper accurately while they

13        are fresh in your mind?

14   A.   Yes, sir.

15   Q.   And preparing reports in a timely and thorough

16        way is something that a fair police officer does,

17        isn't it?

18   A.   I would imagine, yes, sir.

19   Q.   That is, you want the report to be objective?

20   A.   Yes.

21   Q.   Accurate in the sense of fair and factually

22        correct?

23   A.   Yes.

24   Q.   Not tilted or biased in any fashion?

25   A.   Correct.
```

168

```
1   Q.  The idea is to lay out the facts and see where
2       they lead?
3   A.  Yes, sir.
4   Q.  You prepare reports, then, and as they go up the
5       stream, for a supervisors review, the supervisor
6       typically will sign off or indicate approval in
7       some fashion?
8   A.  Yes, sir.
9   Q.  Or may send the report back for further work?
10  A.  Yes, sir.
11  Q.  You are a supervisor, yourself, in the Road
12      Patrol Unit?
13  A.  Yes, sir.
14  Q.  You fill this function.  That's one of your
15      administrative duties, is to review reports
16      prepared by deputies under you, in the Road
17      Patrol Unit?
18  A.  Yes, sir.
19  Q.  You encourage them to file timely reports?
20  A.  Yes.
21  Q.  Thorough reports?
22  A.  Yes.
23  Q.  And fair reports?
24  A.  Yes, sir.
25  Q.  The reports, you know, after now 10, going on 11
```

169

```
1         years as a sworn law enforcement officer, then
2         sometimes will go further, to a prosecutor?
3    A.   Yes, sir.
4    Q.   Prosecutors rely on those police reports in
5         making charging decisions?
6    A.   Yes, sir.
7    Q.   If they elect to charge a case, you know as well,
8         in your criminal justice system, that the
9         reports, then, go to the defense, once a case has
10        been charged in court?
11   A.   Yes, sir.
12   Q.   The defense lawyers then rely on the thoroughness
13        of those reports?
14   A.   Yes, sir.
15   Q.   The accuracy of those reports?
16   A.   Yes, sir.
17   Q.   The timeliness of those reports?
18   A.   Yes, sir.
19   Q.   And at a very practical level, if later, you, as
20        the officer involved in some activity, have
21        forgotten exactly what happened, you can turn
22        back to your report?
23   A.   Yes.
24   Q.   Use it to refresh your recollection?
25   A.   Yes, sir.
```

170

```
 1    Q.   Sometimes use the report of other officers to
 2         refresh your recollection?
 3    A.   Yes, sir.
 4    Q.   Which, again, is you relying on the accuracy and
 5         the thoroughness and the timeliness of reports by
 6         other officers?
 7    A.   Yes, sir.
 8    Q.   And if you were to change your explanation of
 9         what happened, either the prosecution or the
10         defense might use the report to show that you had
11         said something different in the report?
12    A.   Yes, sir.
13    Q.   If you don't prepare a report, then you haven't
14         committed anything to paper, correct?
15    A.   Correct.
16    Q.   And someone who doesn't commit anything to paper,
17         then, can't be pinned down on the details as
18         would someone who had put the details on paper?
19    A.   Okay.  I mean, that makes sense.
20    Q.   Makes sense to you?
21    A.   Mm-hmm.
22    Q.   Now, let's go to this investigation, the
23         activities concerning this investigation, are you
24         with me?
25    A.   Yes, sir.
```

171

1  Q.  November 3, 2005, when you learned from

2      Mr. Wiegert that Teresa Halbach was missing, was

3      just about exactly, to the day, three weeks after

4      your deposition in Steven Avery's lawsuit?

5  A.  Yes, sir.

6  Q.  You were the shift commander that day, as we have

7      established?

8  A.  Yes, sir.

9  Q.  You learned about Ms Halbach being missing at

10     about what time?

11 A.  Somewhere between 6:30 and 7:30.

12 Q.  You were scheduled to get off shift at eight?

13 A.  Yes, sir.

14 Q.  Nearing the end of your day?            19:45

15 A.  Yes, sir.

16 Q.  As shift commander, you could have assigned

17     anyone in road patrol to go out to the address on

18     Avery Road?

19 A.  Yes.

20 Q.  You chose to do it yourself?

21 A.  Yes.

22 Q.  Did you go alone?

23 A.  Yes, I did.

24 Q.  At that time, all you knew is that this address

25     on Avery Road was one of the appointments that Ms

172

```
 1        Halbach evidently had the day she was last seen
 2        by family or friends?
 3   A.   Yes, sir.
 4   Q.   You happened to meet Steve Avery -- or not meet
 5        him for the first time, but run into him, so to
 6        speak, when you went out there that evening?
 7   A.   Yes, sir.
 8   Q.   You talked with him?
 9   A.   Yes, I did.
10   Q.   He was very cordial?
11   A.   Yes, he was.
12   Q.   And as you followed through, you saw events
13        unfold, eventually it was Steven Avery who was
14        charged with killing Teresa Halbach?
15   A.   Yes, sir.
16   Q.   That came a week, roughly, after your first
17        conversation with him on Thursday, November 3rd?
18   A.   Yes, sir.
19   Q.   Mr. Avery then was charged with the most serious
20        crime someone can commit in this state?
21   A.   Yes, sir.          20:01 EG 7
22   Q.   When, sir, did you first make a written report of
23        anything having to do with the November 3, 2005,
24        meeting with Mr. Avery?
25   A.   June of '06 I believe.

                        173
```

| | | |
|---|---|---|
| 1 | Q. | Does June 29, 2006 sound correct? |
| 2 | A. | Yes. |
| 3 | Q. | A few days short of the 4th of July? |
| 4 | A. | Yes, sir. |
| 5 | Q. | Not quite 8 months after the conversation with |
| 6 | | Mr. Avery? |
| 7 | A. | Yes, sir. |
| 8 | Q. | Was that a timely report? |
| 9 | A. | I wasn't even aware that Manitowoc County had our |
| 10 | | own report. I didn't find out about it till |
| 11 | | then. |
| 12 | Q. | You were aware that Manitowoc County sheriff's |
| 13 | | deputies had played a substantial role at the |
| 14 | | Avery property for a week, from November 5 to |
| 15 | | November 12? |
| 16 | A. | Yes. |
| 17 | Q. | You saw literally dozens of fellow officers from |
| 18 | | the Manitowoc County Sheriff's Department during |
| 19 | | that week? |
| 20 | A. | Yes. |
| 21 | Q. | And your testimony today is you aren't aware that |
| 22 | | any of them ever wrote any report? |
| 23 | A. | No, I wasn't. I knew Calumet County Sheriff's |
| 24 | | Department was handling the report portion of it. |
| 25 | Q. | And somebody finally suggested to you, in June, |

174

| | | |
|---|---|---|
| 1 | | more than 7 months later, that maybe you ought to |
| 2 | | write a report about that first interview with |
| 3 | | Steven Avery? |
| 4 | A. | They informed me that there was indeed a report |
| 5 | | and that I should make an entry on it, yes. |
| 6 | Q. | You made an entry on it? |
| 7 | A. | Yes, I did. |
| 8 | Q. | And that entry was all of about a page? |
| 9 | A. | I guess it was a few paragraphs; I don't know how |
| 10 | | many. |
| 11 | Q. | Did you happen to notice when you were with |
| 12 | | Mr. Avery on November 3, a big, fresh gash or cut |
| 13 | | on his right middle finger? |
| 14 | A. | No, I did not notice that. |
| 15 | Q. | Didn't notice him bleeding? |
| 16 | A. | No, sir, I didn't. |
| 17 | Q. | Or notice anything that looked like it had been |
| 18 | | recently bleeding or recently a fresh, open cut? |
| 19 | A. | No, sir, I didn't notice any injury. |
| 20 | Q. | That's why there is no mention of such an injury |
| 21 | | in your report, true? |
| 22 | A. | Correct. |
| 23 | | ATTORNEY STRANG: What time does the Court |
| 24 | | wish to take the afternoon break, for my purposes, |
| 25 | | your Honor? |

175

```
 1              THE COURT:  We'll go another 10 minutes.

 2              ATTORNEY STRANG:  Thank you.

 3    Q.   (By Attorney Strang)~ Now, did I understand you

 4         correctly, in your testimony earlier today,

 5         Sergeant Colborn, that today you remember what it

 6         is you were doing on your day off, Friday,

 7         November 4, 2005, the day after you first talked

 8         to Steven Avery?

 9    A.   Yes.

10    Q.   We were talking about timely and thorough and

11         accurate reports before.  And I wonder if you

12         recall, oh, a little over a month ago, not quite

13         six weeks ago, in fact, January 11, 2007, being

14         interviewed by Investigator Steier of the Calumet

15         County Sheriff's Department; do you remember

16         that?

17    A.   Yes.

18    Q.   And you knew that Investigator Steier was

19         interviewing you in connection with this case?

20    A.   Yes.

21    Q.   You know, as a law enforcement officer, that it's

22         important, if one speaks to another -- to a

23         police officer, to give accurate information to

24         the officer?

25    A.   Yes, sir.
```

176

```
 1   Q.   You know, in fact, that it's a crime in the state
 2        of Wisconsin, intentionally to give false
 3        information to a police officer?
 4   A.   Yes, sir.
 5   Q.   And on January 11, 2007, you recall Investigator
 6        Steier asking you if you could recall what you
 7        had done on Friday, November 4, 2005, your day
 8        off; do you recall him asking you that?
 9   A.   Yes.
10   Q.   And what you told him was, that you could not
11        recall what you had done on your off day; that's
12        what you told Investigator Steier?
13   A.   Yes, at that precise second that he asked me, I
14        could not recall everything that I had done on
15        that day.
16   Q.   You recalled later?
17   A.   Yes.
18   Q.   And when, sir, when did you call up Investigator
19        Steier and say, I'm sorry, I was wrong, I now
20        remember what I did on my day off, Friday,
21        November 4, 2005?                    53:25, &5
22   A.   I didn't call Investigator Steier.
23   Q.   One of the things the road patrol officers, under
24        your supervision, frequently do, is look for cars
25        that appear out of place?
```

177

```
1   A.   Yes, sir.

2   Q.   Or if they made a traffic stop, they will inquire

3        about the license plate or the registration

4        plates on an automobile?

5   A.   Yes, sir.

6   Q.   And they will call into dispatch and give the

7        dispatcher the license plate number of a car they

8        have stopped, or a car that looks out of place

9        for some reason, correct?

10  A.   Yes, sir.

11  Q.   And the dispatcher, very quickly these days, with

12       his or her computer screen, can get information

13       about who -- to whom a license plate is

14       registered?

15  A.   Yes, sir.

16  Q.   Also, the dispatcher can give you, right over the

17       phone or the radio, the information about what

18       car the license plate is registered to?

19  A.   Yes, sir.

20  Q.   This is useful so that you know who you may be

21       approaching, if there's a driver of the car

22       that's stopped?

23  A.   Yes, sir.

24  Q.   It's also useful to know whether the license

25       plate appears to be on the car for which it is
```

178

```
 1        registered?
 2   A.   Yes, sir.
 3   Q.   If the car is abandoned or there's nobody in the
 4        car, the registration tells you who the owner
 5        presumably is?
 6   A.   Yes, sir.
 7   Q.   Are you the only Andy, to your knowledge, in the
 8        Manitowoc County Sheriff's Department?
 9   A.   The only officer with the first name Andy?
10   Q.   Yes.
11   A.   No, I'm not.
12   Q.   All right.  I'm going to ask you to listen, if
13        you would, to a short phone call.  And I will ask
14        you, first, if you are the Andy speaking.  All
15        right?
16   A.   Mm-hmm.
17             ATTORNEY KRATZ:  Judge, before counsel does
18        this, could we have it identified as to the date and
19        time.
20             ATTORNEY STRANG:  Absolutely, I will do the
21        best I can.  In fact, I should mark it.
22        (Exhibit No. 212 marked for identification.)
23             ATTORNEY STRANG:  This is a CD Rom that we
24        obtained from the -- or a copy of the CD Rom that we
25        obtained from the Manitowoc County Sheriff's
```

179

1    Department, Exhibit 212, counsel.  Thank you.

2              For counsel's benefit this will be track

3    three.  All I'm told by the sheriff's department

4    is that these are calls between November 3 and

5    November 12, 2005.

6              ATTORNEY KRATZ:  Judge, we don't know

7    when -- what he is about to play them is within a 9

8    day period?

9              ATTORNEY STRANG:  If the witness made the

10   call, I'm going to ask him when he made the call.

11             THE COURT:  All right.  Go ahead.

12             Manitowoc County Sheriff's Department.

13   This is Lynn.

14             Lynn.

15             Hi, Andy.

16             Can you run Sam William Henry 582. See

17   if it comes back to (Inaudible.)

18             Sam William Henry 582.

19             ATTORNEY STRANG:  Let me just stop it right

20   there.  In fact, I'm going to go back, because it

21   was so soft at the beginning.

22             Manitowoc County Sheriff's Department.

23   This is Lynn.

24             Lynn.

25             Hi Andy.

180

```
 1              Can you run --
 2   Q.  (By Attorney Strang)~ Is that you?
 3   A.  It sounds like me.  I believe it's me.
 4   Q.  Okay.  I'll --
 5              Sam William Henry 582.  See if it comes
 6       back to (Inaudible.)
 7              Lynn.
 8              Hi Andy.
 9              Can you run Sam William Henry 582.  See
10       if it comes back to (Inaudible.)
11              Sam William Henry 582.  I (Inaudible.)
12       All righty.  You speak any Spanish there, Andy?
13       I just a call at the top of the list, is my on
14       call didn't call me back.  If I want to get in
15       trouble, Andy, I get in trouble.  You know, what
16       am I supposed to do?
17              Well --
18              My favorite one is in the city of
19       Manitowoc.  Okay.  Shows that she's a missing
20       person.  And it lists to Teresa Halbach.
21              All set.
22              Okay.  Is that what you're looking for,
23       Andy?
24              '99 Toyota.
25              Yup.
```

181

```
 1              Okay.  Thank you.

 2              You're so welcome.  Bye, bye.

 3    Q.   Okay.  That's the entire call.  Hangs up.  That's

 4         your voice?

 5    A.   Yes, I believe that's my voice.  Yes.

 6    Q.   When did you make that phone call inquiring about

 7         a license plate?

 8    A.   I don't know.                          15:37

 9    Q.   Do you have any recollection of making that phone

10         call?

11    A.   It would have had to have been 11/03/05 or -- I'm

12         guessing 11/03/05.    to p. 184, L24

13    Q.   Okay.  But let's -- let's ask -- establish this

14         first, do you remember making the call?

15    A.   Not really, no.

16    Q.   What you're asking the dispatcher, whose name is

17         Lynn, is to run a plate that's Sam William Henry

18         582; did I hear that correctly?

19    A.   Yes, sir.

20    Q.   Sam William Henry is a phonetic code that law

21         enforcement officers use, because sometimes it's

22         hard to tell just a letter over radio?

23    A.   Yes, sir.

24    Q.   Sam William Henry would be SWH-582.

25    A.   Yes.

                          182
```

1    Q.   This license plate?

2    A.   Yes, sir.

3    Q.   I'm showing, for the benefit of the record, this

4         is either Exhibit 152 or 153?

5                   THE CLERK:  It's on the plate itself.

6                   ATTORNEY STRANG:  This one happens to be

7         153.

8    Q.   (By Attorney Strang)  And the dispatcher tells

9         you that the plate comes back to a missing person

10        or woman?

11   A.   Yes, sir.

12   Q.   Teresa Halbach.  Mispronounces the last name, but

13        you recognize the name?

14   A.   Yes, sir.

15   Q.   And then you tell the dispatcher, Oh, '99 Toyota?

16   A.   No, I thought she told me that.

17                   Manitowoc County Sheriff's Department.

18        This is Lynn.

19                   Lynn.

20                   Hi Andy.

21                   Can you run Sam William Henry 582, see

22        if it comes back to (Inaudible.)

23                   Sam William Henry 582.  I (Inaudible.)

24        All righty.  Do you speak any Spanish there,

25        Andy?  I just got a call that the top of my list,

                              183

```
 1        is my on call didn't call me back.  If I want to

 2        get in trouble, Andy, I get in trouble.  You

 3        know, what am I supposed to do?

 4               Well --

 5               My favorite one is in the city of

 6        Manitowoc.  Okay.  Shows that she's a missing

 7        person.  And it lists to Teresa Halbach.

 8               All set.

 9               Okay.  That's what you're looking for,

10        Andy?

11               '99 Toyota?

12               Yup.

13               Okay.  Thank you.

14               You are so welcome.  Bye, bye.

15   Q.   Actually you who suggests this is a '99 Toyota?

16   A.   I asked if it was a '99 Toyota, yes.

17   Q.   And the dispatcher confirmed that?

18   A.   Yes.

19   Q.   Were you looking at these plates when you called

20        them in?

21   A.   No, sir.

22   Q.   And your best guess is that you called them in on

23        November 3, 2005?

24   A.   Yes, probably after I received a phone call from

25        Investigator Wiegert letting me know that there
```

184

1    was a missing person.

2    Q.    Investigator Wiegert, did he give you the license

3          plate number for Teresa Halbach when he called

4          you?

5    A.    I don't remember the entire content of our          to 8 186

6          conversation but, obviously, he must have because

7          I was asking the dispatcher to run the plate for

8          me.

9    Q.    Did you not trust that Investigator Wiegert got

10         the number right?

11   A.    I don't -- That's just the way I would have done

12         it.  I don't -- It's not a trust or distrust

13         issue.

14                ATTORNEY STRANG:  I'm about to move to a

15         different area, your Honor.

16                THE COURT:  All right.  We'll take our

17         afternoon break at this time.  Members of the jury,

18         do not discuss the case during break.  And we'll

19         resume in about 15 minutes.

20                     (Jury not present.)

21                THE COURT:  Counsel, you should report back

22         a little before 3:00.

23                ATTORNEY STRANG:  Thank you.

24                     (Recess taken.)

25                THE COURT:  Mr. Strang, you may resume your

                          185

```
 1        cross-examination.
 2                      CROSS-EXAMINATION CONTD
 3    BY ATTORNEY STRANG:
 4    Q.   So as you sit here today, Sergeant Colborn, you
 5         don't recall whether Investigator Wiegert gave
 6         you Ms Halbach's telephone number when he called
 7         you that Thursday evening?
 8    A.   He never asked me anything about a telephone
 9         number.
10    Q.   But you think he must have given you her license
11         plate number?  Did I say telephone number?
12    A.   Yes, you did.
13    Q.   I'm sorry.  I apologize.  What I meant is, you
14         don't recall, as you sit here today, whether
15         Mr. Weigert gave you Teresa Halbach's license
16         plate number when he called you on November 3?
17    A.   No, I just don't remember the exact content of
18         our conversation then.
19    Q.   But --
20    A.   He had to have given it to me, because I wouldn't
21         have had the number any other way.
22    Q.   Well, and you can understand how someone
23         listening to that might think that you were
24         calling in a license plate that you were looking
25         at on the back end of a 1999 Toyota; from
```

186

```
 1          listening to that tape, you can understand why
 2          someone might think that, can't you?
 3                    ATTORNEY KRATZ:  It's a conclusion, Judge.
 4          He's conveying the problems to the jury.
 5                    THE COURT:  I agree, the objection is
 6          sustained.
 7     Q.   This call sounded like hundreds of other license
 8          plate or registration checks you have done
 9          through dispatch before?
10     A.   Yes.
11     Q.   But there's no way you should have been looking
12          at Teresa Halbach's license plate on November 3,
13          on the back end of a 1999 Toyota?
14                    ATTORNEY KRATZ:  Asked and answer, your
15          Honor, he already said he didn't and was not looking
16          at the license plate.
17                    THE COURT:  Sustained.
18     Q.   (By Attorney Strang)~ There's no way you should
19          have been, is there?
20     A.   I shouldn't have been and I was not looking at
21          the license plate.
22     Q.   Because you are aware now that the first time
23          that Toyota was reported found was two days later
24          on November 5?
25     A.   Yes, sir.

                          187
```

```
 1   Q.   You were aware that it was found, without its
 2        license plates?
 3   A.   Yes, sir.
 4   Q.   You are aware that the license plates weren't
 5        reported found until November 8, 2005?
 6   A.   Yes, sir.
 7   Q.   Now, you spent a good bit of your time, your
 8        working hours at least, between November 5 and
 9        November 9, at the Avery salvage property.
10   A.   Yes, sir.
11   Q.   You were asked on direct examination if you
12        remembered when you first arrived on Saturday,
13        November 5, at that property; do you recall that?
14   A.   Yes, sir.
15   Q.   And if I heard you correctly, which you said is
16        you thought somewhere between 5 and 5:15?
17   A.   That's what I thought, yes.
18   Q.   Is that your recollection as you sit here now?
19   A.   Yes.
20   Q.   Okay.  Now, that's a question that you have been
21        asked at a prior hearing in this case, correct?
22   A.   Yes.
23   Q.   Back on August 9, 2006, you testified at a
24        hearing?
25   A.   Yes.
```

188

```
 1              ATTORNEY STRANG:  Page 42, counsel.
 2    Q.   (By Attorney Strang)~ And on August 9, 2006, you
 3         were asked the following question and gave this
 4         answer?
 5              QUESTION:  Okay.  Now, moving onto
 6         Saturday, November 5th, did you -- can you tell
 7         me what time you arrived at the Avery property?
 8              And your answer was:
 9              ANSWER:  Sometime between 6 and 6:30, in
10         the evening.
11              And I will show you the transcript.  Is
12         that the question you were asked and the answer
13         you gave on August 9?
14    A.   Yes, it is.
15    Q.   Now, since then, you have had a chance to get
16         prepared to testify for this trial?
17    A.   Yes, sir.
18    Q.   One of the things you have had the benefit of
19         doing is sitting down with the gentleman to my
20         right, at the prosecution table?
21    A.   Yes, sir.
22    Q.   And they ran through some of the areas they
23         expected to cover with you in your testimony?
24    A.   Yes, sir.
25    Q.   You did not have the benefit of doing that on, or

                              189
```

| 1 | | shortly before, August 9, 2006? |
| 2 | A. | Yes, I did.  Actually, we did it on 6/29/06, the |
| 3 | | date you previously mentioned. |
| 4 | Q. | Okay.  Five or six weeks earlier? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Specifically, have you had a chance, though, |
| 7 | | since August 9, to look at the log sheet for |
| 8 | | November 5, 2005, at the Avery property? |
| 9 | A. | I have not. |
| 10 | Q. | How is it that your memory improved or changed |
| 11 | | and that you now think it was between 5 and 5:15 |
| 12 | | that you arrived, not 6 or 6:30? |
| 13 | A. | I -- I don't know.  I did review my time cards |
| 14 | | for that pay period and I saw what time I went on |
| 15 | | duty, so I -- when I answered Mr. Kratz's |
| 16 | | question, I didn't think it would have taken me |
| 17 | | from 6 or 6:30 to get there. |
| 18 | Q. | Okay.  So it's not so much that you actually |
| 19 | | remember now, it's just that you have spent some |
| 20 | | time trying to reconstruct time from your house |
| 21 | | and when you got the call and what your time |
| 22 | | records show? |
| 23 | A. | Yes. |
| 24 | Q. | Okay.  And we have got Exhibit 142 in evidence |
| 25 | | and I would say today you did pretty well.  I |

190

| | | |
|---|---|---|
| 1 | | will show you Exhibit 142. I have got it open to |
| 2 | | the page where I think you will find yourself |
| 3 | | signing in; is that right? |
| 4 | A. | Yes, sir. |
| 5 | Q. | 5:12 p.m.? |
| 6 | A. | Yes, sir. |
| 7 | Q. | That would be the sign in out by the Command |
| 8 | | Post, true? |
| 9 | A. | I don't know. I -- I have never seen this form |
| 10 | | before today. That's what it looks like. |
| 11 | Q. | Well, the question really is, where do you |
| 12 | | remember logging in? |
| 13 | A. | I thought we logged in out by Avery Road and 147, |
| 14 | | but if you say it's by the Command Post, that |
| 15 | | could be. |
| 16 | Q. | No, no, no, I wasn't there. Avery Road and 147, |
| 17 | | in other words, even farther out from the Command |
| 18 | | Post? |
| 19 | A. | Yes, sir. |
| 20 | Q. | To get anywhere near the property you had to log |
| 21 | | in? |
| 22 | A. | Yes, sir. |
| 23 | Q. | All right. 5:12 p.m. you log in? |
| 24 | A. | Yes, sir. |
| 25 | Q. | Do you recall, now, whether Lieutenant James Lenk |

191

```
1        was there when you arrived, on November 5?
2    A.  I don't know if he was there or came later.  I
3        don't know.
4    Q.  Okay.  And you do know that you logged out with
5        him and with Detective Remiker that evening; do
6        you recall that?
7    A.  Yes, sir.
8    Q.  And, indeed, we can see that if you flip forward
9        a couple three pages, can you find where you have
10       logged out, on Exhibit 142?
11   A.  Yes, sir.
12   Q.  The three of you, Lenk, Colborn, Remiker log out
13       another 10:41 p.m.?
14   A.  Yes, sir.
15   Q.  Now, you were, as I say, spending most of your
16       working hours out there, somewhere on the Avery
17       property, from November 5 through at least
18       November 9?
19   A.  Yes, sir.
20   Q.  You -- As you told us already, you went into
21       Steven Avery's trailer a number of different
22       times during those several days?
23   A.  Yes, sir.
24   Q.  You said on direct examination that, you know, at
25       least initially, you still viewed this as a
```

192

```
 1        missing persons case?
 2   A.   Yes, sir.
 3   Q.   You also knew that by the time you entered
 4        Mr. Avery's trailer at 7:30 on Saturday,
 5        November 5, you were doing so with a search
 6        warrant?
 7   A.   Yes.
 8   Q.   A search warrant in which a fellow law
 9        enforcement officer had sworn that you were
10        looking for evidence of murder, among other
11        things?
12   A.   I didn't know what the content of the search
13        warrant was or how they obtained it.
14   Q.   Search warrants, though, you do know, are used in
15        criminal investigations?
16   A.   Yes, sir.
17   Q.   Not in missing person investigations?
18   A.   I can't really answer that.  I could imagine the
19        Court would give a search warrant for a missing
20        person if we could prove probable cause that that
21        missing person was at a certain spot.
22   Q.   Isn't a search warrant ordinarily used --
23   A.   Yes, it is.
24   Q.   -- when there is probable cause to believe you
25        will find evidence of a crime?
```

193

```
 1   A.   Yes, it is.
 2   Q.   All right.  And you were looking for evidence of
 3        a crime, beginning on the evening of November 5,
 4        true?
 5   A.   Yes, sir.
 6   Q.   One of the things you do, as an evidence
 7        technician, is you wear latex gloves, just like
 8        those that Mr. Wiegert had on earlier, when you
 9        searched someone's home, or garage, or whatever
10        it is?
11   A.   Yes, sir.
12   Q.   You wear those, everybody involved, every law
13        enforcement officer involved in the search wears
14        them?
15   A.   Yes, sir.
16   Q.   That way you can't leave your own fingerprints at
17        the scene or on evidence?
18   A.   Yes, sir.
19   Q.   And in theory, you shouldn't be leaving your own
20        DNA on the scene or on evidence?
21   A.   Correct, sir.
22   Q.   So you're in the house on November 5, November 6,
23        November 7, November 8, true?
24   A.   Yes, sir.
25   Q.   And, finally, on November 8, Mr. Kratz asked you,
```

194

```
1         were you doing a thorough search of the master
2         bedroom of Mr. Avery's trailer; do you remember
3         that?
4    A.   Yes.
5    Q.   Now, that thorough search, had you working on the
6         bookcase and on the desk?
7    A.   Yes, sir.
8    Q.   You described yourself as being, I think you said
9         none too gentle?
10   A.   That's true.
11   Q.   With the bookcase.  And explained, I wasn't any
12        too gentle, as we were getting exasperated?
13   A.   Yes, sir.
14   Q.   What was exasperating you about the bookcase, or
15        that bedroom, on November 8, 2005?
16   A.   The content of the material that we were
17        collecting.
18   Q.   So you felt exasperated and that caused you to
19        take it out on the bookcase?
20   A.   Didn't exactly take it out on the bookcase, it
21        just caused us to not be gentle in the handling
22        of the material.
23   Q.   You were back in again on November 9, I don't
24        know that you covered that on direct, but you
25        actually were back into Mr. Avery's trailer,
```

195

Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 132 of 153   Document 330-20

```
1        briefly, on November 9, to look for a garage door
2        opener?
3    A.  Yes, sir.
4    Q.  That was also with Lieutenant Lenk, correct?
5    A.  And a Calumet County deputy, yes, sir.
6    Q.  Named Wendling, Deputy Wendling?
7    A.  Yes, sir.                          21:52, Ep. 7
8    Q.  From Calumet County? There was no time that you
9        went in Mr. Avery's home during November of 2005
10       when you were not also with Lieutenant Lenk?
11   A.  Not that I recall.  No, sir
12   Q.  No time you went into Mr. Avery's garage when
13       Lieutenant Lenk was not also with you?
14   A.  Not that I recall, no, sir.
15   Q.  This case, you would describe as the largest
16       investigation in which you personally had
17       participated as a law enforcement officer?
18   A.  Yes, sir.
19   Q.  Some of the lengthiest searches, if we take
20       November 5 through November 9 as a whole, in
21       which you have participated?
22   A.  Yes, sir.
23   Q.  Led to very serious charges against Mr. Avery?
24   A.  Yes, sir.
25   Q.  You now know that the law enforcement agencies

                         196
```

```
1        involved, principally Calumet County Sheriff's
2        Department and the Division of Criminal
3        Investigation, have generated hundreds or
4        thousands of pages of police reports?
5    A.  Yes, sir.
6    Q.  Your total contribution to those reports, is
7        what, a little bit under half a page, as of
8        November 8, 2005?
9    A.  That's correct, sir.
10   Q.  And then about another page as of June 29, 2006?
11   A.  Correct.
12   Q.  The report that you filed on, or shortly after,
13       November 8, 2005, makes no mention of the Toyota
14       key?
15   A.  That's correct, sir.
16   Q.  Would you like to see it?
17   A.  No, I believe you.
18   Q.  In fact, the only thing you discuss in your
19       report is that on November 8, 2005, you were
20       using these cotton swabs, about which we have all
21       heard a lot, and distilled water, to collect some
22       blood spots in the bathroom and laundry room of
23       Mr. Avery's trailer?
24   A.  Yes, sir.                    2251 Ex. 7
25   Q.  Were there things that you did not want to commit
```

197

1    to paper, in a report?

2  A.  No, sir.

3  Q.  And it all began, I guess, your involvement in

4      this investigation began, that Thursday night,

5      November 3, 2005?

6  A.  Yes, sir.

7  Q.  And that's the -- that's the report that we

8      established you wrote more than 7, nearly 8

9      months later?

10  A.  Yes, sir.                    20:17  Ex 7

11  Q.  That is, it was almost 8 months after that

12      conversation with Steven Avery, the first

13      conversation with him in this investigation, that

14      you wrote down what you say he said to you, back

15      on November 3?
                              back
16  A.  Yes, sir.            to p. 194

17  Q.  Did you have any rough notes, note pad, anything

18      to work off when you wrote that report in the

19      heat of June, 2006?
                              22:58, Ex 7
20  A.  No, I did not, sir.

21  Q.  Well, about 8 months, but then, again, while

22      we're on Steven Avery and your reports about him,

23      that phone call, the phone call you took way back

24      in 1994 or 1995, when you were working in the

25      jail, the phone call where a detective from

                         198

1    another law enforcement agency told you you may

2    have the wrong guy in jail, that one?

3  A. Yes, sir.

4  Q. Did you ever write a report about that?
       J did not

5  A. No, sir.

6  Q. Well, actually you did, didn't you?  It was about

7    8 years later, wasn't it?

8  A. I wrote a statement on it, yes, sir.

9  Q. You wrote a statement after Sheriff Peterson

10    suggested that maybe you should?

11  A. Yes, sir.

12  Q. You wrote that statement in 2003, about the 1994

13    or 1995 telephone call?

14  A. Yes.

15  Q. You wrote that statement in 2003, the day after

16    Steven Avery finally walked out of prison, didn't

17    you?

18  A. I don't know what day Steve was released from

19    prison, but I wrote the statement in 2003.

20  Q. September 12, 2003 sound right?

21  A. I said, I don't know the date that I wrote the

22    statement, but I know it was in 2003.

23  Q. Well, I think I do know the date you wrote it and

24    I'm a happy to show it to you.

25            ATTORNEY STRANG:  I will mark it for

                        199

```
 1    identification.

 2        (Exhibit No. 213 marked for identification.)

 3   Q.   (By Attorney Strang)~ What do you know as

 4        Exhibit 213?

 5   A.   That's the statement I wrote after speaking with

 6        Detect -- or Sheriff Peterson.

 7   Q.   What's the date of your statement?

 8   A.   September 12, 2003.

 9   Q.   Do you remember that now as the day after Steven

10        Avery finally walked out a free man?

11   A.   Sir, I already said I didn't know what day he got

12        released.

13             ATTORNEY STRANG:  That's all I have.      to p. 212

14             THE COURT:  Mr. Kratz.

15             ATTORNEY KRATZ:  I do have a issue outside

16        the presence of the jury, Judge.  I ask that I be

17        able to be heard.

18             THE COURT:  All right.  At this time we'll

19        excuse the jurors for a few minutes.

20                  (Jury not present.)

21             ATTORNEY KRATZ:  I think the witness should

22        be excused as well.

23             THE COURT:  All right.  Mr. Colborn, you

24        may step outside.  Mr. Kratz.

25                  (Witness not present.)

                            200
```

ATTORNEY KRATZ: Thank you, Judge. As this Court may know, this was a cross-examination which was much anticipated. It was the subject of a great deal of pre-trial litigation. It was the point in the trial where the defense had represented to this Court, in something that's called an offer of proof, which is a lawyer's obligation, at least as this Court presented it to the defense, to tell the Court what the defense intended to show at trial.

When submitting the defense theory of the case, in response to the State's motion to exclude evidence of blood vial, of planting evidence, the defense, in their offer of proof, told this Court, promised this Court, that the defense would -- with evidence, would show that this witness, Mr. Colborn, or the next witness, Mr. Lenk, somehow obtained a vial of blood from the Clerk of Court's Office in Manitowoc County and planted that evidence, or planted that blood in Teresa Halbach's SUV.

Now, we have had heard Mr. Strang's opening statement where planted evidence has been eluded to. We have heard cross-examination of other law enforcement witnesses, by Mr. Buting, specifically, where he asked whether those

201

1    officers expected that their superiors would be

2    planting evidence in this case.

3         But now, when it would logically come up

4    in trial, now when evidence would logically be

5    presented, or when the very witness in the

6    defense offer of proof comes before this Court

7    and is able to be asked regarding sneaking into

8    the Clerk's Office, or stealing a vial of blood,

9    or planting evidence, we hear nothing.

10        And despite the contamination by the

11   defense throughout the entire jury selection

12   process, which this Court I think can take

13   judicial notice of, you heard all the questioning

14   about the vial of blood in the Clerk's Office in

15   jury selection, you heard the contamination in

16   press releases, you heard the contamination in

17   opening statements.

18        Now, for the first time, when evidence

19   should be placed into -- into the record, or at

20   least placed into this particular case, we hear

21   nothing.  And so, Judge, I'm asking for

22   alternative direction, or rulings from the Court,

23   first, if the defense is abandoning their

24   planting evidence theory.  The State needs to

25   know that and we need to know that now.

202

1     Because there shouldn't be any more --
2     any more questions of, are you friends with
3     Mr. Lenk, or any questions of any other witnesses
4     about a planting or about blood vials, if they
5     intend not to honor their offer of proof, if the
6     defense now intends not to, as they told this
7     Court in response to the State's motion to
8     exclude this very evidence, that they would prove
9     that evidence from the Clerk's Office, by way of
10    vial of blood would be brought into this case.

11          If they do, in fact, that is, if the
12    defense does in fact intend to abandon that
13    defense, then I will be asking for curative
14    instructions of this jury, at this time, that up
15    to this point in the trial they should disregard
16    Mr. Strang's opening statement, when he talked
17    about further evidence of planting evidence, of
18    any other witnesses that have been asked about
19    planting evidence, or any reference at all to
20    blood vial type evidence.

21          If, in fact, I'm mistaken, if I am
22    jumping the gun, if you will, if this is all
23    going to be Lieutenant Lenk now, rather than
24    Sergeant Colborn, then I am happy to be the first
25    one to stand corrected.  But, if this defense is

203

1    going to be abandoned, before I redirect this
2    particular witness, the State is entitled to that
3    ruling and we're entitled to that information.
4              THE COURT:  Mr. Strang.
5              ATTORNEY STRANG:  I will stand on the
6    written materials we made, we tendered to the Court
7    and filed, with respect to a proffer of evidence and
8    reasonable inferences from evidence as to the blood
9    vial.  I will stand on the transcript that our
10   capable court reporter has made of my opening
11   statement and simply note that, while he means no
12   inaccuracy and he is simply trying to give the Court
13   a summary, Mr. Kratz's description of our written
14   materials and my opening statement are not exactly
15   correct, and I will simply stand on them rather than
16   characterize them.

17             Second, just by the by, we haven't
18   gotten to the defense case-in-chief yet at all.
19   We're in the prosecution case-in-chief.  So all
20   of this, at some level, would be wildly
21   premature.  But, beyond that, to confront it most
22   directly, I'm idealistic.  I'm certainly naive at
23   times.  I am not so naive to think that someone
24   who may have planted blood evidence, who may have
25   been involved in planting a key, would come into

204

1       this courtroom, and simply, because asked under
2       oath, did you do it, say, oh, yes, I did it.  We
3       are not going to have a *Perry Mason* moment here.

4              We will at some point have to establish
5       the existence of the blood vial in the Clerk's
6       Office and its state of being there so to speak.
7       And that could be done in the defense
8       case-in-chief; it could be done on
9       cross-examination in the State's case-in-chief,
10      if the opportunity should present itself with an
11      appropriate witness.

12             But I do not expect anyone, Lieutenant
13      Lenk, Sergeant Colborn, anyone else, to make an
14      admission, that you would see in the *Perry Mason*
15      show, on the witness stand.  And the suggestion
16      that we should be held to getting one from such a
17      witness is preposterous.  This jury will be
18      asked, in the end, by both sides, to rely on
19      reasonable inferences and common sense and on all
20      of the evidence.

21             So I don't think there's any relief to
22      be granted at the moment and there's no point in
23      discussing now what reasonable inferences may be
24      available at this point, since neither the jury
25      nor the parties know what the whole of the

205

```
 1    evidence will be when the evidence is closed.

 2              THE COURT:  Mr. Kratz, anything else?

 3              ATTORNEY KRATZ:  Just -- I'm sure, Judge,

 4    just one moment, if I could.  I appreciate

 5    Mr. Strang's response, Judge.  And when Mr. Strang,

 6    and I believe I wrote these words down correctly, we

 7    will establish the blood vial in the Clerk's Office,

 8    perhaps not through these witnesses; but it is, what

 9    I have heard, that they are not abandoning that

10    defense.

11              That was my concern, because there's

12    nothing that requires Mr. Strang or Mr. Buting to

13    keep planting these little nuggets, if you will,

14    and then when the defense part comes, from them

15    saying, defense rests, or saying, now we have

16    abandoned it, when there is further contamination

17    of the jury.

18              That's our concern, Judge.  We're able

19    to meet this defense and we intend to meet this

20    defense.  But we have to do that in good faith

21    reliance, upon pre-trial rulings of this Court,

22    by pre-trial representations by the defense as to

23    where this trial is going, so that we don't

24    interrupt the flow of this case.

25              I don't want to object every time I hear

                        206
```

the word planting.  I don't want to object every
time I hear the word, are you friends with
Lieutenant Lenk, or anything that might go down
that road.  In fact, the defense intends to, as
their offer of proof, indicates to prove that up
at some point, or to embrace that as one of their
defenses.

And I know that's a clumsy term, and
with my apology to Mr. Strang, but I still
believe that we're entitled to know that.  We're
entitled at some point, before there is further
contamination, if in fact this defense is going
to be abandoned at some point, the State is
entitled to know that.  That was my point in
putting it on the record at this very moment,
before I proceed with my redirect examination.

THE COURT:  I don't know that the defense
disagrees that if they should abandon that defense
that you would be entitled to some notice, but I
don't understand the defense to be saying that they
are abandoning that defense.

ATTORNEY STRANG:  The Court is right on
both counts.  And this is, you know, I would like to
know too whether the State is abandoning the false
imprisonment charge, but until we at least get to

207

1    the point where the State rests its case-in-chief,

2    that's all premature.

3         And I understand Mr. Kratz's concerns.

4    I don't know that if we were abandoning any

5    defense that I would have done the same

6    cross-examination, or for that matter, that

7    Mr. Colborn would have been called on direct at

8    all.

9         ATTORNEY KRATZ:  What I would, just as a

10   final point, Judge, I would ask then, that before

11   the State rests, before the State concludes its part

12   of the case, that we be allowed a hearing, that we

13   be allowed an opportunity on an admissibility

14   hearing, or to meet what at least has been presented

15   to this point.

16        We have heard about vials of blood.  We

17   have heard -- the jury has at least heard,

18   substantially during the voir dire process, about

19   a vial of blood in the Clerk's Office.  We don't

20   have, obviously, any results from the FBI at this

21   particular point yet.  But if and when we do get

22   those, I know that there is some disagreement as

23   to what's rebuttal evidence and can rebuttal, or

24   reply evidence, be put in even in the State's

25   case-in-chief.

208

1          Because if the defense, technically,

2     wouldn't call one single witness and the State

3     relied upon the defense representation that they

4     intended to put this in and the defense changed

5     their mind, we would be precluded from meeting

6     the challenges, or at least meeting the

7     assertions that have been made up to this point.

8          So, perhaps more by way of prediction

9     between now and the close of the State's case, we

10    will be asking for a hearing on this very issue.

11    I don't intend to have this conversation again.

12    Mr. Strang is right, we'll wait to see how the

13    case plays out.

14         But prior to the State being precluded

15    from meeting this defense, or at least from

16    presenting evidence relevant to this particular

17    topic, and before the State rests, we will be

18    asking for a more extensive opportunity to be

19    heard, even if it's just in writing, Judge.  We

20    will submit something, but we will need some kind

21    of a ruling before the State does rest its case.

22         THE COURT:  All right.  If I'm reading your

23    comments correctly, you are not asking the Court to

24    do anything at this point in time, but you are

25    indicating that you may be asking for relief of some

209

1   kind at the close of the -- or before the close of
2   the State's case, pending whatever action the
3   defense takes between now and then.

4            ATTORNEY KRATZ:  This was the earliest
5   opportunity and, in fact, the first obvious
6   opportunity to have heard that kind of evidence.
7   Since I didn't hear it, I'm putting the Court and
8   defense on notice of our position.

9            THE COURT:  Mr. Strang.

10           ATTORNEY STRANG:  Fair enough.  And I -- I
11  think I should, you know, in the spirit of the
12  disclosure that Mr. Kratz has struck, add joining
13  part of what -- part of what he said.  I mean,
14  clearly, because about half, I think, of the blood
15  vial sample has been sent off to the FBI for
16  testing, and we expect testing is ongoing, clearly
17  there will have to be a hearing.  Mr. Kratz may have
18  one type of hearing in mind; we have another.
19  Certainly a **Walstad** hearing and there are a variety
20  of other issues that may arise with the FBI testing.

21           We are no closer to being able to
22  conduct any independent testing or to have an
23  expert to meet and assess the FBI's testing, than
24  we were when we first addressed this issue.  We
25  have received a protocol from the FBI, thanks to

210

1            Mr. Gahn for that; we got that, I don't know, at

2            the end of last week, I think.

3                  And we'll be filing a motion addressing,

4            in writing, the issues that this testing and the

5            denial of defense opportunity for independent

6            testing or even for a reasonable chance to find

7            an expert to meet and help us assess, possibly

8            contradict the FBI test results. It raises a

9            whole field of fair trial and due process issues

10           here. I will address those in writing.

11                 I hope to file that before the end of

12           this week. I expect the State would want a

13           chance to respond in writing and, you know,

14           whatever I see as heading, is the Court needing

15           to schedule, conceivably. I mean, on Wednesday,

16           gets FBI results and what they are, the Court

17           needing to set a fair amount of time aside to

18           address the whole cluster of issues surrounding

19           that FBI testing.

20                 THE COURT: All right. Anything else

21           before we bring the jury back in and allow the State

22           to redirect?

23                 ATTORNEY KRATZ: No. And Mr. Strang's

24           comments are certainly well stated and we actually

25           join that, Judge; we will need a day and whether

211

```
 1              it's going to be on a weekend or whether the Court

 2              is going to allow a day or the better part of a day,

 3              that the jury gets a probably much needed day off,

 4              we'll need to schedule that within the trial.  But I

 5              am prepared with my redirect at this time, Judge.

 6                   THE COURT:  Very well.  We can bring the

 7              witness back in and the jurors.

 8                        (Jury present.)

 9                   You may be seated.  Mr. Kratz, at this

10              time you may begin your redirect.

11                   ATTORNEY KRATZ:  Thank you, Judge.

12                   REDIRECT EXAMINATION       23:45 & 7

13         BY ATTORNEY KRATZ:

14         Q.   Sergeant Colborn, just a very few follow-up

15              questions.  Mr. Strang asked you if you had

16              written a report about that telephone call that

17              you had sometime in 1994 or '95; do you remember

18              that question?

19         A.   Yes, sir.

20         Q.   Do you remember your response?

21         A.   My response was, no, that I did not write a

22              report about it.

23         Q.   As you look back, back in 1994 or '95, if you

24              would have written a report, what would it have

25              been about?

                              212
```

```
1   A.   That is why I didn't do one, I don't know what it
2        would have been about, that I received a call and
3        transferred it to the Detective Division. If I
4        wrote a report about every call that came in, I
5        would spend my whole day writing reports.   to p. 215
6   Q.   Did this person ever identify the individual that
7        they were talking about?
8   A.   No, sir.  There were no names given.        18:37 & 7
9   Q.   Let me ask you this, as you sit here today,
10       Sergeant Colborn, do you even know whether that
11       call was about Mr. Steven Avery?
12  A.   No, I don't.
13  Q.   Mr. Strang also played a telephone call for you,
14       a call to the dispatch center, wherein you asked
15       to verify a license plate; do you recall that?
16  A.   Yes, sir.
17  Q.   Do you know if you made that inquiry of the
18       dispatch center before or after you went to the
19       Avery property on the 3rd of November?
20  A.   I did not, no, sir.  I would think -- I don't
21       know.
22  Q.   Mr. Strang asked whether or not it was common for
23       you to check up on other agencies, or perhaps
24       I'm -- I'm misphrasing that, but when you are
25       assisting another agency, do you commonly verify
```

213

```
1          information that's provided by another agency?

2     A.   All the time.  I'm just trying to get -- you

3          know, a lot of times when you are driving a car,

4          you can't stop and take notes, so I'm trying to

5          get things in my head.  And by calling the

6          dispatch center and running that plate again, it

7          got it in my head who that vehicle belonged to

8          and what type of vehicle that plate is associated

9          with.

10    Q.   All right.  Mr. Strang also asked you about a

11         interview that you had with a Investigator Steier

12         from the Calumet County Sheriff's Department

13         sometime in January of this year; is that

14         correct?

15    A.   Yes, sir.

16    Q.   Mr. Strang asked you if, when Investigator Steier

17         asked if you were able to, at that time, back in

18         January, to recreate your day, if you will, on

19         your day off on the 4th of November; is that the

20         substance?

21    A.   Yes, sir.

22    Q.   And in January, were you able to do that?

23    A.   No, sir.

24    Q.   Have you since been asked to recreate or to

25         reexamine your comings and goings on the 4th of
```

214

|     |     |                                                           |
| --- | --- | --------------------------------------------------------- |
| 1   |     | November?                                                 |
| 2   | A.  | Yes, sir.                                                 |
| 3   | Q.  | And have you now been able to do that?                    |
| 4   | A.  | Yes, sir.                                                 |
| 5   | Q.  | At any time during the 4th of November, were you          |
| 6   |     | anywhere near the Avery salvage property?                 |
| 7   | A.  | No, I was not.                                             |
| 8   | Q.  | At any time other than what we have heard about           |
| 9   |     | on the 3rd, were you anywhere near that salvage           |
| 10  |     | property.                                                 |
| 11  | A.  | No, I was not.                                             |
| 12  | Q.  | Again, before arriving there on the 5th of               |
| 13  |     | November, had you gone near or approached                 |
| 14  |     | anywhere around the Avery salvage property                |
| 15  |     | itself?                                                   |
| 16  | A.  | No, sir, I had not.                                        |
| 17  |     | ATTORNEY KRATZ:  That's all the redirect I                |
| 18  |     | have of this witness.  Thank you, very much, sir.         |
| 19  |     | THE COURT:  Mr. Strang.                                    |
| 20  |     | **RECROSS-EXAMINATION**                                   |
| 21  |     | BY ATTORNEY STRANG:                                        |
| 22  | Q.  | How many calls have you ever gotten in your law           |
| 23  |     | enforcement career, from another police officer,          |
| 24  |     | suggesting you had the wrong guy in jail?                 |
| 25  | A.  | I don't know.  I can't recall any others.                 |

215

```
 1                   ATTORNEY STRANG:  That's all I have.
 2                   THE COURT:  All right.  You are excused.
 3           Mr. Kratz, the State may call its next witness.
 4                   ATTORNEY KRATZ:  The State would call
 5           Lieutenant James Lenk, then.
 6                   THE CLERK:  Please raise your right hand.
 7                   LIEUTENANT JAMES M. LENK, called as a
 8           witness herein, having been first duly sworn, was
 9           examined and testified as follows:
10                   THE CLERK:  Please be seated.  Please state
11           your name and spell your last name for the record.
12                   THE WITNESS:  James M. Lenk, L-e-n-k.
13                         DIRECT EXAMINATION
14           BY ATTORNEY KRATZ:
15           Q.   Mr. Lenk, how are you employed?
16           A.   I'm employed with the Manitowoc County Sheriff's
17                Department.
18           Q.   In what capacity, sir?
19           A.   I'm a lieutenant of detectives.
20           Q.   What are your duties as lieutenant?
21           A.   To distribute work amongst the other detectives,
22                to supervise other detectives, also to take cases
23                myself.
24           Q.   So, together with the supervisory responsibility,
25                you have an active case load; is that right?
```

216