IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

ANDREW L. COLBORN,

               Plaintiff

NETFLIX, INC., et al.,                                    Case No. 19-CV-484

               Defendants.

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

## INTRODUCTION

Plaintiff respectfully submits this combined memorandum in opposition to Defendants' summary judgment motions. As explained below, there are material disputes of fact for trial on Plaintiff's claims for defamation and intentional infliction of emotional distress that are not overcome by any of Defendants' arguments.

## PROCEDURAL POSTURE AND MATERIAL FACTS

This case arises out of the Netflix series, "Making a Murderer" ("MAM"). Defendants Chrome Media, LLC (Chrome") and its principals, Laura Ricciardi and Moira Demos, take significant credit for the content of MAM, contending that they are "producers" of the series. However, Netflix was also undeniably heavily involved in the creative development of each and every episode, as described further below. Netflix approved the final cuts of all MAM episodes. Colborn Additional Proposed Findings of Fact (hereafter "CAPFF") #1. From its first involvement, Netflix aimed to craft the series from "a marketing perspective" and also from an "awards qualifying perspective." *Id*.; Declaration of April Rockstead Barker., Ex. 1 NFXCOL #308.

"Making a Murderer" ("MAM") tells the story of Steven Avery, a former resident of Manitowoc County, Wisconsin, who was convicted in 2007 of killing a young woman named Theresa Halbach. Netflix PFOF # 25. While the parties dispute the extent to which the series conveys to viewers that Avery was wrongly convicted for that crime, there is no dispute that the series also highlights Avery's conviction for a prior alleged rape for which he served time in prison, but for which he was later exonerated on the basis of DNA evidence. Netflix PFOF # 1.



CAPFF #3. As part of that process,

Chrome was also involved in efforts to brainstorm with Avery's defense attorneys to attempt to obtain additional testing of evidence presented in his defense, news that Netflix embraced. Barker Decl., Ex. 1 NFXCOL 1907, 1930; CAPFF #4.  Netflix likewise started from the point of view that Avery was "innocent" of the Halbach murder and that the judge was "biased" against him. Barker Dec. Ex1 NFXCOL ##1949, 1961, 2131; CAPFF #4.

An in-depth examination of the structure of MAM is critical to understanding its presentation of the Plaintiff, Andrew Colborn, as a participant in an alleged Sheriff's Department conspiracy to frame Steven Avery for Theresa Halbach's murder.

2

███████████████████████████████████████████████

█████████████████████████████████████  In particular, Netflix sought to augment the

series' reliance on "voiceovers" by Avery himself to tell Avery's "narrative." Id., Barker Decl.

Ex. 1 NFXCOL 199, 2011; CAPFF #5.  The final product for MAM, according to Netflix's

creative team, was to provide "an immersive and all-encompassing experience for the viewer

including deft and unexpected foreshadowing of key elements, pitch perfect call-backs of

evidence and breathtaking reveals," accompanied by a "thriller" atmosphere imparted through

the music score. Barker Decl. Ex. 1 (NFXCOL 1933-34); CAPFF #6.

The series unfolds over the ten episodes. In the interests of brevity, Plaintiff provides

streamlined summaries of the respective episodes below, focusing more heavily on the episodes

that feature him, but responds more fully to Defendants' characterizations of the episodes in his

responses to their proposed findings of fact. *See* Addendum to Plaintiff's Reponses to

Defendants' Proposed Finding of Fact: Episode Summaries, submitted herewith (referenced

herein as "Addendum").

### Episode 1

Viewers are initially introduced to Steven Avery through what appears to be home video

footage of his joyous return to the Avery family salvage yard and homestead after his prior

conviction for rape was set aside. Kelley Decl., Dkt #120-1 at 00:05 -00:45; Addendum at pp. 1-

2. From there, the series portrays Avery's identification as the suspect for the rape as engineered

by representatives of the Manitowoc County Sheriff's Department. Dkt #120-1  ("They made the

case against him that night" (Walt Kelly)). The series includes testimony of Sheriff's Department

employees from depositions given in a civil case that Avery later brought against the County, the

excerpts from which are interspersed with interpretive comments from Avery's civil suit

attorneys, Steven Glynn and Walt Kelly; Avery's criminal defense attorneys from both the circuit court and appellate level in the rape case; Avery's family members; and Avery himself. Addendum at p 1. MAM relays that the unanimous conclusion of all of these individuals is that the law enforcement community knew or should have known at the time they pursued the rape charge against Avery that the actual perpetrator of the rape, Gregory Allen, was responsible. *Id*. Avery's father is featured angrily calling the judge who presided over the trial as a "son of a bitch," and Avery's parents are also shown describing their pain watching Avery endure the rape trial. *Id*.

Avery's civil suit attorneys, Glynn and Kelly, feature prominently in the episode as they describe what is apparently the evidence that they intended to use to prove a civil case against the County, including, among other things, (1) an alleged friendship between Sandy Morris and the detective who purportedly suggested to the rape victim that her description of the perpetrator sounded like Steven Avery;[1] (2) a sketch of the perpetrator prepared by a high-ranking member of the Sheriff's Department whom Glynn and Kelly allege had access to Avery's mug shot as a guide for the sketch; (3) a claim that City of Manitowoc police officer told the Sheriff that Allen might be the suspect; (4) Assistant District Attorneys' warnings to then District Attorney Dennis Vogel that Allen rather than Avery may have committed the crime; and (5) the discovery that in the Avery case file, there was a copy of a complaint against Allen for a prior sexual assault charge for which he had been prosecuted by Vogel. Dkt #120-1 at 50:45 – 51:18.

As a result, Glynn and Kelly suggest, the case against the County for which they had demanded $36 million was essentially a slam dunk. This is consistent with Netflix's direction

---

[1] Netflix representatives advised Chrome to find photos of Ms. Morris with that detective in order to establish them as "very good friends." Barker Decl. Ex. 1 NFXCOL 209. Netflix advised Chrome that this would "establish a motive" for the Sheriff to interfere with the investigation. Id., NFXCOL 1979.

that the civil suit was to be portrayed as a virtually assured victory prior to the Halbach murder. Barker Decl., Ex. 1 (NFXCOL 1946). ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ To the contrary, Avery's former public defender is shown commenting that it was a "crock of shit" that the Attorney General's office refused to pursue criminal charges against law enforcement representatives in connection with Avery's prosecution. Addendum at p. 2. Glynn is also shown intoning mysteriously that the Sheriff's Department representatives are so "threatened" by the lawsuit that they are writing "memos" of things that happened "10 years earlier" over a copy of a document that will later be revealed as a memorandum written by Plaintiff, Andrew Colborn. Dkt #120-1 at 49:23 – 49:35.

As the episode draws to a close, viewers are informed by an Avery relative that "something told her" that the County was "not done with" Avery and that they would make sure that they did not have to "hand that man $36 million." Addendum at p. 2. This content is consistent with Netflix's direction that the episode should "set up" for viewers the notion that Manitowoc County law enforcement were going to "seek revenge" against Avery because of his civil suit. Barker Decl., Ex. 1, NFXCOL #1940, 1978; CAPFF #8. Glynn is heard stating, as images of police cars are shown, that the one thing they did not warn Avery about was that if you pursue a civil rights case against a County in which you still live, you could be "charged with murder." Dkt #120-1 at 1:02:08 – 1:02:20. At that point, images of Sheriff's Department representatives, including Plaintiff, rotate ominously on screen over foreboding music. Dkt #1:01:30 at 1:01:40. This is the audience's first introduction to the Plaintiff in this case, Andrew

Colborn, who is shown as one of the looming threats waiting to exact revenge on Avery. *Id.* The episode concludes with brief audio of an apparent conversation between a law enforcement officer and a dispatcher asking in the early stages of the Halbach criminal investigation whether Steven Avery is in custody. Dkt # 120-1 at 1:02:28 - 1;02:35.

**Episode 2**

The second episode opens with audio of the phone call that Theresa Halbach placed indicating what time she would be arriving at the Avery salvage yard on what would be the last day anyone else saw her alive. Addendum at pp. 2-3. It then launches into a disturbing home video of Ms. Halbach, several years prior to her death, in which she says that she wanted people to know if she dies that she was happy with what she did with her life. *Id.* From there, MAM jumps back to Avery's release and an upbeat music track plays over video and photos of Avery and his new girlfriend, while Avery and others explain that he had set out to live his life anew. *Id.*

Netflix encouraged Chrome to include photos of Avery and his family to "make them look like a very happy family." Barker Decl., Ex. 1 (NFXCOL #1935); CAPFF #9. Netflix likewise encouraged the use of "sweet photos" of Avery and his nephew, Brendan Dassey as children "to reinforce the sense of injustice and calamity" that was the series' goal. *Id.;* Barker Ex. 1, (NFXCOL #1952). ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ CAPFF #9.

Glynn also explains that Avery has become something of a "celebrity" in the criminal justice field, with politicians posing for photos with him. Addendum at pp. 2-3. The audience learns that in October 2005, a criminal justice reform bill was introduced as "the Avery bill" and Avery was likely to receive $450,000 from the State of Wisconsin as compensation for years

6

wrongly served for the Beernsteen rape  Glynn explains that this will keep Avery from accepting a "lowball" settlement in his civil suit. What appear to be "greatest hits" excerpts from the civil suit depositions followed, in which it appears that Kelley is decimating Manitowoc County witnesses.

With the air of an amiable gossip relishing his role as raconteur, Glynn then dishes that they learned in the lawsuit about some "serious meat" in the form of a telephone call that was received by Mr. Colborn when he previously worked as a jailor. Addendum at p. 3. While Glynn speaks, video imagery of Mr. Colborn appears in the background. "What we learn," Glynn says dramatically, "is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department (an image of Mr. Colborn's report is shown in background while Glynn is speaking) from another law enforcement agency . . . saying that they had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison." Dkt ## 120-2, 17:37-18:24.  In fact, Mr. Colborn testified that the caller indicated that someone in another county may have committed an assault and that someone might be in. the Manitowoc County jail for that assault.[2] CAPFF. DKT. # 290-7 Depo p. 11; Plaintiff's Response to Chrome Proposed Finding of Fact #9.

The series next jumps to scenes from Mr. Colborn's deposition in the Avery case, but the episode omits scenes that would have disclosed that Mr. Colborn testified that he transferred the call to the Detective Division. Dkt #120-2 at 18:28 -19:04.  Glynn then continues, "Manitowoc doesn't have huge numbers of major assaults where people go to prison and certainly where people would still be in prison. . . . . at a minimum, somebody ought to check this out." Dkt #120-2 at 19:05 – 19:41; Addendum, p. 3. At Mr. Colborn's deposition in the Avery civil case, Glynn

---

[2] As shown in Episode 1 of MAM, Avery was transferred between several Wisconsin state prisons throughout his sentence for the rape; he was not housed in the Manitowoc County jail in 1995.

elicited deposition testimony confirming that Mr. Colborn had attempted to transfer the call to the Detective Department, as that was the proper department to handle any such call. Dkt #129, Burnett Decl., Ex. 1 at 12:41-14:30. Mention of the transfer of the call is excluded entirely from Episode 2. ████████████████████████████████

████████████████████████████████████████

████████████████████████ CAPFF#10. MAM also includes a graphic as Glynn is speaking that states, "1995 ● Gregory Allen is arrested for sexual assault in Brown County / Andrew Colborn receives call about inmate confession" Dkt #120-2, 19:24 – 19:41. In fact, Mr. Colborn testified that he received the call at issue in "1994 or 1995." CAPFF #10.

Glynn continues speaking thereafter, stating, "The fellow who got that call was named Colborn. And you might say that there should be a record of him immediately making a report on this, there might be a record of his immediately contacting a supervising officer, there might be a record of him contacting a detective who handles sexual assault cases, ahh, there might be some record of it. But if you thought any of those things, you'd be wrong, because there isn't any record in 1995, 1996, 1997, 1998, 2000, 2001, 2002, 2003 . . . ." . Dkt #120-2, 19:47 – 20:26; Addendum, p. 3. In fact, as noted above, Glynn's statements as portrayed in MAM were demonstrably inconsistent with what Mr. Colborn testified at his deposition at the Avery civil case, which was that he transferred the call to the Detective Division of the Sheriff's Department and that he did not have authority to pursue it further. MAM then displays a graphic with years running from a timeline image with Mr. Colborn's photograph above it, and a statement after the year "2003" that states, 'DNA evidence exonerates Steven Avery." Dkt # 120-2, 20:14 – 20:25; Addendum, p. 3.

At this point in the series, the viewers have been given the impression that Mr. Colborn received a phone call regarding the possible innocence of Avery and did nothing whatsoever about

8

that call for eight years. During the early stages of production, Netflix representatives complained that the details surrounding the call were "confusing" and that "it seemed very thin that Colborn not having specific knowledge of who called him would be key to the case." Barker Decl., Ex. 1 (NFXCOL ## 210, 1937-38, 1981-82); CAPFF #11. Netflix added that this revelation initially seemed "weak." *Id.* Despite these concerns, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ CAPFF #11. In addition, because the phone call was "something we keep going back to throughout the series," Netflix recommended bolstering it with a chart to emphasize "connections between various law enforcement officers" referenced in the segment. *Id.,* Ex. 1, NFXCOL ##293, 329; CAPFF #1.

Episode 2 then continues to feature Glynn explaining how Mr. Colborn, allegedly realizing that he had "screwed up, big time" by allegedly doing nothing with the call, purportedly joined with other Sheriff's Department personnel to participate in a "conspiracy of silence" at Avery's expense. Addendum, p. 3. As Glynn ultimately intimates, this directly sets the stage for accusations, made directly by Avery onscreen, that the Sheriff's Department framed him for the Halbach murder:

| Dkt # 120-2 20:25 – 21:13 | Glynn continues, "Now 2003 is a year that has meaning because that's when Steven Avery got out. And the day he got out, or the day after, that's when Colborn decides to contact his superior officer, named Lenk. And Lenk tells him to write a report. And then they go have contact with the Sheriff. . . . .why does it happen . . . when it didn't happen eight years earlier? Um, ahh, I mean, I think I know the answer**.** I think the answer is pretty clearly these people realized that they had screwed up big time. Colborn realized it, Lenk as his superior realized it, and the Sheriff realized it. |
|---|---|
| Dkt # 120-2 21:08-21:12 | Images of Mr. Colborn, James Lenk, and the Sheriff are shown. |

9

| | |
|---|---|
| Dkt # 120-2 21:12 – 21:39 | Glynn continues, "So Lenk tells Colborn to write a report, the Sheriff tells Lenk, 'Get me the report.' The Sheriff puts the report in a safe. That's how much he cares about documenting this thing. Well obviously it doesn't do anybody, it certainly doesn't do Steven Avery any good to document that eight years after the fact, because Steve Avery has been sitting in a cage . . . ." |
| Dkt # 120-2 22:55-23:14 | Avery voiceover after civil deposition excerpts, stating, "A lot of people told me to watch my back. Most of the time, I didn't even believe them. But then, sitting and doing depositions, I don't know. It kind of changed my mind. They were covering something up." |
| Dkt # 120-2 22:45-22:50 | Cuts to image with close-up of Mr. Colborn's signature. |
| Dkt # 120-2 23:14-23:26 | Avery states, "And they were still covering something up. Even with the sheriff who's on there now – he's covering something up." |
| Dkt # 120-2 23:28-23:50 | Cuts to footage of Mr. Colborn's videotaped deposition |
| Dkt # 120-2 26:52-26:56 | Video image of Mr. Colborn |
| Dkt # 120-2 26:56-27:33 | Steven Glynn asserts, "This was an unconscionable withholding of information that would have been of use to Steven Avery's lawyers . . . If that information had come to light in 1995, Steven Avery would have gotten out in 1995. So they cost Steve Avery eight years of his life. This is as close to a conspiracy of silence as I think you could find in a case." |
| Dkt # 120-2 28:24-29:07 | Rotating images of Mr. Colborn, other alleged conspirators shown. |
| Dkt # 120-2 28:35-29:37 | Interview with Walt Kelly, who states, "October of 2005, from the perspective of the Manitowoc County government and their defense lawyers, I believe they all knew they were in the most serious kind of trouble. There was a very grave prospect of a very, very substantial verdict. [Their] insurers have taken the position that because of the nature of the allegations against the County, the Sheriff and the DA, the policies do not cover, which would mean that Manitowoc County itself, and the Sheriff and the DA, would be on the hook for those damages in the civil suit. |
| Dkt # 120-2 29:40-30:22 | Glynn interview continues, "We don't need to have somebody tell us that this is going to have an effect on law enforcement. Of course it has an effect . . . . Imagine what it's like when you're going to say that you're a liar, and that you hid evidence, and that you deliberately prosecuted a person that you knew, or at least had reason to know, wasn't guilty of the crime? And putting all that aside, by the way, in terms of your own professionalism, there's a guy out there raping and beating women while the guy that you put in prison is sitting in a cell." |
| Dkt # 120-2 30:29-31:04 | Glynn continues, "We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt [Kelly] who tells me that he has gotten a call from a journalist asking if either of |

| | us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach." |
|---|---|

Addendum, pp. 3-4.

Episode 2 then shows what appears to be video footage of the search for Ms. Halbach's vehicle on the Avery Salvage yard, as well as audio of the call made by the woman who located Ms. Halbach's RAV 4 on the property. Addendum, p. 4. Low, staccato tones can be heard ominously in the background. News footage regarding Teresa Halbach's disappearance is followed by footage of an Avery interview in which he says that anyone could have access to his property to plant evidence and accuses the county of possibly doing "something" with Teresa Halbach and trying "to plant evidence on me," adding that he "wouldn't put nothing past the county." Dkt #120-2, 39:30-40:08; Addendum p. 5.

After footage from press conferences by authorities, Avery is heard saying, "All I can think is they're trying to railroad me again." Dkt # 120-2 41:19-41:24; Addendum p. 5. After a search of Avery's property is shown, Avery continues, "I ain't been home. They's been searching. You know, how hard is it to put evidence in the house or on the property? . . . .The . . . . Sheriff . . . was out to get me the first time. How do I know he ain't got nothing to do with it this time?" Dkt #120-2 42:45-43:02; Addendum p. 5. After more news footage, Avery continues, "all these memories and everything else, and they're just sketching me out again. . . . # 120-2, 44:24-44:35; Addendum p. 5. Following a montage of news reports, video of Ms. Halbach's family speaking to interviewers, a vigil for Ms. Halbach, and excerpts from a law enforcement press conference, Avery says tearfully, "You know we're all victims, and they just won't leave us alone. They just keep it up. . . . ." Dkt #120-2, 46:37-46:52; Addendum p. 5. A press conference discloses that

Avery has been arrested, but Walt Kelly is heard allegedly telling a news reporter that he does not know where Avery is being held. *Id.*

Footage of an interrogation of Avery is shown in which he says that Ms. Halbach's bones and vehicle key and Avery's blood were planted on his property, stating, "See, if somebody else plants that shit there, you ain't going to see . . . ." Dkt # 120-2 52:24-52:29; Addendum p. 5. The investigator is heard asking him, "You think two officers who don't know you . . ." Addendum p. 5. The Halbach special prosecutor, Ken Kratz, is then shown explaining that Avery's DNA was found on the Toyota key. *Id.* Afterward, Avery is heard telling the news media as he is transported to jail, "I'm innocent." *Id.* The episode concludes as Avery is heard saying, "You know last time, it took me 18 years to prove my innocence. This time, I don't know how long," over the series' theme music. *Id.*

**Episode 3**

The next episode begins with discussion of the fact that while the legislative reform initiated as the "Avery bill" would be signed, politicians were distancing themselves from him. Addendum p. 5. After Avery's probable cause hearing, MAM shows Ms. Halbach's brother remarking in an apparent statement to press that he "doesn't believe" Avery's attempt to point blame at the "Manitowoc County police," followed by additional montage-style footage of news reports and other material. A sad conversation between Avery's parents and Avery in jail is shown in which Avery says that he's ready to give up, as well as a segment that includes Avery's family members reading angry letters from community members, followed by footage of a jail visit by Avery's relatives. *Id.* Avery's father is heard thereafter saying, "They don't care. They'll take an innocent man and make him guilty . . . . we went through this 20 years ago and we're going through it now again." *Id.*

12

The episode then features a number of unidentified individuals, about whom Chrome and Netflix acknowledged they know essentially nothing other than that they were playing pool with Avery's brother, Chuck, in a bar. Dkt #287 at Proposed Fact #60. The substance of their comments is as follows.

| | | |
|---|---|---|
| Dkt # 120-3 14:14-14:42 | Unidentified woman in a bar states, "I really do think he was framed. . . .There's a lot that points to where the Sheriff's Department could've had something to do with it. And then I don't know if it's true or not, but I also heard that Manitowoc County was not supposed to be allowed in to search, and they were in there and they searched. And that's who found the key apparently after the third day was the Manitowoc County Sheriff's Department. . . " | Bar patron statement follows visuals of Mr. Colborn |
| Dkt# 120-3 14:43-15:05 | Male bar patron adds, "I only have one word, from the cops on up: corruption. I mean, big time. I mean, if people dig far enough, they'll see that." | |

| | |
|---|---|
| Dkt # 120-3 15:06 -15:36 | Unidentified female bar patron continues, "I don't care what anybody says, that's a lot of money to pay out from here in Manitowoc County. It's a small area and I really, truly believe the county didn't have the funds to pay it out . . . .And they can say, "'Oh, you really believe the Manitowoc County police department and the FBI and everybody came in and they set all this up just to have Steven Avery guilty of this thing? Yes, I do. . . .'" |

Addendum, pp. 5-6. Netflix representatives encouraged Chrome to maintain the bar patrons' comments in the series. Barker Decl., Ex. 1 (NFXCOL ##1953, 2050, 300); CAPFF #12.

13

The series then reveals Avery's settlement of his civil suit for $400,000, of which Avery is described as receiving $240,000, while his attorneys receive $160,000. Addendum, p. 6. In a telephone call with his sister, Avery is heard explaining that he "had to do it" in order to obtain funds to pay a private lawyer for the Halbach defense. *Id.* He adds, "This way, they figure they just got away with it, they can do it again . . . . You know it ain't gonna stop 'em." Dkt #120-3, 16:45-16:55; Addendum p. 6. In a telephone call from Glynn to Avery, Glynn introduces viewers to Avery's new private attorneys, Dean Strang and Jerry Buting. . *Id.* Glynn praises them and states that the "Manitowoc cops" respect Strang and that Buting has handled cases involving high notoriety. . *Id.* Buting and Strang are then shown on the salvage yard investigating the scene, followed by the following comments:

| Dkt# 120-3<br>20:21 – 21:03 | Strang says in an apparent MAM interview, "I didn't see them plant evidence with my own two eyes. I didn't see it. But do I understand how human beings might be tempted to plant evidence under the circumstances in which the Manitowoc County Sheriff's Department found itself after Steven's exoneration of the lawsuit, of the Avery Commission, of the governor hugging Steven and holding him up as an example of the criminal justice system gone wrong . . . . I don't have any difficulty understanding those human emotions at all." |
|---|---|

| Dkt # 120-3<br>21:16-21:49 | Buting, in an interview that was apparently also for MAM, states, "So, you've got motivation of the officers to want to get him. And then when lo and behold there's this woman who disappears and one of the last people she saw was Steven Avery. . . .`Now, we've got him. A-ha. We knew it.' They conclude that he's guilty, right off the bat. And they thought, `We're going to make sure he's convicted.'' And they helped it along by planting his blood in the RAV4 and by planting that key in his bedroom." |
|---|---|

Avery then says in a voiceover, "I got a better chance now. I got lawyers – the best ones in Wisconsin. Both of 'em. . . . . And there's so many ways they can go on this, to prove my innocence." Addendum, p. 7. Avery then goes on to identify law enforcement officers as

suspects in Halbach's murder: "I just hope the truth comes out, of who did this. And if it's the cops, I don't know if we'll ever know that or not. See, that's the only thing that scares me." *Id.*

████████████████████████████████████████████████████████████

████████████████████████████. CAPFF #13.

The Undersheriff is shown indicating that it is "far-fetched" and "impracticable" that the evidence could have been planted. Addendum, p. 7. MAM then cuts to a press conference announcing a confession by Brandon Dassey, Avery's nephew, that he participated in Avery's rape and murder of Halbach. *Id.* at pp. 7-8. The rest of Episode 3 focuses primarily on a sympathetic portrayal of Dassey, his mother, and Avery's girlfriend. *Id.*

**Episode 4**

Episode 4 initially continues with more about Dassey's confession. Dkt #120-4; Addendum p. 8. Avery's investigator also criticizes the number of searches of the Avery property during the investigation. *Id.* He says that as a result of the number of searches, "[t]he key was worthless." *Id.* He also claims that investigators' claim that the only DNA found on the Toyota key is "patently ridiculous" and indicates to him that the key was "scrubbed clean" and Avery's DNA was placed on it. *Id.*

Buting is shown criticizing the State's evidence. Attorney Buting, in an interview for MAM, states "Some would – might think, `Well, you know we – our hands were tied . . . .That you got a client who's saying that he's being framed. Publicly, that's kind of the defense you'd better go with . . . . But it really wasn't that way here. The defense was raised because we think the evidence pointed that way. . . ." Dkt # 120-4   32:41 – 33:04; Addendum p. 8.

After a segment about Avery's girlfriend and more about Dassey, Buting says in another MAM interview, "Sheriff Peterson . . . .clearly, clearly has a strong dislike for Avery.   If the very

15

top guy has this kind of attitude . . . that's gonna permeate the department, the whole department. If not, at least it's going to permeate the upper echelon that's close to him, and that would include the lieutenants and the sergeants." *Id.* at p. 9. At that point, a graph showing photographs of a Sheriff's Department hierarchy appears on screen. The photographs of two lieutenants and sergeants, including Mr. Colborn, are then suddenly illuminated during the words "lieutenants and sergeants." Dkt #120-4 1:00:25 – 1:00:47; Addendum p. 9. Buting then states that in their view, Manitowoc County Lt. James Lenk's name "just kept coming up, over and over and over, at critical moments." Dkt #120-4 1:00:25 – 1:00:47; Addendum p. 9. Buting says he did not believe that it was a coincidence that Lenk signed a form relating to the transmittal evidence for the prior rape case to the State. *Id.* Buting then tells Strang says in telephone call as they are examining a blood vial containing Avery's blood that because the tube contains a needle hole, this shows that "Some officer went into that file, opened it up, took a sample of Steve Avery's blood and planted it in the RAV4." Dkt #120-4, 1:03:00 - 1:04:15. He says, "Game on," to conclude the episode. *Id.*

**Episode 5**

Episode 5 opens with continued apparent reaction by Avery and Buting to the vial of evidence, as well as attempts by the state to respond to it. Dkt #120-5; Addendum p. 9. After excerpts of the State's opening statement at the criminal trial are shown, Avery is heard saying in an apparent telephone interview with MAM, "They wouldn't look at nobody else. They're paying all their attention to me. And they shouldn't be doing that. That's what they did before." *Id.* Again, Avery's words are shown in print on screen. Buting discusses the strategy for responding to the prosecution's opening, again in a private interview. Among other things, he states that, "If they would go to the length of planting the key, which I think the jury's going to get, then the blood follows easily." *Id.* at p. 10. MAM includes excerpts from Strang's opening,

including reference to Mr. Colborn's discussion with Avery during the missing persons phase of the investigation and Mr. Lenk's alleged offer to assist in the investigation. *Id.* Strang argues that whomever killed Theresa Halbach "exploited" the Sheriff's Department's tunnel vision in focusing on Avery. *Id.* MAM then shows an apparent excerpt of Avery being interrogated, played over eerie music. *Id.* Avery's nephew Bobby Dassey testifies contrary to Avery's timeline, among other testimony shown. *Id.* After testimony regarding the discovery of Halbach's vehicle on the Avery property, the following is shown:

| | |
|---|---|
| Dkt # 120-5 52:03- 52:12 | Buting states, "Somebody knew that [Ms. Halbach's vehicle]" was there before they ever went in there. I'm convinced of it." |
| Dkt # 120-5 52:13 – 53:20 | Interrogation of Avery regarding follows Buting's statement; Avery tells an officer that he was told by a woman identified only as "Tammy" that "a cop" put Ms. Halbach's vehicle on Avery's property "and planted evidence." |
| Dkt # 120-5 53:20-:24 | Immediately after the above, cuts to footage of Mr. Colborn about to testify |

After Avery's statements that he heard from someone else that "a cop" had "planted evidence" and put the RAV 4 on his property, MAM cuts directly to what is implied to be actual footage of Mr. Colborn's testimony at the trial. Addendum at p. 11. Strang plays a recording of Mr. Colborn's call asking a dispatcher to run Ms. Halbach's plate. Strang asks, "And then, you tell the dispatcher, 99 Toyota?" Mr. Colborn responds, "No, I thought she told me that." The call is replayed. In his actual testimony at trial, Mr. Colborn acknowledged that he made the statement to the dispatcher, conceding the mistake in his prior response. However, in MAM, Mr. Colborn appears to make no such correction; rather, the camera simply pans to him after Strang shuts off the audio of the call. *Id.* Netflix's creative team praised this point in the draft version of

the episode as making Mr. Colborn look "caught in a clear lie." Barker Decl., Ex. 1 (NFXCOL 2063); CAPFF #14.

Immediately following that edited footage, Strang is shown asking Mr. Colborn, "Were you looking at those plates when you called them in?" Mr. Colborn responds, "No." ██████ ████████████████████████████████████████████████████████ Barker Decl., Ex. 3.  In MAM, Mr. Colborn's response appears to be followed by a long pause, during which the camera first pans to Mr. Strang, standing at counsel table and appearing to glare at Mr. Colborn, then to Mr. Colborn, who appears to shift uncomfortably in his chair and then cracks his knuckles. *Id*████████████████████████████████████████

████████████████████████████. *Id.* ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████. *Id.*

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

████████████████████████████████ MAM shows Strang asking, "Do you have any recollection of making that call?" MAM substitutes a response that appears far more equivocal than his trial testimony. CAPFF #18. A portion of a different sentence in Mr. Colborn's testimony is inserted to start his response with the words, "I'm guessing 11/3/05. . ." *Id*. Strang is then shown asking Mr. Colborn, "Investigator Wiegert, did he give you that plate number before you called it in?" *Id.* Again, in MAM, Mr. Colborn seems far less certain than his response at trial, appearing to respond, "No, I just don't recall the exact content of our conversation back then, but he had to have given it to me, as I wouldn't have had the number any other way." *Id.*

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

    In MAM, Strang next asks, "Well, you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota." CAPFF #21.  In the Halbach trial, Mr. Colborn did not respond to that question, because the judge sustained an objection to it. *Id.* However, in MAM, Mr. Colborn instead appears to damagingly admit, "Yes." *Id.* Strang then says, "But there is no way that you should have been looking at Teresa Halbach's license plate on November 3, 2005." Mr. Colborn

responds, "I shouldn't have been and I was not looking at the license plate." Strang states, "Because you're aware now that the first time that the license plate was reported found was two days later . . . ." At this point, eerie music that had been pulsing and swelling during Mr. Colborn's testimony is punctuated by spooky chime tones. *Id*. Mr. Colborn responds, "Yes sir," followed by an immediate cut to the MAM theme music. *Id.*

Netflix refers to this segment in its production notes as the "Colborn license plates bomb" and celebrated it as a perfect "cliffhanger" and as a "[s]ensational and strong end" the episode. Barker Decl., Ex. 1 (NFXCOL 229, 278, 2150); CAPFF #22. In the series notes shared with Chrome, Netflix creative team members likewise chortled that because of the edits made since the prior version, "setting up Colborn as the potential cop to plant the car really works well now." *Id., Barker Decl., Ex. 1, NFXCOL 278, 2150; CAPFF #22.

**Episode 6**

After excerpts of other testimony from the Avery criminal trial are shown, interspersed with Avery's attorneys' criticism, Avery is heard in voiceover saying, "The evidence don't make no sense . . . .. and how do you prove the Sheriff's Department's doing something?" Addendum, pp. 12-13. His comments are again shown in text on the screen. *Id.* As ominous music plays, Buting, in an interview with MAM, states, "One of the things that the state argued was that it would have taken a wide-ranging conspiracy . . . . Really, two people could have done this easily enough if they had the motive to do it. Maybe one even. And the whole argument why would they risk doing this and risk getting caught. You have to understand, they probably would have no fear of ever being caught doing this. You know, who better than a police officer would know how to frame somebody?" Dkt# 120-6, 56:26 – 57:11l; Addendum p. 13. James Lenk is then shown being sworn in to testify, and the episode ends over the series' theme music. Addendum p. 13.

**Episode 7**

Calumet County Sheriff Pagel is shown at a press conference stating that the Manitowoc County Sheriff's Department was only to provide support and equipment. Addendum p. 13. Avery's father says, "They had Steve picked . . . right away. They set him up. Right from the beginning. . . .They didn't find nothing down at his trial for three or four days, then all the sudden . . . oh, we found this, and we found that. And then the Manitowoc cops found they key! They weren't supposed to be investigating this at all. Right?" Dkt ## 120-7 1:04 – 1:10; Addendum p. 13.

Footage is shown of the search. Calumet County Sgt. Tyson testifies that he was told that no Manitowoc County officer was to be alone on the property and that if they were to locate evidence, it was to be turned over to Manitowoc County. Addendum p. 13. Buting asks Tyson whether he ever had to "act like a babysitter" while other officers were conducting a search. He is shown as responding, "No." In the trial transcript, he denies that he felt like a babysitter. CPAFF #23. A discussion between Buting and Strang out of court follows:

> Buting: "It's not enough to just get the key. He wants Avery's DNA on that. And so he is gonna wait until it is the right time. And there is a Calumet County deputy with him on all of their searches.
>
> Strang: Yep. There is . . . .
>
> Buting: Somewhere nearby, and he was just waiting for the right time . . . when he could do it.
>
> Strang: That key does not fall from, you know, in between the backboard and the frame of that little bookcase.
> . . . .
> Buting: And if we get them thinking, look, if the guy's capable of planting a key, who's to say he's not capable of planting blood?
>
> Strang: Blood's easy. . . .

Buting: The bottom line is, they knew their boss had just recused the department and turned over lead authority in this investigation . . . because of that lawsuit. They were deposed in the lawsuit. They didn't tell. . . ."

Addendum pp. 13-14.

Strang then cross-examines Mr. Lenk and asks if it would have been fairer if he had disclosed that he had been deposed in Avery's lawsuit before he joined the search on Avery's property. Netflix representatives proposed cuts to Lenk's testimony as shown in MAM because it never really delivered "enough of a silver bullet" to support a direct claim that Lenk planted evidence. CPAFF #24. They also noted that "Buting's claim that [Lenk] put the DNA on the key is really weak." *Id.* at NFXCOL 2078; CAPFF #24. In addition, Netflix representatives noted that it could have been a "simple oversight" that Lenk didn't sign in at one point during the search of the Avery property, but recommended that a "timeline" be added to ensure that the segment didn't appear to viewers to be "speculative and grasping for conspiracy." *Id.* at NFXCOL 288; CAPFF #24.

After Mr. Lenk's testimony, images of Avery's mother cooking in her kitchen are shown as Avery states, "I'm in the same situation that I was before. Just a couple of them wanting to nail me. And the other ones didn't. But nobody speaks up. I gotta go through this over and over." Dkt # 120-7, 14:48 – 15:15; Addendum p. 14. MAM displays an image of Mr. Colborn, as audio of Avery continues; video then switches between images of Mr. Colborn waiting to testify, Avery looking sad, and Mr. Colborn in court. Dkt #120-7 15:15 – 20:32.; Addendum p. 14. (Netflix advised Chrome during production to avoid using images of Avery in court that made him look "smug." Barker Decl., Ex. 1 (NFXCOL 1974); CAPFF #25 ████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████

Mr. Colborn is shown testifying after Avery's comments. Spooky music plays while Mr. Colborn is asked to describe the call that he received while he was working in the Manitowoc County jail. Ken Kratz asks him, "Do you even know whether that call was about Steven Avery?" He responds, "No sir." Dkt #120-7, 24:24; CAPFF#26. Mr. Colborn's response that no names were given is omitted. *Id.*

In further questioning by Kratz, MAM eliminates Mr. Colborn's emphatic denial that he ever planted any evidence against Mr. Avery, which was "That's ridiculous, no I have not." Dkt #120-7, 24:24. It instead substitutes his answer to a different question, "Have you ever planted any evidence against anybody in the course of your law enforcement career," to which Mr. Colborn responded, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not." CAPFF #27.

Strang then cross-examines Mr. Colborn. Dkt #120-7; Addendum p. 14. MAM cuts to an Avery investigator speaking in an interview. He criticizes Manitowoc County officers as having a conflict of interest, which he says brings into question their "actions and credibility" throughout the case. Addendum p. 14. Mr. Colborn is then shown acknowledging that he was with Lt. Lenk while searching the Avery property. He is asked about police reports. He asks Mr. Colborn, "Your total contribution is a little less than half a page?" *Id.* Mr. Colborn appears to respond yes to this question, but in fact, MAM edits out from this exchange discussion of a second report written by Mr. Colborn. CAPFF #28. MAM then appears to show the following exchange between the prosecutor and Mr. Colborn:

> Mr. Kratz: As you look back, back in 1994 or '95, if you would have written a report, what would it have been about?
>
> Mr. Colborn: That is why I didn't do one. I don't know what it would have been about, that I received a call and transferred it to the Detective Division. If I wrote

a report about every call that came in, I would spend my whole day writing reports.

CAPFF #29. MAM includes the exchange but omits the words, "that I received a call and transferred it to the Detective Division." *Id.*

Strang concludes his cross-examination, saying, "That's all I have." CAPFF #30. ████ ██████████████████████████████████████████████ ████████████████████████████████████████ in MAM, Mr. Colborn is shown sitting on the stand for several seconds looking deflated while ominous, pounding music plays in the background. *Id.* MAM next shows excerpts from a news conference footage of exchange with reporter in which she questions Strang about whether the defense went too far by accusing Mr. Colborn of being a "bad cop," which includes the following:

> Strang:  This was a hard day, and there've been some hard days for Sgt. Colborn. . . ."

> Reporter:  "But my question is though, if you were going to put somebody on the stand and accuse that person of a conspiracy, Mr. Kratz kind of made it sound like you should be able to offer some proof that this planting actually took place."

> Strang:  You're hearing evidence of the conspiracy.  And I've sat in many a federal courtroom and heard federal prosecutors prove a conspiracy on less than we've heard already hear and that you will hear by the end of this trial."

Addendum p. 14. Buting says off camera, "The way the case is coming in at this point is much better for the defense than I would have thought, much better. Every single day, we're reminding them of Manitowoc County's bias in the investigation." Addendum p. 15.

Shortly thereafter in the episode, Buting is shown examining a clerk who testifies that it is "not unusual" for officers to be in the clerk's office and that the security bailiffs would have "master keys" that would enable them to access any room in the courthouse even when the clerk's office is closed. Addendum p. 15.

Audio of a telephone conversation between Avery and his mother follows:

24

Avery's mother:  It seems suspicious.

Avery:  Yeah.

Avery's mother: Them people ain't gonna get away with everything.

*Id.* After more of Buting's and Avery's comments about the blood vial, Buting is shown stating, "Look how quickly they got the FBI to retool their instruments . . . . It shows the imbalance between the individual and the power of the government. The full force of which they're trying to bring to bear on this man.  Why? . . . Because we have accused – and the evidence suspiciously points to – framing by one of them. . . . . Again, it's not like they think they're framing an innocent man.  But they are." *Id.,* Dkt #120-7, 45:35 – 46:54. During production, Netflix commented to Chrome that it was "unlikely" that FBI representatives would "aid and abet" Manitowoc County as part of a conspiracy to frame Avery unless the department had a "deep history" with the agency. CAPFF #31.

In episodes 8 through 10, MAM includes essentially extended reactions to the guilty verdict returned against Avery for Halbach's murder and the verdict returned against Dassey, including the points described below. ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████

Episode 8 (Dkt. #120-8)

● Eerie, foreboding music plays as the Averys and their lawyers in the courtroom (25:50-26:00).
● Avery is shown shaking head as the verdict is read (26:50-27:30).
● There is a long take on Avery, with sad music playing in the background, and shots of his mother looking upset (27:30-27:50).
● In footage of press conferences, first brief remarks by Kratz are shown, then comments are made by Strang and Buting are shown going to the podium. Strang says that the verdicts are clearly inconsistent. He says, "Our criminal justice system failed [Avery] before and I fear this is another example." He adds that it's "sad" that as a society, "we haven't mastered justice any better than we have." (29:35-31:55).
● A reporter asks, "So do you think there's a killer out there who has not been caught?" (31:56-32:08).
● Buting replies, "Absolutely. That's been our position all along." (31:56-32:08).

25

● Avery's father is shown saying, "They got their way, period. Manitowoc County won again." (33:24-33:31).
● Shortly thereafter in the episode, MAM features an interview with an excused juror that says that he felt that there were "biased jurors" who had their minds made up. He said that other jurors were "weak and tired" and that, as a result, the verdict "may have been a compromise." The excused juror states that there are, in fact, "a lot of unanswered questions," adding "I believe we don't know for sure. . . . .who killed Teresa . . . ." (35:40-36:35).
● Following the interview with the excused juror, MAM includes footage from an interview with Avery's investigator in which he accuses the prosecutor of acting "unprofessionally" and states angrily, "This wasn't seeking a truth, this was seeking a conviction." (37:00-37:50).
● Kim Ducat, Avery's cousin, is then shown stating that the conviction proves that "they" were "hellbent" on "nailing" Avery (37:50-38:10).

Episode 9 (Dkt. #120-9)

● Strang directly criticizes the Dassey verdict and says he does not believe that Dassey committed the offenses for which he was convicted (56:45-57:50).
● Avery's mother states, "I love [you] guys and I know you're innocent." (57:50-58:00).
● Clips are shown from the Avery sentencing hearing, at which he denies killing Teresa Halbach and states that he will prove his innocence (1:00:05-1:01:00).
● Strang is shown stating to the camera, "Most of what ails our criminal justice system lie in unwarranted certitude on the part of police officers and prosecutors and defense lawyers and judges and jurors that they're getting it right." (1:03:11-1:03:30).
● Buting is shown stating to the camera, "We can never be guaranteed that no one's ever going to accuse us of committing a crime. And if that happens, then you know, good luck, in this criminal justice system." (1:03:49-1:04:06).

Episode 10 (Dkt. #120-10)

● A reporter for a local radio station is interviewed noting that everyone was convinced that Avery was guilty of rape until evidence proved otherwise and that now, with the Halbach case, investigative techniques are better and that in the community, the feeling is that Avery "got what he deserved." (2:40-3:20)
● Allan Avery is shown stating, "They ruined us. They ruined our business." (3:54-4:00)
● Avery says, "I gotta prove my innocence again. Just like my first case." (5:06-5:30)
● Post-conviction, most hearing footage is shown with a voiceover of Avery stating, "The appellate attorneys – they gotta find a loophole that what they did, it's not legal." (6:23-6:37)
●Allan Avery states that Avery's mother has "a lot of hope for a new trial" as a result of Avery's appeal. (7:13-7:20).
● Avery's girlfriend states in an interview with MAM that she "truly did not believe" that Avery was guilty. (8:25-8:40)
● Dassey's mother (Avery's sister) is shown stating in 2010, "If Steven would have done it, I think he would have confessed by now. And he hasn't confessed. I believe he's innocent." (10:40-10:55).

● Printed words on screen state, "In August 2011, the Wisconsin Court of Appeals upholds Judge Willis' decision denying Steven a new trial." Immediately following that statement, Avery states, "I always feel like they kicked me in the gut again . . . ." (39:36-39:45)

● Printed words state, "Four months later, in December 2011, the Wisconsin Supreme Court refuses to hear Steven's case." Immediately after, Avery states, "They shoulda did something. They shoulda heard it. Because the case doesn't make no sense. You always get let down by the court system." (39:57-40:13)

● Printed words on the screen state, "At the filmmaker's request, Steven's former lawyers meet to discuss Steven's remaining legal options." Those present are shown as including Glynn, now identified as part of the post-conviction team; Strang; and Buting. During the meeting, Buting states, "I've still got my suspicions about whether something improper occurred during the deliberations." (41:14-42:35).

● MAM next cuts to an interview with the excused juror, who states, "I feel terrible that Teresa's gone . . . but I also on the other hand feel bad because Steven and Brendan's life has been taken from them, basically . . . . deep in my heart, with all the evidence and all of the things that I know . . . whoever did this to Teresa is still out there." (43:39-45:01)

● Avery's mother is shown stating, "I'm stickin' by Steven." She is also shown displaying a home listing for a house that she has "picked" for Avery "when he gets out so that he has got a good place to live. After being in prison for something he don't even do." (45:48-46:21)

● Avery is next heard stating, "I'm trying to fight for a new trial." (46:40-46:50)

● The broadcast features Avery's *pro se* post-conviction motion. (46:32-49:08)

● Following sentimental footage of Avery's parents, Kim Ducat, Avery's cousin, is shown stating, "I hope when the day comes when he's freed, his name is finally cleared, that his parents are still there . . ." (58:25-58:45)

● Buting is shown stating, ". . . . This may take a while to right this wrong. It took 18 years last time. I certainly hope that it doesn't take another 18 years." (1:00:00-1:00:14)

● Avery states, "I want my life. But they keep on taking it . .

Addendum pp. 16-17.

## Additional Netflix and Chrome Creative Team Communications



Netflix advised Chrome that Netflix was looking for the series to leave viewers feeling

"terrified and enraged, to feel as though it's their responsibility and need to discuss this case, to

raise it in the social consciousness and to drive awareness . . . . Leave the audience feeling angry!" Barker Decl., Ex. 1 (NFX COL 1964, 2125); CAPFF #6. They further directed, "Our audience needs to be left not only feeling extremely upset and saddened for Steven and Brendan but also incredibly angry." *Id*. "We want to feel the swells of hope, the range of injustice, the horror of the defenseless," Netflix continued. "Viewers across the globe should be in tears and shouting at their screens throughout." *Id.,* Ex. 1 (NFXCOL #1977).

Netflix directed Chrome to "ratche[t] up" the episode in which the guilty verdict against Avery is returned, stating, "Currently the beat emits anger and we feeling justice was done, but given the overall investment made in watching 8 hours thus far, the audience should be feeling more intense anger, sadness, bewilderment, and perhaps even fury at this jury decision." *Id*., Ex. 1 (NFXCOL 2163-64, 2186-87) In order to help infuriate viewers, Netflix encouraged Chrome to look for footage of Avery and his family looking disappointed and footage of law enforcement officers, including Mr. Colborn, "showing satisfaction." *Id.;* CAPFF #6.

To avoid viewers losing interest through the actual details of the Halbach trial or the Avery civil suit, Netflix repeatedly directed Chrome to edit, cut and tighten scenes, especially those involving courtroom testimony, to tell a clearer "story" and to avoid the potential for "a really dry episode." Barker Decl., Ex. 1 (NFXCOL 224-25, 212, 1949, 1959, 1996, 2131, 2062, 2076, 2078, 2083; CAPFF #33. Netflix also advised that Chrome should look for ways to use the series to "allude to" planting of evidence by officers during their visits to the property. Barker Decl., Ex.1 (NFXCOL 202, 1940); CAPFF #33. They also complained about commentary by Buting in a draft version of MAM that "actually detracts" from the argument that "Lenk/Colborn" could have "planted" Ms. Halbach's vehicle key. *Id*., Ex. 1 at NFXCOL 2078; CAPFF #33.

Netflix encouraged Chrome to look for opportunities in MAM to include music that would help identify the "baddies" – i.e., law enforcement representatives, Barker Decl., Ex. 1 (NFXCOL 1953; see also 2009-2010, 243, 2174), CAPFF #34 ███████████████████ ████████████████████████████████████████████████████ see also NFXCOL 2133 (identifying law enforcement character as a "key villain" in the series); NFXCOL 241-43, 339, 296 (music was to "really up the stakes"); CAPFF #34 ████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

Netflix representatives' notes demonstrate that they were brainstorming with Chrome to determine whom should be portrayed as the "mastermind" of the alleged law enforcement conspiracy and that they approved using Avery's lawyers' analysis of law enforcement officers' alleged motive and content. Barker Decl., Ex. 1, (NFXCOL 2134); CAPFF #36. ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████

Netflix also looked for ways to draw attention to Plaintiff's appearances in footage throughout the series, in order to enhance the "shock" for the audience of seeing him performing his duties because according to MAM's storyline, he was "always a suspect" in alleged "tampering with evidence." Barker Decl., Ex. 1 (NFXCOL 245, 2039, 2043, 2167, 2174, 2089); CAPFF #40. Netflix lauded Chrome's use of "danger" music to accompany images of Mr. Colborn in the series. *Id.*, Ex.1 (NFXCOL 287). CAPFF #40.

During the course of production, Netflix notes recognize that its creative team was well aware that out-of-court statements by Avery's attorneys in MAM were "directly claiming that [law enforcement officers] framed Steven" or that law enforcement officers went so far as to Halbach in order to frame Avery. Barker Decl., Ex. 1 (NFXCOL 2071, 2079; NFXCOL 294-95); CAPFF #41. However, Netflix team members confided to one another that despite these concerns, they were reluctant to confuse Chrome because asking to dial these references back would be "contrary to the direction" Netflix had been pushing them. Id. at NFXCOL 294-95. Their exchange, in pertinent part, was as follows:

Adam Del Deo:

. . . .

In this sequence, it feels like Jerry Buting, on an almost definitive basis, is accusing the officers. Although I think the officers have the strongest motive, I think Jerry's statement come across at [sic] fact . . .they thought, for sure, we're going to make sure he's convicted." It may be worth soften his statement so it doesn't come across so subjective.

Benjamin Cotner:

I will do a last pass and draft an email for you, Lisa, to review and send in the morning.

Adam, I am kind of worried that this note goes contrary to the direction we've been pushing them in. I've been under the impression that we are desperate to say that someone else could have done it. I'm afraid that if we tell them to soften something it is going to really confuse the filmmakers . . . . I don't think that subjective is necessarily bad, but if it is complete unfounded then you might be right. Let me know what you think . . . .

Adam del Deo:

I hear you. Let me try to clarify.

I think the statement as Jerry currently communicates it comes across, to me, as a matter of fact that the officers did it (as oppose to highly likely they did it). In other words, I think if Jerry's statement involving the officers can come across as a highly possible/very likely scenario (since the officers had a very strong motive to kill Steven) it would be convincing that someone else, most likely one of/some of the officers, were involved.

I think we're saying the same thing. However, I just wanted to make sure Jerry isn't saying the officers killed as a matter of pure fact since there's no physical evidence to really prove the officers were there, rather just very strong motive. Take a look at Jerry's statement again and see if you agree. If not, leave the way it is.

30

Benjamin Cotner:

I think its a really valid point but I would rather leave it in for now – it is something we can always pull out later, but I am so happy that they finally have a point of view. I hope people know it is just a theory . . . .

CAPFF #41.



A preliminary decision by Judge Willis at Avery's trial permitted his attorneys to introduce evidence of framing despite its low probative value, in deference to the constitutional rights afforded a criminal defendant.  Riccardi Decl., Ex. 43. Excerpts from the hearing are included in MAM.  In describing Avery's attorneys' arguments, the judge noted the highly unlikely nature of the basis for the defense in a written decision:

> [as] pointed out by the State at oral argument: How could Lenk or Colborn have known that Teresa Halbach was dead at the time they are alleged to have planted the defendant's blood in her vehicle? Under the defendant's theory, either Lenk, Colborn, or both would have had to have formulated a plan involving their own commission of serious felonies and executed that plan within a very short period of time, motivated apparently only by their embarrassment for not allegedly having acted more responsibly on information that could have led to Mr. Avery's exoneration back in 1995 or 1996.

 MAM does not incorporate this portion of the judge's decision nor explain that Avery was permitted to introduce the defense because of the very "low bar" that the constitution requires be set for criminal defendants. *Id.*

Nor does MAM acknowledge that in opening and closing arguments to the jury, Avery's attorneys conspicuously avoided statements that made positive accusations of planting evidence. In fact, they carefully limited their argument to an effort to persuade the jury that the fact that if

they believed that any officer may have planted evidence, that meant they also had to find that there was reasonable doubt as to Avery's guilt and return a not-guilty verdict. CAPFF #44. There is no evidence that the court record in Mr. Colborn's civil suit made any mention whatsoever of Mr. Colborn. CPAFF #45.

**Missing Documents and Video**

Defendants universally claimed that none of them any longer has any of the several cuts of each episode that Chrome shared with Netflix for purposes of the notes and comments that they produced. In their declarations, Laura Ricciardi (Decl. ¶44) and Moira Demos (Decl. ¶45) state that they received many messages, both positive and negative after the series was released. Plaintiff requested copies of all relevant messages in multiple discovery requests (Bursik Decl. Ex. 1 requests 1 – 9), but the defendants maintain that they reviewed text messages and none were relevant (Bursik Decl. Ex. 2 p. 4). Defendants have produced no text messages whatsoever while produced over 6600. (Bursik Decl. Ex. 3 p. 2).

After MaM was released on December 18, 2015, Defendants produced a total of 5 emails, and ironically the only message of a positive or negative nature regarding the series was the one sent by Michael Griesbach Dkt. # 290-34. (Dkt. 316 Bursik Decl ¶ 5) Defendants also declined to provide or confirm what search terms were used (Bursik Decl. Ex. 2). It is hard to conceive that after the hundreds of daily phone calls the sheriff's department was receiving after MAM was released (Andrew Colborn Decl. Ex. 2 p. 115/142 – Manitowoc 018111)and all the harassment Colborn received, Defendants claim they did not receive one email or text message mentioning Mr. Colborn or James Lenk. Defendants claim the only relevant message was the one from Griesbach Dkt. 290-34. Defendants also produced no communications that were strictly between Defendants Moira Demos and Laura Ricciardi. It is difficult to believe that they

did not email or text one another about the project during the more than 10 years that they claim that they worked on the series together.

Further discovery motions appear to be pointless as Defendants steadfastly insist that they have produced all responsive materials.

**MAM's Accusations as Understood By Viewers**

Unsurprisingly, viewers' reactions to MAM, both online and in angry verbal attacks directed at Mr. Colborn, reflect that they understood MAM as irrefutably establishing that Mr. Colborn was a central figure in a law enforcement conspiracy to plant evidence and frame Steven Avery for Ms. Halbach's murder. The following represent a sampling of messages received by Mr. Colborn following the release of MAM:

> . . . I'm just calling in regards to the documentary that I just finished watching it and it appears pretty clearly that you were obviously involved beyond a detective role. . .

Dkt #130, Colborn Decl., Ex. 1, 1-7-16 4:04 PM

> Hi Detective Colborn, I'm calling about the Steven Avery case – I wanted to know if you planted evidence with Detective Lenk. It sure seems like that from the documentary. . . . I think you definitely planted evidence . . . .

Colborn Decl., Ex. 1, 1-20-16 1:16 PM

> Hi.  This is regarding the Steven Avery case . . . . You know what you have done. This is completely unprofessional. . . . . You framed him and I don't care if the documentary was one-sided.  You know what you did . . . . You are going to hell. . . .

Colborn Decl., Ex. 1, 1-21-16 10:54 AM

Some callers' messages make it apparent that they formed the belief, based on the edited versions of testimony presented in MAM, that Mr. Colborn had been "caught" in lies under oath:

> . . . . This man was innocent. . . .The Sheriff Sergeant Colborn and Lieutenant Lenk, they were caught in lies under oath . . . . Shame on those corrupt cops . . . .

33

Colborn Decl., Ex. 1, 1-21-16 11:26 AM

> Detective Colborn should be out of a job. Steven Avery and Brendan Dassey are both innocent. . . . You lied under oath multiple times along with all of your other fellow employees. I'm disgusted by the Sheriff's Department completely and fully. . . . I hope you know that everyone knows that you're a **** liar.

Colborn Decl., Ex. 1, 1-14-16 2:16 PM

> . . . I've been calling numerous times and been getting no answer . . . . only awful disgusting human beings would do such a thing to innocent people, not only once, but twice, Colborn. The whole world has observed your lies . . . . I hope you're harassed . . . until the day you die. . . . . I hope that your wife is the next victim. . .

Colborn Decl., Ex. 1, 1-21-16 11:14 AM

> . . . You lied . . . You are a horrible disgusting person for . . . planting evidence in the Steven Avery case . . .

Colborn Decl., Ex. 1, 1-7-16 4:27 PM

> Hi Detective Colborn. I just watched Making a Murder and you are soooo guilty. You were at the . . . you were at the the lot . . . the Avery yard, and you saw the car before, um and you're in it with Lenk. You guys are so shady and corrupt. . . .

Colborn, Ex 1, 1/26/16 to 1/27/16, 3:42 PM

> Yeah, I believe that Lt. Andrew Colborn needs to be investigated for his involvement and manipulating a crime scene and um ah his involvement and I, I think he should probably be in prison right now um for his ah for his behavior because he's obviously perverted justice and manipulated evidence and he has lied under oath, he's perjured himself. And, um everyone knows that man drove Teresa Halbach's car and placed it on Steven Avery's property and um, that man deserves justice and Andrew Colborn needs to be held accountable for his criminal behavior. Thank you.

Colborn, Ex. 1, 2/8/16 to 2/14/15 11:09 PM

> My theory is that ah, [*laughter*] in the ah, Colborn was a dimwitted corrections officer who felt like a loser and committed a crime in order to advance his career and he's a corrupt public servant. . . . it is quite obvious that he is not just a crooked cop but he's a liar. **Um and he's got some some sick perversions and when you watched him in that documentary you could just see his eyes twitching. Um, and ah, he just looks like he is guilty of something.** And probably of ah, corroborating ah, him and James Lenk, framing Steve Avery for Theresa Halbach's murder. It's just a disgusting thing . . . .

34

Colborn, Ex. 1, 2/8/16 to 2/14/15 12:46 AM (emphasis added)

> Hey Andy . . . . You're probably out planting evidence on somebody right now, but um I just want to let you know that **I saw your appearance on the television program and I really couldn't believe how scared you were in that one scene. I just wanted to talk to you about it, when you were upon the stand. Um, I actually thought you were going to wet your pants you were so scared**. . . . .

Colborn, Ex. 1, 2/15/16 to 2/19/16 2:13 PM (emphasis added)

> . . . . I can't even sleep watching this show . . . . you're disgusting. **I can see it in your eyes on every interview**. . . .

Colborn, Ex. 1, 11/16/16 at 3:31 AM (emphasis added)

Other callers' messages referenced and blended the themes presented in MAM, including MAM's repeated assertion that Mr. Colborn had a grudge against Avery because Mr. Colborn allegedly "hid" the 1995 jail call, as well as MAM's conspicuous omission of information that Mr. Colborn's presence at the scene in which the key was discovered was by request and was consistent with his background as an evidence technician:

> . . . . Hello, so, I'm from Canada, and I've watched the Netflix series, called Making a Murderer. . . . Every viewer knows your mistake. So why did you volunteer exactly to view the case when you had problems with this individual in in the past, with the last case? Is it possible that you were trying to take revenge back on this person? Because the Calumet County Department could have clearly taken over this case. Because it is quite obvious that you guys are quite mad with the fact that you caught the wrong guy ruining your reputation as a police officer. . . .

Colborn Decl., Ex. 1, 1-21-16 11:19 AM

> . . . . My biggest question to you, sir, is why were you on the scene when the key was found? . . . That scene was searched seven times before that key was found by other investigators not yourself. So, do you really believe that these other investigators were that incompetent, to find such an item in plain sight? . . . . .

Colborn Decl., Ex. 1, 1-15-16 to 1-18-16 4:35 PM

Likewise, MAM's truncated and altered presentation of Mr. Colborn's testimony regarding the call to dispatch left viewers questioning Mr. Colborn based on the series' failure to fairly convey to viewers Mr. Colborn's reasonable explanation that he received the license plate number from the officer who asked him to look for the vehicle:

> . . . Also when you called the dispatcher and asked her about that license and where it was registered to, where you were reading that license plate number from . . . I just don't understand how you would have that number and how you would know what the car was registered to . . . . .

Colborn Decl., Ex. 1, 1-15-16 to 1-18-16 4:35 PM

Other callers' messages showed that Avery's alleged innocence was linked in their minds with the conclusion that Mr. Colborn had planted evidence:

> Hi Sir. I was just wondering if you felt bad for sending an innocent man to prison and planting evidence. It's not good police work.

Colborn Decl., Ex. 1, 1-7-16 3:38 PM

> Why the **** did you frame Steven? You **** son of a *****. You're a sick, crooked, disgusting cop. . . . . You should be in prison, you son of a *****

Colborn Decl., Ex. 1, 1-3-16 12:03 PM

Others took to heart out-of-court accusations by Avery's defense attorneys and others that asserted that federal prosecutors had proven conspiracy cases on less evidence than the defense allegedly mounted against Mr. Colborn:

> Mr. Colborn, this is a concerned citizen of the state of California. I've seen the case with Steven Avery. . . everybody knows what is going on here with you guys setting up and framing this poor man Steven Avery . . . be ready to sit in federal prison for a long long time. I hope you rot in hell, you son of a ****

Colborn Decl., Ex. 1, 1-15-16 to 1-18-16 4:34 PM

> . . . Everybody knows you're **** guilty . . .

Colborn Decl., Ex. 1, 1-7-16 11:11 AM

36

Many other messages left for Mr. Colborn are simply strings of profanity or insults. Mr. Colborn received hundreds of similar calls. Countless online commenters and bloggers have likewise explained that, after viewing MAM, they are convinced that Avery was framed by law enforcement officers, including Mr. Colborn. *See, e.g.,* Dkt #132-7.

**MAM's Impact on Mr. Colborn**

Unsurprisingly given the public reaction to MAM, Mr. Colborn has suffered intense emotional distress and behavior changes since its release. To avoid repetition, these facts are described in Section IV of the brief.

**Procedural History**

After removing this case from Manitowoc County, Wisconsin, to federal court, Defendants filed motions to dismiss. Certain of the Defendants moved to dismiss the claims against them on the grounds that they had not been properly served with process. Defendant Netflix, Inc. ("Netflix") did not contest service, but filed a 12(b)(6) motion asserting that Mr. Colborn had not pleaded actual malice by Netflix. With his response to Netflix's motion, Mr. Colborn moved for leave to file a Second Amended Complaint. The Court held that the Second Amended Complaint survived Netflix's substantive challenges and granted Mr. Colborn leave to file it.

In response to the Second Amended Complaint, Netflix filed another motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), this time asserting that Mr. Colburn's claims should be dismissed because even assuming that the statements were made and that some of the statements are false, the statements are 1) "substantially true" 2) protected as expressions of opinions, 3) non-defamatory, or 4) non-actionable under the "subsidiary meaning" doctrine.

This Court denied the substantive motion except as to a negligence claim and denied Chrome's motion to dismiss.

Following discovery, Defendants moved for summary judgment. This brief is submitted in response to the motions.

## STANDARD ON SUMMARY JUDGMENT

On cross motions for summary judgment, the Court must consider each movant's motion affording the opposite party all reasonable inferences that may be drawn from the facts of record. *Hotel 71 Mezz Lender, LLC v. Nat'l Retirement Fund,* 778 F.3d 583, 603 (7th Cir. 2015)**.** Only facts that would be admissible in evidence at trial may be considered. If the Court concludes that there are disputes to be resolved by the trier of fact, the Court may deny either or both motions. *Id.*

## ARGUMENT

William Shakespeare wrote in "Othello" that "he that filches from me my good name . . . makes me poor indeed." For that reason, the law recognizes that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation.'" *Milkovich v. Lorrain Journal Co.,* 497 U.S. 1, 22 (1990) (quoting and citing *Rosenblatt v. Baer,* 383 U.S. 75 (1966)).

> The right of a man to protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent system of ordered liberty.

*Id.* (quoting Stewart, J.).

Considered in context and together with the audio and visual elements incorporated into it, as the law requires, MAM cannot be defended as "substantially true." Moreover, there is copious evidence that the series made false statements about Mr. Colborn by design, or at the

very least, with reckless disregard for their truth or falsity. Mr. Colborn's claim for intentional infliction of emotional distress likewise presents questions of fact for trial.[3]

## I.      A JURY COULD FIND THAT MAM IS NOT SUBSTANTIALLY TRUE AND THAT IT IS NOT A FAIR REPORT OF THE MAM TRIAL.

The defense of "substantial truth" can excuse "[s]light inaccuracies of expression" where a defamatory charge is "true in substance." *Prahl v. Brosamle, supra*, 98 Wis. 2d at 141, 295 N.W.2d at 776 (quoting 581A Restatement (2d) of Torts at 237 (1965)); *Maguire v. Journal Sentinel, Inc.,* 232 Wis. 2d 236, 247, 605 N.W.2d 881, 888 (Wis. Ct. App. 1999) (citing *Latham v. Journal Co.,* 30 Wis. 2d 146, 158, 140 N.W.2d 417, 423 (Wis. 1966)). However, a false statement that a person has been charged with (or committed) a crime "is not a slight inaccuracy," even if the "balance" of the publication is substantially true. *Prahl*, 98 Wis. 2d at 141, 295 N.W.2d at 776. The defense of substantial truth does not "sanitize" glaring falsehoods, even when they are presented in a "series of true or substantially true statements." *Id.*

In *Gerol v. Arena*, 377 N.W.2d 618, 620 (Wis. Ct. App. 1985)*,* the Wisconsin Supreme Court rejected an argument that statements were substantially true when a publication magnified evidence of a doctor's hospitalization for a drug overdose by referencing "hospitalizations in the plural" and described evidence of a possible suicide attempt in terms of "plural attempts." *Id.,* 377 N.W.2d at 620-21. The court held that a jury could find that those alterations were more defamatory to the plaintiff than the truth because they represented him "as chronically drug dependent and as mentally unstable." *Id.* Similarly, the Court held that references to the plaintiff as a "hired gun" in medical malpractice actions, when most of his work involved his own

---

[3] Plaintiff preserves for appeal the argument articulated in his prior brief (Dkt #79 at 14-16) in response to Netflix, Inc.'s initial motion to dismiss that the United States Supreme Court should reconsider the actual malice standard articulated in *New York Times v. Sullivan.*

patients, could support a conclusion by jurors that a person would interpret the content in a manner that was "substantially untrue." *Id.,* 377 N.W.2d at 621.

Other courts likewise refuse to protect as "substantial truth" statements that present facts in a way that is false, misleading, or augmented by the publisher. *See, e.g., Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 117-18 (Tex. Sup. Ct. 2000) (publisher may be liable for defamation where discrete facts that are literally or substantially true are published in such a way that they create a substantially false and defamatory impression by "omitting key facts" or juxtaposing facts in a misleading way); *Toney v. WCCO Television, Midwest Cable and Satellite, Inc.,* 85 F.3d 383, 387 (8th Cir. 1996) (defendant may be liable for omitting important facts or juxtaposing facts "so as to imply a defamatory connection").

A court cannot rule, as a matter of law, that statements are substantially true where they impute fraudulent or criminal intent to a person who has not been convicted of or even charged with a crime. *See Scripps NP Operating, LLC v. Carter, supra,* 573 S.W.3d at 794. In addition, even when describing a convicted criminal, a person cannot "hide behind the truth defense" to make a statement whose "gist" is that the convict actually committed the acts for which he was convicted. *See, e.g., Rivera v. Lake County,* 974 F. Supp.2d 1179, 1192 (N.D. Ill. 2013). Moreover, statements that contradict evidence as it was presented in a trial may render a report untrue if they "alter the underlying meaning of the reporting" about the trial. *See, e.g., Skakel v. Grace*, 5 F. Supp.3d 199, 208 (D. Conn. 2014).

The "fair report" privilege is an affirmative defense, as to which the defendant bears the burden of proof, may apply to the extent that a media defendant renders an accurate report of certain official proceedings. *See* David Elder, Defamation: A Lawyer's Guide §3:25. The "fair report" privilege is generally unavailable where reports of what occurs in courts are combined

with "defamatory observations of comments thereon." *Id.* Moreover, the privilege may be forfeited where the defendant expressly adopts or concurs in allegations of criminality or other immoral or unprofessional conduct. *Id.* The defendant's imprimatur for the accusations need not be expressly stated; it is enough that the defendant appears to give them an "air of authenticity" or "insinuates or implies" that the "plaintiff was guilty or culpable." *Id.* As a matter of black letter law, the privilege is unavailable where a report is made with actual malice, or where it is "inaccurate, incomplete, or unfair." 50 Am.Jur.2d Libel and Slander §300 (updated Feb. 2020); *see also Buckstaff v. Hicks*, 68 N.W. 403, 404 (Wis. Sup. Ct. 1896) (conditional or qualified communications such as "fair reports of proceedings of courts and legislatures" are subject to the "cardinal principle" that "they must be made in good faith."). Moreover, "excessive publication" that transmits statements "to the world" may result in loss of a conditional privilege. *Id.,* 68 N.W. at 405.

For many reasons, jurors may and should find that MAM is neither substantially true nor a fair report of the Avery criminal trial or the public record of the civil suit. MAM relies heavily on numerous elements that were not presented at the Halbach trial (nor in Avery's civil case) and further distorts segments of the Halbach trial in ways that misrepresent what occurred. Among other things, MAM includes:

- Heavily edited versions of plaintiff's testimony;

- Changed apparent physical reactions by Mr. Colborn;

- Avery's direct accusations against law enforcement officers, when he did not testify at trial;

- Statements by Avery friends, attorneys, and family, all outside of any court proceedings, that accuse law enforcement officers, including Mr. Colborn, of planting evidence against Avery; and

41

- Juxtapositions of audio and visual elements by MAM that directly identify Mr. Colborn as the subject of others' accusations.

### A. MAM Altered Mr. Colborn's Prior Testimony To Make the Substance and Appearance of His Testimony Appear Less Credible

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ The seminal case involving alteration of quoted material is

*Masson v. New Yorker Magazine, Inc*., 501 U.S. 496 (1991). In *Masson*, a psychologist claimed

that a journalist defamed him by fabricating, altering and misquoting statements that were

attributed to him. The district court granted summary judgment on the grounds that actual malice

could not be established, and the Court of Appeals affirmed.

Reversing, the United States Supreme Court explained that the statements were false if

the published statements materially differed in meaning from the statements that the speaker

actually made. 501 U.S. at 517. The court further clarified that a statement is "false" if it "would

have a different effect on the mind of the reader from that which the pleaded truth would have

produced." *Id.* (quotation and citation omitted). The Court noted that "[i]n general, quotation

marks around a passage indicate to the reader that the passage reproduces the speaker's words

verbatim. They inform the reader that he or she is reading the statement of the speaker, not a

paraphrase or other indirect interpretation by an author." 501 U.S. at 511.

The Supreme Court further explained that when words in a purported direct quotation are

fabricated or altered, a plaintiff's reputation may be injured *either* through the fact of the false

statement *or* through the manner of the false expression. *Id.*

A fabricated quotation may injure reputation in at least two senses, either giving

rise to a conceivable claim of defamation. First, the quotation might injure because

*it attributes an untrue factual assertion to the speaker.* An example would be a fabricated quotation of a public official admitting that he had been convicted of a serious crime when in fact he had not.

Second, r*egardless of the truth or falsity of the factual matters asserted within the quoted statement,* the attribution may result in injury to reputation because *the manner of expression* or even the fact that the statement was made indicates *a negative personal trait* or an attitude the speaker does not hold. . . . .

*Id.* (emphasis added). A fabricated quotation may "carry more force than criticism by another," because it is "against self-interest to admit one's own criminal liability, arrogance, or lack of integrity, and so all the more easy to credit" when allegedly conceded in what appear to be the speaker's own words. *Id.* at 512. For those reasons, "quotations may be a devastating instrument for conveying false meaning." *Id.* at 517.

Analyzing the statements identified by the plaintiff in *Masson,* the Supreme Court noted that it could rule in the Defendants' favor as to each statement only if it could conclude "as a matter of law" that the remarks "bear the same substantial meaning" as the actual recorded statements. 501 U.S. at 521, 524. The court held that five statements presented a jury question as to whether the alterations materially altered the meaning of the statements, including, among others, statements that purported to quote the speaker as indicating that he did not know why he included content in an academic paper when his actual comment was that he included the material because it was true and he believed it. *Id.* The court explained that the revised statement could injure "a scholar's reputation." *Id.* The court additionally held that statements presented questions of fact for the jury where they could be interpreted as making the speaker look more "arrogant" or as using an "unprofessional tone," made the speaker appear to admit that he was dishonorable, and made the speaker appear to admit that he would forsake integrity for pecuniary or other gain. *Id.* at 522-25.

43

Quoted statements also may be found to materially differ from the speaker's meaning when an author adds "innuendoes to some quoted statements" and "quote[s] other statements out of context." *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969), recognized as abrogated on other grounds by *Gleason v. Smolinki*, 125 A.3d 920 (Conn. Sup. Ct. 2015). In addition, "melding" and "distillation" of the contents of statements may result in "misplaced emphasis, or exaggeration, or distortion." *Id.* In *Ginzburg*, the author of an article incorporated materials written by others in an article while omitting other portions of the sources that "might tend to qualify or contradict the part quoted." *Id*. The author also included "distillations" of source material without any indication and changed and rewrote others' words. *Id.*

Defendants contend that they could not portray Mr. Colborn's testimony in its entirety because they did not have the broadcast time to do so. But it is one thing to edit for space when abridged material is clearly labeled as an excerpt. If editing is necessary for length, there is nothing that prevents a creator of a work from disclosing that fact to viewers. Disclaimers can be used, just as re-recreations are often identified as such. *See Masson, supra*, 501 U.S. at 512-13 (noting that an "acknowledgment that the work is so-called docudrama or historical fiction, or that it recreates conversations . . . might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they attributed.") Here, in contrast, MAM edited what are represented as direct statements that are not in any way identified as having been edited and that instead purportedly present seamless representations of trial testimony. MAM openly invited an examination of Mr. Colborn's credibility based on edited portions and spliced of testimony that were effectively scripted to fit its narrative and thesis. Ultimately, MAM's "editing license" argument asserts that it "rationally interpreted" the testimony when it cobbled

44

together responses to different questions and reordered them to suit its presentation – an excuse that was rejected in *Masson*.

As Plaintiff argued in response to Netflix's most recent motion to dismiss, altering testimony without any indication that it has been altered creates a substantial risk of changing the perception upon which the viewer is being invited to evaluate the speaker's credibility, which may be especially damaging when the speaker's statements are represented as actual footage of testimony given under oath. Accordingly, the kinds of edits that may be inconsequential for news interviews may significantly affect a viewer's impression of a witness' credibility. The context of the statements cannot be ignored in evaluating their defamatory effect. *See Masson, supra,* at 524 (considering plaintiff's reputation as a scholar in analyzing whether edits to statements could damage his reputation).

As was cogently explained by a seasoned federal court judge who has judged credibility and overseen juries as factfinders, credibility determinations require those who listen to testimony to pay attention "to the slightest nuance or dissonance." Hon. John L. Kane, Judging Credibility, Litigation Magazine, Vol. 33 No. 3, p. 31, 32 (Spring 2007), Dkt #132-11, Barker Decl., Ex. K. Assertions that strike the listener as illogical or unintelligent can undermine the witness' credibility. *Id.* at 34-36. Responses that do not match the content called for in a question may make the listener believe that the witness is either being evasive or does not know the answer. *Id.*

As Judge Kane further explained, another central factor in assessing a witness' credibility is "the principle of consonance": "A statement must sound as if it makes sense and is capable of being easily understood." *Id.* at p. 35. The sense that a witness' response is consistent with other facts is "what makes us believe a statement is right." *Id*. It follows that a statement that appears

45

to be inconsistent with other facts, or that appears to strike a dissonant note, may appear false. *See id.* at p. 36 (fact or opinion that does not appear to fit will not "ring true" even if it appears to be "superficially logical"). Credibility also "depends on a sense of completeness." *Id.*

This is especially important in the context of a documentary, which often accompanies an assumption by viewers that while the documentary may advocate a particular point of view, the facts that are recorded in the documentary are themselves true. Viewers' perceptions may be altered through access to what appear to be a more immediate view of "real" facts than they otherwise would be able to observe.

Understood in this context, Defendants' claims to unfettered discretion to edit testimony overstate the law. Defendants were responsible to avoid presenting edited statements in a manner that a reasonable viewer would regard as more damaging to the speaker than an unedited account. *See Masson*, 501 U.S. at 521. In this case, as in *Masson,* the supposed clips of Mr. Colburn's trial testimony "purport[] to be nonfiction." *Id*. at 513. Nothing in the broadcast indicates to a viewer that the testimony shown is "anything but the reproduction of actual conversations" between examining counsel and the Plaintiff at trial. *Cf. id.* A viewer would understand that footage to be "nearly verbatim" excerpts of trial testimony. *Cf. id*.

As explained below, significant substantive revisions to Mr. Colburn's testimony occurred respect to 1) his testimony regarding the "call to dispatch" made by Mr. Colburn in which he requested information regarding Ms. Halbach's vehicle; 2) his testimony regarding the call that he forwarded while employed by the Manitowoc County jail; and 3) his testimony regarding the discovery of Ms. Halbach's key in Avery's bedroom.

### 1. Call to Dispatch

MAM's removal of Mr. Colborn's concession, after his call to dispatch was re-played in court, that he mis-remembered the content of his discussion of the dispatcher in his prior testimony, gave viewers the impression that he "didn't have much of a response after [Steven Avery's] defense attorney played the recording twice. At least not from what the documentary showed." Dkt #132-7. Moreover, these edits were made in context of accusation after accusation of misconduct leveled against Mr. Colborn by Avery's attorneys in MAM interviews. The collective impact on viewers was clear, as shown by the content of calls that Mr. Colborn received.

Similarly, during the trial, Mr. Colborn is asked, "Investigator Wiegert, did he give you the license plate number for Teresa Halbach when he called you?" Dkt# 120-29, trans. p. 185. MAM removes Mr. Colborn's response that "obviously" the investigator must have given him the license plate number for Ms. Halbach's vehicle. Instead, MAM substitutes a response to a different question, in which Mr. Colborn states "No, I just don't remember the exact content of our conversation then." *Id.;* Dkt# 120-5 55:53 – 56:10. While Mr. Colborn then adds, "He had to have given it to me, because I wouldn't have had it any other way," the alteration of Mr. Colborn's actual response to the question, removing the stronger phrasing by Mr. Colborn that explained that it was obvious to him that Mr. Wiegert had given him the license plate number, and instead making his response appear to start with the word, "No," alters the impression of Mr. Colborn's testimony and makes it appear as though the line "I wouldn't have had it any other way" was an afterthought or something that he was making up as he went along. These edits made Mr. Colborn's testimony appear inconsistent or, at a minimum, more equivocal. As Mr. Colborn explained at his deposition, MAM's edits made him seem more "wishy washy" and therefore, less believable. CAPFF #52.

Immediately following the above, watered-down version of Mr. Colborn's response to questioning regarding why he had the license plate number, MAM builds on the manufactured ambiguity by wholesale swapping Mr. Colborn's response to one question for another that was not answered due to an objection. MAM portrays the following as seamless trial testimony:

Mr. Colborn:    He had to have given it to me, because I wouldn't have had the number any other way ---

Atty. Strang:    Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back of a 1999 Toyota?

Mr. Colborn:    Yes.

Dkt #120-29, trans. pp. 186-87; Dkt#120-5 55:50-56:28. The above passage makes it appear as though Mr. Colborn damagingly admitted that others could view his comments consistently with the notion that he actually had found the Toyota prior to its official discovery on the Avery property. In fact, the question that counsel is shown as asking was not answered, because the judge sustained an objection to it. Mr. Colborn's "yes," response was offered in response to the following, very different question:

Atty. Strang:    This call sounds like hundreds of other license plate or registration checks you have done through dispatch before?

Mr. Colborn:    Yes.

Dkt#120-29, trans.p. 187. Mr. Colborn's affirmative response was to a question that simply asked whether his call was similar to any license or registration check, which is very different from a question asking him whether his statements during the call made it appear that he was looking at evidence that officially was not reported as discovered for another two days. A viewer of MAM could – and many did – interpret this as an admission that the call could reasonably be interpreted as establishing that he was looking at the back of Ms.

48

Halbach's vehicle when he made the call. Moreover, contrary to Defendants' argument, this does not fairly represent a distilled version Mr. Colborn's testimony: Mr. Colborn never said that <u>he understood</u> how other people could interpret his call as if he was looking at the license plate at the time. This apparent admission is more damaging to Mr. Colborn than an accusation by defense counsel. *See Masson, supra*, at 512.

At her deposition, the head of Netflix's creative team, Lisa Nishamura, responded with breathtaking flippancy to the complaint that this alteration changed Mr. Colborn's testimony. Nishamura claimed that Mr. Colborn "made his point" in a line included thereafter, in which he denies having looked at the plate when he called it in. But it is obvious to all that the "point" of the later statement only compounds the damaging impression for viewers when it appears to contradict something that Mr. Colborn said seconds earlier in the broadcast. Again, it is evident that viewers understood this apparent contradiction and held it against Mr. Colborn.

As also explained above, the altered version of Mr. Colborn's testimony also omits and waters down his preceding explanations for why he would have the license plate, leaving out that it was "obviously" because he had been provided it by the investigator with whom he had previously spoken. This omission, together with other edits that downplayed the significance of Mr. Colborn's testimony that he had received the number from another investigator and was merely confirming it, were effective in leading viewers to conclude that Mr. Colborn did not testify that he received the license number prior to the call. Barker Decl., Ex. G ("Maybe he was given the license plate number before calling dispatch and just wanted to verify it? Still doesn't make sense why he just wouldn't say that in court.")

Ultimately, Mr. Colborn's testimony was truncated to the point where it was not seen credible, with no indication to viewers that it had been edited at all. *See, e.g.,* Barker Decl. at Ex.

G (online comment stating that Mr. Colborn's "reaction in court" with respect to the sequence regarding the call to dispatch was "strange").

### 2. Call to Manitowoc County Jail.

Regarding the call that Mr. Colborn answered at the Manitowoc County Jail in 1995, MAM again damagingly misrepresented the trial testimony as exact footage by:

● Omitting from a response Mr. Colborn's statement that he answered the call identifying himself as "Manitowoc County Jail, Officer Colborn." Dkt# 120-29 trans p. 139; cf. Dkt# 120-5 55:53 – 56:10. While this was previously stated, the fact that testimony is consistent with itself is an important factor in assessing the witness' credibility.

● Omitting from the above response Mr. Colborn's testimony that it was his impression that the person who called him mistook him for a police officer despite his identification of himself as a jail officer. *Id.* The omitted testimony emphasizes that Mr. Colborn had no personal responsibility to investigate the substance of the call.

● Omitting testimony that further underscores the internal consistency of Mr. Colborn's testimony in this exchange. In Episode 7, after suggesting otherwise in Episode 2, MAM finally includes testimony in which Mr. Colborn explains that he transferred the call to a detective, but MAM edits from the conclusion of the sentence Mr. Colborn's clarification that he transferred the call to the Detective Division (identifying the proper division to address the call as an entirely separate division). *Id.*

● Incorporating into Mr. Kratz's supposed direct examination what are in fact redirect examination questions as to allegations by the defense that Mr. Colborn had animosity toward Avery because of the prior civil case. The resulting mash-up feels awkward and nonsensical, thereby making it appear that the prosecution and Mr. Colborn, as its witness, are not credible.

The exchange on redirect, in full was:

Mr. Kratz:     "Did this person ever identify the individual that they were talking about?

Mr. Colborn:  "No sir. There were no names given."

Mr. Kratz:     Let me ask you this, as you sit here today, Sergeant Colborn, do you even know whether that call was about Mr. Steven Avery?

Mr. Colborn:  No, I don't.

Dkt# 120-29 trans. p. 213. MAM removes from its amalgamation of direct and re-direct testimony the first two lines of the redirect testimony, which emphasize that "no names were given" in the call. Dkt# 120-7 18:35 – 18:43. Only the portion that focuses on what Mr. Colborn subjectively claims to be the case – that he does not know whether the call about Avery – is included, eliminating the objective basis for that assertion, *i.e.,* the caller's failure to state any names.

Moreover, the response, "No, I don't," which is a more forceful response, was replaced with "No sir." Dkt #105 at p. 48.

● Removing from Mr. Colborn's answer to the testimony immediately preceding the above exchange Mr. Colborn's explanation why he did not prepare a report of the call in 1995. The actual exchange, as represented in the trial transcript, is as follows:

Mr. Kratz:      As you look back, back in 1994 or '95, if you would have written a report, what would it have been about?

Mr. Colborn:   That is why I didn't do one. I don't know what it would have been about, that I received a call and transferred it to the Detective Division. If I wrote a report about every call that came in, I would spend my whole day writing reports.

Dkt# 120-29 trans. p. 212-213. MAM removed the explanation, "That is why I didn't do one," Dkt# 120-7 23:46-24:03, which would directly respond to the numerous criticisms that the series levels at Mr. Colborn because no report was written in 1995. In addition, starting the response instead with the phase, "I don't know what it would have been about" makes it look as though Mr. Colborn did not answer the question or respond in a normal way of speaking, which is pertinent to an assessment of his credibility by viewers. *See* Kane, *supra*, p. 35.

In addition, MAM again omitted the conclusion of his first sentence, consisting of the words, "that I received a call and transferred it to the Detective Division." *Id.* Mr. Colborn's explanation makes evident in very simple terms the absurdity of any expectation that a report would be prepared based on such limited information.

● Mis-portraying and splicing together an edited version of a question-and-answer exchange between cross-examining counsel and Mr. Colborn that appeared as follows in the trial transcript:

Attorney Strang:      You wrote a statement after Sheriff Peterson suggested that maybe you should?

Mr. Colborn:          Yes, sir.

51

|                   |                                                                              |
|-------------------|------------------------------------------------------------------------------|
| Attorney Strang:  | You wrote that statement in 2003, about the 1994 or 1995 telephone call?      |
| Mr. Colborn:      | Yes.                                                                         |

MAM's version of the exchange is as follows:

|                   |                                                                              |
|-------------------|------------------------------------------------------------------------------|
| Attorney Strang:  | You wrote a statement in 2003, about the 1994 or 1995 telephone call?         |
| Mr. Colborn:      | Yes.                                                                         |

Dkt#120-7 23:10 -23: 43.

In the edited statement, it appears that counsel forced Mr. Colborn to sheepishly admit writing a statement for no good reason only years after an event. But he testified that he wrote the statement when he did because a superior officer instructed him to do so.

● Removing language from a question-and-answer exchange that would have included references to the fact that the call to the jail was "way back in 1994 or 1995" and that it occurred "when you [Mr. Colborn] were working in the jail." Dkt #105, p. 51. The edit as reduce emphasis of the remoteness of the call.

A jury could find that the statements that were combined and reshaped altered and omitted important aspects of Mr. Colborn's testimony that explained more fully the context of the call and his role at the time, that emphasized what he did and that it was appropriate, and that presented his testimony about it in a manner that was coherent and complete. Moreover, the edited testimony was juxtaposed with accusations by Avery and Glynn and visuals that repeatedly identified Mr. Colborn as a principal villain of the story. Contrary to Defendants' arguments, Mr. Colborn is not complaining that MAM did not include video of Avery's entire trial. His complaint is that MAM presented information about the trial and other matters in a manner that was selective and unfair to him.

### 3. Discovery of the Toyota Key

With respect to testimony regarding the discovery of Teresa Halbach's vehicle key in Avery's bedroom, MAM again makes numerous edits to testimony without any indication that the testimony has been edited. Examples include, among others, the following:

- MAM eliminates Mr. Colborn's emphatic denial that he ever planted any evidence against Mr. Avery, which was "That's ridiculous, no I have not." Barker Decl., Ex. 62; CAPFF #61. It instead substitutes his answer to a different question, "Have you ever planted any evidence against anybody in the course of your law enforcement career," to which Mr. Colborn responded, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not." *Id.* The spliced version is substantially less forceful than the actual response and does not appear to respond to the question asked (because it is not the response to the question asked), thereby again making Mr. Colborn appear evasive in his responses. MAM removed from Mr. Colborn's actual reaction that the central theory of their series – that Mr. Colborn planted evidence – was "ridiculous."

- MAM revises Mr. Colborn's answers about reports that he wrote in connection with the search at the Avery property so that it appears that he wrote only one report that was less than half a page, when in fact, he wrote two reports, as the actual answers to the questions would have made clear. Barker Decl., Ex. B, trans. pp. 196-199; Dkt# 120-7 22:22-22:39; 22:54-23:43. The omission augments MAM's accusations that Mr. Colborn hid and failed to provide information throughout the Avery investigation.

- MAM omits an entire "soft cross" that immediately follows the above discussion. Dkt #105, p. 47; Dkt# 120-29 trans. p. 132; Dkt# 120-7 17:06-17:32. In his response to questions in the "soft cross," Mr. Colborn testified that he was "very surprised" that the key was there given that he and the other officers had been in the room "for quite some time" before it was discovered. *Id.* Mr. Colborn also emphasized this by stating, "I believe I said to myself, damn, how did I miss that." *Id.*

- Mr. Colborn's repeated denials in direct examination that he planted evidence, in questions that were obviously intended to build emphasis and effect, are also blunted by cutting and splicing them together into one question and eliminating Mr. Colborn's straightforward, "No" response to whether he "set up Mr. Avery for a charge of murder." Dkt #120-29 trans. p. 140; *cf.* Dkt# 120-7 18:43 – 19:15.

- MAM omits from Mr. Colborn's statements his testimony that the Toyota emblem was on the key and his knowledge that Ms. Halbach's vehicle was a Toyota as influencing why he thought this "was a very important piece of evidence." Dkt #120-29 trans. p. 140; Dkt# 120-7 17:06-17:32; CAPFF #65. The omission removes a credible explanation by Mr. Colborn that contradicts MAM's insinuation that Mr. Colborn already knew the key was Ms. Halbach's because he conspired to plant it in the bedroom.

53

● MAM omits Plaintiff's direct and forthright response, "yes," to the question whether he manipulated "this piece of furniture" – the furniture is not identified in the lead-up in MAM because it has been edited out, but refers to the small bookcase from which law enforcement officers believe the key fell – and severely truncates Mr. Colborn's testimony regarding that critical issue. Dkt #105, p. 45; *cf.* Dkt# 120-29 trans. p. 125-129; CAPFF #66. Instead, MAM substitutes a response that does not appear to directly answer the question, and which therefore appears evasive and as volunteering unrequested information, which is often interpreted as done by those who are not being truthful: "I will be the first to admit, I handled it rather roughly, twisting it, shaking it, pulling it." Dkt# 120-7 16:34-16:50. The question that was in fact asked prior to the shown response was "If you can describe that further, I don't know if you can do it with your words or show us with your hands, how you did it?" *Id.* The response was also edited; it began, "I will be the first to admit, I wasn't any too gentle, as we were, you know, getting exasperated. . . ." *Id.*

● MAM omits critical context from Mr. Colburn's testimony regarding the exact moment of discovery of the key, including omission of testimony that explains that Deputy Kucharski, who is portrayed as likely not in on the alleged conspiracy to plant evidence, was "in very close proximity" to the bookcase near the place where the key was discovered at the time of its discovery, and that Mr. Colborn also "wasn't very far away" and that he had to turn around to see the key at the time that Lieutenant Lenk mentioned it. Dkt# 120-29 trans. p. 140; Dkt# 120-7 16:19 – 17:32; CAPFF #67. The omitted testimony also reduces Mr. Colborn's testimony about Mr. Lenk's statements upon noticing the key, omits his description of what he could see of the key, omits his direction to Deputy Kurcharski to photograph the key, and omits direct testimony that the spot from which the key was photographed was "as close as [they] got" to the key at the time. Dkt #120-7.

● MAM omits 20 lines of trial testimony elicited by prosecutor Ken Kratz. Dkt #105, p. 45 (referencing pages 122-23 of trial testimony).The testimony provides context for Mr. Colborn's assignment to return to the Avery property on the date in question. *See* Dkt# 120-7 16:19 – 17:32; CAPFF #68. Elsewhere, MAM includes accusations, including direct accusations by Avery's defense team investigator, that it was improper for Mr. Colborn and other Manitowoc County Sheriff's deputies to be on the property. As explained above, accusations that Mr. Colborn received from viewers demonstrate that they found the absence of this explanation as corroborating the accusations that Mr. Colborn was there to plant evidence.

● MAM also omitted 30 pages of testimony regarding the lead-up to the search of the Avery property, including Mr. Colborn's background and training as an evidence technician. Dkt #105, p. 49; Dkt #290-19; CAPFF #69,

● MAM omits numerous transcript pages in which Mr. Colborn describes searches on the Avery property before the key was found. Barker Decl., Ex. A., trans. pp. 76-121.

This information would have helped viewers understand that Mr. Colborn did not appear out of the blue for the search in which the key was found. *See* Kane, *supra*, at pp. 38-39.

Construing all reasonable inferences in Plaintiff's favor, the revisions to material that was presented as exact testimony by Mr. Colborn can be interpreted as making his testimony appear less credible and as presenting a distorted impression to viewers.

In addition, the edits are presented by MAM in context of other evidence portraying Mr. Colborn as a villain, including direct statements by Buting and Strang, outside of formal judicial proceedings, that accuse him of planting evidence generally and the key specifically. In this context, edits to Mr. Colborn's testimony remove credibility of his explanation for how the key was discovered, as explained above, in several respects. MAM also eliminates almost entirely the explanation for why he was there – as an evidence technician – omitting multiple pages of pertinent trial testimony. Viewers' reactions demonstrate how this omission made it more credible to viewers that Mr. Colborn was on the scene only as part of a conspiracy to plant the key.

### 4. Avery civil case deposition testimony edits

In addition, portions of the Avery civil case deposition testimony that are included in Episode 2 do not fairly reflect the testimony that Glynn actually elicited from Mr. Colborn, all of which was available to Defendants when they produced MAM. Contrary to the Glynn accusations repeated in MAM, Glynn elicited testimony from Mr. Colborn that establishes that there would have been no reason, under the jail's record-keeping practices, for Mr. Colborn to make a report of the call that he transferred from the jail. Dkt #129, Ex. 1 at 2:46-4:19. Glynn also elicited testimony that established that Mr. Colborn had no authority to investigate the call further, directly contrary to Glynn's accusations in MAM:

| Glynn: | At any rate, you recognized that this was significant enough that you should forward that call that was coming in from another detective to someone in the Manitowoc County Sheriff's Department to take it further, correct? |
|---|---|
| Mr. Colborn: | Yes. |
| Glynn: | It wasn't within your jurisdiction to take it any further, correct? |
| Mr. Colborn: | No, sir. |
| Glynn: | I mean, even if you had wanted to, you didn't have the legal authority under your job duties to do that. |
| Mr. Colborn: | Correct. |

Burnett Decl., Ex. 1 at 12:41-14:30; Dkt.#120-14 p. 14; CAPFF #71.

MAM also portrays Mr. Colborn as furthering the cover-up in his deposition testimony that he did not recall with whom he may have discussed, in 2003, the prior call to the jail. Through juxtaposition with other witnesses' testimony that is pieced together to suggest that Mr. Colborn may have discussed the report with an assistant district attorney in 2003, MAM implies that the other witnesses' testimony exposes Mr. Colborn's testimony as untruthful. Dkt# 120-2 23:50 – 26:52. The testimony by Mr. Colborn that MAM includes stops just short of a clarification that would have dispelled any nefarious construction of Mr. Colborn's testimony: Glynn asks Mr. Colborn, "But you're not ruling out the possibility that you may have discussed it," to which Mr. Colborn replies, "No I'm not ruling out the possibility that I may have discussed it with someone else." Dkt #120-1 at 19:06-19:34; CAPFF #72. The omission of this clarification is used to attempt to portray a more stark contrast between Mr. Colborn's testimony and that of others.

## B. MAM CHANGED MR. COLBORN'S PHYSICAL REACTIONS.

As noted above, audio and visual portions and their relation to each other must be considered when evaluating the defamatory effects of a broadcast. *Mach v. Allison*, 656 N.W.2d 766, 712 (citing *Giwosky v. Journal Co.,* 237 N.W. 2d 36 (1976) and Rodney Smolla, Law of

56

Defamation §4:32, pp. 4-50 to 4-51 (2d ed.)). The "gist" of a publication is the "'natural and reasonable import' of the words and images on the viewer." *Id.* (citing and quoting *Woods v. Sentinel-News Co.*, 216 Wis. 627, 258 N.W. 166 (1935)).

[redacted]



Case 1:19-cv-00484-BHL   Filed 11/04/22   Page 58 of 78   Document 331



[redacted]

[redacted]

[redacted]

CAPFF #74,

[redacted] MAM does not fairly represent Mr. Colborn in excerpts from video depositions taken during Avery's civil trial. The full video deposition of Mr. Colborn's testimony in Avery's civil case demonstrates that Mr. Colborn appeared confident and relaxed and made regular eye contact with the examining attorney. Dkt. 129-1. In contrast, in the clips of Mr. Colborn's testimony at Mr. Colborn's civil suit deposition that appear in MAM, his gaze is not matched to

the examining attorneys. Dkt #120-2 at 18:30 -19:05. Moreover, the deposition footage was not displayed in full screen in MAM, so that Mr. Colborn appears to be looking down in answering questions, but the full-screen video shows that he was looking at an exhibit. Dkt. 129-1 4:10 PM, 4:13-4:17 PM. The document cannot be seen on MAM. *See* Dkt# 120-2 at 18:30-19:05; CAPFF #75.

### C. MAM Includes Direct, Flat-Out Accusations of Framing, While Avery's Lawyers Argued at Trial Only That One or More Officers *Could Have* Framed Avery).

Under Wisconsin law, one who republishes a third party's defamatory statement by a third party is also liable to persons defamed by the statement; it is not a defense to a defamation claim that the defendant merely accurately repeated a statement that was first uttered by a third party. *Hart v. Bennet*, 672 N.W.2d 306, 318 (Ct. App. 2003).

> The principle of the republisher's liability was recognized in Wisconsin almost a century and a half ago in *Sans v. Joerris*, 14 Wis. 722, 726 (1861).
>
>> The law is well established that it is no justification in an action for libel, that the libelous matter was previously published by a third person, and that the defendant, at the time of his publication, disclosed the name of that person and believed all of the statements in the libel to be true.

*Id. See also Gerol v. Arena*, 377 N.W.2d 618, 621 (Wis. Ct. App. 1985) (explaining that under Wisconsin precedent, defendant could not defend statements as "true because he indeed had heard such rumors" because that is not a defense to a defamation action; rather, the defendant was required to prove the truth of "the defamatory charges repeated by the defendant" (citing Restatement (2d) of Torts §581A cmt. e (1977)); *see also Hucko v. Joseph Schlitz Brewing Co.*, 302 N.W.2d 68, 72 (Wis. Ct. App. 1981) ("Secondary publication by a newspaper, magazine, or periodical may expose such a publisher to liability . . . .").

60

As explained in Plaintiff's brief supporting his motion for partial summary judgment, and as further explained below, MAM is replete with express and implied accusations that Mr. Colborn participated in a conspiracy to plant evidence to frame Avery and that Mr. Colborn lied about it in his testimony at Avery's trial. *See* Dkt #285. Police officers who plant evidence may be convicted of felony charges of misconduct in office and obstructing an officer; perjury is likewise a criminal offense. Wis. Stat. §946.31.

A statement by any person that Mr. Colborn committed criminal conduct is defamatory. *See, e.g., Downer v. Tubbs*, 139 N.W. 820, 822 (Wis. Sup. Ct. 1913). Under Wisconsin law, it is "elementary" that a publication that falsely "by printing or writing, or by signs or pictures . . . accuses a person of a crime, blackens his character, or tends to expose him to public ridicule, contempt, or hatred, is libelous." *Id.* (internal quotation and citation omitted). Also defamatory are false statements that tend to prejudice a person in his business, impute to him want of official integrity, or that cause him, in his official capacity, to be regarded with distrust. *Id.* (internal citations omitted). Moreover, a statement that a person has been charged with a crime imputes the commission of the crime to him, "and is defamatory." *Prahl v. Brosamle*, 295 N.W.2d 768, 775 (Wis. Ct. App. 1980), abrogated on other grounds, *Wilson v Layne,* 526 U.S. 603 (1999).

Although Steven Avery's attorneys could potentially assert that statements that they made in defending Avery at his murder trial were subject to a privilege for communications made by attorneys during the course of court proceedings, even they could not seek refuge in that privilege for comments that they made to the media. *See, e.g., Kennedy v. Zimmermann*, 601 N.W.2d 61, 65-66 (Iowa Sup. Ct. 1999) (interviews with news reporters fall outside scope of privilege for statements by attorneys in judicial proceedings); Prof. Resp. Crim. Def. Prac. 3d §31:25 (updated Nov. 2019) (general law of libel applies to attorneys' out-of-court statements);

50 Am.Jur.2d Libel & Slander §300 (updated 2020) (republication to nonparticipants is generally not privileged). *A fortiori,* Defendants' repetition of those statements, long after the conclusion of Avery's trial and to a worldwide audience, could not fall within any such privilege, even if it extended to Defendants rather than merely to the defense attorneys themselves.

As explained above, no Wisconsin authority permits republished third-party statements to be characterized as "true" or "substantially true" just because someone else initially uttered them. Rather, the statements must either be shown by the republisher to fall within a recognized privilege or proven to be true. *See, e.g., Gerol v. Arena, supra*, 377 N.W.2d 621; *see also Hucko, supra,* 302 N.W.2d at 72.

### D.  Defendants Added Graphics and Juxtaposed Video to Expressly Identify Plaintiff as One of the Alleged Conspirators.

To ensure that third parties' statements were understood as woven into the conspiracy theory narrative, MAM enhanced those statements and juxtaposed them with other video and images of Plaintiff to specifically emphasize his alleged role in the purported conspiracy. By doing so, MAM took itself far outside the remote edges of any recognized "substantial truth" doctrine in any jurisdiction. Moreover, as explained above, Wisconsin law directs that  audio and visual portions and their relation to each other must be considered when evaluating the defamatory effects of a broadcast. *Mach v. Allison*, 656 N.W.2d 766, 712 (citing *Giwosky v. Journal Co.,* 237 N.W. 2d 36 (1976) and Rodney Smolla, Law of Defamation §4:32, pp. 4-50 to 4-51 (2d ed.)). The "gist" of a publication is the "'natural and reasonable import' of the words and images on the viewer." *Id.* (citing and quoting *Woods v. Sentinel-News Co.,* 216 Wis. 627, 258 N.W. 166 (1935)).

Among other examples:

- As Glynn remarks that the one thing he did not warn Avery was that "if you pursue a civil rights case against a County in which you still live, you might be charged with murder," Mr. Colborn's photograph is shown along with a rotating small group of other Manitowoc County Sheriff's Department employees, Dkt #120-1 1:02:03 - 1:02:18.

- As Avery is heard saying that sitting through depositions (in his civil case), he realized that law enforcement officers were "covering something up," MAM cuts to a close up of Mr. Colborn's signature on a document, followed by video and images of Mr. Colborn, Dkt #120-2 22:55 – 23:14.

- As Glynn rails about an "unconscionable withholding of information," images of Mr. Colborn are shown along with a rotating small group of other Manitowoc County Sheriff's Department employees, Dkt #120-2 26:56 – 27:33.

- Bar patron's accusation of Avery's framing by the Sheriff's Department follows a visual image of Mr. Colborn, Dkt #120-3 14:14 – 15:36.

- As Buting says that Sheriff Peterson has a "strong dislike" for Avery and that therefore, his subordinates would also have that attitude, including the sergeants and lieutenants, labeled photographs of a small group of sergeants and lieutenants, including Mr. Colborn, are shown and highlighted compared to other photographs onscreen, Dkt #120-4 1:00:05 – 1:00:43.

- After Avery is shown in an interrogation telling an investigator that someone told him that "a cop" planted Ms. Halbach's vehicle on his property, MAM immediately cuts to footage of Mr. Colborn about to testify, Dkt #120-5 52:13 – 53:20.

MAM may as well have included a neon sign announcing, "Andrew Colborn is the officer who planted evidence to frame Steven Avery." In audio and visual effect, it conveyed the same message, just as unmistakably.

### E. MAM MAKES ADDITIONAL ENHANCEMENTS THAT COMBINE WITH THE VERBAL ACCUSATIONS AND VIDEO EDITING TO POINT FINGERS AT MR. COLBORN.

As noted above, in numerous instances, the "bad guy" or "villain" theme plays while Mr. Colborn is on camera, just as Netflix directed. Moreover, MAM's timelines and graphics are used to reinforce for the audience the alleged irrefutable evidence of Mr. Colborn's alleged

involvement in the purported conspiracy. Again, these elements were in some cases directed, and in all cases approved, by Netflix.

### F. MAM'S DEPICTION OF THE AVERY GUILTY VERDICT DOES NOT SALVAGE MAM FOR NUMEROUS REASONS.

#### 1) As Defendants Have Argued, Accusations of Framing Are Not Necessarily Negated Even if Avery's Guilt Is Assumed.

Defendants' argument that they reported the verdict against Avery is, as they themselves have noted, not in and of itself inconsistent with their accusations that law enforcement planted evidence. *See* Dkt #119 at 43.

#### 2) MAM Deliberately Portrays The Guilty Verdict As a Travesty of Justice.

██████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████. As summarized above, the last three episodes of MAM lodge an all-out assault on the verdicts issued against Avery and Dassey, paired with frequent odes to their innocence. In fact, it is difficult to imagine how the series could have more clearly conveyed the filmmakers' position that the verdict got it wrong and was wrongfully obtained.

Moreover, contrary to Defendants' arguments, defamatory statements are not exempt merely because the defendant includes a "caution" that the plaintiff denies them, particularly when the "unmistakable theme" of the publication(s) is that there is evidence that should be used to investigate him. *See, e.g., Hatfill, supra,* 416 F.3d at 333-34. As explained above, this is particularly the case where, as here, MAM deliberately altered Mr. Colborn's denials so that they

64

appear less credible, making his own conduct appear to support their accusations. Nor are supposed denials by Mr. Colborn that are contained in single episodes that viewers may or may not have watched, sufficient to alter the gist of MAM. Some viewers may have watched only one or two episodes and not have been aware of the supposed clarifications in Colborn's own testimony, even as manipulated and truncated by MAM.

### G. Omissions Further Explain the Context of the Defamatory Statements.

Defendants contend that the numerous omissions from MAM that are identified in the complaint are of no consequence because other facts that could have supported Avery were omitted as well. In fact, the omissions, including omissions of information regarding Mr. Avery, directly affected his credibility and, therefore, were critical to the context in which Avery's and his counsel's convoluted accusations about instances of planting evidence and framing him appeared to viewers to be more credible and less far-fetched.

As Judge Kane explained, the "principle of consonance" requires that the framing theory be supported by apparent evidence of Mr. Avery's innocence – otherwise, it could not resonate as powerfully with viewers. In addition, extremely compelling and powerful facts will cause one to search for a way to support the ultimate premise, even in the face of logical evidence to the contrary. Kane, p. 35. In order for the audience to become "enraged" at law enforcement, as Netflix demanded, it was critical that viewers empathized with Avery.

### H. Defendants' Authority is Distinguishable and Inapposite.

Defendants point to non-Wisconsin opinions that have attempted to describe as "substantial truth" in a manner that is contrary to Wisconsin's republication doctrine. Without addressing the conflict posed by Wisconsin law, Defendants primarily rely on the Seventh Circuit's opinion in *Global Relief Foundation, Inc., v. New York Times Co.,* 390 F.3d 973, 987

65

(7th Cir. 2004), a case that was decided based on the court's interpretation of Illinois law as permitting republished statements relating to a government investigation of the plaintiff. As one commentator has noted, that case "reflects Illinois law, at best." Truth, Accuracy and Neutral Reportage: Beheading the Media Jabberwock's Attempt to Circumvent New York Times v. Sullivan, 9 Vand. J. Ent. & Tech. L. 551, 743 (Spring 2007). Even if it did not conflict with Wisconsin precedent governing republisher liability, *Global Relief* could not apply because it reported about a government investigation, 390 F.3d at 987, not repetition and augmentation of a criminal defendant's accusations against those involved in his arrest.

Defendants' reliance on *Riley v. Harr,* 292 F.3d 282 (1st Cir. 2002), is similarly misplaced. The decision purported to apply New Jersey law but cited little precedent in reaching its conclusions. In *Riley*, the Court rejected a defamation claim where a book expressly noted that a jury rejected an allegedly defamatory theory with its verdict. 292 F.3d at 286. Wisconsin law governs Plaintiff's claims, and as explained above, it requires the series to be considered in its totality, including audio and visual evidence. MAM posits loudly and clearly that the verdict against Avery was a travesty of justice. Further, as explained *infra,* Defendants have previously acknowledged that the theories that law enforcement officers planted evidence to frame Avery and that Avery is guilty anyway are not mutually exclusive. Regardless of the jury's verdict, MAM communicates that Mr. Colborn was a key participant in an alleged conspiracy to plant evidence against Avery, and viewers' responses show that they understood that accusation.

## II.     THE "SUBSIDIARY MEANING" DOCTRINE DOES NOT EXCUSE MAM.

Chrome also argues that the "subsidiary meaning" doctrine protects MAM's accusations against Mr. Colborn. The "subsidiary meaning" doctrine, which is infrequently applied, has been described as supporting the conclusion that where some statements are not actionable, others that

"merely imply the same view" are likewise inactionable. *See, e.g., Skakel*, *supra*, 5 F. Supp.3d at 210. As explained in detail above, the statements that are in MAM are actionable. Accordingly, this doctrine has no bearing here. Moreover, Defendants' republication of defamatory accusations out of court, visual and audio additions, and manipulation and edits to Mr. Colborn's direct testimony cannot be described as merely "subsidiary" to any "fair report" of the proceedings. The "subsidiary meaning" doctrine does not apply when a publisher falsely imputes credibility or reliability to even an existing criminal conviction, because purported independent corroboration of alleged guilt cannot be described as merely a "gloss" on a prior conviction. *Skakel,* 5 F.Supp.3d at 212-13. Here, Defendants' broadcast falsely magnified and represented as well-founded and true accusations of criminal conduct.

Similarly, Defendants' insistent arguments that MAM is no different from what was already publicly knowledge repeatedly fail to acknowledge that at trial, Avery's attorneys argued that law enforcement officers could have planted evidence against Avery and that as a result, there was reasonable doubt that merited a "not guilty" verdict against Avery. CAPFF #54. In contrast, in MAM, Defendants used the statements of Avery (who did not testify at his trial), out-of-court statements by Avery's attorneys and family, and others, to affirmatively accuse law enforcement officers of planting evidence. They repeatedly used juxtaposition of Mr. Colborn's image as these accusations were made to convey the message that he was a central participant in the conspiracy, and they manipulated the content ███████ of his testimony to detract from his credibility to bolster Avery's accusations and to direct them to Plaintiff specifically.

## III.   OVERWHELMING EVIDENCE WOULD PERMIT A JURY TO CONLUDE THAT, BY CLEAR AND CONVINCING EVIDENCE, DEFENDANTS ACTED WITH ACTUAL MALICE.

67

## A. Defendants' Communications Are Evidence That They Acted With Reckless Disregard for the Truth and Set Out to Tell a Preconceived Storyline.

Defendants each argue that there is no evidence from which it may be inferred that they acted with actual malice to a clear and convincing evidence standard. In fact, this case is exceptional among defamation cases because of the extensive email record during the course of production of the 10-part series. These communications consistently demonstrate that Defendants acted with, at a minimum, reckless disregard for truth or falsity as they worked to shape MAM's storyline to elicit sympathy for Avery and his family and to demonize law enforcement officers, including especially Mr. Colborn, whom they collectively referenced as the "baddies" and "villains" of the series.

### 1. Chrome

Chrome cannot and does not deny that it was intimately involved in the editing that falsely portrayed Mr. Colborn's testimony and even his appearance while testifying on the matters allegedly represented in the series. ████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████

68

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

Chrome also argues that because they reviewed a lot of source material they could not be biased. But it was clear that they were looking at all times for source material that fit their narrative – not for material that would be favorable to law enforcement. For example, filmmakers gloated to Netflix representatives that they were working with Avery's attorneys to investigate options for re-testing the blood in the RAV 4. Barker Decl., Ex. 1, NFXCOL 1930.

## 2. Netflix

As noted above, Netflix sought to sensationalize the series to ensure that viewers would be feeling "fury" and would be "shouting at their televisions throughout" the series. A balanced report could not incite such strong emotions.  At every turn, therefore, Netflix pushed Chrome to do whatever it took to hammer home the message that law enforcement officers were out to get Avery and to frame him for Ms. Halbach's murder. As explained above, Netflix urged Chrome to shorten and cut testimony and courtroom scenes, celebrating when the edited version of Episode 5 was changed so as to make Mr. Colborn "look caught in a clear lie" and to "set him up" as the "potential cop to plant the car." From this reaction, it can be inferred, even without the missing prior versions of MAM, that Netflix was involved during the evolution of Mr. Colborn's testimony into a segment that portrayed him in a significantly worse light.

69

Netflix representatives could not have been more cavalier in celebrating the changes that "set Mr. Colborn up" to be the "potential cop to plant the car" in Episode 5. It is difficult to imagine a clearer written example of "reckless disregard for the truth" than this gleeful reaction to edits that, by Netflix's own description, identified Mr. Colborn as responsible for planting Ms. Halbach's vehicle on Avery's property.

Similarly, it is stunning to review the exchange of messages between Netflix representatives regarding their acknowledgment that Jerry Buting's comments could be construed as accusing law enforcement officers of going so far as to kill Teresa Halbach in their quest to falsely accuse Avery. They ultimately decide that they should leave the accusation as is, even though they acknowledge that there is no actual evidence officers were present when Ms. Halbach died, because they did not want to "confuse" Chrome and because Netflix was "desperate" to push Chrome into incorporating a "point of view" in the series. *Id.* Again, it is difficult to imagine a more obviously stated example of knowledge of falsity and reckless disregard for truth or falsity.

Likewise, as explained above, Netflix also looked for every opportunity to emphasize "shock" at Mr. Colborn's appearance in the series, even when he is shown performing such routine tasks as escorting Avery or Dassey to or from the courtroom.

## B. MAM's DEMONSTRATED MANIPULATIONS ARE FURTHER EVIDENCE OF ACTUAL MALICE.

A plaintiff may prove actual malice using circumstantial evidence, and motive often bears on the inquiry. *See, e.g., Harte–Hanks Comm'ns v. Connaughton,* 491 U.S. 657, 667 (1989). Circumstantial evidence can suffice to demonstrate actual malice and may "override defendants' protestations of good faith and honest belief that the report was true." *Moore v.*

70

*Vislosky,* 240 Fed.Appx. 457, 468 (3rd Cir.2007) (quotation and citation omitted). Courts have held that malice may be shown by the following:

● Purposeful avoidance of truth, *Harte-Hanks Comm., Inc.,* 491 U.S. at 692;

● Deliberate omission of contrary facts, *see, e.g., Hoyne v. The Innocence Project,* 2011 WL 198128 at *5; and

● Fabrication and changes of meaning through alteration of quoted materials. *See, e.g., Hildebrant v. Meredith Corp,* 63 F.Supp.3d 732, 746 (E.D. Mich. 2014).

Other courts have likewise held that overly aggressive "editing" of broadcasts demonstrated evidence of actual malice. Where there were changed facts and false statements in a broadcast, a significant failure to investigate or verify credibility, and a general makeup and presentation of a story, that, considered as a whole, exhibited hostility to the plaintiff, the Court held there was ample evidence of actual malice in *Kentucky Kingdom Amusement Park Co. v. Belo Kentucky Inc.,* 179 S.W.3d 785, 791 (Ky. 2005). *See also Mitchell v. Griffin Television LLC,* 60 P.3d 1058, 1063 (Okl. Ct. App. 2002) (difference between quoted material and what was broadcasted was sufficient evidence of actual malice); *Perez v. WEWS,* 1986 WL 12966, *7 (Ohio Ct. App.) (omissions that made a stronger case for criminal conduct demonstrated actual malice).

Actual malice may also be found where, as here, innuendoes are added to quoted statements and quoted statements are presented out of context. *Goldwater v. Ginzburg*, 414 F.2d 324, 336-37 (2d Cir. 1969). In addition, "melding" and "distillation" of the contents of statements may result in "misplaced emphasis, or exaggeration, or distortion." *Id.* These kinds of modifications are particularly indicative of actual malice when calculated to achieve a "predetermined result" in the message conveyed. *Goldwater,* 414 F.2d at 337. Likewise, a

"pattern of biased and inaccurate reporting" supports the conclusion that statements were made

with actual malice. *DeRobert v. Gannett Co., Inc.,* 83 F.R.D. 574, 583-84 (D. Hawaii 1979).

A Showing of an intent to avoid the truth also meets the actual malice standard. *Stokes v. CBS,*

*Inc.,* 25 F.Supp.2d 992, 1004 (D. Minn. 1998).

The Court in *Stokes* further opined that the broadcasters "knew or should have known

that the extremity of [the speaker's] assertions far outpaced his evidentiary foundation," adding:

> [the] highly slanted perspective of each report would further support a finding of
> actual malice. *See Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 539 (7th Cir.1982)
> (a preconceived story line may evidence reckless disregard of truth);
> *Westmoreland v. CBS, Inc.,* 596 F.Supp. 1170 (S.D.N.Y.1984) (bias in the editing
> of a story); *Jenoff v. Hearst Corp.,* 453 F.Supp. 541, 549 (D.Md.1978), *aff'd,* 644
> F.2d 1004 (4th Cir.1981) (hostile reporting). In fact, as the court has already
> discussed, the broadcasts' one-sidedness goes beyond merely
> favoring one party's version of events over another. Through the use of ambush
> tactics **and distorting visual and editorial techniques, both reports actively
> contributed to the impression that [the Plaintiff] committed the crime.**
> . . . .
> Chief Justice Warren's admonition in *Curtis Publishing Co. v. Butts* seems
> especially apt in this case: "**Freedom of the press under the First Amendment
> does not include absolute license to destroy lives or careers.**"

*Id.* at 1004-05 (emphasis added).

As explained in detail above, MAM's manner of presentation of the statements of third

parties, augmented by its own graphics and its distortion of Mr. Colborn's trial and deposition

testimony, insinuated, implied, and used innuendo to convey that he did in fact plant the

evidence, as the defense alleged. Defendants combined commentary, sound effects, and visual

imagery – including graphics and charts referencing Mr. Colborn and images shown during or

following incriminating comments by others – together with editing and splicing Mr. Colborn's

testimony at Avery's criminal trial and in deposition for Avery's civil case in a way that made

his testimony seem less credible.

72

Defendants' communications demonstrate that they took great pains, over multiple iterations of each episode, to weave together third-party accusations of planting evidence, visuals of Mr. Colborn during or after voiceovers making accusations of planting and hiding evidence, accusatory graphics, and eerie and suspenseful music. It is no accident that viewers interpreted MAM as accusing Mr. Colborn of participating in a conspiracy to frame Steven Avery.

## IV. THERE ARE DISPUTED ISSUES OF MATERIAL FACT FOR TRIAL AS TO PLAINTIFF'S EMOTIONAL DISTRESS CLAIM.

The Defendants assert that the intentional infliction of emotional distress claim fails because Colborn can prove none of the elements Wisconsin law requires. These are largely factual questions, so the standard on summary judgment is well settled, and it is only if the evidence Colborn offers is legally insufficient that summary judgment becomes appropriate. *Surgery Center, Inc. v. American Physicians Assurance Corp.*, 922 F.3d 778 (7th Cir. 2019).

Primarily, the Defendants assert that Colborn did not suffer sufficiently to merit the claim. They point to the fact that he continued with life as best he could after MAM's release. But they ignore all that he endured and how it affected him. They never mention the bomb and multiple death threats he received, the harm to his children and family that strangers threatened, or the international hatred and vituperation that MAM inspired. (Andy Colborn Decl. ¶¶ 2-25). The messages were vile, profane, menacing, and intimidating in an age where no one is safe from unanticipated violence. Strangers sent packages that looked like a bomb, venomous insults accompanied by sinister warnings, circulated pictures of Colborn and his family, people took pictures of Colborn and his auto license plate to circulate, and complete strangers chastised him publicly based on MAM's accusations. Andy Colborn Decl. ¶ 10, 15 and Colborn Ex. 2. His employer hides him from publicity even now. Colborn Decl. ¶ 16. The bone-chilling voicemails

Colborn endured and the menacing e-mails and letters he received are part of this record but too voluminous to summarize here.  Colborn Decl. Ex. 1 and 2.

The Defendants assert none of this could have possibly caused Colborn emotional distress and whatever distress he might have experienced was inadequately extreme and disabling.  Yet Colborn hardly coped with this ordeal as well as the Defendants claim.  Before MAM's release, he lived a normal and quiet life as a small-town deputy sheriff; after, as the hatred began arriving, he endured constant anxiety.  Barb Colborn Decl. ¶6-7.  He worried incessantly about the threats he and his family received and whether someone planned some unexpected danger.  Andrew Colborn Decl. ¶¶ 4, 5, and 23; Barbara Colborn Decl. ¶¶ 7-13.  He kept his revolver loaded and with him and constantly looked out for threats and violence in every situation.  Andrew Colborn Decl. ¶ 8.  He sheltered in his home and rarely frequented public places out of fear.  Andrew Colborn Decl. ¶ 4, Barbara Colborn Decl. ¶ 8.  The Department of Justice and the FBI became involved as events culminated and threats became more numerous, serious, and worrisome.  Colborn Decl. Ex. 2, Manitowoc 392 and Colborn 5501 and 5171.  When he dined out, he selected a seat with a view of the door; when he visited stores, he surveyed the periphery; and at home, he looked outdoors frequently to ensure all appeared safe.  Andrew Colborn Decl. ¶ 7,  Barbara Colborn Decl. ¶ 12-13.  Though always an introvert, he keeps a very small circle of friends and suspects almost everyone and everything because of MAM.  Andrew Colborn Decl. ¶ 9.  Indeed, the public fascination with Colborn and its antipathy towards him continues to this day, as John Ferak's recent Internet articles sift negative information about him even from the Defendants' filings in this lawsuit.  Bursik Decl. Ex. 4.

Colborn served as a law enforcement officer for decades and prided himself as a deputy beyond reproach.  Andrew Colborn Decl. ¶24.  He never endured such accusations over a

decorated career. MAM changed all that and left him powerless to refute the false accusations and insinuations that it cast about his integrity. The Defendants ignore all this, and in fact, while they spent over 10 hours questioning him in deposition, they hardly inquired of Colborn how he coped with what he experienced.

The Defendants instead point to Colborn's efforts to resume a normal life. He retired, turned to church work, took a part-time job, and found romance again, they note. They emphasize he sought no meaningful medical care, but the law does not require Colborn find a hermitage, seek a doctor, or suffer a nervous collapse or manifest physical injury before his ordeal justifies a claim. *Honaker v. Smith*, 256 F.3d 477, 495-6 (7th Cir. 2001) (Illinois law). He is entitled to refuse to let the falsehoods MAM spread about him disrupt his life as best he can. But the Defendants' falsehoods no doubt changed Colborn's relationships and the way he functioned in the world. He withdrew, and when he engages, he "watches his back" as his detractors warned him to do. Living a life of hyper-anxiety, constant surveillance, fear, and worry about yourself and your family is precisely the type of distress claims for intentional infliction of distress involve. *Id.*

Next, the Defendants contend that if Colborn felt distress, they did not cause it, for he had other sources of anxiety in his life. They mention the fallout from his failed marriage, for one. They add that others perpetrated these falsehoods; many, such as John Ferak, who feasted off of MAM, repeated or expanded upon them. Finally, they assert no expert substantiates he suffered from the falsehoods that MAM spread about him.

As to the notion that he experiences other stressors in his life, the question is not whether MAM's falsehoods about him were the cause of his emotional distress, but rather whether they were a cause—a substantial element—of distress. *Slawek v. Stroh*, 62 Wis.2d 295, 315 (1974);

Wis JI-Civil 1257. The question is entirely factual and appropriate solely for a jury. *Webber v. Armslist LLC*, 572 F.Supp.3d 603, 618 (E.D. Wis. 2021). As to the fact that others, such as Ferak, defamed him too, the Defendants never explain how that immunizes them from responsibility for the falsehoods they planted in the first place. Indeed, Ferak's most recent submissions show that he vaunts MAM as a credible source of his message. It begins, "Millions of people across the globe have become familiar with Andy Colborn . . . from the award-winning Netflix documentary, 'Making a Murderer.' " Bursik Decl. Ex. 4. Nor need Colborn supply an expert to explain that repeated death threats, mailings that resemble bombs, and the antipathy he regularly experienced from people who viewed the documentary and wanted to hurt him caused him distress. Colborn's confirmation about what he experienced is enough. The idea that people who have multiple sources of stress are more, not less, vulnerable to offenses like those Netflix and the other Defendants perpetrated hardly requires an advanced degree. It is common sense, the type of thing that jurors know and understand.

Further, the Defendants suggest that because Colborn did not watch most of MAM they could not be responsible for the distress he feels. But Colborn did not sue Netflix because the documentary offended him; he sued because it lied about him, and others believed those lies and then harassed and sought to punish him, all because Netflix accused him falsely. Netflix is responsible not only for what it said about Colborn but also for what it inspired in others who believed it. *Hucko v. Joseph Schlitz Brewing Co.*, 100 Wis.2d 372, 377 (Ct. App. 1981).

As a last resort, the Defendants say they intended none of this and Colborn's ordeal is just necessary collateral damage so that Netflix can fulfill its goal of supplying quality documentaries to a curious public. They overlook the compelling profit motive that inspired that

76

work and, instead, imply that the law permits Netflix to profit extravagantly while Colborn suffers alone.

But strong facts refute the Defendants' professed intentions. Those accused of holding illicit intentions rarely confess to it, so the Defendants' self-serving denials do not surprise or carry much weight. Intent is best judged not by the what the Defendants say, but by what they did. *Carney v. Village of Darien*, 60 F.3d 1273, 1279 (7th Cir. 1995). People meaning no harm, intent only on an idealistic effort to inform the public, do not profess an allegiance to a man like Steven Avery from the start, snidely call dedicated law enforcement officials like Colborn by derogatory terms such as "the baddies," adopt a sinister musical score when Colborn appears on a screen, darken or enhance his appearance to make him look menacing or evasive, or edit his testimony to attribute statements to him he never made. Barker Decl., Ex. 1, NFXCOL0002009 and 2133. They do not gloat about "setting up" Colborn—with unintended irony when they accuse Colborn of setting up Avery. There is, of course, much more, (see Andrew Colborn Colborn Decl. Ex. 1 and 2), but brevity counsels less. Suffice it to say this was peculiar behavior from people who say they meant Andrew Colborn no harm.

In short, the Defendants contend they intended only to disseminate a fair, balanced, and informative documentary, a dubious contention since their own words reveal they meant to exonerate Stephen Avery from the start. But, even were that the end goal, defaming Andrew Colborn was the means to that goal. A noble goal provides no license to achieve it through illegitimate means and certainly does not immunize the Defendants from responsibility. The Defendants sowed a whirlwind and are responsible for the consequences.

If all else fails, the Defendants resort to implicitly quarreling with this Court's prior decision on whether their conduct was sufficiently reprehensible and outrageous to support the claim for emotional distress. The Court noted,

> Colborn alleges that Defendants took the speculation of a convicted murderer and his advocates and allies and used a world media platform and smoke and mirrors to infuse those baseless accusations with the false appearance of objective truth, thereby near instantly transforming him into a worldwide pariah. Few people can say the same. It is difficult to deny that such conduct meets the Defendants' proffered standard of 'a complete denial of the plaintiff's dignity as a person.' " [Citation omitted]. Colborn has alleged outrageous conduct.

Colborn's allegations have largely proven true, so the Defendants' conduct appears no less outrageous now than it did at the lawsuit's beginning.

## CONCLUSION

For the reasons set forth above, Plaintiff, Andrew Colborn, respectfully requests that the Court deny the Defendants' motions for summary judgment.

Dated this 4th day of November, 2022.


By: /s/April Rockstead Barker
      April Rockstead Barker
      Attorneys for Plaintiff, Andrew L. Colborn


**Co-Counsel:**

Attorney George Burnett
231 S. Adams Street
Green Bay, WI 54301
P.O. Box 23200
Green Bay, WI 54305-3200
Phone: (920) 437-0476
Fax: (920) 437-2868
State Br No. 1005964