**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

ANDREW L. COLBORN,

        Plaintiff,

vs.

NETFLIX, INC.; CHROME MEDIA
LLC, F/K/A SYNTHESIS FILMS, LLC;
LAURA RICCIARDI; AND MOIRA
DEMOS,

        Defendants.

Civil No.: 19-CV-484-BHL

**DEFENDANT NETFLIX, INC.'S REPLY IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Andrew Colborn's Opposition to Defendants' Motions for Summary Judgment ("Opposition" or "Opp.," Dkt. 331) shows that, after years of litigation and months of discovery, he can point to no evidence that would allow him to meet his most fundamental burdens of proof. As a public official suing over a documentary about issues of public concern, Colborn must prove the challenged statements in Making a Murderer ("MaM") are *materially* false. He must prove, by *clear and convincing evidence*, that Netflix published those statements with "actual malice." To the extent that his claims arise from alleged implications, Colborn must prove, again by clear and convincing evidence, that Netflix intended for *reasonable viewers* to understand MaM to convey the alleged defamatory implications (or knew that they would). Further, as the respondent to a motion for summary judgment, Colborn must present *affirmative evidence* that would allow a reasonable jury, applying the proper evidentiary standards, to find in his favor.

Colborn's Opposition does none of this. Instead, he indulges in extended mischaracterization of both the parties' communications during MaM's development and MaM's content itself, relying on an improper "addendum" to his response to Netflix's Statement of Proposed Material Facts.[1] He then fixates on messages from a handful of anonymous individuals, theorizing that these deranged cranks somehow represent the *19.3 million* people who, according to Colborn, watched MaM within weeks of its release. Second Amended Complaint ("SAC") ¶ 15.[2] He then proceeds to misstate both his burdens of proof and the applicable law.

---

[1] *See* General Objections § 1 to the Defendants' Joint Response To Colborn's Additional Proposed Findings of Fact (hereafter "Joint Response").

[2] Not only are these messages unauthenticated, inadmissible hearsay (there is no way to determine who left the messages or whether those individuals even watched any of MaM), they are also irrelevant. As even Colborn acknowledges, they do not represent the opinions of *reasonable* viewers. Netflix Statement of Proposed Material Facts ¶¶ 126-128, Dkt. 271. As other courts have done, *see* Joint Response ¶ 46 & n.7, this Court should give these comments the weight they deserve: none.

1

Case 1:19-cv-00484-BHL   Filed 12/09/22   Page 2 of 17   Document 343

By the end of his Opposition, this much is clear: Despite the "exceptional" and "extensive" email record Colborn relies upon, *see* Opp. at 68, he has not a shred of evidence that Netflix published any statement about him with knowledge of falsity or serious doubts as to truth. Nor could it, given it did not have access to raw footage or any other source material. Thus, the Court does not even need to watch MaM—indeed, it could *assume* MaM is false—to conclude that no reasonable jury could find actual malice by clear and convincing evidence and to determine that Colborn's claims against Netflix must be dismissed for this reason alone.

If the Court does decide to watch MaM and independently evaluate how the series, as a whole, documents Steven Avery's claims that law enforcement framed him for murder, it will find Colborn's evidence on material falsity equally deficient. MaM does not adopt Avery's claims as "truth"—it merely presents them as accusations alongside rebuttals by Avery's detractors. None of MaM's necessary edits to testimony change the gist of what was actually said in open court. None of the 52 statements Colborn listed in his cross motion and incorporates in his Opposition by reference are false. Despite a hyped-up heading, Opp. at 60, Colborn does not identify even one "flat-out accusation of framing." And his claims about graphics and music are meritless. In sum, Colborn's Opposition provides no sufficient reason for this case to go to trial, and plenty of reasons to grant Netflix summary judgment and end this litigation for good.

## I.     No Reasonable Jury Could Find Actual Malice by Clear and Convincing Evidence

"Actual malice" means the defendant had a "high degree of awareness of probable falsity or entertain[ed] serious doubts as to [the challenged statement's] truth." *Madison v. Frazier*, 539 F.3d 646, 658 (7th Cir. 2008). Netflix demonstrated in its opening Memorandum ("Mem.," Dkt. 269) that it must prevail on the issue of actual malice because neither its notes to the filmmakers nor any other evidence support a contrary finding. Mem. at 14-26. In response, Colborn must present *facts*—not mere allegations, inferences, or argument—that would allow a reasonable jury

to find, *by clear and convincing evidence*, that Netflix distributed MaM with actual malice. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986). Despite this high burden, Colborn devotes only *five pages* of his 78-page brief to this dispositive issue and only *four paragraphs* to Netflix, even though its state of mind must be determined separately from that of the Producer Defendants. Mem. at 15. This lack of attention is glaring, yet not surprising: Colborn just does not have much to say.

### A. Netflix never "had the tapes"

First and foremost, Colborn points to no evidence that he could use to genuinely dispute the most important material facts underlying the actual malice question: No one at Netflix attended Avery's legal proceedings or ever viewed or possessed unedited footage or any other source material before it was assembled into episodes by the filmmakers. *See* Dkt. 271 ¶¶ 106-11. No one at Netflix compared one cut to another to identify or monitor the filmmakers' innumerable, granular edits as they tried to condense events that spanned two decades—and included a five-week murder trial—into a 10-hour series. *Id.* ¶¶ 91-96. Colborn cannot explain how, given this uncontroverted evidence, anyone at Netflix had any relevant knowledge about what the filmmakers decided to include or omit, much less knowledge that their decisions somehow rendered statements in MaM that are "of and concerning" him materially false.

Instead of evidence, Colborn relies on speculation and scapegoating. He insists that because Netflix representatives visited the filmmakers' editing studio, "[j]urors may infer that Netflix viewed raw footage and/or other source materials at the visit." Dkt. 323 at 47. But a nonmoving party on summary judgment is entitled only to *reasonable* inferences from the undisputed facts, not to "draw[] inferences that are supported by only speculation or conjecture." *Estate of Biegert v. Molitor*, 968 F.3d 693, 701 (7th Cir. 2020) (cleaned up). One visit to an editing studio does not support an inference that Netflix employees viewed *any* raw footage

3

during that visit—much less raw footage that underlies any of the edits that concern Colborn.

He also complains about purportedly "missing" documents, including episode cuts. Opp. at 32-33, 69. Procedurally, this is improper.[3] Colborn never brought a motion to compel on this subject, and discovery disputes may not be raised for the first time after discovery closes, in opposition to summary judgment. Even if it were proper to complain now, Colborn does not do so with the specificity required by Rule 56. Instead, he concedes that the documents he purports to need do not exist, s*ee* Opp. at 33, yet demands a trial anyway, implying that the "missing" cuts would show something nefarious, where the evidence actually produced does not. He is wrong, for reasons discussed elsewhere, *see, e.g.*, Mem. at 16-18, and "speculation may not be used to manufacture a genuine issue of fact." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). Rather, Colborn "must present affirmative evidence . . . even where [it] is likely to be within the possession of the defendant." *Anderson*, 477 U.S. at 257.[4]

The bottom line: Unlike the journalist whose article was at issue in *Masson v. New Yorker Magazine* and who "had the tapes" of her interviews with the plaintiff "in her possession," 501 U.S. 496, 521 (1991), the uncontroverted evidence here shows just the opposite for Netflix. *See* Dkt. 271 ¶¶ 106-15. Netflix therefore *lacked* any practical ability to discern

---

[3] Also improper: Colborn's insistence on collective references to "Defendants." To provide just one example: although he complains about the number of emails *Producer Defendants* disclosed from after MaM's December 18, 2015 release, Opp. at 32, Netflix produced approximately 280 emails and attachments from that time period. *See* Third Walker Decl. ¶ 2.

[4] Colborn had a full opportunity to conduct discovery and litigate any disputes, and admits that he affirmatively chose not to do so, Opp. at 33, save for an early motion for sanctions, Dkt. 190, that he wisely withdrew. It would be exceedingly unfair to Netflix at this late stage to assuage Colborn's regrets over his litigation strategy by denying summary judgment. *See, e.g.*, *Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir. 2002). Colborn has no one to blame but himself for his choice "not to chase down discovery responses in a timely manner." *Love v. City of S. Bend*, No. 3:15-CV-214-CAN, 2016 U.S. Dist. LEXIS 87900, at *21 (N.D. Ind. July 7, 2016). He cannot force Netflix to trial because he failed to obtain *nonexistent* evidence from some *other* defendant.

whether any given edit amounted to an actionable falsification, and as a result Netflix could not have published any of the statements that Colborn challenges with actual malice.

> B.  **Colborn's other arguments on actual malice lack merit**

Colborn also argues that Netflix shaped MaM to fit a preconceived storyline casting him as a villain and that purported "manipulations" in MaM show actual malice. Neither contention is supported by the evidence, nor could Colborn prevail even if it were.

> 1.  **Netflix had no preconceived storyline (and having one would not amount to actual malice in any event)**

Colborn claims that "Netflix pushed Chrome to do whatever it took to hammer home the message that law enforcement officers were out to get Avery and to frame him for Ms. [Teresa] Halbach's murder." Opp. at 69. This is argument, not evidence, and misleading at that: Colborn claims, for example, that "Defendants" referred to Colborn as one of "the 'baddies' and 'villains' of the series." *Id.* at 68. In fact, the reference to "baddies" was about *other* named individuals, not Colborn. *See* Dkt. 307 at 15 (citing NFXCOL0002009). The sole Netflix reference to a "key villain" that Colborn cites, Opp. at 29, is to Denis Vogel, the prosecutor responsible for Avery's wrongful rape conviction. *See* Dkt. 330-1 at NFXCOL0002133.

Next, Colborn accuses Netflix of wanting a documentary that would have the audience feeling "fury" and "shouting at their [screens] throughout." Opp. at 69. But even construing the evidence in a manner most favorable to Colborn, the "fury" note, which relates to the verdict scene, at most supports an inference that its author believed Avery's conviction to be somehow unjust and wanted viewers upset about that injustice. Publication of content the publisher believes to be true is the *opposite* of actual malice. The separate note on "shouting," meanwhile, refers to the *entire* arc of MaM and the strong reactions, positive and negative, that viewers would have toward *all* its subjects. None of the notes Colborn cites, *id.* at 28, mentions him or

suggests falsification as a way to stir viewer emotions. Also, Colborn is wrong that a "balanced report could not incite such strong emotions." *Id.* at 69. A balanced report about Avery's wrongful rape conviction certainly could incite strong emotions, for example.

Colborn also mischaracterizes the note that he contends shows that Netflix "celebrat[ed] when the edited version of Episode 5 was changed so as to make Mr. Colborn 'look caught in a clear lie.'" *Id.*[5] That is not what the note says, and it does not suggest that the footage was falsified; the word "look" is not there. Rather, the statement reflects the writer's opinion that the trial footage shows that Colborn "goes from being so sure and then is caught in a clear lie about the origin of the car make and model." Dkt. 330-1 at NFXCOL0002063. To the extent this comment shows "subjective awareness" of anything material, it shows the writer *believed* that Colborn had been caught lying, not that he thought the scene was false. Further, there is no evidence that the referenced scene actually appears in the final version of MaM.

Colborn also invents that Netflix "celebrat[ed] the changes that 'set Mr. Colborn up' to be the 'potential cop to plant the car' in Episode 5," and falsely asserts that Netflix described Chrome's edits as "identif[ying] Mr. Colborn as responsible for planting Ms. Halbach's vehicle on Avery's property." Opp. at 69-70. Saying Colborn is the "*potential* cop to plant the car" does not assume Colborn actually planted anything, nor does it express knowledge of the truth or falsity of that claim. It merely reflects the undisputed fact that Avery's "defense alleged" Colborn may have planted Halbach's SUV. *Id.* at 72; *see* Joint Response ¶¶ 22(a)-(b), 120.

Colborn stacks speculation on top of mischaracterization when he says that, from these

---

[5] Colborn also alleges in this sentence that Netflix urged Chrome "to shorten and cut testimony and courtroom scenes." Opp. at 69. Of course it did: MaM documents events that took place over decades, including a weeks-long trial. But Colborn cites no evidence—and there is none—that Netflix urged Chrome to condense material in ways that would falsify it. *Cf.* Dkt. 271 ¶¶ 86, 101.

comments, "it can be inferred" that Netflix "was involved during the evolution of Mr. Colborn's testimony into a segment that portrayed him in a significantly worse light." Opp. at 69. That is not a reasonable inference; it rests on a false premise and is wholly unsupported by any evidence in the record, and thus cannot help Colborn meet his burden of proof. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (citation omitted).

Colborn next refers to emails between Netflix employees discussing comments by Avery defense lawyer Jerry Buting that they were concerned could be interpreted as alleging that law enforcement officers themselves had killed Halbach. Opp. at 70. But those comments do not appear in the final version of MaM and are not at issue. Colborn nowhere claims MaM accuses him of participating in Halbach's killing. Any knowledge of the falsity of statements that are *not even in MaM* is irrelevant. Moreover, the fact that a statement about which Netflix employees expressed doubts did *not* appear in MaM undercuts any inference Netflix knew or suspected MaM conveyed false assertions about Colborn.

Finally, Colborn contends that "Netflix also looked for every opportunity to emphasize 'shock' at Mr. Colborn's appearance in the series, even when he is shown performing such routine tasks as escorting Avery or Dassey to or from the courtroom." Opp. at 70. Even if this were accurate (it is not), expressing shock at the undisputed fact that Colborn escorted Avery and his co-defendant in court is an opinion, not an admission of doubt about truth.

For all these reasons, Colborn has offered no evidence to support his "hammer home" claim. But even if the documents he cites (and mischaracterizes) supported his contention that Netflix had a preconceived storyline, having one is evidence of actual malice only if there is evidence the storyline was knowingly false. *See Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231,

241 (D.C. Cir. 2021) ("Concocting a pre-conceived storyline by itself is not antithetical to the truthful presentation of facts." (internal marks and citation omitted)). No such evidence exists.

### 2. The content of MaM itself is not evidence of actual malice

Colborn's second argument regarding actual malice has even less support. He first cites a number of cases, nearly all of them outside of Wisconsin and the Seventh Circuit, that he claims stand for the proposition that techniques such as "overly aggressive editing" are evidence of actual malice. Opp. at 70-72. All of those cases involved facts far afield from here—and Colborn neglects to mention that one was *reversed* by a higher court that explicitly found that omissions do "not demonstrate a disregard for the truth." *Perez v. Scripps-Howard Broad. Co.*, 520 N.E.2d 198, 204 (Ohio 1988) (reversing *Perez v. WEWS*, 1986 WL 12966 (Ohio Ct. App. Nov. 10, 1986)). Further, even if "overly aggressive editing" was probative of actual malice, it would be probative only as to MaM's *editor*, not Netflix. Netflix did not edit the series and did not have material knowledge of the edits made, "aggressive" or otherwise. *See* Dkt. 271 ¶¶ 89, 91-93, 96.

Also in this section, Colborn claims that MaM's use of graphics, commentary, sound effects and visual imagery "insinuated, implied and used innuendo to convey that he did in fact plant the evidence, as the [Avery] defense alleged," and presented his testimony in a way that made it "seem less credible." Opp. at 72. Colborn says this is evidence of actual malice. It is not—all apart from Colborn's gross mischaracterization of MaM's content and the fact he does not allege any of these aspects are false. Whether MaM was false and whether Netflix *knew* it was false are different questions; "falsity alone does not prove that statements were made with actual malice." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 491 n.6 (1984).

Colborn does not point to a shred of evidence to support his insinuations that Netflix could be found responsible for "[p]urposeful avoidance of truth," "[f]abrication and changes of

meaning through alteration of quoted materials," and a "pattern of biased and inaccurate reporting" similarly to the defendants in the cases he cites. Opp. at 71-72. That is because there is none. To the contrary, such claims are contradicted by the fact that MaM included significant amounts of material favorable to law enforcement and Colborn. *See* Mem. at 36-38.

Although a plaintiff may prove actual malice using circumstantial evidence, Colborn ignores the Seventh Circuit's caution that "courts must be careful not to place too much reliance on such factors." *Chi. Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 464 F.3d 651, 655 (7th Cir. 2006). Here Colborn's "circumstantial evidence" is not evidence at all—it consists entirely of his counsel's mischaracterization of the content of MaM.

### C. Colborn ignores his burden regarding allegedly defamatory implications

Finally, despite not pleading a libel-by-implication claim, Colborn now attempts to survive summary judgment by claiming that MaM "insinuated, implied and used innuendo to convey that [Colborn] did in fact plant the evidence, as the defense alleged." Opp. at 72; *see also id.* at 61. MaM implies no such thing. It documented Avery's accusations (and rebuttals to those accusations), but it neither adopted nor endorsed them. Regardless, the actual malice inquiry is two-fold where a claim is based on implication and innuendo: Colborn must still show actual malice as to *falsity*—i.e., that Netflix knew or had a high degree of awareness that the challenged statements and implications were probably false. In addition, he must show actual malice as to *meaning*—i.e., that Netflix intended for reasonable viewers to understand MaM to convey the defamatory implication Colborn alleges (or at least knew that they would). Mem. at 38-40 (citing *Saenz v. Playboy Enters.,* 841 F.2d 1309, 1318 (7th Cir. 1988) and *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 487 (7th Cir.1986)).

Colborn's Opposition does not contain a single reference to *Saenz* or *Woods*. He simply

9

Case 1:19-cv-00484-BHL   Filed 12/09/22   Page 10 of 17   Document 343

ignores these seminal, binding cases and, as a result, has forfeited any rebuttal to Netflix's argument and the uncontroverted declarations that Netflix had no such knowledge or intent. Dkt. 271 ¶¶ 120-21; Dkt. 272 ¶ 10; Dkt. 275 ¶ 18. Netflix therefore is entitled to summary judgment on all of Colborn's claims to the extent they are premised on what MaM purportedly implies.

In sum, Colborn has failed to identify any evidence sufficient to create a genuine dispute of any material fact that would allow a reasonable jury to clearly and convincingly find actual malice, or knowledge or intent regarding allegedly defamatory implications. Accordingly, this Court should grant summary judgment in Netflix's favor on these dispositive issues.

## II. Colborn Cannot Show Any Portion of MaM About Him Is Materially False

The Opposition also utterly fails to meet Colborn's burden to demonstrate a jury issue on the question of material falsity. Colborn pretends that Defendants have the burden to prove the "defense" of substantial truth. Opp. at 39. He is wrong. Colborn bears the burden to prove material falsity; a determination that the statements at issue are substantially true is simply another way of saying that Colborn cannot meet his burden. *See Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 668 (7th Cir. 2022) (plaintiffs could not meet their burden on falsity because "the record shows that this [allegedly defamatory] implication was substantially true").

To assess this element, the Court must first know the universe of challenged statements. This has been a moving target. Even now, Colborn purports to put in issue statements he did not even plead as actionable in the SAC. *See, e.g.*, Opp. at 55-56 (edits to deposition testimony); *id.* at 56-60 (physical reactions). Those statements must be disregarded. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). What's left are "statements" that fall generally into three buckets: **(1)** edits to his sworn testimony, including on the Jail Call, the Dispatch Call, and discovery of the key to Halbach's vehicle, Opp. § I.A; **(2)** the 52 statements identified in his cross motion papers (Dkt. 287 at 1-9), *see id.* § I.C; and **(3)** a hodge-podge of various visual and

10

Case 1:19-cv-00484-BHL   Filed 12/09/22   Page 11 of 17   Document 343

musical elements included in MaM and facts about Avery (not Colborn) omitted from MaM, *id.* § I.B, D, E, and G.[6] As set forth below, none of these statements are materially false.

### A. Colborn cannot show material falsity of the depiction of his testimony

Reports on court proceedings are protected by the fair report privilege, *see* Mem. at 27-28, and Colborn's argument that the privilege is inapplicable is not credible, as it is based entirely on an obscure treatise, a section of American Jurisprudence that does not cite Wisconsin law, and the later-repudiated 1896 Wisconsin Supreme Court opinion in *Buckstaff v. Hicks*, 94 Wis. 34 (1896). Opp. at 40-41.[7] Colborn ignores the Seventh Circuit's recent discussion of the Wisconsin privilege, in which it held that the privilege shielded a news report that, like MaM, presented allegations made in court proceedings as allegations and "provided [the plaintiff's] own views throughout." *Fin. Fiduciaries*, 46 F.4th at 666. The privilege is lost only if the reporting is not substantially accurate. Netflix has already explained that the challenged edits are not actionably false because they do not materially change the gist of any testimony, Mem. at 17-33, and Colborn appears to agree that *Masson*, the Supreme Court's seminal opinion on altered quotations, controls, *see* Opp. at 42-43. Key to that holding is the principle that a statement is materially false for purposes of a defamation claim only if it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson*, 501 U.S. at 517; Opp. at 42. Netflix showed in its Memorandum that the edits Colborn identified in his SAC do not meet *Masson*'s standard for material falsity, and it is unnecessary to rehash that discussion here. Colborn's Opposition falls far short of contradicting Netflix's showing.

---

[6] Sections I.F and I.H of the Opposition do not identify or address any challenged "statements."
[7] In 1916, the Wisconsin Supreme Court repudiated *Buckstaff*'s holding that "excessive publication" could defeat the privilege as "unquestionably extreme," noting it would preclude newspapers from ever relying on the privilege. *Putnam v. Browne*, 162 Wis. 524, 532 (1916).

One fundamental flaw in Colborn's argument is that, rather than attempt to meet his burden to show that the editing of his testimony rendered it materially false, he argues that the edits were "selective," Opp. at 52, and made him "appear less credible," *id.* at 42. Colborn does not explain how this equates to material falsity, nor could he. Fairness and falsity are different things and credibility is a subjective evaluation, not an objectively verifiable fact.[8] Similarly, Colborn's unsupported insinuation that documentaries are required to provide disclaimers that the footage they present has been edited, *id.* at 44, is incorrect. Viewers of a documentary understand that, out of necessity, its footage has been edited. Certainly viewers of MaM understood this, even without an explicit disclaimer. Among other reasons, Episode 5 includes a local news clip stating the trial was expected to last six weeks, and Episode 8 explains that closing arguments took two days. *See* Ep. 5 (Dkt. 120-5) at 8:40-8:49; Ep. 8 (Dkt. 120-8) at 3:47.

### B. Colborn cannot show material falsity of the 52 statements that purportedly support his implied libel claim

Colborn's discussion of purported "flat-out accusations of framing" is remarkable in that it does not bother to identify even one, instead referencing Colborn's own cross motion for summary judgment. Opp. at 61. But Netflix has already explained why the 52 statements enumerated there are not actionable. *See* Dkt 307 at 7-8; Dkt. 310-2. Likewise, Netflix has explained why Colborn is wrong in his belief that the 52 statements somehow imply that he "participated in a conspiracy to plant evidence" and "lied about it in his testimony." Opp. at 61; *see* Mem. at 38-40; *see also* Dkt. 307 at 8-12. A few additional points:

---

[8] For this reason, Colborn's extensive discussion of a magazine article about how juries determine the credibility of trial witnesses, Opp. at 45-46, is beside the point. Documentaries are not trials. Requiring filmmakers to convey every nuance that bears on credibility would eviscerate the First Amendment's protections for "speech that matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974). Related, Colborn's gripe that MaM omitted more than 85 transcript pages' worth of testimony about the key to Halbach's SUV, Opp. at 53-55, illustrates the practical impossibility of complying with his untenable demands.

First, Colborn's reliance on the republication doctrine is misguided, and not just because he fails to identify a single statement that constitutes a "flat-out accusation of framing." Only one of the cases he cites on this doctrine involve mass media publications—the obsolete and 121-year-old *Sans v. Joerris*, 14 Wis. 663, 726 (1861)—and most involved the repetition of mere "rumors." This case, meanwhile, involves a documentary about an important trial and the surrounding public controversy, which were both the subject of contemporaneous news reports. Colborn ignores both that MaM, in documenting the public controversy, included many statements supporting him and contradicting any claims of framing, and that the Seventh Circuit has made clear that media reports depicting allegations as allegations and including the plaintiff's side are not actionable as false. *See Fin. Fiduciaries*, 46 F.4th at 666; *Glob. Relief Found. v. N.Y. Times Co.*, 390 F.3d 973, 987-90 (7th Cir. 2004). Colborn does not mention *Financial Fiduciaries* at all and he attempts to distinguish *Global Relief* primarily by arguing it was about a government investigation. Opp. at 66. So is this case: a murder trial is nothing if not the culmination of a very high-stakes government investigation.

Second, even if the Court were to accept Colborn's allegations about what MaM implies at face value, Colborn must show a jury issue exists on the question of material falsity. Yet, Colborn does not point to any evidence in the record that would show any of the allegedly defamatory statements and implications in MaM are false. For example, although Colborn says the primary thesis of MaM is that he "was a central figure in a law enforcement conspiracy to plant evidence," Opp. at 33, he does not deny planting evidence in his declaration. Instead, he refers to his trial testimony, while both complaining that MaM did not include enough of it, *id.* at 53, and insisting (erroneously) that, at trial, "Avery's attorneys conspicuously avoided statements that made positive accusations of planting evidence," Joint Response at 44. This failure

precludes Colborn from meeting his burden on falsity and dooms his claims to dismissal.

Third, Colborn strays far from the facts and the law when he falsely asserts that statements cannot be substantially true as a matter of law when they "impute fraudulent or criminal intent to a person who has not been convicted or even charged with a crime," citing a Texas opinion that does not say that. Opp. at 40 (citing *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 794 (Tex. 2019)). Colborn then makes an even more absurd contention: that statements describing a convicted criminal cannot be substantially true where they convey "that the convict actually committed the acts for which he was convicted." Opp. at 40 (citing *Rivera v. Lake Cty.*, 974 F. Supp. 2d 1179, 1192 (N.D. Ill. 2013)). *Rivera* is limited to its extreme facts.[9] If Colborn's distortion of the law were true, he could be liable for defaming Avery by saying Avery killed Teresa Halbach. The law does not countenance such a ridiculous result.

### C. Colborn cannot show any other "statement" is materially false

Colborn also complains about, for example, depictions of his "physical reactions" and the alleged use of graphics and other "enhancements" that purportedly "point fingers" at him, Opp. at 56-6, 62-64. But none of this—even if properly pleaded, in the SAC, and much of it was not, *see supra* at 10—amounts to a material falsification.

For example, it would not make any difference to the mind of a reasonable viewer whether Colborn is shown making eye contact rather than looking down, or getting up from the witness stand rather than cracking his knuckles, or whether footage from square-format videotape is shown in full screen. Opp. at 56-60. As for graphics, *id*. at 62-63, Colborn complains they "expressly identify" him as "one of the alleged conspirators." In fact, he *was* one

---

[9] The defendants had tortured the plaintiff into falsely confessing to raping and murdering a child and obtained a wrongful conviction. *Rivera*, 974 F. Supp. 2d at 1185-87. The court denied motions to dismiss, holding that the defendants could not rely on substantial truth at the threshold stage, especially if they knew the plaintiff was innocent. *Id.* at 1192.

14

of the alleged conspirators the presiding judge allowed to be named. *See* Dkt. 271 ¶ 14. Netflix addresses these claims in its opposition to Colborn's motion for partial summary judgment. *See* Dkt 307 at 7-8; Dkt. 310-2. Finally, as mentioned *supra*, Colborn has no basis for alleging Netflix "directed" that "bad guy" or "villain" music would play while he is shown. Opp. at 63. Regardless, music is not true or false and cannot render a documentary actionable. *See Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶¶ 25-26, 351 Wis. 2d 479, 505-07.

To defeat Netflix's motion for summary judgment, Colborn must come forward with evidence that the statements, scenes, and alleged implications he challenges are false. *Mach v. Allison*, 2003 WI App 11, ¶17, 259 Wis. 2d 686, 702, 656 N.W.2d 766, 773. Because he has not done so, Netflix is entitled to summary judgment on the ground that MaM is substantially true.

### III. Colborn Has Not Shown Any Factual Dispute That Saves His IIED Claim

As Netflix demonstrated, Mem. at 41-45, Colborn's IIED claim fails with his defamation claim, and Colborn cannot prove any of the tort's elements. Colborn's Opposition does not change that. He implicitly admits Netflix did not distribute MaM for the purpose of causing him emotional distress when he asserts Netflix instead had a "compelling profit motive." Opp. at 76-77. He likewise fails to cite evidence that would meet his burden to show his emotional distress was extreme and disabling, or that MaM was a substantial cause of his alleged distress, rather than the other stressors in his life or deranged third parties' statements about a documentary he never actually watched. *Compare* Opp. at 73-77, *with* Mem. at 41-45.

### CONCLUSION

For all of the foregoing reasons, and for all of the reasons set forth in its Memorandum in Support of its Motion for Summary Judgment, Netflix respectfully requests that this Court grant Netflix summary judgment and enter an order dismissing all claims against it with prejudice.

Dated: December 9, 2022                    Respectfully submitted,

*s/ Leita Walker*
Leita Walker
Isabella Salomão Nascimento
Ballard Spahr LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
T: (612) 371-6222
F: (612) 371-3207
walkerl@ballardspahr.com
salamaonascimentoi@ballardspahr.com

Matthew E. Kelley
Emmy Parsons
Ballard Spahr LLP
1909 K Street, NW, Suite 1200
Washington, D.C. 20006-1157
T: (202) 508-1112
F: (202) 661-2299
kelleym@ballardspahr.com
parsonse@ballardspahr.com

James A. Friedman
Godfrey & Kahn, S.C.
One East Main Street
Suite 500
Madison, WI 53703-3300
T: (608) 284-2617
F. (608) 257-0609
jfriedman@gklaw.com

*Counsel for Netflix, Inc.*