# Exhibit 6

guess it sunk into her because she did stop and she's a different person now. I gotta give her a lot of credit. When Jodi gets out, hopefully, we can set a wedding date." (Jodi Stachowski was Avery's loyal girlfriend and fiancée at the time of his wrongful conviction lawsuit and subsequent murder charge.)

Then Avery was heard speaking on a more recent phone call from jail, to the documentarians, most likely.

"A lot of people told me to watch my back. Most of the time I didn't even believe 'em. But then, sitting and doing depositions, I don't know, it kinda changed my mind. They were covering something up. And they were still covering something up. Even with the sheriff who's on there now, he's... covering something up."

By the end of the night I had seen clips of videos from several of the officers' depositions and, I had to admit, they looked like they were being defensive. They were not happy about being grilled by a roomful of attorneys concerning a very black mark on their department, especially not with Steven Avery sitting there, watching them squirm. It's a rare cop who does well when the tables are turned, when they are the one on the receiving end of a blistering interrogation by their accusers.

Most people do get nervous when being deposed. It's not much different than testifying in court, especially with the lens of a video camera peering into your eyes from three or four feet away. You are sworn under oath and intense lawyers start by grilling you about uncomfortable topics that you may or may not know anything about. But as I tell witnesses before they testify during trials, if you stick only with what you know and tell the truth, you have nothing to fear. If you don't understand the question, say that. If you don't know the answer, say that. And by all means, don't let the lawyers get under your skin!

On the other hand, nearly all of them looked more defensive than they should have if they had nothing to hide—at least in the video clips the documentarians chose to include in the series. When I later watched the complete video of the depositions of

Case 1:19-cv-00484-BHL   Filed 12/09/22   Page 2 of 6   Document 344-6

the officers who were most directly accused of wrongdoing—either in the first Avery case or in the second—my concern that they had something to hide, though significantly reduced, was not completely alleviated. This was not simply a case of only selective editing to make them look bad.

They say lawyers are the worst witnesses on the stand. We're either too wordy, too full of ourselves, too prone to analyze questions before we respond—or all of the above. But lawyers can have their fair share of these occupational hazards, and still be a halfway decent witness on the stand. On the three or four occasions I had to testify, I did not find it difficult at all. It helps, of course, if you have no skin in the game, which is the position I was in when it was my turn to be deposed in Steven's wrongful conviction lawsuit.

Almost a year to the day after Steven Avery was exonerated, my boss, DA Mark Rohrer, and I were both subpoenaed to appear for depositions at the local branch of a large Milwaukee law firm. Walt Kelly, one of Avery's lawyers who was prominently featured in the early episodes of *Making a Murderer*, would be our inquisitor that day.

Whether at trial or in depositions, when it comes to grilling reluctant witnesses, Kelly is one of the best. He's an aggressive attorney, but he's not just a hired gun. Kelly passionately believes in his client's cause, and to the extent he pushes the limits of civil advocacy, that's why. His gray beard and piercing blue eyes match the personality of this aging but still vibrant activist of the sixties, and although we'd never met, I liked him immediately. Besides, my feelings about what happened back in 1985 weren't a secret. I'd been open with the Wisconsin Department of Justice in the DOJ's independent review of the circumstances surrounding Steven Avery's wrongful conviction, and I intended to be the same the day I was deposed.

I walked into a not-big-enough conference room, where a crowd of red-eyed and weary attorneys were sitting around a table with pens and legal pads poised in front of them, ready to have at

Case 1:19-cv-00484-BHL   Filed 12/09/22   Page 3 of 6   Document 344-6

*the back of the cabinet. I was in visual contact when they were doing this as they were only a couple of feet from me. Sgt. COLBORN began to put the books that were taken out of the cabinet back into it. He was having some resistance against the books, they were caught on something, and he pushed on the books banging them into the back of the cabinet. Lt. LENK left the room to call the command post for some boxes for the pornographic materials that we had found. Sgt. COLBORN went back to searching through the magazines under the desk area. I was completing the search of the nightstand. After approximately two minutes, Lt. LENK came back to the room. He entered the doorway of the room approximately one foot away from me, pointed to the floor and said, "There's a key here." He pointed to the floor next to the cabinet by a pair of men's slippers.*

It was strike two against Making a Murderer. The documentarians had done a masterful job. By repeatedly showing video clips of the key in plain view on the floor, with books inside the cabinet and items on top, and by carefully editing testimony from Deputy Kucharski and altogether omitting the details from Colborn and Lenk, they convinced Netflix viewers worldwide—beyond a shadow of a doubt—that Colborn and Lenk had planted the key.

Granted, had they included Colborn and Lenk's explanation of how they happened upon the key, viewers' opinions of their account's credibility would be split and, like every other issue in the Avery case, hotly contested. By choosing to hide the explanation of the police because it ran counter to their chosen agenda, the documentarians denied viewers the opportunity to decide for themselves. By skillful editing and their expert use of video and sound, they made the decision for everyone else, and not for the first time in the upcoming weeks did the word "censorship" come to my mind.

I had promised myself I would not let my favorable impression of Colborn and Lenk affect my evaluation of whether they were

Case 1:19-cv-00484-BHL    Filed 12/09/22    Page 4 of 6    Document 344-6

*ontact when they were
et from me. Sgt. COL-
taken out of the cabi-
resistance against the
and he pushed on the
cabinet. Lt. LENK left
ne boxes for the porno-
Sgt. COLBORN went
under the desk area. I
stand. After approxi-
ck to the room. He en-
mately one foot away
There's a key here." He
y a pair of men's slip-*

*rderer.* The documentari-
tedly showing video clips
books inside the cabinet
g testimony from Deputy
letails from Colborn and
s worldwide—beyond a
enk had planted the key.
and Lenk's explanation
wers' opinions of their ac-
e every other issue in the
z to hide the explanation
their chosen agenda, the
pportunity to decide for
expert use of video and
one else, and not for the
word "censorship" come to

t my favorable impression
ion of whether they were

telling the truth. After all, I could imagine without justifying it for a minute that convinced of Steven Avery's guilt, but concerned there was not enough evidence to convict him, Colborn and/or Lenk could have planted the key to strengthen the case. Short of being in the room when they found the key, I realize it's impossible to know with 100 percent certainty. My opinion is just that—an opinion. But at least it's based upon the "totality of the facts and circumstances," as encouraged by the law—not just the ones pushed by the defense and fed to me by *Making a Murderer.*

Case 1:19-cv-00484-BHL   Filed 12/09/22   Page 5 of 6   Document 344-6

teven wasn't the only member of
ible with the law.

d a violent past, most notably an
his former wife accused him of
le her with a telephone cord.
aving been convicted of battery
92, stemming from an attack on
ves don't fare well in the Avery

at the salvage yard and were on
oach was murdered, so they both
y *State* v. *Denny*.

he court found in favor of the de-
n wide. Buting and Strang would
ittention away from Steven Avery
aforementioned siblings—or, for
n unsavory past who happened
the day Halbach was murdered.
that Earl or Chuck or someone
efendant never has to prove any-
burden of proof away from the
ll they would have to do would be
ninded jurors that someone else
very would walk away a free man.
o weeks before the start of what
ong trial, the parties gathered in
rence. Shackled in handcuffs and
a stun belt, Steven Avery was es-
ive deputies standing ready with
. Security outside the courtroom
1 so much riding on his decision
rd-party responsibility *Denny* Mo-
matter under advisement a few
ady to announce his decision.
lefense. After conceding that the

persons identified by the defense had the opportunity to murder Teresa Halbach, the judge said there was nothing to demonstrate that any of them had a motive to kill her. And without evidence of motive, he explained, the evidence failed the legitimate tendency test under the *Denny* case.

Not allowed to blame someone else for Halbach's murder, the defense team would be left with arguing the conspiracy theory and harping on reasonable doubt. The jury would never learn about Chuck or Earl Avery or any other violent miscreant that was roaming the salvage yard that day. It was very good news for the prosecution.

The defense fared much better with the blood vial defense. With each side wanting to shape how the issue would evolve, it had been a long and torturous route. At that same hearing on January 30, Judge Willis sided with the defense and denied the state's motion to exclude the blood vial evidence. The way was cleared for Buting and Strang to accuse the police of secreting some of their client's blood from the vial and planting it inside Halbach's car.

With Judge Willis's decision to permit the frame-up defense, Avery's trial for Halbach's murder would become intertwined with his wrongful conviction case twenty-two years earlier. With the blood vial defense still viable and the allegations that Colborn, Lenk, and a group of unnamed and unnumbered cronies from the sheriff's department planted Halbach's SUV at the salvage yard and its ignition key in the defendant's bedroom, he had a legitimate shot of walking away a free man—especially with Strang and Buting at his side.

The prosecution, I thought, was in trouble. At the time—a decade before researching the matter in full—I was disconcerted by the fact that Colborn and Lenk were the officers who found the key, and only after other searches failed to turn it up. If only Kratz could get Brendan Dassey's confession in front of the jury, I thought, the defense would not stand a chance. But Dassey's Fifth

Case 1:19-cv-00484-BHL    Filed 12/09/22    Page 6 of 6    Document 344-6