## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

ANDREW L. COLBORN,

                **Plaintiff,**

      **vs.**

NETFLIX, INC.; CHROME MEDIA
LLC, F/K/A SYNTHESIS FILMS, LLC;
LAURA RICCIARDI; AND MOIRA
DEMOS,

            **Defendants.**

**Civil No.: 19-CV-484-BHL**

## DEFENDANTS' JOINT RESPONSE TO PLAINTIFF ANDREW COLBORN'S
## ADDITIONAL PROPOSED FINDINGS OF FACT

Pursuant to Civil Local Rule 56(b)(3)(B), Defendants Netflix, Inc. ("Netflix"), Chrome

Media LLC, Moira Demos, and Laura Ricciardi ("the Producer Defendants") (collectively, "the

Defendants"), by and through undersigned counsel, for their Response to Plaintiff Andrew

Colborn's Additional Proposed Findings of Fact ("CAPFF") (Dkt. 325), state as follows:

## GENERAL OBJECTIONS

I.    **Colborn's 17-page, single-spaced, un-enumerated "Addendum" violates the Local
    Rules, and the Court should disregard the Addendum and all references to it in
    Colborn's opposition papers.**

Incorporated in Plaintiff Andrew Colborn's memorandum of law in opposition to the

Defendants' Motions for Summary Judgment (*see* Dkt. 327 at 3-27) and appended in a longer

format to his responses to the Defendants' respective Proposed Findings of Fact (*see* Dkts. 323-

1, 324-1, 326-1) is a document titled "Addendum to Response to Defendants' Proposed Findings

of Fact: Episode Summaries" (the "Addendum"). Pages 3 through 27 of the Opposition are an

abridged version of the Addendum that then cite to the Addendum itself as the supporting, factual record. The Addendum—a 17-page, single-spaced, un-enumerated "summary" of *Making a Murderer* ("*MAM*")—is improper for at least four reasons. As set forth fully below, Defendants object to the Addendum, and respectfully request that the Court disregard it.

*First*, Civil L. R. 56(b)(2)(B) does not permit such a document to be submitted or considered by the Court on summary judgment. That rule contemplates "a concise response to the moving party's statement of facts" and requires "reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph." Colborn purported to file such responses at Dkts. 323, 324, and 326, and he filed his 95 additional statements of fact at Dkt. 325. But nothing in the Local Rules contemplates the third "factual" document Colborn filed—the Addendum. The Addendum does not include cross-cites to the various statement of fact documents, nor do the statement of fact documents address all the facts in the Addendum. As a result, nothing in the Local Rules provides to the Defendants a mechanism by which to respond to the allegations contained therein. The Addendum, and any reference to or reliance on it in the papers Colborn filed in opposition to Defendants' Motions for Summary Judgment, therefore severely prejudices the Defendants. Colborn had the same opportunity as any other litigant, including the Defendants in this case, to (1) respond to the moving party's Proposed Findings of Fact and (2) put forth 100 additional, material facts in his CAPFF. He did both—*and* he submitted the Addendum, which those same rules do not contemplate. Accordingly, the Defendants do not respond to Colborn's improper Addendum, and the Court should similarly disregard it.

*Second*, the Addendum is neither competent evidence nor a factual document. Rather, it is attorney characterization and argument. Citations to the Addendum in any of his opposition

papers are therefore improper. *MaM* speaks for itself, and the Court must consider the challenged statements in the context of the whole 10-hour series. *See* Fed. R. Evid. 106; Fed. R. Evid. 1001–08; *Bd. of Forensic Document Exam'rs, Inc. v. ABA*, 922 F.3d 827, 832 (7th Cir. 2019); *Mach v. Allison*, 259 Wis. 2d 686, 712, 656 N.W.2d 766, 788 (Wis. Ct. App. 2003); *see also* Dkt. 269 at 8 n.3, 30, 33, 36; Dkt. 307 at 4, 9, 10 n.3; Dkt. 309 at 2, General Objection No. 1. For this reason too, the Defendants object to the Addendum's consideration and any reliance thereon in Colborn's opposition papers, and respectfully request that the Court simply watch the series. Netflix previously filed all 10 episodes at Dkts. 120-1 to 120-10.

**Third**, to the extent Colborn wishes to rely on the Addendum for the purpose of asking the Court to make findings of material fact regarding the contents of *MaM*, he should have done so under the procedures provided in the Local Rules. It was incumbent on him to describe the portions of each episode on which he relies in opposing the Defendants' motions for summary judgment in separately numbered paragraphs, limited to one material fact per paragraph and with time stamps to each passage from the series. This is what Defendants did in their respective statements of Proposed Findings of Fact—for example, to show the many instances in which *MaM* portrays a pro-law enforcement, anti-Steven Avery perspective such that no reasonable viewer could have concluded that *MaM* was adopting or endorsing Avery's frame-up theory. *See generally* Dkts. 271, 291.[1] Had Colborn done so, he would have far exceeded the 100-fact limit on the "facts" in the Addendum alone. His failure to follow the procedures set forth in Civil

---

[1] Indeed, out of an abundance of caution, Netflix made its summary of each material fact from *MaM*'s episodes its own, individual enumerated paragraph. Doing so used 59 of Netflix's allotted 150 facts, as permitted under the Local Rules. *See, e.g.*, Dkt. 271 ¶¶ 25-83. If Netflix had believed an un-enumerated "Addendum" was proper, it undoubtedly would have used those 59 items to address some other topic.

Local Rule 56 should not be rewarded, and the Court should decline to consider any "facts" to the extent they appear only in the Addendum and not in the CAPFF.

**Fourth**, and finally, to the extent Colborn's Addendum includes statements from the series which were not expressly pleaded in the body of his Second Amended Complaint ("SAC"), or even either of its exhibits, these statements are not at issue in this case because Colborn has failed to properly plead them. *See* Dkt. 309 at 2-3, General Objection No. 2. It was Colborn's burden to properly plead and put at issue all of the statements from *MaM* he is challenging in this case, and he had three opportunities to do so, including his original complaint, filed on December 17, 2018; his Amended Complaint, filed on March 4, 2019; and his Second Amended Complaint, filed on January 3, 2020. Accordingly, the Defendants dispute the materiality and the propriety of any statements which appear in Colborn's Addendum, but which were not pleaded—and therefore not put at issue—in the SAC. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

## II.      The Court should disregard any additional proposed findings of fact beyond the 100 that the Local Rules permit.

Colborn has violated Civil Local Rule 56 in at least two other ways as well. The rule includes an express limitation on the number of additional facts that a non-moving party can put forth, without leave of court: 100. *See* Civil L. R. 56(b)(2)(B)(ii). It also directs that each additional fact must appear in a separately numbered paragraph and "be limited to one material fact." *Id*. Colborn fails to abide by either requirement.

Colborn did not move the Court for leave to file more than 100 facts in response to the Defendants' respective Motions for Summary Judgment. Instead, in an attempt to evade the 100-fact limit, the vast majority of Colborn's proposed facts are improperly compound. As one

example, No. 74 includes six single-spaced, un-enumerated bullet points that run for more than a page, where Colborn attempts to summarize several scenes that he alleges distort his real-life physical reactions. *See id*. At bare minimum, each supposed "example" included in No. 74 should have been a distinct, enumerated fact. This alone would have put Colborn over the 100-fact limit under the local rules, given that he started with 95 additional proposed facts. Yet another example is No. 46, in which Colborn attempts to propose as material facts the contents of at least 14 voicemail messages. Breaking these 14 voicemails out into their own distinct, enumerated facts would, again, have exceeded the 100-fact limit of the local rules.

Colborn also fails to include in his CAPFF all of the actual, additional "facts" he cites in responding to the Defendants' respective statements of Proposed Findings of Fact—allegations that appear nowhere else in the summary judgment record. The problem with this is twofold. First, on reply, the Local Rules do not permit for Defendants to respond to Colborn's "response" to their facts—rather, the rules allow only for a response to Colborn's CAPFF. By failing to include the new "facts" in his CAPFF, Colborn denies the Defendants a mechanism through which to respond to those facts. Second, the rules allow only 100 additional facts to be introduced on opposition to a motion for summary judgment. By not including the new "facts" from his response in the CAPFF, Colborn again evades the strictures of the Local Rules with which the Defendants complied. This is improper gamesmanship that prejudices the Defendants.

The Defendants object to both of Colborn's flagrant violations of Civil Local Rule 56(b)(2)(B)(ii), which it believes are sanctionable. It is entirely within the Court's discretion to read to whatever it considers to be the 100th fact in Colborn's CAPFF, properly counted, and then stop reading—and to disregard portions of Colborn's Opposition that rely on facts that exceed the limits of the Local Rules. In any event, Defendants have responded to the 95 items

Colborn listed in the CAPFF, notwithstanding their compound nature, and they have also painstakingly identified, listed, and responded to each of the new facts Colborn included in his response to Defendants' respective statements of Proposed Findings of Fact (Dkts. 323 and 326). It has assigned each of these "new" facts its own number, starting with No. 96.

**III.     The Court should rely on the best evidence, and *MaM* and the Parties' communications speak for themselves.**

Defendants generally object to Colborn's characterizations of *MaM* and the Parties' communications and instead ask the Court to rely on the best evidence. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* Fed. R. Evid. 106; Fed. R. Evid. 1001–08; *Bd. of Forensic Document Exam'rs, Inc. v. ABA*, 922 F.3d 827, 832 (7th Cir. 2019). Similarly, the Parties' communications speak for themselves. *See id.*

As one example, Defendants demonstrated in their Oppositions to Plaintiff's Motion for Partial Summary Judgment that there are a number of transcription errors—both material and immaterial—in Colborn's cross motion papers, as well as misleading use of quotation marks for words and phrases that don't appear in the underlying evidence. *See, e.g.*, CAPFF ¶ 15(a) *infra*. Moreover, Colborn regularly selectively quotes from portions of several, unrelated documents, representing them as if related or from a single document, and/or removing the quoted portions from their context. *See, e.g.*, CAPFF ¶¶ 34, 36 (attempting to impute use of the terms "key villain" and "mastermind" as against Colborn, when the notes make clear the individuals to whom they are referring, which are expressly *not* Colborn).

These examples underscore how Colborn's characterization of *MaM* and the evidence is misleading and unreliable, and the best evidence remains *MaM* and the Parties' communications themselves.

**IV.     The Court must consider each Defendants' subjective state of mind separately.**

In the interest of streamlining this case, Defendants file a joint response here, but they object to any suggestion that they share a state of mind. Actual malice is based on an individual defendant's subjective state of mind, and one defendant's intent cannot just be imputed to another. *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Accordingly, Netflix objects to Colborn conflating its state of mind with the Producer Defendants, and vice versa. The Producer Defendants object to any suggestion that notes from Netflix reflect the Producer Defendants' state of mind, and vice versa. Defendants also object to any efforts to conflate the personal opinions of an employee who lacked decision-making authority with any Defendants' state of mind.

In particular, Defendants object to any mischaracterization of Mary Manhardt as "Defendants," "Chrome's editor," "*MaM*'s primary editor," "*MaM*'s creator," or "Chrome's creative team," or any efforts to conflate her personal opinions with any Defendants' state of mind. *See, e.g.*, CAPFF ¶¶ 3, 7(c), 9(c), 10(c), 19(c), 37(b), 39 (a). Moira Demos was the lead editor of the series, and Manhardt's testimony details her project-based editing role, noting that by the time she joined the team, "films that were 1 through 4 I guess were in very good shape. They were very solid rough cuts, very solid," Dkt. 330-14 (Manhardt Tr.) at 53:17–54:8, and responding to question about being a "consulting editor" on Episodes 5 to 9, "those were really Moira's and I did almost nothing on them except watch them and give notes, which is what a consulting editor does." *Id*. at 54:11–19. Manhardt's credits reflect her role, including "consulting editor" for Episodes 5 to 9 (which includes the trial episodes), "additional editor" for Episodes 2 to 4, "co-editor" for Episode 1, and "editor" only for Episode 10. *See* Dkt. 290 (Ricciardi Decl.) ¶ 39; Dkt. 288 (Demos Decl.) ¶ 40; Dkt. 330-14 at 52:8–55:13. In comparison, Demos received "editor" credit for all ten episodes and shared editor credit for only one episode:

Episode 10. *See id.*; *see MaM* credits. Manhardt worked under Demos and Ricciardi's instruction and supervision. *See id.* Manhard's opinions do not reflect the subjective state of mind of either the Producer Defendants or Netflix.

**V.      Beyond state of mind, the Court should resist Colborn's attempts to conflate one Defendant's conduct with another's in this litigation and the events giving rise to it.**

From the beginning of this case, in the original complaints, the subsequent amended complaints, and throughout the discovery process, Colborn has demonstrated an unwillingness to recognize that, while Chrome Media LLC, Laura Ricciardi, and Moira Demos are part of a common enterprise, Netflix is a distinct corporate entity that had a specific role in the creation and release of *MaM*. In his most recent filings, this manifests in the form of accusing "Defendants," in the collective, of supposedly "refusing" to produce certain evidence, including assembled cuts. *See, e.g.*, Dkt. 323 ¶¶ 1, 78, 110, 111. Netflix has been very clear for many months that it never received, possessed, or even watched any raw footage or other source material, and that it did not retain any cut of any episode except the final cut. Dkt. 271 ¶¶ 110-11. Colborn has no evidence to the contrary. *See generally, e.g.*, Dkt. 323. Netflix never had possession of such video evidence, and it certainly has not "refused" to produce it.

Nor did the Producer Defendants "refuse" to produce evidence. As explained in depth in July and August 2022 correspondence, the Producer Defendants produced everything they agreed to and disclosed what materials they no longer possessed. *See* Dkt. 316-2 at 4; *see also* Supp. Decl. of Kevin Vick, Ex. 1 at 4. Tellingly, Colborn never moved to compel further discovery. *See id.* Crucially, all the raw footage of Colborn was produced—the Producer Defendants produced *all* raw footage from *all* camera feeds of Colborn testifying at Avery's trial. Dkt. 288 ¶ 30.

## DEFENDANTS' JOINT RESPONSES TO PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF FACT (DKT. 325)[2]

1.      This case arises out of the Netflix series, "Making a Murderer" ("MAM"). Defendants Chrome Media, LLC ("Chrome") and its principals, Laura Ricciardi and Moira Demos, take significant credit for the content of MAM, contending that they are "producers" of the series. However, Netflix was also undeniably heavily involved in the creative development of each and every episode, as described further below. Netflix approved the final cuts of all MAM episodes. Dkt #286; Barker Decl., Ex. 3, Nishamura Tr. at pp. 170-71; Ex. 4, Del Deo Tr. at p. 141; *see also* Barker Decl., Ex. 21. Netflix aimed to craft the series from "a marketing perspective" and also from an "awards qualifying perspective." Barker Decl., Ex. 1 (NFXCOL ¶308).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 4 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

1(a).      *This case arises out of the Netflix series, "Making a Murderer" ("MAM"). Defendants Chrome Media, LLC ("Chrome") and its principals, Laura Ricciardi and Moira Demos, take significant credit for the content of MAM, contending that they are "producers" of the series.* **Undisputed**.

---

[2] For the Court's ease of reference and convenience, Defendants have followed the numerical sequence of Colborn's CAPFF. However, they note that there are actually 95 facts, rather than 94, as numbered by Colborn. This is so because No. 48 was intentionally left blank, but there are two sets of No. 53 and two sets of No. 74. Additionally, several of Colborn's facts are compound, and should have been separately numbered statements, bringing the total of additional proposed facts well beyond the 100 additional facts permitted by Civil L. R. 56 (b)(2)(B)(ii). Defendants object to all facts over No. 100.

1(b).  *However, Netflix was also undeniably heavily involved in the creative*

*development of each and every episode, as described further below.* **Disputed** as attorney

argument unsupported by record evidence, vague, and misleading. Defendants respond to

Colborn's specific proposed facts regarding Netflix's involvement in *MaM* as they arise below.

1(c).  *Netflix approved the final cuts of all MAM episodes. Dkt #286; Barker Decl., Ex.*

*3, Nishamura Tr. at pp. 170-71; Ex. 4, Del Deo Tr. at p. 141; see also Barker Decl., Ex. 21.*

**Undisputed.**

1(d).  *Netflix aimed to craft the series from "a marketing perspective" and also from*

*an "awards qualifying perspective." Barker Decl., Ex. 1 (NFXCOL ¶308).* This allegation goes

only to Netflix's state of mind and Netflix is thus in the best position to answer it. **Undisputed**

that the document cited contains the quotations "a marketing perspective" and "awards

qualifying perspective." **Disputed** as misleading, removed from its context, and immaterial. The

document speaks for itself, *see* Dkt. 330-1 at NFXCOL0000308, and makes clear that these

comments were made by Netflix in reference to whether the Defendants could afford to "push

the overall start [*i.e.*, release] date" of *MaM* "or else restructure" several episodes to release the

final episodes of the series "at a later date." *Id.*

2.  During the course of MAM's production, Netflix's creative team and the creative

team for Chrome participated in calls that were held for the most part on a weekly basis. Barker

Decl., Ex. 2 (Manhardt 65). At these calls, Netflix provided its comments and direction for the

series. *Id.* Netflix creators viewed numerous versions of the respective editors and had seen early

"assemblies," or what amounted to very rough drafts, of the earliest episodes. *Id.* Ex. 1

(NFXCOL 1906).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

2(a).     *During the course of MAM's production, Netflix's creative team and the creative team for Chrome participated in calls that were held for the most part on a weekly basis. Barker Decl., Ex. 2 (Manhardt 65).* **Undisputed** that certain creative executives from Netflix met with Laura Ricciardi and Moira Demos on a regular basis in 2015, the year *MaM* was released. *See* Dkt. 291 ¶ 87. The Producer Defendants object to the phrase "creative team for Chrome" as vague and clarify that Ricciardi and Demos were Chrome's creative leads who oversaw the work of any contributing editors. *See* Dkt. 290 ¶ 39; Dkt. 288 ¶ 40; *see also* General Objection § IV, *supra*. **Disputed** that Netflix was involved throughout *MaM*'s production, which began in December 2005. Netflix was only involved starting in 2014. *See* Dkt. 290 ¶ 39; Dkt. 288 ¶ 38; *see also* Dkt. 291 ¶ 86.

2(b).     *At these calls, Netflix provided its comments and direction for the series. Id.* **Disputed** that Netflix "directed" *MaM* or required the Producer Defendants to make changes to it. **Undisputed** that Netflix discussed its creative notes and feedback on episodes with the Producer Defendants on regular calls in 2015. Dkt. 271 ¶ 97.

2(c).     *Netflix creators viewed numerous versions of the respective edits and had seen early "assemblies," or what amounted to very rough drafts, of the earliest episodes. Id. Ex. 1 (NFXCOL 1906).* **Undisputed** that the Producer Defendants provided Netflix with "rough cut[s]" (or "assemblies") of early versions of Episodes 1 and 2 of *MaM* when pitching the series to Netflix. *See, e.g.*, Dkt. 288 ¶ 38; Dkt. 290 ¶ 39; Third Decl. of Leita Walker ("Third Walker Decl.") Ex. 1 (CHRM000006). Further **undisputed** that Netflix executives testified at their

depositions in this case to viewing several rounds of "cuts" of *MaM* episodes. *See* Third Walker Decl. Ex. 2 (Del Deo Tr.) at 33:23-34:6; *id.* Ex. 3 (Nishimura Tr.) at 104:14-105:6.

3.      Chrome intended that the "storyline" of MAM would assist viewers to "regain faith" in Steven Avery despite his conviction for the Halbach murder and persuade them to "question the evidence" against him. Barker Decl., Ex. 2 (Manhardt 141); *see also* Barker Decl., Ex. 2 (Manhardt 149) (MAM's creators hoped that the audience would "feel guilty" for initially believing prosecutors' allegations against Avery); Barker Decl., Ex. 2 (Manhardt 63) (Chrome's primary editor treated the Averys as the "underdog heroes" of the series, while law enforcement representatives were portrayed as the "overdogs."); (Manhardt 86, 432, 469, 473, 549) (Chrome editors also expressed personal affection – "lots of love" – to Avery and his family).

**Response:** This allegation goes only to Chrome's state of mind and Chrome is thus in the best position to answer it. **Undisputed** that Mary Manhardt expressed her personal reactions and emotions in response to reviewing source material. **Disputed** that Manhardt was "primary editor" of *MaM* and that her personal opinions may be conflated with any Defendants' state of mind, which is attorney argument unsupported by record evidence. *See* General Objections § IV *supra*. **Undisputed** that the Producer Defendants intended to leave viewers with open questions but otherwise **disputed** as attorney argument. *See* Dkt. 291 ¶¶ 93, 125; Dkt. 288 ¶ 48; Dkt. 290 ¶ 47.

4.      Chrome was so invested in Avery's quest to prove his alleged innocence that they were also involved in efforts to brainstorm with Avery's defense attorneys to attempt to obtain additional testing of evidence presented in his defense, news that Netflix embraced. Barker Decl., Ex. 1 (NFXCOL 1907, 1930). Netflix likewise started from the point of view that

Avery was "innocent" of the Halbach murder and that the judge was "biased" against him. Barker Decl., Ex. 1 (NFXCOL 1949, 1961, 2131).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

4(a). *Chrome was so invested in Avery's quest to prove his alleged innocence that they were also involved in efforts to brainstorm with Avery's defense attorneys to attempt to obtain additional testing of evidence presented in his defense. Barker Decl., Ex. 1 (NFXCOL 1907, 1930).* This allegation goes only to Chrome's state of mind and Chrome is thus in the best position to answer it. **Undisputed** that the Producer Defendants filmed events as they unfolded in real time and sought access to film case developments as they occurred. The Producer Defendants' discussions with Buting to access the blood vial for testing should be considered in the context of the events of 2007 and the need for Buting himself to film the discovery of the unsealed blood vial because the Producer Defendants were not permitted access. *See* Dkt. 291 ¶ 49; Dkt. 290 ¶ 36; Ep. 4 (Dkt. 120-4) at 1:02:26–1:04:14; 1:05:11; Fed. R. Evid. 106. **Disputed** as immaterial and inaccurate. This statement is not about Colborn and therefore not actionable by him. Defendants had no stake in proving innocence or guilt; they did not reach a conclusion and instead hoped *MaM* would raise questions for viewers. *See* Dkt. 291 ¶¶ 93, 125.

4(b). *[This was] news that Netflix embraced.* This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. **Disputed** as attorney argument unsupported by record evidence.

4(c). *Netflix likewise started from the point of view that Avery was "innocent" of the Halbach murder and that the judge was "biased" against him. Barker Decl., Ex. 1 (NFXCOL*

*1949, 1961, 2131).* This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. **Undisputed** that NFXCOL0001949 contains the word "innocent."

**Disputed** as misleading, removed from the context of the entire notes, immaterial, and not "of and concerning" Colborn. This allegation is misleading because the note indicates that the point of view that Avery was "innocent" belongs to Avery's parents. The note, in relevant part, states as follows: "Avery's Parents: It's heartbreaking and effective to have this up close look at parents watching their innocent son in this situation. However, it feels that we're leaning in on Avery's parents too much overall." *See* Dkt. 330-1 at NFXCOL0001949. **Undisputed** that NFXCOL0001961 contains the word "biased" in reference to Judge Willis. **Disputed** as misleading and not "of and concerning" Colborn. The allegation is misleading because the note, which speaks for itself, in no way indicates Netflix started from the point of view that the judge was biased against Avery. NFXCOL0001961 is about Episode 7 of *MaM*.

    5.      In telling its story, MAM relies heavily on Avery and people who were friendly to him as "reliable narrators." Barker Decl., Ex. 2 (Manhardt 381, 406, 483, 493, 529). In particular, Netflix sought to augment the series' reliance on "voiceovers" by Avery himself to tell Avery's "narrative." *Id*. Ex. 1 (NFXCOL 199, 2011).

    **Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

    5(a).      *In telling its story, MAM relies heavily on Avery and people who were friendly to him as "reliable narrators." Barker Decl., Ex. 2 (Manhardt 381, 406, 483, 493, 529).*

**Undisputed** that the series has no "voice of God" narration and instead uses commentary from identified individuals with first-hand knowledge of the events, including pro-law enforcement

sources, with all affiliations disclosed to the audience. *See* Dkt. 291 ¶ 72; Dkt. 290 ¶ 47; Dkt. 288 ¶ 48; Dkt. 330-14 at 94:10–95:2 ("There are different sorts of documentary films, and one sort is the one where you have objective people. And maybe it's the voice of God narrator or maybe it's outside people who are weighing in on this. This is not that sort of film. This is people who were there and had firsthand knowledge and their experience."); *see also* Dkt. 291 ¶ 72.

5(b). *In particular, Netflix sought to augment the series' reliance on "voiceovers" by Avery himself to tell Avery's "narrative." Id. Ex. 1 (NFXCOL 199, 2011).* **Undisputed** that the word "narrative" appears in NFXCOL0000199. Further **undisputed** the words "narrative" and "V.O." (or "voiceovers") appear in the separate and unrelated document NFXCOL0002011.

**Disputed** as misleading, removed from the context of the entire note, and immaterial. *See* General Objections § III *supra*.

6.       The final product for MAM, according to Netflix's creative team, was to provide "an immersive and all-encompassing experience for the viewer including deft and unexpected foreshadowing of key elements, pitch perfect call-backs of evidence and breathtaking reveals," accompanied by a "thriller" atmosphere imparted through the music score. *Id*. Ex. 1 (NFXCOL 1933-34). Netflix advised Chrome that Netflix was looking for the series to leave viewers feeling "terrified and enraged, to feel as though it's their responsibility and need to discuss this case, to raise it in the social consciousness and to drive awareness . . . . Leave the audience feeling angry!" Barker Decl., Ex. 1 (NFXCOL 1964, 2125). They further directed, "Our audience needs to be left not only feeling extremely upset and saddened for Steven and Brendan but also incredibly angry." *Id*. "We want to feel the swells of hope, the range of injustice, the horror of the defenseless," Netflix continued. "Viewers across the globe should be in tears and shouting at their screens throughout." *Id*. Ex. 1 (NFXCOL 1977). Netflix directed Chrome to "ratche[t] up"

the episode in which the guilty verdict against Avery is returned, stating, "Currently the beat emits anger and we feeling injustice was done, but given the overall investment made in watching 8 hours thus far, the audience should be feeling more intense anger, sadness, bewilderment, and perhaps even fury at this jury decision." *Id*. (NFXCOL 2163-64, 2186-87). In order to further infuriate viewers, Netflix encouraged Chrome to look for footage of Avery and his family looking disappointed and footage of law enforcement officers, including Mr. Colborn, "showing satisfaction." *Id*.

**Response:** This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 7 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

6(a).     *The final product for MAM, according to Netflix's creative team, was to provide "an immersive and all-encompassing experience for the viewer including deft and unexpected foreshadowing of key elements, pitch perfect call-backs of evidence and breathtaking reveals," accompanied by a "thriller" atmosphere imparted through the music score. Id. Ex. 1 (NFXCOL 1933-34).* **Undisputed** that the documents cited contain the quotations above. **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. *See* General Objections § III *supra*. The note, in context, reads:

> The macro note [about Episodes 1-4 to date] is that the elements are all there, but the organization, structure, and pacing of the parts needs to be re-examined and elevated entirely. The story begs for a more sophisticated editing style which will provide for an immersive and all-encompassing experience for the viewer including deft and unexpected foreshadowing of key elements, pitch perfect call-backs of evidence and breathtaking reveals.

*See* Dkt. 330-1 at NFXCOL0001933. The latter note from which Colborn quotes reads in full:

"**MUSIC:** Currently, it feels like sometimes the music works, sometimes it's off, and other times

simply too slow of a pace. All in all, we do need to get a composer on board that understands a thriller atmospheric score." *See id.* at NFXCOL0001934.

6(b). *Netflix advised Chrome that Netflix was looking for the series to leave viewers feeling "terrified and enraged, to feel as though it's their responsibility and need to discuss this case, to raise it in the social consciousness and to drive awareness . . . . Leave the audience feeling angry!" Barker Decl., Ex. 1 (NFXCOL 1964, 2125).* **Undisputed** that the documents cited contain the words quoted above. **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. *See* General Objections § III *supra*. The note, in context, reads,

> ENDING: Currently, given the investment the audience has made in the 8 episodes, the ending feels anti-climactic. . . . To close, remember, we're looking for people to feel terrified and enraged; to feel as though it's their responsibility & need to discuss this case, to raise it in the social consciousness and to drive awareness and potentially a new legal look in the same way society did for The West Memphis Three. Leave the audience feeling angry!

*See* Dkt 330-1 at NFXCOL0001964, 2125 (same note); *see also* Dkt. 272 ¶ 13.

6(c). *They further directed, "Our audience needs to be left not only feeling extremely upset and saddened for Steven and Brendan but also incredibly angry." Id.* **Disputed** that Netflix "directed" *MaM* or required the Producer Defendants to make changes to it. Dkt. 271 ¶ 97. **Undisputed** that the documents cited contain the words quoted above, but **disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. *See* General Objections § III *supra*; *see also* Dkt. 272 ¶ 13. This note, too, is about the ending of the series feeling "anti-climactic," "given the investment the audience has made in the 8 episodes." *See* Dkt. 330-1 at NFXCOL0001964, 2125 (same).

6(d). *"We want to feel the swells of hope, the range of injustice, the horror of the defenseless," Netflix continued.* **Disputed** as misleading, removed from the context of the entire

note, not "of and concerning" Colborn, and immaterial. *See* General Objections § III *supra*.

Colborn's use of "Netflix continued" mischaracterizes the evidence because this quote comes from an entirely different set of notes, NFXCOL0001977, not NFXCOL0001964 as cited above. The note from which this quotation is plucked, in context reads,

> **STATUS:** The series is amazing. It is a major accomplishment to lay out such a complex case in such a clear and suspenseful way. [] Some structural & pacing challenges may not support full audience engagement for such a long view that at times gets very granular.
> **GOALS:** [] Identify final overall series structure which supports the most impactful, compelling and revelatory storytelling, including:
> ➢ Ideal number of episodes (9-10?)
> ➢ Ideal length of episodes (recommending 50 minute target, no greater than 60)
> ➢ Best opens and closes (see specific notes in Structural Breakdown)
> ➢ Red Herrings
> ➢ Expand the emotional range for the viewer throughout the series. We want to feel the swells of hope, the rage of injustice, the horror of the defenseless. Viewers across the globe should be in tears and shouting at their screens throughout.

Dkt. 330-1 at NFXCOL0001977.

6(e).　　*"Viewers across the globe should be in tears and shouting at their screens throughout." Id. Ex. 1 (NFXCOL 1977).* **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. *See* Response to 6(d), above, which Defendants incorporate here by reference.

6(f).　　*Netflix directed Chrome to "ratche[t] up" the episode in which the guilty verdict against Avery is returned, stating, "Currently the beat emits anger and we feeling injustice was done, but given the overall investment made in watching 8 hours thus far, the audience should be feeling more intense anger, sadness, bewilderment, and perhaps even fury at this jury decision." Id. (NFXCOL 2163-64, 2186-87).* **Disputed** that Netflix "directed" *MaM* or required the Producer Defendants to make changes to it. Dkt. 271 ¶ 97. Further **disputed** as inaccurate, misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. *See* General Objections § III *supra*. The note, in context, reads,

26:37 – 28:55 – THE VERDICT – The reading of the guilty verdict of Steven still doesn't feel climactic enough given the entire series has been building to this moment. Perhaps enhancing the music and/or cutting to other members of the Avery family in the courtroom showing strong disappointment on their faces (conversely, maybe adding any shots of Kratz, Colburn, Fassbender, etc. and their team showing satisfaction would work too), and adding an overall intensifying of the cutting style would help drive this into a more climactic moment. Currently, the beat emits anger and we feel injustice was done, but given the overall investment made in watching 8 hours thus far, the audience should be feeling more intense anger, sadness, bewilderment, and perhaps even fury at this jury decision. Take a look at see if it can be ratched up.

*See* Dkt. 330-1 at NFXCOL0002163-2164.[3]

6(g). *In order to further infuriate viewers, Netflix encouraged Chrome to look for footage of Avery and his family looking disappointed and footage of law enforcement officers, including Mr. Colborn, "showing satisfaction." Id.* **Disputed** that Netflix made this note "[i]n order to further infuriate viewers;" this is attorney argument unsupported by record evidence. Further **disputed** as inaccurate, misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. *See also* Response to 6(f), above, which Defendants incorporate here by reference. It is also substantially true that Avery and his family were disappointed, and that law enforcement, including Colborn, was "satisfied" with the guilty verdict. *See* Colborn Tr. at 236:12-18; *id*. at 241:21-242:6.

7. Netflix advised Chrome that Avery's civil suit was to be portrayed as a virtually assured victory prior to the Halbach murder. Barker Decl., Ex. 1 (NFXCOL 1946). None of the attorneys who were involved in the defense of the Avery suit appear in the episode, nor is there

---

[3] Colborn also cites to NFXCOL0002186-2187. As an initial matter, these are two separate documents, unrelated to one another and which happen to have sequential Bates numbers. Additionally, NFXCOL0002187-2188 is about the *MaM* trailer, which was never put at issue in any of Colborn's three complaints, and therefore is not relevant to this case. Colborn's reliance on NFXCOL0002185-2186 is similarly misplaced, as the email thread is about finding an additional editor to join the Producer Defendants' editing team, does not contain the quotes above, and is not about—nor does it even reference—Colborn.

any independent legal commentary that might describe, for example, the legal standard that a plaintiff is required to meet in order to prevail on a claim like Avery's. *Cf.* Dkt. #120-2 (Episode 2, featuring Steven Glynn and Walt Kelly discussing the civil case). Chrome's editor testified that while some films include objective commentators, this was "not that sort of film." Barker Decl., Ex. 13 at pp. 94-95.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

7(a).   *Netflix advised Chrome that Avery's civil suit was to be portrayed as a virtually assured victory prior to the Halbach murder. Barker Decl., Ex. 1 (NFXCOL 1946).* **Disputed** that Netflix required the Producer Defendants to make changes to the series. Dkt. 271 ¶ 97. Further **disputed** as incomplete, misleading, removed from the context of the entire note, and immaterial. *See* General Objections § III *supra*. The note in no way suggests portraying Avery's civil lawsuit as a virtually assured certainty. Rather, it explains that the sequence on Avery's civil lawsuit "runs way too long" and "could be a quick 2-3 minute scene," ending with a quotation from one of Avery's attorneys already present in the cut provided to Netflix. *See* Dkt. 330-1 at NFXCOL0001946.

7(b).   *None of the attorneys who were involved in the defense of the Avery suit appear in the episode, nor is there any independent legal commentary that might describe, for example, the legal standard that a plaintiff is required to meet in order to prevail on a claim like Avery's. Cf. Dkt. #120-2 (Episode 2, featuring Steven Glynn and Walt Kelly discussing the civil case).* **Undisputed** that the Producer Defendants included subjects who agreed to be interviewed, which did not include the attorneys defending against Avery's civil rights lawsuit. Dkt. 290 ¶ 12;

Dkt. 288 ¶ 12; *see also* Dkt. 291 ¶¶ 66, 67. **Undisputed** that *MaM* did not include independent legal commentators, as the Producer Defendants chose to only include commentary from identified individuals with first-hand knowledge of the events, including pro-law enforcement sources, with all affiliations disclosed to the audience. *See* Dkt. 290 ¶ 47; Dkt. 288 ¶ 48; Dkt. 330-14 at 94:10–95:2; *see also* Dkt. 291 ¶ 72. **Disputed** as immaterial as this aspect of the series is not "of and concerning" Colborn.

7(c). *Chrome's editor testified that while some films include objective commentators, this was "not that sort of film." Barker Decl., Ex. 13 at pp. 94-95.* **Undisputed** that Mary Manhardt testified that *MaM* did not have an omniscient narrator. **Disputed** that Manhardt acted as "Chrome's editor" and that her personal opinions may be conflated with any Defendants' state of mind, which is attorney argument unsupported by record evidence. *See* General Objections § IV *supra*.

8. Netflix also provided direction that the episode should "set up" for viewers the notion that Manitowoc County law enforcement were going to "seek revenge" against Avery because of his civil suit. Barker Decl., Ex. 1 (NFXCOL 1940, 1978).

**Response:** This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. **Disputed** that Netflix "directed" *MaM* or required the Producer Defendants to make changes to it. Dkt. 271 ¶ 97. Further **disputed** as misleading, removed from the context of the entire note, and immaterial. *See* General Objections § III *supra*. First, NFXCOL0001940, which is about Episode 3, does not include anything about a "set up" for viewers or law enforcement "seeking revenge" against Avery. Second, NFXCOL0001978 is a note about Episode 1 of *MaM*. It reads, "There should be a more explicit ending that makes it clear that in the next episode the cops are going to seek revenge. We should have a really tight

Episode 1 with a strong cliffhanger that immediately engages the audience to come back for Episode 2." *See* Dkt. 330-1 at NFXCOL0001978. It is also substantially true that Avery's defense at his trial for Halbach's murder was that law enforcement planted evidence to ensure his conviction due to embarrassment over his exoneration and fear of a $36 million damages award in his civil lawsuit—*i.e.*, Avery alleged that the cops were "seek[ing] revenge" against him. *See* Dkt. 271 ¶¶ 13-15.

9.      Netflix encouraged Chrome to include photos of Avery and his family to "make them look like a very happy family." Barker Decl., Ex. 1 (NFX 1935). Netflix likewise encouraged the use of "sweet photos" of Avery and his nephew, Brendan Dassey as children "to reinforce the sense of injustice and calamity" that was the series' goal. *Id.*, (NFX 1952). Where convenient, Chrome's editor expressed willingness to use footage from one family gathering to represent it as another or to swap images of children regardless of their actual identities. Barker Decl., Ex. 2 (Manhardt 0000328, 553-54).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

9(a).      *Netflix encouraged Chrome to include photos of Avery and his family to "make them look like a very happy family." Barker Decl., Ex. 1 (NFX 1935).* **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. NFXCOL0001935 highlights the contrast between the Averys' life "before the crimes" with the misery that followed. In any event, Colborn has not presented any evidence that the Averys were *not* "a very happy family."

9(b).    *Netflix likewise encouraged the use of "sweet photos" of Avery and his nephew, Brendan Dassey as children "to reinforce the sense of injustice and calamity" that was the series' goal. Id., (NFX 1952).* **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. NFXCOL0001952 says nothing about "the series' goal." Rather, in relevant part, it discusses concerns with the pacing of Episode 3, flagging "[o]ne macro element which may be leading to the slower pace and potential for viewer disengagement [a]s the very abundant use of exterior shots during transition[]" moments. *See* Dkt. 330-1 at NFXCOL0001952. Nor has Colborn presented any evidence that the "sweet photos of Brendan and Steven and the family all together" are somehow materially false.

9(c).    *Where convenient, Chrome's editor expressed willingness to use footage from one family gathering to represent it as another or to swap images of children regardless of their actual identities. Barker Decl., Ex. 2 (Manhardt 0000328, 553-54).* **Disputed** as to the characterization of Manhardt as "Chrome's editor" and that her personal opinions may be conflated with any Defendants' state of mind. *See* General Objections § IV *supra*. Further **disputed** as misleading, removed from its context, not "of and concerning" Colborn, and immaterial. In the first email, Manhardt asks "how this measures up against the real chronology" to inquire if she can use a scene from Thanksgiving. *See* Dkt. 330-2 at Manhardt00000328. In the second email, Manhardt asks if she can use a baby in a photo as Jason and if it is Jason. *See* Dkt. 330-2 at Manhardt00000553–54.

10.    During his deposition in the Avery civil case, Mr. Colborn testified that he received a call in 1994 or 1995, when he was working for the Manitowoc County jail, and the caller indicated that someone in another county may have committed an assault and that someone might be in the Manitowoc County jail for that same assault. Dkt. #120-14 depo. pp. 10-11. Mr.

Colborn testified that he transferred the call to the Detective Division. Dkt. #120-14 pp. 14-15; Dkt. #129-1 at 12:41-14:30. MAM's editor had full access to the deposition videos and transcripts from the civil case from which the excerpts were taken. Barker Decl., Ex. 13 pp. 70-73, but a Chrome production email message noted that information about the call did not fit neatly with Glynn's accusation that nothing was done with the call at the time. Barker Decl., Ex. 2 (Manhardt 00000509, 524).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

10(a).    *During his deposition in the Avery civil case, Mr. Colborn testified that he received a call in 1994 or 1995, when he was working for the Manitowoc County jail, and the caller indicated that someone in another county may have committed an assault and that someone might be in the Manitowoc County jail for that same assault. Dkt. #120-14 depo. pp. 10-11.* **Undisputed.**

10(b).    *Mr. Colborn testified that he transferred the call to the Detective Division. Dkt. #120-14 pp. 14-15; Dkt. #129-1 at 12:41-14:30.* **Undisputed.**

10(c).    *MAM's editor had full access to the deposition videos and transcripts from the civil case from which the excerpts were taken. Barker Decl., Ex. 13 pp. 70-73, but a Chrome production email message noted that information about the call did not fit neatly with Glynn's accusation that nothing was done with the call at the time. Barker Decl., Ex. 2 (Manhardt 00000509, 524).* **Undisputed** that the Producer Defendants (but not Netflix) had access to Colborn's civil suit deposition video and transcript. **Disputed** as to the characterization of Manhardt as "*MaM*'s editor" and that her personal opinions may be conflated with any

Defendants' state of mind. *See* General Objections § IV *supra*. Further **disputed** as misleading, mischaracterizing the evidence, and removed from its context. In the email, Manhardt suggests potentially *adding* more of Colborn's testimony in a reordering of the segment about the jail call, and Demos agrees to review. *See* Dkt. 330-2 at Manhardt00000509. And Glynn did not make an accusation that "nothing was done with the call at the time;" he said there was "no record" of the call until 2003, which is accurate. *See* Ep. 2 (Dkt. 120-2) at 18:30–20:50; *see also* Dkt. 291 ¶ 12. Further **disputed** as immaterial. *See* General Objections § IV *supra*.

11.     During the early stages of production, Netflix representatives complained that the details surrounding the call were "confusing" and that "it seemed very thin that Colborn not having specific knowledge of who called him would be key to the case." Barker Decl., Ex. 1 (NFXCOL 210, 1937-38, 1981-82). Netflix added that this revelation initially seemed "weak." Despite these concerns, Netflix and Chrome jointly thereafter crafted a "clear" storyline that "sharpened" the impression created by stacking excerpts from other witness' depositions in the Avery civil case. *Id*. Ex. 1 (NFXCOL 227, 231, 1946, 2019); MM 244-45, 280. In addition, because the phone call was "something we keep going back to throughout the series," Netflix recommended bolstering it with a chart to emphasize "connections between various law enforcement officers" referenced in the segment. *Id*. (NFXCOL 293, 329).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 4 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

11(a).     *During the early stages of production, Netflix representatives complained that the details surrounding the call were "confusing" and that "it seemed very thin that Colborn not having specific knowledge of who called him would be key to the case." Barker Decl., Ex. 1*

*(NFXCOL 210, 1937-38, 1981-82)*. **Disputed** that Netflix representatives "complained," which is attorney argument unsupported by record evidence. Further **disputed** as incomplete, misleading, removed from the context of the entire note, and immaterial. As an initial matter, NFXCOL0001981-1982 does not contain the quoted language above. The referenced notes from the other documents include the observation of one Netflix executive, Adam Del Deo, offering the perspective of the viewer up to that point in the series. The notes, in context, read,

> 49:30 – How do we, the audience, know Colburn was contacted [at the jail]? Why does Colburn even mention it? Did it come up from the person who called him? This is confusing.
>
> [ . . . ]
>
> 55:00 – Seems very thin that Colburn not having specific knowledge of who called him would be the key to the case. Who called Colburn? No email? Not fax? Could they track the fall? If you are Colburn, why even disclose?

*See* Dkt. 330-1 at NFXCOL0001937-1938, 0000210 (same notes).

11(b).    *Netflix added that this revelation initially seemed "weak."* **Disputed** as incomplete, misleading, removed from the context of the entire note, and immaterial *See* Response to 11(a), above, which Defendants incorporate here by reference.

11(c).    *Despite these concerns, Netflix and Chrome jointly thereafter crafted a "clear" storyline that "sharpened" the impression created by stacking excerpts from other witness' depositions in the Avery civil case. Id. Ex. 1 (NFXCOL 227, 231, 1946, 2019); MM 244-45, 280.* **Disputed** as incomplete, misleading, and immaterial and as attorney argument unsupported by the record evidence.

- NFXCOL0000227 does not contain any of the quoted language and does not support the allegation above. It is also not about and does not mention Colborn.

- NFXCOL0000231 does not contain any of the quoted language and does not support the allegation above. It is also not about and does not mention Colborn.

- NFXCOL0001946 does not contain any of the quoted language and does not support allegation above.

- NFXCOL0002019 does not contain any of the quoted language and does not support the allegation above.

- Manhardt00000244 is an email from Manhardt to the Producer Defendants that was never sent to Netflix. It is not about and does not mention Colborn. It also does not support the allegation above.

- Manhardt00000280 an email from Manhardt to the Producer Defendants that was never sent to Netflix. It is not about and does not mention Colborn. It also does not support the allegation above.

11(d). *In addition, because the phone call was "something we keep going back to throughout the series," Netflix recommended bolstering it with a chart to emphasize "connections between various law enforcement officers" referenced in the segment. Id. (NFXCOL 293, 329).* **Undisputed** that the documents cited contained the quotes above.

**Disputed** as incomplete, misleading, removed from the context of the entire note, and immaterial. As an initial matter, the notes come from different documents, not the same set of notes, contrary to Colborn's presentation. Further, in context, they read:

> 14:00 – The phone call that Colburn receives and the subsequent flow of information to other figures in the Sheriff's department is something we keep going back to throughout the series. It would really . . .

Dkt. 330-1 at NFXCOL0000293.

> Lisa Nishimura

> The testimony about this phone call and report (which we touch on several times throughout the series) is confusing – could a graphic help chart the related events and make it less necessary to keep repeating the story? It feels like they really land this with the linear time graphic between 1995 and the day after SA is released. Are you proposing that we minimize repetition and rely primarily on the testimony where the graphic is presented?

> Benjamin Cotner

I will try to clarify this – I'm talking about the need to chart out the connection between all of the various law law enforcement officers when this call comes in. The timeline is clear, but who knows what gets really muddy.

Dkt. 330-1 at NFXCOL0000329; *see also* Dkt. 271 ¶ 103; Dkt. 272 ¶¶ 13-14; Dkt. 275 ¶ 16.

12.     Netflix representatives encouraged Chrome to maintain bar patrons' statements that Avery had been framed by Manitowoc County law enforcement in the series. Barker Decl., Ex. 1 (NFXCOL 1953, 2050, 300).

**Response: Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. Contrary to Colborn's suggestion, in several notes, Netflix suggests "trimming" certain scenes regarding the public opinion of the Avery case and points to the pool hall scene in which several bar patrons provide their opinions as "an example of where we seem to run long." *See* Dkt. 330-1 at NFXCOL0001953. The same is true of NFXCOL0002050, in which Netflix executives write that they "[l]ike the townspeople commenting in the pool hall, *but probably one too many*," again suggesting trimming the scene rather than encouraging the Producer Defendants to keep the scene or even lengthen it. *Id.* (emphasis added); *see also id.* at NFXCOL0000300 (same).

13.     Avery was used as a "narrator" for his trial in the series. *See, e.g.*, Barker Decl., Ex. 2 Manhardt 381, 406, 483, 493; screeners "Andrew and Catherine" note that using Avery as narrator for his own trial works well. *Id.* at Manhardt 528 – 530. As he speaks, Avery's statements are often also shown on the screen, a technique that Chrome used to highlight the "very important" things that Avery said in the series. Barker Decl., Ex. 2, Manhardt 493.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

13(a).   *Avery was used as a "narrator" for his trial in the series. See, e.g., Barker Decl., Ex. 2 Manhardt 381, 406, 483, 493.* **Undisputed** that *MaM* features Avery's commentary on his personal experience of the trial. *MaM* has no "voice of God" narration and instead uses commentary from identified individuals with first-hand knowledge of the events, including pro-law enforcement sources, with all affiliations disclosed to the audience. *See* Dkt. 290 ¶ 47; Dkt. 288 ¶ 48; Dkt. 330-14 at 94:10–95:2; *see also* Dkt. 291 ¶ 72.

13(b).   *Screeners "Andrew and Catherine" note that using Avery as narrator for his own trial works well. Id. at Manhardt 528 – 530.* **Undisputed** that Andrew Jacobs and Catherine Allgor provided feedback notes by email after watching draft versions of Episodes 5 and 6 that the notes included "The Steven V.O. (from jail?) is becoming increasingly effective, having him as a kind of commentator in his own trial. Keep it going!" *See* Dkt. 330-2 at Manhardt00000525. **Disputed** that the document cited uses the word "narrator." *See id.*

13(c).   *As he speaks, Avery's statements are often also shown on the screen, a technique that Chrome used to highlight the "very important" things that Avery said in the series. Barker Decl., Ex. 2, Manhardt 493.* **Disputed** as misleading, removed from its context, and immaterial. The cited pages do not use the quoted phrase "very important." *See* Dkt. 330-2 at Manhardt00000493. Those pages discuss the opening of Episode 10, which, as published, is silent with images of Avery's trailer, followed by Ken Kratz at a press conference. *See id.*; *see also* Ep. 10 (Dkt. 120-10) at 0:00–1:17. In *MaM*, subtitles were used to facilitate viewer understanding wherever dialogue with low-quality audio, phone calls, and recorded interrogations appears, regardless of the user's closed captioning settings. *See, e.g.*, Dkt. 330-2 at Manhardt00000525 ("Finally, the last interrogation with Steven Avery is a bit hard to follow—

may need some captions there (as in previous interviews)"); Ep. 3 (Dkt. 120-3) at 9:30 (subtitles of call between Avery and his mother).

14.     Near the end of Episode 5 of MAM, Strang is shown asking Mr. Colborn, in what appears to be actual, unedited trial footage, "And then, you tell the dispatcher, 99 Toyota?" Mr. Colborn responds, "No, I thought she told me that." Dkt. #120-5 at 55:05-55:15. The call is replayed. In his actual testimony at trial, Mr. Colborn acknowledged that he made the statement to the dispatcher, conceding the mistake in his prior response. Barker Decl., Ex. 19 pp. 180-186. However, in MAM, Mr. Colborn appears to make no such correction; rather, the camera simply pans to him after Strang shuts off the audio of the call. Dkt. #120-5 at 55:15-55:30. Netflix's creative team praised this point in the episode – which had been revised from a prior version, as making Mr. Colborn look "caught in a clear lie." Barker Decl., Ex. 1 (NFXCOL 2063). The edit also gave viewers the impression that he "didn't have much of a response after [Steven Avery's] defense attorney played the recording twice. At least not from what the documentary showed." Dkt. #132-7.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 5 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

14(a).     *Near the end of Episode 5 of MAM, Strang is shown asking Mr. Colborn, in what appears to be actual, unedited trial footage, "And then, you tell the dispatcher, 99 Toyota?" Mr. Colborn responds, "No, I thought she told me that." Dkt. #120-5 at 55:05-55:15. The call is replayed.* **Undisputed** that the exchange featured in *MaM* occurred as quoted. **Disputed** as vague as to Colborn's reference to "what appears to be actual, unedited trial footage." It is actual trial footage. **Undisputed** that testimony from Avery's trial for the murder of Halbach was

edited. The trial lasted nearly five weeks, and *MaM* is only 10 hours long. *See* Dkt. 291 ¶¶ 51, 141.

14(b).    *In his actual testimony at trial, Mr. Colborn acknowledged that he made the statement to the dispatcher, conceding the mistake in his prior response. Barker Decl., Ex. 19 pp. 180-186.* **Undisputed.**

14(c).    *However, in MAM, Mr. Colborn appears to make no such correction; rather, the camera simply pans to him after Strang shuts off the audio of the call. Dkt. #120-5 at 55:15-55:30.* **Undisputed.**

14(d).    *Netflix's creative team praised this point in the episode – which had been revised from a prior version, as making Mr. Colborn look "caught in a clear lie." Barker Decl., Ex. 1 (NFXCOL 2063).* **Disputed** as misleading, removed from the context of the entire note, and immaterial. The note, in full, reads, "The Colburn ending is terrific! – can we add music to help emphasize further? He goes from being so sure and then is caught in a clear lie about the origin of the car make and model." Dkt. 330-1 at NFXCOL0002063. Further **disputed** in that the cited evidence does not establish that this note refers to what the audience actually saw in the final version of Episode 5.

14(e).    *The edit also gave viewers the impression that he "didn't have much of a response after [Steven Avery's] defense attorney played the recording twice. At least not from what the documentary showed." Dkt. #132-7.* **Undisputed** that the quoted words appear in the cited document. **Disputed** that this statement reflects, at most, the impression of a single viewer, not all viewers or any reasonable viewer, and because the cited evidence is not probative or admissible. *See* Dkt. 309 at 4-5, General Objection No. 6.

15.     Immediately following that edited footage, Strang is shown asking Mr. Colborn, "Were you looking at those plates when you called them in?" Mr. Colborn responds, "No." Dkt. #120-5 at 55:25-55:35. In the Halbach trial, Strang moves right into the next question; there is virtually no pause. Barker Decl., Ex. 19 pp. 184-186; Barker Decl. Ex. 3. In MAM, Mr. Colborn's response appears to be followed by a long pause, during which the camera first pans to Mr. Strang, standing at counsel table and appearing to glare at Mr. Colborn, then to Mr. Colborn, who appears to shift uncomfortably in his chair and then cracks his knuckles. Barker Decl. Ex. 3.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

15(a).     *Immediately following that edited footage, Strang is shown asking Mr. Colborn, "Were you looking at those plates when you called them in?" Mr. Colborn responds, "No." Dkt. #120-5 at 55:25-55:35.* **Undisputed** that *MaM* shows an exchange with substantially the same gist at the referenced time stamp, with Colborn responding "No, sir" rather than "No." *MaM* speaks for itself. *See* General Objections § III.

15(b).     *In the Halbach trial, Strang moves right into the next question; there is virtually no pause. Barker Decl., Ex. 19 pp. 184-186; Barker Decl. Ex. 3.* **Disputed** as inaccurate, misleading, mischaracterizing the evidence, removed from context, and immaterial. In Colborn's Exhibit 3, there is an approximate eight-second pause between questions in the raw footage of the witness. Dkt. 312, Ex. 3 CHRM867 comparison at 0:06–0:14. The Unterminated Feed Footage Issue, set forth below, explains the edits addressed here. *See* CAPFF ¶ 17, *infra*.

15(c).     *In MAM, Mr. Colborn's response appears to be followed by a long pause, during which the camera first pans to Mr. Strang, standing at counsel table and appearing to glare at*

*Mr. Colborn, then to Mr. Colborn, who appears to shift uncomfortably in his chair and then cracks his knuckles. Barker Decl. Ex. 3.* **Undisputed** that in *MaM*, Colborn's response is followed by a similar seven or eight-second pause as in the raw footage with an exchange of eye contact between Strang and Colborn. *Compare* Dkt. 312, Ex. 3 CHRM867 comparison at 0:33–0:40 *with* 0:06–0:14. **Disputed** as misleading, mischaracterizing the evidence, removed from context, and immaterial. Colborn here complains that this shot shows him "shift[ing] uncomfortably," but Colborn later cites this same shot/moment as making him "look[] more confident" and criticizes Defendants for not using in another sequence. *See* CAPFF ¶ 74, *infra*; *see also* Dkt. 288 ¶ 66. Further noted the Unterminated Feed Footage Issue explains the edits addressed here. *See* Response to 17, below, which Defendants incorporate here by reference .

16.     Netflix's production notes instructing Chrome to "hold a bit longer" on Mr. Colborn in another instance to ensure that he would look "caught in a lie," despite acknowledging that it might require "court footage that might not exist." Barker Decl., Ex. 1 (NFXCOL 213, 215).

**Response: Disputed** that Netflix required the Producer Defendants to make changes to the series. Dkt. 271 ¶ 97; Dkt. 320, Prod. Def. SPFOF ¶ 3. Further **disputed** as inaccurate, misleading, removed from the context of the entire note, and immaterial. Contrary to Colborn's suggestion, Netflix did not and would not instruct the filmmakers to fabricate footage that did not exist—the opposite is true, and the document speaks for itself: Netflix was acknowledging that the filmmakers must work with the footage that they have. *See* Dkt. 269 at 23. The full note reads, "47:37 – Can we hold a bit longer on Colburn's face here. He looks caught. Same at 48:10 – 48:25. We know this is court footage that may not exist. Just a suggestion." *See* Dkt. 330-1 at NFXCOL0000213. Moreover, NFXCOL0000215 lends no support to Colborn's proposed fact.

17.     When asked about changes in Mr. Colborn's responses that appear in MAM,
Demos testified that some of Chrome's footage was not usable because it was unusable in its
appearance. Barker Decl., Ex. 10 at 210-213. She claimed that as a result, Chrome was "forced"
to seek other news reporters' footage, and that because it was not necessarily co-extensive with
their footage, they had to "find sections" that appeared to be similar and insert them. *Id*.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1
proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in
violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

17(a).     *When asked about changes in Mr. Colborn's responses that appear in MAM,*
*Demos testified that some of Chrome's footage was not usable because it was unusable in its*
*appearance. Barker Decl., Ex. 10 at 210-213.* **Undisputed.** The Producer Defendants made
concerted efforts to substitute comparable footage of witnesses responding, listening, and
waiting with the footage available to them due to the **Unterminated Feed Footage Issue**.[4] The
feed from the witness-facing camera at trial was "unterminated," making the image distorted and
blown out in a way that was irreparable and unusable. *See* Dkt. 291 ¶¶ 76, 77, 81; *compare* Dkt.
312, Exs. 3–5 *with* Dkt. 283 Exs. 1–32 (videos reflecting difference in color, visibility, and
quality between the feeds). Thus, the Producer Defendants sought to fill in gaps from
unterminated feed footage with comparable mixed-feed footage from local television stations
that had covered Avery's trial, specifically including witness responses and reactions. *See* Dkt.
291 ¶¶ 76–82, 114. The substituted shots do not alter the meaning of any testimony or present
Colborn in a materially different manner than at trial. *See id.*

---

[4] All references to the "Unterminated Feed Footage Issue" herein incorporate by reference the
response and explanation provided here to CAPFF ¶ 17.

17(b).   *She claimed that as a result, Chrome was "forced" to seek other news reporters' footage, and that because it was not necessarily co-extensive with their footage, they had to "find sections" that appeared to be similar and insert them. Id.* **Undisputed** that, due to the Unterminated Feed Footage Issue, the Producer Defendants sought to fill in gaps from unusable footage with comparable mixed-feed footage from local television stations that had covered Avery's trial. *See* Dkt. 291 ¶¶ 76–82, 114; *see also* Response to 17(a), above, which Defendants incorporate here by reference. **Disputed** that the words "forced" and "find sections" appear in the cited testimony. *See* Dkt. 330-10 at 210–13.

18.   Immediately following that edited segment, MAM shows Strang asking, "Do you have any recollection of making that call?" MAM substitutes a response that appears far more equivocal than his trial testimony. Dkt. #120-5 at 55:35-56:10; cf. Barker Decl., Ex. 19 pp. 182-185. A portion of a different sentence in Mr. Colborn's testimony is inserted to start his response with the words, "I'm guessing 11/3/05. . ." *Id.* Strang is then shown asking Mr. Colborn, "Investigator Wiegert, did he give you that plate number before you called it in?" *Id.* Again, in MAM, Mr. Colborn seems far less certain than his response at trial, appearing to respond, "No, I just don't recall the exact content of our conversation back then, but he had to have given it to me, as I wouldn't have had the number any other way." Dkt. #120-5 at 55:35-56:10; cf. Barker Decl., Ex 19 trans. pp. 182-185.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 5 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

18(a).   *Immediately following that edited segment, MAM shows Strang asking, "Do you have any recollection of making that call?"* **Undisputed.**

18(b).    *MAM substitutes a response that appears far more equivocal than his trial testimony. Dkt. #120-5 at 55:35-56:10; cf. Barker Decl., Ex. 19 pp. 182-185. A portion of a different sentence in Mr. Colborn's testimony is inserted to start his response with the words, "I'm guessing 11/3/05. . ." Id.* **Undisputed** that Colborn's response in *MaM* begins with, "I'm guessing 11/03/05, probably after I received a phone call from Investigator Wiegert letting me know that there was a missing person," which condenses several lines of testimony from the trial transcript. *See* Ep. 5 (Dkt. 120-5) at 55:35–55:49. **Disputed** to the extent Colborn characterizes his response as "far more equivocal," which is attorney argument unsupported by record evidence. *MaM* speaks for itself. *See* General Objections §§ I, III *supra.*

18(c).    *Strang is then shown asking Mr. Colborn, "Investigator Wiegert, did he give you that plate number before you called it in?" Id.* **Undisputed** that Strang asked a similar question with substantially the same gist (*MaM* shows Strang asking, "Investigator Wiegert did he give you the license plate number for Teresa Halbach when he called you?"). *See* Ep. 5 (Dkt. 120-5) at 55:49-56:03; Dkt. 330-20 at 185:2-4. *MaM* speaks for itself. *See* General Objections § III *supra.*

18(d).    *Again, in MAM, Mr. Colborn seems far less certain than his response at trial, appearing to respond, "No, I just don't recall the exact content of our conversation back then, but he had to have given it to me, as I wouldn't have had the number any other way." Dkt. #120-5 at 55:35-56:10; cf. Barker Decl., Ex 19 trans. pp. 182-185.* **Undisputed** that Colborn provided a similar response with substantially the same gist (*MaM* shows Colborn's response as "You know, I just don't remember the exact content of our conversation then. But he had to have given it to me because I wouldn't have had the number any other way."). *See* Ep. 5 (Dkt. 120-5) at 56:03–56:12; Dkt. 330-20 at 186:17–25. **Disputed** to the extent Colborn characterizes himself as

appearing "far less certain," which is attorney argument unsupported by record evidence. *MaM* speaks for itself. *See* General Objections §§ I, III *supra*.

19. The technique of creating an amalgamated statement by inserting words spoken at a different time into a statement in order to revise the portrayed statement was something that the Chrome team referenced as the "frankenbite." Barker Decl., Ex. 13 (Manhardt depo. pp. 90-91; Barker Decl., Ex. 2 (Manhardt 0000142, 244-45, and 385). Netflix encouraged Chrome to shorten trial sequences by "clip[ping] bits and pieces together." *Id*. Ex. 2 (Manhardt 1055). When asked in deposition whether viewers should be advised that segments of trial footage were "Frankenstein" versions of the testimony rather than verbatim recordings of the testimony, Chrome's editor asserted that it was not necessary because a documentary like MAM is "not journalism." Barker Decl., Ex. 13 depo. p. 207.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

19(a). *The technique of creating an amalgamated statement by inserting words spoken at a different time into a statement in order to revise the portrayed statement was something that the Chrome team referenced as the "frankenbite." Barker Decl., Ex. 13 (Manhardt depo. pp. 90-91; Barker Decl., Ex. 2 (Manhardt 0000142, 244-45, and 385).* **Disputed** as misleading, mischaracterizing the evidence, removed from context, and immaterial. In her deposition testimony, Manhardt testified that a "frankenbite" is an industry term used in documentaries, podcasts, and "radio reporting." *See* Dkt. 330-14 at 90:20–25. Asked "So how would you define a Frankenbite?" Manhardt testified, "You know, if you said -- you take a word from one place and you put it in another. So if you said he robbed him that day, but I don't know who 'he' is, I

will find somebody saying Patrick, Patrick robbed him that day. So that's what Frankenbiting is."

Dkt. 330-13 at 91:1–7.

19(b).   *Netflix encouraged Chrome to shorten trial sequences by "clip[ping] bits and pieces together." Id. Ex. 2 (Manhardt 1055).* **Undisputed** that Netflix provided notes to improve pacing and episode length in order to engage viewers and help them digest the most salient points of a long and sprawling account. *See* Dkt. 271 ¶¶ 98-100. **Disputed** as to any implication that Netflix sacrificed accuracy in order to speed up the pace of a scene. *Id.* ¶¶ 101-102.

19(c).   *When asked in deposition whether viewers should be advised that segments of trial footage were "Frankenstein" versions of the testimony rather than verbatim recordings of the testimony, Chrome's editor asserted that it was not necessary because a documentary like MAM is "not journalism." Barker Decl., Ex. 13 depo. p. 207.* **Undisputed** that, at her deposition in this case, Manhardt testified to the following:

> I think that there's sort of a big misunderstanding about documentaries, you know. They're not journalism. And you can't -- like you can't just play things in real time, and you cut; and sometimes, yes, you do cut for effect," in response to the question "Would it be appropriate if it appeared that a different reaction was inserted in order to make Mr. Colborn look more uneasy or uncomfortable after responding to a question from the questioning attorney?

Dkt. 330-14 at 206:24–207:11 (objections omitted); *see also* Dkt. 291 ¶¶ 54 (detailing the length of Colborn's trial testimony); 141 (discussing the need to compress 30 years of history into 10 hours of television). **Disputed** that Manhardt was asked any question with the word "Frankenstein," rather than "frankenbite" or "frankenbiting." *See* Dkt. 330-14. Further **disputed** as to the characterization of Manhardt as "Chrome's editor" and that her personal opinions may be conflated with any Defendants' state of mind. *See* General Objections § IV *supra*.

20.     The edits to testimony were made by Manhardt, after Netflix's involvement, for the first two episodes and by Demos for the trial sequences in the later episodes. Barker Decl., Ex. 13 at pp. 52-55.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

20(a).     *The edits to testimony were made by Manhardt, after Netflix's involvement, for the first two episodes.* **Disputed** as inaccurate. Demos was lead editor for the entire series, including Episodes 1 and 2. Demos only shared "editor" credit with Manhardt on Episode 10. *See MaM* credits. Manhardt testified that by the time she joined the team, "[cuts for episodes] that were 1 through 4 I guess were in very good shape. They were very solid rough cuts, very solid," Dkt. 330-14 at 53:17–54:8. Manhardt's credits were "additional editor" for Episode 2 and "co-editor" for Episode 1. *See* Dkt. 290 ¶ 39; Dkt. 288 ¶ 40; Dkt. 330-14 at 52:8–55:13.

20(b).     *The edits to testimony were made by . . . Demos for the trial sequences in the later episodes. Barker Decl., Ex. 13 at pp. 52-55.* **Undisputed**.

21.     In MAM, Strang next asks, "Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota" Dkt. #120-5 at 56:10-56:28. In the Halbach trial, Mr. Colborn did not respond to that question, because the judge sustained an objection to it. Barker Decl., Ex. 19 trans. pp. 186-187. However, in MAM, Mr. Colborn instead appears to damagingly admit, "Yes." Dkt. #120-5 at 56:20-56:28. Strang then says, "But there is no way that you should have been looking at Teresa Halbach's license plate on November 3, 2005." Mr. Colborn responds, "I shouldn't have been and I was not looking at the license plate." Strang states, "Because you're

aware now that the first time that the license plate was reported found was two days later . . . ." Dkt. #120-5 at 56:20-56:28.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 4 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

21(a).   *In MAM, Strang next asks, "Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota" Dkt. #120-5 at 56:10-56:28.* **Undisputed.**

21(b).   *In the Halbach trial, Mr. Colborn did not respond to that question, because the judge sustained an objection to it. Barker Decl., Ex. 19 trans. pp. 186-187.* **Undisputed** that the objection and the court ruling are not shown in *MaM.*

21(c).   *However, in MAM, Mr. Colborn instead appears to damagingly admit, "Yes." Dkt. #120-5 at 56:20-56:28.* **Undisputed** that *MaM* shows Colborn responding "Yes" to Strang's question, "Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota?" Ep. 5 (Dkt. 120-5) at 56:10–56:28. **Disputed** as to phrase "damagingly admit," which is attorney argument unsupported by record evidence. *MaM* speaks for itself. *See* General Objections §§ I, III *supra.*

21(d).   *Strang then says, "But there is no way that you should have been looking at Teresa Halbach's license plate on November 3, 2005." Mr. Colborn responds, "I shouldn't have been and I was not looking at the license plate." Strang states, "Because you're aware now that the first time that the license plate was reported found was two days later . . . ." Dkt. #120-5 at 56:20-56:28.* **Undisputed** that *MaM* depicts an exchange with substantially the same gist (*MaM*

shows that Strang says, "But there is no way that you should have been looking at Teresa Halbach's license plate on November 3, on the back end of a 1999 Toyota." Colborn responds, "I shouldn't have been and I was not looking at the license plate." Strang follows up, "Because you're aware now that the first time that Toyota was reported found was two days later on November 5."). Ep. 5 (Dkt. 120-5) at 56:30–56:49. *MaM* speaks for itself. *See* General Objections § III.

22.     Netflix refers to this segment in its production notes as the "Colborn license plates bomb" and celebrated it as a perfect "cliffhanger" and as a "[s]ensational and strong end" the episode. (NFXCOL 229, 278, 2150). In the series notes shared with Chrome, Netflix creative team members likewise chortled that because of the edits made since the prior version, "setting up Colborn as the potential cop to plant the car really works well now." *Id.* (NFXCOL 278, 2150).

**Response:** This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

22(a).    *Netflix refers to this segment in its production notes as the "Colborn license plates bomb" and celebrated it as a perfect "cliffhanger" and as a "[s]ensational and strong end" the episode. (NFXCOL 229, 278, 2150).* **Disputed** as inaccurate, misleading, removed from the context of the entire note, and immaterial. As an initial matter, none of the documents Colborn cites contain the quote "Colborn license plates bomb." Nor does Netflix describe Colborn's call to dispatch as the "perfect" cliffhanger. Rather, in NFXCOL0000229, Netflix executives noted that the current cut of Episode 5 they viewed included the plot point that

"Sergeant Colborn had called dispatch and called in Teresa's license plate before the missing car was found," and suggested this as a "potential cliffhanger" on which to end the episode. *Id*. In a subsequent "cut" of Episode 5, Netflix comments that using the dispatch call as the cliffhanger ending "works really well now. Sensational and strong end to this episode." *See also* Dkt. 271 ¶ 100. It is also substantially true that Colborn called into dispatch over Halbach's license plate number before the missing car was found. *See* Dkt. 290-19 at 180–183; Ep. 5 (Dkt. 120-5) at 54:02–54:29; Dkt. 291 ¶ 22 (call to dispatch); Dkt. 290-18 at 170; Ep. 2 (Dkt. 120-2) at 37:13–38:01; Dkt. 291 ¶ 26 (November 5 discovery of Halbach's car).

22(b).    *In the series notes shared with Chrome, Netflix creative team members likewise chortled that because of the edits made since the prior version, "setting up Colborn as the potential cop to plant the car really works well now." Id. (NFXCOL 278, 2150).* **Disputed** as inaccurate, misleading, removed from the context of the entire note, and immaterial. Among other reasons, there is no "chortling" in the referenced notes. *See* Response to 22(a), above, which Defendants incorporate here by reference.

23.    In Episode 7, Calumet County Sgt. Tyson is shown testifying that he was told that no Manitowoc County officer was to be alone on the property and that if they were to locate evidence, it was to be turned over to Manitowoc County. Dkt. #120-7 at 4:20-4:40. Buting asks Tyson whether he ever had to "act like a babysitter" while other officers were conducting a search. He is shown as responding, "No." *Id*. at 5:20-5:35. In the trial transcript, he denies that he felt like a babysitter Dkt. #290-19 trans. pp. 25-26.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

23(a).   *In Episode 7, Calumet County Sgt. Tyson is shown testifying that he was told that no Manitowoc County officer was to be alone on the property and that if they were to locate evidence, it was to be turned over to Manitowoc County. Dkt. #120-7 at 4:20-4:40.* **Undisputed** that *MaM* depicts an exchange with substantially the same gist. However, Calumet County Sgt. Tyson's testimony begins at 3:40 of Episode 7 when he details that Calumet County (not Manitowoc) take possession of any evidence seized by Manitowoc County officers. *See* Ep. 7 (Dkt. 120-7) at 3:40–6:18.

23(b).   *Buting asks Tyson whether he ever had to "act like a babysitter" while other officers were conducting a search. He is shown as responding, "No." Id. at 5:20-5:35.* **Undisputed** that *MaM* depicts an exchange with substantially the same gist. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

23(c).   *In the trial transcript, he denies that he felt like a babysitter Dkt. #290-19 trans. pp. 25-26.* **Undisputed.** Immediately following this was:

> BUTING:   "Had you ever, in any of your years as an officer, had to watch the officers who were searching where you were, to make sure that they weren't alone?"
>
> TYSON:     "No."
>
> BUTING:   "This was a first for you, wasn't it?"
>
> TYSON:     "Yes."

*Compare* Dkt. 290-19 at 25 *with* Ep. 5 (Dkt. 120-5) at 5:20–5:35.

24.   Netflix creative team members recognized at numerous times that the claims of planting evidence needed to be buttressed because they were not very credible on their own. For example, representatives proposed cuts to Lenk's testimony as shown in MAM because it never really delivered "enough of a silver bullet" to support a direct claim that Lenk planted evidence.

Barker Decl., Ex. 1 (NFXCOL 273). They also noted that "Buting's claim that [Lenk] put the DNA on the key is really weak." *Id*. at NFXCOL 2078. In addition, Netflix representatives noted that it could have been a "simple oversight" that Lenk didn't sign in at one point during the search of the Avery property, but recommended that a "timeline" be added to ensure that the segment didn't appear to viewers to be "speculative and grasping for conspiracy." *Id*. at NFXCOL 288.

**Response:** This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 4 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

24(a).    *Netflix creative team members recognized at numerous times that the claims of planting evidence needed to be buttressed because they were not very credible on their own.*

**Disputed** as attorney argument unsupported by record evidence, vague, and misleading. Netflix responds to Colborn's specific "examples" as they arise below. To the extent this allegation is construed as a fact, Netflix disputes and deny this allegation, including the implication that they were making credibility determinations rather than simply documenting the claims and defenses at Avery's trial for Halbach's murder. In any event, any "recognition" that Avery's evidence-planting claims "needed to be buttressed" shows care and due diligence as to the factual accuracy of *MaM*, the opposite of actual malice.

24(b).    *For example, representatives proposed cuts to Lenk's testimony as shown in MAM because it never really delivered "enough of a silver bullet" to support a direct claim that Lenk planted evidence. Barker Decl., Ex. 1 (NFXCOL 273).* **Undisputed** that the quote above appears in the cited document. **Disputed** as misleading, removed from the context of the entire

44

note, not "of and concerning" Colborn, and immaterial. The document speaks for itself. *See* General Objections § III *supra.*

24(c).    *They also noted that "Buting's claim that [Lenk] put the DNA on the key is really weak." Id. at NFXCOL 2078.* **Undisputed** that the quote above appears in the cited document. **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. The document speaks for itself. *See* General Objections § III *supra.*

24(d).    *In addition, Netflix representatives noted that it could have been a "simple oversight" that Lenk didn't sign in at one point during the search of the Avery property, but recommended that a "timeline" be added to ensure that the segment didn't appear to viewers to be "speculative and grasping for conspiracy." Id. at NFXCOL 288.* **Undisputed** that the quote above appears in the cited document. **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. The document speaks for itself. *See* General Objections § III *supra.*

25.    Netflix advised Chrome during production to avoid using images of Avery in court that made him look "smug." Barker Decl., Ex. 1 (NFXCOL 1974). In contrast, Chrome suggested to Netflix that they incorporate a shot of Mr. Colborn looking "squirmy" to include in the trailer for the series. Barker Decl., Ex. 6 (CHRM 395).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

25(a).    *Netflix advised Chrome during production to avoid using images of Avery in court that made him look "smug." Barker Decl., Ex. 1 (NFXCOL 1974).* **Undisputed** that, in response to a draft version of Episode 5, Netflix made the following suggestion, "Dean Strang

soliloquy on the difficulty of this type of trial. v/o over shot of Steven looking a little smug – might be better to use a different shot?" Dkt. 330-1 at NFXCOL0001974. **Disputed** as immaterial to Colborn's defamation claim as the note is not of and concerning the Colborn. *See* Dkt. 320, Producer Defendants' Responses to Plaintiff's PFOF ("Prod. Def. Resp. PFOF") ¶ 77.

25(b).    *In contrast, Chrome suggested to Netflix that they incorporate a shot of Mr. Colborn looking "squirmy" to include in the trailer for the series. Barker Decl., Ex. 6 (CHRM 395).* **Undisputed** that Moira Demos suggested substituting a "squirmy shot" of Colborn for the *MaM* trailer. **Disputed** as immaterial because the *MaM* trailer is not at issue in the case or mentioned in the SAC, Demos already explained the reason the substitution was made, and Colborn does not deny that he squirmed while testifying. *See* Dkt. 105; Dkt. 288 ¶ 98; Dkt. 320 Producer Defendants' Supp. Proposed Findings of Fact ("Prod. Def. SPFOF") ¶ 45. Even Colborn's former counsel of record in this lawsuit described watching Avery civil lawsuit deposition testimony of "the officers who were most directly accused of wrongdoing—either in the first Avery case or in the second" as "watching them squirm." *See* Dkt. 320, Prod. Def. SPFOF ¶¶ 46, 78.

26.    In Episode 7, spooky music plays while Mr. Colborn is asked to describe the call that he received while he was working in the Manitowoc County jail. Ken Kratz asks him, "Do you even know whether that call was about Steven Avery?" He responds, "No sir." Dkt. #120-7 at 18:35-18:45. Mr. Colborn's response that no names were given is omitted. *Cf.* Barker Decl., Ex. 19 trans. p. 213.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

26(a).    *In Episode 7, spooky music plays while Mr. Colborn is asked to describe the call that he received while he was working in the Manitowoc County jail.* **Undisputed** that music plays during Ken Kratz's questioning about the Jail Call in Episode 7. Ep. 7 (Dkt. 120-7) at 17:30–18:41. **Disputed** as to the characterization of the music as "spooky" as attorney argument unsupported by the record. *MaM* speaks for itself. *See* General Objections §§ I, III *supra*.

26(b).    *Ken Kratz asks him, "Do you even know whether that call was about Steven Avery?" He responds, "No sir." Dkt. #120-7 at 18:35-18:45.* **Undisputed** that Kratz asked a question with substantially the same gist (*MaM* shows Kratz asking, "Well, let me ask you this, Sergeant Colborn, do you even know whether that call was about Mr. Steven Avery?" and Colborn replied, "No, sir.") Ep. 7 (Dkt. 120-7) at 18:35–18:45. *MaM* speaks for itself. *See* General Objections § III.

26(c).    *Mr. Colborn's response that no names were given is omitted. Cf. Barker Decl., Ex. 19 trans. p. 213.* **Undisputed** that the redundant testimony that "There were no names given" was not included in *MaM*.

27.    In further questioning by Kratz, MAM eliminates Mr. Colborn's emphatic denial that he ever planted any evidence against Mr. Avery, which was "That's ridiculous, no I have not." Dkt. #120-7 at 19:00-19:15; cf. Barker Decl., Ex. 19 trans. pp. 140-141. It instead substitutes his answer to a different question, "Have you ever planted any evidence against anybody in the course of your law enforcement career," to which Mr. Colborn responded, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not." *Id*.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in

violation of Civil L.R. 56(b)(2)(B)(ii). Defendants further object to this proposed finding of fact as duplicative of CAPFF ¶ 61, *infra*. Responding to each subpart:

27(a).     *In further questioning by Kratz, MAM eliminates Mr. Colborn's emphatic denial that he ever planted any evidence against Mr. Avery, which was "That's ridiculous, no I have not." Dkt. #120-7 at 19:00-19:15; cf. Barker Decl., Ex. 19 trans. pp. 140-141*. **Undisputed** that this particular line of testimony is not included in *MaM*.

27(b).     *It instead substitutes his answer to a different question, "Have you ever planted any evidence against anybody in the course of your law enforcement career," to which Mr. Colborn responded, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not." Id*. **Undisputed** that *MaM* features an exchange with substantially the same gist (*MaM* shows Kratz asking, "Have you ever planted any evidence against Mr. Avery?" and Colborn responding, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not."). Ep. 7 (Dkt. 120-7) at 19:00–19:15. *MaM* speaks for itself. *See* General Objections § III.

28.     In Episode 7, MAM shows what appears to be Mr. Colborn's testimony as Strang asks him about reports concerning the Halbach investigation. He asks Mr. Colborn, "Your total contribution is a little less than half a page?" Dkt. #120-7 at 22:29-22:40. Mr. Colborn appears to respond yes to this question, *id*. at 22:35-22:40, but in fact, MAM edits out from this exchange discussion of a second report written by Mr. Colborn. Barker Decl., Ex. 62.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Defendants further object to this proposed finding of fact as duplicative of CAPFF ¶ 62, *infra*. Responding to each subpart:

28(a).   *In Episode 7, MAM shows what appears to be Mr. Colborn's testimony as Strang asks him about reports concerning the Halbach investigation.* **Undisputed**.

28(b).   *He asks Mr. Colborn, "Your total contribution is a little less than half a page?" Dkt. #120-7 at 22:29-22:40. Mr. Colborn appears to respond yes to this question, id. at 22:35-22:40,* **Undisputed** that *MaM* depicts a question with substantially the same gist (*MaM* shows Strang ask, "Your total contribution is what, a little bit under half a page?" to which Colborn responds, "Correct."). *See* Ep. 7 (Dkt. 120-7) at 22:29–22:40. *MaM* speaks for itself. *See* General Objections § III.

28(c).   *[B]ut in fact, MAM edits out from this exchange discussion of a second report written by Mr. Colborn. Barker Decl., Ex. 62.* **Undisputed** that Colborn's testimony regarding the June 2006 report is not included in that segment of Episode 7 at 22:29–22:40, but it is instead discussed two minutes earlier at 20:02–20:40.[5]

29.   MAM then appears to show the following exchange between the prosecutor and Mr. Colborn:

Mr. Kratz:   As you look back, back in 1994 or '95, if you would have written a report, what would it have been about?

Mr. Colborn:   That is why I didn't do one. I don't know what it would have been about, that I received a call and transferred it to the Detective Division. If I wrote a report about every call that came in, I would spend my whole day writing reports.

Dkt. #120-7 at 23:46-24:03; Dkt. #290-19 pp. 212-213, Ex. 62. MAM includes the exchange but omits the words, "that I received a call and transferred it to the Detective Division." *Id.*

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in

---

[5] Defendants note that there is no Exhibit 62 to the Barker Declaration.

violation of Civil L.R. 56(b)(2)(B)(ii). Defendants further object to this proposed finding of fact as duplicative of CAPFF ¶ 58, *infra*. Responding to each subpart:

29(a).    *MAM then appears to show the following exchange between the prosecutor and Mr. Colborn:*

> *Mr. Kratz:*    *As you look back, back in 1994 or '95, if you would have written a report, what would it have been about?*

> *Mr. Colborn:*    *That is why I didn't do one. I don't know what it would have been about, that I received a call and transferred it to the Detective Division. If I wrote a report about every call that came in, I would spend my whole day writing reports.*

*Dkt. #120-7 at 23:46-24:03; Dkt. #290-19 pp. 212-213, Ex. 62.* **Undisputed** that *MaM* depicts an exchange with substantially the same gist (*MaM* shows Kratz asking, "Sergeant Colborn, back in 1994 or -95, if you would've written a report, what would it have been about?" Colborn responded, "I don't know what it would've been about. If I wrote a report about every call that came in, I would spend my whole day writing reports."). *See* Ep. 7 (Dkt. 120-7) at 23:46–24:03. *MaM* speaks for itself. *See* General Objections § III.

29(b).    *MAM includes the exchange but omits the words, "that I received a call and transferred it to the Detective Division." Id.* **Undisputed** that *MaM* does not include the phrase "that I received a call and transferred it to the Detective Division" in Episode 7 from 23:46–24:03 but noted that *MaM* includes Colborn's testimony explaining that he transferred the jail call to someone at the Manitowoc County Sheriff's Department ("MTSO"). *See* Dkt. 271 ¶ 57.

30.    Strang concludes his cross-examination, saying, "That's all I have." Dkt. #120-7 at 24:20-24:30. At the trial, the judge immediately says, "You're excused," to Mr. Colborn. Barker Decl., Ex. 4. Without hesitation, Mr. Colborn stands and exits the witness stand. *Id.* However, in MAM, Mr. Colborn is shown sitting on the stand for several seconds looking deflated while ominous, pounding music plays in the background. Dkt. #120-7 at 24:20-24:30.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 4 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

30(a).    *Strang concludes his cross-examination, saying, "That's all I have." Dkt. #120-7 at 24:20-24:30.* **Undisputed.**

30(b).    *At the trial, the judge immediately says, "You're excused," to Mr. Colborn. Barker Decl., Ex. 4.* **Undisputed** that, at trial, Judge Willis excused Colborn as a witness once his testimony concluded.

30(c).    *Without hesitation, Mr. Colborn stands and exits the witness stand. Id.* **Undisputed** that, in the raw footage, Colborn stood and exited the witness stand. **Disputed** as to the characterization that it was "without hesitation," as this is attorney argument unsupported by record evidence. *See* Dkt. 312, Ex. 4 comparison at 0:02–0:10. Further, the Unterminated Feed Footage Issue explains the edits addressed here. *See* Response to 17, above, which Defendants incorporate here by reference.

30(d).    *However, in MAM, Mr. Colborn is shown sitting on the stand for several seconds looking deflated while ominous, pounding music plays in the background. Dkt. #120-7 at 24:20-24:30.* **Undisputed** that, in the two seconds of footage from *MaM* after Strang concludes his cross-examination, Colborn is shown still seated. *See* Dkt. 312, Ex. 4 comparison at 0:14–0:16. Due to the Unterminated Feed Footage Issue, there was no usable footage of Colborn seated on the witness stand at this moment while Strang finished his questioning, so Demos substituted footage of Colborn waiting after his direct examination. *See* Dkt. 288 ¶ 55; *see also* Dkt. 283, Exs. 9–12 (video demonstrating how usable footage from that moment was unavailable due to Unterminated Feed Footage Issue); *see also* Response to 17, above, which Defendants

incorporate here by reference (Unterminated Feed Footage Issue). The Producer Defendants did not substitute footage out of any bias or ill will, nor did they believe the substitution altered the meaning of Plaintiff's testimony in any way. *See* Dkt. 288 ¶ 55. **Disputed** as to Colborn's characterizations that *MaM* made him "look[] deflated" or that the music was "ominous, pounding," as these are attorney argument unsupported by record evidence. *MaM* speaks for itself. *See* General Objections §§ I, III *supra*.

31. During production, Netflix commented to Chrome that it was "unlikely" that FBI representatives would "aid and abet" Manitowoc County as part of a conspiracy to frame Avery unless the department had a "deep history" with the agency. Barker Decl., Ex. 1 (NFX 2132).

**Response:** This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. The note, in full, reads:

> 1:17:00- BIG QUESTION: Why would the FBI have a specific interest in covering up for and possibly aiding and abetting with Manitowoc County? Seems like we would maybe need to know that Manitowoc had some deep history with Lebeau/other FBI officials for them to testify in the case in such a subject manner. We are not saying we shouldn't do this arc, it just feels unlikely. This was something we bumped on. Let's discuss.

Dkt. 330-1 at NFXCOL0002132. The document speaks for itself. *See* General Objections § III *supra*.

32. In episodes 8 through 10, MAM includes essentially extended reactions to the guilty verdict returned against Avery for Halbach's murder and the verdict returned against Dassey, including the points described in the Addendum / Episode Summary. Chrome creatives commiserated with one another that the sequences involving the verdicts were "devastating" for them. Barker Decl., Ex. 2 (Manhardt 271, 288, 361-62, 432).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

32(a). *In episodes 8 through 10, MAM includes essentially extended reactions to the guilty verdict returned against Avery for Halbach's murder and the verdict returned against Dassey, including the points described in the Addendum / Episode Summary.* **Undisputed** that Episodes 8 through 10 thoroughly cover the guilty verdicts against Avery and Dassey and the varied reactions to them, both positive and negative. *See* Dkt. 291 ¶¶ 64, 70; Eps. 8–10 (Dkts. 120-8, 120-9, 120-10). **Disputed** that the episodes "extended" reactions. *MaM* speaks for itself. *See* General Objections §§ I, III *supra*. Defendants also object to Colborn's improper Addendum, *see* General Objections § I, *supra*.

32(b). *Chrome creatives commiserated with one another that the sequences involving the verdicts were "devastating" for them. Barker Decl., Ex. 2 (Manhardt 271, 288, 361-62, 432).* **Disputed** as misleading, mischaracterizes the evidence, removed from context, and immaterial. The documents cited lend no support for the fact alleged here and instead are emails with Manhardt's personal reactions to various episodes, not to the verdict. The documents speak for themselves. *See* General Objections § III *supra*. Further **disputed** as to the characterization of Manhardt as part of the "creative team for Chrome," which is attorney argument unsupported by record evidence. *See* General Objections § IV *supra*.

33. To avoid viewers losing interest through the actual details of the Halbach trial or the Avery civil suit, Netflix repeatedly directed Chrome to edit, cut and tighten scenes, especially those involving courtroom testimony, to tell a clearer "story" and to avoid the potential for "a really dry episode." Barker Decl., Ex. 1 (NFXCOL 224-25, 212, 1949, 1959, 1996, 2131, 2062,

2076, 2078, 2083). Netflix also advised that Chrome should look for ways to use the series to "allude to" planting of evidence by officers during their visits to the property. Barker Decl., Ex. 1 (NFXCOL 202, 1940). They also complained about commentary by Buting in a draft version of MAM that "actually detracts" from the argument that "Lenk/Colborn" could have "planted" Ms. Halbach's vehicle key. *Id*. at NFXCOL 2078.

<u>**Response:**</u> This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

33(a). *To avoid viewers losing interest through the actual details of the Halbach trial or the Avery civil suit, Netflix repeatedly directed Chrome to edit, cut and tighten scenes, especially those involving courtroom testimony, to tell a clearer "story" and to avoid the potential for "a really dry episode." Barker Decl., Ex. 1 (NFXCOL 224-25, 212, 1949, 1959, 1996, 2131, 2062, 2076, 2078, 2083).* **Disputed** that Netflix "directed" *MaM* or required the Producer Defendants to make changes to it. Dkt. 271 ¶ 97; Dkt. 320, Prod. Def. SPFOF ¶ 3. **Undisputed** that Netflix provided notes to improve pacing and episode length in order to engage viewers and help them digest the most salient points of a long and sprawling account. *See* Dkt. 271 ¶¶ 98-100. **Disputed** as to any implication that Netflix sacrificed accuracy in order to speed up the pace of a scene or make a scene more impactful. *Id*. ¶¶ 101-102.

33(b). *Netflix also advised that Chrome should look for ways to use the series to "allude to" planting of evidence by officers during their visits to the property. Barker Decl., Ex. 1 (NFXCOL 202, 1940).* **Undisputed** that the cited documents contain the quoted words above. **Disputed** as misleading, removed from the context of the entire note, and immaterial. The note,

in full, reads, "21:23 – Is there anything we can use/show to clarify whether or not the cops had a warrant to search [Avery's] property and allude to the fact that they may have planted something when they were there without permission?" Dkt. 330-1 at NFXCOL0000202, 1940 (same note). It refers only to Episode 3, not the entire series, as Colborn suggests. It is also substantially true that Avery's defense at his trial for Halbach's murder was that law enforcement planted evidence to ensure his conviction. *See* Dkt. 271 ¶¶ 13-15.

33(c). *They also complained about commentary by Buting in a draft version of MAM that "actually detracts" from the argument that "Lenk/Colborn" could have "planted" Ms. Halbach's vehicle key. Id. at NFXCOL 2078.* **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. The note, in context, reads,

> 25:20 – 26:00 – Buting's claim that [Lenk] put the DNA on the key is really weak.

> 19 – 26 This whole section detracts from connecting *Lenk*'s testimony to the officer earlier testifying [who was not Colborn] that they should not have been there to begin with.

> 29:03 – Could we cut Orth after 30:45 once we've established that Lenk/Colburn weren't there at the beginning and that he started the Log (until 31:16)? Lenk's presence on the site is better established with Fassbender reading the log (and finding a record of Lenk leaving but not signing in) and Lenk himself with conflicting testimony across 2 dates (2:05 arrival vs. 6:30pm arrival).

Dkt. 330-1 at NFXCOL0002078. The only part of the note about Colborn is the suggestion to *maintain* a scene that establishes Colborn was not on Avery's property. *See id.*

34. Likewise, Netflix encouraged Chrome to look for opportunities in MAM to include music that would help identify the "baddies" – i.e., law enforcement representatives, Barker Decl., Ex. 1 (NFXCOL 1953; see also 2009-2010, 243, 2174), – and to convey a "bad guy theme" or "villain theme" when they appeared on screen. *Id*. Ex. 2 (Manhardt 793, 817); *see also* Ex. 1, NFXCOL 2133 (identifying law enforcement character as a "key villain" in the

series); NFXCOL 241-43, 339, 296 (music was to "really up the stakes"). This advice from Netflix was consistent with Chrome's intent to portray law enforcement representatives as "villains" in the series. *Id*. Ex. 2 (Manhardt 829).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

34(a).    *Likewise, Netflix encouraged Chrome to look for opportunities in MAM to include music that would help identify the "baddies" – i.e., law enforcement representatives, Barker Decl., Ex. 1 (NFXCOL 1953; see also 2009-2010, 243, 2174), – and to convey a "bad guy theme" or "villain theme" when they appeared on screen. Id. Ex. 2 (Manhardt 793, 817); see also Ex. 1, NFXCOL 2133 (identifying law enforcement character as a "key villain" in the series); NFXCOL 241-43, 339, 296 (music was to "really up the stakes").* **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. First, the note on "the baddies" is as follows: "Can we work to establish a subtle but impactful 'theme' track for the baddies, ***e.g. Lenk, Petersen, Kratz*** and certainly for ***Len Kachinsky & Michael O'Kelly*** to help clearly support that despite their appointed roles to protect Brendan—they are doing him great harm." *See* Dkt. 330-1 at NFXCOL0002009 (emphasis added), 2174 (same note). Second, although Colborn provides no citation to a document that references a "bad guy" or "villain" theme, the note on the "bad guy theme" references a scene in Episode 8, stating, "42:00 – learning that Tom Fassbender is calling Scot Tadych to convince Barbara make Brendan take a plea – perfect moment for 'bad guy theme.'" *See* Dkt. 286 Ex. 9 at NFXCOL0002037. Third, all of the remaining notes are about music in the series, and therefore are not statements that can defame Colborn. *See* Dkt. 269 at 25; Dkt. 271 ¶ 150; *see also* Dkt.

320, Prod. Def. Resp. PFFOF ¶ 73; Dkt. 320, Prod. Def. SPFOF ¶ 9. Several of the documents to which Colborn cites for support—NFXCOL0001953, NFXCOL0002010, NFXCOL0002173—have nothing to do with notes about "the baddies," or a "bad guy" or "villain" theme, so they neither lend support for Colborn's point nor are defamatory of him.[6]

34(b). *This advice from Netflix was consistent with Chrome's intent to portray law enforcement representatives as "villains" in the series. Id. Ex. 2 (Manhardt 829).* This allegation goes only to Chrome's state of mind and Chrome is thus in the best position to answer it.

**Disputed** as attorney argument unsupported by record evidence, vague, misleading, removed from its context, not "of and concerning" Colborn, and immaterial. The referenced note is not about Colborn or about the Halbach investigation or trial. The cited note reads, "Punctuate discover that DV [Denis Vogel] knew about GA [Gregory Allen] – plus, possible place for 'villain' theme." Dkt. 330-3 at Manhardt00000829.

35. Netflix also recommended and approved the series' graphics. *Id*. Ex. 1 (NFXCOL 219).

**Response: Undisputed** that Netflix recommended the use of graphical elements to enhance the clarity and factual accuracy of the series for viewers. *See* Dkt. 271 ¶ 103; Dkt. 272 ¶ 13-14; Dkt. 275 ¶ 16; Dkt. 320, Prod. Def. SPFOF ¶ 10. Further **undisputed** that Netflix approved the final cuts of all MAM episodes. *See* Response to 1(c), above, which Defendants incorporate here by reference. **Disputed** as immaterial because Colborn does not allege that any of the graphics or visual elements in *MaM* are false. *See* Dkt. 269 at 25.

---

[6] Colborn's parenthetical on NFXCOL0002133 is similarly misleading. The note reads, "Should we foreshow Vogel a[s] a key villain earlier." *Id*. Once again, here, the note has nothing to do with Colborn—or even law enforcement—and highlights Colborn's grasping at straws to find actual malice where none exists.

36.     Netflix representatives' notes demonstrate that they were brainstorming with Chrome to determine whom should be portrayed as the "mastermind" of the alleged law enforcement conspiracy and that they approved using Avery's lawyers' analysis of law enforcement officers' alleged motive and content. Barker Decl., Ex. 1 (NFXCOL 2134).

**Response:** This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

36(a).     *Netflix representatives' notes demonstrate that they were brainstorming with Chrome to determine whom should be portrayed as the "mastermind" of the alleged law enforcement conspiracy[.]* **Undisputed** that the word "mastermind" appears in NFXCOL0002134. **Disputed** as attorney argument unsupported by record evidence, vague, misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. The note reads, "Good to see **Tom Kocourek**, but we need to understand if ***he is the mastermind***, the driver, of the original arrest of Steven, the entire cover up, and the second cover up of Steven." Dkt. 330-1 at NFXCOL0002134 (emphasis added).

36(b).     *Netflix representatives' notes demonstrate . . . that they approved using Avery's lawyers' analysis of law enforcement officers' alleged motive and content. Barker Decl., Ex. 1 (NFXCOL 2134).* **Disputed** as misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. The note reads, "Jerry Buting analysis of ***Petersen, Lenk, Kratz*** is strong…Should we use analytical approach throughout." Dkt. 330-1 at NFXCOL0002134 (emphasis added).

37.     Chrome held in high personal regard Glynn, who appears early on to interpret and explain the events as told by MAM. Barker Decl., Ex. 2 (Manhardt 262, 429). After the release of the series, Chrome's editor expressed giddiness at the prospect of sharing a stage with Glynn in public comments about the series. *Id*.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

37(a).     *Chrome held in high personal regard Glynn, who appears early on to interpret and explain the events as told by MAM. Barker Decl., Ex. 2 (Manhardt 262, 429).* This allegation goes primarily to Chrome's state of mind and Chrome is thus in the best position to answer it. **Undisputed** that Manhardt expressed positive personal impressions of Stephen Glynn after *MaM* was released. *But see* General Objections § IV *supra*. Colborn himself referred to Glynn as "amiable" and a "raconteur" in his opposition briefing. *See* Dkt. 327 at 7. **Undisputed** that Stephen Glynn was one of many individuals who provided commentary for *MaM* based on his first-hand knowledge of the events, with his affiliation as Avery's attorney disclosed to the audience. *See* Dkt. 290 ¶ 47; Dkt. 288 ¶ 48; Dkt. 330-14 at 94:10–95:2; *see also* Ep. 1 (Dkt. 120-1) at 26:00 ("Stephen Glynn, Steven's Civil Rights Lawyer").

37(b).     *After the release of the series, Chrome's editor expressed giddiness at the prospect of sharing a stage with Glynn in public comments about the series. Id.* **Disputed** as the characterization of Manhardt as "Chrome's editor" and that her personal opinions may be conflated with any Defendants' state of mind. *See* General Objections § IV *supra*. Further **disputed** to "giddiness," which is attorney argument unsupported by record evidence. *See also* Response to 37(a), above, which Defendants incorporate here by reference.

38.     In contrast, Netflix and Chrome traded snide emails about MAM viewers giving negative Yelp! Reviews to the Avery prosecutors. Barker Decl., Ex. 2 (Manhardt 411).

**Response: Undisputed** that, in an email exchange after *MaM*'s release, Manhardt shared links to news articles from an NBC-affiliate and Buzzfeed about negative Yelp reviews regarding Kratz. **Disputed** as to the implication that Netflix "traded . . . emails" as no Netflix executive is copied or otherwise included on the thread in the document cited. *See* Dkt. 330-2 at Manhardt00000411. Further **disputed** as to "snide," which is attorney argument unsupported by record evidence. Further **disputed** as inaccurate, misleading, removed from context, not "of and concerning" Colborn, and immaterial.

39.     Early on, Chrome's editor asked whether the Avery civil lawsuit claims should be clarified as allegations rather than fact, Barker Decl., Ex. 2, but as the series' content demonstrates, the question was resolved in favor of the latter.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

39(a).     *Early on, Chrome's editor asked whether the Avery civil lawsuit claims should be clarified as allegations rather than fact, Barker Decl., Ex. 2[.]* **Disputed** as vague, misleading, removed from context, unsupported by record evidence, which speaks for itself, and immaterial. Colborn provides no page citation for this assertion, and Exhibit 2 is nearly 60 pages in length. Further **disputed** that Exhibit 2 does not use the words "allegation," "allege," or "fact" in the manner suggested. Further **disputed** as to the characterization of Manhardt as "Chrome's editor" and that her personal opinions may be conflated with any Defendants' state of mind. *See* General Objections § IV *supra*.

39(b).  *[B]ut as the series' content demonstrates, the question was resolved in favor of the latter.* **Disputed** as attorney argument unsupported by record evidence, vague, and misleading. *MaM* speaks for itself and is the best evidence to resolve the claims. *See* General Objections §§ I, III *supra*; *see also* Dkt. 291 ¶¶ 93, 125.

40.      Netflix also looked for ways to draw attention to Plaintiff's appearances in footage throughout the series, in order to enhance the "shock" for the audience of seeing him performing his duties because according to MAM's storyline, he was "always a suspect" in alleged "tampering with evidence." Barker Decl., Ex. 1 (NFXCOL 245, 2039, 2043, 2167, 2174, 2089). Likewise, Netflix lauded Chrome's use of "danger" music to accompany images of Mr. Colborn in the series. *Id.* Ex. 1 (NFXCOL 287).

**Response:** This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

40(a).  *Netflix also looked for ways to draw attention to Plaintiff's appearances in footage throughout the series, in order to enhance the "shock" for the audience of seeing him performing his duties because according to MAM's storyline, he was "always a suspect" in alleged "tampering with evidence." Barker Decl., Ex. 1 (NFXCOL 245, 2039, 2043, 2167, 2174, 2089).* **Disputed** as attorney argument unsupported by record evidence, vague, misleading, removed from the context of the entire note, and immaterial. **Undisputed** that Netflix suggested identifying Colborn when he appeared in the several scenes. *See* Dkt. 330-1 at NFXCOL0000245 ("Andy Colburn is there, again? Maybe worth ID'ing him."); NFXCOL0002039 ("Would it help to point out that Colborn is escorting him out with a lower-

third?"); NFXCOL0002167 ("ID both Colburn and Petersen"); *id.* ("ID that Colburn is walking Steven Avery out of the court."); *see also* NFXCOL0002089 (same note). Netflix provided notes to enhance the clarity and factual accuracy of the series, especially because Avery's prosecution for Halbach's murder involved a large number of facts and relevant players, including several law enforcement agencies and legal teams. *See* Dkt. 271 ¶ 103. Further **disputed** that several of the cited notes are about music in the series which are not statements that can defame Colborn, *see* Dkt. 330-1 at NFXCOL0002043 ("MUSIC BEATS . . . Enhance shock of Colburn escorting Brendan out when his verdict is read"); NFXCOL0002174 (same note); Dkt. 269 at 25; Dkt. 271 ¶ 150.

40(b).    *Likewise, Netflix lauded Chrome's use of "danger" music to accompany images of Mr. Colborn in the series. Id. Ex. 1 (NFXCOL 287).* **Disputed** as misleading, removed from the context of the entire note, and immaterial. The note, in full, reads, "51:20 – Good 'danger' music when Colburn is walking [Avery] out," meaning from the courtroom after the verdict. *See* Dkt. 330-1 at NFXCOL0000287. At his deposition in this case, Colborn agreed that the subject matter of *MaM* involved a murder, which is a horrific crime, and that he believes Avery is and was a dangerous perpetrator. *See* Third Walker Decl. Ex. 4 (Colborn Tr.) at 224:9-225:13. Colborn's cited evidence does not support his assumption that the "danger" music in this scene was somehow tied to or targeted at him. Further **disputed** as the note is about music in the series and therefore is not a statement that can defame Colborn. *See* Dkt. 269 at 25; Dkt. 271 ¶ 150.

41.    Netflix notes recognize that its creative team was aware that out-of-court statements by Avery's attorneys in MAM were "directly claiming that [law enforcement officers] framed Steven" or that law enforcement officers went so far as to [sic] Halbach in order to frame Avery. Barker Decl., Ex. 1 (NFXCOL 2071, 2079); NFXCOL 294-95. However, Netflix team

members confided to one another that despite these concerns, they were reluctant to confuse

Chrome because asking to dial these references back would be "contrary to the direction" Netflix

had been pushing them. Barker Decl., Ex. 1 (NFXCOL 294-95). Their exchange, in pertinent

part, was as follows:

Adam Del Deo:

. . .

In this sequence, it feels like Jerry Buting, on an almost definitive basis, is accusing the officers. Although I think the officers have the strongest motive, I think Jerry's statement come across at [sic] fact . . .they thought, for sure, we're going to make sure he's convicted." It may be worth soften his statement so it doesn't come across so subjective.

Benjamin Cotner:

I will do a last pass and draft an email for you, Lisa, to review and send in the morning.

Adam, I am kind of worried that this note goes contrary to the direction we've been pushing them in. I've been under the impression that we are desperate to say that someone else could have done it. I'm afraid that if we tell them to soften something it is going to really confuse the filmmakers . . . . I don't think that subjective is necessarily bad, but if it is complete unfounded then you might be right. Let me know what you think . . . .

Adam del Deo:

I hear you. Let me try to clarify.

I think the statement as Jerry currently communicates it comes across, to me, as a matter of fact that the officers did it (as oppose to highly likely they did it). In other words, I think if Jerry's statement involving the officers can come across as a highly possible/very likely scenario (since the officers had a very strong motive to kill Steven) it would be convincing that someone else, most likely one of/some of the officers, were involved.

I think we're saying the same thing. However, I just wanted to make sure Jerry isn't saying the officers killed as a matter of pure fact since there's no physical evidence to really prove the officers were there, rather just very strong motive. Take a look at Jerry's statement again and see if you agree. If not, leave the way it is.

Benjamin Cotner:

I think its a really valid point but I would rather leave it in for now – it is something we can always pull out later, but I am so happy that they finally have a point of view. I hope people know it is just a theory . . . .

**Response:** This allegation goes only to Netflix's state of mind and Netflix is thus in the best position to answer it. Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

41(a).    *Netflix notes recognize that its creative team was aware that out-of-court statements by Avery's attorneys in MAM were "directly claiming that [law enforcement officers] framed Steven" or that law enforcement officers went so far as to [sic] Halbach in order to frame Avery. Barker Decl., Ex. 1 (NFXCOL 2071, 2079); NFXCOL 294-95.* **Undisputed** that the quote "directly claiming that they framed Steven" appears in NFXCOL0002079. **Disputed** as misleading, removed from the context of the note, and immaterial. The note, in full, reads, "51:55 – Triple check Buting's statement here for legal. He is directly claiming they framed Steven. Make sure this is 100% covered in their legal filings." Dkt. 330-1 at NFXCOL0002079. The note is a clear request from a non-lawyer at Netflix to the filmmakers to ensure the factual accuracy of *MaM*, including by confirming that Buting's out-of-court statements were consistent with his in-court statements. Further **disputed** that the quoted language appears in NFXCOL0002071.

41(b).    *However, Netflix team members confided to one another that despite these concerns, they were reluctant to confuse Chrome because asking to dial these references back would be "contrary to the direction" Netflix had been pushing them. Barker Decl., Ex. 1 (NFXCOL 294-95).* **Undisputed** that the quoted phrase appears in the cited document. **Disputed** that Netflix "directed" *MaM* or required the Producer Defendants to make changes to it. *See* Dkt. 271 ¶ 97; Dkt. 320, Prod. Def. SPFOF ¶ 3. Further **disputed** as misleading, removed from the

context of the entire note, not "of and concerning" Colborn, and immaterial. The document speaks for itself. *See* General Objections § III *supra*.

41(c).     *Their exchange, in pertinent part, was [provided above, but omitted here for length]*. **Undisputed** that the quoted exchange above appears in NFXCOL0000294-95. **Disputed** insofar as the document speaks for itself. *See* General Objections § III *supra*. Further **disputed** that such comments by Buting do not appear in the final version of *MaM* and therefore are not at issue. *MaM* speaks for itself. *See* General Objection § I, III *supra*.

42.     Besides production notes and comments from Netflix, Chrome also received feedback through screenings with people they knew in the industry. Through these screenings, Chrome sought to ensure that audience members would have a sense of the "antagonists" and "what they were accused of doing." The reviewers opined that the technique of using Avery as a "narrator" for his own trial was "effective." Barker Decl., Ex. 2 (Manhardt 525).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

42(a).     *Besides production notes and comments from Netflix, Chrome also received feedback through screenings with people they knew in the industry*. **Undisputed** that the Producer Defendants received feedback about draft versions of *MaM* episodes from third parties Andrew Jacobs and Catherine Allgor. *See* Dkt. 330-2 at Manhardt00000528.

42(b).     *Through these screenings, Chrome sought to ensure that audience members would have a sense of the "antagonists" and "what they were accused of doing."* **Undisputed** that the Producer Defendants asked Andrew Jacobs and Catherine Allgor questions over email about the Pilot Episode including "7) Do you have any sense of the antagonists? Do you know

what they are accused of doing?" *See* Dkt. 330-2 at Manhardt00000529–30. **Disputed** as

misleading, mischaracterizing the evidence, not "of and concerning" Colborn, removed from

context, and immaterial. The evidence speaks for itself.

      42(c). *The reviewers opined that the technique of using Avery as a "narrator" for his*

*own trial was "effective." Barker Decl., Ex. 2 (Manhardt 525).* **Undisputed** that Andrew Jacobs

and Catherine Allgor provided feedback notes by email after watching draft versions of Episodes

5 and 6 that included "The Steven V.O. (from jail?) is becoming increasingly effective, having

him as a kind of commentator in his own trial. Keep it going!" *See* Dkt. 330-2 at

Manhardt00000525. **Disputed** that the cited document contains the word "narrator." *See id.*

*MaM* has no "voice of God" narration. *See also* Response to 5(a), above, which Defendants

incorporate here by reference.

      43.    A preliminary decision by Judge Willis at Avery's trial permitted his attorneys to

introduce evidence of framing despite its low probative value, in deference to the constitutional

rights afforded a criminal defendant. Excerpts from the hearing are included in MAM. In

describing Avery's attorneys' arguments, the judge noted the highly unlikely nature of the basis

for the defense in a written decision:

> [as] pointed out by the State at oral argument: How could Lenk or Colborn have
> known that Teresa Halbach was dead at the time they are alleged to have planted
> the defendant's blood in her vehicle? Under the defendant's theory, either Lenk,
> Colborn, or both would have had to have formulated a plan involving their own
> commission of serious felonies and executed that plan within a very short period
> of time, motivated apparently only by their embarrassment for not allegedly
> having acted more responsibly on information that could have led to Mr. Avery's
> exoneration back in 1995 or 1996.

*See* Dkt. 290 ¶ 110, Ex. 15, CHRM034924. MAM does not incorporate this portion of the

judge's decision nor explain that Avery was permitted to introduce the defense because of the

very "low bar" that the constitution requires be set for criminal defendants.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 5 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

43(a).    *A preliminary decision by Judge Willis at Avery's trial permitted his attorneys to introduce evidence of framing despite its low probative value, in deference to the constitutional rights afforded a criminal defendant.* **Undisputed** that Judge Willis issued a preliminary ruling allowing the defense to introduce evidence of framing by James Lenk or Andrew Colborn. *See* Dkt. 290-16 at CHRM003732–34. **Disputed** as to the characterization of Judge Willis' basis for doing so. The order speaks for itself. *Id.*

43(b).    *Excerpts from the hearing are included in MAM.* **Undisputed** that *MaM* includes excerpts from the pretrial hearing on the state's motion seeking FBI testing of the blood vial in response to the defense's planting theory after denying their motion to exclude blood vial evidence. *See* Ep. 5 (Dkt. 120-5) at 0:56–2:40.

43(c).    *In describing Avery's attorneys' arguments, the judge noted the highly unlikely nature of the basis for the defense in a written decision[.]* **Disputed** as inaccurate, misleading, mischaracterizing the evidence, removed from context, and immaterial. The order does not include the phrase "highly unlikely." Further, Judge Willis granted Avery's motion to admit the frame-up evidence with the narrowing instruction that any planting theory must be asserted specifically against James Lenk and Andrew Colborn. *See* Dkt. 290-16 at CHRM003733–34. The order speaks for itself. *See* General Objections § III *supra*.

43(d).    *[The written decision includes the passage provided above, but omitted here for length].* **Undisputed** that this passage appears in Judge Willis's order admitting evidence of the blood vial and defense planting theory. *See* Dkt. 290-16 at CHRM003731. The citation Colborn

references, Dkt. 290-15 at CHRM034294, is to Judge Willis's order granting admission of evidence of Avery's wrongful conviction, which does not contain the cited passage.

43(e).    *MAM does not incorporate this portion of the judge's decision nor explain that Avery was permitted to introduce the defense because of the very "low bar" that the constitution requires be set for criminal defendants.* **Undisputed**. *MaM* shows excerpts from hearings and brief screengrabs summarizing the outcomes of motion practice, not the full text of multi-page court orders. *See* Ep. 5 (Dkt. 120-5) at 0:56 (Onscreen text: "The State moves to exclude the blood vial as evidence. Judge Willis denies their motion."); 1:05 (Onscreen text: "The State then asks the judge to allow the FBI to develop a new chemical test, which the State argues will prove the blood in the RAV4 was not planted."); 1:11–2:40 (footage from the hearing).

44.    Nor does MAM acknowledge that in opening and closing arguments to the jury, Avery's attorneys conspicuously avoided statements that made positive accusations of planting evidence. In fact, they carefully limited their argument to an effort to persuade the jury that the fact that if they believed that any officer may have planted evidence, that meant they also had to find that there was reasonable doubt as to Avery's guilt and return a not-guilty verdict. Barker Decl., Ex. 17 trans. p. 18; Barker Decl., Ex. 18 trans. pp. 46-48.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

44(a).    *Nor does MAM acknowledge that in opening and closing arguments to the jury, Avery's attorneys conspicuously avoided statements that made positive accusations of planting evidence.* **Disputed** as inaccurate. Avery's attorneys *did* make positive accusations of planting evidence in their opening statement and closing argument, and thus there was no "conspicuous[]

avoid[ance] for *MaM* to "acknowledge." In his opening argument, Dean Strang argued the

following:

> Suggesting this sort of tunnel vision [by law enforcement], suggesting this kind of investigative bias, planting blood in her car, [are] fairly serious allegations to make. In fact, I will take away the fairly, they are serious allegations. Understand them, that bias and tunnel vision are human anomalies. **And if you conclude, reluctantly, that Mr. Lenk or Mr. Colborn**, in additional to all the other interests they took in searching and focusing on Steven Avery, **planted blood in [Halbach's] car, you will also conclude that they put it there because** they figured it had to be there. It should be there. It must be him. This wasn't so much . . . an effort to frame an innocent man, it was an intense, intense desire to conclude that he, in fact, was the guilty man; all other possible leads for information not withstanding.

Dkt. 120-28 at 147:13-148:7 (emphasis added); *see also* Dkt. 291 ¶ 53.

> In his closing argument, Jerome Buting argued the following:

> Now, from the very beginning, Steven Avery has proclaimed his innocence in this case. He told . . . everybody that had a camera, anybody who talked to him, that he was not guilty, and that he was being framed. **That the police planted his blood**.

> [ . . . ]

> [Who], after all of this evidence comes out, and police, who better than anyone else would know how to plant evidence[.]

> [ . . . ]

> I would also point out, Dr. – Mr. Riddle, I asked him, well, you took the fingerprint standards of Lieutenant Lenk and Sergeant Colborn. **You know what the defense here is. You know what we have been** *accusing* **them of for the last month or more**.

Dkt. 120-34 at 133:20-25 (emphasis added); *id*. at 134:3-6; *id*. at 151:18-23 (emphasis added);

*see also* Dkt. 291 ¶ 62 (Strang's closing). Both are affirmative statements by Buting and Strang

accusing Colborn of planting evidence to frame Avery for Halbach's murder. Further **disputed**

that the only trial statements that matter are statements included in counsel's opening statement

and closing argument. As the trial transcript shows, Avery built his entire defense around the

claim that he was framed for Halbach's murder, and his attorneys examined witnesses, including Colborn, on topics related to that defense. The examples are too numerous to catalog here, but the trial transcript speaks for itself and Colborn himself admits that a "central part of Avery's defense at trial was that [Colborn] and other Manitowoc officers planted" evidence to frame Avery for Halbach's murder. *See* SAC ¶ 33; *see also* Dkt. 325 ¶ 64 (Colborn denying planting evidence to examination questions about the same).

44(b).    *In fact, they carefully limited their argument to an effort to persuade the jury that the fact that if they believed that any officer may have planted evidence, that meant they also had to find that there was reasonable doubt as to Avery's guilt and return a not-guilty verdict. Barker Decl., Ex. 17 trans. p. 18; Barker Decl., Ex. 18 trans. pp. 46-48.* **Disputed** as inaccurate. *See* Response to 44(a), above, which Defendants incorporate here by reference. Moreover, as shown in *MaM*, Strang's closing argument emphasized that the defense's theory was that officers planted evidence "to ensure the conviction of someone they've decided is guilty." *See* Ep. 8 (Dkt. 120-8) at 8:51–9:00; *see also* Dkt. 290 ¶ 119, Ex. 24 (CHRM004546) at 46; Dkt. 291 ¶ 62. Also depicted in *MaM*, Kratz noted in his closing that it "shouldn't matter whether or not that key was planted" because "that key, in the big picture, in the big scheme of things, means very little" compared to the bulk of evidence against Steven Avery. *See* Ep. 8 (Dkt. 120-8) at 9:02, 9:30; *see also* Dkt. 290-24 (CHRM004546) at 64; *see also* Dkt. 291 ¶ 61.

45.    Defendants can point to nothing in the public or court record of Avery's civil suit that mentions Mr. Colborn.

**Response: Disputed** as inaccurate. Colborn was deposed in Avery's civil lawsuit against Manitowoc County. *See generally* Dkt. 120-14 (deposition transcript of Andrew Colborn from Avery's civil lawsuit, which is publicly available on numerous platforms, including Reddit).

46.     Viewers' reactions to MAM, both online and in angry verbal attacks directed at

Mr. Colborn, reflect that they understood MAM as irrefutably establishing that Mr. Colborn was

a central figure in a law enforcement conspiracy to plant evidence and frame Steven Avery for

Ms. Halbach's murder. The following represent a sampling of messages received by Mr. Colborn

following the release of MAM:

> . . . I'm just calling in regards to the documentary that I just finished watching it
> and it appears pretty clearly that you were obviously involved beyond a detective
> role. . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 4:04 PM.

> Hi Detective Colborn, I'm calling about the Steven Avery case – I wanted to
> know if you planted evidence with Detective Lenk. It sure seems like that from
> the documentary. . . . I think you definitely planted evidence . . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/20/16 1:16 PM.

> Hi. This is regarding the Steven Avery case . . . . You know what you have done.

> This is completely unprofessional. You framed him and I don't care if the
> documentary was one-sided. You know what you did . . . . You are going to
> hell. . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 10:54 AM.

Some callers' messages make it apparent that they formed the belief, based on the

edited versions of testimony presented in MAM, that Mr. Colborn had been "caught" in lies

under oath:

>  . . . This man was innocent. . . .The Sheriff Sergeant Colborn and Lieutenant
> Lenk, they were caught in lies under oath . . . . Shame on those corrupt cops . . .
> .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 11:26 AM.

> Detective Colborn should be out of a job. Steven Avery and Brendan Dassey are
> both innocent. . . . You lied under oath multiple times along with all of your
> other fellow employees. I'm disgusted by the Sheriff's Department completely
> and fully. . . . I hope you know that everyone knows that you're a **** liar.

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/14/16 2:16 PM.

> . . . I've been calling numerous times and been getting no answer . . . . only awful disgusting human beings would do such a thing to innocent people, not only once, but twice, Colborn. The whole world has observed your lies . . . . I hope you're harassed . . . until the day you die     I hope that your wife is the next victim. . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 11:14 AM.

> . . . You lied . . . You are a horrible disgusting person for . . . planting evidence in the Steven Avery case . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 4:27 PM.

> Hi Detective Colborn. I just watched Making a Murder and you are soooo guilty. You were at the . . . you were at the lot . . . the Avery yard, and you saw the car before, um and you're in it with Lenk. You guys are so shady and corrupt. . . .

Dkt. #130-1 and Colborn Decl., Ex 1, 1/26/16 to 1/27/16, 3:42 PM.

> Yeah, I believe that Lt. Andrew Colborn needs to be investigated for his involvement and manipulating a crime scene and um ah his involvement and I, I think he should probably be in prison right now um for his ah for his behavior because he's obviously perverted justice and manipulated evidence and he has lied under oath, he's perjured himself. And, um everyone knows that man drove Teresa Halbach's car and placed it on Steven Avery's property and um, that man deserves justice and Andrew Colborn needs to be held accountable for his criminal behavior. Thank you.

Dkt. #130-1 and Colborn Decl., Ex. 1, 2/8/16 to 2/14/15 11:09 PM.

> My theory is that ah, [laughter] in the ah, Colborn was a dimwitted corrections officer who felt like a loser and committed a crime in order to advance his career and he's a corrupt public servant. . . . it is quite obvious that he is not just a crooked cop but he's a liar. Um and he's got some some sick perversions and when you watched him in that documentary you could just see his eyes twitching. Um, and ah, he just looks like he is guilty of something. And probably of ah, corroborating ah, him and James Lenk, framing Steve Avery for Theresa Halbach's murder. It's just a disgusting thing . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 2/8/16 to 2/14/15 12:46 AM (emphasis added).

> Hey Andy . . . . You're probably out planting evidence on somebody right now, but um I just want to let you know that I saw your appearance on the television program and I really couldn't believe how scared you were in that one scene. I

just wanted to talk to you about it, when you were upon the stand. Um, I actually thought you were going to wet your pants you were so scared

Dkt. #130-1 and Colborn Decl., Ex. 1, 2/15/16 to 2/19/16 2:13 PM (emphasis added).

. . . . I can't even sleep watching this show . . . . you're disgusting. I can see it in your eyes on every interview. . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 11/16/16 3:31 AM (emphasis added).

. . . . Hello, so, I'm from Canada, and I've watched the Netflix series, called Making a Murderer. . . . Every viewer knows your mistake. So why did you volunteer exactly to view the case when you had problems with this individual in the past, with the last case? Is it possible that you were trying to take revenge back on this person? Because the Calumet County Department could have clearly taken over this case. Because it is quite obvious that you guys are quite mad with the fact that you caught the wrong guy ruining your reputation as a police officer. . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 11:19 AM.

. . . . My biggest question to you, sir, is why were you on the scene when the key was found? . . . That scene was searched seven times before that key was found by other investigators not yourself. So, do you really believe that these other investigators were that incompetent, to find such an item in plain sight?

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/15/16 to 1/18/16 4:35 PM.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 17 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

46(a). *Viewers' reactions to MAM, both online and in angry verbal attacks directed at Mr. Colborn, reflect that they understood MAM as irrefutably establishing that Mr. Colborn was a central figure in a law enforcement conspiracy to plant evidence and frame Steven Avery for Ms. Halbach's murder.* **Undisputed** that Colborn claims to have received anonymous voicemails and online comments. **Disputed** because the messages are inadmissible and immaterial as not probative of any allegation at issue in this case. Colborn has made no effort to authenticate the alleged anonymous voicemails or comments, they are hearsay to the extent offered to prove the

truth of the matter asserted, and such evidence has been soundly rejected by courts across the country in defamation actions.[7] Further **disputed** that these are "viewers" of *MaM*—Colborn testified in this case that he does not know whether they watched *MaM* unless they expressly said so in their message. *See* Dkt. 271 ¶ 128. Further **disputed** that that the individuals who left Colborn anonymous messages are representative of the reasonable viewer; indeed, Colborn has admitted they are not. *See id.*; *see also* Dkt. 309 at 4-5, General Objection No. 6.

46(b). *The following represent a sampling of messages received by Mr. Colborn following the release of MAM[.]* **Undisputed** that Colborn claims to have received the anonymous voicemails listed below. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(c). *. . . I'm just calling in regards to the documentary that I just finished watching it and it appears pretty clearly that you were obviously involved beyond a detective role. . . Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 4:04 PM.* **Undisputed** that Colborn claims to have

---

[7] *See, e.g.*, *Daniels v. Loop Interactive Grp., LLC*, No. B254005, 2015 WL 134308, at *7 (Cal. Ct. App. Jan. 9, 2015), review denied (Mar. 25, 2015) (pseudonymous comments posted to online version of article "are not indicative of whether the average reader understood" article's alleged defamatory meaning); *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, No. 10-CV-02516-WJM-KLM, 2014 WL 4651643, at *7 (D. Colo. Sept. 18, 2014) (online comments are "inherently unreliable" because "Defendant has no way of testing who made the comments, the bases for these comments, or even verifying that the comments were not made by Plaintiff or its representatives"); *Digital Music News LLC v. Superior Court*, 226 Cal. App. 4th 216, 230, 171 Cal. Rptr. 3d 799, 810 (2014) (noting anonymous "commentary has become ubiquitous on the Internet and is widely perceived to carry no indicium of reliability and little weight"); *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, No. 11-CV-01468-WJM-BNB, 2014 WL 1319361, at *5 (D. Colo. Apr. 2, 2014) (declining to consider iTunes reviews because as "essentially anonymous online comments, they are inherently unreliable"); *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 691-92 (Tex. App. 2013) ("Media defendants cannot be liable for varying subjective impressions that may have been generated from the broadcast of true statements."); *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, No. CIV.08-00359JMS-BMK, 2008 WL 5423191, at *4 (D. Haw. Dec. 31, 2008) (declining to consider anonymous online comments because "under the cloak of anonymity, people will make outrageous, offensive, and even nonsensical statements").

received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference. Further **disputed** as immaterial as this proposed fact does not pertain to Colborn's allegation that *MaM* conclusively accuses him of planting evidence.

46(d).   *Hi Detective Colborn, I'm calling about the Steven Avery case – I wanted to know if you planted evidence with Detective Lenk. It sure seems like that from the documentary. . . . I think you definitely planted evidence . . . . Dkt. #130-1 and Colborn Decl., Ex. 1, 1/20/16 1:16 PM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(e).   *Hi. This is regarding the Steven Avery case . . . . You know what you have done. This is completely unprofessional. You framed him and I don't care if the documentary was one-sided. You know what you did . . . . You are going to hell. . . . Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 10:54 AM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(f).   *Some callers' messages make it apparent that they formed the belief, based on the edited versions of testimony presented in MAM, that Mr. Colborn had been "caught" in lies under oath[.]* **Undisputed** that Colborn claims to have received messages of this nature. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference. Further **disputed** as attorney characterization of messages that speak for themselves.

46(g).  . . . *This man was innocent. . . .The Sheriff Sergeant Colborn and Lieutenant Lenk, they were caught in lies under oath . . . . Shame on those corrupt cops . . . . Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 11:26 AM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(h).  *Detective Colborn should be out of a job. Steven Avery and Brendan Dassey are both innocent. . . . You lied under oath multiple times along with all of your other fellow employees. I'm disgusted by the Sheriff's Department completely and fully. . . . I hope you know that everyone knows that you're a **** liar. Dkt. #130-1 and Colborn Decl., Ex. 1, 1/14/16 2:16 PM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(i).  . . . *I've been calling numerous times and been getting no answer . . . . only awful disgusting human beings would do such a thing to innocent people, not only once, but twice, Colborn. The whole world has observed your lies . . . . I hope you're harassed . . . until the day you die. I hope that your wife is the next victim. . . Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 11:14 AM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(j).  . . . *You lied . . . You are a horrible disgusting person for . . . planting evidence in the Steven Avery case . . . Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 4:27 PM.* **U**ndisputed that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(k).   *Hi Detective Colborn. I just watched Making a Murder and you are soooo guilty. You were at the . . . you were at the the lot . . . the Avery yard, and you saw the car before, um and you're in it with Lenk. You guys are so shady and corrupt. . . . Dkt. #130-1 and Colborn Decl., Ex 1, 1/26/16 to 1/27/16, 3:42 PM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(l).   *Yeah, I believe that Lt. Andrew Colborn needs to be investigated for his involvement and manipulating a crime scene and um ah his involvement and I, I think he should probably be in prison right now um for his ah for his behavior because he's obviously perverted justice and manipulated evidence and he has lied under oath, he's perjured himself. And, um everyone knows that man drove Teresa Halbach's car and placed it on Steven Avery's property and um, that man deserves justice and Andrew Colborn needs to be held accountable for his criminal behavior. Thank you. Dkt. #130-1 and Colborn Decl., Ex. 1, 2/8/16 to 2/14/15 11:09 PM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(m).   *My theory is that ah, [laughter] in the ah, Colborn was a dimwitted corrections officer who felt like a loser and committed a crime in order to advance his career and he's a corrupt public servant. . . . it is quite obvious that he is not just a crooked cop but he's a liar. Um and he's got some some sick perversions and when you watched him in that documentary you could just see his eyes twitching. Um, and ah, he just looks like he is guilty of something. And probably of ah, corroborating ah, him and James Lenk, framing Steve Avery for Theresa Halbach's murder. It's just a disgusting thing . . . Dkt. #130-1 and Colborn Decl., Ex. 1, 2/8/16*

*to 2/14/15 12:46 AM (emphasis added).* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(n).   *Hey Andy . . . . You're probably out planting evidence on somebody right now, but um I just want to let you know that I saw your appearance on the television program and I really couldn't believe how scared you were in that one scene. I just wanted to talk to you about it, when you were upon the stand. Um, I actually thought you were going to wet your pants you were so scared. Dkt. #130-1 and Colborn Decl., Ex. 1, 2/15/16 to 2/19/16 2:13 PM (emphasis added).* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(o).   *. . . . I can't even sleep watching this show . . . . you're disgusting. I can see it in your eyes on every interview. . . . Dkt. #130-1 and Colborn Decl., Ex. 1, 11/16/16 3:31 AM (emphasis added).* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(p).   *. . . . Hello, so, I'm from Canada, and I've watched the Netflix series, called Making a Murderer. . . . Every viewer knows your mistake. So why did you volunteer exactly to view the case when you had problems with this individual in in the past, with the last case? Is it possible that you were trying to take revenge back on this person? Because the Calumet County Department could have clearly taken over this case. Because it is quite obvious that you guys are quite mad with the fact that you caught the wrong guy ruining your reputation as a police officer. . . . Dkt. #130-1 and Colborn Decl., Ex. 1, 1/21/16 11:19 AM.* **Undisputed** that Colborn claims to

have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

46(q).  . . . . *My biggest question to you, sir, is why were you on the scene when the key was found? . . . That scene was searched seven times before that key was found by other investigators not yourself. So, do you really believe that these other investigators were that incompetent, to find such an item in plain sight? Dkt. #130-1 and Colborn Decl., Ex. 1, 1/15/16 to 1/18/16 4:35 PM*. **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

47.      Viewers also criticized Mr. Colborn based on the series' failure to fairly convey to viewers Mr. Colborn's reasonable explanation that he received the license plate number from the officer who asked him to look for the vehicle:

> . . . Also when you called the dispatcher and asked her about that license and where it was registered to, where you were reading that license plate number from . . . I just don't understand how you would have that number and how you would know what the car was registered to

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/15/16 to 1/18/16 4:35 PM.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

47(a).    *Viewers also criticized Mr. Colborn based on the series' failure to fairly convey to viewers Mr. Colborn's reasonable explanation that he received the license plate number from the officer who asked him to look for the vehicle[.]* **Undisputed** that Colborn claims to have received messages of this nature. **Disputed** for the reasons set forth in the Response to 46(a),

above, which Defendants incorporate here by reference. Further **disputed** as attorney characterization of messages that speak for themselves.

47(b). *. . . Also when you called the dispatcher and asked her about that license and where it was registered to, where you were reading that license plate number from . . . I just don't understand how you would have that number and how you would know what the car was registered to[.] Dkt. #130-1 and Colborn Decl., Ex. 1, 1/15/16 to 1/18/16 4:35 PM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

48. *Intentionally left blank.*

49. Other callers' messages showed that Avery's alleged innocence was linked in their minds with the conclusion that Mr. Colborn had planted evidence:

> Hi Sir. I was just wondering if you felt bad for sending an innocent man to prison and planting evidence. It's not good police work.

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 3:38 PM.

> Why the **** did you frame Steven? You **** son of a *****. You're a sick, crooked, disgusting cop. You should be in prison, you son of a *****

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/3/16 12:03 PM.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

49(a). *Other callers' messages showed that Avery's alleged innocence was linked in their minds with the conclusion that Mr. Colborn had planted evidence[.]* **Undisputed** that Colborn claims to have received messages of this nature. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference. Further **disputed** as attorney characterization of messages that speak for themselves.

49(b).   *Hi Sir. I was just wondering if you felt bad for sending an innocent man to prison and planting evidence. It's not good police work. Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 3:38 PM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

49(c).   *Why the **** did you frame Steven? You **** son of a *****. You're a sick, crooked, disgusting cop. You should be in prison, you son of a *****[.] Dkt. #130-1 and Colborn Decl., Ex. 1, 1/3/16 12:03 PM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

50.     Others took to heart out-of-court accusations by Avery's defense attorneys and others that asserted that federal prosecutors had proven conspiracy cases on less evidence than the defense allegedly mounted against Mr. Colborn:

> Mr. Colborn, this is a concerned citizen of the state of California. I've seen the case with Steven Avery. . . everybody knows what is going on here with you guys setting up and framing this poor man Steven Avery . . . be ready to sit in federal prison for a long long time. I hope you rot in hell, you son of a ****

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/15/16 to 1/18/16 4:34 PM.

. . . Everybody knows you're **** guilty . . .

Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 11:11 AM.

**<u>Response:</u>** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

50(a).   *Others took to heart out-of-court accusations by Avery's defense attorneys and others that asserted that federal prosecutors had proven conspiracy cases on less evidence than*

*the defense allegedly mounted against Mr. Colborn[.]* **Undisputed** that Colborn claims to have received messages of this nature. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference. Further **disputed** as attorney characterization of messages that speak for themselves.

50(b). *Mr. Colborn, this is a concerned citizen of the state of California. I've seen the case with Steven Avery. . . everybody knows what is going on here with you guys setting up and framing this poor man Steven Avery . . . be ready to sit in federal prison for a long long time. I hope you rot in hell, you son of a ****[.] Dkt. #130-1 and Colborn Decl., Ex. 1, 1/15/16 to 1/18/16 4:34 PM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

50(c). *. . . Everybody knows you're **** guilty . . . Dkt. #130-1 and Colborn Decl., Ex. 1, 1/7/16 11:11 AM.* **Undisputed** that Colborn claims to have received this anonymous voicemail. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

51. Many other messages left for Mr. Colborn are simply strings of profanity or insults. Mr. Colborn received hundreds of similar calls. Countless online commenters and bloggers have likewise explained that, after viewing MAM, they are convinced that Avery was framed by law enforcement officers, including Mr. Colborn. *See, e.g.*, Dkt. #139-7, Andrew Colborn Decl. Ex. 2.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

51(a).    *Many other messages left for Mr. Colborn are simply strings of profanity or insults.* **Undisputed** that Colborn claims to have received messages of this nature. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference. Further **disputed** as attorney characterization of messages that speak for themselves.

51(b).    *Mr. Colborn received hundreds of similar calls. Countless online commenters and bloggers have likewise explained that, after viewing MAM, they are convinced that Avery was framed by law enforcement officers, including Mr. Colborn. See, e.g., Dkt. #139-7, Andrew Colborn Decl. Ex. 2.* **Undisputed** that Colborn claims to have received messages of this nature. Further **undisputed** that, among online commenters and bloggers, both Avery and Colborn have their supporters. *See* Dkt. 289-2 (Schuler Tr.) at 104:3–18, 231:3–232:8. Further noted that Colborn's supporters are at work on a counter-documentary titled *Convicting a Murderer. See* Dkt. 300 at 2. **Disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference. Further **disputed** as attorney characterization of content that speaks for itself.

52.    As Mr. Colborn explained at his deposition, MAM's edits made him seem more "wishy washy" and therefore, less believable. Barker Decl., Ex. 14 depo pp. 358-359.

**Response:** **Undisputed** that, at his deposition in this case, Colborn used the words "wishy-washy." **Disputed** as inaccurate that *MaM*'s edits altered Colborn's behavior. Any moments in *MaM* showing Colborn testifying actually occurred and were captured in raw footage. *See* Dkt. 288 ¶¶ 17–20, 29, 55, 78, 79; Dkt. 291 ¶¶ 71, 76–82, 114. At his deposition, Colborn testified that as an "introvert" who doesn't like being the "center of attention," the act of testifying makes him feel uncomfortable. Dkt. 321-2 (Colborn Tr.) at 495:4–498:2; Dkt. 320, Prod. Def. SPFOF ¶ 45; Dkt. 320, Prod. Def. Resp. PFOF ¶ 78; *see also* Dkt. 289-31 (excerpts of

Griesbach's *Indefensible*) at 31-32; Dkt. 320, Prod. Def. SPFOF ¶ 46. Further **disputed** that

*MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General

Objections §§ I, III *supra*.

53.　　At her deposition, the head of Netflix's creative team, Lisa Nishamura[8],

responded to the complaint that this alteration changed Mr. Colborn's testimony. Nishamura

claimed that Mr. Colborn "made his point" in a line included thereafter, in which he denies having

looked at the plate when he called it in. Dkt #279, Walker Decl. Ex. 21 (Nishimura Tr.) at 176:16-

25.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1

proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in

violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

53(a).　*At her deposition, the head of Netflix's creative team, Lisa Nishamura,*

*responded to the complaint that this alteration changed Mr. Colborn's testimony.* **Undisputed**

that at her deposition in this case, Lisa Nishimura was asked the following question regarding

Colborn's allegation that some of his testimony had been altered in *MaM*:

> Q.　　. . . so [I'm] representing to you, also, that Mr. Colborn's allegation in this
> document – and specific to this passage – is that the lines that are in
> yellow highlight were edited out or removed from the representation of
> that passage in Making a Murderer, Episode. And my question is: Do you
> agree that remove the yellow highlight lines from that passage would
> effect the meaning of the testimony provided by Mr. Colborn?

*See* Dkt. 279-21 (Nishimura Tr.) at 176:7-15. Further **undisputed** that Nishimura responded to

counsel's question.

---

[8] The correct spelling is Nishimura, but Defendants have retained Colborn's misspelling here.

53(b). *Nishamura claimed that Mr. Colborn "made his point" in a line included thereafter, in which he denies having looked at the plate when he called it in. Dkt #279, Walker Decl. Ex. 21 (Nishimura Tr.) at 176:16-25.* **Undisputed** that Nishimura testified at her deposition that Colborn "made his point" that he was not looking at Halbach's license plate when he called into dispatch as follows:

> A.     . . . I believe that, again, just reading this for the first time, that Colborn successfully makes his point saying, "I should not have been and I was not looking at the license plate." So I believe he made his point.

*See* Dkt. 279-21 (Nishimura Tr.) at 176:16-21.

53.     The altered version of Mr. Colborn's testimony regarding the call to dispatch that left out his testimony that "obviously" he had been provided it by the investigator with whom he had previously spoken was effective in leading viewers to conclude that Mr. Colborn did not testify that he received the license number prior to the call. Dkt # 132-7 ("Maybe he was given the license plate number before calling dispatch and just wanted to verify it? Still doesn't make sense why he just wouldn't say that in court.").

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

53(a). *The altered version of Mr. Colborn's testimony regarding the call to dispatch [ ] left out his testimony that "obviously" he had been provided it by the investigator with whom he had previously spoken[.]* **Undisputed** that *MaM* does not include Colborn saying he "obviously" received information from Investigator Wiegert, and instead shows an exchange with substantially the same gist: Strang asking, "Investigator Wiegert did he give you the license plate number for Teresa Halbach when he called you?" *See* Ep. 5 (Dkt. 120-5) at 55:49–56:03; Dkt. 330-20 at 185:2–4. And Colborn responding, "You know, I just don't remember the exact

content of our conversation then. But he had to have given it to me because I wouldn't have had the number any other way." *See* Ep. 5 (Dkt. 120-5) at 56:03–56:12; Dkt. 330-20 at 186:17–25. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

53(b).    *The altered version of Mr. Colborn's testimony regarding the call to dispatch . . . was effective in leading viewers to conclude that Mr. Colborn did not testify that he received the license number prior to the call. Dkt # 132-7 ("Maybe he was given the license plate number before calling dispatch and just wanted to verify it? Still doesn't make sense why he just wouldn't say that in court.").* **Disputed** as inaccurate, incomplete, misleading, and immaterial and as attorney argument unsupported by the record evidence. *MaM* includes an exchange with substantially the same gist. *See* Ep. 5 (Dkt. 120-5) at 56:03-56:12; Dkt. 330-20 at 186:17-25. Further **disputed** that there is no way to know whether the cited evidence reflects the impressions of a *MaM* viewer—Colborn testified in this case that he does not know whether an unidentified online commenter watched *MaM* unless they expressly said so in their message. *See* Dkt. 271 ¶ 128. At most, the cited evidence reflects the impressions of a *single* viewer, not "viewers." *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*. Further **disputed** for the reasons set forth in the Response to 46(a), above, which Defendants incorporate here by reference.

54.    MAM omits from a response Mr. Colborn's statement that he answered the jail call identifying himself as "Manitowoc County Jail, Officer Colborn." Dkt. #290-19 trans. p. 139; *cf*. Dkt. #120-5 55:53-56:10.

**Response: Undisputed** that *MaM* does not include the phrase "Manitowoc County Jail, Officer Colborn" in Episode 5 at 55:53-56:10, which is testimony about the call to dispatch but

further noted that that *MaM* includes information with substantially the same gist. Episode 7 includes Colborn's testimony that he received the 1995 jail call "when I was working [in] my capacity as a corrections officer at the Manitowoc County Jail." *See* Dkt. 271 ¶ 59 (citing Dkt. 120-7 at 17:46-18:30). Further **disputed** as *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

55.     MAM omits from the above response Mr. Colborn's testimony that it was his impression that the person who called him mistook him for a police officer despite his identification of himself as a jail officer. *Id.*

**Response: Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony.

56.     MAM omits testimony that further underscores the internal consistency of Mr. Colborn's testimony in this exchange. In Episode 7, after suggesting otherwise in Episode 2, MAM finally includes testimony in which Mr. Colborn explains that he transferred the call to a detective, but MAM edits from the conclusion of the sentence Mr. Colborn's clarification that he transferred the call to the Detective Division (identifying the proper division to address the call as an entirely separate division). *Id.*

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

56(a).     *MAM omits testimony that further underscores the internal consistency of Mr. Colborn's testimony in this exchange.* **Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. **Disputed** as misleading, mischaracterizing the evidence, attorney argument

unsupported by record evidence, and immaterial. *MaM* speaks for itself, and the Court must

consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

56(b). *In Episode 7, after suggesting otherwise in Episode 2, MAM finally includes testimony in which Mr. Colborn explains that he transferred the call to a detective, but MAM edits from the conclusion of the sentence Mr. Colborn's clarification that he transferred the call to the Detective Division (identifying the proper division to address the call as an entirely separate division).* **Undisputed** that *MaM* includes Colborn's testimony explaining that he transferred the jail call to someone at the MTSO. *See* Dkt. 271 ¶ 57. **Disputed** as to the rest because *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

57. MAM incorporates into Mr. Kratz's supposed direct examination what are in fact redirect examination questions as to allegations by the defense that Mr. Colborn had animosity toward Avery because of the prior civil case.

The exchange on redirect, in full was:

Mr. Kratz: "Did this person ever identify the individual that they were talking about?

Mr. Colborn: "No sir. There were no names given."

Mr. Kratz: Let me ask you this, as you sit here today, Sergeant Colborn, do you even know whether that call was about Mr. Steven Avery?

Mr. Colborn: No, I don't.

Dkt. #290-19 trans. p. 213. MAM removes from its amalgamation of direct and re-direct testimony the first two lines of the redirect testimony, which emphasize that "no names were given" in the call. Dkt. #120-7 at 18:35-18:43. Only the portion that focuses on what Mr. Colborn subjectively claims to be the case – that he does not know whether the call about Avery – is included, eliminating the objective basis for that assertion, *i.e.,* the caller's failure to state any

names. Moreover, the response, "No, I don't," which is a more forceful response, was replaced with "No sir." Dkt. #105 at p. 48. In contrast, MAM substitutes a more forceful response to a question – "No, I did not sir," for a response that was "No sir," – when it attempts to portray Mr. Colborn as later inconsistently admitting that he wrote a statement about the jail call. Dkt. #290-19 trans. p. 199; cf. Dkt. #120-7 at 23:10-23:43.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 6 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

57(a).    *MAM incorporates into Mr. Kratz's supposed direct examination what are in fact redirect examination questions as to allegations by the defense that Mr. Colborn had animosity toward Avery because of the prior civil case.* **Undisputed** that *MaM* does not formally distinguish direct, cross, re-direct, and re-cross witness examination in the series. Further **undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54.

57(b).    *The exchange on redirect, in full was [provided above].* **Undisputed**.

57(c).    *MAM removes from its amalgamation of direct and re-direct testimony the first two lines of the redirect testimony, which emphasize that "no names were given" in the call. Dkt. #120-7 at 18:35-18:43.* **Undisputed** that the redundant testimony that "There were no names given" was not included in *MaM* but noted that the series shows an exchange with substantially the same gist. *See* Ep. 7 (Dkt. 120-7) at 18:35–18:45. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

57(d).    *Only the portion that focuses on what Mr. Colborn subjectively claims to be the case – that he does not know whether the call about Avery – is included, eliminating the*

*objective basis for that assertion, i.e., the caller's failure to state any names.* **Disputed** as

attorney argument unsupported by record evidence. **Undisputed** that the redundant testimony

that "There were no names given" was not included in *MaM*. **Disputed** for the reasons provided

in Response to 57(c), above, which Defendants incorporate here by reference.

      57(e). *Moreover, the response, "No, I don't," which is a more forceful response, was*

*replaced with "No sir." Dkt. #105 at p. 48.* **Undisputed** that *MaM* shows Colborn responding

"No, sir" at 18:35–18:45 of Episode 7. **Disputed** that "No, I don't" is materially different from

"No, sir."[9] When usable footage of the witness was not available for a specific response, the

Producer Defendants replaced it with an equivalent response that did not alter the meaning. *See*

Dkt. 291 ¶ 82; *see also* Response to 17, above, which Defendants incorporate here by reference

(Unterminated Feed Footage Issue).

      57(f). *In contrast, MAM substitutes a more forceful response to a question – "No, I did*

*not sir," for a response that was "No sir," – when it attempts to portray Mr. Colborn as later*

*inconsistently admitting that he wrote a statement about the jail call. Dkt. #290-19 trans. p. 199;*

*cf. Dkt. #120-7 at 23:10-23:43.* **Undisputed** that *MaM* shows Colborn responding "No, I did not,

sir" at 22:55–23:18 of Episode 7. **Disputed** for the reasons provided in Response to 57(e), above,

which Defendants incorporate here by reference

      58.     MAM removes from Mr. Colborn's answer to the testimony immediately

preceding the above exchange Mr. Colborn's explanation why he did not prepare a report of the

call in 1995. The actual exchange, as represented in the trial transcript, is as follows:

---

[9] Noted that Colborn has repeatedly mistranscribed trial testimony, including mistaking a "No"
for a "No, sir," *see* CAPFF ¶ 15(a) *supra*, underscoring just how immaterial any difference
between the variations on "No" truly are.

| Mr. Kratz: | As you look back, back in 1994 or '95, if you would have written a report, what would it have been about? |
|---|---|
| Mr. Colborn: | That is why I didn't do one. I don't know what it would have been about, that I received a call and transferred it to the Detective Division. If I wrote a report about every call that came in, I would spend my whole day writing reports. |

Dkt. #290-19 trans. p. 212-213. MAM removed the explanation, "That is why I didn't do one," Dkt. #120-7 at 23:46-24:03, which would directly respond to the numerous criticisms that the series levels at Mr. Colborn because no report was written in 1995. In addition, starting the response instead with the phase, "I don't know what it would have been about" makes it look as though Mr. Colborn did not answer the question or respond in a normal way of speaking, which is pertinent to an assessment of his credibility by viewers. In addition, MAM again omitted the conclusion of his first sentence, consisting of the words, "that I received a call and transferred it to the Detective Division." *Id.*

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 5 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Defendants further object to this proposed finding of fact as duplicative of CAPFF ¶ 29, *supra*. Responding to each subpart:

58(a). *MAM removes from Mr. Colborn's answer to the testimony immediately preceding the above exchange Mr. Colborn's explanation why he did not prepare a report of the call in 1995.*

58(b). *The actual exchange, as represented in the trial transcript, is as follows:*

| Mr. Kratz: | As you look back, back in 1994 or '95, if you would have written a report, what would it have been about? |
|---|---|
| Mr. Colborn: | That is why I didn't do one. I don't know what it would have been about, that I received a call and transferred it to the Detective Division. If I wrote a report about every call that came in, I would spend my whole day writing reports. |

*Dkt. #290-19 trans. p. 212-213.* **Undisputed** that *MaM* includes an exchange with substantially

the same gist. *See* Ep. 7 (Dkt. 120-7) at 23:46–24:03. *MaM* speaks for itself, and the Court must

consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

58(c). *MAM removed the explanation, "That is why I didn't do one," Dkt. #120-7 at*

*23:46-24:03, which would directly respond to the numerous criticisms that the series levels at*

*Mr. Colborn because no report was written in 1995.* **Undisputed** that the phrase "That is why I

didn't do one" is not included in Episode 7 at 23:46–24:03 but noted that the series shows an

exchange with substantially the same gist at that timestamp. Further **disputed** that "which would

directly respond to the numerous criticisms that the series levels at Mr. Colborn" as attorney

argument unsupported by record evidence. *MaM* speaks for itself, and the Court must consider it

as a whole and in context. *See* General Objections §§ I, III *supra*.

58(d). *In addition, starting the response instead with the phase, "I don't know what it*

*would have been about" makes it look as though Mr. Colborn did not answer the question or*

*respond in a normal way of speaking, which is pertinent to an assessment of his credibility by*

*viewers.* **Undisputed** that *MaM* shows Colborn's response starting with the phrase "I don't know

what it would've been about" in Episode 7 at 23:46–24:03. **Disputed** as to the rest as misleading,

mischaracterizing the evidence, attorney argument unsupported by record evidence, and

immaterial. *MaM* speaks for itself and must be considered as a whole and in context. *See* General

Objections §§ I, III *supra*.

58(e). *In addition, MAM again omitted the conclusion of his first sentence, consisting of*

*the words, "that I received a call and transferred it to the Detective Division." Id.* **Undisputed**

that the phrase "that I received a call and transferred it to the Detective Division" is not included

in Episode 7 from 23:46–24:03 but noted that the series includes a statement with substantially

the same gist. *See* Dkt. 271 ¶ 57. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

59.     MAM splices together an edited version of a question-and-answer exchange between cross-examining counsel and Mr. Colborn that appeared as follows in the trial transcript:

| | |
|---|---|
| Strang: | You wrote a statement after Sheriff Peterson suggested that maybe you should? |
| Colborn: | Yes, sir. |
| Strang: | You wrote that statement in 2003, about the 1994 or 1995 telephone call? |
| Colborn: | Yes. |

Dkt. #290-19 trans. p. 199.

MAM's version of the exchange is as follows:

| | |
|---|---|
| Strang: | You wrote a statement in 2003, about the 1994 or 1995 telephone call? |
| Colborn: | Yes. |

Dkt. #120-7 at 23:10-23:43.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

59(a).   *MAM splices together an edited version of a question-and-answer exchange between cross-examining counsel and Mr. Colborn that appeared as follows in the trial transcript:*

| | |
|---|---|
| *Strang:* | *You wrote a statement after Sheriff Peterson suggested that maybe you should?* |
| *Colborn:* | *Yes, sir.* |

> *Strang:*          *You wrote that statement in 2003, about the 1994 or 1995 telephone call?*
>
> *Colborn:*       *Yes.*

*Dkt. #290-19 trans. p. 199.* **Undisputed** that this exchange appears in the trial transcript and does not appear verbatim in *MaM*. *See* Dkt. 290-19 at 199; *cf.* Ep. 7 (Dkt. 120-7) at 23:10–23:43.

> 59(b).    *MAM's version of the exchange is as follows:*
>
> *Strang:*          *You wrote a statement in 2003, about the 1994 or 1995 telephone call?*
>
> *Colborn:*       *Yes.*

*Dkt. #120-7 at 23:10-23:43.* **Undisputed** that *MaM* includes an exchange with substantially the same gist but does not include the exact lines as transcribed here. *See* Ep. 7 (Dkt. 120-7) at 23:10–23:43; *see also* Dkt. 290-19 at 199. *MaM* speaks for itself. *See* General Objections § III. **Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54.

60.      MAM removes language from a question-and-answer exchange that would have included references to the fact that the call to the jail was "way back in 1994 or 1995" and that it occurred "when you [Mr. Colborn] were working in the jail." Dkt. #105, p. 51; *cf.* Dkt. #290-19 pp. 65, 139, 198-199.

**<u>Response:</u>** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

60(a).    *MAM removes language from a question-and-answer exchange that would have included references to the fact that the call to the jail was "way back in 1994 or 1995."* **Undisputed** that the phrase "way back in 1994 or 1995" does not appear in Episode 7 at 23:10–43 but noted that *MaM* includes a statement with substantially the same gist. *See* Ep. 7 (Dkt. 120-7) at 23:10–23:43; Dkt. 290-19 at 198–99. **Undisputed** that *MaM*, a 10-hour documentary series

about events that spanned two decades, including a five-week murder trial, truncated certain

testimony. *See* Dkt. 291 ¶ 54. *MaM* speaks for itself, and the Court must consider it as a whole

and in context. *See* General Objections §§ I, III *supra*. Further, Episode 7 includes the following

testimony from Colborn:

> Kratz: Sergeant Colborn, you were asked, as I understand, as part of a
> civil lawsuit to provide what's called a deposition. Can you tell the
> jury what you were asked about?
>
> Colborn: In 1994 or '95, I had received a telephone call when I was working
> in my capacity as a corrections officer in the Manitowoc County
> jail.

Dkt. 120-7 at 17:36-18:02.

60(b).   *MAM removes language from a question-and-answer exchange that would have

included references to the fact that the call to the jail . . . occurred "when you [Mr. Colborn]

were working in the jail." Dkt. #105, p. 51; cf. Dkt. #290-19 pp. 65, 139, 198-199.* **Undisputed**

that *MaM* does not include the phrase "when you were working in the jail" in Episode 7 at

23:10–23:43 but noted that *MaM* includes an exchange that conveys substantially the same gist.

*See* Ep. 7 (Dkt. 120-7) at 17:36–18:02; *see* Dkt. 291 ¶¶ 9, 10. *MaM* speaks for itself, and the

Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

**Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades,

including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54.

61.   With respect to testimony regarding the discovery of Teresa Halbach's vehicle

key in Avery's bedroom, MAM again makes numerous edits to testimony without any indication

that the testimony has been edited. For example, MAM eliminates Mr. Colborn's emphatic

denial that he ever planted any evidence against Mr. Avery, which was "That's ridiculous, no I

have not." Barker Decl., Ex. 62. It instead substitutes his answer to a different question, "Have

you ever planted any evidence against anybody in the course of your law enforcement career," to

which Mr. Colborn responded, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not." *Id.*

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Defendants further object to this proposed finding of fact as duplicative of CAPFF ¶ 27, *supra*. Responding to each subpart:

61(a). *With respect to testimony regarding the discovery of Teresa Halbach's vehicle key in Avery's bedroom, MAM again makes numerous edits to testimony without any indication that the testimony has been edited.* **Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54. **Disputed** that there are no indications that the testimony included had been edited. *See* Ep. 5 (Dkt. 120-5) at 8:40-8:49; Ep. 8 (Dkt. 120-8) at 3:47. Further **disputed** that "any indication that the testimony [in *MaM*] ha[d] been edited" was needed because it was obvious to the viewer. *Id.*

61(b). *For example, MAM eliminates Mr. Colborn's emphatic denial that he ever planted any evidence against Mr. Avery, which was "That's ridiculous, no I have not." Barker Decl., Ex. 62.* **Undisputed** that this particular line of testimony is not included in *MaM*. **Disputed** as to "emphatic denial" which is attorney argument unsupported by record evidence.

61(c). *It instead substitutes his answer to a different question, "Have you ever planted any evidence against anybody in the course of your law enforcement career," to which Mr. Colborn responded, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not." Id.* **Undisputed** that *MaM* includes an exchange with substantially the same

gist. *See* Ep. 7 (Dkt. 120-7) at 19:00–19:15. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

62.     MAM revises Mr. Colborn's answers about reports that he wrote in connection with the search at the Avery property so that it appears that he wrote only one report that was less than half a page, when in fact, he wrote two reports, as the actual answers to the questions would have made clear. Dkt. #290-19 at 196-199; Dkt. #120-7 22:22-22:39, 22:54-23:43.

**Response:** Defendants object to this proposed finding of fact as duplicative of CAPFF ¶ 28, *infra*. **Disputed** as inaccurate, misleading, and immaterial. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*. In two scenes in Episode 7, Avery's attorney, Strang, examines Colborn about his two reports regarding his activity on or at the Avery property: first, that Colborn did not record his November 3, 2005 conversation with Avery until June 2006, *see* Dkt. 291 ¶¶ 21, 57; Ep. 7 (Dkt. 120-7) at 20:02–20:40; *second*, how Colborn's November 8, 2005 entry on the MTSO investigative report was a mere half page with no mention of the RAV4 key being discovered that day, *see* Dkt. 291 ¶ 57; Ep. 7 (Dkt. 120-7) at 21:38–22:57.

63.     MAM omits an entire "soft cross" that immediately follows the above discussion. Dkt. #105 p. 47; Dkt. #290-19 trans. P. 132; Dkt. #120-7 at 17:06-17:32. In his response to questions in the "soft cross," Mr. Colborn testified that he was "very surprised" that the key was there given that he and the other officers had been in the room "for quite some time" before it was discovered. *Id.* Mr. Colborn also emphasized this by stating, "I believe I said to myself, damn, how did I miss that." *Id.*

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

63(a). *MAM omits an entire "soft cross" that immediately follows the above discussion. Dkt. #105 p. 47; Dkt. #290-19 trans. P. 132; Dkt. #120-7 at 17:06-17:32.* **Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54. **Disputed** as to "soft cross," which is attorney argument unsupported by record evidence. The testimony cited comes from Colborn's direct examination during the Avery trial for Halbach's murder. *See* Dkt. 290-19 at 132.

63(b). *In his response to questions in the "soft cross," Mr. Colborn testified that he was "very surprised" that the key was there given that he and the other officers had been in the room "for quite some time" before it was discovered. Id.* **Undisputed** that *MaM* does not include Colborn testifying that he was "very surprised" and had been in the room "for quite some time" in Episode 7 at 17:06–17:32. Further **undisputed** *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54. **Disputed** for the reasons provided in Response 63(a), above, which Defendants incorporate here by reference.

63(c). *Mr. Colborn also emphasized this by stating, "I believe I said to myself, damn, how did I miss that." Id.* **Undisputed**.

64. Mr. Colborn's repeated denials in direct examination that he planted evidence, in questions that were obviously intended to build emphasis and effect, are also blunted by cutting and splicing them together into one question and eliminating Mr. Colborn's straightforward,

"No" response to whether he "set up Mr. Avery for a charge of murder." Dkt. #290-19 trans. P. 140; *cf.* Dkt. #120-7 at 18:43-19:15.

**Response: Undisputed** that, at trial, Colborn repeatedly denied that he planted evidence and *MaM* included those denials. *See* Dkt. 271 ¶¶ 55, 63. **Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. **Disputed** as attorney argument unsupported by record evidence, vague, and misleading. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

65.      MAM omits from Mr. Colborn's statements his testimony that the Toyota emblem was on the key and his knowledge that Ms. Halbach's vehicle was a Toyota as influencing why he thought this "was a very important piece of evidence." Dkt. #290-19 trans. P. 131; Dkt. #120-7 at 17:06-17:32. The omission removes a credible explanation by Mr. Colborn that contradicts MAM's insinuation that Mr. Colborn already knew the key was Ms. Halbach's because he conspired to plant it in the bedroom.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

65(a).      *MAM omits from Mr. Colborn's statements his testimony that the Toyota emblem was on the key and his knowledge that Ms. Halbach's vehicle was a Toyota as influencing why he thought this "was a very important piece of evidence." Dkt. #290-19 trans. P. 131; Dkt. #120-7 at 17:06-17:32.* **Undisputed** that a portion of Colborn's testimony that the key had a Toyota emblem on it and that he knew Halbach's vehicle was a Toyota was omitted from this scene of *MaM*, *see* Ep. 7 (Dkt. 120-7) at 17:06-17:32, but noted that *MaM* includes prior scenes that

establish Colborn's knowledge that the car was a Toyota. Episode 2 includes a close up of the RAV4 key, including the Toyota emblem on it. Dkt. 120-2 at 47:40-47:48. Episode 3 makes clear that Halbach's vehicle was a Toyota RAV4. Dkt. 120-3 at 5:40-6:06; Dkt. 291 ¶ 26; Dkt. 271 ¶ 37. Episode 5 includes Colborn's testimony about calling dispatch about Teresa Halbach's "99 Toyota." *See* Ep. 5 (Dkt. 120-5) at 55:15-55:30; *see also* CAPFF ¶¶ 14, 21 *supra*. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

65(b).    *The omission removes a credible explanation by Mr. Colborn that contradicts MAM's insinuation that Mr. Colborn already knew the key was Ms. Halbach's because he conspired to plant it in the bedroom.* **Disputed**. This is not a fact, but a legal conclusion and unsupported argument by counsel about what *MaM* allegedly "insinuates." To the extent construed as a fact, Defendants dispute and deny this allegation. Further **disputed** as misleading, removed from its context, and immaterial. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*. *See also* Response to 65(a), above, which Defendants incorporate here by reference.

66.    MAM omits Plaintiff's direct and forthright response, "yes," to the question whether he manipulated "this piece of furniture" – the furniture is not identified in the lead-up in MAM because it has been edited out, but refers to the small bookcase from which law enforcement officers believe the key fell – and severely truncates Mr. Colborn's testimony regarding that critical issue. Dkt. #105 p. 45; *cf*. Dkt. #290-19 trans. Pp. 125-129. Instead, MAM substitutes a response that does not appear to directly answer the question, and which therefore appears evasive and as volunteering unrequested information, which is often interpreted as done by those who are not being truthful: "I will be the first to admit, I handled it rather roughly, twisting it, shaking it,

pulling it." Dkt. #120-7 at 16:34-16:50. The question that was in fact asked prior to the shown response was "If you can describe that further, I don't know if you can do it with your words or show us with your hands, how you did it?" *Id.* The response was also edited; it began, "I will be the first to admit, I wasn't any too gentle, as we were, you know, getting exasperated. . . ." *Id.*

     <u>**Response:**</u> Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 6 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

     66(a).   *MAM omits Plaintiff's direct and forthright response, "yes," to the question whether he manipulated "this piece of furniture[.]"* **Undisputed**.

     66(b).   *[T]he furniture is not identified in the lead-up in MAM because it has been edited out, but refers to the small bookcase from which law enforcement officers believe the key fell[.]* **Disputed** as inaccurate. On screen during the question about "this piece of furniture" is an image of the small bookcase in Avery's bedroom. *See* Ep. 7 (Dkt. 120-7) at 16:41. Additional images of Avery's bedroom, including the Toyota key on the floor next to the bookcase, are shown during this segment. *Id.* at 16:3416:50.

     66(c).   *[MaM] severely truncates Mr. Colborn's testimony regarding that critical issue. Dkt. #105 p. 45; cf. Dkt. #290-19 trans. Pp. 125-129.* **Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54. **Disputed** as to "severely" and "critical" as attorney argument unsupported by record evidence. Episode 7 features both Kucharski and Lenk testifying about the discovery of the key, so it did not materially alter the testimony of the key to compress Colborn's segment, which followed the others' testimonies. *See* Dkt. 288 ¶ 75; Dkt. 291 ¶¶ 136, 137, 139.

66(d).    *Instead, MAM substitutes a response that does not appear to directly answer the question, and which therefore appears evasive and as volunteering unrequested information, which is often interpreted as done by those who are not being truthful: "I will be the first to admit, I handled it rather roughly, twisting it, shaking it, pulling it." Dkt. #120-7 at 16:34-16:50.* **Undisputed** that in response to the question, "In performing that search, did you move or manipulate this piece of furniture," *MaM* shows Colborn responding, "Well, I'll be the first to admit I handled it rather roughly, twisting it, shaking it, pulling it." *See* Dkt. 120-7 at 16:34-16:50. **Disputed** that "volunteering unrequested information … is often interpreted as done by those who are not being truthful;" this is attorney argument unsupported by record evidence.

66(e).    *The question that was in fact asked prior to the shown response was "If you can describe that further, I don't know if you can do it with your words or show us with your hands, how you did it?" Id.* **Undisputed** that, in the trial transcript, the above quoted question preceded Colborn's testimony that "I will be the first to admit, I wasn't any too gentle, as we were, you know, getting exasperated. I handled it rather roughly, twisting it, shaking it, pulling it." *See* Dkt. 290-19 at 126. Further **undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54.

66(f).    *The response was also edited; it began, "I will be the first to admit, I wasn't any too gentle, as we were, you know, getting exasperated. . . ." Id.* **Undisputed** that the phrase "I wasn't any too gentle, as we were, you know, getting exasperated" was not included in Episode 7 at 16:34–16:50 but noted that *MaM* includes testimony with substantially the same gist. *See id*. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

67.     MAM omits critical context from Mr. Colburn's testimony regarding the exact moment of discovery of the key, including omission of testimony that explains that Deputy Kucharski, who is portrayed as likely not in on the alleged conspiracy to plant evidence, was "in very close proximity" to the bookcase near the place where the key was discovered at the time of its discovery, and that Mr. Colborn also "wasn't very far away" and that he had to turn around to see the key at the time that Lieutenant Lenk mentioned it. Dkt. #290-19 trans. P. 140; Dkt. #120-7 at 16:19-17:32. The omitted testimony also reduces Mr. Colborn's testimony about Mr. Lenk's statements upon noticing the key, omits his description of what he could see of the key, omits his direction to Deputy Kurcharski to photograph the key, and omits direct testimony that the spot from which the key was photographed was "as close as [they] got" to the key at the time. Dkt. #290-19 trans. Pp. 128-134; *cf*. Dkt. #120-7.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 7 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

67(a).   *MAM omits critical context from Mr. Colburn's testimony regarding the exact moment of discovery of the key[.]* **Disputed** as attorney argument unsupported by record evidence. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

67(b).   *MAM omits . . . testimony that explains that Deputy Kucharski, who is portrayed as likely not in on the alleged conspiracy to plant evidence, was "in very close proximity" to the bookcase near the place where the key was discovered at the time of its discovery[.]* **Disputed** as inaccurate. Episode 7 includes Colborn testifying that "Deputy Kucharski was sitting on the bed

filling out paperwork" when Lenk announced that he saw the key. *See* Ep. 7 (Dkt. 120-7) at 16:53–17:33.

67(c).    *MAM omits . . . testimony that explains . . . that Mr. Colborn also "wasn't very far away" and that he had to turn around to see the key at the time that Lieutenant Lenk mentioned it. Dkt. #290-19 trans. P. 140; Dkt. #120-7 at 16:19-17:32.* **Disputed** as inaccurate. Episode 7 includes Colborn testifying that "I was searching the desk here" when Lenk announced that he saw the key, while images of Avery's bedroom, including the desk, the bed, and the bookshelf, are shown during Colborn's testimony. *See* Ep. 7 (Dkt. 120-7) at 16:53–17:33.

67(d).    *The omitted testimony also reduces Mr. Colborn's testimony about Mr. Lenk's statements upon noticing the key[.]* **Disputed** as inaccurate that *MaM* eliminates Colborn's testimony about Lenk's statements upon noticing the key. Episode 7 includes Colborn testifying that Lenk said, "There's a key on the floor here." *See* Ep. 7 (Dkt. 120-7) at 16:19–17:32. **Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54.

67(e).    *The omitted testimony . . . omits his description of what he could see of the key[.]* **Undisputed** that *MaM* does not include Colborn's testimony about what he could see of the key. **Disputed** as immaterial. *MaM* includes images onscreen of the key sitting next to the bookcase from the search by Colborn of Avery's bedroom. *See* Ep. 7 (Dkt. 120-7) at 16:19–17:32. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

67(f).    *The omitted testimony . . . omits his direction to Deputy Kurcharski to photograph the key[.]* **Undisputed** that *MaM* does not include Colborn's testimony that he told

Deputy Kucharski to photograph the key. **Disputed** as immaterial. Episode 7 includes Kucharski testifying that he was searching and taking photographs. *See* Ep. 7 (Dkt. 120-7) at 6:22–9:44. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

      67(g). *The omitted testimony . . . omits direct testimony that the spot from which the key was photographed was "as close as [they] got" to the key at the time. Dkt. #290-19 trans. Pp. 128-134; cf. Dkt. #120-7.* **Undisputed** that *MaM* does not include Colborn's testimony that the photograph was as close as he got to the key. **Disputed** as immaterial. *MaM* provides information about Colborn's proximity to the key, through Kratz asking, " . . . Sergeant Colborn, did either you, Lieutenant Lenk, or Deputy Kucharski touch that key?" to which he responds, "No, sir." Ep. 7 (Dkt. 120-7) at 17:03–17:33. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

      68. MAM omits 20 lines of trial testimony elicited by prosecutor Ken Kratz. Dkt. #105, p. 45 (referencing pages 122-23 of trial testimony). The testimony provides context for Mr. Colborn's assignment to return to the Avery property on the date in question. *See* Dkt. #290-19 trans. P. 122-23; Dkt. #120-7 at 16:19-17:32. Elsewhere, MAM includes accusations, including direct accusations by Avery's defense team investigator, that it was improper for Mr. Colborn and other Manitowoc County Sheriff's deputies to be on the property.

      **Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

      68(a). *MAM omits 20 lines of trial testimony elicited by prosecutor Ken Kratz. Dkt. #105, p. 45 (referencing pages 122-23 of trial testimony).* **Undisputed** that *MaM*, a 10-hour

documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54.

68(b).    *The testimony provides context for Mr. Colborn's assignment to return to the Avery property on the date in question. See Dkt. #290-19 trans. P. 122-23; Dkt. #120-7 at 16:19-17:32.* **Undisputed** that the trial transcript reflects this context. *See* Dkt. 290-19 at 122. Further **undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54. **Disputed** as immaterial. *MaM* speaks for itself. *See* General Objections §§ I, III *supra*.

68(c).    *Elsewhere, MAM includes accusations, including direct accusations by Avery's defense team investigator, that it was improper for Mr. Colborn and other Manitowoc County Sheriff's deputies to be on the property.* **Disputed** that *MaM* includes "accusations," which is attorney argument unsupported by record evidence. **Undisputed** that *MaM* includes Avery's investigator's discussion of the conflict-of-interest concerns, which is non-actionable statement of opinion. *See* Ep. 7 (Dkt. 120-7) at 20:42–21:42. It is also substantially true that Calumet County was responsible for leading the investigation into Avery for Halbach's murder because of the conflict of interest presented by Avery's pending lawsuit against Manitowoc County. Dkt. 271 ¶ 11.

69.    MAM also omitted 30 pages of testimony regarding the lead-up to the search of the Avery property, including Mr. Colborn's background and training as an evidence technician. Dkt. #105, p. 49; Dkt. 290-19 trans. Pp. 141-71.

**Response:** **Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony. *See* Dkt. 291 ¶ 54. **Disputed** as immaterial. *MaM* speaks for itself. *See* General Objections §§ I, III *supra*.

70.    MAM omits numerous transcript pages in which Mr. Colborn describes searches on the Avery property before the key was found. Dkt. #132-1 trans. Pp. 76-121.

**Response: Undisputed** that *MaM*, a 10-hour documentary series about events that spanned two decades, including a five-week murder trial, truncated certain testimony and did not include all of Colborn's testimony, which spanned 152 transcript pages and comprised more than three hours of footage. *See* Dkt. 291 ¶ 54.

71.    Contrary to the Glynn accusations repeated in MAM, Glynn elicited testimony from Mr. Colborn that establishes that there would have been no reason, under the jail's record-keeping practices, for Mr. Colborn to make a report of the call that he transferred from the jail. Dkt. #120-14 at 14:1-23; Dkt. #129-1 at 2:46-4:19.

**Response: Disputed** as inaccurate, attorney argument not supported by the record, and immaterial. Colborn testified that it wasn't his role to follow up on the Jail Call, but Glynn did not elicit testimony from Colborn about whether there was reason to make a record of the Jail Call. *See* Dkt. 290-7. Colborn testified at the Avery trial in response to questioning by Kratz that he had no reason to make a record, Dkt. 120-29 at 70-71 (212:14-213:5), and *MaM* depicted this, *see* Ep. 7 (Dkt. 120-7) at 23:46–24:03.

72.    Glynn also elicited testimony that established that Mr. Colborn had no authority to investigate the call further, directly contrary to Glynn's accusations in MAM:

| | |
|---|---|
| Glynn: | At any rate, you recognized that this was significant enough that you should forward that call that was coming in from another detective to someone in the Manitowoc County Sheriff's Department to take it further, correct? |
| Colborn: | Yes. |
| Glynn: | It wasn't within your jurisdiction to take it any further, correct? Mr. Colborn: No, sir. |

| Glynn: | I mean, even if you had wanted to, you didn't have the legal authority under your job duties to do that. |
| Colborn: | Correct. |

Dkt. #129-1 at 12:41-14:30; Dkt. #120-14 p. 14.

**Response: Undisputed** that the civil trial deposition transcript reflects an exchange with substantially the same gist. The transcript exchange between Glynn and Colborn is as follows:

| Glynn: | "Okay. At any rate, you recognized this was significant enough that you should forward that call that was coming in from another detective to someone in the Manitowoc County Sheriffs Department to take it further, correct?" |
| Colborn: | "Yes, sir." |
| Glynn: | "It wasn't within your jurisdiction to take it any further, correct?" |
| Colborn: | "No, sir." |
| Glynn: | "And even if you had wanted to, you didn't have the legal authority under your job duties to do that." |
| Colborn: | "Correct." |

Dkt. 129-1 at 12:41-14:30; Dkt. 120-14 at 14. **Disputed** as inaccurate that Glynn accused Colborn of failing to investigate further. Glynn represented Avery in his civil rights case against Manitowoc County, MTSO, Thomas Kocourek, and Dennis Vogel for failing to investigate exculpatory evidence, among other things. He was accusing those defendants of misconduct, not Colborn. *See* Dkt. 291 ¶¶ 6, 16–18. *MaM* accurately reflects Colborn's limited authority at the time of the Jail Call and the fact that he passed the information to higher-ups for decision on how to handle. Dkt. 271 ¶¶ 57-62. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

73.     MAM also portrays Mr. Colborn as furthering the cover-up in his deposition testimony that he did not recall with whom he may have discussed, in 2003, the prior call to the jail. Through juxtaposition with other witnesses' testimony that is pieced together to suggest that

Mr. Colborn may have discussed the report with an assistant district attorney in 2003, MAM implies that the other witnesses' testimony exposes Mr. Colborn's testimony as untruthful. Dkt. #120-2 at 23:50-26:52. The testimony by Mr. Colborn that MAM includes stops just short of a clarification that would have dispelled any nefarious construction of Mr. Colborn's testimony: Glynn asks Mr. Colborn, "But you're not ruling out the possibility that you may have discussed it," to which Mr. Colborn replies, "No I'm not ruling out the possibility that I may have discussed it with someone else." Dkt. #129-1 at 19:06-19:34. The omission of this clarification is used to attempt to portray a more stark contrast between Mr. Colborn's testimony and that of others.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 5 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

73(a).    *MAM also portrays Mr. Colborn as furthering the cover-up in his deposition testimony that he did not recall with whom he may have discussed, in 2003, the prior call to the jail.* **Undisputed** that *MaM* portrays Colborn in his deposition testifying that he did not specifically recall discussing the Jail Call with others before 2003. *See* Ep. 2 (Dkt. 120-2) at 23:34–24:00. The deposition testimony speaks for itself, and Colborn has not alleged he testified falsely. *See* Dkt. 291 ¶¶ 11, 12; Dkt. 324 ¶¶ 11, 12 (Colborn not disputing facts). **Disputed** as attorney argument unsupported by record evidence that accurate portrayal of deposition testimony somehow constitutes a portrayal of Colborn "as furthering the cover-up." The parties accused of failing to investigate exculpatory evidence against Avery were Manitowoc County, MTSO, Thomas Kocourek, and Dennis Vogel, not Colborn. *See* Dkt. 291 ¶¶ 6, 16–18; Dkt. 324 ¶¶ 6, 18 (Colborn not disputing facts).

73(b).    *Through juxtaposition with other witnesses' testimony that is pieced together to suggest that Mr. Colborn may have discussed the report with an assistant district attorney in 2003, MAM implies that the other witnesses' testimony exposes Mr. Colborn's testimony as untruthful. Dkt. #120-2 at 23:50-26:52.* **Undisputed** that, as depicted in *MaM*, law enforcement officers testified inconsistently regarding whether someone in MTSO told Colborn not to worry about the Jail Call because MTSO had "the right guy" (some believed Sheriff Kocourek likely delivered this message to Colborn). *See* Dkt. 291 ¶ 13. Colborn's SAC in this lawsuit contradicts his own sworn testimony on this point. *See* Dkt. 105 ¶ 25; *cf.* Dkt. 290-7 at 15:7–24; Dkt. 324 ¶ 13 (disputing fact with no explanation). **Disputed** as a legal conclusion and attorney argument not supported by the record that *MaM* "implies that the other witnesses' testimony exposes Mr. Colborn's testimony as untruthful." *See* Dkt. 291 ¶ 117.

73(c).    *The testimony by Mr. Colborn that MAM includes stops just short of a clarification that would have dispelled any nefarious construction of Mr. Colborn's testimony[.]* **Disputed** as attorney argument unsupported by record evidence.

73(d).    *Glynn asks Mr. Colborn, "But you're not ruling out the possibility that you may have discussed it," to which Mr. Colborn replies, "No I'm not ruling out the possibility that I may have discussed it with someone else." Dkt. #129-1 at 19:06-19:34.* **Undisputed**.

73(e).    *The omission of this clarification is used to attempt to portray a more stark contrast between Mr. Colborn's testimony and that of others.* **Disputed** as attorney argument unsupported by any record evidence that this "omission" was an "attempt to portray" anything other than the proceedings in Avery's civil suit within the context of a 10-hour documentary series about events that spanned two decades, including a 5-week murder trial. *See also* Response to 73(b), above, which Defendants incorporate here by reference.

74. In general, a comparison between Mr. Colborn's actual testimony at the Halbach trial and the MAM version reveals striking differences. At the trial, Mr. Colborn is virtually always shown looking up at the questioner and making eye contact after speaking into the microphone on the witness stand. Barker Decl., Exs. 3, 4 and 5. In MAM, he is rarely if ever shown making eye contact. He appears to be looking down much of the time. Dkt. #120-7 at 16:03-20:33, 21:43-24:30.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

74(a).    *In general, a comparison between Mr. Colborn's actual testimony at the Halbach trial and the MAM version reveals striking differences.* **Disputed** as attorney argument unsupported by record evidence, vague, misleading, removed from context, and immaterial. Defendants respond to Colborn's specific "examples" as they arise below. **Undisputed** that *MaM* substituted comparable footage where necessary due to the Unterminated Feed Footage Issue. *See* Response to 17, above, which Defendants incorporate here by reference.

74(b).    *At the trial, Mr. Colborn is virtually always shown looking up at the questioner and making eye contact after speaking into the microphone on the witness stand. Barker Decl., Exs. 3, 4 and 5. In MAM, he is rarely if ever shown making eye contact. He appears to be looking down much of the time. Dkt. #120-7 at 16:03-20:33, 21:43-24:30.* **Undisputed** that, when testifying at trial, Colborn at times made eye contact with the examining attorney. **Disputed** as inaccurate and attorney argument unsupported by record evidence. Further **disputed** to the extent read to imply these scenes were somehow fabricated. All footage of Colborn's trial testimony in *MaM* comes from the trial. Any moments showing Colborn *not* looking up and

making eye contact are moments that actually occurred and were captured in mixed-feed footage. *See* Dkt. 288 ¶¶ 29, 55, 78, 79; Dkt. 291 ¶¶ 76–82, 114. The Producer Defendants were unable to use raw footage from the witness-facing camera due to the Unterminated Feed Footage Issue. *See* Response to 17, above, which Defendants incorporate here by reference.

74. Additional edits to Mr. Colborn's testimony appear to change his physical reaction, including those summarized below:[10]

- Different visual into footage of testimony at Barker Decl. Ex. 5A CHRM 864 at 14:45-14:55. Plaintiff testified, "That's what he told me, he never talked to her." After that statement in raw footage, Mr. Colborn continues to hold direct eye contact with the questioner. In MAM, after that statement [Dkt. #120-7 at 16:10-16:20], he looks down, then up, then down again (and it cuts to Steven Avery staring intently at him). Defendants substituted a different visual following this response.

- Barker Decl. Ex. 5B CHRM 866 at 5:54-6:00 is audio of Ken Kratz during which he begins a question by stating "Sergeant Colborn," Mr. Colborn looks up toward the questioner when his name is mentioned. In MAM, over those words, he looks down and fiddles with his glasses instead. MAM then splices in "You were asked, as I understand as part of a civil lawsuit" – Mr. Colborn is shown in MAM (Dkt. #120-7 at 17:34-17:47) as looking down during this question. In Barker Decl. Ex. 5C CHRM 866 at 7:10-7:25, during the question, he makes eye contact with the questioner as the question is asked.

- A completely different "reaction shot" to Dean Strang saying "I have some questions for you" in MAM (Dkt. #120-7 at 19:24-19:35), as compared to Barker Decl. Ex. 5D CHRM 866 at 10:58-11:05, during which Mr. Colborn looks more confident in the footage of his original reaction.

- In Episode 7 (Dkt. #120-7 at 21:59-22:11), Mr. Colborn's response to a spliced question that asked him whether there was "no time" that he was at the Avery property that he was not there with Lieutenant Lenk, is edited so that his "Not that I can recall" response (Barker Decl. Ex. 5E CHRM 867 at 29:40-30:2), and a corresponding pause that demonstrated Plaintiff's genuine attempt to recall and formulate an answer to the question, was

---

[10] As noted above, *see* note 2 *supra*, Colborn included two different paragraphs numbered 74. For the Court's convenience, Defendants preserved Colborn's numbering, but note that this results in 95 additional proposed facts rather than the 94 listed.

instead replaced with a definite and quick "No sir," in an apparent attempt to buttress the impression for viewers that Plaintiff definitively was always at the property with Lt. Lenk and that Plaintiff knew that fact immediately and for certain, without having to think about it, in support of their allegation of a conspiracy involving Lt. Lenk and Mr. Colborn. Although the response "not that I can recall" is included in another responses immediately following that question positing that there was no time that Plaintiff was not there with Mr. Lenk, the omission of the "Not that I can recall" response to the prior question undermines the consistency of Plaintiff' s testimony in response to these questions.

- In Episode 7 (Dkt. #120-7 at 22:20-22:27), MAM swaps out a "Yes, sir" response that shows Plaintiff looking down as he answers and during the next question posed by Mr. Strang, when in fact, Plaintiff responds to the question (whether the case was the largest investigation in which he had been involved), by briefly looking down to speak into the microphone and then immediately looking back up at Mr. Strang (Barker Decl. Ex. 5E CHRM 867 at 29:40-30:21).

- In Episode 7 (Dkt. #120-7 at 22:35-22:40), MAM inserts a response of "Correct" that shows Plaintiff appearing to pause and look down after responding to an altered question about his reports (and MAM omits information about the extent of his report to downplay Mr. Colborn's total contribution to the reports, as explained in Exhibit B to the Second Amended Complaint at Dkt. #105 pp. 50-51), omitting and replacing two "That's correct, sir" and "Correct" responses that show Plaintiff looking down briefly to the microphone for each answer but then looking back up to the questioner each time (Barker Decl. Ex. 5F CHRM 867 at 31:00-31:17).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 18 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Each of these involves the Unterminated Feed Footage Issue. *See* Response to 17, above, which Defendants incorporate here by reference . Responding to each subpart:

74(a). *Additional edits to Mr. Colborn's testimony appear to change his physical reaction, including those summarized below[.]* **Disputed** as attorney argument unsupported by record evidence, vague, misleading, removed from context, and immaterial. Defendants respond

to Colborn's specific "examples" as they arise below. *See* Response to 17, above, which

Defendants incorporate here by reference (Unterminated Feed Footage Issue).

74(b)(1). *Different visual into footage of testimony at Barker Decl. Ex. 5A CHRM*

*864 at 14:45-14:55. Plaintiff testified, "That's what he told me, he never talked to her." After*

*that statement in raw footage, Mr. Colborn continues to hold direct eye contact with the*

*questioner.* **Undisputed** that in the raw footage, Colborn testified as cited and looked up

afterward. *See* Dkt. 312 Ex. 5A CHRM864. *See* Response to 17, above, which Defendants

incorporate here by reference (Unterminated Feed Footage Issue).

74(b)(2). *In MAM, after that statement [Dkt. #120-7 at 16:10-16:20], he looks*

*down, then up, then down again (and it cuts to Steven Avery staring intently at him).* **Undisputed**

that in *MaM*, the visual shows Avery silently sitting in court while Colborn's voice is heard

responding, "That's what he told me. He never talked to her," followed by Colborn silently

looking down, looking up and forward, and then looking up to his right. *See* Ep. 7 (Dkt. 120-7) at

16:10–16:20. *MaM* speaks for itself. *See* General Objection § I, III *supra*. *See also* Response to

17, above, which Defendants incorporate here by reference (Unterminated Feed Footage Issue).

74(b)(3). *Defendants substituted a different visual following this response.*

**Undisputed**. Due to the Unterminated Feed Footage Issue, there was no usable footage of

Colborn on the witness stand at this moment providing this particular answer to Kratz, so Demos

substituted footage from another part of Kratz's examination, including a shot of Avery while

Colborn answered the question, and then footage of Colborn waiting between questions. *See* Dkt.

288 ¶ 78; *see also* Dkt. 283, Exs. 21–24 (videos demonstrating how usable footage from that

moment was unavailable due to Unterminated Feed Footage Issue). The Producer Defendants did

not substitute footage out of any bias or ill will, nor did the substitution alter the meaning of

Colborn's testimony in any material way. *See* Dkt. 288 ¶ 78; *see also* Response to 17, above,

which Defendants incorporate here by reference (Unterminated Feed Footage Issue).

74(c)(1).    *Barker Decl. Ex. 5B CHRM 866 at 5:54-6:00 is audio of Ken Kratz during*

*which he begins a question by stating "Sergeant Colborn," Mr. Colborn looks up toward the*

*questioner when his name is mentioned.* **Undisputed** that the raw footage shows Colborn looking

up to his right and then looking up and forward while rubbing his right hand on his chin. *See*

Dkt. 312, Ex. 5B CHRM000866. *See* Response to 17, above, which Defendants incorporate here

by reference (Unterminated Feed Footage Issue).

74(c)(2).    *In MAM, over those words, he looks down and fiddles with his glasses*

*instead. MAM then splices in "You were asked, as I understand as part of a civil lawsuit" – Mr.*

*Colborn is shown in MAM (Dkt. #120-7 at 17:34-17:47) as looking down during this question.*

**Undisputed** that *MaM* shows Colborn looking forward, to his right, and then down before

adjusting his glasses while Kratz asks the question. The visual then cuts to Kratz speaking, the

courtroom gallery with Avery family members and Wisconsin DOJ investigator Deb Strauss, and

then back to Colborn for his response. *See* Ep. 7 (Dkt. 120-7) at 17:34–17:47. Due to the

Unterminated Feed Footage Issue, there was no useable footage of Colborn on the witness stand

listening to Kratz asking this particular question, so Demos substituted footage from another part

of Kratz's examination while Colborn was listening and waiting for him to complete his

question. *See* Dkt. 288 ¶ 55, Dkt. 283, Ex. 5–8 (videos demonstrating how usable footage from

that moment was unavailable due to Unterminated Feed Footage Issue). The Producer

Defendants did not substitute footage out of any bias or ill will, nor did the substitution alter the

meaning of Colborn's testimony in any material way. *See* Dkt. 288 ¶ 55; *see also* Response to

17, above, which Defendants incorporate here by reference (Unterminated Feed Footage Issue).

74(c)(3).    *In Barker Decl. Ex. 5C CHRM 866 at 7:10-7:25, during the question, he makes eye contact with the questioner as the question is asked.* **Undisputed** that the raw footage shows Colborn looking up during this question. *See* Response to 17, above, which Defendants incorporate here by reference (Unterminated Feed Footage Issue).

74(d).    *A completely different "reaction shot" to Dean Strang saying "I have some questions for you" in MAM (Dkt. #120-7 at 19:24-19:35), as compared to Barker Decl. Ex. 5D CHRM 866 at 10:58-11:05, during which Mr. Colborn looks more confident in the footage of his original reaction.* **Undisputed** that *MaM* features footage of the witness that differs from the raw footage although the difference is immaterial. Due to the Unterminated Feed Footage Issue, there was no usable footage of Colborn waiting for Strang to ask his next question at 55:25–55:35 of Episode 5, so Demos substituted a comparable waiting shot—the "confident" shot—there. *See* Dkt. 288 ¶¶ 65, 66; *see also* Dkt. 283 Exs. 17–20 (videos demonstrating how usable footage from that moment in Episode 5 was unavailable due to Unterminated Feed Footage Issue). Having already used that shot of Colborn's reaction in Episode 5, the Producer Defendants could not reuse it, so they substituted another shot of Colborn waiting for a question at 19:24–19:35 of Episode 7. *See* Dkt. 288 ¶¶ 65, 66. The Producer Defendants did not substitute footage out of any bias or ill will, nor did the substitution alter the meaning of Colborn's testimony in any material way. *See* Dkt. 288 ¶ 65. Colborn complains here that Defendants do *not* use a shot that makes him "look[] more confident," but this is the exact shot that Colborn criticizes for showing him "shift[ing] uncomfortably" in CAPFF ¶ 15, *supra*. *See* Dkt. 288 ¶¶ 65, 66.

74(e).    *In Episode 7 (Dkt. #120-7 at 21:59-22:11), Mr. Colborn's response to a spliced question that asked him whether there was "no time" that he was at the Avery property that he was not there with Lieutenant Lenk, is edited so that his "Not that I can recall" response (Barker*

*Decl. Ex. 5E CHRM 867 at 29:40-30:2), and a corresponding pause that demonstrated*

*Plaintiff's genuine attempt to recall and formulate an answer to the question, was instead*

*replaced with a definite and quick "No sir," in an apparent attempt to buttress the impression*

*for viewers that Plaintiff definitively was always at the property with Lt. Lenk and that Plaintiff*

*knew that fact immediately and for certain, without having to think about it, in support of their*

*allegation of a conspiracy involving Lt. Lenk and Mr. Colborn. Although the response "not that I*

*can recall" is included in another responses immediately following that question positing that*

*there was no time that Plaintiff was not there with Mr. Lenk, the omission of the "Not that I can*

*recall" response to the prior question undermines the consistency of Plaintiff's testimony in*

*response to these questions.* **Undisputed** that *MaM* features footage of Colborn responding "No,

sir" rather than "Not that I can recall" at 21:59–22:11 of Episode 7. Due to the Unterminated

Feed Footage Issue, there was only one instance of usable footage of Colborn saying "Not that I

recall" from that line of questioning, so Demos substituted a "No, sir" for the first instance and

used the original "Not that I can recall" for the second instance. *See* Dkt. 288 ¶ 76. The Producer

Defendants did not substitute footage out of any bias or ill will, nor did the substitution alter the

meaning of Colborn's testimony in any material way. *See* Dkt. 288 ¶ 76; *see also* Response to

17, above, which Defendants incorporate here by reference (Unterminated Feed Footage Issue).

      74(f). *In Episode 7 (Dkt. #120-7 at 22:20-22:27), MAM swaps out a "Yes, sir" response*

*that shows Plaintiff looking down as he answers and during the next question posed by Mr.*

*Strang[.] Plaintiff [in fact] responds to the question (whether the case was the largest*

*investigation in which he had been involved), by briefly looking down to speak into the*

*microphone and then immediately looking back up at Mr. Strang (Barker Decl. Ex. 5E CHRM*

*867 at 29:40-30:21).* **Undisputed** that *MaM* features footage of Colborn's "Yes, sir" response

from Strang's subsequent question at 22:20–22:27 of Episode 7. Due to the Unterminated Feed Footage Issue, the usable footage of Colborn providing his response is a moment too late, as it cuts between Strang and Colborn while Colborn was already answering his question, so Demos substituted footage and an identical "Yes, sir" response from the next question, which isn't cut off. *See* Dkt. 288 ¶ 79, Dkt. 283, Ex. 25–28 (video demonstrating how usable footage from that moment was unavailable due to Unterminated Feed Footage Issue).The Producer Defendants did not substitute footage out of any bias or ill will, nor did the substitution alter the meaning of Colborn's testimony in any material way. *See* Dkt. 288 ¶ 79; *see also* Response to 17, above, which Defendants incorporate here by reference (Unterminated Feed Footage Issue).

74(g).  *In Episode 7 (Dkt. #120-7 at 22:35-22:40), MAM inserts a response of "Correct" that shows Plaintiff appearing to pause and look down after responding to an altered question about his reports[.] MAM omits information about the extent of his report to downplay Mr. Colborn's total contribution to the reports, as explained in Exhibit B to the Second Amended Complaint at Dkt. #105 pp. 50-51[.] MaM omit[s] and replac[es] two "That's correct, sir" and "Correct" responses that show Plaintiff looking down briefly to the microphone for each answer but then looking back up to the questioner each time (Barker Decl. Ex. 5F CHRM 867 at 31:00-31:17).* **Undisputed** that *MaM* features footage of Colborn responding "Correct" rather than "That's correct, sir" at 22:35–22:40 of Episode 7. Due to the Unterminated Feed Footage Issue, the usable footage of Colborn providing this response cuts away from Colborn immediately after he responds, "That's correct, sir," so Demos substituted a shot of Colborn responding "Correct" from the same examination where the camera stays on Colborn longer so that the series could show Strang's question, the image of the report being discussed, and Colborn's response. Dkt. 288 ¶ 80; Ep. 7 (Dkt. 120-7) at 22:35–22:39. The Producer Defendants did not substitute

footage out of any bias or ill will, nor did the substitution alter the meaning of Colborn's testimony in any material way. *See* Dkt. 288 ¶ 80; *see also* Response to 17, above, which Defendants incorporate here by reference (Unterminated Feed Footage Issue).

75.     MAM does not fairly represent Mr. Colborn in excerpts from video depositions taken during Avery's civil trial. The full video deposition of Mr. Colborn's testimony in Avery's civil case demonstrates that Mr. Colborn appeared confident and relaxed and made regular eye contact with the examining attorney. Dkt. #129-1. In contrast, in the clips of Mr. Colborn's testimony at Mr. Colborn's civil suit deposition that appear in MAM, his gaze is not matched to the examining attorneys. Dkt. #120-2 at 17:34-17:44, 18:27-19:05, 19:42-20:00. Moreover, the deposition footage was not displayed in full screen in MAM, so that Mr. Colborn appears to be looking down in answering questions, but the full-screen video shows that he was looking at an exhibit. Dkt. #129-1 at 4:10 PM, 4:13-4:17 PM. The document cannot be seen on MAM. *See* Dkt. #120-2 at 18:30-19:05.

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 5 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

75(a).     *MAM does not fairly represent Mr. Colborn in excerpts from video depositions taken during Avery's civil trial.* **Disputed** as a legal conclusion and attorney argument unsupported by record evidence, vague, and misleading. The claim that *MaM* "does not fairly represent" Colborn is not a fact, but a legal contention. It is inappropriate for inclusion here as a proposed material fact, and the Court should disregard it. To the extent construed as a fact, Defendants dispute and deny this allegation. The content of *MaM* speaks for itself. *See* General

Objections §§ I, III *supra*. Defendants respond to Colborn's specific "examples" as they arise below.

75(b).    *The full video deposition of Mr. Colborn's testimony in Avery's civil case demonstrates that Mr. Colborn appeared confident and relaxed and made regular eye contact with the examining attorney. Dkt. #129-1.* **Undisputed** that, in his deposition for Avery's civil lawsuit, Colborn at times made eye contact with the examining attorney. **Disputed** as attorney argument unsupported by record evidence, inaccurate, and immaterial. The video deposition speaks for itself. *See* General Objection § III *supra*. Any moments in *MaM* showing Colborn testifying actually occurred and were captured in raw deposition footage. *See* Dkt. 288 ¶¶ 17–20; Dkt. 291 ¶¶ 71; *see also* Dkt. 320, Prod. Def. SPFOF ¶ 45 (Colborn admitting how testifying made him feel uncomfortable); Dkt. 320, Prod. Def. Resp. PFOF ¶ 78. Colborn's former counsel of record, Michael Griesbach, described watching Avery civil suit deposition testimony of "the officers who were most directly accused of wrongdoing—either in the first Avery case or in the second," which includes Colborn, as "watching them squirm" and observed that *MaM*'s portrayal of their testimony "was not simply a case of only selective editing to make them look bad." Dkt. 289-31; Dkt. 320, Prod. Def. SPFOF ¶ 46.

75(c).    *In contrast, in the clips of Mr. Colborn's testimony at Mr. Colborn's civil suit deposition that appear in MAM, his gaze is not matched to the examining attorneys. Dkt. #120-2 at 17:34-17:44, 18:27-19:05, 19:42-20:00.* **Disputed** as attorney argument unsupported by record evidence, inaccurate, and immaterial. Colborn alternates between looking up at the attorney and looking down at a paper reflected in his eyeglasses. *See* Ep. 2 (Dkt. 120-2) at 17:34–17:44, 18:27–19:05, 19:42–20:00. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

75(d).   *Moreover, the deposition footage was not displayed in full screen in MAM, so that Mr. Colborn appears to be looking down in answering questions, but the full-screen video shows that he was looking at an exhibit. Dkt. #129-1 at 4:10 PM, 4:13-4:17 PM.* **Undisputed** that the video footage from Colborn's deposition is fit to the screen pursuant to required technical specifications in a way that does not show the paper and table in front of him. *See* Ep. 2 (Dkt. 120-2) at 17:34–17:44, 18:27–19:05, 19:42–20:00.

75(e).   *The document cannot be seen on MAM. See Dkt. #120-2 at 18:30-19:05.* **Disputed** as inaccurate and immaterial. Colborn is shown looking down while Stephen Glynn asks, "You've gone over exhibit 138," and continues with questions referencing the document. The presence of the document is apparent from the questioning, and a reflection of the paper is visible in Colborn's eyeglasses. *See* Ep. 2 (Dkt. 120-2) at 18:27-19:05. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*.

76.     Barbara and Andrew Colborn divorced on February 23, 2022, after filing for divorce on March 10, 2021. (B. Colborn Decl. ¶2).

**Response: Undisputed**.

77.     Andrew Colborn acted differently after *Making a Murderer* was released because of the allegations made about him there: He drank more, though he did not overindulge. He was quieter, avoided going out in public, was suspicious of everybody, and was continually apprehensive and hypervigilant about threats he had received and about confrontations with strangers. He worried about these things constantly. He was always anxious. He never returned to normal after *Making a Murderer* was released, and he was never able to let go of the defamation he endured; in Barbara Colborn's view, it consumed him. (B. Colborn Decl. ¶¶5, 6, 7, 8; A. Colborn Decl. ¶4, 5).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 11 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

77(a). *Andrew Colborn acted differently after Making a Murderer was released because of the allegations made about him there[.]* **Undisputed** that Colborn claims he acted differently after *MaM*'s release and that he attributes his change in behavior to *MaM*. **Disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See* Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶ 132.

77(b). *He drank more, though he did not overindulge.* **Undisputed** that Colborn claims to have started drinking more after *MaM*'s release. **Disputed** for the reasons set forth in the Response to 77(a), above, which Defendants incorporate here by reference. Colborn's ex-wife also reports that Colborn's drinking increased as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶ 9.

77(c). *He was quieter[.]* **Undisputed** that Colborn claims to have become more reserved after *MaM*'s release, but otherwise **disputed** for the reasons set forth in the Response to 77(a), above, which Defendants incorporate here by reference.

77(d).   *He avoided going out in public[.]* **Undisputed** that Colborn claims to have avoided going out in public after *MaM*'s release, but otherwise **disputed** for the reasons set forth in the Response to 77(a), above, which Defendants incorporate here by reference.

77(e).   *He was suspicious of everybody[.]* **Undisputed** that Colborn claims to be suspicious of everyone after *MaM*'s release, but otherwise **disputed** for the reasons set forth in the Response to 77(a), above, which Defendants incorporate here by reference.

77(f).   *And he was continually apprehensive and hypervigilant about threats he had received and about confrontations with strangers.* **Undisputed** that Colborn claims to be continually apprehensive and hypervigilant after *MaM*'s release, but otherwise **disputed** for the reasons set forth in the Response to 77(a), above, which Defendants incorporate here by reference.

77(g).   *He worried about these things constantly.* **Undisputed** that Colborn claims to have become more worrisome after *MaM*'s release, but otherwise **disputed** for the reasons set forth in the Response to 77(a), above, which Defendants incorporate here by reference.

77(h).   *He was always anxious.* **Undisputed** that Colborn claims to have become more anxious after *MaM*'s release, but otherwise **disputed** for the reasons set forth in the Response to 77(a), above, which Defendants incorporate here by reference.

77(i).   *He never returned to normal after Making a Murderer was released[.]* **Undisputed** that Colborn claims to be unable to return to normalcy after *MaM*'s release. **Disputed** for the reasons set forth in the Response to 77(a), above, which Defendants incorporate here by reference. Further noted that several individuals confirm Colborn became so fixated on *MaM* and suing over it that he could not let it go, even to this day. *See* Dkt. 273 ¶¶ 20, 24-25, 26; Dkt. 278 ¶¶ 11-12, 15, 18.

77(j).   *And he was never able to let go of the defamation he endured[.]* **Disputed** because the allegation that Colborn endured "defamation" is not a fact, but a legal conclusion. It is inappropriate for inclusion here, and the Court should disregard it. **Undisputed** that Colborn seems unwilling (if not unable) to "let go" of the reputational harm he believes he has incurred. Further noted, that Colborn believes many third parties harmed his reputation and he is also unwilling to "let go" of that belief. Dkt. 265 ¶¶ 17-22. *See also* the Response to 77(i), above, which Defendants incorporate here by reference.

77(k).   *In Barbara Colborn's view, it consumed him. (B. Colborn Decl. ¶¶5, 6, 7, 8; A. Colborn Decl. ¶4, 5).* **Undisputed** that Colborn's ex-wife made this statement in a declaration Colborn obtained from her. Further **undisputed** that Colborn seems consumed with punishing Defendants for documenting the accusations that Avery and his counsel publicly levied against him at Avery's trial for the murder of Halbach. **Disputed** for the reasons set forth in Response to 77(j), above, which Defendants incorporate here by reference.

78.   Andrew Colborn always took his job in law enforcement seriously and was disturbed, troubled, and offended by how *Making a Murderer* portrayed him and about its negative effect on his reputation. (B. Colborn Decl. ¶9; A. Colborn Decl. ¶24).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

78(a).   *Andrew Colborn always took his job in law enforcement seriously.* **Undisputed**, though immaterial.

78(b).   *He was disturbed, troubled, and offended by how Making a Murderer portrayed him and about its negative effect on his reputation. (B. Colborn Decl. ¶9; A. Colborn Decl. ¶24).*

**Undisputed** that Colborn claims he was disturbed, troubled, and offended by *MaM*, that he claims his reputation was negatively impacted by *MaM*, and that he attributes all of this to *MaM*.

**Disputed** to the extent this allegation implies a legally cognizable causal connection between *MaM* and Colborn's alleged emotional distress that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See* Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. Colborn admitted at his deposition that the trial itself, *see* Dkt. 271 ¶ 139, and statements by various third parties also harmed his reputation and even led to a death threat. Dkt. 265 ¶¶ 17-22. He also admitted at his deposition that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). And he admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34.

79.     Colborn received many threatening e-mails and threatening voice mail messages. He received mail from strange addresses and instructed his wife not to open any of the mail. He received exploding graffiti and other things from strangers. (B. Colborn Decl. ¶10; A. Colborn Decl. ¶¶10, 11, 12).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

79(a).     *Colborn received many threatening e-mails and threatening voice mail messages.* **Undisputed** that Colborn claims to have received (often anonymous) threatening

emails and voicemail messages. **Disputed** as inadmissible and immaterial as they are not probative of any allegation at issue in this case. Colborn has made no effort to authenticate the alleged anonymous voicemails or comments, they are hearsay to the extent offered to prove the truth of the matter asserted, and such evidence has been soundly rejected by courts across the country in defamation actions.[11] Further **disputed** that the senders of the messages are "viewers" of *MaM*—Colborn testified in this case that he does not know whether they watched *MaM* unless they expressly said so in their message. *See* Dkt. 271 ¶ 128. Further **disputed** that that the individuals who left Colborn anonymous messages are representative of the reasonable viewer; indeed, Colborn has admitted they are not. *See id.*; *see also* Dkt. 309 at 4-5, General Objection No. 6.

79(b).    *He received mail from strange addresses and instructed his wife not to open any of the mail.* **Undisputed** that Colborn claims to have received mail and instructed his wife not to open it after *MaM*'s release and that he attributes these behaviors to *MaM*. **Disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See* Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34.

---

[11] *See* note 7 *supra*.

79(c).    *He received exploding graffiti and other things from strangers. (B. Colborn Decl.* *¶10; A. Colborn Decl. ¶¶10, 11, 12).* **Undisputed** that Colborn claims to have received "exploding graffiti and other things from strangers." **Disputed** because the messages are inadmissible and immaterial as not probative of any allegation at issue in this case. Colborn has made no effort to authenticate the alleged anonymous voicemails or comments, they are hearsay to the extent offered to prove the truth of the matter asserted, and such evidence has been soundly rejected by courts across the country in defamation actions.[12] Further **disputed** that these are "viewers" of *MaM*—Colborn testified in this case that he does not know whether they watched *MaM* unless they expressly said so in their message. *See* Dkt. 271 ¶ 128. Further **disputed** that that the individuals who left Colborn anonymous messages are representative of the reasonable viewer; indeed, Colborn has admitted they are not. *See id.*; *see also* Dkt. 309 at 4-5, General Objection No. 6.

80.    After *Making a Murderer*, Andrew Colborn became hypervigilant and did things, such as boarding up the door at his home, because he feared the risk of attack or robbery. If strange cars sometimes appeared in the driveway, his fear became heightened. He was extra vigilant when rallies to free Steven Avery were scheduled and occurred. (B. Colborn Decl. ¶12).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

80(a).    *After Making a Murderer, Andrew Colborn became hypervigilant and did things,* *such as boarding up the door at his home, because he feared the risk of attack or robbery.* **Undisputed** that Colborn claims he acted differently after *MaM*'s release and that he attributes

---

[12] *See* note 7 *supra*.

his change in behavior to *MaM*. **Disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See* Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34.

80(b). *If strange cars sometimes appeared in the driveway, his fear became heightened. See* Response to 80(a), above, which Defendants incorporate here by reference.

80(c). *He was extra vigilant when rallies to free Steven Avery were scheduled and occurred. (B. Colborn Decl. ¶12). See* Response to 80(a), above, which Defendants incorporate here by reference.

81. Andrew Colborn worried about his children and told them to be on the lookout whenever anything about Steven Avery came on the news. (B. Colborn Decl. ¶13).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

81(a). *Andrew Colborn worried about his children[.]* **Undisputed** that Colborn claims he acted differently after *MaM*'s release and that he attributes his change in behavior to *MaM*. **Disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent

or cause of his alleged emotional distress. *See* Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34.

81(b). *He told them to be on the lookout whenever anything about Steven Avery came on the news. (B. Colborn Decl. ¶13). See* Response to 81(a), above, which Defendants incorporate here by reference.

82. Andrew Colborn received voice mails while working at the Manitowoc County Sheriff's Department intended for him and other law enforcement and e-mails at home. The messages were vile, profane, menacing, and intimidating. Strangers sent a package that looked like a bomb and insults accompanied by sinister warnings, circulated pictures of Colborn and his family on the Internet, took pictures of Colborn and his automobile license plate to circulate, and chastised him publicly, all because of *Making a Murderer*'s accusations. (A. Colborn Decl. ¶¶2, 3, 10, 12, 15, Exs. 1, 2).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 6 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

82(a). *Andrew Colborn received voice mails while working at the Manitowoc County Sheriff's Department intended for him and other law enforcement and e-mails at home.* **Undisputed** that Colborn claims to have received anonymous voicemails and other messages.

**Disputed** because the messages are inadmissible and immaterial as not probative of any allegation at issue in this case. Colborn has made no effort to authenticate the alleged anonymous voicemails or comments, they are hearsay to the extent offered to prove the truth of the matter asserted, and such evidence has been soundly rejected by courts across the country in defamation actions.[13] Further **disputed** that these are "viewers" of *MaM*—Colborn testified in this case that he does not know whether they watched *MaM* unless they expressly said so in their message. *See* Dkt. 271 ¶ 128. Also **disputed** that that the individuals who left Colborn anonymous messages are representative of the reasonable viewer; indeed, Colborn has admitted they are not. *See id.*; *see also* Dkt. 309 at 4-5, General Objection No. 6.

82(b).    *The messages were vile, profane, menacing, and intimidating. See* Response to 82(a), above, which Defendants incorporate here by reference.

82(c).    *Strangers sent a package that looked like a bomb and insults accompanied by sinister warnings[.] See* Response to 82(a), above, which Defendants incorporate here by reference.

82(d).    *[Strangers] circulated pictures of Colborn and his family on the Internet[.] See* Response to 82(a), above, which Defendants incorporate here by reference.

82(e).    *[Strangers] took pictures of Colborn and his automobile license plate to circulate, and chastised him publicly[.] See* Response to 82(a), above, which Defendants incorporate here by reference.

82(f).    *All [of this was] because of Making a Murderer's accusations. (A. Colborn Decl. ¶¶2, 3, 10, 12, 15, Exs. 1, 2).* **Disputed**. This is not a fact, but a legal conclusion and unsupported argument by counsel in that it affirmatively links Colborn's alleged emotional distress to *MaM*

---

[13] *See* note 7 *supra*.

and also states that *MaM* itself accused Colborn of misconduct when in fact *MaM* merely documented accusations by others (and rebuttals to same). *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra. See also* Response to 82(a), above, which Defendants incorporate here by reference .

83.     Colborn's employer hides him from publicity and public events even now. (A. Colborn Decl. ¶16).

**Response:** **Undisputed** that, in his declaration, Colborn claims his employer told him "not to appear in anything involving the media at the hospital" and that "[a]nytime there is a press conference at the hospital, [he is] asked to leave." **Disputed** as inadmissible hearsay. Also disputed in that, even if accurate and admissible, Colborn has no evidentiary support for his apparent belief that his employer's request is somehow related to or as a result of *MaM*. Further **disputed** to the extent this allegation is read or intended to imply that Colborn's employer thinks less of him because of *MaM*. Colborn has no evidence to support such an allegation.

84.     When Colborn attended car shows, he used a false name so his car would not be vandalized. (A. Colborn Decl. ¶6; B. Colborn Decl. ¶11).

**Response:** **Undisputed** that Colborn claims he acted differently after *MaM*'s release and that he attributes his change in behavior to *MaM*. **Disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See* Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this

lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34.

85.    Because of *Making a Murderer*, when sitting in a restaurant, Colborn typically sits so he can see the door. (A. Colborn Decl. ¶10).

**Response: Undisputed** that Colborn claims he acted differently after *MaM*'s release and that he attributes his change in behavior to *MaM*. **Disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See* Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34.

86.    Although he was in law enforcement, because of *Making a Murderer*, Colborn made especially sure his weapon was loaded and ready to be used if needed. (A. Colborn Decl. ¶8).

**Response: Undisputed** that Colborn claims he acted differently after *MaM*'s release and that he attributes his change in behavior to *MaM*. **Disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See*

Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34.

87.     Colborn's circle of friends has decreased since *Making a Murderer*, and he is closely guarded with even close friends and relatives. He trusts few people because of *Making a Murderer*. *Making a Murderer* affected Colborn's important social, family, and employment relationships. He lives in a constant state of anxiety because of Making a Murderer. (A. Colborn Decl. ¶¶9, 14).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 5 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

87(a).   *Colborn's circle of friends has decreased since Making a Murderer[.]*
**Undisputed** that Colborn believes this allegation to be true. **Disputed** as to the implication that *MaM* caused his friends to think less of his or distance themselves from him. Moreover, individuals Colborn identified in discovery uniformly attested that *MaM* did not change their opinion of Colborn and that, to the extent their relationship is now more distant, it's not because of *MaM* but because he distanced himself from them at the time of the Avery trial and because he was unfaithful to and divorced his ex-wife. Dkt. 271 ¶¶ 146-47; Dkt. 273 ¶ 9. ██████████

██████████████████████████████████████████████████████████████

Dkt. 289-27 at 00362. Further **disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See* Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34.

87(b). *[H]e is closely guarded with even close friends and relatives.* **Undisputed** that Colborn claims he acted differently after *MaM*'s release and that he attributes his change in behavior to *MaM*. **Disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See* Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34.

87(c). *He trusts few people because of Making a Murderer. See* Response to 87(b), above, which Defendants incorporate here by reference .

87(d).  *Making a Murderer affected Colborn's important social, family, and employment relationships. See* Response to 87(a)-(b), above, which Defendants incorporate here by reference.

87(e).  *He lives in a constant state of anxiety because of Making a Murderer. (A. Colborn Decl. ¶¶9, 14). See* Response to 87(b), above, which Defendants incorporate here by reference .

88.  He instructed his wife not to pick up the mail out of fear that it may harm her. One day he received a package that looked like it contained an explosive, and dismantled it with the help of the sheriff's department. The package was sent regarding the events portrayed by *Making a Murderer.* (A. Colborn Decl. ¶10).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 3 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

88(a).  *He instructed his wife not to pick up the mail out of fear that it may harm her.* **Undisputed** that Colborn claims he told his wife to not get the mail and that he attributes his change in behavior to *MaM*. **Disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See* Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34.

88(b).  *One day he received a package that looked like it contained an explosive, and dismantled it with the help of the sheriff's department.* **Undisputed** that Colborn claims to have received an anonymous package. **Disputed** as inadmissible and immaterial as not probative of any allegation at issue in this case. Colborn has made no effort to authenticate the alleged messages he received, they are hearsay to the extent offered to prove the truth of the matter asserted, and such evidence has been soundly rejected by courts across the country in defamation actions.[14] Further **disputed** that the person who sent the alleged package had watched *MaM*— Colborn testified in this case that he does not know whether senders of messages watched *MaM* unless they expressly said so in their message. *See* Dkt. 271 ¶ 128. Further **disputed** that that any individual who would send something that looks like an explosive is representative of the reasonable viewer; indeed, Colborn has admitted such individuals are not reasonable. *See id*.; *see also* Dkt. 309 at 4-5, General Objection No. 6.

88(c).  *The package was sent regarding the events portrayed by Making a Murderer. (A. Colborn Decl. ¶10). See* Response to 88(b), above, which Defendants incorporate here by reference. Further **disputed** that the evidence indicates that the package contained any reference to *MaM*.

89.      He always answered the phone at home because he did not want his wife to be exposed to the threats that often occurred on those calls. (A. Colborn Decl. ¶11).

**Response: Undisputed** that Colborn claims he acted differently after *MaM*'s release and that he attributes his change in behavior to *MaM*. **Disputed** to the extent this allegation implies a legally cognizable causal connection that neither Colborn nor his ex-wife are qualified to make. Colborn did not disclose an expert on the extent or cause of his alleged emotional distress. *See*

---

[14] *See* note 7 *supra*.

Dkt. 269 at 43-44. Further, to date, Colborn has watched little more than an hour of the series, *see* Dkt. 271 ¶ 126, and his ex-wife reports that Colborn's behavior also changed as a result of Avery's trial for Halbach's murder. *See* Dkt. 273 ¶¶ 8-9. He admitted at his deposition in this case that he did not begin taking medication for his alleged emotional distress until he filed this lawsuit (three years after *MaM*'s release). He also admitted that, these days, his alleged emotional distress is so mild that not even his live-in girlfriend notices its alleged manifestations. Dkt. 271 ¶¶ 132-34. Further **disputed** as immaterial, as neither this fact nor the portion of Colborn's declaration on which it relies appear in Colborn's Brief in Opposition to Defendants' Motions for Summary Judgment, *see generally* Dkt. 327, and because it does not related to any of the four IIED elements. *See* Dkt. 269 at 41-44.

90.     Colborn did not seek professional help because he was concerned that a diagnosis of anxiety or worse could affect his employment as a law enforcement officer carrying a weapon. (A. Colborn Decl. ¶14).

**Response: Undisputed** that, in his declaration, Colborn claims he did not seek counseling because "having a diagnosis of anxiety or worse could have affected my employment, being a law enforcement officer carrying a weapon." **Disputed** as immaterial, as neither this fact nor the portion of Colborn's declaration on which it relies appear in Colborn's Brief in Opposition to Defendants' Motions for Summary Judgment. *See generally* Dkt. 327. Further noted that, although now retired from law enforcement, Colborn still has not sought counseling or any other professional help other than prescriptions from his primary care doctor after he sued Defendants. *See* Third Walker Decl. Ex. 5 at Interrogatory No. 11.

91.     Because of *Making a Murderer*, Colborn is stopped in public by strangers who ask his identity or confront him and often finds people staring at him in public. Strangers sometimes take his picture. (A. Colborn Decl. ¶¶17-20, Ex. 3).

**Response:** Defendants object to this proposed finding of fact as compound, joining as 1 proposed fact at least 2 distinct proposed facts which should have been separately enumerated, in violation of Civil L.R. 56(b)(2)(B)(ii). Responding to each subpart:

91(a).     *Because of Making a Murderer, Colborn is stopped in public by strangers who ask his identity or confront him and often finds people staring at him in public.* **Disputed** as inaccurate. In his interview for *Convicting a Murderer*, ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████     *See* Dkt. 289-27 at 00360; *see also* Third Walker Decl. Ex. 4 (Colborn Tr.) at 314:11-316:10; *cf.* Dkt. 317 ¶ 19. Also **disputed** as to any implication that such strangers have actually watched *MaM* or that it caused them to think less about Colborn (as opposed to simply being curious about him or having their opinion of him improved). Colborn has no evidentiary support for either implication. Further **disputed** as immaterial, as neither this fact nor the portions of Colborn's declaration on which it relies appear in Colborn's Brief in Opposition to Defendants' Motions for Summary Judgment, *see generally* Dkt. 327, and because it does not related to any of the four IIED elements. See Dkt. 269 at 41-44.

91(b).     *Strangers sometimes take his picture. (A. Colborn Decl. ¶¶17-20, Ex. 3).* **Undisputed** that, in his declaration, Colborn claims "a discharged patient took a photo of me leaving the hospital." *See* Dkt. 317 ¶ 20. **Disputed** that a photograph taken by a single person supports an allegation that "strangers" sometimes take his picture. Further **disputed** as to any

implication that such strangers have actually watched *MaM* or that it caused them to think less about Colborn (as opposed to simply being curious about him or having their opinion of him improved). Colborn has no evidentiary support for either implication. Further **disputed** as immaterial, as neither this fact nor the portion of Colborn's declaration on which it relies appear in Colborn's Brief in Opposition to Defendants' Motions for Summary Judgment, *see generally* Dkt. 327, and because it does not related to any of the four IIED elements. See Dkt. 269 at 41-44.

92.     Scotland Yard issued a public statement condemning Colborn and law enforcement in Manitowoc over the Avery case after *Making a Murderer* occurred. (A. Colborn Decl. ¶21, Ex. 4).

**Response: Undisputed** that attached as an exhibit to Colborn's declaration is an article with the headline, "EXCLUSIVE: Is the Making a Murderer killer guilty or not? 5 Scotland Yard detectives give their verdicts." **Disputed** that this article constitutes an official "public statement" by Scotland Yard. Further **disputed** to the extent Colborn's allegation attempts to summarize the statement, which speaks for itself. *See* General Objections § III *supra*. Further **disputed** as immaterial, as neither this fact nor the exhibit to which it cites appear in Colborn's Brief in Opposition to Defendants' Motions for Summary Judgment, *See generally* Dkt. 327, and because it does not related to any of the four IIED elements. See Dkt. 269 at 41-44.

93.     A current Google search shows that his name generates over 500,000 hits with videos. (A. Colborn Decl. ¶30).

**Response: Undisputed** that attached to Colborn's declaration is an exhibit purporting to show Google searches generating over 500,000 hits. **Disputed** as immaterial, as neither this fact nor the exhibit to which it cites appear in Colborn's Brief in Opposition to Defendants' Motions for Summary Judgment, *see generally* Dkt. 327, and because it does not related to any of the four

IIED elements. *See* Dkt. 269 at 41-44. Further noted that there are many positive, supportive mentions of Colborn on the Internet, and this search report presumably includes those mentions.

94.     He continues to be the subject of Internet articles referencing *Making a Murderer*, and those articles are critical of him. (Dkt. 316 D. Bursik Decl. ¶ Ex 4).

**Response: Undisputed** that attached to the declaration of Debra Bursik is a September 18, 2022 article by John Ferak which references *MaM* because the article is about this lawsuit. **Disputed** that the attachment of one article establishes that Colborn "continues to be the subject of Internet articles referencing [*MaM*] and those articles are critical of him." Further **disputed** that the Ferak article is critical; it simply reports on matters of public interest and concern, including this lawsuit, which Colborn voluntarily commenced. Further **disputed** as immaterial. Colborn submits this fact in support of his argument that his intentional infliction of emotional distress claim should survive. Whether there continues to be reporting on Colborn's lawsuit against the Defendants over *MaM* is immaterial to any of the four IIED elements. *See* Dkt. 269 at 41-44.

**NETFLIX'S RESPONSE TO PLAINTIFF'S ADDITIONAL, UNENUMERATED FACTS
CONTAINED ONLY IN PLAINTIFF'S RESPONSE TO
NETFLIX'S PROPOSED FINDINGS OF FACT (DKT. 323)[15]**

95.     The Wisconsin Department of Justice report states that there "was no basis to
bring criminal charges or assert ethics violations against anyone involved in the investigation and
prosecution of this case. At worst, the sheriff's department failed to investigate a viable suspect,
Gregory Allen . . . ." Dkt. 120-11 at 14.

**Response: Undisputed** that this quotation comes from the Wisconsin DOJ report.

**Disputed** that this quote fully reflects the ultimate findings of the report, which should be read in
its entirety and speaks for itself. *See* Dkt. 290-5. Netflix notes, incidentally, that Colborn's own
former counsel called the report a "whitewash." Dkt. 291 ¶ 17.

96.     Colborn's 2003 deposition testimony in Avery's civil lawsuit did not include the
words "unusual," "recall," or "recalled." Rather, the following is an excerpt of how Colborn
testified:

> Q.      You then, in 2003, following the publicity that we've already discussed
> relating to Mr. Allen and Mr. Avery, and you're concerned that perhaps
> the caller that was calling was speaking about Mr. Allen and Mr. Avery,
> true?
>
> A.      I was wondering about that, yes.
>
> Q.      Sure. You brought that up to someone else, correct?

---

[15] These facts—Nos. 95 through 131—appear only in Colborn's Response to Netflix's Statement
of Proposed Material Facts (Dkt. 323), and were not included by Colborn in his Additional
Proposed Findings of Fact (Dkt. 325). This is improper under the local rules for the Eastern
District of Wisconsin. Accordingly, Netflix objects to their inclusion in Colborn's response to
Netflix's proposed facts, as well as to reference to or reliance on them in Colborn's papers in
opposition to Netflix's Motion for Summary Judgment. *See* General Objections § II *supra.*
Further, Netflix objects to consideration of any facts beyond the 100 permitted by Civil Local
Rule 56(b)(2)(B)(ii). Netflix leaves it to the Court to decide how to handle the unenumerated
facts, the inclusion of which puts Colborn well over the 100 additional facts permitted by the
Local Rules. Netflix believes the Court is entitled to disregard them entirely, but it nevertheless
responds to them.

A.    Yes, sir.

Q.    And to whom did you bring that up?

A.    To Lieutenant Lenk.

Dkt. 120-14 at 16:4-13.

**Response: Undisputed**, though immaterial. *See* Dkt. 271 ¶ 4.

97.    Colborn's 2003 deposition testimony in Avery's civil lawsuit did not include the words "prison" or "imprisoned." Dkt. 120-14 at 11:1-6; Dkt. 120-15 at 2.

**Response: Undisputed**, though immaterial. *See* Dkt. 271 ¶ 5.

98.    In his deposition in this case, former Manitowoc County Sheriff Kenneth Petersen testified that he was the only one from Manitowoc County conflicted out of the investigation into Avery for Halbach's murder. *See* Barker Decl. Ex. 12 (Petersen Tr.) at 149-150.

**Response: Undisputed**. *But see* Dkt. 271 ¶ 11 (citing Calumet County detective's testimony from Avery trial that all Manitowoc County personnel were conflicted out).

99.    Judge Patrick Willis issued an order in Avery's criminal trial for the Halbach murder on the State's motion that sought "to preclude the introduction of any evidence pertaining to the Avery's wrongful conviction on charges of sexual assault and attempted homicide in Case no. 85 FE 118." *See* Dkt. 279-3 at 2. Judge Willis' order does not use the words "frame-up evidence," and he did not specifically identify Lenk and Colborn as the only two officers the defense could attempt to implicate as participants in the alleged conspiracy against Avery. *Id*. at 3-5.

**Response: Undisputed** that the prosecution moved to exclude Avery from putting on a "frame up" defense at trial, including by excluding evidence of his wrongful rape conviction, and that Judge Patrick Willis denied that motion. *See* Dkt. 279-3; Dkt. 290-16; Dkt. 291 ¶¶ 48, 50. Further **undisputed** that the order Colborn cites does not use the words "frame-up evidence."

*See* Dkt. 279-3. *But see* Dkt. 290-16 at 2 ("the defendant seeks the introduction of the blood vial

evidence to be used as part of a 'frame-up' defense"), 3, 8, 9, 10, 12, 13 (repeatedly using phrase

"frame-up evidence"); *see also* Dkt. 291 ¶ 50 (identifying Colborn and Lenk as officers Avery

could accuse of frame up). **Disputed** as inaccurate as to the rest. *See* Dkt. 279-3 (CHRM034924)

at 34928-32 (naming only Lenk and Colborn, and explicitly excluding testimony regarding

Petersen).

100.    Avery's defense counsel did not argue to the jury that a call Colborn made to

dispatch regarding the RAV4's license plate number indicated Colborn had located the SUV

before it was discovered in the salvage yard. Rather, Avery's counsel argued the following:

> This sounds a lot like what road patrol officers do when they come across a
> stalled car, an abandoned car, a car where it shouldn't be. That's what this sounds
> like. Draw your own conclusions, obviously look at it like from any other piece of
> evidence.

Dkt. 120-35 at 5 (33:20-25).

**Response: Undisputed** that the excerpted quotation above is by one of Avery's attorneys

from the transcript of Avery's criminal trial for Halbach's murder. **Disputed** as to Colborn's

characterization of the arguments made by Avery's counsel at trial. The trial transcript speaks for

itself.

101.    Although Michael Griesbach made the statements quoted in Netflix's SPMF Nos.

21, 22, he later changed his mind about his own statements. Decl. of Michael Griesbach ¶¶ 3-10.

**Response: Undisputed** that Griesbach claims to have changed his mind about his own

statements, relying on excerpts from his book *Indefensible* to support that he changed his mind

prior to November 3, 2022, the date of his declaration submitted in support of his former client's

opposition to Netflix's Motion for Summary Judgment. **Disputed** that *Indefensible* supports that

Griesbach changed his mind that law enforcement, including Colborn, may have planted

evidence to ensure Avery's conviction. *See* Third Walker Decl. Ex. 6 (excerpts of Griesbach's *Indefensible*) at 31-32, 102-103, 133 (examples of Griesbach, in *Indefensible*, indicating uncertainty whether Colborn and Lenk planted evidence to frame Avery).

102.    At his deposition in this case, Colborn was asked if he agreed with certain newspaper articles, and merely agreed that his understanding was consistent with the articles and that he did not dispute the article headline. He did not testify that Judge Willis permitted Avery and his defense team to "point [the] finger at deputies" or attempt to prove Avery was "framed."

**Response: Disputed** as inaccurate. At his deposition in this case, Colborn testified to the following:

Q.          . . . Do you dispute [the headline's] accuracy that this is what the defense was allowed to do [point the finger at deputies and attempt to prove he was framed]?

[Objection omitted]

A.          No, I don't dispute the headline.

[ . . . ]

Q.          . . . Isn't it true that the judge allowed the attorneys to prove that Avery was framed?

[ . . . ]

**A.          Yes, it's my understanding that the judge allowed that.**

*See* Dkt. 279 Ex. 2 (Colborn Tr.) at 32:12-33:15 (emphasis added).

103.    At her deposition in this case, Moira Demos testified that MaM did not show footage of "actual events," but rather footage taken at actual events then edited extensively by Defendants. Barker Decl. Ex. 11 at 180-207; *id*. Ex. 19.

**Response: Disputed** that the quote "actual events" appears anywhere in the deposition testimony of Moira Demos. Further **disputed** as misleading and mischaracterizing the evidence,

which is a summary of more than 25 pages of testimony. Further **disputed** as immaterial, as all documentaries edit their source material for length. *See* Dkt. 269 at 2, 24.

104.    At his deposition in this case, Colborn was only questioned about "instances" in MaM, not the entirety of the series.

**Response: Undisputed**. Counsel could not examine Colborn about the entirety of the series because he has watched little more than hour of the 10-hour documentary, has not watched any of the last three episodes, and has no intention of watching anymore. *See* Dkt. 271 ¶ 126. Indeed, in response to Defendants' expedited motion for additional time to depose Colborn (Dkt. 255), Colborn argued that the purpose of a deposition is only to ask a witness about "what he or she *knows*, nothing more, nothing less," and that, because Colborn was unaware of most of the contents of his Complaint or *MaM*, Colborn would be unable to answer most of Defendants' questions which should "limit the field of questions about which" Colborn could be asked. *See* Dkt. 255 at 2; Dkt. 257 at 32:20-33:30 (audio of hearing on expedited motion).

105.    Avery did not testify at his own criminal trial for Halbach's murder, *see* Barker Decl. Ex. 8, but MaM includes numerous direct accusations by Avery against Colborn.

**Response: Undisputed** that Avery did not testify at his criminal trial. **Disputed** that *MaM* includes any accusations, direct or indirect, against Colborn, except insofar as those accusations were made by Avery's attorneys in the course of Avery's criminal trial. Further **disputed** to the extent Colborn relies on his improper Addendum to support this allegation. *See* General Objections § I *supra*.

106.    In Episode 1 of MaM, an incident of animal abuse incident is portrayed as essentially an accident and that it was a product of Avery hanging out with the wrong friends. The incident is also portrayed using Avery's voiceovers. Conversely, Judge Willis' Decision and

Order describes the cat incident as the "defendant built a bonfire in his backyard, soaked a cat in gasoline and oil, and threw the cat in the fire. After the cat ran out of the fire, the defendant poured more gasoline on it before the animal died." Dkt. 290-14 at 10-13.

**Response: Disputed** as mischaracterizing the evidence, not "of and concerning" Colborn, and immaterial. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; *see also* Dkt. 309, General Objections 1-3; Dkt. 291 ¶¶ 3, 4, 47, 70.

107.    In Episode 1 of MaM, Avery describes several burglaries that he committed, explaining them as occurring when he and others were looking for something to do, and they decided to rob a tavern. MaM includes scene showing $14.00 in quarters and two six packs of Pabst beer and two cheese sandwiches, implying that this is what was taken in the burglaries. Dkt. 120-1 at 9:30-10:00.

**Response: Disputed** as mischaracterizing the evidence, not "of and concerning" Colborn, and immaterial. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; *see also* Dkt. 309, General Objections 1-3; Dkt. 291 ¶¶ 4, 70.

108.    In Episode 1 of MaM, an incident involving Sandy Morris is portrayed as brought on by her allegedly "spreading rumors" about Avery, leaving him befuddled as to how else to handle the situation. Dkt. 120-1 at 12:31-14:00.

**Response: Disputed** as mischaracterizing the evidence, not "of and concerning" Colborn, and immaterial. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; *see also* Dkt. 309, General Objections 1-3; Dkt. 291 ¶¶ 3, 4, 47, 70.

109.     At their depositions in this case, Defendants were unable to identify the individuals in the bar or provide any information about them, *see* Dkts. 286-3, 286-6, therefore Defendants cannot establish that the individuals who are represented as claiming that Avery was framed were from Manitowoc or that the bar at which they were playing pool was in Manitowoc.

**Response: Disputed** as vague, misleading, incomplete, and immaterial. Netflix does not know who Colborn means in referring to the collective "Defendants." There are four defendants in this case, yet this paragraph cites only to Netflix deposition transcripts. Netflix representative Lisa Nishimura testified that she does not know the identities of the unidentified bar patrons who appear in Episode 3 of *MaM*. *See* Dkt. 286-3 (Nishimura Tr.) at 172:18-20. With respect to whether Nishimura knew anything regarding whether the individuals were from Manitowoc or whether the bar was in Manitowoc, she was not asked that at her deposition. *See id*. at 172:1-173:3. Netflix representative Adam Del Deo testified that he does not recall whether he knew "the identities of any of those people at the time" of producing *MaM*. *See* Dkt. 286-6 (Del Deo Tr.) at 156:5-7. He was not asked at his deposition if he knew whether the individuals were from Manitowoc or whether the bar was in Manitowoc. *See id*. at 154:15-156:16; *see also* Dkt. 320, Prod. Def. Resp. PFOF ¶ 60.

110.     Although Episode 4 of MaM includes text on screen that states Investigator Wiegert and prosecutor Norm Gahn were present at the clerk of court's office inspecting the vial of Avery's blood, this scene in MaM does not show who was present at the time.

**Response: Disputed** as inaccurate, mischaracterizing the evidence, not "of and concerning" Colborn, and immaterial. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; *see also* Dkt. 309, General

Objections 1-3. Both Mark Wiegert and Norm Gahn's faces are shown in frame with the blood vial in the Styrofoam container. *See* Ep. 4 (Dkt. 120-4) at 1:03:33–1:03:41.

111.    In Episode 2 of MaM, where the jail call is first discussed by Stephen Glynn, all references to Colborn's status as a jail employee at the time of the call were omitted. Dkt. 120-2 at 17:20-18:25, 19:05-21:00; *see also* Barker Decl. Ex. 2 (Manhardt #509).

**Response:** **Disputed** as mischaracterizing the evidence, not "of and concerning" Colborn, and immaterial. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; Dkt. 309, General Objections 1-3; *see also* Ep. 7 (Dkt. 120-7) at 17:46-18:30 (including Colborn's testimony that he received the jail call "when I was working [in] my capacity as a corrections officer at the Manitowoc County Jail").

112.    Sgt. William Tyson did not testify that he had been told that Manitowoc County deputies should not be left alone on the Avery property, but he knew that a Manitowoc County district attorney had told the Manitowoc officers not to be alone on the property. Dkt. 290-19 at 23:17-25:4.

**Response:** **Disputed** as inaccurate. Tyson testified on the sixth day of the Avery trial, "It was told to me that no Manitowoc County deputy should be alone on the property." Third Walker Decl. Ex. 7 (CHRM009267) at 175:13-14 ("It was told to me that no Manitowoc County deputy should be alone on the property."); *see* Ep. 7 (Dkt. 120-7) at 3:36–6:19. **Undisputed** that in Tyson's continued testimony, he testified that he knew that a district attorney had also told the Manitowoc officers that they should not to be alone on the property. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; *see also* Dkt. 309, General Objections 1-2.

113.     The reason MaM included footage of prosecutors criticizing Avery's "frame-up" defense theory was in order for MaM to retell prosecutors' versions of events with rebuttals from Avery, his family, and his attorneys' out-of-court statements. Barker Decl. Ex. 2 (Manhard 493).

**Response: Disputed** as mischaracterizing the evidence, not "of and concerning" Colborn, immaterial, and attorney argument unsupported by evidence. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; Dkt. 309, General Objections 1-3; *see also* Dkt. 269 at 36-37 (including non-exhaustive bullet point list of "rebuttal" footage included in *MaM* supportive of law enforcement). The "reason" *MaM* included the referenced footage is that the Producer Defendants sought to tell a complete story. *See* Dkt. 288 ¶¶ 35, 46–48; 290 ¶¶ 34, 45–47 (explaining that, where the filmmakers did not have access to a subject of *MaM*, they still sought to include that subject's perspective through some other means, such as press conferences, newspaper clippings, or the like).

114.     Episode 7 of MaM uses an excerpt of news coverage of a reporter (who is unidentified) in order to set up Strang's response to the reporter that the evidence of the conspiracy in which Colborn is alleged by them to have participated is greater than that on which he has seen federal prosecutors convict defendants in conspiracy cases. Dkt. 120-7 at 24:30-25:47.

**Response: Disputed** as mischaracterizing the evidence and attorney argument unsupported by evidence. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; *see also* Dkt. 309, General Objections 1-2. The reason *MaM* included the referenced footage is that the Producer Defendants sought to tell a complete story that showed various differing viewpoints, including through press conferences,

legal proceedings, and news reports featuring, when sources otherwise were not available for or refused an interview. *See* Dkt. 291 ¶ 68; Dkt. 290 ¶¶ 13, 14, 85.

115.   Episode 8 of MaM includes numerous elements that are slanted toward or in favor of Avery and his supporters.

**Response: Disputed** as mischaracterizing the evidence, not "of and concerning" Colborn, vague, immaterial, and attorney argument not supported by evidence. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; *see also* Dkt. 309, General Objections 1-3.

116.   Episode 9 of MaM includes numerous elements heavily favoring Avery and his supporters.

**Response: Disputed** as mischaracterizing the evidence, not "of and concerning" Colborn, vague, immaterial, and attorney argument not supported by evidence. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; *see also* Dkt. 309, General Objections 1-3.

117.   Episode 10 of MaM includes numerous elements heavily favoring Avery and his supporters.

**Response: Disputed** as mischaracterizing the evidence, not "of and concerning" Colborn, vague, immaterial, and attorney argument not supported by evidence. *MaM* speaks for itself, and the Court must consider it as a whole and in context. *See* General Objections §§ I, III *supra*; *see also* Dkt. 309, General Objections 1-3.

118.   Netflix representatives noted the presence of potentially defamatory material in MaM on more than one occasion. Barker Decl. Ex. 1 (NFXCOL0002071).

**Response: Disputed** as inaccurate, misleading, removed from the context of the entire note, not "of and concerning" Colborn, and immaterial. The note, in context, reads, "20:30 – 21:00 – This Jerry Buting sequence is really powerful, let's just ensure his assertions aren't defamatory. His statement needs to align with the filings they made in court." Dkt. 330-1 at NFXCOL0002071. Contrary to Colborn's suggestion, this note shows exercise of care by Netflix; the note calls attention to a "powerful" sequence for consideration by the Producer Defendants, consistent with their promise to provide a "truthful and accurate" series to Netflix that did not defame anyone. *See* Dkt. 271 ¶¶ 86, 101. All Defendants took care to ensure the accuracy of the series within the scope of their respective roles. The Producer Defendants had their own legal team, and no one at Netflix vetted the series. Dkt. 271 ¶¶ 87, 89. Further noted that this isolated note does not support Colborn's allegation of "on more than one occasion."

119.     On numerous occasions, Netflix representatives provided direction indicating what was needed for the next round of edits and suggested, through their comments, additional changes that they wanted to see made. *See, e.g.*, Barker Decl. Ex. 1 (NFXCOL0000199-202, 208-210, 215-219).

**Response: Disputed** that Netflix "directed" *MaM* or required the Producer Defendants to make changes to it. **Undisputed** that Netflix would provide to the filmmakers "notes," which served as suggestions and jumping-off points for discussion, though not demands, and that the Netflix team helped shape *MaM* by reviewing edited, assembled footage—"cuts"—for their overall look and feel and from the perspective of a Netflix subscriber. *See* Dkt. 271 ¶¶ 95, 97. **Disputed** that just because a suggestion was made means it was necessarily implemented. For example, although Netflix suggested the filmmakers should "[p]otentially add Allan [Avery]'s quote from the top of Ep3 . . . to the cliffhanger" of Episode 2, the final version of Episode 2 that

was released includes no quotes or statements from Allan Avery at all. *See* Dkt. 309 ¶ 72 & Netflix's Response; *see also* Dkt. 320, Prod. Def. SPFOF ¶¶ 3, 9.

120.     After reviewing a revised version of Episode 5, Netflix observed that "setting up Colborn as the cop to potentially plant the car works really well now," showing that they were aware of changes between episode versions.

**Response: Undisputed** that Netflix representatives viewed several versions of Episode 5, and at one point, provided the filmmakers with the following note, "54:20 – Setting Colburn up as the potential cop to plant the car works really well now. Sensational and strong end to this episode." **Disputed** that this indicates Netflix was aware of all changes made between episode versions. Members of the Netflix creative team that worked on *MaM* did not conduct a side-by-side comparison of cuts to previous iterations in an attempt to understand what precisely the filmmakers added or cut to improve the flow of the episodes. *See* Dkt. 271 ¶ 96. The Netflix team was reviewing the cuts for their overall look and feel and from the perspective of a Netflix subscriber. *Id.* ¶ 95. Further noted that Avery and his counsel positioned Colborn as "the potential cop to plant the car," not Netflix. *MaM* simply documented what transpired at trial. *See* Dkt. 271 ¶ 31.

121.     Netflix can point to nothing in its creative notes that cautioned Chrome to avoid sacrificing accuracy in order to speed up the pace of a scene.

**Response: Disputed** as inaccurate and misleading. On several occasions, Netflix flagged for the filmmakers the need for the series to be truthful and accurate. *See, e.g.*, Dkt. 330-1 at NFXCOL0002071 ("20:30 – 21:00 – This Jerry Buting sequence is really powerful, let's just ensure his assertions aren't defamatory. His statement needs to align with the filings they made in court."); NFXCOL0000213 ("47:37 – Can we hold a bit longer on Colburn's face here. He

looks caught. Same at 48:10 – 48:25. We know this is court footage that may not exist. Just a suggestion."); NFXCOL0002079 ("51:55 – Triple check Buting's statement here for legal. He is directly claiming they framed Steven. Make sure this is 100% covered in their legal filings.").

122.    Netflix can point to no instruction advising the Chrome Defendants not to replace or substitute reactions or footage, which jurors may infer as consistent with Netflix's intent to "engage the viewer" at all costs, including the truth.

**Response:** **Disputed** as inaccurate. To provide just one example, the license agreement between the parties is a clear instruction from Netflix to the Producer Defendants that no edits to the series should be made which may compromise its truth or accuracy. *See* Dkt. 271 ¶ 86. *See also* Response to 122, above, which Defendants incorporate here by reference. Further **disputed** that what a jury may infer is not a fact, but a legal conclusion and attorney argument unsupported by evidence. It is therefore inappropriate for inclusion here as a response to a proposed material fact, and the Court should disregard it.

123.    Netflix received access to "cuts" of MaM that were never provided to Colborn. Dkt. 272 at 2 ¶ 5; Dkt. 275 at 2 ¶ 5.

**Response:** **Undisputed**, though immaterial. As explained to Colborn in discovery, Netflix had only fleeting access to the "cuts," did not retain them, and thus was not able to produce them in discovery.

124.    Netflix representatives visited Chrome's editing studio, from which jurors may infer that Netflix viewed raw footage and/or other source materials, despite the Netflix representatives' claims that they have little to no recollection of what occurred at those visits. Dkt. 279-38 at 2; Barker Decl. Ex. 15 (Nishimura Tr.) at 51-52.

**Response: Undisputed** that Netflix representatives visited the filmmakers at their editing studio. **Disputed** as immaterial. Further **disputed** that what a jury may infer is not a fact, but a legal conclusion and attorney argument unsupported by evidence. It is therefore inappropriate for inclusion here as a response to a proposed material fact, and the Court should disregard it. To the extent construed as a fact, Netflix disputes and denies this allegation. Colborn has provided no evidence to support this "inference," whereas Netflix has submitted evidence affirmatively establishing that no Netflix employee who worked on *MaM* ever received or reviewed raw footage of the underlying events depicted in *MaM*. *See* Dkt. 271 ¶ 110. Additionally, Netflix has submitted affirmative evidence establishing that no Netflix employee who worked on *MaM* ever received or reviewed any other source material from the events *MaM* documents, such as deposition or trial transcripts or exhibits. *Id.* ¶ 111.

125.    At his deposition in this case, Adam Del Deo admitted that he reviewed the series notes. Barker Decl. Ex. 16 (Del Deo Tr.) 89-90, 96.

**Response: Undisputed**.

126.    At her deposition in this case, Lisa Nishimura admitted that she reviewed the series notes. Barker Decl. Ex. 15 (Nishimura Tr.) 54-55.

**Response: Undisputed**.

127.    Nishimura and Del Deo encouraged Chrome Defendants to use techniques to portray law enforcement officers as "the baddies" and as "villains" of MaM because either they were intending MaM to convey that law enforcement planted evidence or they were being reckless as to truth or falsity.

**Response: Disputed** as a legal conclusion and attorney argument unsupported by evidence. Further **disputed** as inaccurate, misleading, removed from the context of the entire

note, not "of and concerning" Colborn, and immaterial. In the note remarking about "the baddies," Colborn was expressly omitted from the list. *See* Dkt. 279 Ex. 27 (NFXCOL0001976) at 2009. What's more, these notes are about music in the series, and therefore are not "statements" that can defame Colborn. *See* Dkt. 269 at 25; Dkt. 271 ¶ 150; Dkt. 309 ¶ 73 & Netflix's Response.

128. The woman with whom Colborn lives does not know of any physical manifestations of his alleged emotional distress because he does not discuss them with her.

**Response: Undisputed** that Colborn testified that his live-in girlfriend does not know of any physical manifestations of his alleged emotional distress and that he does not discuss them with her but further noted that, at his deposition in this case, Colborn testified that any physical manifestations of his alleged emotion address are so mild that even the woman he lives with is unable to observe them. *See* Dkt. 271 ¶ 132.

129. At his deposition in this case, Colborn testified that statements by third parties after the release of MaM harmed his reputation. Dkt. 279-2 (Colborn Tr.) 141:8-20.

**Response: Undisputed**. At his deposition in this case, Colborn also admitted that statements by several third parties during and after the Avery trial defamed him and led to death threats. *See* Dkt. 271 ¶ 140.

130. Netflix included in MaM commentary by Glynn regarding the jail call Colborn received. Dkt. 120-2 at 18:20-19:20.

**Response: Undisputed** that *MaM* includes statements of opinion by Glynn regarding the jail call Colborn received. *See* Dkt. 271 ¶¶ 35-36; *see also, e.g.*, Dkt. 309 ¶ 9 & Netflix's Response.

Dated:  December 9, 2022

Respectfully submitted,

*s/ Leita Walker*
Leita Walker
Isabella Salomão Nascimento
Ballard Spahr LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
T: (612) 371-6222
F: (612) 371-3207
walkerl@ballardspahr.com
salamaonascimentoi@ballardspahr.com

Matthew E. Kelley
Emmy Parsons
Ballard Spahr LLP
1909 K Street, NW, Suite 1200
Washington, D.C. 20006-1157
T: (202) 508-1112
F: (202) 661-2299
kelleym@ballardspahr.com
parsonse@ballardspahr.com

*Counsel for Netflix, Inc.*

s/ Kevin Vick
Kevin L. Vick
Meghan Fenzel
JASSY VICK CAROLAN LLP
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
T: (310) 870-7048
F: (310) 870-7010

*Counsel for Laura Ricciardi, Moira Demos,
and Chrome Media LLC*

s/ James A. Friedman
James A. Friedman
Godfrey & Kahn, S.C.
One East Main Street
Suite 500
Madison, WI 53703-3300
T: (608) 284-2617
F. (608) 257-0609
jfriedman@gklaw.com

*Counsel for all Defendants*