# *Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*

United States District Court for the District of Columbia

September 29, 2006, Decided ; September 29, 2006, Filed

Civil Action 04-01161 (HHK)

**Reporter**
2006 U.S. Dist. LEXIS 71858 *; 2006 WL 2844190

THOMAS G. HOULAHAN, Plaintiff, v. WORLD WIDE ASSOCIATION OF SPECIALTY PROGRAMS AND SCHOOLS, et al., Defendants.

**Subsequent History:** Motion to strike denied by *Houlahan v. World Wide Ass'n of Speciality Programs & Schs, 2007 U.S. Dist. LEXIS 95970 (D.D.C., Mar. 30, 2007)*

**Prior History:** *Houlahan v. World Wide Ass'n of Specialty Programs & Schs, 2006 U.S. Dist. LEXIS 17093 (D.D.C., Mar. 28, 2006)*

**Counsel:** [*1] For THOMAS G. HOULAHAN, Plaintiff: Jeffrey K. Walker, BLUELAW LLP, Washington, DC.

For WORLD WIDE ASSOCIATION OF SPECIALTY PROGRAMS AND SCHOOLS, A Corporation, KENNETH KAY, An individual, Defendants: David P. Durbin, JORDAN COYNE & SAVITS, LLP, Washington, DC.

For FREEMAN WALL AIELLO, A Partnership, JAMES WALL, An Individual, Defendants: Roger William Heald, Thomas Michael Hogan, HOGAN & HEALD, Fairfax, VA.

For C.S. LANDRE FOUNDATION, A Nonprofit Organization, LANCE LANDRE, An Individual, Defendants: John Carter Lynch, MACLEAY,LYNCH,GREGG & LYNCH, PC, Washington, DC.

**Judges:** Henry H. Kennedy, Jr., United States District Judge.

**Opinion by:** Henry H. Kennedy, Jr.

# Opinion

**MEMORANDUM OPINION AND ORDER**

In this suit, Thomas Houlahan alleges that the World Wide Association of Specialty Programs and Schools ("WWASPS"); WWASPS President, Kenneth Kay ("Kay"); and Lance Landre, President and CEO of the C.S. Landre Foundation ("Landre") (collectively "Defendants") intentionally interfered with Houlahan's prospective economic advantage and committed libel against him. Pursuant to *Federal Rule of Civil Procedure 56*, Defendants now move for partial summary [*2] judgment (Dkt. # 32/43). Upon consideration of the motions, the opposition thereto, and the record of this case, the court concludes that Defendants' motions must be granted in part and denied in part.

**I. BACKGROUND**

Since May 2003, Houlahan, a journalist writing principally for United Press International ("UPI"), has been investigating the teen behavior modification industry for a series of articles. First Am. Compl. PP 20-21. In the course of his investigation, Houlahan focused on alleged improprieties within facilities operated by WWASPS, one of the largest operators in the field. *Id.* PP 22-24. As such, Houlahan's investigation came to the attention of WWASPS and Kay. Landre also learned of the investigation given the Foundation's involvement in "provid[ing] funding for lower income families wishing to enroll their children in WWASPS facilities." *Id.* P 11.

In this suit, Houlahan alleges that, in response to his investigation, WWASPS, Kay, and Landre: (1) made defamatory statements about him and his work; (2) intentionally interfered with his prospective economic advantage by allegedly attempting to interfere with his relationship with his editor at UPI, Tobin Beck; [*3] and (3) engaged in abuse of process by filing a suit against Houlahan in a Utah federal district court alleging that Houlahan defamed WWASPS and tortiously interfered with WWASPS' contracts with its clients. [1] The court discusses each of these portions of Defendants' motions

---

[1] The Utah case was dismissed for lack of personal jurisdiction over Houlahan.

separately.

## II. ANALYSIS

Defendants move for summary judgment on each of these claims and also seek to limit any potential recovery that Houlahan may receive to nominal damages. [2]

### [*4] A. Intentional Interference with Prospective Economic Advantage

Houlahan alleges that Defendants intentionally interfered with his prospective economic advantage through their communications with UPI and Tobin Beck, a senior editor at UPI and Houlahan's former boss. To establish a claim for intentional interference with prospective economic advantage under District of Columbia law, the evidence must show: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage. *Bennett Enters., Inc. v. Domino's Pizza, Inc., 310 U.S. App. D.C. 192, 45 F.3d 493, 499 (D.C. Cir. 1995)*.

With regards to Landre, the court previously granted his motion to dismiss with respect to Houlahan's intentional interference claim because Houlahan failed to satisfy the cause of action's first element--the requirement that the plaintiff have a "valid business relationship or expectancy." *Houlahan v. World Wide Ass'n of Specialty Programs and Sch., 2006 U.S. Dist. LEXIS 17093, 2006 WL 785326, at \*4 (D.D.C. [\*5] 2006)*. Therefore, Landre's motion for partial summary judgment is moot as it pertains to Houlahan's intentional interference claim.

With respect to WWASPS and Kay, Houlahan's claim relies on the same factual basis as his claim against Landre--that WWASPS and Kay intentionally interfered with Houlahan's prospective economic advantage by negatively affecting his relationship with UPI. Although Houlahan's claim against WWASPS and Kay is worded slightly differently than his claim against Landre, [3] both claims pertain to Houlahan's work with UPI. Therefore, the court's previous determination that Houlahan did not have a "valid business relationship or expectancy" with UPI precludes any such claims predicated on this relationship. *See id.* As a result, the court grants Defendants' motion for summary judgment as to this issue.

### [*6] B. Defamation

Next, Defendants seek summary judgment regarding Houlahan's claim that Defendants made defamatory statements about Houlahan in e-mails they sent to Beck and to WWASPS support group leaders. WWASPS'/Kay's Mot. for Partial Summ. J. ("Defs.' Mot.") at 1; Landre's Mot. for Partial Summ. J. ("Landre's Mot.") at 2-3. Houlahan's libel claim against Landre and Foundation is premised on Houlahan's allegation that Landre allegedly made defamatory statements about Houlahan in an e-mail he sent to Houlahan's editor, Beck. First Am. Compl. PP 108-12. As for WWASPS and Kay, Houlahan cites two communications as the basis for his claim: (1) an allegedly defamatory e-mail about Houlahan that Kay sent to WWASPS support group leaders on behalf of WWASPS, and (2) an allegedly defamatory press release purportedly approved by Kay and sent to WWASPS supporter group leaders. *Id.* PP 93-98.

---

[2] Summary judgment is appropriate when there is "no genuine issue of material fact and[] the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In considering whether there is a triable issue of fact, the court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but… must set forth specific facts showing that there is a genuine issue for trial." *Id. at 248*. Moreover, "any factual assertions in the movant's affidavits will be accepted… as being true unless [the opposing party] submits his own affidavits or other documentary evidence contradicting the assertion." *Neal v. Kelly, 295 U.S. App. D.C. 350, 963 F.2d 453, 456 (D.C. Cir. 1992)*.

[3] Houlahan alleges that Landre intentionally interfered with his prospective economic advantage causing him to "suffer damage to his reputation and career." First Am. Compl. P 81. Houlahan's claim against WWASPS and Kay adds that Houlahan allegedly experienced "loss and delay of income, and economic loss and costs associated with correcting the false and/or misleading statements published by Mr. wall [sic]." First Am. Compl. P 73. This distinction, however, does not rectify the deficiencies in his claim.

To prevail on a defamation claim, a plaintiff must show: (i) a false and defamatory statement was written by the defendant about the plaintiff; (ii) the defendant published it without privilege to a third party; (iii) the defendant exhibited some fault in publishing the statement; and (iv) [*7] the statement is actionable as a matter of law or the publication has caused the plaintiff special harm." *Messina v. Fontana, 260 F. Supp. 2d 173, 176-77 (D.D.C. 2003)* (citing *Beeton v. Dist. of Columbia, 779 A.2d 918, 924 (D.C. 2001)*). For public figures, the fault element is more stringent. Such plaintiffs must show, by clear and convincing evidence, that a defendant published the defamatory statements with "actual malice--that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)* (internal quotations omitted); *see also Curtis Pub. Co. v. Butts, 388 U.S. 130, 164, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967)* (extending the *New York Times* actual malice standard for public officials to "public figures"); *Tavoulareas v. Piro, 260 U.S. App. D.C. 39, 817 F.2d 762, 788 (D.C. Cir. 1987)* (finding that actual malice turns on "whether there is *clear and convincing* evidence to permit the conclusion that the defendant in fact entertained serious doubt as to the truth of [their] publication") (quoting *St. Amant v. Thompson, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968))*. [*8] Here, the parties agree that Houlahan is a limited purpose public figure in his role as an investigative journalist. [4] Defs.' Mot. at 7; Pl.'s Opp'n to Defs.' Mot. for Partial Summ. J. ("Pl.'s Opp'n") at 7.

Defendants' motion raises two discrete issues concerning the sustainability of Houlahan's defamation claims: (1) whether Houlahan has properly alleged that Defendants made false statements about him; and (2) whether Defendants acted with actual malice. Viewing the evidence presented in the summary-judgment record in a light most favorable to Houlahan, and drawing all reasonable inferences in his favor, as we must, the court finds that [*9] Defendants' statements are actionable, and that genuine issues of material fact exist regarding whether Defendants acted with actual malice.

### 1. False and defamatory statements

To sustain his defamation claim Houlahan must demonstrate that there is a genuine issue of material fact surrounding the issue of whether Defendants made false and defamatory statements about him. *See Beeton, 779 A.2d at 923*. Each defendant, however, argues that the allegedly defamatory statements cannot properly provide the foundation for a defamation claim. Nevertheless, the court need now only address the statements made by WWASPS and Kay as the court previously determined that Landre's statements were indeed actionable. [5]

[*10] With regard to WWASPS and Kay, Defendants focus their motion on Houlahan's claim that Kay defamed Houlahan in an e-mail sent on February 23, 2004 to WWASPS support group leaders. Defs.' Mot. at 10-11; Pl.'s Opp'n at 25-31. The relevant portion of Kay's e-mail reads as follows:

> We now have documented, court filed information regarding Mr. Houlahan's contact and inappropriate legal advice, counseling, and psychological test coaching to an ex-student (minor). He is clearly out to damage us, our member schools, and your right as parents to do what you need to do for your families. We are not against any press doing a real story, but when certain lines are clearly crossed, we must take proactive action immediately. if you have not already had the opportunity to contact Tobin Beck… Editor for UPI, I would really appreciate your doing that….

Pl.'s Opp'n, Ex. 2 (E-mail dated Feb. 23, 2004).

Defendants assert two bases for their contention that their statements are non-actionable. The first is that Kay's statements about Houlahan's alleged "psychological test coaching"--referring to Houlahan's

---

[4] In *Waldbaum v. Fairchild Publ'ns, Inc., 201 U.S. App. D.C. 301, 627 F.2d 1287, 1297-99 (D.C. Cir. 1980)*, the D.C. Circuit set forth a three-part inquiry to identify limited purpose public figures. Having reviewed this standard, the court notes that it concludes independently that Houlahan was a public figure with respect to the debate on the teen behavior modification industry.

[5] In a decision dated March 28, 2006, the court found that Landre had implied in e-mail correspondence that Houlahan lied in reporting about WWASPS and therefore Houlahan had stated a valid claim for defamation. *See Houlahan, 2006 U.S. Dist. LEXIS 17093, 2006 WL 785326, at *2-3*. Although this decision was made in the context of Landre's motion to dismiss, Landre has not presented any additional factual evidence to the court that would undermine the reasoning of its previous decision.

allegedly improper e-mail contact with Kristina Mayeur,[6] a child enrolled [*11] in a WWASPS facility--are in fact true and therefore not defamatory. Defs.' Reply at 9-11.[7] Secondly, Defendants contend that the remaining portions of the e-mail cited above are "non-actionable opinions." Id.

Turning to Defendants' first argument, the court notes that Defendants do not cite to specific statements in Houlahan's e-mails that they believe [*12] demonstrate the "psychological test coaching" in which they maintain Houlahan engaged. Nevertheless, the court has identified at least two statements that could qualify as such: (1) "Here's the outline of points you'll[Kristina] need to cover in your reply;" and (2) "Here are the points you [Kristina] need to cover: You have read the psychologist's report and it is clear that there were several misunderstandings between you and the psychologist, which you would like to address." Pl.'s Opp'n, Ex. 8 (Clint Mayeur Aff.).

Despite these statements, Houlahan vehemently disputes that he engaged in "psychological test coaching to an ex-student." Pl.'s Opp'n at 26. Narrowly focusing on the specific words Kay employed, Houlahan argues that Kay's statement was "false and defamatory" because Houlahan did not coach Kristina for the psychological test, but rather spoke with Kristina about the "*results* of [her] psychological evaluation." Id. Houlahan further argues that his discussion with Kristina was "in response to Kristina's contention that her statements and views had been misrepresented by the psychologist and her questions about how to set the record straight." Id.

Upon [*13] examination of Kay's e-mail and Houlahan's e-mail exchange with Kristina, the court finds that a genuine issue of material fact exists regarding whether Kay's e-mail is defamatory. The set of e-mails between Houlahan and Kristina submitted to the court indicate that though they could be construed as involving "psychological test coaching," a reasonable jury could also find the opposite to be true. See Pl.'s Opp'n, Ex. 8 (Clint Mayeur Aff.).[8] In particular, the court finds that, while the phrasing of Kay's e-mail implies that Houlahan advised a student on how to manipulate a forthcoming psychological examination, Houlahan's e-mail exchange with Kristina Mayeur took place after she completed her psychological evaluation at WWASPS.

As for the remainder of Kay's e-mail, the court concludes that the additional statements are also capable of bearing, a [*14] defamatory meaning and therefore, are also actionable. See *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.D.C. 2000) ("It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule, as a matter of law, that it was not libelous.") (citations omitted). Contrary to Defendants' assertion, statements of opinion are not automatically immune from liability for defamation. *Houlahan, 2006 U.S. Dist. LEXIS 17093, 2006 WL 785326, at *2*; see also *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990) ("We are not persuaded that… an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the *First Amendment*"); *White v. Fraternal Order of Police*, 285 U.S. App. D.C. 273, 909 F.2d 512, 522 (D.C. Cir. 1990) ("[E]ven with a *per se* opinion, the question is whether the person has made an assertion that can reasonably be understood as implying provable facts.").

In *Milkovich,* the Supreme Court shifted its defamation and libel analysis away from whether a statement constitutes [*15] an opinion or fact--the framework set forth in *Ollman v. Evans*, 242 U.S. App. D.C. 301, 750 F.2d 970 (D.C. Cir. 1984)--to whether a statement makes direct or implicit factual assertions.[9] *Milkovich,*

---

[6] Kristina Mayeur is the daughter of Clint Mayeur, whose affidavit Kay relied on in constructing his e-mail to WWASPS support group leaders. Kristina was enrolled in Casa by the Sea, a WWASPS facility located in Mexico. The psychological test to which Kay refers is a test that WWASPS administered to Kristina, and the "psychological test coaching" ostensibly refers to Houlahan's e-mail exchanges with Kristina regarding the test. See Pl.'s Opp'n, Ex. 8 (Clint Mayeur Aff.).

[7] Defendants do not explain how Houlahan first came to know Kristina Mayeur. The court assumes that Houlahan's contact with Kristina arose out of his investigation of WWASPS.

[8] The Alaska court case referred to, distinct from the present case, involved the Mayeur family and did not involve Houlahan or any of the present defendants.

[9] To assess whether a statement is opinion or fact, the *Ollman* court endorsed a four-factor test: (1) the common usage or meaning of the specific language of the challenged statement itself; (2) the verifiability of the challenged statement; (3) the full context of the statement; and (4) the broader context or setting in which the statement appears. *750 F.2d at 979*. In interpreting the *Ollman* multifactor test in light of the *Milkovich* decision and its progeny, the District of Columbia Court of Appeals has clarified that "[a]lthough the Supreme Court has

497 U.S. at 18-19; see also Moldea v. New York Times Co., 304 U.S. App. D.C. 406, 15 F.3d 1137, 1144 (D.C. Cir. 1994) ("[I]t is now clear that… the relevant inquiry is no longer simply whether a challenged statement is 'fact' or 'opinion.'"). A close reading of Kay's challenged e-mail leads the court to conclude that the e-mail makes such an implicit factual assertion.

[*16] In particular, the court focuses on the statements: (1) "[Houlahan] is clearly out to damage us, our member schools, and your [WWASPS support group leaders] right as parents to do what you need to do for your families"; (2) "[W]e are not against any press doing a real story, but when certain lines are crossed, we must take proactive action immediately"; and (3) the assertion that Houlahan acted "inappropriately" in his contact with Kristina Mayeur. Pl.'s Opp'n, Ex. 2 (E-mail dated Feb. 23, 2004). Kay's statements suggest that Houlahan, allegedly armed with an agenda against WWASPS, utilized unreliable sources and improper reporting techniques, and spoke untruthfully about WWASPS and its programs. In deeming Houlahan's work not a "real story," and claiming that "certain lines [have been] clearly crossed" in his work, Kay suggests that Houlahan was engaged in substandard journalism. Such an assertion is a direct attack on Houlahan's professional integrity. See Guilford, 760 A.2d at 594 ("[A] statement is defamatory if it tends to injure [the] plaintiff in his [or her] trade, profession or community standing or lower him in the estimation of the community. [*17] ") (quoting Howard Univ. v. Best, 484 A.2d 958, 989 (D.C. 1984)). As such, Houlahan's claim is much like Moldea v. New York Times, where the court found that similar language attacking the integrity of a journalist's work contained factual assertions and was actionable. [10] 15 F.3d at 1145 ("In levying the charge of 'sloppy journalism,' it is inescapable that [the author] implies certain facts--that Moldea plays fast and loose with his sources, that his allegations are not to be believed.").

[*18] 2. Actual malice

In support of their motion, WWASPS and Kay also argue that, in writing the disputed e-mail, Kay reasonably relied on the affidavit of Clint Mayeur. Defs.' Mot. at 10. Thus, Defendants contend, Houlahan cannot meet his burden of showing that Defendants acted with actual malice because they had a factual basis for their statements.

In response, Houlahan offers various reasons why WWASPS and Kay should have questioned the veracity of Mayeur's affidavit and, by refusing to do so, acted with reckless disregard for the truth when publishing the allegedly defamatory statements about him. First, Houlahan argues that Mayeur spoke untruthfully in saying that Kristina's mother, Ms. Rupert, gave written consent for Kristina's enrollment at Casa by the Sea. Pl.'s Opp'n at 28. Houlahan further argues that Mayeur's claim that his new wife, Mrs. Mayeur, "received" the e-mails between Houlahan and Kristina was not believable because Kristina, who was adamantly opposed to returning to a WWASPS facility, would not have sent the e-mails to Mrs. Mayeur. Id at 28-29. Finally, Houlahan insists that Kay should have been skeptical of Mayeur's testimony given the animosity between [*19] Mayeur and Houlahan. Id. at 29.

Defendants summarily argue that they had "no reason to doubt the veracity of Mr. Mayeur's statements made under oath and to be used in a court proceeding" and that the information contained in Mayeur's affidavit was "not objectively suspicious or unreliable." Defs.' Reply at 11. The only evidence Defendants offer to support that cursory conclusion is that the affidavit was made under oath and was to be used in court. Defendants do not offer any further evidence as to how Mayeur was a reliable source or as to why they believed in the accuracy of Mayeur's statements. Nor do they provide any evidence to refute Houlahan's specific evidence suggesting the opposite. Furthermore, WWASPS and Kay do not identify any additional third party sources, aside from Mayeur, that served as a basis for Kay's e-mail.

In New York Times v. Sullivan, the Supreme Court held that defendants act with actual malice if they make a

---

made it clear, since Ollman was decided, that statements of 'opinion' are not constitutionally protected if they assert provably false and defamatory facts, the constitutional principles that animate [] Ollman remain equally compelling and equally good law today." Guilford, 760 A.2d at 583. Thus, the Ollman factors can continue to inform the court's inquiry, but cannot be the end point of that inquiry.

[10] On rehearing, the Court of Appeals narrowed the reach of its holding in Moldea I, concluding that "when a reviewer offers commentary that is tied to the work being reviewed, and that is a supportable interpretation of the author's work, that interpretation does not present a verifiable issue of fact that can be actionable in defamation." Moldea v. New York Times ("Moldea II"), 306 U.S. App. D.C. 1, 22 F.3d 310, 313 (D.C. Cir. 1994). Landre's e-mail is not such a review, and therefore Moldea I remains applicable.

statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *376 U.S. at 279-80*; *see also Lohrenz v. Donnelly, 358 U.S. App. D.C. 425, 350 F.3d 1272, 1283 (D.C. Cir. 2003)* (in order to find actual [*20] malice, a plaintiff must show "clear and convincing evidence 'to permit the conclusion that [defendants] in fact entertained serious doubts as to the truth of [their] publication"). Actual malice is a subjective standard, meaning plaintiffs must show not that a reasonable person should have had obvious reason to doubt the accuracy of their statements, but rather that defendants in fact harbored such doubts. *See Lohrenz, 350 F.3d at 1283* (actual malice is a "subjective state of mind determination"); *see also McFarlane v. Esquire Magazine, 316 U.S. App. D.C. 35, 74 F.3d 1296, 1306 (D.C. Cir. 1996)* ("[T]he question of actual malice turns on [defendant's] subjective beliefs and purposes at the time of publication.").

Although there is no precise test for deciding whether defendants acted with actual malice, since *New York Times v. Sullivan,* courts have set forth various criteria to aid them in making this determination. *See, e.g., St. Amant, 390 U.S. at 730.* In order to prevail on a defamation claim, a public figure must show that when defendants published the allegedly defamatory statements, they knew it was highly likely that the statements were: [*21] "(1) fabricated; (2) so inherently improbable that only a reckless person would have put [the statements] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [defendants] had obvious reasons to doubt." *Tavoulareas, 817 F.2d at 790* (quotations omitted). *See also Lohrenz, 350 F.3d at 1284-85.*

Turning to the instant case, the court finds that a genuine issue of material fact exists regarding Houlahan's allegation that Defendants acted with actual malice. Even a cursory reading of Mayeur's affidavit suggests that a reasonable jury could find him to be an unreliable source. The court is persuaded by Defendants' argument that "the [Mayeur] Affidavit and its attachments… show an entirely reasonable basis for the content and descriptions of Mr. Houlahan" unconvincing. Defs.' Mot. at 11; *see also St. Amant, 390 U.S. at 732* (defendants cannot "automatically insure a favorable verdict by testifying that [they] published with a belief that the statements were true."). In his affidavit, Mayeur allegedly revealed information about Houlahan's purportedly "improper advice and contact" [*22] with Mayeur's daughter. However, Mayeur's affidavit also suggests that he has a personal stake in ensuring that Kristina remained at WWASPS--the "private school in which [he] had enrolled [Kristina] with consent and paid over $ 9,000.00"--and that Mayeur's ex-wife, Ms. Rupert, and Houlahan did not interfere with that plan. *See* Pl.'s Opp'n, Ex. 8 P 12 (Clint Mayeur Aff:). At a minimum, Mayeur was a biased source, and therefore likely an unreliable one. *See id.* ("I [Mayeur] did not want our daughter[Kristina] to be the poster child for anti-behavioral modification schools.").

Furthermore, Mayeur demonstrates a grudge against Houlahan, also bolstering Houlahan's claim that Defendants acted with actual malice by willfully not investigating Mayeur's claims. *Cf. Beeton, 779 A.2d at 925* (finding plaintiff did not prove actual malice where "there was no evidence presented to establish any negative relationship between[plaintiff and defendants].") To illustrate, Mayeur states that "[Houlahan] called me a nasty, mean spirited evil person bent on hurting my daughter" and that "Houlahan… tells Kristina to tell the court things that are harmful [*23] about me and my desires." Pl.'s Opp'n, Ex.8 (Clint Mayeur Aff.). Both of these comments implicate the existence of a "negative relationship" between Mayeur and Houlahan.

It is true that Defendants' failure to further investigate Mayeur's affidavit does not, alone, constitute proof of actual malice. *See Harte-Hanks Commc'ns, 491 U.S. 657 at 692, 109 S. Ct. 2678, 105 L. Ed. 2d 562* ("Although failure to investigate will not alone support a finding of actual malice… the purposeful avoidance of the truth is in a different category."). Yet, the apparent falsity of some of Mayeur's statements--such as his suggestion that his ex-wife co-signed Kristina Mayeur's enrollment forms at Casa by the Sea, Pl.'s Opp'n, Ex. 8 (Clint Mayeur Aff.); and his claim that the e-mails between Kristina and Houlahan simply appeared in his current wife's inbox, *Id.* P 14--in conjunction with Mayeur's demonstrated animosity towards Houlahan, would allow a reasonable factfinder to conclude that Defendants acted with "wanton and reckless indifference" in publishing the challenged statements about Houlahan after relying solely on Mayeur's questionable affidavit. *See Curtis Publ'g, 388 U.S. at 156.*

Based on this analysis, [*24] the court denies Defendants' motion for summary judgment to the extent it asks the court to declare the truthfulness of the allegedly defamatory statements, and to the extent that it asks the court to find an absence of actual malice in the publication of said statements.

**C. Abuse of Process**

Proceeding next to Houlahan's abuse of process claim, Defendants assert that they filed the Utah lawsuit against Houlahan in an earnest attempt to recover damages for defamation and consequently, no abuse of process occurred. Houlahan counters that Defendants had no legitimate basis for their lawsuit, which he contends Defendants filed solely to stir negative publicity about him, to deter him from investigating WWASPS and revealing what he had learned about WWASPS programs, and to intimidate UPI into withholding publication of Houlahan's series on WWASPS. First Am. Compl. P 115. Houlahan also alleges that Defendants chose to file suit in Utah [11] to inconvenience Houlahan, who is domiciled in New Hampshire and is a resident of the District of Columbia, and to make it difficult for him to access the witnesses he needed for his defense. *Id.* PP 116.

[*25] To sustain an abuse of process claim, a plaintiff must show that "the [legal] process has been used [by defendants] to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do." *Morowitz v. Marvel, 423 A.2d 196, 198 (D.C. 1980)* (quotations omitted); *see also Tomai-Minogue v. State Farm Mut. Auto. Ins. Co., 770 F.2d 1228, 1237 (4th Cir. 1 985)* ("[A]buse of process is the improper use of otherwise regularly issued process in a manner not contemplated by law after its issuance."). Allegations that defendants acted with an improper or ulterior motive, without more, are insufficient to support a claim for abuse of process. *Bannum v. Citizens for a Safe Ward Five, Inc., 383 F. Supp. 2d 32, 47 (D.D.C. 2005)* ("Simply filing a lawsuit is not actionable, regardless of the ulterior motive that may have prompted the lawsuit."). Unlike a malicious prosecution claim, which involves the "institution of process for its ostensible result but without probable cause," an abuse of process claim [*26] "lies in the abuse of perversion of the process *after* it has been issued." *Kalantar v. Lufthansa German Airlines, 402 F. Supp. 2d 130, 150 (D.D.C. 2005)* (emphasis in original) (quotations omitted). *See generally* 20 CAUSES OF ACTION 223, *Cause of Action for Abuse of Process* (2005).

Despite Houlahan's protestations to the contrary, it is not the task of the court to determine whether WWASPS had an improper motive in bringing the Utah lawsuit against Houlahan--even a determination in the affirmative would not lend support to Houlahan's abuse of process claim. Under District of Columbia law, allegations that defendants had improper ulterior motives in suing plaintiffs are not enough to support plaintiffs' abuse of process claims in the absence of evidence demonstrating that defendants "attempt[ed] to compel plaintiff[s] to do some collateral thing which [they] could not legally and regularly be compelled to do." *Bannum, 383 F. Supp. 2d at 46*; *Morowitz, 423 A.2d at 198* ("[T]he mere issuance of the process is not actionable, *no matter what* ulterior motive may have prompted it; the gist of the action lies in the improper [*27] use after issuance.") (emphasis added). Houlahan has not shown any evidence that Defendants sought to compel him to do something which he could not regularly or legally be compelled to do. Defendants sought to recover damages from Houlahan for defamation, a perfectly legitimate result of the judicial process. Thus, Houlahan has failed to present evidence of a valid abuse of process claim, and the court grants defendant's motion for partial summary judgment on this claim. [12]

[*28] **D. Nominal Damages**

Finally, Defendants ask the court to limit Houlahan's potential recovery for his defamation claim to nominal damages despite Houlahan's assertion that the allegedly defamatory statements caused UPI to temporarily suspend him, Pl.'s Opp'n, Ex. 1 ("Houlahan's Affidavit") P 56, and caused him to suffer damage to: (1) his reputation as a reporter; (2) his relationship with his editor at UPI, Tobin Beck; and (3) his prospects of writing future articles for UPI. Pl.'s Opp'n at 11. Houlahan also claims that he suffered emotional damages and that he lost time and money in defending

---

[11] Defendant WWASPS is a corporation based in St. George, Utah.

[12] Houlahan requests that the court withhold judgment on Defendants' motion for partial summary judgment on the abuse of process claim until Houlahan's Motion to Compel Discovery, pending before the court, is decided. Pl.'s Opp'n at 20. However, with respect to his abuse of process claim, Houlahan seeks these documents to provide evidence of Defendants' intent to silence "legitimate criticism" of WWASPS through the initiation of lawsuits. Pl.'s Opp'n at 20. Yet, as the court has recognized, evidence of Defendants' ulterior motive in bringing the lawsuit against Houlahan would not be enough to demonstrate a proper abuse of process claim. *See Morowitz, 423 A.2d at 198*; *Bannum, 383 F. Supp. 2d at 46*.

himself in the Utah lawsuit that WWASPS filed against him. Houlahan's Affidavit P 46.

"A successful libel plaintiff can recover three types of damages--nominal, compensatory or punitive." *Robertson v. McCloskey, 680 F. Supp. 414, 415 (D.D.C. 1988)*. Compensatory damages may be "further subdivided into general and special damages." *Id.* General damages "compensate a plaintiff for harm to his reputation or emotional well-being; special damages… are awarded for losses of an economic or pecuniary nature." *Id.; see also Airlie Found., Inc. v. Evening Star Newspaper Co., 337 F. Supp. 421, 431 (D.D.C. 1972)* **[*29]** (holding that plaintiffs in defamation cases may recover for "general, intangible damages" ); *Afro-American Publ'g Co. v. Jaffe, 125 U.S. App. D.C. 70, 366 F.2d 649, 659 (D.C. Cir. 1966)* ("[P]laintiff need not show any pecuniary damage in order to establish the libel and recover nominal damages, or compensation for nonpecuniary damage.").

Examining first the damage to Houlahan's reputation as a reporter, the court finds little indication that any harm has occurred. Although Houlahan asserts that it is unlikely UPI will publish his series on WWASPS and that he is "certain" UPI will not hire him again in the future, Houlahan's Affidavit PP 59-60, he has not produced any evidence to support these assertions. By contrast, Defendants have proffered the testimony of Beck, Houlahan's editor, who testified that Defendants' statements about Houlahan did not affect his decision on whether to publish the series about WWASPS or his perception of Houlahan and the quality of his work. Defs.' Mot., Ex. B at 62 (Beck Dep.). Although the health of Houlahan's reputation as a reporter assuredly is not based solely on his relationship with Beck, the court finds this relationship to be a suitable proxy for **[*30]** determining the extent of any damages to Houlahan's reputation. Aside from WWASPS support group leaders, Beck was the main target of Defendants' statements about Houlahan and Houlahan's editor. If the allegedly defamatory statements were to have any negative impact on Houlahan's reputation, this damage would be manifested in Houlahan's relationship with Beck. Yet, there is no evidence in the record that shows such an effect.

Relatedly, Houlahan contends that his relationship with Beck, and with UPI generally, suffered following Defendants' e-mails to Beck. Pl.'s Opp'n at 11. Houlahan likewise alleges that, following Defendants' publications, he encountered numerous rewrites and delays in attempting to publish the WWASPS series. *Id.* Again, Beck's testimony contradicts Houlahan's contentions. Rather, Beck states that the delays were a result of Beck's concern that the series be as fair as possible and his ultimate decision that the series was not up to publishable standards. Defs.' Mot., Ex. B (Beck Dep.).

Similarly, Houlahan fails to offer evidence that Defendants' allegedly defamatory statements about him have permanently affected his employment prospects with UPI. Although Houlahan **[*31]** claims that he was temporarily suspended from working for UPI after Defendants' publications, he testified that he was able to convince UPI to lift the suspension after some explanation to his superiors about what had occurred with the WWASPS series. Houlahan Aff. PP 56-57. Houlahan's reinstatement shows that his employment relationship with UPI, while perhaps briefly troubled, was not permanently adversely affected. Thus, if damage to reputation and pecuniary loss were the only basis for recovery, Defendants' argument for nominal damages would have significant merit.

However, as mentioned above, if Houlahan prevails on his claim he is also entitled to general damages for his emotional distress. *See Gertz, 418 U.S. 323 at 350, 94 S. Ct. 2997, 41 L. Ed. 2d 789; Lewis, 628 F. Supp 512, at 524*. Plaintiffs need not show evidence of severe emotional distress to prevail on such a claim--"anger" and "outrage" at seeing the defamatory statements is sufficient. *Fiori v. Truck Drivers, Local 170, 354 F.3d 84, 87 (1st Cir. 2004)* ("[M]ental distress is the 'natural result' of libel.").

Houlahan has presented evidence--though somewhat limited--that he experienced mental anguish. Indeed, **[*32]** in his affidavit submitted to this court Houlahan testifies that he was outraged by Defendants' statements, and suffered "a certain amount" of mental hardship and loss of sleep. Houlahan's Aff. PP 48-50. Admittedly, however, he neither sought medical treatment as a result of Defendants' statements nor had anyone else testified on his behalf about any mental suffering he allegedly experienced.

Nevertheless, Defendants were unable to produce, nor could the court identify, any cases that hold that any evidence beyond a plaintiff's own testimony is necessary to establish damages for emotional distress in connection with a libel claim. Evidence of medical treatment might be necessary to prove a claim for intentional infliction of emotional distress, which requires that plaintiffs show they experienced severe emotional

distress, but the court finds Defendants' argument that such a standard should be imposed in defamation unpersuasive.

Finally, Defendants argue that punitive damages are not available to Houlahan because they allege that he is entitled only to nominal--not actual or compensatory--damages. Defs.' Reply at 7. However, because the court finds that Houlahan's recovery is not **[*33]** limited to nominal damages, it need not decide whether or not he is also entitled to punitive damages at this stage.

### III. CONCLUSION

Accordingly, it is this 29th day of September, 2006 hereby **ORDERED** that WWASPS' and Kay's Motion for Summary Judgment [# 32] is **GRANTED** in part and **DENIED** in part; and it is further **ORDERED** that Landre's Motion for Summary Judgment [# 43] is **GRANTED** in part and **DENIED** in part.

Henry H. Kennedy, Jr.

United States District Judge

**End of Document**