IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

_____

ANDREW L. COLBORN,

        Plaintiff

NETFLIX, INC., et al.,              Case No. 19-CV-484

        Defendants.

_____

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT**
_____

## INTRODUCTION

Plaintiff moved for partial summary judgment with respect to several issues concerning Defendants republication of defamatory third-party statements as part of their "Making a Murderer" ("MAM") broadcast, including (1) publication, (2) defamatory meaning, (3) actual malice, and (4) falsity. As further explained below, Defendants' responses fail to proffer any legitimate reason to deny the motion under the unique circumstances presented in this case.

## ARGUMENT

### I. Defendants Do Not Dispute Publication.

Defendants' responses do not appear to mention nor contest their publication of MAM.

### II. The Third-Party Allegations Repeated in MAM Are Defamatory.

Netflix and Chrome each argue that there is nothing defamatory about the statements that are contained in MAM and that are identified in Plaintiff's motion for partial summary judgment. Defendants largely rely on the tactic of considering each statement in isolation and out of context. As Plaintiff has explained on numerous occasions, Wisconsin law requires that a broadcast be considered in its entirety for purposes of a defamation claim. *Mach v. Allison*, 259 Wis. 2d 686, 656 N.W.2d 766, 712 (citing *Giwosky v. Journal Co.,* 237 N.W. 2d 36 (Wis. 1976)

and Rodney Smolla, Law of Defamation §4:32, pp. 4-50 to 4-51 (2d ed.)). The statements are identified by time of broadcast in Mr. Colborn's initial brief to assist the Court in locating the statements in MAM, and they are presented together in a chart because they collectively form a narrative that runs through the broadcast and which accuses Mr. Colborn of planting evidence.

Contrary to Defendants' arguments, it does not take a sophisticated linguistic analysis to discern the recuring accusation from the statements; in fact, it is directly stated on more than one occasion. To the extent that the Defendants contend that it is difficult to understand the accusation from the third-party statements identified in Mr. Colborn's initial brief, Plaintiff provides the following simplified synopsis:

- The statements identified from Episodes 1-2 at pp. 6-8 and most of page 9 of Mr. Colborn's opening brief (Dkt #285) collectively set up for viewers the notion that Mr. Colborn is someone who had an axe to grind against Steve Avery because Mr. Colborn allegedly mishandled a call to the Manitowoc County jail years prior to Mr. Avery's release from prison, with images of Mr. Colborn woven into the statements of Steven Glynn and others to emphasize Mr. Colborn as a key figure in an alleged "cover up."[1]

- The statements identified on page 9, starting with Mr. Avery's statement, "All I can think is they're trying to railroad me again," and through "See, if somebody else plants that shit there, you ain't going to see," from the bottom of page 9 through the first two statements identified on page 10 (Dkt #285), transition from the prior alleged "cover up" to Avery's accusations during the Halbach investigation that Sheriff's Department officers planted evidence against him in connection with the new investigation.

---

[1] The Defendants also provided false and inaccurate information about the call Colborn received as a jailer long before he became a law enforcement officer. An anonymous caller told him someone was in "jail" for an "assault" he may not have committed. See Dkt #120-14, Depo p. 11:1-6; and Dkt #120-15. As a jailer, Colborn was responsible for passing the information on to others in authority, a responsibility he fulfilled. But MAM omitted that information and, instead, quoted Stephen Glynn, one of Avery's attorneys for his civil Section 1983 case against Manitowoc County, who inaccurately related the caller informed Colborn that the man was "in prison," not jail, for a "sexual assault," rather than assault, and added Colborn should have written a report, something that as a correction officer Colborn could not do – a fact his 2005 deposition testimony confirmed. See Dkt #120-14, Depo p. 14:7-12 and Depo p. 5:12-24. Glynn's account appears in episode 2 at Dkt #120-2 at 17:20 – 21:40, but omits mention of Colborn's status of a corrections officer, until episode 5, which ends with Colborn's 2005 call to dispatch as its cliffhanger. The Defendants knew of these inaccuracies, since they possessed Colborn's 2003 statement and 2005 deposition testimony, which appeared in MAM. *See* Dkt #120-2 18:20-19:04 and Dkt# 290-7.

2

- The next three sets of statements include unidentified pool hall patrons confirming that Mr. Avery was framed by the Manitowoc County Sheriff's Department for Ms. Halbach's murder. Dkt #285 at p. 10.

- The next statement includes Avery's statement to his sister that "they figure they just got away with it [an obvious reference to the civil suit settlement for the prior wrongful conviction], they can do it again . . . ." Dkt #285 at p. 10.

- In the next two statements Avery's new criminal defense attorneys, Dean Strang and Jerome Buting, first muse about officers' alleged motivation to plant evidence and then directly accuse them of doing so: ". . . .they thought, `We're going to make sure he's convicted.' **And they helped it along by planting his blood in the RAV4 and by planting that key in his bedroom**." Dkt #285 at p. 11 (emphasis added). These are out-of-court statements that appear to be made in interviews.

- In the next four statements, Buting continues discussing the framing allegations, then asserts that the Sheriff has a "strong dislike for Avery" and therefore, the attitude would "permeate the upper echelon" of the department, including "the lieutenants and the sergeants." At this point, Mr. Colborn's and Jim Lenk's photographs are shown as suddenly illuminated compared to other photographs in a supposed department photo hierarchy. Dkt #285 at p. 11. After the sequence revealing supposed tampering with a vial of Avery's blood that had been stored at the courthouse, Buting says, **"Some officer went into that file, opened it up, took a sample of Steve Avery's blood and planted it in the RAV4."** *Id.*(emphasis added). Again, this is an out-of-court statement. Defense arguments to the jury at the Avery criminal trial side-stepped such direct accusations, as the defense argument was that any reasonable doubt as to whether officers could have planted evidence should compel a "not guilty" verdict. *See* Dkt #330-19 at pp. 46-48.

- In the next three statements, first, Buting states, again, out of court, **"Somebody knew that [Ms. Halbach's] vehicle was there before they ever went there. I'm convinced of it."** Dkt #285 at p. 11 (emphasis added). A brief segment of an apparent interrogation of Avery follows, in which he tells the interrogator that he as told that "**a cop**" put Ms. Halbach's vehicle on his property and "**planted evidence**." *Id.* (emphasis added). MAM next cuts to footage of Mr. Colborn about to testify. *Id*. At the conclusion of the same episode, Mr. Colborn's edited testimony appears to show him admitting that his call to dispatch made it sound as though he was looking at Ms. Halbach's vehicle when he made the call. *See* Dkt #120-5 at 55:25-56:30.[2]

---

[2] Actual malice, especially reckless disregard, depends as much on what the Defendants failed to do and say as it does on what they actually did and said. Here the Defendants advanced an elaborate story that Colborn discovered the Halbach vehicle and none too subtly suggested that Colborn or others surreptitiously transported the car to the Avery salvage yard to plant that evidence. To accomplish this exposition, they altered Colborn's trial testimony to attribute answers to him he never gave, and ignored the most basic of evidence that refuted the thesis. A Manitowoc County sheriff's department record – its

3

- In the next identified statements, Buting explains, again out of Court, that only two, or possibly one, officer would have had to conspire to plant evidence, concluding, "You know, who better than a police officer would know how to frame somebody?" *Id.*

- In the next identified statement, Avery's father directly accuses authorities of setting up Avery, stating, "***They set him up. Right from the beginning. . . .***" *Id.* (emphasis added).

- The next identified statements include an exchange between Buting and Strang in which they appear to discuss the alleged planting of the key in Ms. Halbach's key in Avery's bedroom, concluding with Buting stating that the "bottom line" is that "they knew their boss had just recused the department and turned over lead authority in this investigation. . . . because of that lawsuit. They were deposed in the lawsuit. They didn't tell . . . ." Dkt #285 at p. 12. The statements obviously refer to Mr. Colborn and Mr. Lenk, members of the Sheriff's Department who had both been deposed in the Avery civil suit (as had been described in detail in Episode 2, Dkt #120-2), and who were both in the room at the time that the key was discovered. *See* Dkt #120-7 at 10:45-12:00 Dkt #290-19, transcript pp. 129-132.

- In the next identified statement, from the same episode (Episode 7), Avery's voiceover is used to again accuse Mr. Colborn and Mr. Lenk of wrongdoing against him, stating, "I'm in the same situation I was before. Just a couple of them wanting to nail me. . . . I gotta go through this over and over." Dkt #285 at p. 12. In light of Buting's and Strang's prior statements in the same episode, and prior episode statements in which Mr. Colborn's and Mr. Lenk's photographs were illuminated by MAM and in which Mr. Colborn's testimony is juxtaposed immediately following Buting's and Avery's accusations, respectively, that "some officer" and "a cop" planted Ms. Halbach's vehicle on the Avery property, it is obvious that Mr. Colborn is being referenced as one of the "couple of them" wanting to "nail" Avery. However, in case anyone might have missed that

---

dispatcher's log – records in real time the calls dispatchers receive. The November 3 log showed both a call likely from Investigator Weigert to Colborn, as the officer in charge, at 18:34 reporting Halbach and her vehicle missing and a call likely to be Colborn's call to dispatch three minutes later at 18:37 verifying the basic vehicle information. See Dkt# 289-10 p. 33. This corroborated Colborn's explanation in testimony (Dkt #290-19, transcript pp. 184-185) of the call MAM featured but distorted, yet MAM never mentioned the document. See Plaintiff's response to the Chrome defendants Statement of Proposed Material Facts POF #24 (See Dkt #324 p. 9-10) that lays out the timing and facts of Colborn's call to dispatch. While the Defendants have vaunted their investigation's detail and thoroughness here and elsewhere, they have never explained the absence of this most basic of records from the documentary. One obvious explanation is that the Defendants wanted nothing to do with records that undermined their central thesis. That is a classic display of their reckless disregard of the truth. Contrary to Defendants' arguments, the evidence of actual malice in this case does not consist solely of failure to investigate, but, rather, includes selective investigation and presentation of facts, distortion of Plaintiff's own testimony and appearance, and Defendants' communications that unmistakably expose their joint efforts to sculpt MAM toward a preconceived narrative that portrayed Plaintiff as a key participant in a conspiracy to plant evidence against Avery.

4

- reference, MAM dispels any doubt by immediately juxtaposing an image of Mr. Colborn as Avery continues speaking, then juxtaposes images of Mr. Colborn waiting to testify and Avery looking sad. *Id.*

- In the next identified statement, a question by a reporter to Dean Strang, speaking out of court, concludes with Strang shown asserting that the "evidence" against Mr. Colborn (who was directly referenced in the reporter's question*) is stronger than evidence that has been used to prove conspiracies in federal court.* Dkt #285 at p. 12.

- Later in the same episode, Avery's mother states in a telephone conversation that "It seems suspicious" and that "Them people ain't gonna get away with everything," another reference that builds on all the prior accusations against Mr. Colborn. *Id.*

There can be no reasonable argument that educated, intelligent persons such as the representatives of Netflix and Chrome who produced MAM could possibly have failed to appreciate the collective impact of accusations by Avery, his family members and attorneys that Manitowoc County Sheriff's Department officers planted evidence to frame him for Ms. Halbach's murder. In fact, they did. Dkt #330-1, pp. 50-51. MAM emphasized at every turn that these accusations pertained to Mr. Colborn, as noted above, through juxtaposition of videos and other gimmicks designed to draw attention to Mr. Colborn while they were repeated.

Also contrary to Defendants' arguments, these accusations are never genuinely disputed by anything in MAM. Rather, statements made by law enforcement and prosecution "characters" in MAM were included to let them "have [their] day" as a prelude to retelling their perspectives by "our more reliable narrators" (*i.e.*, Avery and his advocates) thereafter. S*ee* Dkt #330-2, p. 39, Manhardt 493. Further, supposedly including a cautionary statement does not insulate the publisher from liability for a defamatory statement where the "unmistakable theme" of the publication is to the contrary. *See, e.g., Hatfill v. New York Times,* 416 F.3d 320, 333-34 (4th Cir. 2005). This rule is only common sense; otherwise, every person could defame anyone else with impunity through the simple artifice of tagging a perfunctory "but he denies it" after accusations

5

of all manner of reprehensible conduct. Indeed, in MAM, the denials were altered to deliberately misrepresent the manner of Mr. Colborn's testimony, *cf. Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511 (1991), so the denials that Defendants claim exonerate them are additional falsehoods. Having weaponized Mr. Colborn's own statements against him, Defendants cannot credibly claim that the statements soften the blow of third parties' direct accusations. But to the extent that the statements may be construed as ambiguous as to whether they are defamatory to Mr. Colborn, a question of fact would be presented for the jury.

### III. Defendants' Arguments Fail to Redeem MAM's Third-Party Accusations.

Defendants wrongly characterize *Global Relief Foundation, Inc., v. New York Times Co.,* 390 F.3d 973, 987 (7th Cir. 2004), as controlling authority. As Defendants have acknowledged in other submissions, in this diversity case, the Court applies the law of the state in which it sits, which means that Wisconsin law controls. *See, e.g., McCloud Constr., Inc. v. Home Depot, USA,* 149 F.Supp.2d 695, 699 (E.D. Wis. 2001). *Global Relief* applies Illinois law. 390 F.3d at 981.

In Wisconsin, the defense of "substantial truth" can excuse "[s]light inaccuracies of expression" where a defamatory charge is "true in substance." *Prahl v. Brosamle,* 98 Wis. 2d 130, 141, 295 N.W.2d 768, 776 (Wis. Ct. App. 1980) (quoting 581A Restatement (2d) of Torts at 237 (1965)). However, a false statement that a person has been charged with (or committed) a crime "is not a slight inaccuracy." *Id.* The defense of substantial truth does not "sanitize" glaring falsehoods, even when presented in a "series of true or substantially true statements." *Id.*

Further as Plaintiff explained in his prior submissions, *Global Relief* concerned reporting about a party that had been investigated by a government agency for misconduct. In contrast, here, Defendants made direct accusations against Plaintiff and others that were not leveled by any government actor, but only by a convicted murderer who was attempting to cast doubt on his

6

guilt.[3] Moreover, that defendant – Avery – did not even testify at his trial, yet many of his direct accusations are included in MAM. That Defendants' broadcast had more "sting" than the Avery trial is evident in the reactions Mr. Colborn encountered after MAM. Dkt #317, p.4, ¶29.

In *Fin. Fiduciaries, LLC v. Gannett Co., Inc.,* 46 F. 4th 654 (7th Cir. 2022), on which Defendants also heavily rely, the Court considered a newspaper defendant's reporting about a financial adviser who was sued for mishandling funds. 46 F.4th at 661. The newspaper's reporting about the allegations against him and the ultimate holding of the Court that he engaged in "bad faith" were reported. *Id.* Here, Defendants buttressed and magnified theories that a convicted murderer's counsel suggested could provide reasonable doubt and, through statements that were never made in Court and juxtaposed video imagery, made them into express and implied factual accusations that were published after the criminal conviction and that directly accused Mr. Colborn of planting evidence to ensure the conviction. The facts of this case are worlds apart from those considered in *Global Relief and Financial Fiduciaries*.

Nor is this a case about "interpretation" of "ambiguous" source materials, as Chrome argues. Defendants deliberately enhanced and republished express accusations of criminal conduct based on the word of a convicted murderer. If "rational interpretation" authorized false accusations of criminal conduct, it would swallow defamation law whole.

**IV.     Defendants' Actual Malice Can Be Determined As a Matter of Law.**

Defendants argue that their alleged subjective intent cannot be determined on summary judgment as a matter of law. Plaintiff agrees that in many, if not most cases, the question of subjective intent in an actual malice determination should be determined by a jury. *See, e.g.,*

---

[3] Contrary to suggestions by Netflix that no reasonable person would give credence to the assertions of a convicted murder, production notes show that Defendants intended to inspire confidence in Avery. Defendants sought to titillate viewers with a story that portrayed the Averys as "underdog heroes," Dkt #330-2 at p. 1, Manhardt 63, and law enforcement as corrupt.

7

*Eramo v. Rolling Stone,* 209 F.Supp.3d 862, 874-75 (W.D. Va. 2016), reconsideration granted to submit to the jury whether certain statements were "of and concerning" plaintiff, 2016 US Dist. LEXIS 141423. But a party is deemed to have subjectively intended the obvious consequences of that party's actions, and external indicia of subjective intent, not an "ontological" analysis of a person's "inner thoughts," is necessarily the basis for determinations of subjective intent. *Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 859 (7th Cir. 1992). In defamation cases particularly, a defendant's subjective intent may be established by circumstantial evidence, including evidence of the defendant's actions. *See, e.g., Eramo, supra*, at 871-72. On summary judgment, only reasonable inferences are considered. *Box v. A&P Tea Co.,* 772 F.3d 1372, 1379 (7th Cir. 1985).

Here, as explained in Plaintiff's initial brief, Defendants acknowledged that they created and/or viewed and approved MAM. There can therefore be no dispute that they were aware that the third-party statements were contained in MAM. Further, as explained above, it does not take a sophisticated linguistic analysis to understand that the statements, viewed in their totality (and some individually as well) accuse Mr. Colborn of planting evidence to frame Avery.

Moreover, numerous viewers obviously understood the accusations, as explained in Plaintiff's initial brief. There is simply no reasonable inference that can be drawn from the facts to support Defendants' bare allegations that they were unaware of the defamatory nature of the third-party allegations, or that any such interpretation was accidental, when so many irate viewers knew exactly what the statements conveyed, and Defendants' own communications urged shaping the content so as to make viewers "terrified and enraged." Dkt #330-1:102. Further, while Defendants claim that those who contacted Mr. Colborn were "unreasonable" for doing so, that does not mean that their interpretation of MAM's accusations was unreasonable.

**V.     It Is Not Plausible That The Accusations Were Published in Ignorance.**

Defendants also argue that *St. Amant v. Thompson,* 390 U.S. 727 (1968), does not support the proposition that actual malice can be proven by reliance on sources whose credibility the publisher has obvious reasons to doubt. But other courts have interpreted it as so holding. *See, e.g., Harte-Hanks Communications v. Cannaughton,* 491 U.S. 657, 688 (1989) ("In a case such as this involving the reporting of a third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. *St. Amant, supra,* at 752"); *Eramo, supra,* 209 F.Supp.3d at 872 (stating, "*see also St. Amant*, 390 U.S. at 732 `([R]ecklessness may be found where there are obvious reasons to doubt the informant.'") Courts likewise agree that reliance on inherently improbable statements or information that is obviously dubious may show actual malice. *See, e.g., Harte-Hanks Communications, supra,* 491 U.S. at 691 (upholding actual malice finding where there a source's own manner of speaking raised "obvious doubts" about the "veracity" of the speaker); *Butowsky v. Folkenflik,* 2019 U.S. Dist. LEXIS 132268 (E.D. Tex.) at **28, 33, 36 ("debunked and unreliable" source); *see also Curtis Publishing Co. v. Butts*, 388 U.S. 130, 157 (1987) (upholding actual malice finding where publication cited unreliable affiant). Further, a biased source is recognized as "likely an unreliable one" for purposes of an actual malice analysis, particularly where the source carries an evident grudge. *See Houlihan v. World Wide Ass'n of Specialty Programs & Sch.,* 2006 U.S. Dist. LEXIS 71858 (D.D.C.) at *22.

That a defendant shaped facts to conform to a preconceived narrative is further evidence of actual malice*, Butowsky, supra,* at *32, something the producers' public interview corroborated happened here. From the start, Ms. Demos and Ms. Ricciardi related on the podcast "The Crime Story" they promised Steven Avery "to tell his story" and cultivated Avery and his

9

family in order to win their trust. Below is the link to the story that was produced in discovery as Colborn004918 – 00495: https://crimestory.com/2020/01/02/episode-83-the-twelve-days-of-crime-story-day-11-moira-demos-and-laura-ricciardi-making-a-murderer/

They grew close and built "a rapport" so as to foster that relationship; "It was very intimate," they said. From the outset, they regarded Steven Avery as the program's "protagonist" and law enforcement as his "antagonist." *See also* Ricciardi testimony at Dkt #330-10:2-3. Regardless of what the Defendants claim now, they endeavored to create a false narrative that Colborn and members of law enforcement framed Avery for a murder he never committed.

Defendants repeated and fortified accusations by a convicted murderer and his family members and juxtaposed Plaintiff's images with those statements in a way that implicates him in a criminal conspiracy. This is the rare case in which reckless disregard for the truth cannot plausibly be disputed, particularly given Defendants' hunger for a story so inflammatory that viewers would be "shouting at their television sets across the world." Dkt #330-1:114.

## VI. Defendants Admit that Mr. Colborn Testified to the Falsity of "Planting Evidence" Accusations, And They Can Produce No Evidence in Response.

Defendants argue that Mr. Colborn must reiterate his prior testimony denying that he planted evidence in order to put the falsity of any "planting evidence" claims in issue for purposes of summary judgment because his prior testimony is inadmissible in this case. But in fact, Mr. Colborn's prior testimony may be admissible as a prior consistent statement at trial, for example, to support Mr. Colborn's testimony when his credibility is challenged on another ground, such as Defendants' litany of irrelevant accusations in their respective briefs, should any of them be admitted at trial. F.R.E. 801(d)(1)(B)(ii); *see also* Advisory Committee Note, (d) ("Under the rule, they [prior consistent statements] are substantive evidence."). Further, this is a non-issue because Defendants admit in their own proposed findings of fact that Mr. Colborn has

10

denied under oath that he planted evidence. Dkt #326:21-22, Chrome Proposed Finding of Fact #59 (MAM shows Mr. Colborn testifying that he never planted evidence); Dkt #323:29, Netflix PFOF #63 (MAM includes Mr. Colborn's denial at the Avery trial that he planted evidence); *see also* Dkt #323:10 Netflix PFOF #19 (Colborn testified that Avery civil lawsuit did not cause them to plant evidence); *see also Wilson v. Baptiste*, 2016 U.S. Dist. LEXIS 92801 (N.D. Ill) at **5-6 (on cross motions for summary judgment, all materials are considered). Defendants affirmatively posit that Mr. Colborn has denied under oath that he planted evidence.

In response, Defendants offer nothing that could possibly be construed as evidence that could overcome Mr. Colborn's denial. To the contrary, they reallege the rank speculation that MAM portrayed as unrefuted facts, allegedly buttressed by inadmissible hearsay and lay opinion observations of a former juror (which contradict a reasonable view of the raw footage of Mr. Colborn's testimony as provided by Defendants, *see, e.g.,* Dkt #312) and inadmissible hearsay and lay opinion observations from Defendant's former counsel. Dkt #319 at pp. 16-17. Defendants also use their brief as an excuse to further attack Mr. Colborn based on a random list of supposed grievances, including Chrome's after-the-fact swipe at a stipulation that Mr. Colborn entered into with Netflix prior to his deposition. Chrome claims that Mr. Colborn "falsely" claimed that MAM destroyed his marriage but was "forced to backtrack." Dkt #319 at p. 17. In fact, Mr. Colborn was not "forced" to do anything. He stipulated only that *for purposes of this case*, he would not contend that his marriage was affected by MAM. Dkt #213 at ¶13. It is improper for Defendants to now misrepresent as fact their speculation regarding Mr. Colborn's decision to enter the stipulation. Similarly, Chrome falsely claims that Mr. Colborn violated work policies by participating in an interview for another documentary. Dkt #319 at p. 17. In fact, Mr. Colborn had obtained his supervisor's permission. Dkt #317, ¶27.

11

Moreover, regardless of whether the Court grants Mr. Colborn's motion as to the element of falsity that he must otherwise prove at trial for purposes of his claim against Defendants, the Defendants have also asserted truth as an affirmative defense. See Dkt #181 at p. 29 ("Fourth Defense") (Netflix Answer); Dkt #182 at p. 11, ¶3 (Chrome Answer). Defendants' own authority states that a plaintiff may need to prove literal falsity, but a defendant bears the burden to establish "substantial truth," which entails a different analysis. *Global Relief,* 390 F.3d at 982. Summary judgment should be granted as to "planting" offered as alleged substantial truth.

Ultimately, Defendants' responses confirm that there are no facts that could establish that Mr. Colborn planted evidence to frame Avery. But to the extent that the Court may decline to grant summary judgment as to this issue, Plaintiff respectfully requests that the Court do so without prejudice to a motion *in limine* to avoid waste of time at trial based on any speculative theories that Defendants may seek to introduce. Any such efforts by Defendants would be all the more specious given that it is now common knowledge that even Avery himself has stated under oath in his post-conviction proceedings that he no longer believes that law enforcement officers planted his blood in Ms. Halbach's SUV and his counsel has attempted to implicate Mr. Avery's nephew Bobby Dassey in planting the SUV. State v. Avery, Case No. 05-CF-381, Document 1065, p. 26 at ¶¶62, 65, AVERY+PCP+8.16.22+FILED.pdf (squarespace.com).

## VII. Defendants' Remaining Arguments are Without Merit.

Defendants' remaining arguments should be disregarded as inapposite or simply meritless, including Defendants' belated attempts to attack the Second Amended Complaint. In what appears to be an attempt to revive denied motions to dismiss, Defendants criticize Plaintiff for allegedly not identifying well enough for them each of the defamatory statements in the 10-episode series. In fact, even though federal law does not require Plaintiff to reiterate each and

12

Case 1:19-cv-00484-BHL    Filed 12/09/22    Page 12 of 16    Document 355

every defamatory statement, *see, e.g., Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 926 (7th Cir. 2003) (heightened pleading standards do not apply to defamation claims in federal court), Plaintiff went above and beyond by attempting to list many of the defamatory statements in separate exhibits to his complaint. Moreover, this Court already denied prior motions to dismiss the complaint, concluding that Plaintiff stated claims for relief.

Defendants also claim that Mr. Colborn's argument that some of MAM's statements defame him by implication is a "new" theory in this case. Dkt #307 at p. 8. Mr. Colborn was not required to plead legal theories. *Hatmaker v. Memorial Medical Center,* 619 F.3d 741, 743 (7th Cir. 2010). However, the Second Amended Complaint put Defendants on notice that among other tactics, Defendants defamed Mr. Colborn by, among other things, omitting, distorting, and falsifying material, Dkt #105, ¶¶20, 27; misleading viewers, ¶38; casting aspersions against him, ¶38; implying things, ¶39; and slanting and distorting the truth and sensationalizing their broadcast, ¶66. Moreover, the words, "implies, implying, implicated," and variants thereof were used to describe MAM's defamation dozens of times in Mr. Colborn's brief opposing Netflix's second motion to dismiss. Dkt #131 at pp. 17, 20, 21 at chart item #13, 22 at #16, 18, 23, 24, 25 at #26, 26 at #28, 28 at #35 ("classic defamation by implication/insinuation/innuendo"), 29 at #39 ("directly implicating Mr. Colborn"), 31 at #45, 32 at #48, 33 at #49, 35 at #54 ("MAM has repeatedly implicated Mr. Colborn as a member of the alleged conspiracy"), 37 ("replete with express and implied allegations that Mr. Colborn participated in a conspiracy"), 39, 48, 50, 55, 67-68 (several references, including "the statements expressly and impliedly accuse Mr. Colborn of both committing a crime and lying under oath"), 69, 71, 73, 75 ("Statements May Be Defamatory By Implication, Insinuation, or Innuendo,"), 76-77, 89, 93.

13

Defendants also repeatedly chastise Mr. Colborn for bringing this suit without having personally seen the entire series. The series is in the court record. Mr. Colborn's legal counsel represents his legal position as to MAM, just as Netflix's counsel undoubtedly takes legal action on its behalf even when its CEO has not read every word of every allegedly supporting document. As expressed in earlier briefing, Colborn brought suit not because Netflix offended him; he sued because it lied about him, and people who watched the program believed those lies.

Netflix also argues that Mr. Colborn is somehow bound in this civil proceeding by statements made by the judge in Avery's criminal trial while deciding pretrial motions. Dkt #307 at p. 9. Netflix of course cites no authority explaining how a civil litigant who was not a party to a prior criminal proceeding could be bound by anything that occurs during that proceeding, and Plaintiff's counsel is aware of no claim or issue preclusion authority that so holds. The only issue that was finally adjudicated in Avery's trial was that Steven Avery was guilty of murdering Teresa Halbach, with the jury rejecting – beyond a reasonable doubt – any arguments otherwise.

Netflix further bombastically argues that the foundations of Western journalism will crumble if Mr. Colborn's claims are permitted to proceed to trial. In support, Netflix points to examples such as reporting about the criminal trial of Kyle Rittenhouse following the unrest in Racine, Wisconsin. In so arguing, Netflix embraces the same philosophy as MAM itself, refusing to acknowledge the distinction between fair reporting about a criminal trial against a criminal defendant, on the one hand, and flat-out accusations by a criminal defendant and his family and attorneys, published after a criminal defendant has been found guilty, that someone else was responsible for the crime that he committed and/or other crimes. To avoid liability for defamation in cases like this, one need only avoid making, enhancing, or republishing statements that accuse of criminal conduct individuals who have not been convicted nor even charged. That

14

such statements are actionable as defamation has been the law for centuries. As one Court put it, "No First Amendment protection enfolds false charges of criminal behavior." *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 63-64 (2d Cir. 1980) (citation and quotation omitted).

Netflix also includes in several places in its "Appendix" assertions that some republished statements are "nonactionable opinion." Dkt #307 at p. 15; *see also* Dkt #308. The argument is undeveloped, but Glynn, Avery, and the others' statements imply factual assertions, and are therefore actionable. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990).

Finally, Netflix includes in its "Appendix" several claims that individual statements supposedly were "not about" Mr. Colborn. Mr. Colborn must be considered defamed by statements if a recipient could reasonably understand that they referred to him. *Wilson v. Prime Mfg. Corp.*, 160 Wis. 2d 443, 448 (Ct. App. 1991). In their context, there is no doubt that the third-party statements identify Mr. Colborn as planting evidence. Indeed, Netflix celebrated "setting up" Mr. Colborn as planting Ms. Halbach's SUV. Dkt #330-1, p. 39, NFXCOL 278.

## **CONCLUSION**

Defamation can be especially potent when a defendant "baits the hook" with the truth. *Harte-Hanks Communications, supra*, at n. 37. This case could not prove that point more. Defendants took Mr. Colborn's testimony, together with third parties' statements about him, and treated them like lumps of clay to be reshaped and remolded into a work that they represented as photographically accurate. The intended result was to publish falsehoods about Mr. Colborn that served the story that Defendants wanted to tell, regardless of the truth. There is no reasonable inference that Defendants repeated the statements in ignorance of their actual effect.

Dated this 9th day of December, 2022.

<pre>
                         By:  /s/April Rockstead Barker
                             April Rockstead Barker, SBW #1026163
                             Attorneys for Plaintiff, Andrew L. Colborn
                             Rockstead Law, LLC
                             525 N. Lincoln Ave.
                             Beaver Dam, WI 53916
                             (920) 887-0387
                             (262) 666-6483 (facsimile)
                             aprilrbarker@rocksteadlaw.com
</pre>

4434614_3

**Co-Counsel:**

Attorney George Burnett
231 S. Adams Street
Green Bay, WI 54301
P.O. Box 23200
Green Bay, WI  54305-3200
Phone:  (920) 437-0476
Fax:  (920) 437-2868
State Bar No. 1005964