# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

ANDREW L. COLBORN,

               Plaintiff,

    vs.

NETFLIX, INC.; CHROME MEDIA LLC,
F/K/A SYNTHESIS FILMS, LLC; LAURA
RICCIARDI; AND MOIRA DEMOS,

           Defendants.

Civil No.: 19-CV-484

## DEFENDANTS CHROME MEDIA LLC, F/K/A
## SYNTHESIS FILMS, LLC, LAURA RICCIARDI, AND MOIRA DEMOS'
## <u>REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

## INTRODUCTION

The parties' summary judgment papers reveal a sharp contrast: Defendants are asking the Court to watch *MaM* and judge the Series for itself, whereas Plaintiff continues to bombard the Court with supposed summaries and an editorialized "Addendum" purporting to recount *MaM*'s contents. Plaintiff ignores that the case is no longer at the pleading stage and his allegations about *MaM* are no longer accepted as true. It is summary judgment, and the First Amendment requires courts to "make an independent examination of the whole record so as to assure [itself] that the judgment does not constitute a forbidden intrusion on the field of free expression." *N.Y. Times v. Sullivan*, 376 U.S. 254, 285 (1964). As the Wisconsin Supreme Court has stressed, "[t]his duty entails a 'constitutional responsibility that cannot be delegated to the trier of fact,' summary judgment is an important and favored method for adjudicating public figure defamation actions." *Torgerson v. Journal/Sentinel, Inc.*, 563 N.W.2d 472, 479 (Wis. 1997) (internal quotes omitted). Viewed as a whole, both *MaM* and the record show that Plaintiff's claims fail as a matter of law. Plaintiff has tried mightily to make this case seem more complicated than it is. But straightforward application of well-established law shows Plaintiff cannot meet his constitutional burdens of showing material falsity or actual malice by clear and convincing evidence. The Court should grant summary judgment in favor of the Producer Defendants.

## I.   PLAINTIFF FAILS TO CONNECT HIS ARGUMENTS IN HIS OPPOSITION TO THE CLAIMS ACTUALLY PLEADED IN HIS SAC

Rather than substantiate the claims he pleaded, Plaintiff's opposition papers consist of criticisms of *MaM* disconnected from his SAC. 25 pages of the opposition, plus an unauthorized 17-page "Addendum," purport to summarize *MaM* (in violation of the best/secondary evidence rule). *See* Dkts. 323-1; 324-1; *see also* Dkt. 346, Defs. Joint Response to CAPFF, Gen. Obj. § I. Aside from being one-sided, his "Factual Background" and "Addendum" are riddled with

1

obvious inaccuracies, underscoring why the Court must view *MaM* for itself. *See, e.g.*, Dkt. 346

¶¶ 15(b), 44(a)–(b), 62. Plaintiff also fails to explain *how* his criticisms of *MaM* relate to—let

alone substantiate—the allegations and elements of his claims. In opposing summary judgment,

he has to provide admissible evidence showing *specific statements on which the SAC is based* are

materially false and made with actual malice. Dkt. 294 at 19 n. 3, Dkt. 319 at 8–9. He did not do

that. His scattershot opposition not only lacks evidentiary support, but "essentially left it to the

Court and Defendants to connect the dots between the allegations of his Complaint" and his

opposition papers; "accordingly, Plaintiff has not sustained his burden on summary judgment" of

substantiating his claims. *Wilson v. City of Champaign*, 2013 WL 3833042, at *6 (C.D. Ill. July

23, 2013).[1]

## II. THE OPPOSITION CONFIRMS SUMMARY JUDGMENT IS MERITED BASED ON LACK OF MATERIAL FALSITY/SUBSTANTIAL TRUTH

### A. Plaintiff Cannot Escape the Governing Law, Which Bars His Claims

Plaintiff erroneously claims *Global Relief Found., Inc. v. N.Y. Times Co.*, 390 F.3d 973 (7th

Cir. 2004) does not apply. Dkt. 327 at 66. His desire to avoid the case is understandable: it bars

his claims. Dkt. 294 at 14–15, Dkt. 319 at 12–14. While *Global Relief* applied Illinois law, its

principles are based on the First Amendment. *Global Relief* primarily relied on a decision, *Gist v.*

*Macon Cty. Sherifff's Dep't*, 284 Ill. App. 3d 367, 371 (1996), which emphasized that the

substantial truth doctrine "is rooted in the United States Constitution" and relied on *Sullivan* and

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991). Indeed, this Court already noted the

---

[1] *See also Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("When reading ITOW's brief, one wonders if ITOW, in its own version of the 'spaghetti approach,' has heaved the entire contents of a pot against the wall in hopes that something would stick. We decline, however, to sort through the noodles in search of ITOW's claim. As the Seventh Circuit observed in its now familiar maxim, '[j]udges are not like pigs, hunting for truffles buried in briefs.'") (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991)).

2

applicability of *Global Relief*, Dkt. 176 at 13–14, although Plaintiff ignores that.

Recently, the Seventh Circuit, applying *Wisconsin* law, affirmed summary judgment in favor of a defendant newspaper for lack of material falsity based on the same principles as *Global Relief*. *See Fin. Fiduciaries, LLC v. Gannett Co., Inc.*, 46 F.4th 654, 666 (7th Cir. 2022). There, the defendant's "article said Batterman was *accused* of mishandling funds, committing wrongdoing, and putting Geisler's money in 'jeopardy'" and "[t]hese statements, as the district court correctly found, were fully supported by court records" in which those accusations were made. *Id.* at 666 (emphasis added). Plaintiff does not try to distinguish *Fin. Fiduciaries*.[2]

The Wisconsin Court of Appeal reached a similar conclusion in *Erdmann v. SF Broad. of Green Bay, Inc.* 599 N.W. 2d 1 (Wis. Ct. App. 1999). The defendant—represented by Plaintiff's counsel here—prevailed on summary judgment. *Id.* at *8. The court explained that, "… while the facts the police provided to the media ultimately proved to be untrue, the television report accurately reflected the information law enforcement publicly disseminated. . . . Erdmann does not demonstrate that any portion of Channel 11's report was not a fair statement of the information the police publicly disseminated[.]" *Id.* Plaintiff's Opposition fails to address *Erdmann*, despite his counsel's personal familiarity with the case.[3]

Plaintiff's theory of republication liability, Dkt. 327 at 60–62, ignores this governing law. He relies on inapposite cases on subjects like spreading private rumors in contexts very different

---

[2] Other Circuits have reached the same conclusion. *E.g.*, *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120 (2nd Cir. 1977); *Croce v. N.Y. Times*, 930 F.3d 787, 793 (6th Cir. 2019).

[3] Plaintiff cites an inapposite case, *Prahl v. Brosmale*, 98 Wis. 130, 141 (1980), in which a court declined to find substantial truth because the defendant's story falsely stated that the plaintiff had been charged with a crime when he had not been. Nobody in *MaM* says Plaintiff was charged with a crime. While *MaM* includes Avery's planting allegations, the SAC concedes Avery's attorneys accused Plaintiff of planting. Dkt. 105 ¶ 33. *MaM* accurately reflects that accusation, and is thus analogous to *Erdmann*, *Global Relief* and *Fin. Fiduciaries*, not *Prahl*.

3

than *MaM*'s coverage of legal proceedings of great public interest involving accusations of governmental wrongdoing.[4] His theory of liability would radically transform First Amendment law, leaving the media unable to cover contested legal proceedings of significant public interest without the threat of liability for informing viewers of parties' underlying contentions.

Plaintiff cites *Masson*, but it supports Defendants. *Masson* sets a high constitutional bar for material falsity. A statement need not be precisely true in all details; it is sufficient that the "gist" and "sting" are accurate. 501 U.S. at 517. A plaintiff must prove specific challenged statements create "a different effect on the mind of the reader from that which the pleaded truth would have produced" *and* such difference must "bear[] upon their defamatory character." *Id.* (internal quotations omitted). While *Masson* found triable issues for certain statements, they "involved the fabrication of quotations" i.e., "an author who, with full knowledge of the inaccuracy, used quotation marks to attribute to [plaintiff] comments he had not made." *Id.* at 499, 518. Defendant portrayed the plaintiff "in a most unflattering light" through fabricated quotations claiming he had referred to himself as an "intellectual gigolo" trying to turn the Sigmund Freud Archives into "a place of sex, women and fun," and that other psychoanalysts would say, in response to his forthcoming book, that "after Freud-he's the greatest analyst who ever lived." *Id.* at 502–07.

By contrast, Plaintiff's criticisms of *MaM* relate to second-guessing the Producer Defendants' editing decisions in condensing Plaintiff's three-plus hours of trial testimony to approximately eleven minutes of his testimony appearing in *MaM*. *Masson* acknowledged "the practical necessity to edit and make intelligible a speakers' perhaps rambling comments" and the fact that a subject's "full and exact statement will be reported in only rare circumstances." *Id.* at

---

[4] *See also* Dkt. 327 at 39–40 (citing *Gerol v. Arena*, 377 N.W.2d 618 (Wis. Ct. App. 1985) (private vendetta); *id.* at 60 (citing *Hart v. Bennett*, 672 N.W.2d 306, 318 (Wis. Ct. App. 2003) (defendant sent letter to plaintiff's supervisor about abuse allegations from ex-girlfriend).

515. *Masson* stressed that, even when dealing with *fabricated* quotations, there is no libel unless the plaintiff shows alterations "gave a different meaning to the statements, bearing upon their defamatory character[.]" 501 U.S. at 518.[5] Plaintiff fails to show that here. Instead, large swaths of his brief addressing substantial truth consist of unsupported assertions lacking specificity or citations to evidence. Dkt. 327 at 41–46. Much of his "Material Facts" section cites only to his "Addendum," which is not evidence and violates the secondary/best evidence rule.[6]

Plaintiff also misstates the relevant legal standards with regard to the fair report privilege, which courts often apply in conjunction with the substantial truth/material falsity requirement. *See*, *e.g.*, *Fin. Fiduciaries*, 46 F.4th at 666. Plaintiff cites to Am. Jur.[7] and a 19th century case, *Buckstaff v. Hicks*, 68 N.W. 403 (Wis. 1896), claiming the fair report privilege only applies if the defendant acted in good faith and without actual malice. Dkt. 327 at 41. *Buckstaff* is no longer good law. It was premised on a long-outdated understanding of how the First Amendment applies to media coverage of public proceedings. *See Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 13 (1970) (reversing the last case to cite *Buckstaff*, *Co-Op Publication Association v. Bresler*. 252 A.2d 755, 774 (Md. Ct. App. 1969)), and holding that under the First Amendment a newspaper cannot be liable for accurately reporting that a public figure was accused of blackmail at a city council meeting even when the reporters knew that no extortion had occurred).

---

[5] Plaintiff resorts to a strawman argument in falsely referring to "Defendants' claims of unfettered discretion to edit[.]" Dkt. 327 at 46. Defendants claim no such thing. Their moving papers explained in detail why the editing at issue in this case comports with governing law.

[6] Unlike here, the plaintiff in *Masson* also presented "substantial, additional evidence" that could "support a jury determination under a clear and convincing standard that [defendant] deliberately or recklessly altered the quotations" to defame plaintiff. *Id.* at 521; *see also infra*, Section III.B.

[7] Plaintiff's Am. Jur. citation does not support his argument, but instead echoes the principle applied in *Global Relief* and *Fin. Fiduciaries*: "what is important in considering whether the privilege has been abused is not whether the underlying charges are true but whether there was a fair and accurate account of the proceeding," 50 Am. Jur. 2d Libel and Slander §300.

5

**B.** *MaM* **Accurately Captures the Gist of Avery's Accusations and Plaintiff's Denials**[8]

1. Plaintiff Cannot Conflate the Viewpoints of *MaM*'s Subjects with Those of the Producer Defendants

Plaintiff's Opposition continues to do what *Global Relief*, *Fin. Fiduciaries*, *Erdmann* and other cases do not permit: conflating contentions of participants in the underlying controversy with supposed statements by defendants documenting it. The opposition papers repeatedly assert "*MaM* says" or "Defendants state." But the Defendants do not appear in *MaM* and *MaM* does not include voiceover narration. Dkt. 346 ¶ 5. Instead, it lets the documentary's various subjects voice their own viewpoints in interviews, press conferences, hearings, and in arguments and testimony from Avery's and Dassey's trials. Moreover, *MaM* includes *both* Avery's and his defenders' allegations *and also* Plaintiff's and other law enforcement officials' strenuous denials, as well as scores of scenes reflecting negatively on Avery. Dkt. 291 ¶¶ 68, 70. The law is clear that *MaM* must be considered as a whole and that its presentation of both sides of a contested issue is not a materially false endorsement of the truth or falsity of either side's allegations.[9]

Plaintiff's opposition claims that *MaM* "created" a "storyline" and "conspiracy theory narrative" and that "*MaM* may as well have included a neon sign announcing 'Andrew Colborn is the officer who planted evidence to frame Steven Avery.'" Dkt. 327 at 2, 62–63. But *MaM* could not document Avery's trial without reflecting that, as Plaintiff's SAC puts it, *"[a] central*

---

[8] While the Seventh Circuit apparently has not ruled on the issue, the majority of jurisdictions that have done so require a public official plaintiff to prove falsity by clear and convincing evidence. *See DiBella v. Hopkins*, 403 F.3d 102, 114 (2d Cir. 2005); *see also Gazvoda v. Drabin*, 321 N.W.2d 365, at *3 (Wis. Ct. App. 1982) (unpublished) (holding plaintiff "failed to carry his burden of proving by clear and convincing evidence that Drabin's statements were false"). Here, Plaintiff cannot meet his burden under that standard or the preponderance of evidence standard.

[9] *See Fin. Fiduciaries*, 46 F.4th at 666; *Glob. Relief*, 390 F.3d at 987; *Erdmann*, 599 N.W. 2d at 8; *Riley v. Harr*, 292 F.3d 282, 291–92 (1st Cir. 2002) (reasonable readers would consider statements in a book written in attorney's "voice" as statements by attorney, not the author, and not as assertions of fact by author whose book covered the trial in which attorney participated).

*part of Avery's defense at trial was that Plaintiff and other Manitowoc officers planted*" evidence to frame Avery. Dkt. 105 ¶ 33 (emphasis added).[10]

2. <u>*MaM*'s Edits Retain the Gist and Sting of Plaintiff's Testimony</u>

Plaintiff complains about two types of edits: some that do not repeat or underscore points as much as he'd like, and others that substitute similar responses and reactions for the originals. *MaM* necessarily had to cut down Plaintiff's three-plus hours on the witness stand to fit into a ten-hour series covering thirty years of events including Avery's trial with dozens of witnesses. Dkt. 291 ¶¶ 86, 89, 141. This need to compress is why *MaM* did not include repetitive exchanges. Dkt. 346 ¶¶ 54–70. Also, as the Producer Defendants explained, access to usable footage of trial witnesses was an issue due to an unterminated feed at the courthouse. Dkt. 294 at 11–12, 24, 26, 41; Dkt. 291 ¶¶ 76–82, 114; Dkt. 288 ¶¶ 21–27; Dkt. 283, Exs. 1–32; Dkt. 346 ¶ 17. The Producer Defendants made concerted efforts to substitute comparable footage of witnesses responding, listening, and waiting with the footage available to them. *See id.* The unusable, unterminated feed footage problems are why raw footage does not always precisely match certain moments in *MaM*, but, as *MaM* and the evidence (including the raw footage) show, the differences do not alter the gist of Plaintiff's testimony. Dkt. 346 ¶¶ 15, 17, 30, 57, 74, 74 (repeat #).

3. <u>*MaM* Accurately Captures the Gist of Plaintiff's Jail Call Testimony</u>

Many of Plaintiff's complaints about the Jail Call relate to items he admits are included in *MaM*, but which he would have liked covered in more depth or repeated for emphasis to make

---

[10] Plaintiff tries to walk back his SAC's clear-cut admission at times, perhaps because he now realizes it is fatal to his claims under *Global Relief* and *Fin. Fiduciaries*. Dkt. 327 at 60–64. But he repeatedly made similar admissions regarding the centrality of Avery's planting allegations, and the transcript and orders from Avery's trial confirm it. *See* Dkt. 320, SPFOF ¶ 53; *see also* Dkt. 291 ¶¶ 59, 97, 98. Avery's planting allegations were so central to Avery's trial that both sides' closing arguments addressed them. Ep. 8 at 9:01–9:30; Dkt. 291 ¶ 61; Dkt. 346 ¶ 44.

7

him look better.[11] That is no basis for material falsity. *Masson*, 496 U.S. at 515; Dkt. 294 at 30–31. Lacking material criticisms, Plaintiff resorts to quibbling. He complains about a substitution of "No, I don't" for "No, sir," which Demos explained was made because of the unterminated feed. Dkt. 327 at 51–52; Dkt. 346 ¶ 57–59; Dkt. 288 ¶ 30. He gripes that although *MaM* includes his testimony that he transferred the caller to a "detective," it does not include additional testimony that he transferred it to the "Detective Division." *Id.* Although he admits *MaM* includes testimony that he did not know if the Jail Call was even about Avery, he complains it did not include additional testimony that "no names were given." *Id.* But if he did not know if the call was even about Avery, the caller obviously did not provide names. He criticizes *MaM* for accurately documenting that he did not write a report until 2003, but not including that he did so after Sherriff Petersen ordered it. *Id.* However, he fails to identify any material falsity.

Plaintiff concedes *MaM* includes him testifying why he did not prepare a report in 1995: "I don't know what it would have been about" and "if I wrote a report about every call that came in, I would spend my whole day writing reports*." Id.* at 51. Yet he criticizes *MaM* for not including additional testimony to the same effect. *Id.* at 51, 55–56; *see also* Dkt. 291 ¶¶ 11–13, 117, 128; Dkt. 346 ¶¶ 58, 71, 72. He criticizes *MaM* for supposedly not including his testimony about the Jail Call: "No, I'm not ruling out the possibility that I may have discussed it with someone else."

---

[11] *E.g.*, Dkt. 327 at 50 ("While this was previously stated"); *id.* ("omitting testimony that further underscores the internal consistency of Mr. Colborn's testimony"); *id.* at 52 (complaining about non-inclusion of question about "way back in 1994 or 1995" although previous question already asked him "about the 1994 or 1995 telephone call"); *id.* at 50 (complaining *MaM* does not include his testimony that he answered the Jail Call, "Manitowoc County Jail, Officer Colborn," even though *MaM* includes his testimony that he received call "when I was working [in] my capacity as a corrections officer at the Manitowoc County Jail," Dkt. 271 ¶ 59 (citing Ep. 7 at 17:46–18:30); *id.* at 56 (complaining *MaM* did not include more of his deposition testimony).

8

Dkt. 327 at 56.[12] But *MaM* includes his testimony making that point: "I may have mentioned [the Jail Call] to other people but I don't recall doing so. Ep. 2 at 23:30–23:50.[13]

    4.  <u>*MaM* Accurately Captures the Gist of Plaintiff's Call to Dispatch Testimony</u>

Plaintiff admits that *MaM* shows him denying *multiple* times that he was looking at Teresa Halbach's car when he made the Call to Dispatch. Yet he complains *MaM* also shows Avery's attorneys' efforts on cross-examination to cast doubt on his denials, despite those efforts' being an integral part of the trial. For example, he criticizes *MaM*'s inclusion of him erroneously claiming that the dispatch operator provided him with information about Teresa Halbach's car, even though he concedes that occurred at trial. Dkt. 327 at 17, 47; Dkt. 346 ¶ 14. He complains that whereas he testified that "obviously" he got information about Halbach's vehicle from Calumet County's Mark Wiegert, *MaM* conveys that by showing Plaintiff's testimony that Wiegert "had to have given it to me, because I wouldn't have had it any other way." Dkt. 327 at 47; Dkt. 346 ¶ 18. None of these complaints show falsity, let alone material falsity.

Plaintiff's primary complaint about the Call to Dispatch involves compression of a portion of Avery attorney Strang's cross-examination. Dkt. 327 at 48–49; Dkt. 346 ¶ 15, 18, 21. As in

---

[12] Plaintiff ignores that *MaM* includes statements that after he forwarded the Jail Call to a detective, Plaintiff was given "reassurances" by someone in the Sheriff's office—some said Kocourek—that he need not worry because they already had the "right guy." Ep. 2 at 21:46–22;22, 24:00–26:20. That refutes the idea that Plaintiff—rather than Kocourek and Vogel, the defendants in Avery's suit—is presented as the one Avery blamed for lack of follow up.

[13] While Plaintiff suggests *MaM* should have included a "disclaimer" that testimony was edited rather than unabridged, *MaM* informs viewers that Avery's trial lasted more than five weeks whereas *MaM* devotes only a little over two hours to the trial. *MaM* also cuts between direct and cross examinations making it clear that viewers are not watching reel-to-reel CSPAN coverage. No reasonable viewer could be surprised that *MaM* condensed and edited testimony, and the law did not require *MaM* to "state the obvious" with disclaimers. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 583 n. 17 (1994) (defendant could invoke fair use despite not expressly labelling work as parody); *Texas Beef Group v. Winfrey*, 201 F.3d 680, 689 (5th Cir. 2000) (it is "common knowledge" television programs cut down longer footage to fit into a shorter time frame).

his SAC, his opposition presents that compression out of context. He ignores a prior back-and-forth between him and Strang, which Strang drew on when he rephrased his question following an objection. Dkt. 294 at 22. While the wording of Strang's two questions may be different, the gist is the same, especially in context: Strang was suggesting the recording of the Call to Dispatch sounds like one of the frequent calls Plaintiff had testified about earlier where he had been looking at a car's license plate when calling dispatch. Strang was implying he had also been looking at Teresa Halbach's license plate during the call. And Plaintiff denied that. *MaM* does not materially change the gist of the exchange. Plaintiff is wrong that *MaM* suggests he "admitted" he was looking at Ms. Halbach's car. *MaM* shows him expressly *denying* that. Ep. 5 at 55:25, 56:28; Dkt. 346 ¶15. Also, the fact that someone without personal knowledge of the underlying facts "might think" from the audio recording that Plaintiff was looking at Ms. Halbach's car would not "contradict" his testimony that, in fact, he was not. Dkt. 327 at 48. Nor would it constitute a "damning admission" by Plaintiff, particularly in light of *MaM*'s inclusion of his repeated and explicit denials. *Id.*[14]

5. *MaM* Accurately Captures the Gist of Plaintiff's Testimony about the Key

Plaintiff's criticisms of *MaM*'s coverage of his testimony regarding the discovery of the key in Avery's bedroom fail to identify any material falsity and amount to semantics. He complains that, in showing his denial that he had planted evidence, *MaM* does not use his testimony "That's ridiculous, no I have not," but instead includes his testimony, "I have to say that this is the first time my integrity has ever been questioned and, no, I have not." Dkt. 327 at 53. He does not identify any material falsity, but merely claims this is "less forceful than the actual response,"

---

[14] Plaintiffs' reliance on inadmissible, unauthenticated, anonymous voicemails and Internet posts does not change this. Dkt. 327 at 47; Dkt. 346 ¶ 14. He admitted at deposition that, by definition, the anonymous people who left him abusive voicemails were unreasonable. Dkt. 320 at 69, ¶ 47.

ignoring that *MaM* shows him not just denying, but expressing deep personal affront. Dkt. 346 ¶ 27. Plaintiff also criticizes *MaM*'s compression of the testimony from Calumet Sergeant Tyson, but that criticism ultimately boils down to semantics between "babysitting" versus "watch[ing] the officers … to make sure that they weren't alone" on Avery's property. Dkt. 294 at 25; Dkt. 346 ¶ 23.

Many of Plaintiff's criticisms are nothing more than pedantry. He complains *MaM* does not include his testimony that he thought the key "was a very important piece of evidence" because it had a Toyota emblem. Dkt. 327 at 53. But *MaM* includes a close up shot of the key itself, with its Toyota emblem, and also makes clear that Ms. Halbach's car was a Toyota. Dkt. 346 ¶ 65. In other instances, Plaintiff argues that *MaM* "omitted 30 pages of [his] testimony," "numerous transcript pages," and "20 lines of trial testimony," ignoring that *MaM* necessarily had to condense all witness testimony, including his. Dkt. 327 at 54; Dkt. 291 ¶¶ 54, 89, 141. Plaintiff repeats his complaint about *MaM*'s coverage of his report writing, *id.* at 53, but ignores that the Producer Defendants' moving papers addressed this issue, Dkt. 294 at 26; Dkt, 291 ¶¶ 21, 57, and, ultimately, whether he wrote one half-page of reports or two short reports, the gist is the same: his report writing on the Avery case was minimal. Plaintiff also complains that *MaM* showed—but did not go into greater depth about—his speculation about how his moving furniture might have dislodged the key, or how he instructed Calumet Deputy Kucharski to photograph the key. Dkt. 327 at 54; *cf.* Dkt. 291 ¶ 35; Dkt. 346 ¶ 67. But Plaintiff does not— because he cannot—demonstrate that any of his criticisms rise to the level of *MaM* presenting the substance of his testimony in a materially false manner to his detriment.

6.  Plaintiff's Complaints About his Physical Reactions in *MaM* Are Meritless

Plaintiff complains about *MaM* depicting slightly different reaction shots of him at trial, but he provides no evidence that they materially alter the gist of his testimony or are the result of bad

11

faith. *See* Dkt. 327 at 56–60. Nor does he dispute that the substituted footage is actual footage of him testifying at trial. *See id.* He claims that any alterations are "obviously" intended to make Plaintiff look bad, "nervous," or "not credible." *See id.* Demos provided detailed explanations regarding the unusable footage issues with the witness-facing camera for each of these instances and the need to substitute with mixed-feed footage. *See* Dkt. 346 ¶¶ 17, 30, 57 74, 74 (repeat #); Section II.B.2 *supra*. The video files themselves reflect the footage issues with the witness-facing camera and available alternatives. *See* Dkt. 283, Exs. 1–32; Dkt. 312, Exs. 3–5.

Any moments showing Plaintiff not looking up or making eye contact are moments that actually occurred and were captured in mixed-feed footage. Dkt. 346 ¶¶ 74, 74; Dkt. 288 ¶ 29, 55, 78, 79; Dkt. 291 ¶¶ 76–82, 114. Plaintiff admitted at his deposition he is an "introvert" and gets nervous testifying, and his former counsel described him and others as looking "defensive" in depositions in Avery's civil suit. Dkt. 346 ¶ 75; Dkt. 320, SPFOF ¶ 45.

Without any material complaints, Plaintiff resorts to falsehoods. He claims *MaM* includes a "long pause" during Strang's cross-examination of him and "[i]n the Halbach trial, Strang moves right into the next question; there is virtually no pause." Dkt. 327 at 18. Plaintiff's own evidence shows that is false: there was a seven or eight-second pause in *both* the raw footage and in *MaM*. *See* Dkt. 346 ¶ 15. Similarly, Plaintiff criticizes *MaM*'s use of footage he claims makes him "appear[] to shift uncomfortably" and engaging in "knuckle-cracking." Dkt. 327 at 18. But he later points to this *same* footage, complaining it was *not* used in another scene, and describes it as making him look "more confident." Dkt. 288 ¶ 66; *see also* Dkt. 346 ¶¶ 15, 74.[15]

_____

[15] Plaintiff focuses on statements that are not "of and concerning" him. and he misrepresents the statements themselves to obscure that. *E.g.*, Dkt. 327 at 29 (references in Netflix and Manhardt notes to "baddies," "villains," and "mastermind" of "conspiracy," who are identified – e.g. former MTSO Sheriff Kocourek and former D.A. Vogel —but do *not* include Plaintiff); *id.* at 63

### III.    PLAINTIFF HAS NOT MET HIS BURDEN OF PROVING ACTUAL MALICE

#### A.    Plaintiff Ignores the Producer Defendants' Evidence Negating Actual Malice

Plaintiff's Opposition ignores Ricciardi's and Demos' detailed declarations in support of their MSJ. Dkts. 288, 290. Those declarations comprehensively refuted Plaintiff's actual malice allegations, explained why editing decisions were made, and, in Demos' case, provided explanations that were tailored to particular pieces of raw footage for the relevant portions of *MaM*. Although it is Plaintiff's burden to prove actual malice with clear and convincing evidence, not Defendants' burden to disprove it, the Producer Defendants' detailed evidence negates actual malice. Far from knowingly or recklessly presenting Plaintiff's testimony in a materially false manner, the Producer Defendants went to great effort to accurately capture its gist. *See also* Sections II.B.2–II.B.6, *supra*. Plaintiff's failure to substantively engage with the Producer Defendants' declarations is telling: he has no answer for them.

Plaintiff does not dispute the facts from Avery's case files or present evidence of factual inaccuracies in those records. Nor does he argue that it was unreasonable for the Producer Defendants to rely on copious government records to map out the story of *MaM*. *See* Dkt. 326. Instead, he claims everything is hearsay. *E.g.*, *id.* ¶ 85 (claiming Defendants' declarations hearsay); *but compare* Dkt. 317 (Plaintiff's own declaration). Plaintiff misses the point. Much of this record is not being used for truth of the matters asserted but rather to show (1) active efforts to fact-check and present a truthful story, disproving actual malice—*e.g.*, reviewing case files and reports and hiring rights and clearance counsel to vet *MaM* to ensure it was not defamatory;

_____

(statement by Avery attorney about "unconscionable withholding of information" by Kocourek and Vogel); *id.* at 64 (complaints about portrayal of Avery verdict); *id.* (statement about "reliable narrators," in a dig at Kratz); *id.* at 65 (complaints re alleged "omissions"). *See also* Dkt. 294 at 29–31, 43 (addressing defects in Plaintiffs' arguments about alleged omissions in *MaM*).

13

(2) prior consistent statements to rebut allegations of misconduct—*e.g.*, emails about the unterminated feed; (3) Plaintiff's party admissions. Fed. R. Evid. 801(d), 803(8).

### B. Plaintiff Cannot Prove Actual Malice with Clear and Convincing Evidence

1. <u>*MaM*'s Inclusion of Avery's and His Defenders' Viewpoints Is Not Evidence of Actual Malice</u>

The Producer Defendants' moving papers explained why, under governing law, *MaM*'s inclusion of Avery's and his defenders' viewpoints is not grounds for actual malice. Dkt. 294 at 34–37. That caselaw includes, most prominently, *Torgerson*, 563 N.W.2d at 482, *In re Storms v. Action Wis., Inc.*, 750 N.W.2d 739, 750, 752 (Wis. 2008) and *Erdmann*, 599 N.W. 2d at 8, all affirming summary judgment based on *Time, Inc. v. Pape*, 401 U.S. 279 (1971). Plaintiff's Opposition does not address, or even mention, these cases, or numerous other cases cited by Defendants. Under that governing law, *MaM*'s inclusion of Avery's and his defenders' viewpoints would not establish actual malice even if that was *all* that *MaM* included. But *MaM* also includes Plaintiff's denials of Avery's accusations, as well as others supporting Plaintiff and opining that Avery is guilty. Dkt. 294 at 16–18, 31–32; *id.* at 10 (discussing efforts to get access to law enforcement and their efforts to reflect law enforcement viewpoints through statements made in legal proceedings, press conferences, news reports, etc.).; Dkt. 291 ¶¶ 66–68, 70, 123.

2. <u>Plaintiff Focuses on Material Irrelevant to the Producer Defendants' Scienter</u>

Actual malice is a subjective inquiry focusing on specific defendants' knowledge, intentions and scienter. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Lacking evidence of actual malice by the Producer Defendants, Plaintiff's opposition focuses on statements and opinions of others and then impermissibly tries to conflate them with those of the Producer Defendants.

i. <u>Mary Manhardt's Emails and Deposition Testimony</u>

Plaintiff's Opposition acts as if Mary Manhardt were still a defendant in this case. But

14

Plaintiff chose to drop Manhardt when he filed his amended complaint. Nonetheless, Plaintiff's Opposition devotes many pages to Manhardt and seeks to blur all distinctions between her and the Producer Defendants. In so doing, Plaintiff resorts to outright misrepresentations.

He falsely describes Manhardt as "Chrome's editor" or *MaM*'s "primary editor" and tries to confuse her personal reactions and views with Defendants' states of mind. *See* Dkt. 346, Gen. Obj. § IV. Defendant Demos was the lead editor of *MaM* and Manhardt's deposition testimony shows the limits of Manhardt's involvement with *MaM*. Manhardt explained that by the time she joined the then already 10-year-old *MaM* project in 2015, "films that were [Episodes] 1 through 4 I guess were in very good shape. They were very solid rough cuts, very solid." Dkt. 330-14 at 53:17–54:8. When asked about her "consulting editor" credit for Episodes 5 to 9—which include the trial episodes that Plaintiff's SAC focuses on—Manhardt explained, "those were really Moira's and I did almost nothing on them except watch them and give notes, which is what a consulting editor does." *Id.* at 54:11–19. The only episode for which Manhardt received an "editor" credit was Episode 10, which takes place after Avery's and Dassey's convictions and sentencing and is not a focus of Plaintiff's claims. Moreover, Manhardt always worked under Demos and Ricciardi's instruction and supervision, and she stopped working on *MaM* three months before the Series was even delivered to Netflix and before final editorial choices had been made for any episodes. Plaintiff cannot rely on deceptive phraseology such as "*MaM*'s primary editor," "Chrome's editor" or "Chrome's creative" to pass off Manhardt's opinions as those of the Producer Defendants.

Moreover, Plaintiff's accusations of bias against Manhardt do not withstand scrutiny. For example, Plaintiff imputes malevolence to Manhardt's use of the term "frankenbite." Manhardt clarifies that by "frankenbite," she is simply describing taking a word from one place and adding

it to another to provide *clarity*. Dkt. 346 ¶ 19(a). Plaintiff's counsel pointed out an instance in a *MaM* episode: "Teresa Halbach is substituted for the word 'she.'" Dkt. 330-11 at 186:16–17. Adding such clarity is not actual malice. Nor is it actual malice to have human reactions to subjects in a story. Plaintiff reads subtext into Manhardt's excitement to meet Stephen Glynn after *MaM* aired, yet Plaintiff himself describes Glynn as an "amiable" "raconteur." *See* Dkt. 346 ¶ 37; *see also* Dkt. 289-29 (Griesbach and Glynn exchanging warm emails).[16]

### ii. Netflix Executives' Emails and Deposition Testimony

Plaintiff also focuses on notes and deposition testimony from certain Netflix executives that, at most, might speak to Netflix's state of mind, although, even there, they do not remotely show actual malice by Netflix. Dkt. 327 at 27–32. They merely reflect that those Netflix executives had personal opinions about particular aspects of *MaM* and the underlying events. Just like any *MaM* viewer, the Netflix executives inevitably interpreted events through their own personal perspectives. At times, they found certain allegations by Avery's attorneys against Plaintiff to be "weak" or "thin," and at other times they found Avery's attorneys' questioning of Plaintiff to be a "cliffhanger" and "strong end" to an episode as they felt Plaintiff had been caught in a "lie."

Regardless, Netflix executives' statements and opinions are not evidence of the *Producer Defendants'* supposed actual malice.[17] Dkt. 346, Gen. Obj. §§ IV, V. Contrary to Plaintiff's claims, *MaM* did not "set up Colborn as the potential cop to plant" evidence, nor did Defendants

---

[16] Manhardt is far from the only witness in this case to trade a "snide" message about Ken Kratz, the prosecutor who resigned after being exposed for sexually harassing a domestic violence victim—Plaintiff did too with Brenda Schuler. *See* Ep. 10 33:21–36:32; Dkt. 346 ¶ 38.

[17] The Producer Defendants had creative control over *MaM* and took Netflix executives' notes as suggestions, implementing those they agreed with, but not those they did not. Dkt. 320, SPFOF ¶¶ 3, 9. Regardless of whether Netflix's Del Deo mistakenly believed Avery's attorneys were suggesting law enforcement killed Ms. Halbach, Dkt. 327 at 30–31, *MaM* includes statements by Avery's attorneys at trial making it clear they were *not* accusing law enforcement of murder but rather arguing they planted evidence because they thought Avery was guilty. Dkt. 291 ¶ 62.

16

create a "narrative" that Plaintiff was "always a suspect" in alleged "tampering with evidence." *Id.* at 20. Rather, Judge Willis' Order explicitly permitted Avery to accuse Plaintiff and Lenk, and only them, of planting evidence, and Avery's attorneys subsequently did so. Dkt. 291 ¶ 48. Plaintiff does not dispute this. Dkt. 326 ¶ 48; *see* Dkt. 346 ¶ 42; see also Dkt. 105 ¶ 33.

> 3. <u>Plaintiff Fails to Present Clear and Convincing Evidence that the Producer Defendants Made any Defamatory Statements with Actual Malice</u>

Plaintiff's Opposition devotes scarcely a page to the Producer Defendants' supposed actual malice. Dkt. 327 at 68–69.[18] Portions of that page are nothing but outright misrepresentations, such as the falsehood that "Chrome does not and cannot deny that it was intimately involved in the editing that falsely portrayed Mr. Colborn's testimony and even his appearance while testifying[.]" Dkt. 327 at 68. Chrome denies that explicitly and unequivocally and disproved it in its moving papers. *See* Dkt. 293 at 18–26, 29–32, 40–43; Dkt. 291 ¶¶ 126–141. In the handful of instances in which Plaintiff moves beyond misrepresentations and focuses on documents and deposition testimony of Ricciardi and Demos, his arguments fall flat. He cites an email regarding the promotional trailer for *MaM*—which is *not* the basis for any claims in the SAC—in which Demos refers to a "squirmy shot" of Plaintiff on the witness stand. But Plaintiff admits he is an introvert who gets nervous testifying. Dkt. 320, Prod. Def. SPFOF ¶ 45. And Plaintiff's former counsel described watching Avery civil suit deposition testimony of "the officers who were most directly accused of wrongdoing—either in the first Avery case or in the second," which includes Colborn, as "watching them squirm" and observed that *MaM*'s portrayal of their testimony "was not simply a case of only selective editing to make them look bad." *Id.* ¶ 46; *see also id.* ¶ 54.[19]

---

[18] Plaintiff adds a few pages of boilerplate case law on actual malice, but he fails to connect it to the evidence or issues in this case. Dkt. 327 at 70–72.

[19] Moreover, Demos explained the reason for suggesting the "squirmy" shot in the trailer (or alternatively a shot of Petersen) was not to make Plaintiff look bad. Dkt. 288 ¶ 98. Also, Plaintiff

Elsewhere, Plaintiff focuses on an email by Ricciardi mentioning that Avery was *MaM*'s "protagonist" and emails from others referring to the prosecution and law enforcement as "antagonists." Dkt. 327 at 31, 68. These notes simply reflect that Avery is the main character whose story is at the center of *MaM*, and that law enforcement and prosecutors were his opponents in the adversarial legal proceedings documented by *MaM*. Similarly, Plaintiff points to notes from Manhardt and Demos regarding Episode 3 in which they are discussing the audience "regaining faith" in Avery and "feeling guilty" for believing certain allegations about him at a particular point in the Series, Dkt. 327 at 2, but Plaintiff ignores that those *same* notes also discuss how at a different point, the audience could "feel duped by SA [Steven Avery] and even angry about that," Dkt. 330-2 at Manhardt 000148–49. The story of Steven Avery contains many twists and turns, allegations and counter-allegations, and the notes reflect that.[20]

Plaintiff complains about *MaM*'s inclusion of graphics and juxtapositions of his image, Dkt. 327 at 62–63, but ignores that "[a] central part of Avery's defense at trial was that Plaintiff and other Manitowoc officers planted" evidence. Dkt. 105 ¶ 33. While he claims Defendants "inten[ded] to villainize Mr. Colborn as part of a law enforcement conspiracy through *MaM*," Dkt. 326 at 51, ¶ 130, he fails to cite any evidence in support of that claim, *id.* Instead, he impermissibly conflates what certain *MaM* subjects say with what "Defendants" supposedly say. But *MaM* makes it clear to viewers that it is Avery and his defenders accusing Plaintiff of

_____

claims *MaM* includes footage of Plaintiff "looking deflated" at the end of cross-examination, Dkt. 327 at 24. Even putting aside his obvious subjective spin in that characterization, Demos explained that the substitution of footage was done there because of a lack of usable footage, and that she believed it did not present him in a materially different way. Dkt. 288 ¶ 55, Exs. 9–12.

[20] Plaintiff also ignores that particular notes provide feedback with respect to *specific* portions of *MaM*. For example, the note about "regaining faith" and "feeling guilty" concerns a particular point in Episode 3. Dkt. 330-2 at Manhardt 000141. The verdict against Avery does not even occur until Episode 8, although Plaintiff's opposition frequently ignores this chronology.

18

planting. *See* Dkt. 346 ¶ 5. That allows viewers to decide whether to credit those accusations or not based on their source. "[F]ull (or pretty full) publication of the grounds for doubting a source tends to rebut a claim of malice, not to establish one." *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1304 (D.C. Cir. 1996). Plaintiff also ignores portions of *MaM* critical of Avery and pushing back against Avery's accusations against Plaintiff, including Avery's brother opining that Steven probably murdered Teresa Halbach and his sister telling Steven "you can rot in hell." Dkt. 294 at 31–32.[21]

Fundamentally, Plaintiff's premise—that if Defendants held certain viewpoints about the subject matter of *MaM*, that would constitute actual malice—is not just lacking in evidence, but legally flawed. Dkt. 294 at 34–37; Dkt. 269 at 11, 20–21 (particularly discussions of *Torgerson*, *In re Storms*, *Pape*, *Erdmann*, *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994); *Storms v. Action Wis. Inc.*, 309 Wis. 2d 704, 732–33 (2008); *Desnick v. ABC, Inc.*, 233 F.3d 514, 519 (7th Cir. 2000); *Fairfax v. CBS*, 2 F.4th 286, 294 (4th Cir. 2021); and *McFarlane*, 74 F.3d at 1304).[22]

Plaintiff's arguments about libel by implication or innuendo fail. Dkt. 327 at 72. First, his SAC does not plead libel by implication or innuendo, and he cannot amend his SAC *sub rosa* via his opposition brief. Dkt. 319 at 8 n. 4. Second, even if he had pleaded such a claim, if "the plaintiff is claiming defamation by innuendo," in addition to proving actual malice, "he also must show with clear and convincing evidence that the *defendants intended or knew of the*

---

[21] Plaintiff's reliance on *Hatfill v. New York Times Co.*, 416 F.3d 320, 333–34 (4th Cir. 2005) is misplaced. Dkt. 327 at 64. *Hatfill* addressed defamatory meaning, not falsity, at the 12(b)(6) stage. Even in that context, it dealt with defendants attributing criminal allegations against plaintiff "to unnamed sources." *MaM* makes clear that Avery and his defenders accused Plaintiff.

[22] In moments of candor, Plaintiff has admitted that his argument that having a viewpoint equals actual malice lacks merit. For example, he states that "in the context of documentaries, which often accompanies *an assumption by viewers that while the documentary may advocate a particular point of view*..." Dkt. 327 at 46 (emphasis added). And at his deposition, Plaintiff made similar admissions. *See also* Dkt. 269-1 at 11 re Stip. 5; Dkt. 271-1 ¶¶ 129–31.

19

*implications* that the plaintiff is attempting to draw from the allegedly defamatory material."

*Saenz v. Playboy Enters.,* 841 F.2d 1309, 1318 (7th Cir. 1988) (emphasis added); *see also Woods*

*v. Evansville Press Co., Inc.*, 791 F.2d 480, 487–88 (7th Cir. 1986). Plaintiff does not attempt to

prove this, or even acknowledge it is required, and he ignores *Saenz* and *Woods* despite

Defendants' repeated citations to them. *See* Dkt. 294 at 33, 39, Dkt. 319 at 25; *see also* Dkt. 288,

¶¶ 60, 63, 72, 84, 92, 102 & Dkt. 290, ¶¶ 61, 69, 78, 86, 95, 111.

Finally, as part of his "throw everything at the wall and hope something sticks" approach,

Plaintiff falsely accuses the Producer Defendants of "missing documents and videos." In

response to Plaintiff's seven sets of RFPs, the Producer Defendants produced over 35,000 pages

of documents, plus more than 15 hours of raw footage of Plaintiff's trial testimony. *See* Dkt.

349-1 at 2. Demos and Ricciardi spent more than 250 hours combined in connection with

responding to Plaintiff's requests, and their counsel spent many hundreds of additional hours.

*See id.* The Producer Defendants produced all responsive documents in their possession

consistent with what they agreed to produce (indeed, Plaintiff's complaints often ignore the

scope of the Producer Defendants' agreements to produce, which in some cases were limited

based on relevancy and proportionality in light of the incredibly overbroad requests served by

Plaintiff). *See also* Dkt. 316-2 (letter responding to erroneous contentions re discovery); Dkt.

349-1 (same). The Producer Defendants also clarified what materials they no longer possessed.

*See id.* Tellingly, Plaintiff never brought any motion to compel.

## IV.    PLAINTIFF'S EMOTIONAL DISTRESS CLAIM ALSO FAILS

Plaintiff's opposition does not dispute that if his defamation claim fails, his IIED claim

necessarily fails too. Even if his defamation claim were not dismissed, summary judgment of his

IIED claim would still be proper. Dkt. 294 at 45, Dkt. 269 at 41–45, Dkt. 343 at 15 (Netflix).

Dated: December 9, 2022                    Respectfully submitted,


                                           *s/ Kevin L. Vick*
                                           Kevin L. Vick (*pro hac vice*)
                                           Meghan Fenzel (*pro hac vice*)
                                           JASSY VICK CAROLAN LLP
                                           355 South Grand Avenue, Suite 2450
                                           Los Angeles, CA 90071
                                           T: (310) 870–7048
                                           F: (310) 870–7010
                                           kvick@jassyvick.com
                                           mfenzel@jassyvick.com

                                           *Counsel for Defendant Laura Ricciardi, Moira*
                                           *Demos, and Chrome Media, LLC*

                                           James A. Friedman, SBN 1020756
                                           GODFREY & KAHN, S.C.
                                           One East Main Street
                                           Suite 500
                                           Madison, WI 53703–3300
                                           T: (608) 284–2617
                                           F. (608) 257–0609
                                           jfriedman@gklaw.com

                                           *Counsel for the Defendants*