IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

ANDREW L. COLBORN,

                Plaintiff,

    vs.

NETFLIX, INC.,                                 Case No. 19-CV-484
CHROME MEDIA, LLC, f/k/a
SYNTHESIS FILMS, LLC,
LAURA RICCIARDI, and
MOIRA DEMOS,

                Defendants.

## PLAINTIFF, ANDREW L. COLBORN'S RESPONSE TO PRODUCER DEFENDANTS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT

Plaintiff, Andrew L. Colborn, by his attorneys, the Law Firm of Conway, Olejniczak & Jerry, S.C., responds to Producer Defendants' Supplemental Proposed Findings of Fact as follows:

## III. PRODUCER DEFENDANTS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT

### a.    Working with Netflix

1.    Netflix creative executive Lisa Nishimura has attested that, "From the moment I met Laura and Moira, they impressed me. They had conducted exhaustive research into Steven Avery's story and had full command of the facts. They struck me as fastidious and meticulous and devoted to telling Avery's compelling story with accuracy and respect for all involved. As I worked with the filmmakers to bring *MaM* to fruition, my initial impression of them was confirmed. I trusted Laura and Moira. They never gave those of us at Netflix reason to doubt them or their work, and we relied on them to get the facts right." Dkt. 275, Declaration of Lisa Nishimura ("Nishimura Decl.") ¶ 4.

RESPONSE 1:  Plaintiff objects to the relevance of the self-serving, narrative statement as devoid of any probative value.

2.    At his deposition in this case, Netflix creative executive Adam Del Deo testified to the following: "I was very impressed at how . . . how they wanted to . . . capture, you know, accurate, factual events, really follow the story from the Steven Avery perspective and also from the perspective of the police officers involved in the

case, Manitowoc, and let—let the subjects capture in an objective way what was happening[.]" Dkt. 279, Declaration of Leita Walker ("Walker Decl.") ¶ 14, Ex. 13, Deposition Transcript of Adam Del Deo ("Del Deo Dep.") at 62:21–63:5.

RESPONSE 2:  Plaintiff objects to the relevance of the self-serving, narrative statement as devoid of any probative value.

3.      Throughout post-production, Netflix creative executives provided notes, but those were suggestions, not demands. The filmmakers chose how to implement notes and retained creative control. Dkt. 290, Declaration of Laura Ricciardi ("Ricciardi Decl.") ¶ 39; Dkt. 288, Declaration of Moira Demos ("Demos Decl.") ¶ 40; Walker Decl. ¶ 22, Ex. 21, Deposition Transcript of Lisa Nishimura ("Nishimura Dep.") at 126:21–25; *id.* ¶ 10, Ex. 9 Deposition Transcript of Laura Ricciardi ("Ricciardi Dep.") at 94:9–17; *see also* Dkt. 272, Declaration of Adam Del Deo ("Del Deo Decl.") ¶¶ 4–5; *cf. supra* Pl. PFOF¶¶ 59; 71–78.

RESPONSE 3:  Plaintiff disputes this proposed fact. Defendants testified uniformly that Netflix approved the series, and it had the right to do so. The Netflix representatives of the creative team that participated in the production of MAM reviewed and approved the final versions of all episodes of MAM prior to its being published. Proposed Undisputed Fact 59; Barker Decl., Ex. 3, Nishamura Tr. at pp. 170-71; Ex. 4, Del Deo Tr. at p. 141; Dkt #330-22 (license agreement excerpts).Moreover, the series notes repeatedly show Chrome providing revised versions after receiving Netflix notes, with Netflix approving them, as explained in Plaintiff's prior proposed findings of fact. See Dkt #325, CAPFF #2. At these calls, Netflix provided its comments and direction for the series. *Id.*  As just one example, Netflix approved a revised version of Episode 5 with the comment that "setting up Colborn as the potential cop to plant' the SUV "works really well now." Dkt #330-1, p. 39, NFXCOL 278.

4.      Netflix deferred to the filmmakers on presenting an accurate story, and Netflix did not suggest that the filmmakers sacrifice accuracy in order to speed up the pace of a scene or make a scene more impactful. *See* Del Deo Decl. ¶¶ 11, 13; *see also* Nishimura Decl. ¶ 8; Walker Decl. ¶ 25, Ex. 24 (NFXCOL0000212) at 213 (suggesting holding one scene longer if possible, but acknowledging "[w]e know this is court footage that may not exist.")

RESPONSE 4:  Plaintiff disputes this proposed fact. Defendants testified uniformly that Netflix approved the series, and it had the right to do so. The Netflix representatives of the creative team that participated in the production of MAM reviewed and approved the final versions of all episodes of MAM prior to its being published. Proposed Undisputed Fact 59; Barker Decl., Ex. 3, Nishamura Tr. at pp. 170-71; Ex. 4, Del Deo Tr. at p. 141; Dkt 330-22 (license agreement excerpts).Moreover, the series notes repeatedly show Chrome providing revised versions after receiving Netflix notes, with Netflix approving them, as explained in Plaintiff's prior proposed findings of fact. See Dkt #325, CAPFF #2. At these calls, Netflix provided its comments and direction for the series. *Id.*  As just one example, Netflix approved a revised version of Episode 5 with the comment that "setting up Colborn as the potential cop to plant' the SUV "works really well now." Dkt #330-1, p. 39, NFXCOL 278.  Netflix also repeatedly suggested that Chrome cut for space and that it avoid lengthy courtroom scenes. Dkt #330-1 (NFXCOL 224-25, 212, 1949, 1959, 1996, 2131, 2062, 2076, 2078, 2083).

5.       Nishimura stated in her declaration that edits regarding pacing were intended to "engage the viewer" and help the viewer digest the most salient points of a long and sprawling account. Nishimura Decl. ¶¶ 8, 13–14.

RESPONSE 5:  Plaintiff objects to the declaration as containing self-serving testimony that appear to contradict the claims by Nishamura at her deposition that she did not remember much about the series except what she read in notes and exhibits provided to her. Plaintiff further objects to the relevance of the statement and disputes that it proves that Defendants did not act with actual malice or any other fact relevant to this case. Moreover, the Netflix communications show that Netflix was pushing for shorter episodes. Barker Decl., Ex. 1 (NFXCOL 224-25, 212, 1949, 1959, 1996, 2131, 2062,

2076, 2078, 2083). Even if "engaging the viewer" was the goal, this is not an excuse to make edits in a manner that did not fairly represent the subject.

6.    Del Deo has attested that Netflix employees suggested that episodes should end on a cliffhanger in order to keep viewers engaged so they watch the next episode. *See* Del Deo Decl. ¶ 12; *compare* Walker Decl. ¶ 24, Ex. 23 (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 2 (citing *id.* ¶ 25, Ex. 24 (NFXCOL0000212) at 213) with *id.* ¶ 31, Ex. 30 (NFXCOL0000226) at 229; *id.* ¶ 32, Ex. 31 (NFXCOL0000273) at 274; *id.* ¶ 20, Ex. 19 (NFXCOL0000335) at 339; *id.* ¶ 33, Ex. 32 (NFXCOL0002059) at 2063; *cf. supra* Pl. PFOF ¶¶ 71, 72.

<u>RESPONSE 6</u>:  Plaintiff objects to the relevance of the statement and disputes that it proves that Defendants did not act with actual malice or any other fact relevant to this case.

7.    Nishimura has attested that, "In the notes we recommended that the filmmakers "foreshadow" future plot points in early episodes in order to keep viewers engaged, so they would watch coming episodes and benefit from receiving a complete account. This is not an unusual suggestion. We wanted viewers to watch all ten episodes of the series to get the full story *MaM* was intended to capture." Nishimura Decl.¶ 14; *cf. supra* Pl. PFOF ¶¶ 71, 72.

<u>RESPONSE 7</u>: Plaintiff objects to the relevance of the statement and disputes that it proves that Defendants did not act with actual malice or any other fact relevant to this case and objects to the extent that Nishamura is being proffered as an undisclosed expert witness. Plaintiff further objects to the declaration as containing self-serving testimony that appear to contradict the claims by Nishamura at her deposition that she did not remember much about the series except what she read in notes and exhibits provided to her.

8.    Creative executives sometimes use colorful language and terms of art when providing notes to filmmakers. *See* Del Deo Del. ¶ 11–13; *cf. supra* Pl. PFOF¶ 73.

<u>RESPONSE 8</u>:  Plaintiff objects to the relevance of the statement and disputes that it proves that Defendants did not act with actual malice or any other fact relevant to

this case and objects to the extent that Del Deo is being proffered as an undisclosed expert witness.

9.    Netflix creative executives repeatedly suggested changes to the Series' music, including the "lulling guitar" and "prod rock type guitar music," but their suggestions were not implemented, and those themes remain an integral part of the Series' musical score. Dkt. 286-9, Barker Declaration ¶ 10, Ex. 9 at 36 (NFXCOL0002009), 64 (NFXCOL0002037); *c.f., e.g., MaM* Ep. 1 at 3:11 (guitar background immediately after opening credits), 1:02:38 (guitar theme during credits); *cf. supra* Pl. PFOF ¶ 73.

RESPONSE 9: Plaintiff disputes this statement as at numerous points during the series, ominous, foreboding music is played, especially when law enforcement representatives are on the screen. With respect to Plaintiff in particular, his testimony is punctuated by ominous, pounding tones and at some points with spooky chime music. Dkt #312; Dkt #120-5; Dkt #120-7. Netflix encouraged Chrome to look for opportunities in MAM to include music that would help identify the "baddies" – i.e., law enforcement representatives, Dkt #330-1 at NFXCOL 1953; *see also* 2009-2010, 243, 2174, – and to convey a "bad guy theme" or "villain theme" when they appeared on screen. *Id.* Dkt #330-3 at Manhardt 793, 817. It makes sense that Chrome would have worked with Netflix to incorporate the "bad buy" and "villain" themes that Netflix wanted, because Defendants testified uniformly that Netflix approved the series, and it had the right to do so. The Netflix representatives of the creative team that participated in the production of MAM reviewed and approved the final versions of all episodes of MAM prior to its being published. Proposed Undisputed Fact 59; Barker Decl., Ex. 3, Nishamura Tr. at pp. 170-71; Ex. 4, Del Deo Tr. at p. 141; Dkt 330-22 (license agreement excerpts).Moreover, the series notes repeatedly show Chrome providing revised versions after receiving Netflix notes, with Netflix approving them, as explained in Plaintiff's prior proposed findings of fact. See Dkt #325, CAPFF #2. At these calls, Netflix provided its comments and direction for the series. *Id.* As just one example, Netflix approved a revised version of Episode 5 with the comment that "setting up

Colborn as the potential cop to plant' the SUV "works really well now." Dkt #330-1, p. 39, NFXCOL 278.

10. At Netflix's suggestion, Ricciardi and Demos integrated graphical elements to enhance the clarity and factual accuracy of the Series, especially because Avery's prosecution for Halbach's murder involved a large number of facts, events, dates, locations, and individuals, including numerous MTSO officers, to keep track of. Ricciardi Decl. ¶ 42; Demos Decl. ¶ 43; Nishimura Decl. ¶ 16; Del Deo Decl. ¶¶ 13–14; *compare* Walker Decl. ¶ 24, Ex. 23 (Pl.'s Response to Netflix's First Set of Interrogs. (Oct. 6, 2021)), Interrog. 1 at 3–4 with *id*. ¶ 34, Ex. 33 (NFXCOL0000208) at 210; *id*. ¶ 15, Ex. 14 (NFXCOL0000215) at 219; *id*. ¶ 35, Ex. 34 (NFXCOL0000288); *id*. ¶ 28, Ex. 27 (NFXCOL0001976) at 1982; *id*. ¶ 36, Ex. 35 (NFXCOL0000293); *id*. ¶ 37, Ex. 36 (NFXCOL0000245); *id*. ¶ 17, Ex. 16 (NFXCOL0000265); *cf. supra* Pl. PFOF ¶¶ 2, 12, 15.

RESPONSE 10: Plaintiff disputes the characterization of Netflix's direction as a mere "suggestion." Plaintiff disputes this proposed fact. Defendants testified uniformly that Netflix approved the series, and it had the right to do so. The Netflix representatives of the creative team that participated in the production of MAM reviewed and approved the final versions of all episodes of MAM prior to its being published. Proposed Undisputed Fact 59; Barker Decl., Ex. 3, Nishamura Tr. at pp. 170-71; Ex. 4, Del Deo Tr. at p. 141; Dkt 330-22 (license agreement excerpts).Moreover, the series notes repeatedly show Chrome providing revised versions after receiving Netflix notes, with Netflix approving them, as explained in Plaintiff's prior proposed findings of fact. See Dkt #325, CAPFF #2.

11. Del Deo unequivocally denied that he believes *MaM* to be asserting that Colborn planted evidence to frame Avery. Walker Decl. ¶ 14, Ex. 13, Del Deo Dep. at 173:15–19; *id*. 174:2–7; *cf. supra* Pl. PFOF ¶¶ 55–57.

RESPONSE 11: Plaintiff objects to the testimony as it represents merely Defendants' attempt to characterize MAM; the series is in the record and is the best evidence of what is in it. Dkt #120-1 through 120-10. Moreover, because numerous viewers did so interpret MAM and anyone who views it can see that it does so assert, Del

Deo's testimony is at odds with a plain reading of MAM, so his testimony is not credible

on its face. It is also inconsistent with Netflix creative team notes, including Netflix's

approval of a revised version of Episode 5 with the comment that "setting up Colborn as

the potential cop to plant' the SUV "works really well now." Dkt #330-1, p. 39,

NFXCOL 278; and with an e-mail exchange between Del Deo and Ben Cotner of Netflix

in which Del Deo noted that it appeared that Jerome Buting's comments in the series

were accusing law enforcement officers of not just planting evidence, but murder. Dkt

#330-1 at NFXCOL 294-95.

12. Both Del Deo and Nishimura likewise have averred that Netflix did not
intend for *MaM* to convey that Colborn in fact planted evidence and that it never
occurred to them that any reasonable viewer would understand either the series or Netflix
to be reaching a conclusion about Colborn's culpability. *See* Nishimura Decl. ¶ 18; Del
Deo Decl. ¶ 10; *cf. supra* Pl. PFOF ¶¶ 55–57.

RESPONSE 12:  Plaintiff objects to the testimony as it represents merely

Defendants' attempt to characterize MAM; the series is in the record and is the best

evidence of what is in it. Dkt #120-1 through 120-10. Moreover, because numerous

viewers did so interpret MAM and anyone who views it can see that it does so assert, Del

Deo's and Nishamura's testimony is at odds with a plain reading of MAM, so their

testimony is not credible on its face. It is also inconsistent with Netflix creative team

notes, including Netflix's approval of a revised version of Episode 5 with the comment

that "setting up Colborn as the potential cop to plant' the SUV "works really well now."

Dkt #330-1, p. 39, NFXCOL 278; and with an e-mail exchange between Del Deo and

Ben Cotner of Netflix in which Del Deo noted that it appeared that Jerome Buting's

comments in the series were accusing law enforcement officers of not just planting

evidence, but murder. Dkt #330-1 at NFXCOL 294-95.

13.    The filmmakers purposely did not present voiceover narration or a conclusion at the end of the Series regarding whether Avery and/or Dassey were guilty, leaving viewers with open questions. Ricciardi Decl. ¶¶ 47, 48; Demos Decl. ¶¶ 48, 49.

RESPONSE 13:  Plaintiff disputes that the Defendants' self-serving statements

regarding their intent are sufficient to overcome the exhaustive summaries of actual

malice that Plaintiff summarized in his response to Defendants' proposed findings of fact.

Dkt #326 at responses to PFOF ##126-141, Dkt #326-1 and 326-2. Moreover, regardless

of how Avery is or is not portrayed, the series can be and was fairly understood as

accusing law enforcement officers of planting evidence. Dkt. #130-1.

14.    The filmmakers do not know whether Plaintiff or others in law enforcement planted evidence against Avery. They intended to convey the ambiguity and uncertainty they feel in the Series and deliberately raise questions without telling viewers what to think. Ricciardi Decl. ¶¶ 47, 48; Demos Decl. ¶¶ 48, 49.

RESPONSE 14:  Plaintiff disputes that the Defendants' self-serving statements

regarding their intent are sufficient to overcome the exhaustive summaries of actual

malice that Plaintiff summarized in his response to Defendants' proposed findings of fact.

Dkt #326 at responses to PFOF ##126-141, Dkt #326-1 and 326-2. Moreover, regardless

of how Avery is or is not portrayed, the series can be and was fairly understood as

accusing law enforcement officers of planting evidence. Dkt. #130-1.

b.    **Differing Viewpoints in and about *MaM***

15.    Plaintiff has never watched *MaM* in its entirety and watched only snippets totaling less than 30 minutes before bringing this lawsuit. He has since watched no more than an additional 30 to 45 minutes. *See* Dkt. 279, Statement of Stipulated Facts, ¶¶ 3, 4; Dkt. 289, Declaration of Kevin Vick ("Vick Decl.") ¶ 6, Ex. 5, Colborn Dep. at 411:2–23.

RESPONSE 15:  Plaintiff does not dispute this proposed fact but objects to its

relevance.

16.     The Series depicts differing reactions to Steven Avery in the local community, with some who believed his framing defense, some who believed he was guilty, and some whose views were shown changing over time. *See*, *e.g.*, *MaM* Ep. 3 at 14:14–15:40 (bar patrons playing pool with Steven Avery's brother Chuck Avery expressing their belief in the framing theory); *MaM* Ep. 3 at 29:00–29:03 (local news segment after March 2, 2006 press conference with two local residents interviewed at a bar expressing the belief that Dassey and Avery killed Teresa Halbach, and one local resident interviewed in the street whose mind was changed toward guilt); *see also MaM* Ep. 3 at 4:25 and 12:30 (identifying onscreen "Chuck Avery Steven's Brother"); Vick Decl. ¶ 6, Ex. 5, Colborn Dep. at 77:8–14, 83:3–7.

RESPONSE 16:  Plaintiff objects to Defendants' attempt to characterize MAM; the series is in the record and is the best evidence of what is in it and it belies Defendants' characterizations of it as fair or balanced. Dkt #120-1 through 120-10. Moreover, the overwhelming weight of MAM tells the story that those who believed the framing defense were fooled by corrupt law enforcement officers. *Id.*

17.     *MaM* shows Plaintiff denying in sworn testimony that he planted evidence to frame Steven Avery. Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM008000 at 140–41; *MaM* Ep. 7 at 18:42–19:15; *cf. supra* Pl. PFOF¶ 70.

RESPONSE 17:  Plaintiff denies that his testimony as represented in MAM is accurate. As Plaintiff has reiterated numerous times in this case, his testimony was heavily edited, including by eliminating from this denial the response, "That's ridiculous, and no, I have not." The edits to his testimony have been confirmed by Moira Demos in her deposition. Dkt #330-20, Demos Depo Tr., pp. 180-207.

18.     Nishimura has attested that, "MaM included not only the fact that Avery accused law enforcement of planting evidence to frame him for Halbach's murder, but also that the jury did not find this accusation credible, that it convicted him, and that his post-trial motions were unsuccessful." Nishimura Decl.¶ 14; *cf. supra* Pl. PFOF ¶¶ 55–57.

RESPONSE 18:  Plaintiff objects to the testimony as it represents merely Defendants' attempt to characterize MAM; the series is in the record and is the best evidence of what is in it. Dkt #120-1 through 120-10. Moreover, because numerous

viewers did so interpret MAM and anyone who views it can see that it does so assert, Del

Deo's and Nishamura's testimony is at odds with a plain reading of MAM, so their

testimony is not credible on its face. It is also inconsistent with Netflix creative team

notes, including Netflix's direction to Chrome that the series was to be crafted in such a

way as to ensure that "the audience should be feeling more intense anger, sadness,

bewilderment, and perhaps even fury at this jury decision." Dkt #330-1, NFXCOL 2163-

64, 2186-87.

19.     As shown in *MaM*, Avery's attorney Dean Strang's closing argument at
trial emphasized that the defense's theory was that officers planted evidence "to ensure
the conviction of someone they've decided is guilty." *See MaM* Ep. 8 at 8:51–9:00; *see
also* Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 46.

RESPONSE 19:  Plaintiff disputes that the paraphrase mixed with partial quotes

accurately characterizes Strang's closing argument, which indicated that when officers

plant evidence, they do so to ensure the conviction of someone they've decided is guilty –

he did not make the statement that any particular officer in fact planted evidence.

Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24, CHRM004546 at 46.

20.     Kratz noted in his closing that it "shouldn't matter whether or not that key
was planted" because "that key, in the big picture, in the big scheme of things, means
very little" compared to the bulk of evidence against Steven Avery. *See MaM* Ep. 8 at
9:02, 9:30; *see also* Ricciardi Decl. ¶ 119, Ex. 24, 2007 Avery Trial Day 24,
CHRM004546 at 64.

RESPONSE 20:  Plaintiff does not dispute that Kratz made the statements in issue

but objects to MAM as evidence.

21.     Some members of the public who watched *Making a Murderer* were left
with questions about whether Avery was guilty and whether officers planted evidence.
*See e.g.*, Vick Decl. ¶ 31, Ex. 30, Griesbach0026044 ("I've debated this for a week with
my wife and children and in my own mind. I am convinced he is guilty [I said the same in
the interview I sent you.] . .'. but I'm nowhere near as certain that the cops did not plant
evidence to bolster their case."); Vick Decl. ¶ 32, Ex. 31, Griesbach0014413 ("I went into
the documentary determined to see through any bias the film might employ, but I came
out of it more conflicted than ever. Not so much as to either defendants' guilt, but

whether they received a fair trial.”); Vick Decl. ¶ 3, Ex. 2, Deposition Transcript of Brenda Schuler (“Schuler Dep.”) at 45:2–47:11 (testifying that *MaM* raised questions thinking Avery was not guilty, she researched them, and she concluded Avery is guilty).

RESPONSE 21: Plaintiff disputes the relevance of statements by his former counsel and by Ms. Schuler and notes that both ultimately revised their opinions. *See, e.g.,* Dkt #315 (Griesbach Declaration) at p. 2, ¶ ¶8-9. Moreover, numerous members of the public obviously concluded after watching MAM that Plaintiff planted evidence and/or killed Ms. Halbach. Dkt #130, Colborn Decl., Ex. 1.

22. In *Making a Murderer*, the filmmakers took steps to further show the viewpoints of the Halbach family, law enforcement, and the prosecution by including, among other things, footage from press conferences, legal proceedings, and news reports featuring their opinions. *See, e.g.*, Ricciardi Decl. ¶¶ 13 (Halbach family), ¶ 14 (prosecutors); ¶ 86 (scenes in *MaM* that directly push back against Avery's planting allegations); see also *MaM* Ep. 3 at 22:51–23:22 (MTSO Undersheriff criticizing Avery's planting accusations against officers and characterizing them as “impossible”); *MaM* Ep. 7 at 13:55–14:28; 44:00–45:30 (Multiple scenes in which the prosecutors from Avery's murder trial push back against Avery's planting accusations by, among other things, calling those accusations “despicable” and “deplorable.”); *MaM* Ep. 7 at 24:30–24:50 (scene in which a member of the media calls out Avery's criminal defense attorneys for accusing Plaintiff of planting); *MaM* Ep. 8 34:02–19 (newscast in which an anchorman reads Plaintiff's prepared public statement following the jury's guilty verdict in Avery's murder trial); *see also* Dkt. 294, Prod. Def. MSJ at 16–18, 21–26, 31–32, 36–37.

RESPONSE 22: Plaintiff disputes the Defendants' characterization that they “took steps” to show the viewpoints of those described in any manner except to characterize them as “antagonists” to Avery. Chrome sought to have viewers “kicking themselves” for believing officials in early episodes, Dkt #330-2, Manhardt 149, and were included to let them “have [their] day” as a prelude to retelling their perspectives by “our more reliable narrators” (*i.e.*, Avery and his advocates) thereafter. S*ee* Dkt #330-2, p. 39, Manhardt 493.

**c.    Relevant Underlying Events**

23.     While serving a 60-year prison sentence, in 1995–97, Avery filed multiple unsuccessful motions for post-conviction relief, relying on DNA evidence that revealed the victim, Penny Beerntsen's, fingernail scrapings came from a DNA profile that matched neither Avery nor the victim. Avery argued that the sheriff's department had information that it failed to disclose to Avery regarding an "alternative suspect living in Sheboygan County who matched the description of the perpetrator." The court denied the motions, and Avery remained incarcerated for seven more years. *State v. Avery* (*"Avery II"*), 570 N.W.2d 573, 575 (Wis. Ct. App. 1997).

RESPONSE 23:  Plaintiff does not dispute that the cited case generally so states but denies that anything concluded in that case is relevant or admissible evidence in this case for the truth of any matters asserted therein.

24.     DNA evidence showed that Gregory Allen, who had committed and been convicted of another brutal sexual assault in 1995, was the actual assailant of Penny Beerntsen. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281 at CHRM011282.

RESPONSE 24:  Plaintiff objects to the proposed finding of fact as irrelevant and as consisting of numerous layers of inadmissible non-party hearsay and unauthenticated documents.

25.     The Wisconsin Department of Justice determined in their December 2003 Avery Review that Manitowoc County law enforcement had evidence that Avery had sixteen alibi witnesses and corroborating time-stamped receipts at the time of Penny Beerntsen's assault. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281 at CHRM011286.

RESPONSE 25: Plaintiff objects to the proposed finding of fact as irrelevant and as consisting of numerous layers of inadmissible non-party hearsay and unauthenticated documents.

26.     The Wisconsin Department of Justice determined in their December 2003 Avery Review that Manitowoc County law enforcement had information that should have led them to consider Gregory Allen as a suspect in the Penny Beerntsen assault, including a similar assault two weeks prior. Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281 at CHRM011287.

RESPONSE 26:  Plaintiff objects to the proposed finding of fact as irrelevant and as consisting of numerous layers of inadmissible non-party hearsay and unauthenticated documents.

27.    The Wisconsin Department of Justice determined in their December 2003 Avery Review that Manitowoc County law enforcement did not investigate Gregory Allen as a suspect in the Penny Beerntsen assault "because the sheriff's department had only one suspect in mind" and "the sheriff, and eventually the district attorney became convinced that Avery, and no one else, was the responsible party." Ricciardi Decl. ¶ 100, Ex. 5, Wisconsin DOJ Avery Review, CHRM011281 at CHRM011292.

RESPONSE 27:  Plaintiff objects to the proposed finding of fact as irrelevant and as consisting of numerous layers of inadmissible non-party hearsay and unauthenticated documents.

28.    Plaintiff Andrew Colborn testified in his October 13, 2005 deposition in Avery's civil rights lawsuit that in 1994 or 1995, while he was a corrections officer at the Manitowoc County Jail, he received a phone call from someone identifying himself as a detective in another county, who said an inmate in their custody claimed to have committed an assault in Manitowoc County for which someone else was still incarcerated. (The "Jail Call"). Ricciardi Decl. ¶ 102, Ex. 7, Avery Civil Lawsuit Deposition Transcript of Andrew Colborn ("Colborn Avery Dep."), CHRM002891 at 5:12–24 (timeline and role); 10:22–11:8 (detective's message); SAC ¶ 24; *see also MaM* Ep. 2 at 18:37– 19:02.

RESPONSE 28:  Plaintiff does not dispute this proposed finding of fact except that the source materials disclose that the caller relayed that the person at issue was in prison.  *See* Dkt #120-14, Depo p. 14:7-12 and Depo p. 5:12-24. Plaintiff also disputes the use of MAM as evidence of anything purported to be portrayed in it.

29.    Colborn "wrote a statement in September 2003 regarding a telephone call that [he] received in or around 1994 or 1995 while [he] was a corrections officer at the Manitowoc County Jail. That statement was provided to then-Sheriff Kenneth Peterson, who told [Colborn] that he would put the statement in a safe." Dkt. 270, Statement of Stipulated Facts, ¶ 2; *see* Vick Decl., ¶ 34, Ex. 33; Colborn Dep. at 404:4–8; Ricciardi Decl. ¶ 98, Ex. 3, Plaintiff's 2003 Statement re Jail Call, CHRM004479 (dated September 12, 2003); *see also* Ricciardi Decl. ¶ 99, Ex. 4, Wisconsin DOJ Strauss Report re safe, CHRM004724.

RESPONSE 29: Plaintiff does not dispute this proposed finding of fact, but

objects to consideration of the DOJ report as inadmissible non-party hearsay

unauthenticated by any witness with personal knowledge.

30.     Plaintiff has testified that he transferred the Jail Call to an MTSO detective
number but never heard any feedback or response regarding the call. Ricciardi Decl.
¶ 102, Ex. 7, Colborn Avery Dep., CHRM002891 at 15:7–24; Ricciardi Decl. ¶ 98, Ex. 3,
Plaintiff's 2003 Statement re Jail Call, CHRM004479.

RESPONSE 30: Plaintiff does not dispute this proposed finding of fact.

31.     Several others in law enforcement have testified or otherwise stated that
they believed someone in MTSO (some believed it was likely Sheriff Kocourek) relayed
a message to Plaintiff that Plaintiff should not worry about the Jail Call because MTSO
had "the right guy." Vick Decl. ¶ 7, Ex. 6, Jones Memo produced by Wisconsin
Department of Justice, DJ001; Vick Decl. ¶ 8, Ex. 7, Jones Memo metadata from
Wisconsin DOJ, DJ002 ; *see also* Ricciardi Decl. ¶ 104, Ex. 9, Avery Civil Lawsuit
Deposition Transcript of Eugene Kusche ("Kusche Dep.") at 72:16–78:6; Ricciardi Decl.
¶ 97, Ex. 2, Lenk 2003 Statement re Jail Call, CHRM004478 (dated September 12,
2003); *MaM* Ep. 2 at 24:21–26:56 (Rohrer and Kusche testifying re Jones Memo).

RESPONSE 31: Plaintiff objects to this proposed finding of fact as consisting of

non-party hearsay that is inadmissible in this case for the truth of the matters asserted

therein.

32.     Avery filed a civil rights lawsuit for $36 million in this Court in 2004,
asserting claims against Manitowoc County, former Manitowoc County Sheriff Thomas
Kocourek, and District Attorney Dennis Vogel for violating his constitutional right to due
process by targeting him and failing to investigate Allen; focusing the investigation on
Avery because of personal hostility against him; failing to provide exculpatory
information to his defense counsel; and continuing to withhold exculpatory evidence
during his incarceration. *See Avery v. Manitowoc Cty.*, 428 F. Supp. 2d 891, 893 (E.D.
Wis. 2006); *see also MaM* Ep. 2 at 9:43–10:24.

RESPONSE 32: Plaintiff does not dispute this proposed finding of fact, but

disputes that the allegations in Avery's complaint may be considered any evidence of any

of the matters asserted therein and as hearsay.

33.     Calumet County took over the investigation of Teresa Halbach's murder to avoid the appearance of conflict-of-interest issues related to Avery's ongoing lawsuit against Manitowoc County. *See MaM* Ep. 2 at 40:11–41:20 (November 7, 2005 press conference introducing Ken Kratz Calumet County District Attorney as Special Prosecutor in the case).

RESPONSE 33:  Plaintiff objects to the proposed finding of fact as relying on non-party hearsay as presented in MAM,  and which is not admissible evidence for the truth of the matters asserted therein.

34.     Manitowoc County Sheriff Ken Petersen was recused from the Teresa Halbach investigation. Vick Decl. ¶ 2, Ex. 1, Deposition Transcript of Kenneth Petersen ("Petersen Dep.") at 149:6–23.

RESPONSE 34:  Plaintiff does not dispute this proposed finding of fact.

35.     Beginning on November 5, 2005 through November 8, 2005, MTSO Deputies Plaintiff and Lenk took part in several days' searches of the interior of Steven Avery's trailer and garage and only found the Toyota key on November 8, 2005. *See* Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7 CHRM008000 at 196–97.

RESPONSE 35:  Plaintiff does not dispute this proposed finding of fact.

36.     As shown on *MaM*, Plaintiff testified at trial that when searching the bookcase in Avery's bedroom on November 8, 2005, he was handling it "rather roughly, twisting it, shaking it, pulling it" before Lenk discovered a Toyota key on the floor later that day. The officers then stopped and photographed the key on the floor. Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery trial day 7, CHRM008000 at 125–131; *MaM* Ep. 7 at 16:18–17:30; *see also* Ricciardi Decl. ¶ 106, Ex. 11, MTSO Investigative Summary with November 8, 2005 entry, CHRM016566 at CHRM016583 (Lenk's report of finding the Key); *cf. id.* at CHRM016584 (Colborn's report for November 8, 2005 making no mention of the Key); *see also MaM* Ep. 7 at 8:26–9:45 (Buting questioning Kucharski about the theory that the Key fell out the back of the bookcase).

RESPONSE 36:  Plaintiff does not dispute that elements of his testimony were portrayed but disputes that they were presented in context. Rather, his testimony was heavily edited and presented in a manner that did not make sense to listeners. The extensive edits were confirmed by Moira Demos in her deposition. Dkt #330-20, Demos Depo Tr., pp. 180-207.

37. The initial criminal complaint in the Avery case identified Deputy Kucharski as the officer who found the key to Teresa Halbach's Toyota, instead of James Lenk. Ricciardi Decl. ¶ 75; Demos Decl. ¶ 81; Ricciardi Decl. ¶ 105, Ex. 10, State v. Avery Criminal Complaint, CHRM019831–34.

RESPONSE 37: Plaintiff does not dispute this proposed fact but objects to its relevance to the issues to be decided in this case and objects to consideration of the contents of the initial criminal complaint as hearsay.

38. In a January 30, 2007 pretrial order admitting evidence of a vial of Avery's blood taken in 1996, Judge Willis explicitly identified Plaintiff as one of two Manitowoc officers that the defense could accuse at trial of planting evidence: "The court does not understand Avery will be attempting to implicate any members of the Sheriff's Department other than Mr. Lenk or Mr. Colborn in any frame-up." Ricciardi Decl. ¶ 111, Ex. 16, CHRM003721 at CHRM003722, CHRM003727–28; *cf. supra* Pl. PFOF ¶ 57.

RESPONSE 38: Plaintiff does not dispute that Judge Willis' order so stated, but denies that the language quoted is evidence of how Avery's attorneys' argued to the jury at trial, the best evidence of which is the transcript of those arguments. Dkt #330-19 at pp. 46-48.

39. Plaintiff produced no evidence contemporaneous to the underlying events at issue in this lawsuit. Declaration of Meghan Fenzel ("Fenzel Decl.") ¶ 5, Ex. 4, April 12, 2022 Meet and Confer Correspondence (confirming Plaintiff did not retain or produce "documents relating to the events that were the underlying subject of *MaM*").

RESPONSE 39: Plaintiff disputes this proposed finding of fact. The contemporaneous evidence produced by Plaintiff is summarized in the Declaration of Debra L. Bursik, filed as Dkt # 354.

40. Plaintiff acknowledged that unless someone was in the room with him at the time, they could not know with 100% certainty whether he planted Teresa Halbach's Toyota key in Avery's bedroom and would have to trust that he was telling the truth in his trial testimony. Fenzel Decl. ¶ 3, Ex. 2, Colborn Dep. at 173:7–174:12.

RESPONSE 40: Plaintiff disputes the Defendants' characterization of his testimony. Plaintiff's testimony speaks for itself and is set forth below.

```
  1        A    Yes, I do.
  2        Q    But unless Mr. Griesbach was in the room
  3    with you or any of us sitting here today were in the
  4    room with you, none of us can know with 100 percent
  5    certainty, correct?
  6        A    I would think that I drove that point home
  7    in the trial, and based on the subsequent conviction,
  8    I believe the jury was convinced of it.
  9        Q    We would have to trust you, correct,
 10    Mr. Colborn?
 11        A    Yes, you would have to trust that I was
 12    telling the truth under oath.
```

41.     To the extent that there are any inaccuracies in the Series, such inaccuracies were inadvertent, and the Producer Defendants entertained no doubts that *MaM* accurately captured the gist of the parties' contentions. *See* Ricciardi Decl. ¶¶ 30, 49, 51, 52, 54, 58, 59, 60, 61, 63, 69, 70, 71, 72, 73, 74, 78, 80, 86, 87, 95; Demos Decl. ¶¶ 31, 50, 52, 53, 55, 56, 60, 61, 62, 63, 65, 70, 72, 73, 74, 75, 76, 77, 78, 79, 80, 84, 86, 92, 93, 102.

RESPONSE 41:  Plaintiff objects to the testimony as it represents merely

Defendants' attempt to characterize MAM; the series is in the record and is the best

evidence of what is in it. Dkt #120-1 through 120-10. Moreover, because numerous

viewers did so interpret MAM and anyone who views it can see that it does so assert,

Defendants' testimony is at odds with a plain reading of MAM, so it is not credible on its

face.

42.     The Producer Defendants believe that *MaM* accurately portrays the opinion commentary from various individuals sympathetic to Avery. Ricciardi Decl. ¶ 76; Demos Decl. ¶ 82.

RESPONSE 42:  Plaintiff objects to this proposed fact as a mere legal conclusion

that mischaracterize statements as opinion that were factual in nature, as the statements

themselves disclose. Plaintiff's Proposed Findings of Fact, Dkt #287 at ¶¶ 3-54.

43.     The Producer Defendants believe that any perceived omissions to *MaM* were due to the challenge of compressing 30 years of history into 10 hours of television and did not alter the meaning of the Series or present Avery's criminal defense and the

opinions of Avery and his defenders as "actual and unanswered facts." Ricciardi Decl.
¶¶ 77, 79–86; Demos Decl. ¶¶ 83, 85–92.

RESPONSE 43: Plaintiff objects to the Defendants' purported self-serving

"beliefs" as irrelevant to the issues in this case, as legal conclusions, and to any attempt to

characterize in such cursory means the series, which is in the Court record at Dkt #120-1

to 120-10 and speaks for itself as the best evidence of the series.

44. There are numerous scenes in *MaM* that reflect negatively on Avery. *See*,
*e.g.*, Ricciardi Decl. ¶ 84, Demos Decl. ¶ 90; *see also MaM* Ep. 3 at 42:00– 42:08 (A
scene with a statement by Chuck Avery, Steven Avery's brother, stating that he was
"pretty positive" Steven murdered Teresa Halbach); *MaM* Ep. 3 25:21–25:29 (A scene in
which Steven Avery's sister, Barbara Janda, tells Steven "I hate you for what you did to
my kid. All right? So you can rot in hell.") *MaM* Ep. 5 at 19:28–21:56 (Scenes showing
Avery's nephew Bobby Dassey testifying against him at his murder trial, with Dassey
shown as being one of the prosecution's most important witnesses); *MaM* Ep. 7, 59:12–
1:00:04 (A scene showing Teresa Halbach's brother Mike Halbach opining that he
believed Avery was guilty); *MaM* Ep. 1 at 5:18–7:24 (Morris allegations of indecent
exposure by Avery); *MaM* Ep. 1 at 9:30–9:59 (Avery's burglaries); *MaM* Ep. 1 at 10:00–
10:53 (Avery's cat burning and conviction and probation); *MaM* Ep. 1 at 12:31– 13:59
(Avery's reckless endangerment of Morris); *MaM* Ep. 1 at 16:07 (Avery's criminal
charges for reckless endangerment of Morris); *MaM* Ep. 1, 26:36–28:18 (An interview in
which Judge Hazlewood, the presiding judge in Avery's 1985 trial, opines that Avery had
a propensity for violence against women); *MaM* Ep. 3 at 9:30–11:14 (A scene in which
Steven Avery tells his parents that he was going to kill himself if they did not figure out a
way to post bail for him); *MaM* Ep. 6 at 43:20–43:37 (A scene with Avery opining that
the prosecution was going to win at trial); Interviews with various people who opined that
violent crime was in Avery's character, along with interviews of people who disagreed
with that opinion); *MaM* Ep. 1 at 27:09 – 27:52 (An interview with a member of the local
media who said the arrest of Avery for the Beerntsen assault was not a surprise because
Avery was one of the "regular names" on the crime beat in Manitowoc County and the
assault was "in character" for him); *MaM* Ep. 8 at 26:02–28:01 (The jury's guilty verdicts
in Avery's trial for the murder of Teresa Halbach); *MaM* Ep. 9 at 1:01:08–1:02:53 (A
scene showing Judge Willis, who presided over Avery's trial, opining that Avery was
"probably the most dangerous individual to set foot in this courtroom").

RESPONSE 44: Plaintiff admits that various scenes included in MAM discuss

Avery's prior crimes, but the crimes were downplayed as explained in Plaintiff's prior

responses to Defendants proposed finding of fact. Moreover, Defendants sought to

"infuriate" the audience with the statements of others who criticized Avery and described

those who criticized him, including the judge, as "biased." *See, e.g.,* Dkt #330-1 at

NFXCOL 1949, 1961, 2131. Further, Defendants described Avery as their protagonist

and described their relationship with him as "intimate." Colborn 004918 – 00495:

https://crimestory.com/2020/01/02/episode-83-the-twelve-days-of-crime-story-day-11-

moira-demos-and-laura-ricciardi-making-a-murderer/ Defendant Ricciardi also testified

at her deposition that Avery was MAM's protagonist. Dkt #330-10:2-3. Moreover,

whatever MAM's portrayal of Avery, that does not disprove that MAM defamed

Plaintiff.

45.    Plaintiff testified in this lawsuit that as an "introvert" who doesn't like
being the "center of attention," the act of testifying makes him feel uncomfortable. Fenzel
Decl. ¶ 3, Ex. 2, Colborn Dep. at 495:4–498:2.

RESPONSE 45:  Plaintiff does not dispute that he testified as described but

objects to this proposed fact as irrelevant and as an apparent attempt to violate the best

evidence rule; the best evidence of Mr. Colborn's appearance during his testimony in the

Avery trial is raw footage of that testimony. As shown in the videos presented to the

Court, the appearance of his testimony was altered in ways that changed the manner and

presentation of his testimony. Dkt #312.

46.    Plaintiff's former attorney of record Michael Griesbach wrote the
following in his 2016 book INDEFENSIBLE about the Avery case, discussing the officers'
demeanor during depositions in the civil lawsuit: "By the end of the night I had seen clips
of videos from several of the officers' depositions and, I had to admit, they looked like
they were being defensive. They were not happy about being grilled by a roomful of
attorneys concerning a very black mark on their department, especially not with Steven
Avery sitting there, watching them squirm. . . . Most people do get nervous when being
deposed. . . . On the other hand, nearly all of them looked more defensive than they
should have if they had nothing to hide-at least in the video clips the documentarians
chose to include in the series. When I later watched the complete video of the depositions
of the officers who were most directly accused of wrongdoing—either in the first Avery
case or in the second—my concern that they had something to hide, though significantly
reduced, was not completely alleviated. This was not simply a case of only selective
editing to make them look bad." Vick Decl. ¶ 32, Ex. 31, Colborn Dep. Ex. 16-A,
Michael Griesbach, INDEFENSIBLE 31–32 (2016).

RESPONSE 46: Plaintiff objects to this proposed fact as consisting of hearsay and inadmissible lay opinion, and as irrelevant to the issues to be decided by the Court.

47.     In sworn testimony, Plaintiff has acknowledged that, by definition, the anonymous people who left him abusive voicemails were unreasonable. Walker Decl. ¶ 3, Ex. 2 at 296:1–19.

RESPONSE 47: Plaintiff does not dispute that Plaintiff testified essentially as described, but objects to this proposed fact as irrelevant to the question whether viewers reasonably interpreted MAM, as opposed to whether they reasonably interpreted the facts as asserted in MAM.

48.     At the outset of this case, Plaintiff blamed *MaM* for his divorce, but it subsequently came to light that Plaintiff filed for divorce from his third wife after engaging in an extramarital affair. *See* Dkt. 270, Statement of Stipulated Material Facts, ¶¶ 9–12; *see also id.* ¶ 13 ("For the purposes of this case, I have agreed not to assert that Making a Murderer caused my divorce."); Walker Decl. ¶ 49, Ex. 48 (Pl.'s Response to Chrome Defs.' First Set of Interrogs. (Jan. 28, 2022)), Interrog. 8 (" . . . MAM has destroyed my 30 year marriage and the marriage ended in divorce"); Dkt. 273, Declaration of Barbara Colborn ¶¶ 28, 29; Dkt. 274, Declaration of Betty Heinzen ¶ 4; Dkt. 276, Declaration of Paul Kopidlansky ¶¶ 5–7, 9.

RESPONSE 48: Plaintiff objects to this proposed fact as irrelevant and as improperly attempting to speculate regarding Plaintiff's motives for agreeing to a stipulation proposed by Netflix. Plaintiff stipulated that he did not blame MAM for contributing to the demise of his marriage for purposes of this case, not that he did not believe that it did. Plaintiff also objects that the cited materials do not establish that Barb Colborn was his third wife.

49.     Plaintiff violated the confidentiality of the Court-ordered Mediation in this case by telling his friend Brenda Schuler, a producer of the Convicting documentary, about what had happened at the mediation, including the parties' positions. Declaration of Kevin Vick in support of Expedited Motion to Depose Plaintiff ("Vick Dep. Decl."), Dkt. 253 ¶ 2.f, Ex. 1 at 316–22, 341–44.

RESPONSE 49: Plaintiff objects to this proposed fact as irrelevant to the issues before the Court in this case and as a blatant attempt to smear Plaintiff. Moreover,

Plaintiff denies that any information allegedly was disclosed that is not already public record or that would have been evident from the continuation of the case, *i.e.*, it did not settle.

50.　　Plaintiff filmed an interview for a not-yet-released "counter-documentary" *Convicting a Murderer* on March 2, 2018, two weeks before he ended his employment with MTSO and was permitted to publicly speak about the Avery case. Vick Decl. ¶ 22, Ex. 21, COLBTXTS_0004904 (scheduling the interview), Vick Decl. ¶ 23, Ex. 22, COLBTXTS_0004983 (recapping the interview, also reference looking for 11/3 records); *cf.* Vick Decl. ¶ 21, Ex. 20, COLBTXTS_0004696 (stating inability to speak publicly until employment ends March 16, 2018); Vick Decl. ¶ 29, Ex. 28, COLBORN-004888 (*Convicting a Murderer* appearance release form signed and dated March 2, 2018); *see also* Vick Decl. ¶ 27, Ex. 26, SCHULER_00013–25; Vick Decl. ¶ 28, Ex. 27, SCHULER_00330–362.

RESPONSE 50:　Plaintiff objects to this proposed fact as irrelevant to the issues before the Court in this case; subject to the objection, he disputes the proposed fact. Plaintiff had permission from his supervisor to participate in the interview. Dkt #317, ¶27.

51.　　The deposition of Plaintiff's former boss, Sheriff Ken Petersen, revealed that, after Petersen instructed Plaintiff in September 2003 to prepare an incident report regarding the 1994/1995 Jail Call, Plaintiff instead utilized a "statement" form ordinarily utilized by civilian witnesses (not MTSO personnel), which Petersen believed had the effect of burying Plaintiff's report to make it less likely that others would locate it in the future or learn of its contents. Fenzel Decl. ¶ 2, Ex. 1, Petersen Dep. at 94:3–96:14.

RESPONSE 51:　Plaintiff objects to this proposed fact as irrelevant to the issues of this case and as contradicting testimony. Mr. Colborn testified that he was asked to prepare a statement, which he did. Dkt # 120-14, deposition pp. 17-18. Additionally Lenk testified he also was asked by Sheriff Petersen to prepare a statement. Dkt. 120-17, deposition pages 32-33. Sheriff's Petersen's testimony speaks for itself.

52.　　Plaintiff's SAC falsely alleges that "Defendants knew Plaintiff's written report concerning the phone call was not left in the Sheriff's safe but chose to include Glynn's mistaken belief in order to further their false narrative." SAC ¶¶ 28–29. But Plaintiff now has been forced to admit that his statement was kept in a safe in the Sheriff's office—just as contemporaneous December 2005 reports from the Wisconsin

Attorney General provided all along. *See* Dkt. 270, Statement of Stipulated Material Facts ¶ 2; Ricciardi Decl. ¶ 99, Ex. 4, Wisconsin DOJ Strauss Report re safe, CHRM004724.

RESPONSE 52: Plaintiff objects to this proposed fact as to Defendants' gloss and argument contained therein rather than fact, and as to Defendants' improperly speculating regarding matters that were resolved by stipulation. Plaintiff further objects to the DOJ report as unauthenticated non-party hearsay.

53. In this lawsuit, Plaintiff has, at times, refused to admit that Steven Avery's criminal defense at his 2007 trial included a theory that law enforcement planted evidence to frame Avery. These refusals persisted even when confronted with his contradictory prior writings and the Second Amended Complaint specifically referencing the Avery defense's planting theory. *See* Fenzel Decl. ¶ 3, Ex. 2, Colborn Dep. 14:3–17:18 (refusing to stipulate that planting defense was a central theme at Avery's trial); 21:24–26:12 (stating that his position was that he didn't know what the theory was at trial and was never accused of planting evidence); 53:10–25 (acknowledging that he made statement to the news to respond to negative portrayal at trial but still insisted he was never accused of planting evidence); 54:2–56:13 (acknowledging request for admission introduced as Exhibit 11 that denied that Avery's defense "contended" at trial that law enforcement planted evidence); 102:20–103:20 (discussing Brenda Schuler's testimony about how Plaintiff felt wronged for being accused of planting evidence at trial; 107:6–25 (again refusing to acknowledge planting theory); 144:6–147:12 (reading Avery Day 7 trial transcript at pages 201–04 with Kratz and Strang discussing planting theory with the judge yet still not agreeing that the defense had a plaintiff theory); 158:1–163:10 (refusing to acknowledge planting theory when reviewing email Plaintiff wrote to lawyer Patrick Dunphy describing being accused of planting evidence); 408:9–409:16 (after watching *MaM* excerpt of Avery trial with Kratz questioning Plaintiff if he planted evidence, again denying that he was accused of planting evidence at trial); 456:1–458:1 (acknowledging there were implications about police misconduct surrounding the Toyota key, but claiming he thought it was procedural defects rather than a planting theory); *see also* Vick Decl. ¶ 13, Ex. 14, Manitowoc-000158 (email with attorney Patrick Dunphy explaining his ire at Buting and Strang, "In short, the defense was that I and another now retired police officer planted the evidence that led to Mr. Avery's conviction."); Ricciardi Decl. ¶ 114, Ex. 19, 2007 Avery Trial Day 7, CHRM08000 at 201–04 (attorneys and Judge Willis discussing planting theory).

RESPONSE 53: Plaintiff objects to this proposed fact as irrelevant to the substantive issues in this case on multiple levels, including as to what Plaintiff believes on matters that are before the Court for decision. Subject to the objection, Plaintiff's counsel has explained to Defendants' counsel on multiple occasions that review of the

Avery trial materials shows that defense counsel in fact did not directly accuse Plaintiff

of planting evidence at the Avery trial. They argued that if the jury believed that it was

possible that one or more officers planted evidence, then there was reasonable doubt and

Avery should be found not guilty. Dkt #330-19 at pp. 46-48. Further, Plaintiff's prior lay

understanding of a series that Defendants repeatedly note he has not watched is irrelevant

to his understanding of what it presents now.

54.     One Avery juror has stated publicly that he believes Plaintiff testified
falsely at Avery's trial and that Plaintiff "looked like he was sweating and he wasn't
being honest or he was trying to cover up a lot of things on the stand." Fenzel Decl. ¶ 4,
Ex. 3, Rick Maher Interview Part 2 at 15:24–15:37.

RESPONSE 54:  Plaintiff objects to this proposed fact as consisting of hearsay

and irrelevant lay opinion and as irrelevant to the issues in this case, except that the

unrelenting, vitriolic attacks on Mr. Colborn evinced in this and other irrelevant facts set

forth in Defendants' filings may amount to further evidence of actual malice, as

statements following publication can be considered malice and express malice is a factor

that can be considered in the actual malice inquiry.

55.     After deliberations, it was revealed that when the jury was initially polled
at the outset of deliberations, the vote was seven not guilty, three guilty, and two
uncertain. *See MaM* Ep. 8 at 34:53–36:50.

RESPONSE 55:  Plaintiff objects to MAM as evidence of any matters allegedly

portrayed therein; it is hearsay, and edited hearsay, at that.

Dated this 9th day of December, 2022.

By:  *Electronically signed by April Rockstead Barker*
            April Rockstead Barker
            Attorneys for Plaintiff, Andrew L. Colborn
            SBW #1026163
            525 N. Lincoln Ave.
            Beaver Dam, WI 53916
            (920) 887-0387

(262) 666-6483 (facsimile)
aprilrbarker@rocksteadlaw.com

**Co-Counsel:**

Attorney George Burnett
231 S. Adams Street
Green Bay, WI 54301
P.O. Box 23200
Green Bay, WI 54305-3200
Phone: (920) 437-0476
Fax: (920) 437-2868
State Br No. 1005964