UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANDREW L COLBORN,

          Plaintiff,

                                       Case No. 19-cv-0484-bhl

     v.

NETFLIX INC, et al.,

          Defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

On December 18, 2015, Netflix released the ten-part docuseries *Making a Murderer* and turned small-town sergeant Andrew Colborn into a household name. He now very much wishes it had not. His unflattering portrayal in the series transformed his "15 minutes of fame" into what felt like a far longer period of *infamy*, as a mob of outraged viewers flooded his voicemail and email inboxes with vile and hostile messages. Some called him a crooked cop. Others wished him a long, unpleasant stay in fiery perdition. At least one person threatened to harm his family. Meanwhile, two thousand miles away, *Making a Murderer*'s producers were basking in accolades and consorting with major media outlets. Critics lauded their journalistic tenacity and unique ability to synthesize the legal and dramatic.[1] Colborn received no such flattery—as the producers took the stage at the Microsoft Theatre to accept their Emmys, he was busy boarding up the front door to his own house. Outraged by what he believed to be grossly unjust, inverted life trajectories, Colborn filed this lawsuit, accusing Netflix, Inc., Chrome Media LLC, and producers Laura Ricciardi and Moira Demos of defamation. All Defendants have moved for summary judgment. Colborn has also moved for partial summary judgment on 52 allegedly defamatory statements. The dispositive question is whether Colborn has produced sufficient evidence to make a defamation case out of his admittedly harsh portrayal. He has not. The First Amendment does not

---

[1] Mike Hale, *Review: 'Making a Murderer,' True Crime on Netflix*, N.Y. Times, (Dec. 16, 2015), https://www.nytimes.com/2015/12/17/arts/television/review-making-a-murderer-true-crime-on-netflix.html?_r=0; Margaret Lyons, Making a Murderer *Is As Good As 'Serial' and* The Jinx*, If Not Better*, Vulture, (Dec. 17, 2015), https://www.vulture.com/2015/12/making-a-murderer-as-good-as-serial-if-not-better.html.

guarantee a public figure like Colborn the role of protagonist in popular discourse—in fact, it protects the media's ability to cast him in a much less flattering light—so Defendants are entitled to summary judgment on all counts.

## FACTUAL BACKGROUND

*Making a Murderer* attempts to condense the tumultuous life of convicted murderer Steven Avery into roughly ten hours of narratively satisfying television. The series opens in 1985, when police arrested Avery, then only 23 years old but already well-acquainted with the criminal justice system, and charged him with the attempted murder, sexual assault, and false imprisonment of Penny Beerntsen. (ECF No. 326 at 1-2.) Though he professed his innocence, a jury accepted Beerntsen's eyewitness testimony and convicted Avery on all counts, and a judge sentenced him to 60 years in prison. (*Id.* at 2-3.)

About 10 years later, in 1994 or 1995, Andrew Colborn, a Manitowoc County Jail Corrections Officer, fielded a phone call from a detective in another jurisdiction. (*Id.* at 3.) The detective relayed that an inmate in the nearby Brown County jail had claimed responsibility for a sexual assault that Manitowoc County had ascribed to someone else. (*Id.*) Colborn transferred the call to the Detective Division and, consistent with his own limited position, took no further action. (ECF No. 346-1 at 24.) Other members of law enforcement would later testify that then-Manitowoc County Sheriff Tom Kocourek assured Colborn that authorities had "the right guy." (ECF No. 326 at 5.)

If the call Colborn received was indeed about Steven Avery, which seems likely but is not established, the Sheriff's assurances were utterly misplaced. Manitowoc County did not, in fact, have the right guy. In 2002, using DNA evidence, attorneys for the Wisconsin Innocence Project proved that Gregory Allen, not Avery, was the one behind Beerntsen's violent assault. (*Id.* at 3.) Thus, on September 11, 2003, 18 years after he was wrongfully convicted, Avery walked free. (*Id.*)

One day later, at his superior's request, Colborn—now a sergeant in the Manitowoc County Sheriff's Office—authored a statement regarding the phone call he had received eight or nine years prior. (ECF No. 323 at 4.) Manitowoc County delivered that statement to the Wisconsin Department of Justice, which reviewed it as part of its investigation into Sheriff Kocourek's and District Attorney Dennis Vogel's handling of the Beerntsen case. (ECF No. 326 at 4-5.) Wisconsin Attorney General Peg Lautenschlager ultimately chose not to charge Kocourek or

Vogel, (*id.* at 5), but that did not stop Avery from filing his own lawsuit against those he deemed responsible for his wrongful incarceration. (*Id.* at 6.) In 2004, he sued both the sheriff and DA, as well as Manitowoc County, for $36 million, alleging they had unconstitutionally withheld exculpatory evidence while he remained in prison. (*Id.*)

While Avery's civil suit was pending, Teresa Halbach, a 25-year-old professional photographer from Calumet County, Wisconsin, disappeared on business in Manitowoc. (*Id.* at 6.) On November 3, 2005, Halbach's family filed a missing person report, which investigators relayed to on-duty officers, including Sergeant Colborn. (*Id.* at 7.) As part of his investigation, Colborn visited Avery's Auto Salvage and spoke with Steven Avery himself. (*Id.*) He also called dispatch to confirm that the license plate SWH-582 corresponded to a 1999 Toyota registered to Halbach. (*Id.* at 8.) That 1999 Toyota proved critical to the investigation; on November 5, 2005, authorities discovered it on the curtilage of Avery's property. (*Id.* at 10.) With Avery now a prime suspect, police obtained a warrant to search his trailer and garage, which Colborn, Manitowoc County Deputy James Lenk, and Calumet County Deputy Dan Kucharski executed between November 5 and 8, 2005. (*Id.* at 12.)

On the final day of the search, in a fit of frustration, Colborn violently shook a bookcase located in Avery's bedroom. (*Id.* at 13.) Moments later, Lenk discovered the key to Halbach's Toyota lying on the floor. (*Id.*) The evidence against Avery then quickly began to mount. Not only did police find his DNA on the key, they also found both his and Halbach's blood inside her vehicle and retrieved her cremains from a burn pit on his property. (*Id.* at 13-14.) Now confident in his case, special prosecutor Ken Kratz officially charged Avery with homicide on November 15, 2005. (*Id.* at 11, 14.) Weeks later, graduate film students Laura Ricciardi and Moira Demos travelled to Manitowoc and commenced work on a project that would eventually become *Making a Murderer*. (*Id.* at 15.)

Avery went to trial on February 12, 2007 in Manitowoc County Circuit Court. (*Id.* at 18.) His defense attorneys, Dean Strang and Jerome Buting, argued, among other things, that the vindictive Manitowoc County Sheriff's Office, still fuming over Avery's prior exoneration, had planted evidence to ensure conviction of a man they had already deemed guilty. (*Id.* at 15, 18.) As part of this defense, Strang cross-examined Colborn, challenged his motives, and tried to paint his conduct as unscrupulous. (*Id.* at 19-20.) Colborn repeatedly denied any wrongdoing. (*Id.* at 19-21.) In closing argument, Kratz explicitly called the frame-up defense a red herring because,

regardless of whether police planted the Toyota key or Avery's blood, the abundance of other evidence sufficed to establish Avery's guilt beyond a reasonable doubt. (*Id.* at 22.) The jury apparently agreed. It returned a guilty verdict on the charges of intentional homicide and felon in possession of a firearm, and Avery was sentenced to life in prison without possibility of parole. (*Id.* at 24.)

Ricciardi and Demos spent the next several years editing footage and mapping out the first few episodes of their project. (*Id.* at 33.) By July 2013, the pair had independently shot 90% of the series and produced rough cuts of the first three episodes. (ECF No. 323 at 37.) One year later, impressed with the work, Netflix licensed *Making a Murderer*. (*Id.*) The company appointed Lisa Nishimura, Adam Del Deo, Ben Cotner, and Marjon Javadi to oversee the project. (ECF No. 318 at 1.) This core team provided feedback and suggestions to help shape the look and feel of the series, though Ricciardi and Demos retained responsibility for editing the cuts. (ECF No. 323 at 41.) And according to the Netflix team, none of them reviewed the raw footage of the trial or depositions. (*Id.* at 40-41.)

The finished product premiered on December 18, 2015 to critical and commercial acclaim. (ECF No. 326 at 35.) In this final cut, Colborn's three-hour trial testimony is reduced to 10 minutes spread across several episodes. (ECF No. 294 at 20.) Dramatic musical flourishes accent particular moments. (ECF No. 285 at 3.) And anachronistic responses are stitched together to give the appearance of a seamless examination. (ECF No. 105 at 44-56.) The episodes also platform Strang and Buting, who, in out-of-court interviews, reiterate their theory that Manitowoc law enforcement officials planted evidence. (ECF No. 287 at 6.) Netflix later released a second season of the program, also produced by Ricciardi and Demos, which focused on Avery's postconviction attorney's attempts to exonerate him. (ECF No. 326 at 43.)

## LEGAL STANDARD

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. If the parties assert different views of the facts, the Court must view

the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

ANALYSIS

Colborn has two claims for relief.[2] (ECF No. 105.) His primary legal theory is defamation. But he also alleges intentional infliction of emotional distress. (*Id.* ¶¶77-81.) Based on the record, neither claim survives summary judgment.

## I. Colborn's Defamation Claims Fail as a Matter of Law.

Colborn has only seen about an hour of *Making a Murderer*, ECF No. 271 at 23, but that was enough for him to dub it defamatory. Wisconsin law and the First Amendment require a deeper and more comprehensive analysis. To prove defamation under Wisconsin law, a plaintiff "must show that the defendant (1) published (2) a false, (3) defamatory, and (4) unprivileged statement." *Fin. Fiduciaries, LLC v. Gannett Co., Inc.*, 46 F.4th 654, 665 (7th Cir. 2022) (citing *Torgerson v. J./Sentinel, Inc.*, 563 N.W.2d 472, 477 (1997)). For public officials, like Colborn, the First Amendment also requires "clear and convincing evidence that the defendant published the defamatory statement with actual malice, *i.e.*, with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). And the statement at issue must be "of and concerning" the plaintiff. *See Sullivan*, 376 U.S. at 288.

These legal standards wipe out the bulk of Colborn's case. His summary judgment motion adopts an overbroad view of defamation, identifying 52 allegedly defamatory statements. (*See* ECF No. 285 at 6-12.) But most of his gripes read more like media criticism better suited to the op-ed section; they are not actionable statements that could even potentially be defamatory under Wisconsin law. Those few statements that might conceivably be actionable fail for other reasons. Colborn's "defamation by fabricated quotation" claim fares no better because the record shows no instance in which Defendants did not convey the gist of a changed quotation. Colborn's final theory, a claim for "defamation by implication," also fails because he has not produced sufficient evidence to sustain it. Accordingly, the defamation claim cannot proceed to trial.

---

[2] A third claim for negligence was previously dismissed. (ECF No. 176.)

**A.    Most of Colborn's 52 Allegedly Defamatory Statements Are Not Actionable, and Those That Are Fail for Other Reasons.**

Colborn affirmatively seeks summary judgment in his own favor based on a host of specific aspects of *Making a Murderer*.  His kitchen-sink approach identifies 52 instances of alleged defamation.  He cites the series' use of music and graphics, its inclusion of certain statements of and concerning other people, its incorporation of true statements or protected opinions, and the alteration of reaction shots from Avery's homicide trial.  None of these can support a claim for defamation.

Music and graphics, for example, in isolation, are not "statements" of fact capable of filching from one his good name.  *See Terry v. J. Broad. Corp.*, 840 N.W.2d 255, 267-68 (Wis. Ct. App. 2013) (holding that a plaintiff had no case when she challenged only music and video edits but not the words used to portray her).  That ousts 13 of Colborn's proposed 52 defamatory statements.[3]  While it is true that Netflix's representatives sought "to establish a subtle but impactful theme track for the baddies," (ECF No. 286-9 at 36), no principle of defamation law subjects a publisher to liability based solely on an unnerving musical motif.  Moreover, Colborn is not even one of the "baddies" listed in the Netflix notes, so the notes and the corresponding music are also not actionable because they are not "of and concerning" him.  (*See id.*)

Colborn makes similar, futile challenges to other statements that are not "of and concerning" him. For example, he objects to Steven Avery's voiceover: "They had the evidence back [in 1985] that I didn't do it.  But nobody said anything." (ECF No. 285 at 6.)  Though Colborn identifies the voiceover as defamatory, he never explains how it implicates him or why it is false.  This is not an anomalous oversight.  Colborn also takes issue with Stephen Glynn (Avery's attorney in his $36 million civil case) saying:

> We were just on the absolute edge of getting ready to go after the named defendants in the case with depositions when I get a call from Walt who tells me that he has gotten a call from a journalist asking if either of us would care to comment on the apparent intersection in life between Steven Avery and a woman who has gone missing in the Manitowoc area who we later learn to be Teresa Halbach.

(*Id.* at 9.)  On its face, this has nothing to do with Colborn, and he offers no evidence or analysis to the contrary.  It therefore cannot be defamatory towards him.  The same applies to the words of

---

[3] See proposed defamatory facts numbers 5, 8, 10, 12, 15, 17, 21, 23, 24, 26, 43, 47, and 52.  (ECF No. 287 at 2-4, 7-8.)

a male bar patron: "I only have one word, from the cops on up; it's corruption. Big time. I mean, if people dig far enough, they'll see that." (*Id.* at 10) (cleaned up). If this vague critique of bureaucracy constituted defamation, free speech would be reduced to the freedom to commend those in power. *See Sullivan*, 376 U.S. at 292 (rejecting Alabama's attempt to "transmut[e] criticism of government, however impersonal it may seem on its face, into personal criticism, and hence potential libel, of the officials of whom the government is composed."). Yet Colborn relies on 22 allegedly defamatory statements of this ilk.[4] (*See e.g.*, ECF No. 287 at 2, ("They weren't just gonna let Stevie out. They weren't gonna hand that man 36 million dollars."); 5, ("All I can think is they're trying to railroad me again."); 9 ("Them people ain't gonna get away with everything.").)

Other parts of Colborn's case reflect his own dissatisfaction with what is in fact the verifiable truth. It is well-established that "[t]ruth is an absolute defense to a defamation claim." *Anderson v. Hebert*, 798 N.W.2d 275, 280 (Wis. Ct. App. 2011). Thus, in defamation lawsuits at least, verity still prevails, even if the audience lacks the temperament for it. Colborn felt stung by *Making a Murderer*'s inclusion of Glynn's statement:

> [T]here is not only something to this idea that law enforcement had information about somebody else, but there is serious meat on those bones, I mean serious meat. What we learn is that while Steven Avery is sitting in prison, now for a decade, a telephone call comes in to the Manitowoc County Sheriff's Department from another law enforcement agency . . . saying that they had someone in custody who said that he had committed an assault in Manitowoc, and an assault for which somebody was currently in prison.

(ECF No. 287 at 2.) This statement may be unflattering, but the record confirms it is entirely accurate. The same can be said for the docuseries' use of Colborn's deposition testimony from Avery's civil case. (*Id.* at 3.) Altogether, Colborn complains seven times of statements that no one, not even he himself, can prove false.[5] In these instances, it is the facts that aggrieve Colborn, and there is no legal remedy for that. *See Lathan v. J. Co.*, 140 N.W.2d 417, 423 (Wis. 1966)

---

[4] See proposed defamatory facts numbers 3-4, 7, 11, 20, 22, 25, 27-31, 33-38, 41-42, 49, and 54. (ECF No. 287 at 2-8.)

[5] See proposed defamatory facts numbers 9, 13-14, 18-19, 46, and 53. (ECF No. 287 at 2-4, 7-8.)

("Truth is a complete defense to a libel action.") (citing *Williams v. J. Co.*, 247 N.W. 435 (Wis. 1933)).

Nor can Colborn make a defamation case out of his adversaries' opinions. "Although opinions are not completely exempt from the realm of defamatory communications," *see Terry*, 840 N.W.2d at 266, "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (citations omitted). For example, contrary to Colborn's claims, no reasonable viewer could interpret Glynn's explanation of why he thinks Colborn authored a report the day after Avery left prison, *i.e.*, "I think I know [why Colborn authored the report at that time,]" (ECF No. 287 at 3), as anything other than "a subjective view, an interpretation, a theory." Defamation cannot lie for such plainly speculative statements. Colborn relies on another ten, similarly subjective opinions, as part of his defamation case,[6] but these speculations are not actionable as a matter of law.

Equally meritless are Colborn's attempts to turn spliced reaction shots into slander. It is undisputed that the Producers experienced technological snafus that rendered the unedited raw footage of the witness box at Avery's trial unusable. (ECF No. 288 at 10.) As a result, Ricciardi and Demos paid local news outlets for access to their "mixed feed" footage, which cut between counsel, the judge, witnesses, the gallery, and the projection screen. (*Id.* at 10-11.) Because the "mixed feed" did not adopt a steady point of view, it did not always maintain its gaze on witnesses when they stopped speaking. To accommodate for this limitation, the producers occasionally used witness reaction shots from other parts of the trial to fill in the gaps. (*Id.* at 11-12.) Colborn contends that rather than choose the most comparable reaction shots, Ricciardi and Demos used the corrupted footage as an excuse to insert incongruous scenes that made him appear nervous and uncertain. (*See* ECF No. 327 at 57–60.) The problem with this theory is that reaction shots are not falsifiable "statements" capable of defaming their subjects. *See Terry*, 840 N.W.2d at 267 (rejecting a plaintiff's ability to challenge to the way she was portrayed in video edits). In fact, Colborn's papers implicitly acknowledge the vagaries of body language analysis—he has, at different times, described the same shot (leaning back and cracking his knuckles) as making him look apprehensive *and* more confident. (ECF No. 356 at 13.) If the scenes the producers included

---

[6] See proposed defamatory facts numbers 6, 16, 32, 39-40, 44-45, 48, and 50-51. (ECF No. 287 at 2-3, 6-8.)

are open to such ambiguity, then they are not false in any meaningful sense. And the abstruse, knuckle-cracking interstitial is Colborn's strongest case. His other examples ascribe extensive psychoanalytic intentions to momentary breaks in eye contact. (ECF No. 346-1 at 112-119.) None of this is defamatory.[7]

Colborn is, therefore, not entitled to summary judgment on any of the 52 allegedly defamatory statements he identifies. Conversely, because no reasonable jury could find any of the 52 statements defamatory, Defendants are entitled to summary judgment on any claim based on them.

**B.    Even Where _Making a Murderer_ Alters Colborn's Testimony, it Captures the Gist.**

In addition to challenging the 52 previously identified statements, Colborn's complaint includes a "defamation by fabricated quotation" theory. (_See_ ECF No. 105 at 44-56.) The idea here is that, in the course of condensing the trial footage, Defendants deliberately altered Colborn's words to make him appear more contemptible. Of course, some alteration is necessary. No documentary is "true" in the strictest sense of the word; they all abbreviate, edit, and emphasize. But there are degrees of falsity, and, for defamation purposes, the question is where to draw the line. After all, "[i]f every [altered quotation] constituted the falsity required to prove actual malice, the practice of journalism, which the First Amendment standard is designed to protect, would require a radical change . . . inconsistent with . . . First Amendment principles." _Masson_, 501 U.S. at 514. Thus, to protect journalists, as well as other voices shouting into the marketplace of ideas, minor inaccuracies are forgiven "so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" _Id._ at 517 (quoting _Heuer v. Kee_, 59 P.2d 1063, 1064 (Cal. Dist. Ct. App. 1936)). "Put another way, [a] statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" _Id._ (quoting Robert D. Sack, _Libel, Slander, and Related Problems_ 138 (1st ed. 1980)).

Colborn's position is that _Making a Murderer_'s use of "frankenbites" (an industry term for the practice of taking a word from one place and inserting it somewhere else) effected "a material change in the meaning conveyed by [his testimony]." _Masson_, 501 U.S. at 517. It is easy to understand how disparate statements, cobbled together and presented as unbroken speech, might

---

[7] Though none of the 52 allegedly defamatory facts Colborn incorporates in his motion for summary judgment are individually actionable, they will be considered, in the aggregate, as part of his overall claim for defamation by implication in Part I.C.

produce bastardized remarks that alter or even undermine the meaning of those original statements. But the theoretical possibility of defamatory editing is not enough to carry Colborn's burden. Instead, he must cite specific instances where *Making a Murderer* edited his testimony and changed its meaning in a defamatory fashion. Swapping in "No, sir" for "No, I don't" obviously does not suffice. (ECF No. 105 at 48.) Excising similarly trivial revisions, the "frankenbites" Colborn identifies fall into four baskets: (1) those concerning the 1994 or 1995 phone call; (2) those concerning the 2005 call to dispatch; (3) those concerning the discovery of the Toyota key; and (4) those taken from Colborn's deposition in Avery's civil case. The Court will evaluate them in turn.

### 1. Edits to Colborn's Testimony About the 1994 or 1995 Phone Call.

At trial, Colborn testified:

> In 1994 or '95 I had received a telephone call when I was working as my capacity as a corrections officer in the Manitowoc County Jail. Telephone call was from somebody who identified himself as a detective. And I answered the phone, Manitowoc County Jail, Officer Colborn. Apparently, this person's assumption was that I was a police officer, not a corrections officer, and began telling me that he had received information that somebody who had committed an assault, in Manitowoc County, was in their custody, and we may have somebody in our jail, on that assault charge, that may not have done it. I told this individual, you are probably going to want to speak to a detective, and I transferred the call to a detective, to the Detective Division, at the Manitowoc County Sheriff's Department. That's the extent of my testimony.

(ECF No. 105 at 47-48.) *Making a Murderer* condenses this testimony:

> In 1994 or '95 I had received a telephone call when I was working as my capacity as a corrections officer in the Manitowoc County Jail. Telephone call was from somebody who identified himself as a detective, and began telling me that he had somebody who had committed an assault, in Manitowoc County, was in their custody, and we may have somebody in our jail, on that assault charge, that may not have done it. I told this individual, you are probably going to want to speak to a detective, and I transferred the call to a detective.

(*Id.*) Nothing in the abridged version of Colborn's statement "differ[s] materially in meaning from [the original] so as to create an issue of fact for a jury as to falsity." *Masson*, 501 U.S. at 521. *Making a Murderer*'s edits eliminate redundancies, *i.e.*, Colborn repeating his position and reiterating that he transferred the call to detectives, without sacrificing truth. Synthesizing a

lengthy explanation is not defamatory. *Id.* at 524. The revised passage is, thus, substantially the same as the original and not false for purposes of defamation.

During cross-examination, Strang followed up with Colborn about the phone call:

> STRANG: [W]hile we're on Steven Avery and your reports about him, that phone call, the phone call you took way back in 1994 or 1995, when you were working in the jail, the phone call where a detective from another law enforcement agency told you you may have the wrong guy in jail, that one?
>
> COLBORN: Yes, sir.
>
> STRANG: Did you ever write a report about that?
>
> COLBORN: No, sir.
>
> STRANG: Well, actually you did, didn't you? It was about eight years later, wasn't it?
>
> COLBORN: I wrote a statement on it, yes, sir.
>
> STRANG: You wrote a statement after Sheriff Peterson suggested that maybe you should?
>
> COLBORN: Yes, sir.
>
> STRANG: You wrote that statement in 2003, about the 1994 or 1995 telephone call?
>
> COLBORN: Yes.
>
> STRANG: You wrote that statement in 2003, the day after Steven Avery finally walked out of prison, didn't you?
>
> COLBORN: I don't know what day Steve was released from prison, but I wrote the statement in 2003.

(ECF No. 105 at 51-52.) In *Making a Murderer*, the exchange goes like this:

> STRANG: [W]hile we're on Steven Avery and your reports about him, that phone call, the phone call where a detective from another law enforcement agency told you [you] may have the wrong guy in jail, that one?
>
> COLBORN: Yes, sir.
>
> STRANG: Did you ever write a report about that?
>
> COLBORN: No, I did not, sir.
>
> STRANG: Well, actually you did, didn't you? It was about 8 years later, wasn't it?
>
> COLBORN: I wrote a statement on it, yes, sir.
>
> STRANG: You wrote a statement in 2003, about the 1994 or 1995 telephone call?
>
> COLBORN: Yes.

> STRANG: [T]he day after Steven Avery finally walked out of prison, didn't you?
>
> COLBORN: I don't know what day Steve was released from prison, but I wrote the statement in 2003.

(*Id.*)  Both versions convey the same substance—that Colborn wrote a report about a phone call eight years after he received it, around the time of Avery's exoneration.  The only notable difference is that *Making a Murderer* omits Sheriff Petersen's suggestion that Colborn draft the report.  This hardly makes the testimony false, especially considering that, by this point in the docuseries, Stephen Glynn has already told viewers that the sheriff ordered a report from Colborn and Lenk.  (*See* ECF No. 320 at 10.)

On redirect, special prosecutor Kratz and Colborn had the following exchange regarding the phone call:

> KRATZ: As you look back, back in 1994 or '95, if you would have written a report, what would it have been about?
>
> COLBORN: That is why I didn't do one.  I don't know what it would have been about, that I received a call and transferred it to the Detective Division.  If I wrote a report about every call that came in, I would spend my whole day writing reports.
>
> KRATZ: Did this person ever identify the individual that they were talking about?
>
> COLBORN: No, sir.  There were no names given.
>
> KRATZ: Let me ask you this, as you sit here today, Sergeant Colborn, do you even know whether that call was about Mr. Steven Avery?
>
> COLBORN: No, I don't.

(ECF No. 105 at 52.)  In *Making a Murderer*, this exchange is shortened and presented as part of Kratz's direct examination:

> KRATZ: Back in 1994 or '95, if you would have written a report, what would it have been about?
>
> COLBORN: I don't know what it would have been about.  If I wrote a report about every call that came in, I would spend my whole day writing reports.
>
> KRATZ: Let me ask you this, Sergeant Colborn, do you even know whether that call was about Mr. Steven Avery?
>
> COLBORN: No, sir.

(*Id.*)  This, too, adequately captures the gist of Colborn's testimony—the identity of the potentially wrongfully incarcerated individual who was the subject of the 1994 or 1995 phone call was not

established during that call, so Colborn had nothing to write a report about. Both the original and edited passages reflect that Colborn lacked the necessary information to make a report worthwhile; the latter is not materially false.

**2. Edits to Colborn's Testimony About the 2005 Call to Dispatch.**

During Avery's trial, Strang played Colborn an extended recording of his November 3, 2005 call to dispatch. (ECF No. 105 at 53-54.) During the call, Colborn gave the dispatcher Halbach's license plate number and asked to confirm that the car was a 1999 Toyota. (*Id.*) Recapping the call, Strang initiated the following exchange:

> STRANG: And the dispatcher tells you that the plate comes back to a missing person or woman?
>
> COLBORN: Yes, sir.
>
> STRANG: Teresa Halbach. Mispronounces the last name, but you recognize the name?
>
> COLBORN: Yes, sir.
>
> STRANG: And then you tell the dispatcher, "Oh, '99 Toyota"?
>
> COLBORN: No, I thought she told me that.

(ECF No. 290-19 at 184.) Strang then replayed the audio and said:

> STRANG: Actually you who suggests this is a '99 Toyota?
>
> COLBORN: I asked if it was a '99 Toyota, yes.
>
> STRANG: And the dispatcher confirmed that?
>
> COLBORN: Yes.

(*Id.* at 185.) *Making a Murderer* excludes Colborn's admission of his mistake. (ECF No. 105 at 12.) Colborn believes that omission defamatory and cites to an uncommon, online source to prove it. According to Redditor u/docuseriesfan, the way the docuseries presented the testimony left viewers with the misimpression that Colborn "didn't have much of a response after [Strang] played the recording twice." (ECF No. 132-7.) There are two problems with relying on this kind of evidence. First, defamation is (mercifully) not proven in the bowels of social media websites, especially niche subreddits. No publisher is required "to guarantee the truth of all the inferences a [viewer] might reasonably draw from a publication." *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 487 (7th Cir. 1986). Second, and more importantly, *Making a Murderer* got the sting of this portion of testimony right. An inaccuracy is not a falsehood under defamation law unless "it 'would have a different effect on the mind of the reader from that which the pleaded truth would

have produced.'" *Masson*, 501 U.S. at 517 (quoting Sack, *supra*). The reality is that Colborn *did not* actually have much of a response after Strang replayed the dispatch audio. He simply agreed that he had, indeed, first raised the make and year of the vehicle. That much is evident from the first and second listen. Omitting one sentence restating the obvious and instead segueing directly into the next line of questioning did not injure Colborn's reputation any more or less than a verbatim reproduction would have. *See Haynes*, 8 F.3d at 1229 (no defamation where variants of the truth did not paint the plaintiff in a worse light).

Immediately after the preceding exchange, Strang pressed Colborn to answer how he could have called in a license plate if he was not already looking at it. (ECF No. 105 at 55.) The implication being that Colborn discovered Halbach's Toyota two days before it was officially found on Avery's property and therefore had the opportunity to plant the Toyota there as part of a frame-up.

> STRANG: Were you looking at these plates when you called them in?
>
> COLBORN: No, sir.
>
> STRANG: And your best guess is that you called them in on November 3, 2005?
>
> COLBORN: Yes, probably after I received a phone call from Investigator Wiegert letting me know that there was a missing person.
>
> STRANG: Investigator Wiegert, did he give you the license plate number for Teresa Halbach when he called you?
>
> COLBORN: I don't remember the entire content of our conversation, but, obviously, he must have because I was asking the dispatcher to run the plate for me.
>
> STRANG: Did you not trust that Investigator Wiegert got the number right?
>
> COLBORN: I don't – That's just the way I would have done it. I don't – It's not a trust or distrust issue.

(ECF No. 290-19 at 185-86.) At this point, the parties took their afternoon recess. When they returned, Strang mistakenly asked Colborn if Wiegert had given him Halbach's *phone number*. He then corrected himself:

> STRANG: I'm sorry. I apologize. What I meant is, you don't recall, as you sit here today, whether Mr. Wiegert gave you Teresa

Halbach's license plate number when he called you on November 3?

COLBORN: You know,[8] I just don't remember the exact content of our conversation then.

STRANG: But –

COLBORN: He had to have given it to me because I wouldn't have had the number any other way.

STRANG: Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back end of a 1999 Toyota; from listening to that tape, you can understand why someone might think that, can't you?

KRATZ: It's a conclusion, Judge. He's conveying the problems to the jury.

THE COURT: I agree, the objection is sustained.

STRANG: This call sounded like hundreds of other license plate or registration checks you have done through dispatch before?

COLBORN: Yes.

STRANG: But there's no way you should have been looking at Teresa Halbach's license plate on November 3, on the back end of a 1999 Toyota?

KRATZ: Asked and answered, your Honor, he already said he didn't and was not looking at the license plate.

THE COURT: Sustained.

STRANG: There's no way you should have been, is there?

COLBORN: I shouldn't have been, and I was not looking at the license plate.

STRANG: Because you are aware now that the first time that Toyota was reported found was two days later on November 5?

COLBORN: Yes, sir.

(*Id.* at 187-88.) *Making a Murderer* omits a significant chunk of this and inserts a portion of testimony (*italicized* below) given a few minutes earlier:

STRANG: Were you looking at these plates when you called them in?

---

[8] In the trial transcript, Colborn is quoted as saying: "No, I just don't remember the exact content of our conversation then." (ECF No. 290-19 at 187.) The video exhibits, however, conclusively show that he actually said: "*You know*, I just don't remember the exact content of our conversation then." (ECF No. 283-13 at 13-16); *see Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (requiring courts considering summary judgment motions to view the facts in the light depicted by the objective evidence).

COLBORN: No, sir.

*STRANG: Do you have any recollection of making that phone call?*

*COLBORN: I'm guessing 11/03/05, probably after I received a phone call from Investigator Wiegert letting me know that there was a missing person.*

STRANG: Investigator Wiegert, did he give you the license plate number for Teresa Halbach when he called you?

COLBORN: You know, I just don't remember the exact content of our conversation then.

STRANG: But –

COLBORN: He had to have given it to me, because I wouldn't have had the number any other way.

STRANG: Well, and you can understand how someone listening to that might think that you were calling in a license plate that you were looking at on the back of a 1999 Toyota?

COLBORN: Yes.

STRANG: But there's no way you should have been looking at Teresa Halbach's license plate on November 3, on the back end of a 1999 Toyota?

COLBORN: I shouldn't have been, and I was not looking at the license plate.

STRANG: Because you are aware now that the first time that Toyota was reported found was two days later on November 5?

COLBORN: Yes, sir.

(ECF No. 105 at 55-56; ECF No. 290-19 at 185-86.)

Colborn is correct that this amalgamation of truncations and "frankenbites" does not cleanly track the trial transcript. But, again, that is not enough. An author may even attribute words he never uttered to a speaker without running afoul of defamation law, so long as the result conveys the substantial truth. *See Masson*, 501 U.S. at 514-15. Colborn argues that resecting his response—"obviously" Wiegert must have given him Halbach's license plate number—subjected him to "significantly greater opprobrium" because it lent credence to Strang's theory of the case. *Haynes*, 8 F.3d at 1228 (quoting *Herron v. King Broad. Co.*, 776 P.2d 98, 102 (Wash. 1989)). *Making a Murderer* does, however, feature Colborn explaining that Wiegert "had to have given [the license plate number] to me, because I wouldn't have had the number any other way." (ECF No. 105 at 55.) In both passages, Colborn reaches his conclusion through deduction, not

recollection. He admits he cannot remember the conversation with Wiegert but reasons that it must have been the source of Halbach's license plate through process of elimination. Including "obviously" may have intimated a slightly stronger sense of conviction, but its exclusion does not mean that the docuseries departed from the substantial truth or failed to capture the gist of Colborn's testimony. *See Masson*, 501 U.S. at 524 (finding no material falsity when an author wrote that the subject of his piece changed his name because "it sounded better" instead of using the subject's actual explanation that he "just liked" it).

Colborn also challenges the producers' decision to show him agreeing that he could understand how someone might think he was looking at Halbach's Toyota based only on the audio of his dispatch call. In fact, Colborn never answered that question because his attorney objected, and the judge sustained the objection. (ECF No. 290-19 at 188.) But, though not depicted in *Making a Murderer*, Colborn later affirmed on the witness stand that the call sounded like hundreds of other license plate or registration checks he had done before. (ECF No. 105 at 55-56.) In essence, he testified that the audio closely resembled a mine-run dispatch call. And a mine-run dispatch call involves an officer "giv[ing] the dispatcher the license plate number of a car they have stopped, or a car that looks out of place for some reason." (ECF No. 290-19 at 179.) Thus, Colborn implicitly admitted that, based only on the audio of his dispatch call, it sounded like he had Halbach's license plate in his field of vision. This is not materially different from saying that he could understand why someone would think he was looking at Halbach's license plate when he made the call. On top of this, *Making a Murderer* includes Colborn forcefully denying that he ever saw Halbach's vehicle on November 3, 2005. In context, this captures the sting of his testimony—Wiegert must have given him the license plate number, and although it sounded like he was reading the license plate number off a car, he was not in fact doing so.

### 3. Edits to Colborn's Testimony About Discovering the Toyota Key.

On direct examination, Kratz and Colborn had the following exchange:

> KRATZ: Have you ever planted any evidence against Mr. Avery?
>
> COLBORN: That's ridiculous, no I have not.
>
> KRATZ: Have you ever planted any evidence against anybody in the course of your law enforcement career?
>
> COLBORN: I have to say that this is the first time my integrity has ever been questioned, and no, I have not.

(ECF No. 105 at 48.) *Making a Murderer* fuses this into a single question and response:

KRATZ: Have you ever planted any evidence against Mr. Avery?

COLBORN: I have to say that this is the first time my integrity has ever been questioned, and no, I have not.

(*Id.*)  This neither materially altered Colborn's testimony, nor exposed him to significantly greater opprobrium.  *Making a Murderer* communicates in two lines what the trial transcript conveys in four.  That is narrative efficiency, not defamation.

### 4.  Edits to Colborn's Deposition in Avery's Civil Case.

During his deposition, Glynn asked Colborn whether he had spoken to anyone about the 2003 statement he authored regarding the 1994 or 1995 phone call:

GLYNN: And do you recall any further conversations with Sheriff Petersen about this subject matter?

COLBORN: No.

GLYNN: How about any meetings with District Attorney Rohrer about this subject matter, and again, I mean the subject matter of Exhibit 138 that we've been discussing. [9]

COLBORN: No, I've never had a meeting with the district attorney about this.

GLYNN: Okay.  How about an assistant district attorney named Mike Griesbach?

COLBORN: Never had a meeting with Mike Griesbach about this.

GLYNN: [H]ave you ever had any conversations with anybody else, other than Sheriff Peterson and Lieutenant Lenk, about the subject matter of Exhibit 138?  Ever discuss it with anyone else, any other officers, any friends, any family?

COLBORN: Not that I can specifically recall.  I may have mentioned it to other people, but I don't recall doing it.

GLYNN: That is, as you're sitting here today, you don't have any specific recollection of discussing it with anybody else.

COLBORN: No, sir.

GLYNN: But you're not ruling out the possibility that you may have discussed it.

COLBORN: No, I'm not ruling out that possibility that I may have discussed it with someone else, but I can't specifically tell you names of people I may have mentioned this to.

(ECF No. 120-14 at 7.)  *Making a Murderer* depicts only a smidgen of this:

---

[9] Exhibit 138 was Colborn's 2003 statement about the 1994 or 1995 phone call he received.  (ECF No. 120-14 at 3.)

GLYNN: Have you ever had any conversations with anybody else other than Sheriff Petersen and Lieutenant Lenk about the subject matter of [E]xhibit 138? Ever discuss it with anyone else, any other officers, any friends, any family?

COLBORN: Not that I can specifically recall. I may have mentioned it to other people, but I don't recall doing it.

(ECF No. 105 at 32.) The docuseries then transitions to edited excerpts from the depositions of Manitowoc County District Attorney Mark Rohrer and Manitowoc County Chief Deputy Eugene Kusche. Walt Kelly (another of Avery's lawyers in his civil case) and Rohrer are shown having the following conversation:

KELLY: At the time that you received information from the crime lab telling you that Gregory Allen was inculpated in the sexual assault of Mrs. Beernsten, did you have conversation with any people in the Sheriff's office?

ROHRER: Yes.

KELLY: Who were they?

ROHRER: Andy Colborn, and Jim Lenk had information that he had received.

(*Id.*) Kusche's deposition proceeds:

KELLY: This document reflects a conversation between you and [Manitowoc County Assistant District Attorney] Douglass Jones shortly after it became public knowledge that Steven Avery had been exculpated and that Gregory Allen had been inculpated, right?

KUSCHE: That's correct.

KELLY: All right. He says as he, Doug Jones, was trying to close the conversation, you told him that in 95 or 96 Andy Colborn had told Manitowoc County Sheriff Tom Kocourek that an officer from Brown County had told Colborn that Allen and not Avery might've actually committed the [Beerntsen] assault. Okay? Did you in fact tell that to Douglass Jones?

KUSCHE: I don't recall.

KELLY: All right. Does seeing this document, 124,[10] refresh your recollection?

KUSCHE: My recollection of this conversation, which is not very strong, was that Colborn made a comment to me about re-- getting some information…

---

[10] Exhibit 124 is Douglass Jones' September 18, 2003 memo regarding a conversation he had with Kusche about the Avery exoneration. (ECF No. 120-18 at 2.)

KELLY: Yeah …. Okay the statement goes on and says, the next sentence says, "Gene stated," that's you, "that Colborn was told by Kocourek something to the effect that we already have the right guy, and he should not concern himself." Now, did Colborn tell that to you?

KUSCHE: I don't recall….

KELLY: Do you have any reason to believe that Doug Jones would misrecord what you told him?

KUSCHE: No.

KELLY: Then it goes on to say that Doug Jones asked you if this information was known. Do you remember asking that?

KUSCHE: No.

KELLY: Then it goes on to say that you said James Lenk … was aware. Did you tell that to Doug Jones?

KUSCHE: If he put it there, I probably did.

KELLY: And what was the basis for your knowledge about that?

KUSCHE: It would have had to have been from Andy Colborn.

(*Id.* at 33-34) (cleaned up).

Colborn contends this deposition mashup unfairly depicts him as a liar because it undermines his assertion that he may have discussed his statement with others but did not remember doing so, without incorporating his qualification that he was not ruling out the possibility that he spoke to others. This effort, like so many of Colborn's attempts to construct a defamation claim, fails because the docuseries provides a reasonably accurate summation of the gist of the underlying statement. Indeed, contrary to Colborn's suggestion, *Making a Murderer* does incorporate the supposedly missing qualification. Colborn is shown explicitly stating that he cannot "specifically recall" speaking about his statement with others, but that he "may have mentioned it to other people." That qualification is materially the same as "not ruling out the possibility" of speaking with others. Moreover, by excluding certain portions of his deposition testimony, *Making a Murderer* may have actually *enhanced* Colborn's credibility. At his deposition, Colborn unequivocally denied ever broaching the 1994 or 1995 phone call with District Attorney Rohrer. (ECF No. 120-14 at 7.) Rohrer's testimony called that into question. (ECF No. 120-12 at 11.) Were *Making a Murderer* the calibrated hit piece Colborn claims, its producers surely would have leapt at the chance to catch the object of their disdain in an outright lie.

Colborn also decries the juxtaposition of his deposition testimony with Glynn's soliloquy questioning the absence of a paper trail regarding the 1994 or 1995 phone call:

> [Deposition footage]
>
> GLYNN: [Referring to the 1994 or 1995 phone call] I mean that's a significant event.
>
> COLBORN: Right, that's what stood out in my mind.
>
> [Glynn's interview]
>
> GLYNN: The fellow who got that call was a guy named [Colborn]. And you might say that there should be a record of him immediately making a report on this, there might be a record of his immediately contacting a supervising officer, there might be a record of him contacting a detective who handles sexual assault cases, ahh, there might be some record of it. But if you thought any of those things, you'd be wrong because there isn't any record in 1995, 1996, 1997, 1998, 2000, 2001, 2002, 2003. Now 2003 is a year that has meaning because that's when Steven Avery got out. And the day he got out, or the day after, that's when [Colborn] decides to contact his superior officer, named Lenk. And Lenk tells him to write a report.

(ECF No. 105 at 30.) Once more, nothing here is false. Colborn testified that the phone call was a significant event, and there was no *record* of what he did with the information he received until 2003. The absence of that record does not mean *Making a Murderer* communicates that Colborn took no action. On the contrary, the documentary shows him explaining that he transferred the call to a detective. That it does not undertake additional explanation to make Colborn look better does not render the material presented false or defamatory.

Ultimately, every alteration Colborn identifies retains the gist of its source material. "The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974). Modifications that maintain meaning do not implicate this interest and are, therefore, not compensable in defamation. Because, on the evidence in the record, no reasonable jury could find that *Making a Murderer*'s edits to Colborn's testimony materially changed the substance of that testimony, Defendants are entitled to summary judgment as to every allegedly fabricated quotation.

**C.     Colborn Does Not Have Sufficient Evidence to Pursue a Defamation by Implication Claim.**

While the individual statements and "frankenbites" that Colborn cites all fail to support a defamation claim, he makes a better, although still unsuccessful, effort to establish defamation by tying them together.  Under Wisconsin law, "[t]he 'statement' that is the subject of a defamation action need not be a direct affirmation, but may also be an implication."  *Fin. Fiduciaries, LLC*, 46 F.4th at 665 (quoting *Mach v. Allison*, 656 N.W.2d 766, 772 (Wis. Ct. App. 2002)).  "In a case of defamation by implication, the court must decide 'whether an alleged defamatory implication is fairly and reasonably conveyed by the words and pictures of the publication.'"  *Id.* (quoting *Mach*, 656 N.W.2d at 778).  As with other theories, the plaintiff must also proffer at least enough evidence to raise a jury question as to material falsity and actual malice.  *Saenz v. Playboy Enterprises, Inc.*, 841 F.2d 1309, 1317 (7th Cir. 1988).  Additionally, "where the plaintiff is claiming defamation by [implication], he also must show with clear and convincing evidence that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material."  *Id.* at 1318.  "Evidence of defamatory meaning and recklessness regarding potential falsity does not alone establish the defendant's intent."  *Id.* (citing *Woods*, 791 F.2d at 487).

Colborn argues that *Making a Murderer* falsely implies that he committed criminal acts (planting evidence) and is thus defamatory per se.  *See Teague v. Schimel*, 896 N.W.2d 286, 300 (Wis. 2017) (holding that falsely imputing commission of a criminal act is defamation per se).  Defendants assert that Colborn's case falls short for at least three reasons: (1) the implication that Colborn planted evidence is not reasonably conveyed and attributable to Defendants; (2) Colborn cannot prove that he did not plant evidence; and (3) Colborn cannot satisfy defamation by implication's heightened actual malice standard.  The first two arguments fail; a reasonable jury might find that *Making a Murderer* falsely implied that Colborn planted evidence.  But because Defendants are correct that Colborn cannot show actual malice, this theory also fails.

**1.     A Jury Could Find that *Making a Murderer* Reasonably Conveys the Defamatory Implication that Colborn Planted Evidence and Also Find that Implication False.**

"The court decides, as a matter of law, whether an alleged defamatory implication is fairly and reasonably conveyed by the words and pictures of [a] publication or broadcast."  *Mach*, 656 N.W.2d at 712 (citing *Puhr v. Press Publ'g Co.*, 25 N.W.2d 62 (1946)).  If there are competing

implications—one defamatory and one not—the duty to decide which the broadcast implies shifts to the jury. *Id.*

Defendants analogize this case to *Financial Fiduciaries*, which generally protects news media's right to truthfully report *allegations*, even if the truth of those allegations is suspect. 46 F.4th at 665-66; *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975) (recognizing the First Amendment right to report the proceedings of government). But *Financial Fiduciaries* concerned a quintessential case of local news reporting that fell "comfortably within the . . . [reporting] privilege" identified in Wisconsin caselaw. 46 F.4th at 666. *Making a Murderer*, on the other hand, transcends objective journalism and tries to dramatize courtroom business in a manner that the fair report privilege does not obviously contemplate. It is more than a bare recitation of "just the facts." To do as Defendants wish and lump this kind of prestige television in with meat and potatoes beat reporting would expand the scope of the fair report privilege to a degree that is inconsistent with the common law or existing First Amendment authorities.

And without the privilege, the question of whether *Making a Murderer* implicitly adopted and reasonably conveyed the planting accusations raised by Avery and the members of his criminal defense team is for the jury to decide. A "reasonable documentary viewer" does not necessarily conflate the opinions of a documentary's subjects with those of the documentarians. For example, the documentary *Behind the Curve* profiles flat-earther Mark Sargent, but it does not, itself, imply that the Earth is flat. *Making a Murderer* takes a much different tack. Had it scored Avery's allegations to the sound of cuckoo clocks, no one could rationally accuse it of pedaling conspiracy.[11] A faithful recreation of the entire trial, framing defense and all, would also have defeated any claim for defamation. Yet *Making a Murderer* is not always so evenhanded in its presentation. To the extent it qualifies as journalism, it often hews closer to gonzo than objective, and its visual language could be read to suggest something perhaps more nefarious than the totality of the evidence warrants. Thus, a fair-minded jury could conclude that *Making a Murderer* not-so-subtlety nudges viewers toward the conclusion that Colborn did, in fact, plant evidence to frame Steven Avery.

The same jury could also find that implicit conclusion false. *See Torgerson*, 563 N.W.2d at 477 ("If the challenged statements as a whole are . . . substantially true, a libel action will fail.")

---

[11] Defendants certainly knew how to incorporate music to influence the viewers' perceptions. As discussed above, they used specific motifs to suggest Manitowoc County officials may have been up to no good.

(citing *Meier v. Meurer*, 98 N.W.2d 411 (1959)). To qualify as false, a "statement must: (1) assert or imply a fact that is capable of being proven false; or (2) . . . assert an opinion that directly implies the assertion of an undisclosed defamatory fact." *Wesbrook v. Ulrich*, 90 F. Supp. 3d 803, 810 (W.D. Wis. 2015) (citing *Mach*, 656 N.W.2d at 772). "[S]tatements of opinion are not actionable if they merely express 'a subjective view, an interpretation, a theory, conjecture, or surmise,' unless the defendant claims or purports to possess specific and objectively verifiable facts supporting that opinion." *Id.* at 810-11 (quoting *Haynes*, 8 F.3d at 1227).

As Special Prosecutor Kratz acknowledged in his closing argument, Avery's guilty verdict does not exonerate those accused of executing a frame-up. (ECF No. 326 at 22.) On what grounds, then, Defendants ask, can Colborn ascribe falsity to the implication that he framed Steven Avery? There is, admittedly, no formal paperwork absolving Colborn of guilt. But in asking for such proof, Defendants seek too much. If the media has license to accuse anyone of committing a crime unless he can categorically disprove that he has done so, then the protected interest in one's good name depends wholly on the altruism of journalists. What could a plaintiff in Colborn's position do to satisfy Defendants' proposed standard? Even acquittal is not akin to absolution, and there is no branch of logic that sanctions proof of a negative. Under Defendants' view, substantial truth is not only a defense, it is the default unless a defamation plaintiff can show beyond doubt what *did not* happen. That is not the standard. "A statement is … defamatory if, in its natural and ordinary sense, it imputes to the person charged commission of a criminal act." *Converters Equip. Corp. v. Condes Corp.*, 258 N.W.2d 712, 715 (Wis. 1977). If there is no basis for the allegation of criminal conduct, then, for purposes of defamation, the allegation may be considered false. And under Wisconsin law, falsity should go to the jury unless obviously not in dispute. *See Martin v. Outboard Marine Corp.*, 113 N.W.2d 135, 140 (Wis. 1962). A reasonable jury could hold Defendants' statement false, so they are not entitled to summary judgment on the question of falsity.

### 2. Colborn Cannot Show Actual Malice.

To survive summary judgment, a public figure who brings a defamation claim must present enough evidence to allow a jury to find actual malice with convincing clarity. *Woods*, 791 F.2d at 484. Normally, actual malice exists where a defendant "publishe[s] [a] defamatory statement with knowledge of its falsity or with reckless disregard for whether it [is] false." *Id.* (citing *Sullivan*, 376 U.S. at 280). In the context of defamation by implication, though, actual malice requires

evidence that would permit a jury to conclude "that the defendants either *intended* or were reckless with regard to the potential falsity of the *defamatory inferences* which might be drawn from the [publication]." *Saenz*, 841 F.2d at 1318 (emphasis added).  And this is determined subjectively, "not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Thus, defamation defendants are entitled to judgment as a matter of law unless "pretrial affidavits, depositions or other documentary evidence" evince an intention to imply the defamatory implication the plaintiff identifies. *Carson v. Allied News Co.*, 529 F.2d 206, 210 (7th Cir. 1976) (quoting *Wasserman v. Time, Inc.*, 424 F.2d 920, 922-23 (D.C. Cir. 1970) (Wright, J., concurring)).

Colborn cites a trove of email chains that purportedly establish the actual malice of both the producers and Netflix.  Most of these exchanges, however, support Defendants' position that they did not intend to imply and were not aware that viewers might infer that Colborn actually planted evidence to frame Avery.

The following sample of supposedly damning emails illustrates the dearth of evidence suggesting actual malice on the part of Ricciardi, Demos, and Chrome:

- In an email to Ricciardi, Mary Manhardt (a consulting editor who joined the producers' team in 2015) stated that the "[Avery salvage] yard and the rotting cars" were "metaphorical and evocative of our underdog heroes," while "the Manitowoc Courthouse Dome is a symbol . . . for the overdogs."  (ECF No. 330-2 at 1.)

- In an email to Manhardt, Ricciardi wrote that Special Prosecutor Kratz would have "his day only for his 'story' to be retold by our more reliable narrators in the episode." (*Id.* at 39.)

- In an email to Ricciardi and Demos, Manhardt explained that in Episode 3, the producers could use Avery's defense team and family to make "the audience has to regain faith in [Avery] and start questioning the evidence."  She also proposed trying "to make the audience feel very guilty and be kicking themselves for having learned nothing from the first case and having believe the [prosecutor's] press conference." (*Id.* at 9.)

- Peter Stone, who was responsible for compiling the trailer, emailed Demos and told her that he had replaced a shot with Colborn taking the oath at his deposition with a "squirmy shot."  (ECF No. 330-7 at 1.)

- In an email to Nishimura and Del Deo, Ricciardi and Demos said they had met with Avery's former lawyer and "discussed the idea of re-testing the bloodstains found in Teresa's car." (ECF No. 330-1 at 73.)

Nothing in any of these emails indicates an intent to imply that Colborn framed Avery. That Manhardt saw underdogs and overdogs is irrelevant.  Being an overdog means one is expected

to prevail, not that one is guilty of any particular crime. Similarly, intending to portray Kratz as an unreliable narrator is not the same as intending to imply that Colborn planted evidence. Nor is Manhardt's desire to make the audience feel guilty a smoking gun. The audience could feel guilt without the producers intending to imply that Colborn executed a frame job. Stone did not work for the producers, and his decision to use a squirmy shot does not suffice to show intent to imply criminal conduct anyway. And discussing the possibility of retesting some evidence is in no way tantamount to admitting an intention to defame Colborn. (ECF No. 330-1 at 73.)

At most, this collection of emails suggests the producers' sympathy for Avery's plight. But even sympathy for the devil is not clear and convincing proof of actual malice toward the Holy Trinity. *See Saenz*, 841 F.2d at 1319. In fact, under Seventh Circuit precedent, a publisher can omit one side of a story's vehement denials without intending to distort or recklessly disregard the truth. *Id.* Here, the producers included Colborn's denials as well as clips tending to undermine Avery's claims. (ECF No. 294 at 38.) Furthermore, in interviews conducted contemporaneous to *Making a Murderer*'s release, Ricciardi and Demos said they were "not trying to provide any answers," did not "have a conclusion," and that "there are a lot of questions here." (ECF No. 294 at 40-41.) This undercuts any inference of defamatory intent or reckless disregard.

Ultimately, the case against Ricciardi, Demos, and Chrome bears a striking resemblance to defamation plaintiffs' failed gambits in *Woods* and *Saenz*. In the former, the Seventh Circuit rejected a claim of defamation by implication because the plaintiff failed to muster evidence of intent. *See Woods*, 791 F.2d at 487-88. The Court noted that "[t]he result . . . might be different if the [publication] could reasonably have only the meaning the plaintiff ascribes to it or if there was evidence that [the author] harbored ill-will for the plaintiff." *Id.* at 488. But in the absence of either circumstance, it was not enough that the statement at issue could reasonably "be read to contain a defamatory inference" because that did not mean that inference was "the only reasonable one" that could be drawn, nor did it mean "the publisher of the statement either intended the statement to contain such a defamatory implication or even knew that readers could reasonably interpret the statement to contain the defamatory implication." *Id.* at 486. Like the plaintiff in *Woods*, Colborn lacks evidence of intent or reckless disregard, and he also cannot show that *Making a Murderer* has only one reasonable interpretation or that the producers were motivated by ill-will. In *Saenz*, the defamation plaintiff demonstrated only that the article in question was "capable of supporting false and defamatory implications of which [the publishers], according to

their uncontradicted affidavits, were unaware." 841 F.2d at 1319. It did not even matter that one of the authors uttered words that might have indicated a belief in the alleged defamatory inference because that did not "constitute clear and convincing evidence that the defendants knew or intended the defamatory inferences that might . . . be drawn from their publication." *Id.* (citing *Liberty Lobby*, 477 U.S. at 256). Colborn's case against *Making a Murderer*'s producers is even weaker because he has nothing approaching evidence of Ricciardi's or Demos' subjective belief that he planted evidence against Avery.

In sum, a reasonable jury might conclude that *Making a Murderer* implied that Colborn framed Avery, but because Colborn has no evidence that Ricciardi, Demos, or Chrome intended that implication or recklessly disregarded its possible existence *with malice*, the producers are entitled to summary judgment.

As for the case against Netflix, Colborn again references manifold communications, only one of which remotely touches on actual malice:

- In notes sent to Ricciardi and Demos regarding Episode 1, Netflix's creative team asked: "Do we have any great family pictures of the Avery's here?" Netflix also suggested making "them look like a very happy family." (ECF No. 286-11 at 4.)

- Netflix told the producers that Episode 1 needed "a more explicit ending that makes it clear that in the next episode the cops are going to seek revenge." (ECF No. 286-9 at 5.)

- With respect to Episode 2, Netflix commented: "Seems very thin that Colburn [sic] not having specific knowledge of who called him [in 1994 or 1995] would be the key to the case." (ECF No. 286-11 at 7.)

- Netflix suggested adding Avery's father's quote: "They framed an innocent man just like they did 20 years ago" to the Episode 2 cliffhanger. (ECF No. 286-9 at 8.)

- After reviewing Episode 3, Netflix asked: "Is there anything we can use/show to clarify whether or not the cops had a warrant to search [Avery's] property and allude to the fact that they may have planted something when they were there without permission?" (ECF No. 286-11 at 9.)

- Netflix asked if the producers could "establish a subtle but impactful theme track for the baddies, e.g. Lenk, Petersen, Kratz and certainly for Len Kachinsky and Michael O'Kelly."[12] (ECF No. 286-9 at 36.) Netflix also labeled the scene where lead investigator Tom Fassbender called Dassey's parents and asked them to make him take a plea the "perfect moment for 'bad guy theme.'" (*Id.* at 64.)

---

[12] Attorney Kachinsky and private investigator O'Kelly worked on behalf of Brendan Dassey (Avery's nephew), who was also criminally charged in connection with Halbach's murder. *See* John Ferak, *Kachinsky, O'Kelly Paid $15K in Dassey Defense*, Post Crescent (Sept. 4, 2016, 6:03 PM), https://www.postcrescent.com/story/news/2016/09/04/kachinsky-okelly-paid-15k-dassey-defense/89763170/.

- Commenting on Episode 5, Netflix described a shot of Avery "looking a little smug," and suggested it "might be better to use a different shot." (ECF No. 286-12 at 3.)

Once again, most of these script notes fail to move the needle on actual malice. Implying the Averys were a happy family is not the same as implying that Colborn planted evidence. Similarly, underscoring Colborn's tenuous connection to Avery based on the 1994 or 1995 phone call has nothing to do with implying a frame-up. That Netflix wanted to use Avery's father's quote as a cliffhanger does not prove that it intended to imply the truth of that quote. Asking if the producers had anything that could "allude to the fact that [the cops] *may* have planted something" demonstrates that Netflix only wanted to imply the *possibility* of a frame-up and, even then, only evidence-permitting. And suggesting using theme music for characters other than Colborn and removing a shot of Avery looking smug have no bearing on whether Netflix intended the defamatory implication Colborn alleges.

The one piece of evidence that raises an eyebrow is the creative team's suggestion to include a cliffhanger that "makes it clear that in the next episode the cops are going to seek revenge." (ECF No. 286-9 at 5.) Although "seeking revenge" does not necessarily entail executing a frame job, it does sound in that register. And while the note does not explicitly name Colborn, it requires no great logical leap to figure he is one of the referenced "cops." But given this note's lack of specificity, it falls short of clear and convincing evidence that Netflix intended the defamatory inference Colborn has drawn. Even if one gets past this burden of proof issue, two related problems conclusively foreclose Colborn's claim at summary judgment.

First, just as private communications can illuminate ulterior, defamatory motives, so too can they undercut allegations of defamation. In this case, an email exchange between Del Deo and Cotner provides considerable insight into Netflix's state of mind and undercuts the inference of defamatory intent:

> DEL DEO: In this sequence, it feels like Jerry Buting, on an almost definitive basis, is accusing the officers. Although I think the officers have the strongest motive, I think Jerry's statement come[s] across a[s] fact[….] [T]hey thought, for sure, [']we're going to make sure he's convicted.' It may be worth soften[ing] his statement so it doesn't come across so subjective.

> COTNER: I am kind of worried that this note goes contrary to the direction we've been pushing [the producers] in. I've been under the impression that we are desperate to say that someone else could have done it. I'm afraid that if we tell them to soften something it

is going to really confuse the filmmakers. Is there a specific element that you think is overly subjective? I don't think subjective is necessarily bad, but if it is completely unfounded then you might be right.

DEL DEO: I think the statement as [Buting] currently communicates it comes across, to me, as a matter of fact the officers did it (as oppose[d] to highly likely they did it). In other words, I think if [Buting's] statement involving the officers can come across as a highly possible/very likely scenario (since the officers had a very strong motive to kill Steven) it would be convincing that someone else, most likely one of/some of the officers were involved. I think we're saying the same thing. However, I just wanted to make sure [Buting] isn't saying the officers killed as a matter of pure fact since there's no physical evidence to really prove the officers were there, rather just very strong motive. Take a look at [Buting's] statement again and see if you agree.

COTNER: I think it is a really valid point but I would rather leave it for now – it is something we can always pull out later, but I am so happy that they finally have a point of view. I hope people know that it is just a theory …"

(ECF No. 330-1 at 50-51.) In this conversation, two of the four members of Netflix's creative team express an affirmative desire to exclude unfounded allegations. Cotner also expresses his hope that viewers know the frame-up accusation "is just a theory." In *Saenz*, the Seventh Circuit held that similar internal communications "tend[] to support the defendants' contention that they did not intend or believe that" their publication contained the complained of defamatory implication. *Saenz*, 841 F.2d at 1319. In other words, Del Deo's reluctance to include a statement that conforms with his personal beliefs but lacks substantiation undercuts the idea that the "seek revenge" quote proves defamatory intent. The same goes for Cotner's "just a theory" remark.

In addition, as a matter of law, Netflix exhibited actual malice only if it intended to imply a defamatory, *materially false*, and unprivileged statement. But even if Netflix intended to imply that Colborn planted evidence, Colborn has no evidence that Netflix knew that statement to be false. "[K]nowledge of falsity held by a principal cannot be imputed to its agent." *Mimms v. CVS Pharmacy, Inc.*, 889 F.3d 865, 868 (7th Cir. 2018) (citing *Sullivan*, 376 U.S. at 287). No one on Netflix's creative team ever spoke to anyone depicted in *Making a Murderer*. (ECF No. 269 at 18.) They never even watched the raw trial footage, instead relying solely on the cuts the producers provided. (*Id.*) Colborn himself admitted under oath that those who did not attend Avery's criminal trial could not have known what occurred there, including former Assistant District

Attorney Michael Griesbach, who has written three books on the subject. (*Id.* at 19.) By that logic, a handful of Netflix employees with no legal education and limited exposure to trial testimony cannot possibly have understood the intricacies of the case.

Unhappy with the legal implications of his own sworn testimony, Colborn argues that Netflix assumed the risk of a defamation suit when it published *Making a Murderer* without a thorough factcheck. This misstates the law. A publisher is "under no obligation to check [a producer's] facts at all, unless something blatant put[s] them on notice that [the producer] was reckless about the truth." *Saenz*, 841 F.2d at 1319 (quoting *St. Amant*, 390 U.S. at 731-32). In *St. Amant*, the United States Supreme Court collated a list of warning signs that trigger a publisher's duty to investigate:

> Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

390 U.S. at 732. Here, Colborn has failed to prove the existence of any such improbabilities or inconsistencies. He has not even managed to show that the producers bore him ill-will, and that, in and of itself, is insufficient notice under *St. Amant*. *See Saenz*, 841 F.2d at 1319.

In the end, Colborn's turn in *Making a Murderer* may not have been to his liking, but that does not make it defamatory. Few aspire to enter the cultural zeitgeist on such controversial terms. That possibility, though, is a necessary byproduct of the freedom of press that the First Amendment protects. If media could portray us only at our best, we would be a country of antiseptic caricatures, and less intelligent for it. We have not sunken so low just yet.

## II. Colborn's Intentional Infliction of Emotional Distress Claim Also Fails.

Colborn also seeks to recover for Defendants' alleged intentional infliction of emotional distress. Under Wisconsin law, this claim requires proof of four elements: "(1) that the defendant's conduct was intentioned to cause emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling emotional response to the defendant's conduct." *Rabideau v. City of Racine*, 627 N.W.2d 795, 803 (Wis. 2001) (citing *Alsteen v. Gehl*, 124 N.W.2d 312 (Wis. 1963)). But there is no reason to exhaustively engage each

of these predicates. "[P]ublic figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications . . . without showing in addition that the publication contains a false statement of fact which was made with 'actual malice.'" *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988). Colborn failed to establish actual malice in his defamation case, so his intentional infliction of emotional distress claim likewise cannot survive.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Netflix, Inc.'s Motion for Summary Judgment, ECF No. 268, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Laura Ricciardi's, Moira Demos', and Chrome Media LLC's Motion for Summary Judgment, ECF No. 282, is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff Andrew L. Colborn's Motion for Partial Summary Judgment, ECF No. 284, is **DENIED**.

Dated at Milwaukee, Wisconsin on March 10, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge